GMP:AG:PEN
F.#2009R01065

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                          09-CR-466 (S-4) (BMC)

     - against -

JOAQUIN ARCHIVALDO GUZMAN LOERA,
   also known as "El Chapo," "El Rapido,"
  "Chapo Guzman," "Shorty," "El Senor,"
  "El Jefe," "Nana," "Apa," "Papa,"
   "Inge" and "El Viejo,"

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL DETENTION</u>

                                ROBERT L. CAPERS
                                UNITED STATES ATTORNEY
                                Eastern District of New York
                                271 Cadman Plaza East
                                Brooklyn, New York 11201

                                ARTHUR G. WYATT, CHIEF
                                Narcotic and Dangerous Drug Section
                                Criminal Division
                                U.S. Department of Justice

                                OF COUNSEL:

                                WIFREDO A. FERRER
                                UNITED STATES ATTORNEY
                                Southern District of Florida

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in support of its application for a permanent order of detention for the defendant Joaquin Archivaldo Guzman Loera, most commonly known as "Chapo Guzman" ("Guzman" or the "defendant"), the principal leader of the Mexico-based international drug trafficking organization known as the Sinaloa Cartel, which is the world's largest and most prolific drug trafficking organization. Guzman was extradited from Mexico on January 19, 2017, and is scheduled to appear before the Court on January 20, 2017, for arraignment on a seventeen-count Fourth Superseding Indictment, <u>United States v. Joaquin Archivaldo Guzman Loera</u>, <u>et al</u>., 09 CR 616 (S-4) (BMC) (the "Indictment"). For all the reasons set forth below, pursuant to Title 18, United States Code, Section 3142(e), Guzman's detention pending trial is justified.

<u>DISCUSSION</u>

I.     <u>THE CHARGES</u>

A grand jury sitting in the Eastern District of New York returned the Indictment on May 11, 2016. This Indictment, which spans over two-and-a-half decades of Guzman's criminal conduct, charges Guzman in Count One with leading a Continuing Criminal Enterprise ("CCE"), in violation of Title 21, United States Code, Sections 848(a), 848(b) and 848(c), for his role as the leader of the Sinaloa Cartel. In Count Two, Guzman is charged with participating in an international conspiracy to manufacture and distribute cocaine, heroin, methamphetamine and marijuana, knowing and intending that the narcotics would be illegally imported into the United States, in violation of Title 21, United States Code, Sections 960(b)(1)(A), 960(b)(1)(B)(ii), 960(b)(1)(G), 960(b)(1)(H) and 963. Counts Three and Four charge Guzman with being involved in cocaine importation and distribution conspiracies, in

2

violation of Title 21, United States Code, Sections 960(b)(1)(B)(ii) and 963 and Title 21, United States Code, Sections 846 and 841(b)(1)(A)(ii)(II), respectively. The Indictment also charges Guzman in Counts Five through Fifteen with specific instances of international cocaine distribution knowing and intending that the narcotics would be illegally imported into the United States, in violation of Title 21, United States Code, Sections 959(a), 959(c), 960(a)(3) and 960(b)(1)(B)(ii). Count Sixteen charges Guzman with the unlawful use of a firearm in furtherance of his drug trafficking crimes, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii). Finally, Guzman is charged in Count Seventeen with participating in a money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h). The Indictment provides Guzman notice of criminal forfeiture related to all charged counts in the amount of $14 billion, which represents the illegal proceeds of his narcotics trafficking activities.

If convicted of Count One alone, Guzman faces a mandatory minimum sentence of life imprisonment.

## II.    FACTUAL BACKGROUND

Guzman is the most notorious drug trafficker in the world.[1]  The evidence supporting the Indictment encompasses the nearly thirty years of Guzman's drug trafficking activity that gave rise to his leadership of the Sinaloa Cartel. Investigations by United States

---

[1]  As permitted by the Second Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention.  See infra Section III; United States v. LaFontaine, 210 F.3d 125, 130-31 (2nd Cir. 2000); United States v. Ferranti, 66 F. 3d 540, 542 (2nd Cir. 1995).  As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all of the evidence of which the government is aware or will seek to introduce at trial.

law enforcement of the Sinaloa Cartel, primarily by the Drug Enforcement Administration, Department of Homeland Security Homeland Security Investigations, and the Federal Bureau of Investigation, have tracked the cocaine industry from its inception through its present-day buildup of cocaine, and eventually other drugs, in the United States. Nowhere was the devastating impact of the introduction of cocaine into the United States felt more acutely than in New York and Miami in the 1980s, which became central hubs of cocaine distribution and money laundering. Along with the proliferation of drugs into our communities, came an onslaught of violent crime.

