

U.S. Department of Justice

United States Attorney
Eastern District of New York

GMP: AG/HDM
F. #2009R01065

271 Cadman Plaza East
Brooklyn, New York 11201

January 27, 2017

<u>By Hand and ECF</u>

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Joaquin Archivaldo Guzman Loera</u>
     <u>Criminal Docket No. 09-466 (S-4) (BMC)</u>

Dear Judge Cogan:

  The government respectfully submits this letter to request that the Court inquire as to the defendant Joaquin Archivaldo Guzman Loera's (the "defendant" or "Guzman") financial eligibility for court-appointed counsel. Under the Criminal Justice Act of 1964 (the "CJA"), "defendants who are financially unable to afford trial services necessary to an adequate defense are provided them in accordance with the Sixth Amendment."  <u>See</u> <u>United States v. Parker</u>, 439 F.3d 81, 90 (2d Cir. 2006) (citation omitted); 18 U.S.C. § 3006A.  Under well-settled Second Circuit law, prior to the appointment of counsel, the defendant must show that he is financially eligible, and the Court must conduct an appropriate inquiry into the defendant's finances.  <u>See, e.g.</u>, <u>United States v. O'Neil</u>, 118 F.3d 65, 74 (2d Cir. 1997); <u>Parker</u>, 439 F.3d at 93.  As discussed further below, in light of the defendant's position as the billionaire leader of the Sinaloa Cartel, the government respectfully submits that such an inquiry is warranted.

  Moreover, if the Court finds that the defendant is financially unable to afford representation, the government notifies the Court regarding potential conflicts involving the Federal Defenders of New York (the "Federal Defenders"), who currently represent the defendant as appointed counsel.  Specifically, the Federal Defenders have represented two

potential cooperating witnesses for the government, as well as three co-conspirators of the defendant.[1]

As set forth below, the government advises the Court of these circumstances pursuant to its obligations under Second Circuit law so the Court may conduct the appropriate inquiry pursuant to United States v. Curcio, 680 F.2d 881, 888-90 (2d Cir. 1982) ("Curcio"). See, e.g., United States v. Stantini, 85 F.3d 9, 13 (2d Cir. 1996); United States v. Malpiedi, 62 F.3d 465, 467 (2d Cir. 1995). Further, the government requests that the Court appoint Curcio counsel to consult with the defendant regarding these potential conflicts to allow the defendant to make an informed decision regarding his representation.

I.   BACKGROUND

Guzman is the principal leader of the Mexico-based international drug trafficking organization known as the Sinaloa Cartel, which is the world's largest and most prolific drug trafficking organization. On May 11, 2016, a grand jury sitting in the Eastern District of New York returned a 17-count Fourth Superseding Indictment, United States v. Joaquin Archivaldo Guzman Loera, et al., 09 CR 466 (S-4) (BMC) (the "Indictment").

This Indictment, which spans over two-and-a-half decades of Guzman's criminal conduct, charges Guzman with leading a Continuing Criminal Enterprise ("CCE"), based on his role as the leader of the Sinaloa Cartel. The Indictment also charges fourteen counts of narcotics trafficking, including importation, manufacturing and distribution. The Indictment charges Guzman with the unlawful use of a firearm in furtherance of his drug trafficking crimes, and with participating in a money laundering conspiracy. Further, the Indictment provides Guzman notice of criminal forfeiture related to all charged counts in the amount of $14 billion, which represents the illegal proceeds of his narcotics trafficking activities.

Guzman was extradited on January 19, 2017 from Mexico and arraigned on the Indictment on January 20, 2017 before the Honorable James Orenstein, United States Magistrate Judge for the Eastern District of New York. The defendant entered a plea of not guilty to all counts. At the arraignment, the Court appointed the Federal Defenders to represent the defendant for the arraignment and until the defendant engages his own counsel, if he so chooses. See Tr. of Arraignment at 4, United States v. Joaquin Archivaldo Guzman Loera, 09-CR-466 (BMC) (JO) (Orenstein, J.).

