UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------x

UNITED STATES OF AMERICA,

Plaintiff, Docket No.: 09 CR 466 (BMC)

versus

JOAQUIN GUZMAN LOERA, U.S. Courthouse, 225 Cadman Plaza East, Brooklyn, NY 11201

Defendant.

--------------------------------------x

February 3, 2017
9:30 a.m.

Transcript of Criminal Cause for Status Conference

Before: HONORABLE BRIAN M. COGAN, District Court Judge

APPEARANCES

For the Government:

ROBERT L. CAPERS, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: ANDREA GOLDBARG, ESQ.,
PATRICIA NOTOPOULOS, ESQ.,
GINA PARLOVECCHIO, ESQ.,
MICHAEL ROBOTTI, ESQ.,
HIRAL MEHTA, ESQ.,
Assistant U.S. Attorneys

U.S. DEPARTMENT OF JUSTICE
Criminal Division, Narcotic
and Dangerous Drug Section
145 N Street NE
Washington, D.C. 20530
BY: AMANDA LISKAMM, ESQ.
ANTHONY NARDOZZI, ESQ.,
Trial Attorneys

Appearances (continued):

For the Government: WIFREDO A. FERRER, ESQ.
United States Attorney
Southern District of Florida
99 N.E. Fourth Street
Miami, Florida 33132
BY: ADAM FELS, ESQ.,
Special Asst. U.S. Attorney

For the Defendant: FEDERAL DEFENDERS OF NEW YORK, INC.
1 Pierrepont Plaza
Brooklyn, New York 11201
BY: MICHAEL SCHNEIDER, ESQ.
MICHELLE GELERNT, ESQ.

Curcio Counsel: DEBEVOISE & PLIMPTON
919 Third Avenue
New York, New York 10022
BY: MATTHEW FISHBEIN, ESQ.

Also Present: MARIO MICHELENA,
Spanish interpreter
EMMANUEL FASHAKIN, JR.

Court Reporter: MICHELE NARDONE, CSR
Official Court Reporter
Phone: 718-613-2601
Email: Mishrpr@aol.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

* * *

(In open court.)

THE CLERK: All rise.

THE COURT: Good morning. Be seated, please.

(Defendant present.)

(Through the interpreter.)

THE CLERK: United States versus Guzman, docket number 09 CR 466. Counsel, please state your appearances, starting

with the government.

MS. GOLDBARG: Good morning, Your Honor. The government is represented by three separate offices. You have representatives from the Eastern District of New York, by me, Andrea Goldbarg, Gina Parlovecchio, Patricia Notopoulos, Michael Robotti, and Hiral Mehta. We are also joined by our partners in this case from the Narcotics and Dangerous Drug Section of the Criminal Division, and that's Amanda Liskamm and Anthony Nardozzi. And, finally, our partners from the Southern District of Florida, Adam Fels.

THE COURT: Good morning.

MR. SCHNEIDER: The Federal Defenders by Michael Schneider for Mr. Guzman. Good morning.

MS. GELERNT: Good morning. Federal Defenders, by Michele Gelernt, G-E-L-E-R-N-T, for Mr. Guzman, who is seated at counsel table.

THE COURT: Good morning. Good morning, Mr. Guzman.

MR. FISHBEIN: Good morning, Your Honor. Matthew Fishbein from Debevoise & Plimpton. I'm CJA counsel. I'm here today by request of the court, and my associate Emmanuel Fashakin is with me.

THE COURT: Good morning, Mr. Fishbein.

I will note for the record we have an interpreter for Mr. Guzman, who has been previously sworn.

Thank you both for submitting the agenda items to be

covered today. I'm going to go through that, and then, of course, I will hear from you, if there is anything more to do.

It seems to me the first thing we have to deal with is the government has raised the need for a possible Curcio hearing with regard to the defendant's current representation. I haven't been given enough information to conduct that hearing today, and I frankly don't know whether that kind of hearing is practical or achievable or necessary in a case like this.

So I will hear from the government now.

MS. GOLDBARG: Yes, Your Honor. Our first position is that the defendant is not financially eligible to receive counsel either by the Federal Defender or the CJA. So --

THE COURT: Give me your second position because in order to have a lawyer advising him as to what he should do about your first position, then I have to know who that lawyer should be.

