UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
UNITD STATES OF AMERICA,                                    :
                                                            :
                                                            :
              - against -                                   :    **MEMORANDUM**
                                                            :    **DECISION AND ORDER**
Joaquin Archivaldo Guzman Loera,                            :
*also known as* "El Chapo," "El Rapido,"                    :    09 Cr. 466 (BMC) (S-4)
"Chapo Guzman," "Shorty," "El Senor,"                       :
"El Jefe," "Nana," "Apa," "Papa," "Inge"                    :
"El Viejo," *and* "Joaquin Guzman-Loera,"                   :
                                                            :
                          Defendant.                        :
                                                            :
----------------------------------------------------------- X

**COGAN, District Judge.**

      Before the Court is a motion to vacate or, in the alternative, modify the Special Administrative Measures ("SAMs") currently imposed on defendant Joaquin Archivaldo Guzman Loera ("defendant" or "Guzman"). Defendant challenges the imposition of the SAMs in their entirety, arguing that they violate (i) his Sixth Amendment rights to effective assistance of counsel, to develop a defense, and to conduct a meaningful investigation; (ii) his Fifth Amendment right to due process; and (iii) his First Amendment rights to free speech and free exercise of religion. Accordingly, defendant moves to vacate the SAMs in full and for his release into the general prison population.

      Alternatively, defendant moves to modify various sections and provisions of the SAMs, pursuant to both this Court's jurisdiction over him as a pretrial detainee and 28 U.S.C. § 2241. Specifically, defendant seeks the following: (i) a modification so that Guzman may speak with his wife, Emma Coronel Aispuro, either in person or by telephone, for the limited purpose of communicating his choice of private counsel and determining the availability of assets necessary

to retain such counsel; and (ii) a modification to permit defense counsel and private attorneys to relay messages between Guzman and third parties for the limited purpose of ascertaining and securing the assets necessary for their representation. Defendant also seeks an evidentiary hearing under Turner v. Safley, 482 U.S. 78 (1987), if the Court denies the requested relief.

The Government agreed to some modifications in its opposition, and defendant subsequently supplemented his motion for relief, additionally seeking (i) authorization to have Amnesty International assess the conditions at the Metropolitan Correctional Complex's ("MCC") Special Housing Unit ("SHU") in 10 South, where Guzman is currently held; (ii) an order appointing firewall counsel to conduct SAMs clearance for all of Guzman's visitors; and (iii) permission to send unscreened messages to his family regarding retaining counsel. For the following reasons, defendant's motion is denied in part and granted in part.

## DISCUSSION

The Court assumes familiarity with the circumstances of defendant's alleged crimes and extradition to the United States and will not recount them here.[1]

### I. The Court's Jurisdiction to Review SAMs

Although the Prisoner Litigation Reform Act ("PLRA") restricts the kinds of cases that a prisoner may bring by requiring the exhaustion of administrative remedies, that restriction is inapplicable here, and the Court has jurisdiction to review the instant motion. The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

---

[1] Defendant raises the public comments the U.S. Attorney's Office has made regarding defendant's alleged crimes and conduct, particularly highlighting the U.S. Attorney's press conference on the day of defendant's arraignment. The Court reminds the Government of its obligations to abstain from making statements to the media that may reasonably be expected to influence the perceptions of the potential jury pool and therefore the outcome of the trial.

This language supports the Court's jurisdiction: The text plainly prohibits only "actions" that are "brought" regarding prison conditions; it says nothing about motions for relief within the context of an already pending prosecution. The Supreme Court has recognized as much, noting that the provision covers "action[s] . . . brought with respect to prison conditions." Porter v. Nussle, 534 U.S. 516, 5245 (2002) (alteration in the original).

