**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GMP:HDM
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 2, 2017

By ECF

The Honorable Roanne L. Mann
Chief United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joaquin Archivaldo Guzman Loera
Criminal Docket No. 09-466 (BMC) (S-4)

Dear Chief Judge Mann:

The government respectfully writes in response to the defendant Joaquin Archivaldo Guzman Loera's (the "defendant") request for contact visits with his attorneys, the Federal Defenders of New York, Inc. ("defense counsel") at the Metropolitan Correctional Center ("MCC") in New York, New York. See Dkt No. 64. The defendant is currently subject to Special Administrative Measures ("SAMs"), which are restrictions on the defendant's conditions of confinement. Accordingly, the Bureau of Prisons has housed the defendant in the MCC's 10 South Unit, which houses all SAMs defendants. The MCC's 10 South Unit, however, does not allow for contact visits with attorneys.

The defendant claims that this non-contact requirement burdens his Sixth Amendment right to counsel. The defendant is incorrect. As discussed further below, it is well-settled law that non-contact visits do not "burden the defendant's Sixth Amendment rights—and to the extent that the requirement of 'non-contact meetings' imposes any burden on document-sharing between the defendant and his counsel, this requirement is 'reasonably related' to the MCC's legitimate objective of protecting institutional security." See United States v. Basciano, 763 F. Supp. 2d 303, 332 (E.D.N.Y. 2011) (citing Turner v. Safley, 482 U.S. 78, 87, 96-97 (1987)), aff'd, 634 F. App'x 832 (2d Cir. 2015). Thus, the Court should deny the defendant's request.

## I. Background

### A. The MCC Has Provided the Defendant with Reasonable Accommodations to Review Discovery with His Attorneys

In 10 South's present configuration, the defendant and his counsel are placed in a divided attorney visiting room ("attorney visiting room") to review discovery.[1] See Declaration of [redacted][2] ("[redacted] Decl.") ¶ 6. The attorney side of the attorney visiting room has an electronic discovery review system—consisting of a wall-mounted 32-inch monitor connected to a computer located on a cart with wheels next to the monitor—as well as a table and chairs for the attorneys. See id.[3] The defendant is in an individual cell, and he is able to see his counsel through a clear Plexiglas divider and able to speak and hear through a metal screen. Id. ¶ 7. Defense counsel may insert a discovery disc into the computer and display the discovery documents on the monitor. Id. That monitor is mounted on the wall in front of the defendant's cell, just a few feet from him. Id. While the defendant is seated in his cell, and counsel are seated at the table just outside his cell, both counsel and/or their staff and the defendant may easily use that monitor to simultaneously view a document or documents. Id.

---

[1] There are two other no-contact spaces also used for when the defendant is not reviewing digital discovery with defense counsel. Those no-contact spaces consist of a room divided in half by a wall. The defendant's side of one of the rooms also contains a computer.

[2] The government has made limited redactions to this letter and the accompanying declaration for security and safety reasons. See, e.g., United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995). The government has provided unredacted copies to the Court and defense counsel.

[3] The [redacted] Decl. also includes Exhibits A to C, which are photographs of various sections of the MCC as discussed herein. The government has filed these exhibits under seal and for attorneys' eyes only, after conferring with MCC counsel, as per the Court's instructions. See Tr. of May 10, 2017 Conf. at 9 (stating that the government can confer with MCC counsel and provide the photographs of the MCC "with the assurance that any photographs would be for attorneys' eyes only.") Exhibit A contains photographs of the attorney visiting room. [redacted] Decl. ¶ 10. [redacted] Exhibit B contains photographs of the exercise room on 10 South. Id. ¶ 17. Exhibit C contains photographs of the law library on 9 South. Id. ¶ 19.

The government has recommended several modifications that also will allow improvements to the defendant's ability to listen to audio recordings and view documents on the electronic discovery review system. For example, the government has recommended:

- Adding speakers to the electronic discovery review system, so that counsel and the defendant may simultaneously review audio files using that system.

