GMP:HDM
F. #2009R01065

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

JOAQUIN ARCHIVALDO GUZMAN LOERA, also known as "El Chapo," "El Rapido," "Chapo Guzman," "Shorty," "El Senor," "El Jefe," "Nana," "Apa," "Papa," "Inge" and "El Viejo,"

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

DECLARATION OF [redacted]

Criminal Docket No, 09-CR-466 (S-4)(BMC)

I, [redacted], declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that to the best of my knowledge and based in part on my review of relevant records,

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP") as [redacted] in the Metropolitan Correctional Center in New York, New York ("MCC"). I have been employed by the BOP since [redacted] I have held the position of [redacted] with the BOP since [redacted], and I have been a [redacted] at the MCC since [redacted]

2. As part of my duties as [redacted] I am responsible for overseeing and resolving various issues relating to security matters at the MCC, including but not limited to [redacted], serving as resident expert on all custodial and security questions arising at the institution, and making sound decisions in emergency situations. In the course of my duties, I have gained

familiarity with the operations of the MCC, including, among other things, applicable policies and procedures concerning inmates housed under Special Administrative Measures ("SAMs") and the conditions of confinement thereof at the MCC.

3. Inmate Joaquin Archivaldo Guzman Loera, also known as "El Chapo," "El Rapido," "Chapo Guzman," "Shorty," "El Senor," "El Jefe," "Nana," "Apa," "Papa," "Inge" and "El Viejo," (the "defendant") has been in BOP custody, housed at the MCC, since January 19, 2017. Starting on his first day of incarceration at the MCC, the defendant was placed in the MCC's SAMs unit on 10 South, a non-punitive form of separation from the MCC's general population that is used when the presence of the inmate within the general population would pose a serious threat to life, property, staff or other inmates, or to the security or orderly running of the institution.

4. On February 2, 2017, the Acting Attorney General of the United States directed the BOP to implement specified SAMs to restrict the defendant's access to the mail, the media, the telephone and visitors. The BOP implemented the SAMs that same day.

5. Prior to 2010, 10 South was able to accommodate a limited number of contact legal visits in an area on that unit that was previously used for storage but modified to permit limited contact. In the beginning of 2010, however, 10 South was reconfigured to accommodate a large influx of SAMs inmates from Guantanamo Bay. As a result, the area on 10 South used for modified legal visits was converted into a divided attorney visiting room ("attorney visiting room"), with an area for attorneys on one side, and a screened-off set of individual cells for SAMs inmates on the other side.

6. In 10 South's present configuration, if the defendant's counsel seeks to visit him, MCC staff must place the defendant and his counsel in the attorney visiting room. The

attorney side of the attorney visiting room has an electronic discovery review system—consisting of a wall-mounted 32-inch monitor connected to a computer located on a cart with wheels next to the monitor—as well as a table and chairs for the attorneys. There is also a second video monitor located in the divided room, which can be used for video teleconferences; that screen is not currently configured for discovery review.

7. Inside of the attorney visiting room, the defendant sits in an individual cell, and he is able to see through a clear Plexiglas divider into the attorney side of the room and is able to speak and hear through a metal screen. Defense counsel may insert a discovery disc into the computer and display the discovery documents on the monitor, which is visible to the defendant from his cell. That monitor is mounted on the wall in front of the defendant's cell, just a few feet from him. While the defendant is seated in his cell, and counsel are seated at the table just outside his cell, both counsel and/or their staff and the defendant may easily use that screen to simultaneously view a document or documents.

8. The defendant is also able to bring a laptop computer into his cell within the attorney visiting room with him, along with the discovery discs. As presently configured, the defendant must hold the laptop on his lap. On his laptop, the defendant may view electronic documents and listen to audio files. We are looking into the possibility of building a foldout desk in his cell for him to place his laptop. Prior to beginning of the legal visit, defense counsel may provide the defendant with a four-inch stack of paper by giving it to the lieutenant on duty on 10 South. The Lieutenant will provide the documents to the defendant to enable him to review the hard copies during the course of his legal visit. The defendant may maintain these documents in his cell after the visit is over.

9. There are two other no-contact spaces also used for when the defendant is not reviewing digital discovery with defense counsel. Those no-contact spaces consist of a room divided in half by a wall. The defendant's side of one of the rooms also contains a computer.

10. The photographs attached to this declaration as Exhibit A are true and correct copies of photographs of the attorney visiting room on 10 South.

