Federal Defenders
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

June 16, 2017

The Honorable Roanne L. Mann
Chief United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: United States v. Joaquin Archivaldo Guzman Loera, 09 CR 466 (BMC)**

Your Honor:

We write in reply to the government's letter of June 2, 2017 (Dkt. No. 91) ("Gov't Ltr.") opposing Mr. Guzman's request for contact visits with his defense team. Even though the Special Administrative Measures ("SAMs") expressly permits contact visits, the government contends that the non-contact requirement does not burden Mr. Guzman's Sixth Amendment right to assist in his own defense and that contact visits present "insurmountable security challenges." Gov't Ltr. at 4.

As set forth below, the government has no legitimate basis for denying Mr. Guzman contact visits, which are essential to his ability to meaningfully review the vast volume of discovery in this case. The security concerns cited by the government are speculative and implausible, particularly since the government has presented no evidence that Mr. Guzman is personally violent or even physically capable of being a danger to MCC staff, other inmates, or his defense team. The Attorney General was aware of all of the allegations and evidence against Mr. Guzman before authorizing the SAMs and determining that contact visits were permissible. The MCC has no new basis to deny them now. The Court should thus reject the government's position and order the MCC to allow contact visits between Mr. Guzman and his attorneys.

As an initial matter, we renew our request, made at both the May 3, 2017 and May 10, 2017 conferences, for the Court to conduct an inspection of 10 South before deciding whether attorney-client contact visits can be accommodated. The photographs the government provided to the Court do not adequately capture the difficulties we experience reviewing discovery.[1]

[1] For example, the government included a photograph of the video monitor defense counsel may use to display electronic discovery to Mr. Guzman. But the government's photograph does not depict the monitor displaying an actual typewritten document. Counsel and Mr. Guzman have found it virtually impossible to read a document on the monitor at the distance from the booth to the monitor. Additionally, the government's photographs do not capture the difficulty we have had listening to audio recordings of protected material through the Plexiglas and metal dividers and

## ARGUMENT

### I. Denying contact visits impermissibly burdens Mr. Guzman's Sixth Amendment rights.

#### a. The Sixth Amendment guarantees defendants the right to participate in their own defense, including to meaningfully review discovery with their attorneys.

The Sixth Amendment guarantees a defendant in a criminal prosecution the right "to have the assistance of counsel for his defense," U.S. Const. amend. VI, and the Supreme Court has further recognized that, as a matter of due process, "inmates must have a reasonable opportunity to seek and receive the assistance of attorneys," such that "[r]egulations and practices that unjustifiably obstruct the availability of professional representation . . . are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974); *see also Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish*, 441 U.S. 520 (1979); *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990) ("[A] prisoner's right of access to the courts includes contact visitation with his counsel."). An integral aspect of a defendant's right to participate in his defense is the ability to meaningfully review discovery with counsel in preparation for trial.

In light of the voluminous documentary and audio evidence in this case and the impending trial date less than a year away—a date that defense counsel has every intention of being ready for—nothing short of contact visits is sufficient to allow Mr. Guzman to effectively review this evidence. As defense counsel has previously described to the Court, the current arrangements in the area for counsel visits at MCC's 10 South Unit make it exceedingly difficult for counsel to share and review discovery materials with Mr. Guzman.[2] *See* Dkt. Nos. 64, 85. The obstacles imposed by the non-contact setup will not be ameliorated by the minor modifications proposed by the government in its May 26 letter.[3] *See* Dkt. No. 83. Accordingly, the non-contact requirement imposed on Mr. Guzman

---

carrying on a conversation without being overheard by the MCC staff. By necessitating the recordings and conversations to be conducted at a high volume, this setup undermines privileged communication.

[2] As we have noted in our correspondence with the government, notwithstanding its proposed modifications, the counsel area is wholly inadequate to prepare for a trial of this magnitude. *See* Dkt. No. 85, Letter to Government Responding to Proposed Modifications, for the convenience of the Court attached hereto as Exhibit A.

