```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------x
                                          09-CR-466(BMC)
 3   UNITED STATES OF AMERICA,
                                          United States Courthouse
 4              Plaintiff,               Brooklyn, New York

 5              -against-                May 5, 2017
                                          9:30 a.m.
 6   JOAQUIN ARCHIVALDO GUZMAN
     LOERA,
 7
                Defendant.
 8   -------------------------------x
             TRANSCRIPT OF CRIMINAL CAUSE FOR CURCIO HEARING
 9             BEFORE THE HONORABLE BRIAN M. COGAN
                  UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES
     For the Government:         BRIDGET M. ROHDE, ESQ.
12                               Acting United States Attorney
                                 Eastern District of New York
13                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
14                               BY:  HIRAL D. MEHTA
                                      PATRICIA E. NOTOPOULOS
15                                    MICHAEL P. ROBOTTI
                                      GINA PARLOVECCHIO
16                               Assistant United States Attorneys

17   For the United States:      NARCOTIC AND DANGEROUS DRUG
     Department of Justice       145 N. Street N.E.
18                               Suite 300
                                 Washington, DC 20530
19                               BY:  ANDREA GOLDBARG
                                      AMANDA LISKAMM
20                                    MICHAEL LANG
                                      ANTHONY NARDOZZI
21                               Assistant United States Attorneys

22                               UNITED STATES DEPARTMENT OF JUSTICE
                                 99 NE 4th Street
23                               Miami, Florida 33132-2131
                                 BY:  LYNN KIRKPATRICK
24                               Assistant United States Attorney

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

```
 1     APPEARANCES (Continued)

 2
       For the Defendant:        FEDERAL DEFENDERS OF NEW YORK
 3                               One Pierrepont Plaza
                                 Brooklyn, NY 11201
 4                               BY:  MICHELLE A. GELERNT, ESQ.
                                      MICHAEL K. SCHNEIDER, ESQ.
 5                                    EDWARD SCOTT ZAS, ESQ.

 6
       For the Defendant:        DEBEVOISE & PLIMPTON
 7                               919 Third Avenue
                                 New York, New York 10022
 8                               BY:  MATTHEW E. FISHBEIN, ESQ.
                                      EMMANUEL FASHAKIN, JR., ESQ.
 9

10     Interpreters:            MARISTELA VERASTEGUI
                                ESTRELLITA MENDEZ PLESTED
11

12     Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, OCR
                                Phone:  718-613-2330
13                              Fax:    718-804-2712
                                Email:  LindaDan226@gmail.com
14

15

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1               (In open court.)

2               THE COURTROOM DEPUTY:  All rise.

3               THE COURT:  Good morning.  Have a seat, please.

4               THE COURTROOM DEPUTY:  United States versus Guzman,

5      Docket Number 09-CR-466.

6               Counsel, please state your appearances starting with

7      the government.

8               MS. GOLDBARG:  Good morning, Your Honor --

9               THE COURT:  Before you start, Ms. Goldbarg.

10               MS. GOLDBARG:  Yes, Your Honor.

11               THE COURT:  There's a lot of you here.

12               MS. GOLDBARG:  There is.

13               THE COURT:  So let me just have the names of those

14      who might conceivably be speaking.

15               MS. GOLDBARG:  Yes, Your Honor.

16               Today, based on the Court's instructions, Patricia

17      Notopoulos, Gina Parlovecchio and Andrea Goldbarg.

18               THE COURT:  Okay.

19               MS. GOLDBARG:  Thank you.

20               THE COURT:  Thank you.

21               MS. GELERNT:  Good morning, Your Honor, Federal

22      Defenders by Michelle Gelernt, G-E-L-E-R-N-T, and Mike

23      Schneider and Edward Zas.

24               MR. SCHNEIDER:  Good morning, Your Honor, Mathew

25      Fishbein from Debevoise & Plimpton as Curcio counsel.  I'm

4

PROCEEDINGS

1   here with my associate, Emmanuel Fashakin.

2           THE COURT:  All right.  Good morning, counsel.  Good

3   morning, Mr. Guzman.

4           I'll note for the record that Mr. Guzman is wearing

5   headphones and receiving simultaneous translation of the

6   proceedings as we go on.

7           I want to thank the attorneys for the agenda you got

8   me, that's very helpful.  As you can see from the written

9   decision I issued yesterday, I took one of the items off that

10  agenda.

11          But I do want to say that with regard to the matters

12  addressed in that decision, I think the best thing for all

13  concerned is we really should start moving this case towards

14  the earliest reasonable trial date that we can and we're going

15  to start that process today.

16          But first I think the first item of business is the

17  Curcio hearing, based on the issue that the government has

18  raised.  I will say, based on the exchanges that the parties

19  have had with me and now I think I understand the full extent

20  of the issue, I'm not sure a Curcio hearing is required.

21  We're going to do it, we're definitely going to do as a

22  belt-and-suspenders measure, but the prior representation that

23  creates the issues was so fleeting, it seems to me, and so

24  removed from these particular federal public defenders that

25  it's barely an issue.  But for the sake of good order, we will

PROCEEDINGS

1    go ahead and do that.

