**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GMP:HDM
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 23, 2017

By ECF

The Honorable Roanne L. Mann
Chief United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joaquin Archivaldo Guzman Loera
Criminal Docket No. 09-466 (BMC) (S-4)

Dear Chief Judge Mann:

The government respectfully writes in reply to the defendant Joaquin Archivaldo Guzman Loera's (the "defendant") June 16, 2017 letter in support of his request for contact visits with his attorneys, the Federal Defenders of New York, Inc. ("defense counsel") at the Metropolitan Correctional Center ("MCC") in New York, New York. See Dkt No. 95 ("Def. Br."). The defendant claims that this Court should reject the decisions in United States v. Basciano, 763 F. Supp. 2d 303, 332 (E.D.N.Y. 2011) ("Basciano II") and United States v. Kassir, No. S2 04 CR-356 (FK), 2008 WL 2695307, at *1 (S.D.N.Y. July 8, 2008) holding that the MCC's no-contact requirement for inmates subject to Special Administrative Measures ("SAMs")—like the defendant—do not "burden the defendant's Sixth Amendment rights." See id. The defendant argues that the Court should instead adopt the report and recommendation in Basciano v. Martinez, No. 07-CV-421 (NGG) (RML), 2007 WL 2119908, at *8 (E.D.N.Y. May 25, 2007) ("Basciano I") holding that the MCC should provide Basciano contact visits with his attorneys. For the reasons discussed below and in the government's opening brief, see Dkt. No. 91, the Court should deny the defendant's request.

## I. This Court Should Follow *Basciano II* and *Kassir* in this Case

The defendant claims that this Court should reject Basciano II and Kassir and follow Basciano I. In support, the defendant argues: (1) Basciano II incorrectly applied the Turner v. Safley test, which purportedly does not apply to pretrial detainees; and (2) Kassir involved a terrorist, whereas here, the defendant is an alleged narcotics trafficker, money launderer and murderer. None of defendant's arguments has merit.

First, the defendant claims that because he is a pretrial detainee, the Court should not apply Turner but instead apply the test in Bell v. Wolfish, 441 U.S. 520 (1979). Def. Br. at 4. Specifically, the defendant contends that this Court should adopt the report and recommendation in Basciano I because it involved a pretrial detainee and applied the Bell test. Id. By contrast, the defendant argues that Basciano II applied Turner because by that time, Basciano was a convicted defendant. Id. The defendant even claims erroneously that Basciano II distinguished its decision from Basciano I based on the purported "different legal standard" in Turner versus Bell. Id. Therefore, according to the defendant, because Basciano I applied the "correct" test for pretrial detainees—the Bell test—this Court should follow Basciano I and reject Basciano II. The defendant is incorrect.

Contrary to the defendant's contention, courts—including this Court in this case—routinely apply the Turner test in assessing prison conditions for pretrial detainees. See United States v. Guzman Loera, No. 09-CR-466 (BMC), Dkt. No. 71, at 4 ("May 4 Order") (applying Turner in upholding the SAMs) ("The applicable framework for evaluating an infringement on the constitutional rights of prisoners is the four-factor test outlined in Turner v. Safley, 482 U.S. 78 (1987)");[1] see also, e.g., Turkmen v. Hasty, 789 F.3d 218, 260 (2d Cir. 2015) (applying Turner test to pretrial detainees at the Metropolitan Detention Center ("MDC") in Brooklyn, New York because detainees "should be treated in accordance with the standard governing prisons"), rev'd in part on other grounds, Ziglar v. Abassi, --U.S.--, 2017 WL 2621317 (June 19, 2017); Iqbal v. Hasty, 490 F.3d 143, 172 (2d Cir. 2007) ) (applying the Turner test to pretrial detainees at the MDC because confinement environment was more like prison than jail), rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662 (2009); United States v. El-Hage, 213 F.3d 74, 79, 81 (2d Cir. 2000) (applying Turner in upholding prison conditions for SAMs pretrial detainee); Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir. 1992) (applying Turner test to pretrial detainee's constitutional challenge to body cavity searches); United States v. Mohamed, 103 F. Supp. 3d 281, 287 (E.D.N.Y. 2015) (applying Turner to SAMs pretrial detainee and upholding the SAMs under that application); Kassir, 2008 WL 2695307, at *1 (applying Turner and upholding no-contact attorney visits for SAMs pretrial detainee).

