**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

**UNITED STATES OF AMERICA**

               **-against-**

**JOAQUIN ARCHIVALDO GUZMAN LOERA,**

                     **Defendant.**
-------------------------------------------------------------x

                             **REPORT AND**
                             **RECOMMENDATION**

                             **09-CR-466 (S-4) (BMC)**

**ROANNE L. MANN, CHIEF UNITED STATES MAGISTRATE JUDGE:**

      Currently before the Court, on a referral from the Honorable Brian M. Cogan, is the request of defendant Joaquin Archivaldo Guzman Loera ("defendant") for an order directing the government to permit him to have contact visits with his attorneys.  See Order (May 8, 2017) ("Referral Order"), Electronic Case Filing ("ECF") Docket Entry ("DE") #74.  For the reasons that follow, this Court respectfully recommends that defendant's motion be granted, subject to additional security measures referenced herein.

## BACKGROUND

      By a fourth superseding indictment returned on May 11, 2016, defendant is charged in seventeen counts in connection with his alleged role as the principal leader of the Mexico-based international drug trafficking organization known as the Sinaloa Cartel, claimed to be the world's largest and most prolific drug trafficking organization.  See Superseding Indictment (May 11, 2016), DE #14.  Among other counts, defendant is charged with leading a continuing criminal enterprise; participating in an international conspiracy to manufacture and distribute cocaine, heroin, methamphetamine and marijuana, to be imported into the United States;

unlawful use of firearms in furtherance of the drug trafficking crimes; and participating in a money-laundering conspiracy.  See id.

 Defendant's escapes from Mexican maximum security prisons have been widely publicized.  His first escape occurred in 2001.  See Pretrial Memorandum Regarding Detention (Jan. 20, 2017) ("1/20/17 Mem.") at 5, DE #17.  He was apprehended in 2014 and held in custody in Mexico until he escaped again in 2015.  See id. at 10-11.  He was then captured by Mexican authorities in January 2016, see id. at 11, and was ordered extradited to the United States on January 19, 2017, see id. at 12.

The government alleges that in furtherance of his successful attempts to escape prison in Mexico, defendant used his Mexican lawyers and family members to engineer his escapes and pass messages in and out of prison to and from individuals associated with the Sinaloa Cartel.  See Special Administrative Measures (Mar. 13, 2017) ("SAMs") at 2, DE #50-1.  In order to prevent defendant's continued criminal activity and endangerment of those he perceives as having provided information to law enforcement, the Acting Attorney General of the United States imposed certain Special Administrative Measures to restrict defendant's ability to communicate with other inmates, visitors and the media.[1]  See id. at 4, 9-14.  As relevant to the instant motion, the SAMs provide that "[a]ttorney-client privileged visits may be contact or non-contact, at the discretion of the USMS\BOP\DF."  Id. at 6.

Defendant is currently detained awaiting trial in the SAMs unit on 10 South of the Metropolitan Correctional Center ("MCC") in lower Manhattan.  By letter to Judge Cogan

---

[1] The Attorney General is authorized to issue SAMs that are reasonably necessary to protect persons against the risk of death or serious bodily injury.  See 28 C.F.R. § 501.3(a).

dated April 21, 2017, defense counsel complained that they have been unable to effectively review discovery with their client because they are limited to non-contact visits, with a physical barrier impeding their consultation.  See Letter (Apr. 21, 2017) at 2, DE #64.  In response, the government confirmed that 10 South "is not set up to allow for contact visits," see Letter (Apr. 28, 2017) at 7, DE #69, but added that the Bureau of Prisons (the "BOP") was considering ways to facilitate defendant's review of discovery material with counsel during non-contact visits, see id.

Following a status conference held on May 5, 2017, Judge Cogan issued an order in which he referred to the undersigned magistrate judge the issue of "defendant's request for contact visits with his attorneys so that they can effectively review the volumes of discovery material the government is producing . . . ."  Referral Order at 1.  Judge Cogan suggested that the Court may "inspect the attorney visitor rooms in the Special Housing Unit or other possible meeting locations at the MCC and determine whether the facility, either as already configured or with reasonable modifications, can permit contact visits between defendant and his attorneys without unreasonably compromising the interests that the [g]overnment and the Bureau of Prisons have identified."  See id.

This Court held a telephone conference with counsel on May 10, 2017 and encouraged them to discuss ways to resolve the issues raised by defendant.  See Minute Entry (May 10, 2017), DE #75.  Following that conference, the government filed a letter suggesting further changes to the electronic discovery review system.  See Letter to Defense Counsel re Proposed Modifications to Discovery Review System (May 24, 2017) ("May 24 Ltr.") at 3-4, DE #83.  Defendant challenged the proposed accommodations as inadequate, see Letter to Government

Responding to Proposed Modifications to Discovery Review System (May 26, 2017) ("May 26 Ltr.") at 1, DE #85, and reiterated his request that he be permitted to meet with counsel without a barrier between them, see id. at 5.

