GMP:BR
F.#2009R01065/OCDETF# NY-NYE-616

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        09-CR-466 (S-4) (BMC)

JOAQUIN ARCHIVALDO GUZMAN LOERA,
      also known as "El Chapo," "El Rapido,"
      "Chapo Guzman," "Shorty," "El Senor,"
      "El Jefe," "Nana," "Apa," "Papa," "Inge"
      and "El Viejo,"

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

OF COUNSEL:
BENJAMIN G. GREENBERG
Acting United States Attorney
Southern District of Florida

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motion for a jury that is anonymous (<u>i.e.</u> the names, addresses, and specific places of employment of the venire and the jury will not be revealed to the parties and the press) and partially sequestered (<u>i.e.</u> the jury will be transported to and from the courthouse by the U.S. Marshals Service ("USMS") each trial day and will be sequestered from the public while in the courthouse during each trial day). These limited measures are necessary to protect the integrity of the trial and the jury's impartiality by preventing harassment, intimidation, or other interference with the jurors — and, just as importantly, by mitigating any fear in the minds of the jurors of any such harassment, intimidation, or other interference. As the Court is aware from previous filings, this case involves exceptionally serious charges; the defendant has a history of interference with the judicial process (<u>e.g.</u> two dramatic prison escapes; history of employing "sicarios," or hitmen, against potential witnesses); the defendant has the means to interfere with the judicial process; and this case has drawn intense media scrutiny. <u>See, e.g.</u> Dkt. No. 17, Government's Memorandum of Law in Support of Pretrial Detention ("Detention Memo") at 5-6 (defendant escaped a Mexican prison in 2001 with assistance of prison officials whom he had corrupted, and then developed communications network in order to thwart law enforcement surveillance), 7 (defendant's drug empire reaped billions of dollars in profit), 9 (defendant has paid millions in bribes to law enforcement and employed "sicarios" to murder rivals and potential witnesses), 11 (defendant escaped Mexican prison in 2015 through a mile-long tunnel dug by his workers over course of a year). Each of those facts lends support to the need for an anonymous and partially sequestered jury. Moreover, because the Court can take

1

reasonable precautions to minimize the risk of prejudice from an anonymous and partially sequestered jury, including instructing the jury that anonymity and partial sequestration are routine and designed to protect jurors' privacy, there is no risk that the defendant's fundamental rights will be infringed.[1]

FACTUAL BACKGROUND

## I.     The Charges

The defendant Joaquin Archivaldo Guzman Loera is the principal leader of the Mexico-based international drug trafficking organization known as the Sinaloa Cartel, one of the world's largest and most prolific drug trafficking organizations.    On May 11, 2016, a grand jury sitting in the Eastern District of New York returned a 17-count Fourth Superseding Indictment in United States v. Joaquin Archivaldo Guzman Loera, et al., 09 CR 466 (S-4) (BMC) (the "Indictment").

The Indictment alleges over two-and-a-half decades' worth of criminal conduct, charging the defendant with: (1) leading a Continuing Criminal Enterprise ("CCE"), based on his role as the leader of the Sinaloa Cartel; (2) fourteen counts of narcotics trafficking, including importation, manufacturing and distribution; (3) using a firearm in furtherance of his drug trafficking crimes; (4) participating in a money laundering conspiracy; and (5) criminal forfeiture related to all charged counts in the amount of $14 billion, representing the illegal proceeds of his narcotics trafficking activities.

---

[1] The government has consulted with the defense and, with the Court's consent, the parties agree that the defendant shall file any opposition to this motion by January 26, 2018, and the government will file any reply by February 2, 2018.

The Indictment includes the allegation that the defendant, as one of the leaders of the Sinaloa Cartel,

> employed 'sicarios,' or hitmen, who carried out hundreds of acts of violence, including murders, assaults, kidnappings, assassinations and acts of torture at the direction of the defendant[]. The defendant[] directed and ordered these acts of violence for a variety of reasons, including but not limited to:
>
> [. . .]
>
> (c) Enforcing discipline amongst its members and associates by punishing disloyalty and failure; and
>
> (d) Protecting members of the Sinaloa Cartel from arrest and prosecution by silencing potential witnesses and retaliating against anyone who provided information or assistance to law enforcement authorities.

