GMP:PEN/AG/MPR/BR
F.#2009R01065/OCDETF# NY-NYE-616

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                    Docket No. <u>09-CR-466(S-4)(BMC)</u>

JOAQUIN ARCHIVALDO GUZMAN LOERA,
      also known as "El Chapo," "El Rapido,"
      "Chapo Guzman," "Shorty," "El Senor,"
      "El Jefe," "Nana," "Apa," "Papa," "Inge"
      and "El Viejo,"

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S FIRST MOTIONS *IN LIMINE*

                                    RICHARD P. DONOGHUE
                                      UNITED STATES ATTORNEY
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201

                                      ARTHUR G. WYATT, CHIEF
                                      Narcotic and Dangerous Drug Section
                                      Criminal Division
                                      U.S. Department of Justice

                                      OF COUNSEL:
                                      BENJAMIN G. GREENBERG
                                      United States Attorney
                                      Southern District of Florida

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................. 2

I.      Procedural History ............................................................................. 2

II.     Overview ........................................................................................... 3

III.    The Sinaloa Cartel ............................................................................. 4

IV.     Evidence of the CCE .......................................................................... 6

ARGUMENT .................................................................................................. 9

I.      Motion to Admit Evidence of Defendant's Acts of Violence
        and Certain Drug Trafficking Activity .............................................. 9

        A.      Legal Standard ...................................................................... 10

        B.      Evidence of the Defendant's Kidnapping, Torture and
                Other Acts of Violence Against Persons Who Threatened
                the Sinaloa Cartel is Admissible ........................................... 12

                i.      Background ................................................................. 12

                ii.     The Defendant's Uncharged Acts of Violence during
                        the Charged Period are Admissible ............................ 16

        C.      Evidence of the Defendant's Drug Trafficking Prior to
                the Charged Period is Admissible .......................................... 19

                i.      Background ................................................................. 19

                ii.     The Defendant's Pre-Indictment Drug Trafficking is
                        Admissible ................................................................. 20

        D.      The Defendant's Drug Trafficking While in Prison is
                Admissible ............................................................................ 22

        E.      The Defendant's Fentanyl Trafficking is Admissible ............. 23

        F.      The Foregoing Evidence is Not Unfairly Prejudicial ............. 25

II.     Motion to Admit Evidence of Defendant's Flight from Justice ........ 28

i

A.     Background ................................................................ 28

B.     The Defendant's Flight from Justice is Admissible as
Direct Evidence ......................................................... 31

     i.     The Defendant's Flight from Justice is "Inextricably
Intertwined" With the Charged Crimes................................. 31

     ii.     The Defendant's Flight from Justice is Evidence of
Consciousness of Guilt................................................. 34

C.     The Defendant's Flight from Justice is Admissible under
Rule 404(b) .............................................................. 36

III.     Motion to Admit Intercepted and Recorded Communications
and Video Evidence ....................................................... 38

A.     Background ................................................................ 39

B.     The Intercepted and Recorded Communications and
Video Evidence Will be Properly Authenticated ........................... 41

     i.     Federal Rule of Rule of Evidence 901(a)............................... 41

     ii.     The Intercepted and Recorded Communications
Satisfy Rule 901(a) .................................................... 42

     iii.     The Video Evidence Satisfies Rule 901(a) ............................ 44

C.     Certain Intercepted and Recorded Communications and
Video Evidence Do Not Contain Inadmissible Hearsay ................. 48

     i.     Intercepted BBM Messages Sent Through the "OFIS"
Structure are Admissible .......................................... 48

     ii.     Certain Statements in the Video Evidence are
Admissible........................................................... 51

D.     Use of Translations and Transcripts ............................... 53

E.     Cooperating Witness Interpretation of Intercepted and
Recorded Communications and Video Evidence ........................... 53

IV.     Motion to Admit Portions of the 2015 Interview Video and
Preclude the Defense from Introducing Irrelevant, Self-Serving
Portions................................................................... 57

    A.     Legal Standard ................................................................... 57

    B.     Analysis ............................................................................ 59

V.     Motion to Admit Satellite Photographs ...................................... 61

VI.     Motion to Admit Drug Ledgers ................................................. 62

    A.     Legal Standard ................................................................... 63

    B.     Analysis ............................................................................ 66

VII.     Motion to Admit Attorney Payment Records ............................... 68

VIII.     Motion to Permit Select Witnesses to Testify Under
      Pseudonyms and to Preclude Examination of Government
      Witnesses Regarding Certain Identifying Information ................. 70

    A.     The Court Should Permit Certain Witnesses to Testify
        Under Aliases .................................................................... 71

    B.     The Court Should Preclude Elicitation of Specific
        Identifying Information ...................................................... 74

IX.     Motion to Preclude Evidence and Argument Alleging
      Selective Prosecution of the Defendant .................................... 76

X.     Motion to Preclude the Defense from Presenting Irrelevant
      and/or Unfairly Prejudicial Evidence and Argument ................... 79

    A.     Legal Standard ................................................................... 80

    B.     Evidence of Defendant's Prior Good Conduct ..................... 81

    C.     Misleading Rolling Stone Article and Related Media
        Appearances of Sean Penn................................................. 82

    D.     Books, Media Appearances and Other Articles
        Regarding the Defendant .................................................... 84

    E.     Special Administrative Measures Governing the
        Defendant's Confinement................................................... 85

    F.     "Fast and Furious" Operation and Firearms Derived
        Therefrom ......................................................................... 86

    G.     Sensitive Law Enforcement Techniques ............................. 87

H.    Potential Punishment .......................................................................................... 89

CONCLUSION ................................................................................................................... 91

# TABLE OF AUTHORITIES

## CASES

Allen v. West Point-Pepperell Inc.,
 848 F.Supp 423 (S.D.N.Y. 1994) ........................................................................ 68

Arlio v. Lively,
 474 F.3d 46, 52 (2d Cir. 2007) ........................................................................... 80

Bourjaily v. United States,
 483 U.S. 171 (1987).............................................................................................. 63

Delaware v. Van Arsdall,
 475 U.S. 673 (1986).............................................................................................. 72

Gonzalez v. Digital Equip. Corp.,
 8 F. Supp. 2d 194 (E.D.N.Y. 1998) ................................................................... 47

Huddleston v. United States,
 485 U.S. 681 (1988).............................................................................................. 38

In re Grand Jury Subpeona Served Upon Doe,
 781 F.2d 238 (2d Cir. 1986) ........................................................................ 69, 70

In re Shargel,
 742 F.2d 61 (2d Cir. 1984) .......................................................................... 68, 69

Kleveland v. United States,
 345 F.2d 134 (2d Cir.1965) ......................................................................... 44, 62

Lefcourt v. United States,
 125 F.3d 79 (2d Cir. 1997) .................................................................... 68, 69, 70

Linde v. Arab Bank, PLC,
 97 F. Supp. 3d 287 (E.D.N.Y. 2015), vacated on other grounds, 882 F.3d 314 (2d Cir.
 2018) ............................................................................................................... passim

Mikus v. United States,
 433 F.2d 719 (2d Cir.1970) .............................................................................. 44

Old Chief v. United States,
 519 U.S. 172 (1997)..................................................................................... 11, 25

Outerbridge v. City of New York,
No. 13 CIV. 5459 AT DCF, 2015 WL 5813387 (S.D.N.Y. Sept. 30, 2015) ..................... 85

Rivera v. Inc. Vill. of Farmingdale,
29 F. Supp. 3d 121 (E.D.N.Y. 2013) ................................................................. 46

S.E.C. v. Sassano,
274 F.R.D. 495 (S.D.N.Y. 2011) ...................................................................... 68

Tokio Marine and Fire Ins. Co. v. Rosner,
206 Fed. Appx. 90 (2d Cir. 2006) .................................................................... 85

United States v. Abboud,
438 F.3d 554 (6th Cir. 2006) .......................................................................... 76

United States v. Aiello,
864 F.2d 257 (2d Cir. 1988) ........................................................................... 55

United States v. Al Kassar,
660 F.3d 108 (2d Cir. 2011) ....................................................................... 82, 84

United States v. Alaga, 995 F.2d 380, 382 (2d Cir. 1993) ..................................... 22

United States v. Alaniz,
726 F.3d 586 (5th Cir. 2013) .......................................................................... 73

United States v. Alimehmeti,
No. 16-CR-398, 2018 WL 922150 (Feb. 15, 2018) ........................................... 88

United States v. Alosa,
14 F.3d 693 (1st Cir. 1994) ................................................................... 64, 66, 67

United States v. Al-Sadawi,
432 F.3d 419 (2d Cir. 2005) ...................................................................... 34, 36

United States v. Arce,
997 F.2d 1123 (5th Cir. 1993) ........................................................................ 64

United States v. Armstrong,
517 U.S. 456 (1996) ....................................................................................... 76

United States v. Ashraf,
320 F. Appx. 26 (2d Cir 2009) ........................................................................ 64

United States v. Barone,
913 F.2d 46 (2d Cir. 1990) ........................................................................ 43, 52

United States v. Bartelho,
   129 F.3d 663 (1st Cir. 1997) ....................................................................... 34, 37

United States v. Becerra,
   97 F.3d 669 (2d Cir. 1996) ............................................................................ 17

United States v. Bennett,
   409 F.2d 888 (2d Cir. 1969) .......................................................................... 72

United States v. Ben-Shimon,
   249 F.3d 98 (2d Cir. 2001) ............................................................................ 53

United States v. Berrigan,
   482 F.2d 171 (3d Cir. 1973) .......................................................................... 76

United States v. Bohmont,
   413 F. App'x. 946 (8th Cir. 2001) ................................................................ 66

United States v. Bosch,
   399 F. Supp. 2d 521 (S.D.N.Y. 2005) ......................................................... 43

United States v. Brown,
   96 Fed. Appx. 112 (4th Cir. 2004) ............................................................... 37

United States v. Cannon,
   636 Fed. Appx. 30 (2d Cir. 2016) ........................................................... 34, 36

United States v. Carboni,
   204 F.3d 39 (2d Cir. 2000) ................................................................... passim

United States v. Castro,
   813 F.2d 571 (2d Cir. 1987) .......................................................................... 36

United States v. Cavallaro,
   553 F.2d 300 (2d Cir. 1977) .......................................................................... 74

United States v. Celis,
   608 F.3d 818 (D.C. Cir. 2010) ...................................................................... 73

United States v. Chalarca,
   95 F.3d 239 (2d Cir. 1996) ............................................................................ 53

United States v. Chin,
   83 F.3d 83 (4th Cir. 1996) ....................................................................... 17, 27

United States v. Coffey,
   361 F. Supp. 2d 102 (E.D.N.Y. 2005) ......................................................... 50

United States v. Cohen,
    384 F.2d 699 (2d. Cir. 1967) ........................................................ 65

United States v. Conception,
    983 F.2d 369 (2d Cir. 1992) .................................................. 18, 79

United States v. Cooper,
    868 F.2d 1505 (6th Cir. 1989) ..................................................... 65

United States v. Coppola,
    671 F.3d 220 (2d Cir. 2012) .................................................. 50, 51

United States v. Coughman,
    116 F.3d 1472 (2d Cir. 1997) ............................................... 63, 64

United States v. Damrah,
    412 F.3d 618 (6th Cir.2005) ................................................ 45, 48

United States v. DeSimone,
    699 F.3d 113 (1st Cir. 2012) ....................................................... 35

United States v. Eberhart,
    467 F.3d 659 (7th Cir. 2006) ...................................................... 43

United States v. Estrada,
    320 F.3d 173 (2d Cir. 2003) ....................................................... 17

United States v. Everett,
    825 F.2d 658 (2d Cir. 1987) ....................................................... 37

United States v. Farhane,
    634 F.3d 127 (2d Cir. 2011) .................................................. 77, 78

United States v. Figueroa,
    548 F.3d 222 (2d Cir. 2008) ....................................................... 78

United States v. Foster,
    711 F.2d 871 (9th Cir. 1983) ...................................................... 65

United States v. Fuentes,
    563 F.2d 527 (2d Cir. 1977) .................................................. 42, 43

United States v. Gagliardi,
    506 F.3d 140 (2d Cir. 2007) ....................................................... 42

United States v. Garcia Abrego,
    141 F.3d 142 (5th Cir. 1998) ...................................................... 27

United States v. Garcia,
    291 F.3d 127 (2d Cir. 2002) ....................................................................... 54, 55

United States v. Ghavami,
    23 F. Supp. 3d 148 (S.D.N.Y. 2014), aff'd sub nom. United States v. Heinz, 607 F. App'x
    53 (2d Cir. 2015)...................................................................................... 56, 57

United States v. Gibbs,
    190 F.3d 188 (3rd Cir. 1999) ............................................................................ 27

United States v. Gil,
    58 F.3d 1414 (9th Cir. 1995) ............................................................................ 65

United States v. Gilan,
    967 F.2d 776 (2d Cir. 1992) ............................................................................ 38

United States v. Glenn,
    312 F.3d 58 (2d Cir. 2002) ............................................................................ 34

United States v. Goldberger & Dubin, P.C.,
    935 F.2d 501 (2d Cir. 1991) ............................................................................ 68

United States v. Gonzalez,
    110 F.3d 936 (2d Cir. 1997) ....................................................................... 11, 32

United States v. Gupta,
    747 F.3d 111 (2d Cir. 2014) ............................................................................ 50

United States v. Harris,
    733 F.2d 994 (2d Cir. 1984) ....................................................................... 11, 21

United States v. Hassan,
    742 F.3d 104 (4th Cir. 2014) ............................................................................ 46

United States v. Hemmings,
    482 Fed. Appx. 640 (2d Cir. 2012)............................................................... 42, 43

United States v. Hernandez,
    No. 12-cr-809, 2013 WL 3936185 (S.D.N.Y. July 29, 2013) ..................................... 72, 74

United States v. Jackson,
    180 F.3d 55 (2d Cir. 1999) ............................................................................ 59

United States v. Johnson,
    507 F.3d 793 (2d Cir. 2007) ............................................................................ 58

United States v. Jones,
   52 F.3d 924 (11th Cir. 1995) ......................................................................... 76

United States v. Jones,
   554 F.2d 251 (5th Cir. 1977) ......................................................................... 67

United States v. Joyner,
   201 F.3d 61 (2d Cir. 2000) ............................................................................ 33

United States v. Kalaydjian,
   784 F.2d 53 (2d Cir. 1986) ..................................................................... 11, 21

United States v. Khan,
   591 F. Supp. 2d 202 (E.D.N.Y. 2008) ........................................................... 17

United States v. Lizotte,
   856 F.2d 341 (1st Cir. 1988) .......................................................................... 65

United States v. Lopez-Medina,
   461 F.3d 724 (6th Cir. 2006) ......................................................................... 64

United States v. Louis,
   814 F.2d 852 (2d Cir. 1987) .......................................................................... 43

United States v. Lyles,
   593 F.2d 182 (2d Cir. 1979) .......................................................................... 50

United States v. Mahaffy,
   Crim. No. 05-613 (ILG), 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) .......................... 59

United States v. Marcum,
   16 F.3d 599 (4th Cir. 1994) ........................................................................... 76

United States v. Marcus,
   No. 05-cr-457, 2007 WL 330388 (E.D.N.Y. Jan. 31, 2007) ............................................. 71

United States v. Marin,
   669 F.2d 73 (2d Cir. 1982) ............................................................. 57, 58, 59, 60

United States v. Marti,
   421 F.2d 1263 (2d Cir. 1970) .............................................................. 71, 72, 74

United States v. Maso,
   No. 07-10858, 2007 WL 3121986 (11th Cir. 2007) ....................................................... 73

United States v. Massino,
   546 F.3d 123 (2d Cir. 2008) .......................................................................... 38

United States v. Meija,
  545 F.3d 179 (2d Cir. 2008) ...................................................................... 27

United States v. Miller,
  116 F.3d 641 (2d Cir. 1997) ................................................................ 17, 27

United States v. Miller,
  641 F. Supp. 2d 161 (E.D.N.Y. 2009) ........................................................ 80

United States v. Montalvo, No. 11-CR-00366-RJA-JJM, 2014 WL 3894377, at *9
  (W.D.N.Y. Apr. 16, 2014), report and recommendation adopted, No. 11-CR-366-A, 2014
  WL 3894383 (W.D.N.Y. Aug. 8, 2014) ........................................................ 51

United States v. Moran-Toala,
  726 F.3d 334 (2d Cir. 2013) ...................................................................... 12

United States v. Morones,
  530 Fed. Appx. 685 (10th Cir. 2013) .......................................................... 37

United States v. Mulligan,
  573 F.2d 775 (2d Cir. 1978) ...................................................................... 59

United States v. Mullins,
  562 F.2d 999 (5th Cir. 1977) ...................................................................... 23

United States v. Nachamie,
  101 F. Supp. 2d 134 (S.D.N.Y. 2000) ........................................................ 25

United States v. Nekritin,
  No. 10-CR-491, 2011 WL 2462744 (E.D.N.Y. June 17, 2011) ........................ 81

United States v. O'Brien,
  No. 13-CR-586, 2017 WL 2371159 (E.D.N.Y. May 31, 2017) ........................ 88

United States v. Orieckinto,
  234 F. Supp. 3d 360 (D.Conn. 2017) .......................................................... 45

United States v. Persico,
  425 F.2d 1375 (2d Cir. 1970) ...................................................................... 74

United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) .................................. 22

United States v. Pluta,
  176 F.3d 43 (2d Cir. 1999) .................................................................... 41, 42

United States v. Portillo-Quezada,
  469 F.3d 1345 (10th Cir. 2006) .......................................................... 27, 28, 29

United States v. Prevezon Holdings, Ltd.,
    319 F.R.D. 459 (S.D.N.Y. 2017) ...................................................... 62

United States v. Reed,
    576 Fed. Appx. 60 (2d Cir. 2014) .................................................... 10

United States v. Regan,
    103 F.3d 1072 (2d Cir. 1997) ......................................................... 76

United States v. Rivera,
    No. 13-CR-149, 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ........................................ 81

United States v. Roland-Zapata,
    916 F.2d 795 (2d Cir. 1991) ...................................................... 25, 38

United States v. Rommy,
    506 F.3d 108 (2d Cir. 2007) ......................................................... 44

United States v. Rosado,
    728 F.2d 89 (2d Cir. 1984) ....................................................... 77, 79

United States v. Ruggiero,
    928 F.2d 1289 (2d Cir. 1991) ........................................................ 41

United States v. Ruggiero,
    928 F.3d 1289 (2d Cir. 1991) ........................................................ 42

United States v. Sanchez,
    790 F.2d 245 (2d Cir. 1986) ......................................................... 34

United States v. Scott,
    677 F.3d 72 (2d Cir. 2012) ...................................................... 37, 38

United States v. Smith,
    893 F.2d 1573 (9th Cir. 1990) ....................................................... 64

United States v. Talley,
    164 F.3d 989 (6th Cir. 1999) ........................................................ 11

United States v. Taylor,
    562 F.2d 1345 (2d Cir.1977) ......................................................... 76

United States v. Taylor,
    688 F. App'x 638 (11th Cir. 2017) ................................................... 48

United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994) ....................................... 18

United States v. Thomas,
   116 F.3d 606 (2d Cir. 1997) ........................................................... 77, 79

United States v. Thornton,
   197 F.3d 241 (7th Cir. 1999) ............................................................. 64

United States v. Tin Yat Chin,
   371 F.3d 31 (2d Cir. 2004) ............................................................... 41

United States v. Tracy,
   12 F.3d 1186 (2d Cir. 1993) .......................................................... 50, 51

United States v. Tropeano,
   252 F.3d 653 (2d Cir. 2001) ......................................................... 42, 43

United States v. Ulerio,
   859 F.2d 1144 (2d Cir. 1988) ........................................................... 53

United States v. Urena,
   989 F. Supp. 2d 253 (S.D.N.Y. 2013) ............................................... 52

United States v. Vanwort,
   887 F.2d. 375 (2d Cir. 1989) ......................................................... 64, 67

United States v. Vayner,
   769 F.3d 125 (2d Cir. 2014) ............................................................. 46

United States v. Vegas,
   27 F.2d 773 (2d Cir. 1994) ............................................................... 17

United States v. Washington,
   705 F.2d 489 (D.C. Cir. 1983) .......................................................... 76

United States v. Weisberg,
   2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ..................................... 68

United States v. Wilkerson,
   84 F.3d 692 ....................................................................................... 59

United States v. Williams,
   205 F.3d 23 (2d Cir. 2000) ........................................................... 12, 25

United States v. Yannotti,
   541 F.3d 112 (2d Cir.2008) .......................................................... 55, 56

Washington v. Walsh,
   No. 08-cv-6237, 2010 WL 423056 (S.D.N.Y. Feb. 5, 2010) ........... 72

## FEDERAL STATUTES

18 U.S.C. § 3500 ................................................................................................ 2, 73, 77

18 U.S.C. § 924(c) .................................................................................................. 8, 26

21 U.S.C. § 848(c)(2)(B) ............................................................................................ 32

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motions in limine to permit the government to introduce into evidence at trial: (1) the defendant's acts of violence and certain drug trafficking activity as direct evidence of the crimes charged and/or pursuant to Federal Rule of Evidence 404(b); (2) the defendant's escapes from jail and other flight from justice as direct evidence of the crimes charged and/or Rule 404(b) evidence; (3) certain intercepted and recorded wire and electronic communications, as well as video evidence; (4) relevant portions of a videotaped interview of the defendant published by a news outlet, excluding the defendant's non-relevant and/or self-serving portions; (5) satellite photographs; (6) drug ledgers and (7) attorney payment records. The government also moves for a protective order permitting select government witnesses to testify under pseudonyms and to preclude examination of government witnesses concerning certain personal identifying information. Finally, pursuant to Federal Rules of Evidence 401, 402 and 403, the government moves to preclude (1) any evidence and argument alleging selective prosecution of the defendant and (2) the admission of evidence or argument by the defendant regarding a number of topics which are either irrelevant or would likely confuse the issues, mislead the jury or result in unfair prejudice to the government.

