```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :   **MEMORANDUM DECISION**
               - against -                                  :   **AND ORDER**
                                                            :
JOAQUIN ARCHIVALDO GUZMAN                                   :   09-cr-0466 (BMC)
LOERA,                                                      :
                                                            :
                              Defendant.                    :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

This order addresses letters from members of the press [339, 345, 368, 371, 401] about jury selection in this matter. The Government and defendant have responded.

Various members of the press have requested that *voir dire* be conducted in open court, that reporters be allowed to observe *voir dire* in the courtroom, and that at least a single pool reporter be present during sidebar conversations.

The Government asks the Court to limit the press to a single pool reporter who will observe *voir dire* from a separate room via video feed. Defendant does not object to the Government's proposed video feed arrangement. However, he does oppose limiting the press to a single pool reporter; he argues that such a limitation would prejudice his right to a public trial by restricting how the proceedings are relayed to the public to a single viewpoint. The New York Times objects to this proposed video feed arrangement, arguing that it is not an adequate substitute for observing proceedings in the courtroom.

Several competing interests are at stake here, including defendant's Sixth Amendment rights to a public trial and to a fair trial; the public's First Amendment right to access court proceedings; and the prospective jurors' legitimate privacy concerns. Of these, defendant's rights are the most critical. See Presley v. Georgia, 558 U.S. 209, 214 (2010).

Defendant has a right to a public *voir dire* process. However, in rare circumstances, "[t]he right to an open trial may give way . . . to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." Id. at 213 (quoting Waller v. Georgia, 467 U.S. 39, 45 (1984)).

Defendant's Sixth Amendment right to a public trial requires that the following criteria be met before the public can be excluded from *voir dire*. First, "[t]he party seeking to close the [proceeding] must advance an overriding interest that is likely to be prejudiced." Id. at 214 (quoting Waller, 467 U.S. at 48). Second, "the closure must be no broader than necessary to protect that interest." Id. That step requires that I consider reasonable alternatives to complete closure and that I make findings to support whatever closure I impose. Id.

Similarly, under the public's First Amendment right of access, the presumption of an open *voir dire* proceeding "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enter. Co. v. Super. Ct. of Cal., 464 U.S. 501, 510 (1984) ("Press-Enter. I"); see also Press-Enter. Co. v. Super. Ct. of Cal., 478 U.S. 1, 13-14 (1986) ("Press-Enter. II"). If the interest asserted is defendant's constitutional right to a fair trial, *voir dire* "shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." Press-Enter. II, 478 U.S. at 14 (citing Press-Enter. I, 464 U.S. at 510; Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 (1980)).

In this case, the overriding interest that would be prejudiced by public *voir dire* is defendant's Sixth Amendment right to a fair trial. Although secondary to that overriding

interest, the prospective jurors' legitimate privacy interest is also significant and would also be prejudiced by public *voir dire* proceedings. The point of *voir dire* is to empanel a fair and impartial jury, and the process necessarily requires an invasion of the prospective jurors' privacy to elicit detailed information about their experiences, opinions, and actual or potential biases. If the public is present during this exercise, there is a grave risk that jurors will censor themselves out of fear of being judged or later harassed by those listening.

Of course, every criminal defendant theoretically faces this risk. But the highly-publicized nature of this trial will increase exponentially the pressure felt by prospective jurors during *voir dire*. In some ways, this case is unprecedented; the amount of public attention has been extraordinary. No citations to media coverage are necessary to prove this point. It suffices to say that there are not many cases whose allegations are dramatized in popular television productions and podcasts before the trial has even begun.

This prejudice is compounded when the members of the public who attend *voir dire* include a drove of reporters. There is a significant risk that, if confronted with a gallery packed with journalists whom the prospective jurors know will be reporting on their answers, the prospective jurors will self-censor their responses to avoid stigma from expressing unpopular viewpoints on sensitive topics. It does not matter whether this censorship is deliberate or unconscious; either way, the prospective jurors' answers can be affected by their knowledge that this is a remarkably high-profile case. And if sensitive issues are not probed during *voir dire*, a juror who is partial could be empaneled, which would undermine the entire trial.

