LAW OFFICES OF
# JEFFREY LICHTMAN
11 EAST 44TH STREET
SUITE 501
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
PAUL TOWNSEND

PH: (212) 581-1001
FX: (212) 581-4999

January 8, 2019

**FILED VIA ECF & UNDER SEAL**
Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11217

Re: <u>United States v. Guzman Loera</u>, S4 09 CR 466 (BMC)

Dear Judge Cogan:

I am writing on behalf of defendant Joaquin Guzman Loera in response to the government's January 3, 2019 supplemental motion *in limine* (Dkt. No. 524), in which the government highlights three additional areas of inquiry which it seeks to preclude cross-examination of CW1. Specifically, the prosecution is requesting that the Court bar examination of CW1's lies to his family members – and criminal co-conspirators – regarding his girlfriend's abortion, the bribe paid to a DEA agent by CW1 and his brother, Francisco, and CW1's belief that Francisco cooperated with the CIA, which led to his murder. See, generally, Dkt. No. 524. The defendant would initially note that none of the subject areas have developed from trial testimony; instead, they have been known to the government since before the start of the trial as noted in the § 3500 material. Accordingly these *in limine* motions could have been submitted as part of the <u>multiple</u> preceding motions brought by the prosecution to limit cross-examination for CW1, and not a few mere days prior to his testimony. Nonetheless, for the reasons that follow, the government's motions should be denied on the merits.

I.  Lies Regarding His Girlfriend's Abortion

The government has disclosed that CW1 told his mother and brother,█████, that he had been shot and that as a result of this incident that his girlfriend miscarried. See Dkt. No. 524, at p. 3. According to █████ CW1 is prone to dramatics to prompt people to action, and █████ does not believe that CW1 was shot, but rather that his girlfriend had an abortion. Id. In an attempt to justify their request to preclude the defense from pursuing a line of questioning regarding an obvious instance of witness lying, the government describes CW1's actions as a "mischaracterization," rather than an outright falsehood. Id. A mischaracterization and a lie are

JEFFREY LICHTMAN

Hon. Brian M. Cogan
United States District Judge
January 8, 2019
Page 2

two separate things, as is a miscarriage and an abortion. Considering that ▆▆▆▆ does not believe that CW1 "mischaracterized" the abortion but instead lied about it, pursuant to Rule 608 the defendant should be permitted to cross-examine CW1 on specific instances of being untruthful, and this situation falls squarely within the ambit of that Rule.

The District Courts should give a criminal defendant "wide latitude" when cross-examining government witnesses, and should permit the defendant to go into "specific instances of conduct" if those actions are "probative of a witness's character for truthfulness or untruthfulness." United States v. Cedeno, 644 F.3d 79, 82 (2nd Cir. 2011); Fed. R. Evid. 608(b).

In this situation, the government's disclosure makes it perfectly clear that CW1 lied to his brother and mother, his criminal co-conspirators, regarding the situation involving his girlfriend's abortion. The fact that he was willing to lie to both his family and his narcotics trafficking coconspirators, individuals with whom he had multiple levels of confidentiality, is highly relevant to whether the jury should credit his testimony. In addition, the purported cause of the fake miscarriage is a lie that involves the defendant. In a January 3, 2010 recorded conversation between ▆▆▆ and his mother (ref. no. ▆▆▆▆), ▆▆▆ tells his mother, ▆▆▆ that CW1 claimed he had been shot and that, *as a result of the shooting*, that CW1's girlfriend suffered a miscarriage. See 3500-▆▆▆-96, at p. 12. ▆▆▆ further stated that he did not believe that CW1 had been shot, but rather that his girlfriend had obtained an abortion. Id. CW1 himself discusses this lie in his own proffer sessions. On June 20, 2018, when meeting with the government in preparation for this trial, CW1 claimed that he once told his then-wife, ▆▆▆, that he was *shot while he was on the run* with Mr. Guzman. See 3500-CW1-68, at p. 4. CW1 went on to say that he also told ▆▆▆ about this incident. Id. Notably, CW1 still did not admit to the government this was untrue. In addition to the fact that CW1 was willing to lie to his family members, he also demonstrates through this situation that <u>CW1 is willing to lie about his activities with the defendant</u>. CW1 specifically claiming that he was shot while on the run with the defendant (see 3500-CW1-68, at p. 4), an incident which did not happen, should permit the defendant the right to elicit this information, and the related information concerning the miscarriage/abortion, for the jury to weigh in their credibility determination of CW1.

