**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GMP:BCR
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 27, 2018

**TO BE FILED UNDER SEAL**

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Joaquin Archivaldo Guzman Loera
Criminal Docket No. 09-466 (S-4) (BMC)

Dear Judge Cogan:

The government respectfully submits this letter in response to the Court's order, see Dkt. No. 390 (the "Order"), granting and denying certain of the government's second set of motions in limine, see Dkt. No. 326, to proffer additional factual detail to the court in regard to several issues.

I. Evidence of the Defendant's 2001 Prison Escape

The Court granted the government's motion to admit evidence of the defendant's escapes and/or flights from justice in 2012, 2014, 2015 and 2016/17. See Order at 6. The Court denied, however, the government's motion to admit evidence of the defendant's 2001 escape from prison. See id. at 7. The Court explained that, based on the government's proffer, the 2001 escape was "not sophisticated," did not "depend[] on a network of co-conspirators," did not require "significant resources" or the "bribe[ry of] many officials," and so was not direct evidence of the "substantial income" prong of the charged Continuing Criminal Enterprise ("CCE"). Id. The Court also found that the 2001 escape, like the other instances of flight from justice, did not demonstrate consciousness of guilt. See id.

A. Factual Background

The government provides the following additional factual proffer regarding the 2001 escape. Although perhaps not as technologically sophisticated as the 2015 escape, which involved a mile-long tunnel dug directly to the defendant's prison cell, the 2001 escape nonetheless relied upon a willing network of co-conspirators and substantial advance planning to aid the defendant's efforts to escape from prison. The escape was not one of chance or spur-of-the-moment opportunity, but was planned and aided by the defendant's associates.

Specifically, according to Cooperating Witness No. 9 ("CW9"),[1] who had been a high-level official at the Puente Grande prison where the defendant was held, the defendant had by the time of his escape corrupted a substantial portion of the prison staff through a web of bribery. As a result, the defendant enjoyed unprecedented privileges that permitted him a greater ability than most other prisoners to communicate with the outside world, both via telephone and in writing (both handwritten and email). In particular, the bribed prison officials permitted the defendant to freely communicate with family members, including his brother Arturo Guzman and his brother-in-law Marcelo, both of whom were the defendant's criminal associates. CW9 will also testify that the defendant had his own cellular telephone while in custody, which he used to communicate with a corrupt attorney and family members. The defendant's bribes also gave him access to more favorable prison housing conditions and allowed him visits from both of his wives and their children.

Once CW9 began working at the prison, the defendant paid him bribes to persuade CW9 to keep corrupt guards in place so that the defendant could continue reaping the benefits of his corrupt bargain. To that end, the defendant gifted CW9 a house in Guadalajara, which he later sold for just under 2 million pesos (approximately $102,000 U.S. dollars), and approximately 200,000 to 300,000 pesos in cash (approximately $10,000 to $15,000 U.S. dollars).

With respect to the escape itself, the defendant bribed several people on the inside of the prison to facilitate elements of the escape. CW9 and Cooperating Witness No. 6 ("CW6") will testify that the defendant bribed the guards who controlled the doors, the guard who controlled the security cameras, the guard who lifted the barrier leading to the outside of the prison, and "Chito," the maintenance worker who pushed the laundry cart. The government expects CW9 to testify that these bribes were payed "outside" of the prison by an attorney for the defendant, further demonstrating the defendant's network of corrupt associates.

[1] The government continues its numbering sequentially from the second set of motions in limine.

Even once outside of the prison walls, the defendant's escape was not yet complete. The defendant required the assistance of additional coconspirators and substantial resources to fully escape the reach of law enforcement. According to CW6, the defendant's co-conspirator Mayo Zambada orchestrated the delivery of an armored Volkswagen Jetta near to the prison, which was driven by another criminal associate of the defendant, to permit the defendant to drive or be driven under the cover of night to Tepic, Nayarit, the state adjacent to Jalisco, where the prison was located. According to Cooperating Witness No. 10 ("CW10"), once the defendant was in Nayarit, the defendant's criminal associates, including Mayo Zambada, learned that law enforcement was closing in on the defendant and recognized that he needed another means to continue his flight from justice. The government expects CW10 to testify that Mayo Zambada sent his helicopter pilot, Patricio Estolano, to fly to the mountains of Nayarit to help the defendant evade law enforcement capture. CW10 will further testify that when the helicopter landed, Mayo Zambada, CW10 and a small security detail drove the defendant to Mexico City, where he hid for a period of time. This particular event was the occasion on which CW10 first met the defendant face-to-face. The government anticipates that CW10 will also testify that in the immediate aftermath of the defendant's escape from Puente Grande, CW10 and Mayo Zambada used their corrupt connections at all levels of government to receive information about planned capture operations against the defendant, who was now a fugitive from justice.

