6074

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      :      09-CR-466(BMC)

      Plaintiff,            :
                       United States Courthouse
   -against-            :      Brooklyn, New York

JOAQUIN ARCHIVALDO GUZMAN
LOERA,                          :
                        January 24, 2019
      Defendant.            :      9:30 o'clock a.m.

- - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:      RICHARD P. DONOGHUE
                    United States Attorney
                    Eastern District of New York
                    BY: GINA M. PARLOVECCHIO
                        ANDREA GOLDBARG
                        MICHAEL P. ROBOTTI
                    Assistant United States Attorneys
                    271 Cadman Plaza East
                    Brooklyn, New York  11201


                    UNITED STATES ATTORNEY'S OFFICE
                    Southern District of Florida
                    BY:  ADAM S. FELS
                    Assistant United States Attorney
                    99 NE 4th Street
                    Miami, Florida  33132

6075

```
 1   APPEARANCES:  (Continued)

 2
     For the Government:        DEPARTMENT OF JUSTICE
 3                              Criminal Division
                                Narcotic and Dangerous Drug Section
 4                              145 N Street, N.E.
                                Washington, D.C.  20530
 5
                                BY:  ANTHONY NARDOZZI, ESQ.
 6                                   AMANDA LISKAMM, ESQ.

 7
     For the Defendant:         BALAREZO LAW
 8                              400 Seventh Street, NW, Suite 306
                                Washington, D.C.  20004
 9
                                BY: A. EDUARDO BALAREZO, ESQ.
10

11                              LAW OFFICES OF JEFFREY LICHTMAN
                                11 East 44th Street, Suite 501
12                              New York, New York  10017

13                              BY:  JEFFREY H. LICHTMAN, ESQ.
                                     PAUL R. TOWNSEND, ESQ.
14

15                              LAW OFFICE OF PURPURA and PURPURA
                                8 East Mulberry Street
16                              Baltimore, Maryland  21202

17                              BY:  WILLIAM B. PURPURA, ESQ.

18
                                LAW OFFICES OF MICHAEL LAMBERT, ESQ.
19                              369 Lexington Avenue, 2nd Floor
                                New York, New York  10017
20
                                BY:  ARIEL COLON MIRO, ESQ.
21

22   Court Reporter:            Linda A. Marino
                                225 Cadman Plaza East
23                              Brooklyn, New York
                                (718) 613-2484
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.
```

LAM     OCR     RPR

Lopez Nunez - cross - Balarezo                6076

1        THE COURT:  Before we bring in the jury, one detail

2   for tomorrow.  The Government's motion in limine that I got

3   last night, I'd really like a defense response by Friday

4   night, if I can get it; if not, then by Saturday, so that I

5   can get a Government reply on Sunday.  Do the best you can to

6   work out some kind of schedule like that.

7        MR. LICHTMAN:  Would it be possible to get it in on

8   Saturday and give them Sunday?

9        Or they don't have to put in a reply, it's such a

10  strong opening motion.

11       THE COURT:  If the best you can do is Saturday, then

12  Saturday is fine.

13       MR. LICHTMAN:  Only because the summation...

14       THE COURT:  I understand.

15       Let's have the jury, please.

16       (Jury enters.)

17       THE COURT:  Good morning, ladies and gentlemen.

18       (A chorus of good mornings.)

19       THE COURT:  Everyone be seated.  We have a little

20  more cross-examination.

21

22

23

24

25

LAM      OCR      RPR

Lopez Nunez - cross - Balarezo                6077

1    **DAMASO LOPEZ NUNEZ**,

2         called as a witness, having been previously duly

3         sworn, was examined and testified as follows:

4    CROSS-EXAMINATION

5    BY MR. BALAREZO (Continuing):

6    Q    Good morning, Mr. Lopez.  How are you?

7    A    Good morning, sir.

8    Q    First question I have, it's not a funny question, not

9    meant to be a joke.

10        You know a guy by the name of Panchito; is that

11   correct?

12        (Exhibit published to the jury.)

13   A    Yes, sir.

14   Q    Government Exhibit 39, who is that?

15   A    That's Panchito.

16   Q    And you've met him and you've talked to him a few times,

17   right?

18   A    That's correct.

19   Q    At some point during your association with Panchito, did

20   you ever make up, you, ever have made any T-shirts that said

21   Cartel de Sinaloa on them?

22   A    No, sir.

23   Q    Thank you.

24        I'm going to show you Defense Exhibit 498.  We just

25   went over it really briefly yesterday, and I just have one

Lopez Nunez - cross - Balarezo                    6078

1  quick question.

2         (Exhibit published to the jury.)

3         MR. BALAREZO:  Perhaps, actually, your Honor, if I

4  can ask the interpreter just to read the bottom line, which is

5  in Spanish?

6         THE COURT:  Go ahead.

7         THE INTERPRETER:  In English, Damaso's Special

8  Forces.

9  Q    One more question about Panchito and the T-shirts.  You

10 said you did not have any T-shirts made up with Cartel de

11 Sinaloa.

12        How about baseball hats with Cartel de Sinaloa?

13 A    Not that either.

14 Q    You didn't have any clothes or any apparel made with the

15 Cartel de Sinaloa words or logo or anything, correct?

16 A    Yes, sir, I did not do anything like that.

17 Q    Now, are you familiar with two individuals; one by the

18 name of El Koala and one by the name of El Kilo?

19        MS. LISKAMM:  Your Honor, can we have a sidebar?

20        THE COURT:  Okay.

21

22        (Continued on the following page.)

23

24

25

LAM      OCR      RPR

Sidebar                                          6079

 1              (The following occurred at sidebar.)

 2          MS. LISKAMM:  Your Honor, these are two individuals

 3  that Mr. Balarezo is going to want to go into that were

 4  arrested in relation to the journalist Javier Valdez murder

 5  that we talked about extensively yesterday.

 6              Some backstory on this.  Defense counsel and I had

 7  conversations before the witness got on the stand in which we

 8  discussed Javier Valdez's murder.  Defense counsel assured me

 9  that he wouldn't go into anything beyond, Did you kill him,

10  yes or no, and that was it.  As your Honor recalls from

11  yesterday, there was extensive cross-examination about this

12  murder, which I, in good faith, believed defense counsel had

13  forgotten about the prior agreement.

14              This morning, despite that, he's come in and said

15  that he wants to ask additional questions about this murder.

16  I don't see the relevance of this, your Honor, and it calls

17  into question all the assurances that we're getting from

18  defense counsel with respect to upcoming witnesses, whether or

19  not they will call them for the defense case.

20          THE COURT:  It's a big trial.  People forget.

21              Come around and respond, please.

22          MR. BALAREZO:  Ms. Liskamm is correct.  I think

23  several weeks ago she mentioned -- I don't know the date, but

24  it was not yesterday or the day before -- that she wanted to

25  file a motion in limine.  And I believe -- I accept her

                    LAM        OCR        RPR

Sidebar                                                          6080

1    representation that I said I wouldn't go into beyond the

2    aspect of the murder.  When I went into it yesterday, I did

3    not recall that we made that agreement.  She did not bring it

4    to my attention until after I finished.

5            In going over my notes yesterday, I just have three

6    or four questions involving these two individuals.  It is

7    relevant to that particular murder.  It's been discussed.

8    This witness has already said that Mr. Guzman's sons are the

9    ones responsible for murder, but I have information otherwise;

10   again, that he and/or his son are responsible for that murder.

11           I'll move on after three or four questions.

12           MS. LISKAMM:  This witness was in custody when the

13   journalist was killed, if your Honor recalls.

14           THE COURT:  So, what's the point?

15           MS. LISKAMM:  I'm objecting based on relevance.

16           MR. BALAREZO:  It goes to his credibility.  He has

17   said that it was Mr. Guzman's sons that had this journalist

18   killed.

19           THE COURT:  He has said that Mr. Guzman told him it

20   was his sons that had this person killed.

21           MR. BALAREZO:  These two individuals that I just

22   asked, El Kilo and El Koala, my understanding is they were

23   either his workers or sicarios or his son's or Mini Lic's

24   sicarios, and those are the two individuals that, as

25   Ms. Liskamm has said, were arrested for the murder of the

Sidebar                                              6081

1    journalist, which means that they have a link to this witness

2    and/or his son.

3            THE COURT:  He didn't say that the Defendant's

4    people did it.  He said the Defendant told him that the

5    Defendant's people did it.  So, I'm not seeing the

6    inconsistency.

7            This is not the first instance where we've had a

8    witness attribute things to the Defendant which the Defendant

9    takes on himself, according to the witness, which may have

10   happened in some other way.

11           MR. BALAREZO:  I understand that, your Honor, but,

12   again, it goes to his credibility.

13           He is saying my client told him, told the witness,

14   that the client's sons committed the murder.  I have

15   information otherwise.  He can deny it, he could accept it,

16   and we move on.

17           THE COURT:  You have information that your client

18   did not tell him that his sons committed the murder?

19           MR. BALAREZO:  No, I have information that the

20   murder was committed by people associated with him, which

21   would then make what he's saying about my client telling

22   him -- why would my client tell him the he committed a murder

23   that he didn't?

24           THE COURT:  Maybe your client didn't know that it

25   was his people who committed the murder.  That's all that

LAM        OCR        RPR

Sidebar                                              6082

1    there it is.

2          You passed this witness yesterday.  I'm willing to

3    let you clean up things that you might have rushed through in

4    a few minutes, but this is really so far out on the branch

5    that I really -- I'm not going to let you go there.

6          MR. BALAREZO:  Thank you.

7

8          (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lopez Nunez - cross - Balarezo                6083

1              (Sidebar ends; in open court.)

2    BY MR. BALAREZO:

3    Q    Mr. Lopez, yesterday we briefly talked about your plea

4    agreement.  And in your plea agreement, you agreed to pay a

5    $25 million forfeiture upon your conviction; is that correct?

6              (Exhibit published to the jury.)

7    A    Yes, sir.

8              MR. BALAREZO:  And, in fact, for the witness only,

9    Defense Exhibit 491.

10             Any objection?

11             MS. LISKAMM:  No.

12             MR. BALAREZO:  Your Honor, no objection.

13             THE COURT:  It's received.

14             (Defense Exhibit 491 so marked.)

15             (Exhibit published to the jury.)

16   Q    This is a consent order of forfeiture that was entered

17   against you by Judge Ellis in the Eastern District of Virginia

18   in your case, correct?

19   A    Yes, sir.

20   Q    And this is a consent or the order from the judge that

21   says that you have to pay or turn over to the Government

22   $25 million; is that correct?

23   A    It is, sir.

24   Q    And you were sentenced when last year, in October?

25   November?

Lopez Nunez - cross - Balarezo                6084

1    A    November 30.

2    Q    And you have paid not one penny, not one cent, or not one

3    peso of that $25 million; is that right?

4    A    No, sir, I haven't paid one penny.

5    Q    And you don't intend to pay it ever, do you?

6    A    I did have the intention of paying, but I don't know why.

7    My compadre's sons took over my properties, they took over the

8    properties of my family, the properties of my sisters, and

9    they killed -- properties of my friends, and they killed

10   several people.

11   Q    So, Chapo's sons left you poor, is what you're saying,

12   right?

13   A    You are right.

14   Q    And Chapo's sons --

15             THE COURT:  Mr. Balarezo, I didn't get the English

16   answer.

17             MR. BALAREZO:  I apologize.

18             THE INTERPRETER:  You are right.

19             THE COURT:  Thank you.

20   Q    Did they take your properties, your land, your money,

21   kill your friends, and all that after November 30 of last

22   year?

23             No, right?

24   A    No, sir, from the first minute after I was arrested.

25   Q    What's the answer to my question?

Lopez Nunez - cross - Balarezo                6085

1          Did it happen after November 30, yes or no?

2  A    That it was not after November 30, it was after May 2 of

3  2017, and it happened consecutively.

4  Q    When you signed the plea agreement, you knew you didn't

5  have money, yet you signed the plea agreement saying that you

6  would pay, right?

7  A    No, no, sir.  I sign a commitment and I hope to have the

8  opportunity one day to pay it.

9  Q    In the consent order of forfeiture which was entered

10 against you, Defense Exhibit 491, that has your signature

11 right there, doesn't it?

12 A    It is my signature.

13 Q    So, you know that even though that particular condition

14 is in the plea agreement, you know it means nothing because

15 you will never pay it back.

16 A    No, sir.  I back up my signature and I back my word with

17 my signature.

18 Q    Why haven't you paid?

19 A    I haven't had money up to this point.  I hope to one day

20 get it.

21 Q    You were trafficking for twentysome years?

22 A    No, less time than that, but I did do it.

23 Q    When you signed that consent order of forfeiture saying

24 you're going to pay that $25 million, your signature didn't

25 mean anything because you were never going to pay it, right?

1           MS. LISKAMM:  Objection.

2           THE COURT:  Sustained.

3           MR. BALAREZO:  The prior question was about the

4    agreement, your Honor.  This is about the forfeiture.

5           THE COURT:  I don't think so.

6           MR. BALAREZO:  I'll ask.

7    Q    When you put your signature on the plea agreement

8    agreeing to the $25 million forfeiture, that was worthless,

9    your word was worthless there, right?

10          MS. LISKAMM:  Objection.

11          THE COURT:  Sustained.

12   Q    And in that same plea agreement that you signed and that

13   the Government signed where you agreed to a life sentence, you

14   know you'll never do a life sentence here, don't you?

15   A    No, sir.  I cannot divine the future.

16   Q    What sentence did you get?

17   A    Life.

18   Q    Doesn't take a wizard or -- to guess, right?

19          You got life.

20          MS. LISKAMM:  Objection.

21          THE COURT:  Sustained.

22   Q    That's the sentence you agreed to.  And you know that

23   that is garbage because you know you're going to get a letter

24   from the Government --

25          MS. LISKAMM:  Objection.

Lopez Nunez - cross - Balarezo                6087

1   Q      -- requesting a reduction in sentence, don't you?

2          THE COURT:  Sustained.

3   Q      You're only hoping that they give you one, right?

4   A      One what?  Excuse me.

5   Q      Filing a letter to the judge in your case, Judge Ellis,

6   asking him for a reduction of your life sentence.

7   A      I won't deny that.  I do have the hope that that happens.

8   Q      And I don't think you ever answered my question.  You got

9   the sentence you agreed to, life; why are you here?

10  A      Because I signed an agreement.

11  Q      Yeah.  To life.

12         Why are you here?

13         You got life.

14  A      I signed an agreement to cooperate with the U.S.

15  Government and that's what I'm doing.

16  Q      And that agreement is to come in here and testify and

17  throw Chapo into everything you can, right?

18         Your compadre.

19  A      I did not know it at first.  I found out later.

20  Q      What, you didn't know that you were going to come and

21  throw his name into it?

22  A      I didn't -- I did not know it at first.  I found out

23  later.

24  Q      Right.  You also didn't know you were going to throw his

25  sons' names into it also?

LAM      OCR      RPR

Lopez Nunez - redirect - Liskamm                6088

1          Yes or no, did you know it?

2   A    Excuse me, repeat the question.

3   Q    You didn't know you were going to throw his sons' names

4   into this?

5   A    If the questions you ask did not lead me to that type of

6   response, I would not have done it.

7   Q    And you didn't know you were going to throw his wife's

8   name into it also?

9   A    I didn't do it.

10  Q    You didn't throw his wife's name into this yesterday?

11         Did you forget?

12         MS. LISKAMM:  Objection.

13         THE COURT:  Sustained.

14         Reform the question.

15         MR. BALAREZO:  I have nothing further for this

16  witness.

17         THE COURT:  All right.  Redirect.

18  REDIRECT EXAMINATION

19  BY MS. LISKAMM:

20  Q    Good morning, Mr. Lopez.

21  A    Good morning.

22  Q    Do you remember being asked yesterday about several of

23  the slides regarding the letters you received from the

24  Defendant in jail?

25  A    Yes.

Lopez Nunez - redirect - Liskamm                6089

1   Q    And specifically, I'm putting on the projector Slide 13.

2            (Exhibit published to the jury.)

3   Q    And you were specifically asked about the section that

4   says:  Please recommend a collector to tie up Chef so that he

5   gives up the 400 he has.

6            Do you remember that?

7   A    Yes.

8   Q    And do you remember defense counsel asking you why the

9   leader of the Sinaloa cartel would need to find a collector to

10  collect 400 kilos of cocaine?

11  A    Yes, I do.

12  Q    Okay.  Approximately, when did you receive these letters?

13  A    It was between the months of March to May of 2014,

14  approximately.

15  Q    And where was the Defendant when you received these

16  letters?

17  A    He was in jail at Altiplano Prison in Mexico.

18  Q    And the 400 kilos that needed to be collected, what

19  country were those 400 kilos located in?

20  A    In Colombia.

21  Q    Now let's turn to Slide 25.

22            (Exhibit published to the jury.)

23  Q    Do you remember defense counsel asking you about the 50

24  bullets of 40 and the 5 like the ones Negro gave Cosina as a

25  gift?

Lopez Nunez - redirect - Liskamm                6090

1   A    Yes, yes, I do.

2   Q    He went on to ask you about the 322 and the 443 bullets

3   of 40 and the 13 bullets like the ones my compadre Negro gave

4   Cosina as a gift.

5         Do you remember that?

6   A    Yes.

7   Q    Okay.  And I think this got confused yesterday, but just

8   to confirm, the 322 here refers to what?

9   A    I would have to look at a little bit more of the letter,

10  but what I understand from here, I understand from here that

11  it refers to 322 bullets.

12  Q    Okay.  And the 50 bullets of 40, I believe you testified

13  that "40" are 40-millimeter -- I believe you called them

14  explosives; is that correct?

15  A    Yes.

16  Q    And what are those used with?

17  A    A special equipment that is coupled to the rifles.

18  Q    And the ones that Negro gave Cosina, on Line 38 and 39

19  and 40, what are those a reference to?

20  A    Those are bigger bullets that are shot with cylinders,

21  Bazooka-type.

22  Q    Are you familiar with what those look like?

23  A    Yes.

24  Q    Showing you what's already in evidence --

25       MR. BALAREZO:  Objection.

LAM      OCR      RPR

1   Q     -- as Government Exhibit 210-22.

2           THE COURT:  Overruled.

3           (Exhibit published to the jury.)

4   Q     Mr. Lopez, do you know what we're looking at here?

5   A     Yes.

6   Q     What is this?

7   A     I don't know if I can point it out.

8           The three big ones are RPG-7 type.

9   Q     You can touch the screen and actually circle them.

10          Can you circle the RPG ones that you are referring

11  to?

12  A     Here.

13  Q     And is that what you're referring to in what you describe

14  in the letters as the type that Negro gave to Cosina?

15  A     Yes.  The letter that my compadre sent to me says that.

16  Q     And are you familiar with what's next to the RPGs in this

17  photo?

18  A     Yes.

19  Q     And what is that?

20  A     Those are the 40-millimeter bullets.

21  Q     And with your hands, can you show the jury how big the

22  40-millimeter bullets are?

23  A     They're like this.

24          MS. LISKAMM:  For the record, he's estimating

25  approximately three to four inches.

Lopez Nunez - redirect - Liskamm                6092

1    Q    Mr. Lopez, have you seen this photo before today?

2    A    I hadn't seen it.

3    Q    So, when you were asked yesterday about the bullets that

4    were being purchased in another country, you -- these weren't

5    references to the small bullets that get loaded into a

6    magazine clip and a handgun, correct?

7              MR. BALAREZO:  Objection, 611(c).

8              THE COURT:  Sustained.

9    Q    Mr. Lopez, let's move on to Slide 5.

10             (Exhibit published to the jury.)

11   Q    You were asked by defense counsel about the line that

12   starts on Line 26:  Cosina and I and the rest, I invested

13   everything I sent to Canada from Enrique's brothers.

14             Do you recall that?

15   A    Yes.

16   Q    Based our understanding of this letter, was this a

17   reference to one investment of a load or to all loads?

18   A    One load.

19   Q    And what is an investment?

20   A    The purchase of merchandise.

21   Q    Are you aware of the Defendant's drugs only going to

22   Canada?

23   A    On this particular occasion, they were going to Canada.

24             But other times, they were going to the United

25   States.

Lopez Nunez - redirect - Liskamm                6093

1   Q     And, in fact, you helped coordinate some of the

2   Defendant's loads to New York, correct?

3   A     Yes.

4   Q     You were also asked yesterday many questions about your

5   statement of facts; do you recall that?

6   A     Yes.

7   Q     And that was part of your plea agreement, correct?

8   A     Yes.

9   Q     Showing you again what's admitted into evidence as

10  Government Exhibit 3500-DLN-3.

11          (Exhibit published to the jury.)

12  Q     Do you recall defense counsel asked you several questions

13  about the front page, the first page, of this statement of

14  facts and several questions about the second page of the

15  statement of facts; do you recall that?

16  A     Yes.

17  Q     He didn't ask any questions about the third page, so

18  let's take a look at Paragraph 5 on Page 3.  It says:  As part

19  of his entry into drug trafficking and while working as a

20  senior government official in Mexico's Pointe Grande Prison,

21  the Defendant -- meaning you -- directly facilitated illicit

22  communications of Joaquin Guzman Loera, the principal leader

23  of the Sinaloa cartel, while Guzman was incarcerated at the

24  facility.

25          The next sentence says:  Following Guzman's escape

Lopez Nunez - recross - Balarezo            6094

1   from prison in 2001, the Defendant -- again, you -- began

2   working for the Sinaloa cartel.

3            And lastly:  The Defendant eventually became a

4   senior leader within the cartel, working closely with Guzman.

5            Do you recall this?

6   A    Yes.

7   Q    And this is the statement of facts that you signed; is

8   that correct?

9   A    That's correct.

10  Q    And this is the statement of facts that you entered

11  before a judge in district court, correct?

12  A    That's correct.

13  Q    Mr. Lopez, what happens to your plea agreement if you lie

14  here to the ladies and gentlemen of jury?

15  A    It would be torn up.  It would have no effect.

16  Q    So, what would happen to the life sentence that you

17  currently have right now?

18  A    It would be served just like it is.

19  Q    Okay.  Is it in your best interest to lie or tell the

20  truth in court?

21  A    I've only said the truth and I will continue to tell the

22  truth.

23            MS. LISKAMM:  Thank you.  No further questions.

24            MR. BALAREZO:  Briefly, your Honor, if I may.

25            THE COURT:  Yes, go ahead.

1    RECROSS-EXAMINATION

2    BY MR. BALAREZO:

3    Q    Mr. Lopez, very briefly, when you were just asked about

4    those letters that you said that Chapo sent to you, you said

5    several times when you responded what you understand is and

6    then you gave your answer; is that correct, yes or no?

7    A    Yes.

8    Q    And, also, when you were asked a question by the

9    prosecutor, she even said, What is your understanding of the

10   letter?

11            Is that correct?

12   A    Yes, I understand what it says.

13   Q    It's your understanding and your guess at what it says,

14   correct?

15   A    No, sir, the words are clear.

16   Q    And when it says "Canada," is it clear that he was

17   sending drugs to Canada?

