1013

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - X
3

4  UNITED STATES OF AMERICA,    :    09-CR-466(BMC)

5          Plaintiff,           :
                                     United States Courthouse
6       -against-               :    Brooklyn, New York

7  JOAQUIN ARCHIVALDO GUZMAN
   LOERA,                       :
8                                    November 20, 2018
           Defendant.           :    9:30 o'clock a.m.
9

10  - - - - - - - - - - - - - - X

11
                     TRANSCRIPT OF TRIAL
12         BEFORE THE HONORABLE BRIAN M. COGAN
           UNITED STATES DISTRICT JUDGE, and a jury.
13

14  APPEARANCES:

15
    For the Government:       RICHARD P. DONOGHUE
16                            United States Attorney
                              Eastern District of New York
17                            BY: GINA M. PARLOVECCHIO
                                  ANDREA GOLDBARG
18                                MICHAEL P. ROBOTTI
                              Assistant United States Attorneys
19                            271 Cadman Plaza East
                              Brooklyn, New York  11201
20

21                            UNITED STATES ATTORNEY'S OFFICE
22                            Southern District of Florida
                              BY:  ADAM S. FELS
23                            Assistant United States Attorney
                              99 NE 4th Street
24                            Miami, Florida  33132

25

                 CMH     OCR     RMR     CRR     FCRR

1014

1    APPEARANCES:   (Continued)

2

3    For the Government:        DEPARTMENT OF JUSTICE
                                Criminal Division
4                               Narcotic and Dangerous Drug Section
                                145 N Street, N.E.
5                               Washington, D.C.  20530

6                               BY:  ANTHONY NARDOZZI, ESQ.
                                     AMANDA LISKAMM, ESQ.

7

8    For the Defendant:         BALAREZO LAW
                                400 Seventh Street, NW, Suite 306
9                               Washington, D.C.  20004

10                              BY: A. EDUARDO BALAREZO, ESQ.

11                              LAW OFFICES OF JEFFREY LICHTMAN
                                11 East 44th Street, Suite 501
12                              New York, New York  10017

13                              BY:  JEFFREY H. LICHTMAN, ESQ.
                                     PAUL R. TOWNSEND, ESQ.

14

15                              LAW OFFICE OF PURPURA and PURPURA
                                8 East Mulberry Street
16                              Baltimore, Maryland  21202

17                              BY:  WILLIAM B. PURPURA, ESQ.

18

19                              LAW OFFICES OF MICHAEL LAMBERT, ESQ.
                                369 Lexington Avenue, 2nd Floor
20                              New York, New York  10017

21                              BY:  ARIEL COLON MIRO, ESQ.

22   Court Reporter:            Charleane M. Heading
                                225 Cadman Plaza East
23                              Brooklyn, New York
                                (718) 613-2643

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

1015

1    (In open court; outside the presence of the jury.)

2    THE COURT:  Good morning.  Have a seat, please.

3    Okay.  We have some administrative issues to go

4    over.

5    First, I think the government forgot to give me

6    proposed redactions to the second portion of voir dire, the

7    one from Tuesday, November 13th.  That was supposed to be done

8    within five days.  We are more than five days.  Please do that

9    sometime tomorrow.

10   MS. PARLOVECCHIO:  Yes, Your Honor.  We can have it

11   filed by this evening.

12   THE COURT:  Second, does the defendant have any

13   objections to the government's proposed redactions of my order

14   on the government's second set of motions *in limine*, the one

15   dealing with cooperating witnesses and law enforcement

16   witnesses?

17   MR. LICHTMAN:  I think we supplied that to them and

18   it was incorporated in the letter.

19   MR. BALAREZO:  It should have been.

20   THE COURT:  Check that out and let me if there is

21   anything more I need to see.

22   THE COURT:  Third, the government used a numbering

23   system in those motions *in limine* to designate confidential

24   witnesses.  Has the defense been given any information to

25   match up who the numbers are with who the witnesses are?

1016

1    MR. LICHTMAN:  Eventually and finally, Judge.

2    THE COURT:  Okay.

3    MR. LICHTMAN:  I think there were some errors.  We

4  managed to get it together.

5    THE COURT:  So, for my ease of reference, I would

6  like the government to give a copy of that cross designation

7  to me.

8    MS. PARLOVECCHIO:  Yes, Your Honor.

9    THE COURT:  And then we have the government's sealed

10  motion *in limine* last night dealing with cross-examination.  I

11  have, of course, received the letter from some of the

12  reporters arguing that that ought to be publicly disclosed.

13    The way I am going to proceed on it is this.  I am

14  going to hear, because I have not heard from defense counsel.

15  I am going to hear from defense counsel and the government at

16  side bar now both on the merits of the motion and whether

17  either the government's motion or our discussion at side bar

18  should be sealed or unsealed.  I will make those

19  determinations then.  If I decide they should be unsealed, the

20  transcript will be available to everybody.  If I decide they

21  should be sealed, then they won't, but I will make public

22  findings as to why I think the motion and the discussion have

23  to be sealed.

24    So let me see the parties at side bar now and we

25  will see what we can do.

1017

1          (The following occurred at side bar.)

2          MR. BALAREZO:  Can we have one minute and I will

3    explain.  We were speaking with our client when we came out

4    about this particular issue.

5          THE COURT:  You need to confer with him more?

6          MR. BALAREZO:  We need to confer with him more.

7          THE COURT:  Please do this quickly.  We have the

8    jury waiting and we need to get this done.

9          (In open court; side bar ends.)

10          THE COURT:  All right.  We are going to recess to

11    give defense counsel a chance to talk to their client a little

12    more about the government's motion that came in late last

13    night.

14          (Recess taken).

15          (In open court; outside the presence of the jury.)

16          THE COURT:  Have you had an opportunity to talk to

17    Mr. Guzman?

18          MR. BALAREZO:  Yes.

19          THE COURT:  Let me see everybody at side bar.

20          (Continued on next page.)

21

22

23

24

25



























Sealed by Order of the Court                    1030









Side Bar                                                1035

1            (Side bar continues.)

2            THE COURT:  Is there anything else we need to cover?

3            MS. PARLOVECCHIO:  Your Honor, while we're up here,

4    yesterday during Mr. Purpura's cross-examination of the

5    witness, he made personal reference to prosecutors sitting at

6    the counsel table.

7            THE COURT:  You should not do that.  You should not

8    do that.

9            You didn't object.

10           MS. PARLOVECCHIO:  I know and I will going forward.

11           MR. PURPURA:  I'm sorry.  Here's what I believe is

12   going to happen on redirect examination.  Ms. Parlovecchio is

13   going to bring him through more recent notes when she was

14   present when he changes his story.  I think it's important to

15   show that when certain groups of prosecutors were questioning

16   him, he would respond in a certain way.

17           The second group -- the first time he comes in, he

18   tells chronologically what I believe is the truth.  That's in

19   2012.  He then is interviewed starting 2014 and 2015 by a

20   second group of prosecutors for the purpose of Alfredo Beltran

21   Leyva's trial and at that point, the information starts to

22   differ from the first time and then eventually when the new

23   target is Guzman.  Ms. Parlovecchio starts to go through her

24   trial preparation, it is completely skewed to Guzman unlike

25   the first proffers.

Side Bar                                    1036

1          THE COURT:  Okay.  Here is what we can do.  You
2   don't have to name the prosecutors.  You can simply say, to
3   the extent she rehabilitates him the way she suggested, you
4   can simply say:  You went in front of a second group of
5   prosecutors, didn't you?
6          MR. PURPURA:  Okay.
7          THE COURT:  Prosecutors or agents, whatever it may
8   be.  That much I will give.
9          MS. PARLOVECCHIO:  Judge, I just think, going back
10  to Judge Forrest's opinion --
11         THE COURT:  I know.
12         MS. PARLOVECCHIO:  -- you know, the way we take
13  notes is, a lot of times, we write down about material that
14  had not come in or the focus of questioning, it's our trial
15  prep.  It has nothing to do with the fact that the witness is
16  withholding information.
17         THE COURT:  I think that is true and I will put a
18  limit on it if it goes too far, but I do think if there is a
19  complete story given on one occasion and a slightly different
20  story given on another, it is a viable point for
21  cross-examination.
22         MR. PURPURA:  If I may, I've tried to avoid using
23  the reports as much as I can.  I've asked the government if
24  they would stipulate to the amount of proffer sessions which
25  should not be an issue to avoid having to go through -- the

CMH      OCR      RMR      CRR      FCRR

Side Bar                                          1037

1    only way I can do that to refresh his recollection is to have

2    him look at 74 different proffer agreements to agree to the

3    dates.

4              THE COURT:  Hopefully, they all don't have relevant

5    details to go over.

6              MR. PURPURA:  But I have a right to show how many

7    times he met with the government on the issue of credibility.

8              THE COURT:  We're going to give you dozens.

9              MR. PURPURA:  I want 74.  I want every single one.

10             THE COURT:  Dozens as opposed to 74.  What's the

11   difference?

12             MR. PURPURA:  Because I have never, in 40 years, had

13   any witness who had 74 proffers.  And I'm sure the Judge

14   hasn't seen anything like that.

15             MS. PARLOVECCHIO:  He's been with us for six years.

16             THE COURT:  What is the relevance?

17             MS. PARLOVECCHIO:  You can ask how many times did

18   you meet the government.

19             THE COURT:  He did.  He said many times.

20             MS. PARLOVECCHIO:  Right.  He can give a range.

21   More than ten, more than 20, these are normal questions.

22             MR. PURPURA:  I don't have to do more of anything.

23   I can do exactly what I'm saying and I will do it unless the

24   Court stops me.

25             THE COURT:  You have a good faith basis --

Side Bar                                                    1038

1          MR. PURPURA:  I do.

2          THE COURT:  -- for saying to him:  You met for

3     debriefing on 74 occasions, did you not?  He's not going to

4     remember.  He's going to say, I don't remember 74, it was

5     many.  But you have a good faith basis to ask him if he

6     remembers.

7          MR. PURPURA:  If he doesn't remember, the point is I

8     intend to show him each and every one of those debriefing

9     notes with dates on it.

10          THE COURT:  We're not going to do it.  I'm not going

11     to let you do that.  It would take too much time, but if he

12     doesn't remember, you can say:  You would agree with me it was

13     more than four-dozen times, wasn't it?

14          What's wrong with that Mr. Purpura.

15          MR. PURPURA:  All right.  If I step over the bounds,

16     the government can object and you can stop me.

17          THE COURT:  Okay.

18          MR. PURPURA:  But I've done this before.  I have a

19     pretty good idea what I'm doing.

20          THE COURT:  That's fine.

21          I am sealing this side bar up to the last point that

22     we just discussed.

23          MR. PURPURA:  Sure.

24          THE COURT:  That is, the number of proffer sessions.

25     That is publicly available.  The rest of it is sealed for the

1    reasons that I have stated on this record.  I am now going to

2    make some public findings to explain why I'm sealing it.

3            MR. PURPURA:  Judge, while you're doing that, can I

4    run to the restroom?

5            THE COURT:  Yes.  Please go ahead.  You don't mind

6    while you go to the restroom, if I make these public comments?

7            MR. PURPURA:  No, absolutely not.

8            (In open court; side bar ends.)

9            THE COURT:  Okay.  The government has filed a sealed

10   motion as I mentioned before to exclude a certain line of

11   cross-examination that the defendant wishes to pursue.

12           My ruling is essentially that the defendant can

13   pursue most but not all of that line of examination and we

14   have discussed that at side bar.  As to whether the side bar

15   and the government's motion should remain sealed, let me say

16   this.

17           I am going to release a redacted form of the

18   government's motion.  I am not saying that the press will be

19   ecstatic with it, but it will identify the overall subject

20   matter of the nature of the evidence that was discussed.  I

21   think the part of the evidence that is being excluded has to

22   remain under seal because it has miniscule probative value and

23   the government wants to seal it.  That miniscule value is

24   substantially outweighed by the prejudice to the parties and

25   the risk of confusing the issue and wasting time if we were to

1040

1  allow that information, which the jury will not hear, into the

2  public domain.

3           Sealing is necessary to override the interest of

4  protecting the particular individuals and entities who are not

5  parties to this case and would face some embarrassment and

6  harassment if the information were made public particularly in

7  light of the extraordinary amount of press coverage this case

8  has received and I really think that sealing the side bar and

9  the redacted form of the government's motion which I will

10  approve is the narrowest way I can go to exclude prejudicial

11  information, avoid prejudicing the jury or distracting the

12  jury while still allowing the defendant virtually, in my view,

13  a full exploration of the issue that has been identified.

14           So, the government's motion is granted in part and

15  denied in part.  Its motion to seal is granted based on the

16  findings that I have made.  To the extent it is a motion I

17  received from the press, that is denied.

18           All right.  Are we ready for the jury?

19           MR. PURPURA:  Ready.

20           THE COURT:  Let's have the jury, please.  First we

21  should get the witness in.

22           In the future, if either side wants to file a motion

23  *in limine* after business hours and there is opposition to it,

24  please come in at 9:15 so we can take a little less of the

25  jury's time while we are discussing it.

1041

1          Also, Mr. Lichtman, the second motions *in limine*

2    that I talked about before with proposed redactions and you

3    said you thought you had agreed on them, just take a look, my

4    order which is at 415 and the government's proposed redactions

5    are at 443.

6               MR. LICHTMAN:  443, Judge?

7               THE COURT:  Yes.

8               MR. LICHTMAN:  Thank you.

9               (Jury enters.)

10              THE COURT:  All right.  Everyone be seated.

11              Good morning, ladies and gentlemen.

12              THE JURY:  Good morning.

13              THE COURT:  Sorry about the delay in getting you

14   here.  As I said, sometimes there are things that come up

15   overnight that we have to deal with, but we are prepared to

16   continue with cross-examination.

17              Mr. Purpura.

18              MR. PURPURA:  Thank you, Your Honor.

19              (Continued on next page.)

20

21

22

23

24

25

1    JESUS ZAMBADA GARCIA  ,

2         the witness, having been previously duly sworn,

3         resumed as follows:

4    CROSS-EXAMINATION (Continued)

5    BY  MR. PURPURA:

6    Q    Mr. Zambada, I put on the screen Government Exhibit 6.

7    You can obviously identify that person, correct?

8    A    Yes, sir.

9    Q    And that's the person that we know by nickname as

10   El Azul, correct?

11   A    Yes, sir.

12   Q    And you had many conversations according to you with

13   El Azul, is that correct?

14   A    That's right, sir.

15   Q    And you know that El Azul was in prison starting in 1986.

16   Is that correct, sir?

17   A    Yes, yes, sir.  I knew that he was in prison.

18   Q    And he was in prison from 1986 through May of 1993.  Is

19   that correct, sir?

20   A    More or less.

21   Q    Now, you, yourself, were in prison in Mexico, is that

22   correct?

23   A    That's right, sir.

24   Q    In 2008, when you were arrested, you eventually went to

25   Altipano, A-L-T-I-P-A-N-O, which is a federal prison, is that

Zambada Garcia - cross - Purpura                    1043

1    correct?

2    A    That's right, sir.

3    Q    And you spent approximately three to four years in the

4    federal prison before you were extradited here to the United

5    States, is that correct?

6    A    That's right.

7    Q    And you know that Altipano is a high security facility,

8    is that correct?

9    A    Yes, sir.

10   Q    And they record conversations that inmates have when they

11   visit, for instance, their attorneys, is that correct?

12          MS. PARLOVECCHIO:  Objection.

13          THE COURT:  Hang on one second.

14          Foundation?  Does he know?  Ask him if he knows.

15          MR. PURPURA:  I did.  I said "if you know."

16          THE COURT:  You didn't say that.

17   Q    Do you know if conversations of inmates and attorneys are

18   recorded?

19   A    That's what I think.

20   Q    And that's because it's a high security facility, is that

21   correct?

22   A    That's right.

23   Q    And they're trying to attempt perhaps further wrongdoing

24   by inmates, correct?

25          MS. PARLOVECCHIO:  Objection.

Zambada Garcia - cross - Purpura                1044

1          THE COURT:  Sustained.

2   Q    To your knowledge, while you were in prison, were you

3   trafficking any drugs from Altiplano?

4   A    No, sir.

5   Q    And you know that El Azul, as you just testified to, I

6   believe, he was in Altiplano as well, correct?

7   A    That's right, sir.

8   Q    And that's the same high security facility you were in,

9   correct?

10          MS. PARLOVECCHIO:  Objection.

11          THE COURT:  Overruled.

12  A    That's right, sir.

13  Q    I'm going to -- just for the witness, please.

14          I'm going to show you this exhibit which is marked

15  Defense Photo 4.  Do you recognize that person?

16  A    I think so, but I don't remember the name.

17  Q    Is this a person you've seen often?

18  A    Right now, I do not recall.

19  Q    Okay.  Do you remember a nickname for that person?

20  A    I think I know him but right now, I do not recall who he

21  was.

22  Q    When, if you think you know, under what circumstance did

23  you see him?

24  A    I can't answer that because right now, I do not recall

25  who he was.

Zambada Garcia - cross - Purpura          1045

1     THE COURT:  Mr. Purpura, if you want to try to

2  refresh with the name, you can.

3     MR. PURPURA:  Thank you.

4  Q    So the bottom line would be, if I may get right to it,

5  that you think you may recognize that person but you don't

6  know today if you really do or don't?

7  A    I really do not recall the name.

8  Q    You don't know the name, but do you know that face?

9  A    It could be that I know him.  It could be that I don't.

10 Right now, I do not recall who he is.

11 Q    Did you ever see that person with your brother Mayo?

12 A    I can't answer that because I do not recall exactly who

13 he is.

14 Q    And is it fair to assume you don't recall if you ever saw

15 him with Amado Carrillo Fuentes?

16 A    Well, I think that he may be a Colombian but that's as

17 far as I go.

18     MR. PURPURA:  Your Honor, I'm taking down defense

19 Exhibit Photo 4.

20     THE COURT:  Okay.

21 Q    Now, yesterday I asked you specifically about when you

22 first testified about -- strike that -- when you first told

23 government in 2012 -- strike that as well -- when you first

24 told the government in 2014 about your visit to El Barbarino

25 ranch.  Do you remember some of those questions?

Zambada Garcia - cross - Purpura                    1046

1   A    Yes, sir.

2   Q    And then I asked you specifically -- strike that.

3        I used a document to refresh your recollection about

4   your first interview involving the visit to the Barbarino

5   ranch.  Do you remember that being read to you?

6            MS. PARLOVECCHIO:  Objection.

7            THE COURT:  Overruled.

8   A    Yes, sir.

9   Q    Do you remember telling government prosecutors,

10  government agents with your lawyer being present that

11  El Barbarino ranch is in the state of Nayarit, N-A-Y-A-R-I-T,

12  Mexico?

13  A    No, sir.

14  Q    You don't recall saying that?

15  A    No, sir.

16  Q    Well, let me show you, again, document Defense Exhibit --

17  and I apologize.

18            MS. PARLOVECCHIO:  Objection.

19            MR. PURPURA:  It's to refresh his recollection.

20            THE COURT:  I think it's okay to refresh

21  recollection although let me ask the witness.

22        Did you not say that to the government or do you not

23  remember whether you said that?

24            THE WITNESS:  No.  Barbarino's ranch is located in

25  Mexico State, but they also had other ranches in Nayarit as

1  well, but where Chapo was at after he escaped, that was in

2  Mexico City at Barbarino's ranch.  He first --

3            MR. PURPURA:  Judge, there's no question.

4            THE COURT:  There is my question and I think the

5  witness has sufficiently answered it, but I think also that

6  obviates the need to refresh.

7            MR. PURPURA:  Thank you.

8  Q    Now showing you Defense Exhibit Number 27 for

9  identification only and I'm going to ask the interpreter again

10 to please read --

11           MS. PARLOVECCHIO:  Objection, Your Honor.

12           THE COURT:  I think you didn't hear my last part.  I

13 said I think we have eliminated the need to refresh.  The

14 witness is not unclear as to what he said.

15           MR. PURPURA:  Okay.  Well, then let me ask him

16 specifically.

17 Q    Did you on March 6, 2014 tell prosecutors and agents of

18 the United States government that the Barbarino ranch is

19 located in the state of Nayarit, Mexico?

20 A    No.  No.  I first --

21           MR. PURPURA:  There's no question other than no.

22           THE COURT:  The answer "no" is sufficient.

23 Q    You were asked last Thursday about your plea agreement.

24 Do you remember those questions?

25 A    Yes.

Zambada Garcia - cross - Purpura                1048

1    Q    And showing you what has been entered into evidence as
2    Government Exhibit JRZG-2, does this look like a copy of the
3    plea agreement?
4    A    That's right.
5    Q    And if I can turn to the back page, this is your
6    signature?
7    A    Yes, sir.
8    Q    And it was signed on January 31, 2013, correct?
9    A    Yes.
10   Q    And these signatures here are of the two attorneys that
11   represented you, is that correct?
12   A    Correct.
13   Q    And on the same day, January 31, 2013, you appeared in
14   the United States District Court for the District of
15   Washington, DC, for the purpose of entering a plea, is that
16   correct?
17   A    I think so.
18   Q    Well, let me show you what has been marked for
19   identification as Defense 21 and ask you to take a look at
20   that and to see if this document refreshes your recollection
21   as to when you appeared in court in the United States District
22   Court for the District of Columbia.
23   A    The date is correct, yes.
24   Q    January 31, 2013, United States District Court, correct?
25   A    Correct.

1   Q     Thank you.

2           And you appeared before the Honorable

3   Kollar-Kotelly, correct?

4   A     Correct.

5   Q     United States District Court Judge, correct?

6   A     Correct.

7   Q     And at that time, you had two indictments pending against

8   you?

9   A     That's right.

10  Q     You had one from the District of Washington, Washington,

11  D.C., correct?

12  A     Correct.

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

J. Zambada Garcia - cross - Purpura          1050

1   BY MR. PURPURA (continuing):

2   Q    And you had one from the Eastern District of New York as

3   well, correct?

4   A    That's right.

5   Q    And the indictment, the charging document, from the

6   Eastern District of New York was transferred so you could

7   plead guilty on January 31 to both cases, D.C. and New York,

8   at the same time, correct?

9   A    Correct.

10  Q    And before you entered that guilty plea, you had spoken

11  with the Government at least eight to nine times, which I'll

12  get into greater detail in a few minutes; is that fair to say?

13  A    Maybe.

14  Q    When you entered that plea, you reviewed the plea

15  document with your attorney Mr. Valencia, correct?

16  A    Yes.

17  Q    And this document, this plea agreement, that's pretty

18  important to you, isn't it?

19  A    That's right.

20  Q    And if you look on Page 3, this paragraph seven, it says:

21  The sentences imposed on Count One of the Washington

22  indictment and on Count One of the Eastern District of New

23  York indictment may run consecutively.

24       You're familiar with the word "consecutive,"

25  correct?

LAM     OCR     RPR

J. Zambada Garcia - cross - Purpura          1051

1   A     That's right.

2   Q     That means they could run on top of each other, right?

3   A     That's right.

4   Q     And you knew that what you pled guilty to in the United

5   States District Court for the District of Columbia indictment

6   carries a mandatory minimum of ten years in prison up to life,

7   correct?

8   A     Correct.

9   Q     And even more importantly, that what you pled guilty to,

10  the indictment, from the Eastern District of New York carried

11  a mandatory life sentence, correct?

