

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GMP:ASF
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 31, 2018

**FILED UNDER SEAL**

By ECF and Hand

The Honorable Brian M. Cogan
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   United States v. Joaquin Archivaldo Guzman Loera
>        Criminal Docket No. 09-466 (S-4) (BMC)

Dear Judge Cogan:

The government respectfully submits this reply to the defendant Joaquin Guzman Loera's October 26, 2018 response ("Def. Br.") to the government's October 19, 2018 supplemental motions in limine ("Gov. Br."), see Dkt. No. 375, to preclude certain lines of cross-examination of cooperating witnesses who may testify at Court at trial in the above-captioned matter.

It is important to understand at the outset that the government is not seeking to preclude the vast majority of potential cross-examination topics available to the defendant. On October 5 and 19, 2018, the government disclosed potential Giglio material on its cooperating witnesses. This submission consisted of 57 pages' worth of material that the defendant could potentially use to impeach the cooperating witnesses called by the government to testify in addition to the Giglio information contained in the 18 U.S.C. § 3500 material for each witness. By way of contrast, the government is seeking to preclude the use of only a small sliver of the material turned over to the defendant. Regardless of the Court's ruling on this motion in limine, the defendant will have ample material with which to impeach the cooperating witnesses regarding bias, truthfulness and other topics. Cf. United States v. Gordils, 982 F.2d 64, 72 (2d Cir. 1992) (affirming denial of new trial based on new evidence impeaching credibility of government's key witness as new evidence was cumulative of other evidence of witness' criminal activity); United States v. Gilbert, 668 F.2d 94, 96 (2d Cir. 1981) (holding that new evidence impeaching government's witness was cumulative of other evidence questioning the witness' character).

I.      Domestic Violence Allegations

As the government explained in its initial brief, courts in this district have previously prohibited defendants from inquiring about instances of domestic violence on cross-examination. See Oct. 30, 2018 Mem. & Order, Dkt. No. 403 at 4 ("These allegations are not probative of the witnesses' character for truthfulness or their relationships with potential bias against the defendant."); United States v. Fama, No. 12-CR-186 (WFK), 2012 WL 6094135, *1 (E.D.N.Y. Dec. 7, 2012) (precluding cross-examination as to domestic violence allegations, noting that there is not "anything inherent in the nature of such acts that would directly involve truthfulness"). To the extent that the allegations would be relevant to the jury's understanding of the witness's credibility, under Federal Rules of Evidence 403 and 611, any potential relevance is outweighed by the unfair prejudice and potential for jury confusion. Id.; United States v. Jeffers, 402 Fed. Appx. 601, 603 (2d Cir. 2010).

The defendant argues that, with respect to the domestic violence allegations relating to Cooperating Witness No. 9 (two of which were subsequently dismissed and one of which did not even result in an arrest), he should be able to avoid the general rule against impeachment with domestic violence allegations by pointing to the fact that: (1) he was ordered to go into psychiatric treatment by his probation officer, thereby putting his "mental state" in issue; and (2) the evidence "establish[es] a propensity for violence which contradicts a visa application submitted on CW9's behalf, as well as CW9's own characterization of himself." Def. Br. at 2. The defendant's arguments, while creative, miss the mark.

Just because the defendant was ordered by his probation officer to visit a psychiatrist does not bear on his mental state as a witness. "[F]ederal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to." United States v. Butt, 955 F.2d 77, 82 (1st Cir. 1992); see Dkt. No. 403 ("Should defendant uncover evidence of CW1's mental instability, that might be proper impeachment material if it impaired CW1's ability to perceive events at the time they occurred or to tell the truth at trial."). Factors to be considered in allowing cross-examination on psychological evidence include: "the nature of the psychological problem, the temporal recency or remoteness of the history, and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her ability to perceive or to recall events or to testify accurately." United States v. Vitale, 459 F.3d 190, 196 (2d Cir. 2006) (quoting United States v. Sasso, 59 F.3d 341, 347 (2d Cir. 1995)).

