**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

**UNITED STATES OF AMERICA**

  -v.-              **09 CR 466 (BMC)**

**JOAQUIN ARCHIVALDO GUZMAN LOERA,**

       *Defendant.*
-------------------------------------------------------------------X

### MEMORANDUM SUPPORTING JOAQUIN ARCHIVALDO GUZMAN LOERA'S FED. R. CRIM. P. 33 MOTION FOR A NEW TRIAL UPON AN EVIDENTIARY HEARING

LAW OFFICE OF MARC FERNICH
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

LAW OFFICES OF JEFFREY LICHTMAN
11 East 44th Street, Suite 501
New York, NY 10017
(212) 581-1001
jhl@jeffreylichtman.com
*Attorneys for Defendant Joaquin Guzman*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA

     -v.-                               09 CR 466 (BMC)

JOAQUIN ARCHIVALDO GUZMAN LOERA,

                    *Defendant.*
----------------------------------------------------------------X

## MEMORANDUM SUPPORTING JOAQUIN ARCHIVALDO GUZMAN LOERA'S FED. R. CRIM. P. 33 MOTION FOR A NEW TRIAL UPON AN EVIDENTIARY HEARING

### QUESTION PRESENTED

In a case generating publicity the Court called "unparalleled," a juror contacted a reporter a day after the verdict to volunteer that panel members had violated their oath and scorned the Court's incessant instructions by actively following and discussing the blizzard of media coverage, and falsely denying it upon judicial inquiry, throughout the three-month trial.

In the circumstances presented, does the jury's exposure to a flood of presumptively prejudicial extraneous information – including inadmissible allegations that the defendant drugged and raped 13-year-old girls – mandate an evidentiary hearing to determine (a) the

misconduct's precise nature and scope; (b) the information's probable objective effect on a hypothetical average jury; (c) whether the jurors' reported lies to the Court upon inquiry dictated disqualification or mistrial; and (d) whether the whistleblowing juror or any other intentionally withheld disabling bias during *voir dire*, collectively thwarting the defendant's Fifth and Sixth amendment rights to due process and fair trial before an impartial jury?

## **STATEMENT**

The ultimate test of a justice system's fairness and integrity is how it performs under stress – in infamous cases involving heinous accusations and notorious defendants. Joaquin Guzman, no less than any other suspect hauled into an American court, is entitled to the fundamental "touchstone" of due process: an "impartial" jury "capable and willing to decide the case solely on the evidence before it." *US v. Greer*, 285 F.3d 158, 170 (CA2 2002) (citations and internal quotation marks omitted). Recent media reports — presumptively accurate, credible and reliable — strongly suggest Guzman may not have gotten that bare essential. *Cf.* Fed. R. Evid. 803(b)(3)(A), 902(6).

Reports of jury misconduct, of course, are nothing new in high-profile cases.[1] One factor that sets these apart is a juror's frank confession that panel members actively sought out and openly discussed the most sensational extrinsic information — including vile allegations that the defendant raped young girls — overtly defying the Court's perpetual injunctions and cannily lying to Your Honor when asked about it. *E.g.*, *US v. Tin Yat Chin*, 275 F. Supp. 2d 382, 385 (EDNY 2003) ("[t]he most potentially prejudicial material … consists of specific facts about the specific defendant then on trial") (citation and internal quotation marks omitted). Another distinguishing feature: a juror with no apparent agenda, ulterior motive or reason to fabricate voluntarily approached a journalist to divulge the misconduct, whereas jurors unhappy with

---

[1] *E.g.*, *US v. Lynne Stewart*, 590 F.3d 93, 133-34 (CA2 2009) (lawyer for spiritual leader of Islamic terror group); *US v. Martha Stewart*, 433 F.3d 273, 302-08 (CA2 2006) (media mogul and TV personality); *US v. Bin Laden*, No. S7R 98CR1023KTD, 2005 WL 287404 (SDNY Feb. 7, 2005) (al Qaeda embassy bombers), *aff'd*, 552 F.3d 93 (CA2), *reh'g denied*, 553 F.3d 150 (CA2 2008); *US v. Schwarz*, 283 F.3d 76, 97-100 (CA2 2002) (cops charged in Abner Louima assault); *US v. Gigante*, 53 F. Supp. 2d 274 (EDNY 1999) (mafia boss); *US v. Ianniello*, 866 F.2d 540 (CA2 1989) (mafia bosses in 13-month megatrial), *rev'd on other grounds*, 937 F.2d 797 (CA2), *modified on reh'g*, 952 F.2d 623 (CA2), *amended*, 952 F.2d 624 (CA2 1991), *rev'd on other grounds*, 505 US 317 (1992), *on remand*, 974 F.2d 231 (CA2 1992), *vacated on other grounds*, 8 F.3d 909 (CA2 1993) (*en banc*); *US v. Moon*, 718 F.2d 1210, 1233-36 (CA2 1983) (Unification Church founder).

