```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------x
                                          09-CR-00466(BMC)
 3    UNITED STATES OF AMERICA,

                                          United States Courthouse
 4                                        Brooklyn, New York

 5         -against-                      December 11, 2018
                                          9:30 a.m.
 6    JOAQUIN ARCHIVALDO GUZMAN
      LOERA,
 7
              Defendant.
 8
      -------------------------------x
 9
                   TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10               BEFORE THE HONORABLE BRIAN M. COGAN
                     UNITED STATES DISTRICT JUDGE
11                         BEFORE A JURY

12    APPEARANCES

13    For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                 Eastern District of New York
14                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
15                               BY:  GINA M. PARLOVECCHIO, ESQ.
                                      ANDREA GOLDBARG, ESQ.
16                               Assistant United States Attorneys

17                               UNITED STATES ATTORNEY'S OFFICE
                                 Southern District of Florida
18                               99 NE 4th Street
                                 Miami, Florida 33132
19                               BY:  ADAM S. FELS, ESQ.
                                 Assistant United States Attorney
20
                                 DEPARTMENT OF JUSTICE
21                               Criminal Division
                                 Narcotic and Dangerous Drug Section
22                               145 N. Street N.E. Suite 300
                                 Washington, D.C. 20530
23                               BY:  ANTHONY NARDOZZI, ESQ.
                                      AMANDA LISKAMM, ESQ.

24

25    (CONTINUED FOLLOWING PAGE)
```

1   (APPEARANCES CONTINUED)

2

3

4   For the Defendant:          BALAREZO LAW
                                400 Seventh Street, NW
5                               Washington, D.C. 20004
                                BY:  A. EDUARDO BALAREZO, ESQ.

6
                                LAW OFFICES OF JEFFREY LICHTMAN
7                               11 East 44th Street, Suite 501
                                New York, New York 10017
8                               BY:  JEFFREY H. LICHTMAN, ESQ.
                                     PAUL R. TOWNSEND, ESQ.

9
                                LAW OFFICE OF PURPURA & PURPURA
10                              8 E. Mulberry Street
                                Baltimore, Maryland 21202
11                              BY:  WILLIAM B. PURPURA, ESQ.

12                              LAW OFFICES OF MICHAEL LAMBERT, ESQ.
                                369 Lexington Avenue, PMB #229
13                              New York, New York 10017
                                BY:  MICHAEL LEIGHT LAMBERT, ESQ.
14                                   MARIEL COLON MIRO, ESQ.

15

16
    Court Reporter:             Rivka Teich, CSR, RPR, RMR, FCRR
17                              Phone:  718-613-2268
                                Email:  RivkaTeich@gmail.com
18
    Proceedings recorded by mechanical stenography.  Transcript
19  produced by computer-aided transcription.

20

21

22

23

24

25

1               (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.

3          THE COURT:  Good morning.  Have a seat, please.

4          Last night the Government filed readvised and

5     scrutinized redactions of some of the 3500 material relevant

6     to the witness who is on the stand.  I've looked at those last

7     night, and I think those revisions will indeed help the

8     defendant review the reports and will provide him with some

9     context in which they were written.

10         Based on the Government's factual proffer, I agree

11    the redactions are appropriate and consistent with law

12    enforcement privilege.  They are necessary to protect the

13    integrity of ongoing investigations and ensure the safety of

14    cooperating witnesses and their families.  Because the

15    redactions, to the extent they remain, cover information that

16    is entirely irrelevant to the case, defendant hasn't shown the

17    compelling need that you have to show to overcome those

18    redactions and the presumption against disclosure of

19    information protected by this law enforcement privilege.

20         Also, as I think I mentioned yesterday, I did review

21    the reports in their original to see if there was any Brady or

22    Giglio, or as Mr. Lichtman will remind me, Giglio.

23         MR. LICHTMAN:  Giglio, it's a hard G.

24         THE COURT:  There isn't any of either.  So they are

25    fine.

SANCHEZ MARTINEZ – CROSS – MR. PURPURA

1          I do think they ought to be helpful to the defense

2    for the cross-examination.

3          Anything else we need to talk about before we bring

4    the jury in?

5          MS. PARLOVECCHIO:  Not from are the Government.

6          MR. PURPURA:  Not from the defense.

7          (Jury enters.)

8          THE COURT:  Everyone can be seated.  Good morning,

9    ladies and gentlemen.

10          We will continue with cross-examination Mr. Purpura.

11          MR. PURPURA:  Judge, thank you.

12   CROSS-EXAMINATION

13   BY MR. PURPURA::

14   Q    Mr. Martinez, yesterday briefly Government counsel

15   touched on your background.  It's fair to say that you grew up

16   very, very poor; is that correct?

17   A    Yes.

18   Q    And I don't think you mentioned how many brothers and

19   sisters you had, so why don't you tell us how many brothers

20   and sisters did you have?

21   A    Yes, it's 12 siblings.

22   Q    And as you've indicated in past debriefings, your father

23   had some problems with alcohol, he was often not there as

24   well; is that correct?

25   A    Yes.

SANCHEZ MARTINEZ – CROSS – MR. PURPURA

1    Q    And you literally, I mean this literally, you grew up on

2    the streets, correct?

3    A    Yes.

4    Q    And often times you wouldn't even have appropriate

5    clothes that's how difficult it was, correct?

6    A    Could you repeat the question, please?

7    Q    That often when you went outside, you would not be

8    clothed properly, literally you'd be in your underwear as a

9    young boy?

10   A    Yes.

11   Q    As a result of that, you had to hustle, you had to work?

12   A    Yes.

13   Q    Literally you had to do that to survive?

14   A    Yes.

15   Q    And that included at a very young age shining shoes,

16   washing cars, and begging if necessary?

17   A    Yes.

18   Q    You learned at a very early age what you personally had

19   to do to survive to live?

20   A    Yes.

21   Q    And with those lessons learned, today you hope that your

22   cooperation will help you get out of jail sooner, correct?

23   A    No.

24   Q    You don't think, you don't want your cooperation to help

25   you get out of jail earlier?

SANCHEZ MARTINEZ – CROSS – MR. PURPURA

1    A    Yes.

2    Q    That's what I thought.

3          Now, you indicated also on direct examination that

4    for the past 18 months, past 18 months, you met with

5    Government counsel probably more than 30 times to prepare for

6    trial, correct?

7    A    Yes.

8    Q    Would you agree -- strike that.

9          If you're telling the truth, do you need 30 meetings

10   to discuss the truth?

11         MR. ROBOTTI:  Objection.

12         THE COURT:  Sustained.

13   Q    Does the truth change from meeting one to meeting 30?

14   A    No.

15   Q    So it should be the same and consistent from the very

16   first time you're truthful right through the second, third,

17   fourth, eighth, ninth, ten, 12th, right up to 30 times with

18   Government counsel, right?

19   A    Yes.

20   Q    And based on your 30-plus meetings with Government

21   counsel for the past 18 months, this is the train route chart,

22   correct?

23   A    Yes.

24   Q    Mayo to your knowledge is still in Mexico, correct, free?

25   A    Yes.

SANCHEZ MARTINEZ – CROSS – MR. PURPURA

1    Q    Vincent Carrillo is in a Mexican jail, correct?

2    A    As far as I know, yes.

3    Q    Alfredo Vasquez he's in the U.S. jail, correct?

4    A    Yes.

5    Q    The only person on trial here in this courtroom is

6    Joaquin Guzman Loera, correct?

7    A    Correct.

8    Q    And you put him at the top of this chart, correct?

9    A    Yes correct.

10   Q    That's after 30-plus meetings with Government counsel

11   that's what you have, right?

12   A    Yes.

13   Q    You have him above Mayo Zambada, correct?

14   A    Yes.

15   Q    You have him above Vincent Carrillo, correct?

16   A    Yes.

17   Q    And that's 2018, right?

18        MR. ROBOTTI:  Objection.

19        THE COURT:  Overruled.

20   Q    Correct?

21   A    Yes.

22   Q    I'm going to take you back to 2016.  You came to the

23   United States approximately December 17, 2015, correct?

24   A    Yes.

25   Q    You decided soon after arriving here, after speaking with

SANCHEZ MARTINEZ – CROSS – MR. PURPURA

1    counsel, that you wanted to cooperate, correct?

2    A    Yes.

3    Q    As you brought out yesterday through Government counsel,

4    when you got here and you decided to cooperate, you wanted to

5    be truthful, right?

6    A    Yes.

7    Q    And in fact you signed what is called a proffer

8    agreement, an agreement that you wanted to give information to

9    the Government, correct?

10   A    What does that mean?  I'm sorry.

11   Q    Let me show you just for the witness only what is marked

12   as Defendant's exhibit 274.  I'd ask the interpreter just to

13   please just read the first paragraph.

14            THE COURT:  And the title, right?

15            MR. PURPURA:  And the title.

16            (Interpreter reading for the witness.)

17   Q    Now do you recall with the help of your attorney –– and

18   I'll show you the last page as well –– that you entered into

19   an agreement where you wanted to give information to the

20   Government called a proffer agreement, correct?

21   A    Correct.

22   Q    And the very first date you signed the proffer agreement

23   was February 3rd, 2016, correct?

24   A    Correct.

25   Q    And then again about five days later you met with

SANCHEZ MARTINEZ – CROSS – MR. PURPURA

1    Government counsel on February 8, 2016, for a second proffer?

2    A     Correct.

3    Q     And on these dates February 3rd, 2016, and February 8 of

4    2016, there was a different Government counsel than the one

5    that asked you questions and the one you met 30 times in the

6    past 18 months, correct?

7    A     Correct.

8             MR. PURPURA:  Your Honor, we have to approach the

9    bench.

10            THE COURT:  Okay.

11            (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (Sidebar conference.)

2          MR. PURPURA:  I have an excerpt from the proffer

3   agreement, which is identified, it's the first paragraph.  The

4   reason I want this first paragraph in there as evidence in

5   this particular case, is because he's agreed and signed with

6   his lawyer that he will give all the information.  And that

7   the Government is going to weigh this information, so it's

8   extremely important that he doesn't hold anything back.

9          THE COURT:  What is the objection?

10          MR. ROBOTTI:  Your Honor, I think he can ask the

11   witness about his understanding of what the proffer agreement

12   is.  And he can use this to refresh his recollection if

13   necessary; otherwise, it's hearsay.

14          MR. PURPURA:  It's not hearsay.

15          THE COURT:  It's not hearsay.  Offer it and I'll

16   receive it.

17          MR. PURPURA:  Thank you.

18          (End of sidebar conference.)

19          (Continued on the next page.)

20

21

22

23

24

25

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1          (In open court.)

2          MR. PURPURA:  At this time I would offer in an

3    excerpt from the proffer agreement, Defense Exhibit 274A into

4    evidence.

5          THE COURT:  That's received over objection.

6          I will note there is a completeness issue we can

7    deal with that separately.

8          (Defendant Exhibit 274A, was received in evidence.)

9          MR. PURPURA:  Thank you, Judge.

10         THE COURT:  Go ahead.

11   BY MR. PURPURA::

12   Q    Showing you what is paragraphs one, an introductory

13   paragraph from your proffer agreement.  This is dated

14   February 3rd of 2016.  I'm going to ask the interpreter to

15   please read paragraph one.

16         THE INTERPRETER:  Just for the witness, counsel?

17         MR. PURPURA:  Yes, for the witness.

18         (Interpreter reading to the witness.)

19         MR. PURPURA:  Thank you.

20   Q    I'm just going to direct your attention to the first

21   sentence which reads, Client agrees to provide the Office with

22   information and to respond to questions so that the Office may

23   evaluate client's information and responses in making a

24   prosecutorial decision.

25         So what you understood with your lawyer was that you

2701

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    wanted to give as much information, as much truthful

2    information, as possible, correct?

3    A    Yes.

4    Q    And you wanted to do that because the Government was

5    going to evaluate, they were going to weigh that information

6    to see if it was helpful to the Government, correct?

7    A    Yes.

8    Q    And by the Government, that wasn't this trial team, it

9    was different Assistant United States Attorneys at that time,

10   correct?

11              MR. ROBOTTI:  Objection to relevance.

12              THE COURT:  Overruled.

13   A    Yes.

14   Q    At that time one of the things you discussed with

15   Government counsel on February 3rd and February 8 of 2016, was

16   the El Paso seizure, do you remember that?

17   A    I do remember I spoke about that seizure, but I don't

18   remember exactly on what day.

19   Q    Okay.  On February 3rd and February 8 of 2016, when you

20   first came into proffer, you told Government counsel at that

21   time basically the same thing you told the jury about the

22   thousand kilos seized, do you remember that?

23   A    Yes.

24   Q    And that the seizure was at a warehouse in El Paso.  And

25   that the thousand kilos which were seized belonged to Vincent

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1  Carrillo, on the board, correct?

2  A    Yes.

3  Q    And this was in 1999 when that thousand-kilo seizure

4  occurred, correct?

5  A    Yes.

6  Q    At that time in 1999, Amado, Vicente's brother, had

7  already passed away, correct?

8  A    Yes.

9  Q    And then you went on to tell Government counsel in the

10  presence of your attorney, do you remember telling them, that

11  Vicente and Mayo Zambada had taken over the organization

12  following Amado's death?

13  A    I don't remember.

14  Q    I'm going to show you exhibit Defendant's exhibit 271,

15  and direct your attention -- I'd ask the interpreter to please

16  read the first line right here, and where it begins Tirso to

17  the end.

18          (Interpreter reading for the witness.)

19          Thank you.  I'm going to ask you now, sir, you

20  recall telling the Government about the El Paso seizure,

21  correct?

22  A    Correct.

23  Q    You recall telling Government counsel, along with your

24  attorney and agents present that Vincent Carrillo was the

25  owner of the thousand kilos, correct?

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    A     Correct.

2    Q     And now, sir, you do recall that when you first spoke to

3    Government counsel back in February 3rd and February 8 of

4    2016, you told them that the Vincent Carrillo and Mayo Zambada

5    had taken over the organization following Amado's death,

6    correct?

7    A     Yes.

8    Q     You also told them that Mayo Zambada was the ultimate

9    person responsible for the organization of all the drug

10   routes, correct?

11   A     I don't remember that.

12   Q     Madam Interpreter, could you read the one sentence where

13   it begins Tirso?

14              (Interpreter reading for the witness.)

15              Now do you remember telling Government counsel, your

16   attorney, and the agents that were present that Mayo Zambada

17   was the ultimate person responsible for organizing all the

18   drug routes?

19   A     Yes, he was one of the bosses.

20   Q     And the only people you mentioned that took over the

21   train route after the death of your brother, was Mayo and

22   Vicente, correct?

23   A     Yes.

24   Q     So in 2016 when you spoke to different Government

25   counsel, Chapo, Short Legs, Joaquin Guzman, was not mentioned?

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    A    I think I did.

2    Q    Now you mentioned Pollo, correct?

3    A    Yes.

4    Q    And Pollo is Arturo Guzman, correct?

5    A    Yes.

6    Q    You indicated that you met Pollo, correct?

7    A    No.

8    Q    You never met him?

9    A    No.

10   Q    You indicated that you met El Gordo at a cockfight,

11   correct?

12   A    Yes, but from afar.

13   Q    Do you remember Government counsel -- strike that.

14              So from 1994 through 2008 the only time you saw El

15   Gordo was one time from afar at a cockfight, correct?

16   A    Yes.

17   Q    Do you know his other nickname is Tololoche?

18   A    No.

19   Q    Do you remember the Government counsel showed you a

20   series of photographs for you to identify?

21   A    Yes.

22   Q    Do you remember they showed you a photograph -- strike

23   that.

24              Were you ever able to identify the photograph of El

25   Gordo?

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1   A    No.

2   Q    You mentioned that you met one of the twins, correct?

3   A    The older brother of the twins.

4   Q    Pedro, correct?

5   A    I don't know the twin's older brother's name.

6   Q    Regardless of which twin you met, you spent how much time

7   with that person?

8           MR. ROBOTTI:  Objection.  Misstates the testimony.

9           THE COURT:  Overruled.

10  A    Ten, 15, 20 minutes.

11  Q    Government counsel showed you photographs of the twins,

12  do you remember?

13  A    He showed me several photos.

14  Q    Were you ever able to identify the photograph of the

15  person you spoke to for ten to 15 minutes, who you call a

16  twin?

17  A    The person who spoke to me was the twin's older brother.

18  Q    So the question is you were not able to identify his

19  photograph when Government counsel showed it to you, correct?

20  A    No.

21  Q    This is the original chart that Government counsel

22  created, it's not the train route chart.  Do you remember this

23  chart?

24  A    Yes.

25  Q    Again, help me with this, when you placed Mayo's

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1   photograph, I think the word you used was abajo, under,

2   correct?

3   A    A little bit lower than Chapo Guzman.

4   Q    But the word you said was abajo, not abajito; abajo is

5   under, correct?

6   A    No, I said abajito.

7   Q    Bottom line is, you have again Joaquin Guzman who is the

8   defendant on trial above Mayo Zambada, correct?

9   A    Correct.

10  Q    You have El Azul down here below Mayo and Joaquin Guzman,

11  correct?

12  A    Yes.

13  Q    Did you ever visit El Azul in jail?

14  A    No.

15  Q    Then you have the Carrillos below Joaquin Guzman, Mayo,

16  El Azul, correct?

17  A    Yes.

18  Q    You never heard of El Azul being called the Boss of

19  Bosses, the Leader of the Federation?

20  A    No.

21  Q    A lot of what you testified to yesterday early on came

22  from you talking to Alfredo Vasquez, correct?

23  A    Correct.

24  Q    As we discussed, Government's Exhibit 97B, young picture

25  of Alfredo Vasquez, correct?

2707

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    A    Correct.

2    Q    And just for the witness please, Government's Exhibit

3    97A, do you know who that is?

4    A    No.  I feel like I've seen that person but...

5         MR. PURPURA:  Your Honor, it's already in evidence

6    I'd like it to be displayed at this time, thank you.

7    Q    Let me introduce you to Alfredo Vasquez.

8    A    Well, he looks really old.

9    Q    Now according to you, in 1995 you wanted to get close to

10   Chapo Guzman, correct?

11   A    Yes.

12   Q    And that's why you were kind of courting, according to

13   you, this man Alfredo Vasquez?

14   A    Yes.

15   Q    And you knew that Guzman was in a federal penitentiary in

16   Mexico?

17   A    Yes.

18   Q    And you had no idea in 1995 or 1996 or 1997 when or if he

19   would get out, did you?

20   A    Yes.

21   Q    In fact, at that time Mexicans were being extradited to

22   the United States, correct?

23   A    I don't remember.

24   Q    At that time, you were dealing with Amado Carrillo, Nacho

25   Coronel and Mayo, correct?

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1  A     Nacho Coronel, Flaco Quirarte and Amado.

2  Q     You were being supplied cocaine that you could sell and

3  you were being supplied cocaine to transport, correct?

4  A     That I could sell, yes.

5  Q     During that time period, '95, '96, '97, '98, '99, 2000,

6  he's still in jail, right?

7  A     Yes.

8  Q     Right into 2001 he's still in jail, right?

9  A     Until end of 2000 beginning 2001.

10  Q     And during that entire period of time you never went to

11  visit him in jail, did you?

12  A     I never visited him.

13  Q     You never got a letter from him, did you?

14  A     I did not.

15  Q     You never got one of those cellphone calls from him, did

16  you?

17  A     No.

18  Q     And you had no idea when he'd be released from jail if

19  ever, did you?

20  A     I had no idea.

21  Q     You spoke about the chili cans, do you remember that?

22  A     Yes.

23  Q     Did the Government counsel ever show you the chili can

24  video?

25  A     No.

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    Q    You never saw it?

2    A    No.

3    Q    Do you have any idea whether there was actually vinegar

4    in these chili cans, according to you?

5    A    Yes, that's what Alfredo told me.

6    Q    The name on these chili cans was La -- I'm going to have

7    trouble with this one, I apologize.  I was doing well up until

8    this point, la Costena.

9    A    Yes, that's what Alfredo told me.

10   Q    Not La Comadre.

11   A    No, I don't know.

12   Q    You walked away from the train route in 2003, correct?

13   A    Yes.

14   Q    Your testimony yesterday and some today dates from

15   approximately 1994 through 2003, correct?

16   A    Yes.

17   Q    So we're talking a time period at least 15 if not back to

18   22, 23 years ago, correct?

19   A    Yes.

20   Q    You didn't or you don't have notes from back then, do

21   you?

22   A    No, I don't have any notes.

23   Q    You didn't keep ledgers that you still have, do you?

24   A    No.

25   Q    Would you agree with me that time does effect memory?

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    A    It could be, yes.

2    Q    Would you also agree that when you age that could effect

3    memory as well?

4    A    Yes, for some people.

5    Q    Would you also agree with me that if there is organic

6    brain issues that could effect memory as well, correct?

7    A    Yes.

8    Q    And not trying to embarrass you, but you started using

9    cocaine at the very, very young age of 14, correct?

10   A    Yes.

11   Q    And you were receiving that on the streets, and you

12   received a half a gram to a gram of cocaine a day?

13   A    Yes.

14   Q    And as you already indicated on direct examination, from

15   1980 through 2007, except for a two-year hiatus, you were

16   using a gram at least of cocaine every day, correct?

17   A    Approximately, I mean it wasn't a gram every day, but

18   sometimes it was less.  And I didn't just stop for two years,

19   I stopped for four years.

20   Q    Excuse me, four years.  And for that same period of time,

21   approximately 27 years, you were using marijuana on a daily

22   basis as well, correct?

23   A    Not daily, three, four times a week.

24   Q    So in addition to the cocaine and the marijuana three to

25   four times per week, you also abused alcohol to the extent

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    that you are an alcoholic, correct?

2    A    Yes.

3    Q    And you know from your rehab that extensive use of

4    cocaine, extensive use of alcohol, can cause organic brain

5    damage, correct?

6    A    At times.

7    Q    Depression, correct?

8    A    Yes.

9    Q    You've been treated for depression, correct?

10   A    No.

11   Q    No medication for depression?

12   A    No, for anxiety.

13   Q    It also created anxiety as well, correct?

14   A    Well, I mean, I don't know what depression is.

15   Q    In addition to the possible organic memory loss, motive,

16   motive to lie could cause historical revision, correct?

17            MR. ROBOTTI:  Objection.

18            THE COURT:  Sustained.

19   Q    Let me ask you directly, have you lied about historical

20   events to help yourself out?

21   A    Probably so.

22   Q    Just a simple example would be you indicated you used a

23   lot of aliases, correct?

24   A    Yes.

25   Q    You were not born or Christian or Baptized with the name

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1  Manuel Ochoa Martinez, were you?

