GMP:PEN/ASF/MPR/HDM/BR
F.#2009R01065/OCDETF# NY-NYE-616

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

                    - against -                          09-CR-466 (S-4) (BMC)

JOAQUIN ARCHIVALDO GUZMAN LOERA,
      also known as "El Chapo," "El Rapido,"
      "Chapo Guzman," "Shorty," "El Senor,"
      "El Jefe," "Nana," "Apa," "Papa," "Inge"
      and "El Viejo,"

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR A NEW TRIAL</u>

                                    RICHARD P. DONOGHUE
                                      United States Attorney
                                      Eastern District of New York

                                      ARTHUR G. WYATT
                                      Chief, Narcotic & Dangerous Drug Section
                                      Criminal Division
                                      U.S. Department of Justice

                                      OF COUNSEL:
                                      ARIANA FAJARDO ORSHAN
                                      United States Attorney
                                      Southern District of Florida

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

   I.   The Defendant's Trial .................................................................................................. 3

      A.   Summary of the Verdict ......................................................................................... 3

      B.   The Overwhelming Evidence of the Defendant's Drug Trafficking Activities .......... 4

      C.   The Overwhelming Evidence of the Defendant's Violence ....................................... 7

   II.   The Jury ..................................................................................................................... 11

      A.   Jury Selection Process ........................................................................................... 11

      B.   Jury Instructions ................................................................................................... 13

      C.   Jury Conduct During Trial .................................................................................... 15

      D.   Jury Questioning Regarding Media Exposure ......................................................... 17

      E.   Jury Deliberations and Verdict .............................................................................. 28

   III.   The VICE News Article ............................................................................................. 31

ARGUMENT ......................................................................................................................... 35

   I.   The Defendant Has Not Made the Clear, Strong, Substantial and Incontrovertible
      Showing Necessary for a Hearing on His Motion .......................................................... 36

      A.   Legal Standard ...................................................................................................... 36

      B.   The Allegations in the VICE News Article Do Not Meet the Demanding
         Standard for a Hearing ......................................................................................... 40

   II.   Even Assuming the Allegations in the VICE News Article are True, the Defendant
      is Not Entitled to a New Trial ..................................................................................... 54

      A.   The Alleged Media Exposure Does Not Warrant a New Trial ................................. 54

      B.   The Jurors' Alleged Lies Do Not Warrant a New Trial ........................................... 76

III.    Partial Sealing is Appropriate .......................................................................................... 94

CONCLUSION ............................................................................................................................. 96

<u>PRELIMINARY STATEMENT</u>

The defendant Joaquin Archivaldo Guzman Loera, also known as "El Chapo,"
the co-leader of the Sinaloa Cartel and one of the world's most notorious criminals, moves for
a new trial pursuant to Federal Rule of Criminal Procedure 33.   <u>See</u> Dkt. No. 592 ("Def. Mot.").
The defendant's motion rests entirely upon an anonymously sourced, uncorroborated article
published by VICE News eight days after the jury verdict convicting him on all counts
following a 12-week trial (the "VICE News Article").[1]   In support of his motion, the defendant
cites to unsworn hearsay and double-hearsay allegations in the VICE News Article made by an
alleged juror or alternate juror (the "Alleged Juror").   According to the article, the Alleged
Juror claims: (1) certain jurors engaged in a five-minute conversation about media coverage of
inadmissible allegations against the defendant and (2) jurors lied to the Court about viewing
such media coverage.

These dubious allegations—which are contradicted by the trial record in material
respects and which the Alleged Juror did not bring to the attention of the Court, despite ample
opportunity to do so—do not meet the stringent standard of "clear, strong, substantial and
incontrovertible evidence" required for a post-verdict evidentiary hearing.   <u>United States v.
Baker</u>, 899 F.3d 123, 130 (2d Cir. 2018) (internal quotation marks omitted).   Indeed, public
policy designed to avoid the "evil consequences likely to result from post-verdict inquiries"
strongly counsels against granting a hearing based on such a limited showing.   <u>Id.</u> at 131
(internal quotation marks omitted).

---

[1] The VICE News Article is attached hereto as Exhibit A.

In any event, even assuming the truth of the allegations in the VICE News Article, the defendant is not entitled to a new trial.  See Loliscio v. Goord, 263 F.3d 178, 185 (2d Cir. 2001) (Sotomayor, J.) ("[W]e typically proceed immediately to the harmless error determination, assuming without deciding that a Sixth Amendment violation occurred."). Considering the nature of the alleged media exposure (which did not relate to the charged crimes), the Court's repeated instructions as to the jury's proper considerations, the jury's diligence at trial, and the overwhelming evidence against the defendant, the alleged media exposure did not prejudice the defendant.   Likewise, there is no indication that any juror lied to the Court to conceal any purported bias against the defendant, such that the alleged falsehood prejudiced the defendant.   Thus, even if the allegations in the VICE News Article are true, the Court still should deny the defendant's motion for a new trial without an evidentiary hearing. As the VICE News Article raises no concern that the defendant is innocent and that the jury wrongfully convicted him, a new trial is not justified under Rule 33.

BACKGROUND

I.     The Defendant's Trial

    A.     Summary of the Verdict

        The defendant was convicted on February 12, 2019, after a three-month trial during which the government presented overwhelming evidence to support the defendant's conviction of all ten counts in the government's Fourth Superseding Indictment (09 CR 466 (S-4) (BMC)) (the "Indictment").   Specifically, the jury found the defendant guilty in Count One of a violation of Title 21, United States Code, Section 848(a)-(b), charging him with operating a Continuing Criminal Enterprise ("CCE"), which included a finding that the government proved 24 of 26 violations of federal narcotics laws listed on the verdict sheet and also a conspiracy to commit murder violation ("Violation 27").   See Jury Verdict Sheet, Dkt. No. 572.   The jury also found the government sufficiently proved three CCE enhancements that support a sentence of mandatory life imprisonment.   Specifically, the jury found that (1) the defendant trafficked 150 kilograms or more of cocaine, (2) he obtained $10,000,000 or more in gross receipts within a twelve-month period and (3) he was a principal administrator, manager or leader of the organization.   See id.; 21 U.S.C. 848(b).   The jury also convicted the defendant in Counts Two through Four of three overarching drug conspiracies, namely: violations of Title 21, United States Code, Section 963 (international distribution of cocaine, heroin, marijuana and methamphetamine); Title 21, United States Code, Section 963 (conspiracy to import cocaine); and Title 21, United States Code, Section 846 (cocaine distribution conspiracy), respectively.   See Jury Verdict Sheet, Dkt. No. 572.   The jury also

3

found the defendant guilty of Counts Five through Eight (substantive drug offenses), Count Nine (unlawful use of a firearm) and Count Ten (money laundering conspiracy).[2]   See id.

The overwhelming evidence supporting the jury's verdict showed the defendant to be a ruthless, bloodthirsty and cruel leader of the prolific Sinaloa Cartel.   Sworn testimony during the trial showed that the Sinaloa Cartel was a powerful drug trafficking organization that controlled territory throughout Mexico through its use of unbridled violence.   It also wielded violence, often on the defendant's orders, to enforce discipline against its members and those who acted against the Sinaloa Cartel's interests through, among other things, kidnapping, torture and murder.   Collectively, fourteen cooperating witnesses testified that the defendant was a leader of the Sinaloa Cartel and that he was responsible for the importation or attempted importation into the United States of at least 1,213,100 kilograms of cocaine, 1,440 kilograms of cocaine base, 222 kilograms of heroin and 49,800 kilograms of marijuana—drugs worth billions of dollars.

B.    The Overwhelming Evidence of the Defendant's Drug Trafficking Activities

The trial evidence—through cooperating witness testimony, law enforcement testimony and documentary evidence—painted a detailed picture of the means and methods by which the defendant led the Sinaloa Cartel.   The government will not here summarize the entirety of the presentation of the evidence at trial, but by way of example, evidence of specific instances of the defendant's prolific drug trafficking included:

---

[2]   The jury also found that the government sufficiently proved three enhancements to the use of a firearm offense charged in Count Nine, namely, that the defendant brandished and discharged one or more of the firearm(s) and that one or more of those firearms was a machine gun.   See id.

- Testimony by Miguel Angel Martinez Martinez, who had been the defendant's close friend and confidant from the mid-1980s through the late 1990s, that the defendant used a tunnel between Agua Prieta, Mexico and Douglas, Arizona in the late 1980s and early 1990s to smuggle tons of cocaine into the United States, and that the defendant had lamented the loss of "900 to 1,000" kilograms of cocaine, see Tr. 1407, 1411-12;

- Video and photographic evidence of the seizure of cocaine from the Agua Prieta tunnel, which formed the basis of Violation 26 of Count One, see GX 213-4 to GX 213-10;

- Testimony by Martinez Martinez that the defendant's trafficking methods had included a scheme to conceal cocaine in cans of Jalapeno chili peppers, a scheme by which the defendants sent tons of cocaine to the United States, see Tr. 1426-28;

- Video evidence of the seizure of 7.3 tons of cocaine concealed in chili cans, see Tr. 1437; GX 208-8B;

- Testimony by Juan Carlos Ramirez Abadia, one of the defendant's largest cocaine suppliers throughout the 1990s and early 2000s, that he had shipped more than 70 tons of cocaine to the defendant's criminal organization in a series of boats referred to as the "Juanitas," which formed the basis for Violations 1-11 of Count One, see Tr. 1975-87; GX 302-A to GX 302-L;

- Law enforcement testimony, photographic and other physical evidence of the seizures by the United States Coast Guard of two of the "Juanita" loads that Ramirez Abadia had described in his testimony, see GX 200-1 to GX 200-10; GX 201-3 to GX 201-9; Tr. 1750-66, 1782-92;

- Testimony by Jesus Zambada Garcia and Vicente Zambada Niebla—the brother and son, respectively, of the defendant's partner Ismael Zambada Garcia—about the defendant's use of semi-submersible or submarine vessels to transport tons of cocaine, which formed the basis for Violations 16-17 of Count One, see Tr. 964-68, 4044-47;

- Testimony by the defendant's associates Damaso Lopez Nunez and Pedro Flores that the defendant had used submarines to transport cocaine, see Tr. 3510-15, 5840-41;

- Documentary evidence and law enforcement testimony about the seizure of a submarine containing nearly 5 tons of cocaine, see Tr. 2506-22; GX 202-1 to GX 202-10;

- Testimony by brothers Alexander Cifuentes Villa and Jorge Cifuentes Villa—who were involved in supplying cocaine to the defendant—that they attempted to source cocaine for the defendant in Ecuador to ship to him through maritime routes, which formed the basis for Violations 14 and 15, see Tr. 2903-04, 2936-49, 5096-5106;

- Ecuadorian law enforcement testimony and documentary evidence detailing the seizure of 8.3 tons of cocaine in Ecuador that had been destined for the defendant's organization, see Tr. 3322-41; GX 209-7 to GX 209-21;

- Testimony by Tirso Martinez about the Sinaloa Cartel's use of train routes in the United States to move multi-ton quantities of cocaine into American cities including Chicago and New York, which formed the basis for Violations 20-22, see Tr. 2595, 2609, 2616-17;

- Testimony by Martinez Martinez, Pedro Flores, Ramirez Abadia and German Rosero corroborating the fact that the defendant's organization used train tanker cars to import cocaine into the United States, see Tr. 1443-54, 2013-16, 2240-41, 3435-36; and

- Law enforcement testimony and documentary evidence of three seizures of cocaine, of approximately 2 tons each, that belonged to the defendant's criminal organization and had been transported via the train routes, see GX 216-1 to GX 216-42; Tr. 2400-03, 2429, 2453-54.

The jury also heard extensive evidence in the form of intercepted telephone calls and text message conversations between the defendant and his associates.  In those recorded conversations, the jury heard and saw the defendant running his criminal empire in his own words by, for instance, negotiating the purchase of six tons of cocaine from associates of the Cifuentes Villa brothers; arranging shipments of cocaine, heroin, methamphetamine and marijuana to the United States; corrupting a Mexican law enforcement official; discussing weapons purchases; and committing acts of violence against rival Cartel members, including kidnapping, assault and murder.  See, e.g., Tr. 3034-43, 4542-70, 4636-4719; GX 601F-2A, 601F-2B, 601F-6A, 601F-6B, 601I-2A, 601I-2D, 601I-2E, 601I-7A, 606I-3H, 609A-3, 609A-6, 609A-7.  The defendant's own words thus extensively corroborated the testimony of

the government's cooperating witnesses about his crimes.   For example, the defendant's phone call with a Colombian cocaine supplier, during which he negotiated the purchase of six tons of cocaine, corroborated Jorge Cifuentes Villa's testimony about such crimes by the defendant. See Tr. 3034-43; GX 606I-3H.   The defendant's phone call with a worker, during which he discussed the purchase of properties on either side of the U.S.-Canadian border, so that he could use a helicopter to ferry cocaine between the two properties, corroborated Alex Cifuentes Villa's testimony about such crimes by the defendant.   See Tr. 5114-17; GX 610J-2A.   And, the defendant's phone calls with his worker Cholo Ivan, during which the defendant discussed who should live and who should die in Cholo Ivan's territory of control in Mexico, corroborated Vicente Zambada Niebla's and Damazo Lopez Nunez's testimony about the defendant's control of certain drug trafficking territory in Mexico through violence.   See Tr. 4086-88, 4120-23, 4541-54, 5852-53, 5890, 5952-55; GX 601I-2A to GX601I-2E.   In short, at trial, the government presented voluminous and well-corroborated evidence of the defendant's drug trafficking, which left no question as to his guilt of the crimes charged.

C.    The Overwhelming Evidence of the Defendant's Violence

In addition to evidence of the defendant's drug trafficking, the trial evidence showed that the defendant ruled over even the most loyal and productive members of his drug trafficking organization with an iron fist, including through the use of fear, intimidation and extraordinary violence.   In part because the defendant's violence was a key method by which he exercised control over the Sinaloa Cartel and engendered loyalty among his workers and associates, evidence of the defendant's violence was highly relevant at trial and the shocking

7

scope of the defendant's unapologetic depravity was on full display before the jury.   This

evidence included:

- Testimony by cooperating witness Isaias Valdez Rios, a former member of the defendant's personal security detail, that the defendant had personally committed three gruesome murders, see Tr. 6201-02;

- Testimony that the defendant had ordered Valdez Rios and his men to bury a member of a rival drug trafficking organization—whom the defendant had shot—while the man was still clinging to life, see Tr. 6203-06;

- Testimony that the defendant personally tortured two men for hours on end because they were believed to work for a rival cartel, ordered Valdez Rios to dig a shallow pit and light a bonfire in front of the men, shot the men as he yelled "fuck your mother" at them while they watched the fire grow before them, and ordered their bodies burned so thoroughly that no bones would remain, see Tr. 6207-13;

- Testimony by Martinez Martinez, corroborated by testimony of Zambada Garcia, that the defendant ordered and led a shootout at the nightclub "Christine's" in Puerto Vallarta, during which the defendant ordered his men to open fire at a nightclub filled with innocent bystanders because he believed that his rivals, the Arellano Felix brothers, were going to be there, see Tr. 833-35, 1519-22; and

- Video evidence, corroborated by testimony of Valdez Rios, showing the aftermath of a gun battle near the town of Burrion, during which the defendant's men had attacked members of a rival drug trafficking organization and killed seven or eight men working for that rival, see GX 701; Tr. 6197, 6199-6201.

The jury not only heard testimony about the defendant ordering the interrogation

and torture of his rivals, they also witnessed it with their own eyes.   For instance, they saw the

video of the interrogation of a rival known as "Guacho," a high-ranking leader in the Beltran

Leyva organization.   See GX 702-C; Tr. 5882.   The video showed Guacho, battered and

bruised, bound and answering questions posed by the defendant's worker.   See id.   In later

testimony by Damaso Lopez Nunez, the jury learned that the defendant had ordered Guacho

murdered after the video was taken.   See Tr. 5883-86.   The jury also saw the defendant

personally interrogating a prisoner about "contras" or enemies of the Cartel.   See GX 702-B.
When the video was played in court, the jury observed the defendant pacing back in forth in
front of a hostage.   See id.   The victim, who was tied to a pole, was observably intimidated by
the defendant and shaken by the questioning.   See id.

These were far from the only instances of violence with respect to which the jury
heard evidence during trial.   As to Violation 27 alone, the jury heard testimony about the
defendant's conspiracies to murder 26 different categories of victims.   Some of the most
dramatic testimony about Violation 27 concerned the narco-wars the defendant led against other
cartels.   The conspiracy to murder members of the Beltran-Leyva Organization alone
encompassed hundreds of people, according to testimony of cooperating witness Jesus
Zambada Garcia.   See Tr. 968-70.   During Zambada Garcia's testimony, he described the
chilling details of a murder that the defendant and Mayo Zambada ordered of a commander of
the Judicial Police named Rafita, one of the Beltran-Leyvas' top sicarios.   During that murder,
the Sinaloa Cartel's sicarios faked a car accident involving Rafita's son, which caused Rafita
to exit his home.   When Rafita was in front of his house, the sicarios shot him to death.   See
Tr. at 960-63.   Other wars, including those against Vicente Carrillo Fuentes, Los Zetas and the
Arellano Felix drug trafficking organizations were likewise detailed with gruesome facts in
evidence at trial.   Even some of the defendant's closest associates were not immune from the
defendant's murder attempts.   For instance, the jury heard testimony from Martinez Martinez,
once one of the defendant's closest friends and associates, that he was the subject of multiple
assassination attempts, after he stopped financially supporting the defendant's ex-wife while
the defendant was incarcerated in Mexico in the 1990s.

As the jury learned at trial, the defendant's avarice also manifested itself in his callous and dangerous treatment of those closest to him.   Specifically, Lucero Sanchez testified that, although she was involved romantically with the defendant, he made her vulnerable to law enforcement scrutiny while insulating himself by sending her to negotiate the purchase of marijuana from farmers in an area of Mexico known as the Golden Triangle.   See Tr. 5708-10. And, it was not enough that she worked on the defendant's behalf; he instilled fear in her by warning her that she should never lie to him if she made a mistake.   See Tr. 5727.   The defendant also displayed his ruthlessness even to Sanchez, his romantic partner, when she was with him while the defendant's secretary, Condor, entered the room and informed him, "Virgo died."   Tr. 5744:17.   The defendant stared at Sanchez and warned her, "Whoever betrayed him was going to die regardless of whether or not they were family, or women, or, you know, if people ratted him out they were going to die."   Tr. 5744:25-5745:3.[3]

These bone-chilling details of the defendant's violent conduct demonstrated for the jury the defendant's sheer brutality in managing the business of his ruthless criminal enterprise.   By the conclusion of the trial, therefore, the jury had heard extensive evidence of the defendant's shockingly violent conduct, including his direct personal culpability for multiple brutal murders, and his propensity to levy intimidation and fear at even his closest associates, relatives and romantic partners.

