*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

GMP:PEN/MR
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 24, 2017

**SUBMITTED EX PARTE AND UNDER SEAL**

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>   Re:   United States v. Joaquin Archivaldo Guzman Loera
>         Criminal Docket No. 09-466 (BMC) (S-4)

Dear Judge Cogan:

The government respectfully submits this ex parte letter pursuant to Federal Rule of Criminal Procedure 16(d)(1) in further support of its motion for a protective order for discovery provided pursuant to Federal Rule of Criminal Procedure 16 and witness statements provided pursuant to the Jencks Act, see 18 U.S.C. § 3500 (hereinafter, the "Protected Material"). See Dkt. No. 28. This submission provides further factual support for the designation of four categories of information as "Protected Material" in the revised proposed protective order (hereinafter, the "Proposed Order") submitted as attachment A to the government's reply brief, filed separately today in support of the instant motion. See Dkt. No. 44. This submission provides specific examples that justify protecting (1) witness statements provided pursuant to 18 U.S.C. § 3500; (2) information that could lead to the identification of potential witnesses and their locations, including civilian witnesses, foreign and domestic law enforcement witnesses and cooperating witnesses; (3) information related to ongoing investigations, including information which could identify the targets of such investigations; and (4) information related to sensitive law enforcement techniques. See Ex. A ¶ 1. The defendant has agreed that the first three categories of documents should be designated as Protected Material, but not the fourth. Additionally, this submission provides further factual support for the government's request that (1) foreign nationals be subject to prior approval

before they can be considered part of Defense Counsel's Team;[1] (2) persons who are not members of Defense Counsel's Team be subject to prior approval before they are permitted to view the Protected Material; and (3) Defense Counsel not be permitted to disseminate § 3500, even if it is in the public domain.[2] For the reasons discussed herein, as well as in the government's reply brief, see Dkt. No. 44, the Court should enter the Proposed Order without modification.

I.  Section 3500 Material and Information Identifying Witnesses and Their Locations

The government seeks to protect witness statements and information that would identify witnesses and their locations based on the demonstrated history of violence by the defendant and his criminal associates against suspected cooperating witnesses. The defendant does not oppose this request. Specific examples of such conduct include, but are not limited to, the following:

- Cooperating Witness ("CW") #1 is expected to testify that s/he was engaged in cocaine trafficking with the defendant from approximately 1986 until the defendant's first arrest in 1993. CW #1 ran the defendant's day-to-day operations in Mexico City during this time period. In the late 1990s, CW #1 was arrested, and the United States sought CW #1's extradition. Prior to CW #1's extradition, the defendant tried to have CW #1 killed on four separate occasions, while s/he was incarcerated in Mexico. The defendant paid prisoners to stab CW #1 on three separate occasions. On the fourth occasion, an individual entered the jail and threw grenades outside CW #1's cell, which detonated.

- CW #2 is expected to testify that s/he engaged in cocaine trafficking with the defendant from 1993 to 2003, including during a period of time when the defendant was incarcerated. CW #2 oversaw the defendant's train route for importing cocaine into the United States. In 2003, law enforcement officers seized narcotics in New York and uncovered the defendant's train route. The defendant and the other leaders of the Sinaloa Cartel blamed CW #2 for the seizure and, more importantly,

---

[1] The terms "Defense Counsel," "Defense Counsel's Team," "Expert Witnesses," "Prospective Expert Witnesses" and "Approved Persons" are defined in the Proposed Order. See Ex. A ¶¶ 2, 4, 5.

[2] In this submission, the government has provided specific examples of information in order to meet its burden to establish good cause under Rule 16 for issuance of the Proposed Order. Given the volume of the discovery in this case, the government has not endeavored to provide all information that justifies the Proposed Order or to identify all specific documents that should be subject to protection. Should the Court conclude that this submission, in conjunction with the government's publicly-filed motion for a protective order, see Dkt. 28, and reply brief, see Dkt. No. 44, do not establish good cause, the government would respectfully request the opportunity to file a supplemental ex parte submission with the Court.

for the discovery and disruption of the Cartel's train route. Fearing for his life, CW #2 went into hiding. Several years later, CW #2 learned from another member of the Cartel that the defendant and his partner Ismael Zambada Garcia, also known as "Mayo," had both put contracts out for CW #2's murder, but that their sicarios, or hit men, had been unable to locate CW #2.

- CW #3 was a computer engineer who designed a private, encrypted communications system used by the defendant and certain of his Colombian cocaine suppliers. CW #4 was an associate of the defendant and the Colombian suppliers. CW #4 is expected to testify that, in 2012, s/he traveled from Mexico to Colombia to meet with CW #3 at the direction of one of the defendant's associates. Previously, the defendant and the associate had discussed killing CW #3, because they suspected CW #3 of being a confidential source for the United States government. CW #4 was supposed to meet with CW #3 to lure CW #4 out, so that the plan to murder CW#3 could be carried out. CW #4 went to Colombia for this purpose, but could not go through with the mission because CW #4 feared for CW #3's life.

