GMP:PEN/ASF/MPR/BR
F.#2009R01065/OCDETF# NY-NYE-616

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JOAQUIN ARCHIVALDO GUZMAN LOERA,
    also known as "El Chapo," "El Rapido,"
    "Chapo Guzman," "Shorty," "El Senor,"
    "El Jefe," "Nana," "Apa," "Papa," "Inge"
    and "El Viejo,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

Docket No. 09-CR-466(S-4)(BMC)

MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S
SECOND MOTIONS *IN LIMINE*

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

OF COUNSEL:
ARIANA FAJARDO ORSHAN
United States Attorney
Southern District of Florida

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ........................................................................................ 3

ARGUMENT ........................................................................................... 7

I.    Motion to Admit Certain of the Defendant's Acts of Violence
      and Drug Trafficking Activity As Direct Evidence and/or
      Pursuant to Rule 404(b)...................................................................... 7

      A.    Legal Standard ........................................................................ 8

      B.    Evidence of the Defendant's Kidnapping and Torture is
            Admissible ........................................................................... 10

      C.    Evidence of Certain of the Defendant's Violent Acts are
            Admissible To Show the Position of Trust Between the
            Defendant and Coconspirators and To Complete the
            Story of the Crimes on Trial ......................................................... 18

      D.    Evidence of the Defendant's Threats and Intimidation of
            Potential Witnesses is Admissible as Consciousness of
            Guilt ................................................................................ 22

      E.    Evidence of the Defendant's Drug Trafficking Prior to
            and After the Charged Period is Admissible ........................................ 24

      F.    The Defendant's Drug Trafficking While in Prison is
            Admissible ........................................................................... 29

      G.    The Foregoing Evidence is Not Unfairly Prejudicial
            Under Rule 403 ...................................................................... 30

II.   Motion to Admit Evidence of Defendant's Flight from Justice.................................. 33

      A.    Background........................................................................... 34

      B.    The Court Should Admit Evidence of the Defendant's
            Escapes and Flight .................................................................. 40

III.  Motion for Judicial Notice of the Defendant's Public U.S.
      Indictments and the Rewards Offered for His Arrest................................... 42

i

IV.   Motion to Admit Defendant's Voluntary Statements to U.S.
      Law Enforcement ................................................................................. 46

      A.   Background ................................................................................. 46

      B.   The Defendant's Statements to DEA Agents Are
           Admissible as Statements by a Party-Opponent ............................... 49

      C.   Introduction of the Defendant's Voluntary Statements to
           DEA Agents Does Not Violate *Miranda* ......................................... 49

V.    Motion to Admit Defendant's Letters as Statements of a Party-
      Opponent ............................................................................................ 56

      A.   Legal Standard ........................................................................... 57

      B.   The Defendant's Letters are Admissible ......................................... 58

VI.   Motion to Admit the Defendant's Book ................................................... 59

      A.   Background ................................................................................. 60

      B.   Legal Standard ........................................................................... 60

      C.   The Book is Admissible ............................................................... 63

VII.  Motion to Admit Statements of a High-Ranking Cartel Leader
      to His Son as Either Coconspirator Statements or Declarations
      Against Penal Interest ........................................................................ 64

VIII. Motion to Admit Statements in Video Evidence ...................................... 66

      A.   Background ................................................................................. 67

      B.   Legal Standard ........................................................................... 68

      C.   The Statements in the Video Evidence are Admissible
           and Will Aid the Jury ................................................................. 70

IX.   Motion to Prohibit Dissemination of Photographs and Sketches
      of Cooperating Witnesses ..................................................................... 73

      A.   Legal Standard ........................................................................... 73

      B.   The Court Should Prohibit Dissemination of Photographs
           and Sketches of Cooperating Witnesses ......................................... 75

X.      Motion to Preclude Elicitation of Information Related to the
        Witness Security Program and Cooperating Witnesses' Family
        Members ........................................................................................... 79

        A.      Witness Security Program Information .......................................... 79

        B.      Cooperating Witnesses' Family Members ...................................... 82

XI.     Motion to Redact the Certain Names and Replace Them With
        Initials in Transcripts and Translations of Recorded Messages .................. 83

XII.    Motion to Preclude Evidence and Argument Alleging
        Selective Prosecution of the Defendant ...................................... 84

XIII.   Motion to Preclude the Defense from Presenting Irrelevant
        and/or Unfairly Prejudicial Evidence and Argument ................................. 86

        A.      Legal Standard ........................................................................ 87

        B.      The Court Should Preclude the Defense from Introducing
                Evidence or Eliciting Testimony Regarding Sensitive
                Law Enforcement Techniques .......................................... 87

        C.      The Court Should Preclude Reference to A Government
                Official's Statements Regarding Cooperating Witnesses............................... 91

        D.      The Court Should Preclude Reference to Certain Books
                Regarding the Defendant .................................................. 91

        E.      The Court Should Preclude Reference to the "Fast and
                Furious" Operation and Firearms Derived Therefrom ................... 93

XIV.    Partial Sealing is Appropriate ..................................................... 95

        CONCLUSION............................................................................. 97

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its second motions in limine to permit the government to introduce into evidence at trial: (1) the defendant's acts of violence, such as torture, kidnapping, threats and assault, and certain drug trafficking activity as direct evidence of the crimes charged and/or pursuant to Federal Rule of Evidence 404(b); (2) the defendant's escapes from jail and other instances of flight from justice as direct evidence of the crimes charged and/or Rule 404(b) evidence; (3) the judicially noticed facts of the defendant's U.S. indictments and the rewards for information leading to his arrest; (4) the defendant's voluntary, incriminating statements to Drug Enforcement Administration ("DEA") agents while he was in prison in 1998 as statements of a party-opponent; (5) letters written by the defendant as statements of a party-opponent; (6) books written at the direction of the defendant as statements of a party-opponent; (7) statements of a high-ranking member of the Sinaloa Cartel to his family member as coconspirator statements and/or statements against penal interest; and (8) certain statements in the government's video evidence.

The government also moves to (9) prohibit dissemination of photographs and sketches of its cooperating witnesses; (10) preclude the defendant from eliciting information related to cooperating witnesses' participation in the Witness Security Program and information related to cooperating witnesses' family members; (11) redact certain names from transcripts and translations; (12) preclude any evidence and argument alleging selective prosecution of the defendant; and (13) preclude the admission of evidence or argument by the defendant regarding a number of topics that are either irrelevant or would likely confuse the issues, mislead the jury or result in unfair prejudice to the government.

For the reasons set forth herein, the Court should grant the government's motions in limine.

<u>BACKGROUND</u>[1]

The government hereby incorporates by reference the procedural history and factual background from the background section of its first motions <u>in limine</u>.  <u>See</u> Gov't First Br., Dkt. No. 213 at 2-8.  Some of the arguments in this motion are related to issues the government previously placed before the Court in its first motions <u>in limine</u>.  In the Court's ruling on the government's first motions <u>in limine</u>, <u>see</u> Mem. & Order Granting in Part and Denying in Part the Parties' Motions <u>In Limine</u>, Dkt. No. 240 (the "Order"), the Court indicated that it lacked sufficient information to issue pretrial rulings on several issues.  The government provides additional factual detail herein related to some of those issues.  Thus, the government sets forth below a brief summary of the government's previous motions and the Court's rulings to provide context for some of the arguments it raises in this motion.

In its first motions <u>in limine</u>, the government moved to introduce into evidence at trial: (1) the defendant's acts of violence and certain drug trafficking activity as direct evidence of the crimes charged and/or pursuant to Rule 404(b); (2) the defendant's escapes from jail and other instances of flight from justice as direct evidence of the crimes charged and/or Rule 404(b) evidence; (3) certain intercepted and recorded wire and electronic communications, as well as video evidence; (4) relevant portions of a videotaped interview of the defendant published by a news outlet; (5) satellite photographs; (6) drug ledgers and (7) attorney payment records.  The government also moved (8) to permit a government witness

_____

[1] The factual background set forth throughout this motion is a summary of facts that the government expects to prove at trial through witness testimony, as well as physical, documentary and other evidence.  The government has not endeavored to set forth all facts that it expects to prove at trial.

to testify under a pseudonym and (9) to preclude examination of government witnesses concerning certain personal identifying information. Finally, pursuant to Federal Rules of Evidence 401, 402 and 403, the government moved to preclude (10) any evidence and argument alleging selective prosecution of the defendant and (11) the admission of evidence or argument by the defendant regarding a number of topics which are either irrelevant or would likely confuse the issues, mislead the jury or result in unfair prejudice to the government. See generally Dkt. No. 213.

   With respect to the government's motion to admit various categories of evidence, the Court ruled that: (1)(a) at least some evidence of the defendant's acts of violence would likely be admissible as either direct evidence of Violation 85 of the Continuing Criminal Enterprise ("CCE") charged in Count One of the Fourth Superseding Indictment (the "Indictment"), or may be admissible under Rule 404(b), but that the Court did not have sufficient information before it to make a pretrial ruling, and (b) evidence of the defendant's drug trafficking prior to the time period of the charged conspiracy, (c) evidence of the defendant's drug trafficking while incarcerated in Mexico and (d) evidence of the defendant's fentanyl trafficking also likely would be admissible assuming the government lays an adequate foundation; (2) evidence related to the defendant's flight from justice is likely admissible as evidence of the charged CCE and as evidence of the defendant's consciousness of guilt, assuming the government lays an adequate foundation; (3)(a) the government's proposed methods of authenticating intercepted and recorded conversations is proper, (b) videos of news footage are self-authenticating, (c) the Court would reserve ruling on the admission of reporters' statements as present-sense impressions, (d) the government may introduce transcripts and translations of recorded calls to aid the jury and (e) cooperating witness

testimony interpreting recorded conversations and video evidence is likely admissible; (4) the government may introduce portions of a video interview given by the defendant in 2015; (5) satellite photographs of the defendant's ranch are likely admissible assuming an adequate foundation and sufficient authentication; and (6) drug ledgers may be admissible, but the Court did not yet have sufficient information before it to permit a pretrial ruling.[2]  See generally Dkt. No. 240.  The Court also granted the government's motion (7) to permit a witness to testify using a pseudonym, albeit using initials, and (8) to limit cross-examination as to specific identifying information of government witnesses.  See id. at 11-12.

With respect to the government's motion to preclude various defense arguments, the Court ruled that (9) a selective-prosecution argument by the defendant would be improper, but denied the government's motion as premature and (10) the government's motion to preclude other anticipated defense arguments was also premature, given that the defendant had not yet indicated that he would attempt to introduce such evidence.  See id. at 12-13.

* * * * * * * *

As set forth below, in this motion, the government requests that the Court admit specific evidence and make certain other rulings regarding evidence it will present.  The government also asks that the Court preclude the defendant from presenting certain evidence and lines of argument at trial.  These motions include some arguments that the government has renewed in light of the additional information it has proffered here to the Court.  To avoid

---

[2] The government withdrew its motion to admit attorney payment records.  See Dkt. No. 229 at 34.

unnecessary repetition, the government addresses the facts pertinent to each motion in turn below.  The Court should grant the government's motions for the reasons discussed herein.

ARGUMENT

I.    Motion to Admit Certain of the Defendant's Acts of Violence and Drug Trafficking Activity As Direct Evidence and/or Pursuant to Rule 404(b)

As the Court has ruled, see Mem. & Order Denying Def. Motion to Strike Violation 85, Dkt. No. 303 at 8-10, evidence of the defendant murdering, ordering his coconspirators to murder, or otherwise conspiring to murder, individuals who posed a threat to the Sinaloa Cartel is direct evidence of the charged CCE. Such evidence also is admissible pursuant to Rule 404(b). See id. at 10-12. Moreover, as the Court has found, such evidence is also probative of particular witnesses' connection to the defendant and why he trusted them, and may be probative of the crime charged in Count Sixteen of the Indictment (unlawful use of a firearm in furtherance of the CCE and drug crimes). Id. at 10.

Apart from such conduct, during trial, the government also expects to elicit testimony from multiple cooperating witnesses about the defendant's criminal conduct described below—some of which is not specifically charged in the Indictment and/or occurred prior to, or after, the charged time period—that is direct evidence of the methods and means of the charged CCE and drug trafficking crimes. Specifically, the government expects to elicit testimony from multiple cooperating witnesses concerning the following:

- Torture and kidnapping committed by the defendant, and the defendant's orders to commit such acts, some of which occurred prior to the date on which the charged CCE and drug trafficking conspiracy counts begin;

- Uncharged violent acts that relate to the defendant's relationship of trust with his coconspirators and completes the story of the crime on trial;

- Threats and intimidation of potential witnesses after the end date of the charged conspiracy;

- Defendant's drug trafficking prior to January 1989, and after September 2014, the charged date range for the CCE and drug trafficking conspiracy counts; and

7

- Defendant's drug trafficking activity while he was imprisoned in Mexico from 1993 to 2001.

For the reasons discussed below, evidence regarding all of these events should be admissible as direct evidence of the charged CCE and conspiracy counts. In the alternative, it is admissible as "other crimes" or Rule 404(b) evidence. The government raised this issue in its first motions in limine. See Dkt. 213 at 18. The Court denied that motion because it did not have sufficient information before it to make a pretrial ruling, but stated that it may well be admissible if the government laid a sufficient foundation. See Dkt. No. 240 at 6-7. The government hereby renews its motion and has supplied additional facts herein.[3]

A.   Legal Standard

Evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks and citation omitted); see Dkt. No. 303 at 9. In addition, the Second Circuit has explained that, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v.

---

[3] As stated in its first motion in limine, see Dkt. No. 213 at 10 n.3, in the event the Court believes that this evidence described below falls within the ambit of Rule 404(b), rather than direct evidence, the government hereby renews its notice of its intent to offer at trial evidence of the categories of crimes detailed above, see Fed. R. Evid. 404(b) (stating that, "[o]n request by a defendant in a criminal case," the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial").

Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).  Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime."  Id.; see also Fed. R. Evid. 401, 402.  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997).

In the context of providing narrative context and dimension to the government's proof, courts have permitted evidence of uncharged crimes to show the background of the charged conspiracy and to show the relationship of trust between the defendant and his coconspirators.  See United States v. Kalaydjian, 784 F.2d 53, 56 n.3 (2d Cir. 1986) (evidence of defendant's prior meeting with cooperating witness, at which plan to purchase heroin was discussed, was properly admitted "to establish the basis of the trust relationship between [cooperating witness] and [defendant]"); United States v. Harris, 733 F.2d 994, 1006-07 (2d Cir. 1984) (permissible for trial court to admit evidence of defendant's prior narcotics dealings with informant which "tended to show the basis for [defendant's] trust of [informant]"); see also, e.g., United States v. Talley, 164 F.3d 989, 1000 (6th Cir. 1999) (statements made by informant in tape-recorded conversation with defendant, including that informant and defendant had sold drugs together at one point, were properly admitted because they "established [defendant's] and [informant's] long term relationship" and helped explain why defendant would solicit informant to commit murder).

To the extent that uncharged criminal conduct is considered "other crimes" evidence, courts apply the analysis under Rule 404(b).  Evidence of a defendant's other acts is admissible under Rule 404(b) if relevant to an issue at trial other than the defendant's

character—such as proving motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident, see Fed. R. Evid. 404(b)(2)—and if its probative value is not substantially outweighed by the risk of unfair prejudice.  See United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000).  The Second Circuit follows an "inclusionary approach," which admits all relevant "other act" evidence that does not serve the sole purpose of showing the defendant's bad character and that is not overly prejudicial.  See United States v. Moran-Toala, 726 F.3d 334, 345 (2d Cir. 2013) (internal quotation marks and citation omitted).

      B.      Evidence of the Defendant's Kidnapping and Torture is Admissible

Evidence of the defendant's use of kidnapping, torture, assault and threats to control drug territory, collect debts and intimidate individuals whom he believed were cooperating with law enforcement or otherwise posed a threat to the Sinaloa Cartel, is "inextricably intertwined" evidence that is part and parcel of the charged CCE and conspiracy counts.  Carboni, 204 F.3d at 44.  Indeed, courts have held that uncharged acts of violence are frequently "performed as overt acts in furtherance of, and thus are direct evidence of, an alleged drug distribution conspiracy."  United States v. Barret, No. 10-CR-809 (S-3)(KAM), 2011 WL 6704862, at *5 (E.D.N.Y. Dec. 21, 2011), aff'd, 677 F. Appx. 21 (2d Cir. 2017) (admitting evidence of uncharged violent acts as direct evidence in CCE case).  The Court should admit such evidence at trial.

      i.      Background

At trial, the government expects to introduce cooperating witness testimony and other evidence proving that the defendant participated in and directed numerous acts of violence, including torture and kidnapping during the charged period.  Such acts committed during the charged period are, in some instances, admissible as evidence of Violation 85 of

Count One of the Indictment, or in other instances as inextricably intertwined, direct evidence of the overall CCE and drug conspiracy.  A brief description of some of the evidence the government expects to introduce during trial follows below.

As an example of the kidnapping and other violence that is part of the evidence of Violation 85, during the war with the Gulf Cartel and Los Zetas, the defendant instructed his "sicarios" (hitmen) or "pistoleros" (gunmen) to locate, kidnap, torture and interrogate any suspected member of the rival cartels.  At the defendant's explicit orders, his sicarios kidnapped rivals and brought them to him, often bound and helpless, and the defendant then personally interrogated the rivals.  Indeed, in at least one instance, the defendant himself shot the rivals at point-blank range and ordered his lackeys to dispose of the bodies.  Cooperating Witness No. 1 ("CW1") will testify that, around 2006, the defendant's workers brought two suspected Zetas members to the defendant.  After having lunch, the defendant interrogated them, had them beaten and then personally shot them both in the head with a long gun.  The defendant then ordered his workers to dig a hole in the ground, light a fire inside the hole, and throw the bodies in the hole to be burned and subsequently buried.

Later, in 2008, Mexican authorities arrested a leader of the Beltran Leyva Organization ("BLO"), Alfredo Beltran Leyva, also known as "Mochomo."  The other leaders of the BLO believed that the authorities arrested him at the defendant's behest.  This arrest triggered a series of events that fractured the longtime alliance between the defendant and Mayo Zambada on the one hand, and the BLO on the other.  War broke out between the factions.  The defendant, along with Mayo Zambada, ordered hundreds of armed "sicarios" to actively search for any workers of the BLO in Culiacan, especially its top lieutenants.  In retaliation, the BLO ordered their "sicarios" and "pistoleros" to target the defendant's workers

and lieutenants.  Shootouts were frequent, violence was rampant and finding dead bodies strewn across the city of Culiacan was a regular occurrence.  The sicarios representing the defendant's Cartel were well organized and well equipped.  When they did not kill their rivals in shootouts, they abducted and interrogated them to garner intelligence about their rivals' activities.  The defendant ordered most of the captured rivals to be killed and their bodies disposed.

