

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MPR:GMP
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 23, 2019

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *United States v. Joaquin Archivaldo Guzman Loera*
              *Criminal Docket No. 09-466 (BMC) (S-4)*

Dear Judge Cogan:

        The government respectfully submits this letter in opposition to the defendant's motion dated May 9, 2019 in which he requests (1) at least two hours of outdoor recreation a week; (2) access to general population commissary; (3) the ability to purchase six water bottles every week; and (4) access to a set of earplugs.  Def. Mot. at 1 (Dkt. 614).  For the reasons that follow, the Court should reject the defendant's requests.

I.      Background

        On March 13, 2017, the defendant moved to vacate, or in the alternative, modify the SAMs imposed on him at the Metropolitan Correctional Center in New York, New York (the "MCC").  On May 4, 2017, the Court denied in part and granted in part the defendant's motion.  In the May 4, 2017 Order, the Court found that the SAMs were rationally connected to a legitimate government purpose that were specifically tailored to the defendant in light of his previous conduct, which involved running the Sinaloa Cartel from prison, coordinating escapes from jail and intimidating cooperating witnesses.  May 4, 2017 Order (the "May 4 Order") at 5 (Dkt. 71).  In the May 4 Order, the Court noted that the complaints the defendant made in his March 2017 motion—e.g, "the size of the defendant's cell, the parameters of his window, the presence of phantom music and the television programming available to the defendant during his daily hour of exercise"—which are similar to most of the complaints raised here, did not present "constitutional concerns and the Court [was] not going to micro-manage the [Bureau of Prisons]."  Id. at 8.

On February 12, 2019, after a nearly three-month trial, the defendant was convicted on all ten counts, including operating a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a), international conspiracy to manufacture and distribute cocaine, heroin, methamphetamine and marijuana, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(A), 960(b)(1)(G), 960(b)(1)(H) and 963; conspiracy to import cocaine into the United States, in violation of 21 U.S.C. §§ 952(a); conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(A)(ii)(II) and 846; multiple counts of international distribution of cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 959(c) and 960(b)(1)(B)(ii); possessing, brandishing and discharging firearms, including a machinegun, in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c); and conspiracy to launder proceeds of drug trafficking, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  The defendant faces a mandatory sentence of life imprisonment.  Since the end of his jury trial, the defendant has continued to reside in the SAMs unit on 10 South of the MCC.

To date, the MCC has not received a single administrative request regarding any of the complaints that the defendant raises in his motion.  Consequently, the defendant never gave the MCC an opportunity to respond to his complaints until he filed the present motion.  The defendant is aware that he has the ability to make requests regarding his housing conditions, and he has made such requests in the past.  For example, after arriving in the United States, the defendant filed eleven Requests for Administrative Remedies, also known as BP-9's, with the MCC.  Of those requests, the Bureau of Prisons ("BOP") granted or partially granted seven requests.  For instance, the defendant previously used a BP-9 to lodge his initial complaint that the tap water at the MCC was irritating his throat and requested that the BOP allow him to buy bottled water from the commissary.  The BOP granted that request.  The defendant made mention of the lack of Spanish-speaking staff working on his unit and noted that the language barrier made it difficult for him to order items from the commissary.  The BOP provided the defendant a commissary list in Spanish.

In the present situation, the defendant did not make a single attempt to file a BP-9 regarding either the items he would like to receive from the general population commissary, the number of bottles of water he was receiving per week, earplugs or obtaining outdoor recreational privileges.  While the defendant claims that he has not received six bottles of water every week, the MCC's records show that is no longer true.  Indeed, the MCC's records show that the defendant has received six bottles of water per week since April 2019.  As noted above, the first time the MCC learned of the defendant's complaint was in his filing to the Court.[1]  The Court thus should deny the defendant's motion in this regard as moot.

---

[1] Notably, the government did not learn of these issues prior to the defendant filing the instant motion.  As noted by the Court in its May 4 Order, many "routine and rather petty complaints" can be resolved by the parties before seeking Court intervention.  May 4 Order at 8 n.3.  No such effort was made by the defense with regard to any of the defendant's complaints here.

