1696

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - X
3

4   UNITED STATES OF AMERICA,    :   09-CR-466(BMC)

5           Plaintiff,           :
                                      United States Courthouse
6       -against-                :   Brooklyn, New York

7   JOAQUIN ARCHIVALDO GUZMAN
    LOERA,                       :
8                                     November 29, 2018, Thursday
            Defendant.           :   9:30 a.m.
9

10  - - - - - - - - - - - - - - X

11
                    REDACTED TRANSCRIPT OF TRIAL
12            BEFORE THE HONORABLE BRIAN M. COGAN
              UNITED STATES DISTRICT JUDGE, and a jury.
13

14  APPEARANCES:

15
    For the Government:       RICHARD P. DONOGHUE
16                           United States Attorney
                             Eastern District of New York
17                           BY: GINA M. PARLOVECCHIO
                                 ANDREA GOLDBARG
18                               MICHAEL P. ROBOTTI
                             Assistant United States Attorneys
19                           271 Cadman Plaza East
                             Brooklyn, New York  11201
20

21
                             UNITED STATES ATTORNEY'S OFFICE
22                           Southern District of Florida
                             BY:  ADAM S. FELS
23                           Assistant United States Attorney
                             99 NE 4th Street
24                           Miami, Florida  33132

25
```

MDL      RPR      CRR      CSR      OCR

1697

```
1    APPEARANCES:   (Continued)

2

3    For the Government:        DEPARTMENT OF JUSTICE
                                Criminal Division
4                               Narcotic and Dangerous Drug Section
                                145 N Street, N.E.
5                               Washington, D.C.  20530

6                               BY:  ANTHONY NARDOZZI, ESQ.
                                     AMANDA LISKAMM, ESQ.

7

8    For the Defendant:         BALAREZO LAW
                                400 Seventh Street, NW, Suite 306
9                               Washington, D.C.  20004

10                              BY: A. EDUARDO BALAREZO, ESQ.

11                              LAW OFFICES OF JEFFREY LICHTMAN
                                11 East 44th Street, Suite 501
12                              New York, New York  10017

13                              BY:  JEFFREY H. LICHTMAN, ESQ.
                                     PAUL R. TOWNSEND, ESQ.

14

15                              LAW OFFICE OF PURPURA and PURPURA
                                8 East Mulberry Street
16                              Baltimore, Maryland  21202

17                              BY:  WILLIAM B. PURPURA, ESQ.

18
                                LAW OFFICES OF MICHAEL LAMBERT, ESQ.
19                              369 Lexington Avenue, 2nd Floor
                                New York, New York  10017
20
                                BY:  ARIEL COLON MIRO, ESQ.
21

22   Court Reporter:  Michele D. Lucchese, RPR, CRR
                      Official Court Reporter
23                    E-mail: MLuccheseENDY@gmail.com

24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.
```

Proceedings                                      1698

1        (In open court; outside the presence of the jury.)

2        THE COURTROOM DEPUTY:  All rise.

3        THE COURT:  Good morning.  Be seated, please.

4        Something on the parties' minds?

5        MR. PURPURA:  Yes, brief sidebar, Your Honor.

6        THE COURT:  Yes.

7        (Sidebar held outside the hearing of the jury.)

8        (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Portions Sealed by Order of the Court    1699

1           (The following occurred at sidebar.)

2           MR. PURPURA:  Maybe we don't need sidebars on these,

3  I'm not sure.

4           THE COURT:  I prefer not to have them unless there

5  is a reason to have them, but we are here, so let's do what we

6  have to do.

7           MR. PURPURA:  Judge, I know you did rule on ███

8  ████████████  involving this particular witness.  In

9  particular, ███████████████████████████████████████

10 ██████████████████████████████████████, et

11 cetera, in order to get what he wanted at that point because

12 he felt that he wasn't getting what he wants.  Again, I

13 believe that goes to the heart of his credibility.  It shows

14 the motive why he is testifying here as well because he know

15 what he wants and knows how to get what he wants by testifying

16 and we are suggesting it's not truthful testimony.  So it goes

17 right to the heart of his credibility.

18           In addition, the Government on direct examination

19 brought out the fact that he is in WITSEC and he has these two

20 very minor violations which we would not even go into, such as

21 smoking in his room and such as not being truthful after an

22 accident and prevented him from getting a job, which he

23 subsequently did obtain that job despite not being truthful.

24 So it makes him look like an excellent WITSEC candidate when

25 he, in fact, was not.  And he has these two very major

Sidebar Portions Sealed by Order of the Court     1700

1  violations which, again, goes to the heart of his credibility.

2      MR. ROBOTTI:  Your Honor, we've already litigated

3  this twice:  Once on a motion in limine and then, again, on a

4  motion for reconsideration.  The Court has ruled clearly that

5  under Rule 608 this does not go to the character truthfulness.

6  ████████████████████████████████████

7  ████████████████████████████████████████

8  ██████████████████████.  ██████████████████████

9  ████████████.  The Government did, on direct examination,

10  exactly what the Court said it could do, ████████████████

11  ████████████████████████████████████████████

12  ██████████████████████.  The reference that he

13  refers to, the car accident, ████████████████████████████

14  ██████████████████.  So I don't see how in any way

15  the Government has possibly opened the door to going in to

16  this when we did exactly what the Court instructed us to do.

17      THE COURT:  Other than the publication of the two

18  minor offenses that were the subject, or litigated in

19  connection with the motion in limine, this is the third bite

20  at the apple really, so I am going to adhere to my prior

21  decisions on that for the reasons I previously stated.

22      As to whether the Government, by introducing or

23  drawing the teeth on the two minor violations, I agree they

24  are small teeth, but if the defendant doesn't want that to

25  happen, then you had to come to me and say well, if we can't

Sidebar Portions Sealed by Order of the Court    1701

1   get in what we want, then the Government shouldn't be able to

2   get in what they want and we will just leave it unsaid.  I had

3   no motion on that.  I had no objection to that.  So I am

4   adhering to my prior ruling and I am finding that the

5   Government's did not open the door on that issue.

6           I will direct that the reference to this at sidebar,

7   to the ███████████████, will be sealed, everything else

8   will publically available.

9           MS. PARLOVECCHIO:  I'm sorry Your Honor, one more

10  issue while we're up here.  The Government will be filing a

11  motion this morning in regards to defense counsel's

12  social-media use, and it's violation of Local Rule 23.1.  Last

13  night, Mr. Balarezo issued a tweet concerning the narco

14  corrido that was referenced during yesterday's testimony that

15  was played 20 times outside of this witness' jail cell before

16  two hand grenades were thrown inside of his cell.

17          In addition to that, there have been several other

18  concerning tweets commenting on the evidence in this case, and

19  I just want to put the Court on notice that we will filing

20  that this morning, perhaps while we are standing here.

21          THE COURT:  Thank you for the notice.

22          MS. PARLOVECCHIO:  Thank you.

23          (Sidebar ends.)

24          (Continued on the next page.)

25

MDL      RPR      CRR      CSR      OCR

Proceedings                                    1702

1          (In open court; jury not present.)

2          MS. PARLOVECCHIO:  Your Honor, in the Government's

3    October 19th motion in limine we had requested and the Court

4    had granted an instruction to the jury that you had given in

5    *United States versus Cacace* concerning witnesses.

6          THE INTERPRETER:  The interpreter is having trouble

7    hearing you.

8          THE COURT:  And so are the people in the overflow.

9          MS. PARLOVECCHIO:  Should I start over?

10         THE COURT:  You should.

11         MS. PARLOVECCHIO:  So the Government's had requested

12   in its October 19th motion in limine an instruction to the

13   jury regarding cooperating witnesses and Your Honor had

14   granted it.  The Government has it here if Your Honor doesn't

15   have it at hand.

16         THE COURT:  Okay.  So are you saying you want it

17   now?

18         MS. PARLOVECCHIO:  No, after the conclusion of the

19   testimony, Your Honor.

20         THE COURT:  I'm not sure this is the right witness

21   for it because this isn't a standard situation with this

22   witness.  As I understand it, he is not at this point

23   testifying pursuant to the cooperation agreement.  We are past

24   that with him.  Am I wrong about that?

25         MS. PARLOVECCHIO:  No, you're not wrong, Your Honor.

Proceedings                                    1703

1   You had actually granted it in connection with this witness'

2   testimony.

3           THE COURT:  I think I probably didn't know the

4   particulars that I know now.  I think you ought to wait until

5   it's more appropriate for a cooperating witness.

6           MS. PARLOVECCHIO:  Your Honor, because this witness

7   had been sentenced already pursuant to Rule 35 that this

8   particular instruction concerns being sentenced, the fact that

9   the sentencing is up to the judge, not to the prosecutor.

10          THE COURT:  But why does that matter to this witness

11  because he has already been sentenced?

12          MS. PARLOVECCHIO:  Correct.  This is an instruction

13  with regard to witnesses who have already been sentenced.

14          THE COURT:  Oh, I don't recall that.

15          So at the conclusion of this witness' testimony I

16  will give the instruction.

17          MS. PARLOVECCHIO:  Thank you.

18          THE COURT:  Okay.  Jury, please.

19          You might as well sit down.  It's going to take a

20  while to line them up.

21          (Jury enters the courtroom.)

22          THE COURT:  All right.  Everyone have a seat.

23          Good morning, ladies and gentleman.

24          We will continue with cross-examination by Mr.

25  Purpura.

         MDL      RPR      CRR      CSR      OCR

1            MR. PURPURA:  Thank you, Your Honor.

2   **MIGUEL ANGEL MARTINEZ MARTINEZ,**

3        called by the Government, having been previously duly

4        sworn, was examined and testified as follows:

5   CROSS-EXAMINATION

6   BY MR. PURPURA:

7   Q    Mr. Martinez Martinez, I am going to show you what has

8   been admitted into evidence as Government Exhibit 501.  And as

9   to chilly can seizure, you indicated that it is in the Tijuana

10  area; correct, sir?

11  A    Yes.

12  Q    When you referenced drugs allegedly involving Mr. Guzmán,

13  you said Agua Prieta over here; correct?

14  A    Yes.

15  Q    And Nogales here?

16  A    Yes, sir.

17  Q    And this territory here, sir, this is the Arellano Felix,

18  the Tijuana's cartel territory; correct, sir?

19  A    Which one of all of them?

20  Q    1993, Tijuana area.

21  A    Yes, sir.

22  Q    And at that time, according to you, there was no love

23  between Mr. Guzmán and Arellano Felix; correct?

24  A    That's correct.

25  Q    And, finally, the seizure was a large seizure of 7 tons

Martinez - cross - Purpura                    1705

1   of cocaine, that made the press, is that fair to say, sir?

2   A    Yes.

3   Q    As a matter of fact, when you saw that video that was

4   played by Government counsel, that was not the first time you

5   saw that video, was it?

6   A    I don't remember if I had seen it before.

7   Q    Do you remember telling Government counsel, as well as

8   agents that, in fact, you do remember seeing the chili can

9   seizure video, either the public press or agents had shown it

10  to you in the past?

11  A    I think I did say that.

12  Q    Thank you.

13       On the Agua Prieta tunnel, you never visited that

14  tunnel; is that correct, sir?

15  A    No.

16  Q    And you know that when the tunnel was discovered that

17  also made the press and that were videos of the tunnel as

18  well, both in Mexico and the United States; is that correct,

19  sir?

20       MR. ROBOTTI:  Objection.  Compound.

21       THE COURT:  He can answer that.

22  A    I don't remember if I saw it.

23  Q    You recall it being in the press in Mexico?

24  A    I do not remember.

25  Q    And do you remember -- well, let me ask you this, sir, if

Martinez - cross - Purpura                    1706

1   in fact that the land in Douglas was contracted for on July

2   22, 1989, and, in fact, the tunnel was discovered on May 11,

3   2000, that's about ten months; is that correct, sir?

4   A    That's correct.

5   Q    And you don't know how long it took to build that tunnel,

6   do you?

7   A    That's correct.

8   Q    And do you know -- were you in Douglas, Arizona actually?

9   A    No, sir.

10  Q    Do you know how far the customshouse, the United States

11  customshouse was from the warehouse where the tunnel exited?

12  A    No, sir.

13  Q    In approximately June of 1993, you know that Mr. Guzmán

14  was arrested; correct?

15  A    Yes, sir.

16  Q    And we listened to a series of conversations involving

17  you yesterday; is that correct, sir?

18  A    Yes, sir.

19  Q    Showing you Government Exhibit 600T-1, this was the first

20  call we listened to and you see the date on there, June 13,

21  1994; correct?

22  A    Yes, sir.

23  Q    And by that time, Mr. Guzmán was incarcerated for at

24  least one year; correct?

25  A    That's correct.

1   Q    And at that time, you were employed or working for Guero

2   Palma Salazar; correct?

3   A    Yes, sir.

4   Q    And at that time, you were trying to obtain a warehouse

5   for train deliveries involving cocaine for Guero Palma Salazar

6   correct, sir?

7   A    Yes, sir.

8   Q    And as you testified to before, that he was a narcotic

9   trafficker, meaning Guero Palma, that you were then working

10  for in 1994; correct, sir?

11  A    Yes, sir.

12  Q    And you continued to work for Palma Salazar for at least

13  two, two and a half years, according to your own testimony;

14  correct?

15  A    Yes.

16  Q    Now, speaking of Guero Palma Salazar, in 1993, he did not

17  have a very good relationship with the Arellano Felix

18  organization, did he, sir?

19  A    No.

20  Q    And Miguel Felix Gallardo, he is the uncle or the leader

21  of that organization, or was, sir; is that correct?

22  A    Yes.

23  Q    And yesterday on direct examination, you told us that, in

24  fact, Mr. Guero Palma's wife and children were killed, his two

25  children, killed by that organization; is that correct, sir?

Martinez - cross - Purpura                    1708

1    A    According to what Mr. Guzmán told me, yes.

2         MR. PURPURA:  Let me just, for the witness only,

3    please, Your Honor, Defendant's Exhibit 164.

4         MR. ROBOTTI:  Your Honor, the Government is going to

5    object to this.

6         THE COURT:  He hasn't offered it, so you can't

7    object to it.

8    Q    Do you recognize that photograph?

9    A    No, sir.

10   Q    Had you ever seen the wife of Guero Palma Salazar?

11   A    I've never met her, sir.

12   Q    You never met his children either?

13   A    No.

14   Q    But you did hear about how they died; is that correct,

15   sir?

16   A    According to what Mr. Guzmán told me, yes.

17   Q    What you were informed is that, in fact, his wife's head

18   was cut off and sent back to him; is that correct, sir?

19   A    Yes, sir.

20   Q    And that his two children were taken to a high bridge in

21   Venezuela and thrown off that bridge and that it was videoed

22   and that video was sent to Guero Palma?

23   A    That's correct.

24   Q    And you knew from working with Guero Palma that he

25   hated -- you used that word a lot -- the Arellano Felix

1  family; is that correct, sir?

2  A    Yes.

3  Q    And you know that if he could he would have killed Ramon

4  Benjamin or the other brother if he had the opportunity; isn't

5  that correct, sir?

6  A    Yes.

7  Q    Showing you Government Exhibit 807, which is the

8  Christine Disco, you were not there at the time of the

9  shooting, were you sir?

10 A    No, sir.

11 Q    And the shooting occurred approximately in 1993; is that

12 correct, sir?

13 A    Yes, sir.

14 Q    And the target of the shooting was the Arellano brothers,

15 Ramon and Benjamin; is that correct, sir?

16 A    And I think Mr. Guzmán also told me that Javier was there

17 as well.

18 Q    Now, initially, you were indicted in the Southern

19 District of California, which is in San Diego; is that

20 correct?

21 A    Yes, sir.

22        MR. PURPURA:  Your Honor, just a moment with

23 counsel, if I may.

24        (Pause.)

25 Q    And obviously when you get indicted you do receive a copy

1   of your indictment; is that correct?

2   A    If you live in the United States, you do.

3   Q    Well --

4   A    In Mexico, they don't even tell you.  You have an arrest

5   warrant against you.

6   Q    Let's do this:  When you come to the United States, when

7   you were brought here in June of 19 -- excuse me, June 25th of

8   2001, at some time before you went to court to enter a plea,

9   you received a copy of your indictment; correct?

10  A    Yes.

11  Q    Because when you went in for your plea agreement, a

12  judge, just like Judge Cogan, wanted to make sure that you

13  received a copy of the indictment, that you understood the

14  charge against you, that -- this is compound, I apologize.

15          The judge wanted to make sure you understood

16  everything; correct?

17  A    I don't remember if they gave it to me or they gave it to

18  the female attorney that the Government assigned to me to

19  represent me.

20  Q    You did have a court-appointed attorney; is that correct?

21  A    Yes, sir.

22  Q    And the court-appointed attorney went through the charges

23  against you; correct?

24  A    Yes.

25  Q    And the court-appointed attorney went through the

Martinez - cross - Purpura                    1711

1   indictment, which is the charging document against you;

2   correct?

3   A    I think so.

4   Q    And, again, when you appeared in United States District

5   Court on November 29, 2001 in San Diego before the Honorable

6   Judge Rudy Brewster, Judge Brewster, in a 20-page colloquy,

7   reviewed the indictment and all your rights with you; correct?

8   A    I do not remember.

9   Q    Isn't that an important date when you go into court and

10  you are going to enter a guilty plea?

11  A    Yes.

12  Q    And you know -- you want to know what you're entering a

13  guilty plea to, don't you?

14  A    Yes.

15         MR. PURPURA:  Just for the witness, please, Defense

16  Exhibit 81 for identification only.

17  Q    Do you recognize that, sir?

18  A    Yes.

19  Q    And that would be the face sheet of the indictment in

20  which you pled guilty to, the fourth superseding indictment in

21  the Southern District of California; is that correct, sir?

22  A    Yes.

23  Q    All right.

24         MR. PURPURA:  Enter Defense Exhibit 81 into evidence

25  at this time, just the face sheet.

MDL      RPR      CRR      CSR      OCR

Martinez - cross - Purpura                    1712

1       MR. ROBOTTI:  The Government doesn't object to the

2  face sheet, Your Honor.

3       THE COURT:  Received.

4       (Defendant's Exhibit 81 received in evidence.)

5       MR. PURPURA:  Display it.

6  Q    Obviously you're interested in where your name is; is

7  that correct, because you are on the indictment?

8  A    Yes.

9  Q    And you'd also, I would assume, be interested in who else

10 has been charged with you; correct?

11 A    Yes.

12 Q    All right.  And you see that Joaquin Guzmán Loera, the

13 man you have been talking about for the past three-and-a-half

14 days, is on the indictment right at the top; right?

15 A    Yes.

16 Q    And that's the person who you, one of the people that

17 when you started initially proffering, talking to Government

18 counsel about things in Mexico, that's one of the people you

19 started talking about; correct?

20 A    Yes.

21 Q    So my question is to you, why, when you were under oath

22 in Tucson, Arizona, March 21st and 22nd of 2006, when

23 Government counsel --

24       MR. ROBOTTI:  What page?

25       MR. PURPURA:  That's page 169.

Martinez - cross - Purpura                    1713

1    Q     -- when Government counsel asked you:  "Let me ask you,

2    El Chapo, is he under indictment?"

3              And your answer was:  Who?

4              And then the question was "Mr. Chapo."

5              And then you responded:  "But who has indicted him?"

6              And then the question was:  "The American

7    Government."

8              And you said:  "I don't know."

9              Why would you say that?

10   A    Well, because maybe I did not understand the question.

11   Well, El Chapo, meaning Mr. Guzmán was under indictment with

12   me since I was in Mexico, since I was arrested.

13   Q    You had the indictment and you knew what it was right

14   there at the top of your indictment; correct?

15   A    That's correct.

16   Q    And your answer was "But who has indicted him?"

17             And then the next question was "The American

18   Government."

19             And your response was "I don't know."

20             What was confusing about that?

21   A    Well, maybe I had already been testifying for the entire

22   day and my mind wasn't clear anymore.

23   Q    Were you lying under oath?

24   A    No, sir.

25   Q    But you did know he was indicted, right?  Because he is

MDL        RPR        CRR        CSR        OCR

Martinez - cross - Purpura                1714

1    sitting right there on the top of your indictment; correct?

2            MR. ROBOTTI:  Objection.  Asked and answered.

3            THE COURT:  Sustained.

4            MR. PURPURA:  Thank you.

5    Q    So we know you were indicted in 1995, Southern District

6    of California; correct?

7    A    Yes.

8    Q    We've established you were extradited here June 25, 2001;

9    correct?

10   A    Yes.

11   Q    Would you agree with me that you had a few conversations

12   with the Government from June 25, 2001 up until your plea of

13   November 29, 2001?

14           MR. PURPURA:  Did you finish the question?

15   A    Yes.  It was several conversations that I had with them.

16   It's many years ago.  It's 20 years ago.  I don't remember

17   exactly the dates.

18   Q    I understand.  If I told you that records would indicate

19   that you had conversations with the Government on September

20   21, October 12, November 7, 9th, and 29th of 2001, that's --

21   go on.  -- would that sound about right?

22           MR. ROBOTTI:  Objection.

23           THE COURT:  Overruled.

24           MR. PURPURA:  Thank you.

25   A    Could be.

Martinez - cross - Purpura                    1715

1  Q    And we've established that November 29, 2001 is when you

2  entered a plea; is that correct?

3  A    Yes.

4  Q    And do you recall when Judge Rudy M. Brewster said to you

5  during that plea conversation --

6            MR. PURPURA:  Page 5, Counsel.

7  Q    -- do you understand that you will not have any Rule 35

8  motion to modify any sentence imposed by this Court?  Do you

9  remember that?

10 A    No.

11            (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MDL      RPR      CRR      CSR      OCR

Martinez - cross - Purpura                    1716

1        MR. PURPURA:  May I have Defense 460, please, just
2   for the defendant, please -- for the witness, please.
3   BY MR. PURPURA:  (Continuing)
4   Q    I'm just going to direct your attention -- I think you
5   can read in English.
6   A    No.  Could the interpreter please tell me this, please?
7   Q    Okay.
8        THE COURT:  Mr. Purpura, do you want the whole page
9   interpreted?
10       MR. PURPURA:  Just the one sentence.
11       Did she interpret it?
12       THE INTERPRETER:  No, the interpreter did not want
13  to go ahead and did not know exactly what sentence you wanted.
14       MR. PURPURA:  I apologize.  I'm pointing to it.
15       (Translation.)
16  Q    Now, do you remember the court saying to you:  Do you
17  understand that you will not have any Rule 35 motion to modify
18  any sentence imposed by this court?
19  A    No.
20       MR. PURPURA:  Your Honor, I would move into evidence
21  Defense Exhibit 160, just that sentence plus the response.
22       THE COURT:  First you need a number.
23       MR. PURPURA:  160.
24       THE COURT:  Okay.  The government's position?
25       MR. ROBOTTI:  The government doesn't object to

MDL      RPR      CRR      CSR      OCR

1   lines 4 through I believe it's 9.

2           THE COURT:  Okay.  Received.

3           (So marked.)

4           MR. PURPURA:  It's in evidence now.  Can we please

5   display it?

6   Q    The court said:  Do you understand that you will not have

7   any Rule 35 motion to modify any sentence imposed by this

8   court?

9           And then your attorney said:  If I could have a

10  moment, Your Honor.

11          There was a pause.  I assume you spoke to your

12  lawyer.

13          You then responded to the court:  Yes, Your Honor.

14  A    I don't remember that moment but if it's there, I said

15  it.

16  Q    Thank you.

17          And then after your plea, before you appeared before

18  the United States grand jury in San Diego, you had, again,

19  another series of proffers and I know it's back in 2001 and

20  2002, but you do agree you had a series of proffers, correct?

21  A    Yes.

22  Q    And then after that, you did appear before the United

23  States grand jury and you appeared on three separate

24  occasions, correct?

25  A    Yes.

Martinez - cross - Purpura                    1718

1    Q    And that culminated, in fact, in your sentencing, as

2    we've already heard, you got sentenced on May 20, 2002 and you

3    were sentenced to 219 months?

4    A    Yes.

5    Q    And then you had, from 2002 until you testified in 2006

6    in Arizona, you had a lot more proffers in preparation for

7    trial testimony, correct?

8    A    Yes.

9    Q    As a matter of fact, at that trial, you testified that up

10   until that date of 2006, of March 2006, you met with

11   government counsel and agents at least 50 times, does that

12   sound about right?

13   A    I don't remember the times but, yes, I did meet with

14   them.

15   Q    Let me see if this helps you out.

16        You were asked under oath:  Approximately if you

17   estimate how many meetings did you have, debriefing, meetings

18   did you have with the agents?

19        That's from your trial testimony, page 161, 2006.

20   Your response was:  In total, since I arrived to the United

21   States?

22        And the question was:  Yes.

23        And your answer was:  About 50 times.

24   A    I repeat to you, I don't remember the number of times but

25   it was several.

Martinez - cross - Purpura                    1719

1   Q    And your answer under oath when you said it was

2   approximately 50 times, would that be accurate to the best of

3   your knowledge?

4   A    The best thing that I remember, that I do remember is

5   yes.

6   Q    I'm now showing you what has been marked as Defense

7   Exhibit 84 for identification and I'll direct your attention

8   to the caption and see if you recognize this motion.

9        (Pause.)

10  A    Yes.

11       MR. PURPURA:  I would just admit, Your Honor, we're

12  going to redact this portion here which is the top portion.

13  Thank you.  And now with no objection, I move 84 into evidence

14  as redacted.

15       MR. ROBOTTI:  No objection, Your Honor.

16       THE COURT:  Received.

17       (So marked.)

18  Q    Now, this face sheet, this is the face sheet of the

19  Rule 35 which the government filed for you on December 11,

20  2006, some seven months, six or seven months after you

21  testified in Arizona, correct?

22  A    Yes.

23  Q    And the Assistant United States Attorney who was involved

24  with the case who filed the motion, he was the Assistant who

25  followed your case right from the point you were brought into

1    San Diego, correct?

2    A    Yes.

3    Q    He attended the proffers, he attended the grand jury

4    proceedings and he even attended your trial in Arizona,

5    correct?

6              MR. ROBOTTI:  Objection.  Compound.

7    A    Yes.

8              THE COURT:  It's okay.  It's clear.

9    Q    And take one step back.  In March of 2006 when you

10   testified, you had nine years with good time left on your

11   sentence, correct?

12   A    Yes.

13   Q    And approximately within a month of filing this motion,

14   your sentence was reduced from the balance to time served,

15   correct?

16   A    Yes.

17   Q    Now, government counsel asked you about S visas, correct?

18   A    Yes.

19   Q    Up to this date, whatever today is, have you received

20   your S visa at this point?

21   A    No.

22   Q    And since back on February 19, 2016, when you go to these

23   meetings, the status of your S visa is discussed, correct?

24   A    No, I started hearing about the S visa about two or

25   three years ago.

Martinez - cross - Purpura                    1721

1   Q    Let me see if I can refresh your recollection.

2            (Pause.)

3            MR. PURPURA:  Just for the witness, please, this is

4   Defense Exhibit 116 which is government MAM 149.  And I'd ask

5   the witness to read or the interpreter to interpret paragraph

6   number one.

7            (Translation.)

8   Q    Does that refresh your recollection that as far back as

9   February 19, 2016, the status of your S visa was discussed

10  with government counsel and agents?

11  A    Well, I just told you that I heard about the S visa about

12  two or three years ago.

13  Q    So it was discussed on that day to the best of your

14  recollection now, February 19, 2016, correct?

15  A    Yes.

16  Q    And then, again, on May 27, 2016, you either had a phone

17  call -- actually, you met with government agents and again the

18  status or the paperwork for your S visa was discussed again.

19  Does that sound about right to you?

20  A    I think so.

21  Q    And then on September 1, 2016, you met again with

22  government counsel and the agents and, again, the status of

23  your S visa was discussed and they asked you if you were

24  willing to testify against Joaquin Guzman if he was arrested,

25  do you remember that?  That's a yes or no.

1   A    Yes.

2   Q    Thank you.

3        And then, again, on December 6th of 2016, you still

4   haven't received your S visa and the status was discussed

5   again, correct?

6   A    I think so.

7   Q    And, again, what was discussed was the fact that you were

8   willing, as the government asked you, to testify against

9   Joaquin Guzman, correct?

10  A    Yes.

11  Q    And, again, these meetings without going through the

12  dates went right through 2017, correct?

13  A    That's correct.

14  Q    And to this date, your S visa has not been granted,

15  correct?

16  A    That's correct.

17  Q    And who's helping you get your S visa?

18  A    The government.

19       MR. PURPURA:  No further questions.

20       Thank you, sir.

21       (Continued on next page.)

22

23

24

25

