**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

**UNITED STATES OF AMERICA**


   **-v.-**                                        **09 CR 466 (BMC)**


**JOAQUIN ARCHIVALDO GUZMAN LOERA,**


               ***Defendant.***
-------------------------------------------------------------------X



## REPLY MEMORANDUM FURTHER SUPPORTING JOAQUIN ARCHIVALDO GUZMAN LOERA'S RULE 33 MOTION FOR <u>RETRIAL UPON AN EVIDENTIARY HEARING</u>



LAW OFFICE OF MARC FERNICH
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

LAW OFFICES OF JEFFREY LICHTMAN
11 East 44th Street, Suite 501
New York, NY 10017
(212) 581-1001
jhl@jeffreylichtman.com

*Attorneys for Defendant Joaquin Guzman*

# TABLE OF CONTENTS

STATEMENT ...........................................................................................1

ARGUMENT

LOGIC, LAW AND JUSTICE COMPEL A SEARCHING
EVIDENTIARY HEARING AND A FAIR RETRIAL.............................10

I.   THE JUROR'S VICE ALLEGATIONS AMPLY SUFFICE TO
     WARRANT A HEARING .............................................................11

II.  PREJUDICE IS PRESUMED WHEN JURORS
     DELIBERATELY CONSULT EXTRINSIC INFORMATION  IN
     VIOLATION OF THEIR INSTRUCTIONS AND FALSELY
     DENY IT UPON INQUIRY, AND THE GOVERNMENT  FAILS
     TO REBUT THE PRESUMPTION................................................21

CONCLUSION .....................................................................................36

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

**UNITED STATES OF AMERICA**

    **-v.-**                            **09 CR 466 (BMC)**

**JOAQUIN ARCHIVALDO GUZMAN LOERA,**

                      *Defendant.*
-----------------------------------------------------------------X

## REPLY MEMORANDUM FURTHER SUPPORTING JOAQUIN ARCHIVALDO GUZMAN LOERA'S RULE 33 MOTION FOR <u>RETRIAL UPON AN EVIDENTIARY HEARING</u>

### <u>STATEMENT</u>

"Justice must satisfy the appearance of justice,"[1] the old saying goes. No empty slogan, that injunction has achieved immortality for good reason. Ensuring the appearance of justice "promote[s] public confidence in the integrity of the judicial process,"[2] thereby preserving respect for the rule of law. Both are staples in our "scheme of ordered liberty."[3]

---

[1] *E.g.*, *Liteky v. US*, 510 U.S. 540, 564 (1994) (Kennedy, J., concurring) (citation, brackets and internal quotation marks omitted).

[2] *Cf. Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 865 (1988) (citations omitted).

[3] *Timbs v. Ind.*, 139 S. Ct. 682, 686-87 (2019) (citation and internal quotation marks omitted).

In the case before the Court, a juror in Joaquin Guzman's trial voluntarily "reached out"[4] to a disinterested journalist and went on video[5] to report for public consumption – for the whole world to read and know[6] – grave misconduct of their own and by their fellow jurors. To recap, the juror maintained that multiple panel members had pervasively "violated"[7] their oath, and rampantly flouted the Court's instructions, in a cluster of ways:

- "[S]everal" jurors – "at least five," including the subject juror[8] – "follow[ed] the case in the media during the trial." They did

---

[4] Inside El Chapo's Jury: A Juror Speaks for the First Time about Convicting the Kingpin ("VICE Art."), https://news.vice.com/en_us/article/vbwzny/inside-el-chapos-jury-a-juror-speaks-for-first-time-about-convicting-the-kingpin (last visited June 7, 2019).

[5] Having committed their story to video, the subject juror was only nominally "anonymous" — despite the government's dogged efforts to paint them as such. Compare Opp., *e.g.*, 1, 31, 35, 40, 42-43, 53, 79 with*, e.g.*, *Navarette v. Cal.*, 572 U.S. 393, 398-401 (2014) (ostensibly anonymous 911 call sufficiently reliable to establish reasonable suspicion; fact of recording "allow(s) for identifying and tracing callers," providing "safeguards against making false reports with immunity"; "false tipster would [thus] think twice before" calling).

[6] The threats of harassment, tampering, intimidation and fishing expeditions the government conjures are thus apparitions here. Opp., *e.g.*, 37-39, 53, 76. On the contrary, the VICE article practically fell in Guzman's lap, thanks to the juror's own decision to come forward and go public with their story.

[7] VICE Art.

[8] The government's cynical moniker for the subject juror — "*Alleged* Juror" — is too clever by half. Opp., *e.g.*, 1 (emphasis supplied). The article's author, a trial "regular," wrote that he specifically "recognized the juror from [his] time in the courtroom. The juror shared detailed notes taken during the trial, which were kept against the

so, in part, by "routinely" and "'constantly'" checking "Twitter feeds" from the journalist in question, VICE News reporter Keegan Hamilton, and "other[s]" in attendance. Peppering the frenzied media coverage – which the Court dubbed "unparalleled" – were accounts of graphically provocative evidence ruled out of Guzman's trial. Also figuring prominently: updates on developments occurring in the jury's absence, along with pronouncements of Guzman's guilt that preceded the proof's close and the start of deliberations.[9]

- Though instructed "not to discuss the case" before retiring to deliberate, jurors "'broke that rule a bunch of times,'" including "on the ride home." Among their express topics of discussion? "*[T]he latest media coverage*."[10]

- Of the reports on evidence "ordered withheld" from the panel's consideration, the most explosive involved a claim – publicly unveiled "on the eve" of "deliberations" – that Guzman had "drugged and raped girls as young as 13." At least five deliberating jurors and two alternates knew and "'talk[ed] about'" the "child rape allegations," branding them "'disgusting'" and "'totally wrong'" if true.[11]

- Worse, the subject juror read "before arriving at the courthouse" a Hamilton tweet reporting that Your Honor was "likely going to meet with the jurors in private and ask whether they had seen the story." Armed with that tip, the juror alerted the others in advance to the coming inquiry and

---

instructions of the court. Information from the jury selection process provided further corroboration about the juror's role in the case." VICE Art. Do the prosecutors really suggest the author's lying? If so, let them try to prove it at a hearing.

