UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                          :
UNITED STATES OF AMERICA,                                 :
                                                          :    **MEMORANDUM DECISION**
                       - against -                        :    **AND ORDER**
                                                          :
JOAQUIN ARCHIVALDO GUZMAN                                 :    09-cr-0466 (BMC)
LOERA,                                                    :
                                                          :
                              Defendant.                  :
-------------------------------------------------------- X

**COGAN**, District Judge.

　　Following a three-month trial, a jury found defendant guilty of 10 counts related to his

widespread drug trafficking activity as a leader of the Sinaloa Cartel.  Defendant has moved

pursuant to Federal Rule of Criminal Procedure 33 for a new trial upon an evidentiary hearing

based on allegations of juror misconduct.  For the reasons below, his motion for both an

evidentiary hearing and a new trial is denied.

## BACKGROUND

　　Defendant, Joaquín Archivaldo Guzmán Loera, also known as "El Chapo," was

extradited to the United States in January 2017 in connection with various outstanding criminal

indictments pending against him.  He ultimately went to trial in this district in November 2018

on 10 counts charged in the fourth superseding indictment in this case.

　　Defendant's notoriety as a leader of the Sinaloa Cartel was omnipresent before and

during trial.  This required careful planning and execution at every stage, from *voir dire* to

verdict, to ensure that defendant received a fair trial, as efficiently as possible.  An overview of

those trial proceedings is necessary to put into context defendant's new trial motion.

　　After the parties reviewed 923 36-paged juror questionnaires, I conducted three and a half

days of *voir dire*, during which I carefully screened the prospective jurors' questionnaires, asked

the prospective jurors general questions and targeted questions piqued by their questionnaire responses, and allowed the parties to ask follow-up questions where warranted.  Each prospective juror was screened individually in a partially closed courtroom to create an environment in which the juror would feel comfortable speaking openly and honestly.  Both the questionnaires and in-person questions that the parties or I asked the prospective jurors during *voir dire* inquired about their knowledge of defendant and his then-alleged crimes, and, if applicable, their ability to put that knowledge aside and keep an open mind.  The parties selected a jury comprised of 12 empaneled jurors and six alternates, at least some of whom had heard of or knew something about defendant, but all of whom attested to their ability to render a verdict solely on the evidence introduced in court during trial.  By my order, the jurors were (and remain) anonymous and were partially sequestered for the duration of their service.

During the three months of trial, the jury heard testimony from over 50 witnesses, including 14 cooperating witnesses and dozens of law enforcement witnesses.  The witnesses testified about defendant's extensive drug trafficking activities, including of cocaine, marijuana, methamphetamine, and heroin, and including his use of planes, trains, helicopters, boats, semi-submersibles, automobiles, and foot tunnels, to accomplish his international work.  The witnesses also testified about defendant's many acts of violence, including that defendant personally killed or tortured his victims and that defendant ordered his *sicarios*, or hitmen, to murder or torture others, in furtherance of his vast drug empire, as well as about the violent wars in which defendant and his *sicarios* participated against the enemies of the Sinaloa Cartel.  The jury also read defendant's text messages and heard recordings about his drug trafficking activities (including recordings of defendant himself) and saw in court examples of the types of weapons and machinery defendant used and with which he outfitted his *sicarios* to protect his

2

vast and lucrative drug interests.  The jury also saw in court drugs that were seized from some of defendant's narcotics operations.

Members of the press attended and reported on the details of trial every day, and an overflow courtroom with video feed was set up, in part, because there were so many journalists that they would have taken every seat in the courtroom where the trial was being held.  There was also significant and virtually real-time coverage of my written orders.  The juror questionnaires alerted each potential juror to the fact that they would have to avoid all media coverage about this case, and the parties and I followed up on this point during *voir dire*.  I instructed the jury at length in my preliminary instructions after the jury was empaneled that there would be a lot of press coverage about the trial, and the jurors would have to avoid it.  I also admonished the jury daily – and sometimes twice daily – to stay away from any media or news coverage of this case, whether in print or on television or the internet.  And in my final jury charge, I instructed the members of the jury that they must base their verdict solely on the evidence presented in court and that they could not consider anything outside the courtroom in reaching their decision, reaffirming this critical point that I discussed with the jurors during *voir dire*.

Two news articles that were published during trial required me to engage in the process that the Second Circuit outlined in United States v. Gaggi, 811 F.2d 47 (2d Cir. 1987), to determine whether and to what extent the jury encountered potentially prejudicial news.[1]  The first article revealed the private affairs of one of defendant's lawyers.  I canvassed the jury to see

---

[1] "The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors – outside the presence of the other jurors – to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly." Gaggi, 811 F.2d at 51.

whether anyone had read or seen the article.  None of the jurors had seen the article at issue or knew to what I was referring, so I found – with the agreement of the parties – that the jury was and remained impartial and that this news coverage warranted no further action.

The second article concerned allegations contained in one of the Government's previously sealed motions *in limine* that cooperating witness Alexander Cifuentes Villa made to the Government that he and defendant drugged and sexually abused underage women, which I had excluded from evidence.  Pursuant to my order requiring the parties to review and propose unsealing docket entries and approving the parties' proposed schedule for that process, the Government publicly filed a lesser-redacted version of the motion *in limine* at issue, which unsealed to the public for the first time these allegations of sexual abuse.

There was substantial media coverage about these allegations in the few days after they were unsealed.  But because the Government filed this document late on the Friday after the parties had finished their closing arguments, there was also significant coverage of the trial in general that weekend.  The jury was scheduled to be charged and begin its deliberations on Monday.

On Monday morning, after speaking with the parties and hearing their arguments on the best course of action to address the media coverage that weekend, I adhered to the procedure outlined in Gaggi and canvassed the jury as a whole to determine whether any of them had been exposed to any news coverage over the weekend.  I reassured the members of the jury several times that they would not be in trouble if they had encountered anything.  Two jurors indicated that they had seen something about the case.[2]

---

[2] A third juror indicated that the juror saw something that said the jury would start its deliberations that day, but nothing else, so I did not speak with that juror individually, because that coverage was not potentially prejudicial under the first step of Gaggi.

Consistent with <u>Gaggi</u>, I spoke with each juror individually, away from the rest of the jury, with a representative from each party present.  The first juror saw the headline of a newspaper article that also had defendant's picture.  The juror read that the headline said "El Chapo" and "vitamins."[3]  The juror also saw another headline that said the jury would start its deliberations that day.  But the juror looked away from the article when the juror realized that the headlines were discussing this case, and thus did not see anything else.  The second juror opened a Reddit application, saw "El Chapo," and closed the application right away so the page would refresh itself.  The juror did not know what the post was about and did not see anything else about the case.

 After speaking with these two jurors, neither defendant nor the Government moved to strike either of them.  Indeed, defense counsel acknowledged on the record that there was no basis for a motion to strike.  I agreed, found that the jury was and remained impartial, and found that there had been no prejudicial exposure to news coverage.  I therefore proceeded to instruct the jury on the law, after which the jury began its deliberations.

The jury deliberated for six days.  During deliberations, the jury sent 10 substantive notes to the Court, including asking for the full testimony of five cooperating witnesses and three law enforcement officers, and requesting playback of one audio recording about defendant's methamphetamine trafficking.  On February 12, 2019, the jury returned a verdict of guilty on all ten counts.

Specifically, the jury found defendant guilty of one count of operating a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(a); one count of participating in an international cocaine, heroin, methamphetamine, and marijuana manufacturing and distribution

---

[3] In the motion *in limine* at issue, the Government wrote that Cifuentes Villa alleged that defendant had called the underage women "vitamins."

conspiracy, in violation of 21 U.S.C. §§ 959(a), 963; one count of participating in a cocaine importation conspiracy, in violation of 21 U.S.C. §§ 959(a), 963; one count of participating in a cocaine distribution conspiracy, in violation of 21 U.S.C. § 846; three counts of international distribution of cocaine in violation of 21 U.S.C. § 959(a); one count of illegal use of firearms in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and one count of participating in a conspiracy to launder narcotics proceeds, in violation of 18 U.S.C. § 1956(a).

As for the CCE charge, Count One, the jury found that the Government proved beyond a reasonable doubt that defendant committed 25 of the 27 charged felony violations of federal law, including 24 of the 26 charged violations of federal narcotics laws, and the violation that charged conspiracy to commit murder in furtherance of defendant's drug trafficking activities. The jury also found that the Government proved beyond a reasonable doubt three CCE enhancements, including that defendant trafficked 150 kilograms or more of cocaine; that defendant obtained $10 million or more in gross receipts within a 12-month period; and that defendant was a principal administrator, manager, or leader of the CCE. As for the firearms charge, Count Nine, the jury also found that the Government proved beyond a reasonable doubt three statutory enhancements, including that defendant brandished and discharged one or more firearms and that one or more of the firearms was a machine gun.

Eight days after the jury returned its verdict of guilty, VICE News published an article entitled "Inside El Chapo's Jury: A Juror Speaks for First Time About Convicting the Kingpin." The article revealed that a juror who wished to remain anonymous contacted VICE one day after the verdict was announced and spoke to a reporter on video chat for two hours the next day. The juror shared several details about the trial, the jury, and the jury's deliberations.

