

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

GMP:PEN/BGK
F. #2009R01065

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 5, 2019

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   United States v. Joaquin Archivaldo Guzman Loera
      Criminal Docket No. 09-0466 (S-4) (BMC)

Dear Judge Cogan:

The government, pursuant to Fed. R. Crim. P. 32.2, respectfully submits this letter motion and a proposed Order of Forfeiture (attached hereto as "Exhibit A") for the above-referenced case against the defendant Joaquin Archivaldo Guzman Loera (the "defendant"). In accordance with jury's verdict after trial, the government seeks entry of a forfeiture money judgment in the sum of $12,666,191,704.00. See Dkt. 572. The defendant is scheduled to be sentenced on July 17, 2019 at 9:15 a.m.

I.      Background

On February 12, 2019, following an eleven-week trial, Guzman was found guilty of all ten counts in the above-referenced indictment ("Indictment"). These counts charged the defendant with operating a continuing criminal enterprise (Count One); substantive drug and drug conspiracy offenses (Counts Two through Eight); the unlawful use of a firearm (Count Nine); and money laundering conspiracy (Count Ten). The criminal forfeiture allegations set forth in the Indictment state, in part, that, in the event that defendant Joaquin Archivaldo Guzman Loera is convicted of the offenses charged in Count One and Ten of the Indictment, the government will seek forfeiture of: (1) property constituting, or derived from, proceeds obtained, directly or indirectly as a result of the charged continuing criminal enterprise; property used or intended to be used in any manner or part to commit or to facilitate the commission of such offense; and the defendant's interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise under 21 U.S.C. § 853, and (2) property involved in the charged money laundering offense under 18 U.S.C. § 982. See Indictment, ¶¶ 46-47; 52-53. On October 9, 2018, the government

filed a motion seeking the Court's adjudication of a forfeiture money judgment in the event of the defendant's conviction, to which the defendant did not object.  See Dkt. 356.

As a result of Guzman's conviction, and for the reasons set forth below, the government seeks a criminal forfeiture money judgment with respect to Count One in the amount of  $12,666,191,704.00 in accordance with 21 U.S.C. § 853 ("Section 853").[1]  With respect to Count Ten, the government also seeks a forfeiture money judgment in the amount of $12,666,191,704.00, in accordance with 18 U.S.C. § 982(a)(1) ("Section 982").[2]

II.       The Relevant Statutory and Procedural Framework

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture that the government seeks in this case.  See, e.g., United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007) (quoting Fed. R. Crim. P. 32.2(b)(1)).  Rule 32.2(b)(1) provides, in pertinent part:

> As soon as practicable after  a verdict . . . of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute.  If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of the money the defendant will be ordered to pay. . . .  The court's determination may be based on . . . evidence or information submitted by the parties and accepted by the court as relevant and reliable.

Id.

In contrast to the guilt phase of the criminal trial, "criminal forfeiture is viewed as part of the sentencing process," and therefore "the government need prove facts supporting forfeiture only by a preponderance of the evidence."  United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011) (quoting United States v. Gaskin, 364 F.3d 438, 461 (2d Cir. 2004)); see Capoccia, 503 F.3d at 116 ("Sentencing courts determine forfeiture amounts by a preponderance of the evidence.") (internal citation omitted).  Further, forfeiture is mandatory.

---

[1] The forfeiture provision for Count One, 21 U.S.C. § 848, is set forth in 21 U.S.C. § 853.  See 21 U.S.C. § 848(a).

[2] United States v. Brown, 2006 WL 898043, *4 (E.D.N.Y. Apr. 4, 2006) (if defendant is found liable to pay a money judgment under two different theories in the same case, but the judgments relate to the same funds, i.e., the proceeds of a fraud and the property involved in laundering the fraud proceeds, the judgments are concurrent).

The statutes provide that the Court, in imposing sentence on a defendant, "shall order" in addition to any other sentence imposed, that the person forfeit to the United States all property described in those sections, here, namely, Section 853 and Section 982.

