447

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,        :  09-CR-00466(BMC)
4                                :
                                 :
5                                :
          -against-             :  United States Courthouse.
6                                :  Brooklyn, New York.
                                 :
7                                :
                                 :  November 13, 2018
8   JOAQUIN ARCHIVALDO GUZMÁN    :  9:45 a.m.
    LOERA,                        :
9                                :
          Defendant.            :
10  - - - - - - - - - - - - - - X

11              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
               BEFORE THE HONORABLE BRIAN M. COGAN
12             UNITED STATES DISTRICT JUDGE, and a jury

13
                    A P P E A R A N C E S :
14
For the Government:  RICHARD P. DONOGHUE, ESQ.
15                      United States Attorney.
                      Eastern District of New York
16                       271 Cadman Plaza East.
                        Brooklyn, New York 11201
17                   BY:  GINA M. PARLOVECCHIO, ESQ.
                         ANDREA GOLDBARG, ESQ.
18                       MICHAEL P. ROBOTTI, ESQ.
                         Assistant United States Attorneys.
19

20                      United States Attorney's Office.
                       Southern District of Florida
21                       99 NE 4th Street.
                        Miami, Florida  33132
22                   BY:  ADAM S. FELS, ESQ.
                         Assistant United States Attorney.
23
                    A P P E A R A N C E S :   (Continued)
24  G

25


          ANTHONY M. MANCUSO, CSR        OFFICIAL COURT REPORTER

448

```
 1
    For the Government:    Department of Justice, Criminal Division
 2                         Narcotic and Dangerous Drug Section.
                           145 N. Street N.E.
 3                         Suite 300.
                           Washington, D.C. 20530.
 4                    BY:  ANTHONY NARDOZZI, ESQ.
                           AMANDA LISKAMM, ESQ.
 5

 6

 7   For the Defendant:    BALAREZO LAW
                           400 Seventh Street, NW.
 8                         Suite 306.
                           Washington, DC 20004
 9                    BY: A. EDUARDO BALAREZO, ESQ.

10

11                         LAW OFFICES OF JEFFREY LICHTMAN
                           11 East 44th Street.
12                         Suite 501.
                           New York, New York 10017.
13                    BY:  JEFFREY H. LICHTMAN, ESQ.
                           PAUL R. TOWNSEND, ESQ.
14

15                         LAW OFFICE OF PURPURA and PURPURA
                           8 E. Mulberry Street.
16                         Baltimore, Maryland  21202.
                      BY:  WILLIAM B. PURPURA, ESQ.
17

18

19
    Court Reporter:   Anthony M. Mancuso, CSR
20                    Official Court Reporter

21
    Proceedings recorded by computerized stenography.  Transcript
22  produced by Computer-aided Transcription.

23

24

25                         ooo0ooo
```

ANTHONY M. MANCUSO, CSR        OFFICIAL COURT REPORTER

1                    (Trial resumed.)

2                    (In open court; jury not present.)

3                    (Case called; both sides ready.)

4                    THE COURT:   Good morning.   Have a seat.

5                    MS. PARLOVECCHIO:   Good morning, your Honor. Gina

6      Parlovecchio, Andrea Goldbarg, Michael Robotti, Adam Fels,

7      Anthony Nardozzi and Amanda Liskamm for the United States.

8                    MR. LICHTMAN:   Good morning.

9                    MR. BALAREZO:   Eduardo Balarezo, Jeffrey Lichtman,

10     Paul Townsend, William Purpura and Ms. Colon Miro on behalf of

11     Mr. Guzman.

12                   THE COURT:   Good morning.   And good morning

13     Mr. Guzman.

14                   THE DEFENDANT:   Good morning.

15                   THE COURT:   I'm note we have an interpreter who is

16     sitting next to Mr. Guzman who was previously sworn.

17                   MR. BALAREZO:   The reason we are not using the

18     headsets is because of the hearing problem.

19                   THE COURT:   There are administrative details we need

20     to cover before we start.   First, there are the juror issues.

21     We have two.   We have an issue with Juror No. One, formerly

22     number 91, whom you may all recall displayed some anxiety upon

23     her selection last week.   She has delivered to me a

24     handwritten letter, which details medical issues that have

25     been brought about by her selection she says.

                   Anthony M. Mancuso, CSR      Official Court Reporter

1          I'm not going to file the letter because it pertains

2     to personal medical issues, but I'm going to have Ms. Clarke

3     hand a copy to each side to review and after you have reviewed

4     it, please, give it back to Ms. Clarke and we'll talk about

5     what to do about it.

6               (Pause.)

7               THE COURT:  Before we address it, both with regard

8     to this and the other issue, let's put aside the question of

9     whether we draft out an alternate or pick a couple of new

10    jurors, let's separate that and address just whether we think

11    this juror ought to be excused.  I'll hear from the government

12    first.

13              MS. PARLOVECCHIO:  The government believes Juror No.

14    One should be excused, your Honor.

15              MR. BALAREZO:  Your Honor, I think we would prefer

16    to hear what the second issue is before we make a decision.

17    It seems like this lady is expressing various issues that we

18    all have suffered from at any point or another.

19              THE COURT:  Speak for yourself.

20              MR. BALAREZO:  Especially during this trial, your

21    Honor.  I would be very loath to excuse her at this point

22    because we have not had one problem.  We would like to hear

23    about the second issue first and perhaps we can make an

24    informed decision.

25              THE COURT:  Okay.

Anthony M. Mancuso, CSR    Official Court Reporter

1          The second issue is Juror No. Two, formerly known as

2     Juror No. 98, who has advised that he is self-employed and he

3     cannot do without income for the expected length of the trial.

4     He conveyed that information not in writing but to Ms. Clarke.

5     She passed it on to me.

6               (Pause.)

7          MR. BALAREZO:  Thank you, your Honor.

8          THE COURT:  So, now I'll go to the defense first.

9          MR. BALAREZO:  Your Honor, with respect to the first

10    juror, we will defer to the court.  With respect to the second

11    juror, I think at this point there is no reason to let this

12    person go.  They had a full opportunity to disclose these

13    issues to the court and to the parties.  We think they are

14    trying to get out of jury service.

15         Now, that having been said, we do believe that

16    several more jurors need to be qualified so we can begin at

17    least with a full complement of alternates given how this is

18    moving already.

19         THE COURT:  Let me hear from the government.

20         MS. PARLOVECCHIO:  We agree with regard to Juror No.

21    Two.  He was given multiple times to raise this during jury

22    selection.  We're with the defense on this.

23         THE COURT:   Since there's no opposition to excusing

24    Juror No. One, I will also find independently this person has

25    been anxious and upset since selection and it was on full

Anthony M. Mancuso, CSR    Official Court Reporter

1   display.  I have no doubt if I were to ask further questions

2   of this person it would just result in a breakdown and crying

3   and really it's not necessary.  So I'm going to go along with

4   the parties on that.  Okay.  I'm also going to go along with

5   the parties on number two.  I agree with them at this stage he

6   has not demonstrated cause.

7            That means we're one juror short.

8            Mr. Balarezo says we should qualify more.  There's

9   nothing magic about the number six.  I picked six because

10  that's as many alternates as the jury box would hold.  Going

11  with five is not much of a difference.

12           What's the government view on whether we should

13  qualify one more juror?

14           MS. PARLOVECCHIO:  Your Honor, I think we should

15  qualify one more juror, just given the length of there trial,

16  the fact that it goes over several holidays.  We would be on

17  more sure footing if we started with six alternates rather

18  than five.

19           THE COURT:  The parties agree with that?

20           MR. BALAREZO:  Yes, your Honor.

21           THE COURT:  Then let's talk about the procedure for

22  picking this next alternate.

23           Are we going to have the first person who cannot be

24  challenged for cause or do you want a peremptory?

25           MR. BALAREZO:  Your Honor, the potential jurors, are

1    they from the groups that had filled out questionnaires?

2              THE COURT:  They are the questionnaire group.

3              MR. BALAREZO:  I would suggest that perhaps we

4    qualify three and maybe each side exercises a peremptory.

5              MS. PARLOVECCHIO:  We would agree with that, your

6    Honor.

7              THE COURT:  That's what we'll do.  We'll have to

8    reset the courtroom or move to another courtroom.  I'm not

9    sure how we'll do that.  We'll stand in recess until we can

10   set that up.  Then we'll qualify three jurors, each party to

11   get one peremptory against the three.

12             MS. PARLOVECCHIO:  Thank you, your Honor.

13             MR. BALAREZO:  Thank you, your Honor.

14             (Recess.)

15             (In open court; jury not present.)

16             THE COURT:  Everyone be sure to talk microphones so

17   that you are heard.  I guest we'll bring in the first group of

18   ten.  Let's bring in ten.  That has to be enough.

19             MR. LICHTMAN:  Are you going to give them the

20   opening?

21             THE COURT:  I'm going to give the same spiel I did

22   before.  Bring in the ten and then another ten.

23             MS. PARLOVECCHIO:  We went back and looked at the

24   transcript from day one of jury selection.  Juror 98 or Juror

25   No. 2 was never questioned about his hardship.  So in

1    discussing it with counsel beforehand, we would suggest either

2    bringing him in to further inquire about that issue or

3    proceeding without him.

4             THE COURT:  Unless you're going to insist on further

5    inquiring, I just as soon pick two.  We'll qualify five, pick

6    two, give you one peremptory.  I know what he's going to say.

7    He's going to say I'm a taxi driver and I have no income for

8    four months.  Now that is on the questionnaire.  He's supposed

9    to say that.  I don't know what his questionnaire said.  I

10   assume that wasn't a problem on his questionnaire or we would

11   have asked him about it.

12            MR. LICHTMAN:  Yes, of course.  I think the issue is

13   -- our concern is that if we have a juror who either through

14   negligence or purposefully doesn't want to be here --

15            THE COURT:  I see the concern.  If you are both

16   agreed that we should excuse him, I will.  I don't see a need

17   to take the further time to interrogate him because I know

18   what he's going to say.

19            MR. BALAREZO:  He's a cab driver?

20            THE COURT:   Yes.

21            MR. LICHTMAN:  That's understandable.

22            THE COURT:  We're agreed to excuse him.

23            MS. GOLDBARG:  Yes, your Honor.

24            MR. LICHTMAN:  Yes, your Honor.

25            THE COURT:   Number two is excused.

1           Let's have the panel, please.  We're starting with

2     Juror No. 48.

3           (Prospective jurors enter courtroom.)

4           THE COURT:  Please have a seat.

5           Good morning, everybody.  I'm Judge Cogan.  Thank

6     you all for being here today and thank you for taking the time

7     to fill out those very detailed questionnaires that I know you

8     all did.  I know that was not a very easy thing to do.

9           As you know from the questionnaire you are being

10    considered to sit as jurors in a criminal case.  In this case

11    the defendant, Mr. Guzman, is charged with being a leader of

12    the Sinaloa cartel, which the government alleges is a criminal

13    enterprise.  The indictment alleges that Mr. Guzman committed

14    several crimes through that criminal enterprise, including

15    drugs and murder conspiracies.

16          Now, Mr. Guzman has denied those charges.  He's pled

17    not guilty and he is, therefore, entitled to a presumption of

18    innocence throughout these proceedings.

19          Before we get started, I want to give you a brief

20    overview of your role as a juror, if you are eventually

21    selected to be one in this case.  If you've ever served on a

22    jury before, this will probably be a little different

23    experience than that.  You might have noticed that we have

24    been referring to you by your assigned numbers and we have

25    asked that you not tell us your names.  We had the jury

Anthony M. Mancuso, CSR    Official Court Reporter

456

 1    service downstairs remove your names from the questionnaires
 2    before we read them.   So, I don't know any of your names.   The
 3    lawyers don't know any of your names.   The defendant does not
 4    know any of your names.   No one is ever going to know what
 5    your names are.
 6              There's a reason for this.   Earlier this year I
 7    decided that the jury in this case would be what we call an
 8    anonymous and partially sequestered.   That simply means that
 9    no one is going to know who you are.   Although everyone will
10    be able to see you sitting in the jury box during the trial,
11    no one is going to know your names or anything about those
12    names.
13              Now, I did this out of respect for your privacy.
14    This is a high-profile case.   It's gotten a lot of public
15    attention, including the media.   I didn't want anyone trying
16    to talk to you about the trial or stopping you on the subway
17    or outside the courthouse to ask you questions or even try to
18    talk to you downstairs in the cafeteria during lunch to learn
19    anything about the case.   Keeping jurors anonymous is not
20    uncommon in high-profile cases like this because other people
21    will understandably be interested and will want to talk to you
22    about the case if they know that you are involved.   But you're
23    going to have enough on your plates if you are picked for this
24    jury in deciding the issues before you.   I don't want you to
25    have to worry about any people contacting you in this case.

1          Now, I'll also mention that another part of my order

2     is that the jurors will be brought to and from the courthouse

3     by the U.S. Marshals every day and that the jurors stay away

4     from the rest of the public while they are in the courthouse

5     during trial.  They are probably not going to pick you up at

6     home or actually they might.  They'll have central meeting

7     places where they can pick several of you up at a time, where

8     you will be picked up and dropped off every day.  That's done

9     as part of the overall increase in security measures that the

10    U.S. Marshals have imposed for this case and can ensure that

11    the trial will proceed quickly and expeditiously.  I know

12    you'll all be here at the same time because you are all being

13    pick up by the marshals.

14          The point is if you are selected as a juror for this

15    case, your job is going to be very important and I did not

16    want anything to distract you from doing that job.

17          Now, let me tell you what we are going to do this

18    morning.  We're going to do the selection process in a few

19    steps.  First, I'm going to now ask you a handful of important

20    questions while you are sitting here in the gallery.  After

21    I'm done with those questions, I'm going to talk to each one

22    of you individually over there at the end of the table with

23    the attorneys and the defendant present.

24          The five people that you see sitting over there in

25    the jury box, those are reporters, journalists.  They are

Anthony M. Mancuso, CSR    Official Court Reporter

458

1  watching because in our criminal justice system it's important

2  for the public to know what happens at these proceedings.

3  But, again, they don't know your names and they are never

4  going to be able to learn your names.  Your privacy is very

5  important.  So while I'm questioning you up there if at any

6  point you want to discuss something that you don't feel

7  comfortable saying in open court, you're able to ask me to

8  speak to just you and the lawyers without the reporters

9  listening.  We can turn on a noise in the back of the jury

10 box.  It's very annoying to the reporters.  It drowns out all

11 the sound so that you can only hear us when we are talking to

12 you at this table.

13       So if you want to discuss something privately when

14 we're up there, let me know and we'll certainly do that.

15       Now, I'm going to ask you a handful of questions.

16 It's important that you answer these questions honestly so

17 that the parties and I can decide whether you would be

18 appropriate for this jury.  Remember that you took an oath

19 downstairs before you filled out the questionnaire and that

20 oath still applies to the answers you give me today.  It's

21 very important that you answer these questions truthfully.

22       First, as the defendant sits here right now he's

23 considered innocent.  He is presumed innocent until and only

24 if the jury unanimously finds that he's guilty beyond a

25 reasonable doubt.  So what that means is if you are in jury

1  deliberations and you say, you know, I think he probably did
2  it but maybe he didn't.  That's not enough to convict him.
3  You have to find that he did it unanimously beyond a
4  reasonable doubt.

5          Second, as I explained to you earlier, the defendant
6  has been indicted for several crimes.  To say he's indicted
7  that just means that he's been formally charged with those
8  crimes.  It doesn't mean that he's guilty of anything.  You
9  can't think that he's more likely to be guilty just because
10 he's been indicted for those crimes.

11         Now, is there anyone who disagrees with the idea
12 that the defendant is innocent until and unless he is proven
13 guilty?  Anyone have any problem with that concept?  You view
14 him has innocent as we start this trial all the way through
15 the trial.  Everybody okay with that?  Just raise your hand if
16 you are not.  Okay.

17         And do you understand that just because he's
18 indicted that's not to be given any weight in determining
19 whether he's guilty.  He's just been charged.  It doesn't
20 affect his presumption of innocence at all.  Is everybody okay
21 with that?

22         Okay.  Good.

23         Third, as I mentioned to you, the government has the
24 burden of proving the defendant's guilt beyond a reasonable
25 doubt.  Like I said, probably did it is not good enough.  I

Anthony M. Mancuso, CSR    Official Court Reporter

460

1    think he did it, that's not good enough.   Beyond a reasonable

2    doubt is what's required.

3              Anyone have a problem with that principle of law?

4    Okay.

5              Next, it's very important that throughout the trial

6    you keep an open mind until you go in the back at the end of

7    the case and deliberate with your fellow jurors.   You can't

8    hear one witness and think, oh, I know how this case comes

9    out.   You can't do that.   You have to listen to all the

10   evidence, keeping an open mind throughout.   Anyone think they

11   will have any problem keeping an open mind?

12             Okay.

13             Now, when you filled out the questionnaire, you were

14   asked not to do any research, read or watch any news or

15   otherwise learn anything about this case.   It's gotten a lot

16   of newspaper and TV coverage and internet coverage.

17   Notwithstanding that instruction, is there anybody who since

18   they filled out the questionnaire has been exposed to this

19   case or things in it or news coverage of it?   Just raise your

20   hand if that includes you.   Okay.   I'm going to say not number

21   64 or number 70.   Everybody else.   That's fine, we'll talk to

22   you about that.

23             Also, you were asked in the questionnaire whether

24   you know any of the lawyers or the defendant or me.   Now that

25   we are all displayed in front of you, do any of us look

Anthony M. Mancuso, CSR     Official Court Reporter

1    familiar to you?   No.   Okay.

2          Now, we're going to proceed to the individual

3    questions.   We're going to take you to another room, except

4    for one person who we'll bring up to the front and we'll do

5    you one at a time.   If you are not selected for the jury,

6    please, don't take that has any slight against you.   Lawyers

7    have all kinds of reasons for not wanting someone to be on a

8    jury.   It doesn't mean there's anything wrong with you if you

9    are not picked for the jury.   I get called for jury duty

10   myself.   Judges are not exempt.   No lawyer has ever put me on

11   a jury and I'm not offended at all by that.

12         We'll call you in numericals order, so the lowest

13   numbered juror, I think probably 48, we will start with number

14   48.   The rest of you can be taken into another room by

15   Ms. Clarke.

16         Juror No. 48, if you would come forward here.

17         (Continued on next page.)

18

19

20

21

22

23

24

25

Jury Selection                                              462

1    (Continuing.)

2              (Prospective Juror 48 enters.)

3              THE COURT:  First thing is you raised your hand that

4    you had seen some coverage or media about the case.  Tell me

5    what you saw and what you learned.

6              THE PROSPECTIVE JUROR:  Essentially, after the fact,

7    I generally have the local news turned on by default when I

8    get ready in the morning.  And, essentially, they were talking

9    about the case.  They mentioned some details.

10             In addition, I do have some roommates who kind of

11   pieced two and two together when I was leaving and such, and

12   they were also talking about the case while I was home.  So, I

13   heard just various bits and details.

14             THE COURT:  Tell me any details you recall hearing.

15             THE PROSPECTIVE JUROR:  Mostly, they kind of

16   mentioned stuff about how he was, like, on the news about

17   being one of the most dangerous people, like number 48 or

18   something like that; they mentioned about he was convicted in

19   Mexico; that he escaped; of course, obviously, one of the

20   terms for him coming over here is to make sure he doesn't

21   escape again; possibly that he was involved in a couple of

22   murders.

23             And, essentially, just like that.

24             THE COURT:  Okay.  Now, you know it's very important

25   if you serve as a juror on this case -- I expect everybody,

1   and almost everybody raised their hand, has heard things about

2   it.  But when you serve as a juror, you have to be able to put

3   all that aside because there's going to be a tremendous amount

4   of information in this trial, in this courtroom, and base your

5   verdict solely on what you hear in the courtroom and put aside

6   anything you've heard outside of the courtroom.

7          Are you able to do that?

8          THE PROSPECTIVE JUROR:  When I initially filled out

9   the questionnaire I thought I could, but after hearing those

10  details I'm not exactly sure I can.  I could try, but, once

11  again, I'm not sure if I can, reasonably speaking.

12         THE COURT:  Like I said, everybody has been exposed

13  to some details.

14         What makes you think you might have difficulty doing

15  that if, for example, and I think this is true, you get a

16  hundred times more information in this courtroom than you ever

17  heard out there?

18         THE PROSPECTIVE JUROR:  The fact that he's already

19  been convicted, so a part of me kind of feels, if you'll

20  excuse me words, is a bit pointless even if -- it just feels a

21  little pointless to me because he's already been convicted.

22  He's kind of going away regardless.

23         THE COURT:  He hasn't been convicted of anything

24  hear.

25         THE PROSPECTIVE JUROR:  Yes, in the States, yes.

1   But to my understanding, he was convicted in Mexico.

2              THE COURT:  Is that right?

3              THE PROSPECTIVE JUROR:  I heard something along

4   those lines.

5              MR. LICHTMAN:  Yes.

6              THE PROSPECTIVE JUROR:  Like I understand the point,

7   but at the same time it feels pointless.

8              THE COURT:  Okay.  So, you're saying you can't tell

9   me that you're confident you could put aside all this

10  information.

11             THE PROSPECTIVE JUROR:  Yes, that's essentially what

12  I'm saying.

13             THE COURT:  Any questions from the attorneys?

14             MS. PARLOVECCHIO:  No, your Honor.

15             MR. LICHTMAN:  No, Judge.

16             THE COURT:  Thank you very much.  They will take you

17  back.

18             (Prospective Juror 48 exits.)

19             THE COURT:  Cause, right?

20             MS. PARLOVECCHIO:  Yes.

21             (Pause in proceedings; Prospective Juror 58 enters.)

22             THE COURT:  Good morning.  How are you.

23             THE PROSPECTIVE JUROR:  Fine.  And yourself?

24             THE COURT:  Okay.  Just a few follow-up questions.

25             You raised your hand when I asked if you had you

1   heard anything about the case since you filled out the

2   questionnaire.  Tell me, what have you heard?

3           THE PROSPECTIVE JUROR:  I tried my best to avoid any

4   kind of news coverage, but just due to the profiling and how

5   significant this case is...

6           THE COURT:  You heard some things.

7           THE PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Tell me what you heard.

9           THE PROSPECTIVE JUROR:  I heard that the jury has

10  been selected.  I've heard slightly personal information about

11  some of the jurors, such as gender, possible age range, et

12  cetera.

