1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    -------------------------------x
                                        09-CR-00466(BMC)
3    UNITED STATES OF AMERICA,

4                                       United States Courthouse
                                        Brooklyn, New York

5           -against-                   December 18, 2018
                                        9:30 a.m.
6    JOAQUIN ARCHIVALDO GUZMAN LOERA,

7           Defendant.

8    -------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
              BEFORE THE HONORABLE BRIAN M. COGAN
10                 UNITED STATES DISTRICT JUDGE
                        BEFORE A JURY
11

12   APPEARANCES

13   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  GINA M. PARLOVECCHIO, AUSA
                                     ANDREA GOLDBARG, AUSA
16                                   MICHAEL ROBOTTI, AUSA

17                              UNITED STATES ATTORNEY'S OFFICE
                                Southern District of Florida
18                              99 NE 4th Street
                                Miami, Florida 33132
19                              BY:  ADAM S. FELS, AUSA

20                              DEPARTMENT OF JUSTICE
                                Criminal Division
21                              Narcotic and Dangerous Drug Section
                                145 N. Street N.E. Suite 300
22                              Washington, D.C. 20530
                                BY:  ANTHONY NARDOZZI, ESQ.
23                                   AMANDA LISKAMM, ESQ.

24
     (CONTINUED FOLLOWING PAGE)
25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

```
1    (APPEARANCES CONTINUED)

2

3

     For the Defendant:        BALAREZO LAW
4                              400 Seventh Street, NW
                               Washington, D.C. 20004
5                              BY:  A. EDUARDO BALAREZO, ESQ.

6                              LAW OFFICES OF JEFFREY LICHTMAN
                               11 East 44th Street, Suite 501
7                              New York, New York 10017
                               BY:  JEFFREY H. LICHTMAN, ESQ.
8                                   PAUL R. TOWNSEND, ESQ.

9                              LAW OFFICE OF PURPURA & PURPURA
                               8 E. Mulberry Street
10                             Baltimore, Maryland 21202
                               BY:   WILLIAM B. PURPURA, ESQ.
11
                               LAW OFFICES OF MICHAEL LAMBERT, ESQ.
12                             369 Lexington Avenue, PMB #229
                               New York, New York 10017
13                             BY:  MARIEL COLON MIRO, ESQ.

14

15

16

17

18

19   Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
                               Phone:   (718)804-2777
20                             Fax:     (718)804-2795
                               Email:   Georgetteb25@gmail.com
21

22

23   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
24

25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1        (In open court; jury not present.)

2        THE COURTROOM DEPUTY:  All rise.

3        THE COURT:  Good morning.  Let's have the jury in,

4   please.

5        (Jury enters courtroom.)

6        THE COURT:  Everyone be seated.  Good morning,

7   ladies and gentlemen.

8        THE JURY:  Good morning.

9        THE COURT:  We're back to our regular order of

10   evidence, so we'll continue with cross-examination.

11   Mr. Lichtman.

12   JORGE MILTON CIFUENTES VILLA, recalled as a witness, having

13   been previously duly sworn/affirmed, was examined and

14   testified further as follows:

15        MR. LICHTMAN:  Thank you, Your Honor.  Good morning,

16   ladies and gentlemen.

17   CROSS-EXAMINATION(Continued)

18   BY MR. LICHTMAN:

19   Q    Good morning, Mr. Cifuentes.

20   A    Good morning, lawyer.

21   Q    On direct examination, sir, you testified that you pled

22   guilty to an amount of cocaine distribution that put you at a

23   level of 38 on the sentencing guidelines.

24   A    When did I arrive to 38?

25   Q    Didn't you say on direct examination that the amount of

CIFUENTES - CROSS - LICHTMAN

1    drugs you pled guilty to came out to a base level of 38 on the

2    sentencing guideline?

3    A      No, sir.

4    Q      Page 3024, lines eight to 14 you gave this answer to this

5    question.

6              "QUESTION:  What sentence are you facing now?

7              "ANSWER:  Well, I arrived in the U.S. with -- at

8    level 38 in the guidelines."

9              Do you recall giving that answer to that question

10   just a few days ago?

11   A      Yes, sir, that is correct.

12   Q      And you understand what the sentencing guidelines are,

13   correct?

14   A      Yes, sir, that's correct.

15   Q      And you understand that it's a point system based on your

16   criminal conduct, correct?

17   A      Yes, sir, that's correct.

18   Q      And you understand that the more points you have, the

19   more potential jail sentence you're facing?

20   A      Yes, sir.

21   Q      And you understand that the more drugs you move into

22   America, the more points you get and the higher the jail

23   sentence is?

24   A      Yes, sir.

25   Q      And you know that based on the sentencing guidelines, the

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES – CROSS – LICHTMAN

1   most you can get is an actual real life in prison, meaning

2   that you don't get out until you die.

3   A    Yes, sir, that's correct.

4   Q    And as you testified to, you went over the guidelines

5   with your lawyer?

6   A    That's correct, yes, sir.

7   Q    And your level 38 that you testified to was based on the

8   highest amount of cocaine that's allowable on the sentencing

9   guidelines, correct?

10  A    I don't know.

11  Q    Well, let me, if I can, refresh your recollection.

12  A    It isn't necessary.  There was an affair of violence that

13  brings --

14  Q    I'm not talking about the affair of violence --

15  A    -- up to the point of 42.

16  Q    -- I'm talking just about the amount of drugs that you

17  distributed in America?

18            THE COURT:  Mr. Lichtman, you have to let the

19  translator finish.

20  Q    Based on just drugs, not the upward adjustments, the

21  highest amount of drugs to get to the highest level on the

22  guidelines for cocaine is 450 kilograms or more; isn't that

23  correct?

24  A    Yes, sir, that's correct.

25  Q    So anything more than 450 kilograms gets the same level

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3357

CIFUENTES – CROSS – LICHTMAN

1  38 for the drugs, correct?

2  A    I suppose that is the case.  I'm not a lawyer, but I

3  think so.

4  Q    Well, if you think let me refresh your recollection and

5  if you can read the part that's circled with the arrow.

6          THE COURT:  You want the interpreter to interpret

7  that line?

8          MR. LICHTMAN:  If he needs it, yes.

9  Q    Does that refresh your recollection, sir, that the level

10  38, the highest level for the drugs --

11          THE INTERPRETER:  The witness requested the help of

12  the interpreter.

13          MR. LICHTMAN:  Excuse me?

14          THE INTERPRETER:  The witness requested the help of

15  the interpreter.

16          THE COURT:  Interpret that circled line for him,

17  please.

18          What's the question?

19  BY MR. LICHTMAN:

20  Q    Does that refresh your recollection that the level 38,

21  the highest on the guidelines for drug distribution, accounts

22  for 450 kilograms or more of cocaine?

23  A    That's correct, yes, sir.

24  Q    And in your case you obviously distributed significantly

25  more than 450 kilograms of cocaine into America, correct?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3358

CIFUENTES - CROSS - LICHTMAN

1   A    Yes, sir, that's correct.

2   Q    In fact, as you testified, in the 1990s when you were

3   working with Ojeda, before you claim to have even met

4   Mr. Guzman, you trafficked 220 tons of cocaine into America?

5   A    That's correct, yes, sir.

6   Q    Which is significantly more than 450 kilograms, it's in

7   fact 200,000 kilograms.

8   A    Yes, sir, that's correct.

9   Q    And obviously you trafficked a significant amount of

10  cocaine post 1990s?

11  A    Yes, sir, that's correct.

12  Q    So the level 38, which correlates to 450 kilograms or

13  more of cocaine, is not even remotely accurate, doesn't

14  remotely reflect the amount of cocaine you moved into America?

15           MR. FELS:  Objection, Your Honor.

16           THE COURT:  Sustained.

17  BY MR. LICHTMAN:

18  Q    Now you also mentioned on your direct that there were

19  upward adjustments from the level 38 for your conduct?

20  A    Yes, sir, that's correct.

21  Q    Your violence?

22  A    Yes, sir.

23  Q    Being a leader of your organization?

24  A    Yes, sir.

25  Q    And as you testified to, you believe that your sentencing

CIFUENTES – CROSS – LICHTMAN

1   guideline is actually a level 48?

2   A    Yes, sir.

3   Q    Which in your mind is life without parole, that's it?

4   A    Yes, sir.

5   Q    And you're aware that the sentencing guidelines only goes

6   up to a level 43?

7   A    Yes, sir, that's correct.

8   Q    And, according to you, you're five points beyond the top

9   of the guidelines?

10  A    That's what my lawyer told me.

11  Q    You're aware that, regardless of the sentencing

12  guidelines, you have a mandatory 10 years of prison just based

13  on the statute not the guidelines?

14  A    That's correct, yes, sir.

15  Q    Unless you get a 5K1 letter from the government?

16  A    Yes, sir.

17  Q    And you can't get a downward adjustment based on your

18  cooperation unless you get a 5K1 letter from the government?

19  A    That's correct, yes, sir.

20  Q    And it's up to the prosecutors, not the judge, whether or

21  not you get that 5K1 letter, correct?

22  A    Yes, sir, that's correct.

23  Q    And if you get that 5K1 letter that only the government

24  can give you, the judge told you at your plea that you can get

25  as little as time served?

CIFUENTES - CROSS - LICHTMAN

1  A    The judge did not tell me that.

2  Q    Well, you know that without that 5K1 letter you're dying

3  in prison?

4  A    Yes, sir, that's correct.

5  Q    And you know that the people you have to please in order

6  to get that 5K1 letter are the prosecutors here, correct?

7  A    I have to tell the truth, yes, sir.

8  Q    I didn't ask you that.  The people that you have to

9  please in order to get that 5K1 letter which would avoid you

10  dying in prison are these prosecutors?

11  A    No, sir, these prosecutors here are not in my case, it's

12  in Manhattan, and what they've told me is that I'm not

13  supposed to lie --

14  Q    I'm not asking you that --

15  A    -- and I have to give you all the information --

16  Q    -- I'm asking you about --

17  A    -- that you asked from me and all the information that

18  they ask from me.

19            MR. LICHTMAN:  Judge, I asked a yes or no.

20            THE COURT:  Right.  Are you moving to strike the

21  rest of his answer?

22            MR. LICHTMAN:  I would.

23            THE COURT:  The motion is granted.  The jury will

24  disregard everything after "no, sir."

25  BY MR. LICHTMAN:

CIFUENTES - CROSS - LICHTMAN

1  Q    I'll ask again.  In order for you to avoid dying in

2  prison and getting that 5K1 letter, you have to please federal

3  prosecutors in New York, correct?

4         THE COURT:  That's not asking again that's asking a

5  subtly different question.

6         MR. LICHTMAN:  I'm trying to sharpen it for him so

7  we don't have to --

8         THE COURT:  I understand.  When you say "again" it's

9  confusing because it is not again.  Ask whatever question you

10 want to ask.

11        MR. LICHTMAN:  All right.

12 Q    In order for you to avoid dying in prison, you need the

13 5K1 letter that only government prosecutors can give you.

14 A    Yes, sir, that's correct.

15 Q    And the people that prepped you for your testimony, was

16 it -- the last few weeks, was it the prosecutors in Manhattan

17 or was it these folks right here?

18 A    Yes, a prosecutor from Miami.

19 Q    So a few days ago when you met with prosecutors to go

20 over some of your testimony here, it was prosecutors in Miami,

21 you mean the prosecutor here from Miami?  Or do you mean

22 prosecutors that are not here?

23 A    With the gentleman prosecutor who is here from Miami and

24 I was moved to Miami --

25 Q    The prosecutor --

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1   A      -- because I'm a co-defendant of your client in Miami.

2              MR. FELS:  Judge, I'll stipulate that he was talking

3   with me.

4              THE COURT:  Okay.  Now we know.

5              MR. LICHTMAN:  Thank you.

6              THE COURT:  Let's go on.

7   BY MR. LICHTMAN:

8   Q    And when you were being prepared for your direct

9   examination, they told you to say that you were just to tell

10  the truth here?

11  A    Yes, sir, that's correct.

12  Q    But you know in your mind that a conviction helps you,

13  don't you?

14             MR. FELS:  Objection, vague.

15             THE COURT:  I'll allow it -- well, the phrasing is

16  bad, a conviction of whom?

17             MR. LICHTMAN:  Excuse me?

18             THE COURT:  You said a conviction, I know what you

19  meant but it's imprecise.

20             MR. LICHTMAN:  I'll make it more precise, Judge.

21  Q    Mr. Cifuentes, you know that in order to help your

22  situation it would help you if there is a conviction of

23  Mr. Guzman in this case.

24  A    No, sir.

25  Q    So you don't think a conviction of Mr. Guzman helps you?

CIFUENTES - CROSS - LICHTMAN

1    A    No, sir, at all.

2    Q    Do you want a conviction of Mr. Guzman?

3    A    It isn't my business, that's the government's business.

4    Q    So you're testifying here in front of this jury that you

5    don't want Mr. Guzman to get convicted in part based on your

6    testimony?

7    A    I'm not interested in whether he is found guilty or not

8    guilty.

9            That's enough you answered the question.

10           Based on your conversations with these prosecutors,

11   do you think they want a conviction here?

12           MR. FELS:  Objection.

13           THE COURT:  Sustained.

14   BY MR. LICHTMAN:

15   Q    You hope to be sentenced soon after this trial, don't

16   you?

17   A    Who are you referring to, me?

18   Q    Yes, you.

19   A    Yes, sir, I want to go to prison as soon as possible.

20   Q    You want to go prison, or you want to be taken out of

21   prison?

22   A    I would like to go home but I know that I have to do some

23   time.  I've committed responsibilities, I take -- I committed

24   crimes, I've taken the responsibility for them and I know I

25   have to do my time.

CIFUENTES - CROSS - LICHTMAN

1   Q    How much time do you think you should do?

2              MR. FELS:  Objection.

3              THE COURT:  Sustained.

4   BY MR. LICHTMAN:

5   Q    You hope to receive time served when you're sentenced,

6   don't you?

7   A    I'm not that optimistic, but I would love it, yes, of

8   course.

9   Q    And when you get released from prison, you hope to be

10  relocated in the United States, don't you?

11  A    Or to a place very far from Mexico.

12  Q    You hope to be relocated in the United States with your

13  family, don't you?

14  A    I would like to, yes, sir.

15  Q    You'd like to live free amongst us in America, correct?

16  A    If the U.S. justice allows that, yes, sir, I would love

17  to.

18  Q    And you would live with your drug dealing brothers and

19  sisters and mother in America if you can?

20             MR. FELS:  Objection, Your Honor.

21             THE COURT:  Overruled.  I'll let him answer.

22  A    My children because they do not want to move from

23  Colombia.

24  Q    You hope to live with your children in America?

25  A    I'd love to, yes, sir.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

CIFUENTES - CROSS - LICHTMAN

1   Q    The question I asked, though, is whether you'd like to

2   live with your brothers and sisters in America as well?

3   A    No, sir.

4   Q    You don't want to live with Alex and Dolly and Lucia in

5   America at any point?

6   A    No, sir.

7   Q    And we can trust you that if you do live here that you

8   won't violate any more laws, correct?

9   A    I swear to you.

10  Q    Because you wouldn't lie to me, correct?

11  A    No, sir.

12  Q    You would never do anything illegal now, correct?

13             MR. FELS:  Objection, Your Honor.

14             THE COURT:  I'll allow the answer.

15  A    No, sir.

16  Q    No more question in front of you.

17  A    If given a second opportunity I would never commit a

18  crime again.

19  Q    Because you're a trustworthy person?

20  A    Yes, sir.

21  Q    Now, you're so trustworthy that in 2015 you were in

22  prison in Brooklyn?

23  A    Yes, sir.

24  Q    And you claimed you wanted to call your brother, Alex, on

25  his birthday in January of 2015, correct?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1   A    I called him, yes, sir.

2   Q    And his birthday is January, is it 15th?

3   A    Eighteenth of January.

4   Q    Apologies to Alex.

5        And you know that in prison you're permitted 300

6   minutes a month of calls?

7   A    Yes, sir, that's correct.

8   Q    And the telephone numbers that you call they have to be

9   first cleared by the prison?

10  A    Yes, sir.

11  Q    And do you know if the prosecutors also have to clear the

12  numbers that you're calling from prison?

13  A    I don't know, sir.

14  Q    So you think that perhaps you can just call anyone from

15  prison without the prosecutors knowing?

16  A    Everything is recorded in the system.

17  Q    I asked you -- let me ask another question.  Do you think

18  you can call drug dealers or criminals from prison?

19  A    No, sir.

20  Q    And why is that?

21  A    I don't know.

22  Q    You don't know why you're not allowed to call criminals

23  from prison?

24  A    I suppose that it's because it's wrong?

25  Q    It's wrong because if you -- in your mind you know that

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1   the government would not want criminals in prison having

2   criminal conversations with other criminals from their jails.

3   A    Yes, sir.

4   Q    And you know that when you dial a number from prison, you

5   have to put in a bunch of other numbers first that show that

6   the call is coming from Jorge Cifuentes.

7   A    Yes, sir.

8   Q    So that every call made by you can be traced back to your

9   account.

10  A    Yes, sir.

11  Q    Carlos Real, he's an attorney of yours in Colombia?

12  A    I consulted with him, yes.

13  Q    What did you consult with him about without telling me

14  specifically?

15          MR. FELS:  Objection, Your Honor.

16          THE COURT:  Sustained as to form.

17  BY MR. LICHTMAN:

18  Q    Did you discuss your criminal case?

19  A    The case of civil forfeiture in Colombia.

20  Q    When did that case end?

21  A    It's not over, sir.

22  Q    Now, you also are allowed to email and write people from

23  prison, correct?

24  A    Yes, sir, that's correct.

25  Q    And the people that you write to or email have to be

3368

CIFUENTES - CROSS - LICHTMAN

1   approved by the prison, correct?

2   A     Yes, sir, that's correct.

3   Q     And you know that all of your email is reviewed when

4   you -- before you send it out?

5   A     Yes, sir, that's correct.

6   Q     All your mail is read first before it goes out?

7   A     I suppose so, yes, sir.

8   Q     Well, you know so because that's what you've learned in

9   prison.  There are signs all over the place.

10  A     Yes, but there are 2,000 inmates, I'm not sure they have

11  the time to read all of those mails daily but I suppose they

12  do.

13  Q     You're not sure that they are allowed -- that they have

14  the time and the resources to review all of the output from

15  inmates like you, correct?

16  A     But everything remains recorded in the servers.

17  Q     You mean your telephone calls?

18  A     The emails and the phone calls, everything is recorded.

19  Q     Do you know how long the calls are -- the tapes are kept

20  from those phone calls?

21  A     No, I don't know.

22  Q     You don't know that the calls -- the tapes are kept for

23  six months?

24  A     No, sir, I didn't know that.

25  Q     And of the thousands of inmates in the MDC, you know that

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES – CROSS – LICHTMAN

1    only a fraction of them ultimately end up testifying in a

2    courtroom like you, correct?

3    A    I don't know, sir.

4    Q    Does everybody testify that's inside the MDC?

5    A    No, sir.

6    Q    Only some people end up in the witness box like you at

7    some point.

8    A    I didn't know, sir, thank you for the information.

9    Q    You're welcome.

10            Now, you know that if you're testifying from that

11   box your credibility is very important, correct?

12   A    Yes, sir.

13   Q    Now, in January of 2015, you had been cooperating for at

14   least a year with the government?

15   A    Yes, sir, that's correct.

16   Q    And you promised to not lie, not cheat, not steal when

17   you were cooperating?

18   A    Yes, sir, that's correct.

19   Q    And Carlos Real's email address, do you recall putting it

20   in your approved list or requesting it in 2014?

21   A    Yes, sir, I think so.

22   Q    Because you wanted to speak to him about your civil

23   forfeiture case, which was so important to you?

24   A    In fact, he came to see me in person.

25   Q    But I have a question:  The civil forfeiture case, is it

CIFUENTES - CROSS - LICHTMAN

1    a litigation about your criminal assets in Colombia?

2    A    Yes, sir, that's correct.

3    Q    You owe this government $150 million, don't you?

4    A    That's correct, yes, sir.

5    Q    What are you litigating about, why not just turn it over

6    to the government, you owe them that money, remember?

7    A    That's why he came here to have a meeting with OFAC and

8    with the government to figure out how to turn over all the

9    assets to them.  I believe it is called an anticipated ruling.

10   I think that's the legal term.

11   Q    And as you know, as you testified to yesterday, there are

12   at least a hundred million up to maybe 250 million of assets

13   of yours in Colombia?

14   A    Yes, sir, that's correct.

15   Q    Yet yesterday when you testified before this jury, when

16   you were telling the truth, you said there was no way you were

17   paying off that $150 million, do you recall that?

18   A    I told him I did not have money in cash to pay the

19   150 million.

20   Q    So you didn't have the money to pay them, but you had the

21   property to pay them?

22   A    Yes, sir, that's why we had the meeting with OFAC so that

23   the governments could agree with each other, but I don't

24   understand exactly how that works.

25   Q    So yesterday when you testified that you would never be

CIFUENTES - CROSS - LICHTMAN

1    paying back the $150 million that you owed the government,

2    what you meant to say is I don't have the cash in my account

3    but I can easily liquidate properties in Colombia and pay you

4    off.

5    A    Yes, sir, you did not allow me to finish because you're

6    always interrupting me.

7    Q    But somehow yesterday you didn't mention that when you

8    were being questioned by me about the fact that you were going

9    to be turning over all of those assets in Colombia to these

10   prosecutors?

11              MR. FELS:  Objection.  Mischaracterization.

12              THE COURT:  Sustained.  Sustained.

13   BY MR. LICHTMAN:

14   Q    Sir, when did you sign your cooperation agreement, wasn't

15   it in March of 2015?

16   A    Yes, sir, that's correct.

17   Q    This coming March, in a few months, will be four full

18   years since you signed that I owe you to the government,

19   correct?

20   A    Yes, sir, that's correct.

21   Q    How much of that $150 million I owe you has been paid to

22   the government since that March 2015 date?

23   A    I don't know what the legal situation is in terms of the

24   cooperation between the two governments, but my understanding

25   is that nothing up to now.

CIFUENTES - CROSS - LICHTMAN

1    Q    Nothing has been liquidated in four years, correct?

2         Sir --

3    A    Laws are slow but they work out in the end.

4    Q    Sir, you know that you're not paying any of that

5    $150 million off as you testified to yesterday?

6    A    I believe that the Colombian government is going to turn

7    over the amount that is -- that they are supposed to turn over

8    to the U.S., but I don't understand exactly how laws work as

9    you saw when you were asking me about the indictment.

10   Q    Sir, there is nothing in your consent preliminary order

11   of forfeiture money judgment that suggests that any of your

12   property in Colombia is being liquidated and given to the

13   government, is there?

14   A    I don't know, sir.

15   Q    Sir, you're lying right now, aren't you?

16   A    No, sir.

17   Q    Now you --

18        THE COURT:  Mr. Lichtman.

19   Q    -- did actually call --

20        THE COURT:  Mr. Lichtman, let's have a sidebar.

21        (Sidebar conference.)

22        (Continued on the next page.)

23

24

25

3373
SIDEBAR CONFERENCE

```
 1            THE COURT:  I don't know if you're doing this on
 2   purpose or if you really don't understand, but just to give
 3   you my perspective, I thought it was very clear yesterday that
 4   he had no cash to pay off the forfeiture, I think it was clear
 5   to the jury yesterday and I'm not hearing anything
 6   inconsistent when he says they're negotiating over the
 7   property, which is in some other people's names in some cases
 8   and so it takes some doing, and four years for forfeiture, let
 9   me tell you about my 10-year forfeiture, okay.
10            If you want to pursue this, I'm not going to stop
11   you.
12            MR. LICHTMAN:  Then I'm happy to pursue it.  They're
13   not objecting.
14            MR. FELS:  We'll clean it all up later.
15            MR. LICHTMAN:  They have an opportunity on
16   summation --
17            THE COURT:  You're walking into -- not summation
18   just redirect, but -- and for that reason it wastes time --
19            MR. LICHTMAN:  Judge --
20            THE COURT:  -- which is all I'm concerned about.
21            MR. LICHTMAN:  -- you don't think the Colombian
22   authorities are going to take their piece of that property?
23            THE COURT:  Sure.
24            MR. LICHTMAN:  You don't think they plan on taking
25   all of that property?
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3374

SIDEBAR CONFERENCE

1          THE COURT:  I think they plan on taking as much as

2    they can negotiate for.

3          MR. LICHTMAN:  You think that $150 million will ever

4    be paid off from that property that's owed to America?  He

5    says it's only worth a hundred.

6          THE COURT:  But that's not what he testified to.

7          MR. LICHTMAN:  Well, then let them clean it up on

8    redirect.

9          THE COURT:  If you want that, that's fine.

10         MR. LICHTMAN:  It's totally fine.

11         THE COURT:  Except that you're taking a lot of time

12   to do the little building blocks to get to a point that I

13   think is just going to be swept aside in a second, and I don't

14   want to waste time --

15         MR. LICHTMAN:  Understood.

16         THE COURT:  -- that's my only interest.

17         MR. LICHTMAN:  Fair enough.

18         THE COURT:  So I'd ask you to consider if these are

19   points that are going to stick before you make them.

20         MR. LICHTMAN:  I do.  I wouldn't ask them if I

21   didn't think they'd stick, Judge.

22         THE COURT:  Okay.  I wanted to make sure.

23         MR. LICHTMAN:  Based on 28 years of doing this, I

24   think at this point I know what sticks.

25         THE COURT:  As I said to Mr. Purpura, sometimes even

SIDEBAR CONFERENCE

1    squirrels fall out of trees.

2              MR. LICHTMAN:  Fair enough.

3              (End of sidebar conference.)

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1          (In open court.)

2          MR. LICHTMAN:  Thank you, Judge.

3   Q    Do you recall calling Carlos Real to a Colombian phone

4   number in August 2014?

5   A    Yes, sir.

6   Q    It was a three-minute phone call, if you recall?

7   A    I don't remember so clearly, but, yes, I did call him.

8   Q    It was a short phone call?

9   A    Yes, sir.

10  Q    And you didn't call him again for the rest of the year,

11  did you, in 2014?

12  A    He came to see me, sir.

13  Q    You didn't call him again for the rest of 2014, did you?

14  A    No, I don't think so, I don't remember but I don't think

15  so.

16  Q    Did the prosecutors ever go over with you any of the

17  phone calls you made from prison?

18  A    Yes, sir.

19  Q    They did go over calls with you?

20  A    Yes, sir, some.

21  Q    Did they play tapes of your calls for you?

22          MR. FELS:  Objection as to form.  Vague as to which

23  calls.

24          THE COURT:  Overruled.

25  A    No, sir.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1   Q    They never showed you and played for you any of the taped

2   conversations of your calls from the MDC or any prison to

3   anyone?

4              MR. FELS:  Objection, misleading.  If I can have a

5   sidebar.

6              THE COURT:  Sustained, sustained.

7              MR. LICHTMAN:  Is that on form, Judge?

8              THE COURT:  Yes.

9   BY MR. LICHTMAN:

10  Q    When you went over your phone calls from prison with the

11  prosecutors, were any tapes of the calls played?

12             MR. FELS:  Objection.  Assumes facts not in

13  evidence.

14             THE COURT:  Overruled.

15  A    No, sir.

16  Q    So they were required to take your word as to what was

17  actually said in those phone conversations from prison?

18  A    I suppose so.  I don't know.  I don't know what they did

19  with the phone calls, if they looked at them or no.  But I

20  never listened to recordings.

21  Q    Did they ask you what you said during those phone calls

22  from prison?

23  A    Yes, sir, that's correct.

24  Q    So you had to tell them, correct?

25  A    Yes, sir, that's correct.

CIFUENTES - CROSS - LICHTMAN

1   Q    And they had to trust your word?

2   A    Yes, sir, that's correct.

3   Q    Because you wouldn't lie about anything to do with your

4   phone calls from prison, correct?

5   A    That's correct.

6   Q    Except in this case you did lie, didn't you?

7   A    No, sir.

8   Q    In January -- on January 18th of 2015 you made a phone

9   call to a number that was attributed to Carlos Real, didn't

10  you?

