1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                      09-CR-00466(BMC)
3   UNITED STATES OF AMERICA,
                                      United States Courthouse
4                                     Brooklyn, New York

5        -against-                    January 16, 2019
                                      9:30 a.m.
6   JOAQUIN ARCHIVALDO GUZMAN LOERA,

7        Defendant.

8   ------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
              BEFORE THE HONORABLE BRIAN M. COGAN
10                UNITED STATES DISTRICT JUDGE
                      BEFORE A JURY
11

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  GINA M. PARLOVECCHIO, AUSA
                                  ANDREA GOLDBARG, AUSA
16                                MICHAEL ROBOTTI, AUSA

17                           UNITED STATES ATTORNEY'S OFFICE
                             Southern District of Florida
18                           99 NE 4th Street
                             Miami, Florida 33132
19                           BY:  ADAM S. FELS, AUSA

20                           DEPARTMENT OF JUSTICE
                             Criminal Division
21                           Narcotic and Dangerous Drug Section
                             145 N. Street N.E. Suite 300
22                           Washington, D.C. 20530
                             BY:  ANTHONY NARDOZZI, ESQ.
23                                AMANDA LISKAMM, ESQ.

24
    (CONTINUED FOLLOWING PAGE)
25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

```
1    (APPEARANCES CONTINUED)

2

3

     For the Defendant:         BALAREZO LAW
4                               400 Seventh Street, NW
                                Washington, D.C. 20004
5                               BY:  A. EDUARDO BALAREZO, ESQ.

6                               LAW OFFICES OF JEFFREY LICHTMAN
                                11 East 44th Street, Suite 501
7                               New York, New York 10017
                                BY:  JEFFREY H. LICHTMAN, ESQ.
8                                    PAUL R. TOWNSEND, ESQ.

9                               LAW OFFICE OF PURPURA & PURPURA
                                8 E. Mulberry Street
10                              Baltimore, Maryland 21202
                                BY:  WILLIAM B. PURPURA, ESQ.

11
                                LAW OFFICES OF MICHAEL LAMBERT, ESQ.
12                              369 Lexington Avenue, PMB #229
                                New York, New York 10017
13                              BY:  MARIEL COLON MIRO, ESQ.

14

15

16

17

18

19   Court Reporter:            Georgette K. Betts, RPR, FCRR, CCR
                                Phone:  (718)804-2777
20                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com

21

22

23   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

24

25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1          (In open court; jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Good morning.  Have a seat, please.  A

4   couple of things we need to talk about.

5          First, one of the jurors reported to Ms. Clarke that

6   one of her children had approached her last night and said

7   that she had read an article in the newspaper that the

8   defendant might testify, that article obviously came about as

9   a result of our discussion after the jury was excused

10  yesterday.  The juror expressed to Ms. Clarke she's not

11  troubled by that, it will not affect her, but she felt an

12  obligation to report it pursuant to the instructions that we

13  have been giving the jurors.

14         My proposal is that we take no further action on

15  that, but I want hear if the parties have a different view.

16         MR. LICHTMAN:  Judge --

17         MR. BALAREZO:  Hold on.  Your Honor, we don't need

18  further action, but just so that it's clarified in the world

19  at large, the only reason that that name was given by

20  Mr. Lichtman that he gave Mr. Guzman's name was as a possible

21  witness, there is absolutely no decision has been made.

22         THE COURT:  I understood that way, apparently some

23  of the press did not.

24         MR. LICHTMAN:  Judge, what I just would ask perhaps

25  what might end this, is that privately to that juror you can

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1  say that every defendant has the right to testify, there is no

2  obligation either way, you can't hold it against a defendant

3  whether he testifies or not just to that juror just so we can

4  close it off there.  I don't see any harm to that.

5           MS. PARLOVECCHIO:  Your Honor --

6           THE COURT:  Any objection to that?

7           MS. PARLOVECCHIO:  Your Honor, I think that

8  instruction will be given at the end, I don't think any

9  further steps are necessary.  It sounds like everything has

10  been addressed.

11           THE COURT:  This was not a troubled juror.  This is

12  a juror who is, in an abundance of caution, is making sure

13  they are complying with the rules.

14           MR. LICHTMAN:  Obviously, Judge, if I didn't say in

15  Court when they asked for a defense witness list that

16  Mr. Guzman may be testifying, in every case I've had in my

17  life in terms of a defense witness list, I've given the

18  defendant's name because I don't want to be foreclosed down

19  the line.

20           THE COURT:  I knew that.

21           MR. LICHTMAN:  Okay.

22           THE COURT:  Apparently others who were watching may

23  not have.  So that's the first instance, I'm not going to take

24  any further action on that.

25           The second is the government's motion in limine that

PROCEEDINGS

1    was received late last night.  I'm going to hear from the

2    defense on that in minute, but the first thing I want to say

3    is, I'm not inclined to seal that, I think that the grounds

4    that the government offered for sealing that are not

5    persuasive to me.  If anything, I think that the disclosure

6    will further the government's purpose in trying to clear up

7    some misunderstandings about this matter.  I think the letter

8    sets forth very concisely what, in fact, did happen here and

9    how the things have gotten a little twisted around from where

10   I thought they would be at the beginning of the case.

11            So, unless anyone wants to hear me on sealing, I'm

12   going to unseal that and then we can talk about what to do

13   about it.

14            MR. FELS:  Yes, Your Honor, we would ask at least

15   for the name to be sealed.

16            THE COURT:  Which name?  There are several names.

17   The Colombian?

18            MR. FELS:  The name of the person we're seeking

19   relief on.  If we could be heard at sidebar on that perhaps.

20            THE COURT:  Let's see if we can tease it out without

21   at sidebar.  Are you talking about the witness or the subject

22   of the testimony?

23            MR. FELS:  The subject of the testimony.

24            THE COURT:  And you're talking about --

25            MR. FELS:  The subject of the testimony that we're

PROCEEDINGS

1   seeking to preclude further cross-examination.

2            THE COURT:  There were two prongs:  One was Mexican,

3   one was Colombian, which one are you seeking?

4            MR. FELS:  The latter.

5            THE COURT:  The latter.  It's already out as of

6   yesterday.  It came out.  I don't see any reason to do that.

7   I might still preclude it after I've heard from the defendant,

8   but I don't see a ground to seal it.

9            Mr. Lichtman.

10           MR. LICHTMAN:  Do you want to do this in open Court,

11  Judge?

12           THE COURT:  I do.

13           MR. LICHTMAN:  If you look --

14           THE COURT:  If I can set it up a little bit so you

15  can respond to my particular concerns.  I think the government

16  is right that you told the jury in opening that the evidence

17  would show that Zambada was paying bribes to the presidents of

18  Mexico.  Nobody so far has shown me anything to back that up

19  and that's why I said to you at the end of your closing, I'm

20  not sure you're going to be able to deliver on that.

21           What this witness said yesterday was that he had

22  information, which if I understood him correctly, he obtained

23  exclusively from the defendant that the defendant professed to

24  have paid bribes to some president of Mexico.  Very different

25  than what you told the jury.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1          Number one, the government is now alleging, as I

2    understand it, that your client paid bribes to the presidents

3    of Mexico.

4          MR. LICHTMAN:  And why is that, Judge?

5          THE COURT:  I just haven't heard them put in any

6    evidence on it.

7          MR. LICHTMAN:  I think the reason is based in their

8    letter as to why they didn't elicit that from Cifuentes.

9          THE COURT:  Well, maybe they think that your client

10   was not being candid when he gave that information to

11   Mr. Cifuentes.

12         MR. LICHTMAN:  Or maybe they're desperate to protect

13   the Mexican government.

14         THE COURT:  And what if they are, how does that bear

15   on either the witness' credibility or his guilt or innocence?

16         MR. LICHTMAN:  Judge, I would have to discuss that

17   with you in camera and not in open court with the government

18   listening.

19         THE COURT:  I will hear you in camera at sidebar

20   with the same admonition that if I don't find a reason to seal

21   it, I'm going to open the sidebar.

22         MR. LICHTMAN:  Judge, I don't have a problem, I'm

23   past that issue.  I wasn't planning on going back to it.

24         THE COURT:  Well, you've sewn some seeds of

25   confusion and the government doesn't want them to be any

PROCEEDINGS

1   further.  I think the government is quite capable of

2   straightening it out on redirect, so if you're saying you're

3   not going there any more, then I think we can drop it.

4          MR. LICHTMAN:  Look, this was -- just so we're

5   clear, this was an issue that they knew was going to be

6   discussed months ago, there was no motion in limine on it.

7   They allowed me to elicit it.  Even at sidebar Your Honor said

8   because of the inconsistencies that it was a permissible area

9   of cross.

10         THE COURT:  Well, first of all, I think the

11  government could reasonably expect that if they didn't

12  issue -- if they didn't offer evidence that your client had

13  offered bribes to the president of Mexico, that you wouldn't

14  offer that evidence either, that does not seem to me

15  unreasonable.  But be that as it may, if you're done with it,

16  we're done.

17         MR. LICHTMAN:  I'm done with it.  I moved passed it.

18  I didn't say hold on.

19         THE COURT:  The government's motion is moot as to

20  that point.

21         Anything I need to hear more from the government on

22  that?

23         MR. FELS:  Your Honor, we still have a motion as to

24  the future.

25         THE COURT:  As to the Colombian?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1           MR. FELS:  Correct.

2           THE COURT:  Are you done with that?

3           MR. LICHTMAN:  The Mexican.

4           THE COURT:  The Colombian?

5           MR. LICHTMAN:  The Colombian I never got into it

6   because that's when we ended the day.  And I can explain now,

7   if you'd like.  This is the second military person -- I can

8   give you his name, I think there's been no admonition against

9   giving his name --

10          THE COURT:  I thought his name was given yesterday.

11          MR. LICHTMAN:  It was.  I asked and it was not

12  sealed, so I can talk about it.

13          THE COURT:  Go ahead.

14          MR. LICHTMAN:  This was regarding this General

15  Naranjo, if I pronounced that right.  The piece of 3500 is

16  HACV-28 paragraph 42.  And it talks about this Naranjo who was

17  paid monthly allowances to provide protection for the

18  Cifuentes family.  It didn't say the part of the Cifuentes

19  family doesn't include the man on the stand, it says the

20  Cifuentes family.  So how am I to know that he was talking

21  about these members but not this member.

22          THE COURT:  Don't get excited.

23          MR. LICHTMAN:  Well, Judge, this is the 17th in

24  limine motion on Alex Cifuentes --

25          THE COURT:  Yes, we've had a lot.

PROCEEDINGS

1          MR. LICHTMAN:  -- and that could have been made

2     before trial.

3          THE COURT:  Again, I'm not sure that the government

4     could know that this was where you were going to go, but

5     whether it should have or not it doesn't matter, we are where

6     we are.  So the question becomes -- let me try to summarize

7     what I think is your best argument and see if I've got it

8     right.  It's a further indicator of the lack of truthfulness

9     of this witness because he or his family, and we don't know

10    which, was paying bribes for protection, was paying protection

11    money to this military officer.  Is that it?

12         MR. LICHTMAN:  That's it.

13         THE COURT:  Let me hear from the government why

14    that's 401, 402 or 403.

15         MR. FELS:  Well, it's certainly 403 because I think

16    he elicited on numerous occasions that the witness himself

17    paid bribes.  The idea that we now need to go into a

18    particular individual that he may have very limited

19    information about, it sounds like from the interview notes

20    this is -- this is absolutely gilding the lily.  It is

21    designed to embarrass, to provoke and there is no real purpose

22    other than that in light of everything that's already come

23    out.

24         THE COURT:  Well, first of all, there is an

25    ostensible legal purpose which is to impact the witness'

PROCEEDINGS

 1    credibility by showing him to be willing to pay bribes.  Your

 2    points are well taken that, number one, we have plenty of that

 3    about this witness already.  The jury's heard -- I mean

 4    Mr. Lichtman did a, what I'll call, a machine gun approach to

 5    all of the acts of dishonesty and that's all out there, so the

 6    question is, is this additional instance in which,

 7    Mr. Lichtman, we don't know how much, if any, personal

 8    responsibility this witness bore for that particular bribe, is

 9    it worth taking the time to find out when you've got this

10    whole dossier on bribery and corruption by him already.

11               MR. LICHTMAN:  It's like two questions, Your Honor.

12    And the idea that it's designed to embarrass, embarrass who?

13               THE COURT:  I don't care about embarrassment very

14    much.  Okay, I will allow two questions on it but I'm not

15    going to let you --

16               MR. LICHTMAN:  Can they be compound questions,

17    Judge?

18               THE COURT:  I'm going to allow you to find out if

19    this guy was personally -- this witness was personally

20    involved in that.  If it starts taking too long, then I'm

21    going to stop you just because you've got so much on this

22    topic that we have to get through with the trial.

23               MR. LICHTMAN:  Judge, it was such a minor point, it

24    was like subsection 6C of the area of bribery.  This has

25    become a mountain and it really was not even a mole hill.

PROCEEDINGS

1    THE COURT:  When I took evidence from Irving Younger

2  he always said to me, only go for your big points.  He also

3  said to me, never have a cross-examination longer than two

4  hours or you're doing something wrong.

5    MR. LICHTMAN:  Well, I read Younger and I think I

6  remember it saying that it should not go longer than the

7  government's direct of the witness.  I don't think that is

8  even possible, we'll be here to Christmas.

9    THE COURT:  I think we know where we are.

10    Anyone else have anything else to say on it?  All

11  right, let's have the witness in please.

12    MR. LICHTMAN:  Thank you.

13    (Jury enters courtroom.)

14    THE COURT:  All right, be seated please.  Good

15  morning, ladies and gentlemen.

16    THE JURORS:  Good morning.

17    THE COURT:  We'll continue with cross-examination.

18

19

20

21

22

23

24

25

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   HILDEBRANDO ALEXANDER CIFUENTES VILLA, resumed as a witness,

2   having been previously duly sworn/affirmed, was examined and

3   testified further as follows:

4           MR. LICHTMAN:  Thank you, Judge.

5   CROSS-EXAMINATION

6   BY MR. LICHTMAN:

7   Q    Good morning, Mr. Cifuentes.

8   A    Good morning, counsel.

9   Q    When we took a break yesterday, we were discussing your

10  family's bribery of Colombian officials, do you recall that?

11  A    Yes, sir.

12  Q    And you recalled being debriefed by the government in

13  February of 2016?

14  A    Yes, sir.

15  Q    Do you recall telling the government that a General

16  Naranjo was paid a monthly allowance to provide protection for

17  your family?

18  A    Something like that, sir.

19  Q    Well, is that -- do you recall that as being true?

20  A    Could you show me a document to refresh my memory,

21  please?

22  Q    I can.  HACV-28.  If you can review the underlined

23  portion to yourself.

24  A    Yes, sir.

25  Q    That's accurate that, in fact, General Naranjo was paid a

5336

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1  monthly allowance to provide protection for your family in

2  Colombia?

3  A     Yes, sir.

4           THE COURT:  Mr. Lichtman, we're again with the mic

5  situation.  You can pick it up or if you want to stand there,

6  you can pull the podium mic closer to you.  It's up to you.

7           MR. LICHTMAN:  Hobson's choice, Judge.  I think I'm

8  okay for now.

9           THE COURT:  Okay.

10          MR. LICHTMAN:  Is that better?

11          THE COURT:  It is.

12 BY MR. LICHTMAN:

13 Q     Now, while working with your brother, Pacho, in Colombia,

14 do you recall telling the government that while you were

15 trafficking cocaine with him that you and Pacho paid the air

16 force $50,000 to receive navigation charts which located the

17 military and law enforcement ships?

18 A     Yes, sir.

19 Q     Now if I can just go back to one piece that I touched on

20 yesterday, I just want to clarify.

21          You testified yesterday that the time -- you told

22 the government the time you spent with Mr. Guzman living with

23 him was a period of about eight or nine months, correct?

24 A     That was an approximation, it was a little longer.

25 Q     Well, let me just give you page 5198.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1          MS. PARLOVECCHIO:  Objection.

2          MR. LICHTMAN:  Giving an inconsistent --

3          THE COURT:  No, it's okay.

4    Q    Page 5198 line 19.

5          "QUESTION:  And you told the government during your

6    first two days of debriefing that you were living with

7    Mr. Guzman for a period of about eight or nine months.

8          "ANSWER:  Yes, sir."

9          Now you also told the government in a debriefing,

10   your first debriefing --

11         THE COURT:  You're not reading from the transcript

12   anymore, right?

13         MR. LICHTMAN:  No, I'm not.

14   Q    -- in January 2016, that you had visited Mr. Guzman in

15   2007 and that ultimately you were left there to live with him,

16   correct?

17   A    The fall of 2007, yes, sir.

18   Q    But you met with him and then you were left there when

19   you met him, that's my question.

20   A    Yes, sir.

21   Q    Now do you recall that you told the government in those

22   first two debriefings that this occurred in or about July of

23   2007?

24   A    Approximately, yes, sir.

25   Q    Now, by 2006 you were very, very involved with your

5338

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1  brother, Pacho, and the Cifuentes Villa drug trafficking

2  organization, correct?

3  A    Incorrect.

4  Q    In 2006, you were not involved with your brother, Pacho,

5  moving cocaine?

6        Sir, let the translator at least pretend you don't

7  understand the question.

8        MS. PARLOVECCHIO:  Objection.

9        THE COURT:  Sustained.  Okay, now ask another

10  question.

11  BY MR. LICHTMAN:

12  Q    Did you tell the government that in 2006 you were

13  involved with your brother, Pacho, moving cocaine?

14  A    Can you show me the document where I said that?

15  Q    If you can read that -- this is HACV-28.  If you can read

16  that paragraph to yourself and let me know that if in 2006

17  this refreshes your recollection that in 2006 you were working

18  with Francisco, a/k/a Pacho to move cocaine from Colombia?

19        MS. PARLOVECCHIO:  Objection.  Your Honor, may we

20  have a sidebar?

21        THE COURT:  Okay.

22        (Sidebar conference.)

23        (Continued on the next page.)

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5339

SIDEBAR CONFERENCE

1      MS. PARLOVECCHIO:  That paragraph doesn't say that

2   this witness was working with his brother, Pacho, in 2006.

3   The paragraph that Mr. Lichtman is showing to the witness

4   pertains to the subject of our motion in limine in regard to

5   the bribery of the alleged DEA agent.  So it's not refreshing

6   him as to this fact as to that question, it's --

7      MR. LICHTMAN:  I'll explain.  He just said that in

8   2006 it was incorrect that he was working with Pacho to move

9   cocaine.  That paragraph says -- that's a paragraph where he

10  supposedly goes to the lunch meeting with the supposed DEA

11  agent in 2006 to discuss the movement of cocaine.  That's all

12  I'm asking.

13     MS. PARLOVECCHIO:  No, it's to pay for the bribe --

14     THE COURT:  Look, if you're right, it's not going to

15  refresh his recollection.

16     MS. PARLOVECCHIO:  I'm afraid it's being done to

17  just purely confuse the witness and elicit something that he's

18  not allowed to go into beyond the one question that Your Honor

19  said he could ask.

20     THE COURT:  I'm going to limit the question to

21  whether it refreshes his recollection, yes or no.  That's all

22  I'm going to allow.  You can use anything to refresh

23  recollection.  So I'm going to allow him to try to do that.  I

24  agree with you it's not a very direct way, but I don't see the

25  danger if it doesn't refresh his recollection we move on to

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    something else.

2              MS. PARLOVECCHIO:  I just would ask the Court that

3    keep Mr. Lichtman to the one question that he said he could be

4    asked.

5              MR. LICHTMAN:  Judge, if I could --

6              THE COURT:  That's what I'm going to do, I just said

7    that.

8              MR. LICHTMAN:  If I can clarify.  What she's asking,

9    I think that you're confirming, is I'm supposed to just come

10   out and say to him, did you corrupt the DEA.  What I'd like to

11   do --

12             THE COURT:  No.

13             MS. PARLOVECCHIO:  No, that wasn't the question.

14             THE COURT:  No, no, that's not it.  You asked him

15   whether he was dealing in 2006, he said --

16             MR. LICHTMAN:  You mean with regard to this issue?

17             THE COURT:  Of course, yes, that's it.

18             MR. LICHTMAN:  Unless I can prove it otherwise, I'm

19   stuck with his answer.  I can ask him what he was doing in

20   2006, can't I?

21             THE COURT:  Yes, sure, okay.

22             (End of sidebar conference.)

23             (Continued on the next page.)

24

25

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1          (In open court.)

2   BY MR. LICHTMAN:

3   Q    Sir, before that brief break I had asked you if in 2006,

4   before you supposedly met with Mr. Guzman in Culiacan, if you

5   were working with your brother, Pacho, to move cocaine from

6   Colombia.  You said no, you weren't.  I'm asking you if you

7   can read that paragraph if that refreshes your recollection.

8          THE COURT:  Please translate the paragraph for him.

9          All right, so the question before you is whether in

10  2006 that paragraph refreshes your recollection as to whether

11  you were working with your brother, Pacho, to move cocaine

12  from Colombia.  Yes or no?

13         THE WITNESS:  It refreshed my memory but that was at

14  the end of 2005.  Yes, yes, sir.

15         THE COURT:  Go ahead.

16  BY MR. LICHTMAN:

17  Q    So the end of 2005 going into 2006?

18  A    End of 2005.

19  Q    Into 2006?

20         MS. PARLOVECCHIO:  Objection.  Asked and answered.

21         THE COURT:  Sustained.

22  BY MR. LICHTMAN:

23  Q    Hurricane Wilma had occurred in late October 2005, if you

24  recall?

25  A    Yes, sir.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5342
ALEXANDER CIFUENTES – CROSS – LICHTMAN

1   Q    And your apartment in Cancun had been destroyed by it,

2   correct?

3   A    Yes, sir.

4   Q    And you then moved in with Pacho, correct?

5   A    Yes, sir.

6   Q    Pacho had a warehouse in Medellin which he used to

7   facilitate your drug dealing, didn't he?

8   A    Yes, sir.

9   Q    And you assisted Pacho, correct?

10  A    Yes, sir.

11  Q    And Pacho facilitated transportation of drugs and used

12  the warehouse as an office where he met with, I think you told

13  the government, approximately 80 people per day to discuss

14  logistics and loads?

15  A    At least, yes, sir.

16  Q    And some of the 80 people a day that Pacho met with in

17  that warehouse office while you were assisting him included a

18  drug dealer named Chocolate?

19  A    I don't identify who Chocolate is.

20  Q    Excuse me?

21  A    That name I don't recognize it.

22  Q    Okay.  Other names, a drug dealer named Makaco?

23  A    No, not in that office that's not where the meetings with

24  Makaco took place.

25  Q    Cerrano?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   A    Cerrano?

2   Q    A drug dealer named Cerrano that you told the government

3   he was meeting with?

4   A    It could be, yes, sir.

5   Q    The twin brothers who were drug dealers?

6   A    Yes, sir.

7   Q    And part of your duties while assisting Pacho during that

8   period was to discuss the use of airstrips that General

9   Betancourt controlled and others -- actually let me withdraw

10  that question.

11         Regarding the twin brothers, part of your duties

12  while assisting Pacho when you were at the meetings with him

13  discussed the increased use of airstrips that the twin

14  brothers controlled, correct?

15  A    No, sir.

16  Q    Did you discuss the use -- the increased use of airstrips

17  during those meetings?

18  A    No, those were appointments that my brother would hold

19  independently, but I do remember that topic.

20  Q    Well, you remembered it because you learned it from your

21  brother?

22  A    Yes, sir.

23  Q    And the use of airstrips to move drugs was done with the

24  assistance of crooked airport officials and the government?

25  A    That was in one of my brother's "fincas."

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    Q    One of his what?

2    A    "Fincas."  The "finca" or farm, it had an airstrip.

3    Q    You knew about all of this obviously as it was going on?

4    A    Yes, sir.

5    Q    And you weren't just laying around, you were part of

6    Pacho's operation, correct?

7    A    Yes, sir.

8    Q    You were fully aware of everything that was going on with

9    Pacho because you were his right-hand man, so to speak?

10   A    Yes, sir.

11   Q    And you and Pacho were very close.

12   A    Yes, sir.

13   Q    You lived with him?

14   A    Yes.

15   Q    Sir, I asked if you lived with your brother, Pacho, you

16   don't have to throw him in to every answer.

17              MS. PARLOVECCHIO:  Objection.

18              THE COURT:  Sustained.  Don't yell at the witness.

19              MR. LICHTMAN:  Sorry, Judge.

20              THE COURT:  If you're not getting an answer to the

21   question, I'd be glad to help you out.

22              Put another question, please.

23   BY MR. LICHTMAN:

24   Q    You believe that your brother, Pacho, trusted you very

25   much, correct?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5345

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   A    Yes, sir.  I'm an honest man.

2   Q    You're an honest man?

3   A    Yes, sir.

4   Q    And you told the government that you attended meetings

5   with Pacho when he bribed government officials, correct?

6   A    Yes, sir.

7   Q    And you were part of those briberies, weren't you?

8   A    When I was with him, yes, sir.

9   Q    When you were with him you were part of the bribes to the

10  government officials, correct?

11  A    Correct.

12  Q    And you told the government that with Pacho you bribed

13  who you believed to be a DEA agent at a restaurant near the

14  airport in Colombia, correct?

15          MS. PARLOVECCHIO:  Objection.

16          THE COURT:  Overruled.

17  A    My brother did that.  I don't know if it was a bribe or

18  if it was a gift.

19  Q    So just before you testified that when you were with your

20  brother and he was bribing government officials, you were

21  responsible.  Now when I asked you about an American DEA

22  agent, suddenly it was your brother?

23          MS. PARLOVECCHIO:  Objection.

24          THE COURT:  Sustained.

25  Q    You said you weren't sure if it was a gift or a bribe,

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5346

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    fair?

2    A    That's right.

3    Q    It was a box full of cash, wasn't it?

4    A    It was a cell phone box, small, there were some dollars

5    in there.

6    Q    A box with cash?

7    A    Yes, sir.

8    Q    And you recall that during that meeting with that, who

9    you believed to be a DEA agent, that the DEA agent said that

10   he was not concerned about the size of drug trafficking you

11   and your brother were doing?

12             MS. PARLOVECCHIO:  Objection.

13             THE COURT:  Sustained.

14             MR. LICHTMAN:  Can I continue on this line?

15             THE COURT:  Taking it one question at a time.

16             MS. PARLOVECCHIO:  Can we have a sidebar, Your

17   Honor.

18             MR. LICHTMAN:  Judge.

19             THE COURT:  Okay.

20             (Sidebar conference.)

21             (Continued on the next page.)

22

23

24

25

5347

SIDEBAR CONFERENCE

1    THE COURT:  Yes.

2        MS. PARLOVECCHIO:  Your Honor, I think this violates

3    the spirit of your ruling.  You said in your order he could

4    ask one question, he figured out a circuitous way to get

5    there, he made his point.  The witness has said he wasn't a

6    part of the bribe, he didn't know how much money was in the

7    box.

8        MR. LICHTMAN:  First of all --

9        MS. PARLOVECCHIO:  I think any further questioning

10   on this line is completely in violation of your order.

11       MR. LICHTMAN:  First of all, the reason it was one

12   question was to see if I got the answer and he said that when

13   he was at briberies with his brother he was a part of it.  He

14   then acknowledged that either a gift or a bribe was given.

15       THE COURT:  That's your characterization.  The

16   witness's testimony is very clear that he was with his brother

17   but it was his brother's scheme and other than observing it,

18   he was not involved in it.  That's what I'm getting very

19   clearly.

20       MR. LICHTMAN:  Judge, can I just point out, as I

21   tried to do on cross, I led up to him and said every time you

22   were present when a bribe was given were you involved, he said

23   yes.  Once the DEA got mentioned, all of a sudden he backed

24   off because he knows the significance of this and he changed

25   his answer, so it's an inconsistent answer.  First he says he

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5348

SIDEBAR CONFERENCE

1    was responsible, now he says he's not.

2            THE COURT:  I think you're far afield of 403 at this

3    point.

4            MR. LICHTMAN:  Well, that's a different story.

5            THE COURT:  No, it's the same story, it's the story

6    we're talking about.

7            MR. LICHTMAN:  But the point is that he clearly said

8    that he was involved in all bribes that his brother paid while

9    he was there and then when I asked him about the DEA agent he

10   acknowledged that he was there, I asked him if he was involved

11   and suddenly he backed off.  And why do you think he backed

12   off, Judge?  Because he was told you have to back off on this.

13   He was unequivocal in his debriefings that he believed it was

14   a DEA agent, now all of a sudden the government brings out

15   well, it's not in 3500, but he wasn't so certain.  Why do you

16   think, they don't want to be embarrassed.

17           MS. PARLOVECCHIO:  No, your Honor, it has nothing to

18   do with it, he did not directly pay the bribe.

19           THE COURT:  I don't care who is embarrassed or who's

20   not embarrassed, this witness has little information on what

21   happened --

22           MR. LICHTMAN:  Judge, I can move off it.  I got the

23   answer I needed, I can move past it --

24           THE COURT:  -- explained the responsibility.

25           MR. LICHTMAN:  -- but I don't think it's appropriate

5349
SIDEBAR CONFERENCE

1  to suggest when he did say that he was involved in all bribes.

2              THE COURT:  He was involved to the extent of being

3  there.

4              MR. LICHTMAN:  He said he was responsible.  You can

5  look at the record.

6              THE COURT:  I don't recall that.

7              MR. LICHTMAN:  He acknowledged responsibility of it.

8              THE COURT:  I think we have covered this area

9  thoroughly, we are really distracting the jury from the case.

10  Move on to something else.

11              MR. LICHTMAN:  Thank you, Judge.

12              MS. PARLOVECCHIO:  Thank you.

13              (End of sidebar conference.)

14              (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1              (In open court.)

2    BY MR. LICHTMAN:

3    Q    Sir, by the end of 2014 you were sitting in a prison in

4    Colombia, correct?

5    A    That's correct, sir.

6    Q    You were sent there from Mexico, from a Mexican prison?

7    A    Yes, I was illegally expelled from Mexico to Colombia.

8    Q    And you were in Mexico from the end of 2013 before you

9    went to Colombia -- before you went to Colombia?

10   A    Yes, sir.

11   Q    And while you were sitting in a Mexican prison, 2013,

12   2014, you were concerned about getting a fair shake from the

13   Mexican judicial -- from the Mexican judicial process, isn't

14   that fair?

15   A    Yes, sir.

16   Q    And you were also worried about your safety in the

17   Mexican prison, weren't you?

18   A    Yes, sir.

19   Q    And you had lawyers in Mexico representing you, didn't

20   you?

21   A    Yes, your client's lawyers.

22   Q    Can we just assume that every answer has -- you don't

23   have to repeat it every time -- Mr. Guzman?

24              MR. LICHTMAN:  Objection.

25              THE COURT:  Sustained.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1  BY MR. LICHTMAN:

2  Q    You also had an American lawyer that was advocating on

3  your behalf, didn't you?

4  A    In Mexico, no.

5  Q    Not in Mexico.  Your brother, Jorge, and your sister,

6  Dolly, had an American lawyer that was working for them?

7  A    I assume so, sir.

8  Q    Well, did you know that they had a lawyer that was

9  working for them in America?

10       MS. PARLOVECCHIO:  Objection.

11       THE COURT:  Overruled.

12  A    In the jail in Mexico I did not have access to any

13  knowledge about anything, sir.

14  Q    Well, did you have knowledge that an American lawyer for

15  your brother and sister reached out to the American government

16  on your behalf and stated that you were willing to cooperate?

17  A    Yes, sir.

18  Q    While you were sitting in prison in Mexico?

19  A    No.

20  Q    When?

21  A    That was when I arrived in Colombia I believe.

22  Q    When you were arrived in Colombia in 2014?

23  A    At the end of 2014, I think so, sir.

24  Q    And you had an American lawyer reach out to the

25  government?

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1   A    When I was in Colombia, yes, sir.

2   Q    Who was that American lawyer?

3           MS. PARLOVECCHIO:  Objection.

4           THE COURT:  Sustained.

5   Q    When did you meet with that American lawyer?

6   A    Well, there were so many lawyers who wanted to take on

7   the case that I don't remember the names, sir.

8   Q    You don't remember which lawyer you told to contact the

9   American government with news of your desire to cooperate?

10  A    At this time I don't remember, sir.

11  Q    Well, this was a pretty big decision in your life,

12  wouldn't you say?

13  A    Yes, sir.  At that time I had some medical problems not

14  hypochondriac like you said.

15  Q    That's actually not a medical problem, hypochondria, it's

16  a mental problem, wouldn't you agree?

17          MS. PARLOVECCHIO:  Objection.

18          THE COURT:  Sustained.

19  BY MR. LICHTMAN:

20  Q    You decided to cooperate because of your physical

21  problems?

22          MS. PARLOVECCHIO:  Objection.

23          THE COURT:  Sustained.

24  BY MR. LICHTMAN:

25  Q    Why did you decide to cooperate -- hang on.  Didn't you

5353

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1    just testify that the reason you reached out to the American

2    government was because of the physical problems you were

3    having in Colombia, correct me if I'm wrong?

4    A    There's two very different topics here, sir.

5    Q    Let me back up.  The decision to cooperate with the

6    Americans was a huge moment in your life, correct?

7    A    Yes, sir.

8    Q    And you said that you met with many lawyers while you

9    were in Colombia about your case, correct?

10   A    Yes, sir.

11   Q    Many of them who just wanted to represent you because of

12   the size of the case or the notoriety?

13              MS. PARLOVECCHIO:  Objection.

14              THE COURT:  Overruled.

15   A    No, sir.  When you arrive in jail a lot of lawyers start

16   coming in and they want to represent you.

17   Q    So lawyers that you didn't even contact, they just came

18   in to see you on their own?

19   A    Yes, sir.

20   Q    And to one of them you mentioned that you wished to

21   cooperate with the government?

22   A    On my brother's suggestion, yes.  My brother, Hector

23   Mario Cifuentes.

24   Q    Hector Mario Cifuentes was your brother who suggested

25   that you cooperate with the government?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1    A    Yes.

2    Q    And to one of those lawyers that you did not request to

3    come visit you, you gave the order, tell the American

4    government I wish to cooperate?

5    A    Can I expand on the answer in an appropriate manner?

6    Q    Sure, on redirect, but right for now I'm asking you the

7    question.  Did you tell one of these unnamed lawyers who came

8    unsolicited to visit you when you arrived in Colombia's

9    prison, that you wished to cooperate with the American

10   government?

11   A    With one that my brother told me was the appropriate

12   person.

13   Q    But one that was unsolicited?

14   A    I had not solicited any of them in fact.

15   Q    So that would then make him unsolicited if you did not

16   solicit them, correct?

17            MS. PARLOVECCHIO:  Objection.

18            THE COURT:  Sustained.  Go on please.

19   BY MR. LICHTMAN:

20   Q    So you spoke to this lawyer how many times?

21   A    Several occasions.

22   Q    And you don't remember the lawyer's name?

23   A    I believe his last name was Rodriguez from Florida.

24   Q    Rodriguez from Florida.  So you're saying that the lawyer

25   that came unsolicited to see you in a Colombian prison was an

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    American lawyer named Rodriguez?

2              MS. PARLOVECCHIO:  Objection.

3              THE COURT:  Sustained.

4    Q    Was the lawyer from America?

5    A    He was, um, a Cuban-American lawyer I believe.

6    Q    Did you pay him?

7              MS. PARLOVECCHIO:  Objection.

8              THE COURT:  Sustained.

9    Q    Did you have any formal relationship with him?

10             MS. PARLOVECCHIO:  Objection.

11             THE COURT:  Sustained.

12   BY MR. LICHTMAN:

13   Q    And you said you saw him a bunch of times.

14   A    Several times.

15   Q    And you told him to tell the Americans that you wished to

16   cooperate?

17             MS. PARLOVECCHIO:  Objection.

18             THE COURT:  Sustained.

19   Q    Now would you agree that corruption is rampant inside the

20   prisons in Colombia?

21             MS. PARLOVECCHIO:  Objection.

22             THE COURT:  Sustained.

23   BY MR. LICHTMAN:

24   Q    The prison that you were located in, was it a prison

25   filled with corruption?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1    A    Yes, sir.

