1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK
     ------------------------------x
3                                          09-CR-00466(BMC)
     UNITED STATES OF AMERICA,
4                                          United States Courthouse
                                           Brooklyn, New York
5
              -against-                    January 17, 2019
6                                          9:30 a.m.
     JOAQUIN ARCHIVALDO GUZMAN LOERA,
7
              Defendant.
8
     ------------------------------x
9
                TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10             BEFORE THE HONORABLE BRIAN M. COGAN
                  UNITED STATES DISTRICT JUDGE
11                     BEFORE A JURY

12   APPEARANCES

13   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  GINA M. PARLOVECCHIO, AUSA
                                     ANDREA GOLDBARG, AUSA
16                                   MICHAEL ROBOTTI, AUSA

17                              UNITED STATES ATTORNEY'S OFFICE
                                Southern District of Florida
18                              99 NE 4th Street
                                Miami, Florida 33132
19                              BY:  ADAM S. FELS, AUSA

20                              DEPARTMENT OF JUSTICE
                                Criminal Division
21                              Narcotic and Dangerous Drug Section
                                145 N. Street N.E. Suite 300
22                              Washington, D.C. 20530
                                BY:  ANTHONY NARDOZZI, ESQ.
23                                   AMANDA LISKAMM, ESQ.

24
     (CONTINUED FOLLOWING PAGE)
25

```
 1    (APPEARANCES CONTINUED)

 2

 3

      For the Defendant:         BALAREZO LAW
 4                               400 Seventh Street, NW
                                 Washington, D.C. 20004
 5                               BY:  A. EDUARDO BALAREZO, ESQ.

 6                               LAW OFFICES OF JEFFREY LICHTMAN
                                 11 East 44th Street, Suite 501
 7                               New York, New York 10017
                                 BY:  JEFFREY H. LICHTMAN, ESQ.
 8                                    PAUL R. TOWNSEND, ESQ.

 9                               LAW OFFICE OF PURPURA & PURPURA
                                 8 E. Mulberry Street
10                               Baltimore, Maryland 21202
                                 BY:  WILLIAM B. PURPURA, ESQ.
11
                                 LAW OFFICES OF MICHAEL LAMBERT, ESQ.
12                               369 Lexington Avenue, PMB #229
                                 New York, New York 10017
13                               BY:  MARIEL COLON MIRO, ESQ.

14

15

16

17

18

19    Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
                                 Phone:  (718)804-2777
20                               Fax:    (718)804-2795
                                 Email:  Georgetteb25@gmail.com
21

22

23

      Proceedings recorded by mechanical stenography.  Transcript
24    produced by computer-aided transcription.

25
```

VAZQUEZ - DIRECT - GOLDBARG

1          (In open court; jury not present.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Good morning, let's have the jury

4     please.

5          (Jury enters courtroom.)

6          THE COURT:  Please be seated.  Good morning, ladies

7     and gentlemen.

8          THE JURORS:  Good morning.

9          THE COURT:  We will continue with direct

10    examination, Ms. Goldbarg.

11         MS. GOLDBARG:  May I inquire, Your Honor?

12         THE COURT:  Yes.

13         MS. GOLDBARG:  Thank you.

14    VICTOR J. VAZQUEZ, resumed as a witness, having been

15    previously duly sworn/affirmed, was examined and testified

16    further as follows:

17    DIRECT EXAMINATION

18    BY MS. GOLDBARG:

19    Q    Good morning, Agent Vasquez.

20    A    Good morning.

21    Q    When we left off yesterday you were discussing how the

22    operation moved from Culiacan to Topolobampo.  I'm showing you

23    what's in evidence as Government Exhibit 506-19?

24         Can you mark again on the map where Topolobampo is.

25         (Witness complies.)

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5539

VAZQUEZ - DIRECT - GOLDBARG

1          And you also testified that there were three targets

2     of this capture operation and you discussed the attempted

3     capture of Mayo Zambada yesterday, who were the other two

4     targets of that capture operation?

5     A     Rafael Caro Quintero and Joaquin Guzman Loera.

6     Q     Were you assigned the investigation of Rafael Caro

7     Quintero when you arrived in Mexico in 2008?

8     A     No.

9     Q     Did you attempt to capture Rafael Caro Quintero in 2008

10    when you were Mexico?

11    A     No, ma'am.

12    Q     Why not?

13    A     He was already in jail.

14    Q     When was Rafael Caro Quintero arrested?

15    A     1985.

16    Q     So why in 2014 was he one of your targets to capture?

17    A     Because he was let go from prison in August of 2013.

18    Q     So how long did he serve in jail?

19    A     Twenty-eight years.

20    Q     Now when you get to Topolobampo, what decisions are made

21    there?  What decisions do you make there?

22    A     When we -- when we arrived to Topolobampo with another

23    Mexican Marine base we once again regroup all our resources,

24    any new info or intelligence that is coming in from the

25    domestic offices and our options at that time.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ – DIRECT – GOLDBARG

1    Q    What decision did you make at that time?

2    A    We decided to go after Joaquin Guzman Loera.

3    Q    So where did you go?

4    A    We had to go back to the city of Culiacan.

5    Q    What date is this?

6    A    This is February 16, 2014.

7    Q    Where do you go in Culiacan?

8    A    So once again, there is no Mexican Marine base in

9    Culiacan, so we go to a field north of the city.

10   Q    What do you do at the field in the north of Culiacan?

11   A    We establish a command post there.

12   Q    Who do you target first once you set up the command post

13   in Culiacan?

14   A    We targeted an individual known as Condor.

15   Q    Why were you targeting Condor?

16   A    Condor was the individual that was primarily most of the

17   time with Guzman Loera.

18   Q    Did you locate Condor on that date, on February 16th?

19   A    No.

20   Q    Did you get any -- did you try several times on that date

21   to locate him?

22   A    Yes, we had a couple of locations for him.

23   Q    Were there any problems when you were trying to find him

24   or see him at another location?

25   A    Yes, in the first location we didn't have any success, so

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

Case 1:09-cr-00466-BMC-RLM   Document 645   Filed 07/10/19   Page 6 of 221 PageID #: 13426

VAZQUEZ – DIRECT – GOLDBARG

1  we moved to the second location and at the second location we

2  were stopped by the local police force.

3  Q    Why was that a problem?

4  A    Once again, the police force --

5          MR. BALAREZO:  Objection as to this.

6          THE COURT:  Overruled.

7  A    It's a problem because we're moving around the city of

8  Culiacan in two unmarked vehicles and get stopped by the local

9  police force for no reason.  Safety issue and corruption

10  issue.

11  Q    So what decision do you make after this happens?

12  A    We go back to the field north of the city.

13  Q    To the command post?

14  A    Yes.

15  Q    What decision, if any, do you decide -- I'm sorry, strike

16  that.  Who, if anyone, do you attempt to locate next?

17  A    We changed our strategy, we went after an individual

18  known as Nariz.

19  Q    What is Naris, that's N-A-R-I-S, is that a Spanish word?

20  A    Yes.  N-A-R-I-Z.  Nariz.

21  Q    What does it stand for, what does it mean?

22  A    Nariz means nose.

23  Q    What prompted you to look for Nariz?

24  A    We knew Nariz was a individual, a runner for Guzman

25  Loera, a gopher, an individual that would go and retrieve

VAZQUEZ – DIRECT – GOLDBARG

1  things for Guzman Loera, an individual that knew all his

2  houses, his cars, locations, where Guzman Loera spent his time

3  in the city of Culiacan.  He knew absolutely everything about

4  Guzman Loera.

5  Q    Did you locate Nariz on that date?

6  A    Yes.

7  Q    Where did you find him?

8  A    At this residence.

9  Q    Can you describe what happened when you arrived at

10  Nariz's residence?

11  A    We had information that he could be celebrating an event

12  of some sorts.  We went to the location of interest and at

13  first we couldn't find where he was or a good location for

14  him, like a house or a residence, but we did notice that there

15  was a party going on.  This is Sunday night almost on a Monday

16  morning, with two suburbans blocking the entry to this street

17  where all these houses are at.  And I went back to the

18  conversation that I had received from the domestic office that

19  said he's got to be here because we can't find him, we can't

20  get into that street but he is celebrating something and

21  that's a party, he has to be there.

22  Q    So what did you do as a result of this?

23  A    At that point there was only two vehicles around that

24  area, myself and another vehicle of marines.  I called the

25  rest of the Mexican Marines that were now in their marked

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    trucks to surround the area, cordon off the area, make a

2    perimeter, nobody leaves or enters this area until we search

3    or -- this area for Nariz.

4    Q     And what did you do next?

5    A     Once the marines told me they had a good perimeter of the

6    location, I exited my vehicle and we walked towards the party.

7    There was maybe 15, 16, 17 males, 10 to 12 females celebrating

8    a party, having drinking, listening to music.

9    Q     When you arrived at this location did you know what Nariz

10   locked like?

11   A     No, I just knew that it had to do something with his

12   nose.  He had a big nose, small nose, no nose, something.

13   Something told me focus on the nose.

14   Q     When you arrive at this location do you find Nariz, when

15   you first arrive at the location?

16   A     No.  I -- I had the information in hand that I was

17   looking for an individual named Nariz.  So I had asked the

18   marines to line up all the males in front of the party and to

19   please ask them to show us their phones and if they had a

20   Blackberry device to show us their Blackberry PIN.

21   Q     What is a Blackberry PIN?

22   A     A Blackberry PIN is used to message a Blackberry PIN

23   messenger, it's a message from one Blackberry to the other.

24   Blackberry is just like a regular device, a Nokia or another

25   type of device like an iPhone.

VAZQUEZ – DIRECT – GOLDBARG

1   Q   Why were you looking for the specific Blackberry PIN?

2   A   Because of the information we were getting the domestic

3   office.

4   Q   And which domestic office was providing you with this

5   information?

6   A   HSI office out of Nogales, Arizona.

7   Q   What happened when you asked the marines to line up these

8   men at the party?

9   A   At that point I believe it was an all or nothing.  I

10  didn't want to show my hand and say, hey, which one of you is

11  Nariz.  Most likely I was not going to get any positive

12  response.  So I was going down the line of men.  The females,

13  we just let them go.  They were sitting down, standing up.

14  They were obviously complaining, you know, what were you doing

15  here, whatever, so we ignored them, let me do whatever they

16  wanted to.  Some were sitting just looking.

17          As I went by each male, I don't have a Blackberry,

18  okay, step back.  I have a Blackberry, here's my PIN.  At that

19  moment I had a marine Intel analyst with me and I said confirm

20  the last three for Nariz that we have from domestic office.

21  He said it was 87F.  I said that's the number we're looking

22  for, so if you see it, that's going to be our guy.  As I go

23  down, I'm going down, I'm down to four or three males left,

24  and at that point I'm telling myself, this is it, this is our

25  moment it has to be something happening here, one of these

Case 1:09-cr-00466-BMC-RLM   Document 645   Filed 07/10/19   Page 10 of 221 PageID #: 13430

1  guys has to be it and right when I'm asking the third guy to

2  the end, my attention gets diverted to my left as one of the

3  females jumps off her chair and kind of yells, I'm going to

4  check on my baby.  Just out of the blue.

5  Q    Did you observe where this woman went?

6  A    Yes.

7  Q    And did where she went draw any attention to you?

8  A    Absolutely.

9  Q    Why?

10 A    Because it was -- it was -- to me, it triggered some kind

11 of like alert, you got to pay attention.  This is not right,

12 why would she just get up and jump off the chair.

13 Q    Where did you see her go?

14 A    I told the marine next to me, pay attention to her as I

15 kept asking the males and he pointed at me and said, look at

16 the house where she's going to.  I turned around, she walked

17 towards probably one of the nicest houses in the neighbor,

18 with a brand new -- what looked to be a brand new car in the

19 driveway, and I said he's in there, he's in that house.

20 Q    When you say "he" who are you referring to?

21 A    Nariz.

22 Q    So what did you do next?

23 A    I asked the marines to search that residence.  At that

24 point we had a female -- two female marines, one a doctor, one

25 a nurse.  I asked the nurse or the doctor, I can't recall

VAZQUEZ – DIRECT – GOLDBARG

1  which one it was, to please go in there and ask the female to

2  exit the residence as we wanted to have the marines search.

3  Q    Did you go into the residence?

4  A    I went in through the entry of the door.  As I entered, I

5  saw it was a living room and I saw the female holding her baby

6  with tight hands on the side yelling at the marines, Get out

7  of my house, get out of my house, you're corrupt, get out of

8  here.  I asked the female marine, please bring her out, we

9  have to search this residence and she refused.  And what

10  another thing that caught my attention was she held her hands

11  very tight to her sides.  As she's holding the baby, she's

12  yelling but she's yelling in to her baby that was another

13  concern.  It was like, why are you so concerned about the baby

14  if you're yelling in her ear.  So I asked the marine, please

15  pull her out.  As the marine attempts to pull the baby, they

16  struggled a little bit, the marine pulled the baby -- the

17  female marine pulled the baby away, as the baby was pulled

18  away from the female a phone dropped from her armpit.

19  Q    What did you do once you saw the phone?

20  A    When I saw the phone fall, I said check that phone, he's

21  in the house.

22  Q    What happened next?

23  A    The marines went into the back of the master bedroom and

24  they pulled Nariz out.

25  Q    Well, what happened next?

VAZQUEZ - DIRECT - GOLDBARG

1   A    They walked Nariz towards me, I was maybe from here to

2   the wall away from him and I said, "Tu eres Nariz."

3   Q    What does that mean in English?

4   A    I said, you are Nariz, you are nose or the nose.

5   Q    What did this person respond?

6   A    He said -- he nodded, he said yes.

7   Q    Showing you for identification purposes Government

8   Exhibit 219-1.

9         Do you recognize the person in this photo?

10  A    Yes.

11  Q    Is this a fair and accurate depiction of the person you

12  saw --

13        MR. BALAREZO:  No objection, Your Honor.

14  A    Yes.

15        MR. BALAREZO:  No objection.

16        MS. GOLDBARG:  At this time the government moves to

17  admit Government Exhibit 219-1 into evidence.

18        THE COURT:  Received.

19        (Government Exhibit 219-1, was received in

20  evidence.)

21  Q    Agent Vasquez, who is this?

22  A    That's Nariz.

23  Q    Now after he admitted that he was Nariz, what did you ask

24  him next?

25  A    I asked him, do you know where he's at right now, I want

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    to know where he's at right now.  By he, I meant Guzman Loera.

2    Q    What did Nariz respond?

3    A    He responded he's at the 3.

4    Q    Did you ask him anything else?

5    A    Yes.

6    Q    Why?

7    A    'Cause I knew he was lying to me.

8    Q    I'd like to show you what is in evidence as Government

9    Exhibit 610N-6T.

10             You said you were being provided information from

11   HSI Nogales.  When you said that you knew Nariz was lying when

12   said he was in 3, why is that?

13   A    Because of the conversation from the domestic office, the

14   Nogales HSI office had previously sent us.

15   Q    Drawing your attention to paragraph 3.  Can you read that

16   in English, please.

17   A    Yeah, bro, go there very early to the birria and take it

18   to the 5, bring waters.  I forgot the rocket at the 3.  Behind

19   the cautiba in the back, bring it to me.

20   Q    Had you seen this message before?

21   A    Yes.

22   Q    Was this a message that you had when you indicated you

23   believed that Nariz wasn't being honest with you?

24   A    Yes.

25   Q    Can you explain why?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1   A    I received the message in Spanish and my conversations

2   and my chats and when he told me he was at the 3, I knew he

3   was -- Guzman Loera was already at 5.

4   Q    At that time did you know what the 3 or the 5 stood for?

5   A    Code words for locations or safe houses or safe

6   locations.

7   Q    So when Nariz told you that he was at the 3, what did you

8   say to him?

9   A    I said, no, he's not, and I asked him one more question:

10  Where are you taking the birria tomorrow?

11  Q    That's B-I-R-R-I-A.

12  A    Yes.

13  Q    What does that mean?

14  A    Birria it's a goat soup, goat stew.

15  Q    Why did you ask him about the goat stew?

16  A    I used that question because if I -- once I knew he

17  was -- if I used birria he would know that I was -- that I

18  knew he was lying to me and I was on to him, I knew more about

19  him than he thought.

20  Q    And what happened when you asked Nariz about this?

21  A    So when I asked him, he put his head down and his eyes

22  kind of rolled back wide, his air kind of left and he said,

23  he's at the 5.

24  Q    At some point in time did you come to learn where the 3

25  and 5 were?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ – DIRECT – GOLDBARG

1    A    Yes, ma'am.

2    Q    How did you find out?

3    A    Nariz took us there.

4    Q    So after Nariz told you who's at the 5, what did you do

5    next?

6    A    Advised the marines to have Nariz go in the passenger

7    side of his vehicle, have a marine drive and two marines

8    behind.  I told them grab all the remote controls in the

9    vehicles or other vehicles around in the house, remote

10   controls of the garages, I mean.  And he would take us there.

11   Q    He being who?

12   A    Nariz.

13   Q    Where is the first location you went to?

14   A    The 5.

15   Q    For the witness, I'm showing you what's been marked as

16   Government Exhibit 219-2 for identification.

17            MR. BALAREZO:  No objection.

18            THE COURT:  219-2 received.

19            (Government Exhibit 219-2, was received in

20   evidence.)

21   Q    Publishing Government Exhibit 219-2.

22            (Exhibit published.)

23   Q    Agent Vasquez, what are we looking at here?

24   A    House 5.

25   Q    Now, how did you get there?

VAZQUEZ - DIRECT - GOLDBARG

1   A    I didn't want to take all the marines in a convoy marked

2   units, so I wanted Nariz to be in his vehicle, the same

3   vehicle that Guzman Loera would recognize in case he saw him,

4   in case Guzman was looking out the window.  So I used that

5   vehicle with my vehicle and another unmarked vehicle behind

6   us.  I told the marine driving, I said, Listen, when he tells

7   you to make a left, make a left.  When he tells you to make a

8   right, right.  Once you reach the last turn before the houses

9   in the street, you stop, you don't know go.

10  Q    Why did you give the marine that instruction?

11  A    I wanted us close enough, the closest possible to the

12  residence without raising any alert or any suspicion from

13  anybody around in unmarked vehicles.  Three vehicles at the

14  most, Nariz's car, and two vehicles of marines behind him.

15  Q    So what happened next?

16  A    As we traveled, maybe it was 15 minutes of turns and

17  lefts and the marine finally reach out to me, I had my radio

18  right here, he said, Vic --

19            MR. BALAREZO:  Objection.

20            THE COURT:  Overruled.

21  A    He said, Nariz told me that once I make this right the

22  house is on this street.

23  Q    And after the marine told you that, what did you do next?

24  A    I said, Good, don't move park your car there.  I reached

25  out to my marine sergeant, Mexican Marine sergeant that was

VAZQUEZ - DIRECT - GOLDBARG

1    with me, as he called everybody here at our location, surround

2    the neighbor again, nobody in, nobody out.  Once we make that

3    turn it's going to be a go and we need to have a good

4    perimeter.

5    Q    What happened next?

6    A    We waited for the marines to build a perimeter around

7    their location.  Once my sergeant said everything is good,

8    confirm, okay, and I told the marine, make a right.  The two

9    marines behind in the back seat, start using the remote

10   controls to the garage.  I said, whatever house opens,

11   whatever house opens, that's your house.

12   Q    What happened next?

13   A    As the marines made the right, I was maybe 200, maybe

14   150 meters behind it so I hurried up.  I can see them going

15   down the street and I'm behind it and I see a door, a garage

16   door open roll up.

17   Q    What did you do next?

18   A    I was actually surprised that it actually worked.  I was

19   like, whoa, there it is.

20        Nariz -- the marine with Nariz parked right past the

21   residence, I went straight to the opening of the garage, I

22   parked my car right in the opening, I got out and

23   automatically immediately observed what we were looking at.

24   Q    What was that?

25   A    It was a house, you see it has metal railings protecting

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    on the windows, the lights upstairs were on.  The marines in

2    my vehicle along with the other marines that were surrounding

3    the perimeter immediately went up into the entry of the garage

4    and --

5    Q    Before they got to the garage, did you give the marines

6    any instructions as to where to go once they got into the

7    house?

8    A    Yes.

9    Q    What prompted you to give them those instructions?

10   A    A communication from domestic office.

11   Q    Which domestic office?

12   A    HSI Nogales.

13   Q    And what was that information?

14   A    I said, don't waste your time with the upstairs, go

15   straight to the master bedroom bathroom.

16   Q    Why did you instruct the marines to go straight to the

17   bathroom?

18   A    Because I knew he was using tunnels to move from location

19   to the other locations.

20   Q    So what happens when they get to the door?

21   A    When they get to the door, the marines use a ram, a

22   battering ram --

23   Q    What's a battering ram?

24   A    It's a device about this big, maybe shorter, some are

25   cylinder, some are square.  You use them like to make entry.

VAZQUEZ - DIRECT - GOLDBARG

1   Law enforcement uses them all the time to make entry during

2   search warrants.

3           It takes them about eight, nine minutes to get in.

4   They break one, they call for the other one.  They come in and

5   get the second ram going.  They are telling us, hey, it's a

6   fortified door, it's a metal door, it's hard to get in.  I

7   said, keep going, keep going, don't waste your time upstairs

8   go to the straight to master bedroom bathroom when you get in.

9   Q    Had you ever used a battering ram before?

10  A    Yes.

11  Q    How many times in your experience have you had one break

12  trying to get into a door?

13  A    None.

14  Q    As the marines are trying to get into the door with the

15  battering ram, what are you doing?

16  A    I'm standing back and I'm communicating with the marines.

17  The captain is running around and I'm -- he's advising

18  everything -- the perimeter is secure.  I said nobody in or

19  out, tire flats ready, everybody gets stopped and questioned.

20  We need to surround, secure the whole neighborhood.

21  Q    What's a tire flat?

22  A    A tire flat is a device used by law enforcement or

23  military to throw on the street to make a vehicle that's

24  running fast or going away or trying to evade get a flat tire.

25  Q    Were the Mexican Marines able to enter the house?

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

VAZQUEZ - DIRECT - GOLDBARG

1   A      Yes.

2   Q      What happened next?

3   A      As I heard the marines -- I'm still standing in front of

4   the garage, I heard the marines go in 'cause I heard the rams

5   go down and make entry.  I waited maybe what seemed to be

6   forever but it was more like 10, 15 seconds and on my radio

7   said, "tunel," "tunel," "tunel," which means tunnel, tunnel,

8   tunnel.  Then I heard a big bam sound.  After the bang sound I

9   waited for any gunfire because that would tell me who

10  detonated, I didn't hear any gunfire after the bang so I knew

11  the marines had detonated.

12  Q      What did they detonate?

13  A      A flash bang.

14  Q      Why did they do that?

15  A      Once they saw the tunnel opening, it's probably not a

16  good idea to go down there and see who is down there.  You

17  don't know who's waiting for you to go down there, so they had

18  to detonate a flash bang to.

19  Q      What happens when you detonate a flash bang?

20  A      Obviously makes a big sound, big noise.  The walls

21  rattle, stuff on the walls comes down, the lights go out.

22  There's smoke, a little smoke is in the close -- especially in

23  the area like that a bathroom or master bedroom there is a lot

24  of smoke comes out.

25  Q      Where did you go?  Did you enter the house at this time?

VAZQUEZ - DIRECT - GOLDBARG

1    A    No.

2    Q    Where did you go?

3    A    I'm still outside, I hear the sound and I know the

4    marines have found a tunnel, so my priority is to say, okay, I

5    had marines -- we had marines going in there now, let's make

6    sure everything is secure and he's not coming out of the

7    manhole covers.  And we got a good perimeter.

8            So I'm running around making sure everybody is in

9    place.  Some marines are stopping people on the street.  I

10   quickly go, that's not him, let him go.  Boom, boom, boom.

11   There's marines all over the place, action on the radio.  The

12   captain is yelling, hey, do this, do that, make sure you

13   secure.  The marines that are following him say we hear him,

14   we hear him up front, we hear him up front.

15   Q    When the marines are saying, we hear him, we hear him,

16   what do you understand that to mean?

17   A    As they hear Guzman Loera in front in the tunnel.

18   Q    At some point in time did you go in the house?

19   A    Yes.

20   Q    When you say that you're setting a perimeter, what does

21   that mean?

22   A    Staging marines in corners, different layers or different

23   circular perimeters around the block making sure that you

24   identify anybody that's trying to leave or entering, which is

25   easy because it was probably four in the morning 3:30 in the

5557

VAZQUEZ - DIRECT - GOLDBARG

1   morning on a Monday morning so there was not a lot of traffic,

2   so that was really easy to do because, you know...

3   Q    How wide was the perimeter that you set up?

4   A    About two blocks.

5   Q    So what happens when you go inside of the house?

6   A    When I go in, the marine points, direct me to what is

7   enter through my right, I go in, I observe, I go down because

8   the marines are now relaying it's very hot, very humid --

9   Q    You go down where?

10  A    Into the tunnel.  And as I go in, I go in maybe 15,

11  20 feet and I said, wow, this is really hot and I'm going have

12  issues going through here because it's really -- some parts

13  they're telling me, hey, it's very -- "muy chiquito," "muy

14  chiquito."

15  Q    What does that mean?

16  A    Very small areas where the marines -- I mean even they

17  are having trouble getting in there because of the size of the

18  tunnel and the conditions.

19  Q    Agent Vasquez, how tall are you?

20  A    6'2".

21  Q    Were you able to easily maneuver in that tunnel?

22  A    In the beginning, yes, but you can tell as you keep going

23  you're going to be basically crouched the majority of the

24  time.

25  Q    What decision did you make?

VAZQUEZ - DIRECT - GOLDBARG

1    A    I go back out and I start telling the marines, okay,

2    don't go any more in the bathtub.  Let's start using these

3    manhole covers because if he's down here, as we're getting

4    reported by the radio, let's start opening these manhole

5    covers.  Some were square like you have here in New York,

6    square ones, but most of them are circular manhole covers, a

7    little smaller than the ones in the U.S.  And marines are

8    saying, hey, you can't go in there with your long gun because

9    it's too -- at some point you can't -- I mean it's going to be

10   cumbersome.

11   Q    So what happens?

12   A    I was there with the captain, I said, Captain, maybe you

13   should ask volunteers without their long guns and without

14   their vests because this is -- the vest is going to make them

15   really hot.  The captain said okay only handguns and take your

16   vest off, volunteers only.

17   Q    How many people volunteered?

18   A    Every single marine volunteered.

19   Q    What did they do next?

20   A    As they were going down I had some chem lights in my

21   cargo pocket.

22   Q    What is a chem light?

23   A    Chem light is like, I don't know, artificial, a chemical

24   light used to really -- kids use them on Halloween, chem

25   light.  I cracked a few open and I handed them out to each

VAZQUEZ – DIRECT – GOLDBARG

1   marine going in and I said, "Hey, vaya con Dios, ale."

2   Q    What does that mean in English?

3   A    Go with God.

4   Q    So after the marines volunteered to go down in the

5   manholes, what did you do next?

6   A    Can you repeat again.

7   Q    Yes.  After the marines volunteered to go into the

8   manholes, what did you do next?

9   A    As I'm sending them off, and I stayed there for a little

10  bit, again secured everybody, all the marines that are not in

11  the manhole covers are ready on standby and then I make my way

12  back to the house.

13  Q    Do you grab anything before you go into the house?

14  A    Yes.

15  Q    What do you grab?

16  A    I go to my vehicle and I turn on my GoPro.

17  Q    What's a GoPro?

18  A    A device used to record video.

19  Q    Did you record your entry into the house the second time?

20  A    Yes.

21  Q    Showing you for identification Government Exhibit 219-31.

22       MR. BALAREZO:  No objection, Your Honor.

23       THE COURT:  Received.

24       (Government Exhibit 219-31, was received in

25  evidence.)

VAZQUEZ - DIRECT - GOLDBARG

1   Q    What's in evidence now as 219-31, I'd like to play two

2   clips.  The first clip for the record is zero seconds to 45

3   seconds.

4            Agent Vasquez, I would like to ask you to narrate

5   what we're seeing as the video is playing.  If we can also dim

6   the lights.  Thank you.

7            (Video recording played.)

8   A    So that's where my vehicle is at.  I'm walking towards

9   the garage door entry.  I'm making my way into the front door,

10  foyer.  You can see there is a marine standing there and the

11  metal door that was so hard for marines to get in there.

12  There's two rams on the ground.  I'm telling the marine that

13  Nariz had notified Condor, but Condor never got the message

14  that we were coming --

15  Q    What are we looking at here?

16  A    -- you see the entry here of the upstairs and the kitchen

17  area, living room.  You see a frame down because of the

18  explosion, and then you have the master bedroom the lights are

19  completely out, you see the entry to the tunnel underneath the

20  bathtub.