In the 1980s, the drug trade in New York and Miami was controlled by Colombian Cartels, including Pablo Escobar's Medellin Cartel, the Cali Cartel and the Norte Del Valle Cartel. While the Colombians maintained a cocaine distribution infrastructure in United States cities, they relied on Mexican drug traffickers, who were long-time smugglers of marijuana and heroin into the United States, to transport their cocaine shipments north from Mexico into the United States, mostly through the southwestern border of the United States. The cocaine, which had originated in the jungles of Colombia, was bought to Mexico by airplane. These air shipments often consisted of a group of seven or eight airplanes, each one carrying approximately 750 to 1,000 kilograms of cocaine.

Guzman quickly set himself apart from other Mexican transporters with his efficiency in transporting the drugs into the United States, including to California, Arizona and Texas, and returning the drug proceeds to the Colombians in record time. This effectiveness earned him the nickname "El Rapido." As his reputation and prowess grew, Guzman was able to negotiate directly with members of the Colombian Cartels for higher fees, which the Colombians were all too willing to pay.

By the late 1980s, as Guzman's wealth grew, so did his power within Mexico. Guzman deepened his relationship with other prominent Mexican traffickers, including Hector Palma, Juan Jose Esparragoza, Ignacio Coronel Villarreal, Vicente Carillo Fuentes, the Beltran Leyva brothers and Ismael Zambada Garcia, who was known as "Mayo." He vied for control of territories dominated by other cartels. In an event that would foreshadow the recent violence in Mexico resulting from cartel infighting, a new alliance between Guzman and Mayo Zambada led to a bloody battle with members of the Arellano Felix drug trafficking organization for control of the Tijuana-area of Mexico. This conflict infamously led to the 1993 killing of Cardinal Juan Jesus Posadas Ocampo during a barrage of gunfire at an airport in Guadalajara, Mexico.

In the wake of this killing, the Mexican government undertook its first nationwide manhunt for Guzman, who, while initially evading capture by escaping to Guatemala, was eventually apprehended in 1993. Notwithstanding Guzman's subsequent incarceration in a maximum security prison in Mexico following this arrest, he continued to expand his narcotics enterprise through the assistance of his brother, who conducted business from outside the prison while Guzman managed his operation from within. In 2001, Guzman famously escaped from prison, purportedly in a laundry cart with the assistance of prison officials whom he had corrupted.

After this escape, Guzman fled to the mountains surrounding Culiacan, a city in his home state of Sinaloa. To thwart law enforcement efforts to recapture him, he created an army of hundreds of heavily-armed body guards and fortified his hideaways with military-grade weapons. Guzman also established a complex communications network to allow him to speak covertly with his growing empire without law enforcement detection. This included the

use of encrypted networks, multiple insulating layers of go-betweens and ever-changing methods of communicating with his workers. While protected from law enforcement, Guzman began the process of not only adapting his method of operation but also of reshaping what would become the modern Sinaloa Cartel, in part through the strengthening of his alliances and partnerships with other Mexican traffickers, including his alliance with co-defendant Mayo Zambada. Moreover, by the time of Guzman's 2001 escape, the Colombian drug trade was transforming itself. Guzman took advantage of these changes to fuel his dominance, as well as that of the Sinaloa Cartel, not only in Mexico but also through the entire region and beyond.

One critical transformation involved the Colombian traffickers' cocaine distribution businesses in the United States. In the 1980s and 1990s, the Colombian Cartels controlled all aspects of the narcotics trade, to include street distribution in the United States. In the 2000s, with the enforcement of extradition laws in Colombia and the extraterritorial application of United States narcotics laws, the Colombians faced greater risk of prosecution for their United States-based drug trafficking activity. As a result, the Colombians started to abandon their United States distribution businesses in favor of creating partnerships with Mexican traffickers, in which the Mexicans were permitted to invest in the cocaine shipments at a wholesale price. Accordingly, the Mexican traffickers took on a more integral role in moving cocaine from Colombia into the United States.