---

[1] The government has provided the Federal Defenders with the names of these five individuals and the specifics of the Federal Defenders' representation.

> II.  THE COURT SHOULD MAKE AN INQUIRY INTO THE DEFENDANT'S FINANCIAL ELIGIBILITY FOR APPOINTED COUNSEL

The government is aware that Guzman is making inquiries of private counsel and anticipates that Guzman will hire private counsel. In the event that Guzman seeks to maintain appointed counsel, however, the government respectfully requests that the Court inquire as to the defendant's financial eligibility, and require the defendant to show that he is financially unable to afford representation. See 18 U.S.C. § 3006A.

> A.  Applicable Law

The Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. "[A]bsent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial." Argersinger v. Hamlin, 407 U.S. 25, 37 (1972).

In accordance with this constitutional mandate, Congress passed the Criminal Justice Act of 1964. The CJA ensures that defendants who are financially unable to afford legal representation are provided appointed counsel, as required by the Sixth Amendment. See United States v. Barcelon, 833 F.2d 894, 896 (10th Cir. 1987)); see also Heath v. U.S. Parole Comm'n, 788 F.2d 85, 88 (2d Cir. 1986) (noting that right to counsel under the CJA is "derived from the Sixth Amendment's guarantee").

Accordingly, the CJA establishes the broad institutional framework for appointing counsel for a criminal defendant who is financially unable to obtain representation. See 18 U.S.C. § 3006A. Subsection 3006A(a) of the Act directs that "[e]ach United States district court, with the approval of the judicial council of the circuit, shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation in accordance with this section." 18 U.S.C. § 3006A(a). Pursuant to § 3006A(a), the Eastern District of New York has established a Criminal Justice Act Plan to facilitate the appointment of counsel for financially eligible defendants. See Criminal Justice Act Plan for the Eastern District of New York (the "Plan"), available at https://img.nyed.uscourts.gov/files/local_rules/cjaplan.pdf (last visited on Jan. 27, 2017).

The Plan establishes a community defender organization, the Federal Defenders, under the CJA, 18 U.S.C. § 3006A(g)(2)(B). See Plan at 5. The Federal Defenders are a non-profit defense counsel service that is eligible to furnish attorneys and to receive payments under the CJA. See id. The Plan states that all "persons making an initial appearance, who do nothave retained counsel present, shall be assigned counsel regardless of economic circumstances, for that initial appearance." See Plan at 10. After the initial appearance, a "person shall be furnished representation pursuant to this Plan if he or she is financially unable to obtain adequate representation; that is, if his or her net financial resources and income are insufficient to enable the person to obtain qualified counsel." See id.

3

Accordingly, "before appointing counsel, a judge must first conduct an appropriate inquiry into the defendant's financial eligibility." See United States v. Barton, 712 F.3d 111, 117 (2d Cir. 2013) (internal quotation marks and citation omitted). In making this "appropriate inquiry," the Second Circuit requires courts to examine a variety of factors in determining whether a defendant is "financially unable to obtain counsel," including whether the "defendant owned or controlled substantial assets and whether the defendant had concealed those assets." See Parker, 439 F.3d at 93 (citation omitted).

The Second Circuit has held that "[w]hen requesting the appointment of counsel, the burden is on the defendant to show that he is unable to afford representation . . . ." O'Neil, 118 F.3d at 74; see also Harris, 707 F.2d at 660 (holding that the "weight of authority" is that the defendant bears the burden of showing financial eligibility) (citing United States v. Peister, 631 F.2d 658, 662 (10th Cir. 1980), cert. denied, 449 U.S. 1126 (1981); United States v. Anderson, 567 F.2d 839, 840 (8th Cir. 1977); United States v. Ellsworth, 547 F.2d 1096, 1098 (9th Cir.), cert. denied, 431 U.S. 931 (1977); United States v. Kaufman, 452 F.2d 1202 (4th Cir. 1971), cert. denied, 405 U.S. 989 (1972)). "[A] defendant's failure to submit a financial affidavit or otherwise furnish evidence of his eligibility [does not] relieve a district court of its responsibility to inquire into the defendant's financial status." Barton, 712 F.3d at 116–17.