MS. GOLDBARG: Correct. Then, in order to advise him, as we laid out in our position, we believe there is a conflict of interest with regards to the Federal Defenders. There are five witnesses at least that the Federal Defenders have -- or five defendants, two of whom may be potential witnesses for the government that the Federal Defenders have previously represented. Therefore, we believe that this is, at this point in time, a potential conflict of which the defendant should be advised.

THE COURT: Okay. But, first of all, does the defendant know who these five people are?

MS. GOLDBARG: Not from the government, no.

MR. SCHNEIDER: Defense counsel is aware.

MS. GELERNT: Yes, Your Honor. I can address that, if you would like to hear from us.

THE COURT: Okay.

MS. GELERNT: We were given notice of five potential former Federal Defenders clients who may come up in this case, some of whom were referred to as potential witnesses -- I believe two -- and three of whom were referred to as people who may have committed acts that are somehow related but were not seen, at least as of yet, as potential witnesses. The government has not specified any of these people by name.

We have looked into this matter and we are very confident that at least in terms of the five people that our office has been put on notice about, there is no conflict. I believe three of them are people that Federal Defenders represented for one day. There is a case where we were assigned to ascertain if it was possible for a defendant to receive post-conviction sentencing relief. I think Your Honor is aware that often the court calls upon Federal Defenders to handle cases en masse when there is a change in the guidelines or a change in the law. From what we were able to see in that instance regarding any potential conflict, we were assigned, I

believe, by Judge Amon. There doesn't appear to be any document that's been filed, at least on the public docket, by our office, and then Judge Amon denied relief, it appears, without a motion.

The only case that's even, we believe, plausible, involves representation of an individual not by Mr. Schneider or myself but by a colleague in our office. It was Mr. Kamdang. He was relieved as a result of a total breakdown of communication between himself and that client. We asked a lawyer, a supervisor from the Southern District office, to speak to Mr. Kamdang. We haven't spoken to Mr. Kamdang about that case. Mr. Kamdang has no involvement in the representation of Mr. Guzman at this point. From what we were able to ascertain, due to the breakdown in communication there was no -- we have no access. There was no access to any information that was obtained during that representation. We don't believe it's a conflict.

That being said, we certainly, as an office, never oppose our clients receiving advice of independent or objective counsel about any potential conflicts. I do think it's important to note that in this case, where the government's allegations are so sprawling, both in terms of their geographic scope and the decades of conduct they are alleging, that, I think, if the government is allowed to relieve counsel based on these types of conflicts, it will be impossible for Mr. Guzman

to find representation by any experienced counsel that's handled any remotely significant drug case arising out of Mexico or Colombia.

So I do think it's important to just be on guard about these types of issues. When we were first contacted by the government, we were told there were possible conflicts because Federal Defenders in the Eastern District of Virginia or, I believe, D.C. may have represented related people; and certainly those are independent offices that we have no contact with.

So, in light of all that, we still would not oppose Mr. Fishbein, who is present in court, either meeting with Mr. Guzman today or at some future date, if it's not amenable to the marshals and the staff of the courthouse.

THE COURT: Well, we will start there. I mean I will appoint Mr. Fishbein for the present purposes as Curcio counsel, and he will confer with Federal Public Defenders and with the defendant and advise him of what's going on.

I'm still going to need to get better educated, I think, from the government and maybe from Federal Public Defenders as well, if I'm going to have the Curcio dialogue that's required by law with the defendant, because I have to thoroughly explain to him what each of these individuals, who they are and what the nature of their representation was, and then he's got to make an informed judgment as to whether he

wants to continue with Federal Public Defenders or if he wants someone who, as Ms. Gelernt says, if it's possible to find someone, who doesn't have that like baggage I will call it.

So we are not going to do the Curcio hearing today because I don't know enough to do it today, but we will proceed with Mr. Fishbein appointed as Curcio counsel, and whether he becomes something more we will determine next time we meet. I need more information from the government to have the dialogue that's required.

MS. GELERNT: Your Honor, just so the record is clear, our office was provided the names of these five people on the condition that we not relay any significant information that would identify them to our client, which we have not done.

THE COURT: Okay. Well then, that gives us a problem. How am I going to have a dialogue that waives potential conflicts with the defendant when the defendant doesn't know who the potentially conflicting witnesses are?