The cases that the Government cites in arguing that the Court lacks jurisdiction are inapposite, either because they deal with post-conviction measures, post-conviction recommendations, or new actions brought under 42 U.S.C. § 1983 or Bivens. In contrast, almost all of the courts that have squarely considered pretrial defendants subject to SAMs have found that the PLRA does not prohibit the courts from reviewing the SAMs on motion by the defendants. See, e.g., United States v. Mohamed, 103 F. Supp. 3d 281, 286 (E.D.N.Y. 2015) ("A motion filed by a pre-trial detainee in a criminal case, unlike a civil case or criminal appeal initiated by a prisoner, is not an 'action' for PLRA purposes."); United States v. Hashmi, 621 F. Supp. 2d 76, 84-86 (S.D.N.Y. 2008) (holding that a federal pretrial detainee can move directly in the district court for relief from SAMs because the motion is not an action under the PLRA); United States v. Savage, 07-550-03, 2010 WL 4236867, *4-6 (E.D. Pa. Oct. 21, 2010) (collecting cases). Also persuasive is the reasoning that an administrative remedy requirement in the pretrial context could impinge on a district court's ability to honor a defendant's right to a speedy trial. See Savage, 2010 WL 4236867, at *6 (holding that a motion to modify SAMs is "not barred by the PLRA to the extent that it challenges aspects of [the defendant's] incarceration that directly and necessarily affect [the court's] ability to give him a fair and speedy trial.")

Finally, even 28 C.F.R. § 501.3, which is the provision under which the Attorney General authorizes SAMs, does not mandate the exhaustion of remedies; instead, it states that an "affected inmate *may* seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program." 28 C.F.R. § 501.3(e) (emphasis added). Given the foregoing, the Court has jurisdiction to hear the instant motion.

II. **Defendant's Motion to Vacate the SAMs in Their Entirety**

Defendant argues that the SAMs violate his First, Fifth, and Sixth Amendment rights,[2] are unnecessarily harsh and punitive, are imposed in an arbitrary manner, exceed the Government's regulatory authority, and are not tailored to defendant, such that the Court should vacate them in their entirety because of their unconstitutionality. These arguments fail, and defendant's motion is denied as to this request for relief.

The applicable framework for evaluating an infringement on the constitutional rights of prisoners is the four-factor test outlined in Turner v. Safley, 482 U.S. 78 (1987). There, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89. Turner outlines a four-factor test to guide a court's inquiry into whether a regulation is valid; the test asks (i) whether the regulation is rationally connected to a legitimate and neutral government objective; (ii) whether inmates have alternative means of exercising the constitutional right at issue, where the existence of alternative means weighs in favor of deferring to the corrections agency; (iii) whether there is an impact on guards, other inmates, and allocation of prison

---

[2] Specifically, defendant argues that he is prevented from making statements to the press and taking part in group prayer activities, which violate his First Amendment rights; that he is prevented from communicating with his family regarding the retention of private attorneys in the U.S., which violate his Sixth Amendment rights; and that his solitary confinement and the SAMs amount to a deprivation of liberty without due process, in violation of his Fifth Amendment rights.

4

resources because of the requested accommodation; and (iv) whether there are obvious alternatives to the regulation, where alternatives suggest that the regulation is not reasonable but rather responsive to an "exaggerated" concern and where the absence of alternatives suggests deference to the corrections agency is appropriate. Id. at 89-91.

Here, the Turner factors do not support defendant's motion to vacate the SAMs in their entirety. I recognize that the SAMs impose burdens on defendant that an average general-population prisoner does not have to bear, but the SAMs, as a whole, are rationally connected to a legitimate government objective that is specifically tailored to Guzman. Specifically, the Government has articulated legitimate objectives of preventing defendant from running the Sinaloa Cartel from prison, coordinating any escape from prison, or directing any attack on individuals that he may believe are cooperating with the Government. These interests are premised on alleged prior acts by defendant. As the Government has recounted, while defendant was imprisoned in Mexico the first two times, he allegedly used third parties to further his narcotics trafficking enterprise, to plan and execute his escapes from Mexican prisons, and to intimidate possible cooperators.