- Dismounting the 32-inch monitor from the wall and placing it on a cart with wheels, so that counsel may bring the screen even closer to the inmate cell.

- Adjusting the cart to allow counsel to raise the 32-inch monitor to the defendant's eye-level, to ensure it is easily viewable for him.

- Adding a desk in the inmate cell area of the attorney visiting room to enable the inmate to rest papers and/or a discovery laptop on top of it while reviewing discovery with defense counsel.

The BOP is currently working on implementing these modifications.[4] The BOP also plans to attach a speaker near the Plexiglass divider to enable the inmate to better hear audio files played on the discovery system.

The defendant is also able to bring a laptop computer into his cell with him, along with the discovery discs. [redacted] Decl. ¶ 8. This is the same laptop that the defendant may bring into the inmate cell part of the attorney visiting room. On that laptop, the defendant may view electronic documents and listen to audio files. Id. Defense counsel is also able to provide the defendant with a four-inch stack of paper at the outset of each meeting through an MCC officer. Id. Thus, if defense counsel desires to show the defendant particular documents during a meeting, they may pre-select those documents, print them out, and provide them to the defendant through the MCC. Further, as each piece of discovery is Bates-stamped by the government prior to production, in order to review a particular document with the defendant, defense counsel need only tell the defendant the relevant Bates number. The defendant then has the option of pulling that document up electronically on his laptop or selecting it from the stack of hard copy documents that defense counsel provided to him at the outset of the meeting. Defense counsel also has the ability to highlight any portions of the paper documents that are provided to the defendant at the outset of the meeting to further facilitate the review.

---

[4] By letter dated May 24, 2017, see Dkt. No.83, the government advised the defendant of these proposed modifications and requested that the defendant inform the government as to whether these modifications were sufficient to alleviate his concerns. By letter dated May 26, 2017, see Dkt. No. 85, the defendant rejected the government's proposed modifications, claiming that they were insufficient.

B. Contact Visits in the Attorney Visiting Room Present Insurmountable Security Challenges

As outlined in the declaration by [redacted], contact visits between the defendant and his defense counsel in the attorney visiting room present a number of insurmountable security challenges. For example, there are various cords and pipes that are exposed in the attorney visiting room that are part of the structure of the room. [redacted] Decl. ¶ 11. The defendant could use some of these objects to injure himself, for the purpose of triggering a trip to the hospital, which would increase his chances of his escape, as the hospital is a less secure environment. Id. He also would be able to use the items to hurt his attorneys and/or BOP staff or to take them as hostages in an attempt to negotiate his release. Similarly, there are emergency sprinklers in the room that the defendant could smash to flood the attorney visiting room. Id. This would be dangerous for two reasons: (1) flooding the room would make the room slippery and would make it easier for the defendant to evade guards; and (2) the defendant could then use electrical wires in the room to create an electrical shock to himself or others. Id.

There are also other objects in the attorney visiting room that present problems. For instance, the furniture and other discovery-review equipment (such as the computer monitor cart), in the attorney side of the attorney visiting room are not bolted down, for the convenience of attorneys and their staff who visit their clients on 10 South. Id. ¶ 12. As a result, if the defendant sought to harm his attorneys, or to create a hostage situation, he could push any one of these objects against the door to the attorney visiting room to blockade the door. Id. The defendant also could potentially break one of his discovery CDs to create a sharp object that he could then use to assault his attorneys or BOP staff. Id. Similarly, he could use other objects that the attorneys or their staff brought into the room with them, such as pens, as deadly objects. Id. For example, in November 2000, an inmate who was held in 10 South, Mamdouh Mahmud Salim, stabbed a BOP guard in the eye with a plastic comb that Salim had sharpened into a weapon, after initially blinding the BOP guard with hot sauce that he had fashioned into a mace-like weapon. Id. ¶ 13. The BOP guard was nearly killed. Id. The stabbing was an attempt by Salim to kill the BOP guard so he could reach and harm his attorneys. Id. While Salim was incarcerated at the time on charges of participating in a terrorism conspiracy, he had never previously attempted to harm his attorneys or other MCC staff, nor did he have a history of doing so before his incarceration at the MCC. Id.