11. The MCC is not presently able to accommodate contact visits between the defendant and his defense counsel in the attorney visiting room due to a number of security issues that the BOP cannot ameliorate at this time. For example, there are various cords and pipes that are exposed in the attorney visiting room that are part of the structure of the room that the defendant could use to injure himself to trigger a trip to the hospital, which would increase his ability to escape due to the less secure nature of a hospital. Similarly, there are emergency sprinklers in the room that the defendant could smash to flood the attorney visiting room. This would be dangerous because: (1) flooding the room would make the room slippery and would make it easier for the defendant to evade corrections officers; and (2) the defendant could then use electrical wires in the room to create an electrical shock to himself or others, and thus create a possible escape risk.

12. There are also other objects in the attorney visiting room that present security risks. For instance, for the convenience of attorneys and their staff who visit their clients on 10 South, the furniture and other discovery-review equipment, such as the computer monitor cart, in the attorney side of the attorney visiting room are not bolted down or otherwise secured to the floor. As a result, if the defendant sought to harm his attorneys or legal staff, or to create a hostage situation for the purpose of negotiating release, he could push any one of these objects against the door to the attorney visiting room to blockade the

door. The defendant also could potentially break one of his discovery CDs to create a sharp object that he could then use to assault his attorneys or BOP staff. Similarly, he could use other objects that the attorneys or their staff bring into the room with them, such as pens, as deadly objects.

13. We have had a previous instance of a SAMs pretrial detainee attacking a MCC guard. In November 2000, an inmate who was held in 10 South, Mamdouh Mahmud Salim, stabbed a BOP guard in the eye with a plastic comb that Salim had sharpened into a weapon, after initially blinding the BOP guard with hot sauce that he had fashioned into a mace-like weapon. The BOP guard was nearly killed. The stabbing was an attempt by Salim to kill the BOP guard to enable him to reach and harm his attorneys. Salim had never previously attempted to harm his attorneys or other prison staff, nor did he have a history of doing so before his incarceration at the MCC.

14. The fact that the attorney visiting room locks from the outside, rather than from the inside, would not eliminate these security risks. In the event the defendant sought to harm himself or his attorneys, or create a hostage situation, there is still a risk that critical moments could be lost in opening and entering the room. For example, during the attack on Salim, the BOP guards responding to the attack on the BOP guard victim were delayed because they needed the necessary keys to enter the area where the attack occurred.

15. To eliminate or even mitigate all of these risks, the MCC would need to entirely restructure the attorney visiting room – i.e., reconfigure the sprinklers, remove the electronic discovery review system, among other things – which would take time and tremendous expense.

16. Alternatives to using the attorney visiting room, which would allow for a contact visit, are not feasible. For example, the exercise room on 10 South cannot be used for contact legal visits because this is the only exercise room for SAMs inmates. SAMS inmates receive 1 to 2 hours of time daily every weekday in the exercise room, which in addition to having exercise equipment, has a television and access to fresh air and sunlight. Inmates can only use the exercise room for 12 hours a day. Using the exercise room as a meeting room for attorney-client visits would have a significant adverse impact on the SAMs detainees, who would be unable to use the exercise room during these visits. Also, the room would have to be substantially reconfigured to allow for such visits, which would present a whole host of security risks.

17. The photographs attached to this declaration as Exhibit B are true and correct copies of photographs of the exercise room on 10 South.

18. The law library on 9 South is similarly not an option. It is in an open-air area and is visible to all the inmates in 9 South, which houses inmates in solitary confinement. Anyone walking through 9 South would be able to see and hear the defendant and his attorneys in the law library. Inmates in 9 South can communicate with the defendant and would allow him to pass messages to other inmates. Allowing attorney-client visits in the 9 South law library would also curtail access to the law library for the approximately 50 inmates in 9 South who use it.

19. The photographs attached to this declaration as Exhibit C are true and correct copies of photographs of the law library on 9 South.

20. The attorney-client rooms on the third floor also cannot be used by the defendant for attorney-client contact visits. These rooms are for the general population and

serve approximately 750 inmates at the MCC. Allowing the defendant to use that area would require the BOP to restrict access to that room by every other inmate at the MCC, in effect preventing any of the other hundreds of inmates from meeting with their respective attorneys while the defendant meets with his counsel. In addition, because of the security risks associated with this particular defendant, the facility would have to be locked down completely every time BOP staff moved the defendant to this area, which would substantially affect the functioning of the MCC.

Dated: New York, New York
June 2, 2017

[redacted]