[3] The government heralds the "BOP's accommodations for discovery review," and in particular the provision of a laptop computer that allows Mr. Guzman to "view the discovery at his leisure." Gov't Ltr. at 9. But these "accommodations" merely show that the government is meeting its basic obligation to give a defendant access to his discovery materials, and providing Mr. Guzman a laptop computer does not somehow curtail his Sixth Amendment right to consult with his defense team.

impermissibly burdens his Sixth Amendment right to participate in his defense. *See, e.g.*, *Smith v. Coughlin*, 748 F.2d 783, 789 (2d Cir. 1984) (holding that facility's "refusal to allow [defendant] to see paralegal personnel denied him effective assistance of counsel" under the Sixth Amendment); *United States v. Neff*, No. 3:11-CR-0152-L, 2013 WL 30650, at *5 (N.D. Tex. Jan. 3, 2013) (where "Defendant is a pretrial detainee . . . any restrictions placed on his ability to review discovery and assist his counsel in preparation of his defense burdens his Fifth Amendment right to access to the courts and his Sixth Amendment right to counsel.").

**b. Magistrate Judge Levy's rationale for requiring contact visits in *Basciano v. Martinez* applies with equal force here.**

The non-contact visitation policy at 10 South was already determined to "infringe[] upon [the] right to counsel" by Magistrate Judge Levy in the prosecution of Vincent Basciano for many reasons that apply with equal force here. *See Basciano v. Martinez*, No. 07-CV-421 (NGG)(RML), 2007 WL 2119908, at *8 (E.D.N.Y. May 25, 2007), *report and recommendation adopted sub nom. Basciano v. Lindsay*, 530 F. Supp. 2d 435 (E.D.N.Y. 2008). First, as here, the "SAMs themselves d[id] not proscribe contact visits with counsel." *Id.* at *7. Second, the "time lost through [the] cumbersome procedure" at 10 South for reviewing documents was "impairing [Basciano's] ability to prepare for trial." *Id.* Defense counsel has detailed the vast and unduly prolonged amount of time it has expended reviewing documents with Mr. Guzman. We will continue to expend for as long as this "lengthy and burdensome" procedure remains in effect. *Id.* Third, "the government s[aw] no possibility that Basciano intend[ed] to use his current counsel in criminal schemes of any kind." *Id.* The government likewise alleges no such possibility here. Finally, in the same way that the government did not "believe that Basciano present[ed] a danger to his attorneys," *id.*, defense counsel does not believe Mr. Guzman poses a threat to them here, despite the government's assertions to the contrary. *See infra* Part II.a.

Further, in *Basciano* the government obtained specific evidence *during Basciano's pretrial detention* that suggested he personally posed a threat to others—the kind of evidence that is conspicuously lacking here. When Magistrate Judge Levy issued his report and recommendation, Basciano had been charged in a separate indictment with additional crimes allegedly committed while he was incarcerated, such as "soliciting the murder of a federal law enforcement officer." *Id.* at *1. There was also evidence of "a troubling pattern of criminal activity conducted within the confines of federal detention facilities" by Basciano, among them a "hit list" of five individuals that he wanted murdered that included the presiding judge and lead prosecutor. *Id.* at *3, *6.

Despite finding this "evidence of Basciano's dangerousness" to be "substantial," *id.* at *6, Magistrate Judge Levy flatly rejected the government's justifications for denying contact visits. *Id.* at *7 ("[T]he most troubling single circumstance of Basciano's incarceration [is] his non-contact visitation with his attorneys."). The analysis here should be even more straightforward, since the government has presented not a scintilla of evidence that Mr. Guzman has engaged (or even could engage) in any criminal activity during his detention at MCC, or otherwise is a personal threat to anyone. The speculative, purely hypothetical fears cited by the government fall far short of justifying

the very real and severe infringement upon Mr. Guzman's Sixth Amendment rights caused by the non-contact requirement.