2              Any reason why we shouldn't start that hearing now?

3              MS. GELERNT:  No, Your Honor.

4              MS. GOLDBARG:  No, Your Honor.

5              THE COURT:  Okay.  First, let me ask a few questions

6    before I start the required dialogue with the defendant of the

7    federal public defenders.

8              Do either of you recall any conversations with your

9    colleagues about their representation of any of the witnesses

10   involved?

11             MR. SCHNEIDER:  No, Your Honor, and prior to our

12   last appearance, we were given the names of the witnesses.

13             THE COURT:  Right.

14             MR. SCHNEIDER:  From the government.  There was one

15   who had been represented for a lengthier period of time than

16   the others and we had what we would call a firewall counsel, a

17   supervisor in our southern district office, speak to that

18   lawyer regarding the representation.  So we haven't spoken to

19   anybody and we never had any personal dealing with any of the

20   defendants that the government's referring to as cooperating

21   witnesses or cooperating sources.

22             THE COURT:  Okay.  So your knowledge level is zero,

23   right?

24             MR. SCHNEIDER:  That's correct.

25             THE COURT:  Okay.  And I assume you're speaking for

PROCEEDINGS

1   Ms. Gelernt as well.

2              MR. SCHNEIDER:  Yes.

3              MS. GELERNT:  And Mr. Zas as well, Your Honor.

4              THE COURT:  Right, and Mr. Zas.  Okay.

5              In addition, do you have any access to the case

6   files involving those potential witnesses?

7              MR. SCHNEIDER:  No.  We believe they are probably

8   archived now but we have no access to them.  And if we remain

9   on the case, obviously we will have no access to them.

10             And as the Court is aware, I don't believe discovery

11  was received in any of them.

12             THE COURT:  All right.  Okay.  And then lastly, let

13  me ask:  Do either of you, I mean the three of you, feel the

14  slightest compunction that you might be restricted in

15  cross-examining any of these witnesses based on their prior

16  representation by federal public defenders?

17             MR. SCHNEIDER:  No.

18             THE COURT:  Okay.  All right.  That's a good start.

19             Now, I wanted to also ask the government, there were

20  a couple -- there was some number of these witnesses from whom

21  the government got express waivers of attorney/client

22  privilege and some for whom it didn't.  And what I'd like to

23  know is, as to those that it didn't, why not?

24             You know, you got cooperation agreements, what stops

25  the government from saying to them, especially when the prior

PROCEEDINGS

1   representation was so insubstantial, waive it or you're

2   breaching your cooperation agreement?

3            MS. NOTOPOULOS:  Your Honor, these witnesses are

4   witnesses that were sentenced already, and to say that their

5   breaching, I don't know that we can compel a witness.  In past

6   cases we have not compelled witnesses to waive the

7   attorney/client privilege, the problem is that the government

8   either have to forego calling the witness, or what has usually

9   happened is the courts have the either curtailed or prevented

10  cross-examination from the defense.

11           So there's a broad spectrum of the things it can do,

12  but we have not ever compelled a witness to waive the

13  attorney/client privilege.

14           THE COURT:  Well, what would you do if I said to you

15  you can't call the witness unless you get a waiver?

16           MS. NOTOPOULOS:  Your Honor, we may not be able to

17  call the witness.

18           THE COURT:  Okay.  In other words, you're saying you

19  don't have any leverage any more because it's post-sentencing;

20  is that right?

21           MS. NOTOPOULOS:  That is correct, Your Honor, and I

22  don't think, as a matter of policy, that we have in the past

23  compelled a witness to do that.

24           Now, one thing we can do is get a compulsion order,

25  which would alleviate the attorney/client privilege, and that

8

PROCEEDINGS

1    would normally be another way to resolve these problems.

2              THE COURT:  Right.  I mean it does seem to me that

3    these witnesses, to the extent they got as a standard

4    protection from prosecution from crimes beyond those to which

5    they pled, if you declared a breach and they had that exposure

6    all of a sudden, they might change their minds.  I don't know.

7              Do any of the defense counsel have any feeling about

8    that?

9              MR. SCHNEIDER:  I have a lot of feelings.  This

10   isn't the first time this has come up in this courthouse.  You

11   know, I represented somebody charged with terrorism and the

12   government called me and said we had a conflict because we

13   represented a witness and our representation of that witness

14   was substantial, you know, through a cooperation agreement, so

15   I got off the case.  That person never testified.  And that

16   annoyed me.

17             These people who have been sentenced and are no

18   longer under a cooperation agreement, I understand the

19   government has to bring that to the Court's attention but, you

20   know, the likelihood they are going to testify is probably

21   slight.  There are ways we can deal with it.  A CJA counsel

22   could be appointed if it became necessary, if there was some

23   sort of privileged material we were privy to, which I don't

24   think is going to happen, but there are other ways to deal

25   with it where another lawyer can perform the

9

PROCEEDINGS

1  cross-examination.

2          THE COURT:  Okay.

3          MR. SCHNEIDER:  I don't think we're ever going to

4  get that far.

5          THE COURT:  All right.  Well, I don't know if we

6  will or we won't, Mr. Schneider, but I will say that for

7  today's purposes I don't think I have to resolve it, I just

8  want the government to understand that when it comes down to

9  trial, if you still want to call these people, I may say to

10 you at that point, get a waiver.  But I don't think I need to

11 have that today for purposes of the Curcio hearing, so I'm

12 going to leave it at that for now.