Indeed, the defendant's Turner/Bell distinction is a red herring. In Bell, the Supreme Court stated that in assessing the due process concerns of pretrial detention conditions, courts should consider whether those conditions are punitive in nature. See 441 U.S. at 535. The Supreme Court made clear that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these [institutional] considerations, courts should ordinarily defer to their expert judgment in such matters." See id. at 548 (internal quotation marks omitted). Several years after the Supreme Court decided Bell, it issued its opinion in Turner, 482 U.S. at 89-91. In Turner, the Supreme Court set out

[1] The Court's decision applying Turner in upholding the SAMs is the law of the case—"when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815–16 (1988) (citation omitted).

a four-factor test to determine whether a regulation relating to confinement was reasonable. See id. The crux of the test was whether the condition was reasonably related to a legitimate penological interest, such as security, safety or national security. See id. As discussed supra, numerous courts, including the Second Circuit most recently in Turkmen, 789 F.3d at 260 (2015), have applied Turner to prison conditions involving pretrial detainees.[2]

The Second Circuit's decision in El-Hage is instructive in resolving the Turner/ Bell issue. In that case, the defendant, a pretrial detainee, claimed—like the defendant here—that his conditions of confinement violated his constitutional rights "because they restrict his ability to prepare his own defense." El-Hage, 213 F.3d at 81. In rejecting this claim, the Second Circuit first noted that under Bell, pretrial detention must be administrative and not punitive. See id. at 79. The Second Circuit then applied the four-factor Turner test in assessing the defendant's claims. See id. In applying the Turner test, the Second Circuit made clear that where "the regulation at issue imposes pretrial, rather than post-conviction, restrictions on liberty, the 'legitimate penological interests' served must go beyond the traditional objectives of rehabilitation or punishment." See id. at 81 (citation omitted). Thus, the pertinent distinction between pretrial and convicted detainees is whether the restriction is punitive or rehabilitative in nature. In other words, the Turner test applies in both instances; but in post-conviction cases, courts may consider punitive and rehabilitative justifications for the conditions of confinement under Turner, whereas in the pretrial context, courts may not. See id. Thus, in El Hage, the Second Circuit, citing both Turner and Bell, upheld the restrictive prison conditions for the pre-trial detainee in that case as reasonably related to the legitimate penological interest of national security, which the court found not punitive or rehabilitative in nature. Id.[3]

Given the above case law, it is not surprising that the decision in Basciano II does not distinguish the report and recommendation in Basciano I regarding non-contact visits based on a "different legal standard," as the defendant suggests. Def. Br. at 4. The defendant states: "The court in Basciano II took pains to distinguish its ruling from Magistrate Judge Levy's ruling four years prior." Id. The defendant is incorrect; no such "pains" were taken. Basciano II does not even mention Judge Levy's decision in Basciano I.[4] Instead, this Court

[2] These decisions have focused generally on whether the facility in question is more like a prison or a jail, not whether the detainees are pretrial or convicted. See Turkmen, 789 F.3d at 260 (holding that the MDC was a prison); see also Iqbal, 490 F.3d at 172 (same).

[3] The defendant cites to dicta in a footnote in Benjamin v. Fraser, 264 F.3d 175, 187 n.10 (2d Cir. 2001) in arguing that Turner may not apply to pretrial detainees. Def. Br. at 4 n. 5. Since that decision, numerous Second Circuit decisions have applied Turner to pretrial detainees. See, e.g., Turkmen, 789 F.3d at 260; Iqbal, 490 F.3d at 172.

[4] Notably, the Court's decision reviewing the report and recommendation in Basciano I applied both Bell and Turner in upholding the restrictions on Basciano, relying on the Second Circuit's decision in El-Hage (as discussed in the opening brief, the Court did not

relied primarily on the decision in Kassir, 2008 WL 2695307, at *1, where the Southern District of New York court applied Turner in denying a SAMs pretrial detainee's request for attorney contact visits at the MCC's 10 South Unit—identical to the defendant's request here. This Court in Basciano II found the Kassir decision to be "directly on point," and applied Turner to Basciano's request for attorney contact visits, just as Kassir had. Basciano II, 763 F. Supp. 2d at 332. Indeed, in denying Basciano's request, this Court in Basciano II cited Kassir's application of Turner's "legitimate" penological interest test:

> Kassir, like Basciano, argued that his Sixth Amendment rights were violated by being "permitted only non-contact meetings" with his lawyers which "prevent counsel and Mr. Kassir from reviewing particular documents together." Id. at *3. . . . The Kassir court found that "[n]one of this burdens the defendant's Sixth Amendment rights—and to the extent the requirement of 'non-contact meetings' imposes any burden on document-sharing between the defendant and his counsel, this requirement is 'reasonably related' to the MCC's legitimate objective of protecting institutional security." Id. (citing Turner, 482 U.S. at 87, 96–97, 107 S.Ct. 2254).