As the parties were unable to resolve their dispute, the government filed a formal response to defendant's request for attorney contact visits, including a declaration from a Captain at the MCC and photos of the areas in question within 10 South.  See Letter Responding to the Defendant's Request for Attorney Contact Visits (June 2, 2017) ("June 2 Ltr."), DE #91.  The Captain states that prior to 2010, a limited number of attorney contact visits were permitted on 10 South in an area that had previously been used for storage, but that was then "modified to permit limited contact."  See Declaration of Captain (June 2, 2017) ("MCC Capt. Decl. I") ¶ 5, DE #91-1.[2]  However, in the beginning of 2010, to accommodate an anticipated large influx of SAMs inmates from Guantanamo Bay, the area used for attorney contact visits was converted into a divided attorney visiting room, with an area for attorneys on one side and a screened-off set of individual booths for SAMs inmates on the other side.  See id.  This is the visiting room that is currently set up for reviewing electronic discovery, see id. ¶ 6, and it is the area that is the major focus of the parties' submissions and this opinion.[3]

According to the Captain, the MCC is not able to accommodate contact visits with defendant and counsel on 10 South at this time because of security issues.  See id. ¶ 11.  For

_____

[2] In the publicly filed version of the Captain's initial declaration, his name, the attached exhibits, and certain other information are redacted.  An unredacted version of that declaration was provided to the Court and defense counsel.

[3] By order dated August 29, 2017, this Court directed the government to submit a further declaration "describing any modifications that have been made to the conditions described in the Captain's affidavit."  Electronic Scheduling Order (Aug. 29, 2017).  In response, rather than describing the modifications that post-date June 2, 2017, the declaration initially filed by

example, he points to various exposed cords and pipes on counsel's side of the attorney visiting room that defendant could use to injure himself[4] or others, as well as emergency sprinklers that defendant could trigger to flood the room.  See id.  In addition, some of the equipment located in the room, such as furniture and discovery review equipment, could be used to barricade the door.  See id. ¶ 12.  Similarly, the Captain alleges, defendant could break and use as a weapon one of the discovery CDs or other objects that attorneys or their staff might bring into the room.  See id.  The government contends that "[t]o eliminate or even mitigate all of these risks, the MCC would need to entirely restructure the attorney visiting room — i.e., reconfigure the sprinklers, remove the electronic discovery review system, among other things — which would take time and tremendous expense."  See id. ¶ 15.[5]

Defendant counters that due to the "voluminous discovery and audio evidence . . . nothing short of contact visits is sufficient to allow Mr. Guzman to effectively review this

---

the government states that "[t]here have been no modifications made to the attorney visiting room *since July 6, 2017*[,]" Declaration of Captain (Sept. 12, 2017) ("MCC Capt. Decl. II") ¶ 6, DE #132-1, #133-1 (emphasis added), and then discusses hypothetical future modifications, see id. ¶¶ 6-7.  At the Court's direction, the government subsequently filed a revised declaration describing the modifications made to the attorney visiting room since June 2, 2017.  See Declaration of Captain (Sept. 13, 2017) ("MCC Capt. Decl. III"), DE #135-1, #136-1.

[4] The Captain opines that defendant might harm himself in order to be taken to a hospital — a less secure setting.  See MCC Capt. Decl. I ¶ 11.

[5] The Captain's second declaration purports to quantify the time and costs associated with such modifications: He asserts that the "major demolition" entailed in addressing the security risks "would cost as much as $150,000 and take at least 18 months, but possibly as much as 36 months, to complete."  MCC Capt. Decl. II ¶ 7.  The declaration is silent as to the basis for these estimates.

In addition to discussing the alleged impediments to attorney contact visits in the attorney visiting room on 10 South, the Captain's initial declaration also explains why alternative locations within the MCC would be impracticable for attorney contact visits with defendant.  See MCC Capt. Decl. I ¶¶ 16, 18, 20; *infra* pp.15-16.  Defendant's response to that

evidence." June 16 Ltr. at 2. His attorneys maintain that the 60-year-old defendant, who

stands 5 feet 4 inches tall, poses no threat to them and is not accused of personally committing

any acts of physical violence. See id. at 6-7. They also dismiss the risk of self-harm, noting

that even while separated from his counsel, defendant could, if he were so inclined, "break a

discovery disk and use it to cut himself . . . ." Id. at 8. And they contend that cords could be

secured and/or the cart with electronic equipment removed from the room during contact

visits, with counsel using a laptop computer to review electronic discovery with defendant.

See id. at 7-8 n.8. As for the emergency sprinklers exposed in the attorney visiting room,

counsel notes that there is already an exposed sprinkler head in the inmate side of the divide.

See Declaration of Michael K. Schneider (Sept. 15, 2017) ("Schneider Decl.") ¶ 9, DE

#139-1.