Indictment ¶ 5. The Indictment also alleges that the Sinaloa Cartel used corruption in order to achieve the goals of its drug trafficking enterprise. Id. ¶ 3.

II.    The Defendant's History of Interference With the Judicial Process

As the government has previously detailed, the defendant's history of criminal activity has included corruption and violence, including violence against those suspected of providing assistance to law enforcement against the interests of the Sinaloa Cartel. See, e.g., Detention Memo at 9. Specifically, the Sinaloa Cartel, often at the defendant's direction, paid cash bribes to local, municipal, state, and foreign governments to enable its members and associates to move multi-ton quantities of cocaine out of South America, through Central America and Mexico, and into the United States. Those payments not only ensured the safety of the defendant's drug shipments but protected Sinaloa Cartel members from arrest. See id. The defendant also employed armed guards and assassins who engaged in murders, assaults,

3

kidnappings, and torture against both potential drug trafficking rivals and potential witnesses and those suspected of providing assistance to law enforcement authorities.  See id.[2]

The defendant has also engineered two prison escapes.  First, in 2001, he escaped from a Mexican prison in a laundry cart with the assistance of corrupt prison officials. Later, in 2015, the defendant's workers dug a tunnel from an abandoned home over a mile away from the defendant's prison directly into the shower within his prison cell.  A publicly available video shows the defendant in his cell descending a ladder into the tunnel, where a motorcycle was waiting to allow him to drive to the other end of the tunnel.  See Detention Memo at 11; see Government's Response in Opposition to Defendant's Motion to Dismiss, Dkt. No. 146 at 5.

III.    Defendant's Means to Harm the Jury

The defendant has demonstrated the ability to bring substantial resources to bear, even while confined, in his efforts to subvert justice.  As noted above, while he was incarcerated in a maximum-security prison, he was able to arrange the construction of a tunnel into his prison cell in order to escape.  Mexican authorities have extensively investigated the role prison officials played in his escape; it stretches the bounds of credulity to suggest that the

---

[2] The government has also detailed the defendant's demonstrated history of violence against suspected cooperating witnesses in ex parte submissions.  See Dkt. Nos. 31 ("First Ex Parte Submission"), 45 ("Second Ex Parte Submission"), 66 ("Third Ex Parte Submission"), 78 ("Fourth Ex Parte Submission"), 120 ("Fifth Ex Parte Submission"), 169 ("Sixth Ex Parte Submission"), 175 ("Seventh Ex Parte Submission") (collectively, the "Ex Parte Submissions").  The government respectfully refers the Court to those submissions for additional factual detail explaining the defendant's previous interference with the judicial process.

defendant and his emissaries were able to engineer his escape without the aid, or at the very least, the knowledge of corrupt prison employees.  See Detention Memo at 11.[3]

Previously, while incarcerated from 1993-2001 prior to his first prison escape, the defendant continued to manage and expand his narcotics enterprise through the assistance of his brother, who conducted business outside of the prison while the defendant continued to manage his operation from within.  See Detention Memo at 5.  And, immediately following the defendant's 2001 and 2015 prison escapes, he had hundreds of armed guards and others prepared to help him evade detection and recapture, suggesting a vast network of assistance in place even while confined.  See id. at 5, 11.[4]

Moreover, the government is aware that dangerous individuals, seemingly not under the defendant's direction and control, have indicated a desire and willingness to assist the defendant.  For instance, public reporting has indicated that a group of federal prisoners in California released a video shortly after the defendant's extradition in which they stated that they were the "hitmen who are going to take care of [the defendant]" and, in a message apparently directed to the defendant, stated "everything is ready for you.  What you say is the law.  Here you have more than 3,500 soldiers."  Veronia Rocha, "Video Shows California

---

[3] See also Joshua Partlow, "Prison Break Shines Spotlight on Mexico's Shadowy Corruption Woes," The Washington Post (July 13, 2015), available at http://www.washingtonpost.com/world/the_americas/prison-break-shines-spotlight-on-mexicos-shadowy-corruption-woes/2015/07/13/ (quoting Mexican interior minister as saying that escape involved the help of corrupt prison officials).