For the reasons set forth herein, the Court should grant the government's motions in limine.[1]

---

[1] Pursuant to the Court's order at the status conference on February 15, 2018, the government intends to file its second motions in limine on July 27, 2018. See Tr. at 5:14-16. The government anticipates that those motions primarily will relate to (1) evidence for which the Court has granted delayed disclosure under Federal Rule of Criminal Procedure 16, see Dkt. Nos. 176, 207, and (2) the government's witnesses at trial, including anticipated testimony which the government could not discuss in this motion without risking disclosure of

BACKGROUND[2]

## I.    Procedural History

The defendant is the principal leader of the Mexico-based international drug trafficking organization known as the Sinaloa Cartel, one of the world's largest and most prolific drug trafficking organizations.  On May 11, 2016, a grand jury sitting in the Eastern District of New York returned a seventeen count Superseding Indictment in <u>United States v. Joaquin Archivaldo Guzman Loera</u>, et <u>al</u>., 09 CR 466 (S-4) (BMC) (the "Indictment").

The Indictment, which spans Guzman's criminal conduct from January 1989 through September 2014, charges Guzman with leading a Continuing Criminal Enterprise ("CCE"), based on his role as the leader of the Sinaloa Cartel.  The Indictment also charges Guzman with three conspiracy and eleven substantive drug trafficking offenses, involving his scheme to import, manufacture and distribute narcotics in the United States; the unlawful use of a firearm in furtherance of his drug trafficking crimes; and participating in a money laundering conspiracy.  Furthermore, the Indictment provides Guzman notice of criminal

---

the identities of the witnesses, as well as material related to those witnesses disclosed pursuant to 18 U.S.C. § 3500 and <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  The latter category of motions may include, <u>inter</u> <u>alia</u>, motions to limit and/or preclude cross-examination of the government's witnesses under Federal Rules of Evidence 608, 609 and 403, as well as motions to admit certain out-of-court statements under Federal Rules of Evidence 801 and 803.

As discussed below, <u>see</u> notes 21, 28 <u>infra</u>, the ultimate admissibility of certain evidence addressed in this motion is dependent upon witness testimony.  The government, thus, is not in a position to brief the ultimate admissibility of that evidence on this motion. Nonetheless, the government has briefed certain preliminary issues related to that evidence on this motion, in an effort to resolve those issues well in advance of trial.

[2]  The factual background set forth below is a summary of facts that the government expects to prove at trial through witness testimony, as well as physical, documentary and other evidence.  The government has not endeavored to set forth all facts that it expects to prove at trial.

forfeiture related to all charged counts in the amount of $14 billion, which represents the illegal proceeds of his narcotics trafficking activities.

On January 19, 2017, Mexico extradited the defendant to the United States and, subsequently, issued a Rule of Specialty waiver, authorizing the defendant's prosecution in the above-captioned case. On January 20, 2017, the Court arraigned the defendant on the Indictment and entered an order of detention. The defendant entered a plea of not guilty. The Court has set trial for September 5, 2018.

II.     Overview

The enterprise that is the focus of the CCE in this case is a drug cartel known as the Sinaloa Cartel or the Federation (hereinafter "the Cartel"), which evolved over time. In the mid-1980s, it was collaboration of Mexican-based drug trafficking kingpins or "godfathers," who primarily transported drugs across Mexico into the United States on behalf of Colombians Cartels. By the late 2000s, the Cartel had become an independent, worldwide Cartel with tentacles into South and Central America and beyond.

In the mid-1980s, the defendant's drug trafficking organization, which was based in his home Mexican state of Sinaloa, operated under the protection of the godfather Juan Jose Esparragoza, also known as "El Azul" ("El Azul"). In 2001, the defendant formed a partnership with Ismael Zambada Garcia ("Mayo Zambada"), whose organization also hailed from Sinaloa. Over time, this partnership provided both the defendant and Mayo Zambada with considerable power and wealth and helped propel the defendant to a prominent position of leadership within the Cartel. As proof of the CCE, the evidence will show that the defendant engaged in a continuing series of felony narcotics violations resulting in the importation of massive quantities of heroin, cocaine, marijuana and methamphetamine into the United States

and generation of billions of dollars in illegal profits. Indeed, the Indictment charges the defendant with transporting a minimum of 200,000 kilograms of cocaine, worth billions of dollars. Finally, the evidence will show that the enterprise corrupted public and law enforcement officials to avoid interdiction of their criminal activity, and violence, including kidnapping, torture and murder, as a means of enforcing Cartel rules and defending the Cartel from those who worked against the Cartel's interests.

III.   The Sinaloa Cartel

In the mid-1980s, the "godfathers" controlled drug trafficking corridors, or transportation routes, through Mexican states that bordered the United States, which enabled them to import safely large quantities of drugs into the United States. During this time, the defendant partnered with his cousins, Arturo and Hector Beltran Leyva (and later their brother Alfredo) (the "Beltran Leyva Organization" or "BLO") to obtained cocaine from Colombian drug suppliers, which they smuggled into the United States. The defendant also developed a business relationship with Mayo Zambada, who at the time worked under the auspices of the powerful Cartel member Amado Carrillo Fuentes, who also controlled corridors into the United States (the "Carrillo Fuentes Organization").

In the early 1990s, the Arellano Felix brothers (the "Arellano Felix Organization" or "AFO") maintained control of the corridor running from Baja California into the United States, which the defendant and Mayo Zambada also occasionally used to transport drugs. A dispute between the AFO and the defendant over use of the corridor boiled over into a violent armed conflict, or "war." Mayo Zambada, who had soured on his previous business relationship with the AFO, sided with the defendant and assisted in the defendant's fight against the AFO. As the war raged, in 1993, the defendant became embroiled in a shoot-out,

which resulted in the murder of a Catholic cardinal at the Guadalajara airport in Jalisco, Mexico. This shootout caught law enforcement's attention to the defendant's drug trafficking activity, and the defendant was eventually arrested and jailed.

While in jail, the defendant continued to manage the affairs of his drug organization through the assistance of the BLO and his brother, Arturo Guzman Loera, also known as "Pollo." During this time, Mayo Zambada stood by the defendant in part by allowing the defendant to invest drug shipments through Pollo. In 2001, however, the defendant escaped from prison and hid out in Sinaloa under the protection of El Azul and Mayo Zambada.

In the days following the escape, the defendant and Mayo Zambada formed a partnership between their organizations, creating a stronger faction within the Cartel. The defendant and Mayo Zambada agreed to share the profits of their respective organizations' drug trafficking activities, while continuing to coordinate with other factions of the Cartel. This included working closely with the Carrillo Fuentes drug trafficking organization, which Vicente Carrillo Fuentes now led following his brother Amado's death in 1997; Ignacio Coronel Villarreal ("Nacho Coronel"), who operated from Sinaloa's neighboring state of Jalisco; and the BLO. While all members aligned with the Cartel worked in close collaboration with each other, the defendant emerged as the prominent leader.

Cartel members maintained their own drug organizations and drew on the resources of each other's respective drug organizations. These drug organization consisted of hundreds of workers, including (1) high-level lieutenants; (2) security personnel, who protected the leaders and engaged in acts of violence to further the goals of the Cartel; (3) "plaza bosses," who controlled certain drug trafficking territories for their organizations; (4) transporters, such as boat and submarine crews, pilots and truck drivers, who transported

drugs from Colombia through Mexico and into the United States; and (5) money launderers, who funneled drug proceeds from the United States into Mexico.

Members established relationships primarily with Colombian sources of supply and invited other members to invest in larger drug shipments. As detailed in the Indictment, these sources of supply included the Norte Valle Cartel, the Don Lucho Organization and the Cifuentes-Villa Organization, among others. Typically, each member also permitted other members to use their organization's drug transportation infrastructure without collecting a fee for use of these services. Cartel members also made payments to public and law enforcement officials, which allowed the Cartel to move successfully large quantities of drugs and money throughout South America, Central America, across Mexico and into the United States. Further, these essential payments allowed the Cartel at times to receive warnings in advance of law enforcement efforts to apprehend Cartel members and to allow Cartel members to be released if arrested. Finally, the Cartel carried out thousands of acts of violence, including murders, kidnapping and acts of torture to maintain their power and enforce their rules.

IV.   Evidence of the CCE

To prove the defendant guilty of committing a continuing series of narcotics violations while he led the Cartel, the government will introduce evidence proving numerous drug transactions, including many that resulted in drug seizures, such as the 1993 seizure of approximately seven tons of cocaine which was stashed in cans that appeared to contain chilies; the 2003 seizure of approximately 2,000 kilograms of cocaine in Queens, New York (Violation 81); the 2004 seizure of approximately 12,000 kilograms of cocaine in 2004 in the eastern Pacific ocean (Violation 3); the 2007 seizure of approximately 23,000 kilograms of cocaine in Manzanillo, Mexico; and the 2009 seizure of approximately 84 kilograms of cocaine

and 75 kilograms of heroin in New Jersey. Numerous cooperating witnesses, who operated at every level of the defendant's organization and have knowledge of the inner workings of the Cartel, will provide testimony that supports this evidence. They will be corroborated by intercepted wire and electronic conversations and consensual recordings.

Evidence of the defendant's continuing series of violations also will include evidence of the defendant's trafficking-related murders. Starting in the 1980's, the defendant systematically kidnapped, assaulted, tortured and murdered individuals who threatened the success of his drug tracking activity. As each member of the Cartel struggled for more power for their organizations, conflicts arose among the factions. For example, Vicente Carrillo Fuentes severed ties with the Cartel, in part, because the defendant ordered the murder of his brother, Rodolfo, in 2004. This murder ultimately sparked an all-out war for control of Juarez, the focal point of a drug trafficking corridor, which resulted in the murder of thousands of people, including workers within the Carrillo Fuentes' and the defendant's organizations, as well as the innocent. In early 2008, the BLO split away from the Cartel igniting another bloody war for territory, and later aligned with Los Zetas, a violent rival cartel.

As the various Cartel leaders broke away, or were killed, the defendant consolidated power and expanded the Cartel's geographical reach. The Cartel expanded control of border towns not only between the United States/Mexico border but also between the Mexico/Guatemala border. The Cartel infiltrated other Central American countries, including Honduras, El Salvador, Costa Rica and Panama. Moreover, the Cartel embedded representatives in South American source countries, including not only Colombia, but also Ecuador, to negotiate directly with the sources of supply. Evidence of this expansion will be presented through the testimony of cooperating witnesses and intercepted conversations, some

of which include the defendant, that discuss the involvement of the defendant's representatives in drug shipments that were ultimately seized by law enforcement. These seizures include a multi-ton cocaine shipment in Ecuador in 2009, an approximately 25-kilogram cocaine shipment in Arizona (Violation 79) and an approximately 400-kilogram cocaine shipment in Ipiales, Colombia in 2014, which included grenades and three rocket propelled anti-tank grenades.

\* \* \* \* \* \* \* \*

As set forth below, in this motion, the government requests that the Court admit specific evidence and make certain other specific rulings. The government also requests that the Court preclude the defendant from presenting certain evidence and lines of argument at trial. To avoid unnecessary repetition, the government addresses the facts pertinent to each motion in turn below.

## ARGUMENT

I.   Motion to Admit Evidence of Defendant's Acts of Violence and Certain Drug
     Trafficking Activity

As an initial matter, and despite the defendant's claim to the contrary, see Dkt. No. 192, evidence of the defendant murdering, ordering his coconspirators to murder, or otherwise conspiring to murder, individuals who posed a threat to the Sinaloa Cartel is direct evidence of the CCE, not Rule 404(b) evidence.   As part of the CCE charged in Count One of the Indictment, the defendant is charged in Violation Eighty-Five with conspiring to murder individuals who posed a threat to the Sinaloa Cartel.  Count Sixteen also charges the defendant with possessing, brandishing and discharging firearms in furtherance of the charged drug trafficking crimes in violation of 18 U.S.C. § 924(c).  As such, direct evidence of the charged crimes includes the defendant's murders of, and his orders to murder, persons who were rivals or competitors of the Sinaloa Cartel, sought to report members of the Sinaloa Cartel to law enforcement or otherwise interfered with the illicit activities of the enterprise.  Additionally, the defendant's use of firearms in furtherance of the CCE and conspiracy also is direct evidence of the charged crimes.  Thus, any evidence concerning murders or conspiracies to murder individuals who posed a threat to the Sinaloa Cartel or the defendant's use or his coconspirators' use of firearm in the course of committing drug-trafficking-related violence during the charged period is admissible as direct evidence of the crimes charged.

Apart from such conduct, during trial, the government also expects to elicit testimony from multiple cooperating witnesses about the defendant's criminal conduct described below—some of which is not specifically charged in the Indictment and/or occurred prior to the charged time period—that is direct evidence of the methods and means of the

charged CCE and drug trafficking crimes. Specifically, the government expects to elicit testimony from multiple cooperating witnesses concerning the following:

- Torture and kidnapping committed by the defendant, and the defendant's orders to commit such acts, the date on which the charged CCE and drug trafficking conspiracy counts begin;

- Defendant's drug trafficking prior to January 1989, the date on which the charged CCE and drug trafficking conspiracy counts begin;

- Defendant's drug trafficking activity while he was imprisoned in Mexico from 1993 to 2001;

- Fentanyl trafficking by the defendant and his coconspirators in late 2014, after the charged conspiracy period.

For the reasons discussed below, evidence regarding all of these events should be admissible as direct evidence of the charged CCE and conspiracy counts. In the alternative, it is admissible as "other crimes" or Rule 404(b) evidence.[3]

A.  Legal Standard

Evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); accord United States v. Reed, 576 F. App'x 60, 61 (2d Cir. 2014) (summary order). In addition, the Second

---

[3] In the event the Court believes that this evidence falls within the ambit of Rule 404(b), rather than direct evidence, the government hereby gives notice of its intent to offer at trial evidence of the categories of crimes detailed above. See Fed. R. Evid. 404(b) (stating that, "[o]n request by a defendant in a criminal case," the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial").

Circuit has explained that, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime." Id.; see also Fed. R. Evid. 401, 402. Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

In the context of providing narrative context and dimension to the government's proof, courts have permitted evidence of uncharged crimes to show the background of the charged conspiracy and to show the relationship of trust between the defendant and his coconspirators. See United States v. Kalaydjian, 784 F.2d 53, 56 n.3 (2d Cir. 1986) (evidence of defendant's prior meeting with cooperating witness, at which plan to purchase heroin was discussed, was properly admitted "to establish the basis of the trust relationship between [cooperating witness] and [defendant]"); United States v. Harris, 733 F.2d 994, 1006-07 (2d Cir. 1984) (permissible for trial court to admit evidence of defendant's prior narcotics dealings with informant which "tended to show the basis for [defendant's] trust of [informant]"); see also, e.g., United States v. Talley, 164 F.3d 989, 1000 (6th Cir. 1999) (statements made by informant in tape-recorded conversation with defendant, including that informant and defendant had sold drugs together at one point, were properly admitted because they "established [defendant's] and [informant's] long term relationship" and helped explain why defendant would solicit informant to commit murder).

To the extent that uncharged criminal conduct is considered "other crimes" evidence, courts apply the analysis under Rule 404(b). Evidence of a defendant's other acts is admissible under Rule 404(b) if relevant to an issue at trial other than the defendant's character—such as proving motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident, see Fed. R. Evid. 404(b)(2)—and if its probative value is not substantially outweighed by the risk of unfair prejudice. See United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000). The Second Circuit follows an "inclusionary approach," which admits all relevant "other act" evidence that does not serve the sole purpose of showing the defendant's bad character and that is not overly prejudicial. See United States v. Moran-Toala, 726 F.3d 334, 345 (2d Cir. 2013) (internal quotation marks omitted).

B.    Evidence of the Defendant's Kidnapping, Torture and Other Acts of Violence Against Persons Who Threatened the Sinaloa Cartel is Admissible

Evidence of the defendant's use of kidnapping, torture and other acts of violence to control drug territory, collect debts, intimidate individuals who he believed were cooperating with law enforcement or otherwise posed a threat to the Sinaloa Cartel, is "inextricably intertwined" evidence that is part and parcel of the charged CCE and conspiracy counts charged. Carboni, 204 F.3d at 44. The Court should admit such evidence at trial.

i.    Background

At trial, the government expects to introduce cooperating witness testimony and other evidence proving that the defendant participated in and directed numerous acts of violence, including torture and kidnapping during the charged period. Such acts committed during the charged period are admissible as either evidence of Violation 85 of Count One of the Indictment (charging conspiracy to murder) or as inextricably intertwined evidence of the

overall CCE and drug conspiracy. A brief description of some, but not all, of the evidence in this regard that the government expects to introduce during trial follows below.[4]

During the charged period, specifically, during the war with the Arellano Felix Organization in the early 1990s, the defendant and Guero Palma killed numerous workers for the that cartel with the blessing of then-godfather of Mexican drug trafficking, Juan Jose Esparragoza, also known as "El Azul." Among the key battles in the bloody drug war was the infamous shootout in November 1992 at Christine's discotheque in Puerto Vallarta, Mexico. The defendant led an attack on members of the Arellano Felix Organization he learned would be at the club, which resulted in a gun battle that led to the deaths of six people.

Following the defendant's 2001 escape, during the war with the Gulf Cartel and Los Zetas, the defendant instructed his "sicarios" (hitmen) or "pistoleros" (gunmen) to locate, kidnap, torture and interrogate any suspected member of the rival cartel. At the defendant's explicit orders, his sicarios kidnapped rivals and brought them to him, often bound and helpless, and the defendant then personally interrogated the rivals. Indeed, in at least one instance, the defendant himself shot the rivals at point-blank range and ordered his lackeys to dispose of the bodies. Around 2006, the defendant's workers brought two suspected Zetas members to the defendant. After having lunch, the defendant interrogated them, had them beaten and then shot them both in the head with a long gun. The defendant then ordered his

_____

[4] The government also will seek to introduce at trial evidence of acts of murder, torture and kidnapping that the defendant committed prior to the conspiracies charged in the Indictment as direct evidence of the charged conspiracy. Because such evidence implicates specific cooperating witness testimony, the government will discuss that evidence in its second motions in limine.

workers to dig a hole in the ground, throw the bodies in the hole and light the bodies on fire before burying them.

The defendant's war with the Carrillo Fuentes Organization started when the defendant ordered the murder of Vicente Carrillo Fuentes's brother, Rodolfo Carrillo Fuentes, in September 2004. As noted above, in the late 1990s and early 2000s, the defendant and Mayo Zambada sent drugs to the United States through Juarez with the cooperation of the Carrillo Fuentes Organization. The defendant's workers in Juarez, however, started to have disputes with Rodolfo Carrillo Fuentes's workers. After workers for Rodolfo killed several of the defendant's workers and ordered any other of the defendant's workers to seek permission before entering Juarez, the defendant felt disrespected. Notwithstanding the longstanding relationship that the defendant and Mayo Zambada had with Vicente Carrillo Fuentes and his cartel, the defendant ordered his sicarios to kill Rodolfo. This ignited a war. Since the defendant had already coveted the Juarez-El Paso crossing, he supplied his "pistoleros" in Juarez with a cache of weapons and ordered them to target members of the Carrillo Fuentes Organization for assassination. The defendant's aggressive move for control of the Juarez plaza led to unprecedented violence and a staggering body count, making Juarez, for a time, the murder capital of the world.