The Second Circuit has held that intense media attention alone (and the risk that prospective jurors will self-censor because of it) is not an adequate basis to completely close *voir dire* proceedings, even in a high-profile case. ABC, Inc. v. Stewart, 360 F.3d 90, 101, 106 (2d

3

Cir. 2004). There must be something more to justify closure, such as previous incidents of improper conduct by the media in covering the case, see id., or a "controversial issue to be probed in *voir dire* that might [impair] the candor of prospective jurors," United States v. Shkreli, 260 F. Supp. 3d 257, 261 (E.D.N.Y. 2017). This "something more" will depend on the unique circumstances of the case. See United States v. King, 140 F.3d 76, 82 (2d Cir. 1998).

This case has attracted observers, commentators, reporters, and readers from across the globe. The interest in these proceedings is international and prospective jurors understand that. They will also understand what that means – that the world is watching them. Although the Second Circuit has made clear that intense media attention alone is not sufficient, see Stewart, 360 F.3d at 101, 106, if ever there were a case where it could be, this is it. As a result, the Court is concerned that prospective jurors will self-censor their responses to sensitive questions if the public (including a large press contingent) is present in the courtroom, reminding them of this fact during *voir dire*.

Critically, and as in King, 140 F.3d at 83, this is the "unusual case where the fairness of a trial, or at least the *voir dire* phase, that is usually promoted by public access is seriously at risk of being impaired unless some modest limitation on access is imposed." There will be several sensitive and controversial issues probed during *voir dire*, including, but not limited to, prospective jurors' biases against persons of certain races, ethnicities, or national origins. Cf. Stewart, 360 F.3d at 101 (concluding that the district court's findings were inadequate to support complete closure of *voir dire* in part because the court "did not point to any controversial issue to be probed in *voir dire* that might have impaired the candor of prospective jurors"). There will also likely be queries on politically charged topics, such as federal narcotics policy and law-enforcement relations between the United States and Mexico. The Government has already

4

moved *in limine* to preclude reference to certain comments made by the President of the United States.[1] All of these topics are at the forefront of current public discussion and debate, and they often provoke strong reactions. But it is critical that prospective jurors be forthcoming about their views on these topics, as well as any preconceived notions they might have about defendant. There is too great a risk that the public's presence will have a chilling effect on prospective jurors' answers to these hot-button issues to allow public access during *voir dire*.

The most recent letter from The New York Times argues that the issues to be discussed during *voir dire* here will be more akin to those in a "routine drug prosecution[]" than to the racially charged issues that were present in the King case. As explained above, the Court could not disagree more.

The New York Times's attempt to analogize this case to Stewart and Shkreli goes too far. Those cases did not present a need for special attention to prospective jurors' potential racial, ethnic, or national origin biases. This case absolutely does. Further, this case is anything but a routine drug prosecution. It will involve the prospective jurors' views on the Government's use of resources to prosecute individuals like defendant, who are extradited to the United States based on alleged crimes that happened elsewhere but nevertheless affect this country. Indeed, the international scope of the criminal organization alleged makes it an outlier among even the biggest drug prosecutions to date. But even if this case were more routine, law-enforcement policy between the United States and Mexico is a much more politically charged topic, and therefore much more difficult to speak openly about in public, than levels of trust in corporate

---

[1] Although I concluded that such comments were inadmissible as irrelevant to the merits of this case, they are still in the public domain and emblematic of the politically charged nature of the issues that will likely be discussed during *voir dire*.

leadership, "the niceties of home decorating," id., or even the prospective juror's views of *the defendant's views* on race, gender, politics, and class, see Shkreli, 260 F. Supp. 3d at 261-63.

Moreover, unlike Stewart and Shkreli, this is not a case about a high-profile businessperson accused of financial fraud. Although those cases attracted significant public attention, the implications of that attention are more serious here. Defendant is accused of leading a violent criminal organization with an alleged history of threatening and harming witnesses and interfering with the legal process. The prospective jurors may be concerned that if they voice an unpopular or biased view, members of the public observing the proceedings – who, unlike the press, are not vetted – will connect that response to their appearance in a way that could put their safety at risk. That risk is significantly lower if the prospective jurors' responses are simply reported on by the media.