Moreover, the government had no such concern of embarrassment in its attempt to elicit, on direct examination, that another cooperator, Vicente Zambada, had engaged in extramarital affairs. It was not until counsel pointed out at sidebar that the government had filed a motion seeking preclusion of the miscarriage/abortion lie the previous day, and the inherent inconsistency between what the prosecution deems too humiliating or personal between their cooperators, that they offered to withdraw the question regarding Mr. Zambada's philandering. The miscarriage/abortion distinction is less embarrassing to CW1 than asking Mr. Zambada to admit to being unfaithful to his wife.

The government's request to preclude this line of inquiry is simply an attempt to bolster CW1's credibility by shielding the jury from probative and relevant information which paints

JEFFREY LICHTMAN

Hon. Brian M. Cogan
United States District Judge
January 8, 2019
Page 3

their witness as dishonest. Indeed, the government does not even put forth any serious argument in favor of excluding questions about this topic, except to say there are reasons a person might withhold facts from family (see Dkt. No. 524, at p. 4), which is certainly insufficient reason to preclude an otherwise appropriate line of cross-examination under Rule 608.

II.     CW1 and Francisco ████, Bribery and Cooperation with American Law Enforcement

The government is further seeking to preclude inquiry into two other topic areas concerning CW1 and his brother, Francisco. First, the government seeks to prohibit the defendant from eliciting information disclosed in § 3500 materials that CW1 accompanied Francisco to a restaurant near the Colombian airport where Francisco proceeded to bribe a DEA agent. Second, the government is seeking to prevent any questioning with regard to Francisco's purported cooperation with the CIA.

    A.    Bribery of a DEA Agent

In the government's motion, the argument to exclude inquiry concerning the bribe paid to the DEA agent is based on a perceived lack of corroboration that the individual who received the money was actually a DEA agent. Dkt. No. 524, at p. 4. Specifically, the government claims that CW1 was unaware of the decision to bribe a DEA agent prior to the meeting, that the other individuals present at the meeting appeared to be Colombian military or police, that the individual who received the bribe spoke Spanish without an American accent, and that the individual did not overtly identify himself as a DEA agent. Id. Despite the government's desire to paint this individual in an ambiguous light, the proffer sessions with CW1 clearly demonstrate that CW1 had no doubt this individual was a DEA agent.

CW1 specifically notes that he went with his brother, Francisco, to the Mi Ranchito restaurant to meet with people who he believed to be from the DEA. 3500-CW1-25, at ¶ 12. The fact that other individuals present appeared to be Colombian military or police, and yet CW1 specifically noted – several times – his belief that the specific person that he and Francisco met with was a high ranking DEA agent is clearly indicative that Francisco informed CW1 that they would be meeting a DEA agent. Id. The DEA agent also informed CW1 and Francisco that "they were focusing on individuals transporting larger quantities at the airports." Id. This statement is certainly indicative that the speaker is involved in narcotics interdiction efforts, which is consistent with the notion he was in federal law enforcement. CW1 was asked about this transaction in other proffers as well, and each time stressed his belief that he and Francisco met with a high ranking DEA agent. 3500-CW1-28, at ¶ 26. Additionally, CW1 noted that it was apparent that the DEA agent and Francisco knew each other, which is a logical conclusion to draw since CW1 knew that Francisco was working with the DEA and CIA. See 3500-CW1-28,

at ¶ 27. In fact, Francisco's relationship with the DEA and CIA are what CW1 believes directly led to his murder. Id.