Immediately after the escape, the defendant began contracting military personnel to provide security for him. Indeed, his security detail grew to as large as 50 heavily-armed "pistoleros" within weeks of his escape from prison. Additionally, the defendant continued to travel via small private airplane and helicopter to different locations within Mexico in order to avoid apprehension.

All of these events took place within days of the laundry cart incident, and were critical in ensuring that the defendant could continue his criminal activity by avoiding further incarceration and the possibility of extradition to the United States. Additionally, testimony from several cooperating witnesses will show the means by which Mayo Zambada was able to mobilize the cartel's resources to assist the defendant in escaping the prison, and cooperating witnesses will testify that within a few weeks of the escape, the full partnership between the defendant and Zambada—which characterized their relationship throughout the 2001 to 2016 period—took root. The escape and Zambada's efforts to assist the defendant, therefore, were instrumental in cementing the relationship of trust and mutual reliance between the defendant and Zambada, and allowed the enterprise to flourish to unprecedented heights from 2001 until the defendant's ultimate re-capture in 2016.

The significant import of the 2001 escape is additionally corroborated by the fact that, according to CW9, approximately 70 prison guards were arrested by Mexican authorities in the wake of the escape. CW9 will testify that the defendant told CW9 that the defendant was helping to pay for attorneys for many of them. Finally, CW6 and CW9 will testify that the defendant told each of them, separately, that he undertook the 2001 escape because he believed that he was likely to be extradited to the United States.

B. Analysis

The fact that the defendant was able to make these arrangements to escape and avoid re-capture by law enforcement in its immediate aftermath is probative of the substantial income derived from the charged CCE. See Order at 6. As courts across the country have held, there is no threshold amount required to establish the "substantial income" prong of CCE. See, e.g., United States v. Losada, 674 F.2d 167, 173 (2d Cir. 1982) (concluding that even a net income of $2,000 could suffice on particular facts of case, as "neither the statute nor the cases establish a minimum amount of 'income or resources' required to make [21 U.S.C. §] 848 applicable"). Additionally, the "substantial income" prong may be established circumstantially, as by evidence of a defendant's "position" in an enterprise, and by the defendant's "level of operation." United States v. Ayala, 769 F.2d 98, 102 (2d Cir. 1985).

The above-proffered facts relating to the 2001 escape—the defendant's ability to bribe prison officials following eight years in custody, the ready aid of his associates once he escaped, his prompt return to a top position in an ongoing drug cartel—are highly probative of the "substantial income" that the defendant derived from the enterprise. See Order at 6. His escape was not one of chance, and his subsequent re-installation as a leader of the cartel was not a promotion; rather, his ability to bribe prison officials, and the assistance provided to him by his co-conspirators in escaping and returning to a top role in the cartel demonstrate his position as a leader who derived substantial income.[2] Evidence and testimony related to the 2001 escape should therefore be admissible as direct evidence of the charged CCE.

Additionally, in light of the fact that the government will, pursuant to the Court's ruling, introduce evidence of the defendant's ongoing drug trafficking while in prison from 1993-2001, evidence of the 2001 escape is "necessary to complete the story of the crime on trial" and is therefore alternatively admissible as "inextricably intertwined" with evidence of

[2] The fact that the defendant received aid from and promptly returned to work with other co-conspirators following his escape is also probative of the CCE element that he worked "in concert" with five or more other persons in relation to the continuing series of violations which comprise the defendant's CCE. 21 U.S.C. § 848(c)(2)(A).

his crimes. United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks and citation omitted). See also Dkt. No. 213 at 31-33. Without evidence of the 2001 escape, the jury will have no context for understanding how the defendant went from drug trafficking while in prison, to expanded trafficking outside of prison in the 2000s, to being the subject of fugitive capture operations in 2012 and 2014. And, in particular, the jury would not hear evidence explaining the genesis of the defendant's significant relationship with Mayo Zambada, whose efforts to assist the defendant in escaping and whose role in helping the defendant return to the cartel were crucial in establishing the defendant's position as a principal leader of the Sinaloa Cartel and major trafficker. See also United States v. Escalera, 536 Fed. App'x 27 (2d Cir. 2013) (even where not "inextricably intertwined," a district court has discretion to admit uncharged conduct as "background to the conspiracy, helping the jury understand how the illegal relationship among the participants developed, and how [a defendant's] role in the conspiracy evolved").