18   A    Yes, sir.

19   Q    There are no letters saying he was sending drugs to the

20   United States, are there?

21   A    On that letter, it very clearly states Canada.

22   Q    And my question is, are there any letters that say,

23   according to you, where Chapo says:  I'm sending drugs to the

24   United States.

25   A    No, sir.

Lopez Nunez - recross - Balarezo                    6096

1   Q     And --

2              MR. BALAREZO:  Could I have the Elmo?

3              (Exhibit published to the jury.)

4   Q     Regarding the statement of facts that was just read to

5   you, the third page, where it mentions Chapo's name, do you

6   see that?

7              You were just asked some questions.

8   A     Yes, sir.

9   Q     Who wrote this document?

10             You didn't, right?

11  A     I don't know who wrote it.

12  Q     Who is the prosecutor who signed this?

13             MS. LISKAMM:  Objection.

14             THE COURT:  Sustained.

15  Q     You didn't write it.

16             The Government wrote this document, right?

17  A     That's right.

18  Q     And you testified yesterday that your indictment had no

19  mention of Chapo Guzman, correct?

20  A     About the paragraph you were reading to me, that's what I

21  answered about.

22  Q     Let me refresh your recollection.  Defense Exhibit 487,

23  your indictment.  I showed you this yesterday.

24             (Exhibit published to the jury.)

25  A     Yes, sir.

1   Q     This document -- and I'll show every page of it -- does

2   not mention Chapo Guzman in any way, does it?

3              Just you and your son.

4   A     Yes, that's right.

5

6              (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lopez Nunez - redirect - Liskamm                6098

1    BY MR. BALAREZO:  (Continuing)

2    Q    And then it just so happens that on September the 28th of

3    2018, just a few months, a month or two before trial starts,

4    the government puts his name in your statement of facts, is

5    that right?

6    A    That day I signed it, I don't know when it was placed in

7    there.

8    Q    But just to be clear, you didn't put Chapo Guzman's name

9    in that document, right?

10   A    I don't have access to computers.

11          MR. BALAREZO:  Thank you, Your Honor.

12          THE COURT:  All right.

13          MS. LISKAMM:  Your Honor, I just have one follow-up.

14          THE COURT:  Okay.

15   REDIRECT EXAMINATION

16   BY MS. LISKAMM:

17   Q    Mr. Lopez, putting back on the screen 806-3-T which is

18   the transcript of the third letter you received --

19          THE COURT:  Is this in evidence?

20          MR. BALAREZO:  Yes.

21   Q    On line 49, it starts out:  I told him to contact the one

22   who is in charge of the Navy but he tells me he can't.

23          The next sentence says:  The white guys, the

24   *gringos*, don't say anything because they already know that we

25   find out.

LAM        OCR        RPR

Lopez Nunez - recross - Balarezo                6099

1              Who were the white guys, the *gringos*?

2      A    The United States, the agents from the United States.

3              MS. LISKAMM:  Thank you.  No further questions.

4              MR. BALAREZO:  Can I get on the record, Your Honor?

5      One question.  One question.

6              THE COURT:  Okay.

7              MR. BALAREZO:  Can you leave that up, please.

8      RECROSS-EXAMINATION

9      BY MR. BALAREZO:

10     Q    What does that line say that I just underlined?  What

11     they do say isn't the truth.

12             Is that referring to the *gringos*?

13             THE INTERPRETER:  I'm sorry.  The interpreter needs

14     to clarify.

15             (Translation.)

16     A    They're protecting the snitches.  It's a strategy.

17     Q    Well, let me read the whole thing to you beginning this

18     line:  White guys, the *gringos*, don't say anything because

19     they already know that we find out, and what they do say isn't

20     the truth.

21             And talking about what they do say isn't the truth,

22     that's talking about the *gringos*, correct?

23     A    In reference to the information that they let out, yes.

24             MR. BALAREZO:  No further questions.

25             THE COURT:  Okay.

LAM      OCR      RPR

6100

1          Ladies and gentlemen, we need to take a three-minute

2     break just to rearrange the courtroom.  You can go into the

3     jury room.  You can just line up outside.  We will be with you

4     in just a minute.

5               (Jury exits.)

6               (Witness excused.)

7               (Recess taken.)

8               (In open court; jury not present.)

9               THE COURT:  Let's get the jury back, please.

10              (Jury enters.)

11              THE COURT:  All right.  Be seated, please.

12              The government's next witness.

13              MS. PARLOVECCHIO:  The government calls John Paul

14    Osborn.

15              THE CLERK:  Please raise your right hand.

16              (The witness is duly sworn/affirmed by clerk.)

17              THE CLERK:  Please state and spell your name for the

18    record.

19              THE WITNESS:  My name is John Paul Osborn,

20    O-S-B-O-R-N.

21              THE COURT:  You may inquire.

22              MS. PARLOVECCHIO:  Thank you, Your Honor.

23              (Continued on next page.)

24

25

LAM      OCR      RPR

Osborn - direct - Parlovecchio                    6101

1    DIRECT EXAMINATION

2    BY MS. PARLOVECCHIO:

3    Q     Good morning, Mr. Osborn.

4    A     Good morning.

5    Q     How are you employed?

6    A     I'm a private practice forensic document examiner.

7    Q     Where is your business located?

8    A     In Middlesex, New Jersey.

9    Q     And how long have you been a forensic document examiner?

10   A     I've been doing this work on a full-time basis for

11   36 years.

12   Q     Now, you mentioned you're a private practice forensic

13   document examiner.  Have you had partners in your past?

14   A     Yes.  I worked with both my father and my uncle in the

15   early part of my career and my father until his passing in

16   2007.

17   Q     So is it fair to say it's a family business?

18   A     Yes.

19   Q     What is your educational background?

20   A     I have a degree from Susquehanna University in

21   communications which I received in 1982.

22   Q     Did you receive any specialized training as part of your

23   employment?

24   A     Yes.  The certification board for document examiners

25   requires a minimum initial 24 month full-time supervised

LAM       OCR       RPR

Osborn - direct - Parlovecchio                6102

1  training.  It is akin to an apprenticeship and typically, upon

2  the completion of that training, certification testing

3  verifies competence.

4  Q    And over what period of time did you receive that

5  training?

6  A    From 1982 through 1984.

7  Q    Can you describe for the jury what that training entails?

8  A    It involved the study of various texts in the field.  It

9  involved the visitation to various laboratories, both private

10  and government laboratories.  It involved the examination of

11  both problems where the results are already known as well as

12  live case problems under the supervision of a training

13  supervisor.  It involved studying various research performed

14  in the field, primarily utilizing professional libraries.  And

15  it involved the, the process of appearing in court and

16  watching as testimony is given in various cases.

17  Q    And just to be clear, did you receive hands-on training

18  in the process of getting all of this background training?

19  A    Yes, a great deal of hands-on training.

20  Q    Are you currently certified in any way in relation to

21  your field?

22  A    Yes.  I began certification, application and testing in

23  1987 and I was granted certification by the American Board of

24  Document Examiners in 1990.

25  Q    Are those certifications regularly renewed?

Osborn - direct - Parlovecchio                6103

1  A    Yes.  The ABFDE, the certification board which is an

2  accredited board, requires recertification every five years.

3  My most recent recertification was in 2015.

4  Q    Are you a member of any professional societies related to

5  your field?

6  A    Yes.  I'm a member of the American Society of Questioned

7  Document Examiners.  I served in a number of administrative

8  posts in that administration culminating with my serving as

9  its president from 2014 to 2016, its 33rd president.  I'm also

10  a member of the American Academy of Forensic Sciences, the

11  American Society for Testing of Materials, as well as more

12  regional organizations, the Northeastern Association of

13  Forensic Scientists, New Jersey Association of Forensic

14  Scientists, among others.

15  Q    Now, what work, if any, have you done in terms of

16  research and study in the field of forensic document

17  examination?

18  A    Well, I'm a practicing document examiner, I'm not a

19  researcher, but the certification board, in order to attain

20  recertification does require recertification credits be

21  accumulated and those credits can be accumulated by doing

22  research and the presentation of that research at the meetings

23  of these various organizations that I just mentioned.  So,

24  over the course of my career, I have on multiple occasions

25  done that.  My work has been published in the Journal of

Osborn - direct - Parlovecchio                6104

1   Forensic Sciences which is the publication arm of the American

2   Academy of Forensic Sciences, as well as the journal of the

3   American Society of Questioned Document Examiners.

4   Q    Do you belong to any government sponsored working groups?

5   A    Yes.  I had been -- over the course of the past three

6   years -- well, actually, in the latter part of the '90s, I was

7   involved with the scientific working group for document

8   examination which is a government sponsored group including

9   both federal or federal and state laboratory personnel, as

10  well as private practitioners in the development of standards

11  in the field.

12          I also, over the course of the past three or

13  four years worked with the National Institute of Standards and

14  Technology which is part of the U.S. Department of Commerce in

15  a study of human factors in handwriting analysis which

16  specifically focused on, on identifying errors in that field

17  and potential cures to reduce errors in the field.  And then

18  finally, again, with the National Institute of Standards and

19  Technology, the organization of various scientific committees

20  which is currently undertaking the process of reviewing,

21  revising and writing new standards in the field.

22  Q    In your field of work, are there any instruments or tools

23  that you use in connection with document analysis?

24  A    Well, most of the equipment that I use is equipment that

25  allows things to be viewed in greater detail.  So

Osborn - direct - Parlovecchio                6105

1    magnification devices, everything from hand magnifiers to

2    stereoscopic microscopes; a variety of different kinds of

3    lighting sources to allow you to see things under different

4    types of illumination like transmitted light, like passing

5    through a document, or oblique lighting, a lighting cast

6    across a document; and then more specialized equipment, a

7    video spectral comparator is used for the differentiation of

8    writing inks and papers and is, allows you to examine

9    documents under alternative lighting, like infrared and

10   ultraviolent light and filtering, electrostatic detection

11   apparatus or ESDA which allows you to detect and record latent

12   indentations in paper.  So those are more examples of the more

13   technical types of equipment.

14   Q    How many handwriting analyses have you performed in the

15   course of your career as a forensic document examiner?

16   A    Well, I've examined approximately 2,800 cases, some

17   involving just a few documents, others involving hundreds of

18   documents, so I would have to say in the tens of thousands.

19   Q    Have you ever testified in court before as a handwriting

20   examiner?

21   A    Yes.

22   Q    Approximately how many times?

23   A    Approximately 250 times.

24   Q    In which courts have you testified?

25   A    Among others, the federal courts in the Eastern and

Osborn - direct - Parlovecchio                6106

1   Southern Districts of New York, Northern Division of Illinois

2   and the Central District of California, a variety of state

3   courts, superior courts throughout the counties of the State

4   of New York and superior courts through the State of New

5   Jersey, a number of administrative law courts, surrogates

6   courts and then arbitrations.  So a wide variety of different

7   things.

8   Q    And you testified that you're in private practice.  Were

9   you hired by the government to work in this case?

10  A    Yes, I was.

11  Q    Have you only testified for the government or have you

12  also testified for the defense in other cases?

13  A    No, my services are available to anyone.  I do work for

14  both prosecutors at the state and federal level, I do work for

15  retained criminal defense attorneys, I do work for assigned

16  attorneys and I do work for the Legal Aid Society.  So I don't

17  have a preference one way or the other.

18  Q    Now, in addition to testifying, do you also perform

19  questioned document analysis in cases that don't result in

20  testimony?

21  A    Oh, yes.  I would say that only about 10 percent of the

22  cases that I examine actually end up requiring some form of

23  testimony.  So many cases that I examine, the conclusions are

24  unfavorable to the party that I'm working for and most of

25  those cases, I'm not asked to appear.  Many of the cases that

Osborn - voir dire - Purpura                6107

1   I examine are in some way, shape or form settled or resolved

2   or there's a stipulation and my testimony becomes unnecessary

3   and many of the cases that I examine have nothing to do with

4   court work at all.  So, for instance, corporate security

5   matters will, don't involve court litigation and obviously

6   wouldn't involve testimony.

7           MS. PARLOVECCHIO:  Your Honor, at this time, the

8   government moves to qualify Mr. Osborn as an expert in

9   forensic document examination under Rule 702.

10          THE COURT:  Any voir dire?

11          MR. PURPURA:  I do, Your Honor.

12          THE COURT:  Okay.

13          MR. PURPURA:  May I use the podium?

14          MS. PARLOVECCHIO:  Sure.

15  VOIR DIRE EXAMINATION

16  BY MR. PURPURA:

17  Q    Mr. Osborn, I take it you're comfortable testifying in

18  English, is that correct?

19  A    Yes.

20  Q    That's welcoming for me.

21          You indicated that you are, this is a family

22  business, correct, sir?

23  A    Yes.  My practice was established by my great

24  grandfather, continued by my grandfather, father and uncle,

25  myself, and I have a niece coming in this spring.

Osborn - voir dire - Purpura                    6108

1  Q    And as you put on your letterhead, it is at least four

2  generations, now actually going into the fifth generation in

3  this particular business, is that correct, sir?

4  A    Yes.

5  Q    And you, obviously, as you indicated, you went to

6  university, Susquehanna University, is that correct, sir?

7  A    That's correct.

8  Q    And as I believe you testified, you studied

9  communications at Susquehanna University.  Is that also

10 correct, sir?

11 A    Also correct.

12 Q    Did you not -- did Susquehanna have a forensic studies

13 program?

14 A    No, they did not.

15 Q    And did you seek out a forensic studies program?

16 A    Not at that time, no.

17 Q    And did communications itself deal with forensic studies?

18 A    Not at all other than, you know, the indirectly related

19 field of interpersonal and public speaking.

20 Q    And we've used certain words such as document examination

21 because that's, in essence, what you are.  You're more than a

22 handwriting person; you're a document examiner, is that

23 correct, sir?

24 A    The term is typically referred or the field is typically

25 referred to as forensic document examination, yes.

Osborn - voir dire - Purpura                    6109

1   Q     And so we know -- I mean, what you are able to do, what

2   you're certified to do is that you can assess paper, look at

3   paper and see if the papers match each other or the type of

4   paper being used in a document, correct?

5   A     Well, to some degree.  There's limitations on what

6   forensic document examiners who are conventional examiners can

7   do with paper.  So, for instance, I can make differentiations

8   between paper but I'm unable to make determinations of

9   sameness of paper which typically would require chemical

10  analysis.

11  Q     Inks?

12  A     And the same would be true of inks, differentiation of

13  inks, yes, but determination of sameness of inks, again, would

14  require chemical analysis which is actually performed by a

15  subspecialization.

16  Q     Printing methods?

17  A     Printing methods, yes.

18            (Continued on next page.)

19

20

21

22

23

24

25

Osborn - voir dire - Purpura                6110

1         MS. PARLOVECCHIO:  Your Honor, may we have a

2   sidebar?

3         THE COURT:  Okay.

4         (The following occurred at sidebar.)

5         MS. PARLOVECCHIO:  Your Honor, I understand that,

6   you know, Counsel is obviously entitled to voir dire this

7   witness but it should be limited to the scope of his

8   qualifications.  This seems to be going to cross-examination.

9         THE COURT:  There is a fine line between voir dire

10  and cross-examination.  I agree it is getting a little towards

11  cross but not enough for me to stop it yet.

12        MS. PARLOVECCHIO:  That's fine.  I just --

13        THE COURT:  Mr. Purpura is aware of the distinction

14  and is going to try to confine himself to the voir dire part

15  at this stage without prejudice, of course, to you

16  cross-examining him on other things later.

17        MS. PARLOVECCHIO:  Of course.  And just further to

18  that point, just also so it doesn't stray into a <u>Daubert</u>

19  hearing which, you know, Mr. Purpura had raised yesterday.

20        THE COURT:  Yes.  As I have said, I have had no

21  motion for a <u>Daubert</u> hearing so that is not going to happen.

22  The purpose of the voir dire is to test his expertise.  Now,

23  that is easier said than defined but so far, I think

24  Mr. Purpura is within voir dire.

25        MS. PARLOVECCHIO:  Thank you, Your Honor.

Osborn - voir dire - Purpura                6111

1          (In open court; sidebar ends.)

2     VOIR DIRE EXAMINATION (Continued)

3     BY MR. PURPURA:

4     Q    And I was just asking you about the part of document

5     examination, if you're familiar with what's called printing

6     methods, is that correct?

7     A    Yes.

8     Q    And that's something that in your particular skill that

9     you can be called on to do as well, is that correct, sir?

10    A    Yes, to some degree.  I mean, most document examiners do

11    or have been trained in particular areas in the analysis of

12    printing methods.  As an example, I would not examine problems

13    involving counterfeit documents because although I have been

14    trained and am competent to do that work, it's not something

15    that I do or it's something that I very rarely do, but other

16    methods of printing technology, laser printing, ink jet

17    printing, photocopying, yes.

18    Q    What you were called on here in this particular case and

19    the service that the government has asked you to do doesn't

20    involve any of those; it involves specifically handwriting

21    analysis, is that correct, sir?

22    A    That's correct.

23    Q    And do you consider yourself -- do you consider this to

24    be a science or a skill?

25    A    I consider it to be a scientific endeavor, yes.

Osborn - voir dire - Purpura                    6112

1   Q    Well, would you agree with me or not that unlike, let's

2   say physics or chemistry or DNA analysis, handwriting is,

3   identification is really not a science?

4              MS. PARLOVECCHIO:  Objection.

5              THE COURT:  Sustained.

6   Q    Now, as to the handwriting analysis, do you know where it

7   came from, where it developed from?

8   A    Well, I know some of the history of the examination of

9   handwriting going all the way back to the writings of or

10  alleged writings of Shakespeare.

11  Q    Let me ask you specifically.  It developed in the

12  courtroom, not in a science laboratory, correct?

13             MS. PARLOVECCHIO:  Objection.

14             THE COURT:  Sustained.

15  Q    Let me get back to your qualifications.  The

16  qualifications that you indicated, who administered the

17  qualifying tests?

18  A    Well, there's actually several tests that are given so

19  the test for membership in the American Society of Questioned

20  Document Examiners is given by a testing committee within that

21  field and --

22  Q    I apologize.  I don't mean to cut you off.  I just want

23  to shorten it up a little bit.

24             Do other document examiners, people in the field

25  give you the test?

Osborn - voir dire - Purpura                    6113

1    A    Oh, of course.

2    Q    It's not someone outside of your field who would look at

3    your work and test it, correct?

4    A    Yes, certainly document examiners perform and administer

5    the tests to determine competence of document examiners.

6    Q    Has your work itself ever been looked at and reviewed by

7    someone outside your particular peer group?

8    A    Well, it's certainly been looked at by other document

9    examiners but not, for instance, plumbers.

10   Q    Okay.  Listen, an astrologer would have another

11   astrologer verify their science too, correct?

12   A    Well, if you consider astrology a science, then I

13   suppose, yes.

14   Q    As much as handwriting examinations, right?

15        MS. PARLOVECCHIO:  Objection.

16   A    I disagree.

17        THE COURT:  Sustained.

18   Q    So there's no outside peer group review of this work you

19   did in this case or any work in general, correct?

20        MS. PARLOVECCHIO:  Objection.

21        THE COURT:  Sustained.

22   Q    As government counsel put up, you're getting paid, right?

23   A    Yes.

24   Q    They didn't ask you how much.  How much?

25   A    My contract with the federal government for this

Osborn - direct - Parlovecchio                6114

1   particular case has a limit of $7,000.  I anticipate using up

2   that entire amount.

3   Q    And that's because, number one, what you had to do was

4   you reviewed documents, right?

5   A    Yes.

6   Q    And that cost money because you spent hours on it, right?

7   A    Correct.

8            MS. PARLOVECCHIO:  Objection, Your Honor.

9            THE COURT:  Sustained.  You are really at

10  cross-examination.

11           MR. PURPURA:  They brought it up on voir dire.

12  That's why.  I can save it or do it.

13           THE COURT:  You should save it, really.

14  Q    To be continued.

15           MR. PURPURA:  No further questions at this time.

16           THE COURT:  Any objection to the witness testifying

17  to his opinions?

18           MR. PURPURA:  I do object.

19           THE COURT:  All right.  The objection is overruled.

20  The witness has sufficient training and background where he

21  may give opinions in his area of study.  It is, of course, for

22  the jury to determine whether to accept those opinions.

23  DIRECT EXAMINATION (Continued)

24  BY MS. PARLOVECCHIO:

25  Q    So, Mr. Osborn, with respect to this case, did you

                    LAM     OCR     RPR

Osborn - direct - Parlovecchio                6115

1   examine certain documents at the request of the government?

2   A    Yes, I did.

3   Q    Now, after making an examination of certain documents,

4   did you render a report?

5   A    I did.

6   Q    Was that report in writing?

7   A    It was.

8   Q    I'm going to show you for identification, only for the

9   witness, Government's Exhibits 809-1 and 809-2.

10            809-1.  809-2.

11            Just generally, what are we looking at here in

12  Government Exhibits 809-1 and 809-2?

13  A    They are reproductions of the reproductions that I

14  received of writing which was submitted to me as that of the

15  defendant, known examples of that person's writing.

16  Q    I'm also going to show you Government's Exhibits, for the

17  witness only, 809-1-R2 and 809-2-R2.

18            809-2-R2.

19            Are these redacted versions of the documents that

20  you just testified about?

21  A    Yes, they are.

22            MS. PARLOVECCHIO:  The government moves to admit

23  Government Exhibits 809-1-R2 and 809-2-R2.

24            MR. PURPURA:  No objection.

25            THE COURT:  Received.

1          (So marked.)

2    Q    Mr. Osborn, I'm just again showing you these redacted

3    versions of the documents you examined.  Now, I'm now going to

4    show you what's been admitted into evidence as Government

5    Exhibits 805, 806-1, 806-2 and 806-3.

6          Here is 805, 806-1, 806-2 and 806-3.

7          Just generally what are those documents?

8    A    Those are reproductions of various writings, writings

9    which I was able to examine the originals of, the original

10   writing, ink on paper, sheets, and were submitted to me as

11   questioned, unknown, disputed examples of writing.

12   Q    Now, what does it mean if a document is a questioned

13   document?

14   A    Questioned documents are typically, with respect to the

15   examination of handwriting, that which is the focus of

16   examination.  So it is writing which is unknown and wherein

17   there may be one or more suspected writers wherein there is an

18   attempt to determine whether or not each writer did or did not

19   prepare that questioned writing.

20   Q    Now, can you please tell the jury what examination you

21   were asked to conduct here with respect to the known documents

22   which are 809-1 and 809-2 with the questioned documents 805,

23   806-1, 806-2 and 806-3?

24   A    Very simply to attempt to determine whether or not the

25   questioned writings were prepared by the writer of the known

Osborn - direct - Parlovecchio                6117

1   writings.