12              Paragraph 13, correct?

13  A     I think that's correct.

14  Q     That was important to you.  Wouldn't it be really

15  important?

16  A     Of course, yes.

17  Q     And it says right here the statute mandates that a

18  minimum sentence of life in prison be imposed for Count One of

19  the EDNY indictment, right?  Correct?

20  A     Correct.  I mean, that's what it says, right?

21              THE COURT:  Mr. Purpura, did you want to exhibit

22  this?  It's in evidence.

23              MR. PURPURA:  It's not being shown?

24              THE COURT:  Always check the screen up there.

25              MR. PURPURA:  I apologize.

J. Zambada Garcia - cross - Purpura          1052

1              (Exhibit published to the jury.)

2              MR. PURPURA:  I won't torture the jury and run

3    through it again.  Thank you, Judge.

4    Q    All right.  Bottom line is you know that you faced a life

5    sentence on the EDNY indictment alone, correct?

6    A    Correct.

7    Q    And your attorney told you that in the federal system,

8    that in the federal system of the United States, there is no

9    parole, correct?

10   A    I think so, yes.

11   Q    So, a life sentence means that you will spend the rest of

12   your life until you die in prison.

13              That's what you pled guilty to, right?

14   A    That's right.

15   Q    But -- there's always a "but," right?

16              MS. PARLOVECCHIO:  Objection.

17              THE COURT:  It's okay, you can answer.

18   Q    -- you have what's called a cooperation agreement,

19   correct?

20   A    Right.

21   Q    Paragraph 24 is your cooperation paragraph.  Your

22   attorney -- strike that.

23              You knew that if you cooperated, you could avoid

24   spending the rest of your life, day for day, in prison until

25   you die, right?

J. Zambada Garcia - cross - Purpura          1053

1  A    Right.

2  Q    You even knew that if you cooperated, even at mandatory

3  minimum sentence of ten years, you could get below that,

4  correct?

5  A    What I know is that my sentence is going to be decided by

6  the judge.

7  Q    And you know that the only way the judge, no matter who

8  the judge is, whether it's in D.C. or EDNY, the only way you

9  can get below life is if the Government, and the Government

10  alone, moves the judge for your cooperation, correct?

11  A    I know the process.

12  Q    And what it says right here is:  If in the sole and

13  unreviewable judgment of the offices the Defendant's

14  cooperation is of such quality and significance to the

15  investigation and prosecution of other criminal matters as to

16  warrant the Court's downward departure from the sentence

17  recommended or advised by the guidelines or the statutory

18  minimum, the United States will, at or before sentencing, make

19  a motion, pursuant to section 5K1.1 of the guidelines and/or

20  18 United States Code 3553(e) and/or by a Rule 35, reflecting

21  that the Defendant has provided substantial assistance and

22  recommending a sentence reduction.

23          Do you see that?

24  A    Yes.

25  Q    And it's your hope -- strike that.

J. Zambada Garcia - cross - Purpura          1054

1          You haven't been sentenced yet, have you?

2     A    No.

3     Q    And when you're going to be sentenced, you're going to go

4     back in front of Judge Kollar-Kotelly in Washington D.C.,

5     correct?

6     A    Right.

7     Q    And your absolute hope is that the Government will move

8     for reduction of your sentence; isn't that fair to say?

9     A    A letter of recommendation is going to be given to the

10    judge about my case.

11    Q    And without that, you would die in prison, correct?

12    A    The decision is going to be the judge's.

13    Q    Arrested in Mexico 2008 October, correct?

14    A    Correct.

15    Q    Did you consent to extradition?

16    A    That's right.

17    Q    When did you consent to extradition?

18    A    I think around 2011, more or less.  That's when I signed

19    my extradition agreement.

20    Q    You initially contested extradition; isn't that correct?

21    A    No, sir, I never did that.

22    Q    When you were in Mexico, did your United States attorney

23    visit you?

24    A    No, sir.

25    Q    Not until you reached the United States did you meet

LAM      OCR      RPR

J. Zambada Garcia - cross - Purpura                1055

1    Mr. Valencia?

2    A     That's how it was.

3    Q     Did you receive information in Mexico about your case,

4    such as your extradition package with affidavits?

5    A     That's right, sir.

6    Q     Did you discuss with anyone in the federal prison in

7    Mexico about your case?

8    A     Well, with my attorney.

9    Q     Did he share information with you about the case?

10   A     I don't understand your question.

11   Q     Did your attorney review with you some of the facts, the

12   allegations against you in Mexico?

13   A     In Mexico, yes.

14   Q     And you made a decision, based on everything you

15   discussed, that as soon as you came to the United States in

16   2012 you wanted to cooperate with Government counsel, right?

17   A     I decided that that was the path that I should take.

18   Q     And literally, within a week or two weeks of arriving in

19   the United States, you started meeting with Government

20   counsel; isn't that correct, sir?

21   A     That's right, sir.

22   Q     Do you recall signing what's called a "proffer

23   agreement" -- that's an agreement to give information to the

24   United States Government -- on April 16, 2012?

25   A     Perhaps it was on that date.

J. Zambada Garcia - cross - Purpura          1056

1    Q    Would you agree with me or would you like to have your

2    memory refreshed, if possible?

3    A    If that's how it is, that's how it is, sir.

4    Q    April 16, 2012, correct?

5    A    Correct.

6    Q    And when you came here, especially in 2012, the

7    information you wanted to give to the Government was fairly

8    fresh in your mind, right?

9    A    I've been in prison for four years.

10   Q    Correct.  You stopped selling drugs, your drug

11   trafficking, in 2008, and, finally, in April 2012, you begin

12   to talk to Government counsel and agents, right?

13             MS. PARLOVECCHIO:  Objection, form.

14             THE COURT:  Rephrase it, please.

15             MR. PURPURA:  All right.

16   Q    In April of 2012, you agreed in your mind that you want

17   to be truthful when you speak with Government counsel,

18   correct?

19   A    Correct.

20   Q    You want to give them as much information as you can to

21   help them and to help yourself, correct?

22   A    I agreed to cooperate.

23   Q    And this is the first opportunity you've had to sit down

24   and meet with Government counsel and Government agents to tell

25   them about your drug trafficking activity and those

J. Zambada Garcia - cross - Purpura          1057

1   surrounding you.

2   A    Correct.

3   Q    And I mentioned before a series of initial debriefings or

4   proffers you had from April 16, 2012 through June 13, 2012.

5         Does that sound about right, the initial proffers?

6   A    Yes.

7   Q    I'm going to show you just for identification Proffer 1,

8   defense.

9         MS. PARLOVECCHIO:  Objection.

10        THE COURT:  There's an objection?

11        MS. PARLOVECCHIO:  Yes.

12        THE COURT:  Overruled.

13  Q    Looking at Proffer 1, there's a series of dates.

14        Do those dates appear to accurately reflect the

15  meetings you had with Government counsel from April 16, 2012,

16  through June 13, 2012?

17  A    I think so, yes.

18        MR. PURPURA:  Thank you.

19        I move Proffer 1 into evidence at this time.

20        THE COURT:  What are you calling it?

21        MR. PURPURA:  P1, Proffer 1.

22        MS. PARLOVECCHIO:  Your Honor, I just object.  It's

23  hearsay.

24        THE COURT:  Let me see counsel at sidebar.

25        (Continued on the next page.)

```
                        Sidebar                         1058
```

1           (The following occurred at sidebar.)

2           THE COURT:  Why is it not hearsay?

3           MR. PURPURA:  He said he recognized those dates.

4           How about Demonstrative Proffer 1?

5           THE COURT:  Can't you just use it as a

6    demonstrative?

7           MR. PURPURA:  I don't see why I can't use it for

8    evidence as well to show the amount of times he has admitted.

9    Whether I created the document or not, he has adopted those

10   are the dates.

11          THE COURT:  Yes, and you can say, There are eight or

12   ten or however many dates that you proffered, correct?  And

13   he'll say, Yes.

14          What do you need the document for?

15          MR. PURPURA:  I think a visual is sometimes more

16   helpful.

17          THE COURT:  As a demonstrative, I agree with you; as

18   a source of evidence, I don't.

19          MR. PURPURA:  How am I going to identify, say

20   Demonstrative 1?

21          THE COURT:  It can be marked as Defense Exhibit like

22   any other, it's just not admitted into evidence.  So, whatever

23   number you're up to, mark it with that.

24          MR. PURPURA:  I'll keep it as Proffer 1, if that's

25   okay with you.

```
                        Sidebar                      1059
```

1          MS. PARLOVECCHIO:  How about Defense Exhibit 5,

2    which was the last --

3          THE COURT:  Unless you prenumbered --

4          MR. PURPURA:  I have, I have.

5          You want to know the problem, Judge?  There are 74

6    debriefings by this young man here, and I have no idea which

7    ones I'm going to use.  So, I've premarked every single

8    document the Government gave me and my list is now at 120.

9          THE COURT:  I can't tell you how to try your case,

10   but I can put some requirement that you try it efficiently.  I

11   don't know how you're going to do it.

12         You want to call this --

13         MS. PARLOVECCHIO:  Defense Exhibit 5?  Because

14   the --

15         MR. PURPURA:  Five is already taken.

16         MS. PARLOVECCHIO:  Just a suggestion.

17         THE COURT:  We don't do proffer exhibits.  I've

18   never heard of that.

19         Why don't you just start with whatever your last

20   number is of the defense pile of exhibits, make this the next

21   one.  Whatever you want to do, Mr. Purpura.

22         MR. PURPURA:  Not whatever I want to do, but --

23         THE COURT:  Whatever you want to do within the

24   Court's rules of evidence, right?

25         MR. PURPURA:  I think the Government's witness list

Sidebar                                                      1060

1    is broken down the same way I'm suggesting, as well as the

2    sections, and that's, you know, basically -- I have no problem

3    with any way you want to do it.

4

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Zambada Garcia - cross - Purpura          1061

1     (Sidebar ends; in open court.)

2   BY MR. PURPURA:

3   Q    Now showing you what has been changed from Proffer 1 to

4   Defense 75, we had meetings -- you had meetings with the

5   Government April 16, 2012; May 1, 2012; May 2, 2012; May 22,

6   2012; May 23, 2012; May 24, 2012; June 12, 2012; June 13,

7   2012, and you indicated that sounds about right to you,

8   correct?

9   A    That's right.

10            MR. PURPURA:  May I have the exhibit, your Honor?

11            THE COURT:  You may use it as a demonstrative.

12            You want to show it to the jury?

13            MR. PURPURA:  Yes.

14            THE COURT:  Okay.

15            MR. PURPURA:  Thank you.

16            THE COURT:  What are you marking it as?

17            MR. PURPURA:  What the Court wanted, Defense 75.

18            THE COURT:  Defense 75 for identification.

19            MR. PURPURA:  Thank you.

20            (Exhibit published to the jury.)

21   Q    Now, again, when you first came here, when you met with

22   the Government, you had your attorney present, correct?

23   A    That's right.

24   Q    And when you first came here, you knew about the

25   activities of Mayo Zambada Garcia, your brother, correct?

J. Zambada Garcia - cross - Purpura          1062

1   A    Correct.

2   Q    And you knew about the activities of Carillo Fuentes,

3   El Azul, Nacho Coronel, correct?

4   A    That's right.

5   Q    And, of course, you knew about the activities of Arturo

6   Beltran Leyva, Hector, and Alfredo, the three brothers,

7   correct?

8   A    I knew they were all drug traffickers; but directly about

9   their activities, no.

10  Q    But if the Government asked you about them, you gave them

11  as much information as you could.  You wanted to be truthful.

12  A    Excuse me, I made a mistake here with my answer.  I

13  thought you were referring to my beginnings as a drug

14  trafficker.

15          On those dates, I did know about a lot of the

16  activities of those people.

17  Q    You did know about the activities of those people,

18  correct?

19  A    Correct.

20  Q    And you knew -- according to you, you knew Joaquin Guzman

21  Loera, Chapo, mia compa, right?

22  A    Yes, of course.

23  Q    And you were not trying to protect anybody when you spoke

24  to Government counsel in those six meetings or seven meetings

25  or eight meetings, were you?

J. Zambada Garcia - cross - Purpura          1063

1   A    Of course not.

2   Q    And then after these initial meetings, there was a second

3   series of meetings with Government counsel, now in Washington

4   D.C.; do you remember those?

5   A    Yes, I remember that it was a series of meetings.

6   Q    And I'm now going to show, just for your own eyes,

7   Defense Demonstrative 76.

8         Now, there were a lot of meetings between July 15,

9   2013, and February 4, 2016, correct?

10  A    That's correct.

11  Q    And just looking at this document, and I know it's four,

12  five years ago, but does this appear to accurately depict the

13  amount of times you met with Government counsel in these

14  proffer meetings?

15  A    I think so.

16        MR. PURPURA:  I would now, for demonstrative

17  purposes, ask that Defense Exhibit 76 be shown to the jury as

18  well, your Honor.

19        THE COURT:  Okay.

20        (Exhibit published to the jury.)

21  Q    So, you had meetings with Government counsel.  I'm not

22  going to read them all, but it looks like 1, 2, 3, 4, 5, 6, 7,

23  8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23,

24  24, 25, 26, 27, 28, 29, 30, approximately 30 times between

25  July 15, 2013, and February 4, 2016, correct?

J. Zambada Garcia - cross - Purpura          1064

1   A    Correct.

2   Q    And a lot of those meetings during that time period dealt

3   with a particular person, correct?

4        This person, Alfredo Beltran Leyva.

5        You were preparing to testify in his trial, correct?

6   A    Correct.

7   Q    You didn't have to testify, correct?

8   A    Correct.

9   Q    And then, after that, you were taken back here to the

10  Eastern District of New York, correct?

11  A    Correct.

12  Q    And you began another series of proffers with Eastern

13  District of New York prosecutors, correct?

14  A    Correct.

15       MR. PURPURA:  Just for the witness.

16  Q    I'm showing you Defense Demonstrative 77.

17       And these proffers went from May 12, 2017, through

18  September 25, 2018; does that sound about right?

19  A    That's right.

20  Q    And does this Defense Exhibit 77 appear to accurately

21  depict the number of times you had proffer meetings with the

22  Government?

23  A    That's right.

24  Q    Thank you.

25       MR. PURPURA:  I would just ask that the jury be

J. Zambada Garcia - cross - Purpura          1065

1    shown for demonstrative purposes Defense Exhibit 77.

2          THE COURT:  It's not part of the evidentiary record,

3    but the jury may see it in order to facilitate your

4    cross-examination.

5          MR. PURPURA:  Thank you.

6          (Exhibit published to the jury.)

7    Q    It looks like you met with them 1, 2, 3, 4, 5, 6, 7, 8,

8    9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 times.

9          Does that sound about right to you?

10   A    Yes, sir.

11   Q    And in particular with these meetings, you were focused

12   in on one particular defendant, right?

13   A    Correct.

14   Q    And after September 25, 2018 -- it's November something

15   today -- have you met with Government counsel since then to

16   prepare for your testimony?

17   A    That's right.

18   Q    How many times since September 25, 2018, have you met

19   with Government counsel in preparation for your testimony in

20   this trial?

21   A    There were several times.

22   Q    "Several" means a lot of things to a lot of people.

23         More than five?

24   A    Yes, sir.

25   Q    In addition to these, to the five, was it more than ten?

J. Zambada Garcia - cross - Purpura          1066

1   A    Might have been 30.  I don't know.

2   Q    Well, then, it's fair to say that when you took that

3   witness stand right where you're sitting now and

4   Ms. Parlovecchio was asking you questions from her black book

5   right here that you heard those questions before, didn't you?

6   A    No.

7         I have talked about the different topics with the

8   prosecutors many times.

9   Q    And you never heard those questions that Ms. Parlovecchio

10  was asking you?

11        She did not go through question-by-question-

12  by-question the exact questions she asked you?

13  A    We spoke about the topic many times.

14  Q    When you were shown Government Exhibit 508-1 in

15  evidence --

16        (Exhibit published to the jury.)

17  Q    -- you answered a lot of questions about that exhibit,

18  right?

19        MS. PARLOVECCHIO:  Objection, your Honor.  It was a

20  demonstrative, your Honor.

21        MR. PURPURA:  Demonstrative.  Strike that.

22        THE COURT:  Rephrase the question, please.

23        MR. PURPURA:  Strike that.

24  Q    When you were shown demonstrative 508-1 --

25        MR. PURPURA:  I'd ask the jury to see it.

J. Zambada Garcia - cross - Purpura          1067

1              (Exhibit published to the jury.)

2    Q    -- you answered questions about that when

3    Ms. Parlovecchio asked you about it, right?

4    A    That was the structure of the Sinaloa cartel that I had

5    described.

6    Q    Right.  And that's not the first time, when you took that

7    witness stand, when you looked at that exhibit.

8              That was reviewed with you many times before,

9    correct?

10   A    We spoke about the topic many times.

11   Q    Showing demonstrative, I assume, 508-3, a Government

12   exhibit.

13             MR. PURPURA:  Can it be shown?

14             THE COURT:  Yes.

15             (Exhibit published to the jury.)

16             MR. PURPURA:  That one is in evidence.  I apologize.

17   Q    When you took the witness stand, that's not the first

18   time you saw that exhibit, is it?

19   A    That's right.

20   Q    It was shown to you many times and reviewed many times

21   before you testified, right?

22   A    We spoke about the topic many times.

23   Q    Have you ever testified before this trial?

24   A    No, sir.

25   Q    So, before you testified in this case, you met with

J. Zambada Garcia - cross - Purpura          1068

1    multiple Government Assistant United States Attorneys many,

2    many times, right?

3              MS. PARLOVECCHIO:  Objection.

4              THE COURT:  I think it's asked and answered.

5              MR. PURPURA:  Fair enough.

6    Q    Were you surprised by any of the questions

7    Ms. Parlovecchio asked you from her black book?

8    A    I don't understand.

9    Q    Was there anything she asked you that you had to review

10   multiple times?

11   A    We spoke about different topics many times.

12

13              (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Zambada - cross - Purpura                    1069

1    BY MR. PURPURA:   (Continuing.)

2    Q    You were born in Culiacan; correct?

3    A    That's right.

4    Q    You were born on a farm called El Alamo; correct?

5    A    That's where I grew up.

6    Q    Your father was a commercial vendor?

7    A    That's right.

8    Q    And your mother was an elementary school teacher.

9    A    That's right.

10   Q    You had a comfortable childhood?

11   A    I was actually an orphan.  When I was a year old, I lost

12   my father.

13   Q    You were taken care of in the house; correct?  You had

14   money?  You had a mother that worked?

15           MS. PARLOVECCHIO:  Objection.

16           THE COURT:  Sustained as to form.

17           MR. PURPURA:  Multiple questions, sorry.

18           THE COURT:  Okay.

19   BY MR. PURPURA:

20   Q    Your mother had an income; correct?

21   A    She worked so that she could feed me.

22   Q    You know that Joaquin Guzman grew up literally dirt poor;

23   correct?

24           MS. PARLOVECCHIO:  Objection.

25   Q    Do you know?

1          THE COURT:  Sustained.  Relevance.

2          MR. PURPURA:  Fair enough.

3   BY MR. PURPURA:

4   Q    You indicated when you spoke to Government counsel that

5   you realized that your brother was involved in drug

6   trafficking at an early age -- you realize that; correct?

7   A    Correct.

8   Q    And you know that your brother who is 15 years older than

9   you, he helped support the family; correct?

10  A    That's right, but he's not 15 years older than I am.

11  Q    How much older is he?  I apologize.

12  A    Twelve.

13  Q    Twelve years.  And he was making money obviously in drug

14  trafficking, yes?

15  A    Yes.

16  Q    You were able to go to college; correct?

17  A    That's right.

18  Q    But you indicated, I believe, that some of Mayo's

19  activities started showing up in the newspapers; correct?

20  A    That's right.

21  Q    And that affected what you believed was your employment

22  opportunities; correct?

23  A    That's right.

24  Q    To take a step back, when you were in grade school you

25  came to the United States; correct?

Zambada - cross - Purpura                    1071

1   A    High school.

2   Q    About age 14; is that correct?

3   A    That's right.

4   Q    And you went to school in Las Vegas; correct?

5   A    For six months.

6   Q    Did you speak in English?

7   A    Very little.

8   Q    You have learned some English since then, haven't you?

9   A    The basics, you could say.

10  Q    We could actually converse back and forth in English;

11  correct?

12  A    It wouldn't be the right way because I really do not know

13  the language fully.

14  Q    Do you remember -- I think you even corrected the

15  interpreters during your testimony.  Do you remember that?

16  A    I understand some of the language, but I cannot have a

17  conversation, a deep conversation, because I do not know it

18  fully.

19  Q    While in Las Vegas, you had a brother-in-law, an Antonio

20  Cruz Vazquez that got in trouble; correct?

21  A    Correct.

22  Q    And he was arrested because he was a large scale heroin

23  trafficker; correct?

24  A    Correct.

25  Q    Were you driving a Porsche in Las Vegas yourself?

Zambada - cross - Purpura                    1072

1    A    Yes, he had gifted it to me.

2    Q    Nice gift; right?

3    A    Luck.

4    Q    Then you came back here and got your college education

5    and you kind of blamed your brother because people looked at

6    you different; is that right?

7    A    I wasn't going to blame him.  That was the reality of

8    life.

9    Q    And because of that you went to help your brother?

10   A    And for my own safety.

11   Q    I'm going to take you to January 31, 2013 when you were

12   in Washington, D.C. before the Honorable Judge Kollar-Kotelly.

13   Do you remember being under oath at that time?

14   A    Yes.

15   Q    You had to raise your right hand and you were sworn in

16   with an interpreter; right?

17   A    That's right.

18   Q    And you recall that Judge Kollar-Kotelly asked you many,

19   many questions; correct?

20   A    Yes.

21   Q    And one of the questions she asked you, page 26:  "You

22   are considered one of the leaders, managers, that involve more

23   than five people and you acted with members of a drug

24   trafficking organization in Mexico?"

25            Do you recall a question like that?

Zambada - cross - Purpura                    1073

1    A     Yes.

2    Q     And your response was, "That's correct, Your Honor, and

3    as the prosecutor clarified, I would like to clarify that

4    actually my brother was the one who was the very head of the

5    organization and I participated in different ways in different

6    aspects of the organization in both Sinaloa and Mexico City";

7    correct?

8               MS. PARLOVECCHIO:  Objection, form.

9    Q     That's how you responded.

10              MR. PURPURA:  What's --

11              THE COURT:  Let's have a sidebar.

12              (Sidebar held outside of the hearing of the jury.)

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      1074
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          THE COURT:  Are you impeaching him with this?

4          MR. PURPURA:  I am.

5          THE COURT:  What has he said that this is

6    impeaching?

7          MR. PURPURA:  He's mitigating what he is.  We've

8    heard what he companies.  We know that from without to 2008 he

9    is a multi kilo ton kilo distributor.  He worked in Mexico

10   City.  We know exactly what he does and he minimizes

11   everything.

12         THE COURT:  I thought you were trying to get it in

13   because he said it's the very head.

14         MR. PURPURA:  That, too.

15         THE COURT:  That is not inconsistent with anything

16   in his examination.

17         MR. PURPURA:  Isn't that a matter of interpretation

18   by the jury.