The events that CW9 will be testifying to predate his visit to a psychiatrist by at least a decade. Thus, the "mental condition" that even arguably led to CW9's domestic incidents, such as it is, cannot be credibly argued to have existed at the time of the events about which he will testify. Nor can it be credibly posited that a "mental condition" that even arguably led to CW9's domestic incidents could have "affected" CW9's "ability to perceive or to recall events or to testify accurately." Vitale, 459 F.3d at 196.

Nor does defendant's argument about the supposed contradiction with the visa application filed on CW9's behalf justify the improper use of the dropped domestic violence

charges as impeachment material.  As an initial matter, the visa application was not submitted by CW9 himself.   To the extent that the conclusion by the drafter of the application that CW9 was not a violent individual is drawn into question by CW9's domestic violence incidents, this potential conflict does not bear on CW9's credibility.  See Dkt. No. 403 at 2 ("[T]he assertion that someone is not a violent person is an opinion, not a factual statement.  Whether engaging in one act of violence (or ten or fifty) makes someone a violent person is not a factual question, it is a moral or philosophical one.").  At most, were the government to call the drafter to the stand to testify about CW9's nonviolent character (which the government does not plan to do), then the defendant might be able to argue that he could ask that witness whether the prior domestic violence incidents would change the drafter's opinion of CW9's nonviolent character.  However, it is completely inappropriate for the defendant to use the domestic violence incidents to undermine the visa application written by an individual whom the government will not call as a witness to testify about CW9's good character.

This conclusion is bolstered by the fact that the visa application was submitted in November 2009, several years before the domestic incidents even occurred in December 2014 and February 2015.  At the time the visa application was written, the drafter's conclusion that CW9 was a nonviolent person was not contradicted by any available information.

Next, citing to a debrief report of an interview of CW9, 3500-[CW9]-12, defendant claims that CW9's claim to the government that he did not carry out acts of violence is contradicted by the domestic violence incidents, and that the defendant should be able to offer the incidents to "rebut the patently false claims" that CW9 did not participate in acts of violence.  Def. Br. at 3.  It is true that this report, 3500-[CW9]-12, contains the note that CW9 "never saw or carried out any acts of violence."  However, what defendant fails to point out to this Court, however, is that the very next line of the report memorializes the witness's acknowledgement of the domestic violence incidents.  CW9 made no "patently false claims." He did not, for example, acknowledge the domestic violence incidents only after being confronted at a later date with evidence rebutting a broad assertion that he never engaged in any violence.  Rather, when CW9 stated that he "never saw or carried out any acts of violence," he was talking about never seeing or carrying out any acts of violence in connection with his illegal drug trafficking activity.  He immediately acknowledged that while he did not see or carry out acts of violence in connection with his illegal drug trafficking activity, he did, however, engage in recent acts of domestic violence.  Defendant's illusory conclusion that he provided "patently false claims" does not adequately support his improper effort to taint CW9 before the jury as a wife-beater and a loathsome person.

Domestic violence incidents, especially ones that did not result in a conviction, should not be before the jury because they are not probative of truthfulness and because of the undue prejudice and danger of jury confusion.  The Court should reject the defendant's efforts to subvert this sound principle.  Not only should defendant be precluded from confronting CW9 with the allegations of the domestic violence, his questions about the witness's violence should be circumscribed by the Court so as not to entrap CW9.  If defendant asks CW9 whether he has ever engaged in any sort of violence, then, by necessity, CW9 would truthfully have to concede the domestic violence incidents.  The Court should require instead that the defendant

ask CW9 whether he ever kidnapped, tortured or killed anyone.  Phrasing the question in this fashion would allow the witness to answer truthfully without disclosing to the jury the domestic violence incidents.