3

verdicts typically reach out to the defense or are contacted by someone acting on its behalf.[2] If an evidentiary hearing confirms these exceptionally unusual reports, justice and Criminal Rule 33 will demand a fair retrial – one that affords Guzman the basic guarantees enshrined in the Fifth and Sixth amendments. *E.g.*, *Moten*, 582 F.2d at 664 (every "defendant has a right to a trial by an impartial jury, unprejudiced by extraneous influence").

## **BACKGROUND**

Throughout Guzman's trial, the Court continually admonished the anonymous jury to avoid the gavel-to-gavel publicity – unprecedented in its global scope and intensity – saturating the case. T 5011 (THE COURT: "The [press attention] has been unparalleled in my experience and I think most other judges."). Observing "better practice," the Court persistently warned panelists to ignore the avalanche of media coverage

---

[2] *Cf.*, *e.g.*, *Lynne Stewart*, 590 F.3d at 133-34 ("post hoc" deliberation impropriety allegations caused by juror "dissatisfaction" with verdict "do not require further post-[trial] inquiry") (citation and internal quotation marks omitted); *Schwarz*, 283 F.3d at 88 (jurors contacted defense counsel after verdict to discuss aspects of deliberations); *US v. Moten*, 582 F.2d 654, 665 (CA2 1978) ("some jurors, especially those who were unenthusiastic about the verdict or who have grievances against fellow jurors, [c]ould be led into imagining sinister happenings which … did not occur or … saying things which … would serve only to decrease public confidence in verdicts").

– print, broadcast, digital and social – surrounding the ongoing litigation. *US v. Ganias*, 755 F.3d 125, 132 n.4, 133 (CA2 2014) (cautioning that "the availability of the Internet and the abiding presence of social networking now dwarf the previously held concern that a juror may be exposed to a newspaper article or television program") (citation and internal quotation marks omitted), *rev'd on other grounds*, 824 F.3d 199 (CA2 2016) (*en banc*).[3]

A VICE News report by Keegan Hamilton, published eight days after the verdict, reveals that "at least five jurors" systematically "violated" their oath and flouted the Court's instructions by "following the case in the media during the trial."[4] "[R]each[ing] out" by email a day after the "verdict came down," an unidentified juror apprised VICE in a two-hour video interview conducted a day later: "'You know how we were told we can't look at the media during the trial? Well, we did. Jurors did.'" Headlining the juror's bombshell disclosures:

---

[3] *E.g.*, T 5752 ("Ladies and gentlemen, we'll break for the day. Please stay away from any media coverage of the case, do not communicate or say anything to anybody about this case, don't do any research on the case. Keep your mind open.") (Jan. 17, 2019).

[4] Inside El Chapo's Jury: A Juror Speaks for the First Time about Convicting the Kingpin, https://news.vice.com/en_us/article/vbwzny/inside-el-chapos-jury-a-juror-speaks-for-first-time-about-convicting-the-kingpin (last visited March 18, 2019).

- Multiple panel members – including the interviewee and "'some other jurors that'" person "'knew'" – "routinely" if not "'constantly'" checked Hamilton's "personal Twitter feed and tweets from other journalists."[5] Twitter, naturally, was abuzz with "news, analysis, and observations from the courtroom" and elsewhere. As a hearing will verify, much of that content – especially the so-called "analysis" and "observations" – referenced inflammatory evidence the Court had excluded and pronounced Guzman guilty before the proof had closed and the jury began to deliberate.[6]

---

[5] These attributions have the ring of truth. It seems unlikely that the juror would contact Hamilton within a day of the verdict's return unless the juror had been following Hamilton's trial coverage.

[6] By our count at least seven different reporters regularly tweeted about the case. Jurors may have followed any or all of them, so they could have read tweets numbering well into the thousands over a three-month period. For a smattering of representative tweets – the tip of the proverbial iceberg – *see*, *e.g.*, Emily Saul (@Emily_Saul_), Twitter (Feb. 2, 2019) ("#Chapo allegedly 'believed that sexual activity with young girls gave him "life,"' per disturbing new docs."); Noah Hurowitz (@NoahHurowitz), Twitter (Feb. 2, 2019) ("Here's my story for @RollingStone on the explosive allegations that El Chapo regularly drugged and raped underage sex workers, from docs unsealed today. The documents contain a ton of details and we'll be updating the story in a bit."); Keegan Hamilton (@keegan_hamilton), Twitter (Jan. 30, 2019) ("Chapo appears unperturbed…. Doesn't look like he realizes this is likely one of the last days he ever has outside of a federal prison."); *id.* (Jan. 29, 2019) ("What the jurors probably saw was the utter lack of a defense."); *id.* (Feb. 6, 2019) ("We're scrutinizing every tiny development, but there's still no real doubt about the outcome. One way or another, Chapo is getting life in prison."); Alan Feuer (@alanfeuer), Twitter (Feb. 6, 2019) ("[T]here's really only one way this trial is headed in the end. It's just a matter of how long it takes to get there."); Keegan Hamilton (@keegan_hamilton), Twitter (Feb. 6, 2019) ("Here are Chapo's other alleged murder conspiracy victims. Of these, maybe Miguel Martinez Martinez and Ramon Arellano Felix could be construed as personal. The rest seem pretty clearly related to drug trafficking."); Carl Hancock (@carlhancock), Twitter (4 Feb. 2019, 6:50 PM) ("[I]f the jury were to allow him to walk there would be immediate suspicion that the jury was compromised. That their identities were compromised and the cartel got to them. But I doubt that. He'll be found guilty of enough counts to put him away for the rest of his life.").