2  A    Right, no.

3  Q    But you used that name, correct?

4  A    Yes.

5  Q    And then again historically when you were first arrested,

6  you spoke to Mexican officials, United States officials, and

7  you were not truthful about your past, correct?

8          MR. ROBOTTI:  Objection to form.

9          THE COURT:  Sustained as to form. Compound.

10  Q    When you were first arrested you spoke to United States

11  officials, correct?

12  A    Yes, a few days later.

13  Q    In addition to the United States officials you also spoke

14  at the same time to Mexican officials, correct?

15  A    Correct.

16  Q    And you told them that you were a sneaker salesman,

17  correct?

18  A    I told them that in the most recent years what I was

19  working at was selling shoes and cars.

20  Q    Obviously you didn't tell them that you were a narcotics

21  trafficker, correct?

22  A    I accepted responsibility.

23  Q    We'll get back to that.  Now, the first time you came to

24  the United States was 1984, 1985, correct?

25  A    Approximately.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1   Q    When you first met with the Government officials in

2   February 3rd and February 8 of 2016, you told them about your

3   early life truthfully, correct?

4   A    Yes.

5   Q    You told them truthfully that when you first came to the

6   United States you entered illegally, correct?

7   A    Yes.

8   Q    You knew it was against the law to enter the United

9   States illegally, correct?

10  A    Yes.

11  Q    But you weighed the benefit of getting to the United

12  States versus breaking the law, correct?

13  A    Yes.

14  Q    And then you worked at a fish restaurant?

15  A    Yes.

16  Q    You worked for Manuel Martinez, correct?

17  A    Yes.

18  Q    And you began to deliver gram-sized quantities of cocaine

19  at the request of Mr. Martinez, correct?

20  A    Yes, correct.

21  Q    You returned to Mexico after that?

22  A    Yes.

23  Q    1988 approximately you came back to the United States

24  again?

25  A    Yes, approximately.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    And at that time -- strike that.

2              Again you came in illegally through Baja?

3    A    Yes.

4    Q    And as you admitted on direct examination that knowing

5    it's illegally you still crossed back and forth between the

6    Mexican and United States border perhaps 50 to 100 times,

7    correct?

8    A    Yes.

9    Q    When you came back to the United States approximately

10   1988, you started a lunch truck, do you remember that?

11   A    Yes.

12   Q    And after a year or two years you sought out, you looked

13   for Manuel Martinez, the person who you were at point one

14   selling gram quantities for, correct?

15   A    I don't know exactly about the time frame, but I did look

16   for him.

17   Q    You looked for him because you needed money and you

18   wanted cocaine for personal use, that's what you told the

19   agents back in 2016 truthfully?

20   A    Yes.

21              (Continued on next page.)

22

23

24

25

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1  BY MR. PURPURA:

2  Q    And he actually became your first supplier of cocaine

3  giving you an ounce at a time, 28 grams, correct?

4  A    From half an ounce to an ounce, yes.

5  Q    And I indicated an ounce is 28 grams; that's correct,

6  yes?

7  A    That's correct.

8  Q    And then there came a time when you were being supplied

9  after that.  Your second supplier would have been a Jesus

10  Davis.  Do you remember him?

11  A    Yes.

12  Q    And with Mr. Jesus Davis you moved up to kilo quantities,

13  correct?

14  A    Yes.

15  Q    Again, you knew that it was against the law, right?

16  A    Yes.

17  Q    And you knew that the larger amount that you could sell,

18  the more money you could make, correct?

19  A    Yes.

20  Q    And you made that choice, right?

21  A    Yes.

22  Q    Your third supplier was a David Mercardo; do you remember

23  him, M-E-R-C-A-R-D-O?

24  A    Mercardo.

25  Q    Mercardo.  Do you remember him?

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    A    Yes.

2    Q    He had a large ranch, correct?

3    A    Yes, two ranches.

4    Q    And he would be getting a thousand to 2,000 kilos at a

5    time at this ranch, right?

6    A    Yes.

7    Q    And as you told government counsel in 2016 and the agents

8    in 2016 that the supplier of Mr. Mercardo was Amado Carrillo?

9         MR. PURPURA:  This is in evidence, Government 1.

10   A    Yes.  The direct supplier was Lepesios Serratos, and the

11   boss was Amado Carrillo.

12   Q    And you gave all that information, those names you just

13   mentioned you gave it to the government counsel on the first

14   interview back in 2016 on February 3rd and February 8th,

15   correct?

16   A    Yes.

17   Q    Because you knew from that proffer agreement --

18        MR. PURPURA:  Defense Exhibit 80 already in

19   evidence --

20   Q    -- that it was important for you to give all the

21   information you had at that time, correct?

22        MR. ROBOTTI:   Your Honor, the Government objects on

23   completeness grounds.  Can we move the entire agreement?

24        THE COURT:  Yes.  Although whether he moves it now

25   or whether you do it on redirect doesn't really matter.  He's

David R. Roy, RPR - Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1   not going to use more of it now.  I'll receive the entire

2   agreement.  You can use it if you want on redirect.

3          MR. ROBOTTI:  Thank you, Judge.

4   BY MR. PURPURA:

5   Q    Now, again, you wanted to be honest and truthful and give

6   all the information you had to the Government, not this

7   government counsel, but the government counsel you spoke to

8   earlier, right?

9   A    Yes.

10  Q    Then what happens is Mr. Mercardo gets arrested, right?

11  A    Yes.

12  Q    You don't stop, you continue, correct?

13  A    Yes.

14  Q    In fact, now you have another supplier, a Salvador Vargas

15  is the direct supplier to you, correct?

16  A    Yes.

17  Q    And Mr. Vargas, as you found out again, was -- his source

18  of supply was Mr. Carrillo, Amado?

19         MR. PURPURA:  And we again display Government's 9.

20  A    Flaco Guzman.

21  Q    As well as Eduardo Gonzalez Quirarte, El Flaco, correct?

22  A    Yes.

23  Q    So as you indicated before, El Flaco, Eduardo Gonzalez

24  Quirarte were working together as partners with Amado

25  Carrillo, correct?

David R. Roy, RPR – Official Court Reporter

2718

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1   A    He worked for him, yes.

2   Q    All right.  And again, that was your source in 1995 going

3   to 1996, correct?

4   A    El Flaco Quirarte, was, yes.

5   Q    And as you knew, he was getting his drugs from Amado

6   Carrillo, correct?

7   A    Yes.

8   Q    Okay.  And then '96, '97 you told the agents back in 2016

9   that Flaco's partner, Carrillo, wanted you to be responsible

10  for receiving drugs in Chicago, correct?

11  A    Yes, correct.

12  Q    And what you told the government officials back in 2016

13  on those two dates when you were truthful, was there was

14  approximately ten shipments that you received in Chicago?

15  A    Yes.

16  Q    And that all of those drugs were supplied by El Flaco

17  Quirarte, his partner, Amado Carrillo, and this man, Mayo

18  Zambada?

19  A    Yes.

20  Q    That's what you told the Government in 2016, correct?

21  A    Yes.

22  Q    At the same time you told government counsel back in

23  2016, same time period, that you were also receiving drugs

24  from this man, Nacho Coronel?

25  A    What time period?  I'm sorry.

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1   Q    This is the same time period '96, '97.

2   A    Yes, that's true.

3   Q    When you spoke to government counsel about those loads of

4   drugs going to Chicago, you never once, not once mentioned

5   that Joaquin Guzman, El Chapo, Short Legs had any interest at

6   all in those drugs, did you?

7   A    Yes, right.

8   Q    You then spoke to government counsel about the start of

9   the train route; do you remember that?

10  A    Yes, about Alfredo Vasquez.

11  Q    Now, directing your attention to the year 2000 when you

12  take over the train routes to 2003 --

13  A    Yes.

14  Q    -- you told government counsel back in 2016 on the 3rd

15  and 8th of February truthfully, that the first successful

16  train shipment was the drugs were given to you by Alfredo

17  Vasquez?

18  A    Yes.

19  Q    And the owner of those drugs, which you received from

20  Alfredo Vazquez, was Coronel Villareal, Nacho Coronel,

21  correct?

22  A    Yes.

23  Q    You then mentioned another load given to you by Vicente

24  Carrillo which was approximately a thousand to 1400 kilos

25  going to Chicago?

David R. Roy, RPR - Official Court Reporter

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1   A    Yes.

2   Q    And as you testified to yesterday, it was at the

3   direction of Vicente Carrillo --

4              MR. PURPURA:  I'll put his picture up,

5   Government Exhibit 10.

6   Q    -- at the direction of this man, you opened up warehouses

7   in New York, correct?

8   A    Yes.

9   Q    You opened up warehouses in New Jersey, correct?

10  A    Yes.

11  Q    And several warehouses in Brooklyn/Queens, which is

12  New York, I guess?

13  A    Yes.

14  Q    You didn't tell government counsel back in 2016 that

15  Joaquin Guzman wanted you to open these warehouses up, did

16  you?

17  A    No, I didn't say that.

18  Q    You went on to tell government counsel back in 2016 about

19  a 1500- to 1600-kilo load --

20             MR. PURPURA:  Go ahead.

21             THE INTERPRETER:  Go ahead, Counsel.

22  Q    -- which was owned by Mayo --

23             MR. PURPURA:  Go ahead.

24  Q    -- which went to New York?

25  A    Yes.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    And that's the load where Mayo complains that 311 of his

2    kilos were switched out by you, correct?

3    A    Yes.

4    Q    And you had to answer back to Mayo Zambada, correct?

5    A    Yes.

6    Q    He ordered you to come and visit him, correct?

7    A    Vicente ordered me.

8    Q    And you went there, right?

9    A    Yes.

10   Q    That man, Mayo Zambada, whose load he was complaining

11   about, took a gun and put it right at your head, correct?

12   A    Yes.

13   Q    Si?

14   A    Yes.

15   Q    And the only reason he didn't pull that trigger was

16   because of Vicente, correct?

17   A    Yes.

18   Q    You also indicated on your direct testimony as well as in

19   the affidavit for the extradition of Joaquin Guzman to the

20   United States, that there were approximately from 2001 to

21   2003, eight shipments to Chicago?

22   A    Yes, or more.

23   Q    Okay.  And approximately seven or more shipments to

24   New York, correct?

25   A    Yes.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1  Q    And when you met with different government counsel in

2  February 3rd and February 8th of 2016, you went through all

3  those shipments and who the drugs belonged to; do you remember

4  that?

5  A    I don't remember exactly.

6  Q    Okay.

7           MR. PURPURA:   May I have exhibit...

8           Government Counsel, TMS10, 129 Bates stamp through

9  130.

10 BY MR. PURPURA:

11 Q    Showing you what has been marked for identification as

12 Defense Exhibit 271, I'm going to ask if the interpreter would

13 just start to read where it says, "Other Chicago train

14 loads..." --

15           MR. PURPURA:  And this is a question to

16 Mr. Martinez, madam interpreter.

17 Q    Mr. Martinez, at any time if this refreshes your

18 recollection, stop the interpreter.  Okay?

19           THE INTERPRETER:  By interpreter, could counsel

20 indicate where more or less on the page?

21           MR. PURPURA:  "Other Chicago..."

22           THE INTERPRETER:  Oh, thank you.  (Complies.)

23           MR. PURPURA:  If I could just stop the interpreter

24 just a second.

25 Q    Mr. Martinez, does that refresh your recollection about

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    some of the information you gave government counsel back in

2    2016?

3    A    Yes.  But I don't remember it exactly, but it's written

4    there.

5    Q    Okay.  If you remember, do you remember telling

6    government counsel that in February/March of 2002

7    approximately 1700 kilos was delivered to Chicago that

8    belonged to Vicente Carrillo?

9    A    That Vicente Carrillo gave to me, he delivered them to

10   me.

11   Q    And in the summer of 2002, there were two railroad cars

12   with approximately 3200 kilos in them?

13   A    Yes.

14   Q    And let me take a step back.  On that 1700 kilos, do you

15   recall telling government counsel that the 1700 kilos were for

16   Vicente Carrillo?

17   A    I said Vicente Carrillo gave them to me, he delivered

18   them to me.

19   Q    All right.  And my question is, do you remember telling

20   government counsel that the 1700 kilograms were for Vicente

21   Carrillo?  And I'd ask if you have a memory issue, please read

22   that first sentence.

23   A    I'm not having memory issues.  It's just that Vicente

24   Carrillo delivered them to me.  He's the one that delivered

25   them to me.

David R. Roy, RPR - Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    That's fine.  I'll move on.

2    A    Yes.

3    Q    Now, the 3200 kilograms we were just talking about in the

4    summer of 2002, they were owned by Nacho Coronel, correct,

5    most of them?

6    A    Yes.  That's what Alfredo Vasquez told me.

7    Q    And they were given to you by Alfredo Vasquez, correct?

8    A    Yes.

9    Q    And he told you who the owner was and the owner he said

10   was Nacho Coronel, correct?

11   A    That's what he said.

12   Q    Okay.  And also there was a portion of that load that

13   belonged to Rasguno, R-A-S-G-U-N-O?

14   A    400 kilos.

15   Q    So there was a portion that belonged to someone else and

16   that's what you told government counsel truthfully back in

17   2016, correct?

18   A    I've always said the truth.

19   Q    Very good.  And when you spoke to them truthfully back in

20   2016 about those loads going to Chicago, all the people you

21   named, Nacho Coronel, Mayo, Rasguno, you wanted to help the

22   Government by being truthful, correct?

23   A    Yes.

24   Q    Not once in 2016 on February 3rd or February 8th did you

25   say any of the loads belonged to Joaquin Guzman, El Chapo,

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1   Short Legs; not once, did you?

2   A    Yes.  I mentioned him from the beginning.

3   Q    Well, perhaps government counsel would point that out to

4   us in the 2016 interview.

5             MR. ROBOTTI:  Objection.

6             THE COURT:  Sustained.  The jury will disregard that

7   last nonquestion.

8   BY MR. PURPURA:

9   Q    Well, let me continue then with what you named.  Again,

10  another Chicago load you spoke about was August 2002.  This

11  was the load that was seized, 1500 kilograms belonged to

12  Carrillo, 400 belonged to La Camelia; do you remember that?

13  A    Yes.

14  Q    You also told government counsel back in 2016 about

15  November 2002 where Christian helped you get a new warehouse;

16  do you remember?

17  A    2012?  2012, is that what you said?

18  Q    2002.

19  A    Yes.

20  Q    And that the drugs, there were 1700 kilograms in that

21  warehouse and it belonged to Vicente Carrillo, correct?

22  A    Vicente Carrillo had delivered them to me, but they

23  belonged to Chapo Guzman, Mayo Zambada, and Vicente Carrillo.

24  Q    And in your 2016 interview on February 3rd and

25  February 8th, you did not mention one single time that Mayo

David R. Roy, RPR – Official Court Reporter

2726

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    Zambada -- strike that.

2            That Joaquin Guzman had any ownership at all in

3    those drugs, did you, sir?

4    A    I do not remember if I mentioned him at that time.

5    Q    Let me see if this refreshes your recollection.  Just one

6    second.

7            MR. PURPURA:  Government counsel, Page 129.

8    Q    I'm going to ask you please to read --

9            MR. PURPURA:  -- or have the interpreter read --

10   Q    -- the last sentence and ask you, Mr. Martinez, if this

11   refreshes your recollection as to all the information you gave

12   about the 1700 kilograms?

13           THE INTERPRETER:  (Complies.)

14           MR. PURPURA:  And I can turn the page.

15   Q    Mr. Martinez, does that refresh your recollection that

16   when you spoke about the 1700-kilo seizure, that the only

17   person you mentioned was Vicente Carrillo, correct?

18   A    That he had been the one who had delivered the drugs to

19   me.

20           THE COURT:  Mr. Purpura, is this is good time?

21           MR. PURPURA:  It's fine now.

22           THE COURT:  Are you sure?

23           MR. PURPURA:  Yes.

24           THE COURT:  Okay.

25           MR. PURPURA:  Thank you.

David R. Roy, RPR - Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1       THE COURT:  We'll take our morning recess, ladies

2   and gentlemen.  Fifteen minutes.  Don't talk about the case.

3   See you at 11:15.

4           (Jury exits the courtroom.)

5           (The following matters occurred outside the presence

6   of the jury.)

7       THE COURT:  Okay.  Fifteen minutes.

8           (Recess taken.)

9       THE COURTROOM DEPUTY:   All rise.

10      THE COURT:  Let's have the jury, please.

11          (Jury enters the courtroom.)

12          (Jury present.)

13      THE COURT:  All right.  Be seated.

14          Please continue, Mr. Purpura.

15      MR. PURPURA:  Your Honor, thank you.

16  BY MR. PURPURA:

17  Q   Mr. Martinez, we left off and I was asking you questions

18  about what you told government prosecutors and government

19  agents in 2016 on February 3rd and February 8th when you were

20  initially debriefed.  Do you remember me asking those

21  questions?

22  A   No.  Could you actually ask them again, please?

23  Q   Well, we're not going to ask all of them.

24          Let's pick up at New York.  You told the government

25  agents about loads involving New York and ownership of loads;

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    do you recall that?

2    A    Yes, I do remember.

3    Q    Specifically I'm going to ask you from 2001 -- 2000 to

4    2003 when you stopped.

5    A    Yes.

6    Q    In 2016 you told government agents and government counsel

7    about a 450-kilogram load which belonged to Camelia and

8    Rasguno; do you remember that?

9    A    Yes.

10   Q    That went to New York, correct?

11   A    Yes.

12   Q    You also told government counsel about a 950- to

13   1400-kilogram load that went to New York which was owned by

14   Mayo Zambada; do you remember that?

15   A    Yes.

16   Q    And, in fact, you actually owned about 250 of those kilos

17   and they went to Conejo in New York.  Do you remember telling

18   the government counsel that?

19   A    Yes.

20   Q    You also specifically mentioned in October, November 2002

21   load of about 1200 to 1500 kilograms of cocaine which

22   belonged, again, to Mayo Zambada and Vicente Carrillo; do you

23   remember that?

24   A    Yes.

25   Q    And specifically in January 2003 you told then government

David R. Roy, RPR - Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    counsel in 2016 about a 900- to 1000-kilogram load from

2    La Camelia, Rasguno to New York.

3    A    No, not exactly like that.

4            MR. PURPURA:  May I have...

5            For the Government, TMS10, Page 130.

6            I'm going to ask, please, the interpreter to read

7    starting January 2003.  Just that one sentence.

8            THE INTERPRETER:  (Complies.)

9    Q    Does that refresh your recollection about that particular

10   load in January 2003?

11   A    Yes.  But that load approximately was 2,000 kilos, but

12   not all those kilos belonged to Camelia.  Part of it belonged

13   to Camelia, part belonged to me, and part belonged to Alvarez

14   Tostado, and then the other part belonged to Mayo Zambada.

15   Q    Okay.  That's fine.

16           So you divided -- that load of about 2,000 kilos was

17   divided amongst yourself, Tostado, Rasguno, and Mayo Zambada?

18   A    Yes.

19   Q    Okay.  And again, sir, the same as Chicago, when you

20   mentioned all those specific loads and all those people who

21   were involved with those loads to New York and to Chicago, you

22   never once said that El Chapo, Joaquin Guzman was the owner of

23   any of those loads in 2016, did you?

24   A    Well, I don't remember if that was in 2016.  In 2016.

25   But what I do know is that I did mention Chapo Guzman in the

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    first few meetings.  I mentioned everything and without even

2    knowing that I would be here today.

3    Q    I just was directing your attention to what you discussed

4    with government counsel on February 3rd and February 8th of

5    2016 when you initially spoke with government counsel.  That's

6    what I was addressing your attention to, and whether you --

7    and you did subsequently, especially in those 30-plus

8    preparations for trial for Joaquin Guzman, that's when you

9    mentioned his name, correct, in relationship to Chicago and

10   New York loads?

11   A    Well, with all the meetings I started refreshing my

12   memory and I started remembering the details.

13   Q    You would agree with me that your memory is better closer

14   in time than it is further away?

15   A    I don't know.

16   Q    Okay.  Let's be fair, in 2016 February 2nd [sic] and

17   February 8th, you did mention that Joaquin -- you mentioned

18   these two meetings you had with Joaquin Guzman, correct?

19   A    Yes.  I mentioned that and other things.

20   Q    And the meetings you -- where you spoke about the

21   meetings, the first meeting you indicated that you were

22   with -- actually at both meetings with Alfredo Vasquez,

23   correct?

24   A    Yes.

25   Q    The Alfredo Vasquez who is in federal prison in the

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    United States, correct?

2    A    Yes.

3         MR. PURPURA:  Government's Exhibit 97A, in.

4    Q    Alfredo Vasquez, who you suggested was a close associate

5    of Mr. Guzman, correct?

6    A    Yes, that's what he said.

7    Q    And your trial testimony as well as your testimony back

8    in -- your statement back in 2016, there was a -- some sort of

9    a bag placed over your head when you were put in the vehicle,

10   correct?

11   A    Yes.

12   Q    And you also said they put a bag over the close

13   associate, Mr. Vasquez's head as well, right?

14   A    Yes.

15   Q    Did Mr. Vasquez ever say or complain to you or complain

16   in the car, Wait a second.  I'm the right-hand man of

17   Mr. Guzman, you're not going to put a bag over my head; you

18   put a bag over his head?

19   A    No.  Alfredo Vasquez said, You can also place it on me so

20   that he doesn't get scared -- scared.

21   Q    Did everyone have a bag on their head in the car?

22        MR. ROBOTTI:  Objection.

23        THE COURT:  Overruled.

24        I'm overruling the objection.  You can answer.

25   A    Not everyone, just Alfredo Vasquez and I.

David R. Roy, RPR - Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    Okay.  Now quickly, I'm going to go -- we already talked

2    about the El Paso seizure, correct?

3    A    Yes.

4    Q    And you already testified that it was Mayo Zambada who

5    was the owner of the thousand kilos in that El Paso seizure,

6    correct?

7    A    Yes.

8    Q    Now quickly, I'm going to go to the Brooklyn warehouse

9    seizure, May of 2002.  Do you remember testifying about that?

10   A    Yes.

11   Q    And that was about 2,000 kilos, correct?

12   A    Yes.

13   Q    And, again, the only owner of those kilos, according to

14   you in your statement in 2016 as well as your affidavit in

15   expedition for Joaquin Guzman, was that the owner is Mayo

16   Zambada, correct?

17   A    Yes.

18   Q    Now let's move to the Chicago warehouse seizure,

19   August 2002 where approximately 1900 kilos were seized.  Do

20   you remember testifying about that?

21   A    Yes.

22   Q    And the ownership of these 1900 kilos belonged to either

23   Camelia and/or Vicente Carrillo, correct?

24   A    They were Camelia's.  I did not say that Vicente Carrillo

25   was the owner.

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    Okay.  So Camelia was the owner, correct?