---

[3] Isaias Valdez Rios testified that one of the defendant's gunmen told him that Virgo had become a DEA informant.   See Tr. 6192.   Damaso Lopez Nunez testified that the defendant had ordered the killing of his cousin Virgo simply because Virgo had lied to the defendant about his whereabouts.   See Tr. 5894-95.

II.     The Jury

        A.      Jury Selection Process

        Before trial commenced, the Court and the parties engaged in a lengthy, methodical jury selection process.  Prior to jury selection, 923 potential jurors completed a 36-page questionnaire (the "Juror Questionnaire"), including the 12 jurors and six alternate jurors whom the Court ultimately seated (the "Seated Jurors").  During the course of a three-and-a-half day voir dire, the Court and the parties individually questioned the potential jurors.  See Tr. 3-545.

        Question Nos. 48 through 61 of the Juror Questionnaire asked potential jurors about their knowledge of the crimes charged, the defendant and the Sinaloa Cartel.  A number of Seated Jurors provided substantive answers to these questions indicating that they were aware of the defendant, his Cartel and/or his crimes.  The defense, however, did not move to strike any of them for cause.



---

        [4] To protect the Seated Jurors' privacy, the government has not attached their Juror Questionnaires as exhibits to its opposition brief.  See Oct. 30, 2018 Mem. & Order, Dkt. No. 402 at 11 (denying "request by members of the press to make public the completed juror questionnaires").  The government, however, has the Juror Questionnaires available for the Court's review and will submit them in camera at the Court's request.



Question No. 101 of the Juror Questionnaire stated that the Court:

[W]ill instruct you to avoid all media coverage, and not to go on the Internet with regard to this case for any purpose.   That is, you will be forbidden from reading newspaper articles about this case, Googling or performing any other search on this case, blogging/tweeting about it or posting comments on any social media sites, etc.   Do you have any reservations or concerns about your ability or willingness to follow this instruction?

JQ at 27. ███████████████████████████

In addition, the Juror Questionnaire also asked all the Seated Jurors whether they could be fair and impartial, despite any knowledge about the defendant, his Cartel or his crimes.

12

For example, Question No. 56 asked, "If you are familiar with media coverage of drug cartels, is there anything about such coverage that would prevent you from being a fair and impartial juror?"   JQ at 12.   ███████████████████████████   Question No. 93 asked if each Seated Juror would be able decide whether the defendant was guilty "based solely on the evidence in this case."   JQ at 25.   █████████████████████████████

Question No. 102 asked, "Is there anything about the nature of the charges or the facts of the case as they have been explained to you thus far that would affect your ability to serve as a juror in this case?"   JQ at 27.   ████████████████████   During voir dire, the Court also confirmed that all Seated Jurors would be able to "keep an open mind" and decide the case only after "hear[ing] all of the evidence" and "deliberat[ing] with [their] fellow jurors."   Tr. 503:4-9; see Tr. 460, 534-535, 554.

      B.     <u>Jury Instructions</u>

          On November 13, 2018, the Court provided the jury with its preliminary instructions, which included a lengthy instruction on media coverage and outside influence regarding the case:

> Fourth, and this is very critical, there is going to be a lot of press coverage about this case.   You have to do your very best to stay away from it.   If you are watching TV and you see something come on, please click the remote control and switch to another channel.   If you see a headline in the newspaper, stop at the headline, flip the page, don't read the article.   If you see something on the Internet, if something pops up, zip right back to your home page and be there instead.   Even if you hear people talking about the case, whether on the subway or at a family gathering or anything, do your best to tune it out.   That's because your verdict has to be based only on the evidence that's here in this courtroom and we don't want you influenced by anything else.

> [Do] not do any research about the case.   Don't Google places or
> people you hear about during trial to find out more.   Don't post
> anything that mentions this trial on Facebook.   Don't send texts
> or e-mails to anyone saying I think this about the case or the judge
> is doing a really good job.   Nothing at all should you say about
> the case in your social media.   That part is always hard for jurors
> because we all communicate so much on social media, but it is
> very important that you follow that direction.   It would really
> violate your oath if you did and we don't want that to happen.

Tr. 551:12-552:10.

During the course of the three-month trial, the Court admonished the jury to refrain from viewing media coverage or any outside material regarding the case every single day of trial, sometimes more than once on the same day.   <u>See, e.g.</u>, Tr. at 1202:12-15 ("Do not talk to anybody about this case.   Do not post anything on social media.   No Googling, no Facebooking, no Binging, no Twittering, no nothing at all about this, please.   Stay away from any media coverage of the case."); Tr. at 2017:10-13 ("[S]tay away from media coverage, do not communicate with anyone about this case, not by social media, verbally, snail mail or anything else."); Tr. at 2530:22-25 ("[S]tay away from all publicity about the case.   Keep quiet to everyone in the world about your service on this jury or in this case.   Do not do any research on the case.   Do not go onto Google or Bing or Yahoo or anything else."); Tr. 3779:24-3780:2 ("Do not post anything on social media.   Do not do any research on the case.   Stay away from any media coverage of the case.   Turn the page, use the remote control, whatever you need to do to keep yourself limited to the information."); Tr. 4595:8-11("[D]on't do any research on the case, don't post anything on the Internet, don't do a Google search, and stay away from any media coverage of the case that you might run into."); Tr. 5147:9-13 ("Please don't talk about the case with friends, family or anybody else.   Don't post anything on the Internet, don't do

14

any research on Google, stay away from any media coverage of the case.   Please turn the page,

hit the remote control.").   In total, the Court delivered the instruction to the jury at least 45

times during trial.

   Moreover, on January 31, 2019, after the parties' summations, the Court

instructed the jury:

> I think for the last time I'm going to give you—probably for the
> last time—admonitions that I have been giving you.   When you
> come back on Monday, I will give you the instructions under the
> law and you will, in fact, commence deliberations, so pay attention
> to what may be the last time you hear to stay away from media
> coverage, do not discuss this case with anyone, do not post
> anything on social media about it, do not do any research on the
> Internet of things that might interest you, and get a lot of rest,
> because you will have hard work next week.

Tr. 6924:12-21.   In its final instructions to the jury, the Court also instructed the jury that it had

to base its verdict only on the evidence heard at trial and nothing outside the courtroom should

influence the verdict.   See Tr. 6957:10-12 ("You took an oath to base your verdict solely on

the evidence in the case and the applicable law as I give it to you."); Tr. 6962:14-20 ("You also

have to remember that . . . anything you may have seen or heard about the case outside of the

courtroom, . . . if you did run into something, if you got any exposure, that is not evidence and

it has to be entirely disregarded").

  C. <u>Jury Conduct During Trial</u>

   During trial, it was apparent that the members of the jury took their obligations

as jurors seriously.   Throughout the entire 12-week long trial, there was not a single instance

of juror absenteeism or tardiness that delayed court.   As the Court repeatedly observed, the

jurors paid extremely close attention to the evidence, often taking detailed notes on witness

testimony.  See, e.g., Tr. 7105:24-7106:1 ("And I want to thank all of the Jury, the alternates and the main Jury, for the excellent attention you paid throughout this case.  It was really remarkable."); Tr. 2222:21-23 ("I know the vast majority of you are paying close attention to the testimony . . . ."); Tr. 2479:12-13 ("I do want you to know we are watching how closely you are paying attention to the case.  We are very appreciative of that . . . ."); Tr. 3916:21-3917:16 ("You've been playing close attention.  I know you're listening to me. You're listening to the witnesses. . . . The parties and I want to thank you so much for the riveting attention you've given all the testimony."); Tr. 6949:25-6950:1 ("[T]his is a very cohesive jury.   They are paying attention to these instructions.").   In short, the conduct of this jury was exemplary.

Three specific instances during trial also indicated the seriousness with which the jurors took their oaths.



See Tr. 1360:9-1361:8.  This incident indicates that the jurors took any potential misconduct by their fellow jurors seriously and understood the importance of notifying the Court about any questionable behavior they observed by fellow jurors.

---

5

██████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████     Later, on January 16, 2019, a juror self-reported media exposure to the Court. Specifically, one of the jurors reported to the Court's deputy, "[O]ne of her children had approached her last night and said that she had read an article in the newspaper that the defendant might testify."   Tr. 5325:6-8.   "The juror expressed to [the Court's deputy] she's not troubled by that, it will not affect her, but she felt an obligation to report it pursuant to the instructions we have been giving the jurors."   Tr. 5325:10-13.   Given the juror's statements, the Court and the parties agreed to take no further action.   These incidents indicate that the jurors were aware of the Court's instructions and followed them closely.   This last incident also shows that the jurors were aware of their obligations to stay away from any media concerning the case and took the Court's instructions regarding media exposure seriously.

>        D.      Jury Questioning Regarding Media Exposure

        Twice during trial, the Court questioned members of the jury about exposure to specific media coverage.   On each occasion, the Court properly adhered to the procedures set forth in United States v. Gaggi, 811 F.2d 47 (2d Cir. 1987), and its progeny.   As described in Gaggi,

> the simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how

17

much they know of the distracting publicity and what effect, if any,
it has had on the juror's ability to decide the case fairly.

Gaggi, 811 F.2d at 51.   "Ultimately, the trial judge must examine the special facts of each case

to determine whether the jurors remained impartial."   Id. (citations and internal quotation

marks omitted).

        i.     The January 14, 2019 Colloquy

First, on January 14, 2019, the parties brought to the attention of the Court that,

over the previous weekend, the New York Post had reported about certain conduct of one of

the defendant's counsel.   See Tr. 5009.[6]   Defense counsel requested that the Court speak with

the jurors in camera to ascertain whether any of them had seen the media coverage during the

weekend and, if so, whether the jurors could still be fair and impartial, despite that coverage.

See Tr. 5010:2-11.   The government concurred with this approach.   See Tr. 5010:17-5011:2.

After noting that "there has been no indication that [the jurors] have disregarded" the Court's

direction to avoid the media coverage of the case, the Court set forth its proposed procedure for

questioning the jurors.   Tr. 5011:22-23, 5013:9-22.   The Court proposed, in accordance with

Gaggi, to question the jurors as follows:

> I will go in to the room and I will say to them, without mentioning
> the New York Post, I will say to them, there was an article that
> spoke extensively about one of the attorneys in this case over the
> weekend.   I know you've been trying not to observe any media,
> but did anyone see or read that article.   If I get affirmative
> response to that, then I will take each affirmative response into a
> separate room and I will poll that person as to whether they feel

---

[6] Dana Schuster, "Sarma Melngailis had a steamy affair with her married
lawyer," N.Y. Post (Jan. 12, 2019), available at https://nypost.com/2019/01/12/sarma-
melngailis-had-an-x-rated-relationship-with-her-married-lawyer/ (last visited Apr. 26, 2019).

able to disregard what they read in the article and not hold it against the defendant in any way and give him a fair trial.

Tr. 5013:13-22.   Neither party objected to the Court's proposal.   See Tr. 5013:23-25.

Subsequently, the Court questioned the jury in camera.   The Court began by stating: "As you know, I have been instructing you at least once a day, usually at the end of the day to be very careful about staying away from any media coverage of the case.   And I know you've been trying your best to do that . . . ."   Tr. of Jan. 14, 2019 In Camera Proceedings ("Jan 14. Tr."), at 3:7-10.   The Court then addressed the New York Post article in the following colloquy:

> The Court: . . . There was an article over the weekend, and there may be more, that really don't bear on the case directly, but they had to do with the personal actions of one of the attorneys who's working on the case.   And I need to make sure that—first of all, I need to know whether anybody saw that article, despite my instruction to stay away from that stuff, and if anybody did see it, I need to make sure that they still believe they can give the defendant a fair trial and that article isn't going to influence them in any way.
>
> So let me ask the first question, first, does anybody know what article I'm talking about dealing with the personal affairs of one of the attorneys?
>
> The Jury: No.
>
> The Court: Now is the time if anybody saw it.
>
> The Jury: No.
>
> [] Juror: I have no idea what you're talking about.

Id. at 3:13-4:4.

After this in camera colloquy, the Court made the following findings in open court:

19

> I went into the jury room and I told them essentially what I've just outlined to you. I received an absolute unanimous adamant, What are you talking about, Judge? You told us not to look at articles. We haven't seen everything—anything.
>
> I did not ask each juror that individually, but I did repeat it a couple of times, and I looked at their faces and it is clear to me that they really did, not one of them, have any idea what I was talking about; that they have been obeying the instructions to stay away from the media and so that the matters with which the attorneys were concerned are really not a concern. I intend for that to close the matter and we can proceed with trial.

Tr. 5015:19-5016:6.

    ii.    <u>The February 4, 2019 Colloquy</u>

On February 4, 2019, the Court again employed the procedure mandated by <u>Gaggi</u>. On that date, the parties raised with the Court the previous weekend's media coverage of certain documents that had been unsealed by order of the Court on February 2, 2019.[7] <u>See</u> Tr. 6936:6-11. While there was extensive media coverage related to different aspects of the case during that weekend, some of the coverage related to allegations made by a cooperating witness, Alexander Cifuentes Villa, that he and the defendant had drugged and raped underage girls in Mexico. <u>See</u> Tr. 6936:12-22; Tr. 6938:9-12 ████████████████████████

---

[7] On December 21, 2018, the New York Times filed a letter with the Court contesting the breadth of the parties' sealing practices and requesting, among other things, that the Court order the parties to unseal their submissions to the Court. <u>See</u> Dkt. 536 at 1-3. VICE News filed a similar letter with the Court on January 2, 2019. On January 14, 2019, the Court issued an order agreeing that portions of the parties' filings should be unsealed and requested the parties to propose a joint schedule for unsealing certain filings. <u>See</u> Dkt. 550. The parties filed such a joint motion on January 21, 2019. <u>See</u> Dkt. 555. On January 23, 2019, the Court issued an order approving the joint proposed unsealing schedule. <u>See</u> Dkt. 557. Pursuant to that order, on February 1, 2019, the government unsealed portions of six different filings, one of which included the allegations about the defendant's and cooperating witness Alexander Cifuentes Villa's sexual activities with underage girls. <u>See</u> <u>id.</u>; Dkt. 569.

████████████████████████████████████████████████████████

██████████████████████████████████████.[8]   The government had

outlined these allegations in its motion to preclude cross-examination of Cifuentes Villa

regarding such activity that he engaged in with the defendant.   See Dkt. No. 350 at 5-6.[9]   The

Court granted that motion and excluded that testimony from trial.   See Oct. 30, 2018 Mem. &

Order, Dkt. No. 403 at 3.   The media outlets that covered these unsealed allegations also

published defense counsel's vehement denials that the defendant committed this conduct;

among other things, defense counsel asserted that the defendant "denies the allegations," which

"lack any corroboration and were deemed too prejudicial and unreliable to be admitted at

trial."[10]   Aside from publishing defense counsel's denial, many news accounts also published

---

[8]   During the weekend between the unsealing of the filing concerning the allegations and the first day of jury deliberations, there were numerous articles about the trial. See, e.g., Kevin McCoy, "The case against El Chapo is headed to the jury.  Here's what to know," USA Today (Feb. 2, 2019) (repeating defense's claims that the government suborned perjury by its cooperating witnesses), available at https://www.usatoday.com/story/news /nation/2019/02/02/joaquin-el-chapo-guzman-federal-trial-jury-instructions-deliberations-sinaloa/2743595002/ (last visited Apr. 28, 2019); "El Chapo's wife says he is an 'excellent' husband and father as the jury begin their deliberations in the drug kingpin's landmark trial," Daily Mail (Feb. 2, 2019), available at https://www.dailymail.co.uk/news/article-6658415/El-Chapos-wife-says-mobster-excellent-husband-father.html (last visited Apr. 28, 2019); Harriet Alexander, "'El Chapo' Guzman facing life as lawyers offer extraordinary capitulation in 'trial of the century,'" The Daily Telegraph (Feb. 3, 2019), available at https://www.telegraph.co.uk/news/2019/02/03/could-chapo-guzman-walk-free-jury-decides-fate-end-telenovela/ (last visited Apr. 28, 2019); "The Trial of Joaquin Guzman Loera: El Chapo's final chapter," The Economist (Feb. 2, 2019), available at: https://www.economist.com/node/21758296 (last visited Apr. 28, 2019); Emily Palmer and Alan Feuer, "El Chapo Trial: The 11 Biggest Revelations From the Case," N.Y. Times (Feb. 3, 2019), available at https://www.nytimes.com/2019/02/03/nyregion/el-chapo-trial.html  (last visited Apr. 28, 2019).

[9]   Dkt. No. 350 is available publicly in redacted form as Dkt. No. 569-1.

[10]   Alan Feuer, "El Chapo Raped and Drugged Underage Girls, Witness Claims," N.Y. Times (Feb. 2, 2019), https://www.nytimes.com/2019/02/02/nyregion/el-chapo-

Cifuentes Villa's statements that he also had engaged in sexual activity with underage girls.[11] By the time of the media coverage, the jury had already observed defense counsel's extensive cross-examination of Cifuentes Villa, and it had heard defense counsel's closing argument that included lengthy attacks on Cifuentes Villa's credibility.   See Tr. 6723-25, 6743-58.

Notably, defense counsel's claim to the press that the allegations were "deemed too . . . unreliable" to be presented to the jury was wrong.   The government moved to preclude cross-examination of Cifuentes Villa on this topic; it did not did not seek to introduce the allegations against the defendant at trial, unless the Court permitted the defense to cross-examine Cifuentes Villa about them.   See Dkt. No. 350 at 6-7 & n.3.   The Court ruled in favor of the government and precluded the defense from cross-examining Cifuentes Villa about the allegations, deeming such cross-examination too prejudicial.   See Dkt. No. 403 at 3. In so holding, the Court did not rule that allegations were unreliable.   See id.   Nonetheless, the government did not publicly rebut defense counsel's claim to the press that the Court had ruled that the allegations were too unreliable for the government to present at trial.

Following publication of Cifuentes Villa's unsealed allegations, defense counsel requested that the Court poll each individual juror in camera, regarding the media coverage of these allegations against the defendant.   See Tr. 6935:12-13.   The government, however,

---

trial.html?rref=collection%2Fbyline%2Falan-feuer&action=click&contentCollection= undefined&region=stream&module=stream_unit&version=latest&contentPlacement=2&pgty pe=collection (last visited Apr. 18, 2019).

[11] Kevin McCoy, "'El Chapo' allegedly had sex with underage girls, called them his 'vitamins,' records show," USA Today (Feb. 3, 2019), available at https://www.usatoday.com/story/news/2019/02/03/el-chapo-allegedly-had-sex-underage-girls/2761357002/ (last visited Apr. 26, 2019).

requested that the Court adhere to the <u>Gaggi</u> protocol, questioning the jurors as a group first and then questioning individual jurors, if any, who had been exposed to the media coverage. <u>See</u> Tr. 6936:23-6937:8.   After hearing arguments from both sides, the Court ruled as follows:

> Having reviewed again the case law on the issue discussed at sidebar, I'm going to proceed to what the Second Circuit refers to as the step two of the inquiry, but I am going to address the jurors anyone initially as a group <u>in</u> <u>camera</u>.