- CW #5 is expected to testify that s/he was a high-ranking Sinaloa Cartel member, who worked directly with the defendant and his partner Mayo Zambada. In 2008, CW #5 was arrested in Mexico along with two of his stepsons. One stepson began cooperating shortly after his arrest, and he was sent to the United States for protection. The other son remained in custody in Mexico. Months later, the son who remained in Mexico was found dead in his jail, after purportedly committing suicide. Later, Mayo Zambada admitted that he had killed CW #5's son because he was thought to be cooperating. A third son of CW #5 was gunned down in Sinaloa, Mexico, two days after it was disclosed in a reverse proffer that CW #5 was a cooperating witness against Alfredo Beltran Leyva, a member of the Beltran Leyva Organization ("BLO"), which was previously aligned with the Sinaloa Cartel. The son had been in Mexico to visit his newborn baby.

   Given this information, as well as the publicly available information disclosed in the government's motion for a protective order, see Dkt. No. 28 at 4, and detention memorandum, see Dkt. No. 17 at 20 (describing expected cooperating witness testimony regarding the defendant's murder of Julio Beltran and his use of sicarios during the cartel wars), the government has demonstrated good cause under Rule 16 to protect witness statements under § 3500 and Rule 16 material that would disclose witness identities and locations. The government expects to produce numerous such documents during the course of this litigation pursuant to the Proposed Order, including notes and reports of witness interviews, affidavits in support of extradition, wiretap applications, seizure reports, consensually recorded telephone calls and other documents. These materials, as Defense Counsel has agreed, are properly designated as Protected Material pursuant to Rule 16.

3

II.    Information Related to On-going Investigations



4

Case 1:09-cr-00466-BMC-RLM Document 611-1 Filed 05/05/19 Page 4 of 11 PageID #: 10131

II.    Information Related to On-going Investigations



III.	Information Disclosing Sensitive Law Enforcement Techniques

5





## IV. The Prior-Approval Requirements

The Proposed Order includes prior-approval requirements for dissemination of the Protected Material to foreign nationals and persons beyond the Defense Counsel's Team, see Dkt. No. 44, Ex. A ¶¶ 2, 5. In light of the defendant's history of using foreign attorneys and members of his family to further his criminal enterprise, his demonstrated ability to corrupt all levels of government in Mexico and other countries and the overall breath of the defendant's criminal organization, the government submits that these prior-approval requirements are warranted. Specific examples of such conduct include, but are not limited to, the following:

- CW #1 is expected to testify that, between 1986 and 1993, s/he paid attorneys money at the direction of the defendant with the understanding that the attorneys would pay judges to make cases against the defendant and his criminal associates disappear. The defendant, through CW #1, paid up to $1 million to "fix" a case. In addition, when the defendant was incarcerated in 1993, the head of the jail was unwilling to accept bribes. As a result, the jailer was killed shortly after the defendant began his incarceration, and he was replaced by a corrupt individual. CW #1 paid the new head of the jail $10,000 every month from 1994 until the defendant was transferred to another facility in 1995, so that the defendant could run his drug trafficking organization from the prison. During this time, the defendant communicated with his drug trafficking associates from jail primarily through Marcello Pena, who is the brother of Estella Pena, the defendant's ex-wife. Pena met with the defendant almost every day to pass messages to the defendant's drug trafficking associates, including his brother Arturo Guzman, who ran the day-to-day operations of the drug business, while the defendant was incarcerated.

- CW #6 was a former Mexican police officer who, in the early 2000s, went to work for the head of the BLO, Arturo Beltran Leyva, which was aligned with the Sinaloa Cartel at the time. CW #6 is expected to testify that s/he was responsible for public corruption payments for the BLO. In approximately 2005, CW #6 was sent to Culiacan, Sinaloa, Mexico, per order of Arturo Beltran Leyva. During this time, there was a war between the BLO, in alliance with the Sinaloa Cartel, and the rival trafficking organization run by Los Zetas, which was allied with the Juarez Cartel. Culiacan was controlled by Alfredo Beltran Leyva (the younger brother of Arturo), for the BLO, as well as the defendant and his partner, Mayo Zambada. CW #6's first task upon arriving in Culiacan was to ensure that all of the appropriate public officials were being bribed and working for the BLO. According to Alfredo Beltran

Leyva, all of the public officials in Culiacan were being paid off, including: local, municipal, state and federal police, the local and state prosecutor's office, and the governor. While most all of the armed forces were also on the BLO's payroll, there was one General who would not accept the Cartel's bribes. In response to this defiance, the defendant, Mayo and Alfredo Beltran Leyva, Arturo's brother, each contributed $1 million US dollars (for a total of $3 million) as a corruption offering to the General. In a rare instance in Mexico, the General refused the corruption payment from the three Cartel heads, and threatened to arrest the next person who attempted to bribe him. While Alfredo wanted to have this General killed, this was not authorized by Arturo. Instead, the DTO workers gathered stray dogs, killed them and then laid the carcasses in the front yard of the General's residence with a "narco banner"[5] threatening the General's life. The General eventually left Culiacan.