During the height of this war, from approximately 2008 through 2011, the defendant pursued some members of the BLO more than others; close to the top of his list was Israel Rincon Martinez, also known as "Wacho" and "Guacho" ("Rincon"), who had formerly worked for the defendant.  In approximately 2010, Rincon was a top lieutenant and enforcer for the BLO, and actively killed members of the Sinaloa Cartel.  The government anticipates that Cooperating Witness No. 2 ("CW2") will testify that he knew Rincon to be Alfredo Beltran Leyva's secretary.  According to CW2, Rincon had killed the son of the defendant's ally, Manuel Fernandez ("El Animal") because Rincon mistakenly believed that the victim was Ivan Archivaldo Guzman, one of the defendant's sons.  CW2 learned that the defendant gave Alfredo Beltran Leyva's son, Alfredito Beltran Leyva, an ultimatum—either turn over Rincon or the defendant would kill Alfredito.  One of the defendant's sicarios known as "50" picked up Rincon after Alfredito set him up.  Rincon was initially taken to a large garden house where CW2 saw approximately twenty armed people who worked for the defendant.  CW2 saw the defendant's sons and his sicarios torturing two of Rincon's people.  CW2 also saw Rincon tied up to a chair where several high-ranking members of the Sinaloa Cartel, including the defendant's sons, were present and interrogating Rincon.  A doctor arrived shortly thereafter to revive Rincon, who had lost consciousness, so they could continue torturing him in a variety

12

of ways, including shocking his ear and pulling out his teeth.  CW2 will testify that he observed one of the defendant's lieutenant's Juan Guzman Rocha, also known as "Juancho," asking Rincon questions and taking notes in a notebook.

The government expects that CW2 will testify that he saw Rincon again shortly thereafter at a ranch where the defendant, Mayo Zambada, the defendant's sons and other high-ranking members of the Sinaloa Cartel were present.  At that time, CW2 was brought to a warehouse on the property and saw Rincon seated with his hands cuffed behind his back.  The defendant and Mayo began interrogating Rincon in CW2's presence.  Rincon was then taken to another location.

One of the members of the defendant's Cartel made a video recording of Rincon's interrogation, which ultimately was uploaded to YouTube.  See Ex. A.  CW2 will testify that he visited Rincon at a location that looks similar to the location depicted in the YouTube video.  CW2 observed Rincon bound and missing teeth at that location.  CW2 later learned that Rincon's dead body was found on the street in Culiacan.

The government also expects to introduce evidence about numerous kidnappings that the defendant and his workers committed in furtherance of the charged CCE, which did not necessarily result in murders.  For example, as discussed in its first motions in limine, see Dkt. No. 213 at 31, the government expects to introduce a video at trial showing the defendant interrogating a kidnapped and bound member of a rival cartel in another YouTube video.  See Ex. B.  The government anticipates calling at least one cooperating witness, Cooperating Witness No. 7 ("CW7"), to authenticate the video who will testify that a coconspirator showed him a video of the defendant interrogating an individual under a "palapa," or gazebo.  CW7 recalls the coconspirator stating that the video was taken in the

same location where the coconspirator was showing the video to CW7 and that the "patron" investigated his enemies there.  CW7 is familiar with the fact that members of the Cartel often referred to the defendant as the "patron."  CW7 recalls that the location was named "Los Lychees."  CW7 recalls this video being made during the war with the BLO and believed or knew that the individual being interrogated was a member of that organization.  CW7 is expected to testify that Exhibit B is a fair and accurate depiction of the video that the coconspirator showed to him.[4]

The government expects to elicit testimony from its cooperating witnesses about kidnappings that the defendant ordered to intimidate former cartel members whom he suspected of cooperating with law enforcement and individuals who owed money to him.  For instance, the government expects that CW1 will testify that his parents, sibling and significant other were kidnapped shortly after CW1 was arrested by a group of armed individuals in 2014, a few months after the end of the charged conspiracy.  Prior to his arrest, CW1 had been embedded with the defendant for nearly 4 years, and worked with him for 10 years.  CW1's significant other recognized the kidnappers as workers for the defendant's older sons, Ivan Archivaldo Guzman Salazar and Jesus Alfredo Guzman Salazar.  While holding CW1's loved ones, the kidnappers inquired about the arrest of CW1, and asked details about how it occurred.  Further, the kidnappers instructed CW1's family members to tell CW1 to retain an attorney in the United States of the Cartel's choosing, who was then sent to visit CW1 in custody to represent him.  Based upon his past experience working closely with the defendant and as a

---

[4] The government expects to introduce additional witness testimony and other evidence corroborating the CW's testimony, including recorded communications, that the defendant is depicted in the video.

worker for the Sinaloa Cartel as a whole, CW1 will testify that he understood that the kidnappers' inquiries were made in an effort to ensure that CW1 was not cooperating—and would not cooperate—with law enforcement authorities.  Furthermore, CW1 believed that the defendant was foisting the Cartel's attorney upon him to ensure that he did not cooperate with authorities.  Under the circumstances, CW1 understood that these orders came directly from the defendant.

CW1's mother and sibling were released within 24 hours of the initial kidnapping; but CW1's father and significant other were not as lucky.  CW1 will testify that he managed to communicate to the defendant through a backchannel, from custody, that he was not cooperating with law enforcement authorities.  As a result, the defendant's son's workers released CW1's father and significant other approximately one month after they had been captured.

The defendant and his workers did not kidnap only for purposes of dissuading individuals from cooperating with law enforcement.  They also committed kidnappings to encourage business associates to repay their debts.  For example, Cooperating Witness No. 3 ("CW3") will testify that on one occasion, the defendant had been working with an airplane dealer based in Panama to whom he had sent approximately $200,000 to $300,000 in connection with a cocaine shipment that he was arranging.  When the airplane dealer arrived in Mexico to meet with the defendant and CW3 about the pending cocaine deal, the defendant had the airplane dealer and her spouse detained and handcuffed in a house in Culiacan.  The defendant held them at the house for a week until another drug trafficking associate of the airplane dealer paid the debt on her behalf.

15

ii.     The Court Should Admit the Defendant's Acts of Kidnapping and Torture

As the Court has already ruled, any evidence concerning murders and murder conspiracy perpetrated by the defendant during the charged period is likely admissible as direct evidence of Violation 85 of Count One and, in most instances, Count Sixteen.  Many of the kidnappings, like the kidnapping of the Zetas and the Rincon kidnapping, are part of the evidence of murders that fall under Violation 85.  In any event, as explained below, district courts have repeatedly found that "[i]ntimidation, violence, and the payment of debts is generally understood to be intertwined with the management and operation of narcotics conspiracies."  United States v. Khan, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (finding that evidence of intimidation and violence was direct evidence—not reaching an alternative "other act" theory of admissibility under Rule 404(b)—where defendant was charged with being CCE leader); see also United States v. Estrada, 320 F.3d 173, 183 (2d Cir. 2003) (holding that "use of violence to secure the organization's drug turf [and] carrying and using firearms to enforce its control over the drug market" are overt acts of narcotics conspiracy).  Proof of violent actions—such as kidnapping or torture—taken or discussed by coconspirators in a narcotics operation is, therefore, not proof of "other acts," but rather direct evidence of the charged CCE and conspiracy counts.  See United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997) (concluding that evidence of numerous killings was admissible as direct evidence of narcotics conspiracy and enterprise); United States v. Becerra, 97 F.3d 669, 671 (2d Cir. 1996) ("[The Second Circuit has] 'repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade.'") (quoting United States v. Vegas, 27 F.2d 773, 778 (2d Cir. 1994)); see also United

16

States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996) (holding that statements about contract murder made during drug deal were intrinsic to drug conspiracy).

The government has introduced evidence of violent acts repeatedly in trials in this court as direct evidence of a drug conspiracy.  For example, in Barret, the Government moved in limine to introduce evidence at trial that a defendant had ordered an ambush to kill a rival drug trafficker.  2011 WL 6704862, at *6-*7.  The court, relying on Miller, found that "evidence of an order from [the defendant] to his soldiers to murder one of [his] rivals is relevant as direct evidence of the conspiracy because it shows the nature and existence of the conspiracy as well as [his] leadership in the organization."  Id. at *6.

Likewise, the defendant's acts of torture and kidnapping and such acts that he ordered are highly probative of the existence of the conspiracy, the lengths to which the defendant, as a preeminent leader of the Sinaloa Cartel, would go to defend his narcotics trafficking enterprise, and his leadership of the CCE.  They are, therefore, admissible as direct evidence of the charged crimes.  See United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992) (defendant's offer to cooperating witness to arrange murder was admissible to show membership of conspiracy and lengths to which defendant would go to protect narcotics operation); United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994) (evidence regarding beating admissible to show leadership of conspiracy).  All of the defendant's acts of kidnapping and torture, whether they resulted in murders or not, are direct evidence of the charged CCE and drug trafficking conspiracies.  Certainly, the kidnapping of a drug cartel rival and the kidnapping of a coconspirator for the purpose of inducing her to pay a drug-related debt is at the heartland of the type of "[i]ntimidation, violence, and the payment of debts [that] is

17

generally understood to be intertwined with the management and operation of narcotics conspiracies." Khan, 591 F. Supp. 2d at 205.

And, while the kidnappings and torture ordered by the defendant that led to murders are properly viewed as direct evidence of the crimes charged because they are "inextricably intertwined" with the murder conspiracy charged in Violation 85 and the firearms crimes charged in Count Sixteen, Carboni, 204 F.3d at 44, they may also be admissible as Rule 404(b) evidence. Indeed, most of the evidence relating to kidnapping and torture that the government intends to introduce relates to the murders of individuals who posed a threat to the Sinaloa Cartel, charged in Violation 85, and therefore are part of the preparation and plan that ultimately led to the murder of each victim. See Fed. R. Evid. 404(b)(2). For example, as described above, during the war with the BLO, the defendant ordered Rincon murdered. As part of the plan for that murder plot, the defendant ordered Rincon kidnapped and tortured prior to his murder. This type of evidence thus also is admissible under Rule 404(b).

C.    Evidence of Certain of the Defendant's Violent Acts are Admissible To Show the Position of Trust Between the Defendant and Coconspirators and To Complete the Story of the Crimes on Trial

i.    Background

In or about late 2007/early 2008, CW3 agreed to assist the defendant with producing a book about the defendant's life, which they planned to turn into a movie. The defendant sought to tell the story of his life to the public, and intended to use the book and movie to accomplish that end. CW3 enlisted his worker to assist him with this project. CW3's worker found a producer from Colombia (the "Colombian Producer"), who began working on behalf of the defendant to produce the book. In or about late 2007/early 2008, the Colombian Producer came to the mountains of Sinaloa, where the defendant was living in hiding at the

time, and conducted several interviews of the defendant.  With the defendant's knowledge, the Colombian producer also interviewed the defendant's immediate family members (i.e., his sons and wives) and close family friends, with the aim of using this information to produce the book.  During these interviews, the defendant provided statements about his life and, among other things, explained the circumstances under which he escaped from Puente Grande prison in 2001.  This project continued over the course of several years.

In or about 2012, the Colombian Producer came to Mexico to see the defendant and to conduct further interviews.  At that time, the Colombian Producer informed CW3 that he wanted to receive 35 percent of the profits from the book and movie project.  When CW3 informed the defendant about this proposal, the defendant grew angry.  The defendant thought that the Colombian Producer was a thief and wanted to give him a smaller lump sum.  Shortly thereafter, the defendant also began to believe that the Colombian Producer was an informant. As a result of these concerns, the defendant ordered the Colombian Producer killed and tasked CW3 with ensuring it was done.  CW3 devised a plan with his worker to kill the Colombian producer, but ultimately, CW3 was arrested before they took any substantial steps toward executing the plan.  Immediately after his arrest, CW3 asked CW3's spouse to warn the Colombian Producer that his life was in danger and not to return to Mexico.  The Colombian Producer has survived.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



  ii. <u>These Violent Acts Should Be Admissible to Show Relationship of Trust and to Complete the Story of the Crimes On Trial</u>

  As noted above, in the context of providing narrative context and dimension to the government's proof, courts have permitted evidence of uncharged crimes to show the background of the charged conspiracy and to show the relationship of trust between the defendant and his coconspirators.  <u>See</u> <u>Kalaydjian</u>, 784 F.2d at 56 n.3; <u>Harris</u>, 733 F.2d at 1006-07; <u>see also</u>, <u>e.g.</u>, <u>Talley</u>, 164 F.3d at 1000.

  Moreover, evidence of the defendant's participation in, or ordering of, violent acts is also properly admissible because it provides necessary context to many of the anticipated government witnesses' impeachment material.  Many of the government's anticipated cooperating witnesses engaged in violent acts on behalf of the Cartel the defendant

led, or may have been involved with incidents that would cause the defendant to have claims of bias against the witnesses.  Eliciting the witnesses' acts of violence is necessary to complete their own accounts of their illicit conduct.  See Dkt. 303 at 10.  The jury would be misled about the defendant's role in the overarching enterprise if it only learned about the witnesses' violent conduct without understanding that the defendant frequently ordered, or participated in, the violent conduct himself.  And, the fact that the defendant may have committed violent acts against the witnesses, ███████, is necessary to explain why the witness may harbor some bias against the defendant.

Here, the defendant's plot with CW3 to murder the Colombian Producer is direct evidence of the charged conspiracy because (1) it shows the relationship of trust between the defendant and CW3, and (2) it is further proof of the defendant's efforts to silence potential witnesses.  The fact that the defendant entrusted CW3 with carrying out his orders to kill the Colombian Producer, an individual outside of the drug trafficking world whose murder would likely draw close scrutiny from law enforcement, shows that he had a great deal of trust for CW3.  In any event, given that the defendant believed the Colombian Producer to be an informant, evidence of this murder conspiracy is "inextricably intertwined" with the charged conspiracy as charged in Count One, Violation 85, and is thus admissible as direct evidence of the charged conspiracy.[5]  See Carboni, 204 F.3d at 44; Concepcion, 983 F.2d at 392.

████████████████████████████████████████

████████████████████████████████████████

---

[5] The government also expects to elicit this evidence as a "bad act" of CW3, and discussion of the defendant's involvement is necessary to give the jury a fulsome and fair picture of CW3's conduct.

███████████████████████████████   This evidence is necessary to provide "evidentiary richness and narrative integrity in presenting a case."  Old Chief, 519 U.S. at 183. Without this testimony, the jury would be misled as to ███████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Gonzalez, 110 F.3d at 941.  This evidence also should be permitted to be admitted during the government's case-in-chief for the purpose of "taking the sting" out of any claims of bias that the defense may make on cross examination.

D.   Evidence of the Defendant's Threats and Intimidation of Potential Witnesses is Admissible as Consciousness of Guilt

i.   Background

As noted above, CW1 will testify that the defendant directed his workers to kidnap CW1's family members to intimidate him into silence.  Similarly, the government expects to elicit testimony that the defendant engaged in intimidation of other coconspirators after the charged conspiracy period.

The defendant was arrested on February 22, 2014, approximately three months after his long-time drug trafficking associate, CW3 had been captured by Mexican law enforcement.  The defendant was placed in the same prison with CW3.  Throughout the period while the defendant was housed with CW3, one of the defendant's Mexican attorneys regularly visited CW3.  On one of those occasions, the defendant's attorney stated to CW3 that if he/she wanted to cooperate, the same thing would happen to CW3 that had happened to another named

associate of the Sinaloa Cartel who was a well-known assassin.  At the time, it was widely believed that the defendant's assassins had killed members of the named associate's family once he had been arrested by the U.S. government and was suspected of cooperating with law enforcement.  Moreover, during the period that the defendant was housed in the same prison as CW3, they were placed in the same room together for the purpose of being interviewed by a prosecutor.  The purported interview lasted for several hours, during which the defendant and CW3 were permitted to speak freely with each other.  The defendant made clear to CW3 that they should tell the prosecutor that they did not know each other.  CW3 will testify that he felt intimidated by the defendant's insistence that CW3 protect the defendant.

ii.   Threats and Intimidation of Potential Witnesses is Probative of Consciousness of Guilt

Evidence about the defendant's threats and intimidation of potential witnesses after the end date of the charged conspiracy is direct evidence of the CCE because it shows the lengths to which the defendant would go to protect his enterprise.  The defendant's actions in this regard are highly probative of his consciousness of guilt.

A defendant's effort to intimidate or silence potential witnesses is probative of his consciousness of guilt.  See United States v. Mason, No. S17 96 CR. 126(JFK), 2000 WL 680361, *2 (S.D.N.Y. May 24, 2000) (citing United States v. Mickens, 926 F.2d 1323, 1329 (2d Cir.1991)).  Courts have admitted this type of evidence where the government has demonstrated that the defendant's tampering with potential witnesses is evidence of the enterprise charged in the indictment.  See United States v. Herron, No. 10–CR–0615 (NGG), 2014 WL 1894313, *5 (E.D.N.Y. May 12, 2014) (admitting evidence of witness tampering as

23

direct evidence of charged criminal enterprise where tampering done to silence witness of murders charged in indictment); see also Mason, 2000 WL 680361 at *2.

   The defendant's attempts to threaten CW3 into silence after his arrest in 2014 are highly probative of his consciousness of guilt.  As described above, CW3 had been a long-time drug trafficking associate of the defendant's and had participated with him in the conspiracy to kill the Colombian Producer.  The defendant's efforts to intimidate CW3 into silence through visits from the defendant's attorney and statements from the defendant himself, are direct evidence of the charged CCE because the tampering was done to prevent CW3 from speaking about his criminal relationship with the defendant and the drug trafficking crimes and murder conspiracies that are part of the charged Indictment.  As such, evidence of the defendant's threats to CW3 should be admissible as consciousness of guilt.

  E.  Evidence of the Defendant's Drug Trafficking Prior to and After the Charged Period is Admissible

    i.  Background

   At trial, the government expects to prove that the defendant engaged in drug trafficking prior to, and after, the period charged in the Indictment.  The defendant began his career in the drug trade in his early youth.  By his own admission in a video distributed by a news outlet and widely circulated on the internet, the defendant began planting, cultivating and selling both marijuana and poppy around age fifteen.  See Bates No. 000314123.[6]  Cooperating

---

[6] In the Order, the Court ruled that the portions of the video that the government seeks to admit at trial are admissible.  See Dkt. No. 240 at 9-10.