II.     The Defendant's Other Requests Should Be Denied

While at least one of the defendant's complaints has been resolved absent the defendant's request to the BOP, at least two of the defendant's complaints—namely the defendant's request for earplugs and access to the general population commissary—are not the types of "constitutional concerns" the Court contemplated addressing in the May 4 Order. See May 4 Order at 8 (stating that Court would not concern itself with issues that were not "constitutional concerns and the Court is not going to micro-manage the BOP."). In any event, even if the Court considers the defendant's complaints without review by the BOP, the defendant's remaining requests cannot be granted due to safety concerns identified by the MCC. Specifically, the defendant's requests for earplugs, access to all general population commissary items and two hours of outdoor exercise per week should be denied due to legitimate penological concerns identified by the MCC.

A.     Earplugs

The defendant complains that he needs earplugs in order to sleep, and that he has been denied access to ear plugs by the MCC. The defendant submits that this is especially problematic because he suffers from ear pain.[2] Again, the defendant never made this request to the MCC, nor has the defendant made any request for medical treatment for his ear pain. Had the defendant made a request for earplugs, however, he would have learned that the MCC has restricted the use of earplugs to all inmates due to safety concerns within the institution. The reason for the restriction is simple: If there were an emergency, an inmate would not be able to hear the guards alerting the inmates to the problem. Inmates could also use the earplugs as a ruse to ignore, or pretend not to hear, the guards' orders.

B.     Access to General Population Commissary

SAMs inmates are not permitted unfettered access to general population commissary. As this Court has noted, the "exact purpose" of housing certain inmates in SAMs is to "prevent violence." May 4 Order at 10. As a result, the MCC does not make certain commissary items available to SAMs inmates for safety concerns. This is with good reason. Inmates may weaponize certain items listed on the general population commissary. By way of example, in November 2000, an inmate who was held in the SAMs unit on 10 South, Mamdouh Mahmud Salim, stabbed a BOP guard in the eye with a plastic comb that Salim had sharpened into a weapon, after initially blinding the BOP guard with hot sauce that he had fashioned into a mace-like weapon. Declaration at ¶ 13 (Dkt. 91, Attachment 1). The BOP guard was nearly killed. Id. In stabbing the BOP guard, Salim was attempting to reach and harm his attorneys. Id. While Salim was incarcerated at the time on charges of participating

---

[2] To the extent the defendant suggests that his ear problems are a result of his confinement in the MCC, this is false. Based on information from a cooperating witness, the defendant suffered from ear issues for years when he was at large, long before he was extradited to the United States.

3

in a terrorism conspiracy, he had never previously attempted to harm his attorneys or other prison staff, nor did he have a history of doing so before his incarceration at the MCC. Id.

Even notwithstanding restrictions on SAMs' inmates' commissary items, the MCC Warden recently informed SAMs inmates that he would be willing to consider making certain commissary items that were previously restricted from SAMs inmates, available to SAMs inmates, upon review by a committee. To date, the defendant has not made any requests to the MCC for additional items from the general population commissary. Again, the first time the MCC learned of the defendant's desire for additional commissary items was his filing with the Court.

C.  Two Hours of Outdoor Exercise

Finally, the defendant requests two hours of outdoor exercise per week and claims that his lack of access to outdoor exercise is a violation of his Eighth Amendment rights. Def. Mot. at 10. This motion should be denied.

As noted in the Court's May 4 Order, the four-part framework outlined in Turner v. Safley, 482 U.S. 78 (1987), applies when a defendant claims his constitutional rights have been infringed by a prison regulation. May 4, 2017 Order at 4 (Dkt. 71). Under the four-factor Turner test, the Court evaluates: "(1) whether the regulation is rationally connected to a legitimate and neutral government objective; (2) whether inmates have alternative means of exercising the constitutional right at issue, where the existence of alternative means weighs in favor of deferring to the corrections agency; (3) whether there is an impact on guards, other inmates, and allocation of prison resources because of the requested accommodation; and (4) whether there are obvious alternatives to the regulation, where alternatives suggest that the regulation is not reasonable but rather responsive to an "exaggerated" concern and where the absence of alternatives suggests deference to the corrections agency is appropriate. Id. (citing Turner, 482 U.S. at 89-91).