```
                         Sidebar                      1723
```

 1          THE COURT:  Before we start redirect -- there is
 2    redirect?
 3              MR. ROBOTTI:  Yes, sir.
 4          THE COURT:  I need to see counsel very briefly at
 5    sidebar.
 6              (The following occurred at sidebar.)
 7          THE COURT:  I have modified the instruction a little
 8    bit.  The only substantive changes are --
 9              MR. ROBOTTI:  We lost the white noise, Your Honor.
10          THE COURT:  Let's talk quietly.
11          Only the substantive changes are highlighted.  I
12    wanted to make sure the government still wants it as I have
13    revised it since there are changes in favor of the defendant
14    but I think it is still accurate.
15              MR. ROBOTTI:  Can we take a moment, Your Honor?
16              (Pause.)
17              MR. PURPURA:  It's good.  Thank you, Your Honor.
18              MR. ROBOTTI:  The government agrees.
19          THE COURT:  Okay.  All right.  Let's go to redirect.
20              (Sidebar conference ends.)
21              (Continued on next page.)
22
23
24
25

```
          MDL      RPR      CRR      CSR      OCR
```

1  REDIRECT EXAMINATION

2  BY MR. ROBOTTI:

3  Q    Good morning, Mr. Martinez Martinez.

4  A    Good morning, sir.

5  Q    Now, there was a lot of discussion of your past testimony

6  on cross-examination yesterday.  Do you recall that?

7  A    Yes, sir.

8  Q    And, specifically, I'm talking about your past testimony

9  in 2002 and 2006.  Do you recall questions about that?

10  A    Yes, sir.

11  Q    Now, at the time you testified in 2002 before the grand

12  jury in San Diego, was the defendant in custody to your

13  knowledge?

14  A    Yes, but he had just escaped from jail.

15  Q    And he escaped jail in 2001, is that right?

16  A    Yes, sir.

17  Q    And the defendant had not been extradited to the United

18  States at that point either, right?

19  A    No, sir.

20  Q    And when you testified in 2006 in Arizona, was the

21  defendant in custody to your knowledge?

22  A    No, sir.

23  Q    And he had not been extradited to the United States,

24  right?

25  A    That's correct.

Martinez - redirect - Robotti                    1725

1  Q    So at the time of your past testimony, did you know

2  whether you would ever testify against the defendant?

3  A    No, sir.

4  Q    Now, whom did you testify against at trial in Arizona in

5  2006?

6  A    Architect Felipe Corona.

7  Q    And could you remind the jury who he is?

8  A    The person who built the tunnel.

9  Q    That's the tunnel from Agua Prieta to Douglas, is that

10  right?

11  A    That's correct.

12  Q    And for whom did he work?

13  A    For Mr. Guzman.

14  Q    All right.  So I'd like to talk about several portions of

15  your past testimony that defense counsel did not ask you

16  about.

17         Now, do you recall defense counsel asking you about

18  the following question during your 2006 testimony?

19         Question:  Were you aware of El Chapo ordering the

20  death of various people?

21         Answer:  No.

22         Do you recall that question?

23  A    Yes.

24  Q    All right.  So I would like to ask you about the question

25  you were asked just four questions later during your testimony

Martinez - redirect - Robotti                         1726

1   which defense counsel did not read to you and this just for

2   the witness.

3           Question:  Did you ever see anyone be killed?

4           Answer:  No.  That I found out that they had

5   somebody killed, yes.

6   Q     Is that accurate?

7   A     Yes.

8   Q     And then I'd like to look at another portion of that very

9   same testimony that Mr. Purpura was asking you about.  This is

10  while you were on cross-examination in 2006 in Arizona.  This

11  is page 131, lines 4 through 9.

12          Question:  Mr. Martinez, were you present when

13  assassinations were ordered by Mr. Guzman, by Chapo Guzman?

14          Answer:  Correct.

15          Question:  Even though on direct examination you

16  said you were not?

17          Answer:  I said that I wasn't present where people

18  were killed but I was present when he gave the order for

19  people to be killed.

20          Is that accurate?

21  A     Yes.

22  Q     All right.  Page 147.  Same testimony defense counsel

23  asked you about.  Lines 22 to 23.

24          And the defendant -- and Guzman actually discussed

25  the killing of other people?

MDL       RPR       CRR       CSR       OCR

Martinez - redirect - Robotti                1727

1          Answer:  Correct.

2          Is that accurate?

3    A    Yes, sir.

4    Q    And, finally, on this topic, page 167, lines 11 through

5    21.

6          Question:  These killings, was that something you

7    knew about in advance?

8          Answer:  No.

9          Question:  How did you find out about the killings?

10          Answer:  Because I was taking care of Chapo's

11    office.  Chapo would arrive on different days, three or four

12    times a week, and he would arrive and he would start making

13    telephone calls.  It was his office and you could hear what he

14    was saying, what he was talking about, and also what his

15    bodyguards were talking about.  That's how I found out about

16    things.  Chapo never asked me for permission to kill anybody.

17          Is that accurate?

18    A    Yes, sir.

19    Q    So, by my count, that's at least four times during your

20    testimony --

21          MR. PURPURA:  Objection.  That's not a question.

22          THE COURT:  We'll save it.

23    Q    Do you recall the defense attorney asking you about those

24    portions of your testimony?

25    A    Yes.

MDL      RPR      CRR      CSR      OCR

Martinez - redirect - Robotti                    1728

1  Q    Did he read the portions about you hearing the defendant
2  order people killed?
3  A    No.
4  Q    And let's just briefly look back at your testimony in
5  2002 which was four years before that.  This is page 17 of the
6  April 25, 2002, testimony, line 16 to 24.
7          Question:  Did you ever hear Joaquin Guzman Loera
8  direct anyone to go kill a suspected member of the Arellano
9  Felix organization?
10         Answer:  Yes.
11         That's line 16 to 19 for the record.
12         Is that accurate?
13 A    Yes, sir.
14 Q    Do you also recall defense counsel asking you yesterday
15 about your 2006 testimony that there were no seizures in
16 Mexico?
17 A    Yes.
18 Q    All right.  So I'd also like to look back at another
19 portion of your testimony in 2006 that Mr. Purpura asked you
20 about.  And this is page 174, lines 2 to 23.
21         Let's start out with the loads that were seized by
22 the government.  I'm referring to the Mexican government.
23         THE COURT:  You've got to slow down.
24 Q    You had indicated that you remembered either one or two
25 seizures that you had not thought about yesterday.

MDL      RPR      CRR      CSR      OCR

Martinez - redirect - Robotti                    1729

1              Answer:  Not that they hadn't occurred, just that

2       the answer the attorney gave me, I don't know what I was

3       thinking about.

4              Question:  Tell us about these seizures by the

5       Mexican government?

6              Answer:  The Mexican government confiscated 7 tons,

7       300 kilos, and cans of jalapeno chilies.

8              Question:  When was that?

9              Answer:  On the border, Tecate.  That's why I am

10      here.

11             Question:  When was that?

12             Answer:  The seizure?

13             Question:  Yes, sir.

14             Answer:  In 1992.  Excuse me.  1993.

15             Question:  So your indictment has to do with that

16      seizure?

17             Answer:  Yes.

18             Question:  Even though the seizure was in Mexico?

19             Answer:  Yes, sir.

20             Question:  That cocaine, where was it intended to be

21      delivered?

22             Answer:  It was crossed through Tijuana and

23      delivered to Los Angeles.

24             Is that accurate?

25      A    Yes, sir.

Martinez - redirect - Robotti                1730

1   Q    And your testimony in 2002 on this topic, April 18, 2002,

2   page 48 -- excuse me.  Page 49, line 8 to line 14.

3        Did there come a point in time when the method of

4   transporting cocaine in chili pepper cans came to an end?

5        Answer:  Yes.

6        Question:  Was that the result of a specific event?

7        Answer:  Yes, the detention of 7 tons, 200 kilos.

8        Is that accurate?

9   A    Yes, sir.

10  Q    And did the defense counsel read those passages back to

11  you?

12  A    No.

13  Q    Now, do you recall defense counsel asking you about your

14  2002 testimony that you had been stabbed on two different

15  occasions?

16  A    Yes.

17  Q    And then defense counsel reminded you that you testified

18  on direct that you had been stabbed on three separate

19  occasions, is that right?

20  A    Yes.

21  Q    All right.  I'd like to take a look at what you actually

22  said in 2002.  This is April 18th of 2002, page 62, beginning

23  on line 10.

24       Question:  You mentioned a grenade incident.

25  Described what happened on that particular incident.

Martinez - redirect - Robotti                    1731

1          Answer:  Well, first, it was the two times of eight

2     stabs each.  I got all of my body sewed up with different

3     operations.  They performed -- they perforated my lung twice,

4     the intestine, the pancreas.  The authorities at the prison

5     had knowledge that there was going to be another attempt

6     against me.  They transferred me to a different prison.

7          Question:  Almoloya?

8          Answer:  No, another one.  It's called Reclusorio

9     Sur, the southern prison, as opposed to Reclusorio Oriente,

10    the western one.  I was sent to a place known as well, what is

11    in the United States what would be the hole, but the

12    difference is that there are more dangerous prisoners there.

13         THE INTERPRETER:  Now, Counselor, the interpreter

14    will need that if you want it interpreted back.

15         MR. ROBOTTI:  Okay.  Go ahead.

16         (Translation.)

17  Q    And then picking up on line 3:  So when I arrived there,

18    money had already been paid for me to be murdered there, so

19    they tried again to stab me but the shirt, it rips.  I run

20    towards the door and the officer opens the door for me and

21    protects me.

22         Is that accurate?

23  A    Yes, sir.

24  Q    Now, I just wanted to ask you briefly about that grenade

25    attack.  The night before, about how many hours did

MDL       RPR       CRR       CSR       OCR

Martinez - redirect - Robotti                    1732

1    "The Corrido" play for?

2              THE COURT:  "El Corrido" was the song?

3              MR. ROBOTTI:  The song, yes, Your Honor.

4    A    About eight hours.

5    Q    And how did you feel when you heard that?

6              MR. PURPURA:  Objection.

7              THE COURT:  Sustained.  Sustained.

8    Q    Did you think this was any message when you heard it?

9              MR. PURPURA:  Objection.  Really, it's not --

10             THE COURT:  Stop.  Stop.  Sustained.

11   Q    Now, you mentioned that the trial in 2006 was against the

12   architect Felipe Corona who built the tunnel, is that right?

13   A    Yes.

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Martinez - redirect - Robotti                    1733

1    BY MR. ROBOTTI:  (Continuing.)

2    Q    Let's do one final read-back of your testimony here.

3    This is going to be page 87, beginning at line 18.  "Now, you

4    said you were aware of various seizures that took place in the

5    United States:

6              "Were you aware of any large seizures of narcotics

7    that had gone through the tunnel?

8              "Answer:  Yes.

9              "Question:  Describe that to us.

10             "Answer:  What I would like to answer is I don't

11   recall the exact amount.  It was from 900 to 1,000 kilos in

12   Phoenix which they grabbed after they had crossed it through

13   the tunnel."

14             And then continuing:

15             "El Chapo told me, Compadre, we lost 1,000 kilos.

16   We lost them.  They caught them on the truck because that

17   dumb-ass Camarena left the door of the house open and a

18   policeman went by and saw the pool table on the ceiling.  They

19   followed the truck and now they know there is a stash there."

20             Is that accurate?

21   A    Yes, sir.

22   Q    And did defense counsel read that one back to you?

23   A    No.

24             MR. ROBOTTI:  Your Honor, the Government offers the

25   excerpts of the transcripts that I just read into evidence.

Martinez - redirect - Robotti                 1734

1    MR. PURPURA:  No objection.

2    THE COURT:  Received.  Do they have a number?

3    MR. ROBOTTI:  They are excerpts from 3500 MAMM-14,

4  3500 MAMM-10 and 3500 MAMM-9.

5    THE COURT:  Okay.

6    MR. ROBOTTI:  And we will list the specific excerpts

7  after testimony is done.

8    THE COURT:  Fine.  Anything else?

9    MR. ROBOTTI:  Just a couple of more questions,

10  Judge.

11  BY MR. ROBOTTI:

12  Q    Now you've already done your time in jail; is that right?

13  A    Yes.

14  Q    And you can't be sent back to jail for crimes to which

15  you pled guilty?

16    MR. PURPURA:  Objection.

17    THE COURT:  Wait, if you want to talk to me let's

18  talk about it at sidebar.  Let me just think about the

19  question.  If you want to press it, we need to discuss it.

20    MR. PURPURA:  Would the court consider 611(c), the

21  form of the question.

22    THE COURT:  I will overrule that.

23    You may answer.

24  BY MR. ROBOTTI:

25  Q    So it's your understanding that you can't be sent back to

1   jail for the crimes to which you pled guilty; right?

2   A    That's what I think.

3   Q    What do you understand would happen to you today if you

4   didn't tell the truth on the witness stand?

5   A    They could send me to jail.

6   Q    Is perjury a crime?

7   A    Yes.

8   Q    And so the only way you could go back to jail is if you

9   committed perjury?

10  A    Yes.

11          MR. ROBOTTI:  No further questions.

12          THE COURT:  All right.  Anything else?

13          MR. PURPURA:  I do, yes.

14          THE COURT:  Briefly?

15          MR. PURPURA:  Briefly, sure.

16          THE COURT:  Okay.

17  RECROSS-EXAMINATION

18  BY MR. PURPURA:

19  Q    Mr. Robotti just asked you if you committed perjury would

20  you go to jail; correct?

21  A    Yes.

22  Q    Now, you've met with Mr. Robotti in preparation for this

23  trial 20 times?

24  A    Yes.

25  Q    And he had that same black book that he's been carrying

Martinez - recross - Purpura                    1736

1    back and forth each and every time; correct?

2    A    I don't remember.

3    Q    But he asked you basically all the same questions you

4    were asked on the witness stand over and over again; correct?

5    A    Yes.

6    Q    And he was satisfied with your answers after he met with

7    you 20 times; correct?

8    A    I believe so, yes.

9    Q    And so, if you followed the script you have no problem

10   with perjury, do you?

11   A    That could be.

12   Q    Now, would you agree with me that the truth is the truth

13   whether Joaquin Guzman is arrested, whether he's in Mexico or

14   whether he's anywhere.  The truth is the truth; correct?

15   A    Yes.

16   Q    And the same thing applies in 2006 when you were under

17   oath, Mr. Robotti on direct examination didn't read from the

18   transcript where you denied killing anybody, did he?

19   A    That's correct.

20        MR. PURPURA:  This is page 50 from the transcript of

21   2006, Defense Exhibit Excerpt 165.  Move into evidence.

22        THE COURT:  Any objection?

23        MR. ROBOTTI:  No objection, Judge.

24        THE COURT:  Received.

25        (Defense Exhibit 165 received in evidence.)

MDL      RPR      CRR      CSR      OCR

Martinez - recross - Purpura          1737

1        (Exhibit published.)

2   BY MR. PURPURA:

3   Q    When you were asked under oath with an interpreter, you

4   mentioned about different people killed Arturo Beltran, Arturo

5   Guzman, Francisco Salazar.  Were you aware of El Chapo

6   ordering the death of various people, and your answer was No;

7   isn't that correct, sir.  Correct?

8   A    Yes.

9   Q    Thank you.

10       MR. PURPURA:  Excerpt 165-B, offer into evidence,

11  page 80 and 81.  The same transcript.

12       THE COURT:  Any objection?

13       MR. ROBOTTI:  There doesn't appear to be a response

14  to that question, Judge.

15       THE COURT:  I am sorry, didn't understand the

16  objection.

17       MR. ROBOTTI:  No objection.

18       THE COURT:  All right, received.

19       MR. PURPURA:  Thank you.

20       (Defense Exhibit 165-B received in evidence.)

21       (Exhibit published.)

22  Q    Again, about an hour later in the trial you were asked by

23  the same Assistant United States Attorney: "Do you recall him

24  ever talking about people being killed," and the "him" is

25  Mr. Guzman and your response was "No"; correct?  Correct?

MDL      RPR      CRR      CSR      OCR

Martinez - recross - Purpura                          1738

1    A    Correct.

2            MR. PURPURA:  Just one second and I will be

3    finished.

4    BY MR. PURPURA:

5    Q    Defense Exhibit Number 163, excerpt from the same trial

6    page 35.

7            MR. PURPURA:  Move in evidence.

8            MR. ROBOTTI:  No objection.

9            THE COURT:  Received.

10           (Defense Exhibit 163 received in evidence.)

11           (Exhibit published.)

12   BY MR. PURPURA:

13   Q    Again, the same Assistant United States Attorney asked

14   you about seizures that you're aware of in Mexico.

15   Mr. Robotti didn't ask you that from the transcript in direct

16   examination, did he?

17   A    No.

18   Q    And the question was: "And was it a general practice that

19   El Chapo had the Mexican officials paid off," and your answer

20   was "Yes"; correct?

21   A    Yes.

22   Q    And finally the question was:  "And were there a lot of

23   seizures in Mexico by the Mexican police then," and your

24   answer was, "As far as I know there wasn't one."  Correct?

25   Correct?

Martinez - re-redirect - Robotti                1739

1   A    Correct.

2   Q    Finally, does truth matter who asked the question,

3   whether it's the Government or defense counsel?

4   A    That's correct.

5           MR. PURPURA:  Thank you, no further questions.

6           MR. ROBOTTI:  Just a couple of questions, Judge.  I

7   will be brief, Your Honor.

8           THE COURT:  Yes, you will be.

9   RE-REDIRECT EXAMINATION

10  BY MR. ROBOTTI:

11  Q    Mr. Martinez, those portions of the transcript that

12  counsel just showed you, those are the same portions that I

13  asked you about, right?

14          MR. PURPURA:  Objection.

15          THE COURT:  Overruled.

16  A    Yes.

17  Q    You were asked a number of times by a Mr. Purpura whether

18  you were lying on the witness stand today.  Have you lied to

19  this jury?

20          MR. PURPURA:  Objection.

21  A    No, sir.

22          MR. PURPURA:  This is beyond --

23          THE COURT:  It is not.  That is the problem with the

24  recross and redirect and re-redirect.  Ask just the last part

25  of the question.

Martinez - re-redirect - Robotti                1740

1   BY MR. ROBOTTI:

2   Q    Mr. Martinez, have you lied to this jury?

3   A    No.

4           MR. ROBOTTI:  No further questions, Judge.

5           THE COURT:  All right.  The witness may step down.

6           (Witness excused.)

7           THE COURT:  Before we take our break, ladies and

8   gentlemen, let me tell you a little something about how

9   federal sentencing works, particularly with regard to

10  cooperating witnesses.

11          When somebody cooperates with the Government, the

12  Government has to -- doesn't determine what sentence they are

13  going to get and normally the Government doesn't make any

14  recommendation to the sentencing judge as to how much time

15  that cooperating witness should get.  What the Government will

16  do, if it is satisfied with the level of cooperation is to

17  write to the sentencing judge what is known as a 5(k)(1)

18  letter.  That letter sets forth the nature of all the crimes

19  that the defendant has committed and all the cooperation that

20  the defendant has given to the Government.

21          The judge takes that letter, together with a lot of

22  other information about the defendant and all of the crimes

23  that he has committed and it's the judge exclusively who

24  decides the appropriate sentence, not the Government.  So that

25  a cooperating witness, all they get from the Government is

Martinez - re-redirect - Robotti                1741

1   this 5(k)(1) letter.  But the 5(k)(1) letter is significant

2   because if the defendant gets one from the Government, the

3   judge may sentence that defendant below any statutory,

4   mandatory minimum if the law provides one.  For example, if

5   the law says a defendant who commits this crime has to serve

6   at least ten years, then the judge has to sentence him to at

7   least ten years unless the judge gets the 5(k)(1) letter from

8   the Government.  Then the judge doesn't have to if he doesn't

9   want to sentence him to that ten years.  The judge can go

10  below that.

11          So without the letter the judge is stuck with the

12  mandatory minimum.  Besides allowing a sentence below the

13  mandatory minimum, the information in the letter is generally

14  important to the sentencing judge in helping him determine

15  what the appropriate sentence is.  Once the judge receives the

16  letter, it is the judge's decision alone as to what the

17  sentence should be.  However, it is solely the Government's

18  decision as to whether to submit the letter in the first

19  place.  So, that is how that works.  I will give you a copy of

20  this instruction when you go to deliberate, but I wanted you

21  to know that as the trial goes on.

22          All right.  We will take our morning break and come

23  back here at 11:25.  Please remember not to discuss the case

24  at all amongst yourselves.  Okay.  Recess until 11:25.

25          (Jury exits.)

Martinez - re-redirect - Robotti                    1742

1          (Recess taken.)

2          THE COURT:  I am told we need a sidebar.

3          (Sidebar held outside of the hearing of the jury.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MDL        RPR        CRR        CSR        OCR

Sidebar                                                      1743

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          MS. GOLDBARG:  This is just an administrative

4     measure, issue.  There are three law enforcement witnesses

5     that are coming up.  The next witness after that is in the

6     Witness Protection Program so the marshals will need some

7     leeway time, but I don't know if this will take us to lunch so

8     it may be a good idea to break for lunch so the marshals know

9     what to do.

10         As Your Honor is aware, and defense counsel as well,

11    that this witness has severe prostate issues which requires

12    him to use the facilities more frequently.

13         THE COURT:  And he's a long witness?

14         MS. GOLDBARG:  He is not a long witness but

15    depending, he may need to take more breaks than usual.  So,

16    I'm asking the Court how you would like us to let you know

17    that.

18         THE COURT:  Give me a proposal.

19         MS. GOLDBARG:  I can have the witness say, I would

20    like to take a break.  I just would like defense counsel to

21    know.  And we're restricting his liquid.

22         THE COURT:  I think I should inform the jury that he

23    has a medical issue that requires him to take more breaks.

24         MS. GOLDBARG:  I think that's fine if defense

25    counsel is okay with that.

MDL       RPR       CRR       CSR       OCR

Sidebar                                                    1744

1          MR. PURPURA:  Sure.

2          THE COURT:  Okay.

3          (Sidebar ends.)