[9] VICE Art.; T 5011; Def. Mem. 4-8 & n.6.

[10] VICE Art.; Def. Mem. 8.

[11] *Ibid.*

3

convinced them to lie to the Court, falsely denying knowledge of the blockbuster child molestation charge. "'I had told them if you saw what happened in the news, just make sure that the judge is coming in and he's gonna ask us, so keep a straight face. So he did indeed come to our room and ask us if we knew, and we all denied it, obviously.'"[12]

- Another external item jurors knew, apparently talked and seemingly misled the Court about was an adulterous "affair" – widely reported during trial – a defense lawyer allegedly had with "one of his clients." "[M]oments" after answering negatively a "vague [*in camera*] question" from Your Honor — had the jury seen "any recent media coverage" around the time the alleged affair surfaced? — one of their number promptly "used a smartwatch to find [an] article" discussing it.[13]

- Finally, despite an extensive "jury selection process" that featured a detailed written questionnaire running 31 pages, the subject juror withheld during *voir dire* their burning desire to participate in the "'case of the century,'" a "'once-in-a-lifetime'" chance to be "part of history." Compounding that omission, the juror took and "kept" copious trial notes "against" the Court's "instructions."[14]

---

[12] VICE Art.; Def. Mem. 8-9.

[13] VICE Art.; Def. Mem. 9-10.

[14] VICE Art.; Def. Mem. 10.

Sure, you can parse, undersell[15] and assail to death on paper this self-inculpatory spurt of declarations against interest.[16] That's the tack the government's opposition attempts *ad nauseam*, in page after eye-glazing page. But we've never pretended the juror's assertions are "conclusive"[17] or "irrebuttable,"[18] as the government's hairsplitting

---

[15] For just one conspicuous example, the government perpetually soft-pedals the article as alleging only two isolated instances of misconduct, when it actually says multiple jurors purposely sought out and illicitly followed the unprecedented media buzz — much of it enormously prejudicial — from gavel to gavel. Opp., *e.g.*, 49, 53-54, 62, 66, 68, 85, 93. That's one reason a hearing's imperative: to determine how many jurors violated the Court's instructions; exactly what they read and saw; whether, when and how frequently they discussed it; and precisely who said what to whom.

[16] Nowhere does the government's 96-page opus even acknowledge, let alone attempt to engage, the reality that the juror's "confession[s]" (Opp. 31, 45) are self-incriminating statements against interest, fully competent and admissible under Fed. R. Evid. 804(b)(3). *E.g.*, *US v. Parse*, 789 F.3d 83, 111 (CA2 2015) (sworn juror who "deliberately" lies under judicial inquiry "is subject to prosecution for perjury" and "contempt"); *cf.* Opp. 53 (admitting "interview" concerned juror's "supposed rule breaking"). Merely labeling the statements "hearsay" – no matter how often or insistently – doesn't make them so. Opp., *e.g.*, 1, 35, 40-42, 61, 79. Likewise, the juror's volunteering the statements to a dispassionate reporter for worldwide press publication renders them self-authenticating under FRE 902(6) – more trustworthy, not less. As we'll see, the government's heavy reliance on unpublished district court opinions from other circuits – decisions clashing with Second Circuit standards for post-verdict jury misconduct claims – does nothing to upend these truths.

[17] *US v. Ianniello*, 866 F.2d 540, 543 (CA2 1989), *rev'd on other grounds*, 937 F.2d 797 (CA2), *modified on reh'g*, 952 F.2d 623 (CA2), *amended*, 952 F.2d 624 (CA2 1991), *rev'd on other grounds*, 505 US 317 (1992), *on remand*, 974 F.2d 231 (CA2 1992), *vacated on other grounds*, 8 F.3d 909 (CA2 1993) (*en banc*).

[18] *Ibid.*

approach — passing lip service to the appropriate standard aside[19] — functionally demands. And they don't have to be at this preliminary stage; otherwise "there would be no need for a hearing."[20] The "issue, it must be remembered, is not whether the defendant is presently able to prove his case conclusively; rather, it is whether his showing is sufficiently strong to warrant an investigation to discover the truth."[21]

Sufficiently strong to warrant investigation is what the juror's revelations unmistakably are. Were this any other defendant,[22] few would seriously dispute that they present "clear, strong, substantial and incontrovertible evidence"[23] – *as the Second Circuit liberally construes those terms* – of "specific, non-speculative impropriet[ies]."[24] To echo our

---

[19] Opp. 38.

[20] *Ianniello*, 866 F.2d at 543.

[21] *US v. Moten*, 582 F.2d 654, 668 (CA2 1978) (on reh'g pet.).

[22] *Cf. People v. Neulander*, 80 N.Y.S.3d 791, 797 (N.Y. App. Div. 4) ("*every* defendant has a right to be tried by jurors who follow the court's instructions, do not lie … about their misconduct during the trial, and do not make substantial efforts to conceal … their misconduct when the court conducts an inquiry with respect thereto") (emphasis supplied), *lv. granted*, 84 N.Y.S.3d 870 (N.Y. Ct. App. 2018).

[23] *Ianniello*, 866 F.2d at 543 (citations, internal quotation marks and brackets omitted).

[24] *Ibid.*

opening papers, that Court has long "*required*" posttrial misconduct hearings upon a relatively modest showing of "reasonable grounds [to] investigat[e]."[25] Here, a juror with no obvious ulterior motives voluntarily approached a neutral third party to accuse themselves and their counterparts, in a published report circulated across the globe, of (1) brazenly violating their oath and thumbing their collective nose at the Court's instructions, by (2) actively searching for and exposing themselves to the most incendiary publicity throughout Guzman's trial, and then (3) allegedly colluding in lying to the Court's face when asked about it. If those circumstances don't provide reasonable grounds to investigate, then what *would* qualify?