The juror told VICE that the jury looked at media coverage of the trial despite my instructions to the contrary.  For example, the juror told VICE that none of the jurors had seen the article about defense counsel's personal affairs, but after I canvassed the jury to determine whether any of them had seen the story, a juror used a smartwatch to find the article, and after that, at least seven jurors knew about it.  The juror also told VICE that five empaneled jurors and two alternates had heard about the allegations that defendant drugged and sexually abused underage women.  The juror said that, before the juror arrived at the courthouse that Monday, the juror read the VICE reporter's tweet that I would ask the jurors about that news coverage.  The juror told other jurors to keep a straight face and deny that they had seen the articles.  But the juror also said that these allegations did not change anyone's mind, that they weren't "hung up" on it, and that the jurors engaged in no more than a five-minute conversation about the story, after which they all moved on.  According to the juror, during that conversation, the jurors acknowledged that the allegations might not be true.

The juror also told VICE that the jury engaged in conversations about the trial before they began their deliberations, in violation of my instruction that they must not discuss the case amongst themselves while the trial was ongoing, and that the juror who gave the interview brought home and kept the notes that the juror took during trial.

Finally, the juror told VICE that the concept of being a juror in defendant's case was alluring because it would be a historical trial.  But the juror also told VICE that the jurors were honest during *voir dire* when they told me that they did not know much about defendant beyond the allegation that he was a large-scale drug trafficker from Mexico.  The juror said that they understood that defendant's trial would last for months and that their role as jurors would require their anonymity and partial sequestration.

Specifically, VICE quoted the juror as follows:

- "You know how we were told we can't look at the media during the trial?  Well, we did.  Jurors did."

- "We would constantly go to [the VICE reporter's] Twitter . . . .  I personally and some other jurors that I knew."

- "I had told them if you saw what happened in the news [about the sexual abuse allegations], just make sure that the judge is coming in and he's gonna ask us, so keep a straight face.  So he did indeed come to our room and ask us if we knew, and we all denied it, obviously."

- "[F]or sure" five empaneled jurors and two alternates heard about the allegations of sexual abuse.

- "We did talk about [the allegations of sexual abuse].  Jurors were like, you know, 'If it was true, it was obviously disgusting, you know, totally wrong.  But if it's not true, whatever, it's not true,' . . . .  That didn't change nobody's mind for sure.  We weren't really hung up on that.  It was just like a five-minute talk and that's it, no more talking about that."

- "I thought we would get arrested. . . . I thought they were going to hold me in contempt . . . .  I didn't want to say anything or rat out my fellow jurors.  I didn't want to be that person.  I just kept it to myself, and I just kept on looking at your Twitter feed."

- "The judge said, 'You can't talk about the case among each other,' but we broke that rule a bunch of times."

- "It's a once-in-a-lifetime thing.  This is the case of the century.  Do I want to live it . . . or do I want to watch it on the screen?" [4]

Defendant has moved under Rule 33 for an evidentiary hearing to determine the nature and extent of this alleged jury misconduct.  Defendant contends that the VICE article reveals that jurors consulted and discussed prejudicial extrinsic information, engaged in premature deliberations, violated their oaths and lied about it (which renders them unfit to serve), and

---

[4] The VICE article did not include any direct quotes from the juror related to the news coverage about defense counsel's personal matters or the juror keeping the notes that the juror took during trial.

concealed relevant information during *voir dire* (which would have resulted in their being struck for cause).  Defendant argues that he is entitled to an evidentiary hearing and a new trial as a result.

## DISCUSSION

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted."  United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)).  "It is well settled that motions for new trials are not favored and should be granted only with great caution."  United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958).  "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion."  McCourty, 562 F.3d at 475 (citing United States v. Torres, 128 F.3d 38, 48 (2d Cir. 1997)) (alterations in original).

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  Ferguson, 246 F.3d at 134.  In that vein, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict."  Id. (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)).  To answer that question, the trial court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  Id.[5]

---

[5] In his reply, defendant argues that the Government misapplies these general standards to the motion at hand. Although it is true that this language comes from orders ruling on Rule 33 motions arising out of, *inter alia*, perjured testimony, there is no discernible reason to apply a different general standard to new trial motions based on juror misconduct than to those premised on any other reason.  As the analysis below shows, even though there are additional considerations that I must make when ruling on an evidentiary hearing and new trial motion premised

When a Rule 33 motion is premised upon allegations of juror misconduct, the defendant "faces a very high hurdle."  United States v. Stewart, 317 F. Supp. 2d 432, 436 (S.D.N.Y. 2004). "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process."  Tanner v. United States, 483 U.S. 107, 120 (1987).  That is because "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct."  Id. at 120-21 (citations omitted).

A trial judge has more flexibility in responding to allegations of juror misconduct upon a Rule 33 motion when those allegations "relate to statements made by the jurors themselves, rather than to outside influences."  United States v. Baker, 899 F.3d 123, 131 (2d Cir. 2018) (quoting United States v. Sabhnani, 599 F.3d 215, 250 (2d Cir. 2010)).  Under either scenario,

---

upon allegations of juror misconduct, these are the overarching legal standards applicable to all Rule 33 motions, including when juror misconduct is at issue.  Cf. United States v. Sabhnani, 529 F. Supp. 2d 384, 389 (E.D.N.Y. 2008), aff'd, 599 F.3d 215 (2d Cir. 2010) (applying the same general standards to Rule 33 motion based on allegation that jurors engaged in premature deliberations); United States v. Sattar, 395 F. Supp. 2d 66, 72 (S.D.N.Y. 2005), aff'd sub nom., United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) (same as to allegations about jurors' omissions and exposure to alleged extraneous prejudicial information).

This is also demonstrated by the textual alterations made in McCountry, identified above: quoting Torres, the McCountry Court inserted "[Rule 33] motions" for "Such motions" where the Torres Court had written that "[a] motion for a new trial based on newly discovered evidence may be granted if it is required in the interest of justice. Such motions are granted only in extraordinary circumstances, and are committed to the trial court's discretion." Torres, 128 F.3d at 48 (internal quotation marks and citations omitted).  Thus, although the Torres decision could be read to apply only to Rule 33 motions based on newly discovered evidence, the McCountry Court expanded its reach to all Rule 33 motions.

In support of his position to the contrary, defendant cites to Smith v. Phillips, 455 U.S. 209, 215 (1982), for the proposition that the only proper remedy for allegations of juror misconduct is a hearing with prejudice presumed. But Smith arises in the habeas context, where counsel did not have the requisite information with which to make an adequate post-trial Rule 33 motion.  That is not the scenario here, where we are determining whether the record requires additional factual development before I can rule on defendant's new trial motion.  Indeed, if the only adequate remedy for post-trial allegations of juror misconduct was a hearing with prejudice presumed, then there would be no need to conduct an analysis as to whether defendant has met his burden to show that an evidentiary hearing is warranted in the first place.  Accordingly, I find that the legal standards included in this section of the order are the proper overarching standards to apply to defendant's Rule 33 motion as a general matter.

however, "[t]he inquiry should end whenever it becomes apparent to the trial judge that 'reasonable grounds to suspect prejudicial jury impropriety do not exist.'"  United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006) (quoting United States v. Sun Myung Moon, 718 F.2d 1210, 1234 (2d Cir. 1983)).

## I.     Evidentiary Hearing

The Second Circuit has instructed that "courts . . . should be[] hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences."  Moon, 718 F.2d at 1234.  This requirement of caution acknowledges that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts."  United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989).

"[P]robing jurors for 'potential instances of bias, misconduct or extraneous influence' after they have reached a verdict is justified 'only when reasonable grounds for investigation exist.'"  Stewart, 433 F.3d at 302 (quoting Moon, 718 F.2d at 1234).  "[I]n other words," a trial court should order a post-trial evidentiary hearing only "where there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial."  Id. at 302-03 (internal quotation marks and citations omitted); see also Moon, 718 F.2d at 1234 ("[A] trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist.  Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.") (internal citations omitted).

"Allegations of impropriety must be 'concrete allegations of inappropriate conduct that constitute competent and relevant evidence,' though they need not be 'irrebuttable [because] if the allegations were conclusive, there would be no need for a hearing.'" Baker, 899 F.3d at 130 (quoting Ianniello, 866 F.2d at 543) (alterations in original).  An evidentiary hearing, however, "'is not held to afford a convicted defendant the opportunity "to conduct a fishing expedition."'" Stewart, 433 F.3d at 306 (quoting Moon, 718 F.2d at 1234 (quoting United States v. Moten, 582 F.2d 654, 667 (2d Cir. 1978))).

Defendant has moved for a new trial vis-à-vis an evidentiary hearing to investigate further the alleged juror misconduct described in the VICE article.  Defendant's requested evidentiary hearing would explore five general topics: the jurors' exposure to media coverage throughout trial; whether jurors lied to me about that exposure; whether jurors brought home their notes that they took during trial; whether jurors engaged in premature deliberations; and whether jurors concealed information during *voir dire*.  Thus, the first question I must answer is whether defendant has met his burden to show that an evidentiary hearing is warranted on any of these topics based on the VICE article.  In short, he has not.