In making a forfeiture determination under either Sections 853 or 982, the government is not required to provide a precise calculation of the proceeds subject to forfeiture. United States v. Lizza Industries, Inc., 775 F.2d 492, 498 (2d Cir. 1985). Instead, proceeds can be reasonably estimated. See Treacy, 639 F.3d at 48 ("The court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." (citations and internal quotation marks omitted)); United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) ("[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture."). Thus, when deciding the appropriate forfeiture amount, the Court may rely on evidence that is "relevant and reliable," even though the same evidence would not be admissible in a proceeding governed by the Federal Rules of Evidence. See Fed. R. Crim. P. 32.2(b)(1)(B); see also United States v. Jafari, 85 F. Supp. 3d 679, 684-85 (W.D.N.Y. 2015) ("[C]ourts may consider hearsay and other inadmissible evidence so long as it is sufficiently reliable." (citing Fed. R. Evid. 1101(d)(3)); United States v. Stathakis, No. 04-CR-790, 2008 WL 413782, at *14 n.2 (E.D.N.Y. Feb. 13, 2008) (Amon, J.) ("[R]eliable hearsay is admissible.").

Lastly, the government need not prove that the defendant can pay the forfeiture money judgment; it need only prove by a preponderance of the evidence that the amount it seeks is forfeitable. See United States v. Awad, 598 F.3d 76, 78-79 (2d Cir. 2010) ("[M]andatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of the crime." (quoting United States v. Casey, 444 F.3d 1071, 1077 (9th Cir. 2006)). Otherwise, defendants would be incentivized to spend their "ill-gotten gains to avoid the forfeiture sanction." Awad, 598 F.3d at 79 (quoting United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006)). Thus, the government is entitled to the forfeiture of all property that constitutes or is derived from the defendant's narcotics-related crimes, as well as any property that facilitated the commission of those crimes. This forfeiture award may be reduced to "an in personam forfeiture judgment" against the defendant. See Awad, 598 F.3d at 78 ("[W]hen a defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the money judgment [against the defendant] is effectively an in personam judgment in the amount of the forfeiture order.") (internal quotation marks and citation omitted). See also United States v. Roberts, 696 F. Supp. 2d 263, 268 (E.D.N.Y. 2010) (Irizarry, J.), aff'd in part, vacated in part by, 660 F.3d 149, 153 (2d Cir. 2011) (following Awad); United States v. Vampire Nation, 451 F.3d 189, 201-02 (3rd Cir. 2006) (reasoning that applicable procedures set forth in Section 853 do not limit amount of forfeiture to value of assets in defendant's possession); United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006) ("[C]riminal forfeiture may take several forms [including] an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense.") (quoting United States v. Candelaria–Silva, 166 F.3d 19, 42 (1st Cir. 1999)); Casey, 444 F.3d at 1076 ("[A] defendant [must] forfeit a very specific amount — the proceeds of his criminal activity . . . even in cases of insolvent defendants."); United States v. Bourne, 2012 WL

3

526721, at *2 (E.D.N.Y. Feb. 15, 2012) (Garaufis, J.) (finding that entry of money judgment is mandatory, even if defendant has no assets; defendant's statement on the CJA form that he has no assets establishes that a money judgment is appropriate).[3]

      III.       Forfeiture Money Judgment Calculation

           A.  Continuing Criminal Enterprise

Under Section 853, the government is entitled to forfeiture of all property that constitutes or is derived from the defendant's narcotics-related crimes; any property that facilitated the commission of those crimes; and the defendant's interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise. In determining how to calculate the amount of forfeiture liability, courts have consistently found that calculating the amount based on gross, rather that net profits comports with the punitive purpose of the narcotics forfeiture statue, namely Section 853. Section 853 provides that a defendant "shall" forfeit "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly . . . ." In a drug conspiracy, gross proceeds, not net profits, are used to calculate a forfeiture money judgment. See United States v. Peters, 732 F.3d 93, 101 (2d Cir. 2013) (purpose of forfeiture is punishment; forfeiting defendant's profits is not punishment because it merely returns him to the economic position he occupied before he committed the offense; therefore defendant must forfeit the gross receipts). Indeed, the Second Circuit has repeatedly affirmed the use of this approach. See United States v. Colon, 522 F. App'x. 61, 63 (2d Cir. 2013) (rejecting claim that forfeiture order in drug trafficking case should be reduced for defendant's expenses); see also United States v. Khan, 761 F. App'x. 43 (2d Cir. 2019) (negating defendant's argument that he should not be liable for that portion of drug proceeds paid to supplier; forfeitures under criminal forfeiture statute are not limited to profits, but extend to property constituting or derived from any proceeds that defendants obtain as result of the crime of which they are convicted).