13          THE COURT:  Anything else?  Anything about the case

14  itself?

15          THE PROSPECTIVE JUROR:  Not too much.  I tried my

16  hardest to avoid any coverage.

17          THE COURT:  I noticed that you said you wouldn't

18  have any problems serving in the case with regard to a job or

19  education or anything like that.  I just wanted to make sure

20  that's true.

21          THE PROSPECTIVE JUROR:  Correct.

22          THE COURT:  And then I wanted to ask you in answer

23  to the question:  Do you believe that police or law

24  enforcement officers are more likely to tell the truth than

25  other witness? you testified yes, you said:  I feel that

Jury Selection                                          466

1    police or law enforcement officers will be honest because that

2    will result in true justice.

3           Let me ask you some questions about that.  Could you

4    agree with me that there are some police officer that are not

5    honest?

6           THE PROSPECTIVE JUROR:  I agree.

7           THE COURT:  And if I give you an instruction during

8    this trial that you're not to give any credit to police

9    officers -- any special credit over and above what you'd give

10   an ordinary witness, could you follow that instruction?

11          THE PROSPECTIVE JUROR:  Yes I can.

12          THE COURT:  You're sure?

13          THE PROSPECTIVE JUROR:  One hundred percent.

14          THE COURT:  Then there was one page on your

15   questionnaire that I think you just missed it, which is not

16   hard since it's a very lengthy questionnaire.

17          But on Page 25, I asked you some of the same

18   questions I've asked you this morning.  First, we asked you

19   about the burden of proving the Defendant's guilt beyond a

20   reasonable doubt, that he's presumed innocent and he can't be

21   found guilty unless and until the jury unanimously, based

22   solely on the evidence in the case, decides that his guilt has

23   been proven beyond a reasonable doubt.  And it asks you:  Will

24   you accept and apply this rule of law?

25          And you didn't answer.  Can you apply that rule of

1    law?

2              THE PROSPECTIVE JUROR:   Yes, I can.

3              THE COURT:   You're sure?

4              THE PROSPECTIVE JUROR:   Yes.

5              THE COURT:   Second, a question was asked about the

6    right not to testify.   The Defendant doesn't have to testify.

7    He doesn't have to offer any evidence at all.   It's entirely

8    the Government's burden to prove that he's guilty beyond a

9    reasonable doubt.   In fact, if you get on the jury and you're

10   in the jury room, no one is even allowed to mention the fact

11   that he didn't testify if he chooses not to testify.   I don't

12   know what he's going to do.   But you can't hold it against him

13   in any way if he doesn't put on any evidence or chooses not to

14   testify.

15             Are you able to follow that direction?

16             THE PROSPECTIVE JUROR:   Yes.

17             THE COURT:   And then I mentioned to you that the

18   Defendant has been indicted, which means he's been charged

19   with crimes.   But the indictment is no evidence at all that

20   he's guilty of anything.

21             Can you follow that instruction?

22             THE PROSPECTIVE JUROR:   Yes.

23             THE COURT:   Let's see if I have anything else.

24             Now, you mentioned that you don't think cocaine,

25   heroin, and methamphetamine, and marijuana should not be

Jury Selection                                                468

1    legalized, and then you wrote:  This would not affect my

2    ability to serve.

3              I just want to make sure that just because of the

4    nature of these charges, that does not prejudice you in any

5    way against this Defendant.

6              THE PROSPECTIVE JUROR:  It does not.

7              THE COURT:  Are you sure?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Okay.  And another question that you

10   kind of skipped over is:  Do you have any family or friends

11   who have ever been involved with the courts?  Lawyers, judges,

12   law clerks, anybody else in the legal field?

13             THE PROSPECTIVE JUROR:  I do have an uncle that was

14   a criminal defense attorney in Brooklyn.

15             THE COURT:  Did you used to talk to him about his

16   cases?

17             THE PROSPECTIVE JUROR:  Yeah.

18             THE COURT:  Okay.  Without telling us his name, what

19   kind of cases did he defend?

20             THE PROSPECTIVE JUROR:  I believe -- honestly, I

21   can't recall.

22             THE COURT:  Is there anything about anything you've

23   heard from your uncle that might make it difficult for you to

24   keep an open mind in this case?

25             THE PROSPECTIVE JUROR:  No.

1            THE COURT:  All right.  Any questions from the

2    parties?

3            MR. NARDOZZI:  Nothing from the Government, your

4    Honor.  Thank you.

5            MR. LICHTMAN:  Thank you.

6            THE COURT:  Thank you very much.

7            THE PROSPECTIVE JUROR:  Have a good morning.

8            (Prospective Juror 58 exits.)

9            THE COURT:  Next is 62.

10           I assume there's no cause challenge to 58.

11           MR. LICHTMAN:  No.

12           MS. PARLOVECCHIO:  No.

13           MR. NARDOZZI:  No, your Honor.

14           (Prospective Juror 62 enters.)

15           THE COURTROOM DEPUTY:  Juror 62, you can have a seat

16   there.

17           THE COURT:  Hello.  How are you?

18           THE PROSPECTIVE JUROR:  Good.

19           THE COURT:  Let me first ask you, in answer to a

20   question towards the end of the questionnaire, you said that

21   you have a serious difficulty serving on the jury because of

22   your job.  Tell us about that without telling us where you

23   work but generally what you do.

24           THE PROSPECTIVE JUROR:  I work for a very small

25   nonprofit organization.  So, there's just not really people to

Jury Selection                                          470

1    cover if I'm not available.  And I run a process where -- I

2    don't know how to talk about it without saying what we do.  I

3    run a process on behalf of some Government agencies that's on

4    a very strict timeline and, therefore, I have to carry it out.

5              THE COURT:  How will the timeline implicate this

6    case?

7              THE PROSPECTIVE JUROR:  The most important period is

8    basically after Thanksgiving through January.

9              THE COURT:  And there's no one who could replace

10   you?

11             THE PROSPECTIVE JUROR:  Not currently.  My

12   assumption is that I would be asked to, like, go on leave and

13   they would have to hire someone to run that process.

14             THE COURT:  Do you think that's something they'd do?

15             Have you ever heard of that being done at your

16   employer?

17             THE PROSPECTIVE JUROR:  We've brought independent

18   contractors in to fill gaps in the past.  And I think I only

19   get paid for ten days, so I don't know what other option they

20   would have.

21             THE COURT:  Would it be hard for you financially to

22   get paid for only ten days?

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Any questions from the parties?

25             MS. PARLOVECCHIO:  No, your Honor.

Jury Selection                                    471

1              MR. LICHTMAN:  No, your Honor.

2              THE COURT:  Thank you very much.  You can go back.

3              (Prospective Juror 62 exits.)

4              THE COURT:  Any objection to excusing 62 for cause?

5              MS. PARLOVECCHIO:  No objection.

6              MR. LICHTMAN:  No, Judge.

7              (Prospective Juror 64 enters.)

8              THE COURTROOM DEPUTY:  Juror 64, you can have a seat

9    right there.

10             THE COURT:  Good morning.  How are you?

11             THE PROSPECTIVE JUROR:  Good.

12             THE COURT:  Have a seat.  Make yourself comfortable.

13   Just A few follow-up questions I wanted to ask you.

14             You said you weren't sure if you would be able to

15   serve because you have a nine-month-old baby.  First of all,

16   congratulations.

17             THE PROSPECTIVE JUROR:  Thank you.

18             THE COURT:  Boy or girl?

19             THE PROSPECTIVE JUROR:  Girl.

20             THE COURT:  Can you make arrangements to have

21   someone cover the baby while you're here?

22             What we're going to do is we'll stop at 4:30 every

23   day.  We're not going to sit on Fridays at all.  And we're

24   going to take a pretty long break, a ten-day break, over

25   Christmas and New Year's.

1            THE PROSPECTIVE JUROR:   My mom usually takes care of

2    her when I go to work and she said she can take care of her.

3            THE COURT:   She did?  So, that's okay, that won't be

4    a concern of yours?

5            THE PROSPECTIVE JUROR:   No.

6            THE COURT:   Let me ask you a couple of other

7    questions.

8            Okay.   Now, you mentioned that you had watched

9    Narcos on Netflix.  Did you watch all the seasons?

10           THE PROSPECTIVE JUROR:   Yes.

11           THE COURT:   So you saw that one season was supposed

12   to be about this case?

13           THE PROSPECTIVE JUROR:   No, that was, like, the end.

14   They were going to do it, but it was, like, the end.

15           THE COURT:   So, you didn't see anything about this

16   case that you think that Narcos has anything to do with?

17           THE PROSPECTIVE JUROR:   No.

18           THE COURT:   If I told you that anything you saw on

19   that show you had to put aside completely and just base your

20   decision in this case on the evidence that's admitted here in

21   open court, are you able to do that?

22           THE PROSPECTIVE JUROR:   Yes.

23           THE COURT:   You also answered on your questionnaire

24   that you have heard and saw that the Defendant here is the

25   boss of a cartel and that he sells drugs to the U.S. or other

Jury Selection                                            473

1    countries.

2              Let me ask you the same question:  What you've heard

3    about him, are you able to put that aside completely and base

4    your decision solely on what's put into evidence here in this

5    case?

6              THE PROSPECTIVE JUROR:  Yes.

7              THE COURT:  You understand sometimes things --

8              THE PROSPECTIVE JUROR:  Yeah.

9              THE COURT:  -- in the media and press, they're not

10   accurate.

11             THE PROSPECTIVE JUROR:  Of course.

12             THE COURT:  And the Government has to prove this

13   under the rules of law here.

14             THE PROSPECTIVE JUROR:  Yeah.

15             THE COURT:  You have no problem putting that aside?

16             THE PROSPECTIVE JUROR:  No.

17             THE COURT:  You also mentioned that you thought

18   marijuana should be legalized for medical purposes but you

19   said that that would not affect your ability to serve as a

20   fair and impartial juror.

21             Are you sure about that?

22             THE PROSPECTIVE JUROR:  Yes, I am.

23             THE COURT:  So, if you found, for example, that the

24   Government had proven the guilt of this defendant beyond a

25   reasonable doubt with respect to, for example, marijuana

1    importation, you wouldn't have any problem voting to convict

2    him?

3              THE PROSPECTIVE JUROR:  Yeah.

4              THE COURT:  By the same token, if the Government

5    failed to prove that, you wouldn't have any problem acquitting

6    him; is that right?

7              THE PROSPECTIVE JUROR:  Uh-huh.

8              THE COURT:  You're sure about that?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Any questions from the parties?

11             MR. NARDOZZI:  You noted in your questionnaire that

12   at one time you used to smoke marijuana.

13             Is there anything about that that would cause you to

14   be unfair in this case in assessing facts?

15             THE PROSPECTIVE JUROR:  No.  I stopped a while ago.

16   That was high school days.

17             MR. NARDOZZI:  Okay.  And I know the judge

18   questioned you about the show Narcos.  There's a new season

19   coming out soon.

20             Can you abstain from watching that?

21             THE PROSPECTIVE JUROR:  Definitely.

22             THE COURT:  Anything?

23             MR. LICHTMAN:  I've got nothing, Judge.

24             THE COURT:  Thank you so much.  We'll be back to you

25   very shortly.  You can go back to that room.

 1              (Prospective Juror 64 exits.)

 2              THE COURT:   No cause on 64.

 3              Next is 66.

 4              (Prospective Juror 66 enters.)

 5              THE COURTROOM DEPUTY:   Juror 66, you can have a seat

 6     right there.

 7              THE PROSPECTIVE JUROR:   Thank you.

 8              THE COURT:   Hi.  How are you?

 9              THE PROSPECTIVE JUROR:   Okay.  How are you?

10              THE COURT:   Okay.  Just a couple of follow-up

11     questions I need to ask you.

12              You, like most of the people there, said that

13     despite the instruction in questionnaire not to learn anything

14     more about this case, you think you might have seen or heard

15     something.

16              THE PROSPECTIVE JUROR:   Absolutely I did this

17     morning.

18              THE COURT:   What did you hear?

19              THE PROSPECTIVE JUROR:   That the case started today.

20     They had already made their selection.

21              THE COURT:   Obviously, the newspapers were wrong.

22              THE PROSPECTIVE JUROR:   I don't read newspapers.

23              THE COURT:   So, you heard that on the radio?

24              THE PROSPECTIVE JUROR:   Actually, I went to find out

25     what the weather was going to be like, and, boom, first thing.

Jury Selection                                        476

1              THE COURT:  You're right.

2              Anything else you learned about the case, besides

3      that the jury was allegedly selected?

4              THE PROSPECTIVE JUROR:  No.

5              THE COURT:  You were a little bit equivocal on that

6      "no."

7              Is there anything you can think of?

8              THE PROSPECTIVE JUROR:  Nothing at all.  Just

9      nervous to be here.

10             THE COURT:  I understand.

11             Now, you mentioned that you need to check your blood

12     sugar.

13             THE PROSPECTIVE JUROR:  I have letters from the

14     doctor.

15             THE COURT:  I believe you.

16             THE PROSPECTIVE JUROR:  I'm the caretaker for my son

17     right now.  He's in the hospital.  I have -- my diabetes is

18     really bad right now because I'm stressed out; number one,

19     this, and, number two, my son back in the hospital.

20             THE COURT:  Let me talk to you about your son being

21     in the hospital.  I don't want you to tell me what he's got,

22     but how long do you expect him to be in the hospital?

23             THE PROSPECTIVE JUROR:  I'll be very honest, he's

24     been in and out continuously.

25             THE COURT:  Are you his primary caretaker?

Jury Selection                                        477

1           THE PROSPECTIVE JUROR:  I am.

2           THE COURT:  How old is he?

3           THE PROSPECTIVE JUROR:  (Redacted); mentally, 10.

4           THE COURT:  I understand.

5           And would it make it difficult for you to serve on

6    this jury if you had to take care of him?

7           Is there anybody else that can take care of him?

8           THE PROSPECTIVE JUROR:  Right now, I'm the only one

9    that does everything.

10          THE COURT:  Any questions from the parties?

11          MS. PARLOVECCHIO:  No, your Honor.

12          THE COURT:  All right.  Thank you very much.  You

13   can go back in that room, we'll be right with you.

14          THE PROSPECTIVE JUROR:  Thank you.

15          (Prospective Juror 66 exits.)

16          THE COURT:  No objection to excusing 66 for cause?

17          MS. PARLOVECCHIO:  No objection.

18          MR. LICHTMAN:  No.

19          THE COURT:  This is 67.

20          (Prospective Juror 67 enters.)

21          THE COURTROOM DEPUTY:  Juror 67, please have a seat

22   right there.

23          THE COURT:  Hello.  How are you?

24          THE PROSPECTIVE JUROR:  Petrified, thank you.  And

25   how are you?

Jury Selection                                              478

1          THE COURT:  No, don't be petrified.

2          THE PROSPECTIVE JUROR:  Okay.

3          THE COURT:  Just a few follow-up questions I wanted

4    to ask you.

5               First of all, I see you have a medical condition

6    that requires frequent appointments; one per month.  We don't

7    ever work on Fridays, so you could always make your medical

8    appointments on Fridays.

9               Is that okay?

10         THE PROSPECTIVE JUROR:  I already have a couple of

11   appointments that take months in advance to schedule, but that

12   wouldn't be...

13         THE COURT:  Can you move those?

14         THE PROSPECTIVE JUROR:  I already did.  So, I'm

15   still -- no, it's not -- it's November and December, but...

16         THE COURT:  Tell me about November and December,

17   what kind of problems you have.  Anything?

18         THE PROSPECTIVE JUROR:  I am a breast cancer

19   survivor, so I have follow-up appointments with that.

20              But are you talking about conflict as far as work?

21         THE COURT:  Work or anything else.

22         THE PROSPECTIVE JUROR:  Yeah, I do, because I'm in

23   retail and a manager of internet.  And I do have a letter from

24   my employer, which every time I came they said bring it to the

25   judge.  November and December is about half the year's revenue

Jury Selection                                         479

1    and it's a small company.

2              THE COURT:  You sell things retail?

3              THE PROSPECTIVE JUROR:  Online.  And I'm the whole

4    back end.

5              THE COURT:  What would happen if you couldn't be at

6    work except on Fridays or after 4:30?

7              THE PROSPECTIVE JUROR:  I mean, I guess they would

8    survive, but usually I'm there from 7:30 in the morning until

9    5 in the afternoon because it is an internet merchant.  So,

10   the orders come in.  It's (redacted) and accessories, it's not

11   life-or-death stuff, but it's where I get paid.

12             THE COURT:  Okay.

13             MR. BALAREZO:  Your Honor, could she speak into the

14   microphone?

15             THE PROSPECTIVE JUROR:  I'm sorry.

16             THE COURT:  Any questions from the parties?

17             MR. NARDOZZI:  No, your Honor.

18             MR. LICHTMAN:  No.

19             THE COURT:  Thank you very much.  We'll be with you

20   shortly.

21             THE PROSPECTIVE JUROR:  Do you need that letter?

22             THE COURT:  No, I believe you.  I trust you

23   completely.

24             (Prospective Juror 67 exits.)

25             THE COURT:  I generally find only a few people

LAM        OCR        RPR

1    willing to commit perjury to avoid jury duty.

2              MR. LICHTMAN:  This would be the case.

3              THE COURT:  Yes.

4              So, 67 for cause.  Next is 70.

5              (Prospective Juror 70 enters.)

6              THE COURTROOM DEPUTY:  Juror 70, you can have a

7    seat.

8              THE COURT:  Hello.  How are you?

9              THE PROSPECTIVE JUROR:  Good, thank you.

10             THE COURT:  Be sure you talk into that microphone.

11             I see you have two potential conflicts.  You had a

12   November 3 conflict; that's gone, that's no longer a conflict.

13             And you're having some eye surgery, scheduled for

14   (redacted); is that right?

15             THE PROSPECTIVE JUROR:  Yeah.

16             THE COURT:  Can you move that appointment?

17             THE PROSPECTIVE JUROR:  I already did one.  It's not

18   balanced, so I have to do it soon.

19             THE COURT:  Could you move it a week or two?

20             THE PROSPECTIVE JUROR:  Week or two?  I don't know.

21             THE COURT:  Because we're going to be off.  We're

22   not sitting Christmas week or the first part of New Year's

23   week, so we're off that whole ten days.

24             THE PROSPECTIVE JUROR:  I already take my blood

25   test.  I already had the tests.

Jury Selection                                                    481

1            THE COURT:  If you can have the surgery on

2    (redacted), why not have it on December 21?

3            THE PROSPECTIVE JUROR:  He's not available.

4            THE COURT:  He's not available.

5            THE PROSPECTIVE JUROR:  The doctor.  I supposed to

6    go earlier, but he said he's not available so I make it

7    (redacted).

8            THE COURT:  What about later than (redacted)?

9            THE PROSPECTIVE JUROR:  Then I don't know.  Maybe

10   next year.  So, my deductible is -- I have to pay again.  So,

11   I have to do it before December.

12           THE COURT:  Okay.  Any questions from the attorneys?

13           MR. LICHTMAN:  No, Judge.

14           MS. PARLOVECCHIO:  No.

15           THE COURT:  Thank you very much.  You can go back.

16   We'll be in touch with you shortly.

17           THE PROSPECTIVE JUROR:  Thank you.

18           (Prospective Juror 70 exits.)

19           MR. BALAREZO:  I have a torn meniscus in my knee.

20   Can I use that?

21           THE COURT:  You're out.

22           70 is excused for cause.  73 is next.

23           (Prospective Juror 73 enters.)

24           THE COURTROOM DEPUTY:  Juror 73, you can have a seat

25   right there.

1          THE COURT:  Hello.  How are you?

2          THE PROSPECTIVE JUROR:  Good, thanks.  How are you?

3          THE COURT:  Okay.  Make yourself comfortable.  Just

4    try to talk into that microphone there.

5          THE PROSPECTIVE JUROR:  Okay.

6          THE COURT:  Just a few follow-up questions.

7          You noted that your employer pays you for jury

8    service, but you checked that you were unsure if you could sit

9    on a trial this long.

10         THE PROSPECTIVE JUROR:  Yes.

11         THE COURT:  What makes you unsure?

12         THE PROSPECTIVE JUROR:  I just never knew that I was

13   allowed to be -- you know, serve on a jury past, you know, a

14   certain amount, and this is a really long case.

15         THE COURT:  It will probably be two to four months.

16         THE PROSPECTIVE JUROR:  Right.  And I still have not

17   inquired about that.

18         THE COURT:  Oh.  Like I said, you checked that your

19   employer will pay you for jury service.

20         THE PROSPECTIVE JUROR:  I believe so, but I'm not

21   exactly sure.

22         THE COURT:  Without telling me where you work, can

23   you tell me how big a company it is?

24         THE PROSPECTIVE JUROR:  It's a large company.  I

25   want to say upwards of 2,000.

Jury Selection                                483

1              THE COURT:  2,000 people.

2              Without telling me your specific job, can you tell

3    me what field of work you're in?

4              THE PROSPECTIVE JUROR:  I am in the art field.

5              THE COURT:  Art.  Okay.

6              If your employer didn't pay you for jury service,

7    how big a hardship would that be for you?

8              THE PROSPECTIVE JUROR:  Not terrible, but...

9              THE COURT:  You'd rather not.

10             THE PROSPECTIVE JUROR:  Correct.

11             THE COURT:  Okay.  Just a few more questions I want

12   to ask you.

13             Now, you mentioned that there was a home burglary

14   and a stabbing in your neighborhood.

15             THE PROSPECTIVE JUROR:  Yes.

16             THE COURT:  It didn't involve you, did it?

17             THE PROSPECTIVE JUROR:  No, it did not.

18             THE COURT:  Did that give you any impression about

19   the criminal justice system?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  Did you hear what happened to that case

22   after the incident?

23             THE PROSPECTIVE JUROR:  No, I did not, I just heard

24   about the stabbing.

25             THE COURT:  Now, you mentioned you had a close

1    family member who decades ago had a problem with cocaine but

2    that he no longer does.

3              THE PROSPECTIVE JUROR:   Yes.

4              THE COURT:   Let me ask you, can you put that

5    experience aside in determining whether this defendant is

6    guilty or innocent of the charges against him?

7              THE PROSPECTIVE JUROR:   I think so.   I mean, even

8    though it's drug-related, I just -- you know, it's nothing

9    similar about it other than that.

10             THE COURT:   Okay.   Also, you said you would hope

11   that somebody employed in law enforcement would be honest and

12   regard truth as being paramount.