11  A    Yes, sir, that's correct.

12  Q    But it wasn't Carlos Real, was it?

13  A    No, sir, it wasn't Carlos Real.

14  Q    Was a lie that it was Carlos Real, correct?

15  A    That's correct.

16  Q    So when I asked you 30 seconds ago whether you ever lied

17  in connection with any phone calls from prison, that was a lie

18  when you said no?

19          MR. FELS:  Objection.  Mischaracterizes the

20  testimony.

21          THE COURT:  Sustained.

22  BY MR. LICHTMAN:

23  Q    You changed the number that was attributed to Carlos

24  Real, didn't you?

25  A    Yes, sir, that's correct.

CIFUENTES - CROSS - LICHTMAN

1   Q   And you changed it to a Colombian cell number, didn't

2   you?

3   A   Correct.

4   Q   To a phone that you hoped would be smuggled into a

5   Colombian prison to Alex, your brother?

6   A   Can you repeat that, please.

7   Q   The number that you changed -- the number that you

8   changed from Carlos Real's to a new number, the new number was

9   correlated to a cell phone that you had smuggled into a

10  Colombian prison for Alex?

11  A   No, sir.

12  Q   Whose phone number was it?

13  A   My brother, Alex's.

14  Q   So your brother Alex just happened to have his own cell

15  phone in prison?

16  A   Alexander had a smuggled phone in the prison but I did

17  not smuggle it in as you said.

18  Q   How did you know that he had a phone smuggled into the

19  prison?

20  A   Because you're not allowed to have a cell phone in

21  prison.

22  Q   Who told you that he had a cell phone smuggled into his

23  prison cell?

24  A   No one told me that he had had a phone smuggled in, but

25  he -- someone sent me a phone number to call him.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1   Q   Who was that someone?

2   A   My lawyer gave me the phone number, my Colombian lawyer.

3   Q   Carlos Real?

4           MR. FELS:  Objection as to who the other lawyer is.

5           THE COURT:  Is it relevant?

6           MR. LICHTMAN:  I'd like to find out if it is a

7   criminal cohort or a real lawyer.

8           THE COURT:  Is it relevant?

9           MR. LICHTMAN:  Does it hurt?

10          THE COURT:  You answer my questions and then I'll

11  answer yours.

12          MR. LICHTMAN:  I was hoping just to ask you another

13  question instead.  I'll move on.

14          THE COURT:  Go ahead, let him answer.

15          It wasn't Carlos Real it was somebody else, a

16  Colombian lawyer.  What more do you need to know?  You want

17  the name?

18          MR. LICHTMAN:  Yes, I would like the name.

19          THE COURT:  Okay, give him the name.

20          THE WITNESS:  Luisa Fernanda.

21  BY MR. LICHTMAN:

22  Q   Luisa Fernanda?

23  A   Yes, sir.

24  Q   She's a real lawyer in Colombia?

25  A   Yes, sir, that's correct.

CIFUENTES - CROSS - LICHTMAN

1   Q    And did she come visit you at the MDC?

2   A    Yes, sir, that's correct.

3   Q    Is she on your visitor's list?

4   A    Yes, sir.

5   Q    Is she still on your visitor's list?

6   A    No, sir, it's been a while since I saw her last.

7   Q    Did you remove her from your list?

8   A    The government did.

9   Q    After you told her that she smuggled -- she gave you the

10  number of a smuggled phone into Alex?

11  A    I don't have clear at the time when that happened, but

12  she's no longer on my list.  And it's been about two years

13  since I saw her last.

14  Q    It's been about two years, so you're saying at the end of

15  2016?

16  A    Yes, sir, more or less.

17  Q    So you last saw her the end of 2016, just so I can be

18  clear with dates?

19  A    Yes, sir, more or less.

20  Q    So about two years after you made that phone call to the

21  smuggled phone in the Colombian prison cell?

22  A    Yes, sir, that's correct.

23  Q    And you realize that what you did was very wrong,

24  correct?

25  A    No, sir.

CIFUENTES - CROSS - LICHTMAN

1    Q    So you thought it was okay for you to call a smuggled

2    phone into a Colombian prison from your prison cell in

3    Brooklyn?

4    A    Yes, sir, because my brother was about to make the huge

5    mistake, really a crazy thing to come to the U.S. to face a

6    trial just like Don Joaquin is doing, with all that evidence

7    against him, so I had to do it.

8    Q    So you're telling me again that what you did was

9    appropriate and right?

10   A    Yes, sir.

11   Q    You're telling the jury right now that you called -- that

12   you changing your lawyer's number to a smuggled cell phone for

13   your brother Alex was right, was legal, and was in conjunction

14   with your cooperation agreement?

15              MR. FELS:  Objection.

16              THE COURT:  Sustained as to form.

17   BY MR. LICHTMAN:

18   Q    You're telling us that on December 18th, 2018, today, you

19   believe that it was right for you to call -- excuse me, it was

20   right for you, A, to change the number of Carlos Real to a

21   smuggled in cell phone into a Colombian prison, that's the

22   first part.

23   A    What I'm saying is that it was right to have called my

24   brother and to have make him realize that what he was doing is

25   wrong.  That is right.  And I am conscious of the fact that it

CIFUENTES - CROSS - LICHTMAN

1    was illegal.

2    Q    But what's right to you is more important than what's

3    legal, correct?

4    A    I did it, that's the truth.  I did it, I convinced him to

5    cooperate rather than go to trial.  And I do take that charge.

6    Q    And you'd do it again today, wouldn't you?

7    A    I have no one to call -- I have no one to call anymore.

8    We have all pled guilty by now.  The only co-defendant that

9    hasn't is this case --

10   Q    Sir, there is nothing before you --

11   A    -- that's Don Joaquin.

12   Q    There's nothing before you.

13            MR. LICHTMAN:  I ask that be stricken.

14            THE COURT:  All right.  That motion is granted.

15            I'll ask the witness again if it is possible to

16   answer the questions reasonably with a yes or no answer, the

17   witness should try to do that.  If not, just tell

18   Mr. Lichtman, I can't answer that yes or no.

19            THE WITNESS:  Yes, Your Honor.  Thank you.

20   BY MR. LICHTMAN:

21   Q    Whose idea was it for you to call Alex on his birthday in

22   January 2015?

23   A    Mine.

24   Q    And who did you communicate the plan to?

25   A    Can you repeat it?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1    Q    Who did you communicate your plan to?  You obviously had

2    to do things to get this plan in motion, didn't you?

3    A    No, sir, no one.  It's just to enter a number in the

4    computer and make the call.

5    Q    But somebody had to give you that phone number, as you

6    said?

7    A    Yes, sir, Luisa Fernanda.

8    Q    Did you tell Luisa Fernandez, or whatever her name was,

9    to bring you the number of Alex's smuggled in cell phone?

10   A    Yes, sir.

11   Q    Did you tell her in person or did you tell her on the

12   phone?

13   A    In person.

14   Q    That was a crime, wasn't it?

15   A    Yes, sir.

16   Q    While you were cooperating, wasn't it?

17   A    I suppose so, yes, sir.

18   Q    You suppose or you know?

19   A    I suppose it, sir.  As you know, I don't know the law.

20   Q    Do you know right and wrong, the difference?

21        MR. FELS:  Objection, Your Honor.

22        THE COURT:  Sustained.

23   BY MR. LICHTMAN:

24   Q    Now you were confronted by the government at some point

25   about this?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - LICHTMAN

1    A    After making the call I notified both the government and

2    my lawyer that I had placed that call.

3    Q    Immediately after you made the phone call?

4    A    Yes, sir, that's correct.

5    Q    So you're saying that sometime in January of 2015 you

6    told the government that you made this phone call?

7    A    Yes, sir, that's correct.  And to my lawyer.

8    Q    Didn't you initially tell the government that you had

9    permission to make this phone call?

10   A    Yes, sir, that's what I thought.  But during the

11   interview --

12             THE INTERPRETER:  The interpreter needs to clarify a

13   term.

14   A    So while a proffer, having a proffer --

15   Q    I can't hear you.

16   A    -- with the prosecutors.  During the interview with the

17   government I notified them that I realized that I made the

18   call and I notified them after the fact.

19   Q    You notified them in January of 2015, correct?

20   A    Yes, sir, that's correct.

21   Q    But you initially said that you thought you had

22   permission to make this -- to do this fraud and make this

23   phone call?

24   A    Yes, sir, that's correct.

25   Q    And who did you claim gave you that permission?

CIFUENTES - CROSS - LICHTMAN

1    A    The government, the prosecutor.

2    Q    So you claim that a prosecutor gave you permission to

3    falsely change the number of Carlos Real in your numbers in

4    prison and make a phone call to a smuggled cell phone in

5    Colombia?

6    A    No, sir.

7    Q    You just said that you told the government that a

8    prosecutor gave you permission to do this?

9              MR. FELS:  Objection, Your Honor.

10             THE COURT:  Sustained.

11   Q    Did a prosecutor give you permission to do this?

12             MR. FELS:  Objection.  Vague.

13   A    No, sir.

14             THE COURT:  Overruled.

15   BY MR. LICHTMAN:

16   Q    You didn't just testify that you were given permission by

17   a prosecutor?

18   A    No, sir.

19   Q    Well, you said that you told the government that you

20   thought you had permission to make this phone call?

21   A    Yes, sir.

22             (Continued on the next page.)

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CIFUENTES - CROSS - MR. LICHTMAN

1   BY MR. LICHTMAN:

2   Q    Who gave you that permission?

3   A    No one.

4   Q    That was a lie, correct?

5   A    I did not remember it.  That's a confusion not a lie.

6   Q    Which part were you confused about, which prosecutor gave

7   you permission to commit this crime?

8   A    No, sir.

9   Q    What is the confusion about then?

10  A    It was not clear to me whether I had made the call before

11  or after notifying the Government.

12  Q    You're telling us that you're not sure whether you made

13  the -- you may have made the phone call after you told the

14  Government you'd be changing your Carlos Real phone number to

15  your brother's smuggled cellphone then calling him?

16          MR. FELS:  Objection.  Compound.

17          THE COURT:  Sustained.

18  Q    You said that you weren't sure if you told the Government

19  before or after you made the phone call, is that what you just

20  testified to?

21  A    I am certain today that I made the call first and then

22  later I notified both the Government and my lawyer.

23  Q    Sir, that was not my question.

24  A    Excuse me.

25  Q    You know that, don't you?

Case 1:09-cr-00466-BMC-RLM   Document 630   Filed 07/10/19   Page 37 of 219 PageID #: 12353

1           MR. FELS:  Objection, your Honor.

2           THE COURT:  Sustained.

3    Q    You told the Government that you believed you had

4    permission at first to make this phone call, didn't you?

5    A    Yes, sir, that's correct.

6    Q    And who did you tell them that you had permission from?

7    A    From the Government and my lawyer.

8    Q    Your lawyer gave you permission to do this?

9    A    No, sir.

10   Q    That was a lie when you told the Government that your

11   lawyer gave you permission to do this, correct?

12          MR. FELS:  Objection.  Asked and answered.

13          THE COURT:  Overruled.

14   A    No, sir, I believed that I had permission.

15   Q    Which lawyer gave you that permission?

16          MR. FELS:  Objection, again, asked and answered.

17          THE COURT:  Mr. Lichtman, you've got to wrap this

18   up.

19          MR. LICHTMAN:  I'm trying to.  I'm almost done,

20   Judge.  For real.  I'm happy to switch seats.

21          THE COURT:  Let's proceed.

22   BY MR. LICHTMAN:

23   Q    Sir, you said that your lawyer gave you permission,

24   correct?

25   A    I thought that my lawyer had given me permission.  But

CIFUENTES – CROSS – MR. LICHTMAN

1  the truth is that I had no permission.  I made the call and I

2  am guilty of that crime.

3  Q    So you lied to the Government when you said that your

4  lawyer had given you permission?

5  A    No, sir.

6  Q    Then your lawyer did give you permission?

7  A    No, sir.

8  Q    You told the Government that you believed that the

9  Government gave you permission to make this phone call, that's

10  what you just said?

11  A    Yes, sir, that's correct.

12  Q    Which prosecutor gave you permission?

13        MR. FELS:  Objection as to the prosecutor.

14        THE COURT:  Well, I'll allow it here.

15  Q    Which prosecutor gave you permission?

16  A    No prosecutor gave me permission.

17  Q    So then you lied to the Government when you said that a

18  prosecutor gave you permission?

19        MR. FELS:  Objection, your Honor.

20        THE COURT:  Sustained.  I think you got what you're

21  going to get to make your argument at closing.

22  Q    You falsely accused people, didn't you?

23  A    I made a mistake, yes, sir.

24  Q    You falsely accused people, didn't you?

25  A    No, sir.

CIFUENTES - CROSS - MR. LICHTMAN

1  Q    And you spoke to Alex on the phone for 15 minutes you

2  said?

3  A    That's what the call lasted, yes, sir.

4  Q    You said you just spoke to him about telling him to

5  cooperate?

6  A    Yes, sir, that's correct.

7  Q    You've never been played a tape of that conversation,

8  have you?

9  A    No, sir.

10  Q    Because you know that no tape exists, don't you?

11  A    I don't know, sir.

12  Q    Because you didn't tell the Government for well after six

13  months that you did this, correct?

14  A    I notified them after making the call in January and they

15  told me not to do it again.

16  Q    But this women Luisa Fernanda, who you claim gave you the

17  smuggled in cellphone number to Alex's phone, she was visiting

18  you two years after you made the phone call that you testified

19  to?

20  A    During that two-year period, yes, sir.

21  Q    So you told the Government that this women, her name you

22  gave, one of your approved visitors in January 2015, you told

23  the Government that she helped you in this crime?

24  A    No, sir, she gave me the phone number.

25  Q    And she was allowed to visit you for nearly two years

                    CIFUENTES - CROSS - MR. LICHTMAN

1    after you committed that crime in prison while you were

2    cooperating?

3    A     Yes, sir.

4    Q     And you're telling us that you didn't discuss any facts

5    about your testimony with Alex?

6    A     No, sir.

7    Q     You didn't tell Alex to try to identify the Jewish

8    target?

9    A     No, sir.

10   Q     Did the Government ever ask you that if you ever had told

11   Alex to try to identify the Jewish target?

12   A     No, sir.

13   Q     So this is the first time you've heard that you were

14   alleged to have told Alex to try to identify the Jewish

15   target.

16   A     This is the first time I hear that, sir.

17   Q     Did you go over this phone call with the Government,

18   these prosecutors recently?

19            MR. FELS:  Objection.  It's already in evidence that

20   the call doesn't exist, the recording doesn't exist.

21            THE COURT:  The question was broader than that.

22   I'll overrule the objection.

23   Q     Did you discuss -- I'll withdraw that and ask it again.

24            Did you discuss this illegal phone call with the

25   Government in the last week?

CIFUENTES - CROSS - MR. LICHTMAN

1   A   Yes, sir.

2   Q   In the middle of your direct testimony?

3   A   I don't remember, sir.

4   Q   It was within the last week?

5   A   Yes, sir, I don't know.

6   Q   I'm going to refresh your recollection.  If you can

7   review what is by the two arrows.

8           (Interpreter reading for the witness.)

9   A   Yes, sir, that's what I've been telling you.

10  Q   Does that refresh your recollection you discussed this

11  illegal phone call with the Government on December 11 of this

12  year?

13  A   Yes, sir, that's correct.

14  Q   Would Shimon Yelinek be a Jewish target?

15          MR. FELS:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q   Do you have any idea what the term Jewish target means?

18          MR. FELS:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A   What is target?

21  Q   You have no idea what that means?

22  A   I thought you meant white.  He's saying white during the

23  translation, so I don't understand.  A white Jewish person?

24          THE COURT:  Wait, now I'm confused.  Did you

25  mistranslate "white" for "Jewish?"

CIFUENTES – CROSS – MR. LICHTMAN

1          THE INTERPRETER:  The word blanco in Spanish is both

2   white and target.

3          THE COURT:  I see.  Now I understand.

4          Ask another question.

5   BY MR. LICHTMAN:

6   Q    You agree that this was a crime that you had committed,

7   correct?

8   A    What crime?  Can you repeat that?  What crime, please,

9   about the Jewish person?

10  Q    The illegal phone call from your cell to the smuggled

11  cellphone to Alex in Colombia.

12  A    Yes, sir, that's correct.

13  Q    You still hope to get that 5K.1 letter?

14  A    I hope to receive a reduction, yes, sir.

15  Q    You still hope to get time served?

16  A    I'm not that optimistic, but I'd love it.

17  Q    Do you know why it's wrong for you and Alex to have

18  contact and discuss facts of the case while you're both

19  cooperating?

20          MR. FELS:  Objection.

21          THE COURT:  Sustained.

22  Q    You told the Government that you've had indirect contact

23  with Alex since that phone call January 2015, correct?

24  A    Yes, sir, that's correct.

25  Q    Who is the indirect contact through?

CIFUENTES - CROSS - MR. LICHTMAN

1   A     Luisa Fernanda, the attorney.

2   Q     The women who helped you commit that fraud from prison?

3   A     The woman who gave me the cellphone number, yes, sir.

4   Q     And you had contact with Alex through her until the end

5   of 2016?

6   A     Yes, sir, that's correct.

7   Q     Well after you told the Government about her existence?

8         MR. FELS:  Objection.  Mischaracterizes the

9   testimony.

10        THE COURT:  Overruled.  He can answer that question.

11  A     Can you repeat the question, please?

12  Q     Your messages through Luisa to your brother Alex occurred

13  well after you told the Government about her role in the phone

14  call to Alex?

15  A     Yes, sir.

16  Q     And no one stopped you for two years, did they?

17  A     No, sir.

18        MR. LICHTMAN:  Nothing further.

19        THE COURT:  Redirect.

20  REDIRECT EXAMINATION

21  BY MR. FELS:

22  Q     Good morning, Mr. Cifuentes.

23  A     Good morning, Mr. Prosecutor.

24  Q     There were a number of times on cross-examination, you

25  recall, Mr. Lichtman you said had his facts wrong, correct?

CIFUENTES - REDIRECT - MR. FELS

1    A    Yes, sir, that's correct.

2    Q    For example, he talked about Mr. DeDios first saying he

3    was extradited to this country then later saying, no, he was

4    murdered.  Do you remember?

5              MR. LICHTMAN:  Objection.

6              THE COURT:  Overruled.

7    A    Yes, sir, that's correct.

8    Q    There was an exchange about some little papers that he

9    had, do you remember that?

10   A    Yes, sir, that's correct.

11   Q    Now Mr. Lichtman do you recall him asking a lot of

12   questions that you agreed with, correct?

13   A    That's correct, yes, sir.

14   Q    There were a few you said, check your notes that's wrong,

15   correct?

16   A    Many of them, yes.

17   Q    Now, you were debriefed by the Government a number of

18   times?

19   A    Yes, sir.

20   Q    Do you know how the notes of these meetings were

21   memorialized?

22             MR. LICHTMAN:  Objection.

23             THE COURT:  Overruled.

24   A    Can you repeat the question?

25   Q    These meetings with the Government, do you know how they

CIFUENTES - REDIRECT - MR. FELS                    3396

1   were memorialized into notes?

2   A     They take notes during the proffer, they use computers or

3   sometimes they keep notes by hand.

4   Q     Do they these agents or whoever is taking these notes, do

5   they ever show you the notes before they finalize them?

6   A     No, sir.

7   Q     So how do you know if there is not an error in their

8   notes?

9   A     In fact, there are many mistakes in the notes.

10  Q     Now, there was some confusion about the difference

11  between seizing property and actually forfeiting, do you

12  remember that.

13  A     That's correct, yes, sir.

14  Q     Do you remember there was testimony that $12 million

15  worth of property was seized by the Government prior to your

16  cooperation?

17  A     Yes, sir.

18  Q     But when did you sign over the documents to allow those

19  properties actually to be forfeited?

20         MR. LICHTMAN:  Objection.  Form.

21         THE COURT:  Overruled.

22  A     When I was already here in the United States cooperating

23  with the Government.  In fact, it was a condition that was set

24  for me.

25  Q     In other words, you did actually forfeit $12 million

CIFUENTES - REDIRECT - MR. FELS

1    after you began cooperating, right?

2    A    Yes, sir, that's correct.

3    Q    As long as we're talking about assets, you testified that

4    the Government of Colombia has frozen your assets, correct, in

5    Colombia?

6    A    Yes, sir, that's correct.

7    Q    Sir, and you testified that as a consequence you have no

8    money to forfeit to the United States, correct?

9    A    That's correct, yes, sir.

10   Q    So when Mr. Lichtman kept asking you about your ability

11   to liquidate assets in Colombia, what did you understand that

12   to mean?

13   A    That I could go to Colombia, sell them off, and get the

14   money, and come over here to the United States and hand over

15   the money.

16   Q    But if the properties in Colombia are seized by the

17   Colombian Government, do you have the ability to do that, sir?

18   A    No, sir.

19   Q    Sir, if the Colombians don't wind up taking all of these

20   hundreds of millions of dollars worth of assets, who will?

21   A    I suppose it's the Colombian Government and the U.S.

22   Government, I don't know.

23   Q    In other words, do you think you're going to get any of

24   that money back?

25   A    Impossible.

CIFUENTES - REDIRECT - MR. FELS

1  Q    Either the Colombians are going to get it or the

2  Americans are going to get it, right?

3  A    That's correct, yes, sir.

4  Q    There was a question that you attempted to answer then

5  Mr. Lichtman, if you remember, wouldn't allow you to finish

6  the answer.

7            MR. LICHTMAN:  Objection.

8            THE COURT:  What is wrong with that?

9            MR. LICHTMAN:  Basis.  Because I would imagine that

10 you required him to answer every question fully before I asked

11 the next question.

12            THE COURT:  The objection is overruled.

13 A    Some of them, yes.

14 Q    He asked you to explain what you needed to do to please

15 the prosecutors with your testimony today, I should say your

16 testimony last week?

17 A    Yes, sir.

18 Q    What were you trying to tell Mr. Lichtman?

19 A    That the only thing I have to do here is to tell the

20 truth.

21 Q    Sir, do you believe that your sentence reduction is in

22 any way dependent on what happens with Mr. Joaquin Guzman?

23 A    None at all.

24 Q    If there are facts in your possession which would help

25 Mr. Joaquin Guzman, do you believe that you're obligated to

CIFUENTES – REDIRECT – MR. FELS

1    tell this jury?

2    A    Yes, sir, of course.

3    Q    Do you remember Mr. Lichtman asked you a bunch of

4    questions about, I guess about your motives, for meeting

5    Mr. Guzman back in 2003.  Do you remember those questions, I

6    think it was three days ago?

7    A    Yes, sir, that's correct.

8    Q    And I think there was testimony that one motive was to

9    continue doing business in Mexico?

10              MR. LICHTMAN:  Judge, I would object and ask for a

11   sidebar.

12              THE COURT:  Okay.  Sidebar.

13              (Continued on the next page.)

14              (Sidebar conference.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1         MR. LICHTMAN:  Judge, we were handed a Giglio letter

2 that included information, I'm looking for it now,

3 that Cifuentes lied when he initially told them his reasons

4 for asking to meet Mr. Guzman in 2003.  Initially he told the

5 Government it was solely to check on his safety; but in

6 actuality, it was to check on the safety as well as trying to

7 deal drugs again.  What I don't want to have happen here is

8 for them to mislead the jury and make it appear as if that

9 was -- he didn't mislead the Government initially, when it was

10 in the Giglio letter they provided to us.

11         MR. FELS:  Your Honor, I have two lines with this

12 redirect.  One is I noticed that in 2014 before he told the

13 Government that he wanted Mr. Guzman for his own protection,

14 in a report he said that, Jorge wanted to make sure he want to

15 continue to do business in Mexico following Humberto Ojeda's

16 death.

17         So I don't think it's actually accurate to say that

18 he didn't disclose that up front.

19         MR. LICHTMAN:  It's in the Giglio letter, that's the

20 first thing, I relied on that.

21         Secondly, he already testified that the affidavit

22 that he filled out in connection with the extradition of

23 Mr. Guzman contained a lie.

24         MR. FELS:  That's not what he said.

25         MR. LICHTMAN:  That's what he testified to.

SIDEBAR CONFERENCE

1    THE COURT:  Stop.  Isn't it the case that the Giglio

2    letter includes not only material that everybody agrees is

3    impeachment, but also material that the Government reasonably

4    believes the defense might think is impeachment?

5    MR. LICHTMAN:  So I relied on that, they believed

6    that they told me that he initially lied to them about his

7    reason for wanting to see Mr. Guzman.  He told them it was

8    just for safety reasons when in fact it was to deal drugs as

9    well.  I relied on that.

10   THE COURT:  From what I just heard, I'm not hearing

11   the prosecutor bringing out anything different from that.

12   It's just that it was a mixed motive.

13   MR. LICHTMAN:  The point is in their Giglio letter

14   it doesn't say it was a mixed motive, he said one purpose.

15   THE COURT:  The part of the motive that is not

16   impeachment is not Giglio.  They don't have to disclose that.

17   They had to disclose there was an improper motive.  There was.

18   They are not backing away from that.  There was something

19   else.

20   MR. LICHTMAN:  They are saying he initially lied to

21   them about having one motive instead of two that's the point.

22   THE COURT:  I haven't read it.  I don't know what

23   the disclosure said.  If the disclosure is.

24   MS. PARLOVECCHIO:  This is a district practice

25   issue, if I may interject.  We say in our Giglio disclosures

SIDEBAR CONFERENCE

 1    that this is a supplement to what is the 3500.

 2              THE COURT:  It's got to be read together.

 3              MS. PARLOVECCHIO:  It's supposed to be read together

 4    with the 3500 material.  These are all turned over to the

 5    defense as part of 3500 disclosure.

 6              MR. LICHTMAN:  Judge, he said on cross he admitted

 7    that he lied.

 8              THE COURT:  There is no dispute about that.  But

 9    that's because he didn't tell the whole truth.

10              MR. LICHTMAN:  He didn't tell the whole truth,

11    that's the point.  Now it will appear as if he did.

12              THE COURT:  I don't think so.

13              MR. LICHTMAN:  That's why I called the sidebar.

14              MR. FELS:  The larger point is, first of all, what

15    difference does it make what his motives are?  He didn't

16    minimize his drug dealings.  And this is a mischaracterization

17    of, A, the testimony has been consistent; but, B, the

18    document.  The document provided one reason, it didn't say the

19    only reason.

20              THE COURT:  I'm still looking for the excerpt from

21    the disclosure.

22              MR. LICHTMAN:  Here it is.

23              THE COURT:  Can I see it?

24              (Judge reviewing document.)

25              THE COURT:  I think you read it too broadly.

SIDEBAR CONFERENCE

1    Cifuentes did not deny trafficking with the defendant but

2    suggested that he only did it to earn and keep the defendant's

3    protection.  He suggested that.  Cifuentes later stated that

4    he also wanted to the resume drug trafficking in Mexico.

5              Are you going to elicit testimony from him any

6    different than what I just read?

7              MR. FELS:  Slightly, and to this extent.  What I

8    learned is that --

9              THE COURT:  I don't want to keep the jury.  I'm

10   going to let them go and we'll discuss this on the record.

11             (End of sidebar conference.)

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          (In open court.)

2          THE COURT:  Ladies and gentlemen, rather than have

3  you stand by while we work this out, let's take our morning

4  break.  Come back at 11:20.  Please don't talk about the case.

5          (Jury exits.)

6          (In open court; out of the jury's presence.)

7          THE COURT:  Let me ask the Marshals to take the

8  witness out, please.  Everyone else sit down.

9          Let's continue this conversation that we started at

10  sidebar.

11          Mr. Fels, you were about to answer my question how

12  what you're about to solicit from this witness on redirect is

13  different than what is in the Giglio disclosure letter.  How

14  is it different?

15          MR. FELS:  So, your Honor, as we went back to we

16  review all the 3500 material which we turned over to the

17  defense over a month ago, we noticed that even back in 2014

18  this witness declared to the agents who were present that he

19  wanted, that the reason that he wanted to meet Chapo Guzman in

20  2003 was so he could continue to do business in Mexico

21  following Humberto Ojeda's death.

22          THE COURT:  But now respond to Mr. Lichtman's point,

23  that by you not realizing that until now, you led him down a

24  primrose path with regard to the disclosure letter.