2    Q    And phone calls are regulated by inmates, inmate phone

3    calls are regulated in that prison, correct?

4    A    Yes, sir.

5    Q    And are those inmate phone calls recorded?

6    A    On the pay phones, yes, sir.

7    Q    And that's to ensure that there's no criminal activity

8    going on from the inmates in prison, correct?

9         MS. PARLOVECCHIO:  Objection.

10   Q    If you know?

11        THE COURT:  Sustained.

12   Q    Sir?

13        THE COURT:  I sustained the objection.

14        MR. LICHTMAN:  Oh, sorry.

15   Q    But inmates manage to have their own private cell phones

16   in prison, don't they?

17   A    Yes, sir.

18   Q    And they hide those cell phones along with the chargers

19   in their cells?

20        MS. PARLOVECCHIO:  Objection.

21        THE COURT:  Overruled.

22   A    Yes, sir.

23   Q    And the inmates bribe the guards to get the phones,

24   correct?

25   A    Yes, sir.

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1    Q    And these phones are smuggled into the prison?

2              MS. PARLOVECCHIO:  Objection.

3              THE COURT:  Sustained.

4    Q    Did you have a cell phone in the prison?

5    A    Yes, sir.

6    Q    And the purpose -- and was the phone smuggled into the

7    prison?

8    A    Yes, sir.

9    Q    Did you pay a guard to get that phone?

10   A    Yes, sir.

11   Q    And the reason why it was important for you to have a

12   smuggled in cell phone was so that the prison officials

13   couldn't listen in on your conversations?

14   A    No, sir, it was more practical to talk from the cell.

15   Q    Oh, so I see.  So it was against the prison rules to have

16   a smuggled in cell phone, correct?

17   A    Yes, sir.

18   Q    And the only reason -- what you're testifying to, the

19   only reason that you needed a smuggled in cell phone where the

20   prison officials could not listen in to your calls was a

21   matter of convenience?

22   A    Yes.

23   Q    Isn't it really the truth that the reason you had an

24   illegal cell phone was so that you could make calls that could

25   not be overheard by the prison?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    A     Yes, sir.

2    Q     That's why you had the smuggled in cell phone so you

3    could do your thing in private?

4              MS. PARLOVECCHIO:  Objection.

5              THE COURT:  Overruled.

6    A     No, yes, sir.

7    Q     You hid the phone, it wasn't open and notorious, was it?

8    A     Yes, sir.

9    Q     The end of 2014 into 2015, as you said, you were sitting

10   in a prison cell in Colombia?

11   A     Yes, sir.

12   Q     And you had received a message that your brother, Jorge,

13   was going to call you, correct?

14   A     Yes, sir.

15   Q     Who did you receive that message from?

16   A     Hmm, I don't remember who gave me that message but they

17   did tell me to get a number because Jorge was going to call

18   me.  That was right after I had gotten there at the end of

19   December 2014.  It was at a police station called Marterez,

20   right before I got to the jail.

21   Q     So you weren't even in the prison when you got this

22   message?

23   A     Exactly.

24   Q     And the -- you knew your brother was sitting in jail in

25   New York, correct?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1    A    He was already here in jail in the United States.

2    Q    And your testimony is that you don't know who gave you

3    that message?

4    A    Maybe the female attorney I had at the time.

5    Q    Ah, perhaps a female attorney named Luisa Fernanda?

6    A    Maybe.

7    Q    But you're not certain?

8    A    No, sir.

9    Q    So the attorney, is what you're saying, gave you a

10   message to get an illegal cell phone?

11        MS. PARLOVECCHIO:  Objection.  Misstates the

12   testimony.

13        THE COURT:  Sustained.

14   Q    What did the female attorney tell you specifically, you

15   tell us?

16        MS. PARLOVECCHIO:  Objection.

17        THE COURT:  Sustained.

18        MR. LICHTMAN:  Is that to form, Judge?

19        THE COURT:  No.

20   BY MR. LICHTMAN:

21   Q    You were told to get a number, is that what you testified

22   to.

23   A    Yes, sir.

24   Q    And was it any number, what does that mean?  Like the

25   number seven?

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   A    A phone number so that he could call me.

2   Q    Okay, so meaning get a phone that had obviously a number

3   attached to it?

4   A    Obviously.

5   Q    And how long did it take you to get that phone?

6   A    I asked another inmate to borrow his.

7   Q    So you borrowed a phone and then you had to get that

8   number to your brother, correct?

9   A    Affirmative.

10  Q    And how did you get that number to Jorge?

11       MS. PARLOVECCHIO:  Objection.

12       THE COURT:  Sustained.  Mr. Lichtman, you have to

13  bring this together.

14       MR. LICHTMAN:  I'm trying, Judge, but I can't when

15  there's an objection after every question.

16       THE COURT:  There is not an objection after every

17  question, there is an objection to questions that really have

18  no -- ask another question.

19  BY MR. LICHTMAN:

20  Q    Did you get that number to your brother?

21  A    Affirmative.

22  Q    How?

23  A    I imagine it was through the same attorney or through my

24  mother.

25  Q    You were the one that did it so you don't have to

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1   imagine, just tell us what happened?

2              MS. PARLOVECCHIO:  Objection.

3              THE COURT:  Sustained.

4   Q    Do you recall how you did it?

5   A    I don't recall right now, sir.

6   Q    By the way, when was the last time you discussed with

7   Ms. Parlovecchio this issue?

8              MS. PARLOVECCHIO:  Objection.

9              THE COURT:  To the form.  Sustained.

10  BY MR. LICHTMAN:

11  Q    Did you discuss this issue with the prosecutors recently,

12  the issue of phone call from Colombia -- excuse me, from your

13  brother, Jorge, to you in prison?

14  A    Yes, sir.

15  Q    When?

16  A    A long time ago.

17  Q    Not recently?

18  A    Recently, it could be that, sir.

19  Q    So your -- you don't know if it's recently or a long time

20  ago?

21             MS. PARLOVECCHIO:  Objection.

22             THE COURT:  Overruled.

23  A    Recently.

24  Q    Recently, correct?

25  A    Yeah, but we didn't really touch upon that topic.

5362

ALEXANDER CIFUENTES – CROSS – LICHTMAN

1  Q    I just asked you if you discussed the topic of the phone

2  call and you said yes, recently, and now you're saying that

3  you don't know if you discussed that topic?

4           MS. PARLOVECCHIO:  Objection.

5           THE COURT:  I'm going to allow the question.

6  A    Yes, they did ask the question but they didn't ask me who

7  it was that I had passed on the phone number with and I don't

8  remember.

9  Q    You testified there actually were two phone calls you had

10  with Jorge, correct?

11  A    Yes, sir.

12  Q    And you said that each conversation lasted no longer than

13  five minutes, correct?

14           MS. PARLOVECCHIO:  Objection.  Asked and answered

15  yesterday.

16           THE COURT:  I'm letting him set the stage.

17           MR. LICHTMAN:  Not by me.

18  A    That's right.

19  Q    Would it refresh your recollection that you actually

20  spoke to your brother for 15 minutes in one of the phone

21  calls?

22           MS. PARLOVECCHIO:  Objection.  Form.

23           THE COURT:  Sustained.

24  BY MR. LICHTMAN:

25  Q    Does it refresh your recollection that you spoke to your

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1    brother -- if I told you that you spoke to your brother for 15

2    minutes on one of the calls?

3           MS. PARLOVECCHIO:  Objection.

4           THE COURT:  Sustained.

5    Q    Is it possible that you spoke to your brother for 15

6    minutes?

7           MS. PARLOVECCHIO:  Objection.  Calls for

8    speculation.

9           THE COURT:  No, I'll allow that answer.

10   A    I don't think so, sir.

11   Q    Now you're aware that calls from New York prisons are

12   timed, correct?

13   A    Yes, sir.

14   Q    You said you're not certain that the call was possibly 15

15   minutes, was that your testimony?

16   A    I don't think I spoke for 15 minutes.

17   Q    Could I show you something to refresh your recollection

18   that you spoke to him for 15 minutes?

19   A    Yes, sir.

20   Q    You can review that document, the part that's marked off,

21   the date and the time and let me know if that refreshes your

22   recollection that you spoke to your brother on this illegal

23   cell phone for 15 minutes?

24   A    Do you have the audio?

25   Q    I don't have the audio because it was never preserved,

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5364

ALEXANDER CIFUENTES - CROSS - LICHTMAN

1  are you aware of that?

2          MS. PARLOVECCHIO:  Objection.

3          THE COURT:  Sustained.

4  Q    Are you aware of the fact that this audio of this call

5  from a New York prison was allowed to be destroyed, if you

6  know?

7          MS. PARLOVECCHIO:  Objection.

8          THE COURT:  Sustained.

9          MS. PARLOVECCHIO:  Your Honor, may we have a

10 sidebar.

11         THE COURT:  You've got to move on, Mr. Lichtman.

12         MR. LICHTMAN:  Judge, I'm just about done, but I've

13 got to be able to finish.

14         THE COURT:  I agree with the last part.

15 BY MR. LICHTMAN:

16 Q    If preparation --

17         MS. PARLOVECCHIO:  Your Honor --

18         THE COURT:  We're going to have a sidebar.

19         (Sidebar conference.)

20         (Continued on the next page.)

21

22

23

24

25

SIDEBAR CONFERENCE

1    THE COURT:  Go ahead, Ms. Parlovecchio.

2    MS. PARLOVECCHIO:  Your Honor, we've been through

3    this before with Jorge Cifuentes.  Now counsel is trying to

4    insinuate that the government hasn't met its discovery

5    obligations, that we didn't preserve it, that we somehow have

6    done something to create a subterfuge to cover for these

7    individuals.

8    MR. LICHTMAN:  Could I respond?

9    MS. PARLOVECCHIO:  It's a collateral matter and

10   it's --

11   MR. LICHTMAN:  It's not a collateral matter.

12   THE COURT:  That's one possible interpretation.

13   What's your counter-purpose, Mr. Lichtman?

14   MR. LICHTMAN:  He's illegally discussing with his

15   brother from jail, what I'm going to claim is things about the

16   case.  In fact, he has testified already that Jorge instructed

17   him to try to locate the Jewish target during this phone call,

18   that's A.

19   Secondly -- what was the other thing that you said?

20   Can you read that back please what she said I just want to

21   respond to her.

22   MS. PARLOVECCHIO:  You're -- what I said was, you're

23   creating the misimpression that somehow --

24   THE COURT:  Everyone stops talking when I start

25   talking.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1        MS. PARLOVECCHIO:  Correct.

2        THE COURT:  You asked her to refresh your

3   recollection, now she's going to refresh it because I don't

4   know where she was going.

5        So finish your statement, please.

6        MS. PARLOVECCHIO:  Okay.  So my statement was -- it

7   was two-fold.  The second point that he inquired about was the

8   fact that he -- with those two questions he's now suggesting

9   to the jury, once again as he did during the cross of Jorge

10  Cifuentes, that the government has somehow not met its

11  discovery obligations, or somehow destroyed these records in

12  an effort to cover for these two individuals, which is

13  completely false and creates a false impression.  Your Honor

14  had to instruct the jury last time that the government has met

15  its discovery obligations and I would request that instruction

16  be given again.

17       MR. LICHTMAN:  That's completely false.

18       THE COURT:  First of all, is that what you're trying

19  to do?

20       MR. LICHTMAN:  Judge, let me explain --

21       THE COURT:  Answer my question, yes or no.

22       MR. LICHTMAN:  I will but if I can give you some

23  background to why I'm asking the questions.

24       THE COURT:  I'll let you give me the background

25  after you answer yes or no, is that what you're trying to do?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

SIDEBAR CONFERENCE

1          MR. LICHTMAN:  I was not planning on it until he

2     said to me play me the tape.

3          THE COURT:  And now you are planning on it.

4          MR. LICHTMAN:  Well, now I have no choice because he

5     told me to play the tape, and I want to explain exactly what

6     happened in Jorge Cifuentes.  He testified that in January, on

7     his birthday, on this witness's birthday he contacted this

8     witness via phone.  He then testified that he immediately told

9     the government within two days the awful thing he had done.

10    The government in a letter said to me, we did not get

11    information about that phone call until it was after -- too

12    late to get that conversation, it was destroyed.  It takes six

13    months before the MDC destroys.

14          So now she's saying that they didn't do anything

15    wrong.  Well, Jorge claims that he immediately told the

16    government, they claim they didn't learn about it for six

17    months and the call was destroyed.  So who's lying?

18          THE COURT:  I'll let you have the last word.

19          MS. PARLOVECCHIO:  Thank you.  First of all, it was

20    a different prosecutor, it was a prosecutor in the Southern

21    District of New York, so that --

22          MR. LICHTMAN:  That's the government.

23          THE COURT:  Don't interrupt.

24          MS. PARLOVECCHIO:  Okay, but you made the

25    representation based on information, I just want to clarify

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    the record that it was not me or anyone standing here, whether

2    that's relevant or not, I understand.

3            But to the point, you had the opportunity to cross

4    Jorge Cifuentes about that.  He doesn't know about what his

5    brother told the government.  And, you know, so once again, as

6    you tried to do with Jorge Cifuentes, you're trying to impeach

7    him with his brother's statements.  It is improper.

8            MR. LICHTMAN:  Judge, what I would like, if I can,

9    is get the name of the prosecutor who was told about this

10   call, when the call -- when this meeting occurred, because

11   Jorge claimed it occurred in January of 2015 and the

12   government tells me that they didn't learned about it until

13   after six months later.  I would like to know when they

14   actually learned about it.

15           THE COURT:  I think it's absurd to suggest that this

16   prosecution team or any other prosecutor deliberately erased

17   this message so it wouldn't be produced.

18           MR. LICHTMAN:  Judge, I didn't say that.

19           THE COURT:  Excuse me.  We have spent an inordinate

20   amount of time on a matter that's at best tangentially related

21   to the credibility of this witness or any other witness.  I

22   am, therefore, sustaining the objection and telling you to

23   move on to another topic.

24           MR. LICHTMAN:  Judge, and I would ask for production

25   from the government is when they learned of this phone call of

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    Jorge Cifuentes.

2              THE COURT:  I will take that under advisement.  The

3    government will respond to your request, I may not need to be

4    involved if the government responds.

5              MR. LICHTMAN:  I would just need a date because

6    apparently it's going to be inconsistent, the government's

7    already alerted me --

8              THE COURT:  It's a small inconsistency, if it is.

9    It is not related to the credibility of this witness, any

10   other witnesses as far as I can tell, or the guilt and

11   innocence of the defendant.  That's my ruling.  Move on to

12   something else.

13             MR. LICHTMAN:  Can I ask him what he discussed with

14   his brother on the phone?

15             THE COURT:  Yes.

16             (End of sidebar conference.)

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5370

Alexander Cifuentes-Villa - Cross/Lichtman

1    (In open court.)

2    CROSS-EXAMINATION

3    BY MR. LICHTMAN (continuing):

4    Q    Sir, do you recall the conversation you had with your

5    brother when he called you from prison to your illegal cell

6    phone in Colombia?

7    A    Yes, sir.

8    Q    He told you to identify the Jewish target, didn't he?

9    A    Yes, sir.

10   Q    What does that mean, identify him?

11   A    I'm going to tell you verbatim what he told me.  Do you

12   agree?

13        THE COURT:  Go ahead.

14   A    He told me that the target, that the following target was

15   to locate Mr. Shimon and that it would be very good so that he

16   would be turned over to the American authorities; and he asked

17   me if I knew how to locate him.  I told him I did not have any

18   information on him.

19   Q    Was that to help his cooperation or yours, if you know?

20   A    At that time I did not know.  I only knew that we needed

21   to locate Shimon and I did not know how.

22   Q    You claim you didn't discuss Mr. Guzman at all?

23   A    No, sir.

24   Q    He told you to cooperate during that phone conversation?

25   A    I could also tell you verbatim what he said.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa - Cross/Lichtman

1   Q   He told you to cooperate during that conversation?

2   A   He influenced me to do so, yes.

3   Q   And you presumed the cooperation was against Mr. Guzman,

4   didn't you?

5   A   No, sir.

6   Q   You didn't think that it had anything to do with

7   Mr. Guzman?

8           MS. PARLOVECCHIO:  Objection, asked and answered.

9           THE COURT:  Sustained.

10  Q   Now, while you were in prison in Colombia, as you said

11  before, you had an iPhone, correct?

12  A   Yes, sir.

13  Q   And you had a What's App application?

14  A   Yes, sir.

15  Q   And you were actually making What's App voice notes on

16  that phone, weren't you?

17  A   Yes, sir.

18  Q   And you were sending out these voice notes, weren't you?

19  A   Yes, sir.

20  Q   And you were sending them out to Andrea Fernandez Velez,

21  weren't you?

22  A   Yes, sir.

23  Q   This was in 2015?

24  A   Yes, sir.

25  Q   And this was for purposes of what?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa - Cross/Lichtman

1  A    There were several purposes.

2  Q    Well, you were trying to communicate with her secretly,

3  correct?

4  A    Well, not secretly, but yeah, I wanted to talk to her.

5  Q    So you would record the voice notes and you would then

6  send the file to Andrea?

7  A    Yes.

8  Q    And one of the things -- and you have gone over these

9  voice notes with the government in anticipation of your

10  testimony, correct?

11  A    Yes, sir.

12  Q    And you are aware of what's on these voice notes,

13  correct?

14  A    Some of them, yes, sir.

15  Q    And you recall that one of the voice notes that you sent

16  to Andrea you discussed drugging other prisoners in the

17  prison, correct?

18        MS. PARLOVECCHIO:  Objection.

19        THE COURT:  Sustained.

20  Q    Did you drug prisoners in the prison in Colombia?

21        MS. PARLOVECCHIO:  Objection.

22        THE COURT:  Sustained.

23        MR. LICHTMAN:  Judge, can I approach?

24        THE COURT:  Sure.

25        (Continued on the next page.)

*MICHELE NARDONE, CSR -- Official Court Reporter*

1          (Sidebar conference.)

2          MR. LICHTMAN:  On these voice notes he tells Andrea

3   that he is secretly drugging inmates to keep them calm and he

4   wonders, he says, I have to see in American rules if they give

5   me a year off for keeping the yard quiet.

6          MS. PARLOVECCHIO:  Your Honor --

7          THE COURT:  What's your point, he is a bad guy?

8          MR. LICHTMAN:  No.  That he is breaking prison

9   rules, and he thinks he can get time off for drugging other

10  prisoners.

11         THE COURT:  So, first of all, it sounds sarcastic to

12  me; but, more than that, even if it's serious, what does this

13  have to do with his propensity to tell the truth or not tell

14  the truth?  It is not a crimen falsi.  It is not an act of

15  deception.

16         MR. LICHTMAN:  Violating the prison rules by

17  drugging other prisoners?

18         THE COURT:  It's a crime.  It's a bad act, but it is

19  not something that impeaches his credibility.

20         MR. LICHTMAN:  Respectfully, if he is willing to

21  drug other prisoners to keep them calm and thinks there is a

22  chance that he can get time off in America, I think that's

23  relevant here.

24         THE COURT:  It's not a question of relevance.  It's

25  a questions of the rules allow you to impeach by inconsistent

Sidebar

1    statements, bias, or some other act that shows a tendency to

2    deceive.

3              MR. LICHTMAN:  Well, judge, I would say deceiving

4    prisoners by drugging them against their knowledge is

5    something that shows deception.

6              THE COURT:  If it is, then everybody does.

7              MR. LICHTMAN:  The fact that he is actually asking

8    her that he wants to find out if he can get time off in

9    America.

10             THE COURT:  What's the act of deception?

11             MR. LICHTMAN:  Drugging inmates.

12             THE COURT:  I don't think that's an act of

13   deception.

14             MR. LICHTMAN:  Against their knowledge.

15             THE COURT:  I don't think that's an act of

16   deception.

17             MR. LICHTMAN:  You don't think that slipping drugs

18   into another inmate's coffee, as he said, without their

19   knowledge is an act of deception?

20             THE COURT:  It's a crime.

21             MR. LICHTMAN:  It's also an act of deception.  Fraud

22   is a crime also, judge, but it's also an act of deception.  He

23   is giving them coffee, he puts drugs into it, and they are

24   unaware; and he says he is turning them into zombies.

25             THE COURT:  What's the government's position?

1    MS. PARLOVECCHIO:  This is part of the government's

2    motion in limine about banter between this witness and his

3    friends and specifically Ms. Velez.

4    THE COURT:  What's the legal basis for excluding it?

5    MS. PARLOVECCHIO:  Legal basis for excluding:  It's

6    completely collateral, it was in done in jest.  A lot of these

7    voice messages is simply to entertain himself, and this is a

8    remark that's simply not probative for his truthfulness.

9    MR. LICHTMAN:  I take a Klonopin pill, I put it in

10   the coffee I, make them a marijuana extract -- I take a

11   Rivotril pill, which is clonazepam, I put it in coffee, and I

12   make them a marijuana extract, and then in the afternoon I

13   invite them to take it.  In the night you cannot hear them.

14   He is clearly drugging them without their knowledge.

15   Friend, you know, I have them here.  I give them a quarter,

16   and I keep them all like zombies walking in the triangle.

17   They look like zombies.  Even the worst ones wake up around

18   12:00, 1:00 p.m.  I am the soul of this place.  I have them

19   all pacified in this place.  I have to see in the American

20   rules if they give me a year off for keeping the yard quite.

21   Judge, he is drugging the other inmates.  How is

22   that not an act of deception?

23   THE COURT:  I don't see it as an act of deception.

24   MR. LICHTMAN:  You don't think secretly drugging

25   people by giving them coffee and they don't know they are

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sidebar

1    being drugged is an act of deception?

2            THE COURT:  Not as crimen falsi is defined under the

3    rules.  Here is what I'm going to do.  I'm not going to let

4    you do it.  Get me a brief by tomorrow morning, and we will

5    bring him back if you are right.  Show me cases where this is

6    considered proper examination, when somebody administers drugs

7    without their knowledge.

8            MR. LICHTMAN:  Secretly.

9            THE COURT:  Show me the cases.

10           MR. LICHTMAN:  You don't think that's an act of

11   dishonesty?

12           THE COURT:  I don't.

13           MR. LICHTMAN:  Let me be clear.  He tells the

14   inmate --

15           THE COURT:  He doesn't tell them anything.

16           MR. LICHTMAN:  He says he offers them coffee.

17           THE COURT:  Correct.

18           MR. LICHTMAN:  He doesn't tell them that in the

19   coffee is drugs to knock them out.  That is not a act of

20   deception?

21           THE COURT:  It is not an act that shows his lack of

22   propensity to tell the truth.

23           MR. LICHTMAN:  I obviously strongly disagree.

24           MS. PARLOVECCHIO:  I agree with Your Honor and I

25   would further say that this is 403 to the max.

1    THE COURT:  I will find that as an alternative

2    basis.  I will reconsider it, if you show me something.  And

3    it ought to be out there.  There is a lot of case law on what

4    constitutes an act of deception and what doesn't for purposes

5    of impeaching a witness.  Show me something that's close to

6    this, and I will reconsider it.

7    MR. LICHTMAN:  Secretly drugging somebody without

8    their knowledge.

9    THE COURT:  You can keep saying it and it's not

10   going to change my ruling.  Case law is going to change my

11   ruling.  Let's see the case law.

12   (End of sidebar conference.)

13   (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Alexander Cifuentes-Villa – Cross/Lichtman

1          (In open court.)

2    BY MR. LICHTMAN:

3    Q    Sir, you have claimed on direct that Mr. Guzman referred

4    to you as his left and right hand?

5    A    And his secretary, yes, sir.

6    Q    And that meant to you that he trusted you the most?

7    A    In the area where he had me, yes.

8    Q    And you also did things behind his back, didn't you?

9    A    Like what, sir?

10   Q    Did you do anything behind his back?

11   A    No, sir.

12   Q    Like attempt to deal drugs in Canada with Andrea

13   Fernandez behind his back?

14   A    No, sir.

15   Q    You didn't try to, a number of times, deal drugs and not

16   tell Mr. Guzman?

17   A    No, sir.  On the contrary.

18   Q    And you refused orders from him sometimes as well, didn't

19   you?

20   A    At some point.

21   Q    You met with twins from the Italian mafia in Canada?

22   A    Yes, sir, from Toronto.

23   Q    You sent them to a friend of yours in Colombia?

24   A    Yes.  The one who had been most recent supplier for

25   Mr. Joaquin of cocaine.

Alexander Cifuentes Villa - Cross/Lichtman

1   Q    You made a plan for cocaine to be shipped from Colombia

2   to Canada, fused in plastic cubes?

3   A    Yes.  The same project that I presented to Joaquin.

4   Q    Did you tell the government in June of 2018 that you

5   planned on doing jobs in Canada without Mr. Guzman?

6   A    Without the need to go through Mexico.

7   Q    Sir, that wasn't my question.

8        My question was:  On June 20, 2018 debriefing did

9   you tell the government that you planned on doing jobs in

10  Canada without Joaquin?

11  A    It might be wrongly interpreted.

12  Q    Did you tell the government that on another occasion

13  Andrea Fernandez proposed a job in Colombia to report in

14  Halifax using marbles as the cover load for the drugs?

15  A    Yes, sir, and I notified Mr. Joaquin Guzman Loera of it.

16  Q    Did you tell the government that if you could send drugs

17  straight to Canada you wouldn't need Joaquin?

18  A    That's right.

19  Q    Did you tell the government that if Joaquin knew about

20  the planned routes behind his back, it could be a major

21  problem for you?  That was less than a year ago.

22  A    Yes, because I told them that that would be stealing.

23  Q    But you planned on doing it, didn't you?

24  A    No, sir.

25  Q    Isn't the reason that -- one of the reasons that you

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa - Cross/Lichtman

1  couldn't do the cocaine shipments that were fused with plastic

2  cubes is because one of the Italians twins was put in jail?

3  A    No, sir.

4  Q    Do you need your recollection refreshed of what you told

5  the government?

6          MS. PARLOVECCHIO:  Objection.

7          THE COURT:  Overruled.

8  A    Yes, sir, refresh it.

9  Q    HACV-68, if you can read this bracketed area to yourself

10 and let me know when you are finished.

11 A    This refreshes my memory, and I want to tell you about

12 what -- how it happened.

13          Does the judge give me permission to do so?

14 Q    Does it refresh your recollection that you told the

15 government in June of last year that you planned on doing jobs

16 to Canada without Joaquin?

17 A    This is wrongly interpreted or written wrongly here.

18 Q    So it does not refresh your recollection that you told

19 the government that you planned on doing jobs behind Joaquin's

20 back?

21 A    It wasn't going to be like that.

22 Q    Does it refresh your recollection that you told the

23 government that if Joaquin knew about planning routes behind

24 his back it could be a major problem for you?

25 A    Yes.  Doing something behind Joaquin's back would mean

                    MICHELE NARDONE, CSR -- Official Court Reporter

Alexander Cifuentes-Villa - Cross/Lichtman

1    being murdered.

2    Q    I simply asked:  Does it refresh your recollection that

3    you were planning on doing jobs behind his back?

4    A    No, sir.

5    Q    Are you sure about that?

6    A    Behind Joaquin's back?  No.

7    Q    Now, you were arrested on a boat off of Costa Rica in

8    November of 2012?

9    A    Yes, about 230 miles off the coast.

10   Q    Eventually you were escorted back to Culiacan?

11   A    Yes, sir.

12   Q    You testified on direct that it was at this time that you

13   learned that your brother Jorge had been arrested, correct?

14   A    Yes, sir.

15   Q    And he was arrested on charges emanating from America?

16   A    Yes, sir.

17   Q    And according to you, your brother Jorge could have hurt

18   Mr. Guzman, should he decide to cooperate against him in

19   America?

20   A    In fact, Mr. Guzman, through the attorney, Loco

21   Barrera --

22           MR. LICHTMAN:  Judge, I would ask that he be

23   instructed.

24           THE COURT:  Yes.  I'm going to instruct the witness

25   again, if you can answer the question yes or no you should

Alexander Cifuentes Villa - Cross/Lichtman

1   answer the question yes or no.

2   Q    I will ask the question again.

3        According to you, your brother Jorge could have hurt

4   Mr. Guzman should he have decided to cooperate in America

5   against him?

6   A    I wouldn't be able to tell you that.

7   Q    You don't think that your brother's cooperation could

8   harm Mr. Guzman back then?

9        MS. PARLOVECCHIO:  Objection.

10        THE COURT:  Sustained.

11   Q    When you returned to Culiacan you claim you eventually

12   saw Mr. Guzman, correct?

13   A    Yes, sir.

14   Q    And according to you, Mr. Guzman told you that your

15   brother was working with the Americans, correct?

16   A    He didn't say that in those words.  May I be more

17   verbatim?

18   Q    No.  I will ask the questions.

19        Did Mr. Guzman tell you that your brother told the

20   Americans about Loera's account?

21   A    Yes, sir.

22   Q    Meaning he was cooperating against Mr. Guzman, correct?

23        Isn't that what you were led to believe, that

24   because Mr. Guzman told you that your brother had told the

25   government about Loera's account that he was cooperating with

Alexander Cifuentes-Villa – Cross/Lichtman

1   the Americans?

2            MS. PARLOVECCHIO:  Objection.

3            THE COURT:  Sustained.

4   Q    You learned from Mr. Guzman that your brother was

5   cooperating against them in America, correct?

6   A    No, no.  I knew that Mr. Joaquin authorized the lawyer

7   Loco Barrera to do so.

8            THE INTERPRETER:  I'm sorry.  Interpreter

9   correction.  That Loco Barrera's attorney, through him, he

10  authorized Jorge to testify against him.

11  Q    Mr. Guzman didn't kill you then, obviously.  You are

12  sitting here.

13  A    That's correct, he did not murder me.

14  Q    Excuse me.  There is no question before you.

15           And he didn't threaten you at that point, did he?

16  A    No, sir.

17  Q    The answer is no?

18  A    No, sir.

19  Q    And you claim that Mr. Guzman made it clear to you that

20  he was afraid that you were going to turn him into American

21  law enforcement, correct?

22  A    He put some distance between me and his circle.

23  Q    But you told the government that Mr. Guzman was paranoid

24  because you had just had contact with the United States Coast

25  Guard when you were arrested?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa – Cross/Lichtman

1   A    Yes.

2   Q    And also because of Jorge's arrest, those two things?

3   A    Yes, sir.

4   Q    And as you stated just before, instead he sent a message

5   that it was okay for Jorge to discuss Mr. Guzman with the

6   American prosecutors?

7            MS. PARLOVECCHIO:  Objection.

8            THE COURT:  Sustained.

9   Q    Now, in the fall of 2014, you were in jail in Mexico

10  City?

11  A    Yes, sir.

12  Q    In Mexico City, Mexico, correct?

13  A    In Toluca, yes, sir.

14  Q    And inside this prison there were plenty of discussions

15  about criminal activity?

16           MS. PARLOVECCHIO:  Objection.

17           THE COURT:  Sustained.

18  Q    Did you have discussions with others about criminal

19  activity while you were in that prison?

20  A    People would bring it up, yes.

21  Q    People would bring it up to you?

22  A    No.  They would find a way of getting me outside to a

23  certain place to speak to me, yes, sir.

24  Q    And someone named El Metro you met with in prison?

25  A    Yes, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

5385

Alexander Cifuentes-Villa - Cross/Lichtman

1    Q    And El Metro was the bodyguard for Lord of the Skies?

2    A    His right-hand man, yes, sir.

3    Q    And you spoke to him in prison, El Metro, correct?

4    A    Yes, sir.

5    Q    And you claim that El Metro asked for your assistance in

6    collecting $18 million from Colombian drug dealers?

7    A    That's right, sir.

8              THE COURT:  Mr. Lichtman.

9    Q    And --

10             THE COURT:  Mr. Lichtman, at a convenient time we

11   will need to take a break.

12             MR. LICHTMAN:  You got it, judge.  Very close.

13             THE COURT:  Okay.

14   Q    He proposed to you that you use your Colombian

15   associates, criminal associates, to help him collect his debt?

16   A    No.  He asked me directly.

17   Q    Well, he asked you.  You weren't going to be able to

18   collect the money while you were sitting in prison, correct?

19   A    No.  He told me you are going to be released very soon.

20   Q    And he expected you to use your contacts to help him

21   collect the money, correct?

22             MS. PARLOVECCHIO:  Objection, asked and answered.

23             THE COURT:  Sustained.

24   Q    How did he go about asking you to collect the money?

25   A    I don't know.

*MICHELE NARDONE, CSR -- Official Court Reporter*

5386
Alexander Cifuentes-Villa - Cross/Lichtman

1   Q    You don't know how you were supposed to retrieve this

2   money for him?

3   A    Maybe because I'm Colombian.

4   Q    Didn't you have this discussion with him in prison?

5              MS. PARLOVECCHIO:  Objection.

6              THE COURT:  Sustained.

7   Q    Now, you said that people would find a way to get to talk

8   to you?

9              THE COURT:  Mr. Lichtman, we are going to take a

10  break now.

11             MR. LICHTMAN:  Judge, I'm just near the end of this

12  point.

13             THE COURT:  Okay.  One or two minutes.

14             MR. LICHTMAN:  Okay.

15  Q    You testified that people would get you out to be able to

16  talk to them?

17  A    Yes, sir.

18  Q    In fact, you met with El Metro in the prison's infirmary,

19  didn't you?

20  A    Yes, sir.

21  Q    That's where people go when they are sick, correct?

22  A    Yes, sir.

23  Q    And you could have privacy in the infirmary and talk to

24  criminals about criminal activities, correct?

25  A    Yeah, just like Joaquin, same story.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa - Cross/Lichtman

1   Q    Just like Joaquin?

2        So you had -- to get to the infirmary you had to

3   pretend that you were sick, correct?

4        MS. PARLOVECCHIO:  Objection.

5        THE COURT:  Sustained.

6   Q    Did you have your lawyers file a legal motion on your

7   behalf, a request to see a doctor?

8        MS. PARLOVECCHIO:  Objection.

9        THE COURT:  Sustained.

10  Q    Did you do anything dishonest in order to get to the

11  infirmary?

12  A    The people who needed me would do that.  I would just

13  accept the petition.

14  Q    So the people that needed to speak to you about criminal

15  activity would petition the infirmary to allow you to come

16  there because you were fake sick?

17       MS. PARLOVECCHIO:  Objection.

18       THE COURT:  Sustained.

19  Q    Tell us how the people did that petition to get you to

20  the infirmary.

21       MS. PARLOVECCHIO:  Objection.

22       THE COURT:  Sustained.

23       MR. LICHTMAN:  Judge, what can I ask on the subject?

24       THE COURT:  I think you are in 403 land.  That's the

25  problem.

*MICHELE NARDONE, CSR -- Official Court Reporter*

5388

Alexander Cifuentes Villa – Cross/Lichtman

1    Q    Did you do anything dishonest against the infirmary?

2              MS. PARLOVECCHIO:  Objection, asked and answered.

3              THE COURT:  You may answer this one question again.

4    A    I signed saying that I was going to go to the infirmary.

5    Q    That you were sick?

6              MS. PARLOVECCHIO:  Objection.

7              THE COURT:  Overruled.

8    A    Yes, sir.

9    Q    When you weren't sick?

10   A    Yes, sir.

11             MR. LICHTMAN:  Okay.  Judge, we will take a break.

12             THE COURT:  Okay.  11:20, ladies and gentlemen.

13   Please remember not to talk about the case.

14             (Jury exits.)

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

USA v. Guzman Loera

 1          THE COURT:  All right.  Be seated.  The marshals can

 2   take the witness out.

 3          (Mr. Alexander Cifuentes Villa exits courtroom.)

 4          THE COURT:  First, the reason for the abrupt break

 5   was that several jurors were signaling that they really needed

 6   a break, and that's why I had to cut you a little shorter than

 7   I wanted to.

 8          Second, so that we try to get on the same page with

 9   regard to the remainder of this examination.  I assume we are

10   getting to the end part of this examination.

11          MR. LICHTMAN:  Yes.

12          THE COURT:  There has been so much evidence adduced

13   of dishonest acts that it's kind of beating a dead horse.  I

14   mean your next question could have been did you ever call in

15   sick to school to stay home when you weren't sick because you

16   didn't want to take a test.

17          MR. LICHTMAN:  Judge, respectfully, he wouldn't be

18   calling into school saying he was sick when he was planning on

19   meeting with El Metro about collecting $18 million of drug

20   business.

21          THE COURT:  I didn't get that's why he went to the

22   infirmary.

23          MR. LICHTMAN:  That's what he said.  He called there

24   to discuss with him privately because that's the only way he

25   could speak to his criminal cohorts.

USA v. Guzman Loera

1      THE COURT:  In any event, as to the matter we

2  discussed at sidebar, with regard to the possible

3  administration of drugs that he referred to in his e-mails and

4  asked the question of his lawyer, do you think I can get time

5  off if I keep everybody passive, essentially, which is, in all

6  likelihood, in my view, tongue in cheek, the argument over

7  whether he really did that, whether it was tongue in cheek,

8  whether it mattered, is so much on top of the other

9  credibility evidence that you have adduced that, even if

10  admissible, which I don't think it is because I don't think

11  it's an act of dishonesty, if it even happened, it has very

12  little probative value as to this witness; and the amount of

13  time we have taken on it already doesn't warrant it.

14      MR. LICHTMAN:  In terms of it being cumulative?

15      THE COURT:  Correct.

16      MR. LICHTMAN:  Okay, but I just would again

17  reiterate that drugging prisoners without their knowledge in

18  order to subdue them is an act of dishonesty.  I think most

19  people would think that.

20      THE COURT:  The question isn't whether it's an act

21  of dishonesty.  The question is whether it's a crime of

22  dishonesty; and it's certainly not a question of what most