21  Q    That light that we're seeing, was that the entry to the

22  tub?

23  A    Yes.

24  Q    That's at about 38 seconds.

25            Now, at that time you see a painting that's on the

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1  sofa, do you know why it was on the sofa?

2  A    Because of the explosion.

3  Q    Now we're going to play the second clip.  Sorry.  Which,

4  for the record, is from one minute 26 seconds to two minutes

5  53 seconds.

6           (Video recording played.)

7           Now right there on the right-hand side, what do we

8  see on the screen?

9  A    You see like a little command -- not a command center, a

10  place to set up a camera or closed circuit TV.

11  Q    Where you now?

12  A    This is the master bedroom.

13  Q    Where is that?

14  A    There's the tunnel, it's like a vent.  You see the

15  bathtub being pulled up.  It's assisting -- somebody pulls it

16  up it's assisted by two shock absorbers.

17  Q    What else is happening as you're inspecting the bathroom?

18  A    I have a few of the marines coming back.  These are a few

19  of the ones that went into the tunnel originally, they are

20  coming back.  They're absolutely exhausted.  As you can see,

21  they are not very tall but even them had issues with it.

22  Trying to help them get out of that.

23  Q    It looks like there is a sledgehammer at the side of the

24  tub, what was that for?

25  A    That was used to just make sure the tub didn't fall on

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    anybody as far as the Mexican Marines.

2    Q    And what is the physical state of the marines as they are

3    coming out?

4    A    They're tired, exhausted.  They're telling me, oof, it's

5    extremely hot down there.  We went ahead and were relieved by

6    other marines that were going into the manhole covers.

7    Q    By this time approximately how much time had you spent at

8    this location, approximately?

9    A    It was so -- I don't know, maybe an hour.

10   Q    Did you find the defendant at this house?

11   A    No.

12   Q    So after you searched the tunnel, what did you do next?

13   A    Regrouped and regathered, kept going.

14   Q    Where did you go next?

15   A    We still had Nariz, so we had Nariz take us to the next

16   location.

17   Q    Before we move on to the next location, I'd like to show

18   you what's been marked for identification as Government

19   Exhibit 219-8.

20        Do you recognize that photo?

21   A    Yes.

22   Q    What is that photo?

23   A    That's me coming out of the tunnel.

24   Q    Is that a true and accurate depiction of you at that

25   time?

VAZQUEZ - DIRECT - GOLDBARG

1   A      Yes.

2   Q      The government moves to admit --

3          MR. BALAREZO:  No objection.

4          THE COURT:  Received.

5          (Government Exhibit 219-8, was received in

6   evidence.)

7   Q      The government will ask to publish Government

8   Exhibit 219-8.

9          (Exhibit published.)

10         This is the entry of what tunnel, of what tub?  Is

11  that the house we just looked at?

12  A      Yes, house 5.

13  Q      On the left and the right-hand side we see certain

14  objects that I just marked in green, can you describe what

15  those objects are?

16  A      Chucks used to help assist in pulling the bathtub up.

17  Q      Now, you go to the next location, what day is that?

18  A      Still the same day, February 17th, 2014.

19  Q      Does Nariz go with you to this location?

20  A      Yes.

21  Q      Showing you for identification purposes Government

22  Exhibit 219-3.

23         MR. BALAREZO:  No objection.

24         THE COURT:  Received.

25         (Government Exhibit 219-3, was received in

VAZQUEZ - DIRECT - GOLDBARG

1    evidence.)

2    Q     Moving into evidence, 219-3 and publishing to the jury.

3          (Exhibit published.)

4          Agent Vasquez, what are we looking at in this photo?

5    A     That's the second location we went to that Nariz took us

6    to.

7    Q     What happened when you got there?

8    A     Marines made entry, located the tunnel.

9    Q     Did you find anyone inside?

10   A     No, ma'am.

11   Q     What did you do after you entered into this location?

12   A     We immediately kept going.  At each location, house 5,

13   this location.  Once we -- the marines made entry, secured it,

14   checked it, make sure nobody was inside or around the area, we

15   moved to the second location and we always left marines behind

16   to secure it to make sure nobody would come back in.

17   Q     Why were you doing this?

18   A     If we made entry and nobody was there we wanted to keep

19   going, I wanted to keep going because we didn't have enough

20   time, the light -- the sunlight is coming up, word is going to

21   get out that we're going around.  An associate can get the

22   word out, hey, they're going to all these houses, go to this

23   house take this out before they get there.  I wanted to go

24   through the whole house location, warehouses, associate houses

25   that Nariz was aware of before anybody -- an associate of

VAZQUEZ - DIRECT - GOLDBARG

1   Guzman Loera could get to that house and take anything out, I

2   wanted to hit everything in place.

3   Q    So after you went to this location, where did you go

4   next?

5   A    To a third location.

6   Q    Showing you for identification purposes, Government

7   Exhibit 219-4.

8            MR. BALAREZO:  No objection.

9            THE COURT:  Received.

10           (Government Exhibit 219-4, was received in

11   evidence.)

12   Q    Moving into evidence 219-4 and publishing to the jury.

13           (Exhibit published.)

14   Q    Agent Vasquez, what are we looking at here?

15   A    That's the third location that we went to.

16   Q    Was Nariz still with you?

17   A    Yes.

18   Q    Does Nariz enter the house with you?

19   A    Yes.

20   Q    What, if anything, do you see Nariz do or observe him do?

21   A    Nariz shows myself and the marines how to get into the

22   tunnels.

23   Q    What did you observe him do?

24   A    I observed him grab a piece of metal or a little piece of

25   wire with the two ends bare, insert it into the outlet of the

VAZQUEZ - DIRECT - GOLDBARG

1    vanity, underneath the vanity mirror.  Once he does this

2    there's a little sound, a crackling sound from the bathtub

3    which separates the sealant of the bathtub from the base.

4    Q    Did you take a video of Nariz opening the bathtub?

5    A    Yes, ma'am.

6    Q    Showing you for identification purposes what's been

7    marked Government's Exhibit 219-32.

8            Do you recognize this video?

9    A    Yes.

10   Q    I'm sorry, do you recognize this CD?

11   A    Yes.

12   Q    How do you recognize it?

13           MR. BALAREZO:  No objection.

14           THE COURT:  Received.

15           (Government Exhibit 219-32, was received in

16   evidence.)

17           MS. GOLDBARG:  Admitting into evidence 219-32.

18           I'd like to play this for the jury, I'd like the

19   lights dimmed as well.

20           Can you narrate also for us as the video is playing

21   what it is we're looking at?

22   A    So Nariz is standing right underneath the vanity and he's

23   inserting piece of wire into the outlet.  Once it's down,

24   there is a sound, there's a marine taking a picture he's

25   asking where's it at, Nariz says over here, and you can see

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1  the white crackling come apart from the bathtub, from the

2  base, and we asked to Nariz to lift it.  He's having issues,

3  but that's one of the shock absorbers coming to assist

4  anybody, now it makes it easy for him to lift it.

5          MS. GOLDBARG:  Pause it there.

6          (Video recording paused.)

7  Q    In the back we something black, what is that?

8  A    This part here?

9  Q    Yes.  Actually we have a photo.  Yes, we'll do it with

10  the photo.  Keep going.

11          (Video recording played.)

12  A    So we asked Nariz, hey, which one is this, he gave us the

13  number.

14  Q    Keep playing.  Is that Nariz still with you?

15  A    That is Nariz.

16  Q    At this time did you go into this tunnel?

17  A    No.

18  Q    Showing you for identification --

19          THE COURTROOM DEPUTY:  One second.

20  Q    -- what's been marked as Government Exhibit 219-7.

21          Do you recognize this photo?

22  A    Yes.  Yes.

23  Q    What is it?

24  A    It seems to be a still image of the tunnel that Nariz

25  showed us.

VAZQUEZ - DIRECT - GOLDBARG

1    Q    Is it a fair and accurate depiction of the photo?

2              MR. BALAREZO:  No objection, Your Honor.

3              THE COURT:  Received 219-7.

4              (Government Exhibit 219-7, was received in

5    evidence.)

6              MS. GOLDBARG:  I'm trying to clear the red mark on

7    there.

8              THE COURTROOM DEPUTY:  Do you have something on the

9    monitor?

10             MS. GOLDBARG:  I do not.

11   Q    What's the color of the underside of the tub in this

12   photo?

13             MR. BALAREZO:  We'll stipulate it's red, Your Honor.

14             THE COURT:  It's easy to let the witness answer.

15   Q    Answer the question.

16   A    Reddish color.

17   Q    Why didn't you go into the tunnel?

18   A    Nobody in the residence and we wanted to keep going.

19             MS. GOLDBARG:  We're having technical difficulties

20   here, sorry.

21   A    When I say I didn't go in the tunnel, it doesn't mean

22   marines didn't go into the tunnel, but I didn't go in the

23   tunnel.

24             MR. BALAREZO:  Objection.  There is no question.

25             THE COURT:  All right.  That answer is stricken.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5569

VAZQUEZ - DIRECT - GOLDBARG

1      Do you have another question?

2          MS. GOLDBARG:  Yes.

3   Q    Are you aware of whether or not any other marines went

4   into the tunnel at that location?

5   A    No, I'm not aware.

6   Q    After Nariz opened the tunnel for you, what did you do

7   next?

8   A    Nariz took us to the next location.

9   Q    Showing you for identification --

10         MR. BALAREZO:  No objection, Your Honor.

11         THE COURT:  219-5 received.

12         (Government Exhibit 219-5, was received in

13  evidence.)

14         MS. GOLDBARG:  Thank you.  Moving into evidence

15  219-5 and publishing to the jury.

16         (Exhibit published.)

17  Q    What are we looking at here?

18  A    That was next location after he showed us the tunnel.

19  Q    What happened when you got here?

20  A    As we arrived, you see the entry to the garage, I noticed

21  the marines were standing there and I walked towards there.

22  The marines are having difficulty, the hard time opening the

23  door from inside the garage.

24  Q    Were you still recording entries into the house at this

25  time?

VAZQUEZ - DIRECT - GOLDBARG

1    A    Yes.

2    Q    Showing you for identification purposes --

3         MR. BALAREZO:  No objection.

4         MS. GOLDBARG:  Moving into evidence without

5    objection, Government Exhibit 219-20.

6         THE COURT:  Received.

7         (Government Exhibit 219-20, was received in

8    evidence.)

9         MS. GOLDBARG:  Thank you.  And we have two clips

10   from this video.  I ask we play the first one at this point in

11   time which, for the record, is from 36 seconds to two minutes

12   and 17 seconds.

13        (Video recording played.)

14   Q    If you can describe what we're looking at as the video is

15   playing.  Approximately what time is this?

16   A    4:30, five.

17   Q    In the morning?

18   A    Yes.  The same day, February 17th, 2014.

19   Q    What are we seeing here?

20   A    I'm making my way up to the garage entry, I see some of

21   the marines standing by.  As you can see in the back there's

22   marines using a ram attempting to make entry to go into a

23   door.  I walk over to see and I notice there's two metal doors

24   again reinforced.

25   Q    What are we observing here at about --

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    A    Marines are rotating, taking turns using the ram to make

2    entry.

3    Q    Is it common to see this level of effort needed to --

4    with a ram?

5              MR. BALAREZO:  Objection.

6              THE COURT:  Overruled.

7    Q    In your experience?

8    A    No.

9    Q    What do we see here?

10   A    Another marine taking a turn at the ram.

11   Q    Is he making any progress?

12   A    A little bit.

13   Q    What do we see there?

14   A    Another marine attempting to insert -- trying to insert a

15   bar, a metal bar in there as the other marine hits it.

16   Q    The videos -- the audio has been turned off for a few

17   seconds, what are we listening to there?

18   A    Banging of the ram on the metal doors.

19   Q    How many people attempted to gain entry into that door?

20   A    Seven to eight, maybe more.

21   Q    If we could play the second clip of this video and, for

22   the record, it's three minutes 36 seconds to four minutes

23   three seconds.

24              (Video recording played.)

25   Q    What are we observing here?

VAZQUEZ - DIRECT - GOLDBARG

1    A    Another marine again trying to open that door.

2    Q    What do we see here in about 15 seconds?

3    A    I take the ram, I take my turn at it.

4    Q    How heavy is that ram?

5    A    Seven -- seven, eight pounds.

6    Q    What is it made out of?

7    A    Metal.

8    Q    Were you able to gain entry?

9    A    Not me.

10   Q    Were the marines eventually able to get into this

11   location?

12   A    Yes.

13   Q    How long did it take to get in?

14   A    It took a while.  I couldn't tell you how long exactly it

15   took.

16   Q    So what happened once you finally entered into the house?

17   A    As marines made entry they went inside and I went back to

18   talk to the captain, the marine captain and to our next stop.

19   Q    Was anything found inside of this house?

20   A    Yes.

21   Q    Did you take inventory of the items as you were going

22   through the houses, or did you do that later?

23   A    I did that later.

24   Q    Where did you go next?

25   A    To the next location that Nariz took us to.

5573

VAZQUEZ - DIRECT - GOLDBARG

1   Q    Showing you for identification Government Exhibit 219-6.

2   What is this, Agent Vasquez?

3   A    That's the next location we -- Nariz took us.

4   Q    Is this a fair and accurate depiction of the location

5   that you went to afterwards?

6   A    Yes.

7        MS. GOLDBARG:  At this time the government move to

8   government exhibit 219-6 into evidence.

9        MR. BALAREZO:  No objection.

10       THE COURT:  Received.

11       (Government Exhibit 219-6, was received in

12  evidence.)

13       MS. GOLDBARG:  Seek to publish.

14       (Exhibit published.)

15  Q    Agent Vasquez, what are we looking at here?

16  A    The entry of the garage of the residence.

17  Q    And what day is that you arrive at this house?

18  A    February 17th, 2014.

19  Q    Did you find anyone inside of this house?

20  A    No.

21  Q    So what did you do next?

22  A    We continued on with Nariz.

23  Q    Where did you go, where did he take you next?

24  A    Other associates' locations, warehouses, Condor's

25  residence.

VAZQUEZ - DIRECT - GOLDBARG

1    Q    Did you find the defendant in any of those locations?

2    A    No.

3    Q    At some point in time do you return to the five houses

4    that we just saw photos of?

5    A    Yes.

6    Q    When was that?

7    A    The same, the same day.

8    Q    Showing you for identification purposes 219-9, 10 and 11.

9    Do you recognize these photos?

10   A    Yes.

11              MR. BALAREZO:  No objection, Your Honor.

12              THE COURT:  Received.

13              MS. GOLDBARG:  The government would move to admit

14   into evidence.

15              (Government Exhibit 219-9, 10, 11, were received in

16   evidence.)

17   BY MS. GOLDBARG:

18   Q    Starting with Government Exhibit 219-10, what are we

19   looking at here?

20   A    It's a picture of myself standing in front of narcotics.

21   Q    Looking at 219-9, what are we looking at here?

22   A    It's another picture of the narcotics, methamphetamine.

23   Q    Did you inspect these packages?

24   A    Yes.

25   Q    What did you observe?

VAZQUEZ - DIRECT - GOLDBARG

1   A    When I grabbed or picked up a package it had the same

2   feel that of methamphetamine, it's a crystalline feel of it,

3   crackling inside.  It wasn't the same as cocaine.  Cocaine is

4   a powder form packed into a kilo shape or can be any other

5   shape.

6   Q    Had you seen packages like this before with your years

7   with the DEA?

8   A    Absolutely.

9   Q    How many packages of this drug was found at this

10  location?

11  A    Over 2800 packages.

12  Q    Showing you what's now in evidence, 219-11.  What are we

13  looking at there?

14  A    Looking at plastic boxes of plastic bananas, fake

15  bananas.

16  Q    What did you do with these?

17  A    Just took a picture.  I observed them and the marines

18  picked one up and I felt the plastic material it was made out

19  of.

20  Q    Can you describe what it was?

21  A    It was plastic banana like.

22  Q    Was there anything on the inside?

23  A    Oh, substance believed to be cocaine.

24  Q    At what location did you find these items?

25  A    At the one where the marines were having a hard time

5576

VAZQUEZ - DIRECT - GOLDBARG

1    entering.

2    Q    Showing you Government Exhibit 219-5, is that the

3    location?

4    A    That's it.

5    Q    Showing you for identification purposes 219-12 and

6    219-13.

7            MR. BALAREZO:  No objection.

8            THE COURT:  Received.

9            MS. GOLDBARG:  Move into evidence 219-12 and 219-13.

10           (Government Exhibit 219-12 and 219-13, were received

11   in evidence.)

12   Q    Did you take a video of any of the evidence we're looking

13   at?

14   A    Yes.

15           MR. BALAREZO:  No objection.

16           MS. GOLDBARG:  Moving into evidence 219-24.

17           THE COURT:  Received.

18           (Government Exhibit 219-24, was received in

19   evidence.)

20           MS. GOLDBARG:  If I can play, Your Honor, for the

21   jury, the video -- yes, I'm sorry, 219-24.

22   Q    Can you narrate for us what we're looking at.

23           (Video recording played.)

24   A    This is a video of ammunition, handguns, grenades, a

25   holster, and two RPGs.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    Q     I'm showing you what's in evidence as 219-12, what are we

2    looking at here?

3    A     It's a photograph of the video I took.

4    Q     Can you circle the RPGs that you mentioned before.

5          (Witness complies.)

6    Q     And what's right above the RPGs?

7    A     Four grenades, hand grenades.

8    Q     And what about the object in the middle that's on a

9    tripod with the red handle?

10   A     That's the device used to launch the RPGs.

11   Q     Right above that there's a box with items in it?

12   A     Ammunition.

13   Q     Showing you 219-13, what are we looking at here?

14   A     A set of three handguns on the ground.

15   Q     Surrounded by?

16   A     Ammunition, magazines and right beside the RPG launcher.

17   Q     I'm zooming in on one of the handguns on the left, can

18   you describe what we're looking at there?

19   A     You see the diamond encrusted initials, JGL.

20   Q     Now in the video, the first video that we looked at you

21   said that there was a closed circuit TV.  I'm showing you for

22   identification purposes 219-14.

23          What are we looking at here?

24          MR. BALAREZO:  No objection.

25          MS. GOLDBARG:  Moving into evidence 219-14 asking to

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

                    VAZQUEZ - DIRECT - GOLDBARG

1    publish to the jury.

2              THE COURT:  Received.

3              (Government Exhibit 219-14, was received in

4    evidence.)

5              (Exhibit published.)

6    Q    Agent Vasquez, what are we looking at in this photo?

7    A    You're looking at two monitors with plastic cables and

8    used for closed circuit TV to see what's outside of the

9    residence.  The majority of the houses that we hit had this

10   system where they can be inside and see what was going on

11   outside, who is driving on the streets, who is knocking on the

12   door, who is coming and going.

13   Q    Is that what you mean by closed circuit?

14   A    Yes.

15   Q    In how many houses did you find this type of system?

16   A    The majority.

17   Q    Did you find any personal effects in any of these houses?

18   A    Yes.

19   Q    Showing you for identification purposes what's been

20   marked Government Exhibit 219-15.

21             MR. BALAREZO:  No objection.

22             MS. GOLDBARG:  Move into evidence Government

23   Exhibit 219-15.

24             THE COURT:  Received.

25             (Government Exhibit 219-15, was received in

5579

VAZQUEZ - DIRECT - GOLDBARG

1    evidence.)

2    Q     Also what's in evidence as Government Exhibit 219-15.

3    Agent Vasquez, can I ask you to describe what we're looking at

4    here?

5    A     A photo of Mr. Guzman Loera's family.

6    Q     Who do you recognize in this photo?

7    A     I recognize the top, top two on the right.

8    Q     Can you circle the people you recognize.

9               (Witness complies.)

10   Q     Who do you recognize those to be?

11   A     Those are Ovidio and Joaquin.

12   Q     What relation do they have to the defendant?

13   A     They are Mr. Guzman Loera's sons.

14   Q     Do you recall which house you found this in?

15   A     I cannot recall which one it was.

16   Q     At some point in time when you're reviewing what's been

17   found in these houses, did you also go back to inspect the

18   tunnels?

19   A     Yes.

20   Q     Did you take a video of the tunnels?

21              Showing you for identification purposes -- actually

22   it's in evidence, 219-33.

23              Have you reviewed this video, Agent Vasquez?

24   A     I have to look at it.

25   Q     Have you reviewed this video?

VAZQUEZ - DIRECT - GOLDBARG

1    A    Oh, yes.

2    Q    Is this a video you took?

3    A    No.

4    Q    Does this video accurately depict part of the tunnel that

5    you went through?

6    A    Yes, at some point.

7    Q    For the record, we're playing just a clip from 52 seconds

8    until one minute 25 seconds, and, Agent Vasquez, if you could

9    narrate for us what it is that we're seeing in this video.

10              (Video recording played.)

11   A    So this reporter is going into the tunnel.  Those are

12   consistent with the tunnels that I observed, the wood paneling

13   with the lights to a certain point.  And he's making his way

14   up to the drainage to go out to the city.

15   Q    Do you recognize that location right there?

16   A    Yes, that's the tunnel that Nariz showed us opening, you

17   can see the -- you can still see the sealant on ground there.

18              MS. GOLDBARG:  Thank you.

19   Q    Now, how many days did you spend in Culiacan searching

20   these houses?

21   A    About four days.

22              (Continued on the next page.)

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

VAZQUEZ – DIRECT – GOLDBARG

1          (In open court.)

2     DIRECT EXAMINATION

3     BY MS. GOLDBARG (continuing):

4     Q     What were you doing during those four days?

5     A     My or our idea was to flush him out of the city.

6     Q     What do you mean by that?

7     A     To make it hard for him to ever come back to Culiacan.

8     What do I mean by that?  Is I want to take out every tunnel he

9     has, via Nariz, take out his infrastructure, all residences,

10    associates, or his associates, make it hard for him to, once

11    we leave, for him to come back to the city and just begin

12    again.

13    Q     So does the operation end in Culiacan?

14    A     No.

15    Q     Do you continue searching for the defendant in Culiacan?

16    A     No.

17    Q     Where did you go?

18    A     We go to Mazatlan.

19    Q     Where is Mazatlan?

20    A     Mazatlan is a fishing town about an hour and 15 minutes

21    south of Culiacan.

22    Q     I'm showing you what's in evidence as Government

23    Exhibit 506-19:

24          Can you mark for us on the map where is Mazatlan.

25    On what date did you go to Mazatlan?

*MICHELE NARDONE, CSR -- Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    A    February 21, 2014.

2    Q    What prompted you to go from Culiacan to Mazatlan?

3    A    An interview of the plaza boss, of Picudo, and

4    information from domestic offices.

5    Q    Who is Picudo?

6    A    Picudo was the plaza boss in Culiacan for Guzman Loera

7    and the Sinaloa Cartel.

8              MR. BALAREZO:  Objection.

9              THE COURT:  Ask another question.

10   Q    Based on your investigation, did you learn what role

11   Picudo had in the organization?

12   A    Yes.

13   Q    What's that?

14             MR. BALAREZO:  Objection.

15             THE COURT:   Overruled.

16   A    As the plaza boss in Culiacan.

17   Q    Was Picudo detained?

18   A    Yes.

19   Q    What date?

20   A    February 17, evening.

21   Q    Were you present?

22   A    Yes.

23   Q    I'm showing you what's in evidence as Government

24   Exhibit 68.

25             MR. BALAREZO:  No objection.

*MICHELE NARDONE, CSR -- Official Court Reporter*

VAZQUEZ – DIRECT – GOLDBARG

1          MS. GOLDBARG:  It's in evidence.

2          THE COURT:  Received.

3     Q    Who is that?

4     A    Picudo.

5     Q    You said there was information from Picudo that caused

6     you to go to Mazatlan.

7          What was that information?

8          MR. BALAREZO:  Objection.

9          THE COURT:  Overruled, not being offered for the

10    truth.

11    A    When Picudo was detained by the marines, the marines

12    interviewed him, and I was present and he told the marines a

13    conversation he had with Guzman Loera.

14    Q    Did he provide information -- what did he say?

15         MR. BALAREZO:  Objection.

16         THE COURT:  Overruled.

17    A    He told the marines that Guzman Loera had contacted him

18    early that morning to meet him at a location where Guzman

19    Loera was waiting for him.  Picudo got up in his vehicle,

20    traveled to that location that was asked by Guzman Loera.

21         When he arrived at the location Guzman Loera was --

22    I believe he said he was just wearing pants.  There were two

23    females with him and Condor.  Mr. Guzman Loera was very quiet,

24    very pensive, didn't say much.

25         All he told Picudo was take me to Mazatlan, hand me

MICHELE NARDONE, CSR -- Official Court Reporter

5584

VAZQUEZ - DIRECT - GOLDBARG

1    over to Bravo Aponte.

2    Q     Who is Bravo Aponte?

3    A     Bravo Aponte is the plaza boss for Sinaloa Cartel in

4    Mazatlan.

5                 MR. BALAREZO:  Objection.

6                 THE COURT:  Overruled.

7    Q     What preparations did you make to get from Culiacan to

8    Mazatlan?

9    A     Going down to Mazatlan, I didn't want to raise -- I

10   wanted to keep the majority, or we needed to keep the majority

11   of the marines in Culiacan, to keep the focus of the marines

12   in Culiacan.

13                The idea was to travel in unmarked vehicles, one or

14   two at a time together, without the uniform on, and to leave a

15   majority of the marked Mexican marine trucks behind, just take

16   three.  We went to -- equivalent to a Walmart, had the marines

17   buy sandals, board shorts, beachwear.  We acted like we were

18   just going on -- to the beach as tourists.

19   Q     Why did you do that?

20   A     Not to -- to make it look like we are just going on a

21   Friday afternoon to the beach, to drink, or whatever touristy

22   thing.

23                Once we were ready, we traveled in one at a time,

24   two at a time, going down to Mazatlan with the marked units

25   behind us, always being alert of lookouts or any activity on

*MICHELE NARDONE, CSR -- Official Court Reporter*

VAZQUEZ - DIRECT - GOLDBARG

1    the way down.

2    Q    How long did it take you to travel from Culiacan to

3    Mazatlan on that day?

4    A    About two hours.

5    Q    Did you have to change how you were traveling to

6    Mazatlan?

7    A    Yes.

8    Q    What prompted you to change how it is you were traveling

9    to Mazatlan?

10   A    Information received from HSI's Nogales.

11   Q    What was that information?

12              MR. BALAREZO:  Objection.

13              THE COURT:  Overruled.

14   A    HSI relayed to us on the ground that there was

15   communications between the division known as Pinpo and Condor,

16   alerting them or that there was marines in civilians, civilian

17   wear, going down to a place called Mojolo, marine's boludo

18   leaving the airport.

19              So the lookouts, halcones, were calling out

20   everything that moves.  That's their job.  They call out

21   anything that leaves the airport, leaves north of the city,

22   south of the city, in the city.  They are calling out

23   everything; and that specific conversation, that was reported

24   to Condor from Pipo.

25   Q    Once you received that information, how was it you were

MICHELE NARDONE, CSR -- Official Court Reporter

VAZQUEZ - DIRECT - GOLDBARG

1    approaching Mazatlan?

2    A    Instead of traveling two vehicles together, I decided to

3    have the first vehicle even go farther away, which made us, in

4    a way, more vulnerable.  I alerted the marines of this.  I had

5    a conversation in English and a chat in a Mexican chat.  I

6    alerted the marines of this; and they said, okay, copy, we

7    will be alert.

8    Q    Where did you get to that day?

9    A    Mazatlan.

10   Q    What day is this?

11   A    February 21, 2014.

12   Q    When you arrived at Mazatlan what did you do?

13   A    We gathered in the safe location or command post that we

14   set up, and we went ahead with the plan for the next day.

15   Q    Where did you go the next day?

16   A    The next morning we went to a location known as Hotel

17   Miramar.

18   Q    When did you leave for Hotel Miramar?

19   A    In the morning, 4:00, 4:30, on February 22, 2014.

20   Q    I'm showing you what's been marked for identification as

21   Government's Exhibit 217 -- 219-17.

22         MR. BALAREZO:  No objection.

23         MS. GOLDBARG:  I'm moving into evidence what's been

24   marked Government Exhibits 219-17, 18, and 19.

25         THE COURT:  Received.

VAZQUEZ – DIRECT – GOLDBARG

1          (Government Exhibit 219-17, 219-18, 219-19, were

2     received in evidence.)

3     Q     I'm showing you Government Exhibit 219-17.

4          What do we see there?

5     A     The street with Hotel Miramar.

6     Q     Can you circle where is the hotel.

7          The large building in the middle?

8     A     Yes.

9     Q     Thank you.  Also, now showing you 219-18.

10         Now, what time do you arrive at the hotel?

11    A     4:30, 4:45.

12    Q     Do you encounter any issues as you arrive at the hotel?

13    A     Yes.

14    Q     What were those?

15    A     As we arrived there were two local police units with

16    their lights on, each one facing each way in front of the

17    hotel.