Filling a vacuum in cities in the United States left by the Colombian traffickers, the Mexicans established distribution networks across the United States, including, but not limited to, in New York, New Jersey, Georgia, Illinois, Texas and California. This was evidenced by drug seizures traced to the Sinaloa Cartel throughout the United States, including

a 511 kilogram cocaine seizure from a motor vehicle in Patterson, New Jersey (Count One, Violation 80; see Exhibit 1);[2] a 1,997 kilogram seizure of cocaine from a warehouse in Queens, New York (Count One, Violation 81; see Exhibit 2); a 1,925 kilogram seizure of cocaine from a motor vehicle and warehouse in the vicinity of Chicago, Illinois (Count One, Violation 82); a 1,923 kilogram seizure of cocaine from a motor vehicle and warehouse in Brooklyn, New York (Count One, Violation 83; see Exhibit 3); and a 1,100 kilogram seizure of cocaine from a motor vehicle and warehouse in El Paso, Texas (Count One, Violation 84; see Exhibit 4). These distribution networks also supported massive money laundering efforts that delivered billions of dollars in illegal profits generated from the cocaine sales in the United States to the Mexican traffickers and their Colombian partners.

These changes enabled Guzman to exponentially increase his profits to staggering levels. Accordingly, Guzman used this wealth to increase his power and the Sinaloa Cartel's footprint in the drug trafficking world. Within Mexico, Guzman expanded his control of its Atlantic and Pacific ports. He also expanded his control of border towns not only between the United States/Mexico border but also between the Mexico/Guatemala border. Guzman and members of the Sinaloa Cartel infiltrated other Central American countries, including Honduras, El Salvador, Costa Rica and Panama. Guzman's workers in these countries accepted the delivery of cocaine shipments that had been transported in tractor trailers or through other land transportation methods. Some of these countries were also used to establish clandestine landing strips that facilitated the use of small planes to transport drugs. Eventually, the Colombians and Mexicans invested in the building of semi-submersible

___

[2] All exhibits referenced herein are attached to this memorandum.

submarines which were capable of transporting up to six tons of cocaine for water-based trafficking.

This expansion continued further south; whereas previously the Colombian Cartels were the only power brokers with the sources of supply, Guzman soon embedded Sinaloa Cartel members in South American source countries, including not only Colombia, but also Ecuador and Venezuela, to negotiate directly with traffickers in the supply chain. This expansion is evidenced by a 12,000-kilogram cocaine seizure from a fishing vessel in the Eastern Pacific (Count One, Violation 3; see Exhibit 5); a 1,302-kilogram cocaine seizure from a semi-submersible submarine in the Eastern Pacific (Count One, Violation 13; see Exhibit 6); a 373-kilogram cocaine seizure from a small airplane in Ecuador (Count One, Violation 73; see Exhibit 7); a 1,000-kilogram cocaine seizure from a small boat off the coast of Baja, California (Count One, Violation 75; see Exhibit 8); a 4,716-kilogram cocaine seizure from a semi-submersible vehicle in the Eastern Pacific (Count One, Violation 76; see Exhibit 9); a 19,000-kilogram cocaine seizure from a maritime vessel en route from Colombia to Mexico (Count One, Violation 78, see Exhibit 10); and the seizure of cocaine, a plane, RPGs and ammunition in Colombia (Count Two, see Exhibit 11).

Guzman also set out to diversify the types of drugs sold in the United States by the Sinaloa Cartel. While Guzman started in the drug trade distributing marijuana and heroin, the 2000s led to the introduction of methamphetamine into the flow of drugs heading north to the United States. As a result, Guzman established sources of supply for the precursor chemicals for the production of methamphetamine in Africa and Asia, including in China and India.

Guzman ensured the success of his international operation, as well as those of other Sinaloa Cartel members, by further solidifying his power within Mexico. A cornerstone of his strategy was the corruption of officials at every level of local, municipal, state, national and foreign government, who were paid cash bribes to ensure that he and the Sinaloa Cartel were free to bring in tonnage quantities of cocaine from South America and move it freely to the United States. The payments guaranteed that drug shipments would be safely received within Mexico and escorted by law enforcement as the shipments were transported through Mexico to towns at the United States/Mexico border. These payments also ensured that Sinaloa Cartel members were protected from arrest and that territorial disputes were resolved in favor of the Cartel. For example, as much as one million dollars in cash bribes were paid to law enforcement to ensure the safe passage of a single drug shipment through Mexico.