The standard for financial eligibility "means something less than indigency or destitution." See Harris, 707 F.2d at 660. The CJA states that the defendant must be "financially unable" to afford representation. See 18 U.S.C. § 3006A. "In determining whether a defendant is financially unable to afford counsel, courts generally attempt to consider the economic realities facing the defendant, i.e., the realistic costs of defense and the financial needs of the defendant and his family." United States v. Knott, 142 F. Supp. 2d 468, 469 (S.D.N.Y. 2001); see also Barcelon, 833 F.2d at 897, n. 5 (10th Cir. 1987) (laying out various factors for courts to consider). In conducting this analysis, the district judge "should be satisfied that 'the defendant will not suffer extreme hardship.'" Parker, 439 F.3d at 93 (quoting United States v. Bracewell, 569 F.2d 1194, 1199 (2d Cir. 1978)).

Moreover, the Plan established the following procedures regarding this inquiry into a defendant's financial eligibility:

> All statements made by such person in such inquiry shall be either (a) by affidavit sworn to before a judicial officer, Court Clerk, or deputy clerk, or notary public, or (b) under oath in open court before a judicial officer. All statements of financial need shall be sealed other than for viewing by Pretrial Services, defense counsel and the Court. After final termination of the matter, the United States Attorney may, upon good cause shown, seek access to the financial need statement from the last presiding judicial officer.

4

> If, on the basis of such inquiry, the judicial officer finds that such person is financially unable to obtain counsel, the judicial officer shall assign counsel for such person.

Plan at 11.

    B.        Analysis

        The Court is required to make an inquiry into the defendant's financial eligibility. See Barton, 712 F.3d at 117. In this inquiry, the defendant bears the burden of showing that he is financially unable to afford representation. Harris, 707 F.2d at 660 (citations omitted). By all accounts, the defendant will not be able to meet his burden.[2] Guzman has profited immensely from trafficking narcotics for the past 30 years. Guzman is the principal leader of the Sinaloa Cartel, and as a result, made billions of dollars trafficking narcotics. As alleged in the Indictment, Guzman was involved in trafficking at least 250 tons of cocaine in shipments destined for the United States, only a fraction of which were seized. That cocaine is worth billions of dollars. In fact, the Indictment provides notice to the defendant of criminal forfeiture related to all charged counts in the amount of $14 billion, which represents the illegal proceeds of his narcotics trafficking activities.

        Moreover, the President of the United States and the United States Department of Treasury's Office of Foreign Assets Control ("OFAC"), has identified Guzman and the Sinaloa Cartel as significant foreign narcotics traffickers, pursuant to the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908. Over the past several years, OFAC has designated approximately 260 companies involved and associated with Guzman, the Sinaloa Cartel and its leadership. See Timeline of OFAC Designations Against the Sinaloa Cartel, available at https://www.treasury.gov/press-center/press-releases/Documents/i2_Analysts_Notebook_8-13-0019_Sinaloa_Desig_Timeline%20_public_releas.pdf (last visited on Jan. 27, 2017) (attached as Exhibit A). These companies cover a broad range of areas including real estate, gas stations, construction and trucking companies, and furniture stores. American companies and individuals are prohibited from doing business with these OFAC-designated foreign companies. OFAC's designations of these companies illustrate the breadth of Guzman's financial reach, showcasing his access to cash and businesses.