MS. GOLDBARG: Your Honor, the court -- the government is more than willing to supplement our filings and to provide more information with regard to the nature of the conflict, but even mentioning the names of the conflict to the defendant would create a conflict because one would have to assume whether or not these witnesses also have a right to conflict-free counsel from their perspective as well. We would have concerns about providing those names to the defendant.

I think that having defense counsel have those names would be sufficient in order for them to be able to proceed in terms of the nature of the conflict and the nature of the representation.

THE COURT: I don't see any way that's possible. I mean, they have the information. They can advise him generally, but they can't give him the names. I don't know how I get a knowing and voluntary waiver from him unless he knows what's at risk, and he only knows what's at risk if he knows who the people are you are talking about.

MS. GOLDBARG: We are in a difficult position, Your Honor, because -- well, in the sense that we didn't get to the second point without addressing the first point. It's our understanding that there have been various people that have been represented or reached out by the family to represent the defendant, which is our first point; and, because of that, we feel that getting to the second point of Curcio, the analysis doesn't get there.

THE COURT: Like I said, I think you have got it backwards. I need him represented today.

You are certainly not suggesting he should be pro se today, right?

MS. GOLDBARG: No, Your Honor.

THE COURT: So he's got to have counsel today, and he is entitled to conflict-free counsel. In order to do that, I

have to get better educated and he has to get better educated; and, if you can't educate him because you have confidentiality concerns, then I'm not sure that what might otherwise be a waivable potential conflict is waivable. You are asking him to buy a pig in a poke, and I don't think I can ask him to do that.

Does Federal Public Defenders have any view on that?

MS. GELERNT: Well, Your Honor, we certainly wouldn't want to be put in the place of the government deciding without giving the court information that they won't disclose these names and creating a situation where an otherwise waivable conflict would be waivable -- would be unwaivable.

I think some of these issues that now the government has brought up about people contacting the government about representation of Mr. Guzman need to be addressed because one of the other things that's coming up in terms of the government's now second point, regarding whether or not he requires the assistance of the Federal Public Defenders, is that this is another area where the government seems to want it both ways. They are preventing him from having any communication with anybody, but then at the same time saying he should hire a lawyer. He has no ability to do that.

THE COURT: Well, it happens lots of times that family members hire a lawyer for a defendant.

MS. GELERNT: I understand, Your Honor, but the

government -- and I believe you received an ex parte letter yesterday -- the government has prevented Mr. Guzman from having any direct contact with his family members, whether by phone call, whether by visit, or his Mexican lawyers, or really anybody who would be in the position to advise him or assist him in obtaining counsel.

THE COURT: That's why family members would be the ones to hire a lawyer.

MS. GELERNT: Right, but that would be done in consultation with Mr. Guzman.

THE COURT: Not necessarily, not necessarily.

MS. GELERNT: Our other point regarding that -- I don't know if we have now gone too far afield -- is that we believe that the section of the code under 18 U.S.C. 3600(A)(b) that it's the person's eligibility, their ability to access funds, that determines whether or not a public defender or CJA should be appointed and that the inquiry is not of their family members.

THE COURT: Okay.

MS. GELERNT: That being said, he may choose to do that, but this is not something that he can do without conferring.

THE COURT: Okay. We are getting ahead of ourselves.

Let me just ask Mr. Fishbein: Do you think I can get a knowing and voluntary waiver without the defendant knowing

who the clients, the prior clients of Federal Public Defenders are?

MR. FISHBEIN: No, Your Honor. I share the view that you expressed, that it can't be a knowing waiver unless he knows the name.

THE COURT: Okay. Now, putting all that aside, it also seems to me that even if I could get a knowing and voluntary waiver, this may be a situation, considering the nature of the conduct and the potential sentence that arises from it, where I would not accept a waiver because it's just too big a case and the defendant should have, it seems to me, conflict-free counsel. All right.

Well, we can't do anything about this right now, it seems to me. I'm going to proceed with the Federal Public Defenders representing him today and with Mr. Fishbein added additionally as Curcio counsel. That's just to get things moving and figure out where we are.

Now, let's then turn to the government's next point, which is, is he entitled to public representation at all considering that the government thinks he has access to substantial assets. I guess the first question I want to ask his lawyers is: Has he signed a CJA affidavit?

MS. GELERNT: Your Honor, at this point he has not. Given the nature of how things proceeded the last time we were in court, he had been brought here the day before, we were

contacted late in the evening on Thursday, the day before the court appearance. We were just meeting him for the first time.