Regarding defendant's particular request to be taken out of solitary confinement and placed in the general prisoner population, the Court would be hard pressed not to acknowledge that defendant's widely-publicized second escape from a Mexican maximum-security facility was accomplished under 24-hour video surveillance in solitary confinement. The risk attendant to placing him in the general prison population is not lost on the Court. Regarding the visitor and communication restrictions, the Government has expressed a reasonable concern that without such restrictions, there is a possibility that defendant may pass encoded messages to his co-conspirators, which is a concern several courts have recognized. See, e.g., United States v.

5

Hammoud, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code."); United States v. Johnson, 223 F.3d 665, 673 (7th Cir. 2000) ("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code.").

Accordingly, defendant's solitary confinement at the MCC, communication restrictions, and visitor restrictions, to the extent they burden his First, Fifth, and Sixth Amendment rights, are rationally connected to the Government's legitimate purposes. See, e.g., Basciano v. Lindsay, 530 F. Supp. 2d 435, 446 (E.D.N.Y. 2008) (finding that the government's objective of preventing harm to those whom the defendant "may wish to harm and of inhibiting his ability to oversee the operations of the Bonanno crime family, widely known for its propensity to order and commit violent acts, are legitimate purposes").

Moreover, there are no obvious alternatives to confinement in the SHU – the only alternative to the SHU is placement in the general prison population, and that is an unreasonable request for the reasons already stated. Regarding alternatives to certain of the SAMs, however, as the Government recognizes and as will be discussed later, there are alternatives, in the form of limited SAMs modifications, that the Court believes are appropriate here.

Although defendant characterizes the SAMs as imposing unnecessarily harsh and isolating conditions of confinement, these conditions are not actually atypical of solitary confinement generally. Defendant's motion, to the extent it intends to be a referendum on the use of solitary confinement, is denied. The Government has demonstrated the need to hold defendant away from the general prison population and to vet the visitors who seek to meet with him or talk to him by telephone. The conditions are reasonably necessary to ensure that

6

defendant cannot coordinate any escape from prison, direct any violence against cooperators, or manage any aspect of the Sinaloa Cartel's enterprise, which includes narcotics trafficking and violence.

Relatedly, defendant's motion to have Amnesty International assess the conditions of 10 South is also denied. The motion is denied for reasons unrelated to arguments about opening a "floodgate" to similar requests or any perceived concern that anyone from Amnesty International would pass along messages from defendant; rather, the motion is denied because there is absolutely no reason to have a self-appointed inspector make any such assessment. This is obvious for two reasons. First, defense counsel has thoroughly explored and explicated the conditions under which defendant is being held, and counsel has not shown any additional value that Amnesty International could contribute. Indeed, defense counsel has not pointed to a single action that Amnesty International would take that defense counsel would not, other than further sensationalize an already sensationalized case. Second, having considered defense counsel's thorough exploration and advocacy for their client, the Court is making its ruling on a full record. Nothing in defendant's motion suggests how or why Amnesty International would bring about a different result. The depth and detail of defendant's motion is itself conclusive to show that any role for Amnesty International in this case would be superfluous. The fact is that the general conditions at 10 South do not depart from a reasonable expectation of what solitary confinement entails, and having Amnesty International chime in would not change that.

As to the specific conditions imposed on defendant that create additional burdens that he has characterized as atypical or arbitrary, for example, *inter alia*, the bar on purchasing bottled water, the lack of a Spanish-language commissary list, and the removal of items from his cell, defendant has been appropriately making use of the Bureau of Prison's ("BOP") Administrative

Remedy Program though his filing of Requests for Administrative Remedies (known as "BOP-9s"). Nevertheless, defendant's description of the bureaucratic hoop-jumping associated with his use of the BOP-9 process raises concerns about the practical availability of remedies to Guzman. Were it not for his able counsel and their continued follow-up with BOP, it does not appear that defendant could independently have been able to seek any remedies at all. If defendant encounters similar problems in the future, he may bring those issues to the attention of the Court.