The fact that the attorney visiting room locks from the outside, rather than from the inside, does not mitigate the risks outlined above. Id. ¶ 14. In the event the defendant sought to harm himself or his attorneys or create a hostage situation, there is still a risk that critical moments could be lost in opening and entering the room. Id. For example, during the attack on Salim, the BOP guards responding to the attack on the BOP guard victim were delayed because they needed the necessary keys to enter the area where the attack occurred. Id. Moreover, it would not be feasible to place a BOP guard in the attorney visiting room to prevent these risks, of course, because it would destroy the defendant's attorney-client privilege.

To eliminate or even mitigate all of these risks, the MCC would need to entirely restructure the attorney visiting room – i.e., reconfigure the sprinklers, remove the electronic discovery review system, among other things – which would take time and tremendous expense. Id. ¶ 15.

## II. It Is Well-Settled Law that Non-Contact Visits Do Not Burden a Defendant's Constitutional Rights

Restrictive conditions of pretrial detention pass constitutional muster so long as they are administrative rather than punitive in nature. See United States v. Salerno, 481 U.S. 739, 746-51 (1987); Bell v. Wolfish, 441 U.S. 520, 535-40 (1979). In Turner, the Supreme Court set out a four-factor test to determine whether a regulation relating to confinement was reasonable. See Turner, 482 U.S. at 89-91. Specifically, courts should consider whether: (1) a valid, rational connection exists between the regulation and the purported government interest; (2) alternative means of exercising the constitutional right at issue remain available; (3) accommodation of the right asserted by the prisoner will have a significant impact on the prisoner's fellow inmates, prison staff or prison resources; and (4) there is an absence of ready alternatives to the regulation. Id. at 89-91; see also United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000).

The Turner Court further recognized that courts must afford prison administrators deference in managing detention facilities as "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Turner, 482 U.S. at 84 (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)). Similarly, the Supreme Court has held that courts should strongly consider the "professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Bell, 441 U.S. at 540 n.23, 547-48 (quoting Pell v. Procunier, 417 U.S. 817, 826 (1974)). This deference can have particular significance when the restrictions at issue have been implemented for security purposes. See, e.g., Thornburgh v. Abbott, 490 U.S. 401, 407 (1989). Indeed, the Supreme Court has found that prohibiting contact visits generally do not violate a prisoner's constitutional rights, especially when there are legitimate security concerns involved. See Block v. Rutherford, 468 U.S. 576, 576 (1984) (ruling that outright denial of contact visits to jail inmates is reasonable, nonpunitive, and "not excessive in relation to the security and other interests at stake").

In Basciano and Kassir, this Court and the Southern District of New York, respectively, addressed the same issue raised here—whether non-contact attorney visits at the MCC for a SAMs pretrial detainee violated the defendant's Sixth Amendment right to counsel. See Basciano, 763 F. Supp. 2d at 332; United States v. Kassir, No. S2 04 CR. 356 (JFK), 2008 WL 2695307, at *1 (S.D.N.Y. July 8, 2008). Both Basciano and Kassir held that the non-contact requirement was "valid," "even if it does make Defendant's access to counsel more cumbersome, because 'it is reasonably related to legitimate penological interests.'" Basciano, 763 F. Supp. 2d at 332 (quoting Turner, 482 U.S. at 89).