The government attempts to explain away Magistrate Judge Levy's report and recommendation (*Basciano I*) by characterizing it as "effectively overruled" by *United States v. Basciano*, 763 F. Supp. 2d 303, 332 (E.D.N.Y. 2011) (*Basciano II*). Gov't Ltr. at 7. This is incorrect. The court in *Basciano II* took pains to distinguish its ruling from Magistrate Judge Levy's ruling four years prior. *Basciano II* arose from a separate prosecution and a separate indictment than *Basciano I*, after Basciano had already been convicted in *Basciano I* of a racketeering conspiracy as well as substantive racketeering, including predicate acts of illegal gambling, conspiracy to distribute marijuana, solicitation to murder, conspiring to murder, and murder.[4] *Basciano II*, 763 F. Supp. 2d at 310. And, as the court explained, "[t]he fact that Basciano was previously tried and convicted in *Basciano I* is relevant to a number of the *Basciano II* motions." *Id.*

First, *Basciano II* applied a different legal standard to assess non-contact visitation than did *Basciano I*. Magistrate Judge Levy used the *Bell v. Wolfish* test because Basciano was then "challenging pretrial prison conditions," under which restrictions are impermissible if "imposed for the purpose of punishment" or "appear[] excessive in relation" to the government's proffered non-punitive purpose. *Basciano I*, 2007 WL 2119908, at *4 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979)). The non-contact requirement failed this test because it was "an exaggerated response to the government's security concerns." *Id.* at *8. In contrast, in *Basciano II*, "[b]ecause Petitioner ha[d] now been convicted of a series of crimes and sentenced to life in prison, his conditions of confinement [were] reviewed under the standard applied to prisoners serving a sentence" set forth in *Turner v. Safley*, 482 U.S. 78 (1987).[5] *Basciano II*, 763 F. Supp. 2d at 332 (citation omitted). The court upheld the non-contact requirement under this standard, which requires a prison regulation to be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

---

[4] Indeed, it was the court in *Basciano II* that introduced the "*Basciano I*" and "*Basciano II*" labels to refer to the two separate prosecutions, to emphasize that *Basciano I* was "an earlier criminal action." *Basciano II*, 763 F. Supp. 2d at 310.

[5] Magistrate Judge Levy specifically pointed out that the *Turner* test—applied by the district court in *Basciano II* and the government in its motion here—arose from "a challenge by convicted inmates . . . hence, its relationship to cases involving pretrial detainees is unclear." *Basciano I*, 2007 WL 2119908, at *8 (citation omitted); *see also Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001) ("*Turner* involved convicted prisoners" and is "therefore arguably not an appropriate guide for the pretrial detention of accused persons."). Magistrate Judge Levy nevertheless performed a *Turner* analysis in addition to the *Bell* analysis and found Basciano's non-contact visitations "unconstitutional even under the 'legitimate penological interests' test." *Id.* at *9. Accordingly, the Court here should likewise strike down the non-contact requirement imposed on Mr. Guzman, whether based on the *Bell* test appropriate to his status as a pretrial detainee, or even the more stringent *Turner* test invoked by the government.

Second, by the time the *Basciano II* decision was rendered, there was "extensive evidence that [Basciano had] violated prison communications restrictions, engaged in criminal activity from jail, and tried to interfere with his own trial." *Basciano II*, 763 F. Supp. 2d at 331. It was in the context of this evidence that the court found non-contact visitations "to be connected to valid penological purposes." *Id.*

In short, the government's contention that *Basciano II* "effectively overruled" Magistrate Judge Levy's report and recommendation in *Basciano I* elides the crucial distinctions that make any attempt to conflate the cases wholly inappropriate. *Basciano II* concerned a separate prosecution, applied a different legal standard, and was based on a larger body of evidence than *Basciano I*. It cannot be disputed that the facts and analysis in *Basciano I* are far more salient to this case. *Basciano I* ordered contact visits for a pretrial detainee, like Mr. Guzman, who was neither a danger to his attorneys nor a risk to use them in criminal schemes, in a case involving vast amounts of discovery materials. *Basciano I* so ruled even though there was evidence that the detainee was engaged in criminal activity during his incarceration. There is no such evidence for Mr. Guzman, and therefore even less of a justification for the non-contact requirement imposed on him.