13         Okay.  Let's me start the dialogue with Mr. Guzman.

14 I assume that both federal public defenders and Mr. Fishbein

15 have met with him and gone over the nature of the disclosure

16 that the government the gave as to each of these witnesses; is

17 that right?

18         MS. GELERNT:  That's correct, Your Honor.  And

19 Mr. Fishbein had the Curcio letter translated, the new more

20 detailed letter, and that was reviewed both by my office with

21 Mr. Guzman and by Mr. Fishbein as well.

22         MR. FISHBEIN:  And I can answer that, Your Honor.

23 We met for close to two hours with Mr. Guzman earlier in the

24 week and I'm convinced that he thoroughly understands the

25 issues, and to the extent that he's prepared to give a waiver,

PROCEEDINGS

1    that that is a fully informed waiver.

2                THE COURT:  Okay.  All right, let me just ask

3    Mr. Guzman to confirm what counsel just said, which is, he has

4    read, reviewed and discussed the letter describing these prior

5    witnesses with his various attorneys.

6                Is that correct, Mr. Guzman?

7                THE DEFENDANT:  Yes, sir.

8                THE COURT:  All right.  Thank you.  Give me just a

9    minute.

10               All right, Mr. Guzman, do you understand that you

11   have the right to be represented by counsel at all stages of

12   this proceeding?

13               THE DEFENDANT:  Yes, sir.

14               THE COURT:  Right.  Now, you also need to understand

15   that part of that right is the right to have counsel that has

16   no interest at hand other than yours.  That's what we call

17   "conflict free counsel."

18               Do you understand you have that right?

19               THE DEFENDANT:  Yes, sir.

20               THE COURT:  All right.  Now, as you know from having

21   had the letter translated to you, there are four witnesses who

22   the government says could create potential conflicts for your

23   attorneys.  They're potential, doesn't mean they're really

24   going to happen, but they might happen.

25               It's because those witnesses were, for various

PROCEEDINGS

1    periods, represented by other federal public defenders.  The

2    somewhat unusual part of this case, Mr. Guzman, is that you

3    can't know the names of who those four witnesses are.

4    Nevertheless, you have to make a decision as to whether you

5    want to the continue to have federal public defenders

6    represent you, or whether you want me to appoint new counsel,

7    Mr. Fishbein, who has no prior exposure to any witnesses in

8    this case at all.  You have the right to make that choice.

9            THE DEFENDANT:  I thank you, sir, and I would like

10   to continue with my current attorneys because I feel well with

11   them.

12           THE COURT:  All right.  That's fine.  I just want to

13   make sure you fully understand your rights so that I know

14   you're doing this in a knowing and voluntary way.  So let me

15   just outline the problem for you a little bit because I know

16   your attorneys have educated you on it before.

17           These four witnesses have admitted to transporting

18   cocaine or marijuana for the Sinaloa Cartel.  Some of the

19   witnesses say they met you, others say they never met you.

20   Each of the witnesses has either served or is currently

21   serving a sentence in United State's custody.  In theory,

22   because the federal public defenders, not these federal public

23   defenders, but others, had some representation of those

24   witnesses in the past.  These federal public defenders might

25   be restricted in going after those witnesses in

PROCEEDINGS

```
 1    cross-examination at trial.  That's the problem.  That's what
 2    you have to decide whether you want to the accept or you're
 3    perfectly free to say give me new counsel.
 4            Now, the way this inquiry works between you and me,
 5    is now that I've explained the problem to you, the law
 6    requires you to explain it back to me so that I know you
 7    understand what it is.
 8            So I need you to tell me in your own words what you
 9    think the potential conflict might be that you are giving up.
10            THE DEFENDANT:  Well, I would waive -- I would want
11    to continue with my attorneys because I feel fine.
12            THE COURT:  Yes.
13            MS. GELERNT:  Your Honor, is it possible for us,
14    either Mr. Fishbein or myself, to have a moment to consult
15    with Mr. Guzman?
16            THE COURT:  Either or both.
17            (Counsel conferring with the defendant.)
18            MS. GELERNT:  We're ready to continue, Your Honor.
19            THE COURT:  All right.
20            MR. FISHBEIN:  Your Honor, before we continue, one
21    thing that would be helpful to clarify for Mr. Guzman, we have
22    done it but I think it would be helpful to have it come from
23    the Court, is that in the event that the Federal Defenders
24    could not cross-examine these witnesses, he would have someone
25    available, you know, appointed by the Court or retained to be
```

PROCEEDINGS

1    brought in for the limited purpose of cross-examining other

2    witnesses.  So they will be questioned, he will have someone

3    on his behalf questioning.

4            THE COURT:  Angels on the head of a pin.

5            I think, of course, you're right, I never had to go

6    that far in one of these.  But that's fine, I'll advise him of

7    that.

8            Mr. Guzman, in the event that your attorneys were to

9    tell me at trial that they could not examine a particular

10   witness because they felt they or somebody in their office had

11   an obligation to that witness not to examine them, I would at

12   that point appoint a lawyer for you to deal with that

13   particular witness.

14           I will note that your attorneys have told me they

15   see no problem cross-examining any of the witnesses that the

16   government has identified.  But I think you should be aware

17   that in the event something like that happened, I could get

18   you another attorney for that particular witness that was

19   causing them a problem.