Basciano II, 763 F. Supp. 2d at 332 (quoting Kassir, 2008 WL 2695307, at *1).[5]

Similarly, here, the MCC's restriction of non-contact attorney visits is neither punitive nor rehabilitative and satisfies both the Bell and Turner tests. The restriction is reasonably related to a legitimate penological interest—security and safety concerns. As discussed at length in the government's opening brief, there are serious security concerns about placing the defendant on the attorney side of the attorney visiting room. See Dkt. No. 91. There are no other areas in the MCC that both alleviate such concerns and do not adversely impact other detainees and substantially strain BOP resources. See id. And because the BOP's accommodations for discovery review are reasonable and allow the defendant to review discovery adequately with defense counsel, this Court—like the courts in Basciano I and Kassir—should deny the defendant's request for attorney contact visits, as the requirement is

---

review the no-contact issue because it was moot). See Basciano v. Lindsay, 530 F. Supp. 2d 435, 445 (E.D.N.Y. 2008).

[5] The defendant also claims that Basciano, unlike the defendant, had violated prison communications restrictions, engaged in criminal activity from jail, and tried to interfere with his own trial. Def. Br. at 4. The defendant, however, has twice escaped from maximum-security prisons, a feat Basciano never accomplished even once. The defendant has also engaged in criminal activity while incarcerated in Mexico, effectively directing the activities of one of the world's largest drug trafficking organizations. The defendant has also ordered murders and harmed individuals in order to obstruct justice. See Gov't Detention Memorandum, Dkt No. 17. In short, the defendant's attempt to distinguish himself as less of a security risk than Basciano fails.

valid under both Turner and Bell.[6] See, e.g., Defreitas v. Lindsay, No. 08-CV-0052 (DLI) (RLM), 2008 WL 4850195, at *4 (E.D.N.Y. Nov. 6, 2008) (applying Bell and upholding MDC's decision to place the defendant in the SHU because the defendant was charged with serious and violent crimes and had ties to dangerous networks); United States v. Khan, 540 F. Supp. 2d 344, 346 (E.D.N.Y. 2007) (applying Bell and upholding MCC's decision to place defendant in the SHU because it was based on legitimate security concerns and not punitive in nature).

Second, the defendant's attempt to distinguish Kassir is also without merit. The defendant contends that Kassir, which involved the application of Turner to a SAMs pretrial detainee, is inapposite because it involved an alleged terrorist and al-Qaeda associate. Def. Br. at 5. The defendant notes that the last violent incident at the MCC's 10 South Unit also involved an individual named Salim, "another al-Qaeda-associated inmate." Def. Br. at 5. The defendant claims this is a significant difference, as terrorists are known for "irrational" violence, while there is purportedly nothing in the defendant's history to suggest that he is prone to "irrational" violence. Def. Br. at 5. The defendant's distinction is of no moment. Whether an inmate's violent behavior is driven by ideological interests, profit, retaliation, obstruction of justice, or desperation, such violence poses serious safety concerns for prison officials and others. Ultimately, the reason and motivations for a prison inmate's use of violence is far less important than the risk that an inmate may use violence. The defendant's history demonstrates that he has used violence and will use violence in pursuit of his aims—whether they be profiting from narcotics trafficking, killing rivals and law enforcement officials or obstructing justice. Accordingly, his capacity for violence knows no "rational" limits. As for the defendant's claim that the government has not provided evidence that he personally has used violence, the government intends to call witnesses at trial who will testify about the defendant's personal involvement in acts of violence.