On July 6, 2017, the Court, accompanied by counsel for the parties, conducted a site

visit of areas within the MCC, including 10 South, see Minute Entry (July 6, 2017), DE #105,

and observed the following: The partitioned area in which defendant and his counsel have met

to review discovery is comprised of an area for legal visitors, which is separated by a floor-to-

ceiling partition from the inmate side of the divide, which in turn is sectioned off into several

individual cells, each of which is the approximate size of a phone booth (the "booth"). See

May 26 Ltr. at 3 & photographs attached as Ex. A to MCC Capt. Decl. I ("MCC Capt. Decl.

I Ex.") A003 through A005; Schneider Decl. ¶ 4. The booth contains a bar-like stool with a

low back and a narrow fold-out shelf on which defendant may balance a laptop. See MCC

_____

submission does not address these other areas. See generally Letter Replying to Government's
Response in Opposition to Contact Counsel Visits (June 16, 2017) ("June 16 Ltr."), DE #95.

Capt. Decl. I Ex. A006; MCC Capt. Decl. III ¶ 6; Schneider Decl. ¶ 5.  The upper portion of the partition that separates defendant from his counsel consists of metal screens on either side of a narrow, translucent acrylic (plexiglass) window.  See May 26 Ltr. at 3; MCC Capt. Decl. I ¶ 6 & Ex. A003 through A005.  As defense counsel correctly noted, the plexiglass window is scratched and dirty.  See May 26 Ltr. at 3.  The attorney side of the attorney visiting room contains an electronic discovery review system, consisting of a wall-mounted 32-inch monitor connected to a computer located on a cart with wheels, on which another monitor has been placed.  See May 24 Ltr. at 3-4; MCC Capt. Decl. I ¶ 6 & Ex. A003, A004, A005, A007, A008;[6] MCC Capt. Decl. III ¶ 6; Schneider Decl. ¶ 4.  There are mounted shelves that face the inmate side of the attorney visiting room to allow the speakers to project sound directly through the screen.  See MCC Capt. Decl. III ¶ 6.

During the site visit, the government demonstrated the operation of the electronic discovery review system, while the Court made observations from inside one of the booths. The audibility problems cited by defendant with respect to audio played from the attorney side of the divide appears to have been resolved by the addition of speakers.  See June 16 Ltr. at 1-2 n.1.  However, defense counsel maintain that it is difficult for them to hear audio files played by defendant from his side of the partition, see Schneider Decl. ¶ 3, and no demonstration was conducted of audio played from inside the booth.  Whatever the degree of audibility problems, the Court concurs with the defense assertion that viewing text and other visual depictions from within the booth is significantly hampered by the narrow width and

---

[6] At the time the government filed the Captain's initial declaration, the second screen was not configured for discovery review.  See MCC Capt. Decl. I ¶ 6.

marred surface of the plexiglass "window."  See also Schneider Decl. ¶ 4 ("Because the window and screens in the inmate's booth are located several feet from the floor, I have found it impossible to see and speak to Mr. Guzman while seated" and "have stood during the entire visit."): id. ¶ 5 ("Because the screen [on the cart] must be positioned close to the door of the booth for Mr. Guzman to see the screen, it is impossible for both he and the visitor to view the screen at the same time.").

## DISCUSSION

As an initial matter, the parties dispute whether defendant's challenge is governed by the standard formulated by the Supreme Court in Bell v. Wolfish, 441 U.S. 520 (1979), as opposed to its standard in Turner v. Safley, 482 U.S. 78 (1987).  Defendant contends that the Bell v. Wolfish test applies to pretrial detainees, while the test in Turner v. Safley applies only to convicted prisoners.  The government disagrees, correctly noting that the Second Circuit regularly applies the *Turner* test to challenges to the conditions under which pretrial detainees are held.  See Turkmen v. Hasty, 789 F.3d 218, 237-38, 260 (2d Cir. 2015) (applying *Turner* standard to claims of pretrial detainees at the Metropolitan Detention Center ("MDC")), rev'd in part on other grounds, Ziglar v. Abbasi, 137 S.Ct. 1843 (2017); Iqbal v. Hasty, 490 F.3d 143, 172 (2d Cir. 2007) (applying *Turner* to pretrial detainees at the MDC), rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662 (2009); United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000) (applying *Turner* to pretrial detainee's challenge to conditions of confinement).  Indeed, in denying defendant's motion to vacate the SAMs imposed by the government, Judge Cogan applied the *Turner* test.  See Memorandum Decision and Order (May 4, 2017) ("May 4 M&O") at 4-5, DE #71.  Judge Cogan's decision to apply the *Turner* framework to

8

defendant's challenges to his conditions of confinement constitutes law of the case, to which

this Court should adhere.  See Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009).[7]

Under Turner, "when a prison regulation impinges on inmates' constitutional rights, the

regulation is valid if it is reasonably related to legitimate penological interests" rather than "an

exaggerated response to those concerns."  482 U.S. at 87, 89.  In this connection, the Court

must determine (1) "whether there is a valid, rational connection between the regulation and

the legitimate governmental interest used to justify it"; (2) "whether there are alternative

means for the prisoner to exercise the right at issue"; (3) "the impact that the desired

accommodation will have on guards, other inmates, and prison resources"; and (4) "the

absence of 'ready alternatives.'"  El-Hage, 213 F.3d at 81 (citing Turner, 482 U.S. at 79-81).[8]

The government oversimplifies this "fact-specific" analysis, see United States v.