[4] The First Ex Parte Submission provides additional detail regarding the defendant's means to contact outside associates while incarcerated in an effort to subvert justice, as well as details regarding the assistance he received to facilitate his 2015 prison escape.

Prisoners Offering Protection and Escape Help to Drug Lord 'El Chapo,'" Los Angeles Times (Jan. 26, 2017), available at http://www.latimes.com/local/lanow/la-me-ln-california-prisoners-el-chapo-escape-protection-video-20170126-story.html.

Not only has the defendant demonstrated both his ability to direct his drug empire while incarcerated as well as his control of a vast network of criminal associates, the defendant also possesses the financial means to procure assistance in interfering with the judicial process. See Indictment ¶ 52 (government's forfeiture allegations).

IV.    Widespread Media Coverage

This case has engendered substantial media coverage and public interest.  Even before the defendant's extradition to the United States in January 2017, there was extensive press coverage of the defendant's crimes and prison escapes.[5]  The interest in the defendant has only intensified following his extradition to the United States.  Hundreds, if not thousands, of articles about the defendant have been published in a wide array of major news outlets in this country and others in the wake of his extradition.[6]

---

[5] See, e.g., Bill Whitaker, "The Greatest Escape: How Mexican drug lord Joaquin 'El Chapo' Guzman, one of the world's most wanted men, escaped from prison – again," CBS 60 Minutes (Sep. 28, 2015), available at https://www.cbsnews.com/news/el-chapo-joaquin-guzman-escape-60-minutes/; Eric Lichtblau, "El Chapo Faces Array of Drug Charges in United States," The New York Times (Jan. 10, 2016), available at https://www.nytimes.com/2016/01/11/world/americas/extradition-of-el-chapo-to-us-is-neither-certain-nor-simple.html; Joshua Partlow, "How Mexico Secretly Launched a Crackdown After [Actor Sean] Penn Met 'El Chapo,'" The Washington Post (Jan. 16, 2016), available at https://www.washingtonpost.com/world/the_americas/how-mexico-secretly-launched-a-crackdown-after-sean-penn-met-chapo/2016/01/16/.

[6] See, e.g., Patrick J. McDonnell, Kate Linthicum, Del Quentin Wilber, "Drug Lord 'El Chapo' Extradited to the U.S.," Los Angeles Times (January 19, 2017), available at http://www.latimes.com/world/la-fg-el-chapo-extradition-20170119-story.html; "Joaquin 'El Chapo' Guzman Arrives in U.S. After Extradition," CBS News (January 20, 2017), available

Unlike most cases, moreover, the interest of the public and the press has continued through the Court's resolution of legal motions and other procedural matters, with the jury box full of reporters and sketch artists at even routine status hearings.[7] The defendant's attorneys have also granted press interviews related to this case in conventional and online publications.[8] Public interest is also likely to remain high given that, even apart from press coverage, Netflix and Univision have released a television series chronicling the defendant's drug trafficking career.

This widespread and intense press coverage has continued to the present and is likely to continue, and only increase, up to and during trial.

---

at https://www.cbsnews.com/news/el-chapo-mexico-extradites-drug-lord-joaquin-guzman-to-us/.

[7] See, e.g., Hannah Murphy, "What We Learned at Joaquin 'El Chapo' Guzman's Federal Court Appearance," Rolling Stone (Feb. 3, 2017), available at http://www.rollingstone.com/culture/el-chapo-what-we-learned-at-federal-court-appearance-w464806; Erin Keohane and Emily Shapiro, "Mexican Drug Lord 'El Chapo' to Go On Trial in April 2018," ABC News (May 5, 2017), available at http://abcnews.go.com/US/mexican-drug-lord-el-chapo-trial-april-2018/story?id=47226841.