In 2008, Mexican authorities arrested a leader of the Beltran Leyva Organization, Alfredo Beltran Leyva, also known as "Mochomo." The other leaders of that organization believed that the authorities arrested him at the defendant's behest. This arrest triggered a series of events that fractured the longtime alliance between the defendant and Mayo Zambada on the one hand, and the Beltran Leyva Organization on the other. War broke out between the factions. The defendant, along with Mayo Zambada, ordered hundreds of

armed "sicarios" to actively search for any workers of the Beltran Leyva Organization in Culiacan, especially the top lieutenants. In retaliation, the Beltran Leyva Organization ordered their "sicarios" and "pistoleros" to target the defendant's workers and lieutenants. Shootouts were frequent, violence was rampant, and finding dead bodies strewn across the city was a regular occurrence. The sicarios representing the defendant's organization were well organized and well equipped. When they did not kill their rivals in shootouts, they abducted and interrogated them to garner intelligence about their rivals' activities. The defendant ordered most of the captured rivals killed and their bodies disposed.

During the height of this war, from approximately 2008 through 2011, the defendant pursued some members of the Beltran Leyva Organization more than others; close to the top of his list was Israel Rincon Martinez, also known as "Wacho" and "Guacho" ("Rincon"). In approximately 2010, Rincon was a top lieutenant and enforcer for the Beltran Leyva Organization, and actively killed members of the Sinaloa Cartel. The defendant and his Cartel made considerable efforts to locate Rincon, and their efforts intensified after Rincon attempted to kill one of the defendant's sons, but instead mistakenly killed the son of one of the defendant's allies. The defendant finally located Rincon and had him kidnapped. The defendant's workers took Rincon to several different properties owned by the defendant and other cartel members, where they interrogated and tortured him. One of the defendant's top lieutenants, and the defendant's cousin, Juan Guzman Rocha, also known as "Juancho," was present along with several other members of the defendant's Cartel. At the defendant's instructions, Juancho interrogated and tortured Rincon regarding one of the defendant's rivals. Several members of the defendant's family also were present and tortured Rincon; they instructed the other torturers that they were not to kill Rincon before the defendant and Mayo

Zambada arrived and interrogated Rincon themselves.  Ultimately, though, they killed Rincon before the defendant and Mayo Zambada arrived.

One of the members of the defendant's Cartel made a video recording of Rincon's interrogation, which ultimately was uploaded to YouTube.  <u>See</u> Bates-number 000314218.  This is not the only time that the defendant's workers published a video of such conduct on the internet.  As discussed further below, the government expects to introduce evidence at trial showing the defendant interrogating a bound member of a rival cartel in another YouTube video.  <u>See</u> Bates-number 000313386.[5]

The defendant did not inflict violence solely upon rival cartel members.  The defendant also ordered murders of Sinaloa Cartel members whom he suspected of cooperating with law enforcement.  Even close family members did not escape this fate.  For instance, the defendant ordered the murder of the aforementioned "Juancho," because the defendant suspected him of cooperating with law enforcement officials.  Indeed, the government expects to introduce evidence that the defendant and members of his Cartel attempted to kill or threatened to kill several of the cooperating witnesses who the government anticipates will testify at trial.

     ii.    <u>The Defendant's Uncharged Acts of Violence during the Charged Period are Admissible</u>

As noted above, any evidence concerning murders and murder conspiracy perpetrated by the defendant during the charged period is admissible as direct evidence of

---

[5] As set forth below in section footnote 22 <u>infra</u>, the government is providing the Court with a disc containing copies of these videos and others as Exhibit A to this motion.

Violation 85 of Count One and, in most instances, Count Sixteen. In any event, even if the government had not specifically charged the murder conspiracy as a CCE violation and the firearms count, district courts have repeatedly found that "[i]ntimidation, violence, and the payment of debts is generally understood to be intertwined with the management and operation of narcotics conspiracies." United States v. Khan, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (finding that evidence of intimidation and violence was direct evidence—not reaching an alternative "other act" theory of admissibility under Rule 404(b)—where defendant was charged with being CCE leader); see also United States v. Estrada, 320 F.3d 173, 183 (2d Cir. 2003) (holding that "use of violence to secure the organization's drug turf [and] carrying and using firearms to enforce its control over the drug market" are overt acts of narcotics conspiracy). Proof of violent actions—such as kidnapping or torture—taken or discussed by coconspirators in a narcotics operation is, therefore, not proof of "other acts," but rather direct evidence of the charged CCE and conspiracy counts. See United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (concluding that evidence of numerous killings was admissible as direct evidence of narcotics conspiracy and enterprise); United States v. Becerra, 97 F.3d 669, 671 (2d Cir. 1996) ("[The Second Circuit has] 'repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade.'") (quoting United States v. Vegas, 27 F.2d 773, 778 (2d Cir. 1994)); see also United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996) (holding that statements about contract murder made during drug deal were intrinsic to drug conspiracy).

Accordingly, the defendant's violent acts and such acts that he ordered are highly probative of the existence of the conspiracy, the lengths to which the defendant, as the preeminent leader of the Sinaloa Cartel, would go to defend his narcotics trafficking enterprise,

and his leadership of the CCE. They are, therefore, admissible as direct evidence of the charged crimes. See United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992) (defendant's offer to cooperating witness to arrange murder was admissible to show membership of conspiracy and lengths to which defendant would go to protect narcotics operation); United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994) (evidence regarding beating admissible to show leadership of conspiracy).

While the kidnappings and torture ordered by the defendant are properly viewed as direct evidence of the crimes charged because they are "inextricably intertwined" with the murder conspiracy charged in Violation Eight-Five of the CCE and the firearms crimes charged in Count Sixteen, Carboni, 204 F.3d at 44, they may also be admissible as Rule 404(b) evidence. Indeed, most of the evidence relating to kidnapping and torture that the government intends to introduce relates to the murders of individuals who posed a threat to the Sinaloa Cartel, charged in Violation Eighty-Five, and therefore are part of the preparation and plan that ultimately led to the murder of each victim. See Fed. R. Evid. 404(b)(2). For example, as described above, during the war with the Beltran Leyvas, the defendant ordered Rincon murdered in retaliation for killing the son of one of the defendant's allies. As part of the plan for that murder plot, the defendant ordered Rincon kidnapped and tortured prior to his murder. Most of the testimony about kidnappings and torture that will be introduced during trial follows a similar pattern, and thus is also admissible as 404(b) evidence.

C.    Evidence of the Defendant's Drug Trafficking Prior to the Charged Period is
      Admissible

      i.    Background

At trial, the government expects to prove that the defendant engaged in drug

trafficking prior to the period charged in the Indictment.  The defendant began his career in

the drug trade in his early youth.  By his own admission in a video distributed by a news outlet

and widely circulated on the internet, the defendant began planting, cultivating and selling both

marijuana and poppy around age fifteen.  See Bates-number 000314123.[6]

      By the early and mid-1980s, the defendant expanded his activities into the

international arena as he transitioned from selling drugs within Mexico to transporting drugs

across the Mexico/U.S. border, and eventually distributing drugs into the United States.  The

defendant pioneered the use of cross-border tunnels between Mexico and the United States to

ensure the quick delivery of drugs, mainly cocaine and marijuana.  The defendant actively

sought to expand the quantities and types of drugs he was sending to the United States.

Therefore, the defendant traveled to Colombia proactively to seek out sources of supply for

both marijuana and cocaine.  The defendant and his representatives met with various sources

of supply, including the upper echelons of the Medellin Cartel—the most powerful Colombian

drug cartel at the time—to reach an agreement to ship cocaine to the United States.

      The defendant's first forays into the cocaine trafficking business were relatively

small, only a few cocaine-laden planes at a time landing on small airstrips in select locations

in Mexico.  The defendant used his drug-smuggling tunnel that crossed the border between

---

[6] As set forth below in section footnote 22 infra, the government is providing
the Court with a disc containing a copy of this videos and others as Exhibit A to this motion.

Agua Prieta, Sonora and Douglas, Arizona to deliver the Colombian cocaine to the United States, and do so very quickly. The defendant earned the nickname "El Rapido" due to the speed with which he delivered the cocaine in the United States. It took the defendant as few as four or five days to transport large shipments of cocaine from Mexico to specific cities in the Southern United States, such as Phoenix and Los Angeles, which was an unprecedented speed for that era of narco-trafficking. As his reputation grew, so did the defendant's client base and shipment capacity. Before long, the defendant arranged for the nightly receipt of as many as 15 to 20 planes loaded with 1,000 to 1,500 kilograms of cocaine each. These plane shipments to the defendant continued as the charged period began in 1989 and into the early 1990s, when the defendant switched to a maritime method of distribution.

ii.     The Defendant's Pre-Indictment Drug Trafficking is Admissible

The defendant's pre-indictment drug trafficking activity is admissible both as direct evidence of the crimes charged, and as background evidence that gives context to how the conspiracy and the defendant's drug trafficking enterprise developed. Alternatively, it is admissible as Rule 404(b) evidence of the defendant's knowledge and intent.

First, evidence of the defendant's pre-indictment drug trafficking activity is direct evidence of the CCE. The defendant's drug trafficking activity in the early and mid-1980's tells the story of how the defendant rose from a minor marijuana trafficker to a significant cocaine and marijuana trafficker with international connections. This evidence supplies a crucial piece of the history of the early days of the defendant's drug trafficking empire. This evidence is "necessary to complete the story of the crime on trial," because it explains how the defendant was able to traffic such massive quantities of cocaine from Colombia to the United States by 1989, the beginning of the charged period. Carboni, 204

F.3d at 44. Indeed, the evidence regarding the defendant's reputation for unprecedented speed in delivering and paying for drugs during that era of narco-trafficking—earning him the nickname "El Rapido"—provides essential detail and context for the defendant's rapid rise to power in the world of drug trafficking in the late 1980s. Id. This early drug trafficking activity also "is inextricably intertwined with the evidence regarding the charged offense"; during the charged period, the defendant relied on his long-standing relationships with Colombian cocaine suppliers—which he forged during this early period—to expand his drug trafficking enterprise. Id. The evidence of the defendant's pre-1989 conduct is helpful and necessary to the jury's understanding of the scope of his enterprise, and how he was able to re-establish himself as a high-level cocaine trafficker so quickly after escaping from prison in 2001.

Second, testimony about pre-indictment drug trafficking activity by the defendant and his coconspirators, some of whom will testify about this period, is also background evidence of the CCE and the charged international narcotics trafficking conspiracy. Namely, the cooperating witnesses' testimony about their drug trafficking activities with the defendant during the 1980's provides evidence that gives necessary context to the manner in which they established a relationship of trust with the defendant. See Kalaydjian, 784 F.2d at 56 n.3; Harris, 733 F.2d at 1006-07.

Even assuming, for the sake of argument, that the pre-indictment conduct described above is not inextricably intertwined with the charged crimes, such conduct still would be admissible under Rule 404(b). The government would not offer this evidence for the purpose of showing the defendant's bad character or propensity for committing drug offenses. Rather, evidence of the defendant's extensive dealings with Colombian cocaine suppliers in the 1980s shows his knowledge and intent with regard to his dealings with

Colombian cocaine suppliers during the charged CCE and drug conspiracy.  See Fed. R. Evid. 404(b)(2).  Moreover, the defendant's use of drug tunnels to transport his drugs across the border into the United States demonstrates his knowledge and intent with regard to his use of tunnels and other related smuggling methods during the period charged in the Indictment.  Id.

     D.       The Defendant's Drug Trafficking While in Prison is Admissible

Testimony regarding the defendant's drug trafficking activity while he was in prison is direct evidence of the crimes charged.  The government expects to elicit testimony from multiple cooperating witnesses that, after the defendant was arrested in June 1993 on Mexican criminal charges of drug trafficking, criminal association and bribery, and imprisoned in Puente Grande prison, the defendant continued to lead the charged CCE and an international narcotics trafficking conspiracy by directing his coconspirators to traffic drugs on his behalf.  Specifically, multiple cooperating witnesses will testify that the defendant's brother Arturo Guzman and the Beltran Leyva Organization, trusted members of the defendant's drug enterprise, arranged for the purchase of narcotics from Colombian suppliers and their transport to the United States on the defendant's behalf.

This conduct "arose out of the same transaction or series of transactions as the charged offense," and is "inextricably intertwined with the evidence regarding the charged offense," because it shows the defendant's continued participation in drug trafficking during the charged period and is thus direct evidence of the charged CCE and conspiracy counts.  Carboni, 204 F.3d at 44.  The fact that the defendant continued to traffic narcotics from jail is also necessary to complete the story of the crime on trial, because it explains how the defendant was able continuously to lead the charged CCE over a twenty-five year period despite his imprisonment in Mexico for eight years.  Id.  The fact of the defendant's incarceration during

this period also is admissible to explain the nature of the defendant's role in these narcotics transaction—e.g., the fact that the defendant himself was not negotiating face-to-face transactions with sources of supply. See United States v. Alaga, 995 F.2d 380, 382 (2d Cir. 1993) (citing United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992)) (finding defendant's imprisonment during charged drug crime was necessary to explain his role in drug transaction). As such, evidence of the defendant's drug trafficking activity from prison is critical to proving the CCE and conspiracy charges in the Indictment.[7]

E.    The Defendant's Fentanyl Trafficking is Admissible

During trial, the government expects to elicit testimony from one or more cooperating witnesses that the defendant and his coconspirators trafficked fentanyl in late 2014, just after the charged period, which he and his coconspirators referred to as "synthetic heroin." Specifically, one or more cooperating witnesses will testify that the defendant and his coconspirators would import fentanyl precursors from China and manufacture fentanyl in the defendant's lab in Sinaloa. The defendant and his coconspirators then sold fentanyl for

---

[7] Even aside from its admissibility as either direct evidence or 404(b) evidence, the government is permitted to cross-examine the defendant about his conviction in Mexico that led to his 1993-2001 incarceration should the defendant take the stand in his own defense. See Fed. R. Evid. 609(a)(1)(B) (evidence of prior criminal conviction "must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant"). The government hereby provides notice that, should the defendant testify, the government will seek to cross-examine him on the basis of his conviction and incarceration in Mexico. See Fed. R. Evid. 609(a), 609(b)(2). While the government reserves the right to respond to any objection to its notice or motion to preclude such cross-examination, the government notes here that the defendant's 2001 prison escape and flight from justice operate to toll the 10-year limitation of Rule 609(b). That rule would typically impose a limit (but not an absolute bar) on the admissibility of prior crimes evidence when more than 10 years have passed since the witness-defendant's release from confinement. But no such bar is applicable here. See United States v. Mullins, 562 F.2d 999, 1000 (5th Cir. 1977) ("[T]he defendant's voluntary flight tolled the ten-year limitation in Rule 609(b).").

shipment to the United States, for ultimate distribution in large cities, such as New York and Los Angeles. The government may also elicit testimony from a drug expert that fentanyl trafficking is an important aspect of the heroin trade in the United States. Specifically, the government expects that a drug expert will testify that fentanyl trafficking goes hand-in-hand with heroin trafficking, because heroin dealers often use fentanyl to "cut" or mix with heroin, which is more expensive. The expert will testify that narcotics traffickers commonly mix fentanyl with heroin to improve the potency of the heroin and to increase its effect on the user.

While the defendant is not charged with trafficking fentanyl, he is charged in Counts One through Four with trafficking multiple narcotics, including heroin. The defendant's fentanyl trafficking is not "other crimes" evidence under Rule 404(b) because it "arose out of the same transaction or series of transactions as the charged offense"—namely, his sprawling drug trafficking enterprise—and is "inextricably intertwined with the evidence regarding the charged offense," i.e., the conspiracy to distribute heroin. Carboni, 204 F.3d at 44. Indeed, the testimony that the defendant's coconspirators referred to the fentanyl as "synthetic heroin" is probative of the fact that their fentanyl trafficking was inextricably intertwined with their heroin trafficking activity charged in the Indictment.

Even if the Court finds that evidence of the defendant's fentanyl trafficking is not direct evidence of the crimes charged in the Indictment, it is admissible as 404(b) evidence to prove the defendant's knowledge and intent. As noted, the government expects to elicit testimony from a drug expert that fentanyl plays an important role in altering the potency and quality of heroin sold in the United States. As such, evidence of the defendant's involvement in producing and selling fentanyl is probative of his knowledge and intent in the heroin distribution conspiracy charged in the Indictment.

F.    The Foregoing Evidence is Not Unfairly Prejudicial

Otherwise admissible evidence may be excluded at trial if its probative value is "substantially outweighed" by the danger of unfair prejudice.  See Fed. R. Evid. 403.  This is true regardless of whether the Court considers the evidence of uncharged crimes to be direct evidence of the charged conspiracy or to be governed by Rule 404(b).  The fact that evidence is highly probative and tends to prove the defendant's guilt of the charged crimes does not mean it is unfairly prejudicial.  Rather, the touchstone for unfair prejudice is the extent to which the evidence creates a risk of conviction based on propensity:  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief, 519 U.S. at 180.  Put another way, unfair prejudice "'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Nachamie, 101 F. Supp. 2d 134, 141 (S.D.N.Y. 2000) (quoting Fed. R. Evid. 403 advisory committee's note) (internal quotation marks omitted).

In the present case, the probative value of the evidence of uncharged crimes that the government seeks to admit is significant, and it is not substantially outweighed by the danger of unfair prejudice to the defendant.  The Second Circuit has stated repeatedly that Rule 403 favors the admission of evidence where the uncharged crimes "did not involve conduct more serious than the charged crime[s]."  Williams, 205 F.3d at 34.  The defendant is charged with leading a CCE that trafficked multi-ton quantities of heroin, cocaine, methamphetamine and marijuana, and used violence, intimidation and public corruption as the methods and means of operating the enterprise.  Plainly, evidence related to the details of the defendant's narcotics trafficking offenses, like testimony concerning fentanyl, and to the defendant's drug

trafficking prior to the charged period does not raise these sorts of concerns. That evidence does not involve "conduct any more sensational or disturbing than the crimes . . . charged." Pitre, 960 F.2d at 1120 (quoting United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)) (internal quotation marks omitted).

Similarly, the fact that the defendant continued to lead a CCE and traffic narcotics while he was imprisoned is highly probative for two reasons: (1) it explains how the defendant was able to continue leading the charged CCE while he was incarcerated and (2) it demonstrates the defendant's preeminent position in the enterprise, as he was able to direct others to continue committing criminal activity on his behalf even while incarcerated. Any prejudicial impact related to the defendant's incarceration during this period is outweighed by its highly probative value, and it is not "any more sensational or disturbing than the [rest of the] crimes with which [the defendant was] charged." Pitre, 960 F.2d at 1120; see also Alaga, 995 F.2d at 382.

Evidence of the defendant's violent crimes in furtherance of the charged CCE and conspiracy is also not unfairly prejudicial. As discussed above, Violation Eighty-Five of Count One charges the defendant with conspiring to murder individuals who posed a threat to the Sinaloa Cartel, and he is charged with possessing, brandishing and discharging firearms in furtherance of the drug trafficking charges in violation of 18 U.S.C. § 924(c). During trial, the government will present extensive evidence, including witness testimony, proving these charges. Thus, testimony concerning kidnappings and torture that the defendant ordered against individuals who posed a threat to his drug enterprise, does not involve "conduct any more sensational or disturbing than the crimes . . . charged," Pitre, 960 F.2d at 1120, and will not be unfairly prejudicial. Evidence of violence, including shootings, should be admitted not

only to prove the elements of the charged murder conspiracy and firearms counts, but also because it is highly probative of the existence of the CCE and conspiracy, the membership of the conspiracy, the leadership of the conspiracy and the goals of the conspiracy.