My findings below are based on the unique facts presented in this case, but they are also informed by my experience with jurors' reactions to *voir dire* in high-profile cases. These findings supplement the findings I made when approving an anonymous and partially sequestered jury:

1. Defendant's Sixth Amendment right to a fair trial and the prospective jurors' privacy interests are the two interests that weigh against public proceedings; the former is the overriding interest and the latter is an important interest.

2. Because of the intense (and international) public and media interest in this case, there is an abnormally high risk that prospective jurors will self-censor their answers to questions about sensitive topics like their biases against people of certain races, ethnicities, or national origins or their opinions about federal drug policy or law-enforcement relations between the United States and Mexico.

3. There is also a unique risk in this case that prospective jurors will self-censor their answers for fear of their safety, given the nature of the crimes that defendant is accused of and the criminal organization that he is alleged to have led.

4. In this case, where the media coverage has been particularly intense, a gallery or jury box full of reporters could intimidate prospective jurors by reinforcing the fact that, even though their names, addresses, and job information will be anonymous, *voir dire* involves an examination into personal details about them

6

that could lead to an identification and that their answers may be reported by the press.

5. There is a substantial probability that defendant's right to an impartial jury (and therefore a fair trial) would be prejudiced by the presence of the public and by a large group of reporters during *voir dire*. Some degree of closure will prevent that prejudice.

6. That substantial probability of prejudice outweighs defendant's Sixth Amendment right to a public trial and the public's general First Amendment right to access *voir dire*.

In light of these findings, I conclude that some degree of closure is necessary. Therefore, I must consider reasonable alternatives to complete closure. See Presley, 558 U.S. at 214; Press-Enter. I, 464 U.S. at 511.

One alternative to complete closure would be to allow members of the press, but not the public generally, to attend *voir dire* so that the press can observe the proceedings and report them to the public. The members of the press have suggested that I allow any number of reporters to observe from the gallery, or alternatively, that I fill the jury box (which seats 18 people) with reporters. Neither suggestion is a reasonable alternative to complete closure. Prospective jurors will likely be intimidated by a gallery or even a jury box full of reporters. Based on the factual findings above, permitting a significant number of reporters in the courtroom would increase the risk that prospective jurors will self-censor their answers to controversial and sensitive (and here, critical) topics. Therefore, if the press is permitted to attend *voir dire*, they must be limited to a number that will not be intimidating to the prospective jurors.

This will be the case whether members of the press observe *voir dire* from the courtroom or in a separate room via video feed. In either scenario, I would inform the prospective jurors that the press is watching the proceedings, as I do not believe it would be proper to conceal that information from them. But a smaller group of reporters will seem less formidable and will

reduce the risk that the prospective jurors will be distracted by their presence or self-censor because of it.

The Government proposes another alternative: to have one pool reporter observe *voir dire* via video feed from an overflow room. As mentioned above, defendant does not object to journalists observing *voir dire* via video feed, but he does object to the Government's proposal of a single reporter. Defendant argues that this restriction would infringe on his Sixth Amendment right to a public trial because a single reporter (who can necessarily only provide a single viewpoint) cannot accurately report everything that happens during *voir dire*. Defendant raises a fair point about the importance of multiple viewpoints; and because his rights are the most important to consider here, I give great weight to this objection. Thus, if the press is permitted to attend, there should be enough reporters to provide a variety of perspectives, but not so many that their number will intimidate prospective jurors.

However, the suggestion by members of the press that a reporter be present at sidebar conversations is also unreasonable in this case. The function of sidebar (which, during completely open *voir dire* proceedings, is when a prospective juror speaks with the Court and the lawyers on the record, but the other prospective jurors and members of the public sitting in the gallery cannot hear the discussion) is to allow the prospective juror to speak candidly about a topic that they do not feel comfortable discussing in public. Permitting a reporter – even a single pool reporter – to overhear these conversations would completely undermine that function. Moreover, because jurors often wish to discuss personal matters at sidebar, those conversations are more likely to contain identifying information that the press and public should not hear, consistent with the order approving an anonymous and partially sequestered jury.