The specific act of the bribery is also attributable to both CW1 and Francisco. They were narcotics trafficking partners, they lived together in Francisco's apartment in Cancun and worked together in a warehouse in Medellin where drugs were stored. 3500-CW1-25, at ¶ 10. There can be no argument regarding whether CW1 accompanied Francisco to this meeting, and bribing law enforcement was certainly something that would not be out of character or a surprising behavior for CW1, as the government noted in its motion. See Dkt. No. 524, at p. 5 (indicating that the government expects CW1 to testify about multiple bribes that CW1 paid). CW1 was in no way merely a "bystander" at the meeting with no role in the bribe, contrary to government's assertion. Id. It is also of no consequence that CW1 did not have any further interaction with the DEA agent. See, id. A payment to an individual is not considered a bribe only if it happens multiple times, it is inane to believe that an individual would not be guilty of bribery if they delivered a box of cash delivered to a DEA agent but had no subsequent interaction with that individual. United States v. Silver, 864 F.3d 102, 111 (2nd Cir. 2017) (giving the definition of bribery using terminology for a single act). Accordingly, CW1 is certainly culpable of the bribe, and the act of bribery is clearly probative concerning an individual's character for truthfulness and is a valid line of cross-examination. United States v. Giordino, 172 F.App'x 340, 343 (2nd Cir. 2006); United States v. Bustamonte, 45 F.3d 933, 946 (5th Cir. 1995).

Further, testimony has already been elicited concerning Francisco bribing law enforcement using "boxes of cash," nearly identical to the situation which the government is currently attempting to exclude. During ▮▮▮▮▮▮ testimony, the following discourse took place:



JEFFREY LICHTMAN

Hon. Brian M. Cogan
United States District Judge
January 8, 2019
Page 5

████████████. The government is unconcerned with instances of bribery to foreign law enforcement agencies but is adamant that this one specific instance of bribery to an American law enforcement agency must be precluded. The prosecution's actions here are simply an attempt to cover up corruption by United States law enforcement and prevent embarrassment to the government, which, absent a legally permission reason, is not just cause to impermissibly curtail a defendant's right to cross-examination under Rule 608. Giordino, 172 F.App'x at 343.

    B.    Francisco's Cooperation with the CIA

The government also asserts that cross-examining CW1 on Francisco's cooperation with the CIA would be inappropriate as they claim CW1 had no direct knowledge of these actions and only heard the information "second hand." See Dkt. No. 524, at p. 5. This lack of knowledge, the government contends, presents a danger of unfair prejudice, confusion of the issues, considerations of delay, wasting time, and needless presentation of cumulative evidence. Id.

Preliminarily, the defendant is unaware of how cross-examination concerning Francisco's cooperation with the CIA could possibly present considerations of delay, wasting time, or presenting cumulative evidence, as this is the only opportunity for this subject to be explored as no witness other than CW1 has knowledge concerning these actions. To date, no other witness has testified concerning Francisco and the CIA, and the defendant is unaware of any witness subsequent to CW1 who could even be asked to present "cumulative" evidence on this topic.

Concerning CW1's knowledge about Francisco's cooperation, CW1 was asked questions regarding Francisco's relationship with law enforcement during his meetings with the government. Despite the government's proffer in their motion, CW1 was neither unsure nor equivocated at all about Francisco's cooperation. Rather, the proffer notes indicate "[CW1] stated that Pacho [Francisco] bought planes from the CIA and was working with both the CIA and DEA." 3500-CW1-28, at ¶ 27. The notion that CW1 was unsure about these facts is further belied by the fact that the sentences both before and after his statement regarding Francisco's relationship with American law enforcement both discuss situations which CW1 believes to be true, however the sentence referenced above was noted as a statement of fact, not belief. Id. Additionally, the government's motion makes the assertion that CW1's knowledge is all passed down without citing any specific proffer session which indicates that is true. The simple reason for this is that CW1 is clearly speaking from a position of firsthand knowledge about Francisco's cooperation.

Cross-examination concerning Francisco's cooperation is also proper as it goes to bias and motive. CW1's cooperation with the government, combined with his clear affinity for his brother, who was also cooperating with law enforcement at the time of his death (see 3500-CW1-

JEFFREY LICHTMAN

Hon. Brian M. Cogan
United States District Judge
January 8, 2019
Page 6

28, at ¶ 28), demonstrate a clear bias as CW1 can consider their shared cooperation as motivation for him to testify for the government. United States v. Abel, 469 U.S. 45, 45-6 (common membership in an organization or group is "certainly probative of bias"). The government is free to elicit on direct, or even redirect, that Francisco's cooperation is unrelated to his decision to testify, but the jury should be aware of CW1's potential bias and motivation based on Francisco's status.

III.     Conclusion

For the foregoing reasons, the government's motions *in limine* should be denied.

Respectfully submitted,

Jeffrey Lichtman

cc:     All counsel (by email and ECF)