Finally, as set forth in the government's prior briefing, evidence of the 2001 escape demonstrates the defendant's consciousness of guilt of the crimes charged. As the government expects CW6 and CW9 to testify, the defendant himself told his associates that he had been motivated to escape because he believed he would be extradited to the United States to face charges here. As the government has explained in previous briefing, evidence of flight that demonstrates consciousness of guilt can be admissible as direct evidence of the crimes charged. See Dkt. No. 213 at 34-36. See also United States v. DeSimone, 699 F.3d 113, 125 (1st Cir. 2012) (admitting evidence of escape as probative of consciousness of guilt where defendant escaped prison after learning that he was under investigation for separate, previously uncharged offenses).[3]

## II. Dissemination of Photographs and Sketches of Cooperating Witnesses

In its Order, the Court denied without prejudice to renewal the government's motion to limit dissemination of photographs and sketches of cooperating witnesses. See Order at 13-14. The Court explained that, with respect to photographs, the government must identify the specific photographs and exhibits at issue before the Court can make a ruling. See id. at 14. With respect to courtroom sketches, the Court explained that the government would be permitted to make a factual proffer to the Court prior to a particular witness taking the stand

[3] The escape is alternatively admissible as Rule 404(b) evidence to show the defendant's "opportunity, intent, preparation, [and] plan" to commit the charged CCE. See Dkt. No. 213 at 36-38; see also Order at 6 ("[E]vidence of these three events is admissible under FRE 404(b) to show defendant's opportunity to commit the charged crimes.").

to explain the specific safety concerns faced by that witness, in order to determine whether to prohibit sketching of that witness. See id.

The government may raise additional factual proffers during trial as necessary, but provides additional factual detail here for two cooperating witnesses in order to permit the Court to make an advance ruling. In light of the unique security concerns associated with these witnesses, which the government has detailed for the Court in a separate ex parte submission submitted simultaneous with this briefing (the "Fifteenth Ex Parte Submission"), the government requests a pretrial ruling from the Court that it may redact or pixilate eight photographs that the government intends to introduce as evidence at trial. It further requests a pretrial ruling that courtroom sketch artists may not draw and disseminate the faces of these two witnesses.

Specifically, with respect to Cooperating Witness No. 5 ("CW5"), the government requests a ruling that permits the government to pixilate seven photographs that it intends to introduce at trial. See Ex. A. The government took five of the photographs earlier this year; those photographs show the scars that the defendant has on his body, including one photograph of a scar on his face, from the multiple stabbing attacks directed by the defendant against him. The government will introduce these photographs at trial to corroborate CW5's testimony regarding the multiple attacks against him while he was incarcerated in Mexico. The sixth photograph is a headshot of CW5 from the early 1990s, which the government expects one or more other cooperating witnesses to identify at trial to corroborate testimony regarding the past drug trafficking relationship between the cooperating witness, CW5 and the defendant. Finally, the seventh photograph that the government intends to introduce is a photograph from the early 1990s showing CW5 sitting next to the defendant at a restaurant along with other persons. The government will introduce this photograph to corroborate his testimony regarding his drug trafficking relationship with the defendant.

The government is not aware of any recent photographs of CW5 that are public, and CW5 has no social media presence. The government is aware that the seventh photograph described above has been published on the internet by at least one foreign internet site; however, the photograph was not linked to CW5's name, and it has not been widely circulated. For the reasons discussed in the government's Fifteenth Ex Parte Submission, the broad dissemination of CW5's photograph or sketch in the media would raise significant security concerns. Moreover, the possibility that CW5's photograph or sketch may be circulated following CW5's testimony would put undue stress on CW5 and CW5's family members leading up to CW5's testimony in light of the security risks that they would face if CW5's image is disseminated. The government thus requests that the Court issue a pretrial ruling permitting the government to pixilate or redact the photographs in which CW5 is depicted and prohibiting CW5's sketch from being drawn during trial.