2   Q     So what did you do to conduct that analysis?

3   A     Examinations were performed on each of the individual

4   pages of examined writing to determine the presence of natural

5   and unnatural examples of writing, distorted writing, the

6   general writing characteristics like the height and size

7   relationship of letters, apparent speed of execution, the

8   spacing of letters, and also individual letter forms,

9   distinctive characteristics within the writing, either in

10  terms of entire letters, combinations of letters or even

11  letter components and then separately, examinations and

12  comparisons of the known examples of writing or materials

13  submitted as known for very much the same purpose but in

14  addition to that, examining for the natural variation which is

15  present in the writing.  So no one can write a word or any

16  complex body of writing exactly the same way twice and

17  consideration of variation within writing is a part of the

18  process of looking at known examples of writing and making

19  assessments with regard to that writing, and then, finally, a

20  comparative analysis between the two to identify differences,

21  similarities and to gauge the significance of each towards

22  potential resolution of the problem.

23  Q     Now, you mentioned natural variations.  Can you give the

24  jury an example of what a natural variation might be in

25  writing?

Osborn - direct - Parlovecchio                    6118

1   A    Well, I would say probably the most easy-to-recognize

2   example of natural variation is in one's own signature.  You

3   probably noticed in writing checks or writing your signature

4   on credit card receipts or any kind of document that your

5   signature is never exactly the same, and one of the primary

6   tenets of the examination of writing and of the examination of

7   handwriting including signatures is that each body of writing

8   is unique unto itself.  It will never be replicated exactly

9   the same way.

10          So that's a good example of the natural variation

11  that occurs as a product of all different kinds of things:

12  The circumstances under which the writing was prepared, the

13  surface under which the writing was prepared, the writing

14  instrument, but just the natural act of writing which is a

15  human act prepared by human beings and subject to natural

16  variation.

17  Q    Now, were you able to reach a conclusion in this case

18  based on your analysis?

19  A    Yes.

20  Q    What conclusion did you reach?

21  A    That it is highly probable that the writing prepared by

22  the, that was in question was prepared by the individual who

23  prepared the examples of writing submitted as known.

24  Q    So what do you mean by "highly probable"?  What does that

25  term mean?

Osborn - direct - Parlovecchio                6119

A    Document examiners, as in many areas of forensic science
and certainly general science, utilize standards and part of
our standards is our standards for conclusion terminology.  We
use a scale of words as opposed to numbers because this is
considered as soft science which does not utilize
quantification or could not utilize quantification.

So we use a nine point scale.  The scale is if you
can visualize a horizontal line where the center point of that
line is inconclusive or no conclusion, basically, that a
determination can't be made one way or the other based on the
available evidence, going out to each side of that scale are:
Indications did; indications didn't, which is a weak
conclusion but not an inconclusive; probable didn't, which is
a strong conclusion but where there are certain limiting
factors; and then highly probable which is basically an
expression of virtual certainty; and then the penultimate
conclusions of identification and elimination.

So, in this particular instance, highly probable is
the conclusion that was reached based on what evidence was
available and taking into consideration limiting factors.

Q    So what was this highly probable conclusion based on?

A    It was based on the examination and comparative analysis
of the questioned and known material and took into
consideration the fact that the known material was somewhat
limited in quantity but, more importantly, that it was

Osborn - direct - Parlovecchio                    6120

1  submitted in the form of reproductions as opposed to

2  originals.  And, certainly, it is advantageous to have at

3  least some original known writing.

4  Q   So was there anything about the known writings that

5  assisted you in your analysis?

6  A   I'm sorry?

7  Q   Was there anything about the known writings that assisted

8  you in your analysis?

9  A   Well, certainly, it was applicable because it contained

10 letter strings, individual letters and a sufficient quantity

11 of writing to make the appropriate comparisons.  It was, you

12 know, extended writing on lined sheets which was consistent

13 with the writing in question.  So it was generally

14 advantageous to use.  I would have liked to have had some

15 originals but what I had was adequate.

16 Q   Now, these documents are in Spanish.  Did that in any way

17 inhibit your analysis?

18 A   No.  I don't understand -- I don't speak Spanish but

19 because it is written utilizing the Latin alphabet, the ABCs,

20 it is appropriate to perform these examinations.  If, for

21 instance, it was written in Cyrillic, no, I couldn't perform

22 those examinations, but in the utilization of the Latin

23 alphabet, yes, certainly.

24 Q   In the course of conducting your analysis, did you create

25 any illustrations to help demonstrate the similarities in the

Osborn - direct - Parlovecchio                6121

1    writing between the known documents and the questioned

2    documents?

3    A    Yes.

4    Q    And did you personally make them?

5    A    Yes, I did.

6    Q    I'm going to show you what's marked for identification as

7    Government's Exhibit 512-1.

8             What are we looking at here?

9    A    It's a series of three charts typically referred to as

10   comparison charts prepared specifically for the purpose of

11   testimony as general illustrations to give some examples of

12   the evidence that was examined.  It is captioned with the

13   exhibit numbers at the top of each page and a column of

14   examples.

15            MR. PURPURA:  No objection, Your Honor.  No

16   objection.

17            THE COURT:  Okay.

18            MS. PARLOVECCHIO:  The government moves to admit

19   Government Exhibit 512-1.

20            THE COURT:  Received.

21            (So marked.)

22            MS. PARLOVECCHIO:  Thank you.

23   Q    Now, we're actually going to transition to a PowerPoint

24   because it will enable us to look more closely.  I'm now

25   showing you on your screen Government's Exhibit 512-1.

Osborn - direct - Parlovecchio                6122

1          So just generally what is the purpose of these

2     illustrations?

3     A    Again, they were prepared as general illustrations to

4     give examples of the writings that were examined, obviously, a

5     very small number, just about a dozen examples of words or

6     names that were written and appear on both questioned and

7     known writings which are comparable to one another and allows

8     more direct comparison instead of having to shuffle through

9     individual sheets.  So, as I pointed out, they're organized

10    according to the exhibit number which appears on the top of

11    each page.

12    Q    So let's walk through this exhibit and we can explain to

13    the ladies and gentlemen of the jury some of the comparative

14    analysis here.

15          Let's first look at the first line of Government's

16    Exhibit 512-1.  Can you please explain the illustration that

17    appears in the first row?

18    A    Yes.  If you could click it once so we have a somewhat

19    more enlarged view.  Thank you.

20          The first line includes examples of the words "*esta*"

21    and "*asta*" which contains similar letters and in this example,

22    you'll see a number of different variations and consistencies,

23    the extended initial stroke of the E's in the examples of the

24    word "*esta*" as well as the formation of the A's where the,

25    there is a slight overhang that occurs as the individual

Osborn - direct - Parlovecchio                6123

1  letter is started.  Those are the beginnings of the letters.

2  You will also notice a variation in terms of both blunt and

3  somewhat sharper apex or upper portions of the letter S.

4           So, for example, you have a fairly acute example

5  here, a fairly blunt example here -- (Indicating) -- and the

6  same sorts of characteristics and variations appear among the

7  examples of questioned writing.

8  Q    How about the second row, what are we looking at here?

9  A    In this, we have examples of the words "*carta*" or

10 "*carte*," and you will note the interior hook on the inside of

11 the C's, from the beginnings of the C's, in each example.

12          You will notice the Palmer method or Palmer style,

13 single stemmed letter R which is distinctive in terms of

14 its -- not its format because that is a class characteristic,

15 it's a characteristic in the Palmer method of writing, but its

16 position in terms of its up and down orientation in

17 relationship to the other letters and it is carried over or

18 visible on the various known specimens of writing as well.

19          (Continued on next page.)

20

21

22

23

24

25

Osborn - direct - Parlovecchio                        6124

1   BY MS. PARLOVECCHIO:   (Continuing.)

2   Q     And how about the third line?

3   A     Again, examples of the Cs, additional examples of the Cs

4   but you will also notice the Ms which are formed with somewhat

5   separated and rather acute, angular directional changes at the

6   very top of each as well as the -- as well as the terminal

7   strokes of the Os.

8   Q     And the fourth line?

9   A     Formation of the letters D, which are executed with

10  fairly narrow staffs where in you occasionally get a loop but

11  more often the staffs are executed with a retracing or line

12  that comes up and then retraces downwards, but you will also

13  see that variation of a very narrow loop, for instance in the

14  example from 809-2.

15  Q     And let's look at the --

16  A     I'm sorry.

17  Q     I'm sorry.

18  A     Also, the lower case letters S or the small letters S are

19  distinctive in terms of their terminal strokes which are

20  separated from the preceding letter, either A or O and

21  executed with a -- some -- occasionally with a left-to-right

22  finishing stroke or terminal stroke.

23  Q     And let's look at the bottom row.

24  A     Additional examples of the S that appears within or

25  surrounded by letters as in *escribe*.  You will note, again,

LAM      OCR      RPR

Osborn - direct - Parlovecchio                6125

1  examples of the lowercase letter C and you will also note the

2  height and size relationship of the C in comparison with the

3  other letters.  Again, examples of that -- of that letter R,

4  that single-stemmed letter R, you will note in this particular

5  instance Bs which are made with fairly bulbus formations of

6  the staff and oval-shaped formations of the lower portion of

7  the letter with a somewhat distinctive connecting stroke to

8  the following letter O.

9  Q    Okay.  So let's look at the next page of this document.

10 What do we see here at the top line?

11 A    Okay.  In this particular instance we're looking at the

12 word *familia* and it is exemplified by the formation of the F

13 which oftentimes is made with an initial upward stroke

14 followed by a retraced up and downward stroke which then goes

15 to form the upper loop and also the formation of the eyelet

16 loop on the left-hand side of each and you will notice the

17 variation in size that appears in both the questioned and the

18 known examples.  The formation, once again, of the As and Ms

19 that I pointed out before in -- in this particular group of

20 examples.

21 Q    And let's move on down to the third row of this page.  It

22 starts with *mucho*.  Can you describe for the jury the

23 similarities there?

24 A    In this particular instance you have the narrow formation

25 of the loop representing the letter L and its variation as

LAM      OCR      RPR

Osborn - direct - Parlovecchio                6126

1  well as, once again, additional examples of the As.  You will

2  note that in some instances the As are connected and

3  occasionally connected with a rather sweeping loop and that is

4  present both in questioned and known, examples of the Ds that

5  I pointed out before as well as the terminal strokes of the

6  Os.

7  Q    Okay.  Moving on to the third line.

8  A    In this particular example.  Again, I would point towards

9  the formation of the M in general with its rather acute,

10 angular up and downward strokes, but you will find in cursive

11 writing variation depending upon the position of the letter in

12 the word.  So these are examples of the word *mucho* where M is

13 the first letter of that particular word and the formation of

14 the initial stroke in each instance which begins generally

15 under the baseline and comes up, in some instances starting

16 underneath the first up and downward stroke.

17        Also examples, again, of the Cs and that interior

18 eyelet even those these particular Cs are written within the

19 interior of a -- of a word.  Formation of the H and it's

20 rather high right hand up and downward stroke are some of the

21 characteristics within those words.

22 Q    And looking at the next line, *otro*.

23 A    Again, you will note additional examples of the variation

24 found in the lowercase, single-stemmed Rs in that particular

25 word.

1  Q     And the last line?

2  A     Once again, formation of the Ps with its initial starting

3  stroke.  You will also note in a number of examples the rather

4  high formation of the left-hand portion of that particular

5  letter before the bulb is formed.  This is a class

6  characteristic of Palmer-style handwriting.  Once again, the

7  formation of the Rs, single-stemmed Rs and that, once again,

8  is a class characteristic of Palmer-style writing.

9  Q     Just briefly, what is Palmer-style writing?

10  A     There are various systems that have been taught in the

11  United States and all over the world.  Palmer system writing

12  is rather old in terms of what is taught in the United States.

13  In the United States, typically when cursive writing is

14  taught, which has become somewhat of a rarity nowadays, it is

15  typically taught utilizing the D'Nealian system, which is a

16  simplified version of another writing system called the

17  Zaner-Bloser.

18         Palmer-method writing a bit more aesthetically

19  attractive, at least in my opinion, and is characterized by

20  certain individual letter forms, which are a little bit

21  different like the single-stemmed letters are, but it is a

22  writing system that is taught and has been taught and it is a

23  writing system which is oftentimes used in schools throughout

24  South America.

25  Q     Now, I want to show you the last portion of your -- of

1    this exhibit here.  Can you just walk us through the top line

2    there?

3    A    Okay.  In this particular instance you will note the

4    formation of the Q.  Now, this is a -- the formation is a

5    lowercase formation of a Palmer-style Q, but it is made quite

6    large and it is made quite large so that it looks like a

7    capital letter, both at the beginning of sentences as well as

8    midst of sentences.  So this is a fairly distinctive

9    characteristic in terms of its use inn the format of the

10   letter in its position within the writing.  But you will also

11   notice the rather high separation between the upper bulb of

12   the letter and the downward or descending stroke and also the

13   formation of this eyelet in each instance.  And --

14   Q    Now let's look at the second row.

15   A    In the second row is words which begin with a *solud*,

16   S-O-L-U-D, and once again examples, as I pointed out before,

17   of the narrow formation of the Ls.  You will note in many

18   instances when Ss are used in the beginning of words that they

19   are disconnected or separated from the following stroke.  Now,

20   in this particular example from 809-2, you will see that the

21   letters P -- S and A do intercept, but they are written with a

22   lift of the writing instrument between them.

23           And you will note the formation of just basic

24   formations of the Us and in some cases the final letters E.

25   These are all consistencies that appear throughout these

Osborn - direct - Parlovecchio                    6129

1   various examples.  And keep in mind that none of these words,

2   comparing the questioned to the known or comparing the

3   questioned to questioned or known to known, are identical to

4   one another, certainly not.

5          They are each unique bodies of writing that have

6   their own distinctive combination or preponderance unique

7   combination of characteristics, but they do have consistencies

8   within them in terms of repeated characteristics or repeated

9   portions of characteristics that appear both in the question

10  and in the known writing to the extent that the conclusion is,

11  in my opinion, justified.

12  Q    Now, finally, let's take a look at the bottom of the

13  comparison chart.  You see there's some signatures and some

14  initials there.  Can you walk it through that, please?

15  A    On Exhibit 805, there was what appears to be a signature

16  of Mr. Guzman along with what appears to be on 806-1 and

17  806-2, initials of Mr. Guzman as compared with examples of the

18  writing of his name, either within return addresses or

19  within -- as signatures at the conclusion of letters from

20  809-1 and 809-2.  And there is a number of consistencies, most

21  of which I have already pointed out in discussing other letter

22  forms within this writing, but I did want to show this, the

23  formation of the entire name as it appears at least on the 805

24  as compared with the examples that are on the known specimens

25  of writing and point out the high degree of consistency.

Osborn - direct - Parlovecchio                    6130

1          Now, I will also mention these letter forms, wherein

2     there is what we would refer to as distorted writing and the

3     question always is with distorted writing is, is that writing

4     distorted because of an attempt to simulate the writing of

5     someone or because of some of circumstances or effect that

6     occurs within the writing.  Now, with that particular example

7     on the 805, what we have are examples of writing which has

8     been either corrected or adjusted because of the very small

9     area that the signature appears in on 805.  It is way down on

10    the bottom right-hand corner of that particular letter which

11    is the first of the group of four.

12         And you don't see that kind of distortion in the

13    known specimen, but there's an explanation for why and

14    otherwise this writing, besides having a number of

15    consistencies in individual characteristics, significant

16    similarities, similarities in class characteristics, a lack of

17    any significant differences, differences which rise to the

18    level that one would reasonably describe as significant, when

19    you take into consideration natural variation and anticipate a

20    natural variation and most importantly lack of any evidence

21    suggestive of attempted simulation where someone were to try

22    to copy the way another person writes and which is typically

23    marked by retouching, unusually tremulous, but very subtle

24    line quality, the kinds of things that you would see in a

25    drawing, very carefully, meticulously written, as opposed to a

Osborn - cross - Purpura                    6131

1   free-flowing body of writing.  And I found no evidence

2   indicating attempted simulation either on any of the

3   questioned material.

4   Q    So what was your conclusion when comparing the signatures

5   and initials on the questioned documents to the known

6   documents?

7   A    With respect to all of the writing, the writing is

8   sufficiently consistent.  There's a lack of significant

9   differences, an abundance of significant similarities to the

10  extent that the proposition that the questioned writing was

11  prepared by the writer of the known writing is strongly

12  supported to the extent that a highly probable conclusion is

13  warranted.

14          MS. PARLOVECCHIO:  I have no further questions.

15          THE COURT:  Any cross?

16          MR. PURPURA:  I do.

17  CROSS-EXAMINATION

18  BY MR. PURPURA:

19  Q    Mr. Osborn, I left off asking you about payments in this

20  particular case.  You indicated that your total allotment from

21  the United States Government is $7,000; is that correct, sir?

22  A    That's correct.

23  Q    That's not a lump sum of $7,000.  You get an hourly rate;

24  is that correct?

25  A    That's correct and my hourly rate is 250 an hour.

Osborn - cross - Purpura                    6132

1    Q    Do you use part of an hourly rate for the initial review

2    of the documents; correct?

3    A    Yes.

4    Q    And then the next -- at that point, once you've reviewed

5    the documents, did you orally give to the Government your

6    findings at that point?

7    A    No.

8    Q    So then you wrote a report?

9    A    No.

10   Q    What happened next?

11   A    Well, after the initial review of the documents, then the

12   documents were separated and more detailed examinations were

13   made first of the questioned items, looking at the various

14   characteristics that I pointed out on direct.  Second --

15   Q    Mr. Osborn, I apologize.  I'm not asking for the

16   procedure.  I'm trying to work as quickly as I can as to

17   generally what you did.  So, you're getting paid for your

18   review and everything that entails?

19   A    Correct.

20   Q    And then you have an opinion?

21   A    Correct.

22   Q    Now, that opinion, is it put in writing first or do you

23   orally tell the Government here is what I found?

24   A    No, it was verbally reported first.

25   Q    And then once that's verbally reported, then you ask --

Osborn - cross - Purpura                    6133

1   the followup is to give a written report; correct?

2   A    Correct.

3   Q    And the simple question would be that let's assume for a

4   second that you found these writings to be inconsistent, okay?

5   Then, in your experience, does the person who's paying you ask

6   for a report to show that it's inconsistent?

7   A    Very, very, rarely.

8   Q    So if you found these writings to be inconsistent, then

9   whatever portion of the 7,000 would have to be returned to the

10  Government, right?

11       MS. PARLOVECCHIO:  Objection.

12  A    Well, no --

13       THE COURT:  Wait, wait, wait.

14       I will allow it.

15  A    Well, no.  The $7,000 contract is not something that I

16  receive and then refund.  It's gauged according to the number

17  of hours but I understand what you're saying and my response

18  is that if my findings are unfavorable, then certainly the

19  likelihood is I will be paid less because there will be less

20  work involved.

21  Q    That's all.  I'm just trying to decide, naturally, just

22  naturally, not you -- not casting dispersions, but just

23  naturally isn't that an inherent bias just to begin with?  I

24  like being paid.  I'm sure you like being paid and I'm sure

25  you would like your work to continue; correct?

1           MS. PARLOVECCHIO:  Objection.

2           THE COURT:  Sustained.

3           Mr. Purpura, can you check your mic?

4           MR. PURPURA:  It's on now.  I apologize.

5    BY MR. PURPURA:

6    Q    Let me leave it.  Do you think that's a natural inherent

7    bias incentive type work like this?

8    A    It is -- well, first of all, bias is something that is

9    always present.  There is never a point where someone can say

10   I am totally and without a question unbiased.  The best that

11   you can do is attempt to work towards the suppression of bias.

12   In my particular field and with respect to cases like this,

13   cases in which I'm receiving compensation, I can only say that

14   my tendency obviously would be to produce conclusions which

15   are accurate and report those conclusions accurately, no

16   matter where the conclusions went, because for the couple of

17   thousand dollars extra that I might make for producing a

18   favorable conclusion, I could seriously damage my reputation.

19   Q    And by giving a favorable conclusion in this case, I

20   mean, it can almost enhance your reputation with the

21   Government because they may be more likely to want to hire you

22   again, right?  We used Osborn before, he found for us.  Let's

23   use him again.

24           MS. PARLOVECCHIO:  Objection.

25           THE COURT:  Overruled.

Osborn - cross - Purpura                    6135

1   A    The same said can be said of defense attorneys and my

2   goal throughout the work that I perform is to try as best as I

3   can to suppress that bias and to remain neutral until that

4   point where I'm able to reach a well-founded conclusion and

5   that's what I did in this case.

6   Q    Okay.  Now, let me ask you about another type of bias,

7   the cognitive bias.  You're familiar with that term; right?

8   A    Yes.

9   Q    Your contact person with the U.S. Attorney's Office, they

10  tell you generally what the case is about?

11  A    Yes.

12  Q    And they told you about letters; correct?

13  A    Correct.

14  Q    And who purportedly sent those letters; those were the

15  known examples; right?

16  A    I don't know that I was informed that they were sent, but

17  that there was a problem involving a single suspect

18  potentially preparing bodies of writing that were unknown.

19  Q    And, in essence, you knew the case was about Joaquin

20  Guzman; correct?

21  A    Yes.

22  Q    And, in your field -- in your field, that does cause

23  what's called a cognitive bias; correct?

24  A    Once again, bias is something -- yes, cognitive bias

25  exists no matter what you do.

Osborn - cross - Purpura                    6136

1    Q    But here, I mean, you could have just been given the

2    materials in, like, a blind, right, and they would say take a

3    look at these, questioned versus known, and see if they're

4    similar.  You wouldn't have to know anything else about the

5    case, nothing; correct?

6    A    Well, no, in that that would be basically a

7    questioned-to-questioned examination which is something that

8    involves a different type of examination than a questioned

9    versus known.

10   Q    No, I apologize.  No, questioned versus known.  You can

11   have a known document which you had here and you can have the

12   questioned documents, which you had here, but you're not told

13   anything else.  That's what I mean.

14   A    That's certainly true but it wouldn't have had an effect

15   in this case because of course in both the questioned and the

16   known, there's a specific name that appears in both examples.

17   Q    Well, they could have been redacted if they wanted to.

18   A    And that would have reduced the ability to examine,

19   number one, and would have prevented the submission of the

20   originals because obviously redacted copy would have had to

21   have been produced.  So it's an example of where -- yes,

22   cognitive bias is always going to be present, but there is

23   some instances where there is --

24   Q    Sir, sir.  I apologize.  Maybe I'll shorten it a little

25   bit.  You knew, as I indicated before, that the case was about

Osborn - cross - Purpura                    6137

1    Joaquin Guzman; correct?

2    A     Yes.

3              MS. PARLOVECCHIO:  Objection.

4    Q     And you know about Joaquin Guzman before this case;

5    correct?

6              MS. PARLOVECCHIO:  Objection, asked and answered.

7              THE COURT:  That was not asked and answered.

8    BY MR. PURPURA:

9    Q     So you know about him; right?

10   A     Yes, I've certainly heard of Mr. Guzman.

11   Q     And so the question is cognitive bias, isn't that a big

12   one?

13   A     I'm satisfied that in this particular instance I was able

14   to sufficiently suppress cognitive bias and develop a

15   conclusion which was based on the evidence and only the

16   evidence.  And, yes, cognitive bias is something that's

17   impossible to totally avoid, but in the manner in which the

18   material was submitted, as flawed as it may be, when

19   considering cognitive bias, the end product was something that

20   I believe is based strictly on the evidence.

21   Q     I asked you before in the voir dire process whether or do

22   you believe that your science, as you call it, is similar to

23   physics, chemistry or DNA?