19         THE COURT:  If you set it up the right way, I will

20   give you that.  You have got to get his testimony back to

21   where he said there were several lead heads and isn't it a

22   fact that you said that he's the head, he's the very head.

23         MR. PURPURA:  I can do that.

24         THE COURT:  But as to the other stuff I am not

25   hearing the inconsistency with what he said.

```
                        Sidebar                        1075
```

1    MR. PURPURA:  It starts here and comes out in little

2    greater detail as I go further but what he does what I'm

3    trying to show maybe not successfully that he minimizes he

4    said and I participated in different ways, in different

5    aspects of the organization both Sinaloa and Mexico City.  So

6    the point being he does much more than that.

7    THE COURT:  First of all, I get this sometimes from

8    defense lawyers and I find it a little peculiar.  You

9    understand that at the plea hearing he's supposed to say and

10   if you were his lawyer you would have counseled as little and

11   general as necessary to allocute to the crime.

12   MR. PURPURA:  No, no.

13   THE COURT:  You should.

14   MR. PURPURA:  Especially when they're cooperating

15   when they're cooperating I want them to come forward as much

16   as they can.

17   THE COURT:  That is not the allocution.  If it were

18   the allocution you would be there for as many meetings as he

19   had proffer sessions.

20   MR. PURPURA:  I'm setting it up because the next

21   questions he's asked when he talks about his involvement he

22   says P since my brother was the leader was the organization it

23   led me to participate but as I mentioned my role consisted

24   principally with working in Mexico City.

25   THE COURT:  It's a plea.  I don't see the

Sidebar                                                    1076

1  inconsistency.  If you want to show that he previously said

2  there are several heads of Sinaloa.  But here he said he was

3  the head you can do that.  But there's no inconsistencies.

4  It's not for the jury because it's not arguable.  It's not

5  inconsistent.  It's a more general statement but it's not

6  inconsistent.

7           MS. PARLOVECCHIO:  Also, Your Honor, just due to the

8  interpretation issue some of the questions are very, very

9  lengthy and that's why I've objected on a few questions.  Just

10  if you can break it up a little bit.  It's hard on the

11  interpreters.

12           THE COURT:  Mr. Purpura knows.

13           MR. PURPURA:  Thank you.  Is there a cutoff time I

14  know there's a midmorning break time.

15           THE COURT:  I think we started at 10:15 so I'm

16  prepared to go to 12:15 and then take lunch.

17           MR. PURPURA:  Then I will push.

18           (Sidebar ends.)

19           (Continued on next page.)

20

21

22

23

24

25

1   (Continuing.)

2   BY MR. PURPURA:

3   Q    Again, using the chart here, you indicated that there

4   were multiple leaders of the Sinaloa Cartel; correct?

5   A    Correct.

6   Q    And what you said under oath when questioned by the Court

7   was that your brother Mayo was the one who was the very head;

8   correct?

9   A    That's correct.

10  Q    One second.  You know what a sicario is; right?

11  A    Yes.

12  Q    You knew what a sicario was when you entered a guilty

13  plea before Her Honor, Judge Kollar-Kotelly in Washington,

14  D.C.; correct?

15  A    Correct.

16  Q    When you were questioned here by Ms. Parlovecchio under

17  oath she asked you, Did you ever participate in any murder

18  conspiracies.  Do you remember that question?

19  A    Perhaps, yes.

20  Q    And your answer was, Yes?

21  A    Correct.

22  Q    Because you were involved in murder conspiracies;

23  correct?

24  A    Correct.

25  Q    And as you told the jury just the other day under oath

Zambada - cross - Purpura                    1078

1    that your duties were sometimes to locate the people, the

2    targets, and pass the messages to the sicarios so that they

3    could complete their order.  And based on Ms. Parlovecchio's

4    questions you admitted at least three times being involved in

5    murder conspiracies; correct?

6    A    Correct.

7    Q    So now I'm going to take you back to when you were before

8    Judge Kollar-Kotelly at your plea, page 42, counsel and the

9    judge asked you in particular:  "And were you aware that

10   members of the Federation also employed sicarios, or hit men,

11   who carried out various acts of violence?  And your response

12   was:  "Well, I wasn't aware of that directly, Your Honor, but

13   I know that type of group does employ that sort of people."

14             When you said that, you knew you were involved

15   before that in at least three murder conspiracies that you

16   testified to; correct?

17   A    Correct.

18   Q    And when you told the judge under oath that you were not

19   aware directly about sicarios, that was a lie?

20   A    It was that at that time I didn't understand correctly

21   the question that was being asked of me.

22   Q    I don't want to waste time, but what is it you don't

23   understand about were you aware that members of the federation

24   employed sicarios or hit men?

25   A    Well, I didn't understand the question correctly.  In the

SN        OCR        RPR

Zambada - cross - Purpura                    1079

1  aspect I thought that they were asking me if I was a sicario.

2  At that moment, I didn't understand correctly well the

3  question.

4  Q    You had your attorney present, actually two attorneys

5  present; right?

6  A    Correct.

7  Q    It was being told to you through an interpreter; correct?

8  A    Correct.

9  Q    And your response was, I wasn't aware of that directly:

10 You were aware; right?

11 A    But I will repeat to you again, it was a confusing

12 question for me.

13 Q    Okay.  Now you went to college to become an accountant;

14 correct?

15 A    Right.

16 Q    And what you first did to help your brother Mayo was you

17 went through all of his books because someone was stealing

18 from his organization; right?

19 A    I set up an accounting system for him for client

20 collection.

21 Q    Okay.  And in kick you were looking to see who was

22 stealing money from Mayo; right?

23 A    Through the system you detect those problems, those

24 failures.

25 Q    And after one year you determined that Andreas

Zambada - cross - Purpura                    1080

1   Peraza-Audo who was a manager of narcotics for Mayo in the

2   United States was stealing millions of dollars?

3   A    That's right.

4   Q    And that's what you told Government counsel and agents at

5   one of your many, many proffer sessions; correct?

6   A    Correct.

7   Q    And as a result of this person stealing millions of

8   dollars of Mayo's money, he was fired -- according to you,

9   fired?

10  A    Correct.

11  Q    No severance pay, just fired?

12  A    Correct.

13  Q    Yelled at?

14       MS. PARLOVECCHIO:  Objection.

15       THE COURT:  Sustained.

16  BY MR. PURPURA:

17  Q    You also discovered there were other people stealing too,

18  didn't you?

19  A    I was detecting just the payment failures.

20  Q    You also detected that other people were stealing, didn't

21  you?

22       MS. PARLOVECCHIO:  Objection.

23       THE COURT:  Overruled.

24  A    Well, I particularly remember Andreas Peraza.

25       MR. PURPURA:  Just one second, Your Honor.

Zambada - cross - Purpura                    1081

1              That's Government 51 Bates stamped 587.  I

2      apologize.

3              THE COURT:  That is okay.

4              MR. PURPURA:  Just for identification, please,

5      Exhibit 36.  I'm going to ask the interpreter to please read

6      paragraph 13.

7              THE COURT:  Counsel, there's only a piece of it.

8      There may be more.  The interpreter does not know.  The bottom

9      of the page is cut off.

10              MR. PURPURA:  I can see it.

11              THE COURT:  We can see it but --

12              MR. PURPURA:  And now we go to the next page.

13              THE INTERPRETER:  Thank you, Counsel.

14              MR. PURPURA:  And read right through paragraph 14.

15              THE INTERPRETER:  The interpreter cannot see the

16      top.

17              THE COURT:  Pull it down.  Okay, let's have a

18      question.

19      BY MR. PURPURA:

20      Q    Thank you.  Does that help refresh your recollection that

21      other people were stealing from the organization?

22      A    Yes, there were payment failures.

23      Q    Thank you.  And the other people, one was a Marcario

24      Robles, and excuse me for crushing the names, a Hector

25      Rodriguera, Oscar Rodriguera, Jose Luis Barrago?

Zambada - cross - Purpura                    1082

1    A    Yes.

2    Q    Santiago Chaides.  Do you remember those as well, five

3    people?

4    A    Yes, I do remember.

5    Q    And you told Mayo about those people; right?

6    A    Of course.

7    Q    And those people were just told to pay the money back;

8    right?

9    A    For them to be up-to-date.

10   Q    Now, you were interviewed back in 2012, again when you

11   first came into this country.  And at that time you were asked

12   specifically when the information is fresh in your mind who

13   gets killed.  And when they said who gets killed that means

14   who gets killed by Mayo in the organization, right?

15   A    Correct.

16   Q    And you said a commander who works with an enemy group,

17   right?  Do you remember saying that?

18   A    Perhaps.

19   Q    Well, let's -- let me see if I can refresh your

20   recollection, Exhibit 19, Bates stamp 26 for the Government.

21   Showing you defense Exhibit 19 for identification only.  Can

22   you read that?

23             THE COURT:  You mean in English?

24             MR. PURPURA:  It's in English.

25             THE COURT:  It's not career if the --

Zambada - cross - Purpura                    1083

1              MR. PURPURA:  I will ask the interpreter to please

2      translate it.

3              THE INTERPRETER:  From where to where, counsel?

4              THE COURT:  Before you do that I think I messed it

5      up.  The question is, are you able to read it in English and

6      understand it?

7              THE WITNESS:  Not correctly.

8              THE COURT:  Okay.  Now you may translate it.

9              THE INTERPRETER:  Counsel, for the interpreter, from

10     where to where?

11             MR. PURPURA:  From "Who gets killed."

12             THE INTERPRETER:  That paragraph?

13             MR. PURPURA:  Yes.

14     BY MR. PURPURA:

15     Q    Are you finished?  Now, let me ask you -- you

16     indicated -- I asked you who gets killed and you said a

17     commander who works with an enemy group.  Do you remember

18     saying that?

19     A    That's right.

20     Q    The next is someone who wants to quit or get out, they

21     get killed?

22             MS. PARLOVECCHIO:  Objection.

23             THE COURT:  Sustained, sustained.

24     BY MR. PURPURA:

25     Q    Do you recall saying that someone who wants to get out or

Zambada - cross - Purpura                    1084

1    quit?

2            MS. PARLOVECCHIO:  Objection.

3            THE COURT:  Sustained.  Let's have a sidebar

4            (Sidebar held outside of the hearing of the jury.)

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                          1085

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  The problem is you are using this like

4     it is his statement and it is not his statement.  It is the

5     agent's understanding of what the agent was hearing.  So you

6     are perfectly allowed to ask him, isn't it a fact that when

7     people steal, they get killed.  If he says no, there is

8     nothing you can do with that because it is not his statement.

9          MR. PURPURA:  I can do more than that, respectfully.

10    What I can do, first of all, is say do you recall saying to

11    the agent on this date that a person who gets killed is a

12    person who steals and if he says no, I can refresh his

13    recollection which I am now doing and if he says that does not

14    refresh my recollection --

15         MS. PARLOVECCHIO:  Your Honor --

16         MR. PURPURA:  Excuse me.

17         -- then I can ask him specifically didn't you say on

18    such-and-such a date, this is the person --

19         THE COURT:  You are describing the procedure for an

20    inconsistent statement of a witness.  This is not an

21    inconsistent statement of a witness; it is an agent statement.

22         MS. PARLOVECCHIO:  He hasn't established that the

23    witness didn't remember saying that and then refreshed his

24    recollection.  He's backing into it.

25         THE COURT:  If that is the Government's objection, I

SN        OCR        RPR

```
                    Sidebar                      1086
```

1   will let you do it that way.  More than that, I am not seeing

2   the relevance here.  What's the relevance?

3              MR. PURPURA:  He is not credible, one.

4              THE COURT:  How does this show that?

5              MR. PURPURA:  You know who gets killed, people who

6   steal.

7              THE COURT:  Not everybody who steals.

8              MR. PURPURA:  Let's think practically, Your Honor.

9   If someone steals multiple million of dollars from this

10  cartel, Mayo's cartel, and he's ousted, do you think Mayo

11  fires him like he testified --

12             THE COURT:  I would be surprised.

13             MR. PURPURA:  -- or does he kill him?

14             THE COURT:  I would be surprised if he is just

15  fired.

16             MR. PURPURA:  Then he's not credible because that's

17  what he told the Government and the agents; that Mayo fires

18  these people.

19             THE COURT:  He told the Government agents who gets

20  killed -- you are impeaching his statement to the agent that

21  he just told them --

22             MR. PURPURA:  Who gets killed.

23             THE COURT:  -- that they should have been killed

24  effectively?

25             MR. PURPURA:  Right.

Sidebar                                                    1087

1          THE COURT:  Okay.  That's two statements that are

2    not this witness' statement.  You have to get him to say one

3    on the stand before you attack him for the another.

4          MR. PURPURA:  The first one he completely adopted

5    because that's what he did.  We have it in that that's what

6    happens to people.

7          THE COURT:  I do not think this is impeaching him.

8          We're going to let you ask, Didn't you also tell the

9    agent that people who steal get killed.  Go ahead if that is

10   what you want to do.

11

12          (Sidebar ends.)

13

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1088

1     (In open court.)

2     THE COURT:  Okay.  Ladies and gentlemen, we are

3 going to take a 15 minute break.  Please come back at 12:10.

4 Remember to not discuss the case amongst yourselves or with

5 anyone else.

6     (Jury exits.)

7     THE COURT:  We're taking the break only because the

8 jurors indicated they needed a convenience break.  Okay?  So

9 be back at 12:10.

10     (Recess taken.)

11     (In open court; outside the presence of the jury.)

12     THE COURT:  Be seated, please.

13     Sorry for the change in plans.  The jurors went back

14 to find out their lunch had arrived and they are not going to

15 wait.  So we are going to break for lunch and reconvene at

16 12:50, but I understand there was something that the parties

17 wanted to discuss with me?

18     MR. BALAREZO:  Just one second.

19     THE COURT:  Okay.

20     (Pause.)

21     MR. BALAREZO:  It's something.  It's a minor thing

22 that we can deal with at the end of the day.  It doesn't have

23 to be done now unless you want to.

24     THE COURT:  I'm at your pleasure.

25     MS. PARLOVECCHIO:  It's okay.

1089

1          THE COURT:  You want to do it later?

2          MS. PARLOVECCHIO:  We can address it at the break.

3          MR. BALAREZO:  I think it's separate things.

4          THE COURT:  If there is anything anyone would like

5    to do now, I am here.  If not, I am happen to do it later.

6          MR. BALAREZO:  How about go to lunch, Judge?

7          MS. PARLOVECCHIO:  Lunch is fine.

8          THE COURT:  See you at 12:50.

9          (Luncheon recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Side Bar                                    1090

1            AFTERNOON SESSION

2            (In open court; outside the presence of the jury.)

3            THE COURT:  Everyone be seated.  The witness is on

4     the stand.

5            Let me see counsel at side bar for 30 seconds.

6            (The following occurred at side bar.)

7            THE COURT:  Mr. Purpura, I was mistaken.  You can

8     ask the witness from the notes:  Isn't it true that on X date

9     you told the government, whatever the note said.  What you

10    can't do and you did on only one occasion is wave the notes in

11    a way that suggests that it's a statement of the witness which

12    it's not.

13           MR. PURPURA:  Right.  Absolutely.

14           THE COURT:  Are we clear?

15           MR. PURPURA:  We are clear.  It's clear now I set up

16    a prior inconsistent statement because he's adopted the

17    statement he made before about he found out who stole and

18    those people were fired or paid money back.

19           THE COURT:  Let's try it and see how it goes.

20           MR. PURPURA:  I got it.  I really honestly know how

21    to do this.

22           THE COURT:  I have no doubt about it whatsoever.

23    You are a fine lawyer.

24           MR. PURPURA:  I want to order that.

25           (In open court; side bar ends.)

Side Bar                                    1091

1        THE COURT:  The first thing I want to note is I have

2   heard during various times in the witness' testimony some

3   reaction from the audience.  I do not want to hear reaction

4   from the audience.  All right.  It's a courtroom.  If we

5   continue to hear reaction, we will have to take measures to

6   stop it.

7        Is there anything that the parties need to tell me

8   before we bring in the jury?

9        MR. PURPURA:  That was it, Your Honor.  Thank you.

10       MS. PARLOVECCHIO:  No, Your Honor.

11       THE COURT:  Okay.

12       MR. PURPURA:  Judge, can we approach the bench just

13  for a minute?  I apologize.

14       THE COURT:  Okay.

15       (The following occurred at side bar.)

16       MR. PURPURA:  The Zambada file is sealed so we can't

17  find out certain things in his file.  What I wanted to learn

18  is there was a forfeiture order of $3 million and government's

19  counsel has told me that it's been paid and I want to know is

20  it paid by a promissory note, I want to know is it paid by

21  property, I want to know, in essence, was it really paid.

22       MS. PARLOVECCHIO:  I believe it was paid in the

23  standard way forfeiture is paid which is by a check.  I don't

24  have a copy of the check.

25       THE COURT:  Why do you care if he asks him how it

```
                      Side Bar                        1092
```

1    was paid?

2             MS. PARLOVECCHIO:  I don't care.

3             MR. PURPURA:  But I'd like to know.

4             THE COURT:  Well, but if she doesn't know --

5             MR. PURPURA:  Okay.  As long as -- I'm good.  Thank

6    you.

7             MS. PARLOVECCHIO:  I don't think there is anything

8    else.

9             THE COURT:  She says probably by check but she

10   doesn't know.

11            (In open court; side bar ends.)

12            (Jury enters.

13            THE COURT:  All right.  Be seated, please.

14            Mr. Purpura, you may continue.

15            MR. PURPURA:  Thank you.

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION (Continued)

2   BY MR. PURPURA:

3   Q    Mr. Zambada, we left off before lunch when you told us

4   that you were aware of certain people that stole from the

5   organization and that one person who stole millions of dollars

6   was fired and others were ordered to pay money back.  Do you

7   remember that?

8   A    Correct.

9   Q    And then I asked you if you recall on June 13, 2012, when

10  you were interviewed by government counsel as well as agents

11  whether you indicated or whether they asked you who got

12  killed, that you said that people who steal get killed.

13          Do you recall that?

14  A    That's right.

15  Q    But then someone who steals millions of dollars,

16  according to you, from narcotics flowing into the United

17  States just got fired instead of murdered, correct?

18  A    Correct.  He was a special person.

19  Q    Now, in particular -- just one second.

20          (Pause.)

21  Q    I'm displaying Defense Exhibit Demonstrative 75.  This

22  series of questions I'm going to ask you involving the first

23  interviews when you first came to the United States and the

24  first time you spoke to Assistant United States Attorneys and

25  government agents.

Zambada Garcia - cross - Purpura          1094

1        Do you remember having this, seven or eight or nine

2   meetings with them back in 2012?

3   A    Yes.

4   Q    And during that time period, this man, Joaquin Guzman,

5   El Chapo, he was not arrested, was he?  You don't know?

6   A    No.

7   Q    You don't know where he was in 2012?

8   A    I don't think that he had been arrested.  I do not know.

9   I don't recall exactly when he was arrested.

10  Q    Very good.

11       Now, on May 1, 2012, you were asked about your

12  brother's early years in selling drugs and you indicated that

13  when Ray was young, 16, when you were young, 16 to 24, excuse

14  me, that your brother was growing marijuana with a Jose

15  Contreras.  Does that sound right to you?

16  A    Could you repeat the question, please?

17  Q    Sure.

18       When you were young, 16 to 24, you remember that

19  your brother Mayo at that time was growing and selling

20  marijuana with Jose Contreras, C-O-N-T-R-E-R-A-S?

21       MS. PARLOVECCHIO:  Objection.

22       THE COURT:  Overruled.

23  A    Yes, sir.

24  Q    Okay.  And then from 1975 to 1985, your brother was

25  involved in heroin and marijuana, your brother, as in Mayo, I

Zambada Garcia - cross - Purpura          1095

1   should say, was involved in heroin and marijuana and they were

2   taking it into, my pronunciation is terrible, Nogales,

3   N-O-G-A-L-E-S.  "Nogales."  Edward is telling me the right way

4   to say it.

5   A    Correct.

6   Q    And still on that very same day, when you first came to

7   the United States and when you first spoke to U.S. Attorneys

8   and the agents of the government, you explained that in 1987,

9   your brother started to work in cocaine with the Padrino,

10  correct?

11  A    1997?

12  Q    1987 through 1993.

13  A    He worked with cocaine at the time.

14  Q    With, in particular, Miguel Felix Gallardo, the Padrino,

15  correct?

16  A    Miguel Felix Gallardo.  Around '87.

17  Q    Very good.  And --

18         THE COURT:  Mr. Purpura, the questions are fine, but

19  they're long and the interpreter is doing a great job but if

20  you can break them up, please do.

21         MR. PURPURA:  Thank you.

22  Q    And at this point, there's no mention of Joaquin Guzman,

23  El Chapo, correct?

24  A    Correct.

25  Q    And then still on that same date, I'm breaking it now,

Zambada Garcia - cross - Purpura                1096

1    May 1, 2012, your brother was involved in sending planes to

2    Mexicali?

3              MS. PARLOVECCHIO:  Objection.

4              THE COURT:  Give me one word on the objection.

5              MS. PARLOVECCHIO:  Misstates the testimony, Your

6    Honor.

7              THE COURT:  Overruled.

8              You may answer.

9              MR. PURPURA:  Actually, I'll rephrase the question.

10   Q    Your brother greeted planes in Mexicali in 1990?

11   A    Yes.  Around this time, my brother worked in Baja

12   California.

13   Q    And that's your brother, not Joaquin Guzman working with

14   him, isn't that correct?

15   A    That's right.

16   Q    And then what happens in 1993, at least what you told the

17   government on May 1, 2012, when you first came here from

18   Mexico, that your brother partnered up with Amado Carrillo

19   Fuentes who is this gentleman here in 1993, the Lord of the

20   Skies, right?

21   A    It was more or less around that time.

22   Q    And then you went on to say in 1995 through 1996, that

23   your brother Mayo were splitting loads 50/50, that's your

24   brother and the Lord of the Skies?

25   A    That's right.

Zambada Garcia - cross - Purpura          1097

1   Q    Okay.  And you even went on to say that during that time

2   period, they boat, meaning your brother Mayo and the Lord of

3   the Skies put up $50 million apiece to buy a 747?

4   A    No.

5   Q    You didn't say that?  Strike that.

6        Do you remember saying that?

7   A    Not right now.

8   Q    Thank you.

9        May I have Defense Exhibit 14, please.

10       MR. PURPURA:  Counsel, it's Bates stamped 205.

11  Q    I'm going to show you for identification only Defense

12  Exhibit 14 and ask the interpreter with the Court's permission

13  just to read the last sentence.

14       (Translation.)

15  A    They put 50 million each for the cocaine investment.

16  Q    Excuse me.  All right.  And that was the Lord of the

17  Skies and your brother Mayo, right?

18  A    Yes.

19  Q    And that's what you told the government in 2012, correct?

20  A    Perhaps maybe it was at that time.

21  Q    Thank you.

22       And then on May 2nd, when you spoke to the

23  government for about the third time, your third proffer once

24  you came from Mexico, you said that your brother in the time

25  period of 2000 to 2001 started working, bringing drugs in the

Zambada Garcia - cross - Purpura          1098

1  airport in suitcases?

2  A    Correct.

3  Q    And, again, you said in this time period, 2000, 2001, it

4  was your brother Mayo who was doing that, correct?