II.    Prior Arrests and Assaults

Defendant next pivots to seek the ability to cross-examine CW3 with two drunk-driving arrests.  Def. Br. at 3.  He concedes that the "prior arrests are significant not for the fact that CW3 was driving while intoxicated and high."  Id.  However, he seeks to cross-examine CW3 about the fact that he bribed a prosecutor to extricate himself from one arrest and his mother may have paid another bribe to extricate him from the other arrest.  Id.  First, the actions of CW3's mother have no bearing on his credibility; so the Court should preclude cross-examination on that incident for that reason alone.  Second, CW3 engaged in bribery of public officials on other occasions in furtherance of his drug trafficking activities about which the defendant will be able to cross-examine him.  For instance, CW3 paid federal highway police in Tapachula, Mexico to escort a drug load for him.  He also gave a high-level Mexican politician an interest free loan of $300,000 in approximately 2001 or 2002.  And, he attempted to bribe the commander who arrested him in Mexico in 2014 with a property.  Moreover, he will testify that members of the organization paid substantial bribes to protect the drug loads that he sent to the United States while working for the defendant and other leaders of the Cartel.  Thus, cross-examination about his bribery of a prosecutor in relation to his drunk driving arrest would be cumulative, and it would be unduly prejudicial in light of the nature of that arrest.  See Dkt. No. 403 at 2 ("This particular bribe's connection to a domestic violence charge makes it prejudicial in a way that other examples of CW1 bribing a public official are not.").  The defendant can cross-examine CW3 about his bribery, without getting into the improperly prejudicial details of the drunk driving case (which defendant concedes is not significant).

Defendant seeks to cross-examine CW1 about an incident in the early 2000s when he choked a taxi driver who had refused to pull over the cab at CW1's direction.  While defendant does not reject the government's central thesis that violence, particularly violence that was remote in time and did not lead to a felony conviction, is not probative of truthfulness, the defendant instead lumps in this taxicab incident with other threats of violence to his wife, and baldly asserts that these incidents in total "put the lie to the claim that CW1 is not a violent individual."  Defendant cites a debrief report in which—he claims—CW1 asserted that he was not a violent individual.  Once again, defendant completely mischaracterizes this report to the Court.  This report—3500-[CW1]-29—does not indicate that CW1 denied being a violent individual.  To the contrary, the report only notes that when asked about his experiences with violence, CW1 recounted an incident when burglars tied up him and his family, and that CW1 stated that he never ordered for anyone be kidnapped or killed, nor has he ever killed anyone.  This report simply does not support defendant's claim that CW1 denied being a "violent individual."  The taxicab incident does not bear on CW1's credibility, and the Court should preclude the defendant from probing the incident during CW1's cross-examination.

III.    Collection of a Personal Loan

        Defendant seeks to question CW9 about his efforts to collect from a widow a personal loan of $3.5 million that he had made to the widow's former husband, one of CW9's friends from his teenage years, who had also later worked with him in the drug trafficking business for a period of time.  Although a government investigation revealed that CW9 had not done anything improper and, in fact, the loan was personal in nature, defendant, without a shred of evidence to the contrary, nevertheless seeks to question CW9 about the efforts to collect from the widow, because, he claims, he is "far less confident than the government that this loan was merely a personal monetary transaction between old friends." Def. Br. at 4.

        The defendant is entitled to ask whether CW9 tried to collect any drug debts from anyone during his drug trafficking career.  This is certainly fair game.  If the witness denies attempting to collect a drug debt, then the defendant must accept the answer and may not seek to introduce extrinsic evidence to counter the defendant's testimony. Fed. R. Evid 608(b).  What is not appropriate, however, is cross-examining CW9 about the <u>identity</u> of the person or persons from whom he attempted to collect the debt.  Any efforts to turn the jury's minds against the witness by mentioning that CW9 attempted to collect a debt from a friend's widow should be precluded under Fed. R. Evid. 403 and 611.

IV.    Accidental Death

        Defendant seeks to cross-examine CW1 about a vehicular accident that resulted in the death of a 10-year-old girl.  Def. Br. at 4.  Although the defendant acknowledges that no criminal or civil charges were filed, defendant speculates that the reason no charges were filed was because CW1 bribed officials.  The defendant's speculation is premised on an agent report of a debriefing session of CW1 on April 13, 2016, which states that CW1 claimed that CW1's family members paid off officials in connection with this incident.  When asked about this incident in a subsequent debrief, CW1 clarified that his family members paid the victim's family, not officials.