For a smattering of representative articles – again the proverbial iceberg's tip

– *see*, *e.g.*, Steve Frank, El Chapo Lawyer Suggested Hiring Belly Dancer to Visit Accused in Jail (Jan. 14, 2019) ("'[E]ven if he's not convicted of the top count, even [if] he's not numero uno racketeer of the Sinaloa cartel, he's certainly up there enough to be convicted of everything else, in which case he's never getting out of prison'"), cbsnews.com/news/el-chapo-belly-dancer-text-defense-attorney-drug-trial (last visited March 18, 2019); Leon Krauze, The End of El Chapo (Feb. 5, 2019) ("The trial also helped uncover allegations that Guzmán procured young girls he would drug and then rape. Guzmán would refer to the girls, some as young as 13, as his 'vitamins.' This is not a man who deserves a nickname or any other term of endearment.... He is ... personally responsible for thousands of deaths ... a ruthless criminal who helped poison millions ... Joaquín Guzmán built a perverse empire through the suffering of others. He does not deserve a nickname. 'El Chapo' should be no more."), https://slate.com/news-and-politics/2019/02/el-chapo-trial-folk-hero-myth.html (last visited March 18, 2019); Hollie McKay, Cruelty of El Chapo's Sinaloa Cartel Knows No Bounds: Beheadings by Chainsaw, Body Parts Strewn in the Streets (Dec. 8, 2018) ("the cartel's horrific tactics include the injection of adrenaline and other substances that affect the central nervous system of its victims, 'which kept them awake to enhance the responses of pain receptors during slow, prolonged torture.' These tactics are used on women and children ... including 'family members of rivals or snitches, to elicit information and sow fear. These cartels have a history of sexually assaulting the family members of their target, and forcing the target to observe....' There's beheading by chainsaw – a rumored favored method of Guzmán, who is said to feature in a 2010 video doing exactly that to murder victim Hugo Hernandez. Even worse, Hernandez's face was reportedly peeled off after he was killed and stitched on a football. Then there is the practice of putting people in drums and either boiling them or setting them on fire or feeding humans to exotic animals like lions and tigers. One wealthy Tijuana native described ... the day she came home from work ... to find a package containing her husband's body, chopped up in pieces and sent back by cartel associates."), https://www.foxnews.com/world/cruelty-of-el-chapos-sinaloa-cartel-knows-no-bounds-beheadings-by-chainsaw-body-parts-strewn-in-the-streets (last visited March 18, 2019); Alan Feuer, El Chapo Trial: How Many Gory Details Can One Jury Take? (Dec. 6, 2018) ("It remains unclear how many more assassinations will be mentioned at the trial — and just how explicit the details will be. The government has not yet offered the evidence it has about the murder of Francisco Aceves Urías, a Guzmán gunman known as Barbarino, who was slain three years ago in a restaurant parking lot in Mexico. Nor has the jury heard about the two rival traffickers whom Mr. Guzmán is accused of doing away with after relaxing over lunch. Prosecutors claim that once the men were dead, he had their bodies tossed into a pit and set on fire."), https://www.nytimes.com/2018/12/06/nyregion/el-chapo-trial.html (last visited March 18, 2019).

One line of coverage misconstrued Guzman's 30-minute defense case as an "extraordinary capitulation" that only underscored his guilt, confounding the maxim

- Though "[c]ell phones were confiscated" and the Court directed jurors "not to discuss the case" – "'You can't talk about the case among each other'" ahead of deliberations – the jury reportedly "'broke that rule a bunch of times.'" Some conversations "happened on the ride home." Other times jurors would "whisper to each other or mouth words." Topics discussed included, significantly, *the latest media coverage.*" (Emphasis supplied.)

- Lacing the Twitter feeds that "several" jurors followed were updates on developments occurring in the jury's absence, including reports on evidence that the Court "ordered withheld" from the panel's consideration. The most explosive allegation, publicly unveiled "on the eve" of "deliberations," was a claim that Guzman had "drugged and raped girls as young as 13." At least five deliberating jurors and two alternates knew and "'talk[ed] about'" the "child rape allegations," branding them "'disgusting'" and "'totally wrong.'"