2    A    Of the 400, yes.

3    Q    Vicente Carrillo was the person who you received cocaine

4    from in the past, correct?

5    A    Yes.

6    Q    Vicente Carrillo is Juarez Cartel, correct?

7    A    Well, it was that and together with the Sinaloa Cartel.

8    Q    Vicente Carrillo was the brother of Amado Carrillo,

9    correct?

10   A    Yes.

11   Q    He was the enforcer for the Juarez Cartel; he was the

12   sicario, correct?

13   A    Yes.

14   Q    Now, the final seizure is the Queens warehouse seizure,

15   correct?

16   A    Yes.

17           MR. PURPURA:  Your Honor, already in evidence is

18   204-17.

19   Q    I'm going to show you what is already in evidence as

20   Government's Exhibit 204-17.  Does that appear to be one of

21   your tanker cars?

22   A    Yes.  The type I used, yes.

23   Q    And you know that at the Queens warehouse there were a

24   tank of cars seized as well, correct?

25   A    Yes.

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1   Q    And the agents were able to determine that there were

2   hidden compartments in the tanker cars, correct?

3           MR. ROBOTTI:  Objection.

4   Q    To your knowledge and I think you testified to that,

5   after speaking to your workers they didn't put the welds back,

6   they didn't sand it down and so the agents knew that these

7   cars were used for transporting cocaine, correct?

8           MR. ROBOTTI:   Same objection.

9           THE COURT:  I'll allow it.

10  A    Yes.

11  Q    And finally, sir, that the 2,000 kilos that were seized

12  in Queens, New York, according to you in your 2016 statement

13  as well as your affidavit for the extradition of Joaquin

14  Guzman, was that the owner was Mayo Zambada, correct?

15  A    Yes.

16  Q    Now, briefly, we touched on the wealth that you acquired

17  through drug trafficking on direct examination.  Do you

18  remember testifying about that?

19  A    Yes.

20  Q    Roughly you said this is just generally, gross profit

21  from 2000 to 2003 was 45 to 50 million, correct?

22  A    Yes.

23  Q    And you also were involved in bringing cocaine in go-fast

24  boats during that same period of time, correct?

25  A    Yes.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    And I'm not sure if we really discussed go-fast boats,

2    but you've seen go-fast boats, correct?

3    A    Yes.

4    Q    And they're basically a hull with four big engines on the

5    back?

6    A    Were, with two or three motors, yes.

7    Q    And they're called go fast, because they go fast, right?

8    A    Yes.

9    Q    And in addition to the 45 to 50 million on your smuggling

10   alone, you made another 15 to $20 million in that short period

11   of time, correct?

12   A    Yes.

13   Q    And you were able to purchase a restaurant in Tijuana?

14   A    Yes.

15   Q    You had at least four separate clothing stores?

16   A    Yes.

17   Q    You purchased at least four, if not more, football,

18   soccer teams, correct?

19   A    Yes.

20   Q    And, again, forgive my pronunciation, one team Venados de

21   Yucatan?

22   A    Venados de Yucatan.

23   Q    About 600 to 700,000 that cost you?

24   A    Yes.

25   Q    La Pidad, about 2.2 million it cost you?

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1   A    Yes.

2   Q    And you sold one of the teams in 2004 for $10 million,

3   and after paying the players, you made about a $4 million

4   profit, correct?

5   A    Yes.

6   Q    The Mexican Soccer Federation, apparently they discovered

7   who you were and they offered to buy you out of your teams,

8   correct, in about 2006?

9   A    Yes.

10  Q    About $10 million, right?

11  A    Approximately.

12  Q    You had multiple properties, at least five properties?

13  A    Yes.

14  Q    You purchased a Grumman I 1968 airplane for 400,000 in

15  2004?

16  A    Yes.

17  Q    You had multiple show horses?

18  A    Yes.

19  Q    You had lots of cars, expensive cars?

20  A    Yes.

21  Q    And speaking of cock fights, you indicated you ended up

22  losing over a million dollars at cock fights?

23  A    Yes.

24  Q    You came out better than the roosters though, right?

25         MR. ROBOTTI:  Objection.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1          MR. PURPURA:  You know, I'll strike that.

2          THE COURT:  Sustained.  It's funny, but it's not

3  pertaining to...

4  Q    But I expect in seriousness, based on your wealth, you

5  were actually able to wager -- your largest wager on a rooster

6  was $100,000?

7  A    Yes.

8  Q    You owned in the United States a body shop in

9  Los Angeles?

10  A    Yes.

11  Q    A restaurant in Rockford, Illinois?

12  A    Yes.

13  Q    A car dealership in El Monte, California?

14  A    Yes.

15  Q    You made a lot of money, you had a lot of assets,

16  correct?

17  A    I did make money, yes.

18  Q    And the assets, they were identifiable; they could be

19  seized; they could be found, right?

20  A    Yes.

21  Q    March 4th -- strike that.

22          Do you remember the day you were arrested?

23  A    Yes.

24  Q    What was the date?

25  A    February 2nd, 2014.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    And sometime after that arrest, approximately March 5th

2    of 2015, you were interviewed, as we mentioned before, by

3    agents of the United States as well as an Assistant

4    United States Attorney in Mexico, correct?

5    A    Yes.

6    Q    And one thing that you told them was that you were never

7    wealthy; do you remember that?

8    A    I don't remember.

9         MR. PURPURA:  May I please have TMS8.

10   Q    I'm going to show you what has been marked as

11   Defense Exhibit 269 for identification only.

12        MR. PURPURA:  And I would ask the interpreter please

13   just to read the following -- I'll just make it bigger.  And

14   if you could start right here and read the first sentence.

15        THE INTERPRETER:    (Complies.)

16   Q    So you remember telling the agents in the United States

17   and the Assistant United States Attorney that you were not

18   wealthy, correct?

19   A    Yes.

20        (Continued on the next page.)

21

22

23

24

25

David R. Roy, RPR – Official Court Reporter

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    BY MR. PURPURA::

2    Q    You also remember telling them that you do not own any

3    property, correct?

4    A    Yes.

5    Q    Those were lies, right?

6    A    Yes.

7    Q    And at that point you lied because you thought it would

8    help you out, right?

9    A    Yes, probably, yes.

10   Q    In reference to not being truthful, you've used, as

11   you've indicated on direct examination, multiple passports?

12   A    Yes.

13        MR. PURPURA:  Showing you without objection

14   Defendant's exhibit 318, move in.

15        THE COURT:  Received.

16        (Defendant's Exhibit 318, was received in evidence.)

17   BY MR. PURPURA::

18   Q    I know it's in English, but do you recognize the it

19   caption of the Indictment which was filed against you in New

20   York?

21   A    Yes.

22   Q    Speaking of aliases or names that you used, let's forget

23   El Doctor and all these Futbolista, those are just nicknames,

24   right?

25   A    Yes.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    But actual real names that you used was Jose Tirso,

2    correct?

3    A    Yes.

4    Q    Jose Martinez, correct?

5    A    Yes.

6    Q    Jose Tirso Hernandez Felix, correct?

7    A    I don't remember very well if I used that one.

8    Q    You've used a lot and it's difficult to remember some of

9    these, correct?

10   A    Yes.

11   Q    You used the name Manuel Ochoa Martinez, correct?

12   A    Yes.

13   Q    And in addition when you filled out your financial

14   affidavit you were asked what other names you used, do you

15   remember that?

16   A    Yes, I remember.

17           MR. PURPURA:  Your Honor, without objection

18   Defendant's exhibit 319.

19           THE COURT:  Received.

20           (Defendant's Exhibit 319, was received in evidence.)

21   Q    You recognize this handwriting?  You recognize this as

22   names that you used?

23   A    Yes.

24   Q    And in your own handwriting you indicated you used the

25   name Jose Luis, correct?

                    MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1    A    Yes.

2    Q    Martinez Sanchez, correct?

3    A    Yes.

4    Q    Luis Angel Aguilar, correct?

5    A    Yes.

6    Q    Manuel Martinez Ochoa, correct?

7    A    Yes.

8    Q    Rafael Barragan Sanchez?

9    A    Yes.

10   Q    Arturo Mendez Mendez?

11   A    Yes.

12   Q    And Luis Alberto Mendez Gomez?

13   A    Yes.

14   Q    You used all these names, as you said on direct

15   examination, because you didn't want to get caught, right?

16   A    Yes.

17   Q    You didn't want to be arrested, you didn't want to go to

18   jail?

19   A    Exactly.

20   Q    And so you would lie by creating false passports and

21   false names to stay out of jail, correct?

22   A    Yes.

23   Q    In addition, you would actually try to modify your face

24   to stay out of jail, correct?

25   A    Yes.

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1  Q    You had as you testified to, you had a nose job, nose

2  plastic surgery, correct?

3  A    Yes.

4  Q    You had your eyes done?

5  A    I had my eyes done, yes.

6  Q    And you were prepared to do apparently a complete face

7  lift?

8  A    Yes.

9  Q    But you stopped because of high blood pressure, you were

10 bleeding too much, it was a danger?

11 A    Yes.

12 Q    All this you were prepared to do to avoid being arrested

13 and go to jail, correct?

14 A    Yes.

15 Q    Government counsel showed you and asked you about your

16 plea agreement, do you remember that?

17 A    Yes.

18 Q    And before you signed that plea agreement, you reviewed

19 the plea agreement in detail with your attorney, correct?

20 A    Yes.

21 Q    And either you had a copy of the plea agreement in

22 Spanish or it was read to you in Spanish, correct?

23 A    It was read.

24      MR. PURPURA:  Your Honor, the plea agreement is

25 Government's Exhibit TMS-2, I'm asking to use Defendant's

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    exhibit 264, which is the plea agreement as a demonstrative

2    because it's underlined.

3             THE COURT:  Okay.

4             MR. PURPURA:  Thank you.

5    Q    Showing you what has been entered into evidence as the

6    face page of your cooperation agreement, you recognize that,

7    correct?

8    A    Yes.

9    Q    And as you indicated or as pointed out to you on direct

10   examination, page two of your cooperation agreement sets out

11   the maximum term of imprisonment, correct, life?

12   A    Yes.

13   Q    And the minimum mandatory term of imprisonment of ten

14   years, correct?

15   A    Yes.

16   Q    And you know now that in the United States in Federal

17   prison you serve day for day except for perhaps 15 percent of

18   your time, correct?

19   A    Yes.

20   Q    And you know that the only way you could possibly get

21   below those ten years is through cooperation, correct?

22   A    Yes.

23   Q    On page three, paragraph two, there is a discussion about

24   guidelines, sentencing guidelines.  You know that the offense

25   you pled to involves at least 50,000 kilograms of cocaine,

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1   correct?

2   A     Yes.

3   Q     And your attorney showed you the United States Sentencing

4   Guidelines, didn't he?

5   A     Yes.

6   Q     And there is a schedule there for the quantity of drugs

7   that you've pled to, you'd be at what is called a Level 38,

8   the highest drug level.

9   A     Yes.

10  Q     And you also know, number two says, that he, meaning you

11  maintained premises for the purposes of distributing

12  narcotics.  That's what you agreed to, correct?

13  A     Yes.

14  Q     And you know after speaking with your lawyer that that

15  also gives you what is called an upward adjustment, you go

16  higher on the Guidelines because of that particular fact that

17  you maintained premises, right?

18  A     Yes.

19  Q     And lastly, number three says that you were the leader in

20  the charged offense, correct?

21  A     Yes.

22  Q     And your lawyer explained to you that that also carried

23  an upward bump, upward adjustment, to put you higher in the

24  Guideline range, correct?

25  A     Yes.

MARTINEZ SANCHEZ – CROSS – MR. PURPURA

1    Q    Your Guideline range is life, correct?

2    A    Yes.

3    Q    An important paragraph in your plea agreement for you

4    would be paragraph 13, page eight, where it says, If the

5    office determines that the defendant has cooperated fully,

6    provided substantial assistance to law enforcement

7    authorities, and otherwise complied with the terms of this

8    agreement, the office will file a motion pursuant to United

9    States sentencing guidelines 5K1.1 and 18 U.S.C. Section

10   3553(e).

11         And the Office represented twice in that sentence is

12   the Government at this table, correct?

13   A    Yes.

14   Q    It goes on to say that, Such a motion will permit the

15   Court in its discretion to impose a sentence below any

16   applicable mandatory minimum sentence, correct?

17   A    Yes.

18   Q    And that's the sentence which allows the possibility of

19   you getting less than ten years in jail, that's the mandatory

20   minimum.

21   A    Yes.

22   Q    The next sentence says, In this connection, it is

23   understood that a good faith determination by the Office as to

24   whether the defendant has cooperated fully.  Do you see that?

25   A    Yes.

2746

MARTINEZ SANCHEZ - CROSS - MR. PURPURA

1   Q     And the good faith determination by the Office, the

2   Office, again, is the Government, right?

3              MR. ROBOTTI:  Objection.  Asked and answered.

4              THE COURT:  Sustained.

5              MR. PURPURA:  Fair enough.

6   Q     Lastly, on your plea agreement, Government counsel

7   mentioned there was a forfeiture provision in your plea

8   agreement, correct?

9   A     Yes.

10  Q     Page five, paragraph six, the amount of money which

11  you've agreed to pay is approximately $2 million, correct?

12  A     Yes.

13  Q     The paragraph goes on to say, The forfeiture money

14  judgment shall be paid in full on or before the date of the

15  defendant's sentencing, correct?

16  A     Yes.

17  Q     Your sentencing has been postponed at least once if not

18  twice, correct?

19  A     No, the sentencing hasn't been postponed at all.

20  Q     Have you up to today's date made any payments of the

21  $2 million?

22  A     Not yet.

23  Q     They even tell you where you can send your check.

24  A     I don't remember.

25  Q     It's right here.  They give you an address.  They even

MARTINEZ SANCHEZ – REDIRECT – MR. ROBOTTI

1    tell you who to send it to.  You make it out to Customs Border

2    Protection, you send it by overnight delivery to an Assistant

3    United States Attorney, Brandon G. King with the address.

4              Will you tell the Government the check is in the

5    mail?

6              THE INTERPRETER:  Could you repeat that for the

7    interpreter?

8    Q    Will you tell the Government that the check is in the

9    mail?

10   A    No.

11             MR. PURPURA:  Thank you.  No further questions.

12             THE COURT:  Any redirect?

13             MR. PURPURA:  Could I have a minute to clear off?

14             THE COURT:  Yes.

15             MR. PURPURA:  Thank you.

16   REDIRECT EXAMINATION

17   BY MR. ROBOTTI::

18   Q    Good afternoon, Mr. Martinez.

19   A    Good afternoon.

20   Q    So I'd like to begin by speaking about Government's

21   Exhibit 97B in evidence.  This is the person you identified as

22   Alfredo Vasquez; is that right?

23   A    Yes.

24   Q    And Government counsel -- excuse me, defense counsel

25   showed you Government's Exhibit 97A.  And you said that

MARTINEZ SANCHEZ - REDIRECT - MR. ROBOTTI

1    Alfredo Vasquez looks much older there.

2    A    Yes.

3    Q    Did Alfredo Vasquez look like that at the time you knew

4    him?

5    A    No.

6    Q    When was the last time you saw Alfredo Vasquez?

7    A    Alfredo Vasquez, approximately 2005, 2006.

8    Q    You were asked a number of questions about the money you

9    made from drug trafficking.

10   A    Yes.

11   Q    How much money do you have left from drug trafficking?

12   A    You mean right now?

13   Q    Yes.

14   A    I spent it all.

15   Q    What did you spend it on?

16   A    I spent it on cockfights, horses, cars, properties,

17   houses, parties, women.

18   Q    And the assets you purchased, what assets do you have

19   left in Mexico?

20   A    I have five, five assets --

21   Q    We don't need to go through --

22              MR. PURPURA:  Objection.  He should go through.

23              THE COURT:  The question was narrow.

24              MR. PURPURA:  That's fine.

25   Q    Go ahead and list your properties.

MARTINEZ SANCHEZ - REDIRECT - MR. ROBOTTI

1    A    Yes, I have one apartment, one ranch, a plot of land in

2    Guadalajara, a plot of land in Leon, Guanajuato, and a plot of

3    land in Queretaro.

4    Q    Are those properties presently in your name?

5    A    No.

6    Q    Are you taking steps to recover the properties?

7    A    Yes.

8    Q    Why are the properties not in your name.

9    A    Because I placed them in the name of other people.

10   Q    What happened when you were extradited to the United

11   States?

12   A    The people refused to change the name of the properties

13   to my family's.

14   Q    How much in total are those properties worth?

15   A    I don't know exactly, but I would say about

16   two-and-a-half million to $3 million.

17   Q    As part of your cooperation agreement you've agreed to

18   forfeit $2 million; is that right?

19   A    Yes.

20   Q    Now you were asked a number of questions by defense

21   counsel about your meetings with the Government in February of

22   2016, do you recall those questions?

23   A    No.

24   Q    Do you recall defense counsel asking you about meetings

25   in February of 2016?

MARTINEZ SANCHEZ - REDIRECT - MR. ROBOTTI

1        MR. PURPURA:  Objection.  Asked and answered.

2        THE COURT:  Overruled.

3   A    Yes.

4   Q    And he asked you if those meetings were with other

5   prosecutors, right?

6   A    Yes.

7   Q    And he showed you the notes from that meeting probably

8   four, five, six, seven times?

9   A    Yes.

10  Q    You mentioned at least three times that you did speak

11  about the defendant during that meeting, right?

12  A    Yes.

13  Q    Defense counsel never asked you what you said during

14  those meetings about the defendant right?

15       MR. PURPURA:  Objection.

16       THE COURT:  Sustained.

17  Q    I'd like to look at a few pages of the notes, or I guess

18  a few --

19       MR. PURPURA:  Objection.  Objection.  Can we have a

20  sidebar on this?

21       THE COURT:  Sure.

22       (Continued on the next page.)

23

24

25

SIDEBAR CONFERENCE

1              (Sidebar conference.)

2              MR. PURPURA:  I could be wrong, but wasn't this the

3    subject of one of the Government's motions and the Court's

4    ruling, that we shouldn't reference them, those notes, that we

5    shouldn't be waiving them around, which I have not done, to

6    the best of my ability.

7              THE COURT:  You kind of did.

8              MR. ROBOTTI:  Defense counsel put this in issue.

9              THE COURT:  I think it was clearly apparent to the

10   jury that you were reading from some notes.  I think the jury

11   may be confused who took the notes.  They may think this

12   defendant took the notes -- this witness took the notes.  I

13   don't know if they think that or not.  They know notes were

14   taken at the meetings you were inquiring about.  You asked

15   about a level of specificity that could only be from

16   documents.

17             MR. PURPURA:  You have to -- first of all --

18             THE COURT:  What you did was fine.  I don't have a

19   problem with it.  But then, of course for the sake of

20   completeness, if there is other things you didn't ask about,

21   he gets to ask about those.

22             MR. PURPURA:  The way you should do that, rather

23   than reference the notes, is do you recall saying such and

24   such.

25             THE COURT:  I think that's fine.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

SIDEBAR CONFERENCE

1          MR. PURPURA:  Then if he does, fine; if he doesn't,

2    then show it to him.

3          MR. ROBOTTI:  At this point --

4          MR. PURPURA:  Same way we did it.

5          MR. ROBOTTI:  -- this isn't refreshing recollection,

6    this is prior consistent statements.

7          THE COURT:  No.  These are, for the same reason he

8    couldn't use them as inconsistent statements, you can't use

9    them as consistent statements.  They are not the witness's

10   statements.

11         MR. ROBOTTI:  I understand, your Honor.  But he

12   showed the witness the statements.  I'd like to show the

13   witness the statements too then ask him what he said during

14   that meeting.

15         THE COURT:  That's not the way it works.  You have

16   to first say to him, do you remember talking about this

17   subject.  I'll give you leeway.  I'll let you lead.  Do you

18   remember talking about.  This if he says no, then you can show

19   him the notes privately, have her translate them, just like

20   the defense attorney did.  Does that refresh your recollection

21   that in fact you talked about this.

22         MR. ROBOTTI:  Okay.

23         THE COURT:  Painful, but you can't have your cake

24   and eat it too.

25         (End of sidebar conference.)

MARTINEZ SANCHEZ – REDIRECT – MR. ROBOTTI

1           (In open court.)

2    BY MR. ROBOTTI::

3    Q    Mr. Martinez, do you recall talking about the defendant

4    during your first two meetings with the Government?

5    A    The defendant, yes, from the beginning.  And without

6    knowing that I'd be sitting here.

7    Q    Without knowing that you'd be testifying as to the

8    defendant?

9    A    Exactly.

10   Q    Did you mention the two meetings you had with the

11   defendant during these meetings with the Government?

12   A    Yes.

13   Q    Did you mention who invented the train route during those

14   meetings with the Government?

15   A    Yes.

16   Q    Who did you say that was?

17   A    Chapo Guzman.

18   Q    How did you say you knew that?

19   A    Through himself, he himself.

20   Q    Who?

21   A    Chapo Guzman, he told me himself.

22   Q    Who did you say managed the train route for the defendant

23   before you?

24   A    Alfredo Vasquez, his compadre and worker.

25   Q    Who did you say you managed the train route for?

MARTINEZ SANCHEZ – REDIRECT – MR. ROBOTTI

1    A    For Chapo Guzman.

2    Q    Did you also discuss that 200-kilogram shipment to Los

3    Angeles over the train route?

4    A    Yes.

5    Q    Who did you say directed you to transport those

6    200 kilograms over the train route to Los Angeles?

7    A    Chapo Guzman.

8    Q    You were asked about Government's Exhibit 3500-TMS-11

9    which we've moved into evidence.  And defense counsel only

10   asked you about the first paragraph of this, right?

11   A    Yes.

12   Q    I'd like to just read paragraph two to you.  In any

13   prosecution brought against client by the Office, except a

14   prosecution for false statements, obstruction of justice,

15   perjury with respect to acts committed or statements made at

16   or after the meeting, the Office will not offer in evidence

17   any statements made by the client in this case in, A, its case

18   in chief; or, B, in sentencing.

19            (Interpreter reading to the witness.)

20            Now is it your understanding that if you lied to the

21   Government in these meetings in February 2016 you could be

22   prosecuted for perjury?

23   A    Yes.

24   Q    You were asked about a number of shipments that Mayo

25   Zambada was involved in while the defendant was in jail from

MARTINEZ SANCHEZ - REDIRECT - MR. ROBOTTI

1   199 -- during the 1995 to the 2001 time period?

2   A    Yes.

3   Q    Do you recall those questions?  That would include the

4   seizure in El Paso, Texas?

5   A    Yes.

6   Q    And what was your understanding of the relationship

7   between Mayo and the defendant while the defendant was in jail

8   during this time period?