> It seems to me that in order to address individual jurors, in order to inquire to that, there has to be some indication that one or more of them were, in fact, exposed to the questionable material, and we have nothing to suggest that in this case at all.

> In fact, we know that I've been instructing this jury every single day to stay away from all media coverage of the case.   We know that at least one juror, when her son slipped up and said something to her about the case, she came and reported it to [the Court's deputy] immediately.

> And we know that we had a similar, although admittedly not as severe issue involving some press coverage of Mr. Lichtman, I did proceed in the way I'm going to proceed now, in front of the jury, and there was no question that the jury had not seen the offensive or suspect article.

> It seems to me that I have a very good rapport with this jury.   I think I know how to talk to a jury.   Doing it <u>in</u> <u>camera</u>, where I can look each one of them in the face and get an answer from them seems to me a very sure way of taking down any inhibitions they might have about disclosing something they shouldn't have done.

> I'm going to make it clear to them they're not in any trouble.   I just need to know [if] this has happened, and I think the parties can count on me—and they'll see the transcript to do a thorough examination and make sure that this is not an issue.

> If I discover as to one or more jurors that it is an issue, then I will inquire of that juror separately, outside the presence of all of them, and I'll do that in a separate room with a representative counsel from each side present, so that if those counsel have any questions they want to put to that juror, they'll have the chance to do that.

But I see no reason to go through 18 separate jurors without any indication at all, that they have been exposed to the material that we're concerned they should not have been exposed to.

You know, from day one, there's been extensive press coverage. We can't view the press coverage in a vacuum and while Mr. Lichtman was of the view that the issue about which we are concerned was the only issue covered over the weekend, that is not accurate.   It was the dominant issue, I agree with that, but there's still no reason to think that a jury that has [been fastidiously] avoiding any coverage of the case, suddenly decided this weekend that they were going to disregard that daily forcefully given instruction.

Tr. 6944:14-6946:13.

After ruling on the proper procedure, the Court then proceeded to question the

jurors as a group.   The Court engaged in the following colloquy:





Tr. 6947:5-6948:14.

After this exchange, the Court reported its findings in open Court, stating as

follows:

> I have thoroughly questioned the jury, as the lawyers will see from
> the transcript.   I could not be more confident that they have been
> following my direction.
>
> I looked at each of them.   I gave multiple chances to answer the
> question.   I asked open-ended questions.   I assured them they
> weren't going to be in any trouble.   I drew them out, really
> looking at each one on individual basis as much as I could.

Tr. 6949:4-11.   The Court then proposed, with respect to the two jurors who had raised their

hands, to "question those jurors as to what they saw and become satisfied that either they didn't

see anything or if they did [see] something, it's not going to affect their deliberations."   Tr. 6949:20-23.   The Court concluded: "[T]his is a very cohesive jury.   They are paying attention to those instructions."   Tr. 6949:25-6950:1.

The Court then proceeded to question the two jurors who had raised their hands during the Court's questioning of the entire panel with counsel from both parties present. ▮



. . .

---

[12] In its motion to preclude cross-examination of its cooperating witness about the sexual activity that he and the defendant engaged in with minors, the government noted that the defendant referred to young girls as "vitamins."   Dkt. No. 350 at 5-6.   Certain media outlets included the term "vitamins" in their headlines related to the government's unsealed filing.   See, e.g., McCoy, supra note 11; Emily Saul, "El Chapo Allegedly Had Sex With 13-Year-Old Girls He Called 'Vitamins,'" N.Y. Post (Feb. 2, 2019), available at https://nypost.com/2019/02/02/el-chapo-allegedly-had-sex-with-13-year-old-girls-he-called-vitamins/ (last visited on Apr. 23, 2019).



Tr. 6951:9-6952:12.





Tr. 6953:7-25.

Tr. 6954:7-14.

E.  Jury Deliberations and Verdict

Following the February 14, 2019 colloquy with the jurors, the Court proceeded to instruct the jury on the law.   As noted above, the Court specifically reiterated to the jury in its closing instructions that "anything you may have seen or heard about the case outside of the courtroom, even though, as I confirmed this morning, you've all done your very best to stay away from anything like that, if you did run into something, if you got any exposure, that is not evidence and it has to be entirely disregarded."   Tr. 6962:14-20.   The jury began deliberations later that same day.

The jury deliberated for a total of six days.   During the deliberations, it became readily apparent that the jury was diligently reviewing and scrutinizing the evidence.   The jury sent a total of 14 notes to the Court.   Ten of these notes asked specific questions related to the

28

law and the facts and/or requested to review particular evidence.[13]   The jury requested to review the testimony of six of the government's 14 cooperating witnesses—including the full testimony of five of those cooperating witnesses—as well as the full testimony of three law enforcement officers.   The jury also requested playback of one of the key intercepted phone calls involving the defendant.   The jury's notes indicate that the jury engaged in a thorough deliberative process, focused on the evidence and testimony, prior to reaching a verdict.

Specifically, on the afternoon of February 4, 2019, the jury sent several notes. Court Exhibit No. 1 asked, "Is a 'drug war' considered part of a drug trafficking crime? (With specific reference to the weapons charge.)"   Tr. 7047:20-22.   Court Exhibit No. 2 asked, "Can we please get jury charge and verdict sheet for every juror?   If not, more?"   Court Exhibit No. 4 asked, "How long until we get the evidence and pictures? . . . Is Ephedrine considered as Methamphetamine?"   Tr. 7055:13-17.

The following day, on February 5, 2019, the jury sent a note marked Court Exhibit No. 6 asking for several pieces of evidence.   It read, "First, can we please hear the phone call 601F-BT, page two, regarding quote, ice, unquote; second, requesting Rey Zambada's testimony regarding Chespiro; third, requesting testimony for Alex Cifuentes Villa; fourth, requesting testimony for Jorge Cifuentes Villa."   Tr. 7066:4-9.   Shortly thereafter, the jury sent another note marked Court Exhibit No. 8, which read, "Can we please get the testimony of Juan Aguayo?   The testimony.   All the testimony."   Tr. 7069:25-7070:1.

---

[13]   The remaining jury notes related to scheduling and the jury reaching a verdict. See Court Ex. Nos. 1, 2, 4, 6, 8, 10, 12, 13, 14, 15 (substantive notes); Tr. 7047:20-22, 7055:13-17, 7066:4-9, 7069:25-7070:1, 7076:4-12, 7083:4-7, 7089:6-7, 7089:12-13, 7090:16-17.

The next day, on February 6, 2019, the jury sent a note marked Court Exhibit No. 10, asking, "Can we please get a copy of the testimonies of Rey Zambada and Damaso Lopez and Vicente Zambada? . . . If members of a drug cartel are killed from an opposing cartel for personal reasons, does that constitute as a drug trafficking crime?"  Tr. 7076:4-12.   The following day, on February 7, 2019, the jury sent a note marked Court Exhibit No. 12, which read, "Can we please request Juan Carlos Abadia's (Chupeta's) testimony in regard to the Juanita shipment and ledgers.   Specifically, direct, cross and redirect."   Tr. 7083:4-7.

After breaking for the weekend, the jury resumed deliberations on February 11, 2019.   That day, the jury sent three notes in quick succession.   Court Exhibit No. 13 asked, "Can we please have the testimony of Scott Schoonover?"   Tr. 7089:6-7.   Court Exhibit No. 14 read, "We are requesting Clifton Harrison's testimony."   Tr. 7089:12-13.   Finally, Court Exhibit No. 15, asked, "Does a violation have to be proven or not proven unanimously?"   Tr. 7090:16-17.

The jury returned for its final day of deliberations on February 12, 2019.   The jury sent one note that day, marked Court Exhibit No. 16, which read, "We have reached a verdict."   Tr. 7099:4-5.   Subsequently, the Court read the verdict sheet.   Tr. 7100:14-7103:17.   As discussed previously, the jury convicted the defendant of all ten Counts charged in the Indictment.   Id.   As to Count One, the charged CCE, the jury found 25 of the 27 charged violations proven.   See Tr. 7100:16-18 ("[T]he Jury has checked proven as to all Violations except Violation 18 and 24.").   At the request of the defense, the Court polled the jury.   See Tr. 7103:19-20.   Each member of the jury agreed that the verdict read by the Court was his or her true and accurate verdict.   See Tr. 7103:21-7104:21.

30

Prior to discharging the jury, the Court offered this assessment of the jury's deliberative process and its conduct during the trial:

> What I do want to say to you and I have to commend you for this, in my nearly 13 years as a trial judge I have never seen a jury in a case this complicated pay the kind of attention and focus on detail and go through the deliberations the way you did.   We're one of the few countries in the world that trusts our citizens to make these important kinds of decision over other people's lives.   You have demonstrated why we do that and why we have the confidence in it.
>
> Not with regard to the decision you reached, but the way you went about it, was really quite remarkable; and frankly, made me very proud to be an American.
>
> . . .
>
> And I want to thank all of the Jury, the alternates and the main Jury, for the excellent attention you paid throughout this case.   It was really just remarkable.

Tr. 7105:6-7106:1.

III.    The VICE News Article

On February 20, 2019, eight days after the jury rendered its verdict, VICE News published an article entitled "Inside El Chapo's jury: A juror speaks for the first time about convicting the kingpin."   See Ex. A.   In the VICE News Article, the reporter recounted an interview with an anonymous "juror" conducted during a two-hour "video chat."   Id. at 1.   The article did not specify whether the juror was an alternate juror in the trial, or whether he or she was a deliberating juror.   See id. at 3   ("VICE News is not disclosing whether the juror was an alternate or one of the 12 people involved in deliberations.").   In the article, the Alleged Juror relayed purported details of discussions among jurors during trial.   The VICE News Article—fashioned in a "tell-all," confessional style—included the Alleged Juror's notion that

31

the jurors could have had "a TV reality show, like 'The Jurors on MTV.'" Id. at 1. As the article itself stated, the Alleged Juror's account of his or her conversations with other jurors was completely uncorroborated. See id. at 3 ("The juror reached out to another juror at the request of VICE News but said nobody else wanted to speak on the record. . . . [P]arts of this juror's account could not be independently verified.").[14]

In the article, the Alleged Juror described several of the jurors as having sympathy for the defendant and harboring the concern that the defendant, if convicted, would spend the rest of his life alone in a prison cell. The Alleged Juror stated, "A lot of people were having difficulty thinking about him being in solitary confinement, because, well, you know, we're all human beings, people make mistakes, et cetera." Id. at 2. The VICE News Article also stated that several jurors "talked about whether or not he was going to be in solitary confinement for the rest of his life, because if he was, they wouldn't feel comfortable finding him guilty." Id. Later, after the jury had reached a verdict, the juror stated that several jurors were emotional because "they felt bad about sending Chapo away for life." Id. at 5.

The Alleged Juror indicated that the jury carefully examined the evidence at trial. As the VICE News Article summarized the Alleged Juror's report: "[M]any people were skeptical of the cooperators who cut deals with the government and flipped on Chapo, pointing to several instances where they appeared to contradict themselves or each other." Id. at 9.

---

[14] As discussed below, see Argument Section I.B. infra, the Alleged Juror's statements in the VICE News Article are inconsistent in certain respects. For example, although the reporter stated he had spoken with only one juror—and, as noted above, would not specify whether that juror was an alternate or a regular juror—the article purported to recount what had occurred both in the regular jury's deliberations, as well as in the alternates' room. See Ex. A at 5.

Indeed, the Alleged Juror indicated to VICE News that jurors were "appalled that prosecutors were working with the likes of" some of the cooperating witnesses.   Id.   The jury, however, convicted the defendant because, "[e]ven if the jury didn't believe cooperators, the government showed several videos, dozens of wiretapped phone calls, and hundreds of intercepted text messages."   Id. at 11.   "It was plenty to convince 12 people to find Chapo guilty beyond a reasonable doubt."   Id.   "In the end, the juror left feeling that Chapo was definitely guilty but also a product of his environment."   Id.

          As for the Alleged Juror's exposure to news during the course of trial, the Alleged Juror stated that he or she and unspecified other jurors followed VICE News reporter Keegan Hamilton's Twitter feed, but did not specify what other news outlets he or she followed.   Id. at 3.   With respect to the article about Mr. Lichtman's alleged affair, the Alleged Juror stated, without elaboration, "at least seven people on the jury were aware" of it.   Id. at 8.   The Alleged Juror further stated that, when questioned by the Court, the jurors "responded honestly: They hadn't seen anything."   Id. at 8.   However, according to VICE News reporting, the Alleged Juror claimed, "[M]oments after the judge left, someone allegedly used a smartwatch to find the article."   Id. at 9.

          As for the media coverage discussing the defendant's sexual activities with underage girls—reporting that included defense counsel's vehement denials of the allegations—the Alleged Juror stated, again without elaboration, that "'for sure' five jurors who were involved in the deliberations, plus two of the alternates," had heard about the allegations. Id. at 8.   The Alleged Juror also asserted that he or she learned of the allegations before arriving at the courthouse and reported to other jurors that the Court would question them about it.   Id.

33

The Alleged Juror stated, "I had told them if you saw what happened in the news, just make sure that the judge is coming in and he's gonna ask us, so keep a straight face." Id.  The Alleged Juror then asserted, "So he did indeed come to our room and ask us if we knew, and we all denied, obviously." Id.  The Alleged Juror claimed that he or she did not answer the Court's questions honestly because the Alleged Juror believed that he or she would get in trouble: "I thought we would get arrested . . . I thought they were going to hold me in contempt . . . I didn't want to say anything or rat out my fellow jurors." Id. at 8 (second alteration in original; internal quotation marks omitted).

Nonetheless, while the Alleged Juror saw the article and believed that other jurors did as well, the Alleged Juror stated that jurors did not necessarily credit the allegations: "We did talk about it.   Jurors were like, you know, 'If it was true, it was obviously disgusting, you know, totally wrong.   But if it's not true, whatever, it's not true.'" Id.  The Alleged Juror stated that the allegations "didn't seem to factor into the verdict" and "didn't change nobody's mind for sure." Id.  The Alleged Juror concluded: "We weren't really hung up on that.   It was just like a five-minute talk and that's it, no more talking about that." Id.

**** 

On March 26, 2019, based primarily on the VICE News Article, the defendant filed a motion for a new trial pursuant to Rule 33.   See Dkt. No. 592.   For the reasons set forth below, that motion is meritless.   The Court should deny it without an evidentiary hearing.

ARGUMENT

The defendant argues that the Court should grant him a new trial pursuant to Rule 33. Rule 33 provides, in pertinent part, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts "exercise Rule 33 authority sparingly" and only in "the most extraordinary circumstances." United States v. Cote, 544 F.3d 88, 101 (2d Cir. 2008) (internal quotation marks omitted)). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (emphasis added; internal quotation marks omitted). "[A] strong presumption exists against setting aside jury verdicts based on charges of juror misconduct." United States v. Bangiyev, No. 07CR331NGRLM, 2008 WL 4240005, at *7 (E.D.N.Y. Sept. 12, 2008) (citing Tanner v. United States, 483 U.S. 107, 120 (1987)); see United States v. Stewart, 317 F. Supp. 2d 432, 436 (2d Cir. 2004) ("Martha Stewart II") ("[A] defendant who seeks a new trial based on allegations of juror misconduct faces a very high hurdle."). The Second Circuit will reverse a district court's denial of a new trial motion only upon a finding that it abused its discretion. See United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011).

No extraordinary circumstances justifying a new trial are present here. The defendant's motion rests entirely upon the anonymous, unsworn, uncorroborated, hearsay and double-hearsay allegations in the VICE News Article, which are, at times, both vague and conclusory. See Def. Mot. at 13-16. These allegations do not meet the strict standard for a

35

post-verdict hearing on this motion, let alone present a basis for a new trial.   Indeed, given the overwhelming evidence of the defendant's guilt at trial, there is absolutely no chance that the jury convicted an innocent person—a concern this court <u>must</u> harbor under binding precedent to order a new trial.   Rather, the jury rightfully convicted the defendant, the co-leader of the Sinaloa Cartel, one of the world's most notorious criminals and a man responsible for brutal crimes.   The Court thus should deny the defendant's motion without an evidentiary hearing.

I.   <u>The Defendant Has Not Made the Clear, Strong, Substantial and Incontrovertible Showing Necessary for a Hearing on His Motion</u>

The defendant argues that he is entitled to a post-verdict hearing on his motion based on the Alleged Juror's allegations in the VICE News Article.   <u>See</u> Def. Mot. at 3-4, 13-25.   In particular, he seeks an evidentiary hearing regarding the allegations that (1) members of the jury viewed certain media coverage about the defendant, (2) members of the jury lied to the Court about such media exposure when questioned during trial and (3) members of the jury lied to the Court about their intent to follow the Court's instructions during <u>voir</u> <u>dire</u>. For the reasons discussed below, these allegations do not warrant a post-verdict hearing.

A.   <u>Legal Standard</u>

As the Supreme Court has noted, sound public policy strongly disfavors post-verdict evidentiary hearings with juror testimony:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.   Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.   If evidence thus secured could be thus used, the result would be to make what

> was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

Tanner, 483 U.S. at 119-120 (internal quotation marks omitted).  "There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior."  Id. at 120.  "It is not at all clear, however, that the jury system could survive such efforts to perfect it."  Id.  "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process."  Id.  "Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct."  Id.; see Baker, 899 F.3d at 131 (stating that public policy against post-verdict hearings avoids "subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts" (internal quotation marks omitted)).

In light of these "evil consequences likely to result from post-verdict inquiries," Baker, 899 F.3d at 131 (internal quotation marks omitted), post-verdict hearings "should be avoided whenever possible," United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotation marks omitted).  A court should be "reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences."  Id. (internal quotation marks omitted).  "[A]lthough judges are sometimes tempted to order hearings 'to put matters to rest even if not strictly required' in a simple effort

to ensure fairness, there are often 'compelling reasons not to hold a hearing involving the recalling of discharged jurors.'" United States v. Fumo, 639 F. Supp. 2d 544, 552 (E.D. Pa. 2009), aff'd, 655 F.3d 288 (3d Cir. 2011) (quoting United States v. Gilsenan, 949 F.2d 90, 97 (3d Cir. 1991)).   A district court should be particularly cautious in authorizing post-trial questioning where, as here, the jury was anonymous during trial.   See Ida v. United States, 191 F. Supp. 2d 426, 436 (S.D.N.Y. 2002) ("Moreover, the fact that this was an anonymous jury is entitled to consideration in the balance.   The purpose of an anonymous jury in this case was to prevent jury tampering, juror harassment and intimidation.").