- CW #7 is expected to testify that he was a Sinaloa Cartel pilot and coordinator for drug shipments. According to CW #7, on two separate occasions, he bribed a member of the Federal Public Ministry in Mexico to facilitate the release of other cartel members from the Mexican prison system. Additionally, in 2010, CW #7 negotiated an arrangement on behalf of the Cartel with a Mexican Policia Federal Preventiva officer, whereby the Cartel's vehicles carrying drugs would be permitted to pass each police checkpoint for a price of $10,000 and each X-Ray station for a price of $30,000.

- CW #8 is expected to testify that he was a member of the Sinaloa Cartel, who operated as a Cartel representative in Colombia and Ecuador. In 2013, he was charged with securing a runway at the San Luis Airport in Colombia for the purpose of transporting narcotics through that commercial airport. He was authorized by the Cartel to pay airport officials $250,000 for the use of that airport, so that Cartel pilots could transport large quantities of cocaine through it.

- As discussed in the government's ex parte submission dated February 2, 2017, 

---

[5] A "narco banner" is a type of sign used by drug cartel members as a means to publicly advertise their criminal organizations and threaten rivals.

8



- Multiple other cooperating witnesses are expected to testify that the Sinaloa Cartel and their associated drug trafficking organizations bribed government officials in Colombia, Ecuador, Honduras, Guatemala and other locations in Central America.

Based on the foregoing information, the government has demonstrated good cause for the prior-approval requirements in the Proposed Order. Throughout his criminal career, the defendant has relied on family members, criminal associates, foreign attorneys and corrupt officials to do his bidding. He has built an extensive international network of such persons, who have demonstrated their willingness to use the defendant's vast financial resources to achieve the defendant's goals and, where that fails, to use violence. The prior-approval requirements are necessary to ensure that such persons do not access the Protected Material, and it is only the government that has access to the information necessary to properly vet them. Foreign nationals, in general, pose a more substantial risk of violating the protective order than United States citizens, because they may easily flee beyond the Court's jurisdiction. But the pervasive corruption of foreign governments in this case and the defendant's reliance on foreign attorneys to commit his crimes, weigh heavily in favor of proper vetting before foreign nationals are permitted to join Defense Counsel's Team.

Similarly, the potential witnesses in this case, to whom Defense Counsel may seek to disclose the Protected Material are, by definition, likely to be members or associates of the defendant, the Sinaloa Cartel or other criminal organizations doing business with the Cartel. Indeed, drug trafficking is the defendant's family business and many of his family members are deeply involved in his crimes. Disclosure of the Protected Material to the



9

defendant's family members or other members of the Sinaloa Cartel or other drug trafficking organizations determined to be potential fact witnesses by Defense Counsel, without proper vetting, presents serious safety concerns. It also presents concerns that those persons will use the Protected Material to thwart ongoing investigations. Thus, the Court should include the prior-approval requirements in the Proposed Order.

V.    Limitation on the Dissemination of Publicly Available Section 3500 Material

In the Proposed Order, the government has requested that Defense Counsel not be permitted to disseminate witness statements provided pursuant to § 3500, even if that material is in the public domain. While some witness statements may be available in the public domain, such as the transcript of previous witness testimony in another criminal proceeding, those publicly available statements do not reveal that the witness is now a witness in this case. Dissemination of the publicly available statements by Defense Counsel, however, would identify the witnesses as potential witnesses against the defendant. Defense Counsel's dissemination of the publicly available statements of a witness thus poses a significant risk of harm to that witness.

For instance, CW #1, described above, who the defendant previously tried to kill four separate times, testified in a prior criminal proceeding against an associate of the defendant. The transcript of his testimony is public. The government, however, has not publicly confirmed that CW #1 will be a witness against the defendant. If Defense Counsel were to disseminate the transcript of CW #1's previous testimony, which the government ultimately will turn over as § 3500 material, that dissemination would confirm that CW #1 is a potential witness for the government in this trial. That would pose a serious risk of harm to CW #1 and his/her family. Disclosure of CW #1's prior testimony in connection with this case would put the family in grave risk of harm, especially if that testimony is publicly disclosed. To be sure, CW #1 ultimately may need to testify at this trial, at which time, his/her identity will need be disclosed. If the defendant pleads guilty after § 3500 material is disclosed, but before trial, though, CW #1's identity may never need to be publicly disclosed. And, in any event, the government has a significant interest in minimizing the potential harm to its cooperating witnesses leading up to trial, because the defendant's incentive to harm those witnesses is greatest before they testify against him. For these reasons, the government requests that Defense Counsel be precluded from further disseminating witness statements disclosed pursuant to § 3500, as such dissemination would identify them as potential witnesses in this trial.

VI.     Conclusion

        For the foregoing reasons, and for the reasons set forth in the government's reply brief, the government respectfully submits that its motion for a protective order should be granted and that the Court enter the Proposed Order without modification.

        Respectfully submitted,

        ROBERT L. CAPERS
        UNITED STATES ATTORNEY
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201

        ARTHUR G. WYATT, CHIEF
        Narcotic and Dangerous Drug Section
        Criminal Division,
        U.S. Department of Justice

        OF COUNSEL:

        WIFREDO A. FERRER
        UNITED STATES ATTORNEY
        Southern District of Florida