Witness No. 5 ("CW5") is expected to testify that the defendant made substantially similar admissions to him.

CW5 is expected to testify that, by the early and mid-1980s, the defendant expanded his activities into the international arena as he transitioned from selling drugs within Mexico to transporting drugs across the Mexico/U.S. border and eventually distributing drugs into the United States.  The defendant pioneered the use of cross-border tunnels between Mexico and the United States to ensure the quick delivery of drugs, mainly cocaine and marijuana.  The defendant actively sought to expand the quantities and types of drugs he was sending to the United States.  Therefore, the defendant traveled to Colombia proactively to seek out sources of supply for both marijuana and cocaine.   The defendant and his representatives met with various sources of supply, including the upper echelons of the Medellin Cartel—the most powerful Colombian drug cartel at the time—to reach an agreement to ship cocaine to the United States.

CW5 is further expected testify that the defendant's first forays into the cocaine trafficking business were relatively small, only a few cocaine-laden planes at a time landing on small airstrips in select locations in Mexico.  The defendant used his drug-smuggling tunnel that crossed the border between Agua Prieta, Sonora, Mexico and Douglas, Arizona to deliver the Colombian cocaine to the United States, and do so very quickly.  The defendant earned the nickname "El Rapido" due to the speed with which he delivered the cocaine in the United States.  It took the defendant as few as four or five days to transport large shipments of cocaine from Mexico to specific cities in the southern United States, such as Phoenix and Los Angeles, which was an unprecedented speed for that era of narco-trafficking.  As his reputation grew, so did the defendant's client base and shipment capacity.  Before long, the defendant arranged

for the nightly receipt of as many as 15 to 20 planes loaded with 1,000 to 1,500 kilograms of cocaine each.  These plane shipments to the defendant continued as the charged period began in 1989 and into the early 1990s, when the defendant switched to a maritime method of distribution.

In addition, after the end of the charged period in the Indictment, the defendant continued to operate his criminal enterprise and traffic narcotics even while in custody in late 2014.  Specifically, as discussed in more detail below, infra at Section V, the defendant sent at least three handwritten letters to members of the Cartel with instructions on collecting drug debts and continuing with current drug operations, as well as concerns about individuals that the defendant believed were cooperating with law enforcement authorities.

    ii.    The Defendant's Pre- and Post-Indictment Drug Trafficking is Admissible

The defendant's pre- and post-indictment drug trafficking activity is admissible as both direct evidence of the crimes charged and as background evidence that gives context to how the conspiracy and the defendant's drug trafficking enterprise developed and continued even while he was in custody.  Alternatively, it is admissible as Rule 404(b) evidence of the defendant's knowledge and intent.

First, evidence of the defendant's pre- and post-indictment period drug trafficking activity is direct evidence of the CCE.  The defendant's drug trafficking activity in the early and mid-1980's tells the story of how the defendant rose from a minor marijuana trafficker to a significant cocaine, methamphetamine, heroin and marijuana trafficker with international connections.  This evidence supplies a crucial piece of the history of the early days of the defendant's drug trafficking empire.  This evidence is "necessary to complete the

story of the crime on trial," because it explains how the defendant was able to traffic such massive quantities of cocaine from Colombia to the United States by 1989, the beginning of the charged period. Carboni, 204 F.3d at 44. Indeed, the evidence regarding the defendant's reputation for unprecedented speed in delivering and paying for drugs during that era of narco-trafficking—earning him the nickname "El Rapido"—provides essential detail and context for the defendant's rapid rise to power in the world of drug trafficking in the late 1980s. Id. This early drug trafficking activity also "is inextricably intertwined with the evidence regarding the charged offense;" during the charged period, the defendant relied on his long-standing relationships with Colombian cocaine suppliers—which he forged during this early period—to expand his drug trafficking enterprise. Id. The evidence of the defendant's pre-1989 conduct is helpful and necessary to the jury's understanding of the scope of his enterprise, and how he was able to re-establish himself as a high-level cocaine trafficker so quickly after escaping from prison in 2001.

The defendant's post-indictment drug trafficking activity is also direct evidence of the CCE. Specifically, the government will introduce letters written by the defendant (the "Defendant's Letters") showing that he continued to discuss with his closest coconspirators collecting pending drug debts and a recent seizure of drugs and weapons—both of which are part of the charged offenses. Further, several cooperating witnesses will discuss the defendant's continued distrust of members of the Cartel and fear that these individuals were cooperating with law enforcement officials. The Defendant's Letters, in which he names individuals whom he believed were cooperating with law enforcement, corroborate the defendant's fear. The government also anticipates that several cooperating witnesses will testify that the defendant had, during his prior incarceration from 1993 to 2001, passed

27

messages from prison regarding drug trafficking activities.   The letters corroborate the cooperating witnesses by showing the defendant's continued modus operandi for running his Cartel from prison, and his trust of the members of the Cartel to whom he sent the letters.

Second, testimony about pre-indictment drug trafficking activity by the defendant and his coconspirators, some of whom will testify about this period, is also background evidence of the CCE and the charged international narcotics trafficking conspiracy.  Namely, the cooperating witnesses' testimony about their drug trafficking activities with the defendant during the 1980's provides evidence that gives necessary context to the manner in which they established a relationship of trust with the defendant.  See Kalaydjian, 784 F.2d at 56 n.3; Harris, 733 F.2d at 1006-07.

Even assuming, for the sake of argument, that the pre- and post-indictment conduct described above is not inextricably intertwined with the charged crimes, such conduct still would be admissible under Rule 404(b).  The government would not offer this evidence for the purpose of showing the defendant's bad character or propensity for committing drug offenses.  Rather, evidence of the defendant's extensive dealings with Colombian cocaine suppliers in the 1980s shows his knowledge and intent with regard to his dealings with Colombian cocaine suppliers during the charged CCE and drug conspiracy.  See Fed. R. Evid. 404(b)(2).  For example, CW5 will testify that the Medellin Cartel supplied the defendant with cocaine in the 1980s.   After the defendant's escape from prison in 2001, he swiftly reestablished his connections with former members of that cartel who began supplying him with large quantities of cocaine again.  Moreover, the defendant's use of drug tunnels to transport his drugs across the border into the United States demonstrates his knowledge and

intent with regard to his use of tunnels and other related smuggling methods during the charged period.  Id.

      F.    <u>The Defendant's Drug Trafficking While in Prison is Admissible</u>

      Testimony regarding the defendant's drug trafficking activity while he was in prison is direct evidence of the crimes charged.  The government expects to elicit testimony from multiple cooperating witnesses that, after the defendant was arrested in June 1993 on Mexican criminal charges of drug trafficking, criminal association and bribery, and imprisoned in Puente Grande prison, as well as after the defendant's February 2014 arrest, the defendant continued to lead the charged CCE and an international narcotics trafficking conspiracy by directing his coconspirators to traffic drugs on his behalf.  Specifically, multiple cooperating witnesses are expected to testify that the defendant's brother Arturo Guzman and the Beltran Leyva brothers and their associates, trusted members of the defendant's drug enterprise, arranged for the purchase of narcotics from Colombian suppliers and their transport to the United States on the defendant's behalf.  Further, cooperating witnesses are expected to testify that the defendant passed messages from prison during his incarcerations in order to keep his drug enterprise running.

      This conduct "arose out of the same transaction or series of transactions as the charged offense," and is "inextricably intertwined with the evidence regarding the charged offense," because it shows the defendant's continued participation in drug trafficking during the charged period and thus is direct evidence of the charged CCE and conspiracy counts.  <u>Carboni</u>, 204 F.3d at 44.  The fact that the defendant continued to traffic narcotics from jail is also necessary to complete the story of the crime on trial, because it explains how the defendant was able continuously to lead the charged CCE over a twenty-five year period despite his

imprisonment in Mexico for eight years.  Id.  The fact of the defendant's incarceration during this period also is admissible to explain the nature of the defendant's role in these narcotics transactions—e.g., the fact that the defendant himself was not negotiating face-to-face transactions with sources of supply.  See United States v. Alaga, 995 F.2d 380, 382 (2d Cir. 1993) (citing United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992)) (finding defendant's imprisonment during charged drug crime was necessary to explain his role in drug transaction). As such, evidence of the defendant's drug trafficking activity from prison is critical to proving the CCE and conspiracy charges in the Indictment.

  G. The Foregoing Evidence is Not Unfairly Prejudicial Under Rule 403

   Otherwise admissible evidence may be excluded at trial if its probative value is "substantially outweighed" by the danger of unfair prejudice.  See Fed. R. Evid. 403.  This is true regardless of whether the Court considers the evidence of uncharged crimes to be direct evidence of the charged conspiracy or to be governed by Rule 404(b).  The fact that evidence is highly probative and tends to prove the defendant's guilt of the charged crimes does not mean it is unfairly prejudicial.  Rather, the touchstone for unfair prejudice is the extent to which the evidence creates a risk of conviction based on propensity:  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged."  Old Chief, 519 U.S. at 180.  Put another way, unfair prejudice "'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Nachamie, 101 F. Supp. 2d 134, 141 (S.D.N.Y. 2000) (quoting Fed. R. Evid. 403 advisory committee's note) (internal quotation marks omitted).

In the present case, the probative value of the evidence of uncharged crimes that the government seeks to admit is significant, and it is not substantially outweighed by the danger of unfair prejudice to the defendant.  The Second Circuit has stated repeatedly that Rule 403 favors the admission of evidence where the uncharged crimes "did not involve conduct more serious than the charged crime[s]."  Williams, 205 F.3d at 34.  The government has charged the defendant with leading a CCE that trafficked multi-ton quantities of heroin, cocaine, methamphetamine and marijuana, and used violence, intimidation and public corruption as the methods and means of operating the enterprise.  Plainly, evidence related to the details of the defendant's narcotics trafficking offenses and to the defendant's drug trafficking prior to the charged period does not raise these sorts of concerns.  That evidence does not involve "conduct any more sensational or disturbing than the crimes . . . charged."  Pitre, 960 F.2d at 1120 (quoting United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)) (internal quotation marks omitted).

Similarly, the fact that the defendant continued to lead a CCE and traffic narcotics while he was imprisoned is highly probative for two reasons: (1) it explains how the defendant was able to continue leading the charged CCE while he was incarcerated and (2) it demonstrates the defendant's preeminent position in the enterprise, as he was able to direct others to continue committing criminal activity on his behalf even while incarcerated.  Any prejudicial impact related to the defendant's incarceration during this period is outweighed by its highly probative value, and it is not "any more sensational or disturbing than the [rest of the] crimes with which [the defendant was] charged."  Pitre, 960 F.2d at 1120; see also Alaga, 995 F.2d at 382.

31

Evidence of the defendant's violent crimes, such as kidnapping, assault and torture, in furtherance of the charged CCE and conspiracy is also not unfairly prejudicial.  As discussed above, Violation 85 charges the defendant with conspiring to murder individuals who posed a threat to the Sinaloa Cartel, and he is charged with possessing, brandishing and discharging firearms in furtherance of the drug trafficking charges in violation of 18 U.S.C. § 924(c).  During trial, the government will present extensive evidence, including witness testimony, proving these charges.  Thus, testimony concerning kidnappings and torture that the defendant ordered against individuals who posed a threat to his drug enterprise, does not involve "conduct any more sensational or disturbing than the crimes . . . charged," Pitre, 960 F.2d at 1120, and will not be unfairly prejudicial.  Evidence of such violence should be admitted not only to prove the elements of the charged murder conspiracy and firearms counts, but also because it is highly probative of the existence of the CCE and conspiracy, the membership of the conspiracy, the leadership of the conspiracy and the goals of the conspiracy.

Courts have consistently held that evidence of violent acts by a defendant's coconspirators is more probative than prejudicial.  See Miller, 116 F.3d at 682 (affirming trial court's decision that evidence of murders was relevant to show existence and nature of enterprise and conspiracy and that probative value of evidence was not substantially outweighed by its potential for unfair prejudice); United States v. Mejia, 545 F.3d 179, 207 (2d Cir. 2008) (allowing evidence of prior shootings and stating that, although there is likelihood that evidence proving existence of enterprise through its acts will involve considerable degree of prejudice, evidence nonetheless "may be of important probative value") (citing United States v. Matera, 489 F.3d 115, 121 (2d Cir. 2007)); see also United States v. Garcia Abrego, 141 F.3d 142, 174-76 (5th Cir. 1998) (evidence that defendant ordered

uncharged murders admissible to prove CCE charge); United States v. Gibbs, 190 F.3d 188, 217-18 (3rd Cir. 1999) (evidence that defendant used violence to further illegal objectives of cocaine conspiracy admissible); Chin, 83 F.3d at 87-88 (evidence regarding contract killing scheme emphasized violent and dangerous context of heroin deal and was inextricably intertwined with defendant's crime of selling heroin and conducting ongoing criminal enterprise); United States v. Portillo-Quezada, 469 F.3d 1345, 1353-54 (10th Cir. 2006) (murder evidence not unduly prejudicial where admitted as direct proof of narcotics conspiracy).[7]  The Court should likewise admit the evidence of violence here.

II.     Motion to Admit Evidence of Defendant's Flight from Justice

In its first motions in limine, the government moved the Court to admit evidence of six instances of the defendant's flight from justice, including his two dramatic prison escapes.  See Dkt. No. 213 at 28-38.  In ruling on the government's motion, the Court explained that the evidence is "likely admissible as direct evidence and as probative of consciousness of guilt, assuming the Government lays an adequate foundation and the evidence is admissible under Rule 403," but the Court stated that the factual proffer before the Court in that motion was too vague to permit a pretrial ruling.  Dkt. No 240 at 7.  The government renews its motion to admit evidence of the defendant's flight from justice, and sets forth here additional factual detail to permit the Court to admit the proffered evidence in a pretrial ruling.  For the sake of brevity, the government will not repeat all of the facts and argument set forth in its previous motion, which it incorporates here by reference.  See Dkt. No. 213 at 28-38.

---

[7] To the extent the Court views any such evidence as overly prejudicial, however, the government is willing to entertain a method to minimize any potential prejudicial impact, such as a limiting instruction.

As described in its previous motion, the instances of the defendant's flight from justice that the government seeks to introduce include his 2001 escape from a high-security prison in Mexico (the "2001 Escape"), and his July 2015 escape from a different high-security Mexican prison through a tunnel dug into his prison cell (the "2015 Escape").  Additionally, the defendant fled from law enforcement during a 2012 raid on one of his residences in the resort city of Los Cabos, Baja California Sur (the "2012 Flight"); fled law enforcement through a series of tunnels during a 2014 raid on another one of his residences in Culiacan, Sinaloa (the "2014 Flight"); and made plans for another possible escape from prison in late 2016 and early 2017, prior to his extradition to the United States (the "2016/2017 Planned Escape").

A.     Background

i.     The 2001 Escape

The government anticipates calling at least one cooperating witness who will testify that he met with the defendant in the mountains after his 2001 escape from the Puente Grande prison.  Cooperating Witness No. 6 ("CW6") will testify that during that meeting, the defendant recounted how he escaped from the prison.  Specifically, the defendant told the cooperating witness that an individual named "Chito," who worked in the prison, helped the defendant escape by concealing him in a laundry cart.  The defendant explained to CW6 that because it was common for Chito to wheel a laundry cart out of the prison, the defendant had not needed to pay off many prison officials to ensure that his escape would succeed.  CW6

also will testify that the defendant explained to him that he had escaped because he had received word that he might be extradited to the United States, which he wanted to avoid.

ii.     The 2012 Flight

The government anticipates calling law enforcement officers and a cooperating witness, CW3, to testify about a raid by Mexican law enforcement on a compound that the defendant rented and at which he was staying in Los Cabos, Mexico, on February 22, 2012. U.S. law enforcement officers will testify that they were present when the Mexican military executed an operation in which they attempted to arrest the defendant.  Although the defendant narrowly escaped arrest, law enforcement officers recovered a trove of evidence at the compound, including a cache of weapons, a bag of methamphetamine, the defendant's vehicle, multiple documents indicating that the defendant and his workers had been present. Additionally, Mexican law enforcement arrested three individuals whom U.S. law enforcement officers connected to the defendant through recorded communications.

The government also expects that CW3 will testify that he was in Los Cabos at the time of the raid, and that he communicated with the defendant immediately before and after the defendant managed to escape the law enforcement authorities who attempted to arrest him. Specifically, CW3 is expected to testify that the defendant had been planning to visit CW3 on the day of the raid, but did not do so because the defendant learned that law enforcement was planning to attempt to arrest him.  CW3 is expected to testify that after he communicated with the defendant that day about their planned meeting, he began to see helicopters in the area and heard that law enforcement was targeting the defendant.  CW3 attempted to contact the defendant and could not do so:  the defendant's mobile device would not answer.

Subsequently, the defendant contacted CW3 and notified him that he had escaped to Culiacan and advised CW3 to throw away his phones and to go into hiding.

    iii.    <u>The 2014 Flight</u>

With respect to the 2014 Flight, the government expects to call CW4, who was present with the defendant during the raid on his residence, as well as a law enforcement officer who participated in the raid.  Specifically, CW4 will testify that she was sleeping at the residence with the defendant on February 16, 2014 when the defendant's "secretary" woke her up.  As she awoke, she observed the defendant scrambling in the bedroom, grabbing various items and disappearing into a bathroom.  The defendant returned to the bedroom and ushered CW4 into the bathroom.  Once in the bathroom, CW4 observed a bathtub or toilet elevated above the ground by a hydraulic lift.  Underneath the fixture, CW4 observed a wooden ladder leading into a dark recess.

CW4 is expected to further testify that the defendant first entered the recess, followed by CW4, the defendant's secretary, and an individual whom CW4 knew as a cook who worked for the defendant.  The group, at this point in various states of undress, traveled down a dark hallway until reaching a vault-style metal door.  CW4 observed the defendant and his secretary struggle with operating the door until finally opening it.  Through the door, the group traveled down a dark, wet tunnel, eventually emerging onto a street in Culiacan, some distance from the residence.

Once on the street, CW4 and other members of the group observed law enforcement authorities approaching from down a street.  CW4 is expected to testify that the defendant and the group huddled near a building in order to conceal themselves from law enforcement.  The defendant, unclothed, yelled for the group to give him what little clothes

they had as law enforcement officers passed by without noticing the hidden group.  Shortly thereafter, one of the defendant's workers arrived in a red vehicle and took the group to another location.  After arrival at the new location, CW4 will testify that she heard the defendant telling his secretary that he believed that CW4 had set him up for capture by bringing her iPad to his residence, which he believed contained GPS tracking software.  The defendant insisted that CW4 travel to a nearby shopping center and purchase something with her credit card, under the belief that law enforcement authorities would rendezvous with her if she were cooperating with them.  When law enforcement did not arrive at the shopping center, the defendant was satisfied that CW4 had not cooperated with law enforcement to reveal the defendant's location.