In this case, the BOP has considered—and rejected—the possibility of giving SAMs inmates extended outdoor exercise time because it is reasonably related to legitimate penological interest: preventing escape from the MCC. The only outdoor exercise area available at the MCC for high-security risk inmates is a rooftop recreation area covered by wire screening. This particular MCC rooftop recreation area was the scene of an attempted jailbreak on January 25, 1981.[3] In that instance, an inmate's cohorts hijacked a sightseeing helicopter, flew it over the MCC rooftop recreation area and attempted to cut through the wire screening surrounding the recreation area. When that did not work, they rammed the helicopter

---

[3] Robert D. McFadden, Escape by Copter Foiled at U.S. Jail in Manhattan, N.Y. Times, available at https://www.nytimes.com/1981/01/26/nyregion/escape-by-copter-foiled-at-us-jail-in-manhattan.html (last visited May 21, 2019). Notably, this was not the only attempted escape from the MCC rooftop recreation area. On another occasion, an inmate attempted to escape by climbing over a wall.

into the screen, and then dropped a pistol to one of the inmates on the roof. Ultimately, the escape plot was foiled, but the incident itself resulted in a standoff between two armed inmates and more than 100 armed, flak-jacketed police officers and prison guards in a population dense, urban area.

In this case, any outdoor exercise time would be particularly problematic for this defendant. The defendant has successfully planned and executed elaborate escapes from two high-security penal institutions. As detailed at trial, one of the defendant's escapes involved the construction of a sophisticated, ventilated tunnel that stretched for over a mile. Certainly, an escape via rooftop, using a helicopter, or any related means would be elementary by comparison. Moreover, one of the purposes of imposing the SAMs on the defendant is to prevent his communication with other members of the Sinaloa Cartel, or other criminal associates who could carry out orders on his behalf. If the MCC permitted the defendant to have regular outdoor exercise, there is a serious risk that the defendant could potentially communicate with individuals in buildings surrounding the MCC, or in buildings that are taller than the MCC and have a view of the recreation area. In light of these facts and the MCC's past experience with escape attempts involving its rooftop recreation area, the MCC's concerns about the defendant spending extended, regular time outdoors in this area are well founded and rationally connected to a legitimate government objective.

The second prong of Turner is also satisfied. The defendant has alternative means by which he can exercise and receive access to outdoor air and light. As noted in the government's previous filings, the defendant has access to a recreation area in 10 South that is equipped with several different types of exercise equipment, including an exercise bike and elliptical, and a vented window that provides the defendant with access to fresh, outdoor air and sunlight.[4] See Dkt. 52 at 39. The defendant is permitted five hours per week in this recreation area.

Considering the third Turner prong, substantial additional resources would, indeed, be required to accommodate the defendant's request. In light of the prior attempted rooftop escapes, far more prison guards than the few who accompany the defendant to the 10 South recreation area would be needed—contrary to what the defendant suggests—to supervise any outdoor recreation time to ensure that he did not attempt an escape, or pass any messages. This would unduly burden prison resources and would have an unfair impact on other inmates in the institution, especially because the MCC often must put its other inmates on lock down every time the defendant is moved out of 10 South.

Finally, there are no "obvious" alternatives to the regulation, beyond what has been provided to the defendant—i.e., 5 hours in the 10 South recreational area. Considering the MCC's history with attempted escapes from the rooftop recreational area, the MCC's concern is not "exaggerated," and its determination about outdoor recreation should be given

---

[4] The recreation area on 10 South is similar to a recreation area used by general population inmates at the Metropolitan Detention Center in Brooklyn.

deference. As such, the defendant's request for 2 hours of outdoor exercise per week should be denied.

III. Conclusion

For the foregoing reasons, the government respectfully submits that the Court should regard the defendant's request for six bottles of water per week as moot, and reject the defendant's requests for (1) access to a set of ear plugs; (2) access to general population commissary; and (3) at least two hours of outdoor recreation a week.

Respectfully submitted,

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

ADRIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
Southern District of Florida

cc: Michael Lambert, Esq. (counsel to defendant)
Jeffrey Lichtman, Esq. (counsel to defendant)