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Baker - direct - Fels                    1745

1           (Jury enters.)

2           THE COURT:  Everyone be seated.  The Government may

3    call its next witness.

4           MR. FELS:  Thank you, Your Honor.  The Government

5    calls Shawn Baker.

6           THE COURTROOM DEPUTY:  Raise your right hand.

7           (Witness sworn/affirmed.)

8           THE COURTROOM DEPUTY:  State and spell your name for

9    the record.

10          THE WITNESS:  Shawn Baker, S-H-A-W-N B-A-K-E-R.

11          THE COURTROOM DEPUTY:  Have a seat.

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **SHAWN BAKER**,

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5  DIRECT EXAMINATION

6  BY MR. FELS:

7  Q    Good morning, Detective Baker.  With whom do you work?

8  A    I'm currently employed in California with the Marin

9  County Sheriff's Department.

10 Q    What's your current rank?

11 A    Detective.

12 Q    Where are you currently assigned within the sheriff's

13 office?

14 A    The investigations division.

15 Q    Now, prior to being a detective at Marin County, where

16 did you work?

17 A    I worked for Rohnert Park Department of Public Safety

18 where I was a police officer and a firefighter.

19 Q    And prior to that what did you do?

20 A    I had the privilege of serving in the United States Coast

21 Guard.

22 Q    How long were you with the United States Coast Guard?

23 A    From February of 1999 to August of 2007.

24 Q    And did you have any employment prior to that?

25 A    No.

Baker - direct - Fels                    1747

1    Q     You came straight out of school?

2    A     Out of high school.

3    Q     So why did you decide to leave the Coast Guard?

4    A     In 2007, I was faced with the decision of staying in the

5    Coast Guard.  I had originally gone in wanting experience in

6    law enforcement and I applied to a couple of local police

7    departments, at which point I was offered a job and decided to

8    get out and carry on my career in law enforcement.

9    Q     So what were your responsibilities at the United States

10   Coast Guard at the time that you left in August of 2007?

11   A     In August of 2007, I was assigned to TRACEN Petaluma

12   which is a training facility where I taught the National

13   Registry EMT course, emergency medical technician, and worked

14   at the fire department.

15   Q     So first responder position?

16   A     Yes, as a first responder and teaching EMT school.

17   Q     Now, let's go back to September of 2004.  Where were you

18   stationed at that point?

19   A     In September of 2004, I was stationed at PACTACLET which

20   is a Pacific area tactical law enforcement unit based out of

21   San Diego.

22   Q     What is PACTACLET?

23   A     In the Coast Guard, PACTACLET was a unit where there are

24   several LEDETs which is a law enforcement detachment.  And

25   eight to ten personnel, Coast Guard members, make up that team

Baker - direct - Fels                    1748

1   and our primary mission is to deploy on either U.S. or foreign

2   Navy vessels for the purpose of conducting counter drug or

3   migrant operations off of Central/South America and the

4   Caribbean as well as deploying to the Middle East.

5   Q    And what vessel were you on board in September of 2004?

6   A    In September of 2004 I was on board the U.S. Naval vessel

7   Curts.

8   Q    And did you have a particular responsibility on that

9   mission when you were on board the Curts?

10  A    I was part of a boarding team and in September I would

11  rotate between being just a regular member of the boarding

12  team or leading the boarding as the boarding officer.

13  Q    So can you explain, what's a boarding team?

14  A    A boarding team is going to be the eight to ten Coast

15  Guard members that go over to vessels to conduct the various

16  operations or boardings for that day.

17  Q    And what is -- what would the boarding officer do?

18  A    So the boarding officer in that sense would be the team

19  leader or someone in charge of the operation once on board

20  that vessel to ensure the safety of the team and the crew and

21  to ensure the operation goes smoothly by delegating or

22  assigning tasks to make sure that we're efficient and

23  everything is covered.

24  Q    Directing your attention specifically to September 16th

25  of 2004, did anything of note happen in the early morning of

MDL      RPR      CRR      CSR      OCR

Baker - direct - Fels                    1749

1  that day?

2  A    Yes.  Earlier on that date we were given tasking to

3  conduct the boarding on that fishing vessel, Lina Maria, and I

4  was appointed to be the boarding officer.

5  Q    And do you know approximately where you were, where the

6  ship was, at that point early in the morning of September 16,

7  2004?

8  A    Yes.  We were approximately 200 miles west of Manta,

9  Ecuador.

10 Q    Now, in preparation for your testimony today, did you

11 help prepare a map basically showing the coordinates of where

12 you were?

13 A    I did.

14       MR. FELS:  And just for the witness, Your Honor.

15       THE COURT:  Okay.

16 BY MR. FELS:

17 Q    Showing you what's been marked as Government Exhibit for

18 identification as GX 200-20.  Is this one of the maps -- is

19 this the map that you helped to put together?

20 A    Yes, sir.

21 Q    And does this fairly and accurately depict where the

22 vessel was in the early morning of September 16, 2004, the

23 Curts vessel?

24 A    It does.

25       MR. FELS:  Your Honor, if we may publish.

Baker - direct - Fels                                       1750

1           THE COURT:  Any objection?

2           MR. BALAREZO:  Your Honor, I already said I don't

3    have any objection to any of these exhibits to save some time.

4           THE COURT:  It's in.

5           (Government Exhibit 200-20 received in evidence.)

6           (Exhibit published.)

7    BY MR. FELS:

8    Q    So showing you what's been admitted into evidence as

9    Government Exhibit 200-20, what is it that we're looking at

10   here?

11   A    It's a map of part of Central and South America as well

12   as the Pacific Ocean.  You will note the red pin is the

13   approximate position of the USS Curts.

14   Q    And that's a couple of miles, as you said, off the coast

15   of Ecuador?

16   A    Roughly 200.

17   Q    Which ocean?

18   A    The Pacific Ocean.

19   Q    Now did something of note happen on that date, September

20   16, 2004?

21   A    We were given tasking to perform a nighttime tactical

22   takedown of the fishing vessel Lina Maria as it was suspected

23   in illegal trafficking.

24   Q    And what was your role that you fulfilled that day?

25   A    I was assigned to be the boarding officer of that team.

Baker - direct - Fels                    1751

1   Q    Take us through.  Did you board the Lina Maria vessel?

2   A    Yes.  We had the location.  The USS Curts closed to

3   approximately five miles at which point it launched its small

4   boat, referred to as a rigid-hull inflatable boat with the

5   LEDET, the law enforcement detachment from the Coast Guard.

6   There's eight of us that day that went over and made our way

7   towards the Lina Maria.

8   Q    And what position were you in as you approached the Lina

9   Maria?

10  A    As we were trying to be covert, we approached from the

11  rear and also so we could confirm that the vessel was, in

12  fact, the Lina Maria.

13  Q    When you said you wanted to be covert what does that

14  mean?

15  A    We wanted our presence not to be known as there's certain

16  hazards when attempting to board vessels that are suspected of

17  smuggling illegal contraband.

18  Q    Were you and your team armed at that time?

19  A    Yes, we were.

20  Q    As you approached the vessel was it dark or light?

21  A    It was dark.

22  Q    Did later it became light as you were on the scene?

23  A    It did.

24  Q    I want to show you what's been marked for identification

25  purposes as Government Exhibits 200-1 and 200-2.

Baker - direct - Fels                    1752

1        MR. FELS:  And I point out no objections, so put

2   them into evidence?

3        MR. BALAREZO:  I already said I don't have any

4   objection.

5        THE COURT:  He is being polite.  It is received.

6        (Government Exhibit 200-1 and 200-2 received in

7   evidence.)

8        MR. FELS:  So 200-1 and 200-2.

9        THE COURT:  Yes.

10       (Exhibit published.)

11  BY MR. FELS:

12  Q    What are we looking at here in 200-1?

13  A    It would be the aft or the back end of the fishing vessel

14  Lina Maria that I observed when we approached that morning on

15  September 16th.

16  Q    Just to be clear, when you approached it was dark and

17  this photograph was taken later on when it was light; right?

18  A    The photo was taken later when it lightened up.  And that

19  morning, to confirm or to see the name, we used a flashlight.

20  One of the boarding team members illuminated the back of the

21  ship.

22  Q    Now, look right underneath the name of the ship, you have

23  the country name.  What country is that?

24  A    Cambodia.

25  Q    Okay.  And were you anywhere close to Cambodia at this

MDL        RPR        CRR        CSR        OCR

Baker - direct - Fels                    1753

1  time?

2  A    No.

3  Q    I'm showing you what's introduced as 200-2 and ask if you

4  could identify that for us.

5  A    Yes.  This is the left or port side of the fishing vessel

6  Lina Maria.

7  Q    What happened once you got on board the Lina Maria?

8  A    Once the boarding team embarked the fishing vessel Lina

9  Maria we had split in teams, two teams; one to secure the

10  pilot house or where the boat is operated and one team to

11  secure the engine room because those are the two main safety

12  and control points of the vessel.

13  Q    And what happened -- which side were you on?

14  A    I proceeded up the starboard or right side of the vessel

15  with Chief Petty Officer LeFleur.

16  Q    Which team were you on on that day?

17  A    May tasking was to control or secure the pilot house on

18  the bridge.

19  Q    What happened once you got to the pilot house?

20  A    Just prior, I encountered one of the crew members who had

21  "Vietnam" on his stomach, called Brother, a boarding team

22  member to handle him so I could proceed to the pilot house

23  with Chief Petty Officer LeFleur.  Once I entered the pilot

24  house, I observed Chief Petty Officer LeFleur had an

25  individual with his hands up on the wall.  At which point I

MDL      RPR      CRR      CSR      OCR

Baker - direct - Fels                    1754

1   had him get on the ground and detained him in handcuffs.

2   Q    Was there some sort of a safety issue that occurred

3   before you could do anything else?

4   A    We secured all crew members and then when performing a

5   protective sweep of the vessel, it was noted that the vessel

6   was taking on water near the aft steering or back portion of

7   the vessel.

8   Q    What did you do to address that?

9   A    Utilizing a pump that I located on board, I rigged it up

10  to de-water the steering department.

11  Q    What's your mission?  You said you did this protective

12  sweep.  What's your mission then?

13  A    We conduct a protective sweep not only for the safety of

14  the Coast Guard members, but everyone on board to ensure that

15  we have control of the vessel and everyone is properly watched

16  over.

17  Q    Okay.  And so once you've completed that sweep, what

18  happened?  What did you do then?

19  A    Once completing that sweep, I looked at the ship's

20  documents to determine if it had any sort of registration or

21  information regarding the crew members.

22  Q    And what did you learn about the nationality of the crew

23  members?

24  A    All ten crew members on board were of Colombian descent.

25           (Continued on the following page.)

Baker - direct - Fels                    1755

1   DIRECT EXAMINATION

2   BY MR. FELS:   (Continuing)

3   Q     So did that create some sort of discrepancy based on what

4   we saw in Government Exhibit 200-1 here?

5   A     Yes.   Obviously the port of nationality of the vessel

6   claimed to be Cambodia, yet no one on board was Cambodian.

7   Q     So did you report this information to somebody?

8   A     Yes.   I passed it to the officer in charge, Chief Le

9   Fleur, who relayed the information to the Coast Guard command.

10  Q     And what was the information that you got back?   Did you

11  get an authority to do something?

12  A     They advised that we had authorization to search the

13  vessel.

14  Q     Now, based on your understanding of the Coast Guard

15  procedures, why did you have authority to search the vessel?

16  A     Depending on what countries we have certain agreements

17  with, as far as the exact steps, I cannot tell you what was

18  gone through, whether there was an agreement with a country,

19  but also with the conflicting of the Colombian crew members as

20  well as their last port of call being in Colombia and

21  returning to Colombia, there's no other signs that the vessel

22  was associated to Cambodia, therefore they determined that it

23  was a vessel without nationality.

24  Q     And that gave you authority to search it?

25  A     Yes.

Baker - direct - Fels                    1756

1    Q    Now, what happened next?

2    A    We started the boarding by completing ion swabs of the

3    vessel.

4    Q    Was is that?

5    A    So officer Andersen went around swabbing.  It's basically

6    a small patch that you could rub on various surfaces

7    throughout the ship, and after collecting several samples, we

8    take that back over to the USS Curts where it is then ran

9    through a machine that will detect any trace amounts of

10   narcotics.

11   Q    Did that give you an immediate feedback or did you have

12   to wait some time for the results?

13   A    Depending on how many swabs you have, it is a process, so

14   it's not immediate.

15   Q    While you were in process of doing the ion swabs, was

16   there some other searching that you were doing?

17   A    We also -- we continued our search.  So we tried to get

18   as close to 100 percent at-sea accountability of every

19   compartment on board a fishing vessel.  So, in doing so, we

20   access fuel tanks, water tanks or open spaces on the vessel

21   and what aides us is taking measurements as we go along so we

22   can confirm that it matches up with what we see.

23   Q    And did you notice some form of discrepancy?

24   A    Yes.  By taking measurements, the approximate length of

25   the vessel was 83 feet, and through the measurements, we

MDL      RPR      CRR      CSR      OCR

Baker - direct - Fels                    1757

1   determined that we were missing or had unaccounted for space

2   somewhere in the vicinity under the forward berthing area or

3   living quarters for the crew.

4   Q    When you say unaccounted for space, what do you mean by

5   that?

6   A    So, on most ships you are able to account for where or

7   what's supposed to be in that location, whether it's a fuel

8   tank or a water tank, you could typically tell because with

9   those tanks they have to be vented, so there are vents that go

10  up to the deck that will help you determine that yes, in fact,

11  there should be a tank down there and as well as a hatch that

12  allows you access whether it's for maintenance, cleaning, or

13  if there is some sort of issue.

14  Q    So, in other words, what was the significance of your

15  discovery when you found this unaccounted for space?

16  A    There was no immediate or obvious way into that

17  compartment.

18  Q    So at some point after that, did someone alert you to

19  something that they had found?

20  A    Yes, having realized that we had an unaccounted for space

21  around the forward berthing area of the ship, Officer Winters

22  investigated further and on the portside of the vessel under

23  these --

24           MR. BALAREZO:  Objection.

25           Objection.

Baker - direct - Fels                    1758

1         THE COURT:  Overruled.

2    Q    Sir, let me ask it this way, did you see what Officer

3    Winters pointed out to you?

4    A    Yes, Officer Winters alerted me to a wet cement patch

5    that was located on the portside of the vessel in the forward

6    berthing, on the deck.

7    Q    Did you actually personally observe that wet patch of

8    cement?

9    A    Yes, I did.

10         MR. FELS:  And, Your Honor, if we can move to

11   introduce Government Exhibit 200-3, please.

12         THE COURT:  Received.

13         (Government's Exhibit 200-3 received in evidence.)

14   Q    What are we looking at here in Government Exhibit 200-3?

15   A    That was the wet patch of cement after the bed was lifted

16   up.

17   Q    And, so, what did you do?

18   A    I contacted the officer in charge and requested

19   permission to remove or, if any of the cement had actually

20   set, to chip it away so we can reveal what was underneath.

21   Q    Did you get permission?

22   A    Permission was granted to remove the cement.

23   Q    And then what happened?

24   A    In removing the cement and placing it in buckets, it

25   revealed a handle and as we continued to clear away the

Baker - direct - Fels                          1759

1    cement, it revealed a hatch.

2    Q    Did you open up the hatch?

3    A    The hatch was removed and looking into the unaccounted

4    for space, I observed several black bails.

5    Q    When you say "bails," could you describe what they looked

6    like?

7    A    Yes, so the bail, or what I've described as a bail, these

8    particular ones had black outer packaging were approximately

9    two feet in length by one foot.

10        MR. FELS:  Your Honor, if we can move to introduce

11   Government Exhibit 200-4 and 200-5.

12        THE COURT:  Received.

13        (Government's Exhibits 200-4 and 200-5 received in

14   evidence.)

15   Q    Showing you, Detective Baker, what has been marked as

16   Government Exhibit 200-4, could you describe what we are

17   looking at in this photograph?

18   A    That was a photograph taken of the unaccounted for space

19   that revealed the black bails, looking at this picture, the

20   bottom portion would be the hull or the bottom of the ship.

21        Looking towards the top of the photograph would be

22   the starboard or right side of the ship, and off to the right

23   is, when I say the black bails, those are what's depicted

24   there.

25   Q    Do you mind circling those for the jury?  Put your finger

Baker - direct - Fels                    1760

1    there and circle.

2              Thank you.

3              And over to the left there's this light.  Do you

4    know what this is?

5    A    That is possibly either a flashlight or just a finger

6    from holding it too close to the lens.

7    Q    Thank you, let me show you what has been marked as

8    Government Exhibit 200-5.  What are we looking at here?

9    A    That is another photograph of the unaccounted for space

10   where you can see several of the black bails, as well as the

11   starboard bulkhead or right side wall towards the top.

12   Q    Now, besides these photographs, was there some other way

13   that the discovery on board Lina Maria was memorialized?

14   A    Yes, we took video as well.

15   Q    And prior to testifying today, did you -- I am going to

16   show you what has been marked as Government Exhibit 200-6.

17             Prior to today, did you review the contents of this

18   disc, sir?

19   A    Yes.

20   Q    And did you do anything to memorialized that you had, in

21   fact, reviewed the contents?

22   A    Yes.  As you could see, I've placed my initials and the

23   date that I have reviewed the clips.

24   Q    Just to be clear, you said that these, they're clips?

25   A    Yes, not the entire video, just clips of.

Baker - direct - Fels                    1761

1  Q    Did you confirm that those clips are from the entire

2  video?

3  A    Yes.

4  Q    And did you -- and clips of what, by the way?

5  A    Clips of the -- the unaccounted for space that tried to

6  give a better idea or image of the bails that were located

7  down there and the size.

8          MR. FELS:  Your Honor, we move to introduce

9  Government Exhibit 200-6.

10          THE COURT:  I understand there is no objection.

11          MR. BALAREZO:  No.

12          THE COURT:  Received.

13          (Government's Exhibit 200-6 received in evidence.)

14          MR. FELS:  We would also like to play three small

15  clips.

16          THE COURT:  Go ahead.

17          MR. FELS:  This is Government Exhibit 200-6A for

18  identification from 6:53 to 7:14.  If we could just play it.

19          (Video playing.)

20  Q    What are we looking at here to the left?

21  A    You can see the bucket that we removed the cement and it

22  leads down into the hatch that was located under the bunkbed.

23  Q    What can we see to the left of the photograph underneath?

24  A    There is a ladder that allowed access and then there's

25  several bails, the black bails.

Baker - direct - Fels                    1762

1  Q    Let's play Government Exhibit 200-6B for identification,
2  7:33 to 8:55.  It's about a minute and 22 seconds.  What are
3  we looking at here?
4  A    Again, looking at the hidden compartment, several of the
5  black bails.
6  Q    I think that's sufficient.  We will move on to the next
7  clip.  Government Exhibit 200-6E from 15:19 to 16:07.  What
8  are we looking at here?
9  A    That is the aft or back end of the fishing vessel Lina
10 Maria.
11 Q    You can read there the Cambodia; is that correct?
12 A    Correct.
13 Q    Where is this footage being shot?
14 A    On the starboard or right side of the vessel.  That's
15 looking down into the engine room, proceeding up the starboard
16 side where there is a life ring that is also marked Lina
17 Maria.
18 Q    Thank you.
19       Now, what kind of vessel was the Lina Maria?
20 A    A fishing vessel.
21 Q    And did you find any evidence of fishing on board?
22 A    It did have some gear and a small amount of fish.
23 Q    Did they appear to be alive?
24 A    No, the fish appeared to be in a decaying state.
25 Q    Showing you what has been marked as Government Exhibit

Baker - direct - Fels                    1763

1   200-7, which we will introduce into evidence, Your Honor,

2   without objection.

3            THE COURT:  Received.

4            (Government's Exhibit 200-7 received in evidence.)

5   Q    What are we looking at?

6   A    This is inside the fish hold and you can see some of the

7   fish that they had on board.

8   Q    Now, what did you do once you found this discovery of the

9   bails?

10  A    When finding the bails in the hidden compartment, I

11  immediately placed a guard, meaning one of the Coast Guard

12  lead members on it, to maintain control.

13  Q    Did you do anything with one of the bails in particular?

14  A    Yes, in speaking with the officer in charge, Chief Petty

15  Officer Le Fleur.  He requested that I send one bail back over

16  to the USS Curts, at which time I appointed one of the

17  boarding team members, Officer Cute, to take the bail back

18  over to the USS Curts for testing.

19  Q    When you say testing, what kind of testing?

20  A    We would perform a NIC test, which is a narcotic

21  identification test.

22  Q    Again, what is the NIC test?  Could you describe it?

23  A    It's a small plastic pouch that has vials inside it and

24  you are to take a small sample from the suspected narcotics,

25  place it in there and break the vials, which will then reveal

Baker - direct - Fels                    1764

1    a color.  The color will either show that it's positive for

2    the narcotics tested or negative.

3    Q    You were not present when this test was done; correct?

4    A    Correct.

5    Q    I am going to ask very specifically, were you notified of

6    the results?  Yes or no?

7    A    Yes.

8    Q    Based on what you learned of the results, did you wind up

9    doing something?  What did you wind up doing after you learned

10   of the results of this NIC test?  What did you do with the