In this light, the government's relentless nitpicking bristles with circular reasoning and proves too much. Like the juror's own contentions, it merely points out "various unknowns"[26] and raises "many unanswered

---

[25] *US v. Vitale*, 459 F.3d 190, 197 (CA2 2006) (citing *US v. Moon*, 718 F.2d 1210, 1234 (CA2 1983)) (emphasis supplied); *accord US v. Baker*, 899 F.3d 123, 134 (CA2 2018) (some form of exploration "*mandatory*" upon "reasonable grounds for investigation") (emphasis supplied); *US v. Schwarz*, 283 F.3d 76, 98 (CA2 2002) (similar).

[26] *Vitale*, 459 F.3d at 197-99.

questions,"[27] serving only to punctuate the need for a hearing. After all, resolving unanswered questions is a hearing's central office.[28]

Against that backdrop, leaving the juror's daunting allegations unexamined – whitewashing or sweeping them under the rug due largely to Guzman's notoriety – would indelibly taint the verdict's legitimacy. Such a dreary prospect defies the heightened solicitude traditionally afforded infamous defendants in high-profile cases, to curb popular "passions"[29] and check the "community's"[30] thirst for "revenge or retribution."[31]

And if that specter wasn't bad enough, letting the cloud linger would have broader and more damaging institutional implications. It would stain the reputation for uncompromising fairness and objectivity that sets our system apart and makes it a model for other nations,

---

[27] *Ibid.*

[28] *E.g.*, *US v. Martha Stewart*, 433 F.3d 273, 306 (CA2 2006) ("if *any* significant doubt as to a juror's impartiality remains in the wake of objective evidence of false *voir dire* statements, an evidentiary hearing generally should be held") (emphasis supplied).

[29] *Dennis v. US*, 341 U.S. 494, 525 (1951) (Frankfurter, J., concurring).

[30] *Spaziano v. Fla.*, 468 U.S. 447, 476-78, 480 (1984) ((Stevens, Brennan and Marshall, JJ., concurring and dissenting).

[31] *Ibid.*

creating a result-oriented perception diminishing us both at home and abroad.[32] Even more pointedly, it would belie this Court's stirring post-verdict speech quoted at length in the government's memo,[33] reducing it to so many idle words and unfulfilled promises. And it would make hypocrites of us all in the bargain, shattering our pretenses to superiority and rendering our system only incrementally better than those Guzman allegedly "corrupt[ed]."[34] It would, in short, make a "farce" of the core virtues thought to distinguish "our system of justice."[35]

With all that in mind, the government's resisting so strenuously "an investigation to discover the [full] truth"[36] and scope of what happened here can only rank as disappointing. For it is fundamental that a

---

[32] *Cf.* Opp. 37 (legitimacy of "system that relies on the decisions of laypeople" hinges on "community's trust") (quoting *Tanner v. US*, 483 US 107 (1987)).

[33] *Ibid.* 31 ("We're one of the few countries in the world that trusts our citizens to make these important kinds of decisions over other people's lives. You have demonstrated why we do that and why we have the confidence in it. Not with regard to the decision you reached, but the way you went about it, was really quite remarkable; and frankly, made me very proud to be an American.") (quoting T 7105-06).

[34] *Ibid.* 6.

[35] *Ibid.* 87-88 (quoting *US v. Parse*, 789 F.3d 83, 126 (CA2 2015) (Straub, J., concurring)).

[36] *Moten*, 582 F.2d at 668 (on reh'g pet.).

9

prosecutor's job is to pursue "justice," not "win a case."[37] Why, then, does the government resort to 96 pages of overkill to avoid the sort of straightforward posttrial inquiry that's commonly conducted in our Circuit?[38] Why does it protest too much? What's it so afraid to find out? To ask these questions is to certify a hearing's necessity.

## ARGUMENT

## LOGIC, LAW AND JUSTICE COMPEL A SEARCHING EVIDENTIARY HEARING AND A FAIR RETRIAL

Professing "evidentiary deficiencies" and reliability "concerns," the government says the juror's VICE allegations don't deserve a hearing because they're "vague, conclusory" and "cannot be credited."[39] Even assuming their truth, it urges alternatively, any jury misconduct worked no prejudice, counseling summary denial of Guzman's motion.[40] Both contentions fail.

---

[37] *Berger v. US*, 295 U.S. 78, 88 (1935); *cf. Moten*, 582 F.2d at 660 ("*both sides* have a vital interest in learning everything there is to know about the matter") (emphasis supplied).

[38] Def. Mem. 12 n.9, 23 n.17.

[39] Opp., *e.g.*, 35-36, 40.

[40] *Ibid.*, *e.g.*, **ARGUMENT II**.

10

## I.  THE JUROR'S VICE ALLEGATIONS AMPLY SUFFICE TO WARRANT A HEARING

Our **STATEMENT** unmasks the major analytic and conceptual flaws dooming the government's bid to discredit the juror's allegations and poke holes in the VICE report. To quickly review:

A.  The government vastly exaggerates the showing needed to "*mandate*[]" and "*require*[]" a posttrial jury misconduct hearing in our Circuit: "clear, strong, substantial and incontrovertible evidence" of specific improprieties, construed simply to mean "reasonable grounds for investigation."[41] While a single stray sentence disclaims any need for "conclusive" or "irrebuttable" proof,[42] the rest of the government's 96-page brief (an oxymoron, we know) essentially demands just that.

---

[41] Def. Mem. 10-12; *ante* 6-7 & nn. 23-25; authorities cited therein. *US v. McCourty*, a case addressing witness perjury, scarcely requires an actual innocence showing to win a new trial for jury misconduct. Opp. 35-36, 75 (citing 562 F.3d 458, 475 (CA2 2009)). To the contrary, jury misconduct involving exposure to extra-record information is *presumptively* prejudicial, regardless of guilt or innocence. Def. Mem. 14-15, 21 & sources cited. And disqualifying bias is likewise *presumed* when a juror deliberately and materially lies to secure a seat or avoid dismissal (*id.* 17, 19 & sources cited) – though you'd hardly know either from the government's telling.

[42] Opp. 38 (citation omitted).

B.    By alleging "deficiencies"[43] and "contradictions"[44] in the VICE report, attacking its source's "reliability"[45] and pressing competing hypotheses,[46] the government raises classic credibility issues[47] that go to weight[48] rather than substance,[49] merely amplifying the need for a hearing. If the juror's "allegations"[50] don't "add up"[51] or "risk …

---

[43] *Ibid.* 40.