### A. Evidentiary Hearing on Jurors' Exposure to Media Coverage

With respect to the jurors' exposure to media coverage, defendant argues that a hearing is necessary "to determine how many jurors violated the Court's instructions; exactly what they read and saw; whether, when and how frequently they discussed it; and precisely who said what to whom."  But when defendant's position is considered in conjunction with the entirety of the VICE article and the trial record, this request is the textbook definition of a fishing expedition, rather than "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred."  Moon, 718 F.2d at 1234.

To achieve defendant's desired result, I would have to credit portions of what the juror told VICE but disregard other statements that the juror made in the interview, as well as other portions of the trial record of which I am aware.  In other words, defendant would like me to deem the VICE article inherently reliable because it was written by a neutral member of the press and treat the juror's allegations in the VICE article as truthful and trustworthy because they were voluntarily made and are against the juror's interests, but then hold an evidentiary hearing to see whether there is anything else that happened that was not included in the VICE article, presumably either because the juror withheld information from the VICE reporter, the VICE reporter chose not to include information in the article, or because the juror did not know of other potentially improper conduct in which other members of the jury engaged during trial.  I decline to do that here.

As for the media coverage about defense counsel's personal affairs, the juror told VICE that no juror had seen the article when I asked the jury about it.  But after I canvassed the jury pursuant to Gaggi, according to the juror, a juror used a smartwatch to find the coverage at issue, and as a result, at least seven members of the jury learned about the story.

Defendant would like me to credit the juror's statement that a juror used a smartwatch to search for the news article at issue as a basis to hold an evidentiary hearing to determine the extent to which the jury knew about this article.  But that request ignores the fact that the juror also told VICE that at least seven jurors learned of this coverage through the smartwatch incident.  There is nothing in the trial or post-trial record to suggest that in another instance, other jurors through other means were exposed to this news coverage, so to hold a hearing to ask those questions would only be a fishing expedition to explore what else might have happened that the juror did not tell VICE or did not know about.  In other words, no further investigation is

13

warranted here to determine if other jurors saw this article, because what one group of seven jurors did implies nothing about what the other jurors did, nor does it give rise to a right of defendant to inquire about what other jurors might have done or known based purely on his speculation.  There is no basis to extrapolate from the fact that seven jurors knew about this article that the 11 other jurors did as well.

Moreover, Federal Rule of Evidence ("FRE") 606(b)(1) provides that "[d]uring an inquiry into the validity of a verdict . . . , a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  An exception to this rule, however, is that "[a] juror may testify about *whether* . . . extraneous prejudicial information was improperly brought to the jury's attention."  Fed. R. Evid. 606(b)(2)(A) (emphasis added); see also Loliscio v. Goord, 263 F.3d 178, 186 (2d Cir. 2001) ("We then noted that although Federal Rule of Evidence 606(b) permits jurors to testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations.") (internal quotation marks, alterations, and citations omitted); United States v. Sattar, 395 F. Supp. 2d 66, 75 (S.D.N.Y. 2005) ("This exception is a narrow one, because even when a juror attests to outside information, 'the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations.'") (quoting Bibbins v. Dalsheim, 21 F.3d 13, 17 (2d. Cir. 1994)).

Thus, if I were to hold an evidentiary hearing on this issue, all I could ask the jurors is whether they were exposed to this article.  I could not ask the jurors how that information might

14

have factored into their verdict, if at all.[6]  In other words, an evidentiary hearing would add nothing to the record.

As for the media coverage about the allegations that defendant drugged and sexually abused underage women, the juror told VICE that seven jurors saw the articles, that the juror who gave the interview warned other members of the jury that I would ask if they saw the news coverage about the allegations, that those members of the jury denied seeing the articles, and that the jury talked about the allegations.  Here, too, defendant would like me to hold an evidentiary hearing to determine the extent to which the jury knew about these articles.  But, once again, his request overlooks other critical parts of the juror's interview with VICE, as well as relevant parts of the trial record.

The juror told VICE that five empaneled jurors and two alternates knew about the allegations of sexual assault but denied having seen the coverage when I canvassed the jury pursuant to Gaggi.  Further, the trial record demonstrates that two jurors came forward when I canvassed the jury to determine whether there was any exposure to the articles at issue.  One of

---

[6] It is worth noting here that the juror told VICE that members of the jury had already formed opinions about the lawyer at issue, and the juror did not imply that learning about this news story changed any of those opinions in one way or the other.  Thus, there is no indication that this news coverage was prejudicial to defendant in any way – and prejudice is the key factor in any new trial motion.  To be clear, this point is made in addition to the other sufficient grounds to deny defendant's request for an evidentiary hearing.

Defendant contends that I cannot consider the effect that this news coverage had on the actual jurors in this case in determining whether to hold an evidentiary hearing.  I see nothing in the caselaw which explicitly prevents me from doing so in making this discrete decision (as compared to the express limitations on conducting an evidentiary hearing imposed by FRE 606(b) or the objective limitations discussed below when ruling on the Rule 33 motion itself).  Indeed, there is at least one case which supports the opposite conclusion.  See Sattar, 395 F. Supp. 2d at 76 (considering subjective juror affidavits in inquiry of whether evidentiary hearing on alleged juror misconduct was warranted).

Even though these opinions are neither necessary nor dispositive to my decision to deny an evidentiary hearing, they further illustrate the contorted nature of defendant's request: he asks me to credit the veracity of the juror's statements in the VICE article to grant an evidentiary hearing, but in doing so, defendant asks me to disregard parts of that same article indicating that there was no prejudice to the trial, so that he might use the evidentiary hearing to elicit or explore other avenues of possible prejudice to his verdict.  The policies surrounding post-verdict inquiries of jurors to impeach their verdict counsel strongly against doing that.

them told me that they had seen a relevant headline but did not know anything about the article's content, and the other had not seen anything of substance. The rest of the jurors told me repeatedly, after I assured them several times that they would not be in trouble, that they did not see any media coverage during the relevant time. Thus, crediting both the juror's allegations in the VICE article and the jury's colloquies with me during trial, I know that eight jurors saw (in some capacity) the articles about the allegations that defendant sexually abused underage women.

But there is nothing in the trial or post-trial record to suggest that the 10 other jurors saw or knew anything about these allegations. Indeed, the record suggests that they did not. The Second Circuit has instructed that "absent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." United States v. Cox, 324 F.3d 77, 87 (2d Cir. 2003) (quoting United States v. Rosario, 111 F.3d 293, 300 (2d Cir. 1997)). Evidence of what eight jurors did or knew is not evidence of what the 10 other jurors did or knew. Thus, to hold an evidentiary hearing to ask whether any other jurors saw the articles and to what extent would only be a fishing expedition to determine if there was anything that the juror did not tell VICE or if there was anything that happened about which the juror did not know and could not tell VICE.

This is especially true when considered in conjunction with FRE 606(b), which would prohibit me from asking at an evidentiary hearing how, if at all, exposure to this extraneous information impacted the verdict.[7] In other words, the only way a hearing could meaningfully

---

[7] The statements that the juror made about the subjective impact that these allegations had on the jury further color this analysis and weigh strongly against defendant (although, once again, they are neither necessary nor dispositive considerations). First, the juror told VICE that the jurors who knew about the sexual abuse allegations (but declined to tell me that they had seen the articles) had at most a five-minute conversation about the coverage and then moved on. They were not hung up on it. Second, the juror told VICE that during that conversation, the jurors recognized that the allegations were just that: allegations. The jurors understood that they could be false. And third, the juror told VICE that the allegations did not change the jurors' minds about defendant's guilt for the crimes charged in the

build on the record before me would be if defendant could explore other instances of potential misconduct, which is inappropriate.

As for the jurors' voluntary and intentional exposure to media coverage generally, defendant asks me to hold an evidentiary hearing to determine which, if any, jurors were exposed to which, if any, articles or posts – out of the nearly unprecedented panoply of news coverage about the trial – and, if so, when and to what extent.  But besides the two specific topics of news coverage discussed above, all the juror told VICE is that unidentified members of the jury looked at unidentified media coverage, and that some jurors routinely checked the VICE reporter's Twitter feed during trial.

The former is precisely the type of vague allegation that is not substantial enough to warrant an evidentiary hearing under the well-established Second Circuit standard.  See, e.g., Moon, 718 F.2d at 1234 (finding that newspapers left in the jury room did not give rise to a sufficient predicate to conduct a post-verdict hearing, even though media outlets were covering the case in newspapers at the time).  A bare statement that jurors were exposed to media coverage during the trial does not rise to the level of reasonable grounds for investigation, because it is just not specific enough, and therefore, is too speculative to warrant a hearing on the matter.  See id.; United States v. Bin Laden, No. S7R 98CR1023, 2005 WL 287404, at *2 (S.D.N.Y. Feb. 7, 2005) (denying evidentiary hearing on allegation that juror conducted legal research on the internet at home during trial because "[t]he sentence is vague; it does not identify

---

indictment.  In other words, even though jurors knew the substance of the sexual abuse allegations, that knowledge had no impact on their verdict of guilty, and there is nothing to suggest that the allegations changed the impression of defendant that the jurors made during the preceding three months of trial.