Accordingly, to determine the amount of the criminal forfeiture money judgment when the government seeks a money judgment in a drug case, it is permissible to calculate the forfeiture amount by multiplying the drug quantities by the retail or street value of the narcotics. Awad, 598 F.3d at 78, n.4. In fact, this is the most reliable method. Id. In Awad, the government proved by a preponderance of the evidence that the defendant was responsible for the criminal forfeiture money judgment by multiplying the drug quantities by the narcotics street value, a figure that was "advanced at trial" and remained "undisputed" by the defendant. United States v. Awad, Dkt. No. 06-CR-600, 2007 WL 3120907, at *5 (S.D.N.Y. Oct. 24, 2007), aff'd, 598 F.3d 76 (2d Cir. 2010). See also United States v. Numisgroup Int'l Corp., 169 F. Supp. 2d 133, 136-137 (E.D.N.Y. 2001) (Spatt, J.) (money

---

[3] The government notes that, as set forth in the Presentence Investigative Report ("PSR"), on February 3, 2017, the defendant completed a financial affidavit wherein he reported no income for the previous 12 months, no cash, no bank accounts and no other kinds of assets. PSR ¶162.

judgment based on the value of property used or intended to be used to commit, to facilitate or to promote the commission of the offense); Casey, 444 F.3d at 1073 (holding Section 853 should be construed liberally - requires the forfeiture of "any proceeds").  Further, a criminal forfeiture money judgment can be entered, in part, based upon testimony of co-conspirators with first-hand knowledge of the illegal activity.  See  United States v. Munson, 2019 WL 188493 (S.D.N.Y. Jan. 14, 2019) (criminal forfeiture money judgment calculated in a narcotics case based on co-conspirator's testimony).  Thus, the government may rely on reasonable estimates of the quantity of distributed drugs and their value.  Roberts, 660 F.3d at 166.

While in Honeycutt v. United States, ___ U.S. ___, 137 S. Ct. 1626 (2017), the Supreme Court held that a defendant convicted of a narcotics conspiracy may not be held jointly and severally liable under 21 USC § 853 "for property that his co-conspirators derived from the crime but that the defendant himself did not acquire."  This is not the case here.   In Honeycutt, the defendant played an incidental role in the conspiracy, received no personal profits from the transactions and was not a leader of the organization.  The defendant, on the other hand, was a kingpin and principal leader of the Sinaloa Cartel who controlled and distributed over $12 billion worth of drugs, while reaping the proceeds from this criminal activity.  See United States v. Beltran Leyva, 916 F.3d 14, 30-31 (D.C. Cir. 2019) (holding, in a case involving the defendant's fellow leader of the Sinaloa Cartel, the court did not plainly err in holding organization leader liable for all proceeds earned by drug organization from drug activity he supervised); see also S.E.C. v. Metter, 706 F. App'x 699, 702 n.2 (2d Cir. 2017) (Honeycutt is limited to cases involving "incidental figures" whose role in offense does not justify joint-and-several liability and does not apply to a person who had a controlling interest and determined how proceeds of the offense were distributed); United States v. Munson, 2019 WL 188493 (S.D.N.Y. Jan. 14, 2019) (where $46.2 million money judgment was based on 44,000 lbs. of marijuana defendant distributed for at least $1,050/lb., Honeycutt does not require a vacation of forfeiture judgment because defendant actually obtained amount ordered forfeited); United States v. Gigliotti, Dkt. No. 15-CR-201 (Dearie, J.) (where a defendant was found to be the "main mover and principal decision-maker" in a drug conspiracy, the court had "no reservation" in ordering forfeiture of the full amount of the money judgment).