13             Would you agree with me that sometimes law

14   enforcement witnesses are not entirely honest?

15             THE PROSPECTIVE JUROR:   Correct, I see that.

16             THE COURT:   And if I gave you an instruction that

17   you had to evaluate the testimony of a law enforcement officer

18   the exact same way you do with any other witness, giving no

19   more or less credit, could you follow that instruction?

20             THE PROSPECTIVE JUROR:   I think so.

21             THE COURT:   You think so?

22             THE PROSPECTIVE JUROR:   Yes.

23             THE COURT:   Are you confident?

24             THE PROSPECTIVE JUROR:   I'm not a hundred percent

25   confident.

Jury Selection                                    485

1          THE COURT:   Are you 99 percent confident?

2          THE PROSPECTIVE JUROR:   I think so.

3          THE COURT:   Any questions from the parties?

4          MR. NARDOZZI:   Hi, ma'am.   How are you?

5          THE PROSPECTIVE JUROR:   Hi.

6          MR. NARDOZZI:   In one of your questions you were

7    asked, you mentioned that you had read or heard about possible

8    jury tampering and you expressed some concern about that

9    happening to you potentially.   As the judge instructed you,

10   this is an anonymous jury.

11          Did that kind of take care of those concerns for

12   you.

13          THE PROSPECTIVE JUROR:   Not really.   I mean, it's a

14   huge case.   And even though we're supposed to be anonymous,

15   there's still information getting out that, you know.   For

16   example, that they've already chosen the jury and how many

17   male versus female.

18          THE COURT:   That's pretty generic stuff.

19          THE PROSPECTIVE JUROR:   It is generic.

20          THE COURT:   Did you know that, in fact, the jurors

21   are not going to be picked up at their homes and coming to

22   court by themselves, they're going to be picked up at central

23   meeting places and brought here?

24          THE PROSPECTIVE JUROR:   I just found that out.

25          THE COURT:   Does that make you feel more comfortable

Jury Selection                                          486

1    about maintaining anonymity?

2                THE PROSPECTIVE JUROR:   Honestly, no.

3                THE COURT:   How come?

4         You just think reporters are good at getting

5    information and ultimately can do it if they want?

6                THE PROSPECTIVE JUROR:   Yeah.

7                THE COURT:   Anything else from the parties?

8                MR. NARDOZZI:   Just a follow-up on that point.

9         Would that fear of potential jury tampering impact

10   your ability to be fair in rendering a verdict in this case?

11               THE PROSPECTIVE JUROR:   No, I don't think so.

12               MR. NARDOZZI:   You believe you could be fair

13   regardless of that?

14               THE PROSPECTIVE JUROR:   If I were to be chosen, I

15   mean, I'm hoping that I'm not, but if I do -- if I am, I will

16   do my best.

17               MR. NARDOZZI:   Thank you, ma'am.

18               THE COURT:   Anything?

19               MR. LICHTMAN:   Yes.

20        How are you?

21               THE PROSPECTIVE JUROR:   Good, thanks.

22               MR. LICHTMAN:   I don't mean to pile on the same

23   area, but you're concerned for your safety.

24               THE PROSPECTIVE JUROR:   Yes.

25               MR. LICHTMAN:   Do you think that would be

Jury Selection                                                    487

1    distracting during this two- to four-month trial?

2              THE PROSPECTIVE JUROR:  I believe so, yes.

3              MR. LICHTMAN:  Thank you.

4              THE COURT:  What do you mean by "distracted"?

5              THE PROSPECTIVE JUROR:  Just based on what I know

6    about drug cartels, you know, I've seen movies, shows, it's

7    something that, you know, I've witnessed not firsthand but,

8    you know --

9              THE COURT:  You've heard about it.

10             THE PROSPECTIVE JUROR:  Yes, I've heard about it.

11   And it's scary.

12             THE COURT:  If I told you that, first of all, I do

13   not expect that there's going to be any problems with this

14   jury, and I also told you that you would have an obligation to

15   put all the things you heard about cartels or drugs or

16   anything else out of your mind and base your decision solely

17   on the evidence in this case, could you follow that

18   instruction?

19             THE PROSPECTIVE JUROR:  I believe so.

20             THE COURT:  Okay.

21             MR. NARDOZZI:  Nothing from the Government.

22             THE COURT:  Thank you.

23

24             (Continued on the next page.)

25

Jury Selection                                    488

1   (Continuing)

2              THE COURT:   Anything else?

3              MR. NARDOZZI:   Nothing from the Government.

4              THE COURT:   Thank you very much.

5              Are you going to challenge?

6              MR. LICHTMAN:   I am.   She's too close.   She's almost

7    teetering on the edge of feeling she can't be fair.   She has

8    given some answers that she would be distracted.   She doesn't

9    really feel safe even though you have given her some

10   assurances.   You got her at the end -- respectfully, that was

11   impressive rehabilitation -- to say that she could still be

12   fair.   And, look, I'm not looking to knock off a juror because

13   there's nothing here otherwise that makes me think she's pro

14   or anti-defense.   I just am afraid we're going to lose her

15   down the line.   She seems very skittish.   And we are here

16   qualifying jurors, why not pick another one.

17             THE COURT:   I understand your point.

18             MR. NARDOZZI:   To be honest, she gave a nuanced

19   answer to a difficult question.   It's just not a yes-or-no

20   question.   I asked her, and she said she would, the ultimate

21   question is can you be fair and impartial in rendering a

22   verdict.   Despite her fears, she said yes.   I think she can be

23   a fair juror despite her concerns.   And everybody likely has

24   these concerns.   She just expressed them to us.

25             THE COURT:   I appreciate the candor of the

1    objection.  It is largely right, but it is not cause to excuse

2    her.  She's a little nervous because there has been so much

3    publicity about the case.  But that's not to say she can't be

4    fair or she has a bias one way or the other.  I frankly don't

5    know which way that would cut, if it cuts at all.  I suspect

6    once we get underway, it won't cut either way and it will be

7    fine.  I am going to consider her qualified.

8            Next is 74.

9            That's three so far.

10           THE COURTROOM DEPUTY:  74.  You can have a seat

11   right there.

12           (Prospective Juror No. 74 enters the courtroom.)

13           THE COURT:  Hello.  How are you?

14           THE PROSPECTIVE JUROR:  How you doing?

15           THE COURT:  Have a seat.  Make yourself comfortable.

16           A couple of things I picked up on your

17   questionnaire.  First, I think you said after you filled out

18   the questionnaire you had heard some things about the case.

19           THE PROSPECTIVE JUROR:  Uh-hum.

20           THE COURT:  Tell me what you heard.

21           THE PROSPECTIVE JUROR:  News 12, whatever comes up.

22           THE COURT:  Do you recall any details?

23           THE PROSPECTIVE JUROR:  No, I try not to pay

24   attention to it.

25           THE COURT:  Okay.  Is there anything you heard that

1   you couldn't put aside for purposes of sitting on this jury?

2              THE PROSPECTIVE JUROR:  No.

3              THE COURT:  You mentioned you might have a family

4   vacation that you could move from December 2nd to 7th.  If I

5   ask you to move that to Christmas week, could you do that?

6              THE PROSPECTIVE JUROR:  No.  I checked into it and

7   it is non-changeable, non-refundable.

8              THE COURT:  So you are saying there is no way you

9   can be here December 2nd to December 7th?

10             THE PROSPECTIVE JUROR:  No.

11             THE COURT:  Any questions from the parties?

12             MS. PARLOVECCHIO:  No, Your Honor.

13             MR. LICHTMAN:  No, Your Honor.

14             THE COURT:  Thank you very much.  We will get back

15  to you shortly.

16             THE PROSPECTIVE JUROR:  Thank you.

17             (Prospective Juror No. 74 exits the courtroom.)

18             THE COURT:  That juror is excused for cause.  Any

19  objection?

20             MS. PARLOVECCHIO:  No objection.

21             MR. LICHTMAN:  No objection.

22             THE COURT:  Next is 92.

23             THE COURTROOM DEPUTY:  Juror 92.  Have a seat.

24             (Prospective Juror No. 92 enters the courtroom.)

25             THE COURT:  Hello.  Have a seat.  Just a few

Prospective Juror No. 92                              491

1    follow-up questions I need to ask you.  You mentioned that

2    you, after you filled out the questionnaire, you had heard a

3    few things about the case someplace.

4              THE PROSPECTIVE JUROR:  That's what I saw in the

5    news and, you know, I just -- just a few.  And I'm not

6    watching all the news.

7              THE COURT:  Do you recall anything that you heard?

8              THE PROSPECTIVE JUROR:  Well, just what the New York

9    1 says, I only watch New York 1.

10              THE COURT:  What did it say?

11              THE PROSPECTIVE JUROR:  That he's a drug dealer

12    and -- you know, I don't know much about him.  A lot of

13    things.

14              THE COURT:  Anything else you recall hearing on New

15    York 1?

16              THE PROSPECTIVE JUROR:  Just jury been selected and

17    I was surprised to be back here.

18              THE COURT:  Obviously not everything in the press is

19    right, right?

20              THE PROSPECTIVE JUROR:  Well, I'm not sure.

21              THE COURT:  Let me ask you this:  Would you be able

22    to put aside everything you heard on the news, just put it out

23    of your mind and base a decision in this case solely on the

24    basis of what you hear in evidence in this courtroom.

25              THE PROSPECTIVE JUROR:  I guess I could do that.

1          THE COURT:  Are you guessing or are you confident

2  you can do that?

3          THE PROSPECTIVE JUROR:  I am so nervous.

4          THE COURT:  That's perfectly normal.

5          THE PROSPECTIVE JUROR:  Of course I'm nervous about

6  my family.  I live close by the courthouse.

7          THE COURT:  What makes you nervous about that?

8          THE PROSPECTIVE JUROR:  Just the security and, you

9  know.

10          THE COURT:  Is there anything about that nervousness

11  that would make it difficult for you to give this defendant a

12  fair trial?

13          THE PROSPECTIVE JUROR:  It could be.

14          THE COURT:  Could be?

15          THE PROSPECTIVE JUROR:  Yeah.

16          THE COURT:  How could it be?

17          THE PROSPECTIVE JUROR:  Sometimes when I get nervous

18  I talk too much or I don't talk at all.

19          THE COURT:  Okay.  So you think you might hold it

20  against this defendant that there is all this security near

21  the courthouse?

22          THE PROSPECTIVE JUROR:  Well, I'm not sure.

23          THE COURT:  Any questions from the parties?

24          MR. LICHTMAN:  No, Your Honor.

25          MS. PARLOVECCHIO:  No, Your Honor.

Prospective Juror No. 100                              493

1          THE COURT:  Thank you very much.  We will be in

2     touch with you shortly.

3          THE PROSPECTIVE JUROR:  Thank you.

4          (Prospective Juror No. 92 exits the courtroom.)

5          THE COURT:  Any objections to excuse 92 for cause?

6          MR. LICHTMAN:  No, Judge.

7          MR. NARDOZZI:  No.

8          THE COURT:  100 is next.

9          (Prospective Juror No. 100 enters the courtroom.)

10          THE COURTROOM DEPUTY:  Juror 100.

11          THE COURT:  Hello, how are you?  Have a seat.

12     Thanks for coming in this morning.  Just a few follow-up

13     questions I needed to ask you.  First, you mentioned when you

14     were sitting in the galley that you heard a few things about

15     the case since you filled out your questionnaire.  Tell me,

16     what did you hear?

17          THE PROSPECTIVE JUROR:  Just I guess jurors, what

18     they were saying.

19          THE COURT:  Do you recall anything specific?

20          THE PROSPECTIVE JUROR:  The Michael Jackson one,

21     something about a sandwich, someone asking for his autograph,

22     and then just I guess on the news they were saying what he was

23     being tried for.

24          THE COURT:  Okay.

25          THE PROSPECTIVE JUROR:  Things he has done in the

1    past.  Just like a bunch of stuff on the news, articles.

2         THE COURT:  Would you have any difficulty putting

3    aside anything you had heard or read about the case and just

4    basing your decision on whether he is guilty or innocent based

5    on the evidence you hear in this room?

6         THE PROSPECTIVE JUROR:  I'm going to be honest and

7    say I cannot.

8         THE COURT:  How come?

9         THE PROSPECTIVE JUROR:  I think -- I mean, I've

10   watched Narcos.  I've seen a documentary on him.  I watched

11   his show on Netflix.  I feel like I know too much.  And even

12   though I want to be honest and be truthful because that's how

13   I am as a person.  I don't think I can set that a part at this

14   point.

15        THE COURT:  Any questions from the parties?

16        MS. PARLOVECCHIO:  No, Your Honor.

17        MR. LICHTMAN:  No thank you.

18        THE COURT:  Thank you very much.  Go back to that

19   room.  We will be with you shortly.

20        (Prospective Juror No. 100 exits the courtroom.)

21        THE COURT:  So our options are to pick one out of

22   three and to give you each a peremptory or bring in another

23   10.

24        MR. LICHTMAN:  That would give us five alternates.

25        THE COURT:  That is correct.  That would give you

Jury Selection                                          495

1    five instead of six.  Do you want another 10?

2              MS. PARLOVECCHIO:  We do, Your Honor.

3              MR. LICHTMAN:  I'm sorry?

4              MS. PARLOVECCHIO:  We'd like another 10.

5              MR. BALAREZO:  We would be fine with one.

6              MR. LICHTMAN:  I'm just afraid if we go through

7    another 10, we may get another note, then we are going to have

8    another 10.

9              MS. PARLOVECCHIO:  We worry about running out of

10   alternates given the length of the trial.

11             THE COURT:  The question is does the difference

12   between five and six materially increase that risk.  We might

13   have 10 and still run out of alternates, but from five to six.

14             MS. PARLOVECCHIO:  In a trial of this length, I

15   think the Government would feel much more secure.  We don't

16   want to have to do this whole thing over.

17             THE COURT:  Another 10.

18             MR. BALAREZO:  Can we have a few minutes to get the

19   questionnaires?

20             THE COURT:  The question is should we exercise

21   peremptories on the three we have and pick one.

22             MR. NARDOZZI:  And do the same process for the next

23   three qualified.

24             MR. LICHTMAN:  How many more do we want to qualify

25   if we take another 10?

MDL        RPR        CRR        CSR

Jury Selection                                    496

1          THE COURT:  If you are only going to get one

2    peremptory --

3          MR. LICHTMAN:  Well, do you want to do one even

4    though --

5          THE COURT:  It's my proposal.  I think everybody

6    wants to get this over with.

7          MR. LICHTMAN:  Well, if we do two peremptories, then

8    we would have to get to six.  Two, two, and two to pick.

9          THE COURT:  That's right.

10         MR. LICHTMAN:  So we've got three right now.  We

11   would have to do another 10 and hopefully catch three out of

12   10.  Right now we are batting 300, so it is tight.

13         MR. NARDOZZI:  I'd rather do everything at once.

14         THE COURT:  Let's try and get another three.

15         MR. LICHTMAN:  I would be happy to do the

16   peremptories right now.

17         THE COURT:  What's the difference?  We are going to

18   be here for another 10.  What are the next 10 numbers?

19         MR. LICHTMAN:  We just need to get these

20   questionnaires.  We don't have these 10.  They are in the

21   other room.

22         THE COURT:  Get those and we will take a break.  Let

23   Melonie know when you're ready.

24         Let me ask one other question before we break.  This

25   takes at most an hour.  We can still open today, I think.

Jury Selection                                    497

1              MS. PARLOVECCHIO:  Yes.

2              THE COURT:  I am not going to send the jurors home.

3    I am not going to tell the marshals to take them back.

4              MS. PARLOVECCHIO:  No, we can.

5              THE COURT:  Okay.  Let's get the other 10.

6              (Pause.)

7              THE COURT:  Okay.  Have a seat, please.

8              Looking at Rule 24, if we are picking two

9    alternates, each side only gets one peremptory, so we could

10   qualify one more and be in accordance with the rule.

11             MS. PARLOVECCHIO:  That's fine.

12             MR. LICHTMAN:  If that's the rule, that's the rule.

13             THE COURT:  It's the rule; I can do whatever I want.

14   Do you want to persuade me to do something else?

15             MR. LICHTMAN:  No.

16             THE COURT:  Let's have the next group.

17             (Prospective jurors enter the courtroom.)

18             THE COURT:  Please sit down.  Make yourself at home.

19             Good afternoon, everybody.  I am Judge Cogan.  We

20   are very pleased to have you with us today.  Thanks for coming

21   and thanks for filling out that very detailed questionnaire,

22   which I know was a lot of work, but it will make it easier to

23   get through this process.

24             As you know from the questionnaire, you are being

25   considered to sit as jurors in a criminal case.  In this case,

1    the defendant, Mr. Guzmán, is charged with being a leader of

2    the Sinaloa cartel which the Government alleges is a criminal

3    enterprise.  The indictment alleges that Mr. Guzmán committed

4    several crimes through that criminal enterprise, including

5    drugs and murder conspiracies.

6              Now, Mr. Guzmán has pled not guilty to those

7    charges, so he is entitled to a presumption of innocence

8    throughout this case unless and until the jury decides he is

9    guilty beyond a reasonable doubt.

10             Now, before we get started, let me give you an

11   overview of what your role as a juror would be if you are

12   eventually selected for this jury.  If you have served on a

13   jury before, and I know some of you have, this case is going

14   to be a little different than that experience.  You might have

15   noticed that we have been referring to you by your assigned

16   jury numbers and that we have asked you not to tell us your

17   names.  That is going to continue.  We had the jury service

18   downstairs remove your names from your questionnaires before

19   we read the questionnaires.  So I don't know any of your

20   names.  I haven't had access to them.  The lawyers don't know.

21   The defendant doesn't know.  No one is ever going to know your

22   names.  There is a reason for this.  Earlier this year, I

23   decided that the jury in this case would be what we call

24   anonymous and partially sequestered.  That simply means no one

25   is going to know who the members of the jury have.

Jury Selection                                              499

1            Although, everyone will be able to see the jurors

2    sitting in the jury box during the trial, they are not going

3    to know their names or anything else to associate them with

4    the case.  I did this out of respect for your privacy.  This

5    is a high-profile case that has gotten a lot of public

6    attention, including the media, and I don't want anybody

7    trying to talk to you about what goes on during the trial.  I

8    don't want anybody stopping you on the subway or outside the

9    courthouse or even trying to talk to you downstairs and asking

10   you questions about yourself or about the case.  Keeping

11   jurors anonymous this way is not uncommon in high-profile

12   cases because we know people are going to be interested in

13   talking to you and we don't want you to be burdened with that.

14   We know that in focusing on the evidence in this case you are

15   going to have enough to do and we don't want you to be

16   distracted in any way.

17           Now, another part of my order is that when the jury

18   is impaneled in this case, you are going to be brought to

19   court and home every morning by the U.S. marshals.  When I say

20   home, I don't necessarily all the way home.  They will arrange

21   for pick-up points and drop-off points for you every day so

22   that they will collect like three or four of you, maybe five

23   of you in one place and the rest of you in some other place.

24   That's, again, just as part of the overall security measures

25   in the case and to ensure that the trial will proceed

1   officially and expeditiously.  The main point is if you are

2   picked as a juror in this case, I want you to focus on your

3   job and I don't want anybody to be distracted by any outside

4   influences.  That's why we are protecting your identity here.

5           Now, let me tell you what's going to happen here

6   today.  First, in a few minutes, I am going to ask the group

7   of you collectively just a few questions about principles of

8   law and make sure you are okay with those.

9           After that, I am going to talk to each one of you

10  individually about your questionnaires and some things that I

11  wanted to follow up on the questionnaires.

12          Now, you might have noticed that there are five

13  people sitting in the jury box.  Usually this process is open

14  to the public and the courtroom would be filled, but because

15  we are keeping you anonymous, we are not doing that today.

16  The people in the jury box are reporters, but they don't know

17  your names either.  They are just here representing the press

18  so that it is a public proceeding and they can communicate the

19  information that they have received.  But nothing in here is

20  going to identify you.  Your privacy is very important.  So

21  when I am talking to each of you up there, if at any time you

22  don't want what you have to say heard by the reporters, just

23  tell me and we have a very annoying noise that will turn on in

24  the back of that jury box that will block them from hearing

25  anything we discuss at this table.  So don't hesitate to ask

1    if you think that there's something personal you need to say.

2            I will tell you that while a lot of people have some

3    reluctance in serving on a jury like this, especially when it

4    is going to last as long as this case is going to last, my

5    experience is in these big cases every juror, when it is over,

6    they say that was one of the most interesting things I have

7    ever done in my life and it brings you closer to the democracy

8    that we have, it makes you a participant, and it takes your

9    judgment to decide the case.  I think any reluctance you have

10   you will look back on and say, wow, that was really something

11   that I found interesting to do.

12           All right.  Now, let me ask you just a few questions

13   collectively.  It is important that you answer those questions

14   honestly so that the parties and I can decide who would be

15   appropriate for the jury and who might not.  Remember that you

16   took an oath when you filled out the questionnaire to answer

17   all the questions truthfully.

18           First, as he sits here right now, the defendant is

19   considered innocent.  He is presumed innocent until and only

20   if the jury unanimously finds that he is guilty beyond a

21   reasonable doubt.

22           Does anybody have any problem with that principle of

23   law?  Presumed innocence.  Presumption of innocence.

24   Everybody okay with that?

25           Let me see head nods.

Jury Selection                                    502

1           You have a problem with that?

2           THE PROSPECTIVE JUROR:  I don't have a problem with

3     the law.

4           THE COURT:  We will talk to you about that in just a

5     minute.  What is your juror number?  I can't see it.

6           THE PROSPECTIVE JUROR:  37.

7           THE COURT:  37.  No one is going to associate the

8     number with the name.  I don't even know it.  Nobody knows it.

9     They are locked downstairs.

10          Okay, second, as I explained to you earlier, the

11    defendant has been indicted for several crimes.  The

12    indictment just means he has been charged.  It doesn't in any

13    way mean that he's guilty.  So you have to go into this case

14    without holding it against him in any way that there is an

15    indictment.  Again, an indictment is just a charge.  It

16    doesn't mean he is more likely to be guilty than not guilty.

17    You have to put it aside entirely and judge the case just on

18    the evidence that is introduced at trial.

19          Does anybody have a problem with that legal

20    principle?