25          MR. FELS:  Your Honor, as we explained in the

PROCEEDINGS

1    sidebar conference, the Giglio disclosures that we make are to

2    be read in conjunction with the material itself, which

3    Mr. Lichtman has had now over a month.

4            THE COURT:  It's a little awkward to expect him to

5    have found this when you didn't find it until recently; isn't

6    it?  He's going on the basis of the letter, which is the

7    primary source from which defense counsel are going to give

8    their impeachment areas.  Then you discover a week ago or

9    during the trial or very recently, that in fact the disclosure

10   in the Giglio letter is not true after he's cross-examined?

11           What I'm suggesting to you is it sounds like it took

12   you too long to find the thing that you say you should have

13   found earlier.

14           MR. FELS:  I understand that, your Honor.  We don't

15   need to elicit that portion, if that's the Court's ruling.  I

16   certainly was not trying to sandbag Mr. Lichtman.

17           THE COURT:  It's not an intentional sandbag; it's an

18   unintentional sandbag.

19           MR. FELS:  We'd like to at least point out that the

20   motives are not relevant.  Because he has always consistently

21   described the number of cocaine loads that he did with this

22   witness, the size of those cocaine loads with this witness,

23   the number and size of cocaine he's done, loads, with other

24   witnesses.  And his understanding that regardless of what his

25   motives may have been, his ultimate sentence was the same.  So

PROCEEDINGS

1  he had no justification and no reason to provide a false

2  statement about his motive.

3           THE COURT:  That sounds to me like more argument in

4  your closing; a lot of Mr. Lichtman's examination sounded the

5  same way to me.  It sounds to me that you ought to save that

6  for closing in order to avoid having mislead the defendant,

7  which impeachment that you now say wasn't really there.

8           MR. FELS:  Respectfully, I don't believe this part

9  deals with impeachment.  We can sever that off and just focus

10  on the fact that his motives -- he never, regardless of what

11  he may have said about his motives, he never --

12           THE COURT:  But look how you phrase the question,

13  'And I think there was testimony that one motive was to

14  continue doing business in Mexico.'  Right?

15           MR. FELS:  Which he has said, he acknowledged that

16  is one the motives that he said.

17           THE COURT:  Then argue it to the jury.  You'll have

18  the transcript and you can argue that.  But you can't take

19  away from Mr. Lichtman what you gave him in pretty expressed

20  terms in the Giglio letter.

21           MR. FELS:  I'm not seeking to do that.  All I'm

22  seeking to do is if we put the motives to one side, and again,

23  as I said, we can all argue motives.  That he understands that

24  whatever he may have said about the motives is really

25  irrelevant, because he believed that regardless of what the

PROCEEDINGS

1    motives were, whether it was to go back to Mexico for his own

2    safety or to traffic drugs, regardless of what the motives

3    were, he provided all the information about the drug loads.

4    That's the important part.

5         THE COURT:  Assume the question you asked him is

6    objectionable, how are you going to phrase it next time?

7         MR. FELS:  We can just start anew and say there were

8    questions about your motives.  I can provide a proffer of what

9    the questions would be, your Honor.

10        The questions would be, essentially, 'Regardless of

11   what your motives were, did you ever hide anything from the

12   Government, any drug shipments you did with Don Joaquin?'

13        THE COURT:  Take out the first part, don't refer to

14   motive.  Ask, did he hide, did he ever do that.  He can answer

15   that question.

16        MR. FELS:  Thank you, your Honor.

17        MR. LICHTMAN:  Thank you.

18        THE COURT:  See you at 11:20.

19        (Brief recess.)

20        THE COURT:  The parties wanted to see me at sidebar.

21        (Continued on the next page.)

22

23

24

25

SEALED SIDEBAR CONFERENCE

1          (Sidebar conference.)



SEALED SIDEBAR CONFERENCE



(End of sidebar conference.)

(Continued on the next page.)

```
 1                (In open court.)

 2                (Jury enters.)

 3                THE COURT:  All right.  Everyone be seated.  We'll

 4   finish up redirect.

 5                (Continued on next page.)
```

Cifuentes - Redirect/Fels

1          (In open court.)

2          (Through the interpreter.)

3          MR. FELS:  Thank you, Your Honor.

4   REDIRECT EXAMINATION

5   BY MR. FELS:

6   Q     Mr. Cifuentes, when you were cooperating with the

7   government, did you hide from the government any drug

8   shipments that you did with Don Joaquin's money?

9   A     Nothing.

10  Q     Did you hide any drug shipments you had done with anyone

11  else?

12  A     No, sir.

13  Q     Similar question:  Did you ever try to hide the amounts

14  of drugs that you were shipping in these shipments?

15  A     No, sir.

16  Q     Now, I wanted to talk to you -- there were some questions

17  about your father and whether you attempted to not talk to the

18  government about your father.  It was way back last week.

19  A     Yes, sir.

20  Q     Do you remember those questions?

21  A     Yes, sir, I remember.

22  Q     Sir, did you try to hide your family's drug trafficking

23  activities with the government?

24  A     No, sir.

25  Q     Lucia, she has, as you testified, been in prison for a

Cifuentes - Redirect/Fels

1   nine-year sentence; is that correct?

2   A    Eleven years, sir.

3   Q    I'm sorry.  So what motive would you have to hide --

4          MR. LICHTMAN:  Objection.

5          MR. FELS:  May I continue, Your Honor?

6          THE COURT:  No, I know the question.  Sustained.

7   Q    Sir, I'm talking about your father, right?

8   A    Yes, sir, that's correct.

9   Q    Is your father alive, sir?

10  A    No, sir.  He died 15 years ago.

11  Q    Several years before you began cooperating with the

12  government?

13  A    Yes, sir.

14  Q    And remember there were some questions about Mayo

15  Zambada?

16  A    Yes, sir.

17  Q    And working with him in drug trafficking, after he killed

18  your partner, Robachivas, do you remember those questions?

19  A    Yes, sir, that's right.

20  Q    Remind us, who did you meet in 2003 first, Don Joaquin

21  Guzman or Mayo?

22  A    I first met Don Joaquin Guzman, but I already knew

23  Mr. Mayo Zambada since 1988.

24  Q    In 2003 you met Don Joaquin first and then Mayo?

25  A    Yes, sir, that's correct.

Cifuentes - Redirect/Fels

1   Q    You testified that Mayo offered to work with you,

2   correct?

3   A    That's correct, yes, sir.

4   Q    And when you said I would rather work directly with

5   Don Joaquin, he said, don't worry, we are all the same.

6        Do you remember that testimony?

7   A    Yes, sir, that's correct.

8   Q    When Mayo offered in 2003 to work with you did you want

9   to work with him?

10  A    No, sir.

11  Q    Why not?

12  A    Because he murdered Ojeda, my partner.

13  Q    In fact, when Mayo offered to work with you in drug

14  trafficking again, what did you say?

15  A    I told him that because at this time it was Don Joaquin

16  who had put me in contact with him, I have to do everything

17  through Don Joaquin.

18  Q    So did you work after that directly with Don Joaquin or

19  with Mayo?  Who was your point of contact?

20  A    Don Joaquin.

21  Q    Do you remember there were some questions about the

22  helicopter, the blue helicopter that we saw the exhibit of?

23  A    Yes, sir, I remember.

24  Q    And you stated that there was a fraudulent scheme?

25  A    Yes, sir.

Cifuentes - Redirect/Fels

1    Q    What did you stand to benefit from that scheme to

2    backdate the insurance?

3    A    None.  Just to look good in front of Don Joaquin.

4    Q    What did Don Joaquin have to benefit from this insurance

5    fraud scheme?

6    A    That he would get a new helicopter.

7    Q    What did Don Joaquin do to further this insurance fraud

8    scheme?

9    A    He sent me the money with Damaso Lopez.

10   Q    Now, you agreed cooperate with the government and began

11   meetings with the government in 2014.

12              That was your testimony, correct?

13   A    That's correct, yes, sir.

14   Q    You started talking about various enhancements that you

15   got to your sentencing guidelines.

16   A    Yes, sir.

17   Q    You were talking of your trying to answer a question

18   about why you got a ten-point increase, but Mr. Lichtman cut

19   you off.

20              MR. LICHTMAN:  Objection.

21              THE COURT:  Overruled.

22   A    Yes, sir, that's correct.

23   Q    What were you trying to explain?

24   A    When I arrived in the United States I was a level 38

25   because of the charges against me.  When I agreed to

*MICHELE NARDONE, CSR -- Official Court Reporter*

Cifuentes - Redirect/Fels

1    cooperate, the government told me that I had to confess to

2    absolutely every one of my crimes.

3            MR. LICHTMAN:  Objection.

4            THE COURT:  Overruled, not being offered for the

5    truth.

6    Q    Sir, in your effort to cooperate did your sentence

7    guidelines initially go up or go down?

8    A    They went up ten points.

9    Q    Sir, do you know as you sit here today whether the

10   government had any information about your murders, before you

11   told and volunteered that information to the government?

12   A    They have no knowledge, sir.

13   Q    So what was, in your mind, the effect of you volunteering

14   this information about these murders and attempted murders?

15   A    It hurt me.  It raised my guidelines for sentencing by

16   ten points.

17   Q    Now, you testified on both direct and cross-examination

18   that you believed that your guidelines are now life in prison,

19   correct?

20   A    That's correct, yes, sir.

21   Q    And but you are hoping to get a reduction of your prison

22   time?

23   A    Yes, sir, that's correct.

24   Q    So, Mr. Cifuentes, without getting into details, have you

25   cooperated with the government on other matters besides this

Cifuentes - Redirect/Fels

1    matter of Don Joaquin Guzman?

2    A     Yes, sir, that's correct.

3    Q     And what is your understanding about what, if anything,

4    you have already earned as a result of that other cooperation

5    with the government?

6    A     My understanding is that I had already earned the benefit

7    before this trial.

8    Q     What do you think would happen to that benefit if you

9    were to lie in this case?

10   A     The government would tear it up and I would face life in

11   prison.

12   Q     Okay.  Without going into details, sir, have you signed

13   any documents under oath in connection with this case?

14   A     Yes, sir.

15   Q     Do you believe that because of this you have already

16   earned some benefits in this case?

17   A     Yes, of course, sir.

18   Q     Did you lie in that document?

19   A     No, sir.

20   Q     What do you think would happen to that reduction you have

21   already earned in this case if you were to lie to this jury?

22   A     I would lose the entire benefit.

23   Q     Sir, what other consequences would happen besides losing

24   benefits that you have earned?

25   A     I would spend the rest of my life in prison.

                MICHELE NARDONE, CSR -- Official Court Reporter

Cifuentes - Redirect/Fels

1    Q    Would you be subject to other charges as well?

2    A    Aside from that, yes, sir.

3    Q    And what about if you were to falsely implicate Joaquin

4    Guzman on crimes he didn't commit?

5    A    I would lose my benefit and spend the rest of my life in

6    prison.

7    Q    Now, remember Mr. Lichtman -- actually, I will do

8    something first.

9            I want to go over some timelines in this case.

10   Okay.  I'm going to ask you about two events, and I want you

11   to tell me which one happened first.  Okay?

12   A    Yes, sir.

13   Q    Sir, did you tell the government and describe that

14   Don Joaquin had a gold-handled pistol encrusted with stones,

15   or were you shown what's Government's Exhibit 811-1, which

16   happened first?

17   A    I gave my statement before, first.

18   Q    Okay.  Let's do another one.  Which happened first, you

19   talked to the government about buying speed boats in Ecuador

20   for the shipment of cocaine and then receiving four Mexican

21   boat operators, or the government showed you the ledgers

22   showing the payments for those things, which happened first?

23   A    I showed the government a statement on the facts prior to

24   being shown any documents.

25   Q    Which happened first, sir, you talked to the government

*MICHELE NARDONE, CSR -- Official Court Reporter*

Cifuentes - Redirect/Fels

1   about the fact that Joaquin Guzman would call you Simon, or

2   you saw that ledger entry, Simon, which happened first?

3   A    I told the government first.

4   Q    Which happened first, sir, you talked to the government

5   about the fact that Don Joaquin's code name for you was Simon,

6   or you heard the call in which Joaquin Guzman tells his nephew

7   and refers to your properties as Simon's properties, which?

8   A    I made the statement first.

9   Q    Talking about Tomas, which happened first, sir, you

10  described how you received Tomas in Ecuador, or you saw those

11  entries on the ledger referring to payments in Ecuador to

12  Tomas?

13  A    I gave all those statements five years ago.

14  Q    Which happened first, sir, you described how you

15  introduced Tomas to your nephew, Jaime Roll Cifuentes, or,

16  sir, you saw this photograph?

17  A    I gave the statement first.  I gave the information to

18  the government before seeing this photograph.

19  Q    How recently were you shown that photograph, sir?

20  A    A few days ago.

21  Q    Thank you.  One more question in this line.

22       THE COURT:  How much more do you have?

23       MR. FELS:  Not much, Your Honor.

24  Q    Which happens first, sir, you described to the government

25  the concerns that your family had because Jaime Roll

*MICHELE NARDONE, CSR -- Official Court Reporter*

1    Cifuentes' name was on the lease in Ecuador or you saw the

2    lease itself?

3    A    I told the government first, but I haven't seen any

4    leases.

5    Q    You haven't even seen a lease, sir, have you?

6    A    No, sir.

7    Q    Do you have any idea where that lease might be?

8    A    No, sir.

9    Q    Now, remember that there were some questions on

10   cross-examination about how dangerous cocaine and ephedrine

11   are?  Do you remember those questions?

12   A    Yes, sir, that's correct.

13   Q    And Mr. Lichtman got you to acknowledge that sending this

14   stuff to the United States was very dangerous, right?

15   A    Yes, sir, that's correct.

16   Q    Sir, remind the jury who was it that received the

17   6,000 kilograms of cocaine that you shipped in 2008 from

18   Ecuador?

19   A    Mr. Joaquin Guzman Loera.

20   Q    Who is it that received the 350 kilograms of cocaine you

21   sent on that experimental Lancair plane in 2003?

22   A    Don Joaquin Guzman Loera's people.

23   Q    Who was it, sir, that received the kilograms of cocaine

24   plus the ephedrine that your family was hiding behind your

25   back?

Cifuentes - Recross/Lichtman

1      MR. LICHTMAN:  Objection, judge.

2      THE COURT:  Overruled.

3    A    Don Joaquin Guzman Loera.

4    Q    Do you remember there were some questions that were asked

5    of you about how you didn't really want to send

6    methamphetamine, remember?

7    A    That's correct, yes, sir.

8    Q    Took a moral stand?

9    A    Yes, sir.

10   Q    But then you testified that you got hungry when you were

11   in Venezuela?

12   A    Yes, sir.  I was in a very desperate situation.

13   Q    And somebody asked you at that desperate situation to go

14   get them ephedrine to make methamphetamine, right?

15   A    Yes, sir, that's correct.  Don Joaquin asked me for that.

16       MR. FELS:  Nothing further, Your Honor.

17       THE COURT:  Okay.  Mr. Lichtman?

18       MR. LICHTMAN:  Yeah.

19       THE COURT:  How much do you have?

20       MR. LICHTMAN:  Five minutes, real five minutes.

21       THE COURT:  Okay.

22   RECROSS-EXAMINATION

23   BY MR. LICHTMAN:

24   Q    Sir, you talked about your moral stand?

25   A    Yes, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Cifuentes - Recross/Lichtman

```
 1    Q    Did you have a moral stand when you were killing people?

 2    A    Yes, sir.

 3    Q    Did you have a moral stand when you were sending

 4    220,000 kilograms of cocaine into the United States in the

 5    '90s?

 6    A    Yes, sir.

 7    Q    Your greed overcomes your morals; isn't that true?

 8    A    Yes, sir.

 9    Q    When people need killing that overcomes your morals;

10    isn't that true?

11    A    When my life is in danger, yes, sir.

12    Q    Your life was in danger when somebody stole cocaine from

13    you?

14    A    No, sir.

15    Q    You said that the agents got a lot wrong.

16              Is that what you said during your debriefings?

17    A    I said that government papers had a lot of mistakes.

18    Q    You said there were many mistakes in the agent's notes,

19    on redirect, didn't you say that?

20    A    They make mistakes with names, last names and situations,

21    yes.

22    Q    But you haven't seen these notes, have you?

23    A    You were showing them to me, I suppose.

24    Q    You haven't seen the notes, have you?

25              MR. FELS:  Objection, asked and answered.
```

*MICHELE NARDONE, CSR -- Official Court Reporter*

Cifuentes - Recross/Lichtman

1           THE COURT:  Overruled.

2    A    What?

3           THE COURT:  You may answer.

4    Q    You haven't seen --

5    A    Repeat the question.

6    Q    You haven't seen the agent's notes, have you?

7    A    No, sir.  The ones you showed me that you told me

8    belonged to the agents.

9    Q    There were mistakes in them, according to you?

10   A    Yes, sir, the ones I corrected.

11   Q    We are supposed to take your word over everyone's,

12   correct?

13   A    Yes, sir.  I am telling the truth.

14   Q    Because you would never lie, correct?

15   A    I don't lie here, sir.

16   Q    You said that the Colombians froze your assets, correct?

17   A    That's correct, yes, sir.

18   Q    You also testified that many assets of yours were in

19   strawman's names, correct, other people's names, correct?

20   A    Some in Mexico, three.

21   Q    You testified that you had Swiss bank accounts, of which

22   $20 million or so went through, correct?

23   A    Yes, sir.

24   Q    Is Switzerland in Mexico?

25   A    No, sir.

Cifuentes - Recross/Lichtman

1    Q    So we have to rely on you as to whether or not you told

2    them about all of your Swiss bank accounts and all of your

3    other assets in other people's names, correct?

4    A    No, sir.  I provided information.  The accounts can be

5    verified.

6    Q    But it's based on your word, if you provided them all of

7    your assets, including Swiss bank accounts?

8                 THE COURT:  Mr. Lichtman, we are past that.  Is

9    there anything new from redirect?

10   Q    You testified you told the government about all your drug

11   shipments, correct?

12   A    Yes, sir, that's correct.

13   Q    We have to rely on your word for that?

14   A    Yes, sir.

15   Q    You testified that you didn't want to deal drugs with

16   Mayo in 2003, correct?

17   A    That's correct, yes, sir.

18   Q    But you did, didn't you, sir?

19   A    No, sir.

20   Q    You didn't have any dealings with Mayo Zambada after

21   2003?

22   A    No, sir.  All of them took place directly with

23   Don Joaquin Guzman Loera.

24   Q    Is it up to the judge whether you get a 5K1 letter, or

25   prosecutors?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Cifuentes - Recross/Lichtman

1          THE COURT:  Mr. Lichtman, you asked that on cross.

2    The jury heard that.  Is there anything new?

3          MR. LICHTMAN:  It was brought up on redirect.

4          THE COURT:  I'm sorry?

5          MR. LICHTMAN:  It was brought up on redirect.

6          THE COURT:  You can ask something more about it

7    since it was brought up on redirect, but you can't simply

8    repeat.

9    Q    You know, ultimately, after you were asked about the 5K1

10   letter on redirect, you know that it's up to the government

11   who can give it to you only?

12   A    Yes, sir, that's correct.

13   Q    And the questions about which happened first, we have to

14   rely on you for those answers, if it's the truth?

15   A    Yes, sir, that, besides the reports.

16   Q    Sir, if you commit any crimes or lie, you lose the chance

17   to get a 5K1 letter, in your mind?

18   A    Yes, sir, that's correct.

19   Q    You committed a crime when you called your brother on a

20   smuggled cell phone in January of 2015?

21          THE COURT:  Mr. Lichtman, I'm going to have to -- we

22   are on recross.  This was raised on redirect, and you already

23   asked the question on cross before.

24   Q    Has your cooperation agreement been ripped up?

25   A    Not yet, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

USA v. Guzman Loera

1          MR. LICHTMAN:  Not yet.  Thank you.

2          THE COURT:  Anything else?

3          MR. FELS:  No, Your Honor.

4          THE COURT:  All right.  Ladies and gentlemen, we

5   need to reset the courtroom for a minute.

6          Have the marshals take the witness out, please.

7   Thank you, sir.

8          Let's have the government call its next witness.

9          MR. FELS:  Your Honor, the government calls Pedro

10  Flores.

11         THE COURT:  All right.

12         (Pause.)

13         THE COURT:  What's happening, Mr. Fels?

14         MR. FELS:  We are waiting, obviously -- I believe

15  the marshals were coordinating with the courtroom deputy for

16  the witness.

17         THE COURT:  Okay.

18         (Pause.)

19         THE COURT:  Okay.  Look, I'm not sure what's going

20  on but we are not going to sit here all day waiting.

21         I will send the jury to lunch now.  Please don't

22  talk about the case, ladies and gentlemen.  We will see you

23  back here at 1:00 p.m.

24         (Jury exits.)

25         THE COURT:  All right.  1:00 p.m.

*MICHELE NARDONE, CSR -- Official Court Reporter*

3426
USA v. Guzman Loera

1          (Lunch recess.)

2          (Continued on the next page.)

FLORES - DIRECT - FELS

1              A F T E R N O O N   S E S S I O N

2                      (1:00 p.m.)

3          THE COURTROOM DEPUTY:  All rise.

4          THE COURT:  Please bring in the jury.

5          (Jury enters courtroom.)

6          THE COURT:  All right, everyone be seated.  The

7    government may now call its next witness.

8          MR. FELS:  Thank you, Your Honor, the government

9    calls Pedro Flores.

10         (Witness sworn.)

11   PEDRO FLORES, called as a witness, having been first duly

12   sworn/affirmed, was examined and testified as follows:

13         THE WITNESS:  Yes, I do.

14         THE COURTROOM DEPUTY:  Please state and spell your

15   name for the record?

16         THE WITNESS:  Pedro Flores.  P-E-D-R-O F-L-O-R-E-S.

17         THE COURT:  You may inquire.

18         MR. FELS:  Thank you, Your Honor.

19   DIRECT EXAMINATION

20   BY MR. FELS:

21   Q    Mr. Flores, where were you born?

22   A    Chicago, Illinois.

23   Q    How old are you?

24   A    I'm 37 years old.

25   Q    What languages do you speak?

FLORES - DIRECT - FELS

1    A    English and Spanish.

2    Q    And you'll be testifying in which language today?

3    A    English.

4    Q    What's the highest level of education that you've

5    attained?

6    A    I had a semester at community college.

7    Q    You graduated high school?

8    A    Yes.

9    Q    Sir, are you currently in custody?

10   A    Yes, I am.

11   Q    And why are you in custody?

12   A    I pled guilty to drug trafficking.

13   Q    And did you get caught?

14   A    No, sir, I turned myself in.

15   Q    How long have you been in custody?

16   A    Just over 10 years.

17   Q    When did you turn yourself in?

18   A    On November 30th, 2008.

19   Q    Sir, you said that you pled guilty, did you admit you

20   were a drug trafficker?

21   A    Yes, I did.

22   Q    How much drugs did you admit dealing in?

23   A    Over 60 tons of cocaine and other drugs.

24   Q    What were the other drugs?

25   A    Heroin and methamphetamines.

FLORES - DIRECT - FELS

1  Q   Was there a person or group who's the source of the

2  majority of those drugs you acknowledged dealing?

3  A   Yes.

4  Q   What's that?

5  A   The Sinaloa Cartel and the man.

6  Q   The man?

7  A   Yeah.

8  Q   What man?

9  A   Mr. Guzman.

10  Q   Do you know his first name?

11  A   Yes, it's Joaquin.

12  Q   Sorry?

13  A   Joaquin.

14  Q   Do you see him the courtroom today?

15  A   Yes, I do.

16  Q   Could you describe an article of clothing that he's

17  wearing?

18  A   He's wearing a black suit --

19       MR. PURPURA:  We'll stipulate he can identify

20  Joaquin Guzman.

21       THE COURT:  The witness can identify defendant.

22  BY MR. FELS:

23  Q   Now what efforts did you make after turning yourself in

24  to try to reduce the amount of prison time that you were

25  facing?

FLORES - DIRECT - FELS

1    A    I continued to cooperate with the U.S. Government.

2    Q    Now you said you continued to cooperate, were you

3    cooperating even before you turned yourself in?

4    A    Yes, I was.

5    Q    We'll get to that a moment.

6         How did it come to pass that you cooperated with the

7    United States Government?

8    A    In early 2008 I reached out to the DEA through my lawyer.

9    Q    And what did you -- what message did you send?

10   A    That I wanted to make a deal, I wanted to come in.

11   Q    Now let me take you back.  How did you get your start in

12   drug trafficking?

13   A    I was around seven or eight years old when I began to

14   assist my father in his drug trafficking business by

15   translating during his drug deals and helping him to load and

16   unload cars with drugs.

17   Q    Were there other siblings of yours that were also in the

18   drug business?

19   A    Yes, all my siblings, my brothers.

20   Q    Let's move to a little bit forward into 1998.  What

21   changed then?

22   A    Well, my older brother was arrested for drug trafficking

23   which allowed me and my twin brother to step up and we began

24   to supply his customers with cocaine.

25   Q    I want to show you some photographs, sir.

FLORES - DIRECT - FELS

1    MR. FELS:  Just for witness only, Your Honor.

2    Q    Showing you what's already in evidence as Government

3    Exhibit 51 -- actually I'll just show it to the witness.

4        Sir -- Your Honor, I believe these are already in

5    evidence --

6        THE COURT:  Okay.

7        MR. FELS:  -- if they are not we'll --

8        MR. PURPURA:  There is no objection.

9        THE COURT:  They are received in any event.

10       (Government Exhibit 51 and 52, were received in

11   evidence.)

12   BY MR. FELS:

13   Q    Do you recognize the photograph, Government's Exhibit 51

14   on the left?

15   A    Yes, I do.

16   Q    And what about Government's Exhibit 52 on the right?

17   A    Yes.

18   Q    Are these the same person or two different people?

19   A    Two different people.

20   Q    And who is on the left, and who is on the right?

21   A    That's my twin brother Margarito, I call him J. on the

22   left.

23   Q    And the one on the right?

24   A    That's me.

25   Q    And, Mr. Flores, your first name is Pedro; is that

FLORES - DIRECT - FELS

1    correct?

2    A    Yes.

3    Q    Do you go by some other short form of that?

4    A    Yeah, they call me P, or Pete, or twin.

5    Q    So what did you and your brother do from then on, that

6    period of time in 1998?

7    A    We continued to sell drugs and grow our customer base in

8    around Chicago.

9    Q    Let's start with the -- skip ahead to the 2001, 2002 time

10   frame.  Give us a sense of what your business -- what your

11   cocaine business was like at that time?

12   A    I began to expand pretty quickly.  We began to receive

13   hundreds of kilos of cocaine at a time.

14   Q    Do you know a man named Guadalupe or Lupe Ledezma?

15   A    Yes, I do.

16   Q    Who is that?

17   A    He was a -- associates of my father.  I was introduced to

18   him in around that time 2001, 2002.

19   Q    And did he have an offer for you and your twin brother,

20   Margarito?

21   A    Yes, he did.

22   Q    What was that?

23   A    He offered us three things:  That he can supply us with

24   unlimited amounts of cocaine; that he could give us the best

25   quality cocaine; and that he could beat any price of the -- of

FLORES - DIRECT - FELS

1    cocaine that we were purchasing at the time at a thousand

2    dollars.

3    Q    Did you accept Lupe Ledezma's offer?

4    A    Yes, I did.

5    Q    Did you know at the time who he was working for?

6    A    No, I didn't.

7    Q    Did you later find out?

8    A    Yes.

9    Q    Who told you who was Lupe Ledezma's boss?

10   A    The man, El Chapo.

11   Q    Chapo Guzman?

12   A    Yes.

13   Q    The defendant in the case here?

14   A    Yes.

15   Q    When did you learn that?

16   A    I think that after my initial meeting in 2005.

17   Q    We'll get to that in a moment.

18   A    Okay.

19   Q    Going back to that 2001, 2002 time frame, when you first

20   started working with Lupe Ledezma, what did Lupe encourage you

21   and your twin brother to do in order to make your cocaine

22   business run smoother?

23   A    He encouraged us to set up warehouses so that we would be

24   able to unload the shipments of cocaine on our own.

25   Q    And where were those warehouses located?

FLORES - DIRECT - FELS

1   A    They're located in and around the Chicago area.

2   Q    Did you follow Lupe Ledezma's advice?

3   A    Yes, I did.

4   Q    And why did you follow his advice about this warehouse

5   system in Chicago?