23  people think.  It's a question of what the law defines it as.

24  I have invited you to give me a brief to reconsider my

25  position on that; but, on the other hand, I'm telling you,

*MICHELE NARDONE, CSR -- Official Court Reporter*

USA v. Guzman Loera

1    even if you are right, Rule 403 is going to take it out

2    because you have got so much already.

3            MR. LICHTMAN:  If that's what you are planning on,

4    I'm not going to knock my head against a wall and put together

5    a brief that you are going to knock out of the bar because of

6    403.

7            THE COURT:  I think that is perfectly

8    understandable.  Okay.

9            See you at 11:20.

10           (Recess.)

11           THE CLERK:  All rise.

12           THE COURT:  All right.  Let's have the jury, please.

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Alexander Cifuentes-Villa - Cross/Lichtman

1          (Jury enters.)

2          THE COURT:  All right.  Be seated, please.

3          Please continue, Mr. Lichtman.

4          MR. LICHTMAN:  Thank you, judge.

5    BY MR. LICHTMAN:

6    Q    When you were arrested, sir, in November of 2013 in

7    Culiacan, you were arrested under a fake name?

8    A    That's right, sir.

9    Q    When I say that you were arrested under a fake name, you

10   provided a fake name to the arresting officers?

11   A    They took from one of the drawers in the room where I was

12   in.

13   Q    And you had a passport under that fake name?

14   A    Yes, sir.

15   Q    That was this Enrique Garcia Rodriguez?

16   A    Rodriguez Garcia, yes, sir.

17   Q    And according to you, the Mexican military claimed that

18   when they arrested you they found you in possession of nine

19   cellular phones, an iPad, and a small amount of marijuana?

20   A    They placed the marijuana in that package.

21   Q    On your bed?

22   A    On the bed, yes, sir.

23   Q    And you claim that they planted it, that it wasn't there

24   before?

25   A    I saw him take it out of his right-hand pocket, his pants

*MICHELE NARDONE, CSR -- Official Court Reporter*

5393

Alexander Cifuentes-Villa – Cross/Lichtman

1  pocket.

2  Q    And illegally plant it on the bed, to make it appear as

3  if it was yours?

4  A    He threw it on the bed, yes, sir.

5  Q    And you claim that the Mexican military brought you then

6  to a huge -- brought you in a huge military convoy and flew

7  you to Mexico City?

8  A    No, sir.

9  Q    Well, did you tell the government that the Mexican

10 military actually tortured you at the ranch when they arrested

11 you?

12 A    They beat me up at Las Azucenas, yes, sir.

13 Q    How long did they meet you for?

14      THE COURT:  Sustained.

15 Q    You told the government that they had no warrant to

16 search your premises?

17 A    That's right, sir.

18 Q    And they searched regardless?

19      MS. PARLOVECCHIO:  Objection.

20      THE COURT:  Sustained.

21 Q    And you claim that they lied before the judge?

22      MS. PARLOVECCHIO:  Objection.

23      THE COURT:  I will allow it.

24 A    That's right, sir.

25 Q    And you claim that you fought this case because of those

*MICHELE NARDONE, CSR -- Official Court Reporter*

                    Alexander Cifuentes-Villa - Cross/Lichtman

1    lies?

2    A    That's right, sir.

3    Q    And how did you fight the case?

4            MS. PARLOVECCHIO:  Objection.

5            THE COURT:  Overruled.

6    A    Mr. Joaquin Guzman Loera attorneys did it.

7    Q    Did you have a trial?

8    A    There was -- they call it there an amparo, or a motion.

9    Q    At this time was when you talked to the -- you didn't get

10   out of jail then, did you?

11   A    Could you ask that -- could you repeat the question

12   again, please.

13   Q    You remained in prison after that, correct?

14   A    During the proceeding, yes, sir.

15   Q    And you were interviewed by the director of organized

16   crime while you were there?

17   A    Initially, when I was arrested, yes, sir.

18   Q    And you weren't required to speak to this man, were you?

19   A    Yes, sir.

20   Q    And you did it without an attorney?

21   A    Yes, sir.

22   Q    And you told them about all of your -- you were asked

23   about all of your criminal activities since 2007?

24   A    Yes, sir.

25   Q    And you provided much information about your criminal

Alexander Cifuentes-Villa - Cross/Lichtman

1   activity, as you said?

2   A    Some.

3   Q    You also withheld some, correct, as you said, on direct?

4   A    Yes, sir.

5   Q    And you were provided a declaration, a written

6   declaration of what you had told that man, correct?

7   A    Yes, sir.

8   Q    And this declaration included much of the evidence that

9   was in the American indictment against you, correct?

10  A    Yes, sir.

11  Q    And you had seen the American indictment against you?

12  A    They handed it to me.

13  Q    At that time for you to read?

14  A    Yes, sir.  Because in the beginning they had given me

15  one, but that was my brother's, and I told them that wasn't

16  me.  And they asked me, well, what do you mean because you

17  were arrested in Venezuela --

18           THE COURT:  Excuse me.  You are talking over each

19  other.  The reporter is not getting it.  Let's read the last

20  thing the reporter got, and I will have her read that back and

21  I will see if we can reconstruct it.

22           (Record read.)

23           THE COURT:  Next question.

24  Q    So you were given your brother's indictment, his American

25  indictment?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa - Cross/Lichtman

1    A    Yes.

2    Q    And, as you said, you were given your American

3    indictment?

4    A    Yes.

5    Q    And you had provided some extra information to this

6    director of organized crime, correct?

7    A    Yes, sir.

8    Q    And one of the things you provided was you identified a

9    picture of Damaso Lopez Nunez to them, correct?

10   A    That's right.

11   Q    And you and Damaso didn't exactly get along; isn't that

12   true?

13   A    Yes, sir.

14   Q    I mean, you thought he was a bad guy?

15        MS. PARLOVECCHIO:  Objection.

16        THE COURT:  Sustained.

17   Q    You thought he was trying to kill you?

18        THE COURT:  Sustained.

19   Q    You thought he was trying to manipulate others against

20   you?

21        MS. PARLOVECCHIO:  Objection.

22        THE COURT:  Sustained.

23   Q    Now, you mentioned an attorney named Grenados during your

24   direct examination.

25   A    Yes, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa - Cross/Lichtman

1   Q   And you testified on direct that Mr. Guzman sent him to

2   you?

3   A   Yes.

4   Q   Didn't you in fact tell the government in a debriefing

5   that you were the one that reached out to him.

6   A   If I did that, I made a mistake, but he was sent from

7   Mr. Joaquin Guzman Loera.

8   Q   But you didn't tell the government in debriefing that

9   through criminal associates in jail you got contact

10  information for Grenados?

11  A   There is a little mistake in that writing you have there.

12  Q   Well, didn't you tell the government that other inmates

13  actually referred Grenados to you?

14  A   They referred me to Mr. Oscar Manuel Gomez Nunez,

15  Don Joaquin Guzman Loera's main attorney.

16  Q   So it's a mistake to say that you actually contacted

17  other inmates and got the referral for Grenados from them?

18  A   That's not a lie.

19  Q   So, in fact, you received a referral from other inmates

20  for this attorney?

21          MS. PARLOVECCHIO:  Objection, asked and answered.

22          THE COURT:  Sustained.

23  Q   Andrea Fernandez was your friend?

24  A   Yes, sir.

25  Q   And you met her through a Colombian actress?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes-Villa - Cross/Lichtman

1    A    That's right.

2    Q    She owned a modeling agency in America?

3         MS. PARLOVECCHIO:  Objection, relevance.

4         THE COURT:  Sustained.

5    Q    She started working for you managing your petty cash?

6    A    Yes, sir.

7    Q    And she bought you a phone and managed your drug

8    trafficking contacts?

9    A    Yes, sir.

10   Q    And some of your contacts were from the FARC?

11   A    Yes, sir.

12   Q    And the FARC was a Colombian communist terrorist group?

13   A    Yes, sir.

14   Q    Not only was Andrea your friend, but you also trusted her

15   to deal with other drug dealers on your behalf, correct?

16   A    That's right, sir.

17   Q    And she met with other drug traffickers on your behalf in

18   Canada and South America?

19   A    Yes, sir.

20        (Continued on the next page.)

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Alexander Cifuentes – cross – Lichtman

1  BY MR. LICHTMAN:  (Continuing.)

2  Q    She was basically your mouthpiece; correct?

3  A    Yes, sir.

4  Q    And with regard to the FARC you actually sent her to see

5  someone from the FARC; is that correct?

6  A    Yes, sir.

7  Q    And you told the Government that Mr. Guzman never did a

8  deal with the FARC; is that correct?

9  A    There's some mistake there.

10  Q    Did you tell the Government, if you recall, in

11  debriefings in June of 2016 that, as far as you knew,

12  Mr. Guzman never did a deal with the FARC?

13  A    Could you show me the document, please?

14  Q    I can.  HACD-35.  Read that bracketed information to

15  yourself and let me know when you're done.

16  A    (Reviewing.)

17         Yes.

18  Q    So does that refresh your recollection that you told the

19  Government that Mr. Guzman never did a deal with the FARC?

20  A    Yes.

21  Q    Now, you haven't spoken to Andrea Fernandez for a long

22  time?

23  A    That's right, sir.

24  Q    And you asked federal prosecutors if you could speak to

25  her?

*SN        OCR        RPR*

Alexander Cifuentes - cross - Lichtman

1    A    Yes, sir.

2    Q    And you were told that you could have no contact with

3    her?

4    A    That's right.

5    Q    Now, as you said, this was a very close friend of yours;

6    correct?

7    A    Yes, sir.

8    Q    But you also wanted to kill her?

9    A    In reality, it was Joaquin who wanted to kill her.

10   Q    You sent your wife, Valentine to Canada to find someone

11   to kill Andrea?

12   A    Steven.  And that's when Joaquin said that they should

13   also kill the secretary because she was a liar.

14   Q    Sir, the question was you sent your wife to Canada to

15   find someone to kill Andrea, didn't you?

16   A    Yes, sir.

17   Q    And your wife Valentine -- am I pronouncing that

18   correctly?

19   A    In English it's okay.

20   Q    Thank you.  And the reason you sent Valentine was because

21   she was Canadian and Andrea was in Canada?

22   A    That's right.

23   Q    And you told the prosecutors that you were planning to

24   hire the Hell's Angels to kill Andrea; correct?

25   A    That's right.

SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1  Q    And, in fact, on the day of your arrest, you were

2  planning on meeting the head of the Hell's Angels in Canada to

3  make that murder happen; correct?

4  A    Yes, sir.

5  Q    Now, obviously, when you asked the prosecutors to speak

6  to Andrea Fernandez you asked with the belief that she wasn't

7  aware that you were trying to kill her; correct?

8         MS. PARLOVECCHIO:  Objection.

9         THE COURT:  Sustained, phrase it better.

10 Q    You wanted to speak to Andrea Fernandez because she was

11 your friend; correct?

12 A    Yes.

13 Q    You also tried to kill her; correct?

14        MS. PARLOVECCHIO:  Objection, asked and answered.

15        THE COURT:   Sustained.

16 Q    When you wanted to speak to Andrea, you secretly in your

17 mind knew that you also tried to kill her?

18        MS. PARLOVECCHIO:  Objection.

19        THE COURT:   Overruled.

20 A    She betrayed my boss.

21 Q    My question was that when you wanted to speak to her you

22 didn't believe that she knew that you tried to kill her;

23 correct?

24 A    Yes, sir.

25 Q    I mean that's not how we treat friends, right?  We don't

SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1   try to kill them.

2               MS. PARLOVECCHIO:  Objection.

3               THE COURT:  Sustained.

4   Q   And you also lied to Andrea Fernandez; correct?

5   A   Correct.

6   Q   You sent Andrea to Ecuador to meet with Telmo Castro?

7   A   Correct.

8   Q   You lied to her about the purpose of the meeting?

9   A   In part.

10   Q   You were planning on having Telmo Castro kidnapped at

11   that meeting; correct?

12   A   Yes, sir.

13   Q   And she thought she was just going to see Telmo Castro to

14   settle some accounts?

15   A   Correct.

16   Q   And you had to lie to her to convince her to see Telmo

17   Castro in Ecuador under false pretenses; correct?

18   A   Correct.

19   Q   And you tricked her, didn't you?

20   A   Yes, sir.

21   Q   And you claimed that people dressed up as police showed

22   up at the restaurant and kidnapped Castro?

23   A   That's how it was done.

24   Q   And she ran into the kitchen to hide.  She was terrified

25   as you know?

Alexander Cifuentes - cross - Lichtman

1    A    Correct.

2    Q    Months later, you told her the truth, didn't you?

3    A    More like right away.

4    Q    Well, she was mad, wasn't she?

5    A    Frightened.

6    Q    Well, she was mad at you for lying to her and sending her

7    there under false pretenses.

8    A    She was scared.  She told me I should have told her.

9    Q    And you told her that if I had told you the truth, I

10   didn't think that you would actually go.

11   A    That's correct.

12   Q    The point is that you're willing to use your good friends

13   to accomplish what you want; correct?

14   A    Well, we had agreed on this, but she didn't know that it

15   was going to be at that moment.

16   Q    My point is that you are willing to use your friends and

17   lie to them in order to get what you want; correct?

18          MS. PARLOVECCHIO:  Objection.

19          THE COURT:   Sustained.

20   Q    Now, Andrea, when you first met her, she stayed at your

21   house in Cancun?

22   A    Yes, because she arrived as a person who did not have a

23   place to live so I told her to stay there and whatever she

24   needed I was at her service.

25   Q    And she became your personal assistant?

Alexander Cifuentes – cross – Lichtman

1    A    Yes, sir.

2    Q    She bought clothing for you?

3    A    Yes, sir.

4    Q    Watches?

5    A    Personal things, yes, sir.

6    Q    She bought you $500 sheets?

7         MS. PARLOVECCHIO:  Objection.

8         THE COURT:  Sustained.

9    Q    She had a friend name Roche who helped her with your

10   errands?

11        MS. PARLOVECCHIO:  Objection.

12        THE COURT:  Sustained.

13        We have to get someplace.

14        MR. LICHTMAN:  We're getting there.  I have to ask

15   the questions.

16        THE COURT:  Those questions are not going to

17   illustrate your point.

18        MR. LICHTMAN:  Judge, I don't know if you know where

19   I'm going.

20        THE COURT:  I know where you are going generically

21   and you do not need those questions to do it.

22   BY MR. LICHTMAN:

23   Q    You had a fallout with Andrea, didn't you?

24   A    Yes, sir.

25   Q    And she left; correct?

Alexander Cifuentes – cross – Lichtman

1    A    Yes, sir.

2    Q    And this occurred after you and Roche prayed together?

3         MS. PARLOVECCHIO:  Objection.

4         THE COURT:  Sustained.

5    Q    Now, you also used Andrea in an attempted murder, didn't

6    you?

7    A    Whose, sir?

8    Q    Juan Zapata was married to your niece?

9    A    He was her boyfriend.

10   Q    Was he ever married to her?

11   A    They were boyfriend and girlfriend.

12   Q    Did you tell the Government that he was married to your

13   niece?

14   A    Yes, and she was, like, his lover.

15   Q    Now, you recall that your brother Jorge paid $500,000 for

16   the American arrest warrants against him and you and Dolly?

17        MS. PARLOVECCHIO:  Objection.

18        THE COURT:  Sustained.

19   Q    Do you recall that your brother paid for some warrants?

20        MS. PARLOVECCHIO:  Objection.

21        THE COURT:  Sustained.

22   Q    Do you recall that your family had the ability -- excuse

23   me, withdrawn.

24        -- that your family had a connection in the

25   Colombian prosecutor's office.

                    SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1     MS. PARLOVECCHIO:  Objection.

2     THE COURT:  Sustained.

3     MR. LICHTMAN:  Judge, can I have a sidebar?

4     THE COURT:  Sure.

5     (Sidebar held outside of the hearing of the jury.)

6     (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SN     OCR     RPR*

1      (The following sidebar took place outside the

2   hearing of the jury.)

3      MR. LICHTMAN:  I don't know what the objection is

4   for.

5      THE COURT:  It doesn't impeach this witness'

6   credibility.

7      MR. LICHTMAN:  Judge, if he has information that the

8   American government -- the charges against him, he has prior

9   knowledge of what he's testifying to about.  So if he gets

10  ahold --

11     THE COURT:  I am sorry.  Say it again.

12     MR. LICHTMAN:  If he gets prior control of American

13  arrest warrants that contain information that ultimately he's

14  testifying about today, he obviously has seen this before, he

15  could be then testifying about things that he read as opposed

16  to what he knows firsthand.

17     THE COURT:  And?

18     MR. LICHTMAN:  And, therefore, he could be shaping

19  his testimony based on what he read as opposed to what he's

20  experienced just as the other day when he mentioned he read

21  something in the news you sustained an objection because he

22  may have been testifying about what he read instead of what he

23  firsthand saw.

24     THE COURT:  Let me hear from the Government.

25     MS. PARLOVECCHIO:  Your Honor, if Mr. Lichtman wants

Sidebar

1    to ask about whether he saw that information before he came to

2    testify or came to the United States, that's one thing, but

3    the circuitous route of, you know, his family having

4    connections to corrupt prosecutors, et cetera, et cetera, it's

5    just completely collateral and doesn't get to the heart of the

6    matter.

7              MR. LICHTMAN:  I wasn't allowed to ask the question.

8    I simply asked about the fact that money was paid to get the

9    American warrants against him and his family.  I wasn't

10   allowed to ask that question.  I don't know how I'm supposed

11   to get it --

12             THE COURT:  You simply say, did you see the

13   indictments and the affidavits that have been filed against

14   you before you were arrested or extradited.  What is wrong

15   with the direct approach?

16             MR. LICHTMAN:  Because it was done in a dishonest

17   way to get these.

18             THE COURT:  If he says yes, I did, maybe I will let

19   you go into how he got that access, okay, a little bit, but I

20   am not going to let you lead up to something that may get to

21   nothing because it takes 15 minutes, and you have taken a long

22   time.  Ask him the direct question and if there is something

23   there then we can talk about how much more deeply you want to

24   go into this.

25             MS. PARLOVECCHIO:  I just note for the record that

*SN        OCR        RPR*

Sidebar

1    this witness as part of his extradition gets presented with

2    the indictment, the affidavits against him.

3            THE COURT:  That is true.

4            MS. PARLOVECCHIO:  So building up with all of these

5    atmospherics creates the misimpression that he has obtained

6    this information by an unlawful way.

7            MR. LICHTMAN:  I'm not asking him post arrest.

8            THE COURT:  That is fine.  Ask him that question.

9            (Sidebar ends.)

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SN        OCR        RPR*

Alexander Cifuentes - cross - Lichtman

1    BY MR. LICHTMAN:  (Continuing.)

2    Q    Sir, did you learn about information that was contained

3    in American arrest warrants before you were arrested?

4              MS. PARLOVECCHIO:  Objection, vague.

5              THE COURT:  Hang on one second.

6              You have got to phrase it better than that.

7    BY MR. LICHTMAN:

8    Q    Are you aware that your brother Jorge paid $500,000 for

9    American arrest warrants?

10             MS. PARLOVECCHIO:  Objection.

11             THE COURT:  Sustained.

12   Q    Have you seen the American arrest warrants that your

13   brother had gotten?

14   A    No, sir.

15   Q    Did you learn from your brother that he believed that

16   Juan Ramon Zapata was behind arrest warrants in America for

17   you guys; you and your brother and sister?

18             MS. PARLOVECCHIO:  Objection.

19             THE COURT:  I will allow it.

20   A    I don't remember, sir.

21   Q    Sir, your brother Jorge told you that he believed that

22   Juan Ramon Zapata was behind arrest warrants for you and your

23   family?

24             MS. PARLOVECCHIO:  Objection, asked and answered.

25             THE COURT:  Well, he said he did not remember.  I do

SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1  not see why the same question would get him to remember.

2  Sustained.

3  BY MR. LICHTMAN:

4  Q    Did you have angry feelings towards Juan Zapata?

5  A    Yes, sir.

6  Q    What were the angry feelings about?

7  A    Because there were inconsistencies in money regarding

8  money with him and we thought he was an informant.

9  Q    Your brother Jorge thought he was an informant; correct?

10  A    I don't know if it was my brother Jorge or my sister

11  Dolly but the news did come from Columbia, yes, sir.

12  Q    Either your brother Jorge or your sister Dolly believed

13  that Zapata was an informant against you?

14        MS. PARLOVECCHIO:  Objection.

15        THE COURT:   Sustained.

16  Q    You were angry because you thought he was an informant;

17  correct?

18        MS. PARLOVECCHIO:  Objection.

19        THE COURT:   Sustained.

20  Q    You wanted to kill Zapata; correct?

21  A    Yes, sir.

22  Q    And you asked Jaime, Jaime, Roll Cifuentes to find

23  someone to kill Zapata for you; correct?

24  A    That would follow him, yes.

25  Q    And Jaime Roll Cifuentes was your nephew; correct?

SN        OCR        RPR

Alexander Cifuentes - cross - Lichtman

1   A    That's correct.

2   Q    His mother was -- was it Luisa?

3   A    No it's Lucia Ines Cifuentes Villa, my sister.

4   Q    Now, you actually paid Jaime $10,000 to start the process

5   of killing Zapata?

6   A    It was like 10 million Colombian pesos, sir.

7   Q    Which is how many American dollars?

8   A    1,000 something dollars.

9   Q    And Zapata wasn't killed, was he?

10  A    No, sir.

11  Q    Andrea Fernandez had a prior romantic relationship with

12  Zapata at some point?

13          MS. PARLOVECCHIO:  Objection, relevance.

14          THE COURT:  Sustained.

15  Q    You asked Andrea to find Zapata, didn't you?

16  A    Yes, sir.

17  Q    So that you could have him killed?

18  A    Yes, sir.

19  Q    You didn't tell Andrea the reason why you were having her

20  find him?

21  A    I don't remember having told her.

22  Q    And the reason you used Andrea Fernandez to help you find

23  Zapata was because she had a prior romantic relationship with

24  Zapata; correct?

25          MS. PARLOVECCHIO:  Objection.

*SN          OCR          RPR*

Alexander Cifuentes – cross – Lichtman

1    THE COURT:  Sustained.

2  Q    You thought that she would have a decent chance to find

3  him because of her prior relationship with him; correct?

4  A    Well, since he's from Medellin, they're from the same

5  city and they know the same places.

6  Q    And they had a prior relationship?

7    MS. PARLOVECCHIO:  Objection.

8    THE COURT:  Sustained.

9  Q    And then after you asked Jaime Roll Cifuentes to kill

10 Zapata, you then tried to have Jaime Roll Cifuentes killed,

11 didn't you?

12 A    That was much later on, yes, sir.

13 Q    And your brother Jorge told you that he thought Jaime was

14 a law enforcement informant; correct?

15 A    I don't remember that part, sir.

16 Q    HACV-32, if you can read --

17    MS. PARLOVECCHIO:  Objection.

18 Q    -- if you can read that to yourself --

19    THE COURT:  Hang on.

20 Q    -- and let me know if that refreshes your recollection

21 that your brother Jorge thought that Jaime Roll Cifuentes was

22 an informant?

23    THE COURT:  The objection is overruled.  The

24 interpreter will translate the paragraph for the witness.

25 A    (Reviewing.)

*SN       OCR       RPR*

Alexander Cifuentes – cross – Lichtman

1          Okay.

2     Q     Does that refresh your recollection that your brother

3     Jorge told you that he believed that Jaime Roll Cifuentes was

4     an informant?

5     A     It appears that that's where the information came from.

6     Q     And because of that and the fact that Jaime Roll

7     Cifuentes issued an order to kidnap your mother, his own

8     grandmother, you ordered him killed?

9     A     Affirmative.

10    Q     And you told the Government that you asked another one of

11    your nephews, Sebastian Cifuentes, to kill his cousin, Jaime

12    Roll Cifuentes?

13    A     Yes.

14    Q     So, you ordered one of your nephew's to kill his cousin?

15    A     Yes.

16    Q     Because your nephew ordered a kidnapping of his

17    grandmother?

18    A     Yes.

19    Q     And the one that you ordered to be killed you had

20    previously used him to try to kill someone else?

21          MS. PARLOVECCHIO:  Objection, form.

22          THE COURT:  Sustained.

23    Q     The nephew that you tried to have killed, you also

24    employed him to kill another individual.

25    A     Whom, sir?

*SN        OCR        RPR*

Alexander Cifuentes - cross - Lichtman

1    Q    You had Jaime -- you paid Jaime to try to kill Zapata;

2    correct?

3    A    For him to find his location, yes.

4    Q    To kill him, to have him killed?

5    A    That's right.

6    Q    And then you had another one of your nephews try to kill

7    that nephew?

8              MS. PARLOVECCHIO:  Objection, asked and answered.

9              THE COURT:  Sustained.

10   Q    And you have a sister-in-law name Patricia?

11   A    Yes.

12   Q    You told the Government you threatened to kill her too?

13   A    Yes.

14   Q    And your ex-wife Valentine you threatened to kill her as

15   well?

16             MS. PARLOVECCHIO:  Objection.

17             THE COURT:  Sustained.

18   Q    Do you recall telling the Government during debriefing

19   that you never ordered for anyone to be kidnapped or killed?

20   A    Initially, yes, sir.

21   Q    That wouldn't be true; correct?

22   A    That's right.

23   Q    You lied to the Government?

24   A    Yes, sir.

25   Q    And if I can change to a different subject.  You

Alexander Cifuentes – cross – Lichtman

1  testified on direct about a Memin?

2  A    Yes, sir.

3  Q    You testified that Mr. Guzman sent Memin to Honduras to

4  buy a ranch to build an airstrip?

5  A    Yes, sir.

6  Q    And when did that occur?

7  A    That was in 2008.

8  Q    And how long was he there for?

9  A    He was there for a short time.

10  Q    What's a short time, if you know?

11  A    No more than two months.

12  Q    And you testified that Memin may have misused some petty

13  cash and bought himself a Mercedes; correct?

14  A    Yes, sir.

15  Q    And you testified that you presumed Mr. Guzman ordered a

16  beating of him?

17  A    Yes, sir.

18  Q    And you testified that you saw a picture of Memin;

19  correct?

20  A    Yes, sir.

21  Q    And you testified that he was wearing a cast from the

22  bottom all the way to the top?

23  A    Legs and arms.

24  Q    His legs and arms were in casts?

25  A    Yes, sir.

SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1    Q    And from that, you made a presumption; correct?

2    A    Joaquin's guards told me.

3    Q    Now, you've claimed to the Government that Mr. Guzman had

4    several stash houses or safe houses throughout Mexico where

5    his money was kept?

6    A    Could you refresh that?

7    Q    Okay.

8    A    Pardon me, please.

9    Q    HACV-40.  If you can read that bracketed paragraph to

10   yourself and let me know when you're done.

11   A    (Reviewing.)

12        Yes, sir.

13   Q    Does that refresh your recollection that you told the

14   Government that Mr. Guzman had several stash or safe houses

15   throughout Mexico where his funds were stored?

16   A    Mexico City.

17   Q    And these houses, according to what you told the

18   Government, held anywhere from 5 to $10 million each?

19   A    I think I said that, yes, sir.

20   Q    That's what you told the Government; correct?

21   A    Yes, sir.

22   Q    And you told the Government that there were additional

23   stash houses in Culiacan?

24   A    I think so, sir.

25   Q    And you told the Government that you personally have seen

SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1   many of these stash houses throughout Culiacan, Mazatlan,

2   Guadalajara, Chihuahua, Sonora and Baja.

3          MS. PARLOVECCHIO:  Objection.

4   Q    You told the Government that you have personally seen

5   much of these stash houses?

6   A    No, that's false.

7   Q    In April of 2017, did you tell the Government that you,

8   Alex Cifuentes, has personally seen many of these stash houses

9   throughout Culiacan, Mazatlan, Guadalajara, Chihuahua, Sonora

10  and Baja, California?

11  A    No, sir.

12  Q    Do you need your recollection refreshed on that?

13         MS. PARLOVECCHIO:  Objection.

14         THE COURT:  Sustained.

15  Q    Do you know where any of these stash houses were located?

16  A    No, sir and, in fact, some of those places I haven't even

17  visited.

18  Q    Did you visit any of the places?

19  A    No, no.

20  Q    Now, according to you, Mr. Guzman claimed to have a fleet

21  of planes?

22  A    He said he had a fleet of planes.

23  Q    That's what he told you; correct?

24  A    And to the pilots whenever they came.

25  Q    And you told the Government that you weren't sure if this

*SN        OCR        RPR*

Alexander Cifuentes – cross – Lichtman

1    was true.

2    A    That's right.

3    Q    And according to what you told the Government, Mr. Guzman

4    often lied about his wealth and influence?

5    A    Could you repeat the question?

6    Q    According to what you told the Government, Mr. Guzman

7    often lied about his wealth and influence; correct?

8    A    Yes.

9    Q    And according to you, the reason he lied about this was

10   to keep his competitors away?

11   A    I don't know what you mean.

12   Q    What was the reason that he lied about his wealth and

13   influence, according to you?

14            MS. PARLOVECCHIO:  Objection.

15            THE COURT:   Sustained.

16   Q    Now, according to you, Mayo Zambada was his partner;

17   correct?

18   A    Yes, sir.

19   Q    And according to you, Mayo Zambada shared drug gains and

20   losses with Mr. Guzman?

21   A    Yes, sir.

22   Q    And according to you they shared all the expenses that

23   they had; correct?

24   A    Yes, sir.

25   Q    Including expenses with the wars that he had -- that they

Alexander Cifuentes - cross - Lichtman

1   had?

2   A    Yes, sir.

3   Q    And you told the Government that in 2007 to 2013 that

4   Mr. Guzman went $20 million into debt; correct?

5   A    Before that time.

6   Q    He went into $20 million of debt according to you?

7   A    There was a deficit in 2008 of more or less $20 million,

8   yes, sir.

9   Q    The question I had was that did you tell the Government

10  that between 2007 and 2013 Mr. Guzman had incurred

11  approximately $20 million in debt from drug losses and a war,

12  a prolonged war, with the Beltran-Leyvas?

13  A    That's not written properly.

14  Q    I just asked if that's what you told the Government.

15  A    Part of it.

16  Q    Now, during the period that you lived with Mr. Guzman, he

17  was living in pretty primitive conditions, wouldn't you agree?

18  A    I agree, yes, sir.

19  Q    He was hiding basically; correct?

20  A    Yes, sir.

21  Q    He was being hunted; correct?

22  A    Yes, sir.

23  Q    You told the Government that all the chairs in his house

24  were the plastic folding variety; correct?

25  A    Yes, sir.

SN        OCR        RPR

Alexander Cifuentes - cross - Lichtman

1   Q    You told the Government that Mr. Guzman slept on a simple

2   wooden frame bed; correct?

3   A    Yes, sir.

4   Q    You told the Government that his night table was just

5   planks of wood?

6   A    Yes, sir.

7   Q    You told the Government that he had wireless phones up

8   there that were terrible in 2007 and 2008?

9   A    Yes, sir.

10  Q    You told the Government that the house he lived in was

11  fitted with old tube televisions; correct?

12  A    Yes, sir.

13  Q    And you told the Government that you asked him why he had

14  these old tube televisions; correct?

15  A    Yes, sir.

16  Q    And you told the Government that he didn't even know what

17  a plasma television was?

18  A    Yes, sir.

19  Q    Now, you obviously knew what plasma televisions were;

20  correct?

21  A    Correct.

22  Q    He was stuck in the mountains of Culiacan; correct?

23  A    Yes, sir.

24  Q    You had a much more worldly existence, wouldn't you

25  agree, at that time?

                    SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1    MS. PARLOVECCHIO:  Objection.

2    THE COURT:  Sustained.

3  Q    Now, in June of last year do you recall having a

4  debriefing with the Government about this testimony?

5  A    I think so, sir.

6  Q    You told the Government in debriefing last June that

7  Joaquin, Mayo, Vicente, Nacho, Don Salazar, Macho Prieto were

8  part of the Empresa?

9  A    Yes, sir.

10 Q    And that's like part of the company, the cartel?

11 A    Some of them, yes, sir.

12 Q    And that when the war started you told the Government

13 they all started killing each other?

14 A    Against the Beltran-Leyvas, yes, sir.

15 Q    You told the Government that you heard Mr. Guzman mention

16 that he was the boss of the cartel de Sinaloa; correct?

17 A    Yes, sir.

18 Q    You told the Government that Tomaso made hats and

19 T-shirts with the words "Cartel de Sinaloa" on them?

20 A    Yes, sir.

21 Q    Do you have any of those hats or T-shirts today?

22    MS. PARLOVECCHIO:  Objection.

23    THE COURT:  Sustained.

24 Q    In September of last year, you were debriefed by the

25 Government again?

Alexander Cifuentes - cross - Lichtman

1    A    Yes.

2    Q    And you discussed in that debriefing an interview that

3    Mr. Guzman gave to develop material for the movie that you

4    claimed he was planning; correct?

5    A    Yes, sir.

6    Q    And you claimed that this interview that Mr. Guzman gave

7    took place in 2012?

8    A    Yes, sir.

9    Q    And you claim that the interview took place in the house

10   in Culiacan where you had lived for a period of time; correct?

11   A    Oh, yes, that was one of many interviews.

12   Q    And you were present for this interview; correct?

13   A    Yes, sir.

14   Q    And the topic of this interview was an occasion when

15   Mr. Guzman was nearly arrested in Nayarit by the Mexican Army?

16   A    Yes, sir.

17   Q    And Nayarit is a state in Mexico?

18   A    Yes, sir.

19   Q    According to you Mr. Guzman claimed that the Army almost

20   arrested him?

21   A    In fact, they arrested him.  They banged up on his

22   hands --

23   Q    Let me interrupt you and we can go through it slowly.

24   A    Yes.

25   Q    You claimed to the Government that the Army smashed his

SN        OCR        RPR

Alexander Cifuentes – cross – Lichtman

1  hands with the butts of their rifles?

2  A   He told that to the producer, yes, sir.

3  Q   And that's what you told the Government; correct?

4  A   Yes, sir.

5  Q   And you told the Government that they were smashing his

6  hands with the butts of the rifles demanding to know where the

7  drugs were; correct?

8         MS. PARLOVECCHIO:  Objection.

9         THE COURT:  Sustained.

10 Q   You told the Government that Mr. Guzman said that the

11 army tied his feet to a rope which was attached to a

12 helicopter and flew him upside down?

13        MS. PARLOVECCHIO:  Objection.

14        THE COURT:  Overruled.

15 A   Yes.

16 Q   And according to you, Mr. Guzman claimed he never gave up

17 the drugs; correct?

18 A   That's what he said.

19 Q   And you also told the Government that Mr. Guzman said

20 that the army could not arrest him as they had no evidence?

21        MS. PARLOVECCHIO:  Objection.

22        THE COURT:  Go ahead.

23        MS. PARLOVECCHIO:  Your Honor, may I have a sidebar?

24        THE COURT:  Yes.

25        (Sidebar conference.)(Continued on the next page.)

*SN        OCR        RPR*

Sidebar

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  I know what you're doing.

4          MS. PARLOVECCHIO:  Yes.  I mean, it's improper

5     listing the witness' statement.

6          THE COURT:  It's hearsay.

7          MR. LICHTMAN:  The point I'm trying to make is what

8     Mr. Guzman told him is ludicrous and not all of it is

9     accurate.

10          THE COURT:  You are trying to prove that Mr. Guzman

11     lied to this witness.

12          MR. LICHTMAN:  Right.  Because a lot of his

13     testimony is coming from what he learned from Mr. Guzman and

14     he's telling it to the jury listing it as a fact.

15          MS. PARLOVECCHIO:  But I think we've already gone

16     there.

17          THE COURT:  The question is, is it enough.

18          MR. LICHTMAN:  This is the end.  I have three

19     questions left.

20          THE COURT:  It is not technically hearsay because he

21     is not offering it for its truth.  He is offering it to prove

22     it is false.  So it is kind of self-serving.  It allows the

23     defendant to get in his words without testifying about his

24     words and there is something wrong with that, but I cannot

25     quite think of the rubric other than once we have done enough

1    of it, it is Rule 403.

2            MR. LICHTMAN:  This is the very end.  For real.

3            MS. PARLOVECCHIO:  If they want the defendant to

4    testify to impeach him as to his credibility, they should call

5    him.

6            THE COURT:  We are going to go along with this

7    because I cannot identify a legal basis for now.

8            (Sidebar ends.)

9            (Continued on next page.)

5427

Alexander Cifuentes - cross - Lichtman

1   (Continuing.)

2              THE COURT:  The very end, Mr. Lichtman.

3              MR. LICHTMAN:  Did you think I needed a reminder,

4   Judge?

5              THE COURT:  I did, yes.

6              MR. LICHTMAN:  Can you read back that last question

7   that prompted the sidebar?  Actually, I think I've got it.

8   BY MR. LICHTMAN:

9   Q     And according to what you told the Government, Mr. Guzman

10  told you the army could not arrest him because they had no

11  evidence?

12  A     Yes, that's right.

13  Q     And you claimed, you told the Government, that Mr. Guzman

14  actually showed his hands to the interviewer in front of you;

15  correct?

16             MS. PARLOVECCHIO:  Objection.

17             THE COURT:  Overruled.

18  A     Yes.

19  Q     Did you see the scars on his hands?

20             MS. PARLOVECCHIO:  Objection.

21             THE COURT:  Overruled.

22  A     No, no, I didn't look.

23  Q     The Government hasn't asked you to look at pictures of

24  Mr. Guzman's hands, have they?

25             MS. PARLOVECCHIO:  Objection.

SN          OCR          RPR

Proceedings

1          THE COURT:  Sustained.

2  Q     There are no scars on his hands, are there?

3          MS. PARLOVECCHIO:  Objection.

4          THE COURT:  Sustained.

5          MR. LICHTMAN:  No further questions.

6          THE COURT:  All right.  You want to do redirect now

7  or break for lunch?

8          MS. PARLOVECCHIO:  Break for lunch, Your Honor.

9          THE COURT:  Let's break until 1:20.  Do not talk

10  about the case amongst yourselves.  We will see you in 15

11  minutes.

12          (Jury exits.)

13          (In open court.)

14          THE COURT:  All right.  The witness may be removed.

15          (Witness steps down.)

16          THE COURT:  Everyone have a seat for just one

17  second.  I have made a couple of remarks to the jury

18  emphasizing the need for them to focus on the testimony which

19  they have all been doing very well, in my view, except for one

20  juror who I have noticed is kind of going in and out.  In

21  fact, when I have made those remarks to the jury it has been

22  really directed to that one juror without singling that juror

23  out.  I kind of feel we are at the point, based on the last

24  hour or so, where either Ms. Clarke or I ought to say to the

25  juror privately we need you to pay more attention.

5429
Proceedings