18    Q     Can you mark on Government Exhibit 219-18 where is it you

19    saw those marked police officers?  All right.

20         Why did this cause you --

21    A     Each facing.

22    Q     Why did those cause you concern?

23    A     Once again, the corruption in the state is rampant.  I

24    didn't know if those units were put there by the organization

25    to protect or to see anybody coming in and out of that area.

VAZQUEZ – DIRECT – GOLDBARG

1 So we wanted to be absolutely aware of their presence and

2 maybe attempt to move them out of the way.

3 Q    Were they moved out of the way?

4 A    Yes.

5 Q    On Government Exhibit 219-18, can you circle where is the

6 Hotel Miramar.

7        MS. GOLDBARG:  Just for the record, it's in the

8 middle of the photograph with the blue top.

9 Q    And then you put dots and arrows on either side of that.

10        Is that the location of the police cars that you

11 saw?

12 A    Yes.

13 Q    As you were traveling to Hotel Miramar, how many people

14 are a part of this operation present?

15 A    Twenty-four, twenty five.  Twenty-four.

16 Q    Is this considered a large group for this type of

17 operation?

18 A    No.

19 Q    Why not?

20 A    You are going into a stronghold of the cartel with 24

21 individuals to take control of a hotel that's ten stories and

22 multiple entries and exits and rooms.  It's very, very small.

23 So it was done for a reason, to stay low profile.

24 Q    What happened once you arrived at Hotel Miramar?

25 A    Once we arrived at Hotel Miramar, we had marines in the

*MICHELE NARDONE, CSR -- Official Court Reporter*

VAZQUEZ – DIRECT – GOLDBARG

1   back.  We had already moved the patrol units away.  We had

2   marines in the front.  Now their marked units had come in.

3          I come out of my car.  I make entry into the -- if

4   you are looking at the hotel from the street, I run up --

5   thank you -- this is kind of sort of my view.  I was looking

6   up, and I said, okay, he's got to be in there somewhere.

7          MS. GOLDBARG:  Can we publish 219-19 for the jury,

8   please.  Thank you.

9   Q    So you said this was the vantage point you had when you

10  arrived.

11  A    Yes.

12  Q    What are you looking for?

13  A    I'm looking for anybody opening a window or attempting to

14  jump out of the balcony from the side.  So I have a marine

15  next to me, and I said you need to focus on this whole side of

16  the building, anybody opens a window or tries to pop their

17  head out.  You have to alert us of anybody trying to run out

18  the window.  There is no tunnels in this hotel, I hope, so

19  let's -- he's got to probably run through a window.

20         I had marines in the back, securing that area.

21  There was entries in the back.  There was kind of like a big,

22  open entry.  In front of that is a pool.  So I had that

23  secured.  I had marines out.

24         So our resources were very, very stretched out.

25  Q    Do you stay outside of the hotel?

MICHELE NARDONE, CSR -- Official Court Reporter

VAZQUEZ – DIRECT – GOLDBARG

1    A    I do.

2    Q    What happened next?

3    A    The marines are inside going floor to floor.  I finally

4    get a confirm, saying seven, seven, seven; seven, seven,

5    seven.

6    Q    What does that mean?

7    A    Seven, seven meant gather everything, let's go, let's go,

8    let's go.  We're moving to the next location.

9    Q    When they said confirmed, what did you understand that to

10   mean?

11   A    When they said siete, siete, siete, confirmado, confirmed

12   it.  Means come to the basement.  I knew they had got him,

13   Guzman Loera.

14   Q    What did you do?

15   A    I ran to the basement parking lot.

16   Q    You are making a circular motion with your hand.

17   A    Yes.  If you go down, the parking lot is kind of like --

18   sorry -- you make your way into a circular mode all the way

19   down to the basement.

20        I ran there.  As I approached the entry to the

21   basement, the marines had Mr. Guzman Loera on his knees and

22   they were holding him.  The marines said, please confirm,

23   confirm it is him.  Is it him?  Is it him?  Is it him?

24   Q    Why were the Mexican marines asking you to confirm if the

25   person in front of them was the defendant?

*MICHELE NARDONE, CSR -- Official Court Reporter*

VAZQUEZ – DIRECT – GOLDBARG

1    A    The marines at that time did not have a lot of history

2    working against the Sinaloa Cartel.  They are mostly the Zetas

3    and Gulf Cartel.  I was the one indebted to them with the

4    knowledge of what he looked like or what he would be like, the

5    history, the experience, the training.  The marines were

6    relying on me to make that identification.

7    Q    So what did you do?

8    A    I –– at this moment I walked towards him.  I believe he

9    was here –– from this gentleman –– far away on his knees, and

10   at that point I kind of froze myself and I said, holy, it is

11   him.  And I said –– I took a moment and I looked at him and he

12   kind of looked at me, and I said eres tu, eres tu, Chapo.

13   Q    What does that mean?

14   A    It's you, it's you.

15          I said please stand him up, and at that point my

16   vehicle had been driven behind me, in the parking lot.  As the

17   marines stood him up, I asked them please put him in the back,

18   and one of you marines drive him out.

19   Q    Who else was present at that time with the defendant?

20   A    Oh, yes.  Two baby girls and his wife.

21   Q    Which one?

22   A    Emma Coronel.

23   Q    I'm showing you what's in evidence as Government's

24   Exhibit 45.

25          Is that the person that was with him at Hotel

VAZQUEZ – DIRECT – GOLDBARG

1    Miramar?

2    A    Yes.

3    Q    What happened after the defendant was placed in the car?

4    Where did you go?

5    A    The marines relayed it via the radio to the admiral on

6    the base, in Topolobampo in Culiacan.  He said, take him to

7    the nearest Semar base, which is two kilometers away.

8    Q    Did you go there as well?

9    A    Yes.

10   Q    What happened when you arrived at the base?

11   A    When we arrived at the base the marines took Mr. Guzman

12   Loera to process him.  I walked around.

13   Q    Did you stay in Mazatlan at that time?

14   A    No.

15   Q    Where did you go?

16   A    I went back to Mexico City.

17   Q    How did you get to Mexico City?

18   A    On a Mexican marine Lehr jet.

19   Q    Who was on that jet with you?

20   A    Four marines, one admiral, myself, Mr. Guzman Loera, and

21   Condor.

22   Q    I'm showing you what's in evidence as Government

23   Exhibit 63.

24        Who is that?

25   A    Condor.

*MICHELE NARDONE, CSR -- Official Court Reporter*

VAZQUEZ – DIRECT – GOLDBARG

1    Q    Is that the person that was on --

2    A    Yes.

3    Q    -- the plane with you?

4    A    Yes.

5    Q    When you arrived in Mexico City was that the last time

6    that you saw the defendant, aside from when you saw him

7    yesterday?

8    A    Yes.

9    Q    When did you leave Mexico?

10   A    July of 2014.

11   Q    From this capture operation in February of 2014 until

12   July of 2014, did you have any further involvement in the

13   investigation of the defendant?

14   A    No.

15            MS. GOLDBARG:  Can I have a moment, Your Honor?

16            THE COURT:  Yes.

17            (Pause.)

18            MS. GOLDBARG:  No further questions, Your Honor.

19            THE COURT:  Mr. Balarezo, do you want a break or do

20   you want to start now?

21            MR. BALAREZO:  I think I need a break.

22            THE COURT:  We will take our morning break, ladies

23   and gentlemen, and reconvene at five after 11:00.

24            Please don't talk about the case.

25            (Jury exits.)

                    *MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez - Cross/Balarezo

| | |
|---|---|
| 1 | THE COURT:  Okay.  Recess 15 minutes. |
| 2 | (Recess.) |
| 3 | THE CLERK:  All rise. |
| 4 | THE COURT:  Please bring in the jury. |
| 5 | (Jury enters.) |
| 6 | THE COURT:  Everyone be seated.  Cross-examination, |
| 7 | Mr. Balarezo. |
| 8 | MR. BALAREZO:  Thanks, Your Honor. |
| 9 | CROSS-EXAMINATION |
| 10 | BY MR. BALAREZO: |
| 11 | Q    Good morning, agent.  How are you? |
| 12 | A    Good morning, sir. |
| 13 | Q    I want to go back to yesterday a little bit.  You |
| 14 | testified that as part of this operation when you went into |
| 15 | Mexico or -- strike that. |
| 16 | You had three targets, correct, when you started |
| 17 | searching? |
| 18 | A    Top three, yes. |
| 19 | Q    Well, the three that you talked about were Mayo Zambada, |
| 20 | correct? |
| 21 | A    Yes, sir. |
| 22 | Q    You talked about Mr. Guzman? |
| 23 | A    Yes, sir. |
| 24 | Q    And the other person you talked about was somebody named, |
| 25 | I think you said RCQ, Rafael Caro Quintero? |

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez — Cross/Balarezo

1    A    Rafael Caro Quintero.

2    Q    Also known as RCQ?

3    A    Yes, sir.

4    Q    Yesterday you also talked about how a DEA agent had been

5    killed in Mexico; is that correct?

6    A    Yes, sir.

7    Q    Now, that DEA agent that you are referring to is a DEA

8    agent by the name of Enrique Quique Camarena?

9    A    Yes, sir.

10   Q    As a matter of fact, his death happened back in 1985; is

11   that correct?

12   A    Yes, sir.

13   Q    He was in Mexico investigating narcotics trafficking; and

14   he got picked up, he got tortured, and died, correct?

15   A    Yes, sir.

16   Q    And the people that were arrested and eventually in

17   prison for that murder were a guy by the name of Ernesto

18   Fonseca, Don Neto?

19   A    Yes, sir.

20   Q    Another one was a guy by the name of Miguel Angel -- I

21   forgot his name -- Padrino?

22   A    Felix Gallardo.

23   Q    Felix Gallardo.  I'm sorry.  His padrino, correct?

24   A    Yes.

25   Q    The third guy was who?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez — Cross/Balarezo

1    A    Rafael Caro Quintero.

2    Q    Rafael Caro Quintero had been in prison, as you said, I

3    think, for 25 years?

4    A    Twenty-eight.

5    Q    Twenty-eight, and then a Mexican court released him; is

6    that correct?

7    A    Yes, sir.

8    Q    And the Mexican court released him prior to your

9    including him in that top three target list, correct?

10   A    Yes, sir.

11   Q    All right.  Now, the murder of that DEA agent, of course,

12   had nothing to do with this man, right, with Joaquin Guzman,

13   right?

14   A    That's correct, sir.

15   Q    So to your knowledge that's the only DEA agent that's

16   been killed in Mexico, correct?

17   A    In that way, yes.

18   Q    Tortured?

19   A    Yes.

20   Q    For days, right?

21   A    Yes, sir.

22   Q    You know the story?

23   A    Yes, sir.

24   Q    Again, nothing to do with Chapo, correct?

25   A    That's correct, sir.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez - Cross/Balarezo

1    Q    Now, yesterday you also talked about the first raid that

2    you did and how you set up for that particular raid.

3              What you said was that you had decided to partner

4    with the Mexican marines; is that right?

5    A    Yes, sir.

6    Q    And I believe you decided to partner with the Mexican

7    marines because, according to you, you couldn't trust the --

8    hell, most of the rest of the Mexican outfit, right?

9              You couldn't trust the local police?

10   A    I couldn't trust the local police or state police.

11   Q    Or the state police.

12             And there was some politicians perhaps that were

13   also suspect, right, that may not need to know about your

14   operations?

15   A    I don't think I mentioned any politicians.

16   Q    I'm asking you.

17   A    I don't deal with politicians.

18   Q    Well, your operation was closely held, right?

19   A    Yes, sir.

20   Q    Meaning that you tried to keep it within a tight little

21   group?

22   A    Yes, sir.

23   Q    Correct, because you don't want the information filtering

24   out somewhere so that perhaps people know that you are coming?

25   A    That's correct.

*MICHELE NARDONE, CSR -- Official Court Reporter*

                        Vazquez - Cross/Balarezo

1    Q     All right.  So now, when you set up your operation in --

2    was it La Paz?

3    A     La Paz, yes.

4    Q     And in Baja, California, you were there for about 30

5    days, I think you said.

6    A     Roughly, approximately 30 days.

7    Q     I mean you are not vacationing in Baja, California; you

8    are working?

9    A     Yes, sir.

10   Q     And you are obtaining information?

11   A     Yes, sir.

12   Q     You have to -- not me -- you -- you have to speak it for

13   the reporter.

14   A     Yes, sir.

15   Q     So you are getting information and you are getting

16   information from different sources, correct?

17   A     Yes, sir.

18   Q     Maybe some live sources, cooperators, informants, that

19   kind of thing?

20   A     Yes, sir.

21   Q     You also getting some information and intelligence from

22   electronic sources, that kind of thing, right?

23             MS. GOLDBARG:  Objection, Your Honor.

24             THE COURT:  I'm going to allow it a little bit.

25   A     Yes, sir.

                 MICHELE NARDONE, CSR -- Official Court Reporter

5599

Vazquez - Cross/Balarezo

1    Q    I mean this wasn't just boots on the ground, let's go

2    door to door looking for Mayo Zambada, for that first raid,

3    right?

4    A    That's correct.

5    Q    In fact, you had drones up in the air?

6         MS. GOLDBARG:  Objection, Your Honor.

7         THE COURT:  Sustained.

8    Q    You had a fair amount of information when you decided we

9    are going to hit that ranch outside of Culiacan and capture

10   Mayo Zambada; is that right?

11        MS. GOLDBARG:  Objection, Your Honor.

12        THE COURT:  Overruled.

13   A    Yes, sir.

14   Q    Because otherwise you figure it takes you a while to get

15   the information, number one, right?

16   A    Some of it, yes.

17   Q    And you don't want to keep going because you want to get

18   it on that first shot; is that right?

19   A    Yeah.  It's very important that you have the best

20   available information to make that first move.

21   Q    So the point is, when you made that first move you felt

22   that you had sufficient, valid, and current information in

23   order to make that first move?

24   A    Yes, sir.

25   Q    Now, given that Mayo Zambada was the first -- strike that

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez -- Cross/Balarezo

1    for a second.

2              MR. BALAREZO:  I would like to show the witness

3    Exhibit number 457.  Do you see -- can you go to 457.

4              MS. GOLDBARG:  No objection.

5              MR. BALAREZO:  I move 457 into evidence, Your Honor.

6              THE COURT:  Any objection?

7              MS. GOLDBARG:  No, Your Honor.

8              THE COURT:  Received.

9              (Defense Exhibit 457, was received in evidence.)

10   Q    You were shown this earlier.

11             The gentleman on left was Rafael Caro Quintero,

12   correct?

13   A    Yes.

14   Q    The one that was in prison for the murder of that DEA

15   agent?

16   A    Yes, sir.

17   Q    And the gentleman on the right, that I'm pointing out

18   now, is Mayo Zambada, correct?

19   A    That's correct, sir.

20   Q    So now, when you decide -- strike that.

21             As part of this operation you said you had about

22   40 -- how many men did you have?

23   A    At what point, sir?

24   Q    When you decide we are going to go into that ranch in

25   Sinaloa and we are going to try to capture Mayo, how many

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez - Cross/Balarezo

1    bodies, let's say, did you have working on that particular

2    operation?

3    A    Roughly 40, 45 bodies left La Paz, and four helicopters,

4    towards Culiacan.

5    Q    So you had about ten marines per helicopter, or

6    thereabouts?

7    A    More about, yeah.

8    Q    Well, four times ten is -- maybe some had more, some had

9    less?

10   A    Correct.

11   Q    All right.  So you had these 40 guys, and they all

12   weren't -- they were not all Mexican, correct?

13            MS. GOLDBARG:  Objection, Your Honor.

14            THE COURT:  Sustained.

15   Q    Well, you weren't the only DEA agent in that group of 40

16   people, were you?

17   A    I was.

18   Q    The only one?

19   A    Yes, sir.

20   Q    Okay.  And you were there as an observer?

21   A    No.

22   Q    You were there to participate in the raid, correct?

23   A    To advise, provide information.

24   Q    Were you armed?

25            MS. GOLDBARG:  Objection, Your Honor.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez - Cross/Balarezo

1                 THE COURT:  Sustained.

2     Q     Well, if you were shot at, you would have shot back,

3     correct?

4                 MS. GOLDBARG:  Objection, Your Honor.

5                 THE COURT:  Sustained.

6                 MR. BALAREZO:  Can I have a sidebar, Your Honor?

7                 THE COURT:  Sure.

8                 (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar

1           (Sidebar conference.)

2           MR. BALAREZO:  I just want to make sure I'm not

3    stepping on something I shouldn't have.

4           THE COURT:  I think you are close, and the question

5    is why.  What are you trying to elicit?

6           MR. BALAREZO:  Well, my understanding is -- and I

7    believe either this -- not this agent.  Another agent

8    testified that United States law enforcement have no role in

9    Mexico as a law enforcement type of agent.

10           This witness, as far as I'm aware, not only from

11    what he has testified but from what I know, was heavily

12    involved in the investigation.  He was armed, he was involved

13    in the raids themselves.  So he is in fact acting as a law

14    enforcement agent.

15           He is acting outside the scope of his authority in

16    Mexico; and I think it goes both to his bias and it goes to

17    his credibility, if he is going to say no.  I'm not interested

18    in the means and methods and, you know, they had five drones

19    and this and that.  I think that's fair game.

20           MS. GOLDBARG:  I think he is mischaracterizing the

21    testimony of the prior law enforcement witness who testified.

22           MR. BALAREZO:  That was my recollection.

23           MS. GOLDBARG:  No.  Again, you know, whether or not

24    he is acting, in what capacity he is acting as an adviser with

25    the Mexican, he already testified to.

                *MICHELE NARDONE, CSR -- Official Court Reporter*

1          MR. BALAREZO:  I don't believe that's correct.  I'm

2     sorry.  I didn't mean to interrupt you.

3          MS. GOLDBARG:  Go ahead.

4          THE COURT:  What's the difference if it is correct

5     or not?

6          MR. BALAREZO:  He is trying to shade, number one,

7     his testimony, which goes to his credibility as a witness.

8          THE COURT:  What's he trying --

9          MR. BALAREZO:  To hide his actual role in the

10    matter.

11         THE COURT:  Why would he try to do that?

12         MR. BALAREZO:  That's what I'm trying to get to.

13         THE COURT:  Give me a theory how it would help the

14    government's case, help him personally, to diminish his role.

15    How would that work?

16         MR. BALAREZO:  Because, Your Honor, they made a big

17    deal out of this.  It is a see-more operation.  These are the

18    best marines.  These are the marines who are not bribed.

19    These are the ones we can trust.

20         Then this guy and the other operations, they are an

21    integral part.  It's a credibility issue.  It's a credibility

22    issue of the witness on the stand.

23         MS. GOLDBARG:  I would like to respond, Your Honor.

24    I don't believe it's a credibility issue with this witness

25    because he has testified of his specific involvement in this

1    operation.  We see the videos.  He has described everything

2    that he has done.

3            The issues that the defense counsel wants it get

4    into are collateral to his testimony.  They don't go to his

5    credibility.  I don't know if there is any good-faith basis

6    for him to inquire that he is doing something that he is not

7    authorized to do, and it becomes a 403 issue.

8            THE COURT:  What's the point if he is armed or not

9    armed?  How does that affect his credibility?

10           MR. BALAREZO:  The fact that he is armed or not

11   armed is not the issue of his credibility.

12           THE COURT:  That's what you asked.

13           MR. BALAREZO:  It goes to his testimony in this

14   case, which he just repeated to me, which is to say he was

15   just an adviser to give information.  He is not that.  He is

16   fully participating.  Again, if he is shading the truth that

17   clearly goes to credibility.

18           THE COURT:  If it's material, but I'm trying to

19   figure out why would it be material if he had a greater role

20   than he is saying.  He is on the ground.  He is describing

21   everything he did.

22           What does it matter if in fact he was calling more

23   shots than he testified to?  How does that -- why would he

24   deemphasize that for some reason, in a way that would cause

25   the jury to believe him less?  I'm just not seeing materiality

MICHELE NARDONE, CSR -- Official Court Reporter

Sidebar

5606

1    here.

2            I'm going to sustain the objection.

3            MR. BALAREZO:  Thank you.

4            (End of sidebar conference.)

5            (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez - Cross/Balarezo

1              (In open court.)

2              MR. BALAREZO:  If I could just have one second, Your

3    Honor?

4              THE COURT:  Sure.

5              (Pause.)

6    BY MR. BALAREZO:

7    Q    Let me show you Government Exhibit 219-10, which is in

8    evidence.

9              Is that you, sir?

10   A    Yes, sir.

11   Q    Okay.  You are wearing a camouflage uniform?

12   A    Yes, sir.

13   Q    And what is this item here, here in your hand?  Can you

14   see it?

15   A    Yes, sir.

16   Q    What is that?

17   A    That's a assault rifle.

18   Q    You are wearing basically full military gear, correct?

19   A    Yes, sir.

20   Q    Embedded with the Mexican marines?

21   A    Yes, sir.

22   Q    Now, before, as part of your -- as part of your evidence

23   gathering -- well, actually, strike that.

24              You testified that you were there in an advisory

25   capacity, correct?

Vazquez - Cross/Balarezo

1   A    Yes, sir.

2   Q    To give intelligence?

3   A    Yes, sir.

4   Q    Nothing else?

5   A    Guidance, historical information, up-to-the-minute

6   information from domestic offices, experience.

7   Q    Anything else?

8   A    No.

9   Q    Why were you carrying an assault weapon?

10          MS. GOLDBARG:  Objection.

11          THE COURT:  Overruled.

12   A    Protection.

13   Q    I'm sorry?

14   A    Protection.

15   Q    What does that mean, if I could --

16   A    That means, like I stated yesterday, I'm in the same

17   Culiacan, controlled by the Sinaloa Cartel.  I need protection

18   in case members of the cartel come and attack the marines.

19   I'm in there with a hundred marines, yes, well trained,

20   trusted marines.  Still, 100 marines is still not enough for

21   that state.

22   Q    Did you have law enforcement authority in Mexico?

23          MS. GOLDBARG:  Objection.

24          THE COURT:  Sustained.

25   Q    Now, before you went on this raid to the ranch outside of

*MICHELE NARDONE, CSR -- Official Court Reporter*

Vazquez - Cross/Balarezo

1    Culiacan, you obtained a lot of information on Mayo Zambada, I

2    think we said a little earlier, right, which led you to

3    believe that you had sufficient information to go in, right?

4    A    Yes, sir.

5    Q    And you knew that Mayo Zambada was considered the leader

6    of the Sinaloa Cartel, correct?

7    A    One of the leaders, yes.

8    Q    You know that he was -- you would consider him a

9    dangerous person, correct?

10   A    Consider him a dangerous person?

11   Q    Yes.

12   A    Yes, sir.

13   Q    That you needed to protect yourself with that assault

14   rifle, sufficiently, right?

15            MS. GOLDBARG:  Objection, Your Honor.

16            THE COURT:  Overruled.

17   A    Yes, sir.

18   Q    His men were dangerous men?

19   A    Yes, sir.

20   Q    You know that because you had that fear about the local

21   police and the state police, you know that -- you knew at that

22   time that Mayo Zambada was capable and had bribed local and

23   state police, correct?

24   A    Information of that sort, yes.

25   Q    So you knew who you were dealing with, right?

Vazquez - Cross/Balarezo

1    A    Yes, sir.

2            MR. BALAREZO:  Your Honor, the government, maybe

3    they can assist us.  We are having some technical difficulties

4    with the video of the helicopter ride.

5            (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vazquez - Cross/Balarezo

1    MR. BALAREZO:  Your Honor, if I could ask what

2    exhibit number is that?  I'm sorry.

3    MS. GOLDBARG:  Government 219-22.

4    MR. BALAREZO:  Government's 219-22.

5    THE COURTROOM DEPUTY:  Just a moment.

6    (Pause in proceedings.)

7    BY MR. BALAREZO:

8    Q    So this is when you decided to leave La Paz in the four

9    Black Hawk helicopters, right?

10   A    Yes, sir.

11   Q    With 40 Marines or 39 Marines and you?

12   A    Forty, forty-five.

13   Q    Okay.  And, of course, they were all holding arms, right?

14   A    Yes, sir.

15   Q    And you guys were flying, if I remember correctly; it was

16   daytime?

17   A    It was starting to get sunset.

18   Q    All right.  And you could see the ground, right?

19   A    I could see the ground, yes.

20   Q    And presumably the ground could see you guys, right; you

21   weren't flying that high?

22   A    No.  When we made land, we were not that high.

23   Q    Right.

24   MR. BALAREZO:  Is the video ready?

25   Q    And about what time was that?

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Vazquez - Cross/Balarezo

```
 1   A     Leaving La Paz or getting to Culiacan?

 2               MR. BALAREZO:  I think it's almost ready, I hope.

 3               (Pause in proceedings.)

 4   Q     So you're flying, what, maybe a couple hundred feet up in

 5   the air right now?

 6   A     Yes, sir.

 7   Q     All right.  And I think we can see one gentleman with a

 8   weapon looking out the window there, out the side door?

 9   A     Yes, sir.

10   Q     All right.  And I think you testified that part of what

11   you were doing was looking to see if there were any people

12   that might warn Mayo Zambada, for example, that you guys were

13   on the way, right?

14   A     Lookouts, yes, sir.

15   Q     Lookouts.  Because four Black Hawks flying through

16   Sinaloa is kind of suspicious to someone who is involved in

17   that business, correct?

18               MS. GOLDBARG:  Objection.

19               THE COURT:  Overruled.

20   Q     And the entire time if --

21               MR. BALAREZO:  One second.

22               If you could pause it right there.

23   Q     Do you see that middle window that's in the video where

24   it's paused and there's two vehicles that are on that road?

25   A     Yes, sir.
```

Vazquez - Cross/Balarezo

1    Q    All right.  You said that you thought that might have

2    been some of the scouts or the lookouts?

3    A    No.  I said we were looking out for any suspicious

4    activity from the vehicle and people standing pointing at the

5    Black Hawks.

6    Q    All right.  And from what we could tell, there were no --

7    nobody standing on the back of the trucks with a long weapon

8    that could shoot down a helicopter or anything, were we?

9    A    No, sir.

10   Q    No one took a shot at any of the helicopters, to your

11   knowledge?

12   A    No, sir.

13   Q    And, in fact, those were really -- in the videos that

14   we've seen, those were the only two vehicles that were on the

15   road at that time, right?

16   A    I'm not sure, but it could be so.

17   Q    We can play the rest.

18   A    Yeah.

19   Q    I think it's a fairly short video.

20   A    Okay.

21        (Video plays.)

22   Q    And it appears that you're -- the helicopters are now

23   getting lower, about to land, correct?

24   A    Yes, sir.

25   Q    So you're definitely visible from the ground?

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Vazquez - Cross/Balarezo

1    A    Yes, sir.

2    Q    And since we don't have the volume on, I think you just

3    testified that the helicopters were pretty loud?

4    A    Yes, sir.

5    Q    And your knowledge of the military, given the height that

6    you are, you probably could be heard from the ground too,

7    correct?

8    A    Yes.  Yes, sir.

9              MR. BALAREZO:  That's fine.  Thank you.

10   Q    Now, after this particular -- after you landed, you said

11   that the ranch was outside of Culiacan, correct?

12   A    Yes, sir.

13   Q    Okay.  Approximately how far from the house that you

14   eventually raided did the helicopters land?

15   A    Like, walking distance, maybe football field away.

16   Q    All right.  Fairly close, right?

17   A    Yes, sir.

18   Q    And as you are landing there was nobody there with

19   weapons shooting at you, correct?

20   A    No, sir.

21   Q    There was no -- no trucks leaving at a high rate of speed

22   because, you know --

23   A    Not when we arrived, no, sir.

24   Q    All right.  Nothing going on, correct?

25   A    Not the activity, no.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

Vazquez - Cross/Balarezo

1  Q     All right.  And when you went in the house, in fact, you

2  didn't meet any resistance either?

3  A     No, sir.

4  Q     And when you went in the house, there was only one person

5  there, right, a caretaker, I believe you called him?

6  A     No, he wasn't in the house.

7  Q     Well, he was in another -- like a caretaker's house?

8  A     Him and his family and there's other people.

9  Q     He was like the old guy in the rocking chair at the end

10  of the video, right?

11  A     The caretaker, yes, sir.

12  Q     The caretaker.

13         Now, in that particular house although you had had

14  sufficient information in your mind to justify the raid, you

15  didn't find Mayo Zambada in that house, did you?

16  A     That's correct.

17  Q     And you didn't find drugs, guns, anything of that nature,

18  correct?