Another essential aspect of Guzman's method of control was brutal force and intimidation. Guzman wielded violence to punish disloyalty and enforce discipline among Cartel members. As discussed above, Guzman and the Sinaloa Cartel had a veritable army, ready to war with competitors and anyone Guzman deemed to be a traitor. Some of these armed guards were tasked with Guzman's personal protection. In addition to his cadre of armed guards, Guzman himself was known for carrying a gold plated AK-47 and a gold and diamond-encrusted .45 mm handgun. Guzman also employed "sicarios," or "assassins," who carried out thousands of acts of violence, including murders, assaults, kidnappings, torture and assassination at his direction, to promote and enhance his prestige, reputation and position within the Sinaloa Cartel and to protect the Cartel against challenges from rivals. Sicarios were deployed to silence potential witnesses and retaliate against anyone who provided assistance to law enforcement authorities against Sinaloa's interests.

With Guzman's vast expansion of the Sinaloa Cartel's sphere of influence, armed conflicts with competitors and internecine disputes within the Cartel began to dominate the Mexican landscape. The causes of these wars can be traced, in part, to Guzman's provocation. In the early 2000s, Guzman and the Sinaloa Cartel and their allies engaged in open warfare with the Gulf Cartel and Los Zetas. At the time, Los Zetas was the armed faction of the Gulf Cartel and notorious for being comprised of former members of the Mexican military special forces. This eruption of violence gained international attention for its gruesome impact on Mexico, especially the public displays of beheaded victims. In 2007, Guzman sent his sicarios to perpetrate a war with cartel leader Vicente Carillo Fuentes, which was fought on the streets of Juarez, Mexico. These sicarios kidnapped and tortured their victims often prior to brutally murdering them and subsequently boasted of their exploits through gruesome videos that they posted on the internet. In 2008, the Beltran Leyva organization, which was once a strong ally and partner of the Sinaloa Cartel, fractured that alliance, engaging in an armed conflict against the Sinaloa Cartel that is still being felt in Mexico to this day. These violent conflicts often spilled over into the United States, endangering members of law enforcement working at the border and families living in nearby towns.

As Guzman's infamy increased, the manhunt for him reached new intensity. In early 2014, Mexican special forces tracked Guzman down to a house in Culiacan, but they were thwarted in their attempt to capture him when Guzman fled through a concealed escape hatch underneath a bathtub and into an elaborate maze that Guzman had constructed within the city's sewer system. On February 22, 2014, after months of a national manhunt, Guzman was finally arrested at an apartment complex in Mazatlán, Sinaloa, Mexico. At the time of his

capture, Guzman had control of most of the western hemisphere's cocaine transportation and distribution network from South America to as far north as Canada.

After his 2014 arrest, Guzman was incarcerated in a Mexican maximum security prison. Guzman, however, escaped on July 11, 2015. After more than a year of well-orchestrated planning, his workers dug a tunnel from a seemingly abandoned home, which was located over a mile away from the prison, directly into the shower in his prison cell. Guzman can be seen in a well-publicized video calmly descending a ladder into the tunnel, where a motorcycle was waiting. This escape exemplified the power of Guzman's drug empire and his control over government officials, even while he was incarcerated.

After Guzman's second prison escape, intense efforts ensued to recapture him. On January 8, 2016, Guzman was captured in Los Mochis, Sinaloa, Mexico. The Mexican military had raided an apartment only to find that Guzman had once again used a hidden escape route out of the building. A gun battle ensured between Guzman's body guards and Mexican law enforcement authorities, which resulted in several deaths. Guzman was pursued through the city's sewer system until he was forced to the surface, where he was detained by Mexican federal police. Guzman has since been held under extraordinary security measures at a maximum security prison.

Guzman's exploits made him a cult-like celebrity to those from his home state of Sinaloa. He was viewed as a modern-day Robin Hood, popular with the down-trodden and extoled in popular songs. There was civil unrest and popular protests in the street of Mexico, condemning Mexican authorities for their valiant efforts in his capture. Guzman's worldwide

fame has resulted in his appearance in Forbes Magazine's most powerful and wealthy person lists.[3]  These last few decades have shown that Guzman's influence knows no bounds.

Since his 2016 capture, Guzman vigorously fought his extradition to the United States up until the moment that his extradition was ordered on January 19, 2017, and he was put on a plane to the United States.