        There are also numerous well-published accounts of Guzman's wealth. For example, in 2009, Forbes estimated Guzman's net worth at $1 billion and included the defendant as a billionaire until 2013. Most recently, in January 2015, Guzman escaped from a Mexican prison through a constructed tunnel. As part of its investigation into Guzman's escape, the Mexican authorities stated that Guzman expended a significant amount of money for the escape. Press accounts estimate the cost of the escape as over a million dollars, and

---

[2] It does not appear that the defendant has provided a financial affidavit to Pretrial Services.

5

note that in addition to the elaborately constructed tunnel, Guzman had a private plane and pilot for his escape. And Guzman continues to have a cadre of privately retained counsel for his criminal charges in Mexico, which he also used for his lengthy extradition proceedings. His privately retained counsel also travelled to the United States to issue human rights complaints with international bodies this past year.

In sum, given the limited resources available for indigent defendants and others who lack the financial ability to retain counsel in this district, and in light of the numerous accounts of Guzman's wealth, the Court should make a strenuous inquiry into whether the defendant is financially unable to afford counsel. Such an inquiry is necessary to ensure that American taxpayers are not needlessly paying for the representation of Guzman, the billionaire leader of the Sinaloa Cartel, the world's largest and most prolific drug trafficking organization.

### III. THE COURT SHOULD APPOINT CURCIO COUNSEL AND HOLD A CURCIO HEARING

After making an inquiry, if the Court finds that the defendant is financially unable to afford representation, the Court should appoint Curcio counsel and hold a Curcio hearing with respect to the Federal Defenders. At the hearing, the Court can determine whether there is a potential conflict of interest, whether it is waivable and whether the defendant chooses to make an informed and knowing wavier of the potential conflict.

A.   Applicable Law

1.   Overview

The Sixth Amendment affords a criminal defendant the right to effective assistance of counsel. See Wood v. Georgia, 450 U.S. 261, 271 (1981); United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003). That right, however, is not absolute and does not guarantee the defendant counsel of his own choosing. See United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004); United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993), cert. denied, Gotti v. United States, 511 U.S. 1070 (1994). While there is a "presumption in favor of the [defendant's] chosen counsel, such presumption will be overcome by a showing of an actual conflict or a potentially serious conflict." Jones, 381 F.3d at 119 (citing Locascio, 6 F.3d at 931); see also Wheat v. United States, 486 U.S. 153, 164 (1988).

To determine if the defendant's counsel is burdened by a conflict of interest, a district court "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994). An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." Jones, 381 F.3d at 119 (internal quotation marks and citations omitted). A potential conflict arises if "the interests of the

6

defendant could place the attorney under inconsistent duties in the future." Id. (emphasis and citations omitted).

### 2. Discretionary Disqualification

Regardless of the severity of the conflict or the defendant's willingness to waive the conflict, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160. "The question of [attorney] disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." Locascio, 6 F.3d at 931. Accordingly, "a district court should decline to permit a defendant to be represented by the counsel of his choice if that representation would undermine the integrity of the judicial process." United States v. DiPietro, No. 02 CR 1237 (SWK), 2004 WL 613073, at *4 (S.D.N.Y. Mar. 29, 2004) (citing Wheat, 486 U.S. at 163), aff'd, United States v. Genua, 274 F. App'x 53 (2008).

### 3. Conflicts That May Be Waived

If a conflict is such that a rational defendant could knowingly and intelligently choose to continue to be represented by the conflicted attorney, the Court must obtain directly from the defendant a valid waiver in accordance with the procedures set forth in Curcio, 680 F.2d at 881. See, e.g., Malpiedi, 62 F.3d at 470; Levy, 25 F.3d at 153; United States v. Iorizzo, 786 F.2d 52, 58-59 (2d Cir. 1986). In summarizing Curcio procedures, the Second Circuit has instructed the trial court to:

> (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

Iorizzo, 786 F.2d at 59; see also Curcio, 680 F.2d at 888-90. By relying on waivers of potential conflict claims, courts are spared from having to wade into the intricacies of those claims. United States v. Jiang, 140 F.3d 124, 128 (2d Cir. 1998).