I think the court is aware that at that point neither Mr. Guzman nor his counsel in Mexico were aware that he would be facing charges in this district. Indeed, it's our understanding that these charges were never presented as part of the extradition proceedings in Mexico. So that's something he did not do.

Whether, if the court directs it, we would be prepared to do that, yes.

THE COURT: Okay. Please have him sign the CJA affidavit, and submit it to me. And then, as far as I'm concerned, that moots the government's concerns. If the government doesn't like the affidavit, it can investigate it; but there is nothing more for me to ask.

MS. GOLDBARG: That's correct, Your Honor. Thank you.

THE COURT: So let's get the signed affidavit, and we will proceed from there. Okay.

Next item on my agenda, discovery. I have heard a lot about discovery but nothing in terms of how much discovery is there really and how long is it going to take.

MS. GOLDBARG: Yes, Your Honor. The discovery in this case is going to be voluminous. It is voluminous. For the last two years these three offices have been working to combine their long investigations. We have reviewed tens of thousands

of documents. We are prepared to proceed to provide a summary.

The nature of the discovery will be in the form of multiple years of wiretaps, both domestically and foreign, mostly in the Spanish language. There will be documentary discovery as well, and we anticipate that will be in the tens of thousands, which is what we have now.

THE COURT: Tens of thousands of what?

MS. GOLDBARG: Documents, Your Honor. As well as tens of thousands of intercepts as well. So it is voluminous.

We have sought a protective order. When defense counsel requested discovery, we asked them to join a protective order to stipulate to it, and they did not. So that's why we submitted before the court. So we are prepared to proceed.

As the impact of this organization and this defendant isn't just limited to these three jurisdictions bringing this case but it impacts the United States as well as other jurisdictions, we have submitted MLATs. There are outstanding MLATs to various countries. We have received some of the evidence from the foreign countries. Some of it we have not yet received. Therefore, as we get more evidence, we will be working diligently, as we have over this past year, to review the discovery and get it ready to produce on a rolling basis.

THE COURT: Is any of this discovery subject to CIPA?

MS. GOLDBARG: Not this discovery, but there will be CIPA litigation in this case.

THE COURT: So that's going to be a later phase of discovery?

MS. GOLDBARG: Yes, Your Honor.

THE COURT: Anything defense counsel needs to add to that?

MR. SCHNEIDER: Just briefly, Your Honor, we don't agree with the government's proposed protective order, and we would like to have until the 15th to respond in writing to their request for that. In our view, it's both overbroad in what it deems to be protected material and too restrictive in our use of even what is protected material. We don't think it's appropriate that if we talk to an expert we haven't hired yet that we have to tell the government that we are doing that and bring him to court so that you can read him the rule.

So, we don't agree to it. We will respond in writing by the 15th.

THE COURT: Okay.

MR. SCHNEIDER: One other issue, judge. When we initially talked to the government about the protective order, we asked for the extradition paperwork. We asked for that when Mr. Guzman first appeared in court and again by letter a couple of days later. It's our view that those documents have been public in Mexico for at least a year, and we don't see the reason for a protective order for those documents.

We would like to review those because, if there is an

issue as to whether this case should be in the Eastern District, probably we should address that before we start reviewing thousands of hours of wiretaps and tens of thousands of documents.

THE COURT: What's the difficulty with giving the extradition papers?

MS. GOLDBARG: Your Honor, this morning we tried to facilitate an official from the Mexican consulate to come and provide and serve on the defendant the document that explains the basis for which he is here. While the government of Mexico granted his extradition for the cases in the Western District of Texas and the Southern District of California, the U.S. Government also submitted a request for a waiver of the rule of specialty, and that document lays out that the Mexican government has granted the request for the waiver of specialty. Defense counsel did not allow the Mexican consulate to serve the document on him.

The consulate service is here. We would like to work with the marshals to hopefully effectuate that service, but the document that they have been requesting is the document that the Mexican consul is trying to serve on the defendant, which they are required to do under their law.

THE COURT: I want to make sure we are talking about the same thing. When defense counsel says "extradition papers," I understand that to mean the papers that led to his

extradition. Is that the same thing that the Mexican consul general is trying to serve him with?

MS. GOLDBARG: No. The Mexican consul general -- the Mexican government allowed a waiver of the rule of specialty to have the defendant brought here. Therefore, under Second Circuit precedent, the defendant does not have standing to argue that he was improperly brought to this jurisdiction, especially given that the government in Mexico has explicitly granted the waiver of the rule of specialty.