As part of this motion, the parties also traded volleys back and forth about, among other things, the size of defendant's cell, the parameters of his window, the presence of phantom music, and the television programming available to defendant during his daily hour of exercise. None of these issues present constitutional concerns and the Court is not going to micro-manage the BOP. Similarly, defendant's attempts to draw comparisons to recent publicity about the conditions of the women's detention area at the Metropolitan Detention Center are inapposite. The judges that are presiding over those cases where women detainees are allegedly subject to unacceptable conditions can deal with those cases; this Court is dealing only with the allegations here. Although the Court has a responsibility to protect inmates from cruel and unusual conditions, defendant's current confinement does not raise those issues.[3]

I also reject defendant's arguments that the SAMs should be vacated because they exceed regulatory authority. Defendant argues that the Government has imposed SAMs restrictions under 28 C.F.R. § 501.3(d), without first shouldering its burden of showing that reasonable

---

[3] Some of the issues raised are routine and rather petty complaints that often arise in pretrial and post-trial detention cases, for example, BOP's removal of the clock that defendant purchased through the commissary from his cell and BOP's decision to permit defendant to watch only nature programming or the same movie over and over. For issues like these, the parties should have communicated with each other before briefing it; given that defendant's clock was returned to him after his counsel raised the issue, it seems like the parties can resolve some of these complaints without resort to judicial intervention. If these types of issues cannot be resolved by the parties, defendant can raise them to the Court to the extent they seem to reflect a practice of arbitrary enforcement by BOP. The Court has previously used a Magistrate Judge to assist in informally resolving those kinds of issues and may do that here.

suspicion supports this monitoring. However, the Government has not imposed SAMs pursuant to § 501.3(d) at all. Rather, the SAMs have been imposed pursuant to § 501.3(a). Put another way, defendant is effectively arguing that the Government has impermissibly couched § 501.3(d) measures in § 501.3(a) authority. This is not so.

Under § 501.3(d), "the monitoring or review of communications between that inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege" is permitted if the Government has a reasonable suspicion that a defendant "may use communications with attorneys or their agents to further or facilitate acts of terrorism." 28 C.F.R. § 501.3(d). The Government has not shown a potential to facilitate acts of terrorism because it does need to do so; the SAMs, as authorized and applied, do not impose any review or monitoring on any of defendant's attorney-client communications to require this showing.

Defendant conflates the attorney-client provisions at § 2 of the SAMs, which simply regulate the attorney-client relationship, with the monitoring of attorney-client communications; however, the SAMs impose no § 501.3(d) monitoring. Particularly, defendant takes issue with the following attorney-client provisions found at § 2 of the SAMs: (i) distinctions between members of the defense team and who may meet with defendant without an attorney present;[4] (ii) distinctions between members of the defense team who may "disseminate the contents of the inmate's communication" to prepare a defense; and (iii) a bar on reviewing "inflammatory material" with defendant. Although these measures impose limitations on the attorney-client relationship that otherwise would not exist in, for example, a typical possession-with-intent-to-distribute case, these rules simply do not amount to a monitoring or review of attorney-client communications. Accordingly, the attorney-client SAMs do not exceed regulatory authority.

---

[4] This distinction is discussed later as it pertains to defendant's motion to modify the SAMs.

9

Finally, defendant also argues that the Government has failed to tailor the SAMs to him specifically. Defendant argues that instead, the Government has imposed untailored SAMs that "seem designed for a defendant charged with terrorism-related crimes" and that the Government has previously imposed on other defendants "whose circumstances were qualitatively different" than Guzman's. In support, defendant cites SAMs § 2(h)(i) as imposing an unjustifiable limitation on defendant's reading material[5] that courts have used in terrorism cases. I disagree. Although some of the examples the Government uses do not appear to directly bear on defendant and the alleged conduct charged, for example the limitation on reviewing "military training materials," the list is provided in the disjunctive, which suggests that the Government is being more inclusive. In imposing the SAMs, the Government necessarily had to draft them to be broader than simply what the Government believes defendant has already allegedly done – the Government had to contemplate other scenarios where a defendant could effect violence from his cell and include those as well.