In Kassir, the defendant was housed in MCC's 10 South Unit and subject to SAMs. The defendant claimed that he was unable to review the voluminous discovery because the non-contact requirement prevented "counsel and Mr. Kassir from reviewing particular documents together." See Kassir, 2008 WL 2695307, at *3 (internal quotation marks and citation omitted). The Kassir court observed that the government had provided the defendant with a laptop computer and discovery discs, which the BOP allowed the defendant to keep in his cell. Id. This permitted the defendant to review discovery for several hours at a time and on his own schedule. Id. at *2. The Kassir Court also noted that defense counsel were "allowed to pass up to three inches of documents to Kassir, through an MCC officer," which was estimated to be approximately 1400 pages per visit. Id. In light of these facts and the MCC's security concerns, the Kassir court upheld the non-contact attorney visits as "reasonably related to legitimate penological objectives." Id. (quoting Turner, 482 U.S. at 87, 96-97).

In Basciano, this Court concluded that the Kassir Court's decision upholding the non-contact attorney visits was "directly on point." See Basciano, 763 F. Supp. 2d at 332. This Court recounted the similarities between Kassir and Basciano—i.e., both were SAMs pre-trial detainees held at MCC 10 South. Id. The Court then observed that the non-contact rule was motivated by security concerns arising in part from an incident in which "'a pretrial MCC detainee against whom a charge of providing material support to al-Qaeda was still pending, stabbed an MCC officer in the eye as part of a conspiracy to take hostages, including defense lawyers visiting clients in the prison.'" Id. (quoting Kassir, 2008 WL 2695307, at *3).

The Court then rejected the defendant's attempt to distinguish Basciano from Kassir by arguing, "Kassir, unlike Basciano, was accused of being a terrorist" and that the Salim incident "was an incident involving an alleged terrorist." Id. (citation omitted). The Court held that, despite the fact that the Salim incident involved an alleged terrorist, "the legitimate security concerns presented by Basciano's detention, which have been exhaustively litigated, justify the determination to house Basciano under SAMS and in 10 South, regardless of the no-contact rule." Id. This Court then upheld the non-contact requirement.

Notwithstanding this well-settled law—none of which is cited in the defendant's May 26, 2017 letter regarding contact visits—the defendant argues that the no-contact requirement violates the defendant's Sixth Amendment right to counsel. See Dkt. No. 85, at 2. In support, the defendant relies primarily on Magistrate Judge Levy's report and recommendation in Basicano v. Martinez, No. 07-CV-421 (NGG) (RML), 2007 WL 2119908 (E.D.N.Y. May 25, 2007) (unpublished).[5] In Martinez, Judge Levy granted Basciano's habeas request for contact visits with his attorneys at the MCC. See id. at *8. On appeal, the District Court, per Judge Garaufis, stated, "Basciano has been allowed contact visits with his attorneys, which thus renders this particular aspect of his habeas petition moot" and thus did not address the issue. See Basciano v. Lindsay, 530 F. Supp. 2d 435, 437 (E.D.N.Y. 2008). Subsequently,

[5] During the May 10, 2017 telephonic conference, the Court also referenced this decision. See Tr. of May 10, 2017 Conf. at 4-5.

in 2010, the government notified the Court that the MCC "no longer has the physical layout to accommodate legal visiting for SAMs inmates housed on 10 South" and accordingly, "the MCC is not able to reasonably accommodate contact legal visits for Basciano at this time." See December 7, 2010 Letter, United States v. Basciano, No. 05-CR-060, Dkt. No. 978 at 1.[6] Basciano then moved the Court to allow him contact visits with his attorneys because the lack of contact attorney visits purportedly violated his Sixth Amendment right to counsel. As discussed supra, the Court denied Basciano's motion, upholding the no-contact requirement. See Basciano, 763 F. Supp. 2d at 332. Thus, the Court's decision upholding the no-contact requirement effectively overruled Judge Levy's earlier report and recommendation.