In addition to *Basciano II*, the government relies heavily on *United States v. Kassir*, No. S2 04 – CR-356 (FK), 2008 WL 2695307, at *1 (S.D.N.Y. July 8, 2008). Gov't Ltr. at 5-6. However, *Kassir* is not controlling and readily distinguishable from this case. The defendant in *Kassir* was charged with material support of al-Qaeda. He apparently acknowledged receiving jihad training in Afghanistan, supporting Osama Bin Laden, and claimed he would kill a person and dispose of the body for not having a large enough jihad training operation. *Kassir*, 2008 WL 2695307, at *3. In rejecting Kassir's request for contact visits, the court specifically found that the MCC's policy was reasonable based on "its experience with other al-Qaeda-associated inmates." *Id.* The only specific incidence of violence cited by the government here and in *Kassir*, in opposition to the defense request for contact visits, concerned another al-Qaeda-associated inmate. *See* Gov't Ltr. at 4; *Kassir*, 2008 WL 2695307, at *3 (citing *United States v. Salim*, 287 F.Supp. 250, 290-301 (S.D.N.Y. 2001)). Further, at the time of the *Kassir* court's decision, the defendant had already been punished for violating the SAMs for two separate infractions, including conferring in Arabic with a convicted al-Qaeda operative who was found to have weapons in his cell.

There can be no doubt the fact that the defendant in *Kassir* was acknowledged to support a terrorist organization – known for its use of suicide missions and unpredictable acts of violence – played a crucial part in determining that the burden imposed on defendant was not unreasonable. Here, there is nothing in the government's allegations or in Mr. Guzman's history to suggest he is prone to the type of suicidal or irrational, unpredictable violence typically associated with a member of a terrorist organization such as al-Qaeda. Further, unlike the defendant in *Kassir*, the government has not accused Mr. Guzman of personally carrying out acts of physical violence. Additionally, in contrast to *Kassir*, Mr. Guzman has not been accused of any disruptive or violent behavior since his arrival in this District, nor has he been accused of any violations of BOP regulations or the SAMs. Thus, while it may have been reasonable to impose a burden on the defendant in *Kassir*, the same cannot be said as to Mr. Guzman.

There is no question that the current prohibition on contact counsel visits has and will continue to impose a substantial burden on the defense as we prepare for trial. As the government noted in the February 3, 2017 status conference, "The discovery in this case is going to be voluminous. It is voluminous. For the last two years these three offices have been working to combine their long investigations. . . . The nature of the discovery will be in the form of multiple years of wiretaps, both domestically and foreign, mostly in the Spanish language. There will be documentary discovery as well, and we anticipate that will be in the tens of thousands, which is what we have now. . . . As well as tens of thousands of intercepts as well. So it is voluminous." *See* February 3, 2017 Tr. at 13-14. Given this burden, "contact visits, especially to detainees, are an appropriate, humane remedy, within the court's constitutional exercise of its judicial power." *Miller v. Carson*, 563 F.2d 741, 749 (5th Cir. 1977).

## II. The government has no legitimate basis for denying Mr. Guzman contact visits.

### a. The "insurmountable security challenges" cited by the government are speculative, implausible, and exaggerated.

The government claims contact visits between Mr. Guzman and his attorneys present "insurmountable security challenges." Gov't Ltr. at 4. The government alleges that if contact visits were held in the visit room suggested by defense counsel,[6] Mr. Guzman could exploit these visits to facilitate an escape attempt. The government proposes a number of hypothetical dangerous scenarios which Mr. Guzman might employ to effectuate an escape involving: 1) destruction of property; 2) self-harm requiring a trip to the hospital, a less secure environment; 3) attacking his attorneys and taking them hostage; and 4) attacking BOP staff. *Id.*

Mr. Guzman poses no threat whatsoever to his legal team. The government's contrary position is completely without merit. Over the past five months, the defense team has spent literally hundreds of hours visiting Mr. Guzman at 10 South. He has always treated us with respect, and we have absolutely no concern for our personal safety.

---

[6] As the Court noted in the May 10, 2017 telephonic status conference, many of the defendants housed in 10 South will undoubtedly, like Mr. Guzman, be involved in "very complex cases" and the issue of contact visits is, and will be, a "recurring issue." *See* May 10, 2017 transcript, attached hereto as Exhibit B, at 27. To the extent the government has essentially argued that there is currently no appropriate area in 10 South to conduct attorney-client contact visits, it is incumbent upon the BOP to reconfigure a space within the facility where such visits can be safely held. The BOP's failure to do so cannot be justified on the grounds that it would be "a significant resource drain." Gov't Ltr. at 10; *see Detainees of Brooklyn House of Det. for Men v. Malcolm*, 520 F.2d 392, 399 (2d Cir. 1975) (rejecting the City's contention that prison conditions are "not so constitutionally offensive as to compel the City, given its limited jail facilities and financial resources, to build additional facilities" because "[i]nadequate resources of finances can never be an excuse for depriving detainees of their constitutional rights."). Mr. Guzman's ability to prepare for trial should not be hampered by a structural flaw of the facility.