20           All right.  So, Mr. Guzman, I know it's a somewhat

21   cumbersome procedure we're required to use, but I need to have

22   you explain to me what you think the problem is so I know

23   you're understanding what you are waiving.

24           THE DEFENDANT:  If I understand what the conflict

25   is, it would be if these witnesses were being called, would be

PROCEEDINGS

1  called to testify against me, another attorney would question

2  them.

3          THE COURT:  Right, another attorney would question

4  them if your attorney says they could not question those

5  witnesses.

6          Do you understand that?

7          THE DEFENDANT:  I'm sorry, I did not understand.

8          THE COURT:  Okay.  Let's suppose one of these

9  witnesses takes the stand.  Your attorneys have said to me

10 they have no problem cross-examining these witnesses, but if

11 they changed their mind on that, I would then get you another

12 attorney to cross-examine those witnesses.

13         Do you understand that?

14         THE DEFENDANT:  Yes, I understand very well.  Thank

15 you.

16         THE COURT:  Okay.  And do you also understand that

17 if you wanted to avoid any issue about this at all, I would

18 appoint Mr. Fishbein to represent you right now, and I would

19 tell your federal public defenders not to represent you any

20 more, if you have any concerns.  You have that right.

21         Do you understand that?

22         THE DEFENDANT:  Thank you, but I would like to

23 continue with the attorneys I have until today.

24         THE COURT:  Okay.  All right.  Does the government

25 think I need to allocute him any further on this?

PROCEEDINGS

1          MS. NOTOPOULOS:  Your Honor, I agree with the Court

2    that the level of conflict here is fairly minor, however, I

3    would ask the Court to address not only the issue of the

4    conflict in cross-examination, but because knowledge gained by

5    other Federal Defenders is imputed to these defendants -- I'm

6    sorry, to the other attorneys representing the defendant, not

7    only by the disciplinary rules but by case law, that

8    information that might have been obtained by the witnesses by

9    Federal Defenders cannot be used to help this defendant in,

10   for example, developing a defense or finding a witness.  And

11   so I think that is another aspect that the Court should

12   address with the defendant outside of the problems that might

13   occur at trial if there's an actual conflict in

14   cross-examination.

15          THE COURT:  All right, I will try to address that,

16   too.

17          Mr. Guzman, I want you to assume that some of the

18   federal public defender attorneys who previously represented

19   these witnesses obtained some information from them that would

20   be helpful to you if your attorneys knew that information.

21   Your attorneys would not be able to use that information

22   against these witnesses without their permission.  As to two

23   of these witnesses, they've given their permission.  As to two

24   of them, they have not.

25          So do you understand that your attorneys would not

PROCEEDINGS

1    be able to help you with information, if there is any

2    information, that other federal public defenders might have?

3               THE DEFENDANT:  Yes, sir, I do understand.

4               THE COURT:  All right.  And does that in any way

5    affect your decision that you don't want to change attorneys?

6    You still want to retain your current federal public defender

7    attorneys; is that correct?

8               THE DEFENDANT:  Yes, sir, I want to continue with my

9    Federal Defenders attorneys.

10              THE COURT:  Okay.

11              MS. NOTOPOULOS:  We need a moment, Your Honor.

12              THE COURT:  Sure.

13              MS. NOTOPOULOS:  Your Honor, I appreciate, the

14   government is just concerned about the sufficiency of the

15   defendant's articulation of the understanding of the conflict,

16   and I would ask the Judge to elicit an answer particularly to

17   the last issue that the Court just raised with the defendant.

18              THE COURT:  Okay.

19              Mr. Guzman, I've just explained to you how if your

20   attorneys came into possession of information about these

21   witnesses from the other attorneys who represented them, they

22   couldn't use that information.  I need you again to explain

23   that back to me so that I know you understand it.

24              MS. GELERNT:  And, Judge, if we could just have a

25   minute so we can help him form an answer.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

17

PROCEEDINGS

1          THE COURT:  Yes.

2          (Counsel confers with the defendant.)

3          THE DEFENDANT:  I understand that my attorneys will

4    not be able to use any private situation about these

5    witnesses.

6          THE COURT:  I think this is more of a translation

7    problem than anything else.  I believe he understands.

8          MS. NOTOPOULOS:  I agree, Your Honor, we understand

9    the intent of his words.

10          THE COURT:  Okay.  I mean I will also say I

11    understand the requirements of Curcio, but I think appellate

12    judges look at what happens in the district court and

13    established this need for this dialogue that we've had, you

14    know, district judges allocute defendants under Rule 11 all

15    the time, and we look the defendant in the eye and we make a

16    judgment as to whether they understand what we're talking

17    about and that's really a superior check in my view to the

18    rather cumbersome dialogue that we're required to have in

19    this, but it is neither here nor there.  I do believe the

20    defendant has allocated sufficiently in accordance with the

21    requirements of the Curcio case.

22          All right, let me just ask him a couple more

23    questions again just to complete it.

24          Mr. Guzman, have you had all the time you need to

25    consider this issue as to who your counsel should be?

PROCEEDINGS

1          THE DEFENDANT:  Yes, sir, I am making my own

2     decisions.

3          THE COURT:  Okay.  And are you fully satisfied with

4     the representation they have given you thus far?