Moreover, Basciano II rejected this exact argument regarding Kassir. See Basciano II, 763 F. Supp. 2d at 332. In Basciano II, this Court rejected the defendant's attempt to distinguish Basciano from Kassir by arguing, "Kassir, unlike Basciano, was accused of being a terrorist" and that the Salim incident "was an incident involving an alleged terrorist." Id. (citation omitted). The Court held that, despite the fact that the Salim incident involved an alleged terrorist, "the legitimate security concerns presented by Basciano's detention, which have been exhaustively litigated, justify the determination to house Basciano under SAMS and in 10 South, regardless of the no-contact rule." Id. Here, the legitimate security concerns presented by the defendant's detention have also been exhaustively litigated, and the Court upheld the SAMs restrictions on the defendant based on these legitimate security concerns. See Dkt. No. 71 at 5 ("Specifically, the Government has articulated legitimate objectives of preventing defendant from running the Sinaloa Cartel from prison, coordinating any escape

[6] In its opening brief and in the accompanying declaration, the government provided numerous examples concerning security and safety concerns, as well as the BOP's efforts to make reasonable accommodations for the defendant, including allowing him to have his own personal laptop in his cell. See Dkt. No. 91.

from prison, or directing any attack on individuals that he may believe are cooperating with the Government.").

In sum, this Court should apply the clear holdings of Basciano II and Kassir—that the MCC's no-contact requirement does not burden the defendant's Sixth Amendment rights and to the extent that it makes discovery review more difficult for the defendant, the restriction is reasonably related to the BOP's legitimate penological interest in addressing security and safety concerns.

## II. The Government Has a Legitimate Basis for Restricting Contact Visits

The defendant claims that there are no security concerns with contact visits because (1) the defendant poses no threat to his legal team and since his incarceration in the United States, the defendant has not been disruptive; (2) it would be impossible for the defendant to escape the MCC; and (3) the defendant can harm himself and BOP staff even without contact visits. All of these arguments are meritless.

First, defense counsel claims, "we have absolutely no concern for our personal safety." Def. Br. at 6. That may be so. It is also irrelevant. Defense counsel's opinion about their safety does not assuage BOP's concerns about the defendant taking his attorneys hostage or harming them physically. Unlike defense counsel, BOP correctional officers are trained to deal with potential attacks and placing the defendant and defense counsel in a setting susceptible to a potential hostage situation is problematic. The defendant also argues that he has not been disruptive since coming to the United States in January. While accurate, the defendant has also ordered the murder of countless individuals over many decades. The defendant is also the former leader of the Sinaloa Cartel, the world's largest drug trafficking organization. And the defendant is facing a mandatory life sentence. Simply put, the defendant is an individual with vast resources, a history of violence and nothing to lose. The BOP has determined, after assessing (1) the risk that the defendant poses, (2) compliance with the SAMs restrictions; and (3) the facilities available at the MCC, that contact visits pose significant security concerns.

Second, the defendant claims it would be impossible to escape the MCC. In support, the defendant notes that he is five feet, four inches tall and his nickname means "shorty" in English. Def. Br. at 7. The defendant's height, however, did not prevent him from escaping two maximum-security prisons in Mexico, including by building a mile-long tunnel with a motorcycle, lights, and ventilation underneath the prison. Suggesting that there is a correlation between height and ability to escape is absurd. The defendant also supports his claim that escape would be impossible by saying he is 60 years old, id., but one of his escapes was less than two years ago. Regardless, the no-contact restriction is based on, among other things, potential harm to defense counsel, a possible hostage situation, harm to BOP staff and self-harm, and not just on likelihood of escape. Although given the defendant's track record, it is not unreasonable to be concerned about prison escape as well.

Third, the defendant claims he can harm himself and BOP staff even without contact visits. The defendant's claim brings to mind the old adage that "the perfect should not be the enemy of the good." Unless the BOP placed the defendant under severe restrictive conditions, such as waist chains, handcuffs and ankle cuffs, and removed his laptop, and his ability to use the exercise room, among other things, there will be opportunities for the defendant to commit self-harm and possibly harm BOP staff. That does not mean that the BOP should not take cautionary measures to minimize such opportunities. In addition, the defendant currently has no opportunities to harm defense counsel and defense counsel staff or to place any non-BOP personnel in a hostage situation. Given the defendant's well-documented history of violence and prison escape, the BOP's concomitant security and safety concerns, and the BOP's reasonable accommodations for discovery review, including the personal use of a laptop, the BOP's no-contact requirement is more than valid.

[redacted]

[redacted]

---

[redacted]

III. The MDC Also Cannot Accommodate Attorney Contact Visits

The defendant claims that he can have attorney contact visits at the Metropolitan Detention Center in Brooklyn, New York ("MDC"). Def. Br. at 8. The defendant is incorrect.