Kassir, No. S2 04 Cr. 356 (JFK), 2008 WL 2695307, at *5 (S.D.N.Y. July 8, 2008),

contending that "it is well-settled law that non-contact visits do not 'burden the defendant's

Sixth Amendment rights . . . .'"  June 2 Ltr. at 1 (quoting United States v. Basciano, 763

F.Supp.2d 303, 332 (E.D.N.Y. 2011)).  But the decision on which the government relies did

not purport to establish a blanket rule that prohibitions on attorney contact visits never violate

the Sixth Amendment rights of pretrial detainees.  Rather, the Honorable Nicholas G. Garaufis

concluded in Basciano that "the non-contact rule is valid, as applied to Basciano."  Basciano,

763 F.Supp.2d at 332 (emphasis added).  Significantly, by the time Judge Garaufis issued his

---

[7] Nevertheless, in weighing the various Turner factors, discussed hereinafter, the Court may
consider the fact that an inmate is a pretrial detainee, as opposed to a sentenced prisoner.  See
infra p. 10.

[8] In evaluating these factors, the Court need not hold an evidentiary hearing.  See El-Hage, 213
F.3d at 82.

decision, Basciano had been convicted of a series of crimes and sentenced to life imprisonment — facts that Judge Garaufis characterized as "relevant to a number of the . . . . motions addressed herein." Id. at 310.  In fact, Judge Garaufis quoted from a decision of the Second Circuit that had rejected Basciano's previous challenge to the SAMs imposed on him: "Because Petitioner has now been convicted of a series of crimes and sentenced to life in prison, his conditions of confinement should be reviewed under the standard applied to prisoners serving a sentence." Basciano v. Martinez, 316 F.App'x 50, 50 (2d Cir. 2009) (cited in Basciano, 763 F.Supp.2d at 332).[9]  Accordingly, while Judge Garaufis' decision in Basciano is instructive, it does not dictate the conclusion in this case.[10]

---

[9] At an earlier stage of the proceeding, before Basciano was convicted and sentenced to life imprisonment in connection with his prior prosecution, Judge Garaufis had declined to disturb the conclusion of Magistrate Judge Robert M. Levy, who had found that the prohibition on attorney contact visits infringed upon Basciano's constitutional right to counsel.  See Basicano v. Martinez, No. 07 CV 421 (NGG)(RML), 2007 WL 2119908, at *8, *11 (E.D.N.Y. May 25, 2007).  The government had thereafter filed an objection from that aspect of Magistrate Judge Levy's report and recommendation, but Judge Garaufis ruled that the issue was moot, as Basciano had been allowed contact visits with his attorneys in the interim.  See Basciano v. Lindsay, 530 F.Supp.2d 435, 437 (E.D.N.Y. 2008).

[10] Basciano is distinguishable for another reason.  While it is undisputed that defendant herein twice escaped from Mexican prisons and, according to the government, continued to oversee his narcotics enterprise while incarcerated in Mexico, see 1/20/17 Mem. at 5, he has not been charged with violating his SAMs or other prison restrictions at the MCC.  In contrast, in rejecting Basciano's request for attorney contact visits in 2011, Judge Garaufis observed that the Second Circuit had found that there was "'extensive evidence that [Basciano had] violated prison communications restrictions, engaged in criminal activity from jail, and tried to interfere with his own trial,'" see Basciano, 763 F.Supp.2d at 331 (quoting Basciano, 316 F.App'x at 50-51), creating a "hit list" while incarcerated, which included the names of the lead prosecutor, the presiding judge and three cooperating witnesses, see id. at 312.

Likewise distinguishable are the facts in the other case on which the government relies, Kassir, 2008 WL 2695307, where the court approved the denial of attorney contact visits based upon a "particularized, fact-specific examination" of the attendant circumstances, id. at *5.  There the defendant, who was charged with providing material support to al-Qaeda, violated the SAMs imposed on him by conferring in Arabic with a convicted al-Qaeda operative, "whose cell turned out to contain hidden weapons." See id. at *5.  The court noted that Kassir