[8] See, e.g., Keegan Hamilton and David Noriega, "Counsel to the Cartel: We Talked to El Chapo's Lawyer About Defending a Notorious Drug Lord," VICE News (Aug. 11, 2017), available at https://news.vice.com/story/we-talked-to-el-chapos-lawyer-about-defending-a-notorious-drug-lord; "El Chapo Attorney Has Possible Conflict of Interest in Trial of Accused Mexican Drug Lord," Univision News (Aug. 12, 2017), available at http://www.univision.com/univision-news/united-states/el-chapo-attorney-has-possible-conflict-of-interest-in-trial-of-accused-mexican-drug-lord; "El Chapo Guzman Says: I Will Not Make a Deal With the U.S. or Rat Out Anyone," Borderland Beat (Sep. 13, 2017), available at http://www.borderlandbeat.com/2017/09/el-chapo-guzman-says-i-will-not-deal.html.

ARGUMENT

I.    <u>Legal Standards</u>

The Second Circuit has long recognized that anonymous juries are often necessary to protect the integrity of a trial and to ensure an impartial jury and that, when properly used, they do not infringe a defendant's constitutional rights.  <u>See, e.g.</u>, <u>United States v. Pica</u>, 692 F.3d 79, 81 (2d Cir. 2012); <u>United States v. Quinones</u>, 511 F.3d 289, 291 (2d Cir. 2007);  <u>United States v. Gotti</u>, 459 F.3d 296, 345 (2d Cir. 2006);  <u>United States v. Paccione</u>, 949 F.2d 1183, 1192 (2d Cir. 1991); <u>United States v. Vario</u>, 943 F.3d 236, 239 (2d Cir. 1991); <u>United States v. Tutino</u>, 883 F.2d 1125, 1132 (2d Cir. 1989); <u>United States v. Barnes</u>, 604 F.2d 121, 133-43 (2d Cir. 1979).

Anonymous juries are necessary when potential jurors are vulnerable to pressure and influence by "defendants' friends or enemies, or harassment by the public."  <u>Vario</u>, 943 F.2d at 240 (internal quotation marks omitted); <u>accord</u> <u>Quinones</u>, 511 F.3d at 296.  The Second Circuit has also indicated that even where such improper influence does <u>not</u> occur, jurors' awareness that their identities are publicly known may impair their impartiality, justifying anonymity as a means of ensuring an impartial jury.  <u>See</u> <u>Barnes</u>, 603 F.2d at 141 ("If the anonymous juror feels less pressure as the result of anonymity, this is as it should be a factor contributing to his impartiality.") (internal quotation marks and citation omitted).

To determine whether to use an anonymous jury, a district court in this circuit must undertake a two-step inquiry.  First, the court must assess whether there is "strong reason to believe that the jury needs protection."  <u>Pica</u>, 692 F.3d at 88 (internal quotation marks omitted).  Second, if the court determines that anonymity is necessary to protect the jury, the

8

court should take "reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."   Id.

With respect to the first prong of the inquiry, courts in this circuit have considered several factors in weighing whether the jury needs protection, including (1) the dangerousness of the defendant, demonstrated by the seriousness of the charged crimes; (2) whether the defendant or his associates have engaged in past attempts to interfere with the judicial process; (3) whether the defendant has access to means to harm the jury, and (4) whether the trial is likely to attract media attention and publicity.   See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (citing, inter alia, Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; and Tutino, 883 F.2d at 1132-33).   In weighing those factors, the Court may rely on the government's proffer of facts showing that the jury needs protection, see United States v. Persico, No. 10-CR-147 (SLT), 2012 WL 1188243, at *1 (E.D.N.Y. Apr. 6, 2012) (citing United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994)), and may consider the facts alleged in the indictment alone.   See Wilson, 493 F. Supp. 2d at 399 ("Based on these charges alone, I would seriously consider empaneling an anonymous jury."); see also Quinones, 511 F.3d at 295 (record was "plainly . . . contrary" to defendants' contention that there was no risk of harm to the jury because the "indictment specifically charged defendants with murdering a confidential informant . . .").