Courts have consistently held that evidence of violent acts by a defendant's coconspirators is more probative than prejudicial. See Miller, 116 F.3d at 682 (affirming trial court's decision that evidence of murders was relevant to show existence and nature of enterprise and conspiracy and that probative value of evidence was not substantially outweighed by its potential for unfair prejudice); United States v. Mejia, 545 F.3d 179, 207 (2d Cir. 2008) (allowing evidence of prior shootings and stating that, although there is likelihood that evidence proving existence of enterprise through its acts will involve considerable degree of prejudice, evidence nonetheless "may be of important probative value") (citing United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007)); see also United States v. Garcia Abrego, 141 F.3d 142, 174-75 (5th Cir. 1998) (evidence that defendant ordered uncharged murders admissible to prove CCE charge); United States v. Gibbs, 190 F.3d 188, 217-18 (3rd Cir. 1999) (evidence that defendant used violence to further illegal objectives of cocaine conspiracy admissible); Chin, 83 F.3d at 87-88 (evidence regarding contract killing scheme emphasized violent and dangerous context of heroin deal and was inextricably intertwined with defendant's crime of selling heroin and conducting ongoing criminal enterprise); United States v. Portillo-Quezada, 469 F.3d 1345, 1354 (10th Cir. 2006) (murder evidence not unduly prejudicial where admitted as direct proof of narcotics conspiracy). The Court should likewise admit the evidence of violence here.

II.    <u>Motion to Admit Evidence of Defendant's Flight from Justice</u>

At trial, the government expects to introduce testimony by one or more cooperating witnesses, as well as other evidence, including intercepted communications, related to the defendant's prison escapes and other flight from justice. This evidence is direct evidence of the charged CCE and conspiracy counts. The evidence is inextricably intertwined with the charged crimes, and it demonstrates the defendant's consciousness of guilt. In the alternative, this evidence is admissible under Rule 404(b) to show the defendant's knowledge, plan and preparation regarding the charged crimes. The Court should therefore admit it.

A.    <u>Background</u>

In 1995, the government first indicted the defendant in connection with his smuggling of multi-ton quantities of narcotics into the country during the late 1980s and early 1990s. Specifically, on April 26, 1995, a federal grand jury sitting in the District of Arizona returned an indictment against the defendant for drug trafficking charges (the "1995 DAZ Indictment"). <u>See</u> <u>United States v. Guzman</u>, No. 91-CR-446 (FRZ) (D. Ariz.), Dkt. No. 597.[8] Those charges, among other things, related to the May 1990 discovery of a football-field-length tunnel from Agua Prieta, Mexico to Douglas, Arizona, which the defendant had constructed and used to smuggle his drugs into the United States. Additionally, on August 4, 1995, a federal grand jury sitting in the Southern District of California returned an indictment against the defendant for drug trafficking charges (the "1995 SDCA Indictment"). <u>See</u> <u>United States v. Guzman Loera</u>, No. 95-CR-973 (JM) (S.D. Cal.), Dkt. No. 15. Those charges, <u>inter</u>

---

[8] The government filed an earlier indictment against the defendant in the District of Arizona on March 24, 1993, but moved to dismiss it two days later. <u>See</u> <u>id.</u> at Dkt. Nos. 230-31.

alia, related to (1) the April 1993 seizure of 7.3 tons of the defendant's cocaine in Tecate,

Mexico, which Mexican authorities discovered hidden inside cans of jalapeno chili peppers

destined for the United States and (2) the June 1993 discovery of an approximately 1,400-foot

tunnel, which the defendant had constructed from Tijuana, Mexico to Otay Mesa, California

to smuggle his drugs into the United States.  The government filed both indictments publicly.[9]

On January 19, 2001, shortly after the Mexican Supreme Court issued a

precedent-setting decision in favor of extraditing drug kingpins to the United States, the

defendant escaped from a maximum-security prison in Mexico (the "2001 Escape").[10]  From

that point on, the defendant was a fugitive from justice, wanted to stand trial in both the United

States and Mexico.  Over the next 13 years, authorities searched for him, and the defendant

continued to flee from justice.

While the defendant was a fugitive, U.S. and Mexican authorities took

numerous steps to bring attention to his escape and enlist the help of the public in bringing him

to justice.  For instance:

- In June 2001, the President of the United States designated the defendant as a Significant Foreign Narcotics Trafficker under the Foreign Narcotics Kingpin Designation Act.  The White House publicly announced the designation.[11]

---

[9] The government unsealed the 1995 SDCA Indictment on September 28, 1995. See id. at Dkt. No. 20.

[10] See "Under New Law, Mexico Extradites Suspect to U.S.," N.Y Times (May 5, 2001), available at http://www.nytimes.com/2001/05/05/world/under-new-law-mexico-extradites-suspect-to-us.html?mcubz=0 (last visited April 9, 2018).

[11] See "Fact Sheet Overview of the Foreign Narcotics Kingpin Designation Act," The White House (June 1, 2001), available at https://georgewbush-whitehouse.archives.gov/news/releases/2001/06/20010601-3.html (last visited April 9, 2018). Designation under the Act denied the defendant, and his related businesses, access to the U.S. financial system and precluded U.S. companies and individuals from doing business with him.

- By 2004, the U.S. State Department had offered a $5 million reward for the defendant's capture.[12]

- By 2008, Forbes magazine named the defendant the second most wanted fugitive in the world, noting that the government had indicted him and offered a $5 million reward for his arrest.[13]

- By 2009, Mexico named the defendant one of its most wanted drug traffickers and offered a reward equivalent to more than $2 million.[14]

- By 2011, Forbes magazine named the defendant as the most wanted fugitive in the world.[15]

- From 2009 to 2012, the government publicly indicted the defendant in five federal districts in the United States, including in the above-captioned matter.[16]

---

[12] See "Joaquin Guzman-Loera," State.gov (Mar. 7, 2005), available at https://2001-2009.state.gov/p/inl/narc/rewards/39413.htm (last visited April 9, 2018); "Drug Lord, Ruthless and Elusive, Reaches High in Mexico," N.Y. Times (Feb. 9, 2005), available at http://www.nytimes.com/2005/02/09/world/americas/drug-lord-ruthless-and-elusive-reaches-high-in-mexico.html?mcubz=0 (last visited April 9, 2018).

[13] See "The World's 10 Most Wanted," Forbes.com (Apr. 25, 2008), available at https://www.forbes.com/2008/04/25/crime-binladen-guzman-biz-cz_nv_0425mostwanted/ (last visited April 9, 2018).

[14] See "Mexico offers $2-million rewards for top drug suspects," L.A. Times (Mar. 24, 2009), available at http://www.latimes.com/world/la-fg-mexico-reward24-2009mar24-story.html#axzz2uRFIGH2Z (last visited April 9, 2018).

[15] See "The World's 10 Most Wanted Fugitives," Forbes.com (June 14, 2011), available at https://www.forbes.com/sites/nathanvardi/2011/06/14/the-worlds-10-most-wanted-fugitives/#410f05cb217d (last visited April 9, 2018).

[16] See United States v. Guzman Loera, 09-CR-466 (BMC) (E.D.N.Y.), Dkt. Nos. 1-2 (indictment filed July 10, 2009; unsealed Aug. 20, 2009); United States v. Guzman Loera, 09-CR-383 (N.D. Ill.), Dkt. Nos. 7, 15 (indictment filed Aug. 6, 2009; unsealed Aug. 19, 2009); United States v. Guzman Loera, 07-CR-20508 (S.D. Fla.), Dkt. No. 48 (indictment publicly filed Nov. 4, 2010); United States v. Guzman Loera, 11-CR-84 (JL) (D.N.H.), Dkt. Nos. 4, 26 (indictment filed June 8, 2011; unsealed Sept. 4, 2012); United States v. Guzman Loera, 12-CR-849 (FM) (W.D. Tex.), Dkt. Nos. 49, 175 (indictment filed April 11, 2012; unsealed April 24, 2012). The government also indicted the defendant in a sixth federal district; that indictment was under seal until after the defendant was arrested on February 22, 2014. See United States v. Guzman Loera, 12-CR-439 (PAC) (S.D.N.Y.), Dkt. Nos. 14, 15 (indictment filed Jan. 23, 2014; unsealed Feb. 25, 2014).

In addition to the 2001 Escape, the government intends to introduce evidence related to five separate events involving the defendant's flight from justice:

- The "2012 Flight": The defendant's February 2012 flight from law enforcement authorities during a raid on a residence in the resort of Los Cabos, Baja California Sur, Mexico, after being tipped off by corrupt officials about the raid. Law enforcement officers subsequently recovered, inter alia, the defendant's narcotics, weapons, drug ledgers and communications equipment from the residence.
- The "2014 Flight": The defendant's February 2014 flight from law enforcement during a raid on one of his residences in Culiacan, Sinaloa, Mexico, days prior to his arrest in Mazatlán, Sinaloa, Mexico. The defendant escaped through a vast system of tunnels—the entrances to which were located underneath bathtubs on hydraulic lifts—that connected several of his residences. Authorities also recovered, inter alia, the defendant's narcotics, weapons and armored vehicles.

- The "2015 Escape": The defendant's prison escape in July 2015, during which he escaped a high-security Mexican prison through a laboriously constructed and highly-engineered tunnel dug directly into his prison cell.

- The "2016 Arrest": The defendant's attempted, but ultimately unsuccessful, flight from Mexican law enforcement during the January 2016 raid in Los Mochis, Sinaloa, Mexico, during which he escaped from a safe house through tunnels and eventually into a city sewer before being captured.

- The "2016/2017 Planned Escape": The defendant's attempts to plan another possible escape from prison in late 2016 or early 2017, shortly before his extradition to the United States, during which time he spoke with family members and other coconspirators about trying to bribe officials to arrange his movement to another facility in Mexico from which he could more easily flee.

B.     The Defendant's Flight from Justice is Admissible as Direct Evidence

    i.     The Defendant's Flight from Justice is "Inextricably Intertwined" With the Charged Crimes

As previously discussed in more detail, see Section I.A. supra, evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." Carboni, 204 F.3d at 44 (internal quotation marks

omitted). "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." Gonzalez, 110 F.3d at 941.

To begin with, all six events described above are admissible as direct evidence of the charged crimes. They establish the existence of the charged CCE and narcotics conspiracy, as well as the money laundering conspiracy charged in Count Seventeen of the Indictment, and they prove the substantial income element of the CCE charge, see 21 U.S.C. § 848(c)(2)(B) (government must prove defendant "obtain[ed] substantial income or resources" from his drug trafficking activities). As outlined above, and as the government expects to prove at trial, the defendant's escapes and flight attempts involved an extraordinary combination of (1) bribery and corruption, (2) a network of willing coconspirators who personally profited from the defendant's largesse and their role in his drug trafficking enterprise, (3) an array of secure residences, vacation homes and safe houses, and (4) remarkable feats of sophisticated engineering and construction. Standing alone, each of these events is highly probative of the existence of the charged CCE and conspiracy. Taken together, however, they paint a clear picture of the defendant's immense resources derived from his vast criminal enterprise.

In particular, evidence of the 2001 Escape, the 2012 Flight, and the 2014 Flight—all of which occurred during the charged period—are admissible because they are inextricably intertwined with, and necessary to complete the story of, the charged crimes. See Carboni, 204 F.3d at 44. Regarding the 2001 Escape, the full story of the defendant's criminal activity would be incomplete if witnesses had to excise that event from their testimony. Indeed, the government expects one or more cooperating witnesses to testify about the

defendant's 2001 escape and about the Sinaloa Cartel's rapid expansion of its business, along with renewed conflict and militarization, in the years following that escape. The same is true with respect to the 2012 Flight and the 2014 Flight. The government expects to introduce testimony and evidence that, in 2012, corrupt Mexican officials tipped off the defendant to the attempt by Mexican authorities to apprehend him, and that, in 2014, the defendant fled through a complex series of tunnels that the defendant had constructed beneath bathtubs on hydraulic lifts in his residences. Far from peripheral events, the defendant's corruption payments and clandestine construction projects go to the core of charged crimes; they show the existence of the charged CCE, narcotics conspiracy and money laundering conspiracy, as well as the substantial income that the defendant derived from his drug trafficking. Furthermore, during both of these events, law enforcement authorities seized evidence of the defendant's crimes from his residences, including, among other things, drugs, weapons, ledgers, communications equipment and armored vehicles. These seized items are direct evidence of the charged crimes.

The 2015 Escape, the 2016 Arrest and the 2016/2017 Planned Escape took place after the charged period, but are nonetheless highly probative of the charged crimes. These events demonstrate that, in the less than three years following the end of the charged period, the defendant was able to marshal massive resources to support his flight from justice. Such facts demonstrate the existence of the CCE and narcotics and money laundering conspiracies during the charged period, as well as the defendant's substantial income derived therefrom; without his criminal enterprise, the defendant would not have had access to such immense resources after the charged period. See United States v. Joyner, 201 F.3d 61, 72 (2d Cir. 2000) ("[T]he jury may infer substantial income from outward evidence of wealth in the absence of other, legitimate sources of income.") (internal citation and quotation marks omitted).

ii.  The Defendant's Flight from Justice is Evidence of Consciousness of Guilt

In the Second Circuit, it is "well-settled that flight can, in some circumstances, evidence consciousness of guilt." United States v. Al-Sadawi, 432 F.3d 419, 424 (2d Cir. 2005) (citing United States v. Glenn, 312 F.3d 58, 67 (2d Cir. 2002)); see United States v. Sanchez, 790 F.2d 245, 252 (2d Cir. 1986) ("[I]t is universally conceded that the fact of an accused's flight is admissible as evidence of consciousness of guilt.") (citing 2 J. Wigmore, Evidence § 276 (3d ed. 1940)) (alterations and internal quotation marks omitted). Before the government can introduce evidence of flight, however, the government must demonstrate a "sufficient factual predicate" in order to ensure that the jury does not "draw[] unsupported inferences from otherwise innocuous behavior." Al-Sadawi, 432 F.3d at 424 (internal quotation marks and citation omitted). Notably, these cases did not rely on Rule 404(b) to conclude that evidence of flight is admissible; instead, they concluded that such evidence is admissible as direct evidence of guilt. See id.

Accordingly, courts have held that: (1) evidence of flight from an imminent arrest is admissible to show consciousness of guilt, see, e.g., United States v. Cannon, 636 F. App'x 30, 32-33 (2d Cir. 2016) (summary order); (2) evidence of an escape or attempted escape from jail while charges are pending is likewise admissible to show consciousness of guilt, see, e.g., United States v. Bartelho, 129 F.3d 663, 677-78 (1st Cir. 1997);[17] and (3) evidence of an escape—even where the defendant was serving a sentence for a different

---

[17] Although the Bartelho court admitted the evidence of the planned escape under Rule 404(b), under Second Circuit precedent, such evidence is admissible here as direct evidence of the defendant's consciousness of guilt. Nonetheless, as set forth below, Rule 404(b) provides an alternate ground for admitting the defendant's flight from justice.

crime—is admissible to demonstrate consciousness of guilt of crimes for which the defendant is later charged, see, e.g., United States v. DeSimone, 699 F.3d 113, 125 (1st Cir. 2012).

Each of the six events described above is admissible as evidence of the defendant's consciousness of guilt. The government expects to introduce evidence at trial that, by 2001, the government wanted the defendant to stand trial in the United States, including that the defendant faced public pending charges on the 1995 DAZ Indictment and 1995 SDCA Indictment. Testimony from one or more cooperating witnesses at trial will show that, prior to the defendant's 2001 escape, the defendant was concerned about possible extradition to face charges in the United States. Moreover, the government expects one or more cooperating witnesses to testify that, by 2012, the defendant was aware that the U.S. government was assisting in ongoing operations to apprehend him and sought his extradition to stand trial in the United States. Indeed, witness testimony and other evidence, including intercepted communications, will show that the defendant was concerned about ongoing investigations into him by U.S. authorities and worried that informants had infiltrated his organization. This evidence of the defendant's knowledge of the U.S. charges against him is corroborated by the significant public rewards that the government offered for the defendant's arrest beginning in 2004, as well as the five public indictments the government filed against the defendant from 2009 to 2012.[18] Furthermore, the government expects one or more cooperating witnesses to

---

[18] To minimize any prejudice associated with the admitting the public indictments and rewards into evidence, the government will request that the Court (1) take judicial notice of these facts, see Fed. R. Evid. 201; (2) instruct the jury of these judicially noticed facts and (3) instruct the jury that such facts are only to be considered on the issue of the defendant's knowledge of the charges pending in the United States. See United States v. Memoli, 648 F. Appx. 91, 94 (2d Cir. 2016) (summary order) (holding that limiting instructions in jury charge are "sufficient to ensure against any unfair prejudice" where evidence is admitted for a limited purpose); see also United States v. Downing, 297 F.3d 52,

testify that, during his two separate stints in prison from 2014 to 2017, the defendant actively expressed concern that he would be extradited to the United States.

Additionally, given that the defendant engaged in elaborate and sophisticated schemes to facilitate his flight from justice, the defendant's behavior could not be described as "innocuous." Al-Sadawi, 432 F.3d at 424 (holding that evidence of obtaining passport and purchasing airline tickets does not, without more, demonstrate consciousness of guilt). Notably, during the 2001 Escape and the 2014 Escape, the defendant escaped from maximum-security prisons; during the 2012 Flight and 2016/2017 Planned Escape, the defendant bribed and attempted to bribe, respectively, government officials; and during the 2014 Flight, 2015 Escape and 2016 Arrest, the defendant relied on expertly engineered tunnels. The only explanation for the defendant's conduct is his consciousness of guilt. See, e.g., Cannon, 636 F. App'x at 32 ("[A]ttempted flight and false statements can admit a jury finding of consciousness of guilt, in turn supporting an inference of [actual guilt]."); United States v. Castro, 813 F.2d 571, 577 (2d Cir. 1987) (holding that defendant's attempt to flee while authorities searched premises permitted inference of consciousness of guilt). Thus, the evidence is admissible.

C.      The Defendant's Flight from Justice is Admissible under Rule 404(b)

In the alternative, insofar as the defendant's flight from justice is considered "other crimes" evidence, courts apply the analysis under Rule 404(b). See Section I.A. supra. As noted above, evidence of a defendant's other acts is admissible under Rule 404(b) if

---

59 (2d Cir. 2002) (noting that Rule 404(b) prejudice "can be cured with proper instructions, and juries are presumed to follow their instructions").

relevant to an issue at trial aside from the defendant's character—such as proving motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident, see Fed. R. Evid. 404(b)(2)—and if its probative value is not substantially outweighed by the risk of unfair prejudice.

While the Second Circuit has not addressed this precise issue, several circuit courts have found that an escape from prison, or a plan to escape from prison, is admissible evidence of consciousness of guilt, which falls under the "knowledge" prong of the 404(b) admissibility analysis. See United States v. Brown, 96 F. App'x 112, 113-14 (4th Cir. 2004) (summary order) (affirming admission of evidence of prison escape pending trial as 404(b) evidence of consciousness of guilt); United States v. Morones, 530 F. App'x 685, 688-89 (10th Cir. 2013) (summary order) (permitting evidence of prison escape under 404(b) and explaining that 'consciousness of guilt' rationale falls within the "knowledge" prong enumerated by 404(b)); Bartelho, 129 F.3d at 677-78 (affirming admission of testimony regarding defendant's planned prison escape pending trial under 404(b) to show defendant's consciousness of guilt). Here, where the government intends to present evidence that one of the reasons for the defendant's escapes was that he feared that he would be extradited to the United States, his escapes and attempts at flight are powerful evidence of his knowledge and consciousness of guilt. Thus, in the alternative, the Court should admit them under Rule 404(b).[19]

_____

[19] In addition to consciousness of guilt, the defendant's escapes are admissible under 404(b) for the purpose of corroborating prosecution witness testimony about the defendant's narcotics trafficking enterprise. See United States v. Scott, 677 F.3d 72, 81 (2d Cir. 2012) ("We have consistently held [404(b)] evidence admissible to corroborate crucial prosecution testimony.") (citing United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987)). If necessary, the government can more fully detail this potential corroboration in its second motion in limine concerning evidentiary issues related to specific witnesses.

A court considering Rule 404(b) evidence must also engage in a Rule 403 analysis to ensure that the "probative value" of such evidence is not "substantially outweighed by its prejudicial effect." Scott, 677 F.3d at 83 (citing Huddleston v. United States, 485 U.S. 681, 691 (1988)); see also United States v. Gilan, 967 F.2d 776, 780 (2d Cir. 1992) (holding that "evidence must satisfy the probative-prejudice balancing test of Rule 403"). In this case, evidence of the defendant's escapes and attempts at flight does not risk an "adverse effect upon [the] defendant beyond tending to prove the fact or issue that justified its admission." United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008). Evidence of the defendant's prison escapes and attempts to flee, if admitted only as Rule 404(b) evidence, will be offered to the jury to show the defendant's consciousness of guilt of his drug trafficking crimes, which themselves will be proved through direct evidence such as witness testimony, drug ledgers, intercepted communications and other evidence. The prison escapes and attempts at flight, though dramatic in their own right, are no "more sensational or disturbing" than the crimes with which the defendant is charged. Roldan-Zapata, 916 F.2d at 804.