In their letters to the Court, members of the press also request that the Court release the transcripts of *voir dire* (including the conversations at sidebar) at the end of each day, whether or not a pool reporter is permitted at sidebar. That request is impracticable. Before the transcripts of these sidebar conversations can be made public, information that could identify the prospective jurors must be redacted from them. (This is required not just by this Court's order granting an anonymous and partially sequestered jury, but also by Supreme Court caselaw recognizing jurors' legitimate privacy interests, see Press-Enter. I, 464 U.S. at 520-21.) It would be very difficult to review and prepare these redacted transcripts each day following *voir dire* and it would risk distracting the lawyers and the Court from the *voir dire* process itself.

Although none of these proposed alternatives are, by themselves, reasonable or practicable under the circumstances, variations on a few of them can protect the interests identified here without requiring complete closure of the courtroom. Consequently, the Court will conduct *voir dire* as follows:

- *Voir dire* will take place in the courtroom.
- Each side will be permitted to have three attorneys present in the courtroom.
- Five pool reporters will be permitted to attend *voir dire*. They will sit in the back row of the jury box. The press will select which five reporters will attend each day. All five reporters will be required to satisfy the U.S. Marshal of their credentials as legitimate members of the press.
- Members of the public, other than the five reporters, will not be permitted to attend *voir dire*.
- Each prospective juror will be brought into the courtroom individually for *voir dire*. The other prospective jurors will not sit in the gallery.
- The Court will inform each prospective juror that the five individuals in the jury box are reporters, and that, if at any point the prospective juror would like to speak with the Court *in camera* so that the press cannot overhear, the prospective juror may request a sidebar. Sidebar conversations will be on the record with counsel present. The reporters will not be able to hear the sidebar conversations (although they will still be able to observe the conversation taking place). The Court will remind the prospective jurors that the substance of the sidebar conversation will be released in the transcript of the proceedings, but that any

information that could identify them in connection with the sidebar conversations or that would be an unwarranted invasion of their privacy will be redacted before the transcripts are made public.

- The transcript of the *voir dire* proceedings, including the conversations at sidebar, will be filed publicly once *voir dire* is over. Information that could identify the prospective jurors or that would constitute an unwarranted invasion of their privacy will be redacted from those transcripts.[2]

This process will allow each interested party to exercise their constitutional rights in a way that also protects the privacy of the prospective jurors. However, if it appears during *voir dire* that the reporters' presence risks infringing on defendant's right to a fair trial or on the prospective jurors' legitimate privacy concerns, the Court will revisit this ruling.

This process also resolves the media's related request that the completed juror questionnaires be made public. The reporters will observe *voir dire* as it unfolds, and a transcript of the entire proceeding (including non-identifying and non-private information from the sidebar conversations) will be filed within a reasonable time after *voir dire* ends. Because of this, there is little to no public interest in the contents of the completed questionnaires. First, almost all the questionnaires were filled out by individuals who ultimately will not be selected as jurors; those individuals' interest in keeping their responses private outweighs whatever public interest there may be in knowing and reporting on that information. Second, and more importantly, the questionnaire process was designed to protect the jurors' anonymity. The completed questionnaires contain identifying information beyond prospective jurors' names, dates of birth, and places of employment: they paint a picture of the prospective jurors' lives, which, with enough time, consideration, and Internet access, could identify them. Moreover, anything contained in a questionnaire that bears on an individual's ability to serve as an impartial juror

---

[2] The Government, as the party that sought an anonymous and partially sequestered jury, will be responsible for proposing these redactions. The Government is ordered to file its proposed redacted transcript of the *voir dire* proceedings within five days after the close of *voir dire*.

will be discussed during *voir dire*, which the public will have access to through the procedure outlined above. Therefore, the request by members of the press to make public the completed juror questionnaires is denied.

**SO ORDERED.**

                                                                    _____
                                                                                    U.S.D.J.

Dated: Brooklyn, New York
           October 30, 2018