With respect to Cooperating Witness No. 11 ("CW11"), the government seeks to introduce a headshot of CW11 from the period about which CW11 will testify. CW11's identity is subject to the Court's delayed disclosure order; thus, the government has attached CW11's photographs as Exhibit 1 to the government's Fifteenth Ex Parte Submission. [redacted] See Dkt. No. 240 at 11. The government is not aware of any public photographs of CW11. Indeed, given the security risks that he faces, CW11 has no social media presence. Thus, the broad dissemination of CW11's image would [redacted] likely permitting members of the press, the public and the Sinaloa Cartel to discover his true identity. Moreover, as with CW5, the possibility that CW11's photograph or sketch may be circulated following CW11's testimony would put undue stress on CW11 and CW11's family members leading up to CW11's testimony in light of the security risks that they would face if CW11's image is disseminated. In light of the security concerns discussed in the government's Fifteenth Ex Parte Submission, the government requests that the Court issue a pretrial ruling permitting the government to pixilate or redact the photographs in which CW11 is depicted and prohibiting CW11's sketch from being drawn during trial.

III. Present Sense Impressions and Excited Utterances in 2015 Prison Surveillance Video

The Court has ruled that the statements of law enforcement officers and journalists in several of the videos that the government intends to introduce at trial are not admissible as "present sense impressions" or "excited utterances." See Order at 12. The Court, however, did not issue a ruling with respect to the statements made by prison officials during surveillance footage of the defendant's escape from prison. As described below, those statements qualify as excited utterances and present sense impressions. The government thus requests that the Court rule these statements are admissible.

As set forth in Exhibit G-1 to the government's second motions in limine, see Dkt. No. 326, the audio in the video contains a conversation between a prison guard and a supervisor or chief.[4] As the guard and other prison staff are scrambling to determine why the defendant's cell is empty, the guard—in real time and as he observes it—calls out the defendant's name to determine if he is in the cell and then reports to his chief that there was a "hole in the shower," that the hole is "big," and that the "person" is not present in the cell.

---

[4] Since filing its second motions in limine, the government has finalized the transcription and translation of the video. That transcript is attached hereto as Exhibit B.

The statements of the first guards to arrive at the defendant's empty cell, describing the "event or condition [] while the declarant was perceiving the event or condition." Order at 12 (citing Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004)). These contemporaneous statements of the guards are the first observations of the defendant's startling and dramatic escape. They should therefore be admissible under the present sense impression and excited utterance exceptions to the rule against hearsay.

IV. Rule 403 Preclusion of Rape Allegation

The government acknowledges that the Court has ruled that evidence that the defendant raped a cooperating witness, thereafter beginning a romantic relationship with her and drawing her into his criminal enterprise, is precluded pursuant to Rule 403. See Order at 4. The government asks that the Court confirm that the defendant will also not be permitted to elicit testimony or otherwise introduce evidence of the rapes, which he might do in an attempt to show bias on the part of the cooperating witness.

V. Conclusion

For the foregoing reasons, the Court should grant the government's motions in limine with respect to the evidence described above.

VI. Partial Sealing is Appropriate

Pursuant to the protective order in this case, the government respectfully requests permission to submit this brief under seal. See Dkt. No. 57 ¶ 8. This brief details information regarding the government's cooperating witnesses. Although the cooperating witnesses are not identified by name herein, the defendant's criminal associates likely could use the information described herein to identify that witness. Moreover, the information discussed herein is sensitive information about which the government seeks to preclude public questioning.

Thus, sealing is warranted because of the concerns regarding the safety of potential witnesses and their families, and the danger posed by disclosing the potential witnesses' identities and their cooperation with the government. Sealing is further warranted to protect the disclosure of sensitive information regarding the government's witnesses. See United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect integrity of ongoing investigation, including safety of witnesses and identities of cooperating witnesses, and to prevent interference, flight and other obstruction, may be compelling reason justifying sealing); see Feb. 5, 2018 Mem. & Order Granting Gov't Mot. for Anonymous and Partially Sequestered Jury, Dkt. No. 187 at 2-3 (concluding that defendant's actions could pose risk of

harm to cooperating witnesses). As the facts set forth herein provide ample support for the "specific, on the record findings" necessary to support partial sealing, Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d. Cir. 2006), the government respectfully requests that the Court permit the government to file these motions in limine under seal. Should any order of the Court regarding this application describe the sealed information in question with particularity, rather than in general, the government likewise requests that those portions of the order be filed under seal.[5]

Respectfully submitted,

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
Southern District of Florida

cc: Clerk of Court (BMC) (via ECF)
Defense Counsel (via Email)

[5] The government will publicly file a redacted copy of this motion, once the Court unseals the Order. See Dkt. No. 390.