24             MS. PARLOVECCHIO:  Objection.

25             THE COURT:  Sustained.

LAM      OCR      RPR

Osborn - cross - Purpura                    6138

1          MR. PURPURA:  This is the area that I can't get

2     into?

3          THE COURT:  Not the way you have just tried to get

4     into it.  I do not know what he knows about physics or DNA or

5     any of those things, so how can you draw a comparison?

6          MR. PURPURA:  Fair enough.

7     BY MR. PURPURA:

8     Q    Are you familiar with the sciences, the sciences of

9     physics, chemistry and DNA?

10    A    As far as my limited basic education in some of those

11    fields, but I'm certainly not an expert in any of them.

12    Perhaps --

13    Q    That's a yes or no.

14    A    Okay.

15    Q    The -- where does this -- forgive me, this purported

16    science, where does it come from, your handwriting expertise

17    science?

18    A    Well, it emanates from the human product of writing.

19    Q    Did it emanate from a courtroom -- in other words, a need

20    in a courtroom many, many years ago when your great

21    grandfather started the business?

22          MS. PARLOVECCHIO:  Objection.

23          THE COURT:  To form, sustained.

24    BY MR. PURPURA:

25    Q    Forget the end part with your great grandfather.  Did it

Osborn - cross - Purpura                    6139

1    emanate, start from, a courtroom this science?

2    A    It was a subject which was studied by my decendents as

3    well as others prior to its admission in any courtroom, but

4    eventually because of its application in both criminal and

5    civil litigation became a significant part of the forensic

6    sciences which is basically courtroom science, just like DNA

7    is.

8    Q    And that created a kind of a demand, in essence, for your

9    type of business; correct?

10   A    Oh, certainly, yes, and the work that I perform is

11   courtroom work for the most part.

12   Q    Let me ask you, and I can be wrong on this, it's my

13   understanding that kind of the foundation of what you call

14   your science is that handwriting, like a fingerprint, is

15   unique to an individual.  Is that correct or not correct?

16   A    Well, not really.  Fingerprints are something that --

17   Q    We'll get to -- I'm trying to shorten it.  Yes or no?

18            THE WITNESS:  Your Honor, I can't answer that

19   question as a yes or no.

20            THE COURT:  I do not blame you.

21            Ask a different question.

22            MR. PURPURA:  I apologize.  I'm just trying to make

23   it quick.

24            THE COURT:  Go ahead.

25   A    Fingerprints are something that -- while a fingerprint

LAM       OCR       RPR

Osborn - cross - Purpura                6140

1    is, at least according to the practitioners unique to the

2    individual person whose print or friction ridge impression

3    that belongs to, but handwriting is quite a bit different in

4    that not only is the distinctive pattern or even unique

5    pattern of writing that occurs that someone creates

6    distinctive to that person, but also that each instance of

7    writing is unique unto itself.

8    Q    I guess that's what I'm really trying to find out.  Do

9    you believe -- it's belief, the subject of belief, that

10   handwriting is unique to an individual?  In other words, I

11   have a particular handwriting that's unique to me, Bill

12   Purpura.

13   A    Yeah, it's not a cult thing.  It's part of the field of

14   forensic document examination and the basic tenet is that

15   everybody's writing is unique to them.

16   Q    And you know within your own field itself there are

17   people that dispute that basic tenet; isn't that correct, sir?

18            MS. PARLOVECCHIO:  Objection.

19            THE COURT:  Overruled.

20   A    No.  No, I don't know of anyone who has the serious

21   dispute with the idea that people do have unique patterns of

22   writing that are unique to themselves.

23   Q    Well, you know Andrew Sulner, S-U-L-N-E-R -- I will just

24   give you a little bit more about him, the principal

25   forensic -- forensic document examiner from New York.  He has

LAM        OCR        RPR

Osborn - cross - Purpura                          6141

1   an MS in forensic science, a JD at George Washington

2   University, diplomat and immediate past president of the Board

3   of Forensic Document Examiners, which I believe you are very

4   familiar with; right?

5   A    No.

6   Q    You're not familiar with them?

7   A    No.  That's a different certification board, much

8   smaller.

9   Q    How about the Juris Prudence section of the American

10  Academy of Forensic Sciences?

11  A    That is the section dedicated to lawyers and Mr. Sulner

12  is a lawyer.

13  Q    You know who he is; correct?

14  A    Yes, I've heard of him.

15  Q    And you're familiar with his Georgetown Law Review

16  article in which he absolutely disputes the fact that

17  handwriting and your so-called science is unique to an

18  individual; correct?

19  A    And as an attorney and advocate, I do understand why he

20  would write that, but I do disagree with that.  I also

21  disagree that that is something that is even in question among

22  conventional, qualified, competent document examiners.

23  Q    What mythology (sic) did you use?

24  A    I beg your pardon?

25  Q    What mythology (sic) did you use in your examination?

LAM      OCR      RPR

1              MS. PARLOVECCHIO:  Objection to form.

2              THE COURT:  Sustained, sustained, sustained.

3    BY MR. PURPURA:

4    Q    What mythology (sic) did you use in the handwriting --

5              THE COURT:  Do you mean "methodology"?

6              MR. PURPURA:  What did I say?

7              THE COURT:  You said "mythology."

8              MR. PURPURA:  Well, that may be close.

9    BY MR. PURPURA:

10   Q    What methodology did you use in the examination of the

11   documents?

12   A    I had mentioned Scientific Working Group for Document

13   Examiners standards before, SWGDOC standards, and that was

14   standard that was employed.

15   Q    You didn't use the ACE-V, the Analyze, Compare, Evaluate

16   approach?

17   A    Well, that is a general standard that is applicable to

18   the SWGDOC standard.

19   Q    And did you use it?

20   A    No, I used the SWGDOC standard which is more specific to

21   my field.

22   Q    Would you agree or disagree that your science is highly

23   subjective -- strike that.  Let's take a step back.

24              If I say my arm hurts and you examine it and there's

25   nothing wrong with it, that would be my subjective pain;

Osborn - cross - Purpura                    6143

1    correct?

2              MS. PARLOVECCHIO:  Objection.

3              THE COURT:  Sustained.

4    BY MR. PURPURA:

5    Q    If you look at someone and you see a bone sticking out of

6    their arm, that's objective; correct?

7              MS. PARLOVECCHIO:  Objection.

8    Q    You can see the problem.

9              THE COURT:  I will allow an answer to that question.

10             MR. PURPURA:  Thank you.

11             THE COURT:  You are asking him is there a subjective

12   aspect to your evaluation.  Why don't you just ask him that?

13             MR. PURPURA:  I hate to go right after it.

14             THE COURT:  I have to move things along.

15             MR. PURPURA:  I appreciate that.

16   BY MR. PURPURA:

17   Q    The bottom line is you would agree that there is, as the

18   Court just questioned, a subjective aspect to your evaluation;

19   right?

20   A    Certainly, particularly in the development of conclusions

21   which are not quantified so there is subjectivity.

22   Q    And there is -- so you indicated before that you're not

23   familiar with the science of DNA, are you?

24   A    Only in the very -- in the most general ways.  I'm aware

25   of what DNA analysis is and what its purpose is.  I'm not

Osborn - cross - Purpura                6144

1    aware of the analysis itself.  But I do understand it to be a

2    forensic science which is able to quantify results.

3    Q    Right.  And to -- objectively; correct?

4            MS. PARLOVECCHIO:  Objection.

5            THE COURT:  Sustained.

6    Q    Did you ever hear of Dr. Moshe Kam, a computer scientist

7    commissioned by the FBI to evaluate your science?

8    A    Moshe Kam is a professor at Drexel University.  Yes, I am

9    familiar with him.

10   Q    And that, in fact, when he was commissioned by the FBI to

11   research handwriting expertise, he found that forensic

12   document examiners, much like yourself, are just moderately

13   better than a layperson to identify handwriting?

14           MS. PARLOVECCHIO:  Objection.

15           THE COURT:  Sustained.

16   BY MR. PURPURA:

17   Q    You're familiar with Mr. Kam, as you pronounced it;

18   correct?

19   A    Dr. Kam, yes.

20   Q    And his works?

21   A    Yes.

22   Q    How about that study that I just mentioned?

23           MS. PARLOVECCHIO:  Objection.

24           THE COURT:  He can answer whether he is familiar

25   with the study.

Osborn - cross - Purpura                      6145

1   A     The particular study that you're referring to, no I am

2   not familiar.  I am familiar with numerous other studies that

3   Dr. Kam has done and actually participated in some of those

4   studies but not the one that you're referring to that was

5   apparently sponsored or paid for by the FBI.

6   Q     Your firm, as we indicated earlier, was one of the

7   originators, one of the first firms in --

8   A     It is the oldest practice in the United States, yes.

9   Q     The oldest one.  And, in fact, in New Jersey back in the

10  1930s, your firm was involved with the Lindbergh kidnapping

11  case; correct?

12  A     That is correct.

13

14              (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

LAM       OCR       RPR

Osborn - cross - Purpura                    6146

1   BY MR. PURPURA (continuing):

2   Q    Most of us remember that.  Just from books, of course.

3   A    You don't look that old, counselor.

4   Q    Thank you.

5         And your, I assume, great-grandfather was actually

6   called to testify in that case, correct?

7              MS. PARLOVECCHIO:  Objection.

8              THE COURT:  I have to sustain that.

9              We're pretty far afield here.

10             MR. PURPURA:  I can proffer where I'm going.

11             THE COURT:  I think I know where you're going, I

12  just don't see that it matters.

13  Q    There was testimony and A conviction, correct?

14             MS. PARLOVECCHIO:  Objection.

15             THE COURT:  Sustained.

16             If you want to have a sidebar, we can have a sidebar

17  and I'll explain it more fully.  If you don't want to, that's

18  okay too.

19             MR. PURPURA:  Let me move on and see if I can get

20  this in.  If not, then I need a sidebar.

21             MS. PARLOVECCHIO:  Can we just go to sidebar?

22             THE COURT:  Let's have a sidebar.

23

24             (Continued on the following page.)

25

LAM        OCR        RPR

```
                          Sidebar                    6147
```

1              (The following occurred at sidebar.)

2              THE COURT:  Once he acknowledges that it's a

3    subjective evaluation, he is allowing the possibility of

4    error.  And it's a waste of time to cite particular cases

5    where errors have occurred because he has already allowed by

6    saying it's subjective that there could be error.

7              Where else are you going?

8              MR. PURPURA:  Here's where I'm going:  Clifford

9    Erving, in 1970, his firm was called in to verify the

10   handwriting of Howard Hughes, the signature.  And they found

11   the same conclusion as they found in this case:  That it was

12   impossible that it was a forgery.  And, in fact, as we know,

13   Clifford Erving pled guilty in federal court in the Southern

14   District to fraud.

15             THE COURT:  That sounds like what I just said.

16             MS. PARLOVECCHIO:  Right.  And your Honor --

17             THE COURT:  You can no doubt find examples where the

18   opinion has been wrong.  I agree.

19             You can say that to him.  He's given you that by

20   saying it's subjective, but I don't want to take more time

21   with Clifford Erving or other famous people.  Then the

22   Government will say but here in Julius Rosenberg, it was

23   right, and Whittaker Chambers was right.  I'm not getting into

24   that.

25             MR. PURPURA:  Are you going to take a morning break?

```
                        Sidebar                      6148
```

1           THE COURT:  I really want you to finish and then

2     take the morning break.

3           MR. PURPURA:  I have another 15 minutes.

4           THE COURT:  We'll take 15 minutes.

5           MS. PARLOVECCHIO:  May I be heard?

6           THE COURT:  Yes.

7           MS. PARLOVECCHIO:  This individual was not certified

8     as an handwriting examiner until the '80s.  So, what happened

9     in the 1930s, '70s, it's not relevant.

10          THE COURT:  I'm ruling it's not relevant.  Even if

11    it were a contemporaneous example of an error in an

12    evaluation, it would still not be relevant.

13          What would be relevant is for you to have an expert

14    witness on the stand who says this whole area cannot ever be

15    trusted because here's the studies showing the rate of error

16    and it's so high.  And you don't have that, so you can't bring

17    it out through this witness.

18          MR. PURPURA:  Fair enough.

19          THE COURT:  That's my ruling.  Let's take a break.

20

21          (Continued on the following page.)

22

23

24

25

Osborn - cross - Purpura                    6149

1              (Sidebar ends; in open court.)

2              THE COURT:  Once again, ladies and gentlemen, we

3     have talked ourselves into our morning break.  So, let's take

4     15 minutes.  Come back at quarter to 12.  Please do not talk

5     about the case amongst yourselves.

6              See you in a few minutes.

7              (Jury exits.)

8              THE COURT:  Mr. Purpura, I will want you to wrap

9     this up when we get back fairly promptly.

10              Take 15 minutes, until quarter to twelve.

11              (Recess taken.)

12              THE COURT:  Please bring in the jury.

13              (Jury enters.)

14              THE COURT:  Everyone be seated.

15              Please continue, Mr. Purpura.

16              MR. PURPURA:  Thank you.

17     BY MR. PURPURA:

18     Q    Mr. Osborn, you are aware that errors are made in your --

19     in handwriting analysis, correct?

20     A    As all forensic sciences.

21     Q    Let me just move on to known exemplars.

22              What are they?

23     A    They are examples, in the case of an examination of

24     handwriting, of what has been submitted as the product of a

25     particular person.

LAM       OCR       RPR

Osborn - cross - Purpura                    6150

1    Q    And this, the comparison chart, Government Exhibit

2    5912-1, you list the questioned handwriting and the known; is

3    that correct?

4    A    Yes.

5    Q    And the known comes from letters that Mr. Guzman was

6    apparently attempting to send or did send, correct?

7    A    That's what I understood them to be.

8    Q    And even though the Government exhibit for privacy

9    purposes, Government Exhibit 809-1R2, is redacted --

10            By "redacted," you know, obviously, what redacted

11   means.  It's blacked out.

12            You didn't receive a letter all blacked out.  There

13   was writing throughout the entire letter.

14            Is that correct, sir?

15   A    That's correct, my submissions were unredacted.

16   Q    And, in fact, as you can see, this letter purportedly was

17   written or penned on June 5, 2017, correct, at least on the

18   top?

19   A    That is the date that appears at the top of it.

20   Q    Now, you had some issues with the known exemplar,

21   correct?

22   A    Yes.

23   Q    And what were those issues specifically with the known

24   exemplar?

25   A    That the known specimen -- the primary limiting factor

Osborn - cross - Purpura                    6151

1    was that the known specimens were submitted in the form of

2    reproductions, as opposed to writing ink on paper originals.

3    Q     Can I stop you there?

4          Reproductions as in the Government exhibit, correct.

5    A     Yes, that the Government exhibit was a nonoriginal.

6    Q     That does cause some -- could cause some problems in

7    analysis, correct?

8    A     It is a limiting factor that absolutely should be

9    acknowledged.  It is a weakness in the submission of evidence.

10   Q     And in all fairness to you, in your report you did

11   absolutely acknowledge that; is that correct sir?

12   A     I'm obligated to do that.

13   Q     And there was another weakness as well; is that correct,

14   sir, with the known, again, the known sample, correct?

15   A     Yes.

16   Q     And what was that second weakness?

17   A     The overall quantity of known writing, wherein the

18   questioned writing represented about twice as much in terms of

19   overall writing than the known specimens.

20   Q     And let me ask you, is it better to have the known sample

21   and the questioned sample, if possible, to be contemporaneous?

22         That means written close in time to each other.

23   A     Depending upon the particular writer.

24         So, for example, an individual whose ability to

25   write is dramatically affected by a recent blindness or

Osborn - cross - Purpura                    6152

1   Parkinson's disease or a broken arm, certainly very

2   contemporaneous writing is important.

3            Generally, you would want to have contemporaneous

4   examples of writing, particularly if in examining that writing

5   you noted an affected ability to write, and, certainly, that

6   would be a reason.

7   Q    And as you're saying that, then, obviously, the person's

8   mental and physical condition when they are writing the known

9   sample is important; is that correct, sir?

10  A    Well, it may be important if the writing exhibits

11  affected ability to write.

12  Q    Let me ask you this:  Let's assume that the person who

13  was writing that letter on June 5, 2017, for the past five

14  months before they wrote that letter was kept in isolation 23

15  hours --

16            MS. PARLOVECCHIO:  Objection.

17            THE COURT:  Sustained.

18            MR. PURPURA:  Can we have a sidebar?

19            THE COURT:  Yes.

20

21            (Continued on the following page.)

22

23

24

25

LAM      OCR      RPR

Sidebar                                    6153

1               (The following occurred at sidebar.)

2          THE COURT:  Your objection?

3          MS. PARLOVECCHIO:  Your Honor, this is the defense's

4    backdoor way of getting the Defendant's conditions of

5    confinement, as they've been trying to do throughout this

6    trial.

7               He's not a doctor.  He's not going to be -- he

8    hasn't examined the Defendant physically, he hasn't been given

9    a record of his mental state.  This is just overly

10   prejudicial.

11         THE COURT:  I have to hear his answers without the

12   jury in here.

13         MR. PURPURA:  Judge, if I may, all of the research

14   in writing indicates that the known exemplar is extremely

15   important under the conditions that it is written.  And in

16   this particular situation, even the letter that he sends out

17   on June 5, 2017, shouts to his wife that:  I've been kept in

18   complete isolation, I am going crazy, and I'm requesting

19   psychiatric and psychological help at that point.

20              We know what the conditions were for five months.

21   We know how it affected him.  There's been a motion by June 5,

22   2017, on the conditions and how it affected him.  And none of

23   this was shared with this person before he makes his

24   evaluation.

25         MR. LICHTMAN:  Can I add one thing?

LAM       OCR       RPR

```
                          Sidebar                        6154
```

 1          THE COURT:  Hold it, hold it.  No, you may not.

 2          There were no facts found as to those allegations of

 3   some kind of diminished ability at that time.  I didn't find

 4   that he wasn't capable.

 5          What we have to do, I think it is fair, if it

 6   degrades the comparison by reason of his physical condition.

 7   But if they're going to ask the question in which they put all

 8   the physical conditions in front of him and the witness says

 9   probably doesn't matter or it could matter or hypothetically

10   it could matter but there's no reason to think it could

11   happen, then I'll keep it out on Rule 403.

12          So, I've got to hear the testimony.  I'm inclined to

13   excuse the jury, hear it first, and see where we are.

14          MS. PARLOVECCHIO:  The witness has testified that a

15   physical condition, like Parkinson's, a broken arm, would

16   affect his ability to compare the analysis.

17          Here, what's being asserted is a mental impairment,

18   which there has been no fact finding as to whether or not the

19   Defendant was suffering from it.  We've talked a lot about

20   subjectivity of state of mind.

21          If he wants to ask this witness would somebody's

22   mental state affect it --

23          THE COURT:  We're not going to do mental states.  As

24   I said, there were no facts found on that and the Defendant's

25   self-profession is not enough to justify going down that road.

Sidebar                                          6155

1          The question I heard him going to was if he's in

2   isolation six months.  Objective, physical circumstances.

3          MR. PURPURA:  Frigid cell, constant lighting in the

4   cell, minimal medical care, no fresh air --

5          MS. PARLOVECCHIO:  403.

6          THE COURT:  None of those are proved, that's the

7   problem.  The only thing we know is proved is isolation.

8          MS. PARLOVECCHIO:  Your Honor, under 403, I would

9   submit none of those things should come into evidence.  It's

10  highly prejudicial.  This is just a shot at jury

11  nullification.

12         THE COURT:  Certainly the way you just phrased it,

13  Mr. Purpura, that is unduly prejudicial and has very little

14  probative value, especially what we're talking about here.

15  We're talking about the handwriting comparison, right.

16         MR. PURPURA:  Judge, I didn't put this witness on

17  the witness stand.  I knew what I was going to do when the

18  witness came up here and this is part of it.  It's important

19  in this particular case to show that he was not given this

20  information.  Now, he could say yes, it would; and, if it

21  does, then it degrades the whole comparison.

22         MS. PARLOVECCHIO:  But there's no evidence that the

23  conditions affected your client's physical condition.  There's

24  nothing.  Nothing in the course of litigating this for two

25  years.

LAM      OCR      RPR

```
                      Sidebar                        6156
```

1          MR. PURPURA:  I can't put myself on the witness

2   stand.  I know how it affected him.  I know how cold it is in

3   those cells.  I've been in that cell.  There's a light on

4   24/7, without blinders to sleep.

5          What do you think it would do to any human being?

6          THE COURT:  I don't know what it would do to their

7   handwriting.  I don't know if it would do anything, if there's

8   a 10 percent or 90 percent chance it would do something.

9          If we had a handwriting expert to do that, then

10  there would have been a *Daubert* hearing and we could have

11  figured out where this is coming from.  But at this stage, to

12  have the defense characterization of special administrative

13  measures when I have found none of those things --

14         MR. PURPURA:  We have found --

15         THE COURT:  He's isolated that's it.

16         MR. PURPURA:  He's isolated, that there's a light on

17  24/7 in the room where he is, he has had no visits for anybody

18  except his trial team for this period of time, that's all

19  true, and that he has absolutely no sunlight for that period

20  of time as well.

21         That is superdeprivation of his sensory system.

22         THE COURT:  What if the witness were to say yes,

23  that could have an impact on his handwriting?

24         MS. PARLOVECCHIO:  I mean, I don't -- there's no

25  reason why it should be asked in this manner.  It's overly

Sidebar                                                    6157

1    prejudicial.  The probative value is completely outweighed by

2    the prejudice.

3              THE COURT:  The compromise will be this:  I'll allow

4    you to ask one question on it, which is assuming that a person

5    were held in -- pick the adjective; demanding, strict,

6    deprived, one word that is not selling it too hard --

7    difficult physical conditions, could that affect the

8    handwriting?

9              MR. PURPURA:  Okay.

10             THE COURT:  That's all I'm going to let you do.

11   Otherwise, we're down a rabbit trail that I don't see the end

12   of.

13             MS. PARLOVECCHIO:  Can I have a proffer of what the

14   actual word of those options will be?

15             THE COURT:  Difficult.  Difficult and demanding

16   physical conditions.

17             MR. PURPURA:  How about "deprived"?

18             You gave me that one.

19             MS. PARLOVECCHIO:  No.

20             THE COURT:  I'm not saying he's deprived.

21             MR. PURPURA:  You said that.

22             THE COURT:  You've said a lot of things.

23             MS. PARLOVECCHIO:  But it also implies he's been

24   deprived of his rights.

25             MR. PURPURA:  Difficult.

Sidebar                                                    6158

1              THE COURT:  Difficult and demanding, I think those

2    are fair characterizations.

3              MR. PURPURA:  Thank you.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Osborn - cross - Purpura                6159

1              (Sidebar ends; in open court.)