5  A    Correct.

6  Q    And then in that same proffer, on May 2, 2012, you told

7  the government that from 2002 through 2003, your brother added

8  on the Guerrero route?

9  A    More or less.

10 Q    And to do that, he had to speak to Arturo Beltran Leyva,

11 the gentleman in the second row up there, because that was his

12 area, he sought permission, correct?

13 A    Correct.

14 Q    And then you told the government about shipments

15 involving go-fast boats coming in and during this period of

16 time, 2002 through 2003, at Guerrero, the investor in these

17 shipments is solely Mayo?   Correcto?

18 A    Correct.

19 Q    And then on May 22nd, approximately the fourth time you

20 met with the government counsel, chronologically, you're up to

21 2002 to 2006 and that's when you tell them about Pineda, do

22 you remember him?

23        Do you know who he is?

24 A    Yes, of course.

25 Q    Of course.  As a matter of fact, you told the government

Zambada Garcia - cross - Purpura            1099

1    he was a good friend of yours, correct?

2    A    That's right.

3    Q    And he was bringing in loads for Arturo Beltran Leyva,

4    correct?

5    A    Correct.

6    Q    But then you got involved because you could move the

7    cocaine faster, correct?

8    A    Yes.

9    Q    And, in fact, what you told the government in this time

10   period, 2002 to 2006, you helped sell about seven tons of

11   cocaine, correct?

12   A    Correct.

13   Q    And you also had in 2002 through 2006 some individual

14   buyers as well, correct?

15   A    Correct.

16   Q    These were your customers, correct?

17   A    Correct.

18   Q    Such as Tribilin?

19   A    Yes, correct.

20   Q    Jaime Andres, correct?

21   A    Correct.

22   Q    And then what you told government counsel on May 23rd,

23   the 5:00:00 time you met with government counsel here in the

24   United States, was that in August 2008, your brother was

25   partners with Benny Contreras, correct?

Zambada Garcia - cross - Purpura          1100

1   A    Correct.

2   Q    And the very next day, you had another proffer on

3   May 24th in 2012 and you told government counsel and

4   government agents that Kiki Fernandez was a major investor

5   with your brother, correct?

6   A    Correct.

7   Q    And then you also named other people who shared loads if

8   the load was big with your brother Mayo, do you remember that?

9   A    Yes, sir.

10  Q    And you named specifically Kiki, Tocayo, Alonso, Vicente

11  Zambada, Benny Contreras, and then you mentioned other

12  investors that would occasionally invest with your brother was

13  Richard Arroyo, Chepe, Chichi; no mention of Chapo, correct?

14  A    Correct.

15  Q    And that's when the information was fresh in your mind,

16  correct?

17  A    True.

18  Q    Just a few questions about corruption and we're almost

19  finished.

20         You spoke about Hector Beltran Leyva.  Do you

21  remember that?

22  A    Perhaps, yes.

23  Q    Hector.  He had a nickname, didn't he?

24  A    True.

25  Q    Elegante?

1  A    Elegante and H.

2  Q    H.  And Elegante, I could probably figure that out,

3  that's because he dressed well, correct?

4  A    Yes.

5  Q    And he was the man who was involved on the Beltran Leyva

6  organization side of paying off politicians, correct?

7  A    Correct.

8  Q    And he was arrested and he was in Mexico, correct?

9  A    Yes, he's arrested in Mexico.  That's what I think.

10  Q    And he had a relationship with someone by the name of

11  Asse, correct?

12  A    I don't remember exactly.

13            MR. PURPURA:  May I have Defense Exhibit 12, please,

14  just for the witness.  And I'm going to ask respectfully just

15  for the interpreter just to read perhaps maybe the first

16  couple of lines.

17            (Translation.)

18            THE WITNESS:  Yes.

19  Q    Does it refresh your recollection a little bit about what

20  you said about Hector?

21  A    Yes, sir.

22  Q    Okay.  And Hector had a relationship with a person by the

23  name of Asse, correct?

24  A    That's right.

25            (Continued on next page.)

Zambada - cross - Purpura                    1102

1   BY MR. PURPURA:   (Continuing.)

2   Q    And when you talk about corruption, if possible, you

3   would want to -- you, I mean you, Mayo, would want to corrupt

4   probably the local police and go as high as you could in

5   Mexican politics; correct?

6              MS. PARLOVECCHIO:   Objection.

7              THE COURT:   I will allow that.

8              MS. PARLOVECCHIO:   He referred to the witness as

9   Mayo.

10             MR. PURPURA:   I said you and Mayo.

11             THE COURT:   No, you did not.   Put the question

12  again.

13  BY MR. PURPURA:

14  Q    When it came to police corruption on behalf of Mayo, you

15  would want to corrupt from the local highway police, federal

16  police; you would want to corrupt as high as you could.   Look,

17  if Mayo could corrupt the president of Mexico, he would do it,

18  wouldn't he?

19  A    Perhaps.

20  Q    And your brother had a particular interest in a person by

21  the name of Garcia Luna; correct?

22  A    Correct.

23  Q    And from 2001 until approximately 2006 Garcia Luna was in

24  charge of the Agency of Federal Investigation; correct?

25  A    Correct.

Zambada - cross - Purpura                    1103

1   Q     And in 2006, he actually got a cabinet position in

2   Mexican government as the secretary of public security;

3   correct?

4   A     Correct.

5   Q     What is the secretary of public security?

6   A     The person in charge of the federal police.

7   Q     And you and your brother Mayo met Luna in a restaurant

8   sometime between 2005 and 2006, do you remember that?  Do you

9   remember?

10  A     No, not right now.

11  Q     Let's see if we can help you.

12        MR. PURPURA:  May I have Exhibit 28?

13  BY MR. PURPURA:

14  Q     I'm going to show you for your eyes only Defense Exhibit

15  28.

16        MR. PURPURA:  I am respectfully going to ask the

17  interpreter to please read the first paragraph --

18  Q     Or as much as necessary to refresh your recollection.

19        (Interpreter translates passage.)

20  A     I would like you to repeat the first sentence again for

21  me.

22  Q     He wants you to repeat it?

23        THE INTERPRETER:  Exactly, counselor.  The

24  interpreter is just repeating him.

25        THE WITNESS:  Say it on the microphone so they can

SN       OCR       RPR

1   hear what you are saying.

2          THE COURT:  Tell the witness that when she is

3   reading something to him that no one needs to hear it but him.

4   A    There's a mistake in what you are saying.  You're saying

5   that I met with my brother Mayo with Luna and I met with my

6   brother's attorney with Luna who is Santiago Oscar Paredes and

7   just like that there can be a lot of mistakes with what's

8   written and with the interpretation.  I'm just clarifying it

9   for you.

10  Q    You met --

11  A    No, sir.

12  Q    You did not meet -- did you meet with Luna at a

13  restaurant?

14  A    That's right.

15  Q    Okay.  And the purpose of you meeting with Luna at the

16  restaurant was because you were going to bribe him, give him

17  $3 million in a briefcase; right?

18  A    Correct.

19  Q    And the purpose of giving Luna the money was because your

20  brother Mayo wanted Vigeras to be the boss in Culiacan, be the

21  police boss in Culiacan; correct?

22  A    Correct.

23  Q    And that's because your brother Mayo had Vigeras in his

24  right-hand pocket; right?

25  A    Correct.

Zambada - cross - Purpura                    1105

1   Q    And so Luna, this politician, took $3 million of Mayo's

2   money; correct?

3   A    Correct.

4   Q    And then there was a second meeting with Luna when he

5   actually was the secretary of public security; correct?

6   A    Correct.

7   Q    And at this meeting, there was another briefcase;

8   correct?

9   A    Correct.

10  Q    And at this meeting Luna took that briefcase and in that

11  briefcase was 3 to $5 million; correct?

12  A    Yes, there was money.

13  Q    There's money and there's money?

14  A    That's right.

15  Q    Right.  So 3 to 5 million sounds a lot more than 5 to

16  $10; right?

17  A    Yes, of course.

18  Q    Right.  And, again, this was Mayo's money in 2007,

19  correct, not yours?

20  A    Correct.

21  Q    In addition, this Luna who was the secretary of public

22  security had a firm commitment with Arturo Beltran-Leyva;

23  correct?

24  A    Correct.

25  Q    One step back.  In giving that money to Luna he was

Zambada - cross - Purpura                    1106

1    assuring your brother that he would not interfere with his

2    narcotics trafficking and arresting him; correct?

3    A    Correct.

4    Q    And in 2006/beginning of 2007 it was your understanding

5    that Arturo Beltran-Leyva, Hector Beltran-Leyva, El Indio, La

6    Barbie and Grande, had put together $50 million for protection

7    money for Luna; correct?

8    A    That was what was being said.

9    Q    And in 2005 there is a gentleman by the name of Rajino,

10   R-A-J-I-N-O; correct?

11   A    Correct.

12   Q    Who is Rajino?

13   A    He was the secretary of the government when Lopez Obrador

14   was the secretary of the state of the Government in Mexico

15   City, the state of Mexico.

16   Q    What, if any, relationship did Rajino have with Obrador?

17            MS. PARLOVECCHIO:  Objection.

18            THE COURT:  Sustained.

19   Q    How much money was paid to Rajino in 2005?

20   A    I'm not sure but it was a few million dollars.

21   Q    And why was it paid?

22   A    It was paid to him because he was said to be the next

23   secretary of security and if that were the case it was for our

24   protection.

25   Q    Thank you.  Let me ask you just a couple of more

1    questions.

2            MR. PURPURA:  With the Court's permission would the

3    witness be able to stand up as I approach the board?  I don't

4    think he can see the board.

5            THE COURT:  Sure.

6    BY MR. PURPURA:

7    Q    If you can't see.  We have already said that

8    Carillo-Fuentes is deceased; correct?

9    A    Yes.

10   Q    Jose Esperazo, who is El Azul dead, *muerte*?

11   A    That's what I believe.

12   Q    Nacho Coronel, dead?

13   A    That's right.

14   Q    Arturo, dead?

15   A    Dead.

16   Q    Hector -- you're not sure where he is, but he is not

17   here?

18   A    I think he's in prison.  He is not here.

19   Q    That leaves your brother and where is your brother?

20   A    Probably in the mountains.

21   Q    Then the only person here is who; Joaquin Guzman, El

22   Chapo?

23           MS. PARLOVECCHIO:  Asked and answered.

24           THE COURT:  Sustained.  Sustained.

25   BY MR. PURPURA:

Zambada - cross - Purpura                    1108

1   Q    Who is the key to you getting out of prison early?

2   A    The judge is the one who makes that decision.

3   Q    Right.  You filled out a financial statement.  Do you

4   remember doing that?

5   A    Yes.

6   Q    You are an accountant; correct?

7   A    Yes.

8   Q    You made millions of dollars in narco trafficking;

9   correct?

10  A    Correct.

11  Q    You know how to hide money; correct?

12  A    I know a few ways.

13  Q    You know how to use aliases, that is names which are not

14  yours; correct?

15  A    Correct.

16  Q    You know how to establish offshore accounts with aliases;

17  correct?

18  A    Yes.

19  Q    So when you filled out this financial statement for the

20  United States Government you said you have no savings

21  accounts, no credit cards, no foreign bank accounts, no stocks

22  or bonds, no mutual funds, no securities, a couple of vehicles

23  and some properties; correct?

24  A    Correct.  Well, you can tell me.

25            THE INTERPRETER:  The interpreter is now going to

Zambada - cross - Purpura                    1109

1    interpret the question.

2    Q    You can understand when I talk to you?

3         THE COURT:  Let's make sure she interprets the

4    question, please.

5    A    That's correct.

6    Q    And the only asset you have is supposedly $10 million

7    that some narco trafficker owes you; correct?

8    A    That's right.

9    Q    You have no hidden money?

10   A    No, sir.

11   Q    You know what a *caleta* is?

12   A    Yes.

13   Q    What is a *caleta*?

14   A    Hidden place, a hiding place.

15        THE INTERPRETER:  Interpreter correction.

16   Q    And an accountant like you, you don't have any hiding

17   places for your money?

18   A    No, sir, not in my case.

19   Q    And that's the truth, yes?

20   A    Yes.

21        MR. PURPURA:  No further questions, thank you.

22        THE COURT:  Any redirect?

23        MS. PARLOVECCHIO:  Just a little, Your Honor.

24        MR. PURPURA:  Could I have one second before the

25   Government starts?  I apologize.

Zambada - redirect - Parlovecchio          1110

1          THE COURT:  Yes.  Keep in mind that you have a mic

2     on.

3          (Pause in proceedings.)

4          THE COURT:  Are you ready Ms. Parlovecchio.

5     REDIRECT EXAMINATION

6     BY MS. PARLOVECCHIO:

7     Q    Good afternoon.  You were asked some questions on

8     cross-examination about meetings you had with prosecutors in

9     your case.  Do you recall those questions?

10    A    Yes.

11    Q    And you testified that you were prepared for other trials

12    during the course of those meetings.  Do you recall those

13    answers?

14    A    That's right.

15    Q    And one of those trials that you prepared for was a trial

16    against Alfredo Beltran-Leyva; is that right?

17    A    That's correct.

18    Q    What was the focus of those trial preparation sessions?

19    A    Well, we talked about the case many times.

20    Q    The case against Alfredo Beltran-Leyva?

21    A    That's right.

22    Q    And did the date for that trial against Alfredo

23    Beltran-Leyva change or did it stay the same?

24    A    It changed.

25    Q    Now during the course of the six years of your

1  cooperation, did the Government ask you about a few people

2  that you had committed crimes with or with everyone that you

3  had committed crimes with?

4  A    Of some and then others -- and others on separate

5  occasions.

6  Q    Do you know about how many individuals about whom you

7  have provided information during the course of your

8  cooperation?

9  A    There are many.

10 Q    Would you approximate?

11 A    Maybe 20.

12 Q    Have you provided information about the all of the

13 leaders of the Sinaloa Cartel that you know during your

14 cooperation?

15 A    The majority, if not all of them.

16 Q    Have you provided information about all the sub leaders

17 that you were asked about?

18 A    I think so as well, the majority of them.

19 Q    Now, you were asked some questions on cross-examination

20 about what you said during your guilty plea.  Do you recall

21 those questions?

22 A    Yes, of course.

23

24          (Continued on the following page.)

25

J. Sambada Garcia - redirect - Parlovecchio      1112

1   BY MS. PARLOVECCHIO (CONTINUING):

2   Q    And Mr. Purpura asked you some questions about what you

3   said on the record at your guilty plea in regard to your

4   knowledge about sicarios; do you recall those questions?

5   A    Correct.

6   Q    Did your lawyer later help clarify on the record what

7   your knowledge was about the sicarios during your guilty plea?

8   A    Yes.

9   Q    Do you recall what your attorney said on the record about

10  your knowledge about sicarios?

11  A    He clarified the confusion that I had.

12  Q    Do you recall that your attorney clarified that you had

13  knowledge of sicarios?

14  A    That's right.

15  Q    Now, prior to pleading guilty, did you tell the

16  Government about all of the murders you had participated in?

17  A    Yes.

18  Q    And Mr. Zambada, you were asked some questions on

19  cross-examination about your understanding of your cooperation

20  agreement.

21         Do you recall those questions?

22  A    Yes.

23  Q    As you sit here today, do you know whether the Government

24  will file a 5K letter in your case?

25  A    I think so.

J. Sambada Garcia - redirect - Parlovecchio          1113

1   Q    Do you have an understanding about whether the judge can

2   take all your criminal conduct in consideration when the judge

3   determines your sentence?

4   A    Yes, of course.

5   Q    What do you understand would happen to you if you didn't

6   tell the truth to the jury?

7   A    Well, I would be committing a crime and I think that they

8   could also cancel my agreement.

9   Q    What crime would you be committing if you lied to the

10  jury today?

11  A    Well, the crime of false statements.

12  Q    And you could be prosecuted for that; is that right?

13  A    Of course.

14  Q    Do you believe it's in your best interest to tell the

15  truth or lie to the jury?

16  A    Well, no, of course, my interest is to always tell the

17  truth.

18  Q    Why?

19  A    Because that's how it should be.  And because I also know

20  what are the consequences for lying.

21  Q    In your cooperation agreement, if you were asked to

22  testify in another trial in the future, would you be required

23  to do so?

24  A    Yes, of course.

25  Q    Now, on cross-examination, you were asked some questions

J. Sambada Garcia - redirect - Parlovecchio        1114

1  about statements that you made at your first proffer with the

2  Government in April 2012.

3          Do you recall those questions?

4  A    Yes.

5  Q    Specifically, you were asked about a meeting you had with

6  the Government on April 16, 2012.

7          Do you recall those questions?

8  A    Yes.

9  Q    Do you recall telling the Government at that first

10 meeting on April 16, 2012 that Chapo ordered the murder of

11 Rodolfo Carillo?

12 A    That's what I know.

13 Q    Do you recall stating at that meeting?

14 A    Well, I said it at one meeting.  I don't know the exact

15 date of the meeting in which I said that, but that is how it

16 was.

17          MS. PARLOVECCHIO:  One moment, please.

18 Q    Sir, you testified that you recall stating that Chapo

19 ordered the murder of Rodolfo Carillo.

20          Do you recall if it was at the very first meeting

21 you had with the Government?

22 A    The first one?  Well, maybe, because I did say it.

23 Q    If I showed you a document -- can I show you a document

24 to refresh your recollection?

25 A    Yes, of course.

J. Sambada Garcia - redirect - Parlovecchio       1115

1      MS. PARLOVECCHIO:  Showing just for the witness

2  Government Exhibit 3500-JRZG-13.

3  Q    Directing your attention to the last page, Bates number

4  192, the bottom of the page, starting here at the bottom of

5  the page, read the last three lines.

6  A    What does it say?

7      THE INTERPRETER:  Would you like the interpreter to

8  read that?

9      MS. PARLOVECCHIO:  Yes, please.

10     (Interpreter complies.)

11 A    Yes, I remember that.

12 Q    And just showing you the first page of that document, the

13 date of the proffer?

14 A    Yes.

15 Q    Sir, does that refresh your recollection that you stated

16 that Chapo ordered the murder of Rodolfo Carillo at your first

17 meeting with the Government on April 16, 2012?

18 A    That's right.

19     MS. PARLOVECCHIO:  No further questions.

20     THE COURT:  Anything else?

21     MR. PURPURA:  Just a couple.

22     THE COURT:  Just a couple, really?

23     Can you stay at the podium or do you want the mic

24 back?

25     MR. PURPURA:  Well...

LAM      OCR      RPR

J. Zambada Garcia - recross - Purpura          1116

1  RECROSS-EXAMINATION

2  BY MR. PURPURA:

3  Q    Mr. Zambada, you, obviously, when you were first

4  interviewed those eight times in 2012, you knew the name of

5  Joaquin Guzman, correct?

6  A    That's right.

7  Q    And you know the nickname El Chapo and you know all the

8  other nicknames, correct?

9  A    Correct.

10 Q    So, when Government counsel Ms. Parlovecchio asked you

11 did you give all the information you knew about the leaders of

12 the cartel, that is certainly one of the people you knew in

13 2012, correct; when you first came here, right?

14 A    That's right.

15 Q    And not once in that entire time in those initial

16 interviews when you first came here did you ever say that

17 Joaquin Guzman and Mayo Zambada were partners, did you?

18 A    I don't know.  I don't recall.

19           MR. PURPURA:  No further questions.

20           THE COURT:  Anything else?

21           MS. PARLOVECCHIO:  No your Honor.

22           THE COURT:  All right.  Marshals may take the

23 witness out.

24           The Government's next witness?

25           MR. ROBOTTI:  The Government calls Thomas Lenox.

Lenox - direct - Robotti                    1117

1              (Witness sworn.)

2              THE COURTROOM DEPUTY:  Please state and spell your

3    name for the record.

4              THE WITNESS:  Name is Thomas Lenox, T-H-O-M-A-S

5    L-E-N-O-X.

6              THE COURT:  You may inquire.

7    **THOMAS LENOX,**

8              called by the Government, having been

9              first duly sworn, was examined and testified

10             as follows:

11   DIRECT EXAMINATION

12   BY MR. ROBOTTI:

13   Q    Good afternoon.

14             Are you employed?

15   A    Yes, I am.

16   Q    What's your position?

17   A    I'm currently a chief of enforcement for the California

18   State Board of Pharmacy.

19             THE COURT:  Mr. Robotti, you're very tall and the

20   microphone is not.  Get it as close to you as you possibly can

21   and try to speak up.

22             MR. ROBOTTI:  Yes, your Honor.

23   Q    How long have you been with the California State Bored of

24   Pharmacy?

25   A    Approximately 18 months.

                    LAM      OCR      RPR

Lenox - direct - Robotti                1118

1    Q    And what are your duties and responsibilities there?

2    A    I supervise the inspectors for the Board of Pharmacy that

3    go out and inspect and investigate the pharmacies,

4    pharmacists, technicians, with regard to violations of

5    California state law and regulations for the practice of

6    pharmacy.

7    Q    And where did you work before the California State Board

8    of Pharmacy?

9    A    With the United States Drug Enforcement Administration.

10   Q    And how long were you with the DEA?

11   A    Over 30 years.

12   Q    What positions did you hold?

13   A    I was a special agent in several different offices:

14   El Paso, Texas; Hermosillo, Mexico; and San Diego; and I was

15   also a supervisory special agent in the San Diego field

16   division.

17   Q    In general, what were your duties and responsibilities

18   with the DEA?

19   A    To investigate violations of the *Controlled Substance Act*

20   with regard to the smuggling, distribution, and sales of

21   controlled substances.

22   Q    Now, let me direct your attention to April 21, 1993.

23        Were you working as a special agent with the DEA?

24   A    Yes, I was.

25   Q    Where were you stationed?

Lenox - direct - Robotti                    1119

1   A    At that time, I was stationed in Hermosillo, Sonora,

2   Mexico.

3   Q    What were your duties and responsibilities there?

4   A    We were there to conduct liaison between U.S. law

5   enforcement agencies, which included the DEA, and Mexican law

6   enforcement agencies.

7   Q    What do you mean by "liaison" with Mexican --

8   A    We would share intelligence information with regard to

9   drug trafficking, drug distribution, drug smuggling.  We would

10  also pass various leads.  If U.S. agents had information they

11  wanted acted upon by Mexican authorities, we would share that

12  information with Mexican law enforcement.  And vice versa, if

13  Mexican law enforcement had information regarding activity

14  leads in the United States, we would pass that on to the

15  respective office in the United States.

16  Q    I'd like to show you what's in evidence as Government

17  Exhibit 502.

18       (Exhibit published to the jury.)

19  Q    Could you identify for the jury where Hermosillo is?

20  A    Yes, I can.

21       (Complies.)

22  Q    And aside from being stationed in Hermosillo, what was

23  your area of responsibility for the DEA?

24  A    At that time, my responsibility -- we were responsible

25  for liaison with the federal judicial police in the state of

LAM      OCR      RPR

Lenox - direct - Robotti                    1120

1    Chihuahua, Sonora, and Baja California Norte.

2    Q    Could you identify those states for the jury.

3    A    (Complies.)

4    Q    How long were you stationed in Hermosillo?

5    A    For three years.

6    Q    And where were you on April 21, 1993?

7    A    At that time, I was in Ensenada, Baja California Norte.

8    Q    Zooming out the map a little, can you point out for the

9    jury where that is?