        The government does not deny that CW1 paid numerous bribes to law enforcement officials in order to allow him to engage in criminal conduct and to protect him from the consequences of his actions.  It is entirely appropriate for CW1 to be confronted on cross-examination with the fact that he paid numerous bribes (or had others pay them in his stead).  What is inappropriate, however, is for the defendant to divulge the specific circumstances of this incident, and the highly prejudicial fact that his accident resulted in the death of a 10-year-old girl.  <u>See</u> Dkt. No. 403 at 2 ("[D]efendant can cross-examine CW1 about the other times he bribed public official without discussing the potentially inflammatory domestic violence charge . . . .").  Once again, the defendant is seeking to impeach a witness with inappropriate and highly inflammatory information for one reason and one reason alone: to attempt to get the jury to hate the witness.

        There is no issue with credibility here: CW1 clarified that the initial notes from April 13, 2016 were incorrect and that, from the start, he had told agents that he had paid off

the victim's family, not the police.  If, hypothetically, CW1 had tried to hide an act of bribery by first claiming that he paid off the family, then acknowledging that he had in fact bribed his way out of charges, then defendant could credibly argue that cross-examination on his efforts to hide an act of bribery would be relevant and material to his trustworthiness.  But that is not the case here.  At best, the defendant could argue that CW1 had initially stated that he paid off the police and later changed his account to say that he paid off the victim's family.  This does not demonstrate any effort to hide an act of bribery, nor does it demonstrate any lack of credibility in the least.  Even assuming the facts in the light most favorable to defendant, this alleged change in account is insufficiently material to warrant the divulging of highly inflammatory details about the death of a 10-year girl in a car accident that happened over 32 years ago.  The Court should preclude the details of the accidental death under Fed. R. Evid. 403 and 611.

V.      Mental Health

   Defendant argues that he should be able to cross-examine CW10 about both his significant cocaine use as well as post-arrest mental health issues.  Def. Br. at 5-6.  To be clear, the government is not seeking to preclude cross-examination on CW10's cocaine and other drug use; the government concedes that CW10's use of cocaine, particularly while CW10 was working directly for the defendant, is fair game.  The government disagrees, however, that it is appropriate to cross-examine the witness about one alleged denial of cocaine use, reflected in medical notes from a routine medical interview 16 years ago.  That notation is not relevant to CW10's credibility, particularly when he did not write the notes, has no recollection of providing a denial and has consistently admitted his drug use to the government during the course of his cooperation.  See Fed. R. Evid. 403.  The Court should not allow cross-examination on this particular point, given the length of time that has passed since the medical examination, given CW10's consistent accounts of his own cocaine use, and, consequently, the significant possibility that the note-taker erred in writing down the notes.

   The Court should also preclude impeachment of CW10 with his mental health issues, which arose out of CW10's conditions of confinement years after his criminal conduct with the defendant.  The Court should also preclude cross-examination about CW10's present treatment for anxiety and sleep deprivation.  Defendant cites United States v. Paredes, No. 99 CR 290 (PKL), 2001 WL 1478810 (S.D.N.Y. Nov. 20, 2001), for the proposition that a defendant is entitled to cross-examine a witness regarding anxiety and other psychological issues as they were important to assessing the witness's credibility.  See Def. Br. at 6.  While the district court in Paredes did in fact reach the conclusion stated by defendant, the facts in that case are substantially different from the facts at issue here.

   Paredes set forth the relevant Second Circuit metric for considering the use of psychological issues in cross-examination:  "In order to assess the probative value of such evidence, the Second Circuit has indicated courts should consider the nature of the psychological problem, the temporal recency or remoteness of the condition, and whether the witness suffered from the condition at the time he perceived the events about which he will testify."  Paredes, 2001 WL 1478810, *1, citing United States v. Sasso, 59 F.3d 341, 347–48

(2d Cir.1995).  Citing a number of Second Circuit cases in which courts found that a serious psychological issue from 10 or more years prior to trial was too remote to be probative for cross-examination, see, e.g., United States v. Bari, 750 F.2d 1169, 1179 (2d Cir.1984), the district court in Paredes found that since the witness in that case suffered from psychological issues that both existed during at least some of the events which she was expected to testify about and continued to the time of trial, cross-examination on these issues was appropriate.