- Worse, the juror read "before arriving at the courthouse" a Hamilton tweet reporting that Your Honor was "likely going to meet with the jurors in private and ask whether they had seen the story." Armed with that tip, the juror alerted the others in advance to the coming inquiry and convinced them to lie to the Court, falsely denying knowledge of the

---

that an accused need not call *any* witnesses, present *any* evidence or otherwise prove his innocence. *E.g.*, Harriet Alexander, 'El Chapo' Guzman Facing Life as Lawyers Offer Extraordinary Capitulation in 'Trial of the Century' (3 Feb. 2019), https://www.telegraph.co.uk/news/2019/02/03/could-chapo-guzman-walk-free-jury-decides-fate-end-telenovela/amp/; Alan Feuer, El Chapo's Defense? It Lasted Just 30 Minutes (Jan. 29, 2019), https://www.nytimes.com/2019/01/29/nyregion/el-chapo-trial.html (both as visited March 21, 2019). Since the VICE report impugns the "presumption" that Guzman's jury followed the Court's contrary instructions (*e.g.*, *US v. Baker*, 899 F.3d 123, 134 (CA2 2018), *cert. denied*, 139 S. Ct. 577 (2018)), these flagrant distortions of the proof burden in criminal cases demonstrably rate as prejudicial.

8

blockbuster child molestation charge. "'I had told them if you saw what happened in the news, just make sure that the judge is coming in and he's gonna ask us, so keep a straight face. So he did indeed come to our room and ask us if we knew, and we all denied it, obviously.'"[7]

- Why the lies? Fear of "serious" repercussions. "'I thought we would get arrested,' the juror said. 'I thought they were going to hold me in contempt.... I didn't want to say anything or rat out my fellow jurors. I didn't want to be that person. I just kept it to myself, and I just kept on looking at your [Hamilton's] Twitter feed.'" All this even though the Court took pains to assure the jurors, "You're not in any trouble" and "You haven't done anything wrong." T 6947-48; *see also id.* 6945, 6949.

- Another external item jurors knew, apparently talked and seemingly misled the Court about was an adulterous "affair" – widely reported during trial – a defense lawyer allegedly had with "one of his clients." "[M]oments" after answering negatively a "vague [*in camera*] question" from Your Honor — had the jury seen "any recent media coverage" around the time the alleged affair surfaced? — one of their number promptly "used a smartwatch to find [an] article" discussing it. *E.g.*, T 5009 (DEFENSE COUNSEL: "It was … a rather salacious article and it's something which can be offensive and if it is offensive to certain people that can very well color their opinion of our client in this particular case"); *id.* 5012-13 (DEFENSE COUNSEL: article's nature and content may

---

[7] The panelists' evident dishonesty punctuates the prescience of Guzman's unsuccessful request – denied partly because of what the Court termed its "very good rapport with this jury" – that "each of the jurors individually be polled *in camera*" and not "*en mass[e]*. It should be individual because I think this is something that perhaps some people will not want to say if they see no one is raising their hands, and it's such a crucial issue at such a crucial time, literally as the jury is about to get the case." T 6935, 6945; *see also id.* 6939 ("Raping underaged girls, Judge, there's nothing that could be worse."); *id.* 6935 ("it's a tag line in every single article … all over the world").

"particularly" offend women jurors, "spill[ing] over on Mr. Guzman").

- Finally, despite an extensive "jury selection process" that featured a detailed written questionnaire running 31 pages, the whistleblowing juror withheld during *voir dire* his burning desire to participate in the "'case of the century,'" a "'once-in-a-lifetime'" chance to be "part of history." Compounding that omission, the juror "kept" copious trial notes "against" the Court's "instructions," perhaps with an eye toward future literary or commercial opportunities.

## ARGUMENT

### LOGIC, LAW AND JUSTICE COMPEL A SEARCHING EVIDENTIARY HEARING AND A FAIR RETRIAL

## I.   PREVAILING LEGAL FRAMEWORK

The standards for obtaining a posttrial hearing on claims of jury misconduct are settled and straightforward.

**First**, as the Second Circuit reaffirmed just last summer, some form of exploration is "*mandatory*"[8] where "reasonable grounds for investigation exist." *Moten*, 582 F.2d at 667; *accord, e.g., US v. Vitale*, 459 F.3d 190, 197 (CA2 2006) (posttrial jury hearing "*required*" upon "reasonable grounds for investigation") (emphasis supplied) (citing *Moon*, 718 F.2d at 1234).

---

[8] *Baker*, 889 F.3d at 134 (emphasis supplied); *Schwarz*, 283 F.3d at 98.

**Second**, "reasonable grounds for investigation exist" when there is "clear, strong, substantial and incontrovertible evidence" that a "specific, non-speculative impropriety has occurred." *Ianniello*, 866 F.2d at 543 (citations, internal quotation marks and brackets omitted); *accord*, *e.g.*, *US v. Sabhnani*, 599 F.3d 215, 250 (CA2 2010) (similar) (collecting cases).