9   A    Drug partners.

10  Q    You were asked about a number of shipments involving Mayo

11  Zambada after the defendant got out of jail from 2001 to 2003,

12  including the three seizures on the train route.  Do you

13  recall those questions?

14  A    Yes.

15  Q    During this time period, from 2001 to 2003, what was your

16  understanding of the relationship between the defendant and

17  Mayo Zambada?

18  A    Drug partners.

19  Q    You were asked a number of questions about your meetings

20  with the Government.

21  A    Yes.

22  Q    During those meetings with the Government did the

23  Government ever tell you to lie about the defendant?

24  A    No.

25  Q    What, if anything, did the Government tell you to say?

MARTINEZ SANCHEZ – RECROSS – MR. PURPURA

1    A    Always the truth.

2    Q    What do you understand would happen to you today if you

3    didn't tell the truth to the jury?

4    A    I will spend the rest of my life in jail.

5           MR. ROBOTTI:  No further questions, your Honor.

6           MR. PURPURA:  Just a few.

7           THE COURT:  Okay.

8    RECROSS-EXAMINATION

9    BY MR. PURPURA::

10   Q    You were just asked a series of questions about the

11   partnership between Mayo Zambada and Joaquin Guzman from '95

12   to 2000, correct?

13   A    Yes.

14   Q    Not once did you mention Joaquin Guzman as Mayo Zambada's

15   partner in your interviews in February 3rd through the eighth

16   of 2016, did you, sir, not once?

17   A    I don't remember.

18   Q    Not once did you mention that Mayo Zambada and Joaquin

19   Guzman, not once, were partners from 2000 to 2003 in those

20   initial interviews when you were truthful in 2016, did you,

21   sir?

22   A    I don't remember.

23   Q    It's only after you have 30-plus meetings with this

24   Government counsel that they become partners; isn't that

25   correct?

MARTINEZ SANCHEZ – RECROSS – MR. PURPURA

1    A    I don't remember in those meetings, but I know later on,

2    yes, I started telling them because I started remembering more

3    things and my memory was refreshed as we had more meetings.

4               MR. PURPURA:  Thank you.  I have nothing further.

5               THE COURT:  Anything else?

6               MR. ROBOTTI:  Nothing further, Judge.

7               THE COURT:  Lunch break ladies and gentlemen, come

8    back at 1:20.  Don't talk about the case.  We'll see you

9    shortly.

10              (Jury exits.)

11              (Lunch recess.)

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Let's not have the jury until we have

3     the defendant out.

4          All right, please bring in the jury.

5          (Jury enters the courtroom.)

6                A F T E R N O O N   S E S S I O N

7          (Time noted:  1:35 p.m.)

8          (In open court; Jury present.)

9          THE COURT:  All right, everyone be seated.

10          Ladies and gentlemen, I've noticed several of you

11     are wearing jackets or coats.  Is it the cold?

12          THE JURY:  Yes.

13          THE COURT:  Is it cold back there or in here?

14          THE JURY:  All over.

15          THE COURT:  It's 72 degrees here.  That's room

16     temperature.  All right, well, please wear you jackets if you

17     need to, because this is about the warmest I like it.

18          All right, government may call its next witness.

19          MS. GOLDBARG:  Thank you, Your Honor.  The

20     government calls Ernest Cain to the stand.

21

22

23

24

25

CAIN – DIRECT – MS. GOLDBARG

1          (Witness takes the witness stand.)

2   **ERNEST CAIN**, called as a witness, having been first duly

3   sworn/affirmed, was examined and testified as follows:

4               THE WITNESS:  Yes, I do.

5               THE COURTROOM DEPUTY:  Please state and spell your

6   name.

7               THE WITNESS:  My name is Ernest Cain.  Spelled

8   C-A-I-N.

9               MS. GOLDBARG:  May I inquire, Your Honor?

10              THE COURT:  You may.

11              MS. GOLDBARG:  Thank you.

12  DIRECT EXAMINATION

13  BY MS. GOLDBARG:

14  Q    Good afternoon, Mr. Cain.

15  A    Good afternoon.

16  Q    How old are you?

17  A    I'm 71 years old.

18  Q    What do you do for a living right now?

19  A    I'm retired.

20  Q    How long have you been retired?

21  A    I have been retired for approximately 12 years.

22  Q    And before you retired, what did you do?

23  A    I was a Chicago police officer.

24  Q    Now, Mr. Cain, in your retirement, have you had any

25  health issues?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CAIN - DIRECT - MS. GOLDBARG

1    A    Yes, I have.

2    Q    And what would the major health issue be?

3    A    Well, the major health issue is about a year after I

4    retired, I had at stroke.

5    Q    What short-term problems did that cause you?

6    A    I have problems to this day with my balance, when I walk.

7    I have a left eye twitch.  And I had a memory loss.

8    Q    How long did the memory loss last?

9    A    Approximately five to six months.

10   Q    What is the state of you ever memory today?

11   A    I believe my memory is about 90 percent back.

12   Q    Did you go through therapy or rehabilitation after your

13   stroke?

14   A    Yes, I did.

15   Q    Now, Mr. Cain, you mentioned that you retired in the

16   Chicago Police Department.

17            How long did you work for the Chicago Police

18   Department?

19   A    I was a Chicago police officer for 36 years.

20   Q    When did you start at the Chicago Police Department?

21   A    June 15th of 1970.

22   Q    When did you retire as a police officer?

23   A    June 15th of 2006.

24   Q    Now, what unit with the Chicago Police Department were

25   you working at the time of your retirement?

CAIN – DIRECT – MS. GOLDBARG

1    A    At the time of my retirement, I was working in the

2    organized crime division, narcotics section.

3    Q    And how long did you work in this specific section?

4    A    I worked in narcotics from January of 1987 until I

5    retired in 2006.  Approximately 19 years.

6    Q    During the 19 years that you worked in the narcotics

7    section, what were your responsibilities as an officer?

8    A    To investigate narcotic-related crimes.

9    Q    Approximately how many narcotic-related crimes did you

10   investigate in the 19 years that you spent in the section?

11   A    I was either the case officer or part of a team that

12   investigated more than 200 cases.

13   Q    And in these narcotics cases that you investigated or

14   were a part of, what were the predominant drug that you

15   investigated?

16   A    The predominant drug was cocaine.

17   Q    Now, drawing your attention to the summer of 2002, were

18   you working as a police officer in the organized crime

19   division, narcotics section?

20   A    Yes, I was.

21   Q    And more specifically, drawing your attention to

22   August 16th, 2002, were you working on that date?

23   A    Yes, I was.

24   Q    How did that day start for you, Mr. Cain?

25   A    That day started myself and my partner started on a

CAIN – DIRECT – MS. GOLDBARG

1   surveillance.

2   Q    And what were you looking for as part of your

3   surveillance?

4   A    We were looking for a green Ford van with the first three

5   numbers of the plate being 377, driven by a male Hispanic,

6   with the weight of between 240 and 260 pounds, approximately

7   six-foot tall.

8   Q    Now, when you received this information, where did you

9   go?

10  A    I went to the area of the south side of Chicago,

11  southwest side of Chicago, in the area of 6300 south and

12  between 3200 west and 2800 west.

13  Q    Now you said this was the southwest side of Chicago?

14  A    That's correct.

15  Q    How would you characterize this neighborhood?

16  A    The neighborhood was mostly made up of Hispanic and

17  black, black people.

18  Q    Now, what, if anything, did you observe while you were

19  doing surveillance in this area?

20  A    Approximately 1:00 in the afternoon, I observed a green

21  Ford Aerostar van on -- parked in a parking lot near a pay

22  phone and a subject on the pay phone near the van.

23  Q    Was this the van that you were looking for?

24  A    That's correct.

25  Q    What did you observe this person doing on the pay phone?

CAIN - DIRECT - MS. GOLDBARG

1    A    He was in conversation on the pay phone.

2    Q    Did anything about this draw your attention to him?

3    A    Yes.

4    Q    What was that?

5    A    On his belt he had a -- he had a cellular phone attached

6    to his belt.

7    Q    And this was in what year?

8    A    This was in 2002.

9    Q    How prevalent were pay phones back in 2002?

10   A    Well, there were very prevalent.  This was the -- the few

11   years where people switched from pay phones to cellular

12   phones.

13   Q    So why did it seem odd to you that this person was on the

14   pay phone?

15   A    Well it seemed odd because he had a cell phone attached

16   to his waist and he was paying for a phone call.

17   Q    So what did you observe next?

18   A    I observed him get into -- hang up the phone and get in

19   the van and he drove away.

20   Q    Did you follow him?

21   A    Yes, I did.

22   Q    Where did you go to next?

23   A    Went approximately four blocks away to a laundromat at

24   63rd and Francisco.

25   Q    Did you follow him, sir?

CAIN - DIRECT - MS. GOLDBARG

1          MR. BALAREZO:  Objection.

2          THE COURT:  Wait.  Wait.  Wait.

3          How do you know he went there?

4          THE WITNESS:  I followed him.

5          THE COURT:  Thank you.  Overruled.

6          Go ahead.

7     Q    Did you observe the person at the laundromat?

8     A    Yes, I did.

9     Q    And what did you observe this person do?

10    A    He was inside the laundromat.  I got out of my car.  I

11    walked up the front of the laundromat.  It had picture

12    windows.  I looked through the window and I saw him in the

13    rear of the laundromat on a pay phone.

14    Q    What did you observe next?

15    A    I went back to my car, waited.  The subject exited the

16    laundromat and I continued the surveillance.

17    Q    Did the person leave the laundromat?

18    A    Yes, he did.

19    Q    How did he do that?

20    A    He went out the side door towards the rear.  Entered the

21    parking lot.  Got in his vehicle and drove off.

22    Q    When you say he "entered his vehicle," are you talking

23    about the green Ford Aerostar van?

24    A    That's correct.

25    Q    And did you follow the green van?

CAIN - DIRECT - MS. GOLDBARG

1    A    Yes, I did.

2    Q    And where did you follow the green van to?

3    A    He drove approximately a mile and a half north to a Kmart

4    parking lot.

5    Q    And did you maintain surveillance on this person while he

6    was in the Kmart parking lot?

7    A    Yes, I did.

8    Q    What did you observe?

9    A    I observed a white van pull into the parking lot, parked

10   a few spaces away from the green van, and a subject -- the

11   driver of the white van, it was a panel van, Dodge panel van.

12   He exited, the driver exited and met the driver of the green

13   van behind the two vans.

14   Q    And this was all in the parking lot at the Kmart?

15   A    That's correct.

16   Q    What happened next?

17   A    Appeared to be in conversation.  The driver of the white

18   panel van motioned to the panel van, and a second subject

19   exited the panel van and got into the green van, the original

20   green van, along with the driver of the green van.

21         The two of them entered the green van.  The driver

22   of the white panel van went back to his van and got into the

23   driver's seat.

24   Q    Let's step back a second.

25         The driver of the green Ford Aerostar, was that

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CAIN - DIRECT - MS. GOLDBARG

1   person arrested on this day?

2   A    Yes.

3   Q    Did you participate in this event?

4   A    Yes.

5   Q    Do you know the name -- were you later able to identify

6   the person who was arrested?

7   A    Yes.

8         (Exhibit published.)

9   Q    Showing you what's in evidence as Government Exhibit 88.

10         Do you recognize the person in this photo?

11  A    Yes, I do.

12  Q    Was that the person arrested on that date?

13  A    Yes, he is.

14  Q    Do you recall this person's name?

15  A    His name is Andres Robles.

16  Q    What car was this person driving?

17  A    He was the driver of the original green van.

18  Q    Now, you mentioned there was a white van as well.  And

19  you said someone entered from the white van into the green van

20  with Mr. Robles?

21  A    Yes.

22  Q    All right.  Then what happened to these two vans?

23  A    The -- once the drivers were back in their vans, they

24  exited the parking lot with the green van leading and the

25  white van following.  They then made their way approximately a

CAIN – DIRECT – MS. GOLDBARG

1    couple of miles to I57, the Stevenson Expressway.

2    Q    What interstate was that?

3    A    I'm sorry, it's I55.  I55, the Stevenson Expressway.

4    Q    And did you see what the green van and the white van did

5    once they got to I55?

6    A    Both vans started southwest bound on I55.

7    Q    Do you follow them on to I55?

8    A    Yes.

9    Q    Now, Mr. Cain, you testified that you started this day

10   with your partner.

11         By the time that you seen the two vans, the green

12   van and the white van, how many members of the surveillance

13   team did you have with you?

14   A    We started out with two officers, but by the time we got

15   to the expressway, there was at least five of us, five

16   officers there in the surveillance team.

17   Q    Now, what do you observe the green van and the white van

18   do on I55?

19   A    They drive southwest bound approximately 20, 20 miles,

20   25 miles to Route 53.  It's the Romeoville/Bolingbrook exit,

21   and they exited the expressway.

22   Q    What did you do when the green van and the white van

23   exited I55 on to Route 53?

24   A    I exited the expressway with the -- with the vehicles in

25   front of me.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CAIN - DIRECT - MS. GOLDBARG

1    Q    And what did you observe the green van and the white van

2    do?

3    A    Both vans turned and went southbound on Route 53.

4    Q    And then what did you observe them do?

5    A    I observed them drive southbound for approximately a mile

6    and a half to Joliet Road and I53.

7    Q    What did you --

8    A    I mean Route 53.

9    Q    Sorry.

10        What did you observe the green van and the white van

11   do once they got to Joliet Road and Route 53?

12   A    The green van pulled into a gas station located at that

13   intersection.  And the white -- he pulled up to the pump.  And

14   the white van, the white panel van pulled into the gas station

15   and was approximately 20, 25 feet behind the van, the green

16   van.

17   Q    You said he pulled up to the gas station.  Who are you

18   referring to?

19   A    I'm referring to Robles and the green van with the 377

20   license plate.

21   Q    And then the white van, did the white van also park in

22   the gas station?

23   A    He parked behind the green van about 25 feet away.

24   Q    Did you observe anything new at the gas station?

25   A    I observed the passenger of Robles' green van exited the

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CAIN – DIRECT – MS. GOLDBARG

1  green van and then again entered the white panel van.

2  Q    And then what happened to the white panel van?

3  A    The white panel van was there.

4        The driver of the white panel van got out and Robles

5  got out and they began having a conversation.

6  Q    Did you see Robles do anything with his hands?

7  A    Yes.

8  Q    What did you observe?

9  A    He pointed northward down Route 53 in the same road that

10  we had just taken from the expressway.  But he pointed back

11  towards the expressway.

12  Q    And what happened to the white van after this

13  interaction?

14  A    The driver of the white van entered the white van and

15  then pulled out of the gas station, traveled northbound to

16  I -- Route 53 and Marquette.  Then pulled into a McDonald's

17  parking lot.

18  Q    Did you observe this?

19  A    I did not.  No.

20  Q    Okay.  What did you see at the gas station while you were

21  doing surveillance?

22  A    I stayed with the green -- the green Ford Aerostar van.

23  Mr. Robles gassed up his vehicle, pulled out of the lot and

24  also went northbound on Route 53 and pulled into the same

25  McDonald's parking lot.

CAIN - DIRECT - MS. GOLDBARG

1   Q    And did you follow Mr. Robles as he did that?

2   A    Yes, I did.

3   Q    And where did you go once the green van went to the

4   McDonald's parking lot?

5   A    I took a point of surveillance directly west -- or I'm

6   sorry, east of the McDonald's parking lot facing the

7   McDonald's parking lot.

8   Q    And what did you observe from that vantage point?

9   A    From that vantage point, I observed the -- Mr. Robles,

10  who was already out of his vehicle, walking into the door of

11  the McDonald's.

12  Q    Was there a third car that entered into your surveillance

13  at this point in time?

14  A    Yes.

15  Q    Can you describe that?

16  A    It was a tan work van in the parking lot parked near the

17  white van.  The tan van was also a panel van, and it had

18  the -- a sign on the side that said Valdez Wholesale Meats.

19       That was parked in the parking lot near the other

20  two vehicles.

21  Q    So we now have three vans that you guys are conducting

22  surveillance on; is that correct?

23  A    That's correct.

24  Q    You had a green van, a white van, and a tan van.

25  A    That's correct.

CAIN – DIRECT – MS. GOLDBARG

1   Q    Do you observe all three of those vans in the parking lot

2   at McDonald's?

3   A    Yes.

4   Q    What did you observe next with regard to these three

5   cars?

6   A    I next observed the three subjects from the white van

7   come out of the McDonald's followed by an unknown male

8   Hispanic.

9          The male Hispanic that they were with entered the

10  brown or the tan panel van, and the three subjects entered the

11  white -- white panel van.

12  Q    And where did you see the white panel van go?

13  A    The white panel van followed the tan panel van out of the

14  lot northbound on Route 53 towards the I55 expressway.

15  Q    Did you follow the tan van and the white van?

16  A    No, I did not.

17  Q    What did you do?

18  A    I stayed surveillance of the green Aerostar van.

19  Q    And did you follow the green van?

20  A    Yes, I did.

21  Q    Where did you follow the green van to?

22  A    He exited the McDonald's lot, drove on to Marquette up --

23  back to Route 53, south on Route 53, back to the gas station,

24  which is Joliet Road and Route 53, and then turned right on to

25  Joliet Road and went southwest bound.

CAIN - DIRECT - MS. GOLDBARG

1    Q     Okay.  Now, you mentioned that there was someone that got

2    into the tan van.

3          Did you eventually arrest the person that got into

4    the tan van?

5    A     Yes, I did.

6          MS. GOLDBARG:  Showing you what's in evidence as

7    Government Exhibit 38.

8          (Exhibit published.)

9    Q     Can you identify that person as well?

10   A     That is Javier Cecena.

11   Q     Is that the person that you arrested that you first saw

12   in the tan van?

13   A     Yes, that's correct.

14   Q     Now, you said that Mr. Robles exited the McDonald's.

15         What did you observe next?

16   A     When he exited -- when Mr. Robles exited the McDonald's

17   and entered this van, he was with another unknown subject.

18         The two of them entered the van, Mr. Robles was the

19   driver, and they then exited the McDonald's lot.

20   Q     Did you follow them?

21   A     I was across the street from them when they pulled up the

22   Route 53.  There's a light right there.  I was directly across

23   the street.  They were facing eastbound.  I was facing

24   westbound.  They made a right turn going south, and I made a

25   left turn going south approximately one or two cars behind

CAIN - DIRECT - MS. GOLDBARG

1   them.

2   Q    What did you observe next?

3   A    I observed them drive to Route 53 and Joliet Road.  Made

4   a right turn on Joliet Road.

5   Q    And did you follow them?

6   A    Yes, I did.

7   Q    At some point in time did you lose the green van?

8   A    Yes, I did.

9   Q    Did you see the green van again that day?

10  A    Yes.

11  Q    Where did you see the green van again?

12  A    The green van was parked in front of a building, 1277

13  Naperville Drive.

14  Q    Did you go into the area of 1277 Naperville Drive?

15  A    I did not pull into the parking lot, but I was able to

16  look into the parking lot from Naperville Drive and see the

17  van there.

18  Q    Where did you go after you saw the green van at 1277

19  Naperville Drive?

20  A    I continued north and -- continued north for about three

21  quarters of a block, and I was back at Marquette and

22  Naperville and the McDonald's that we were just at right in

23  front of me.

24  Q    Mr. Cain, did you return to this area recently?

25  A    Yes, I did.

CAIN - DIRECT - MS. GOLDBARG

1   Q    And were photographs taken of this visit?

2   A    Yes.

3   Q    And does this area that you just described, where the

4   McDonald's is and the gas station and the property at 1277

5   Naperville Drive, look similar to what it did back in 2002

6   when you conducted the surveillance?

7   A    Yes.

8              MS. GOLDBARG:  Only for the witness, Your Honor.

9              Showing you Government Exhibit 31.

10             I'm sorry, it's 205-31, Government Exhibit 205-29.

11  205-20.  205-23.  205-24.  205-28.  205-26.  And 205-28.

12  Q    Mr. Cain, are these photos that were taken of your recent

13  trip to this area?

14             MR. BALAREZO:  We have no objection, Your Honor.

15             THE COURT:  All right, those are all the admitted.

16             (Government Exhibit 205-31, was received in

17  evidence.)

18             (Government Exhibit 205-29, was received in

19  evidence.)

20             (Government Exhibit 205-20, was received in

21  evidence.)

22             (Government Exhibit 205-23, was received in

23  evidence.)

24             (Government Exhibit 205-24, was received in

25  evidence.)

Case 1:09-cr-00466-BMC-RLM   Document 595   Filed 03/26/19   Page 86 of 180 PageID #: 9301

CAIN – DIRECT – MS. GOLDBARG

1          (Government Exhibit 205-28, was received in

2    evidence.)

3          (Government Exhibit 205-26, was received in

4    evidence.)

5          (Government Exhibit 205-28, was received in

6    evidence.)

7          (Exhibit published.)

8    Q    I'd also like to show you what's been mark for

9    identification as Government Exhibit 205-35.

10         Do you recognize what this is, Mr. Cain?

11   A    Yes, I do.

12   Q    What it is?

13   A    It is a picture of a map of the I55 expressway.  A

14   picture of Route 53 and a picture of Joliet Road.

15   Q    Does this accurately depict the area that you were

16   conducting the surveillance in?

17   A    Yes, it does.

18         MS. GOLDBARG:  At this time the government moves to

19   admit 205-35 into evidence.

20         MR. BALAREZO:  No objection.

21         THE COURT:  Received.

22         (Government Exhibit 205-35, was received in

23   evidence.)

24         (Exhibit published.)

25   Q    All right.  Now that the jury can see this, Mr. Cain, if

CAIN - DIRECT - MS. GOLDBARG

1    you touch the screen right in front of you, could you mark for

2    the jury I55?

3    A    I55 would be this line coming down (indicating.)

4    Q    Okay.  And when you were conducting surveillance and

5    following the green van and the white van, in what direction

6    were those two cars going?

7    A    They were coming from the right and going left

8    (indicating.)

9    Q    Now, can you mark where it is that the exit was that the

10   green van and the white van took off of I55.

11   A    Yes, it would be right here (indicating.)

12   Q    Okay.

13            THE COURT:  Can I ask you question.

14            You mentioned that I55 was the Stevenson Expressway.

15   The map says the Barack Obama Expressway.  They changed the

16   name?

17            THE WITNESS:  Well, Your Honor, they must have

18   changed the name, because back in 2002, it was the Stevenson

19   Expressway.

20            THE COURT:  Okay.  Thank you.

21            MS. GOLDBARG:  Must be an old map, Your Honor.

22            THE COURT:  Yes.

23   BY MS. GOLDBARG::

24   Q    Now, you said that you followed the green and the white

25   van off of I55 and they went to a gas station.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

CAIN - DIRECT - MS. GOLDBARG

1          Can you mark the road that they took that you

2    followed them on?