Thus, "[t]he standard for conducting a post-verdict jury inquiry is demanding." United States v. Yeagley, 706 F. Supp. 2d 431, 433 (S.D.N.Y. 2010) (alterations and internal quotation marks omitted).   "[A] post-verdict inquiry into allegations of such misconduct is only required when there is clear, strong, substantial and incontrovertible evidence . . . that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant."   Baker, 899 F.3d at 130 (alteration in original; internal quotation marks omitted). "Allegations of impropriety must be concrete allegations of inappropriate conduct that constitute competent and relevant evidence, though they need not be irrebuttable because if the allegations were conclusive, there would be no need for a hearing."   Id. (alteration and internal quotation marks omitted).   "The gravity of granting such a request should not be underestimated, however, because even a post-verdict evidentiary hearing raises serious questions."   Ianniello, 866 F.2d at 543.   "The duty to investigate arises only when the party alleging the misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality."   Id. (internal quotation marks omitted).   The Second Circuit

has "consistently refused to allow a defendant to investigate jurors merely to conduct a fishing expedition." Id. (internal quotation marks omitted).

The Second Circuit reviews a district court's handling of alleged juror misconduct and its decision to deny a defendant's request for a post-verdict hearing only for abuse of discretion. Baker, 899 F.3d at 130; Farhane, 634 F.3d at 168. In making these determinations, the Second Circuit "accord[s] the district court broad flexibility, mindful that addressing juror misconduct always present[s] a delicate and complex task." Farhane, 634 F.3d at 168 (internal quotation marks omitted). "This is because the trial judge is in a unique position to ascertain an appropriate remedy, having the privilege of continuous observation of the jury in court." United States v. Peterson, 385 F.3d 127, 134 (2d Cir. 2004) (internal quotation marks omitted). Indeed, the Second Circuit has "recognize[d] that the district court is in the best position to sense the atmosphere of the courtroom as no appellate court can on a printed record." Farhane, 634 F.3d at 168 (internal quotation marks omitted).

In accordance with this strict standard for a post-verdict evidentiary hearing, and as discussed at greater length below, district courts routinely deny defense requests for such hearings. See, e.g., Baker, 899 F.3d at 131 (affirming district court decision to deny post-verdict hearing following juror's email to defense counsel alleging juror misconduct); Yeagley, 706 F. Supp. 2d at 435 (denying hearing based on "vague and conclusory" allegations of juror misconduct in juror letter); United States v. Bin Laden, No. S7R 98CR1023KTD, 2005 WL 287404, at *2-3 (S.D.N.Y. Feb. 7, 2005), aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93 (2d Cir. 2008) (denying evidentiary hearing request based on post-verdict media interviews of jurors); Ida, 191 F. Supp. 2d at 430-36 (denying hearing

and interview of anonymous jurors based on third-party affidavit recounting alleged conversation with anonymous juror); United States v. Lipari, No. CRIM. 92-164, 1995 WL 84221, at *8 (D.N.J. Feb. 24, 1995), aff'd, 70 F.3d 1258 (3d Cir. 1995) (denying evidentiary hearing request based on post-verdict media interviews of jurors).

B.   The Allegations in the VICE News Article Do Not Meet the Demanding Standard for a Hearing

The defendant claims that the Alleged Juror's allegations in the VICE News Article are "presumptively accurate, credible and reliable."  Def. Mot. at 2.  Not so.  To the contrary, on its face, the VICE News Article raises serious concerns about the reliability of the allegations contained therein.   When weighed against the record in this case—which materially contradicts those allegations in several respects—the allegations cannot be credited.   Thus, the defendant cannot make the required showing for a hearing on this motion.

i.   The Allegations in the VICE News Article Are Not Competent Evidence

Standing alone, the VICE News Article has numerous deficiencies that should preclude the Court from considering it "competent" evidence that could justify a hearing. Baker, 899 F.3d at 130 (internal quotation marks omitted).   In particular, the allegations in the VICE News Article (1) consist of unsworn hearsay and double hearsay, (2) are anonymous, (3) were not raised to the Court during trial, despite ample opportunity to do so, (4) were made during an inquiry not conducted under court supervision and (5) are vague, conclusory and uncorroborated.   Based solely on these evidentiary deficiencies, the Court should conclude that the VICE News Article does not meet the standard for a post-verdict hearing.

The defendant vainly attempts to equate the VICE News Article with a juror affidavit sworn under penalty of perjury.   See Def. Mot. at 13-14 & n.10.   But it is not a sworn

juror affidavit.  It is an online newspaper article.  "A newspaper article is, by its nature, a mixture of hearsay and journalistic opinion."  Lipari, 1995 WL 84221, at *7.  While reporters have a "duty to collect and accurately set forth statements of interviewees," their "standards of reliability are too far removed from those typically required in this Court for a newspaper article to be given much evidentiary weight."  Id.  "[A]n unsworn snippet of hearsay within a newspaper article[] is far less substantial than the sworn affidavits present in cases where evidentiary hearings have been ordered."  Bin Laden, 2005 WL 287404, at *2.  Here, the VICE News Article intersperses journalistic commentary with (1) unsworn hearsay statements made by the Alleged Juror to the reporter and (2) unsworn double-hearsay statements supposedly made by other members of the jury to the Alleged Juror and then relayed from the Alleged Juror to the reporter.  See generally Ex. A.

            Courts have repeatedly concluded that this type of second- and third-hand information does not meet the rigorous standard for a post-verdict hearing.  See, e.g., Fumo, 639 F. Supp. 2d at 552 (concluding that defense counsel's "double hearsay" affidavit, which recounted reporter's interviews with jurors, did not meet standard for post-verdict hearing); United States v. Sattar, 395 F. Supp. 2d 66, 77-78 (S.D.N.Y. 2005), aff'd sub nom. United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) ("Lynne Stewart") (concluding that hearsay and double hearsay allegations did not warrant hearing); Busch ex rel. Estate of Busch v. City of New York, 224 F.R.D. 81, 97-98 (E.D.N.Y. 2004) (noting that trial court may deny claims of juror misconduct on "sole ground that the only proffer in support thereof" is "hearsay allegations"); Lipari, 2005 WL 287404, at *7 (newspaper article recounting juror statements "would fall short even of a much less rigorous standard than 'clear, strong, substantial and

incontrovertible' evidence"); United States v. Abcasis, 811 F.Supp. 828, 836 (holding that "frail and ambiguous showing" of "attorney affidavits based on hearsay allegations" can "hardly meet such a stringent requirement" (internal quotation marks omitted)).   Such hearsay allegations are not "competent evidence."   Daniels v. Hollins, No. CV-02-4495 (FB)(LB), 2006 WL 47412, at *8 (E.D.N.Y. Jan. 9, 2006) (denying post-verdict hearing and contrasting with cases involving "affidavits by juror or other witnesses who could testify about particular juror misconduct that they had directly witnessed").[15]

Not only are the unsworn allegations in the VICE News Article hearsay and double hearsay, they are also completely anonymous.   The VICE News Article identifies neither the Alleged Juror, nor the other jurors to whom the Alleged Juror attributes statements. It is not even clear from the VICE News Article whether the Alleged Juror was a member of the main jury or an alternate juror.[16]   The anonymity of these unsworn hearsay allegations further undercuts their reliability, and courts have refused to rely on such allegations to grant a hearing.   See, e.g., United States v. Mendez, 440 Fed. Appx. 906, 911-12 (11th Cir. 2011) (summary order) (affirming denial of hearing based on anonymous second-hand information);

---

[15] See also, e.g., 31A Corpus Juris Secondum Evidence § 4 ("'Competent evidence' is evidence that is both admissible and that tends to establish a fact at issue.   The term has also been used and construed as synonymous with 'properly receivable' or 'relevant.'   However, note that evidence may be logically relevant and yet inadmissible because not competent, that is, because it is not the character of proof that the law permits in the particular case.").

[16] In this regard, it is notable that the Alleged Juror claims to know both what was happening in the room in which the main jury was deliberating and the separate room in which the alternates were held during those deliberations.   See Ex. A at 5.   It therefore is questionable whether the Alleged Juror was, in fact, part of the deliberations in this case and, more generally, what allegations the Alleged Juror is making based on first-hand observations.

42

United States v. Caldwell, 776 F.2d 989, 999 (11th Cir. 1985) ("[T]he anonymity of the call in our minds simply creates no burden to investigate."); United States v. Stewart, 317 F. Supp. 2d 426, 429 (S.D.N.Y. 2004) ("Martha Stewart I") (denying hearing based on anonymous call from juror to defense attorney); Martha Stewart II, 317 F. Supp. 2d at 443 (denying hearing based on anonymous call to defense attorney and stating that "[g]ossip and anonymous tips do not satisfy [post-verdict hearing] standard"); Busch, 224 F.R.D. at 97 (rejecting hearing based on anonymous allegation); United States v. Gotti, No. CR-90-1051(S-1), 1992 WL 12146729, at *3 (E.D.N.Y. June 23, 1992), aff'd, 166 F.3d 1202 (2d Cir. 1998) (denying hearing based on anonymous letter defense counsel contended that juror sent, stating that "anonymous letter falls short by a very wide margin" of hearing standard).   "To require any investigation in the face of such unreliable accusations would place an imposing burden on the district court . . . , when the court has no basis whatsoever to adjudge the reliability of the initial accusation."   Caldwell, 776 F.2d at 999.

Notably, while the jury in this case was anonymous during trial for safety reasons, the Alleged Juror's allegations need not have been.   At any point prior to the verdict, the Alleged Juror had the ability to raise these concerns with the Court in-person—an opportunity that he or she spurned.   Indeed, on three occasions, jurors pursued this option, raising concerns directly with the Court.   See Tr. 1360:4-8 ██████████████████████ ███████████████████████████████████ Tr.  3408:2-3409:9 ███ ██████████████████████████████████████████ ); Tr. 5325:5-13 (juror notified Court she had inadvertently been informed by son of news media about case). Moreover, on two different occasions, the Court directly questioned the jurors about their

exposure to media articles that are the subject of the Alleged Juror's allegations in the VICE News Article.   See Tr. 6947:5-6948:14 (Feb. 4, 2019 colloquy); Jan 14 Tr. 3:13-4:4. (Jan. 14, 2019 colloquy).   And, at the defendant's request, the Court polled the jury after reading the verdict.   Yet, despite being well aware of his or her ability to raise issues directly with the Court, the Alleged Juror did not do so at any point during trial.

While the defendant appears to view the Alleged Juror's decision to approach a media outlet, as opposed to the Court, favorably, see Def. Mot. at 3-4, the law does not.   See, e.g., Yeagley, 706 F. Supp. 2d at 435.   Instead, the law treats as suspect allegations raised for the first time following trial, despite many opportunities to raise them with the Court prior to verdict.   Id.   Where a juror had "several opportunities to communicate directly with the court regarding any potential improprieties, but failed to do so," the juror's failure to take advantage of those opportunities indicates that later allegations "are post hoc efforts caused by dissatisfaction that do not require further post-verdict inquiry."   Lynne Stewart, 590 F.3d at 133-34 (internal quotation marks omitted); see, e.g., Jacobson v. Henderson, 765 F.2d 12, 15 (2d Cir. 1985) ("[H]ad there been any undue internal influence or any outside influence, the jury had the clear opportunity to bring this to the trial judge's attention."); Yeagley, 706 F. Supp. 2d at 435 (concluding that juror's failure to "rais[e] any concerns about his/her fellow juror's conduct during deliberations . . . undercuts Defendant's request for a hearing, let alone any claim that the verdict is invalid").

The reason for the law's skepticism of post-verdict allegations is plain.   Jurors' motivations and views may change after trial, and they may speak out due to unhappiness with the verdict or a hope for some pecuniary gain or a simple desire for notoriety.   See United

States v. Moten, 582 F.2d 654, 665 (2d Cir. 1978) ("Human nature is such that some jurors, instead of feeling harassed by post-trial interviewing, might rather enjoy it, particularly when it involves the disclosure of secrets or provides an opportunity to express misgivings and lingering doubts."). While the Alleged Juror's motivations are unclear, the VICE News Article's "tell-all," confessional style raises concerns that the Alleged Juror gave the interview—as the defendant suggests—"because he craved future literary or commercial engagements." Def. Mot. at 18. Such a motivation could incentivize the Alleged Juror to exaggerate or fabricate statements or to mischaracterize or overstate events to tell a good story that could sell. The Court should treat such claims with "great caution to avoid giving to the secret thought of one the power to disturb the expressed conclusions of twelve." Munafo v. Metro. Transp. Auth., 381 F.3d 99, 108 (2d Cir. 2004) (alteration and internal quotation marks omitted).

Given these concerns, the Second Circuit has held that a district court should strictly supervise any post-verdict juror questioning. See Sattar, 395 F. Supp. 2d at 75.

> Such a rule is necessary because . . . a serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts.

Id. (internal quotation marks omitted). While this rule applies only to the parties, and does not bar the press from interviewing jurors following trial, the same concerns that animate this rule against unsupervised interviews by the parties are present with respect to unsupervised press interviews. Here, the Court did not supervise questioning of the Alleged Juror that yielded the allegations at issue; rather, a reporter questioned the Alleged Juror in an unsupervised two-hour

video chat in the days following the verdict.   Coupled with the Alleged Juror's potential motivations in giving the interview, such unsupervised questioning further exacerbates the risk that his or her allegations are not accurate.

The vague, conclusory and uncorroborated nature of the allegations also underscores this concern.   The Alleged Juror claims, "[S]everal people followed this [media] coverage, which included reporting on evidence that Judge Cogan ordered withheld from the jury at the request of the defense and prosecution."   Ex. A at 7.   But the Alleged Juror does not identify which other jurors followed such coverage, how he or she knew the other jurors followed the coverage or how he or she knew that the coverage observed by other jurors included information ruled inadmissible by the Court.   The Alleged Juror also "said at least seven people on the jury were aware of a story published Jan. 12 by the New York Post about an alleged affair between Lichtman and one of his clients."   Id. at 8.   Yet, the Alleged Juror does not indicate which jurors knew of the story or explain how he or she became aware that those seven people knew of the article.   Similarly, the Alleged Juror claims, "'[F]or sure' five jurors who were involved in the deliberations, plus two of the alternates, had at least heard about the child rape allegations against El Chapo."   Id.   Again, though, the Alleged Juror does not provide any detail or context explaining which other jurors knew of the media coverage or how the Alleged Juror became aware that the other jurors knew of it; the Alleged Juror simply claims that he or she knew it "for sure."   Id.   Finally, the Alleged Juror claims that he or she told "other jurors" that, "if you saw what happened in the news, just make sure that the judge is coming in and he's gonna ask us, so keep a straight face."   Id. (internal quotation marks omitted).   The Alleged Juror further claims, when the Judge came into the room, "[W]e all

46

denied it, obviously." Id. (internal quotation marks omitted).  The Alleged Juror, however, does not indicate with how many other jurors he or she spoke; which of them, if any, knew of the media coverage at the time the Court questioned them, as opposed to learning of it after that questioning; or why these other jurors would agree to lie to the Court.[17]

Critically, as the VICE News Article acknowledges, it could not corroborate these vague and conclusory allegations.  Id. at 3 ("The juror reached out to another juror at the request of VICE News but said nobody else wanted to speak on the record. . . . [P]arts of this juror's account could not be independently verified.").  Because no other jurors agreed to be interviewed, the reporter could not have corroborated any of the Alleged Juror's purported conversations with other members of the jury.

Such vague, conclusory and uncorroborated allegations are insufficient to satisfy the strict standard for a post-verdict hearing, which requires "specific and detailed factual assertions."  King v. United States, 576 F.2d 432, 438 (2d Cir. 1978) (internal quotation marks omitted); see, e.g., Baker, 899 F.3d at 132 (affirming denial of hearing request, noting that juror's email did not convey content of alleged improper discussions with other jurors); Yeagley, 706 F. Supp. 2d at 435 (rejecting "vague and conclusory" allegations in juror letter as basis for hearing); Bin Laden, 2005 WL 287404, at *2 (concluding that "vague" allegation from juror interview in newspaper article did warrant hearing); Lipari, 1995 WL 84221, at *7 (denying hearing, in part, because other jurors did not corroborate juror allegations in article).

---

[17] As discussed below, see Argument Section I.B.ii. infra, the Alleged Juror's account is also at odds with what actually happened—two jurors did, in fact, inform the Court that the jurors glimpsed headlines of the coverage, but did not look/read beyond that.

In this regard, <u>King</u> is instructive.   There, during a weekend recess of trial, the defendant went to the house of the lead FBI agent on his case, "walked to a front window, punched out the window and threw into the house a hand grenade," which, fortunately, did not explode.   576 F.2d at 434-35.   The FBI and the defendant then engaged in a shootout, and the defendant fled by car to the "parking lot of the Ramada Inn, the very place where the jury had been sequestered," where he engaged in another shootout with the FBI and was seriously wounded.   <u>Id.</u> at 435.   "There was extensive publicity about this incident."   <u>Id.</u>   The following Monday, the trial proceeded in the absence of the defendant, who was in the hospital, after the Court noted that the jury had been sequestered and had been instructed not to view media.   <u>Id.</u>   Following conviction, defense counsel submitted a form affidavit to the Court, which a defense investigator prepared and, according to the defense, a juror signed.   <u>Id.</u> at 438. On the affidavit, the juror checked boxes indicating that she had read articles about the case, watched news about the case and knew why the defendant was in the hospital.   <u>Id.</u>   In affirming the conviction, the Second Circuit concluded that "this weakly authenticated, vague, and speculative material as to one juror" fell "far short" of the standard for a post-verdict hearing.   <u>Id.</u>   As in <u>King</u>, here, the Alleged Juror's vague, conclusory and uncorroborated allegations of juror media exposure are insufficient.[18]

---

[18] The defendant's reliance on <u>Moten</u> in support of his motion for a hearing is misplaced.   <u>See</u> Def. Mot. at 12-13.   In that "unusual" case, it was "clear that a very serious irregularity occurred during the trial."   582 F.2d at 666.   Specifically, "a juror named Keno approached the sister of one of the defendants, one Intersimone, told her that he had a message for Intersimone, and insisted that Intersimone meet him for lunch."   <u>Ida</u>, 191 F. Supp. 2d at 433.   "Intersimone's lawyer reported this to the trial judge and the AUSA," which resulted in an <u>in camera</u> examination of and subsequent dismissal of Keno.   <u>Id.</u>   The government later opened a jury tampering investigation and arrested Keno.   582 F.2d at 658.   Thus, the basis for the post-verdict inquiry into influence on the other jurors in that case was "competent

For all the reasons above, the allegations in the VICE News Article, on their face, do not justify a hearing on this motion.    The Court should deny the hearing on this basis alone.

ii.    The Allegations in the VICE News Article Contradict the Record

The Court, however, need not evaluate the VICE News Article in a vacuum. Rather, it should weigh the article against the record in this case, namely, the Court's detailed observations of and findings of fact with respect to the jury during the course of the trial.    As the Second Circuit has held:

> Where, as here, the incident was explored before submission to the jury, the trial judge's initial appraisal of the jurors to render a fair verdict in light of the objective facts should stand unless it is manifestly unreasonable . . . or significant new objective facts are developed.