Another cooperating witness, CW2, will corroborate this account by testifying that he knew in February 2014 that the defendant was staying in Culiacan with CW4.  CW2 also knew that one of the defendant's secretaries was at the house at the time, and CW2 learned that the defendant had almost been captured, but managed to escape by running through a drainage tunnel.

The government also anticipates that a DEA Special Agent will testify that in early 2014, U.S. law enforcement agents consulted with Mexican government officials to discuss and plan an operation to capture high level targets of the Sinaloa Cartel who were wanted in both the United States and Mexico.  On or about February 16, 2014, the DEA Special Agent traveled to Culiacan with Mexican law enforcement officers, where they located the general vicinity in which the defendant was hiding.  The law enforcement officers identified an associate of the defendant, hiding in the bedroom of one of the houses in the area.  That associate identified another house in the area to law enforcement as a location where he had delivered food to the defendant earlier in the day.

The government expects that the DEA Special Agent will testify that he traveled with Mexican law enforcement officials to the house identified by the defendant's associate, and that the door was constructed with reinforced steel and was difficult to breach. Once the door was opened, the DEA Special Agent followed the Mexican law enforcement officials inside, and recorded his entry into the home on video. This video has been produced in discovery. See Bates No. 000321663. The DEA Special Agent is expected to testify, consistently with the video, that the house was empty by the time that authorities entered.

In the master bedroom of the house, the DEA Special Agent observed a bathtub that had been partially raised through operation of a hydraulic lift, underneath which was a staircase. The DEA Special Agent and Mexican law enforcement officers went down those stairs, which ultimately connected to the sewer or drainage system for the city of Culiacan. The group of law enforcement officers returned into the house. The DEA Special Agent is expected to testify that a search of the house and information provided from associates of the defendant led law enforcement to search other properties that belonged to the defendant. In those locations, the DEA Special Agent observed Mexican law enforcement officers seizing various weapons, as well as plastic bananas and cucumbers that appeared to be filled with a white powdery substance. The government expects the DEA Special Agent to testify that the substance he observed is consistent with cocaine.

iv.     The 2015 Escape

The government expects to call law enforcement and cooperating witnesses to testify about the defendant's 2015 escape from prison in Mexico. Specifically, at least one cooperating witness, CW2 will testify that he, the defendant's sons, and the defendant's wife participated in a 2014 meeting in Mexico during which they discussed a plan to tunnel the

defendant out of Altiplano prison.   During that meeting, the participants discussed the possibility of soliciting contributions from other traffickers in the defendant's Cartel to help fund the operation, including the engineering and construction of the tunnel.  CW2 will also testify that a watch with GPS functionality was smuggled into the prison so that the individuals digging the tunnel would be able to directly locate the defendant's cell.

On July 11, 2015, the defendant escaped from Altiplano prison through a mile-long tunnel dug directly into the defendant's cell.  CW2 is expected to testify that the defendant had relayed that he hoped to escape on July 4, 2015, as he knew that "Americans" would be celebrating on that date and he hoped to cause embarrassment to the United States, but the tunnel was not yet complete on July 4.  CW2 has also spoken to a coconspirator, who was present when the defendant emerged from the tunnel, and told CW2 that the defendant changed clothes, armed himself and stowed himself away in a tractor-trailer that drove him out of the area.

The government anticipates that another cooperating witness, CW7, will testify that the defendant's sons solicited him to provide approximately $3 million to help pay for the defendant's escape.  CW7 is expected to testify that he ultimately provided approximately $1 million to the defendant's sons.

Finally, a law enforcement witness will testify that he traveled to Altiplano prison after the defendant's escape and observed the tunnel into the defendant's cell and that they traveled through the tunnel to a home nearly a mile away.  The law enforcement witness will describe the tunnel and its location, and the government expects to introduce photographic and video evidence to show the tunnel to the jury.

v.     The 2016/2017 Planned Escape

The government anticipates calling a cooperating witness, CW2, who will testify that in 2016, the defendant's wife met with one of the defendant's partners and provided him with approximately $100,000 for the purpose of purchasing land near Altiplano prison. The government expects that CW2 is expected to testify that the land was to be used to perform the same engineering feat that had permitted the defendant to escape Altiplano in 2015: to dig a tunnel from a house or other building on the purchased land directly into the prison.  At the time, the defendant was not in prison at Altiplano, but was housed at another prison in Juarez, but CW2 is expected to testify that the defendant's wife and the defendant's partner discussed how a government official was being bribed to transfer the defendant from the prison in Juarez to Altiplano prison.  This attempted escape was ultimately unsuccessful as the defendant was extradited to the United States in January 2017.

B.     The Court Should Admit Evidence of the Defendant's Escapes and Flight

As the above factual proffer shows, and as the government will prove at trial, the defendant's escapes and flight attempts involved a combination of (1) bribery and corruption, (2) a network of willing coconspirators, (3) an array of secure residences, vacation homes and safe houses and (4) remarkable feats of engineering and construction.  As the government argued in its previous motion in limine, and as the Court indicated in its order it was likely to agree, evidence of these attempts to flee justice are admissible as direct evidence of the charged crimes, as they demonstrate, inter alia, the means by which the defendant was able to continue to lead the Cartel, the substantial resources that the Cartel devoted to protecting the defendant and ensuring that he could avoid capture, the substantial income available to the defendant, and the breadth of the Cartel's reach in Mexico, both geographically

40

and in terms of public corruption.  The Court also indicated in its previous order that the evidence likely would be admissible in the alternative as evidence of the defendant's consciousness of his guilt.  See Dkt. No. 213 at 32-36; Dkt. No. 240 at 7.[8]

Evidence of the defendant's escapes, as set forth above, is not unfairly prejudicial when balanced against its probative value under a Rule 403 analysis.  First, the evidence is highly probative of the defendant's involvement in a long-running drug trafficking enterprise, as his flight attempts both span a large number of years and demonstrate the substantial resources that he and the Cartel devoted to his evasion of law enforcement (such as the extensive networks of tunnels beneath his residences and safe houses).  Moreover, because the defendant's escapes permitted him the freedom to engage in the drug trafficking enterprise charged in the Indictment, they are "necessary to complete the story of the crime on trial," and are therefore admissible as "inextricably intertwined" with evidence of his crimes.  Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted).  In addition, the evidence of his escapes shows his substantial income from drug trafficking, an element of the charged CCE.

In the alternative, the evidence is probative of his consciousness of guilt.  See, e.g., United States v. Sanchez, 790 F.2d 245, 252 (2d Cir. 1986) ("[I]t is universally conceded that the fact of an accused's flight is admissible as evidence of consciousness of guilt.") (citing 2 J. Wigmore, Evidence § 276 (3d ed. 1940) (alterations an internal quotation marks omitted).  Balanced against this probative value, there is no risk of unfair prejudice, as the only "adverse

---

[8] The government respectfully refers the Court to its prior briefing for a more detailed legal analysis.

effect upon [the] defendant" of such evidence is to "prove the fact or issue that justified its admission," i.e. his involvement in the drug trafficking enterprise.  United States v. Massino, 546 F.3d 123, 132 (2d Cir. 2008) (internal quotation marks and citation omitted).   The government submits that evidence of prison escapes and attempts to flee law enforcement proffered above will not cause the jury to consider decision on an improper or emotional basis.

For the foregoing reasons, as well as those set forth in the government's first motions in limine, the government renews its motion for a pretrial ruling to admit evidence of the defendant's flight from justice in light of this expanded factual proffer.

III.   Motion for Judicial Notice of the Defendant's Public U.S. Indictments and the Rewards Offered for His Arrest

To demonstrate the defendant's consciousness of guilt in relation to his escapes and flight from justice, the government intends to present evidence to the jury that it publicly indicted the defendant in multiple jurisdictions beginning in 1995 and offered substantial monetary rewards for information leading to the defendant's arrest beginning in 2004. Pursuant to Fed. R. Evid. 201, a court may "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  In a criminal case, a court must instruct the jury that the jury "may or may not accept the noticed fact as conclusive." Fed. R. Evid. 201(f). To minimize any prejudice associated with admitting the indictments and the rewards into evidence, the government requests that the Court take judicial notice of, instruct the jury of those facts and that such facts are only to be considered on the issue of the defendant's knowledge of the charges pending in the United States, which is relevant to the jury's consideration of his consciousness of guilt.  In its first motion in limine, the government

indicated that it would seek to have the Court take such notice; here, the government makes that request and provides proposed instructions.

Specifically, the government indicted defendant on drug trafficking charges in the following indictments:  (1) United States v. Guzman Loera, No. 3:95-cr-00973-JM (S.D. Cal.), Dkt. Nos. 15, 20 (superseding indictment filed Aug. 4, 1995; unsealed Sep. 28, 1995); (2) United States v. Guzman Loera, No. 4:91-cr-00446-FRZ (D. Ariz.), Dkt. No. 597 (superseding indictment filed April 26, 1995),[9] (3) United States v. Guzman Loera, 09-CR-466 (BMC) (E.D.N.Y.), Dkt. Nos. 1-2 (indictment filed July 10, 2009; unsealed Aug. 20, 2009); (4) United States v. Guzman Loera, 09-CR-383 (N.D. Ill.), Dkt. Nos. 7, 15 (indictment filed Aug. 6, 2009; unsealed Aug. 19, 2009); (5) United States v. Guzman Loera, 07-CR-20508 (S.D.Fl.), Dkt. No. 48 (indictment publicly filed Nov. 4, 2010); (6) United States v. Guzman Loera, 11-CR-84 (JL) (D.N.H.), Dkt. Nos. 4, 26 (indictment filed June 8, 2011; unsealed Sept. 4, 2012); (7) United States v. Guzman Loera, 12-CR-849 (FM) (W.D.Tex.), Dkt. Nos. 49, 175 (indictment filed April 11, 2012; unsealed April 24, 2012); and (8) United States v. Guzman Loera, 12-CR-439 (PAC) (S.D.N.Y.), Dkt. Nos. 14, 15 (indictment filed Jan. 23, 2014; unsealed after defendant's arrest, on Feb. 25, 2014).

The dockets from the eight indictments against the defendant are publicly available through those districts' PACER/ECF systems and through the clerks of the respective courts.  Because these are public records, the Court may properly take judicial notice.  See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public

---

[9] The government had filed an earlier indictment against the defendant in the District of Arizona on March 24, 1993, but moved to dismiss it two days later.  See id. at Dkt. Nos. 230-31.

records of which the court could take judicial notice."); <u>United States v. Marsalis</u>, 314 F. Supp. 3d 462, 464 n.2 (E.D.N.Y. 2018) (noting that court may take notice of judicial proceedings). Taking judicial notice of the fact of the defendant's previous indictments is not only permissible, but it is the most efficient and least prejudicial way to put the facts before the jury, as there will not be any risk of confusion that might otherwise be inherent in actually putting charging documents from another case before the jury.

Similarly, with respect to the existence of rewards for information leading to the defendant's arrest or capture, the existence of those rewards beginning in approximately 2004 may be determined from official government documents, press releases and press accounts of the public reward.  <u>See</u> <u>In re Zyprexa Prods. Liab. Litig.</u>, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("Judicial notice can be taken of prior complaints and legal proceedings, press releases and news articles . . . . Public documents issued by government agencies . . . may also be considered.").  In this case, not only did the United States government issue a press release noting the $5 million reward for the defendant's capture, but news articles from the time period covered the reward extensively.[10]  The State Department, which administers the Narcotics Rewards Program, also maintains documentation on its website of the reward offered for information about the defendant.[11]  Thus, it is appropriate for the Court to take judicial notice

---

[10] <u>See, e.g.,</u> Bootie Cosgrove-Mather, <u>$5 Million Reward for Mexican Drug Lord</u>, CBS News/Associated Press (Dec. 20, 2004), <u>available at</u> https://www.cbsnews.com/news/5m-reward-for-mexican-drug-lord/ (last visited Sep. 19, 2018); <u>Reward Offered for Mexican Drug Lord</u>, UPI (Dec. 21, 2004), <u>available at</u> https://www.upi.com/Reward-offered-for-Mexican-drug-lord/75281103649239/ (last visited Sep. 19, 2018).

[11] <u>See</u> U.S. Department of State Bureau of International Narcotics and Law Enforcement Affairs, <u>Joaquin Guzman-Loera,</u> <u>available at</u> https://2001-2009.state.gov/p/inl/narc/rewards/39413.htm (last visited Sep. 19, 2018).

of the fact of the reward for information about the defendant, as the offer of a reward "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

In connection with this request for judicial notice, the government proposes that the Court give the following limiting instruction to the jury at the time it informs them of the judicially noticed facts:

> The Court has taken judicial notice of the fact that the U.S. government indicted the defendant for drug trafficking offenses in several federal districts in the United States beginning in 1995. The Court also has taken judicial notice of the fact that the U.S. government publicly offered a monetary reward for information concerning the defendant beginning in 2004.
>
> When a court declares that it has taken judicial notice of some fact or event, you may accept the court's declaration as evidence and regard as proved the fact or event that has been judicially noticed. You are not required to do so, however, since you are the sole judges of the facts.
>
> You may, but need not, infer from that fact that the defendant believed that he was guilty and thereafter acted in a manner to avoid being brought to justice. You may not, however, infer on the basis of this alone that the defendant is in fact guilty of the crimes for which he is charged. Whether or not the evidence shows that the defendant knew that he had been indicted or that the U.S. government had offered a reward for the defendant's arrest, and the significance, if any, to be given to such evidence, are matters for you the jury to decide.

See United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) (affirming similar instruction in holding that limiting instruction is appropriate where evidence is offered for limited purpose of showing consciousness of guilt).[12]

---

[12] Should the Court grant the government's motion to take judicial notice of these facts, the government will work with defense counsel to draft a stipulation regarding the noticed facts for the Court to read to the jury.

IV.    <u>Motion to Admit Defendant's Voluntary Statements to U.S. Law Enforcement</u>

While in prison in Mexico in 1998, the defendant requested, through an intermediary, that U.S. DEA agents visit him so that he could provide information to them about rival drug traffickers.  In the course of providing that information to the DEA agents who visited him, the defendant also incriminated himself as having been involved in drug trafficking, and in particular as a member of a "federation" of the most powerful drug traffickers in Mexico.  The defendant's statements were voluntary, and <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and the Fifth Amendment's exclusionary rule do not apply to the defendant's statements because he was not in "custody" nor was the conversation an "interrogation" as defined by <u>Miranda</u> and its progeny.  The Court thus should permit the government to call at trial the former DEA Special Agent who attended the 1998 interview to testify as to what the defendant told him.

A.    <u>Background</u>[13]

On November 7, 1997, DEA agents in Mexico received an unusual request:  a confidential informant contacted the DEA office in Mexico City and asked if he could speak to DEA agents in order to pass along a message from the defendant.  At the time, the defendant was well-known to the DEA as a notorious and large-scale drug trafficker who had been held in a Mexican prison since 1993.  He also had been indicted in 1995 in both the District of Arizona and the Southern District of California.  The confidential informant met with DEA agents and indicated that the defendant wished to provide information to the DEA in person.

---

[13] The operative facts related to this motion are set forth in a DEA report that the government previously produced to the defendant.  <u>See</u> Ex. C.  After further review, the government has unredacted certain names that it previously redacted in this report.

Working with a trusted official in the Mexican government, DEA agents crafted a plan to covertly visit the defendant in the Puente Grande prison without raising suspicion that the defendant was cooperating with U.S. law enforcement.  Posing as sociologists who wanted to administer personality tests to inmates, two DEA agents and a Mexican government official were admitted to the prison and provided with a private room in the prison's medical wing. Mexican authorities had previously given the prison warden permission to permit the group to meet with the defendant.

A prison guard escorted the defendant into the room; the guard then left and closed the door.  Using a prearranged pseudonym as a code word—that the defendant's intermediary, the confidential informant, had previously passed to the defendant—the group introduced themselves.  After the DEA agents assured the defendant that it had taken measures to prevent the guards from knowing their true identities and reason for the meeting, and told him that he could trust the group and speak freely and honestly, the defendant said, "I will speak honestly to you, I will give you my word on everything I am about to say."

The defendant volunteered that he was willing to speak with the agents and would reveal as much as possible about the Arellano Felix Organization ("AFO"), a rival drug trafficking organization headed by a group of brothers, but that he wanted something in return. He wanted to resolve his outstanding charges in the United States and assurances for his family's safety.  A DEA agent advised the defendant that the U.S. government could not consider making any such promises until after the defendant provided information and showed his willingness to cooperate.

In response, the defendant expressed distrust for the Mexican government, indicating that, earlier in his imprisonment, he had attempted to provide information to the

government about where they could locate the Arellano Felix brothers, but that the Mexican government had failed to strike and let the brothers escape. He indicated that he continued to want to provide information about the AFO, however, and offered to have an associate of his provide the DEA with specific information about the AFO as well as the location of a tunnel used by the AFO to smuggle drugs, money, arms and people into and out of the United States. The defendant volunteered a range of detailed information about the AFO, including its leadership structure, information about the relationships between its members and the identities of some of the group's assassins.

The defendant also informed the group that a recent drug seizure had involved many individuals who had not yet been identified by the government. He indicated that he knew about the seizure and the identities of the persons involved in it because most of the persons involved were his former associates. By that point, they had aligned with the organization of another trafficker and former associate of the defendant named Hector Palma Salazar, also known as "Guero Palma." The defendant told the DEA agents and the Mexican government official that he had broken off relations with Palma Salazar because Palma Salazar had not informed the defendant in advance that he was going to kill the defendant's brother-in-law. Because Palma-Salazar had killed his brother-in-law, the defendant said, he was willing to provide information to help dismantle Palma Salazar's organization.

Additionally, the defendant explained that a "federation" had existed among the most powerful drug traffickers in Mexico in the early 1990s. In particular, the defendant indicated that a truce and division of territory had been negotiated at a meeting in Mexico City between the defendant and several other large-scale traffickers, including Benjamin Arellano-Felix. According to the defendant, that truce agreement broke when one of the AFO fired on

the defendant's associates in Puerto Vallarta, followed by the killings of other traffickers, and what the defendant described as a bloodbath throughout Mexico.

DEA agents did not meet with the defendant in Puente Grande prison again following the 1998 interview.  The defendant escaped from the prison in 2001.