11   bails of the cocaine still on Lina Maria?

12   A    They still maintained guards.  So we had that posted

13   suspecting and from experience from other boardings and what I

14   observed, it was suspected contraband, so we immediately

15   maintained a guard on the contraband.

16   Q    Now, did you personally observe that single bail that had

17   been on route for the test?

18   A    Later in the evening of the 16th or early morning into

19   the 17th, I returned back over to the USS Curts and I did see

20   the bail that had been tested.

21          MR. FELS:  Your Honor, if we can move to introduce

22   Government Exhibits 200-9 and 200-10.

23          THE COURT:  Received.

24          (Government's Exhibits 200-9 and 200-10 received in

25   evidence.)

MDL        RPR        CRR        CSR        OCR

Baker - direct - Fels                    1765

1   Q    What are we looking at here in Government Exhibit 200-9?

2   A    That is a bail with the black outer shell cut and pulled

3   down revealing plastic wrapped over.

4   Q    And Government Exhibit 200-10?

5   A    Again, with the black outer shell removed, some of the

6   plastic where it's wrapped less, you can see different bricks

7   or kilos within that.

8   Q    Could you just circle one of those bricks just by

9   touching your finger on the --

10          Thank you.  There appear to be some sort of red

11  marking.  Can you make that out?

12  A    I see the letters XTP.

13  Q    Is that TP?

14  A    Yes.

15  Q    And then next to that, right here, what we are looking

16  at, what I just circled?

17  A    Yeah, I'm not positive, but it looks to be TRA.

18  Q    Thank you.

19          What did you wind up doing with the crew of the Lina

20  Maria?

21  A    On September 17, 2004, at approximately 2:00 p.m. the

22  decision was made to transfer the 10 crew members that were

23  detained over to the USS Curts.

24  Q    And you said which date was that?

25  A    2017, I'm sorry.

MDL      RPR      CRR      CSR      OCR

Baker - direct - Fels                           1766

1  Q     You said the 17th; is that correct?

2  A     Sorry.  It was September 17, 2004.

3  Q     Correct.  The next day after that, the 18th, what did you

4  do with the bails of cocaine on board the Lina Maria?

5  A     On the 18th, myself and Officer Winters conducted a count

6  of the bails that were on board Lina Maria.

7  Q     And how many bails were there in total?

8  A     We had a total count on board the fishing vessel Lina

9  Maria of 599, plus the one that had been sent back over to the

10 USS Curts, for a total of 600 bails.

11 Q     And now, moving -- directing your attention to the next

12 day, September 19th of 2004, what did you do with the bails on

13 board Lina Maria?

14 A     The 599 bails that were aboard the Lina Maria were

15 transferred over to the USS Curts.

16            MR. FELS:  And moving to introduce Government

17 Exhibit 200-8.

18            THE COURT:  Received.

19            (Government's Exhibit 200-8 received in evidence.)

20 Q     Does this fairly and accurately depict what was going on

21 on September 19th of 2004?

22 A     Yes.

23 Q     What DOES Government Exhibit 200-8 depicting?

24 A     Based off the sheer number of the bails, we formed a

25 chain line utilizing navy personnel as well with the various

MDL      RPR      CRR      CSR      OCR

Baker - direct - Fels                        1767

1   Coast Guard members spread out to maintain custody or control

2   over the product and passed it from the small boat to a secure

3   facility on the USS Curts.

4   Q    From the time that cocaine, the bails of cocaine were

5   first discovered on September 16th until the time that you

6   moved it on to the Curts, was there some sort of a guard

7   present the whole time?

8   A    Yes.  We always maintained a U.S. Coast Guard member

9   guarding the contraband.

10  Q    So what did you wind up doing with the crew members and

11  the bails?

12  A    On September 20th, we met with the Coast Guard Cutter

13  Jarvis and transferred custody of the 10 crew members and the

14  fishing vessel Lina Maria, as well as one bail of cocaine.

15  Q    And do you know where that one bail of cocaine ultimately

16  went to, which agency?

17  A    Ultimately it went to the DEA.

18  Q    And what about the other 599?

19  A    Again, later once the USS Curts --

20            MR. BALAREZO:  Objection.

21            THE COURT:  Better foundation.

22  Q    Sir, do you know what happened with the other 599

23  kilograms -- sorry, 599 bails that were on board the Curts

24  that you moved from the Lina Maria?

25            THE COURT:  The question is just do you know, yes or

Baker - direct - Fels                    1768

1     no.

2               THE WITNESS:  Yes.

3               THE COURT:  How do you know?

4               THE WITNESS:  I saw another DD-1149 form

5     transferring the remaining 599 bails over to the DEA.

6               MR. BALAREZO:  Objection.

7               THE COURT:  Sustained.

8               MR. BALAREZO:  Move to strike.

9               THE COURT:  Stricken.  The jury will disregard the

10    last answer.

11    BY MR. FELS:

12    Q    Sir, let me ask another question, for the transfer of any

13    of the bails from the Curts, was there another count done --

14    A    Yes.

15    Q    Of the bails?

16         And did the counts on board the Curts match the

17    count that you had done with the Lina Maria?

18    A    Yes.

19    Q    How many bails were there?

20    A    In total, 600.

21    Q    Okay.  So one you said was handed over to a Coast Guard

22    to go to the DEA?

23    A    Correct.

24    Q    Do you know what is the standard practice of what happens

25    with the other 599?

MDL       RPR       CRR       CSR       OCR

Baker - cross - Balarezo                    1769

1    MR. BALAREZO:  Objection.

2    THE COURT:  Overruled.

3  Q    What is the standard practice, sir?

4  A    The standard practice is after submitting one bail for a

5  sample the remaining bails will stay on board the U.S. vessel

6  until it returns to an American port, typically being Florida

7  or San Diego.

8  Q    And when the boat comes into port, what happens to the

9  boat?

10   MR. BALAREZO:  Objection.  Are we talking about this

11 particular boat?

12   THE COURT:  He is talking about the standard

13 procedure.

14 Q    Just the standard procedure.

15 A    Standard procedure is to turn it over to the DEA.

16 Q    And --

17   MR. FELS:  One second, Your Honor.

18   (Pause.)

19   MR. FELS:  I have no further questions, Your Honor.

20   THE COURT:  Any cross?

21 CROSS-EXAMINATION

22 BY MR. BALAREZO:

23 Q    Good morning, sir, or good afternoon.

24 A    Good afternoon.

25 Q    Just a quick question to start.  You were asked some

1   questions on direct about the Cambodian registered name of the

2   ship.

3   A    Yes.

4   Q    You were also asked some questions about the nationality

5   of the crew.

6   A    Yes.

7   Q    Is there any requirement that the crew be from the same

8   country of registration of the boat?

9   A    No.

10  Q    Now, how long were you in the Coast Guard at the time of

11  the seizure?

12  A    Approximately five years.

13  Q    And at that time you had, you had received a lot of

14  training in how to conduct these stops, these seizures, that

15  kind of thing; right?

16  A    Yes.

17  Q    This was not the first one you had done; right?

18  A    Yes.

19  Q    About how many more had you done before this one?

20  A    I couldn't tell you an exact number or even estimate.  I

21  would say at least 20 or more.

22  Q    So at least 20 and you have boarded many boats also;

23  correct?

24  A    Correct.

25  Q    In the Coast Guard, I've noticed a lot of reports that

Baker - cross - Balarezo                1771

1   whenever there are any boardings or seizures these are very

2   highly-documented events; is that right?

3   A    Yes.

4   Q    I think, in fact, the case package -- strike that.

5            What is a case package?

6   A    A case package is our investigation as far as to document

7   with photographs, video, and reports what we found, and

8   essentially documenting the fact of the case.

9   Q    Right, so the point of the case package is to detail

10  everything that happened during the stop, the boarding, the

11  seizure, arrest or detention; correct?

12  A    Yes.

13  Q    Okay.  And it contains also information about the boat

14  that was stopped?

15  A    Yes.

16  Q    It contains detailed statements of Coast Guard members

17  who boarded the boat or had anything to do with the stop; is

18  that right?

19  A    Typically, yes.

20  Q    And also I think you mentioned that there's a lot of

21  video like the ones we are seeing here.  That's not all the

22  video that you took; right?

23  A    No.

24  Q    And you also take a lot of pictures?

25  A    Yes.

Baker - cross - Balarezo                    1772

1   Q    In fact, I think you even take pictures of the clothing

2   that the crew members had on?

3   A    Yes.

4   Q    So you document their sandals, their underwear, their

5   T-shirts, all of that stuff?

6   A    I don't recall on this particular case, but typically we

7   try to photograph as much as we possibly can.

8   Q    All right.  Now, this particular seizure took place off

9   the coast of Ecuador; correct?

10  A    Yes.

11  Q    I think as part of the investigation you indicated that

12  you determined the nationality of the crew; is that right?

13  A    Yes.

14  Q    And in this particular case there was about nine crew

15  members aboard, including the master?

16  A    10 total.

17  Q    Including the master?

18  A    Yes.

19  Q    Who is the master?  Not a name, but what is the master, I

20  should say?

21  A    The captain of the boat.

22  Q    All of these individuals were from Colombia?

23  A    Correct.

24  Q    You also determined who the owner of the boat was; is

25  that right?

Baker - cross - Balarezo                    1773

1   A    I don't recall.  I believe we did, but.

2        MR. BALAREZO:  Could I put up Defense Exhibit 166

3   for the witness only.

4        THE COURT:  Okay.

5   Q    Do you recognize that, sir, just yes or no?

6   A    Yes.

7   Q    Would this document be part of that case package that I

8   was referring to earlier?

9   A    Yes, sir.

10  Q    Does this document refresh your recollection as to

11  whether or not you were able to identify the ownership of the

12  boat?

13  A    Yes.

14  Q    And who was the owner of the boat?

15       MR. BALAREZO:  I can help you with the

16  pronunciation.

17  A    That would be wonderful.

18  Q    Sure.  Willinthon Estupinan Portocarreno, does that sound

19  about; right?

20  A    That's probably what I would have said.

21  Q    And what's the nationality of the owner of the boat?

22  A    Colombian.

23  Q    Thank you.

24       Now, to your knowledge, and since this whole

25  boarding was documented very highly, there were no Mexicans on

Baker - cross - Balarezo                    1774

1   board, were there?

2   A     No.

3   Q     They weren't hiding in that little hiding area with the

4   drugs or anything of that nature?

5   A     No.

6   Q     Okay.  Now, there was one picture that was shown, and if

7   I could -- this is Government Exhibit 200-9 which is in

8   evidence.  Do you see that?

9   A     Yes, sir.

10  Q     When you initially saw the bails of cocaine, they were

11  wrapped in that black kind of black wrapping; is that right?

12  A     Correct.

13  Q     And this one has been unwrapped at least with one layer

14  and then there's other plastic wrapping?

15  A     Yes.

16  Q     Is that fair to say there are many different layers of

17  wrapping of the cocaine?

18  A     Several, yes.

19  Q     The contraband?

20  A     Yes.

21  Q     It's not in evidence.

22        Now, you calculated that each of these bails weighed

23  about 51.2 pounds; is that right?

24  A     Correct.

25  Q     So it's 600 bails, the total weight, approximately, would

Baker - cross - Balarezo                    1775

1    be 30,720 pounds?

2    A    You got it.

3    Q    So, as far as the actual contraband inside of it, it's

4    not that same weight because there is weight with the

5    wrapping, that kind of thing?

6    A    Our weights are just approximate because being underway

7    and the seas, it's an estimation.

8    Q    Fair enough.  Fair enough.

9            Now, when these black bails were opened, you

10   indicated that -- this is Government Exhibit 200-10.  Can you

11   see that?  I'm trying to focus.

12           I'm not as good as Mr. Purpura at these things.

13           Can you make out the writing?  I think you said it

14   said XTRA?

15   A    I believe.  I see the letters XTR and what appears to be

16   an A.

17   Q    Now, this is not the first time that you had seen any

18   kind of marking of that type on contraband that you have

19   seized from other ships; is that right?

20   A    I have seen a variety of marks, yes.

21   Q    With this particular seizure, XTRA was the only marking

22   that was seen?

23   A    We did not unwrap all the bails, so I cannot speak to

24   what all the markings were.

25   Q    And with respect to what the Government has called the

Baker - cross - Balarezo                    1776

1   standard procedure, you haven't seen any reports once all the

2   standard procedures were followed as to whether or not there

3   were any other markings?

4   A    As far as follow-up information that we received back,

5   no, we don't typically get that.

6   Q    Just to make sure, to your recollection, did you see any

7   markings that would indicate the word Reina, R-E-I-N-A?

8   A    Not that I recall.

9   Q    The word sapphire?

10  A    Again, not that I recall.

11  Q    The word safiro, S-A-F-I-R-O?

12  A    Not that I recall.

13  Q    The word condor?

14  A    Still no.

15  Q    The word alacarn, A-L-A-C-A-R-N?

16  A    No.

17  Q    Or the image of a scorpion?

18  A    Not that I recall.

19  Q    Or Pac-Man?  Like gobble, gobble.

20  A    No gobble, gobbles.

21  Q    Coca-Cola?

22  A    I don't believe so.

23  Q    The letter R or the letter B?

24  A    Well, there is a letter R in here, but as far as anything

25  other than this one, this is solely what I saw unwrapped.

Baker - cross - Balarezo                    1777

1   Q    So you didn't see anything with the Chapo, El Chapo,

2   Sinaloa, CDS, Cartel Sinaloa, any of that?

3              THE COURT:  Mr. Balarezo, I think this is all he

4   saw.

5              MR. BALAREZO:  And that's all I have.  Thank you,

6   sir.

7              THE COURT:  Any redirect?

8              MR. FELS:  No, Your Honor.

9              THE COURT:  You may step down.  Thank you.

10             THE WITNESS:  Thank you, Your Honor.

11             THE COURT:  The Government's next witness.

12             MS. LISKAMM:  The Government calls Michael Gris.

13             THE COURTROOM DEPUTY:  Please raise your right hand.

14             (Witness sworn.)

15             THE COURTROOM DEPUTY:  Please state and spell your

16   name for the record.

17             THE WITNESS:  Michael Charles Gris.  Michael,

18   M-I-C-H-A-E-L.  C-H-A-R-L-E-S, G-R-I-S.

19             THE COURTROOM DEPUTY:  Thank you.  You may be

20   seated.

21             THE WITNESS:  Thank you.

22             THE COURT:  You may inquire.

23   MICHAEL CHARLES GRIS,

24        called by the Government, having been duly

25        sworn, was examined and testified as follows:

MDL      RPR      CRR      CSR      OCR

Gris - direct - Liskamm                          1778

1    DIRECT EXAMINATION

2    BY MS. LISKAMM:

3    Q     Good afternoon.

4    A     Good afternoon.

5    Q     Where do you work?

6    A     Currently stationed at Coast Guard Sector Buffalo, New

7    York.

8    Q     And how long have you been with the U.S. Coast Guard?

9    A     A little over 16 years.

10   Q     What rank do you currently hold?

11   A     Lieutenant Commander.

12   Q     What type of responsibilities do you have as a Lieutenant

13   Commander?

14   A     In my current assignment, I'm the Chief of the

15   Enforcement Division For Sector Buffalo, so we oversee the law

16   enforcement activity of the U.S. Coast Guard on Lake Erie and

17   Lake Ontario.

18   Q     And what type of training have you received with the

19   Coast Guard?

20   A     I'm a 2002 graduate of the U.S. Coast Guard Academy.  I'm

21   also a graduate of the U.S. Coast Guard Boarding Officer

22   Course.

23   Q     What types of things did you learn at the Boarding

24   Officer Course?

25   A     The Boarding Officer Course covers all of the statutory

Gris - direct - Liskamm                    1779

1  law enforcement admissions of the United States Coast Guard,

2  so that can range from recreational boating safety to criminal

3  law enforcement as well.

4  Q    Was there anything specific to narcotics that you learned

5  in the Boarding Officer Course?

6  A    Yes.  We learned to identify narcotics and we're also

7  trained on smuggling tactics for the illegal transport of

8  narcotics.

9              (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MDL      RPR      CRR      CSR      OCR

Gris - direct - Liskamm                    1780

1  BY MS. LISKAMM:

2  Q    Can you take the ladies and gentlemen of the jury briefly

3  through your career at the Coast Guard.

4  A    So I graduated from the academy in 2002 and I was

5  stationed aboard the Coast Guard Cutter Dallas Clayton in

6  South Carolina for two years, as a gunnery officer and chief

7  law enforcement officer of the ship.  I then transferred to

8  San Diego, California, and was the officer in charge of the

9  law enforcement DEA attachment for three years there, doing

10 narcotics work with the U.S. Coast Guard and Navy.  After that

11 assignment I was the commanding officer of the Southeast

12 Regional Law Enforcement Training Center in Charleston, South

13 Carolina.  I did that for three years.  Following that, I was

14 the Executive Officer of the Antiterrorism Boat Unit of the .

15 USS Galveston in Galveston, Texas.  I went to Saudi Arabia for

16 a year as a security advisor.  I did that for a year.  Upon

17 returning from Saudi Arabia was assigned in the United States

18 Marine Corps as a student, as a marine corps staff in

19 Quantico, Virginia.  After completing my time at this command

20 I was assigned to the domestic nuclear detection office in

21 Washington D.C.  I did that liaison assignment for two years

22 and I have been in Buffalo for two years.

23 Q    During your time in the coast guard units have you seized

24 drugs?

25 A    Seven times.

MDL      RPR      CRR      CSR      OCR

Gris - direct - Liskamm                    1781

1  Q    I'm going as to direct your attention to September  23,

2  2004, were you working at the coast guard at that time?

3  A    Yes, ma'am.

4  Q    What was your rank?

5  A    Lieutenant junior grade.

6  Q    Where were you working?

7  A    I was deployed aboard the USS Crommelin.

8  Q    Spell that?

9  A    Testing my memory, C R O M M E L I N.

10        MS. LISKAMM:  Counsel, same situation, no objection?

11        MR. BALAREZO:  No.

12        MS. LISKAMM:  At this time, the government would

13  move Exhibit 201-15 into evidence.

14        THE COURT:  Received.

15  Q    Lieutenant Commander, is it the U.S. S Crommelin that you

16  were aboard that day?

17  A    Yes, it is.

18  Q    What type of a vessel is that?

19  A    It's a U.S. Navy war ship, specifically, is a frigate.

20  Q    Approximately how big?

21  A    There's a little bit of a difference between the bow --

22  the length overall -- and the water line.  But 440 to 445 feet

23  approximately.

24  Q    You said that you were patrolling in the Eastern Pacific

25  on that date?

Gris - direct - Liskamm                    1782

1   A    Yes, ma'am.

2         MS. LISKAMM:  Your Honor, I will put up what's

3   already moved into evidence as Government's Exhibit 504.

4         THE COURT:  All right.

5   Q    Lieutenant Commander, do you recognize this?

6   A    This is a map of North and South America and Central

7   America, yes, ma'am.

8   Q    Does that contain the eastern pacific in it as well?

9   A    Portions of it, yes.

10  Q    Can you circle on your screen in front of you the area

11  that you were patrolling on your vessel is that day?

12  A    So, generally speaking, it would be around that area.

13  Q    What was the assigned task of the U.S. S Crommelin on

14  that date?

15  A    The Crommelin was assigned to conduct a routine counter

16  narcotics patrol in that area.

17  Q    What were your duties?

18  A    My duties as part of that law enforcement detachment were

19  to assist with the conduct of all maritime law enforcement

20  operations and provide security for the boarding team, if we

21  were to be embarked on a vessel.

22  Q    And how many individuals were on that board team that

23  day?

24  A    Eight.

25  Q    So tell the ladies and gentlemen of the jury what

Gris - direct - Liskamm                    1783

1    happened on September 23, 2004.

2    A    So, the Crommelin is on routine patrol in the Eastern

3    Pacific and we detected another vessel, fishing vessel San

4    Jose.  The vessel was moving northbound.  It was nighttime.

5    They were not employing any navigational lights which is not

6    customary for vessels operating at nighttime.  Also did not

7    appear to be working actively any fishing equipment at the

8    time.

9    Q    Upon seeing the lack of the navigational lights and

10   fishing on vessel, what did you do?

11   A    We conducted a boarding of the vessel that night.

12   Q    How did you do that?

13   A    By making an approach with the small boat from the

14   Crommelin and embarking the vessel on its starboard quarter,

15   the back right side of the vessel.

16   Q    Upon boarding the vessel, what did you do?

17   A    So, we immediately conducted a safety sweep of the vessel

18   to make sure that the vessel was safe to be on.  There was no

19   active flooding or fire or anything going on like that, any

20   unsafe conditions.  I proceeded up to the front of the boat

21   where the boat was being driven from the pilot house and we

22   detained the person who was on helm there and I took over

23   steering the ship and controlling the helm and throttle.

24   Q    Approximately how big was this boat that you boarded?

25   A    It was approximately 65 feet in length.

Gris - direct - Liskamm                    1784

1    Q    Once you took control of the boat what happened next?

2    A    So, at that time, we would begin a search of the vessel

3    to see if there was any indicators of potential smuggling

4    activity.

5    Q    Let's go back a second.  When you first encountered this

6    boat did you determine what flag the boat was flying?

7    A    It was Belizean.

8    Q    Did you obtain any approvals to board this vessel before

9    you boarded?

10   A    The eleventh coast guard district granted the

11   authorization, yes, ma'am.

12   Q    How did they do that?

13   A    They informed us by voice over the radio.

14   Q    Are you aware of whether the United States has any

15   bilateral agreements with the country of Belize?

16   A    We do we have bilateral cooperation, a mutual enforcement

17   agreement.

18   Q    What led to your boarding the vessel?

19   A    I can only assume.  I was not part of that conversation.

20   It was through a bilateral agreement or through an ad hoc

21   state to state discussion.

22   Q    Let's go back to when you are on vessel.  As you went

23   through the vessel what did you observe when you boarded the

24   boat?

25   A    So upon doing the search of the vessel what our practice

Gris - direct - Liskamm                    1785

1   would be was to look around for indicators that might denote

2   potential hidden compartments.  We do this by looking for

3   things that seem to be out of place and we also conduct

4   measurements of the vessel.  So we literally take a tape

5   measure and run from the front of the boat to the back of the

6   both externally and we make similar measurements internally

7   and we do the quick math to see if those measurements don't