[44] *Ibid.* 53.

[45] *Ibid.* 40.

[46] *Ibid.*, *e.g.*, 45 (surmising – baldly – that juror may have "exaggerate[d] or fabricate[d] statements" or "mischaracterize[d] or overstate[d] events to tell a good story that could sell"), 51 ("Had there been an open discussion among all the jurors of lying to the Court … those jurors would have reported it to the Court.").

[47] *Ibid., e.g.*, 52 ("implausible"), 53 ("suspect").

[48] *E.g.*, *US v. Lipari*, Crim. No. 92-164, 1995 WL 84221, at *6 (DNJ Feb. 24, 1995) (court "must weigh the evidentiary showing made by the defendant and the record of the proceeding as a whole to determine whether" juror examination "appropriate"), *aff'd without op.*, 70 F.3d 1258 (CA3 1995); *id.* at *8 (court "may consider the source of the evidence of jury influence in determining its weight") (citation omitted); *id.* ("possibility that defendant engineered the appearance of the article himself diminishes the weight it will be accorded").

[49] Opp., *e.g.*, 46 (juror "does not identify which other jurors followed such coverage, how he or she knew the other jurors followed the coverage, or how he or she knew that the coverage observed by other jurors included information ruled inadmissible by the Court"), 46-47 (continuing in similar vein).

[50] *Ibid.* 46.

[51] *Ibid.* 51.

[in]accura[cy],"[52] it doesn't follow that you just cast them aside on a prosecutor's say-so. No, you hold a hearing to find out why – to resolve the claimed discrepancies, reconcile the supposed "inconsisten[cies]"[53] (if you can) and generally get to the bottom of the matter. The "remedy for allegations of juror partiality" stemming from outside influence is a "hearing" with prejudice presumed.[54] In effect, the government accuses the juror, the author or both of lying[55] – with no clear motive to do so, as it candidly admits.[56] How can the Court evaluate their credibility – much less dismiss their accounts out of hand – without hearing them in person?

   C.   In stressing the Court's recurring cautionary instructions, juror inquiries during trial and favorable impressions of the

---

[52] *Ibid.* 46.

[53] *Ibid.* 53 (citation and internal quotation marks omitted).

[54] *Smith v. Phillips*, 455 U.S. 209, 215 (1982).

[55] Opp., *e.g.*, 40 ("cannot be credited"), 51 ("defies belief").

[56] *Ibid.* 45 (juror's "motivations" concededly "unclear"). Though Evidence Rule 606 bars its consideration, the juror's having "left feeling that Chapo was definitely guilty as charged" (VICE Art.) dispels the government's insinuations of "dissatisfaction" and "unhappiness" with – or lack of "enthusias[m]" for – the "verdict." Opp. 44-45 (citation omitted). Nor does the article give the slightest inkling of any "grievances against fellow jurors." *Id.* 45 (citation omitted). More on Rule 606, and the flagrant violations riddling the government's brief, later. Incidentally, what would entitle courts to "supervise" interviews conducted by a free "press"? *Id.* 45-46.

panel's diligence, obedience and attentiveness,[57] the government simply begs the question presented. After all, the subject juror alleges in the VICE article that they and their counterparts habitually violated the Court's instructions and answered its inquiries dishonestly. That's the whole point of Guzman's motion and hearing request. Try as it might, the government can't just wish the disputed issue away, or paper the contest over, by assuming a preferred conclusion.

Indeed, the Second Circuit roundly rejected a similar exercise in circular reasoning just a few years ago. In *US v. Haynes*, defense counsel informed the judge that an alternate juror told the lawyer he'd overheard some women jurors saying "prior to" deliberations that the defendant "'might be guilty, she's here,'" even though the alternate "obviously didn't give any specifics."[58] The judge "responded," much like the government in this case, that "the jury had been 'continuously advised that if there were any discussions prior to deliberations, that it should be brought to the Court's attention immediately,' and 'no juror brought anything like

---

[57] Opp. **SUBARGUMENT I(B)(ii)**.

[58] 729 F.3d 178, 186-87 (CA2 2013) (citation omitted).

14

that to the Court's attention."[59] The Second Circuit reversed for retrial, partly because the court "fail[ed] to investigate"[60] the possibility that the jury had "deliberated prematurely in violation of the Judge's instructions," impairing the "presumption of innocence" and committing potential "misconduct."[61]

More recently, a New York appeals panel reversed a murder conviction after a "thorough" trial court "hearing" established that a juror "failed to follow the court's instructions concerning communicating with outside parties about the case prior to rendering a verdict by sending and receiving text messages regarding the trial and the events surrounding it, and by *misrepresenting her actions when questioned about them*."[62] Prompting the hearing? Nothing more than "a discharged alternate juror['s] report[ing] to defense counsel" after the verdict that the

---

[59] *Ibid.* at 187 (citation and alterations omitted).

[60] *Ibid.* at 183, 197; *see also ibid.* at 187, 191-92.

[61] *Ibid.* at 191-92 ("Where the District Court instructs the jury to refrain from premature deliberations, as the Court did in this case, and the jury nevertheless discusses the case prior to the close of trial, that premature deliberation may constitute jury misconduct.") (citing *US v. Cox*, 324 F.3d 77, 86 (CA2 2003)).

[62] *Neulander*, 80 N.Y.S.3d at 798 (dissenting op.) (emphasis supplied).

offending juror "had engaged in prohibited communications during the trial"[63] – a proffer far more "vague and "conclusory"[64] than the in-depth (especially by comparison) VICE expose.

In asserting otherwise, the government reaches for a pair of unpublished district court opinions – one from a different circuit – deeming news articles insufficient to trigger posttrial evidentiary hearings. As one of the cases allows, "this type of analysis" – gauging the strength of the defendant's "evidentiary showing" – is "highly fact-sensitive."[65] They thus offer the government little comfort here.