Here, too, I must be clear that this consideration of prejudice is in addition and extraneous to the already-discussed other sufficient objective grounds for denying defendant's motion for an evidentiary hearing based on the news coverage about the allegations of sexual abuse.  But it certainly counsels against letting defendant haul the jurors back into the courthouse to try and impeach their verdict in other ways based on something that did not impact defendant at all.

the issue that was allegedly researched or the juror who purportedly conducted the research"). The amount and variety of media coverage published during this trial was unprecedented, and the scope of possible points of jury exposure to that media is undefinable.  Thus, to grant an evidentiary hearing on such an allegation would only result in an ocean-wide fishing expedition to see to what specific coverage on what specific date any given juror was exposed and to what extent.

The latter allegation – that some jurors routinely checked the VICE reporter's Twitter feed – also does not warrant an evidentiary hearing.  This allegation does not give rise to the need for a hearing because that hearing would simply result in asking the jurors which specific tweets they saw (of which there were likely multiple per day) over the course of three months.  It also rests on the tenuous assumption that the jurors who accessed the VICE reporter's Twitter feed would even remember which tweets they saw, the substance of those tweets, and when they saw the posts.  Given that tweets are limited to 280 characters,[8] they present information summarily and there is no basis for a determination that jurors would be able to distinguish between the various posts that they saw, or that the posts would have even conveyed any potentially prejudicial information.

Indeed, as is discussed below, this reporter's tweets primarily relayed updates on trial proceedings, of which the jurors already knew firsthand.  And based on the strong policies against bringing jurors back for an evidentiary hearing after a verdict for the purpose of impeaching that verdict, a bare statement that an unidentified number of jurors monitored a journalist's Twitter feed at unidentified times during trial is not specific enough to bring back all of the jurors to attempt to discover which of them monitored the feed, when they monitored the

---

[8] I have taken judicial notice of this fact.  See https://blog.twitter.com/official/en_us/topics/product/2017/Giving-you-more-characters-to-express-yourself.html (last visited July 2, 2019).

feed, and what on the feed they saw.  This is especially true given that the tweets were often germane to the trial proceedings and the juror who VICE interviewed provided more specific and more prejudicial exposure to media coverage, as discussed above, and even that exposure does not warrant a hearing.

### B.  Evidentiary Hearing on Jurors' Lies About Exposure to Media Coverage

Nor does the allegation that jurors lied to me about their exposure to media coverage warrant a hearing.  Based on what the juror told VICE, seven[9] jurors were aware of the coverage about the allegations that defendant sexually abused underage women and denied it when I canvassed the jury pursuant to Gaggi.  That does not suggest that the other jurors also read the articles and lied about seeing them.  Indeed, the trial record contradicts that assumption, because three jurors raised their hands and came forward about being exposed to media coverage when I asked.  And on a separate occasion, a different juror came forward and told me that the juror's child told the juror that a newspaper article revealed that defendant might testify during trial.

Nor does this allegation suggest that on other occasions jurors denied that they had been exposed to news about defendant or the case during the course of trial.  Thus, as to those seven jurors, I know that they might have lied to me.  But that does not mean defendant gets to dig for unrelated incidents of when those or other jurors might have disregarded their oath or my instructions and lied to me about it.

### C.  Evidentiary Hearing on Whether Jurors Brought Home Notes

The same is true for the allegation that the juror kept notes from the trial.  There is no need to investigate this issue further.  I can assume that this juror brought home all the notes that the juror took during trial, which would have transcribed the record evidence or the juror's

---

[9] When the VICE article (assumed true) is viewed in conjunction with the trial record, there are eight jurors in total who were aware of this coverage (seven who lied about it and the eighth who came forward).  This analysis concerns only the seven who lied.

thoughts and observations.  That does not mean anyone else did the same, or that the juror who

took home the notes did anything with them that would prejudice defendant.  And, of course,

because they were the juror's own notes, there is nothing prejudicial about the juror having

access to them.  Thus, an evidentiary hearing would add nothing to the record on this issue.

### D.  Evidentiary Hearing on Premature Deliberations

With respect to the juror's statement to VICE that the jurors talked about the case

amongst each other before they began their deliberations, defendant argues that he should be able

to explore in an evidentiary hearing whether and to what extent the jurors engaged in premature

deliberations.  But when considered with the rest of the relevant portions of the VICE article, it is

clear that, based on the record before me, nothing quite so nefarious happened, so no reasonable

grounds for investigation exist.

The juror told VICE that during trial, the jurors would talk about the trial participants

(including by coming up with nicknames for the lawyers), try to guess who the next cooperating

witness would be, write notes to each other on their notepads, whisper to each other or mouth

words during trial proceedings, discuss media coverage, and have some conversations on the ride

home.  But, there is no basis to pursue this matter further, because the specific allegations that

the juror did give to VICE do not amount to any type of prejudicial communication between the

jurors about the case, and the juror's other, more general allegations about the jurors conversing

are too vague and tenuous to give rise to a hearing to investigate further.

Most important to this analysis is the fact that the VICE article does not demonstrate in

any way that the jurors prematurely deliberated defendant's guilt or innocence of the crimes

charged in the indictment.  See Sabhnani, 599 F.3d at 249 (finding district court did not abuse its

discretion in denying evidentiary hearing based on allegation that a juror might have said "guilty,

guilty" during a conversation with other jurors three weeks before the jury returned its verdict in

part because the allegation did not make clear that the jurors were talking about the defendant's case).  In other words, even if the jurors did violate their oath, nothing in the VICE article constitutes "clear, strong, substantial and incontrovertible evidence[] that a specific, nonspeculative impropriety has occurred which could have prejudiced" defendant's trial.  Moon, 718 F.2d at 1234.

The jurors might have talked about the case, but the VICE article does not suggest that these conversations were prejudicial to defendant's trial or the jury's verdict.  The article simply does not give rise to an inference that the jurors discussed the evidence in a substantive way, and it certainly does not indicate that the jurors discussed whether that evidence tended to prove or disprove defendant's guilt of the crimes for which he was charged.  Indeed, even with respect to the allegations about defendant's alleged sexual abuse of minors, the jurors spoke at most for five minutes about the news coverage, engaged in an objective and open-minded conversation that recognized that the allegations might not be true, did not get hung up on it, and then moved on to their deliberations.[10]  And although the VICE article states generally that the jurors discussed media coverage, the juror did not identify any other specific media coverage that the jurors discussed, and as demonstrated above, there is no basis to explore that matter further.  Thus, the record that is before me contradicts defendant's conclusory statements that the jurors must have engaged in prejudicial premature deliberations.

Moreover, as indicated above, I have "'broad flexibility' in responding to allegations of [juror] misconduct, particularly when the incidents relate to statements made by the jurors themselves, rather than to outside influences."  Sabhnani, 599 F.3d at 250 (citing United States v.

---

[10] It is appropriate here to consider the juror's statements about what specifically the jurors discussed (as compared to how that discussion might have impacted their verdict) because the nature of what they discussed and how they discussed it is the only way to determine whether the jurors did, in fact, engage in conversations that can be deemed deliberations.

Thai, 29 F.3d 785, 803 (2d Cir. 1994)).  I observed the members of the jury throughout trial and, as I noted several times on the record, the jury's engagement with the evidence, careful attention paid to the trial proceedings, and consistent patience with and courtesy to the trial participants and the process was beyond exemplary.  Nothing in the VICE article suggests that any jurors who discussed the case amongst themselves "would be unreceptive to opposing arguments or that any juror failed to participate in deliberations in good faith."  Id. at 249.  Indeed, the objective trial record about deliberations suggests exactly the opposite.  The jury deliberated for six days, sent back several substantive notes during their deliberations (including asking for the complete testimony of key witnesses), and, tellingly, found that the Government did not meet its burden of proof with respect to two of the predicate violations charged in Count One.

This overwhelming record suggests first that the jurors did not engage in any prejudicial conversations about defendant or the trial before their official deliberations began, and second that – despite any potentially prejudicial conversations in which they might have engaged – the jurors ultimately rendered their verdict based solely on the evidence presented during trial, consistent with their oath and my instructions, which renders any such prejudicial conversations harmless.

More important to this inquiry, however, is that even if I did hold an evidentiary hearing, defendant could not inquire about any impact those premature deliberations had on the jury's verdict, just whether they occurred.  See Baker, 899 F.3d at 132 ("Moreover, even assuming, arguendo, that premature deliberations occurred, we agree with the district court that Rule 606(b) of the Federal Rules of Evidence prohibited the jurors from impeaching their verdict by testifying about the effect of such deliberations on the verdict, rendering the inquiry futile from

the start.").  The juror has already told VICE what happened, and that record is before me.  I need not inquire further.

### E.  Evidentiary Hearing on Whether Jurors Concealed Information During Voir Dire

Finally, the VICE article does not support the allegation that jurors might have concealed during *voir dire* information about their biases against defendant, and therefore, it does not provide reasonable grounds for investigation.  Defendant argues that because the juror referred to this trial as a "once-in-a-lifetime thing" and "the case of the century," and expressed a preference to "live it" rather than "watch it on the screen," that suggests that jurors harbored impermissible biases against defendant that they intentionally withheld during *voir dire*, which would have commanded that they be excused for cause from the jury.  But defendant's conclusion overlooks the fact that the juror told VICE that the jurors were honest with me and with the parties during *voir dire* when they responded to our questions about what they knew about defendant.  Thus, there is no evidence in the record that the jurors – either the juror who gave the interview with VICE or any other juror – affirmatively lied or concealed information during *voir dire*.