### 1. Drug Quantity

In the instant case, numerous drug suppliers testified that they provided the defendant and other members of the Sinaloa Cartel (the "Cartel") with massive quantities of cocaine with the understanding that it would be sold in the United States. (Tr. 2962-63; 1819-20; Yusti Affidavit at ¶ 3 (attached as Exhibit B)).  Jesus "Rey" Zambada Garcia testified that Cartel members, who were leaders of drug organizations with roots in the Mexican state of Sinaloa, mutually invested in drug shipments to share the risks and rewards of their drug trafficking schemes. (Tr. 749, 752).  Moreover, they shared control over territory and plazas to facilitate their drug trafficking business. (Tr. 731-32).  As Jesus "Rey" Zambada Garcia testified, "it is one cartel, it's one organization and they help each other when that help is needed." (Tr. 736).  In the instant case, the jury convicted the defendant in Count One of being a principal leader of the Cartel.  See Dkt, 532.  Accordingly, he is liable for all of the proceeds of the Cartel's drug activity.  See United States v. Beltran Leyva, 913 F.3d at 30-31.

At trial, various witnesses, including drug suppliers, testified about the quantity of drugs the defendant received.  Specifically, the Colombian drug supplier Juan Ramirez Abadia ("Chupeta"), a leader of the Norte Valle Cartel, testified to supplying the Cartel with a conservative total of approximately 436 tons (436,000 kilograms)[4] of cocaine.  According to Chupeta, he delivered approximately 200 tons of cocaine by airplane to the Cartel between 1990 through 1996, 200 tons by boat between 1993 and 1998, and 36 tons by submarine in the mid to late 2000s.  See Tr. 1893, 1948, 2010.  Based in part on this evidence, the defendant was convicted of Violations 1 through 12 of Count One, which related to several of the boat shipments that were known as the "Juanitas" and one of the plane shipments that was known as a "Cometa."  The drug quantity in these violations was also reflected in drug ledgers submitted into evidence.  See GXs 302-A through 302-L.  Further, Chupeta testified that, although law enforcement seized 22,500 kilograms of cocaine from the Juanita shipments were (Violations 2 and 3 on Verdict Sheet (Dkt. No. 572)).  Chupeta also testified that a 14 ton boat shipment was lost in a hurricane.  (Tr. 1940-41).  Thus, subtracting the amount of drugs that were lost or seized (14,000 kilograms plus 22,500 kilograms) from 436,000 kilograms, the defendant is liable for the forfeiture of the value of 399,500 kilograms of cocaine that Chupeta supplied to the Cartel.

Miguel Martinez Martinez ("Martinez") also testified at trial that between 1987 and 1993, the defendant obtained substantial amounts of cocaine from Colombian suppliers and that, from his office in Mexico City, Martinez supervised the transportation of the cocaine and marijuana into the United States where the defendant's co-conspirators sold the drugs.  (Tr. 1340-42, 1347-48, 1418).  In addition to amounts of cocaine that the defendant obtained, Martinez also testified that the Cartel transported 5 to 10 tons of marijuana into the United States each year while he was a member of the Cartel (approximately 7.5 tons for 6 years, totaling 423,000 kilograms of marijuana) and 2 kilograms of heroin during the same period.  (Tr. 1461-62, 1465-66).