21          Okay, a third, as I mentioned to you, the Government

22    has the obligation to prove the defendant's guilt beyond a

23    reasonable doubt.  It is not sufficient if you are in the jury

24    room and you say I think he probably did it.  That's not good

25    enough.  You have to find that he's guilty beyond a reasonable

Jury Selection                                          503

1    doubt.  That's a basic principle of our legal system.  Anybody

2    have any problem with that?

3              Okay.

4              Next, it is very important that if you sit as a

5    juror in this case, you keep an open mind.  That is, you can't

6    hear one witness or opening statements and make up your mind

7    as to whether the defendant is guilty or innocent.  You have

8    to hear all of the evidence and make up your mind only after

9    you deliberated with your fellow jurors.

10             Does anybody have a problem following that

11   procedure?

12             Okay.

13             Next, when you filled out the questionnaire, you

14   were asked not to do any research or watch any news or

15   otherwise learn anything about this case.  Now, I know there

16   has been a lot of coverage.  All I want to ask you is since

17   you have filled out the questionnaire, have you been exposed

18   to any news coverage, any information about the case?

19             How many people?  Raise your hand.

20             Okay.  We will talk to you more about that.

21             Finally, you were asked in the questionnaire whether

22   any of you knew the lawyers or the defendant or me.  Now that

23   you are looking at all of us displayed before you, any of us

24   look familiar to anybody?  Ever saw us before?

25             Okay.  Now, we are going to proceed to the

Prospective Juror No. 21                              504

1    individual questioning.  Please keep in mind that if you are

2    not selected for a jury -- some of you maybe reluctant, there

3    are also going to be some of you who kind of find it

4    interesting and would like to be selected -- don't hold it

5    against anybody if you are not selected.  Lawyers have all

6    kinds of reasons for not wanting somebody on a jury.  I will

7    tell you, I get called to jury duty myself, I've been called a

8    number of times, nobody has ever picked me for a jury and I

9    don't take it personally.  It's just the way it has worked

10   out.

11            We are going to call you in numerical order.  So

12   what's the low number we have?

13            THE COURTROOM DEPUTY:  21.

14            THE COURT:  Juror 21, if you will come forward.  The

15   rest of you can go back there with Ms. Clarke, and we will

16   take you one at a time.

17            Have a seat right there, ma'am.  Make yourself

18   comfortable.  How are you?

19            THE PROSPECTIVE JUROR:  Good.

20            THE COURT:  Just a few questions I wanted to follow

21   up on with you.  You mentioned that you heard some things

22   about the case since you filled out your questionnaire.

23            THE PROSPECTIVE JUROR:  I hear it every day.

24            THE COURT:  Tell me what you have heard if you

25   recall.

Prospective Juror No. 21                              505

1          THE PROSPECTIVE JUROR:  In the papers and on the

2     news, they mentioned he came from Mexico.

3          THE COURT:  If you can talk right into the mic,

4     please.

5          THE PROSPECTIVE JUROR:  That he's from Mexico, that

6     he escaped a few times, and then he was brought to the United

7     States and talking about the different charges.  And among

8     other things that got me, people have been threatened.  I

9     didn't really like that.

10          THE COURT:  Okay.  Anything else that you can

11     recall?

12          THE PROSPECTIVE JUROR:  What he's charged with,

13     among other things.

14          THE COURT:  Okay.  All right.  You know, there is

15     going to be an all of lot of evidence put into this trial.

16     And if I ask you as a juror to put aside everything you have

17     heard about this case except what you hear in the trial, do

18     you think you are able to do that?

19          THE PROSPECTIVE JUROR:  I could.

20          THE COURT:  You could?

21          THE PROSPECTIVE JUROR:  Yeah, do I want to do it?  I

22     don't know.

23          THE COURT:  You have some reluctance?

24          THE PROSPECTIVE JUROR:  Yes.

25          THE COURT:  What is your reluctance based on?

1          THE PROSPECTIVE JUROR:   Maybe I'm scared.

2          THE COURT:   You are a little bit scared?

3          THE PROSPECTIVE JUROR:   Uh-hum.

4          THE COURT:   If I tell you you have no need to be

5     scared and that the marshals are going to pick you up and drop

6     you off every day, does that make you feel better?

7          THE PROSPECTIVE JUROR:   To be honest, no.

8          THE COURT:   Do you think being scared would make it

9     difficult for you to render a fair and impartial verdict as to

10    this defendant?

11         THE PROSPECTIVE JUROR:   To be honest, I think it

12    would.

13         THE COURT:   Tell me why it would.

14         THE PROSPECTIVE JUROR:   If -- I'm scared or

15    whatever, I probably would want to do a verdict of not guilty.

16    I'm sorry.  I'm sorry.

17         THE COURT:   All right.  Any more questions?

18         THE PROSPECTIVE JUROR:   That's my opinion.

19         MR. LICHTMAN:   Not from us.

20         MS. PARLOVECCHIO:   No, Your Honor.

21         THE PROSPECTIVE JUROR:   I'm sorry.  That's my opinion.

22         THE COURT:   I appreciate you being honest.   Thanks

23    very much.  You can go back there now.  We will be with you

24    very shortly.

25         (Prospective Juror No. 21 exits the courtroom.)

507

1          THE COURT:   The government's has no objection for

2     cause, right?

3          MS. PARLOVECCHIO:   We would move to strike for

4     cause.

5          THE COURT:   Any opposition?

6          MR. LICHTMAN:   No, your Honor.

7          THE COURT:   Okay.   27 is next.

8          (Prospective juror enters courtroom.)

9          THE COURT:   Hello, sir.   How are you?

10          THE PROSPECTIVE JUROR: Fine.

11          THE COURT:   A couple of questions I wanted to follow

12     up with you on.   I think you said you had not seen anything on

13     this case since you filled out our questionnaire, is that

14     right?

15          THE PROSPECTIVE JUROR:   No.

16          THE COURT:   Yes, that is right, you have not seen

17     anything?

18          THE PROSPECTIVE JUROR:   I don't even know what's

19     going on to tell you honestly the truth.

20          THE INTERPRETER:   Can you ask the juror to speak up.

21          THE COURT:   Talk into the microphone so everybody

22     can hear you.   He said he hadn't heard anything about the

23     case.

24          There were a few questions on your questionnaire

25     that you didn't complete.   You said that serving on this jury

Anthony M. Mancuso, CSR    Official Court Reporter

508

1    for as long as it's going to go would not interfere with any

2    obligations that you have.  That you answered.  But you didn't

3    check whether -- are you working, sir?

4            THE PROSPECTIVE JUROR:  No, I'm not working.

5            THE COURT:  You didn't check whether you have any

6    personal commitment or travel plans or anything like that.  Is

7    there anything that you have planned?

8            THE PROSPECTIVE JUROR:  I don't understand some of

9    the words, honestly.

10           THE COURT:  Okay.  The question was:  Do you have

11   any personal commitment or nonrefundable travel plans that

12   cannot be rescheduled?

13           THE PROSPECTIVE JUROR:  Honestly, I just wrote

14   anything on the paper.  I can't read too well.  I just, you

15   know.

16           THE COURT:  Okay.  That's fine.

17           Do you have any special conditions or disability or

18   anything we need to take care of if you were to serve as a

19   juror in this case?

20           THE PROSPECTIVE JUROR:  No.  I have a skin

21   condition, like a skin condition I have.

22           THE COURT:  Is it under control?

23           THE PROSPECTIVE JUROR:  No.  I take a pill for that.

24           THE COURT:  You do.  Okay.  Does it affect your

25   ability to concentrate in any way?

509

1          THE PROSPECTIVE JUROR:   Probably so.

2          THE COURT:   What kind of side effects do you get

3     from the pill?

4          THE PROSPECTIVE JUROR:   Dry mouth and stuff like

5     that.   I'm taking it for a week, probably two weeks now.

6          THE COURT:   You think it interferes with your

7     ability to concentrate?

8          THE PROSPECTIVE JUROR:   Probably so.   I'm a little

9     nervous right now to tell you the truth.

10          THE COURT:   No one likes to be sitting in a

11     courtroom full of people.   That's perfectly understandable.

12     You are no different than anybody else.

13          Your hearing is fine.   You don't wear glasses.

14          THE PROSPECTIVE JUROR:   I got glasses but I don't

15     wear them.

16          THE COURT:   Can you read without them?

17          THE PROSPECTIVE JUROR:   No, not really.

18          THE COURT:   Do you have a problem with reading?

19          THE PROSPECTIVE JUROR:   Yes.   I can't read too well.

20     I understand certain things.   I'm not perfect, you know.

21          THE COURT:   You checked that you don't have any

22     difficulty reading or understanding English.   You said, no, I

23     don't have any problem.

24          THE PROSPECTIVE JUROR:   Like I said, I just checked

25     anything.   I didn't understand the question.

510

1          THE COURT:  Any further questions from the parties?

2          MR. NARDOZZI:  No, your Honor.

3          MR. LICHTMAN:  No, your Honor.

4          THE COURT:  Thank you very much.  Go back to the

5     room and we'll be with you shortly.

6               (Prospective juror leaves courtroom.)

7          THE COURT:  Cause?

8          MS. GOLDBARG:  Yes, your Honor.

9          THE COURT:  Okay.  Number 37 is next.

10              (Prospective juror enters courtroom.)

11         THE COURT:  Hello.  How are you?

12         THE PROSPECTIVE JUROR:  Great.

13         THE COURT:  As they say on Big Bang Theory, sarcasm?

14    Let me ask you, you raised your hand when I asked about the

15    presumption of innocence, how come?

16         THE PROSPECTIVE JUROR:  Could I speak to you

17    privately?

18         THE COURT:  Is it a private matter?

19         THE PROSPECTIVE JUROR:  Well, since the press is

20    here, yes.

21         THE COURT:  Any objection.

22         MS. PARLOVECCHIO:  No objection.

23         MR. LICHTMAN:  No objection.

24              (Pause.)

25         THE COURT:  I think it's best if you go back into

Anthony M. Mancuso, CSR    Official Court Reporter

1    the other room.  We'll be in touch with you very shortly.  We

2    might call you back in a second.  I need to talk to the

3    attorneys first.

4              (Prospective juror leaves courtroom.)

5              THE COURT:  Her family's lives have been touched.

6    All of her family members have been touched by drugs.  She

7    knows all about him and she thinks that it would color, her

8    words, color her ability to be a fair juror in this case.  I

9    don't think we need to hear any more from her.

10             MS. PARLOVECCHIO:  Thank you, your Honor.

11             MR. LICHTMAN:  Thank you, your Honor.

12             THE COURT:  37 is dismissed.  57 is next.

13             (Prospective juror enters courtroom.)

14             THE COURT:  Have a seat.  If you would talk right

15   into the microphone.

16             THE PROSPECTIVE JUROR:  Sure.

17             THE COURT:  When you filled out your questionnaire

18   you said you had some training in November and three days in

19   the middle.  Tell me, without telling me what kind of job you

20   do, have you been able to work out those dates?

21             THE PROSPECTIVE JUROR:  No.  They will be next week

22   starting for training for my work.

23             THE COURT:  What happens if you miss that training?

24             THE PROSPECTIVE JUROR:  It might impact my job

25   responsibilities.

                  Anthony M. Mancuso, CSR    Official Court Reporter

512

1          THE COURT:  Can't you reschedule the training for

2   say February?

3          THE PROSPECTIVE JUROR:  The issue is, without

4   getting into too much detail, we started a new group in my job

5   and they asked that I start this training so that we could

6   build up a group.

7          THE COURT:  Any questions from the parties?

8          MR. LICHTMAN:  No, your Honor.

9          MS. PARLOVECCHIO:  No, your Honor.

10         THE COURT:  Thank you very much.  You can go back in

11  the room.  We'll be in touch with you soon.

12         (Juror leaves courtroom.)

13         THE COURT:  Okay.  57 is excused for cause without

14  objection.

15         (Prospective juror enters courtroom.)

16         THE COURT:  Hello, how are you?

17         THE PROSPECTIVE JUROR:  Fine.

18         THE COURT:  If you could talk right into that

19  microphone, I would appreciate it.  This is Juror No. 60.  The

20  first question I wanted to ask you is you mentioned that

21  you're working full-time and you're also a student and you're

22  concerned about missing classes and affecting your grades.

23  Tell me a little about that.

24         THE PROSPECTIVE JUROR:  It's already become a

25  problem.  Missing classes, I missed a mid-term already because

Anthony M. Mancuso, CSR    Official Court Reporter

1    of having to be here.

2            THE COURT:   Because of me?

3            THE PROSPECTIVE JUROR:   Not you directly.   Having to

4    be here.

5            THE COURT:   I take full responsibility.

6            THE PROSPECTIVE JUROR:   You don't have to.

7            THE COURT:   Is the damage already done?

8            THE PROSPECTIVE JUROR:   Yes.   I have make up work to

9    do, testing and papers to make up.

10           THE COURT:   If we don't sit on Fridays and we take

11   off the week of Christmas and most of the week of New Year,

12   are you going to be okay?

13           THE PROSPECTIVE JUROR:   Well, the semester is over

14   by Christmas.

15           THE COURT:   Right.   We start a new semester.

16           THE PROSPECTIVE JUROR:   Yes.

17           THE COURT:   What happens then?

18           THE PROSPECTIVE JUROR:   It depends on the professor.

19           THE COURT:   Well, you tell me how hard it would be

20   for you to sit on this jury if it went say two to four months?

21           THE PROSPECTIVE JUROR:   It would be extremely

22   difficult between my job and my obligations that I have a trip

23   planned and stuff like that.

24           THE COURT:   When is your trip?

25           THE PROSPECTIVE JUROR:   March.

Anthony M. Mancuso, CSR     Official Court Reporter

514

1          THE COURT:   You'll be out of here by March.

2          THE PROSPECTIVE JUROR:   You never know.

3          THE COURT:   You never know for sure.   All

4    expectations are you would be.

5          THE PROSPECTIVE JUROR:   You would hope so.   You

6    never know.

7          THE COURT:   I am concerned --

8          THE PROSPECTIVE JUROR:   I am being honest.

9          THE COURT:   I appreciate that.   I'm primarily

10   concerned about you being a student.

11         THE PROSPECTIVE JUROR: Me, too.

12         THE COURT:   Okay.   Any questions from the parties?

13         MS. GOLDBARG:   No, your Honor.

14         MR. LICHTMAN:   No, your Honor.

15         THE COURT:   Okay.   If you would go back in that room

16   we'll be in touch with you shortly.

17         THE PROSPECTIVE JUROR:   Sure.

18         (Prospective juror leaves courtroom.)

19         MR. BALAREZO:   Judge, we may still be picking a jury

20   in March.

21         THE COURT:   I will tell you we play go to one

22   alternate if we don't get anybody out of this ten.

23         Number 63 is next.   I'll note that number 60 was

24   excused for cause without objection.

25         (Prospective juror enters courtroom.)

Anthony M. Mancuso, CSR    Official Court Reporter

1     THE COURT:  How are you doing?

2     THE PROSPECTIVE JUROR:  Okay, thank you.

3     THE COURT:  Just a couple of questions I wanted to

4  ask you.  You mentioned, when I asked the group questions, you

5  heard a few things about this case since you signed the

6  questionnaire?

7     THE PROSPECTIVE JUROR:  Right.

8     THE COURT:  Tell me what you have heard.

9     THE PROSPECTIVE JUROR:  You know, just, I mean,

10  whatever this gentleman is being accused of and just, you

11  know, certain jurors were let go for whatever their reasonings

12  were, things of that nature, really.

13     THE COURT:  Any details of the charges that you

14  learned?

15     THE PROSPECTIVE JUROR:  Not necessarily.  I just

16  heard whatever came up and just continued on.

17     THE COURT:  I noticed it's not like you have

18  unalterable plans that would make it difficult for you to

19  serve or is it?

20     THE PROSPECTIVE JUROR:  As far as my vacation?

21     THE COURT:  Vacation, any other responsibilities.

22     THE PROSPECTIVE JUROR:  I have a child.  That's my

23  responsibility.

24     THE COURT:  How old?

25     THE PROSPECTIVE JUROR:  She's five.

516

 1            THE COURT:  If you were here four days a week, what

 2    would you do to have arrangements for your child?

 3            THE PROSPECTIVE JUROR:  That might be a problem

 4    because I drop her off at school.  I don't pick her up.  My

 5    husband picks her up.  It's my dropping her off at school

 6    would be an issue.

 7            THE COURT:  Could he do both?

 8            THE PROSPECTIVE JUROR:  He works for (redacted).

 9    I'm going to say no.

10            THE COURT:  He reports early?

11            THE PROSPECTIVE JUROR:  He hasn't been there that

12    long, so basically he's like a rookie, whatever shift --

13    whatever is available that's where they are putting him.

14            THE COURT:  If not for you and your husband --

15            THE PROSPECTIVE JUROR:  Sometimes my sister helps me

16    out.  She also works and has her own child.  I need time to

17    plan if I know that I need someone else to care for my

18    daughter.

19            THE COURT:  Well, if we take off Fridays, would you

20    be able to make your plans this Friday?

21            THE PROSPECTIVE JUROR:  I have to ask my sister for

22    this Friday.

23            THE COURT:  What do you think the odds are that

24    she'll be able to do it?

25            THE PROSPECTIVE JUROR:  I don't see why she won't be

517

1    able to.

2           THE COURT:  It's not for Friday.  The question is

3    asking your sister about Monday to Thursday.

4           THE PROSPECTIVE JUROR:  That won't work.  Monday and

5    Tuesday she works from eight to six and Wednesdays and

6    Thursdays I'm actually picking up her child and take him to

7    her job.  So we help each other, but it's a complicated

8    schedule.

9    Q    You tell me, do you think you can get someone to cover

10   the pickup in the morning, Monday to Thursday?

11          THE PROSPECTIVE JUROR:  I can't promise that to be

12   honest with you and it's not because I didn't want to sit on

13   this.  It sounds interesting.  I don't want my daughter

14   sitting in school or having issues getting to school because

15   of this.

16          THE COURT:  Okay.  Any questions from the parties?

17          MR. LICHTMAN:  No, your Honor.

18          MS. GOLDBARG:  No questions.

19          THE COURT:  Thanks very much.  We'll be with you in

20   a second.

21          (Prospective juror leaves courtroom.)

22          THE COURT:  63 is excused for cause.  Next is 87.

23          I will tell you, I am not inclined to do another

24   group of ten.  The trend is not favorable.

25          MR. LICHTMAN:  You've noticed?

Anthony M. Mancuso, CSR    Official Court Reporter

1                    THE COURT:   Yes.

2                    (Prospective juror enters courtroom.)

3                    THE COURT:   Hello.   How are you?

4                    THE PROSPECTIVE JUROR:   Okay.

5                    THE COURT:   I have to tell you I caught your eye

6      roll when I said make yourself at home.   Like, yeah, I'm

7      really at home, right.   It's okay.   We appreciate you coming

8      in.   We understand everybody is a little bit nervous sitting

9      here.

10                   THE PROSPECTIVE JUROR:   I just want to tell you

11     before you start I'm not really understanding.   My English is

12     very basic.

13                   THE COURT:   Sounds okay so far.

14                   THE PROSPECTIVE JUROR:   Sometime I don't understand

15     different words, but basically yes.

16                   THE COURT:   Without telling me where you work or

17     specifically what your job is, how much English do you have to

18     use in the course of your work?

19                   THE PROSPECTIVE JUROR:   Like it depends.   It depends

20     because we speak another language.

21                   THE COURT:   What's that first language, Polish or

22     Russian?

23                   THE PROSPECTIVE JUROR:   Russian.   The second one

24     Armenian.

25                   THE COURT:   Would you say English is the primary

                  Anthony M. Mancuso, CSR    Official Court Reporter

519

1    language at your workplace or the secondary language?

2            THE PROSPECTIVE JUROR:   Usually, in America primary

3    is just the English.   I speak Russian with the Russian people.

4    Some terminology I could not understand.   I don't want to be

5    sitting and not understanding.

6            THE COURT:   We don't want you to do that either.

7    When you watch TV, do you watch English or Russian?

8            THE PROSPECTIVE JUROR:   Russian.

9            THE COURT:   You don't watch any English TV?

10            THE PROSPECTIVE JUROR:   Sometimes the news or

11    something.   Usually if it's a movie, I try to -- I mean I want

12    to watch it in the Russian language.

13            THE COURT:   Do you watch any regular shows that are

14    in English?

15            THE PROSPECTIVE JUROR:   No.

16            THE COURT:   No?

17            THE PROSPECTIVE JUROR:   No.

18            THE COURT:   Okay.

19            Any questions from the parties?

20            MR. LICHTMAN:   No, your Honor.

21            MS. GOLDBARG:   No, your Honor.

22            THE COURT:   Thank you very much.   If you go back in,

23    we'll be with you in just a few minutes.

24            (Prospective juror leaves courtroom.)

25            THE COURT:   Okay.   87 is excused for cause without

Anthony M. Mancuso, CSR    Official Court Reporter

520

1    objection:   Next is 99.

2                    (Prospective juror enters courtroom.)

3                    THE COURT:   Hello.   How are you?

4                    THE PROSPECTIVE JUROR:   I'm all right.   Hanging in

5    there.

6                    THE COURT:   This is a big-time commitment.   You had

7    a really funny answer to the question on whether you're

8    available.   We asked if you have any obligations that would

9    interfere, you wrote down, you took my phone, so I don't have

10   access to my calendar.   You have since.   Do you have any

11   problems that you can't get out of?

12                   THE PROSPECTIVE JUROR:   Well, I did have surgery on

13   my shoulder in the summer, so it's ongoing medical, physical

14   therapy and doctors' appointments.

15                   THE COURT:   Okay.   Can you fell me generically what

16   kind of surgery was it?

17                   THE PROSPECTIVE JUROR:   I tore my (redacted).

18                   THE COURT:   You tour your (redacted)?

19                   THE PROSPECTIVE JUROR:   My (redacted).

20                   THE COURT:   So the surgery was arthroscopic for

21   repair?

22                   THE PROSPECTIVE JUROR:   Yes.

23                   THE COURT:   How many times a week?

24                   THE PROSPECTIVE JUROR:   Twice a week.

25                   THE COURT:   Could you do that on one day Friday and

Anthony M. Mancuso, CSR     Official Court Reporter

1    any other day after 4:30?

2           THE PROSPECTIVE JUROR:   Potentially, buy the

3    doctors, for the actually doctors' appointment, he leaves at

4    three.