6   A    Because I wanted to continue to work and receive cocaine

7   from him.

8   Q    And what was the significance of Chicago as a city?

9   A    I believe it being the third largest city in the United

10  States is important.  Also, its geographic location.  It's

11  practically centered in the middle of our country which makes

12  it convenient, you know, you're halfway to everywhere and

13  logistically the infrastructure of railroad systems, highways,

14  airports, waterways just makes it ideal, not just for drugs

15  probably for any type of goods.

16  Q    For distribution, is that what you're talking about?

17  A    Yes.

18  Q    Now, how did Lupe Ledezma send you and your twin brother

19  Margarito cocaine during this 2001, 2002 time frame?

20  A    They were using tractor trailers.

21  Q    Do you know from -- what was the route, did he tell?

22  A    Yes, they were coming from Mexico through Juarez across

23  the border and up to Chicago.

24  Q    While you were based in Chicago during still this 2001,

25  2002 time frame, was there another way that your organization

FLORES - DIRECT - FELS

1  was receiving large shipments of cocaine from a different

2  supplier other than Lupe Ledezma?

3  A    Yes.

4  Q    What was the method of shipment of those shipments of

5  cocaine?

6  A    Through train.

7  Q    From whom did you learn that this cocaine that you were

8  being -- basically being brought to you was coming by train?

9  A    From my -- from the connect -- the source of supply, my

10 partner, Carlos Sillas.

11 Q    Did Carlos Sillas have a nickname?

12 A    Yes, El Profe.

13 Q    El Profe, did you say?

14 A    Yes.

15 Q    Did El Profe at some point tell you where the cocaine was

16 hidden in the trains?

17 A    Yes, he did.  He said they were -- there's a stash, some

18 kind of a steel stash located somewhere in the interior of the

19 train where they would hide the drugs.

20 Q    When you say "stash," what are you talking about?

21 A    Like A secret compartment.

22 Q    And was it -- how was it in the train do you remember?

23 Or how was it attached to the train?

24 A    It was welded somehow into the train.

25 Q    Did you ever ask El Profe who he got his cocaine from?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

```
 1   A     Yes, he mentioned it to me before.

 2   Q     And what was the name of the person who supplied El Profe

 3   with the cocaine who then supplied it to you?

 4   A     Jose Tirso.

 5   Q     How were you and your twin brother physically receiving

 6   this cocaine after it arrived by these trains?

 7   A     We were instructed to pick up the cocaine at a Denny's

 8   outside of Chicago.

 9   Q     Do you remember where that Denny's was located, sir?

10   A     Yes, I do.  It was Bolingbrook, Illinois off of Route 53

11   and Interstate 55.

12   Q     Are you familiar with that Denny's?

13   A     Yes.

14   Q     Showing you what's already in evidence as Government's

15   Exhibit 205-30, do you recognize what this is?

16   A     Yes.

17   Q     What is this?

18   A     That's the Denny's off of 55.

19   Q     Did you physically go to this Denny's?

20   A     Yes, I did.

21   Q     Approximately how many times in the course of your drug

22   trafficking business?

23   A     About four or five times.

24   Q     Let's talk about that.  What would happen -- let's talk

25   about the first time you went to the Denny's, what happened
```

FLORES - DIRECT - FELS

1    then?

2    A    I went to the Denny's and I spoke with the drug couriers

3    at the time and they had instructed me that they're going to

4    park a van in the parking lot with the cocaine inside and they

5    were going to leave the keys somewhere in the ashtray, I don't

6    know, or under the mat of the van.  I was just instructed to

7    pick up the van and take the work and when I was done to park

8    the van in the same spot where I found it.

9    Q    What would you do with the keys?

10   A    I would unload them in my own stash house.

11   Q    I'm sorry.  I didn't mean the kilograms --

12   A    I'm sorry.

13   Q    -- I meant the actual keys.

14   A    Put the key back where I found them.

15   Q    And just for the jury's benefit and everyone else's, when

16   I say keys --

17   A    I thought -- thought you meant kilos, I'm sorry.  The car

18   keys.

19   Q    So do you remember what that van looked like by the way?

20   A    Yes, it was a ugly, old beige, beige or cream colored

21   Ford Econoline cargo van.  My worker called it a kidnapper

22   van.

23   Q    Why did he call it kidnapper van?

24   A    It was scary looking, like old and grimy.

25   Q    Let's talk about that first time.  You get the keys to

FLORES - DIRECT - FELS

1  this van?

2  A     Yeah.

3  Q     And you drive it where?

4  A     So, yeah, the first time I show up to pick up van it was

5  six in the morning, the van was sitting in the parking lot

6  just like the courier had told me the night before.  My worker

7  was afraid to drive the van 'cause we saw some law enforcement

8  in the area, so I jumped in the van myself.  And as I was

9  driving the van, I began to just think, oh, my God, please

10  don't shut off on me.  It was a old, raggedy van.  My nerves

11  were up.

12         I drove it to our stash house, which luckily for me

13  was about 15 minutes away from there.

14  Q     You mentioned you were there to pick up the work, what

15  did you mean by the work?

16  A     The cocaine.

17  Q     So you said you drive the van, what happens when you stop

18  the car -- or stop the van?

19  A     When I get to the stash house and I try to reverse the

20  van into the garage and I hit the top of the roof of the

21  garage.  The van was too big.  It had these big, like, heavy

22  duty shocks on it and I couldn't fit the van into the garage.

23  So I had to open the doors and go through the van and to

24  unload the cocaine, which was all in a bunch of black garbage

25  bags.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

1    Q    What happened as you were trying to bring this cocaine

2    into the stash house?

3    A    The bags began to rip and the kilos were falling out and

4    there's neighbors out.  It was a pretty hectic day.

5    Q    So once you are able to load all the cocaine you'd bought

6    from the tan cargo van, how much -- first of all, how much

7    cocaine was it, do you remember?

8    A    I would say it's around 250 kilos.

9    Q    So then what did you do?

10   A    I unloaded the cocaine, drove the van back, parked it in

11   the same spot where we had picked it up from.

12   Q    Now you've got this cocaine, what do you do with it?

13   A    I would distribute it to my cocaine customers.

14   Q    Okay.  And then what do you get back in return?

15   A    Cash.

16   Q    What did you do with the cash?

17   A    I would count it and package it and return it to the same

18   person that gave us the cocaine.

19   Q    The person at Denny's?

20   A    Yes.

21   Q    Was there another van besides this, I think you mentioned

22   a raggedy tan van that you used in this process?

23   A    Yes.  It was --

24   Q    Who provided that van?

25   A    The couriers.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

1   Q    The other side?

2   A    Yeah, the same guys from Denny's.

3   Q    Can you describe what did that van look like?

4   A    I remember it to be a Ford Aerostar minivan.  It was a

5   two-tone color.  It was gray and I believe blue or green or

6   some kind of bluish green.

7   Q    Now was there ever -- you said you did this four or five

8   times?

9   A    Yes.

10  Q    Was there ever a problem that you learned from El Profe

11  with this method of shipping?

12  A    Yes.

13  Q    What happened?

14  A    I believe it was 2001, 2002 where he told me they had

15  took a hit and lost some work in New York.

16  Q    What did that mean, take a hit and lost some work?

17  A    That the drugs were seized by law enforcement.

18  Q    Did Profe tell you how much cocaine was seized in New

19  York?

20  A    Yes, he said it was over two tons of cocaine.

21  Q    What about any other seizures right after that did you

22  hear from Profe?

23  A    Yes.  There's seizure -- well, he didn't tell me I heard

24  it on the news.  There was a seizure of cocaine in Chicago --

25  well, Romeoville, Illinois.

FLORES - DIRECT - FELS

1    Q    How much was that seizure?

2    A    It was another two tons of cocaine.

3    Q    Now why was that important to you?

4    A    I had seen the news and I'd seen that it was three people

5    were arrested in connection with that and I recognized the

6    three men as the couriers that were giving us the cocaine.

7    Q    So who did you call?

8    A    I called Profe.

9    Q    And what did he tell you?

10   A    To get rid of my phones and that was the work, that was

11   the same people we were getting the cocaine from.

12   Q    Did he connect the New York seizure with this seizure in

13   Romeoville?

14              MR. PURPURA:  Objection, Your Honor.

15              THE COURT:  Sustained.  Sustained.

16   BY MR. FELS:

17   Q    I'll ask it a different way.  What in your -- or what did

18   he say to -- about the New York seizure?

19   A    That they were both related to the boss.

20   Q    Again, who was?

21   A    Jose Tirso.

22   Q    And on what type of vehicle?

23   A    Train.

24   Q    You said you heard about this on the news?

25   A    Yes.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

1    Q    What did the news say about this Denny's?

2    A    Nothing.

3    Q    What did the news say about the tan van?

4    A    Nothing that I remember.

5    Q    What did the news say about the trains?

6    A    Nothing.

7    Q    What did the news say about the green-blue two-tone Ford

8    van?

9    A    Nothing.

10   Q    Within a couple of days after the seizures, did El Profe

11   ask you for something?

12   A    Yes.

13   Q    What did he ask you for?

14   A    He asked me for a loan of around $750,000.

15   Q    For whose benefit?

16   A    It was for his boss to -- he said that they needed money

17   to get set up again.

18   Q    Again, who is his boss?

19   A    Jose Tirso.

20   Q    Did you give him any money?

21   A    Yes, I did.

22   Q    How much in total?

23   A    I gave him about 1.4, $1.5 million.

24   Q    What did El Profe tell you this money was for?  You said

25   to set up business, but was there another reason?

Case 1:09-cr-00466-BMC-RLM   Document 630   Filed 07/10/19   Page 92 of 219 PageID #: 12408

1   A    Yeah, there's a couple of loans during that time.  The

2   next time he came he said that, you know, Tirso needed 500

3   grand in Houston, Texas because he was going to buy some kind

4   of a diamond or something.

5   Q    Did you loan this money to Tirso through El Profe?

6   A    Yes, I did.

7   Q    Let's go back to Lupe Ledezma, flash forward to 2003,

8   2004, okay?

9   A    Yes.

10  Q    By that time, how much cocaine was Lupe Ledezma sending

11  by tractor trailer to you and your twin brother?

12  A    I'd say from 800 kilos to 1200 kilos a month.

13  Q    Where were you distributing cocaine at this frame, 2003,

14  2004?

15  A    Chicago, other cities like Milwaukee,

16  Minneapolis-St. Paul, Columbus, Ohio, New York City.

17  Q    Let me just stop you for a moment.

18          Sir, were you asked at some point to draw your

19  routes around the 2003, 2004 time frame on a map?

20  A    Yes.

21  Q    I'm showing you, just for the witness, Your Honor, what's

22  been identified as Government's Exhibit --

23          MR. PURPURA:  No objection to the exhibit.

24          MR. FELS:  Move to introduce?

25          THE COURT:  500B is admitted.

3444

FLORES - DIRECT - FELS

1       (Government Exhibit 500B, was received in evidence.)

2       (Exhibit published.)

3   BY MR. FELS:

4   Q    Sir, do you recognize 500B?

5   A    Yes, I do.

6   Q    You can use your finger on that screen.  How did the

7   cocaine get from Mexico to you through Lupe Ledezma in this

8   2003, 2004 time frame?

9   A    It would go from -- I'm sorry, it would go from El Paso,

10  Texas to Chicago using tractor trailers.

11  Q    And it's this line right here?

12  A    Right here.(indicating)

13  Q    Now, cocaine gets to you in Chicago, how much -- do you

14  sell any of it in Chicago?

15  A    Yes, I'm selling most of it in Chicago.

16  Q    Give us a rough sense, what profit margin are you making

17  based on what you paid for it versus what you're able to sell

18  it for in Chicago?

19  A    Well, I'm trying to make at least 2,000 kilos -- I mean,

20  I'm sorry $2,000 a kilo at a time.

21  Q    And then there are these other lines here, you have a

22  line to Minneapolis, and --

23  A    Yes.

24  Q    And a line up here to Milwaukee?

25  A    Uh-huh.

FLORES - DIRECT - FELS

```
1    Q    What does this represent?

2    A    I'm sorry, the drug routes?

3    Q    Yes, the lines from Chicago to Minneapolis and Milwaukee.

4    A    The places I was sending cocaine to.

5    Q    Why are you sending it to these locations?

6    A    To increase my profit margin.

7    Q    Explain to the jury, how did that work?

8    A    Well, the farther you get from the border, the higher the

9    price of the cocaine.  The bigger the risk, the bigger the

10   reward.

11   Q    So you were saying you're trying to make about $2,000 per

12   kilo of the cocaine in Chicago, approximately how much profit

13   could you make in cities like Minneapolis and Milwaukee?

14   A    I would try to double that at least.

15   Q    Then we've got Memphis here?

16   A    Yes.

17   Q    Kentucky, Bowling Green and --

18   A    Louisville.

19   Q    -- Louisville.  Then we have Columbus, then we have this

20   one.  What am I circling here?

21   A    New York City.

22   Q    So when did you start sending cocaine to New York City?

23   A    About 2002.

24   Q    And tell us about the profit margins you were getting in

25   New York City versus Chicago?
```

FLORES - DIRECT - FELS

1  A    Well, if I was selling the kilos for 17 in Chicago, I

2  could easily get 20,000 in New York City.

3  Q    What was the quality of this cocaine that you were

4  getting from Lupe Ledezma?

5  A    It was great.

6  Q    How do you know?

7  A    'Cause from years and years of looking at kilos I could

8  tell just by looking at it almost whether it's good or bad.

9  Q    What do you mean by that?

10  A    So by opening I see if it has a chalky, kind of drywall

11  look to it there's something wrong with it, it's not right

12  most of time.  But what we're looking for is a pearly, like a

13  fish scale we call it.

14  Q    Is it fish scale?

15  A    Yes.

16  Q    And would you do any more scientific ways of determining

17  how pure this cocaine you were receiving from Lupe Ledezma

18  was?

19  A    Yes.  We could also -- we call it cook it, cook the

20  cocaine to see what was coming back.  What I would do is I

21  would take 15 grams out of a kilo, for instance, and throw it

22  in a glass jar and mix about five grams of baking soda with

23  it, a little bit of water, throw it in the microwave even and

24  cook it down to its oil, and then pull it out and begin to mix

25  it and have like an ice bath ready for it.  As it begins to

FLORES - DIRECT - FELS

```
1   cool and mix it hardens and turns to crack cocaine.  And I'll
2   take all that's left from it and I would measure it, I weighed
3   it out, sorry, I weighed it out to see what I got back and if
4   it was anything north of 15 grams it was good.  But, for
5   instance, if only 10 grams came back, then it would be losing
6   around 30 percent of the whole kilo, which was not good.
7   Q    So you were able to measure what you started with and
8   what you wound up with?
9   A    Yes.
10  Q    And this cocaine that you would receive from Lupe
11  Ledezma, what type of purity are we talking about?
12  A    I would say it's over 90 percent pure.
13  Q    Now would this cocaine just come in the tractor trailer
14  loads by itself?
15  A    No.
16  Q    And what would typically be, in your experience, be there
17  with the cocaine in the tractor trailer?
18  A    It would be cover loads.
19  Q    What's a cover load?
20  A    It's a load you use to hide the true identity of a drug
21  deal.
22  Q    Give us some examples.
23  A    The most common thing is would be like fresh produce, you
24  know, fruits and vegetables.  It could be anything, livestock.
25  I've seen it all.
```

FLORES - DIRECT - FELS

1   Q    So let's talk about the produce, you get the tractor

2   trailer in Chicago --

3   A    Uh-huh.

4   Q    -- got a whole bunch of produce, what do you do with the

5   produce once you recover the cocaine?

6   A    Well, at first we were trying to get rid of it at local

7   markets, you know, but that started to become -- it became an

8   issue, you know, we couldn't keep doing that.

9   Q    Why not?

10  A    I mean, we didn't want the people to get suspicious and

11  the prices of produce would drop dramatically in certain

12  areas, you know.

13  Q    What do you mean they would drop dramatically?

14  A    We were just kind of dumping out the produce for nothing,

15  we were practically giving it away just to get rid of it.

16  Q    What would the markets do?

17  A    The prices would drop so you gotta -- it was practically

18  free vegetables and produce.

19  Q    Let's move forward to 2004.  Did there come a time that

20  you and your brother moved in 2004 from Chicago to somewhere

21  else?

22  A    Yes.

23  Q    Where did you go?

24  A    We moved to Mexico.

25  Q    And why?  Why did you move from the United States to

FLORES - DIRECT - FELS

1    Mexico?

2    A    We left as fugitives.  I was indicted out of a case from

3    Milwaukee and we went there to get away.

4    Q    You went to Mexico to get away?

5    A    Yeah.

6    Q    You were evading the law?

7    A    Yes.

8    Q    Now, did you and your twin brother Margarito resume your

9    drug business while in Mexico?

10   A    Yes, we did.

11   Q    How were you able to accomplish that if you're not in the

12   United States anymore?

13   A    Using cellular phones, telephones.

14   Q    Give the jury an example what do you mean by using

15   cellular phones?

16   A    I would give my customers phones and then I would get new

17   phones and we'd just communicate through telephone.  And I

18   would -- same thing with the couriers, I'd set up my courier

19   system, and that's it.

20   Q    So were all of your dealings successful or did you have

21   some losses?

22   A    We had losses.

23   Q    Now you talked specifically of this loss at the trains in

24   New York and Chicago and you said that the supplier El Profe

25   was this guy named Tirso, did you ever meet Tirso after you

FLORES — DIRECT — FELS

1   moved to Mexico?

2   A     Yes, I did.

3   Q     How did you come about to meet Tirso?

4   A     I bumped into his secretary at a restaurant in

5   Guadalajara, Mexico.

6   Q     What did you explain to that secretary?

7   A     That I was interested in speaking with Tirso over the

8   debt that he still owed me.

9   Q     The money that you loaned him through Profe?

10  A     Yes.  Maybe continue on our -- or reestablish our drug

11  business.

12  Q     And did this secretary agree to introduce you to Tirso

13  for the purpose of continuing the drug business?

14  A     Yes, he did.

15  Q     Did this secretary tell you if Tirso had a nickname?

16  A     Yes.

17  Q     What was that?

18  A     El Futbolista, right, the soccer player.

19  Q     Did he tell you what his connection was with football?

20  A     Yeah, he was a soccer fanatic or something.  He owned two

21  soccer teams or something.

22  Q     Did the secretary tell you if Tirso was connected himself

23  to other drug traffickers?

24  A     Yes.

25  Q     Who?

FLORES - DIRECT - FELS

```
 1    A    That he was connected to Vicente Carillo Fuentes.

 2    Q    Now did you ultimately meet Tirso?

 3    A    Yes.

 4    Q    Where did you meet him?

 5    A    In Guadalajara at his little ranch.

 6    Q    Can you describe what was on the ranch of note that you

 7    recall?

 8    A    Yes, it had a soccer field and horse stables.  It was a

 9    pretty big property.

10    Q    Do you remember the name of that ranch?

11    A    Yes.

12    Q    What was it?

13    A    I believe it was El Centenario.

14    Q    I'm going to show you a photograph already in evidence,

15    Government's Exhibit 74B.

16          Sir, do you recognize the person on the right?

17    A    Yes.

18    Q    Who is that person?

19    A    That's Tirso.

20    Q    So what did you and Tirso discuss when you met at his

21    ranch, El Centenario?

22    A    We discussed the drug debt that he owed me and we

23    discussed the cocaine business.

24    Q    Did you talk about what had happened in the past too?

25    A    Yes.
```

FLORES - DIRECT - FELS

1    Q    What did he tell you specifically about some losses

2    that --

3             MR. PURPURA:  Your Honor, objection.  Sidebar may be

4    necessary.

5             THE COURT:  I think it is because I'm not seeing

6    your objection.

7             (Sidebar conference.)

8             (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          MR. PURPURA:  Your Honor, Tirso Martinez testified

2    that after 2003 he no longer had any connection to Joaquin

3    Guzman, he broke off their connections, as matter of fact what

4    he testified to was he stopped trafficking in drugs after

5    2003.  This now will be hearsay testimony coming in.

6          MR. FELS:  If I might respond?

7          MR. PURPURA:  You may.

8          MR. FELS:  This is Tirso and the witness who are now

9    talking about an upcoming drug load that they are doing and

10   Tirso is providing information about their past as a way to

11   encourage the ongoing and/or planned future drug conspiracy.

12         THE COURT:  So it may not be the conspiracy, but

13   it's a conspiracy --

14         MR. FELS:  Correct.

15         THE COURT:  -- and therefore it's usable.  That's

16   right.

17         MR. PURPURA:  I'm not sure --

18         THE COURT:  He's entering into a new conspiracy.

19         MR. FELS:  They agreed to traffic future drugs and

20   it's absolutely within the scope of encouraging a new drug

21   conspiracy to say, hey, we work together.

22         THE COURT:  I'm going to overrule the objection.

23         MR. PURPURA:  Judge if I may, if government had the

24   information prior to Tirso Martinez testifying, that

25   information should have been disclosed, that is *Giglio*

SIDEBAR CONFERENCE

1    information because it's contrary to what his testimony was

2    that he stopped trafficking in drugs and it is clearly what he

3    said.

4            THE COURT:  We'll address that later but right now

5    the question is appropriate.

6            MR. FELS:  All of this was turned over, just to be

7    clear, Pedro Flores' debriefs have been turned over for a long

8    time and all this information was turned over.  He described

9    it 2009 --

10           THE COURT:  We're not going to fight about that now.

11   If there's been some violation of disclosure, we'll talk about

12   that at the appropriate time.  The question as it stands is

13   appropriate.

14           (End of sidebar conference.)

15           (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

FLORES - DIRECT - FELS

1                    (In open court.)

2    BY MR. FELS:

3    Q    So, sir, we were talking about Tirso Martinez, did you

4    and Tirso -- sorry, strike that.  Did you and Tirso have any

5    conversations about some future drug business that you were

6    about to do?

7    A    Yes.

8    Q    We'll get into that in just a moment.

9              Did you and he discuss any sort of prior connections

10   that you might have had with each other?

11   A    Yes.

12   Q    What did Tirso say?

13   A    He acknowledged that we were working through the train

14   and he told me that he wasn't doing the oil thing anymore,

15   that it fell.

16   Q    That it fell did you say?

17   A    Yes.

18   Q    Did you understand what that meant at the time?

19   A    No.

20   Q    Did you ever later learn what Tirso meant about --

21   A    Yes.

22   Q    -- the oil falling?

23   A    Yes.

24   Q    We'll get to that in just a moment.

25              What future drug business did you discuss with

FLORES - DIRECT - FELS

1  Tirso?

2  A    That he was going to continue -- begin to supply me again

3  with cocaine.

4  Q    And through what method?

5  A    I think he was using some kind of a small trucks with

6  some kind of seafood business or shrimp trucks, something like

7  that.

8  Q    Did you work out some sort of deal, not necessarily at

9  this meeting but in some later meeting?

10  A    Yes.

11  Q    What was the deal?

12  A    I made a deal to give him a bunch of vehicles I had and

13  he was going to pay me with cocaine.

14  Q    Did you make delivery on those vehicles?

15  A    Yes, I did.

16  Q    To whom did you make delivery?

17  A    To Tirso.

18  Q    Who was present when you delivered these vehicles to

19  Tirso?

20  A    There was a number of people, including my older brother.

21  Q    Did Tirso ever send you any cocaine?

22  A    No.

23  Q    Have you ever had any contact with him since that day you

24  turned over the vehicles to him?

25  A    No.

FLORES - DIRECT - FELS

1    Q    Did you ever talk to anyone else about whether Tirso

2    might pay you back for these vehicles that you gave him?

3    A    Yes.

4    Q    With whom?

5    A    One of his other workers named -- I just knew him as

6    Chino.

7    Q    What did Chino basically tell you?

8    A    He told me to kind of count it as a loss.

9    Q    Count it as a loss?

10   A    Yeah.

11   Q    We'll go back, when you're in Mexico in 2004, did there

12   come a time that you and Lupe Ledezma had some sort of issue

13   with one another?

14   A    Yes.

15   Q    What was that?

16   A    Well, in December of 2004, two of my workers were

17   kidnapped and I was robbed for 400 kilos of cocaine.  So I

18   reached out to him and told him that my stash houses had been

19   compromised and I couldn't receive any more cocaine.

20   Q    You say you reached out to him, who are you talking

21   about?

22   A    Lupe.

23   Q    What was Lupe's response?

24   A    His response was that there is no way I could stop the

25   shipments and that if I didn't receive it, that I was going to

FLORES - DIRECT - FELS

1   have a problem.  And I took that as a threat.

2   Q    So what happened?

3   A    So I received the next shipment of cocaine, which was

4   like another two to 300 kilos, and since I didn't have nowhere

5   to put the cocaine, I tried to distribute as many as I could

6   and whatever I had left I left it at one of my friend's house

7   which resulted in those last 105, 110 kilos also being stolen.

8   Q    What did you do at that point?

9   A    I was upset and I told him I couldn't receive any more

10  cocaine.

11  Q    You told who you couldn't receive any more cocaine?

12  A    Lupe.

13  Q    What was Lupe's response?

14  A    He was not happy.  And then he requested that I turn over

15  all of my warehouses and my workers, essentially my whole

16  business.

17  Q    What did you tell him?

18  A    There's no way I could do that.  We had a disagreement.

19  Q    Did he tell you that he had a conversation about this

20  lost kilos and this debt with anyone else?

21  A    Yes.

22  Q    Who did he -- what did he say?

23  A    He said he had gone up to the mountains and that the man

24  said whoever owes is going to pay.

25  Q    You said the man?

FLORES - DIRECT - FELS

1    A     Yeah.

2    Q     Did he identify the man at that point?

3    A     No.

4    Q     But you later learned who that was, correct?

5    A     Yes.

6    Q     Who?

7    A     Chapo.

8    Q     So you tell Lupe I'm not turning over my warehouses, what

9    happens next?

10   A     So I begin -- I continue to pay off my debt and try to

11   square out our business that we had pending and then he

12   summoned me to a meeting in Zacatecas and told me, you know,

13   if you want to fix things, and he wanted to get back to

14   business.

15   Q     What happened at that meeting?

16   A     Well, I was -- I drove to Zacatecas with my wife and my

17   worker, Ashley.  That day I got this bad feeling and I asked

18   my brother to meet me at the spot where Lupe was at and

19   there's going to be no phone service so he picked up my wife

20   and my worker.  So when I arrived my brother was waiting for

21   me and he took my wife and my worker and I seen Lupe and his

22   son and they greeted me and I went inside the house to speak

23   with them.

24   Q     Where did your brother and your wife and your worker go?

25   A     He took them home.

FLORES - DIRECT - FELS

1    Q    So you're now in the house with Lupe?

2    A    Yeah.

3    Q    And some other people and what happens?

4    A    It's about maybe 10 minutes into our conversation, you

5    know, he has a bunch of men there with him and I hear a loud

6    bang, like a flash bang or something, and I see about 20, 25

7    armed men coming through the back of the house and yelling,

8    federal police, everyone down.  Which surprised me.  And they

9    came straight at me and began to beat me with their rifles,

10   put me on my knees, stripped me to my underwear and handcuffed

11   me and began to blindfold me, which I thought at that moment

12   we're all being arrested because he kept telling me, you're

13   going back to the U.S.

14   Q    Where did they take you?

15   A    That day they took me to somewhere like in the mountains

16   like and --

17   Q    How did you know that they were taking you there?

18   A    They put me in the back of the truck I could just -- I

19   mean, I felt -- they put me in the back of truck, I felt how

20   bumpy it was, they went offroad to the mountains and they had

21   me just sit out there 'til about four in the morning and they

22   put me back in the truck and drove me to some kind of like a

23   little room, like a jail cell with like a bed in it and metal

24   doors.

25   Q    Did they take off your blindfold?

FLORES - DIRECT - FELS

1  A    No, they never took off my blindfold.

2  Q    How long were you there in the jail?

3  A    They handcuffed me and bandaged my feet.  I was

4  practically laying in that bed for about 15, 16 days.

5  Q    What happened?

6  A    I lost about over 30 pounds.  I got sick.  It was pretty

7  traumatic.  I thought I was going to die and it's an

8  experience.