```
 1              Has anyone else noticed what I have noticed?  I am
 2   not asking the audience.  Have any lawyers noticed that?  I do
 3   not want to identify the juror, but there is one juror in
 4   particular.  Have you noticed.
 5              MR. LICHTMAN:  Yes.
 6              THE COURT:  Does anyone think that Ms. Clarke or I
 7   should say something to give that juror a little more focus?
 8              MR. BALAREZO:  If it's who we think it is, you
 9   wouldn't get there anyway.
10              THE COURT:  It seems that everyone in the box may be
11   called upon.
12              MR. BALAREZO:  We would leave it up to the Court.
13              MS. PARLOVECCHIO:  The Government would as well,
14   Your Honor.
15              THE COURT:  All right.  I'm going to do that.
16              All right, see you at 1:20.
17              (Luncheon recess taken.)
18
19
20
21
22
23
24
25
```

*SN      OCR      RPR*

5430

ALEXANDER CIFUENTES - REDIRECT - PARLOVECCHIO

1    A F T E R N O O N   S E S S I O N

2                    (1:30 p.m.)

3         THE COURTROOM DEPUTY:  All rise.

4         THE COURT:  Please bring in the jury.

5         (Jury enters courtroom.)

6         THE COURT:  All right, be seated please.

7         Redirect examination, Ms. Parlovecchio.

8    REDIRECT EXAMINATION

9         MS. PARLOVECCHIO:  Thank you, Your Honor.

10   BY MS. PARLOVECCHIO:

11   Q    Good afternoon, Mr. Cifuentes.

12   A    Good afternoon.

13   Q    You were asked some questions on cross-examination

14   yesterday about the calls that you heard on the stand, do you

15   recall those questions?

16   A    Yes.

17   Q    Now what happened first, you told the government about El

18   Cuate or you heard the call with the defendant talking to El

19   Cuate?

20        THE INTERPRETER:  I'm sorry, the interpreter needs a

21   moment.  Can you repeat that for the interpreter.

22        MS. PARLOVECCHIO:  Sure.

23   Q    When you were debriefing with the government, what

24   happened first, you spoke about El Cuate or you heard the call

25   between the defendant and El Cuate?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5431
ALEXANDER CIFUENTES - REDIRECT - PARLOVECCHIO

1  A    I spoke about El Cuate long before.

2  Q    And what happened first, you told the government about

3  Guano or you heard the call between the defendant and Guano?

4  A    I spoke about Guano.

5  Q    And when you were being debriefed by the government what

6  happened first, you spoke about Lazaro or you heard the call

7  between you, the defendant, and a third person talking about

8  Lazaro?

9  A    I first spoke about that person, Lazaro.

10  Q    Now yesterday you were also asked some questions on

11  cross-examination about your understanding of your cooperation

12  agreement, do you recall those questions?

13  A    Yes.

14  Q    Do you have an understanding about whether the judge can

15  take all of your criminal conduct into consideration when

16  determining your sentence?

17  A    Yes.

18  Q    And what is your understanding about that?

19  A    That it is in the judge's hands.

20  Q    Now what do you understand would happen to you if you

21  didn't tell the truth to the jury today or any day that you

22  testified?

23  A    I would be accused of perjury.  And in addition,

24  everything that I actually spoke about here and in my

25  cooperation agreement, everything would be used against me.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ALEXANDER CIFUENTES - RECROSS - LICHTMAN

1   Q    So do you believe it is in your best interest to tell the

2   truth or to lie to the jury?

3            MR. LICHTMAN:  Objection.

4            THE COURT:  Overruled.

5   A    It is better to tell the truth to the jury and the judge.

6            MS. PARLOVECCHIO:  No further questions.

7            THE COURT:  All right.

8            MR. LICHTMAN:  From here, Judge, one question.

9            THE COURT:  Okay.

10  RECROSS EXAMINATION

11  BY MR. LICHTMAN:

12  Q    Sir, everything you testified to the jury yesterday,

13  today, you didn't make a single lie?

14  A    There could have been some interpretation mistakes, sir.

15  Q    Tell me, who can charge you with perjury, the government

16  or the defense?

17  A    The government.

18  Q    Who determines whether you're telling the truth or not,

19  the government or the defense?

20  A    The government.

21  Q    Who gives you that 5K1 letter to get you below mandatory

22  minimums --

23            MS. PARLOVECCHIO:  Objection.

24  Q    -- the government, the judge or the defense?

25            THE COURT:  Sustained.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

ALEXANDER CIFUENTES - RECROSS - LICHTMAN

1          MR. LICHTMAN:  Nothing further.

2          THE COURT:  All right.  Hang on one second.

3          Ladies and gentlemen, I need you to line up in the

4     hall for just one minute, we'll be have you right back in here

5     in 90 seconds.

6          (Jury exits courtroom.)

7          THE COURT:  Everyone may be seated.  The witness may

8     be removed by the Marshals.

9          (Witness excused.)

10          THE COURT:  The government's next witness.

11          MS. GOLDBARG:  Omar Rodriguez.

12          (Jury enters courtroom.)

13          THE COURT:  Be seated, please, except the witness.

14     The government may call its next witness.

15          MS. GOLDBARG:  Thank you, Your Honor.  The

16     government calls Omar Antonio Rodriguez Mendez to the stand.

17

18

19

20

21

22

23

24

25

5434

MENDEZ – DIRECT – GOLDBARG

1          (Witness sworn.)

2          THE WITNESS:  I do.

3   OMAR ANTONIO RODRIGUEZ MENDEZ, called as a witness, having

4   been first duly sworn/affirmed, was examined and testified as

5   follows:

6          THE COURTROOM DEPUTY:  Please state and spell your

7   name for the record.

8          THE WITNESS:  Omar Antonio Rodriguez Mendez.

9   O-M-A-R, A-N-T-O-N-I-O, R-O-D-R-I-G-U-E-Z, M-E-N-D-E-Z.

10         THE COURTROOM DEPUTY:  You may be seated.

11         MS. GOLDBARG:  May I inquire, Your Honor?

12         THE COURT:  You may.

13   DIRECT EXAMINATION

14   BY MS. GOLDBARG:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    What is your profession?

18   A    I am military man.

19   Q    What country are you a member of the military?

20   A    Dominican Republic.

21   Q    What branch of the Dominican military do you belong to?

22   A    The Army of the Dominican Republic.

23   Q    How long have you been with the Dominican army?

24   A    Nineteen years.

25   Q    What is your current rank?

MENDEZ - DIRECT - GOLDBARG

1   A    Lieutenant Colonel.

2   Q    Are you assigned to a specific division?

3   A    Yes, ma'am.

4   Q    What division is that?

5   A    The National Directorate of Drug Control.

6   Q    Is that known by the initials DNCD?

7   A    Yes.

8   Q    What is the National Department of Drug Control?

9   A    It is the mother institution in the Dominican Republic to

10  fight drug trafficking.

11  Q    What agencies participate in the DNCD?

12  A    The Army of the Dominican Republic, the Navy of the

13  Dominican Republic, the Air Force of the Dominican Republic,

14  and the National Police.

15  Q    How long have you worked for the DNCD?

16  A    Almost 14 years, I have been there for almost 14 years.

17  Q    Do you belong to a specialized unit within that group?

18  A    Yes, madam.

19  Q    What is the name of that specialized unit?

20  A    The Tactical Division of Sensitive Investigations.

21  Q    Is that known by the initials SIU?

22  A    Precisely, yes.

23  Q    Is that unit in partnership with any U.S. law enforcement

24  agency?

25  A    Yes.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5436

MENDEZ – DIRECT – GOLDBARG

1    Q    Which one is that?

2    A    DEA.

3    Q    When did you join the SIU?

4    A    In 2005.

5    Q    As part of the SIU, did you receive any specialized

6    training?

7    A    Yes.

8    Q    What type of training have you received?

9    A    Well, I received training about the handling of

10   informants; training about telephone interceptions; training

11   about telephone analysis; training on detention orders;

12   training also about searches or raids; training about

13   surveillance and a few others.

14   Q    Where did you receive this training?

15   A    At the DEA academy in Quantico, Virginia.

16   Q    Do you receive a financial stipend as a result of your

17   work with the SIU?

18   A    Yes, of course.

19   Q    And how much is that?

20   A    $400.

21   Q    How frequently?

22   A    $400 a month.

23   Q    What is the main mission of the SIU in the Dominican

24   Republic?

25   A    Well, actually the mission is to create cases at the

MENDEZ - DIRECT - GOLDBARG

1   national -- at both the national and international level so

2   that we can go after drug trafficking organizations.

3   Q      How many investigations have you conducted as part of the

4   SIU, approximately?

5   A      More than 100 investigations.

6   Q      And of those investigations, approximately how many of

7   them involved the use of wiretaps?

8   A      More than 80 percent, more than 80.

9   Q      Drawing your attention to May 25th, 2010, were you

10  assigned to an investigation at that time?

11  A      Yes.

12  Q      And did that investigation involve the use of a wiretap?

13  A      Yes.

14  Q      And at that time who was the target of your

15  investigation?

16  A      At the time the person was identified first as Jaime.

17  Q      Were you later able to learn a different name for this

18  person?

19  A      Correct.

20  Q      And what was that name?

21  A      Tono.

22  Q      Why did the investigation first receive the name Jaime?

23  A      Initially when we identify the phone number, since we

24  actually don't know the real name of the person, we assigned

25  them a name which is not the actual name for the time being.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5438

MENDEZ - DIRECT - GOLDBARG

1   Q    So Jaime was not the name of the person you were

2   investigating, correct?

3   A    Exactly, correct.

4   Q    What did you learn -- I'm sorry, what did you learn was

5   the name of the person you were investigating?

6   A    Tono.

7   Q    Can you briefly walk the ladies and gentlemen of the jury

8   through the process of obtaining a wiretap in the Dominican

9   Republic.

10  A    Yes, of course.

11       Well, we initially received information about a

12  phone number and that that person is doing drug trafficking in

13  the country.  Then later we have a meeting with the

14  prosecutor, we present to them the urgency with which we need

15  to intercept the phone number.  Once the prosecutor listens to

16  us and authorizes, the prosecutor draft a request, a petition

17  to the judge, the judge receives the prosecutor's request and

18  finally the judge issues a legal order, a judicial order to

19  intercept said phone number.

20  Q    Is that the process that you followed in this case?

21  A    Yes.

22  Q    I'd like to show you for identification purposes what's

23  marked as 607A.  Do you recognize this CD?

24  A    Yes.

25  Q    How do you recognize it?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

MENDEZ - DIRECT - GOLDBARG

1    A    Because of my initials.

2    Q    And what is on the CD?

3    A    The audio recording of a phone conversation.

4    Q    And what phone number was intercepted where you received

5    this call?

6    A    (809)214-6286.

7    Q    Is this a true and accurate copy of a call that you

8    intercepted off of this line after it was ordered by the

9    judge?

10   A    Yes.

11            MS. GOLDBARG:  At this time the government moves to

12   admit 607A --

13            MR. LICHTMAN:  No objection.

14            THE COURT:  Received 607A.

15            (Government Exhibit 607A, was received in evidence.)

16   BY MS. GOLDBARG:

17   Q    Once you received the judge's order to wiretap the phone

18   number (809)214-6286, what did you do?

19   A    We immediately brought the judicial order to the phone

20   company, in this case Codetel, once the company received the

21   original judicial order from the judge, the phone company

22   gives us access to be able to listen to the phone

23   conversations in realtime.

24   Q    At this time I'd like to play a portion of 607A.  And for

25   the ladies and gentlemen of the jury, the transcript is on the

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

MENDEZ - DIRECT - GOLDBARG

1    screen.

2              I will ask a question on the transcript afterwards.

3    We can play it.

4              (Audiotape played.)

5              MS. GOLDBARG:  We can stop it there.

6              (Audiotape stopped.)

7              MS. GOLDBARG:  For the record, that was the

8    beginning of the call to one minute and 21 seconds.

9              And I'd also like to put on the screen what's in

10   evidence as Government Exhibit 607A-T, as in alpha tango.

11             Now, Lieutenant Colonel, do you know who were the

12   speakers of this call when you heard the call initially?

13   A    I only knew about Tono.

14   Q    I'd like to draw your attention to the transcript

15   paragraph 4 when it says, Am I talking to Tono?  What did that

16   lead you to believe?  What did it lead you to believe?

17   A    That he was Tono, that his name was Tono.

18   Q    Were you able to recognize the nationality of the

19   speakers on the call?

20             MR. LICHTMAN:  Objection.

21             THE COURT:  I'll take it subject to connection.

22             MS. GOLDBARG:  Yes, Your Honor.

23   A    Yes, of course.

24   Q    How were you able to do so?

25   A    Well, due to my time, my experience having conducted many

MENDEZ - CROSS - LICHTMAN

1    cases I'm able to -- I do have control of listening, I do know

2    about several different nationalities.

3              MR. LICHTMAN:  Objection.  Move to strike.

4              THE COURT:  Overruled.

5    BY MS. GOLDBARG:

6    Q    What were you able to determine listening to this call?

7    A    That one person was named Tono and that actually one was

8    Dominican and the other one was a Mexican national.

9    Q    Was this the only call in your investigation that you

10   intercepted with the person who was a Mexican national?

11   A    Yes.

12   Q    Was the Mexican national intercepted on this call, did

13   this person become a target of your investigation?

14   A    No.

15   Q    After you listened to this call, did you take any steps

16   to try and identify who the Mexican national was on the call?

17   A    No.

18   Q    The government -- one moment, please.

19             MS. GOLDBARG:  The government has no further

20   questions.

21             THE COURT:  Cross-examination.

22             MR. LICHTMAN:  Yes, briefly.

23   CROSS-EXAMINATION

24   Q    Sir, on the transcript that you identified and discussed

25   to the jury, where it said JGL, do you remember that?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5442

MENDEZ - CROSS - LICHTMAN

1    A    JGL?

2    Q    The prior one that was played for you, the first tape?

3    A    Tono, just Tono.

4    Q    The only voice that you claim you recognize was Tono's in

5    those tapes that were just played?

6    A    Yes, of course.

7    Q    And with regard to the fact you just testified that you

8    believed it was a Mexican national who was speaking, that's an

9    educated guess by you, correct?

10              MS. GOLDBARG:  Objection.

11              THE COURT:  Sustained, but you can get at it.

12   BY MR. LICHTMAN:

13   Q    You don't know with any certainty whether that man was

14   from Mexico, do you?

15   A    Yes, because of his words I knew -- I did know that he

16   was Mexican.

17   Q    His words, you mean because they were in Spanish?

18   A    Precisely.

19   Q    So if words are in Spanish that means that the speaker

20   has to be from Mexico?

21              MS. GOLDBARG:  Objection.

22              THE COURT:  Sustained.

23   BY MR. LICHTMAN:

24   Q    My point is, you're assuming, correct?

25   A    No.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

MENDEZ - CROSS - LICHTMAN

1    Q    You think you can tell anybody from Mexico that you hear

2    you know is from Mexico?

3              MS. GOLDBARG:  Objection.

4              THE COURT:  Overruled.

5    A    Because of the way they speak you are able to identify

6    where that person could be from.

7    Q    Well, the way they speak, do you mean the words they use

8    or the lilt in their voice?

9    A    The lilt in their voice.

10   Q    So this talent that you have where you can determine --

11             MS. GOLDBARG:  Objection.

12   Q    -- anyone from Mexico their point --

13             THE COURT:  Finish the question.

14             MR. LICHTMAN:  Can I finish the question?

15             THE COURT:  I was interrupting Ms. Goldbarg because

16   she was objecting before you finished the question.  Now I'm

17   saying finish the question.

18   BY MR. LICHTMAN:

19   Q    This talent you have where you can determine any Mexican

20   voice as being from Mexico, does this extend to any other

21   countries or just Mexico?

22             MS. GOLDBARG:  Objection.

23             THE COURT:  Sustained.

24   BY MR. LICHTMAN:

25   Q    You're telling the jury that you are 100 percent certain

5444

MENDEZ - REDIRECT - GOLDBARG

1  that you can identify a voice as being Mexican with just

2  hearing the voice?

3  A     Not 100 percent.

4  Q     Of course not.

5        What if somebody is born in, let's say Chicago, and

6  they move to Mexico let's say at age, I don't know, six, do

7  you think they sound the same as every other Mexican?

8              MS. GOLDBARG:  Objection.

9              THE COURT:  Overruled.

10 A     That could be the case, it depends.

11 Q     It depends on a lot of factors, correct?

12 A     Yes, correct.

13 Q     You flew here to help them get a conviction, didn't you?

14             MS. GOLDBARG:  Objection.

15             THE COURT:  Sustained.

16             MR. LICHTMAN:  Nothing further.

17             THE COURT:  Anything else?

18             MS. GOLDBARG:  Just a few based on that, Your Honor.

19 REDIRECT EXAMINATION

20 BY MS. GOLDBARG:

21 Q     Lieutenant Colonel, you testified that you have done over

22 80 or so investigations involving wiretaps, correct?

23 A     Of course, yes.

24 Q     And in those many investigations, were the people that

25 you were intercepting only from the Dominican Republic?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

MENDEZ – RECROSS – LICHTMAN