19  A     Yes, we did.

20  Q     You did.  In that particular house what did you find?

21  A     In that property.

22  Q     On the property.  I'm talking about the house.  And then

23  we'll talk about --

24  A     Not in the house, sir.  I'm sorry.

25  Q     Now, on the property, what did you find?

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Vazquez - Cross/Balarezo

```
1    A    Big blue plastic barrels --

2    Q    Okay.

3    A    -- buried underground.

4    Q    Okay.

5    A    Full of long guns, assault weapons.

6    Q    Okay.  And how many assault weapons did you find?

7    A    Over a hundred.

8    Q    A hundred assault weapons?

9    A    Yes, sir.

10   Q    In the house that Mayo Zambada --

11   A    In the property.

12   Q    In the property, okay.

13   A    Uh-huh, the big property.

14   Q    We got it.

15        But the property you believe to be Mayo Zambada's

16   property, correct?

17   A    Yes, sir.

18   Q    Okay.  Did you find anything else besides the hundred or

19   so assault rifles?

20   A    No.

21   Q    Drugs?

22   A    No drugs, sir.

23   Q    All right.  Anything else?

24   A    An individual hiding in the bushes.

25   Q    Okay.  And that wasn't Mayo, was it?
```

Vazquez - Cross/Balarezo

1    A    No, sir.

2    Q    Okay.

3         And I forget, were you shown a picture of that big

4    blue tarp with the hundred assault rifles on your direct

5    examination?

6    A    No, sir.

7    Q    Now, would it be -- would it be accurate to say that you

8    were disappointed at the results of that raid?

9    A    I wouldn't say I was disappointed because we were just

10   starting, so you know...

11   Q    Right.  Well, you wanted --

12   A    Yeah, I wanted him to be there --

13   Q    Right.

14   A    -- and capture him, absolutely --

15   Q    Yeah.

16   A    -- but it wasn't like, they, Oh, shucks, let's go home.

17   Q    Well, right.  You went home after two days, right?

18   A    Well, we didn't go home.  We went -- we continued.

19   Q    Right.  But did you look for Mayo for two days?

20   A    For those two days, and then --

21   Q    We'll get to the others after.  But for those two days,

22   you were looking for Mayo, right?

23   A    Or his associates.

24   Q    You didn't find him?

25   A    Yes.

Vazquez - Cross/Balarezo

1   Q    Yes, you did find him; or yes, you did not find him?

2   A    Yes, we did find associates.

3   Q    Okay.  And you arrested them?

4   A    They were detained.

5   Q    Okay.  And did they tell you where Mayo was?

6   A    They told us -- well, during the interview they told the

7   Marines where they last saw him.

8   Q    Okay.

9   A    Yes.

10  Q    Did they tell you which house number they were at or

11  which number house they were at?

12  A    Well, they don't have house numbers --

13  Q    Okay.

14  A    -- on the Mayo side.

15  Q    There's a different operation?

16       MS. GOLDBARG:  Objection.

17       THE COURT:  Sustained.

18  Q    Well, what do you mean on the Mayo side?

19       MS. GOLDBARG:  Objection.

20       THE COURT:  Overruled.

21  A    On his security they don't use numbers to identify the

22  locations.

23  Q    All right.  But bottom line is, even though you arrested

24  some of these people and they gave you some information,

25  you weren't able to capture Mayo, right?

Vazquez - Cross/Balarezo

1    A    That's correct, sir.

2    Q    And to your knowledge as you sit here today, do you know

3    if he has been captured?

4    A    No, he has not.

5    Q    Now, with respect to -- when was that search again?

6    A    February 13th, 2014.

7    Q    Were you aware that Mayo Zambada's son, Vicente Zambada

8    Niebla, at that time was in U.S. custody?

9         MS. GOLDBARG:  Objection.

10        THE COURT:  Overruled.

11   A    Yes, sir.

12   Q    And were you aware that Vicente Zambada Niebla had been

13   in contact with his father?

14        MS. GOLDBARG:  Objection, Your Honor.

15        THE COURT:  Overruled.

16   A    I was not aware of that.

17   Q    The Government never told you that or your intelligence

18   people didn't tell you that?

19        MS. GOLDBARG:  Objection, Your Honor.

20        THE COURT:  Sustained.

21   Q    You were not aware?

22        MS. GOLDBARG:  Objection.

23        THE COURT:  Sustained.

24   Q    Were you aware that his lawyers, that Vicente's lawyers

25   were visiting Mayo Zambada regularly?

Vazquez - Cross/Balarezo

1            MS. GOLDBARG:  Objection.

2            THE COURT:  Sustained.

3   Q    Were aware that two other sons of Mayo Zambada were in

4   custody?

5   A    I was aware --

6   Q    Serafin being one of them?

7   A    I was aware that Serafin was arrested at the Nogales port

8   of entry.

9   Q    All right.  And Mayito Gordo?

10  A    Was not in custody yet.

11  Q    Okay.  So you knew that at least two sons were in U.S.

12  custody?

13  A    Yes, sir.

14  Q    Okay.

15         Are you aware of whether or not you or your team

16  ever sought to interview them?

17            MS. GOLDBARG:  Objection.

18            THE COURT:  Sustained.

19  Q    Now, let's talk about the -- what you did after those two

20  days when you -- well, strike that.

21         Let me go back to the house where you thought Mayo

22  might be.  There were no -- you called it signs of presence

23  or --

24  A    Yes, sir.

25  Q    Is that the term?

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

Vazquez - Cross/Balarezo

1          And that means basically when you go into a house to

2   raid it, you're looking at any information that would let you

3   know whether or not a person was there, right?

4   A    Yes, sir.

5   Q    For example, not to be funny, sometimes the toilets are

6   unflushed, right, food on the table?

7   A    Yes, sir.

8   Q    Clothes, right?

9   A    Yes, sir.

10  Q    Nike sneakers, you know, that kind of stuff?

11          MS. GOLDBARG:   Objection.

12  A    Yes.

13  Q    Okay.  And you didn't find any of that proof of presence

14  of Mayo Zambada in that house, correct?

15  A    Yes, we did.

16  Q    Did you find any clothing of his?

17  A    Yes, in the --

18  Q    I'm sorry?

19  A    Some in the cupboards, uh-huh.

20  Q    What did you find?

21  A    Hats.

22  Q    Okay.  What kind of hat, baseball hat?

23  A    Baseball hats, yeah.

24  Q    Now let's talk about what you did afterwards.  You and

25  the Marines continued.  You testified that Chapo popped up or

Vazquez - Cross/Balarezo

1    I don't remember the term you used but...

2    A    Well, Mayo Zambada jumped, that's where we --

3    Q    Jumped first.

4    A    -- went first, and then after that we decided to go after

5    Mr. Guzman Loera.

6    Q    Right.  Did he jump?

7    A    Not the way I wanted him to jump, but we had information

8    that we --

9    Q    But he jumped?

10   A    But he jumped.

11   Q    All right.  So you got -- you started tracking some of

12   the people here, correct?

13   A    Yes, sir.

14   Q    And you were able to make contact with -- with Nariz, the

15   first one that you captured?

16   A    For Mr. Guzman?

17   Q    Yes.  We're done with Mayo Zambada for right now.

18   A    Yes, sir.

19   Q    Okay.  And he's the gentleman that eventually told you

20   where he expected or -- well, not where -- strike that.

21        He told you where Guzman was, in House Number 5,

22   correct?

23   A    Yes, sir.

24   Q    And then he went and showed you that red bottomed bathtub

25   that we saw a couple pictures of, showed you how to open it

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Vazquez - Cross/Balarezo

1   and do all that stuff, right?

2   A    Yes, he showed us how to open the bathtub.

3   Q    Right.  And now did you have any reason to not believe

4   what Mr. Nariz was saying about, you know, Chapo is at

5   House Number 5, Number 2, whatever it was?

6   A    Originally, yes, when he told me he was at the three.

7   Q    He was at the three, right?

8   A    No, he was at the five.

9   Q    At the five.  But after that he went to the five?

10  A    Yes, sir.

11  Q    That's the one where you went, you drove down the street,

12  you hit the clicker and the garage door opened, correct?

13  A    Yes, sir.

14  Q    Now, when you went in that house, Chapo wasn't there,

15  correct?

16  A    No, sir.

17  Q    Okay.  You went through five houses that your

18  intelligence and your experience and information told you

19  Chapo might be at, correct?

20  A    We went there because Nariz took us there.  And it helped

21  that we had intelligence that kind of put our locations in

22  place.

23  Q    Right.  You had some signals, intelligence, that kind of

24  stuff, right?  Not a secret.

25       MS. GOLDBARG:  I'm sorry.  Objection.

Vazquez - Cross/Balarezo

1    Q    Can you answer or no?

2              THE COURT:  You need to answer his question.

3              Some of your questions do not sound like questions,

4    Mr. Balarezo.

5              MR. BALAREZO:  Oh, I apologize.

6              THE COURT:  That's why he's not answering.

7    Q    Well, you just didn't have Nariz; you had other

8    information that Chapo Guzman was there, correct?

9    A    Yes, the foreign intercepts.

10   Q    Foreign intercepts?

11   A    Yes, sir.

12   Q    Signals and intelligence, I think?

13             MS. GOLDBARG:  Objection.

14             THE COURT:  Overruled.

15   A    Intercepts of conversations on connected wires, yes.

16   Q    Right.

17             So in none of these houses that you have Nariz

18   taking you to, that you have this -- this -- domestic wires

19   and whatnot, in any of those wires does Joaquin Guzman jump up

20   so you can capture him, right?  I'm talking about the five

21   houses first.

22   A    The first one.

23   Q    I'm sorry?

24   A    The first one.

25   Q    Okay.  What was at the first one?

Vazquez - Cross/Balarezo

1   A    Well, that afternoon when we went into Culiacan, we
2   failed to catch him.
3   Q    Uh-huh.  Did you see him?
4   A    No, sir.
5   Q    Did any of the Marines see him running down the tunnel?
6   A    I'm talking about before even Nariz.
7   Q    Okay.
8   A    So, no, we didn't see him.
9   Q    All right.  Well, I'm focusing -- right now let's just
10  focus on the five houses --
11  A    Okay.
12  Q    -- that we talked about, all right?
13  A    Uh-huh.
14  Q    Did anyone see Mr. Guzman in those houses, any of the
15  Marines or you?
16  A    The ones that Nariz took us to?
17  Q    Uh-huh.  The five homes.
18  A    Okay.  The --
19  Q    Let me stop you for a second.
20  A    I'm sorry.
21       MR. BALAREZO:  If we could have these -- these are
22  all in evidence:  219-2, 219-3, 219-4, 219-5, and 219-6.
23  Q    Are you with me?
24  A    Yes, sir.
25  Q    All right.  And these five houses -- you went through all

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Vazquez - Cross/Balarezo

1   of these houses, first of all?

2   A    Yes, sir.

3   Q    Right.

4            Based on your intelligence and on your conversations

5   with Nariz, correct?

6   A    Yes.

7   Q    All right.  My question is, was Mr. Guzman at any one of

8   these homes?

9   A    Never saw him there.

10  Q    Okay.  Did any of the Marines see him there?

11  A    They heard him.

12  Q    They heard him.  Did they hear him talking?

13  A    They heard him yelling in the tunnel.

14  Q    All right.  And any of the Marines, were they familiar

15  with Chapo Guzman's voice to say, Hey, I hear a guy yelling in

16  the tunnel, that's Chapo?  No, right?

17  A    You're correct, sir.

18  Q    All right.  So you're testifying as if Chapo Guzman was

19  in those tunnels running based on what some Marine said he may

20  have heard, correct?

21  A    No.  I'm testifying on what Nariz said.

22  Q    And Nariz was outside with you, correct?

23  A    Yes, sir.

24  Q    And when this person was running through the tunnels,

25  Nariz wasn't in the tunnel, was he?

5627

1    A    No, sir.

2    Q    Okay.

3         Now, as to each of these homes that I have, and

4    there's one of them on the screen, it's accurate to say that

5    when you guys rode up to them, I mean, you didn't just ride up

6    with sirens blaring and all that stuff and run in; is that

7    correct?

8    A    That's correct, sir.

9    Q    Okay.  You were trying to be surreptitious, meaning you

10   were trying to a little sneaky so that if anyone was there

11   they're not going to -- you know, they're not going to fight

12   you; they're not going to run away, that kind of thing, right?

13   A    Yes, sir.

14   Q    Now, how close in distance were you to these houses to

15   each other; were they like next door to each other, you know,

16   a mile away?

17   A    Some were close.  Some were not.

18   Q    Well, what's close?

19   A    Maybe half a mile away from each other, maybe less or

20   more --

21   Q    Well, let me ask you this --

22   A    -- throughout the city.

23   Q    I'm sorry.

24        MR. BALAREZO:  I don't know if she's objecting or

25   not, Your Honor.

Vazquez - Cross/Balarezo

1          THE COURT:  I didn't hear an objection.

2          MR. BALAREZO:  All right.

3   Q    How close -- how close just as -- how close were the two

4   closest houses?

5   A    Half a mile away.

6   Q    Half a mile.  And --

7          MR. BALAREZO:  Should we take a break, Your Honor?

8          MS. GOLDBARG:  I'm fine.

9          THE COURT:  Just ask, Ms. Goldbarg, if you need to.

10         MS. GOLDBARG:  I will, Your Honor.  Thank you,

11  though.

12  Q    So these houses are sort of spread through the city,

13  right?

14  A    Yes, sir.

15  Q    And as you're driving around going through each of these

16  homes, you didn't encounter any resistance, right?  You didn't

17  say anything on direct.

18  A    No.

19  Q    Correct?

20  A    That's correct.

21  Q    All right.  You did encounter -- well, strike that.

22         You're familiar with -- in the business you are in,

23  you're familiar with the security methods that some people may

24  use, correct?

25  A    Yes, sir.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

```
1   Q    Bodyguards?

2   A    Yes, sir.

3   Q    Rings of security, you've heard that before, right?

4   A    Yes, sir.

5   Q    There's usually like an outer ring that's looking out

6   generally, then as it gets closer, it's gets a little --

7   right?  You know what I'm talking about, right?

8   A    Looking out.  You said it, yeah.

9   Q    Yeah, they're looking out?

10  A    Yes.

11  Q    Well, as to any of these homes, you didn't encounter any

12  of those rings of security, did you?

13  A    Not at that time in the moment, no.

14  Q    Well, at the time in the moment that's when you're going

15  into the house, right?

16  A    That's correct.

17  Q    There was no outer ring, no middle ring, no inner ring,

18  right?

19  A    That's correct.

20  Q    You don't encounter -- you know what a pistolero is,

21  right?

22  A    Yes, sir.

23  Q    What's a pistolero?

24  A    It's a gunman.

25  Q    And what's a sicario?
```

Vazquez - Cross/Balarezo

```
1    A    A hit man.
2    Q    All right.  Did you encounter any pistoleros, sicarios as
3    you were going into these five homes?
4    A    No, sir.
5    Q    Not one, right?
6    A    No, sir.
7    Q    Now, in one of the homes -- in one of the homes you
8    indicated there were some weapons found, correct?
9    A    Yes, sir.
10   Q    And what types of weapons were those?
11   A    Handguns, grenades, RPG's.
12   Q    And in that same home was that where those drugs were
13   found?
14   A    I believe that's the home, yes, sir.
15   Q    Okay.  And do you remember which one it was, Number 3, 1,
16   2, 3, 4?
17   A    It was the fourth one.
18   Q    It doesn't matter.  One of those five homes these things
19   were found, correct?
20   A    Yes, sir.
21   Q    And I think you also testified one of the handguns, was
22   there one of them that was special that day?
23   A    Yes, sir.
24   Q    And what was so special about that handgun?
25   A    It was with initials JGL.
```

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

5631
Vazquez - Cross/Balarezo

1    Q    All right.  And a wild guess, what would that be?

2    A    Joaquin Guzman Loera.

3    Q    Right.  And so in your mind, that led you to believe that

4    Joaquin Guzman Loera had been in that house, correct?

5    A    Yes, sir.

6    Q    That was one of those signs of life or presence or

7    whatever?

8    A    Yes, sir.

9    Q    Okay.  Now, when was the last time you saw that weapon,

10   the one with the JGL on it?

11   A    That morning.

12   Q    That morning, during the raids?

13   A    When I took the video, yes, sir.

14   Q    All right.  That was 14th, so we're almost five years

15   later.

16            Have you seen that weapon since?

17   A    Just on photos.

18   Q    Pictures?

19   A    Yes, sir.

20   Q    On the Internet --

21   A    Yes, sir.

22   Q    -- right?

23            Have you seen the actual gun?

24   A    Since then, no.

25   Q    Okay.  You know this trial's been going on since early

Vazquez - Cross/Balarezo

1    November --

2    A    Yes, sir.

3    Q    -- right?

4         And you know that the Government has presented

5    evidence of weapons and that kind of stuff, right?

6         MS. GOLDBARG:  Objection, Your Honor.

7         THE COURT:  Sustained.

8    Q    Well, in -- in a trial -- this is not the first time

9    you've testified in a trial, right?

10   A    It is, sir.

11   Q    It is?  Oh, wow.  You just saved ten minutes.

12        Well, let's check -- let me say this:  If in those

13   raids you had found 39 or 40 AK-47's, it's a great idea to

14   bring those AK-47's and put them right here in front of the

15   jury so they can see them, right?

16        MS. GOLDBARG:  Objection, Your Honor.

17   Q    Don't you think?

18        THE COURT:  Sustained.

19   Q    Or what they -- rocket-propelled grenades?

20        MS. GOLDBARG:  Objection, Your Honor.

21        THE COURT:  Sustained.

22   Q    Have you had a case where weapons were seized and were

23   not presented in court?

24        MS. GOLDBARG:  Objection.

25        THE COURT:  Sustained.

Vazquez - Cross/Balarezo

1    Q    So do you know where that weapon is now?

2    A    No, sir.

3    Q    Do you know if the Government knows where that weapon is?

4              MS. GOLDBARG:  Objection.

5              THE COURT:  Sustained.

6    Q    Now, with respect to those homes, are you aware if any of

7    those homes have been linked to Chapo Guzman, either through

8    property records or familial records or anything of that

9    nature?  And I'm not talking about what Nariz said or --

10   any -- anything that's sort of indisputable?

11             MS. GOLDBARG:  Objection.

12             THE COURT:  Overruled.

13   A    Never seen any records for the residence, no.

14   Q    Now if that particular -- well, in one of those homes

15   because -- I don't even know which one.

16             MR. BALAREZO:  If I could have the Elmo, please.

17   Q    In one of these homes you said that this item was --

18   whatever it is that's depicted in this Exhibit Number 219-15,

19   it was located, correct?

20   A    Yes, sir.

21   Q    And what you're telling -- what you told the jury is that

22   I believe these two gentlemen here are Mr. Guzman's sons?

23   A    Yes, sir.

24   Q    And you identified one as Ovidio and you identified the

25   other one as?

Vazquez - Cross/Balarezo

1    A    Joaquin.

2    Q    Okay.  Have you ever met them?

3    A    No, sir.

4    Q    Okay.  So you just looked at them and said that's his

5    son?

6    A    No, no.

7    Q    Well, you haven't met them, correct?

8    A    That's correct, sir.

9    Q    You showed it to somebody and they said that's Joaquin

10   and that's Ovidio?

11   A    I've seen pictures of them before.

12   Q    Okay.

13            MS. GOLDBARG:  Okay.

14   Q    So you're identifying this -- these two pictures here,

15   the ones I'm pointing at that you say are Mr. Guzman's sons

16   based on other pictures that you've seen before, correct?

17   A    Yes, sir.

18   Q    That's what you're saying, right?

19            And I'm going to have to bring it up to you.

20            This -- this young lady here, do you see that?

21   A    Yes, sir, I can see it.

22   Q    And what does that say in Spanish?

23   A    I can't see the word.

24            MR. BALAREZO:  Your Honor, may I approach the

25   witness, it might be easier.

Vazquez - Cross/Balarezo

```
1          THE COURT:  Sure.

2          MR. BALAREZO:  Give him a copy of the original.

3   Q   Right here.  I'll give you a hint.

4   A   Sus Reinas.

5   Q   You speak Spanish, what does Sus Reinas mean?

6   A   Your Queen.

7   Q   Your Queen?

8   A   Yes, sir.

9   Q   Okay.  Now that's not Mr. Guzman's Reina, is it?

10          MS. GOLDBARG:  Objection.

11          THE COURT:  Sustained.

12   Q   Well, you see Emma Guzman in the audience, correct?

13  Excuse me, Emma Coronel, right?

14          MS. GOLDBARG:  Objection.

15          THE COURT:  Sustained.

16   Q   Well, the lady on this picture, where it says Your Queen,

17  that's not Emma Coronel, right?

18          MS. GOLDBARG:  Objection.

19          THE COURT:  Overruled.

20   A   That's not her.

21   Q   So there's another Reina somewhere out there, correct?

22          MS. GOLDBARG:  Objection.

23          THE COURT:  Sustained.

24   Q   Now, let's talk a little bit about the Miramar operation.

25   A   Yes, sir.
```

Vazquez - Cross/Balarezo

1    Q    You eventually get to the Miramar Hotel and you have your

2    same team; is that correct -- or you have a team?

3    A    Yeah, a small portion of my team, yes.

4    Q    Okay.

5    A    Or of the team.

6    Q    And if you're going to the Miramar Hotel, once again you

7    didn't just ride in there lights blared and all that stuff,

8    you went in surreptitiously?

9    A    Marines don't.

10   Q    Don't have lights?

11   A    Lights blared, yeah.

12   Q    Were they making noise?

13   A    No.

14   Q    Okay.  And hold that thought for a second.

15            When you were still going through those homes, the

16   five houses that we talked about?

17   A    Yes, sir.

18   Q    Do you remember when you guys were looking for Nariz?

19   A    Okay, yeah.

20   Q    You mentioned something about a party?

21   A    Yes, sir.

22   Q    Do you remember that?

23   A    Uh-huh.

24   Q    And you suspected that he had to be there because he was

25   celebrating something?

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Vazquez - Cross/Balarezo

```
1    A    Yes, sir.

2    Q    All right.  And, in fact, that party was not being held

3    in Nariz's house, correct?

4    A    In the street.

5    Q    That party was not being held at his house, correct,

6    because you got him in another house?

7    A    It was a block party.

8    Q    I understand block party.  All right (indicating).

9              I'm talking about --

10             MS. GOLDBARG:  Objection.

11             THE COURT:   There's no question yet.

12   Q    The -- all right, fine.

13             THE COURT:  Do you need a moment?

14             MR. BALAREZO:  I've got the giggles, Your Honor, I'm

15   sorry.

16             THE COURT:  Go ahead, please.

17   Q    So at some point you and the Marines lined up these guys,

18   correct?

19   A    Yes, sir.

20   Q    And basically have them standing there, right?

21   A    Yes, sir.

22   Q    Trying to get -- going through their pockets make sure

23   they don't have guns, show me your phones?

24   A    Yes.

25   Q    Had those guys done anything?
```

5638

Vazquez - Cross/Balarezo

1    A    No.

2    Q    You lined them up against the wall and started patting

3    them, right?

4    A    We asked them to line up and we asked them to see their

5    phones.

6    Q    And you guys were like 40 heavily armed Marines and one

7    American?

8    A    Mexican American.

9    Q    I'm sorry?

10   A    Mexican American.

11   Q    I'm sorry, and one Mexican American?

12   A    Yes, yes.

13   Q    They really didn't have a choice, did they?

14             MS. GOLDBARG:  Objection.

15             THE COURT:  Sustained.

16   Q    All right.  Let's go back to the Miramar for a second.

17             So the Marines don't have the lights but you're

18   trying to get there surreptitiously -- cut through it, there

19   was no ring of security, correct?  No outer perimeter, no

20   middle perimeter at the Miramar, correct?

21   A    We observed those two patrol cars, yes.

22   Q    We'll get to the patrol cars.  But you didn't see any

23   pistoleros with AK-47's or rocket launchers or rocket

24   propelled grenades and long weapons that may knock down

25   helicopters, you didn't see any of that, right?

Vazquez - Cross/Balarezo

1    A    No, sir.

2    Q    Okay.  And you didn't see any inner perimeter a block or

3    so away of sicarios or pistoleros, did you?

4    A    That's correct.

5    Q    And with respect to those two police cars that were

6    blocking the street, they were just sitting there facing each

7    other, right?

8    A    Facing away.

9    Q    Facing away from each other?

10   A    Yes, sir.

11   Q    Do you know if they were eating a doughnut or anything

12   what were they doing?

13              MS. GOLDBARG:  Objection.

14              THE COURT:    Sustained.  Put the question properly.

15   Q    Did you see what they were doing?

16   A    They were sitting in the vehicle.

17   Q    All right.

18   A    Facing away.

19   Q    And when they were asked to move they did what?

20   A    They moved.

21   Q    Right.  And as far as you know they had nothing to do

22   with Chapo Guzman, right?

23              MS. GOLDBARG:  Objection.

24   Q    As far as you know?

25              THE COURT:  Overruled.

Vazquez - Cross/Balarezo

1    A    As far as I know.

2    Q    All right.  Now, eventually what floor was -- was

3    Mr. Guzman?

4    A    The fourth floor, sir.

5    Q    Fourth floor.

6         So given what you had -- those other five houses

7    that you basically said you believe were connected to

8    Mr. Guzman, a fourth floor hotel room in Mazatlan is a quite

9    different scenario; isn't that right?

10   A    Yes, sir.

11   Q    I mean, there's no -- I think you said yourself, it would

12   be hard to get the tube off and go down four floors, right?

13   A    Yes, sir.

14   Q    Okay.  There wasn't even like a fire escape, was there?

15   A    I don't know.

16   Q    Was there like a sheet tied in knots out the window just

17   in case?

18   A    I never say anything like that.

19   Q    Nothing, right?

20   A    No, sir.

21   Q    Just a plain old hotel room in Mazatlan?

22   A    Yes, sir.

23   Q    I mean, the door wasn't armored, was it?

24   A    I never saw the door.

25   Q    You never went upstairs?

Vazquez - Cross/Balarezo

1    A    No.

2    Q    Are you sure?

3    A    Yes.

4         MS. GOLDBARG:  Objection, Your Honor.

5         THE COURT:  Sustained.

6    Q    All right.  And were there any other Americans in this

7    particular raid?

8         MS. GOLDBARG:  Objection.

9         THE COURT:  Sustained.

10   Q    Well, what you're telling us is you had no involvement

11   whatsoever in the actual physical entry to the apartment; is

12   that correct?

13   A    That's correct, sir.

14   Q    And you had no actual physical contact with Mr. Guzman;

15   is that correct?

16   A    That's correct, sir, other than after he was identified

17   by myself.

18   Q    Right.

19        That reminds me.  So -- so when you -- when you went

20   to try to catch Chapo Guzman, you believe that he was, you

21   know, one of the heads of the cartel, right?

22   A    Yes, sir.

23   Q    He's a huge drug trafficker in Mexico according to what

24   you believe, right?

25   A    Mexico and the United States.

Vazquez - Cross/Balarezo

1   Q    United States, Africa, Europe, Australia, right?

2              MS. GOLDBARG:  Objection.

3              THE COURT:  You can answer.

4   A    We care about traffic in the United States.

5   Q    I understand that, but you were in Mexico at this time,

6   right?

7   A    Yes, sir.

8   Q    And when -- and we'll come back in the actual capture,

9   but when he's actually captured and I think you said they

10  bring him down to you in the parking lot which is downstairs

11  somewhere?

12  A    Yes, sir.

13  Q    These 40 highly trained Mexican Marines, right?

14             MS. GOLDBARG:  Objection, misstates the testimony.

15  Q    Well, the Mexican Marines that you were working with

16  highly trained?

17             THE COURT:  Stop.  Do another question, please.  You

18  can have that last question just do it again.

19             MR. BALAREZO:  Was it objected to --

20             THE COURT:  The one that was not objected to.

21  Q    Were the Mexican Marines that you were working with that

22  night, would you consider them to be highly trained?

23  A    Yes, sir.

24  Q    And you would agree that this is probably not their first

25  capture operation, correct?  I mean, most of them had been

Vazquez - Cross/Balarezo

```
 1    with you at the houses, right?

 2    A    That's correct.

 3    Q    They knew you were looking for Chapo Guzman, correct?

 4    A    We were looking for, yes.

 5    Q    I mean, wasn't a secret who you were looking for?

 6    A    Amongst the Marines, no.

 7    Q    Yeah, right.

 8              But these highly trained Marines know you're looking

 9    for Chapo, they have to rely on you at that point to identify

10    Chapo Guzman?

11    A    Yes, sir.

12    Q    All right.  This notorious Mexican drug trafficker?

13              MS. GOLDBARG:  Objection.

14              THE COURT:  Sustained.

15    Q    Let me show you Defense Exhibit 458.

16              MR. BALAREZO:  Any objection?

17              MS. GOLDBARG:  No objection.

18              THE COURT:  Received.

19              (Defense Exhibit 458, was received in evidence.)

20    Q    Do you see that, sir?

21    A    Yes, sir.

22    Q    And that's Mr. Guzman, correct?

23    A    Yes.

24    Q    And is it accurate to say that that is Mr. Guzman at the

25    time he was arrested in this raid?
```

Vazquez - Cross/Balarezo

1    A    Yes, sir.

2    Q    Okay.  And is this that you saw him for that very first

3    time in the garage?