III.    Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds probable cause to believe that the person committed such offense.  18 U.S.C. § 3142(e)(3)(A). A similar presumption arises when the court finds probable cause that the person committed an offense under Title 18, United States Code, Section 924(c).  Id. § 3142(e)(3)(B). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination.  United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that he does not pose a danger to the community or risk of flight."  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted).   In any event, the government must ultimately persuade the court by

---

[3]  See  http://www.forbes.com/profile/joaquin-guzman-loera/ (last visited January 19, 2017).

a preponderance of the evidence that the defendant is a flight risk. United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Detention based on danger to the community must "be supported by clear and convincing evidence." See 18 U.S.C. § 3142(f).[4]

The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See id. § 3142(g). At a detention hearing, the government may proceed by proffer, Ferranti, 66 F.3d at 541; United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. See [ ] LaFontaine, 210 F.3d at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n. 7 (2d Cir. 2004).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "harm to society caused by [continued] narcotics trafficking." United States v. Leon, 766

---

[4] In the immigration context, the Supreme Court held that detention of a deportable alien did not violate the Eighth Amendment of the Constitution. Carlon v. Landon, 342 U.S. 524, 544-546 (1952).

F.2d 77, 81 (2d Cir. 1985); see S.Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3195 ("[L]anguage referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of alternatives to confinement. See, e.g., United States v. Cantarella, No. CR 02-0307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility."); United States v. Masotto, 811 F. Supp. 878, 883 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

In keeping with this Congressional purpose, pretrial detention is warranted where defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence. See United States v. Colombo, 777 F.2d 96, 99 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996) (stating that "leader of a criminal enterprise with the ability

to order members of the enterprise to engage in [violence] may be a danger to the community" even if he did not engage in the violence himself) (citing <u>Colombo</u>, 777 F.2d at 98-99)).  In <u>United States v. Salerno</u>, in ordering the detention of two leaders of the Genovese organized crime family, the court observed that:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions.  The illegal businesses, in place for many years, require constant attention and protection, or they will fail.  Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual.  When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self-evident.

631 F. Supp. 1364, 1375 (S.D.N.Y. 1986), <u>order vacated</u>, 794 F.2d 64 (2d Cir.), <u>order reinstated</u>, 829 F.2d 345 (2d Cir. 1987).  Similarly, in <u>Colombo</u>, the captain of a crew in the Colombo organized crime family was ordered detained because the operation of that organization posed a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations."  777 F.2d at 99 (internal quotation marks omitted); <u>see</u> <u>Ferranti</u>, 66 F.3d at 543; <u>United States v. Defede</u>, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) ("Given [defendant]'s position of leadership in a notorious and violent criminal organization, his ability to plan, order, and supervise criminal activity is of paramount importance.  [Defendant] is a danger at least as much for what he might direct or assist others in doing as for what he might do himself." (citations and internal quotation marks omitted)).

IV.    <u>GUZMAN SHOULD BE DETAINED PENDING TRIAL</u>

A.    <u>A Presumption of Detention Applies</u>

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community.  <u>See</u> 18 U.S.C. § 3142(e)(3).  The presumption for detention applies to the CCE offense charged in Count One, which prescribes a mandatory life sentence based upon Guzman's role in the offense together with the quantity of drugs and illegal proceeds at issue. Violation Eighty-Five of Count One notices a conspiracy to murder persons who posed a threat to the Sinaloa Cartel, which prescribes a mandatory minimum of 20 years' incarceration but also can warrant a life sentence or the death penalty.  <u>See</u> 18 U.S.C. § 3142(e)(3)(A).[5]  The presumption also applies to the drug trafficking offenses charged in Counts Two through Fifteen, each of which prescribes a mandatory minimum term of imprisonment of ten years. <u>See id</u>.  The presumption also applies to Count Sixteen, which charges a violation of 18 U.S.C. § 924(c).  <u>See</u> § 3142(e)(3)(B).  Accordingly, the defendant bears the initial burden of showing that he would be neither a danger to the community nor a flight risk.  For the reasons set forth below, that burden cannot be sustained.

A.    <u>The Defendant Is a Danger to the Community</u>

The facts and circumstances of this case compel Guzman's detention, as all four factors set forth in Section 3142(g) inescapably show that he poses a danger to the community.

---

[5] The United States, however, has assured the Mexican government that it will not seek the death penalty in this case.

1. <u>The Nature and Circumstances of the Offenses Charged</u>

The nature and circumstances of the crimes charged are the most egregious. Virulent in nature, Guzman's criminal activity demands detention.

As detailed above, Guzman's stewardship of the Sinaloa Cartel is directly responsible for a large portion of the cocaine, heroin, methamphetamine and marijuana that floods our streets and causes thousands of deaths each year.[6] In addition to the tons of cocaine that he obtains from Colombian suppliers, Guzman manufactures heroin, methamphetamine and marijuana, all for distribution in the United States. Guzman oversees a vast cocaine transportation infrastructure in South and Central America and within Mexico that brings cocaine to Mexico's northern border with the United States. He also maintains an equally formidable transportation infrastructure, which includes the use of tunnels, to smuggle cocaine, heroin, methamphetamine and marijuana over the Mexican-American border to the United States. Guzman uses drug distribution networks throughout the United States, including within the Eastern District of New York, to sell the drugs and obtain multi-billions in cash profits. He also oversees a vast money laundering apparatus which returns the illicit profits to Guzman and his Colombian partners.