Finally, the need for a Curcio hearing exists regardless of whether a case is disposed of by way of guilty plea or trial. "A claim that counsel is conflicted is in essence a claim of ineffective assistance of counsel." Stantini, 85 F.3d at 15. Likewise, "[e]ffective assistance of counsel includes counsel's informed opinion as to what pleas should be entered." Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996). Therefore, it necessarily follows that a defendant has a right to conflict-free representation during the plea negotiation stage. See id. ("[P]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.") (quoting Von Moltke v.

7

Gillies, 332 U.S. 708, 721 (1948) (emphasis added)); see also Stantini, 85 F.3d at 16-17 (suggesting that ineffective assistance of counsel may be shown if attorney's dual representation led to inadequate advice "with respect to the advantages or disadvantages of a plea").

4. Prior Representation of Government Witness/Co-conspirator

An attorney's representation of a government witness or a co-conspirator presents an inherent conflict of interest. Iorizzo, 786 F.2d at 57; Restatement (Third) of the Law Governing Lawyers § 121 (2000) (recognizing that a serious problem arises when "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's duties to a former client"). This is because a lawyer owes an absolute duty of loyalty and confidentiality to both his current and former clients. See United States v. Yannotti, 358 F. Supp. 2d 289, 295 (S.D.N.Y. 2004); United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994); ABA Model Code of Professional Responsibility, Ethical Consideration 4-6. That duty, which remains in force even after representation ends, precludes the lawyer from disclosing matters revealed to her by reason of the confidential relationship, absent release from that duty under the law. See Rahman, 861 F. Supp. at 274; EC 4-6 ("The obligation to protect confidences and secrets of a client continues after the termination of employment."). Therefore "unless the client waives these obligations, the attorney's representation creates the potential for a serious conflict of interest." Yannotti, 358 F. Supp. 2d at 295.

Furthermore, in evaluating an actual or potential conflict of interest, actions of any member of a law firm are imputed to every member of a firm. E.g., Jiang, 140 F.3d at 127. Courts have viewed this presumption of a conflict with more "flexibility" in cases involving government departments and legal aid societies, because of theses entities' heavy caseloads. See United States v. Lech, 895 F. Supp. 586, 591 (S.D.N.Y. 1995). Nonetheless, even in cases involving legal aid societies, such as the Federal Defenders, courts have disqualified counsel based on conflicts arising from prior representation of potential government witnesses. See United States v. Pappa, 37 F. App'x 551, 554 (2d Cir. 2002) (affirming disqualification of Federal Defender attorney where another Federal Defender attorney "had been briefly assigned to a potential government witness and Federal Defender paralegals and interns had been exposed to that witness and to relevant discovery files.").[3]

In other words, in representing a current client, a lawyer may not use privileged information obtained from another client. See United States v. James, 708 F.2d 40, 45-46 (2d Cir. 1983); United States v. Cunningham, 672 F.2d 1064, 1072-73 (2d Cir. 1982). Moreover, in representing a current client, a lawyer may not attack other clients through cross-examination or argument to the jury. See United States v. Pizzonia, 415 F.

---

[3] In that case, no Curcio hearing was held because the Federal Defenders agreed there was a potential conflict and the district court found that the defendant did not have enough information to make a knowing and intelligent waiver. See Pappa, 37 F. App'x at 554.

Supp. 2d 168, 177-78 (E.D.N.Y. 2006); Rahman, 861 F. Supp. at 277; United States v. Massino, 303 F. Supp. 2d 258, 262 (E.D.N.Y. 2003) ("Because of [the attorney's] prior representation of [the cooperating witness], [the attorney] cannot ethically cross examine [the cooperating witness] without his consent."); United States v. Falzone, 766 F. Supp. 1265, 1275 (W.D.N.Y. 1991) (finding it improper for an attorney to cross-examine his prior client because the attorney is in a position to use information gleaned from the prior representation "either purposely or inadvertently").