THE COURT: That may be, but why not give him publicly available in Mexico extradition papers?

MS. GOLDBARG: We don't know that the documents are, and we would argue that they aren't publicly available documents in Mexico; and we wouldn't find that those extradition documents are actually responsive under Rule 16.

THE COURT: I see. Okay.

MS. GOLDBARG: So we believe that the document that we are trying to effectuate service on today would provide them the legal basis for which the defendant is here.

THE COURT: Okay. Mr. Schneider.

MR. SCHNEIDER: Just briefly. The question of whether Mr. Guzman has standing to challenge the nature of extradition under the rule of specialty is pending before the Second Circuit.

The government's allegation here doesn't obviate the

need for us to view the documents, which we believe were public in Mexico. They just tell us on what charges he was extradited here; and we also don't think the nature of those documents means that it needs to be protected. That's our position.

THE COURT: I'm not going to determine the application of the rule of specialty today because I don't know what it is, but, it seems to me, there is no reason not to produce the extradition documents to them. Please go ahead and produce those.

MS. GELERNT: Your Honor, just to address the government's point regarding accepting service from the Mexican government.

THE COURT: That's my next point.

MS. GELERNT: What we were told yesterday for the first time is that the government confirmed that Mr. Guzman, the extradition proceedings were not based on these charges, the government never filed paperwork seeking to extradite Mr. Guzman here, and that for the first time after Mr. Guzman had been removed from Mexico the government of Mexico agreed to this rule of specialty. Whether or not they even have been asked while he was still in Mexico and before he was taken from Mexico --

THE COURT: Does that matter?

MS. GELERNT: -- is another matter. I think it's something we all need to explore.

Our problem with accepting service is that what we were told by the officials from the Mexican government is that we were not permitted to review the document they were serving on our client; that we couldn't look at it ourselves; and that if we asked to review it, which we did, they would take it back to their government.

I think as lawyers we would never permit our client to sign something and acknowledge something that we haven't been able to see; and I think it's a fair request to say we would like to see the document you are asking Mr. Guzman to sign that is responsible for him being prosecuted in this district rather than in Texas or in California, where it was assumed he would be prosecuted.

THE COURT: Let me ask the government. Why does he have to sign? It seems it me normally service is done by tendering papers to an individual. If the individual places their hands behind their back and the process server drops the papers on the floor, that's still valid service. Does there have to be a signature?

MS. GOLDBARG: Your Honor, I'm not sure. When we spoke to the consular officials, they said that they were going to request a signature to acknowledge receipt. I don't know if it's necessary for it to effectuate service. We can inquire. They are present in the courthouse.

THE COURT: Well, I'm going to direct that the papers

be served by delivering them to either Mr. Guzman, if the MCC lets the consul general in to do that, or else, if it doesn't, then service on the Federal Public Defender.

And, like I said, I don't really care if Mr. Guzman refuses to accept them and they have to be dropped on the floor or if Federal Public Defenders refuses to accept them and they have to be dropped on the floor. That, in my view, is valid service. So that's what we are going to do, unless someone tells me there is a nonwaivable, mandatory signature requirement, in which case I don't know how you ever get them served, if somebody refuses to sign. I mean that would be an easy way to evade process.

So that's going to be adequate service. I don't expect the Federal Public Defenders to actually let them drop on the floor; I expect them to take them.

MR. SCHNEIDER: We will catch them, judge.

THE COURT: Yes, I expect you will. But that's how we are going to proceed with that. Okay.

On the protective order, I will take a submission from defendant's counsel by the 15th, the government response by the 20th; and then I will make a decision on that. Okay.

Is there any dispute -- I couldn't tell for sure from the agenda submitted by counsel for the defendant -- is there any dispute about this being a complex case for speedy trial purposes?

MR. SCHNEIDER: No.

MS. GELERNT: No, Your Honor.

MR. SCHNEIDER: No, there is none.

MS. GOLDBARG: We are in agreement there, Your Honor.

THE COURT: Based on what I have heard and what's on the record thus far, I find that the case is complex for purposes of the Speedy Trial Act, and I so designate it.

Okay. I think that covers everything on my agenda. What else do we need to talk about?

MS. GOLDBARG: Your Honor, can we clarify the court's ruling in terms of the production of the extradition packages?