Having reviewed the SAMs in their entirety, I find that they are specifically tailored to defendant and his alleged conduct. The exact purpose of the SAMs is to prevent violence, and the Government is not limited to preventing only those acts that the defendant allegedly committed previously. A requirement that particular SAMs may be imposed only if that particular defendant has caused the particular harm the SAMs address would be nonsensical and unduly burdensome. It is both reasonable and logical that the SAMs contemplate a wide variety of scenarios so that the purpose, the prevention of harm, is met.

For the foregoing reasons, defendant's motion to vacate the SAMs in full is denied, as is defendant's motion to have Amnesty International assess the conditions at 10 South.

---

[5] To be clear, the imposition is not limiting what defendant may read from the library – instead the imposition relates to what kind of discovery materials defense counsel may show to defendant.

### III.    Defendant's Motion to Modify the SAMs

Notwithstanding the Court's denial of the motion to vacate the SAMs, defendant raises concerns about the SAMs as applied to him.

#### A.    Emma Coronel Aispuro

The SAMs currently prevent defendant from having telephone calls and visits with members of his family that the Government has not pre-cleared or whose clearance was denied. Specifically at issue is defendant's wife, who has sought access to visit her husband, but whose request was denied. Given the denial, defendant has been prevented from speaking with his wife at all. This is problematic because his wife is one of the very family members through whom defendant can procure the necessary funding to retain his own private counsel.[6]

In light of the Government's prohibition on any communications with his wife, defendant argued that he is being deprived of his Sixth Amendment right to counsel. The Government recognized the issue in its opposition and sur-reply and has suggested a solution that the Court will adopt with its own modifications. Specifically, the Government has proposed "a SAMs modification allowing pre-screened written communications between the defendant and his wife . . . solely regarding the retention of counsel."

According to defendant, this proposed modification, where the prosecution pre-screens messages, forces defendant to choose between his Sixth Amendment right to counsel of his choice and potentially his Fifth Amendment right against self-incrimination. His argument is that if the Government is in the position to scrutinize the messages and know the sources of the funds, those facts could imply a relationship that could incriminate defendant. See United States v. Simmons, 923 F.2d 934, 949 (2d Cir. 1991) (noting that "payment of attorneys' fees by one

---

[6] The Government previously argued that defendant may have a daughter in California (although defendant denies paternity) and a sister in Mexico.

11

individual on behalf of other suspected members of a criminal enterprise 'may imply facts about a prior or present relationship' between the benefactor and his beneficiaries").

This argument is unavailing here because if defendant's wife were permitted to speak to defendant in a visitor's booth at the MCC, those communications would be subject to monitoring, recording, and translation. They are thus monitored in effectively the same way that any pre-screened message would be monitored (and in the same way that any letter from any inmate is monitored). The real issue then it seems is who is doing the monitoring.

Pursuant to § 3(d) and § 3(e) of the SAMs, the DEA, Homeland Security, or the FBI contemporaneously monitor phone calls to family, while either the same agencies, the U.S. Marshals Service, BOP, or detention facility employees contemporaneously monitor family visits. Therefore, the U.S. Attorney's Office's suggestion that the prosecution team be responsible for pre-screening messages seems like a departure from the SAMs. Given these facts, defendant may send letter messages to his wife, subject to pre-screening by the DEA, Homeland Security, FBI the U.S. Marshals Service, BOP, or detention facility employees (the "screening agencies") and/or by firewall counsel.

Moreover, those messages need not be limited solely to the retention of counsel. If defendant would like to send his wife and infant children a personal message or they would like to send those messages to him, this can happen, subject to review by the screening agencies, which is actually fully contemplated by the SAMs in § 3(g), or by firewall counsel. In addition, my understanding from the Government's *ex parte* submissions and footnote 8 in its sur-reply is that the concerns relate to telephonic and in-person communications only – this understanding is particularly supported by the Government's proffer that it has requested additional SAMs from the Attorney General "implement[ing] this prohibition on in-person or telephone visits between

the defendant and Ms. Coronel." The distinction is understandable: Statements can be made in-person or via telephone where contemporaneous monitoring may not pick up a concealed message. The same cannot be said of a letter that the aforementioned screening agencies or firewall counsel will be able to review and analyze for impropriety or risk.