In any event, Martinez is inapposite. In Martinez, Judge Levy relied on the government's proffer that "Basciano poses no threat to his legal team." See Martinez, 2007 WL 2119908, at *10. Here, to the contrary, the government has serious concerns about the safety of defense counsel, and the risk the defendant could use defense counsel as hostages. The government's concerns are well founded; the government has provided specific and detailed accounts of the defendant's violent history in both its public and ex parte filings. See, e.g., Dkt. Nos. 17, 28, 31 & 44. Unlike Basciano, the defendant also has a documented history of escaping maximum-security prisons. Id. In addition, Judge Levy also noted that the government did "not dispute that there are rooms in Unit 10 South that could be used for contact visits with counsel in this case." See Martinez, 2007 WL 2119908, at *10. Here, the government has made clear that there no available rooms in Unit 10 South or, as discussed below, in the MCC generally, to accommodate contact visits for the defendant. See [redacted] Decl. ¶¶ 16-20. Moreover, Judge Levy found that the setup in 2007 for Basciano substantially impaired his ability to review discovery with his attorneys. Unlike Basciano, the defendant here has his own laptop, and has a 32-inch monitor that is just a few feet from his cell, making reviewing discovery far easier than the conditions in Basciano (which the Court upheld).[7]

The defendant also cites to United States v. Savage, No. 07-550-03, 2010 WL 4236867, at *2 (E.D. Pa. October 21, 2010)—an unpublished decision outside the circuit—for the proposition that "the prosecution and BOP agreed that the Sixth Amendment required

---

[6] Prior to 2010, 10 South accommodated a limited number of contact legal visits in an area on that unit that was previously used for storage but modified to permit limited contact. See [redacted] Decl. ¶ 5. 10 South, however, was reconfigured to accommodate a large influx of SAMs inmates expected from Guantanamo Bay. Id. As a result, that storage area was converted into a divided attorney visiting room, the current "attorney visiting room," with an area for attorneys on one side, and a screened-off set of individual cells for SAMs inmates on the other side. Id.

[7] Moreover, none of the cases cited by Judge Levy in support of his decision—Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001), Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989), and Lynch v. Leis, No. C-1-00-274, 2002 U.S. Dist. LEXIS 27604, at *17 (S.D. Ohio Feb. 19, 2002)—involved SAMs pre-trial detainees or the issue of attorney contact visits.

contact visits." See Dkt. No. 85, at 2-3. The defendant misstates Savage. In that case, the parties agreed to move the defendant from the MCC SAMs facility, which the Savage court recognized "does not allow contact visits between inmates and their attorneys" to FDC in Philadelphia once a month for contact visits. Savage, 2010 WL 4236867, at *2. The Savage decision makes absolutely no mention of the prosecution or the BOP agreeing that the Sixth Amendment required such visits. It would severely strain BOP resources to move the defendant to FDC Philadelphia for contact visits, given the defendant's history of violence and escape, and the concomitant security precautions that must be taken every time the defendant is moved from the MCC.[8]

III. The Non-Contact Requirement Here Is Reasonably Related to a Legitimate Penological Interest

As discussed, based on the holdings of Basciano and Kassir, the Court should uphold the non-contact requirement as "reasonably related to a legitimate penological interest." Turner, 482 U.S. at 87. The government submits that, under Turner, (1) a valid, rational connection exists between the regulation and the purported government interest; (2) alternative means of exercising the constitutional right at issue remain available; (3) accommodation of the right asserted by the prisoner will have a significant impact on the prisoner's fellow inmates, prison staff or prison resources; and (4) there is an absence of ready alternatives to the regulation. Turner, 482 U.S. at 89-91; see also El-Hage, 213 F.3d at 81.