Since his incarceration in the United States, Mr. Guzman has also not engaged in any disruptive or threatening behavior. Indeed, we have watched his interactions with MCC staff as he is escorted to and from his counsel visits, and witnessed Mr. Guzman treat the staff with the same courtesy and respect with which he treats his defense team. Mr. Guzman has conducted himself appropriately not only while in solitary confinement at 10 South but at each of his three court appearances. Additionally, Mr. Guzman behaved completely appropriately on February 3, 2017, when, directly after the status conference, the United States Marshals Service allowed defense counsel and representatives of the Mexican consulate to have a brief contact visit in the pens at the courthouse.

The two alleged escapes from custody in Mexico involved no violence at all. And while the government has spared no ink relaying acts of horrific violence alleged to have been perpetrated at the behest of Mr. Guzman, it has not alleged that Mr. Guzman himself has personally committed any acts of violence. The obvious conclusion is that the government has no evidence that any such acts occurred. This conclusion is supported by the fact that the Attorney General, after considering the full force of the government's allegations against Mr. Guzman, allowed for contact visits in the SAMs. Thus, we submit that the government's baseless and speculative allegations do not justify denying counsel contact visits. *See Lopez v. Cook*, No. 2:03-CV-1605 (KJM) (DAD), 2014 WL 1488518, at *4 (E.D. Cal. Apr. 15, 2014) (ordering prison to provide plaintiff with contact visits with counsel because detainee's "old record of discipline and conviction is not predictive of any security problems in light of his behavior in other proceedings" and "counsel are willing to assume any risk inherent in a contact visit with their client").

Further, there is no rational basis to believe that Mr. Guzman, a 60 year-old man who stands 5 feet 4 inches tall and is aptly nicknamed "Chapo" ("Shorty" in English), would be able to escape from the MCC, even in the highly unrealistic event he were able secure his release from the counsel visit room on the 10th floor of the building. Mr. Guzman would have to pass through at least 7 locked steel doors, descend a flight of stairs, and take a manned elevator—all with acquiescence of the highly trained BOP staff just to get access to the street, where he would encounter additional staff at the guard booth who would undoubtedly be armed and ready for his arrival. While the government has accused Mr. Guzman of many things, he has never been accused of being irrational.

Additionally, regarding the other imagined threats the government identifies—self-harm, attacks on BOP staff, or property destruction—contact visits present no increased likelihood that any of these events would occur. Mr. Guzman's ability to attack BOP staff exists during any interaction with the staff; it is no more or less likely during a contact visit with his defense team.[7] The government suggests that Mr. Guzman could use various objects[8] in the visit room to harm

---

[7] Tellingly, in support of its claim that contact visits pose an insurmountable threat to BOP staff, the government relies on only one specific incident of violence which occurred almost 17 years ago. Gov't Ltr. at 4.

[8] Among the items the government asserts to be a danger are the unsecured cords from the video monitors and computer on the moveable cart. Gov't Ltr. at 4. Surely the BOP could find a way to

himself in order to be taken to the hospital, a less secure environment from which he could effectuate an escape. However, the possibility of self-harm is not increased or related to attorney-client contact visits at all. As the government points out, Mr. Guzman is provided with his discovery discs and a laptop computer to view the discs in his cell. Following the government's logic, Mr. Guzman could break a discovery disc and use it to cut himself while in his cell. Perhaps most compellingly, the MCC routinely allows Mr. Guzman to shave with a disposable razor, belying the claim that there is any real concern that he would attempt to harm himself.