5          THE DEFENDANT:  Yes, sir, completely satisfied.

6          THE COURT:  All right.  And do you understand that

7     you're not going to be able to change your mind about this

8     later; that is, if you go to trial and you're convicted,

9     you're not going to be able to complain that you had attorneys

10    who had a conflict of interest?

11         Do you understand that?

12         THE DEFENDANT:  Yes, sir, I'm very well aware of

13    this.

14         THE COURT:  All right, anything further before I

15    make findings?

16         MS. NOTOPOULOS:  No, Your Honor, thank you.

17         THE COURT:  Okay.

18         Based on what I've heard today, I accept

19    Mr. Guzman's waiver of the potential conflict.  I find that he

20    knowingly and voluntarily waived it.  He's had two sets of

21    attorneys explain it to him.  He's also had me explain it to

22    him.  He was able to intelligently summarize the conflicts to

23    the Court, as well as I think any lay witness could and, it's

24    clear that he has been thoroughly informed of the potential

25    conflicts and understands the issues that they could present.

PROCEEDINGS

1          Also, as I said at the beginning, because of the

2     very minor nature of the potential conflict, not only is it

3     waivable, but I think it's waivable fairly easily.  So I

4     accept the waiver of potential conflict under Curcio, and

5     Mr. Schneider and Ms. Gelernt will remain as counsel to the

6     defendant.  And I do want to specifically thank Mr. Fishbein

7     for his input and his advice on this.

8          All right, the next thing I want to turn to on the

9     agenda is the proposed motion to dismiss concerning

10    extradition that defense counsel wants to make.  I have some

11    questions about this.  I understand you want discovery that

12    the government isn't willing to give you before you make the

13    motion, but I don't understand why you haven't made the motion

14    for discovery.

15          MS. GELERNT:  Your Honor, we have in some senses

16    made the motion for discovery.  We filed, I believe in

17    addition to the oral request since the January 20th hearing we

18    filed, three letters with the government.  I believe it was

19    January 26th, January 31st, and most recently on April 21st we

20    filed letters requesting the discovery and renewing our

21    previously requests, so that's four times now we've requested

22    discovery.

23          THE COURT:  Okay.

24          MS. GELERNT:  And then in our motion, letter motion

25    on April 21st, we again requested the discovery.

PROCEEDINGS

1          If the Court's position is that we should request

2    this discovery more formally in terms of a motion to compel

3    discovery, we can do that.  We had originally thought that

4    based on the government's position on April 28th, we would ask

5    you for some time to respond in the form of a reply, but

6    perhaps what would be more proper in the circumstance would be

7    to not file it as a reply but do it as a motion to compel

8    discovery.  The government will have an opportunity to answer

9    and then the Court can render a decision.

10          I think if we schedule it that way, then we can let

11   you know -- then we could also either today schedule out the

12   motion schedule for the rule of specialty, motion to dismiss

13   based on when we anticipate a decision on this discovery

14   motion.  So that might be the best way to proceed.

15          THE COURT:  Okay, I leave it entirely up to you.

16   I'm happy to deem the prior oral and written references as the

17   motion to compel discovery, if you want to rest on that, and

18   then, of course, I'll give you reply because I've had a pretty

19   full statement of the government's opposition to that.  But if

20   you want to file a formal motion that's fine, too.  So it's

21   entirely up to you.

22          MS. GELERNT:  I mean, can I have a moment to consult

23   with my colleagues?

24          THE COURT:  Sure.  Sure.

25          (Pause.)

PROCEEDINGS

1          MS. GELERNT:  Your Honor, if the Court is prepared

2    to deem the prior filings as a motion to compel, then we will

3    just file a reply, that way it may us some time since the

4    Court indicated the desire to move the case forward.

5          THE COURT:  Okay.  When would you like to do that?

6          MS. GELERNT:  I was going to suggest, if possible,

7    May 19th, which I believe is a Friday, for our reply.

8          THE COURT:  Okay.  That's fine.

9          MS. GOLDBARG:  Your Honor, if the defense lawyers

10   were to raise new issues in their reply brief that weren't

11   raised in the original motion, the government would ask for

12   permission to be able to reply to those new arguments.

13         THE COURT:  Let's say you're reserving your right.

14         MS. GOLDBARG:  Yes, sir.

15         THE COURT:  Let's wait and see what's in the rely,

16   and if you still feel that need, I will note that you

17   mentioned it now and we'll deal with it then.

18         MS. GOLDBARG:  Thank you, Your Honor.

19         THE COURT:  Okay.  Now, let's say it ends on the

20   19th and the reply is the last paper, I think I could get a

21   decision out within a week, which would be the 26th, and then

22   the question becomes when to file the motion to dismiss.  But

23   that to me, it seems, is going to be somewhat dependent on

24   whether and how much discovery I get to you, I allow you and

25   the time it takes the government to produce it, although it

PROCEEDINGS

1  shouldn't take much time, based on what you've asked for, if I

2  do order it.

3        MS. GELERNT:  I think then it's fine, Your Honor.

4  When we get the decision the parties can speak amongst

5  themselves and present the Court with a schedule that we

6  believe is reasonable based on the Court's order.