As detailed in the accompanying declaration ("MDC Decl."), the MDC has limited ability to house SAMs inmates and as a general rule, the BOP transfers SAMs inmates from the MDC to the MCC as soon as practicable. Decl. ¶¶ 3-4. To the extent the MDC houses SAMs inmates, it hold them in its Special Housing Unit ("SHU"). Id. ¶ 3. The MDC SHU is not conducive to housing SAMs inmates because the individual cells are arranged in a straight line, down a hall, which makes it easy for inmates in the SHU to communicate with the inmates housed in the cells next to them. Id. ¶ 4. Consequently, MDC rarely houses SAMs inmates because it is difficult for MDC staff to enforce the SAMs. Id. Moreover, in the past few years, when the MDC housed a SAMS inmate in the SHU, it did not permit that defendant to have attorney contact visits. Id. Indeed, current procedures at MDC do not permit contact legal visits for SAMs inmates. Id.

Here, the SAMs restricts the defendant's communications with third parties, including other inmates. SAMS § 1(c), Dkt. No. 50-1 at 4. Given the MDC SHU's physical layout, the defendant would be able to communicate with other SHU inmates, in violation of the SAMs. MDC Decl. ¶ 4. In addition, because of the SAMs, the MDC would have to shut down the SHU every time the defendant had a legal visit. Id. ¶ 7. There would be no other inmates permitted in the SHU law library. Id. It would inhibit other inmates in the SHU from having visitation. Thus, if implemented, attorney contact visits at the MDC would have a "significant ripple effect" on the prisoner's fellow inmates, prison staff and prison resources. See Turner, 482 U.S. at 89-91 (internal quotation marks omitted).

There are no alternative visiting rooms in which a SAMs inmate could have a contact legal visit in the MDC. MDC Decl. ¶ 8. For example, the attorney-client rooms on the first floor also cannot be used by SAMs inmates for attorney-client contact visits. Id. These rooms are for the general population. Id. Allowing a SAMs inmate to use that area would require the BOP to restrict access to that room by every other inmate at the MDC, in effect preventing any of the other hundreds of inmates from meeting with their respective attorneys while the defendant meets with his counsel. Id. In addition, because of the security risks associated with this particular defendant, the facility would have to be locked down completely every time BOP staff moved the defendant to this area, which would substantially affect the functioning of the MDC. Id. The MDC also would have to increase staffing in order to facilitate both housing the defendant, due to his high security risk, and moving the defendant within the MDC, as only certain staff would be able to have contact with him. Id.

---

[redacted]

Shuttling the defendant between the MDC and MCC to allow him to conduct contact legal visits at the MDC is also not feasible for two reasons. First, as noted above, the MDC does not presently permit contact visits for SAMs inmates. Second, due to the unique security concerns inherent to this defendant, the U.S. Marshals Service ("USMS") must take extraordinary measures and redirect massive resources every time it transports the defendant. For example, when the USMS transports the defendant to court, the USMS must convene a large caravan around the vehicle transporting the defendant to prevent his escape. Due to the nature of the caravan, traffic frequently must be redirected, and traffic must be restricted on the Brooklyn Bridge. Thus, transporting the defendant back-and-forth for contact legal visits would not only strain the resources of BOP, it would significantly burden USMS resources.

IV. Conclusion

For the foregoing reasons, the Court should deny the defendant's request for contact visits with defense counsel. To the extent possible, the government, in conjunction with the MCC, will continue to attempt to craft solutions to ameliorate defense counsel's concerns about discovery review on 10 South.

The government respectfully submits the public version of this letter in redacted form as it contains information that is currently under seal, see Dkt. No. 97, and the accompanying declaration in redacted form for security and safety reasons. See, e.g., United States v. Amodeo, 71 F.3d 1044, 1050-51 (2d Cir. 1995). The government is simultaneously providing unredacted versions to the Court (under seal) and to defense counsel.

Respectfully submitted,

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

BENJAMIN GREENBERG
ACTING UNITED STATES ATTORNEY
Southern District of Florida

cc: Michelle Gelernt, Esq. (counsel to defendant) (unredacted, by email)
Michael Schneider, Esq. (counsel to defendant) (unredacted, by email)
Edward Zas, Esq. (counsel to defendant) (unredacted, by email)