Nor is the Court persuaded by the government's argument that "the Supreme Court has found that prohibiting contact visits generally do[es] not violate a prisoner's constitutional rights. . . ." June 2 Ltr. at 5 (citing Block v. Rutherford, 468 U.S. 576, 576 (1984)).  In the case cited, the class action plaintiffs challenged a prohibition on contact visits with detainees' friends and relatives.  See Block, 468 U.S. at 585.  Accordingly, unlike here, the detainees' Sixth Amendment rights were not implicated in Block.  In contrast, a number of courts have found violations of the Sixth Amendment when faced with prison policies prohibiting contact visitation between inmates and their counsel.  See, e.g., Mann v. Reynolds, 46 F.3d 1055, 1060-61 (10th Cir. 1995); Ching v. Lewis, 895 F.2d 608, 610 (9th Cir. 1990); Lopez v. Cook, No. 2:03-CV-1065 (KJM)(DAD), 2014 WL 1488518, at *3-4  (E.D. Cal. Apr. 15, 2014); United States v. Sellers, No. 2:07-cr-00145 (KJD)(PAL), 2008 WL 11343606, at *2 (D. Nev. Sept. 23, 2008); Basciano, 2007 WL 2119908, at *7-11; County of Nevada v. Superior Court, 236 Cal. App.4th 1001, 1008-11 (Cal. Ct. App. 2015); see also Maine v. Moulton, 474 U.S. 159, 170 (1985) ("to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself"); Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001) ("unreasonable interference with the accused person's ability to consult counsel is itself an impairment of" his Sixth Amendment rights); Wolfish v. Levi, 573 F.2d 118 (2d Cir. 1978) ("one of the most serious deprivations suffered

---

"has said that he received jihad training in Afghanistan; that he supports Usama Bid Laden; and that he would kill a person and bury that person's body for not having a sufficiently large enough jihad training operation in place at Bly, Oregon." Id. at *3.  The court found significant the MCC's prior experience with al-Qaeda-associated inmates, particularly a 2000 incident wherein a pretrial detainee stabbed an MCC officer in the eye as part of a scheme to take hostages, including defense lawyers visiting their clients in the facility.  See id. at *5.

by a pretrial detainee is the curtailment of his ability to assist in his own defense"), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520 (1979).

Consequently, in order to determine whether the prohibition on attorney contact visits violates this defendant's Sixth Amendment rights, the Court must conduct a "particularized, fact-specific" inquiry. Kassir, 2008 WL7 2695307, at *5.

I. Connection Between Regulation and Legitimate Government Interest

The first consideration in the Court's inquiry is whether there is a rational connection between the MCC's policy precluding attorney contact visits and a legitimate governmental objective. See Turner, 482 U.S. at 89-90. If such a rational relationship exists, the Court must next consider the three additional factors set forth in Turner. See United States v. Savage, No. CRIM.A. 07-550-03, 2012 WL 424993, at *4 (E.D. Pa. Feb. 10, 2012).

The government has articulated legitimate concerns about placing defendant in an unpartitioned area with his attorneys, and the risk that he could seize the opportunity to take counsel hostage and/or injure himself in order to make his escape during a trip to the hospital. See June 2 Ltr. at 8-9 (citing MCC Capt. Decl. I). In rejecting defendant's motion to vacate the SAMs (which, inter alia, restricted his communications with other inmates, the media and his family), Judge Cogan held that the burdens imposed on defendant were rationally connected to legitimate objectives "of preventing defendant from running the Sinaloa Cartel from prison, coordinating any escape from prison, or directing any attack on individuals that he may believe are cooperating with the [g]overnment." May 4 M&O at 5. This Court concludes that, as to the first Turner factor, the government has identified a legitimate concern for safety and security in the MCC, and there is a rational connection between that concern and the

12

prohibition on attorney contact visits (which, in this instance, applies not only to defendant but to all inmates on 10 South).  Nevertheless, as discussed in connection with the fourth factor, there are reasonable measures available to address that concern.

II.  Alternative Means for Defendant to Exercise Right

The second *Turner* factor asks whether there are alternative means for the inmate to exercise the right asserted.

The government's attempts to accommodate defendant's need to participate in meaningful discovery review have ameliorated but not resolved the problems identified by defendant.  The scope of documentary and electronic discovery in this case is voluminous.  At a conference held before Judge Cogan on February 3, 2017, the government acknowledged that "[t]he nature of the discovery will be in the form of multiple years of wiretaps, both domestically and foreign, mostly in the Spanish language.  There will be documentary discovery as well, and we anticipate that will be in the tens of thousands . . . .  As well as tens of thousands of intercepts . . . ."  Transcript of Status Conference held on Feb. 3, 2017 (Feb. 16, 2017) at 14, DE #42; see also Letter Regarding Discovery (Sept. 12, 2017) at 1, DE #131 (as of September 12, 2017, the documents disclosed by the government spanned nearly 31,000 pages).