As for the second prong of the test for empaneling an anonymous jury, the requirement of "reasonable precautions to minimize any prejudicial effects on the defendant," the Second Circuit has explained that a court should "conduct a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself," and reduce the possibility that

9

the jury will infer that the defendant is dangerous by providing the jurors a "plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures." Paccione, 949 F.2d at 1192; see also United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995). An anonymous and partially sequestered jury may be informed, for example, that "the reason for their anonymity and partial sequestration is to maintain their personal privacy and their ability to render a fair verdict in light of [] media and public attention," and that the reason for transportation provided by the USMS is "to protect their privacy and to ensure a timely start to each day of what promises to be a long trial." Wilson, 493 F. Supp. 2d at 401 (citing Aulicino, 44 F.3d at 1116).

"Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Pica, 692 F. 3d at 88 (citing Gotti, 459 F.3d at 345) (internal quotation marks and citation omitted). Considering these same factors, other judges in this district have empaneled anonymous and partially sequestered juries. For instance, in Wilson, the court determined that, because of (1) the seriousness of the charges against the defendant, who was charged with murdering two police officers; (2) the defendant's alleged membership in a criminal enterprise that engaged in robbery, murder and narcotics trafficking; (3) the defendant's history of attempts to interfere with the judicial process, including coercing witnesses not to testify or cooperate; and (4) the significant press coverage in the case, an anonymous and partially sequestered jury was warranted. 493 F. Supp. 2d at 399-401. In another case, United States v. Urso, No. 03-CR-1382, 2006 WL 1210886 at *1-2 (E.D.N.Y. May 2, 2006), the court determined that an anonymous and partially sequestered jury was appropriate where the defendants had been accused of being involved with murders and

10

with threatening members of their criminal organization who were suspected of cooperating with the government. See id. ("These allegations and evidence point to a willingness to interfere with the judicial process."). More recently, this Court has approved the use of an anonymous and partially sequestered jury in an organized crime trial and an anonymous jury in a terrorism trial. In United States v. Cacace, this Court granted the use of an anonymous and partially sequestered jury based on the seriousness of the murder-in-aid of racketeering charge against the defendant, the possibility that the defendant might be dangerous, the defendant's demonstrable prior "capacity and willingness to resort to physical violence," and substantial media interest in the case. United States v. Cacace, No. CR-08-240-14 (BMC), 2013 WL 4775531 at *3-*4 (E.D.N.Y. Sep. 6, 2013). Similarly in approving the use of an anonymous jury in a terrorism trial, this Court cited (1) the seriousness of the crimes with which the defendant was charged; (2) the possibility that the judicial process could be compromised due to the likelihood that jurors may be afraid of retaliation from the defendant or his associates, which could impact their ability to carry out their duties; and (3) expected substantial media coverage. United States v. Al Farekh, No. 15-CR-268 (BMC) (E.D.N.Y.), Mem. & Order dated June 16, 2017, Dkt. No. 102.

## II.    Discussion

Applying the standards and considering the facts set forth above, the government respectfully submits that it is necessary to keep anonymous and not reveal the names, addresses,

and other identifying information of both the venire and the final jurors, as well as to require that the jury be partially sequestered during the course of the trial.[9]

A.    <u>The Seriousness of the Charges Against the Defendant Weigh in Favor of an Anonymous and Partially Sequestered Jury</u>