III.    Motion to Admit Intercepted and Recorded Communications and Video Evidence

At trial, the government will seek to admit a variety of intercepted and recorded wire and electronic communications, as well as video evidence. The government requests rulings from the Court related to this evidence that (1) its proposed methods of authenticating such evidence satisfy the standards of Federal Rules of Evidence 901(a); (2) certain portions of the evidence do not contain inadmissible hearsay under Federal Rules of Evidence 801, 802 and 803; (3) the government's use of translations and transcripts is proper; and (4) cooperating witnesses, who were members and associates of the Sinaloa Cartel, may explain the meaning

of such evidence based on their personal knowledge of the Cartel under Federal Rules of Evidence 701 and 702.[20]

A.    Background

The intercepted and recorded wire and electronic communications that the government intends to introduce at trial include, but is not limited to, the following categories of evidence:

- Wire communications intercepted by domestic and foreign law enforcement officers, which consist largely of intercepted telephone calls.

- Electronic communications intercepted by domestic and foreign law enforcement officers, which consist largely of intercepted emails and text messages, including messages sent using the Blackberry Messenger application ("BBM");[21]

- Wire communications recorded by confidential sources and cooperating witnesses, which consist largely of recorded telephone calls and recorded in-person meetings.

- Electronic communications recorded by confidential sources and cooperating witnesses, which consist largely of recorded text messages, including messages sent using the BBM.

The video evidence that the government intends to introduce at trial includes, but is not limited to, pertinent portions of the following video evidence:

---

[20] On this motion, the government does not seek rulings on the ultimate admissibility of these intercepted and recorded communications and video evidence; rather, it seeks rulings on the four limited issues described above. The government expects to establish that this evidence is relevant and admissible at trial through witness testimony. See Fed. R. Evid. 401, 402. Thus, the government will seek rulings on the ultimate admissibility of the portions of this evidence it designates as trial exhibits after it discloses its witnesses and exhibits to the defense. The government expects that it will be in position to make such motions, where necessary, in its second round of motions in limine due in July 2018.

[21] BBM is the proprietary text messaging service of BlackBerry devices. A Personal Identification Number ("PIN"), a hexadecimal, alpha-numeric identifier, is hard-coded and permanently assigned to a particular BlackBerry handheld device or application. BBM uses device PINs for addressing and ensuring that BBM communications only reach their intended destinations.

- The "1993 Chili Can Seizure Video": News footage of the seizure of 7.3 tons of cocaine located inside cans of chili peppers in Tecate, Mexico in April 1993, <u>see</u> Bates number 000008134, which an FBI analyst downloaded from YouTube.

- The "1993 Guadalajara Airport Shooting Videos": News footage showing the aftermath of the shootout between members of the Sinaloa Cartel, including the defendant, and members of the Arellano Felix Organization in May 1993, <u>see</u> Bates number 000146871-000146873, which an FBI analyst downloaded from YouTube.

- The "2009 Quito Seizure Video": News footage related to the seizure of 8.3 tons of cocaine in and around Quito, Ecuador in October 2009, <u>see</u> Bates number 000321646, which an FBI analyst downloaded from YouTube.

- The "2010 Rincon Interrogation Video": Footage of Sinaloa Cartel members' torture and interrogation of Israel Rincon Martinez, also known as "Wacho" and "Guacho," at the direction of the defendant and Mayo Zambada in approximately 2010, <u>see</u> Bates number 000314218, which was subsequently uploaded to YouTube, and Google, Inc., provided to the government in response to a search warrant.

- The "2011 Defendant Interrogation Video": Footage of the defendant interrogating a hostage in approximately 2011, <u>see</u> Bates numbers 000313386, which was subsequently uploaded to YouTube, and Google, Inc., provided to the government in response to a search warrant.

- The "2014 Tunnel Videos": News footage showing the defendant's residences and the series of tunnels that connected them that Mexican authorities raided in Culiacan, Sinaloa, Mexico in February 2014, <u>see</u> Bates numbers 000146869-0001468670, which an FBI analyst downloaded from YouTube.

- The "2015 Escape Videos": Surveillance footage of the defendant's escape from a maximum-security prison in Mexico in July 2015, as well as news footage of the tunnel used during the escape, <u>see</u> Bates numbers 000146865-000146868, which was published by a news organization, and an FBI analyst then downloaded it from YouTube.

- The "2015 Interview Video": News footage of an interview of the defendant while he was a fugitive in 2015, <u>see</u> Bates numbers 000314123, which an FBI analyst downloaded from YouTube.

- The "2016 Capture Video": Footage from a Mexican officer's helmet-cam taken during the raid on the defendant's residence in Los Mochis, Sinaloa, Mexico in

January 2016, see Bates number 000146874, which was subsequently uploaded to YouTube, and an FBI analyst then downloaded it.[22]

B.    The Intercepted and Recorded Communications and Video Evidence Will be Properly Authenticated

i.    Federal Rule of Rule of Evidence 901(a)

Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  A trial court has "broad discretion to determine whether [evidence] has been properly authenticated." United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999).  "Rule 901(a) . . . is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."   United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991) (internal quotation marks and citation omitted); see also United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004).  "[T]he burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  Pluta, 176 F.3d at 49 (internal quotation marks and citation

---

[22] With this motion, the government is hand delivering to the Court a disc containing the following items: (1) a set of the above-described video evidence, which is marked as Exhibit A; (2) draft translations of the 2010 Rincon Interrogation Video, the 2011 Defendant Interrogation Video and the 2015 Interview Video, which are marked as Exhibit B, Exhibit C and Exhibit D, respectively.  To the extent that the Court requires translations of any of the other Spanish language videos to resolve this motion, the government will provide such translations upon request.  The government has produced the video evidence marked as Exhibit A to the defendant in discovery.  The government is providing copies of the draft translations marked as Exhibits B, C and D to the defendant with this motion.

The government intends to introduce only some portions of the above-referenced videos at trial; it will identify specific portions that it intends to play when it discloses its exhibits prior to trial.

omitted).  Rule 901 "does not erect a particularly high hurdle."  United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001) (internal quotation marks and citation omitted).

In general, the Second Circuit has "stated that the standard for authentication is one of reasonable likelihood, and is minimal."  United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007) (internal quotation marks and parenthetical omitted).  With respect to audio recordings, however, the court has required the government to prove "by clear and convincing evidence that sound recordings are what they purport to be."  United States v. Hemmings, 482 F. App'x 640, 643 (2d Cir. 2012) (summary order) (internal quotation marks omitted) (citing Ruggiero, 928 F.3d at 1303).

ii.    The Intercepted and Recorded Communications Satisfy Rule 901(a)

Regarding the intercepted and recorded communications that the government intends to present, the Second Circuit has "never . . . adopted a rigid standard for determining the admissibility of tape recordings."  United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977); accord United States v. Tropeano, 252 F.3d 653, 661 (2d Cir. 2001).  Several types of witness testimony may authenticate such communications.  See Gagliardi, 506 F.3d at 151 ("The testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard.") (citing Fed. R. Evid. 910(b)(1)).

First, a participant to the conversation may testify that the recording, including recordings of electronic written communications, such as instant messages or e-mails, is an accurate record of the conversation.  See Gagliardi, 506 F.3d at 151 (affirming district court ruling that testimony of participants in email and instant messages was sufficient to authenticate such communications under Rule 901).  Participants in the conversation who may authenticate recordings include persons who were present for and overheard one side of the

recorded conversation, but are not captured speaking on the recording. See United States v. Eberhart, 467 F.3d 659, 667 (7th Cir. 2006) ("[A] court may admit a recording where a witness testifies that he only heard half of the recorded conversation.").

Second, an individual who did not participate in the conversation can authenticate the recording through testimony that he or she recognizes the voices of the participants. See Hemmings, 482 F. App'x at 643 (holding that "tapes were authenticated by a government agent who recognized the voices on the tapes"); United States v. Louis, 814 F.2d 852, 856 (2d Cir. 1987) (concluding that tapes of defendant's conversations with known drug dealer were properly authenticated by testimony of alleged coconspirator that he recognized defendant's voice).

Third, a technician or agent who made or oversaw the making of a recording may authenticate it. See United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990) (stating that government is "not required to call as a witness a participant in a recorded conversation in order to authenticate the recording; it may lay the foundation for the recording through the testimony of the technician who actually made it"); United States v. Bosch, 399 F. Supp. 2d 521, 522 (S.D.N.Y. 2005) (concluding that case agent who oversaw monitoring of court-authorized wiretap could authenticate recordings).

Fourth, evidence of an unbroken chain of custody may establish the authenticity of recordings even in the absence of a contemporaneous witness to the recorded conversations. See Tropeano, 252 F.3d at 661 (citing Fuentes, 563 F.2d at 532). The absence of an unbroken chain of custody, however, does not preclude authentication of the recordings through other means. See id.; Hemmings, 482 F. App'x at 643.

At trial, the government intends to rely upon each of these methods to authenticate its intercepted and recorded communications. For instance, the government expects that one or more cooperating witnesses will testify at trial that they (1) were participants in or present for intercepted and recorded communications and/or (2) recognize the voices of the participants in such conversations. The government further expects that domestic and foreign law enforcement witnesses will testify that (1) they monitored or oversaw the monitoring of communications intercepted pursuant to court orders; (2) they recognize the voices of the participants in the recordings; and/or (3) there has been an unbroken chain of custody of the communications since the time of recording.[23] The government requests that the Court rule that such methods of authentication are proper under Rule 901(a).

### iii. The Video Evidence Satisfies Rule 901(a)

This Court recently addressed the standard for authenticating videotapes in Linde v. Arab Bank, PLC, 97 F. Supp. 3d 287 (E.D.N.Y. 2015), vacated on other grounds, 882 F.3d 314 (2d Cir. 2018), stating that:

> Videos may be authenticated "on the same principles as still photographs," Mikus v. United States, 433 F.2d 719, 725 (2d Cir. 1970) (citations omitted), and still photographs may be authenticated by a witness familiar with what is pictured. See Kleveland v. United States, 345 F.2d 134, 137 (2d Cir. 1965) ("The witness qualifying a photograph, however, does not need to be the photographer or see the picture taken. It is only necessary that he recognize and identify the object depicted and testify that the photograph fairly and correctly represents it.").

---

[23] The government obtained certain intercepted communications (1) pursuant to foreign court orders through Mutual Legal Assistance Treaty requests or (2) through the direct provision of the evidence by foreign law enforcement officials to U.S. law enforcement authorities. Evidence obtained through either method is admissible in U.S. court. See United States v. Rommy, 506 F.3d 108, 129 (2d Cir. 2007).

"Evidence of how the [video] tapes were made and handled" before they came into the proponent's possession is not necessarily required to authenticate them. <u>United States v. Damrah</u>, 412 F.3d 618, 628 (6th Cir.2005) (district court did not err in admitting video tapes seized from a third party that depicted the defendant speaking at Palestinian Islamic Jihad fundraising events, where defendant offered no proof that the Government had altered the tapes after their seizure, and there was no dispute that they accurately depicted the defendant's likeness and words).

<u>Id.</u> at 338.

In <u>Linde</u>, the Court admitted videos, including video wills, that had appeared on a Hamas terrorist organization website as admissions against penal interests, concluding that the fact that "each video was found on a Hamas website" and that "expert witnesses . . . identified the individuals depicted in the 'video wills' as the same individuals who carried out the attacks in question." <u>Id.</u> at 341. The Court also admitted into evidence a "CNN" video of a Hamas member who professed that Hamas was responsible for a bombing of a hotel in part based upon the fact that the video was self-authenticated:

In terms of authentication, [the expert] testified that the individual in the video was Osama Hamdan, the spokesman for Hamas. The record also contained Mr. Hamdan's passport. The picture on that passport demonstrated that the Osama Hamdan in the CNN video was the same individual who held an account at Arab Bank. In addition, the video itself was effectively self-authenticating. It bore CNN logos and showed no signs of being edited. Before beginning the interview, the anchor identified Osama Hamdan, both by name and as a spokesman for Hamas. Simply put, there is no doubt that the CNN video was authentic. Indeed, forging such a video would be extremely difficult. <u>Cf.</u> Advisory Committee Notes to Fed. R. Evid. 902(6) ("The likelihood of forgery of newspapers or periodicals is slight indeed. Hence no danger is apparent in receiving them.").

<u>Id.</u> at 341 & n.28; <u>see also</u> <u>United States v. Orieckinto</u>, 234 F. Supp. 3d 360, 365-66 (D. Conn. 2017) (court admitted images downloaded from internet that depicted sweatshirt logos, noting

that "depending on the purpose for which an Internet image is to be offered into evidence, there is no reason to conclude that the image may not be authenticated solely upon the basis of the testimony of a person who has accessed and retrieved the image"); Rivera v. Inc. Vill. of Farmingdale, 29 F. Supp. 3d 121, 131 (E.D.N.Y. 2013) ("The bar for authentication of internet postings is not particularly high . . . .") (citing Gagliardi, 506 F.3d at 140) (internal quotation marks omitted).

Additionally, the Second Circuit has held that the "contents or 'distinctive characteristics' of a document can sometimes alone provide circumstantial evidence sufficient for authentication." United States v. Vayner, 769 F.3d 125, 133 (2d Cir. 2014) (citing Fed. R. Evid. 901(b)(4)). The Fourth Circuit also has held that certain video evidence maintained by internet providers may be self-authenticating as records of regularly conducted activity under Federal Rule of Evidence 902(11). See United States v. Hassan, 742 F.3d 104 (4th Cir. 2014) (finding YouTube videos and Facebook pages of defendant properly self-authenticating under Rule 902(11)).

Here, the government intends to authenticate its video evidence through a variety of methods. As an initial matter, the videos from news sources are self-authenticating under Rule 902(6). See Linde, 97 F. Supp. 3d at 341 n.28. Specifically, news sources released the 1993 Chili Can Seizure Video, the 1993 Guadalajara Airport Shooting Video, the 2009 Quito Seizure Video, the 2014 Tunnel Videos, the 2015 Escape Videos and the 2015 Interview Video. The videos bear news organization logos, contain statements describing the events to which they relate and/or reflect video footage of the unique events to which they relate. The videos, in effect, establish on their own that they are depictions of what the government claims them to be. Because the likelihood of forgery is "slight indeed," there is "no danger [] apparent

in receiving them." Id. (internal quotation marks omitted); see also Fed. R. Evid. 104(a), 1101(d)(1) (noting that court is not bound by evidence rules in determining preliminary question as to whether evidence is admissible). Moreover, two of the 2015 Escape Videos, see Bates numbers 000146865-000146866, and one of the 2014 Tunnel Videos were released to news organizations by the Mexican government, see Bates numbers 000146870. Thus, they also are self-authenticating under Rule 902(5) ("A book, pamphlet, or other publication purporting to be issued by a public authority."). Additionally, Google, Inc., provided the 2010 Rincon Interrogation Video and the 2011 Defendant Interrogation Video to the government in response to search warrants along with business records certifications indicating that the records meet the requirements of Federal Rule of Evidence 803(6)(A)-(C). These videos are therefore self-authenticating under Rule 902(11).

The videos also each contain distinctive characteristics that authenticate them as what the government claims them to be under Rule 901(b)(4). For instance, the 1993 Chili Can Seizure Video shows law enforcement officers emptying packages of cocaine from hundreds of chili cans. The 2010 Rincon Interrogation Video shows the interrogation of Rincon, who is bound and bruised, and the 2011 Defendant Interrogation Video shows the defendant walking back and forth in front of a bound hostage. One of the 2015 Escape Videos shows the defendant pacing back-and-forth in his prison cell before disappearing into the entrance of the tunnel in his shower, see Bates number 000146866, and the other videos show that tunnel. The 2015 Interview Video shows the defendant on a farm answering questions, with persons carrying long-guns walking behind him. And, the 2016 Capture Video shows helmet-cam footage taken during a shootout. The distinctive characteristics of these videos are sufficient to establish their authenticity. See Gonzalez v. Digital Equip. Corp., 8 F. Supp.

2d 194, 197 (E.D.N.Y. 1998) (concluding that distinctive characteristics of videos were sufficient to authenticate them under Rule 901(b)(4)); see also United States v. Taylor, 688 F. App'x 638, 641-42 (11th Cir. 2017) (summary order) (admitting video evidence under Rule 901(b)(4)); Damrah, 412 F.3d at 628 (6th Cir. 2005) (same).

Finally, the government expects that, for most, if not all, of the videos that it seeks to present at trial, a cooperating or law enforcement witness will testify that he or she recognizes the location, events and/or items depicted. Such testimony is sufficient to authenticate the videos. See Fed. R. Evid. 901(b)(1); Linde, 97 F. Supp. 3d at 341.

C.     Certain Intercepted and Recorded Communications and Video Evidence Do Not Contain Inadmissible Hearsay

The government requests that the Court rule that certain intercepted and recorded electronic communications, specifically, BBM messages sent by the defendant and his coconspirators through the "OFIS" structure are not hearsay. Additionally, the government request that the Court rule that (1) present sense impressions and (2) statements made by hostages reflected in certain video evidence do not constitute hearsay.

i.     Intercepted BBM Messages Sent Through the "OFIS" Structure are Admissible

During the course of this investigation, law enforcement authorities intercepted BBM messages sent by the defendant and his coconspirators from approximately 2013 to 2014. Through these intercepted communications, law enforcement authorities identified the communications structure that the defendant used to communicate with other members of the Sinaloa Cartel in order to evade law enforcement detection. First, the defendant would personally provide a message to a trusted associate, who held a "top tier" device. The operator of the top-tier device would then pass that message via BBM to a second tier of messengers.

That second tier of messengers would then pass the message electronically, using BBM, to a third tier of messengers, who in turn would pass the message to the intended recipient, such as the defendant's plaza bosses, sources of supply, transporters, pilots, and others. The second-tier devices generally had screen names of some variation of "TELCELL" or "USACELL." The third-tier devices, in turn, generally had screen names starting with "OFIS."

The defendant intended this tiered method of passing messages to insulate himself and the highest levels of cartel leadership, by limiting the number of persons who had direct contact with them, and thus limiting the risk that law enforcement officers would discover their BBM PINs. On the other hand, this structure allowed the defendant to pass messages to operatives and to recognize that messages sent from the OFIS were orders and instructions from the higher levels of the cartel. Likewise, they recognized that the high-level leadership of the Cartel would receive their responses up through the tiers of communication. Multiple cooperating witnesses will testify that orders received from the OFIS were considered to be the orders of the defendant himself. Multiple cooperating witness also will testify that the defendant told them, in person, that orders from the OFIS were coming directly from the defendant.

By monitoring communications passed through this communications structure, law enforcement authorities intercepted not only communications sent by the defendant's coconspirators—including his "secretaries," who were often in the defendant's presence when relaying messages from him to other Sinaloa Cartel members—but they also intercepted communications sent by the defendant, when he communicated using others' devices. The interception of these communications also allowed authorities to identify the various nicknames by which the defendant's coconspirators identified him.

The BBM communications that the government intends to offer against the defendant are communications either between the defendant and coconspirators or between two or more coconspirators. It is axiomatic that statements made by the defendant in the course of these communications are admissible as non-hearsay when offered by the government pursuant to Rule 801(d)(2)(A). Moreover, because the government will prove that the defendant participated in the charged conspiracy—as, indeed, the discovery provided to the defendant to date amply demonstrates—each of his coconspirator's statements is admissible against him as non-hearsay pursuant to Rule 801(d)(2)(E).

In the Second Circuit, statements of a defendant's coconspirators are admissible where the government shows "(a) that there was a conspiracy, (b) that its members included the declarant and the [defendant], and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Coppola, 671 F.3d 220, 246 (2d Cir. 2012) (internal quotation marks and citation omitted). And, while Rule 801(d)(2)(E) requires that both the declarant and the defendant be part of the conspiracy, it does not require the person to whom the declarant's statement is made also be a member. See United States v. Gupta, 747 F.3d 111, 125 (2d Cir. 2014); see also United States v. Lyles, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a coconspirator need not be charged in the indictment.").