2    BY MR. PURPURA:

3    Q    Assume that prior to June 5, 2017, for five months prior

4    to that writing, for five months, assume that Joaquin

5    Guzman --

6              MS. PARLOVECCHIO:  Objection.

7              THE COURT:  Sustained.

8              A hypothetical individual.

9              MR. PURPURA:  Excuse me.

10   Q    A hypothetical individual was held in difficult and

11   demanding conditions 23 out of 24 hours a day --

12             MS. PARLOVECCHIO:  Objection.

13   Q    -- seven days a week --

14             MS. PARLOVECCHIO:  Objection.

15             THE COURT:  Sustained.

16             Difficult and demanding conditions.

17   Q    That's all you're getting, difficult and demanding

18   conditions.

19             Can that or would that affect someone's writing?

20   A    It may; however, it's quite clear the known writing in

21   this particular instance was not affected.

22             MR. PURPURA:  I have no further questions.

23             THE COURT:  Any redirect?

24             MS. PARLOVECCHIO:  No, your Honor.

25             THE COURT:  You may step down.

Osborn - cross - Purpura                6160

1          (Witness excused.)

2          THE COURT:  Once again, I need to have you line up

3     outside for a minute, ladies and gentlemen.  We'll be right

4     with you.

5          (Jury exits.)

6

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Osborn - cross - Purpura                    6161

1          (In open court; jury not present.)

2          THE COURT:  All right.  Be seated.

3          Who is the government's next witness?

4          MR. NARDOZZI:  Isaias Valdez Rios.

5          MS. PARLOVECCHIO:  Your Honor, before we start with

6     this witness, defense counsel has repeatedly violated the

7     Court's instructions at sidebar.  Here is another example.

8          THE COURT:  I could attribute the phraseology of

9     that question to a misunderstanding that Mr. Purpura thought

10    that he was okay with objective facts.

11         You were mistaken, Mr. Purpura.  It was difficult

12    and demanding.  Please adhere to the ruling at side bar.

13         MR. PURPURA:  Thank you.

14         (Jury enters.)

15         THE COURT:  Everyone except the witness, please be

16    seated.

17         The government may call its next witness.

18         MR. NARDOZZI:  Thank you, Your Honor.  The

19    government calls Isaias Valdez Rios.

20         THE CLERK:  Please raise your right hand.

21         (Witness sworn by the clerk and testified through

22    the Spanish interpreter.)

23         THE CLERK:  Please state and spell your name for the

24    record.

25         THE WITNESS:  Isaias Valdez Rios.  I-S-A-I-A-S,

Valdez Rios - direct - Nardozzi                    6162

1    V-A-L-D-E-Z, R-I-O-S.

2              THE CLERK:  You may be seated.

3              THE COURT:  You may inquire.

4              MR. NARDOZZI:  Thank you, Your Honor.

5    DIRECT EXAMINATION

6    BY MR. NARDOZZI:

7    Q    Good morning, Mr. Rios.  How are you today?

8    A    Good morning.  Fine, thank you.

9    Q    Mr. Valdez, how old are you?

10   A    Thirty-nine years old.

11   Q    And where were you born?

12   A    Culiacan, Sinaloa.

13   Q    Is that where you lived growing up?

14   A    That's right.

15   Q    And what nationality are you?

16   A    Mexican.

17   Q    Where were you residing prior to being arrested?

18   A    In Culiacan, Sinaloa.

19   Q    And where do you live now?

20   A    In a prison in the United States.

21   Q    Why do you live in a prison in the United States?

22   A    Because I was arrested for a conspiracy, drug trafficking

23   conspiracy to bring drugs from Central America and South

24   America to Mexico with the final objective of it entering the

25   United States.

Valdez Rios - direct - Nardozzi                6163

1   Q    When did you first become involved in drug trafficking?

2   A    In 2004.

3   Q    And who did you become involved in drug trafficking with?

4   A    With the Sinaloa Cartel, with the leader, Mr. Joaquin

5   Guzman Loera, Chapo Guzman.

6   Q    Do you see anyone in the courtroom today that you

7   recognize?

8   A    Yes.

9   Q    Can you point this person out by an article of clothing

10  they're wearing?

11  A    Yes.  It's the man who has a plaid blue shirt.

12         MR. NARDOZZI:  Your Honor, he also gestured toward

13  the defendant, and I would ask the record to reflect he

14  identified the defendant Joaquin Guzman.

15         THE COURT:  It does.

16         MR. NARDOZZI:  Thank you, Your Honor.

17  Q    Who is that person you just identified?

18  A    Chapo Guzman, the leader of the Sinaloa Cartel.

19  Q    In summary, from the time that you got involved in drug

20  trafficking with the defendant until you were arrested, what

21  types of activities did you do for him?

22  A    Yes.  I started out in his security circle for his, when

23  he was in the mountains.  Then for a while, I was his

24  assistant or secretary.  Afterwards, he sent me to a country,

25  to Honduras, to get property so we could put landing strips on

Valdez Rios - direct - Nardozzi                6164

```
 1   them.  Afterwards, he sent me to be in charge of security for

 2   his sons, Ivan and Alfredo.  And lastly, I became a pilot.

 3   Q    During the time that you worked for the defendant, did he

 4   or any of the people that worked for him have any nicknames

 5   for you?

 6   A    Yes, they called me Memin or Memo.

 7   Q    Okay.  I want to discuss with you the charges against

 8   you.  How long, first of all, have you been in a prison

 9   facility in the United States?

10   A    Four years and 10 months.

11   Q    Do you remember the date you were arrested?

12   A    It was March 24, 2014.

13   Q    And do you remember where you were arrested?

14   A    Yes, at the airport in Bogota, Colombia, El Dorado.

15            MR. NARDOZZI:  Just for the witness only.

16   Q    Showing you what's been marked as Government Exhibit 96.

17            MR. BALAREZO:  No objection, Your Honor.

18            MR. NARDOZZI:  Your Honor, at this time, I would ask

19   that be received in evidence.

20            THE COURT:  Received.

21            (So marked.)

22   Q    Who is that?

23   A    Me.

24   Q    How did you get here to the United States?

25   A    Well, as I said before, I was arrested in Bogota,
```

Valdez Rios - direct - Nardozzi                6165

1    Colombia, for conspiracy charges for drugs.

2    Q    And when you came to face those charges, did you

3    eventually plead guilty to that?

4    A    That's right.

5    Q    When did you plead guilty to those charges?

6    A    Around the month of September 2014.

7    Q    And where did you plead guilty to those charges?

8    A    In a federal court in the United States, Washington, D.C.

9    Q    When you pled guilty to those charges, did you do so

10   pursuant to a cooperation agreement?

11   A    Yes, that's right.

12        MR. NARDOZZI:  Again, for the witness only.

13   Q    Showing you what's marked as Government

14   Exhibit 3500IVR-2.

15        MR. BALAREZO:  No objection, Your Honor.

16        MR. NARDOZZI:  Your Honor, I heard no objection.  I

17   would ask to admit Government Exhibit 3500IVR-2 in evidence.

18        THE COURT:  Received.

19        (So marked.)

20   Q    Mr. Rios, do you recognize this document?

21   A    Yes.

22   Q    What is this document this I'm flipping through right

23   now?

24   A    It's the plea agreement.

25   Q    And going to the last page of this document, is that your

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                    6166

1   signature, the first signature?

2   A    Yes.

3   Q    What were the terms of your cooperation agreement?

4   A    Well, to plead guilty, to speak about my activities in

5   the cartel and other people's activities, testify in front of

6   a jury if needed and always tell the truth.

7   Q    Is that why you're testifying here today?

8   A    That's right.

9   Q    You are still waiting for your sentence to be delivered,

10  correct?

11  A    Yes, sir.

12  Q    What type of sentence are you potentially facing based

13  upon the charges against you?

14  A    Ten years to life.

15  Q    What is your understanding of what the government may do

16  for you in exchange for your cooperation?

17  A    Well, the government has not promised anything to me but

18  they told me that they might bring all of the cooperation that

19  I have given to them before the judge that will sentence me

20  for a possible, so that he can take it into account for a

21  possible reduction in time.

22  Q    And it's your understanding that ultimately only the

23  judge makes the decision on your sentencing, correct?

24              MR. BALAREZO:  Objection.

25              THE COURT:  Overruled.

Valdez Rios - direct - Nardozzi                    6167

1   A    Yes, that's right.

2   Q    Outside of that, has the government provided any benefits

3   to any members of your family in exchange for your

4   cooperation?

5   A    Yes, that's right.  They took them out of Mexico and they

6   put -- they located them in a safe place.

7   Q    In preparing to testify here in court today, have you met

8   with the government to discuss your testimony?

9   A    Yes, sir.

10  Q    Have you also met with the government to just discuss

11  information that you had generally?

12  A    Yes, sir.

13  Q    If you can estimate, how many times do you think you've

14  met with the government?

15  A    Some 25 or 30 times approximately.

16  Q    Okay.  You testified earlier you started working for the

17  defendant in 2004.  What role did you start working for the

18  defendant in?

19  A    In his security circle in the mountains.

20  Q    What were your job duties as a member of the defendant's

21  security circle?

22  A    To provide security to Mr. Joaquin, Chapo Guzman.  If the

23  use of weapons was needed, we would use them against a

24  possible attack from the enemies or the government.

25  Q    Did you have any prior experience that qualified you to

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                 6168

1   work in this type of capacity?

2   A    Yes.  I had belonged to the army, to the special forces.

3   Q    A moment ago, you said you might have to protect the

4   defendant from his enemies.  Who are his enemies?

5   A    Members of other cartels.

6   Q    Before you began working for the defendant, did you know

7   that it was him specifically you would be working for when you

8   accepted this job?

9   A    Not initially.

10  Q    So did you believe you were going to be working for some

11  legitimate business or company in security?

12  A    No, I knew it was illegal but I did not know it was for

13  him.

14  Q    So tell us, where did you go to report on your first day

15  of work for the defendant?

16  A    Okay.  The first day, I received a phone call from a

17  person named or nicknamed Fantasma.  He told me to get ready

18  and that the time had come for me to go to the mountains.

19  They came to pick me up in my house.  I was driven to a

20  landing strip in the outskirts of Culiacan in Sinaloa.  We

21  were Fantasma, two other people and me together.

22  Q    Go ahead.  Where did you go from there?

23  A    A Cessna, a small plane was waiting for us.  We got on

24  the Cessna plane and we flew towards the mountains.

25  Q    I'm going to show you what's in evidence as Government

Valdez Rios - direct - Nardozzi                6169

1    Exhibit 91.  Do you recognize this?

2    A    Yes.

3    Q    Who's that?

4    A    That's Fantasma.  His name is Marcelino Ticanti.

5    Q    And what was his role?

6    A    At one time, he was the assistant in the mountains for

7    Mr. Joaquin Chapo Guzman and later on, he became the person in

8    charge or one of the people in charge of the *plaza* of

9    Culiacan.

10   Q    What did you see when you arrived in the mountains on

11   your first day?

12   A    Well, when we arrived at the landing strip, there were

13   about 30 people there approximately.  They were all wearing

14   camouflage uniforms, tactical vests with magazines, long arms,

15   short arms like R-15s, AK-47s, handguns, rocket launchers,

16   grenade launchers.

17   Q    About how many people were up there carrying these types

18   of weapons?

19   A    I'll say it again.  It was about 30 people that you could

20   see, you could see easily.

21   Q    And what happened to you when you arrived?  Did you

22   interact with anyone?

23   A    Yes, a person came to me and that person was dressed just

24   in regular civilian clothes.  He gave me a vest, a vest with

25   magazines, he gave me a long gun, an AK-47 and a rocket

Valdez Rios - direct - Nardozzi                6170

1    launcher.

2    Q    You say a vest with magazines.  What's a magazine?

3    A    The magazine is the magazine.  It's the, what you use to

4    put on the long gun and the vest is a tactical vest that

5    carries all the magazines.  It clicks in it.

6    Q    Why did this person give you these things?

7    A    Well, because at that point, it was his time to get some

8    rest and I had gone to relieve him as security.

9    Q    How long would you work as security before you would take

10   these rests that you just described?

11   A    Well, you would work one month, one month doing security

12   and one month resting.  Well, I mean, you would, you would say

13   there was rest but, ultimately, if something was needed, done

14   in the city, we would meet up.

15        MR. NARDOZZI:  A moment ago, you used the word

16   "*cargadores.*"  For the translator, what does that mean in

17   English?

18        THE INTERPRETER:  "*Cargadores*"?  Magazines.

19   Q    Did you have people that you work with regularly when you

20   were in the mountains?

21   A    Can you repeat the question, please?

22   Q    Sure.  Did you have any individuals that you worked with

23   on a regular basis when you were working in the mountains on

24   the security circle?

25   A    Yes.  There were all his gunmen, Mr. Joaquin, Mr. Joaquin

1    Chapo Guzman, and there was Fantasma and there were others of

2    us who provided security to Mr. Joaquin.

3    Q    This first place that you went with, to view with

4    Joaquin, where was that?

5    A    In La Tuna, Badiraguato, Sinaloa.

6    Q    And this encampment you were in, did it have a name?

7    A    Oh, yes.  We called it El Cielo.

8    Q    I'm going to show you what's in evidence as Government

9    Exhibit 502.

10          Using the screen in front of you, can you show us

11   generally where that encampment was?

12   A    Yes, approximately right here.  (Indicating.)

13   Q    What kind of an area was that generally?  Was it a

14   populated area?  Was it a rural area?

15   A    It was a rural area.

16   Q    And what were your arrangements there for sleeping and

17   housing?

18   A    Well, we slept pretty much on the ground.  Well,

19   Mr. Joaquin, he had his own cabin where he slept.  We pretty

20   much slept around the cabin where he slept and, in addition,

21   in a smaller area where there was a small elevation, we would

22   pretty much take a little room there for us to sleep.

23   Q    After you arrived in the mountains, when did you first

24   encounter the defendant?

25   A    Well, in the beginning, I was not allowed to be close to

Valdez Rios - direct - Nardozzi                6172

1   Mr. Joaquin Chapo Guzman because Fantasma and the other people

2   who had been there for a longer time would tell me that

3   whenever he would deem it convenient for me to be close to

4   him, he would have called me and that for me not to even

5   approach or even come close to where he was because he still

6   did not trust me.  Afterwards, about 10 or 15 days later,

7   Mr. Joaquin Chapo Guzman had Fantasma come get me.  At that

8   time, he was Mr. Joaquin's assistant together with another

9   person by the name Chinacate.

10  Q    Who was Chinacate?

11  A    He's a person who was also in the role of assistant to

12  Mr. Joaquin Chapo Guzman.

13  Q    What color hair did Chinacate have?

14  A    He was a redhead.

15  Q    Is that relatively uncommon in the mountains?

16  A    Yes.

17  Q    Okay.  What did you discuss with the defendant at that

18  initial meeting?

19  A    Well, I arrived and I was told that El Senor wanted to

20  see me, that's what Fantasma told me, that he wanted to greet

21  me.

22       I came closer to him, to Mr. Joaquin, and he started

23  telling me: *Chavalon*, dude, how are you doing.  And he said:

24  Oh, I was told that you have been part of the special forces

25  with the *gafes*.

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                6173

1      That's right, that's right, that's what I answered

2   him.

3      And he said:  Well, you know, here you have to

4   really be on the lookout if there's anything, you have to

5   really watch out.  How long were you part of the army?

6      About seven years, I said.

7   Q    Did he discuss with you what you were doing up there?

8   A    He just told me:  You know, here, you have to really be

9   on the lookout.  You have to really watch out for the

10  government or the enemies not to come close to us.  And then

11  he said:  Well, you know, if there's anything here with the

12  *chavalones*, these guys here, if there's anything, they will

13  let you know.

14          (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Valdez - direct - Nardozzi                    6174

1   bY MR. NARDOZZI:   (Continuing.)

2   Q    When he referred to the *chavalones* who was he talking

3   about?

4   A    He was referring to the assistants, to the secretaries to

5   Fantasma and Chinacate.

6   Q    How did you receive your orders when you were up in the

7   mountains as part of the security circle?

8   A    It was -- if I was up in the mountains, it was either

9   through Chinacate or Fantasma.

10  Q    Over time was there any other individuals who delivered

11  orders to you on behalf of the defendant?

12  A    Yes, his compadre, El Bravo, pretty much it was -- he

13  was -- pretty much he was the head, the direct head of the

14  sicarios or the hit men.

15  Q    I want to show you what's in evidence as Government

16  Exhibit 105.

17            (Exhibit published.)

18  Q    Do you recognize that person?

19  A    Yes.

20  Q    Who is that?

21  A    That's Bravo Alejandro Aponte.

22  Q    Did Bravo have any other nicknames that you knew about?

23  A    Yes, he we would call him Bravo, Negro or Omar.

24  Q    Were there any other individuals that passed you orders

25  on behalf of the defendant?

Valdez - direct - Nardozzi                6175

1    A    No, just him and the assistants, Mr. Joaquin's

2    assistants.

3    Q    When you were a member of the security circle, how often

4    were you physically present with the defendant?

5    A    Every single day, all throughout the day.

6    Q    And that was during those days that you were working,

7    right, the 30 days on your shift?

8    A    That's right.

9    Q    Were you paid for your work as a member of the security

10   detail?

11   A    Yes.

12   Q    How much?

13   A    I started making about 2,000 -- 2,000 pesos per week.  As

14   time went by then I started getting 8,000, but they wouldn't

15   pay us on a weekly basis.  They would pay us on a biweekly

16   basis until I got to or we got to get 14,000 pesos.

17   Q    As a member of the security circle did you ever have any

18   armed confrontations with the Government?

19   A    No.

20   Q    Why not?

21   A    Well, because -- I mean, usually whenever we were up in

22   the mountains, always -- well, whenever you're up in the

23   mountains of Sinaloa, the Government is already there fighting

24   drug trafficking in marijuana.  And it was really common then

25   for us to be in the area where we were at.  There would

Valdez - direct - Nardozzi                6176

1  usually be military people around us.  So if the military were

2  coming closer to where we were -- and at the time the

3  assistants, well, they had communication radios.  And all

4  throughout the mountains, the different towns, everyone had,

5  like, CB radios.  And they were actually telling you

6  constantly, hey, the guachos, the military people, are on the

7  way and there were people who would actually let us know

8  they're on their way, they're coming closer to where you're

9  at.  So we would just simply step aside so that they would go

10  by and then we would go back to that original location.

11  Q    Were you aware of any individuals who regularly provided

12  information about incoming government operations?

13  A    Yes.

14  Q    How were you aware of those individuals?

15  A    Well, that came afterwards once I became assistant to

16  Mr. Joaquin Chapo Guzman and it was later on, you know, when I

17  was the assistant that I found out who would be providing

18  information about direct government operations against

19  Mr. Joaquin.

20  Q    Who provided direct information about government

21  operations against the defendant?

22  A    Well, it was Licenciado Damaso.  And Ismael Mayo Zambada

23  through Virgo.

24  Q    Okay.  Let's take a look first at Government Exhibit

25  11-A.  Do you recognize this?

Valdez - direct - Nardozzi                6177

1   A    Yes.

2   Q    Who is that?

3   A    That's Licenciado Damaso.

4   Q    To your understanding, what was Licenciado Damaso's role

5   in the organization?

6   A    He was a right-hand man -- actually, the right-hand man

7   of Mr. Joaquin Chapo Guzman.

8   Q    Okay.  I'm going to show you what's in evidence as

9   Government Exhibit 58.  Do you recognize that?

10  A    Yes.

11  Q    Who is that?

12  A    Virgo.

13  Q    Did you know Virgo by any other names?

14  A    Yes, we would call him Juancho.

15  Q    And what was Juancho's role within the organization?

16  A    Well, when Mr. Joaquin Chapo Guzman needed to get in

17  touch with Mr. Mayo Zambada, the communication was first

18  through Virgo.

19  Q    You described for us a minute ago the first encampment

20  you went to was called El Cielo?

21  A    Yes.

22  Q    Were there other encampments?

23  A    Yes, there were others.  One that was called Bastantita.

24  Another town -- I mean, I just remember the areas around it.

25  It's called Coluta, but I don't remember the exact name.

LAM      OCR      RPR

Valdez - direct - Nardozzi                6178

1   There was Coluta, Durango.

2   Q    Using the map that's on the screen --

3   A    San Juan, La Mesa de San Juan.

4        (Exhibit published.)

5   Q    Using the map that's on the screen, Government Exhibit

6   502, could you show us where some of those camps were located?

7   A    (Indicating.)

8   Q    In that circle -- that general area is where all of those

9   camps were located, in that general region; correct?

10  A    Yes.

11  Q    When the defendant was up in these mountain areas did he

12  carry firearms?

13  A    Yes.

14       MR. BALAREZO:  Objection.  403, Your Honor.

15       THE COURT:  Sustained.

16  Q    Do you recall any special firearms the defendant carried?

17       MR. BALAREZO:  Objection.

18       MR. NARDOZZI:  Your Honor if I could have a sidebar

19  to proffer some evidence to the Court.

20       THE COURT:  No.  Did he observe.

21  BY MR. NARDOZZI:

22  Q    Did you observe the defendant carrying firearms?

23  A    Yes.

24  Q    And did he have any special firearms that he carried?

25       MR. BALAREZO:  Objection.

Valdez - direct - Nardozzi                    6179

1          THE COURT:  I'll allow it.

2   A    Yes, he had an M16 or an AR 15 that was short and it was

3   camouflaged.  He had a pistol and it had a handle that was

4   diamond encrusted with either a white or a black panther.

5   Q    I'm going to show you briefly what is in evidence as

6   Government Exhibit 1-K.

7          (Exhibit published.)

8   Q    Do you recognize that?

9   A    Yes.

10  Q    What's that?

11  A    That is the pistol, the diamond-encrusted handle with a

12  white panther.

13  Q    I'm going to zoom out on this picture a little bit.  Do

14  you recognize that location?

15  A    Yes.

16  Q    How do you recognize that location?

17  A    That place was a mesa -- well, it was San Juan.  Well,

18  you know, I can look -- I can identify it because of the --

19  the roof.  I mean, they were still building it.

20  Q    You were actually at that location?

21  A    Yes.

22  Q    Okay.  On the night this picture was taken?

23  A    Yes.

24  Q    Okay.

25          MR. NARDOZZI:  For the witness only.

Valdez - direct - Nardozzi                    6180

1  Q    I want to show you what's marked as Government Exhibit

2  811-2.  Do you recognize this?

3  A    Yes.

4  Q    What is this?

5  A    That is the pistol with a diamond-encrusted handle with a

6  black panther with diamonds.

7  Q    Who did that belong to?

8  A    To Mr. Joaquin Chapo Guzman.

9         MR. NARDOZZI:  Your Honor, at this time I would ask

10  to move Government Exhibit 811-2 into evidence.

11         MR. BALAREZO:  It is what it is, Your Honor.

12         THE COURT:  Received.

13         (Government Exhibit 811-2 received in evidence.)

14  BY MR. NARDOZZI:

15  Q    Is there anything in particular about these panthers?

16  A    Well, not -- not in -- not in particular.  I mean, those

17  handles, those pistols, I mean, as far as I knew whenever

18  somebody would come visit or there was a birthday, a special

19  occasion, that's when people would give him those, but it

20  wasn't anything special.  And I never heard Mr. Guzman say can

21  you order me a golden, like, handled pistol with my initials.