10   A    (Complies.)

11   Q    Why were you there?

12   A    I was there conducting liaison with the Mexican judicial

13   police.

14   Q    And what, if anything, happened when you were in

15   Ensenada?

16   A    I was contacted by my office in Hermosillo that there had

17   been --

18          MR. PURPURA:  Objection.

19          For the truth of the matter?  I don't know, but it

20   sounds like hearsay.

21          THE COURT:  I think it's trying to show why he did

22   what he's going to tell us he did.

23          Go ahead.

24   A    I was contacted by my office that there had been a

25   seizure of cocaine in Tecate, Mexico.

Lenox - direct - Robotti                    1121

1    THE COURT:  Let's stick to what were you asked to

2  do.

3    THE WITNESS:  I was asked to contact the Mexican

4  federal judicial police in Tijuana regarding a seizure of

5  cocaine that took place in the Tecate, Mexico.

6  Q    What did you do after that?

7  A    I returned to the Tijuana area.

8  Q    And on what date did you go to Tijuana?

9  A    I returned to Tijuana on the 22nd in an attempt to

10  contact the Mexican federal judicial police comandante.

11  Q    Did you, in fact, meet with the comandante?

12  A    I did.

13  Q    Where did you meet?

14  A    The federal judicial police office in Tijuana.

15  Q    When you arrived at the federal judicial police office,

16  what did you see?

17  A    As I arrived there at the office, there was a large

18  tractor-trailer that was parked there adjacent to the building

19  that contained white nylon bags with square bricks in them

20  that were being offloaded.

21  Q    What did you do after observing that?

22  A    I went into the office of the comandante to meet with

23  him.

24  Q    And did you subsequently have a conversation with the

25  comandante?

Lenox - direct - Robotti                    1122

1   A    Yes, I did.

2   Q    During this conversation, what, if anything, did the

3   comandante show you?

4   A    He showed me an empty chili can, chili pepper can.

5   Q    What did you do with that?

6   A    I took photographs of that can.

7   Q    Why?

8   A    I was advised that the can had contained --

9              MR. PURPURA:  Objection.

10             THE COURT:  Sustained.

11             Is that based on what he told you?

12             THE WITNESS:  Yes.

13  A    The can had contained --

14             THE COURT:  No, no.  We know why you took the

15  pictures.  It was based on what he told you.

16             What did you do next after you took the pictures?

17             THE WITNESS:  I continued to have a conversation

18  with the comandante.

19  Q    And following this conversation, what did you do after

20  that?

21  A    I went outside where the truck was parked, where the

22  semi-tractor-trailer was parked.

23  Q    What did you do when you were outside there?

24  A    I began taking pictures of the truck and the bags that

25  contained the square bricks in them.

                    Lenox - direct - Robotti                    1123

1    Q     So, I'd like to show you what's been marked for

2    identification as Government Exhibits 208-1 to 208-6.

3              Do you recognize those?

4    A     Yes, I do.

5    Q     What are they?

6    A     They are pictures that I took there in Baja and Tijuana,

7    outside the federal judicial police office.

8              MR. ROBOTTI:  The Government offers Government

9    Exhibits 208-1 to 208-6 into evidence.

10             MR. PURPURA:  Can I have one moment, your Honor?  I

11   apologize.

12             THE COURT:  Yes.

13             (Pause in proceedings.)

14             MR. PURPURA:  No objection.  Thank you.

15             THE COURT:  They are received.

16             (Government Exhibits 208-1 through 208-6 so marked.)

17   Q     Let's begin by looking at Exhibit 208-1.

18             (Exhibit published to the jury.)

19   Q     What do we see here?

20   A     That is a picture of the truck that had contained the

21   white bags with the blocks of cocaine in them.

22   Q     Let's look at Government Exhibit 208-2.

23             (Exhibit published to the jury.)

24   A     That's a zoomed-in picture of the front license plate on

25   the truck.

                    LAM      OCR      RPR

Lenox - direct - Robotti                    1124

1    Q     And what is the license plate?

2    A     That's 777AR1.

3    Q     Looking at Government Exhibit 208-3?

4          (Exhibit published to the jury.)

5    A     That's the rear of the truck, the trailer portion, where

6    they're offloading the white nylon bags.

7    Q     Government Exhibit 208-4?

8          (Exhibit published to the jury.)

9    A     Again, that's the truck that has the white nylon bags

10   containing the square blocks of cocaine.

11   Q     And what do we see protruding from those bags there?

12   A     If you look closely, you can see, like, these square

13   blocks cellophaned, cellophaned blocks.

14   Q     Looking at Government Exhibit 208-5 and Government

15   Exhibit 208-6.

16         (Exhibits published to the jury.)

17   Q     What are these?

18   A     Those are photographs that are, unfortunately, a little

19   blurry that I took trying to focus on the logo and the

20   labeling of the chili cans.

21   Q     There's a yellow circle in the top portion of Government

22   Exhibit 208-6.

23         What do you recognize that to be?

24   A     That's the logo for La Comadre brand chili peppers.

25   Q     I'd like to show you what's been marked for

LAM      OCR      RPR

Lenox - direct - Robotti                    1125

1    identification as 208-7A.

2              MR. ROBOTTI:  Your Honor, this is a physical

3    exhibit.  May I approach?

4              THE COURT:  Yes.

5    Q    Do you recognize this?

6    A    Yes, I do.

7    Q    How do you recognize it?

8    A    That's the La Comadre chili can.

9    Q    How does that compare to the photo you saw in the

10   comandante's office in Tijuana?

11   A    It's exactly the same.

12             MR. ROBOTTI:  The Government offers this exhibit

13   into evidence.

14             MR. PURPURA:  No objection.

15             THE COURT:  Received.

16             (Government Exhibit 208-7A so marked.)

17             MR. ROBOTTI:  May I pass this around to the jury,

18   your Honor?

19             THE COURT:  You may.

20   Q    I'd like to show you what's been marked for

21   identification as Government Exhibit 208-8A.

22             Do you recognize this?

23   A    Yes, I do.

24   Q    And what do you recognize this to be?

25   A    It is a DVD that has my initials on it and the date that

Lenox - direct - Robotti                    1126

1    I initialed it, and it's a video of the seizure of the cocaine

2    in Tecate.

3    Q    Did you review this video prior to your testimony here

4    today?

5    A    Yes, I did.

6    Q    What, if anything, did you recognize in the video?

7    A    You could recognize the chili cans, you recognize the

8    square cellophaned blocks of cocaine, you could recognize the

9    actual labeling off of the cans, you could recognize the white

10   nylon bags that were used to put the cocaine kilos in and

11   transport them back to Tijuana from Tecate, I recognize the

12   tractor-trailer and the truck which bore the same license

13   plate number.

14            MR. ROBOTTI:  Your Honor, the Government offers this

15   into evidence.

16            MR. PURPURA:  Your Honor, may I speak with counsel

17   for one minute?

18            THE COURT:  Yes.

19            (Pause in proceedings.)

20

21            (Continued on the next page.)

22

23

24

25

1127

1       MR. PURPURA:  Your Honor, I believe it would come in

2  regardless under 104 subject to connection so I have no

3  objection at this point.

4       THE COURT:  Well, I need to understand what the

5  connection will be so let's have a very fast side bar.  Very

6  fast.

7       (The following occurred at side bar.)

8       THE COURT:  Okay.  What's the problem?

9       MR. ROBOTTI:  Your Honor, first of all, the Court

10  ruled this was authentic previously in a motion *in limine*.

11  This is a news video so we were just establishing relevance

12  here but, in any event, this would come in through our

13  cooperating witness next week.  He will testify that he was

14  involved in this load and recognizes it as a load he was

15  involved in.

16       THE COURT:  Okay.  I will receive it on that basis.

17       MR. PURPURA:  Thank you, Judge.

18       (In open court; side bar ends.)

19       THE COURT:  All right.  The exhibit is received

20  subject to connection.

21       (Government Exhibit 208-8A so marked.)

22       (Continued on next page.)

23

24

25

Lenox - direct - Robotti                    1128

1    BY MR. ROBOTTI:   (Continuing)

2    Q    All right.  I'd like to play Government Exhibit 208-8A.

3    Agent Lenox, can you narrate the relevant portions as you see

4    them in this video?

5              (Video plays.)

6    A    So this is the truck as they're offloading.  You have all

7    the cases of chili cans.  There's a square block.  There is

8    the cans with the La Comadre logo on them.  You can also see

9    on the cases, there's the logo that's also on the cans.

10             Again, more pictures of the square kilo blocks of

11   cocaine.  And here you can see he's cutting in and he pulls

12   out a little bit of white powder and here we're back at the

13   truck, in the front of the truck.  They're cutting open the La

14   Comadre.  You can see the label, La Comadre label on the cans.

15   Q    What are they dumping out of those cans?

16   A    They're dumping out sand.  The cans had a specific weight

17   on the label so just by having the kilo of cocaine in that, it

18   did not match the true weight of what should have been in the

19   can so they augmented it by putting sand so then the can had

20   the balance and so if the cans were weighed, it would show the

21   weight that was on the label as to be the exact weight, if

22   that makes sense.

23             (Video stopped.)

24   Q    Okay.  I'd next like to show you Government

25   Exhibit 208-10 and Government Exhibit 208-10T.

Lenox - direct - Robotti                    1129

1          Do you recognize these?

2    A    Yes, I do.

3    Q    And what do you recognize them to be?

4    A    They're a lab, a laboratory report from the chemist who

5    analyzed samples of the cocaine that were taken from the

6    truck.

7              MR. ROBOTTI:  Your Honor, the government offers

8    Government Exhibits 208-10 and 208-10T into evidence.

9              MR. PURPURA:  No objection.

10             THE COURT:  Received.

11             (So marked.)

12   Q    So looking at Government Exhibit 208-10, is this the

13   Spanish language version of the lab report?

14   A    Well, that's a letter that's requesting the analysis be

15   completed.  That's the first page of it.  It's a multipage

16   document.

17   Q    And did the remaining pages contain the Spanish language

18   version of the lab report?

19   A    Yes, it does.

20   Q    Directing your attention to Government Exhibit 208-10T,

21   is this the English translation of that lab report?

22   A    Yes, it is.

23   Q    And just turning to the third page of this exhibit,

24   directing your attention to this line here, what does that

25   say?

Lenox - direct - Robotti                    1130

1  A     United States, United Mexican States Office of the

2  Attorney General of the Republic.

3  Q     And two lines below that, what does it say?

4  A     It says Tijuana, Baja California, April 27, 1993.

5  Q     Okay.  And under report, this paragraph here, can you

6  read that?

7  A     I was asked to analyze whether the white powder contained

8  in 2000 (two thousand) bags of transparent synthetic material

9  is a narcotic and/or psychotropic as defined by the General

10 Health Act.

11 Q     And turning to the following page, under Conclusion,

12 could you read this paragraph?

13 A     Exclusive:  The white powder described above in the

14 subject of this report is the substance known as cocaine which

15 is considered a narcotic under Article 234 of the General

16 Health Act, RF value equal to that of this substance.

17 Q     So following your meeting with the *comandante*, did you

18 end up going back to the United States?

19 A     Yes, I did.

20 Q     And directing your attention to May 31, 1993, where in

21 the United States were you located?

22 A     At that time, I was in the San Diego, California region.

23 Q     And what, if anything, notable occurred on that day?

24 A     I was contacted by my office in Hermosillo to reach out

25 to the local DEA office regarding the finding of an

Lenox - direct - Robotti                    1131

1    underground tunnel.

2    Q    What did you do in response to that information?

3    A    I attempted to contact the supervisory Special Agent with

4    DEA in San Diego but at that time, I couldn't get through to

5    him and I left a message for him to contact me as soon as

6    possible.

7    Q    And what did you do following that?

8    A    He eventually got ahold of me and I was to meet the next

9    morning on June 1, 1993 at the DEA office there in San Diego.

10   Q    And what happened that day?

11   A    Several of us were escorted into Mexico where we went to

12   a, what I refer to as a compound area on the south side of the

13   international border in Tijuana, Mexico where we were shown an

14   underground tunnel that crossed underneath the international

15   border into the United States.

16   Q    All right.  I'd like to show you what's been marked as

17   Government Exhibit 501.  It's in evidence.

18        Now, can you just point out for the jury where

19   approximately on the border you were?

20   A    Right around that area there.  (Indicating.)

21   Q    Is that the San Diego-Tijuana area?

22   A    That's correct.

23   Q    In general, could you describe what you saw when you

24   arrived at this compound?

25   A    It was a white painted facility with some light blue

Lenox - direct - Robotti                    1132

1   trim.  It was triangular in shape.  It had three structures in

2   it on the eastern corner of the triangle.  There was a large

3   open warehouse with a couple of other rooms inside.  It had a,

4   you know, high ceiling, almost a two-story ceiling similar to

5   this where you could drive vehicles into.  And then there was

6   another smaller two story structure along the southern wall of

7   the compound and then on the western end, there was another

8   smaller structure which actually was where the entrance to the

9   tunnel began.

10  Q    And did you go inside the tunnel?

11  A    Yes, I did.

12  Q    And did you take photographs?

13  A    Yes, I did.

14  Q    All right.  I'd like to show you what's been marked as

15  Government Exhibit 208-11 to 208-34 for identification.

16            MR. ROBOTTI:  May I approach since this is a stack

17  of photos?

18            THE COURT:  You may.

19  Q    Can you take a moment to look through those briefly.

20            (Pause.)

21  Q    Do you recognize those photographs?

22  A    Yes, I do.

23  Q    What do you recognize them to be?

24  A    These are pictures of the compound as well as of the

25  tunnel in the buildings that were there in Tijuana.

Lenox - direct - Robotti                    1133

1        MR. ROBOTTI:  Your Honor, the government moves

2   Government's Exhibit 208-11 to 208-34 in evidence.

3        MR. PURPURA:  No objection.

4        THE COURT:  Received.

5        (So marked.)

6   Q    So I'd like to take a moment just to walk through these

7   photographs.

8        Looking first at Government Exhibit 208-11, what do

9   we see here?

10  A    This is an aerial photograph.  So here at the bottom of

11  the picture in the center, I'm circling now, that's the

12  compound that I described.

13       So it was triangular shaped with the large building

14  on the right side which is actually on the eastern end of the

15  compound.  You have a smaller, little two-story building there

16  where I put an "X" and then on the western end of this

17  compound, you have a smaller structure which actually

18  contained the entrance to the tunnel.

19       Now, this dark line going across the photograph,

20  that is actually the international, international border.  The

21  tunnel actually proceeded from this one building where the

22  arrow is going north and it ended in this field.  And then you

23  can see here more in the upper center portion of the

24  photograph I circled, that is a building that's under

25  construction.  It was a warehouse that was to be used for the

CMH        OCR        RMR        CRR        FCRR

Lenox - direct - Robotti                    1134

1   final termination point of the tunnel.

2   Q    So just to be clear, this circle at the bottom center of

3   the photograph, that is a structure on the Mexican side of the

4   border?

5   A    That is correct.

6   Q    And the circle in the top center of the photograph,

7   that's the U.S. side, correct?

8   A    That is correct.

9   Q    I'd like to show you Government Exhibit 208-13.  What do

10  we see here?

11  A    So that is an aerial photograph of the warehouse that is

12  under construction that is on the U.S. side of the border that

13  was the termination point for the tunnel.

14  Q    And looking at Government Exhibit 208-14, what's this?

15  A    So that is the southern wall of the warehouse that's

16  under construction.  It has a sign listed with the owner of

17  the building, the developer and who the eventual occupant was

18  going to be.

19  Q    And the sign in the middle of the photograph here, what's

20  this for?

21  A    That is who's going to be occupying the building, a

22  company called Tia Anita Cannery Warehouse.

23  Q    Looking at 208-15, what's this?

24  A    So this is a much closer aerial photo of the compound

25  that contained the tunnel.

Lenox - direct - Robotti                    1135

1   Q    And there's three structures here, right?

2   A    That's correct.

3   Q    Where was the entrance to the tunnel?

4   A    It was on this -- well, what I'm circling here.  It's the

5   one that is on the right side of the photograph.

6   (Indicating.)

7            THE COURT:  This is the compound on the Mexican

8   side, correct?

9            THE WITNESS:  Correct, this is on the Mexican side.

10  You can see -- I'll draw a line down here, this brown, this is

11  actually the United States-Mexico border, the international

12  border.  So this compound is approximately 50 feet just south

13  of the border.  So this bottom right corner of the picture

14  where the arrows are is actually the United States.

15           THE COURT:  Okay.  Let's have a question.

16  Q    Looking at Government Exhibit 208-16, what is this?

17  A    That is the two-story structure that is against the south

18  wall of the compound sort of in the center of that south wall.

19  Q    And 208-17, what do we see here?

20  A    So that is ventilation units that were in the lower level

21  of that two-story structure that's on that south wall in the

22  center of the compound.

23  Q    And based on your observations, were you able to

24  determine what these ventilation units were for?

25  A    Yes.  They were utilized to push air into the tunnel,

Lenox - direct - Robotti                    1136

1   fresh air into the tunnel.

2   Q    Looking at Government Exhibit 208-19, what's this?

3   A    This is the inside of the large warehouse structure that

4   was on the eastern side of the compound, the one that I

5   described as having a huge high ceiling that you could

6   actually drive vehicles into.

7   Q    So this is the structure on the far left, is that right?

8   A    That's correct.

9   Q    208-20, what do we see here?

10  A    That is a kitchen area that is, again, in that same large

11  warehouse building that's on the eastern end of the compound.

12  Q    208-21?

13  A    This is another room that was used for sleeping quarters,

14  again, in that same large building that's on the eastern end

15  of the compound.

16  Q    And what led you to believe there were sleeping quarters

17  in here?

18  A    These are all beds and mattresses.  They're lined up.

19  They are leaning up against the wall and bed frames.

20  Q    Government Exhibit 208-22, what is this?

21  A    That was a dump truck that was parked inside the

22  warehouse, again, this same warehouse that we're still talking

23  about that's on the eastern end of the compound.

24  Q    208-23?

25  A    So this is a photograph that's looking to the structure

CMH      OCR      RMR      CRR      FCRR

Lenox - direct - Robotti                    1137

1  that's on the west corner of the triangle compound.  This is

2  the building that has the beginning of the tunnel, the

3  entrance of the tunnel in it.

4  Q    208-24?

5  A    That is inside that western building.  It is actually --

6  actually, these are two large white double doors here.  They

7  open up and a truck similar to that dump truck we just saw

8  could back down in this area.  It's like a loading ramp,

9  loading dock area.

10 Q    208-25?

11 A    Again, we're still in that eastern building -- I'm sorry.

12 Excuse me.  We're still in the western building that contains

13 the entrance to the tunnel and this is a doorway that leads

14 into a room that will eventually drop down before the tunnel

15 begins.

16 Q    208-27?

17 A    So the way this was structured was when you went through

18 that door, you came into an area of the room and this was an

19 entrance that led you down into another what I refer to as a

20 cellar or basement in that one building.  That's the best way

21 I can describe it.  And then when you went into that cellar

22 room and that basement room, that's where the actual entrance

23 of the tunnel begins.

24 Q    Looking at 208-28.

25 A    So this is in, what I refer to as the basement room or

Lenox - direct - Robotti                    1138

1  the cellar room.  This is a winch that was in that room that

2  was being used to haul materials up and down from the tunnel.

3  Q    And next looking at 208-29.

4  A    This is the main entrance shaft that leads down.  It

5  goes -- this is the beginning of the tunnel.  You go down this

6  shaft for approximately 65 feet underground.

7  Q    208-30?

8  A    So this is a picture looking north into the tunnel.  So

9  we are now down in the bottom, at the bottom where the tunnel

10 begins to go north and south and so this is the beginning

11 where we are looking north through the tunnel.

12 Q    Looking next at 208-31.

13 A    This is another picture of the tunnel.  It's a little

14 further down in the tunnel where you can see this is all solid

15 rock, you can see the ventilation pipe, there's a green pipe

16 and then there's, it looks like a black pipe or two.  You can

17 see lighting which was part of the tunnel already.  This stuff

18 was already there when we got in there.  You can possibly see

19 a little bit of the reflection -- there's actually water on

20 the floor of the tunnel so you can see a little bit of the

21 reflection of the light which is coming off the water in the

22 tunnel.

23 Q    Looking at 208-32.

24 A    This is a portion of the ceiling of the tunnel which

25 shows markings, markings for the tunnel.

Lenox - direct - Robotti                          1139

1    Q      208-33.

2    A      This is some equipment, shovels, buckets, that were used

3    to move material in the tunnel and construction materials that

4    they had stored in there that were being used.

5    Q      Is this the end of the tunnel?

6    A      It appears to be the end of the tunnel, yes.

7    Q      And, finally, looking at 208-34.

8    A      This is actually the ceiling at the end of the tunnel

9    and, even though it didn't come to the termination point in

10   the warehouse, for some reason, they had opened up the tunnel.

11   So it was almost, like, cone-shaped at the top where the

12   tunnel had terminated at this point.

13   Q      So this is digging back up towards the surface?

14   A      Going back up, yes.

15   Q      And about how far away was this point from the building

16   on the U.S. side which I'll circle here in the center of

17   Government Exhibit 208-11?

18   A      So the termination point of the tunnel as constructed was

19   100 feet short of this building.  So it came up 100 feet just

20   south in this field.

21   Q      And based on your observation, did it appear that the

22   tunnel was heading toward this building?

23   A      Yes, it did.

24          (Continued on next page.)

25

CMH      OCR      RMR      CRR      FCRR

1140

1   Q    I'd like to show you Government Exhibit 208-35 --

2           THE COURT:  Before you do that, do you have much

3   more?

4           MR. ROBOTTI:  We have a video left to play,

5   Your Honor, which is about 15 minutes or so.

6           THE COURT:  We should take a break now.

7           Ladies and gentlemen, please remember not to talk

8   about the case.  We will see you back in here at five minutes

9   to 3.

10          (Jury exits.)

11          THE COURT:  Okay.  Recess.  2:55.

12          (Recess taken.)

13          (In open court; outside the presence of the jury.)

14          THE COURT:  All right.  Bring in the jury, please.

15          (Jury enters.)

16          THE COURT:  Okay.  Be seated, please.

17          We will continue with direct examination.

18          (Continued on next page.)

19

20

21

22

23

24

25

Lenox - direct - Robotti                    1141

1    BY MR. ROBOTTI:

2    Q    Agent Lenox, I'd like to show you what's been marked for

3    identification as Government Exhibit 208-35.

4              Do you recognize this?

5    A    Yes, I do.

6    Q    And what is it?

7    A    This is a DVD of the tunnel that I was talking about

8    earlier from, beginning at the compound.  My initials are on

9    it and date.

10   Q    Is this video footage of that tunnel?

11   A    Yes, it is.

12   Q    And were you present when this video was made?

13   A    Yes, I was.

14             MR. ROBOTTI:  Your Honor, the government offers

15   Government Exhibit 208-35 in evidence.

16             MR. PURPURA:  No objection.

17             THE COURT:  Received.

18             (So marked.)

19             MR. ROBOTTI:  So at this time, we'd like to play

20   208-35 for the jury.

21   Q    Agent Lenox, can you please narrate portions of the video

22   as you see it during the course.

23             (Video plays.)

24   A    So this is, again, the large warehouse building that's on

25   the eastern corner of the compound.