In CW10's case, his psychological issues did not exist during any of the events about which he is expected to testify.  Nor were the issues noted in the report recent—they occurred over 16 years ago, well beyond the 10-year mark often found by the Second Circuit to be too remote to be probative for cross-examination.  While CW10 does acknowledge that he currently suffers from anxiety and sleep deprivation, and he has had some more recent suicidal thoughts related to the stress associated with his upcoming testimony, there is nothing to suggest that such present issues (which did not exist during the events he is expected to testify about) affect his ability to recall his drug dealing activities with the defendant over 20-plus years ago.  The Court should preclude cross-examination on CW10's mental health issues.  See Dkt. No. 403 at 4.

The defendant seeks to obtain a copy of CW10's medical evaluation from 2002 so he can see for himself "exactly what CW10 proffered about past drug use." Def. Br. at 5, n.3. The government understands its Brady and Giglio obligations, and it has provided the defendant with the pertinent information from the medical evaluation, which is limited to the statement: "Denies a history of mental illness or substance abuse."  There is no basis for the defendant to have access to unrelated and irrelevant medical information about CW10 in his medical records, in light of CW10's significant privacy interest in those records.

VI.   Cooperating Witness Concerns With ██████████████

Defendant next seeks to cross-examine CW10 about ██████████████
████████████████████████████████████████████████████
████████████████████████████  In addition, defendant inaccurately claims that CW10 is testifying under a cooperation agreement.  Def. Br. at 6.  As noted in CW10's § 3500 material, CW10 did not plead guilty pursuant to a cooperation agreement, but rather to a standard plea agreement; he later received a sentencing reduction under Federal Rule of Criminal Procedure 35 based upon his cooperation.  He has no present agreement with the government.

Questioning CW10 about his ████████████████████████
████████████ is not only inappropriate; it also runs counter to this Court's prior rulings.   In its second tranche of motions in limine, the government sought to preclude questioning about whether a witness ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████  The Court granted this motion.   See Oct.

25, 2018 Order, Dkt 390, at 14-15. There is no reason to revisit that ruling here. The circumstances of CW10's ████████████████████████ are not relevant to his capacity to tell the truth. Any line of cross-examination on this point would mislead the jury, create a risk of unfair prejudice, and would be cumulative of a substantial amount of impeachment material on CW10 set forth in his § 3500 material, including his decade-long drug trafficking and money laundering activities. In light of the security concerns presented by this line of questioning and its minimal probative value, the Court should exclude it. *See* Fed. R. Evid. 403, 611.

Pointing to CW10's ████████████████████████, the defendant asserts that he should be able to explore CW10's potential bias in ████████████ Defendant's "bias" argument is illusory—████ ████████████████████ Moreover, as the defendant knows, CW10 previously testified twice about the defendant and other Cartel members ████████████████████ ████████████████████ Thus, this line of cross is of limited probative value. The defendant's argument does not justify revisiting the Court's prior ruling to exclude cross-examination on a witness's ████████████.

Moreover, cross-examination about CW10's ████████████ would be confusing and irrelevant. While these statements bear on CW10's ████████████, they do not bear on his capacity for truthfulness. *See* Fed. R. Evid. 608(b). Especially given that these statements occurred more than six years ago and more than two decades after the primary events about which the defendant will testify, the Court should not permit cross-examination on these points under Rule 403. As for ████████████████████ ████████████, neither of these incidents are relevant or material enough to the fundamental question of CW10's capacity for truthfulness to justify the danger of unfair prejudice, unnecessary delay and jury confusion under Rule 403.

VII.   Alleged "Obfuscation" Regarding ████ Identity



Respectfully submitted,

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
Southern District of Florida