**Third**, "incontrovertible" doesn't mean "irrebuttable; if the allegations were conclusive, there would be no need for a hearing." *Ianniello*, 866 F.2d at 54; *see Vitale*, 459 F.3d at 197 ("allegations need not be conclusive"). The "issue, it must be remembered, is not whether the defendant is presently able to prove his case conclusively; rather, it is whether his showing is sufficiently strong to warrant an investigation to discover the truth." *Moten*, 582 F.2d at 668 (on reh'g pet.).

**Fourth**, a "duty to investigate" thus arises upon "concrete allegations" of "specific" instances of "inappropriate conduct that constitute competent and relevant evidence." *Ianniello*, 866 F.2d at 543 (citations and internal quotation marks omitted); *accord*, *e.g.*, *Schwarz*, 283 F.3d at 98-99 ("clear and specific allegations of inappropriate" behavior "plainly" comprised "'strong, substantial and incontrovertible

evidence'" and were "sufficiently serious to warrant further inquiry") (quoting *Ianniello*, 866 F.2d at 543).

In Guzman's case, a whistleblowing juror's volunteering declarations against interest to a neutral third party easily vaults these modest hurdles. *Cf.* Fed. R. Evid. 803(b)(3)(A). As our **BACKGROUND** section attests, the VICE article identifies a concrete and specific "series of events" indicating that "very serious irregularit[ies] occurred during the trial of this" action. *Moten*, 582 F.2d at 660, 666. "There is ample support for the propriety of a hearing in cases like this one." *Id.* at 666. Indeed, courts in our circuit routinely conduct posttrial hearings or reverse their denial on commensurate — if not slimmer and less troubling — proffers.[9] With so "many unanswered questions" and "various unknowns" attending the juror's reports, departing from that wealth of precedent here – "fail[ing] to order a hearing now" – would "seem like willful blindness." *Vitale*, 459 F.3d at 197-99.

---

[9] *E.g.*, *US v. Parse*, 789 F.3d 83, 86 (CA2 2015); *Ganias*, 755 F.3d at 132; *Sabhnani*, 599 F.3d at 249; *US v. Nieves*, 354 F. App'x 547, 552 (CA2 2009); *Vitale*, 459 F.3d at 200; *Greer*, 285 F.3d at 166; *Schwarz*, 283 F.3d at 99-100; *Ianniello*, 866 F.3d at 541; *US v. Colombo*, 869 F.2d 149, 150 (CA2 1989); *US v. Carmona*, 858 F.2d 66, 69 (CA2 1988); *Moten*, 582 F.2d at 667-68.

More precisely, the tipster's revelations implicate three distinct but related types of misconduct that, separately and together, "certainly warrant[]" robust exploration – especially in the absence of any discernible motive to lie. *Moten*, 582 F.2d at 666.

## II.   JURORS CONSULTED AND DISCUSSED DESPICABLE EXTRINSIC INFORMATION, ENGAGING IN PREMATURE DELIBERATIONS

According to the juror's VICE interview, at least five panel members actively followed and openly discussed ongoing media accounts of the trial, including extra-record charges that Guzman drugged and raped children and one of his lawyers carried on an adulterous affair with a client. If so – and there's no reason to doubt the juror's word at this point[10] – the panelists blithely disobeyed emphatic orders against both behaviors and committed undeniable misconduct.[11] They thereby violated Guzman's Fifth and Sixth amendment rights to confront his accusers and to an impartial decision based solely on evidence properly

---

[10] *Cf. Colombo*, 869 F.2d at 151 ("we must assume the truth" of affidavit asserting juror misconduct absent hearing).

[11] *E.g.*, *US v. Cox*, 324 F.3d 77, 86 (CA2 2003) ("[premature deliberations present a number of dangers" touching the "Sixth Amendment right to a fair and impartial jury trial," and they "may constitute juror misconduct" where, as here, the jury is told to "refrain") (citations and internal quotation marks omitted); *US v. Feng Li*, 630 F. Appx. 29, 32-33 (CA2 2015) (similar).

13

presented in court. *E.g.*, *Ianniello*, 866 F.2d at 541-42 (outside influences

threaten Sixth Amendment "confrontation" and "fair trial" rights). And

those infirmities may well counsel reversal of Guzman's conviction and

retrial before an untainted tribunal – especially where the Court

conceded the child rape reports were "thoroughly covered" and "very

bad." T 6938, 6942. As the Second Circuit has long recognized:

> It is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial. *See Remmer v. US*, 347 U.S. 227, 229 (1954). A government showing that the information is harmless will overcome this presumption. *See id.* "Where an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (CA2 1994) (per curiam) (internal quotation marks omitted). A "trial court's post-verdict determination of extra-record prejudice must be an objective one," focusing on the information's probable effect on a "hypothetical average juror." *US v. Calbas*, 821 F.2d 887, 896 n. 9 (CA21987); *see Bibbins*, 21 F.3d at 17. The court may not inquire into "the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it." *Calbas*, 821 F.2d at 897 (citing Fed.R.Evid. 606(b)); *see Bibbins*, 21 F.3d at 17 (juror's affidavit as to how extrinsic information affected the thinking and voting of the jurors or the deliberations of the jury as a whole was inadmissible). However, in applying the

objective test, the court "may appropriately consider the circumstances surrounding the introduction of [the] information in making [its] determination." *Calbas,* 821 F.2d at 896 n. 9.