3    A    (Witness complying.)

4    Q    And if you go all the way down to the C, is that where

5    the gas station is?

6    A    Yes, it is.

7          MS. GOLDBARG:  All right.  Showing you Government

8    Exhibit 205-18 in evidence.

9          (Exhibit published.)

10   Q    What are we looking at there, Mr. Cain?

11   A    That's the gas station that Mr. Robles pulled into

12   followed by the white panel van.

13   Q    Now, Mr. Cain, you testified that after they left the gas

14   station, the green van and the white van went to the

15   McDonald's.

16          Can you circle where the McDonald's is?

17   A    (Witness complying.)

18   Q    All right.  Letter B?

19   A    (Witness complying.)

20   Q    And where were you conducting surveillance from,

21   Mr. Cain, that you could observe all this happening?

22   A    The McDonald's is on the left side of route -- McDonald's

23   is on the left side of Route 53, and I am in this parking lot

24   of this warehouse or building on the east side of the street.

25   On the right side of as we're looking at this map on the right

CAIN - DIRECT - MS. GOLDBARG

1    side of Route 53.

2    Q    And then when you followed the green van out of

3    McDonald's, what route did the green van take?

4    A    When the green van left McDonald's, it went out back to

5    Route 50 -- Route 53, and went south down Route 53 to Joliet

6    Road.

7    Q    If you can mark that on the map that you see it in front

8    of you, please.

9    A    (Witness complying.)

10   Q    And then where did it go?

11   A    It then went southwest bound on Joliet Road.

12   Q    Can you mark that as well.

13   A    (Witness complying.)

14   Q    And you followed the car to Route 53?

15   A    Yes.  That's correct.

16   Q    Now, Mr. Cain, you testified that you lost surveillance

17   but you saw the car at 1277 Naperville Road.

18        Can you mark where for us 1277 Naperville Road is on

19   this map, please?

20   A    (Witness complying.)

21   Q    The letter D?

22   A    It's by the letter D, yes.

23        MS. GOLDBARG:  Now, showing you what's in evidence

24   as Government Exhibit 205-26.

25        (Exhibit published.)

CAIN – DIRECT – MS. GOLDBARG

1   Q    Now, do we see 1277 Naperville Road on this map, the

2   building?

3   A    That's the building that's located there, correct.

4   Q    Can you circle it?

5   A    (Witness complying.)

6   Q    And is that the front or the back of the building?

7   A    That's the front of the building.

8   Q    And you testified that you drove past this location once

9   you saw the green van.

10            Where did you go?

11  A    I continued on -- I was on Naperville -- the street that

12  runs in front of it is Naperville -- Naperville Drive.  I

13  continued north on Naperville Drive right past this parking

14  lot.

15  Q    And where did you go?

16  A    I went straight approximately three quarters of a block

17  to a McDonald's that was located right at Marquette and

18  Naperville Road.

19  Q    If you look at the photograph, Mr. Cain, do you see

20  anything that would --

21  A    Yes, I do.

22  Q    See where the McDonald's was?

23  A    Yes, I do.

24  Q    Can you please circle that.

25  A    (Witness complying.)

CAIN - DIRECT - MS. GOLDBARG

1  Q    The golden arches we see.  Thank you.

2            Now, was part of your team conducting surveillance

3  or following the white and the tan van?

4  A    Yes.  Correct.  Three officers.

5  Q    And did something happen?

6  A    They -- they followed the white panel van and the tan van

7  to Route 53 and I55.

8            MR. BALAREZO:  Objection.

9  Q    Do you know what happened to their surveillance?

10 A    Yes, I do.

11 Q    What happened?

12 A    They lost the van at -- they lost it in traffic.

13 Q    At some point in time, did you reestablish surveillance

14 of the white and the tan vans?

15 A    Later we established surveillance of the tan van,

16 correct.

17 Q    Where did you see the tan van?

18 A    The tan van was observed pulling into the rear of --

19           MR. BALAREZO:  Objection, 602.

20 Q    Where did you next see the tan van?

21           THE COURT:  Tell us about your own observations.

22 A    I next saw the tan van on Naperville Road driving

23 northbound.

24 Q    And did you follow it?

25 A    Yes, I did.

CAIN – DIRECT – MS. GOLDBARG

1    Q    And where did the tan van go?

2    A    The tan van was directly behind the green van.  It went

3    north on Naperville Road to Marquette Road.  Went back to

4    Route 53.  Made a left and went in northbound on Route 53

5    towards I55 expressway.

6    Q    And did the tan van and the green van pass I55?

7    A    Yes, they did.

8    Q    And what did you observe the tan van and the green van

9    do?

10   A    I observed the tan van pull into a gas station that was

11   approximately half a block past I55 with the people -- I

12   observed the green van pull in there and the tan van was

13   following it into the gas station.

14        MS. GOLDBARG:  Going back to Government

15   Exhibit 205-35.

16        (Exhibit published.)

17   Q    Can you mark on the map where it is that both cars, the

18   green van and the tan van, went into the gas station?

19   A    (Witness complying.)

20        MS. GOLDBARG:  And also showing you Government

21   Exhibit 305-28.

22        (Exhibit published.)

23   Q    What are we looking at here, Mr. Cain?

24   A    That's the Shell gas stations that both vehicles pulled

25   into.

CAIN – DIRECT – MS. GOLDBARG

1   Q     And did you observe both vehicles turning into this gas

2   station?

3   A     I observed the tan van pull up to the gas pump, and the

4   green van went right past it on the south side of the building

5   and it continued on to the Denny's restaurant parking lot.

6   Q     Can you circle on Government Exhibit 205-28 where you see

7   the Denny's restaurant?

8   A     (Witness complying.)

9   Q     Now, did you go into -- did you follow these cars into

10  the gas station, Mr. Cain?

11  A     No, I did not.

12  Q     What did you do?

13  A     I then went about approximately half a block further

14  north.  There was a stoplight there.  Made a right and went

15  into a -- either a strip mall or a shopping center parking

16  lot.

17  Q     And where did the rest of the team go?

18  A     The rest of the team went to do surveillance around the

19  area and in the Denny's parking lot.

20        MS. GOLDBARG:  Showing you what's in evidence as

21  Government Exhibit 29.

22        (Exhibit published.)

23  Q     What is that, Mr. Cain?

24  A     That's the Denny's restaurant parking lot.  Outside

25  Denny's restaurant.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

CAIN - DIRECT - MS. GOLDBARG

1          MS. GOLDBARG:  Let's go with Government

2     Exhibit 205-31.

3          (Exhibit published.)

4     Q    What are we seeing there?

5     A    That's a picture of the Denny's restaurant with the

6     parking lot in front of it.

7     Q    Now, from where you were conducting surveillance, did you

8     see the green van again?

9     A    Not from my surveillance point, no.

10    Q    At some point in time did you see the green van again?

11    A    Yes, I did.

12    Q    And who was inside of the green van when you saw it?

13    A    I saw -- I could see three people:  Mr. Robles,

14    Mr. Cecena; and a third subject, Mr. Barragan.

15    Q    Was Mr. Barragan arrested that day as well?

16    A    Mr. Barragan was stopped and -- but not arrested.

17    Q    Do you recall the first name of Mr. Barragan?

18    A    Mr. Barragan's first name is Rafi -- Rafael.

19    Q    What did you observe the green van do from your vantage

20    point?

21    A    From my vantage point, I observed the green van pull from

22    the Denny's restaurant parking lot, pull up to the light at

23    Route 53, make a left turn towards the expressway and drive

24    towards the expressway.

25    Q    On the map in front of you, Government Exhibit 205-35,

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CAIN – DIRECT – MS. GOLDBARG

1    can you approximate where you saw the green van leave the

2    Denny's parking lot?

3    A    (Witness complying.)

4    Q    And did you see the tan van again from where you were

5    conducting surveillance?

6    A    Yes, I did.

7    Q    Now, between the time that you saw the tan van and the

8    green van go into the gas station next to the Denny's --

9    again, showing you Government Exhibit 205-28 -- to when you

10    saw the green van leave and go south towards I55,

11    approximately how much time had passed?

12            (Exhibit published.)

13    A    I would estimate 15 minutes.

14    Q    And while you're conducting surveillance at the corner,

15    were you ordered to do anything?

16    A    Yes.

17    Q    What were you ordered to do?

18    A    We were ordered to stop the tan van.

19    Q    And did you do that?

20    A    Yes, I did.

21    Q    Can you describe for the jury what you did?

22    A    The tan van was -- pulled out of the Denny's lot driven

23    by a female.  It pulled up to the light at Remington and

24    I50 -- or Route 53, and had their left turn signal on.  It was

25    parked at the light.

CAIN - DIRECT - MS. GOLDBARG

1          I pulled up behind it, exited my vehicle, and
2    knocked on the driver's side window.
3    Q    What happened next?
4    A    The female inside opened the door.  I explained to her or
5    I showed her my identification.  I said that I was a police
6    officer.  I explained some of the investigation to this point.
7    Q    Did you request consent to search this van?
8    A    Yes, I did.
9    Q    And did the female that was driving the van provide that
10   consent?
11   A    Both verbally and written she did.
12   Q    Did you search the tan van?
13   A    Yes, I did.
14   Q    And what did you find inside the tan van?
15   A    In the rear area of the tan van, I found boxes
16   containing kilos of cocaine.
17   Q    Can you describe what the boxes looked like.
18   A    They were brown cardboard boxes.  They were taped.  One
19   box was open.
20   Q    Can you describe what you saw inside of the box?
21   A    I observed what I thought to be -- what I suspected to be
22   kilos of cocaine.
23   Q    Did you count how many kilos were found in that car?
24   A    Yes.
25   Q    How many were there?

CAIN - DIRECT - MS. GOLDBARG

1    A    206.

2    Q    Was this the first time that you had seen a kilo of

3    cocaine, Mr. Cain?

4    A    No, it wasn't.

5    Q    Approximately how many kilos of cocaine had you seen

6    before this incident?

7    A    I would estimate that I've seen more than 500.

8    Q    At some point in time after you seized these 206 kilos

9    from this tan van, did you return to 1277 Naperville Drive?

10   A    Yes.

11   Q    Why?

12   A    We had a consent to search from Mr. Robles for the

13   warehouse at 1277 Naperville Drive.

14            MS. GOLDBARG:  Showing you what's in evidence as

15   Government Exhibit 205-24.

16            (Exhibit published.)

17   Q    Mr. Cain, what are we looking at here?

18   A    That is the front of the warehouse at 1277 Naperville

19   Drive, Unit One.

20   Q    Can you circle where the entrance is to Unit One is,

21   please.

22   A    (Witness complying.)

23            MS. GOLDBARG:  Now, showing you what's in evidence

24   as Government Exhibit 205-23.

25            (Exhibit published.)

CAIN – DIRECT – MS. GOLDBARG

1  Q    What are we looking at here?

2  A    That's the south side of the building of the warehouse at

3  1277 Naperville Drive, Unit One.

4          MS. GOLDBARG:  And now showing you what's in

5  evidence as Government Exhibit 205-20.

6          (Exhibit published.)

7  Q    What are we looking at here?

8  A    It's the rear service doors, the two overhead doors and

9  the service door for the warehouse at 1277 Naperville Drive,

10 Unit One.

11 Q    How many officers were present with you when you

12 conducted the search of 1277 Naperville Drive?  Approximately.

13 A    There were seven Chicago policeman.  And two or three

14 Romeoville policeman.  Two or three Romeoville policeman.  And

15 I believe one Bolingbrook policeman.

16 Q    Did you go inside of 1277?

17 A    Yes, I did.

18 Q    Can you describe what you saw.

19 A    As we entered, it's a large parking area.  There were

20 two -- two International straight trucks, straight-bed trucks

21 as we entered.

22 Q    What did you do?

23 A    We then -- my sergeant, Rivera, had one of our team

24 members come in.  And Officer Corcoran, he is the K9 officer,

25 and he had K9 Roxie do a narcotic search of the area.

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

CAIN - DIRECT - MS. GOLDBARG

1   Q    And did Roxie have any results from the narcotics search?

2   A    Yes, he did.

3   Q    Do you know where it was that the K9 had the --

4   A    Officer Corcoran pointed to the -- showed me an area --

5   on both trucks, an area between the rear cab and the box of

6   the truck.

7   Q    So what did you do next?

8   A    Myself and other officers searched the area inside the

9   cab under the box with negative results.

10  Q    Did you go -- did you look everywhere in the cabs?

11  A    We looked everywhere in the cab.  We looked everywhere

12  outside.  We couldn't find anything.

13  Q    So what did you do next?

14  A    We then searched the remaining warehouse.  We went into

15  the office.  We --

16  Q    Can you describe what you saw inside of the office of the

17  warehouse?

18  A    In the office of the warehouse, there were desks in the

19  office.  On the desk, there were seal meal machines and

20  stacks -- and stacks of seal meal plastic, bags of rubber

21  bands and a calculator.

22  Q    And by 2002, officer -- I'm sorry, Mr. Cain, how long had

23  you been an officer doing narcotics investigations?

24  A    In 2002, I had been in narcotics approximately 15 years.

25  Q    And based on your training and experience, what did the

CAIN – DIRECT – MS. GOLDBARG

1    bags and the rubber bands indicate to you?

2    A    It indicated to me that this is where the proceeds, the

3    money --

4            MR. BALAREZO:  Objection, Your Honor.

5            THE COURT:  Overruled.

6    A    The money of the -- the proceeds of the cocaine would

7    come.

8    Q    Now, you used the term "seal meal."  Can you describe

9    what that is?

10   A    A seal meal is -- is plastic that you put into a machine

11   and it seals it by burning the plastic together.

12   Q    So you after you searched the office and the warehouse,

13   what did you do next?

14   A    We searched the -- there was a storage room there, and

15   the storage room there they had tools, compressor.  They had a

16   sealer, gasket sealer in there.  A few other things.

17           We pretty much searched the whole place and we had

18   come up with at that point negative results.

19   Q    What were you looking for in the warehouse?

20   A    We were looking for more cocaine.  We were looking for --

21   the cocaine came out of this warehouse.

22   Q    So what did you do when you searched all these places and

23   found nothing?

24   A    We pretty much felt that the 206 kilos in the van were

25   probably all they had and we were about ready to leave.

CAIN – DIRECT – MS. GOLDBARG

1   Q     Did you leave 1277 Naperville Drive?

2   A     No.  We were making arrangements to leave, and I went

3   back to the truck, to the truck on the left, the newer one,

4   and I looked in the truck that I went by the side and I went

5   heel-to-toe and I walked the length of the boxes back,

6   heel-to-toe.

7   Q     From the inside or the outside?

8   A     From the outside.

9   Q     And then what did you do?

10  A     Then I went inside the box of the truck and walked

11  heal-to-toe there and I found that there was approximately a

12  two-foot difference.

13  Q     What do you mean by there was "a two-foot difference"?

14  A     Well the nose from the tailgate to the nose was two feet

15  shorter than the outside of the box.

16  Q     So once you noticed this discrepancy, what did you do?

17  A     I then got a screwdriver and I started taking screws out

18  of the panel that was there.

19  Q     What, if anything, did you find?

20  A     Once I got the panel off, there was a door to a secret

21  compartment in the nose of the box.

22  Q     And is this the area of the truck around the same area

23  where the dog had indicated?

24  A     It's the same area, but he hit on the outside of the

25  vehicle -- of the box.

2791

CAIN - DIRECT - MS. GOLDBARG

1    Q    So once you removed the panel and you find the secret

2    compartment, what do you do?

3    A    I looked inside.  I see there was kilos of cocaine.

4    Q    What did you guys do next?

5    A    Well, I then had the other officers come back.  I showed

6    them what I had found.  And I told them that I have a screw

7    gun in my car, I'll be right back, we'll unscrew this other

8    one.  And by the time I got back, they had already unscrewed

9    it themselves and found another hidden compartment in the

10   other truck.

11   Q    Was a picture taken of this warehouse --

12   A    Yes.

13   Q    -- once where the narcotics were found?

14   A    Yes, they were.

15   Q    Showing you for identification purposes Government

16   Exhibit 205-17.

17        Do you recognize that, Mr. Cain?

18   A    Yes, I do.

19   Q    What is that?

20   A    That is a -- that's a CD of the video that was taken on

21   that day.

22   Q    Does it contain clips of the video that was taken that

23   day?

24   A    Yes, it does.

25   Q    And is that a true and accurate representation of what

                         CAIN - DIRECT - MS. GOLDBARG

1    you saw on that date in 2002?

2    A    Yes, it is.

3              MS. GOLDBARG:  At this time the government moves to

4    admit Government Exhibit 205-17.

5              MR. BALAREZO:  No objection.

6              THE COURT:  Received.

7              (Government Exhibit 205-17, was received in

8    evidence.)

9              MS. GOLDBARG:  And we would like to show the clips

10   to the jury.

11   Q    Now before we start playing, what are we observing here,

12   Mr. Cain?

13   A    This is the -- this is one of the white International

14   trucks that were in the warehouse at 1277 Naperville Drive.

15             (Video recording played.)

16   Q    Now that the video's playing, if you could narrate for

17   what the jury is seeing.

18   A    The hood of the hood, the engine hood is up on the

19   struck.  This is the view of when we came in, the door was

20   closed, the hood was up.  That's what we saw when we walked

21   through the door.

22             MS. GOLDBARG:  Pause.  And go back a little bit.

23   There we go.  Pause it there.

24   Q    What are we looking there?

25   A    That's the inside.  That's the cab of the truck.

CAIN - DIRECT - MS. GOLDBARG

1    MS. GOLDBARG:  And this is the clip -- for the

2    record, this clip 1 at 11 seconds.  Pause it there.

3         This is the same clip at 14 seconds.

4    Q    What are we observing in this clip of the video,

5    Mr. Cain?

6    A    This vehicle is one of the -- one of the vehicles -- one

7    of the trucks that was in the warehouse.

8         The panel is taken off, and you can look in you can

9    see the secret compartment.

10   Q    Can you circle on the screen where it is that we're

11   seeing the secret compartment?

12   A    (Witness complying.)

13   Q    Sorry.  There we go.  There's an arrow in the back.

14        And that's where you found the secret compartment in

15   the first truck, correct?

16   A    Right.

17        The secret compartment is where I put the arrow, and

18   the yellow that you see there is insulation.  It's fiberglass

19   insulation.

20        MS. GOLDBARG:  Pause there.  Keep playing from

21   there.  And we're about to see a -- what are we -- pause right

22   there.

23   Q    What are we seeing there?

24   A    This is the vehicle -- this is the vehicle that I

25   found -- that I took the panel off of and found the

CAIN - DIRECT - MS. GOLDBARG

1    compartment.

2         I'm sorry, this is the vehicle that's next to the

3    one that I found.

4    Q    To the left do you see another van there?

5    A    Yes.

6    Q    Was that a view of both of the vans in the warehouse?

7    The trucks, sorry.

8    A    Yes, it was.

9    Q    Playing the second clip, what do we see here?

10        MS. GOLDBARG:  Let's pause it there.  Keep playing.

11   A    This is a view from inside, inside the secret compartment

12   in the truck.  These are -- and these are kilos of cocaine.

13   Q    What are we looking at there?

14   A    This is the office with the stacks of the plastic food

15   saver -- the food saver plastic.

16        MS. GOLDBARG:  Let's pause it there.

17   Q    When you said the "seal meal," is that what you're

18   talking about?

19   A    That's exactly what I meant.

20        MS. GOLDBARG:  So keep playing.  Pause it there.

21   Q    What do we see there?

22   A    These are bags of rubber bands, and a calculator to the

23   left.  And the box to the right is a seal meal -- seal meal

24   plastic.

25        Calculator that was on the desk.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

CAIN - DIRECT - MS. GOLDBARG

```
 1    Q    Now, were photographs also taken of the items that were

 2    seized and searched on that day?

 3    A    Yes.

 4         MS. GOLDBARG:  For the witness only for

 5    identification purposes, Your Honor.

 6         THE COURT:  Okay.

 7    Q    Showing you for identification Government Exhibit 205-4.

 8    205-16.  205-1.  205-9.  205-3.  205-2.  205-8.  205-10.

 9    205-13.  And 205-15.

10         Do you recognize these photos, Mr. Cain?

11    A    Yes, I do.

12    Q    And what are they?

13    A    They're photos of the cocaine that -- that was recovered

14    that day.

15    Q    Do they truly and accurately represent the items that

16    were seized on that day?

17    A    Yes.

18         MS. GOLDBARG:  At this time the Government moves to

19    admit these photos.

20         MR. BALAREZO:  No objection.

21         THE COURT:  Received.

22         (Government Exhibit 205-4, was received in

23    evidence.)

24         (Government Exhibit 205-16, was received in

25    evidence.)
```

CAIN - DIRECT - MS. GOLDBARG

1           (Government Exhibit 205-1, was received in

2     evidence.)

3           (Government Exhibit 205-9, was received in

4     evidence.)

5           (Government Exhibit 205-3, was received in

6     evidence.)

7           (Government Exhibit 205-2, was received in

8     evidence.)

9           (Government Exhibit 205-8, was received in

10    evidence.)

11          (Government Exhibit 205-10, was received in

12    evidence.)

13          (Government Exhibit 205-13, was received in

14    evidence.)

15          (Government Exhibit 205-15, was received in

16    evidence.)

17          MS. GOLDBARG:  Let's go through them in reverse

18    order.

19          Showing you what's now in evidence as Government

20    Exhibit 205-13.

21          (Exhibit published.)

22    Q    Mr. Cain, what are we looking at here?

23    A    This is the cocaine that was recovered from the tan van

24    with the -- recovered from the tan van that the female was

25    driving.

2797

CAIN – DIRECT – MS. GOLDBARG

1   Q    And is this what the box looked like when you searched

2   the tan van?

3   A    All the boxes were closed except for the one there next

4   to the door.

5   Q    I'm going to flip it over.

6            Do you see writing on the box?

7   A    Yes, I do.

8   Q    What do you see, what does it say there?

9   A    It has the initials P-R-O-F-E, Profe.

10  Q    Can you circle that, please.

11  A    (Witness complying.)

12           MS. GOLDBARG:  Thank you.

13           Showing you Government Exhibit 205-15.

14           (Exhibit published.)

15  Q    What are we looking at here?

16  A    This is the same narcotics in the tan van.

17           MS. GOLDBARG:  Showing you Government Exhibit 205-8.

18           (Exhibit published.)

19  Q    What do we see here, Mr. Cain?

20  A    This is the -- this is the box of the truck that I opened

21  up.  I took the paneling off the wall and found the secret

22  compartment.  This is a picture of the secret compartment

23  behind the wall.