Moten, 582 F.2d at 660.    Notably, here, the Court made many of these factual findings because it meticulously followed the procedures the Second Circuit set forth in Gaggi for addressing potential juror exposure to media coverage.    See Gaggi, 811 F.2d at 51 ("Absent a clear abuse of the trial court's discretion, its finding that the jury was impartial should be upheld.").    It is "appropriate for the [Court] to draw upon [its] personal knowledge and recollection in considering the factual allegations . . . that related to events that occurred in [its] presence." Tanner, 483 U.S. at 125-26 (citation and internal quotation marks omitted; alteration in original); see Gotti, 1992 WL 12146729, at *10 ("Drawing upon my personal knowledge and recollection in considering the factual allegations pertaining to the matter in issue is entirely

---

evidence of an improper contact between at least one juror and the defense camp."   191 F. Supp. 2d at 433.    There is nothing of the sort here.    See id. at 432-36 (distinguishing Moten).

proper.").   The record developed by the Court pursuant to <u>Gaggi</u> squarely contradicts the VICE News Article is several important respects.

First, the Alleged Juror claims that numerous members of jury disregarded the Court's instructions to stay away from media about the case—an instruction the Court gave to the jury in its preliminary and final instructions and everyday (at least 45 times) during trial. <u>See</u> Ex. A at 3.   This allegation thus contradicts repeated Court findings that the jury was heeding its instructions.   <u>See, e.g.</u>, Tr. 5016:2-3 ("[T]hey have been obeying the instructions to stay away from the media."); Tr. 6946:10-11 (concluding that jury "has [been fastidiously] avoiding any coverage of the case"); Tr. 6949:25-6950:1 ("[T]his is a cohesive jury.   They are paying attention to these instructions.").   The Court based its findings upon the Court's observations of the jury's diligence and attention during trial, its colloquies with the jurors, the Court's daily instructions to the jurors and the fact that a juror self-reported accidental exposure to media coverage to the Court.   <u>See, e.g.</u>, Tr. 6944:14-6946:13.

Second, the Alleged Juror asserts that several members of the jury viewed media coverage about a cooperating witness's allegation that the defendant drugged and raped underage girls.   <u>See</u> Ex. A at 8.   The Court, however, directly questioned members of the jury about this article during the February 4, 2019 colloquy.   It unequivocally concluded based on this colloquy that all but two of the jurors were unaware of the coverage.   The Court "looked at each of them," gave them "multiple chances to answer the question," "asked open-ended questions," and "drew them out, really looking at each one on individual basis as much as I could."   Tr. 6949:4-11.   Based on that colloquy, the Court concluded, "I could not be more confident that they have been following my direction."   Tr. 6949:5-6.

Third, the Alleged Juror claims that all the jurors who had viewed the media coverage at issue during the February 4 colloquy falsely denied seeing it to the Court.   Ex. A at 8.   But that allegation is inconsistent with the record.   As noted above, two jurors did, in fact, come forward during the February 4 colloquy and acknowledge that they had seen certain media coverage during the prior weekend.   The Court then individually questioned those jurors in the presence of the parties.   Following the individual questioning, the parties agreed that there was no basis to strike the jurors, and the Court concluded, ████████████████████  ████████████████████   Tr. 6954:13-15.

Fourth, the Alleged Juror asserts that jurors agreed to lie to the Court prior to the February 4 colloquy.   See Ex. A at 8.   The Alleged Juror claims that he or she lied to the Court because he or she thought the jurors "would get arrested" or "held in contempt" for viewing the media, and the Alleged Juror did not want to "rat out my fellow jurors."   Id.   These claims simply do not add up.   The idea that "all the jurors apparently got together and hatched a plan to falsely claim ignorance," Def. Mot. at 16, defies belief here.   On three separate occasions during trial, jurors brought potential issues to the Court's attention.   ████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████, and the third time a juror self-reported accidental media exposure.   These incidents demonstrate that members of the jury took the Court's instructions and their obligations quite seriously.   Had there been an open discussion among all the jurors of lying to the Court—as the defense claims—those jurors would have reported it to the Court.   See Tanner, 483 U.S. at 127

51

("[J]urors are observable by each other, and may report inappropriate juror behavior to the court before they render a verdict." (emphasis in original)).

Equally implausible on this record is the Alleged Juror's claim that the risk of getting in trouble deterred him or her from coming forward.   During the January 14 colloquy, the Court explained the purpose of the colloquy to the jury as follows: "I need to know whether anybody saw that article, despite my instruction to stay away from that stuff, and if anybody did see it, I need to make sure that they still believe they can give the defendant a fair trial and that article isn't going to influence them in any way."   Jan. 14. Tr. 3:13-4:4.   The Court did not indicate that any juror would be in trouble or risked losing a seat on the jury because he or she viewed media about the case.   Rather, the Court indicated that it sought only to determine whether any juror saw such coverage and, if so, whether they could remain impartial.   Later, during the February 4 colloquy, the Court explicitly stated that ███████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████    ███████████████████████████████████

Moreover, two jurors did raise their hands in front of the other jurors; the Court then individually questioned them about their media exposure, and they did not get in any trouble or lose their seats on jury as a result of coming forward.   Thus, the Court made it clear to the members of the jury that they could disclose any media exposure without getting in trouble.

Indeed, the Alleged Juror's decision to give an interview to a media outlet about his or her supposed failure to follow the Court's instructions casts further doubt on the claim that he or she did not notify the Court to avoid getting in trouble.   If the Alleged Juror, in fact, had this fear, it is doubtful that the Alleged Juror would have given an interview about his or her supposed rule breaking—an interview destined for publication to a worldwide audience.

Considering these material contradictions, especially when taken in conjunction with the evidentiary deficiencies in the VICE News Article discussed above, see Argument Section I.B.i. supra, the Alleged Juror's allegations do not qualify as the type of "objective facts" that would justify the Court's departure from its "initial appraisal" of the jury made pursuant to Gaggi.   Moten, 582 F.2d at 660.   The Court should adhere to its detailed and repeated findings that the jury followed its instructions, and it should decline to revisit those determinations in a post-verdict hearing.   See Sattar, 395 F. Supp. 2d at 78 (denying hearing where juror's "statements of outside influence [were] internally inconsistent"); Gotti, 1992 WL 12146729, at *3 (denying hearing where record contradicted assertions of misconduct made in anonymous letter).   The allegations in the VICE News Article are far too suspect to warrant "haul[ing]" the jurors in this case back into court for questioning, especially in light of the safeguards the Court put in place during trial to shield them from tampering, harassment and intimidation.   Ida, 191 F. Supp. 2d at 436-47.   "[T]o permit an inquiry based on such scant evidence in a case that continues to receive an unprecedented level of publicity would do serious damage to the policies that justify limitations on postverdict juror scrutiny."   Martha

Stewart II, 317 F. Supp. 2d at 443.   The Court should therefore deny the defendant's motion

without a hearing.[19]

II.   Even Assuming the Allegations in the VICE News Article are True, the Defendant is
Not Entitled to a New Trial

For the reasons set forth above, the Court should conclude that the VICE News

Article does not meet the demanding standard for a post-verdict evidentiary hearing and deny

the motion summarily.   See Argument Section I. supra.   The Court, however, need not resolve

that issue on this motion.   Instead, rather than addressing the defendant's request for a hearing,

the Court may assume that the defendant would establish the truth of the allegations in the VICE

News Article at a hearing and proceed directly to the defendant's argument that he has suffered

the requisite prejudice to justify a new trial.   See, e.g., Loliscio, 263 F.3d at 185; Stewart, 433

F.3d 273, 306 (2d Cir. 2006) ("Martha Stewart III").   Here, even assuming arguendo that the

Alleged Juror's claims in the VICE News Article are true, the defendant's motion still fails,

because he cannot show the necessary prejudice to justify a new trial based on (1) the jurors'

alleged media exposure or (2) the jurors' alleged lies to the Court.

A.   The Alleged Media Exposure Does Not Warrant a New Trial

The defendant argues that the Alleged Jurors' claim that some members of jury

viewed certain media justifies a new trial.   See Def. Mot. at 13-16.   "Because the

determination of whether a [defendant's] Sixth Amendment rights have been violated by the

jury's consideration of extra-record information requires a determination of whether the extra-

record information had a prejudicial effect on the verdict," the Second Circuit has instructed

---

[19] If, however, the Court grants the defendant's request for a hearing, the
government will separately submit a brief regarding the parameters of such a hearing.

54

that courts should "typically proceed immediately to the harmless error determination, assuming without deciding that a Sixth Amendment violation has occurred."   Loliscio, 263 F.3d at 185; accord Daniels, 2006 WL 47412, at *8 (citing Loliscio, and stating that court should assume Sixth Amendment violation "to avoid the need for a hearing").   Here, assuming that the Alleged Juror's claims that certain members of the jury viewed media coverage about the case are true, such media exposure was harmless.   Thus, the defendant cannot show that he was prejudiced based on that alleged media exposure.

      i.    Legal Standard

"[N]ot every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial."   United States v. Schwarz, 283 F.3d 76, 99 (2d Cir. 2002).   "Many such instances do not."   Id.; see Gaggi, 811 F.2d at 52 ("Obviously, a reversal is not required in every case in which a news story containing facts inadmissible in evidence reaches the jury." (citation and internal quotation marks omitted)).

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.  Were that the rule, few trials would be constitutionally acceptable . . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Schwarz, 283 F.3d at 99 (citing United States v. Olano, 507 U.S. 725, 738 (1993)) (internal quotation marks omitted; alterations in original).   "It is the impartiality of the jurors—not the quantum of publicity—that determines whether the trial proceedings may be fairly conducted." Gaggi, 811 F.2d at 52.

Thus, "[w]hile the law presumes prejudice from a jury's exposure to extra-record evidence, that presumption may be rebutted by a showing that the extra-record information was harmless."   Farhane, 634 F.3d at 168-69 (citations and internal quotation marks omitted). "The necessary inquiry is objective, and focuses on two factors: (1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury."   Id. (citations and internal quotation marks omitted).   "The effect inquiry properly considers the entire record, in making an objective assessment of possible prejudice."   Id. (internal quotation marks omitted).   "This includes circumstances surrounding the juror's exposure to information."   Id. "But a court may not reach further to inquire into the subjective effect of the information on jurors' mental processes or on the jury's deliberations."   Id.   "This limitation, memorialized in Fed. R. Evid. 606(b), is grounded in the deeply rooted view that the secrecy of deliberations is essential to the proper functioning of juries."   Id. (internal quotation marks omitted).[20]

In evaluating the nature of the extraneous information viewed by the jury, courts have considered, inter alia, whether that information (1) related to the charged crimes, (2) was cumulative of and/or less prejudicial than evidence presented to the jury at trial and (3) the

---

[20] Federal Rule of Evidence 606(b) states, in pertinent part:

(1) Prohibited Testimony or Other Evidence.  During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions.  A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention . . . .

extent of the exposure.   See, e.g., Fumo, 655 F.3d at 307; Farhane, 634 F.3d at 169; Schwarz, 283 F.3d at 99; Loliscio, 263 F.3d at 189; United States v. Lloyd, 269 F.3d 228, 240-43 (3d Cir. 2001); United States v. Weiss, 752 F.2d 777, 782-83 (2d Cir. 1985); United States v. Gigante, 729 F.2d 78, 82 (2d Cir. 1984).

Courts evaluate several factors to probe the potential prejudicial effect from the jury's exposure to extraneous material on a hypothetical juror, including: (1) the court's instructions to the jury, (2) curative action taken by the court, (3) the court's observations of the jury, (4) the length and diligence of deliberations, (5) the structure of the verdict and (6) the strength of the evidence against the defendant.   See, e.g., Fumo, 655 F.3d at 307; Farhane, 634 F.3d at 169-70; Loliscio, 263 F.3d at 189-90; Gaggi, 811 F.2d at 52-53; Weiss, 752 F.2d at 783; Lloyd, 269 F.3d at 240-43; Gigante, 729 F.2d at 82; United States v. Spano, No. 01 CR 348, 2002 WL 31681488, at *3 (N.D. Ill. Nov. 27, 2002), aff'd in part, vacated in part on other grounds, remanded, 421 F.3d 599, 605-06 (7th Cir. 2005).

Several cases applying these principles are instructive here.   For instance, in Gaggi, the district court confronted media coverage related to two deaths that occurred during trial: (1) the murder of the lead-named defendant on the indictment two-and-a-half months into trial and (2) the apparent suicide of one of the government's major cooperating witnesses, who had testified earlier at trial, during deliberations.   811 F.2d at 50-53.   Following the murder of the lead-named defendant, which generated significant publicity for several weeks, the district court took prompt action by questioning jurors regarding their media exposure.   Id. at 51. Although all the jurors had heard of the murder, and six had heard that the murdered defendant had been the head of an organized crime family, the district court ruled—"based in part on the

57

jurors' responses and in part on its own assessment of the jurors' awareness of their responsibilities and obligations—that the jury had not been prejudiced by the media reports." Id. at 52.   In affirming the district court's ruling, the Second Circuit held that the publicity was "collateral in nature," because the murder "did not relate directly to the issues at stake in the ongoing trial" or "the remaining defendants' guilt with respect to the charges against them." Id.   The Second Circuit also noted that the district court "took prompt action to determine the effect of that publicity and gave the jury repeated and cautionary instructions."   Id. at 52-53.

As to the apparent suicide of one of the government's major cooperating witnesses during deliberations, which generated multiple news reports, the district court conducted a general voir dire of the jurors.   Id. at 53.   "In response to the question whether any of them had seen the newspaper that day, the jurors responded by shaking their heads 'no.'" Id.   "The court then emphasized repeatedly that they were to avoid media reports 'at all costs.'" Id.   The district court thus denied the defendants' motion for a mistrial, and their request for voir dire of the jurors individually.   Id.   In affirming, the Second Circuit held that the district court's "general inquiry satisfying itself that no actual jury exposure to prejudicial information had occurred" was sufficient.   Id.   Additionally, the Second Circuit agreed with the district court "that the jury's ability to render an impartial verdict [was] confirmed by the care which it took in its deliberations."   Id.   Specifically, it noted that the length of its deliberations; its numerous requests for "rereadings of testimony, exhibits, stipulations, and instructions" and its complex split verdict "reveal[ed] an impartial and meticulous jury."   Id. It thus saw no reason to revisit the district court's ruling.

Spano addressed the effect of publicity regarding one defendant's "mob ties" on the jury, during the trial of multiple defendants on charges related to an insurance fraud scheme targeting a town in Illinois.  2002 WL 31681488, at *1.  Following the three-month trial in that case, which received "a great deal of media coverage," the press interviewed several jurors, and "articles concerning the interviews were printed in the Chicago Tribune for the two days following the trial."  Id.  In one of the articles, a juror was quoted as saying that he or she was upset that the defendant's "reputed mob connections also came up in the jury room . . . , even though [the judge] had forbidden its mention in court as too prejudicial to the defendants."  Id.

In denying the defendants' motions for a post-verdict evidentiary hearing and a new trial, the district court cited a variety of factors.  Id. at *2-*3.  Assessing the prejudicial effect of the publicity, the court noted, "[a]n important factor is the judge's assessment of the jury itself, based on the jurors' behavior during trial."  Id.  The court concluded that the jury's behavior had been "exemplary" during the three-month trial; there was not a single absent juror, they were attentive and followed the testimony closely, and they took notes.  Id. at *3.  On three separate occasions, jurors reported concerns to the Court, including one incident in which a juror impermissibly brought a book about the mob into the jury room.  Id.  Based on its observations, the court concluded, "[t]his was not a jury that was likely to have been affected by references to prejudicial matters they knew they were not to consider in arriving at their verdict."  Id. at *4.  "On the contrary, they gave ample evidence of their dedication to the task of deciding the case on the basis of the evidence produced in court and nothing else."  Id.  The court then proceeded to assess specifically the nature of the extraneous information discussed during the media report and its potential prejudicial effect.  Id.

The court noted that the allegation in the newspaper article that the defendant's mob connections "came up" was vague; it did not specifically say "when the matter came up during the three-month trial, or in what connection," i.e., whether it came up during deliberations or affected deliberations in any way.   Id.   In any event, though, the court pointed out that the defendant's purported mob connections were "irrelevan[t]" to the charges in the indictment, which bore "heavily on whether any extraneous information about that connection might have had a prejudicial effect upon the jury's verdict."   Id. at *5.   "To conclude that such an effect was likely, one would have to assume that the jury would take an extraneous item that was irrelevant to the charges and use it as a basis for finding guilt."   Id.   "In other words, defendants' theory ha[d] to be that hearing about [the defendant's] mob connection would so inflame the jury that it would cause them to ignore an insufficiency of evidence and find [the defendants] guilty . . . ."   Id.   The court concluded, "[e]verything [it knew] about the attitude and behavior of this jury makes the theory implausible in the extreme."   Id.   The court further noted that the jury was presumed to follow the court's instructions, and the court had "repeatedly admonished [the jury] at the close of trial sessions not to read, watch or listen to anything in the media about the case."   Id. at *6.   It had also instructed the jury that they were not to consider anything seen or heard outside the courtroom during their deliberations.   Id. Finally, the court cited the jury's lengthy deliberations and acquittal of one defendant.   Id. at *8.   These facts demonstrated that the jury did not "ignore[] the requirement of proof beyond a reasonable doubt, ignore[] the court's instructions of law, and [go] outside the evidence to reach an irrational conclusion," basing "its verdict on one irrelevant and extraneous piece of information."   Id.   Thus, the court concluded that there was no reasonable possibility that the

extraneous information prejudiced the defendants.   Id.; see Spano, 421 F.3d at 605-06 (affirming district court, stating that it "did not abuse [its] discretion in concluding that the likelihood that a reference to [defendant's] possible connections to organized crime had polluted the jury's consideration of the case was too slight to warrant hauling the jurors before [it] for an examination").

Lastly, in Fumo, the district court considered the defendant's motions for a hearing and a new trial based on a journalist's interviews with six unnamed jurors following trial.   639 F. Supp. 2d at 547, 551-54.   After denying the defendant's request for a hearing based on the double-hearsay affidavit of defense counsel recounting the jurors' statements to the reporter, the court assumed the truth of the allegations in the affidavit and proceeded to analyze whether the defendant had demonstrated the requisite prejudice for a new trial.   Id. at 553.   Assuming that all the jurors had, as alleged, read improper twitter posts about the trial by another juror, the Court concluded that there was no prejudice, because those posts were "innocuous," given that they were limited to the fact of the juror's service.   Id. at 555-56.   The court then considered the allegation that an unnamed juror had learned of the defendant's prior conviction and the conviction of his associate, facts the court had ruled inadmissible.   Id. at 556-57 & n.11.   As the court had instructed the jury to report any exposure to extraneous influences, assuming the truth of the allegations, "the juror contravened the Court's instructions."   Id. at 556.   The court concluded, nonetheless, that its "obligation at this stage [was] not to discipline alleged juror missteps, but to consider the impact of this information— in the context of the entire trial—in order to discern whether Defendant suffered a prejudicial impact."   Id.