B.      The Defendant's Statements to DEA Agents Are Admissible as Statements by a Party-Opponent

It is axiomatic that a defendant's own statement is not hearsay and is admissible to prove the truth of the matter asserted when offered against him.  See Fed. R. Evid. 801(d)(2)(A) (statement is not hearsay where it is "offered against an opposing party and . . . was made by the party . . . ."); see also United States v. Yakobov, No. 00-1263, 2001 WL 1312727, at *2 (2d Cir. Oct. 23, 2001) ("Federal Rule of Evidence 801(d)(2)(A) expressly permits the admission of a party's own statements when offered against that party and [the defendant] has not demonstrated that [the statement is] so prejudicial as to substantially outweigh its probative value.").  And, although the defendant's 1998 statements to DEA agents were self-incriminating because, among other things, he identified himself as a member of a federation of Mexican drug traffickers, a defendant's statements are admissible against him "regardless of whether such statements were against his interest when made."  United States v. Shulman, 624 F.2d 384, 390 (2d Cir. 1980).  The defendant's statements are therefore presumptively admissible through the testimony of the former DEA Special Agent, who was one of the agents who took the defendant's statement.

C.      Introduction of the Defendant's Voluntary Statements to DEA Agents Does Not Violate Miranda

The Supreme Court ruled in Miranda that law enforcement officers may not interrogate a suspect who has been taken into custody without first warning him that "he has

the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 479.  Miranda's warning requirements, however, apply only to "custodial interrogation."  Id. at 444; see also United States v. Newton, 369 F.3d 659, 669 (2d Cir. 2004).  Although Miranda may apply to the interviews of foreign citizens by U.S. law enforcement officials conducted abroad and later prosecuted in the United States, see United States v. Odeh, 552 F.3d 177, 201 (2d Cir. 2008), it does not bar the admission of the defendant's statements here because he was neither "interrogated" nor in "custody" within the meaning of Miranda and its progeny.

 i. Legal Standard

Miranda's protections only apply where a person is both in custody and subjected to interrogation.  See United States v. Rommy, 506 F.3d 108, 132 (2d Cir. 2007) ("[A] person must have been both in custody and subjected to interrogation for statements made without warnings or waiver to be inadmissible in the government's case in chief.").

"Custody," for Miranda purposes, is "not coterminous with . . . the colloquial understanding of custody."  United States v. Faux, 828 F.3d 130, 135 (2d Cir. 2016).  Instead, an individual is in "custody" only if "a reasonable person would have thought he was not free to leave the police encounter at issue," and "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."  Id.  The "ultimate inquiry" is whether a reasonable person would have understood the law enforcement agents' restraint on his freedom to equal the "degree associated with a formal arrest."  Newton, 369 F.3d at 670.

In evaluating whether a defendant is in "custody" within the meaning of these authorities, courts in the Second Circuit consider a variety of factors:

> (1) the interrogation's duration; (2) its location (e.g. at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

Faux, 828 F.3d at 135.

The Supreme Court has held that the fact that a defendant is imprisoned when questioned by law enforcement does not in and of itself constitute "custody" for Miranda purposes.   See Howes v. Fields, 565 U.S. 499, 512 (2012) ("[S]tandard conditions of confinement and associated restrictions on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation.   Thus, service of a term of imprisonment, without more, is not enough to constitute Miranda custody.").   Even the use of "escorts and special security precautions" to take a prisoner to a private location within the prison for questioning does not implicate Miranda's custody prong.   See id. at 513.   Thus, in Howes, the Supreme Court held that a prisoner was not in "custody" where he was questioned for five to seven hours by armed deputies, did not invite the interview, did not consent to it and was not advised that he was free to decline to speak with the deputies who spoke with him.   See id. at 514-15.

Miranda defined "interrogation" as "questioning initiated by law enforcement officers."   384 U.S. at 444.   However, "[v]olunteered statements of any kind are not barred by the Fifth Amendment," and do not require Miranda's prescribed warnings.   See id. at 478; see also Edwards v. Arizona, 451 U.S. 477, 485 (1981) ("[N]othing in the Fifth and Fourteenth

Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial."). As the Second Circuit has stated, even follow-up questions by law enforcement do not convert a defendant's voluntary statements into "interrogation." See Rommy, 506 F.3d at 133 ("[W]here a person in custody volunteers incriminating information to the police, simple clarifying questions do not necessarily constitute interrogation. . . . [A]bsent extraordinary circumstances, a court may generally conclude that follow-up questions asking only for volunteered information to be repeated or spelled to not constitute interrogation. The same conclusion might also easily apply to discrete questions seeking confirmation of what appears implicit in the volunteered disclosure.").

The Second Circuit applied these principles to a case similar to this one in United States v. Rommy, 506 F.3d 108 (2d Cir. 2007). In that case, the defendant, Henk Rommy, was a Dutch national who conspired to import massive quantities of MDMA, or "ecstasy," into the United States. Following an investigation by the DEA, Spanish authorities arrested Rommy on a request from the United States for his provisional arrest. See id. at 115. While in custody in Spain, Rommy had an intermediary—his girlfriend—contact the DEA to request a meeting with DEA agents. See id. In response, a DEA special agent, a DEA intelligence analyst, an inspector from the Spanish police, and Rommy's girlfriend visited Rommy in a Madrid prison. See id. Rommy was not advised of Miranda rights, nor was he asked for a waiver of those rights. See id. Instead, the DEA agent asked Rommy why he had requested a meeting, and Rommy indicated that he wanted to offer his cooperation to the DEA to "set[] up other traffickers that he knew," in the hopes of obtaining leniency at an eventual sentencing. Id. The DEA agent indicated that he could not promise any consideration, but Rommy nonetheless "proceeded to speak at some length and in detail about areas of potential

cooperation." Id.  In particular, he provided names and background information on more than

a dozen other drug traffickers and inculpated himself as an associate of those traffickers as

well as a large-scale drug broker in his own right.  See id.  The agent interrupted Rommy while

he spoke with follow-up questions as to names, dates and descriptions.  See id.

At trial in the United States, Rommy moved to suppress his Madrid prison

statement as having been obtained in violation of the Fifth Amendment—specifically, his

failure to be advised of his Miranda rights.  See Rommy, 506 F.3d at 132.  Noting that Rommy

himself had requested the meeting, that his stated purpose was to provide information about

other traffickers, that he volunteered incriminating information about himself, and that he had

not arranged for his own counsel to be present, the Second Circuit affirmed the district court's

denial of the motion to suppress.  See id. at 131.  As the court explained, Miranda does not

require that warnings be provided before "volunteered statements" can be properly admitted

at trial.  Id. at 132.  Because Rommy "voluntarily initiated the meeting" and "chose the

subjects" discussed, the Second Circuit held that the DEA agent's interview of Rommy was

not an "interrogation" and thus did not violate Miranda.  See id. at 134.

Rommy argued that the agent's comments about cooperation and leniency

converted the prison meeting into an interrogation.  See Rommy, 506 F.3d at 134.  The Second

Circuit rejected this argument, explaining that the discussion of leniency and potential

cooperation was a "direct response to Rommy's assertion that his purpose in asking for a

meeting with DEA agents was to obtain leniency."  Id.  Because Rommy had raised the topic,

and the DEA agent did not promise leniency in response, the court held that Rommy could

"not claim that his decision to proceed with the meeting and to volunteer extensive statements

was the product of interrogation."  Id.  Although Rommy noted that Miranda requires that an

inadmissible statement must have been made by a person who was <u>both</u> "in custody and subjected to interrogation," <u>id.</u> at 132, the court did not consider whether or not Rommy had been "in custody" within the meaning of <u>Miranda</u> at the time of his statements.

      ii.    <u>Application</u>

The defendant was neither "in custody," nor was he subject to "interrogation" within the meaning of <u>Miranda</u> during the 1998 DEA interview. His statement therefore is admissible at trial.

With respect to the custody requirement, the DEA Special Agent who attended the interview will testify that the conversation lasted no more than a few hours. The interview occurred in Puente Grande prison, and the agents arranged it only after the defendant sent an intermediary to inform the U.S. government that he wished to speak to them in order to provide information to the DEA. The defendant was not restrained during the interview, and the agents—who had posed as visiting sociologists in order to interview the defendant without creating any suspicion—were not armed. Although the DEA agents did not advise the defendant that he was free to leave, it is unlikely that they would have needed to do so, given that their status as foreign agents and their cover, posing as sociologists, rendered them powerless to exercise any control or direction over the prison guards, who escorted the defendant into and out of the interview room.

Moreover, this factor—whether the defendant is told that he is free to leave— has little relevance in prison. As the Supreme Court explained in <u>Howes</u>, "[f]or a person serving a term of incarceration . . . the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same inherently compelling pressures that are often present when a suspect is yanked from familiar surroundings in the

outside world and subjected to interrogation in a police station."  565 U.S. at 511 (internal quotation marks and citation omitted).  Indeed, "[w]hen a person is arrested and taken to a station house for interrogation, the person who is questioned may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home."  Id.  "On the other hand, when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement. . . ."  Id.  Additionally, "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence."  Id. at 512.  Thus, the restrictions on freedom inherent in his incarceration "will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation."  Howes, 565 U.S. at 512.  Thus, the defendant was not "in custody" within the meaning of Miranda at the time of the interview.

Because a court that concludes that Miranda is implicated must find both that a defendant was in custody and subjected to interrogation, the Court's analysis could end here. But the defendant also was not subjected to interrogation within the meaning of Miranda, which provides an independent ground for concluding that his voluntary statements to the DEA in 1998 are admissible.  Rommy is directly on point.  In that case, the defendant was incarcerated in a foreign country, affirmatively reached out to U.S. officials through an intermediary and asked to speak with DEA agents, was visited in prison by DEA agents, and did not arrange for his attorneys to be present.  See Rommy, 506 F.3d at 115.  He thereafter "chose the subjects" discussed, and the DEA agents posed follow-up questions.  Id. at 133-34. Although he later argued that an agent's statement about leniency converted the meeting into

an interrogation, the Second Court disagreed, finding that the conversation about leniency was not "unsolicited," but rather raised by the defendant himself.  See id. at 134.

All of these same facts are present here.  The defendant was serving a lengthy sentence in Puente Grande prison in Mexico, used an intermediary to request a meeting with the DEA, did not arrange for his attorneys to be present, and upon being visited by DEA agents indicated that he was willing to reveal to them "as much as possible" about certain rival traffickers.  See Ex. C.  A former DEA Special Agent who attended the meeting is expected to testify that, as in Rommy, the defendant himself chose the topics discussed, and that the only conversation about leniency or consideration for the information he was providing was initiated by the defendant himself.  See id.  "Under these circumstances, [the defendant] cannot claim that his decision to proceed with the meeting and to volunteer extensive statements was the product of interrogation."  Rommy, 506 F.3d at 134.

Because he was neither in custody nor interrogated as defined by binding precedent, the government did not obtain the defendant's voluntary statements providing information to the DEA in violation of Miranda.  The Court should therefore admit them.

V.    Motion to Admit Defendant's Letters as Statements of a Party-Opponent

The government intends to offer letters, following proper authentication, authored by the defendant while he was incarcerated in Mexico in 2014 and sent to a trusted associate of the defendant, which contain the defendant's statements concerning (1) cocaine shipments in which the defendant had invested; (2) pending drug shipments; (3) debt collecting; (4) weapons and cocaine seizures; (5) identification of witnesses cooperating

against his interests.[14]  The government also intends to offer a personal letter authored by the defendant to CW4, which corroborates that witness's account of her interactions and relationship with the defendant.[15]  The letters from the defendant to his trusted associate and draft translations are attached hereto as Exhibits I and I-1, respectively.  The letter from the defendant to CW4 and draft translation are attached hereto as Exhibits J and J-1, respectively. These statements are admissible under Rule 801(d)(2)(A) as statements by a party-opponent.

The government also seeks to offer various known samples of the defendant's handwriting for the jury's lay comparison of his handwriting on the letters detailed above as to the known samples.  See Fed. R. Evid. 901(b)(2).  The known samples will include (1) the defendant's signature on a properly redacted and authenticated financial affidavit previously submitted to the Court (redacted in all other respects) and (2) samples of the defendant's handwriting on properly redacted and authenticated letters which the defendant has written while incarcerated in the United States.

A.    Legal Standard

As noted above, Rule 801(d)(2) provides, in pertinent part, that a statement is not hearsay if "[t]he statement is offered against an opposing party and (A) was made by the party in an individual or representative capacity."  A party's "own statements [are] admissible

---

[14]  The Court granted the government's motion to delay disclosure of the defendant's letters.  See Dkt. No. 207.  Because those documents are the subject of this motion, the government has provided them to the defense earlier than required under the Court's order as an exhibit to this motion.

[15]  The government inadvertently did not specifically move for delayed disclosure with respect to this this letter; however, it notes that the same rationale that governed the delayed disclosure of the letters from the defendant the trusted associate referenced herein also applies to CW4's letter as well.

as non-hearsay admissions regardless of whether such statements were against his interest when made." United States v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006). Moreover, "[t]here is no express requirement in the Federal Rules of Evidence that a party can adopt only those statements which either incriminate him or are otherwise against his interest." United States v. Shulman, 624 F.2d 384, 390 (2d Cir. 1980). "Statements made by the defendant," where relevant, "may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." United States v. Russo, 302 F.3d 37, 43 (2d Cir.2002) (internal citation omitted); see also United States v. Warts, 934 F. Supp. 2d 451, 465-66 (E.D.N.Y. 2013) (stating that audio recordings of defendant are not hearsay under Rule 801(d)(2)).

### B. The Defendant's Letters are Admissible

The defendant's letters are being offered as admissions of a party-opponent pursuant to Rule 801(d)(2)(A). Clearly, the defendant will be the party-opponent at trial and, as such, his statements are admissible. They also satisfy a Rule 403 analysis. First, the statements contained in the letters to his trusted associate are inculpatory, as they discuss cocaine shipments, debt collecting, weapons and drug seizures and the identities of persons who the defendant believed were cooperating against him. They are therefore probative of the charged crimes themselves, and do not invite conviction on an improper basis. See Old Chief, 519 U.S. at 180. Second, the statements contained in the letter to CW4, though of a more personal character, corroborate CW4's anticipated testimony as to the nature of her relationship with the defendant. The contents of the letter are not prejudicial and do not invite improper judgment or bias by the jury, and therefore do not outweigh the probative value of the letter as corroborative of CW4's anticipated testimony.

The government will offer known handwriting samples of the defendant in order to allow the jury to draw a comparison to the defendant's letters.  These known handwriting samples—the signature on the defendant's financial affidavit, and letters written while he has been incarcerated in the United States, which will be introduced through a custodian from the Metropolitan Correctional Center—will not be offered for their truth.  They will only be offered for the limited purpose of providing the exemplar for the jury's comparison.  See 28 U.S.C. § 1731 ("The admitted or proved handwriting of any person shall be admissible, for purposes of comparison, to determine genuineness of other handwriting attributed to such person.").  Even if offered for their truth, moreover, they would be admissible as admissions by a party-opponent pursuant to rule 801(d)(2).   The Court should therefore admit them into evidence.  See United States v. Scott, 270 F.3d 30, 50 (1st Cir. 2001) (stating that handwriting comparison could be made as easily by the jury).

VI.    Motion to Admit the Defendant's Book

At trial, as noted above, see Section I.C., supra, the government expects to introduce cooperating witness testimony and other evidence proving that the defendant participated in and directed acts of violence that include the attempted murder of the Colombian Producer.  The government also expects to use a written text prepared by the Colombian Producer based on his extensive interviews of the defendant.  This book and a draft translation are attached hereto as Exhibits K and K-1, respectively.[16]

---

[16]   The Court granted the government's motion to delay disclosure of the book that the Colombian Producer wrote.  Because that document is the subject of this motion, the government has provided it to the defense earlier than required under the Court's order as an exhibit to this motion.

A.     Background

As previously described, in or about late 2007/early 2008, CW3 agreed to assist the defendant with producing a book about the defendant's life, which they planned to turn into a movie, using the services of the Colombian Producer.  In early 2008, the Colombian Producer came to the mountains of Sinaloa, where the defendant was living in hiding at the time, and conducted several interviews of the defendant, his immediate family members (i.e., his sons, wives) and close family friends, with the aim of using this information to produce the book.  During these interviews, the defendant provided extensive statements about his life and, among other things, explained the circumstances under which he escaped from Puente Grande prison in 2001.  CW3 was present for most of these interviews and heard the defendant making these admissions to the Colombian Producer.  This project continued for several years.

By approximately 2012, when the Colombian Producer came to Mexico to conduct further interviews with the defendant, he presented his draft of the book.  Much of the draft manuscript was still in interview format.  The defendant and his sons reviewed the book, and the defendant's sons decided that they would take over supervising the project from CW3. The government anticipates that it will offer this book as evidence of the defendant's admissions about his drug trafficking history.

B.     Legal Standard

Rule 801 of the Federal Rules of Evidence carves out several exceptions to the rule that hearsay is generally inadmissible at trial.  One of these exceptions provides that a statement is non-hearsay if "the statement is offered against an opposing party" and is either a "statement which a party has manifested an adoption or belief in its truth" or a statement "made by a person whom the party authorized to make a statement on the subject."  Fed. R. Evid.

801(d)(2)(B), (C).  "When a statement is offered as an adoptive admission, the proponent must show that the party against whom the statement is offered adopted or acquiesced to the statement and that 'adoption or acquiescence may be manifested in any appropriate manner.'" Penguin Books U.S.A. v. New Christian Church of Full Endeavor, Ltd., 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003) (citing Fed. R. Evid. 801(d)(2)(B) advisory committee's note).  "The rules call for 'generous treatment of the avenue of admissibility' for admissions in general." Id. (citing Fed. R. Evid. 801(d)(2), advisory committee's note).

Penguin Books sets forth the relevant legal inquiry for both exceptions.  With respect to adoptive admissions, the Penguin Books case stated:

> Adoption is evaluated by examining the behavior of the party it is to be offered against.  Adoption of another's statement can be manifest by any appropriate means, such as language, conduct or silence.  A party may adopt a written statement by using it or taking action in response to or in compliance with it.  5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.31 at 801.54-57 ["Weinstein"]; Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 239 (2d Cir.1999).