8   add up, if there's any space that we can't account for

9   visually.  We then would look to those spaces to see if there

10  was anything potentially secreted inside those.

11  Q    What was the result of those measurements on the vessel

12  that day?

13  A    There was a large amount of area that was unaccounted for

14  that you could not see or access by walking around the boat.

15          MS. LISKAMM:  Your Honor, at this time I would seek

16  to move Government's Exhibit 201-14 into evidence.

17          THE COURT:  Received.

18          (So marked.)

19  Q    Lieutenant Commander, do you recognize  this?

20  A    Yes, I do.

21  Q    What do you recognize this to be?

22  A    This is a depiction of the layout of the San Jose.

23  Q    And can you tell us where you found the unaccounted for

24  space on the San Jose fishing vessel?

25  A    So, if you can see the front, the front of the boat,

Gris - direct - Liskamm                    1786

1    that's the bow.  The area indicated number one and number two

2    are access areas to the hidden compartment that was on board

3    the vessel.

4    Q    Can you circle the area that you are referring to.

5         What type of space was one and two?

6    A    So these are areas that the crew would be -- it's their

7    berthing compartments or sleeping areas, the crew cabin areas.

8    Q    What did you notice in those berthing areas?

9    A    So they had in the berthing areas -- they had bunk beds.

10   The team had also discovered in the flooring beneath the bunks

11   that there were tiles in the deck and several of the tiles

12   appeared to either be new or they didn't match the surrounding

13   tiles and it was fairly obvious based upon the configuration

14   of those tiles that they were not there as part of the

15   original construction.

16   Q    After locating those tiles what did you do?

17   A    So we removed those tiles and found beneath that very

18   fresh concrete.  It was to the fully cured concrete and so at

19   that time we asked permission from the eleventh coast guard

20   district to conduct a search beneath the concrete.

21   Q    Were you granted approval?

22   A    We were.

23   Q    What did you do?

24   A    So, at that time in the motor berthing area which is

25   number one, that is where I circled first, I took a hammer and

Gris - direct - Liskamm                    1787

1    I smashed through the top portion of the concrete that was

2    there and it was maybe an inch and a half thick or so that was

3    partially cured and beneath that I found wet concrete.

4    Q    And upon finding the wet concrete what did you do?

5    A    So I cleared the wet concrete away and there was a rubber

6    gasket and metal plate which I immediately removed as well and

7    then looked down into that space to see that there was a

8    hidden compartment.

9    Q    What did you see there?

10   A    There were stacked rectangular packages within that

11   space.

12   Q    Were you able to determine how big that space was?

13   A    Not immediately.  We had to remove several of the

14   packages because it was full up from the bottom all the way to

15   the top.  So the top of the ceiling of that space is basically

16   the floor that we were standing on.  It was full.  We had to

17   pull out a bunch of the those packages in order to be able to

18   get in and look around and see how big the whole situation

19   was.

20   Q    What were you able to determine?

21   A    Well, it was full and that the space actually ran -- if I

22   can draw on this diagram.  Again, the space was sort of a

23   U-shaped and it ran both sides of the vessel and then across

24   the vessel as well.

25   Q    Inside of the hidden compartment you said that you found

MDL      RPR      CRR      CSR      OCR

Gris - direct - Liskamm                    1788

1    some black-shaped objects or square-shaped objects?

2    A    Rectangular-shaped objects, yes, ma'am.

3    Q    What did you do with those?

4    A    So we moved those and then we were able to get down

5    further in the space and see the entirety of that space.

6    Q    While you were conducting the search of this space did

7    anyone on the boarding team take any videos?

8    A    Yes, video was taken.

9    Q    Showing you --

10         MS. LISKAMM: I believe there's no objection, your

11   Honor.  I ask to move into evidence Government's Exhibit

12   201-11.

13         THE COURT:  Received.

14         (So marked.)

15   Q    Lieutenant Commander, do you recognize this?

16   A    Yes, I do.

17   Q    What do you recognize this to be?

18   A    This is a CD that has video on it that I reviewed.

19   Q    How do you know that?

20   A    Those are my initials that and the date that I initialed

21   it.

22         MS. LISKAMM:  Your Honor, if we can play a brief

23   clip and dim the lights.

24         THE COURT:   Okay.

25         MS. LISKAMM:  This is the first fifteen of the

Gris - direct - Liskamm                    1789

1    video.

2    A    Would you like me to narrate as it goes?

3    Q    That would be great.

4         (Tape plays.

5    A    So, we're looking down obviously.  Those are boots and

6    the black trousers there.  This is our boarding time.  This is

7    on board the San Jose.  You can see some of the tile.  And

8    we're working in the berthing compartments that I was

9    mentioning before.  That's one of the access plates right

10   there.  You can see those bumper rails, the bunk material was

11   removed.  Right there you can see those black rectangular

12   bales that are sewn up with that cord.  That's what we expect

13   to be contraband in that hidden compartment.

14        (Tape plays.)

15   A    So this is a view from one side and this is a similar

16   view from the other side of the vessel.  So there was two

17   access points of the hidden compartment.  Again you can see

18   that the rectangular package is there, what we suspected to be

19   contraband as well.  And there's some of that concrete that we

20   cleared away and those are a couple of those bales that are up

21   on the deck on the floor of the vessel.

22   Q    Thank you.

23        Now you mentioned several times the world bale, what

24   is bale?

25   A    It's a package.  It's typically rectangular in shape.

MDL      RPR      CRR      CSR      OCR

Gris - direct - Liskamm                    1790

1  But it's a package that is in my experience has often been

2  used to transport narcotics.

3  Q    Did you encounter any other individuals other than the

4  master on the boat?

5  A    Yes, in total there were eight people on the vessel.

6  Q    What nationality were they?

7  A    They were Colombian.

8  Q    What, if anything else, did you recover on the vessel?

9  A    We also recovered a loaded .38 caliber revolver in the

10 master's area.

11 Q    Did you observe any other members of the boarding team

12 conduct any testing on the black bales that were recovered on

13 the boat?

14 A    Yes.  The bales were opened and we did conduct a field

15 narcotics test on substances that we found inside those bales.

16 Q    Did you view that testing that was done?

17 A    Yes.

18 Q    What were the results of those tests?

19 A    They were positive for cocaine.

20 Q    Now, you said that there were bales discovered in the

21 hidden compartment on the boat. Do you know approximately how

22 many bales were recovered?

23 A    525.

24 Q    And were you able to determine how much suspected cocaine

25 was in each one of the bales?

Gris - direct - Liskamm                    1791

1   A    We didn't open each one of the bales.  We opened ten

2   bales that we chose at random as representative samples.

3   Inside each of these, once we cleared away all of the

4   packaging material, we found 120 one-kilogram packages.

5           MS. LISKAMM:  Your Honor, at this time I would seek

6   to move into evidence Government's Exhibits 201-3, 201-4,

7   201-6, 201-9 and 201-10.

8           THE COURT:  Received.

9           (So marked.)

10  Q    Turning to Exhibit 201-4:  Lieutenant Commander what are

11  we looking at here?

12  A    It is an image of the access point into the hidden

13  compartment on board of the San Jose.

14  Q    That was found in one of the berthing areas?

15  A    That's correct.  You can also see the black external

16  packaging material for some of the bales that are below in

17  that space.

18  Q    Can you circle what you are referring to.  Okay.  And

19  turning to Exhibit 201-6, what are you looking at here?

20  A    So, this is a closer angle view looking down into the

21  hidden compartment and again the same rectangular packages,

22  the bales of the cocaine.

23  Q    Is this what the hidden compartment looked like when you

24  first cracked into it?

25  A    It was more full than that.  We had to remove some of the

Gris - direct - Liskamm                    1792

1    bales in order to get down in there.  We took some pictures,

2    intermediate to removing all of them to give a sense of what

3    was in there and how big the space actually was.

4    Q    Looking at Government's Exhibit 201-9.  What are we

5    looking at here?

6    A    Can you rotate that 90 degrees?  There you go.  That will

7    give a better depiction.  You can see the size of the vessel

8    there.  That's the water in the background and all these black

9    rectangular bales are the suspected cocaine that we removed

10   from the hidden compartment on the San Jose.

11   Q    I see on here what looks like strings on each one of the

12   bales.  What are those?

13   A    You can see they go along the edge here.  This is the

14   cordage that is used to basically sew up the external material

15   that comprises the bale there.  It's also part of the way that

16   you transport the bales when you are moving them by hand so it

17   provides a handle.

18   Q    And looking hat Government's Exhibit 201-10, what are we

19   looking at here?

20   A    So, again, this is on the San Jose.  These are bales of

21   the suspected cocaine stacked up on the deck there.

22   Q    Lastly looking hat Government's Exhibit 201-3, do you

23   recognize that?

24   A    I do.

25   Q    What are we looking at?

Gris - direct - Liskamm                      1793

1   A    So this is the inside view of a bale.  It's been opened

2   so that you can see the individual one-kilogram packages of

3   the cocaine inside.

4   Q    Is this what you were referring to when you were

5   previously discussing what a bale was?

6   A    Yes, ma'am.

7   Q    What is on the wrappings that we're looking at here?

8   A    If you're talking about the package itself, there's

9   rubber, there's plastic material, there's waterproofing

10  material.

11  Q    Specifically on the individual kilos of cocaine, do you

12  see anything right there?

13  A    I do.  It looks like packing tape.

14  Q    Can you tell what letters are on there?

15  A    If I'm reading right it says X T R, X T R A.

16  Q    Lieutenant Commander, after you seized the 525 bales of

17  cocaine from the San Jose, what happened to them next?

18  A    Ultimately the bales were -- all of the contraband was

19  transferred to the DEA.

20         MS. LISKAMM:  I have no further questions, your

21  Honor.

22         THE COURT:  Any cross-examination?

23         MR. BALAREZO:  No, your Honor.

24         THE COURT:  You may step down.  Thank you very much.

25         (Witness excused.)

Schoonover - direct - Liskam                      1794

1              THE COURT:  The government's next witness.

2              MS. LISKAMM:  Your Honor, the government calls Scott

3     Schoonover.

4              THE COURT:  Why doesn't the government see if it can

5     pick up the rate of the entrance a little bit.

6              MS. LISKAMM:  I apologize, your Honor.

7              (Pause.)

8     S C O T T   S C H O O N O V E R,

9         called as a witness, having been duly

10        sworn, was examined and testified as follows:

11             THE CLERK:  State your name and spell it.

12             THE WITNESS:  Scott Schoonover, S C O T T, S C H O O

13    N O V ER.

14             THE COURT:  Please proceed.

15             MS. LISKAMM:  Thank you.

16    DIRECT EXAMINATION

17    BY MS. LISKAMM:

18    Q    Good afternoon.

19    A    Good afternoon.

20    Q    Where do you work?

21    A    I am a special agent with the DEA, Drug Enforcement

22    Administration.

23             THE COURT:  Sir, can I ask you to pull that

24    microphone to you.

25    Q    How long have you been with the DEA?

Schoonover - direct - Liskam                    1795

1   A    I'm in my 21st year.

2   Q    Getting close to retirement?

3   A    21 days from today.

4   Q    What type of training have you received with the DEA?

5   A    I've been to Quantico, Virginia for 17 weeks on basic

6   agent training.  I did advance agent training after that.

7   I've also had specialty schools in marijuana eradication and

8   money laundering.

9   Q    What group are you assigned to at the DEA?

10  A    I'm currently with it's called the Panama Express Strike

11  Force and it's based in Tampa, Florida.

12  Q    What are your responsibilities with the Panama Express

13  Strike Force?

14  A    Our main objective, our main duty, is to maritime

15  international drug trafficking.

16  Q    What specifically do you do with the strike force?

17  A    Of course I'm an agent, so I work cases.  One of my

18  collateral duties is I'm the drug evidence custodian for the

19  office and for the strike force.

20  Q    What is a drug evidence custodian?

21  A    We handle the drugs.  We do logistics on planning where

22  the drugs go, to getting back do the office, we process them

23  according to DEA policy and we also put them into evidence.

24  Q    And is one of those responsibilities also to take the

25  drugs to the lab?

Schoonover - direct - Liskam                    1796

1   A    Yes.

2   Q    And for testing?

3   A    For testing, yes.

4   Q    As the drug evidence custodian, are you familiar with how

5   drugs seized at sea make their way to a DEA lab?

6   A    Yes, I do.

7   Q    Can you walk the ladies and gentlemen of the jury through

8   how that happens?

9   A    When the drugs are seized by a coast guard or Navy

10  vessel, we plan and go through the logistics of bringing that

11  ship into a port, whether that port is in California or Boston

12  or New York or somewhere in Florida and then we logistically

13  send agents to pick it up.  We load it into whatever we have

14  to load it in and we take it to the lab, process it per DEA

15  regulations and then submit it into the lab for them to

16  process.

17  Q    As part of this process, are you familiar with the term

18  called a representative sample?

19  A    I am, yes.

20  Q    What is that?

21  A    A representative sample is a piece of the bulk.  So when

22  a boat comes in or a ship comes in with prisoners a

23  representative sample follows those prisoners along with the

24  nondrug evidence or the evidence that was found on the vessel,

25  plus a representative sample or ten to 20 kilograms of

MDL        RPR        CRR        CSR        OCR

Schoonover - direct - Liskam                    1797

1   suspected drug, whatever it is, comes with them and it follows

2   us, follows them to the -- to our office and we process that

3   as a piece of evidence.

4   Q    You mentioned bulk.  What is bulk drugs?

5   A    The bulk is whatever is taken.  So it could be -- it

6   could be one kilo that I have had or it could be thousands of

7   the kilos, whatever is taken.

8   Q    Okay.  So it is the remainder of the drugs?

9   A    Yes.

10  Q    For each representative sample and bulk that are seized

11  is a DEA 7 generated?

12  A    Yes, it is.

13  Q    What is a DEA 7?

14  A    A DEA 7 is our form of paperwork where it basically says

15  where it came from, from the case it is associated with and

16  with that seven and piece of evidence it's given -- every

17  piece of evidence is given a distinct different lab number

18  that follows it in the lab.

19  Q    Okay.  Is it fair to say that a DEA 7 is the DEA's

20  version of a property receipt?

21  A    Yes.  That is part of it, yes.

22  Q    Prior to working for the DEA, where did you work?

23  A    For almost ten years I was a trooper in South Carolina.

24  I was a Highway Patrolman in South Carolina.

25  Q    What type of cases did you work?

Schoonover - direct - Liskam                    1798

1    A    Traffic, basic traffic cases to begin with and then I was

2    given a promotion or given another job on interdiction on the

3    interstates and trained depots and stuff like that, called the

4    Aggressive Criminal Enforcement team.  There was only fifteen

5    of us in the state.

6    Q    I am going to take you through four separate seizures.

7              MS. LISKAMM: I believe there's no objection to the

8    introduction of the exhibits as well, your Honor.

9              MR. BALAREZO:  Can I talk with Ms. Liskamm?

10             THE COURT:  Sure.

11             (Pause.)

12             MR. BALAREZO:  Thank you, your Honor.

13             THE COURT:  Okay.

14             MS. LISKAMM:  There's no objection.  May I approach

15   the witness with a number of pieces of paper?

16             THE COURT:  Fine.

17             MS. LISKAMM:  Thank you, your Honor.

18   Q    Agent Schoonover, I'm going to give you a second to look

19   through what I just handed you.  Do you recognize those

20   documents?

21   A    I do, yes.

22   Q    And are those the DEA 7s and lab reports for four

23   separate seizures?

24   A    Yes, they are.

25   Q    As well as photographs from the lab?

MDL      RPR      CRR      CSR      OCR

Schoonover - direct - Liskam                    1799

1    A    Yes.

2    Q    Okay.  So let's start with the first seizure there that

3    should be labeled Lina Maria.  Looking at Government's Exhibit

4    200-18 -- you should have it in front of you.

5    A    Yes.

6         MS. LISKAMM:  Your Honor, I'll move this all into

7    evidence at the end.

8         THE COURT:  That's fine.

9    Q    Agent Schoonover, what are we looking at here?

10   A    This is a DEA 7 representing Exhibit 3 from the fishing

11   vessel Lina Maria.

12   Q    What date does it say the seizure occurred on?

13   A    It says it occurred on 9-16, September 16, 2004.

14   Q    Are we looking at the DEA 7 for the representative sample

15   or the bulk?

16   A    This would be the bulk.

17        (Continued on next page.)

18

19

20

21

22

23

24

25

Schoonover - direct - Liskamm                1800

1   BY MS. LISKAMM:   (Continuing.)

2   Q    And how much cocaine was -- first of all, what substance

3   was on the Lina Maria?

4   A    Cocaine.

5   Q    And how much cocaine was seized in the bulk?

6   A    13,633 gross kilograms.

7   Q    What is a gross kilogram?

8   A    The gross kilogram would be the packaging -- it's the

9   drug and the packaging around the drug and around the drug.

10  So, when we process it, we try to take most of the packaging

11  off of it that we can without actually going into the --

12  whatever drug it is at this point, in this case cocaine.  So

13  we try to take most of the packaging out but we just can't

14  take all of it out.  We submit it and then the lab will take

15  out that drug and put the packaging aside.

16  Q    Okay.  Is the drug ever weighed without packaging?

17  A    We do not do that.

18  Q    Does the lab do that?

19  A    The lab does that.  The agents do not.

20  Q    And what is that weight called?

21  A    That would be the net.  The net would be the drugs

22  itself, no packaging at all.

23  Q    What was the net weight for the bulk cocaine seized from

24  the Lina Maria?

25  A    The net total weight would be -- I'm sorry, for Exhibit 3

Schoonover - direct - Liskamm                1801

1  would be 11,962 net kilograms.

2  Q    Okay.  All right.  Let's move on to Government Exhibit

3  200-19.  Is this the other DEA-7 for the Lina Maria?

4  A    Yes, it is.

5  Q    And is this for the representative sample?

6  A    Yes, it is.

7  Q    Okay.  And how much gross and net weight cocaine were

8  seized from the Lina Maria?

9  A    It was 20 bricks that weighed 53.5 pounds, but when you

10  convert that to kilograms it would be 24.3 gross kilograms.

11  Q    Okay.  And what would the net weight be?

12  A    The net weight, 19.93 kilograms net weight.

13  Q    Okay.  So Agent Schoonover how are you at math?

14  A    These aren't that bad, I think I could do it.

15  Q    How much total net weight of cocaine was seized from the

16  Lina Maria?

17  A    Can I write it somewhere to make sure?

18  Q    You can write on the screen?

19  A    Just with my finger?

20  Q    Yup.

21  A    So 11,962 plus 19.93.

22        MR. BALAREZO:  Your Honor, we can give him a

23  calculator.

24        THE COURT:  There may be a faster way, but at this

25  point there probably is not.

MDL      RPR      CRR      CSR      OCR

Schoonover - direct - Liskamm                    1802

1    A    I have to put my decimal point and move it over, too, so

2    it would be 11 -- and that's not the right number.  It's

3    989.93.

4              MR. BALAREZO:  Your Honor, we'll just stipulate --

5              THE COURT:  If you have a number, you can stipulate

6    to it.  What's the number?

7    A    It should be 11,981.93 net kilograms.

8    Q    Okay.  We got it.

9    A    I can do it in my head better.

10   Q    And then just very briefly looking at the photographs

11   that were taken at the lab for the Lina Maria --

12   A    Yes.

13   Q    -- you have this in front of you.  What are we looking at

14   here?

15   A    That picture is Exhibit 1 which would be the

16   representative sample that was taken.

17   Q    Okay.  And looking at Government Exhibit 200-13?

18   A    That would be the boxes.  In those boxes would be the

19   bulk, Exhibit 3, from the Lina Maria.

20   Q    And so in each one of these cardboard boxes there are

21   these black bales of cocaine inside?

22   A    Yes.  There should be 799 boxes.

23   Q    And looking at Government Exhibit 200-14, what are we

24   looking at here?

25   A    That would be Exhibit 3 which would be part of the bulk

Schoonover - direct - Liskamm                    1803

1    from the Lina Maria.

2    Q    Okay.  Let's go on to the next seizure.  Do you have the

3    San Jose folder in front of you?

4    A    I do.

5    Q    Let's start with 201-12.  Is this the DEA-7 for the

6    representative sample?

7    A    It is.

8    Q    And what substance was seized from the San Jose?

9    A    Cocaine.

10   Q    And how much net kilos was seized in the representative

11   sample?

12   A    Net kilos was 20.05 net kilograms.

13   Q    Okay.  And in Government Exhibit 201-13, is this the

14   DEA-7 from the bulk cocaine that was seized on the San Jose?

15   A    It is.

16   Q    And how much net cocaine was seized?

17   A    10,460 net kilograms.

18   Q    Okay.  So in total?

19   A    This would be easy.  It is 10,480.05 kilograms.

20   Q    All right.  We got it.  Let's look at the photos that

21   were taken at the lab.  What are we looking at here?

22   A    Exhibit 2 which is two sealed boxes on the bottom and

23   that would be the representative sample for the San Jose.

24   Q    Okay.  Looking at -- we have some cardboard boxes here

25   and we saw some in the previous pictures.  Does each box

Schoonover - direct - Liskamm                    1804

1   contain one bale or are there more than one bale in each box?

2   A    No, there would just be single kilograms in the box.

3   Q    The amount of boxes and the amount of bales would not

4   necessarily match?

5   A    They probably -- in my experience, they do not match.

6   Q    Okay.  Again these are photos from the San Jose?

7   A    Yes, they are.

8   Q    And what are the red letters that are on the wrappings in

9   these photos?

10  A    The red letters?  Oh, those are packaging that they --

11  that's how it comes.  That's the way we receive it.

12  Q    Do you see the letters X-T-R-A on there?

13  A    Yes, I do.

14  Q    Let's move on to the third seizure the Gatun?

15       MS. LISKAMM:  Your Honor, we are introducing them

16  through Agent Schoonover for judicial economy and I believe