*US v. Bin Laden*, fronted in our opening papers, found that a "single [vague] sentence" – "frail," "ambiguous" and "made almost as an aside in a news story" – did "not warrant hauling [] jurors back to court over two years after the verdict was rendered."[66] Meanwhile, the out-of-circuit

---

[63] *Ibid.* at 795 (maj. op.).

[64] Opp., *e.g.*, 35.

[65] *Lipari*, 1995 WL 84221, at *6 (citations omitted).

[66] No. S7R 98CR1023KTD, 2005 WL 287404, at *2-*3 (SDNY Feb. 7, 2005), *aff'd*, 552 F.3d 93 (CA2), *reh'g denied*, 553 F.3d 150 (CA2 2008).

case – *Lipari* – involved a claim of judicial, not jury, misconduct: namely, coercive *ex parte* contact with the panel while deliberating.

The *Lipari* article "grew out of" a reporter's interview with the *defendant* "in prison" more than a year after sentencing.[67] "[W]hat defendant" said – but never "detail[ed]" for the court – "motivated" the reporter to track down the jurors.[68] The defendant sought a new trial some "two years" after the verdict.[69]

"[R]ecusal of the Court and investigation of a long discharged jury," the judge noted, "is relief of the most extraordinary nature."[70] Accordingly, and given the "significant passage of time" – the "length of time that has passed" – the "Court is justified in requiring a showing of real substance in support of this application."[71] The "time elapsed is also

---

[67] 1995 WL 84221, at *1-*3.

[68] *Ibid.* at *6, *8.

[69] *Ibid.* at *9.

[70] *Ibid.* at *4.

[71] *Ibid.* & *7.

significant," added the judge, "when the Court looks to the burden on the jury and cost to the interests of the jury process."[72]

In these novel circumstances, the court "held here" that "only" the "most compelling of evidentiary showings" would rationalize "bring[ing] these people back for yet another inquiry into the integrity of their deliberations…. Defendant's article is not such a showing…. The remedy sought is too extreme and the evidentiary support to scanty to justify a different result."[73]

Since the VICE article appeared and is being litigated immediately following the verdict – among many palpable distinctions – the *Bin Laden* and *Lipari* situations scarcely resemble this one.

Equally unavailing is the government's juxtaposing the juror's trial silence as to the VICE allegations with "three occasions" when jurors "raise[d] … concerns with the Court": ███████████████████████ ████████████████████████████████████████████ ██████████████████████████████ and a third when a juror disclosed

---

[72] *Ibid.* at *9.

[73] *Ibid.* & *10.

"accidental media exposure."[74] But reporting accidents ██████████

████████████████ is a far cry from coming forward to implicate

yourself in deliberate criminal activity.[75] It's folly to compare the two –

and fancy to expect the subject juror or their culpable colleagues to have

taken the latter step.

In a last-ditch effort to skirt a hearing, the government's memo

impugns the subject juror throughout as an "anonymous" source.[76] But it

was the *government* that successfully moved to keep "the jury in this case

… anonymous during trial for safety reasons."[77] Yet, having lobbied the

Court to implement that "drastic measure,"[78] the same government now

scorns the juror for nominally preserving their anonymity due to what

the article plainly identifies as the same safety concerns.[79] The

---

[74] Opp. 16-17, 43, 51-52.

[75] *See* Def. Mem. 17, 19.

[76] *But see ante* n.5.

[77] Opp. 43.

[78] *US v. Mostafa*, 7 F. Supp. 3d 334, 336 (SDNY 2014).

[79] VICE Art. (juror "requested anonymity 'for obvious reasons' and declined to provide a real name, noting that the jurors didn't even share their identities with one another"); *id.* (juror "said speaking out after convicting the world's most notorious drug kingpin wasn't easy. At one point in the interview, I mentioned it was brave to come forward after serving on Chapo's jury. 'I'm either brave or stupid,' the juror

government can't have it both ways, wielding anonymity as both sword (to help convict Guzman at trial)[80] and shield (to help avoid a requisite jury misconduct hearing afterward).

Having it both ways, though, is exactly what the government seeks in simultaneously scolding the juror for remaining anonymous *and* accusing him of courting "notoriety"[81] – a Catch-22 situation if ever there was one. Damned if you do, damned if you don't. Heads or tails, the government always wins.[82]

---

responded. 'It could go either way.'"); *id.* ("With everyone paranoid about the prospect of being threatened or killed by the Sinaloa cartel, the topics of conversation were initially limited to the Knicks and the weather. 'No one wanted to talk about their personal life,' the juror said. 'We didn't want to give out what we did for a living.'").

[80] *E.g.*, *Mostafa*, 7 F. Supp. 3d at 336 (anonymous jury risks "unfair[ly] prejudic[ing]" defendant and "encroaching on the presumption of innocence") (citation omitted).

[81] Opp. 44.

[82] Elsewhere the government complains that the juror "does not indicate with how many other jurors he or she spoke; which of them, if any, knew of the media coverage at the time the Court questioned them, as opposed to learning it of it after that questioning; or why these other jurors would agree to lie to the Court." Opp. 47 (footnote omitted). Although these unanswered questions merely underscore the need for a hearing, the article suggests a response to at least the last one. VICE ART. ("Asked why they didn't fess up to the judge when asked about being exposed to media coverage, the juror said they were worried about the repercussions. The punishment likely would have been a dismissal from the jury, but they feared something more serious. 'I thought *we* would get arrested,' the juror said. 'I thought they were going to hold me in contempt.… I didn't want to say anything or rat out my fellow jurors. I didn't want to be that person. I just kept it to myself, and I just kept on looking at your Twitter feed.'") (emphasis supplied). And it may be that the juror did fill in the supposed blanks for the reporter but what they said didn't make the article.

## II. PREJUDICE IS PRESUMED WHEN JURORS DELIBERATELY CONSULT EXTRINSIC INFORMATION IN VIOLATION OF THEIR INSTRUCTIONS AND FALSELY DENY IT UPON INQUIRY, AND THE GOVERNMENT FAILS TO REBUT THE PRESUMPTION

After spending dozens of pages picking the VICE article apart and quibbling over the smallest details, the government urges the Court to forget all that, presume the article's truth and summarily deny Guzman's motion without a hearing. Even assuming its truth, the government says, a hearing's unnecessary because multiple jurors' starkly violating their oath and chronically flouting the Court's instructions – by regularly tracking a storm of sensational media coverage, unprecedented in scope and intensity – only to lie about it when asked somehow didn't prejudice Guzman. No harm, no foul, as it were – even if the coverage included bombshell allegations, child rape among them, that the *government* deemed too inflammatory to admit at trial. And even if it prematurely pronounced the defendant guilty by an overwhelming margin.