The juror questionnaire asked about the jurors' knowledge and feelings about, *inter alia*, defendant, the Sinaloa Cartel, drug cartels in general, and large-scale narcotics trafficking, and inquired whether there was anything about that knowledge or those feelings which would prevent them from being fair and impartial jurors or viewing the evidence with an open mind.  The record reflects that every empaneled and alternate juror affirmed that they could put aside anything that they knew about defendant and decide the case solely on the evidence introduced in court.

The VICE article does not suggest that any juror lied or behaved to the contrary.  The question posed to each juror was whether there was anything within their knowledge or understanding that would prevent them from being a fair and impartial juror.  It was not simply

23

whether the prospective jurors understood the potential international and historical import of this case.  And even if they did understand its notoriety, that does not prevent them from being impartial or disqualify them as a juror.  It is their answer to the follow-up question, whether they can put that understanding aside and decide the case based solely on the evidence, that could.  Nothing in the record suggests that was not the case, and nothing in the VICE article suggests that there is any reasonable basis to investigate whether the record is inaccurate.

Defendant argues that when this desire to be a part of defendant's trial is considered in conjunction with the fact that the juror kept notes from the trial, it suggests that the juror has an eye towards infamy.  In other words, defendant thinks that this juror might have wanted to use jury service to pursue literary or commercial opportunities.  But that is pure speculation, and it does not move the needle at all, especially considering that it is constrained to just one juror who has not otherwise indicated a semblance of partiality.

The Second Circuit has cautioned trial courts "that, if any significant doubt as to a juror's impartiality remains in the wake of objective evidence of false *voir dire* responses, an evidentiary hearing generally should be held."  Stewart, 433 F.3d at 306.  But based on the trial and post-trial record, I have no doubt that each juror gave true and complete *voir dire* responses, and further, I have no doubt that each juror was impartial in this case.[11]

Accordingly, defendant's motion for an evidentiary hearing on the allegations of juror misconduct raised in the VICE article is denied.  An evidentiary hearing on the specific enough allegations included in the VICE article is not necessary, and the more vague allegations included in the article do not satisfy the high standard for an evidentiary hearing in the Second

---

[11] To be clear, the same is true for the alleged lies that the jurors told me when they denied seeing articles about the sexual abuse allegations.  The VICE article says these jurors lied out of fear of getting in trouble, not in any display of partiality.  I credit this explanation just as I credit the allegation itself.

Circuit.  It would only result in hauling jurors back into the courthouse for a speculative exercise on what else might or might not have happened during trial.  The specifics of the record before me do not provide an adequate basis for an evidentiary hearing under the Second Circuit's well-established strict standard for such relief.  See United States v. Procario, 356 F.2d 614, 619 (2d Cir. 1966) ("The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain.") (quoting United States v. Crosby, 294 F.2d 928, 950 (2d Cir. 1961); citing McDonald v. Pless, 238 U.S. 264, 267 (1915)).

## II.    New Trial

Rather than grant an evidentiary hearing (because a hearing is not necessary to further develop the record on the issues of which I am aware and not warranted on the issues on which defendant can only speculate), I can instead proceed to defendant's motion for a new trial based on the allegations of juror misconduct raised in the VICE article.  I will assume for the purpose of this order the truth of the allegations contained in the VICE article.  Cf. Loliscio, 263 F.3d at 185 (instructing federal habeas courts to assume a Sixth Amendment violation and proceed to the harmless error analysis instead of determining whether a Sixth Amendment violation occurred on allegations that the jury considered extra-record information).

Defendant argues that I cannot presume something to be true if I do not know what I am presuming, which is why he claims that an evidentiary hearing is warranted.  But as demonstrated above, defendant's analysis is backwards.  I do know what I am presuming true: the specific allegations made in the VICE article.  That I cannot presume true defendant's various speculations does not retroactively entitle him to an evidentiary hearing to see if those speculations are right.  It is precisely for that reason that he is not entitled to an evidentiary

25

hearing on those matters.  They are too vague and unsubstantiated to be considered in this analysis.

Thus, there are three bases for defendant's new trial motion: that the jurors were exposed to prejudicial news coverage; that the jurors engaged in premature deliberations; and that the jurors lied to me during *voir dire* and during trial.[12]

### A.  New Trial Based on Jurors' Exposure to Media Coverage

The Supreme Court has repeatedly recognized that "the Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation because it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."  Rushen v. Spain, 464 U.S. 114, 118 (1983) (quoting Smith, 455 U.S. at 217); see also United States v. Olano, 507 U.S. 725, 738 (1993) (quoting Smith, 455 U.S. at 217). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Smith, 455 U.S. at 217.[13]

Whether jurors' exposure to media coverage "is so prejudicial as to require a new trial is ordinarily committed to the trial judge's discretion," and must turn on the unique facts of each case.  United States v. Brasco, 385 F. Supp. 966, 972 (S.D.N.Y. 1974) (quoting United States v. Armone, 363 F.2d 385, 396 (2d Cir. 1966).  "[N]ot every instance of a juror's exposure to

---

[12] To the extent defendant moves for a new trial based on the assumed fact that a juror brought home the notes that the juror took during trial, rather than simply employing that fact in support of his new trial motion for other reasons, defendant's motion is denied.  There is no demonstrated prejudice from that conduct standing alone.

[13] Although, as mentioned above regarding Smith, these cases arise in the habeas context and not the Rule 33 context, they are relevant here in terms of determining what due process requires with respect to defendant's fair trial rights.  This is a different issue than whether defendant is entitled to an evidentiary hearing before the merits of his Rule 33 motion are decided.  See, e.g., United States v. Greer, 285 F.3d 158, 170 (2d Cir. 2002) (quoting from McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984), which in turn quotes Smith, 455 U.S. at 217, on an appeal of the denial of a Rule 33 motion based on juror misconduct).

extrinsic information results in the denial of a defendant's right to a fair trial.  Many such

instances do not."  United States v. Schwarz, 283 F.3d 76, 99 (2d Cir. 2002).

Prejudice is presumed on a Rule 33 motion when the jury is exposed to extra-record

information.  See United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011) (citing Remmer v.

United States, 347 U.S. 227, 229 (1954); United States v. Greer, 285 F.3d 158, 173 (2d Cir.

2002)).  But that presumption can be rebutted by showing that the extra-record information was

harmless.  Id. (quoting Bibbins v. Dalsheim, 21 F.3d 13, 16 (2d Cir. 1994)).  To determine

whether extra-record information was harmless, a trial court must consider (1) the nature of the

information; and (2) "its probable effect on a hypothetical average jury."  Id. at 169.  This is an

objective inquiry, and, consistent with FRE 606(b), does not consider the effect, if any, that the

extra-record information had on the specific jury in this case – neither the jurors' mental

processes nor their deliberations.  See id.

Assuming the truth of the allegations in the VICE article, several jurors were exposed to

extra-record information, including seven jurors who saw the allegations that defendant drugged

and sexually abused underage women (plus the eighth juror who came forward during trial);

seven jurors who saw the article about a member of the defense team's personal affairs; and an

unidentified number of jurors who followed the VICE reporter's Twitter feed routinely

throughout trial.[14]  I will address each media exposure noted in the VICE article in turn.

The jurors' exposure to allegations that defendant drugged and sexually abused underage

women is the most prejudicial extra-record information at issue.  That being said, the driving

---

[14] As noted above, the VICE article also states more generally that unidentified members of the jury accessed unidentified news coverage about the case.  Because the VICE article also provides specific examples, I construe those examples as the scope of media coverage that the jurors accessed throughout trial.  I do not address the broader statement introducing those examples (mostly because there would be nothing to analyze).  But to the extent defendant argues that this general, unspecific allegation is enough to warrant a new trial, I disagree.

force behind my decision to exclude this evidence upon the Government's motion *in limine* was that the allegations are irrelevant to either the crimes charged in the indictment or the credibility of the witness who told the Government this information. Thus, the nature of this information is simply extraneous to whether defendant is guilty or innocent of the charges against him, although it is potentially inflammatory.

As for the probable effect that this information would have on an average, hypothetical jury, I must consider the entire record and the circumstances surrounding the jurors' exposure to the extra-record information. See id. Although different in kind, these allegations of sexual abuse are no more gruesome and prejudicial as the overwhelming amount of evidence that the jury heard and saw about defendant threatening, torturing, and murdering people, about defendant ordering others to torture and murder people, about defendant outfitting his army of *sicarios* with heavy artillery (examples of which – including machine guns and rocket-propelled grenades – were put in front of the jury and demonstrated in open court), and about defendant's use of that infantry to further his drug business. Thus, it is not as if this media coverage exposed the jury to a form of prejudicial information to which they had not already been exposed at length.

Not only did the jury hear extensive and detailed information about defendant's extraordinary violence, the jury also heard an overwhelming amount of evidence of defendant's guilt of drug trafficking. This trial lasted for months, and the Government put on 14 cooperating witnesses, each of whom testified at length about their participation in defendant's drug operations. The jury heard defendant's own voice on recorded tapes talking about drugs. The jury read defendant's text messages sent over what he thought was a secure communication system that concerned his widespread narcotics trafficking operation. The jury saw pictures and

watched videos of defendant's planes, trains, automobiles, helicopters, and tunnels, all of which were expertly equipped to traffic narcotics. And the jury saw and heard about the fruits of several seizures of defendant's drug shipments. In sum, there was no shortage of evidence that defendant was guilty of the crimes for which he was convicted, in addition to a significant amount of evidence that was likely very uncomfortable for the jury to hear.