The evidence further showed that Chupeta was not the only drug supplier providing cocaine to the Sinaloa Cartel.  Violations 13 through 69, as charged in Count One of the original (S-4) Indictment, provided notice to the defendant of evidence of an additional 122,776 kilograms of cocaine supplied to the Sinaloa Cartel by the Colombian supplier Luis Caicedo, who was known as "Don Lucho," during the period January 15, 2003 through May 2, 2010.  While members of the Don Lucho organization did not testify at trial, the witness Jose Yusti Llanos ("Yusti") submitted an affidavit in support of the defendant's extradition from Mexico.  See Yusti Affidavit (Spanish version) (attached as Exhibit B); Yusti Affidavit (English translation) (attached as Exhibit C).  In his affidavit, Yusti interpreted ledgers that attested to successful cocaine shipments from the Don Lucho organization to the Sinaloa Cartel that correspond to Violations 13 through 69 set forth in the original (S-4) Indictment.  See Exhibit C ¶ 5 and ¶ 7.  He also attested to the fact that the drugs were "intended for ultimate distribution in the United States."  See Exhibit C ¶ 3.  While Yusti discussed in his affidavit the fact that shipments were sent to Mayo Zambada (Ismael "Mayo" Zambada Garcia),

---

[4] One metric ton of cocaine is equivalent to 1,000 kilograms of cocaine.

testimony at trial established that Mayo Zambada and the defendant were partners within the Cartel who shared, among other things, transportation infrastructure and security. See Exhibit C ¶ 3.  (Tr. 709, 714, 715, 724, 862).[5]

At trial, Jorge Cifuentes, another Colombian supplier, testified that he supplied the defendant with cocaine.  Specifically, he stated that the defendant sent money from Mexico to Cifuentes, who was living in Ecuador at the time, so that Cifuentes could purchase cocaine and send it to the defendant.  (Tr. 2929-31).  Cifuentes testified about a 6,000 kilogram shipment of cocaine that was successfully delivered to the defendant and sold in New York. (Tr. 2986).  This testimony was also corroborated by Cifuentes's drug ledgers that reflected this drug shipment.  See GXs  301A, 301A-T, 301B and 301B-T.

In addition, Pedro Flores ("Flores") testified that he and his twin brother distributed cocaine and heroin in Chicago for the defendant and Mayo Zambada.  In addition to substantial amounts of cocaine (approximately 53 tons) that Flores and his brother distributed for the Cartel, Flores testified that between May 2005 and November 2008, he and his brother received approximately 200 kilograms of heroin from the defendant and Mayo Zambada. (Tr. 3524-27).

Thus, the total quantity of cocaine that the defendant distributed that he received from Chupeta, Don Lucho and Jorge Cifuentes alone, was 528,276 kilograms of cocaine.[6] Additionally, according to Martinez and Flores, the total amount of heroin distributed by the defendant was 202 kilograms and, according to Martinez, the total amount of marijuana the defendant distributed was 423,000 kilograms.

It is worth noting that this amount of cocaine, 528,276 kilograms, is a conservative amount when compared to the testimony of Jesus "Rey" Zambada Garcia, the brother of the defendant's partner Mayo Zambada, who received drugs shipments in Mexico City warehouses sent by Colombian suppliers to the defendant and the Cartel.  Zambada testified that, between 1995 and 2008, he received approximately 80 to 100 tons of cocaine a year in the warehouses for an approximate total quantity of 7,200,000 kilograms of cocaine. (Tr. 755, 760).  The difference indicates that large cocaine quantities of cocaine were being supplied to the defendant and the Cartel from sources of supply other than Chupeta, Don Lucho and Jorge Cifuentes.

---

[5] The Court may rely on evidence that is relevant and reliable, including affidavits. See Fed. R. Crim. P. 32.2(b)(1)(B); United States v. Feng Li, 630 F. App'x. 29, at 35 (2d Cir. 2015) (affirming the district court's conservative computation of a money judgment forfeiture which relied on a DHS special agent's affidavit).

[6] Amounts distributed by Martinez, Tirso, Flores and other distributors were not included in this figure, so that there was no double counting between amounts of drugs supplied by suppliers and amounts of drug sold by distributors.

## 2.  Value of Drug Quantity

At trial, various witnesses testified about the value of the drugs distributed by the defendant.  Martinez testified that during the time that he was working with the defendant (1987 through 1993), a kilogram of cocaine was sold in Los Angeles for approximately $12,000 to $16,000 per kilogram. (Tr. 1317, 1319, 1351).  Cocaine was sold during that same time in Chicago for approximately $25,000 and in New York for approximately $35,000 to $40,000. (Tr. 1351-52).  Thus, averaging the price of cocaine throughout the United States during the years 1987 through 1993, the defendant sold his cocaine for an average price of $25,500 per kilogram (average of $14,000 in Los Angeles, $25,000 in Chicago and $37,500 in New York).  Martinez further testified that marijuana was sold for $2,000 per kilogram during the same period.  (Tr. 1461).