5           THE COURT:   How about seeing him on Friday morning?

6           THE PROSPECTIVE JUROR:   He doesn't work Fridays I

7    think.

8           THE COURT:   How about getting a new doctor?

9           THE PROSPECTIVE JUROR:   I don't want to get a new

10   doctor.

11          THE COURT:   So how often do you see him though?  It

12   should be less and less?

13          THE PROSPECTIVE JUROR:   Like once every four to six

14   weeks.  Actually next week is my appointment.

15          THE COURT:   Could you reschedule that appointment?

16          THE PROSPECTIVE JUROR:   I mean for 16 weeks from

17   now?

18          THE COURT:   No.  I'm hoping, I keep thinking he'll

19   have to change his schedule and work Friday.  It may not be

20   Friday.

21          THE PROSPECTIVE JUROR:   I don't know his schedule

22   because I work Fridays.  I know that the times I have gone has

23   been me leaving work early to get to him before he leaves.

24          THE COURT:   It's at 3:00  or 3:30?

25          THE PROSPECTIVE JUROR:   Sometimes he's not in the

Anthony M. Mancuso, CSR    Official Court Reporter

522

1   office because those are the days he's doing surgery.  I'm not

2   100 percent sure.

3           THE COURT:  When he's there, do you ever have like a

4   5:00 o'clock appointment?

5           THE PROSPECTIVE JUROR:  No.

6           THE COURT:  That's too late for him?

7           THE PROSPECTIVE JUROR:  Yes.

8           THE COURT:  And how long have you been in the

9   therapy so far?

10          THE PROSPECTIVE JUROR:  So, maybe started

11  mid-September-ish.

12          THE COURT:  How long a course of treatment is it?

13  Should be done in another month or two?

14          THE PROSPECTIVE JUROR:  I have no idea.

15          THE COURT:  How do you feel?  How does the shoulder

16  feel?

17          THE PROSPECTIVE JUROR:  It hurts.

18          THE COURT:  Not as much as the therapy.  Okay.  Any

19  questions from the parties?

20          MS. GOLDBARG:  No, your Honor.

21          MR. LICHTMAN:  No, your Honor.

22          THE COURT:  Thank you very much.  If you go back in

23  that room, we'll be in touch with you shortly.

24          THE PROSPECTIVE JUROR:  Thank you.

25          (Prospective juror leaves courtroom.)

Anthony M. Mancuso, CSR    Official Court Reporter

1     THE COURT:  This is the last one in this group.

2  This one definitely has attendance problems.  The big sticker

3  to look for is the purple.  Purple means their schedule

4  doesn't fit.  We're going to have to talk about what to do, if

5  this appears to be as it looks, if it looks as it appears to

6  be.

7     MS. PARLOVECCHIO:  Your Honor, would it be possible

8  to have number 87 reach out to her doctor's office to see what

9  the schedule is?

10     MR. LICHTMAN:  I have had surgery.  I don't remember

11  six months of rehab.

12     MS. PARLOVECCHIO:  Surgeons have variable schedules.

13  He may have a Friday appointment.  She doesn't know because he

14  works on Fridays.

15     MR. LICHTMAN:  First she said it was no Fridays and

16  then she said it was because she worked or Fridays.

17     MS. PARLOVECCHIO:  Just for purposes of --

18     THE COURT:  I'll ask her to make the call.  We'll

19  have Ms. Clarke call with her.

20     MR. BALAREZO:  Has she been struck?

21     THE COURT:  She's been struck.  We might

22  rehabilitate her in order to get a sixth juror.

23     (Pause.)

24     THE COURT:  103 is next.

25     (Prospective juror enters courtroom.)

Anthony M. Mancuso, CSR    Official Court Reporter

524

1          THE COURT:  Hello.  How are you?  Just a few

2    questions I wanted to ask you to follow up on your

3    questionnaire.  You pick up your daughter from school?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Is there anybody else that can do that?

6          THE PROSPECTIVE JUROR:  I have to make many

7    arrangements for that.  That's the only reason I have to work

8    on the weekends.

9          THE COURT:  There's no one else who can pick up your

10   daughter?

11         THE PROSPECTIVE JUROR:  Nobody.  I have to make a

12   big arrangement.

13         THE COURT:  How old is your daughter?

14         THE PROSPECTIVE JUROR:  She's eleven, but there's no

15   school bus.  It's Long Island.  There's no sidewalk and she

16   has to walk on the street which is dangerous.

17         THE COURT:  Any questions from the parties?

18         MS. PARLOVECCHIO:  No, your Honor.

19         MR. LICHTMAN:  No, your Honor.

20         THE COURT:  Thank you very much.  If you go back in

21   the room, we'll be with you shortly.

22         (Prospective juror leaves courtroom.)

23         THE COURT:  Here is what we're going to do:  We'll

24   find out the doctor's schedule as to that juror 99.  If that

25   doesn't work, then we're going to go with five alternates,

Anthony M. Mancuso, CSR    Official Court Reporter

525

1    unless the two sides want to confer and, instead of

2    necessarily exercising your peremptories, agree on a sixth

3    alternate.  You'll talk about it.  It's entirely up to you.

4              Let's stand in recess until we get that answer.

5    Hopefully, it won't be too long.

6              THE COURT:  Let's reconvene at a quarter to two.

7              (Lunch recess taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Selection                                        526

1                A F T E R N O O N   S E S S I O N

2                              1:45 P.M.

3            THE COURT:  I thought we had agreed before lunch we

4    would go with five alternates and not question any more.  Both

5    sides were going to agree on two out of the three that were

6    cleared and if you can't, you'd exercise peremptories and we'd

7    pick one and go with five alternates.

8            The parties still want to do more questionnaires?

9    Have you looked at what's coming?

10           MR. LICHTMAN:  Looks like a lot of purple.

11           MS. PARLOVECCHIO:  Yes.

12           THE COURT:  Purple means they say they can't serve.

13           MS. PARLOVECCHIO:  Your Honor, I think we just

14   misunderstood.  We thought that if we couldn't agree on the

15   peremptory, that we'd go to another group.

16           MR. BALAREZO:  We're happy with five on the

17   Defendant's side.

18           MS. PARLOVECCHIO:  We feel very uncomfortable with

19   five, your Honor, just based on the length of the trial and --

20           THE COURT:  But what are you going to do if we spend

21   three more days making the trial longer and don't get more

22   than five?

23           MS. PARLOVECCHIO:  We'll cross that bridge when we

24   come to it, Judge.

25           THE COURT:  We may have come to it.  We may be at

1    the bridge.

2             MS. PARLOVECCHIO:  We're very close to the bridge.

3    I understand.

4             THE COURT:  Let me mention this:  With regard to

5    Juror 99, whose number I can't remember for some reason, her

6    doctor problem can be worked out; however, when we found it

7    could be worked out, she said to Ms. Clarke, But the judge

8    didn't ask me about my other issues.

9             Want to start with her again?

10            MS. PARLOVECCHIO:  Sure.

11            THE COURT:  This is off the record.

12            (Discussion off the record.)

13            THE COURT:  Let's have 99.

14            (Prospective Juror 99 enters.)

15            THE COURTROOM DEPUTY:  Juror 99, you can have a seat

16   right there.

17            THE COURT:  Welcome back.

18            THE PROSPECTIVE JUROR:  Hi.

19            THE COURT:  I understand we were able to work out a

20   possible medical and physical therapy issue, but you've got

21   another issue.

22            THE PROSPECTIVE JUROR:  I'm concerned about --

23   because I work in the schools, so, with my students and, also,

24   my home care clients that I have after work, how, you know, 16

25   weeks being away from my students.  Some of them are nonverbal

1    with AAC devices.

2              THE COURT:  What does your school do when you're

3    ill?

4              THE PROSPECTIVE JUROR:  They actually don't usually

5    provide a sub for me.  I don't know what they would do in this

6    instance.

7              But even so, with my home care clients --

8              THE COURT:  Your home care clients are at night.

9              THE PROSPECTIVE JUROR:  They're after work.  Some of

10   them are, like, in the early afternoon because the kids

11   usually nap.  They're (redacted).

12             THE COURT:  Any questions from the attorneys?

13             MS. PARLOVECCHIO:  No, your Honor.

14             MR. LICHTMAN:  No, Judge.

15             THE COURT:  Thank you.  We'll be with you again

16   shortly.

17             Anything else you need to tell me?

18             THE PROSPECTIVE JUROR:  I just feel like being part

19   of this, my mentality would be governed by fear and it

20   wouldn't be unbiased.  It's biased because it's governed by

21   fear.

22             THE COURT:  Okay.  Thank you.

23             (Prospective Juror 99 exits.)

24             THE COURT:  Anyone think there's not cause?

25             MS. PARLOVECCHIO:  No.

1          THE COURT:   111?

2          THE COURTROOM DEPUTY:   This is the next group.

3          (Prospective jurors enter.)

4          THE COURT:   Okay.  Good afternoon, everybody.  Thank

5     you for your patience through this long and difficult process.

6     We're just about at the end of it.  I also want to thank you

7     for taking the time to fill out those very detailed

8     questionnaires that you did.  That saved the lawyers and me a

9     lot of effort in figuring out who might be able to sit for

10    this trial.

11         As you know from the questionnaire, you're being

12    asked to sit as jurors in a criminal case if you're selected

13    for this jury.  The Defendant, Mr. Guzman, is charged with

14    being a leader of what's called the Sinaloa Cartel, which the

15    Government alleges is a criminal enterprise.  The indictment

16    in this case alleges that Mr. Guzman committed several crimes

17    through that criminal enterprise, including drug and murder

18    conspiracy.  Mr. Guzman has pled not guilty, so he's presumed

19    innocent of all of those charges.

20         Before we get started today, I wanted to give you a

21    brief overview of what your role as juror would be if you're

22    selected for this case.  If you served on a jury before, this

23    case is going to be a little bit different than your prior

24    jury service.

25         You might have noticed that we've been referring to

Jury Selection                                      530

1   you, everybody in the court, by your assigned jury numbers and

2   we've asked you not to tell us your name.  We had the jury

3   service downstairs remove the names from your questionnaire so

4   that I don't have access to any of your names nor do the

5   lawyers nor do the defendants.  We will never know what your

6   real names are.  There's a reason for this.

7           Earlier this year, I decided that the jury in this

8   case would be what we call "anonymous" and "partially

9   sequestered."  That simply means that no one is going to know

10  who the members of the jury are.  Although you'll be seen

11  sitting in the jury box, no one is going to know your names or

12  anything about you.  I did this out of respect for your

13  privacy.  This is a high profile case that's gotten a lot of

14  public attention, including in the media, and I didn't want

15  anyone trying to talk to the jurors during the trial or

16  stopping you on the subway or outside the courthouse or even

17  trying to talk to you downstairs.

18          This kind of procedure is not unusual in high

19  profile cases because a lot of people are obviously interested

20  in the case and might approach you and ask you questions about

21  yourself or what you think or how you think the evidence is

22  coming in.  And if you sit as a juror on this case, you're

23  going to have enough to do with the evidence in the courtroom.

24  I just didn't want you had bothered or distracted by any of

25  those inquiries.

1              I'll also mention that as part of that same order

2      that I entered for the anonymous jury, the marshals are going

3      to bring you to court every day and bring you home.  When I

4      say "home," I don't necessarily mean to your house but what

5      they're doing is they break you into groups at different

6      pickup points near your house and they take you all to court

7      at the same time and they take you back to those pickup points

8      in the evening.  The pickup points and dropoff points are

9      entirely confidential.  This, again, is just to add a measure

10     of security to protect your privacy.

11             Now, let me tell you what we're going to do in the

12     next few minutes this afternoon.  First, I'm going to ask you,

13     as a group, a handful of important questions while you're

14     sitting here.  After I get through those questions, I'm going

15     to talk to each one of you individually.  You'll be seated in

16     that chair at the front of the table.  So, the rest of you

17     will go out the courtroom, but, again, to protect your

18     privacy, I'll just talk to you one at a time at the head of

19     that table.

20             There are five people you see in the jury box.  They

21     are reporters, journalists.  They're watching because in our

22     criminal justice system, it's important for the public to know

23     what happens at these proceedings.  But, again, we're not

24     going to ask you any questions that would require you to

25     disclose your identity, who you are, the particular employer

1    you have, or any details like that.

2         While we're talking one-on-one up there, if at any

3    point you have something to say to me that you don't want the

4    journalists to hear, let me know.  I turn on a noise box that

5    goes on behind them and it blocks out their hearing completely

6    and you should feel free to speak to the lawyers and me

7    privately and not worry about that.

8         I will tell you I know that in a big case like this,

9    a lot of people have some initial reluctance to serve on a

10   jury, especially considering that the trial will be fairly

11   long.  But I'll also tell you that whenever I've done a big

12   case, after the trial, the jurors come up to me and say, You

13   know, you were right, Judge Cogan.  That was really one of the

14   most interesting experiences I've had in my life.  And they're

15   very grateful to have had it.  That may sound strange to

16   you -- I expect it doesn't to some of you who may want to

17   serve -- but I will tell you it's the near universal response

18   of jurors in the cases that I've had before me.

19        Let me ask you all a handful of questions as a

20   group.  All I'll ask you to do, if necessary, is raise your

21   hand and identify yourself.  Then we'll talk about it more at

22   the front of the table when I talk to you one-on-one.

23   Remember that you took an oath when you filled out the

24   questionnaire to answer every question truthfully.  That oath

25   still controls your answers you're about to give me now, so

Jury Selection                                            533

1    it's very important that you tell the truth.

2              First, as he sits here right now, the Defendant is

3    considered innocent.  He is presumed innocent.  He has a

4    presumption of innocence unless and until a jury unanimously

5    find that he's guilty beyond a reasonable doubt.  That's what

6    the Government has to prove.  He's considered innocent unless

7    and until the Government does prove that.

8              Does anybody have a problem with that principle of

9    law?

10             Okay.  Second, as I mentioned to you earlier, the

11   Defendant has been indicted for several crimes.  An

12   "indictment," to be indicted, it just means that he's been

13   formally charged with those crimes.  It doesn't mean he's

14   guilty of anything.  So, you cannot think, you're not allowed

15   to think, that just because he's been indicted, oh, that must

16   mean he's guilty.  That is not the case at all.  The

17   indictment is just a charge.  It doesn't mean anything.

18             Does anybody have a problem with that principle of

19   law?

20             Yes.  What's your number?

21             THE PROSPECTIVE JUROR:  111.

22             THE COURT:  Hang on for that and I'll talk to you in

23   a minute.

24             Anybody else have a problem with that?  Your number?

25             THE PROSPECTIVE JUROR:  114.

LAM        OCR        RPR

1          THE COURT:  All right.

2          Next, as I mentioned to you, the Government has the

3    burden of proving the Defendant's guilt beyond a reasonable

4    doubt.  That means that if you go into the jury room and go

5    yeah, I think he probably did it, that's not enough.  You

6    can't convict him on that basis.  You have to convict him only

7    if you think he's guilty beyond a reasonable doubt.  Not

8    probably, not seems like, not most likely, but beyond a

9    reasonable doubt.

10          Does anyone have any issue with that principle of

11   law?

12          THE PROSPECTIVE JUROR:  I do.

13          THE COURT:  I'll just note your number and talk to

14   you about it.  171.  Thank you.

15          Anybody else?

16          Next, it's very important that if you sit as a juror

17   in this case you keep an open mind throughout the trial.

18   There's going to be a lot of evidence, so we don't want you

19   making up your mind after you hear opening statements or the

20   first couple of witnesses.  You have to listen to all the

21   evidence and keep an open mind until you engage in your

22   deliberations with your fellow jurors.

23          Anybody have a problem keeping an open mind in the

24   trial?

25          Your number again?

Jury Selection                                          535

1              114, 111, 193, 147, and 1717.

2              Anyone else?

3              Now, when you filled out the questionnaire, we asked

4    you not to do any research on the case and try to avoid any

5    news coverage of it.  I know there's been quite a bit.

6    Despite those efforts, after you filled out your questionnaire

7    I assume most of you ran into something you heard about the

8    case.

9              Is there anyone who didn't hear anything about the

10   case after you filled out your questionnaire?

11             THE PROSPECTIVE JUROR:  Did or didn't?

12             THE COURT:  Did not.

13             So, everyone's heard something about the case after

14   you filled out your questionnaire.

15             And then last, when you filled out your

16   questionnaire, you were asked whether you knew any of the

17   lawyers or the Defendant or me or any of my staff.  We're now

18   all gloriously displayed before you.

19             Do any of us look familiar?  Nobody knows anybody?

20             Now we're going to break into asking questions about

21   each of you individually.  Please keep in mind that you should

22   not be offended if you're not selected for the jury.  The fact

23   of the matter is I get called for jury service lots of times

24   and I never get picked for a jury.  The lawyers always boot me

25   off.

Jury Selection                                           536

1            You may want to serve.  And if you're not picked,

2    it's nothing against you.  Lawyers have all kinds of reasons

3    for wanting certain people on a jury and other people not on

4    the jury and it's nothing you should take personally.

5            We'll proceed in numerical order.  111 is first.

6    Everyone else, if you go with Ms. Clarke, we'll bring you in

7    one at a time.  Thank you very much.

8            (Prospective Juror 111 remains; all other

9    prospective jurors exit.)

10           THE COURT:  You can have a seat right there at the

11   end of the table.  Make yourself at home.

12           THE PROSPECTIVE JUROR:  Thank you.

13           THE COURT:  Hi.  How are you?

14           THE PROSPECTIVE JUROR:  I've been better.

15           THE COURT:  You didn't feel more comfortable when I

16   said make yourself at home?  It's just like my living room.

17           THE PROSPECTIVE JUROR:  No.  I have a lot of anxiety

18   right now.

19           THE COURT:  You answered a couple of the questions

20   that I asked affirmatively.  I think you answered the question

21   whether you had -- whether you understood that the indictment

22   is just a charge and it's not evidence of guilt.

23           What's the problem there?

24           THE PROSPECTIVE JUROR:  I think intellectually I

25   understand it, but from everything I know surrounding the

Jury Selection                                                537

1    precautions taken, it's hard for me to go with the

2    justification that that is being upheld -- not being upheld,

3    that's not a question of the Court, but I guess maybe it

4    speaks more to the presumed innocence and all the kind of --

5    let's call it situation surrounding what's the case and the

6    accused.

7              THE COURT:  Sometimes things are exaggerated in the

8    press and they are not as they appear to be and it would be

9    erroneous to draw conclusions from that.  Like you said, you

10   like to approach it intellectually.  We want jurors to

11   approach this case intellectually.

12             So, if I told you intellectually you've got to

13   assume that the Defendant is innocent unless you're convinced

14   the Government has proven him guilty beyond a reasonable

15   doubt, could you do that?

16             THE PROSPECTIVE JUROR:  I don't think so.

17             THE COURT:  You don't think so?

18             THE PROSPECTIVE JUROR:  No.

19             THE COURT:  Why?

20             THE PROSPECTIVE JUROR:  I have a lot of trepidation.

21   And even right now, I feel very emotional related to it.  So,

22   I don't think I could disconnect the two.

23             THE COURT:  Any questions from the parties?

24             MS. PARLOVECCHIO:  No, your Honor.

25             MR. LICHTMAN:  No, thanks.

Jury Selection                                        538

1            THE COURT:  If you just go back in the room, we'll

2    be with you again shortly.

3            THE PROSPECTIVE JUROR:   Thank you.

4            (Prospective Juror 111 exits.)

5            THE COURT:  Next is 114.

6            (Prospective Juror 114 enters.)

7            THE COURTROOM DEPUTY:  Juror 114, you can have a

8    seat right there.

9            THE COURT:  How are you?

10           THE PROSPECTIVE JUROR:  Okay.

11           THE COURT:  You had a couple of concerns when I

12   mentioned at least the proving guilt beyond a reasonable doubt

13   and that the indictment is not really indicative of anything.

14           What are your concerns?

15           THE PROSPECTIVE JUROR:  From what I've heard and

16   read, I find it hard to find the Defendant may be not guilty,

17   based on what I've learned, what I know just from what I've

18   seen on TV news and that kind of thing.

19           THE COURT:  But if I were to give you an instruction

20   that you've got to do that, the law requires you to do that,

21   it's the fundamental aspect of our system, that jurors must

22   put aside everything they've heard in the outside world and

23   confine themselves to what they hear at trial, are you saying

24   you couldn't do that?

25           THE PROSPECTIVE JUROR:  I think it would be hard to

1   do that.

2             THE COURT:  Hard's okay.  The question is, could you

3   do it?

4             THE PROSPECTIVE JUROR:  I'm not sure.

5             THE COURT:  Okay.  Any questions from the parties?

6             MR. NARDOZZI:  No, your Honor.

7             MR. LICHTMAN:  No, your Honor.

8             THE COURT:  Thank you very much.  You can go back

9   in.  We'll be with you shortly.

10            (Prospective juror 114 exits.)

11            THE COURT:  114 excused for cause.  117 is next.

12            (Prospective Juror 117 enters.)

13            THE COURT:  How are you?

14            THE PROSPECTIVE JUROR:  Good, thank you.

15            THE COURT:  If you wouldn't mind talking into that

16   microphone right there so those at the end of the table can

17   hear you.  You can pull it towards you.

18            You raised your hand or you didn't raise your hand

19   when I asked if there was anyone who hadn't heard anything

20   about the case since they filled out the questionnaire.

21            You've heard a few things about this case?

22            THE PROSPECTIVE JUROR:  Yes.

23            THE COURT:  What have you heard?

24            THE PROSPECTIVE JUROR:  Didn't hear anything major,

25   just general stuff that they've been talking about on the

1   news, couple things in the papers.

2           THE COURT:  Any details of those claims or news

3   stories that you recall?

4           THE PROSPECTIVE JUROR:  No.

5           THE COURT:  Have you heard anything at all that

6   would make it difficult for you to be fair and impartial in

7   this case?

8           THE PROSPECTIVE JUROR:  No.

9           THE COURT:  If I told you you had to set aside

10  everything you heard outside of the courtroom, could you do

11  that?

12          THE PROSPECTIVE JUROR:  Yes.

13          THE COURT:  There's a couple of things from your

14  questionnaire that I wanted to follow up on.