9  Q    And on the 16th day what happened to you?

10  A    They eventually put me back in the trucks and they drove

11  me for like 30 minutes and somewhere like in the middle of the

12  highway they stopped and they transferred me to another

13  vehicle, this time it was like a squad car, like a federal

14  police vehicle.

15  Q    Were you able to see at this point?

16  A    I could see glimpses, I could see under my blindfold that

17  it was a black and white squad car.

18  Q    Where did the squad car take you?

19  A    They drove me for another about an hour and then I felt

20  the car like go off the highway and into like a bumpy road and

21  took me out of the car and walked me a couple of steps.  I was

22  still blindfolded and handcuffed, and he kicked me in the back

23  of the knees and put me on my knees.  At that point I felt

24  like it wasn't even more worth for me to beg for my life, I

25  just thought it was going to be over.

FLORES - DIRECT - FELS

1  Q    What happened?

2  A    I felt them put something in my back pocket and then he

3  handed me a piece of paper.  He whispered to me, he said,

4  you're lucky, your brother saved you.  And he said, I'm

5  putting this handcuff key in your shoe.  He said, when I leave

6  I want you to count to a hundred and don't get up and don't

7  turn around until I leave.

8  Q    And then what happened?

9  A    I counted to a hundred like he said and when I came out I

10 reached for the handcuff key and managed to take the handcuffs

11 off and I reached for the phone he had placed in my pocket

12 which lucky for me had a flashlight on it.  It was like a

13 cheap Nokia phone with a flashlight and I was so weak, man,

14 you know, I could barely walk so every couple of steps I would

15 have to sit in the middle of the floor and just rest.  I

16 finally got some phone service and I was able to call the

17 number when my brother answered.

18 Q    You say the floor, what do you mean?  You said sit in the

19 middle of the floor?

20 A    I was sitting on the ground, man, just -- like I could

21 hear the wild cat around me, I hear, you know.  It was pitch

22 black though.

23 Q    Where did you go?

24 A    I finally made my way back and found myself on the

25 highway and I was able to contact my brother and I would still

FLORES - DIRECT - FELS

1  be hiding from the cars that were passing by because I was

2  pretty messed up.  I didn't want to bump into like a cop or

3  something and he sees me in that condition, you know.  And...

4  Q    How were you able to get out of that situation?

5  A    After I called my brother I was kind of lost where I was

6  at, but I could see across like the open valley there was like

7  a cop car with its strobe lights on, I could see it, and I

8  could see it follow the kind of zigzag of, you know, like a

9  snake road.

10  Q    Down a mountain?

11  A    Yes, down the mountain.  I see cars going up and down the

12  mountain and I recognized it from a road I had tooken plenty

13  of times.  So I told my brother just take a chance, man, see

14  if you come, see if I could see you.  He says, look it, I'm

15  going to call you when I'm on that road, so I'm going to flash

16  my lights, and I'll to put my hazard lights on, let me know if

17  you see them.  So it took him about 30 minutes 30, 40 minutes

18  and then I finally was able to see him.  He was shutting his

19  lights off and on and I seen his hazard lights on like from

20  far away from across the valley on to the next mountain and he

21  eventually found a way to me.

22  Q    What did he say when he saw you?

23  A    He said I stink.  And --

24  Q    What else did he tell you.

25  A    I gave him a hug.  And he told me that he had met Chapo

FLORES - DIRECT - FELS

1   Guzman.

2   Q    What was the significance of linking your experience with

3   Chapo Guzman?

4   A    He told me that Lupe, Lupe had set everything up.  And --

5   Q    How did your brother fix this problem with Lupe?

6   A    He had met Chapo and Chapo heard him out and that he send

7   some of his guys with my brother to speak with Lupe, which

8   then he told me that Lupe had slapped the shit out of him and

9   was yelling at him, but the guy that he sent with him had a

10  recording device in his pocket.

11  Q    Which guy who had sent?

12  A    That Chapo had sent.

13  Q    Chapo had sent one of his works with a recording device,

14  is that what you're saying?

15  A    Yes, yes.

16  Q    Did you ever meet Mr. Guzman shortly after this episode,

17  this kidnapping episode?

18  A    Yeah, I would say about 12 days later.

19  Q    What happened?

20  A    I was -- I was instructed to go to Culiacan, Sinaloa.

21  Q    Let's start with the first part of that trip.  You get to

22  Culiacan, who do you meet first?

23  A    I meet German Olivares and Omar Wiwi.

24  Q    Wiwi did you say?

25  A    Yes.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3465
FLORES - DIRECT - FELS

1    Q    Who is Wiwi?

2    A    He was a worker for Zambada, Mayo Zambada, somebody they

3    had running around for him.

4    Q    Did you later have conversations with Wiwi about what he

5    did for the Zambadas?

6    A    Yes, besides running around doing errands I believe that

7    later on he began to involve himself in the drug business as

8    well.

9    Q    So Wiwi and Olivares take you somewhere, where do they

10   take you?

11   A    They take me to a compound where I meet, among others,

12   Mayo Zambada.

13   Q    Let's talk about who else was at that first meeting with

14   Mayo Zambada -- and where was this compound?

15   A    In Culiacan, Sinaloa.

16   Q    Who else was there when you first meet Mayo Zambada?

17   A    There was a lot of people there.

18   Q    That you can remember?

19   A    Vicente Zambada, Juancho Guzman, Olivares, my brother,

20   me.  And Tomas Arevalo.

21   Q    Let's talk about some of these people.

22        Showing you what's been introduced into evidence as

23   Government's Exhibit 2B, who is this?

24   A    That's Mayo Zambada.

25   Q    Government's Exhibit 101 already in evidence, who is

FLORES - DIRECT - FELS

1   this?

2   A    That's Vicente Zambada.

3   Q    What's the relationship between Vicente Zambada and Mayo

4   Zambada?

5   A    Vicente Zambada is Mayo's son.

6   Q    Now, Government Exhibit 58A -- I think this is just for

7   the witness, Your Honor.

8           Sir, do you recognize who is depicted in

9   Government's Exhibit 58A?

10  A    Yes.

11  Q    Have you met this individual?

12  A    Yes.

13  Q    One time, many times?

14  A    Many times.

15  Q    Who is this individual?

16  A    Juancho.

17          MR. FELS:  Your Honor, if we may move to introduce

18  Government Exhibit 58A --

19          MR. PURPURA:  No objection.

20          MR. FELS:  -- and publish it.

21          THE COURT:  58A received.

22          (Government Exhibit 58A, was received in evidence.)

23          (Exhibit published.)

24  BY MR. FELS:

25  Q    You said Juancho, did you later learn what his full name

FLORES - DIRECT - FELS

1    was?

2    A    Yes.

3    Q    What did you know, what's his full name?

4    A    Juan Guzman Rocha.

5    Q    Did he ever tell you he was related to somebody?

6    A    Yes.

7    Q    Who?

8    A    That he was Chapo's cousin.

9         MR. FELS:  I don't believe this is in evidence

10   either, Your Honor.  I'm sure I'll get a stern talking to if

11   it was, I apologize.

12   Q    Government's Exhibit 78, do you recognize what this is?

13   A    Yes.

14   Q    What is it?

15   A    It's a picture of German Olivares.

16   Q    And you met him multiple times?

17   A    Yes.

18        MR. FELS:  Your Honor, move to introduce, if we

19   haven't already, Government's Exhibit 78.

20        MR. PURPURA:  No objection.

21        THE COURT:  Received.

22        MR. FELS:  And publish.

23        (Government Exhibit 78, was received in evidence.)

24        (Exhibit published.)

25   BY MR. FELS:

3468

FLORES - DIRECT - FELS

1  Q   So this is the individual, German Olivares in

2  Government's Exhibit 78, who drove you to meet Mayo along with

3  Wiwi?

4  A   Yes.

5  Q   I want to get you back to that first meeting with Mayo

6  and all these individuals in Culiacan.  What did Mayo Zambada

7  say to you about what had happened in the past?

8  A   Well, we discussed the drug business and he had said to

9  me that he believed that we sold over 20 tons of cocaine in

10  that time period.

11  Q   What did you say back to him?

12  A   I argued back to him that it was less than that maybe 15,

13  between 15 and 20 maybe were accurate.

14  Q   And what was his response?

15  A   Well, he got up from his chair and began to tell me how

16  he had personally sold drugs in LA, New York, Texas and

17  Chicago and told me he was familiar with the little village

18  where I'm from.

19  Q   The little village area in which city?

20  A   In Chicago, and he had sold drugs there himself.  Then he

21  said to me that -- and there's a bunch of people there, he

22  said any one of these idiots could sell tons of drugs in

23  Mexico, but very few could do it in the United States like

24  that.  He got up and shook me and brother's hand and he says,

25  you know, you guys have my respect, congratulations, you know.

FLORES - DIRECT - FELS

```
 1   Then he laughed and said, imagine if you guys were triplets.

 2   Q     What did you take that to mean?

 3   A     That we'd probably be doing a lot more than we had

 4   already done.

 5   Q     Did you and Mayo Zambada at that time talk about what you

 6   might be doing in the future?

 7   A     Yes.  We -- during those meetings I felt like I took the

 8   chance and asked if me and my brother continue to -- we could

 9   continue to work with them on our own behalf instead of

10   through another middleman.

11   Q     Another middleman such as Lupe Ledezma?

12   A     Yes.

13   Q     What was Mayo's response?

14   A     He then got up from his chair again and said, you know

15   what, you guys have earned it, he said.  I said, you're right.

16   And he told me you can get work from me and he pointed at

17   Olivares and Juancho, they were there, he said you could get

18   work from him or him, it's the same thing, he said, from now

19   I'm going to give the same prices as I give to my top

20   lieutenants and you guys are my people, man, and he got up and

21   shook our hand.

22              (Continued on the next page.)

23

24

25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - MR. FELS

1   BY MR. FELS:

2   Q    Did he offer you any work at that time frame, that

3   meeting?

4   A    Yes.  Immediately I seen Juancho and Olivares speaking

5   with each other.  I heard him saying some numbers, I have 300,

6   I have 200 something.  He said something to Mayo, do you want

7   to some cocaine now?  I said, yes.

8          I heard -- they took over the conversation.  They

9   said they had over 500-something kilos sitting in Chicago

10  right at that moment.  He said okay.

11  Q    Who said?

12  A    I'm -- I think it was Juancho, give me the number, so he

13  can put up these kilos.

14  Q    Did you pick up the 500-some odd kilos at that time?

15  A    They kind of were at that moment, that night, that very

16  moment I picked up the 500 kilos, I'm not sure.

17  Q    At this meeting did Mayo tell you from then on who he

18  would be working for?

19  A    Yes, he told me working with him and his compadre.

20  Q    Who is his compadre?

21  A    The Man, Chapo.

22  Q    Who did Mayo then want you to meet?

23  A    He said, I want you to go see my compadre tomorrow, I

24  believe his words were.

25  Q    Then who did you go to meet after that?

3471

FLORES - DIRECT - MR. FELS

1   A    I went to see Chapo.

2   Q    How did you get there?

3   A    I was taken by Wiwi to a runway right outside Culiacan.

4   We met in a corn field.

5   Q    What kind of a plane did you get on?

6   A    A small plane, about a four, five passenger, little

7   plane.

8   Q    Where did you go.

9   A    They flew us over to some mountains.

10  Q    Approximately how long did that flight take?

11  A    I'm not sure, could have been 40 minutes, I don't

12  remember, about 45 minutes.

13  Q    Can you describe the landing strip up in the mountains?

14  A    Yes.  The run way was cut out, cut into the side of a

15  mountain, kind of like you land going up hill, toward the

16  mountain.

17  Q    You made a sort of a --

18  A    Uphill landing.  You kind of land the plane going up the

19  hill.

20  Q    What was your state of mind when you got off the plane?

21  A    I was nervous.  I was very nervous.

22  Q    Did you see something after you landed that made you more

23  nervous?

24  A    Yes.

25  Q    What did you see?

FLORES - DIRECT - MR. FELS

1    A    I was picked up by a bunch of his men.  I was driven like

2    up the mountain on trucks.  And as we're going up the mountain

3    I was able to look over to my right, above me, and I see a man

4    that was naked.  He was tied to a tree with a chain.  He had a

5    chain around his hands.  He was crouching down looking down at

6    us.

7    Q    Do you know what happened to that man?

8    A    No.

9    Q    Who were you taken to see?

10   A    The Man.

11   Q    You keep saying the Man.

12   A    I'm sorry, Chapo.

13   Q    Could you describe what Chapo Guzman was carrying that

14   first time that you met him?

15   A    I mean, he had some jeans, and a T-shirt, a hat.

16   Q    Was he carrying anything?

17   A    In his hand he had two radios, like walkie-talkies.

18   Q    Where did you meet him?  Where specifically?  What kind

19   of structure did you meet him in?

20   A    It was a big cement structure.  The foundation was

21   sitting above ground.  The stairway was cut into that

22   foundation, the cement structure.  It was under a palapa.

23   Q    What is a palapa?

24   A    A dry palm tree hut, like you see on vacation spots.

25   Q    Including this occasion, let me make sure, what month was

FLORES - DIRECT - MR. FELS

1    this that you met Chapo Guzman for the first time?

2    A    That was May.

3    Q    What year?

4    A    2005.

5    Q    Including this occasion in May 2005, approximately how

6    many times have you met with Chapo Guzman?

7    A    About four times.

8    Q    There four times that you're sure about, could there be

9    more times?

10   A    Yes.

11   Q    Could you explain that a little bit?

12   A    I was there a couple of times, but for sure I want to

13   testify about four times today.

14   Q    Is that because there may have been more times you just

15   don't remember?

16            MR. PURPURA:  Objection.

17   A    Yes.

18            THE COURT:  It's fine.

19   Q    How would you refer to Mr. Guzman when you met him?

20   A    Senor.

21   Q    What does that mean?

22   A    With respect, like Boss, the Man.

23   Q    Who is at this first meeting that you had with Chapo

24   Guzman?

25   A    My brother, me and there is a couple of people there, but

FLORES – DIRECT – MR. FELS

1    right at that meeting just one other man.

2    Q    I asked you what he was wearing, what were you wearing?

3    A    I had some jeans short, a T-shirt, some jewelry on.

4    Q    Mr. Guzman have any reaction to your shorts?

5    A    Yes.

6    Q    What did he say?

7    A    With all that money I couldn't afford the rest of the

8    pants.

9    Q    Did he have a reaction to your jewelry as well?

10   A    Yes.

11   Q    What did he say?

12   A    The only thing that was missing was a dress.

13   Q    Did you ever see Mr. Guzman with any weapons either at

14   this time or others?

15   A    Yes, every time I seen him.

16   Q    What did he have?

17   A    He had a handgun in his waistband.

18   Q    Do you remember what?  Can you describe it?

19   A    It was black.  It had something shiny in it.  I don't

20   remember exactly what it was, but it was shiny.

21   Q    Do you remember the caliber?

22   A    I believe it was like a .38 Super.

23   Q    What other weapons does you see him carrying around?

24   A    That day I seen him he had a AK leaning on the chair,

25   AK-47.

FLORES - DIRECT - MR. FELS

1    Q    Did you ever wind up getting him any weapons yourself?

2    A    During that trip or another one, I'm not sure, I gave him

3    two .50 caliber Desert Eagle handguns, gold-plated handguns.

4    Q    What was his reaction when you gave him these guns?

5    A    It wasn't like, it was, I don't know, it wasn't positive.

6    I guess I was just watching too many movies, big, old, heavy

7    handguns.

8    Q    What do you mean?

9    A    They weighed 15 pounds each.  It was not, you know,

10   something that they use, I guess.

11   Q    Can you describe what his security situation was when

12   you're up there in the mountains?

13   A    Yes, he had a lot of heavily armed men.

14   Q    Any sense of how many, that you saw?

15   A    At least 40 or so.

16   Q    You're up there in the mountains, May 2005, with Chapo

17   Guzman, what do you and Chapo and your twin brother discuss at

18   this meeting?

19   A    We discuss a number of things.  Including Guadalupe

20   Ledesma.

21   Q    What specifically did you discuss with respect to

22   Guadalupe Ledesma?

23   A    We talked about unpaid debt and my concern that we hadn't

24   resolved the issues.

25   Q    What issues?

FLORES - DIRECT - MR. FELS

1    A    With my kidnapping and debt.

2    Q    What did Chapo tell you about his position in this

3    dispute between you and Lupe Ledesma?

4    A    He said he was going to be with a -- we're going to be

5    able to fix it.  And he told me he was like, he was going to

6    make them come.  What he told me was -- I complained saying he

7    didn't want to show up, he didn't want to fix it, we can't

8    talk to him.  He said, if he doesn't want to come I'm going to

9    make him come.

10   Q    What did you understand him to mean by that?

11   A    He would forcibly make him come speak to all of us.

12   Q    Then what happened?

13   A    Then he said, but if I make him come, I'm going to give

14   you a gun and he told my brother and I, I want you two guys to

15   shoot him once in each eye.

16   Q    Did you do that?

17   A    No.

18   Q    Did you ever kill Lupe Ledesma any other way?

19   A    No.

20   Q    Have you ever shot or killed anyone?

21   A    No.

22   Q    Have you ever ordered that anyone kill or shoot anyone?

23   A    No.

24   Q    So what, if anything, did Mr. Guzman say about whether he

25   believed you or he believed Lupe in this dispute?

FLORES - DIRECT - MR. FELS

1   A     He said he believed us, man.  That, I mean, we had the

2   books, you know, regarding the money, the payments we had made

3   in the past.  He told him that, Lupe told Chapo, that he

4   hadn't seen us for over a year or something.  He also told me

5   they were intercepting his phone calls.

6   Q     Who said who's intercepting who's phone calls?

7   A     Chapo that they were intercepting Lupe's phone calls.

8   Q     Chapo said that he was intercepting it Lupe's phone

9   calls?

10  A     He was in someway intercepting his phone calls.

11  Q     Did Mr. Guzman hold you accountable for any portion of

12  this debt?

13  A     Yes.

14  Q     How much did you later pay back of that debt?

15  A     All of it.

16  Q     What was the amount that you owed?

17  A     $4.4 million.

18  Q     Did Mr. Guzman in this first meeting ask you any

19  questions about your drug business in the United States?

20  A     Yes.

21  Q     What did he ask?

22  A     He asked us what cities we were selling drugs in, we

23  could move, how many kilos could we actually move at the time.

24  Q     Kilos of what?

25  A     Of cocaine and then of heroin.

FLORES - DIRECT - MR. FELS

1   Q    He talked to you of other drugs besides cocaine and

2   heroin?

3   A    Not at that meeting.

4   Q    But later he did.  What later drug did he talk about?

5   A    Methamphetamine.

6   Q    What is it that he wanted to know from you and your

7   brother?

8   A    How much we could move at the time.

9   Q    Did he ask you about anything that didn't have to do with

10  obtaining -- anything that didn't have to do with drugs?

11  A    Yes.  He asked if we could obtain, we get him guns.

12  Q    Did you tell him where your base of operation was?

13  A    No, he knew.

14  Q    He knew it was what?

15  A    Chicago.

16  Q    After he asked you all these questions about your

17  capacity to move drugs, what, if anything, did he tell you

18  about what you would be doing in the future for him?

19  A    If we would continue to be working together through

20  Juancho and Olivares.

21  Q    I'm going to show this picture again, Government's

22  Exhibit 58 and Government's Exhibit 78.  Going forward after

23  this May 2005 meeting, what connection did you and your

24  brother have, Mr. Flores, with Juancho and with German

25  Olivares?

FLORES - DIRECT - MR. FELS

1   A      Connection, just drug business.  We were in constant

2   communication.

3   Q      Did these two men represent two individuals?

4   A      Yes.

5   Q      Explain to the jury?

6   A      Well, Juancho was speaking on behalf of Chapo.  And

7   Olivares was speaking on behalf of more of Mayo Zambada.

8   Q      Did you continue after this first meeting to accept drug

9   shipments from either of these two individuals?

10  A      Yes.

11  Q      From which ones?

12  A      From both.

13  Q      We'll get to that in a moment.  But during this first

14  meeting, did Chapo Guzman talk to you about any other violence

15  besides that violence with Lupe Ledesma?

16  A      Yes.

17  Q      Tell us what happened?

18  A      While I was sitting there he asked if I knew, if I could

19  read English.  I said yes.  He had his guy put a piece of

20  paper over to me and my brother, he asked me to read it and

21  tell him what I thought.

22         It was a news article, a drug seizure that happened

23  a couple months earlier.  I'm not sure when, but it was two

24  cars that were pulled over on a highway and cocaine and heroin

25  were seized.

FLORES - DIRECT - MR. FELS

1  Q    And what is it that Chapo Guzman wanted you to do with

2  this article?

3  A    To tell him if I thought it was a real or if I thought it

4  was phony.  It looked simply wrote.  It didn't look real to me

5  at that time.  I said, man, it looks like anybody could type

6  this up, you know.

7  Q    What did Chapo say?

8  A    He turned to his worker.  He told him, look.  The worker

9  told him, what do you want me to do?  He says, ejecuntenlo.

10 Q    Which means?

11 A    Execute him.  The worker said, what about the money?  He

12 said, the money is spent by now.

13 Q    Who said the money is spent by now?

14 A    Chapo.

15 Q    Did you ever follow up with this account?

16 A    Yes.

17 Q    What happened?

18 A    It didn't sit easy with me and my brother.  So as soon as

19 we got back to the business center of the hotel, we searched

20 that seizure again.  We found it in multiple newspapers.  So I

21 immediately called Juancho, told him, listen, I explained the

22 situation, tell him it's real, the news story is real, you

23 know.

24 Q    What did why did you say that?

25 A    I was worried that somebody might get hurt over a simple

FLORES - DIRECT - MR. FELS

1    mistake.

2    Q    Do you know what happened?

3    A    No.

4    Q    Moving on.  You were talking about receiving kilos of

5    cocaine from Juancho and Olivares.  You talked about receiving

6    that first load of 500-some odd kilos that first day, was that

7    first shipment successful?

8    A    Yes.

9    Q    How do you know?

10   A    Because I distributed to my workers and paid them back

11   for it.

12   Q    You distributed it to your workers?

13   A    I mean to my customers.

14   Q    Approximately how much did you make on that first

15   shipment?

16   A    After that first meeting I ended up paying a thousand

17   dollars cheaper than I paid before.  So I easily made over a

18   million-and-a-half dollars that first shipment.

19   Q    Just on that first shipment alone?

20   A    Yes.

21   Q    Over the next few years did you receive other cocaine

22   shipments from Chapo and Mayo through these two gentlemen,

23   Juancho and German Olivares?

24   A    I continued to receive cocaine from them routinely.

25   Q    With whom did you coordinate from period from May 2005

3482
FLORES - DIRECT - MR. FELS

1    until you turned yourself in in November 2008 to receive Chapo

2    Guzman's and Mayo Zambada's cocaine loads?

3    A    With different people including Juancho and German,

4    Vicente Zambada, Alfredo Vasquez, Damaso.

5    Q    What about heroin?  Did you have someone who distributed

6    heroin on behalf of Mayo Zambada an individual that you met?

7    A    Yes, Felipe and Alfredillo.

8    Q    Who is Alfredillo?

9    A    Chapo's son.

10   Q    Do you know his -- do you know any other names for him?

11   A    Alfredo Guzman and Salazar.

12             MR. FELS:  I'll show you Government's Exhibit 16,

13   move into evidence, your Honor.

14             THE COURT:  You're moving it or it's in?

15             MR. PURPURA:  No objection.

16             THE COURT:  Received.

17             (Government Exhibit 16, was received in evidence.)

18   Q    Who is this individual Government's Exhibit 60?

19   A    That's Alfredillo.

20   Q    You said he's the son of Chapo Guzman?

21   A    Yes.

22   Q    You mentioned someone else, another name, Damaso?

23   A    Yes.

24   Q    Who did you meet Damaso with?

25   A    With Alfredillo.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

FLORES - DIRECT - MR. FELS

1    Q    What did Damaso do with you?

2    A    He also supplied me with cocaine.

3    Q    Do you recognize Government's Exhibit, already in

4    evidence, 11A?

5    A    Yes.

6    Q    Who is that?

7    A    That's Damaso.

8    Q    What did Damaso do for Chapo Guzman?

9    A    My understanding is that he was like Chapo's right-hand

10   man.

11   Q    And specifically, what specific things did you observed

12   that he did for Chapo Guzman?

13   A    Help him coordinate certain drug shipments.

14   Q    Over the next few years, did you receive any drug loads

15   from Damaso?

16   A    Yes.

17   Q    Approximately how much?

18   A    No more than 500 kilos.

19   Q    Is that one time or multiple times?

20   A    It was a couple of different shipments, totally no more

21   than 500 kilos.

22   Q    You mentioned Felipe Sarabia in shipping heroin.  Did you

23   ever meet Felipe?

24   A    No.

25   Q    What about your twin brother?

FLORES - DIRECT - MR. FELS

1    A    Yes.

2    Q    You mentioned Alfredo Vasquez, did you meet him?

3    A    Yes.

4    Q    One time, many times?

5    A    Many times.

6    Q    Showing you what is already in evidence as Government's

7    Exhibit 97A, who is this individual?

8    A    Alfredo.

9    Q    Did you know him by a nickname?

10   A    Alfredo Compadre.

11   Q    How did you come to be introduced by Alfredo Vasquez's

12   a/k/a Compadre?

13   A    Through Chapo.

14   Q    For what purpose?

15   A    There was, I was looking for a money courier, someone

16   help me bring money down from Chicago.

17   Q    To where?

18   A    To Mexico.

19   Q    Did this individual, Alfredo Vasquez, did he agree to

20   help bring this money down?

21   A    Yes.

22   Q    Did you later agree to do some other kinds of illegal

23   work with Vasquez?

24   A    Yes.

25   Q    What?

3485

FLORES - DIRECT - MR. FELS

1    A    We invested in a submarine load together and the train

2    company.

3    Q    When you say submarine and train, what were you shipping?

4    A    Cocaine.

5    Q    With whom?

6    A    With Alfredo and, I mean, Chapo.

7    Q    You testified earlier that Tirso, the man you met in his

8    ranch, El Centenario, told you in connection with this train

9    route in New York and Chicago that the thing with the oil

10   fell.  Do you remember that?

11   A    Yes.

12   Q    You said you didn't know what that meant at the time?

13   A    Correct.

14   Q    Did you later find out what Tirso meant by that?

15   A    Yes.

16   Q    Through whom?

17   A    Through Alfredo.

18   Q    What did Alfredo tell you?

19   A    That he was some sort of partner with Tirso in that train

20   business.  And that he had helped him set up certain companies

21   and that they were moving it using some kind of vegetable oil

22   or olive oil.

23   Q    What where were they moving it?

24   A    To Chicago and New York.

25   Q    From?

FLORES - DIRECT - MR. FELS

1    A    From Mexico.

2    Q    Did Alfredo ever show you any documentary evidence about

3    this?

4    A    Yes.  In his office he pulled out a stack of paperwork.

5    He said that some of the companies were still under his name,

6    for that reason that he thought that the U.S. Government was

7    still looking for him.

8    Q    Now did you have any conversations with Alfredo about

9    whether Tirso would be able to pay you back for the money that

10   you had lent him?

11   A    Yes.

12   Q    What did Alfredo tell you?

13   A    He said he was having some --

14   Q    Who is he?

15   A    That Tirso was having financial problems and that he was

16   a big-time gambler.

17   Q    What would he gamble?  What did Alfredo say that Tirso

18   was gambling?

19   A    Cockfights, horse races, he played a lot of poker.

20   Q    Did you ever wind up talking to somebody else about a

21   drug debt that they had with Tirso?

22   A    Yes.

23   Q    With whom?

24   A    One of my associates, Tomas Arevalo.

25   Q    I want to talk about someone different.  Did you ever

FLORES - DIRECT - MR. FELS

1    talk to someone who acknowledged that Tirso had in fact paid

2    on a drug debt?

3    A    Oh, yes.

4    Q    Who is that?

5    A    Mayo Zambada.

6    Q    What did Mayo tell you?

7    A    After I met him, you know I was still feeling a little

8    funny about the situation that Tirso robbed me for around

9    $2 million.  I was curious to see, you know, what his status

10   was in the cartel.  I asked Mayo if he knew Tirso.

11   Q    What did Mayo say?

12   A    Mayo acknowledged that he knew him.  He referenced him as

13   Fletro.

14   Q    What does that mean?

15   A    One who transports.

16   Q    What did Mayo say that Tirso had done for Mayo?

17   A    He said that he had, he told me he was he had guaranteed

18   the cocaine shipment.

19   Q    You keep saying he.

20   A    Tirso guaranteed him the cocaine shipments.

21   Q    Tirso guaranteed whom the cocaine shipments?

22   A    Mayo.  And that if he lost anything, that he would pay

23   each kilo at $20,000 a kilo, which was already outrageous to

24   me.

25   Q    Why?

*Rivka Teich CSR, RPR, RMR*
*Official Court Reporter*

FLORES – DIRECT – MR. FELS

1  A     A high price to pay, you know.

2  Q     What did Mayo tell you had happened after Tirso had

3  guaranteed his work at $20,000?

4  A     I asked him, so what happened?  He said he lost it.

5  And --

6  Q     I'm sorry, you keep saying "he."

7  A     Mayo said, I asked him what happened with Tirso.  And he

8  said he lost, Tirso lost, the cocaine.  And he paid me.  That

9  was the last time I've seen him.

10  Q     That's what Mayo is telling you?

11  A     Yes.

12  Q     You testified you were getting cocaine shipments

13  consistently from Chapo and Mayo from 2005 to 2008.  Who else

14  were you receiving cocaine shipments from?

15  A     From Alfredillo, Damaso, Alfredo Vasquez.

16  Q     What about someone connected to Chapo and Mayo?

17  A     Vicente Zambada.

18  Q     Let's talk about Vicente Zambada.  You were receiving

19  shipments from him as well.

20  A     Yes.

21  Q     Was there another person or group that was connected with

22  Chapo and Mayo?

23  A     Yes.

24  Q     Who is that?

25  A     Arturo Beltran-Leyva.

3489

FLORES - DIRECT - MR. FELS

1    Q    Did you ever meet him in person?

2    A    No.

3    Q    Did you ever have any contact with him.

4    A    Yes.

5    Q    What kind of contact?

6    A    Telephone contact.

7    Q    How did you wind up getting supplied cocaine through

8    Arturo Beltran-Leyva?

9    A    I was introduced to one of his lieutenants, which kind of

10   informed me that I had been recommended by Chapo.

11   Q    Did you at some point have a conversation with Chapo

12   Guzman about whether it was okay for you to be purchasing

13   cocaine from Arturo Beltran-Leyva?

14   A    Yes.

15   Q    What did he say?

16   A    To try to make money.

17               THE COURT:  Hang on.

18               Ladies and gentlemen, are you ready to go for

19   another 15 minutes or you want a break?  You're okay.  Okay.

20               Please continue.

21   Q    Government's Exhibit 500B was a map that you drew from

22   your 2003/2004 time frame.  Were you asked to draw another map

23   that represented what your routes were after you met Mayo and

24   Chapo?

25   A    Yes.

FLORES - DIRECT - MR. FELS

1      MR. FELS:  Showing what you is marked for

2  identification purposes as Government's Exhibit 500A.

3      MR. PURPURA:  No objection.

4      MR. FELS:  Move to introduce.

5      THE COURT:  Received.

6      (Government Exhibit 500A, was received in evidence.)

7  Q    Sir, what is Government's Exhibit 500A?

8  A    It's a map.  I drew the lines on it.  It represents the

9  cities I was selling cocaine in at the time.

10 Q    At what time?

11 A    After I met Chapo and Mayo.

12 Q    I'm going to -- follow with me here.  You have a line

13 here from El Paso to Chicago, but you've written over here

14 2007, what does that mean?

15 A    That's the line that we worked up until 2007.

16 Q    After 2007, in other words, your route from Mexico

17 changed?

18 A    Yes.

19 Q    We'll get to that in just a moment.  You've got a whole

20 number of cities here, we'll go through them.

21      We still have two cities in Kentucky, you have New

22 York, you don't have Milwaukee or Minnesota anymore; is that

23 correct?

24 A    Correct.

25 Q    And you have now Philadelphia, Washington DC, and

FLORES - DIRECT - MR. FELS

1  Detroit.  So would you say that your cocaine supply increased

2  or decreased after you met Chapo Guzman and Mayo Zambada in

3  2005?

4  A    It increased.

5  Q    And you also have this line here from the border of

6  Mexico and California up to Los Angeles, then it looks like up

7  into Canada.  What does this signify?

8  A    That's the place where the drugs were coming across in

9  Baja California area, up to LA, then to Chicago and to Canada.

10 Q    So this line here from Los Angeles to Chicago represents

11 what?

12 A    That's the route that we would take to move the kilos

13 from LA to Chicago.

14 Q    What is the significance of Canada up here?

15 A    That's Vancouver, British Colombia.

16 Q    Did you have customers there?

17 A    Yes.

18 Q    Who's cocaine were you selling?

19 A    Chapo, Mayo and Arturo Beltran-Leyva.

20 Q    Do you know who was in charge of delivering loads to you

21 here in Los Angeles?

22 A    Juancho and German Olivares.

23 Q    Let's talk about, did you meet Chapo Guzman again?

24 A    Yes.

25 Q    Was there an incident with a cocaine load that happened

3492
FLORES - DIRECT - MR. FELS

1    shortly after you met Mayo and Chapo for that first time?

2    A    Yes.

3    Q    What happened?

4    A    There is a seizure of cocaine, 398 kilos.

5    Q    Where was that seizure?

6    A    Bloomington, Illinois.

7    Q    Where in Illinois is that?

8    A    I think it's like two hours away outside of Chicago.

9    Q    I'm circling Illinois, in that state?

10   A    Yes.

11   Q    So what happened?

12   A    So this was our first shipment that we're going to load

13   after we met Chapo and Mayo.

14   Q    You talked about a 500-plus shipment, what is the

15   difference between that 500-plus shipment that you got from

16   the Juancho and German and this 398-kilo shipment?

17   A    That shipment was given to us by one of the carriers.  It

18   was already in Chicago.

19   Q    So when you say this was the first shipment that you were

20   receiving, what do you mean by that?

21   A    Directly from them.  We were supposed to unload these

22   semi tractor-trailers with the cocaine.

23   Q    What happened in Bloomington, Illinois?

24   A    The truck was pulled over and law enforcement seized

25   398 kilos.

FLORES - DIRECT - MR. FELS

1    Q    How did you learn that?

2    A    Because two of my workers were arrested at a warehouse in

3    Chicago.

4    Q    Once you learned about that seizure, did you have to go

5    somewhere?

6    A    Yes.

7    Q    Tell us what happened?

8    A    I had to the give proof of that seizure and go back and

9    see Chapo, and Olivares, and Vicente Zambada to discuss who's

10   fault it was.

11   Q    You said Vicente Zambada, why was he involved?

12   A    It was both their cocaine.

13   Q    Did you meet with Chapo, Vicente Zambada and Olivares?

14   A    Yes.

15   Q    This was when?

16   A    June, July 2005.

17   Q    You were asked to obtain something before you met with

18   these individuals?

19   A    Some kind of proof of the drug, that these drugs were

20   seized.

21   Q    What is the significance of obtaining proof the drugs

22   were seized?

23   A    To see who's fault it was, to make sure nobody was just

24   ripping them off.

25   Q    What, if anything, were you able to obtain.

FLORES - DIRECT - MR. FELS