```
 1              MR. LICHTMAN:  Objection.

 2              THE COURT:  Overruled.

 3   A    And from other countries.

 4   Q    Other countries such as?

 5   A    Colombia, Puerto Rico, Panama, Venezuela, Mexico.

 6   Q    And in your investigations, have you become familiar with

 7   a person with a Mexican accent or speaking from Mexico?

 8   A    Correct, yes.

 9   Q    And was that the determination you used when you

10   determined that this person was a Mexican national?

11   A    Yes, Madam Prosecutor.

12              MS. GOLDBARG:  Thank you.  No further questions.

13              MR. LICHTMAN:  Very briefly.

14   RECROSS EXAMINATION

15   BY MR. LICHTMAN:

16   Q    All those countries you mentioned are all Spanish

17   speaking countries?

18   A    Yes.

19   Q    Anyone from those other countries could move to Mexico

20   and be on the phone, can't they?

21              MS. GOLDBARG:  Objection.

22              THE COURT:  Sustained.  Look, I think we've joined

23   issue on this, you've made your point.

24              MR. LICHTMAN:  Okay.

25              THE COURT:  The government has made its point.  I
```

                MENDEZ – RECROSS – LICHTMAN

1    have one question for the witness.

2              Ms. Goldbarg referred to you several times as

3    Lieutenant Colonel, when people talk to you in the Dominican

4    Republic, soldiers, when they are conversing with you orally,

5    do they call you Lieutenant Colonel or just Colonel?

6              THE WITNESS:  My underlings address me as Commander.

7              THE COURT:  All right.

8              Anything else from the parties?

9              MS. GOLDBARG:  No, Your Honor.

10             THE COURT:  Thank you, you may step down.

11             (Witness excused.)

12             THE COURT:  The government's next witness.

13             MR. ROBOTTI:  Yes, Your Honor, the government calls

14   Melissa Corradetti.

15             THE COURTROOM DEPUTY:  Please raise your right hand.

16

17

18

19

20

21

22

23

24

25

              *GEORGETTE K. BETTS, RPR, FCRR, CCR*
                  *Official Court Reporter*

Case 1:09-cr-00466-BMC-RLM   Document 644   Filed 07/10/19   Page 125 of 213 PageID #: 13332

1           (Witness sworn.)

2           THE WITNESS:  Yes.

3    MELISSA CORRADETTI, called as a witness, having been first

4    duly sworn/affirmed, was examined and testified as follows:

5           THE COURTROOM DEPUTY:  Please state and spell your

6    name for the record.

7           THE WITNESS:  My name is Melissa Corradetti

8    C-O-R-R-A-D-E-T-T-I.

9           THE COURTROOM DEPUTY:  You may be seated.

10          THE COURT:  You may inquire.

11          MR. ROBOTTI:  Thank you, Judge.

12   DIRECT EXAMINATION

13   BY MR. ROBOTTI:

14   Q    Good afternoon.

15   A    Good afternoon.

16   Q    Are you employed?

17   A    Yes, I am.

18   Q    Where do you currently work?

19   A    I work in the Cryptanalysis and Racketeering Records Unit

20   of the FBI Laboratory in Quantico, Virginia.

21   Q    What is your position at the FBI Laboratory?

22   A    I am a forensic examiner.

23   Q    What's your educational background?

24   A    I have a bachelor's degree in political science from the

25   College of Charleston.

Case 1:09-cr-00466-BMC-RLM   Document 644   Filed 07/10/19   Page 126 of 213 PageID #: 13333

```
 1   Q    What did you do prior to joining FBI?

 2   A    I worked for the U.S. Marshals Service as program analyst

 3   and prior to that I had several jobs in the private sector

 4   analyzing legitimate business practices and doing some

 5   corporate filings and things of that nature.

 6   Q    How long have you been employed at the FBI Laboratory?

 7   A    Since August of 2004.

 8   Q    What's cryptanalysis?

 9   A    Cryptanalysis is essentially breaking codes and ciphers

10   typically with the use of a key.

11   Q    What's a code?

12   A    A code is when you replace a word or a phrase with

13   another word or phrase for secrecy or brevity.

14   Q    What is a cipher?

15   A    A cipher is where you are replacing individual characters

16   to change the meaning with other -- individual characters with

17   other characters or symbols to change the meaning.

18   Q    What was your starting position at the FBI Laboratory?

19   A    I was a cryptanalyst.

20   Q    What were your duties and responsibilities as

21   cryptanalyst?