4    A    Yes, sir.

5    Q    And you see -- you see him in the courtroom right now,

6    right?

7    A    Yes.

8            MR. BALAREZO:  May I have Mr. Guzman stand up?

9            THE COURT:  You may.

10   Q    Look at his face.  This mark that appears in the picture,

11   that's not on his face now, is it?

12   A    No, sir.

13   Q    I know he's got a shirt on, but do you see these other

14   bruises and whatnot on his shoulder?

15   A    Yes, sir.

16           MS. GOLDBARG:  Objection.

17   Q    There's another bruise on his upper --

18           THE COURT:  Overruled.

19   Q    On his forehead?

20   A    Yes, sir.

21   Q    You don't get those falling out of bed, right, these

22   Marines --

23           MS. GOLDBARG:  Objection.

24   Q    -- kind of roughed him up a bit, right?

25           MS. GOLDBARG:  Objection.

Vazquez - Cross/Balarezo

```
1              THE COURT:  Sustained.

2    Q    You didn't see that?

3              MS. GOLDBARG:  Objection.

4              THE COURT:  Sustained.

5    Q    Do you know how he got those bruises?

6              MS. GOLDBARG:  Objection.

7              THE COURT:  Sustained.

8    Q    And that hand that appears there, is that your hand, sir?

9    A    No, sir.

10   Q    Did you take any pictures with your cell phone?

11             MS. GOLDBARG:  Objection.

12             THE COURT:  Sustained.

13   Q    And now let's just talk about the actual -- you -- you

14   testified that in the hotel room, were -- were his wife and

15   two baby girls, I think you described them, right?

16             MS. GOLDBARG:  Objection, misstates --

17             MR. BALAREZO:  I'm sorry?

18             MS. GOLDBARG:  Misstates --

19             THE COURT:  I'm going to overrule the objection.  He

20   can answer if that's right.

21   A    I didn't testify anything about the hotel room.

22   Q    Well --

23   A    I said his wife was present.

24   Q    Let me ask the right question.

25             When Mr. Guzman was seized for the very first time
```

Vazquez - Cross/Balarezo

1     in the Miramar hotel, right, was he alone, yes or no?

2              MS. GOLDBARG:  Objection.

3              THE COURT:  Overruled.

4     A     No, he was not.

5     Q     Was Emma Coronel with him at the Miramar Hotel, yes or

6     no?

7     A     Yes, sir.

8     Q     Were his two baby girls with him at the Miramar Hotel,

9     yes or no?

10    A     Yes, sir.

11    Q     And were there any pistoleros, 150 pistoleros outside the

12    room?

13    A     No, sir, not outside.

14    Q     Are you aware of whether or not there were anyone else

15    besides Emma, and the two baby girls in the hotel room or in

16    similarity to Mr. Guzman?

17    A     Condor.

18    Q     Uh-huh.

19    A     And I believe another baby-sitter or --

20    Q     All right.

21    A     -- or assistant.

22    Q     A lady?

23    A     Yes, sir.

24    Q     She was no pistolero or --

25             MS. GOLDBARG:  Objection.

Vazquez - Cross/Balarezo

1    Q    Do you know whether the lady was a pistolero?

2              MS. GOLDBARG:  Objection.

3              THE COURT:  Sustained.

4    Q    Was she armed?

5              MS. GOLDBARG:  Objection.

6              THE COURT:  I'll allow that answer.

7    A    I didn't see her armed.

8    Q    And this guy Condor that you said was also there, was he

9    armed?

10   A    Yes, sir.

11   Q    All right.  Did they fire upon you or any of the Mexican

12   Marines?

13   A    No, sir.

14             MS. GOLDBARG:  Objection, Your Honor.

15             THE COURT:  Overruled.

16   Q    Did they put up a fight in any way?

17             MS. GOLDBARG:  Objection, Your Honor.

18             THE COURT:  Overruled.

19   Q    You can answer.

20             MS. GOLDBARG:  Your Honor, may we --

21   A    I don't know what he did in the hotel room.

22   Q    Are you aware?

23             MS. GOLDBARG:  May we approach?

24             THE COURT:  Sure.

25             (Continued on next page.)

5648

SIDEBAR CONFERENCE

1              (The following occurred at sidebar.)

2              MS. GOLDBARG:  Your Honor, the agent testified that

3      he was not upstairs in the room whenever this happened, so all

4      the questions that Mr. Balarezo is asking for all rely on

5      hearsay and he doesn't -- you know, all the questions that he

6      is asking is information that he got through someone else.

7              THE COURT:  Okay.  I did not think that was your

8      objection.  That is a good objection.

9              How does he know?

10             MR. BALAREZO:  I'll move on.

11             THE COURT:  He is downstairs, they are upstairs.

12             MR. BALAREZO:  I'll move on.

13             (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Vazquez - Cross - Balarezo

1                (Sidebar ends; in open court.)

2    Q    During the time that -- well, was it the Marines only

3    that went in and captured Mr. Guzman?

4                MS. GOLDBARG:  Objection.

5                THE COURT:  Overruled.

6                MS. GOLDBARG:  Objection, Your Honor, may we

7    approach.

8                THE COURT:  Okay.

9                (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          MS. GOLDBARG:  Your Honor, the answer that he's

3    giving is covered under the Court's pretrial motion in limine

4    motion about how it was identified and who was present.  So we

5    believe that this is covered in the Court's prior ruling.

6          MR. BALAREZO:  And I'm sorry.  The witness already

7    said that he identified Mr. Guzman in the basement.  I'm not

8    asking anything about any intelligence or means or method.  I

9    simply asked who was in the apartment.

10          MS. GOLDBARG:  But asking who's in the apartment

11    could also lead to information that would reveal this

12    information.

13          THE COURT:  Well, he just asked if the Mexican

14    Marines were still in the apartment.

15          MS. GOLDBARG:  I believe he asked if anyone else was

16    in the room.

17          THE COURT:  I see.  Is that your concern that he is

18    asking if anyone else was --

19          MS. GOLDBARG:  Yes, Your Honor.

20          THE COURT:  Okay.  Do you understand?

21          MR. BALAREZO:  I think so, but I -- I'll ask.

22          THE COURT:  Well, no, you won't.

23          MR. BALAREZO:  I will ask a question that will not

24    concern the Government, Your Honor.

25          THE COURT:  We'll see.

SIDEBAR CONFERENCE

1          MR. BALAREZO:  I promise.

2          THE COURT:  Okay.

3          (Continued on next page.)

Vazquez - Cross - Balarezo

1          (Sidebar ends; in open court.)

2     Q    During the --

3               THE COURT:  Give the reporter a second.

4               MR. BALAREZO:  Oh, I'm sorry.

5     Q    Excuse me, during the operation itself when entry into

6     the hotel room was made, right?

7     A    Yes, sir.

8     Q    You said you weren't there when entry was made?

9     A    At the hotel room?

10    Q    Yes.

11    A    Yes, sir.

12    Q    Okay.  You were down in the garage or somewhere else, not

13    at the hotel room?

14    A    In the entry, Lobby 40-A of the hotel.

15    Q    Okay.  And, of course you were in contact with the

16    Marines as they made entry, correct?

17    A    Yes, sir.

18    Q    You had live communications?

19    A    Yes, sir.

20    Q    And is that to say that if a shot had been fired at the

21    Marines as they came in, would you have been able to hear that

22    shot through those radios, or whatever you were wearing at

23    that --

24              MS. GOLDBARG:  Objection.

25    A    I have heard it --

Vazquez - Cross - Balarezo

1        THE COURT:  I am going to allow that.

2    A    I would have heard it without the radios.

3    Q    Okay.  And did you hear any shots?

4    A    No, sir.

5    Q    Did you hear any RPG's going off?

6    A    No, sir.

7    Q    No violence that you could think of, right?

8        MS. GOLDBARG:  Objection.

9    Q    Did you hear any screaming, yelling, he's shooting, he's

10   got a gun, anything of that nature?

11       MS. GOLDBARG:  Objection.

12       THE COURT:  Overruled.

13   A    No, sir.

14   Q    And to your knowledge Mr. Guzman himself never put up a

15   struggle, right?

16       MS. GOLDBARG:  Objection.

17       THE COURT:  Sustained.

18       MR. BALAREZO:  If I could just have a moment,

19   Your Honor?

20       THE COURT:  Sure.

21       (Pause in proceedings.)

22       MR. BALAREZO:  Your Honor, I think I may be done,

23   I'm just --

24       THE COURT:  Check it over.

25       MR. BALAREZO:  Yes.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

5654
Vazquez - redirect - Goldbarg

```
 1              (Pause in proceedings.)

 2              MR. BALAREZO:  Your Honor, I believe I have no

 3   further questions.

 4              THE COURT:  Okay.  Any redirect?

 5              MS. GOLDBARG:  Very briefly, Your Honor.

 6   REDIRECT EXAMINATION

 7   BY MS. GOLDBARG:

 8   Q    Agent Vazquez, defense counsel asked you some questions

 9   about some of the weapons and other contraband that was seized

10   at the houses that you were searching; do you recall those

11   questions?

12   A    Yes, ma'am.

13   Q    Who took possession of these items?

14   A    The Mexican Marines and then the PGR, which is the

15   Mexican authorities.

16   Q    Did you have any role in securing these weapons that you

17   recovered?

18   A    No, ma'am.

19   Q    Why not?

20   A    It was not my role.  It's a Mexican case.

21   Q    Okay.  And what was your role?

22   A    To capture and essentially extradite one of the three --

23              MS. GOLDBARG:  Objection.

24   A    -- into the United States.

25              THE COURT:  Overruled.
```

5655

Vazquez - Recross - Balarezo

1          MS. GOLDBARG:  I have no further questions,

2     Your Honor.

3          THE COURT:  All right.

4          MR. BALAREZO:  Your Honor, I just have one or two.

5          THE COURT:  Go ahead.

6     RECROSS EXAMINATION

7     MR. BALAREZO:

8     Q    Sir, with respect to that question about who took

9     possession of the weapons --

10    A    Yes, sir.

11    Q    -- that you were just asked, are you aware of anything

12    that would have prevented the Government from bringing those

13    weapons here?

14         MS. GOLDBARG:  Objection, Your Honor.

15         THE COURT:  Sustained.

16         MR. BALAREZO:  Nothing further, Your Honor.  Thank

17    you.

18         THE COURT:  All right.  You may step down.  Thank

19    you very much.

20         (Witness exits the witness stand.)

21         THE COURT:  It's a little early for lunch.  Should

22    we call another witness?

23         (No audible response.)

24         THE COURT:  Let's call another witness.

25         MR. NARDOZZI:  Your Honor, The Government calls John

Zappone - Direct - Nardozzi

1    Zappone.

2    J O H N    Z A P P O N E,

3    called as a witness having been first duly sworn/affirmed, was

4    examined and testified   as follows:

5              THE COURTROOM DEPUTY:  Please state and spell your

6    name for the record.

7              THE WITNESS:  My name is John Zappone,

8    Z-A-P-P-O-N-E.

9              THE COURTROOM DEPUTY:  You may be seated.

10             THE COURT:  All right.  You may inquire.

11             MR. NARDOZZI:  Thank you, Your Honor.

12   DIRECT EXAMINATION

13   BY MR. NARDOZZI:

14   Q    Good morning, Special Agent.  How are you today.

15   A    Well enough.

16   Q    Good.  Could you tell us where you're currently employed?

17   A    I work for Homeland Security Investigations in Nogales,

18   Arizona.

19   Q    And what is your job title there?

20   A    I'm a supervisor, a special agent.

21   Q    Okay.  And what does that mean; what do you do in that

22   job?

23   A    Basically supervise investigations that we're authorized

24   to conduct, specifically narcotics investigations.

25   Q    How long have you been working at Homeland Security

Zappone - Direct - Nardozzi

1    Investigations?

2    A     Since 2004.

3    Q     And what kind of training do you have to become a

4    Homeland Security Investigations special agent?

5    A     We have two academies.  The basic criminal investigator

6    academy and job-specific academy.

7    Q     And you mentioned a moment ago you investigate primarily

8    narcotics crimes; is that correct?

9    A     Yes.

10   Q     Where were you working prior to Homeland Security

11   Investigations?

12   A     I was a United States border patrol agent.

13   Q     Okay.  And where were you located for that?

14   A     Nogales, Arizona.

15   Q     Okay.  Special Agent Zappone, have you conducted

16   something called a Title 3 investigation?

17   A     Yes, a few.

18   Q     Can you explain to the Ladies and Gentlemen of the Jury

19   what a Title 3 investigation is?

20   A     A Title 3 investigation is essentially a legalized

21   wiretap investigation, basically where we monitor either

22   electronic or oral communications that were being passed over

23   communications devices.

24   Q     You say electronic communications, what do you mean by

25   that?

David R. Roy, RPR, CSR, CCR
Official Court Reporter

5658

Zappone - Direct - Nardozzi

1    A    Something like a text message or an email.

2    Q    And oral communications meaning?

3    A    Voice.

4    Q    How do you receive authorization to conduct Title 3

5    investigations?

6    A    A United States District Judge authorizes it.

7    Q    And when you receive authorization to conduct a Title 3

8    investigation, how long does that authorization typically last

9    for?

10   A    Approximately 30 days.

11   Q    Okay.  In conducting a Title 3 investigation, are you

12   familiar with something called a target device?

13   A    Yes.

14   Q    Can you explain to the Ladies and Gentlemen of the Jury

15   what a target device is?

16   A    A target device is typically going to be the device

17   that's be used in furtherance of a crime that's being -- or

18   where elements of that crime are being communicated over.

19   Q    Okay.  This target device, this is the device that you,

20   in fact, are intercepting, correct?

21   A    Yes.

22   Q    And what about a target subject, what that mean?

23   A    A target subject would be a person in communication with

24   that target device or the person using it.

25   Q    And without providing the jury with the methods that you

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Zappone - Direct - Nardozzi

1    use, what does it mean to intercept a communication?

2    A    Basically to -- almost like a -- well, when a message is

3    being passed from one point to another point, we basically see

4    that message coming across in realtime and be able to read it.

5    Q    And what type of communication are you looking for when

6    you conduct a Title 3 investigation?

7    A    Basically, any kind of communications that talk about the

8    criminal activities that we're authorized to intercept.

9    Q    Okay.  Were you involved in a Title 3 investigation that

10   began in 2013?

11   A    Yes, I was.

12   Q    And when did the overall investigation that led to this

13   Title 3 investigation begin?

14   A    Approximately in 2011.

15   Q    Okay.  And when did the Title 3 portion of that

16   investigation begin?

17   A    Oh, in -- the Title 3 portion begin in February 25th of

18   2013.

19   Q    And how long did that Title 3 portion of your

20   investigation last?

21   A    Until August of 2014.

22   Q    What was your role in the Title 3 investigation that

23   lasted from February of 2013 to August of 2014?

24   A    I was one of the main case agents on that case, and I

25   also authorized many of the affidavits that were used to

Zappone - Direct - Nardozzi

1    intercept the wire device.

2    Q    And what was that investigation focused on?

3    A    A joint chapter of the organization in Mexico.

4    Q    Okay.  What types of communication did you gather during

5    the course of this Title 3 investigation that we're speaking

6    about?

7    A    Well, specifically we were intercepting

8    BlackBerry Messenger communications, which is the proprietary

9    chat application used by BlackBerry.

10   Q    Okay.  And what types of communication were you looking

11   for specifically?

12   A    Well, they were basically instant messages concerning

13   drug trafficking.

14   Q    Okay.  You mentioned target devices a moment ago.  How

15   many target devices did you intercept during the course of

16   this Title 3 investigation?

17   A    It was well over 70.  I think we went up all the way

18   almost to 77 devices.

19   Q    Well, when you intercept a target device, how do you

20   determine when it's time to stop intercepting that target

21   device?

22   A    When it's no longer being used to further illegal

23   activity.

24   Q    Okay.  And how can you tell that?

25   A    Well, it's either dropped, there's no longer any messages

Zappone - Direct - Nardozzi

1    coming across that, which I believe we consider somebody

2    dropping a telephone, or, for example, if the target subject

3    that is basically using it pass it off to like another subject

4    that's not involved in the investigation.

5    Q    Okay.  You mentioned a moment ago you're intercepting

6    BlackBerry Messenger communications in this case?

7    A    Yes.

8    Q    Can you describe how BlackBerry Messenger works?

9    A    BlackBerry Messenger was -- it's an application that was

10   hardwired into every single BlackBerry device back in 2013.

11   They basically assigned a hexagonal ten, which was

12   alphanumeric number and it would be associated to that

13   specific device and it would allow you just to basically

14   instant message each other over the BlackBerry proprietary

15   network.

16   Q    Okay.  So that's essentially like the phone number for

17   that BlackBerry?

18   A    Yes.

19   Q    -- device?

20   A    Yes.

21   Q    Okay.

22   A    It's hardwired, though.  You can't change it, back then.

23   Q    Okay.  After you stop intercepting the device, target

24   device, what do you do with it?

25   A    We basically preserve the evidence that we received from

Zappone - Direct - Nardozzi

1    it.  We have a working copy of the disk and then we have

2    another copy of the evidence that we basically take to a judge

3    to have it seal.

4    Q    Okay.  What does it mean to have it sealed?

5    A    Well, when we're done intercepting, we basically eject

6    the disks.  We take it immediately to a Federal Judge.  He

7    then -- we put it in an envelope.  We put a seal over it, and

8    the judge will sign over the top of it basically preserving

9    the evidence so no one can alter it.

10   Q    Okay.  When you get authorization to intercept a target

11   device, is that authorization tied to the devise itself or is

12   it the user of that device?

13   A    It's mostly tied to the device itself.

14   Q    And if you have instances as an investigator where the

15   device is regularly dropped, is there some sort of a judicial

16   remedy for that?

17   A    Yes.  It's something that we would call a roving wiretap

18   that targets the person using the devices.

19   Q    All right.  So describe how a roaming wiretap works for

20   the jury.

21   A    A roving wiretap would be like, for example, someone

22   who's tossing a device or dropping the device frequently, so

23   frequently enough that it's difficult for us to basically get

24   back up and maintain continuous communication on that.  So

25   what we do is we basically articulate the facts about the

Zappone - Direct - Nardozzi

1   target subject that's using those devices to the judge, and

2   the judge gives us authorization to intercept the person

3   rather than the device.

4   Q    Did you intercept any roving devices during the course of

5   the Title 3 investigation that you participated in from

6   February 2013 until August 2014?

7   A    Yes, we did.

8   Q    How many of those did you intercept?

9   A    I want to say approximately eight.

10  Q    Approximately how many total communications did you

11  intercept during that period that we've been discussing?

12  A    We intercepted approximately 1.5 million communications,

13  but those include actually messages, image files, and

14  basically updates for the applications themselves.

15           MR. NARDOZZI:  Your Honor, may I approach the

16  witness?

17           THE COURT:  You may.

18           MR. NARDOZZI:   Thank you.

19  BY MR. NARDOZZI:

20  Q    You can start looking through those.

21  A    (Witness complies.)

22  Q    Special Agent Zappone, I have handed you what is marked

23  for identification.  It's Government Exhibit 610-A through

24  610-N and Government Exhibit 610-R.

25           Just take a moment looks through those and let me

5664
Zappone - Direct - Nardozzi

1   know when you're done.

2   A     (Witness complies.)

3   Q     All right.  Special Agent, do you recognize those?

4   A     Yes, I do.

5   Q     What are those?

6   A     It is the original disks that we intercepted that were

7   sealed by the judge.

8   Q     Okay.  And how many of these disks were generated during

9   the course of the entire investigation?

10  A     There was a disk generated for every specific device we

11  intercepted.

12  Q     Okay.  And each of those disks, what do they correspond

13  to?

14  A     They correspond to the interceptions that we collected

15  off of the device.

16  Q     All right.

17  A     Target device.

18  Q     And does each individual target device have its own disk?

19  A     Yes.

20  Q     Okay.  Can you access these disks from a regular computer

21  like a laptop?

22  A     No.

23  Q     Why not?

24  A     Because there's a -- there's a system, a proprietary

25  system that's basically used to intercept the messages.  If

Zappone - Direct - Nardozzi

1    you put it into a regular laptop without that program actually

2    installed, you're not going to be able to basically read it.

3    Q    Okay.  These disks that you're looking at, have they been

4    altered in any way?

5    A    No.

6    Q    In fact, is the seal that you placed on them with the

7    judge still affixed?

8    A    All of them are.

9    Q    You said a moment ago you have something called working

10   copies?

11   A    Yes.

12   Q    What are those?

13   A    The working copies, they were used to basically further

14   our investigation, provide to the defense when they need it.

15   If we need to basically review the interceptions that we're

16   look at, that's the copy we use.

17   Q    So when you review interceptions on a working copy, what

18   type of a file are you looking at or what do you see when you

19   access the data?

20   A    On this one we basically had to extract them with

21   spreadsheets on Excel.

22   Q    Okay.  What do those spreadsheets contain?

23   A    BlackBerry messages basically, the addressing system of

24   the BlackBerry proprietary network uses, the PIN number that's

25   being contacted by the other PIN number, and the screen name

Zappone - Direct - Nardozzi

1    or the print the user is using, and the intercepted message

2    itself.

3    Q    Okay.

4         MR. NARDOZZI:  I'm going to leave this on.

5    Q    I'm showing you what's marked as

6    Government Exhibit 610-N.  Do you recognize this?

7    A    Yes.

8    Q    And what is this?

9    A    That's a copy of the disk containing all the

10   interceptions with my signature on it.

11   Q    Okay.

12        MR. NARDOZZI:  At this time, Your Honor, the

13   Government would ask to move Exhibit 610-A into evidence.

14        MR. PURPURA:  There's no objection, other than what

15   may or may not have been done previously.

16        THE COURT:  Say that one more time.

17        MR. PURPURA:  There's no objection except what we

18   may have or may not have been preserved at any pretrial

19   motion.

20        THE COURT:  Okay.

21        MR. PURPURA:  Thank you.

22        THE COURT:  Received on that basis.

23        (Government Exhibit 610-A, was received in

24   evidence.)

25        MR. NARDOZZI:  Your Honor, can I speak to counsel

Zappone - Direct - Nardozzi

1    briefly --

2              THE COURT:  Yes.

3              MR. NARDOZZI:   -- so I can understand?

4              THE COURT:  He's saying he's preserved any

5    objections that he made pretrial.

6              MR. NARDOZZI:  Thank you, Your Honor.

7              (Government Exhibit 610-N, was received in

8    evidence.)

9    Q    What is on Government Exhibit 610-N?

10   A    A bunch of the intercepts that we intercepted and

11   preserved on these wiretaps.

12   Q    Okay.  And you had an opportunity to review these and

13   confirm that they are from the investigation you were a part

14   of?

15   A    Yes, I did.

16   Q    All right.  I want to ask you couple of brief questions

17   about your observations during the course of your Title 3

18   investigation.  First of all, were you overseeing the room

19   where they intercepted communications at the time -- during

20   the interception?

21   A    Not particularly.

22   Q    Okay.  Did you have access to the line sheets that were

23   generated during the course and time of the investigation?

24   A    Yes.

25   Q    Okay.  And what did you review those communications for?

5668

Zappone - Direct - Nardozzi

1    A    Basically elements of the crimes that we were

2    investigating and authorized to intercept.

3    Q    Okay.  Without discussing at all any of the content of

4    the messages, were you able to make any observations about the

5    way that the messages were flowing during the course of your

6    period of interception?

7    A    Yeah.  It was a -- yes.  It was a very unique method of

8    communication that we basically hadn't seen before.

9    Q    Okay.  I'm going to show you what's --

10            MR. NARDOZZI:  Just for the witness only.

11   Q    -- marked as Government Exhibit 515-1.  Do you recognize

12   this?

13   A    Yes, I do.

14   Q    What is this?

15   A    It's basically a flowchart of basically how this drug

16   trafficking organization was operating.

17   Q    And is this a chart that you actually created?

18   A    Yes, I did.  I actually make it.

19   Q    All right.  And is this based upon your observation

20   during the time of interception?

21   A    Yes.

22            MR. NARDOZZI:   Your Honor, at this time,

23   the Government would ask to move Exhibit 515-1 into evidence.

24            MR. PURPURA:  No objection.

25            THE COURT:  Received.

Zappone - Direct - Nardozzi

1              (Government Exhibit 515-1, was received in

2      evidence.)

3      BY MR. NARDOZZI:

4      Q    All right.  So Special Agent Zappone, let's use this

5      chart to help us a little bit.  What are -- you have different

6      tiers on this chart, correct?

7      A    Uh-huh, yes.

8      Q    And can you explain to the Ladies and Gentlemen of the

9      Jury what are tiered communications?

10     A    Well, basically this DTO would have a field operative,

11     basically out in the field or in another country such as

12     Colombia, Ecuador, Canada, and they would want to communicate

13     with the head of the DTO, they would basically send a message

14     to a device that they would referred to as an office device,

15     and they would be thinking they were communicating with that

16     person directly.  But what would, in fact, happen is -- what

17     this was was the mirror system --

18     Q    Okay.

19     A    -- and basically -- well, that's what we refer to it as,

20     mirror.  The office would then basically cut and paste the

21     message that he received from the field operatives and then

22     pass it up to what we called the second tier device.  That

23     second tier device would do the same thing.  We'd basically

24     cut and paste that message and send it up and send it out --

25              MR. PURPURA:  Your Honor, I apologize.

Zappone - Direct - Nardozzi

1          But Madam Interpreter, I'm sorry, but I can't hear.

2          THE COURT:  I'm not sure what to do about that.

3   I'll ask the interpreter to be a little more quiet if she can.

4          MR. PURPURA:  Thank you, Your Honor.

5          THE COURT:  If she can't -- or maybe you need to

6   move your chair someplace else.

7   A    So --

8   BY MR. NARDOZZI:

9   Q    Continue, sir.

10  A    So on the second tier devices, there are basically paths

11  you would have to jump to what we refer to as a top tier

12  device.  And messages that would return would flow down

13  similarly where the top tier device would type a message, send

14  it down to the second tier device.  The second tier device

15  would cut and past it and forward it down to the first tier

16  device who would, again, basically cut and past that and send

17  it down to the field operatives.

18  Q    You used an abbreviation a second DTO?

19  A    Yes.

20  Q    What does that mean?

21  A    That means drug trafficking organization.

22  Q    Okay.

23          Now, based upon your observations, how would a

24  message kind of be addressed in a way to make sure it wound up

25  at the right location?

Zappone - Direct - Nardozzi

1    A     Well, there were a great many field operatives sending

2    messages up through this system, and there were a great many

3    different offices each had a number assigned after them.  But

4    a field operative would basically communicate with just one

5    office, but there would be several of them communicating

6    through the same office.

7          So what they would do in order to basically make

8    sure the messages are being forwarded to the right person,

9    they would basically type the nickname or a screen name of

10   whoever it was addressed to and put a parenthesis beside it

11   and forward it up.  That way they would know who the message

12   was coming from at the top tier level.  And then when they

13   would send the messages back down, they would address it

14   similarly.  And when the office level would get it, they would

15   try to erase it and basically make it look like it was just

16   one level of communication.

17   Q     Very briefly --

18         MR. NARDOZZI:  And switch to the PowerPoint.  I

19   would like to pull up Government's Exhibit 515-2 which I

20   believe is without objection.

21         MR. PURPURA:  That's correct.

22         THE COURT:  Received.

23         (Government Exhibit 515-2, was received in

24   evidence.)

25         THE COURTROOM DEPUTY:   Hold on.

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

Zappone - Direct - Nardozzi

1    By MR. NARDOZZI:

2    Q     All right.  Special Agent Zappone, 515-2 depicts two

3    separate conversations, 610N-1LT on the left and 610N-1PT on

4    the right.  Taking a look at this, looking at the first red

5    box on the column on the left, can you read the contents of

6    that red box for the jury?

7    A     Memin, parenthesis, from Belize gets the route straight

8    to Manta.  And from Manta to Ipiales.  Did you check that out

9    yet?

10   Q     And can you read the first red box on the other side?

11   A     Memin from Belize gets the route straight to Manta.  And

12   from Manta to Ipiales.  Did you check that out yet?