Guzman controls corrupt government officials at all levels of Mexico and other foreign governments through bribery. These payments protect his drug shipments as they are transported through Mexico to northern border towns and ensure safe passage of these shipments through border crossings into the United States.

---

[6] <u>See</u> https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (last visited January 19, 2017).

Guzman has an arsenal of military grade weapons to protect his person, his drugs and his drug empire. His heavily-armed private security forces are used not only as Guzman's personal bodyguards but also as protection for the drug shipments as they move throughout Mexico. Guzman maintains a stable of sicarios, who carry out gruesome assassinations aimed at maintaining discipline within his organization, protecting against challenges from rivals and silencing those who would cooperate with law enforcement against his interests. Guzman's use of violence while enforcing discipline and fighting for territory has killed thousands.

Thus, based upon the breadth of Guzman's international drug trafficking empire, his ability to thwart government and law enforcement efforts to disrupt his criminal activity and his unrestrained use of violence, the nature and the circumstances of the charged offenses justify detaining Guzman as a danger to our community.

### 2. The Weight of the Evidence

The weight of the evidence against Guzman overwhelmingly supports detention. The charges in the Indictment will be proven with a variety of evidence acquired through in-depth investigations into Guzman and the Sinaloa Cartel, not only in the United States but throughout the Western hemisphere.

### a. Cooperating Witnesses

The government will rely on the testimony of a large coterie of cooperating witnesses, including dozens of witnesses who have had face-to-face dealings with Guzman, to prove Guzman's power, corruption and violence within the Sinaloa Cartel. Spanning the entire time period of the charged conduct, these witnesses will testify to every aspect of Guzman's organization from its inception in the late 1980s through his building of an international

empire, including his expansion into Central and South America and opening of drug distribution centers throughout the United States.

Numerous Colombian Cartel leaders and other suppliers are expected to testify concerning their multi-ton cocaine shipments to Guzman, including the details of Guzman's investment in the drugs. They will also testify concerning their use of air, sea and land routes to transport cocaine into Mexico. Finally, they will quantify the astonishing illegal profits that Guzman made from the sale of the drugs.

Colombian and Mexican drug transporters are expected to provide further details concerning Guzman's and the Sinaloa Cartel's means and methods of transporting drug shipments along Guzman's chain of distribution from South and Central America, through Mexico and across the Mexican/American border into the United States. For example, some transporters will discuss the use of cocaine-laden airplanes, which flew from clandestine airstrips in Colombia and Venezuela to others in Central America and Mexico. Others will discuss the use of tanker trucks carrying fuel to deter inspection by law enforcement, while transporting cocaine from Central America, across Mexico and into northern Mexican border towns. Finally, transporters will discuss schemes to smuggle drugs across the Mexican/American border that subverted law enforcement detection, including the use of motor vehicles with secret compartments, trucks with cover loads and tunnels dug beneath the borders.

United States-based distributors are expected to testify concerning Guzman's and the Sinaloa Cartel's distribution hubs across the United States and the transportation of drugs from there to every part of the United States. Moreover, these witnesses will also discuss specific shipments and seizures that can be linked directly to Guzman and the Sinaloa Cartel.

Finally, these witness will identify the manner in which their networks collected the illegal cash proceeds and facilitated Guzman's massive money laundering apparatus in transporting bulk cash shipments back across the border.

Many witnesses are expected to testify concerning Guzman's payment of bribes to politicians and members of law enforcement to ensure that Mexican criminal laws were not enforced. For example, one former member of local law enforcement in Juarez, Mexico, is expected to testify to being paid hundreds of dollars per month to release from custody Sinaloa Cartel members who were arrested, remove road blocks from routes over which trucks containing drug shipments were traveling and provide armed escorts for the drug-laden trucks that were passing through their area.

Finally, other witnesses are expected to testify about the violence perpetrated by Guzman's armed security forces and sicarios. They will detail specific murders carried out under Guzman's orders, including that of Sinaloa Cartel members, members of rival cartels and also government and law enforcement officials. For example, Guzman, along with investors in drug shipments affiliated with the Sinaloa Cartel, ordered the murder of Julio Beltran, a trafficker who was accused of doing private cocaine transactions contrary to the interests of the investors. Subsequently, assassins gunned down Beltran in the streets of Culiacan, using so many rounds of ammunition that Beltran's head was almost completely separated from his body.