The duty of loyalty to his other client thus effectively precludes a lawyer from vigorously cross-examining the other client or commenting on his credibility, which may be essential to the effective representation of the present client. See United States v. Kelly, 870 F.2d 854, 856-57 (2d Cir. 1989) (finding disqualification necessary because the defendant's interests would best be served by "vigorous cross-examination of the informant in a manner wholly inconsistent with the informant's interests" — a task that defense counsel could not perform without "violat[ing] the rights of the informant" to expect continued loyalty and confidentiality from his former attorney); Malpiedi, 62 F.3d at 469 (finding that the lawyer was prohibited from seeking to "conduct a thorough, no-holds-barred cross-examination . . . because of [the lawyer's] obligations as [the witness's] prior attorney").

     5.     Cumulative Prejudice

Further, in cases where, as here, numerous conflicts have been raised, "each cannot be considered in isolation, but rather must be considered together when assessing whether there is a congruence of interests between the lawyer and his client." United States v. Rahman, 861 F. Supp. 266, 274 (S.D.N.Y. 1994); see also Levy, 25 F.3d at 157.

B.     Analysis

The Federal Defenders have represented two potential cooperating witnesses for the government. Because of their prior representation of these two government witnesses, the Federal Defenders may not be able to ethically cross-examine these two witnesses without their consent. See Massino, 303 F. Supp. 2d at 262. As the Second Circuit held in United States v. Lussier, 71 F.3d 456, 462 (2d Cir. 1995), "when a defense attorney cross-examines a former client who is a witness against the defendant, a conflict of interest may exist; absent a waiver from the former client, the attorney cannot inquire into the privileged matter." See id. An attorney cannot avoid this conflict by choosing not to cross-examine the former client. See Massino, 303 F. Supp. 2d at 262. "An attorney who is prevented from pursuing a strategy or tactic because of the canons of ethics, is hardly an objective judge of whether that strategy is sound trial practice. Counsel's inability to make such a conflict-free decision is itself a lapse in representation." See id. (citing Malpiedi, 62 F.3d at 469).

In determining whether the conflict can be waived here, the Court should also consider the severity of the charges against the defendant. For example, Count One, the CCE charge, carries a mandatory life sentence. See Massino, 303 F. Supp. 2d at 262

9

(disqualifying counsel and stating, in case involving the death penalty, that the Court "must do everything in its power to protect the accused's Sixth Amendment rights, and to secure a just and fair trial" given that the "stakes were so high and the penalty so grave").

In addition, the Federal Defenders have also previously represented three co-conspirators of the defendant, individuals who are either members of the Sinaloa Cartel, which the defendant led, or associated with the Sinaloa Cartel. Because the Federal Defenders may have learned privileged information from these prior representations, such information cannot be used to further the interests of their current client, the defendant, to the detriment of their former clients.

Based on these previous representations of potential government witnesses and co-conspirators, the government requests that the Court appoint Curcio counsel and hold a Curcio hearing on these potential conflicts. The Curcio hearing will provide an opportunity for the defendant to consider these potential conflicts with independent counsel.

### IV. CONCLUSION

For the foregoing reasons, the Court should make an inquiry into the defendant's financial eligibility for appointed counsel. As discussed, in such an inquiry, the defendant bears the burden of showing that he is financially unable to afford counsel.

In addition, the Court should notify the defendant of the potential conflicts raised above and conduct an appropriate inquiry pursuant to Curcio. The Court should further advise the defendant regarding his right to conflict-free representation and determine if he can waive those rights.

Respectfully submitted,

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

WIFREDO A. FERRER
UNITED STATES ATTORNEY
Southern District of Florida

cc: Michelle Gelernt, Esq. (counsel to defendant)
Michael Schneider, Esq. (counsel to defendant)