THE COURT: Sure.

MS. GOLDBARG: One of the concerns that we have is obviously this is dealing with investigations in other jurisdictions. Mexico requires, as part of an extradition, a first-person affiant, which means that we would be required to disclose these witnesses. This is the type of information that we are seeking to protect.

THE COURT: The line is going to be this. If the papers are publicly available, produce them. If you can go to Mexico and go into a court and copy them out of a court file, produce them. If they are not, if they are sealed, then they need not be produced.

MS. GOLDBARG: Thank you, Your Honor.

THE COURT: Okay. What else?

MS. GELERNT: If there is nothing from the government, Your Honor, we do have issues that we want to bring to the court's attention regarding the conditions of Mr. Guzman's confinement.

THE COURT: Okay. Go ahead.

MS. GELERNT: As the court is aware, he is in the specialized housing unit. He is on 23-hour lock-down.

At this point he has only been permitted to interact with a select group of people from our staff, that the MCC has taken the position and -- it's our understanding, based on their representation that this is in consultation with the government -- that they are prohibiting -- they have -- first of all, they have only approved myself, Mr. Schneider, and two paralegals in our office to enter the facility to visit, whether or not those additional people are with us or not.

We have sought approval for additional staff members to be able to accompany us. I should correct that, that the head of our office, David Patton, has been permitted to enter; but it's our position that these are people who are regularly permitted entry into the jail, both the MDC and the MCC, to meet with our clients. They are people who are employed or work for the Federal Defenders. The government and the MCC have delayed any approval, saying they are going through some sort of outside screening process.

At a certain point, given the nature of the documents

that exist, the necessary hours that we have to spend at the MCC, we simply need additional staff allowed into the MCC. The people that we have requested are fluent Spanish speakers, and in our understanding there has been no -- the government, neither the government nor the MCC has sought the court's approval for any of these additional unusual restrictions; and I don't think there is any real colorable argument that somehow allowing additional staff members from the Federal Defenders or other attorneys or investigators from the Federal Defenders is somehow a security risk.

Things at the jail are so secure that when we go for a visit we are not permitted to give Mr. Guzman a glass of water. So then we can't have a glass of water while we sit there. So I think we understand the need for security, but I think it's gone above and beyond, and at this point it's impacting our ability to adequately represent our client in terms of staffing.

I mean we are certainly willing to spend the hours, but it would be helpful if we can have these additional staff members; and there has been no representation as to why they pose a security risk.

THE COURT: Obviously, they are taking extra security measures. We know the reasons for that.

Let me ask you: Are you asking for a carte blanche for any Federal Public Defender employee to go in?

MS. GELERNT: No. Right now what we have done is I believe very shortly after we first appeared on this case, shortly after January 20, we submitted two additional names to the jail. They have not been approved. In fact, for the first -- it took us a while to even get a second person approved.

THE COURT: Okay, but right now you can get in two paralegals, the two of you, and the head of the office; and my understanding from what you said -- tell me if I'm wrong -- is that they are still considering the additional two names that you have submitted but they haven't done it fast enough for you.

MS. GELERNT: I think there has also been sort of, what seems to be from our point, stalling. There have been times when we have come to the jail and we are told, oh, we are not sure you are on the list, even though I have been regularly visiting Mr. Guzman with the exception of one day.

So we are just asking that for these additional security measures, if there are other things -- I guess the most serious issue that we had is that we tried to arrange for a counsel call yesterday with Mr. Guzman, because we anticipated that we may need to be available at our desks and not locked in a segregated housing unit with no ability to contact our office or receive e-mail. We were told by the jail that we could only receive that call if those same people, that

only those same people that they approved to go into the jail, could be in my office, so that no other attorney could come into my office.

And the other issue with that is that they are asking us to disclose who in our office is meeting with Mr. Guzman or talking to Mr. Guzman or giving us advice or helping us with the case. We don't believe it's appropriate that they determine who is sitting in our office while we speak to our client on the phone. We have certainly never had that happen in prior cases. That's not a security risk in terms of entering the jail, where they might have a reason for that.

THE COURT: Really, based on what I know of the case, there are grounds for taking extra security measures and making sure that the public isn't in your office, for example, while you are having this conversation. That seems to me perfectly well based.