**B.     Messages to Third Parties**

Defendant also sought permission to allow SAMs-cleared private attorneys and defense counsel to relay unscreened messages from defendant to third parties and to relay messages from third parties to defendant for purposes of ascertaining and securing the assets necessary to retain counsel. The Government has "agree[d] that the Court may modify the SAMs to allow defense counsel and/or private counsel, who have been pre-cleared to meet with the defendant, to send pre-screened communications to the defendant's family members for the limited purpose of communicating the defendant's desire to retain particular counsel and the logistics of obtaining funds to do so." The only differences between defendant's request and the Government's proposal is that the Government imposes a pre-screening requirement and defendant wants to send messages to third parties, whereas the Government's proposal only permits communications to family.

Because the requests for relief continued to be modified as the parties essentially negotiated via briefing, it is unclear whether the Government's proposal is actually responsive to the third-party messaging request or represents its opening bargaining position with respect to defendant's request to send messages to his wife. Notwithstanding this ambiguity, the Government's proposal seems reasonable insofar as the SAMs already preclude defendant from contacting third parties that do not include "immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement

entities," see § 3(g), and the Court has already determined that pre-screening by the screening agencies (or firewall counsel) is necessary and provided for in the SAMs.

C. **Communications to Potential Witnesses**

Defendant argues that the SAMs limitations on his non-legal contacts violate his right to present a defense and investigate his case because it prevents defense counsel from locating, interviewing, and securing witnesses necessary for his defense, witnesses that in all likelihood will be located in foreign countries and "may be skeptical of foreigners they have never met coming to speak to them." To resolve this issue, defendant argues that he should be permitted to let these potential witnesses know that it is okay for the witnesses to speak to defendant's attorneys.

Defendant's motion to modify this particular SAMs provision is denied. There is a legitimate government interest in limiting the recipients of communications by defendant. Further, the highlighted issue neglects the fact that there has been widespread reporting that identify Guzman's attorneys. And as a practical matter, if a potential witness receives a phone call from an attorney wishing to speak about defendant, it is more likely that there would be refusals to speak if it was the Government calling, not defense counsel. Finally, there is a strong argument that direct communication from defendant, given his alleged history of witness intimidation, could suppress witness cooperation, as well. Therefore, defendant's motion to permit communications with potential witnesses is denied.

D. **MCC Visits by Federal Defender Investigators**

Defendant objects to what he deems to be an arbitrary distinction in the SAMs regarding which members of the defense team may visit Guzman alone in contrast to those who may only visit him with an attorney present. Currently, the SAMs permit a Federal Defender paralegal to visit defendant without the need for counsel, but a pre-cleared, full-time Federal Defender

14

investigator may not meet with Guzman without counsel. This appears to be an arbitrary distinction. Given the limited resources of the Federal Defenders and the fact that the investigator is a full-time employee of the Federal Defenders, has been cleared by the Federal Defenders, and pre-cleared by the Government in the same ways as the Federal Defender paralegals, there is no reason to require an attorney escort.

Accordingly, the SAMs should be modified to delete this distinction and permit visits by the Federal Defenders' pre-cleared investigator without an attorney present.

### IV. Firewall Counsel

Defendant requests that the previously-designated firewall counsel take over responsibility for conducting all clearance requests made by individuals seeking to visit Guzman at the MCC. Given that the universe of potential visitors is limited to pre-cleared immediate family, of which there may be none, and pre-cleared individuals associated with Guzman's defense, it seems like the only people who will be visiting defendant are those associated with his defense team.

Consistent with this Court's holding modifying the Protective Order to require firewall counsel, sometimes the simple fact that a particular expert or professional needs to speak to defendant may reveal defense strategy. Defendant offers an apt example: If defense counsel asked a forensic accounting investigator to meet with defendant, the exercise of getting the investigator cleared would divulge to the prosecution the privileged information that they are using a forensic accounting investigator.