First, a rational connection exists between the non-contact requirement and the MCC's security concerns. As detailed in [redacted] declaration, there are serious security concerns about placing the defendant on the attorney side of the attorney visiting room. See [redacted] Decl. ¶ 12. The attorney visiting room has a table, chairs and a wheeled computer cart with a monitor. Id. ¶ 6. The defendant could easily barricade the room by placing the table or wheeled cart against the door, causing a hostage situation. The defendant could use any of the items in the attorney side of the attorney visiting room as a weapon, including breaking the discovery discs and turning them into sharp objects, breaking the monitor, or using the wires to choke someone. In addition, the defendant could cut the electrical wires. There is a water sprinkler that the defendant could break, causing the room to flood and making it slippery for correctional officers attempting to secure the room. Id. at ¶ 11. The defendant could also hurt himself in order to get to a hospital so he could more easily escape. These security concerns are real, as noted by both the Basciano and Kassir courts' citing of Salim, who stabbed an MCC guard in the eye with a comb and conspired to take his defense counsel hostage. See Kassir, 2008 WL 2695307, at *3; Basciano, 763 F. Supp. 2d at 332. The security concerns are also pertinent here where the defendant, the leader of the Sinaloa Cartel, the world's largest drug-trafficking organization, has a history of escaping maximum-security prisons on two occasions, including an elaborate scheme involving a mile-

[8] For example, for each of the defendant's court appearances, law enforcement officials have to close down the Brooklyn Bridge in order to transport the defendant from the MCC to the United States District Court in Brooklyn, New York.

long tunnel underneath the prison that was equipped with cellular phones, lights and a motorcycle. The defendant also has a long history of personally ordering murders and personally threatening to harm individuals, according to cooperating witnesses and as detailed in the government's ex parte filings to the Court. See Dkt. Nos. 31 & 44. Moreover, given that the defendant faces a mandatory minimum sentence of life imprisonment, there are significant concerns that he would resort to violence against his attorneys and BOP staff in order to effect his release.

Second, the BOP's accommodations for discovery review are reasonable and allow the defendant to review discovery adequately with defense counsel. As an initial matter, the government has provided the defendant with a laptop computer, which pretrial detainees do not usually receive. The BOP allows the defendant to keep this laptop computer in his cell and, because the defendant has copies of the discovery discs, he can view the discovery at his leisure and for hours at a time, just like the defendant in Kassir. See Kassir, 2008 WL 2695307, at *2. In addition, the attorney visiting room is fully equipped with a computer cart, with a large 32-inch monitor that defense counsel can place just a few feet from the defendant. The defendant can easily view the discovery on the monitor simultaneously with defense counsel. Defense counsel can also provide the defendant with four inches of documents[9] prior to the meeting, like the defendant in Kassir (who only was given three inches of documents). See id. at *3. The discovery is bates-stamped so defense counsel can tell the defendant which page to refer to, which the defendant can do so in paper or on his laptop. In sum, defense counsel can review discovery with defendant in numerous different ways.

Third, because the attorney visiting room raises numerous security concerns, the defendant contends that the MCC can accommodate him and defense counsel in (1) the exercise room on 10 South; (2) the law library on 9 South or (3) the attorney-client rooms for the general population on the third floor. None of these options are feasible, and if implemented, would have a "significant ripple effect" on the prisoner's fellow inmates, prison staff and prison resources. See Turner, 482 U.S. at 89-91 (internal quotation marks omitted). As an initial matter, all three options suffer from the same security concerns as the attorney visiting room—risk of a hostage situation, risk to safety of the defendant and defense counsel, and risk to safety of correctional officers. Moreover, as discussed below, each of the three options have their own distinct problems.

**The exercise room on 10 South.** This is the only exercise room for SAMs inmates. SAMS inmates receive 1 to 2 hours each weekday in the exercise room, which in addition to having exercise equipment, has a television and access to fresh air and sunlight. [redacted] Decl. ¶ 16. Allowing the defendant to use the exercise room as a meeting room for attorney-client visits would have a significant adverse impact on his fellow SAMs detainees, who would be unable to use the exercise room during these visits. Id. The exercise room is open 12 hours a day and given that there are currently five SAMs detainees, it would be

[9] This would amount to approximately 1,800 to 1,900 pages of documents.

impossible to allow the defendant sufficient time with his defense counsel in this room without infringing on the rights of the other SAMs detainees. Id.