The government has not sufficiently demonstrated that contact visits cannot be accommodated in the counsel area proposed by defense counsel or that such visits pose any additional security risks. Additionally, the government summarily dismissed the suggestion that Mr. Guzman could be transferred to the MDC, where contact counsel visits are routinely held in the SHU, even for inmates who have been designated there for disciplinary segregation. The government did not submit an affidavit from a member of MDC staff, but merely noted in a footnote that it had "conferred" with legal counsel from the MDC who "indicated that the MDC also currently cannot accommodate legal contact visits for SAMs inmates." *See* Gov't Ltr. at 10 n.10.

**b. The cases cited by the government in defense of non-contact visits are inapposite.**

The government cites a litany of cases that purportedly support its position on contact visits, but none of those cases controls here.

According to the government, *Block v. Rutherford*, 468 U.S. 576 (1984) shows that "the Supreme Court has found that prohibiting contact visits generally do[es] not violate a prisoner's constitutional rights, especially when there are legitimate security concerns involved." Gov't Ltr. at 5. But *Block* had nothing to do with contact visits with counsel. Rather, it involved a jail policy "denying pretrial detainees contact visits with their *spouses, relatives, children, and friends*." *Block*, 468 U.S. at 578 (emphasis added). As such, the case did not concern the Sixth Amendment right to counsel at all. Moreover, the security rationale in *Block*—that "[v]isitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate"—does not apply here, where there is no allegation that counsel might attempt to aid the defendant in unlawful conduct. *See id.* at 586. Finally, the facility in *Block* was a county jail at which "the vast majority of [detainees] remain [for] at most a few days or weeks while they await trial." *Id.* at 576-77. Mr. Guzman has already been, and will continue to be, incarcerated for a much longer period.

The government cites *United States v. Salerno*, 481 U.S. 739 (1987) for the proposition that "[r]estrictive conditions of pretrial detention pass constitutional muster so long as they are administrative rather than punitive in nature." Gov't Ltr. at 5. But *Salerno* held only that pretrial

---

secure those cords, or remove the cart from the room during contact visits, allowing counsel to use the laptop computer to play electronic discovery as necessary. It is unimaginable that the BOPs inability to secure electrical cords should result in the denial of attorney-client contact visits.

detention itself is permissible under the "narrow circumstances" where "the Government musters convincing proof that the arrestee . . . presents a demonstrable danger to the community." *Salerno*, 481 U.S. at 748. Mr. Guzman is not challenging his detention, merely his inability to have contact visits with counsel, and *Salerno* says nothing about conditions of confinement.

Finally, the government asserts that courts owe deference to the judgment of corrections officials on necessary conditions of confinement based on *Procunier v. Martinez*, 416 U.S. 396 (1974) and *Thornburgh v. Abbott*, 490 U.S. 401 (1989). *See* Gov't Ltr. at 5. Critically, however, neither *Procunier* nor *Thornburgh* prohibited contact visits with attorneys. In fact, both cases affirmed the importance of maintaining access to counsel for detained defendants. *See Procunier*, 416 U.S. at 419-20 (striking down an "absolute ban on the use by attorneys of law students and legal paraprofessionals to interview inmate clients" as an "unjustifiable restriction on the right of access to the courts"); *Thornburgh*, 490 U.S. at 407 (emphasizing that prison "[a]ccess is essential to lawyers and legal assistants representing prisoner clients"). Moreover, the Second Circuit has cautioned that, while it is "the business of prison officials . . . to maintain order within their institutions[,] . . . this fact does not support a claim that every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security." *Zavaro v. Coughlin*, 970 F.2d 1148, 1154 (2d Cir. 1992) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 207 (1985)).

## III. Conclusion

For these reasons we ask the Court to order the Bureau of Prisons to permit contact visits between Mr. Guzman and his defense team, and respectfully request that the Court conduct an inspection of the counsel visit area of 10 South to determine if the area proposed by defense counsel is suitable for such visits.

Respectfully submitted,

/s/

Michelle Gelernt, Esq.
Michael K. Schneider, Esq.
Edward Zas, Esq.

cc: Clerk of the Court (BMC)(RLM) (by ECF)
AUSA Patricia Notopoulos, Esq.
AUSA Andrea Goldbarg, Esq.
AUSA Michael Robotti, Esq.
AUSA Hiral Mehta, Esq.
Mr. Joaquin Guzman