7        THE COURT:  Okay.  The only thing I would ask is you

8  keep it reasonably short, do the best you can; you know, no

9  one has to give up family weddings or anything, but make it

10 reasonably short.

11       MS. GELERNT:  Certainly, Your Honor.

12       THE COURT:  Okay.  So I won't set a fixed schedule

13 on the motion to dismiss now, I'll wait to hear from the

14 parties some time shortly after I render the decision which

15 will be by May 26th.  Okay.

16       The next thing I think we have to deal with is I'd

17 like to set a trial schedule, like a trial date so we lock it

18 in -- yes, there's a problem.

19       MS. GELERNT:  There's no problem with that, Your

20 Honor, but just before we move on from the discovery issues,

21 one of the items on the agenda was the defense team's need for

22 contact with Mr. Guzman.

23       THE COURT:  Right.

24       MS. GELERNT:  We have made a proposal that we think

25 is reasonable and easy to achieve and is secure.  There are

PROCEEDINGS

1      two types of counsel booths, I know we described this to you

2      in the SAMs litigation.  We're always locked in to the counsel

3      room.  So there's a larger counsel room where we get locked

4      in, and that booth in particular they have now given

5      Mr. Guzman some sort of bar stool.  He sits behind a glass

6      that has even more metal sort of blocking it, and where the

7      speaker holes are on that booth it's very difficult to hear.

8              I don't think it's reasonable, especially if we're

9      looking forward to as early a trial date as possible, that we

10     can review voluminous discovery.  As of this morning, the

11     government indicated they were providing us with or we've

12     acknowledged receipt of what they claim to be close to 1500

13     recordings.

14             It's simply not feasible that we're going to be able

15     to review this type of evidence with Mr. Guzman on one side of

16     a plexiglass wall either playing a speaker to us or us playing

17     a speaker to him.  What we proposed is perfectly securely and

18     really Mr. Guzman's right to have contact visits, which isn't

19     precluded by the SAMs, it specifically allowed by the SAMs

20     shouldn't be precluded by the MCC not being equipped to honor

21     his right to a contact visit.  We personally feel that there

22     is a secure way to do this.  And I know Your Honor in the SAMs

23     portion rejected the right for outside overseer to view the

24     situation, but the government had suggested as well that the

25     Court could also view the area.  So if the Court was not

PROCEEDINGS

1  prepared to accept our representation about the way this can

2  be facilitated, we can suggest that either Your Honor, or in

3  your decision you also mention the possibility of an assigned

4  magistrate dealing with some of these types of issues could

5  actually review what we're proposing.  But I just don't think

6  months of preparation with our client can take place separated

7  by a plexiglass wall listening to hours and hours of

8  recordings.

9       THE COURT:  You know, my difficulty is that I

10  really, as I indicated in the decision yesterday, I don't want

11  to get in a position of micromanaging everything.  And the

12  concern you're raising, while I recognize it makes it harder,

13  I don't think even you contend that it rises to a

14  Sixth Amendment violation level; do you?

15       MS. GELERNT:  Your Honor, I think it does, and I

16  would point to the Savage case where the MCC had went beyond

17  what we're asking for, and that was a defendant who had

18  actually -- I believe the accusation was that he had had

19  somebody killed while he was in custody in the United States

20  and was actually physically transported down to Philadelphia

21  to have contact visits with his attorneys.  We're not asking

22  for that.  We're saying just lock us on the same side of

23  counsel booth that you already have prepared.

24       So we do think it rises to that and what we don't

25  want to happen is constantly coming back and not being able to

25

PROCEEDINGS

1    make progress.  We'd like to clear up all of these issues so

2    that we can actually prepare in earnest.  But I do think it

3    will rise to that, it's just not tenable to sit there and try

4    and hear and actually work in a matter of this importance.

5    He's faces a mandatory minimum of life without parole.

6            So much, much wider accommodations have been met,

7    and I don't think this is something that should be dismissed

8    out of hand without seeing if there's some way that it can

9    really be accommodated.

10           THE COURT:  Let me just ask you this:  How does it

11   work when you want to review say a particular document with

12   him?  Does he have his copy and you have your copy?  Do you

13   have one and press it up against the glass?  How does it work?

14           MS. GELERNT:  I would say that we try and use every

15   way possible.  You know, in one of the rooms they have now

16   moved in a longer table, which is somewhat easier, but we

17   still to -- if we're showing him documents, we have to hold

18   them one up on a time while he's reading them, instead of

19   spread documents out on table and look at them.

20           It's also very difficult for us, because often the

21   lawyers will be reading English versions of the same document

22   trying to match up what it is that Mr. Guzman may be looking

23   at, and it's just really not feasible.  I don't think under

24   any other circumstances we can imagine that this is how we

25   would prepare for a case of this magnitude, sort of the

PROCEEDINGS

1   government at some point indicated that there's going to be

2   10,000 documents.  Are we supposed to sit there and hold up

3   10,000 pages for hours at a time?

4        It's just going to end up with the exact type of

5   problem the Court doesn't want, which is us coming back here

6   on a weekly basis or to the magistrate or litigating with the

7   BOP why this is a decision endlessly.  I think it will hinder

8   his right to prepare for trial and it will also hinder our

9   ability to actually meet whatever schedule the Court sets.

10        THE COURT:  All right, let me hear from the

11   government.