Although the government has made substantial efforts to respond to the defense concerns under the current non-contact conditions,[11] it is impracticable for defendant and his

---

[11] The government has provided defendant with a laptop computer that he is permitted to have with him in the booth in the visiting room, along with copies of the discovery discs; a computer and monitor are situated on one side of the attorney-client rooms; and counsel are permitted to provide defendant with up to four inches of documents prior to an attorney visit, through corrections officials.  See MCC Capt. Decl. I ¶¶ 7, 8, 9.  In addition, the government placed the computer monitor on a cart with wheels so that it could be brought closer to

counsel to review together extensive documentary and electronic discovery through a scratched and narrow plexiglass window and metal screen.  Among other things, it is not reasonable to expect defense counsel to anticipate in advance every document, among tens of thousands, that they will need to review that day with defendant, so that hard copies of those documents will have been provided to him prior to the attorney visit.  And, in attempting to review hard copy documents together, counsel and defendant are relegated to holding documents up to the plexiglass barrier.  See Schneider Decl. ¶ 6.  It is also difficult for both counsel and defendant to view the computer monitor at the same time, as it is located on one side of the divide and thus is visible to defendant only through the narrow acrylic opening.  See id. ¶ 5.

The Court concludes that the current situation impedes the ability of defendant and his counsel to adequately prepare for trial, and that contact visits appear to be the only method for defendant to effectively review with counsel the voluminous discovery involved in this case.

III.  Impact of Desired Accommodation

The third *Turner* factor addresses the impact that accommodating the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally.  See Turner, 482 U.S. at 90.  In this case, defendant's challenge focuses on the attorney visiting room where he and his counsel have been meeting, albeit separated by a physical barrier with a narrow plexiglass window.  Before considering the feasibility of allowing contact visits within the attorney area of that space, the Court briefly addresses, and disposes of, alternative sites that defense counsel apparently raised in discussions with the

---

defendant; added speakers; raised the computer monitor to make it more visible through the high plexiglass window; and built a fold-out shelf on which defendant may place his laptop. See MCC Capt. Decl. III ¶ 6; May 24 Ltr. at 4.

government: the inmate exercise room on 10 South; the law library on 9 South; and the attorney-client rooms for the general population, which are located on the third floor of the MCC.  See June 2 Ltr. at 9; see also Transcript of Hearing Before Judge Brian M. Cogan on May 5, 2017, at 28, DE #96.

The Court and counsel visited the aforesaid areas during the July 6 MCC site inspection, and the Court finds persuasive the government's rebuttal to those proposals, pursuant to which other inmates would be precluded from accessing those areas whenever defendant and his counsel were meeting.  See MCC Capt. Decl. I ¶¶ 16, 18, 20.  The exercise room on 10 South is the only one of its kind available to SAMs inmates, each of whom is permitted only one to two hours every weekday in that space, which also includes a television and access to fresh air and sunlight.  See id. ¶ 16 & Ex. B001 through B003.  The law library on 9 South, which services approximately 50 inmates, is an open-air area, see id. ¶ 18, and its use by defendant and his counsel would be incompatible with sharing confidential attorney-client communications and would also allow for the possibility of communications between defendant and other inmates, see id., in violation of his SAMs restrictions.  The attorney-client rooms on the third floor are available to the facility's general population of approximately 750 inmates.  See id. ¶ 20.  Moving defendant to the attorney visiting rooms in general population would not only preclude those inmates from accessing that area, but would necessitate a lock-down of the entire facility, substantially impacting the functioning of the MCC.  See id.  For all of these reasons, defendant's letter in opposition to the government's June 2 submission understandably does not even pursue these alternative sites.  See generally June 16 Ltr.

Defendant has also proposed that he be allowed contact visits at the MDC in Brooklyn. See id. at 8.  Through the declaration of a Deputy Captain at the MDC, the government has convincingly shown that if an inmate subject to SAMs were to be housed at the MDC, he would have to be held in its Special Housing Unit ("SHU"), the physical layout of which would make it virtually impossible to prevent him from communicating with inmates in adjoining cells.  See Declaration of MDC Deputy Captain (June 23, 2017) ¶ 4, DE #98-1, #99-1.  In addition, the SHU "would have to be shut down every time [defendant] is in legal visiting[,]" thereby barring other inmates from using the SHU law library and "inhibit[ing] other inmates in the SHU from having visitation." Id. ¶ 7.  And to allow defendant to have attorney contact visits elsewhere in the MDC would require that the facility "be locked down completely every time BOP staff moved the defendant" to the visiting area. Id. ¶ 8.  Given defendant's history of prison escapes, and the government's showing regarding the impact on the facility and other inmates, the Court is not prepared to recommend that defendant either be housed at the MDC or be transported there from the MCC for attorney-client visits.

The remaining location proposed by defendant prior to the Court's site visit — and the one most vigorously debated by the parties — is the attorney conference room on 10 South that is equipped with an electronic discovery review system.  That is the space where defendant and his counsel have been meeting, separated by a floor-to-ceiling barrier with a high, narrow, scratched plexiglass window that impedes their ability to review together the thousands of pages of discovery materials produced by the government.  See supra pp. 6-8.  Defendant proposes that he be permitted to meet with his counsel on the attorney side of that barrier, see June 16 Ltr. at 7-8; Schneider Decl. ¶ 10, which is located in a room that locks from the

outside.[12]  See MCC Captain Decl. I ¶ 14.  The government's submissions are silent as to the impact of this accommodation on other inmates and guards.[13]  Instead, the government cites a series of security issues "that the BOP cannot ameliorate at this time[,]" id. ¶ 11, and claims that mitigation of the perceived risks "would take time and tremendous expense[,]" id. ¶ 15; see MCC Capt. Decl. II ¶ 7.  Those assertions bring us to the fourth and final *Turner* factor.