There is no reasonable dispute that the crimes with which the defendant is charged are among the most egregious and are exceptionally serious. As described above, Count One of the Indictment alleges that the defendant ran a CCE for more than 25 years, a charge which carries a mandatory life sentence. Moreover, Count One includes allegations of extraordinary violence, such as the defendant's knowing and intentional conspiracy to kill and cause the intentional killings of one or more persons. <u>See</u> Indictment ¶ 13; <u>see also</u> <u>id.</u> ¶ 5 (describing defendant's use of hitmen to carry out hundreds of acts of violence on behalf of Sinaloa Cartel). The remainder of the charges include the distribution of extremely large quantities of cocaine, the use of firearms in the commission of the other offenses, and conspiracy to launder narcotics proceeds. Thus, the allegations in the Indictment establish the potential dangerousness of the defendant, as "demonstrated by the seriousness of the charged crimes, including whether the defendant is charged with participating in a large-scale criminal enterprise." <u>Wilson</u>, 493 F. Supp. 2d at 398 (citing <u>Paccione</u>, 949 F.2d at 1192; <u>Tutino</u>, 883 F.2d at 1132; and <u>United States v. Thomas</u>, 757 F.2d 1359, 1364-65 (2d Cir. 1985)).

---

[9] The government also submits, however, that it is appropriate for the USMS, which will be responsible for maintaining the safety and security of the jury during the course of the trial, to know the names and addresses of the jurors. The USMS will keep that information confidential and will not reveal it to counsel for the government, the defense, or any other third party.

B.     <u>The Defendant's Past Interference With and Present Means to Interfere with the Judicial Process Support Anonymity and Partial Sequestration</u>

As detailed above, public filings, open source reporting, and the government's <u>Ex Parte</u> Submissions all demonstrate both the defendant's history of interference with the judicial process and means to interfere with the judicial process in the future. Specifically, the defendant has substantially hindered the judicial process twice by engineering and organizing his own escapes from prison, engaging in widespread corruption related to public officials, and hiring hitmen to engage in acts of violence against rivals and suspected government cooperators. The Second and Third <u>Ex Parte</u> Submissions, in particular, detail the defendant's past attempts to harm potential cooperating witnesses.[10]

This conduct supports an anonymous and partially sequestered jury, even though charges of obstruction of justice have not been filed against the defendant. <u>See, e.g.</u>, <u>United States v. Mayes</u>, No. 12-CR-385 (ARR), 2013 WL 6175824, at *4-5 (E.D.N.Y. Nov. 25, 2013) (empaneling anonymous and partially sequestered jury based in part on government's proffer of obstructive conduct even though "the defendants are not charged in the indictment with witness tampering, jury tampering, or obstruction of justice"); <u>see also</u> <u>United States v. Kaziu</u>, 559 F. App'x 32, 37-38 (2d Cir. 2014) (summary order) (affirming decision to empanel anonymous jury based in part on government's "proffer" of attempted witness tampering and "an online commenter's suggestion that force be used to free [the defendant] from custody"). Additionally, the Second Circuit has approved the use of anonymous and partially sequestered

---

[10] The Court may rely on the <u>ex parte</u> submissions in deciding this motion. <u>See</u> <u>United States v. Khan</u>, 591 F. Supp. 2d 166, 172 (E.D.N.Y. 2008) (evidence for decision to empanel anonymous jury may include <u>ex parte</u> submissions).

juries in other instances where the scale of a defendant's criminal organization provides its leaders with a well-connected network, where the defendant and his associates have shown a likelihood of obstruction of justice, and where the pattern of violence by the defendant and his criminal associates may cause a juror to reasonably fear his safety.   See, e.g., Gotti, 459 F.3d at 345-46 (defendant's membership in powerful crime organization is factor supporting anonymous jury); Vario, 943 F.3d at 240 (while mere invocation of organized crime is not sufficient to justify anonymous jury, a defendant's connection to a broader criminal enterprise may merit anonymous jury where there is a "demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendant and his associates such as would cause a juror to reasonably fear for his own safety").

As previously set forth in the Detention Memo, the defendant has a history of violence and maintained caches of weapons for protection and to punish those who act against his interests.   See Detention Memo at 23.   His sprawling drug trafficking enterprise has legions of members, and has both made and spent enormous sums of money during a decades-long campaign of corruption and violence to maintain power.   See id. at 22.   And the defendant's drug trafficking operations are not limited to his home country of Mexico:   as alleged in the indictment and as the evidence will show at trial, the defendant's drug trafficking organization distributed multi-ton quantities of cocaine into the United States, including the Eastern District of New York.   See, e.g., Indictment ¶ 12, Violations 81 and 83.   In short, he has a long and storied history of interference with the judicial process in Mexico and has the means to do so in this case, even in the United States.