Coconspirator statements may be conditionally admitted at trial subject to the government's introduction of evidence that the conspiracy existed, that the declarant and the defendant were members of it and that the proffered statement was made "in furtherance" of it. See United States v. Coffey, 361 F. Supp. 2d 102, 124 (E.D.N.Y. 2005) (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)). If the Court determines after hearing the

evidence that the foundational predicates for the admission of coconspirator statements pursuant to Rule 801(d)(2)(E) have not been met, it may instruct the jury to disregard the statements. See id. at 124 n.20.[24]

Here, once the government establishes the authenticity of the recorded conversations and the existence of the defendant's conspiracy, the government will offer evidence and testimony that (1) the defendant passed messages through the OFIS structure, (2) the other participants in the BBM communications, who passed messages through the tiered system, also were members of the conspiracy, and (3) the recorded communications offered at trial were made in furtherance of the conspiracy. Those factual predicates are sufficient to permit the statements made in the BBM communications to be admitted as coconspirator statements pursuant to Rule 801(d)(2)(E). See Coppola, 671 F.3d at 246.

### ii.    Certain Statements in the Video Evidence are Admissible

The government acknowledges that certain portions of its video evidence contain inadmissible hearsay. For example, news correspondent opinions and commentary in the 1993 Guadalajara Airport Shooting Videos about the defendant's role in that shooting are inadmissible hearsay. With respect to those videos, the government intends to introduce only portions of the raw footage from the aftermath of the shooting at the airport at trial; it will mute

---

[24] At trial, the government intends to introduce numerous coconspirator statements through its cooperating witnesses and intercepted and recorded communications. This standard also governs introduction of those statements, and a pretrial hearing on their admissibility is not required. See Coffey, 361 F. Supp. 2d at 124 (citing United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993)); see also United States v. Montalvo, No. 11-CR-00366-RJA-JJM, 2014 WL 3894377, at *9 (W.D.N.Y. Apr. 16, 2014), report and recommendation adopted, No. 11-CR-366-A, 2014 WL 3894383 (W.D.N.Y. Aug. 8, 2014) (holding that practice in Second Circuit is for judge to make ruling during trial, rather than at a pretrial hearing, regarding admissibility of coconspirator statements).

any news correspondent opinions or commentary during those portions of the videos and redact any text on the screen that qualifies as hearsay. Present sense impressions by journalists, however, are admissible under Rule 803(1). For instance, during one of the 2014 Tunnel Videos, the correspondent describes the defendant's residence and his tunnels as he tours them. See Bates-number 000146869. Likewise, during one of the 2015 Escape Videos, the journalist describes the escape tunnel used by the defendant as he tours the tunnel. See Bates-number 000146867. Such statements are admissible. See United States v. Urena, 989 F. Supp. 2d 253, 260 (S.D.N.Y. 2013) ("A real-time narration of events may be admissible as a present-sense impression."). The government requests a ruling from the Court that present sense impressions by news correspondents in its video evidence are admissible at trial.[25]

The government also requests a ruling from the Court that statements of the hostages in the 2010 Rincon Interrogation Video and 2011 Defendant Interrogation Video are admissible at trial. To begin, the government is not offering those statements for their truth; rather, the government is offering them to show that they were elicited in response to interrogation by, or at the direction of, the defendant. In any event, these statements are admissible as necessary context to explain the non-hearsay statements of the defendant and his coconspirators, see Fed. R. Evid. 801, who are conducting the interrogations captured on these videos. See Barone, 913 F.2d at 49 (holding that where recorded statements are presented "not for the truth of the matter asserted, but only to establish a context for the recorded statements

---

[25] The government will identify specific statements that it seeks to admit at trial as present sense impressions when it discloses its exhibits.

of the accused," they are admissible without violating the hearsay rule or the Confrontation Clause).[26]

D.     <u>Use of Translations and Transcripts</u>

It is well-settled that the Court has discretion to permit transcripts of intercepted and recorded communications to be provided to the jury to aid their review of the evidence. <u>See</u> <u>United States v. Chalarca</u>, 95 F.3d 239, 246 (2d Cir. 1996). Where the original conversations were conducted in a foreign language, moreover, "an English language transcript may be submitted to permit the jury to understand and evaluate the evidence." <u>United States v. Ben-Shimon</u>, 249 F.3d 98, 101 (2d Cir. 2001); <u>see also</u> <u>United States v. Ulerio</u>, 859 F.2d 1144, 1145 (2d Cir. 1988) (holding that there was no abuse of discretion to admit translated transcripts into evidence and allow jury to retain them during deliberations). The government requests that the Court admit as exhibits translated transcripts of the government's intercepted and recorded communications and video evidence, where the Court has admitted the underlying evidence.

E.     <u>Cooperating Witness Interpretation of Intercepted and Recorded Communications and Video Evidence</u>

To the extent that the meaning of various intercepted and recorded communications and video evidence related to the defendant and/or his coconspirators is not evident, the government will seek to elicit testimony from cooperating witnesses regarding the

---

[26] In Section IV <u>infra</u>, the government separately moves to preclude the defendant from introducing his own hearsay statements from the 2015 Interview Video.

meaning of those communications. The government requests a ruling from the Court that this type of testimony is permissible.[27]

As the Second Circuit has recognized, drug traffickers "seldom negotiate the terms of their transactions with the same clarity as business persons engaged in legitimate transactions." United States v. Garcia, 291 F.3d 127, 139 (2d Cir. 2002). Therefore, "courts may allow witnesses to 'decipher' the codes drug dealers use and testify to the true meaning of the conversations." Id. Such testimony is admissible as lay opinion testimony pursuant to Federal Rule of Evidence 701. See id.

Rule 701 states:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

First, as to the rational-basis requirement of Rule 701(a), a witness offering a lay opinion must "base his opinion on his own personal knowledge, which must be established to the court and jury." Garcia, 291 F.3d at 140. There is no dispute that, in a narcotics trial concerning the use of coded language in conversations, witnesses who were party to a recorded conversation may testify as to what they themselves meant, because their participation in the

---

[27] As noted above, see notes 1, 21 supra, the government does not seek a ruling on the admissibility of specific statements at this time, because the ultimate admissibility of such statements will turn on witness testimony introduced at trial. Rather, the government requests a more limited ruling at this time that this type of testimony is permissible.

conversation establishes their personal knowledge. See id. at 140-41. Additionally, though, a non-participant in such a conversation may have knowledge of the broader conspiracy being discussed; thus, subject to a proper foundation being laid, that witness may testify as to his or her interpretation of what the participants in the conversation meant. See United States v. Yannotti, 541 F.3d 112, 125-26 & n.8 (2d Cir.2008) ("[D]irect participation in the . . . activities of the charged enterprise" may sufficiently "afford[ ] [a witness] particular perceptions of its methods of operation [such that he or she] may offer helpful lay opinion testimony under Rule 701 even as to coconspirators' actions that he did not witness directly.").

Second, Rule 701 requires that the lay testimony be "helpful" to the jury in understanding the witness's testimony or determining a fact in issue. As the Second Circuit has explained, where individuals engaging in illicit activity use coded language or are otherwise not transparent in their discussion, "there is little question" that proper lay opinion testimony will be helpful to the jury. Yannotti, 541 F.3d at 126; see also United States v. Aiello, 864 F.2d 257, 265 (2d Cir. 1988) (holding that district court did not err in permitting interpretive testimony of a recorded conversation because "language on the tape [was] . . . punctuated with ambiguous references to events that are clear only to the conversants" (internal quotation marks and alterations omitted)).

Finally, Rule 701 requires that an interpretive lay witness not base his or her testimony on scientific, technical, or specialized knowledge. This requirement is satisfied where the testifying witness derives his or her opinions "from a reasoning process familiar to average persons," rather than specialized training such as that relied upon by scientific witnesses or statisticians. Yannotti, 541 F.3d at 126. Thus, where a witness's opinion is derived from the witness's "insider perceptions of a conspiracy of which he was a member, he

may share his perspective as to aspects of the scheme about which he has gained knowledge as a lay witness . . . ."  Id.; see also United States v. Lumiere, 249 F. Supp. 3d 748, 755-56 (S.D.N.Y. 2017) (permitting witness to offer lay opinion testimony about meaning of defendant's statements in recorded conversations).

During trial, the government anticipates that it will introduce numerous intercepted and recorded communications, as well as video and documentary evidence, that is coded.  The government intends to have cooperating witnesses testify about the meaning of such coded language.  Many cooperating witnesses will testify about communications in which they are involved; the government, however, also expects that cooperating witnesses will testify about the meaning of some communications—including communications of the defendant—to which they are not parties, but of which they have an understanding due to their participation in the conspiracy.  The Court should admit such testimony here.  See Yannotti, 541 F.3d at 126 ("[W]here a witness derives his opinion solely from insider perceptions of a conspiracy of which he was a member, he may share his perspective as to aspects of the scheme about which he has gained knowledge as a lay witness . . . ."); see also Lumiere, 249 F. Supp. 3d at 755 ("Thorell testified that he had participated in the mismarking scheme with Plaford and Lumiere . . . [and] explained the mechanics of the fraud in detail.  In other words, Thorell not only had firsthand knowledge of what was actually said, but firsthand knowledge of the underlying scheme sufficient to interpret the statements of his former partner-in-crime."). United States v. Ghavami, 23 F. Supp. 3d 148, 170-71 (S.D.N.Y. 2014), aff'd sub nom. United States v. Heinz, 607 F. App'x 53 (2d Cir. 2015) (summary order) ("Zaino was able to decode Welty and Grimm's conversations based on his experience in the conspiracies, in which he was an active member, who participated personally in many of the transactions, worked in

close proximity with his codefendants for many years, and regularly communicated with them and with other alleged coconspirators about their deals." (citations omitted)).

IV.   Motion to Admit Portions of the 2015 Interview Video and Preclude the Defense from Introducing Irrelevant, Self-Serving Portions

In approximately January 2016, the defendant, speaking in Spanish, gave a video-recorded interview about his life by answering written questions, asked in the recording by an off-screen interlocutor (defined above as the "2015 Interview Video"). The defendant then provided the 2015 Interview Video to intermediaries, and a news outlet ultimately released the video on its website. During that interview, a draft translation of which is attached hereto as Exhibit D, the defendant discussed, among other things, the manner in which he became involved in drug trafficking, his life after his 2015 escape, the morality of drug trafficking and the effect of his potential arrest on his drug trafficking and his family. The government may choose to play at least some portions of the interview at trial, which would be properly admitted as an admission of the defendant. See Fed. R. Evid. 801(d)(2)(A).

For the reasons set forth below, however, the Court should preclude the defendant from admitting any portion of the defendant's interview at trial. Because the defendant would not be offering any such statements against an opposing party, they would be inadmissible hearsay. Id. Nor does the Rule of Completeness compel introduction of the portions of the interview not offered into evidence by the government. See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982).

A.   Legal Standard

Rule 801(d)(2) provides in part that a statement is not hearsay when it is "(a) offered against an opposing party and (b) the statement was made by a party in an

individual capacity." See Fed. R. Evid. 801(d)(2)(A).  Thus, a defendant's recorded statement

may be admissible against him even as it is impermissible for the defendant to offer the same

statement.  As the Second Circuit explained in Marin:

> When the government offers in evidence the post-arrest statement
> of a defendant, it commonly does so for either of two reasons.  It
> may wish to use the statement to establish the truth of the matter
> stated.  In these circumstances, under Rule 801(d)(2)(A) the
> statement is not hearsay, because it is simply a statement of the
> opposing party . . . When the defendant seeks to introduce his
> own prior statement for the truth of the matter asserted, it is
> hearsay, and it is not admissible.

669 F.2d at 84.

In Marin, the defendant argued that even though his post-arrest statement would

typically be inadmissible hearsay if not offered by the government (as an opposing party), the

doctrine of completeness required the court to allow him to introduce an exculpatory portion

of his post-arrest statement.  As articulated by Federal Rule of Evidence 106, the doctrine of

completeness provides that "even though a statement may be hearsay, an omitted portion of

the statement must be placed in evidence if necessary to explain the admitted portion, to place

the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial

understanding of the admitted portion."  United States v. Johnson, 507 F.3d 793, 796 (2d Cir.

2007) (alteration and internal quotation marks omitted).

The Second Circuit rejected the defendant's argument, thereby articulating

substantial limitations on the application of the doctrine of completeness.  As the court

explained, while the rule of completeness may "require that a statement be admitted in its

entirety when [it] is necessary to explain the admitted portion, to place it in context, or to avoid

misleading the trier of fact," it does not require the "introduction of portions of a statement

that are neither explanatory of nor relevant to the admitted passages." Marin, 669 F.2d at 84 (internal citations omitted); see United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999) ("The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages."); United States v. Mulligan, 573 F.2d 775, 778 (2d Cir. 1978) ("[T]he prosecution is not required to offer the defendant's entire grand jury testimony so long as the statements admitted are given sufficiently in their context so as not to confuse the trier.") (internal quotation marks and citation omitted); United States v. Mahaffy, No. 05-cr-613, 2007 WL 1094153, at *3-*5 (E.D.N.Y. Apr. 10, 2007) (refusing to permit introduction of excerpts of defendant's prior statements because they were "otherwise inadmissible hearsay statements" that were "self-serving" and "exculpatory"); see also United States v. Wilkerson, 84 F.3d 692, 695-96 (4th Cir. 1996) (noting that during direct examination, the government could have introduced inculpatory statements made by defendant but also recognizing that the Rules of Evidence do not provide exception to hearsay rule for self-serving, exculpatory statements made by party which are being sought for admission by that same party).

B.    Analysis

The 2015 Interview Video, which the defendant made while he was a fugitive following his 2015 escape from prison, is hearsay if offered by the defendant and, therefore, the Court should bar the defendant from offering the recording, or any portions thereof, into evidence. The government seeks to admit portions of the interview that are relevant to the charged offenses as admissions of a party opponent pursuant to Federal Rule of Evidence 801(d)(2)(A). The portions of the interview that the government proposes to redact are

highlighted in the transcript attached as Exhibit D.[28]  As a general matter, the interview was conducted in a question and answer format that covered a disjointed range of topics in no particular order.  Thus, each question and answer is easily severable from others.  Moreover, when seeking to redact any part of the transcript, the government redacted the entire question and answer; thus, the doctrine of completeness is not a consideration here.  See Marin, 669 F.2d at 82 ("The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages.")

The specific redactions for which the government seeks a ruling involve the following.  First, there are irrelevant questions and answers about the defendant's upbringing and his relationship to his family, which, as they are designed to invoke sympathy, should be redacted.  See Fed. R. Evid. 401, 403.  The defendant also made false exculpatory statements that he is not part of a cartel and never initiated any violence, which constitute inadmissible hearsay.  See Fed. R. Evid. 801, 803.  The defendant also opined on whether (a) the Mexican government would kill him if he were captured, (b) if terrorist organizations had an effect on Mexican drug trafficking and (c) if his final days would be like that of Pablo Escobar.  Thus, because many of the defendant's answers were speculative, irrelevant, misleading and, at times, politically motivated and unduly prejudicial to the government, the Court should exclude them.  See Fed. R. Evid. 401, 403.

---

[28] As noted above, the 2015 Interview Video is in Spanish, and the government will offer into evidence a translated transcript of portions of the interview as an aid to the jury's understanding of the conversation.  While the government is seeking a ruling on potential redactions at this time, the government may seek to admit additional portions of the video when it finalizes the transcript closer to trial.  The government will provide the defendant with a final redacted transcript at the time it discloses its exhibits.

In sum, the Court should grant the government's motion to allow the government to play only portions of the videotaped interview.

V.     Motion to Admit Satellite Photographs

The government intends to introduce into evidence satellite photographs of the location of the defendant's ranch where he sat for the interview shown in the 2015 Interview Video.  This evidence will (1) help prove the defendant's efforts to conceal himself and his criminal activity (because it will show that the interview was recorded at a remote, difficult-to-access location), (2) corroborate the recording of the interview by demonstrating its location, and (3) demonstrate the defendant's means and wealth derived from his criminal activity because, for instance, the photographs will show the size and scope of the facility including a helicopter landing pad.  See Bates-numbers 000125505-000125509.[29]  The government anticipates that this evidence will be introduced through a federal law enforcement agent who will explain that the images were obtained from a commercially-licensed satellite imaging company, and who will demonstrate how the images compare to notable features on the interview video.  For instance, the presence of fencing and man-made features in the video recording of the defendant can be conclusively matched to similar features identifiable in the satellite imagery, as can geographic and topographical features observable in the video recording such as mountain ranges.

---

[29] The government has produced these satellite images to the defendant in discovery.  The photographs were produced to the defendant as "Protected Material" within the meaning of the Protective Order, see Dkt. No. 57 at 1, but the government hereby removes that designation in light of its discussion of them in its public filing.  The government is providing copies of the photographs for the Court's reference as Exhibit E on the disc provided to the Court with this motion.

This kind of comparison is sufficient to authenticate proffered evidence pursuant to Fed. R. Evid. 901(b)(4). That rule provides that evidence can be authenticated, and demonstrated to be "what the proponent claims it is," through the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." As with the downloaded video evidence cited above, this satellite imagery may be authenticated like any other photograph, where the "witness qualifying a photograph [] does not need to be the photographer or see the picture taken," so long as the witness can "recognize and identify the object depicted and testify that the photograph fairly and correctly represents it." Kleveland, 345 F.2d at 137. In this case, the witness will be able to identify the objects in the satellite imagery, which are also depicted in the 2015 Interview Video, and testify that the satellite imagery fairly and correctly shows the same location. See United States v. Prevezon Holdings, Ltd., 319 F.R.D. 459, 464 (S.D.N.Y. 2017) (permitting, pursuant to Rule 901(b)(4), authentication by comparison of unique characteristics of proffered document to previously admitted documents).

VI.     Motion to Admit Drug Ledgers

The government seeks to offer various books and records that generally contain notations related to dates, quantities and prices of drug shipments and/or accountings of monies collected from and owed to various drug traffickers. These ledgers were either kept and maintained by (1) cooperating witnesses who will testify at trial or (2) third parties under the instruction and/or supervision of cooperating witnesses who will testify at trial. The government will also offer documents seized during the February 2012 raid of the defendant's residence in Los Cabos, Mexico, which an expert witness will interpret as records of drug trafficking. (These categories of books and records hereafter will be referred to collectively

as "drug ledgers."). The government also will seek to admit an address book that contains identifying information about the defendant's coconspirators, which the government expects that one or more cooperating witnesses will authenticate at trial. The government seeks to admit these drug ledgers and the address book as either coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) or business records under Federal Rule of Evidence 803(6).[30]

A.    Legal Standard

As previously discussed, see Section III.C.i. supra, pursuant to Rule 801(d)(2)(E), coconspirator statements may be admitted against a defendant where the government shows "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990). In determining whether a party has established a proper foundation, a court may consider hearsay and other evidence not admissible at trial, including the content of the drug ledgers themselves. See Fed. R. Evid. 104(a), 1101(d)(1); Bourjaily, 483 U.S. at 178-79.

In United States v. Coughman, 116 F.3d 1472 (2d Cir. 1997), the Second Circuit outlined the evidence required to authenticate a drug ledger as a coconspirator statement. In that case, the government presented "substantial evidence of the narcotics conspiracy itself, and of the defendants' involvement in it." Id. The government's expert testified that the

_____

[30] As noted above, at this time, the government is constrained in providing specific details about the cooperating witnesses' expected testimony. If necessary, the government can supplement its motion through an ex parte submission or in its second round of witness-specific in limine briefing in July 2018.

records were drug ledgers, explained why such ledgers were necessary in a drug trafficking organization, and offered testimony as to the ledgers' coded references to the defendants' nicknames and the quantities of drugs sold. As the court explained, "[t]his evidence was more than sufficient to establish the admissibility and authentication of the drug ledgers." Id.

Similarly, in United States v. Vanwort, 887 F.2d. 375 (2d Cir. 1989), the Second Circuit upheld the admissibility of a computer printout that contained names and addresses of coconspirators, as well as accounting ledgers "depicting several drug transactions." Id. at 388. The defendant objected to the admission of the printout claiming it was of questionable relevance and probative value. Id. The court upheld the admission of the documents, stating that the print-out was "analogous to a conspirator's address book." Id.; see also United States v. Ashraf, 320 F. App'x 26, 28-29 (2d Cir 2009) (summary order) (holding that Sixth Amendment's Confrontation Clause is not implicated when admitting drug ledger and testimony of coconspirator interpreting ledger because coconspirator statements are not hearsay under Rule 801(d)(2)(E)).