22  I never heard that.

23  Q    Okay.  Now, when you were up in the mountains with the

24  defendant, would people come to visit him?

25  A    Yes.

Valdez - direct - Nardozzi                6181

1    Q    Who came to visit him?

2    A    Well, I would often see Mr. Mayo Zambada, his son Vicente

3    Zambada, Vicentino, Virgo, Alfredo Beltran, people from other

4    countries, like Honduras, Colombia.  I saw another person,

5    Marciel.  They call him La Puerca.

6    Q    When these people would come to visit him, just to orient

7    us, what time frame are we talking about here?

8    A    Well, from the time I started seeing those people it was,

9    like, 2004 to 2007.  That's the time period in which I was

10   with Mr. Joaquin Guzman in the mountains.

11   Q    Why would these people come to visit Mr. Guzman?

12   A    Well, these are people that I don't think they're coming

13   to just say, hey, how are you doing.  They were people who

14   were going to do business with him.

15   Q    What kind of business?

16   A    Drugs.

17   Q    Let's talk about a couple of people.  I'm showing you

18   what's in evidence as Government Exhibit 2-A.

19            (Exhibit published.)

20   Q    Do you recognize this?

21   A    Yes.

22   Q    Who's that?

23   A    Ismael el Mayo Zambada.

24   Q    And who is Mayo Zambada?

25   A    Another head of the Sinaloa Cartel.

Valdez - direct - Nardozzi                    6182

1  Q    I'm going to show you what's in evidence as Government

2  Exhibit 101.

3            (Exhibit published.)

4  Q    Do you recognize that?

5  A    Yes.

6  Q    Who is that?

7  A    Vicente Zambada Niebla, Mayo Zambada's son.

8  Q    What was his role within the organization?

9            MR. BALAREZO:  Objection.  Objection.  Objection.

10           THE COURT:  Yeah, sustained.

11 BY MR. NARDOZZI:

12 Q    Were you present when Vicente Zambada was in the

13 mountains meeting with the defendant?

14 A    Yes.

15           THE COURT:  Is now a good time for lunch?

16           MR. NARDOZZI:  That's fine, Your Honor.

17           THE COURT:  Let's have lunch, ladies and gentlemen.

18 Please come back at 20 to 2.  Remember not to talk about the

19 case amongst yourselves.

20           (Jury exits.)

21           (In open court.)

22           THE COURT:  Be seated a minute.

23           The marshals can take the witness out.

24           (Witness steps down.)

25           THE COURT:  I think where Mr. Balarezo's objections

Valdez - direct - Nardozzi                    6183

1    are going, I am not hearing anything I have not heard before

2    so far.  Have I missed some new evidence that's been added?

3             MR. NARDOZZI:  Your Honor, your point is well-taken.

4    This is our last cooperator.  We assume they're going to

5    attack the credibility of our cooperators and I also want to

6    establish that he's a legitimate person who was in the

7    mountains and knows what their distinctive roles are.  I'm,

8    frankly, towards the end of this anyway and into the next part

9    of his personal role so, you know, I just --

10            THE COURT:  What is his personal going to add that

11   we do not already have?

12            MR. NARDOZZI:  I can proffer the entire testimony

13   for you.

14            THE COURT:  No, you do not have to go through that

15   much, but I want to know is there new stuff?

16            MR. NARDOZZI:  Yes, Your Honor.  This cooperating

17   witness is going to talk about a series of violent acts

18   ordered by the defendant and he's going to talk about violent

19   acts carried out by the defendant.  He's going to talk about

20   working for the defendant's son and corroborate some of the

21   nicknames and things that show up in our ledgers.  He's going

22   to talk about going to Honduras and finding a landing strip

23   and the interaction he had with the prior cooperating witness

24   to corroborate his.  He's going to talk about the Colombian

25   drug seizure that we put in evidence before Christmas that we

LAM      OCR      RPR

Valdez - direct - Nardozzi                    6184

1    need to sew up still.  He was headed to be the pilot on that

2    trip and he's going to go through a series of intercepted

3    communications in planning that drug load and also the end

4    game of that drug load.  That's a map of where his testimony

5    is headed and he is our final cooperator.

6              THE COURT:  I would like you to think about, during

7    the lunch hour, can we avoid repetition.  I mean, there are

8    some things where either the jury does not need any further

9    corroboration on them or there is no amount of corroboration

10   that's going to convince the jury so there's no point in

11   having him corroborate.

12   A    I would like to get down to his particular role, his

13   knowledge and I would like a lot of that to be something that

14   the jury hasn't heard before.  From the jury's perspective,

15   they are thinking how many more of these people are going to

16   say the same thing.

17             MR. NARDOZZI:  I understand, Your Honor.  I want to

18   be sure on cross-examination it's not going to be a line of

19   questioning, you saw Vicente Zambada, but you don't know that

20   he's a drug trafficker, you don't know that he was working in

21   the organization.

22             THE COURT:  So be surprised if they ask those

23   questions and these are not defense lawyers who can easily

24   surprise.  Do what you can.  See you at 1:40.

25             (Luncheon recess taken.)

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                    6185

1           AFTERNOON SESSION

2                  1:40 p.m.

3           THE COURT:  Please bring in the jury.

4           (Jury enters.)

5           THE COURT:  Everyone be seated.  We'll continue with

6    direct examination.

7              MR. NARDOZZI:  Thank you, your Honor.

8    **ISAIAS VALDEZ RIOS**,

9        called as a witness, having been previously duly

10       sworn, was examined and testified as follows:

11   DIRECT EXAMINATION

12   BY MR. NARDOZZI (Continuing):

13   Q    Mr. Valdez, I want to move ahead a little bit.  When you

14   were a member of the Defendant's security circle and while

15   working for the Defendant, did you ever observe or participate

16   in any acts of violence ordered by the Defendant?

17   A    Yes.

18   Q    Who were those acts of violence typically carried out

19   against?  What type of people?

20              MR. BALAREZO:  Objection.

21              THE COURT:  Overruled.

22   A    They could be enemies of Mr. Joaquin or informants.

23   Q    Let's talk first about informants.

24              How many instances were you asked to carry out acts

25   of violence against informants?

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                      6186

1    A    Two.

2    Q    When did the first instance occur?

3    A    It was around 2006, 2007, approximately.

4    Q    And what were the orders that you received?

5    A    Bravo called me to meet up at an office.  That's what we

6    called security house that we had, which was a regular house.

7    We would call it "oficina."  And I met immediately with them,

8    with Bravo and other people who were there, sicarios, gunmen.

9    I got there, and then Bravo said, Are we all here?  Okay.

10   Let's go.

11   Q    How many of you were there, approximately?

12   A    They were approximately ten of us.

13   Q    What happened next?

14   A    Okay.  We got on the vehicles, in the pickup trucks, and

15   we headed towards Tamazula, Durango.  And that was

16   approximately three hours away from Culiacan.

17   Q    What were you going to Tamazula, Durango, to do?

18   A    Well, at the time, Bravo still hadn't told us what we

19   were doing there.  So, we headed to Tamazula, Durango.  When

20   we got there, there was a person waiting there for us by the

21   name Cojito.

22   Q    As a result of your meeting with El Cojito, what did you

23   do next?

24   A    Well, you know, Cojito was waiting for that person who

25   had sort of pointed the finger at, you know, the person we

Valdez Rios - direct - Nardozzi                6187

1    were actually on the way to get.  He was waiting for the

2    person to call Cojito to confirm that he was in his domicile.

3    Q    When you say pointed the finger at, what do you mean by

4    that?

5    A    How can I explain this?  It's a person who -- it was a

6    person who was pretty much indicating specifically where that

7    person where we were out to get was located at.

8    Q    What happened next?

9    A    Well, Bravo told us while we're on our way to get a dedo,

10   a rat, a finger.

11   Q    What happened next?

12   A    Well, you know, it came the afternoon, early evening, and

13   we went by the house of that person, and Cojito actually

14   pointed that house to us.  And Cojito told Bravo, You know

15   what?  They're actually telling me that asshole is, indeed,

16   there.

17            So, we turned around, and the doors to the home were

18   open.  Five of us got out of the cars.  It was Bravo, another

19   guy we would call Mohohoho -- it was Bravo, Mohohoho, me,

20   Cavorka, and a guy we would call El Roke.

21   Q    What happened when you went inside the house?

22   A    Well, the first thing that we found was actually people

23   in the living room that were women and children, and Mohohoho

24   subdued them.

25            Bravo, Roke, and I headed towards the patio of the

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                6188

1    home, where there were some bedrooms there, and we started

2    searching the bedrooms until, in fact, we actually found the

3    person whom we were looking for, who was in one of the

4    bedrooms.  He was a very, you know, tall, like, big guy;

5    bigger than Bravo, bigger than Roke, and bigger than me.

6    Bravo and I, we stayed outside, and then Roke went in and he

7    pretty much, you know, got him out, pushing him out.

8            And the patio in this house, it was like an indoor

9    patio and it had, like, a column in the middle that was sort

10   of holding that, you know, the roof.  And the person, when he

11   got out on the patio, he actually hugged that column.

12           Obviously, we couldn't actually pull him out, so

13   Bravo activated his weapon against him, meaning he shot at

14   him.  And the person just dropped from the column, he fell on

15   the ground.  And Bravo pretty much, you know, like, shot out a

16   burst of bullets in automatic with his weapon, and the person

17   was just laying there.  And then from there, Roke also

18   activated his weapon and he shot at him in his head.

19           From there, we left.  We actually got on the

20   vehicles, on the pickups, and we headed towards the mountains.

21   Q    Was this all communicated back to the Defendant?

22   A    Yes, after Bravo did it -- actually, Bravo did it after

23   we finish.  It was the next day, yes.

24   Q    What did the Defendant say?

25   A    Well, according to Bravo, what he said, and what

Valdez Rios - direct - Nardozzi                6189

1  Mr. Joaquin Guzman said, was, Oh, well, one less person.

2  Q    When was the second time you were ordered to carry out an

3  act of violence against an informant?

4  A    Well, that was around 2011, 2012, approximately.  I was

5  already a pilot.

6  Q    What were the orders that you received?

7  A    Well, the oficina, the office, how we called it, meaning

8  the secretary or Mr. Joaquin Chapo Guzman's assistant, while

9  we were there, it was Cachimba, who is his personal pilot,

10 Chapo's personal pilot, and I, we were at the airstrip which

11 we called number three.  We were receiving the order to go to

12 an airstrip which was in the outskirts of the mountains in

13 Culiacan.

14 Q    Let me stop you for a second and take a look at Exhibit

15 93.  It's in evidence.

16        (Exhibit published to the jury.)

17 Q    Do you recognize that?

18 A    Yes.

19 Q    Who is that?

20 A    Cachimba or 17.

21 Q    So, what happened next?

22 A    Well, you know, we started -- well, Cachimba started

23 answering the messages, and they wanted us to pick up another

24 person in the outskirts of Culiacan at a ranch.  And the deal

25 was so that once this person would get on the plane, once

Valdez Rios - direct - Nardozzi                6190

1    we're airborne, I would subdue him once we were already up,

2    you know, flying, and then we would take him to another place.

3    Another place, I don't know where that other place was.

4            And things that we started arguing about, the pros

5    and the cons of doing that, because that person we were going

6    to go pick up was always armed and always with his secretary

7    who was also armed all the time.

8    Q    At the time, did you know who the person was?

9    A    No, not at that point.

10   Q    A moment ago, you said you received these orders from the

11   oficina.

12   A    That's right.

13   Q    Who did you believe those orders to be from?

14           MR. BALAREZO:  Objection.

15           THE COURT:  Sustained.

16   Q    What is the oficina?

17   A    The oficina is the place -- well, it's Mr. Joaquin Chapo

18   Guzman.

19   Q    How do you know that?

20   A    Well, I used to be El Senor's assistant, and that was

21   actually the code, the name, that we would use over the radio.

22   And once we started using the BlackBerries, we would use the

23   same thing for all the communications.

24   Q    When you say you received an order, how did that order

25   come in?  Over what medium?

Valdez Rios - direct - Nardozzi                          6191

1   A    It was from Mr. Joaquin to the secretary; from the

2   secretary directly either to me, but in this case directly to

3   Cachimba, but that was an order that also involved me.

4   Q    So, what did you do next?

5   A    Well, we continued to plan that alleged, well, pickup.

6   And then at the end, the oficina said, Okay.  Just be on the

7   watchout, be attentive.  We'll let you know when we're going

8   to do it.

9          Two, three days went by, nothing happened.  And I

10  ask Cachimba, Hey, what happened with what we were going to

11  do?

12          No, he said.

13          No, Cachimba said, they did it already.  They

14  already picked him up, Bravo and his people picked him up.

15  Q    Did you find out who the person they picked up was?

16  A    And I ask Cachimba, Hey, at the end of the day, who was

17  that person?

18          He said, It was Virgo.

19  Q    I'll show you what's in evidence as Government Exhibit

20  58.

21          (Exhibit published to the jury.)

22  Q    Is this the same Virgo, Juancho, you told us about

23  before?

24  A    Yes.

25  Q    Did you ever speak to Bravo about Virgo's death?

Valdez Rios - direct - Nardozzi                6192

1    A    Yes, one time when Bravo actually called me to come see

2    him, he was interested in me fixing a plane for him.  I met up

3    with him in the outskirts of Culiacan at a town that's called

4    El Dorado.

5    Q    What did Bravo tell you about Virgo's death?

6    A    Well, I didn't ask him directly, but Virgo's issue came

7    out, and I actually dared ask him, Well, what happened?  Why

8    did they kill him?

9         Well, because he was an informant with the DEA.  He

10   was an informant for the Government.  And on three occasions,

11   he actually put me with the Government, he ratted me out to

12   the Government.  And I told my compadre in this case -- well,

13   Joaquin El Chapo, so it was ordered for him to be picked up.

14   And finally, well, the person was interrogated, we

15   interrogated him, and, well, yes, you know, he was, in fact, a

16   dedo, a rat, and I personally killed him.

17        That's what Bravo told me:  I shot him in the chest.

18   Q    You also said a few minutes ago that there were instances

19   where the Defendant ordered you had to carry out acts of

20   violence against enemies; remember that?

21   A    Yes.

22   Q    I don't want to talk about all of those, but I want to

23   ask you if there was ever an instance where he asked you to

24   carry an act against -- in a larger scale against enemies?

25   A    Yes, yes, yes.

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                6193

1          I went to a confrontation that we had -- well,

2    supposedly we were not going to a confrontation, we were

3    supposedly going to a party where an enemy of Chapo Guzman is

4    at, meaning Chapo Isidro.

5    Q    When did this occur, approximately?

6    A    That was around 2009.

7    Q    And you mentioned someone named Chapo Isidro.

8          Just so there's no confusion, who was that?

9    A    An enemy of Chapo Guzman, a person who worked for the

10   Beltran Levyas.

11   Q    What were the orders that you received specifically?

12   A    Well, at that time -- at that time, I was bodyguard of

13   Joaquin's sons, Ivan and Alfredo.  I received a message from

14   Bravo telling me to meet up with them in an area that is

15   called Los Nopales or Sonoma.

16   Q    Who is "them"?

17   A    Well, with Bravo, Bravo.  Bravo asked me to meet up with

18   him.

19   Q    Did you go where Bravo asked you to go?

20   A    Yes, that's correct.

21   Q    What happened when you got there?

22   A    Well, when I arrived, there were a lot of people.

23   Q    How many, approximately?

24   A    About 40 people.  I mean, obviously, I didn't start

25   counting them, but there were about 40 people there.

Valdez Rios - direct - Nardozzi                    6194

1      There were people there; Choco Ivan's people,

2  Licenciado's people, Mayo's people, and us, Chapo's people.

3  Q    And what happened when you arrived?

4       What did you discuss?

5  A    Well, Bravo started explaining what this was about.  We

6  were supposed to go to a party where Chapo Isidro was and we

7  were supposed to go there to kill him, but there was also the

8  idea that we had to go by an airstrip and destroy all of his

9  planes and also pick up the people who worked for him.

10 Q    Let's focus first on this party.

11      Where was the party supposedly located?

12 A    It was an area in Sinaloa; Culiacan, Sinaloa.  It was

13 more or less around the area of Guasave, Los Mochis, around

14 there.

15 Q    Showing you what's in evidence as Government Exhibit

16 506-19, can you show us where the area is on the map that

17 you're discussing?

18 A    (Complies.)

19 Q    What was the significance of that area, Guasave?

20 A    Well, it's not just Guasave, it's all of Sinaloa.  It's a

21 coastal area, so that's a good area to receive drugs.  And

22 mainly that it's also an area that produces marijuana and

23 poppies as well.

24 Q    At the time this was happening, who controlled that area?

25 A    That was the area where Chapo Isidro was and Chapo

Valdez Rios - direct - Nardozzi                6195

1    Isidro's people.

2    Q    What did you do next?

3    A    Well, the different teams were divided up.  Bravo gave

4    out instructions as to what each team should do, and we

5    started the journey towards those areas in Guasave.

6    Q    Before you started for that journey, did you arm

7    yourselves?

8    A    Yes, of course, of course.

9    Q    What did you arm yourselves with?

10   A    Well, it was AK-47s, AR-15s, M-16s, guns, handguns,

11   rocket launchers, grenade launchers, rifles, and .50 caliber

12   Barretts.

13   Q    How many of you went to Guasave?

14   A    Well, people started splitting up.  We were, like, about

15   15 to 20 people.

16   Q    How did you get to Guasave?

17   A    Well, we arrive in a place before going into Guasave, a

18   place called Burrione.  When we arrived, it was already dark.

19   We went into a graveyard that was located there, and we waited

20   there for some time.

21   Q    Before we get into that, did you do anything to your

22   vehicles before you traveled to Guasave?

23   A    Well, when we were already in the graveyard, we marked

24   our vehicles with an X.

25   Q    What happened next?

LAM        OCR        RPR

Valdez Rios - direct - Nardozzi                    6196

1  A    Well, at specific time came up, it was, like, 12 or 1 in

2  the morning, we came out of the graveyard into the road again.

3  And approximately 500 to 1,000 meters away, there was a gas

4  station.  And when I went by there, I observed a person who

5  stood in the middle of the road on the opposite direction

6  lane, and he started shooting at us, at all of our vehicles.

7  Q    Were you a driver or a passenger as you were traveling?

8  A    No, I was driving.

9  Q    So, what did you do when you saw this person?

10  A    Well, my pickup was hit with several shots.  Well, we

11  immediately turned around, all of the vehicles, and then I --

12  we went toward the gas station, and I personally went with a

13  vehicle on that person.  The person laid there dead.

14        And then the confrontation started.  The shots were

15  exchanged and the firing started.

16  Q    How many of your people were there at that point?

17  A    There were between 15 and 20 of us at that time,

18  approximately.

19  Q    How many of their people were there?

20  A    There were a bunch.  I don't know exactly how many, but

21  there were many of them.

22  Q    Were any of your people killed?

23  A    No.

24        There were only two people who were wounded, and

25  they were not serious wounds.

Valdez Rios - direct - Nardozzi                6197

1   Q     How about the other guys?

2   A     Yes, no, they did have about seven to eight dead people.

3

4                (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Valdez Rios - direct - Nardozzi                    6198

1    BY MR. NARDOZZI:   (Continued)

2    Q    What happened next?

3    A    Well, the confrontation lasted approximately 15 to

4    20 minutes.  Little by little, it died down and we left the

5    area.  We went back to Culiacan.

6    Q    At some time afterwards, did you ever see yourself any

7    news coverage of this incident?

8    A    Yes, in the press, in the newspaper.

9    Q    And did you eventually see video footage as well?

10   A    Yes.

11   Q    Okay.  I'm showing you what's in evidence as Government

12   Exhibit 701.  Do you recognize this?

13   A    Yes.

14   Q    What is it?

15   A    It's the video of the confrontation at Borrion.

16   Q    And right there, those three letters, "IVR," what's that?

17   A    They're the initials from my name.

18            MR. NARDOZZI:  Your Honor, at this time, I'd like to

19   play some selected clips from this video.

20            THE COURT:  Offer it into evidence first.

21            MR. NARDOZZI:  It is in evidence, Your Honor.

22            Your Honor, the first clip starts at 5 seconds and

23   runs to 1 minute 20 seconds.

24   Q    Mr. Valdez, I would ask that as you watch this video, you

25   narrate for the jury what it is we're seeing.

LAM        OCR        RPR

Valdez Rios - direct - Nardozzi                6199

1        MR. BALAREZO:  What's the exhibit number?

2        MR. NARDOZZI:  701-A.

3        (Video played.)

4    A    Well, the position of the camera here is showing the road

5    going from Burrion towards Culiacan.

6        That's the federal forces.  They're already there.

7    This is already by the morning.

8        MR. NARDOZZI:  Pause it right there.

9        (Video stopped.)

10   Q    We paused at 30 seconds.  Can you tell us what we're

11   looking at here?

12   A    Yes.  That's my pickup truck.  It's marked with an "X."

13   This is the pickup that I brought.  As you can see, there are

14   shots on the door and on the front windshield, like the front

15   part.

16       MR. NARDOZZI:  Please continue the video.

17       (Video played.)

18   Q    What are we looking at here?

19   A    Those are pickup trucks belonging to the people we had

20   the confrontation with, meaning Chapo Isidro's people.  Those

21   vehicles are inside the gas station because that's where they

22   were shooting from towards the road.  We were on the roadside.

23   Q    And this?

24       MR. NARDOZZI:  We can stop it.

25       (Video stopped.)

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                6200

1   A    Well, this is glass from the shots that were fired at the

2   vehicles.

3   Q    Another clip at 2 minutes and 28 seconds to 3 minutes.

4            (Video played.)

5   Q    What are we looking at here?

6   A    Well, one vehicle -- these are vehicles belonging to the

7   enemies, the Chapo Isidro's people, and some houses showing

8   some shots that were fired at them because behind the gas

9   station in the back, there were houses over there.  The

10  vehicles were covered in blood.

11  Q    Okay.

12           (Video stopped.)

13  Q    And let's look next at 3 minutes and 22 seconds to

14  4 minutes and 10 seconds.

15           (Video played.)

16  Q    What do we see here on the ground?

17  A    Casings from bullets.  This, again, is the pickup truck

18  that I was driving.  It was an armored pickup truck.

19  Q    In a moment, can you tell us what we're seeing on the

20  seats of this pickup truck?

21  A    Those are the clips for a weapon, the AK-47.

22           (Video stopped.)

23  Q    And, finally, 4 minutes and 46 seconds to 5 minutes and

24  46 seconds.

25           (Video played.)

Valdez Rios - direct - Nardozzi                    6201

1   A     Well, that was one of the houses that was affected by the

2   cross-fire, one of the many houses that were located at the

3   back of the gas station.

4   Q     This is a residential area that you were in?

5   A     No, no, no, of course not.  It was the beginning, the

6   entrance to the town of Borrion.

7   Q     And, finally, this vehicle that we're seeing?

8   A     Well, it was a vehicle, a vehicle from the municipal

9   police that was there.  I didn't see it but I guess, you know,

10  it was there.