Lenox - direct - Robotti                    1142

1        This is -- that's the loading ramp.  That's the
2   western building where the tunnel begins and that's the
3   loading ramp, loading dock area.  You can actually see better
4   in the video footage the angle that that ramp goes down, so
5   you can back that dump truck down in there and just load, put
6   it on the trailer on the back of that truck, if needed.
7        Again, they're just scanning through, through the
8   room.  This is a main entrance shaft going straight down of
9   the tunnel.
10  Q    How far was that drop?
11  A    Approximately 65 feet.  And there was a wrought iron --
12  you saw, you could see that there's a wrought iron ladder.
13       Again, these are ventilation pipes, the wench.
14  Q    Is this the pulley for dirt we saw earlier?
15  A    That's correct.
16       That's an agent's foot.
17  Q    And how did you get down this shaft?
18  A    Again, he's standing on the top rung of the ladder.
19  There's a ladder that goes down.
20       Can you see now he's looking up from the bottom of
21  the tunnel?  So here we're turning around inside the tunnel.
22  There's some flatbeds inside the tunnel that were used to
23  carry equipment, dirt, buckets of dirt, from the end of the
24  tunnel back out to where they could be loaded on to the winch
25  and lifted up.

Lenox - direct - Robotti                    1143

1    We're starting to walk now through the tunnel.  So

2    you can see there's the lighting on the left-hand side.

3    There's some additional ventilation tubing that runs on the,

4    adjacent to the ceiling, on the top of the ceiling on the

5    right-hand side.  This is pretty much solid, solid rock that

6    we're looking at.  There were some areas where there was some

7    shoring with two-by-sixes up against the wall and against the

8    ceilings.

9    Q    About how tall is the tunnel?

10   A    It's about four and a half feet high so you actually have

11   to bend over.  So then when you're looking at this video,

12   you've got to realize you're hunched over as you're

13   videotaping and walking through this tunnel so it's a very

14   uncomfortable environment to be in.

15         And you can see, again, there's water which is just

16   seepage that came in from underground, some water of the floor

17   of the tunnel.

18   Q    And just pointing out, again, this pipe that we see

19   running along the upper right-hand corner of the video, what's

20   that?

21   A    That is for ventilation.

22   Q    And these lights on the upper left-hand side, were those

23   there when you arrived?

24   A    Those were all there and were all working when we were

25   there, yes.

Lenox - direct - Robotti                    1144

1          Here I think you can see, I don't know if you can
2    tell, the part of the ceiling that looks a little flat where
3    they reinforced the ceiling.  And here's some materials.
4    Every so often, as you would walk down through the tunnel,
5    every so often there would be a little cutout, like a little
6    alcove, where they would store supplies.  So you can see here
7    there's supplies.  So they had them off to the side so you can
8    access them as you go in through the tunnel.
9          Again, we're continuing walking.  And now we're
10   walking north.  We're -- by this point we're already into the
11   United States.
12   Q    So you're walking north from the Mexican side under the
13   border and into the United States?
14   A    That's correct.
15   Q    About how wide is the tunnel?
16   A    I would say between three to four feet.  It wasn't really
17   very wide at all.
18   Q    Did you fit two people walking side by side or just
19   single?
20   A    No.  You had to go, for the most part, single file
21   through the tunnel.  It was hard going side by side.  Again,
22   for the most part, this was all solid rock that was cut out.
23   And, again, this is -- this was about 1,450 feet, almost
24   1,500 feet.  So to put that in a little bit more perspective,
25   you're talking about five football fields.  So it's a pretty

CMH      OCR      RMR      CRR      FCRR

Lenox - direct - Robotti                    1145

1   long walk.  You're hunched over.  The camera is sort of

2   bouncing up and down.  The air in there, even though there was

3   ventilation, was a little bit stale so it was a little bit of

4   a trek trying to go through this thing.

5   Q    About how many meters is that?

6   A    I believe it's a little over 400 meters.

7           THE COURT:  Mr. Robotti, do we need the whole tape?

8           MR. ROBOTTI:  Your Honor, I think I would like to

9   play the whole tape.  It's just a couple more minutes.

10          THE COURT:  Okay.

11  Q    There's another cutout here.  What do we see here?

12  A    There's some type of valves or filters.  I'm not exactly

13  sure what they're for, if they're for part of the ventilation

14  or if they're for use for the hydraulic jacks to do the

15  drilling, but there's some type of a valves and possibly

16  filters that are in there.  I'm not construction oriented.

17          Again, there's another small cutout where they

18  stored supplies.

19  Q    So this tape runs about the length of the tunnel.  How

20  long does it take to walk through the tunnel?

21  A    Honestly, I don't recall.  I don't recall the exact time

22  but it was, it was a trek.  It took us quite a while.  It's

23  not as though you're just standing up straight and you're just

24  walking down the sidewalk.  You're hunched over and it's a

25  little narrow and so it was a cumbersome walk.  So it took a

Lenox - direct - Robotti                    1146

1   little bit longer than you would think just to walk that

2   distance if you were walking down the street just because of

3   being in that area, that closed area.

4   Q    And we see the ceiling appears to have changed here?

5   A    Right.  So that's an area that was reinforced with

6   two-by-sixes.

7   Q    And what about the walls?  They appear to be smoother

8   than the earlier walls.

9   A    There's some areas where the walls, again, are reinforced

10  by two-by-six shoring.  So, typically, when you see the smooth

11  area, that's the area that's been reinforced.  So it helped to

12  support it.

13          Here we're getting close to the end.  You can see

14  the person is leaning over on their knees because, again, you

15  can't stand straight up in this tunnel.  And, again, you can

16  see people standing there so that sort of gives -- when you

17  were asking about how wide it is, it's a very tight area in

18  there.  So for two people to walk down side by side is just

19  not feasible.

20          This appears to be the end of the tunnel.  It looks

21  like they're looking up into the ceiling.  It's that

22  cone-shaped area that I had described earlier where they cut

23  out the ceiling.

24  Q    And this hole we're looking at here, can you tell what

25  that was?

Lenox - direct - Robotti                    1147

A     Other than it just being a hole going up, I don't know if
they were continuing to drill up or -- I honestly don't know
the purpose of it, whether they were attempting to determine
where they were at and drill up for air or they're just
opening it up for some type of spacing.  You can see here they
cut into the wall and they had a little, actually designed,
like, a little shelf area where they can put hand tools and
other supplies.

          So now we're back into the building on the western
end that contained the tunnel entrance and you can see there's
an agent that's looking through a hole in the wall and that is
actually the northern wall.  So when you look through that
hole, and you'll see in a minute, you're looking into the
United States.

          So here.  So here's the metal, that metal at the
fence at the bottom is actually the international border and
looking north into the United States from there so they can
put a lookout standing there looking north to see if there was
any type of activity with the United States Border Patrol and
U.S. Customs or anybody that would be on the northern side of
the border, if there's any attention being drawn to the area.
So they had that spot, they could use it as a spotting
location.

          (Video stopped.)

Q     Thank you, Agent Lenox.

CMH        OCR        RMR        CRR        FCRR

Lenox - cross - Purpura                    1148

1           MR. ROBOTTI:  No further questions.

2           THE COURT:  All right.  Any cross?

3           MR. PURPURA:  I do.

4           THE COURT:  Do you want the lapel mic?

5           MR. PURPURA:  No, I'll stay right here.

6   CROSS-EXAMINATION

7   BY MR. PURPURA:

8   Q    Agent Lenox, good afternoon.

9   A    Good afternoon.

10  Q    I take it you're not claustrophobic?

11  A    I'm not.

12  Q    It looked like a pretty tight tunnel.

13  A    Yes, it did.

14  Q    And it appeared -- I know you said you're not an

15  engineer, you're not a construction guy, but it appeared to be

16  kind of like a pick-and-shovel type of tunnel perhaps with

17  some drills as well, about right?

18  A    I would guess that, yes.

19  Q    Obviously a little too small to get any type of backhoe

20  or any type of large machine into that tunnel, would that be

21  about right?

22  A    That's correct.

23  Q    And 30 years DEA.  Long time.

24  A    Yes, sir.

25  Q    We heard what a DEA-7 is but we haven't heard quite yet

CMH      OCR      RMR      CRR      FCRR

Lenox - cross - Purpura                    1149

1    what a DEA-6 is.  Can you tell us what a DEA-6 is?

2    A    That's a report of investigation.  That is our standard

3    form to write our reports on.

4    Q    And an investigation such as this, you actually authored

5    a fairly large DEA-6, correct?

6    A    I believe so, yes.

7    Q    And one of the reasons would be you never know as an

8    agent when you're getting called back to testify so it helps

9    to have something that refreshes your recollection?

10   A    That's correct.

11                (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lenox - cross - Purpura                    1150

1   BY MR. PURPURA:  (Continuing.)

2   Q    And when you write these things generally, you try to be

3   as accurate as possible; is that fair to say?

4   A    That's correct.

5   Q    And DEA 6's can also contain -- do you know what a

6   debriefing is?

7   A    Yes, sir.

8   Q    What is a debriefing?

9   A    It's another term for an interview.

10  Q    And you have interviewed cooperators and informants

11  throughout your career; is that correct?

12           MR. ROBOTTI:  Objection, Your Honor.  It's outside

13  the scope.

14           THE COURT:  Sustained.

15  A    Yes, I have.

16           MR. ROBOTTI:  Can we strike the answer?

17           THE COURT:  The answer is stricken.  The jury will

18  disregard it.

19  Q    This is Government Exhibit 502 which can be displayed.

20  And the tunnel, help me with this, it's right up by Tijuana;

21  is that correct?

22  A    That's correct.

23  Q    I know that Tijuana is on the border with Mexico and the

24  United States; correct?

25  A    That's correct.

Lenox - cross - Purpura                    1151

1    Q    And the area -- how close is the -- was the tunnel

2    discovered to Tijuana itself, the city?

3    A    It was in an area called -- out by the Tijuana Airport.

4    It was just east of the Tijuana airport so I don't know

5    geographically if it was considered within the city limits,

6    but if I had to say, I would say that it was part of Tijuana.

7    Q    So obviously very, very close if not inside Tijuana

8    proper; correct?

9    A    Correct.

10   Q    In 1993, you were working in Mexico at that time?

11   A    That's correct.

12   Q    And you were somewhat or I would assume somewhat familiar

13   with various drug trafficking organizations in Mexico during

14   that period of time; is that correct?

15   A    Yes, I was.

16   Q    And it's also fair to say that during that time certain

17   drug trafficking organizations had particular areas where they

18   had their strongholds; is that correct?

19             MR. ROBOTTI:  Objection.

20             THE COURT:  Sustained.

21             MR. PURPURA:  Judge, this is within the scope and I

22   will approach if you need me to explain.

23             THE COURT:  I need to hear it.  I do not see it.

24             (Sidebar held outside of the hearing of the jury.)

25             (Continued on next page.)

SN       OCR       RPR

```
                         Sidebar                        1152
```

 1              (The following sidebar took place outside the

 2     hearing of the jury.)

 3              MR. PURPURA:  Judge here is the relevance.

 4              THE COURT:  I can see the relevance.  I do not see

 5     how it is within the scope.

 6              MR. PURPURA:  The only purpose to calling this

 7     witness to describe the tunnel is because they're attributing

 8     the tunnel to my client, Joaquin Guzman.

 9              THE COURT:  They did not say that.  That is the

10     Government's case.  This witness is not the guy who is going

11     to do it.

12              MR. BALAREZO:  Then we can -- I'll move to strike

13     his entire testimony at this point because it's not relevant.

14              THE COURT:  I am assuming they're going to tie the

15     tunnel to your client through some other testimony, which they

16     have with the prior witness.

17              MR. BALAREZO:  Then you should give a subpoena to

18     this man in California to fly back in because they it be

19     relevant at that time.

20              THE COURT:  If you want to call him during your case

21     you can do that, but I am not sure it will be relevant.  What

22     are you trying to get at?

23              MR. BALAREZO:  I know in 1993 where this -- this was

24     the area that --

25              THE COURT:  It is just not remotely related to his

Sidebar                                          1153

1   history.  What makes you think he knows anything about where

2   these areas are -- you must know because you have seen 3500

3   material, but he did not testify to any of it.

4          MR. ROBOTTI:  The Government does continue to object

5   to this.  The next cooperating witness will testify about this

6   tunnel and connect it to the defendant.  If the counsel wants

7   to cross-examine him on his area of control --

8          THE COURT:  This is not within the scope.  This

9   witness simply testified to the physical configuration of the

10  tunnel that he observed.  That's it.  He can be a guy off the

11  street.  The fact that he is an agent and that he has done

12  other investigations -- and maybe he knows about where the

13  drug manufacturers are maybe he doesn't.

14         MR. PURPURA:  He testified to that; he has a liaison

15  in his three years with Mexico that they share intelligence,

16  they share investigative techniques.  They share tips and

17  areas and seizures, so this is all part of it.

18         THE COURT:  It is not.  It is not.  That is just

19  background.  No.  I am going to sustain the objection.

20         (Sidebar ends.)

21         (Continued on next page.)

22

23

24

25

Putman - direct - Robotti                    1154

1           (Continuing.)

2           THE COURT:  Anything else?

3           MR. PURPURA:  Based on the Court's ruling, I have no

4   further questions.  I would ask that the witness,

5   unfortunately, be subject to recall by the defense.

6           THE COURT:  That should have been don at sidebar.

7           You may step down, sir.

8           (Witness excused.)

9           THE COURT:  All right.  The Government's next

10  witness.

11          MR. ROBOTTI:  The Government calls Owen Putman.

12          THE COURTROOM DEPUTY:  Raise your right hand.

13          (Witness sworn/affirmed.)

14          THE COURTROOM DEPUTY:  State and spell your name for

15  the record.

16          THE WITNESS:  My name is Owen Putman, P-U-T-M-A-N.

17  **OWEN PUTMAN**,

18          called by the Government, having been

19          first duly sworn, was examined and testified

20          as follows:

21  DIRECT EXAMINATION

22  BY MR. ROBOTTI:

23  Q    Good afternoon.

24  A    Good afternoon.

25  Q    Are you employed?

Putman - direct - Robotti                    1155

1    A    Yes, I am.

2    Q    Where are you employed?

3    A    I am currently employed with a company Forfeiture Support

4    Associates.

5    Q    And what's your position there?

6    A    I'm a financial investigator.

7    Q    How long have you been at Forfeiture Support Associates?

8    A    For approximately ten months.

9    Q    Where did you work previously?

10   A    Prior to that I was a special agent with the Drug

11   Enforcement Administration.

12   Q    How long were you with the Drug Enforcement

13   Administration?

14   A    Approximately 28 years.

15   Q    And what were your duties and responsibilities?

16   A    As a special agent I investigated violations, both

17   individuals and organizations, involved in illegal drug

18   trafficking.

19   Q    Now, I would like to direct your attention to May 1994.

20   A    Yes.

21   Q    Were you working as a special agent with the Drug

22   Enforcement Administration at that time?

23   A    Yes, I was.

24   Q    Where were you based?

25   A    I was assigned to the Chicago field division.

Putman - direct - Robotti                    1156

1    Q    And whom, if anyone, were you investigating at that time?

2    A    At that time we were investigating Enrique

3    Avalos-Barriga, Miguel Angel Martinez Martinez and Enrique

4    Avalos and Joaquin Guzman.

5    Q    And other associates of them as well?

6    A    That's correct.

7    Q    How did your investigation start?

8    A    In the summer of 1993, we learned that there was

9    activity --

10                MR. BALAREZO:  Objection.

11                THE COURT:  I understand, I understand.  Sustained.

12   BY MR. ROBOTTI:

13   Q    In the summer of 1993 did you learn that a person named

14   Enrique Avalos was in Chicago?

15   A    We ultimately learned he was in Chicago in November of

16   1993.

17   Q    And what investigative steps did you take with respect to

18   Mr. Avalos in 1993 and 1994?

19   A    In 1993 we received information that an individual had

20   been instructed to wire $30,000 to Mr. Avalos at the address

21   6441 West 27th Street under the name Juan Robles.  Based on

22   that information, we established surveillance on 6441 West

23   27th Street and observed Enrique Avalos.

24   Q    And following your physical surveillance of Mr. Avalos

25   what did you do next?

Putman - direct - Robotti                    1157

1   A     Ultimately we were able to obtain a court authorization

2   for a wire intercept on Mr. Avalos' phone.

3   Q     And was Mr. Avalos the initial target of the wiretap?

4   A     Yes, he was.

5   Q     I would like to show you what's been marked as Government

6   Exhibit 27 for identification.  Did you recognize this?

7   A     Yes, I do.

8   Q     What this?

9   A     A picture of Enrique Avalos.

10             MR. ROBOTTI:  Your Honor, the Government offers

11  Government Exhibit 27 in evidence.

12             THE COURT:  Anybody?  All right, received without

13  objection.

14             (Government Exhibit 27 received in evidence.)

15             (Exhibit published.)

16  BY MR. ROBOTTI:

17  Q     So looking at Government Exhibit 27 was this the target

18  of your physical surveillance and your wiretap?

19  A     That's correct.

20  Q     In general what's the process for obtaining a wiretap?

21  A     In order to obtain a wiretap you first need to obtain

22  approval from the Drug Enforcement Administration and the

23  Department of Justice.  An application is submitted which

24  contains an affidavit establishing probable cause to the

25  deciding officials at the DEA and DOJ.  Once you receive

Putman - direct - Robotti                    1158

1  approval from the DEA and DOJ, the application is submitted to

2  a judge in the district court where the application is sought.

3  Q    And if a judge approves that application, for how long

4  are you authorized to wiretap a phone?

5  A    30 days.

6  Q    Did you, in fact, receive court authorization to wiretap

7  Mr. Avalos' phone?

8  A    Yes, we did.

9  Q    When was that?

10 A    We received authorization May 18, 1994.

11 Q    After you obtained authorization what was your role in

12 this wiretap?

13 A    I was the case agent overseeing the investigation.

14 Q    What's a case agent?

15 A    A case agent is the individual primarily tasked with

16 overseeing and directing a particular investigation.

17 Q    How was the wiretap monitored?

18 A    Because the majority of the calls were in the Spanish

19 language, interpreters familiar with the Spanish language were

20 present to monitor and interpret the calls and translate the

21 calls under the direct supervision of a special agent.

22 Q    After the initial 30-day court order expired on

23 Mr. Avalos' phone what happened next?

24 A    Based on the information we acquired during the first

25 30-day wire intercept, we were able to apply for a follow-up

Putman - direct - Robotti                    1159

1  wire intercept on Mr. Avalos' phone as well as two additional

2  phones.

3  Q    In total how many wiretap orders did you get for

4  Mr. Avalos' phone?

5  A    Including the initial order I believe there were

6  approximately eight.

7  Q    So during -- approximately what time period was the

8  wiretap ongoing on Mr. Avalos' phone?

9  A    From the beginning of May or the middle of May through

10  the end of September of 1994.

11  Q    And aside from Mr. Avalos did you intercept other

12  persons' phones during the course of this investigation?

13  A    Yes, we did.

14  Q    How many other phones were the target?

15  A    Because the individuals that we were targeting were

16  changing their phone numbers, dropping phones and picking up

17  new numbers, I'm not sure of the exact amount.  I believe it

18  was five.

19  Q    Let me rephrase that.  How many different persons were

20  the target?

21  A    There were three primary individuals whose phones we were

22  listening to.

23  Q    And approximately how many calls did you intercept during

24  the course of this wiretap investigation?

25  A    Over 1,000.

Putman - direct - Robotti                    1160

1   Q      During the course of your investigation, did you -- you

2   mentioned you investigated somebody known as Miguel Angel

3   Martinez Martinez; is that correct?

4   A      That's correct.

5   Q      Why were you investigating him?

6   A      We intercepted Mr. Martinez Martinez during our wiretaps

7   of Mr. Avalos' phone.

8   Q      How was he referred to on the calls?

9   A      He was referred to by a number of ways, El Tololoche, El

10  Tolo and El Compadre.

11  Q      I would like to show you what's been marked as Government

12  Exhibit 73 for identification.  Do you recognize this?

13  A      Yes, I do.

14  Q      And what do you recognize it to be?

15  A      It's a photograph of Miguel Angel Martinez Martinez.

16         MR. ROBOTTI:  The Government offers Government

17  Exhibit 73 in evidence.

18         MR. BALAREZO:  No objection.

19         THE COURT:  Received.

20         (Government Exhibit 73 received in evidence.)

21         (Exhibit published.)

22  BY MR. ROBOTTI:

23  Q      Government Exhibit 73, this is the person you identified

24  as Miguel Angel Martinez Martinez also known as Tololoche?

25  A      That's correct.

Putman - direct - Robotti                    1161

1   Q     Next I would like to show you what's been marked as

2   Government Exhibits 600A-1 to 600A-5 for identification only.

3   Do you recognize these?

4   A     Yep, I do.

5   Q     What are they?

6   A     Audio cassette tapes that were acquired during our wire

7   intercepts.

8   Q     And how do you recognize them?

9   A     I recognize them by my initials on the tapes in the lower

10  left-hand corner as well as markings on the tape to include

11  the case number.

12  Q     All right.  So looking first at Government Exhibit

13  600A-1, what is the date of the communications recorded on

14  this tape?

15  A     The date on that tape is June 13, 1994.

16  Q     And 600A-2?

17  A     August 23, 1994.

18  Q     600A-3?

19  A     September 1, 1994.

20  Q     600A-4?

21  A     September 5, 1994.

22  Q     And 600A-5?

23  A     September 21, 1994.

24  Q     All right.  I would next like to show you what's been

25  marked as Government Exhibit 600B for identification.  Do you

Putman - direct - Robotti                                1162

1   recognize this?

2   A     Yes, I do.

3   Q     What do you recognize this to be?

4   A     That's a CD that contains copies of the audio recordings

5   of the cassette tapes that we just saw.

6   Q     And are there six calls on here?

7   A     Yes, there are.

8   Q     Did you review this in anticipation of your testimony

9   today?

10  A     Yes, I did.

11  Q     How do you recognize it?

12  A     I recognize it by the signature on the CD itself.

13            MR. ROBOTTI:  Your Honor, the Government offers 600B

14  into evidence.

15            MR. BALAREZO:  No objection.

16            THE COURT:  Received.

17            (Government Exhibit 600B received in evidence.)

18  BY MR. ROBOTTI:

19  Q     Are the calls dated on this specific disk?

20  A     Yes, they are.

21  Q     And how do those dates compare to the dates of the audio

22  cassettes we just looked at in 600A-1 to 600A-5?

23  A     The dates on the files on the CD match the dates on the

24  audio cassette tapes.

25            MR. ROBOTTI:  Can we publish 600B to the jury.

SN        OCR        RPR

Putman - direct - Robotti                    1163

1              (Exhibit published.)

2    Q    So for each of the six calls on Government Exhibit 600B,

3    does the date of the call match the audio cassette from which

4    it was copied?

5    A    Yes, it does.

6    Q    Who are the participants on these six calls?

7    A    Enrique Avalos, Miguel Angel Martinez Martinez.

8    Q    Now, I would like to switch gears a little bit and talk

9    about a company called Agro Industrias Unidas.  Are you

10   familiar with that company?

11   A    Yes, I am.

12   Q    How are you familiar with it?

13   A    It's a company that was identified in connection with our

14   investigation.