In the evidentiary hearing in this case, the District Court asked jurors whether the extra-record information impacted their ability to be fair and impartial. Because this was a post-verdict hearing, that line of questioning was improper. *See Bibbins,* 21 F.3d at 17 (under Fed.R.Evid. 606(b), "[e]ven when a juror attests to receiving information outside the record, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations"); *Ianniello,* 866 F.2d at 544 ("Whether the jury relied on improper evidence ... is not a question to be asked jurors....").

*Greer*, 285 F.3d at 173-74; *see, e.g., Ianniello*, 866 F.2d at 544 (new trial "necessary if '"hypothetical average jury"' would've been "led astray"); *US ex rel. Owen v. McMann*, 435 F.2d 813, 818, 820 (CA2 1970) (Friendly, J.) (prejudice determination turns on "nature of [extraneous] matter and its probable effect on a hypothetical average jury"; verdict inherently lacks due process where there's a high "probability that prejudice will result"); *US v. Farhane*, 634 F.3d 127, 168 (CA2 2011) ("the law presumes prejudice from a jury's exposure to extra-record evidence").

The whistleblowing juror's VICE revelations check all the boxes identified in *Greer* and associated cases. Extra-judicial reports that

15

Guzman drugged and raped minors would surely have a negative and disturbing "effect on a hypothetical average jury." *Owen*, 435 F.2d at 820. As defense counsel asked rhetorically, "What could be worse than that or even equal?" T 6941.

## III. BY DISDAINING THEIR INSTRUCTIONS AND LYING ABOUT IT ON JUDICIAL INQUIRY, THE JURORS DEMONSTRATED UNFITNESS TO SERVE, REQUIRING DISQUALIFICATION OR MISTRIAL

Beyond spurning unequivocal warnings to avoid press coverage of the case, the juror's VICE remarks indicate that panel members brazenly lied to the Court when asked about it. They did so on at least two occasions that we know of. Tipped by the whistleblower that the Court would privately inquire if they'd seen or discussed the depraved child rape allegations – after he'd learned of the coming interrogation by illicitly checking Hamilton's Twitter feed – all the jurors apparently got together and hatched a plan to falsely claim ignorance. And right after Your Honor quizzed the panelists on reports of a Guzman lawyer's marital infidelity, at least one of them promptly turned around and looked up the story on a smartwatch.

The Sixth Amendment "expressly" entitles "a defendant in a criminal prosecution to a trial 'by an impartial jury.'" *Parse*, 789 F.3d at

16

110. Similarly, "A fair trial in a fair tribunal is a basic" ingredient of "due process," guaranteed by the Fifth Amendment. *Id.* at 110-11 (citation and internal quotation marks omitted). A sworn juror who "deliberately" lies under judicial inquiry not only impairs those integral rights, but "is subject to criminal prosecution for perjury" and "contempt." *Id.* at 111. Accordingly, a new trial is required when a juror "fail[s] to answer honestly a material question" and a "correct response would have provided a valid basis for" dismissal. *Greer*, 285 F.3d at 170 (citation and internal quotation marks omitted). And, notably, "bias" and "partiality" are "*presumed*" where, as here, jurors "deliberately conceal[] information" to avoid that fate. *Parse*, 789 F.3d at 111 [(quoting *Colombo*, 869 F.2d at 151-52) (juror lied to prevent defense counsel from acting on information that might lead to her removal)] (emphasis supplied) (alteration and internal quotation marks omitted).

It follows that intentionally deceiving the Court about exposure to the most reprehensible outside allegations – and committing crimes along the way – rendered the offending jurors unfit to serve in Guzman's case, furnishing "good cause" to strike them or declare a mistrial and start afresh. Fed. R. Crim. P. 23(b)(2)(B)-(3). Indeed, an unfit jury, like a

17

faulty reasonable doubt charge or a racist tribunal, constitutes a "structural" defect in the composition of the trial mechanism, vitiating all the jury's findings and mandating reversal *per se*, without a showing of more tangible harm. *See generally*, *e.g.*, *Weaver v. Ma.*, 137 S. Ct. 1899, 1907-08 (2017). To put it in fine, a fair trial before unfit jurors is a logical impossibility and a contradiction in terms. It is simply inconceivable, the notions being mutually exclusive.