24  Q    And what did you find behind that secret compartment?

25  A    I found that there was kilos of what I suspected to be

CAIN - DIRECT - MS. GOLDBARG

1    cocaine in the secret compartment.

2            MS. GOLDBARG:  Showing you Government

3    Exhibit 205-10.

4            (Exhibit published.)

5    Q    Is this from the same van that you searched?

6    A    That's correct.

7    Q    And what do we see in the middle of the screen?

8    A    In the middle of the screen, I see what I suspect to

9    be -- what I suspected to be kilos of cocaine.

10           MS. GOLDBARG:  Now showing you Government

11   Exhibit 205-2.

12           (Exhibit published.)

13   Q    Mr. Cain, can you walk us through what we're seeing here

14   in this photograph, please?

15   A    This is a picture from inside the secret compartment, and

16   it's a picture of the door on the secret compartment.

17           The two locks that you see in the picture are used

18   to open and close the door.

19           You would use specially-made screwdrivers and stick

20   them through two holes, open the two locks and the door would

21   come off.

22   Q    Can you circle on the photograph where it is you see the

23   two locks, please?

24   A    (Witness complying.)

25   Q    Thank you.

CAIN – DIRECT – MS. GOLDBARG

1          So this photograph would be taken from where you

2     found the suspected cocaine?

3     A    From -- it would be taken inside the truck, inside the

4     secret compartment.

5

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAIN - DIRECT - MS. GOLDBARG

1    BY MS. GOLDBARG:

2    Q    Moving on to Government's Exhibit 205-3.  What are we

3    looking at here?

4    A    This is the other truck that -- that also had a seated

5    compartment.

6    Q    What do we see inside?

7    A    Bundles of -- bundles of kilos of suspected cocaine.

8    Q    The next is 205-9.  What are we seeing in this

9    photograph?

10   A    This is the same picture.  This is a little closer up of

11   the last picture.  It's a picture with the secret compartment

12   and bundles of cocaine.

13   Q    Now, when you found the suspected cocaine in the two

14   vans -- I'm sorry, in the one tan van and the two trucks, what

15   did you and your partners do?

16   A    Went -- we brought them back to our office, made a count

17   of the -- of the kilos of cocaine and sent it to the Illinois

18   Crime Lab.

19   Q    How many total kilos did you recover from the tan van and

20   the two trucks?

21   A    1,920 -- 29 kilos.

22   Q    Showing you what has been marked as

23   Government's Exhibit 205.1.  Do you recognize this?

24   A    Yes, I do.

25            MS. GOLDBARG:  It's in evidence.

David R. Roy, RPR - Official Court Reporter

CAIN – DIRECT – MS. GOLDBARG

1  Q    And what are we looking at in Government's Exhibit 205-1?

2  A    This is a picture back in our office in Chicago and this

3  is a picture of the cocaine that was seized.

4  Q    And then 205-16, what are we looking at here?

5  A    Again, this is a picture in Chicago in our office, and

6  this is a picture of cocaine that was seized that day.

7  Q    Finally, Government's Exhibit 205-4?

8  A    This also was a picture of cocaine that was seized that

9  day.  We're in our office in Chicago.

10 Q    Now, I would like to go back just briefly to

11 Government's Exhibit 205-3?

12      MS. GOLDBARG:  And zoom a little bit on the bricks

13 that we're looking at.

14 Q    Do you see the white tape that I'm circling (indicating)?

15 A    Yes, I do.

16 Q    Do you have any idea what that is?

17 A    (No audible response.)

18 Q    Did you see it on all of the --

19 A    It looks like -- it look like it's some sort of duct

20 tape.

21 Q    Now, Mr. Cain, you testified that 1929 kilos of suspected

22 contraband were sent over to the Illinois State Lab.

23      MS. GOLDBARG:  For the witness only.

24 Q    I would like to show you Government's Exhibit 205-34.

25      Do you recognize this document?

David R. Roy, RPR – Official Court Reporter

CAIN – DIRECT – MS. GOLDBARG

1   A    Yes, I do.

2   Q    What is this document?

3   A    It's a lab analysis report sent to -- it was sent back to

4   me from the Illinois State Crime Lab.

5        MR. BALAREZO:   Objection.   Improper recollect,

6   refreshing.

7        THE COURT:   Overruled.

8   BY MS. GOLDBARG:

9   Q    Was this kept in the ordinary course of business,

10  Mr. Cain?

11  A    Yes, it was.

12  Q    Does it contain the results of the lab reports --

13  A    Yes.

14  Q    -- for the analysis of the cocaine that you submitted for

15  analysis?

16  A    Yes, it does.

17       MS. GOLDBARG:   At this time, the Government moves to

18  admit Government's Exhibit 205-34.

19       MR. BALAREZO:   Objection.

20       THE COURT:   Sidebar, please.

21

22

23

24

25

David R. Roy, RPR – Official Court Reporter

2803

CAIN - DIRECT - MS. GOLDBARG

1          (Continued on the next page.)

2          (Sidebar conference.)

David R. Roy, RPR - Official Court Reporter

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          (Sotto voce discussion between Mr. Balarezo and Ms.

3   Goldbarg.)

4          THE COURT:  Yes, it's withdrawn?

5          MR. BALAREZO:   Yes.

6          THE COURT:  All right.

7          MS. GOLDBARG:  Yes, thank you.

8          THE COURT:  All right.  Let's continue.

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAIN – DIRECT – MS. GOLDBARG

1          (Sidebar ends; in open court.)

2          THE COURT:  All right.  The objection is overruled.

3          MS. GOLDBARG:  The Government moves to admit

4  Government's Exhibit 205-34.

5          MR. BALAREZO:  No objection.

6          THE COURT:  It's received.

7          (Government Exhibit 205-34, was received in

8  evidence.)

9          MS. GOLDBARG:  Publish to the jury.

10 BY MS. GOLDBARG:

11 Q    Mr. Cain, according to the lab report, what was found in

12 1929 kilos; what did they contain?

13 A    They contained cocaine.

14 Q    Now, Mr. Cain, you said around this time you'd been with

15 Joint Narcotics Investigation for approximately 15 years.  In

16 2002, what was the approximate wholesale value of a kilo of

17 cocaine in Chicago approximately?

18 A    The wholesale value was -- would have been anywhere

19 between 19,000 and 22, 23,000.

20 Q    All right.  What about the street value of a kilo of

21 cocaine?

22 A    The street value of cocaine in 2002 was $125,000.

23 Q    Can you explain to the jury the difference between the

24 wholesale price of 19 and 23,000 and the street value of

25 $125,000, please.

CAIN - DIRECT - MS. GOLDBARG

1  A    The kilos that were in the truck would be either

2  distributed to or broken up into smaller -- smaller groups and

3  then -- and then wholesaled out to different narcotics

4  dealers.  They would pay approximately 19 to 23,000 per kilo.

5  They would then maybe sell it whole or bust it up, and if they

6  did bust it up, they would add -- add fillers to the cocaine

7  to expand the product, so you had more product to sell --

8  Q    What do you mean by --

9  A    -- so --

10  Q    I'm sorry, Mr. Cain.

11      What do you mean by busting it up?

12  A    So they would take the kilo and they would --

13      MR. BALAREZO:   Objection, Your Honor.

14  A    -- literally --

15      MR. BALAREZO:  This is not personal knowledge.  He

16  is testifying as an expert and no foundation.

17      THE COURT:  Well, I mean, he is an officer.  He can

18  testify to his experience with this product.  I think he can

19  testify without being an expert.

20      You may answer.

21      MS. GOLDBARG:  Thank you.

22  A    I mean, they take a kilo and they -- and they bust it

23  down.  They break it up and put it into a powder form.  They

24  add more powder of procaine or some other additive to the --

25  to the cocaine to expand what they already have.  So a kilo in

CAIN – DIRECT – MS. GOLDBARG

1   that truck by the time it hits the street, could be three

2   kilos or it could be four, it could be two.  It all depends on

3   what they're selling.

4            And that's –– the Chicago Police Department did a ––

5   an analyst for the Chicago Police Department went and took

6   samplings from the across the city of Chicago on street ––

7            MR. BALAREZO:  Objection.

8            THE COURT:  Sustained.

9   Q    Let me focus your attention, Mr. Cain.  Did you estimate

10  the street value of the cocaine that was found in the van and

11  the two trucks that were found at 1277 Naperville Drive?

12  A    Yes, I did.

13  Q    And what was the proximate street value at the time ––

14           MR. BALAREZO:  Objection.  Speculation.

15           THE COURT:  Overruled ––

16  Q    What was the ––

17           THE COURT:  Well, you know what?  I'm going to

18  sustain that.  Give a little better foundation first.

19  Q    Mr. Cain, you just testified that the approximate street

20  value was $125,000.  Did you gain that –– how did you get that

21  information?

22  A    At that time I had a guide from the Chicago Police

23  Department that stated what the current street value was for a

24  kilo of cocaine, and that ––

25           MR. BALAREZO:  Objection.

CAIN – DIRECT – MS. GOLDBARG

1    A    -- street value --

2    Q    As an officer of the Chicago Police Department --

3         THE COURT:  Overruled.

4    Q    As on officer of officer of the Chicago Police

5    Department, was it part of your responsibility or your role to

6    know the street value of drugs?

7    A    Yes.

8    Q    Okay.  And based on your experience and knowledge, what

9    was the street value again?

10   A    The street value of the cocaine is -- that we seized or I

11   seized was $142 million -- I mean, I'm sorry.  $242 million.

12   Q    Now, Mr. Cain, your memory seems pretty intact.  Did you

13   write in a report related to this seizure, this event?

14   A    Yes, I did.

15   Q    Did you review those reports before you testified?

16   A    Yes, I did.

17   Q    Independently did you recollect a lot of the events that

18   happened on this day?

19   A    Yes.

20   Q    And why?

21   A    Well --

22   Q    Is there anything that stands out about this event that

23   you --

24   A    I was in narcotics for --

25        MR. BALAREZO:  Objection.

PROCEEDINGS

1          THE COURT:  Overruled.

2          Go ahead.

3   A    I was in narcotics for 19 years.  This is the biggest

4   seizure of cocaine in -- that I've ever experienced, and to my

5   knowledge, it's the biggest seizure of cocaine the

6   Chicago Police Department has ever made, so this stands out in

7   my mind vividly.

8   Q    Thank you.

9          MS. GOLDBARG:  One moment, Your Honor.

10          (Pause in proceedings.)

11          MS. GOLDBARG:  The Government has no further

12   questions.

13          THE COURT:  All right.

14          Any cross?

15          MR. BALAREZO:   Your Honor, tempting, but no.  No

16   question.

17          THE COURT:  You may step down.  Thank you very much.

18          Next witness, please.

19          MS. GOLDBARG:  Yes.  The Government calls Leilani

20   Laureano to the stand.

21          (Pause in proceedings.)

22          MS. GOLDBARG:  Perhaps while we wait, Your Honor,

23   with this witness, the jurors will find a transcript binder

24   underneath their chairs.

25          THE COURT:  Okay.  You can pull those out, ladies

David R. Roy, RPR – Official Court Reporter

2810

LAUREANO – DIRECT – MS. GOLDBARG

1    and gentlemen, but don't open them yet.  Just hold onto them.

2                (Pause in proceedings.)

3                THE COURTROOM DEPUTY:   Okay.  Please raise your

4    right hand --

5                THE COURT:  Excuse me.  We need you to stand up.

6                THE COURTROOM DEPUTY:   Please stand and raise your

7    right hand.

8                THE WITNESS:  I'm sorry.

9                (Witness takes the witness stand.)

10   LEILANI LAUREANO, called as a witness, having been first duly

11   sworn/affirmed, was examined and testified as follows:

12               THE COURTROOM DEPUTY:   Okay.  Please state and spell

13   your name for the record.

14               THE WITNESS:  Leilani, L-E-I-L-A-N-I; Laureano,

15   L-A-U-R-E-A-N-O.

16               THE COURTROOM DEPUTY:   Thank you.  You may be

17   seated.

18               THE COURT:  All right.  You may inquire.

19               MS. GOLDBARG:  Thank you, Your Honor.

20   DIRECT EXAMINATION

21   BY MS. GOLDBARG:

22   Q    Good afternoon, Ms. Laureano.

23   A    Good afternoon.

24   Q    What do you do for a living?

25   A    I'm a staff operations specialist for the FBI.

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1   Q    Can you explain to the jury what a staff operations

2   specialist does?

3   A    It's a tactical analyst that focuses on research and

4   analysis.

5   Q    How long have you worked for the FBI, Ms. Laureano?

6   A    Eight years.

7   Q    What did you do immediately prior to joining the FBI?

8   A    I was a college student.

9   Q    Within the FBI, what positions have your held?

10  A    I was a file clerk and a forfeiture paralegal.

11  Q    How long have you been in your current position as a

12  staff operations specialist with the FBI?

13  A    Four and a half years.

14  Q    And what kind of training did you receive in your

15  position to date?

16  A    I attended a SOS basic training.

17  Q    Is SOS short for staff operations specialist?

18  A    Yes.

19  Q    And where was your training?

20  A    Quantico, Virginia.

21  Q    And what role do you fulfill as a staff operations

22  specialist?

23  A    I research and analyze information from a variety of

24  databases to paint a picture for the special agents for their

25  investigations.

2812
LAUREANO – DIRECT – MS. GOLDBARG

1   Q    Were you tasked with a specific investigation?

2   A    Yes.

3   Q    Approximately when did that start?

4   A    October of 2016.

5   Q    I'm showing you for identification purposes only

6   Government's Exhibit 701, 219-33, 220-1 and 1A, and 220-46.

7        What were you asked to do related to these four

8   items?

9   A    I was asked to download YouTube videos.

10  Q    And do you recognize these?

11  A    Yes.

12  Q    How do you recognize them?

13  A    My initials and the date.

14  Q    And what did you do?

15  A    I was provided a link to the web -- the website and the

16  videos and I downloaded them.

17  Q    Were you asked to do anything else other than download

18  these?

19  A    No.

20  Q    Were you asked to do any research or analysis on these?

21  A    No.

22  Q    Or verify any of the authenticity of the content of them?

23  A    No.

24       MS. GOLDBARG:  Your Honor, the Government would seek

25  to admit in connection with these four items, 701, 219-33,

David R. Roy, RPR – Official Court Reporter

LAUREANO - DIRECT - MS. GOLDBARG

1   220-46 --

2           MR. BALAREZO:   Judge, could we have just a quick

3   bench conference?

4           THE COURT:  Hang on.  Let her say the numbers.

5           MS. GOLDBARG:  And 220-1 and 1-A.

6           THE COURT:   Okay.  Do you need a sidebar?

7           MR. BALAREZO:   Just a very brief one.

8           THE COURT:  Okay.

9           (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          MR. BALAREZO:  Your Honor, to the extent --

3          MS. GOLDBARG:  Hold on.  Thank you.

4          THE COURT:  And Ms. Goldbarg.

5          MS. GOLDBARG:  Yes, sir.

6          MR. BALAREZO:  To the extent that there's any audio

7    on these videos, I would object.  I don't object to the videos

8    themselves coming in, but any commentary and audio of that

9    nature, I would object.

10          MS. GOLDBARG:  Well --

11          THE COURT:  I don't know what these are, so it's

12   hard for me to say.

13          MS. GOLDBARG:  I just wanted to avoid a sidebar

14   coming up.

15          The four items that we are currently seeking to

16   admit subject to connection are news clippings that have been

17   muted.  This witness --

18          THE COURT:  They have been, I'm sorry?

19          MS. GOLDBARG:  Muted --

20          THE COURT:  Okay.

21          MS. GOLDBARG:  -- per the Court's instructions.

22          THE COURT:  So there's no sound?

23          MS. GOLDBARG:  There's no sound on these four.

24          THE COURT:  Okay.

25          MS. GOLDBARG:  The Government will seek to admit two

SIDEBAR CONFERENCE

1   videos subject to connection in which witnesses can testify --

2   or I believe the witnesses will testify and interpret and

3   narrate some of them.

4           The Government will also seek to play the infamous

5   Rolling Stone video, which the witness did download which has

6   the audio and the transcripts with it, which are already in

7   evidence.  They will come in through her.

8           THE COURT:  Okay.

9           MS. GOLDBARG:  So that's -- unless there's any other

10  objections to those.

11          MR. BALAREZO:   So there's no sound except for the

12  Rolling Stone?

13          MS. GOLDBARG:  No, the Rolling Stone's the only one

14  we intend to play to the jury -- publish to the jury --

15          THE COURT:  With sound?

16          MS. GOLDBARG:  With sound.

17          THE COURT:  Oh, et al.?

18          MS. GOLDBARG:  At -- through this witness.  Through

19  this witness at this time.

20          THE COURT:  Okay.  That's fine.

21          MS. GOLDBARG:  The others would be subject to

22  connection.

23  (Continued following page.)

24

25

                        SIDEBAR CONFERENCE

1          THE COURT:  There's no objection, right?

2          MR. BALAREZO:    That's fine.

3          THE COURT:  Okay.

4          MS. GOLDBARG:  Okay.  Thank you.

5          (End of sidebar conference.)

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAUREANO – DIRECT – MS. GOLDBARG

1              (Sidebar ends; in open court.)

2              MS. GOLDBARG:   Once again, Your Honor, at this

3    time the Government seeks to admit the subject in connection?

4              THE COURT:   Okay.   That's received without

5    objection.

6              (Government Exhibit 701, 219-33, 220-46, 220-1,

7    220-1A, was received in evidence.)

8              MS. GOLDBARG:   Sorry, Your Honor.   One moment.

9              (Pause in proceedings.)

10   BY MS. GOLDBARG:

11   Q    Ms. Laureano, were you also asked to participate or

12   assist in obtained a search warrants for various providers?

13   A    Yes.

14   Q    Okay.   And showing you what's marked for identification

15   purposes only, Government's Exhibit 702-A just for

16   identification.

17             Do you recognize this CD?

18   A    Yes.

19   Q    What is it?

20   A    They're the search warrant results from Google --

21   Q    Okay.

22   A    -- for a YouTube video.

23   Q    And what did you do with this information?

24   A    I received the results via email.   I copied them to a CD

25   and entered it into evidence.

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1    Q    Showing you what has been marked as

2    Government Exhibit 702-B for identification.  Do you recognize

3    this CD?

4    A    Yes.

5    Q    And what's on this CD?

6    A    The Google search warrant results.

7            THE COURT:  Can you get the mic a little closer to

8    you?

9            THE WITNESS:  Uh-huh.  Sorry.

10            MS. GOLDBARG:  I'm sorry, Your Honor, I'm missing

11    one document.

12            (Pause in proceedings.)

13    BY MS. GOLDBARG:

14    Q    Showing you for identification purposes 702-B1.  Do you

15    know what this document is?

16    A    Yes.  It's the certification of the business records from

17    Google for the YouTube video that was requested.

18    Q    All right.  Pursuant to 902.11, Your Honor, the

19    Government would seek to admit --

20            THE COURT:  Any objection?

21            MR. BALAREZO:  Yes, Judge.  I do have an objection

22    to the text, to the handwritten portion 701-A.  I don't know

23    if you're moving that one in or not.

24            MS. GOLDBARG:  Nope.

25            MR. BALAREZO:  No?  Okay.

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

```
 1            THE COURT:  No, not yet.  All I am offered is
 2   702-B.
 3            MR. BALAREZO:  No, Your Honor.  No objection.
 4            THE COURT:  Okay.  Received.
 5            (Government Exhibit 702-B, was received in
 6   evidence.)
 7            MS. GOLDBARG:  And there's one more, and as soon as
 8   we find it, Your Honor, we will submit it.
 9            THE COURT:  All right.
10   BY MS. GOLDBARG:
11   Q    I'm showing you what's marked for identification as
12   702-C.  Do you recognize this, Ms. Laureano?
13   A    Yes.
14   Q    And what is this?
15   A    It is the video, the YouTube video.
16   Q    So can you describe how it was that it ended up on 702-C;
17   how you got it and then how you transferred it there?
18   A    It was provided to us via email.  I transferred it to a
19   CD, and there it is.
20            MS. GOLDBARG:  Your Honor, at this time, the
21   Government would also move to admit 702-C subject to
22   connection.
23            MR. BALAREZO:  Your Honor, I don't object, except
24   to the handwritten portion which is on the left-hand side of
25   that disk.  I don't object to any designation to the disk, let
```

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1    me put it that way.

2              MS. GOLDBARG:  This will be subject to connection to

3    another witness, Your Honor, and we're not seeking to publish

4    it to the jury at this time.

5              THE COURT:  Let me take it subject to connection and

6    there's an objection.  I need to hear at sidebar what the

7    connection's going to be.

8                   (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          THE COURT:  What's the disk; what's the handwritten

3    notation and what's the catch?

4          MS. GOLDBARG:  Your Honor, Government Exhibit 702-B

5    is a video, interrogation video --

6          THE COURT:  Okay.

7          MS. GOLDBARG:  -- subject to many of the motions in

8    Limine.  This witness reviewed the video and signed --

9    initialled it and signed it on the right-hand side of the CD.

10   Another witness who will testify and discuss the video and the

11   contents of the video, signed and initialled it on the

12   left-hand side of the video.  And so it is through this

13   subsequent witness that the Government will seek to admit and

14   publish this through that witness --

15         THE COURT:  Okay.

16         MS. GOLDBARG:  So that is the connection of that --

17         MR. BALAREZO:   Okay.  Well, my issue is with --

18         THE COURT:  The second witness is going to testify

19   that these are his initials --

20         MS. GOLDBARG:  Correct --

21         THE COURT:  -- and that he reviewed the CD.

22         MS. GOLDBARG:  -- and that he wrote that --

23         MR. BALAREZO:   Oh, he wrote the --

24         MS. GOLDBARG:  Correct --

25         THE COURT:  Yes.

SIDEBAR CONFERENCE

1            MS. GOLDBARG:  -- provided by that other witness.

2            THE COURT:  Okay.  Subject to connection.

3            MS. GOLDBARG:  Subject to connection.  Thank you,

4    Your Honor.

5            (End of sidebar conference.)

6            (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1          (Sidebar ends; in open court.)

2          THE COURT:  Okay.  That's received subject to

3    connection.

4          (Government Exhibit 702-C, was received in

5    evidence.)

6          MS. GOLDBARG:  Thank you, Your Honor.

7    BY MS. GOLDBARG:

8    Q    Now, showing you only for identification

9    Government Exhibit 705-A.  Ms. Laureano, what were you asked

10   to do, what were you tasked with related to this item?

11   A    I was asked to download the YouTube video.

12   Q    And did you do so?

13   A    Yes.

14   Q    And is the entire video on 705-A?

15   A    Yes.

16   Q    Okay.

17          Marking for identification as Government

18   Exhibit 705-C as in "Charlie," do you recognize this CD?

19   A    Yes.

20   Q    And what is 705-C?

21   A    They're clips of the original YouTube video that I

22   downloaded.