To that end, the court first noted that, "given the complexity of this case, which required five months of courtroom proceedings, over a hundred witnesses, and thousands of documents, any exposure" to the extraneous material "was merely a small part of the entire trial." Id. at 557. The court then stated that the defendant's previous conviction did not relate to the charged crimes and the conviction of his associate had only a "tangential bearing" on a small number of counts at issue. Id. Among other factors, the court also pointed out that the government introduced "more than adequate" evidence of the defendant's guilt and that the court had specifically instructed the jury not to consider any extraneous information. Id. at 558. Accordingly, the court concluded that the extraneous information did not prejudice the defendant. Id.; see Fumo, 655 F.3d at 306-07 (affirming district court); see also Lloyd, 269 F.3d at 240-43 (reversing district court's grant of new trial based on juror's exposure to news story regarding computer virus similar to that at issue during trial).

As discussed below, many of the same factors present in Gaggi, Spano and Fumo are present here. Those factors clearly demonstrate that the defendant did not suffer prejudice because of the alleged media exposure.

ii.   The Nature of the Extraneous Information

The primary focus of the defendant's motion is the news coverage related to a cooperating witness's allegations that the defendant drugged and raped underage girls. See Def. Mot. at 13-16. While those allegations are undoubtedly serious, as this Court has held, they are completely irrelevant to the crimes with which the defendant was charged at trial. See Oct. 25, 2018 Mem. & Order, Dkt. No. 390 at 4 ("Defendant is not charged with rape or any other similar crimes and the evidence is not obviously probative of the existence of the CCE or

another charged crime."); Dkt. No. 403 at 3 (describing cooperating witness's sexual activities with minors as having, at best, "miniscule relevance").   "The most damning type of publicity is that which shows or states that the defendant has committed the crime charged."   Bowers v. Walsh, 277 F. Supp. 2d 208, 220 (W.D.N.Y. 2003).   This is so because the courts condemn "trial by newspaper," whereby the jury has been "exposed to inflammatory reports purportedly establishing defendant's guilt."   Id.   "In general, references to the fact that the defendant has committed other crimes have a less damaging effect," especially where the other crimes are not "similar, or otherwise related to, the charged crime."   Id.; see Lloyd, 269 F.3d at 239 ("[F]or there to be any possibility of prejudice, the extraneous information must relate to one of the elements of the case that was decided against the party moving for a new trial.").   As the cooperating witness's allegations against the defendant did not relate to the charged crimes, they did not cause prejudice to the defendant.   See, e.g., Gaggi, 811 F.2d at 52; Fumo, 639 F. Supp. 2d at 557; Martha Stewart I, 317 F. Supp. 2d at 430 ("[T]his information is completely irrelevant to the charges against defendants, so it would not have led a typical jury to draw impermissible conclusions about guilt."); Spano, 2002 WL 31681488, at *5.[21]

Moreover, in this case, the jury did not view media coverage about the defendant's conviction for another crime.   Rather, here, the coverage was about unproven allegations that the Court had excluded from trial.   Many media articles also carried defense counsel's statement that the defendant "denie[d] the allegations," which "lack[ed] any

_____

[21] Compare Schwarz, 283 F.3d at 80, 99 (concluding extraneous material not harmless because it pertained to "co-defendant's admission of wrongdoing" to charged crimes that could be "powerful evidence against a remaining defendant," as well as a statement that "significantly bolstered the testimony" of government witness).

corroboration and were deemed too prejudicial and unreliable to be admitted at trial."[22]   In addition, by the time of the media coverage, the jury had already observed defense counsel's extensive efforts to discredit the cooperating witness in question, Alexander Cifuentes Villa, through extensive cross-examination and closing argument attacking his credibility at length. Thus, these unproven and excluded allegations are "presumptively of a type capable of being disregarded by the jury as not being evidence, even if they were read."   United States v. Simone, No. Cr. 91-569, 1993 WL 106478, at *3 (E.D. Pa. March 31, 1993) (concluding that article regarding sealed court order excluding certain evidence as unfairly prejudicial was harmless); see Fumo, 639 F. Supp. 2d at 557 ("The former evidence had no bearing on any element of the Government's case, particularly in light of the fact that [the defendant] was prosecuted and ultimately acquitted.").

The media coverage at issue also was prejudicial to the government, which further offsets any claimed prejudice by the defendant.   The media coverage included Cifuentes Villa's acknowledgment that he participated in sexual relations with underage girls along with the defendant, which would have cast him in a negative light based on the excluded allegations, not long after he testified at trial.[23]   Moreover, defense counsel publicly rebutted the allegations by wrongly claiming to the media that the allegations "were deemed too . . . unreliable to be admitted at trial."[24]   Because the government did not respond to this incorrect claim, the media coverage left the public with the false impression that the Court had

---

[22] See Feuer, supra note 10.

[23] See Feuer, supra note 10.

[24] See McCoy, supra note 11.

excluded the allegations for being, in part, unreliable.   A juror exposed to both the allegations and the defense counsel's misleading insinuation likely was left to speculate whether they had heard other questionable allegations from the government's witnesses.

Furthermore, at this trial, where the government presented the jury with evidence regarding horrific crimes committed by the defendant, the allegations carried by the media were not likely to so inflame the jury that it would disregard the evidence and the Court's instructions. See Tr. 6940:1-14 ████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████

Specifically, the government presented evidence at trial that the defendant led the prosecution of multiple narco-wars that resulted in the deaths of hundreds of people, including innocent bystanders, that he ordered his rivals tortured and murdered, that he ordered the murder of his own family members and that he personally, viciously tortured and murdered several of his rivals, one of whom he had buried alive.   Because that evidence was equally as horrific as, if not more horrific than, the allegations of sexual relations with underage girls against the defendant, those allegations were harmless.   See Gigante, 729 F.2d at 82 (holding jurors exposure to media harmless where "jury had already heard considerable evidence to the effect that [the defendant] was a member of organized crime and was prone to violence"); cf. United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) (holding evidence admissible under Fed. R. Evid. 403 where it "did not involve conduct any more sensational or disturbing than the crimes with which [defendants were] charged" (internal quotation marks omitted)).

The jurors' very limited discussion of the allegations at issue reinforces the conclusion that their exposure to those allegations was harmless.   The Alleged Juror stated in the VICE News Article:

> We did talk about it.   Jurors were like, you know, "If it was true, it was obviously disgusting, you know, totally wrong.   But if it's not true, whatever, it's not true. . . . That didn't change nobody's mind for sure.   We weren't really hung up on that.   It was just like a five-minute talk and that's it, no more talking about that.

Ex. A at 8.   It is not clear whether the Alleged Juror's conversation took place during deliberations or not.   But assuming it did, if credited, the Alleged Juror's statement indicates (1) that members of the jury did not assume that the allegations were true and (2) spent only five minutes discussing the allegations and then moved on.   Thus, the Alleged Juror's "objective statements about how [he or she] heard . . . the prejudicial information not admitted into evidence, and the circumstances surrounding introduction of that information, clearly indicate that the extent to which the jur[y] discussed and considered [the information] was quite negligible."   Loliscio, 263 F.3d at 189 (citations and internal quotation marks omitted; second and third alteration in original); see Fumo, 655 F.3d at 307 (holding no prejudice where juror was exposed to only "brief verbal summary of excluded evidence"); Lloyd, 269 F.3d at 240 (finding no prejudice and stating article was only "mentioned" during deliberations (internal quotation marks omitted)); United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) (finding no prejudice and noting that jurors mentioned "main subject of the article . . . only casually and [it] was passed-off lightly").

As for other media coverage related to the defendant that the jury may have seen during trial, it is unclear whether the defendant contends that such material was of such a

prejudicial nature that it warrants a new trial.   See Def. Mot. at 13-16.   Insofar as he makes

that argument, it is meritless.   Even if viewed by the jury, the media coverage of Mr.

Lichtman's affair was not related to the defendant, let alone the charged crimes.   There is no

indication that the jury spoke about that story—which occurred nearly a month prior to the end

of trial—during deliberations.   Exposure to such an article would not warrant a new trial.   See,

e.g., Martha Stewart I, 317 F. Supp. 2d at 430.[25]

As to other unspecified news coverage that members of the jury may have seen,

most of the news coverage during trial simply summarized events that happened in the

courtroom.[26]   To the extent there was news commentary, many instances were critical of the

government's prosecution or witnesses and thus favorable to the defendant.[27]   Such news

---

[25] Moreover, if credited, the Alleged Juror's statements show that the jury
carefully weighed Mr. Lichtman's attacks on the government's case during deliberations.   See
note 26 infra.   Thus, the media coverage did not cause them to disregard his advocacy.

[26] See, e.g., Keegan Hamilton, "El Chapo's Lawyer Just Claimed Mexico's
President Took "Millions in Bribes" From Sinaloa Cartel, " VICE News (Nov. 13, 2018),
available    at    https://news.vice.com/en_us/article/nepbmx/el-chapos-lawyer-just-claimed-
mexicos-president-took-millions-in-bribes-from-sinaloa-cartel (last visited Apr. 25, 2019);
Keegan Hamilton, "Twin Brothers From Chicago Secretly Taped El Chapo. One Just Testified
Against Him," VICE News (Dec. 18, 2018), available at https://news.vice.com/en_us/article/
qvqabp/twin-brothers-from-chicago-secretly-taped-el-chapo-one-just-testified-against-him
(last visited Apr. 25, 2019).

[27] See, e.g., Keegan Hamilton, "El Chapo's Trial is Revealing the Futility of the
War   on   Drugs,"   VICE   News   (Nov.   30,   2018),   available at   https://news.
vice.com/en_us/article/9k4dap/el-chapos-trial-is-revealing-the-futility-of-the-war-on-drugs
(last visited Apr. 25, 2019); Keegan Hamilton, "Drug lords are using El Chapo's trial as a Get
Out of Jail Free Card," VICE News (Dec. 7, 2018), available at https://news.vice.com
/en_us/article/kzvpyn/drug-lords-are-using-el-chapos-trial-as-a-get-out-of-jail-free-card    (last
visited Apr. 25, 2019); Keegan Hamilton, "A Key Witness Against Chapo Believes in Aliens,
the Illuminati and Witchcraft," VICE News (Feb. 11, 2019), available at https://news.vice.com
/en_us/article/pankdm/a-key-witness-against-chapo-believes-in-aliens-the-illuminati-and-
witchcraft (last visited Apr. 25, 2019).

coverage is not prejudicial in nature to the defendant.   See, e.g., Farhane, 634 F.3d at 169 (holding report of co-defendant's guilty plea not prejudicial where defense counsel conceded in summation that co-defendant was guilty); Martha Stewart I, 317 F. Supp. 2d at 430 ("[A]ll that this information reveals is that Stewart is a wealthy woman.   Defendants cannot seriously contend that the jurors were not already aware of that."); Chase Manhattan Bank, N.A. v. T&N, No. 87 Civ. 4436 (JGK), 1997 WL 221203, at *7 (S.D.N.Y Apr. 28, 1997) (concluding that articles were "largely summaries of portions of testimony" of two witnesses, "which was already before the jury in full" and "[c]umulative information does not provide a basis for a new trial"); Simone, 1993 WL 106478, at *3 (holding that media coverage of "favorable" ruling for defendant not prejudicial to defendant).   The defendant has not pointed to any other news coverage that could have so prejudiced the jury that it justifies a new trial here.

    iii.   The Defendant Did Not Suffer Any Prejudice from the Alleged Media Exposure

Turning next to the potential prejudicial effect of the allegations at issue on a hypothetical juror in this case, all the pertinent factors weigh in favor of the conclusion that the defendant did not suffer the requisite prejudice.   The Court therefore should conclude that the alleged media exposure was harmless.[28]

---

[28]   Although the inquiry focuses on the hypothetical juror, it is worth noting that, assuming the Alleged Juror's statements in the VICE News Article are true, the media exposure at issue did not, in fact, prejudice the jurors.   The Alleged Juror stated that the five-minute conversation about the allegations "didn't seem to factor into the verdict" and "didn't change nobody's mind for sure."   Ex. A at 8 (internal quotation marks omitted).   Additionally, the Alleged Juror indicated that the jury carefully scrutinized the government's evidence, stating: "[M]any people were skeptical of the cooperators who cut deals with the government and flipped on Chapo, pointing to several instances where they appeared to contradict themselves or each other."   Id. at 9.   Further, the Alleged Juror claims that jurors were "appalled that prosecutors were working with the likes of" some of the cooperating witnesses.   Id. at 10.   The

First, the Court repeatedly instructed the jury to avoid the media, and it instructed the jury multiple times that they may only consider the evidence at trial.   Specifically, the Court instructed the jury in its preliminary instructions, every single day at trial (sometimes more than once per day), and prior to the jury's deliberations and during deliberations, that the jurors should do their "very best to stay away from" press coverage, "not do any research about the case," base their verdict "only on the evidence that's here in this courtroom" and not be "influenced by anything else."   Tr. at 551:12–552:10.   Moreover, the day of the February 4 colloquy regarding the allegations at issue, the Court again emphasized, "if you got any [media] exposure, that is not evidence and it has to be entirely disregarded."   Tr. 6962:14-20.   The Second Circuit presumes that "jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court."   <u>Baker</u>, 899 F.3d at 134 (internal quotation marks omitted).   Given the Court's instructions, the jury clearly knew that it was not to consider any information from outside the courtroom—particularly, information learned from the news media—during the course of its deliberations.   There is no reason to believe that the jurors disregarded those instructions and considered extraneous material in reaching their verdict. <u>See, e.g.</u>, <u>Farhane</u>, 634 F.3d at 170 (citing instruction similar to that given by the Court in concluding extraneous material was harmless); <u>Fumo</u>, 655 F.3d at 307 (same); <u>Lloyd</u>, 269 F.3d

---

Alleged Juror also pointed out that many jurors retained sympathy for the defendant, stating "they felt bad about sending Chapo away for life" and "[a] lot of people were having difficulty thinking about him being in solitary confinement."   <u>Id.</u> at 2, 5 (internal quotation marks omitted).   Ultimately, however, the jury convicted because, "[e]ven if the jury didn't believe cooperators, the government showed several videos, dozens of wiretapped phone calls, and hundreds of intercepted text messages."   <u>Id.</u> at 11.   "In the end, the juror left feeling that Chapo was definitely guilty but also a product of his environment."   <u>Id.</u>

69

at 241 (same); Spano, 2002 WL 31681488, at *6 (citing fact that "jury was repeatedly admonished at the close of trial sessions not to read, watch or listen to anything in the media about the case" and that "anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded" (internal quotation marks omitted)).   In addition, the Court specifically questioned the jurors on the Juror Questionnaire and during voir dire as to whether they could follow the Court's instructions to disregard the media, judge the defendant based solely on the evidence, keep an open mind and remain fair and impartial.   See Background Section II.A. supra.   The jurors' affirmation that they could do so further establishes that they did not render their verdict based on extraneous information.   See Farhane, 634 F.3d at 169 ("[C]onfirmation of a juror's ability to follow cautionary instructions can indicate the lack of harm from misconduct.").

Second, on two occasions, the Court followed the procedure outlined in Gaggi to assess the risk that the jury had been exposed to media stories about the case and, if necessary, to take curative action.   By conducting those inquiries, the Court specifically emphasized that the jury could not consider the articles that gave rise to the inquiries.   During the January 14 colloquy conducted in response to the article about Mr. Lictman's alleged affair, the Court reiterated the importance of staying away from the media.   It also informed the jury that the purpose of its inquiry was to make sure that, if any jurors saw media stories over the weekend, it needed "to make sure that they still believe they can give the defendant a fair trial and that article isn't going to influence them in any way."   Jan. 14 Tr. 3:19-21.   In response to the Court's questioning, no juror indicated that he or she had seen the articles.   On February 4, in response to the articles about the allegations that the defendant had drugged and raped underage

70

girls, the Court told the jurors that it needed to engage in a similar inquiry to the one from earlier at trial.   See Tr. 6947:2-4.   The Court questioned the jurors as a group about their media exposure, and it then individually questioned the two jurors who acknowledged briefly seeing some media over the weekend.   Thus, even assuming that some jurors saw the articles at issue and declined to tell the Court about it during the colloquies, the colloquies nonetheless had the effect of specifically emphasizing that the jury could not consider the articles at issue during deliberations.   See, e.g., Gaggi, 811 F.2d at 52 ("[T]he district court here took prompt and effective corrective action."); Gigante, 729 F.2d at 82 (noting importance of "prompt action to determine the effect of the publicity on the jurors").

Third, the Second Circuit gives great weight to the Court's assessment of the jurors regarding their ability to follow the instructions and the prejudicial effect of media exposure.   See Gaggi, 811 F.2d at 53 ("Because the trial court is in a much better position to assess the partiality of juror, it is inappropriate for an appellate court to second-guess that face to face appraisal").   Here, the Court repeatedly concluded the jury was diligent, attentive and following its instructions.   See Background Section II.D-E. supra.   Moreover, following both colloquies with the jury, the Court concluded that the jury remained fair and impartial.   See Tr. 6954:13-14 ████████████████████████████ Tr. 5016:2-5 ("[T]hey have been obeying the instructions to stay away from the media and so that the matters with which the attorneys were concerned are really not a concern.").   During those colloquies, the Court "was in a position to watch the jurors' reaction" and "gauge the jurors' responses" to determine whether "they could continue to deliberate in an impartial manner."   Peterson, 385 F.3d at 136.   Based on those observations, as in Spano, "[t]his was not a jury that was likely to

have been affected by references to prejudicial matters they knew they were not to consider in arriving at their verdict."  Spano, 2002 WL 31681488, at *4.  "On the contrary, they gave ample evidence of their dedication to the task of deciding the case on the basis of the evidence produced in court and nothing else."  Id.

The jurors further demonstrated their impartiality during their lengthy and diligent deliberations.  "[T]here was no rush to judgment following" the media coverage of allegations at issue.  Loliscio, 263 F.3d at 190.  Instead, after the February 4 colloquy, the jury began its deliberations that day and continued deliberating for six days in total.  During those deliberations, the jury sent the Court ten notes asking specific questions related to the law and the facts and/or requesting to review particular evidence.  In total, the jury requested to review the testimony of six of the government's 14 cooperating witnesses—including the full testimony of five of those cooperating witnesses—as well as the full testimony of three law enforcement officers.  The jury also requested playback of one of the key intercepted phone calls involving the defendant.  The length and diligence of the jury's deliberations following the alleged media exposure strongly indicates that such exposure was harmless.  See, e.g., id. (citing three additional days of deliberations following exposure to extraneous information, during which jury requested read-back of six witnesses' testimony, in concluding information was harmless); Gaggi, 811 F.2d at 53 (holding that lengthy deliberations and numerous requests to review evidence demonstrated "jury's ability to render an impartial verdict"); Gigante, 729 F.2d at 82 (citing four days of deliberations and jury's requests "to review selected exhibits, tapes, and portions of testimony" as evidence that extraneous information was not prejudicial);

72

Spano, 2002 WL 31681488, at *8 (stating that 11 days of deliberations indicated extraneous information harmless).