> "Adoption by use" is another way the courts describe behavior that constitutes evidence of adoptive admission by a party.  White Indus., Inc. v. Cessna Aircraft Co., 611 F.Supp. 1049, 1062 (W.D.Mo.1985).  The court stated, "use of a document supplied by another in fact represents the party's intended assertion of the truth therein, [and] an adoptive admission can be found," such as where a party forwards a document to another in response to some request for information contained in the document. Id. Furthermore, even if the document is not expressly "vouched for" by the party it must only be shown by implication that business was conducted in a fashion that the statement was adopted. Pekelis v. Transcon. & W. Air, Inc., 187 F.2d 122, 128 (2d Cir.1951), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951).

> An entity's printing, publishing and dissemination of a document or a report that contains statements that pertain in some way to

the organization or company can constitute an adoptive admission. Alvord–Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996 (3d Cir.1994), cert. denied, 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995) (statements made by trade association's officers, including the president, published in the association's newsletters were adoptive admissions of the association, even though there was a general disclaimed printed at the beginning of the newsletter); Wagstaff v. Protective Apparel Corp. of Am., Inc., 760 F.2d 1074, 1078 (10th Cir.1985) (finding newspaper articles that included inflated statements of the defendant company's worth, that had been reprinted and distributed by the defendant company to people doing business with the company, to be "unequivocally" adoptive admissions.); Church of Scientology of California v. Commissioner of Internal Revenue, 83 T.C. 381, 514-15, 1984 WL 15614 (1984), aff'd, 823 F.2d 1310 (9th Cir.1987), cert. denied, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988) (Policy letters, written by church founder and collected for publication by the church and as sold through the church bookstore, were adoptive admissions of the church).

Penguin Books, 262 F. Supp. 2d at 258-59.

Penguin Books also set forth the appropriate legal analysis regarding the admissibility of non-hearsay authorized statements:

The relevant inquiry of Fed. R. Evid. 801(d)(2)(C) is whether the person making the statements had the authority to speak on a particular subject on behalf of the party the admission is to be used against. Wright & Miller, § 7022; Precision Piping and Instruments, Inc. v. E.I. du Pont de Nemours & Co., 951 F.2d 613, 619 (4th Cir.1991). The courts' inquiries generally require that a person making the statement be an agent of the party-opponent against whom the admission be offered. Wright & Miller, § 7022. . . . Under Fed. R. Evid. 801(d)(2)(C), speaking authority can be either "expressly or implicitly" bestowed upon an individual. Weinstein, § 801.32 at 801-60. Under this rule, the court examines whether a person has speaking authority on the particular subject in question. A writing by an agent of a party that was written and researched with the party's permission and authority with free access to the party's books and information and then circulated by the party constitutes an admission under Fed. R. Evid. 801(d)(2)(C). Reid Bros. Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1306–07 (9th Cir.1983), cert. denied, 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 259 (1983).

Penguin Books, 262 F. Supp. 2d at 260.  The district court in that case ultimately concluded that a nonfiction book, commissioned by a company and written by that company's president, was admissible against the company as, among other reasons, a non-hearsay statement against a party-opponent under Rules 801(d)(2)(B) and (C).

C.      The Book is Admissible

The facts in this case dictate a similar result.  Here, the evidence will show that the defendant agreed to have the Colombian Producer assemble a book detailing the defendant's drug trafficking activities.  The resulting manuscript based on numerous in-person interviews of the defendant and members of his family.  The evidence will show that the defendant hired the Colombian Producer to interview the defendant and his family members and to prepare the book based on the defendant's life.  Much like the litigant in Penguin Books, against whom the court ultimately admitted the book, the defendant hired the Colombian Producer to make sure that the story of his life came out to the public in a way that he could control.  As such, the defendant authorized the Colombian Producer to make statements about the defendant's drug trafficking ventures; and, therefore, the Colombian Producer was an agent of the defendant.  The Colombian Producer's screenplay of the defendant's life, which contained numerous quotes and admissions of drug dealing by the defendant and his close family and associates—with his acquiescence—is admissible as a statement against a party-opponent made by a person whom the party authorized to make a statement on the subject.

The book that the government seeks to admit has strong indicia of reliability separate and apart from the fact that it an agent of the defendant wrote it.  CW3 is expected to testify that he was present for some of the interviews of the defendant, and he can therefore

testify that the quotes contained in the book that are attributed to the defendant are in fact accurate.  While not germane to the Rule 801(d)(2)(C) analysis, this fact further supports the government's argument that the statements contained therein are in fact the defendant's own statements.  Such statements are commonly admissible under a third Rule 801(d)(2) exception: statements by a party-opponent.  See Fed. R. Evid. 801(d)(2)(A).[17]

VII.   <u>Motion to Admit Statements of a High-Ranking Cartel Leader to His Son as Either Coconspirator Statements or Declarations Against Penal Interest</u>

During the course of the defendant's conspiracy, a cooperating witness, CW6 is expected to testify about conversations he had with his father, who were high-ranking members of the Cartel or otherwise affiliated with the defendant.  CW6 had these conversations with his father prior to joining the Cartel in his own right.  These conversations included discussions concerning: (1) meetings between CW6's father and the defendant; (2) the hierarchy of the Cartel and its membership, including the relative positions of the cooperator's father and the defendant; (3) drug loads that CW6's father invested in with the defendant; (4) wars and/or violence between the Cartel and rival cartels, (5) the defendant's 1993 arrest, time in prison and 2001 escape; and (6) the shootout at the Guadalajara airport between the defendant and his rivals the AFO.  The government requests that the Court admit these statements as either non-hearsay or as exceptions to the rule against hearsay.  See generally Fed. R. Evid. 801-803.

The government expects to establish that most of statements by the father about which CW6 will testify were made in furtherance of the conspiracy, even though those

---

[17] Regardless, even it was not offered for the truth of the matter asserted, the book would be admissible for the limited purpose of corroborating CW3's testimony.  See Harris v. Jamaica Auto Repair Inc., No. 03-CV-417 (ERK), 2009 WL 2242355, at *4 (E.D.N.Y. July 27, 2009) (holding invoices admissible for limited purpose of corroboration).

statements were made prior to the time period in which CW6 joined the conspiracy.  The fact that the father made such statements while CW6 was not part of the conspiracy is irrelevant. "[T]here is no requirement that the person to whom the statement is made [] be a member [of the conspiracy]."  United States v. Gupta, 747 F.3d 111, 125 (2d Cir. 2014) (internal quotation marks and citations omitted).  Thus, the father's statements made in furtherance of the conspiracy are admissible as non-hearsay pursuant to Rule 801(d)(2)(E).  See United States v. Coppola, 671 F.3d 220, 246 (2d Cir. 2012) (statements of defendant's coconspirators are admissible as non-hearsay where the government shoes "(a) that there was a conspiracy, (b) that its members included the declarant and the [defendant], and (c) that the statement was made during the course of and in furtherance of the conspiracy").

The government anticipates that at least some of the statements that the cooperating witnesses will relate at trial, although relevant, may not have been made in furtherance of the charged conspiracy.  For instance, CW6 is expected to testify that his father described the Cartel's hierarchy to him, including his father's role and rank vis-à-vis the defendant, or that his father described acts of violence in which he and the defendant had engaged.  Such a statement may well be probative of the organization of the Cartel and the defendant's role, and the government would offer them for that purpose.

In these instances, such statements are admissible as a hearsay exception under Rule 804(b)(3) as a statement against the interest of the declarant.  Rule 804(b)(3), in pertinent part, provides a hearsay exception for statements made by an unavailable declarant that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to . . . criminal liability."  See

Gupta, 747 F.3d at 127 (quoting rule).  Whether such a statement satisfies the requirements of the rule requires an analysis of "all the surrounding circumstances."  Id.  The Second Circuit has held that the proffered statement "need not have been sufficient, standing alone, to convict the declarant of any crime," so long as it would have been "probative" in a case against him. Id. (citing United States v. Persico, 405 F.3d 85, 99 (2d Cir. 2011)) (alterations omitted).  The fact that the proffered statements at trial will have been made between close family members additionally serves to establish their reliability.  See United States v. Watts, No. 09-CR-62, 2011 WL 167627, *3 (S.D.N.Y. Jan. 11, 2011) ("When the out-of-court declarant made the statement to a close relative or confidant, the statement is deemed to be 'generally more reliable and trustworthy.'") (quoting United States v. Shukri, 207 F.3d 412 (7th Cir. 2000)); see also Gupta, 747 F.3d at 127 ("[A] statement incriminating both the declarant and the defendant may possess adequate reliability if . . . the statement was made to a person whom the person believes is an ally . . . .").

Here, CW6's father is a fugitive from justice; thus, he is unavailable to testify at trial.  His statements to CW6 regarding his involvement with the defendant and the Cartel were inculpatory.  Additionally, because the father made them to his son, they carry indicia of reliability.  The statements thus meet the exception to the hearsay rule as statements against interest pursuant to Rule 804(b)(3).  The Court should admit such testimony at trial.

VIII.  Motion to Admit Statements in Video Evidence

In its first motion in limine, the government moved to admit certain statements in its video evidence.  See Dkt. No. 213 at 38-56.  In the Order, the Court declined to rule on the government's motion, noting that the government indicated that it would identify specific portions of the video evidence that it sought to admit closer to trial.  See Dkt. No. 240 at 8-9.

As set forth below, the government now has identified specific statements in its video evidence that it seeks to admit at trial. The government therefore requests that the Court admit those statements into evidence at trial.

A.   Background

The government seeks to introduce several videos in which journalists and law enforcement officers describe their contemporaneous perceptions of locations. In addition, the government seeks to admit the statements of individuals on videos being interrogated and tortured by the defendant and members of his Cartel. In particular, the government seeks to introduce the following videos:

- "The 1990 Drug Tunnel Video": CW5 is expected to testify that the defendant used this drug tunnel from Agua Prieta, Sonora, Mexico to Douglas, Arizona to smuggle cocaine and marijuana into the United States. The defendant used the tunnel until law enforcement authorities uncovered it in May 1990. The video shows a law enforcement officer describing the tunnel and the hydraulic lift system used to access it as he observes them. See Ex. D.[18]

- "The 1993 Drug Tunnel Video": CW5 is expected to testify that the defendant had this tunnel constructed from Tijuana, Baja California, Mexico to San Isidro, California for the purpose of smuggling drugs into the United States. Law enforcement officers discovered the tunnel before the defendant's workers completed it. The video shows a law enforcement officer describing the tunnel as he observes it. See Ex. E.

- "The 2010 Rincon Interrogation Video": As discussed above, see Section I.B.i. supra, CW2 is expected to testify that Sinaloa Cartel members' tortured and interrogated Rincon at the direction of the defendant and Mayo Zambada in approximately 2010. They ultimately killed him. The video shows a portion of that interrogation and torture. See Ex. A.

- "The 2011 Defendant Interrogation Video": As discussed above, see Section I.B.i., the government expects multiple cooperating witnesses to testify that the defendant is depicted interrogating a bound hostage in this video. The government also expects to

---

[18] With this motion, the government is hand delivering to the Court a disc containing the government's exhibits, including the video evidence at issue. The government has muted portions of the videos that it does not seek to play at trial.

introduce other evidence, including recorded communications, corroborating that fact. See Ex. B.

- "The 2014 Escape Tunnel Video": As discussed above, see Section II.A.iii., CW4 will testify that the defendant escaped through a system of tunnels under bathroom fixtures during a raid by Mexican authorities on the defendant's residence in Culiacan, Sinaloa, Mexico in 2014. This video depicts a journalist describing the defendant's residences, the series of tunnels that connected them and the hydraulic lift systems under bathtubs in the residences as the journalist observes them. See Ex. F.

- "The 2015 Escape Videos": As discussed above, see Section II.A.iv., CW2 and CW7 are expected to testify regarding the defendant's escape from a maximum-security prison in Mexico in July 2015. One video related to this event shows the surveillance footage of the escape from the prison, including the guards' contemporaneous statements in response to the discovery that the defendant had escaped. See Ex. G.[19] The second video shows a journalist describing the escape tunnel as he observes it. See Ex. H.

B.    Legal Standard

"[T]he present sense impression exception permits a court to admit hearsay testimony of a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004); see Weinstein's Federal Evidence § 803.03[3] (2d ed. 2000) ("The proponent of the evidence must show that the event or condition about which the statement was made was perceived by the declarant."). A statement meets the present-sense-impression exception to the bar against hearsay if the government establishes by a "preponderance of the evidence: (1) that the declarant observed firsthand the event or condition, (2) that the statement was made while the declarant was observing the event or condition or immediately thereafter, and (3) that the statement reports what the declarant

---

[19] The 2010 Rincon Interrogation Video, the 2011 Defendant Interrogation video and the surveillance video included in the 2015 Escape Videos are in Spanish. The government has provided translations of those videos as Exs. A-1, B-1 and G-1, respectively.

observed firsthand through senses." United States v. Griggs, No. 04 CR. 425 (RWS), 2004 WL 2676474, at *5 (S.D.N.Y. Nov. 23, 2004); 5 Weinstein's Federal Evidence § 803.03[1] (describing elements of exception).

> As Judge Korman has explained:
>
> Rule 803(1) of the Federal Rules of Evidence provides an exception to the general rule against hearsay for any statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." The theory behind this exception is essentially twofold. First, the immediacy requirement reduces the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the part of the declarant. See Fed.R.Evid. 803(1) Advisory Committee Note ("substantial contemporaneity of event and statement negative the likelihood of deliberate or conscious misrepresentation"); United States v. Medico, 557 F.2d 309, 315 (2d Cir.), cert. denied, 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 480 (1977). Secondly, immediacy also greatly reduces the likelihood that the declarant will have inaccurately remembered the event in question. See United States v. Blakey, 607 F.2d 779, 785 (7th Cir.1979); 4 David W. Louisell & Christopher B. Mueller, Federal Evidence, § 437, at 483 (1980).

United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994); see United States v. Urena, 989 F. Supp. 2d 253, 260 (S.D.N.Y. 2013) ("A real-time narration of events may be admissible as a present-sense impression.").

An excited utterance is a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability. See United States v. Tocco, 135 F.3d 116, 127–28 (2d Cir. 1998). An excited utterance need not be contemporaneous with the startling event to be admissible under Rule

803(2). See, e.g., United States v. Fell, 531 F.3d 197, 231 (2d Cir. 2008) (recognizing that "key

question governing admission [under the excited utterance exception] is whether the declarant

was, within the meaning of Rule 803(2), under the stress of excitement caused by the event or

condition" (internal quotation marks and citation omitted); United States v. Scarpa, 913 F.2d

993, 1017 (2d Cir.1990) (five or six hours between beating and statement).

Finally, it has long been the rule that "[s]o long as . . . statements are not

presented for the truth of the matter asserted, but only to establish a context . . . the defendant's

Sixth Amendment rights are not transgressed." United States v. Paulino, 445 F.3d 211, 216

(2d Cir. 2006) (citing United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990)).  Moreover,

third-party statements in recorded conversations with the defendant are admissible where the

government offers them to place the defendant's statements in a proper context.  United States

v. Perez, No. 05 CR. 441 (PKL), 2005 WL 2709160, at *2 (S.D.N.Y. Oct. 20, 2005).  Similarly,

third-party statements are admissible when they are offered to give proper context to

statements by the defendant's coconspirator.  See id.

C.    The Statements in the Video Evidence are Admissible and Will Aid the Jury

The statements that the government seeks to introduce in (1) the 1990 Drug

Tunnel Video, (2) the 1993 Drug Tunnel Video, (3) the 2014 Escape Tunnel Video and (4) the

news video included in the 2015 Escape Videos fall squarely within the present-sense

exception set forth in Rule 803(1).  All of these videos depict persons walking through

residences, warehouses, jails and tunnels, while making statements about their surroundings

immediately as they observe them.  In the 1990 Drug Tunnel Video and the 1993 Drug Tunnel

Video, the law enforcement officers describe, among other things, the entrances/exits to the

tunnels, the materials used to create the tunnel, the length of the tunnels and items found within

the tunnels.  In the 2014 Tunnel Videos, the journalist describes his surroundings based upon what he saw and felt:  the types of doors to the house, the security system, the materials used to build the walls of the tunnel and the fact that a tunnel connected to the sewer system, which then connected to a tunnel leading to another house.  Similarly, the 2015 Escape Video, the journalist described the size and shape of the entrance to the tunnel, the room in which the entrance was located, the size of the ladder leading into the tunnel, the multiple different sections of the tunnel as he descended through it, the height and length of the tunnel and items observed inside the tunnel.  The law enforcement officers' and journalists' immediate descriptions of their surroundings as they observed them indicate the trustworthiness of the statements.  The statements are unlikely to be fabricated or inaccurate because the declarants made the statements about their surroundings while observing them.  See United States v. Bundy, No. 2:16-CR-46-GMN-PAL, 2017 WL 4803929, at *5 (D. Nev. Oct. 24, 2017) (concluding that journalist's videotaped statement regarding protest was admissible as present-sense impression); Okoroafor v. City of New York, No. 07 CIV. 9387 DAB, 2013 WL 5462284, at *2 n.3 (S.D.N.Y. Sept. 25, 2013) (court reporter's handwritten notes admissible as present-sense impression).

　　　　These statements are relevant at trial because they will aid the jury in understanding the images depicted in the video.  In the absence of the narration, the jury may not understand the images that they are viewing, especially given that many of the images depict the inside of dark tunnels.  Moreover, the events depicted in the videos are highly relevant.  The tunnels show the sophistication and substantial resources of the Sinaloa Cartel, as well as the defendant's methods of drug smuggling and escaping law enforcement detection.

As the declarants' real-time narrations will assist the jury in understanding the videos of highly relevant events, they are admissible. See Fed. R. Evid. 401; Old Chief, 519 U.S. at 179-82.

The government also requests that the Court admit the statements of the prison guards' in the surveillance video include in the 2015 Escape Videos as excited utterances and present-sense impressions. In that video, upon discovery that the defendant is no longer in his jail cell, the guards exclaim, inter alia, that there is a hole in the shower and that the prisoner is no longer in the cell. These statements are excited utterances because the guards made them shortly after what was certainly a startling event: the head of the Sinaloa Cartel's escape from jail. See, e.g., United States v. Asaro, No. 14-CR-26, 2015 WL 5841804, *11 (E.D.N.Y. Oct. 7, 2015) (holding that statement when declarant realized her husband was missing qualified as an excited utterance). They are also present-sense impressions because the guards can be heard describing the empty jail cell and the hole in the shower floor as they viewed it. See Mejia-Valez, 855 F. Supp. at 613. The Court thus should admit these statements.