17  there's no objection to linking this up later through another

18  witness.

19       MR. BALAREZO:  That's right.

20       THE COURT:  That is fine.

21  BY MS. LISKAMM:

22  Q    Agent Schoonover, do you have a folder in front of you

23  marked Gatun?

24  A    Yes.

25  Q    Looking at Government Exhibit 203-47 is this the DEA-7

Schoonover - direct - Liskamm                1805

1   for the representative sample?

2   A    It is.

3   Q    Okay.  And how much net cocaine -- excuse me.

4         We also have the DEA-7 for the bulk?

5   A    Yes.

6   Q    In this case were lab reports prepared for the drugs that

7   were seized?

8   A    Yes.

9   Q    Looking at Government Exhibit 203-28, is this the lab

10  report for the representative sample?

11  A    Yes.

12  Q    How much net cocaine was seized in that?

13  A    Net would be 10.02 kilograms.

14  Q    Okay.  And looking at the lab report for the bulk what do

15  we have for the bulk?

16  A    This is the Gatun.

17  Q    Correct?

18  A    Net weight would be 15,147 kilograms.

19  Q    Okay.  Agent Schoonover, did you have any involvement in

20  the transportation of the drugs seized from the Gatun?

21  A    I did, yes.

22  Q    What was your involvement?

23  A    I received the representative sample and I also received

24  the bulk and started the process.

25  Q    Are you aware of where the drugs came to the United

MDL        RPR        CRR        CSR        OCR

Schoonover - direct - Liskamm                    1806

1    States?

2    A    Yes, I am.

3    Q    And where was that?

4    A    The representative sample came into Tampa and then the

5    bulk came into Alameda, Florida which was right outside of San

6    Francisco.

7    Q    California?

8    A    California.

9    Q    How did the drugs get from California to Florida?

10   A    We had to set up a Coast Guard C-130 to transport those

11   drugs from California into the Florida or Miami area Opa-Locka

12   Regional Airport near our lab.

13   Q    Was transporting drugs -- what type of plane?

14   A    A C-130.

15   Q    Was transporting drugs on a Coast Guard C-130 a normal

16   occurrence?

17   A    That is not.  That was -- that was not normal, no.

18   Q    Why was one used in this case?

19   A    We had to safely get the bulk to Tampa or to Miami and

20   over-land transportation would take too long.  It was too

21   cumbersome so we elicited the help from the Coast Guard and

22   they furnished us a C-130 so we could do it all at one time

23   and it only took five or six hours instead of five or six

24   days.

25   Q    Is it fair to say that the cargo plane was used due to

1   the amount of drugs that was seized?

2   A    Yes, the bulk, the bulk.

3   Q    Just moving this along, was the total amount of net

4   cocaine seized in the Gatun seizure 15,157.02 kilograms?

5   A    The net, yes.

6   Q    Okay.  And that seizure occurred on what date?

7   A    It occurred 3/17 of '07.  March 17 of '07.

8   Q    Just showing should what's been marked as 203-22.  Are

9   these the bricks from the Gatun seizure?

10  A    Yes.

11  Q    203-18 is that as well?

12  A    It is.

13  Q    Okay.

14       MS. LISKAMM:  Your Honor, at this time we would like

15  to -- I don't know if this is a good time go into some of the

16  physical evidence that we have here in court.  That may take a

17  while to open up.

18       THE COURT:  We should break for lunch.  Okay.  Don't

19  talk about the case, ladies and gentlemen.  Your lunch is

20  there and waiting for you.  We will come back here at 1:45.

21  See you then.

22       (Jury exits.)

23       THE COURT:  Okay, 1:45.

24       (Luncheon recess.)

25

Schoonover - direct - Liskamm                1808

1        AFTERNOON SESSION

2        (In open court.)

3        (The Hon. Brian M. Cogan, presiding.)

4        (Defendant present.)

5        THE COURT:  Okay, let's have the jury, please.

6        (Jury enters.)

7        THE COURT:  Everyone be seated.  Let's continue.

8   **SCOTT SCHOONOVER**,

9        called as a witness, having been previously duly

10       sworn, was examined and testified as follows:

11  CONTINUED DIRECT EXAMINATION

12  BY MS. LISKAMM:

13  Q    Agent Schoonover, before we broke for lunch we were

14  talking about the Gatun seizure.  Do you remember that?

15  A    I do.

16  Q    And that seizure occurred on March 17, 2007?

17  A    Yes.

18       MS. LISKAMM:  Okay.  I'm going to ask with the

19  Court's permission if the witness can step down from the

20  witness box to look at a physical exhibit.

21       THE COURT:  That is fine.

22  BY MS. LISKAMM:

23  Q    Agent Schoonover, if you could take a look at Government

24  Exhibit 203-21 A, B and C which, for the record, are three

25  cardboard boxes.

MDL      RPR      CRR      CSR      OCR

Schoonover - direct - Liskamm                    1809

1    A    Yes.

2    Q    And, Agent Schoonover, do you recognize those boxes?

3    A    Yes.

4    Q    What do you recognize those to be?

5    A    These are boxes containing Exhibit 1-A and Exhibit 1.

6    Q    And those are the exhibits from the Gatun seizure?

7    A    Yes.

8    Q    How do you recognize those?

9    A    My name is on -- my name is on one and I helped process

10   the other one.

11   Q    Okay.  And is your name actually on the top right-hand

12   side of the second box?

13   A    Yes.

14   Q    The one closest to me?

15   A    It is right here, yes.

16   Q    So your name is on both boxes?

17   A    Both boxes.

18   Q    What does that indicate?

19   A    That I actually helped seal the boxes.

20        MS. LISKAMM:  Your Honor, at this time I'd like to

21   move Government Exhibits 203-21-A, B and C into evidence.

22        MR. BALAREZO:  No objection.

23        MS. LISKAMM:  Your Honor, if I could get Special

24   Agent Soupios to assist in opening the boxes.

25        THE COURT:  Go ahead.

Schoonover - direct - Liskamm                    1810

1          MS. LISKAMM:  Thank you.

2    BY MS. LISKAMM:

3    Q    Agent Schoonover, were these some of the drawings that

4    were seized from the Gatun?

5    A    No.

6    Q    Where are the rest of the drugs?

7    A    The remaining bulk has been destroyed.

8          MR. BALAREZO:  Objection.  Knowledge, Your Honor.

9          THE COURT:  I understand.  How do you know what

10   happened to them?

11         THE WITNESS:  Policy and procedure from the DEA.

12         THE COURT:  You have no firsthand knowledge; right?

13         THE WITNESS:  No.

14         THE COURT:  Talk about the policy and procedure.

15         MR. BALAREZO:  Your Honor, I move to strike his

16   answer.

17         THE COURT:  That is fine.  The answer is stricken.

18         Go ahead.

19         THE WITNESS:  Our policy says that after 60 days the

20   bulk is destroyed and there is another representative sample

21   that is kept in place of the bulk.

22   Q    And, Agent Schoonover, could you approximate

23   approximately how many kilos of cocaine we have on the table

24   here?

25   A    About ten.

MDL       RPR       CRR       CSR       OCR

Schoonover - direct - Liskamm                    1811

1   Q    Do you recall how many kilos were seized from the Gatun

2   in total?

3   A    In total?

4   Q    Is it approximately 15,157.02?

5   A    Yes.

6   Q    Okay.  Agent Schoonover, if my math is correct, you've

7   been in law enforcement for over 30 years; is that correct?

8   A    That is correct, yes.

9   Q    And the majority of which you've spent working narcotics

10  cases?

11  A    In DEA, correct.

12  Q    In your 30-plus years of experience, where do the Lina

13  Maria, Gatun and the San Jose seizures rank in terms of

14  weight?

15  A    In the top five.

16  Q    I would now like to turn your attention to what's marked

17  on -- you have a manila folder that says Submersible.  Do you

18  have that in front of you?

19  A    I do.

20  Q    I'm going to have you look at Government Exhibit 202-15?

21  A    Okay.

22       MS. LISKAMM:  Which, counsel, still no objection?

23  Q    What are we looking at?

24  A    A DEA-7 for Exhibit 1-A which is a representative sample.

25  Q    Okay.  And where were those drugs seized?

Schoonover - direct - Liskamm                1812

1  A      They were seized from the Gatun on or about 9/13 of '08.

2  September 13th of 2008.

3  Q      Was the seizure from the Gatun or another vessel?

4  A      From the SPSS.

5  Q      What's the SPSS?

6  A      It's a self-propelled semi-submersible.

7  Q      What is that?

8  A      That is a morph between a submarine and an open value

9  go-fast vessel.  So it has a covering, but there's no --- the

10 bow is closed.  There's no open cockpit.  It was actually

11 covered and it goes a little bit under the water but not quite

12 fully 100 percent of the water it skims just at that water

13 level.

14 Q      Is it often referred to as a semi-submersible?

15 A      It is, yes.

16 Q      And looking at Government Exhibit 202-13, do you

17 recognize this?

18 A      Yes.

19 Q      What do you recognize that to be?

20 A      That is the DEA-7 for Exhibit 1 which is the bulk of the

21 bulk evidence.

22 Q      Okay.  And looking at Exhibit 202-16, what are we looking

23 at here?

24 A      That would be a lab report for Exhibit 1-A which is

25 the -- 1-A is the ten original kilos.

Schoonover - direct - Liskamm                    1813

1    Q     So this is for the representative sample?

2    A     That is correct.

3    Q     That's from the semi-submersible we were just talking

4    about?

5    A     That is, yes.

6    Q     I show you 202-11.  Is this the lab report for the bulk

7    that was seized from the semi-submersible?

8    A     Yes, it is.

9    Q     Can you tell the ladies and gentlemen of the jury what

10   the net weight was for the bulk of the cocaine?

11   A     The net weight is 4,716 kilograms net weight.

12   Q     And going back to 202-16, the net weight for the

13   representative sample?

14   A     That is 9,943 grams or converted it would be 9.943

15   kilograms.

16   Q     I'm going to show you 202-12.  What are we looking at

17   here?

18   A     That is cocaine that came out of the SPSS.

19   Q     Okay.  And these are kilos similar to what we see on

20   Government counsel table right now?

21   A     That's correct.

22   Q     And looking at the second page of Government Exhibit

23   202-12, are these cardboard boxes lines up?

24   A     Those are cardboard boxes kind of representative of the

25   boxes that you had that there had been.

Schoonover - direct - Liskamm                    1814

1    Q    Which would contain the cocaine from the
2    semi-submersible?
3    A    That's correct.
4    Q    And looking at the last page here is this what would be
5    inside of those cardboard boxes?
6    A    Yes, it would be.
7    Q    For all of the seizures that we've discussed here today,
8    the Lina Maria, the San Jose, the Gatun and the
9    semi-submersible we talked about the lab reports for each one
10   of those.  Are these reports generated by the DEA?
11   A    They are.
12   Q    Are they generated after testing has been done on the
13   substances inside of a lab?
14   A    That's correct.
15   Q    After concluding their testing what is the DEA policy on
16   what happens to these drugs?
17   A    After they are tested and the case is then concluded, the
18   drugs are destroyed and then the case would be closed.
19   Q    Okay.  To your knowledge is the Lina Maria or San Jose
20   case closed?
21   A    They are, yes.
22   Q    What is the status of the drugs for those cases?
23   A    They are destroyed because the cases close.  You can't
24   have outstanding drugs and have a case open.
25   Q    What about for the semi-submersible.

Schoonover - cross - Balarezo                    1815

1  A    They would also be destroyed.

2           MS. LISKAMM:  I have no further questions, Your

3  Honor.

4           THE COURT:  Okay, any cross?

5           MR. BALAREZO:  Very briefly.

6  CROSS-EXAMINATION

7  BY MR. BALAREZO:

8  Q    Good afternoon, sir.

9  A    Good afternoon.

10  Q    So you've testified that the DEA -- the seizures were

11  destroyed, the bulk cocaine; is that correct?

12  A    Yes.

13  Q    With respect to the Lina Maria, do you have any personal

14  knowledge that, in fact, it was destroyed?  Were you there

15  when it was destroyed?

16  A    I was not.

17  Q    With respect to the San Jose, the same question?

18  A    I was not there.

19  Q    With respect to the semi-submersible, were you there?

20  A    I was not.

21  Q    With respect to the Gatun, were you there?

22  A    I was not.

23  Q    And the DEA would keep paperwork about these things;

24  correct?

25  A    Yes, sir.

Schoonover - cross - Balarezo                    1816

1    Q    Do you have them here today?

2    A    I do not.

3              MR. BALAREZO:  Nothing further.

4              THE COURT:  Any redirect?

5              MS. LISKAMM:  No, Your Honor, thank you.

6              THE COURT:  Ladies and gentlemen, for the next

7    witness, we need to set up the courtroom and it's going to

8    take about five minutes; again, one of these very short

9    breaks.  We will do that now.  The next witness has a medical

10   issue and we may need to take breaks during the testimony more

11   than we ordinarily would.  So bear with us if that happens.

12   Please do not talk about the case and we will see you in just

13   a few minutes.

14             (Witness excused.)

15             (Jury exits.)

16             THE COURT:  A real five-minute recess.

17             (Recess taken.)

18

19             (Continued on the following page.)

20

21

22

23

24

25

MDL       RPR       CRR       CSR       OCR

Ramirez - direct - Goldbarg                    1817

1          (In open court; outside the presence of the jury.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Let's have the jury, please.

4          (Jury enters.)

5          THE COURT:  Be seated.

6          The Government can call its next witness.

7          MS. GOLDBARG:  Thank you, Your Honor.

8          The Government calls Juan Carlos Ramirez Abadia.

9          THE COURTROOM DEPUTY:  Please stand and raise your

10   right hand.

11          (Witness sworn.)

12          THE COURTROOM DEPUTY:  Please state and spell your

13   name for the record.

14          THE WITNESS:  J-U-A-N, C-A-R-L-O-S.  R-A-M-I-R-E-Z.

15   A-B-A-D-I-A.

16          THE COURTROOM DEPUTY:  You may be seated.

17          MS. GOLDBARG:  May I inquire?

18          THE COURT:  Go ahead.

19   **JUAN CARLOS RAMIREZ ABADIA,**

20       called by the Government, having been duly

21       sworn, was examined and testified as follows:

22   DIRECT EXAMINATION

23   BY MS. GOLDBARG:

24   Q    Good afternoon, Mr. Ramirez.

25   A    Good afternoon.

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                1818

1   Q      How old are you?

2   A      55 years old.

3   Q      Where were you born?

4   A      In Colombia, Palmira.

5   Q      Where did you grow up?

6   A      In Cali, Colombia.

7   Q      Where do you live now?

8   A      In the United States.

9   Q      In what type of facility?

10  A      In a BOP prison.

11  Q      How long have you been in prison?

12  A      11-and-a-half years approximately.

13  Q      When were you arrested?

14  A      In August of 2007.

15  Q      Where were you arrested?

16  A      In Brazil, Sao Paolo.

17  Q      Is this the only time that you have been in jail, Mr.

18  Ramirez?

19  A      No.

20  Q      When else were you in jail?

21  A      I was in jail in Colombia and also in Brazil waiting for

22  my extradition to the United States.

23  Q      What years were you in jail in Colombia?

24  A      The first time I was in jail was in 1998 -- 1988,

25  approximately, and again in 1996.

Ramirez - direct - Goldbarg                    1819

1   Q    In 1996, how long did you spend in jail in Colombia?

2   A    Four years and two months approximately.

3   Q    At the time of your arrest in Brazil in 2007, what did

4   you do for a living?

5   A    I was a fugitive, a capo, who was conducting my business,

6   my drug businesses, from Brazil.

7   Q    You used the term capo.  What does that mean?

8   A    That I was the leader of a cartel of the Colombian mafia

9   that went by the name cartel Norte Del Valle, North Valle

10  Cartel.

11  Q    What was the business of the North Valle Cartel?

12  A    Drug trafficking business.

13  Q    What kind of drugs did the North Valle Cartel deal in?

14  A    We dealt with cocaine at that time.

15  Q    Where did you send the cocaine to?

16  A    We used to send the cocaine to the United States via

17  Mexico.

18  Q    How long were you a drug trafficker?

19  A    20 years, approximately.

20  Q    When did you start sending cocaine to the United States?

21  A    1989, approximately.

22  Q    Where did you sell the majority of your cocaine in the

23  United States?

24  A    In the City of New York.

25  Q    From the late 1980s until your arrest in 2007,

Ramirez - direct - Goldbarg                    1820

1  approximately how many kilos of cocaine did you transport to
2  the United States?
3  A    400,000 kilos of cocaine, approximately.
4  Q    Now, Mr. Ramirez, you just testified that the cocaine
5  that you sold would come to the United States via Mexico.
6  What would happen to your drugs once it got to Mexico?
7  A    Can you repeat the question, please.
8  Q    Is it on the screen, on the realtime.
9         MS. GOLDBARG:  Is there an issue with the realtime?
10 Sorry, Your Honor.
11 Q    Let me repeat the question.  From the late 1980s until
12 your arrest in 2007, approximately how many kilos -- I'm
13 sorry.  That is not where I was.
14        When the drugs that you sold to the United States
15 arrived in Mexico, what would happen to your drugs in Mexico?
16 A    They were delivered to the Mexican drug traffickers,
17 especially to those from the Sinaloa Cartel, and then they
18 moved them to the United States where they delivered them to
19 me.
20 Q    You mentioned that your drugs were transported from
21 Mexico to the United States by Mexican traffickers.  Was the
22 Sinaloa Cartel the only cartel you worked with?
23 A    No.
24 Q    What was the primary group that you worked with in
25 Mexico?

Ramirez - direct - Goldbarg                  1821

1    A    The Sinaloa Cartel.

2    Q    Do you know the Sinaloa Cartel by any other names?

3    A    Yes.

4    Q    What other names?

5    A    The Federation.  La Federación.  The Federation.

6    Q    Can you tell the members of the jury who specifically you

7    worked with in the Sinaloa Cartel?

8    A    Yes, Mr. Guzmán Loera, his brother Arturo, the Beltran

9    Leyva brothers, the Carrillo Fuentes' brothers, Mr. Nacho

10   Coronel, Mr. Mayo Zambada and his brother Ray Zambada, and

11   Guero Palma.

12   Q    Did you meet Mr. Guzmán Loera personally?

13   A    Yes.

14   Q    Approximately how many times?

15   A    Over 10 times.

16   Q    Do you see Mr. Guzmán Loera in the courtroom?

17   A    Yes.

18   Q    Can you describe an article of clothing that he is

19   wearing?

20   A    Yes.  He is wearing a blazer and a light blue shirt.

21        MS. GOLDBARG:  Your Honor, the Government would ask

22   the Court record to reflect the witness has identified the

23   defendant.

24        THE COURT:  It so reflects.

25   Q    What specifically did the defendant do with your cocaine?

MDL       RPR       CRR       CSR       OCR

Ramirez - direct - Goldbarg                    1822

1   A    To receive it from me in Mexico and then it would be

2   transported to the United States.

3   Q    When did the defendant first start transporting your

4   cocaine from Mexico to the United States?

5   A    1990, approximately.

6   Q    When was the last time you sent cocaine to the defendant?

7   A    Back in 2007, before my arrest.

8   Q    Mr. Ramirez, while you were in Brazil, did you do

9   anything to avoid being captured?

10  A    Yes.

11  Q    What did you do?

12  A    I had changes done to my face.

13  Q    What changes did you have done to your face?

14  A    I altered the physical appearance of my face by changing

15  my jaw bone, my cheek bones, my eyes, my mouth, my ears, my

16  nose.

17  Q    How many surgeries did you have to alter your appearance?

18  A    More than three or four surgeries.

19  Q    I am going to show you what has been marked for

20  identification I believe without objection Government Exhibit

21  85-A.

22           MR. PURPURA:  No objection.

23           THE COURT:  It is received.

24           (Government's Exhibit 85-A received in evidence.)

25  Q    Who is this a photo of?

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                1823

1    A    Mine.

2    Q    Approximately when was this taken?

3    A    More or less 1998, approximately.

4    Q    Showing you what has been marked for identification as

5    Government Exhibit 85-C, also without objection.

6              THE COURT:  Received.

7              (Government's Exhibit 85-C received in evidence.)

8    Q    Who is that a picture of?

9    A    Mine.

10   Q    And when was this photo taken?

11   A    When I was arrested in Brazil.

12   Q    And what year was that?

13   A    2007.

14   Q    And this was taken after your surgeries?

15   A    Correct.

16   Q    Mr. Ramirez, are you known by any nicknames?

17   A    Yes.

18   Q    What nickname is that?

19   A    Chupeta.

20   Q    Mr. Ramirez, when you were arrested in Brazil, how many

21   countries were seeking your extradition?

22   A    Just one country, the United States.

23   Q    How many cases did you have against you in the United

24   States at the time of your arrest in Brazil?

25   A    Two cases.

Ramirez - direct - Goldbarg                    1824

1   Q     Where were those two cases?

2   A     One in Washington, D.C. and the other one in the court in

3   Brooklyn.

4   Q     This courtroom?

5   A     Yes, the Eastern District of New York.

6   Q     Mr. Ramirez, did you plead guilty to both of those

7   indictments?

8   A     Yes.

9   Q     Where did you plead guilty to those two indictments?

10  A     In the Eastern District of New York.

11  Q     What were you charged with as part of your Washington,

12  D.C. indictment?

13  A     Under the RICO law.

14  Q     What is your understanding of what the RICO law is or

15  what you were charged with?

16  A     To be the leader of a cartel that was doing drug

17  trafficking, cocaine.

18  Q     What crime were you charged with as part of the

19  indictment?

20  A     Drug trafficking, money laundering, and corruption.

21  Q     What criminal organizations specifically were you charged

22  with being a leader of?

23  A     Norte Del Valle, the North Valle Cartel.

24  Q     What were the charges against you in the Eastern District

25  of New York indictment?

Ramirez - direct - Goldbarg                    1825

1   A    CCE.

2   Q    Could you describe your understanding of a CCE?

3   A    A continuous criminal enterprise of which I was a leader.

4   Q    Do you understand CCE to mean continuing criminal

5   enterprise?

6   A    Yes.

7   Q    What were the violations of the CCE in the Eastern

8   District of New York indictment?

9   A    Murder and drug trafficking.

10  Q    Under the law, what is the maximum sentence that you can

11  receive as a result of your guilty plea in both indictments?

12  A    Life.

13  Q    And under the law, what is the minimum sentence you can

14  receive as a result of your guilty plea?

15  A    20 years.

16  Q    As a result of your drug trafficking activities, did the

17  Government of Colombia seize anything from you?

18  A    Correct.

19  Q    What was the approximate total value of the assets seized

20  by the Colombian Government?

21  A    One billion dollars.

22  Q    Did you agree to forfeit anything to the United States?

23  A    Correct.

24  Q    What did you agree to pay?

25  A    To pay an additional amount of $1.2 million.

Ramirez - direct - Goldbarg                    1826

1  Q    Mr. Ramirez, have you been sentenced yet?

2  A    No.

3  Q    Are you testifying today under an agreement with the

4  Government?

5  A    Correct.

6  Q    What is that agreement called?

7  A    A cooperation agreement.

8  Q    What is your understanding of your responsibilities under