Not so fast. The Court should see this ploy for what it is: an illicit attempt to lure it into conventional harmless error analysis[83] in a setting

---

[83] "[L]ure" may give the prosecutors too much credit; they lay their intentions bare. Opp. 75 ("after assessing the nature of the extraneous information and its likely effect

where the exposure's likely impact is evaluated for objective influence on a hypothetical average jury, not subjective effect on the actual jurors in Guzman's case – and where prejudice is thus presumed, with reversal all but automatic for material misrepresentations upon judicial inquiry. For a swarm of reasons, the government's invitation to legal impropriety should be swiftly declined.

A.     As Pres. Reagan memorably put it, "There you go again." In exhorting the Court to presume the VICE report's truth and summarily deny relief anyway, the government reverts to its familiar pattern of selling the juror's assertions short, refusing to give the article full play or recognize it as the tip of a probable iceberg. Fairly read, the juror's VICE remarks accuse themselves and several fellow jurors of systematically breaking their oath and consciously spurning their instructions by "routinely" and "constantly" monitoring the media blitz throughout Guzman's trial. They *don't* merely imply that "some members of [the] jury viewed certain media," as the government lamely tries to sugarcoat it.[84]

on a hypothetical juror in this case [sic], it is clear that the alleged exposure to such information here was harmless").

[84] *Ibid.* 54.

It follows that the government can't duck a hearing by presuming the allegations true because we don't know the allegations' – or the underlying misconduct's – full nature and extent: how many jurors are claimed to have violated their instructions; precisely what they read and saw; whether, when and how frequently they discussed it; and exactly who said what to whom.[85] Put more concisely, you can't presume something's true if you don't know what you're presuming. The government's alternate suggestion is a logical impossibility and a contradiction in terms. It gets things precisely backward, putting the cart before the proverbial horse. In short, this is a case where ignorance *isn't* bliss; sunlight will best disinfect.

B.    In taking the opposite approach, the government basically argues that it doesn't really matter *what* extraneous information the jurors may have seen, read or heard, or how many of them may have seen, read, heard or discussed it; Guzman's such a bad

---

[85] *Ante* n.15; *cf.* Opp. 66-67 ("As for other media coverage related to the defendant that the jury may have seen during trial, it is unclear whether the defendant contends that such material was of such a prejudicial nature that it warrants a new trial."). Just so. How could we – or anyone – credibly press that sort of contention without knowing what else the jury "may have seen"? That's why God made hearings – to help us all find out. *See ante* n.37.

guy – "one of the world's most notorious criminals,"[86] responsible for "horrific"[87] and "brutal crimes"[88] – and the case against him was so strong that *no* outside information was capable of hurting his defense. In other words, extrinsic injury to this defendant is legally and factually impossible; he's functionally immune from harm, essentially prejudice-proof. Chapo planned the JFK assassination? So what? El es el Diablo. Chapo arranged the 9/11 attacks? Big deal. The government's evidence was crushing.

C.     But those unspoken premises – and the government's ironic paeans to the performance of Guzman's actual jury[89] – contradict and invert the settled legal principles controlling this motion's disposition. True, those key tenets get fleeting nods in a few lonely snippets of the government's memo.[90] But having grudgingly

---

[86] Opp. 1, 36.

[87] *Ibid.* 75.

[88] *Ibid.* 36.

[89] *Ibid.*, *e.g.*, 16 ("the conduct of this jury was exemplary"), 72-73 (praising "lengthy and diligent deliberations"; "conscientious" and "exemplary jury remained impartial throughout").

[90] *Ibid.*, *e.g.*, 56, 68, 75, 86-88.

acknowledged the guiding precepts, the bulk of its 96 pages proceed to studiously ignore them – if not poke a sharp stick in their eye, tacitly encouraging the Court to discard them and substitute forbidden harmless error review.

Put more bluntly, the government's memo says one thing and does another. Indeed, it effectively does the converse. To briefly recall, the operative rules are these:

1.   *Any* extra-record information of which a juror becomes aware is *presumed* prejudicial. That is, the law *presumes* prejudice from a jury's exposure to extra-record evidence.[91] In that light, the government's **ARGUMENT II** amounts to an elaborate exercise in burden-shifting – an extended attempt to turn the applicable presumption on its head.[92]

2.   Disabling bias and partiality are similarly *presumed* when a juror deliberately conceals information to secure a seat

---

[91] Def. Mem. 14-15, 21 & sources cited.

[92] Opp., *e.g.*, 54 (Court should "proceed directly to the defendant's argument that he has suffered the requisite prejudice to justify a new trial"); *id.* 66-67 ("unclear whether defendant contends that such material was of such a prejudicial nature that it warrants a new trial"), *id.* 68 ("defendant has not pointed to any other news coverage that could have so prejudiced the jury that it justifies a new trial here").

or avoid dismissal.[93] That, of course, is precisely what Guzman's jurors allegedly did in falsely denying exposure to at least the child rape accusations when the Court asked them about it during trial.[94]

        3.    In fact, intentionally deceiving the Court about exposure to the most reprehensible outside allegations – and committing crimes along the way – rendered the offending jurors unfit to serve in Guzman's case, furnishing "good cause"[95] to strike them or declare a mistrial and start afresh.[96] Indeed, an unfit jury, like a faulty reasonable doubt charge or a racist tribunal, constitutes a "structural" defect in the composition of the trial mechanism, vitiating all the jury's findings and mandating reversal *per se*, without a showing of more tangible harm.[97]

---

[93] Def. Mem. 17, 19 & sources cited.