To find in defendant's favor, I would have to assume that the hypothetical, average jury would view this news coverage about the extraneous allegations that defendant sexually abused underage women as a determinative factor in convicting him. That would require me to accept an idiosyncratic or irrational point of view as that of the objective, average juror, which I decline to do. These allegations were published during one weekend of a three-month trial, at the same time significant other case-related news was published. Moreover, the articles included mere allegations that defendant might have participated in offensive conduct – they were not definitive. Finally, the allegations are entirely irrelevant to the crimes for which the jury convicted defendant.

By comparison, a mountain range of evidence was introduced against defendant over three months of trial that directly implicated him in the crimes with which he was charged. A rational, hypothetical, average jury would certainly have convicted defendant of the crimes charged in the indictment based on the overwhelming amount of direct evidence presented during trial that defendant did, in fact, commit those crimes. That is true regardless of the fact that the jury was also exposed to this extra-record information. See United States v. Spano, No. 01 CR 348, 2002 WL 31681488, at *5 (N.D. Ill. Nov. 27, 2002). Thus, this extra-record information about conduct collateral to the crimes charged in the indictment would not have had a prejudicial impact on the hypothetical jury's verdict. Cf. Gaggi, 811 F.2d at 52 (finding that

jury's exposure to media coverage related to the murder of a defendant and his role as the head of an organized crime family months into trial did not warrant a new trial because the event was "collateral in nature" and "did not relate to the remaining defendants' guilt with respect to the [car theft conspiracy] charges against them").[15]

Defendant argues that Spano's allowance of the consideration of overwhelming evidence of guilt in this context is not controlling authority.  It is true that Spano is not a Second Circuit case, but the facts and circumstances of that case are remarkably similar to the facts here.  Spano was a criminal fraud case in which one of the defendants was a well-known mob figure; the case took three months to try; there was a significant amount of media coverage of the case from the moment of indictment through trial; and the jury was in every respect exemplary.  The defendant filed a post-trial motion based on interviews that the jurors had with the press immediately after they were discharged in which the jurors said that during deliberations the jury discussed the defendant's mob connection, even though that information was not mentioned during trial and the jurors understood that they were not supposed to consider it in reaching their verdict.  Spano is thus extremely persuasive in this case, and it counsels strongly against granting defendant's new trial motion.[16]

---

[15] Technically, this part of the analysis only applies to the empaneled jurors, not the alternates, because the alternates did not participate in deliberations.  But, of course, that further weighs against defendant.  He cannot claim that his verdict is in jeopardy because alternate jurors – who never proceeded to determine defendant's guilt – were exposed to this media coverage and engaged in a neutral conversation about it for five minutes.  See Procario, 356 F.2d at 619.  But even if I assumed that every exposed juror was an empaneled juror, that would not make a difference.

[16] Defendant also argues that Spano is inapposite because the Spano court did not apply a presumption of prejudice and did not consider the hypothetical, average jury.  To be clear, I am relying on Spano only for the narrow proposition that I can and should consider the overwhelming evidence of guilt in defendant's trial when determining how the hypothetical, average juror would react to presumptively prejudicial extra-record information in defendant's case.  Thus, it matters not whether the Seventh Circuit's overall standard for granting a new trial is different, especially because the Spano court's approach is not inconsistent with the approach that courts in Second Circuit take.  I am still deciding defendant's motion under the Second Circuit's standard for post-trial motions based on jury exposure to extra-record information.

Nor, for that matter, does Spano (or my reliance on it) fly in the face of Second Circuit precedent, as defendant so adamantly argues. He states in his reply that Spano's outcome – a finding that no hearing or new trial was warranted – contradicts the outcome in the Second Circuit's Ianniello and Moten cases – which found that hearings were necessary to further develop the record. But defendant is wrong. Ianniello and Moten are qualitatively different from his case.

In Ianniello, the Second Circuit found that it was an abuse of discretion for the trial court to deny an evidentiary hearing where juror affidavits obtained post-verdict said that the judge appeared in their jury room during deliberations and reminded the jury to either acquit or convict because the judge did not want a split decision or a hung jury; that at another point during deliberations the judge told the foreperson to go back in the jury room and tell the other jurors to agree; and that a United States Marshal told the foreperson that the jurors would have to listen to over 100 tapes if they did not reach a decision. Even the Second Circuit recognized that this set of facts was "most unusual." 866 F.2d at 541. The Second Circuit denied the defendant's new trial motion but remanded for an evidentiary hearing in front of a different judge to determine with precision the facts of what actually happened (given the unusual and extraordinary nature of the allegations). The facts of Ianniello simply do not translate to this case, which is about alleged juror misconduct.

Moten at least concerned alleged juror misconduct, but it is still far afield from the salient issues in defendant's case. In Moten, an individual approached the defendant during trial and said there was "a possibility of reaching one of the jurors," 582 F.2d at 656, and a juror later approached the defendant's sister with a message for the defendant. The trial court dismissed that juror, instructed the remaining jurors that they were not to speak to anyone about the case or

discuss the case amongst themselves, and asked each juror individually *in camera* whether either of those things had happened to them.  The *voir dire* reflected no additional evidence of jury tampering or juror misconduct.  After the jury returned a verdict of guilty, the defendant moved for a new trial supported by juror affidavits suggesting that two other jurors had a good rapport with the dismissed juror and that another juror was with the dismissed juror when he approached the defendant's sister seeking to relay a message to the defendant.  The Second Circuit remanded for an evidentiary hearing because, although the district court conducted a minimal investigation, many questions remained unanswered about this discrete incident.  For that reason, a further evidentiary hearing would not be a fishing expedition.  But the Second Circuit also recognized that Moten was another unusual case.

In short, Ianniello and Moten, although binding Second Circuit precedent, are far less on point than Spano, because they involve unique circumstances of extremely prejudicial conduct such as improper influence on the jury by a judge or jury tampering.  Those concerns are not present here.

Defendant further argues that by relying on the overwhelming evidence of guilt against him, as I do here and as the court did in Spano, he is essentially immunized from a finding of harm in this analysis.  That is an overstatement,[17] but it is accurate to observe that the more overwhelming the evidence of guilt against him, the more difficult it is for defendant to show the necessary level of prejudice that would warrant a new trial.  That is the situation in any area of

---

[17]  Consider a scenario in which the Government had not charged the murder conspiracy violation, and there was little, if any, evidence of violence introduced during trial.  If the jurors were somehow exposed to the extensive evidence of defendant's violence in the media, whereas all they had heard in trial was routine evidence about drug shipments, that could certainly present a situation where the extra-record information might have had a prejudicial effect on the hypothetical, average jury.  But that is not where defendant finds himself here.

the law in which prejudice to a criminal defendant must be assessed, and there is no reason for a different standard here.

The touchstone here is prejudice, and prejudice depends on the circumstances.  When the record of guilt overwhelmingly suggests that a hypothetical, average jury would convict defendant based on the admissible, credible evidence whether or not they were also exposed to extraneous information, then defendant cannot show prejudice, regardless of what that information may be.  There are no automatic new trials or strict liability-type analyses.  No matter how egregious the extraneous information is, the Second Circuit's test allows for a showing of harmlessness to rebut the prejudicial nature of that information.  Overwhelming, extensive, direct evidence of guilt can do just that.

The weakness in defendant's position is compounded by the lack of evidence that a hypothetical jury would not and could not put aside any exposure to this collateral extra-record information and evaluate defendant's guilt based solely on the extraordinary amount of evidence introduced against him.  That is especially true where, as here, the news reports at issue were not only irrelevant to defendant's guilt, they were also published after the Government presented the evidence of his guilt to the jury.

The objective record in this case further supports my conclusion about the effect that this news coverage would have on the hypothetical, average jury.  The jury did not blindly convict defendant; it held the Government to its burden of proof and found that the Government did not prove beyond a reasonable doubt two of the predicate violations for Count One.  This was after the jury deliberated for six days, sent several substantive notes, and requested the complete testimony of key witnesses.  See Greer, 285 F.3d at 174 ("Moreover, as the District Court found,

the jury's 'complex verdict resulting in convictions on some counts and acquittals on others' demonstrated its fairness.") (citing <u>United States v. Aiello</u>, 771 F.2d 621, 631 (2d Cir. 1985)).

Thus, the harmless nature of this news coverage rebuts the presumption of prejudice in this instance, and the jurors' exposure to articles or headlines about allegations that defendant drugged and sexually abused underage women does not warrant a new trial. Allowing defendant to obtain a new trial with no showing of prejudice would severely undermine the finality of his jury verdict. That outcome would be flatly inconsistent with Second Circuit caselaw on Rule 33 motions in general and especially Rule 33 motions based on alleged juror misconduct.

As for the nature of the information in the media about defense counsel's personal affairs, it is not nearly as prejudicial as the allegations discussed above. First, it does not relate to defendant or the crimes charged in the indictment. And second, the article was not published or disseminated widely or for any extended amount of time, nor was it sensationalized.