Additionally, Tirso Martinez Sanchez ("Tirso") testified that, in the late 1990s, one kilogram of cocaine in the United States was worth between $15,000 and $20,000, for an average price of $17,500 per kilogram. (Tr. 2578-79).  He also testified that each kilogram contained between 8,000 to 10,000 individual doses. (Tr. 2609).

Jesus "Rey" Zambada Garcia testified that, during the time of his membership with the Cartel from 1995 through 2008, the price for which the Cartel sold a kilogram of cocaine in California was $20,000, in Chicago was $25,000 and in New York was $35,000. (Tr. 706-707, 750-51).  Thus, according to Zambada Garcia, the average price of cocaine across the United States from 1995 through 2008 was $26,666.

Pedro Flores also testified that in 2002, he sold a kilogram of cocaine in Chicago for $17,000 and in New York for $20,000 per kilogram. (Tr. 3446).  He further testified that from May 2005 to November 2008, the average wholesale price in the United States was $21,000. (Tr. 3525).  Thus, the average price of the cocaine, on a nationwide basis, that the Flores brothers sold for the defendant as a leader of the Sinaloa Cartel was $19,750.  Flores also testified that the heroin that he and his brother distributed for the defendant sold for an average price of $55,000 per kilogram. (Tr. 3526-27).

In sum, the average price for which the Cartel sold a kilogram of cocaine from the late 1990s through approximately late 2008, based on evidence provided from Martinez, Tirso, Zambada and Flores, was $22,354.  This amount conservatively represents the wholesale amount for which the defendant sold his drugs in the United States.  The total quantity of cocaine supplied to the Sinaloa Cartel by Chupeta, Don Lucho and Cifuentes was 528,276.  Based upon the average price of $22,354 per kilogram, the total amount of money obtained by the defendant and the Cartel from the sale of this cocaine was $11,809,081,704.

The defendant also sold a total of $11,110,000 worth of heroin (202 kilograms at $55,000 per kilogram) through the Flores brothers (200 kilograms) and Martinez (2 kilograms).  The defendant also sold $846,000,000 worth of marijuana (423,000 kilograms at $2000 per kilogram) through Martinez.

Thus, as detailed on the chart attached as Exhibit D, the total forfeiture money judgement related to the defendant and the Cartel's drug trafficking activity is $12,666,181,704.00. This amount represents "property constituting, or derived from" the defendant's narcotics-related crimes; property used to facilitate the commission of those offenses; and the defendant's interest in property or contractual rights affording a source of control over, the continuing criminal enterprise. See 21 U.S.C. § 853.

B.      Money Laundering Conspiracy

For forfeiture arising from a money laundering conspiracy conviction, Section 982(a)(1) provides that, "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956 . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." See also United States v. Bermudez, 413 F.3d 304, 306 (2d Cir. 2005). As a result, defendants "must forfeit to the government all property that [wa]s either 'involved in' that violation or traceable thereto." United States v. Seher, 562 F.3d 1344, 1368 (11th Cir. 2009). See  United States v. Coffman, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012), aff'd, 574 F. App'x. 541 (6th Cir. 2014) ("Money laundering forfeiture is required for all property 'involved in' the crime."). "The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or  used to facilitate the money laundering offense." United States v. Schlesinger, 396 F. Supp. 2d 267, 271-72 (E.D.N.Y. 2005) (Spatt, J.) aff'd, 514 F.3d 277 (2d Cir. 2008); see also United States v. Nicolo, 597 F. Supp. 2d 342, 347-48 (W.D.N.Y 2009).