15          You speak a little Spanish?

16          THE PROSPECTIVE JUROR:  Just a little bit.

17          THE COURT:  Can you carry on a conversation in

18  Spanish?

19          THE PROSPECTIVE JUROR:  Not really, no.

20          THE COURT:  A lot of the testimony at this trial is

21  going to be in Spanish, and there will be an interpreter there

22  translating it into English.  I have to make sure that if you

23  sit as a juror in this case, you go by what the English

24  interpreter says even if you heard something in Spanish that

25  you think might have been interpreted a little bit

Jury Selection                                            541

1    differently.

2              Can you do that?

3              THE PROSPECTIVE JUROR:   Yes.

4              THE COURT:   All right.   In answer to the question of

5    whether law enforcement officers are more likely to tell the

6    truth than other witnesses, you say:   Law enforcement are

7    supposed to protect and serve, and, so, I feel that they must

8    tell the truth.

9              Would you agree with me sometimes police officers

10   and law enforcement people don't tell the truth?

11             THE PROSPECTIVE JUROR:   Yes.

12             THE COURT:   If I told you that you have to evaluate

13   the testimony of the law enforcement officer the same way you

14   evaluate anybody else's testimony, not giving it more credit

15   or less credit, could you follow that instruction?

16             THE PROSPECTIVE JUROR:   Yes.

17             THE COURT:   Questions from the parties?

18             MS. PARLOVECCHIO:   Just one question.   You.

19             Had indicated on your questionnaire that you were

20   unsure about whether your employer would pay for your time

21   missed while you're on jury service.

22             Were you able to check on that since you filled out

23   the questionnaire?

24             THE PROSPECTIVE JUROR:   Yes.

25             MS. PARLOVECCHIO:   What did you learn?

1          THE PROSPECTIVE JUROR:   They said they would pay me

2    if I was to serve.

3          THE COURT:   So, it's not a problem for you to serve?

4          THE PROSPECTIVE JUROR:   No.

5          MR. LICHTMAN:   I have no questions, your Honor.

6          THE COURT:   Okay.   Thank you very much.   We'll be

7    with you shortly.

8

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Selection                                    543

1    (continuing)

2              THE COURT:   Any challenges for cause to 117?

3              MS. PARLOVECCHIO:   No.

4              MR. LICHTMAN:   No.

5              THE COURT:   So you were right, we have four cleared.

6    Each side gets one peremptory.   Do you want to take five

7    minutes to figure it out?

8              MS. PARLOVECCHIO:   Yes.   Thank you.

9              THE COURT:   Let's try to make it ten minutes.

10             Do the parties still think we can do openings this

11   afternoon?

12             MS. PARLOVECCHIO:   Yes.

13             MR. LICHTMAN:   I am concerned.   You have to swear

14   them, instruct them.   My opening is about an hour.   Having

15   them at the end of the day.

16             THE COURT:   Let's see where we stand in ten minutes.

17   At the least we will swear them in and I will give them the

18   preliminary instructions and then we will send them home

19   depending on where we are.

20             MS. PARLOVECCHIO:   Thank you, Your Honor.

21             (Recess taken.)

22             THE COURT:   I guess we will do this from here.   Have

23   a seat.   Okay, I think it's the Government first.

24             MS. PARLOVECCHIO:   The Government strikes number 58.

25             THE COURT:   58 is stricken.

1          And for the defense?

2          MR. LICHTMAN:  73.  73.

3          THE COURT:  And that leaves us with?

4          THE COURTROOM DEPUTY:  64 and 117.

5          THE COURT:  64 and 117 rounds out the 18.

6          Do you want to do openings?

7          MS. PARLOVECCHIO:  Yes.

8          THE COURT:  How long do you anticipate your opening?

9          MS. PARLOVECCHIO:  25 minutes.

10         MR. LICHTMAN:  25 minutes.

11         THE COURT:  Mr. Lichtman, it does concern me that

12    you said an hour.  Here's why.  I'm sure you know --

13         MR. LICHTMAN:  I haven't timed it, Judge, to be

14    honest with you.

15         THE COURT:  My point is please keep in mind it is an

16    opening statement, not a closing argument.

17         MR. LICHTMAN:  I understand, Judge.  We are talking

18    about the evidence that's going to come out.  There is a lot

19    of 3500 material.

20         THE COURT:  If we reconvene realistically at 3:10,

21    it takes me 15 minutes to do my part and then we have to

22    figure half an hour for the Government, until 4 o'clock.  It

23    is longer than I want to keep these people.

24         MR. LICHTMAN:  I hate to do it at the end of the

25    day.  I don't think they will be paying attention.

Jury Selection                                              545

1           THE COURT:   What's your concern?

2           MS. PARLOVECCHIO:   I think the likelihood of

3    everyone feeling like it's moving forward will help solidify

4    the jury, Your Honor.

5           MR. LICHTMAN:   Especially with all of the

6    difficulties we have had in terms of getting people that

7    actually can be open-minded, I hate to have them at the end of

8    the day asleep and very tired.

9           THE COURT:   What do you think about doing the

10   Government's opening and if you wanted to I'd let you start

11   and break at 4:30 and we can pick it up tomorrow morning?

12          MR. LICHTMAN:   I'd rather not break up the opening

13   obviously because once you get the momentum, Judge, it is hard

14   to stop.  If they have to open, I have to go because I am not

15   going to leave them with the night.

16          THE COURT:   I agree with the Government that it's

17   important that we show these people we are doing something

18   other than picking juries.  So we are going to start with the

19   Government's opening, whether you go and break it into two s

20   pieces, because we will stop at 4:30 or whether you wait until

21   tomorrow morning, I will leave that to you.

22          MR. LICHTMAN:   Are you going to stop me at 4:30

23   pretty much on the button?

24          THE COURT:   4:30, you want that, fine, but no later

25   than 4:35.  See you in a few minutes.

Proceedings                                                    546

1          (Recess taken.)

2          (In open court.)

3          THE COURTROOM DEPUTY:  All rise.

4          THE COURT:  Have a seat, please.  One more issue.

5    Ms. Clarke has been checking with the jury all day and they

6    were all fine and just now, Juror No. 7, who was formerly 391,

7    if you recall, this juror was concerned because they have an

8    ill family member who might expire during the course of the

9    trial and the juror simply said to Ms. Clarke that he wanted

10   to talk to her after today is over.

11         Now, it is not uncommon in a case that goes this

12   long that occasionally a juror or a lawyer or a party has a

13   death in the family and a day has to be taken off for a

14   funeral.  I don't know if we have reached that point with this

15   juror.  But I propose we go forward, swear him in, hear what

16   he has to say at the end of the day and make whatever

17   arrangements we need to make after we have done that.

18         Anybody opposed to that plan?

19         MR. LICHTMAN:  No objection.

20         MS. PARLOVECCHIO:  No, Your Honor.

21         THE COURT:  All right.  Then let's have the jury,

22   please.

23         We will stand for the jury's entrance and exit.

24         (Jury enters the courtroom.)

25         THE COURT:  The jury can sit down.  We are all

1    standing for you.   Everyone can be seated.

2            All right.   Let me have the jury sworn, please.

3            THE COURTROOM DEPUTY:   Please stand and raise your

4    right hand.

5            THE COURT:   Now you have that sat down, you need to

6    stand up.

7            (Jury sworn.)

8            THE COURTROOM DEPUTY:   You may be seated.

9            THE COURT:   All right.   Ladies and gentleman, just

10   as a reminder, I am still Judge Cogan.   Now that you have been

11   sworn in as members of the jury, I am going to tell you

12   briefly about your duty as jurors and give you some

13   preliminary instructions.   When the trial is over, I am going

14   to give you more detailed instructions and it is those

15   instructions that will govern your deliberations in this case.

16           Now, at the end of the evidence and my final

17   instructions to you, it is going to be your duty to decide the

18   facts from the evidence in this case and decide whether the

19   Government has proven beyond a reasonable doubt if the

20   defendant committed the crimes charged against him.   In doing

21   that, remember you have to follow the law whether you agree

22   with it or not.

23           Now, the evidence in this case is going to consist

24   of many things:   The testimony of witnesses, documents and

25   other things that are received into evidence as exhibits, any

Preliminary Instructions                          548

1   facts on which the lawyers agree, and the inferences that you

2   may reasonably draw from all of this evidence that I have just

3   described.

4             Now, there are two kinds of evidence.  There is

5   direct evidence.  That means that a witness personally saw,

6   heard, or did something, or evidence in a document that

7   something happened.  If you are looking at it, you see it, you

8   hear it, that is direct evidence.

9             Circumstantial evidence is evidence that you can

10  reasonably infer from the direct evidence.  One isn't better

11  than the other.  You consider how much weight to give every

12  piece of evidence whether it is direct or circumstantial.  It

13  is going to be entirely up to you to decide how much weight to

14  give any particular piece of evidence in the case.  You have

15  to determine which of the witnesses you believe, what portion

16  of their testimony you want to accept, whether reasonably may

17  be inferred from what they saw, heard or did, and what weight

18  you attach to each aspect of the evidence and to the evidence

19  as a whole.

20            Now, you also need to understand what is not

21  evidence.  The questions and objections of the attorneys are

22  not evidence, neither is any testimony that I instruct you to

23  disregard.  The statements and arguments of the attorneys are

24  not evidence.  The only evidence for you to consider is that

25  which I admit into evidence here in court in the presence of

1    the parties and you the jurors.

2           Now, at times during the trial, I am going to

3    sustain objections to questions that the attorneys ask.  When

4    that happens, I won't permit the witness to answer or if the

5    witness is too fast for me and gets the answer out, I will

6    sustain the objection and strike the testimony.

7           If I sustain an objection or if I say the answer is

8    stricken, you are to disregard the question and the answer

9    entirely.  It has to be for you like it was never asked and

10   answered.  Put it out of your mind.

11          The law requires that you decide the case solely on

12   the evidence placed before you.  You have to let commonsense

13   be your guide subject to and aided by the instructions on the

14   law that I will give you at the end of the case.

15          There is unfortunately no single or magical formula

16   by which you evaluate the testimony and exhibits.  You are

17   bringing with you to this trial all of your experiences and

18   your background and, most importantly, your commonsense.

19   That's really why we want you here.

20          Use the same reasoning and tests that you do in your

21   everyday dealings with people to decide who's telling the

22   truth and to what degree, who to believe and who not to

23   believe, and how to reason, understand and weigh the documents

24   and exhibits.  Watch the witnesses carefully and listen to

25   everything that is said.

Preliminary Instructions                                    550

1           Now, I gave you some of the instructions I am about

2    to give you previously when I met with you, but I want to

3    repeat them now because they are very important.  If somebody

4    were to violate all these instructions it could set us back to

5    square one, which is a place no one wants to go.

6           First, it is very important that you do not talk to

7    each other about the case or the evidence in the case until

8    all of the evidence has been presented and I have sent you to

9    the jury room and told you to begin your deliberations.  That

10   includes members of your family and friends.  As I said to you

11   previously, you can tell them that you are sitting as a juror

12   in a federal case in federal court and that's all you can tell

13   them.  As I told you, you are going to be anonymous and

14   partially sequestered throughout the trial.  So you need to be

15   as diligent as the rest of us are going to be to make sure you

16   remain anonymous.

17          Second, for the same reason, don't let anybody talk

18   to you about the case or about anyone who has anything to do

19   with it.  I don't expect this is going to happen, but if

20   anybody walks up to you and starts talking to you about the

21   case, please tell Ms. Clarke about it immediately.  You are

22   supposed to remain anonymous, so we absolutely need to know if

23   somebody has figured out that you are a juror in this case and

24   is asking you questions about it.  If that does happen, don't

25   talk to anybody about it except Ms. Clarke, not even your

1    fellow jurors.  Again, I don't expect it, but I need to give

2    you this caution to anticipate things sometimes do happen.

3              Third, don't speak with any of the lawyers, the

4    defendant, or the witnesses.  Don't even pass the time of day

5    or say hello or goodbye to them.  If they walk right by you

6    and appear not to make eye contact, they are just doing what I

7    have asked them to do.  It's not that they are rude people.

8    None of them are.  Everyone has to make a point of avoiding

9    even the appearance of impropriety so there is no

10   misimpression between anyone about what happened between the

11   jurors and lawyers or the witnesses.

12             Fourth, and this is very critical, there is going to

13   be a lot of press coverage about this case.  You have to do

14   your very best to stay away from it.  If you are watching TV

15   and you see something come on, please click the remote control

16   and switch to another channel.  If you see a headline in the

17   newspaper, stop at the headline, flip the page, don't read the

18   article.  If you see something on the internet, if something

19   pops up, zip right back to your home page and be there

20   instead.  Even if you hear people talking about the case,

21   whether on the subway or at a family gathering or anything, do

22   your best to tune it out.  That's because your verdict has to

23   be based only on the evidence that's here in this courtroom

24   and we don't want you influenced by anything else.

25             For the same reason, it is very important that you

1    not do any research about the case.  Don't Google places or

2    people you hear about during trial to find out more.  Don't

3    post anything that mentions this trial on Facebook.  Don't

4    send texts or e-mails to anyone saying I think this about the

5    case or the judge is doing a really good job.  Nothing at all

6    should you say about the case in your social media.

7           That part is always hard for jurors because we all

8    communicate so much on social media, but it is very important

9    that you follow that direction.  It would really violate your

10   oath if you did and we don't want that to happen.

11          Now, let me tell you how this trial is going to

12   proceed.  The first thing that is going to happen is that the

13   Government is going to make an opening statement.  As I

14   mentioned to you before, an opening is not evidence.  It is an

15   outline of what that party intends to prove or show and it is

16   offered to help you follow the evidence that you will see and

17   hear during the trial.

18          (Continued on next page.)

19

20

21

22

23

24

25

1           THE COURT:  After the government makes its opening

2   statement, the defendant is going to make one as well.  After

3   those opening statements the government will present witnesses

4   and the defendant may cross-examine those witnesses.  Then if

5   the defendant wants he may present witnesses and the

6   government may cross-examine the defendant's witnesses.

7           Finally, there may be what we call rebuttal

8   witnesses for the government.  I want to remind you that the

9   defendant doesn't have to prove his innocence.  He's presumed

10  innocent.  So he's not required to testify or to present any

11  evidence at all and if he decides to go that way you can't

12  hold it against him in any way.

13          After all the evidence has been submitted the

14  attorneys will make closing arguments to summarize and give

15  you their interpretation of the evidence that you saw and

16  heard during the trial.  Like the opening statements, the

17  closing arguments are not evidence.  They are, again, just

18  offered as guides to let you know what the issues are and to

19  give you each side's perspective on what has been proven or

20  not proven.

21          Then after those closing arguments I'll give you the

22  instructions on the law and you will retire to deliberate on

23  your verdict. You'll get a copy of those instructions when you

24  go in to deliberate on your verdict.  Don't worry.  They are

25  long and involved but you will have them in front of you.

1          Please, as I told you when I selected you, do not

2     make up your mind about what the verdict should be until after

3     you have heard all the evidence and I've instructed you on the

4     law at the end of the case and after you have deliberated with

5     your fellow jurors.  Please, keep an open mind until then.

6     The parties deserve and the law requires that you give them an

7     opportunity to be fully heard and that you not make up your

8     mind until you and your fellow jurors have heard all the

9     evidence and instructions and you completed your

10    deliberations.

11         Finally, let me repeat for you so you know what the

12    schedule for the trial is going to be.  We're going to start

13    hopefully every morning at 9:30 sharp.  We will do our best to

14    do that.  Then we'll take about 45 minutes for lunch and we'll

15    be bringing in your lunch to you.  We'll take a break so you

16    can rest a little bit.  During the morning we'll take a ten or

17    fifteen-minute break before lunch.  After lunch we'll go no

18    later than 4:30 and we'll probably take a break between

19    lunchtime recess and the end of the day as well, again, just

20    so you can recharge your batteries a little bit.  Those are

21    approximate times.  You need to bear with me if I can't stick

22    to them precisely.

23         Remember, we don't sit on Fridays.  That may change

24    a little depending on the progress that we make.  I expect it

25    will not.  You should set any appointments you have, any

1    things you have to do, try to set those for Fridays.

2            It's very important that you be here on time.

3    Please, meet the marshals at your meeting points.  Some of you

4    don't know them yet, but you'll know them by the end of the

5    day.  You don't want to delay your fellow jurors.  You don't

6    want to delay the parties to the case.  You go right into that

7    jury room when you get here and once you're all there

8    Ms. Clarke will bring you into this courtroom and we'll start

9    the day.

10           You may have already noticed this.  When you enter

11   and exit the courtroom everyone rises due to the solemn duty

12   you have undertaken to judge this case honestly and fairly

13   according to the law.

14           The other thing I wanted to mention is taking notes.

15   It is going to be a long trial.  I can understand you want to

16   take notes.  The other thing I want to caution you about,

17   don't let your note taking get in the way of your hearing the

18   testimony.  Whenever I get new law clerks, they start writing

19   down everything I say.  I tell them stop writing.  Listen.

20   They are trying to figure out how to write something and the

21   next thing I say will go over their heads.  Don't fall into

22   that trap.  Feel free to take notes.  You have a court

23   reporter as you see here.  He's preparing what we call a

24   verbatim transcript.  If there is a portion thereafter you

25   want to see during your deliberations, we'll have that

1    available for you.  You are also going to see me occasionally

2    typing on my computer.  I'm following along with the

3    transcript on the computer.  Just because you see me typing

4    don't draw the conclusion that I am doing something that shows

5    we've reached a significant part of the case.  That's not it

6    at all.  If I'm making a note it's probably on a point of law

7    that doesn't concern you.  It may be for another case where I

8    see a similar issue.  Don't be distracted by my note taking go

9    habits.

10         All right. At this point we're going to begin with

11   the government's opening statement.

12         MR. FELS:  Thank you, your Honor.

13         Ladies and gentlemen of the jury, this case is about

14   drugs.  This case is about money.  This case is about

15   violence.  This case is about prisons escapes.  This case is

16   about a vast global narco empire, all culminating in the

17   seizure of billions -- and that's with B -- of dollars of

18   illegal narcotics from 1989 until 2014.

19         And the kingpin who ran the organization, who is

20   responsible for these illegal activities, that man, the

21   defendant, Joaquin Guzman Loera, a man from the mountains of

22   Mexico with street smarts.  He started low down in the

23   organization, referred to as the Sinaloa Cartel or The

24   Federation.  But he sold enough drugs and used instinct and

25   brutality to rise all the way to the top of an organization of

1    hundreds of people.  He rose from being a man who followed

2    orders to being one who gave them.  And he used all and every

3    means available to him to insure that he stayed at the top,

4    including corruption of public officials, kidnappings, torture

5    and even murder.

6             Now, even as a boss Guzman was not content just to

7    give orders to kill.  No.  He was a hands-on leader.  The

8    evidence in this case will show how he took out a rifle and

9    shot two men at point-blank range.  And then he ordered his

10   workers to dig a hole and burn the bodies.

11            Using all the tools of his trade Guzman expanded his

12   criminal organization to nearly a dozen countries.  And he

13   used this operation to flood the streets of Brooklyn, New York

14   City and the United States with hundreds and hundreds of tons

15   of cocaine, marijuana, heroin and methamphetamine.

16            Now, to give you a sense of the size and scope of

17   his criminal organization, I want you to consider the

18   following shipments of cocaine:  Twelve tons.  That's over 26

19   thousand pounds on a fishing both in the Eastern Pacific ocean

20   in 2004. 19 tons on a boat off the coast of the Panama in

21   2007.  Eight tons in warehouses in Ecuador in 2009.  And two

22   tons seized right here in Brooklyn on Third Avenue, about two

23   miles away from where we're sitting today.

24            Ladies and gentlemen, this is just a small set of

25   examples of cocaine shipments that Guzman and his partners

1    tried to sell here in the United States.

2            Now, how much cocaine is in these 41 tons?  There's

3    enough cocaine in those 41 tons for 328 million lines of

4    cocaine.  That is more than a line of cocaine for every single

5    person in the United States.

6            Now, Guzman sent all this cocaine, plus the

7    marijuana, the methamphetamine, the heroin to this country,

8    the United States, for one and only one reason, to make money.

9    Those same 41 tons, Guzman could have sold those 41 tons of

10   cocaine for over 850 million dollars.

11           Now, luckily all four of those shipments were seized

12   by the authorities before Guzman and his partners could sell

13   it here in the United States.  Throughout the course of this

14   trial you will hear about those four seizures and you will

15   hear about several more and you will hear testimony that

16   Guzman boasted that for every one seizure he suffered he had

17   100 successful shipments.  Think about that, ladies and

18   gentlemen.  Guzman was not a narco trafficker for 25 years

19   because he lost money.  He made billions.

20           Ladies and gentlemen, my name is Adam Fels and I'm

21   one of the prosecutors representing the United States of

22   America in this case.  You've already met Gina Parlovecchio

23   and Anthony Nardozzi.  I would like to introduce you from

24   right to left the other prosecutors on this case, Amanda

25   Liskamm, Michael Robotti and Andrea Goldbarg, together we

1    represent the United States in this matter.

2          Now, who is Chapo Guzman, the defendant in this

3    case?  As you're going to hear in a video that Guzman made and

4    sent to the media, he started out at the age of fifteen

5    growing and selling marijuana and poppy flowers, which is

6    you'll hear the source of heroin.

7          THE COURT:  Counsel, I'm sorry to interrupt you.

8    You know, we have an overflow courtroom and they can't hear

9    you unless you speak into the microphone.

10         Of course, the microphone has to work.

11         Thank you very much.

12         MR. FELS:  Sorry about that, ladies and gentlemen,

13   technical difficulties.

14         From the start in the early 1970s you are going to

15   hear from the government's witnesses that Guzman started by

16   selling marijuana within Mexico, but he moved on to transport

17   other traffickers' marijuana up to the United States/Mexico

18   border and then from there he gained the capacity to bring it

19   across the border into the United States for a fee.

20         Now, back then it took illegal drug shippers weeks

21   to move that marijuana over the border.  So Guzman slashed

22   that delivery time to mere days by moving marijuana under the

23   border, using tunnels that he had built.  Then in the

24   mid-1980s Guzman pursued a new venture, the shipment of

25   cocaine.  You're going to hear that he established

1    relationships with some of the largest Colombian cartels at

2    that time.  He convinced them to ship their cocaine from

3    Colombia to him in Mexico and that he could use his tunnels to

4    move the Colombians' cocaine into the United States as quickly

5    as possible.