```
 1   A    The criminal complaint in that case.

 2   Q    What did you do with that complaint?

 3   A    I took it to them to show it to them.

 4   Q    To who?

 5   A    Chapo, and Vicente Zambada, and Olivares, Juancho.

 6   Q    What was Chapo's reaction when you showed him the

 7   complaint?

 8   A    They were happy with it.

 9   Q    What do you mean they were happy with it?

10   A    They acknowledged that it wasn't our fault.  We were

11   clear of having to pay anything back for it.

12   Q    What did he want you to do?

13   A    Continue the business.

14   Q    Continue to do business, what kind of business?

15   A    Receive these drug shipments.

16   Q    Let's flash forward now to the end of that year,

17   December 2005, what happened then?

18   A    My father was kidnapped.

19   Q    How did you attempt to resolve this kidnap?

20   A    I went to see Chapo.

21   Q    What conversation did you and he have about this kidnap?

22   A    I explained to him that I believe that Lupe Ledesma was

23   behind this kidnapping.

24   Q    Why did you think that?

25   A    Because the kidnappers were asking me for $6.6 million
```

FLORES - DIRECT - MR. FELS

1   something like that.

2   Q    What about the amount the kidnappers were asking you

3   caused to think that this was Lupe Ledesma?

4   A    Lupe Ledesma owed $10 million to Chapo.  And after me

5   paying off that $4 million debt, I figured he owed around

6   $6 million.  He just -- it was weird, just the 6.6, it sounded

7   weird to me.

8   Q    So where did you see Chapo this third time?

9   A    The mountain.

10  Q    Did you bring him a present?

11  A    Yes.

12  Q    What did you bring him?

13  A    A pair of jean shorts in a Viagra box.

14  Q    You said a Viagra box?

15  A    Yes, a box, it looked like a Viagra box.

16  Q    What was his reaction?

17  A    He laughed.

18  Q    At this meeting or other meetings, did you meet any of

19  Chapo Guzman's secretaries?

20  A    Yes.

21  Q    What does that mean to you, secretary of Chapo Guzman?

22  A    He carried phones for him, and he had a bunch of radios

23  and phones, someone who takes care, he would make calls from,

24  he was like his voice on the phone.

25  Q    Do you remember the name of this secretary that you saw?

FLORES - DIRECT - MR. FELS

1    A    Yes.

2    Q    Who was it?

3    A    Chinacate.

4    Q    Chinacate?

5    A    Yes.

6    Q    Do you remember what he looked like?

7    A    He was red head.

8    Q    Getting back to the meeting.  You hand Chapo Guzman the

9    present of the shorts, what else did you and Chapo discuss

10   besides this issue of your father's kidnapping?

11   A    I don't --

12   Q    Did you talk about?

13              MR. PURPURA:  Objection.

14   Q    Let's start with the --

15              THE COURT:  He's going to refresh him.  It's okay.

16   Q    What else did you and Chapo talk about relating to the

17   kidnapping?

18   A    It was my believe that it was Lupe, which he agreed.  He

19   said to me to negotiate whatever I had to do with the

20   kidnappers, try to get my Dad back under any means, you know.

21   Q    Were you successful in negotiations initially?

22   A    No.

23   Q    So what ultimately happened?

24   A    Chapo sent me someone, Pocos Pelos.

25   Q    How do you know that Chapo sent you this guy, Pocos

FLORES - DIRECT - MR. FELS

1    Pelos?

2    A    Because he told me, Pocos Pelos came.  I met him in

3    Guadalajara.  And he came and told me he was going to need a

4    bunch of things from me.

5    Q    What things?

6    A    Some vehicles, some guns, money.

7    Q    And did you provide Pocos Pelos with any of these items?

8    A    Yes.

9    Q    Did you provide him with all of the items that Pocos

10   Pelos requested?

11   A    No, I didn't have the guns that he needed, all the guns

12   he needed.

13   Q    How did you resolve this issue providing Pocos Pelos with

14   all the guns that he needed?

15   A    I spoke with Chapo.  And he told me, don't worry about

16   it.  I'm going to send someone to you, just receive it.

17   Q    And did you receive something?

18   A    Yes.

19   Q    What?

20   A    It was a vehicle.  I had set up the drop in my house.

21   The guy drove a local pick up.  It was escorted by a federal

22   police car.

23   Q    A federal police car?

24   A    Yes.

25   Q    And what was in the pickup truck?

FLORES - DIRECT - MR. FELS

1   A    There was a stash compartment in it and he showed me how

2   to open it.

3   Q    Who showed you?

4   A    The courier, the guy who brought, who drove the pick up

5   to my house.  He showed me how to open it.  I opened it.

6   There was about 25, 30 AR-15s in the stash.

7   Q    What else?  You said it was escorted by a police car what

8   was in the police car that Chapo sent?

9   A    It was bunch of logos for the federal police.

10  Q    You say logos, what do you mean by that?

11  A    Like badges, stickers, like that represented the federal

12  police in Mexico, the AFI.

13  Q    And what did you do with those badges?

14  A    I helped iron them on a bunch of uniforms, black

15  uniforms.

16  Q    Who did you turn those uniforms over to?

17  A    To Pocos Pelos and the 20, 25 men they had sent with

18  them.

19  Q    Now you mentioned that you had obtained -- did you obtain

20  some vehicles as well?

21  A    Yes.

22  Q    What was the issue?  Was there an issue with the

23  vehicles?

24  A    Yes, there was.

25  Q    What was that?

FLORES - DIRECT - MR. FELS

1    A    One of my associates recommended that I get these stolen

2    vehicles, which I thought was not a problem.

3    Q    But what happened once you got these stolen vehicles?

4    A    Somehow, I guess Pocos Pelos or one of them, reported

5    back to Chapo that they were stolen.

6    Q    Did Chapo reach out to you?

7    A    Yes.  He was upset because the vehicles were stolen.  He

8    kind of reprimanded me about it.  He said no innocents should

9    get hurt or take a loss because of something like this.  We

10   can buy the vehicles new.

11   Q    What did he say?

12   A    For me to buy the vehicles brand new if I had to, but not

13   to do that again.

14   Q    Was there another concern about the fact that his people

15   would be driving around in stolen vehicles, did he express to

16   you?

17   A    Yes, that they could be in a situation with law

18   enforcement putting them in danger.

19   Q    Sir, what happened next?

20   A    These men, including Pocos Pelos, kidnapped Lupe Ledesma

21   and both his sons.

22   Q    Were you there?

23   A    No.

24   Q    How did you find out about it?

25   A    I found out about it afterwards from Pocos Pelos.

3500

Proceedings

```
1              THE COURT:  Mr. Fels, at your convenient time.

2              MR. FELS:  We can break now.

3              THE COURT:  We'll break until 3:00 o'clock.  Please

4    don't talk about the case.  See you shortly.

5              (Jury exits.)

6              THE COURT:  Be seated.  Chambers has gotten a note

7    from a couple of sketch artists saying that they observed on a

8    particular specific television station what appeared to be a

9    sketch or art depicting the jurors.  I'm inferring from the

10   note that it means they thought they were discernable,

11   realistic drawings of the jurors.  I haven't made any specific

12   findings on that, I don't think.

13             But I want to give the parties a chance to think

14   about it and see what we should do.  We'll address it at the

15   end of the day.  You can think about it from now until then.

16             I'll see you at 3:00 o'clock.

17             (Brief recess.)

18             (Continued on the next page.)

19

20

21

22

23

24

25
```

Flores - Direct/Fels

 1              (In open court.)

 2              THE CLERK:  All rise.

 3              THE COURT:  Please bring in the jury.

 4              (Jury enters.)

 5              THE COURT:  Everyone be seated.  Please continue,

 6   Mr. Fels.

 7              MR. FELS:  Thank you, Your Honor.

 8   DIRECT EXAMINATION

 9   BY MR. FELS (continuing):

10   Q    Mr. Flores, when we left off we were describing how Pocos

11   Pelos, the man that had been sent to you by Chapo Guzman, went

12   off and kidnapped Lupe Ledezma.

13              From whom did you learn that?

14   A    From Pocos Pelos.

15   Q    What did Pocos Pelos tell you about the kidnapping?

16   A    That he had picked up him and his two sons, Ledezma and

17   his two sons.

18   Q    Who ordered Pocos Pelos to kidnap?

19   A    Chapo did.

20   Q    For what purpose?

21   A    For a debt that was owed to him.

22   Q    Did you ever find out what happened to Lupe's kidnapped

23   sons?

24   A    They were released.

25   Q    First of all, who did you hear it from?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    Pocos Pelos.

2    Q    What did Pocos Pelos tell you about Lupe Ledezma's sons?

3    A    They had let them go because everything that had helped

4    secure the payment that was owed to Chapo by giving them

5    certain lands and stuff they owned.

6    Q    What did Pocos Pelos tell you about how Lupe Ledezma's

7    sons turned over those properties?

8    A    That they had brought a notary to sign over these deeds

9    to wherever they had Lupe kidnapped at, and -- but that his

10   sons had changed their mind and went to the police.

11   Q    What happened then?

12   A    That Chapo had those brothers killed as well as Ledezma.

13   Q    Who told you that?

14   A    Pocos Pelos.

15   Q    Did Pocos Pelos explain to you how he killed Lupe Ledezma

16   on Chapo's orders?

17   A    Yes.

18            MR. PURPURA:  Objection.

19            THE COURT:  Overruled.

20   Q    How?

21   A    He said he had suffocated him to death, put a plastic bag

22   over his head.

23   Q    Who, if anyone, did you later confirm that Lupe Ledezma

24   was dead?

25   A    Chapo, with Chapo.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    Q    Describe what happened.

2    A    So my father had been released from his kid -- from his

3    kidnapping and mentioned to me that there was rumors going

4    around that they had seen Lupe in some place somewhere.  So

5    that left me uneasy.

6    Q    Why?

7    A    Because I felt that he was a threat to me.  So I

8    mentioned it to Chapo.

9    Q    What did he say?

10   A    He said you are seeing ghosts, worry about something

11   else.

12   Q    What did you take that to mean?

13   A    That he was in fact dead, that Lupe was in fact dead.

14   Q    Did you have other meetings with Chapo Guzman besides the

15   ones we have talked about so far?

16   A    Yes.

17   Q    And let's talk about this meeting that happened a couple

18   years later.

19        Do you remember the exact date?

20   A    No.

21   Q    Give us a general time frame as to when this meeting took

22   place, this fourth one, that you can remember?

23   A    2000 -- the end of 2006, 2007, I would say.

24   Q    By this time you had already met with Chapo at least

25   three times; is that correct?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    Yes.

2    Q    Were you nervous still about being with Chapo?

3    A    No, not anymore, no.

4    Q    So what did you say to him when you saw him this time?

5    A    I explained to him that on my first trip I was extremely

6    nervous, and he asked me why.  I said I had this idea like the

7    movies that you had lines of people and guys would shoot them

8    in the head and say next.

9    Q    You told Chapo that you --

10   A    I had this idea in my head of how it would be to meet

11   someone like that.

12   Q    What was Chapo's reaction?

13   A    Everyone there laughed.

14   Q    Including Chapo?

15   A    Yes.  Then, in a serious tone, he told me, no, only the

16   ones we have to.

17   Q    Now, you testified earlier you typically get cover loads

18   to hide cocaine shipments.

19            Do you remember that?

20   A    Yes.

21   Q    Did you ever have a conversation with Chapo Guzman about

22   a strange cover load that you received in Chicago?

23   A    Yes.

24   Q    Some years earlier?

25   A    Yes.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    Q    Describe it.  Tell us about this load.

2    A    It was live sheep.

3    Q    Live sheep was the cover load?

4    A    Yes.

5    Q    Who presented you or made these connections and

6    arrangements with the sheep?

7    A    Guadalupe did.

8    Q    This is before he was killed?

9    A    Yes, on his way to Chicago.

10   Q    Approximately what time frame was this?

11   A    About 2003.

12   Q    So Lupe tells you that there is going to be a shipment of

13   cocaine?

14   A    Yeah.

15   Q    And the cover load of sheep?

16   A    Yeah.  He says we got go meet the driver.  We have a

17   small issue.

18   Q    What was the small issue?

19   A    There was about 150 heads of sheep, live sheep; and I --

20   and we were in a dilemma because the warehouse I had at the

21   time was in the city.  So now I'm looking at a bunch of live

22   sheep, like what are we going to do with them, because the

23   driver explains he can't take the sheep back with him.

24   Q    So after you unload the cocaine into the warehouse what

25   do you do with the sheep?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1   A     Chaos.  We had to load the sheep back up on the trailer,

2   and I found a friend of mine who owned a ranch outside of

3   Chicago.  We had to pay him $10,000 to take the sheep.

4   Q     All the sheep?

5   A     No.  So that day I had took off --

6              MR. PURPURA:  Objection, 401.

7              THE COURT:  Sustained, sustained.

8   Q     And what ultimately did you do with the remaining sheep?

9              MR. PURPURA:  Objection.

10             THE COURT:  Sustained.

11  Q     Let me jump ahead a couple of years.

12             Did you ever talk to Chapo Guzman in this meeting

13  that you are describing about this load with the sheep?

14  A     Yes.

15  Q     Why?

16  A     Because I was concerned that -- that these cover loads

17  were kind of, you know, weak, man.  They put no effort into

18  really concealing the drugs, and the risk of that was that

19  every time a load got popped off in the city or got seized, I

20  would lose people, you know.

21  Q     What do you mean you would lose people?

22  A     He would get arrested, and I explained that there was

23  maybe possible -- there is better ways we could do it, you

24  know.

25  Q     What was Chapo Guzman's response?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    That they lose one out of a hundred, and it was just the

2    price of business.

3    Q    What do you mean by that they lose one out of a hundred?

4    A    That they lose one out of a hundred loads, you know.

5    Q    What happened to the other 99 loads?

6    A    That they were successful.  So it's just the price of

7    doing business.

8    Q    Where in the United States was Chapo Guzman sending you

9    cocaine?  I'm just going to jump ahead to the 2008 time frame.

10        Where was Chapo Guzman sending you cocaine in the

11   United States?

12   A    L.A., Chicago.

13   Q    In 2008 did you ever learn from one of Chapo Guzman's

14   lieutenants about whether Chapo was sending cocaine somewhere

15   other than the United States?

16   A    Yes.

17   Q    Who told you?

18   A    Juancho.

19   Q    What did Juancho tell you?

20   A    We were inquiring about possibly meeting with a purchase

21   some cocaine in Culiacan.

22   Q    Who is the we?

23   A    My brother and I.

24   Q    You wanted to purchase cocaine in Culiacan for what

25   purpose?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    To bring to Chicago.

2    Q    What was the benefit of purchasing it in Culiacan?

3    A    The prices were cheaper.

4    Q    So you would be able to make what?

5    A    A lot more money.

6    Q    Okay.  And so you are asking Juancho about whether you

7    can buy some of this cocaine in Culiacan.

8         What did Juancho say?

9    A    He said let me check with my dad.  There is 1500 kilos

10   there.  Let me check with my dad and see if they are

11   available.

12   Q    Wait a minute.  I thought you said Juancho is a cousin?

13   A    Yes.

14   Q    Why does Juancho refer to Chapo as his dad?

15   A    When we refer to each other we use code names to

16   represent certain people in the cartel.

17   Q    So Juancho says let me check with my dad, meaning whom?

18   A    Chapo.

19   Q    About sending the cocaine.

20        And what was the response you got from Juancho?

21   A    About sending the cocaine, he said that his father had

22   told him that they were all destined for Canada.

23   Q    Did Juancho explain to you what Chapo Guzman was

24   sometimes receiving in exchange for the cocaine he was selling

25   in Canada?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    Yes.

2    Q    What?

3    A    They were exchanging the cocaine for buckets of

4    pseudoephedrine.

5    Q    Pseudoephedrine, what's that?

6    A    That's the main chemical they use to manufacture

7    methamphetamine.

8    Q    Now, did you -- speaking of chemicals, did you ever hear

9    Chapo's workers talking or any of Chapo's workers talking

10   about certain chemicals used in the manufacture of cocaine?

11   A    Yes.

12   Q    Tell us what you heard.

13   A    At the meeting with Juancho, he was discussing with

14   someone on the radio about moving some chemicals, that there

15   was some kind of a police presence in the area where they had

16   these chemicals housed.  And he was telling them hurry up and

17   move everything from that warehouse.

18        When I heard him say the chemicals, I asked him, the

19   chemicals for what?  We had some kilos of cocaine in front of

20   us, and he said to do that shit.

21   Q    I'm sorry.  To do what?

22   A    To make that shit, the cocaine.

23   Q    Let's move on to a different topic.

24        Other than the cocaine that you are talking about

25   there, are you aware of other places that Chapo Guzman

Flores - Direct/Fels

```
 1   obtained cocaine?

 2   A     Yes.

 3   Q     Where?

 4   A     Colombia.

 5   Q     Were you ever aware of any different ways that Chapo

 6   Guzman arranged to get the cocaine from Colombia?

 7   A     Yes.

 8   Q     Who did you learn this from?

 9   A     From one of the persons, Alfredo Vasquez.

10   Q     That's the guy you referenced was called Compadre?

11   A     Yes.

12   Q     Did Alfredo Vasquez ever explain to you why he had the

13   name Compadre?

14   A     Yes.  He told me that he had baptized Chapo's son,

15   Alfredo.

16   Q     Alfredillo you mean?

17   A     Yes.

18   Q     So you were saying that Alfredo Vasquez, a/k/a Compadre,

19   was explaining to you different ways Chapo was getting his

20   cocaine from Colombia?