22   A    My primary duties I was assigned -- I was primarily

23   assigned working code cases, so I would analyze the

24   communications, do all of the work and prepare reports under

25   the guidance of a forensics examiner.
```

CORRADETTI - DIRECT - ROBOTTI

1  Q    To what team were you initially assigned?

2  A    The cryptanalysis team.

3  Q    What was your next assignment as a cryptanalyst?

4  A    In 2008, I transferred to our drug records team.

5  Q    And how did the drug records team differ from the

6  cryptanalyst team?

7  A    On the cryptanalysis team we typically examined

8  communications.  On the drug records team, we were analyzing

9  the records of illicit drug businesses.

10 Q    At some point did your position on the drug records team

11 change?

12 A    Yes.

13 Q    How so?

14 A    In 2011, I became a forensic examiner.

15 Q    Will you please describe what your duties and

16 responsibilities as a forensic examiner are?

17 A    Yes.  So in addition to doing all the analysis I did as a

18 cryptanalyst, I also issue reports and testify to those

19 reports if necessary.

20 Q    Have you received any specialized training at the FBI

21 Laboratory related to your current position?

22 A    Yes.  So when I first came in to the unit I was trained

23 in core cryptanalysis, so basically how to break codes and

24 ciphers.  Upon completion of that training, I successfully

25 completed some competency tests and then when I transitioned

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1    to the drug team I had approximately eight months of training

2    on the illicit drug businesses and the records.  Upon

3    completion of which I passed more competency tests and a

4    series of oral examinations.

5    Q    Have you attended any training outside the FBI?

6    A    Yes.  So we have continuing education requirements so we

7    attend -- they're typically law enforcement conference, things

8    to kind of keep us up on trends within the drug arena, so that

9    we are able to stay on top of things that we may see in drug

10   records.

11   Q    Do you take any annual proficiency tests?

12   A    Yes, I have proficiency tests every year in cryptanalysis

13   and in drug records.

14   Q    How have you done on your tests?

15   A    I have passed them all.

16   Q    Approximately how many forensic examinations of illicit

17   business records have you conducted?

18   A    I have conducted approximately 66 examinations

19   encompassing more than 15,000 records.

20   Q    Could you explain to the jury how you conduct an

21   examination of suspected illicit business records?

22   A    Yes.

23        So the first thing that we do when we get some

24   suspected records is that we look at them to try to determine

25   are we looking at records of an illicit business or are we

CORRADETTI - DIRECT - ROBOTTI

1    looking at the records of a legitimate business.  And so we're

2    looking for some specific characteristics there, you know, is

3    there full and complete information, do we have names, dates,

4    products, pricing information, things that you would expect to

5    see, you know, from a legitimate business.  Essentially

6    something that could be audited.  If we don't find those

7    characteristics, we then determine it's likely records of an

8    illicit business, we then try to determine what the business

9    is.

10           So we're looking for characteristics that would

11   distinguish, say, a drug business from a prostitution

12   business, or a gambling business, or something of that nature.

13   Q    And once you determine that you're looking at records

14   from an illegal business, what do you do next?

15   A    Then we try to come up with what we call analytical

16   findings.  We're basically trying to determine the size and

17   scope of the business from within the documents.  So as much

18   as we can determine about that business, you know, the dates

19   of operation, what the products were, what the prices were,

20   anything that we can determine about that business from within

21   those records.

22           MR. ROBOTTI:  Judge, could we approach briefly?

23           THE COURT:  Sure.

24           (Sidebar conference.)

25           (Continued on the next page.)

SIDEBAR CONFERENCE

1              MR. ROBOTTI:  Judge, sorry for the interruption.

2     Between the mic being low for the witness and the interpreter

3     being somewhat loud during this witness I think the jury may

4     be having difficulty hearing.  We're just wondering if we

5     could adjust one or the other, either the mic for the witness

6     or the interpretation here.

7              THE COURT:  You want the witness's mic louder?

8              MR. ROBOTTI:  Yes, if we could, Your Honor.

9              THE COURT:  That's easier, let's try that.

10             (End of sidebar conference.)

11             (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CORRADETTI - DIRECT - ROBOTTI

1       (In open court.)

2       THE COURT:  Let's try again.

3  BY MR. ROBOTTI:

4  Q    Now, Ms. Corradetti, is your work reviewed?

5  A    Yes, it is.  Every report that I put out is

6  administratively and technically reviewed.

7  Q    Could you explain the difference between technical review

8  and administrative review?

9  A    Yes.  So a technical review is where an examiner, who is

10  also qualified in my discipline, reviews my work to make sure

11  that I have followed our procedures and come up with an

12  appropriate conclusion.

13       An administrative review is where a member of our

14  management checks to make sure that I have followed all of the

15  administrative processes.

16  Q    Have you ever instructed others about analyzing illicit

17  business records?

18  A    Yes.  In two ways.  I train new examiners to our unit in

19  certain aspects of the discipline.  In addition, I train

20  federal, state and local law enforcement in analyzing business

21  records.

22  Q    Have you ever testified in Court as an expert in forensic

23  analysis of illicit business records?

24  A    Yes, I have.

25  Q    How many times?

1    A    Twice.

2    Q    And when was that?

3    A    The first time was in 2012 in the Eastern District of

4    Texas, and the second time was in 2017 in the Northern

5    District of Illinois.

6    Q    Are you aware of other forensic examiners from your lab

7    testifying in court as experts?

8    A    Yes, I am.

9    Q    How many times?

10        MR. LICHTMAN:  Objection.

11        THE COURT:  Overruled.

12   A    In my discipline specifically we have more than 400

13   testimonies.

14        MR. ROBOTTI:  Your Honor, at this time the

15   government moves to qualify Ms. Corradetti under Rule 702 as

16   an expert in cryptanalysis and forensic analysis of illicit

17   business records.

18        MR. LICHTMAN:  No objection.

19        THE COURT:  She can testify as to her opinions.

20   BY MR. ROBOTTI:

21   Q    I'd like to show you what's in evidence as Government's

22   Exhibit 218-27T.

23        And just looking at the first few pages here, do you

24   recognize this document?

25   A    Yes.

CORRADETTI - DIRECT - ROBOTTI

1    Q    And what is it?

2    A    This is a copy of the photographs that I examined and a

3    translation.

4    Q    And from where did the FBI obtain these photographs?

5    A    It is my understanding that they were obtained in Mexico.

6    Q    And when was that?

7    A    In 2012.

8    Q    And there is also a translation accompanying these

9    photographs here too?

10   A    Yes.

11   Q    Is this translation that you relied upon at the time of

12   your examination of these records?

13   A    No.  I relied upon a draft translation.

14   Q    Did you compare the draft translation to the final

15   translation for any material differences that would affect

16   your analysis?

17   A    Yes, I did.

18   Q    Were there any such differences?

19   A    No, there were not.

20   Q    And did you prepare a report in connection with your

21   examination of these documents?

22   A    Yes, I did.

23   Q    I'd like to show you what's been marked as Government

24   Exhibit 218-28 for identification and 218-28A.

25           Do you recognize these two documents?

CORRADETTI - DIRECT - ROBOTTI

1    A    Yes, I do.

2    Q    What do you recognize them to be?

3    A    The first was the report of examination that I issued in

4    connection with analyzing these documents and the second is an

5    amended financial spreadsheet.

6    Q    Just for the record, 218-28 is the report, and 218-28A is

7    the amended spreadsheet; is that correct?

8    A    Yes.

9    Q    Did you prepare this report marked Government

10   Exhibit 218-28 at or near the time that you conducted your

11   original analysis of the records in Government

12   Exhibit 218-27T?

13   A    Yes, I did.

14   Q    And did you prepare the revised spreadsheet marked

15   Government Exhibit 218-28A at or near the time you conducted

16   your revised financial analysis of the records in Government

17   Exhibit 218-27T?

18   A    Yes.

19   Q    And is it a regular practice of the FBI Laboratory to

20   keep and maintain records of this type?

21   A    Yes, it is.

22   Q    And are these documents the type of documents kept under

23   the custody and control of the FBI Laboratory?

24   A    Yes.

25              MR. ROBOTTI:  Your Honor, the government offers

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1    Government Exhibits 218-28 and 218-28A into evidence.

2                MR. LICHTMAN:  No objection.

3                THE COURT:  Received.

4                (Government Exhibit 218-28 and 218-28A, were

5    received in evidence.)

6                MR. ROBOTTI:  Just publishing briefly to the jury.

7                (Exhibit published.)

8    Q    This is your report of examination, correct?

9    A    Yes, it is.

10   Q    And this is your revised financial spreadsheet, correct?

11   A    Yes, it is.

12   Q    Now, in general, what type of information did you rely

13   upon in preparing this report?

14   A    So primarily I relied on my training and experience.  In

15   addition, I definitely reached out to some linguists if I

16   needed just to kind of -- a little bit more information about

17   a word that was translated.

18           I also reached out to some intelligence analysts to

19   see if they were familiar with some terms that I was

20   unfamiliar with.  For example, the term "hojas," that is

21   common for us to reach out because terms can be specific to

22   certain areas or things of that nature.

23           And I also did reach out -- I did some open source

24   research any time I would find something in the records just

25   to sort of confirm something that I already suspected or just

5458

CORRADETTI - DIRECT - ROBOTTI

1   to look up different words that I wasn't familiar with and I

2   did reach out to some case agents as well.

3   Q    What did you reach out to the case agents for?

4   A    Again, nine times out of 10 it was to clarify

5   information.  For example, there was a series of three digit

6   numbers and so I reached out to ask if they already knew what

7   that was or if I needed to focus on that and they told me they

8   are already knew that, so it was stuff like that.

9   Q    Were any one of these sources determinative in your

10  analysis?

11  A    No.  My analysis, my conclusions are based on the

12  totality of the records and my training and experience in

13  addition to everything else.

14  Q    I'd like to show you what's been marked for

15  identification as Government Exhibit 218-32.  Do you recognize

16  this?

17  A    Yes, I do.

18  Q    What do you recognize this to be?

19  A    This is a presentation, essentially a summary of my

20  conclusions from my report.

21  Q    So this is a summary of the conclusions and methodology

22  found in your report marked Government Exhibit 218-28 as well

23  as documents relied upon in supporting your reports and

24  conclusions?

25  A    Yes.

CORRADETTI - DIRECT - ROBOTTI

1          MR. ROBOTTI:  The government offers 218-32 into

2     evidence.

3          MR. LICHTMAN:  No objection.

4          THE COURT:  Received.

5          (Government Exhibit 218-32, was received in

6     evidence.)

7     Q    If we can switch to the PowerPoint presentation.

8          Turning to Slide 2 of your presentation, what do we

9     see here?

10    A    So this is a slide that illustrates what I had previously

11    talked about.  So this is the methodology that I used to

12    conduct the analysis in this case.

13    Q    And what does the left side show here?

14    A    So what the left side shows is, like I previously

15    discussed, what we are looking to first determine when we

16    receive records is whether or not they could be records of a

17    legitimate business and so these are some of the things that

18    we're looking for.  And so if you think of it like a CVS

19    receipt, in a legitimate business you would have complete

20    information.  You would have the name of the business,

21    addresses, a complete product information.  You know, you

22    would know if you bought shampoo or gum, quantities.  You

23    would know the price.  So all of that kind of complete

24    information, that's what we expect to see in a legitimate

25    business.

1  Q    And turning to the portion on the right, what do you see

2  there?

3  A    So that is, like I had previously mentioned, when we're

4  looking at illicit records those records are missing sort of

5  that complete information.  The dates may be missing, they may

6  be incomplete, they could be complete dates.  We're missing

7  information.  We don't know what product it is that we're

8  looking at.  It's either not referenced at all or it might be

9  coded.  We have what we call undisclosed numbers.  So we'll

10  see a number and we don't know if what we're looking at is a

11  quantity, or an amount of money, or a weight.  All of that

12  kind of information that makes looking at those records very

13  unclear and that is what's consistent with records of an

14  illicit business.

15  Q    I just want to direct your attention to two terms that

16  are listed here, Account Designations and Product Identifiers,

17  could you describe what those are?

18  A    Yes.  So account designations are participants in a

19  transaction.  You can think of them as most often a person but

20  it could be a person, place or a location.  So it's usually a

21  person's name, but, you know, in business terminology it's

22  what we would call an account.

23       I'm sorry, and product identifiers, again that's

24  where if I'm looking at a product and it's shampoo, it would

25  say shampoo.  It's some way to reference and identify what

CORRADETTI – DIRECT – ROBOTTI

1   product we're talking about.

2   Q    Turning to Slide 3, in general what do we see here?

3   A    So these, once we determined that something is an illicit

4   business, we are then looking to determine, as I discussed

5   before, what the business is.  What we do is we look for class

6   and individual characteristics.

7   Q    What is a characteristic?

8   A    So a characteristic is just something in the record that

9   we're looking for that you would associate with something.

10  Q    And what's a class characteristic?

11  A    A class characteristic is a characteristic that we would

12  associate with any illicit business.  It's what makes

13  something illicit versus legitimate.

14  Q    What's an individual characteristic?

15  A    An individual characteristic is what is going to be the

16  characteristics that help us distinguish between the

17  businesses, so it helps us distinguish between a gambling

18  business and a drug business.

19  Q    So this slide here, are these some of the class and

20  individual characteristics that you found within the records

21  you examined?

22  A    Yes.

23  Q    Let's start with class characteristics.  Could you walk

24  us through the first bullet point there.

25  A    Yes.  So again, these are characteristics that I found

CORRADETTI - DIRECT - ROBOTTI

1    within these records.  And so the account designations that

2    can be a person, place or thing, it's just what refers to

3    participants in a transaction.  They are often, in illicit

4    business records, nicknames or initials, they are not often

5    full and complete names.

6    Q    And the second bullet point, dates?

7    A    Dates.  So again, with illicit business records we're

8    often not seeing full and complete dates, they are often

9    missing or incomplete.

10   Q    And what about undisclosed numbers?

11   A    So the undisclosed numbers, that's no indication that

12   those numbers represent money, or a weight, or, you know, a

13   quantity.  We're not sure when we look at a number what it is.

14   Q    And general accounting terminology, what did you find in

15   these records about that?

16   A    So we're always looking for the accounting terminology to

17   help us determine that we are looking at business records and

18   in this particular case we found words like -- that

19   represented deposit, deposited, and things like that.

20   Q    What did you find associated with expenses, the last

21   bullet point?

22   A    So again, expenses are something all businesses have

23   expenses and so when we see them in the records that helps us

24   to determine that we're looking at business records and they

25   are typically nondescript.  They can be things like rent,

CORRADETTI - DIRECT - ROBOTTI

1  transportation, gas, food, any type of business that could

2  be -- expense that would be associated with that business.

3  Q    Based on your review of the class characteristics found

4  within these ledgers, what did you find, what did you

5  determine?

6  A    I was able to determine that these were records of an

7  illicit business.

8  Q    Now let's look at the individual characteristics found

9  within these records.  Could you start with the first bullet

10  point.

11  A    Yes.  So the first characteristic that I was able to

12  identify was drug terminology or slang.  So in this particular

13  case I found the term "mata," which is used to refer to

14  marijuana.  I found the term "chiva," which is a term used to

15  refer to heroin, and I found the term "perico," which is the

16  term used for cocaine.

17  Q    How about the next bullet point, specific manufacturing

18  terminology/slang?

19  A    Again, we're always looking for any slang that helps us

20  understand what we're looking at and so in this particular

21  case I found the terms for paste or base, which is used to

22  refer to cocaine base, and then I found the term for

23  methylamine hydrochloride, which is a precursor chemical for

24  methamphetamine.

25  Q    What types of weight indicators did you find in these

CORRADETTI - DIRECT - ROBOTTI

1    records?

2    A    In this particular case I found common references to

3    kilograms and pounds.

4    Q    And the last bullet point, the brand identifiers, what's

5    that?

6    A    Brand identifiers are markings often called package

7    markings.  These are markings that are typically found on

8    packages, but they can just be an identifier on a -- commonly

9    found on a load or a shipment as a way to identify it could be

10   a supplier, or a shipment, but it's just a way to identify

11   that specific quantity.

12   Q    And did you find brand identifiers within the records

13   that you examined here?

14   A    Yes, I found all of the identifiers that are listed here.

15   Q    And based on your review of the individual

16   characteristics found within these documents, what did you

17   conclude?

18   A    I was able to determine that these in fact were records

19   of an illicit drug business.

20   Q    Now turning to Slide 4, in general what do we see here?

21   A    This is my conclusion.

22   Q    And what are the different types of conclusions you could

23   reach?

24   A    We have five different types of conclusions.  So a Type I

25   conclusion would be that we have sufficient characteristics to

CORRADETTI - DIRECT - ROBOTTI

1    identify something as an illicit business.

2            A Type II would be that we have meaningful

3    characteristics to conclude that the records are consistent

4    with an illicit business.

5            A Type III would be that there are limited

6    characteristics, so we would identify that it was may or may

7    not be an illicit business.

8            A type IV would be that there were no meaningful

9    characteristics associated with an illicit business, and then

10   a Type V is simply that the items aren't sufficient for

11   examination.

12   Q    So what type of conclusion did you reach here?

13   A    I reached a Type I conclusion.

14   Q    On a scale of one to five, where does the Type I

15   conclusion fall in terms of strength?

16   A    That is our strongest conclusion.

17   Q    So what does that mean with respect to these particular

18   document at issue?

19   A    I concluded that these were records of an illicit drug

20   trafficking organization.

21   Q    Now based on your review of these ledgers, were you able

22   to make a determination about the total amount of drugs

23   reflected in them?

24   A    Yes.

25   Q    Were you able to make a determination about the total

                    CORRADETTI - DIRECT - ROBOTTI

1   amount of money reflected in the ledgers?

2   A    Yes.

3   Q    So I'd like to speak about each of those in turn today,

4   but before we do that, let's talk about the time frame of the

5   ledgers.

6            Turning to Slide 5, were you able to make a

7   determination about the dates of any of the drug and financial

8   transactions listed in the ledgers?

9   A    Yes.  I was able to determine that, where shown, the

10  transactions were dated between October 3rd, 2011 and

11  November 18th, 2011.

12  Q    And in the two boxes on this page are these actually

13  excerpts from the ledgers?

14  A    Yes, they are.

15  Q    What do we see highlighted there?

16  A    So in red boxes I have just indicated the particular

17  dates associated with those two different ledger pages.

18  Q    And are these just some examples of the dates found

19  within the ledgers?

20  A    Yes.

21  Q    Turning to slide 6, what do we see here?

22  A    This is the total amount of drugs that I was able to

23  determine within the records.

24  Q    And there are different weight indicators here.  Could

25  you walk us through those.

CORRADETTI - DIRECT - ROBOTTI

1    A     Yes, I was able to conclude that there were 9,124 pounds,

2    21,266 kilograms, and 12,606 units with no specific weight

3    indicators for a total of 42,996 units.

4    Q     And when you say units with no weight indicators, what do

5    you mean there?

6    A     In these particular records we often had an indication

7    that something was a pound or a kilo, and then we had units

8    that were written in the same manner that didn't specify.  So

9    in this particular case I chose not to assign a specific

10   weight to them and we just called them units with no specific

11   weight identified.

12   Q     Let's turn to some specific examples of drug entries

13   within the ledgers.  Looking at Slide 7 here, again are these

14   pages from the actual ledgers?

15   A     Yes, they are.

16   Q     And could you walk us through how you identify particular

17   drug entries in these pages.

18   A     Yes.  So on this particular slide in the red boxes I've

19   highlighted where I was able to find the specific drug

20   terminology associated with some of the packages.  So in the

21   first red box I've highlighted term perico, which is commonly

22   used to refer to cocaine.  I've highlighted the term one

23   kilogram of chiva, which is again chiva is commonly used to

24   refer to heroin, and in the bottom ledger page I've

25   highlighted the term mata, which is used to refer to

CORRADETTI - DIRECT - ROBOTTI

1    marijuana.

2    Q    And what are the weight references you see here?

3    A    So in the first example, that top section, that 482,

4    that's an example of those units with no weight identifiers

5    that I previously referenced, you can see that there are no

6    identifiers on them.  But in the second part of the first

7    example you can see it translates to be 160 pounds without a

8    brand and one kilo of white chiva.

9    Q    What about in the bottom box, what weight indicator do we

10   see there?

11   A    We see the notation three tons of mata or marijuana.

12   Q    And what type of ton did you use in your analysis?

13   A    We used a U.S. ton, which is equivalent to -- one ton is

14   equivalent to 2,000 pounds.

15   Q    And what's the other type of ton?

16   A    It would be a metric ton, which is slightly more than --

17   I believe 2,200.  So we were -- we went with the more

18   conservative U.S. ton.

19              (Continued on the next page.)

20

21

22

23

24

25

CORRADETTI - DIRECT - ROBOTTI

1          (In open court.)

2    DIRECT EXAMINATION

3    BY MR. ROBOTTI (continuing):

4    Q    All right.  Turning to slide eight, what do we see here?

5    A    So this is a ledger page, wherein the red boxes I have

6    highlighted the brands that I had previously referenced.  I

7    did -- I highlighted those -- I'm sorry -- in the red box, and

8    then in the translation on the right I have highlighted the

9    specific brands in red.

10   Q    So just as an example, the third line there, what's that?

11   A    146 are Corona.

12   Q    What's the final entry listed on this page?

13   A    And 557 small pieces without a brand were also delivered,

14   1,114.

15   Q    So there are some entries here without specific brand

16   identifiers; is that right?

17   A    Yes, that's correct.

18   Q    Turning to slide nine, what do we see here?

19   A    So this is another page, another example of brands and

20   identifiers.  And in this particular case, as is not uncommon,

21   we do see accounts or people are also used as identifiers, and

22   that's what this is an example of.

23          So in red I have highlighted the brands or

24   identifiers, on the left in the red box; and in the red box is

25   the translation.

MICHELE NARDONE, CSR -- Official Court Reporter

CORRADETTI - DIRECT - ROBOTTI

1    Q    What's the blue writing on the right-hand side there?

2    A    So that is the math that I have done that explains that

3    notation.

4    Q    Could you walk us through just the first parenthetical in

5    the blue writing here.

6    A    Yes.  So it's 20 packages of ten kilograms each, for a

7    total of 200 kilograms.

8    Q    So would these blue numbers have gone into your weight

9    analysis?

10   A    Yes.

11   Q    All right.  So turning to slide ten, would you walk us

12   through what we see here in general?

13   A    Yes.  So this is sort of kind of a culmination of

14   everything that I have been talking about.  So we have just a

15   lot of examples here with different highlighting that I have

16   done to help make it easier to understand.

17   Q    Okay.  Could you walk us through what each color

18   highlighting means here?

19   A    Yes.  So in the blue I have highlighted the quantity, so

20   like the number of packages.  In yellow I have highlighted the

21   weight per package and the total weight.  In orange I have

22   highlighted the brand or identifier.

23   Q    What's the red writing?

24   A    That is my mathematical computations, my math analysis.

25   Q    So you are just doing the math that's reflected in the

*MICHELE NARDONE, CSR -- Official Court Reporter*

                     CORRADETTI - DIRECT - ROBOTTI

1   ledgers here?

2   A    Yes.

3   Q    And what's the green writing?

4   A    That is the translation.

5   Q    All right.  So could you walk us through the first two

6   rows on this ledger page?

7   A    Yes.  So what we have is 222, ten-kilogram packages, for

8   a total of 2,220 kilograms; and 18 of five kilograms each, for

9   a total of 90 kilograms of the Garus brand.

10  Q    Could you walk us through the last two rows?

11  A    Yes.  So we have 1,930 of two kilograms, for a total of

12  3,860 kilograms without a brand.

13  Q    All right.  Turning to slide 11, what do we see here?

14  A    So this is two particular examples from within the

15  ledgers that illustrates how we are looking for duplication

16  within the ledgers.

17  Q    In general, what do you do if you determine something is

18  a duplicate.

19  A    So we operate under what we call the principle of

20  conservative presumption.  We know we are going to see

21  multiple references to the same transaction, and so we are

22  aware of that.

23          If we see two transactions that we cannot determine

24  to be two different transactions, we do not count them twice,

25  thereby ensuring that we are giving a minimum total and not

                 *MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   overinflating the totals that we are providing.

2   Q    So let's see how that plays out in the example.

3        So we have two different ledger pages here, right?

4   A    Yes.

5   Q    What is shown at the bottom, below the ledger page on the

6   right?

7   A    The bottom, that is my math analysis.

8   Q    All right.  Could you just walk us through that analysis?

9   A    Yes.  So in red, we have 1,930 two-kilogram packages, for

10  a total of 3,860 kilograms.  In blue, we have 244

11  five-kilogram packages, for a total of 1,220 kilograms.  Then

12  in orange, we have 388 ten-kilogram packages, for a total of

13  3,880 kilograms.

14       I have totaled up all three of those, in green, to

15  come with -- to come up with the total of 8,960 kilograms.

16  Q    So what do you notice about the page on right when you

17  compare it to the page on left?

18  A    So on the page on the right shows all of those

19  transactions, or all of those notations that I mentioned.

20       The page on the left, I also see that same

21  3,860-kilogram reference as well as the 1,220-kilogram

22  reference.  So I do not count that a separate time because --

23  I do not count that additionally because I have already

24  counted it once.

25  Q    All right.  Turning to slide 12, what do we see here?

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   A     These are three separate ledger pages, excerpts from the

2   ledgers, that contain references to chemicals and a chemist.

3   Q     Could you walk us through each one of those entries.

4   A     Yes.  So the first entry translates to methylamine

5   hydrochloride, which is a precursor chemical for

6   methamphetamine.

7         The second excerpt contains the translation 50, talk

8   to chemist PGR, which is the reference to the Mexican Attorney

9   General's office.  And the third translation is 50, spoke to

10  the chemist.

11  Q     And why were these notations relevant to you?

12  A     So for two reasons.  One is that, again, one of the

13  characteristics we are looking for is manufacturing

14  terminology, and so that precursor chemical goes to that

15  specific characteristic.  But, in general, all of these

16  notations go to the size and scope of the operation.

17  Q     What, if anything, did this tell you about the size and

18  scope of the operation?

19  A     So these are references to -- when we are looking at

20  using a chemist and a government and precursor chemicals, we

21  are definitely looking at a larger organization.  This is not

22  something we would typically see with a street-level

23  organization.

24  Q     Turning to slide 13, what's this?

25  A     This is a portion of the spreadsheets that I used to

MICHELE NARDONE, CSR -- Official Court Reporter

CORRADETTI - DIRECT - ROBOTTI

1    calculate the totals.

2    Q    And does this tally up all the different drug entries you

3    were able to find within the ledgers?

4    A    Yes.

5    Q    And this was a spreadsheet that underlies the conclusions

6    in your chart; is that right?

7    A    Yes.

8    Q    Could you let us know what we see here with the red

9    highlighted portions?

10   A    So highlighted in red are some of the transactions that

11   we have previously used as examples.

12   Q    All right.  So looking at that first one, what does that

13   show?

14   A    So, highlighted in the first red box, we did not have a

15   date.  So I did not have a date entered here.  The account was

16   Lic.  The number, quantity of pieces, it's three pieces.  The

17   weight per piece was 2,000.  The total weight was 6,000.

18        The identifier on this particular load was the

19   matas, which is a reference to marijuana; and that right

20   column that says reference, that's just a page where that

21   transaction can be found.

22   Q    And sometimes I see we have multiple pages listed here.

23        What does that mean?

24   A    So when we have multiple pages, that's how I document

25   that duplication that I spoke of.  So I'm going to list every

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   single page where I found that particular transaction.

2   Q    And when you total up all the different entries in these

3   ledgers, did you get the total of 42,996 units of drugs that

4   we previously spoke about?

5   A    Yes.

6   Q    So we just talked about drug entries found in the

7   ledgers.  Now let's turn to talk about your conclusions about

8   money.

9        So looking at slide 14, what do we see here?

10  A    This was the total amount of money that I was able to

11  arrive at from within the records.

12  Q    And what were the totals?

13  A    2,120,054 U.S. dollars and 4,137,433 Mexican pesos.

14  Q    And what's that translated to, for U.S. dollars?

15  A    Approximately 322,437 U.S. dollars.

16  Q    So this is a total of about $2.45 million reflected in

17  these ledgers?

18  A    Yes, that sounds correct.

19  Q    All right.  There is a notation here at the bottom about

20  your totals in this slide differing from your totals in your

21  original report.

22       In general, why is that?

23  A    Upon reviewing the -- my report, I revised my conclusion

24  about one specific term.

25  Q    And when did you make this determination?

CORRADETTI - DIRECT - ROBOTTI

1    A    In preparation for trial.

2    Q    What was the term you changed your conclusion about?

3    A    The term "hojas."

4    Q    Does that mean sheets in English?

5    A    Yes.

6    Q    What was your interpretation of that term in your initial

7    report?

8    A    My interpretation was that hojas were equivalent to 1,000

9    U.S. dollars.

10   Q    How did your understanding of that term change in

11   anticipation of your trial testimony?

12   A    I concluded that hojas were in fact 1,000 Mexican pesos.

13   Q    In general, what led you to change your conclusion about

14   the term hojas?

15   A    When I was reviewing my work, I saw a cutoff number that

16   I hadn't previously recognized the significance of.  That

17   caused me to go back and rework some of the -- kind of look at

18   my specific section of some of the math that I had done, at

19   which point I realized that it made more sense that hojas were

20   pesos.

21   Q    And based on your revised analysis, did the dollar and

22   peso amounts in the ledgers go up or go down?

23   A    They went down.

24   Q    Did that change, impact in any way your analysis that