13   Q     What do use notice about those two messages?

14   A     They're identical.

15   Q     Okay.  There's a series of arrows depicted on this, on

16   this screen.  What do they represent?

17   A     They represent communications flowing down from the top

18   tier device and communications from the field operative that

19   there are four being returned.

20   Q     So in this set of examples here, who is the field

21   operative?

22   A     A pilot that we identified by the name of Memin.

23   Q     And which device does the OFIS flow, the first tier?

24   A     OFIS 2.

25   Q     Okay.  And then on the screen to the right, what's the

David R. Roy, RPR, CSR, CCR
Official Court Reporter

Zappone - Direct - Nardozzi

1    first tier operative device?

2    A    It's referred to as USACELL.

3    Q    Okay.  And, again, taking a look at all the boxes on the

4    screen --

5    A    Okay.

6    Q    -- do we see the same kind of convention here where the

7    messages match on either side?

8    A    Yes.  They're basically using it as a filter.

9    Q    Looking forward to the next screen.  On the set of

10   translations to the right, we see some gaps where there aren't

11   any red boxes.  Why is that?

12   A    Because those are communications from other field level

13   operatives being pass out or in the communication structure

14   going back and forth.

15   Q    Okay.  So what does this reflect?

16   A    A constant level of communication and a lot of messages

17   coming in.

18   Q    Does it also reflect multiple users --

19   A    Oh, yes.

20   Q    -- communication devices?

21   A    Yes, there are quite a few.

22   Q    Okay.

23            MR. NARDOZZI:   Your Honor, I don't have any further

24   question.

25            THE COURT:  All right.  Do you have any cross?

Zappone - Cross - Purpura

```
 1              MR. PURPURA:  I do.

 2              THE COURT:   All right.

 3   CROSS-EXAMINATION

 4   CROSS-EXAMINATION

 5   BY MR. PURPURA:

 6   Q    Good afternoon, Agent Zappone.

 7   A    Hello.

 8   Q    You are -- you were the case agent for the 2013 to 2014

 9   on a Title 3; is that correct?

10   A    I was one of a few, yes.

11   Q    And we haven't had many case agents in this case.  So

12   just tell us again quickly, what is a case agent?

13   A    It would basically be the leader or organizer of the

14   investigation.

15   Q    So you were one of the leaders or organizers starting

16   from those dates, 2013 to 2014 when this Title 3 was running;

17   is that correct, sir?

18   A    I would said I was one of the few, yes.

19   Q    That's what I said, one.

20              How many other case agents were there?

21   A    There was one specific case agent past the investigation,

22   and then an entire team devoted to it.

23   Q    And the entire team would not be designated case agents;

24   is that correct, sir?

25   A    No.
```

Zappone - Cross - Purpura

1  Q    I'm trying to say, you were the man on this wire.  It

2  that fair to say?

3  A    No, because it was a team effort.

4  Q    And you're a team player?

5  A    Yes.

6  Q    But who was the captain of that team?

7  A    The captain of the team?

8  Q    Yes.

9  A    I wouldn't lay claim to that.  I was one of many people

10  involved in it.

11  Q    And as a case agent of this particular Title 3 wiretap,

12  you also wrote up some of the affidavits; is that correct?

13  A    Yes.

14  Q    And that's what the case agent would do; is that correct,

15  sir?

16  A    It depends.  It would basically be an assigned level of

17  work, because it's a large amount of work to actually do one

18  of these investigations.

19  Q    And on those affidavits, you put down that you are one of

20  the case agents; is that correct, sir?

21  A    I can't remember.

22  Q    Now, you indicated that when the Title 3 was up and

23  running from February of 2013 through August 2014, you can

24  intercept either oral interceptions and/or electronic; is that

25  fair, sir?

Zappone – Cross – Purpura

1    A     No.  The judge didn't give us authorization to do that.

2    Q     I'm sorry.  The judge did or did not?

3    A     We didn't ask for it.  We only asked for permission to

4    intercept the BlackBerry message.

5    Q     And this Title 3, that's all you have is electronic

6    messages; is that correct, sir?

7    A     That and imagines, yes.

8    Q     And, in fact, you were able to target 77 devices; is that

9    correct, sir?

10   A     Approximately.

11   Q     It's a lot of devices?

12   A     Yes.

13   Q     You had close to 1.5 million messages which were

14   intercepted and/or pictures, downloads, correct?

15   A     Yes.

16   Q     That's a lot, correct?

17   A     Yes.

18   Q     That's why you needed a large team, right?

19   A     Yes.

20   Q     And that team needed some structure and supervision,

21   correct?

22   A     Yes.

23   Q     And you were one of those people who gave that team some

24   structure and supervision, correct?

25   A     I wasn't the assigned supervisor, but I did have a

5677

Zappone - Cross - Purpura

1   leadership role in that.

2   Q    And if you chose, you could listen to the -- not listen,

3   excuse me -- you could read the messages in realtime; is that

4   correct, if you chose to do that?

5   A    They wouldn't be in realtime.  It took awhile to make it

6   through the systems, but we would try to see them as quick as

7   we could.

8            (Continued on the next page.)

ZAPPONE - CROSS - PURPURA

1    CROSS-EXAMINATION(continuing)

2    BY MR. PURPURA:

3    Q    And of course you can look at them historically as well

4    once they are past we have sheets, line sheets, correct?

5    A    Yes.

6    Q    And what you may not do but some of the people who work

7    in the wire room would do, would be look for pertinent or

8    non-pertinent messages; is that correct, sir?

9    A    We basically have a contract wiretap monitors that

10   basically filter that stuff out so we don't see it.

11   Q    When I say pertinent I mean -- and non-pertinent, you

12   wouldn't want a text messages involving, say, where do you

13   want to go to dinner tonight?  Well, that may be relevant now,

14   right?

15   A    It depends.  If that helped us to prove the

16   identification of the person holding the device, we would

17   consider that pertinent.

18   Q    Fair enough.  But I guess the bottom line is that you,

19   yourself, were able to review what you thought was necessary

20   to review as the -- one of the case agents on this particular

21   case; is that correct, sir?

22   A    Yes.

23   Q    And as a result of that -- this is an investigation,

24   correct?

25   A    Yes.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

ZAPPONE - CROSS - PURPURA

1   Q    And the person under investigation, one of the people at

2   least was Mr. Guzman; is that correct, sir?

3   A    Yes.

4   Q    And you've been doing this before 2013, how long have you

5   been involved in this type of work, law enforcement?

6   A    Since 2000.

7   Q    2000.  So 13 years of experience you brought to the

8   table; is that correct, sir?

9   A    Yes.

10  Q    And as a result of what you were doing, based on the

11  information you received in your investigation, you had some

12  conclusions involving Mr. Guzman; is that correct, sir?

13          MR. NARDOZZI:  Objection, Your Honor.

14          THE COURT:  Let's have a sidebar.

15          (Sidebar conference.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          THE COURT:  Is this the guy with the opinions?

2          MR. PURPURA:  I'm not asking for his opinion.

3          MR. NARDOZZI:  Yes, you are.

4          MR. PURPURA:  I'm going to use the language the

5  government used, which I just did, and what he's going to say

6  is responsive, I'm not asking for his opinion at this point.

7          THE COURT:  You asked him, did he reach conclusions,

8  he'll say yes, then what are you going to ask?

9          MR. PURPURA:  Your conclusion based on the

10  investigation, based on the information you received is

11  Mr. Guzman did not move any drugs to Chicago.

12          THE COURT:  That's his opinion.

13          MR. PURPURA:  That's an opinion -- it's an

14  investigation based -- there's nothing in his investigation --

15  well, how about this:  Was there anything in your

16  investigation which indicated that Mr. Guzman moved drugs to

17  Chicago?

18          THE COURT:  That's better.

19          MR. NARDOZZI:  Your Honor, we did file a motion

20  about this, the Court did grant the motion to keep his

21  conclusions out, specifically the content of the email that

22  Mr. Purpura is quoting from.

23          THE COURT:  No, he's phrasing it differently.  All

24  he's saying is it's equally consistent with him having a

25  limited role.  If you phrase it the way you did just now to

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1   say you did not find any, I think he can answer that because

2   that explains what he did and the investigation that the

3   government put him on to testify about.  It goes to the limits

4   of the investigation not his opinion, I think.

5          MR. NARDOZZI:  If I can also add, Your Honor, I

6   think it's outside the scope of the direct.  I didn't ask him

7   about conclusions about drug trafficking, I simply asked him

8   about the communication system.  I was careful in the way that

9   I crafted that question.

10         THE COURT:  That's true.  How does it go to his

11  credibility?  Maybe you're saying it doesn't, maybe it goes to

12  the limits of the investigation.

13         MR. PURPURA:  Well, it goes to the investigation

14  itself and what he did and what counsel did bring out that he

15  monitored the wire, that he had access to line sheets, that he

16  is the case agent in this particular case and from that and

17  the target of the investigation was Mr. Guzman.  You can't put

18  blindfolds on him.  As a result of that, based on the

19  information he looked at, based on 13 years of investigations

20  concluded that Mr. Guzman was not trafficking drugs.

21         THE COURT:  No, now you lost me.  Now he's giving

22  his evaluative opinion as an agent and he's not qualified to

23  give that, he's not competent to give that.

24         MR. PURPURA:  No, it's not based on an opinion, it's

25  based on the investigation that he did.

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

5682

SIDEBAR CONFERENCE

1    MR. BALAREZO:  You changed the question.

2    THE COURT:  It's still his opinion based on the

3  investigation that he did.

4    MR. NARDOZZI:  Your Honor, if I can.  I also never

5  elicited Mr. Guzman's name quite purposefully for this exact

6  reason.

7    THE COURT:  Scope, you're saying?

8    MR. NARDOZZI:  Yes, well scope and the findings you

9  made in the motion and the order.

10    MR. PURPURA:  I'm sorry.

11    THE COURT:  Take one more shot.  So far you haven't

12  got me.

13    MR. PURPURA:  I think that based -- am I doing scope

14  or am I doing relevance?

15    THE COURT:  You're doing scope first because

16  Mr. Guzman was never mentioned during direct.

17    MR. PURPURA:  The chart has been identified and the

18  numbers on the chart have been identified as connected to

19  Mr. Guzman and he goes through the chart, and that's the

20  relevance of that chart coming in, because various cooperators

21  have identified those PIN numbers to Mr. Guzman, and that's

22  why it's coming in.

23    The conversation the government just put on the --

24  as the PowerPoint was a conversation which was testified by a

25  cooperator involving drug trafficking and Mr. Guzman.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1       THE COURT:  I assume the government is going to let

2   the jury know that at some point.

3       MR. NARDOZZI:  Your Honor, the cooperating

4   witnesses -- three of the upcoming cooperating witness will

5   testify the system was Mr. Guzman's, but part of the reason I

6   didn't elicit the evidence from the agent is because I think

7   that information is more credible from the witnesses not from

8   the speculation of the agents thinking it went to Mr. Guzman.

9   I also don't believe any of those pins have been identified

10  with any specificity or the screen names that are in the

11  chart.  And again, I was very careful not to elicit

12  Mr. Guzman's name.

13      THE COURT:  Here's what I want to do, we're going to

14  break for lunch and I'll think about it, but I do want you to

15  give me another proffer as to the questions you intend to ask.

16  The language here is important.

17      MR. PURPURA:  Thank you.

18      THE COURT:  But I want you to do that now.

19      MR. PURPURA:  Why don't you give me the break for

20  lunch to make sure that I articulate it properly.

21      THE COURT:  All right.  We'll do that.

22      MR. PURPURA:  We'll come back early.

23      THE COURT:  We'll take a break for lunch, maybe you

24  two can even talk about it, see if you can work out acceptable

25  questions.  I would appreciate it if you can.

5684

SIDEBAR CONFERENCE

1          MR. PURPURA:  Thank you.

2          MR. NARDOZZI:  Thank you, Your Honor.

3          (End of sidebar conference.)

4          (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5685

Proceedings

1          (In open court.)

2          THE COURT:  Once again, ladies and gentlemen, rather

3   than keep you during our extended discussions, we're going to

4   send you to lunch.  Please don't talk about the case.

5          We'll have you back in here at 1:35.  Thanks.

6          (Jury exits courtroom.)

7          THE COURT:  Let's meet at 1:30.

8          (Luncheon recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5686

Proceedings

1                    A F T E R N O O N   S E S S I O N

2              (In open court.)

3              (The Hon. Brian M. Cogan, presiding.)

4              (Defendant present.)

5              (The following occurs outside the presence of the

6    jury.)

7              THE COURT:  Any chance that the parties worked out

8    the issue we had discussed at sidebar?

9              MR. NARDOZZI:  I'm sorry, Your Honor.  We didn't.

10             THE COURT:  I will tell you I reread the decision I

11   wrote down prior to trial and I thoroughly convinced myself I

12   was right.  So, Mr. Purpura, let me hear why I wasn't.

13             MR. PURPURA:  The issue before, Your Honor, that was

14   presented in the motion was the -- that, in fact, we intended

15   to introduce under 801(d)(2)(D) would be Zappone's conclusion

16   that based upon his investigation that Mr. Guzman was more

17   myth than legend, but what I'm seeking to introduce at this

18   point right now is not that conclusion.

19             What I'm seeking to introduce is the specific

20   finding that based on his investigation and I'm going to go

21   into greater detail.  I would indicate that first I would show

22   that again he is the case agent for the wiretapping.  It was

23   his job to update other agents as to what's progressing in the

24   intercept of these electronic messages.  It was his job to

25   update Andrea Goldbarg who in the affidavits the -- the

SN        OCR        RPR

Proceedings

1      affidavits to continue the wiretap and that information that

2      he was giving to her was put in the wiretap itself and it was

3      his job to review all the messages and after reviewing all the

4      messages he concludes as the investigator in this case, not so

5      much the opinion, which I would like to get in, in fact that

6      Guzman is more myth than legend, but what he finds based on

7      the investigation is that Guzman did not move any drugs to

8      Chicago based the intercepts from that period of time 2013 and

9      2014 and that's a factual question.

10          THE COURT:  Why not if it is that narrow?  You might

11     have other people that will say we do find that he moved drugs

12     into Chicago during that period.

13          MR. NARDOZZI:  Your Honor, first of all, I too

14     believe you were right as well.  Secondly, the truth of the

15     matter is that he's still asking for the opinion of the agent

16     asking about intercepts about where drugs went and even

17     that -- it goes right into what you drafted in the order for

18     the motion to be filed.  So it's still the opinion of the

19     agent as to whether or not drugs went to Chicago.

20          THE COURT:  It is a little different the way he's

21     phrased it and he asked it and I am going to hold him to it.

22     It is difficult to say to an agent, in the course of your

23     investigation did you find any evidence of X and the agent

24     will say, no, I didn't find any evidence of X.  Then the

25     Government will call another agent who will say I found

SN        OCR        RPR

Proceedings

1    evident of X.  That's not an opinion.  It's just a report on

2    what the evidence showed to that agent.  Now I agree with you

3    though that the line between opinion and conclusion is hazy

4    there, but when he says, more myth than actuality, that's

5    clearly opinion; but when he says I didn't see any of this,

6    that's not his opinion.  It is saying what his perceptions

7    are.

8             So if Mr. Purpura holds him to his perceptions as

9    he's indicated that he will, then that is okay is.

10            MR. NARDOZZI:  The only other grounds are that I

11   would renew my scope objection.  He was asked only about the

12   wire investigation and not about the content.

13            THE COURT:  But he is being asked based on his work

14   whatever he did that you brought out, the wire connection and

15   that, did he see any evidence of movement to Chicago in 2013

16   to 2014.  He did or he didn't.  It's an observation not an

17   opinion.  So I will let him have that.  But like I said before

18   it's a fine line and you've got to be on the right side of it.

19   All right?

20            MR. PURPURA:  Yes, sir.

21            MR. NARDOZZI:  Yes, Your Honor.

22            THE COURT:  Let's have the witness back and then the

23   jury, please.

24            (Witness resumes stand.)

25            (Jury enters.)

*SN       OCR       RPR*

Proceedings                                    5689

1          THE COURT:  Be seated, please.

2          Mr. Purpura.

3          MR. PURPURA:  Your Honor, thank you.

4          (Continuing on the following page.)

*SN        OCR        RPR*

Zappone - Cross - Purpura

1    JOHN ZAPPONE,  resumed:

2    CROSS-EXAMINATION

3    BY MR. PURPURA:  (Continuing.)

4    Q    Agent Zappone, as the case agent, you and your team and

5    your group were involved in wiretapping the Guzman

6    organization, in your words, pretty extensively over the past

7    year and the year being 2013 and 2014.  Does that sound about

8    accurate, sir?

9    A    It's about accurate.

10   Q    In addition to the extensive wiretapping -- and the

11   wiretapping I'm talking about these electronic messages from

12   the BlackBerry, your job, part of your job was to update other

13   agents in the field about these messages as well; is that

14   correct, sir?

15   A    Was it part of my job?

16   Q    Yes, was it part of what your duties were.  There were

17   communication with boots on the ground, other agents; is that

18   correct?

19   A    Yes.

20   Q    In addition to other agents, you were also in direct

21   communication electronically by e-mails and text messages with

22   Assistant United States Attorneys; is that correct, sir?

23   A    Yes.

24   Q    And the reason why you're in contact with the Assistant

25   United States Attorneys is because they need to know the

SN        OCR        RPR

Zappone - Cross - Purpura

1    results of your investigation, your team's investigation, so

2    that they can prepare affidavits and orders to the United

3    States district court judges to continue the year-long

4    wiretapping; is that correct, sir?

5    A    Yes.

6    Q    And one of the Assistant United States Attorneys that you

7    were in contact with giving information that you received from

8    these intercepts was Andrea Goldbarg; is that correct?

9         MR. NARDOZZI:  Objection, Your Honor.

10        THE COURT:  Sustained.

11   Q    The person that you gave the information to, the

12   Assistant United States Attorney would then prepare affidavits

13   to the Court; is that correct, sir?

14   A    I would write the affidavits and submit them to her for

15   her review and --

16   Q    And that person, he and/or her, would then submit those

17   to the Court for a continued authorization; is that correct,

18   sir?

19   A    No, I would have to actually go to the Court and sign the

20   affidavit myself.

21   Q    And based on your year-long investigation -- strike that.

22        In the course of your year-long investigation from

23   2013 through 2014, did you find any evidence, any evidence,

24   that Joaquin Guzman moved any drugs to Chicago.

25   A    No.  That wasn't our investigation.

SN        OCR        RPR

Zappone - Cross - Purpura

1   Q    You did not find that in your investigation; is that

2   correct, sir?

3   A    In our part, no.

4   Q    This is in evidence.  You quickly went through the tiers

5   of messages in your direct examination; is that correct, sir?

6   A    Yes.

7   Q    And as we can see -- as we can't see, this -- whoever

8   this is here is unidentified; is that correct, sir?

9   A    Yes.

10  Q    And the reason that person, him, her or whoever is

11  unidentified is because despite what you were able to do in

12  2013 and 2014 about intercepting these messages, it still does

13  not identify who this person is up here; is that correct, sir?

14              MR. NARDOZZI:  Your Honor, can we have a sidebar?

15              THE COURT:  Okay.

16              (Sidebar held outside of the hearing of the jury.)

17              (Continued on next page.)

18

19

20

21

22

23

24

25

1        (The following sidebar took place outside the

2   hearing of the jury.)

3        MR. NARDOZZI:  Your Honor, I anticipate that

4   Mr. Purpura is attempting to kind of fling the door open for

5   himself.  I think Special Agent Zappone may testify that the

6   defendant was at the top of that structure, that he was

7   guessing essentially, but I would like to make it clear that

8   if he flings the door open he can't walk through it following

9   with that e-mail, if the Court agrees of course.

10       THE COURT:  I do not really understand what you just

11  said.

12       MR. NARDOZZI:  I think he's trying to elicit from

13  Special Agent Zappone that the person at the top of the

14  structure is the defendant.

15       MR. PURPURA:  I think he's going to say we don't

16  know.  It's a blank.  The agent has got to say that because it

17  is blank.

18       MR. NARDOZZI:  Okay, that's fine, Your Honor.  If he

19  does say he believes that Guzman was involved in the

20  communications --

21       THE COURT:  You can object and I will strike it.

22       (Sidebar ends.)

23       (Continued on next page.)

24

25

            SN        OCR        RPR

Zappone - Cross - Purpura

1    BY MR. PURPURA:

2    Q    Agent, the person at the top at this point is based on

3    the -- based on the chart, is unidentified; is that correct,

4    sir?

5    A    At this point?

6    Q    Yes.

7    A    At the point I created the chart or now?

8    Q    At the point when you created the chart.

9    A    At the point when we created the chart, it would be

10   unknown.

11   Q    And obviously the Government could have put any picture

12   they wanted to put in there before your direct examination.

13   Would that be fair to say, sir?

14   A    I would say -- I would -- we would want to be honest with

15   it, yes.

16         MR. PURPURA:  Your Honor, may I have just have one

17   moment?

18         THE COURT:  Sure.

19         (Pause in proceedings.)

20         MR. PURPURA:  Thank you, Judge, nothing further.

21         THE COURT:  Any redirect?

22         MR. NARDOZZI:  No redirect, Your Honor.

23         THE COURT:  You may step down.

24         (Witness excused.)

25         THE COURT:  Do we need to organize the courtroom?

Zappone - Cross - Purpura

1          MR. NARDOZZI:  Yes, Judge.

2          THE COURT:  Ladies and gentlemen, if you will line

3   up in the hallway, we will get you right back in.

4              (Jury exits.)

5              (In open court.)

6          THE COURT:  You're too suspicious.  Sometimes

7   defense lawyers really do what they say they will.

8          MR. NARDOZZI:  Most times they don't, Your Honor.

9              (Jury enters.)

10         THE COURT:  Be seated.

11         The Government can call the next witness.

12         MR. NARDOZZI:  Your Honor, the government calls

13  Lucero Lopez Sanchez.

14         THE COURT:  Could everyone besides the witness be

15  seated, please.

16         THE COURTROOM DEPUTY:  Raise your right hand,

17  please.

18             (Witness sworn/affirmed.)

19         THE COURTROOM DEPUTY:  State and spell your name for

20  the record.

21         THE WITNESS:  Lucero Guadalupe Sanchez Lopez.

22  L-U-C-E-R-O G-U-A-D-A-L-U-P-E S-A-N-C-H-E-Z L-O-P-E-Z.

23             (Continued on the following page.)

24

25

                      SN        OCR        RPR

Sanchez Lopez - direct - Nardozzi

1    DIRECT EXAMINATION

2    BY MR. NARDOZZI:

3    Q    Good afternoon, Ms. Sanchez.  How are you today?

4    A    Good afternoon, fine.

5    Q    How old are you?

6    A    29.

7    Q    And where were you born?

8    A    In Mexico in a town called Cosala in Sinaloa.

9    Q    Is that where you lived growing up?

10   A    Yes.

11   Q    Where do you live today?

12   A    In a jail in the United States.

13   Q    What nationality are you?

14   A    Mexican.

15   Q    And is that where you were living prior to being

16   arrested?

17   A    Yes.

18   Q    Why are you living in a prison?

19   A    Because I was arrested while trying to cross the border.

20   Q    What were you arrested for?

21   A    For cocaine conspiracy.

22   Q    And when -- did you say cocaine conspiracy?

23   A    Yes.

24   Q    When did you become involved in drug trafficking?

25   A    In the year of 2011.

Sanchez Lopez - direct - Nardozzi

1    Q    And who did you become involved in drug trafficking with?

2    A    With Joaquin Guzman Loera, the head -- the main leader of

3    the Sinaloa cartel.

4    Q    Do you see that person in the courtroom today?

5    A    Yes.

6    Q    Can you identify him by an article of clothing he is

7    wearing?

8         MR. PURPURA:  We will stipulate that the witness

9    identified Mr. Guzman.

10        THE COURT:  And that she knows him?

11        MR. PURPURA:  Yes, that she knows him.

12        THE COURT:  Okay.

13   BY MR. NARDOZZI:

14   Q    By the time you first became involved in drug trafficking

15   in 2011 until the time you were arrested, what type of work

16   were you doing for the defendant?

17   A    Well, I worked with him collecting marijuana in the

18   mountains of Durango Sinaloa and doing some straw businesses.

19   Q    What do you mean by straw businesses?

20   A    Well, some businesses were structured as a small curtain

21   so that they could be used in the drug trafficking business.

22   Q    During this time what was your relationship to the

23   defendant?

24   A    Well, up until today I'm still confused because I thought

25   our relationship -- we were romantically involved as partners.

SN          OCR          RPR

Sanchez Lopez - direct - Nardozzi

1   Q    Prior to being arrested, did you have a different job not

2   working for defendant?

3   A    Yes.

4   Q    What was that job?

5   A    I was a legislator, a local legislator in the state of

6   Sinaloa.

7   Q    Okay.  I want to talk about the charges against you

8   briefly.  How long have you been living in a prison facility

9   in the United States?

10  A    It's been one year and six months.

11  Q    And do you recall the date you were arrested?

12  A    Yes.

13  Q    Where were you arrested?

14  A    In California, San Diego.

15  Q    And what were you doing that led to you getting arrested?

16  A    I was trying to get the permit so that I could cross the

17  checkpoint in San Diego.

18  Q    And why were you going to San Diego?

19  A    Because I wanted to cross over to the United States.

20       MR. NARDOZZI:  Just for the witness, please.

21  Q    I'm showing you what's marked as Government Exhibit 92,

22  what is that?

23  A    My picture.

24  Q    Okay.

25       MR. NARDOZZI:  Your Honor, at this time the

5699

Sanchez Lopez - direct - Nardozzi

1    Government would like to offer Government Exhibit 92 into

2    evidence.

3              MR. PURPURA:  No objection.

4              THE COURT:  Received.

5              (Government Exhibit 92, was received in evidence.)

6    BY MR. NARDOZZI:

7    Q    What crimes were you charged with specifically following

8    your arrest?

9    A    The transportation and distribution of controlled

10   substances, conspiracy.

11   Q    Did you plead guilty to those charges?

12   A    Yes.

13   Q    When did you plead guilty to those charges?

14   A    In October 2018.

15   Q    And where did you plead guilty to those charges?

16   A    In a court in Washington, D.C.

17   Q    Why did you plead guilty to those charges?

18   A    Because I'm guilty.

19   Q    When you pled guilty to those charges did you do so

20   pursuant to a cooperation agreement?

21   A    Yes.

22   Q    I'm going to show you 3500-LSL-2 and I'm going to flip

23   through it.

24             MR. NARDOZZI:  Madam Interpreter, can you read this

25   portion to her.

Sanchez Lopez - direct - Nardozzi

1    A    (Reviewing.)

2    Q    Ms. Sanchez, do you recognize that document?

3    A    Yes.

4    Q    What is that document?

5    A    It is the document that I signed in court.

6    Q    Now I'm showing you the last page of this document.  Is

7    this your signature?

8    A    Yes.

9              MR. NARDOZZI:  Your Honor, at this time I'd ask to

10   move 3500-LSL-2 into evidence.

11             MR. PURPURA:  No objection.

12             THE COURT:  Received.

13             (Government Exhibit 3500-LSL-2, was received in

14   evidence.)

15   BY MR. NARDOZZI:

16   Q    Ms. Sanchez, what were the terms of your cooperation

17   agreement?

18   A    To testify in court, to sign affidavits, and to just tell

19   the truth.

20   Q    Did you also have to accept responsibility for your own

21   acts as part of that agreement?

22   A    Yes, yes, for my bad acts.

23   Q    Is that agreement why you're testifying here today?

24   A    Yes.

25   Q    And you are still awaiting your sentencing in your own

5701

Sanchez Lopez - direct - Nardozzi

1    case; is that right?

2    A    Yes.

3    Q    What kind of a sentence are you facing based upon the

4    charges that you pled guilty to in your case?

5    A    Life or mandatory minimum of ten years in prison.

6    Q    What is your understanding of what the Government might

7    do for you in exchange for your cooperation?

8    A    To do a recommendation with the judge so that the judge

9    can reconsider my sentence.

10   Q    Has the Government, the prosecutors, any of the law

11   enforcement agents you've met with promised you anything in

12   regards to your sentencing?

13   A    No.

14   Q    Outside of this, has the Government done anything to

15   assist any members of your family as a result of your

16   cooperation?

17   A    Yes.

18   Q    And you understand in this case a judge -- ultimately a

19   judge in Washington, D.C., will be the only person to decide

20   your sentence; correct?

21   A    Yes.

22   Q    In preparing to testify today in court have you met with

23   the Government to discuss your testimony at all?

24   A    Yes.

25   Q    Approximately how many times have you met with the

Sanchez Lopez - direct - Nardozzi

1    government prior to testifying here today?