Several witnesses will testify about the wars fought against forces belonging to the Arellano Felix, Gulf, Los Zetas, Vicente Carillo and Beltran Leyva Cartels. For example, one witness is expected to testify to the activities of one of Guzman's sicarios during the Vicente Carillo war in Juarez, including his use of a house specially outfitted for murdering

victims.  The house had plastic sheets over the walls to catch spouting blood and a drain in the floor to facilitate the draining of blood.  Other witnesses are also expected to discuss the purchase of weapons for use by the security forces and sicarios.

        b.        <u>Physical Evidence</u>

The government will also prove its case against Guzman through physical evidence.  For example, the government recovered drug ledgers from Colombian cartel bosses and suppliers, which detail the financial agreements between Guzman and the suppliers for various drug shipments.  There will also be evidence produced through numerous physical surveillances in the United States and throughout the Western hemisphere.

The government will also rely on evidence obtained through numerous weapon and drug weapon seizures.  For example, the government will also produce evidence of a seizure in El Paso, Texas, of a gun shipment tied to Guzman, which contained numerous AK-47s and .50mm long rifles.  As discussed above, the government will produce evidence of the seizure of numerous drug shipments in the United States and Mexico, as well as throughout Central and South America.  All told, the violations set forth in the indictment incorporate 200 metric tons—or 200,000 kilograms—of cocaine that was seized by law enforcement and tied to Guzman and the Sinaloa Cartel.

        c.        <u>Electronic Surveillance</u>

Guzman's guilt will also be proven through consensually recorded conversations of Guzman during which he discusses specific drug transactions, as well as other court-authorized electronic surveillance, which detail in real-time drug trafficking activity by

Guzman and his cohorts.[7]  For example, law enforcement authorities intercepted and recorded communications establishing that Guzman organized and directed cocaine shipments that were intercepted by law enforcement authorities.  Such seizures include: (1) approximately 373 kilograms of cocaine on or about January 15, 2014, by Ecuadorian law enforcement authorities; (2) approximately 25 kilograms of cocaine on or about September 27, 2013, by United States law enforcement authorities; and (3) approximately 456 kilograms of cocaine on or about June 6, 2013, by Ecuadorian law enforcement authorities.

Thus, the weight of the evidence substantiates the government's portrayal of Guzman's role as the boss of the most prolific drug trafficking cartel in the world, who used corruption and violence to maintain his power.  Consequently, the evidence will show that Guzman is an extreme danger to the community.

3.      The History and Characteristics of the Defendant

Guzman started as a teenager cultivating marijuana and growing poppies for heroin production, which he sold for a living.  Over the next forty years, Guzman devoted his efforts to growing his organization and increasing and enhancing the power of the Sinaloa Cartel, often through torture and murder.  As the leader of the Sinaloa Cartel, Guzman operated with impunity at the highest level of the Mexican drug trafficking world, while being assured of his continued success and safety from arrest through his payment of bribes to government

---

[7] The government hereby provides notice to the defendant pursuant to 18 U.S.C. § 2518(8)(d) of its intent to rely on wiretap interceptions at detention proceedings in this case. In order to preserve the integrity and confidentiality of the government's investigation, and due to the nature of the defendant's incarceration in a foreign country, notice to the defendant of the wiretap interceptions prior to his arrest was not feasible.  The government, however, does not rely on specific information from that material for purposes of the factual proffer in support of this motion.

officials and law enforcement officers.  Guzman has known no other life than a life of crime and violence.

Driven by insatiable power and greed, Guzman's personal history and characteristics demand detention to prevent him from being a danger to the community.

4.     The Nature and Seriousness of the Danger Posed by Release

Guzman's violent, international and multi-billion-dollar drug trafficking empire continues to pump thousands of kilograms of cocaine, heroin, methamphetamine and marijuana into the United States for distribution in our communities.  Without question, Guzman will continue to be a danger to the community should he be released from jail.  The complexity and breadth of Guzman's criminal organization requires his unique ability to orchestrate and carry out its goals, which will compel Guzman to reassume his leadership throne if released from custody.  See Defede, 7 F. Supp. 2d at 395.

Even during prior incarcerations, the defendant continued to manage his drug trafficking operations and successfully plot escapes from jail.  Once free, Guzman was undeterred and continued to oversee the activities of his drug trafficking empire.  Given Guzman's prior history, unless Guzman is incarcerated under the strictest security arrangements, the risk of his continued criminal activity is certain.