Look, I have to defer to the BOP and the MCC in determining appropriate security measures, unless I hear that something is really completely beyond the pale, and I'm not hearing that yet. I would urge, without ordering, the MCC to consider the additional two names you have submitted; but, if you just have to tell them who is in your office for a phone call, I think that's reasonable under the circumstances.

MS. GELERNT: Your Honor, we would ask that any additional security or unusual security requests or conditions

on our representation, imposed on us by either the government or the jail, be that they seek court approval for those.

THE COURT: I'm going to do it the other way. If you get anything that you think warrants my consideration, you bring it to my attention.

MS. GELERNT: Yes, Your Honor.

THE COURT: But I will tell you do it with an understanding that I'm willing to give what I think is appropriate deference to the MCC under the circumstances of this case.

MS. GELERNT: Understood, Your Honor.

I think the other issue that relates to that is that we have sought permission for Mr. Guzman's wife to visit him -- she is present in court here today -- or to have some sort of contact, if not a visit, a telephone call.

One of his lawyers who has represented him in Mexico or worked for him in Mexico is here today in court also. She has not been permitted to visit. She submitted her identification and information to both the Bureau of Prisons and the government in order to facilitate a visit. We have asked the court -- and I know this would depend on the marshals' ability to effectuate this -- to perhaps allow the lawyer, Sylvia Delgado, to visit in the marshals' pens here in the courthouse, if she can't be given entry.

We know that the government has filed a letter. We

are in no position to oppose it because this is another thing that they have given to the court and have not given us, the information about why it would be inappropriate for either Mr. Guzman's wife or his counsel from Mexico to visit with him.

THE COURT: All right. I will hear from the government.

MS. GOLDBARG: Your Honor, it's our understanding that with regards to one of the persons that there is private counsel who is assisting the defendant in filling out the paperwork to have that visitor have access, and that's going through its normal process. With regard to the Mexican attorney, we did submit an ex parte last night in which we disclosed some of the reasons that we do have concerns at this point in time having access by that person.

THE COURT: Okay. With regard to visitation of the defendant, I am again going to defer to the prison authorities for determining who should be in and who should not. It is an unusual case, and reasons have been given to me on an ex parte basis, which I feel are sufficient to defer to the MCC on that.

For the same reason, with regard to any meetings that occur in this courthouse or in the holding cell areas, I'm going to defer to the marshal service to determine whether those meetings should be allowed or not.

Now, I understand that this may put defense counsel under some burdens that are unusual, but I again emphasize that

even the public history of this defendant is somewhat unusual, and I think it's appropriate for there to be considered extra security protections if the responsible authorities think they are needed. So I'm going to allow control to remain there.

What else?

MR. FISHBEIN: Your Honor, I have one point. At this point, it's not clear when and if there will be a Curcio hearing. But assuming that one is scheduled, obviously we will need to have access to Mr. Guzman as well.

THE COURT: Right.

MR. FISHBEIN: So I just want to make sure that I and my associate will be able to have access to him at the MCC.

THE COURT: All right. I'm going to ask the government to submit to the MCC a request, with my advocacy, to allow Mr. Fishbein and his associate to visit.

MS. GOLDBARG: We will do so, Your Honor.

MR. FISHBEIN: I have been reminded that I also should ask for an interpreter to be allowed as well.

THE COURT: Yes. Okay.

Anything else we need to cover?

MS. GELERNT: No, Your Honor, not at this time.

MS. GOLDBARG: Not from the government. Thank you, Your Honor.

THE COURT: Now, considering the nature of this case and all of the things that have to get done, I'm inclined to

have our next status conference in 90 days, by which time I will have resolved the Curcio issue, and I will bring you in earlier if I feel a need for a hearing on that. And also I will have resolved the issue on the protective order so that discovery can commence.

Anyone have any different thoughts on that?

MR. SCHNEIDER: No, Your Honor.

MS. GOLDBARG: No, Your Honor.

THE CLERK: May 5th.

MR. SCHNEIDER: I'm scheduled for trial.

THE CLERK: That's a Friday.

MR. SCHNEIDER: Okay.

THE CLERK: May 5th at 9:30 a.m.

THE COURT: All right. Time is excluded until then on the basis of this being designated a complex case. All right. Thank you, all.

We are adjourned.

(End of proceedings.)

o O o

Certified to be a true and accurate transcript.
/s/ Michele Nardone
MICHELE NARDONE, CSR -- Official Court Reporter