Although the Government agrees that it is appropriate for firewall counsel to vet expert witnesses who may need to meet with defendant, the Government's concession appears to exclude the forensic accounting investigator or any person not qualified to offer testimony under Federal Rule of Evidence 702. The Government does not explain this seemingly arbitrary

15

distinction. Instead, the Government argues that the prosecution team should continue to conduct all non-expert visitor vetting because the "prosecution team is best positioned to evaluate visitation requests, relying on information that it has gathered in the years spent investigating the defendant, his organization, and his associates."

Maybe it is. But this argument is unpersuasive given the fact that the prosecution team has designated members from the three offices overseeing this prosecution in the Eastern District of New York, Southern District of Florida, and U.S. Department of Justice Narcotic and Dangerous Drug Section, including at least one Assistant U.S. Attorney who was formerly on the prosecution team in the Eastern District. They may not be as good from a prosecution perspective as the prosecution team itself, but they are good enough considering the countervailing interest. As a result, it is a reasonable extension of firewall counsel's responsibility to handle the vetting of all visitors to the MCC. Firewall counsel is ordered to take over visitor vetting at the MCC consistent with its vetting responsibilities for foreign nationals seeking to join the defense team and non-defense-counsel individuals seeking to review Protected Material, as defined in the Protective Order.

V.      **Communications Between the Prosecutors and the MCC**

In response to defendant's argument regarding his solitary confinement, the Government stated that the visitor logs at the MCC showed that defendant had received visits from his defense team almost every day, averaging about four to five hours of legal visits a day. These visits were with counsel, paralegals, or private attorneys who were meeting with defendant regarding being possibly retained as counsel. The Government also included characterizations relayed to them by the MCC regarding what may be going on during these visits based on MCC staff observations.

Defendant's meetings with his defense team take place in windowed visitor rooms, so obviously MCC staff can readily see what is happening, but it is not obvious why the MCC is relaying this back to the prosecutors. Neither party disputes that the Government can know and has access to information regarding the frequency of visits, which is found in the MCC's sign-in log, but defendant takes issue with the MCC's reporting to the prosecutors regarding the content of legal visits. Whether defendant is having the paper read to him or the discovery material read to him, the MCC should not be keeping tabs on what occurs during his legal visits and reporting back to the U.S. Attorney's Office.

The prosecution is ordered to cease any communications with MCC staff where the MCC staff reports the content of legal visits based on staff observations. Those reports from the MCC may continue, but they have to be made to firewall counsel, not the prosecution team. Firewall counsel can determine whether further investigation and reporting to the prosecution team is necessary, and if they think it is, they can request permission from the Court to relay that information to the prosecution team.

## CONCLUSION

Defendant's motion to vacate, or in the alternative modify, the SAMs is denied in part and granted in part as follows:

a. Defendant's motion to vacate the SAMs in full is denied;

b. Defendant's motion to have Amnesty International assess the conditions at 10 South is denied;

c. The SAMs are to be modified to permit defendant to send pre-screened messages to his wife, subject to review by the screening agencies or firewall counsel, regarding retention of private counsel, payment of private counsel, and of a personal nature;

17

d. The SAMs are to be modified to permit pre-cleared defense counsel and/or private counsel to send pre-screened (by the screening agencies or firewall counsel) communications to defendant's family members for the limited purpose of communicating defendant's desire to retain particular counsel and the logistics of obtaining funds to do so;

e. Defendant's motion to permit communications with potential witnesses is denied;

f. The SAMs are to be modified to permit visits by the Federal Defenders' pre-cleared investigator without an attorney present;

g. Firewall counsel is ordered to take over visitor vetting at the MCC consistent with its vetting responsibilities as outlined in the Protective Order;

h. The prosecution team is ordered to cease any communications with MCC staff where the MCC staff describes the content of legal visits based on staff observations, and the MCC is ordered to relay such observations to firewall counsel only.

**SO ORDERED.**

                                                    U.S.D.J.

Dated: Brooklyn, New York
        May 4, 2017