**The law library on 9 South**. The library is in an open-air area and is visible to all the inmates in 9 South, which houses inmates in solitary confinement. [redacted] Decl. ¶ 18. Therefore, anyone walking through 9 South would be able to see and hear the defendant and his attorneys in the law library, and would therefore infringe upon attorney-client privilege. Id. Moreover, inmates in 9 South could communicate with the defendant, which would violate the SAMs' prohibition of the defendant's communication with third parties and create an added security risk by allowing the defendant to pass messages to other inmates. Id. Allowing attorney-client visits in the 9 South law library would also adversely impact the approximately 50 inmates in 9 South who use that law library, by curtailing access to the law library.

**The attorney-client rooms on the third floor**. These rooms are for the general population and serve approximately 750 inmates at the MCC. [redacted] Decl. ¶ 20. Allowing the defendant to use that area would require the BOP to restrict access to that room by every other inmate at the MCC, in effect preventing any of the other hundreds of inmates from meeting with their respective attorneys while the defendant meets with his counsel. Id. In addition, as discussed in [redacted] declaration, there are other security concerns in using the attorney-client rooms on the third floor of the MCC.[10] Id. And importantly, the entire MCC must be locked down every time BOP staff moves the defendant within the facility, which would substantially interfere with the orderly operation of the facility. Id.

Fourth, as discussed earlier, there is no ready alternative to the non-contact requirement. For example, placing correctional officers with the defendant and defense counsel to alleviate security concerns would not only be a significant resource drain, but would break attorney-client privilege.

Thus, as in Basciano and Kassir, the Court should uphold the no-contact requirement as reasonably related to a legitimate penological objective. The defendant—like Kassir and Basciano—is housed in the MCC's 10 South Unit under SAMs. See Basciano, 763 F. Supp. 2d at 332; Kassir, 2008 WL 2695307, at *1. The defendant—like Kassir—has a laptop that he keeps in his cell to review discovery. See Kassir, 2008 WL 2695307, at *2. The defendant—like Kassir and Basciano—meets with his defense counsel in a designated room that allows him to see and speak to his lawyers through a transparent screen. See Basciano, 763 F. Supp. 2d at 332; Kassir, 2008 WL 2695307, at *3. The defendant—like Kassir and Basciano—"argued that his Sixth Amendment rights were violated by being 'permitted only non-contact meetings' with his lawyers which 'prevent counsel and [the defendant] from reviewing particular documents together.'" Id. Both this Court and the Kassir Court held that "[n]one of this burdens the defendant's Sixth Amendment rights—and to the extent the

[10] The government has conferred with legal counsel [redacted] at the Metropolitan Detention Center, who has indicated that the MDC also currently cannot accommodate legal contact visits for SAMs inmates.

requirement of 'non-contact meetings' imposes any burden on document-sharing between the defendant and his counsel, this requirement is 'reasonably related' to the MCC's legitimate objective of protecting institutional security." Kassir, 2008 WL 2695307, at *3 (citing Turner, 482 U.S. at 87, 96–97); see Basciano, 763 F. Supp. 2d at 332. For the reasons discussed, the Court should do the same here.

IV. Conclusion

For the foregoing reasons, the Court should deny the defendant's request for contact visits with defense counsel. To the extent possible, the government, in conjunction with the MCC, will continue to attempt to craft solutions to ameliorate defense counsel's concerns about discovery review on 10 South.

Respectfully submitted,

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

BENJAMIN GREENBERG
ACTING UNITED STATES ATTORNEY
Southern District of Florida

cc: Michelle Gelernt, Esq. (counsel to defendant) (unredacted, by hand)
Michael Schneider, Esq. (counsel to defendant) (unredacted, by hand)
Edward Zas, Esq. (counsel to defendant) (unredacted, by hand)