12        MS. GOLDBARG:  Thank you, Your Honor.  The case that

13   defense counsel cites is correct.  There is no facility or

14   space within the current shoe to allow contact visits, which

15   is why in that case to accommodate the request, the defendant

16   was sent to another state.

17        I don't believe, given the security concerns of

18   bringing the defendant here, that that would be feasible.  The

19   area that they're talking about, the space that they want to

20   neat is not a secure space, so that's why the facility cannot

21   do it.

22        The government, working with the MCC, has tried to

23   make sure that the defendant has access.  We provided him with

24   a laptop.  We provided him with electronic copies of the

25   discovery that defense counsel has as well, therefore, there's

PROCEEDINGS

1  able for a simultaneous viewing of the report.  The space that

2  they've talked about, they've discussed ways to improve the

3  sound so that the defendant -- both parties can hear the

4  recordings.

5        We understand that it would be more comfortable to

6  be in the same space, the MCC is saying that they simply

7  cannot, they don't have the ability or facility to accommodate

8  that, and we are working with them.

9        THE COURT:  Let me ask you this:  Is it really

10 feasible for them to hold up documents to the plexiglass when

11 you have so many documents, and I think Ms. Gelernt at least

12 speaks Spanish, but still, there's going to be a lot of

13 translation involved.  How are we going to get the case ready

14 for trial if they have to do that with every document?

15       MS. GOLDBARG:  That's why we provided the defendant

16 with a laptop and his own copy of the discovery so they can

17 simultaneously look at the same documents.  So it doesn't have

18 to be through the plexiglass, but he has a laptop that he can

19 look at the documents.  So we're working with ways to try to

20 facilitate his access to discovery.

21       The defendant gets to keep the laptop in the cell,

22 except when it needs to be charged, and he gets to keep the

23 discovery that we provided.  So we believe that that gives him

24 the ability, and if they're sitting next to each other and

25 they both have the same document up, they're looking as it

PROCEEDINGS

1    simultaneously.

2           THE COURT:  I thought the laptop was just because

3    he's got a right to his own copy of the documents, it doesn't

4    really address the question.  We have some conference call

5    providers that will let you do conference calls by video and

6    you can simultaneously see people what discussing on the

7    screen.  They don't have that, do they, they have to each

8    manually pull up a document?

9           MS. GELERNT:  No, we don't have any conference

10   system.  The problem is that we have to be able to communicate

11   with each other.  So, yes, he has a copy.  And so he can say,

12   we were sitting at the office and we thought this was

13   important.  Now see if you can find that.  But we can't

14   actually go over to him and say, I think it's here, open up

15   this file.

16          And I think the point, instead of looking at is

17   there ways in which we can accommodate and bend over backwards

18   to accommodate this, they -- I don't know what the facility is

19   like at MCC, whether there is some other way we can do this,

20   it's been a while since I was in the MCC shoe.

21          But there's also, on the ninth floor, a sort of cage

22   area where other inmates view discovery.  We could be there

23   and the MCC could make sure the floor was cleared and no other

24   inmates were on the floor.

25          THE COURT:  I understand.

PROCEEDINGS

1             MS. GELERNT:  There's other ways, and it shouldn't

2    be that they decide that this is where they're going to house

3    Mr. Guzman and that any problems there are in terms of our

4    preparation they say, well, we don't have a facility that

5    allows for contact visits.

6             THE COURT:  Look, I'm not unsympathetic to the

7    government's position in that the mere movement of him out of

8    the shoe into some other area where other prisoners are

9    allowed to go to meet with their counsel over discovery raises

10   the security issues that we've been talking about.  On the

11   other hand, it seems to me very cumbersome, very cumbersome,

12   may not be possible, even, to prepare a case this way.

13            MS. GOLDBARG:  Your Honor, I don't mean to

14   interrupt, but I do believe the facility has a screen where

15   both parties are able to look at the same document.  And so

16   since a lot of exhibits are particularities, we would ask

17   perhaps to have the MCC legal counsel have the ability --

18            THE COURT:  Well, I'm thinking I don't want to rule

19   on this by the picture that I might see in my head over it.  I

20   think what I want to do is refer it to a magistrate judge to

21   actually go over there and look at the facility and give me a

22   report and recommendation as to what, if anything, should be

23   done.  So I'm going to do that, hopefully we can get that done

24   promptly.

25            MS. GELERNT:  Thank you, Your Honor.

PROCEEDINGS

1          THE COURT:  All right.

2          MS. GELERNT:  And then another issue that came up

3   since that we were thinking about in terms of the firewall

4   counsel, and we understand Your Honor's order, there was some

5   language suggested that it might be appropriate to have other

6   agencies do the screening rather than limiting it just to the

7   firewall counsel in terms of visitation or preclearing

8   messages.  And I think we would run into the same problems if

9   it was DEA or FBI who would also need firewall agents.  So we

10  would just that ask in terms of Your Honor's order regarding

11  that it be limited to the firewall counsel that's been

12  designated.

13         THE COURT:  No, I don't want to do that.  I think

14  what I had in mind was firewall counsel and/or the usual

15  agencies that would have screening access to any prisoner's

16  communications.  And I don't see why we would change that

17  here.