IV. Ready Alternatives To Accommodate Defendant's Sixth Amendment Concerns

As the Supreme Court recognized in Turner, "the absence of ready alternatives [to accommodate the asserted right] is evidence of the reasonableness of a prison regulation."  482 U.S. at 90.  On the other hand, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."  Id.

Among the security concerns that the government claims cannot be cured by the BOP with respect to using the attorney side of the attorney client visiting room, the government cites the existence of various exposed cords and pipes that defendant could use to harm himself and trigger a trip to the hospital and an escape attempt.  See MCC Capt. Decl. I ¶ 11.  The government additionally points to emergency sprinklers in the room that defendant could use to flood the room, thereby creating conditions that defendant could exploit in an attempt to

---

[12] In defense counsel's most recent submission, they also propose that attorney contact visits be conducted in a "holding cell" just outside the door to 9 South or in one of the two cells designated for defendant, since one of those cells is always empty.  See Schneider Decl. ¶ 10.

[13] In connection with defendants' unsuccessful challenge to the SAMs imposed on him, the government advised Judge Cogan of detailed observations made by MCC officials, "as part of [their] need to maintain visual contact for safety purposes" during non-contact attorney visits with defendant.  See Memorandum in Opposition re Motion to Vacate Special Administrative Measures (Mar. 21, 2017) at 10 & n.3, DE #52.  Thus, it appears that a system of visual monitoring is already in place, and the government's papers opposing attorney contact visits make no showing as to the need for any additional staffing in the event defendant's motion were granted.

escape.  See id.  Finally, the government contends, defendant could use the furniture or computer equipment in the room to barricade the door or as a weapon.  See id. ¶ 12.

None of the risks identified by the government is irremediable.  To the extent the BOP deems it necessary, it can replace the existing door to the attorney visiting room with a more secure door, as it has for attorney visiting rooms used by non-SAMs SHU inmates.  See Schneider Decl. ¶ 8.  Cords and pipes can easily be covered, furniture and other equipment can be secured.[14]  Moreover, defendant's access to these items can be prevented by having him shackled during attorney contact visits – an alternative that is readily achievable and that has been approved by at least one other court in connection with attorney contact visits.  See, e.g., Savage, 2012 WL 424993, at *2, *4-7 & n.9 (upholding use of hand restraints during contact visits with counsel).

Significantly, the SAMS imposed on defendant by the Attorney General do not restrict defendant to non-contact attorney visits.  See SAMs at 6.  In fact, according to counsel for defendant, following a court conference on February 3, 2017, the United States Marshals Service permitted a brief contact visit at the courthouse between defendant, his counsel and representatives of the Mexican consulate.  See June 16 Ltr. at 7.  The only obstacle to providing contact visits on 10 South appears to be the current configuration of the attorney-client rooms.  As described in the Captain's initial declaration, prior to 2010, "a limited

---

[14] Significantly, the government does not claim that the attorney visiting room is the only area on 10 South with an emergency sprinkler system, see Schneider Decl. ¶ 9, nor does it deny that the potential for self-harm is present during non-contact visits with counsel, see June 16 Ltr. at 8.  As for the electrical cords, defense counsel has proposed that the cart, with its corded equipment, be removed during attorney contact visits, with defendant and counsel using a single laptop to review electronic discovery.  See June 16 Ltr. at 7-8 n.8.

number of contact legal visits" took place on 10 South, in an area that had been modified to permit such visits.  See MCC Capt. Decl. I ¶ 5.  However, in 2010, in anticipation of "a large influx of SAMs inmates from Guantanamo Bay," the area that had been used for contact visits was modified to physically separate attorneys from their clients.  See id.  Thus, according to the government's submissions, the current configuration of attorney-client rooms, and the absence of an area for attorney contact visits on 10 South, were not brought about in response to security concerns posed by the prospect of barrier-free meetings between attorneys and SAMs inmates.[15]  Rather, the attorney-client rooms were reconfigured to accommodate an influx of prisoners from Guantanamo Bay that never materialized.[16]  Although this Court is mindful that it "should ordinarily defer to the[] expert judgment [of correctional officials] in such matters," Bell, 441 U.S. at 535, 547-48 (internal quotation marks omitted), the conclusion is inescapable that, in the past, those officials made the judgment that attorney contact visits with SAMs inmates were consistent with maintaining institutional security.  Furthermore, in light of the failure of the Acting Attorney General to prohibit contact visits between defendant and counsel, the government's opposition to defendant's motion seems less tailored to the particulars of this defendant's situation[17] and more a defense of existing structures.