Moreover, due to the defendant's notoriety, there are other factors that create the risk that the judicial process could be compromised in the absence of an anonymous and partially sequestered jury. For example, in addition to his own network of associates, there have been others, such as the California state inmates discussed above, supra at 5-6, who have vowed to assist the defendant in escaping justice even without explicit direction from the defendant. And because the defendant was widely known as the dangerous, powerful leader of one of the world's largest drug cartels prior to his extradition to the United States, potential jurors may fear retaliation from the defendant's associates — and therefore may be unable to adequately perform their duties as jurors — if their identities are publicly available. See United States v. Stewart, 590 F.3d 93, 125 (2d Cir. 2008); Al Farekh, June 16, 2017 Mem. & Order at 3. As such, this factor supports anonymity and partial sequestration.

C.    <u>Extensive Press Coverage Justifies an Anonymous and Partially Sequestered Jury</u>

The intense media scrutiny that this case has received and will continue to receive is the final factor in support of an anonymous and partially sequestered jury. See United States v. Kadir, 718 F.3d 115, 121 (2d Cir. 2013) (observing that "extensive media coverage" is a "significant" factor in considering whether to empanel anonymous jury). As set forth above, many press reports have been published around the world documenting the defendant's arrests and prison escapes in Mexico, his extradition to the United States, his court appearances, and even legal filings in this case. Domestic publications such as the New York Times, New York Post, New York Daily News, Washington Post, Los Angeles Times, and the Chicago Tribune have reported extensively on this case, which has many times been "front page news." Paccione, 949 F.2d at 1193. Members of the press have both appeared outside of the

courthouse and attended nearly every court appearance, and the Court has had to make use of "overflow" courtrooms to accommodate press and public interest in the case.[11]

International press is also likely to cover the defendant's trial extensively. The defendant's Mexico-based drug trafficking organization was responsible for the distribution of illicit narcotics from South America, through Central America and Mexico, to the rest of the world. Moreover, the colorful facts about the defendant's rise, arrests, and prison escapes have enhanced his notoriety as a narcotics trafficker, furthering global public interest in the defendant and his trial.[12]

The anticipated press coverage of the defendant's trial strongly supports the anonymity and partial sequestration requested in this motion. See Kadir, 718 F.3d at 121; Wong, 40 F.3d at 1377 ("The prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment."). The fact that jurors are aware that their identities are public may subtly or unconsciously impair their impartiality in a case with this degree of media attention. See United States v. Shkreli, No. 15-CR-637 (KAM) (E.D.N.Y.), Mem. & Order dated June 25, 2017, Dkt. No. 259 (observing that in a "high profile

---

[11] See, e.g., "Judge Won't Guarantee Pay for 'El Chapo' Lawyers," CBS News (Aug. 14, 2017), available at: http://newyork.cbslocal.com/2017/08/14/el-chapo-seeks-new-lawyers/; Alan Feuer, "The U.S. Case vs. El Chapo: 10,000 Pages and Recordings," The New York Times (May 5, 2017), available at: https://www.nytimes.com/2017/05/05/nyregion/el-chapo-size-of-case.html.