In other circuits, too, drug ledgers may be admitted as coconspirator statements. See United States v. Alosa, 14 F.3d 693, 696 (1st Cir. 1994) (holding that drug ledger was admissible to show character and use of place where they are found); United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993) (stating that ledgers were properly admitted where entries matched known drug transactions); United States v. Lopez-Medina, 461 F.3d 724, 745-48 (6th Cir. 2006) (holding that scraps of paper with notations concerning number of shipments, quantity and price were used to further conspiracy); United States v. Thornton, 197 F.3d 241, 251 (7th Cir. 1999) (finding that ledgers were tools of the drug trade that constituted statements made by coconspirators during the course and in furtherance of conspiracy; United States v.

Smith, 893 F.2d 1573, 1578 (9th Cir. 1990) (holding drug ledger admissible where evidence sufficiently identified coconspirator as author); United States v. Gil, 58 F.3d 1414, 1420 (9th Cir. 1995) (finding that author of drug ledger sufficiently identified to admit ledger as coconspirator's statement).

While admission of a drug ledger as a coconspirator statement is widely accepted, ledgers are also admissible into evidence as business records. To admit drug ledgers under the business records exception to the hearsay rule under Rule 803(6), the government must show: (1) the document was made or transmitted by a person with knowledge at or near the time of the incident recorded and (2) the document was kept in the course of a regularly conducted business activity. Fed. R. Evid. 803(6). In United States v. Foster, 711 F.2d 871 (9th Cir. 1983), the court admitted drug ledgers under the business record exception of Rule 803(6), which implicated the defendant in drug transactions. Id. at 882. There, a witness testified that she kept a record of drug transactions and that it was her regular practice to enter the amounts of drugs sold on a particular day and the amount of money she received for those drugs. Id. The testimony also showed that the information was recorded contemporaneously. Id. Despite the fact that the ledger was incomplete and that the entries were out of sequence, the court held that the ledger was admissible pursuant to Rule 803(6) as a business record. Id. See United States v. Cooper, 868 F.2d 1505, 1514 (6th Cir. 1989) (holding that log book of sham prescriptions kept contemporaneously with creation of the sham prescriptions was admissible pursuant to Rule 803(6)); United States v. Lizotte, 856 F.2d 341, 344 (1st Cir. 1988) (holding that drug ledger made contemporaneously with drug sales was admissible under Rule 803(6)); United States v. Cohen, 384 F.2d 699, 700-01 (2d. Cir. 1967) (holding that bookkeeper's list of union bribes was admissible as a business record).

Finally, drug ledgers are admissible when not offered to prove the truth of the notations contained therein, but as evidence of the commission of the crime or the existence of the conspiracy. See Alosa, 14 F.3d at 696 (holding that admission of drug ledgers presented no hearsay problem because they were admitted for non-hearsay purposes of showing "character and use of the place where the notebooks were found" and that there had been "more than one participant and thus a conspiracy") (internal quotation marks and citation omitted); see also United States v. Bohmont, 413 F. App'x 946, 955-56 (8th Cir. 2001) (summary order) (entries in drug ledger showed that "types of activities that were charged in the indictment were being carried out in the hotel room").

B.    Analysis

Cooperating witnesses who kept and maintained their own drug ledgers are expected to identify their ledgers—including by noting their handwriting, in the case of handwritten ledgers—and to testify as to the purpose and meaning of the notations. The government also expects them to testify that notations in the ledgers were made within the time-period of the conspiracy. Thus, these ledgers will be properly authenticated under Rule 901(a) and admissible as coconspirator statements under Rule 801(d)(2)(E). See Ashraf, 320 F. App'x at 28-29 (statements of conspirators interpreting drug ledgers are not hearsay). The government also expects the cooperating witnesses to testify that they placed entries in the ledgers at or near the time of the incident recorded, and that the ledgers were kept in the course of a regularly conducted business activity. Thus, the Court also may admit the ledgers as business records. See Fed. R. Evid. 803(6). In some cases, additionally, the entries will be corroborated by evidence of the seizure of drug shipments that match notations in the ledgers.

In situations where cooperating witnesses caused third parties to maintain the ledgers, the cooperating witnesses are nonetheless expected to testify that they reviewed the ledger entries at or near the time that the entries were made or that they can identify the author of the entries. Moreover, cooperating witnesses will testify that the notations in the ledgers recorded drug trafficking activity and that ledgers were kept in the course of a regularly conducted business activity. Thus, ledgers which were maintained by third parties are also admissible as either coconspirator statements or business records. See United States v. Jones, 554 F.2d 251, 252 (5th Cir. 1977) ("It is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business." (citations omitted)).

The government will authenticate the drug ledgers seized during the 2012 raid in Los Cabos, Mexico through cooperating witness testimony and other evidence tying the defendant to that the seizure, as well as through the testimony of an expert who will identify the notations as records of drug trafficking activity. In these instances, the records will not only be probative of drug trafficking activity but will help identify the "the character and use of the place where the notebooks were found." Alosa, 14 F.3d at 696.

Finally, an address book that identifies some of the defendant's coconspirators will be authenticated through witness testimony that identifies the handwriting in the address book. The information contained therein will be relevant to prove "relationships and knowledge" among coconspirators. Vanwort, 887 F.2d. at 388.

For these reasons, the government respectfully asks the Court to rule that drug ledgers, if properly authenticated under Rule 901(a), and pursuant to a proper foundation under

Rule 801(d)(2)(E), are admissible as coconspirator statements. In the alternative, the government asks the Court to rule that, if the government lays a proper foundation, the drug ledgers are admissible as business records under Rule 803(6).

VII.    Motion to Admit Attorney Payment Records

The government seeks to admit evidence of monies paid by the defendant to defense counsel as part of defense counsel's retainer agreement for representation in the instant case. The government will offer this evidence as proof of the defendant's unexplained wealth and substantial income, which is relevant to establishing the defendant's involvement in the charged CCE, as well as the drug and money laundering conspiracies.

In Allen v. West Point-Pepperell Inc., 848 F.Supp 423, 428 (S.D.N.Y. 1994), the court held that retainer agreements between the plaintiffs and their attorney were discoverable by the defendant, stating "[i]n this Circuit, fee arrangements are not privileged." Id. at 431. In support of its holding, the court cited In re Shargel, 742 F.2d 61, 62 (2d Cir. 1984), and United States v. Goldberger & Dubin, P.C., 935 F.2d 501, 504-07 (2d Cir. 1991). Those cases hold that, absent special circumstances, attorney fee information is not privileged. See Shargel, 742 F.2d at 62 ("We have consistently held that . . . fee information [is], absent special circumstances, not privileged"); Goldberger & Dubin, P.C., 935 F.2d at 504-07 (holding that, "absent special circumstances," identity of and amount paid by clients, submitted to the IRS in Form 8300, was not protected by attorney-client privilege); see also Lefcourt v. United States, 125 F.3d 79, 86 (2d Cir. 1997) ("As a general rule, a client's identity and fee information are not privileged." (citations omitted)); United States v. Weisberg, No. 08-CR-347, 2011 WL 1327689, at *7 (E.D.N.Y. Apr. 5, 2011); S.E.C. v. Sassano, 274 F.R.D. 495, 496-97 (S.D.N.Y. 2011) (compelling compliance with SEC subpoena for "[a]ll

documents concerning any payment made by or on behalf of [defendant] to [the law firm]" and "[a]ll documents concerning any bank or financial account of [defendant]").

To qualify as "special circumstances" and permit nondisclosure, it is not sufficient for the defendant to allege that the evidence of payments tends to, or likely does, incriminate the defendant. <u>Lefcourt</u>, 125 F.3d at 86. For instance, in <u>Shargel</u>, the grand jury sought to compel the attorney for the defendants, who had been indicted for RICO violations, to produce records of money he had received from them as evidence that the defendant's possessed unexplained wealth. 742 F.2d at 62. The Second Circuit ruled that the attorney-client privilege did <u>not</u> protect such payment information because, though it tended to incriminate the defendants, its protection was not necessary to effect the purpose of the attorney-client privilege—clients obtaining informed legal advice and enabling the communication necessary for an attorney to act effectively. See <u>id.</u>; <u>see also</u> <u>In re Grand Jury Subpeona Served Upon Doe</u>, 781 F.2d 238, 247-48 (2d Cir. 1986) (directly addressing evidentiary relevancy issue, in same RICO/unexplained wealth context, "[f]ee information may be sought as evidence of unexplained wealth which may have been derived from criminal activity"). Likewise, in <u>Lefcourt</u>, the fact that the client paid the law firm in cash was further probative of unexplained wealth. 125 F.3d at 87.[31]

The government intends to offer evidence of funds paid pursuant to the defendant's retainer agreement with the defendant for the reasons set forth in <u>Shargel</u> and

---

[31] It is irrelevant that the foregoing cases related to grand jury, IRS or SEC proceedings, because the scope of the attorney-client privilege is generally the same in all proceedings governed by the Federal Rules of Evidence. <u>Id.</u> at 86 n.4; <u>see also</u> Fed. R. Evid. 501.

Leftcourt, namely, to prove that the defendant had unexplained wealth. Evidence will show that the defendant had no ostensible signs of legitimate employment, yet numerous witnesses will testify that the defendant, with whom the witnesses engaged in multi-million dollar cash narcotics transactions, had tremendous wealth, including owning large amounts of real estate, businesses through straw purchasers and living a lavish lifestyle. See Doe, 781 F.2d at 247-48 ("Fee information may be sought as evidence of unexplained wealth which may have been derived from criminal activity"). Moreover, if the defendant paid the fees in cash, the payment will constitute further evidence that the defendant derived his wealth from an illegal source. See Lefcourt, 125 F.3d at 87. Thus, there are no special circumstances that bar admission of evidence of money that the defendant paid to defense counsel as part of a retainer agreement.

VIII.   Motion to Permit Select Witnesses to Testify Under Pseudonyms and to Preclude Examination of Government Witnesses Regarding Certain Identifying Information

Nearly all of the government's witnesses—law enforcement agents, cooperating witnesses, expert witnesses, and others—will identify themselves in court using their full names during their testimony. For a small number of witnesses (the "Protected Witnesses"), however, there is a risk of serious security concerns should the witnesses have to testify in open court under their full names. The government requests that the Court grant a protective order (1) authorizing the Protected Witnesses to testify under aliases or their initials; (2) precluding defense counsel and the defendant from disseminating the true names of the Protected Witnesses, after the government discloses the names to them in connection with its disclosures under 18 U.S.C. § 3500; (3) permitting other government witnesses to use the pseudonyms to refer to the Protected Witnesses and (4) instructing any defense witnesses, including the defendant, to use the pseudonyms when referring to the Protected Witnesses.

The government has separately filed an ex parte submission ("Ninth Ex Parte Submission"), see Dkt. No. 214, detailing the security concerns for the specific witness for whom it seeks such a protective order on this motion.[32]  In this public filing, the government sets forth the legal standards governing testimony under an alias.

The government also requests the Court to grant a protective order, precluding the defense from eliciting in open court identifying information for government witnesses, such as home and work addresses, telephone numbers, e-mail addresses, and other specific identifying information (such as current employers of non-law enforcement witnesses), which could be used to locate the witnesses.  Due to the high-profile nature of this trial and the security concerns related to the defendant's criminal organization, such information, if revealed, could subject the witnesses to harassment and annoyance and significant danger.

A.    The Court Should Permit Certain Witnesses to Testify Under Aliases

The Court has discretion to permit witnesses to testify using aliases.  Where the government seeks to limit disclosure of identifying information in open court, "the government must provide a reason for the limitation."  United States v. Marcus, No. 05-cr-457, 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing United States v. Marti, 421 F.2d 1263, 1266 (2d Cir. 1970)).  The reason offered by the government to justify such a limitation "may be that the answer may subject the witness to reprisals."  Id.  Once the government has offered such a rationale, the defendant is then required to demonstrate a "particularized need" for

_____

[32] At this time, the government has only identified one witness for whom the use of a pseudonym is required.  Additional information about this witness and the security concerns justifying anonymity are detailed in the Ninth Ex Parte Submission.  Should the government identify other such witnesses in the course of continuing to prepare for trial, it will promptly notify the Court and file appropriate briefing.

in-court disclosure of the identifying information.  Id. (citing United States v. Bennett, 409 F.2d 888, 901 (2d Cir. 1969)).

Allowing a witness to use an alias or otherwise limiting cross-examination as to identifying details does not infringe upon a defendant's Sixth Amendment right to confront the witnesses against him.  See United States v. Hernandez, No. 12-cr-809, 2013 WL 3936185, at  *3 (S.D.N.Y. July 29, 2013) (explaining that, while "Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to cross-examine adverse witnesses, this right is not absolute, and trial court has broad discretion to restrict cross-examination 'based on concerns about, among other things . . . the witness's safety'" (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986))); see also Washington v. Walsh, No. 08-cv-6237, 2010 WL 423056, at *7 (S.D.N.Y. Feb. 5, 2010) (collecting cases, and holding that law enforcement officer "testifying under a badge number rather than his name does not infringe upon a defendant's right to confront the witnesses against him").  A witness's use of an alias, moreover, does not prejudice the defendant where the identity of the witness is known to or provided to the defendant, and where the government provides Giglio material.  As the Court stated in Hernandez,

> [T]he limited open-court anonymity of permitting the [witness]
> to testify using an alias does not outweigh the defendant's right
> to cross-examination, because the defendant will not be
> prejudiced by the use of an alias.  The Government must still
> provide the defense with any and all Giglio material for the
> [witness].  The Government also offered to provide the
> [witness's] real name privately to defense counsel under a
> stipulation or under a protective order if necessary, in order to
> allow the defense to fully investigate the [witness] out of court to
> prepare for cross-examination.

2013 WL 3936185 at *3.

Applying these principles, courts have granted the government's request to allow cooperating witnesses to testify using an alias in circumstances substantially similar to those present here. For instance, in United States v. Celis, 608 F.3d 818, 833 (D.C. Cir. 2010), the government requested that certain government witnesses testifying against the FARC, a Colombian drug trafficking and terrorist organization, be permitted to testify under aliases. Id. at 830. The government made that request in light of "evidence that in Colombia the FARC had killed people suspected of helping to arrest [the defendant] and had threatened to kill cooperating witnesses." Id. at 833. The district court granted the order, and the D.C. Circuit affirmed. Id. In so holding, the D.C. Circuit noted that the district court appropriately weighed the competing interests "where the government disclosed the true identities of protected witnesses to defense counsel and those witnesses testified at trial under pseudonyms." Id. The court further held that the "appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant or another source." Id. at 832.

Likewise, in United States v. Alaniz, 726 F.3d 586, 609 (5th Cir. 2013), the Fifth Circuit upheld the district court's protective order authorizing two confidential informants to testify under aliases against members of the Gulf Cartel and Los Zetas. See id. at 599, 609. Specifically, the court upheld the procedure by which the confidential informants testified under aliases and precluded defense counsel from using the witnesses' true names in court, but defense counsel was provided their true names and significant background information. See id. at 609-10. The court concluded that, "[b]alancing the public interest in protecting the flow of information against the defendant's confrontation rights, . . . the limited use of pseudonyms did not violate the Confrontation Clause in this case." Id. at 610; see also United States v.

<u>Maso</u>, No. 07-10858, 2007 WL 3121986, at *3-*4 (11th Cir. 2007) (summary order) (affirming district court's order authorizing cooperating witness to testify under pseudonym).

For any Protected Witness for whom the government seeks the Court's permission to use an alias or initials to identify the witness in court and in public filings, the government will provide the defendant with the witness's name and will fully comply with its obligations under <u>Giglio</u> and 18 U.S.C. § 3500. The defendant, therefore, will be able to fully investigate and cross-examine the Protected Witnesses, avoiding any prejudice or Confrontation Clause concerns. <u>See generally</u> <u>Hernandez</u>, 2013 WL 3936185 at *3.

As noted above, the Ninth <u>Ex Parte</u> Submission details the specific security and safety concerns for the Protected Witness for whom the government seeks permission to testify using an alias in this motion. For the reasons herein, as well as set forth in that submission, the government requests that the Court grant the protective order for that witness.

B.    <u>The Court Should Preclude Elicitation of Specific Identifying Information</u>

As the Second Circuit has explained, a trial court has a "duty to protect [a witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him." <u>United States v. Persico</u>, 425 F.2d 1375, 1383-84 (2d Cir. 1970) (internal quotation marks omitted). It has also explained that the possibility that disclosure of a witness's address in open court may "subject the witness to reprisals or . . . humiliate or annoy the witness" is sufficient justification to limit cross-examination about such information. <u>Marti</u>, 421 F.2d at 1266. Thus, the court has upheld district court orders limiting cross-examination about such information. <u>See</u> <u>Persico</u>, 425 F.2d at 1383-84 (affirming district court ruling that two government's witnesses need not disclose their addresses or employers in open court); <u>United States v. Cavallaro</u>, 553 F.2d 300, 304-05 (2d

Cir. 1977) (affirming district court order denying defendant access to witness's address, because "there was good reason to fear for the safety of the witness").

The government requests that the Court preclude cross examination of government witnesses as to their home and work addresses, phone numbers and other specific identifying information, such as the identities of their employers (for witnesses who are not currently law enforcement officers), which could be used to locate the witnesses. Such a limit on cross-examination is proper in this case, which has so far drawn extraordinary attention from the media and the public at large—attention which will only increase as trial draws closer. To disclose the witnesses' addresses and identifying information to the public in open court would invite harassment of the witnesses and interference with their testimony as the press and members of the public might seek to contact and question those witnesses about their testimony and involvement with this matter. Moreover, the disclosure of such information to the public would necessarily mean that members of the defendant's Sinaloa Cartel and other persons seeking to act on his behalf would have access to that information. Such persons could use that information to attempt to locate and harm the defendants. See Dec. 14, 2017 Mem. & Order, Dkt. No. 176 (recognizing danger members of Sinaloa Cartel and others acting on defendant's behalf pose to government witnesses).

A limit on cross-examining the witnesses as to specific identifying details, by contrast, would not inhibit the defense from investigating witnesses or conducting meaningful cross-examination. Nor will the limitation proposed by the government prevent the jury from fully assessing the government's witnesses, including their credibility. See Marti, 421 F.2d at 1266. Thus, the Court should grant the government's request for this protective order.

IX.  Motion to Preclude Evidence and Argument Alleging Selective Prosecution of the Defendant

The government is concerned that the defendant will attempt to argue to the jury that the U.S. and Mexican government selectively targeted him for prosecution.  The defendant may attempt to bolster his argument by playing upon current social and political controversies.  For the reasons set forth below, the Court should preclude the defendant from raising any issue of selective prosecution or targeting before the jury.

"The Supreme Court has observed that a selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.  Because it involves a defect in the institution of the prosecution, the selective prosecution defense is an issue for the court rather than the jury."  United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (citing United States v. Armstrong, 517 U.S. 456, 463 (1996)); accord United States v. Berrigan, 482 F.2d 171, 175 (3d Cir. 1973) ("The question of discriminatory prosecution relates not to the guilt or innocence of appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution."); United States v. Taylor, 562 F.2d 1345, 1355 (2d Cir. 1977) (finding defense of selective prosecution waived because it was not raised prior to trial); United States v. Marcum, 16 F.3d 599, 602 (4th Cir. 1994) (noting that selective prosecution concerns constitutional defects in prosecution, not guilt or innocence of defendant); United States v. Jones, 52 F.3d 924, 927 (11th Cir. 1995) ( "[S]elective prosecution is a defect in the institution of the prosecution that has no bearing on the determination of factual guilt."); United States v. Washington, 705 F.2d 489, 495 (D.C. Cir. 1983) ("[T]he issue of selective prosecution is one to be determined by the court . . . as it relates to an issue of law

entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged.").