11        (Video stopped.)

12        MR. NARDOZZI:  Okay.  We can turn the lights back

13  on.

14  Q     All right.  We talked about some acts of violence that

15  you were ordered to carry out.  Were there ever any instances

16  where you saw the defendant carry out any acts of violence?

17  A     Yes.

18  Q     How many times?

19  A     Two times.

20  Q     When was the first time?

21  A     It was around 2006, 2007.

22  Q     And what happened?

23  A     We were in a town called Bastantita, Durango.  There,

24  Mr. Chapo Guzman asked to make a phone call, receive a phone

25  call, I don't remember if it was on the radio or on the

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                6202

1    telephone.  He made his phone call and he finished it.

2            At that time, he said we have to go send -- well, he

3    said to his secretary -- I don't remember if it was Chinacate

4    at that time or a different person.  No, I think it was.  I

5    don't remember who the secretary was.  But he said:  Oh, send,

6    we have to send someone to pick up some things that my

7    *compadre* Mayo is sending and someone who has been picked up

8    and tied up is coming with them, one of the *Aretes*.  And

9    "*Arete*" was a word we used from people from the Arellano-Felix

10   cartel.

11   Q    What happened next?

12   A    And he said:  Be careful, let's see how beaten up he is

13   because it looks like he's coming, that he's already been

14   beaten up.  Be careful not to be seen by the people in the

15   town where he is at and bring him to the place where you

16   sleep.

17           We went.  We picked him up.  Mayo's plane arrived.

18   I say it's Mayo's plane because the pilot who brought it was

19   El Nino and he was the one who always brought Mayo.  We picked

20   him up.  We took him to the place.  We looked at the person to

21   see what state he was in or what he looked like.

22   Q    What was this place that you took him to?

23   A    It was a place where we slept about 50 to 100 meters from

24   the small cabin where Mr. Guzman slept.

25   Q    All right.  And once you arrived there with him, what

Valdez Rios - direct - Nardozzi                6203

1   happened next?

2   A     Well, we arrived with the person there.  We observed how

3   he had been tortured.  He had been severely tortured.

4         We informed Chapo how this person's state was.  He

5   had been burned with an iron, an iron you use to iron clothes.

6   He had been burned all over his body.  His back was burned.

7   The T-shirt he was wearing was actually stuck to his skin.  He

8   had lighter marks all over his body, the lighter that you have

9   in the car.  His feet had also been burned.  He couldn't walk.

10  He had been blind in his eyes --

11        THE INTERPRETER:  "Blindfolded," Interpreter

12  correction.

13  A     Mr. Joaquin Chapman Guzman was a little upset.  In fact,

14  he said:  How can they send me this asshole just like that?

15  They would have just rather they killed him.  What am I going

16  to do with him like that?

17        And that's how he was left there.  That day went by.

18  Mr. Joaquin went to sleep.  He did not see him.  Then the

19  next, the next day came.  He went to the place where he would

20  meet up with guests and he didn't see him on that day either.

21  Q     What happened next?

22  A     Well, the next day, on the third day, he then approached

23  the area where the person was.

24  Q     When you say "he," you're talking about the defendant?

25  A     Yes, Mr. Chapo.  He came close to where the person was

Valdez Rios - direct - Nardozzi          6204

1    and he started interrogating him.  And I, I heard him asking

2    him about what had happened with the members of that cartel.

3    He would ask about specific names.

4    Q    When you say "that cartel," which cartel are you

5    referring to?

6    A    He was referring to the Arellano-Felix cartel.

7    Q    How long did he interrogate him for?

8    A    It wasn't that long.  It was about 20 minutes.

9    Q    Then what happened?

10   A    Well, then Mr. Joaquin Chapo went back to the place where

11   he would meet up with his guests.  And in the afternoon, he

12   said:  Well, we have to move to another place close to that

13   town of Bastantita.  It's about three, four, five kilometers

14   away.

15        We took off.  We actually brought that person, that

16   person who worked for the Arellano Felix, we took him with us,

17   and we put him inside this, like, you know, a henhouse, like a

18   wooden structure.  We put that person in there.  The person

19   was still there for days.  And then we told, later on,

20   Mr. Joaquin that the person had this really bad odor because

21   he was pretty much decomposing away.

22   Q    What did he tell you to do with that?

23   A    Well, in front of that little house where we had gotten

24   to, it was isolated, there were no other houses nearby, there

25   was a small graveyard.  And then he said, you know, take him

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                6205

1   out of where he's at and then place him in, like, a little

2   elevated area that's right in front of the graveyard there,

3   and then he said, Dig a hole in the graveyard and I don't want

4   him to hear while you're excavating there.

5   Q    Did you dig a hole?

6   A    Yes.  Chaneke, another guy, we would call him Cotorrito,

7   and I went there.  We dug the hole.  Another two people were

8   watching out for the Arellano's worker.  When we finished

9   digging out the hole, we reported back and said, you know, we

10  had dug out the hole.

11          Mr. Joaquin had a small gun, it was like a .25

12  caliber, a small caliber.

13  Q    It was a handgun?

14  A    Yes, exactly, a handgun, a 25-caliber, a small one.  And

15  he grabbed it and he put a bullet in the chambers, he removed

16  the safe and he put it behind him in his back.  And then he

17  asked for us to take him close to the area where we had dug

18  out the hole, right close to the hole.  The guys who were

19  taking care of him, that were watching out for him, brought

20  the guy close.  The guy, the guy was right there on the

21  ground.  It wasn't even cold at that time but I think that,

22  you know, he was afraid, I don't know.

23  Q    Was he restrained in any way?

24  A    Yes.  He was blindfolded and his hands and legs were tied

25  up.  The only thing he would hear were the voices.

Valdez Rios - direct - Nardozzi                6206

1   Q    What was the next time the defendant came into contact

2   with him?

3   A    Well, he came close, Mr. Joaquin came close to the person

4   who had been tied up and then he started interrogating him

5   once again.  He started interrogating him, he started asking

6   him questions, and the person who was tied up, you know, he

7   was responding.  And in one of those times when he was

8   responding, Mr. Joaquin grabbed his gun and shot at him.

9   Boom.  You motherfucker, he said.  And then he said:  Remove

10  the handcuffs and bury him.

11           Chaneke and I removed the handcuffs.  And the shot

12  in him was a small shot and still the person was sort of

13  gasping for air, and that's how we dumped him in the hole and

14  we buried him.

15  Q    Okay.  You said there were two occasions.  When did the

16  second one occur?

17           MR. BALAREZO:  Objection.  402.

18           THE COURT:  Overruled.

19  A    The second time was around the same time I already

20  mentioned, 2006, 2007.  We were in the area of Coluta,

21  Durango, in some little houses that belonged to a person by

22  the name of Pedro Loiaza.

23           And the same thing.  Mr. Joaquin, he requested or he

24  placed a call.  He placed a call.  I mean, he finished his

25  call, he finished.  And then he said:  Hey, *chavalones*, guys,

Valdez Rios - direct - Nardozzi                6207

1    you know, they are sending us a gift.  Lic's people grabbed

2    some Zetas close to El Dorado.

3    Q    Who is "he"?

4    A    Licenciado Damaso.

5            They are already delivering them to my *compadre* El

6    Bravo and we have to go pick them up at the airstrip.  And

7    then he told me:  Memin, hey, send some guys so that they can

8    go pick up those people there at the airstrip and they should

9    be careful.

10   Q    These people, were they picked up?

11   A    Yes.  Those people, the Zetas, they had been picked up in

12   the area of El Dorado, Sinaloa.

13   Q    How did you find out they were Zetas?

14   A    Oh, because Mr. Joaquin himself said so.

15   Q    And what are Zetas?

16   A    The Zetas, it's another cartel, it's one of the cartels

17   that we have in Mexico and they're enemies of the Sinaloa

18   Cartel.

19   Q    Were these two Zetas brought up to where you were in the

20   mountains?

21   A    That's right.

22   Q    What happened next?

23   A    And then -- well, I told Mr. Joaquin, you know, if he

24   wanted to, I could go.  And he said:  Yeah, better you go so

25   that the people in the little town around there, they don't

Valdez Rios - direct - Nardozzi                    6208

 1   see anything.

 2            So we went to get the people, I went to the airstrip

 3   to get those people.  Bravo was also there with them, with the

 4   two Zetas.  Obviously, the Zetas were tied up, but they were

 5   not blindfolded.  And I took them all the way to where we were

 6   camping at.  And Mr. Joaquin had ordered us to put them in,

 7   like, a shed or, like, an area where they were saving some or

 8   storing some grass for the cows or something like that.  And

 9   then he said:  And you can start heating them up.

10   Q    What does that mean?

11   A    Heated them up in the sense of we could start beating

12   them up, beating them up so that they could start saying

13   things, so that they can start revealing information.

14   Q    Did you start beating them up?

15   A    Yes.  Two or three guys were, remained there and they

16   started beating them up.

17            And then after that, Chapo asked me to send some

18   other guys to look for another place that was a little more

19   like secluded, within the mountains so that we could take the

20   Zetas there.  And, yes, the guys, like, found this place.  It

21   was, like, an area with, like, trees and it was about

22   500 meters away from the base where we were at and we took

23   them there, we brought them to that place.

24   Q    Once they arrived at that location, what happened next?

25   A    Well, Mr. Joaquin arrived together with his *compadre*

Valdez Rios - direct - Nardozzi                6209

1    Bravo, and another one of the guys, another one of the guys

2    got in there with them.  And Mr. Joaquin requested like a big,

3    you know, stick, like a large branch, stick.  We found it, we

4    brought it over to him and then he started torturing them.

5    That's when he started torturing them.

6              And I actually left that area because I was in

7    charge of communications.  I had a radio, I had a phone, so I

8    needed to be in an area where there was a better signal.

9    Q    When you said he started torturing them, what do you mean

10   by that?  What was he doing to them?

11   A    Well, the stick, you know, that he had requested,

12   obviously he didn't request that to be affectionate towards

13   them, obviously.  He started beating them up with that stick.

14   At one point, he told me actually to go closer with where

15   Mr. Joaquin was with Bravo and the other guy.  And the people,

16   there were, they were pretty much already like ragged dolls.

17   All the bones in their body were fractured and they couldn't

18   move.  And Mr. Joaquin kept beating them up with that stick

19   and he also had his firearm and he was hitting them with that

20   firearm.

21   Q    What kind of firearm was it?

22   A    Either the AR-15 or the M-16, the short one that he had

23   that was camouflaged.  And he was telling them:  You

24   motherfuckers, how is it possible that you're working for

25   those people and you are betraying us.

LAM        OCR        RPR

Valdez Rios - direct - Nardozzi                    6210

1    Q    Why was he saying that to them?

2              MR. BALAREZO:  Objection.

3              THE COURT:  Sustained.  Rephrase it.

4    Q    Did you, how did you know why -- let me rephrase.

5              MR. NARDOZZI:  I'm sorry, Your Honor.

6              Did you know these two Zetas, anything about them

7    other than the fact that they were Zetas, without telling us

8    what it is?

9    A    No.  The only thing I knew was that they lived in

10   Sinaloa, in the area of El Dorado, Sinaloa, an area that is

11   controlled by Licenciado Damaso.

12   Q    So based upon that, why did you think the defendant was

13   saying that?

14             MR. BALAREZO:  Objection.

15             THE COURT:  No.  The question is what was your

16   understanding of why he was saying that.

17             THE WITNESS:  Excuse me?

18   Q    What was your understanding of why he was saying that?

19             MR. BALAREZO:  Objection.

20             THE COURT:  Overruled.

21   A    Well, because that organization, the Zetas organization,

22   I mean, those are not people who belong to Sinaloa.  Those are

23   not people in the Sinaloa.  Those are people from other

24   states, for example, in the areas of Tampico, Tamaulipas,

25   Zacatecas and other areas in the north of the country.  So the

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                    6211

1  fact that two people who were originally from the state of

2  Sinaloa and who were working for them --

3          MR. BALAREZO:  Again, objection.

4          THE COURT:  Overruled.

5  A    -- that was the issue, because those were two people from

6  the same state and that, in fact, they were betraying the

7  people from Sinaloa, Sinaloan people themselves.

8  Q    How long did it go on for?

9  A    Quite a long time.  I would say about three hours, I

10 think.

11 Q    And what happened after the beating?

12 A    Well, like I said, I had to come close to the area

13 because Bravo asked me to come close to that place.  Yes, it

14 was him who told me to go, sir, to tell me, he said:  Well, my

15 *compadre* Chapo said to dig a very large hole and for us to put

16 some wood inside and to make a huge fire.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

LAM      OCR      RPR

1    BY MR. NARDOZZI:   (Continuing.)

2    Q     Did you do it?

3    A     Yes, yes.

4    Q     What happened next?

5    A     I had some guys do that and a large bonfire was made as

6    he had asked for.  Later on in the night, they -- he asked for

7    two ATVs to be brought over.  They brought -- the ATVs came

8    and the two Zetas were slung across the back grid of the ATVs.

9    Q     Where did they take the ATVs?

10   A     We brought the ATVs to where Chapo's man was with the

11   Zetas.  There, we put the people on the back -- the rack --

12   the back rack of the ATVs.  Mr. Joaquin got on one of them.

13   Bravo got on the other one.  There was a Zeta on each ATV and

14   they went closer to where the bonfire was.  The people were no

15   longer tied up.

16   Q     What happened next?

17   A     So then the other ones of us from the security circle

18   that were there, they picked them up, they threw them off the

19   ATVs.  Then Mr. Joaquin got off his ATV and he put a bullet in

20   the chamber of his rifle, the AR 15 or M16 that he had.  The

21   Zetas were seeing the bonfire.  They were seeing the bonfire

22   in their faces.  They were scared.  Their faces looked like

23   they were scared.  Mr. Joaquin did not say much.  He just came

24   up with a rifle to the head of one of them and said, Fuck your

25   mother, and boom, shot him.  And he did the same thing to the

Valdez - direct - Nardozzi                          6213

1    other one.  He shot him in the head and the same thing, Fuck

2    your mother.  Put them in the bonfire.

3    Q     And was that done?

4    A     Yes, that was done.  He said, I don't want any bones to

5    remain.  And then some of the guys from the security detail

6    stayed there putting more lumber into the fire for a long

7    time, until practically it was daylight.  And when they

8    finished doing that, then they came to us and they said, Yes,

9    that's done.  We finished.  They are covered over.  We ground

10   up the bones.

11            MR. NARDOZZI:  Your Honor, I'm about to switch

12   topics.  It may be a little early for a break, but --

13            THE COURT:  Okay.  We will take 15 minutes for a

14   break until 3:10.  Please don't talk about the case.  See you

15   in 15 minutes.

16            (Jury exits.)

17            (In open court.)

18            THE COURT:  Okay.  Recess, 15 minutes.

19            (Recess taken.)

20            (Judge enters.)

21            THE COURT:  Please bring in the jury.

22            Do you think you will finish today?

23            MR. NARDOZZI:  Your Honor, I don't think so.  I

24   think it will be about an hour into Monday.  I will try.

25            THE COURT:  Do what you can do.

Valdez - direct - Nardozzi                    6214

1          (Jury enters.)

2          THE COURT:  All right, everyone be seated.  Let's

3    continue.

4    BY MR. NARDOZZI:

5    Q    Mr. Valdez, you told us earlier that you were a secretary

6    for the family.

7    A    Yes.

8    Q    When did you start in that role?

9    A    It was around 2006, 2007.

10   Q    Just very briefly, what were your general job duties in

11   that role?

12   A    Well, receiving messages or sending messages that were

13   coming from Mr. Joaquin to the rest of the people who worked

14   for him.

15   Q    As it relates to sending and receiving messages, what

16   medium did you use to send and receive messages from the

17   defendant?

18   A    Well, at that time, technology was not very advanced as

19   it is today.  At that time we used radios, communication

20   radios, long-range radios.  And some phones that were called

21   Senao cordless.  And these were placed at some distance -- the

22   base would be placed at a certain distance in a place that was

23   elevated so that you might be able to make or receive some

24   phone calls.

25   Q    We'll get to that in a moment.  Why did you use two

Valdez - direct - Nardozzi                    6215

1   different things, radios and Senaos, to communicate?

2   A    Well, the radios were more for communications in the

3   towns, in the towns where we used to spend time.  And the

4   telephones were more for communications that were outside of

5   there, more in the different cities.

6   Q    What type of people would you communicate with over the

7   radio?

8   A    Well, there was one radio that was special.  It was only

9   used to communicate with -- I only used it to communicate with

10  Licenciado Damaso or Virgo or Mayo.

11  Q    When you say communicate with these people, were you

12  having lengthy conversations with them?

13  A    No, of course not.

14  Q    So what were you doing when you communicated with those

15  people?

16  A    So, if Mr. Joaquin would ask me to get in contact with

17  Licenciado, I would pick up the radio and say, Come in, come

18  in, and then either Licenciado's secretary or Licenciado

19  himself would answer and I would hand it over and say, Here it

20  is.

21  Q    You said a moment ago that you had a special radio for

22  Licenciado Damaso.  How many radios did you?

23  A    Many.  There were several that I had on me.  Like, it

24  might be some ten, ten radios.

25  Q    When you said you had them on you, what do you mean by

LAM      OCR      RPR

Valdez - direct - Nardozzi                        6216

1  that?

2  A    I had them on me on the vest, the tactical vest.  They

3  were all charging on there.

4  Q    How about the Senaos.  Who were you communicating with

5  with the Senaos?

6  A    I was not -- I didn't have knowledge about the people

7  that he was communicating with over the Senaos.  The Senaos

8  would have a name or a phone number.  So, if he asked for me

9  to get in touch with someone over a Senao by him, Mr. Joaquin,

10  he would say there's a phone -- like, let's say that it's a

11  phone named Rocky and he would say, dial it and as soon as the

12  person responds, please pass it over to me.  I would obey that

13  order.

14  Q    Were there more than one Senao?

15  A    Yes, of course.

16  Q    And how many of those were there?

17  A    There were, like, ten or fifteen telephones.  They were

18  not all on activated but I would bring them in a bag.  Some

19  had a name.  Some had a phone number.  Others didn't have

20  anything in case a phone had to be switched.

21  Q    You testified a few moments ago that the base of those

22  Senaos was some distance away.  How far away was it?

23  A    Well, they were -- you know, it depended on the location

24  we were at.  Sometimes the base would be two or three

25  kilometers away.  In other places they were further away than

Valdez - direct - Nardozzi                    6217

1    that.

2    Q    How would you communicate if this base was so far away?

3    A    Well, so the base was situated in higher areas, like on

4    top of hills, the higher areas of hills or mountains, and the

5    aluminum antenna was installed there and on the antenna would

6    be the antenna for the phones.  They were like bases, like

7    repeaters.

8            MR. NARDOZZI:  Your Honor, without objection I admit

9    Government Exhibit 821.

10            MR. BALAREZO:  No objection.

11            THE COURT:  Received.

12            (Government Exhibit 821 received in evidence.)

13            (Exhibit published.)

14   BY MR. NARDOZZI:

15   Q    Looking at Government Exhibit 821, is this the type of

16   base or antenna that you're talking about?

17   A    Yes, sir.

18   Q    These are the actual antennas that you used; correct?

19   A    No, no, no, it wasn't these, but it was that structure.

20   Q    What was the purpose of having the base of the phone a

21   distance away from where you were situated?

22   A    Well, basically it was because if a call of Mr. Joaquin's

23   was intercepted, the government would arrive at the base and

24   not at the place where we were located.

25   Q    Did the defendant use any other types of devices to

LAM        OCR        RPR

Valdez - direct - Nardozzi                    6218

1   communicate?

2   A    Well, at the time we used the Senaos and the radios later

3   on.  There came a time when we used the Nextels.  They were

4   like small radios, but telephones.

5   Q    When you say later on, can you give us a timeframe?

6   A    Well, it was during that same time period around 2006,

7   2007 that more phones started coming out, more types of

8   phones, more communications that were more effective.

9   Q    Did the Nextels provide a kind of direct communication?

10  A    Well, yes.  As I said, they were radios and telephones.

11  It was a little more complicated to use them.  You had to go

12  to a higher area so you could get a signal for the phone.

13  There was no base, nothing like that.  You had to just catch

14  the signals.

15  Q    What was your typical day like as the secretary for the

16  defendant?

17          MR. BALAREZO:  Objection.

18          THE COURT:  Overruled.

19  A    It was hard.

20  Q    Okay.  Describe what you mean.  Tell us what you did.

21  A    Well, it was hard, basically all day sending and

22  receiving messages over the radio, running messages from him

23  to other people.  Well, even at the time when he would go to

24  rest in his cabin, I tried to sort of rest but I had a small

25  radio for communications between myself and Mr. Joaquin and he

LAM      OCR      RPR

Valdez - direct - Nardozzi                    6219

1  would be all the time, Memin, what did so-and-so say.  Memin,

2  tell this to so-and-so.  I mean, like, I hardly ate at all

3  even until very late at night.

4  Q    When you communicated with other people about the

5  defendant's orders or you discussed them over these

6  communication devices, how did you refer to him?

7  A    Him, who, you mean?

8  Q    The defendant.

9  A    I would only say the *gerente*, the manager, says or my *apa*

10 says.

11 Q    Why would you refer to him by those names and not his

12 true name?

13 A    Because I could not do that.  Because if the

14 communications were intercepted, then they would immediately

15 detect what it was about and who it was about.

16 Q    After you finished working for the defendant as a

17 secretary, did you take on another job for the organization?

18 A    Yes, that's right.

19 Q    What was your next job?

20 A    Well, I was sent to Honduras, to Central America, to the

21 country of Honduras to get properties, to buy properties so

22 that we could get -- build some airstrips, some landing strips

23 right there.

24 Q    I show you what's marked in evidence as Government

25 Exhibit 504.

Valdez - direct - Nardozzi                6220

1              (Exhibit published.)

2    Q     Could you circle on the map where Honduras is?

3    A     (Indicating.)

4    Q     These airstrips that you were looking to build, were

5    these for commercial airports or something else?

6    A     No, of course not.  It was a clandestine airstrip.

7    Q     And, very briefly, what do you mean by that?

8    A     It was like a piece of land that was approximately 1,000

9    meters in length and we would pretty much have to build some

10   sort of road so that a small plane could land there, like a

11   Cessna plane like a 210 or 206, but I would say more about a

12   Cessna 210.

13   Q     Was there anything geographically about Honduras that

14   made it a good place for a landing strip?

15   A     Well, more than anything Honduras was going to be used as

16   a layover place because it's a place that's between Mexico and

17   South America.  So these are very short distances that you can

18   fly.  Well, for example, you would leave from Ecuador you

19   would then land in Honduras.  You would unload and then the

20   plane could go back and then pick up some more drugs.

21   Q     When you were arrived in Honduras, was there anyone that

22   you could communicate with there?

23   A     Well, there was a person there, a woman who was the one

24   who received me by the name of Julisa.

25              (Continued on the following page.)