15   Q    And why did you start investigating it?

16   A    Well, the information about the company was intercepted

17   over our wire intercepts.

18   Q    And where was this company based?

19   A    It was based in Mexico and it had locations in Los

20   Angeles.

21   Q    I would like to show you what's been marked as Government

22   Exhibit 403-10 for identification.  Do you recognize this?

23   A    Yes, I do.

24   Q    And what do you recognize this to be?

25   A    It's a certified business record.

Putman - direct - Robotti                          1164

1   Q     And does this certified business record relate to Agro

2   Industrias Unidas?

3   A     Yes, it does.

4   Q     And in particular it's a lease 14325 Alondra Boulevard,

5   La Mirada, California?

6   A     That's correct.

7          MR. ROBOTTI:  Your Honor, the Government offers

8   Government Exhibit 403-10 into evidence.

9          MR. BALAREZO:  No objection.

10         THE COURT:  Received.

11         (Government Exhibit 403-10 received in evidence.)

12         (Exhibit published.)

13  BY MR. ROBOTTI:

14  Q     So this address, 14325 Alondra Boulevard, La Mirada,

15  California.  Are you familiar with that?

16  A     Yes, I am.

17  Q     How so?

18  A     It's a warehouse that was identified during the course of

19  our investigation and investigated related to our

20  investigation.

21  Q     I would like to direct your attention to page 329330.

22  What's the title of this document?

23  A     Standard Proposal to lease.

24  Q     And can you see the date here?

25  A     June 23, 1994.

Putman - direct - Robotti                    1165

1    Q    And looking at paragraph one, who is the lessee?

2    A    Agro Industrias Unidas SA de CV.

3    Q    What is the premises to be leased?

4    A    14325 Alondra Boulevard, La Mirada, California.

5    Q    And how is the premises described?

6    A    Approximately 40,044 square foot warehouse.

7    Q    And under paragraph eight right here what is the use of

8    the premises listed as?

9    A    Storage, refilling edible oil containers to tank oil

10   cars -- rail cars, pardon me.

11   Q    I would like to look at page 329331.  Who is listed as

12   the representative of Agro Industrias Unidas?

13   A    Manuel Trevino Soto.

14   Q    Looking at page 329332 what does it say under the

15   paragraph CPI?

16   A    "Lessor to construct a steel shed covering two railroad

17   tanker cars on the spur.  The cost to be paid back to the

18   lease or amortized through the first five-year lease period."

19   Q    Do you know what a spur is?

20   A    Yes, I do.

21   Q    What's a spur?

22   A    A spur is a section of railroad track that separates from

23   the main line usually next to or inside a warehouse that

24   allows customers to load and unload rail cars without

25   interfering with other railroad operations.

Putman - direct - Robotti                    1166

1    Q    I would like to show you what's been marked for

2    identification as Government Exhibit 215-1 to 215-6.  I'm

3    sorry it will actually be 215-9.

4            Do you recognize these?

5    A    Yes, I do.

6    Q    What are they?

7    A    This picture here is an overview of the industrial area

8    where the warehouse 14325 Alondra Boulevard is located.

9    Q    And do all of these photographs relate to that location?

10   A    Yes, they do.

11           MR. ROBOTTI:  Your Honor, the Government offers

12   Government Exhibits 215-1 to 215-9 into evidence.

13           MR. BALAREZO:  No objection.

14           THE COURT:  Received.

15           (Government Exhibit 215-1 to 215-9 received in

16   evidence.)

17           (Exhibit published.)

18   BY MR. ROBOTTI:

19   Q    Now, when were these photographs taken?

20   A    They were taken in the summer of 1994.

21   Q    All right.  First looking at Government Exhibit 215-1

22   what do we see here?

23   A    This is an overview of the industrial area of 14325

24   Alondra Boulevard.

25   Q    Do you actually see the Alondra Boulevard warehouse in

SN        OCR        RPR

Putman - direct - Robotti                    1167

1   this photograph?

2   A    You can see the tip of it right down here.

3   Q    That's the building at the lower center of the

4   photograph; correct?

5   A    That's correct.  The lower center of the photograph.

6   Q    Let's next look at Government Exhibit 215-3.  What do we

7   see here?

8   A    This is a different view of 14325 Alondra.  It's the

9   building located right here.

10  Q    And do you see these train tracks in the upper left hand

11  of the photograph, is that a spur?

12  A    That's a railroad spur; correct.

13  Q    Looking at Government Exhibit 215-7 what is this?

14  A    It's a tanker car situated on the railroad spur next to

15  the warehouse.

16  Q    And looking at Government Exhibit 215-8 and 215-9, are

17  these different photographs of those same tanker cars?

18  A    That's correct.

19  Q    Looking back for a moment at Government Exhibit 215-7,

20  are you able to make out the tanker car number on the side of

21  the tanker car here?

22  A    Yes, I am.  UTLX58403.

23  Q    Looking back at 215-2 here, these aerial photographs that

24  we took?

25  A    Yes.

SN        OCR        RPR

Putman - direct - Robotti                    1168

1   Q    Were these aerial photographs taken while the tanker cars

2   were there or not there?

3   A    The tanker cars are not there at that time.

4   Q    Based on the other photographs we looked at, are you able

5   to tell where those tanker cars were situated?

6   A    Yes, they were located in the shadow area next to this

7   warehouse right here where the line is.

8   Q    Were they on a spur?

9   A    They were on a railroad spur.

10  Q    I would like to show you what's been marked for

11  identification as Government Exhibit 401-1 and 401-1-A?

12        Do you recognize these?

13  A    Yes, I do.

14  Q    What do you recognize them as?

15  A    Business records.

16  Q    And are these certified business records from BNSF

17  Railway Company?

18  A    That's correct.

19        MR. ROBOTTI:  Your Honor, the Government offers

20  Government Exhibit 401-1-A and 401-1 into evidence.

21        MR. BALAREZO:  No objection.

22        THE COURT:  Received.

23        (Government Exhibit 401-1-A and 401-1 received in

24  evidence.)

25        (Exhibit published.)

Putman - direct - Robotti                    1169

BY MR. ROBOTTI:

Q    So, looking first at page 291843 of this exhibit, what is this?

A    This is a bill of lading from the Atchison, Topeka & Santa Fe Railway Company.

Q    What does this first line here say?

A    It says, "La Mirada, California August 26, 1994 from Agro Industrias Unidas."

Q    And going down to the line titled "Destination" what does it say there?

A    "Laredo, Texas."

Q    And what is the car initial and car number for this car, directing your attention here?

A    The car initials UTLX the car number is 58403.

Q    And how does that number compare to the tanker car that was situated in the warehouse in the photographs we previously looked at?

A    It's the same number.

Q    And what's the description of the articles?

A    "One tank soybean oil estimated 16,000 pounds."

Q    Directing your attention to 291846, what's the title of this document?

A    "Uniform Straight Bill of Lading."

Q    Do you know what a bill of lading is?

A    A shipping document.

Putman - direct - Robotti                    1170

1    Q      For tanker cars?

2    A      Correct.

3    Q      Is this from the Atchison, Topeka & Santa Fe Railway

4    Company?

5    A      Yes it is.

6    Q      Could you read this line here?

7    A      At 14235 East Alondra Boulevard, La Mirada, California

8    90638.  The date is August 26, 1994 from Agro Industrias

9    Unidas SA de CV.

10   Q      And what's the destination listed on this one?

11   A      The destination is Estacio Pentaco, Mexico, District

12   Federal.

13   Q      And below that, the route?

14   A      ATSF La Mirada - Laredo Nationale de Mexico, Laredo

15   Mexico DF.

16   Q      And again here, the description and the weight?

17   A      Soybean edible oil, 60,000 pounds.

18   Q      And directing your attention to the lower left-hand

19   corner, what's the name listed here as the representative of

20   Agro?

21   A      Manuel Trevino Soto.

22   Q      Looking at Government Exhibit 291867 -- I'm sorry it's

23   the same exhibit.  Page 291867.

24   A      Yes.

25   Q      What is this document?

SN        OCR        RPR

Putman - direct - Robotti                    1171

1    A    It's a letter confirming correspondence.

2    Q    Is it from the Atchison, Topeka & Santa Fe Railway

3    Company?

4    A    Yes it is.

5    Q    On what date?

6    A    August 19, 1994.

7    Q    To whom is it addressed?

8    A    Mr. Norberto Guzman at Agro Industrias Unidas SA de CV.

9    Q    Can you read the first three lines?

10   A    "Confirming our previous conversations regarding

11   shipments of vegetable oil from La Mirada to Mexico City via

12   Laredo we are offering the following rates."

13   Q    And you mentioned the DF on the previous page is DF

14   another name for Mexico City?

15   A    Yes.

16   Q    Meaning District Federal?

17   A    Correct.

18   Q    And, finally, looking at 291869 --

19             THE COURT:  The same exhibit?

20             MR. ROBOTTI:  Of the same exhibit, Your Honor.

21   Q    What's this document?

22   A    A freight bill from the Atchison, Topeka & Santa Fe

23   Railway Company Railway Company.

24   Q    And to whom is this addressed?

25   A    Mr. Norberto Guzman.

Putman - direct - Robotti                              1172

1    Q    And what is the freight charge?

2    A    The freight charge is $5,382 for soybean oil.

3    Q    60,000 pounds?

4    A    60,000 pounds, correct.

5    Q    And the car number here what is that?

6    A    UTLX56403 -- I apologize.  UTLX58403.

7    Q    And is that the same car we have been talking about?

8    A    Yes, it is.

9    Q    Thank you, Agent Putman.  I have no further questions.

10             THE COURT:  All right, any cross?

11             MR. BALAREZO:  Very briefly.

12

13

14             (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Putman - cross - Balarezo                    1173

1    CROSS-EXAMINATION

2    BY MR. BALAREZO:

3    Q    Good afternoon, sir.  How are you?

4    A    Good afternoon.

5    Q    Just a few brief questions.

6              You initially said that back in May of '94, you were

7    with the Chicago field division.  Was that of the DEA?

8    A    That's correct.

9    Q    At that point, how long had you been with the DEA?

10   A    I came on in February of 1990.  So, is that four and a

11   half years?

12   Q    How long eventually did you end up with the DEA?

13   A    28 years.

14   Q    Now, when you were conducting that investigation back in

15   May of '94, you said that you were investigating and you

16   mentioned three names:  Enrique Avalos; Miguel Martinez

17   Martinez, who you identified as Tololoche; and you also

18   mentioned Mr. Guzman; is that correct?

19   A    That's correct.

20   Q    At that point, how long had that investigation been going

21   on?

22   A    The investigation began in the summer of '93.

23   Q    Summer of '93 to approximately when?

24   A    I believe it was July of '93 when we began.

25   Q    At that time, when you began that investigation in July

LAM       OCR       RPR

Putman - cross - Balarezo                        1174

1   of '93, you already had gotten some intelligence about

2   Mr. Guzman; is that right?

3   A    Correct.

4   Q    At that point, at the point where the investigation

5   began -- strike that.

6           In May of '94 that you talk about, you were already

7   aware that Mr. Guzman had been arrested in Mexico; is that

8   correct?

9           MR. ROBOTTI:  Objection.

10          THE COURT:  Overruled.

11  A    I believe I was aware that he had been arrested in

12  Mexico.  I'm not certain.

13  Q    By the Mexican authorities, correct?

14          MR. ROBOTTI:  Objection.

15          It's hearsay, your Honor.

16          THE COURT:  Well, do we need a sidebar on this?

17          MR. ROBOTTI:  Yes.

18          MR. BALAREZO:  I didn't, but let's go.

19

20          (Continued on the next page.)

21

22

23

24

25

```
                         Sidebar                        1175
```

1           (The following occurred at sidebar.)

2           THE COURT:  Where are you going with this?

3           MR. BALAREZO:  Given that the Government brought out

4    that he was conducting an investigation, I was asking two or

5    three questions regarding what investigatory steps he did

6    regarding Mr. Guzman in that investigation.

7           THE COURT:  Two or three questions?

8           MR. BALAREZO:  Unless he gives me something to run

9    with.

10          THE COURT:  I'll allow it.

11

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Putman - cross - Balarezo                    1176

1       (Sidebar ends; in open court.)

2   BY MR. BALAREZO:

3   Q    At that time, you were aware Mr. Guzman had been arrested

4   by the Mexicans, right?

5   A    I'm not certain.

6   Q    Were you aware that he was detained at that time?

7   A    I was aware that he had been arrested at some point, but

8   I don't remember specifics.

9   Q    Third question.  Did you take any investigatory steps

10  with respect to the Mexicans and Mr. Guzman at that time?

11  A    Do you mean contacting Mexican authorities?

12  Q    Correct.

13  A    I did not.

14  Q    You did mention that in this particular case, you had

15  used what are called Title III wiretaps, correct?

16  A    Correct.

17  Q    And I think you indicated that you had wires up on 12 or

18  13 phones; is that correct?

19  A    No.

20       I think we had eight authorizations.  I don't

21  remember the number of phones.  I think it was five.

22  Q    But, in any event, you intercepted approximately a

23  thousand calls or over a thousand calls?

24  A    Correct.

25  Q    And at that point, you didn't intercept any calls of

LAM       OCR       RPR

Putman - cross - Balarezo                    1177

1    Mr. Guzman, did you?

2    A    Not that I'm aware of, no.

3    Q    Now, just some very quick questions.

4         With respect to some of the documents the Government

5    showed you, there were documents that were directed or had the

6    name of Norberto Guzman; is that right?

7    A    Yes, sir.

8    Q    Your investigation didn't reveal any relation between

9    that Guzman and Joaquin Guzman, correct?

10   A    Not that I'm aware of.

11   Q    Very briefly, you said you were with the DEA for 28 years

12   in total?

13   A    Yes, sir.

14   Q    When did you leave the DEA?  What year?

15   A    I just left the DEA last December, 2017.

16   Q    When was the first time the Government contacted you

17   about testifying in this case?

18   A    I believe it was in the fall of 2017.

19   Q    So, over a year ago?

20   A    Yes, sir.

21   Q    And how many times have you met with the Government in

22   preparation for your testimony here today?

23   A    I met with counsel this week several times.

24   Q    What's "several"?  Two?  Ten?

25   A    Three times, I believe.

Putman - cross - Balarezo                    1178

1    Q     And approximately for how long?

2    A     The first time I think we met for between two and three

3    hours, and then the last two times just for a couple of

4    minutes each time.

5    Q     And when they contacted you last fall, fall of 2017, with

6    respect to testifying in this case, did they tell you why you

7    were going to come?

8    A     No.

9    Q     When did you find out what you were going to testify

10   about here?

11   A     I think over the summer I had several conversations where

12   we discussed my testimony.

13   Q     Over the summer you had discussion about the subject

14   matter of your testimony here today, correct?

15   A     Yes.

16   Q     Now, at that point, were you able to discuss events that

17   happened back in 1994 from your memory or did you go back to

18   notes, reports, that kind of thing?

19   A     I did review reports.

20   Q     The reason you reviewed reports was because the event

21   that happened -- how long ago was 1994?

22         My math isn't as good as Purpura's.

23   A     24.

24   Q     24 years ago.

25         You can't remember everything that happened back

Putman - cross - Balarezo                    1179

1    then, right?

2    A    That's correct.

3    Q    Something like a tunnel, that kind of thing, would that

4    have stuck out in your mind in particularly?

5    A    A tunnel?  I would remember a tunnel.

6    Q    And even though you remember the tunnel, you still had to

7    review reports in order to refresh your recollection --

8              MR. ROBOTTI:  Objection, your Honor.  This witness

9    didn't testify --

10             THE COURT:  Just say "scope."

11             Sustained.

12             MR. BALAREZO:  Very well.

13   Q    With respect to your testimony, regardless of the subject

14   matter or specific incident, it's correct that the reason you

15   reviewed your notes is because you did not remember all the

16   details, correct?

17   A    That's correct.

18   Q    For example, you can't testify here today about a

19   specific conversation that was had on a specific date; is that

20   right?

21   A    Not any specific conversation, correct.

22   Q    For example, out of those thousand -- over one thousand

23   wiretaps, you can't specify any one date that you heard any

24   particular conversation involving any particular people, can

25   you?

Putman - cross - Balarezo                    1180

1    A    I think there are some conversations that I remember.

2    Q    And these are because why that you remember them?

3    A    Well, they were related to a seizure that we had in

4    Chicago.

5    Q    And that's not the subject matter of your testimony here

6    today, is it?

7    A    No, sir.

8                 MR. BALAREZO:  I have nothing further, your Honor.

9                 THE COURT:  Any redirect?

10                MR. ROBOTTI:  No questions, your Honor.

11                THE COURT:  All right.  You may step down.  Thank

12   you very much.

13                Government's next witness?

14                MS. PARLOVECCHIO:  The Government calls Michael

15   Humphries.

16                THE COURT:  Ms. Parlovecchio, are we going to finish

17   this witness by 4:30?

18                MS. PARLOVECCHIO:  I think so, your Honor, maybe at

19   least on direct.  Maybe within five or ten minutes, give or

20   take.

21                THE COURT:  Okay.

22                (Witness sworn.)

23                THE COURTROOM DEPUTY:  Please state and spell your

24   name for the record.

25                THE WITNESS:  Michael Humphries, H-U-M-P-H-R-I-E-S.

LAM      OCR      RPR

Humphries - direct - Parlovechhio                    1181

1          THE COURTROOM DEPUTY:  You may be seated.

2          THE COURT:  You may inquire.

3          MS. PARLOVECCHIO:  Thank you, your Honor.

4    **MICHAEL HUMPHRIES**,

5               called by the Government, having been

6               first duly sworn, was examined and testified

7               as follows:

8    DIRECT EXAMINATION

9    BY MS. PARLOVECCHIO:

10   Q    Good afternoon, Mr. Humphries.

11   A    Good afternoon.

12   Q    I'm over here.  Hello.

13        Where are you employed?

14   A    U.S. Customs and Border Protection.

15   Q    What is your title there?

16   A    Area port director.

17   Q    Where are you the port director?

18   A    Nogales, Arizona.

19   Q    What are your duties and responsibilities as the port

20   director at the Nogales port of entry?

21   A    I lead a staff of over 475 employees.  Some of our -- at

22   a busy port of entry between the U.S. and Mexico border.  Some

23   of our major responsibilities are the prevention of opioids

24   and other dangerous drugs from entering the country and the

25   prevention of firearms, ammunition, and illicit currency from

Humphries - direct - Parlovechhio                    1182

1   leaving the country.

2   Q    How long have you been with Customs and Border

3   Protection?

4   A    31 years.

5   Q    I'm going to direct your attention to November 1989.

6            What was your assignment at that time?

7   A    I was working at the Douglas, Arizona, port of entry in

8   the outbound lanes.

9   Q    What title did you hold at that time?

10  A    I was a U.S. Customs Inspector.

11  Q    I'm going to show you what's in evidence as Government

12  Exhibit 501.

13           (Exhibit published to the jury.)

14  Q    Using Government Exhibit 501, can you please show the

15  jury where Douglas, Arizona is located?

16  A    Yes, it's...

17  Q    Is it right here?

18  A    Can I touch the screen?

19  Q    Yes.

20  A    Douglas is right here.

21  Q    That's approximately where the port of entry is located?

22  A    The port of entry is located right at the international

23  boundary with Mexico, yes.

24  Q    What is the Mexican city across the border from Douglas,

25  Arizona?

Humphries - direct - Parlovechhio          1183

1   A    The town immediately south of Douglas is called Agua

2   Prieta, Sonora, Mexico.

3   Q    What was were you duties as a customs inspector at the

4   Douglas, Arizona, port of entry in November of 1989?

5   A    Prevention of the narcotics entering the country and

6   stopping stolen vehicles, warrants, outbound currencies,

7   firearm, ammunition from leaving the country.

8   Q    Were you working in your role as a customs inspector on

9   November 10, 1989?

10  A    Yes, ma'am.

11  Q    What were you doing on that date?

12  A    I was on the outbound lanes conducting outbound

13  inspections of vehicles attempting to leave the country.

14  Q    I'm going to direct your attention to approximately

15  12:50 p.m. on that date.

16       What happened?

17  A    At that time, I was doing outbound inspections.  I saw a

18  black Ford Bronco approaching toward me.  I stopped the

19  vehicle and began to interview the driver.

20  Q    What caused you to stop that black Ford Bronco?

21  A    I hadn't seen the vehicle before and it had California

22  plates.  I just hadn't seen it before.  It's a good vehicle

23  for just a stop and interview.

24  Q    When you stopped the Bronco, did you recognize the

25  driver?

Humphries - direct - Parlovechhio                1184

1   A    Yes, I did.  Shortly after stopping that vehicle, I

2   recognized that he was a driver that came northbound in a

3   different vehicle a short time earlier, maybe 25 to 35 minutes

4   earlier.

5   Q    I'm going to show you what's marked for identification as

6   Government's Exhibit 214-5.

7          What is this?

8   A    That is the vehicle I stopped that day.

9   Q    How do you recognize it?

10  A    That picture is in the fenced-in area of the Douglas port

11  of entry.  I've seen that picture many times.

12         MS. PARLOVECCHIO:  The Government moves to admit

13  Government Exhibit 214-5.

14         MR. BALAREZO:  No objection.

15         THE COURT:  Received.

16         (Government Exhibit 214-5 so marked.)

17         MS. PARLOVECCHIO:  Publish, please.

18         (Exhibit published to the jury.)

19  Q    Is this the Ford Bronco you stopped that day?

20  A    Yes, sir.

21  Q    You indicated these were out of state plates.  I'll just

22  indicate on the drawing.

23         What is the state that these plates relate to?

24  A    That was a California plate.

25  Q    What did you do after you stopped the Bronco?

Humphries - direct - Parlovechhio          1185

1    A    I began to interview the driver, I got an immigration

2    document from him, and began to take a declaration.

3    Q    What was the identity of the driver?

4    A    The driver's name was Arturo Guzman Loera.

5    Q    What was Mr. Guzman Loera wearing when you stopped him?

6    A    He was wearing a two-piece suit, kind of gray in color.

7    Q    What caused you to notice he was wearing a suit?

8    A    I had recognized him entering the United States from

9    Mexico that short time earlier in a different vehicle.

10   Q    Now, after you got the identification documents for

11   Mr. Arturo Guzman, did you interview him?

12   A    Yes, I did.

13   Q    And, briefly, what, if anything, did he say?

14        MR. BALAREZO:  Objection.

15        MS. PARLOVECCHIO:  Your Honor, I won't be offering

16   it for the truth.

17        THE COURT:  I think I see why.  Overruled.

18        MR. PURPURA:  Judge, we have a problem.

19        THE COURT:  Do you want a sidebar?

20        MR. PURPURA:  Yes.

21        You overruled my objection?

22        THE COURT:  I did, and I'll tell you why if you

23   want.

24

25        (Continued on the next page.)

Sidebar                                                      1186

1          (The following occurred at sidebar.)

2          THE COURT:  I assume your objection was on hearsay

3    grounds.  I assume the Government is putting it in as

4    co-conspirator statement.

5          MS. PARLOVECCHIO:  Your Honor, I'm putting it in to

6    explain why he took his next action, which was to shut off the

7    vehicle because the answer the individual gave him was very

8    suspicious.

9          THE COURT:  What was the answer?

10         MS. PARLOVECCHIO:  The driver said that he went to

11   visit girlfriend in Bisbee, Arizona, which was a good 20, 25

12   minutes away from --

13         THE COURT:  I see.  So, you're not offering it for

14   the truth.