## IV. THE WHISTLEBLOWING JUROR AND OTHERS CONCEALED MATERIAL *VOIR DIRE* INFORMATION SUPPORTING AT LEAST AN INFERENCE OF BIAS AND MERITING DISQUALIFICATION FOR CAUSE

"The *voir dire* of prospective jurors, who have been placed under oath, 'is an important method of protecting a defendant's right to trial by' jurors who are [fair and] impartial." *Parse*, 789 F.3d at 111 (quoting *Colombo*, 869 F.2d at 151). As confessed in VICE, the tipster came to the jury selection process relishing an "histor[ic]," "'once-in-a-lifetime'" opportunity to sit in the "'case of the century'" – if his prohibited notekeeping is any guide, perhaps because he craved future literary or commercial engagements. Several questions in the sworn juror questionnaire distributed before trial – identifying Guzman by popular nickname, mentioning the Sinaloa Cartel and summarizing the charges

against him – surely should have elicited the tipster's ardent wish to serve. *See* ECF No. 330 (Sept. 25, 2018).[12]

To repeat, a new trial is obligatory when "a juror fail[s] to answer honestly a material question on *voir dire*" and "a correct response would have provided a valid basis for a challenge for cause." *Greer*, 285 F.3d at 170 (citation and internal quotation marks omitted). "Challenges for cause are generally based on actual bias, implied bias, or inferable bias." *Id.* at 172 (citing *US v. Torres*, 128 F.3d 38, 43 (CA2 1997)). And again, "bias" is "*presumed*" where, as here, a juror "deliberately conceal[s] information" for the "purpose of securing a seat on the jury." *Pearse*, 789 F.3d at 111 (quoting *Colombo*, 869 F.2d at 152) (emphasis supplied) (brackets and internal quotation marks omitted). After all, a mission "so powerful as to cause the juror to commit a serious crime" – lying "in order to be chosen as a juror" – intrinsically "reflects an impermissible partiality on the juror's part." *Id.* (quoting *Colombo*, 869 F.2d at 151) (brackets and internal quotation marks omitted). The tipster's

---

[12] *E.g.*, Question 53 ("This case involves allegations about a criminal enterprise commonly known as a drug cartel. Do you have any feelings about serving as a juror in a case where the defendant has been accused of having connections with a drug cartel?"); Question 102 ("Is there anything about the nature of the charges or the facts of the case as they have been explained to you thus far that would affect your ability to serve as a juror in this case?").

misconduct in consciously withholding his intense desire to serve thus compels reversal and retrial.

But there's more. Other questions in the sworn questionnaire explicitly asked if prospective jurors could accept, follow and apply the Court's "instructions" – specifically including instructions that would restrict them "solely [to] the evidence in th[e] case" and direct them to "avoid all media," "Internet" and "social" networking "coverage." *See* ECF No. 330, Questions 58, 93, 101. It now appears that multiple panelists answered those questions falsely, betraying inferable if not actual bias that should have kept them off the jury. *E.g.*, *Greer*, 285 F.3d at 171 ("[a]ctual bias is bias in fact," whereas "inferable bias is available when actual or implied bias does not apply") (citing *Torres*, 128 F.3d at 43, 46-47).

## V.   A FULL AND FAIR HEARING, WITH DEFENSE COUNSEL ACTIVELY PARTICIPATING, IS NECESSARY TO ENSURE THE APPEARANCE OF JUSTICE AND PROMOTE PUBLIC CONFIDENCE IN THE INTEGRITY OF JUDICIAL PROCEEDINGS

Though judges normally enjoy "broad flexibility" in addressing claimed jury misconduct, cases involving "media publicity or other outside influences" constrain their leeway. *US v. Thai*, 29 F.3d 785, 803

(CA2 1994) (citation and internal quotation marks omitted). The "remedy for allegations of juror partiality" stemming from outside influence is thus a "hearing" with prejudice presumed. *Smith v. Phillips*, 455 U.S. 209, 215 (1982); **SUBARGUMENT II**; *cf. Martha Stewart*, 433 F.3d at 306 ("if *any* significant doubt as to a juror's impartiality remains in the wake of objective evidence of false *voir dire* responses, an evidentiary hearing generally should be held") (emphasis supplied).

In that regard, it bears remembering that "both sides have a vital interest in learning everything there is to know about the matter." *Moten*, 582 F.2d at 660. As such, the requisite "exploration should be done not merely to the government's satisfaction, or to the satisfaction of the district judge, but also to the satisfaction of the defendant." *Id.* For a "defendant has a constitutional right to trial by an impartial jury," and the "interest of the accused in learning the whole story does not end with the trial." *Id.* at 660-61 (citation omitted). To give those tenets effect, the "scope of the questioning … should be adequate to permit the entire picture to be explored,"[13] with "all interested parties permitted to

---

[13] *Moten*, 582 F.2d at 667.

participate." *Schwarz*, 283 F.3d at 98 (citations and internal quotation marks omitted); *see Moten*, 582 F.2d at 660 ("no reason to limit" defendant's investigation unless "necessary to protect some other interest").