23   Q    And did you watch the content of this video?

24   A    Yes.

25   Q    And what did you observe?

LAUREANO – DIRECT – MS. GOLDBARG

1   A    They were the -- it's the same of the original, just

2   clipped.

3   Q    And what was the content of the video that you observed?

4   A    It's a man walking in the background with a rifle on his

5   back.

6   Q    And before that for the entire video, what was -- what's

7   in the foreground of the video?

8   A    The man walking in the background.

9   Q    Before that -- I'm sorry, that would be 705-C as opposed

10  to 705-E.

11  A    I don't recall, no.

12  Q    You said that they were clips of 705-A.  Where were those

13  clips place onto; were those placed onto 705-C?

14  A    E.

15  Q    Okay.  And what is in C?

16  A    Your -- a variety of clips of the entire video.

17  Q    Was it an interview?

18  A    Yes, it's an interview of the defendant.

19  Q    Did you watch it and see the person that was talking in

20  the interview?

21  A    Yes.

22  Q    And do you recognize the person that was being

23  interviewed as someone that's in the courtroom today?

24  A    Yes.

25  Q    And can you identify that person with an article of

David R. Roy, RPR – Official Court Reporter

LAUREANO - DIRECT - MS. GOLDBARG

1   clothing that they're wearing?

2   A    Blue tie.

3   Q    What color is their jacket?

4   A    Blue.

5   Q    What color's --

6   A    Navy blue.

7   Q    There we go.

8          MR. BALAREZO:    Your Honor, we'll --

9   Q    The person standing up.

10         MS. GOLDBARG:  The Government would --

11         THE WITNESS:  Thank you.

12         MS. GOLDBARG:  Your Honor --

13         THE COURT:  All right.  She has identified the

14  defendant.

15         MS. GOLDBARG:  Thank you, Your Honor.

16         THE COURT:  All right.  Go ahead.

17  Q    And you watched this video, correct?

18  A    Yes.

19  Q    Okay.  And it is -- and what's inside the --

20  A    Which one, C or --

21  Q    705-C.  I'm sorry.

22  A    C?  It's a -- they're a variety of clips of the entire

23  video.

24  Q    Okay.  705-E also contains one specific clip?

25  A    It's a man walking in the background with a rifle on his

David R. Roy, RPR - Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1  back.

2  Q    Now I would like to show you for identification 704-A for

3  identification purposes only.

4       MS. GOLDBARG:  Actually, I'm sorry, Your Honor,

5  before we go into that, the Government would seek to move into

6  evidence 705-E and 705-C into evidence?

7       MR. BALAREZO:   No objection.

8       THE COURT:  Received.

9       (Government Exhibit 705-C & 705-E, was received in

10  evidence.)

11      MS. GOLDBARG:  Thank you.

12      MR. BALAREZO:   Your Honor, we do renew the

13  objection that we had on the --

14      THE COURT:  I'm sorry.  Say that again.

15      MR. BALAREZO:   What we covered at bench conference.

16      THE COURT:  Let me see what you said.

17  BY MS. GOLDBARG:

18  Q    Now, going back to 704-A, were you asked to conduct any

19  or assist in that other search warrant, Ms. Laureano?

20  A    Yes.

21  Q    Okay.  Have you heard of the company Liveleak?

22  A    Yes.

23  Q    What were you asked to do in relation to Liveleak?

24  A    I was asked to download a video that was posted on their

25  website.

LAUREANO – DIRECT – MS. GOLDBARG

1    Q    And were you able to do that?

2    A    No.

3    Q    And so what did you have to do?

4    A    There was a search warrant served on the company and they

5    provided the video.

6    Q    And is the video in 704-A?

7    A    Yes.

8    Q    Okay.  And showing you what's been marked Government

9    Exhibit 704-A1 --

10            MS. GOLDBARG:  The Government would seek to admit

11   this under 902.11 as a business record of certificate of

12   authenticity.

13            MR. BALAREZO:   No objection.

14            THE COURT:  Received.

15            (Government Exhibit 704-1A, was received in

16   evidence.)

17            MS. GOLDBARG:  And publishing it to the jurors.

18   BY MS. GOLDBARG:

19   Q    Does this business record state when it was that the

20   video that they sent to you was uploaded onto liveleak.com?

21   A    Yes.

22   Q    And when was that?

23   A    March 11th, 2012.

24   Q    Now, when you said you originally went to Liveleak to try

25   and find the docket and it wasn't there, did you try to obtain

David R. Roy, RPR – Official Court Reporter

2828

LAUREANO – DIRECT – MS. GOLDBARG

1   the video from another source?

2   A    Yes.  A search warrant was sent to Google for the same

3   video that was posted on YouTube.

4   Q    Showing you for identification 704-B.  Do you recognize

5   that document?

6   A    Yes.

7   Q    And what is that?

8   A    Those are the search warrant results from Google for the

9   YouTube video.

10  Q    Did they provide a return; did they provide -- did Google

11  provide any documentation when they completed the search

12  warrant?

13  A    Yes.

14  Q    Showing you for identification Government Exhibit 704-C1.

15  Do you recognize this?

16  A    Yes.

17         MS. GOLDBARG:  And under 902.11, Your Honor,

18  the Government would move to admit this as a --

19         MR. BALAREZO:   No objection.

20         THE COURT:  Received.

21         (Government Exhibit 704-C1, was received in

22  evidence.)

23  BY MS. GOLDBARG:

24  Q    I'm showing you also 704-C2.  Was this also provided by

25  Google as a result of the search warrant?

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1    A    Yes.

2    Q    And what information does this contain?

3    A    The date and time it was uploaded to YouTube.

4    Q    And according to this --

5        MS. GOLDBARG:  Well, under 902.11, Your Honor, the

6    Government would seek to admit this as well.

7        MR. BALAREZO:    No objection.

8        THE COURT:  Received.

9        (Government Exhibit 704-C2, was received in

10   evidence.)

11       MS. GOLDBARG:  And if we could publish it?

12   BY MS. GOLDBARG:

13   Q    According to 704-C2 at what point in time was this video

14   uploaded to the Internet, to YouTube?

15   A    July 18th, 2015 at 1:13 p.m.

16       MS. GOLDBARG:  Your Honor, at this time the

17   Government would seek to play the clips from what is in

18   evidence as Government Exhibit 705-B.  We would ask that the

19   lights be dimmed.  And if the jurors -- before we start

20   playing them, if the juror could open up their transcript

21   binders.  And they have two choices:  There will be subtitles

22   on the video and if they want to follow on paper.

23       We're going to play the first video, and it's in

24   evidence, and they can follow along with Government Exhibit

25   705-B1T.

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1      THE COURT:  Well, let's make sure.

2      Ladies and gentlemen, are you all in the right

3  place?

4      THE JURY:   (Nodding heads up and down.)

5      THE COURT:  Yes?  Okay.

6      Okay.  Go ahead.

7      MS. GOLDBARG:  Well, if we could play the first

8  clip?

9      (Video plays.)

10      (Video stops.)

11      MS. GOLDBARG:  Now, before going to the second clip,

12  for the jury that will be the transcript at 705–B3T if you

13  want to follow along with the transcript or on the video.

14      (Video plays.)

15      (Video stops.)

16      MS. GOLDBARG:  Okay.  Was that the third clip?

17      I'm sorry about that, Your Honor.

18      If the jurors could switch to GX 705–B4T, this will

19  be the third clip.  It's also very short.

20      Play that again.

21      (Video plays.)

22      (Video stops.)

23      MS. GOLDBARG:  All right.  We'll move onto the

24  fourth clip, which if the jurors look at Tab 705–B5T.

25      All right.  If we could play that one?

LAUREANO – DIRECT – MS. GOLDBARG

1          (Video plays.)

2          (Video stops.)

3          MS. GOLDBARG:  Okay.  And if we could move now onto

4     the fifth clip, and if they go to the Tab 705-B6T.

5          Let's just go ahead and play the final clip.

6          (Video plays.)

7          (Video stops.)

8          MS. GOLDBARG:  Now, we would also like to play --

9     and there's no transcript for this -- Government

10    Exhibit 705-E.  It's a very short video and let me ask that it

11    be paused.

12    BY MS. GOLDBARG:

13    Q    Ms. Laureano if you can watch this video as well?  All

14    right.  Ms. Laureano, did you watch that video as well?

15    A    Yes.

16    Q    And as the defendant was in the foreground there was

17    someone in the background.  Could you see what that person was

18    carrying?

19    A    Yes.  He was carried a rifle on his back.

20    Q    I would like to show you for identification purposes

21    705-E1 and 705-E2.

22          THE COURTROOM DEPUTY:   One moment.

23    Q    What are these items?

24    A    They're stills from that clip.

25    Q    And are they a true and accurate depiction of what you

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1    see in the video?

2    A    As best as we could, yes.

3              MS. GOLDBARG:  At this time, Your Honor, the

4    Government would admit --

5              MR. BALAREZO:   No objection.

6              THE COURT:  Received E1 and E2 of 705.

7              (Government Exhibit 705-E1 & 705-E2, was received in

8    evidence.)

9              MS. GOLDBARG:  Publish them to the jury.

10             THE COURT:  Yes.

11   BY MS. GOLDBARG:

12   Q    And when you say there's someone walking behind him, the

13   defendant with a weapon, can you circle that person in front

14   of you?

15   A    (Witness complies.)

16             MS. GOLDBARG:  And that's in 705-E2 on the lower

17   left-hand corner.

18   Q    705-E1, can you circle that same person that you saw

19   carrying the rifle?

20   A    (Witness complies.)

21   Q    Thank you.

22             THE COURT:  How is your timing?

23             MS. GOLDBARG:  I can finish if you give me a couple

24   minutes, Your Honor.

25             THE COURT:  Okay.

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1          MS. GOLDBARG:  I would like to go back to the

2    document I now found.  702-B1, the Government -- Your Honor,

3    the Government would seek to admit this --

4          MR. BALAREZO:   No objection.

5          MS. GOLDBARG:  -- under 902.11.

6          THE COURT:  Received.

7          (Government Exhibit 702-B1, was received in

8    evidence.)

9    BY MS. GOLDBARG:

10   Q    All right.  And this is -- Ms. Laureano, can you tell the

11   jury what the search warrant return this was for?  It's one of

12   the first --

13   A    This was for the interrogation video.

14   Q    Okay.  Thank you.

15          Now, after you watched the interview that we just

16   saw on Government Exhibit 705, I'm going to show you for

17   identification purposes 704-D.

18          I believe, Ms. Laureano, you testified that you

19   received copies of the videos from Google, correct?

20   A    Correct.

21   Q    And did you watch the video?

22   A    Yes.

23   Q    Did you notice anything similar between the person in

24   this video and the person in Government Exhibit 705?

25   A    Yes, there were the same individual.

David R. Roy, RPR – Official Court Reporter

LAUREANO – DIRECT – MS. GOLDBARG

1          MS. GOLDBARG:  The Government at this time would

2     seek to admit, but not publish Government Exhibit 704-D as

3     well.

4          MR. BALAREZO:   Same objection as before, but

5     subject to connection.

6          THE COURT:  Subject to connection, it's received.

7          MS. GOLDBARG:  Actually, Your Honor, this would not

8     be subject to connection.

9          THE COURT:  Well --

10         MR. BALAREZO:   Then I object to the --

11         THE COURT:  You're objecting to the handwriting?

12         MR. BALAREZO:   -- the handwriting in the middle in

13    the --

14         THE COURT:  Okay.  Let's have a sidebar -- well, do

15    you want to admit it without the handwriting?

16         MS. GOLDBARG:  Excuse me?

17         THE COURT:  Do you want to admit it without the

18    handwriting that's not hers?

19         MS. GOLDBARG:  We can do that at this time,

20    Your Honor.

21         THE COURT:  Okay.  Let's do that.

22         MS. GOLDBARG:  Okay.

23         We're not seeking to publish it at this time,

24    Your Honor.

25         THE COURT:  I know.  But when it's in evidence, you

LAUREANO – DIRECT – MS. GOLDBARG

 1   will redact that handwriting.

 2            You don't need the handwriting, I take it?

 3            MS. GOLDBARG:  I can do that, Your Honor, if that's

 4   sufficient for --

 5            THE COURT:  That's good.  Okay.

 6            MS. GOLDBARG:  So the Government would seek to admit

 7   this into evidence --

 8            THE COURT:  Okay.  It's admit --

 9            MS. GOLDBARG:  -- 704-D into evidence.

10            THE COURT:  -- without connection with the redaction

11   attached.

12            (Government Exhibit 704-D, was received in

13   evidence.)

14            MS. GOLDBARG:  I have no further questions,

15   Your Honor.

16            THE COURT:  Are you going to have any cross?

17            MR. BALAREZO:   Just a few questions.

18            THE COURT:  Really five minutes, because if it's

19   long, we'll break.

20            MR. BALAREZO:   Let's take a break.

21            THE COURT:  Okay.  Let's take our mid-afternoon

22   break, ladies and gentlemen.  We'll come back here at 3:27 or

23   so, maybe probably 3:30.

24            Please don't talk about the case.  See you in a few

25   minutes.

LAUREANO – DIRECT – MS. GOLDBARG

1              (Jury exits the courtroom.)

2              (The following matters occurred outside the presence

3  of the jury.)

4              THE COURT:  Okay.  3:27.

5              (Recess taken.)

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David R. Roy, RPR – Official Court Reporter

LAUREANO – CROSS – MR. BALAREZZO

1          THE COURT:  Let's have the jury, please.

2          (Jury enters.)

3          THE COURT:  Be seated.  Cross-examination.

4          MR. BALAREZZO:  Thank you, your Honor.

5   CROSS-EXAMINATION

6   BY MR. BALAREZZO::

7   Q    Good afternoon, Ms. Laureano.

8   A    Good afternoon.

9   Q    I just want to talk to you about the that video that was

10  played here in the courtroom, the clips?

11  A    Yes.

12  Q    You got, obtained, that from where did you download it

13  from?

14  A    YouTube.

15  Q    You also served a subpoena or you just downloaded it from

16  the Internet?

17  A    Just downloaded it from YouTube.

18  Q    You were able to review the video, see it, prior to the

19  video being shown today?

20  A    Yes.

21  Q    I'm going to show you what in evidence as Government's

22  Exhibit 705B1T, do you see that?

23  A    Yes.

24  Q    Now, is it accurate to say that the portions that were

25  played in court today were, the Government called them clips?

LAUREANO - CROSS - MR. BALAREZZO

1    A    Yes.

2    Q    That means they are just parts of a larger whole,

3    correct?

4    A    Correct.

5    Q    In fact, what was shown in court today is not the entire

6    video that you downloaded, correct?

7    A    Correct.

8    Q    As you can see from Government's Exhibit 705B1T where it

9    says source of information, I think the source of information

10   is Rolling Stone video; is that right?

11   A    Yes.

12   Q    Are you familiar with what the context of this video was?

13            MS. GOLDBARG:  Objection.

14            THE COURT:  I don't know where -- I'm going to

15   overrule the objection.

16            Do you know the context?

17   A    It was an interview with the defendant.

18   Q    By whom?

19   A    I don't know.

20   Q    The person asking the questions in the video, you don't

21   know who that person is, do you?

22   A    Correct.

23            MS. GOLDBARG:  Objection.  Can we approach?

24            THE COURT:  Okay.

25            (Continued on the next page.)

LAUREANO – CROSS – MR. BALAREZZO

1                (Sidebar conference.)

SIDEBAR CONFERENCE

1

2          THE COURT:  Where would you like this to go.

3          MR. BALAREZZO:  What I'm trying to ask this witness

4    in particular, given that it's not in evidence, I understand,

5    but given that the interview for Rolling Stone was in relation

6    to a movie I want to know, I want to ask her if she knows

7    whether the questions being asked of the witness are part of a

8    script.  I'm not going to get into the movie.  I'm going to

9    ask her if it was part of a script, do you know where the

10   questions came from, nothing major.

11         THE COURT:  The answer is going to be, no, I don't

12   know.  We know that because she had a very limited role just

13   downloading these things.  So that moves it beyond the scope.

14   You're not impeaching her.  You're not saying there is

15   something wrong with it, you're trying to get supplemental

16   information which she plainly doesn't have.

17              I'm not going to take the time for that.  If I need

18   to invoke Rule 403, that's what I'm doing.

19              (End of sidebar conference.)

20              (Continued on the next page.)

21

22

23

24

25

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

2841

LAUREANO - CROSS - MS. BALAREZZO

1          (In open court.)

2          THE COURT:  Anything else?

3          MR. BALAREZZO:  I'm not done yet.

4    BY MR. BALAREZZO::

5    Q    Ms. Laureano, you said you downloaded it from YouTube,

6    right?

7    A    Yes.

8    Q    YouTube is a public website, right?

9    A    Yes.

10   Q    The video is out there for the world to see, correct?

11   A    Yes.

12   Q    Let me show you again 705B1T, which is the Government's

13   exhibit.  Do you see that?

14   A    Yes.

15   Q    And do you speak Spanish or do you rely on the English?

16   A    I speak Spanish.

17   Q    Okay, good.  You see a question that was asked, How did

18   it happen, how did it, how did you come in contact with drugs?

19   A    Yes.

20   Q    The response was, About from the age of 15 on?

21   A    Yes.

22   Q    You see that what was said in the video was --

23          MS. GOLDBARG:  Objection.

24          THE COURT:  Well, he's just quoting the video, if he

25   is.  I'll let him do that.  I don't know where it's going to

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

LAUREANO - CROSS - MS. BALAREZZO

1   go after that, but go ahead.

2            MR. BALAREZZO:  We'll see, your Honor.

3            THE COURT:  All will be revealed.

4            MR. BALAREZZO:  Here it is.

5   Q    The way to have the means to buy food, to survive is to

6   sow poppy, marijuana.  And at that age I began to sow, to

7   cultivate, and to harvest and to sell it.  Right?

8   A    Right.

9   Q    Are you familiar anywhere in the video where it says

10  where Mr. Guzman says I continue to sell it?

11           MS. GOLDBARG:  Objection.

12           THE COURT:  Sustained.

13  Q    Government's Exhibit 705B2T.

14           MS. GOLDBARG:  Objection.

15           THE COURT:  There is no question.

16           MS. GOLDBARG:  I don't believe it's in evidence,

17  your Honor.

18           MR. BALAREZZO:  I'll move on until Ms. Goldbarg --

19  705BT3.

20  Q    Do you see the highlighted parts?

21  A    Yes.

22  Q    You see the response to the question and the response is,

23  Well, from what I know and can see, everything is the same.

24  It hasn't decreased or increased, right?

25  A    Right.

LAUREANO - CROSS - MS. BALAREZZO

1    Q    And that refers to the drug business?

2              MS. GOLDBARG:  Objection.

3              THE COURT:  Did you object?

4              MS. GOLDBARG:  I did.

5              THE COURT:  Sustained.

6    Q    Government's Exhibit 705B6T, you had a chance to review

7    the whole video, correct?

8    A    Yes.

9    Q    The whole video that you saw was a continuous interview

10   not just clips, correct?

11   A    Yes.

12   Q    In particular with this Exhibit 705B6T, there was a

13   question posed to Mr. Guzman.  His response was drug

14   trafficking doesn't depend on just one person, it depends on a

15   lot of people.  Do you remember hearing that part?

16   A    Yes.

17   Q    And also if there was no comsumption there would be no

18   sales?

19   A    Yes.

20   Q    Were there other questions that were posed to him in

21   relation to that?

22              MS. GOLDBARG:  Objection.

23              THE COURT:  Sustained.

24              MR. BALAREZZO:  I have nothing else, your Honor.

25              THE COURT:  Any redirect?

PROCEEDINGS

1           MS. GOLDBARG:  No, your Honor.

2           THE COURT:  You may step down.  Thank you very much.

3           (Whereupon, the witness was excused.)

4           THE COURT:  I know ladies and gentlemen, you just

5    got comfortable in your chairs.  We need to reset the

6    courtroom a bit for the next witness.

7           What I'm going to have you do, to get as much time

8    as we can, is just go into the hall and lineup in your usual

9    come-in order.  It should be like a minute or a

10   minute-and-a-half, then we'll bring you right back in.

11          (Jury exits.)

12          THE COURT:  Let's have the jury back.

13          (Jury enters.)

14          THE COURT:  Be seated, please.

15          Government's next witness.

16          MR. FELS:  Thank you, your Honor, the Government

17   calls Jorge Milton Cifuentes Villa.

18          COURTROOM DEPUTY:  Stand and raise your right hand.

19          (Witness takes the witness stand.)

20   JORGE MILTON CIFUENTES VILLA, called as a witness, having been

21   first duly sworn/affirmed, was examined and testified as

22   follows:

23          THE WITNESS:  I swear.

24          COURTROOM DEPUTY:  State and spell your name for the

25   record.

CIFUENTES VILLA - DIRECT - MR. FELS

1        THE WITNESS:  Jorge Milton Cifuentes Villa.

2   J-O-R-G-E, M-I-L-T-O-N, C-I-F-U-E-N-T-E-S, V-I-L-L-A.

3        COURTROOM DEPUTY:  You may be seated.

4        THE WITNESS:  Thank you.

5        THE COURT:  You may inquire.

6        MR. FELS:  Thank you, your Honor.

7   DIRECT EXAMINATION

8   BY MR. FELS::

9   Q    Mr. Cifuentes, where were you born?

10  A    In Medellin, Colombia.

11  Q    How old are you, sir?

12  A    Fifty-two years old.

13  Q    What is your highest level of education?

14  A    High school.

15  Q    What languages do you speak?

16  A    I speak Spanish and a little bit of English, I'm

17  learning.

18  Q    Do you feel more comfortable continuing this examination

19  in Spanish, sir?

20  A    Yes, sir, please.

21  Q    Sir, are you currently in custody?

22  A    Yes, sir.

23  Q    When were you arrested, sir?

24  A    I was arrested November 8, 2012, in Venezuela.

25  Q    How did you come to be here today?

CIFUENTES VILLA – DIRECT – MR. FELS

1   A    Well after my removal I was waiting for my extradition to

2   the United States, and I was finally extradited on

3   December 12, 2013.

4   Q    Sir, what were you extradited to face?

5   A    I was charged with drug trafficking and money laundering

6   crimes.

7   Q    In how many different courts, sir?

8   A    In two districts, the District of Miami and the District

9   of Manhattan in New York.

10  Q    What did you decide to do with these pending charges

11  against you?

12  A    I pleaded guilty --

13  Q    Sir --

14  A    -- as I am.

15  Q    Thank you.  Sir, did you engage in any cocaine

16  trafficking with anyone in this room?