The jury's verdict also reflected its diligent deliberations.   While the jury found the defendant guilty of all ten Counts charged in the Indictment, as to the CCE charged in Count One, it found two of the 27 violations not proven.   Such a split verdict on Count One shows that the jury engaged in a careful review of the evidence and "had, in fact, as they had indicated they would, approached their task responsibly, objectively and conscientiously."   Gigante, 729 F.2d at 82 (citing split verdict as evidence jury remained impartial in light of extraneous information); see, e.g., United States v. Greer, 285 F.3d 158, 174 (2d Cir. 2002) ("[T]he jury's complex verdict resulting in convictions on some counts and acquittals on others demonstrated its fairness." (internal quotation marks omitted)); Lloyd, 269 F.3d at 241 (citing split verdict after three days of deliberations, during which jury asked questions and requested testimony); Gaggi, 811 F.2d at 52 (stating that split verdict "reveal[ed] both an impartial and meticulous jury"); United States v. Stanfa, No. CRIM. A. 94-127-01, 1996 WL 368967, at *9 (E.D. Pa. 1996) (following six days of deliberations, jury returned "split verdict finding most but not all racketeering acts proven," which made it "apparent that the jury carefully viewed the evidence present in court and based its decision on that evidence").   Notably, following the jury's lengthy deliberations and split verdict, the Court concluded that this was the most conscientious jury it had seen in its entire time on the bench.   See Tr. 7105:6-7106:1 ("[I]n my nearly 13 years as a trial judge[,] I have never seen a jury in a case this complicated pay the kind of attention and focus on detail and go through the deliberations the way you did.").   This exemplary jury remained impartial throughout deliberations.

Finally, the overwhelming evidence of the defendant's guilt that the government presented during the 12-week trial shows that the extraneous information was harmless. "The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." Weiss, 752 F.2d at 783. During trial, the government presented a wealth of evidence supporting the defendant's guilt, including (1) testimony from 14 cooperating witnesses; (2) dozens of law enforcement witnesses who testified to evidence that corroborated the cooperating witnesses' accounts of drug shipments to the United States—including 1,213,100 kilograms of cocaine, 1,440 kilograms of cocaine base, 222 kilograms of heroin and 49,800 kilograms of marijuana; (3) 40 AK-47 rifles and 7 kevlar vests that were destined for the Cartel and (4) dozens of audio recordings and hundreds of text messages showing the defendant running his criminal enterprise and conducting his drug business in his own voice. Indeed, the government played intercepted at phone calls and showed intercepted text messages at trial in which the defendant, in his own words, inter alia, negotiated the purchase of cocaine from a source of supply in Colombia; arranged shipments of cocaine, heroin, methamphetamine and marijuana to the United States; corrupted a Mexican law enforcement official; and discussed obtaining weapons and committing acts of violence against rival Cartel members, including kidnapping, assault and murder. See, e.g., Tr. 3034-43, 4542-70; 4636-4719. In fact, in at least one text message exchange in evidence, the jury saw the defendant ordering the murder of an unnamed police officer. See Tr. at 5864-66.

Importantly, this overwhelming evidence leaves no doubt that the defendant was guilty of the charged crimes, and it shows that the extraneous information at issue did not

prejudice him.   See, e.g., Fumo, 655 F.3d at 307 ("[T]he heavy volume of incriminating evidence . . . weighs heavily against a finding of prejudice."); Loliscio, 263 F.3d at 190 (citing "'overwhelming evidence'" in finding extraneous information harmless); Lloyd, 269 F.3d at 241-42 (same); Taus v. Senkowski, 134 Fed. Appx. 468, 470 (2d Cir. 2005) (summary order) (same).   This mountain of evidence also eliminates any "real concern that an innocent person may have been convicted"—a concern that the Court must harbor to grant the defendant a new trial pursuant to Rule 33.   McCourty, 562 F.3d at 475; see United States v. Gioeli, No. 08 CR. 0240 (BMC), 2013 WL 12121224, at *9 (E.D.N.Y. July 15, 2013), aff'd sub nom. United States v. Cacace, 796 F.3d 176 (2d Cir. 2015) ("Based on the extensive evidence presented at trial, there is no real concern that an innocent person may have been convicted, and [the defendant's] motion for a new trial is therefore denied.").   The defendant is not innocent.   He committed horrific crimes as the co-leader of the Sinaloa Cartel, and the jury rightfully convicted him based on the overwhelming evidence the government presented.

In sum, after assessing the nature of the extraneous information and its likely effect on a hypothetical juror in this case, it is clear that the alleged exposure to such information here was harmless.   To hold otherwise would be to assume that this jury took "an extraneous item that was irrelevant to the charges" and "use[d] it as a basis for a finding of guilt."   Spano, 2002 WL 31681488, at *5.   But, as discussed above, "the attitude and behavior of this jury makes the theory implausible in the extreme."   Id.   This is not a jury that "ignored the requirement of proof beyond a reasonable doubt, ignored the court's instructions of law, and went outside the evidence to reach an irrational conclusion," to base "its verdict on one irrelevant and extraneous piece of information."   Id. at *8.   "In this case[,] the jury gave the

Court and the parties [12] weeks of their lives."   Lipari, 1995 WL 84221, at *9.   "They served

diligently."   Id.   "They rendered an intelligent verdict, amply supported by the evidence."   Id.

"Presumably[,] they have put the experience behind them and gone on with their everyday

affairs."   Id.   "The justice system should not lightly ask for more."   Id.; see United States v.

Radonjich, 1 F.3d 117, 120 (2d Cir. 1993) ("[T]he jurors have a right to go home at the end of

the trial . . . secure in the belief that they will not be harassed and they will not be questioned,

and they have a right to return to the community and enjoy the privacy and anonymity that they

enjoyed before they were summoned to serve as jurors." (alterations in original)).   For the

reasons set forth above, even assuming the Alleged Juror's allegations in the VICE News

Article are true, the Court should deny the defendant's motion for a new trial based on the jury's

alleged exposure to extraneous information without an evidentiary hearing.[29]

     B.     The Jurors' Alleged Lies Do Not Warrant a New Trial

     The defendant also argues that the Alleged Juror's claims that certain jurors lied

to the Court justify a new trial.   See Def. Mot. at 16-20.   As discussed above, the defendant

has not met the demanding standard for a hearing on this dubious claim.   See Argument

Section I. supra.   Regardless, though, to avoid an unnecessary hearing, the Court may assume

the truth of the allegations in the VICE News Article and proceed directly to the analysis of

---

[29]   To the extent the defendant argues that he is entitled to a new trial because the
jurors allegedly engaged in premature deliberations, see Def. Mot. at 13, he is wrong.   The fact
that the jury may have violated the Court's instructions not to discuss the case until deliberations
is not a basis to reopen the verdict.   See, e.g., Baker, 899 F.3d at 132 ("[A]ssuming, arguendo,
that premature deliberations occurred, we agree with the district court that Rule 606(b) of the
Federal Rules of Evidence prohibited the jurors from impeaching their verdict by testifying
about the effect of such deliberations on the verdict, rendering the inquiry futile from the
start.").

whether those allegations meet the standard for a new trial.   See Martha Stewart III, 433 F.3d

at 305-06 (affirming district court denial of hearing on alleged juror falsehoods after it assumed

"allegations were established by competent evidence" and found no prejudice). [30]   Even

assuming arguendo that the allegations in the VICE News Article regarding the jurors'

statements to the Court are true, they do not warrant a new trial.

   i. Legal Standard

   In McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984), the

Supreme Court established the "standard for analyzing allegations that a juror's false voir dire

concealed bias that affected the fairness of the trial."   Martha Stewart III, 433 F.3d at 303.

Notably, courts have applied the McDonough standard not only to juror questioning during voir

dire, but also to questioning of jurors during trial.   See, e.g., United States v. Ling Liu, 69 F.

Supp. 3d 374, 377-83 (S.D.N.Y. 2014), aff'd sub nom. United States v. Feng Li, 630 Fed. Appx.

29, 33 (2d Cir. 2015) (summary order).   Under that framework, "a party alleging unfairness

based on undisclosed juror bias must demonstrate first, that the juror's voir dire response was

false and second, that the correct response would have provided a valid basis for a challenge

---

   [30] In support of his argument for a hearing, the defendant cites to the statement in Martha Stewart III that, "if any significant doubt as to a juror's impartiality remains in the wake of objective evidence of false voir dire responses, an evidentiary hearing generally should be held."   433 F.3d at 306.   Notably, that case does not purport to change the Second Circuit standard for post-verdict hearings.   Id. at 303 (citing hearing standard for false voir dire responses as requiring "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial" (internal quotation marks omitted)).   Thus, the language quoted by the defendant is simply a restatement of the governing standard.   Whichever way the standard is stated, the defendant has failed to meet it.   For the reasons stated infra, there is no significant doubt as to any juror's impartiality and, in any event, the VICE News Article does not qualify as competent evidence, see Argument Section I. supra.

for cause." Martha Stewart III, 433 F.3d at 303 (citing McDonough, 464 U.S. at 556).   In other words, "even where a juror deliberately omitted or misstated facts during voir dire, a new trial will not be granted absent a finding that the juror's nondisclosure concealed some bias or partiality that would have sustained a for-cause challenge." Martha Stewart II, 317 F. Supp. 2d at 437.   Under the second prong of the McDonough test, "the district court must determine if it would have granted the hypothetical challenge." Martha Stewart III, 433 F.3d at 304 (internal quotation marks omitted).   "Challenges for cause are generally based on a finding of bias." Martha Stewart II, 317 F. Supp. 2d at 437 (citing Greer, 285 F.3d at 171).   "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." Id. at 436 (quoting McDonough, 464 U.S. at 556).

The district court's determination as to whether it would grant the hypothetical for-cause challenge "is reviewed for abuse of discretion." Martha Stewart III, 433 F.3d at 304. In that regard, the Second Circuit has stated, "[T]here are few aspects of a jury trial where [it] would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury." Id.   (alteration and internal quotation marks omitted).   Indeed, a trial judge has the most flexibility when responding to allegations of juror misconduct "when the incidents relate to statements made by the jurors themselves." Baker, 899 F.3d at 131; United States v. Nix, 275 F. Supp. 3d 420, 439 (W.D.N.Y. 2017) ("[A] McDonough claim necessarily fails unless the court would have committed reversible error—that is, abused its discretion—in failing to dismiss a juror." (citation, alteration and internal quotation marks omitted)).

Overturning a jury's verdict based on juror nondisclosure under <u>McDonough</u> is "extraordinary relief" warranted only in "exceptional circumstances."   <u>United States v. Parse</u>, 789 F.3d 83, 101 (2d Cir. 2015) (internal quotation marks omitted); <u>Martha Stewart II</u>, 317 F. Supp. 2d at 437 (detailing "difficulty of this showing").   In fact, "[t]here is only one instance where the Second Circuit has found a reason to overturn a verdict on the basis of juror nondisclosure under <u>McDonough</u>."   <u>Nix</u>, 275 F. Supp. 3d at 439 (footnote omitted) (citing <u>Parse</u>); <u>see</u> <u>Martha Stewart III</u>, 433 F.3d at 304 (observing, pre-<u>Parse</u>, "this Court has never found reason to overturn a verdict on the basis of juror nondisclosure under <u>McDonough</u> and only once, <u>see</u> <u>United States v. Colombo</u>, 869 F.2d 149 (2d Cir. 1989), has remanded for an evidentiary hearing on the matter").   As no such exceptional circumstances are present here, this case should not be the second instance.

ii.   <u>The Defendant Is Not Entitled to a New Trial Based on the Jurors' Alleged Lies During Mid-Trial Questioning by the Court</u>

a.   <u>The Defendant Cannot Satisfy the First Prong of *McDonough*</u>

As an initial matter, for all the reasons stated above, <u>see</u> Argument Section I. <u>supra</u>, the anonymous, unsworn, uncorroborated hearsay and double-hearsay allegations in the VICE News Article do not qualify as competent evidence that any jurors lied to the Court.   As such, it is not sufficient to overcome "the presumption that jurors are truthful."   <u>United States v. Cartelli</u>, 272 Fed. Appx. 66, 70 (2d Cir. 2008) (summary order) (citing <u>United States v. Cox</u>, 324 F.3d 77, 87 (2d Cir. 2003) ("[A] court should generally presume that jurors are being honest. . . . "[O]ne who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." (citation and internal quotation marks omitted)).   The defendant therefore cannot establish that any juror's response

79

to the Court was false, and his claim fails at the first step of <u>McDonough</u>.   <u>See</u> <u>Martha Stewart</u>
<u>III</u>, 433 F.3d at 303.

        Assuming <u>arguendo</u>, however, that the allegations in the VICE News Article are true, at most, those allegations establish that the Alleged Juror lied to the Court.   As for the five jurors and two alternates whom the Alleged Juror claims "had at least heard about the child rape allegations," Ex. A at 8, the Alleged Juror does not state whether those other jurors knew about those allegations at the time the Court questioned them or learned at some point afterwards.   The Alleged Juror simply states that the Alleged Juror told other jurors, "<u>if</u> you saw what happened in the news, just make sure that the judge is coming in and he's gonna ask us, so keep a straight face."   <u>Id.</u> (emphasis added).   He then states that all the jurors "denied it" (which, as noted above, <u>see</u> Argument Section I.B.ii. <u>supra</u>, is factually inaccurate), but the Alleged Juror does not say how many jurors had heard of those allegations prior to being questioned by the Court.   Regardless, though, even if five jurors and two alternates heard about the allegations in advance of the Court's questioning and falsely denied it to the Court, the defendant still cannot meet the <u>McDonough</u> standard.[31]

_____

[31] The defendant claims that jurors also lied to the Court when the Court "quizzed the panelists on reports of a Guzman lawyer's marital infidelity."   Def. Mot. at 16.   The VICE News Article, however, says the exact opposite.   The Alleged Juror said that, at the time the Judge questioned the jury, "the group responded honestly: They hadn't seen anything."   Ex. A at 8.   Hence, even assuming the truth of the allegations in the VICE News Article, no jurors lied to the Court during its questioning on this matter.   The defendant fails at step one of <u>McDonough</u> on this point.

b.   The Defendant Cannot Satisfy the Second Prong of *McDonough*

Under step two of McDonough, the defendant cannot establish that any juror lied to conceal actual bias against the defendant, such that the Court would have granted a hypothetical for-cause challenge.  See Martha Stewart III, 433 F.3d at 304.  For this reason too, his motion on this ground fails.

First, had any jurors admitted that they had reviewed the media coverage at issue, they would not have been automatically subject to a successful challenge for cause based solely on their exposure to that press coverage.  The Second Circuit has repeatedly indicated that mere knowledge of press coverage does not prevent a juror from serving fairly and impartially.  For example, in Gaggi, all of the jurors had heard about the murder of the lead defendant in the case during trial through media reports.   811 F.2d at 51.   Yet, the district court dismissed none of them after it questioned them on the media exposure.   Id. (affirming district court ruling); Gigante, 729 F.2d at 82-83 (affirming conviction, where all but two jurors admitted that they were aware of "sensational" article regarding defendant's mafia connections published during trial); Williams v. Folino, No. CIV.A.98-1320, 2009 WL 2998154, at *11 (W.D. Pa. Sept. 15, 2009) ("Petitioner has provided no basis for concluding that, had [juror] stated that he had read the articles prior to trial, the statement alone would have provided a challenge for cause . . . .").  Accordingly, when concerns about press coverage arose during the trial in this matter, this Court, too, did not indicate that mere exposure to the press coverage at issue would be presumed to evince bias or prejudice on the part of the jury.   See Tr. 5013:19-22 (Jan. 14, 2019) ("I will take each affirmative response into a separate room and I will poll that person as to whether

they feel able to disregard what they read in the article and not hold it against the defendant in any way and give him a fair trial."); see also Tr. 6945:20-25 (Feb. 4, 2019).

Second, and relatedly, even if the parties had been aware of jurors' exposure to press coverage, the record indicates that the defense would not necessarily have challenged those jurors for cause.   As set forth in Background Section II.A. supra, ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  ██████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████   All of

these jurors ultimately stated that they would judge the case fairly and impartially.   See id. The defendant did not challenge any of these jurors who had previously heard of the defendant or, more notably, had heard about the defendant's crimes or his Cartel.   It thus is not at all clear on this record that the defendant would have challenged any juror exposed to the media coverage at issue for cause.   See Greer, 285 F.3d at 171 n.4 ("The District Court's determination that it would not have excused [juror] for cause as a result of his contact with a

82

third party is supported by the fact that no challenge for cause was made—let alone sustained—with regard to the other venire person who was [likewise] asked by a third party to lend a 'sympathetic ear' [to the defendant].").

Third, as discussed in more detail above, see note 28 supra, assuming the VICE News Article is true, it shows that the jurors harbored no actual bias towards the defendant. Rather, it demonstrates diligence on the part of the jury when it came to their deliberations and their obligation to consider the evidence fairly and impartially.  With respect to the press coverage about the rape allegations, the Alleged Juror specifically "said it didn't seem to factor into the verdict" and "that didn't change nobody's mind for sure."   Ex. A at 8.   The Alleged Juror also reported that the jury was "skeptical of the cooperators" who testified at trial, that members of the jury were "appalled that prosecutors were working with the likes of" some of the cooperating witnesses, and that the juror "felt bad about sending Chapo away for life" and was sympathetic to the defendant as a "product of his environment."   See id. at 6, 9-11.   These statements, if true, confirm that the jury carefully weighed witness credibility, maintained sympathy for the defendant during deliberations and maintained an open mind as they considered the evidence.   Furthermore, when asked why he or she lied to the Court, the Alleged Juror did not suggest that he or she lied to cover any actual bias towards the defendant; instead, the Alleged Juror claimed that he or she did not want to "get arrested" or "rat" out other jurors. Id. at 8.   Thus, any false statements were not a product of actual bias towards the defendant.

Fourth, and most importantly, objective facts prove that the jurors were fair and impartial throughout trial and deliberations.   To begin with, the Court engaged in a rigorous jury selection process.   It sent out a 36-page questionnaire to over 963 potential jurors to screen

83

out jurors ahead of time who could not be fair and impartial.   Then, it engaged in a three-and-a-half day <u>voir</u> <u>dire</u> with the parties to ensure that the jurors ultimately selected would be impartial.   <u>United States v. Gigante</u>, 53 F. Supp. 2d 274, 277-78 (E.D.N.Y. 1999) ("[The jury] was selected after a meticulous attempt to obtain an impartial panel through extensive written questionnaires and oral <u>voir</u> <u>dire</u>.   Credulity would be fractured were the court to conclude that this jury based its decision on the picayune departures described by the witness.").