Finally, the government also requests that the Court admit the statements of the hostages in the 2010 Rincon Interrogation Video and 2011 Defendant Interrogation Video. To begin, the government is not offering those statements for their truth; rather, the government is offering them to show that they were elicited in response to interrogation by, or at the direction of, the defendant. Moreover, these statements are admissible as necessary context to explain the non-hearsay statements of the defendant and his coconspirators, see Fed. R. Evid. 801(d)(2), who are conducting the interrogations captured on these videos. See United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990) (holding that where recorded statements are presented "not for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused," they are admissible without violating hearsay rule or

Confrontation Clause); <u>Perez</u>, 2005 WL 2709160 at *2 ("Because the informant's statements are offered solely to place in context Rivera's statements, which themselves are admissible non-hearsay pursuant to Rule 801(d)(2)(E) as statements by a co-conspirator of a party during the course and in furtherance of the conspiracy, the informant's statements are not hearsay."). The Court thus should also grant the government's motion regarding these statements.

IX.   <u>Motion to Prohibit Dissemination of Photographs and Sketches of Cooperating Witnesses</u>

The extreme danger to the government's cooperating witnesses and their families has been chronicled in numerous previous filings and court orders. <u>See, e.g.</u>, Dkt. No. 31 at 3-4 (detailing defendant's attempts to silence cooperating witness by kidnapping his family members); Dkt. No. 45 at 2-3 (describing defendant's attempts to murder multiple cooperating witnesses, as well as murder of sons of cooperating witness by defendant's associates); Dkt. No. 78 at 2-3 (describing defendant's attempts to intimidate one cooperating witness and kidnapping of family of another cooperating witness at defendant's direction). In light of that danger, the government seeks an order from this Court prohibiting dissemination of photographs and sketches of the faces of the cooperating witnesses who testify at trial. Distribution of such images will markedly increase the danger to some, if not all, of the government's cooperating witnesses, as well as their family members.

A.   <u>Legal Standard</u>

The First Amendment protects the right of the press to attend trial proceedings. <u>Press–Enterprise Co. v. Superior Court</u>, 464 U.S. 501 (1984); <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 604 (1982); <u>United States v. Yonkers Bd. of Ed.</u>, 747 F.2d 111, 112–13 (2d Cir.1984). The Supreme Court has previously explained that "without some

protection for seeking out the news, freedom of the press could be eviscerated." Branzburg v. Hayes, 408 U.S. 665, 681 (1972). However, the rights of the public and the press are not absolute, and not without bounds. See Globe Newspaper, 457 U.S. at 606. "The right to speak and publish does not carry with it the unrestrained right to gather information." Zemel v. Rusk, 381 U.S. 1, 17 (1965); see, e.g., United States v. Gurney, 558 F.2d 1202, 1208 (5th Cir.1977).

Specifically, the Supreme Court has addressed the circumstances where a trial judge may interpose reasonable time, place, and manner restrictions on access to criminal trials:

> Just as government may impose reasonable time, place and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic . . . (citation omitted), so may a trial judge in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. '[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581–82 n. 18, (1980).

Furthermore, a trial judge enjoys broad discretion with matters that concern the activities of his or her court in order to ensure a fair and orderly trial. See Gurney, 558 F.2d at 1209. "Within this discretion . . . the district judge can place restrictions on parties, jurors, lawyers, and others involved with the proceedings despite the fact that such restrictions might affect First Amendment considerations." Id. at 1210; see, e.g. United States v. Columbia Broadcasting System, Inc., 497 F.2d 102, 104 (5th Cir. 1974) (stating trial judge has extremely broad discretion to control courtroom activity, even when restriction touches on matters protected by First Amendment); Seymour v. United States, 373 F.2d 629 (5th Cir. 1967) (finding trial court's order prohibiting taking of photos on same floor of courtroom fell within

ambit of permissible maintenance of judicial decorum); United States v. Dinitz, 538 F.2d 1214, 1223-24 (5th Cir. 1976); Tsokalas v. Purtill, 756 F. Supp. 89, 94 (D. Conn. 1991) (order prohibiting publication of sketches of jurors' likenesses as reasonable time, place and manner restriction that did not violate the First Amendment).

Historically, federal courts have consistently prohibited the photographing of federal criminal court proceedings.  Rule 53 of the Federal Rule of Criminal Procedure states: "Except as otherwise permitted by a statute or these rules, the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom." Fed. R. Crim. P. 53. This rule has been found to be constitutional, as a reasonable "time, place, and manner" restriction by several Circuits.  See Conway v. United States, 852 F.2d 187, 188 (6th Cir. 1988); United States v. Edwards, 785 F.2d 1293, 1295-96 (5th Cir. 1986); United States v. Kerley, 753 F.2d 617, 622 (7th Cir. 1985); United States v. Hastings, 695 F.2d 1278, 1282 (11th Cir. 1983).  The press's right of access to observe trial proceedings is coextensive with the public's right of access to attend trial proceedings. It provides journalists with the rights to "attend, listen, and report on the proceedings." Hastings, 695 F.2d. at 1280.  "[T]o conclude . . . that the right of access extends to the right to televise, record, and broadcast trials [] misconceives the meaning of the right of access at stake in these cases." Id.

   B.    The Court Should Prohibit Dissemination of Photographs and Sketches of Cooperating Witnesses

In accordance with these principles, the Court should grant the government's request to prohibit the media from sketching the cooperating witnesses or publishing photographs of the witnesses introduced during trial without significant pixilation or other

alteration.   Public dissemination of the images of these witnesses, by way of sketches or photographs, would endanger the lives of the witnesses and their families. Some of the government's witnesses are not incarcerated, but live in hiding at locations that the government and the witnesses have taken measures to keep secret from the Cartel.   Other witnesses are incarcerated and already in the Witness Security Program (the "Program") and thus are housed in Protective Custody Units in their correctional institutions in light of the great risk to their lives stemming from the nature of their specific testimony.   Many of these cooperating witnesses and their families will be candidates for protection by the Program following release from custody, a program that enshrouds its participants and families by providing them with new identities and residences, and instructs its participants to cut off all ties with family and friends in order to maintain the highest levels of protection.   These drastic protective measures will be rendered ineffective should photographs or sketches of the cooperating witnesses be disseminated to the public.   Moreover, permitting witnesses' faces to be publicly identified would significantly hamper the government's ability to encourage similar witnesses to come forward and testify in open court in the future.   While the public does have an interest in a fully open trial, including access to the exhibits shown to the jury during trial, this interest is dwarfed by the substantial government interest in protecting its witnesses and their families from harm and encouraging future witnesses to come forward and testify in court.

The government's request is not without substantial precedent.   In a recent case in this district, United States v. Nasser, 10-CR-19 (S-4) (RJD) (E.D.N.Y.), the government requested, among other things, that Judge Dearie issue an order to prohibit the media from sketching the undercover officers in a terrorism case.   See Gov't Motion In Limine, Nasser, 10-CR-19, Dkt. No. 396.  Judge Dearie granted the motion in part, ordering that the courtroom

sketch artists could only depict the undercover officers with "blank faces and generic haircuts" and had to first show the sketches to the government so the government had an opportunity to make additional motions to restrict dissemination if the government believed that the sketch was still objectionable.  Feb. 24, 2015 Order, Nasser, 10-CR-19, Dkt. No. 398.  Similarly, in United States v. Pugh, 15-CR-116 (NGG) (E.D.N.Y.), the government sought an order to partially close the courtroom during the testimony of an undercover FBI agent.  Motion for Partial Closure of Courtroom, Pugh, 15-CR-116, Dkt. No. 86.  Judge Garaufis weighed the public interest in a fully public trial with the compelling government interests of maintaining the safety of the witness and the continued effectiveness of ongoing undercover investigations, and granted the motion to close the courtroom during the testimony.  Feb. 24, 2016 Order, Pugh, 15-CR-116, Dkt. No. 99.  As part of his order, Judge Garaufis required that "any videos or photographs of the UCE that are shown in open court or are otherwise released to the public or the press shall be altered to pixelate or otherwise obscure the UCE's face."  Id. at 3.

In United States v. Almehmeti, 284 F. Supp. 3d 477 (S.D.N.Y. 2018), the government submitted a number of pretrial motions in limine to restrict access to the courtroom during the testimony of undercover officers.  Id. at 482.  The defendant opposed the requests, suggesting that, instead of closing the courtroom during the testimony of the witnesses, the court could prevent a courtroom sketch artist from sketching the likenesses of the witnesses.  Id. at 489.  The court found that this accommodation did not adequately address the government's concerns, and ordered that the courtroom be closed for the specific testimony, subject to certain restrictions; and, citing Judge Garaufis's order in Pugh, the court granted a motion to "alter, pixelate, or otherwise obscure the visage of the UCs in any exhibit made available to the public and press."  Id. at 490.

The government makes a more limited request here than the requests in Nasser, Pugh, and Almehmeti.  Rather than seeking to restrict access to the courtroom during the cooperating witnesses' testimony, the government simply seeks to prevent courtroom sketches of the witnesses' faces and to alter, pixelate or otherwise obscure the visage of the cooperating witnesses in any exhibit made available to the public and press.  The government's twin interests in protecting the cooperating witnesses and their families and in encouraging future cooperating witnesses to testify overcome the public's interest in seeing photographs or sketches of the witnesses.[20]

This request is narrowly tailored to prohibit only those sketches and photographs that might assist Cartel members or others acting on the defendant's behalf in locating the cooperating witnesses.  The government does not seek to prohibit sketching of any other courtroom scene or any other courtroom participants or to interfere with the media's right to inform its readers of developments in the proceedings.  See KPNX Broadcasting Co. v. Arizona Superior Court, 459 U.S. 1302, 1306 (1982) (declining to stay order of state trial court requiring that sketch artist drawings of jurors be reviewed by court before being broadcast on television, in part, because "[t]he trial has never been closed," "all the proceedings may be reported," and "the [order did] not prohibit the reporting of any facts on the public record")

---

[20] The government recognizes that photographs of certain cooperating witnesses are available to the public already.  Thus, to the extent members of the press request photographs of such witnesses during trial, the government seeks the Court's approval to evaluate disclosure of such photographs on a case-by-case basis, depending upon the photograph requested as compared to the photographs already available to the public.  For instance, the government may retain a strong interest in preventing dissemination of a current photograph of a witness who lives in hiding or is a member of the Program, if only much older photographs—in which the witness's appearance is quite different from his or her present appearance—are widely available to the public.

(opinion by sole Justice (Rehnquist) acting as Circuit Justice).  In <u>KPNX Broadcasting Co.</u>, while he approved the trial judge's requirement that all sketches be reviewed and approved by the court before being published, Justice Rehnquist nonetheless noted, "I think that in all probability the trial judge's order would be more defensible on federal constitutional grounds if he had flatly banned courtroom sketching of the jurors, and if he had extended the ban to those who sketch for the print media as well as to those who sketch for television." <u>Id</u>. at 1308.

Accordingly, the restriction the government seeks herein does not impinge on the fundamental news dissemination processes of the press nor does it limit fair commentary on the proceedings.  "The press is free to attend the entire trial, and to report whatever they observe." <u>Hastings</u>, 695 F.2d at 1282. The Supreme Court has held that such access is sufficient to protect the press's right of access to criminal trials under the First Amendment. <u>Nixon v. Warner Communications</u>, 435 U.S. 598, 610 (1978) ("The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed.").  The Court should therefore grant the government's motion to prevent courtroom sketches of the witnesses' faces and to alter, pixelate or otherwise obscure cooperating witnesses' faces in any exhibit made available to the public and press.

X.      <u>Motion to Preclude Elicitation of Information Related to the Witness Security Program and Cooperating Witnesses' Family Members</u>

     A.      <u>Witness Security Program Information</u>

As stated above, <u>see</u> Section IX <u>supra</u>, multiple cooperating witnesses are in the Program or were formerly in the Program.  Such witnesses are or were housed in Protective Custody Units while in custody and/or lived in undisclosed locations under the protection of the Program following release from custody.  The Program put these enhanced security

measures in place because the witnesses are at significant risk for violent attack or murder by members of the Sinaloa Cartel or other persons acting on the defendant's behalf as a result of their cooperation with law enforcement.  Despite these significant risks, the witnesses have nevertheless expressed a willingness to testify in the upcoming trial.  The government respectfully requests an order prohibiting inquiry or disclosure, on the part of either the government or the defense, into specifics related to:  (1) the location where the witness is or was housed or located while in the Program; (2) the operation of the Program and (3) for former Program participants, the fact that such a witness is no longer in the Program.

At trial, the "disclosure of [Program] participation must be handled delicately." United States v. DiFrancesco, 604 F.2d 769, 775 (2d Cir.  1979)  (internal  quotation  marks omitted), rev'd on other grounds, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); see also United States v. Melia, 691 F.2d 672, 675 (4th Cir. 1982).  "Since a defendant often will seek to impeach a participating witness by showing that he has received significant benefits while in the program, the government may desire to bring out the witness' participation during direct examination in order to avoid an inference that the government was attempting to hide the witness' possible bias." DiFrancesco, 604 F.2d at 775.  "Such testimony is permissible so long as the prosecutor does not attempt to exploit it." Id.

The government intends to elicit limited testimony referring to a witness's involvement in the Program on direct examination; that is, it will elicit only testimony that the government has taken such steps to protect the witness and/or his or her family members.  The government does not object to proper cross-examination of its witnesses using information regarding prior convictions or other appropriate forms of impeachment, including perceived benefits received while in the Program.  That said, the government would object to the

80

improper insinuation by the defendant that witness participation in the Program is itself a benefit intended to influence the witness's testimony.  Documents relating to witness participation in the Program make clear that witnesses are to be afforded no special benefits as compared with other inmates in the Bureau of Prisons.  Moreover, a witness would violate the Program guidelines and may be terminated from the Program, if he or she provides false or incomplete testimony.  Should the defendant attempt to raise a witness's participation in the Program in the manner described, the government should then be permitted to explore more fully the terms of the witness's Program participation, as well as the witness's fear of the defendant and the Sinaloa Cartel as a basis for entering the Program.  See United States v. Simmons, 923 F.2d 934, 955 (2d Cir. 1991) (concluding that government may properly respond to defense argument that witness was biased in favor of government due to placement in Program); United States v. DeFillipo, 590 F.2d 1228, 1235 n.10 (2d Cir. 1979) (same).

While the defense may explore perceived benefits from the Program on cross-examination, specific information regarding the Program is irrelevant and would risk danger to the witnesses and/or other present and future Program participants.  Such information includes (1) the location where the witness is or was housed or located while in the Program; (2) the operation of the Program and (3) for former Program participants, the fact that such a witness is no longer in the Program.  Public disclosure of the locations of the witnesses would undermine the very purpose of their placement in the Program, namely, to prevent Cartel members and/or other persons acting on the defendant's behalf from locating and harming them.  It also would jeopardize other Program participants, who may be housed at the same locations.  Public disclosure of the details of the Program would similarly jeopardize the Program's operation by potentially providing sensitive information to persons who may be

seeking to locate persons protected by the Program.  Lastly, public disclosure that a witness has left with the Program—and therefore no longer under its strict protections—could encourage persons seeking to the harm the witness to attempt to locate him or her, believing that their chances of finding the witness have increased now that the witness is no longer in the Program.  In light of these risks, and given that these facts have little, if any, bearing on the facts at issue, the Court should preclude the defendant from cross-examining cooperating witnesses about this information.  See United States v. Cavallaro, 553 F.2d 300, 304-05 (2d Cir. 1977) (affirming district court order denying defendant access to witness's address, because "there was good reason to fear for the safety of the witness").

B.    Cooperating Witnesses' Family Members

The government has taken numerous and varying steps to protect the cooperating witnesses' family members from retaliation by the defendant and the Sinaloa Cartel, including relocating family members.  The government does not object to proper cross-examination regarding these perceived benefits, such as the fact that the government took such actions and the amount of money the government spent to protect these family members.  Of course, should the defense engage in such cross-examination, the government should be permitted to elicit testimony from the cooperating witnesses regarding the witnesses' fear of retaliation from the defendant and the Sinaloa Cartel against their families. The government, however, requests that the Court preclude the defendant from cross-examining government witnesses about (1) the identities of family members that the government has taken steps to protect; (2) specific steps that the government took to the protect the family members; and (3) the family members' present locations.  Such information is irrelevant at trial, and its disclosure could seriously jeopardize the safety of the cooperating witnesses' family members.

See Dkt. No. 240 (citing United States v. Marti, 421 F.2d 1263, 1266 (2d Cir. 1970), and granting motion to preclude examination regarding identifying information of government witnesses); United States v. Persico, 425 F.2d 1375, 1383-84 (2d Cir. 1970) (stating that trial court has "duty to protect [a witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him.").

XI.    Motion to Redact Certain Names and Replace Them With Initials in Transcripts and Translations of Recorded Messages

The government intends to introduce certain electronic communications between the defendant and other individuals, as well as certified public records, containing the names of the defendant's minor children.  During the recorded communications, the defendant references by name some of his minor children.  Those references, in part, identify the defendant as a participant in those communications.  The government also intends to introduce public records, including the birth certificates of the defendant's minor children and passport applications of the defendant's wife and minor children, which establish their relationship to the defendant.  The government seeks permission to redact the minor children's names from the transcripts of these communications and records and replace them with the initials of their respective names.  The government makes this request to ensure the privacy of these minor children.  The government will seek a stipulation with defense counsel agreeing that the names of the minor children in the recorded communications correspond to the names of the defendant's minor children listed in the public records.  In the event that the defendant will not stipulate, the government will seek such a jury instruction from the Court.

XII.   Motion to Preclude Evidence and Argument Alleging Selective Prosecution of the Defendant

In its initial motions in limine, the government sought to preclude evidence and argument alleging selective prosecution of the defendant.  See Dkt. 213 at 91-94.  There, the government expressed concern that "the defendant will attempt to argue to the jury that the U.S. and Mexican government selectively targeted him for prosecution."  Dkt. 213 at 91.  In the government's reply brief, the government pointed to an article published in Time Magazine, noting that the defense "plans to challenge the broader tactics of American agents in their decades of following Guzman" and quoted attorney Eduardo Balarezo as stating: "Some of the ways that the DEA operates abroad are unethical or illegal . . . . They are walking a thin line and sometimes stepping over it."  Dkt. 237 at 41.[21]  The government incorporates by reference the arguments made in both its initial brief and the reply brief.

In the Order, the Court considered the government's and the defense's arguments on the issue and found that "any selective-prosecution argument by defendant to the jury would . . . be improper."  Dkt. 240 at 12.  The Court, however, denied the government's motion as premature because "the defendant has not stated that he intends to make such an argument."  Id.