9  the cooperation agreement?

10 A    To tell the absolute truth to the Government, to

11 cooperate with the Government in whatever they need me, and

12 not to commit any further crimes.

13 Q    If fulfill all of your obligations under the cooperation

14 agreement, what is your understanding of what the judge --

15 what the Government will do, sorry?

16 A    They will write to the judge a 5K letter.

17 Q    What is your understanding of what a 5K letter is?

18 A    It's a letter written by the -- which is written by the

19 Attorney General's Office describing my bad acts and my

20 cooperation.

21 Q    Who receives that letter if one is written?

22 A    The judge.

23 Q    What is your understanding of what the 5K letter will

24 allow the judge to do at sentencing?

25 A    To move away from the maximum sentence that I could

Ramirez - direct - Goldbarg                    1827

1  receive in accordance to the extradition treaty with Brazil.

2  Q    You mentioned the extradition treaty.  Were any

3  conditions placed by the Brazilian Government when you were

4  extradited to the United States?

5  A    Yes.

6  Q    What was that?

7  A    That I could not be sentenced to over 30 years.

8  Q    According to the cooperation agreement you have with the

9  Government, what is the minimum sentence you can get even

10 after cooperation?

11 A    25 years.

12 Q    So the maximum reduction you can get is five years?

13 A    Correct.

14 Q    And if the judge does receive a 5K letter, does the judge

15 have to give you the 25-year sentence?

16 A    It is up to the judge.  It is the judge's decision.

17 Q    Per the terms of the cooperation agreement, can the judge

18 go below 25 years?

19 A    No.

20 Q    And who decides your sentence?

21 A    The judge does.

22 Q    In addition to the terms of your cooperation agreement,

23 has anything else been promised to you?

24 A    Yes.

25 Q    What other promises have been made to you?

Ramirez - direct - Goldbarg                    1828

1    A    I was promised to be given protection in prison, also to

2    recommend protection for me once my sentence is over, and

3    protection for my family.

4              MS. GOLDBARG:  I'd like to show to the witness what

5    has been marked as Government Exhibit 3500-JCRA-4 without

6    objection from the defense.

7              THE COURT:  Received.

8              (Government Exhibit 3500-JCRA-4 received in

9    evidence.)

10             MR. BALAREZO:  Your Honor, no objection.  Can we

11   have a sidebar?

12             THE COURT:  Is this about hearing the witness

13   better?

14             MR. BALAREZO:  It is about the witness, yes.

15             THE COURT:  Brief sidebar.

16             (Sidebar held outside the hearing of the jury.)

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

MDL       RPR       CRR       CSR       OCR

Ramirez - direct - Goldbarg                    1829

1            (The following occurred at sidebar.)

2            MR. BALAREZO:  Your Honor, this is not regarding the

3    direct.  He is Mr. Purpura's witness.  It appears that the

4    witness is make a concerted effort to hide.  Mr. Guzmán cannot

5    see him at all and I think he has a right to be confronted by

6    the person.

7            MR. LICHTMAN:  There's a lot of things in the way.

8            MR. BALAREZO:  There's a screen.  He's tucked into

9    the corner.  He can't see him at all.

10           THE COURT:  Okay.

11           MR. BALAREZO:  So I --

12           THE COURT:  I will ask him to please adjust his seat

13   and move forward.

14           MR. LICHTMAN:  Thank you, Judge.

15           MR. BALAREZO:  Whatever you can accommodate.

16           MS. GOLDBARG:  We would ask that be done outside the

17   presence of the jury so there is no implication.  I know the

18   witness is answering me.

19           THE COURT:  Are we going to excuse the jury while we

20   do this?

21           MS. GOLDBARG:  Your Honor, I could possibly ask the

22   witness to get closer to the interpreter.

23           THE COURT:  That's fine.

24           MS. GOLDBARG:  Thank you.

25           (Sidebar ends.) (Continued on the next page.)

Ramirez - direct - Goldbarg                1830

1              (In open court.)

2    Q    Mr. Ramirez, could I ask you to just get a little bit

3    closer to the interpreter, please.

4    A    Yes.

5    Q    Thank you very much.  Before the sidebar, I was about to

6    show you what's now in evidence Government Exhibit

7    3500-JCRA-4.  Do you recognize this document?

8    A    Yes.

9    Q    I'd like to show you the last page.

10   A    Correct.

11   Q    Is that your signature on the last page?

12   A    Yes.

13   Q    What is this document?

14   A    That's the cooperation agreement.

15   Q    What happened to your Washington, D.C. case?

16   A    It was joined with the Eastern District case.

17   Q    As part of your cooperation with the United States

18   Government, are you required to meet with the Government?

19   A    Correct.

20   Q    When was the first time you met with the Government?

21   A    2008, approximately.

22   Q    In the last ten years, approximately how many times have

23   you met with the Government?

24   A    Many more than 50 times.

25   Q    Have you met with the Government to the prepare your

Ramirez - direct - Goldbarg                    1831

1   testimony today?

2   A    Yes.

3   Q    Did you meet with the Government to prepare to testify in

4   any other trials?

5   A    Yes.

6   Q    Did you testify in that other case?

7   A    No.

8   Q    Did you meet with the Government to sign affidavits in

9   support of extradition?

10  A    Yes.

11  Q    Mr. Ramirez, does you receiving a 5K depend on the

12  conviction of anyone?

13  A    No.

14  Q    I'd like to turn to the North Valle Cartel that you

15  mentioned earlier on.  I'd like to show you for identification

16  Government Exhibit 506-22.

17           MR. PURPURA:  No objection.

18           THE COURT:  All right.  It is received.

19           (Government Exhibit 506-22 received in evidence.)

20  Q    Mr. Ramirez, what is this?

21  A    A map of Colombia.

22  Q    Now, what is the North Valle Cartel?

23  A    It's a criminal enterprise that conducted drug

24  trafficking and exported cocaine to the United States.

25           (Continued on next page.)

Ramirez - direct - Goldbarg                    1832

1    BY MS. GOLDBARG:   (Continuing.)

2    Q    With your finger if you could mark on the screen next to

3    you where the North Valle Cartel was located?

4    A    Approximately here.

5    Q    What state is that in?

6    A    The Cauca, the Cauca Valley.

7    Q    Did you have a structure in your organization?

8    A    Yes.

9    Q    Have you heard of the term front?

10   A    Front?

11   Q    *Frente*?

12   A    Yes.

13   Q    What is a front?

14   A    A front is part of the organization that is dedicated to

15   the illegal part of the business.

16   Q    As leader of the North Valle Cartel, how many fronts did

17   you have in your organization?

18   A    Five fronts.

19   Q    Can you tell the members of the jury what those five

20   fronts were?

21   A    Yes.  The armed branch, the political corruption and

22   police corruption, the ledger, general ledger or the dirty

23   money, the front that did the investments and the money

24   laundering.  And the operations front that did the cocaine

25   shipments.

Ramirez - direct - Goldbarg                1833

1   Q    I'd like to go through a couple of those fronts with the

2   jury, please.  You mentioned the general ledger front?

3   A    Correct.

4   Q    What was the purpose of that front?

5   A    It handled all the dirty money of the organization.

6   Q    For what purpose?

7   A    For the cocaine shipments, for the corruption payments to

8   the politicians and the police and the acts of violence.

9   Q    You said you had a front that was dedicated to

10  corruption.  Can you briefly describe what that was?

11  A    Correct.  So the corruption one was one that we used in

12  order to have the officers from the Colombian government not

13  do their job and that way it would benefit our illegal drug

14  trafficking organizations or activities rather.

15  Q    I'm sorry, I think there was a problem with the

16  microphone.  Based on your experience as the boss of a cartel

17  why was it important to have a corruption front?

18  A    Because it's impossible to be the leader of a drug

19  trafficking cartel in Colombia without having that corruption.

20  They go hand-in-hand.

21  Q    You mentioned also that you had an armed wing?

22  A    Correct.

23  Q    What was the purpose of that?

24  A    The purpose was to protect my organization, to protect

25  the safety and the life of my family, to protect the cocaine

Ramirez - direct - Goldbarg                    1834

1  loads, to eliminate enemies, informants, thieves, and in that

2  manner protect the cocaine business.

3  Q    What was the name of the people that worked in the armed

4  front?

5  A    Hit men, sicarios.

6  Q    Did you participate in any violence, Mr. Ramirez?

7  A    Yes.

8  Q    While you were leader of the North Valle Cartel and your

9  involvement throughout the North Valle Cartel, how many people

10  were killed as a result of orders that you gave?

11  A    Approximately 150 people.

12  Q    What period of time did this occur?

13  A    From approximately 1989 to 2007.

14  Q    Did you ever personally kill anyone?

15  A    Yes.

16  Q    When was this?

17  A    In the two -- in 2004.

18  Q    How did you kill this person?

19  A    With gunshots in his head -- in the head.

20        THE INTERPRETER:  Interpreter correction.

21  A    The head and the face.

22  Q    Did you shoot this person?

23  A    Yes, I shot the person with a gun.

24  Q    Of the total number of people you ordered murdered, were

25  any of them in the United States?

Ramirez - direct - Goldbarg                    1835

1   A      Yes.

2   Q      Did you plead guilty to those murders?

3   A      Yes.

4   Q      Now, Mr. Ramirez, how many years did you work with the

5   Sinaloa Cartel?

6   A      For approximately 17 to 18 years.

7   Q      And you just described the structure of your

8   organization.  Did you see any similarities in those 18-years'

9   work with the Sinaloa Cartel between the two organizations?

10  A      Yes.

11  Q      Briefly, what were those?

12  A      Well, they had -- well, they also used corruption to

13  receive and to protect my cocaine shipments and they also had

14  an armed wing.

15  Q      Okay.  Let's go to when the defendant first started

16  transporting your cocaine.  You said this was approximately

17  what year?

18  A      In approximately 1990.

19  Q      And when you were sending -- were you sending cocaine to

20  the United States before the defendant starting transporting

21  your cocaine here?

22  A      Correct.

23  Q      When did you start becoming involved in the drug trade in

24  the United States?

25  A      Approximately somewhere between 1985/1986.

Ramirez - direct - Goldbarg          1836

1   Q     How did you get started in the drug trade in those years?

2   A     Well, I was receiving cocaine in the United States to

3   distribute it and sell it on the streets.

4   Q     Did you ever come to the United States?

5   A     Correct.

6   Q     When was the first time you came to the United States?

7   A     In approximately 1985/1986.

8   Q     And during this time how many visits to the United States

9   did you engage in?

10  A     Three or four times.

11  Q     Where would you travel to in the United States?

12  A     I traveled to Miami in Florida, Los Angeles, California

13  and New York.

14  Q     What did you do when you would come to the United States

15  on these trips?

16  A     Receive cocaine to distribute it and sell it on the

17  streets of New York mainly.

18  Q     Anything else?

19  A     I received the cocaine.  We would process it at a lab in

20  Florida in Miami.

21  Q     Once the drugs were sold in New York, what else did you

22  do related to the drug trade?

23  A     Pick up the money so that it could then be sent to

24  Colombia.

25  Q     Did you eventually have an infrastructure in the United

Ramirez - direct - Goldbarg                1837

1    States?

2    A    Yes.

3    Q    And in what United States cities did you have

4    infrastructure?

5    A    In Los Angeles, California, in New York, mainly and

6    Chicago.  I also did in Houston and Phoenix, Arizona.

7    Q    What time frame are we talking about, what years?

8    A    So I started creating the infrastructure more or less in

9    1986, 1987.  And I kept it until approximately 1996, 1997.

10   Q    Can you describe for the members of the jury what the

11   infrastructure was that you had in Los Angeles?

12   A    Yes.  Well, I had several cells and they had houses where

13   they could receive the cocaine that was coming from Mexico in

14   order to store it in those homes, in those houses, and to then

15   transport it to New York.  And we also had the cars to receive

16   that cocaine in Los Angeles and we also had the transport in

17   order to transport it from Los Angeles to New York City.

18   Q    How would your cocaine get transported from Los Angeles

19   to New York City?

20   A    We transported it in several ways.  Sometimes we used

21   tractor trailers, camper cars, small cars with hidden

22   compartments and even airplanes were used.

23   Q    What infrastructure did you have in New York?

24   A    I had an infrastructure that was comprised of several

25   cells to receive the cocaine that was coming from Los Angeles

Ramirez - direct - Goldbarg                1838

1  in order to store it and to later distribute it in the streets

2  of New York and we also had a separate infrastructure to pick

3  up the money -- the proceeds of the sales of the cocaine to be

4  sent to Colombia, the money.

5  Q    You mentioned that you had separate structures one for

6  drugs and one for money.  Was that on purpose?

7  A    Yes.

8  Q    Why?

9  A    To keep the cocaine separate from the money so as not to

10  mix them in that and that way to avoid seizures of the

11  American authorities.

12  Q    You mentioned that you would gather the money in New

13  York.  Where would you send it?

14  A    We used to send it to Colombia, mainly.

15  Q    Did you send your money to anywhere else other than

16  Colombia?

17  A    No, to Colombia.

18  Q    Did you ever have to transport money back to Los Angeles?

19  A    Yes.

20  Q    For what purpose?

21  A    To pay the Mexicans for the transport of my cocaine.

22  Q    When was your last trip to the United States?

23  A    1988, approximately.

24  Q    Why did you not return after that?

25  A    Because I tried to enter with a fake passport and I was

Ramirez - direct - Goldbarg                    1839

1    caught by the authorities in Miami and they sent me back to

2    Colombia that very same day.

3    Q    What happened to you when you got back to Colombia?

4    A    I was arrested for using fake documents.

5    Q    And what happened to you?

6    A    I went to prison for approximately a month.

7    Q    How did you get out?

8    A    By making corruption payments.

9    Q    Did you do anything to have this criminal arrest record

10   expunged?

11   A    Yes.

12   Q    What did you do?

13   A    I made corruption payments so that that would be

14   completely disappeared and there would be no trace of it.

15   Q    Did you pay to expunge any other records in Colombia?

16   A    Yes.

17   Q    What did you pay for?

18   A    I paid to destroy so that there wouldn't be any trace of

19   any picture of mine in any government office, Colombian

20   government office that might have a photograph of me.  I also

21   disappeared my fingerprints and I disappeared all trace of my

22   having been in prison, all the files of my having been in

23   prison in Colombia.

24   Q    Do you know what a *cedula*, C-E-D-U-L-A, is?

25   A    Cedula, yes.

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                1840

1  Q    What is it?

2  A    It is an identification document that we use in Colombia.

3  Q    Did you do anything with regards to your records on this

4  document?

5  A    Right, I disappeared them completely.

6  Q    Why did you do all of this?

7  A    So as to avoid the authorities would have any information

8  about me to avoid an arrest so that it would be more difficult

9  for them to have and that would benefit, that would make my

10 illegal activities easier.

11       MS. GOLDBARG:  Your Honor, I'm about to get into a

12 new topic.  I don't know if you want me to keep going.

13       THE COURT:  If you can keep going a little more, I

14 think we should.

15       MS. GOLDBARG:  Absolutely.

16       THE COURT:  Okay.

17 BY MS. GOLDBARG:

18 Q    Mr. Ramirez, you testified that at the time of your

19 arrest in 2007 in Brazil you were the leader of the North

20 Valle Cartel?

21 A    Correct.

22 Q    When did you start working for the North Valle Cartel?

23 A    1987, '88, approximately.

24 Q    And in the beginning in these years, in the 1980s, what

25 was your role with the North Valle Cartel?

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                    1841

1  A    To receive cocaine in small quantities in Los Angeles,

2  California and to transport it to New York.

3  Q    I think there might be a clarification.

4           THE INTERPRETER:  The interpreter needs to clarify a

5  term.  Interpreter's correction.  "In bulk" he didn't say "in

6  small quantities" but "in bulk."

7  A    To transport it to New York then to distribute it and

8  sell it in the streets of New York and return the money from

9  the sales to Colombia.

10 Q    How were you able to continue running a drug operation in

11 the United States if you didn't go back?

12 A    Through the infrastructure that I had set up in the

13 United States and through my lieutenants in the United States.

14 Q    What do you mean by the term lieutenant?

15 A    Lieutenant means those people who work for me in my

16 organization.

17 Q    Did you eventually take a more active role in the drug

18 business in Colombia itself?

19 A    Yes.

20 Q    What did you do?

21 A    Well, I decided to go up through the ranks of the cartel,

22 the North Valle Cartel, and I began to take care personally,

23 myself, of the shipment of drugs to Mexico.  I would go to the

24 clandestine landing strips in Colombia where the planes would

25 come from to Mexico.  I also decided to visit the labs where

Ramirez - direct - Goldbarg                    1842

1   the -- where the said cocaine was produced and that's how I

2   started to go up, little by little in the North Valle Cartel.

3   Q    Now, you mentioned that you would go to the clandestine

4   air strip.  What is a clandestine air strip?

5   A    A clandestine landing strip, an air strip that is does

6   not appear or is not registered on any navigational charts.

7   In general, they're not paved.  They are dirt roads.  And in

8   Colombia many locations, they are located in the middle of the

9   mountains, in the middle of the jungle.  And all of this is to

10  of course avoid the authorities who would have seized the

11  cocaine in the planes.

12  Q    You mentioned planes.  How would your cocaine get from

13  Colombia to Mexico?

14  A    Initially, at first, by planes.

15  Q    During this time in the beginning years what kind of

16  planes did you use to transport cocaine from Colombia to

17  Mexico?

18  A    We use mainly some planes that are called turbo

19  propeller, turbo commanders, King 300s, Cheyenne, Conquer,

20  mainly, those mainly.

21  Q    How would you obtain these planes?

22  A    We bought them.

23  Q    Where would you buy these planes?

24  A    Many times we bought them in the United States, yes, and

25  then they were taken to Colombia.

Ramirez - direct - Goldbarg                    1843

1  Q    The planes that you purchased in the United States and

2  would take to Colombia, did you have to do anything to them to

3  prepare them to transport your cocaine?

4  A    Yes.

5  Q    What did you do?

6  A    We had to install a device to be able to carry more fuel

7  and remove the seats.

8  Q    Why would you remove the seats?

9  A    Because we needed the room to place the bales with my

10  cocaine and the additional fuel tanks.

11  Q    Why did you need to make room for additional fuel?

12  A    Well, because according to the distance that the plane

13  would have to fly to make it to Mexico, we needed to place

14  additional fuel.  Otherwise the tanks itself of the plane were

15  not enough.

16  Q    Did you have any role with the pilots that would fly

17  these planes?  Let me rephrase that.  Did you have any

18  interaction with the pilots that would fly these planes?

19  A    Of course, completely, all the time.

20  Q    Why?

21  A    Because I would speak to them, I would hire them.  I had

22  my own pilots who belonged to my organization and every time

23  they went to Mexico and would come back to Colombia, I would

24  get together with them so that they could tell me how the

25  flight had been, how the operation had been conducted, how

Ramirez - direct - Goldbarg                    1844

1    they had been received by the Mexicans, how the landing strips

2    were.

3    Q    Now, you mentioned that you went to laboratories.  What's

4    a laboratory?

5    A    A laboratory is the place where the cocaine is processed.

6

7                 (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MDL        RPR        CRR        CSR        OCR

Ramirez - direct - Goldbarg                1845

1   BY MS. GOLDBARG:   (Continuing)

2   Q    Why would you go to the laboratories?

3   A    Because I wanted to supervise to make sure that the

4   cocaine that I was sending to the United States via Mexico was

5   of optimal quality.

6   Q    All right.  Did you become familiar with how cocaine was

7   made?

8   A    Yes.

9   Q    Can you briefly describe for the jury how it is that

10  cocaine is made?

11  A    Correct.  In -- back in the '90s, cocaine, we would bring

12  it by plane from Peru and Bolivia which were the base of coca,

13  of coke.  Some of the time, we would use Colombian coke which

14  was collected.  And it was, first, cocaine base which is a

15  yellowish powder.  And then later, once it is transported to

16  the cocaine labs, we would dry it up and we would clean it

17  because it would be dirty and then we began the process which

18  consisted in adding, adding some chemicals so that the

19  cocaine, the cocaine crystals would come up, would result,

20  meaning pure cocaine.  So for that, we would add sulfuric

21  acid, ether, acetone, potassium permanganate, gas, gasoline

22  among other chemicals.

23  Q    And once the cocaine was actually made, how was it

24  packaged?

25  A    Once the cocaine came off from the liquid, we would dry

MDL        RPR        CRR        CSR        OCR

Ramirez - direct - Goldbarg                    1846

1   it up in microwave ovens and we would give it the shape that

2   we wanted.  To give you an example, if it was to be a square,

3   we would give it that shape.  Then there it would be vacuum

4   packed and it would be taped, taped up and then we would place

5   a brand on it.

6   Q    Let me step back one second, Mr. Ramirez.  You made a

7   motion when you were doing the tape.  How much tape would you

8   put on these kilos of cocaine?

9   A    Well, we would just grab a roll of tape and just use it,

10  you know, do it, just do it, do it.  I wouldn't know exactly

11  how much tape we used, but we used a lot of it to protect it.

12  Q    And once it was wrapped in the tape, what would you do

13  with the kilos?

14  A    We would place our brand on them and we would place it in

15  burlap sacks which were usually between 25 and 30 kilograms of

16  weight.  So then it was ready to be sent to Mexico.

17  Q    The sacks that you described, what do they look like?

18  A    Sometimes they were military sacks that we used and some

19  of the times just duffel bags.

20          (Continued on next page.)

21

22

23

24

25

                MDL      RPR      CRR      CSR      OCR

1847