[94] Compare VICE Art. ("The allure was being part of history: 'It's a once-in-a-lifetime thing. This is the case of the century. Do I want to live it… or do I want to watch it on the screen?'") with Opp. 87 ("not clear from his or her statements that the Alleged Juror, or any other juror for that matter, was motivated to lie to the Court during the February 4 [child rape] colloquy based on a desire to sit on the jury" – an objection that only invites a hearing).

[95] Fed. R. Crim. P. 23(b)(2)(B)-(3).

[96] *Accord People v. Havner*, 798 N.Y.S.2d 476, 477 (N.Y. App. Div. 2 2005) (juror properly discharged for disregarding court's instructions by discussing case outside courtroom and then lying when questioned about discussion's substance).

[97] *See generally*, *e.g.*, *Weaver v. Ma.*, 137 S. Ct. 1899, 1907-08 (2017).

To put it in fine, a fair trial before unfit jurors is another logical impossibility or contradiction in terms. It's simply inconceivable, the notions being mutually exclusive.[98] Tellingly, the government's 96-page submission relegates this claim – that presumptive jury bias arising from deliberately concealed information is a structural defect triggering automatic reversal – to seven words of *ipse dixit*.[99]

        4.    Where extraneous influence is shown, courts apply an objective test focusing on the information's probable effect on a typical or hypothetical average jury. They thus look to the extrinsic material's objective nature, reversing if it would have led a hypothetical average jury astray.[100] It follows that the government blunders in fixating on *this* jury's subjective behavior and *this* Court's subjective "assessment" of it,[101] applying a faulty standard and asking the wrong question. It's one thing to "consider the circumstances surrounding" the extrinsic

---

[98] Def. Mem. 17-18.

[99] Opp. 88 ("such a presumption is subject to rebuttal").

[100] Def. Mem. 14-15 & sources cited.

[101] Opp. **SUBARGUMENT IIA(iii)**.

information's "introduction" – how it came before the jury.[102] It's another to exhaustively examine every aspect of the trial's conduct in service of injecting a *de facto* or backdoor harmless error test. The first is permissible,[103] the second prohibited.

D. *Neulander*, the New York appellate case discussed in **ARGUMENT I**, cogently illustrates these points. A post-verdict hearing established that one of Neulander's jurors exchanged during trial text messages "with third parties about the trial." As in this case, the jury was instructed "numerous times to report any such communication to the court," but the offending juror "failed to do so." In sum, the record showed that the juror, like her counterparts here, "repeatedly disregarded the court's instructions, and actively concealed and was untruthful about her numerous violations." She "failed to report" her improper communications and then "actively concealed and lied about them" during "the court's inquiry into the misconduct."[104]

---

[102] Def. Mem. 14-15 & sources cited.

[103] *Ibid.*

[104] 80 N.Y.S.3d at 795, 797.

An appellate panel reversed Neulander's murder conviction, finding violations of "rights" that are "substantial and fundamental to the fair and impartial administration of a criminal trial."[105] It held, in language equally applicable here, that due to the juror's

> flagrant failure to follow the court's instructions and her concealment of that substantial misconduct, defendant, through no fault of his own, was denied the opportunity to seek her discharge during trial on the ground that she was grossly unqualified and/or had engaged in substantial misconduct….

> Our focus is not on the time of … the misconduct['s discovery]. Instead, our focus is [the] juror['s] failure to follow the court's instructions, her failure to report her own misconduct … and her concealment of that misconduct …, evidencing a consciousness that she had engaged in misconduct, which denied defendant the *opportunity* to pursue a remedy…. Under the dissent's approach, a juror's flagrant disregard of court rules and admonitions and her active concealment of her own misconduct becomes "speculative" … because the juror was successful in deliberately concealing and withholding the misconduct from the court and defendant until after the verdict. We conclude that there is nothing speculative about the denial of defendant's substantial right and concrete *opportunity* to pursue a remedy … based on the juror misconduct that is patent on this record.[106]

---

[105] *Ibid.* at 797.

[106] *Ibid.* at 796.

E.    Resisting this logic's force, the government seeks principal refuge in a trilogy of cases[107] that are digressive, unpersuasive or both.

1.    By the government's own reckoning, *US v. Gaggi*[108] prescribes "procedures" and "protocol[s]" for handling allegations of juror misconduct that surface "*during*" trial.[109] It says nothing about a defendant's right to a hearing on misconduct allegations emerging *after* trial, or the prejudice that's presumed when they involve exposure to extraneous information – the issues facing this Court. As observed in *Lipari*, a decision the government touts, "cases" concerning "pre-verdict" accusations of "extrinsic [jury] influence" are thus "inapposite."[110] "[D]eference" may be "[]appropriate" for a "face to face appraisal" that's "prompt[ly]" conducted during trial – but not when a

---

[107] Opp., *e.g.*, 57-64, 66, 69-76.

[108] 811 F.2d 47 (CA2 1987).

[109] Opp., *e.g.*, 17-20, 22-23, 49-50, 53, 57-58, 70-71, 84 (emphasis supplied).

[110] 1995 WL 84221, at *4. Another of the government's cases confirms the "distinction between juror misconduct discovered during trial and misconduct discovered post-verdict," terming it "crucial." *US v. Fumo*, 639 F. Supp. 2d 544, 553 n.6 (E.D. Pa. 2009), *aff'd*, 655 F.3d 288 (CA3 2011). Cases like *Gaggi*, "where juror misconduct was discovered *during the trial*," are thus "inapposite" in our post-verdict posture. *Id.*

court summarily discounts plausible posttrial allegations casting significant doubt on its "initial" assessment.[111]

      2.    *US v. Spano*,[112] an unpublished district court ruling from Chicago, fares no better.

      a.    Evidence Rule 606 facially barred the news item proffered there, recounting "statement[s] made [and] incident[s] that occurred"[113] "during the jury deliberations."[114]

      b.    More fundamentally, the non-binding opinion conflicts with controlling Second Circuit precedent.

      i.    Unlike *Ianniello* and *Moten* – seminal authorities the government largely ignores – it didn't apply a presumption of prejudice or force the prosecution to rebut the presumption. Nor did it consider the article's objective effect on a hypothetical average jury.