As a result, the probable effect of this wholly irrelevant and almost neutral news article about one of defendant's lawyers on the hypothetical, average jury is virtually non-existent. Such a jury will understand that a criminal defendant has no control over the personal conduct of his attorney. To think otherwise would assume less of our jurors than they deserve. This is especially true given the notion discussed above, that the jury heard an overwhelming amount of evidence that directly implicated defendant in the crimes for which he was convicted. A rational jury would not disregard three months of evidence only to convict defendant based on one article that included salacious, but not otherwise prejudicial, information about defendant's lawyer. Moreover, I instructed the jury that the personalities and conduct of counsel were not in issue in the case.[18] This is not a situation where a hypothetical jury would have convicted defendant

---

[18] The instruction was as follows: "Please don't bear any prejudice against any attorney or the attorney's client because the attorney made an objection or asked for a sidebar outside of your hearing or asked me for a ruling on a

34

based on the news coverage that they accessed on a smartphone.  For that reason, the presumption of prejudice is rebutted, and defendant's new trial motion based on this article is also denied.

Finally, the VICE reporter's Twitter feed generally tracked trial proceedings, of which the jurors were mostly aware.  By their nature, tweets are short, summary posts that do not engage in-depth in substantive matters.  Defendant has not identified any specific tweets that he argues are unduly prejudicial and warrant a new trial, and where defendant does address specific allegations, they are included in the above analyses.  Otherwise, the jury did not have access to other, unidentified, potentially prejudicial information by virtue of tracking the reporter's Twitter feed during trial.  Thus, the nature of the information they learned is that which they already knew.

The hypothetical, average jury would not be swayed by exposure to this type of media content.  Jurors reading updates about the daily trial proceedings – which they experienced firsthand – is not something that would affect their decision to find defendant guilty of the crimes charged in the indictment.  Defendant has not pointed me to any more prejudicial information than the news coverage that I discuss above, so there is no reason to think that a hypothetical jury would react any differently to the media coverage in the reporter's Twitter feed.  The presumption of prejudice is once again rebutted because any exposure to the reporter's Twitter feed was harmless.

Neither do these three categories of substantively unrelated news media coverage – the allegations of sexual abuse, the lawyer's conduct, and the Twitter feed – considered together warrant a new trial.  Finding otherwise would still require me to determine that this media

---

point of law.  If you formed opinions or reactions of any kind to the lawyers in this case, I instruct you to disregard them.  The personalities and conduct of the counsel here, that's just not the issue in this case." Tr. 6958:6-12.

coverage would be a determinative factor in the hypothetical, average jury's decision to convict defendant, rather than the overwhelming evidence of defendant's guilt of widespread drug trafficking.  As explained above, that outcome is inconsistent with both common sense and the Second Circuit's standard for upsetting jury verdicts based on jurors' exposure to extra-record information.[19]

Assuming the truth of the VICE allegations, the jurors' conduct is certainly undesirable, and constitutes a violation of their oath as jurors.  But their exposure to extra-record information does not rise to the level of implicating defendant's constitutional rights, considering the entire record; the exceptional conduct of the jury throughout trial; and the months' worth of testimony, recordings, and physical evidence admitted against defendant, including evidence that is much more relevant, prejudicial, and condemning than the extra-record allegations to which the jury was exposed.  This is true whether the jurors were exposed to this extra-record information by accident or whether they affirmatively sought it out – its prejudicial impact remains the same in either circumstance.

Defendant's new trial motion based on the jury's exposure to media coverage is therefore denied.

---

[19] Defendant's reliance on People v. Neulander, 162 A.D.3d 1763, 1768, 80 N.Y.S.3d 791, 796 (4th Dep't), leave to appeal granted, 32 N.Y.3d 943, 84 N.Y.S.3d 870 (2018), in which a state intermediate appellate court reversed the trial court's denial of the defendant's motion to set aside the verdict and granted the defendant a new trial, is unavailing.  First, Neulander involves the legal standard under N.Y. C.P.L.R. § 330.30(2), which, as the state court recognized, "does not require a defendant to establish actual prejudice."  Id. at 1755, 80 N.Y.S.3d at 795.  Prejudice is a key factor in any Rule 33 motion.  Second, Neulander's facts – that a juror deleted text messages on her phone from her father encouraging her to convict the defendant after it came out on the record during trial that the juror was text messaging her friends about the case and the defendant and after the juror supplied a sworn affidavit that she at all times during trial followed the judge's instructions – give rise to a far stronger inference of prejudice and partiality than the facts presented here.  And finally, leave to appeal in Neulander has been granted, so the final pronouncement of state law in that case has not yet been made.

**B.  New Trial Based on Premature Deliberations**

As noted above, I have more flexibility in determining how to respond to allegations of juror misconduct as it relates to statements made by the jurors themselves than in the inquiry related to the jurors' exposure to media coverage.  See Sabhnani, 599 F.3d at 250 (citing Thai, 29 F.3d at 803).  Premature deliberations fall into this category of misconduct allegations, because "jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body."  United States v. Haynes, 729 F.3d 178, 191 (2d Cir. 2013) (citations omitted).

"[P]rejudice is generally the touchstone of entitlement to a new trial when improper intra-jury influences are at issue."  United States v. Abrams, 137 F.3d 704, 709 (2d Cir. 1998) (citing United States v. Resko, 3 F.3d 684, 694 (3d Cir. 1993)).  Here, defendant cannot show any prejudice from the conversations that the jury had before they began their deliberations, which I am assuming occurred as alleged in the VICE article.

Specifically, seven jurors (five empaneled jurors and two alternates) talked for five minutes about the allegations that defendant drugged and sexually abused underage women.  As I discussed above, these allegations have nothing to do with defendant's guilt or innocence of the charged crimes.  Thus, the jurors' brief discussion, which also included an acknowledgement that the allegations are not necessarily true, did not amount to premature deliberations.  In other words, the record reflects that the jurors discussed the fact that the allegations were made; the record does not reflect that the jurors credited those allegations or that they took the next step and considered those allegations in determining whether defendant was guilty in this case.

Even assuming that this conversation did relate to defendants' guilt or innocence of the crimes charged in the indictment, the Second Circuit has made clear that "[n]ot every comment a

37

juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition of deliberation." Baker, 899 F.3d at 132 (alterations in original) (quoting United States v. Peterson, 385 F.3d 127, 135 (2d Cir. 2004)); see also Deliberation, Black's Law Dictionary (11th ed. 2019) (defining deliberation as "[t]he act of carefully considering issues and options before making a decision or taking some action; esp., the process by which a jury reaches a verdict, as by analyzing, discussing, and weighing the evidence"). This discussion amongst the jurors does not suggest that they considered these allegations relevant to the merits of the crimes for which they found defendant guilty. It only suggests that the jurors discussed what they read.

Contrary to defendant's position, the Second Circuit's decision in Haynes does not compel a different conclusion. There, the Court of Appeals held that the district court abused its discretion by declining to investigate during trial an allegation that before the jury began its deliberations defense counsel heard jurors say that the defendant might be guilty because the defendant was on trial. The Second Circuit found that because this statement directly implicated the defendant's presumption of innocence, an inquiry to determine whether any prejudicial premature deliberations occurred was necessary. The same implications are not present here. Indeed, the VICE article suggests that the jury respected defendant's constitutional presumption of innocence, because their conversation about the allegations recognized that they might not be true. Ultimately, the assumed fact that seven jurors discussed for five minutes allegations unrelated to defendant's culpability published in the media does not compel a finding of prejudice, and a new trial is not warranted as a result.[20]

_____

[20] Moreover, as defendant argued elsewhere in his reply, cases challenging a trial court's failure to investigate or cure allegations of juror misconduct mid-trial, rather than post-trial, are not directly on point here.

The same is true for the rest of the discussions that the jurors had amongst themselves about the case before the jury began its official deliberations.  According to the VICE article, seven jurors were aware of the story about defense counsel's personal affairs and discussed that they had been "put off" by that lawyer's style of questioning during the trial.  Jurors had conversations on their rides home from the courthouse and in the courtroom by mouthing words to each other or writing notes, which related to guessing the identity of the next cooperating witness to testify, as well as media coverage.  Jurors also discussed their opinions about the Government working with cooperating witnesses, who often had lengthy and gruesome criminal histories.  They also discussed the testimony that one cooperating witness got his wife pregnant while incarcerated and created nicknames for the lawyers in the case.  Although these conversations are tangentially related to the case, none of them qualify as deliberations, and thus, none of them suggest a hint of prejudice to defendant's conviction and cannot serve as the basis for a new trial under Rule 33.[21]

In further support of the conclusion that defendant cannot identify any prejudice from these conversations, nothing in the VICE article suggests that the jurors did not engage in fulsome deliberations consistent with my instructions that they were to base their verdict solely on the evidence introduced in court.

Thus, his new trial motion based on premature deliberations is denied.

### C.  New Trial Based on Jurors' Lies

As the Supreme Court has explained, "[o]ne touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'"

---

[21] Indeed, as the Government notes, the closest to substance that the jurors got was discussing their opinions on cooperating witnesses.  But these discussions expressed distaste with the Government's practice, so any possible prejudice from this conversation inures against the Government and in defendant's favor.

McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith, 455 U.S. at 217).  "*Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors."  Id.  "[A] party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and second, that the correct response would have provided a valid basis for a challenge for cause."  Stewart, 433 F.3d at 303 (citing McDonough, 464 U.S. at 556).

The VICE article identifies two potential lies that the jurors told me – one during *voir dire* about a juror's desire to sit on the jury and one during trial in response to my Gaggi inquiry about potential exposure to media coverage.[22]  Defendant has failed to satisfy either prong of the McDonough test in each instance.[23]

First, the VICE article confirms that jurors were honest during *voir dire* when they discussed with me and the parties the extent, if any, of their knowledge of defendant and the Sinaloa Cartel.  According to the article, none of the jurors knew much more than the allegations

---

[22] The fact that in other instances the jurors violated their oaths and did not tell me about it, namely, that they engaged in conversations about the case before deliberations and that they accessed media coverage about the case against my instructions, do not also constitute lies.  The jurors, as one would expect, did not announce that they were violating their oath.  But the potential prejudicial impact of those violations is addressed above.  The jurors' failure to disclose those violations to me does not warrant reassessment here.  This analysis concerns only lies or information purposefully concealed in response to direct questions from the Court.

[23] Although questioning potential jurors during *voir dire* is different from questioning empaneled jurors during trial pursuant to Gaggi, I agree with the Government that the McDonough standard should apply in both scenarios, because each involves an instance where the Court is inquiring of a juror under oath about an issue that relates directly to the case at hand.  McDonough cuts to the heart of when a juror's lie or omission would implicate a defendant's fair trial rights and serve as the basis for a new trial.  See Greer, 285 F.3d at 170 ("In McDonough, the Supreme Court held that a party moving for a new trial based on juror nondisclosure or misstatements must satisfy a two-part test.") (citations omitted).  Indeed, the purpose of the Gaggi inquiry is to determine whether a juror must be excused from the jury for cause as a result of their media exposure, much like the purpose of *voir dire*.  Defendant seems to agree, because he argues in his reply that the jurors' lies about exposure to media coverage renders them unfit to serve and furnishes good cause to strike them or declare a mistrial.  But defendant's likening of this situation to a structural defect, such as when the Court gives a legally incorrect reasonable doubt charge or when the courtroom is improperly closed is wrong.  This is a narrow issue of whether the jurors were impartial or whether their continued service violated defendant's fair trial rights.  It does not mandate an automatic reversal without a showing of harm.

that he was a "Mexican drug lord."  I am assuming everything true in the VICE article, not just the statements that defendant thinks weigh in his favor.

Despite that clarity, defendant construes a *post hoc* comment made by one juror to a reporter that the juror recognized that sitting as a juror on this case would be an opportunity to participate in a historical trial to mean that the juror must have necessarily lied during *voir dire*. That is not true.  The only *voir dire* question to which this could fairly be considered a false response was whether there was anything about what the juror knew about defendant or the allegations in the case that would prohibit the juror from serving as a fair and impartial juror. Understanding the historical nature of this trial does not preclude someone from being fair and impartial.  Indeed, every trial participant shared that same knowledge and understanding, and yet, they were still able to execute their jobs to the best of their abilities, with clear minds, and in accordance with their respective duties and responsibilities.[24]

Each juror attested during *voir dire* to their ability to be fair and impartial.  There is no reason to doubt those assertions, and there is no basis in the record to construe that assertion as anything but an honest assessment of their ability to serve as a juror in a high-profile case.  Thus, there was no lie or omission here.

Even assuming, however, that this was a false *voir dire* response, defendant cannot show that this establishes a valid basis for challenging the juror for cause.  See Greer, 285 F.3d at 171 ("McDonough's second prong requires that a party moving for a new trial show that the correct answer to a question at *voir dire* would have provided a valid basis for a challenge for cause. The district court then must determine if it would have granted the hypothetical challenge.")

---

[24] Given the overwhelming amount of evidence against defendant, a juror interested in being part of history would be much more likely to vote for acquittal than conviction.  Acquittal would have raised profound social, political, and legal implications that a conviction based on overwhelming evidence does not.

41

(citations omitted).  As I explain to every party during every *voir dire* I conduct, the operative question is not whether a juror has, for example, any knowledge, belief, or life experience that might render that juror biased; the relevant inquiry is whether, despite that knowledge, belief, or experience, the juror can put it aside, decide the case solely on the evidence admitted during trial, and follow my instructions on the law.  Each juror unambiguously agreed that they could do that, and their acknowledgement about the historical import of this case does not provide a valid basis for a challenge for cause.

Thus, this case is a far cry from United States v. Colombo, 869 F.2d 149, 151-52 (2d Cir. 1989), the only example of the Second Circuit remanding for an evidentiary hearing on a new trial motion under McDonough.  In Colombo, a juror deliberately withheld information during *voir dire* that her brother-in-law was a Government attorney, even though the judge asked the juror about her contacts with law enforcement and lawyers, including specific questions like whether the juror knew any Assistant United States Attorneys in the district of prosecution and whether the juror had any relatives who were lawyers.  The juror outright lied and said that she did not.  Another juror's affidavit filed in support of the motion for a new trial in Colombo said that the juror at issue told the affiant that she withheld this information because she wanted to sit on the case, and because she lived near the location where the RICO defendants met to discuss their robbery plans and "knew it was a hideout for gangsters."  Id. at 150.  The Second Circuit found that this intentional nondisclosure was done for the precise purpose of prohibiting defense counsel from striking her, exhibited a partiality towards the Government, and displayed such a powerful sense of personal interest to sit on a case that it suggested the juror could not be impartial during deliberations.

Here, by comparison, there is no inference of either deliberate concealment or purposefully incorrect responses.  Nor does the juror's statement display any sort of partiality to either defendant or the Government.  It is a neutral observation that does not suggest that the juror had some sort of extreme personal desire to serve as a juror on this case such that the juror would commit a crime to do it.  See Greer, 285 F.3d at 172-73 ("[Colombo] simply held that a lie which simultaneously demonstrates both dishonesty and partiality on the part of the juror will satisfy both prongs of the [McDonough] test.  That is, in [Colombo] it was not simply that the lies in question were deliberate, but that *the deliberateness of the particular lies evidenced partiality*.") (emphasis in original).

Most critical, however, is that this statement by the juror does not imply that the juror – despite being excited about serving – could not and did not decide the case solely on the evidence introduced during trial or hold the Government to its burden of proof, consistent with my instructions.  (And, as discussed several times above, the record reflects that the jury engaged in fulsome deliberations based on the record and, as displayed by its unanimous verdict, held the Government to its burden of proof on each count charged in the indictment.)

Even assuming that this gave rise to some basis to challenge the juror for cause, I would not have granted the motion.  "Challenges for cause are generally based on actual bias, implied bias, or inferable bias."  Id. at 171.  None of these biases are present here.  "Actual bias is bias in fact," id., which, as I just noted, cannot be extrapolated from the juror's neutral, factual statement.  Implied bias is presumed as a matter of law, is "reserved for 'extreme situations,'" id. at 172 (quoting Smith, 455 U.S. at 222 (O'Connor, J., concurring)), and generally only applies when jurors are related to the parties or victims of the alleged crimes.  That is not the case here.  Finally, inferred bias is more of a catch-all, which is available when "a juror discloses a fact that

bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." Id. at 171 (quoting Torres, 128 F.3d at 47).  I would not have sustained a challenge for cause based on inferred bias, because as I said above, the juror's recognition of the historical import of this case does not render the juror biased, especially given the juror's attestation that the juror could and would decide the case based solely on the evidence and follow my instructions on the law.

Finally, it is worth noting that the VICE article does not give rise to an inference that any juror other than the one who gave the interview shared that juror's recognition about serving on this case.  But, of course, even if they did, that recognition would not provide the basis for a new trial for the reasons I just explained.

The same is true with respect to the lie that seven jurors told me during trial when they denied their exposure to media coverage about the allegations that defendant drugged and sexually abused underage women.  Because I am assuming that the allegations in the VICE article are true, the jurors' answers that they did not see any articles in response to my question constitute false statements under the first prong of the McDonough test.

But this does not give rise to a valid for-cause challenge, at least not one that I would have sustained.  The article does not support that the jurors lied because they harbored any biases against defendant or in favor of the Government (like in Columbo).  Rather, the juror told VICE that they lied because they were afraid they would be arrested or held in contempt of court for seeking out media coverage of the case.  Moreover, the jurors recognized that these allegations might not be true and were not hung up on them.  This does not give rise to actual, implied, or inferred bias, as those terms are described above.  As demonstrated by the fact that I did not excuse – nor did defendant move to strike because there was no basis for such a motion – the

juror who did come forward to tell me that the juror had seen the news coverage of these allegations, there is absolutely no reason to suggest that a truthful answer would have provided any basis to strike the seven other jurors for cause.

Defendant's motion for a new trial based on the jurors' lies is denied as a result.

## CONCLUSION

Accordingly, defendant's [592] motion for an evidentiary hearing and new trial is DENIED.

**SO ORDERED.**

Dated: Brooklyn, New York
      July 3, 2019
                                                    U.S.D.J.