For money laundering offenses, the government is entitled to seek a money judgment against the defendant for an amount equal to the value of the property that was involved in the money laundering offense. See Bermudez, 413 F.3d at 305 (affirming entry of forfeiture money judgment in the amount of $14.2 million representing the value of the funds laundered, even though the defendant forwarded the money to third parties); United States v. Huber, 404 F.3d 1047, 1056 (8th Cir. 2005) ("Forfeiture under section 982(a)(1) in a money-laundering case allows the Government to obtain a money judgment representing the value of all property 'involved in' the offense, including the money or other property being laundered (the corpus), and any property used to facilitate the laundering offense"; in a conspiracy case, the corpus is the funds the defendant conspired to launder, including commingled clean money (citation and internal quotation marks omitted)).

In this case, the government seeks a $12,666,191,704 forfeiture money judgment as this amount represents "property involved in, used to commit, [and] used to facilitate the money laundering offense." See Schlesinger, 396 F. Supp. 2d at 271-72. Based upon the gross proceeds of the defendant's drug trafficking activity, as calculated above, the government asserts that these gross proceeds were used to enable the defendant and the Cartel to continue to operate. As noted by Donald Semesky, the government's expert in money laundering and money laundering techniques, money laundering is an integral component of

9

any international drug trafficking organization. (Tr. 1233).  Specifically, Mr. Semesky testified that:

> [m]oney is the lifeblood of a drug organization, especially an organization that operates internationally, and money laundering is, you can call it the IV that pumps the blood into the veins of a drug trafficking organization so it can continue to live and function and operate.

(Tr. 1233).

As Semesky's testimony further demonstrates, without the ability to launder drug proceeds, an international drug trafficking organization "would not be able to operate." (Tr. 1235).  Drug organizations need a "constant flow of money to be able to pay all the expenses," which includes paying suppliers. (Tr.1235).  The defendant's organization was no different.  As demonstrated by the evidence presented at trial, the defendant relied up on this constant flow of money that he derived primarily from the sale of drugs in the United States. Once these drugs were sold, the proceeds would then be accumulated and laundered from the United States to places that included Mexico and Colombia and sent back to the defendant and/or his organization. (Tr. 3528).  This was done by various methods, including methods similar to those testified to by Mr. Semesky, including, among other things, bulk cash smuggling and methods designed to conceal the nature and source of the funds.

As an example of bulk cash smuggling and methods of concealment, United States Custom and Border Patrol Officer Michael Humphries testified that in November 1989, Arturo Guzman Loera, the defendant's brother, attempted to cross an international boundary from the United States into Mexico at the port of entry in Douglas, Arizona.  (Tr. 1182-85). Secreted within the confines of his vehicle was over $1.2 million in U.S. dollars.  (Tr. 1192, 1201).  Miguel Martinez testified that Arturo Guzman Loera worked in the defendant's drug business in Agua Prieta, Mexico, and confirmed that the currency seized from Arturo Guzman Loera was, in fact, proceeds of defendant's drug sales in the United States. (Tr. 1422-24)

Moreover, Jesus "Rey" Zambada Garcia testified that the Cartel generated billions of dollars from cocaine sales in the United States.  (Tr. 760).   Once the drugs were sold in the United States, the drug proceeds in the form of U.S. dollars were then sent back to Mexico and Colombia in United States dollars to repay those who invested in that drug shipment. (Tr. 752-53).  To illustrate his point, Zambada Garcia testified about an instance in which a co-conspirator delivered between $15 and $20 million of drug proceeds to his warehouse in Mexico City.  (Tr. 760-61).  Thereafter, Zambada Garcia arranged to send these drug proceeds to Colombia to compensate the Cartel's Colombian co-conspirators who had invested in the drug shipments. (Tr. 760).