6              Now, where does this cocaine come from?  Cocaine is

7    processed from the coca plant, which is grown in the

8    mountains, the Andes Mountains of South America and it has to

9    get to the United States and other places where there's a

10   significant market.  Now, there are a number of ways that it

11   can go from South America to the United States and one of

12   those ways you'll hear is across into Mexico and then over

13   into the United States by land.  You can see that Mexico is

14   here in the middle between South America and the United

15   States.  So that narco traffickers like Chapo Guzman played a

16   critical role in the supply chain.

17             Now, in the beginning Guzman started relatively

18   small.  He began receiving only a few airplanes in select

19   hidden landing strips throughout Mexico.  But before long

20   Guzman began receiving anywhere from ten to fifteen planes

21   stuffed with cocaine every night.  This earned Guzman a new

22   nickname from the Colombian cartel.  He was no longer just El

23   Chapo, the short one, he was now El Rapido, the speedy one,

24   because of the unprecedented speed with which he moved the

25   Colombians' cocaine into the United States, using these

1    tunnels and other means.

2            Now, as the 1990s started, you'll hear Guzman

3    continued to receive hundreds of tons of cocaine, carrying on

4    these planes, which he successfully transported to the United

5    States.

6            Now, how does a drug trafficker like Guzman make so

7    much money transporting cocaine?  During the course of the

8    trial you'll learn that cocaine costs a certain amount in

9    Colombia.  But if it can be successfully shipped to Mexico,

10   the price of that cocaine goes up three to five times and if

11   it can be brought into the United States it's now worth ten

12   times what it originally was worth.  Now, what accounts for

13   that increase?  You'll hear that various risks such as

14   seizures by governments or acts of God or a ship that gets

15   sunk all cause the price to increase, because the closer you

16   can bring that cocaine to the United States, the eventual

17   market, the more value it's worth.

18           Now, at the start Guzman made a percentage of the

19   cocaine that he transported as a fee for moving it for the

20   Colombians.  But later the Colombians sold the bulk of their

21   cocaine to Guzman at the Mexico price and then allowed Guzman

22   to double his profits by crossing it one border into the

23   United States.  But Guzman wanted to earn even more.  He sent

24   his family members down to South America to negotiate with the

25   sources of supply so that he could buy directly from the

Opening - Fels                                          562

1    source and make all of the profits.  You'll hear how Guzman

2    used just about every possible way to move that cocaine,

3    including his tunnels, planes, trains, automobiles, fishing

4    vessels, tractor trailers, even submarines.

5              Now, Guzman's tremendous success caught the eye of

6    his biggest competitors.  You'll hear how Guzman's

7    organizations started a bloody war against his rivals in

8    Mexico.  There were a number of killings on both sides.

9    Guzman had his people kill his rivals just as his rivals

10   targeted Guzman's people.  In 1993 Guzman had to flee to the

11   neighboring country of Guatemala but he was arrested and

12   brought back to Mexico and put in prison.  For the next eight

13   years Guzman was in prison in Mexico but not even the four

14   walls of that prison could stop Guzman from running his

15   illegal drug empire. You're going to hear how Guzman kept his

16   illegal drugs empire going by passing messages to his workers

17   while he was still in prison so he could continue his

18   profitable illegal deals.

19             Now, Guzman's continuing criminal conduct did not

20   escape the notice of American law enforcement, ladies and

21   gentlemen.  After learning he had been charged in the United

22   States Guzman realized that Mexico could send him to the

23   United States to face charges.  So Guzman and his people did

24   the one thing that they could in order to prevent them from

25   losing their boss.  They busted him out of the prison.  You

1    will hear how in 2001 Guzman escaped in a prison cart, then

2    fled to hide in the mountains of Mexico where he escaped

3    capture for over a decade.

4           Now, after Guzman escaped in 2001 you'll hear how he

5    immediately took back the reins of his criminal organization.

6    He arranged for multiple heavily-armed compounds and

7    heavily-guarded compounds to be built in the mountains in his

8    home state  of Sinaloa, Mexico and that he pulled the strings

9    of his organization, along with the other leaders, from there.

10          Before long Guzman became even more organized, more

11   powerful than he had been before his arrest.  Now, around the

12   same time you'll hear Guzman forged a strong partnership with

13   a man by the name of Ismael Zambada Garcia, otherwise known as

14   Mayo Zambada.  From 2001 until Guzman's final capture in 2016,

15   Guzman and Mayo were the principal leaders of their criminal

16   organization.  They consulted each other constantly.  They

17   planned drug deals together.  They assembled a team of

18   smugglers, pilots, of killers, of corrupt officials and other

19   experts in narco trafficking.  They were based in their home

20   state of Sinaloa and thus came to be known as the Sinaloa

21   Cartel.

22          Now, during the mid-2000s the Sinaloa Cartel under

23   Guzman and Mayo's leadership continued shipping hundreds and

24   hundreds of tons of cocaine and other drugs into the United

25   States on a constant basis.  There were so many deals, ladies

Opening - Fels                                    564

1    and gentlemen, you're glowing to hear Guzman couldn't keep

2    track of which deal is for which.  He would say is this a deal

3    for marijuana or is this a deal for cocaine?  Guzman and Mayo

4    arranged for cocaine to be shipped to a number of cities,

5    including Los Angeles, Chicago, New York City.  From there it

6    was spread throughout the United States.  Once the cocaine was

7    sold, the proceeds, the drug profits, were brought back down

8    to Mexico so that Guzman and Mayo could purchase even more

9    drugs to ship up to the United States and so Guzman and Mayo

10   could share in the profits.

11           Now, what do these profits go for?  You'll hear

12   those profits went for a number of different things.  Some of

13   that money went to go pay off the Mexican military and police,

14   both so that Guzman could get information on upcoming raids

15   but also so that the Mexican police wouldn't interfere with

16   his drug trafficking.  Some of that money went to go arm

17   Guzman with an impressive array of fire power, assault rifles,

18   grenade launchers, explosives.  Some of that money went back

19   down to South America to pay for the next shipment of cocaine.

20   And some of that money went to fight war after bloody war that

21   he and the other members of his organization waged over the

22   next few years to rip control of territories and critical

23   gateways into the United States from rival cartels.

24           Now, the next war you will hear was in 2006 and was

25   over control of a city called Ciudad Juarez.  Ciudad Juarez,

1    which shares a border with the City of El Paso, Texas, you are

2    going to hear is a critical gateway to the lucrative United

3    States illegal drug market.  Prior to the war Guzman and other

4    rival traffickers shared in critical gateway.  But Guzman was

5    not content with sharing, ladies and gentlemen.  He wanted

6    that city all to himself.  So he sent out a number of killers

7    to wipe out his rivals and over the next few years Juarez

8    turned into a war zone, with the bodies piled up on all sides.

9            Now, another bloody front opened up in 2008 as

10   Guzman waged war against his long-time partners and cousins

11   who had split from Guzman's organization and turned against

12   him.  Witnesses will describe to you how Guzman gave a

13   standing order for hundreds of armed gunmen loyal to him and

14   to Mayo to fan out in the streets of Culiacan and target and

15   murder those loyal to Guzman's rivals, his own cousins.  In

16   retaliation his cousins did the same and before too long

17   Culiacan, and like Ciudad Juarez before it, turned into a war

18   zone.  As that war raged on traffickers were caught in the

19   middle, who moved drugs for both sides, were forced on pain of

20   death to pick a side.

21           Guzman did not just sit on the sidelines and give

22   orders.  During this trial you will see a video of both Guzman

23   and his killers interrogating enemies of the rival cartels.

24   You'll even hear how Guzman himself pulled the trigger and

25   ordered his workers to dispose of the bodies.

Opening - Fels                                566

1              Now, in order to maintain control over his vast drug

2     empire Guzman had to be able to communicate his orders, his

3     desires, to the members of his organization who would follow

4     them out.  Now, one issue that Guzman had to address early on

5     is he had to find a secret and secure way to pass these

6     messages along to his workers without fear of them being

7     intercepted by law enforcement or his rivals.  Guzman began to

8     use ever more sophisticated methods of communicating with his

9     workers.  Starting off with the use of pay phones, then

10    switching to cellphones and then switching to encrypted

11    cellphones and finally encrypted apps on his phone that he

12    could send texts on.

13             You'll hear how he would use workers to pass

14    messages back and forth so that he would know what was going

15    on without a chance of him being on the calls and being

16    recorded.  You'll hear that Guzman didn't just use these

17    communications systems to communicate with his own workers.

18    He also used them to spy own his competitors so he could find

19    out what they were doing.  Now, despite all of his efforts to

20    keep his communications secure, what Guzman did not count on,

21    ladies and gentlemen, is that for a short period of time the

22    government was listening.  The government was recording.

23    During this trial, thanks to these recordings, you will have

24    the opportunity to hear Guzman running his global narco empire

25    in his own words.  You'll have a chance to read his text

Anthony M. Mancuso, CSR      Official Court Reporter

Opening - Fels                                    567

1    messages, ladies and gentlemen.  These recordings and text

2    messages provide evidence of the drug deals, the kidnappings,

3    the corruption, the murders.  In some of Guzman's text

4    messages you are going to hear about his narrow escape from

5    capture in a city called Cabo San Lucas in Mexico in 2011.  In

6    his rush to flee, however, Guzman left behind a treasure

7    trover of evidence, implicating him in his drug business.

8            Ladies and gentlemen, you'll see that evidence.  In

9    early 2014 the authorities tracked Guzman to Culiacan, but

10   upon arrival, Guzman and some others escaped through a hidden

11   passageway underneath a bathtub outfitted with hydraulic lifts

12   and the scurried away through the city's sewer system to

13   safety.  He was apprehended shortly afterwards, but he didn't

14   stay in prison for long.  In July of 2015 you will hear that

15   Guzman and members of his criminal organization orchestrated a

16   dramatic escape from prison, his second.  In a sophisticated

17   feat of engineering Guzman's workers dug a nearly mile long

18   tunnel-- from an house that they had bought specifically for

19   this purpose -- to Guzman's prison cell, a tunnel so long, so

20   wide, that Guzman needed a motorcycle to escape to freedom.

21           But that freedom was short-lived.  The authorities

22   caught up to Guzman again in 2016 and he was sent to the

23   United States before he could flee again.  But you will hear

24   that just before that happened Guzman was planning yet another

25   escape from Mexican custody.

1              Now, how do we prove all of these things to you?

2    Through many different sources of evidence, ladies and

3    gentlemen.  We'll present to you the audio and video

4    recordings that I just mentioned, the text messages, documents

5    proving the crimes, photographs of members of the criminal

6    organization and of the seizure of tons upon tons of drugs.

7    Law enforcement witnesses who participated in those seizures

8    who will testify before you.  And in addition throughout the

9    trial you're going to hear from a number of individuals who

10   will pierce the inner circle of Guzman's criminal

11   organization.

12             Now these individuals who are sometimes -- will be

13   sometimes referred to during the trial as cooperating

14   witnesses, these are individuals who themselves were involved

15   in criminal activity with Guzman.  They are going to testify

16   to you about their own criminal conduct, the criminal conduct

17   of Guzman and the criminal conduct of others who worked with

18   both them and Guzman.

19             Now, these testifying witnesses, these cooperating

20   witnesses, are frequently testifying for some sort of benefit

21   from the government, whether that means the opportunity to

22   stay in the United States or perhaps a reduction of their

23   sentence.  Now, you should of course take these witnesses'

24   cooperation into account.  But, please, pay close attention to

25   these witnesses' testimony about their criminal interactions

Opening - Fels                                    569

1   with Guzman and I submit to you this testimony will provide

2   critical evidence against Guzman because these witnesses

3   provide the inside story of how this vast narcotics empire

4   worked.

5            In addition, the evidence will show that the

6   information from these insiders will be supported by the other

7   evidence in this case, such as the recordings, the

8   communications, the documents that you will both hear and see.

9   And over the course of this trial the evidence will show that

10  Guzman had absolutely no trouble at all selling all of the

11  cocaine that he could bring to the United States.  In that

12  video that he made and sent to media that I discussed a few

13  minutes ago you will see and hear Guzman state in his own

14  words how his drugs catches people's attention and one way or

15  another people try it to see how it feels or how it tastes and

16  then the addiction starts to grow.

17           Ladies and gentlemen, we are here today because for

18  25 years Guzman sent massive quantities of illegal drugs to

19  the United States and because he led a vast narcotics

20  trafficking empire.

21           Now, over the next few minutes I would like to talk

22  to you a little bit about the charges that Guzman is facing in

23  this case.  Because of his illegal conduct the government has

24  charged Guzman with various crimes ranging from 1989 to 2014,

25  including operating a continuing criminal enterprise,

1    international narcotics importation and distribution

2    conspiracies, multiple cocaine importation charges, money

3    laundering and using a firearm in furtherance of drug

4    trafficking activity.

5             Now, the first of these crimes is his participation

6    in what's called a continuing criminal enterprise.  Now, as

7    Judge Cogan will instruct you at the end of case in detail, to

8    show that there was a continuing criminal enterprise, the

9    government must prove several things.  First, the government

10   must prove a series of different violations of the United

11   States narcotics laws involving five or more participants.

12   Now, over the 25 years of the criminal activity charged in the

13   indictment you will hear throughout the trial hundreds of

14   people participated, not just five.  Some people in the

15   beginning, some people near the end, some people in the

16   middle.  The one constant, even during his period of

17   incarceration, was the defendant, Joaquin Guzman Loera.

18            Next, we'll prove that Guzman was a principal

19   administrator, organizer or leader of a continuation criminal

20   enterprise.  We will prove to you, ladies and gentlemen, that

21   he was a leader, not only through the testimony of these

22   insiders, some of his former employees, who received orders

23   from Guzman, but we'll also prove Guzman's leadership position

24   through intercepted calls he made, through a letter that

25   Guzman himself wrote.  In one of these calls you'll hear one

Opening - Fels                                    571

1     of Guzman's workers refer do him as boss, Jefe.  And he was a

2     hands on involved boss of his criminal organizations, ladies

3     and gentlemen.  Please, pay special attention to the level of

4     detail that Guzman goes into his written letter to one of his

5     top lieutenants.  That letter will be in evidence.  Another

6     example of how hands on he was, you'll hear a call in which

7     Guzman is personally involved in negotiations with a Colombian

8     trafficker regarding up front payments that he is being asked

9     to make for a shipment of cocaine, how he gives his nephew

10    specific step by step instructions about how to go forward

11    with that cocaine deal.

12            The government will also prove that Guzman received

13    substantial income and resources from this criminal

14    enterprise, at least $10 million in any one twelve month

15    period.

16            Ladies and gentlemen, we'll have witnesses testify

17    about the cocaine shipments that they personally participated

18    in with Guzman.  They'll go through the figures with you to

19    show you how Guzman could sometimes receive $10 million from a

20    single shipment of cocaine.  You will see drug ledgers.  These

21    are documents used by drug traffickers to keep track of who

22    owns what portion of a cocaine shipment and these will prove

23    some of these drug losses for you.

24            Finally, the government will prove that the

25    violations involved at least 150 kilograms of cocaine.  You

 1   will see evidence of seizures by the government of illegal

 2   drugs that were being shipped or received by Guzman or members

 3   of Guzman's criminal organization.   Some of these shipments

 4   would land in warehouses.   Others were on fishing vessels, out

 5   on the high seas.   We will present to you law enforcement

 6   officers who were personally involved in these seizures.

 7   They'll describe to you how they discovered the drugs, how

 8   they recovered them on fishing vessels, on trains, even on

 9   submarines.   Among the other charges is that Guzman used or

10   carried one our more firearms during or in relation to a

11   charged drug trafficking crime.

12          You will learn how Guzman had his own private army,

13   consisting of hundreds of men armed with assault rifles.   They

14   were responsible for his protection and movement in and around

15   the mountains of Sinaloa.   You will see how Guzman himself

16   carried various weapons on his person, how some of his

17   personal favorite were a diamond encrusted handgun with his

18   initials and a gold plated AK 47. You will hear from numerous

19   witnesses who frequently saw Guzman armed when they met with

20   him to discuss drug shipments.

21          (Continued on next page.)

22

23

24

25

1    (Continuing.)

2        MR. FELS:  The Government will also prove that at

3    least on one occasion, one of these firearms was fired.  The

4    evidence will show that in addition to the private army that

5    he maintained, Guzman also financed and controlled groups of

6    "sicarios," hitmen, or "pistoleros," gunmen, whom he used to

7    target and kill members of rival traffickers and in multiple

8    narco wars that he and other members of his criminal

9    organization waged.  Witnesses will recount for you how Guzman

10   ordered his hitmen to locate, kidnap, torture, interrogate,

11   and shoot members of his rival organizations.  Guzman didn't

12   only order the sicarios to shoot people in the course of his

13   drug dealings.  Guzman himself sometimes did the shooting.

14       His violence did not only affect members of rival

15   organizations, ladies and gentlemen.  You'll hear how after

16   Guzman ordered the murder of a rival trafficker who hadn't

17   shown Guzman the proper amount of respect, both the rival

18   trafficker, he and his wife, were gunned down in front of a

19   movie theater.

20       Witnesses will also testify how Guzman gave orders

21   to neutralize threats from within his own organization by

22   ordering the murders of those suspected of cooperating with

23   law enforcement.  You will hear how not even Guzman's own

24   family members were immune.  A number of witnesses with will

25   testify for you how Guzman ordered the murder of one of his

Opening Statement - Fels                    574

1   cousins, one of his closest lieutenants, simply because he was
2   suspected of cooperating with the authorities.
3           Next charge is a conspiracy to launder drug money.
4   We'll show you how Guzman took the money from his illegal drug
5   sales, how he got it back down to Mexico so he would both reap
6   the profit as well as buy more drugs to send up to the United
7   States.
8           Money.  Drugs.  Murder.  A vast global narcotics
9   trafficking organization.  That is what this case is about.
10  And that is what the evidence in this case will prove.  And at
11  the end of the trial, after all the evidence has come in and
12  both sides have had an opportunity to summarize, you will be
13  asked to go back into the jury room and deliberate.  When you
14  consider all of the evidence in this case, the seizures, the
15  ledgers, the testimony of the cooperating witnesses, and the
16  Defendant's own recordings, video, texts, and letters, we are
17  confident that you will come to one and only one conclusion:
18  That the Defendant is guilty of all the crimes charged.
19          Thank you.
20          THE COURT:  Let me see counsel at sidebar for just a
21  second.
22          Ladies and gentlemen, cover your ears.  There's
23  going to be an annoying noise in the background in just a
24  minute.
25          (Continued on the next page.)

1           (The following occurred at sidebar.)

2           THE COURT:  What's the defense want to the do?

3           I'll give them an instruction to keep an open mind,

4    of course, that just because they've heard one side doesn't --

5           MR. LICHTMAN:  Judge, I'm ready to go.  Let me

6    start.  We'll take a break if we have to.

7           THE COURT:  Plan on breaking.  What the Government

8    thought 25 minutes was closer to 35 minutes.  Planning on

9    breaking at 20 to 5, but it's a hard break.

10          MR. LICHTMAN:  What I'll do is if I see a segue that

11   makes sense...

12          THE COURT:  But no later --

13          MR. LICHTMAN:  Understood.  Thank you, Judge.

14

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1           (Sidebar ends; in open court.)

2           THE COURT:  All right.  Defense may proceed.

3           MR. LICHTMAN:  Thank you, your Honor.

4           If a stranger from another planet who knew nothing

5   about the criminal justice system in America sat through the

6   Government's opening statement, they would think that

7   everything that the prosecutor said was fact, everything was

8   truthful, and we would just go right to sentencing for

9   Mr. Guzman.  His guilt wouldn't be in doubt, he seemed very

10  certain about what he was saying, and that would be the end of

11  it.

12          This is not the case, however.  The prosecutor's

13  opening statement is not evidence.  And there is another side

14  to this story, an uglier side to this story that you have not

15  heard yet, the side that the governments of Mexico and the

16  United States do not want you or anyone else to hear about.

17          This is a case that will require you to throw out

18  much of what you were taught to believe in about the way

19  Government's work and how they behave, governments in South

20  and Central America and Mexico and even the United States.

21  This is a case which will require you to open your minds to

22  the possibility that government officials at the very highest

23  level can be bribed, can conspire to commit horrible crimes;

24  that American law enforcement agents can also be crooked; that

25  governments can allow drug kingpins to operate openly for

1    decades solely for the bribes and the economic advantages that

2    drug dealing does for their impoverished countries but mostly

3    for the money.

4             These are horrible things for me to have to say and

5    I'm not happy about it.  I know this is shocking to hear.  But

6    everything I am telling you will be part of the evidence in

7    this case.  Everything I just told you and will tell you comes

8    directly from the mouths of the witnesses lined up by the

9    Government, not me.  Their witnesses.

10            And these witnesses are like nothing you could ever

11   possibly imagine.  Imagine, if you will, a group of witnesses

12   who have lied every single day of their lives since they could

13   walk, who have committed a crime every single day of their

14   lives, who have stolen from anyone and everyone they come in

15   contact with, who will tell you that they have lied to their

16   Government, to our Government, who will tell you other

17   cooperators in this case can't be trusted to tell the truth.

18   They're killers, they're thieves, they're drug dealers,

19   witnesses who have paid off foreign prosecutors and judges and

20   police and federal law enforcement and even the DEA of

21   America.  And not just for drug trafficking business.  They've

22   bribed and paid off and obstructed justice for personal

23   matters as well.  Witnesses who have killed prosecutors, who

24   have tried to kill presidents of other countries.

25            That's what gives life to the Government's case

Opening Statement - Lichtman                    578

1    here.   Those witnesses.

2              And, yes, there are many drug seizures you're going

3    to see and hear about, taped calls, videos, pictures.  We'll

4    get to all of that in a bit, but what is the main component of

5    evidence in this case against Joaquin Guzman?

6              The so-called cooperating witnesses from Mexico,

7    Colombia, Honduras.  People who will make your skin crawl when

8    they testify here.

9              You're going to be asking yourselves soon why?  Why

10   is the Government going so far in this case, using these

11   gutter human beings as their prized evidence?  Giving them

12   benefits like getting them visas to stay in this country

13   amongst us.   Short jail sentences so that they'll be out soon

14   amongst us.   Some of them already are out.

15             Why are they willing to affect our country with

16   these degenerates, these violent, drug-dealing, dead-end

17   criminals?

18             It's not because of their claim that they need to

19   stop Joaquin Guzman from dealing drugs which reach America.

20   It's because a conviction of Chapo Guzman is the biggest prize

21   that this prosecution could ever dream of.  And they have

22   dreamed of it for decades.  He has become a mythical, elusive

23   figure to not only the world at large but to American

24   prosecutors and law enforcement officers as well.