21   A     Right.

22   Q     What was one of those ways?

23   A     Using a submarine.

24   Q     How did you learn about the use of submarines to bring

25   the cocaine from Colombia?
```

                 *MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    Vasquez, in 2008 -- or early 2008 came and offered me a

2    chance to invest in one of these submarines.  He explained to

3    me that Chapo had invited him to invest in submarines to fill

4    this cupo they had.

5    Q    What's a cupo?

6    A    Space in the submarine, or a quota.

7    Q    Did you say quota?

8    A    Yes.

9    Q    Go on.

10   A    But that he had some conditions, some concerns.

11   Q    What were the concerns that Alfredo Vasquez had about the

12   cocaine?

13   A    That Chapo had told him that he couldn't provide the

14   cocaine in Colombia or his sister would, you know, take the

15   money down there.  The only thing he could provide was the

16   ride.

17   Q    Chapo is telling this to Alfredo?

18   A    Yes.  The only thing he was providing was the transport,

19   the submarine.

20   Q    So what concerns did that create?

21   A    Alfredo told me he had no contacts in Colombia to

22   purchase the cocaine or do anything.  So he asked me if I

23   could help him.

24   Q    Did you?

25   A    Yes.

*MICHELE NARDONE, CSR -- Official Court Reporter*

1    Q    And did you invest in this submarine load?

2    A    Yes.

3    Q    So how did you go about doing that?

4    A    I had contacted my Colombian friend Andres, and we

5    purchased the cocaine and we were given a number where they

6    would drop the cocaine off to a certain person in Colombia;

7    and we deposited the cocaine, someone confirmed that it was

8    received, and waited for the shipment.

9    Q    Do you remember what city in Colombia that was?

10   A    It was in, I believe, Buenaventura, Colombia, something

11   like that.  I don't remember.

12   Q    Okay.  Now, what happened?  You invest in this cocaine,

13   you invested money, bought the cocaine for this submarine

14   load.  What happened?

15   A    We were waiting on it and it wasn't coming.

16   Q    Was this load ever successful?

17   A    No, I don't know.

18   Q    Well, did you ever follow up with your investment in the

19   submarine?

20   A    Yes.  After a couple of months, in talking to Alfredo, he

21   was kind of like -- he was worried.  He was concerned that he

22   wasn't getting no response about the cocaine.

23   Q    Alfredo was?

24   A    Yes.  He didn't know how to go about talking to Chapo

25   about it.  So I told him that I would explain the situation to

Flores - Direct/Fels

1    Juancho and receive back information.

2    Q    So what did you do with Juancho?

3    A    So I contacted Juancho and I explained to Juancho that I

4    had invested with Alfredo into the submarine load and that I

5    had been fronting some of that load by the Colombians.

6    Q    Was that truthful?

7    A    No.

8    Q    So you lied to Juancho?

9    A    Yes.

10   Q    Why did you lie to him?

11   A    Just because I was trying to get information, and I knew

12   that if I told him I owed some of the money it would give a

13   good reason to be kind of concerned about the time limit.

14   Q    So explain that a little bit.

15        Why would the fact that you owed money to the

16   Colombians make it more likely that Juancho would get you the

17   answer?

18   A    Because he would understand.  They are used to work with

19   the people down in Colombia, and he would understand the

20   situation.

21   Q    So what did Juancho say after you claimed these

22   Colombians were co-investors in the load?

23   A    He got a little serious and he said, listen, who did you

24   buy the cocaine from?  Because if there was a rival, we are

25   going to have some problems.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    Q    What did you tell him?

2    A    I found out who we bought the cocaine from and told him.

3    Q    Did you give him the answer?

4    A    Yes.

5    Q    Who is it that you told Juancho you bought cocaine from?

6    A    Zero Seis.

7    Q    Zero Seis?

8    A    Yes.

9    Q    What was Juancho's response?

10   A    He was saying, okay, same people.

11   Q    Meaning what?

12   A    That it was the same people maybe possibly they were

13   working with.

14   Q    Okay.  So did Juancho, now that you had given him

15   information that you wanted, did he come back to you and give

16   you some updates about the submarine load?

17   A    Yes.  He said he had spoke with Chapo; and I explained to

18   him that I had like over $6 million invested, and his response

19   was that Chapo said, don't worry, you are going to make a lot

20   more.  But before that he did tell me good luck because we

21   just lost one in the water the other day and I hope it wasn't

22   yours.

23   Q    Juancho is telling you that they lost a submarine with

24   cocaine in the water?

25   A    Yes.

Flores - Direct/Fels

1    Q    Sir, do you remember when that conversation took place?

2    A    It was August or September of 2008.

3    Q    But then he called you back?

4    A    Yes.

5    Q    To tell you something, and what did he tell you?

6    A    He said you are in luck, you are doing good, man; it's

7    still on its way.  Just be patient.

8    Q    So that means, what did you interpret that to mean?

9    A    That our cocaine wasn't seized in the water.

10   Q    Did you understand that there was one or more than one

11   submarine?

12   A    More than one submarine.

13   Q    So did you ever follow up about this submarine investment

14   with Alfredo Vasquez after you agreed to cooperate with the

15   government?

16   A    Yes.

17   Q    And what, if anything, did you do to memorialize your

18   meeting with Alfredo Vasquez?

19   A    I recorded the conversation.

20   Q    How did you do that?

21   A    I had a recorder in my pocket.

22   Q    Where did you meet with Alfredo Vasquez?

23   A    In my house in Guadalajara, Mexico.

24   Q    (By Mr. Fels) Your Honor there is an exhibit that's

25   already in evidence and I'm sure you have your binders on your

Flores - Direct/Fels

1    chairs.

2              THE COURT:  Which tab?

3              MR. FELS:  The tab is 609A dash 10T -- 609A dash

4    10T.

5    Q    So sir did you review a recording of your meeting with

6    Alfredo Vasquez prior to today?

7    A    Yes.

8    Q    Do you remember hearing the recording or being in the

9    meeting?

10   A    Yes.

11   Q    Was the recording that you reviewed a fair and accurate

12   depiction of the meeting that you had with Vasquez and others

13   in November of 2008?

14   A    Yes.

15   Q    Now, I want you to take a look at this transcript,

16   609A-10T.

17   A    Yes.

18   Q    Did you have a chance to review this transcript before

19   today?

20   A    Yes.

21   Q    And what were you asked to do with respect to this

22   transcript?

23   A    To read it and listen to the call and read the transcript

24   see if it was accurate and make any corrections.

25   Q    Were you able to do that?

Flores - Direct/Fels

1  A    Yes.

2  Q    Now, why don't we just play the first few seconds.  I'm

3  going to do a clip.  I'm not going to play the whole meeting

4  but just do a clip, starting at the first clip, two minutes 15

5  seconds in.

6            MR. FELS:  This is starting, ladies and gentlemen,

7  on page 4, line 33.

8            (Recording played.)

9  Q    Let's stop right there.  We are stopping at two minutes

10  27 seconds.

11            First of all, who are the voices that we can hear in

12  this recording?

13  A    My voice, my brother J, and Alfredo Vasquez.

14  Q    You say J.  Is he marked on this one as MF?

15  A    I'm sorry, yes.  Margarito.  We call him J.

16  Q    What's the J short for?

17  A    Junior.

18  Q    What was your father's name?

19  A    Margarito.

20  Q    So your twin brother's name is Margarito Flores, Junior?

21  A    After my father, yes.

22  Q    So these two lines, your brother says, I thought you were

23  telling me you were ready today, all ready.  Alfredo says they

24  just left yesterday; and Margarito says no, the man's.  And

25  you say no, he thought you were bringing news they were here

Flores - Direct/Fels

1    already.

2            What's going on in these four lines?

3    A    Yeah.  We thought that Alfredo Vasquez was telling us

4    that the cocaine load in the submarine had arrived already.

5    Q    What's the significance of Margarito correcting Alfredo

6    and saying, no, the man's?

7    A    We had a pending drug load in a train at the time.

8    Q    So when your brother says no -- when Alfredo says they

9    left yesterday, what is he talking about?

10   A    He is talking about that train load.

11   Q    And then your brother says no, the man's?

12   A    Yes.

13   Q    Who is the man?

14   A    El Chapo.

15   Q    Let's continue on, please.  Line 37.

16           (Recording played.)

17   Q    Let's stop there, at 3:17.

18           Sir, this call isn't very easy to hear.  Why is the

19   audio quality not so great?

20   A    Because I had just a simple recorder I placed in my

21   pocket.

22   Q    And going back on page 5, line 37, you ask, I thought --

23   you thought you were bringing news they were here already.

24   Alfredo says no, you are probably going to find out faster

25   before I do.

Flores - Direct/Fels

1        What is he talking about?

2    A    I guess he thought that after my conversation with

3    Juancho and my relationship with them that I would probably

4    hear about the pending load arriving before he did.

5    Q    Which load is this?

6    A    The submarine load.

7    Q    On the top of page 6, Alfredo tells you, all I heard is

8    they are going to have a surprise for me.  That's all I heard

9    over a week ago.

10        What is he talking about, a surprise?

11   A    That's what he referenced.  He said the submarine.

12   Q    Now, you were saying that there was some sort of a train

13   load going on that he negotiated during the same time,

14   correct?

15   A    Yes.

16   Q    What is this, this train load that you had with Alfredo?

17   A    I had set up a train -- a business where we were

18   transporting cocaine from L.A. to Chicago, using the train.

19   Q    Do you know what kind of trains?

20   A    It was heavy freight, freight trains.

21   Q    Okay.  And so you are really talking about two loads here

22   or just one?

23   A    Two loads.

24   Q    The train and submarine?

25   A    Yes.

Flores - Direct/Fels

1    Q    Let's continue on.  Line 49.

2              (Recording played.)

3    Q    I will just pause there, line 52.

4              Your brother says, better that he doesn't tell us

5    about surprises.  It's better for him to tell us a date.

6    Don't you agree?  What does that mean?

7    A    My brother was kind of playing with him saying you know

8    it's been a while, why don't we stop with the games.  Tell

9    them to tell us a date.

10   Q    Who to tell you a date?

11   A    Chapo.

12   Q    Chapo?

13   A    Yes.

14   Q    And Alfredo says, or maybe he will send someone to kill

15   all four of you.

16             What did you understand him to mean?

17   A    I think what he was saying is that what if he just

18   decides to kill all four of us instead of telling us a date.

19   Q    What is the connection between that and surprise?

20   A    You know, the submarine load, what if he chooses not to

21   pay us and just kills us instead.

22   Q    All right.  Let's -- we will put away the binder for now.

23   We will get back to it in just a second.

24             Sir, can you remind the jury, did you ever learn

25   what happened to your investment in the submarines?

Flores - Direct/Fels

1   A     No.

2   Q     I want to direct your attention now, talk about a

3   different topic, about New York City.

4         You testified earlier that you had been delivering

5   cocaine in New York City since 2002, I believe is your

6   testimony.

7   A     Yes.

8   Q     Tell us what was your organization here in New York?

9   A     I had customers and a couple of workers.

10  Q     Let's talk, I guess, about the workers.

11        What did you have workers here for?

12  A     To help distribute the cocaine and pick up the money from

13  the sale of the cocaine.

14  Q     And who were your workers here?

15  A     A woman named Joanna and Ashley.

16  Q     Ashley, you testified about her earlier today?

17  A     Yes.

18  Q     Who is she?  Remind the jury.

19  A     She was a worker that helped me set up houses, stash

20  houses, across the United States.

21  Q     What is the purpose of having these stash houses across

22  the United States?

23  A     To keep the drugs and money safe.

24  Q     Did you have a particular preference about where to put

25  these stash houses?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

```
 1   A    Yes.

 2   Q    Tell the jury.

 3   A    I would choose the best neighborhoods.

 4   Q    Why?

 5   A    Because they were the ones less likely to be, you know,

 6   people would be suspicious about, and we were trying to

 7   minimize our contact with law enforcement.

 8   Q    And what about the houses being in a nice neighborhoods

 9   would cause it to be less suspicious?

10   A    It's -- they wouldn't suspect that there was any funny

11   stuff going on; and the house would work because if somebody

12   was trying to break in or something the neighbors are a little

13   more alert over things like that.

14   Q    Now, you mentioned Ashley.

15        Did Ashley ever set up any stash houses here for you

16   in New York City?

17   A    Yes.

18   Q    Did she ever talk to you about those stash houses?

19   A    Yes.

20   Q    What did she tell you about them?

21   A    I would usually tell her not to speak to me about the

22   exact location of the stash houses over the phone, just in

23   case the phones were tapped.

24   Q    So did she give you some hints as to where the stash

25   house that she set up for you and your brother was here in
```

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    New York?

2    A    Yes.  She said it was a beautiful property and she was

3    looking out the window and that she had a beautiful view of

4    the Brooklyn Bridge.

5    Q    Did you ever keep, did you ever personally visit the

6    stash house here in New York?

7    A    No.

8    Q    And approximately what time frame did you use this stash

9    house?

10   A    2007 to 2008.

11   Q    Now, you mentioned that you also had customers here in

12   New York City.

13        Have you talked to the government about who these

14   customers are?

15   A    Yes.

16   Q    Just give us some names, some of the customers that you

17   had here in New York City?

18   A    Carlos, Viejo, Omar.

19   Q    Do you know how much of Chapo Guzman's cocaine that you

20   moved to New York City over the years?

21   A    Tons of cocaine.

22   Q    Do you have any set accounting --

23   A    I can't.

24   Q    -- that you would be able to make a better, more concrete

25   figure?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    No, no.

2    Q    All right.  Let's talk about the total accounting.

3         From May of 2005, when you first realized that you

4    were getting shipments of cocaine from Chapo Guzman and Mayo

5    Zambada, until you turned yourself into DEA -- what date was

6    that?

7    A    November 30, 2008.

8    Q    Until November 30 of 2008, approximately how many tons of

9    cocaine did you receive from Mexico?

10   A    Over 60 tons.

11   Q    And of those over 60 tons that you received from Mexico

12   how many of those did you get from Chapo or Mayo?

13   A    I would say at least 38 tons.

14   Q    You said 38?

15   A    Yes.

16   Q    I just ask that you speak a little bit clearer into the

17   microphone and a little bit louder, please.

18        This 38 tons, are you counting tons of cocaine or

19   any cocaine that you received from people like Chapo's son,

20   Alfredillo, or Alfredo Vasquez?

21   A    No.

22   Q    So we are just limiting to shipments you received from

23   whom?

24   A    From Chapo and Mayo.

25   Q    Through?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    Through Juancho, Olivares, those people.

2    Q    Included in that 38-ton figure, are you including the 15

3    to 20 tons that Mayo said you had shipped to them prior to

4    2005?

5    A    No, I'm not.

6    Q    So that's an additional amount, correct?

7    A    Correct.

8    Q    So is there any way to figure out how much in drug

9    proceeds, drug money, that you turned over to Chapo and Mayo

10   just in that three-and-a-half-year period from May 2005 to

11   December 2008?

12   A    Yes.  If you average out the price of the sale of cocaine

13   we were selling and multiply it by 38,000, you could get a

14   pretty rough estimate.

15   Q    So what's the average price, you would guess, during that

16   time frame 2005, 2008?

17   A    I guess it could be about 21,000.

18   Q    21,000 per kilo?

19   A    Yes.

20   Q    So doing the math, 21,000 per kilo times 38,000 is what?

21   A    Around $800 million.

22   Q    And that's the amount of money that you turned over to

23   Chapo and Mayo during that three-and-a-half-year period?

24   A    Yes.

25   Q    Now, during this period of time between May of 2005 and

Flores - Direct/Fels

1   December of 2008 the cocaine shipments that you got from Chapo

2   and Mayo, were they consistent in time, or were there long

3   stretches where you wouldn't receive any cocaine?

4   A    They were consistent.  I don't remember ever having to

5   tell my customers that I didn't have cocaine.

6   Q    And let's do the math.  Okay.  How much money would you

7   provide Chapo Guzman on average in any one, 12-month period?

8   A    About $222 million a year.

9   Q    Now, that's for cocaine, right?

10  A    Yes.

11  Q    You mentioned that there was another drug that you

12  received from Chapo and Mayo, right?

13  A    Yes.

14  Q    Let's talk about that.  What drug was that?

15  A    Heroin.

16  Q    And when did you start receiving shipments of heroin from

17  Chapo or Mayo?

18  A    About 2006, 2007.  I'm not too sure exactly.

19  Q    Okay.  So from that period of time, 2006 to 2007, until

20  the end of 2008, approximately how many kilos, kilograms of

21  heroin, did you receive from Chapo and Mayo?

22  A    I would say around 200 kilos.

23  Q    Now, why did you only get 200 kilos of heroin and you got

24  38,000 kilos of cocaine?

25  A    Well, at the time, you know, heroin wasn't as popular as

Flores - Direct/Fels
3527

1   it is today.  And our primary cocaine -- our customers were

2   cocaine.

3   Q    So did you ever have any conversations or discussions

4   with Chapo Guzman about how you and your brother -- what kind

5   of ability you had to receive heroin loads?

6   A    Yes.

7   Q    What were those?

8   A    I told him that we couldn't move heroin as fast in those

9   huge quantities.

10  Q    We will get to that in just a bit, but what was the

11  average price that you were paying Chapo and Mayo per kilo for

12  the heroin?

13  A    55,000 a kilo.

14  Q    All right.  So let's do the math again.

15       About two years, in the course of two years, how

16  much money did you pay Chapo Guzman and Mayo for the

17  200 kilograms of heroin?

18  A    About $10 million.

19  Q    All right.  So on average 5 million a year?

20  A    Yes.

21  Q    So 5 million a year plus the 220 million, you said?

22  A    Yes.

23  Q    Which you were paying for the cocaine.

24       What was the average amount of money you were paying

25  Chapo and Mayo per year for the cocaine and the heroin

*MICHELE NARDONE, CSR -- Official Court Reporter*

3528

Flores - Direct/Fels

1   combined?

2   A    About $227 million a year.

3   Q    I'm sorry.  I thought you said 222.  So 227 million of

4   cocaine and heroin combined?

5   A    Yes.

6   Q    How would you pay for this cocaine and heroin once you

7   sold it here in the United States?  How would you get back to

8   Chapo and Mayo?

9   A    I would say -- in cash, bulk shipments of cash.

10  Q    Can you describe how that process went?

11  A    After I would distribute the drugs to my customers I

12  would have my couriers pick up the money, take it back to the

13  stash house; and there they would count it and separate it in

14  denominations.  And then we would package it up and mark the

15  packages, depending on the denomination.  So singles would be

16  A, $5 bills would be B, tens would be C, and so on.

17  Q    Then how would you get that money down to Mexico?

18  A    Either I would turn it in to his couriers in Chicago

19  and/or L.A.

20  Q    So you weren't bringing it down to Mexico, someone else

21  was?

22  A    Correct.

23  Q    And you testified earlier you turned yourself in to the

24  United States authorities in November 30, 2008.

25       What prompted you to turn yourself in, sir?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1   A    There was a number of different reasons.  But primarily

2   my wife became pregnant in 2008, and I began to think about

3   our future or the lack of a future and the life I was living.

4   I couldn't promise my family tomorrow, you know.  I couldn't

5   see a future with them.  I couldn't even imagine being a

6   husband or a father to my children, to my unborn children.

7           And I felt that it was better.  Me and my brother

8   were born while my father was in prison, and I just wanted

9   something better for my own children.  I felt they deserved

10  it.  That, those feelings, were emphasized by the next reason,

11  was an internal war that broke out in the cartel.

12  Q    Between whom?

13  A    Between Chapo and Mayo and Arturo Beltran.

14  Q    How did this war between Chapo and Mayo versus Arturo

15  Beltran affect you and your brother?

16  A    The case was in a lose-lose situation.  We were forced to

17  choose sides.

18  Q    What do you mean by that?

19  A    They were both demanding loyalty, and they had both told

20  us that we couldn't do business with the other.

21  Q    Now, before you testified that Chapo had given you the

22  okay several years earlier to work with Arturo Beltran.

23          Did you learn something different at some point?

24  A    Yes.

25  Q    From whom?

*MICHELE NARDONE, CSR -- Official Court Reporter*

3530

Flores - Direct/Fels

1   A    From Mayo Zambada.

2   Q    What did Mayo tell you?

3   A    At a meeting with my brother and I, he explained to us

4   that he was giving us a warning and he said this is the only

5   chance I'm giving you.  So this is the last warning I'm giving

6   you.  I don't want you to do any more business with Arturo or

7   any of his people and for me to cease all communication with

8   him.

9   Q    And you said that that affected your decision to turn

10  yourself in?

11  A    Yes.

12  Q    Why?

13  A    For years my brother and I had enjoyed the sweet spot in

14  the cartel, where we could just focus on making money.  You

15  know, we didn't have to worry about all this other stuff; and

16  that was about to change.  You know, my life would be put in

17  danger at that point, more danger.

18  Q    So what did you decide to do?

19  A    So I just my brother and I figured that if we were going

20  to continue to risk our lives we are better off trying to do

21  it by trying to find a way out.

22  Q    What was that way out for you?

23  A    To reach out to the U.S. Government and telling them that

24  we wanted to come in.

25  Q    So let's talk about that.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1      Did you have any meetings with the DEA in the early

2  part of 2008?

3  A    Yes.

4  Q    And where?

5  A    In -- through the phone and in person in Mexico.

6  Q    And did these meetings go on for some period of time

7  before you surrendered?

8  A    Yes.

9  Q    Where were you living at this time?

10 A    In Mexico.

11 Q    What kind of protection did you have?

12 A    None.

13 Q    What is it that the DEA -- without getting into too much

14 detail, what is it that the DEA wanted you to do during this

15 period of time before your surrender?

16 A    To help build a solid case on our suppliers.

17 Q    Anyone else?

18 A    And our workers and our customers, everyone.

19 Q    Did the DEA have you volunteer drugs and money to be

20 seized?

21 A    Yes.

22 Q    Explain how that works.  How is the DEA going to build

23 cases during this period of time while you were cooperating?

24 A    Well, they told me that there is no way they were going

25 to pay for any drugs.  So what I had to do was I began to

Flores - Direct/Fels

1   continue my drug business, and whenever I offered up a seizure

2   to the DEA I would pay for the load myself.

3   Q    Approximately how much money did the DEA have you turn

4   over in this way, pay for drug shipments, before you

5   surrendered?

6   A    Close to $40 million.

7   Q    And with regard to these seizures that you were helping

8   the DEA make during this period of time prior to your

9   surrender, who would have to pay the suppliers of the drugs

10  once those drugs were seized?

11  A    My brother and I.

12  Q    Why didn't they just -- why didn't the DEA just seize the

13  drugs and say, oh, you know what, the cops seized them?

14  A    They could have done that, but that would put my life and

15  my family's life at risk.

16  Q    What else did would it put at risk?

17  A    My relationship with the cartel.  They would become

18  suspicious that all these loads were getting seized.  That

19  would be a big problem for me and my brother.

20  Q    So let me ask you this question, sir:  Before the day you

21  agreed to surrender, November 30, 2008, did you have any drug

22  deals with suppliers that you didn't first get the

23  authorization of the DEA to do?

24  A    Yes.

25  Q    Tell us about those.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    A    Well, the loads on the train.

2    Q    The one we were just talking about with Alfredo Vasquez?

3    A    Yes.

4    Q    How many kilos was that?

5    A    Two hundred seventy-six kilos.

6    Q    Let's talk about that one first.

7         You are saying you didn't tell the DEA ahead of time

8    about that load coming in?

9    A    No.

10   Q    What happened to the drugs once they arrived?

11   A    I received them and sold them.

12   Q    You didn't let the DEA know you were doing this?

13   A    No.

14   Q    Why?  Why did you do it?

15   A    Well, I was trying to continue with my brother in the

16   drug deals at the time.  It was a foolish decision.

17   Q    It was a mistake?

18   A    Yes.

19   Q    Now, did you hide this deal?

20   A    No.

21   Q    Well, we just heard this recording of this meeting,

22   Government's Exhibit 609A-10T, where you discussed this

23   276-kilo load that you did behind the DEA's back, right?

24   A    Right.

25   Q    So what did you do with this recording?  Did you throw it

Flores - Direct/Fels

1  away?

2  A    No.  I turned it in to the DEA.

3  Q    You turned it in to the DEA, but wouldn't the DEA figure

4  out that you had done this deal without authorization?

5  A    Of course, yes.

6  Q    Were there other unauthorized deals that did you with the

7  DEA -- I'm sorry -- that you did that you didn't have

8  authorization from the DEA before you turned yourself in?

9  A    Yes.

10  Q    Give me another example.

11  A    The heroin.  I picked up a couple of kilos of heroin that

12  I wasn't supposed to.

13  Q    When you say you weren't supposed to, what do you mean by

14  that?

15  A    DEA had told me there had been multiple seizures of

16  heroin prior to this load, and they explained to me that they

17  couldn't keep seizing these kilos of heroin without arresting

18  someone, so for me to stop making these deals.

19  Q    Okay.

20  A    So that put me in a hard situation.

21  Q    What do you mean, it put you in a hard situation?

22  A    Yes.

23  Q    What do you mean by that?

24  A    Because my brother had given his word to Chapo and Mayo

25  that we were going to receive these heroin shipments.

Flores - Direct/Fels

1    Q    So on the one hand the DEA is saying don't receive any

2    more, but you are saying your brother had already agreed.

3         Why is that a hard situation?

4    A    Because I mean, the whole timing of it was delicate.  The

5    war kind of made things even worse, and I felt like at any

6    moment if I told -- told Chapo and Mayo that I wasn't going to

7    receive drugs it would be weird to them.  They would find that

8    would be rare, because it never happened.  I was afraid they

9    might think I was choosing the other side.

10   Q    What other side?

11   A    Arturo Beltran.

12   Q    Then what did you think would happen?

13   A    They would kill me.

14   Q    So you picked up the load of heroin that you didn't get

15   authorization for?

16   A    Yes.

17   Q    You said you sold some of that?

18   A    Yes.  I sold five kilos.

19   Q    What did you do with the other eight?

20   A    I had DEA pick them up.

21   Q    Where had you -- what had you done with the eight?

22   A    I had thrown them in the garbage.

23   Q    You had thrown kilos of heroin in the garbage?

24   A    Yes.

25   Q    Why?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1  A    I started having a little like guilt about picking up

2  these kilos, and I figured, man, you know, if they would find

3  them in my possession I would be in more trouble.  So I

4  thought, you know, what I will just have my guys throw them

5  away.

6  Q    Do you know if DEA ever recovered those eight kilos of

7  heroin you threw away?

8  A    Yes.

9  Q    So you engaged in -- do you know the term double dealing?

10 A    Yes.

11 Q    Working both sides?

12 A    Yes.

13 Q    You did that, didn't you?

14 A    Yes.

15 Q    Did you think it was the right thing to do?

16 A    At the time, I guess, but today I see it wasn't.  It was

17 wrong.

18 Q    What's your explanation?

19 A    I mean, it was me and my brother were out there along.

20 We didn't have a DEA SWAT team in the next room, ready to come

21 save us if something went wrong.  We were forced to make these

22 decisions split, at the moment.

23       And DEA don't work that way, you know.  They got to

24 get permission and they have to set the team up and they have

25 to do all these things, all this red tape; and I didn't have

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1      that luxury to do that at that time.

2      Q     You understand that was a crime, sir, don't you?

3            MR. PURPURA:  Objection.

4            THE COURT:  Sustained.

5      Q     Let's keep going on.

6            Once you surrendered, or I should say before you

7      surrendered to the United States law enforcement on

8      November 30, 2008, did you have some -- did you give

9      instructions to your family members to do something?

10     A     Yes.

11     Q     What?

12     A     To pick up some money that was owed to me.

13     Q     When you say money that was owed to you, what kind of

14     money?

15     A     Drug money.

16     Q     Pick it up where?

17     A     From Washington, D.C.

18     Q     So you had your family go out and collect your drug

19     debts, correct?

20     A     Yes.

21     Q     How much did they collect, did you ever find out?

22     A     Over $5 million.

23     Q     And did you tell the DEA before you went out to collect

24     this money?

25     A     No.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    Q    They didn't give you permission?

2    A    I didn't ask for permission.

3    Q    What about the prosecutors you were working with, did you

4    ask them?

5    A    No.

6    Q    Now, shortly after you got arrested, or I shouldn't

7    say -- shortly after you turned yourself in, in November 2008,

8    did you meet with the prosecutors to go over how much money

9    you and your family have in the United States?

10   A    Yes.

11   Q    Did you fess up that you had millions of dollars in the

12   United States?

13   A    Yes.

14   Q    Did they at the time ask you how you had gotten that

15   money?

16   A    No.

17   Q    So years later, did they ask you then about how you got

18   these millions of dollars?

19   A    Yes.

20   Q    What did you tell them?

21   A    I told them how I arranged for them to be picked up.

22   Q    Now, why didn't you ask the DEA for permission, or the

23   prosecutors for permission, before you had your family members

24   pick up these drug debts?

25   A    I planned to just keep the money.  I mean that was like

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1   the money we were going to live off for the rest of our lives.

2   Q    Was this the right thing to do?

3        MR. PURPURA:  Objection.

4        THE COURT:  Sustained.

5   Q    Did you have a member of your family buy a big present

6   for your wife with some of that money?

7   A    Yes.

8   Q    What?

9   A    A car.

10  Q    What kind of car?

11  A    A brand-new Bentley.

12  Q    How much was it worth?

13  A    Two hundred grand.

14  Q    Now, once you told the DEA that you -- about these drug

15  debts that you had your family collect and about the Bentley,

16  what wound up happening to that money and that Bentley?

17  A    It was eventually turned over to the DEA.

18  Q    Were you allowed to keep any of that money?

19  A    Yes.

20  Q    How much?

21  A    $300,000.

22  Q    Is that for your family or for your brother's family?

23  A    That was for both of our families.

24  Q    Some extra.  What about for your lawyer?

25  A    Yes, and for the lawyer.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    Q    That's an additional couple of hundred thousand?

2    A    Yes.

3    Q    And your families, you said, were involved in collecting

4    this drug debt, right?

5    A    Yes.

6    Q    Including your wife?

7    A    Yes.

8    Q    Was your wife ever charged with collecting drug debts?

9    A    No, she was given immunity.

10   Q    And what about your other family members, were any of

11   them charged?

12   A    No.

13   Q    Now, from the outset, when you were asked by the agents,

14   prosecutors, did you acknowledge the roles that your immediate

15   family had played in collecting the drug debt?

16   A    Yes.

17   Q    What about your extended family, did you come clean about

18   that?

19   A    Not right away, no.

20   Q    Why not?

21   A    I was trying to protect them.

22   Q    Why did you treat your immediate family members

23   differently than your extended family members?

24   A    I felt I had kind of fooled them into helping me, and I

25   didn't want them to get into trouble.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1   Q    What do you mean fooled them?  What do you mean by that?

2   A    They didn't understand the scope of what I was doing, my

3   immediate family did, you know.

4   Q    Sir, how much prison time did you wind up getting?

5   A    I was sentenced to 14 years in prison.

6   Q    How much time are you looking at if you hadn't cooperated

7   with the government?

8   A    Life in prison.

9   Q    Sir, did you sign a plea agreement in your case?

10  A    Yes.

11           MR. FELS:  I don't think there is an objection, Your

12  Honor.  This is a redacted form.  The defense requested some

13  redactions.  Government's Exhibit 3500-PF-4?

14           THE COURT:  Received.

15           (Government Exhibit 3500-PF-4, was received in

16  evidence.)

17  Q    Sir, I'm showing you a document.  You will see there is a

18  portion redacted, agreed by the parties.

19           The last page here, sir, do you recognize your

20  signature on the last page?

21  A    Yes.

22  Q    Page 27, Government's Exhibit 3500-PF-4?

23  A    Yes.

24  Q    Sir, do you recognize what this is?

25  A    Yes.

Flores - Direct/Fels

1    Q    What is it?

2    A    It's my plea agreement.

3    Q    Now, did you acknowledge in your plea agreement a number

4    of crimes that you had committed?

5    A    Yes.

6              MR. FELS:  And that's -- just for the record, that's

7    the part that's blacked out.

8    Q    What did you acknowledge in the plea agreement regarding

9    weapons?

10   A    That I had obtained weapons.

11   Q    Including what kind?

12   A    Handguns and AK-47.

13   Q    For what purpose?

14   A    To protect my drug business.

15   Q    What about did you acknowledge anything in the plea

16   agreement regarding mortgage fraud?

17   A    Yes, that I had committed mortgage fraud.

18   Q    What about putting properties in other people's names,

19   did you do that too, sir?

20   A    Yes.

21   Q    For what purpose did you do that?

22   A    To conceal the true identity of the ownership of the

23   homes and the properties.

24   Q    Why is that?

25   A    So they wouldn't be seized by law enforcement.

Flores - Direct/Fels

1  Q    What were those properties purchased?

2  A    With drug money.

3  Q    Did you get additional penalties for acknowledging having

4  weapons, mortgage fraud, money laundering, tax fraud?

5  A    My -- I was enhanced for the weapons.

6  Q    So with all of the enhancements that you received,

7  remember what your guideline sentence was?

8  A    I believe it was 49 or 47.  I'm not sure.

9  Q    That's the guideline number, correct?

10  A    Yeah.

11  Q    What was the sentence, what was the sentence?

12  A    Oh, life in prison.

13  Q    How much more time would you have been facing if you had

14  been charged with the other crimes, like the mortgage fraud

15  and the tax fraud case?

16  A    Life in prison.

17  Q    I'm sorry?

18  A    I could only give them one life.

19  Q    Did the prosecutors in your case make a recommendation to

20  the judge to reduce your sentence?

21  A    Yes.

22  Q    For what reason?

23  A    For my cooperation.

24  Q    Without getting into all the names, do you know

25  approximately how many different people you cooperated against

*MICHELE NARDONE, CSR -- Official Court Reporter*

Flores - Direct/Fels

1    and helped build a case against?

2    A    At least 50, over 50.

3    Q    That's five-zero?

4    A    Yes.

5    Q    How much prison time did the government recommend?

6    A    They recommended a ten-year sentence.

7    Q    What did the judge sentence you to again?

8    A    To 14.

9    Q    Why did he give you four more years, sir?

10   A    Because he felt that my cooperation wasn't perfect.

11   Q    What do you mean?

12   A    The loads I had sold while I was cooperating and the

13   money I had picked up.

14   Q    And how much time do you have left, sir?

15   A    About two years.

16   Q    So you got sentenced to 14 years and you have been in for

17   ten.

18             Why do you only have two years left?

19   A    Well, you get good time, so.

20   Q    What does that mean, good time?

21   A    For good behavior in the BOP, Federal Bureau of Prisons.

22             (Continued on the next page.)

23

24

25

FLORES - DIRECT - FELS

1   DIRECT EXAMINATION

2   BY MR. FELS:

3   Q    So can you explain just what you understand?

4   A    You get 54 days a year for every year, you know, you get

5   into serious trouble.

6   Q    And you've gotten into trouble in prison, haven't you?

7   A    Yes.

8   Q    To your knowledge, have you had any of this good time

9   removed?

10  A    Yeah -- no.

11  Q    So you're still on target to get out in two years?

12  A    Yes.

13  Q    Let's talk about the problems that you had in prison.

14  Have you had some issues with not following the rules?

15  A    Yes.

16  Q    Do you continue to have problems with not following the

17  rules, sir?

18  A    Yes.

19  Q    Let's talk about some of these issues.  A few years back,

20  did you acknowledge to the prison authorities about something

21  you had done with respect to other inmate's commissary

22  accounts?

23  A    Yes.

24  Q    Can you tell the jury, what is a commissary account?

25  A    It's your comp you use to purchase items at the store,

3546

FLORES - DIRECT - FELS

```
 1   like food items, you know.