25   these are in fact drug ledgers?

CORRADETTI - DIRECT - ROBOTTI

1    A    No, it did not.

2    Q    Let's walk through a few examples of the financial

3    analysis here.

4              Turning to slide 15, what do we see in the ledger

5    entry on the left?

6    A    So in the ledger entry on the left, I have highlighted

7    two terms.  We were dealing with in these ledgers two

8    different currencies.  As you can see, here in the blue box I

9    have the term pesos, and in the green box I have the word for

10   dollars.

11   Q    Directing your attention to the sentence at the bottom

12   left portion of the slide, what does that say?

13   A    That says, Delivered 533 to Los Angeles at the money

14   exchange house.

15   Q    What is the blue text below that?

16   A    So a casa de cambio is a currency exchange location,

17   where you would go to exchange one currency for another.

18   Q    Is that significance to you here?

19   A    Yes.  Again, it's indicative of we are looking at money.

20   We are looking at dollars and pesos, and I would expect then

21   to see references to that.

22   Q    Looking at the entry on the right, what do we see there?

23   A    So in this particular example, on the right we have two

24   things.  I see the word "documentos," which we have seen

25   before.  It refers to money.  The word document is used to

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1    refer to money.  And, in the green boxes, I have highlighted

2    the abbreviation for the word dollars.

3    Q    When you say you have seen the word document before to

4    refer to money, is that based on your experience with other

5    drug ledgers?

6    A    Yes.

7    Q    What's the writing in red indicate here?

8    A    That is where I have totaled up the amounts of money on

9    that side.

10   Q    There is some locations listed on the bottom right here.

11        What are those locations?

12   A    Los Angeles and Tijuana.

13   Q    And what does the ledger indicate is happening at those

14   locations?

15   A    So what we have, we have Wero delivering money to

16   specific people in those particular locations.

17   Q    Now, turning to slide 16, what do we see here?

18   A    This is an excerpt of one of the ledger pages that talks

19   about depositing money at the -- at those -- at those

20   casa de cambios, or the money exchange places.

21   Q    Could you just read the translation on the right here.

22   A    Yes.  November 15, 2011, Tuesday, delivered $104,000 to

23   the casa -- exchange place -- in Tijuana.  What Lazaro

24   delivered to Nelli was deposited at the money exchange house

25   in Tijuana.  In turn, the place sent them to -- something

*MICHELE NARDONE, CSR -- Official Court Reporter*

5479

CORRADETTI - DIRECT - ROBOTTI

1   illegible.

2   Q     All right.  So let's talk about the term hojas and your

3   sheets on slide 17 here.

4             What do we see?

5   A     So in this particular slide this is an example of the

6   term hojas and how we were able to determine mathematically

7   what that was.

8             So we have the term 300 hojas added to 469,440, with

9   a total of 769,440, which means that 300 sheets must equal

10  $300,000.  Therefore, one sheet would equal 1,000 -- my

11  apologies, I misspoke; it's Mexican pesos.  So it's 1,000

12  Mexican pesos.

13  Q     Turning next to slide 18 here, what do we see in terms of

14  expenses?

15  A     So this is an expense list that I previously discussed,

16  where it leads to finding expenses defined in businesses.

17  That's what we have here.

18  Q     Before we get to the actual list of expenses, did this

19  page also inform your conclusion that hojas also equals 1,000

20  Mexican pesos?

21  A     Yes, in two different ways.  So at the top we see 200

22  hojas, which would mean 200,000 Mexican pesos; and, if we add

23  up all the numbers underneath it, it does total 200,000.  And,

24  in addition, that bottom line that says 1,000 pesos for Hugo.

25  Q     Can you walk us through what the other expenses are

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   listed here?

2   A     Yes.  We have 170,000 for Omar funeral; 20,000 for

3   Manuel; 4,000 for Chinese food; 2,000 for cards; 3,000 for gas

4   for guys; and 1,000, Hugo's pesos.

5   Q     Turning to slide 19, what do we see here?

6   A     This is a portion of the spreadsheet that contains the

7   financial transactions that I found.

8   Q     And this is the spreadsheet used to total up all the

9   monetary entries in these ledgers?

10  A     Yes.

11  Q     And this tally led to your conclusion that we saw

12  previously, that there is about $2.45 million in here?

13  A     Yes.

14  Q     Let's look at a few specific entries.  We will start with

15  the ones in yellow highlighting at the top.

16            Could you walk us through those two entries?

17  A     Yes.  Again, in this first particular entry, we don't

18  have a date.  The transaction was from Ms. Nelli, deposited to

19  the account Condor.  The amount was 300,000 Mexican pesos,

20  which was identified as hojas; and then, again, that last

21  column is the reference, the two pages where that transaction

22  was found.

23            In the second yellow box, we have the date

24  October 5, 2011, from Nelli to Charlie, in the amount of

25  100,000 Mexican pesos, identified as hojas, for the purchase

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   of black telephones was the notation in the ledgers; and,

2   again, in that last column are the different pages where we

3   found that transaction.

4   Q    In the boxes highlighted in red, are those some of the

5   entries that we looked at on the previous slides?

6   A    Yes.

7   Q    Can you walk us through the first entry in the top red

8   box?

9   A    Yes.  So again, here we did not have a date.  The

10  transaction was from Wero, delivered to Nelli, in the amount

11  of $150,000, in Los Angeles; and the two places we saw that

12  transaction.

13  Q    Looking at slide 20, you mentioned Wero on the previous

14  slide.  Is that right?

15  A    Yes.

16  Q    Here, what do we see?

17  A    In this slide I pulled out the transactions that were

18  specific to the account Wero and I totaled them.

19  Q    And what do we see in terms of total drugs?

20  A    For drugs, we had 8,961 kilograms, 160 pounds, and 583

21  pieces with no associated weight.

22  Q    What do we see in terms of money?

23  A    We have a total amount of money of $793,000.

24  Q    What are the locations associated with these deliveries

25  of money from Wero?

*MICHELE NARDONE, CSR -- Official Court Reporter*

1   A    Los Angeles and Tijuana.

2   Q    All right.  So now moving on from finances and drugs,

3   let's talk a little bit about communications.

4        What does slide 21 show?

5   A    So on this slide we have a portion of the ledger page,

6   which just shows -- it's kind of a list of subjects and who it

7   would go to regarding that subject.

8   Q    There is a number in the top row there.

9        Do you recognize that number?

10  A    Yes.

11  Q    What's that?

12  A    That is consistent with a Blackberry pin number.

13  Q    Can you walk us through the contact names and the

14  different subjects associated with them?

15  A    Yes.  So on the first line, we have the contact would be

16  Kanam, and the subject is RPG7 and Colombia matter.  The

17  second line is Omar.  The subject would be casino matter,

18  Monterrey.  The third line, the contact would be Tostash.  The

19  subject would be Mr. Hidden compartments in trailers.

20       Then we have Wero as the contact, and the subject is

21  Frijol payments.  Then we have the contact Jobin, and the

22  subject would be matter regarding the cooks.  Then we have the

23  contact Joaquin Arki, and the subject would be matter

24  regarding the warehouse in Calexico.

25       And finally, we have the contact Mr. Maik, and the

CORRADETTI - DIRECT - ROBOTTI

1   subject is proposal to plant in California.

2   Q    Now, turning to slide 22, what does this show?

3   A    So what we found was that the book itself was used as a

4   means for two-way communication, and this is one excerpt from

5   one of the ledger pages that shows that.

6   Q    All right.  And could you read the translation for us

7   here?

8   A    Yes.  I'm here near where you are because the Lic

9   recommended that I leave where I was.  Yano.

10  Q    So what about that leads you to believe it's a

11  communication?

12  A    Two different things.  One, it's written in first person.

13  And then, it was actually signed.

14  Q    All right.  So let's look at some additional examples of

15  these two-way communications.

16       What do we see here?

17  A    In the first excerpt of the ledger -- well, in both of

18  these excerpts, it's two excerpts of the ledgers that show --

19  they are trying to pass or convey information.

20  Q    You have there in blue a notation.

21       What is the blue notation?

22  A    So when we see this X through things, that's typically an

23  indication that that's something that's been completed or is

24  done essentially.

25  Q    Okay.  Could you read the message in the top box?

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1  A    Yes.  Good afternoon, compadre.  How are you?  To tell

2  you what the guy said, they went to check the cars is what

3  they are saying.  They aren't saying anything else.  The car

4  had plants.  They went and opened the car, and that is where

5  they arrested them.  They aren't saying more.  It's up to you

6  to decide if you are going to let them go or not.  I will try

7  to be there with you tomorrow if all goes well.  I need to see

8  you urgently.

9  Q    The message on the bottom box?

10 A    Also, compadre, they should go home right now, and we

11 will talk there, you and I.  Also, compadre, be well.  We will

12 be on the lookout.  If anything comes up, we will send each

13 other messages.

14 Q    Turning to slide 24, what were these two-way

15 communications about?

16 A    In these particular examples the writer appears to be

17 requesting advice on how to handle something.

18 Q    Okay.  So could you walk us through the communication on

19 left?

20 A    Yes.  Compadre, good afternoon.  To inform you that I had

21 to leave in the early morning.  It was in the early morning.

22 I need to see you urgently.  Things are very sensitive.  I, as

23 soon as I can, I will be with you because it's urgent to get

24 together and see how we are going to resolve this.  There is a

25 99 percent chance the prima is also involved in this.

CORRADETTI - DIRECT - ROBOTTI

1    Q     And the communication on the right?

2    A     The day that I can, I will be there with you so that we

3    can make a decision.  There is a 99 percent chance that she is

4    flirting, and I need to see you to put a stop to this.

5    Compadre, with all due respect that you deserve, this only you

6    and I are going to know.  This is between two people.  You

7    should know, you and I.  Because of how sensitive this is, we

8    are going to handle it very firmly.

9    Q     Based on your training and experience, are you familiar

10   with the term flirting?

11   A     Yes.

12   Q     What could that mean?

13   A     It could possibly indicate a cooperation, possibly with

14   law enforcement.

15         MR. LICHTMAN:  Judge, I object.  Move to strike.

16         THE COURT:  Overruled.  Cross-examination.

17   Q     All right.  Turning to slide 25, who is this

18   communication from or who is listed as being associated with

19   this communication?

20   A     Virgo.

21   Q     Okay.  Could you please read that communication for us?

22   A     Yes.  Virgo, information that Tocallo gave me, which was

23   given to him by his father.  To tell you his or your compadre

24   Pequeno not to go and baptize the twins, to inform exactly

25   where he is because the operation they are doing on El

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1 Chaparrito is very big.  Last night I was told that 50, 5

2 letters agents showed up.  He doesn't know what they are

3 after.

4 Q    Turning to slide 26, what is the name associated with the

5 top communication?

6 A    Charly.

7 Q    Could you read that?

8 A    The little antenna so you can put it on the edge of town

9 so that it can go from town to town.

10 Q    And turning to the middle communication, what's the name

11 associated with that one?

12 A    Panchito.

13 Q    Could you read that one?

14 A    What's going on with Misterios?  The week is over.  So

15 what are they going to do?  I'm going to send Chavalo, who is

16 in, Cali, to Ecuador.

17 Q    And the last communication on this page, what's the name

18 associated with that?

19 A    Cachimba.

20 Q    Can you read that communication for us?

21 A    Go get Chure so that he can meet with Tocallo.

22         THE COURT:  Mr. Robotti, how are you doing on time?

23         MR. ROBOTTI:  I probably have 15 more minutes,

24 judge.

25         THE COURT:  You want to break now, ladies and

*MICHELE NARDONE, CSR -- Official Court Reporter*

                        CORRADETTI - DIRECT - ROBOTTI

1    gentlemen or 15 minutes?  I'm getting head nods.

2              Let's take a break now.  We will reconvene at 3:15.

3    Don't talk about the case, ladies and gentlemen.  See you in

4    15 minutes.

5              (Jury exits.)

6              THE COURT:  All right.  Recess until 3:15.

7              (Recess.)

8              THE CLERK:  All rise.

9              THE COURT:  All right.  Let's have the jury, please.

10             (Jury enters.)

11             THE COURT:  Be seated.  Continue, Mr. Robotti.

12             MR. ROBOTTI:  Thank you, judge.

13   BY MR. ROBOTTI:

14   Q    If we could put the PowerPoint back up.

15             So Ms. Corradetti, we left off we were about to

16   speak about some other notations in the ledgers.

17             Looking at this slide here, could you read these

18   notations for us?

19   A    Yes.  In the first box, it says, Cholo, green light.  In

20   the second box, it says remind your compadre Cosina; and in

21   the last box it says, Eligio 2, 105831.

22   Q    Turning next to slide 28, let's move on to the

23   communications here.

24             What are we going to talk about in this slide?

25   A    On this slide, we have some examples of the different

                 *MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   references to transportation methods and different geography.

2   Q    And what methods of transportation are shown here?

3   A    We have boats, planes, trailers, and trucks.

4   Q    What geographic regions?

5   A    Mexico, Tijuana, Tapachula, San Diego, Ensenada,

6   Los Angeles, and Guatemala.

7   Q    Why are transportation and geographical regions relevant

8   to your analysis?

9   A    Again, these are things that go to the size and scope of

10  the operation.  So multiple international geographic locations

11  and transportation methods like a plane, those are things that

12  are indicative of, again, a larger organization.

13  Q    All right.  Could you read the entries on these pages, on

14  these rows for us?

15  A    Yes.  Jobin, we need to take the boats and give --

16          THE COURT:  Hang on just a second.  You are going to

17  have her read the whole page?

18          MR. ROBOTTI:  I was, Your Honor.

19          THE COURT:  Is there a way to highlight certain

20  parts instead of reading out the whole page?

21          MR. ROBOTTI:  I can pick a few to highlight, judge.

22          THE COURT:  Why don't we do that.

23  Q    Can we read the top one?

24  A    Yes.  Jobin, we need to take the boats and give the

25  20,000.

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   Q    All right.  We can skip over the long one.

2        How about the next one?

3   A    How much can the boat fit if it is big?

4   Q    Okay.  Can we read the last two?

5   A    Yes.  Guero, bring the trucks down so you can take that

6   frijol up.

7        Gato, this afternoon I'm going to tell Capi what he

8   is going to bring from Ensenada.  The base in Ensenada is

9   recommended.  Have them wrap it with the products they are

10  sending with clothes.  It got hot in Guate, Guatemala.  Toni

11  isn't going to work out any longer to deliver the frijol in

12  Los Angeles.

13  Q    All right.  In that last message there, there is the term

14  "base."

15       Do you have an understanding what that term men's?

16  A    Yes.  Typically base is typically a reference to cocaine

17  base.

18  Q    The term "frijol," were you able to tell anything about

19  that term?

20  A    We were able to determine that frijol was a reference to

21  a drug, but I was unable to determine what specific drug.

22  Q    All right.  Now, did you also find notations about

23  weapons in these ledgers?

24  A    I did.

25  Q    In confirming your understanding of what these notations

*MICHELE NARDONE, CSR -- Official Court Reporter*

CORRADETTI - DIRECT - ROBOTTI

1   were, what, if anything, did you do?

2   A    I did two things.  First, I did some open-source research

3   to confirm that certain things were what I thought that they

4   were.  Then, I further reached out to the FBI, a firearms

5   examiner, to have him look at the terms and further confirm

6   for me that they were weapons.

7   Q    Did you review any documents?

8   A    Yes, that --

9   Q    What?

10  A    Sorry.

11  Q    What did you review?

12  A    That examiner provided me with photographs of the --

13  photographs of examples of weapons that were in -- that I had

14  showed him from the ledgers.

15  Q    All right.  So let's walk through some of those photos.

16       Turning to slide 29, what do we see here?

17  A    AK-47.

18  Q    Slide 30?

19  A    A Krinkov.

20  Q    Slide 31?

21  A    AR-15 or M-16.

22  Q    Slide 32?

23  A    AR-15 with 40-millimeter grenade launcher.

24  Q    Slide 33?

25  A    Remington R-15.

Corradetti - Cross/Lichtman

1    Q    Finally, slide 34?

2    A    RPG 7.

3    Q    So, turning to our final slide here, is this the -- are

4    these the ledger pages with the weapons references you were

5    referring to?

6    A    Yes.

7    Q    Could you walk us through what we see here?

8    A    Yes.  In the first portion of the ledgers, we see the

9    term Krinkov and 50-millimeter.

10             In the second ledger page, the translation on the

11   right, we see 50 AK-47s, or cuernos archivo, which a common

12   reference to AK-47; 1,000 AK-47; 100 M-16; 1,000 40-millimeter

13   grenade launcher; 50 minimi short range; container of 200;

14   1,000 grenades P1, and something illegible; 20,000 shots of

15   cuernos; 25 R.P.7, which is possibly an RPG 7, or

16   rocket-propelled grenade launcher, and R-15 10 VC.

17             MR. ROBOTTI:  No further questions.

18             THE COURT:  All right.  Cross-examination?

19             MR. LICHTMAN:  Thank you, judge.

20   CROSS-EXAMINATION

21   BY MR. LICHTMAN:

22   Q    Ms. Corradetti, you said that referring to AK-47 as

23   cuernos is a common reference?

24   A    Yes, it is.

25   Q    Common where?

MICHELE NARDONE, CSR -- Official Court Reporter

                                                                                5492

1    A    Common in Mexico but also common in drug ledgers.

2    Q    Is this something that you have come across before?

3    A    Yes.

4    Q    Many times?

5    A    In ledgers I have come across it.  I have come across it

6    in different books and different training that I have attended

7    as well.

8    Q    When you mentioned that you were doing some open-source

9    research, is that like poking around on the Internet?

10   A    Yes, it can absolutely be that.

11   Q    So you couldn't have just said that you were looking on

12   the Internet --

13             MR. ROBOTTI:  Objection.

14   Q    -- you were doing open-source research?

15             THE COURT:  Overruled.

16   A    So that's typically the term that's used to indicate

17   that.

18   Q    So looking on the Internet, the term is open-source

19   research, not just looking on the Internet?

20             MR. ROBOTTI:  Objection.

21             THE COURT:  Sustained.

22   Q    Is that a special term, a law enforcement term?

23             MR. ROBOTTI:  Objection.

24             THE COURT:  I will allow it.

25   A    No.  I believe that to be more of a research term,

                    *MICHELE NARDONE, CSR -- Official Court Reporter*

Corradetti - Cross/Lichtman

1   possibly academic.

2   Q    Academic?  Looking on the Internet, it's an academic

3   term, open-source research?

4   A    It's a common term that we use when we are researching

5   something.

6   Q    Now, you have been working for the government for about

7   the last 15 years or so?

8   A    For the FBI, yes.

9   Q    Marshals and then the FBI?

10  A    Yes.

11  Q    You have testified for the government numerous times, as

12  you said?

13  A    Yes.

14  Q    Have you ever testified for a defense lawyer?

15  A    I have never been called to testify for the defense, no.

16  Q    Have you ever worked for a defense lawyer?

17  A    No.

18  Q    Now, you said that you had some sources that assisted you

19  in determining this report, correct?

20  A    Yes.

21  Q    You said you spoke to linguists?

22  A    Yes.

23  Q    You spoke to intelligence analysts?

24  A    Yes.

25  Q    You spoke to case agents?

Corradetti - Cross/Lichtman

1   A      Yes.

2   Q      You had your own observations?

3   A      Yes.

4   Q      Did you speak to any of the witnesses in this case?

5   A      No.

6   Q      Did you ask to speak to any of the witnesses in this

7   case?

8   A      No.

9   Q      Do you think it would have helped you to speak to

10  witnesses in the case, who might have firsthand knowledge of

11  what was in this ledger?

12  A      No.

13  Q      You don't think that would have helped?

14  A      Not within the scope of what I do, no.

15  Q      So you needed to understand terms, phrases, sentences

16  that were written in code in the materials that you were

17  provided, correct?

18  A      Yes.

19  Q      And you don't think it would have helped you to speak to

20  the people that may have been the targets or the ultimate

21  recipients of the messages, codes that were in these notes?

22          MR. ROBOTTI:  Objection, asked and answered.

23          THE COURT:  Sustained.

24  Q      You said that there was actually a lot of different

25  handwriting in these notes, correct?

Corradetti - Cross/Lichtman

1   A    I don't know.  I'm not a handwriting expert.

2   Q    You are not a handwriting expert, correct?

3   A    No.

4   Q    Are there handwriting experts in Quantico, where you

5   work?

6   A    Yes.

7   Q    Were any of the handwriting experts actually availed to

8   help you with this analysis?

9   A    I'm not sure.  Not to me.  I am not sure for the rest.

10  Q    In connection with the report that you produced, that's

11  the only report we are talking about in your testimony,

12  correct?

13  A    Yes.

14  Q    You had no handwriting analyst help you create any of the

15  conclusions in here, did you?

16  A    No.

17  Q    Do you have voice analysts, by the way, in Quantico?

18          MR. ROBOTTI:  Objection.

19          THE COURT:  Sustained.

20  Q    Did you look at any other evidence in this case, other

21  than the notes that you were provided?

22  A    No.

23  Q    Did you ask to look at any other evidence in the case?

24  A    No.

25  Q    Do you know anything about what this case is about?

Corradetti - Cross/Lichtman

1    A    No.

2    Q    You hesitated.  You maybe had done some open-source

3    research about this case?

4    A    No.  I read the incoming request, which did provide some

5    details.

6    Q    Now, you had noticed that or noted in your report the

7    results of your examination.  You had a unit total where you

8    mixed pounds, kilograms.

9         Pounds and kilograms are obviously different weight

10   measures, correct?

11   A    Yes.

12   Q    One kilogram is 2.2 pounds?

13   A    Yes.

14   Q    And you also have a large amount of your ultimate total

15   units is units with no weight indicators at all?

16   A    Yes.

17   Q    So that could be anywhere from, let's say, for example, a

18   hundredth of an ounce to a thousand pounds, correct?

19   A    No.

20   Q    You don't know what these unknown weight indicators are

21   for that section over here, units with no weight indicators,

22   correct?

23   A    No, that's not technically correct.

24   Q    Well, how much is each one of these unknown units with no

25   weight indicators?  Do you know the exact amount?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Corradetti - Cross/Lichtman

1    A    In my opinion, they are either pounds or kilograms.

2    Q    In your opinion?

3    A    Yes.

4    Q    You are not certain, are you?

5    A    No, I am certain that they are either pounds or

6    kilograms.

7    Q    So you mixed pounds, kilograms, and what you believe, in

8    your opinion, is either pounds or kilograms, correct?

9    A    Yes.

10   Q    And then you mixed all of that together and you got a

11   number?

12              MR. ROBOTTI:  Objection, asked and answered.

13              THE COURT:  Sustained.

14   Q    You don't know who these notes belong to, do you?

15   A    No.

16   Q    You don't know who wrote the notes, do you?

17   A    No.

18   Q    Are aware that the government has handwriting exemplars

19   for Mr. Guzman?

20   A    No.

21   Q    Did you ask?

22   A    No.

23   Q    So you were not asked to compare the handwriting in

24   this -- in these notes that you were provided with any

25   handwriting?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Corradetti - Cross/Lichtman

1          MR. ROBOTTI:  Objection, asked and answered.

2          THE COURT:  Sustained.

3   Q    Regardless, you are not a handwriting expert?

4          MR. ROBOTTI:  Objection, asked and answered.

5          THE COURT:  Sustained.

6   Q    Now, you said that you have -- these are firm opinions,

7   would you say that, a fair description of what's contained in

8   your ultimate report?

9   A    That is my conclusion.

10  Q    But you created an initial conclusion, didn't you?

11  A    No, that is my only conclusion.

12  Q    Well, you said on direct that you had a conclusion and

13  then you changed some things as you were preparing for your

14  testimony at the trial, correct?

15  A    No.

16  Q    Well, didn't you say that you changed one of your

17  conclusions?

18  A    I changed my interpretation of a specific term.

19  Q    You changed your report, didn't you, to reflect that?

20  A    No.  I did not actually change the report.

21  Q    But you said that you changed your conclusion on one of

22  the -- excuse me -- what was the?

23          THE COURT:  She changed her interpretation on one of

24  the conclusions.

25  Q    And this was after you did your initial report, correct?

Corradetti - Cross/Lichtman

1   A    My conclusion did not change.  I changed my

2   interpretation of a specific term.

3   Q    So one of your --

4        MR. ROBOTTI:  Objection, asked and answered.

5        MR. LICHTMAN:  I didn't get an answer.

6        THE COURT:  Ask it one more time, please.

7   Q    One of your interpretations changed after you reached

8   your conclusion?

9   A    Yes.

10  Q    Does that happen often with you?

11       MR. ROBOTTI:  Objection.

12       THE COURT:  Sustained.

13  Q    You said that on one of these pages that there was some

14  mention of the word "flirting."

15  A    Yes.

16  Q    And you said that in your estimation, that meant

17  cooperating?

18  A    Possibly.

19  Q    Why only possibly?  Aren't you certain?

20  A    In order to conclusively confirm a code word, we would

21  need -- we would need more confirmation; and so that is why we

22  say possibly.

23  Q    So what would account possibly for more information would

24  be, say, someone within the conspiracy that these notes were

25  intended to?

Corradetti - Cross/Lichtman

1        MR. ROBOTTI:  Objection, asked and answered.

2        THE COURT:  No, not quite.  Overruled.

3   A    I'm sorry.  Could you repeat that?

4   Q    You said that you need more information to determine if

5   the word "flirting" actually meant cooperation, correct?

6   A    I would mean correlation.

7   Q    Wouldn't you agree that some correlation might be a

8   member of, let's say, the conspiracy that these notes were a

9   part of?

10  A    I don't know that I could answer that with a yes or no.

11  Q    It's possible, though, don't you agree, that would have

12  helped?

13  A    It's possible that would have given me the information.

14  Q    Did you say to the government, hey, I'm not certain what

15  this word means, maybe you can give me some of your 4,000

16  witnesses to help me out?

17       MR. ROBOTTI:  Objection.

18       THE COURT:  Sustained.

19  Q    Did you ask them for any assistance?

20  A    No.

21  Q    Why?

22  A    That is not within the scope -- within our procedures.

23  Q    So you would rather have part of your conclusion that is

24  possibility as opposed to a definite rather than just ask for

25  additional help?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Corradetti - Cross/Lichtman

1        MR. ROBOTTI:  Objection, asked and answered.

2        THE COURT:  Sustained.

3    Q    You mentioned that there is some references to guns, some

4    weapons in here, correct?

5    A    Yes.

6    Q    And then you took pictures of an AK-47.

7             Where did you get this?

8    A    From an FBI firearms examiner.

9    Q    Not open-source research?

10   A    These pictures, no.

11   Q    And a Krinkov, also what you got from the FBI files?

12   A    From the FBI firearms examiner, yes.

13   Q    You asked him, send me a picture of a Krinkov?

14   A    No.

15   Q    What did you do?

16   A    I brought the ledger page to him to confirm that what I

17   was looking at were weapons, and he printed off pictures of

18   the weapons that were referenced on that page.

19   Q    And you then included the pictures in your report?

20   A    In the presentation, not in the report.

21   Q    Okay.  So your report didn't have pictures of these scary

22   weapons, did they?

23        MR. ROBOTTI:  Objection.

24        THE COURT:  Sustained.

25   Q    But your ultimate presentation included pictures of

                MICHELE NARDONE, CSR -- Official Court Reporter

Corradetti - Cross/Lichtman

1   pretty serious automatic weapons?

2   A     Yes.

3   Q     You know what I mean by an automatic weapon; is that

4   right?

5   A     I'm familiar with the term.

6   Q     What's an automatic weapon?

7   A     I don't know a definition.  I'm sorry.

8   Q     So you are not very familiar?

9             MR. ROBOTTI:  Objection.

10            THE COURT:  Overruled.

11  Q     You said you were familiar with an automatic weapon.  I'm

12  asking you:  What's an automatic weapon?

13  A     I'm familiar with the term.

14  Q     What does the term mean?

15  A     It's a reference to a weapon.

16  Q     Automatic is a reference to a weapon?

17            MR. ROBOTTI:  Objection.

18            THE COURT:  Sustained.

19  Q     What about an automatic can opener?

20            MR. ROBOTTI:  Objection.

21            THE COURT:  Sustained.

22  Q     Do you know what the word "automatic" even means in

23  reference to a weapon?

24            MR. ROBOTTI:  Objection.

25            THE COURT:  Overruled.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Corradetti - Cross/Lichtman

1    A     I'm not a weapons expert.  So I'm familiar with it.

2    Q     Well, you said you are familiar.

3          Tell me what your familiarity is in connection with

4    the word automatic weapons.

5          MR. ROBOTTI:  Objection.

6          THE COURT:  Overruled.

7          MR. ROBOTTI:  Can we approach?

8          THE COURT:  Sure.

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sidebar

1              (Sidebar conference.)

2              MR. ROBOTTI:  Judge, this witness has testified that

3    she does not have a definition of the term automatic.  She

4    said she is familiar with the term as it's used to represent

5    weapons.  That is the limitation of her understanding with

6    respect to this specific term.

7              THE COURT:  He is trying to find that out.  If she

8    says all I know is there is a term called automatic weapon, I

9    don't know what it means but it refers to weapons, certain

10   kinds of weapons, then the question is done.

11             MR. ROBOTTI:  She says that.

12             MR. LICHTMAN:  She hasn't said that.

13             THE COURT:  Excuse me.  She has not said that.

14             (End of sidebar conference.)

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

                   *MICHELE NARDONE, CSR -- Official Court Reporter*

Corradetti - Cross/Lichtman

1              (In open court.)

2    BY MR. LICHTMAN:

3    Q    Did you ever fire a gun in your life?

4    A    Yes.

5    Q    What kind of gun?

6    A    A handgun, I believe.

7    Q    What kind of gun?

8    A    I don't know.

9    Q    Do you know what caliber?

10   A    No.

11   Q    Do you know what company?

12   A    No.

13   Q    Do you know if it was semiautomatic or automatic?

14              MR. ROBOTTI:  Objection.

15   A    No.

16              THE COURT:  Overruled.

17   Q    Do you know the difference between semiautomatic and

18   automatic?

19   A    No.

20   Q    So when you refer -- when you say that you have a

21   familiarity with the word automatic weapon, you don't have any

22   idea what you are talking about, do you?

23   A    I'm familiar with the term.

24   Q    Tell me what your familiarity is.

25   A    I have heard the term in reference to weapons.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Corradetti - Cross/Lichtman

1    Q    And what does the term mean?

2    A    A gun that fires more rounds.

3    Q    That's false, you know that, right?

4    A    No, I don't.

5              THE COURT:  Sustained.

6    Q    You don't know is the point.

7              MR. ROBOTTI:  Objection.

8              THE COURT:  Sustained.

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Corradetti - Cross - Lichtman

1    BY MR. LICHTMAN:  (Continuing.)

2    Q    When you fired the gun that you claimed that you fired,

3    do you recall pulling back the slide?

4              MR. ROBOTTI:  Objection.

5              THE COURT:  Sustained for all three.

6    Q    Do you know what I'm even talking about?

7              MR. ROBOTTI:  Objection.

8              THE COURT:  Sustained.

9              MR. ROBOTTI:  Nothing further.

10             THE COURT:  Any redirect?

11             MR. ROBOTTI:  No, Your Honor.

12             THE COURT:  You may step down.

13             (Witness excused.)

14             THE COURT:  The Government may call its next

15   witness.

16             MS. GOLDBARG:  The Government calls Victor Vazquez.

17             THE COURTROOM DEPUTY:  Raise your right hand.

18             (Witness sworn/affirmed.)

19             THE COURTROOM DEPUTY:  Please state and spell your

20   name for the record.

21             THE WITNESS:  Victor J. Vazquez, V-I-C-T-O-R J.

22   V-A-Z-Q-U-E-Z.

23             THE COURT:  You may inquire.

24             MS. GOLDBARG:  Thank you, Your Honor.

25

SN        OCR        RPR

Vazquez – direct – Goldbarg