2    A    Approximately 20 or 30 times.

3    Q    Okay.  When did you first meet the defendant?

4    A    In 2010.

5    Q    When did your romantic relationship with the defendant

6    begin?

7    A    Formally in 2011.

8    Q    In around what month?

9    A    More or less February, February 2011.

10   Q    How old were you at that time?

11   A    Twenty-one.

12   Q    How did you communicate with the defendant in February of

13   2011?

14   A    By phone.  He called me over the phone and then after

15   that through text messages.

16   Q    The phone that he called you over, was that just a

17   personal phone that you had?

18   A    It was a phone that he had sent to me through one of his

19   workers by the name of Perillo.

20   Q    After you received that phone, how long was it that you

21   received a phone call from the defendant?

22   A    At least -- well, more or less about two hours and then

23   he called me.

24   Q    What did you talk about with the defendant when he called

25   you?

Sanchez Lopez - direct - Nardozzi

1    A    Well, I just remembered that he told me that I had gotten

2    lost from his sight for some time and that he was going to

3    send me another phone so that we can talk and so that he could

4    see me.

5    Q    Did he?

6    A    Yes.

7    Q    When did he send you another phone?

8    A    Well, that same day, later on, the same person came with

9    a phone that had already been fixed and that's how they set

10   it.  It had been fixed so that we can communicate.

11   Q    What kind of a phone was it?

12   A    It was a BlackBerry phone.

13   Q    And how did you communicate with him over that BlackBerry

14   phone?

15   A    Through text messages through the application that's part

16   of that phone through the PIN system.

17   Q    What was the PIN?

18   A    Well, it's an application that's already integrated in

19   the BlackBerry phone and it gives -- that's a six-digit number

20   and it's a mixture of numbers and letters and that is actually

21   your contact number.

22   Q    Do you remember -- did you have a screen name associated

23   with the PIN?

24   A    Yes.

25   Q    Do you remember what your screen name was?

                    SN        OCR        RPR

Sanchez Lopez - direct - Nardozzi

1    A    Yes, Hermosura.

2    Q    Did you have any other names?

3    A    Yes.

4    Q    What were some of the other screen names?

5    A    Well, among them there was one just the letter M with

6    some dots afterwards, after the letter.

7    Q    What was his screen name?

8    A    Well, he would just use J or sometimes Juan.

9    Q    Did you always use the same phone or did you use

10   different phones?

11   A    No, he would change it on me.  He would switch it every

12   two weeks or every month.

13   Q    At that time, what types of things did you discuss with

14   him over BBM -- or with the PIN, excuse me?

15   A    Well, we spoke about our romantic relationship, things

16   like that.  He wanted to have a more stable relationship with

17   me, things like that.

18   Q    Did you speak to him on the phone at this time or did you

19   only communicate over PIN?

20   A    Just through the PIN messages.

21   Q    So during the time that you became involved with the

22   defendant romantically, how often would you see him?

23   A    Well, at times I would meet him once a month or sometimes

24   twice a month.  And then later on I would meet up with him

25   more often; sometimes three times a month, and then I would

Sanchez Lopez - direct - Nardozzi

1   even stay with him for longer.

2   Q    Okay.  And where would you visit with the defendant

3   during those times?

4   A    Well, I actually visited him in different places.  I went

5   to Cabo San Lucas and that was in 2011 when I saw him there.

6   It was starting at this point that I became more involved with

7   drug trafficking with the marijuana trafficking.

8   Q    Can you describe the home that you visited him in in Cabo

9   San Lucas?

10  A    Well, there were different houses.  There were different

11  locations.  He would change constantly.  The last one I saw

12  him at was a beige house with a pool and jacuzzi and an ocean

13  view.

14         MR. NARDOZZI:  For the witness only.

15  BY MR. NARDOZZI:

16  Q    I show you what's marked as Government Exhibit 219-29-AC.

17  Ms. Sanchez, do you recognize that?

18  A    Yes.

19  Q    What is that?

20  A    That's my signature.

21  Q    What is this?  What's on this disk?

22  A    There is an image there of the house in which I saw him

23  last time in Cabo.

24         MR. NARDOZZI:  Your Honor, this is already in

25  evidence.  I would like to play for the witness a short

Sanchez Lopez - direct - Nardozzi

1    portion of this video.

2         THE COURT:  Okay.

3         (Video played.)

4    BY MR. NARDOZZI:

5    Q    Can you tell the ladies and gentlemen what we're seeing

6    here?

7    A    Yes, it's a part of the house.

8    Q    Which house?

9    A    Where I saw Joaquin for the last time in Los Cabos.

10   Q    Was that the last time you saw him or the last time you

11   saw him in Los Cabos?

12   A    It was the last time I saw him in Los Cabos.

13   Q    Okay.

14   A    And that would have been beginning in 2012.

15   Q    Did the defendant tell you anything about what happened

16   in this house?

17   A    Yes, he told me how he had escaped from there.

18   Q    When did he tell you this?

19   A    When he came back to Sinaloa.  He came looking for me

20   right away.

21   Q    Do you remember approximately the date?

22   A    Well, yes.  That was more or less in February 2012.

23   Q    What did he tell you about escaping from that location?

24   A    He told me that the Government had come up on them and

25   that he had escaped by jumping over a fence and that's why he

*SN      OCR      RPR*

Sanchez Lopez - direct - Nardozzi

1   had a lot of thorns and scrapes.  And he told me how his

2   secretary had helped him jump over the fence.

3   Q    And you say thorns and scrapes.  What do you mean by

4   that?  Describe what you're talking about.

5   A    Well, he told me because his body had wounds on it.  It

6   was hurt.  He had blood on him and he told me about what had

7   happened; that he had fallen down after he jumped the fence

8   and that's when he got scraped up.  And they were hiding among

9   thorn bushes.

10  Q    You mentioned a moment ago that he escaped with the

11  secretary.  What --

12  A    Yes, with Condor.

13  Q    First of all, what's the secretary?

14  A    It's the person in charge of establishing communications

15  to one side, on Joaquin's side, and also takes care of

16  security within, in the interior with the people who are

17  outside.

18  Q    And what was that secretary's name?

19  A    I don't know his name.  I just know he called him Condor,

20  Muchacho or Chabelo.

21  Q    I'm going to show you what's already in evidence as

22  Government Exhibit 63.

23            (Exhibit published.)

24  Q    Do you recognize this?

25  A    Yes.

Sanchez Lopez - direct - Nardozzi

1    Q    Who is that?

2    A    That's Condor.  Joaquin's secretary.

3    Q    How many times did you meet Condor?

4    A    I have no idea.  There were very many times.

5    Q    Okay.  So you said that your relationship with the

6    defendant started out romantically but that you also

7    trafficked marijuana for him; correct?

8    A    Yes.

9    Q    When was it that you began moving marijuana for the

10   defendant?

11   A    Well, I remember that it was in October 2011

12   approximately.

13   Q    Okay.  What specifically was he asking you to do?

14   A    Well, what I remember is one time he asked me if I knew

15   about the different kinds of marijuana and I said I did not

16   know very much about that.  Still, he sent me to the mountains

17   to meet up with people who were growing marijuana to get

18   marijuana for him.

19   Q    Why did he send you to the mountains?

20   A    Because he sent me to a community where I had lived for

21   some time and I knew the people who would -- were marijuana

22   producers.

23   Q    So what about that would make you best suited to go find

24   marijuana for him?

25   A    Because that would make it easier for me to find -- to

SN          OCR          RPR

Sanchez Lopez - direct - Nardozzi

1    get the marijuana in that community because he did not have

2    anyone to get him marijuana.  At least that's what he would

3    say; that he didn't have anyone to get it for him.

4    Q    So did you go?

5    A    Yes.

6    Q    Okay.  I'm going to show you what's already in evidence

7    as Government Exhibit 502.

8                 (Exhibit published.)

9    Q    This will give us a little bit of an idea.  Can you

10   circle on the screen the general area where you went to look

11   for marijuana?

12   A    Yes.  It was Durango.  Sinaloa.

13   Q    Okay.  How many different -- were you going to single

14   places in these two Mexican states or were you going to

15   various places to find marijuana?

16   A    Within the states of Sinaloa and Durango, I went to

17   several communities.

18   Q    Are you familiar with the term "The Golden Triangle"?

19   A    Yes.

20   Q    What's that?

21   A    It is the route, as they call it.  They're the main

22   routes that are used for the traffic of marijuana and poppies

23   and it is the corner of Durango, Chihuahua and Sinaloa where

24   they meet.

25   Q    So the areas that you went to, were they within this

                    SN        OCR        RPR

Sanchez Lopez - direct - Nardozzi

1    Golden Triangle?

2    A    Yes.

3    Q    So what were your instructions?

4    A    Well, I had the instructions to send packages of 10 kilos

5    that would fit on the flight according to the weight that he

6    would ask me for and to send them with the 3 Bs for quality,

7    meaning buena, bonita and barato; good, pretty and cheap.

8    Q    So you say packages of 10 kilos.  How many total kilos of

9    marijuana were you asked to find?

10   A    400 per flight.

11   Q    Why 400 per flight?

12   A    Because that was how much the plane could lift off with.

13   Q    And what was the significance of the 10 kilogram

14   denominations you mentioned awhile ago for the individual

15   package?

16   A    That's what he asked for.  For 10 kilo packages.  I don't

17   know why.  I know that the plane had to have 400 kilos but on

18   the first flight they did not fit in, so only 350 fit in and

19   50 were remaining.

20   Q    Were you in communication with the defendant when you

21   were harvesting marijuana in The Golden Triangle?

22   A    Yes, every day at all hours.

23   Q    And how were you in communication with the defendant?

24   A    I would communicate over text messages with a PIN.  I had

25   to climb up on a tall hill every morning and every afternoon

                    SN        OCR        RPR

Sanchez Lopez - direct - Nardozzi

1   so I could get a signal and give him all the details of what

2   was going on with that shipment.

3   Q   And what would he tell you as you updated him with

4   details?

5   A   Well, we would talk about price and the size of the

6   packages.  At first, at the beginning, he wanted me to get it

7   on credit, and then he would pay later.  But I did not agree

8   to that.

9   Q   Okay.  Why not?

10  A   Because I thought it was unfair that the people who had

11  worked so hardy knew that if it went out on credit that those

12  people who had worked on it would not receive the money back.

13  Q   Were you coordinating with any people specifically when

14  you were in that area looking for marijuana?

15  A   Yes.

16  Q   Who?

17  A   With Joaquin's pilot.

18  Q   What was his name?

19  A   I don't know his name.  I just know that they called him

20  Cachimba.

21        MR. NARDOZZI:  For the witness only please.

22  BY MR. NARDOZZI:

23  Q   I'm going to show you what's marked as Government Exhibit

24  93.  Do you recognize this?

25  A   Yes.

*SN      OCR      RPR*

Sanchez Lopez - direct - Nardozzi

1    Q    Who is this?

2    A    Joaquin's pilot, Cachimba.

3          MR. NARDOZZI:  Your Honor, I would ask to move in

4    Government Exhibit 93.

5          MR. PURPURA:  No objection.

6          THE COURT:  Received.

7          (Government Exhibit 93, was received in evidence.)

8    Q    How did you know Cachimba?

9    A    Well, I met him in 2011 when I started my relationship

10   with Joaquin.

11   Q    And did you interact with him before you were sent to go

12   Harvest marijuana?

13   A    Yes.

14   Q    Under what circumstances?

15   A    When I was traveling over to the locations where Joaquin

16   was.

17   Q    You said you had a flight that you were able to move 350

18   kilograms of marijuana on?

19   A    Yes.

20   Q    Were you paid for your work harvesting marijuana?

21   A    No.

22   Q    When you communicated with the defendant you said you did

23   this over PIN; correct?

24   A    Yes.

25          MR. NARDOZZI:  If you can switch to the PowerPoint,

Sanchez Lopez - direct - Nardozzi

1    Government Exhibit 516.

2              Do you have an objection?

3              MR. PURPURA:  No, sir.

4    BY MR. NARDOZZI:

5    Q    Take a look at the first page of Government Exhibit 516.

6    Who's that person at the top?

7    A    Joaquin, El Chapo.

8    Q    Who's the person on the bottom?

9    A    That's me.

10   Q    Okay.

11             MR. NARDOZZI:  Your Honor, for the record this

12   PowerPoint image shows a transcript that is already in

13   evidence.

14             (Exhibit published.)

15   BY MR. NARDOZZI:

16   Q    All right.  Let's take a look.  What are we looking at

17   here?

18   A    The conversations on those dates when I was trafficking

19   marijuana for Joaquin and with him.

20   Q    You had a chance to review this communication prior to

21   coming to court today; correct?

22   A    Yes.

23   Q    Who is the screen name J?

24   A    Joaquin.

25   Q    And who is the screen name M with two dots after it?

Sanchez Lopez - direct - Nardozzi

1    A    Me.

2    Q    And looking at that very first communication underneath

3    the first screen names is a date.  What is that date?

4    A    This is a date in 2011.  That's January 17.

5    Q    You're having a hard time with the screen.  Maybe January

6    17, 2012?

7    A    Yes.

8            THE COURT:  A lot of the Government Exhibits have

9    been very small when it comes to this font.  Do you have that

10   device where you can highlight and expand one piece of the

11   display.

12           MR. NARDOZZI:  I sure wish I did Your Honor.

13           THE COURT:  Okay.  Do the best you can.

14           MR. NARDOZZI:  I'll do the reading here so I can go

15   off my copy.

16           I would ask to move 516 into evidence.

17           MR. PURPURA:  No objection.

18           THE COURT:  Received.

19           MR. NARDOZZI:  Thank you.

20           (Government Exhibit 516, was received in evidence.)

21   BY MR. NARDOZZI:

22   Q    Let's take a look at the first couple of parts of this

23   conversation.  I will read them to you and ask you some

24   questions.

25           "J:  All right, love.  Make the arrangements with

SN        OCR        RPR

Sanchez Lopez - direct - Nardozzi

1    Cachimba."

2              And now I'm showing you Government Exhibit 93.

3              (Exhibit published.)

4    Q    This is the same Cachimba we see here?

5    A    Yes.

6    Q    And when J orders to you make the arrangements, who is he

7    talking about?

8    A    To talk to Cachimba so he can go get the flight which was

9    ready by then to bring it over and to move it over to the city

10   of Culiacan.

11   Q    Why would you move it over to the city of Culiacan?

12   A    Because that was the point where I had to make my salary.

13   After that, I don't know which direction they were going to

14   take it.

15   Q    Starting at paragraph 13:

16         "M:  Are you going to want me to buy more or not,

17   just so I know?  Cachimba would be going tomorrow, right?  It

18   came out exactly at 400 kilos."

19         MR. NARDOZZI:  And that, for the record, was

20   paragraphs 13, 15 and 16.

21   Q    Ms. Sanchez, what are you telling the defendant here?

22   A    Well, I was asking if he was going to want me to keep

23   purchasing more marijuana after the 400 kilos that I had

24   already purchased to send to him.

25   Q    And, again, the significance of that 400 kilos, what was

SN        OCR        RPR

Sanchez Lopez - direct - Nardozzi

1    that?

2    A    Because, as I said, the plane could only lift that

3    amount.  If more had fit into the plane, he would have wanted

4    to send more, but 400 was what I had to get to fill up the

5    plane so that the plane would not have to go back and come

6    back for the rest of it with two trips.

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sanchez Lopez - direct - Nardozzi

1           (In open court.)

2           (Through the interpreter.)

3    DIRECT EXAMINATION

4    BY MR. NARDOZZI (continuing):

5    Q    Let's move ahead a little bit, to paragraphs 32, 34, and

6    35; and these are from January 18, 2012.

7           M:  I want to let you know that the packages didn't

8    fit in the airplane.  Fifty kilos packed were left there.

9           J:  And how many were there, love?

10          M:  400 kilos, only 350 fit.

11          J:  Was it very well packed, love?  How many are in

12   each package?

13          M:  Ten kilos, love, all of them.

14   Q    What are you trying to tell the defendant in this

15   exchange?

16   A    That in the flight that Cachimba had taken, the 400 kilos

17   that were ready were not able to fit, only 350 kilos fit in

18   it.

19   Q    And in paragraph 37, where you tell him, Ten kilos, love,

20   why are you telling him that?

21   A    Because those were the characteristics of the packages

22   that he wanted me to send them, with the right size and the

23   right weight, that he wanted me to send to him.

24   Q    Moving ahead, also from January 18 of 2012, paragraphs

25   42, 43, and 45.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - direct - Nardozzi

1          M:  Yes, love, that's the one.  It has a heart and

2     the number four.  The heart means that I love you, and the

3     number four means that I bless the day you came into this

4     world, the day of your birthday; and there is a heart

5     emoticon.

6          What is this that you are describing to the

7     defendant in these messages?

8     A    I'm giving him sort of the brand as to how to identify

9     the packages that I sent him.

10    Q    What is the significance of the number four?

11    A    Four is Joaquin's birthdate.

12    Q    Do you know his date of birth?

13    A    Yes, April 4.

14    Q    Paragraph 46:

15         J:  Oh, yes.  That's right.  Buy 300 next week, and

16    that way you can make another trip, love.

17         What's he telling you to do here?

18    A    That he needs me to complete the other flight.

19    Q    Paragraphs 50 through 52, also from the same date.

20         M:  The owner of the runway sends his greetings and

21    says we can use the runway whenever you want since no one

22    takes off from there.

23         J:  And did Cachimbas like it?

24         M:  Yes.  He asked me how many meters it had because

25    it felt very long to him, I think.  Haha.

                    Sanchez Lopez - direct - Nardozzi

1              Why is Cachimbas' opinion important in this

2       conversation?

3       A    Because he had to look at the air strip to make sure that

4       the air strip was adequate, if you could land there, if you

5       could actually take off from there.  It depended on the meters

6       and the height and to see if the air strip was adequate.

7       Q    That's because he would be taking off and landing from

8       that air strip, correct?

9       A    Yes.  Well, yes.  It was an air strip that we had just

10      gotten.  I got it because the last one had been damaged

11      because of the government.

12      Q    Paragraph 62, from the same date.

13             M:  I was telling you that the runway is in a good

14      location, far from La Mesa, because there are soldiers in

15      La Mesa.

16             What's going on in La Mesa?

17      A    La Mesa was a place where we had taken off with the first

18      flight, but then it got all filled with the government people;

19      and that's why we had to switch places, so that we would avoid

20      being located.

21      Q    This landing strip that you are talking to the defendant

22      about, did you eventually wind up using it?

23      A    Yes.

24      Q    Moving forward, on the same date, paragraphs 63 through

25      74, the highlighted ones.

                *MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - direct - Nardozzi

1          J:  How much did your ex buy it for?

2          M:  At 500 a pound.

3          J:  And how much did he buy?

4          M:  500 kilos.

5          J:  And where did he buy?

6          M:  Where I bought, in Mezecaltitan and La Culacha.

7    He didn't get here in Tapichugua.

8          J:  Who bought better quality?

9          M:  Well, I was told I took the best one.

10          M:  And he bought a lot with seeds.

11          What does it mean, a lot with seeds?

12    A    Well, it's the quality is very different to the one that

13    does not have any seeds.

14    Q    Okay.  So how so?  Explain that for us.

15    A    Well, the one that was really good quality should not

16    have any seeds, because supposedly, if that's not the case,

17    that then they don't sell that much and that the sales slow

18    down.  That's what they said.

19    Q    So it's a lower quality?

20    A    Yes.  When it has seeds it's lower quality and it's also

21    cheaper, but when it doesn't have any seeds then it's better

22    quality and there is also different types.

23    Q    Paragraph 79 and 82 from the same day.

24          J:  Love, check how much there is available for you

25    to buy it all, but, if you have to, rip the bags and check

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - direct - Nardozzi

1   properly so you don't buy any more with seeds.

2          M:  Yes, love.  According to what I found out, there

3   are about 400 more, and a friend said there are about two tons

4   of pure bola, higher, with no seeds.

5          What's pure bola?

6   A    Well, the one that is bola in this case is the best

7   quality that you have or you can find there.  Well, the one

8   that we call bola there, they refer to it as crack; and the

9   one that is not bola, they refer to it as the commercial one.

10  The one that's bola is much more expensive compared to the

11  commercial one.

12  Q    Is there a reason why the defendant is talking to you so

13  much about the amount of seeds in the marijuana?

14  A    Yes.  Because I was actually sending him packages with

15  seeds because I wanted him to get upset with me so he would

16  ask me to come back, but I did not manage that.

17  Q    Let's skip a little further ahead.  Paragraphs 95 through

18  99 for the next day, January 19, 2012.

19         M:  Cachimba said that for the 400 kilos to fit

20  perfectly we should make 24 packages of five kilos.  What do

21  you think?

22         J:  Do that, love.

23         M:  Okay, love.  Then I will buy 350 or 400 kilos

24  more for this flight, love.  It would be 350 to complete the

25  four with the 50 that are left there, right?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - direct - Nardozzi

1              J:  Yes, love.

2              When you say, 350 to complete the four, what are you

3    referring to?

4    A    It was to complete the second flight.  So that we would

5    get it together with the 50 kilos that had been left from the

6    first flight that Cachimba could not take with him.

7    Q    That's the 50 that you are referring to in paragraph 98?

8    A    Yes.

9    Q    Moving ahead to January 21, 2012, paragraph 135 through

10   137, for the record.

11             M:  If I don't complete the flight by tomorrow, I

12   will go to Galancita to buy, love.

13             J:  All right, sweetheart.  I love you.  Whenever

14   you can go, go up to send a message, love.

15             M:  Well, I'm sitting here in the car with Juan, my

16   sister, and Callo.

17             First of all, what are you telling him here?

18   A    Well, that if I could not complete that flight in that

19   town, then I was going to go to a separate town where they had

20   more marijuana.  They had said that there was more marijuana

21   there at a different ranch, because the ranch where I was at I

22   was having a hard time completing that flight.

23   Q    That town, is that Galancita?

24   A    Yes, in Tamachula, La Durango.

25   Q    That's in the same general area of the golden triangle,

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - direct - Nardozzi

1    correct?

2    A    Yes.

3    Q    You mentioned somebody by the name of Callo.

4         Who is that?

5    A    Callo was a guy from that community who was one of the

6    marijuana producers.

7    Q    How do you know Callo?

8    A    I met him there because he lived in the same area in

9    which I lived for some time.

10   Q    Moving ahead to paragraphs 145 through 148, on

11   January 23, 2012.

12        M:  I came here to Las Trancas.  El Guero gave me a

13   chance to buy here, but the people don't want for less than

14   750; and there are another 150K, but they are asking 600.

15        J:  All right, love.  Complete it.  Send my regards

16   to Guero.  Buy them at 600.

17        In general, what is this discussion about?

18   A    We are talking about the price of the marijuana.  He is

19   giving me -- I'm giving him the price of the kilos that we had

20   there, and he is telling me to buy at 600 because he didn't

21   want to pay the 750.

22   Q    All right.  That number 150K, what does that refer to?

23   A    Kilos.

24   Q    Okay.  Let's take a look at paragraphs 206 to 212 from

25   January 26 of 2012.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - direct - Nardozzi

1          M:  Love, have they told you about the packages I

2     sent today?

3          J:  They are fine, love.  Did you mark them?

4          M:  15 kilos are marked.  Those weren't really good,

5     and they were from Callo's marijuana.  Those turned out bad.

6     Yes, love, they are marked.

7          Why are you distinguishing the marijuana that's

8     being sent by Callo?

9     A    Because Callo's had seed, and I wanted to buy it from

10    him.  I didn't want to leave it there, because I felt a pity

11    for him.  So I bought it from him.  Those were people who were

12    very low income people and they worked way too much.

13    Q    Let's take a look at paragraphs 232 and 233 from

14    January 31, 2012.

15         M:  No, but, yes, people talk too much.  I was

16    careful not to be seen, and you see how everybody knows.  I

17    may show up hanging somewhere soon due to envy.  I don't

18    sleep, love.

19         J:  Look, the mafia kills people who don't pay or

20    people who snitch, but not if you are serious, love.

21         Could you give us some context.  What are you

22    talking about with the defendant leading up to this portion of

23    the conversation?

24    A    Well, what we are talking about there is that he had

25    received some message where people were telling him that they

Sanchez Lopez - direct - Nardozzi

1   had seen me buying marijuana.  And I told him that I was

2   taking care and that I didn't want to be seen because I didn't

3   want to be involved with that.  And I would watch out also

4   from the other buyers because, you know, if they were envious

5   they would also then try to hurt me; and I didn't want for

6   that to happen because I was working and they were working

7   too.

8           And I would then watch out from the buyers that he

9   had before because if they thought he was actually paying me,

10  then they might actually trying to do something against me,

11  and that was not the case.

12  Q    Was he paying you off?

13  A    No.

14  Q    Paragraph 234 and 235, from the same date.

15          M:  Well, that's true, love.  I know that when a

16  person is loyal and straightforward he or she can last for

17  years.  He or she can die of natural causes.  But there are

18  also envious people who, just because they want to get someone

19  out of their way, do bad things.  But I'm not afraid of that,

20  love.

21          I have thought about things before.  I know that I'm

22  not doing anything bad.  On the contrary, I think this is good

23  for people, and even more so with you because you have helped

24  the ranches a lot and I'm proud and hold my head up high

25  guided by you, love.

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - direct - Nardozzi

1    THE INTERPRETER:  Counsel, the interpreter read

2    that.

3    MR. NARDOZZI:  That's even better.

4    Q    If you like what I have done and you want me to continue,

5    I will continue until whenever you want me to.  I like it.  At

6    least I feel useful.

7    When you said that someone could last for years,

8    what were you telling him?

9    A    Well, I'm telling him that people can last a long time if

10   nobody rats on them because I was actually feeling threatened

11   because of the message that he had sent me before.

12   Q    So, I mean, if you read this message it seems like you

13   are happy to be doing the work you are doing.

14   Is that true?

15   A    Yes.  I had my reasons.

16   Q    What were they?

17   A    Well, first of all, so that he didn't think that I could

18   actually rat him out or give his location to the government so

19   they could find him.  And I didn't want for him to mistrust me

20   because I thought that maybe he could also hurt me.

21   And the second one was because I didn't want for him

22   to get my feelings involved.  There was a time when he wanted

23   to get them involved, and I didn't want them to do that; and

24   that's the reason why I continued to do it myself.

25   Q    Paragraph 236 from the same day.

Sanchez Lopez - direct - Nardozzi

1          J:   That's right, love.   Lies are what cause

2    problems.   Don't lie, and people will always see the good,

3    love.   Always remember that.   I'm telling you this because I

4    love you.   Even if you make a mistake, don't deny it, and you

5    will always be happy and people will appreciate you.   I love

6    you.

7          What is the defendant telling you here?

8    A    Well, to do the right thing, and what he was telling me,

9    that as long as I said the truth and didn't lie to him that

10   everything would be okay.

11         And I was trying always to keep him happy.   I was

12   confused about my own feelings over him.   Sometimes I loved

13   him and sometimes I didn't, because of the different attitudes

14   that he would have at different times.

15   Q    When he said that something could happen, what did you

16   take that to mean?

17   A    That something could happen to me.

18   Q    Did you ever discuss the messages that we just reviewed

19   with the defendant in person after you exchanged them over

20   PIN?

21   A    No, only about the marijuana.   And he would always say to

22   me in person that I shouldn't go around saying where he was or

23   things like that.

24         In fact, I wasn't allowed to bring a cell phone when

25   I went to be with him and they would put -- cover my eyes when

*MICHELE NARDONE, CSR -- Official Court Reporter*

USA v. Guzman Loera

1    they would take me to the places where he was.

2              MR. NARDOZZI:  Okay.  Your Honor, I'm about to

3    switch topics.  I'm not sure if it's a good time for a break.

4              THE COURT:  Yes, it's a good time.  We will take our

5    mid-afternoon break, ladies and gentlemen.  Reconvene at 3:15.

6              Please don't talk about the case amongst yourselves.

7              (Jury exits.)

8              THE COURT:  All right.  Let's have the marshals take

9    the witness out, please.

10             Do you have a lot more reading of telephone calls?

11             MR. NARDOZZI:  That was it, Your Honor.  There are

12   no more phone calls.

13             THE COURT:  All right.  See you at 3:15.

14             (Recess.)

15             THE CLERK:  All rise.

16             THE COURT:  Please bring in the jury.

17             MR. PURPURA:  Your Honor, please --

18             THE COURT:  Please don't bring in the jury?

19             MR. PURPURA:  I see the witness is upset, and I

20   don't want them to see her upset, crying.  That's all.

21             THE COURT:  Okay.  Let's take five more minutes and

22   let the witness compose herself.

23             (Recess.)

24             (Continued on the next page.)

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

5729

Sanchez Lopez - Direct/Nardozzi

1          THE CLERK:  All rise.

2          THE COURT:  All right.  Now let's have the jury,

3    please.