As detailed above, Guzman is extremely violent and maintains caches of weapons to be used for protection and to punish those who act against Guzman's interests.  Moreover, Guzman has a history of murdering individuals whom he perceived as having provided information to law enforcement.  Therefore, witnesses for the government and their families, many of whom still reside in Mexico without protection, would be in grave danger of physical harm or even death as a reprisal for their cooperation with the government should

Guzman be at liberty.  Keeping Guzman in custody pending the disposition of his case will dramatically reduce the risk that he can orchestrate reprisals against government witnesses and their families.

In sum, releasing Guzman would guarantee only one outcome: an extraordinary danger to the community.  No conditions or combination of conditions can assure its safety.

B.     Release of Guzman Poses a Guarantee of Flight

Similarly, Guzman cannot overcome the presumption that he is a risk of flight. First, the fact that Guzman twice escaped from maximum security prisons in Mexico speaks volumes about his readiness and ability to avoid prosecution at all costs.  Should Guzman be released from custody, he would draw on his nearly boundless, undisclosed wealth to orchestrate his flight from the jurisdiction and sustain himself in hiding, as he has done twice before.  Moreover, his drug trafficking empire would provide him with a continued revenue stream should the need arise.  Finally, Guzman's massive wealth provides him with the ability to tempt all but the strongest of individuals with large cash bribes to assist him in his flight.

Second, if convicted of operating a continuing criminal enterprise, Guzman faces mandatory life imprisonment.  Each substantive drug trafficking crime charged in the Indictment carries a ten-year mandatory minimum sentence of incarceration, and, if convicted of the use of a firearm charge, an additional mandatory minimum ten-year consecutive sentence will be imposed.  In any event, a Guidelines sentence alone for the substantive drug trafficking crimes will dictate a life sentence of imprisonment.  Thus, Guzman has every incentive to flee from prosecution and, having twice escaped from maximum security prisons in Mexico when facing incarceration, he has a proven track record of choosing flight rather than facing prosecution.

Third, even if Guzman were to prevail in the instant case, he faces charges in many other jurisdictions of the United States, including the Western District of Texas, the Southern District of California, the Northern District of Illinois, the Southern District of New York and the District of New Hampshire. These cases provide Guzman with an even greater incentive to flee. The fact that Guzman recently fought each and every single proceeding in Mexico for his extradition to the United States, illustrates his desire to avoid prosecution. See Jhirad v. Ferrandina, 536 F.2d 478, 483 (2nd Cir. 1976) (finding that defendant intended to avoid prosecution when refusing to return to native country to face charges); cf. United States v. Botero, 604 F. Supp. 1028, 1032 (S.D.F.L. 1988) (observing no meaningful distinction between person who left the country when he learned of pending charges and one who was already outside the country and refused to return to face charges).

Fourth, as previously mentioned, Guzman uses large-scale corruption to control key government officials to protect his criminal activity and that of the Sinaloa Cartel. This behavior depicts an individual who has no respect for public authority and the rule of law. Thus, there is no reason to believe that Guzman would obey the Court's orders or conditions of release if bail were granted.

Fifth, as detailed above, Guzman maintains substantial drug distribution networks in the United States, including the New York area. Thus, although a citizen of Mexico, Guzman has members of his organization nearby, ready to assist him to flee the Court's jurisdiction.

Sixth, Guzman was admitted to the United States solely for the purpose of facing prosecution. Thus, he has no legal status in the county. Moreover, he is not known to have any substantial connection to the United States aside from his drug trafficking activity.

In sum, it is difficult to imagine another person with a greater risk of fleeing prosecution than Joaquin Archivaldo Guzman Loera.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that Guzman cannot rebut the government's proof that supports the presumption that "that no condition or combination of conditions will reasonably assure [his] appearance . . . as required and the safety of the community." 18 U.S.C. § 3142(e). Accordingly, Guzman must be detained pending trial.

Dated: January 20, 2017
      Brooklyn, New York

Respectfully submitted,

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

WIFREDO A. FERRER
UNITED STATES ATTORNEY
Southern District of Florida

# EXHIBIT 1



# EXHIBIT 2



# EXHIBIT 3



EXHIBIT 4



# EXHIBIT 5





# EXHIBIT 6





# EXHIBIT 7





# EXHIBIT 8



# EXHIBIT 9





# EXHIBIT 10







# EXHIBIT 11