18         MS. GELERNT:  I think the only reason we would

19  change it, and correct me if I'm wrong, is I believe the Court

20  included in those other agencies DEA and FBI.  So people who

21  are part of the investigation from DEA or FBI should also not

22  be receiving the information, if they are actively part of the

23  prosecution.  It's a simple point and that's all we wanted to

24  address.

25         THE COURT:  Okay, my inclination is to reject that.

PROCEEDINGS

1    What you're suggesting is almost build more firewalls within

2    the agencies.  I'm certainly not going to do that.  And it

3    seems to me if we didn't have this conversation at all the DEA

4    and the FBI would have monitoring rights as they have --

5    monitoring abilities as they have over any prisoner.  Why is

6    this different?

7            MS. GELERNT:  I'm just saying since the Court

8    recognized that the prosecution team itself, the assigned

9    prosecutors, should not have access to the information, it

10   shouldn't be that, for example, the members of the DEA agents

11   who are integral to the team would then obtain the

12   information.

13           THE COURT:  I see the logic in what you're saying,

14   but I also don't see the basis for differentiating this from

15   any other case.  That's my problem.

16           Now, you know, the fact is that any defendant's

17   ability to covertly or privately communicate is compromised by

18   virtue of being a defendant because the FBI and the DEA can

19   hear their communications, so you're really asking for a

20   special protection, right?

21           MS. GELERNT:  Well, it's only special in terms of

22   the fact that generally while it's true for all recorded

23   conversations, the DEA and FBI perhaps by obtaining the

24   evidence from the BOP can monitor, they can't monitor or don't

25   monitor in-person conversations at visits which does not

PROCEEDINGS

1    happen.

2          So I think it's a very simple request, since his

3    only ability to communicate with anybody is in a screened

4    fashion, that simply not be members of the DEA or FBI who are

5    in charge off or working prosecutors who have investigating

6    the case.  I think it would also then just make it impossible

7    that what the Court desired is that the information not be

8    passed to the prosecutors, that couldn't be achieved if their

9    same agents were gathering the information.

10          THE COURT:  All right, but let me ask the

11   government.  Is my assumption correct that the screening

12   agencies who would screen in the ordinary course are the same

13   ones who are involved in this investigation?

14          MS. GOLDBARG:  Yes, sir, and that would include also

15   HSI.

16          THE COURT:  All right, I will think about your

17   request.

18          MS. GELERNT:  Thank you very much.

19          THE COURT:  Okay.  Are we ready for a trial date

20   now?

21          MS. GELERNT:  I believe so, Your Honor.

22          THE COURT:  I'm thinking about next February.  Is

23   that realistic, unrealistic?  Mr. Schneider is shaking his

24   head with a smile.

25          MS. GELERNT:  I think we have no idea when discovery

PROCEEDINGS

1   will be complete.  Perhaps the government should let us know

2   that first and we then we can work from there.

3            MS. GOLDBARG:  Your Honor, February may be early due

4   to the volume of discovery.  We are working and we are

5   providing discovery as we review it pursuant to the protective

6   order.  Once discovery is complete, we anticipate there will

7   be additional information so February may be kind of

8   optimistic.

9            THE COURT:  Do you have a prediction?  I assume

10  because I think I've heard this before that there's going to

11  be CIPA proceedings here, right?  When are those going to

12  happen?

13           MS. GOLDBARG:  We believe that hopefully by the next

14  status conference we will be able to inform the Court if we're

15  ready to have the first status conference on that issue.

16           THE COURT:  Okay, let me do this.  Let's set a trial

17  date of April 16th.  I recognize it is somewhat aspirational,

18  but the parties should understand I'm going to start pushing

19  them harder and harder to get through discovery and set up any

20  motion schedule ahead of that so let's give it the old college

21  try and try to make this date.  If that has to slip, it'll

22  slip, but I want to have it on the calendar so no one gets

23  their calendar filled up with something else.

24           MR. SCHNEIDER:  That's 2018?

25           THE COURT:  Yes.

PROCEEDINGS

1          MR. SCHNEIDER:  And how long does the government

2   think this trial is going to last, because I'm going to

3   have -- we're going to have to clear a lot of time I assume.

4          MS. GOLDBARG:  It is a little bit early to determine

5   that but we would say possibly between two and three months.

6          THE COURT:  That's what I was thinking.

7          MR. SCHNEIDER:  Okay.

8          THE COURT:  That's fine.  Let's set another status

9   conference 90 days out.

10          THE COURTROOM DEPUTY:  August 15th at 10 a.m.

11          THE COURT:  August 15th, 10 a.m., does that work for

12   everybody?

13          MS. GELERNT:  Yes.

14          MS. GOLDBARG:  Yes, Your Honor.

15          THE COURT:  Okay, I will exclude time until then

16   based on the previous designation of the case as complex and

17   the ongoing discovery.  I find the interest of justice

18   outweigh the interest of the public and the defendant as to

19   speedy trial because of those concerns.  Anything further?

20          MS. GOLDBARG:  Not from the government, Your Honor.

21          THE COURT:  Anything else, Ms. Gelernt?

22          MS. GELERNT:  No, Your Honor.  Thank you, Your

23   Honor.

24          THE COURT:  Thank you.  We're adjourned.

25          (Whereupon, the matter was concluded.)

I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.
/s/ Linda D. Danelczyk          May 8, 2017