---

[15] But cf. Basciano, 763 F.Supp.2d at 332 (finding that "the no-contact-visit rule [on 10 South] was created in response to an incident involving an alleged terrorist" who stabbed an MCC officer in the eye as part of a conspiracy to take hostages).

[16] Interestingly, the Court's research suggests that prisoners held at Guantanamo are afforded attorney contact visits.  See Declaration of Colonel John V. Bogdan (Oct. 3, 2013) ¶¶ 5, 6, 14, DE #73 in In re Guantanamo Bay Detainee Continued Access to Counsel, 12-mc-398 (RCL) (D.D.C.).

[17] It is undisputed that defendant is 5'4" and sixty years of age.  See June 16 Ltr. at 7.  Given his detention on 10 South, and his isolation within the facility, it is not reasonable to infer that

Having modified the former storage area to create an attorney contact visiting room, and thereafter having converted the attorney contact visiting room into divided non-contact attorney visiting rooms, the government does not dispute that it could modify the current configuration to allow for attorney contact visits.[18]  Although the government contends that "restructur[ing] the attorney visiting room . . . would take time and tremendous expense[,]" MCC Capt. Decl. I ¶ 15, it provides no documentation to support its time or cost estimates or its assumption that the modifications would require "major demolition," MCC Capt. Decl. II ¶ 7.  And as previously noted, without extensive changes to the existing attorney-client rooms, there may be methods of restraining defendant in such a way (for example, by shackling) that a

---

he poses the same level of security and escape risks as when he was held in Mexican prisons. Nor is there any claim that defendant may collude with his American lawyers or members of their staffs, who must go through a rigorous governmental screening process.  See Motion to Vacate Special Administrative Measures (Mar. 13, 2017) at 6, 12, DE #50; SAMs § 2(a) & n.2.

[18] Indeed, the government has gone to great lengths to facilitate attorney contact visits in certain other cases.  For example, in Savage, 2012 WL 424993, the defendant, who was serving a thirty-year sentence for drug-related crimes and witness-tampering, was awaiting trial for racketeering offenses, including witness-tampering and a dozen murders in aid of racketeering, including several that the defendant ordered while incarcerated as a pretrial detainee at the Federal Detention Center ("FDC") in Philadelphia.  Id. at *1.  Savage was thereafter transferred to the MCC, which then, as now, did not allow contact visits between SAMs inmates and their attorneys.  See id. at *1-2.  The court initially required that the defendant be transported from the MCC to the FDC in Philadelphia once per month for contact visits with his attorneys, and thereafter increased the frequency to twice per month.  See id. at *2.  In order to further accommodate the defendant and his counsel, the defendant was later transferred to the FDC.  See id.  Because the FDC is not a maximum security facility equipped to handle SAMs inmates, the government constructed a "suite" to house him on the second floor of the FDC, where he was permitted to have contact visits with his attorneys, while shackled with hand restraints.  See id. at *2, *4-7.

  As for Basciano, before he was convicted and sentenced to life in prison, the government apparently accommodated Basciano's demands for attorney contact visits following Magistrate Judge Levy's report and recommendation.  See Basciano, 530 F.Supp.2d at 437.

contact visit would not present a realistic risk of violence or escape.[19]  Simply put, having

viewed the facility and considered counsel's submissions, this Court concludes that with the

implementation of readily achievable additional security measures and/or "reasonable

modifications, [the MCC] can permit contact visits between defendant and his attorneys

without unreasonably compromising the interests that the [g]overnment and the Bureau of

Prisons have identified."  Referral Order at 1.

   Finally, since the prohibition on attorney contact visits for SAMs inmates housed on 10

South is not unique to this defendant, the issue before this Court will undoubtedly recur in the

future.  Indeed, detainees housed in this area are far more likely to be charged in complex

cases that require them to review voluminous documentary and electronic discovery with their

attorneys, increasing the need for contact visits.  It makes eminent sense for the BOP to

address this structural limitation now, rather than resorting to defensive case-by-case litigation

over attorney contact visits.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

   For the foregoing reasons, the Court respectfully recommends that the government be

ordered to allow defendant to hold contact visits with his attorneys as soon as reasonably

practicable, subject to reasonable security measures, including, at the option of the BOP,

shackling defendant.

   Any objections to this Report and Recommendation must be filed with the Honorable

Brian M. Cogan or before **October 11, 2017**.  Failure to file objections in a timely manner

---

[19]  The Court's opinion should not be read to require that contact visits be conducted in the existing attorney-client rooms if the BOP determines that other areas within the facility can more readily be configured to allow such visits.  <u>See</u>, <u>e.g.</u>, *supra* note 12.

may waive a right to appeal the District Court order.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R.

Crim. P. 59.

       **SO ORDERED.**

**Dated:** **Brooklyn, New York**
        **September 27, 2017**

            /s/     *Roanne L. Mann*
            **ROANNE L. MANN**
            **CHIEF UNITED STATES MAGISTRATE JUDGE**