[12] See, e.g., Victor Sancho, "'El Chapo' contrata al abogado que defendio a jefe de la mafia en EU," El Universal (Aug. 8, 2017), available at: http://www.eluniversal.com.mx/articulo/mundo/2017/08/8/el-chapo-contrata-al-abogado-que-defendio-jefe-de-la-mafia-en-eu; Harriet Alexander, "Joaquin 'El Chapo' Guzman to face 'drug trial of the century' in April 2018," The Telegraph (May 5, 2017), available at: http://www.telegraph.co.uk/news/2017/05/05/joaquin-el-chapo-guzman-stand-trial-april-2018/.

case in which there has been ongoing pre-trial media coverage," disclosure of juror names would increase the risk that jurors would fear the pressure of public identification and "not be candid"). Anonymity and partial sequestration will also protect jurors from inappropriate contact. See Paccione, 949 F.2d at 1193 (stating that the anonymity and partial sequestration were appropriate because the "case had been front-page news and that the trial could be expected to be the subject of extensive publicity, exposing the jurors to inappropriate contacts that could compromise the trial"); Al Farekh, June 16, 2017 Mem. & Order at 3 (citing Paccione, 949 F.2d at 1193). Accordingly, to preserve their impartiality and ability to fairly consider the evidence without fear of public intrusion or reprisal, and to prevent inappropriate contact, the jurors' identities should be anonymous as to the public and they should be kept together during lunch recesses and transported by the USMS to and from an undisclosed location each trial day.[13]

D.     Protection of the Defendant's Rights

The Court can take simple precautions to ensure that the relief requested by the government will not infringe upon the defendant's rights. See Kadir, 718 F.3d at 120 (explaining that if a "district court determines that an anonymous jury is appropriate, the court must take reasonable precautions to minimize any prejudicial effects on the defendant and to ensure protection of his fundamental rights") (internal quotation marks and citation omitted).

As the Second Circuit has explained, a defendant has two concerns that are potentially impacted by a decision to empanel an anonymous jury: (1) the right to make

---

[13] Absent partial sequestration, anonymous jurors would be able to be identified by, for example, the license plates of their vehicles parked near the courthouse.

informed choices during the jury selection process; and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity. See Kadir, 718 F.3d at 120. The first concern can be alleviated by the use of a jury questionnaire as well as thorough and probing voir dire. As this Court has previously explained in empaneling an anonymous jury, a jury questionnaire is an appropriate means of minimizing potential prejudice to a defendant when an anonymous jury is empaneled in a case with intense media scrutiny. Cacace, 2013 WL 4775531 at *5. The second concern can be alleviated by informing the jurors that partial anonymity is being ordered to protect their privacy, which the Second Circuit has expressly sanctioned as an appropriate "plausible and nonprejudicial" reason for not disclosing jurors' identities. Kadir, 718 F.3d at 120-21 (upholding decision where court instructed the jury that, "given the media interest in this case, anonymity would protect the jurors' 'rights of privacy' and assist them 'in discharging [their] responsibility as jurors independently, fairly and impartially'") (quoting jury instructions) (alterations in original). The Court can also explain jurors' partial anonymity by telling prospective jurors, accurately, that anonymity would allow them to feel more comfortable in giving candid answers to the questions asked in voir dire.

As for the jury's partial sequestration, the government proposes that the Court instruct the jury that transportation is being provided to protect their privacy and to ensure that the trial can proceed expeditiously.[14]   This explanation has been routinely given in cases where

---

[14] The Court can also provide similar instructions for any other security measures that the USMS might employ which might be apparent to the jury (as opposed to, for example, "behind the scenes" monitoring and security assessments that the USMS may conduct which will not be noticed by jurors and therefore do not need to be explained to them).   In order for the Court to craft such instructions, the government proposes that it and the USMS brief the Court, ex parte, shortly before jury selection concerning the specific security measures that the

transportation to and from court is provided.  See United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL 2783359, at *3 n.3 (E.D.N.Y. July 15, 2008) ("Jurors are generally told that such steps are not unusual and are taken to ensure their privacy and impartiality in light of the media and public attention the trial is expected to receive."); see also Gotti, 459 F.3d at 345-46 (2d Cir. 2006) (reviewing decision to order anonymity and partial sequestration under the same standard).

---

USMS intends to employ with regard to jury security.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motion for an anonymous and partially sequestered jury.

Dated:      Brooklyn, New York
              January 5, 2018

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

OF COUNSEL:
BENJAMIN G. GREENBERG
Acting United States Attorney
Southern District of Florida