Any claim alleging a defect in instituting the prosecution based on alleged improper governmental motives must be raised with the Court in advance of trial.  See Fed. R. Crim. P. 12(b)(3)(A); United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011).  A claim not made prior to the deadline set by the Court for motions is waived.  See Fed. R. Crim. P. 12(e).  Because the government's alleged motive in bringing charges against a defendant is irrelevant to guilt, by asking the jury to focus on the government's conduct, the defense would be encouraging the jury to decide the case based on something other than the elements of the charged crimes.  That is impermissible.  See, e.g., United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984) (holding that arguments about selective prosecution "invited jury nullification by questioning the Government's motives in subpoenaing appellants and prosecuting them for contempt"); see also United States v. Thomas, 116 F.3d 606, 615-16 (2d Cir. 1997) (noting that "trial courts have the duty to forestall or prevent jury nullification").  Courts therefore regularly preclude criminal defendants from presenting such arguments to the jury in the opening and summation, as well as in cross-examinations of the government's witnesses.

In Farhane, for example, the court sustained an objection by the government to defense counsel's argument in summation that the government had targeted the defendant for prosecution based on his religion.  Farhane, 634 F.3d at 166.  The court then instructed the jury as follows:

> Ladies and gentlemen, the decision of the government to investigate an individual or the decision of a grand jury to indict an individual is none of your concern.  The only concern this jury has is whether or not the government has or has not proved each element [ ] of the crimes charged beyond a reasonable doubt.

Id. On appeal, the Second Circuit held that there was "no error in the district court's challenged rulings with respect to the defense summation" because "a selective prosecution defense alleges a defect in the institution of the prosecution, and as such is an issue for the court rather than the jury." Id. at 167 (internal quotations omitted).

Similarly, in United States v. Stewart, the court granted the government's motion to preclude the defense from cross-examining government witnesses or arguing to the jury that the government's prosecution was driven by an improper motive. No. 03-CR-717, 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004). The court explained:

> [T]he defense wishes to elicit from witnesses who are cooperating with the Government their understanding of the Government's eagerness to obtain evidence against Ms. Stewart. But any evidence that raises questions of prosecutorial bias against Stewart has no bearing on the issues properly before the jury, including the credibility of cooperating witnesses. Therefore, such evidence is inadmissible. The defendants are, of course, free to raise questions about the credibility and reliability of cooperating witnesses. But defendants may not use their ability to impeach such witnesses to introduce impermissible evidence of prosecutorial motive.

Id. at *1.

As in Farhane and Stewart, this Court should preclude the defendants from presenting to the jury improper arguments concerning alleged governmental motives for arresting the defendant, because such arguments may only be presented to the Court.

Even if such arguments were to be properly presented to the jury, there is no evidentiary basis to argue that any selective prosecution or targeting occurred in this case. See United States v. Figueroa, 548 F.3d 222, 227 (2d Cir. 2008) ("Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good

faith basis for questioning that alleges adverse facts." (internal quotation marks omitted));

Concepcion, 983 F.2d at 391 ("The trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis.").

Finally, the government submits that any statements and arguments regarding selective prosecution or targeting would result in unfair prejudice to the government, confusing the issues, and misleading the jury and invite jury nullification. See Fed. R. Evid. 403; Rosado, 728 F.2d at 93; Thomas, 116 F.3d at 615-16.

Thus, the Court should preclude the defendant from alleging improper governmental motive in prosecuting the defendant during jury addresses or the presentation of evidence in the case.

## X. Motion to Preclude the Defense from Presenting Irrelevant and/or Unfairly Prejudicial Evidence and Argument

The government moves in limine to preclude the admission of evidence or argument by the defendant regarding a number of topics which are either irrelevant or would likely confuse the issues, mislead the jury, and result in unfair prejudice to the government. Specifically, the government seeks to preclude the defendant from eliciting or introducing: (1) evidence of the defendant's good conduct; (2) reference to the Rolling Stone article 'El Chapo Speaks,' by actor Sean Penn, and Penn's related media appearances; (3) references to books, media appearances, and other articles related to this prosecution; (4) reference to the Special Administrative Measures ("SAMs") which govern the defendant's current confinement pending trial; (5) reference to the "Fast and Furious" law enforcement operation undertaken by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF");

(6) evidence of sensitive law enforcement techniques related to the attempts to locate and apprehend the defendant; (7) evidence of potential punishment for the crimes charged.

A. <u>Legal Standard</u>

As discussed above, Rule 401 defines "relevant evidence" as evidence having "any tendency to make a fact more or less probable than it would be without the evidence," where "the fact is of consequence in determining the action." Rule 402, in turn, provides that irrelevant evidence is not admissible. <u>See, e.g.</u>, <u>Arlio v. Lively</u>, 474 F.3d 46, 52 (2d Cir. 2007) ("If an item of evidence tends to prove a fact that is of consequence to the determination of the action, it is relevant. If it does not tend to prove a material fact, it is irrelevant.") (internal quotation marks omitted).

Pursuant to Rule 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "District courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice." <u>United States v. Miller</u>, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009). Courts also have broad discretion to exclude evidence if it has an "undue tendency to suggest decision on an improper bias, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note. Indeed, the Court may preclude the introduction of evidence under Rule 403 even if it is intended to further a purported defense theory. <u>See</u> <u>United States v. Roberts-Rahim</u>, No. 15-CR-243 (DLI), 2015 WL 6438674, at *9 (E.D.N.Y. Oct. 22, 2015).

B.      Evidence of Defendant's Prior Good Conduct

The government moves in limine to preclude the admission of any evidence or argument at trial by the defendant regarding his prior good conduct, including but not limited to, evidence of the defendant's alleged charitable giving to citizens of Sinaloa or his attempts to serve the public through his current run for Mexican State Senate.[33]  Any evidence on these topics is irrelevant under Rule 401, and the Court should exclude it under Rule 402.  In the alternative, the Court should exclude the evidence under Rule 403 because such evidence is likely to confuse the issues, mislead the jury, and result in unfair prejudice to the government.

Evidence of any alleged prior good conduct, such as the defendant's alleged charitable works or attempts at serving the public through his run for Senate, is irrelevant to any of the issues at trial.  The Court should exclude any such evidence or argument regarding those issues at trial.  See United States v. Rivera, No. 13-CR-149, 2015 WL 1725991, *2 (E.D.N.Y. Apr. 15, 2015) ("Evidence that a defendant engaged in prior good acts, when the defendant has not been charged with 'ceaseless' criminal conduct[,] is generally irrelevant and inadmissible.").  Here, although the Indictment alleges a vast and long-running drug trafficking conspiracy, the charges against the defendant do not allege the kind of "ceaseless, all-encompassing criminal conduct" that can, in limited circumstances, justify the admission of evidence of non-criminal conduct by the defendant. See United States v. Nekritin, No. 10-CR-491, 2011 WL 2462744, *5 (E.D.N.Y. June 17, 2011).  Rather, the Indictment alleges a series

---

[33] See "Imprisoned Drug Lord El Chapo Says He's Running for Senator," Riviera Maya News (March 17, 2018), available at https://www.riviera-maya-news.com/imprisoned-drug-lord-el-chapo-says-hes-running-for-senator/2018.html (last visited Apr. 9, 2018).

of acts of drug trafficking and related crimes, and evidence that the defendant has on occasion engaged in charitable acts or other non-criminal conduct is not relevant to his guilt or innocence regarding the crimes charged.

In the alternative, the defendant should not be permitted to introduce evidence of prior good conduct such as the type outlined above under Rule 403, because such evidence is highly likely to confuse the issues, mislead the jury and could result in substantial unfair prejudice to the government. Assuming <u>arguendo</u> that any prior good conduct would be relevant, evidence of good conduct of the sort described above would present a substantial risk of confusing the jury. The jurors could view the trial and their deliberations as a judgment of the defendant's character as a whole, losing sight of the specific and discrete issues that they are being asked to decide, <u>i.e.</u>, whether the defendant committed the essential elements of the charged offenses. <u>See</u> <u>United States v. Al Kassar</u>, 660 F.3d 108, 124 (2d Cir. 2011) ("[T]he trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible."). In addition, the introduction of such evidence could improperly invite jury nullification. If presented with evidence about the defendant's personal history and current circumstances, there is a significant possibility that the jurors will let sympathetic feelings for the defendant interfere with their duty to apply the law to the facts, which could result in substantial unfair prejudice to the government.

C.     <u>Misleading Rolling Stone Article and Related Media Appearances of Sean Penn</u>

In late 2015, following the defendant's dramatic tunnel escape from maximum-security prison in Mexico, actor Sean Penn traveled to Mexico to meet with and

interview the defendant.  In January 2016, Penn published a discursive memoir of his visit with the defendant in Rolling Stone magazine.[34]  In it, Penn casts the defendant's drug trafficking activities in various exculpatory lights.  Among other things, he implies that the defendant was the true "president of Mexico," a "Robin Hood-like figure" and a "businessman," who "unlike many of his counterparts [does not] engage in gratuitous kidnapping and murder."  Penn also asserts that the American public is "complicit in every murder, and in every corruption" of Mexican legal and political institutions stemming from the defendant's actions, and that the defendant is merely a "humble, rural Mexican."  Additionally, in connection with the article, Penn made media appearances to discuss his meeting with the defendant.[35]

        The defense may seek to elicit references to the Rolling Stone article or to Penn's meeting with and commentary about the defendant, in order to try to minimize the defendant's conduct, provide alternate explanations for his motives or for other purposes.  The Court should preclude any attempt to elicit such references or make argument based on this extraneous reporting as irrelevant and unduly prejudicial, confusing and misleading.  First, as to relevance, the exculpatory gloss on the defendant's conduct provided by the Penn article and related media appearances do not bear on any material fact to this action.  See Fed. R.

---

[34] See Sean Penn, "El Chapo Speaks," Rolling Stone (Jan. 9, 2016), available at https://www.rollingstone.com/culture/features/el-chapo-speaks-20160109 (last visited April 9, 2018); see also Carrie Kahn, "Ruthless Mexican Drug Trafficker Was A Robin Hood In Home State," NPR (Feb. 24, 2014), available at https://www.npr.org/2014/02/24/282123622/ruthless-mexican-drug-trafficker-was-a-robin-hood-in-home-state (last visited Apr. 9, 2018) (describing some Sinaloans' opinion of defendant as having "Robin Hood reputation").

[35] See, e.g., 60 Minutes: Sean Penn (CBS Television Broadcast Jan. 17, 2016), available at https://www.cbsnews.com/news/60-minutes-sean-penn-joaquin-guzman-el-chapo-charlie-rose/ (last visited April 9, 2018).

Evid. 401.  The article provides broad generalizations about the defendant, his motivations, the conduct of the United States government, the Mexican government and others.  But none of those generalizations bear on the specific charges of the Indictment, and their introduction into evidence would not therefore tend to prove a "fact that is of consequence to the determination of the action."  Id.

Additionally, even if relevant, the Rolling Stone article and related media appearances are unfairly prejudicial, would confuse the issues and mislead the jury.  If introduced into evidence, the article would be calculated to draw sympathy from the jury and imply that their decision should be based on personal feelings about the defendant rather than the specific conduct charged, without providing a defense to the defendant's crimes.  See Roberts-Rahim, 2015 WL 6438674 at *9 (precluding introduction of evidence that would "only mislead or confuse the jury, as it does not provide a defense to the violation of the statute").  The Court should preclude aeferences to the article and argument based upon it.

D.    Books, Media Appearances and Other Articles Regarding the Defendant

The government is aware that recent publications and media attention have been directed at the defendant, his drug trafficking crimes and his escapes and apprehension.[36]  This attention is only likely to intensify as this case nears trial.

The government moves to preclude any reference to or introduction into evidence of these books, articles, interviews and other publications related to the instant case.

---

[36] See, e.g., Today Show: "Ex-DEA Agent Recalls the Moment He Finally Captured El Chapo," (NBC Television   Broadcast Apr. 4, 2018), available at https://www.today.com/video/ex-dea-agent-recalls-the-moment-he-finally-captured-el-chapo-1202251331546 (last visited April 9, 2018); Andrew Hogan & Douglas Century, Hunting El Chapo: The Inside Story of the American Lawman Who Captured the World's Most Wanted Drug Lord (HarperCollins 2018).

Even if properly authenticated and relevant—which the government reserves the right to challenge should the defense offer them—such publications or testimony about their contents would be inadmissible as pure hearsay.  See Fed. R. Evid. 802; see also Tokio Marine and Fire Ins. Co. v. Rosner, 206 F. App'x 90, 95 (2d Cir. 2006) (summary order) (holding that newspaper article offered for truth of the matter asserted was inadmissible hearsay); Outerbridge v. City of New York, No. 13 CIV. 5459, 2015 WL 5813387, at *4 (S.D.N.Y. Sept. 30, 2015) ("[N]ewspaper articles offered for the truth of the matters asserted therein are inadmissible.").

      E.      Special Administrative Measures Governing the Defendant's Confinement

      The defendant is currently in custody at the Metropolitan Correctional Center ("MCC") in Manhattan.  At the direction of the Attorney General, SAMs have been implemented to govern the defendant's conduct, outside contact and other conditions of confinement during his detention at the MCC.  See 28 C.F.R. § 501.3 (permitting imposition of SAMs for certain inmates).  The defendant has mounted challenges to the SAMs in this court.  See Dkt. Nos. 50 (motion to vacate SAMs).  In so doing, the defendant and his counsel have extensively argued that the SAMs and his confinement more generally have had deleterious effects on the defendant.  See, e.g., id. at 8-9, 23; Dkt. No. 161 at 2 (letter requesting permission for psychological evaluation).  The government has responded and the Court has addressed every challenge or legal issue that the defendant has raised on this front.  See, e.g., Dkt. No. 71 (order denying in part defendant's motion to vacate SAMs); Dkt. No. 155 (order denying contact visits with attorneys).

      The defendant may seek to make reference to the SAMs or the conditions of his confinement at trial.  Any such reference is plainly irrelevant under Rule 401.  The condition

of the defendant's confinement is not a "fact of consequence in determining the action."  To the extent that the defense seeks to elicit information about the impact of the defendant's confinement on his well-being, such evidence would tend to confuse and mislead the jury by encouraging the jury to determine the facts based on their sympathy for the defendant and his lawful confinement rather than his conduct.  The Court should therefore exclude such evidence under Rule 403.

F.     "Fast and Furious" Operation and Firearms Derived Therefrom

An ATF operation known as Operation "Fast and Furious" has drawn extensive media coverage and public attention in recent years.  That operation related to the transportation and illicit sale of firearms into Mexico from the United States for use by Mexican drug cartels.  Public reporting has indicated that a weapon connected to Operation Fast and Furious was recovered from a residence at which the defendant hid from law enforcement shortly before his capture.[37]

The Court should preclude eference to Operation Fast and Furious.  The operation does not bear on the facts at issue in this prosecution, and itdoes not make any fact of consequence any more or less probable.  See Fed. R. Evid. 401.  Any reference to Operation Fast and Furious by the defense could only be intended to inflame the passions of the jury and attempt to use the operation to undermine the jury's confidence in United States law enforcement and the government's investigative efforts.  If the Court were to permit the

---

[37] See Matt Zapotosky, "Rifle at El Chapo Hideout Tied to Flawed ATF Operation Fast and Furious," Washington Post (Mar. 16, 2016), available at https://www.washingtonpost.com/world/national-security/rifle-at-el-chapo-hideout-tied-to-flawed-atf-operation-fast-and-furious/2016/03/16/3b57eaa8-eb89-11e5-bc08-3e03a5b41910_story.html (last visited April 9, 2018).

defendant to make such references, it would risk confusing the issues and misleading the jury, improperly suggesting that the ATF and law enforcement agents related to Operation Fast and Furious were involved with the government's investigation and prosecution of the defendant, and implying the jury's judgment of the defendant's conduct should hinge on any broader views that the jurors have about the operation.[38] Even if relevant, then, Rule 403 bars any reference to Operation Fast and Furious. See United States v. Soto-Barraza, No. 15-CR-00150, ECF No. 505 (D. Ariz. Sep. 18, 2015) (granting motion to preclude reference to Operation Fast and Furious in prosecution of defendant accused of murdering Border Patrol Agent Brian Terry with weapon obtained through Operation Fast and Furious).

G.    Sensitive Law Enforcement Techniques

The government's witnesses may include law enforcement officers who are familiar with law enforcement efforts to locate and apprehend the defendant, including an unsuccessful capture attempt in 2012, and the successful arrests of the defendant in 2014 and 2016. While the government itself may elicit testimony related to those raids and does not seek to restrict meaningful cross-examination that bears upon the defendant's innocence or guilt, the government asks the Court to preclude inquiry into the means and methods used by law enforcement to track and locate the defendant. Such inquiry is irrelevant, and potentially would confuse the issues and mislead the jury.

---

[38] As noted above, the operation was run by the ATF, which is not one of the lead law enforcement agencies that investigated the defendant in connection with his current charges. Indeed, the government does not presently intend to call any ATF agents or other ATF personnel to testify at trial.

Various aspects of the attempts by United States and Mexican law enforcement to apprehend the defendant are relevant and properly admissible at trial. For example, as discussed above, the government may introduce evidence of the defendant's flight from law enforcement in order to demonstrate consciousness of guilt. The government may also introduce relevant evidence seized by law enforcement during the law enforcement operations that were aimed at capturing the defendant.

But the government is not required to prove the means by which its agents, or law enforcement officials in Mexico, conducted these operations. Indeed, this court and other courts in this circuit routinely instruct juries not to consider how evidence was obtained. See, e.g., United States v. O'Brien, No. 13-CR-586, 2017 WL 2371159, *12 (E.D.N.Y. May 31, 2017) (denying motion for new trial based on purported new evidence of law enforcement agents' conduct by noting that court had instructed the jury at trial that it was not to consider the means and methods by which law enforcement officers obtained evidence). The Court should preclude the defense from eliciting testimony related to the sensitive law enforcement techniques by which law enforcement located the defendant and eventually apprehended him. Such evidence has no bearing on the defendant's guilt or innocence of the charged crimes, and it would only invite the jury to judge the defendant based, in part, on their views about the propriety of law enforcement methods. See United States v. Alimehmeti, 284 F. Supp. 3d 477, 494 (S.D.N.Y. 2018) (precluding inquiry into law enforcement means and methods under Rules 402 and 403, noting that such matters are "irrelevant to the defendant's innocence and guilt," and that "[a]n inquiry at trial into the details of law enforcement recording methods would invite the jury to pass judgment on the propriety of such investigative techniques").

H.     Potential Punishment

        The defendant faces a potential sentence of life in prison.  Under 21 U.S.C. §§ 848(b)(1) and (b)(2)(a), upon conviction of Count One, the CCE offense, the defendant must be sentenced to life imprisonment if he is found liable for a drug quantity of 350 kilograms of cocaine or more, and for being the principal administrator, leader or organizer of the Sinaloa Cartel.  The government intends to prove that that the defendant was the pre-eminent leader of the Sinaloa Cartel, who was responsible for numerous multi-ton (1,000 kilogram) shipments of cocaine.  Because of the potential severe sentence in this case, any mention by the defendant of punishment during any part of the opening or closing statements, or during the presentation of evidence, will be extremely prejudicial to the government.  The government therefore moves to preclude the defendant from referring to punishment.

        Courts routinely instruct jurors to disregard the question of punishment in their deliberations. Modern Federal Jury Instructions provide:

> The question of possible punishment of the defendant is of no concern to the jury and should not, in any sense, enter into or influence your deliberations. The duty of imposing sentence rests exclusively upon the court. Your function is to weigh the evidence in the case and to determine whether or not the defendant is guilty beyond a reasonable doubt, solely upon the basis of such evidence. Under your oath as jurors, you cannot allow a consideration of the punishment that may be imposed upon the defendant, if he is convicted, to influence your verdict, in any way, or, in any sense, enter into your deliberations.

Instruction 9-1.

        As issues of punishment are not within the province of the jury, the defendant's sole motive for placing before the jury the possible sentence that he will face in this case would be to curry the sympathy of the jury and thereby create undue prejudice against the

government.  Thus, the Court should preclude the defendant from raising the issue of the defendant's potential punishment during jury addresses and the presentation of evidence.  See United States v. Heslop, 225 F.3d 647, at *3 (2d Cir. 2000) (summary order) (affirming propriety of instruction that jury must not consider potential punishment).

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the government's motions <u>in limine</u> in their entirety.


Dated:      Brooklyn, New York
            April 9, 2018

                                    Respectfully submitted,


                                    RICHARD P. DONOGHUE
                                    Acting United States Attorney
                                    Eastern District of New York

                                    ARTHUR G. WYATT, CHIEF
                                    Narcotic and Dangerous Drug Section
                                    Criminal Division
                                    U.S. Department of Justice

                                    OF COUNSEL:
                                    BENJAMIN G. GREENBERG
                                    United States Attorney
                                    Southern District of Florida