Valdez Rios - direct - Nardozzi                    6221

1    BY MR. NARDOZZI (Continuing):

2    Q    And was there anybody you were coordinating with back in

3    Mexico?

4    A    Yes, that's right.  In the beginning, it was with

5    Licenciado Damaso, but then it was later on with a Colombian

6    who was with Mr. Joaquin up there in the mountains.

7    Q    Who is that Colombian?

8    A    We would call him Panchito, but his name is Alex

9    Cifuentes.

10   Q    I'm showing you what's in evidence as Government Exhibit

11   39.

12            (Exhibit published to the jury.)

13   Q    Who is that?

14   A    That's Alex Cifuentes, Panchito.

15   Q    Did you ever find a property suitable to serve as a

16   clandestine airstrip in Honduras?

17   A    Yes.

18   Q    Where was that property located?

19   A    The name of the town was Duyure.  It's in the border with

20   Nicaragua.

21   Q    And when you found this property, what did you do to go

22   about purchasing it?

23   A    Well, the oficina sent me money.

24   Q    You said the "oficina."

25            Who are you referring to?

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                    6222

1   A    Mr. Joaquin El Chapo Guzman.

2         He sent me money so I could purchase that property.

3   Q    How much money did he send you?

4   A    About $250,000.

5   Q    When you received the $250,000, what did you do next?

6   A    At the time, Mrs. Julisa didn't want to provide any

7   support for me with the vehicles that she would normally give

8   me so that I could transport myself from one place to the rest

9   because, well, she also wanted money and she wasn't getting

10  any.

11        So, then I requested authorization from the oficina

12  so that I could purchase a vehicle.  And the oficina, the

13  office, Mr. Joaquin, authorized me.

14  Q    How much money did he authorize you to put towards the

15  purchase of a vehicle?

16  A    He authorized $18,000 for me.

17        But what he had authorized for the kind of vehicle

18  that he had authorized me for, the cost would be about

19  $20,000.  And I didn't ask any more money from Mr. Joaquin.

20  I, actually put my own money from out of my pocket to purchase

21  that pickup.  It was an old Mercedes Benz pickup truck, a 4x4.

22  Q    With the remainder of the money you received from the

23  Defendant, did you put that all towards the landing strip?

24  A    No, not yet, because at the time, Ms. Julisa already knew

25  that I had the money, and she came crying to see me.  She came

Valdez Rios - direct - Nardozzi                6223

1   to the house that she was actually renting for me.  She came

2   crying, saying that she needed money because her son was

3   really sick and that she needed money because she had to bring

4   him to the United States to get some treatment that she could

5   only get for him here in the state of Miami.

6   Q    What did you do as a result of what Julisa told you?

7   A    Well, I couldn't get any more money from the oficina, I

8   couldn't ask them for more money, so I grabbed what I had left

9   and I -- because I didn't know how to not do that.  So, I just

10  grabbed the $40,000 and I gave them to her and I said to her,

11  Well, I'll see.  I'll see how I get this money back.

12  Q    So, the $40,000 you gave Julisa, that was from the 250

13  that was sent to you for the landing strip and the car?

14        MR. BALAREZO:  Objection, your Honor.

15  A    Yes, of course.  I didn't have that money from my pocket

16  to lend to her.

17  Q    As a result of all this, what was the reaction from

18  Mexico?

19  A    Well, at that time, I don't think they knew that yet.  At

20  that time, Mr. Joaquin had asked me to buy some of those

21  vehicles -- what are they called?

22        Well, to check out the prices of the vehicles and to

23  pass the information on to him so that I could buy those

24  vehicles.  We're talking about large trucks, large vehicles,

25  and some tractors.

Valdez Rios - direct - Nardozzi                 6224

1   Q    What were those for?

2   A    Well, it was specifically to do that, to do the airstrip

3   thing and I could transport fuel in the truck.

4            And then I, stupidly -- that's the truth -- I

5   altered the prices, the costs, for those vehicles.

6   Q    Did they eventually find out about this back in Culiacan?

7   A    Yes, because the assistant at that time told me, Memin,

8   be careful because Panchito is saying things about you.

9            And I said, That's fine.  What is he saying?

10           And he said, No, I'm not going to tell you what, but

11  I'm just telling you to be very careful because Panchito is

12  saying some very bad things about you.

13           Chapo ordered me to come back to Culiacan.

14  Q    Did you go back?

15  A    Yes, I went.

16  Q    What happened when you got back?

17  A    Okay.  I saw Mr. Joaquin in the mountains.  He told me,

18  All right, just hand everything over to the accountant, all

19  the books to the accountant, and just wait.

20           Then later on, I kind of guessed at what was going

21  on.  I was at home and I received a message, Memin, come over

22  here.

23           It was Bravo calling.  I got scared at that point.

24  I got scared.  I said, No, you know what?  No.  I already know

25  what's going on.  Tell Tio, tell El Senor, thank you very much

LAM        OCR        RPR

Valdez Rios - direct - Nardozzi                    6225

1    for the opportunity he gave me, but that to go on pure rumors

2    and gossip, I don't work like that.

3    Q    So, what did you do as a result?

4    A    I was scared.  I hid.  I turned off communications.  I

5    even faked having broken my leg.  I had a cast put on my leg.

6    He asked me for pictures, and I sent them to him.

7              And that's how things remained until some time

8    later, some days later, they start looking for me, they

9    started looking for me, until finally they pick me up.

10   Q    When you say "they" picked you up, who picked you up?

11   A    Well, Bravo's people.  Obviously, Chapo Guzman's people.

12             They pick me up.  They went into the house where I

13   was staying and they brought me out.

14   Q    And where did you go from there?

15   A    Well, at that time, I -- I didn't know where I was --

16   where it was that I went, at that time.  But I was in a

17   location inside a pickup, tied up, handcuffed.  In fact, it

18   was an armored pickup truck.  And blindfolded.

19   Q    Where were you taken?

20   A    A town, I don't know what -- where it is.  At that time,

21   I didn't know where I was.

22   Q    What happened when you arrived?

23   A    Fantasma arrived first and he told me, Memin, what have

24   you done?

25             He's like -- I said, No.  Nothing, dude, nothing.

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                    6226

1    And he's like, The thing is that my Apa was told --

2    referring to Mr. Guzman -- my Apa is being told that you have

3    been buying a mansion in Honduras, that you bought a new car,

4    and that you've been buying Rolex watches that you're handing

5    out.  He's superpissed at you.

6  Q    When he says my "Apa," who is he referring to?

7  A    He was referring to Mr. Joaquin.

8         And I said, No.

9         And I started explaining to him what had happened.

10   And I said to him, Look, that same house that you're talking

11   about, it's a house that Mrs. Julisa herself is renting out to

12   me for $700.  There was even a girl living there, a girl who

13   worked for her at a spa.  Those Rolex -- that Rolex watch or

14   those Rolex watches they're talking about, that's a lie.  I

15   live near a mall over there in San Pedro Sula --

16        MR. BALAREZO:  Objection, 403.

17        THE COURT:  Can we have less of a narrative, please?

18        MR. NARDOZZI:  That's fine, your Honor.

19  Q    How did the situation resolve itself?  How did it end?

20  A    Different day, well, Bravo told me, Let's wait until my

21   compadre wakes up and I'm going to go talk to him because

22   Pinguino -- who was Chapo's assistant -- told me to kill you.

23   But I'm not going to do it.  I'm first going to talk to my

24   compadre.

25  Q    So, after the conversation with Bravo ended, did you have

Valdez Rios - direct - Nardozzi                    6227

1    an opportunity to talk to the Defendant?

2    A    Yes, another day, in the morning, Bravo spoke to

3    Mr. Joaquin.

4         MR. BALAREZO:  Same objection.

5         THE COURT:  Just tell us about the conversation

6    between you and the Defendant.

7         MR. NARDOZZI:  Thank you, your Honor.

8    A    Well, they passed -- they handed me Mr. Joaquin on the

9    phone, and then Mr. Joaquin said, Chavalon, how you doing?

10   They already told me, Chavalon, that all of those were lies,

11   everything that Panchito was telling me were lies.  And here

12   we are.  We're family.  There's nothing to worry about here.

13   Let's start working.  Let's get ready.  You should do what my

14   compadre Bravo asks you to do.  Nothing has happened.

15

16              (Continued on the following page.)

17

18

19

20

21

22

23

24

25

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                    6228

1    BY MR. NARDOZZI:   (Continuing)

2    Q    Did you get assigned to a new job within the organization

3    after that?

4    A    Yes, at that time was when I took over security for

5    Mr. Joaquin's sons, Ivan and Alfredo.

6    Q    Approximately what year was that?

7    A    It was like at the end of 2008 or beginning of 2009

8    approximately.

9    Q    I'm showing you what's in evidence already as

10   Government's Exhibit 59-A.

11             Do you recognize that?

12   A    Yes.

13   Q    Who's that?

14   A    That's Alfredo.

15   Q    And does he have any nicknames?

16   A    Yes.  We called him Menor.

17   Q    And I'm showing you what's in evidence as Government

18   Exhibit 60.  Who's that --

19   A    No.  I'm sorry.  I'm mistaken.

20   Q    Go ahead.  Fix your statement.

21   A    This is Ivan.

22   Q    Okay.  And does he have any nicknames?

23   A    Yes, we called him Mayor.

24   Q    And I'm showing you what's in evidence as Government's

25   Exhibit 60 again.

Valdez Rios - direct - Nardozzi                    6229

1              Do you recognize that?

2    A    Yes.

3    Q    Who's that?

4    A    Alfredo.

5    Q    And did he have any nicknames that you're aware of?

6    A    Yes.  We called him Menor.

7    Q    And collectively together, did they have a nickname that

8    you would refer to them as?

9    A    Yes, they were called Los Menores.

10   Q    How long did you work for Los Menores?

11   A    Almost a year.

12   Q    And after you stopped working for Los Menores, what did

13   you do next?

14   A    Well, while I was still working with them, I started to

15   pay my way through flight school.

16   Q    And you eventually learned how to fly an airplane?

17   A    Within three months, I learned how to fly a plane.

18   Q    Did you eventually begin to fly for the defendant's

19   organization?

20   A    Yes, sir.

21   Q    When was that?

22   A    Starting in two thousand -- yes, 2010.

23   Q    And what types of flights were you conducting for the

24   defendant's organization initially?

25   A    Well, initially I started out by getting on planes as a

LAM      OCR      RPR

Valdez Rios - direct - Nardozzi                6230

1   co-pilot.  I was a co-pilot to bring marijuana down from the
2   mountains.
3   Q    How many times did you fly marijuana down from the
4   mountains?
5   A    Several, several times.  I didn't count them but there
6   were many times.
7   Q    And these marijuana flights, where would they occur, from
8   where and to where?
9   A    From the mountains in Durango and mountains in Sinaloa,
10  the mountains in Chihuahua to Culiacan.
11  Q    What types of aircraft would you use to conduct these
12  flights?
13  A    For the mountains, it was the Cessna 206 that was used.
14  Q    I'm going to show you what's marked as Government's
15  Exhibit 822.  Do you recognize this?
16  A    Yes.  That's a Cessna plane 206.
17  Q    And this isn't one of the planes that you personally flew
18  but is an example of a 206, correct?
19  A    That's right.
20         MR. NARDOZZI:  Your Honor, at this time, I would ask
21  to move Government Exhibit 822 into evidence.
22         MR. BALAREZO:  I have no objection, Your Honor.
23         THE COURT:  It's received.
24         (So marked.)
25  Q    So this is the kind of plane that you would use to fly

Valdez Rios - direct - Nardozzi                6231

1   marijuana loads in Mexico, is that correct?

2   A    That's right.

3   Q    Why would you use this type of an aircraft to move

4   marijuana?

5   A    Well, because it's a kind of plane that's used, I mean,

6   it transports people but it's used for rough work because of

7   the landing gear that it has.

8   Q    What about the landing gear that it has makes it suitable

9   for what you say is rough work?

10  A    Well, it's not just the landing gear.  It's also the kind

11  of tires and they have some coils in them that can hold up the

12  weight, so that it can hold a lot of weight.

13  Q    For the purposes of moving marijuana in the Cessna 206,

14  did you have to make any modifications to the plane?

15  A    Well, the modifications that were done, generally, was to

16  take out the passenger seats and previous to that, the tanks

17  would be modified, the fuel tanks which are the wings, to

18  increase the fuel capacity because the larger the fuel

19  capacity, the longer the flight time can be for the plane.

20  Q    With these modifications that you just discussed, how

21  much marijuana can you fit into a Cessna 206?

22  A    Well, it depended on the size of the packages of

23  marijuana, but usually they would be like 400 to 450 kilos.

24  Q    What was the ideal size packages of marijuana to move

25  most efficiently in a Cessna 206?

Valdez Rios - direct - Nardozzi                6232

1   A     Well, the size, the size and weight, it was 10 or

2   5 kilos.  They were these cubes that looked kind of like this.

3   (Indicating.)

4              MR. NARDOZZI:  In a rectangular motion I believe

5   with his hands, for the record, Your Honor.

6

7   Q     Did you move any other types of drugs?

8   A     Yes.  They started sending me to Central America and

9   South America.

10  Q     And what type of drug would you move from there?

11  A     Cocaine or base.

12  Q     Okay.  I'm going to show you what's marked as Government

13  Exhibit 823.

14             Do you recognize this?

15  A     Yes.  It's a Cessna 210 airplane.

16  Q     And, again, this is just an example of a Cessna 210, not

17  one that you personally flew, right?

18  A     Yes.

19             MR. NARDOZZI:  I ask that it be moved into evidence.

20             MR. BALAREZO:  No objection.

21             THE COURT:  Received.

22             (So marked.)

23  Q     What did you use the Cessna 210 for?

24  A     To transport cocaine or base.

25  Q     Did you have to make any modifications to the Cessna 210

Valdez Rios - direct - Nardozzi                6233

1    to move cocaine or base?

2    A    Yes.  I had to remove some of the weight because the

3    instruments also have weight and so I would keep the

4    instruments to be able to fly.  I remove the seats, make the

5    capacity of the wings larger so that I can increase the amount

6    of fuel, to put some, like, tips at the end that had a

7    capacity for 50 gallons each to increase the capacity, and

8    place some pumps inside to be able to pump the fuel from

9    inside the plane out toward the wings.

10   Q    How much cocaine could you fit into a modified Cessna

11   210?

12   A    Well, usually, these planes, both the Cessna 206 and the

13   Cessna 210 have a capacity for 400 kilos, but thanks to the

14   modifications that were made, it could transport 450, 500, up

15   to 600 kilos, but that's not really something that's

16   recommended.

17   Q    What size packages of cocaine would you use to most

18   efficiently pack a Cessna 210?

19   A    Well, the bricks of cocaine, those aren't normally large.

20   You can say they would probably be one kilo.  They're little.

21   They're about, approximately this size, like this, and about

22   this thickness more or less.  (Indicating.)

23        MR. NARDOZZI:  Your Honor, for the record, the

24   witness indicated a rectangular shape of about 18 inches wide

25   and 4 inches thick.

Valdez Rios - direct - Nardozzi                    6234

1         THE COURT:  Yes.

2         MR. NARDOZZI:  Thank you, Your Honor.

3    Q    I want to talk about some of your specific activity

4    moving cocaine via airplane.

5         At first, would you fly these cocaine loads by

6    yourself or with a partner?

7    A    I started as a co-pilot.

8    Q    Okay.  And when did you start flying cocaine as a

9    co-pilot?

10   A    Around 2011, approximately.

11   Q    How many flights did you conduct as a co-pilot?

12   A    Six.

13   Q    And did you always transport cocaine or cocaine base

14   during that time?

15   A    Yes, sir.

16   Q    Over the course of those six flights, how much cocaine

17   did you transport?

18   A    Well, I didn't count them really but it was approximately

19   between 400 and 450.

20        One time, one time we crashed because they put in

21   about 700 kilos of cocaine and our fuel ran out and so we

22   crashed.

23        (Continued on next page.)

24

25

Valdez - direct - Nardozzi                    6235

1    BY MR. NARDOZZI:   (Continuing.)

2    Q    Okay.  But on average how much cocaine was there per

3    shipment?

4              MR. BALAREZO:  Asked and answered, Your Honor.

5              THE COURT:  He may answer.

6    A    Between 400 and 450.  Just the exception of that one

7    flight, that's all.

8    Q    Were you paid for your flights as a co-pilot?

9    A    Yes, sir.

10   Q    How much were you paid?

11   A    $30,000.

12   Q    Per flight?

13   A    Per flight.

14   Q    Did you eventually graduate to becoming a lead pilot?

15   A    Well, I didn't finish it because I learned to fly in a

16   lesser amount of time than what it usually takes for a school

17   to teach you.

18   Q    Did you eventually become a lead pilot of these flights?

19   A    Yes, sir.

20   Q    How many flights did you conduct as a lead pilot?

21   A    Four.

22   Q    And during what time frame did you conduct those flights?

23   A    2012, 2013.

24   Q    What type of drug were you moving, was it cocaine or

25   cocaine base each time?

Valdez - direct - Nardozzi                          6236

1    A    That's right.

2    Q    And on average what was the size of the cocaine shipped

3    during each of those flights?

4    A    I didn't risk putting a lot of cargo onto the plane.

5    I -- it was between 400 and 420 kilos what I would have put on

6    or what I would request be put on, better said.

7    Q    The cocaine you moved both as a co-pilot and as a pilot,

8    who was it going to?

9    A    Mr. Joaquin.

10   Q    And once it arrived at Mr. Joaquin, where did it go from

11   there?

12           MR. BALAREZO:  Objection.

13           THE COURT:  Sustained.

14   Q    Did you ever have any discussions, without telling us the

15   nature of those discussions, with Joaquin or any other members

16   of the organization, about where the cocaine was going once it

17   arrived with the defendant?

18   A    My job was --

19           MR. BALAREZO:  Objection, unresponsive, Your Honor.

20           THE COURT:  Sustained.  Ask it again.

21   BY MR. NARDOZZI:

22   Q    Did you ever have any discussions with the defendant or

23   any members of his organization about where the cocaine was

24   going once it was received by the defendant?

25   A    No.

Valdez - direct - Nardozzi                6237

1   Q    Were you paid for your flights as a co-pilot -- as a

2   pilot, excuse me?

3   A    Yes.

4   Q    How much were you paid for each of your flights?

5   A    I would get $80,000, out of which I had to give $30,000

6   to the person who was flying with me as a co-pilot.

7   Q    How much money did you make in total flying cocaine for

8   the defendant?

9   A    Around $300,000.

10  Q    Your Honor, I'm about to move to the last section of

11  this.  Would it be a good time to break?

12          THE COURT:  You mean the last section of your direct

13  examination?

14          MR. NARDOZZI:  Yes, Your Honor.

15          THE COURT:  Okay.  Let me see counsel at sidebar for

16  just a minute.

17          (Sidebar held outside of the hearing of the jury.)

18          (Continued on next page.)

19

20

21

22

23

24

25

```
                              Sidebar                        6238
```

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  A very loquacious witness.  In order to

4     give the jury something to look forward to, I would like to

5     say that while there are no guarantees, the odds are high that

6     we will finish the evidentiary presentation in the case next

7     week.

8          MS. PARLOVECCHIO:  Certainly from us, Your Honor, we

9     should be done -- barring Mr. Balarezo's cross we should be

10    done by the end of the day on Monday.

11         THE COURT:  Is this your last witness?

12         MS. PARLOVECCHIO:  We have two very short witnesses

13    after that.

14         THE COURT:  Can I tell them that we will finish?

15         MR. BALAREZO:  It depends on the witness' answer.

16         THE COURT:  All right, it will be between you and

17    me.

18         (Sidebar ends.)

19         (Continued on next page.)

20

21

22

23

24

25

Proceedings                                      6239

1    (Continuing.)

2           THE COURT:  Ladies and gentlemen, before I send you

3    home for the weekend the good news I have is that while I

4    cannot give you a guarantee, I can tell you the odds are high

5    and it is my expectation that the parties will finish their

6    evidentiary presentation to you next week.  So, when I have

7    told you that we are getting there, I have been serious.  We

8    are definitely getting there.

9           For those reasons, as we get nearer to the end of

10   the case, it's particularly important to continue to observe

11   all of the rules that I have given you every night, staying

12   away from media coverage, not doing any research on the

13   internet or otherwise and please do not communicate anything

14   about the case to anyone.

15          Have a restful weekend and we will see you Monday

16   morning at 9:30.  Thank you very much.

17          (Jury exits.)

18          THE COURT:  All right.  The marshals can take the

19   witness out.

20          (Witness steps down.)

21          (In open court.)

22          THE COURT:  The only thing I want to tell the

23   parties is that tomorrow afternoon I will have a proposed jury

24   charge ready for you and I will e-mail you each.  Each lawyer

25   will get an e-mail, while I won't cover of everybody on the

Proceedings                                      6240

1   Government.  I will send two or three and defense counsel with

2   a copy of those proposed instructions.

3              I will tell you I am not looking to add.  They are

4   long and I also want on Monday for you all to start thinking

5   about how long you're going to need for closing.  Unless the

6   parties tell me that we can definitely finish all three

7   arguments in one day, which seems to me unlikely, then we're

8   going to need to set a little bit longer schedule to

9   accommodate everyone.

10             The instructions are probably just short of half a

11  day the way they are now.  Maybe you will think of a way to

12  cut them when I send you the proposed draft.  Thank you.

13             Have a good weekend, everybody.

14             MR. NARDOZZI:  Thank you, Your Honor.

15             MR. BALAREZO:  Thank you.

16

17      (Matter adjourned to Monday, January 28, 2019 at 9:30

18  a.m.)

19

20

21                      - ooOoo -

22

23

24

25

6241

1                          <u>I N D E X</u>

2

3    <u>WITNESS</u>                                        <u>PAGE</u>

4

5      **DAMASO LOPEZ NUNEZ**

6          CROSS-EXAMINATION BY MR. BALAREZO          6077

7          REDIRECT EXAMINATION BY MS. LISKAMM        6088

8          RECROSS-EXAMINATION BY MR. BALAREZO        6095

9          REDIRECT EXAMINATION BY MS. LISKAMM        6098

10         RECROSS-EXAMINATION BY MR. BALAREZO        6099

11     **JOHN PAUL OSBORN**                              6100

12         DIRECT EXAM BY MS. PARLOVECCHIO            6101

13         VOIR DIRE EXAMINATION BY MR. PURPURA       6107

14         DIR.EXAM (Cont'd) BY MS.PARLOVECCHIO       6114

15         CROSS-EXAMINATION BY MR. PURPURA           6131

16     **ISAIAS VALDEZ RIOS**                            6161

17         DIRECT EXAMINATION BY MR. NARDOZZI         6162

18

19

20

21

22

23

24

25

6242

## <u>E X H I B I T S</u>

Defense Exhibit 491                              6083

Government Exhibits 809-1-R2 and 809-2-R2       6115

Government Exhibit 512-1                        6121

Government Exhibit 96                           6164

Government Exhibit 3500IVR-2                    6165

Government Exhibit 811-2                        6180

Government Exhibit 821                          6217

Government Exhibit 822                          6230

Government Exhibit 823                          6232

*     *     *     *