15         MS. PARLOVECCHIO:  Correct.

16         THE COURT:  If you want me to instruct the jury that

17   it's not being offered for the truth, I will.

18         MR. PURPURA:  I would.

19         THE COURT:  That means that I'm going to instruct

20   the jury this is not being offered to show he was visiting his

21   girlfriend, it's being offered to show just what he told the

22   officer.

23         MR. PURPURA:  If I may.

24         THE COURT:  You may.

25         MR. PURPURA:  The Court asked whether 801D2E.  It

LAM      OCR      RPR

Sidebar                                                1187

1  could not come in under that because it is not a

2  co-conspirator to another co-conspirator in furtherance of a

3  conspiracy.

4          THE COURT:  Agree.

5          MR. PURPURA:  I suggest what the Government is

6  attempting to do is to, in fact -- they're suggesting it's not

7  for the truth of the matter asserted.  The only way it's

8  relevant is to impeach the integrity, the truthfulness, of the

9  brother of the Defendant here.

10         THE COURT:  That's one inference that could be

11 drawn, but I'll instruct the jury the only thing it's being

12 offered for is to show why the officer did what he did next.

13         MR. PURPURA:  Why shouldn't this, under 403, not be

14 relevant?  Because when you balance it under relevance versus

15 prejudice, it's highly more prejudicial.

16         THE COURT:  Arturo is not on trial.

17         MR. PURPURA:  But his brother is.

18         And he's been referenced a number of times.

19 Arturito was the person that the last witness suggested was

20 running the organization when the Defendant was in jail.

21         If they're not suggesting for truth of the matter

22 asserted, it's certainly more prejudicial than probative.

23         THE COURT:  Let me say it this way:  Obviously,

24 you're right to the extent there has to be a 403 balancing, as

25 there does on all evidence.

LAM      OCR      RPR

Sidebar                                              1188

1          What is the import of this witness' testimony?

2          MS. PARLOVECCHIO:  Your Honor, the import of this

3    witness' testimony is that he stopped the Defendant's brother

4    with a Bronco loaded with $1.26 million in cash that was

5    suspected drug proceeds.

6          The reason for eliciting the statement is to explain

7    to the jury why he turned off the vehicle next and then

8    proceeded to search him.

9          THE COURT:  I've got it.

10         Mr. Purpura, if the Government wasn't able to say

11   that and went on to the next step saying, We seized

12   $1.26 million, the jury would wonder what the heck was the guy

13   doing thinking there was anything wrong.

14         So, it's just to show why the statement was made and

15   explain why the officer took the action he took next.  It is

16   not for the truth.  It has no prejudicial impact at all.  What

17   has a prejudicial impact is what he found in the car.

18         MR. PURPURA:  That's the statement, that he's trying

19   to lie about where he was going.

20         THE COURT:  I'm overruling the objection.

21         MR. PURPURA:  Judge?

22         THE COURT:  You want the instruction.

23         MR. PURPURA:  On second thought, we don't want the

24   instruction.

25         (Continued on the next page.)

LAM      OCR      RPR

Humphries - direct - Parlovecchio                1189

1      (Sidebar ends; in open court.)

2  BY MS. PARLOVECCHIO:

3  Q    What happened when you questioned Arturo Guzman when you

4  stopped the Bronco that day?

5  A    I asked him who the vehicle belonged to; he said it

6  belonged to a friend.  Then I asked where he was coming from;

7  he said was coming from Bisbee, Arizona, which was about a

8  30-minute drive from where we stood at the port of entry.

9      I then asked him what his purpose was in Bisbee; he

10  said he went to visit his girlfriend.  I asked if he made any

11  purchases or anything in Bisbee; he looked around the vehicle

12  and reached back and pulled up a teddy bear and said that he

13  purchased that for his girlfriend.  At that time, I asked

14  where the girlfriend lived; he said she lived in Bisbee.  I

15  then asked him, Why didn't you give it to her then?

16      At that time, I became suspicious.  I had seen the

17  vehicle that he had come in, like, a half-hour before, pull up

18  behind the vehicle I was inspecting.  So, for officer safety

19  purposes, I reached in and grabbed the key and shut off that

20  vehicle.

21  Q    When you were speaking with Arturo Guzman, what, if

22  anything, did you observe about his behavior?

23  A    He had become arrogant, he was fidgety.

24      I had already known that he was untruthful because

25  when I saw the red Pontiac pull up behind him, you know, I had

LAM      OCR      RPR

Humphries - direct - Parlovecchio                    1190

1  just seen it just shortly before.  I knew there wasn't time

2  for a round trip to Bisbee to go purchase something and to

3  visit a girlfriend all in 30 minutes.

4  Q    You mentioned that red Pontiac.

5           Is that the vehicle you had seen Arturo Guzman come

6  in into the port of entry that day?

7  A    Yes, that's the vehicle I saw him driving northbound from

8  Mexico a short time earlier.

9  Q    Now, who was driving that red Pontiac?

10 A    There were two male individuals in that vehicle.

11 Q    What did you do with regard to Arturo Guzman after you

12 shut his Bronco off?

13 A    I opened the driver's side door, removed him from the

14 vehicle, and brought him into the building for a secondary

15 search and, at the same time, I asked another customs

16 inspector to remove the two individuals in the red Pontiac

17 behind the black Bronco.

18 Q    You mentioned something called a "secondary search."

19           What is a secondary search?

20 A    I was going to conduct a more detailed search of the

21 individual and the vehicle.

22 Q    And did that involve a pat-down?

23 A    For officer safety purposes, whenever you put somebody in

24 a search room or detention cell, yes, we conduct a pat-down

25 search of the individual.

Humphries - direct - Parlovecchio                    1191

1    Q     Let me show you what's marked for identification as

2    Government Exhibit 214-15.

3              What is this?

4    A     That's a photograph of Arturo Guzman Loera.

5    Q     And how do you recognize it?

6    A     That was in our search room, wearing that suit as I

7    described earlier.

8              MS. PARLOVECCHIO:   Government moves to admit

9    Government Exhibit 214-15.

10              MR. PURPURA:   No objection.

11              THE COURT:   Received.

12              (Government Exhibit 214-15 so marked.)

13              MS. PARLOVECCHIO:   Thank you.

14              (Exhibit published to the jury.)

15   Q     After you escorted Arturo Guzman to the search room, what

16   did you do next?

17   A     I had taken a declaration from him whether he had any

18   firearms, ammunition, or money over $10,000, secured him in

19   the search room, and then I went back to get the vehicle and

20   move it into a more secure area, to our secondary area, as it

21   was blocking traffic trying to get going to Mexico.

22   Q     You mentioned you took a declaration regarding currency

23   or firearms.

24              Did Mr. Guzman declare firearms or currency?

25   A     No, he gave a negative declaration.

Humphries - direct - Parlovecchio                1192

1  Q    What happened after you moved the Bronco to the secure

2  area?

3  A    I began a search of the vehicle.  I open the driver's

4  door; I had taken off a screw on the driver's side panel;

5  removed a little piece of molding; and then I pried it open

6  and looked in the hollow area beyond the panel with a tool, I

7  looked in there with a flashlight, and I could see multiple

8  bundles of currency.

9  Q    What did you do after you discovered the currency?

10  A    My port director was sitting on the sidewalk nearby, and

11  I called him over to secondary.

12  Q    What happened next?

13  A    I gave him my flashlight and had him look in there.  Once

14  he saw what was in there, he ordered additional inspectors to

15  deploy shotguns and to get the vehicle into a more secure

16  area.

17  Q    What did you do after the vehicle was moved to the more

18  secure area?

19  A    I returned and I called a customs agent, whom is our

20  investigatory arm, to come in.  They conduct all

21  investigations.  I called the customs agents to respond to the

22  port of entry.

23  Q    What happened after they arrived?

24  A    They arrived, they took photographs, authorized the

25  removal of the contents in the side panel.

Humphries - direct - Parlovecchio                1193

1    Q    Did you conduct a search after they arrived?

2    A    Yes, I continued the search.

3    Q    What did you discover during your continued search?

4    A    That the driver's side panel was full of bundles of U.S.

5    currency, the passenger side panel as well, and within the

6    hull area in the tailgate was loaded as well.

7    Q    I'm going to show you what's marked for identification as

8    Government Exhibits 214-2, 214-9, and 214-10.

9          What are you looking at here?

10   A    I'm looking at the driver's side side panel.

11   Q    And do you recognize it?

12   A    Yes.

13              MS. PARLOVECCHIO:  Government moves to admit

14   Government Exhibit 214-2, 214-9, and 214-10.

15              MR. PURPURA:  No objection.

16              THE COURT:  Received.

17              (Government Exhibits 214-2, 214-9, and 214-10 so

18   marked.)

19              MS. PARLOVECCHIO:  Thank you.

20              (Exhibit published to the jury.)

21   Q    Mr. Humphries, I'm showing you Government Exhibit 214-10.

22          What are we looking at here?

23   A    That's a photograph taken from the passenger's side of

24   the driver's side side panel with the cover being held up.

25   Q    This cover here that you're referring to, what is that?

LAM       OCR       RPR

Humphries - direct - Parlovecchio                    1194

1    A    That's a speaker that was in the vehicle on the side

2    panel.

3    Q    And that white area right behind the speaker?

4    A    That's within the inside of the compartment.

5    Q    I'm showing you Government's Exhibit 214-9.

6              (Exhibit published to the jury.)

7    Q    What do we see here?

8    A    Once that panel with that speaker was removed, this is

9    what it revealed.

10   Q    And what is inside of that panel?

11   A    That was U.S. currency.

12   Q    And now looking at Government Exhibit 214-2.

13             (Exhibit published to the jury.)

14   Q    I'll try to zoom out a bit here.

15             What do we see here?

16   A    That's a photograph of the driver's side side panel but

17   from up above, from the driver's -- probably from the front

18   seat.

19   Q    Now, you testified that you also found cash in the

20   passenger side of the vehicle; is that right?

21   A    Yes, it is.

22   Q    I'm going to show you what's marked for identification as

23   Government Exhibit 214-1, 214-7 -- sorry, 214-1, 214-8, and

24   214-11.  What are these exhibits?

25   A    Those are photographs of the passenger's side side panel.

Humphries - direct - Parlovecchio                1195

1   Looks like they were taken from the driver's side of the

2   vehicle.

3                MS. PARLOVECCHIO:  Government moves to admit

4   Government Exhibit 214-1, 214-8, and 214-11.

5                MR. PURPURA:  No objection.

6                THE COURT:  Received.

7                (Government Exhibits 214-1, 214-8, and 214-11 so

8   marked.)

9   Q    Let's first look at Government Exhibit 214-1.

10               (Exhibit published to the jury.)

11  Q    What do we see here?

12  A    We see the side panel with the speaker removed on the

13  passenger side panel, and we can see bundles of currency

14  behind that, that opening.

15  Q    And this round object or the round cutout, is that the

16  speaker area?

17  A    Yes.

18  Q    And Government Exhibit 214-11.

19               (Exhibit published to the jury.)

20  Q    Is that the same area?

21  A    That's the same area after the backseat was removed, and

22  you can see the entire side panel on the passenger's side.

23  Q    Now Government's Exhibit 214-8, what do we see here?

24               (Exhibit published to the jury.)

25  A    That was after the side panel cover was completely

Humphries - direct - Parlovecchio                1196

1    removed, revealing bundles of currency throughout.

2    Q    You testified that you also found currency in the

3    tailgate; is that right?

4    A    Yes, ma'am.

5    Q    I'm showing you what's marked for identification as

6    Government Exhibit 214-7.

7                (Exhibit published to the jury.)

8    Q    What is this?

9    A    That's a photograph of the tailgate after the covers were

10   removed.

11               MS. PARLOVECCHIO:   Government moves to admit

12   Government Exhibit 214-7.

13               MR. PURPURA:   No objection.

14               THE COURT:   Received.

15               (Government Exhibit 214-7 so marked.)

16               (Exhibit published to the jury.)

17   Q    Mr. Humphries, what do we see here?

18   A    We see bundles of currency within the tailgate of that

19   Ford Bronco.

20   Q    I direct your attention to the left side of this photo.

21   We see some brown objects there.

22               What is that?

23   A    There were grocery-type plastic bags, three of them,

24   within that tailgate that all had U.S. currency within them.

25               (Continued on the next page.)

Humphries - direct - Parlovecchio                    1197

1   BY MS. PARLOVECCHIO: (Continuing)

2   Q    Was any of the other cash in wrapping like that?

3   A    No, just the three bags.

4   Q    How was the other cash wrapped?

5   A    Rubber bands, mostly.

6   Q    Now, did you find anything else in the vehicle besides

7   cash during your search?

8   A    When doing a general search of the vehicle, there were

9   documents.

10  Q    I'm going to show you what's marked for identification as

11  Government's Exhibit 214-14.  I'll show you all the pages,

12  double pages.

13        And what is Government's Exhibit 214-14?

14  A    Those are documents I found inside the interior of the

15  vehicle.

16        MS. PARLOVECCHIO:  The government moves to admit

17  Government's Exhibit 214-14.

18        THE COURT:  Any objection?

19        MR. PURPURA:  I'm sorry.  I apologize.  No

20  objection.

21        THE COURT:  Received.

22        MS. PARLOVECCHIO:  Thank you.

23        (So marked.)

24  Q    Mr. Humphries, I will direct your attention to the first

25  page of Government's Exhibit 214-14.  What is this?

Humphries - direct - Parlovecchio                1198

1    A     That is a sales contract for the vehicle.

2    Q     And who is it, what is the name here at the top?

3    A     Arturo Guzman.

4    Q     And the date of the contract?

5    A     November 8, 1989.

6    Q     And is that two days before the day you stopped

7    Mr. Guzman?

8    A     Yes, ma'am, two days prior.

9    Q     Okay.  And now directing your attention to the second

10   page and the third page of Government's Exhibit 214-14, what

11   do we see here on page two and three of that exhibit?

12   A     That's notifying the buyer that the vehicle was purchased

13   as is, no warranty.

14   Q     And what is the name on these no-warranty documents?

15   A     Both of them have a signature of Arturo Guzman.

16   Q     And is one of them in Spanish?

17   A     Yes, one is in Spanish and one is in English.  They

18   basically say the same thing.

19   Q     And the fourth page of Government's Exhibit 214-14, who

20   is that addressed to?

21   A     That is notice.  It shows the buyer is Arturo Guzman.

22   Q     And is that also dated two days before the day you

23   stopped Arturo Guzman?

24   A     Yes, November 8, 1989.

25   Q     And this is an as-is agreement?

Humphries - direct - Parlovecchio          1199

1    A    Yes, ma'am.

2    Q    And the last page here, what is that?

3    A    That's the back of a California registration showing a

4    transfer of ownership.

5    Q    And this number here, does that match the Bronco?

6    A    Yes, ma'am.

7    Q    And that refers to a Ford Bronco, is that right?

8    A    Yes.

9    Q    Now, what did you do after you completed the search of

10   the Bronco?

11   A    Removed all the currency, placed it into garbage bags,

12   separate garbage bags for each compartment.  So all the money

13   that was in the driver's side panel went into a garbage bag,

14   all the money that was in a, in the passenger side side panel

15   went into a separate garbage bag and then all of the money

16   that was within the tailgate went into a third bag.

17   Q    What did you do after you put all the cash into separate

18   bags?

19   A    The bags were sealed and there was no way to count it so

20   we made arrangements with a local bank to take it there to be

21   counted.

22   Q    Which bank did you take it to?

23   A    The Valley National Bank in Douglas, Arizona.

24   Q    I'm going to show you what's marked for identification as

25   Government's Exhibits 214-6 and 214-12.  What are these?

Humphries - direct - Parlovecchio                1200

1    A    Those are photographs of the interior at the bank.

2    Q    And they're of the day you counted the cash?

3    A    Yes, ma'am.

4         MS. PARLOVECCHIO:   The government moves to admit

5    Government Exhibit --

6         MR. PURPURA:   No objection.

7         THE COURT:   Received.

8         (So marked.)

9         MS. PARLOVECCHIO:   Publish, please.

10   Q    So what are we looking at here, Mr. Humphries?

11   A    We're looking at two bank tellers counting money.

12   There's a big stack or big pile of money on their counting

13   table there.   That was most likely the money from the tailgate

14   and then there's a photograph there where I'm holding two

15   garbage bags which are the tailgate -- the side panel.

16   Q    Who is this gentleman here?   (Indicating.)

17   A    That was a K-9 officer assigned to the Douglas port of

18   entry at the time.   He's holding a shotgun at the bank for

19   security purposes.

20   Q    And these are the tellers there that helped you count it

21   that day?

22   A    Yes, the two were the tellers.

23   Q    And what is this here on the bottom right-hand corner?

24   (Indicating.)

25   A    That's a currency counting machine.

Humphries - direct - Parlovecchio          1201

1   Q    And Government's Exhibit 214-12, what is that?

2   A    Same room.  You can see money being counted or placed on

3   the money counting machine by the teller on the right side of

4   the photo.

5   Q    Now, how much money was seized in total from the Bronco

6   driven by Arturo Guzman?

7   A    That day, the total was $1,226,354.

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1202

1    Q    I'm going to show you Government's Exhibits 214-3, 214-4,

2    214-14 and 214-16.

3              THE COURT:  Are you really close to being done?

4              MS. PARLOVECCHIO:  I am.

5              THE COURT:  Okay.

6              MS. PARLOVECCHIO:  I do have 5, 10 more minutes.

7              THE COURT:  No.  Because we're not going to get to

8    cross anyway, let's do it on Monday.

9              Ladies and gentlemen, listen very carefully.  You've

10   heard it before but it is particularly important because we're

11   taking a long break.

12             Do not talk to anybody about this case.  Do not post

13   anything on social media.  No Googling, no Facebooking, no

14   Binging, no Twittering, no nothing at all about this, please.

15   Stay away from any media coverage of the case.  Flip the page.

16   Hit the remote control.  Do something to get away from it.  We

17   need you to focus only on what is going on here in the

18   courtroom.  That is your oath.  It is excessively important

19   that you do that and just as importantly, please have a very

20   nice Thanksgiving holiday.

21             We will see you on Monday, 9:30 a.m.  Thank you.

22             (Jury exits.)

23             THE COURT:  All right.  Be seated, please.

24             Anything else we need to cover?

25             MR. LICHTMAN:  Judge, one minor housekeeping issue,

1203

1  perhaps, you can help us with.

2          THE COURT:  Sure.

3          MR. LICHTMAN:  As you're aware, the defense team has

4  to go through the magnetometer in the line downstairs which we

5  do in all the cases that we're in here.  Obviously, there are

6  additional security conditions upstairs outside the courtroom.

7  We're required to go through that again which requires us to

8  take our belt off, our jacket, the same thing.  As of

9  apparently this morning or yesterday afternoon, now after

10 going through all the security downstairs and we get to the

11 8th floor, we're now required to take our shoes off every

12 time.  And it's just the defense.  Obviously, not the

13 government.  We're required to take our shoes off.  If we

14 simply go to the bathroom and come back, we have to go through

15 the same rigamarole.

16         I don't know if there's any specific reason why

17 defense counsel, because it slows us down considerably, why

18 we're treated the same as --

19         THE COURT:  Everyone else.

20         MR. LICHTMAN:  The masses.  I was going to say hoi

21 polloi but that's a bad word.

22         THE COURT:  Everyone else.

23         MR. LICHTMAN:  Perhaps there's something you can do

24 or perhaps if there's a reason why the marshals need us to be

25 treated that way, perhaps they can let you know and I'm sure

CMH     OCR     RMR     CRR     FCRR

1204

1  if there is a good reason, there is, but I can't imagine that

2  there is but it's slowing us down and making it majorly

3  inconvenient.

4          THE COURT:  Okay.  I appreciate what you are saying

5  and if there's, unless -- let me say this.  I am going to talk

6  to the marshals about many things tonight.  I will raise this

7  and see if I can get some relief for you.

8          MR. LICHTMAN:  Thank you.

9          MR. PURPURA:  Judge, there is also the appearance.

10 There's international -- I mean, in my district, the

11 U.S. Attorneys go through the same thing defense attorneys do

12 on a daily basis.  I know it's a different district, but the

13 appearance just seems, like, it just seems to favor, the

14 government should be treated better.

15         THE COURT:  I understand and in the usual case, you

16 wouldn't have this issue, but I'm not sure even this case is

17 big enough for you to have it here, so I'll talk to the

18 marshal about it.

19         MR. PURPURA:  Thank you.

20         MR. LICHTMAN:  Thank you.

21         THE COURT:  The only other thing I would mention is,

22 Mr. Robotti, I'm not sure you were at side bar but I did

23 mention yesterday I really would not like to have speaking

24 objections.  You went into a thing about how he, the witness

25 didn't testify about this.  Just say "objection."  I knew

CMH      OCR      RMR      CRR      FCRR

1205

1   before you said anything that you were objecting to scope.  If

2   you have any doubts that I'll know what you're saying, just

3   say, "Objection, scope," and then I certainly will know.  And

4   if you feel like I have missed something and it is very

5   important to you, ask for a side bar and I won't hesitate to

6   give it to you.  Okay?

7          MR. ROBOTTI:  Yes, Your Honor.  I apologize.  I was

8   overzealous.

9          THE COURT:  That's all right.

10          Anything else?

11          MR. PURPURA:  Have a good Thanksgiving.

12          THE COURT:  You too.  Have a good holiday.

13          (Matter adjourned to November 26, 2018 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1206

```
 1                      I N D E X

 2   WITNESSES:

 3      JESUS ZAMBADA GARCIA

 4         CROSS-EXAMINATION (Cont'd)BY MR. PURPURA      1042

 5         REDIRECT EXAMINATION BY MS. PARLOVECCHIO      1110

 6         RECROSS-EXAMINATION BY MR. PURPURA           1116

 7      THOMAS LENOX

 8         DIRECT EXAMINATION BY MR. ROBOTTI            1117

 9         CROSS-EXAMINATION BY MR. PURPURA             1148

10      OWEN PUTMAN

11         DIRECT EXAMINATION BY MR. ROBOTTI            1154

12         CROSS-EXAMINATION BY MR. BALAREZO            1173

13      MICHAEL HUMPHRIES                               1181

14         DIRECT EXAMINATION BY MS. PARLOVECCHIO       1181

15                      EXHIBITS:

16      Government Exhibits 208-1 through 208-6         1123
        Government Exhibit 208-7A                       1125
17      Government Exhibit 208-8A                       1127
        Government Exhibits 208-10 and 208-10T         1129
18      Government's Exhibit 208-11 to 208-34          1133
        Government Exhibit 208-35                       1141
19      government Exhibit 27                           1157
        government Exhibit 73                           1160
20      Government Exhibit 600B                         1162
        Government Exhibit 403-10                       1164
21      Government Exhibit 215-1 to 215-9              1166
        Government Exhibit 401-1-A and 401-1           1168
22      Government Exhibit 214-5                        1184
        Government Exhibit 214-15                       1191
23      Government Exhibits 214-2, 214-9, 214-10       1193
        Government Exhibits 214-1, 214-8,214-11        1195
24      Government Exhibit 214-7                        1196
        Government's Exhibit 214-14                     1197
25      Government's Exhibits 214-6 and 214-12         1199
```