Since "each situation in this area is *sui generis*,"[14] courts have latitude to "decide the extent to which the parties may participate in questioning the witnesses." *Ianniello*, 866 F.2d at 544; *see Moten*, 582 F.2d at 667 ("We leave to the district judge's sound discretion whether he should conduct the questioning personally or whether it should be done by someone else."). With Guzman's case commanding unprecedented worldwide attention – and intervening revelations clouding "confiden[ce]" in the Court's professed "rapport with this jury," ability to "really look[] at each" juror individually and "dr[a]w them out," and belief that they were heeding their "instructions" and "following my direction[s]"[15] – the "appearance"[16] of fairness calls for defense counsel's examining the

---

[14] *Vitale*, 459 F.3d at 197 (quoting *Moon*, 718 F.2d at 1234).

[15] T 6945, 6949-50.

[16] *Vitale*, 459 F.3d at 199.

witnesses personally[17] or, at the very least, submitting questions in writing. *E.g.*, *Calbas*, 821 F.2d at 894, 897; *US v. Greer*, 998 F. Supp. 399, 404 (D. Vt. 1998), *aff'd in relevant part*, *rev'd in part on other grounds*, 285 F.3d 158 (CA2 2002). We'll propose potential witnesses and address whether the hearing should be open or closed upon *Waller* findings[18] at a future date. *See Ianniello*, 866 F.2d at 544 (confiding to district court "discretion" whether to "hold the hearing *in camera*").

## CONCLUSION

If a justice system's measure is how it treats the most reviled and unpopular, then ours may have failed Joaquin Guzman by denying him

---

[17] *E.g., US v. Nix*, 275 F. Supp. 3d 420, 428 (WDNY 2017) (counsel "permitted to ask questions" at posttrial juror misconduct hearing), *aff'd on reconsideration*, No. 14-CR-06181 EAW, 2018 WL 1009282 (WDNY Feb. 20, 2018), *app. filed*, Nos. 18-619, -625 (CA2 March 5, 2018); *Parse*, 789 F.3d at 91-92 (defense counsel appears to cross-examine juror on *voir dire* concealment); *US v. Ganias*, No. 08 CR 224 (EBB), 2011 WL 4738684, at *3 (D. Conn. Oct. 5, 2011) (defense counsel questioned juror on undisclosed "bias or predisposition"), *aff'd in relevant part, rev'd on other* grounds, 755 F.3d 125 (CA2 2014), *rev'd on other grounds*, 824 F.3d 199 (CA2 2016) (*en banc*); *US v. Sabhnani*, 529 F. Supp. 2d 384, 387 (EDNY 2008) (defendants presented witness testimony at jury misconduct hearing), *aff'd in relevant part, vacated in part on other grounds*, 599 F.3d 215 (CA2 2010); *Ida v. US*, 207 F. Supp. 2d 171, 175-76 (SDNY 2002) (defendant called witnesses at evidentiary hearing on jury misconduct); *US v. Ianniello*, 740 F. Supp. 171, 179-80 (SDNY 1990) (defense counsel examined witnesses at post-remand jury misconduct hearing), *rev'd on other grounds*, 937 F.2d 797 (CA2), *modified on reh'g*, 952 F.2d 623 (CA2), *amended*, 952 F.2d 624 (CA2 1991), *rev'd on other grounds*, 505 US 317 (1992), *on remand*, 974 F.2d 231 (CA2 1992), *vacated on other grounds*, 8 F.3d 909 (CA2 1993) (*en banc*).

[18] *See Waller v. Ga.*, 467 U.S. 39 (1984).

the fair trial before an untainted jury to which he's constitutionally entitled. Because sunlight is the best disinfectant, that prospect merits serious consideration, close investigation and a new trial as appropriate. *See* L. Brandeis, Other People's Money 62 (1933). Where another judge in the same courthouse threatened criminal referrals and promised to "'come down very hard'" on jurors who "'go on the internet, Twitter, and ignore their duties'" – and lie about it to a judge's "face" to boot – anything less than rigorous scrutiny could create an unsettling appearance of inequity.[19] As the other judge aptly put it, "'We are here to do justice, not spread gossip about the defendants on trial.'"[20]

Dated:     New York, NY
           March 26, 2019

                              Respectfully submitted,


                              **LAW OFFICE OF MARC FERNICH**

                              By: _____
                              810 Seventh Ave
                              Suite 620
                              New York, NY 10019

---

[19] Elizabeth Rosner and Emily Saul, NXIVM Judge Says He'll Crack the Whip on Juror Misconduct (Feb. 28, 2019) (El Chapo trial shows that "'people don't listen to judges,' Garaufis railed"), https://nypost.com/2019/02/28/nxivm-judge-says-hell-crack-the-whip-on-juror-misconduct/ (last visited March 22, 2019).

[20] *Ibid.*

(212) 446-2346
maf@fernichlaw.com

**LAW OFFICES OF JEFFREY LICHTMAN**
11 East 44th St.
Suite 501
New York, NY 10017
(212) 581-1001
jhl@jeffreylichtman.com

*Attorneys for Joaquin Guzman*