17  A    Yes, sir.

18  Q    With whom?

19  A    With Don Joaquin Guzman Loera.

20  Q    I noticed you pointed over to the left side of the

21  courtroom to your left, do you recognize Joaquin Guzman in

22  this courtroom?

23         MR. LICHTMAN:  We'll stipulate the identification.

24         THE COURT:  Okay.  Ladies and gentlemen, the witness

25  notes what the defendant looks like.

CIFUENTES VILLA - DIRECT - MR. FELS

1          Go ahead.

2    BY MR. FELS::

3    Q    Now prior to your arrest and incarceration did you have

4    any sort of legitimate employment other than drug trafficking?

5    A    Yes, sir.

6    Q    Tell us what kind of employment did you have?

7    A    I had a construction company, a cattle ranching,

8    reforestation, real estate, fuel distribution, mining, and I

9    was working on a climate change project.

10   Q    How did you become involved in all of these legitimate

11   businesses?

12   A    Well, with the profits of drug trafficking I established

13   companies.

14   Q    Who owns these companies now?

15   A    They were confiscated by the Colombian Government.

16   Q    Sir, how did you first become involved in drug

17   trafficking?

18   A    Well, this was a family activity from the time I was very

19   young; I made cocaine.

20   Q    Sir, we're going to skip through a lot of your career.

21   Let's start with 1988, did you leave Colombia that year?

22   A    Yes, that's right, January 13, 1988.

23   Q    Where did you go?

24   A    To Mexico.

25   Q    What kind of work did you go to Mexico to do?

CIFUENTES VILLA - DIRECT - MR. FELS

1   A    So I was a supervisor for Don Efrain Hernandez for the

2   North Valley Cartel for the shipment of cocaine by airplane.

3   Q    What was your special responsibility back in 1988?

4   A    Well, I had to verify that the air strip was the correct

5   size, that the fuel was ready with the gas pumps there ready

6   to refuel the planes, food for pilots.  And make sure the

7   Mexicans weren't drunk.

8   Q    What part of Mexico were you working in 1988?

9   A    In Culiacan, Sinaloa.

10  Q    Did there come a time in 1988 that you met a man who

11  later became a high-ranking leader of the Sinaloa Cartel?

12  A    Yes, sir.

13  Q    Who was that?

14  A    Ismael Zambada.

15  Q    How did you come to meet Ismael Zambada?

16  A    The first time I met him was at air strip in Culiacan

17  when we were receiving some airplanes with cocaine from

18  Colombia.

19  Q    Does Ismael Zambada have a nickname?

20  A    Mayo.

21  Q    Who was he, Mr. Mayo Zambada, working with at that time?

22  A    With Balthazar Diaz.

23  Q    So did you meet Mr. Mayo Zambada one time or many times?

24  A    A lot of times.

25  Q    Showing you what is already in evidence which is

CIFUENTES VILLA - DIRECT - MR. FELS

1   Government's Exhibit 2A, who is depicted in Government's

2   Exhibit 2A?

3   A     Ismael Zambada, El Mayo Zambada.

4   Q     What did you wind up doing with Mayo Zambada in 1988?

5   A     I received planes with cocaine that trafficked drugs.

6   Q     Tell the jury, was there an incident that caused you to

7   become close with Mayo Zambada?

8   A     So on one occasion we were done off loading planes.  We

9   were getting ready to leave the air strip area that was in the

10  area of Sonora Navojoa, and we ran into an army road block on

11  the road.  We were in a truck with three seats.  Mayo was

12  driving, I was in the middle, and a compadre of his was next

13  to that.

14        And right getting to the road block, Mayo turned

15  around and started trying to flee.  So the army starts

16  shooting.  And I dived towards the passenger's feet.  And he

17  keeps driving for like more than half an hour.  And I was

18  still hiding down by the passenger's feet.

19        And he said, Jorge, you can come up.  It's all done.

20  And he thought that was very funny so he would tell all his

21  friends and compadres about it because I was such a coward.

22  Q     Did you wind up meeting someone in Mexico with whom you

23  developed, someone else in Mexico, who you developed a close

24  relationship?

25  A     Yes, sir.

CIFUENTES VILLA – DIRECT – MR. FELS

1   Q    Who?

2   A    Humberto Ojeda -- Robachivas.

3   Q    What was your relationship to Robachivas?

4   A    Well, we were partners.  We became partners in drug

5   trafficking.  And we had a relationship that was like we were

6   brothers.

7   Q    How long were you partners with Robachivas?

8   A    Approximately for eight years, from 1990 to 1998.

9   Q    Approximately how many kilograms of cocaine do you

10  estimate moving with Robachivas in the 1990s?

11  A    220 tons.

12  Q    Where did you move it to?

13  A    Well, part of it would go to Los Angeles, California.

14  The other part would go to Houston and New York.

15  Q    How much money do you think you made during that time

16  frame in the 1990s?

17  A    Approximately $300 million.

18  Q    What did you do with all that money?

19  A    Well, I bought properties.  I established companies.  I

20  lost a lot of money learning how to run legitimate businesses.

21  And the rest of the money I lost trying to do other shipments,

22  other cocaine shipments.

23  Q    So you already testified about the successful legitimate

24  businesses that were seized by the Colombian Government, what

25  other assets do you own?

CIFUENTES VILLA - DIRECT - MR. FELS

1    A    I don't have anything, everything was confiscated.  But I

2    have some properties in Mexico and my bank accounts were

3    frozen.

4    Q    As a result of your decision to cooperate with the United

5    States Government, what did you agree to do with the United

6    States regarding forfeiture of your assets?

7    A    I committed to giving them all the information and all

8    the coordinates, all the locations of all my assets anywhere

9    in the world.  And also information on my bank accounts, which

10   I've already done completely.

11   Q    Did you agree to forfeit a figure of money to the United

12   States?

13   A    Yes, sir.

14   Q    How much?

15   A    Yes, sir, I signed an IOU for $150 million.

16   Q    You mentioned information about coordinates and other

17   information, have you provided that information about your

18   remaining assets to the Government?

19   A    Yes, sir.

20   Q    What about, you said bank accounts, did you forfeit any

21   bank accounts you had here in the United States?

22   A    Yes, sir.

23   Q    How much?

24   A    Yes, approximately $12 million.

25   Q    You said that you partnered with Robachivas until about

CIFUENTES VILLA - DIRECT - MR. FELS

1    1998, what happened to Robachivas?

2    A    He was murdered.

3    Q    What did you do when you heard that he got murdered?

4    Where did you go?

5    A    Well, I went back to Colombia because I feared for my

6    life.

7    Q    What did you do for work once you returned to Colombia in

8    1998?

9    A    Well, I was managing my legal businesses.  And I was also

10   helping my brother Francisco Cifuentes with his drug

11   trafficking.

12   Q    Does Francisco Cifuentes go by a nickname?

13   A    Pachito Cifuentes.

14   Q    Also go by Pacho Cifuentes?

15   A    Yes, sir.

16   Q    I'm going to show you what is identified, for the

17   witness, as Government's Exhibit 41.  Do you recognize who is

18   in this photograph?

19   A    Yes, sir, that's my brother Francisco Ivan Cifuentes.

20            MR. FELS:  If we could add move to admit

21   Government's Exhibit 41.

22            MR. LICHTMAN:  No objection.

23            THE COURT:  Received.

24            (Government Exhibit 41, was received in evidence.)

25            MR. FELS:  And publish, your Honor.

CIFUENTES VILLA – DIRECT – MR. FELS

1   Q    What were you doing during this time period for Pacho

2   Cifuentes, your brother?

3   A    So I was helping him with the movement of money.  The

4   cash money had to be transferred into bank accounts.  It had

5   to be placed in different locations here in the U.S. to buy

6   airplanes to transport cocaine.  And also to China to change,

7   exchange, into Colombia pesos for the businessmen and for the

8   purchase of cocaine.

9   Q    During this time frame, from 1998 to 2003, did you come

10  to purchase any weapons for a group?

11  A    Yes, sir.

12  Q    Which group was this?

13  A    The Colombian para-militaries.

14  Q    How did this come about?

15  A    Well, the para-militaries, the AUC, were fighting against

16  the FARC.  And Group 57 of the FARC tried to kill my mother

17  and to kidnap my father.  And I bought these weapons in order

18  to reenforce, give the para-militaries more strength.

19  Q    Did your supplying of these weapons -- approximately how

20  many weapons did you supply?

21  A    5,000 AK-47 rifles, with 5 million rounds.

22  Q    Did your supplying of these weapons to the AUCs

23  para-militaries group, did that help your personal safety

24  situation?

25  A    No, on the contrary.

CIFUENTES VILLA - DIRECT - MR. FELS

1    Q    Please explain.

2    A    It became a problem, because the para-militaries decided

3    they wanted me to continue being their weapons provider.

4    Q    So why did that become a problem?

5    A    Well, because in reality the para-militaries were not

6    fighting the guerrilla, they were just control of certain

7    areas for the cocaine trafficking.  They wanted me to continue

8    to provide them with weapons.

9    Q    So what did you decide to do for your safety at that

10   point?

11   A    To go back to Mexico.

12   Q    What kind of business did you want to do in Mexico?

13   A    Drug trafficking.

14   Q    What did you need to do to get reestablished in Mexico

15   now several years later?

16   A    Well, I needed to recover the infrastructure, especially

17   the tuna fishing boats that I had left to Humberto Ojeda's

18   widow.

19   Q    What were these tuna fishing boats for?

20   A    In order to be able to pick up the cocaine down south,

21   right across from Colombia.

22   Q    You mentioned that they were left with Humberto Ojeda

23   with his widow; is that correct?

24   A    She wasn't really in charge of the tuna fishing boats,

25   but actually I delivered that to her as the inheritance

CIFUENTES VILLA – DIRECT – MR. FELS

1   because she was Humberto Ojeda's widow.

2   Q     What was her name?

3   A     Laura Avila.

4   Q     Did you reach out to her at this time in 2002?

5   A     Yes, that's correct.

6   Q     Without getting into what she told you, based on what she

7   said, did you send somebody to Mexico to have a meeting with

8   someone else?

9   A     Yes my, brother Alexander Cifuentes and Ruben Reygosa.

10  Q     Who did you send them to meet?

11  A     With Don Joaquin Guzman Loera.

12          MR. LICHTMAN:  Could we get a date approximately?

13          MR. FELS:  I think we said.

14  Q     Is this from 2002?

15  A     Towards the end of 2002.

16  Q     Showing you, just for the witness, what is marked

17  Government's Exhibit 39.  Mr. Cifuentes, who is the individual

18  depicted in Government's Exhibit 39?

19  A     That's my brother, Alexander Cifuentes.

20  Q     Is he your younger brother or older brother?

21  A     He's my younger brother.

22  Q     Francisco, Pacho, was he your older brother or younger

23  brother?

24  A     My older brother.

25  Q     So you're in between Pacho and Alex; is that correct?

CIFUENTES VILLA - DIRECT - MR. FELS

1   A    Almost correct.  Because there were nine of us total with

2   me.  I'm number eight.

3   Q    Did the fact that you were not nine but eight give you a

4   nickname?  What would the last person have been?

5   A    The Menor, the youngest one.

6   Q    Who is Menor?

7   A    Hidelbrando Alexander.

8   Q    This is a good time, what were your nicknames?

9   A    Jay, Jota.

10  Q    Stop with that one.  What is the significant of Jota?

11  A    It's the initial of my first name, Jorge.

12  Q    What were some of your other nicknames?

13  A    Simon.

14  Q    We'll get to that in a second.  What about within your

15  family, what did some of the other members of your family call

16  you?

17  A    El Penultimo.

18  Q    What is the significance of Penultimo?

19  A    That I'm not the last one, that I'm not the youngest, El

20  Menor.

21  Q    Eight out of nine?

22  A    Eight of nine, that's correct.

23          MR. LICHTMAN:  Objection to the relevance.

24          THE COURT:  I think we're going a bit deep into

25  this.

CIFUENTES VILLA - DIRECT - MR. FELS

1    MR. FELS:  Your Honor, I have my reasons, if you'll

2    indulge.

3    At this point I'll move in Government's Exhibit 39

4    and publish to the jury.

5    MR. LICHTMAN:  No objection.

6    THE COURT:  Received.

7    (Government Exhibit 39, was received in evidence.)

8    BY MR. FELS::

9    Q    Could you just explain again to the jury who is

10   Government's Exhibit 39.

11   A    Hidelbrando Alexander Cifuentes Villa, my younger

12   brother.

13   Q    At the time, at the end of 2002 that you sent

14   Alex Cifuentes, your brother, and Ruben Reygosa to meet

15   Joaquin Guzman, did you and Alex come to some kind of

16   agreement about drug trafficking?

17   A    Yes, we wanted to get the tuna fishing boats so we could

18   traffic with cocaine.

19   Q    Did Alex and Ruben go meet Don Joaquin Guzman?

20   A    Yes, sir, to Culiacan.

21   Q    How do you know that?

22   A    I sent them there.

23   Q    And did Alex report back on the meeting?

24   A    Yes, sir.

25   Q    What did he tell you had happened at this meeting with

CIFUENTES VILLA - DIRECT - MR. FELS

1   Joaquin Guzman?

2   A    He told me that Don Joaquin did not have the tuna fishing

3   boats available, but that he had other things that were more

4   interesting.  And that he had a good impression.  And that it

5   would then good for me to visit him and see him personally.

6   Q    Based on that report, what did you decide to do?

7   A    To go meet him.

8   Q    Tell the jury, why did you want to go meet Don Joaquin?

9   A    Well, I wanted to go and recover the tuna fishing boats

10  because Laura told me she had given them to him.  So this was

11  so I could traffic with cocaine.

12  Q    What other reasons did you want to meet with Don Joaquin?

13  A    Also because of my own security.

14  Q    Could you explain a little more?

15  A    Well, after Ojeda's murder, I was afraid that the people

16  who had killed him wanted to kill me.  And my intention was

17  for Don Joaquin to find out who had killed him and also for me

18  to be under his protection, under his wing if you will.

19  Q    When you say who had killed him, who are you talking

20  about?

21  A    Humberto Ojeda's murderer.

22  Q    Meaning Humberto Ojeda, his nickname was Robachivas?

23  A    Yes, sir.

24  Q    At that time did you suspect who had been responsible for

25  killing your partner Robachivas?

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES VILLA - DIRECT - MR. FELS

1    A    Yes, sir.

2    Q    Who had you suspected had killed him?

3    A    Mayo Zambada.

4    Q    Now how did you try to get in contact with Mr. Guzman

5    before going to see him?

6    A    Through Laura, Laura put me in touch with Damaso Lopez.

7    Q    What was the relationship at that time between Laura

8    Avila and Damaso Lopez?

9    A    Well, Laura Avila and Damaso Lopez were in a romantic

10   relationship.

11   Q    Laura Avila, did she agree with you to engage with you in

12   efforts to traffic in drugs?

13   A    Yes, sir.

14   Q    Before you met Chapo Guzman, what did Laura tell you

15   about Chapo Guzman?

16   A    When I asked her about the tuna fishing boats, she told

17   me she had given them to Don Joaquin.  And that she had also

18   given him the El Robles ranch.  As well as the fact that she

19   was helping with him with money.

20   Q    The El Robles ranch, was there something significant

21   about that ranch?

22   A    That's an ostrich farm.

23   Q    Was Laura eventually able to connect you to Joaquin

24   Guzman?

25   A    Yes, sir.

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

CIFUENTES VILLA – DIRECT – MR. FELS

1  Q     Who did she introduce you to first?

2  A     With Damaso Lopez.

3  Q     Did you ever meet Damaso Lopez in person?

4  A     Yes.

5  Q     One time or many times?

6  A     Many times.

7  Q     Did he have a nickname?

8  A     El Licenciado.

9           MR. FELS:  For identification purposes, your Honor,

10  and just for the witness, Government's Exhibit 11A to the

11  witness.

12  Q     Mr. Cifuentes, do you recognize the individual portrayed

13  in Government's Exhibit 11A?

14  A     Yes, sir, that's Licenciado Damaso Lopez.

15          MR. FELS:  Move to introduce.

16          MR. LICHTMAN:  No objection.

17          THE COURT:  Received.

18          (Government Exhibit 11A, was received in evidence.)

19          MR. FELS:  Publish to the jury.

20  Q     What was Damaso's current position with Chapo Guzman at

21  this time in late 2002?

22  A     Well, he was helping him, he was looking for cocaine

23  suppliers.

24          MR. LICHTMAN:  Judge, I object to this.

25          THE COURT:  602?

CIFUENTES VILLA - DIRECT - MR. FELS

1          MR. LICHTMAN:  Where is it coming to?

2          THE COURT:  Sustained.

3    Q     Prior to meeting Joaquin Guzman, did you have

4    conversations with Damaso Lopez?

5    A     Yes, sir, several.

6    Q     Did he talk to you about what he was doing with Chapo

7    Guzman at that time?

8    A     Yes, sir.

9    Q     What did he say?

10   A     That he was trafficking with cocaine, with drugs.  He

11   also told me that he had helped him escape from prison.  And

12   that he was very interested in me helping them work.

13   Q     Did he appear based on your experience to himself be

14   experienced in drug trafficking at that time?

15   A     Not at all.

16   Q     Did Damaso Lopez ultimately arrange for you to meet Chapo

17   Guzman?

18   A     Yes, sir.

19   Q     Describe to the jury how you got there?

20   A     Well, I traveled to Culiacan and I stayed at the Lucerna

21   Hotel.  Then Licenciado Damaso picked me up at the hotel and

22   took me over to the fumigation air strip on the outskirts of

23   Culiacan.  When we got on a small plane, a Cessna 206, and we

24   were bringing also some supplies and some things because they

25   were having a party, and we flew to the mountains, to the

CIFUENTES VILLA - DIRECT - MR. FELS

1    Golden Triangle.

2    Q    Just a quick question about the air strip that you took

3    off from, what was around the area around that air strip?

4    A    There were corn crops.

5    Q    You were describing the flight over to the mountains.

6    Approximately how long did it take?

7    A    Between 30 to 45 minutes.

8    Q    Describe the landing.

9    A    You know we were actually approaching a really large

10   mountain, very high mountain.  And on top there is a small

11   section that is completely barren, there are no trees there.

12   The plane actually approaches like this, and then it goes and

13   lands on that ascending air strip, in that cleaned air strip.

14   And it's like the plane had some sort of grips, it was like

15   hanging on to it in that small space.

16   Q    You said ascending, was the landing strip flat or on an

17   incline?

18   A    With an incline.

19   Q    How did this flight make you feel?

20   A    Horrible.  I actually had to pray three times, three our

21   fathers.

22            MR. LICHTMAN:  How much longer?

23            MR. FELS:  Is there an objection?

24            THE COURT:  You don't know why this is relevant?

25            MR. LICHTMAN:  I don't.

CIFUENTES VILLA – DIRECT – MR. FELS

1      THE COURT:  I do.  Overruled.

2  Q    Now, sir, based on your reaction to this flight did you

3  resolve on that day to get Joaquin Guzman something?

4  A    Yes, sir, to gift him with a helicopter so he would fly

5  in a more civilized way.

6  Q    You say gift, was there something about this particular

7  occasion when you met Joaquin Guzman that called for a gift?

8  A    He was celebrating his second anniversary from his

9  escape.

10  Q    Who greeted you at the air strip?

11  A    Don Joaquin himself.

12      THE COURT:  I'm going to interrupt you, counsel,

13  because it sounds to me like it may be a good time to break

14  for the day.

15      MR. FELS:  Certainly, your Honor.

16      THE COURT:  Are you sure?  It sounds like you're

17  getting into a new thing.  We'll break for the day.

18      Remember no researching about the case, no

19  communicating with anybody, stay away from media coverage, no

20  social media about this.  And we will see you tomorrow morning

21  at 9:30.  Have a good evening.

22      (Jury exits.)

23      THE COURT:  Mr. Lichtman, as I told several lawyers

24  in this case, if you have an objection just say one word.  I'm

25  with you, I know what you're saying.  If you need a sidebar

CIFUENTES VILLA - DIRECT - MR. FELS

1    because you don't think I've got it, then we'll have a

2    sidebar.   See you tomorrow at 9:30.

3                MR. PURPURA:   Sidebar?

4                (Continued on the next page.)

5                (Sidebar conference.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE – SEALED

1          (End of sidebar conference.)

2          (Continued on the next page.)

1          (In open court.)

2          (Proceedings adjourned at 4:30 p.m. to resume on

3    December 12, 2018 at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2    WITNESS                              PAGE

3    MARTINEZ SANCHEZ
     CROSS-EXAMINATION        BY MR. PURPURA   2696
4    REDIRECT EXAMINATION  BY MR. ROBOTTI   2750
     RECROSS-EXAMINATION    BY MR. PURPURA   2759

5

6    ERNEST CAIN
     DIRECT EXAMINATION       BY MS. GOLDBARG   2762

7

8    LEILANI LAUREANO
     DIRECT EXAMINATION       BY MS. GOLDBARG   2813
9    CROSS-EXAMINATION        BY MR. BALAREZZO   2840

10   JORGE MILTON CIFUENTES VILLA
     DIRECT EXAMINATION       BY MR. FELS   2848

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         I N D E X

 2                         EXHIBITS

 3   GOVERNMENT                     PAGE
     205-31                         2777
 4   205-29                         2777
     205-20                         2777
 5   205-23                         2777
     205-24                         2777
 6   205-28                         2778
     205-26                         2778
 7   205-28                         2778
     205-35                         2778
 8   205-17                         2795
     205-4                          2798
 9   205-16                         2798
     205-1                          2799
10   205-9                          2799
     205-3                          2799
11   205-2                          2799
     205-8                          2799
12   205-10                         2799
     205-13                         2799
13   205-15                         2799
     205-34                         2808
14   701, 219-33, 220-46, 220-128, 220-1A
                                    2822
15   702-B                         2822
     702-C                         2826
15   705-C & 705-E                 2829
16   704-1A                        2830
     704-C1                        2831
17   704-C2                        2832
     705-E1 & 705-E2               2835
18   702-B1                        2836
     704-D                         2838
19   41                            2855
     39                            2860
20   11A                           2863

21
     DEFENDANT                      PAGE
22   274A                          2703
     318                           2742
23   319                           2743

24

25
```

1              I, RIVKA TEICH, hereby certify that:

2    (A) The foregoing pages represent an accurate and complete

3    transcription of the entire record of the proceedings before

4    the UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF

5    NEW YORK, JUDGE BRIAN M. COGAN PRESIDING, in the matter of

6    UNITED STATES OF AMERICA V. JOAQUIN GUZMAN LOERA, 09-CR-466,

7    held on December 11, 2018;

8    And (B) these pages constitute the original transcript of the

9    proceeding.

10

11   _____

12   Rivka Teich, CSR, RPR, RMR, FCRR
     Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25