In addition, as discussed more fully above, <u>see</u> Argument Section II.A.iii. <u>supra</u>, this Court specifically instructed the jury on numerous occasions regarding the importance of fairly and impartially judging the evidence before it.   The Court observed the jury's diligence throughout trial and made specific findings regarding the jury's continued impartiality following the two <u>Gaggi</u> inquiries—an assessment entitled to significant deference.   <u>See</u> <u>Gaggi</u>, 811 F.2d at 52; <u>Peterson</u>, 385 F.3d at 136-37.   And, jury deliberations lasted for six days, during which time the jury asked a number of questions of the Court, sought read-backs and transcripts of a large volume of trial testimony, and ultimately rendered a split verdict by declining to find the defendant responsible for two of the charged violations of Count One. These objective facts indicate that the jury remained impartial and, assuming members of the jury lied to the Court, they were not doing so to conceal any actual bias.   <u>See</u> <u>Greer</u>, 285 F.3d at 171 ("The court . . . noted that the outcome of the trial demonstrated that all the jurors, including Baker, fairly considered the evidence.").[32]

---

[32]   Later in his motion, the defendant also suggests that the Court may find implied or inferable bias on the part of the juror interviewed in the VICE News Article.   <u>See</u> Def. Mot. at 19.   It is unclear "whether a post-trial allegation of jury partiality may alternatively be proven by implied or inferred bias."   <u>Greer</u>, 285 F.3d at 172; <u>see</u> <u>Nix</u>, 275 F. Supp. 3d at 439.   Regardless, neither implied nor inferable bias could be properly presumed in this case.

In urging otherwise, the defendant argues that the jurors' alleged lies to the Court "mandate[e] reversal per se, without a showing of more tangible harm."   Def. Mot. at 18.   But that is not the law.   To the contrary, the Second Circuit has explicitly stated that there is no "per se rule requiring a new trial whenever an intentionally false answer is discovered."   Greer, 285 F.3d at 173.   Rather, it has "emphasized that McDonough establishes a multi-part test in which a juror's dishonesty is among the 'factors to be considered' in the ultimate determination of bias and that an analysis of bias is required even if the juror's erroneous response was deliberate."   Id. (emphasis added); United States v. Langford, 990 F.2d 65, 68-69 (2d Cir. 1993) (rejecting per se rule).

Insofar as the defendant advances an argument that the McDonough standard does not apply to mid-trial questioning of jurors, but only to voir dire, the Court should reject this claim.[33]   See Ling Liu, 69 F. Supp. 3d 378-84 (applying McDonough standard to

---

Implied bias is reserved for "extreme situations" and, where it applies, it is "automatically presumed" without any necessary review of the record.   See id.   It "deals mainly with jurors who are related to the parties or who are victims of the alleged crime itself."   Id. (citing United States v. Torres, 128 F.3d 38, 45 (2d Cir. 1997); see also Torres, 128 F.3d at 46 ("[T]he situations in which a trial judge must find implied bias are strictly limited and must be truly 'exceptional' . . . .").   The defendant offers no basis for its application here.   A finding of inferable bias is "within the discretion of the trial court" and "must be grounded in facts developed at voir dire."   Greer, 285 F.3d at 172 (internal quotation marks and citation omitted). Inferable bias applies where a "juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause."   Torres, 128 F.3d at 47.   Even assuming, contra Greer, that inferable bias can be grounded in facts outside of voir dire, as the government explained supra, there is no basis for a for-cause dismissal of any juror based on the VICE News Article.   The Court should therefore reject the defendant's argument that implied or inferable bias apply here.

[33] The defendant cites the McDonough standard in support of his argument, but also argues for per se reversal without a showing of prejudice.   See Def. Mot. at 17-18.   It therefore is unclear which standard he contends governs the Court's inquiry.

questioning of jurors following notification near end of trial that juror had been tweeting about trial).   At a minimum, it would be irrational for a lower standard for reversal—i.e., one that makes it easier to overturn a verdict—to apply to a juror's responses to a court's questions during trial than during jury selection, where the McDonough standard unquestionably applies. Such an outcome would have the perverse effect of treating potential jurors' responses on voir dire as less important and less deserving of scrutiny than any later questioning by the Court. That would be inconsistent with instructions by the Supreme Court and the Second Circuit about the importance of jury selection.   See Gomez v. United States, 490 U.S. 858, 873 (1989) ("Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice . . . ."); United States v. Diaz, 922 F.2d 998, 1002 (2d Cir. 1990) ("[P]etit jury selection is a crucial phase in the protection of the right of the accused to a fair trial.").   There is no basis to apply a lower standard for reversal than McDonough to mid-trial false statements by jurors.

The defendant's reliance on Colombo—the one case in which the Second Circuit has remanded for a hearing based on a juror's falsehoods—and Parse—the one case in which that court has ordered a new trial for such a claim—is similarly misplaced.   See Def. Mot. at 17, 19.   As to Colombo, "the Second Circuit has . . . [made] clear that Colombo is limited to its facts."   United States v. Bangiyev, No. 07-CR-331(NG)(RLM), 2008 WL 4240005, at *8 (E.D.N.Y. Sept. 12, 2008); see Langford, 990 F.2d at 69 (stating that, in Colombo, "we held that a juror who claims to know that a locale at which the evidence will place the defendant is a hang out for gangsters, and who has deliberately responded falsely to a material question on voir dire precisely because she wanted to sit on the case, should be presumed not to be

impartial" (internal quotation marks omitted)).   To the extent the defendant relies on Colombo to suggest that a juror's lie meant to conceal a desire to sit on a jury is sufficient to satisfy the second prong of McDonough, see Def. Mot. at 19-20, Colombo does not bear the weight the defendant assigns to it.   "Colombo does not hold that deliberate omissions that are prompted by a desire to serve, but which do not show bias or prejudice, should overturn a jury verdict." Martha Stewart II, 317 F. Supp. 2d at 441.   "Such a holding would be at odds with McDonough's requirement that the undisclosed information suffice to support a for-cause challenge."   Id. at 441-42.   "Subsequent Second Circuit opinions suggest that this would be an overly broad reading of Colombo."   Id. at 442 (citing Greer, 285 F.3d at 173); see Martha Stewart III, 433 F.3d at 305 (distinguishing Colombo); Bangiyev, 2008 WL 4240005, at *8 (same).   Per these decisions, "the law is clear that lack of candor, in the absence of bias, does not undermine the fairness of defendants' trial."   Martha Stewart II, 433 F. Supp. 2d at 443.

In any event, even if credited, it is not clear from his or her statements that the Alleged Juror, or any other juror for that matter, was motivated to lie to the Court during the February 4 colloquy based on a desire to sit on the jury.   Rather, the Alleged Juror stated he or she was motivated by a desire to avoid "arrest[]" and to not "rat" out fellow jurors.   Neither of these motivations evince any type of actual bias towards the defendant.   And, as previously discussed, the record establishes that this jury was not, in fact, biased.

Parse—also relied on by the defendant, see Def. Mot. at 17, 19—demands the same conclusion.   There is a good reason that Parse is the only case to reverse a conviction under McDonough: it involved "such egregious juror misconduct" that upholding the verdict would have made "a farce of our system of justice."   Parse, 789 F.3d at 126 (Straub, J.,

concurring) ("I am not aware of a case involving more egregious juror misconduct than that found here, a finding which is undisputed on appeal.").   While that case stated, "[w]here the juror has deliberately concealed information, 'bias' is to be presumed," Parse, 789 F.3d at 111 (alteration omitted), such a presumption is subject to rebuttal.   In fact, every Second Circuit case prior to Parse to address a juror's falsehood under the second prong of McDonough held the juror was not actually biased and, therefore, the presumption was rebutted.   See, e.g., Greer, 285 F.3d at 170-73; Martha Stewart III, 275 F. Supp. 3d at 303; Langford, 990 F.2d at 69-70; Nix, 275 F. Supp. 3d at 439-40, 449.   Parse's sui generis facts distinguish it entirely from this case.   See Nix, 275 F. Supp. 3d at 439-40 (distinguishing Parse).

In Parse, the juror whose misconduct merited a new trial had concealed during jury selection that (1) she had been arrested and charged with crimes on at least five occasions; (2) she had been an attorney prior to having her license suspended (particularly relevant to the trial on which she served, where all of the defendants were attorneys); (3) her husband was a "career criminal" who had served a seven-year prison sentence and (4) she had lived in the Bronx, thereby concealing her identity from the parties.   See Parse, 789 F.3d at 88-90.   The day after trial—at which the jury convicted the defendant of two counts and acquitted him of several others—the juror at issue sent the prosecutors a letter.   Id. at 90.   In that letter, she praised their performance and lamented that, although she had "held out," she had to "throw in the towel" on the charges that the jury acquitted on, noting that Parse "presented a conundrum— not for me, but for the other eleven [on the jury]."   Id. at 90-91.   In a later evidentiary hearing, the juror admitted that she had lied to the Court in order to make herself "marketable" as a prospective juror; that she had a pre-conceived notion that "most attorneys," such as the

defendants, were "career criminals"; and that she knew that telling the truth during jury selection would "not have allowed [her] to sit as a juror."   Id. at 91-92.

The district court concluded in a written opinion that the juror was a "pathological liar and utterly untrustworthy," who could not "distinguish truth from falsehood." Id. at 92, 100.   She had "created a totally fictitious persona to get on the jury"; "she presented herself as an entirely different person and lied about virtually every detail of her life."   Id. at 100.   The court concluded that her "lies [had been] breathtaking" and "calculated to prevent the Court and the parties from learning her true identity" and that she had "purposefully lied" in order to appear attractive to the parties as a prospective juror.   Id. at 93.   Moreover, her statement that attorneys like the defendants were all "crooks" reflected a "pre-existing bias" that she concealed during voir dire.   Id.

Based on the foregoing, the district court held that the juror was "actually biased against Defendants."   Id. (internal quotation marks omitted).   It also concluded that the juror was "manifestly incapable of performing the central functions of a juror—evaluating witness credibility and making a fair assessment of the evidence"—and that her "fundamental contempt for the judicial process" warranted the "extraordinary relief" of a new trial.   Id. at 101.   Citing these same facts, the Second Circuit affirmed, concluding that the juror was "in fact, impliedly, and inferably biased against the defendants" and that "if the court had known the truth, it would have dismissed [the juror] for cause."   Id. at 111; id. at 126 (Straub, J., concurring) (stating that juror "saw herself not as a fact-finder, but as a partisan for the prosecution who characterized her efforts to persuade other jurors against acquitting [the defendant] as 'fighting the good

fight.'" (alteration and internal quotation marks omitted)).   Nothing remotely similar occurred in this case.   Parse, thus, is inapposite.

For these reasons, the defendant cannot satisfy the McDonough standard with respect to the jurors' alleged falsehoods in response to the Court's inquiries during trial.   The Court thus should deny his motion on this ground without an evidentiary hearing.

iii.   The Defendant is Not Entitled to a New Trial Based on the Jurors' Alleged Lies During *Voir Dire*

The defendant's next argument, that he is entitled to a new trial based on jurors' concealment of material voir dire information, see Def. Mot. at 18-20, is equally unavailing. The parties agree that the McDonough standard applies to this claim.   See Def. Mot. at 19. The defendant, however, cannot meet that standard with respect to this claim either.

As to the first prong, there was no direct question put to the prospective jurors that could have elicited a false response sufficient to meet this prong.   First, even if the Alleged Juror's statements in the VICE News Article are credited, the defendant's allegations of voir dire misconduct rests on the following:

> The juror who spoke with VICE News said they were being honest about not knowing much about Chapo beyond his alleged status as a Mexican drug lord.   They realized the trial was going to go on for months and be dangerous enough to require anonymity and an armed escort to and from the courthouse.
>
> The allure was being part of history: "It's a once-in-a-lifetime thing.   This is the case of the century.   Do I want to live it . . . or do I want to watch it on the screen?"

Ex. A at 6.

However, this passage does not establish that the Alleged Juror lied in either his or her questionnaire or in response to in-person questioning by the Court or attorneys.   It is not

clear whether the Alleged Juror came to his or her stated conclusion about the historic nature of the case prior to voir dire or during trial.   Indeed, the Alleged Juror states that he or she honestly knew little about the defendant prior to voir dire.   See id.   Thus, it is reasonable to infer that the Alleged Juror came to this conclusion about the nature of the case after being selected for the jury and came to more fully understand the nature of the case.

Moreover, even if the Alleged Juror held this view about the historic nature of the case prior to jury selection, there was no question on the Juror Questionnaire that directly probed whether a juror wanted to serve on the jury.   Nor were any of the 18 jurors asked whether they wanted to serve on the jury.

The defendant claims that Question No. 53 on the Juror Questionnaire—which queried whether the prospective juror had "any feelings about serving as a juror in a case where the defendant has been accused of having connections with a drug cartel" —"surely should have elicited the [Alleged Juror's] ardent wish to serve."   Def. Mot. at 19 & n.12 (internal quotation marks omitted).   However, a plain reading of Question No. 53 leads to the conclusion that it does not solicit information about a prospective juror's desire to serve; rather, it seeks information about whether a prospective juror's feelings about drug cartels would cause that individual to be biased.

The defendant next points to Question No. 102—whether the "nature of the charges or the facts of the case as they have been explained to you thus far . . . would affect your ability to serve as a juror in this case"—and asserts that this question, too, should have elicited the Alleged Juror's desire to serve as a juror.   Id. (internal quotation marks omitted). Again, this question does not seek information about whether a prospective juror desired to

serve as a juror.   A reasonable prospective juror would have understood Question No. 102 as probing potential bias based on information that individual had already learned about the case.

The defendant's next argument—that the Alleged Juror's (or other jurors') failure to notify the Court during voir dire that they could not follow the Court's instructions supports his request for a new trial, see id. at 20—also falls short of establishing the first prong of McDonough.   Unlike the issue pertaining to prospective jurors' desire to serve on the jury, the Court did ask prospective jurors directly on voir dire whether they could follow the Court's instructions.   See JQ at 27 (Question 101).   However, even assuming that the Alleged Juror's allegations are true, the defendant still cannot establish that the Alleged Juror or any of the other jurors knew at the time they responded to the voir dire questions that they were not going to follow the Court's instructions.

Put another way, the defendant's argument fails because he cannot demonstrate from the Alleged Juror's allegations show any intent to deceive or mislead the Court during voir dire.   The Alleged Juror does not allege, for example, that any of the prospective jurors had already decided that they were going to follow the case on the internet before falsely claiming on the Juror Questionnaire that they would follow the Court's admonition to avoid all media, internet and social networking coverage of the case.   That a juror may have ultimately succumbed to his or her curiosity does not ab initio establish that the juror was lying when the juror stated at voir dire that he or she could follow the Court's instructions.

The Ninth Circuit recently rejected a similar argument in United States v. Leung, 796 F.3d 1032 (9th Cir. 2015) (cited approvingly by Baker, 899 F.3d at 132).   There, the defendant relied on an affidavit of a juror claiming, inter alia, that several jurors violated the

court's instructions not to discuss the case and regularly spoke about the evidence during breaks in the trial.  Id. at 1034.  On appeal, the defendant argued, "[B]ecause some jurors did in fact discuss the evidence before the case ended, they must have concealed their intent to break their promise and defy the court's directive during voir dire."  Id. at 1037 (alterations and internal quotation marks omitted).  "Taking this logic a step further, [the defendant] contend[ed] that he was denied a fair and impartial jury because the jurors' alleged deception denied him the opportunity to exercise a valid challenge for cause before the start of the trial."  Id. (alteration and internal quotation marks omitted).

> In holding this argument lacked merit, the Ninth Circuit stated:
>
> The affidavit does not contain any evidence of juror deceit or bias; at most it suggests that some jurors failed to follow through on their promise to follow all the court's instructions.   Nothing in the affidavit indicates that any juror had dishonest intentions at the time of that commitment.   That some jurors may not have complied with each instruction does not support the inference that they lied or concealed bias.
>
> Accepting [the defendant's] invitation to cast every instance of juror misconduct as admissible evidence of dishonesty or bias would have staggering consequences for the finality of jury verdicts.   Even the most trivial missteps would become fair game for a motion for a new trial.   For example, standard jury instructions in California admonish jurors not to "take their notebooks out of the courtroom or jury room," and to keep cellular phones "turned off" during trial.   Judicial Council of California Criminal Jury Instructions 101-02.   [The defendant's] position would necessarily require the court to treat jurors who take their notepads home at the end of the day or sneak a peek at their email during trial as having lied or concealed bias during voir dire.   We decline to automatically attribute such common mistakes to jurors' hidden intent to "break their promise and defy the court's directive" rather than mere human fallibility.

Id. (footnote omitted).   For these same reasons, the Court should reject the defendant's argument here.

The Alleged Jurors' allegations of juror misconduct during voir dire are too speculative to justify a hearing on his motion, let alone the granting a new trial, as sought by the defendant.   Even assuming that the allegations in the VICE News Article are accurate, the defendant's argument must still fail because he cannot satisfy the first McDonough prong.   He cannot show that the Alleged Juror or any other juror lied about either their desire to serve on the jury or their willingness to follow the Court's instructions to avoid media coverage.

Nor is there any basis to conclude that any of the jurors lied during voir dire to conceal their actual bias against the defendant, as required to meet the second prong of McDonough.   To the contrary, as discussed above, many jurors did, in fact, candidly admit their knowledge of the defendant, his Cartel and/or his crimes during voir dire.   See Background Section II.B. supra.   In light of their candid answers, and the objective evidence of the jury's impartiality, see Argument Section II.A.iii. supra, the defendant cannot meet the second prong of McDonough based on any of the jurors' statements during voir dire. Accordingly, the Court should deny the defendant's motion on this ground without a hearing.

III.    Partial Sealing is Appropriate

Portions of this brief refer to material that the Court sealed during trial to protect the anonymity and privacy of the jurors.   That material remains under seal.   Thus, partial sealing of this filing is warranted.   See Feb. 5, 2018 Mem. & Order Granting Gov't Mot. for Anonymous and Partially Sequestered Jury, Dkt. No. 187 at 2 ("Here, the Government has presented strong and credible reasons to believe that the jury needs protection."); cf United

States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect integrity of ongoing investigation, including safety of witnesses, and to prevent interference, flight and other obstruction, may be a compelling reason justifying sealing).   Should any order of the Court regarding the defendant's motion describe the sealed information in question with particularity, rather than in general, the government likewise requests that the Court file those portions of the order under seal.

CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion for a

new trial without an evidentiary hearing.

Dated:        Brooklyn, New York
              April 29, 2019


                                    RICHARD P. DONOGHUE
                                    United States Attorney
                                    Eastern District of New York

                                    ARTHUR G. WYATT
                                    Chief, Narcotic & Dangerous Drug Section
                                    Criminal Division
                                    U.S. Department of Justice

                                    OF COUNSEL:
                                    ARIANA FAJARDO ORSHAN
                                    United States Attorney
                                    Southern District of Florida