Since the Court issued its ruling, though, the defendant's legal team has made additional comments to the press signaling that the selective-prosecution argument, in fact, will be one of the key pillars of its defense.  For example, in an August 19, 2018, article published in the New York Post, the defendant's new counsel, Jeffrey Lichtman, Esq., was

---

[21] See Ioan Grillo, Inside the Trial of Joaquin 'El Chapo' Guzman, the World's Most Infamous Drug Baron, Time Magazine (May. 10, 2018), available at http://time.com/longform/joaquin-guzman-el-chapo-trial (last visited Sep. 21, 2018).

quoted as stating: "The jury and the public will be stunned when they see the types of cooperators being used in this case . . . . I've been on many cases where all sorts of questionable characters have been used, but this dwarfs them all.  There are so many mercenary, dishonest people being tapped in an attempt to bring down Mr. Guzman."[22]  More recently, Mr. Lichtman was quoted as saying: "I've defended some difficult cases and some notorious clients but I've never had both arms tied behind my back like this . . . This is literally an inquisition. Constitutional fairness has gone out of the window because the government wants a show trial with a quickie conviction."[23]

These quotes, along with the earlier quote in Time Magazine, and others like it, may be nothing more than a concerted defense effort to attempt to gain sympathy for the defendant in the courtroom of public opinion.  More likely, however, these quotes— referencing "inquisitions," "mercenary" government witnesses and "unethical or illegal" government conduct—belie a trial strategy to attempt to put the government on trial.

The government understands the Court's reticence to issue a definitive ruling without first learning whether the defense intends to pursue a "selective prosecution" strategy at trial.  However, the government is faced with the very significant possibility that the defense may not move in limine to introduce such selective prosecution evidence or argument as required under Federal Rule of Criminal Procedure 12(b)(3), and may attempt to introduce

---

[22] Priscilla DeGregory and Emily Saul, "Ex-Gotti Lawyer Rejoins El Chapo Legal Team," New York Post (Aug. 19, 2018), available at https://nypost.com/2018/08/19/ex-gotti-lawyer-rejoins-el-chapo-legal-team/ (last viewed on Sep. 15, 2018).

[23] Edward Helmore, "El Chapo Lawyers Accuse Government of 'An Inquisition' As Trial Nears," The Guardian (Sep. 3, 2018), available at https://www.theguardian.com/world/2018/sep/03/el-chapos-lawyers-accuse-government-of-an-inquisition-as-trial-nears (last viewed on Sep. 15, 2018).

such arguments to the jury in opening statement.  In effect, the defense may attempt to seek forgiveness from this Court rather than permission.

The danger to the prosecution's case is evident.  If the defendant does not signal his willingness and desire to introduce a selective prosecution argument until he makes the argument to the jury, it will be too late.  While the Court can admonish the defense and issue a curative instruction, the damage will have already been done.  In light of the clear case law referenced in the government's previous motion, see Dkt. No. 213 at 76-79, and the defense counsel's prior statements to the press signaling a concerted effort to argue selective prosecution, this Court should now grant the government's motion to preclude evidence and argument alleging selective prosecution of the defendant.

XIII.   <u>Motion to Preclude the Defense from Presenting Irrelevant and/or Unfairly Prejudicial Evidence and Argument</u>

The government moves <u>in</u> <u>limine</u> to preclude the admission of evidence or argument by the defendant regarding a number of topics which are either irrelevant or would likely confuse the issues, mislead the jury and result in unfair prejudice to the government. Specifically, the government seeks to preclude the defendant from eliciting or introducing: (1) evidence of sensitive law enforcement techniques related to the attempts to locate and apprehend the defendant; (2) a government official's recent statements regarding cooperating witnesses; (3) references to certain books related to the defendant; (4) reference to the "Fast and Furious" law enforcement operation undertaken by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

A.      Legal Standard

As discussed above, Rule 401 defines "relevant evidence" as evidence having "any tendency to make a fact more or less probable than it would be without the evidence," where "the fact is of consequence in determining the action."  Rule 402, in turn, provides that irrelevant evidence is not admissible.  See, e.g., Arlio v. Lively, 474 F.3d 46, 52 (2d Cir. 2007) ("If an item of evidence tends to prove a fact that is of consequence to the determination of the action, it is relevant.  If it does not tend to prove a material fact, it is irrelevant.") (internal quotation marks omitted).

Pursuant to Rule 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "District courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice."  United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009).  Courts also have broad discretion to exclude evidence if it has an "undue tendency to suggest decision on an improper bias, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403 advisory committee's note.  Indeed, the Court may preclude the introduction of evidence under Rule 403 even if it is intended to further a purported defense theory.  See United States v. Roberts-Rahim, No. 15-CR-243 (DLI), 2015 WL 6438674, at *9 (E.D.N.Y. Oct. 22, 2015).

B.      The Court Should Preclude the Defense from Introducing Evidence or
        Eliciting Testimony Regarding Sensitive Law Enforcement Techniques

At trial, the government intends to introduce evidence related to attempts to capture the defendant in 2012 and 2014, as well as evidence related to a 2014 seizure in Ipiales,

Colombia of cocaine and weapons linked to the defendant.  Foreign law enforcement initiated each operation, and the capture operations involved U.S. law enforcement assistance.  The government seeks to preclude the defendant from cross-examining witnesses or otherwise introducing evidence about sensitive law enforcement techniques used in these operations.

As the government set forth in its previous letter, see Dkt. No. 249, the government worked with foreign counterparts in Mexico in 2012 and 2014 in an effort to capture the defendant, who was at the time a fugitive.  The efforts to locate and capture the defendant included the lawful warrantless tracking of geolocation data associated with cellular telephones used by the defendant's coconspirators, as well as other sensitive law enforcement techniques.  See id.  At trial, the government expects to call one or more U.S. law enforcement agents who were invited by Mexican authorities to assist in locating the defendant in 2012 and 2014.  Those agents will generally testify about the defendant's flight from law enforcement in 2012, as well as the defendant's attempt to flee law enforcement in 2014, shortly after which Mexican authorities arrested him.  During and following those actions, law enforcement officers recovered narcotics, weapons, drug ledgers, armored vehicles and communications equipment from the residences in which the defendant had been staying.  In addition to observing and participating in those events and the recovery of evidence, the government's potential witnesses observed sensitive law enforcement techniques used to locate the defendant for his potential capture.  If the specific details of those techniques were elicited in court, they would publicly reveal capabilities and technology available to apprehend fugitives, such as the defendant, and could thwart future government capture attempts.

Separately, at an airport in Ipiales, Colombia, on January 30, 2014, Colombian law enforcement officers seized an aircraft containing 403 kilograms of cocaine, three rocket-

propelled grenades and 49 40-millimeter grenades, as well as aircraft fuel.  The government expects to link this seizure to the defendant through the testimony of cooperating witnesses and a U.S. judicially-authorized wiretap.  The government also expects that a Colombian law enforcement official who conducted the seizure will testify to the evidence recovered, its chain of custody and actions taken by Colombian law enforcement immediately following the seizure.  That Colombian official participated in the seizure because he was directed to do so by others in his same unit.  He has a general understanding of the sensitive law enforcement methods and technologies that led others in Colombian law enforcement to direct him to Ipiales.  If details about those techniques were elicited in court, they would publicly reveal capabilities and technology available to the Colombian government and could thwart future efforts to disrupt narcotics shipments.

As the government explained in its previous motions in limine, various elements of the 2012 and 2014 operations by law enforcement are relevant and properly admissible at trial.  See Dkt. No. 213 at 88.  Indeed, the government itself intends to elicit testimony related to those operations in order to present the jury with, inter alia, evidence concerning the defendant's flights from justice and a foundation for the admission of evidence recovered during the 2012 and 2014 raids.  But the government renews its motion to preclude inquiry into the means and methods used by law enforcement to track and locate the defendant.  Such inquiry is irrelevant to the defendant's innocence or guilt and risks confusing the jury.  The same is true with respect to sensitive law enforcement techniques underlying the Ipiales, Colombia seizure:  the seizure itself is properly admissible at trial, and the government will elicit testimony to establish what occurred when Colombian law enforcement arrived at the airport to seize the aircraft, weapons and cocaine.  But the means and methods used to target

the Ipiales airport on that date are irrelevant to the seizure itself, do not bear on the defendant's innocence or guilt and do not bear on the evidence linking the defendant to the seizure (which will be introduced through cooperating witnesses and a judicially-authorized wiretap in the United States). Permitting the defendant to inquire as to the means and methods used by the Colombian government to identify the location of drugs and other contraband would have virtually no probative value, and would risk confusing the issues before the jury.

As the government explained in its previous motion, courts in this circuit routinely instruct juries not to consider how evidence was obtained. See, e.g., United States v. O'Brien, No. 13-CR-586, 2017 WL 2371159, *12 (E.D.N.Y. May 31, 2017) (denying motion for new trial based on purported new evidence of law enforcement agents' conduct by noting that court had instructed jury at trial that it was not to consider the means and methods by which law enforcement officers obtained evidence). In this case, the details of the law enforcement techniques used in Mexico and Colombia are not relevant to the defendant's guilt or innocence. Introduction of testimony or evidence concerning those techniques would only serve to invite the jury to judge the defendant based on their views about the propriety of the law enforcement methods, rather than the pertinent evidence. See United States v. Alimehmeti, 284 F. Supp. 3d 477, 494 (S.D.N.Y. 2018) (precluding inquiry into law enforcement means and methods under Rules 402 and 403, noting that such matters are "irrelevant to the defendant's innocence and guilt," and that "[a]n inquiry at trial into the details of law enforcement recording methods would invite the jury to pass judgment on the propriety of such investigative techniques").

The defendant should therefore be precluded from inquiring into the details of the means and methods used by Colombian and Mexican law enforcement related to these operations.

C.     The Court Should Preclude Reference to A Government Official's Statements Regarding Cooperating Witnesses

A government official's recent comments in which he criticized cooperating witnesses in a wholly separate investigation, calling them "flippers" whose use probably should be illegal, have been highly publicized.  The government requests that the Court preclude the defense from referring to those comments during argument or questioning of witnesses.  These statements have no bearing on the facts at issue in this case or the particular cooperating witnesses that the government expects to call at trial.  The Court thus should preclude reference to them under Rules 401, 402 and 403.  See United States v. Jamal Russell, 16-CR-396 (S.D.N.Y. Aug. 23, 2018), Trial Tr. at 520:6-522:4, 529:25-531:19 (precluding defense argument related to government official's comments referring to cooperating witnesses as "flippers").

D.     The Court Should Preclude Reference to Certain Books Regarding the Defendant

The government moves to preclude statements in two books about the defendant, Cartel Wives: A True Story of Deadly Decisions, Steadfast Love, and Bringing Down El Chapo ("Cartel Wives") and Hunting El Chapo: The Inside Story of the American Lawman Who Captured the World's-Most-Wanted Drug Lord ("Hunting El Chapo").

Cartel Wives was published in 2017.   One of the authors of the book is currently married to Cooperating Witness No. 8 ("CW8"), who may be a witness for the government at trial, and the other author is the sister-in-law of CW8.  CW8 did not write Cartel Wives and

has not read the book, although his wife did discuss various relevant events with CW8 while drafting the manuscript.  CW8's wife will not be a witness at trial; however, CW8 is expected to testify about a number of different events that are also depicted in Cartel Wives.

Hunting El Chapo was written by Andrew Hogan and published in 2018.  See Andrew Hogan, Hunting El Chapo (2018).  Andrew Hogan was an agent with the Drug Enforcement Administration ("DEA"), had been assigned to the U.S. Embassy in Mexico City during the 2014 capture of the defendant.  Mr. Hogan participated in some of the activities leading to the defendant's capture in 2014, along with another DEA Special Agent.  Mr. Hogan will not be a witness at trial; however, the other DEA Special Agent will testify about the events he personally observed during this capture operation.  The DEA Special Agent did not write Hunting El Chapo, did not participate in its creation and did not read the book.

The Court should preclude admission of the statements in Cartel Wives and Hunting El Chapo because they constitute inadmissible hearsay.  Hearsay is evidence of a declarant's out-of-court statement to prove the truth of what is asserted in the statement.  See Fed. R. Evid. 801; 5 Wigmore, On Evidence § 1364 (3d ed. 1974); 2 McCormick, On Evidence § 246 (4th ed. 1992).  "The principal vice of hearsay evidence is that it offers the opponent no opportunity to cross examine the declarant on the statement that establishes the declared fact." United States v. Reyes, 18 F.3d 65, 69 (2d Cir. 1994).

Here, the defendant may attempt to introduce statements in the books on cross-examination to impeach CW8 and the DEA Special Agent, respectively.  Admission of such extrinsic evidence—hearsay statements made by another party—should be prohibited. To the extent that the defendant claims that the statements in Cartel Wives or Hunting El Chapo are admissible as extrinsic evidence under Federal Rule of Evidence 613, the defendant's claim

fails.  Rule 613 states that extrinsic evidence of a "prior inconsistent statement by the witness" may be admitted "if the witness is given an opportunity to explain or deny the statement and an adverse party is given the opportunity to examine the witness about it."  Fed. R. Evid. 613; see United States v. Surdow, 121 F. App'x. 898, 899 (2d Cir. Feb. 9, 2005) (summary order). The statements in Hunting El Chapo are not the DEA Special Agent's statements, but rather statements of a colleague that was not present during the events to which the Special Agent will testify.  Similarly, the statements in Cartel Wives are not CW8's statements, but statements of his wife and sister-in-law, who were themselves not present during the events to which CW8 is expected to testify.  Even statements attributed to the Special Agent in Hunting El Chapo or to CW8 in Cartel Wives are not their statements, as they have not written the statements nor adopted the statements in any way.  As such, Rule 613 does not apply, and the statements contained in the books attributed to the DEA Special Agent or CW8 cannot be introduced as prior inconsistent statements.  Accordingly, the Court should preclude the admission of these statements at trial.

      E.      The Court Should Preclude Reference to the "Fast and Furious" Operation and Firearms Derived Therefrom

In its initial motion in limine, the government sought to preclude the admission of evidence or argument by the defendant regarding an ATF operation known as Operation Fast and Furious.  See Dkt. 213 at 79, 101-02.  Noting that the operation related to the transportation and illicit sale of firearms into Mexico from the United States for use by Mexican drug cartels, the government asserted that "public reporting has indicated that a weapon connected to Operation Fast and Furious was recovered from a residence at which the defendant hid from law enforcement shortly before his capture."  Id. at 101.  The government

argued that "any reference to Operation Fast and Furious by the defense could only be intended to inflame the passions of the jury and attempt to use the operation to undermine the jury's confidence in United States law enforcement and the government's investigative efforts," and sought a ruling precluding evidence or argument related to Operation Fast and Furious.  Id.

In response, the defendant asked the Court to deny the government's motion as premature because the defendant "cannot without hearing the government's evidence regarding how and where this weapon was supposedly possessed by Mr. Guzman, whether its source—be it United States law enforcement or otherwise—will be relevant." Def. Brief, Dkt. No. 231 at 25.  Notably, however, the defendant did not cite any reason for denying the government's motion.  The Court's ruling on the government's motion in limine did not specifically address the government's request to preclude evidence or argument on Operation Fast and Furious.  See Dkt. 240.

The government renews its motion to preclude evidence or argument on Operation Fast and Furious and, in so doing, incorporates by reference the arguments in its initial motion in limine and reply brief.  See Dkt Nos. 213 at 86-87, 237 at 46-47.  There are no conceivable set of facts that would make evidence of the ATF operation relevant or material to this case.  Defendant is charged with possessing (and using) firearms in furtherance of drug trafficking activities.  Assuming arguendo that some or all of the firearms which the government sought to introduce at trial to prove this charge could be traced back to Operation Fast and Furious, any details of the operation itself would have no bearing on whether the defendant or his associates possessed or used the firearms in question.  The contours and details of the operation are very much in question—some reporting suggests that the operation was designed to allow weapons to be illegally transported across the border to Mexican drug

cartels, while other reporting suggests that the operation was only designed to track and monitor "straw" purchases of firearms in the United States.[24]  However, in no case could the defendant craft an argument that the operation authorized him to possess or use any firearms in furtherance of his drug trafficking activities.  In light of the lack of relevance or materiality, and in light of the substantial prejudicial effect on the jury by referencing Operation Fast and Furious, the Court should grant the government's motion to preclude evidence or argument on the operation pursuant to Rules 401, 402 and 403.

XIV.   Partial Sealing is Appropriate

Pursuant to the protective order in this case, the government respectfully requests permission to submit this brief partially under seal.  See Dkt. No. 57 ¶ 8.  Portions of this brief refer to the government's cooperating witnesses.  Although the cooperating witnesses are not identified by name herein, the defendant's criminal associates likely could use the information described herein to identify those witnesses.

Thus, partial sealing is warranted because of the concerns regarding the safety of potential witnesses and their families, and the danger posed by disclosing the potential witnesses' identities and their cooperation with the government.  See United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect integrity of ongoing investigation, including safety of witnesses and the identities of cooperating witnesses, and to prevent interference, flight and other obstruction, may be a compelling reason justifying sealing); see Feb. 5, 2018

---

[24] Compare Katherine Eban, "The truth about the Fast and Furious Scandal," Fortune (Jun. 27, 2012), available at http://fortune.com/2012/06/27/the-truth-about-the-fast-and-furious-scandal/ (last visited Sept. 21, 2018) with Andew Cohen, "The Real Scandal of Fast and Furious," The Atlantic (June 22, 2012), available at https://www.theatlantic.com/politics/archive/2012/06/the-real-scandal-of-fast-and-furious/258844/ (last visited Sept. 21, 2018).

Mem. & Order Granting Gov't Mot. for Anonymous and Partially Sequestered Jury, Dkt. No. 187 at 2-3 (concluding that defendant's actions could pose risk of harm to cooperating witnesses).  As the facts set forth herein provide ample support for the "specific, on the record findings" necessary to support partial sealing, Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d. Cir. 2006), the government respectfully requests that the Court permit the government to file this opposition to the defendant's suppression motions partially under seal.  Should any order of the Court regarding this application describe the sealed information in question with particularity, rather than in general, the government likewise requests that those portions of the order be filed under seal.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the government's motions <u>in limine</u> in their entirety.


Dated:          Brooklyn, New York
                September 21, 2018

                                        Respectfully submitted,


                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York

                                        ARTHUR G. WYATT, CHIEF
                                        Narcotic and Dangerous Drug Section
                                        Criminal Division
                                        U.S. Department of Justice

                                        OF COUNSEL:
                                        ARIANA FAJARDO ORSHAN
                                        United States Attorney
                                        Southern District of Florida