```
1            THE COURT:  Ms. Goldbarg, at a convenient time.

2            MS. GOLDBARG:  Yes.

3            THE COURT:  Is it now?

4            MS. GOLDBARG:  This one is fine, Your Honor.

5            THE COURT:  Okay.  Let's take our mid afternoon

6   break, ladies and gentlemen.  We will come back here at 3:35.

7            Please remember not to talk about the case.  See you

8   then.

9            (Jury exits.)

10            THE COURT:  Okay.  3:35.

11            MS. GOLDBARG:  Thank you.

12            (Recess taken.)

13            THE COURT:  All right.  Let's have the jury, please.

14            (Jury enters.)

15            THE COURT:  All right.  Be seated.

16            Let's continue.

17            MS. GOLDBARG:  Thank you, Your Honor.

18            (Continued on next page.)

19

20

21

22

23

24

25
```

MDL       RPR       CRR       CSR       OCR

Ramirez - direct - Goldbarg                1848

BY MS. GOLDBARG:

Q    Mr. Ramirez, before the break, you were talking about the different ways that you would package cocaine.

A    Correct.

Q    At some point in time, did you start sending cocaine by sea?

A    Yes.

Q    The cocaine that you would send by sea, would you wrap it or package it any differently?

A    Yes.

Q    Can you describe for the jury what that would, that process would entail?

A    Correct.  After the kilo of cocaine was manufactured, we placed protective plastic around it that we called a condom. It's like a rubber that goes all around the kilo of cocaine to protect it from water, precisely.

Q    What color was this rubber?

A    Different colors.

Q    Such as?

A    Sometimes it was brown, yellowish, white.  It depended.

Q    Did you ever use black rubber to package your cocaine?

A    Yes, many times.

Q    Now, you also testified that before the cocaine would get wrapped in the tape -- actually, let me strike that.

        I believe you said after you put a tape on it, you

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                    1849

1   would put a brand on the cocaine.

2   A    Correct.

3   Q    What is a brand?  What do you mean by that?

4   A    A brand is an identifier that you place on the cocaine so

5   that then I can know that the cocaine belongs to me.

6   Q    What kind of brands did you use to mark your kilos of

7   cocaine?

8   A    I used several brands such as Reina, Metro, Clinton,

9   Rolex, one that had a scorpion on it, a sticker with, like, a

10  horse on it, another with a dollar sign, among others.

11  Q    Why would you use different brands to mark your cocaine?

12  A    Because when we had cocaine seizures in the United

13  States, we would then decide to change the brand to try to

14  keep away the authorities.  They would be thinking it wasn't

15  the same cocaine.

16  Q    In the 20 years that you were a drug trafficker, did you

17  just tell us every single brand that you used to mark your

18  cocaine?

19  A    No, not all.  The ones I remember.

20  Q    Now, I'd like to turn your attention to the first time

21  you met the defendant.

22  A    Correct.

23  Q    You testified that the defendant started to receive your

24  cocaine in approximately 1990.  When did you have your first

25  meeting with the defendant?

Ramirez - direct - Goldbarg          1850

1    A    Approximately in the beginning of the '90s.

2    Q    Where did you meet the defendant?

3    A    I met the defendant, I met him at the lobby of a hotel in

4    Mexico City.

5    Q    When did you first hear the defendant's name?

6    A    I heard it from a Mr. Mayo Zambada at a meeting I had

7    with him in Tijuana, Mexico.

8    Q    Who's Mayo Zambada?

9    A    Mayo Zambada is one of the heads of the Sinaloa Cartel or

10   the Federation.

11   Q    Did you ever meet Mayo Zambada?

12   A    Yes.

13   Q    Approximately when did you first meet Mayo Zambada?

14   A    Approximately at the end of 1989.

15        MS. GOLDBARG:  Sorry, Your Honor.  I'm looking for

16   something.

17   Q    I'm showing you what's been marked for identification as

18   Government Exhibit 2B.

19        MS. GOLDBARG:  And I believe without objection, I

20   would ask to move this into evidence, Your Honor.

21        THE COURT:  It already is in evidence.

22        MS. GOLDBARG:  I believe 2A is already in evidence.

23        THE COURT:  All right.  No objection?

24        MR. PURPURA:  MR. PURPURA:  There's no objection.

25        THE COURT:  It's received.

Ramirez - direct - Goldbarg                1851

1              (So marked.)

2    Q    Who is this?

3    A    Mayo Zambada.

4    Q    And what did Mayo Zambada tell you about the defendant?

5    A    He told me:  I'm going to introduce you to a *compadre* of

6    mine.  You will be very interested in meeting him and he will

7    be too.

8    Q    At this time that you, that Mr. Zambada mentioned the

9    defendant, were you sending cocaine to Mr. Zambada?

10   A    Yes.

11   Q    Do you know why it was that the defendant wanted to meet

12   with you?

13   A    Mr. Zambada?

14   Q    No, why the defendant wanted to meet you.

15   A    To start receiving my cocaine from Colombia into Mexico.

16   Q    Now, you said that this meeting happened in a hotel in

17   Mexico City?

18   A    Correct.

19   Q    Who was present at this first meeting?

20   A    Mr. Guzman Loera was present, his brother Arturo, El

21   Pollo, a lieutenant of his that they called or we called

22   El Gordo, one of my lieutenants called Sergio Ramirez a/k/a

23   Pechuga, me, and there was a Colombian woman called Cristina.

24   Q    What was Cristina's role in this first meeting?

25   A    Connect me to Mr. Guzman Loera.

Ramirez - direct - Goldbarg                    1852

1   Q    So what happened when you get to the hotel?

2   A    I arrived first.  After that, Mr. Guzman Loera arrived

3   with his brother Arturo and El Gordo.

4   Q    How did the defendant introduce his brother and El Gordo?

5   A    Mr. Guzman Loera said:  This is my bosom buddy, Arturo,

6   and this is my first man on board.

7   Q    You used the word C-A-R --

8             THE COURT:  Continue, please.

9   Q    You used the word C-A-R-N-A-L.  What was your

10  understanding of what that means?

11  A    It's a word that the Mexicans use to describe their

12  brother.

13  Q    Showing you what's in evidence as Government Exhibit 3,

14  who is that?

15  A    That's Arturo Guzman Loera a/k/a El Pollo.

16  Q    And you said that the defendant also introduced you to

17  Gordo.  Do you remember how he introduced you?

18  A    Yes.

19  Q    What did the defendant say?

20  A    He said:  This is my first man on board.

21  Q    How is it that you remember that phrase exactly?

22  A    Because I was in the Colombian navy and that was a term

23  we used in the navy and it drew my attention because it was a

24  military term.

25  Q    Showing you what's in evidence as Government Exhibit 73,

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                1853

1    who is that?

2    A    This is El Gordo.

3    Q    Mr. Ramirez, what was the purpose of this first meeting

4    that you had with the defendant?

5    A    To propose a shipment of my cocaine to him from Colombia,

6    for him to receive it in Mexico and subsequently transport it

7    to the United States.

8    Q    Did you discuss the details of this business proposition

9    with the defendant in this first meeting?

10   A    We spoke about some of them.

11   Q    Who participated in this part of the conversation?

12   A    Mr. Guzman Loera, his brother Arturo, El Gordo, my

13   lieutenant Sergio Ramirez and me.

14   Q    I'd like to show you for identification purposes --

15        MR. PURPURA:  No objection.

16        MS. GOLDBARG:  Actually, without objection,

17   Government Exhibit 84, we'll move this into evidence,

18   Your Honor.

19        THE COURT:  Received.

20        (So marked.)

21   Q    Who is this?

22   A    This is my lieutenant, Sergio Ramirez.

23   Q    And when you say he was your lieutenant, what

24   responsibilities did he have for you?  And let's focus on

25   these early years, in 1990.

Ramirez - direct - Goldbarg                    1854

1   A    Coordinate with the Sinaloa Cartel people regarding

2   logistics of receiving my airplanes with my cocaine from

3   Colombia so that, subsequently, the Sinaloa people would

4   transport it to the United States and deliver it to me there.

5   Q    Mr. Ramirez, you said that you discussed some of the

6   details of this business transaction with the defendant.  Can

7   you tell the jury some of the topics you discussed at this

8   very first meeting with the defendant?

9   A    Yes.  Yes.  We spoke about the amount of airplanes I

10  could send him.

11  Q    Did the defendant say or ask you anything specifically

12  about the quantity of planes you could send to him?

13  A    Yes.  He told me to send him as many as I could.

14  Q    What else did you discuss?

15  A    We discussed the airstrips, their location, possibly

16  which states of the Mexican Republic, the possibility of

17  sending a pilot to get to know the airstrips in order to be

18  able to identify them.  We talked to or made arrangement for

19  the possible times of arrival of my airplanes to those

20  airstrips.  We spoke about the amount of kilos that the

21  airplanes can hold depending on the location of the airstrip.

22  Q    I'd like to show you what's in evidence as Government

23  Exhibit 502.

24          In this first meeting, you said that you discussed,

25  the defendant told you there were locations where he could

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                    1855

1    receive your planes.

2    A     Correct.

3    Q     What locations were those in Mexico?

4    A     Possibly in Nayarit, Durango, Sinaloa and Sonora.

5    Q     Could I ask you to circle those states on the map in

6    front of you, please.

7    A     (Witness complies.)

8    Q     Now, you were just saying that you discussed with the

9    defendant the quantity of cocaine that you could send to him.

10   How much cocaine could you fit on these airplanes?

11   A     So, it depended on the distance they had to fly from

12   Colombia to Mexico, depending on how close it was or how far

13   it was.

14   Q     What was the range?

15   A     The range was 600 kilos of cocaine to 1,300 kilos of

16   cocaine.

17   Q     Can you explain to the jury why it is that the location

18   of the landing strip would determine the quantity of the drugs

19   you would put on the plane?

20   A     Correct, because, for example, if the airstrip was in

21   Nayarit, that's further south than, for example, the state of

22   Sonora.  So the distance that my planes would have to fly to

23   get to Nayarit is a lot shorter than, for example, if they had

24   to go to Sonora, and since they were shorter, they could carry

25   more cocaine because they could carry less fuel.  The farther

Ramirez - direct - Goldbarg                    1856

1    away it was, more fuel, more weight for the fuel, less room,

2    fewer kilos of cocaine.

3    Q    Did you also discuss with the defendant anything about

4    the quantity, the quality of the cocaine you would send to

5    him?

6    A    Yes.

7    Q    What did the defendant tell you?

8    A    To send him 100 percent pure cocaine, optimum cocaine.

9    Q    Were you offended by this request?

10   A    Not at all.

11   Q    Why not?

12   A    Because I was the party that was most interested always

13   in sending pure cocaine in order to have a reputation for

14   myself because of my cocaine being so good with the Sinaloa

15   Cartel people and also for the United States, to sell it

16   because the clients would then seek it, they would search for

17   it.

18   Q    What other topics did you discuss with the defendant at

19   this first meeting with him?

20   A    Well, he told me what we spoke about, the price he was

21   going to charge me.

22   Q    How were you going to pay the defendant to transport your

23   cocaine?

24   A    I was going to pay him -- well, he was going to keep a

25   percentage of my cocaine.

Ramirez - direct - Goldbarg                    1857

1   Q     What does that mean?

2   A     For example, let's say I was sending him 1,000 kilos of

3   cocaine.  He would charge me 40 percent to transport that

4   cocaine to the United States.  Forty percent of 1,000 kilos is

5   400 kilos of cocaine.  And I would receive 60 percent of the

6   cocaine, that is, I would receive 600 kilos of cocaine in the

7   United States.

8   Q     The other Mexican traffickers that you were working with,

9   did they also charge you a percentage fee?

10  A     Also, yes.

11  Q     How did the defendant's rate of 40 percent compare to the

12  other traffickers?

13  A     Well, I had been paying 37 percent before my business

14  deal with Mr. Guzman who was charging 40 percent so it was

15  more expensive.

16  Q     Did the defendant explain to you why he was charging you

17  a higher percentage than the other traffickers?

18  A     Yes.

19  Q     What did the defendant tell you?

20  A     He said:  I'm a lot faster.  Try me and you'll see.  And

21  your planes and your cocaine and your pilots are going to be

22  secure because I have very good arrangements.

23  Q     When the defendant told you that your planes would be

24  secure, what did you understand that to mean?

25  A     That the corruption arrangements he had for receiving,

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                    1858

1  receiving the planes were good, they were effective, and that

2  would make me feel sure for my, the security or the safety of

3  my planes and my pilots.

4  Q    How would the defendant's corruption payments make your

5  pilots and your cocaine safe?

6  A    Well, precisely because when the planes arrive to the

7  Mexican airstrips, they were being protected by the federal

8  police.  They were receiving my planes and the cocaine and on

9  many occasions, they were doing the transportation themselves.

10 Q    At the end of this meeting with the defendant, the first

11 meeting you had with the defendant, did you finalize every

12 single detail of your business arrangement with the defendant?

13 A    No.

14 Q    Was the defendant carrying a weapon during this meeting?

15 A    Yes.

16 Q    What kind of gun?

17 A    A pistol.

18 Q    So what was your understanding after this first meeting

19 of the business deal you had arranged with the defendant?

20 A    That we had an agreement for me to send my planes with my

21 coke in from Colombia, for him to receive it in Mexico and to

22 transport, to transport it for me to the United States.

23 Q    And what was, what was -- did you finalize on the

24 percentages that you would pay?

25 A    Yes.

Ramirez - direct - Goldbarg                    1859

1    Q    And what was that?

2    A    Forty percent, 40 percent of my cocaine was to be the

3    payment that I had to make to him for transporting my cocaine

4    to the United States.

5    Q    I'm showing you for identification what's been marked as

6    Government Exhibit 510-1.

7         MR. PURPURA:  No objection.

8         THE COURT:  Received without objection.

9         (So marked.)

10   A    Okay.

11   Q    Mr. Ramirez, what is this?

12   A    This is a chart.

13   Q    What's -- what's in the chart?

14   A    It is a chart, a graph of my, the sending of my cocaine

15   to Mexico and the transportation of it by Mr. Guzman from

16   Mexico to the United States, mainly to Los Angeles, to the

17   City of Los Angeles, and then later, I moved it to New York.

18   Mr. Guzman charged me 40 percent and he would deliver to me

19   60 percent of my cocaine in the United States.

20   Q    Mr. Ramirez, did any of your cocaine ever get lost or

21   seized?

22   A    Of course it did.

23   Q    And during the time that you had this arrangement with

24   the defendant, who would have to pay for the cocaine if it was

25   lost or seized?

Ramirez - direct - Goldbarg                    1860

1   A    Each one of us would lose their, their share.

2   Q    Would it depend on where the cocaine was?

3   A    Yes, if it was in the United States or Mexico, but in

4   Mexico, you sell them the kilo because they had their

5   corruption arrangements.  I mean, it did happen.  There were

6   some seizures in Mexico but they were few and far between.

7   Q    If you were to deliver your cocaine to the defendant and

8   he would take possession of it in Mexico and the cocaine was

9   lost, who would be responsible for paying for that cocaine?

10  A    Mr. Guzman would lose his share and I would lose mine.

11  Q    So if it was in his possession -- I'm sorry.  I think

12  there was something in the translation.

13       If the defendant had your cocaine in Mexico and it

14  was lost, who would have to pay for it?

15  A    Well, in that case, it was Mr. Guzman's responsibility in

16  Mexico.

17  Q    But if it was lost in the United States, who would have

18  to pay for that cocaine?

19  A    Each one of us then would lose the percentage that we had

20  agreed to once it had crossed the border.  Now, if it was in

21  my hands, then I would lose it.

22  Q    So if there was a seizure -- looking at the screen, I'm

23  just making a mark.

24       If there was a seizure along the route from Colombia

25  to Mexico, would the defendant owe you anything?

Ramirez - direct - Goldbarg                1861

A      No, not if he was -- not if it happened in the ocean.  It

would be me.  It would be my loss.

                    (Continued on next page.)

Ramirez - direct - Goldbarg                    1862

1    DIRECT EXAMINATION

2    BY MS. GOLDBARG:    (Continuing)

3    Q    Now, you said that after this first meeting with the

4    defendant you didn't finalize every single detail.  How long

5    did you stay in Mexico on this trip?

6    A    Two months approximately.

7    Q    Did you meet with the defendant again at this time?

8    A    Yes.

9    Q    Approximately how many times did you meet with the

10   defendant?

11   A    Three, four times that I remember.

12   Q    What would you discuss at those meetings?

13   A    We were finalizing the details for me to send them the

14   planes with my cocaine from Colombia where they might possibly

15   arrive in what state, you know, in what air strip and

16   depending on that, then the amount of kilos that were going to

17   be transported by the planes, where he would deliver in the

18   United States, which at the time he told me that it would be

19   in Los Angeles, most of it.

20   Q    Was the defendant alone during these meetings that you

21   had with him?

22   A    Sometimes he was.  Some of the times his brother would be

23   there or El Gordo.

24   Q    When you say his brother, which brother are you referring

25   to?

Ramirez - direct - Goldbarg                    1863

1   A    I was referring to Arturo Guzmán Pollo.

2   Q    Do you know Mr. El Gordo's real name?

3   A    No.

4   Q    Would you meet with Arturo and El Gordo by yourself

5   without the defendant?

6   A    Yes.

7   Q    What would you discuss at those meetings?

8   A    We were always speaking about the same thing, the

9   expectations of my planes going from Colombia to Mexico and

10  where they were going to be received by Mr. Guzmán.

11  Q    Now, you testified that there were four Mexican states

12  that you discussed at that first meeting with the defendant.

13  I'd like to go through each one so you can give us some of

14  those landing strips.

15  A    Correct.

16  Q    I am going to show you what has been marked as Government

17  Exhibit 506-19, which I believe is in evidence.

18            THE COURT:  Any objection?

19            MR. PURPURA:  No.

20            THE COURT:  Received.

21            (Government's Exhibit 506-19 received in evidence.)

22  Q    Can you mark on the map what landing strips or what areas

23  you discussed you could land your planes in the State of

24  Sinaloa?

25  A    Yes.  There were landing strips in Los Mochis, near Choix

Ramirez - direct - Goldbarg                    1864

1   Q    C-H-O-I-X?

2   A    Correct.  El Fuerte, and in Southern Sinaloa in Rosario.

3   Q    I am now showing you what has been marked for

4   identification as Government Exhibit 506-20, which is also in

5   evidence.  The State of Sinaloa, where did you discuss having

6   landing strips to receive your cocaine?

7   A    Possibly near Guamas, Obregon, Hermosillo, Rosario, what

8   I recall.  That's what I recall.

9   Q    Now, in the State of Durango, do you recall what landing

10  strips you discussed where the defendant could receive your

11  cocaine?

12          And I'm sorry, that's Government Exhibit 506-8?

13          THE COURT:  Received without objection.

14          MR. PURPURA:  No objection.

15          (Government's Exhibit 506-8 received in evidence.)

16  A    Well, I recall that it was in Durango  and that it was in

17  the mountains, but I do not recall the exact place.

18  Q    And lastly, looking at Government Exhibit 506-14.

19          THE COURT:  Received without objection.

20          MS. GOLDBARG:    Thank you.

21          (Government Exhibit 506-14 received in evidence.)

22  Q    In the State of Nayarit, do you recall where you

23  discussed you could land your planes full of cocaine?

24  A    I remember that there was a landing strip in Nayarit, but

25  I do not recall its exact location.

Ramirez - direct - Goldbarg                    1865

1    Q    Did you eventually send cocaine to the defendant after

2    this trip to Mexico?

3    A    Yes.

4    Q    Do you recall any details of the first shipment of

5    cocaine you sent to him?

6    A    Yes.

7    Q    Tell us about that.

8    A    Well, I remember that there was five planes and they took

9    4,000 kilos of cocaine approximately and they arrived to a

10   landing strip near Los Mochis, Sinaloa.

11   Q    I'm sorry, where is Los Mochis?

12   A    In Sinaloa.

13   Q    Do you know what time the planes arrived in Mexico?

14   A    Yes.

15   Q    How do you know this?

16   A    From my lieutenants in Mexico and from my pilots.

17   Q    What time did these planes arrive?

18   A    Between 3:00  and 4:00  in the morning approximately.

19   Q    Who set the time  when the planes should land at the

20   landing strip?

21   A    Mr. Guzmán Loera.

22   Q    And did you speak with your pilots after they completed

23   this transportation?

24   A    Yes.

25   Q    What did your pilots tell you?

Ramirez - direct - Goldbarg                    1866

1    A    They told me that they landing strip was very well

2    lighted, meaning that the visibility, it was very easy to land

3    the planes, that they had arrived and that the unloading of

4    the cocaine from my planes had been fast, that there were

5    tankers there, gas tankers there, and they had refueled the

6    planes very quickly and that the federal police was there in a

7    Suburban SUV, they had taken the cocaine very quickly, that

8    they had been fed, and that they were happy and wanted to go

9    back.

10   Q    I'm sorry, when you said that your pilots told you that

11   they had placed the cocaine in the Suburbans, who was that?

12   A    Those who unloaded the planes, who were at the landing

13   strip, there were people there who belonged to the federal

14   police and people who belonged to Mr. Guzmán Loera's

15   organization, they placed the cocaine in the Suburbans and

16   left with it.

17   Q    What happened to your cocaine after it landed in Los

18   Mochis, Sinaloa?

19   A    It was transported to the border with the United States

20   and then later it crossed the border between Mexico and the

21   United States and it was delivered to me in Los Angeles.

22   Q    How do you know this?

23   A    Through my lieutenants.

24   Q    Your lieutenants where?

25   A    In the United States, those who received the cocaine, and

Ramirez - direct - Goldbarg                    1867

1   my lieutenants who were in Mexico, who were in contact with

2   Mr. Guzmán Loera and his people.

3   Q    How long did it take for the defendant to deliver these

4   4,000 kilos from Los Mochis to your people in Los Angeles?

5   A    That was super quick, that I recall, it was less than a

6   week.

7   Q    Was this expected?

8   A    Well, that was the first time that one of the Mexican

9   drug traffickers delivered the cocaine to me that quickly.  I

10  did not expect it to be that quickly.

11  Q    How much time would the other traffickers take you to get

12  your cocaine to Los Angeles?

13  A    Sometimes a month or more.

14  Q    I'd like to draw your attention to another conversation

15  you had with the defendant.  Did he ever ask you to process

16  cocaine or package cocaine in a special form?

17  A    Yes.

18  Q    What did the defendant ask you?

19  A    He said he was going to give a mold to my people in

20  Mexico to see if I could manufacture the cocaine in that

21  shape.

22  Q    Did the defendant provide your people with this mold?

23  A    Yes.

24  Q    When was this approximately?

25  A    That was sometime like 1991, '92.  I really don't

MDL      RPR      CRR      CSR      OCR

Ramirez - direct - Goldbarg                 1868

1    remember the exact date.

2    Q    Were you having any problems with how your cocaine was

3    being delivered in the United States at this time?

4    A    Yes.

5    Q    What was the problem?

6    A    I was receiving the cocaine in pieces, like in powder,

7    and many times it was not complete, meaning that the full

8    weight of the cocaine wasn't present.

9    Q    What was the shape of the mold that the defendant

10   provided to you?

11   A    It was a cylindrical shape, cylindrical, like the shape

12   of a food jar or a preserve jar.

13   Q    What did you do with that mold once the defendant

14   provided it to you?

15   A    I took it to my cooks, my chemists so that they could

16   make it in that shape.

17   Q    Were your cooks successful in being able to make it in

18   that shape?

19   A    Yes.

20             THE COURT:  Is this a good breaking point?

21             MS. GOLDBARG:   If I could have a couple more

22   minutes, Your Honor.

23             THE COURT:  Sure.

24   Q    How long did you produce this cocaine in this special

25   form?

Ramirez - direct - Goldbarg                    1869

1    A    Several months.

2    Q    Do you know approximately how many kilos of cocaine you

3    sent to him in this special shape?

4    A    I don't remember exactly.  It was several tons.

5    Q    Why did you stop using the special shape of cocaine?

6    A    Because there was a seizure in Los Angeles, a several-ton

7    seizure, and it was my cocaine that belonged to me that had

8    that shape.

9    Q    How did you find out about the seizure?

10   A    Through my lieutenants in Mexico and in the United States

11   and in Los Angeles where they were sending my cocaine.

12   Q    What did your lieutenants tell you about what happened at

13   that seizure?

14   A    The L.A. people called me to speak to them, and they said

15   hey, they just took several tons of cocaine in some cans that

16   had chillies in them and that's just like the cocaine that we

17   have been receiving, what's happening?  Is there a problem

18   with us?

19   Q    Did you speak with your workers in Mexico about this?

20   A    Yes.

21   Q    Who did you speak with?

22   A    With Mr. *Sergio Ramirez Pechuga.

23            (Continued on next page.)

24

25

MDL        RPR        CRR        CSR        OCR

Proceedings                                      1870

1   BY MS. GOLDBARG:   (Continuing.)

2   Q    What did Sergio tell you?

3   A    That Mr. Arturo Guzman Loera, El Pollo, had called him to

4   tell him that we had lost several tons of cocaine in Los

5   Angeles or he in Los Angeles.  And that he was waiting for the

6   documents for the indictment that would support the seizure.

7   Q    Did Arturo respond?  Did he provide those documents?

8   A    Yes.

9   Q    Did you see these documents?

10  A    I saw them.

11  Q    Do you recall how many kilos were involved in the

12  seizure?

13  A    Not exactly, it was several tons.

14        MS. GOLBARG:  Your Honor, this would be a good time

15  to stop.

16        THE COURT:  I am going to give you three days off,

17  ladies and gentlemen, but that's conditioned on your promise

18  to stay away from media coverage, not to communicate with

19  anyone.  No twittering or Facebooking.  Keep it out of your

20  mind and have a restful weekend.  As you can see, this is

21  fairly hard work that you are doing and the parties and I very

22  much appreciate the hard work that you are putting into it.

23  Thank you, have a good few days off.

24        (Jury exits.)

25        (In open court.)

MDL       RPR       CRR       CSR       OCR

Proceedings                                                    1871

1           THE COURT:  Anything else we need to talk about?  I

2   have the Government's motion.  Defense should look at it.  You

3   know, we will talk one day about -- it would be nice if I

4   could get a response on Monday, but if not, maybe Tuesday.

5           MS. LISKAMM:  Your Honor, I wanted to formally move

6   into the exhibits that we had with Agent Scott Schoonover.  So

7   for the record, for the Lina Maria seizure, it's Government

8   Exhibits 200-19 and 200-18, which were the DEA-7s; 200-12,

9   200-13, and 200-14, which were the photos from that seizure.

10  For the San Jose seizure it's Government Exhibits 201-12 and

11  201-13 which were the DEA-7s and 201-5, 201-7, 201-8, 200-15

12  and 200-16 which were all the photos from that seizure.

13          For the Gatun seizure, it's Government Exhibits

14  203-49 and 203-47 which were the DEA-7s.  203-50 and 203-28

15  which were the lab reports.  And 203-18, 203-22, 203-23,

16  through 203-27 which were all photos from the Gatun seizure.

17  And, lastly, for the semi-submersible, Government Exhibit

18  202-11 and 202-16 which were the lab reports; 202-13 and

19  202-15 which were the DEA-7s and 202-12 which were the photo.

20          THE COURT:  Those are all received without

21  objection.

22          (Government Exhibits 200-19, 200-18, 200-12, 200-13,

23  200-14, 201-12, 201-13, 201-5, 201-7, 201-8, 200-15, 200-16,

24  203-49, 203-47, 203-50, 203-28, 203-18, 203-22, 203-23 through

25  203-27, 202-11, 202-16, 202-13, 202-15 and 202-12 received in

Proceedings                                      1872

1   evidence.)

2           THE COURT:  Did we fix the view problem?

3           MR. BALAREZO:  I think we did, but it sort of

4   alternates.

5           MR. LICHTMAN:  It's fine now, Your Honor.

6           THE COURT:  I ask the Government to ask the witness

7   to stay forward.

8           MS. GOLDBARG:  Yes, Your Honor.

9           THE COURT:  Thank you.

10

11     (Matter adjourned to 9:30 a.m., Monday, December 3, 2018.)

12

13

14

15                        - ooOoo -

16

17

18

19

20

21

22

23

24

25

                MDL       RPR       CRR       CSR       OCR

1873

I N D E X

**WITNESS**                                          **PAGE**


**MIGUEL ANGEL MARTINEZ MARTINEZ**

    CROSS-EXAMINATION BY MR. PURPURA            1704

    REDIRECT EXAMINATION BY MR. ROBOTTI         1724

    RECROSS-EXAMINATION BY MR. PURPURA          1735

    RE-REDIRECT EXAMINATION

    BY MR. ROBOTTI                              1739

**SHAWN BAKER**

    DIRECT EXAMINATION BY MR. FELS              1746

    CROSS-EXAMINATION BY MR. BALAREZO           1769

**MICHAEL CHARLES GRIS**

    DIRECT EXAMINATION BY MS. LISKAMM           1778

**SCOTT SCHOONOVER**                                  1794

    DIRECT EXAMINATION BY MS. LISKAMM           1794

    CROSS-EXAMINATION BY MR. BALAREZO           1815

**JUAN CARLOS RAMIREZ ABADIA**

    DIRECT EXAMINATION BY MS. GOLDBARG          1817

                                                1821

1874

# E X H I B I T S

| | |
|---|---|
| Defendant's Exhibit 81 | 1712 |
| Defense Exhibit 165 | 1736 |
| Defense Exhibit 165-B | 1737 |
| Defense Exhibit 163 | 1738 |
| Government Exhibit 200-20 | 1750 |
| Government Exhibit 200-1 and 200-2 | 1752 |
| Government's Exhibit 200-3 | 1758 |
| Government's Exhibits 200-4 and 200-5 | 1759 |
| Government's Exhibit 200-6 | 1761 |
| Government's Exhibit 200-7 | 1763 |
| Government's Exhibits 200-9 and 200-10 | 1764 |
| Government's Exhibit 200-8 | 1766 |
| Exhibit 201-15 | 1781 |
| Exhibit 201-14 | 1785 |
| Exhibit 201-11 | 1788 |
| Exhibits 201-3, 201-4, 201-6, 201-9 and 201-10 | 1791 |
| Government's Exhibit 85-A | 1822 |
| Government's Exhibit 85-C | 1823 |
| Government Exhibit 3500-JCRA-4 | 1828 |
| Government Exhibit 506-22 | 1831 |
| Government Exhibit 2B | 1850 |
| Government Exhibit 84 | 1853 |
| Government Exhibit 510-1 | 1859 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1875

Government's Exhibit 506-19                     1863

Government's Exhibit 506-8                      1864

Government Exhibit 506-14                       1864

Government Exhibits 200-19, 200-18, 200-12,
200-13, 200-14, 201-12, 201-13, 201-5,
201-7, 201-8, 200-15, 200-16, 203-49,
203-47, 203-50, 203-28, 203-18, 203-22,
203-23 through 203-27, 202-11, 202-16,
202-13, 202-15 and 202-12                       1871


Defense Exhibit 160                             1716

Defense Exhibit 84                              1719