---

[111] Opp. 53, 71, 84 (citations and internal quotation marks omitted).

[112] 2002 WL 31681488 (N.D. Ill. Nov. 27, 2002), *aff'd*, 421 F.3d 599 (CA7 2005).

[113] Fed. R. Evid. 606(b)(1).

[114] 421 F.3d at 605.

ii. Instead, the court demanded a "reasonable possibility"[115] that the article had a "prejudicial effect upon the jury's verdict,"[116] which it equated with a showing that the evidence was legally insufficient for a rational jury to convict – the standard for a judgment of acquittal.[117]

iii. Worse, the opinion leaned heavily on the "judge's" subjective "assessment of the [actual] jury itself, based on the [*Spano*] jurors' [actual] behavior during the trial,"[118] which it proceeded to describe in painstaking detail.[119]

---

[115] 2002 WL 31681488, at *2 (citation and internal quotation marks omitted).

[116] *Ibid.*

[117] *Ibid.* at *5 ("To conclude that such an effect was likely, one would have to assume that the jury would take an extraneous item that was irrelevant to the charges and use it as a basis for a finding of guilt. In other words, defendants' theory has to be that hearing about Spano's mob connections would so inflame the jury that it would cause them to ignore *an insufficiency of evidence* and find Spano guilty...") (emphasis supplied).

[118] *Ibid.* at *2 (citations omitted); *see also id.*, *e.g.*, at *3 ("The jury in *this* case can only be described as exemplary.") (emphasis supplied); *id.* ("*This* was not a jury that was likely to have been affected by references to prejudicial matters they knew they were not to consider in arriving at their verdict.") (emphasis supplied); *id.* at *5 ("Everything we know about the attitude and behavior of *this* jury makes [defendants'] theory implausible in the extreme.") (emphasis supplied).

[119] *Ibid.* at *3-*6, *8.

iv.    Indeed, the opinion rests exclusively on Seventh Circuit precedent, notably failing to cite a single case from the Second (or any other) Circuit.

c.    Mimicked almost to the word,[120] *Spano* forms the crux of – and blueprint for – the government's entire no-prejudice argument. But its reliance is sorely misplaced. *Spano* squarely contravenes binding Second Circuit authority and is wholly unpersuasive. It simply has no application here.

3.    For similar reasons, the third case in the government's holy trinity – another trial court opinion from a different circuit – requires little discussion.

a.    Philadelphia's *Fumo*, much like Chicago's *Spano*, not only expressly rejected New York's prejudice presumption for

---

[120] Compare Opp., *e.g.*, 16 ("the conduct of this jury was exemplary") and 73 ("This exemplary jury remained impartial throughout deliberations.") and 75 ("To hold otherwise would be to assume that *this* jury took an extraneous item that was irrelevant to the charges and used it as a basis for finding guilt. But, as discussed above, the attitude and behavior of *this* jury makes the theory implausible in the extreme. *This* is not a jury that ignored the requirement of proof beyond a reasonable doubt, ignored the court's instructions of law, and went outside the evidence to reach an irrational conclusion, to base its verdict on one [sic] irrelevant and extraneous piece of information.") (citations, internal quotation marks and alterations omitted) (emphasis supplied) with *ante* nn. 117-18.

extrinsic information exposure, but affirmatively tasked the defense with proving it, overtly shifting the burden of persuasion.[121]

    b. Contrary to the government's mischaracterization, the information at issue concerned the defendant's earlier *prosecution* and ultimate *acquittal*, not his prior *conviction*.[122] "Fumo's former prosecution occurred almost thirty years ago, his conviction was ultimately overturned on the basis of insufficiency of the evidence, and he remained in office, with no repercussion from voters, until the current prosecution."[123]

    c. "Perhaps most importantly, … only one juror was exposed to a brief summary of th[at] excluded evidence from her coworkers."[124] In marked contrast to the VICE article, there was "no allegation" that "any of this information" was shared "with any other member of the jury."[125]

---

[121] 639 F. Supp. 2d at 550 n.3, 553

[122] Compare *ibid.* at 557 & n.9 and 655 F.3d at 306 with Opp. 61.

[123] 639 F. Supp. 2d at 557.

[124] 655 F.3d at 307.

[125] 639 F. Supp. 2d at 557.

F.    All the preceding aside, it bears emphasis that the *government* previously argued the child rape allegations were so irreparably prejudicial – albeit chiefly to its own witness, of course – that they had to be kept from the jury's consideration at trial. Yet now, with the shoe on the other foot, it reverses course and seeks to sterilize them by playing down their natural impact.[126] What's sauce for the goose is sauce for the gander, right? Not if you're a federal prosecutor with Joaquin Guzman in your crosshairs. Then a double standard is perfectly fine. Anything goes so long as the end justifies the means.

G.    To cap its quest for an inapt harmless error finding, the government brazenly violates Rule 606(b)(1) by persistently inviting the Court to consider the exposure's asserted "effect" on the "vote" and the jury's purported "mental processes concerning the verdict."[127] Needless to say, the Court must decline. But that cardinal sin isn't even the half of it. Enticing a federal judge to break the law by ignoring evidentiary rules while slamming your opponent's evidentiary proffer as incompetent and inadmissible is the height of irony, if not something worse.

---

[126] Opp., *e.g.*, 62.

[127] *Ibid.*, *e.g.*, 66, 67 n.25, 68-69 n.28, 83.

35

## CONCLUSION

Joaquin Guzman deserves an evidentiary hearing and a potential retrial. At a minimum, his motion cannot properly be denied summarily – at least not without creating a pernicious aura of unfairness whose ripples will long outlast and far surpass this transient case. If there's no procedural justice for the reputed worst among us, there can be none for our best – or for anybody.

Dated:        Brooklyn, NY
              June 14, 2019

Respectfully submitted,

**LAW OFFICE OF MARC FERNICH**

By: _____
810 Seventh Ave
Suite 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

**LAW OFFICES OF JEFFREY LICHTMAN**
11 East 44th St.
Suite 501
New York, NY 10017
(212) 581-1001
jhl@jeffreylichtman.com

*Attorneys for Joaquin Guzman*

36