Martinez testified about the bulk cash smuggling of cash generated from selling drugs in the United States.  He stated that the money would be brought to the defendant in

Agua Prieta smuggled "[i]n pickups and mobile homes with special compartments." (Tr. 1421). After the money arrived in Agua Prieta, the defendant would fly the money in planes to Guadalajara or Guanajuato. Id. Martinez noted that, during the operation of the tunnel, the defendant initially received approximately between $3 to $5 million in drug proceeds a month but, over time, that number increased to $20 million each time they would "send some" [cocaine]. Id. Martinez further testified that between 30 to 35 tons of cocaine went through the tunnel each year, and the defendant received approximately $400 to $500 million as a result. (Tr. 1470). Martinez also testified about the use of private jets to fly cash from Tijuana to Mexico City, with each jet holding approximately $8 to $10 million each month. Martinez further testified that about the use of bank accounts to pay for expenses and to hide the true ownership of the funds. He testified that the money "would be stashed, it would be placed in bank accounts, it would be exchanged, payments [for expenses] would be made…." (Tr. 1471). Martinez stated that he had "stored" up to $30 million in cash in "private residences and apartments" Id. Finally, Martinez testified that they would put money into the banking system "every week." Id. When asked how much would be put into the banking system on a given occasion, Martinez responded, "Well, so that you have an idea, we would spend between 10 to 11 to 12 million dollars a month." Id.

Alex Cifuentes testified that, when the defendant needed to send money from New York to Colombia to buy cocaine, the defendant used several methods of concealment utilizing his brother Jorge Cifuentes's "friends." (Tr. 5135). First, Alex Cifuentes testified that Jorge Cifuentes and his partner Juan Pablo Londono opened a company named Monodeaux, through which visa debit cards were issued with an approximate $9,900 balance. (Tr. 5135). Jorge Cifuentes explained that the cards were transported to Colombia where the money on a card was withdrawn through an ATM. (Tr. 2905-06). Alex Cifuentes also noted that the defendant did not like this method because "it would never end." (Tr. at 5135-36).

Alex Cifuentes also testified about people who would ship money for the defendant, including an individual named Lazaro. Lazaro was based in Atlanta and "ran" money through an insurance company. (Tr. 5136-39). When money had to be moved, "they" would call Lazaro, who provided them with a number to call to arrange for a pick-up of the drug money. Id. The government admitted into evidence recordings of calls between Alex Cifuentes, the defendant and Pedro Flores discussing a pick-up of cash by Lazaro from the Flores brothers in Chicago. (Tr. 5139; GX 609A-609T). Jorge Cifuentes testified that Lazaro was a worker of Gordo Mangueras, who would "move Don Joaquin's money to Colombia and Ecuador so that [they] could purchase the cocaine and so [they] would have money for expenses." (Tr. 2936-37).

Finally, Jorge Cifuentes interpreted his ledgers for the jury (GX 301(A) and 301(B)), which documented the defendant's transfer of money from Mexico to Jorge Cifuentes through Lazaro and Mangueras. The ledgers recorded disposition of money sent to Jorge Cifuentes by the defendant to pay for cocaine and expenses.

11

As set forth above, the defendant's organization obtained for distribution, conservatively, over $12,666,191,704.00 worth of illegal drugs.  The evidence showed that the drugs were sold in United States and the proceeds were laundered back to pay expenses, which included, but were not limited to, payroll for the defendant's workers (Tr. 3041, 5036, 5044-45); the cost paying suppliers (Tr. 3593, 2963); communication equipment (Tr. 5480); and money to purchase planes, submarines and other vehicles (Tr. 2942, 1338).  With the defendant having no legitimate source of income, the laundered proceeds from his drug trafficking activity and that of other members of the Cartel promoted the Cartel's drug trafficking activity.  As such, the government seeks a forfeiture money judgment in the amount of $12,666,191,704.00, which represents the total amount of money laundered and/or property involved in the course of the charged money laundering conspiracy.

IV.     Conclusion

For the reasons discussed above, the defendant is liable to forfeit the amount of proceeds of the conspiracies of which the jury found him guilty.  Accordingly, the Court should issue an order of forfeiture directing the defendant to forfeit $12,666,191,704.00.

Respectfully submitted,


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

ARTHUR G. WYATT, CHIEF
Narcotic and Dangerous Drug Section
Criminal Division,
U.S. Department of Justice

OF COUNSEL:

ARIANA FAJARDO ORSHAN
United States Attorney
Southern District of Florida


cc:     Counsel of Record (by ECF)