25             They claim that he is the biggest drug dealer in the

1   world, the biggest that the world has ever seen.  It's false.

2   It's not true.  The Government witnesses will admit that there

3   are many leaders of the so-called Sinaloa Cartel, many

4   different factions, some of them at war with each other.

5   Chapo Guzman, numerous government witnesses will claim that

6   they are close to him but they will tell you that he has no

7   money, a far cry from the billions of dollars they claim that

8   he's made.

9           How can it be their own witnesses think that he is

10  not who the prosecutors claim he is?

11          The DEA agent who listened in on wiretaps for a year

12  said the same thing in an e-mail that he sent to colleagues,

13  quote:  Chapo was more myth than an actual legend and didn't

14  move any drugs to Chicago, despite these claims that he

15  supplied eighty percent.  Spent almost a year listening to him

16  and his group and we were unimpressed.

17          That's them.  Not me.  That's from the mouth of a

18  lead law enforcement agent in this case who's been chasing

19  Mr. Guzman for years.

20          So, why and how did Mr. Guzman become public enemy

21  number one, a man who has had television shows made about him,

22  books, rap groups singing about him, his image on hats,

23  T-shirts, lunchboxes?

24          Well, in order to explain it all to you I need to go

25  back 25 years, when Mr. Guzman's life changed dramatically

1   when a Mexican Catholic cardinal was killed in a high profile

2   May 24, 1993, shooting at the airport in the Guadalajara,

3   Mexico.

4           According to the Mexican government's initial

5   account, Mr.  Guzman was the intended target of this shooting

6   by the Arellano Felix drug trafficking organization and the

7   cardinal was supposedly shot in a cross-fire of bullets by

8   mistake, that the Arellano Felix shooters mistook the cardinal

9   for Mr. Guzman, despite the fact that the cardinal was decades

10  older than Mr. Guzman at the time, looked nothing like him,

11  was dressed in clerical robes, and was shot 14 times at close

12  range.

13          In fact, the cardinal was assassinated.  And very

14  possibly by the Mexican Government in an effort to shut the

15  cardinal up.  The cardinal had been warned to stop accusing

16  government officials of corruption with drug organizations,

17  but, as you'll learn throughout this trial, the Mexican

18  Government has been and up until today completely and utterly

19  corrupt.  And they needed a scapegoat for the murder of the

20  cardinal, and little-known Joaquin Guzman at the time, who was

21  raised dirt poor in a tiny town in the state of Sinaloa in

22  Mexico --

23          MS. PARLOVECCHIO:  Objection.

24          THE COURT:  I need you, as discussed, to focus more

25  on what the evidence is going to show and not argument.

1          MR. LICHTMAN:  Judge, this is going to be coming,

2    perhaps, from a witness in the case.

3          THE COURT:  I'm just giving you guidance.

4          MR. LICHTMAN:  Thank you, Judge.

5          I'm talking about Joaquin Guzman, who was a

6    little-known nothing at the time with a second grade

7    education, who grew up in a very poor town named La Tuna, the

8    town of the Mexican State of Sinaloa, with dirt roads, had no

9    cars.  He was required as a child to walk from house to house

10   selling oranges, cheese, and bread that his mother baked in

11   order to feed his family.  And as everyone else in his town

12   did, they farmed marijuana and poppy flowers, the resin of

13   which is used to make heroin and opium.

14         Mr. Guzman grew up with other kids who became

15   couriers for notorious narco traffickers.  You'll hear about

16   the Beltran Leyva family.  They grew up alongside with

17   Mr. Guzman.  Once friends, they became enemies over the years.

18         Keep in mind that this is not disputed, and you need

19   to understand, that there are areas in Mexico that are so

20   poor, with no jobs, no chance to survive, that people are

21   involved in the drug trade from a young age in order to eat.

22   It's nothing that anyone is ashamed of in these towns because

23   it's their only chance at survival.  And they're proud of what

24   they do.  It is understood and accepted and even the Mexican

25   government doesn't interfere because they're happily bribed to

1    stay away.

2            So Joaquin Guzman, the scapegoat, was manhunted down

3    after the cardinal was killed and put into prison, even as the

4    government was claiming that he was the intended recipient for

5    those 14 bullets.  He was not the shooter, but they said he

6    was the intended recipient, and he was hunted down as the

7    killer.  Makes no sense.

8            Joe Lebond, the DEA agent who was based in Mexico at

9    the time, will testify in this case.  He notes in his report

10   that Mr. Guzman was in prison for the --

11           MS. PARLOVECCHIO:  Objection.

12           THE COURT:  Sustained.  Move on to something else,

13   please.

14           MR. LICHTMAN:  Why did the Mexican government need a

15   scapegoat?

16           Because they were making too much money being bribed

17   by the leaders of the Sinaloa cartel.  I'm going to get into

18   that in a minute.  As you'll hear from the evidence in the

19   case, the Arellano Felix drug organization, which was

20   responsible, supposedly, for the murder of the cardinal, had,

21   in 1993, the time of the cardinal's murder, quote,

22   presidential connections, as Rey Zambada, the Government's

23   first cooperating witness, will testify to.

24           So, who did the Government of Mexico and the

25   Arellano Felix drug organization decide together to frame for

1    this murder?  Joaquin Guzman.

2            He had been a low-level nobody, as I said, who

3    suddenly found his face on billboards, on TV, being hunted

4    down, so you can imagine when he found himself in a jail cell

5    in Mexico accused of the shocking murder of a popular Catholic

6    cardinal by the Mexican government, who actually did the

7    killing themselves, and, in fact, seven of them were actually

8    arrested for assisting in the shooting of the cardinal, when

9    Mr. Guzman found himself in the Mexican prison under these

10   circumstances, he knew he would be killed if he stuck around.

11   Jails in Mexico are not like jails here.  Prisoners walk

12   around with guns, grenades, pretty much anything they want

13   because of the broken jailers.

14           The prison escapes help the myth of El Chapo, but,

15   again, it all started with the murder of the Mexican cardinal

16   in the airport in 1993, which led to his first escape.  And

17   that began the beginning of the mythological status as

18   El Chapo, the biggest drug dealer in the history of the world

19   according to the press and the governments of America and

20   Mexico.

21           And you're going to hear about how the myth of

22   El Chapo grew over the years; in part, because Mr. Guzman

23   himself enjoyed the publicity and the status that it afforded

24   him.  He fostered it and he helped create that myth too.  The

25   prison escapes, as I said, helped fuel that myth.  And they

1    all served turning him into a larger figure than life.   And

2    we're going to get around to what Mr. Guzman had to do in

3    order to stay alive while he was in jail beyond escaping.

4         But he desperately did not trust the Mexican

5    government to not kill him when he was inside there, having

6    reached out to the DEA while he was in prison there and did

7    all that he could to keep the Mexican government and the

8    Mexican prison officials unaware of his dealings with the

9    American law enforcement agency.

10        But as I said earlier, this team of prosecutors from

11   all over the United States will tell you that Joaquin Guzman

12   is the biggest drug dealer in the history of the world.   But

13   as you're going to learn in this case, through the

14   Government's witnesses, he's not even alleged to be the

15   biggest drug dealer in Mexico.

16        But who is?

17        A man who has not had TV shows made about him, does

18   not have his face on lunchboxes, he's not meeting with Sean

19   Penn, he's not being sung about by musicians, he's not

20   escaping from prison because he's never even been in one, a

21   man who is 70 years old and has operated as a drug trafficker

22   for 55 years in Mexico without ever being arrested, despite

23   being first charged in an American federal court 40 years ago,

24   a man you've never heard of before today:   A man named Ismael

25   Zambada, or Mayo for short, Mayo Zambada.

1         How did he get away being the biggest narco

2    trafficker on the planet whose name you never even heard of?

3         I'm going to tell you why:  He pays for it.  He

4    bribes the entire government of Mexico, including up to the

5    very top:  The current president of Mexico.  And for good

6    measure, the previous one as well.

7         I'm going to say that again with some emphasis:  The

8    current and former presidents of Mexico received hundreds of

9    millions of dollars in bribes from Mayo, according to the

10   Government's witnesses.

11        You didn't hear that in the Government's opening.

12   You're hearing it now.

13        Can you imagine -- and you don't have to because

14   there are witnesses that are going to say it here -- other

15   foreign governments, the Mexican army, prosecutors, judges,

16   local police, you name it, Mayo bribed them today.  And his

17   own brother and two sons are cooperating with the United

18   States Government today.

19        In this case, Mayo was under multiple indictments in

20   America, his sons and brother are cooperating with this

21   Government, and, yet, not only has he never been arrested, but

22   he is continuing his multibillion dollar leadership of the

23   Sinaloa Cartel.  And has been for years.

24        The U.S. Government pretends to want him.  They've

25   issued a reward for $5 million for information leading to his

Opening Statement - Lichtman                    586

1    arrest, yet they have his sons and his brother in custody.

2    But somehow they still can't seem to develop the information

3    required to lead to his arrest.  You figure it out.

4            Oh, and here's the best part.  Mayo said to his son

5    Vicente, a cooperator in this case, said the DEA, according to

6    Mayo, the American DEA double-crossed him and arrested Vicente

7    instead.

8            They work together when it suits them, Mayo and the

9    United States Government.  The Government witnesses will

10   testify they can make evidence appear and disappear.  Criminal

11   files disappear.  That's what the evidence will show.  These

12   are the underlings that are testifying, not the boss.  Imagine

13   what Mayo can do.

14

15           (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Opening Statement - Lichtman                                   587

1                  Opening Statement - Mr. Lichtman

2          MR. LICHTMAN:  (Continuing)  Mayo can get people

3    arrested.  He can cause the Mexican Army to kill who he wants.

4    You figure it out.

5          And Chapo Guzmán, a nickname meaning Shorty, he does

6    have the stature of a sort, is on trial -- excuse me, is on

7    the run constantly since the Cardinal was killed, getting

8    arrested and breaking out of jail in 2001 on the run in the

9    mountains for over a decade before being arrested again in

10   2014, breaking out of jail again, because to sit in jail in

11   Mexico is to ensure your death if you are El Chapo Guzmán.

12   Inmates walk around with guns, grenades, phones, you name it.

13   People get killed all the time in jail there, including Mr.

14   Guzmán's brother, who was arrested just after meeting with the

15   American law enforcement agents in Mexico City and then was

16   killed in prison.

17         And who was responsible for Joaquin Guzmán escape

18   from prison in that laundry cart in 2001 that you heard about?

19   Who provided a helicopter who whisked him to safety?  Who had

20   the most to gain from Mr. Guzmán escaping from that Mexican

21   Prison and being on the run for the next 13 years with a huge

22   target on his back, Mayo Zambada, that's who.

23         The bottom-line is that the world is focusing on

24   this mythical El Chapo figure.  The world is not focusing on

25   Mayo Zambada to allow him to remain free and in business.  It

Opening Statement - Lichtman                    588

1    makes sense and the evidence will support this.

2           Good morning.  Good afternoon.  Good night.  We've

3    been here all day.  I'm Jeffrey Lichtman, and along with

4    Eduardo Balarezo and Bill Purpura, we are here and have the

5    privilege to represent Joaquin Guzmán.

6           You will hear a lot of evidence over the next couple

7    of months, and all I could ask of you, or I will ask of you

8    are two things:  The first is keep an open mind.  Keep an open

9    mind.  Do not prejudge this case just because the story that

10   unfolds here will shake everything you know about law

11   enforcement and about Government.

12          Second, and I ask you to treat Mr. Guzmán as you

13   would want yourself or a loved one treated if God forbid you

14   or they had the great misfortune to be sitting at that table

15   over there with the entire Government on your neck.

16          Keep an open mind and remember that the burden of

17   proof is entirely on them, not on us.  I'm not required to

18   give an opening statement.  The burden is on them.  I'm not

19   required to even cross-examine any witnesses.  The burden is

20   on them, but we will, and unlike the direct examinations which

21   are carefully scripted events, question, answer, question,

22   answer that they go over in proffers, and the

23   cross-examinations are evidence too.  And unlike the direct

24   examinations, as I said, the cross-examinations are caldrons

25   of truth because at that point they are actually required to

1    let witnesses to think on their feet.  They're not just going

2    off a script that they've prepared, that they've been over

3    dozen of times.

4           Now, the backdrop, if I can, to this trial is the

5    American war on drugs.  Incredibly, for whatever reason,

6    Americans consume more illegal drugs than any country by far

7    on the planet.  And cocaine and heroin came to America from

8    various South American countries and Mexico in the 70's and

9    '80s and demand in America exploded.  And at that point a

10   large amount of drug trafficking organizations came from South

11   and Central America and Mexico and started shipping drugs to

12   America.  We had that whole "Just Say No" era during the

13   Reagan years, which obviously accomplished nothing.  There

14   were numerous drug trafficking organizations and numerous

15   leaders of them.  As the Government's version goes, Joaquin

16   Guzmán somehow became the leader of all this.  The most

17   significant drug dealer sending the most drugs to America.

18   But, again, keep in mind that he was either in prison or on

19   the run hiding out in the mountains of Culiacan in Mexico, in

20   the State of Sinaloa literally from 1993 until his extradition

21   to the United States in 2017.  Mr. Guzmán was on the run from

22   either the Mexican, American authorities, or sitting in jail

23   during that entire period.  The flow of drugs never slowed

24   down during all that period and yet he is blamed for being the

25   leader when the real leaders are living freely and openly in

1   Mexico.  It is very convenient.  The truth is he controlled

2   nothing.  Mayo Zambada did.

3           And you will see again that while he has been here

4   in America, the flow of drugs hasn't stopped.  Nothing has

5   changed, business as usual.  Mayo Zambada is in charge and

6   doing all of that.

7           Judge, I'm going to ask if we can take a break here.

8   I will be going into a different section.

9           THE COURT:  If you'd like.

10          We did promise you exit by 4:30, ladies and

11  gentleman, so we're going to break for the day.  We will have

12  Mr. Lichtman finish his opening statement tomorrow morning and

13  then we will proceed directly with the Government's case after

14  that.

15          So, please, I'm not going to repeat all the

16  admonitions that I gave you about staying away from the press

17  and social media and all of that because I just told them to

18  you an hour ago.  But please keep those in mind and strictly

19  adhere to them.  We will see you tomorrow morning at 9:30.

20  Thank you very much.

21          (Jury exits the courtroom.)

22          THE COURT:  Everyone be seated, please.

23          We may have some things to talk about based on the

24  opening, but before we get to that, there were things that I

25  intended to go over this morning which I haven't had a chance

Proceedings                                        591

1    to go over.  Let me go through those and then we will hear if

2    anybody else has anything they want to say.

3              First, I have the defendant's motion for disclosure

4    of the identity of trial witnesses last night.  The

5    Government, of course, hasn't had a chance to respond, but it

6    seems like you need to do a little more identification in

7    advance.

8              MS. PARLOVECCHIO:  Actually, Your Honor, we made a

9    disclosure last night so I believe that issue has been

10   resolved.

11             MR. BALAREZO:  Your Honor, it has been resolved

12   insofar as they've given us names for maybe the next week and

13   a half.  It's a start.

14             THE COURT:  That's good.  Let's try to maintain that

15   kind of timetable not everyday, but give them a week and a

16   half notice.

17             MS. PARLOVECCHIO:  Yes, Your Honor.

18             THE COURT:  Next, on the defendant's second motion

19   for a reconsideration, which is still open, the defense hasn't

20   filed a reply.  The time has past.  I don't know if you want

21   to file a reply.

22             You don't know which one I am talking about?

23             MR. LICHTMAN:  Yes, there are so many.

24             THE COURT:  It is Docket No. 420.

25             MR. LICHTMAN:  Yes, I remember.

MDL        RPR        CRR        CSR

Proceedings                                              592

1           Judge, do you mind if we perhaps wait until tomorrow
2    morning?  I had thought we actually had filed one, a reply.
3           THE COURT:  Check.  Let me know tomorrow morning.
4           MR. LICHTMAN:  I will. Thank you.
5           THE COURT:  Next, the Government has proposed
6    redactions to the voir dire transcripts, at least as of
7    yesterday.  Not today obviously.
8           Any objections to those from the defense?
9           MR. BALAREZO:  Your Honor, we didn't respond because
10   I think the Court's order required the Government to submit
11   it.  We have no objection.
12          THE COURT:  That's fine.  Okay.  Next, I need to
13   address the seating arrangements in the courtroom.  Now,
14   putting aside press seating, which is one issue, in terms of
15   general admission, people are concerned that if they come
16   early enough to get a seat and then they leave to go to the
17   bathroom or they leave to go to lunch when they come back,
18   their seat is gone.  If you signed in with the marshal when
19   you get here in the morning and you tell the marshal when you
20   leave the courtroom that you will or will not be back, then we
21   will do our best to hold the seat for you.  If you tell the
22   marshal you will be back and then you are not back or you
23   don't tell the marshal anything at all, then you will not get
24   any reservation privileges even if you show up early the next
25   day.  I hope that's clear enough.

Proceedings                                          593

1            That's all I intend to say about it.

2            All right.  Anything that the parties have to tell

3    me besides what I have just gone through?

4            MS. PARLOVECCHIO:  Just with regard to Mr.

5    Lichtman's opening, Your Honor.  It really skated very close

6    to the line and arguably crossed the line on a few things,

7    Your Honor had precluded any arguments regarding selective

8    prosecution.  I believe that Mr. Lichtman has come very close,

9    if not has violated that order.  He also seems to have raised

10   a public authority defense in his opening.  We all well know

11   that is a pretrial defense that has to be raised.  That has

12   never been raised by the defense.  The Government has received

13   no notice that that would be a defense.

14           And, finally, the Government objected to the

15   repeated references to inadmissible hearsay in Mr. Lichtman's

16   opening and we would request that Your Honor admonish him from

17   further doing that.

18           THE COURT:  Those all seem right to me, Mr.

19   Lichtman.  What do you have to say?

20           You have to say let me confer with Mr. Purpura.

21           MR. LICHTMAN:  Exactly.

22           Judge, we don't believe there has been any issue

23   about the public authority or selective prosecution.  We are

24   not suggesting that he is -- that he was permitted to deal

25   drugs.  We are just saying that a different person was the

Proceedings                                          594

1    leader and he was framed for it.  That's not --

2              THE COURT:  All right.  I am going to stop at that.

3    That's fine.  I understand your position.  The Government can

4    send me a letter telling me why it thinks your statement was

5    incorrect just now by quoting excerpts from your opening.  I

6    think the Government will be able to establish that.  That's

7    my take on it.  But I will read it in writing first and I will

8    get a response from you and then I will decide.  I will just

9    tell you don't promise the jury things you're going to get.  I

10   mean, some of the things I heard, when Ms. Parlovecchio refers

11   to inadmissible evidence, if an agent says I believe this guy

12   or I don't believe that guy, that's not admissible evidence.

13             MR. LICHTMAN:  Judge, we're not talking about an

14   agent.

15             THE COURT:  It sounded to me like you were talking

16   about somebody who had an opinion of someone else's veracity.

17             MR. LICHTMAN:  Judge, Government witnesses will

18   state they didn't trust other Government witnesses.  Why can't

19   I ask a Government witness do you think that this other

20   Government witness is truthful?

21             THE COURT:  Okay, I will take a brief from the

22   Government on that.

23             MS. PARLOVECCHIO:  Yes, Your Honor.

24             THE COURT:  I will take a response.  But I'm telling

25   you I think you are incorrect, at least until I see a brief,

1    because his opinion is irrelevant.  He is not there to

2    evaluate anyone's credibility.  The jury is here to do that.

3              MR. LICHTMAN:  If a witness can state that another

4    witness has a reputation for dishonesty, for lack of

5    truthfulness.

6              THE COURT:  There's a limited area in which you can

7    make inquiry.  That is right.  But that's not how you phrased

8    it in your opening.  You have a limited area.  You do not get

9    statements from a 302 that say I don't think this guy is

10   credible when he tells me this story.

11             MR. LICHTMAN:  The 302 would not be the evidence.

12   It would be the witness who stated that another witness is a

13   liar and can't be trusted.

14             THE COURT:  You can get in certain limited

15   reputational evidence for veracity.  Please stick closely to

16   the rules.  I will take briefing on it and then I will decide.

17   I am not deciding now.  Okay?

18             MS. PARLOVECCHIO:  Your Honor, just a further point

19   on the selective prosecution issue, pervasive through Mr.

20   Lichtman's argument is the idea of outrageous Government

21   conduct which necessarily is encompassed in the selective

22   prosecution argument that was precluded by the Court.  So I'd

23   just like to put that on the record, that that should be

24   something that should be precluded and should not be further

25   argued tomorrow morning.

Proceedings                                                      596

1            THE COURT:  It did sound to me like you were

2    arguing, Mr. Lichtman, well, they're going after the little

3    guy when really who they should have gone after was this guy.

4    If that's not a selective prosecution argument, I don't know

5    what is a selective prosecution.

6            MR. LICHTMAN:  I will tell you why I disagree.  I

7    never once said that Mr. Guzmán was continuing to deal drugs.

8    I simply said that he was scapegoated and that the real person

9    who was dealing the drugs, the leader, was Mayo Zambada.  I

10   never once said that he was continuing to deal drugs during

11   all of this period.

12           MS. PARLOVECCHIO:  Your Honor, I believe there was a

13   statement that the DEA allowed people to continue dealing

14   drugs in his opening statement.

15           MR. LICHTMAN:  Not him.  I'm talking about Mayo

16   Zambada.

17           THE COURT:  Right.  And it will be included in the

18   Government's letter as well.  Hang on one second.

19           I have been advised that Juror No. 7's mother-in-law

20   passed away last night in the DR.  He is going to find out

21   arrangements and he will let us know.

22           Anything else we need to cover tonight?

23           MS. PARLOVECCHIO:  Not from the Government.

24           MR. BALAREZO:  No, Your Honor.

25           THE COURT:  Please, everybody, be on time for 9:30

MDL        RPR        CRR        CSR

Proceedings                                        597

1    tomorrow.  I hope the marshals will be, with the jurors as

2    well.  Have a good evening.

3                MS. PARLOVECCHIO:   Thank you.

4                MR. BALAREZO:   Thank you.

5                (Matter adjourned to November 14, 2018 at 9:30 a.m.)

6

7                              ooo0ooo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MDL          RPR          CRR          CSR