 2   Q    The store in the prison?

 3   A    Yes.

 4   Q    So many years ago -- or a couple of years ago --

 5   A    We have --

 6   Q    -- what happened?

 7   A    We have a 360-dollar spending limit.  You go through it

 8   pretty fast, things are expensive in prison.  I would put

 9   money in other inmates' accounts to circumvent that.

10   Q    To circumvent the 360-dollar limit?

11   A    Yes.

12   Q    What were you doing with that money?

13   A    Excuse me?

14   Q    What would you do with the money?

15   A    I wanted commissary, I wanted food, more, you know.

16   Q    For yourself?

17   A    Myself and those other inmates that were helping me.

18   Q    Helping you what?

19   A    Buy the commissary.

20   Q    And did the prison find out about this?

21   A    Yes.

22   Q    What happened when you admitted -- first of all, did you

23   admit to prison officials that you were doing this?

24   A    Yes.

25   Q    So what happened?
```

FLORES - DIRECT - FELS

1    A    They put me in the SHU.

2    Q    What's the SHU?

3    A    Segregation Housing Unit.

4    Q    Like a punishment?

5    A    Yes.

6    Q    Did you learn your lesson about not putting money in

7    other inmates' accounts, sir?

8    A    No.

9    Q    Okay.  Have you been doing this again?

10   A    Yes.

11   Q    Tell us what happened.

12   A    I received another incident report, and they took my

13   phone privileges for six months.

14   Q    Now, approximately how much money during a year period

15   were you doing?

16   A    $6,000.

17   Q    And you're again putting in other people's accounts?

18   A    Yes.

19   Q    Was this during the time that you were having debriefs

20   with myself and other agents about this trial?

21   A    Yes.

22   Q    So why did you keep doing this?

23   A    I have a hard time following the rules I guess.

24   Q    Okay.  A couple of months ago did you admit to the agents

25   and to the prosecutor that you had been sending thousands of

FLORES - DIRECT - FELS

1    dollars and putting it in other people's commissary accounts?

2    A    Yes.

3    Q    Did you try to hide it from us?

4    A    No, I admitted it.

5    Q    What happened to you a couple of days later?

6    A    I received an incident report.

7    Q    And again, what happened, what was the punishment?

8    A    They took my phone for six months.

9    Q    What else did you acknowledge, did you volunteer to the

10   prosecutor and the agents that you had done recently?

11   A    That I was misusing a legal phone.

12   Q    What do you mean by that?

13   A    Some of the other inmates had found out that the legal

14   phone that's used to call our attorneys and prosecutors was

15   broken and that you could pick it up and dial out.

16   Q    Dial out to whom?

17   A    To whoever you want.

18   Q    And so what did you do?

19   A    I couldn't help it, I eventually used it myself.

20   Q    Who were you calling?

21   A    My wife.

22   Q    And why are you calling on this phone and not the regular

23   prison phone?

24   A    You get 300 minutes a month and they go pretty fast.

25   Q    So what were you talking about with your wife?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

```
1    A    Regular family stuff, you know.

2    Q    Were these calls being recorded?

3    A    No.

4    Q    Now are your normal calls with your wife, the ones that

5    you have the 300-minute limit on, are those being recorded?

6    A    Yes.

7    Q    Let's talk about some other rules you broke.  A couple of

8    years back, did you pay another prisoner to put something up

9    that your wife would see?

10   A    Yes.

11   Q    What was that?

12   A    Two billboards.

13   Q    Did you say two billboards?

14   A    Yes.

15   Q    Where did you have these billboards put up?

16   A    Outside the prison.

17   Q    Outside the prison?

18   A    Yes.

19   Q    And --

20              MR. PURPURA:  Judge, objection.  If we can approach

21   it's -- counsel's not going to get into this and so it's not

22   relevant.

23              MR. FELS:  I'd like to document his wrongdoing.

24              THE COURT:  Let's have a sidebar.

25              MR. PURPURA:  We'll be here all day.
```

FLORES - DIRECT - FELS

1          THE COURT:  Let's talk about it.

2          (Sidebar conference.)

3          (Continued on the next page.)

SIDEBAR CONFERENCE

1          THE COURT:  What Mr. Purpura is telling you is since

2    he's not going into these areas you don't have to bring out

3    everything wrong this guy has done.  Generally, we allow that

4    on direct in order to diffuse the cross, but if there is

5    nothing to diffuse then...

6          MR. FELS:  Okay, I'll skip to the next one.

7          THE COURT:  Let's do that.

8          MR. FELS:  The next one is --

9          THE COURT:  Why don't you tell me what they are

10   right now --

11         MR. FELS:  Sure.

12         THE COURT:  -- and Mr. Purpura can say whether it's

13   worth going into.

14         MR. FELS:  Going by memory, I think the next one was

15   going to be that he got his wife pregnant in DEA custody.

16         MR. PURPURA:  That's a good one.

17         MR. LICHTMAN:  You okay with that one.

18         MR. FELS:  That's a good one.  I'm also going to go

19   over some of the allegations based on the Court's recent

20   ruling, and ask him about having a cell phone in the unit and

21   bringing in contraband, pills and -- thank you, Johnny on the

22   spot, and the other allegation related to bribing the guards

23   and I think that's it.

24         THE COURT:  Okay.

25         MR. FELS:  In terms of the bad.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1          THE COURT:  Those are all that he should go into.

2          MR. PURPURA:  He should.

3          THE COURT:  Let's do that.  If you find anything

4   else, walk over to Mr. Purpura.

5          MR. FELS:  I will, I'll talk to him.

6          MR. PURPURA:  Thank you appreciate it.

7          (End of sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

1          (In open court.)

2          THE COURT:  Let's continue.

3          MR. FELS:  Moving on.

4    Q    Was there an issue violating the rules with your wife

5    while you were in DEA custody?

6    A    Yes.

7    Q    Tell us what happened?

8    A    I had an opportunity to sneak away with her into the

9    bathroom and I got her pregnant.

10   Q    And was this on one occasion or a couple of occasions --

11   not that you got her pregnant, but that you were able to spend

12   some private time with your wife?

13   A    Two occasions.

14   Q    Were you allowed under the rules to do this while you

15   were in DEA custody?

16   A    No.

17   Q    Did any DEA agents authorize you to do this?

18   A    No.

19   Q    Did any DEA agents, to your knowledge, know that you were

20   doing this?

21   A    No.

22   Q    Now let's talk about some other allegations out there.

23   You're aware, sir, that there is an allegation that you had

24   illegal cell phones in your -- a recent allegation that you

25   had illegal cell phones?

FLORES - DIRECT - FELS

1   A    Yes.

2   Q    Is that true?

3   A    No.

4   Q    Why is this allegation does not make sense to you?

5   A    Because if I had a cell phone I wouldn't have been

6   abusing the legal phone.  It doesn't make sense.

7   Q    What about the allegation that you had contraband, like

8   some sort of pills in the jail, are you aware of that one?

9   A    Yes.

10  Q    Is that true?

11  A    That's false.

12  Q    It's false?

13  A    Yes.

14  Q    Allegation that you were bribing guards?

15  A    Yes, that's false.

16  Q    Those three allegations, they all come to your knowledge

17  from a certain individual?

18  A    Yes.

19  Q    Is there some sort of issue that you have with this

20  individual?

21  A    Not really, no.  I barely know this person, but I know

22  that he's done this before in the past with -- in another

23  institution.  He might have some mental issues, I'm not sure.

24  Q    Have you been punished in any way for any of these

25  allegations?

FLORES - DIRECT - FELS

1    A    No.

2    Q    Let's talk about allegations that you're still continuing

3    to hide money from the government.  Are you hiding any money

4    from the government?

5    A    No, that's false.

6    Q    Do you know from someone of any efforts to ensure that

7    you weren't hiding money from the government?

8    A    You know what?  Since I've been in custody the DEA raided

9    our houses and punched holes in walls and dug holes in the

10   ground and they went through some extreme process to find

11   money.

12   Q    To your knowledge, were you asked to forfeit any other

13   money they might have found, besides the 4 million that you

14   agreed to turn over?

15   A    I think it was like maybe $84,000.

16   Q    Where?

17   A    In part of my forfeiture, right.

18   Q    I'm not talking about the amount that you forfeited,

19   we'll get to that in a moment, I'm talking about are you aware

20   that the DEA found any additional money that you weren't --

21   A    No, not at all, no.

22   Q    Sir, let's -- we'll get back to this in a minute your

23   plea agreement.  Let's talk about some more recordings you

24   made.

25            In November 2008, before you surrendered, what, if

FLORES - DIRECT - FELS

1    anything, did you and your brother do to collect some realtime

2    information on members of Chapo Guzman's and Mayo's

3    organization?

4    A     We continued to record conversations we were having.

5    Q     Did the DEA give you any devices to make these

6    recordings?

7    A     No.

8    Q     So what did you wind up doing?

9    A     I went to a local Radio Shack and bought some.

10   Q     Radio Shack where?

11   A     Mexico.

12   Q     And so can you describe what was the mechanism, how were

13   you able to use these recordings -- these recording devices to

14   make these recordings?

15   A     They're just a simple digital recorder, I had a earpiece

16   with a microphone in it that I would place in my ear and then

17   record the call.

18   Q     Now you mentioned that you had lots of phones, correct?

19   A     Yes.

20   Q     Were some of these phones have a unique feature that

21   allowed you to record without that earpiece?

22   A     Yes, there are speakers.

23   Q     Do you remember what kinds of phones these were?

24   A     Yes, Nextel radios.

25   Q     Maybe we can all remember, what was the feature that the

FLORES - DIRECT - FELS

1   Nextel phones had?

2   A    Chirp, push to talk.  It worked like a walkie-talkie.

3   Q    So in those cases what did you need to do to record it?

4   A    I just place the recorder on the table, or hold it in my

5   hand.

6   Q    Now who is typically present when you made these

7   recordings, sir?

8   A    My brother J.

9   Q    And what about when he made recordings, who was present?

10  A    I was.

11  Q    Can you describe these recording devices, what do they

12  look like?

13  A    Just small recording devices with the capability to be

14  like up loaded into a computer or something, like a USB port.

15  Q    Periodically what would you do with these recordings once

16  you made some calls, recorded calls?

17  A    I would turn them over to the DEA.

18  Q    In where?

19  A    In Mexico.

20  Q    Which office?

21  A    Guadalajara.

22  Q    I want to direct your attention to November 2008, did you

23  make some recordings at that time?

24  A    Yes.

25  Q    These calls we're about to listen to, what do they

FLORES - DIRECT - FELS

1    pertain to?

2    A    Heroin deals I had with the man.

3    Q    The man being?

4    A    I'm sorry, El Chapo.

5    Q    Give us the background of this heroin deal.  What

6    happened?

7    A    In October of 2008, we were summoned to a meeting with

8    the heads of the cartel that I wasn't able to make so my

9    brother attended this meeting and they had --

10            MR. PURPURA:  Objection.

11            THE COURT:  Sustained.

12   BY MR. FELS:

13   Q    Did your brother -- were you still trafficking with your

14   brother?

15   A    Yes.

16   Q    Sir, without getting into the details of what he said,

17   was there something that he had to tell you to instruct you

18   about how to proceed next?

19   A    Yes, he had told me he had given Chapo and Mayo's word

20   that we would help move these kilos of heroin.

21   Q    All right.  So which group, from which group?

22   A    From both.

23   Q    Both meaning what?

24   A    Chapo and Mayo.

25   Q    And did your brother say that he came to some sort of

FLORES - DIRECT - FELS

1    agreement on Chapo's side how many kilos he was supposed to

2    obtain?

3    A    Yes.

4    Q    How many?

5    A    Eighteen.

6    Q    And who was going to be the one coordinating that deal

7    from the Mexico side?

8    A    Alfredillo, his son.

9    Q    This gentleman here, Government Exhibit 60?

10   A    Yes.

11              THE COURT:  Is it in evidence?

12              MR. FELS:  Yes, it's already in evidence, sir.

13   Q    All right.  So directing your attention to November 9 of

14   2008 -- ladies and gentlemen, you should have it in your books

15   as call 609A-1T.

16              Sir, do you remember listening to this call?

17   A    Yes.

18   Q    And the call that you listened to in the recording, was

19   it a true and accurate depiction of that call that you were

20   present for?

21   A    Yes.

22   Q    Does it appear to have been altered in any way?

23   A    No.

24   Q    Was this one of the calls that you submitted on that

25   recording device to the agents?

FLORES - DIRECT - FELS

1   A    Yes.

2   Q    Again, same questions with the transcript, you were asked

3   to do something with these transcripts?

4   A    Yes.

5   Q    What's that?

6   A    To review them, make any corrections.

7   Q    And you did that, sir?

8   A    Yes.

9            MR. FELS:  Why don't we play, it's a short call,

10  609A-1T.

11           (Audiotape played.)

12           (Audiotape stopped.)

13  BY MR. FELS:

14  Q    You hear that beeping, do you recognize that beep sound?

15  A    Yes.

16  Q    What is that?

17  A    That's the Nextel radio, the chirp.

18  Q    Who are we listening to in this call?

19  A    That's my brother J. and Alfredillo.

20  Q    Alfredillo, El Chapo's son?

21  A    Yes.

22  Q    Let's continue on, please.

23           (Audiotape played.)

24           MR. PURPURA:  Objection, Judge.

25           MR. FELS:  Objection pending.

FLORES - DIRECT - FELS

```
 1              THE COURT:  I'm sorry, I didn't even hear a word.

 2              MR. PURPURA:  I apologize.

 3              THE COURT:  Let me see.

 4              MR. PURPURA:  I think we can stop it there.

 5              THE COURT:  Well, I'm not sure of the objection.

 6   It's in evidence, right?

 7              MR. PURPURA:  I'll withdraw the objection if there

 8   is no further question.

 9              THE COURT:  Is there no further question?

10              MR. FELS:  There is not a question about what the --

11   the end of this and we don't have to play the rest.

12              THE COURT:  Okay, go ahead.

13   BY MR. FELS:

14   Q    You mentioned that this is your brother's and

15   Alfredillo's call, now how do you know you were present for

16   this call, sir?

17   A    I remember that day, you know, I could hear my phone

18   ringing in the background.

19   Q    There was like a little melody there, that was your

20   phone?

21   A    Yes, I remember that ringtone.

22   Q    What was that ringtone?

23   A    That was my DEA handler at the time calling me.

24   Q    So he's calling you in the midst of your brother

25   recording this call with Chapo's son?
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

FLORES - DIRECT - FELS

1   A    Yes.

2   Q    Now, your brother on line 6 page 2 says, All right, here

3   goes, ready.  It's (333)136-1113.  What is that?

4   A    My brother was giving him a cell phone number.

5   Q    For what purpose, sir?

6   A    Where Chapo was supposed to call us on.

7   Q    Was this a phone number -- did you have a phone that was

8   assigned to that (333)136-1113 number?

9   A    Yes, I did.

10  Q    And when you surrendered to the DEA less than a month

11  after making this call, did you turn anything in to the DEA?

12  A    Yes, I turned over I believe a couple of dozen phones.

13  Q    Sir, I'll actually put this down here.  Showing --

14         MR. FELS:  Oh, Your Honor, may I approach?

15         THE COURT:  Yes.

16  BY MR. FELS:

17  Q    Showing you what's been marked as Government's

18  Exhibit 606F.  Sir, is that bag sealed.

19  A    Yes.

20  Q    Let's see what's inside.

21         MR. FELS:  May I approach again, Your Honor?

22         THE COURT:  You may.  You have standing permission.

23         MR. FELS:  Thank you.

24  Q    Sir, did you just observe me opening up that sealed bag?

25  A    Yes.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

Case 1:09-cr-00466-BMC-RLM   Document 630   Filed 07/10/19   Page 212 of 219 PageID #: 12528

FLORES - DIRECT - FELS

1   Q    And what is the contents of that bag, which that you're

2   holding in your hand, Government's Exhibit 609F, sir?

3   A    This is a cellular phone I purchased with that number

4   where Chapo was going to call me -- where he called me.

5   Q    Is this one of the phones you turned into the DEA?

6   A    Yes.

7              MR. FELS:  Your Honor, we move to introduce

8   Government's Exhibit 609F.

9              MR. PURPURA:  No, objection.

10             THE COURT:  Received.

11             Before you go on, either you're going to finish in

12  the next five minutes or you're going to take a break at a

13  convenient time.

14             MR. FELS:  We can stop at any time, Your Honor.

15             THE COURT:  Now is okay?

16             MR. FELS:  Sure.

17             THE COURT:  Ladies and gentlemen, we'll quit for the

18  day.  Please don't look at any media about the case, don't do

19  any research on the case, don't tell anyone anything about the

20  case and keep an open mind.

21             We'll see you tomorrow morning.  Thank you very

22  much.

23             (Jury exits courtroom.)

24             THE COURT:  All right, let's have the Marshals take

25  the witness out, please.  Everyone else be seated.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

3564

PROCEEDINGS

1      Let's talk about what the parties want to do with

2 regard to juror sketching.  The government's position?

3      MS. PARLOVECCHIO:  Your Honor, this is an anonymous

4 jury for a reason.  We would object to any drawing of the

5 jurors' likenesses in the courtroom sketches.

6      My understanding is usually when these courtroom

7 sketches are published on a news site there is an attribution

8 to it, so to the extent we can determine which of the artists

9 made the sketch that captured the likenesses of the jurors, we

10 would just ask to admonition them not to further disseminate

11 it.

12      THE COURT:  Well, I can't do that because I don't

13 know who made the sketch.  The sketch artists who are in here

14 saw it on TV on one of the stations.  I suggest you talk to

15 those sketch artists maybe they can give you more information.

16 If you have an application, I'll consider it.

17      MS. PARLOVECCHIO:  We will do that.

18      THE COURT:  Any position from defense.

19      MR. BALAREZO:  Your Honor, we will defer to the

20 Court, I will just note it was not posted on Twitter.

21      MR. LICHTMAN:  Judge, is it known whether or not

22 anyone on the jury is aware of this?

23      THE COURT:  There's no reason to think they are.

24 The only communication about it has been a note from the

25 sketch artists to chambers.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

PROCEEDINGS

1          MR. LICHTMAN:  Well, if that's the case if the jury

2   is not aware of it, it's obviously a different set of

3   circumstances.

4          THE COURT:  So what does that mean your position is?

5          MR. LICHTMAN:  Well, I would think at this point all

6   we need is an admonition to the artist not to draw the jury

7   anymore.

8          THE COURT:  Okay.  Well, we need a little more than

9   that.  I have to make a record to show that there's a need for

10  that if I indeed find that there is a need for that.  For the

11  reasons suggested by the government, I think there is a need

12  for it, I incorporate by reference all of the rationale that I

13  set forth in my decision authorizing an anonymous jury in the

14  first place, I will then add to that the fact that given the

15  extraordinary media coverage that we've had virtually every

16  day of the trial, the dissemination of good likenesses of the

17  jurors would indeed create an intolerable risk that the

18  jurors' identity could be uncovered despite the efforts of the

19  Court to make sure that doesn't happen.  So that's the basis

20  for my finding that there should be no discernible sketching

21  of the people on the jury, and that's my ruling.

22          I have no reason to believe the sketch artists that

23  are here would not adhere to that.  They've been very good.

24  They've asked for guidance in fact on this issue, so that's

25  fine.  They also suggested there is different levels of detail

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1   that sketch artists can give.  I have to leave it somewhat to

2   their judgment as to how much detail that they can use without

3   creating an identifiable likeness of the juror.  They have

4   suggested to me, for example, that one level of redaction you

5   can have no faces at all, another level you can have the hair

6   and the glasses only, and at another level you actually have

7   full disclosure of face and what clothes they're wearing.  I

8   think the middle one is probably okay.  We're talking about

9   hairstyle and glasses or no glasses, I think that's probably

10   non-discernible.  Does anybody think we need the severe

11   imposition of no faces at all?

12                   MR. LICHTMAN:  No, Judge.

13                   THE COURT:  Let me just say this, if any of the

14   sketch artists -- yes, Ms. Shepard I'll hear from you.

15                   MS. SHEPARD:  If you want to keep something

16   anonymous you have to keep it completely empty so you might

17   not identify that particular person, but you might identify

18   somebody else with the hair.

19                   THE COURT:  Okay.

20                   MS. SHEPARD:  And if you have just the hairstyle,

21   the people who are interested in this trial know who the

22   jurors are.  The media follows people, as you well know.

23                   THE COURT:  I don't know that the identities of the

24   jurors have been compromised yet.

25                   MS. SHEPARD:  Many artists have drawn the jurors and

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1  when the verdict comes in they show the actual juror, so there

2  is no trust.

3         THE COURT:  Okay, well, in light of that I'm going

4  to say this, let's have no face jurors, no faces.  Any

5  sketching of the jurors please show it to the government

6  before it is shown to anyone else in the public or anyone who

7  could release it to the public to make sure that it's adequate

8  and complies with that direction, okay.

9         Yes, Mr. Riley.

10        MR. RILEY:  I don't see why one sketch artist saying

11 something should result in a new ruling.

12        THE COURT:  Do you disagree?

13        MR. RILEY:  I do.  I think I would like to find out

14 what -- where this was published and see what it looks like,

15 see if this violates the ruling.

16        THE COURT:  Well, look, I'm not getting into it at

17 that level, I'm talking about what we're going to be doing

18 going forward and I have to make sure that the jurors are not

19 readily discernible so that their identities might get

20 disclosed.  It seems to me that if there is an issue, and I'm

21 not artist believe me, that hair and glasses might result in

22 the identification of someone, then we should have more

23 obscure drawings of the jurors than that, so that's what we're

24 going to do.

25        Anything else Mr. Riley I'll take by written

PROCEEDINGS

1    application and I'll be glad to act on.

2              Anything further before we break?

3              MR. PURPURA:  Yes, unrelated to the sketches, Your

4    Honor.  Your Honor, just this is my lack of due diligence.  In

5    reviewing the transcripts now, this is my witness, I see that

6    in numerous of the endings of the transcript, that's what I

7    attempted to object to, was in essence a synopsis by

8    Mr. Flores as to who he's contacted and what was said.  That

9    would be hearsay.  I apologize for the extra work, but I'd ask

10   the government to collect the binders and to redact those from

11   the transcripts.  And again, it was based on my lack of due

12   diligence and so that's all I can say.

13             THE COURT:  What's the government's position.

14             MR. FELS:  Your Honor, we have no objection to that,

15   we can redact that portion.

16             THE COURT:  Good, we'll do that.

17             Anything else?  Okay.

18             MR. PURPURA:  Just --

19             THE COURT:  Yes.

20             MR. PURPURA:  I'm sure Mr. Fels will address this,

21   it was an issue about kidnapping of this witness' father.  I

22   indicated there appear to be some reference to that in a DEA 6

23   but it's all redacted, and I'm sure that sooner rather than

24   later I'll get a response so that I can be prepared for cross,

25   hopefully by lunchtime tomorrow.

3569
PROCEEDINGS

1          THE COURT:  Any problem with that?

2          MR. FELS:  We don't have a problem with that, we're

3     working on it now.  Part of the problem is that we didn't do

4     some of the redacting so we need to go to the original agents

5     who did it and figure out what's behind there.

6          THE COURT:  Let's make sure we don't have to break

7     for cross-examination so that you can do what we all knew had

8     to be done in all likelihood anyway.

9          MR. FELS:  I understand, Your Honor.

10          THE COURT:  Thank you, all.  See you tomorrow

11     morning.

12          (Whereupon, the trial adjourned at 4:30 p.m. to

13     resume Wednesday, December 19, 2018 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                           I N D E X

 2     WITNESS                                PAGE

 3     JORGE MILTON CIFUENTES VILLA

 4     CROSS-EXAMINATION      BY MR. LICHTMAN     3354

 5     REDIRECT EXAMINATION   BY MR. FELS         3394

 6     RECROSS EXAMINATION    BY MR. LICHTMAN     3420

 7

 8     PEDRO FLORES

 9     DIRECT EXAMINATION     BY MR. FELS         3427

10                       E X H I B I T S

11     GOVERNMENT              PAGE
       51 and 52              3431
12     500B                   3444
       58A                    3466
13     78                     3467
       3500-PF-4              3541
14     16                     3482
       500A                   3490
15

16

17

18

19

20

21

22

23

24

25
</pre>

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*