```
 1   VICTOR J. VAZQUEZ,

 2   called by the Government, having been first duly sworn, was

 3   examined and testified as follows:

 4   DIRECT EXAMINATION

 5   BY MS. GOLDBARG:

 6   Q    Good afternoon.

 7   A    Good afternoon.

 8   Q    Mr. Vazquez, who do you work for?

 9   A    The Drug Enforcement Administration.

10   Q    How long have you worked for DEA?

11   A    15 years.

12   Q    What did you do prior to joining the Drug Enforcement

13   Administration?

14   A    I was a deputy sheriff in San Diego County, California.

15   Q    How long did you do that for?

16   A    Three years.

17   Q    And prior to becoming a deputy with the Sheriff's

18   Department, what did you do?

19   A    I was in the United States Marine Corps.

20   Q    How long did you serve in the United States Marine Corps.

21   A    Four years.

22   Q    What is your current title with the Drug Enforcement

23   Administration?

24   A    I'm a group supervisor.

25   Q    What does that mean?
```

Vazquez – direct – Goldbarg

1  A    I supervise a group of agents.

2  Q    Where are you currently a group supervisor?

3  A    In the Lima, Peru country office.

4  Q    How long have you been in your current position in Lima,

5  Peru?

6  A    15 months.

7  Q    Now where did you start your career with the DEA?

8  A    I started with DEA in Imperial County.  That is about an

9  hour and a half east of San Diego.

10  Q    In addition to Imperial County and Lima, Peru what other

11  offices of the DEA have you worked with?

12  A    The Tucson, Arizona district office and the Mexico City

13  country office.

14  Q    When did you become a group supervisor?

15  A    July of 2014.

16  Q    What was your position prior to becoming a group

17  supervisor?

18  A    A special agent.

19  Q    Special Agent Vazquez, do you speak any languages other

20  than English?

21  A    Yes, Spanish.

22  Q    Where were you born?

23  A    Durango, Mexico.

24  Q    What was your first language?

25  A    Spanish.

Vazquez – direct – Goldbarg

1    Q     Now, you mentioned that you worked for the Mexico city

2    country office.  When were you assigned to the Mexico City

3    country office?

4    A     December 2008 to July 2014.

5    Q     So in total approximately how many years were you in

6    Mexico City?

7    A     Five and a half.

8    Q     Can you describe for the ladies and gentlemen of the jury

9    what were your responsibilities in the Mexico City country

10   office for the Drug Enforcement Administration?

11   A     My responsibilities in Mexico City country office

12   representing DEA was to liaison or to interact with host

13   nation counterparts.  That would be the Mexican Federal

14   Police, the Mexican Army, the Mexican Navy, on a day-to-day

15   basis to share information, to work cases and -- together, and

16   to eventually help our domestic office here in the United

17   States.

18   Q     What do you mean by a domestic office?

19   A     A domestic office is any office of DEA or of any other

20   agency needing assistance from us in Mexico.

21   Q     And what kind of information or assistance would you

22   provide as a DEA agent in Mexico City to the domestic offices

23   of the DEA in the United States?

24   A     Intelligence or numbers of family members or maybe a

25   passport from that country that maybe an office in the

SN        OCR        RPR

Vazquez - direct - Goldbarg

1    domestic arena would require.  If there was a fugitive in

2    Mexico and the office in the U.S. wanted a location, we would

3    work with our host nation counterparts and attempt to locate

4    the fugitive for them.

5    Q    You said liaison.  Could you describe what that means

6    basically?

7    A    Basically working with them on a daily basis.  Calling

8    them, meeting them, sharing information.

9    Q    When you first arrived in Mexico City in 2008, were you

10   assigned any cases?

11   A    Yes.

12   Q    How many cases were you assigned?

13   A    Two.

14   Q    What were the two cases that you were assigned when you

15   first arrived in Mexico City?

16   A    The La Familia Michoacana.

17   Q    What is that?

18   A    It's a cartel based in Michoacana, Mexico.  It operates

19   also in the United States.

20   Q    And what was the other investigation?

21   A    The other was the Sinaloa cartel.

22   Q    When did you start investigating the Sinaloa cartel?

23   A    As soon as I landed in Mexico.

24   Q    I would like to draw your attention to January of 2014.

25   Where were you working at that time?

SN          OCR          RPR

Vazquez - direct - Goldbarg

1    A    Mexico City.

2    Q    Which investigations, if any, were you pursuing at that

3    time?

4    A    The Sinaloa cartel investigation.

5    Q    Who specifically within the Sinaloa cartel were you

6    investigating at that time?

7    A    Rafael Caro Quintero, Ismael Mayo Zambada and Joaquin

8    Guzman Loera.

9    Q    And these three individuals, what roles within the

10   organization did they have?

11   A    They were the leaders of the --

12            MR. BALAREZO:  Objection.

13            THE COURT:  Overruled.

14   Q    I'm sorry, I didn't get the answer.

15   A    Leaders of the cartel.

16   Q    And why were you -- what was the purpose of targeting the

17   three leaders of the Sinaloa cartel?

18   A    The purpose was to eventually capture in -- for potential

19   extradition in the United States to face criminal charges.

20   Q    Was there a plan in place in early in 2014 to arrest or

21   target any of these leaders of the Sinaloa cartel?

22   A    Yes.

23   Q    Did you succeed in any part of that operation?

24   A    Yes.

25   Q    And how is it that you succeeded in that operation?

SN        OCR        RPR

Vazquez - direct - Goldbarg

1   A    We were able to capture Joaquin Guzman Loera.

2   Q    Were you present when Joaquin Guzman Loera was arrested?

3   A    Yes.

4   Q    Do you see the person that you assisted in capturing in

5   the court today?

6   A    Yes.

7   Q    Can you describe an article of clothing that he is

8   wearing?

9            MR. BALAREZO:  Your Honor, we will stipulate that

10  Mr. Guzman is at the table.

11           THE COURT:  And the witness will recognize him as

12  such.

13           MR. BALAREZO:  Yes.

14           THE COURT:  Do you?

15           THE WITNESS:  Yes.

16           THE COURT:  All right.  So stipulated.

17  BY MS. GOLDBARG:

18  Q    What was your role specifically within this capture

19  operation?

20  A    My role was I was the lead U.S. liaison embedded with the

21  Marines on the ground.

22  Q    When you say Marines, what are you talk about?

23  A    The Mexican Marine.

24  Q    What's the name of the Mexican Marines?

25  A    They are also known as Semar, S-E-M-A-R.

Vazquez – direct – Goldbarg

1    Q     When you say Mexican Marines, can you describe for the

2    ladies and gentlemen of the jury what that is?

3    A     It means I was the one embedded with the Marines on a

4    daily basis on the ground from the start of the operations to

5    the end; sharing information again with the Marines on a daily

6    basis from the information coming from offices on the domestic

7    side.

8    Q     Now, before we get on the ground, what role did you play

9    in organizing this specific capture operation?

10   A     I requested or suggested to my chain of command that we

11   use the Marines for this specific operation.

12   Q     When you say chain of command who --

13   A     My supervisors in Mexico City.

14   Q     With what agency?

15   A     The DEA.

16   Q     Why is it that you specifically requested to work with

17   the Mexican Marines in this capture operation?

18   A     My relationship with Marines and the success with the

19   Marines have gotten me to that date, to that point, the

20   reputation.

21   Q     Now had there been capture operations against any of

22   these three leaders of the Sinaloa cartel in the past?

23   A     Yes.

24   Q     Were those successful?

25   A     No.

SN        OCR        RPR

Vazquez - direct - Goldbarg

1    Q    Were they done with the Mexican Marines in this same type

2    of proposal that you were doing?

3    A    No.

4    Q    And was is your proposal different than past operations?

5    A    It took away the federal police out of the picture.  It

6    only involved the Marines, the Mexican Marines.  It involved

7    us going on the ground and providing and advising Marines

8    up-to-the-minute information.

9    Q    When you say taking up the federal police who are you

10   referring to?

11   A    The Mexican Federal Police.

12   Q    And why was that a consideration in your decision?

13   A    We had done it with them before and simply the corruption

14   level -- using them again was not going to work.

15   Q    And when you say the proposal was to have you on the

16   ground, what does that mean to be on the ground?

17   A    To be in with the Marines.  To drive with them, to sleep

18   with them, to travel with them, to be on patrol cars with

19   them, to be on the Black Hawks with them.

20   Q    So after you made this proposal to your management or

21   your chain of command what was the next step in getting this

22   operation approved?

23   A    We briefed the Marines on the operation.

24   Q    And when you say Marines, which ones are you talking

25   about?

Vazquez - direct - Goldbarg          5516

1   A    The Mexican Marines.

2   Q    And what happened after you briefed the Mexican Marines?

3   A    The Mexican Marines agreed to participate in the

4   operation and we set a date of the beginning and locations and

5   planned the beginning of the operation.

6   Q    Now at this time when you're proposing a capture

7   operation to the Mexican Marines, were there domestic

8   investigations or investigations in domestic offices that were

9   also looking at and targeting the leaders of the Sinaloa

10  cartel?

11  A    Yes, ma'am.

12  Q    How do you know that?

13  A    We communicate with them as well.  That office has

14  provided information for anybody in the Sinaloa cartel or

15  their associates.  We are already in communication with them.

16  Q    When you say "we" who are you referring to?

17  A    Our office in Mexico City.

18  Q    At this time when you're planning this capture operation,

19  what offices in the United States are providing information or

20  have investigations into the leaders of the Sinaloa cartel?

21  A    The New York Field Division, DEA -- DEA Los Angeles field

22  division, DEA Phoenix Field Division, DEA Chicago Field

23  Division, DEA Chicago Field Division and HSI Nogales, Arizona.

24  Q    HSI is that Homeland Security Investigations?

25  A    Yes.

SN          OCR          RPR

Vazquez - direct - Goldbarg

1   Q    And you said it was in Nogales, Arizona?

2   A    Yes.

3   Q    Were domestic offices providing you any information to

4   support your capture operation?

5   A    Yes.

6   Q    Do you know what type of investigative techniques these

7   domestic offices were conducting in their investigation?

8   A    Yes.

9   Q    And how do you know this?

10  A    We had daily communications with them and they told us.

11  Q    What type of investigative techniques were being used in

12  the United States to support this capture operation?

13            MR. BALAREZO:  Objection.

14            THE COURT:  Sustained.

15  BY MS. GOLDBARG:

16  Q    Do you know -- how do you know the type of investigative

17  techniques that were being used?

18            MR. BALAREZO:  Objection, asked and answered.

19            THE COURT:  I will allow the answer.

20  A    How do I know what the domestic offices were using?

21  Q    Yes.

22  A    They told us.  They called us and communicated with us.

23  They were intercepting this person that might be of interest.

24            MR. BALAREZO:  Objection.

25            THE COURT:  Sustained.  The last answer is stricken.

                    SN        OCR        RPR

Vazquez - direct - Goldbarg

1    Put another question.

2    BY MS. GOLDBARG:

3    Q    Based on what the offices, the domestic offices, told

4    you, what type of investigative techniques were they using?

5                MR. BALAREZO:  Objection.

6                THE COURT:  Sustained.

7                MS. GOLDBARG:  May we approach Your Honor?

8                THE COURT:  Sure.

9                (Sidebar held outside of the hearing of the jury.)

10               (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SN        OCR        RPR*

Sidebar

```
 1              (The following sidebar took place outside the
 2    hearing of the jury.)
 3              THE COURT:  You are asking him what types they were
 4    using?
 5              MS. GOLDBARG:  Correct.
 6              THE COURT:  They told him what types they were
 7    using.  If he repeats that, he is offering an out-of-court
 8    statement, statements he has heard to prove that, in fact,
 9    they were using those techniques.
10              MS. GOLDBARG:  It's not going to be offered for --
11              THE COURT:  What is it offered for?
12              MS. GOLDBARG:  To explain how the information was
13    used to further the investigative steps that he took in the
14    capture operation.
15              THE COURT:  Well, then you should be able to skip
16    over all of that and simply say to him based on what you
17    learned from those other agencies, what did you do.
18              MS. GOLDBARG:  Okay.
19              (Sidebar ends.)
20              (Continued on next page.)
21
22
23
24
25
```

Vazquez - direct - Goldbarg

1   BY MS. GOLDBARG:  (Continuing.)

2   Q     Based on what you learned from those domestic offices,

3   what were the next steps you took in planning this capture

4   operation?  When does the capture operation begin?

5   A     January 19, 2014.

6   Q     And where does this capture operation begin?

7   A     La Paz, Baja, California Sur.

8   Q     Showing you what's in evidence as Government Exhibit

9   506-1.

10                MR. BALAREZO:  No objection.

11                THE COURT:  It was received.

12                (Exhibit published.)

13  BY MS. GOLDBARG:

14  Q     Special Agent Vazquez, what are we looking at here?

15  A     Looking at a map of Baja, California Sur.

16  Q     Can you circle on the map where the capture operation

17  started?

18  A     (Indicating.)

19  Q     Now, why is it that -- at this time did you have

20  information or did you know where the targets that you were

21  investigating the operation were?

22  A     Yes, they were in the state of Sinaloa.

23  Q     I would like to show you what's in evidence as Government

24  Exhibit 506-9 -- I'm sorry, 506-19.  What are we looking at

25  here?

*SN        OCR        RPR*

Vazquez – direct – Goldbarg

1              (Exhibit published.)

2    A    We're looking at a map of the state of Sinaloa, Mexico.

3    Q    Now if the targets that you were trying to apprehend were

4    in Sinaloa, why was it that the capture operation started in

5    Baja, California Sur in La Paz?

6    A    For one, there was a Semar Mexican Marine base in La Paz.

7    There was not one in the City of Culiacan.  Two, we were going

8    to set up our operation base there in La Paz to continue to

9    gather information from our domestic offices from other

10   foreign offices, to build, like, a capture book of intel to

11   say, okay, this is -- this is apparently a good time to go at

12   one of the three.

13   Q    Now, why was it important that there wasn't a Semar base

14   in Culiacan?

15   A    Because in Culiacan you're going into the lion's den.

16   You're going into the stronghold of the most powerful cartel.

17              MR. BALAREZO:  Objection, 602.

18              THE COURT:  Overruled.

19   Q    Proceed.

20   A    You're going into the area of control of the most

21   powerful cartel in the world.

22              MR. BALAREZO:  Objection.

23              THE COURT:  Overruled.

24   A    You can't easily set up a base or a location where we're

25   still gathering information and Intel and just be there

                    SN        OCR        RPR

Vazquez - direct - Goldbarg

1   sitting.  You can't.  It's not possible.

2   Q    You also said that you wanted to set up an operational

3   base.  What happened when you arrived in La Paz?

4   A    We set up an operation base.

5   Q    And what does that mean?

6   A    Myself and marines from Mexico City started arriving

7   there, started gathering information, doing training

8   operations with the Black Hawks, how to land, where to land,

9   the points of interest that we were building.  Locations of

10  interest that we wanted to -- to see what's the best possible

11  way to go at them with the Black Hawks and the two other MI-17

12  helicopters.

13           So you are basically gathering all of this intel

14  from the domestic offices, historical information that you

15  know about three of them and you are building -- not a pattern

16  of life, but kind of like a pattern of life to the most

17  probable location to hit first.

18  Q    How long were you in La Paz at this operational base?

19  A    Almost a month.

20  Q    Did the -- did you inform the people at the base, the

21  higher-ups at the base, what your were doing other than

22  training exercises?

23  A    No.

24  Q    Why not?

25  A    They are also Mexican Marines, but they are --

SN        OCR        RPR

Vazquez - direct - Goldbarg

1           MR. BALAREZO:  Objection, relevance.

2           THE COURT:  Overruled.

3    A    Once again the fear of corruption.  We wanted just to

4    keep it amongst us and the Mexican Marines from Mexico City.

5    Q    You mentioned that you were trying to gather a pattern of

6    life.  What do you mean by that?

7    A    Identifying a repetitive move either from one -- one of

8    the three or their associates that we can basically identify

9    and say that person has a pattern of doing this, the person

10   has a pattern of going here and doing this.  He most likely

11   does it between these hours of the day so it gives us

12   information to say we want to be successful and hit them

13   during these times of the day or these times of the night.

14   Q    Now, you mentioned that you were with the Mexican

15   Marines.  What's the difference between a Marine and a law

16   enforcement officer?

17   A    The law enforcement officer of course has training in

18   investigations, training in surveillance, training in weapons

19   shooting but so do Marines.  They're more -- law enforcement

20   have patrols and more gear to -- law enforcement they know

21   more the laws.  As opposed to the military -- it's the

22   military.  It's the Mexican Marines.  They don't do

23   surveillance or investigations.

24   Q    What was your function there?

25   A    To relay the information to them, the investigative point

SN          OCR          RPR

Vazquez - direct - Goldbarg

1    to the Marines on the ground; to give them our view of the new

2    information coming in.

3    Q    And while you arrived in La Paz who are the three

4    principal targets that you are gathering information on?

5    A    Raphael Carlos Quintero, Ismael Mayo Zambada and Joaquin

6    Guzman Loera.

7    Q    Who made the determination as to where to go first and

8    who to go after first?

9    A    I did.

10   Q    And what was the decision based on?

11   A    In speaking where my offices are -- the offices we were

12   working with in domestic -- I wanted to decide a -- make

13   everybody agree at the same time we have to agree who we're

14   going to go after first and the first one to jump we're going

15   to go after.  And by jump, it's the one of the three that had

16   the best possible outcome to capture.  I was going to call

17   and -- and advise the Marines that we go after that specific

18   target.

19   Q    Was there a decision to go after the first target?

20   A    Yes.

21   Q    And when was that?

22   A    February 13, 2014.

23   Q    And who was the first target that you went after in this

24   operation?

25   A    Ismael Mayo Zambada.

SN        OCR        RPR

Vazquez - direct - Goldbarg

1    Q    Where did you go to try to locate Ismael Mayo Zambada?

2    A    In a ranch in the outskirts of the city of Culiacan.

3    Q    And what was the purpose of going there?

4    A    To capture Ismael Mayo Zambada.

5    Q    I'm going to show you what's in evidence as Government

6    Exhibit 502.

7                 (Exhibit published.)

8    Q    Can you circle for us where you see La Paz, where the

9    base was?

10   A    (Indicating.)

11   Q    And can you circle where Culiacan is?

12   A    (Indicating.)

13   Q    On February 13, 2014 when you make the decision to

14   attempt to capture Mayo Zambada, how do you get there?

15   A    Black Hawk helicopters.

16   Q    How many went from La Paz to Culiacan?

17   A    Four.

18   Q    Approximately how many personnel were on board those four

19   helicopters?

20   A    About 45 -- 40, 45.

21   Q    Was there any other support other than the 40 or 45

22   people in the helicopters?

23   A    Yes, ma'am.

24   Q    What else was there?

25   A    Mexican Marines in the -- in pickup trucks, in marked

Vazquez - direct - Goldbarg

1   Marine pickup trucks.

2   Q    So in total, how many personnel were part of this

3   operation to attempt to capture Mayo Zambada?

4   A    About 100.

5   Q    Where were you?

6   A    I was in one of the Black Hawks that left La Paz.

7   Q    How long did you take to fly from La Paz to Culiacan?

8   A    An hour and 45 minutes just across the Sea of Cortez.

9   Q    Where did you go?

10  A    To a ranch east of the city of Culiacan.

11  Q    Why did you go to that specific location?

12  A    That's the information where Mayo Zambada jumped.

13  Q    When you say "jumped" --

14  A    The most location, the best possible location to get the

15  outcome to capture one of the three.

16  Q    What happens when you land?

17  A    We land and we search the ranch.

18  Q    What did you find when you searched the ranch?

19  A    Two of his associates.

20  Q    When you say "his associates" who are you --

21  A    Sorry, Mayo Zambada's associates.

22  Q    Was Mayo Zambada captured?

23  A    No.

24  Q    Did you keep trying to find Mayo Zambada?

25  A    Yes, ma'am.

SN         OCR         RPR

5527

Vazquez - direct - Goldbarg

1    Q    For how long?

2    A    Two days.

3    Q    When you were traveling from La Paz to Culiacan did you

4    take a video of this travel?

5    A    Yes.

6    Q    And when you arrived at the ranch in Culiacan did you

7    also take a video of this?

8    A    Yes.

9    Q    I show you what's been marked for identification

10   purposes --

11              MR. BALAREZO:  No objection.

12   Q    I move to admit Government Exhibits 219-22 and 219-21.

13              THE COURT:  Received.

14              (Government Exhibit 219-22 and 219-21, were received

15   in evidence.)

16   BY MS. GOLDBARG:

17   Q    And I ask that we play a clip from Government Exhibit

18   219-22, for the record starting at 0 seconds and going towards

19   1 minute and 47 seconds.  Special Agent Vazquez can you tell

20   us what we're looking at and narrate the video for us?

21              (Video played.)

22   A    Sure.  So this is the view of one of the sides of the

23   Black Hawk.  I am sitting behind or in between both of

24   gunners.  The doors are open.  The Marines are waiting.  We

25   are already past the Sea of Cortez and we're heading to the

Vazquez – direct – Goldbarg

1   location.  It's a rural area.  The little pueblos here and

2   there.  We're looking for vehicles, any Suburbans, any convoy

3   anyone attempting to shoot at the helicopter, stopping or any

4   lookouts in the streets.  We're looking for anything, anything

5   that can tell us –– to alert us to our presence.  You see two

6   vehicles are going there –– just keeping an eye on everybody

7   as we go to the location.

8   Q    For the record that's about 45 seconds.  Why is it that

9   you're looking at convoys of cars?

10  A    The cartel has lookouts.  And it was a far way to get

11  there.  I mean, you're looking at almost over two hours.  So

12  and they have lookouts throughout the city and they control

13  the whole state.  So lookouts are reporting, letting their

14  supervisors or their bosses know that there are two to four ––

15  four Black Hawks over –– coming over from the Sea of Cortez

16  into their state.

17  Q    The sound has been muted on the video, but how loud is a

18  Black Hawk helicopter?

19  A    Very loud.  I mean, you can hear ––

20        MR. BALAREZO:  Objection, relevance.

21        THE COURT:  Overruled.

22  A    Extremely loud and extremely hard to make communications.

23  Q    Now, you mentioned the same –– you mentioned the word

24  lookout a couple of times.  What is a lookout?

25  A    A lookout is somebody that worked for the cartel and does

SN          OCR          RPR

5529
Vazquez - direct - Goldbarg

1    that; looks out.  It's any corner, a specific location and

2    their job is to look out all day.  A taco guy, a vendor

3    working on the gas station, they look and they're looking at

4    law enforcement, military, enemy cartel coming in their area

5    and their job is to report it via phone or handheld; whatever

6    device is given to them.

7    Q    Now, if we can play a short clip from Government Exhibit

8    21.  And at the same time if I could ask where is this

9    location?

10            (Video played.)

11   A    This is at is the ranch that we referred to, Mayo

12   Zambada's location, sorry.

13   Q    Go ahead.  Now, the prior video -- what time were you

14   arriving in Culiacan?

15   A    It was getting -- the sun was coming down.

16   Q    And what are we seeing here?

17   A    We're making -- there's Marines already inside.  I asked

18   one of the Marines to go back in there to make sure, make an

19   entry from the back of the kitchen.

20   Q    What are we looking at here?

21   A    The kitchen, the living room and the other part of the

22   living room.  There's three bedrooms in that location.

23   Q    And when you're going into those rooms, what are you

24   looking for?

25   A    We're looking for anything that -- either evidence that

                    SN        OCR        RPR

Vazquez – direct – Goldbarg

1    the Marines can take or anything that tells -- that is telling

2    me that he left in a hurry, that he's been there, how long has

3    been there.  We're going into maybe the bathrooms to see if

4    maybe the bathrooms were used or anything that says he was

5    just there or he just left.

6    Q     Now, you mentioned that when you arrived there, you did

7    not find Mayo Zambada?

8    A     Correct.

9    Q     Who was present at this location?

10   A     It was the caretaker who lives on the other property, the

11   other structure on the property.

12   Q     Special Agent Vazquez, you said that you spent

13   approximately two days trying to locate Ismael Mayo Zambada.

14   What else were you doing in those two days' time?

15   A     Trying to locate his associates or gather information to

16   get to Mayo Zambada.

17   Q     Did you find any of Mayo Zambada's associates?

18   A     Yes.

19   Q     What happened to them?

20   A     There was two of them captured and they provided

21   information to the Marines and it led to hundreds of weapons.

22   Q     What happened after two days?

23   A     After two days and being in the City of Culiacan, we

24   moved -- we decided to move our location to another base.

25   Q     Why did you make that decision?

                    SN        OCR        RPR

Vazquez - direct - Goldbarg

1    A    Because you're sitting -- you're driving around for two

2    days so there's no -- there's news reports.  There's news

3    articles already coming out that the Marines are in the city.

4    It's -- you're driving around in the lion's den of this cartel

5    and you can't really trust anybody, law enforcement or

6    military, in that city or in that state.

7    Q    Let me ask you about that.  You said that there were

8    about 100 personnel strong in this operation.  Is that

9    considered a large or a small number for an operation of this

10   nature?

11   A    Very small.

12   Q    Why is that?

13   A    Even though they're highly skilled, highly trained

14   Marines, Mexican Marines, it is a small group for this

15   one-of-a-kind operation.

16   Q    What do you mean that it was one-of-a-kind?

17   A    It's the first time that it was ever done.

18   Q    It's the first time that what was ever done?

19   A    This type of operation hadn't been conducted with the

20   intent of capturing one of the three leaders of the cartel.

21   Q    Was that going into Culiacan itself?

22   A    Yes, ma'am.

23   Q    And what were the safety concerns or the dangers that you

24   were facing, the 100-group strong, was facing in Culiacan?

25   A    In my four and a half years there, five and a half years,

SN        OCR        RPR

Vazquez - direct - Goldbarg

1  police officers, federal, state, municipal get killed every

2  day.  Marines get killed there every day, DEA agents has been

3  killed there before.

4          MR. BALAREZO:  Objection.

5          THE COURT:  Overruled.

6  A    Of course, you're there with 100 marines, but you still

7  have to think about safety.

8  Q    Why can't you go to or seek the assistance of the local

9  or state police?  You are shaking your head.

10 A    The fear of corruption.  You don't want to trust anybody.

11 Once you're there, you're there on your own, moving around

12 trusting the people there, that are there with you.

13 Q    After two days, what decision is made?

14 A    To move our camp to the nearest Mexican Marines base.

15 Q    Where do you go?

16 A    We go to Topolobampo, Sinaloa.

17          THE COURT:  Ms. Goldbarg?

18          MS. GOLDBARG:  If I can have him point out the city

19 on a map, we can call it a day.

20 BY MS. GOLDBARG:

21 Q    Showing you Government Exhibit 506-19 in evidence, you

22 said you go to Topolobampo.  Can you point it out on the map?

23 A    (Indicating.)

24          MS. GOLDBARG:  Your Honor, this is a great place to

25 stop.

Proceedings

```
1          THE COURT:  You may have heard this before, ladies

2   and gentlemen.  Please don't communicate about this case with

3   anybody in any way, neither on social media or talking to

4   anyone nor even telling your family members.  Please stay away

5   from any media coverage of the case.  Don't do an internet

6   research of the case.  Put it out of your mind until 9:30

7   tomorrow morning.  We are getting there and making good

8   progress.  Have a good evening.  See you tomorrow.

9          (Jury exits.)

10         (In open court.)

11         (Witness steps down.)

12         THE COURT:  All right.  Everyone may be seated.

13  Before we adjourn, I just want to mention with regard to the

14  sidebars which we have to have from time to time, there has

15  been some deterioration of the process.  So I just want to

16  remind every one of the basic rules.  Number one, do not talk

17  to each other at the sidebar.  Talk to me.  Number two, do not

18  cut off each other and certainly do not cut off me.  I can cut

19  you off, but you cannot cut me off and let's let everyone say

20  what they have to say at the sidebar so we can get the best

21  decisions.  Okay?  Anything else?

22         MS. PARLOVECCHIO:  Not from the Government, Your

23  Honor.

24         MR. BALAREZO:  No, Your Honor.

25         THE COURT:  I am not going to call on you,
```

SN          OCR          RPR

Proceedings

1    Mr. Reilly, but you can send me a letter.

2              (Whereupon, the trial adjourned at 4:25 p.m. to

3    resume Thursday, January 17, 2019 at 9:30 a.m.)

*SN          OCR          RPR*

```
1                         I N D E X

2    WITNESS                              PAGE

3    HILDEBRANDO ALEXANDER CIFUENTES VILLA

4    CROSS-EXAMINATION      BY MR. LICHTMAN    5335

5    REDIRECT EXAMINATION BY MS. PARLOVECCHIO 5430

6    RECROSS EXAMINATION   BY MR. LICHTMAN    5432

7
     OMAR ANTONIO RODRIGUEZ MENDEZ
8
     DIRECT EXAMINATION    BY MS. GOLDBARG    5434
9
     CROSS-EXAMINATION      BY MR. LICHTMAN    5441
10
     REDIRECT EXAMINATION BY MS. GOLDBARG     5444
11
     RECROSS EXAMINATION   BY MR. LICHTMAN    5445
12
     MELISSA CORRADETTI
13
     DIRECT EXAMINATION    BY MR. ROBOTTI     5447
14
     CROSS-EXAMINATION      BY MR. LICHTMAN    5491
15

16

17                     E X H I B I T S

18   GOVERNMENT              PAGE
     607A                    5439
19   218-28 and 218-28A      5457
     218-32                  5459
20   219-22 and 219-21       5527

21

22

23

24

25
```

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*