4          (Jury enters.)

5          THE COURT:  All right.  Be seated, please.

6          Please continue, Mr. Nardozzi.

7          MR. NARDOZZI:  Thank you, Your Honor.

8    BY MR. NARDOZZI:

9    Q    All right.  Ms. Sanchez, so after the harvesting of

10   marijuana that you were doing that we were just discussing in

11   these exchanges, did you ever do that again for Mr. Guzman?

12   A    No.  Afterwards I only did it through messages.  I served

13   as the middle person with another guy he sent up to the

14   mountains.

15   Q    Okay.  You mentioned earlier that you took a role in

16   operating some front businesses.

17          Do you remember that?

18   A    Yes.

19   Q    Did you do that at the defendant's request?

20   A    Yes.

21   Q    When did you start operating or taking a role in these

22   front businesses?

23   A    I started those businesses in the year 2012,

24   approximately in June.

25   Q    How long did you work on those front businesses?

                    *MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - Direct/Nardozzi

1    A     For three months.  It was in August that it was all done,

2    the articles of incorporation of one of the businesses that I

3    set up.

4    Q     All right.  So you mentioned businesses.  How many

5    businesses were there, that you were aware of?

6    A     There were three.  The ones that I had a lot of knowledge

7    about were three.

8    Q     All right.  And where were those three businesses

9    located?

10   A     Well, the main one, which was the one that I was

11   organizing, was in Mexico City.

12   Q     Where were the other two that you had some involvement

13   in?

14   A     The other one was in Los Angeles, California.  That was

15   the one that was being set up by Angie Torres.

16   Q     What about the third?

17   A     The third one was in Ecuador, and it was being set up by

18   Callo.

19   Q     Is this the same Callo that you were in the mountains

20   with that you just told us about?

21   A     Yes.

22   Q     All right.  Let's start with the Mexico City business.

23         Is this the one that you were most involved with?

24   A     Yes.

25   Q     What did you do to assist the Mexico City business?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - Direct/Nardozzi

1    A    Well, what I did was to give some guidance to the guy who

2    was being like the main owner of the company.  He was called

3    Pancho.

4    Q    Who is Pancho?

5    A    Pancho was the guy who was going to lend his name for the

6    company.

7    Q    All right.  Let's go back a little bit.

8         What was the stated purpose of this company?

9    A    It was a company that commercialized the importation and

10   distribution of juices.

11   Q    What was the actual purpose of the company?

12   A    It was for the exportation of drugs.

13   Q    What was the benefit of having a legitimate business on

14   top of an exportation of drug business?

15   A    It was to clean up whatever came into the accounts of the

16   company so that they wouldn't be found out, you know, to be

17   under the radar, and to keep working in a way that was, you

18   know, you could say, more correct or right.

19   Q    When you say, "clean up whatever came into the accounts,"

20   what specifically are you referring to coming into the

21   accounts?

22   A    The money from what was sold, the juices or drugs,

23   whatever that was being managed through there.

24   Q    So what did you do to further this business along in

25   setting up?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - Direct/Nardozzi

1    A    Well, I indicated to the guy Pancho what institutions he

2    had to go to in order to register the company, how to set up

3    bank accounts, everything related to the legal documentation

4    of the company and its incorporation, to establish the

5    foundation to be able to start operating.

6    Q    Does your name ever show up on any of these documents?

7    A    No.

8    Q    You said earlier that Pancho lent his name to the

9    articles of incorporation.

10        What do you mean by that?

11   A    Well, he appeared as the main and sole owner, as the main

12   manager and director, the sole one, and he could be the only

13   one to sign checks and do anything that was -- that came up

14   for the company.

15   Q    What was Pancho's background?  Was he a businessman?

16   A    No.

17   Q    Did he have a formal education?

18   A    No.

19   Q    Did he have a lot of money?

20   A    No.  He was a neighbor.

21        THE COURT:  Excuse me.  Do you understand?

22   Q    Yes.  So what qualified Pancho to run this business?

23   A    Well, Pancho was a low-income person who could be easily

24   manipulated, and this is why he was hired.

25   Q    Who asked you to hire Pancho?

*MICHELE NARDONE, CSR -- Official Court Reporter*

Sanchez Lopez - Direct/Nardozzi

1   A    Well, first of all, it was Benjamin who hired him.  He

2   was another worker of Joaquin's.  And then I helped them lead

3   this, and this was under Joaquin's orders so I could teach

4   them how to do things under his orders.

5   Q    Did the defendant ask you to seek out somebody who had

6   the characteristics of Pancho?

7   A    He simply said that it was -- I should find a low-income

8   person that could be manipulated so that every time that an

9   order was given he would satisfy it.

10  Q    You said you worked for three to four months on this

11  business?

12  A    Yes.

13  Q    Did any money or assets ever come through the business

14  accounts?

15  A    Not through the accounts of the company, but they did go

16  through Pancho's hands to go to other people.

17  Q    How much money went through Pancho's hands during that

18  period of time?

19  A    What I was able to calculate was $5 million, but that

20  also included some national currency.

21             (Continued on the next page.)

22

23

24

25

*MICHELE NARDONE, CSR -- Official Court Reporter*

5734

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   DIRECT EXAMINATION (continuing)

2   BY MR. NARDOZZI:

3   Q     By that you mean Mexican pesos?

4   A     Yes.

5   Q     And also U.S. dollars?

6   A     Yes.

7   Q     And during that period of three to four months, how many

8   gallons of juice were exported?

9   A     None.

10  Q     Were there any fruits that were moved through the

11  business to help to make juice?

12  A     Yeah, no, there were no operations that moved within this

13  business, but they would move money.

14  Q     Did the business operate at all?

15  A     No, not yet.

16  Q     You mentioned two other businesses in Ecuador and Los

17  Angeles, describe for us what was the Los Angeles-based

18  business?

19  A     Well, I really don't know the extent of the business that

20  was being constituted by Angie in Los Angeles, I just know she

21  was the main operator of that business.

22  Q     How do you know that?

23  A     I found out about it through a meeting with Joaquin,

24  Angie, the sister, mother and one of his partners called,

25  Ricon.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   Q   When did that meeting take place?

2   A   In the city of Culiacan Sinaloa Mexico.

3   Q   Why were you at that business -- or that meeting?  Excuse

4   me.

5   A   Because at that time I was living with Joaquin, we would

6   share our home for stretches of time.

7   Q   And what was discussed at that meeting?

8   A   Well, the things that Joaquin said to his partner Ricon,

9   I don't know about that, but the conversation with Angie I did

10  hear they were talking about razors and she was saying that

11  she needed one.

12  Q   What's a razor?

13  A   Razors are like ATV vehicles that are used in the

14  mountains so you can go around in them.

15  Q   What did the defendant say in response to her request for

16  a razor?

17  A   Well I heard him say that to her, when you finish the

18  business in Los Angeles I'm going to gift you one he said.

19        And she responded that she had everything already,

20  that the only thing she was missing was some permits for the

21  warehouses and paint.

22  Q   Where was this home located where the meeting occurred?

23  A   In the Libertad neighborhood of Culiacan.

24  Q   Did you ever communicate with Angie or her family about

25  this business after the meeting?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    A    Yes.

2    Q    Why?

3    A    First, I communicated with her because she would tell me

4    that she needed money for expenses, that I should tell my

5    husband, meaning Joaquin.  And afterwards I ran into her mom

6    in a cafe some months later and she confirmed that everything

7    had been fixed with the warehouse in Los Angeles and that I

8    should communicate that to my husband, Joaquin.

9    Q    Did you?

10   A    No, not directly.

11   Q    Let's talk also about the business in Ecuador.  Who was

12   running that business?

13   A    Callo.

14   Q    And Callo, did he fit that same profile as Pancho?

15   A    Yes.

16   Q    How about Angie, did she fit that profile as well?

17   A    I really don't know, but I don't think so.

18   Q    What was the business in Ecuador?

19   A    Well, as far as I understand, they were setting up a

20   company for the importation and exportation of fish flour.

21   Q    Did you ever communicate with Callo about this business

22   in any capacity to help move it along?

23   A    Yes.

24   Q    How often?

25   A    Well, it was a long time because I pretty much was not

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    really familiarized with that kind of business.  I got in

2    touch with him after Joaquin was arrested because he wanted to

3    know what was happening with that business that was being set

4    up, and about some expenses that were pending.

5    Q    And just so everyone is clear, fish flour you mentioned,

6    what is fish flour?

7    A    Well, as far as I understand it's flour that is made out

8    of fish bones but I do not know what that is used for.

9    Q    It's like a powder, right?

10   A    Yes, regular flour, just like corn flour.

11   Q    Okay.  You stated earlier that your relationship with the

12   defendant changed over time.  When would you say your

13   relationship, the main part of it ended?

14             MR. PURPURA:  Objection, 401.

15             THE COURT:  Overruled.

16   A    My relationship with the defendant started having

17   problems at the end of 2012.

18   Q    As a result of that, what happened?

19   A    Well we had some difficulties and we distanced each other

20   for some time.

21   Q    Did you continue to work for the defendant's organization

22   after the relationship ended?

23   A    No.

24   Q    So what what did you decide to do?

25   A    Well I decided to start another job and I got into

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    politics.

2    Q    When was that?

3    A    It was in 2014.

4    Q    And when you say you got involved in politics,

5    specifically what did you do?

6    A    Well, I ran for office as a candidate in the local

7    Congress and in my town Cosala, District Number 16.

8    Q    And did you win?

9    A    Yes, with many votes.

10   Q    How long was your term?

11   A    Three years.

12   Q    Did you serve the whole thing?

13   A    Most of that time, a few months before I would finish my

14   term I was removed.

15   Q    Why?

16   A    Because of my relationship with Joaquin.

17   Q    We'll talk about that in a little bit.

18        First, during this period of time when you were

19   acquiring marijuana, setting up businesses for the defendant,

20   is it fair to say you were spending a lot of time with him?

21   A    Yes.

22   Q    What kind of things would you do for him during that

23   time?

24   A    Well, when I would not go out to work then I would just

25   be there in the house living there with him.  I was like his

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    house, home wife.  I would make his purchases, his personal

2    clothing, his lotions, everything that deal with his own

3    personal care.  I was like a home wife.

4    Q    Just to give us a perspective, what was the time frame of

5    that?

6    A    Well, that was from 2011 to 2012 and even part of 2013.

7    Q    You said a minute ago you purchased clothes for him, what

8    kind of clothes did you purchase for him?

9    A    Well, yes, I would buy his shirts, his pants, his tennis

10   shoes, his underwear, his lotions, everything because he could

11   not -- whatever he needed because he couldn't go out of the

12   house.

13   Q    Do you recall what size pants the defendant wore?

14   A    Yes.

15   Q    What was the size?

16   A    Thirty-two by 32.

17   Q    When you would buy him 32 by 32 pants, did you ever have

18   to do anything to them?

19   A    Yes, well I would have to cut the legs of the pants

20   because they were a little long so I had to like readopt them,

21   re-tailor them to his own height.

22   Q    What would the ideal size of pants have been?

23   A    Well I think about a 32 by 28 I think that could have

24   been.

25   Q    What about shoes, you mentioned you purchased shoes for

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   him before?

2   A    Well, right now I mean I don't recall the exact size but

3   I would buy for him like between a six or seven, but I do not

4   have the exact number right now.

5   Q    Is that the Mexican size or the U.S. size?

6   A    Mexican.

7   Q    What kind of shoes would he ask you to buy for him?

8   A    Nike tennis shoes.

9   Q    Do you remember what color he liked?

10  A    Either completely black or sometimes black with blue.

11  Q    During this period of time where you were spending a lot

12  of your time with the defendant, is it fair to say that you

13  had an opportunity to observe the way that he communicated

14  with other people?

15  A    Yes.

16  Q    How did he communicate with other people?

17  A    Well, through text messages.

18  Q    And did he have any people that he had help assist him in

19  these communications?

20  A    Well, yes, the secretaries who worked for him.

21  Q    Who were the secretaries that he had help him with his

22  communications?

23  A    Well, one of them was Condor, the other one was Picudo

24  and then there was another one, Chaneque.

25  Q    Showing you what's already in evidence as Government's

5741

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    Exhibit 63.  Who is that?

2    A    Condor.

3    Q    Showing you what is in evidence as Government's

4    Exhibit 68.  Who is that?

5    A    Picudo.

6    Q    What was Picudo's role for the defendant, generally?

7    A    Well, he was a secretary and he was always the lookout

8    for whatever he needed and all of the communications that he

9    needed to send to other people who were out of the house.

10   Q    And this Chaneque that you mentioned, did he hold a role

11   that was similar to Picudo and Condor?

12   A    Yes, they were similar.

13   Q    These secretaries, did they all work at the same time?

14   A    No.

15   Q    So what did they do?

16   A    Well, they would actually take turns every 21 days.  So

17   one person would leave, the other one would come in and the

18   person who left, left everything that was pending for the one

19   who was coming in.

20   Q    So it was always one at a time, right?

21   A    Yes.

22   Q    During your time with the defendant, did you become

23   familiar with something called the oficina?

24   A    Yes.

25   Q    What's the oficina?

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    A    Well, I decipher that as a filter.  It was an oficina, an

2    office where there were several spots.  They would have to

3    communicate Chapo's messages or the messages from the

4    secretaries through five different spots until they reach the

5    final destination.

6    Q    You say this word "filter," what do you mean by that?

7    A    Well it was series of steps that the message had to climb

8    through in order to get to the final destination.

9    Q    How did you decipher this?

10   A    By listening and by observing.  They would send -- well,

11   for example, they would -- they had a contact by the name

12   Changeque, another one Medusa and then they had another one

13   Tiki and two other people whose nicknames I don't recall and

14   that's how I realized they had to go through different spots.

15           And because, for example, when one of the oficinas

16   or spots did not work, the secretary would tell Joaquin that

17   they were not responding and they had to go through a

18   different person to communicate that message.

19   Q    Did you ever communicate with the defendant through this

20   oficina, this filter system?

21   A    Yes.

22   Q    Did you have a screen name that you used?

23   A    Yes.

24   Q    What did you use?

25   A    Maico.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    Q    Did you have any other names that you were referred to by

2    over this system?

3    A    Yes, Tere or Diputada or La Diputada.

4    Q    That was after you were elected to office, right?

5    A    Yes.

6    Q    So if a message were to go from you to the person at the

7    top of the system, the defendant, how would that work?

8    A    Well, for example I would send a message and then it

9    would go to the next spot and, for example, it was Medusa.  So

10   then Medusa would tell Chaneque this message is from Maico and

11   then that would go to Joaquin's secretary and that's how they

12   would continue to communicate the message and that's how it

13   would reach him.

14   Q    When the message moved from point A to point B, was the

15   message summarized or was it the exact words that were typed

16   into the Blackberry system?

17   A    It was the same one, they would just add the name of the

18   person who sent it.

19   Q    How would the defendant receive messages from the

20   secretaries?

21   A    Well it was either verbally or sometimes whenever it

22   would give him message they would actually pass the phone on

23   to him so that he could be in direct contact with the person

24   that was passing on the message.

25   Q    Were there instances where the defendant himself would

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5744

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1  use the device given to him by a secretary to send a message?

2  A    Yes.

3  Q    Were there also instances where he would order a message

4  to be sent?

5  A    Yes.

6  Q    During the time that you were with the defendant, did you

7  ever hear him discussing any acts of violence?

8  A    One time.

9  Q    Okay.  And on that one occasion, what were you doing with

10  the defendant that time?

11  A    Well, I was at the table with him, I recall it really

12  clearly because on that day because we were eating when the

13  secretary came in to give him a message.

14  Q    Do you remember which secretary?

15  A    I think it was Condor who was there.

16  Q    What did Condor say to the defendant?

17  A    Well, what he told him was, Tio, Uncle Virgo died.

18  Q    And when the defendant received this message, how did he

19  react?

20  A    Well, at first he did not react.  I mean he looked like

21  he was uncertain and then he turned around to look at me and

22  he looked at me seriously -- with a serious demeanor and then

23  he said some words that I did not like.

24  Q    What did he say?

25  A    Well what he said was that from that point on whoever

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   betrayed him was going to die regardless of whether they were

2   family, or women, or, you know, if people ratted him out that

3   they were going to die.

4   Q    What did you think when you heard this reaction from the

5   defendant?

6   A    Well at first I thought that maybe that person had passed

7   away from an illness, but then when he said that and he

8   reacted that way I thought that he had had him killed.

9   Q    Okay.  You told us earlier that the main part of your

10  relationship with the defendant ended sometime around the end

11  of 2012 or 2013, the beginning is the that last time you saw

12  him?

13  A    No.  Like the relationship had ended but it seemed that

14  it actually would never end.

15  Q    You stayed in contact with him, right?

16  A    Yes.

17  Q    I want to direct your attention to the date of

18  February 16th, 2014.  Where were you that day?

19  A    I was with him at the Guadalupe neighborhood.

20  Q    Describe the circumstances, how did you get to be there

21  with the defendant that day?

22  A    Well that day he saw me out, he sent me a message via PIN

23  and he asked to see me and so I went to where he was.  And he

24  told me that he wanted to see me.  I responded to his message

25  and I started heading towards where he was because he wanted

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    to see me and so I went towards the Libertad neighborhood.

2    Q    Where is that, is that the city?

3    A    No, well, this is a neighborhood that he's located in the

4    city of Culiacan in Mexico.

5    Q    And after you went to Colonia Libertad, did you stay

6    there with the defendant or did you go somewhere else?

7    A    He was -- we were there, we were sharing the table and he

8    was eating when Condor came in suddenly and said, Tio, we have

9    to move.

10   Q    So what happened next?

11   A    Well, he left -- he said that he should go and that they

12   turned on the truck and they got on the truck.  He told me to

13   get his personal things together and he said that he would

14   send a worker of his to come get me.

15   Q    I'm going to show you what's marked as Government

16   Exhibit 62 and it's in evidence.

17        Who is that?

18   A    Nariz.

19   Q    Who is Nariz?

20   A    He was one of the guys who worked running errands at the

21   house.  He was the one who would bring me over to where

22   Joaquin was.

23   Q    So where did you end up going that night?

24   A    Well I was waiting there for a long time, for hours at

25   the house and then he called me -- no, he had -- there was a

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   servant, a maid who called me and said that I should drive to

2   Guadalupe and that I would receive instructions on how to get

3   there.

4   Q    Did you arrive at Guadalupe?

5   A    Yes.

6   Q    What happened when you got to Guadalupe?

7   A    Well I arrived, he showed me the house because the house

8   that he was in at that time was new to me.

9   Q    When you say he showed you the house, who are you

10  referring to?

11  A    Joaquin.  He took me around to see the entire house.

12  Q    Describe the house just very briefly for us, what did you

13  see?

14  A    Well, it's a house that has, you know, two gates, I think

15  the color I'm not that sure, but the gates were brown I do

16  remember that.  It had two stories and inside there was a pool

17  and the pool had some screens or monitors and I remember about

18  that because I asked him about that.

19  Q    What did he tell you about the monitors?

20  A    Well what he said, oh, that's so we can watch TV when we

21  are dipping here in the pool.  That's what he told me.

22  Q    What happened that night?

23  A    Well, that night later we went to sleep.  Our room was in

24  the ground floor.

25  Q    After you went to sleep, what happened next?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   A    Well, you know, after we stayed up, we were talking for

2   hours, him and me, and after that I couldn't sleep.  I was up

3   kind of falling asleep around three or four in the morning

4   when I started hearing some loud noises on the door outside.

5   Q    What kind of noises were they?

6   A    Well, I heard like a lot of thumps and helicopters, I

7   heard yelling.  I heard Condor come in and say, Tio, Tio, open

8   up, they're on us, they're on us.  And I was very scared.  I

9   was in shock that day.

10  Q    What happened next?

11  A    I was looking at them, they were running around

12  everywhere and then I saw him go into the bathroom with Condor

13  and with the maid and he said, Love, come, come with me, come

14  in here.

15  Q    When you say "him," you're referring to the defendant?

16  A    Joaquin, yes.

17  Q    What was the maid's name?

18  A    They called her Chaparra.

19  Q    Did you go in the bathroom?

20  A    Yes.

21  Q    What did you see when you got in the bathroom.

22  A    Well what happened was that there was like a lid on the

23  bathtub that came up and right there and I was, like, do I

24  have to go in there.  I was very scared because it was very

25  dark and they had all gone in there.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

Case 1:09-cr-00466-BMC-RLM   Document 645   Filed 07/10/19   Page 214 of 221 PageID #: 13634

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   Q    When you say a lid on the bathtub, what do you mean by

2   that?

3   A    Well it was the entire tub.  The entire tub was hollow

4   underneath.

5   Q    And was there anything assisting the tub to stay up?

6   A    Yes, it had kind of, some kind of a hydraulic, you know,

7   like a piston they call it.

8   Q    What was underneath the bathtub?

9   A    Well the first thing that I saw were wooden steps and

10  then the next thing the only other thing I could see was

11  complete darkness.

12  Q    So what did you all do?

13  A    Well, we went in there and I heard him say to Condor,

14  close up the tub and he pulled on it and then we were in

15  complete darkness.

16  Q    Once he pulled in the tub, you're in complete darkness,

17  what is the space that you're in?

18  A    Well for me it was horrible because I had never been in a

19  place like that.  It was a humid place filled with water, with

20  mud.

21  Q    Before we go any further down there, before you went

22  underneath the bathtub, did you ever see anything on any of

23  those TVs in the house that night?

24  A    Yes, on that day I just saw a lot of people outside.  I

25  was staring at them.  I was in shock, I was in bed.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

5750
SANCHEZ LOPEZ - DIRECT - NARDOZZI

1   Q    So the TVs, they had an image from outside of the house?

2   A    Yes, they were the security cameras that he had at the

3   house.

4   Q    What kind of people did you see on those screens?

5   A    Well what I remember is that there were people wearing

6   helmets, like government people, and I could hear them yelling

7   and they were hitting the door really hard.  They were wearing

8   uniforms that had hoods on them that's what I saw.

9   Q    Once you're underneath the bathtub, what do you hear,

10  what happens next?

11  A    Well, what I could observe was that they were trying to

12  force open a door that was about five meters away from the

13  steps.  I could see Joaquin and Condor trying to open this

14  hatch door to open it so they could go out to a tunnel.

15  Q    When you say a hatch door, what do you mean by that?

16  A    Well it was like a door that was made of reinforced

17  steel, I don't know why, but it had like a handle that was

18  like a wheel that had to be turned in order to unlatch it or

19  unlock it.

20  Q    Was the door eventually opened?

21  A    Yes.

22  Q    What happened when the door opened?

23  A    Well, we took off running.  First, he took off running,

24  then it was me, then Condor, and then chap piece.

25  Q    You say "he," meaning the defendant, correct?

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

SANCHEZ LOPEZ - DIRECT - NARDOZZI

1    A    Yes.

2    Q    This is the middle of the night, what was the defendant

3    wearing?

4    A    Nothing, he was naked.

5    Q    What about the rest of you?

6    A    I did have clothes, I think Condor did too and the girl

7    had pajamas on.

8    Q    So the door opens, what do you all do?

9    A    Well he -- we took off running.  He ran off first, he

10   left us behind, so I continued feeling the sides of the tunnel

11   in order to be able to get through the darkness and know where

12   to go.

13   Q    How big was this tunnel?

14   A    Well, it was taller than me.  I couldn't really see but

15   it was, I think, like a meter and a half tall and it was wide.

16   I could feel the walls were concrete and as I walked along I

17   could feel the water coming up my legs.

18   Q    How tall are you approximately?

19   A    In Mexican measurements I'm 152 in meters.

20   Q    How long were you in this tunnel?

21   A    Oh, enough to traumatize me.  I think it was more than an

22   hour I believe.

23   Q    And did you travel with the defendant and the other two

24   individuals, Chaparra and Condor, through the tunnel?

25   A    Yes.

SANCHEZ LOPEZ      DIRECT - NARDOZZI

1  Q    Where did you emerge from the tunnel?

2  A    Well, we came out to an area, it was like a river.  I

3  think it was the Humaya River where Cunada was in Culiacan.

4  Q    You were underground the whole time until you got there?

5  A    Yes.

6            MR. NARDOZZI:  I'm going to, for the witness only,

7  put up on the screen what's marked as Government

8  Exhibit 815-1.

9            THE COURT:  How are you doing on timing?

10            MR. NARDOZZI:  Actually this will be a fine time,

11  because I can wrap this up in the morning on Tuesday.

12            THE COURT:  Ladies and gentlemen, we'll break for

13  the day.  Please stay away from any media coverage of the

14  case, do not communicate or say anything to anybody about this

15  case, don't do any research on the case.  Keep your mind open.

16            We'll see you Tuesday morning, remember Tuesday

17  morning not Monday, Monday Court is closed, Tuesday morning at

18  9:30.

19            Have a good weekend.

20            (Jury exits courtroom.)

21            THE COURT:  Anything else to cover?

22            MR. BALAREZO:  Your Honor, just one quick thing.

23            THE COURT:  Everyone can sit down.

24            MR. BALAREZO:  The Court had given us until today to

25  comment on the government's request for charge.  I was

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

PROCEEDINGS

1   wondering if you could give us just a few more days.  We had a

2   little miscommunication, we need to resolve some of our

3   concerns.

4          THE COURT:  I thought I had actually given you a

5   couple of more days, which wasn't today.

6          MR. BALAREZO:  Oh, then I'll take it.

7          THE COURT:  You can have it.

8          MR. BALAREZO:  Until Tuesday.

9          THE COURT:  That's fine, Tuesday, really Monday.

10         MR. BALAREZO:  We'll get it to you Monday.

11         THE COURT:  Also the government did not give me a

12   proposed verdict form.  I need to see that.  Please keep in

13   mind that it should be -- it will be as simple and

14   straightforward as possible.  We're not going to argue the

15   case on verdict form.

16         MS. PARLOVECCHIO:  Yes, Your Honor, we'll make it as

17   straightforward as possible and user friendly as possible.

18         Just briefly, the defense has provided us with the

19   name of a number of individuals who they say they intend to

20   call.  At least three of those individuals, they are fairly

21   generic names, there is no other identifying information or

22   indication as to what they relate to.  We would just request

23   that there be some sort of additional information so we can

24   conduct an investigation.  They may be located abroad, we

25   don't know.  We're just asking for a little bit more detail.

5754

PROCEEDINGS

1         MR. BALAREZO:  Your Honor, I've already told the

2    government I will give them the information as soon as I have

3    it in my hands.

4         THE COURT:  Okay.  But keep in mind, you know I'm

5    not going to have the government sandbagged --

6         MR. BALAREZO:  Not --

7         THE COURT:  I'm not accusing you, I'm not saying you

8    would do that, but I don't want to have to take the time to

9    adjourn the trial so the government can look into people.

10   It's more likely I'll just say you can't call that person

11   because you didn't tell the government enough information, so

12   please tell the government enough information.

13        MR. BALAREZO:  I understand.

14        THE COURT:  Okay.  See you all Tuesday.

15        MS. PARLOVECCHIO:  Thank you.

16        (Whereupon, the trial adjourned at 4:20 p.m. to

17   resume Tuesday, January 22, 2019 at 9:30 a.m.)

18

19

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

```
1                          I N D E X

2    WITNESS                                    PAGE

3    VICTOR J. VAZQUEZ

4    DIRECT EXAMINATION      BY MS. GOLDBARG    5538

5    CROSS-EXAMINATION       BY MR. BALAREZO    5594

6    REDIRECT EXAMINATION    BY MS. GOLDBARG    5654

7    RECROSS EXAMINATION     BY MR. BALAREZO    5655

8

     JOHN ZAPPONE

9

10   DIRECT EXAMINATION      BY MR. NARDOZZI    5656

11   CROSS-EXAMINATION       BY MR. PURPURA     5674

12

13   LUCERO GUADALUPE SANCHEZ LOPEZ

14   DIRECT EXAMINATION      BY MR. NARDOZZI    5696

15

16

17

18

19

20

21

22

23

24

25
```

1                          E X H I B I T S

2      GOVERNMENT                      PAGE
       219-1                           5547
3      219-2                           5550
       219-31                          5559
4      219-8                           5563
       219-3                           5563
5      219-4                           5565
       219-32                          5566
6      219-7                           5568
       219-5                           5569
7      219-20                          5570
       219-6                           5573
8      219-9, 10, 11                   5574
       219-12 and 219-13               5576
9      219-24                          5576
       219-14                          5578
10     219-15                          5578
       219-17, 219-18, 219-19          5587
11     610-A                           5666
       610-N                           5667
12     515-1                           5669
       515-2                           5671
13     92                             5699
       3500-LSL-2                      5700
14     93                             5712
       516                             5714

15

16     DEFENSE                        PAGE
       457                             5600
17     458                             5643

18

19

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*