2021

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
 - - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,        : 09-CR-00466(BMC)
4                                :
                                 :
5                                :
        -against-                : United States Courthouse.
6                                : Brooklyn, New York.
                                 :
7                                :
                                 : Tuesday, December 4, 2018
8  JOAQUIN ARCHIVALDO GUZMÁN      : 9:30 a.m.
   LOERA,                        :
9                                :
           Defendant.            :
10
 - - - - - - - - - - - - - - - X
11

12

13           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE BRIAN M. COGAN
14         UNITED STATES DISTRICT JUDGE, and a jury

15

16                    A P P E A R A N C E S:

17  For the Government: RICHARD P. DONOGHUE, ESQ.
                        United States Attorney.
18                      Eastern District of New York
                         271 Cadman Plaza East.
19                       Brooklyn, New York 11201
                        BY:  GINA M. PARLOVECCHIO, ESQ.
20                      ANDREA GOLDBARG, ESQ.
                        MICHAEL P. ROBOTTI, ESQ.
21                      Assistant United States Attorneys.

22                      United States Attorney's Office.
                        Southern District of Florida
23                       99 NE 4th Street.
                         Miami, Florida  33132
24                      BY:  ADAM S. FELS, ESQ.
                        Assistant United States Attorney.

25

2022

1            A P P E A R A N C E S:   (Continued)

2

3    For the Government:    Department of Justice, Criminal Division
                            Narcotic and Dangerous Drug Section.
4                           145 N. Street N.E.
                            Suite 300.
                            Washington, D.C. 20530.
5                        BY:ANTHONY NARDOZZI, ESQ.
                            AMANDA LISKAMM, ESQ.

6

7

8    For the Defendant:    BALAREZO LAW
                           400 Seventh Street, NW.
                           Suite 306.
9                          Washington, DC 20004
                        BY:A. EDUARDO BALAREZO, ESQ.

10

11

12                         LAW OFFICES OF JEFFREY LICHTMAN
                           11 East 44th Street.
                           Suite 501.
13                         New York, New York 10017.
                        BY:JEFFREY H. LICHTMAN, ESQ.
14                         PAUL R. TOWNSEND, ESQ.

15

16                         LAW OFFICE OF PURPURA and PURPURA
                           8 E. Mulberry Street.
                           Baltimore, Maryland  21202.
17                      BY:WILLIAM B. PURPURA, ESQ.

18

19                         LAW OFFICES OF MICHAEL LAMBERT, ESQ.
                           369 Lexington Avenue.
                           2nd Floor - PMB #229.
20                         New York, New York  10017.
                        BY:MARIEL COLON MIRO, ESQ.

21

22

23   Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
                        Official Court Reporter
24                      E-mail:  SMaceRPR@gmail.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

Ramirez - cross - Purpura                    2023

1              (In open court - jury not present.)

2                   (Witness resumes the stand.)

3              THE COURTROOM DEPUTY:  All rise.

4              (Judge BRIAN M. COGAN enters the courtroom.)

5              (Defendant present in the courtroom.)

6              THE COURT:  Let's have the jury, please.

7              (The jury enters the courtroom.)

8              THE COURT:  All right, everyone be seated.  Good

9    morning, ladies and gentlemen.

10             THE JURY:  Good morning.

11             THE COURT:  We will commence cross-examination,

12   Mr. Purpura.

13   J U A N   C A R L O S   R A M I R E Z   A B A D I A,

14        previously called as a witness by the Government, having

15        been previously duly sworn/affirmed, was examined and

16        testified further as follows:

17   CROSS-EXAMINATION

18   BY MR. PURPURA:

19   Q    Mr. Ramirez, yesterday you ended up by going through --

20             MR. PURPURA:  Excuse me, let me grab the mic.

21   Q    Mr. Ramirez, yesterday you ended up going through the

22   ledgers.

23             Do you recall your testimony about the ledgers?

24   A    Correct.

25   Q    And the ledgers which you discussed yesterday that dealt

Ramirez - cross - Purpura                    2024

1   with cocaine shipments, approximately ten cocaine shipments,

2   correct?

3   A    Yes.

4   Q    So those ledgers in addition had other information as

5   well; is that correct, sir?

6   A    It is.

7   Q    In particular, you specified on the ledgers monies

8   expended for assassinations, killings, murders; is that

9   correct, sir?

10  A    It is.

11  Q    Showing you what is an excerpt from Government Exhibit

12  GX-302, Defense Exhibit 242-A.

13          THE COURT:  Is this in evidence?

14          MR. PURPURA:  At this point, I'll move it into

15  evidence without objection, I believe.

16          MS. GOLDBARG:  No objection.

17          THE COURT:  Received.

18          (Defense Exhibit 242-A was received in evidence.)

19          (Exhibit published.)

20          MR. PURPURA:  Thank you, Your Honor.

21  BY MR. PURPURA:

22  Q    And I am directing your attention to what has been

23  highlighted.

24          Do you see that, sir?

25  A    Yes, sir.

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2025

1    Q      And the word *Charla Vero,* 3 persons, do you see that?

2    A      Correct.

3    Q      And that is a reference to payment for the murder of

4    three people; is that correct, sir?

5    A      It is.

6    Q      Now, do you know the names of the three people who were

7    killed?

8    A      I do not recall them.

9    Q      And how much money was expended for the assassination of

10   those three individual people?

11   A      $45,000.

12   Q      I am going to next show you another example from GX-302,

13   Defendant 242-B.

14          MR. PURPURA:  Without objection, move in.

15          (Exhibit published.)

16          THE COURT:  Received.

17          MR. PURPURA:  Thank you, Your Honor.

18          (Defense Exhibit 242-B was received in evidence.)

19   BY MR. PURPURA:

20   Q      And there is another reference which is highlighted here.

21          Can you see that reference?

22   A      Correct.

23   Q      And that, again, is another reference to a murder of

24   Tatiana, correct, sir?

25   A      It is.

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2026

1   Q     And I used that name.  Who is that individual?

2   A     He was Victor Patiño's brother.

3   Q     And how much did it cost you to have Victor Patiño's

4   brother assassinated?

5   A     $338,776.

6   Q     How come so much money for this particular assassination?

7   A     Because it was a big group of hit men who took part in

8   that killing.

9   Q     And showing you what has been marked as Defense

10  Exhibit 242-C, which is another excerpt from Government

11  Exhibit GX-302.

12          MR. PURPURA:  Without objection.

13          THE COURT:  Received.

14          (Defense Exhibit 242-C was received in evidence.)

15          (Exhibit published.)

16  BY MR. PURPURA:

17  Q     And, again, you can see the highlighted section; is that

18  correct, sir?

19  A     That's correct.

20  Q     And, again, that's another payment for an assassination,

21  for the taking of a human life; is that correct, sir?

22  A     It is.

23  Q     And which human life was taken in this particular case?

24  A     That was a lieutenant of the Patiño Fomeque.

25  Q     And how much money was expended for the assassination of

Ramirez - cross - Purpura                    2027

1   this lieutenant?

2   A    $200,000.

3   Q    And if we took our time and went through all of the

4   ledgers, there would be approximately about a 150 notations of

5   monies spent for assassinations; is that correct, sir?

6   A    That could be the case, it's possible.  I haven't counted

7   them, but it is possible.

8            MR. PURPURA:  Just for the witness, please.

9   BY MR. PURPURA:

10  Q    I am going to show you what has been marked as

11  Defendant's Exhibit 232, and ask you if you can recognize that

12  particular person?

13  A    Yes, sir.

14  Q    And who is he?

15  A    He is my -- he was my main lieutenant, Laureano Renteria

16  Mantilla.

17           MR. PURPURA:  Move into evidence Defense Exhibit 232

18  at this time.

19           MS. GOLDBARG:  No objection.

20           THE COURT:  Received.

21           (Defense Exhibit 232 was received in evidence.)

22           MR. PURPURA:  Thank you.

23           (Exhibit published.)

24           MR. PURPURA:  Thank you.

25  BY MR. PURPURA:

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2028

1    Q    Now, we've heard you speak of Mr. Renteria during your

2    direct examination; is that correct, sir?

3    A    It is.

4    Q    And he, as you indicated, was one of your lieutenants; is

5    that correct, sir?

6    A    Correct, sir.

7    Q    And he was also a very close personal friend; is that

8    correct, sir?

9    A    Correct, sir.

10   Q    And one of his jobs was that he was partially responsible

11   for the ledgers that we reviewed; is that correct, sir?

12   A    That's right, sir.

13   Q    Along with a person you identified as a Mr. Alzate,

14   A-L-S-A-T-E -- A-L-Z-A-T-E?

15   A    Correct.

16   Q    And those two individuals would have very personal

17   information as to those ledgers, correct, sir?

18   A    That's right, sir.

19   Q    And Mr. Renteria was arrested before you; is that

20   correct, sir?

21   A    Yes, sir.

22   Q    While you were in Brazil, he was in Colombia; is that

23   correct, sir?

24   A    It is.

25   Q    And he was arrested in one of your *caletas*, one of your

SAM       OCR       RMR       CRR       RPR

Ramirez - cross - Purpura                    2029

1    homes which was a stash home, correct, sir?

2    A    Correct.

3    Q    And there were millions and millions of dollars seized as

4    a result of his arrest?

5            MR. PURPURA:  And could we please have his picture

6    back up again?

7            (Exhibit published.)

8            MR. PURPURA:  Thank you.

9    A    That's right, sir.

10   Q    And that individual had intimate knowledge of not only

11   the ledgers, but of your many *caletas*, your stash houses,

12   correct, sir?

13   A    That's right, sir.

14   Q    That individual had intimate knowledge of your

15   organization, the one you have been testifying about; is that

16   correct, sir?

17   A    That's right, sir.

18   Q    Now, are you familiar with a facility that I believe is

19   closed now, Cómbita, in Colombia?

20   A    Cómbita, yes, sir.

21   Q    And Cómbita was a facility where a lot of Colombians were

22   housed prior to extradition, correct, sir?

23   A    That's right, sir.

24   Q    Now, Mr. Renteria, he went to La Picota because Cómbita

25   was closed, correct, sir?

Ramirez - cross - Purpura                    2030

1          MS. GOLDBARG:  Objection, foundation.

2          THE COURT:  No, he can ask if he knows.  Overruled.

3    A    To my understanding, that's what could have happened.

4    I'm not sure, though.

5    Q    Well, you knew that he was arrested and you knew from all

6    the information, all your informants, that he was in

7    La Picota, correct, sir?

8    A    Yes, sir.  Yes, sir, correct.

9    Q    You wanted to know where your main man was; is that fair

10   to say, sir?

11   A    I knew where he was.

12   Q    And you know, and you know, and you know that

13   Mr. Renteria, he never made it out of La Picota, did he, sir?

14   A    That's correct.

15   Q    He was poisoned in that maximum security facility, wasn't

16   he, sir?

17   A    That's what other lieutenants of mine informed --

18   informed me.

19   Q    And with his death died many secrets about your

20   organization; is that correct, sir?

21   A    He died and he had a lot of knowledge about my

22   organization, that's correct.

23   Q    You mentioned a Guero Palma, correct, sir?

24          Guero, excuse me.

25   A    It is, sir.

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2031

1   Q     And Guero is a nickname, correct, sir?

2   A     Correct.

3   Q     And it's -- Latin Americans often give descriptive

4   nicknames; fair to say?

5   A     That's correct.

6   Q     And Guero, and help me with this, it means light-skinned?

7   A     Yes.

8   Q     And, in fact, you know from the photographs and from

9   meeting him that Guero Palma was somewhat light-skinned,

10  correct?

11  A     You could say that.

12  Q     And, again, just with nicknames, El Chapo is kind of the

13  short one, right?

14  A     Correct.

15  Q     And you mentioned El Gordo; El Gordo would be the fat

16  one?

17  A     Yes.

18  Q     El Flaco would be the thin one, right?

19  A     Yes.

20  Q     And there may be some nicknames which are particular to

21  various countries.

22        So, in Mexico, Mona, M-O-N-A, that is a nickname for

23  someone, a woman, Mona with the A, correct?

24  A     It could be.

25  Q     You've heard that before, right?

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2032

1  A    Yes, in my country I have.

2  Q    And when I say Mona with the A, that's feminine, correct?

3  A    Correct.

4  Q    And if it was Mono, with the O, that would be masculine,

5  correct?

6  A    That's right, sir.

7  Q    Thank you.

8        Now, I am going to go back to one of your charts

9  again, your ledgers.  It's already in evidence.  It's

10  Government Exhibit 302-K.

11        (Exhibit published.)

12  BY MR. PURPURA:

13  Q    And in 302-K there appears to be payments.  It looks like

14  income payment, *ingreso abono,* correct?

15  A    Correct.

16  Q    And the payment looks like Mona, female with the A,

17  correct?

18  A    That's right, sir.

19  Q    And there's a date there, that's January 9th of 2004,

20  correct?

21  A    That's right, sir.

22  Q    And it looks like it's Mona Cha, C-H-A, right?

23  A    The word C-H-A, Cha, comes afterwards; that's correct.

24  Q    And who is Mona Cha?

25  A    When it says income, that's not a payment being made.  It

Ramirez - cross - Purpura                    2033

1   is an income, money coming in from a *bajador*, a person who

2   used to bring money down whom we used to call Mona.

3          So money was coming in from the job that we had done

4   with Chapo, and that is why we wrote Mona Cha.

5   Q    Well, what you have there is a payment from a Mona Cha,

6   correct?

7   A    Not a payment, an income, income to my organization.

8   There is no payment there.  We are not making any payments

9   there.

10  Q    It's all right.  Income coming in, *entrada*, right?  Money

11  coming in, right?

12  A    Correct.

13  Q    All right, good.  Correct.

14         And Mona Cha making payment -- excuse me, income

15  coming in, according to you, $2,717,740, Mona Cha making

16  payments in, $999,000; correct?

17  A    Income.

18  Q    Right.

19         And Mona Cha, again, female, Cha, making another

20  payment in, 1,500,000; correct?  That's what it shows, right?

21  A    It's an income, not a payment.  You have the two columns,

22  one says *entrada*, which means coming in.  The other one says

23  *salida*, going out.

24         Meaning this is an income from a *bajador*, someone

25  who brought down money who we used to call -- we gave the name

Ramirez - cross - Purpura                    2034

1   Mona, and we wrote Cha because it was money from the job that

2   we had done with Chapo.

3   Q    And just so I understand it, it's money coming in from

4   this person who you have listed there as Mona Cha, correct?

5              MS. GOLDBARG:  Objection.

6              THE COURT:  Overruled.

7   BY MR. PURPURA:

8   Q    Correct?

9   A    Correct, sir.

10  Q    Thank you.

11             THE INTERPRETER:  The interpreter did not finish

12  interpreting the question.

13             MR. PURPURA:  That's all right.

14  Q    Now, Government Exhibit 302-E, which is another ledger,

15  this is for Juanita 6.

16             Look at the top.  Do you see Juanita 6?

17  A    Yes, sir.

18  Q    And you testified about this before, correct?

19  A    That's right, sir.

20  Q    And in your testimony, what you said is Olfato, that is a

21  code word for Beltran-Leyvas, that's either Arturo or Hector

22  or Alfredo Beltran-Leyva, correct, sir?

23  A    (Spanish answer given.)

24  Q    It wasn't interpreted, but go ahead.

25  A    (Spanish answer given.)

Ramirez - cross - Purpura                    2035

1   Q    It's okay.

2   A    That's right, sir.  Excuse me.

3   Q    You are, obviously, an intelligent man.  You understand

4   English as well as Spanish, correct?

5   A    No, sir, very little.

6   Q    You did good just then, by the way.

7         All right.  So we have Beltran-Leyvas, $2,500

8   according to you, that they are the organizer and the receiver

9   of the cocaine, correct?

10  A    Not $2,500; 2,500 kilos of cocaine.

11  Q    Correct, I agree with you.

12        And do you recall that you prepared, under oath, an

13  affidavit in support of the extradition of Hector

14  Beltran-Leyva; do you recall doing that?

15  A    Yes, sir.

16  Q    And in that affidavit, on page 8, you spoke specifically

17  about Juanita 6 and who was involved in Juanita 6.

18        Do you recall that?

19  A    I don't remember that exactly.

20  Q    Well, do you recall -- strike that.

21        MR. PURPURA:  At this point I would enter into

22  evidence the excerpt 174-A of this statement.

23        THE COURT:  Any objection?

24        MS. GOLDBARG:  No objection, Your Honor.

25        THE COURT:  You need to give it a number.

SAM     OCR     RMR     CRR     RPR

Ramirez - cross - Purpura                    2036

1              MR. PURPURA:  Excuse me?

2              THE COURT:  A number.

3              MR. PURPURA:  I did, 174-A, Your Honor.

4              (Defense Exhibit 174-A was received in evidence.)

5     BY MR. PURPURA:

6     Q     Showing you what has been marked as Defense

7     Exhibit 174-A, and that is just the face sheet of the

8     affidavit for the extradition of Hector Beltran-Leyva; is that

9     correct, sir?

10             (Exhibit published.)

11    A     Yes, sir.

12    Q     So, in essence, what you're doing in that affidavit is

13    you are giving the country of Mexico information about Hector

14    Beltran-Leyva which will help them, allow them to extradite

15    him, send him back to the United States; correct?

16    A     That is correct.

17    Q     And, in fact, on the last page you signed the affidavit

18    swearing that what you said was honest and truthful, correct,

19    sir?

20    A     That's correct.

21    Q     And on page 8 of that affidavit you were asked, or you

22    wrote specifically about Juanita 6, and although it's in

23    Spanish, let me attempt at interpreting.  Please let me know

24    if you object to what I say.

25             For example, the load Juanita 6 contained 10,000

Ramirez - cross - Purpura                    2037

1    kilograms of cocaine sent to Vicente Carrillo-Fuentes and

2    received in Mexico by Ismael Jesus Zambada Garcia.

3              Correct?

4    A    Correct.

5    Q    Nothing about the Beltran-Leyvas organizing or receiving,

6    correct?

7    A    Correct, it doesn't say that there.

8    Q    And that was under oath, much like your testimony

9    yesterday, correct?

10   A    That's correct.

11   Q    In 1996 -- in 1996 you surrendered to Colombian

12   authorities, correct?

13   A    That's correct, sir.

14   Q    And at least the Colombian authorities, the intent was to

15   dismantle the Norte Del Valle Cartel, and various leaders were

16   self-surrendering, correct?

17   A    That was the alleged arrangement.

18   Q    And we say alleged because that's not what happened,

19   right?

20   A    Exactly.

21   Q    You continued in your drug trafficking, correct?

22   A    That is correct, sir.

23   Q    So you were dishonest with the Colombian authorities,

24   correct?

25   A    Right, completely.

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2038

1   Q    And you were supposed to cooperate as well, correct?

2   A    I had to dismantle the organization and supposedly

3   cooperate.

4   Q    And you did not dismantle the organization and you did

5   not truthfully cooperate, correct?

6   A    That is correct.

7   Q    So the point is, in 1996, you absolutely bold-faced lied

8   to the Colombian authorities, correct?

9   A    Totally.

10  Q    And you had no problem with lying to the Colombian

11  authorities because you wanted to continue your empire,

12  correct?

13  A    That is correct.

14  Q    And for what it's worth, even the Mexicans tried to come

15  up and talk to you, right?

16  A    That's right, sir.

17  Q    And you absolutely boldfaced lied to them as well,

18  correct?

19  A    Totally.

20  Q    Do you have any respect for the Mexicans, at all?

21       MS. GOLDBARG:  Objection.  I'm sorry, objection.

22       THE COURT:  Sustained.

23       THE INTERPRETER:  Sorry, I didn't hear objection.

24  The interpreter did not hear the objection.  I'm sorry, Your

25  Honor.

Ramirez - cross - Purpura                    2039

1          THE COURT:  That's all right.

2          Go ahead.

3  BY MR. PURPURA:

4  Q    And you know that your term of incarceration was

5  24 years, that's what it was supposed to be, right?

6  A    That's right, sir.

7  Q    And you knew that, based on the bribes that you paid,

8  that you were not going to go to a Colombian jail for

9  24 years, right?

10 A    Totally correct.

11 Q    And you knew that you would be released in a fairly short

12 period of time, correct?

13 A    That's right.

14 Q    And your lies helped you get released, correct?

15 A    Yes, it was a fake agreement based on corruption.

16 Q    Now, in your testimony -- actually, I believe -- strike

17 that.

18          You had -- you met with Government counsel, and we

19 will get into that in more detail, but many, many times;

20 correct?

21 A    That is right, sir.

22 Q    And one of the very first times that after -- well,

23 strike that.

24          You remember you actually signed what's called a

25 proffer agreement, an agreement to talk freely to the

SAM     OCR     RMR     CRR     RPR

Ramirez - cross - Purpura                                    2040

1    Government?

2    A     You mean the cooperation agreement or when I did the

3    initial proffers?

4

5                (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM        OCR        RMR        CRR        RPR

Ramirez - cross - Purpura                    2041

1    BY MR. PURPURA:   (Continuing.)

2    Q    I mean the initial proffers.

3    A    Yes, sir.

4    Q    All right.  And soon after that, you met with Government

5    counsel, actually Government counsel who presented you on your

6    direct examination and other Government counsel October 1st of

7    2008, sound about right?

8    A    Yes, I remember.

9    Q    And at that time at one of the very first meetings with

10   Government counsel you indicated that Beto, B-E-T-O -- and who

11   is Beto?

12   A    Beto Renteria?  Can you give me the last name if you have

13   it, please.

14   Q    I don't.

15   A    Well, if it's Beto Renteria he is a member of the North

16   Valley Cartel.

17   Q    You indicated to Government counsel that it was Beto,

18   B-E-T-O, who introduced you to the Mexicans.  Do you remember

19   telling them that?

20   A    He introduced me initially to one Mexican.

21        MR. PURPURA:  May I have defense Exhibit JCR 15?

22   Just for the witness, please.  Defense Exhibit Number 180.

23        Would the interpreter please read starting at -- it

24   says "Traveled."

25        THE INTERPRETER:  By interpreter, up to where did

Ramirez - cross - Purpura                    2042

1    you want the interpreter to read?  Sorry.

2            MR. PURPURA:  Right up to here.

3    Q    You didn't tell Government counsel when you first met

4    with them that it was Mayo Zambada who mentioned El Chapo;

5    right?

6    A    It's possible, sir.

7    Q    Do you recall now telling Government counsel one of the

8    very first times that you met with them, that it was Beto who

9    introduced you to the Mexicans and you gave a list of the

10   Mexicans that he introduced you to?

11   A    What I told the Government was that Beto Renteria had

12   initially introduced me to El Gordo and once he introduced me

13   to El Gordo and connected me to Gordo, this gave way for me to

14   meet the Arellano Felixes, Mayo Zambada, and it was like a

15   chain reaction until I met all the members of the Sinaloa

16   Cartel.

17   Q    Let me ask you specifically.  Do you recall or did you,

18   did you, on October one 2008 tell Government counsel along

19   with agents at a meeting that it was Beto who introduced you

20   to Chapo?

21           MS. GOLDBARG:  Objection.

22           THE COURT:  I will allow it one more time.

23   A    No.  I told them what I already told you.

24   Q    And at that first meeting you spoke with an El Gordo; is

25   that correct?

Ramirez - cross - Purpura                    2043

1          THE INTERPRETER:  By the interpreter, you spoke of

2     El Gordo?

3     Q    You spoke of an El Gordo; correct?

4     A    Yes, that was El Gordo that Mr. Renteria introduced me

5     to.

6     Q    And El Gordo -- the El Gordo you mentioned at that first

7     meeting and subsequent meetings thereafter was an El Gordo who

8     worked with the Arellano Felix brothers; correct?

9     A    Well, when he gets killed and then I travel to Mexico,

10    his lieutenant connects me to the Arellano Felixes and that's

11    when I meet Mayo Zambada.

12    Q    First the El Gordo that you mentioned actually died about

13    six months after you met him; is that right, sir?

14    A    He died a few months later.

15    Q    And you also at meetings with Government counsel spoke of

16    an Amado Carillo; correct, sir?

17    A    That's correct.

18    Q    And you actually became friends with Mr. Carillo;

19    correct, sir?

20    A    That's right.

21    Q    You became the Godfather to one of his children; is that

22    correct?

23    A    That is not true.

24    Q    Well, let me if I may --

25          MR. PURPURA:  Just one moment if I may, Your Honor.

Ramirez - cross - Purpura                    2044

1              THE COURT:  All right.

2              (Pause in proceedings.)

3              MR. PURPURA:  Bates stamp 287.

4    BY MR. PURPURA:

5    Q    Sir, just for your eyes only, I'm going to show you

6    Defense Exhibit 178.

7    A    Yes.

8    Q    And before I'm going to ask you, do you recall one of the

9    very, very first interviews when you were in Brazil, August 9,

10   2007, you spoke with DEA agents and Brazilian authorities.  Do

11   you remember that?

12   A    That's correct.

13             MR. PURPURA:  I would ask the interpreter to please

14   read paragraph seven.

15   Q    Now I'm going to ask you did you tell government agents

16   approximately two days after you were arrested that, in fact,

17   you were the Godfather of one of Amado Carillo's sons?

18   A    I don't remember that because I am not the Godfather of

19   any of Amado Carillo Fuentes' sons.

20   Q    Do you recall later talking about the son, saying that

21   the son is twelve years old and the brother is Marga,

22   M-A-R-G-A?

23   A    No, sir.

24   Q    Do you recall saying that you were great friends with

25   him?

Ramirez - cross - Purpura                    2045

1  A    Well, I always got on really well -- he was the person of

2  the federation or the Sinaloa Cartel with whom I got along the

3  best.

4  Q    And you also indicated to the agents that he was your

5  business partner; is that correct?

6  A    Well, we did have -- we worked together for many years.

7  Q    And he was known as the Lord of the Skies; correct, sir?

8  A    That's how he was known in Columbia.

9  Q    And you mentioned -- speaking of Lord of the Skies, you

10 mentioned planes which are used in narco trafficking.  Do you

11 remember that in your direct testimony?

12 A    Correct, sir.

13         MR. PURPURA:  Demonstrative only, Your Honor.

14 Defense Exhibit 230.  And, just a second.  I need to speak to

15 counsel.  This is for everybody and the witness as well.  It's

16 a demonstrative exhibit.

17         THE COURT:  Okay.

18         (Exhibit published.)

19 BY MR. PURPURA:

20 Q    This is not one of your planes or anyone's plane in

21 particular, but would this depict or accurately depict what

22 you have referred to as a Cheyenne?

23 A    That could be the case, but I don't have experience

24 enough to be able to recognize planes because it was my pilot

25 who dealt with that.

Ramirez - cross - Purpura                    2046

1   Q     Just as to your planes alone, this is a prop -- a

2   propeller plane, and it looks like a prop plane.  Would that

3   be accurate you used propeller-type planes in transporting

4   your narcotics?

5   A     Yes, I use turbo prop planes.

6   Q     And you also mentioned a King 200.  This is Defense

7   Exhibit 231, demonstrative only.

8             (Exhibit published.)

9   A     King 300.

10  Q     And, again, this is what may be called a turbo prop

11  plane; is that correct, sir?

12  A     That's what we used to call them, turbo prop.

13  Q     And all of these planes, again turbo props, all have

14  propellers, they don't have jets; correct?

15  A     That's right, sir.

16  Q     And the last plane I will show you is Defense Exhibit

17  229, demonstrative again which is another turbo prop type

18  plane; correct?

19  A     Well, I don't know that this is a turbo prop because

20  turbo props have two engines -- two engines with the

21  propellers on the side and this one has only one in the front.

22  Q     And the reason you use these types of planes is also they

23  have to land on what's called clandestine airstrips; correct?

24  A     That's correct.

25  Q     And these are often dirt and rutted airstrips; correct?

Ramirez - cross - Purpura                    2047

1   A    Dirt, but compacted dirt.

2   Q    Sir, speaking of the introduction again to Chapo, do you

3   recall Government counsel -- Government counsel presented you

4   as a witness, as well as government agents, that you were

5   introduced to Chapo by Cristiana (sic) Jorgito in 1993?

6            THE INTERPRETER:  Counsel can you repeat the names?

7            MR. PURPURA:  Cristiana (sic) Jorgito.

8   A    Cristina.

9   Q    Jorgito.  Do you remember telling Government counsel that

10  and it was in 1993, not 1990?

11  A    I told him that it was at the beginning of the '90s,

12  around 1990.  It is impossible that that took place in 1993

13  because that is the year when he was arrested.

14  Q    Well, that was my follow-up question.  Let me show you

15  Defense Exhibit Number 187 and see if this refreshes your

16  recollection to an April 20, 2010 meeting.  It's JCR-22, Bates

17  stamped 342.

18            I'd ask you to read and have the interpreter read to

19  you as well in English --

20            MS. GOLDBARG:  Objection, Your Honor.

21            THE COURT:  I am not seeing it.

22            MS. GOLDBARG:  May we approach, Your Honor?

23            THE COURT:  Yes.

24            (Sidebar held outside of the hearing of the jury.)

25            (Continued on next page.)

Sidebar                                                      2048

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          MS. GOLDBARG:  I believe that defense counsel is

4    attempting to refresh his recollection where the witness just

5    testified that he did not state it was in 1993, so I think

6    therefore it's --

7          THE COURT:  I think he said it cannot be 1993.

8          MR. PURPURA:  Then I'm going to refresh his

9    recollection as to a prior inconsistent statement because he

10   says here in approximately 1993, supposedly Cristiana (sic)

11   Jorgito personally introduced him to Chapo.

12         THE COURT:  You can ask, isn't it true that you told

13   agents that this happened in 1993 and he will say no.

14         MS. GOLDBARG:  Your Honor, I believe he just asked

15   the question didn't he state to the agents --

16         THE COURT:  But now he is refreshing his

17   recollection.  He is impeaching him with a good-faith basis

18   for believing there is a prior inconsistent statement even

19   though we don't believe there is one.

20         MR. PURPURA:  Thank you.

21         (Sidebar ends.)

22         (Continued on next page.)

23

24

25

Ramirez - cross - Purpura                    2049

1    BY MR. PURPURA:

2    Q    Mr. Ramirez, let me be more direct.  On April 20, 2010

3    again while you are being interviewed by Government counsel

4    along with agents, did you tell Government counsel and the

5    agents that in approximately 1993, Cristina Jorgito personally

6    introduced you to Chapo?

7              The answer, did you make that statement, yes or no

8    to government agents?

9              MS. GOLDBARG:  Objection, Your Honor.

10             THE INTERPRETER:  Can the interpreter state the

11   response?

12             THE COURT:  Sustained.

13             You have to let the interpreter state the response.

14   A    No.  Sir, what I told the Government was that around 1990

15   Cristina introduced me to Chapo in the lobby of a hotel in

16   Mexico City.

17   Q    But you didn't say 1993 in 2010?

18             MS. GOLDBARG:  Objection.

19             THE COURT:  I'll allow it.

20   A    No.

21   Q    And you know that Chapo, Mr. Guzman, was in jail by June

22   of 1993; correct?

23   A    I know that he was arrested in 1993.

24   Q    Good.  Now I'm going to ask you a couple of quick

25   questions on chili cans and cylinders.

Ramirez - cross - Purpura                    2050

1              MR. PURPURA:  Your Honor, I'd like to play an

2    excerpt from Government Exhibit 208-8 which is the chili can

3    seizure.

4              THE COURT:  Okay.

5              MR. PURPURA:  While we're setting up I will ask a

6    couple of more questions so we don't waste time.

7    Q    Mr. Ramirez, you said that Mr. Guzman to your knowledge

8    never came to Columbia; is that correct, sir?

9    A    I had heard rumors that he had been to Columbia, but not

10   to meet me, never.

11   Q    He never met you in Columbia; correct, sir?

12   A    Never.

13   Q    And when Mr. Guzman was in prison in 1993 in Mexico --

14   strike that.

15             You were able to visit a prison when you came to

16   Mexico; correct?

17   A    That's right.

18   Q    And you were basically, as you described, walked right

19   in; correct?

20   A    That's right.

21   Q    And you had no problem entering or leaving; right?

22   A    Correct.

23   Q    When Mr. Guzman was incarcerated in 1993 up to the point

24   where you turned yourself in in 1996, did you ever visit

25   Mr. Guzman in a Mexican jail?

                    SN      OCR      RPR

Ramirez - cross - Purpura                    2051

1   A     Never.

2   Q     And during that same period of time, 1993 to 1996, did

3   you ever get one of these cell phone calls from Mr. Guzman in

4   jail to you in Columbia?

5   A     I never spoke to Mr. Guzman while he was -- from the time

6   he was arrested.

7   Q     Thank you.  Now, back to the cylinders.  You indicated

8   that Mr. Guzman specifically requested that the cocaine be

9   made in a cylinder shape -- a perfect example.  Using the

10  disinfectant just an example, would this be the cylinder-type

11  shape you are talking about?

12  A     That's correct, but bigger.

13          MR. PURPURA:  And, just for the record, this is

14  Clorox disinfectant.  Now, can we please play the clip which

15  is Government Exhibit 208-8 of the chili can seizure portion.

16          (Video played.)

17  Q     Now, you see what appears to be cocaine coming out of the

18  chili cans, sir?

19  A     Yes.

20  Q     It appears to be a square not a cylinder; correct, sir?

21  A     That's correct, sir.

22  Q     And have you ever seen a kilo -- have you seen a kilo of

23  cocaine cut in half and taped together, what it looks like?

24  A     Yes, the kilo is square and you can split it in half.

25  That's correct.

Ramirez - cross - Purpura                    2052

1   Q    So that it could fit in a chili can that way; correct?

2   A    I don't -- I don't know that.  I did not pack the cans.

3   Q    Fair enough.

4         MR. PURPURA:  Could we continue to play the clip?

5         (Video played.)

6         MR. PURPURA:  One more time, let it run a little

7   bit.

8         (Video played.)

9   BY MR. PURPURA:

10  Q    Another square; correct?

11  A    That's right, sir.

12        MR. PURPURA:  Thank you.  Take it off.

13  Q    You were approximately 44 years old when you were

14  arrested; correct?

15  A    That's right.

16  Q    And you were once a lieutenant in the armed forces of

17  Columbia and the Marines; correct?

18  A    I did not become -- I did not get to become a lieutenant,

19  but that was my career, to become a lieutenant.

20  Q    Very good.  And you also had aspirations of becoming an

21  engineer; correct?

22  A    Yes, there was the possibility there of studying Naval

23  engineering.

24  Q    And what happened is that you, for whatever reason, you

25  left the military and you sought an engineering degree and you

Ramirez - cross - Purpura                    2053

1   came to the United States; correct?

2   A    That's right.  I came to the United States initially with

3   the idea of studying and I was also trying to sell cocaine

4   here.

5   Q    And you actually went to the University of Miami;

6   correct?

7   A    I don't remember if it was the university or the college,

8   but I went -- but I went there for a while to study English.

9   Q    And you also, I believe you have indicated to Government

10  counsel and others, that in addition to English studies and

11  engineering studies, that you also attempted to do some

12  financing studies as well; correct?

13  A    In Columbia, yes, economy and finances.  I did some

14  semesters at university.

15  Q    And, again, as you mentioned you did use submersibles as

16  part of your cocaine trafficking; correct?

17  A    That's right, sir.

18  Q    And I believe that based on your engineering skill you

19  actually had -- you participated in developing the

20  submersible; correct?

21  A    No, I'm not an engineer.  I did a few semesters but I

22  didn't participate in the physical or mechanical development

23  of the submarines.

24  Q    Do you recall in your very -- again, very initial

25  interview August 9, 2007, when you spoke to DEA agents in

Ramirez - cross - Purpura                    2054

1    Columbia and the far east you kind of actually bragged about

2    that you were one of the first persons to invent -- invent,

3    you used those words to invent, the submarine.

4    A    When I was -- what I was referring to was inventing the

5    method of using the submarine to transport, but I wasn't

6    saying I developed the submarines.

7    Q    Fair enough.  Obviously you're an intelligent

8    entrepreneur and you saw the advantage of a submarine.

9    A    I saw it as an efficient method to transport cocaine

10   through the Pacific ocean because of the seizures we had had

11   with the fishing boats.

12   Q    And you also used a sophisticated encrypted computer

13   system obtained from Israel; correct?

14   A    Yes.

15   Q    Now, in that initial interview, you also told Colombian

16   authorities and the DEA that when you came to Brazil in 2004

17   that you had not committed any criminal acts, specifically

18   money laundering or drug trafficking; correct?

19   A    I don't remember.

20        MR. PURPURA:  May I please have defense exhibit

21   Bates stamp 287, please.  It's JCR 13.  One second.

22   Q    Again, sir, I'm asking you if this refreshes your

23   recollection as to what you told the DEA.

24        MR. PURPURA:  Paragraph 14, please, madam

25   interpreter.

Ramirez - cross - Purpura                           2055

1    Q     And that is defense Exhibit 178.  Does that help refresh

2    your recollection of what you said way back in 2007 when you

3    spoke to the DEA and Colombian authorities?

4    A     I don't remember having said that.  If I had been in jail

5    in 1996 in Columbia for money laundering crimes and drug

6    trafficking, then that makes no sense.  The Colombian

7    authorities knew I had been in jail because of those crimes.

8    The American authorities knew it too.

9    Q     The question is when you spoke to the authorities after

10   your arrest, did you tell them that since your arrival in

11   Brazil, in Brazil in 2004, that you weren't comitting any drug

12   trafficking crimes or money laundering crimes?  In other

13   words, did you lie to them when you first met them?

14   A     That's correct.  I lied to the Brazilian authorities when

15   I was arrested.  That's right.  I don't remember the exact

16   details of what I said but I lied.

17

18                 (Continued on the following page.)

19

20

21

22

23

24

25

Ramirez - cross - Purpura                    2056

1    CROSS EXAMINATION

2    BY MR. PURPURA:   (Continuing)

3    Q    You speak a little bit of English; correct?

4    A    Very little.

5    Q    And you obviously are fluent in Spanish?

6    A    That's correct.

7    Q    Now, Brazil, it's one of the few South American countries

8    that the native language is not Spanish; correct?

9    A    The only one in South America.

10   Q    I think there may be one more.

11            Now, the language spoken in Brazil is Portuguese;

12   correct?

13   A    That's right.

14   Q    And you've learned to speak Portuguese; correct?

15   A    Yes, sir.

16   Q    Did you develop an accent so that you could fit in or you

17   still spoke with a Colombian accent?

18   A    I spoke Portuguese, but with an accent like a foreigner.

19   Q    And you have already indicated that you were the leader

20   of a multi-, I guess with a B, billion-dollar industry;

21   correct?

22   A    That's right, sir.

23   Q    And to get there, we know that you lied, corrupted,

24   killed, manipulated?  You did a lot of things; right?

25   A    All of that is correct, sir.

Ramirez - cross - Purpura                    2057

1    Q    You obviously know how to use information that you've

2    obtained to your own benefit; correct?

3    A    I don't understand your point.

4    Q    You obtained information, you obtained information about

5    rival cartels and you want to be pro-active, you want to use

6    it to your benefit, that's what I'm asking.

7    A    In my life as a drug trafficker?  That is possible that

8    happened, yes, sometimes.

9    Q    How about in your life as a witness?

10   A    No, sir.

11   Q    Now, you went -- strike that.

12             Prior to your arrest in Brazil, you had a Brazilian

13   attorney; correct?

14   A    Before my arrest in Brazil, I hired --  no, sir.  I hired

15   a Brazilian attorney after I was arrested.  I hired him after.

16   Q    You never spoke to anyone before you were arrested in

17   2007 to determine what the penalties for drug trafficking were

18   in Brazil?

19   A    No, sir.  I was in hiding there.  I didn't want to talk

20   to anybody, only with the people within my organization.

21   Q    You were hiding because you wanted to avoid, as you knew

22   at that point, extradition to the United States based on a

23   Washington, D.C. indictment; correct?

24   A    I was a fugitive.

25   Q    And you were in hiding because you know that the

Ramirez - cross - Purpura                    2058

1  penalties in the United States, if you're brought there, could

2  be extreme?

3  A    If I was arrested in Colombia or somewhere else, well,

4  yes.

5  Q    And you knew, or you knew soon after you were arrested

6  that the maximum period of incarceration that you could

7  receive for narcotics trafficking in Brazil was 30 years?

8            MS. GOLDBARG:  Objection, Your Honor.

9            THE COURT:  Overruled.

10  A    Correct.  When I was arrested, I found a Brazilian

11  attorney because I was arrested for the purpose of extradition

12  and he explained how that worked.

13  Q    And you also knew that if you would be extradited from

14  Brazil to the United States you could not face the most

15  drastic penalty, which is the death penalty; correct?

16  A    That is correct.

17  Q    And before, before you would speak freely with United

18  States authorities, you wanted to make sure that there was an

19  agreement between Brazil, the United States Government and

20  you, that, number one, you could not face the death penalty

21  and, number two, you could not receive any period of

22  incarceration more than 30 years; correct?

23  A    Correct.  That was my attorney's job in Brazil.

24  Q    And showing you what is Government Exhibit, I believe, 1,

25  which is your plea agreement.

Ramirez - cross - Purpura                    2059

1        And this is the front page of your cooperation

2   agreement here in the United States; correct?

3   A    Yes, sir.

4            THE COURT:  It's in evidence?

5            MR. PURPURA:  It is.  I apologize, Government

6   Exhibit 1.

7   Q    And on the second page, it sets out what could be the

8   maximum penalties for the drug importation conspiracy,

9   actually for the CCE, the criminal continuing enterprise?

10  A    That's correct.

11  Q    And you reviewed this statute, this American statute not

12  only with your Colombian attorney, you also had multiple

13  attorneys in the United States; correct?

14  A    I had my attorneys in the United States.

15  Q    And that was Paul Nalven, N-A-L --

16           MR. PURPURA:  You can't say attorneys' names?

17           MS. GOLDBARG:  Objection.

18           Relevance.

19           THE COURT:  Is there a reason to?

20           MR. PURPURA:  Probably not.  Unless they were here,

21  but they are not.

22           THE COURT:  Do it another way.

23           MR. PURPURA:  Thank you.

24  Q    You had at least -- strike that.

25           Bottom-line is you carefully reviewed the

Ramirez - cross - Purpura                    2060

1   cooperation agreement with your attorneys; correct?

2   A    I reviewed it with them, yes, sir.

3   Q    And the penalties that you could have received in the

4   United States; correct?

5   A    That's right.

6   Q    And in particular, 21 U.S.C. 848(e), you knew that here

7   in the United States that could carry the death penalty?

8   That's the death penalty statute?  You knew that; right?

9   A    I knew what my attorneys told me, that because of the

10  CCE, the American law allowed for life.  That's what I knew.

11  Q    And you also knew that you were not going to face the

12  death penalty by coming here to the United States; correct?

13  A    Well, my Brazilian attorney told me that was one of the

14  conditions of the Brazilian Government in order to turn

15  somebody in to the United States.

16  Q    Did you just pick Brazil randomly or did you realize that

17  there were some penalties that maybe helpful if you were

18  arrested?

19  A    Randomly.  I had no idea whatsoever about the laws there.

20  Q    The amount of times that you met with Government counsel

21  from October 1, 2008 through September 25, 2018, that's over

22  ten years, would you agree with me, that you met with

23  Government counsel roughly, during that ten-year period, about

24  40 separate times?

25  A    That could be the case.  There were many times.

Ramirez - cross - Purpura                    2061

1   Q    So you will not question if I say that we counted up to

2   about 40 times, would you?

3   A    That's right, sir.  It could be 40.  It could be more.

4   Q    And recently, just recently, before you testified on

5   Thursday, and that would be since September 25th, how many

6   times have you met just to prepare for this testimony with

7   this prosecutor?

8             MS. GOLDBARG:  Objection, Your Honor.

9             THE COURT:  Overruled.

10  A    On several occasions, sir.

11  Q    Well, several is how many?  10?  Does that sound about,

12  right?

13  A    Yes.  That could be the case, sir, or maybe more.

14  Q    And Chupeta, Chupeta is a nickname; correct?

15  A    Correct.

16  Q    Lollipop?  Pacifier?  What does it mean?

17  A    Candy.  In Colombia, candy, Bon-bon.

18  Q    Who is, forgive my pronunciation, who is Marcelo Javier

19  Unzue, U-N-Z-U-E?

20  A    That was a fake name on an Argentinean identification

21  document that I used in Brazil.

22            THE COURT:  Mr. Purpura, we need to take a break for

23  the jury, if this is a good time.

24            MR. PURPURA:  Whatever the Court wants.

25            THE COURT:  Let's come back at 11:20, ladies and

Ramirez - cross - Purpura                    2062

1   gentleman.  Please don't talk about the case amongst

2   yourselves.  See you in a few minutes.

3              (Jury exits the courtroom.)

4              THE COURT:  How are you doing on time, Mr. Purpura.

5              MR. PURPURA:  I will be finished before you lunch.

6              THE COURT:  Recess until 11:20.

7              (Recess taken.)

8              (In open court; outside the presence of the jury.)

9              THE COURTROOM DEPUTY:  All rise.

10             THE COURT:  Jury, please.

11             MS. GOLDBARG:  Your Honor, before we bring in the

12  jury, the Government would ask that the Court instruct the

13  jury that the death penalty is not an issue in this case.

14             THE COURT:  I am going to do that at some point.

15  Let me think about what I'm going to do.

16             MS. GOLDBARG:  Thank you, Your Honor.

17             (Jury enters the courtroom.)

18             THE COURT:  All right.  Everyone be seated.  Mr.

19  Purpura.

20             MR. PURPURA:  Thank you.

21  (Continuing)

22  BY MR. PURPURA:

23  Q    Mr. Ramirez, I'm going to take you back to August 7,

24  2007, when you were living in Sáo Paolo, Brazil and your

25  arrest.  You remember that date?

Ramirez - cross - Purpura                    2063

1   A    Yes.

2   Q    As we've already established, you were approximately 44

3   years old and you were just recovering from some facial

4   surgery; correct?

5   A    True, sir.

6   Q    And in addition to the law enforcement that came into

7   your house, they -- strike that.

8          The law enforcement that came into your house, also

9   they were taking videos of your caletas, your little stash

10  areas, some watches and other belongings of yours; correct?

11  A    Yes, sir.

12  Q    And they actually were even taking pictures of you as you

13  were being exited from the house in cuffs; correct?

14  A    I think so, sir.

15  Q    Thank you.

16         MR. PURPURA:  Your Honor, without objection, we are

17  going to ask to play, if we can put the lights down, Defense

18  Exhibit 235.

19         THE COURT:  Okay.  Where are you playing it from?

20         MR. PURPURA:  Being played right there.

21         THE COURT:  Lights.

22         (Video playing.)

23         MR. PURPURA:  Can you stop it, please.

24         (Video stopped.)

25  Q    Now, you recognize these photographs; correct?

MDL       RPR       CRR       CSR

Ramirez - cross - Purpura                      2064

1   A    Yes, sir.

2   Q    And these were some of the photographs that were used on

3   various passports and documents that you had with different

4   disguises, is that fair to say?

5   A    That's right, sir.

6            MR. PURPURA:  Can you continue, please.

7            (Video playing.)

8            MR. PURPURA:  Can you stop that, please.

9            (Video stopped.)

10  Q    In addition, you had various passports; correct, sir?

11  A    That's right, sir.

12           MR. PURPURA:  Can we refocus on the photograph.

13  Right there.

14  Q    And that's you; correct?

15  A    That's right.

16  Q    And that's you in one of the many disguises you used; is

17  that correct?

18  A    Correct.

19  Q    In addition to that Venezuelan passport, you had

20  passports in multiple different countries; is that correct,

21  sir?

22  A    I had Venezuelan passports and identifications off all

23  the countries, but not passports.

24  Q    You had identification of Paraguay, Argentina, Brazil,

25  Venezuela; correct?

Ramirez - cross - Purpura                    2065

1  A     Not from Brazil.  From the other countries, I did.

2  Q     And all those identifications, they were all lies;

3  correct?

4  A     That's correct, sir.

5  Q     Each and every one of them, including the one on the

6  screen is an absolute lie; correct?

7  A     An absolute lie.

8  Q     And you used those lies because you wanted to stay free?

9  You didn't want Chupeta Ramirez to be arrested; correct?

10  A     Obviously, sir.

11          MR. PURPURA:  Can you please, finish.

12          (Video playing.) (Video stopped.)

13  Q     Here are examples of some of your passports and

14  identification in multiple names; correct?

15  A     That's right, sir.

16          MR. PURPURA:  Thank you.

17          That's good.  You can put the lights back on.

18  BY MR. PURPURA:

19  Q     In addition, as we heard, to avoid being arrested, to

20  avoid being extradited to the United States, you changed your

21  face, your appearance on your face; correct?

22  A     That's how it was, sir.

23  Q     You had your nose altered?

24  A     That's right.

25  Q     A piece in your chin?  Cleft?

Ramirez - cross - Purpura                    2066

1    A    Correct.

2    Q    Cheekbone?

3    A    Yes.

4    Q    Hair transplant?

5    A    That too.

6    Q    How did that work out?  Maybe I --

7              MS. GOLDBARG:  Objection.

8              Objection.

9    A    It worked well.

10   Q    You had your eyes opened up?

11   A    Correct.

12   Q    And you had lip implants?

13   A    That's how it was, sir.

14             MR. PURPURA:  Showing just the witness, please,

15   Defense Exhibit 228.

16   Q    Do you recognize both of those photographs?

17   A    Yes, sir.

18   Q    Both of you; correct?

19   A    That's how it is, sir.

20             MR. PURPURA:  Your Honor, move in Defense Exhibit

21   228.

22             MS. GOLDBARG:  No objection.

23             THE COURT:  Received.

24             (Defense Exhibit 228 received in evidence.)

25   Q    You obviously, you were a handsome man, would you agree

Ramirez - cross - Purpura                    2067

1   with me?

2           MS. GOLDBARG:  Objection, Your Honor.

3           THE COURT:  Sustained.

4           MR. PURPURA:  All right.

5   Q    You weren't a handsome man?

6           MS. GOLDBARG:  Objection.

7           THE COURT:  Come on.

8   Q    You took this face, you took this face and you

9   dramatically altered your appearance?

10  A    That's right.

11  Q    And you did that to yourself to avoid arrest?

12  A    Correct.

13  Q    To avoid extradition to the United States?

14  A    That's correct, to avoid being captured.

15  Q    And to avoid time in jail; correct?

16  A    Obviously, if I wasn't captured, I was not going to spend

17  time in prison.

18  Q    Would you lie to avoid apprehension, arrest, time in

19  prison?

20  A    At that time, of course I lied.  I changed my appearance.

21  That's right.

22  Q    Would you lie now?

23  A    I'm not lying, sir.

24  Q    In addition, you were involved in corrupting police

25  officers and politicians; correct?

Ramirez - cross - Purpura                     2068

1   A    All that -- all that is correct, sir.

2   Q    Initially, in the early 1990s, you would pay $25 to

3   $50,000 just to get ears in congress to various people;

4   correct?

5   A    Yes.  I paid thousands of dollars to have ears in

6   congress to know what was going on.  That's correct.

7   Q    You paid the Rodriguez brothers at least a one-time

8   payment of $200,000?

9   A    That's correct, for corruption of politicians.

10  Q    All right.  You have paid a congressman at least a

11  million dollars for a safe conduct letter?

12  A    Yes, sir.

13  Q    When President Samper was a candidate for president, you

14  contributed $500,000 to his campaign, half a million?

15  A    Yes, I think somewhat more.

16  Q    And you paid this for the future benefit of when you

17  turned yourself in in 1996 for some consideration; correct?

18  A    That's how it was, sir.

19  Q    And lastly, which I am just going to mention, is that

20  there came a time when the Colombian Congress was debating

21  extradition, to reinstate extradition?

22  A    Correct.

23  Q    And you paid at least $10 million to influence the

24  Colombian Congress on the issue of extradition; correct?

25  A    At least, because I think it was more.

Ramirez - cross - Purpura                    2069

1    Q     And you didn't stop with corrupting congress or the
2    police, did you?
3    A     No.
4    Q     You even corrupted the press; right?
5    A     Correct.  Totally correct.
6    Q     Television, newspapers, you would pay money so that
7    stories would run that would be helpful to you and you would
8    prevent stories which were harmful to you; correct?
9    A     Yes, I did make corruption payments to the press.
10   Q     And although you didn't directly -- or unsuccessfully, I
11   should say, indirectly giving money to DEA agents, you did
12   corrupt agents by supplying prostitutes, gifts, apartments for
13   them, didn't you?
14   A     Yes, through some high-ranking officers of the Colombian
15   national police who worked with the SIU group at the embassy,
16   that's correct.
17   Q     From 1990 through your arrest in 2007, did you ever see
18   Joaquin Guzmán's art gallery?
19   A     Mr. Guzmán's art gallery, no.
20                (Continued on following page.)
21
22
23
24
25

Ramirez - cross - Purpura                    2070

1    EXAMINATION CONTINUES

2    BY MR. PURPURA:

3    Q    Did you ever go on a ride on the yacht El Chapito?

4    A    Negative, sir.

5    Q    Did you ever stay in one of his many Mexican villas in

6    every state in Mexico and more on the beaches?

7    A    No, sir.

8    Q    You had real assets, correct?

9    A    Yes, sir.

10   Q    You had real traceable assets, such as homes and a boat

11   as well, at least one yacht, right?

12   A    That is completely true, sir.

13           MR. PURPURA:  Can we please play, without objection,

14   Defense Exhibit 237, which is the *casas*?

15           Can we put the lights down, please?

16           (Exhibit published.)

17   Q    Do you recognize that house?

18   A    I can't see it that well.  I cannot see it clearly here.

19   Oh, I do now.  I do now.

20   Q    One of your homes, right?

21   A    Yes, sir.

22           MR. PURPURA:  Continue.

23   Q    Swimming pool, everything else?

24   A    Yes, sir.

25           MR. PURPURA:  Play.

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2071

1              (Video played.)

2    BY MR. PURPURA:

3    Q    Do you recognize that house?

4    A    Correct, sir.

5    Q    Another one of your houses?

6    A    That's right, sir.

7    Q    This is the house you were arrested in, correct?

8    A    Yes, sir.

9              MR. PURPURA:  Can we, please, play the clip of the

10   boat, 238?  Just for the witness only.  Defense 238 for

11   identification only at this time.

12   Q    Do you recognize that boat?

13   A    I believe it was a yacht or a boat that belonged to me.

14   Q    Thank you.

15             MR. PURPURA:  Move into evidence, Defense

16   Exhibit 238.

17             MS. GOLDBARG:  No objection.

18             THE COURT:  Received.

19             (Defense Exhibit 238 was received in evidence.)

20   BY MR. PURPURA:

21   Q    As you indicated, one of your boats?

22   A    That's right, sir.

23   Q    That was seized, as well as the houses, correct?

24   A    That's right, sir.

25   Q    In addition to the boats and the houses seized, there was

SAM     OCR     RMR     CRR     RPR

Ramirez - cross - Purpura                    2072

1    watches seized, as well, in your house?

2    A    Yes, sir.

3    Q    There was money in *caletas* -- when I say *caleta*, it's a

4    hidden area in speakers -- in your house, correct?

5    A    Totally true.

6              MR. PURPURA:  Could we please play that clip, and

7    that would be without objection, Defense Exhibit 240?

8              (Video played.)

9    BY MR. PURPURA:

10   Q    The *caleta* that's a speaker, inside that speaker was

11   money, correct?

12   A    That's right, sir.

13             (Video continues.)

14   Q    Money seized from your house?

15   A    Yes, sir.

16   Q    These are cell phones seized from your house?

17   A    Yes, sir.

18             MR. PURPURA:  Can you hold that, please?  Just go

19   back.  Play it.

20             (Video resumed.)

21   Q    This is your collection of watches, at least, from that

22   particular house, correct?

23   A    Yes, sir.

24             MR. PURPURA:  Play it.

25             (Video played.)

Ramirez - cross - Purpura                    2073

BY MR. PURPURA:

Q    In addition to money seized in that house, there was, I think the number you put on it, about a hundred-twenty-million dollars seized as well, correct?

A    That's correct, sir.

Q    And that was in gold and cash, correct?

A    They seized cash and gold also.

Q    And in addition, they seized -- you had quite a collection of art, is that fair to say?

A    Correct, sir.

Q    In particular, you supported an artist, sculptor from Medellín, last name Botero, B-O-T-E-R-O, correct?

A    I didn't support him, but I had some of his art work.

Q    And his art would be, to describe it would be, he would take figures and make them somewhat larger than life, *grande*?

A    That's correct.

         MR. PURPURA:  Without objection, 172-A.

         (Exhibit published.)

Q    This was a painting which was seized from your house, correct?

A    Yes, sir.

Q    And this artist is -- it sold for a fairly substantial amount of money, his art, correct?

A    Correct, sir.

Q    And this particular piece, which you had in your house,

Ramirez - cross - Purpura                    2074

1   was somewhere around a half-a-million dollars, correct?

2   A    Yes, sir.

3              MR. PURPURA:  And 172-B, which would be the last

4   piece of art.

5              (Exhibit published.)

6   BY MR. PURPURA:

7   Q    Another Botero painting, correct?

8   A    Yes, sir.

9   Q    And, again, this piece of art would go somewhere in the

10  vicinity of $580,000, a little north of half-a-million

11  dollars, correct?

12  A    Yes, sir.

13  Q    And you had many pieces of art and sculptor in your

14  houses, correct, sir?

15  A    Yes, sir.

16  Q    Now, on direct examination yesterday government counsel

17  asked you, in essence, if you were a hands-on boss.

18             Do you remember that question?

19  A    That's correct, sir; yes.

20  Q    And your response was:  Always; correct?

21  A    Yes, sir.

22  Q    Now, I am going to ask you about some murders in which

23  you were a hands-on boss.

24             In your New York Indictment, Government Exhibit --

25  excuse me, Defense Exhibit 168-A.

Ramirez - cross - Purpura                    2075

1           MR. PURPURA:  Without objection, Your Honor.

2           THE COURT:  Okay.

3           MR. PURPURA:  It's the very first one in the book.

4    I think it's already in anyway.

5           (Exhibit published.)

6    BY MR. PURPURA:

7    Q    Again, this is the face sheet of your Indictment, the

8    caption?

9    A    That's right.

10   Q    Okay.  And it's United States District Court, Eastern

11   District of New York, which is here, Brooklyn.  Right?

12   A    Yes, sir.

13   Q    And inside the Indictment there is a portion, a paragraph

14   which says the following:

15           The offices of the *sicarios* or hitmen, which

16   employed several dozen gunmen who carried out hundreds of

17   murders, kidnappings and violent collections of drug debt, at

18   the direction of the defendant Ramirez Abadia.

19   A    Abadia.

20   Q    Everyone is correcting me around here.

21           You remember that from your Indictment, right?

22   A    Yes, sir.

23   Q    And when you entered a guilty plea here in this

24   courthouse on March 1st, 2010, you prepared a written

25   statement, which you read in, under oath, to a United States

Ramirez - cross - Purpura                    2076

1   District Court judge in the presence of your attorneys,

2   correct?

3   A    That's right.

4          MR. PURPURA:  Defense Exhibit 178-A without

5   objection, which is JCRA-5.  This would just be the face

6   sheet, the transcript of your plea.

7          (Exhibit published.)

8   BY MR. PURPURA:

9   Q    And it shows March 1st, 2010, United States of America

10  against you.  And as part of your statement, you acknowledged

11  the following:

12         We also had a front that functioned as offices of

13  collection and assassination dedicated to acts of violence,

14  among which were committed kidnappings and murders ordered by

15  me as leader of the enterprise and by my lieutenants and our

16  subordinates.  I declare myself guilty of all this conduct

17  that I led and supervised that comprised a criminal

18  organization as an alias *Chupeta*.  All of the allegations in

19  the Eastern District Indictment are true?

20  A    That's right, sir.

21  Q    And that Indictment suggests that you and your group are

22  responsible for hundreds of murders, correct?

23         MS. GOLDBARG:  Objection.

24         THE COURT:  No, overruled.

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

Ramirez - cross - Purpura                    2077

1   Q      Tocayo, T-O-C-A-Y-O, you know who he is?

2   A      Yes, sir.

3   Q      You were informed roughly in 2002 that there had been a

4   meeting and there was an agreement that no longer should any

5   Norte Del Valle members cooperate with the United States, and

6   if they did, they'd be killed and their property would be

7   seized?

8   A      All of that is true.

9   Q      There was information that Tocayo was working to take

10  down the Norte Del Valle Cartel, correct?

11  A      That's right.

12  Q      And Tocayo had a large armed group himself, right?

13  A      That's right.

14  Q      And your job was to -- not to assassinate him, but to

15  lure him to a particular place, correct?

16  A      That's right.

17  Q      And you lured him to a *finca*, which was owned by Ramon

18  Quintero?

19  A      Yes, sir.

20  Q      You fooled him, he thought he was coming to a meeting,

21  correct?

22  A      That's right.

23  Q      He believed you?

24  A      He believed me and other North Valle Cartel drug

25  traffickers who were involved in setting up that meeting.

Ramirez - cross - Purpura                     2078

1   Q     And based on this ruse, this trick, that you presented to

2   him, he showed up at that purported meeting with ten to twelve

3   of his people and his attorney?

4   A     That's right.

5   Q     And waiting for him was not a meeting with food, right?

6   A     Correct.

7   Q     Waiting for him was about 40 *sicarios* who obliterated all

8   12 of those people with guns?

9   A     That's right, sir.

10  Q     In addition, Tocayo had a backup squad, some more of his

11  armed men at a nearby gas station?

12  A     Yes, sir.

13  Q     And the *sicarios* went out to that gas station and they

14  killed the remainder of those people there, correct?

15  A     Yes, sir.

16  Q     The bodies of all those people, the 12, plus the people

17  at the gas station, were thrown in the back of a pickup truck

18  and disposed of?

19  A     Yes, sir.

20  Q     Not just men were killed, women were killed as well; not

21  at that incident, but at other incidents, right?

22  A     Maybe.

23  Q     What is CTI?

24  A     CTI, it's -- CTI is an investigative group of the

25  Colombian prosecutor's office.

Ramirez - cross - Purpura                    2079

1    Q    Do you remember that two women from that office were

2    taking action against the Norte Del Valle Cartel, in

3    particular, because one of the women's brothers was killed?

4    A    That's right, sir.

5    Q    And you, you ordered the killing of both?

6    A    That's right, sir.

7    Q    And they were executed on a highway outside of Cali,

8    correct?

9    A    Uh-huh, yes, that's right, sir.

10   Q    The one person who you admit shooting is Rodriguez,

11   correct?

12   A    Yes, sir.

13   Q    And the one person you admit executing was killed in

14   2004?

15   A    Approximately, yes, sir.

16   Q    And you shot him in the face?

17   A    Correct.

18   Q    The distance of one meter?

19   A    Yes.

20   Q    In 1989 and 1990 there was a retired lieutenant from the

21   Army, his last name was Ramirez, who apparently stole arms

22   from the Norte Del Valle Cartel; do you remember him?

23   A    Yes.

24

25             (Continued on the following page.)

Ramirez - cross - Purpura                    2080

1   BY MR. PURPURA:

2   Q    And because he stole these arms, he was executed in his

3   vehicle; correct?

4   A    Can you repeat that, please?

5   Q    As a result of his theft, he was executed.

6   A    Yes.

7   Q    Take a break from murder for a second.  You also -- you

8   also were involved in loaning money to legitimate businesses?

9   A    That's right.

10  Q    Businesses that perhaps had money troubles; correct?

11  A    Yes, sir.

12  Q    The honest business owners didn't know that it was narco

13  money; correct?

14  A    Many times they did not.  Some of the times they did.

15  Q    But the bottom line is that if the business didn't pay

16  back the money, you took the business over.

17  A    Sometimes to collect the debt, yes.

18  Q    Back to murders.

19        THE COURT:  Before we get back there, could we have

20  a sidebar briefly with counsel

21        (Sidebar held outside of the hearing of the jury.)

22        (Continued on next page.)

23

24

25

SN        OCR        RPR

```
                        Sidebar                      2081
```

1          (The following sidebar took place outside the
2     hearing of the jury.)
3          THE COURT:  I am not stopping it because the
4     Government is not objecting, but I am not understanding the
5     relevance of bad acts as opposed to crimes involving
6     falsehoods.  For example, you had one murder where he deceived
7     the person in getting him there, and that was fine, but
8     generally to have a witness who did bad acts, how does that
9     affect his credibility?
10          MR. PURPURA:  These are infamous acts.  Murder is an
11     infamous act and infamous acts go right to the heart of
12     someone's credibility.  If they're capable of comitting or
13     ordering those acts it goes right to the heart of credibility.
14     You can't just gloss over it by saying it's 150.  We have a
15     right to go over all of these bad acts to show what type of
16     character this is.  There is nothing greater to show the
17     character of an individual than the effect that they are
18     willing to order the execution of all of these individuals.
19          THE COURT:  I just do not think that that is what
20     the rules provide.  You know, you can get him for truthfulness
21     or untruthfulness.  You can get him for convictions of crimes,
22     you can get him for bias, obviously.  Well, okay.  Like I
23     said, there is no objection, but we are spending a lot of time
24     on it.  I agree, if it is authorized, 150 isn't as good as a
25     few examples, but see if you can not do 150 murders.

Sidebar                                                          2082

1              MR. PURPURA:  I don't have 150, but what I have are

2       the ones that he specifically mentioned in the 3500 which the

3       Government has which is about ten and I --

4              THE COURT:  Okay.  I am not going to stop you.

5              MS. GOLDBARG:  Your Honor, I'm sorry, understanding

6       that the defense does have some leeway with this in light of

7       what the Government and the witness said in his direct

8       examination --

9              THE COURT:  That is true.

10             MS. GOLDBARG:  -- there is a certain step and I was

11      getting to that point where there's a 403 issue where a few of

12      them are fine, but, again if he plans on going into all 150,

13      it does become I believe a 403 issue.

14             THE COURT:  He says he's got ten and if they are not

15      too much detail, I suppose that is not an unreasonable number.

16      So let's try it and see how far it gets before we think we

17      have a Rule 403 problem.

18             MS. GOLDBARG:  Thank you.

19             MR. PURPURA:  Judge, just to avoid another bench

20      conference, to shorten and to culminate, I have a picture, a

21      demonstrative, of approximately 150 individuals to show the

22      depth and breadth of at least what 150 would look like.

23             MS. GOLDBARG:  The Government would object to this

24      on 403 grounds as well.

25             THE COURT:  Gee, to me that is the least

Sidebar                                                                    2083

1  prejudicial.  Is the actual victims' pictures?

2          MR. PURPURA:  No.  It's a group of 150 people to

3  show -- the number 150 becomes just --

4          THE COURT:  I understand.

5          MR. PURPURA:  So, I mean --

6          MS. GOLDBARG:  Your Honor, it's a photograph, I

7  believe, of perhaps some of the court employees or

8  reporters -- is it across the street --

9          MR. PURPURA:  No.  It's a random Google 150 search

10  picture.

11          MS. GOLDBARG:  It is also overly prejudicial.

12  There's no testimony that he actually killed 150 people at the

13  same time.  I think with the level of murders that he's going

14  into and the details it's more than sufficient.

15          THE COURT:  I have not even seen the picture, so I

16  cannot tell how prejudicial it is.  I suspect it is not going

17  to be nearly as prejudicial as the actual events, even the ten

18  events, that we are going to get into.  As a demonstrative, I

19  do not have a problem with it, but I will want to see it

20  before you do it.

21          MR. PURPURA:  Certainly.

22          (Sidebar ends.)

23          (Continued on next page.)

24

25

Ramirez - cross - Purpura                    2084

BY MR. PURPURA:

Q     Mr. Ramirez, back to murders.  Carlos Maya, M-A-Y-A, this was a Patino worker and you and others were concerned he was talking and he was killed, executed.  Is that correct, sir?

A     Correct.

Q     Captain Medina, M-E-D-I-N-A, handled the police for the organization.  He was killed in approximately 2004; is that correct, sir?

A     That's how it was, sir.

Q     You, in effect, ordered him to disappear because you thought he was going to give information as to your location; correct?

A     That's how it was.

Q     Yohani Casanas, C-A-S-A-N-A-S, he was executed because he stole money?

A     That's right.

Q     Jaime Rizo, R-I-Z-O, the same reason?

A     Yes, sir.

Q     And there is an El Canoso, C-A-N-O-S-O, who stole approximately $2 million?

A     Yes, sir.

Q     You ordered the group not to scare him or put pressure on him, but when he was comfortable to shoot him in the back of the head.

A     Correct.

Ramirez - cross - Purpura                    2085

1   Q    And there's many, many more.  There's an attorney, a
2   Pedro Arboleda, A-R-B-O-L-E-D-A.  Do you remember him?
3   A    Yes, sir.
4   Q    His fault was that he was a drunk and was talking about
5   the organization; correct?
6   A    He was providing information about the organization, yes,
7   sir.
8   Q    And as a result of that he was shot in a book store in
9   Cali?
10  A    That's how it was.
11  Q    There was a war with the Zunigas, Z-U-N-I-G-A.  Do you
12  remember that?
13  A    Yes, sir.
14  Q    Approximately four people were killed?
15  A    Yes, sir.
16  Q    And there was -- there's a gentleman by the name of --
17  and you mentioned him.  I will mispronounce his name.  Ivan
18  Urdinola?
19  A    Yes.
20  Q    And he was part of the Norte del Valle Cartel?
21  A    Yes.
22  Q    Your organization?
23  A    Yes.
24       MR. PURPURA:  For the witness only, please.
25  Q    Do you recognize that man?

Ramirez - cross - Purpura                    2086

1   A    Correct, that's Ivan Urdinola.

2        MR. PURPURA:  Move into evidence Defense Exhibit

3   227.

4        THE COURT:  Received.

5        (Defense Exhibit 227 received in evidence.)

6   BY MR. PURPURA:

7   Q    He was also involved in killing people; correct?

8   A    That's right.

9   Q    He seemed to favor motocierra?

10  A    That's what people used to say.

11  Q    That's a chain saw; right?

12  A    Correct.

13  Q    And he would kill and dispose of the bodies in the Cauca

14  River; correct?

15       MS. GOLDBARG:  Objection, Your Honor.

16       THE COURT:  Sustained.

17  BY MR. PURPURA:

18  Q    You worked with him; right?

19  A    During my first few years, yes, I worked for him.

20  Q    And then finally, there was an attempt to kidnap one of

21  your sons in 2002 or 2003; correct?

22  A    That's right.

23  Q    And you ordered that at least seven or eight people be

24  killed as a result of that; is that correct?

25  A    Yes, the kidnappers.

Ramirez - cross - Purpura                    2087

1    Q    Your murders extended outside of Columbia; correct?

2    A    That's right.

3    Q    In your New York indictment, you are charged with the

4    ordering of the murder of Vladimir, V-L-A-D-I-M-I-R,

5    Biegelman?

6    A    Yes, correct.  Yes, correct.

7    Q    And he lived and was killed in Mill Basin Brooklyn?

8             MS. GOLDBARG:  Objection.

9             THE COURT:  Sustained.

10   Q    Do you know -- first of all, have you ever seen

11   Mr. Biegelman?

12   A    No, sir.

13   Q    Do you know if he was married?

14   A    No, sir, I have no idea.

15   Q    Do you know if he had children?

16   A    No, sir.

17   Q    Grandchildren?

18             MS. GOLDBARG:  Objection.

19             THE COURT:  Sustained.

20   Q    Do you know where he lived?

21   A    No, sir.

22   Q    Do you know if he lived in New York?

23   A    In New York, yes.

24   Q    And you had a problem with him here in Brooklyn; correct?

25   A    Yes, in New York.  I don't recall exactly where.

SN        OCR        RPR

Ramirez - cross - Purpura                    2088

1    Q    And he was executed on December 2, 1993; correct?

2    A    Yes, sir.

3    Q    There was -- you testified about various stash houses

4    here in Brooklyn and Queens, in particular Queens.  Do you

5    remember that?

6    A    In Queens, in Queens, Long Island.

7    Q    And there was a woman who ran one of the stash houses who

8    apparently was either talking to the police or taking some of

9    the product; correct?

10   A    That's right, sir.

11   Q    And this woman was shot four times in her head at her

12   place of employment at your orders; correct?

13          MS. GOLDBARG:  Objection, foundation.

14          THE COURT:  Sustained.

15   Q    This woman was executed; correct?

16   A    Yes, sir.

17   Q    Did you know this woman?

18   A    No, sir.

19   Q    Did you know she had a husband?

20          MS. GOLDBARG:  Objection.

21          THE COURT:  Sustained.

22   BY MR. PURPURA:

23   Q    You also had stash houses in New Jersey, particularly in

24   Fort Lee; correct?

25   A    I had some stash houses in New Jersey.

SN        OCR        RPR

Ramirez - cross - Purpura                    2089

1    Q    And you were informed that someone who lived in that

2    stash house was, again, stealing some of the product; correct?

3    A    That's right.

4    Q    And as a result of that, a mother, a father, and a son

5    were executed; correct?

6    A    That's what I believe, yes, sir.

7    Q    Your Honor, could we approach on that one issue?

8             THE COURT:  Yes, sure.

9             (Sidebar held outside of the hearing of the jury.)

10            (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        2090
```

 1          (The following sidebar took place outside the

 2   hearing of the jury.)

 3               THE COURT:  Let's see your picture.

 4               MR. PURPURA:  I'm finished with that.

 5               THE COURT:  I know, this is your rhetorical flourish

 6   at the end.  I think it is okay as long as you make it clear

 7   it is not the victims.  You're showing him a stock photo of

 8   150 people.

 9               MS. GOLDBARG:  The Government still objects but --

10               THE COURT:  Okay.

11               MS. GOLDBARG:  Thank you.

12               (Sidebar ends.)

13               (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Ramirez - cross - Purpura                         2091

BY MR. PURPURA:

Q    The murders were committed because people did not strictly obey the rules of the organization, one reason; correct?

A    Yes, sir.

Q    The murders were committed to avoid apprehension to be arrested, people giving information out about you; correct?

A    Yes, killings took place because of that reason.

Q    And, you know that whenever you get sentenced, that the maximum period of incarceration that you can receive based on your agreement with the Government is 30 years; correct?

A    That's right.

Q    And you hope, you hope, that Government counsel will file either what's called the 5(k)(1) or a Rule 35 so that your sentence could be less; correct?

A    Well, what I understand is that it's a 5(k) letter so my sentence could be reduced from 30 to 25 years, five years reduction.

Q    And if you receive a 25-year sentence and you've agreed you ordered and are responsible for at least 150 murders, that's approximately 60 days incarceration per murder?

        MS. GOLDBARG:  Objection.

        THE COURT:  Sustained.

BY MR. PURPURA:

Q    Did you figure out how much time you would be spending in

Ramirez - redirect - Goldbarg                    2092

1    jail based on each murder committed?

2              MS. GOLDBARG:  Objection.

3              THE COURT:  Sustained.

4    BY MR. PURPURA:

5    Q    Finally, just showing you demonstrative 233.

6              MS. GOLDBARG:  Note the Government's objection.

7              THE COURT:  Over objection.

8    Q    That's a random picture of 150 people.  It's a lot of

9    people; right?

10   A    That's right.

11             MR. PURPURA:  No further questions.

12             THE COURT:  Any redirect?

13             MS. GOLDBARG:  Yes, Your Honor.

14             MR. PURPURA:  I would ask the Court's indulgence to

15   pick up my things and get ready --

16             THE COURT:  We will not start until you are ready.

17             MR. PURPURA:  Thank you.

18   REDIRECT EXAMINATION

19   BY MS. GOLDBARG:

20   Q    Mr. Ramirez, I'm showing you what's in evidence as

21   Government Exhibit 302-K.  Defense counsel asked you several

22   questions about these entries in your drug ledgers.  Do you

23   recall those questions?

24   A    Yes, ma'am.

25   Q    Was it common in your organization to give female code

Ramirez - redirect - Goldbarg                    2093

1    names to male members of your organization?

2    A    That's right.

3    Q    For example, did you have any female code names for

4    yourself?

5    A    Yes.

6    Q    What were some of the female code names that you had for

7    yourself?

8    A    Yamilet.  Dr. Yamilet.

9    Q    And defense counsel asked you many questions about Mona

10   Cha.  Do you remember those questions?

11   A    Yes.

12   Q    In those questions he seemed to insinuate that this was

13   one person?  Do you recall those questions?

14   A    Yes.

15   Q    Mona Cha, is that one person or two people?

16   A    Two people.

17   Q    Who was Mona?

18   A    It was a person who would bring money down from Mexico

19   down to us.

20   Q    Do you recall the person's real name?

21   A    No.

22   Q    Was it a male or a female?

23   A    Male, male.  It was a money launderer.

24   Q    And Cha, who was that, C-H-A?

25   A    That's how we referred to Mr. Guzman Loera in our

Ramirez - redirect - Goldbarg                    2094

1   ledgers.

2   Q     So this was someone that was bringing down money from

3   investments that the defendant paid to you; correct?

4   A     That's correct.

5   Q     Defense counsel also asked you a series of questions

6   about Juanita 6 in your declaration in support of extradition

7   of Jorge Beltran Leyva.  Do you recall those questions?

8   A     Yes.

9   Q     Showing you what's in evidence as Government Exhibit

10  302-E, the ledger for Juanita 6.

11  A     Yes.

12

13              (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Ramirez - redirect - Goldbarg                    2095

1  REDIRECT EXAMINATION (Continuing)

2  BY MS. GOLDBARG:

3  Q     You indicated that the ledger says Olfato, O-L-F-A-T-O.

4  Who is that a code word for?

5  A     It's for my lieutenant in Mexico whose name is Alvaro

6  Palau.

7  Q     Showing you what's in evidence as Government Exhibit 80.

8         (Exhibit published.)

9  Q     Who is that?

10  A    That's Alvaro Palau, also Olafo or Olfato.

11  Q    Who did Alvaro Palau deal with in Mexico?

12  A    With Conejo.

13  Q    Which Mexican traffickers did Alvaro Palau have dealings

14  with in Mexico?

15  A    With Conejo and the Beltran-Leyva brothers.  He

16  coordinated the logistics for the receipt of the Juanitas.

17  Q    Did he deal with any other Mexican traffickers?

18  A    Well, the dealings he did with us was always things that

19  the Beltran-Leyvas were in charge with, but he knew drug

20  traffickers way back from the '90s when he was working with me

21  from the Sinaloa Cartel.

22  Q    Regardless of who had received the logistics for

23  Juanita 6, who were the investors in that specific shipment of

24  cocaine?

25  A    The investors were Mr. Guzmán Loera, the Beltran-Leyva

Ramirez - redirect - Goldbarg                    2096

1    brothers, Mr. Nacho Coronel, Mayo Zambada, his brother Rey

2    Zambada and Vicente Carrillo.

3    Q    So the entire Sinaloa Cartel participated in the

4    investment of that Juanita 6?

5    A    That's right.

6    Q    Defense counsel also asked you questions about a couple

7    of Gordos; do you recall those questions?

8    A    Yes, right.

9    Q    You testified that there was a Gordo that you met that

10   was killed?

11   A    Correct.

12   Q    Showing you what's in evidence as Government Exhibit 73.

13        (Exhibit published.)

14   BY MS. GOLDBARG:

15   Q    Is this a different Gordo than the one you testified

16   about just now?

17   A    Of course.

18   Q    Defense counsel asked you several questions about chili

19   cans; do you recall those questions?

20   A    Correct.

21   Q    And they played for you Government Exhibit 208-8.  And I

22   believe they played to you from at least a portion from one

23   minute 10 to one minute 18.  I would like to play that for

24   you.

25        MS. GOLDBARG:  Can you lower the lights?

SAM      OCR      RMR      CRR      RPR

Ramirez - redirect - Goldbarg                    2097

1          (Video played.)

2    Q    Do you recall watching this portion of the video,

3    Mr. Ramirez?

4    A    Yes.

5    Q    And before today, had you ever seen this video before?

6    A    I had never seen it.

7    Q    I'd like to go back to approximately a point at

8    29 seconds on the video, a portion that defense counsel did

9    not show you.

10          MS. GOLDBARG:  If we could play that, please.

11          (Video played.)

12   BY MS. GOLDBARG:

13   Q    Do you see that?

14   A    Yes, I see it.

15   Q    Do you see anything that looks like it's shaped in a

16   cylindrical shape?

17   A    That's right.

18   Q    Is that the circle -- the item that's circled on the

19   left-hand side?

20          MR. PURPURA:  Object as to leading, but it's a

21   little late.

22          THE COURT:  True.

23          Do not do that again, please.

24          MS. GOLDBARG:  Your Honor, we would ask that, we

25   will take a screenshot of this and ask --

Ramirez - redirect - Goldbarg                    2098

1          MR. PURPURA:  No objection.

2          MS. GOLDBARG:  -- it be admitted as Government

3    Exhibit 208-8C as in Charlie.

4          THE COURT:  It will be received on that basis.

5          (Government's Exhibit 208-8C was received in

6    evidence.)

7          MS. GOLDBARG:  We are done with that, if you would

8    like to turn the lights back on.  Thank you.

9    BY MS. GOLDBARG:

10   Q    Defense counsel also asked you about the number of times

11   that you met with and proffered with the Government.

12          Do you recall that testimony?

13   A    Yes.

14   Q    During those meetings with the Government, how many

15   people, different drug traffickers did you discuss?

16   A    I discussed many or several Mexican drug traffickers from

17   the Sinaloa Cartel, the Arrellano-Felixes, El Gordo, who was

18   from Juarez who I met in the beginning.  Mainly, these guys.

19   Q    Was every single proffer or meeting that you had with the

20   Government about this defendant?

21   A    No.

22   Q    Defense counsel also asked you many questions and showed

23   you photos and videos about your assets.

24          Do you recall those?

25   A    Yes.

Ramirez - redirect - Goldbarg                    2099

1  Q    The videos of the watches and your houses, and the items
2  that you had inside, what happened to those?
3  A    They were confiscated by the Government.
4  Q    And the artwork that defense counsel asked you about and
5  all the other assets that he mentioned in Colombia, including
6  the cash and the gold, where is all that now?
7  A    It was all confiscated by the Government.
8  Q    What about the yacht that we saw video of?
9  A    Confiscated by the Government.
10 Q    Did you ever invite Chapo on that yacht when he came to
11 visit you?
12          MR. PURPURA:  Objection.  He never came to Colombia.
13          MS. GOLDBARG:  That wasn't the testimony.
14          THE COURT:  Let's find out.  You can ask the
15 question.
16 A    He never came to Colombia with me.
17 Q    The amount of money that you made, who was one of your
18 main partners in these drug transactions?
19 A    The Sinaloa Cartel people.
20 Q    Would that include the defendant?
21 A    Of course.
22 Q    Can you estimate how much money the defendant made from
23 transporting your cocaine?
24          MR. PURPURA:  Objection, this is beyond the scope.
25 This is.

SAM     OCR     RMR     CRR     RPR

Ramirez - redirect - Goldbarg                    2100

1          THE COURT:  Sustained.

2    BY MS. GOLDBARG:

3    Q    Defense counsel asked you a lot of questions about the

4    violence that you ordered and committed as a leader of the

5    drug cartel, right?

6    A    That's right.

7    Q    Did you admit to the Government that you committed

8    murders?

9    A    Of course, I did.

10   Q    Did you tell the Government about all the murders that

11   you remember ordering?

12   A    Of course, I did.

13   Q    Did you tell the Government about murders that the

14   Government didn't have information about?

15   A    That's right, yes.

16   Q    Why did you do that?

17   A    Because I had to tell the American government the truth

18   about all my criminal activities because that was the

19   agreement, about the things the American government knew about

20   and what they didn't know about.

21   Q    Did you accept responsibility for the murders?

22   A    Absolutely.

23   Q    Did you plead guilty to murders as part of your plea?

24   A    That's right.

25   Q    As a leader of a drug cartel, why did you engage in

Ramirez - redirect - Goldbarg                    2101

1   violence?

2   A    Because it's impossible to be a leader of a cartel in

3   Colombia with no violence because, for example, if one of your

4   cocaine shipments gets stolen and you don't do an act of

5   violence against the people who stole the cocaine from you,

6   they'll keep stealing the cocaine from you and then they're

7   gonna kill you.

8           Also, for example, if somebody tries to kidnap one

9   of your relatives, I used violence or we used violence

10  because, if not, then there were gonna be more kidnappings of

11  my family and it was the only way as the head of a cartel to

12  deal with it, with violence.

13          Being the leader of a cartel in Colombia goes

14  hand-in-hand with violence.  It's impossible to be a leader

15  without violence.

16  Q    And as a leader of a drug cartel, why would you order

17  people who you thought were cooperating against you to be

18  murdered?

19  A    Because it was a risk against my organization and against

20  myself.

21  Q    Defense counsel also asked you a lot of questions about

22  Tocayo?

23  A    That's right.

24  Q    Who was Tocayo?

25  A    Tocayo was a member of the North Valle Cartel.

Ramirez - redirect - Goldbarg                2102

1   Q    Who was his brother?

2   A    Victor Patiño Fomeque.

3   Q    And what was Victor doing when all of this -- when

4   Tocayo's murder was ordered?

5   A    He was incarcerated in the United States and he was

6   cooperating against us, against the leaders of the cartel in

7   the United States.

8   Q    Did this cause a war within your organization?

9   A    Yes, correct.

10  Q    Are wars an unavoidable part of a drug cartel?

11  A    That's right, they happen all the time.

12  Q    Why?

13  A    Because someone is ratting someone else out due to

14  problems among the hitmen, themselves, among the lieutenants,

15  because of the taking of cocaine routes, the stealing of

16  cocaine routes, and many other factors that could come up

17  during the criminal life of the North Valle Cartel, a drug

18  cartel in Colombia.

19          MS. GOLDBARG:  Just a few more questions, Your

20  Honor, I'm sorry.

21          THE COURT:  It's all right.

22  BY MS. GOLDBARG:

23  Q    Defense counsel asked you questions about your plea

24  agreement.  Do you recall those questions?

25  A    Yes, ma'am.

SAM      OCR      RMR      CRR      RPR

Ramirez - recross - Purpura                    2103

1   Q     Who set the condition that your maximum sentence is

2   30 years?

3   A     The extradition treaty between the United States and

4   Brazil.  It was a condition by the Brazilian government to

5   proceed with my extradition to the United States.

6   Q     And based on your cooperation, what is the lowest

7   sentence you will get in the United States?

8   A     Twenty-five years.

9              MS. GOLDBARG:  Can I have one moment, Your Honor?

10             THE COURT:  Yes.

11             (Pause.)

12             MS. GOLDBARG:  No further questions, Your Honor.

13             THE COURT:  All right.

14             MR. PURPURA:  About three questions.

15             THE COURT:  Okay, quickly, please.

16  RECROSS-EXAMINATION

17  BY MR. PURPURA:

18  Q     Mr. Ramirez, you were asked some questions, and I don't

19  have the exhibit here, it was 302-K, which was one of the

20  ledgers.

21             Do you remember some of the questions on that?

22  A     Yes.

23  Q     And on the names and the nicknames and the abbreviations,

24  we have your word that it's all accurate, correct?

25  A     That's right.

Ramirez - recross - Purpura                    2104

1    Q    And counsel mentioned Victor Patiño.

2         Victor Patiño was in the United States and he was

3    cooperating against the Norte Del Valle Cartel; is that

4    correct, sir?

5    A    That's right.

6    Q    And as a result of that, you ordered the murder of 36 of

7    his family members and close associates; is that correct, sir?

8    A    Yes, there was a war between my organization and his;

9    that's correct.

10        MR. PURPURA:  No further questions.

11        THE COURT:  Okay.

12        All right, ladies and gentlemen, we will break for

13   lunch.  Please remember, do not talk about the case amongst

14   yourselves.  We will have you back in here at 1:40.

15        Thank you very much.

16        (Jury exits.)

17        THE COURT:  Can everyone be seated?

18        I want to continue briefly the discussion that we

19   started at sidebar because I suspect this is going to be a

20   recurrent problem.

21        Let me just lay out for you my understanding of what

22   matter is appropriate for cross and what matter is not.

23        If the marshals want to take the witness out, that

24   is fine.

25        (Witness exits.)

SAM      OCR      RMR      CRR      RPR

Ramirez - recross - Purpura                    2105

1          THE COURT:  My understanding is, generally speaking,

2    bad acts, in and of themselves, to make the witness look like

3    a bad guy and make the jury dislike him are not permissible

4    subjects of cross, unless those bad acts happen to be *crimens*

5    *falsi*, in which case they show that the witness has a penchant

6    for dishonesty.  If something shows he has a penchant for

7    dishonesty, then that's fair game.

8          Of course, you can also cross-examine the witness on

9    the potential areas of bias.  And I thought on direct the

10   reason the Government was bringing out the murders was to draw

11   the teeth on the fact that the witness is getting some

12   possible exoneration from that large number of murders and the

13   defense, therefore, would want to say, well, that goes to his

14   possible bias, and I think that's right.

15         That does not, however, in my view, open the door to

16   cross-examining on the details of the murders.  I mean someone

17   who shoots a victim, someone who beats a victim to death, I am

18   not sure they are in any different state for purposes of

19   legitimate impeachment.

20         So I just want to lay that out for everybody, that

21   is my current thinking.  If anybody has different views and

22   wants to brief it, I would certainly welcome it.  But as I

23   say, because I think this may be a recurrent issue, I want to

24   let you know where I'm starting from.

25         MR. LICHTMAN:  Thank you.

Ramirez - recross - Purpura                    2106

1          THE COURT:  Okay.

2          MR. LICHTMAN:  Judge, and we'll submit something on

3    that.

4          If I could briefly say?

5          THE COURT:  Sure.

6          MR. LICHTMAN:  As Your Honor noted, certainly the

7    number of murders, perhaps even the particular circumstances

8    relating to a murder, are important to draw out the bias and

9    the motive of the witness to curry favor with the Government

10   so that when that sentencing day occurs, that the -- they will

11   receive more benefit than otherwise they, perhaps, would

12   without the 5K1 letter.

13         THE COURT:  I agree with you.

14         MR. LICHTMAN:  And in addition, with some of the

15   details, there is a difference between -- and I say this

16   respectfully -- ordering a murder 3,000 miles away than

17   walking up to someone, putting a gun in his face and shooting

18   him so that his teeth are splattering all over the wall.

19         THE COURT:  In terms of the character for

20   truthfulness, how is that different?

21         MR. LICHTMAN:  Because I think what it does is the

22   same thing with regard to bias and motive, that this is

23   someone so violent, so vicious, so willing to commit such an

24   egregious murder, and yet they still will be receiving some

25   benefit from the Government.

SAM      OCR      RMR      CRR      RPR

Ramirez - recross - Purpura                    2107

1          THE COURT:  Yes, I am not seeing it that way, but I

2    am certainly willing to be persuaded.

3          MR. LICHTMAN:  Thank you, Judge.

4          THE COURT:  Okay.  See you at 1:40.

5          MS. PARLOVECCHIO:  Your Honor, prior to the break

6    Ms. Goldbarg had raised the issue of instructing the jury in

7    regard to the death penalty and the fact that it is not an

8    issue here.

9          We would just ask that that instruction be given

10   sooner than rather than later, while it's still fresh in the

11   jury's mind and to avoid re-raising it later on and bringing

12   it to their attention again, certainly since it was brought up

13   during this witness's --

14         THE COURT:  I think I usually give it as part of the

15   final charge.

16         Does the defendant have a position on it?

17         MR. PURPURA:  I believe it should be given as part

18   of the final charge.  That is the issue here.

19         THE COURT:  You know, we instruct the jury not to

20   make up their mind, to keep an open mind.  We give them the

21   instructions all at one time.  While it is true we haven't

22   screened this jury for death penalty, it is because we didn't

23   have to.

24         So I think it is appropriate that we not run the

25   risk of having jurors who are absolutely opposed to the death

SAM      OCR      RMR      CRR      RPR

Ramirez - recross - Purpura                    2108

1  penalty and wrongfully thinking that this may be that case.

2  But I see no reason to pull that instruction out in the middle

3  of the testimony, as opposed to it fit very nicely in the

4  final instructions where you talk about the jury's general

5  obligation not to consider penalty and not to worry about this

6  one particularly because it is not an issue.

7            MS. PARLOVECCHIO:  Here is the only concern, Your

8  Honor.

9            Because of the length of this trial, they are not

10  going to get that instruction until the end of January,

11  beginning of February, if we keep moving at this pace.  So for

12  that reason the Government would just request that it be done

13  sooner.

14            THE COURT:  I assume you have got other witnesses

15  who might have been death qualified, except for the fact of

16  extradition or their cooperation agreement or something.

17            Is there anybody else like that coming?

18            MS. PARLOVECCHIO:  I don't think we have anybody

19  else.  It would have been an issue with regard to the first

20  witness, but I don't believe any of the others have that

21  issue.

22            THE COURT:  Okay.  Let me circulate the proposed

23  instruction.  And you are right, it is a point in light of the

24  trial, the length of the trial, maybe it should be given a

25  little earlier so the wrong idea does not set into the jury's

Ramirez - recross - Purpura                    2109

1  mind.  But I will let you look at the instruction before I

2  give it.

3          MS. PARLOVECCHIO:  Thank you, Your Honor.

4

5          (Luncheon recess taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                                    2110

1                    A F T E R N O O N   S E S S I O N

2

3                          (In open court.)

4                    (The Hon. Brian M. Cogan, presiding.)

5                          (Defendant present.)

6        (The following occurs outside the presence of the jury.)

7                    THE COURT:  What I am going to say to the jury about

8        the death penalty is this:  I am going to say you just heard

9        some testimony from a witness who testified that as a result

10       of his extradition and cooperation agreement, he does not face

11       the death penalty for crimes as to which he might otherwise

12       face.  You should be advised, ladies and gentlemen of the

13       jury, that the defendant in this case is not facing any death

14       penalty charge at all and that should not be your concern.

15                   MR. PURPURA:  Judge, can you say this is not a death

16       penalty case rather than the defendant is not facing a death

17       penalty charge?

18                   THE COURT:  Do you think the jury will know what I

19       mean when I say this is not a death penalty case?  Is the

20       Government satisfied with that?

21                   MS. PARLOVECCHIO:  Your Honor, the Government would

22       prefer that you make it clear that the defendant is not

23       subject to the death penalty in this case, as you were

24       proposing.

25                   THE COURT:  I think it is better to be direct with

SN         OCR         RPR

Proceedings                                        2111

1    the jury and not use language that we're all comfortable with

2    but that they don't necessarily know.

3              (Jury enters.)

4              THE COURT:  Ladies and gentlemen, before we move on

5    to the next witness, you just heard the last witness testify

6    that as a result of his extradition and cooperation agreement

7    he didn't face a death penalty for the things that he had

8    done.  I wanted to be clear that as to the charges in this

9    case against this defendant, this defendant also does not face

10   the death penalty.  So that's nothing you need to be concerned

11   about.

12             The Government may call its next witness.

13             MR. ROBOTTI:  The Government calls Jamal Hornedo.

14             THE COURTROOM DEPUTY:  Please raise your right hand.

15             (Witness sworn/affirmed.)

16             THE COURTROOM DEPUTY:  State and spell your name for

17   the record.

18             THE WITNESS:  Jamal Hornedo, H-O-R-N-E-D-O.

19             THE COURT:  You may inquire.

20             (Continued on the following page.)

21

22

23

24

25

1    **JAMAL HORNEDO**,

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5    DIRECT EXAMINATION

6    BY MR. ROBOTTI:

7    Q    Good afternoon.

8    A    Good afternoon.

9    Q    Are you employed?

10   A    Yes.

11   Q    Where are you employed?

12   A    The Drug Enforcement Administration in New York.

13   Q    What's your title?

14   A    Special agent.

15   Q    And how long have you been a special agent with the DEA?

16   A    18 years.

17   Q    What are your current duties and responsibilities as a

18   special agent with the DEA?

19   A    I'm responsible for investigating midlevel to high level

20   narcotics traffickers.

21   Q    And were you working as a DEA special agent on May 23,

22   2002?

23   A    Yes, I was.

24   Q    What was your assignment on that date?

25   A    I was the case agent on investigation and conducting

Hornedo - direct - Robotti                    2113

1    surveillance.

2    Q    What location were you surveilling?

3    A    400 Third Avenue, Brooklyn, New York.

4    Q    And what type of location is 400 Third Avenue in

5    Brooklyn?

6    A    It's an industrial warehouse.

7    Q    I would like to show you what's been marked as Government

8    Exhibit 201 --

9           MR. ROBOTTI:  Which is coming in without objection,

10   Your Honor.

11          THE COURT:  All right it is admitted.

12          (Government Exhibit 201 received in evidence.)

13          (Exhibit published.)

14   BY MR. ROBOTTI:

15   Q    Do you recognize this?

16   A    Yes, I do.

17   Q    What is it?

18   A    It's the warehouse at 400 Third Avenue.

19   Q    And could you please just describe what we see in this

20   photograph.

21   A    It's a large brick building with a large, grey, roll down

22   gate.

23   Q    And about what time did you start conducting surveillance

24   on May 23, 2002?

25   A    It was mid-afternoon.

Hornedo - direct - Robotti                    2114

1    Q    What, if anything, happened during the course of your

2    surveillance?

3    A    At approximately 8:20 p.m. I observed a green Nissan

4    Quest drive into the metal gate that was opened at the

5    warehouse.

6    Q    And could you just identify by circling which metal gate

7    you're referring to?

8    A    (Witness complies.)

9    Q    Is that the metal gate in the center of the photograph

10   there?

11   A    Yes.

12   Q    What happened next?

13   A    The gate was closed.  We maintained surveillance at that

14   location and at approximately 10 p.m. the gate opened and the

15   green Nissan Quest exited the warehouse.  The vehicle appeared

16   to be heavily weighted down as if there were items that were

17   loaded into it.  Myself and members of my team conducted

18   surveillance of that vehicle and ultimately conducted a car

19   stop on the vehicle.

20   Q    Okay.  And what happened during your car stop of that

21   vehicle?

22   A    As I approached the vehicle using my flashlight, I

23   observed in the rear of the vehicle several large duffel bags

24   which appeared to be full.

25   Q    What happened next?

Hornedo - direct - Robotti                    2115

1  A    I spoke to the driver and gained consent to search the

2  vehicle.  I opened one of the bags and observed a -- several

3  large brick-shaped objects which appears to be cocaine.

4  Q    And when you are saying duffel bags, about how many did

5  you see?

6  A    There were several, numerous duffel bags.

7  Q    And what size were the duffel bags?

8  A    They were extremely large, sport-type duffel bags.

9  Q    What, if anything, did you do with respect to the

10 occupants of the vehicle?

11 A    There were two occupants in the vehicle, a driver and a

12 passenger.  They were placed under arrest and the vehicle was

13 seized along with the drugs.

14 Q    What did you do next with respect to the warehouse?

15 A    A search warrant was obtained for the warehouse and a

16 search was later conducted on the warehouse.

17 Q    And about what time of day was that?

18 A    That was early the next day approximately 1 a.m.

19 Q    And during the execution of your search warrant what did

20 you see?

21 A    As they entered the warehouse there were two individuals

22 that were detained and placed under arrest.  I observed two

23 large box trucks and one 16-passenger van.

24 Q    And what did it appear that the individuals had been

25 doing?

Hornedo - direct - Robotti                    2116

1    A    It appeared the individuals were transferring drugs and

2    narcotics from the two --

3             MR. BELARDO:  Objection, objection.

4             THE COURT:  Did you see what they were doing?

5             THE WITNESS:  No.

6             THE COURT:  Okay, sustained.

7             MR. BELARDO:  Move to strike, Your Honor.

8             THE COURT:  He did not say anything yet.

9             The jury is instructed to disregard the answer if I

10   sustain the objection.

11   BY MR. ROBOTTI:

12   Q    Inside the warehouse you saw three vehicles?

13   A    Yes.

14   Q    I'd like to show you Government Exhibit 206-2 and

15   206-3 --

16             MR. ROBOTTI:  -- which are coming in without

17   objection, Your Honor.

18             THE COURT:  All right, received.

19             (Government Exhibits 206-2 and 206-3 received in

20   evidence.)

21             (Exhibit published.)

22   BY MR. ROBOTTI:

23   Q    First, looking at Government Exhibit 206-2, what's this?

24   A    That's a Ford box truck that was inside the warehouse.

25   Q    And there are four photographs here?

SN        OCR        RPR

1    A    Yes.

2    Q    And could you describe what we see in the top two

3    photographs?

4    A    The top two photographs are a photo of the front of the

5    truck.

6    Q    Okay.  And then in the bottom left photograph, what do we

7    see down here?

8    A    The bottom left is the exterior of the cargo or box area

9    of the truck.

10   Q    Looking at the bottom-right photograph, what do we see

11   here?

12   A    That's the interior of the box truck and there's a false

13   wall that was built into the front of the interior of the box

14   truck.

15   Q    And could you circle for the members of the jury where we

16   see this false wall?

17   A    (Witness complies.)

18   Q    Where were the kilos of cocaine recovered from this

19   truck?

20   A    From behind the false wall.

21   Q    Okay.  I would like to show you what's in evidence as

22   Government Exhibit 206-3.  Is this the other vehicle that was

23   located inside that warehouse?

24   A    Yes.

25              (Exhibit published.)

Hornedo - direct - Robotti                    2118

1    Q    Also four photographs here?

2    A    Yes.

3    Q    So what do we see in the top two photographs?

4    A    The top two are photos of the front exterior of the box

5    truck.

6    Q    Okay.  And then looking at the bottom two photographs?

7    A    The bottom two photographs are the interior of the box

8    truck which also shows a false -- false wall and the front

9    area of the cargo.

10   Q    Could you circle that in the bottom right of the

11   photograph for the members of the jury?

12   A    (Witness complies.)

13   Q    Where were the kilograms of cocaine recovered from this

14   vehicle?

15   A    The kilos were recovered from behind that false wall.

16   Q    And you mentioned there was a third type of vehicle in

17   this warehouse?

18   A    Yes.

19   Q    And what type of vehicle was that?

20   A    It was a 16-passenger van, a white Dodge Ram van.

21   Q    And what was recovered from that vehicle?

22   A    Numerous packages of cocaine.

23   Q    All right.  I would like to show you what's been marked

24   as Government Exhibit 206-4 which is also coming in without

25   objection.

SN        OCR        RPR

Hornedo - direct - Robotti                    2119

1            THE COURT:  Received.

2            (Government Exhibit 206-4 received in evidence.)

3            (Exhibit published.)

4    BY MR. ROBOTTI:

5    Q    And what do we see in this photograph?

6    A    Those are photos of the cocaine that was seized from the

7    green Nissan Quest, the two cargo vans and the 16-passenger

8    van that was inside the warehouse.

9    Q    And could you describe how these kilograms of cocaine

10   were packaged?

11   A    A majority of them were packaged in a yellow tape or

12   cellophane and further packaged in clear cellophane with an

13   oil substance and the outer edge were wrapped in orange tape.

14   Q    And do we see the orange tape in this photograph here?

15   A    Yes.

16   Q    And could you just identify, you know, one instance here

17   where we see the orange tape?

18   A    (Witness complies.)

19            MR. ROBOTTI:  That's a circle in the top-right

20   corner of the photograph marked 206-4.

21   Q    All right.  I would like to direct your attention to the

22   four boxes on counsel table here.  Do you recognize the boxes?

23   A    Yes.

24   Q    And what are those?

25   A    Those are exhibits of the drugs that were seized and that

Hornedo - direct - Robotti                    2120

1    were shown in Exhibit 206-4.

2              MR. ROBOTTI:  Your Honor, these are marked

3    Government Exhibits 206-9A through D which are also coming in

4    without objection.

5              THE COURT:  Received.

6              (Government Exhibits 206-9A through D received in

7    evidence.)

8              MR. ROBOTTI:  I would ask the witness to step down

9    to the exhibits and show the content to the jury.

10             THE COURT:  Yes, let's give him a lapel mic.

11             MR. ROBOTTI:  Could I ask that Special Agent Soupios

12   assist with this?

13             THE COURT:  Fine.  I assume you are going to be

14   asking questions while he is standing there?

15             MR. ROBOTTI:  Yes, Your Honor.

16   BY MR. ROBOTTI:

17   Q    How many kilograms of cocaine are in each box?

18   A    There are ten kilograms of cocaine in each box.

19   Q    And how many of these brick shapes were recovered at the

20   warehouse?

21   A    At the warehouse?

22   Q    In total from the four vehicles.

23   A    In total was 1,937 kilograms.

24   Q    And I think that that first box is open there.  So could

25   you first show us one of those bricks and describe how it's

Hornedo - direct - Robotti                    2121

1    packaged?

2    A    This is one of the kilogram bricks that were found

3    packaged in -- duct tape and there's further packaging inside

4    of cellulose and oil.

5    Q    And I think the courtroom deputy has a microphone for

6    you.

7            So this brick shape here, you said it was further

8    wrapped in additional packaging?

9    A    Yes.

10   Q    And between the two layers of packaging, what was there?

11   A    There was an oily substance.

12   Q    Could you show us the external packaging?

13   A    This is the external packaging and you can see there's

14   oil substance in between the plastic bag.

15   Q    And the colored tape there that was on the external

16   portion of these kilos?

17   A    Yes.

18   Q    Okay.  And while Special Agent Soupios is unpackaging the

19   rest of those, you can have a seat on the witness stand and

20   we'll resume the questioning.

21           Now, what did you do with the kilograms of cocaine

22   once they were seized from the warehouse?

23   A    They were transported to the New York division, processed

24   and submitted to the northeast regional laboratory.

25   Q    Now, I would like to show you what's coming in without

Hornedo - direct - Robotti                2122

1    objection as Government Exhibits 206-5 to 206-8.

2              THE COURT:  Received.

3              (Government Exhibits 206-5 to 206-8 received in

4    evidence.)

5    BY MR. ROBOTTI:

6    Q    So what are we looking at in Government Exhibit 206-5?

7    A    We're looking at the lab report for Exhibit Number 1.

8    Q    And do these lab reports -- there's four lab reports

9    here.  Do they correspond to each one of these boxes?

10   A    Yes.

11   Q    And so looking at the lab report conclusion here, what

12   was the substance?

13   A    Cocaine hydrochloride.

14   Q    And under reserve weight what's listed there?

15   A    446.52 kilograms.

16   Q    And what is the reserve weight?

17   A    The reserve weight is the net weight without the

18   packaging materials.

19   Q    Now, according to DEA procedures is the entire weight of

20   such a large cocaine seizure retained?

21   A    No, it is not.

22   Q    What's retained?

23   A    Ten kilograms from each exhibit is normally retained.

24   Q    All right.  So looking at Government Exhibit 206-6.  And

25   what is the conclusion of this laboratory report?

Hornedo - direct - Robotti                    2123

1    A    Cocaine hydrochloride.

2    Q    And what's the reserve weight for this one?

3    A    644.46 kilograms.

4    Q    Looking at Government Exhibit 206-7, what is the

5    conclusion here?

6    A    Cocaine hydrochloride.

7    Q    And the reserve weight for this exhibit?

8    A    368.76 kilograms.

9    Q    And finally looking at Government Exhibit 206-8, what's

10   the conclusion in this report?

11   A    Cocaine hydrochloride.

12   Q    And what's the reserve weight for this one?

13   A    463.42 kilograms.

14   Q    All right.  So was the total reserve weight from the

15   kilos seized at 400 Third Avenue in Brooklyn, about 1,923.16

16   kilograms?

17   A    That is correct.

18   Q    And how did the size of this seizure compare to other

19   seizures you observed in New York while a special agent?

20   A    The seizure was the largest seizure in New York for the

21   ten years prior and it's been the largest seizure that I've

22   dealt with while in my career in New York.

23           MR. ROBOTTI:  No further questions, Your Honor.

24           THE COURT:  All right.  Any cross?

25           MR. BALAREZO:  Very short, Your Honor.

Hornedo - cross - Balarezo                          2124

1   CROSS-EXAMINATION

2   BY MR. BALAREZO:

3   Q     Good afternoon, Special Agent.

4   A     Good afternoon.

5   Q     You said you were the case agent at the time of the

6   seizure?

7   A     Yes.

8   Q     And the case agent is the agent who has general control

9   of the case; is that right?

10  A     Yes.

11  Q     Has intimate knowledge of the details?

12  A     Yes.

13  Q     With the investigation?

14  A     Yes.

15  Q     With the facts?

16  A     Yes.

17  Q     And after you went in and executed the search warrant at

18  the warehouse, you had an opportunity to look at the evidence,

19  the cocaine; correct?

20  A     Yes.

21  Q     And I think Government Exhibit 206-4, that was sort of

22  the -- all three -- well, all three bundles put together,

23  correct, about 1,926 kilos?

24  A     All three bundles?  What do you mean all three bundles?

25  Q     Strike that.  That was all the cocaine that was seized;

Hornedo - cross - Balarezo                          2125

1   correct?

2   A     Yes.

3   Q     Now, when you went into the warehouse there were some

4   people there?

5   A     Yes.

6   Q     And do you recall what their ethnicity was?

7   A     Excuse me?

8   Q     They were Latinos; correct?

9   A     Yes.

10  Q     Spanish?

11  A     Yes.

12  Q     Were they Mexicans?

13  A     Yes.

14  Q     Do you know where they were from in Mexico?

15  A     Yes.  I believe one of them I knew where they were from.

16  Q     Where was that?

17  A     Sinaloa.

18  Q     Culiacan?

19  A     I don't recall.

20  Q     Was he related to Joaquin Guzman by any chance?

21  A     I do not remember that.

22  Q     When you looked at the cocaine -- and you had an

23  opportunity to look at the evidence itself, right?

24  A     Yes.

25  Q     Did you notice that there were any marks on the cocaine?

Hornedo - cross - Balarezo                    2126

1    A     Yes.

2    Q     Okay.  Let me just -- they all generally looked like

3    this; correct?

4          MR. ROBOTTI:  Counsel, it's open.

5          MR. BALAREZO:  I need a pick-me-up.

6    BY MR. BALAREZO

7    Q     This is what they looked like; right?

8    A     Generally, that's right.

9    Q     Did you see if any of them had a mark called Reina,

10   R-E-I-N-A?

11   A     I do not remember.

12   Q     Do you remember one called Sapphire, in English,

13   Sapphire?

14   A     I don't remember that.

15   Q     Or in Spanish *Safiro*, S-A-F-I-R-O?

16   A     I don't remember that.

17   Q     How about Safidi, S-A-F-I-D-I?

18   A     I don't remember that.

19   Q     How about Condor?

20   A     I don't remember that.

21   Q     How about Alacran, A-L-A-C-R-A-N?

22   A     I don't remember that.

23   Q     How about Pacman?

24   A     I don't remember that.

25   Q     Coca Cola?

Hornedo - cross - Balarezo                    2127

1  A    I don't remember that, no.

2  Q    The letter R?

3  A    No, I don't remember that.

4  Q    The word Corona, like the beer?

5  A    I do not remember that.

6  Q    Or a crown, like a drawing of a crown?

7  A    Do I not remember that.

8  Q    The word Xtra, X-T-R-A?

9  A    I don't remember that.

10  Q    A dollar sign?

11  A    I do not remember that.

12  Q    The word Metro?

13  A    I do not remember that.

14  Q    Or the word Clinton, like the president?

15  A    I do not remember that.

16         MR. BELARDO:  Actually, that's all I have for this

17  witness.

18         THE COURT:  Any redirect?

19         MR. ROBOTTI:  No, Your Honor.

20         THE COURT:  Thank you very much you may step down.

21         (Witness excused.)

22         THE COURT:  The Government may call its next

23  witness.

24         MS. PARLOVECCHIO:  The Government calls Matthew

25  Ryan.

Hornedo - cross - Balarezo                    2128

1          (Witness takes the stand.)

2          THE COURTROOM DEPUTY:  Please raise your right hand.

3          (Witness sworn/affirmed.)

4          THE COURTROOM DEPUTY:  State and spell your name for

5    the record.

6          THE WITNESS:  Matthew Ryan, R-Y-A-N.

7          THE COURTROOM DEPUTY:  Please be seated.

8          THE COURT:  You may inquire.

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ryan - direct - Parlovecchio                    2129

1  **MATTHEW RYAN**,

2              called by the Government, having been

3              first duly sworn, was examined and testified

4              as follows:

5  DIRECT EXAMINATION

6  BY MS. PARLOVECCHIO:

7  Q    Good afternoon.

8  A    Hello.

9  Q    I'm over here.

10  A    Sorry.

11  Q    By whom are you employed?

12  A    I'm a special agent with the U.S. Drug Enforcement

13  Administration.

14  Q    What is your current assignment?

15  A    I'm assigned to the Newark division office.

16  Q    And how long have you been a DEA agent?

17  A    Approximately 27 years.

18  Q    What are your duties and responsibilities as a DEA agent?

19  A    To investigate violations of federal narcotics laws.

20  Q    I'm going to direct your attention to January 2003, what

21  was your assignment at that time?

22  A    I was assigned to the New York division, enforcement

23  group D-22.

24  Q    And what case were you investigating at that time?

25  A    Again investigating violations of federal narcotics laws

Ryan - direct - Parlovecchio                2130

1    as well.

2    Q    What if any investigation were you working on in January

3    of 2003?

4    A    We received -- at that time in March -- in 2003, it was

5    an investigation titled Four Queens Soybean.

6    Q    Briefly, how did that investigation begin?

7    A    We received intelligence information in March of 2002

8    that a business by the name of Four Queens Soybean Oil had

9    rented a warehouse at 5118 Grand Avenue in Queens, New York

10   for the purpose of receiving and distributing cocaine.

11   Q    Who were the targets of that investigation?

12   A    The targets initially were Manuel Silva, a gentleman

13   named Alex Montoya, Jose Gudino and a Saul Ramirez.

14   Q    Were you working as a Special Agent on January 28, 2003?

15   A    Yes, I was.

16   Q    What were you doing on that day?

17   A    Conducting surveillance.

18   Q    Where were you conducting surveillance?

19   A    We started surveillance on January 28th.  We started

20   surveillance at 7979 78th Avenue in Queens.

21   Q    And what type of place was that?

22   A    That was a residence, four individuals that we had

23   associated to the warehouse through our investigation.

24   Q    Were you working with other special agents on that day?

25   A    Yes, I was.

Ryan - direct - Parlovecchio                2131

1  Q     What, if anything, did you observe when you were doing

2  surveillance on the residence on January 28, 2003?

3  A     During the course of surveillance we observed three

4  individuals exit the residence and get into a red Ford

5  Explorer with Illinois registration and proceed to the

6  warehouse at 5118 Grand Avenue.

7  Q     When you said it had an Illinois registration, did it

8  have Illinois license plates?

9  A     That's correct.

10  Q     What happened next?

11  A     Upon arriving at the warehouse, the Explorer backed up to

12  one of the rollup doors.  One of the subjects entered --

13  exited the Explorer and entered the warehouse.  A few minutes

14  later, he exited the warehouse driving a silver minivan at

15  which point one of the other individuals from the Explorer

16  exited the Explorer and also got into the minivan.

17  Q     When you said the Explorer went to the warehouse, was

18  this the warehouse that you were targeting in your

19  investigation?

20  A     That's correct.

21  Q     What happened next?

22  A     We surveilled both vehicles as I traveled back on to

23  Grand Avenue to a Stop & Shop a short distance away.

24  Q     Where was that Stop & Shop located approximately?

25  A     Also on Grand Avenue.

Ryan - direct - Parlovecchio                    2132

1    Q    What happened next?

2    A    They drove up.  Both vehicles drove up to the upper deck

3    parking lot where the two individuals parked the minivan while

4    the Explorer remained stationery in the lobby.

5    Q    And briefly tell the jury what you saw next.

6    A    The two individuals then exited the minivan, walked to

7    and entered the Explorer while the remaining individual in the

8    Explorer, he had gotten out and went to the lower deck where

9    he was observed meeting with an unknown male.

10   Q    What did you observe next?

11   A    Then the two individuals that were in the Explorer drove

12   the Explorer down to the lower deck, the two other individuals

13   then got into the Ford Explorer for a brief period of time and

14   then the new, fourth, unknown individual existed while the

15   Explorer departed the area.

16   Q    What happened next?

17   A    Then a short time after that, I observed two individuals

18   on the upper deck parking lot engaged in conversation.

19   Q    And this upper deck parking lot, you're still at the Stop

20   & Shop?

21   A    That's correct.

22   Q    What happened next?

23   A    And one of those individuals who was identified as Ramon

24   Cava, he separated from the other, walked to and entered the

25   silver minivan that was previously left there.

Ryan - direct - Parlovecchio                    2133

1  Q    What, if anything, did you see Cava do before he entered

2  the minivan?

3  A    As he was walking towards the minivan, he looked around

4  to see if he could suspect any law enforcement presence in the

5  lot.

6            MR. BELAREZO:  Objection.

7            THE COURT:  Overruled.

8  BY MS. PARLOVECCHIO:

9  Q    What happened next?

10 A    Then Mr. Cave drove the van out of the lot and turned

11 right onto Grand Avenue.

12 Q    Did you follow him when he was driving out of the lot?

13 A    Yes, I did.

14 Q    What happened next?

15 A    Based on my training and experience I suspected that a

16 drug transaction just occurred and I attempted an

17 investigative stop of the minivan utilizing my police lights

18 and siren.

19 Q    What happened when you tried to initiate that

20 investigative stop?

21 A    At that point Mr. Cava took a right turn onto 74th Street

22 and sped off at a high rate of speed.

23 Q    What happened next?

24 A    A chase ensued for a short distance up to 51st Drive at

25 which point Mr. Cava attempted to take a left turn and lost

SN        OCR        RPR

Ryan - direct - Parlovecchio                    2134

1    control of the vehicle and crashed into a parked car on 51st

2    Drive.

3    Q    What happened after Mr. Cava crashed this minivan?

4    A    He got out of the vehicle and attempted to flee on foot

5    but was apprehended approximately half a block down the road.

6    Q    I show you what was marked for identification as

7    Government Exhibit 204-23 and 204-21.

8              MS. PARLOVECCHIO:  Just for the witness, please.

9    Q    And what are Government Exhibits 204-21 and 204-23?

10   A    This is a map of -- I'm sorry, a photograph.  This

11   initial photograph here is of the Stop & Shop located here,

12   and here is -- this is a picture of the intersection of 74th

13   Street and the left turn on 51st Drive where the accident

14   occurred.

15

16              (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Ryan - direct - Parlovecchio                    2135

1    (Continuing.)

2          MS. PARLOVECCHIO:  Government moves to admit

3    Government Exhibit 204-21 and 204-23.

4          MR. LICHTMAN:  No objection.

5          THE COURT:  Received.

6          (Government Exhibits 204-21 and 204-23 so marked.)

7          (Exhibit published to the jury.)

8    Q    Can you show the jury where the Stop & Shop is located

9    where you were conducting surveillance that day?

10   A    Right here, in the upper center of the picture.

11   Q    Then using your touchscreen there, can you trace for the

12   jury the chase route that you followed Mr. Cava that day?

13   A    Can I draw on this?

14   Q    Yes.

15   A    Came out of the lot here, went to Grand Avenue,

16   74th Street, and this is where -- approximately where the

17   accident occurred.

18   Q    And using Government Exhibit 204-21...

19         (Exhibit published to the jury.)

20   Q    What are we looking at here?

21   A    This is the intersection of 74th Street and 51st Drive.

22   Q    Using Government Exhibit 204-21, can you show us where

23   the vehicle ultimately crashed?

24   A    About three or four car lengths into the intersection on

25   51st Drive.

1  Q    Just to be clear, you chased Mr. Cava after he exited his

2  vehicle?

3  A    Yes.

4  Q    Now, what happened after Mr. Cava was apprehended in this

5  area?

6  A    We went back to the minivan and conducted a search.

7  Q    What did you find during the search of the minivan?

8  A    The minivan contained 11 black plastic trash bags

9  containing approximately 418 kilograms of cocaine.

10 Q    What happened after you discovered cocaine in the

11 minivan?

12 A    All the evidence was secured and brought back to New York

13 Division, where it was again secured.

14 Q    What, if any, other steps were taken next?

15 A    So, after that, we applied for and received a state

16 search warrant for the warehouse at 51-18 Grand Avenue, which

17 was executed later that evening.

18 Q    Can you please describe the warehouse located at Grand

19 Avenue?

20 A    It's on Grand Avenue.  It's a small warehouse complex.

21 The target warehouse is located towards the back of the

22 development.  It's -- it has two, I believe two, roll-up doors

23 with a small normal entry door in between those.

24 Q    I'm going to show you what's marked for identification as

25 Government Exhibit 204-16, 204-17 and 204-18.

Ryan - direct - Parlovecchio                    2137

1           What are Government Exhibits 204-16 through -18?

2    A    Those are pictures of a railroad tanker car that was

3    parked at 5118 Grand Avenue in the side rear that had access

4    to a rail spur.

5    Q    And are these the outside of the warehouse located on

6    Grand Avenue?

7    A    That's correct.

8           MS. PARLOVECCHIO:  Government moves to admit

9    Government Exhibits 204-16 through -18.

10          MR. LICHTMAN:  No objection.

11          THE COURT:  Received.

12          (Government Exhibits 204-16 through -18 so marked.)

13   Q    I'm going to show you Government Exhibit 204-17.

14          (Exhibit published to the jury.)

15   Q    What are we looking at here?

16   A    Again, this is the railcar, which we eventually

17   determined was how the cocaine was being transported.  This

18   here is a roll-up door, which gives access to the interior of

19   warehouse.  This here is a just a fence/wall-type structure

20   that was constructed by the tenants to afford them privacy,

21   along with this structure here, for the privacy when unloading

22   from the tanker car.

23   Q    What side of the warehouse is this?

24   A    This is -- as you enter the warehouse, this is to the

25   rear, to the left.

Ryan - direct - Parlovecchio                    2138

1    Q    And I'm just going to circle something here in yellow.

2         What are we looking at here in the bottom of the

3    photograph?

4    A    This is what's known as a rail spur that leads off from

5    the main rail line that allows the tanker cars to be

6    transported to the warehouse.  Entry door.

7    Q    Can we see the main rail line in this photograph?

8    A    No, I believe -- this is possibly it here.

9    Q    This one?

10   A    Yes, ma'am.

11   Q    On the bottom right-hand corner of the photo?

12   A    Yes.

13   Q    I'm going to show you Government Exhibit 204-18.

14        (Exhibit published to the jury.)

15   Q    Do we see any other rails here?

16   A    Yes, there's rails here.

17   Q    And showing you Government Exhibit 204-16, what is this?

18        (Exhibit published to the jury.)

19   A    This is another picture of the railroad tanker car at the

20   warehouse.

21   Q    Now, using the search warrant, did you execute a search

22   of the warehouse?

23   A    That's correct.

24   Q    And what was the inside of the warehouse like?

25   A    It was a large open area.  Inside, there were three or

Ryan - direct - Parlovecchio                    2139

 1    four different vehicles.  As you go in, to the left there was

 2    a roll-up door that gave access to the rail spur.  And by the

 3    door, there was a shelving with a number of power tools, as

 4    well as sheet metal, as well as there was various quantity

 5    advertise of cocaine located throughout the warehouse.

 6    Q    I'm going to show you what's market for identification as

 7    Government Exhibits 204-2, -4, -9, -10, and -12.

 8         What are we looking at in these photographs?

 9    A    Again, those are quantities of cocaine that were

10    discovered within the warehouse in various locations.

11         MS. PARLOVECCHIO:  The Government moves to admit

12    Government Exhibits 204-2, 204-4, 204-9, -10, and -12.

13         MR. LICHTMAN:  No objection.

14         THE COURT:  Received.

15         (Government Exhibits 204-2, 204-9, 204-10, and

16    204-12 so marked.)

17         (Exhibit published to the jury.)

18    Q    I'm going to show you them one-by-one, Special Agent

19    Ryan.

20         What do you see here?

21    A    That is a quantity of cocaine that was just sitting on

22    the floor of the warehouse.

23         MS. PARLOVECCHIO:  I think our mics just went out.

24         (Pause in proceedings.)

25         THE COURT:  How about now?

Ryan - direct - Parlovecchio                    2140

1        MS. PARLOVECCHIO:  Sounds like it.

2   Q    What are we seeing here in Government Exhibit 204-2?

3   A    Again, this is a pile of cocaine that was sitting on the

4   floor of the warehouse when we made entry.

5   Q    Was it just sitting there all over the floor like this

6   with nothing on top of it?

7   A    It was covered by a tarp.

8   Q    How was this cocaine wrapped?

9   A    It all seemed to be wrapped in Saran Wrap with further

10  color-coded wrapping.

11  Q    I want to show you Government Exhibit 204-4.

12       (Exhibit published to the jury.)

13  Q    What is this?

14  A    Again, that's another quantity of cocaine that was found

15  within the warehouse.

16  Q    And Government Exhibit 204-10.

17       (Exhibit published to the jury.)

18  Q    What is this?

19  A    That's additional cocaine discovered from within the

20  warehouse.

21  Q    Government Exhibit 204-12.

22       (Exhibit published to the jury.)

23  A    Again, additional amounts of cocaine.

24  Q    So, were there several piles of cocaine throughout the

25  warehouse?

LAM     OCR     RPR

Ryan - direct - Parlovecchio                    2141

1   A    There was several piles as well as there was cocaine

2   located in some of the vehicles that were within the warehouse

3   as well.

4   Q    Now, you testified that there were some tools that you

5   found in the warehouse.

6   A    Yes.

7   Q    And some other metal?

8   A    Yes, there were power tools for, like, grinding and

9   cutting, and various sheets of sheet metal as well that looked

10  appeared to be cut up.

11  Q    Showing you what's marked for identification as

12  Government Exhibit 204-15, what is this?

13  A    This is pictures of the sheet metal that was found within

14  the warehouse.

15       MS. PARLOVECCHIO:  The Government moves to admit

16  Government Exhibit 204-15.

17       MR. LICHTMAN:  No objection.

18       THE COURT:  Received.

19       (Government Exhibit 204-15 so marked.)

20       (Exhibit published to the jury.)

21  Q    Could you just point out for the jury what this is,

22  exactly?

23  A    This is the sheet metal that was being used to construct

24  the false wall within the railroad tanker car that was

25  concealing the cocaine.

LAM      OCR      RPR

Ryan - direct - Parlovecchio                    2142

1    Q    Are these piles of several pieces of the sheeting?

2    A    Yes.

3    Q    What else did you find inside the warehouse?

4    A    Again, there was a number of gray plastic barrels that

5    contained oil; like I said, there were multiple vehicles;

6    tools; things of that nature.

7    Q    Let me show you what's marked for identification as

8    Government Exhibit 204-14.

9              What is this?

10   A    This is the gray plastic pails containing what we

11   believed to be soybean oil that was found within the

12   warehouse.

13             MS. PARLOVECCHIO:  Government moves to admit

14   Government Exhibit 204-14.

15             MR. LICHTMAN:  No objection.

16             THE COURT:  Received.

17             (Government Exhibit 204-14 so marked.)

18             (Exhibit published to the jury.)

19   Q    These are the bins that you believe contained soybean

20   oil?

21   A    That's correct.

22   Q    Approximately how many bins are we looking at here?

23   A    I'd say twelve.

24   Q    Now, you testified that you also found some vehicles

25   inside of the warehouse.

Ryan - direct - Parlovecchio                      2143

1            What vehicles did you find?

2    A    We found a red minivan -- we found a red minivan and two

3    pickup truck-type vehicles, and I believe possibly a sedan.

4    Q    What, if anything, did you find inside the red minivan?

5    A    Again, we found quantities of cocaine in two or three

6    different locations in the minivan; in the center passenger

7    area, as well as the trunk area.

8    Q    Showing you what's marked for identification as

9    Government Exhibit 204-1, 204-5, 204-6, 204-8, and 204-11.

10            What are we looking at here, Special Agent Ryan?

11   A    This is pictures of the cocaine within the red minivan,

12   as previously described.

13            MS. PARLOVECCHIO:  Government moves to admit

14   Government Exhibits 204-1, -5, -6, -8 and -11.

15            MR. LICHTMAN:  No objection.

16            THE COURT:  Received.

17            (Government Exhibits 204-1, -5, -6, -8, and -11 so

18   marked.)

19   Q    Looking first at government Exhibit 204-8...

20            (Exhibit published to the jury.)

21   Q    What do we see here?

22   A    This is, again, the red minivan that was in the

23   warehouse, containing black plastic bags similar to the one

24   from the silver minivan that Mr. Cava was driving which

25   contained cocaine.

Ryan - direct - Parlovecchio                2144

1  Q    Government Exhibit 204-5, what is this?

2           (Exhibit published to the jury.)

3  A    This is the rear area of that red minivan within the

4  warehouse, containing a cardboard box of kilograms of cocaine.

5  Q    Government Exhibit 204-11.

6           (Exhibit published to the jury.)

7  A    Again, the same -- I believe that's the same box within

8  the same minivan, with cocaine.

9  Q    Government Exhibit 204-6, what is this?

10          (Exhibit published to the jury.)

11 A    Again, that's another picture of that same box.

12 Q    And Government Exhibit 204-1?

13          (Exhibit published to the jury.)

14 A    That's a picture of the opened black plastic bag that was

15 photographed earlier, again, which now you can see contains

16 cocaine.

17 Q    How much cocaine was seized in the warehouse that day?

18 A    I believe it was approximately 1,534 kilograms.

19 Q    What did you do with all the cocaine after you seized it?

20 A    It was transported back to the New York Division office,

21 where it was secured.

22 Q    And based on your knowledge of the investigation, how

23 much cocaine in total was seized on January 28, 2003?

24 A    I believe the total was 1,954 kilograms.

25 Q    I'm going to show you what's marked for identification as

Ryan - direct - Parlovecchio                    2145

1    Government Exhibit 204-13.

2              What is this?

3    A    That is the entire seizure of cocaine from the warehouse,

4    as well as Mr. Cava's vehicle.

5              MS. PARLOVECCHIO:  Government moves to admit

6    Government Exhibit 204-13.

7              MR. LICHTMAN:  No objection.

8              THE COURT:  Received.

9              (Government Exhibit 204-13 so marked.)

10             (Exhibit published to the jury.)

11   Q    And this is all of the cocaine that you seized that day?

12   A    Yes, ma'am.

13   Q    Was this cocaine submitted for analysis?

14   A    Yes, it was.

15   Q    Where was it submitted?

16   A    It was submitted to the Northeast Regional Laboratory.

17   Q    I'll show you what's marked for identification as

18   Government Exhibit 204-19 and 204-20.

19             What are Government Exhibits 204-19 and -20,

20   briefly?

21   A    They are lab analysis reports.

22             MS. PARLOVECCHIO:  The Government moves to admit

23   Government Exhibits 204-19 and -20.

24             MR. LICHTMAN:  No objection.

25             THE COURT:  Received.

Ryan - direct - Parlovecchio                    2146

1          (Government Exhibits 204-19 and 204-20 so marked.)

2    Q    Special Agent Ryan, let's first look at Government

3    Exhibit 204-19.

4          (Exhibit published to the jury.)

5    Q    Does this relate to the cocaine that you seized on

6    January 28, 2003?

7    A    Yes.  This lab report identified Exhibit 4 is a

8    one-kilogram sample of cocaine seized from Mr. Cava's vehicle

9    from the 418 kilograms.

10   Q    Is the "reserve" weight the same thing as "net" weight?

11   A    No.  The net weight is prior to analysis and reserve

12   weight is what's left over after analysis.

13   Q    What is the reserve weight here for Exhibit No. 4?

14   A    It reads 996.9 grams.

15   Q    And "concentration," what does that mean?

16   A    The purity level of the item analyzed.

17   Q    What is the purity level?

18   A    93 percent.

19   Q    This is cocaine hydrochloride?

20   A    That's correct.

21   Q    And I'm going to show you Government Exhibit 204-20.

22         (Exhibit published to the jury.)

23   Q    This is Exhibit No. 6.

24         What is Exhibit No. 6 in relation to the cocaine you

25   seized that day?

Ryan - direct - Parlovecchio                    2147

1   A    Exhibit 6 is a one-kilogram representative sample of the

2   1,534 kilograms seized from the warehouse at 51-18 Grand

3   Avenue.

4   Q    What is the reserve weight for this sample?

5   A    The 999.7 grams.

6   Q    And the purity level or concentration level?

7   A    97 percent.

8   Q    And this is cocaine hydrochloride?

9   A    That's correct.

10  Q    You mentioned that this is a sample of the drugs that

11  were seized that day.

12       What's the purpose of only maintaining a sample of

13  the drugs that are seized?

14  A    The laboratory only has a limited capacity to store

15  evidence, so they usually take one sort of representative

16  sample of the seizure; and then after the remainder is

17  analyzed, it's destroyed.

18  Q    After this cocaine seizure, did you continue your

19  investigation?

20  A    Yes.

21  Q    What types of investigative steps did you take after this

22  seizure?

23  A    We conducted numerous inquiries with Archer Daniel

24  Midland, who was the leasee of the tanker, identified probably

25  eight to ten different tanker cars used by this organization.

Ryan - cross - Lichtman                    2148

1    We also reviewed the lease records and identified an

2    individual named Manuel Silva to be associated to the business

3    as well.

4    Q    How did this cocaine seizure on January 28, 2003, compare

5    to other seizures you had made in your 27 years with the Drug

6    Enforcement Administration?

7    A    This is the largest seizure of my career.

8            MS. PARLOVECCHIO:  No further questions.

9            THE COURT:  All right.  Any cross?

10           MR. LICHTMAN:  Very briefly.

11   CROSS-EXAMINATION

12   BY MR. LICHTMAN:

13   Q    Good afternoon, Agent.

14   A    Good afternoon.

15   Q    I'm showing you Government Exhibit 204-13, Agent.

16           (Exhibit published to the jury.)

17   Q    All of the drugs that are put out there, they're put on a

18   table, they're in front of a table?

19   A    Yes.

20   Q    And they're next to what appears to be a podium with a

21   very large -- would that be a badge?

22   A    An emblem-type badge.

23   Q    This was set up for a press conference that was later

24   held?

25           MS. PARLOVECCHIO:  Objection.

Ryan - cross - Lichtman                    2149

1           THE COURT:  Sustained.

2  Q    Now, this occurred 16 years ago, about?

3  A    It occurred in 2003.

4  Q    January of 2003?

5  A    2003, yes.

6  Q    So, nearly 16 years ago.

7  A    Yes.

8  Q    And you've been an agent, a DEA agent, for 27 years?

9  A    That's correct.

10 Q    Did you have any law enforcement experience before you

11 became a DEA agent?

12 A    Yes, I did.

13 Q    What did you do before that?

14 A    I worked as a criminal investigator for the Internal

15 Revenue Service for three years prior.

16 Q    Is that the totality of your experience in law

17 enforcement?

18 A    That's 30 years of experience, that's my totality, yes.

19 Q    And you're still going strong, obviously.

20 A    Thank you.

21 Q    You've obviously investigated hundreds of cases over the

22 years.

23 A    Yes.

24 Q    You've made many arrests.

25 A    That's correct.

Ryan - cross - Lichtman                    2150

1    Q    And you've made many seizures as well.

2    A    Yes.

3    Q    Hundreds, would you say?

4    A    Yes.

5    Q    And in this case, when you discussed the weights, you

6    mentioned that there were 1,534 kilograms that were seized

7    inside the warehouse?

8    A    That's correct.

9    Q    And then there was a totality of 1,954 kilograms in the

10   entire seizure relating to this case?

11   A    Yes, sir.

12   Q    And you noted, I think you mentioned, 418 kilograms.

13        Is that what was seized inside one of the vehicles?

14   A    From the silver minivan that Mr. Cava was driving, yes.

15   Q    And you mentioned there was a silver minivan that someone

16   was driving and inside the warehouse was a red minivan?

17   A    That's correct.

18   Q    Two pickup trucks?

19   A    Correct.

20   Q    And a sedan?

21   A    I believe there was a sedan.  I'm not a hundred percent

22   sure right now.

23   Q    After this occurred in 2003, when was the last time

24   before you had contact with these prosecutors and even thought

25   about this seizure?

LAM        OCR        RPR

1    A    When I thought about it?

2    Q    When did you last deal with it?

3    A    I would have discussions with other agents over the

4    course of my career about this seizure because it was a

5    significant seizure, but I'm not sure I can answer your

6    question when you say when was the last I thought about it.

7    Q    When did you first get contacted by these prosecutors in

8    connection with this case?

9    A    In February of 20 -- probably February of this year.

10    Q    So, less than a year ago.

11    A    Yes, sir.

12    Q    And it had been many years since before then that you had

13    dealt with anything relating to this case; is that fair?

14    A    That's fair, yes.

15    Q    And your recollection, you would agree, is pretty

16    extraordinary, down to the number.

17    A    Okay.

18    Q    Would you say that's fair in terms of what you just

19    testified to?

20    A    Yes.

21    Q    In terms of the colors, colors of the vehicles?

22    A    Well, I had an opportunity to review my reports and

23    everything.

24    Q    That's the thing.  You met with them how many times in

25    connection with your testimony here today?

Ryan - cross - Lichtman                    2152

1   A    I believe three times.

2   Q    And you had your reports.

3   A    Yes, sir.

4   Q    Your DEA 6s, is what they're called.

5   A    Correct.

6   Q    And there are dozens of them in connection with your

7   investigation of this case.

8   A    Yes.

9   Q    And you reviewed them before you testified today.

10  A    Of course, yes.

11  Q    Which is why you're so good with the specific details you

12  testified to.

13  A    Okay.

14  Q    That's a large part of it, wouldn't you agree?

15  A    I used it to refresh my recollection, yes.

16  Q    You wouldn't have necessarily remembered there were

17  1,534 kilograms found inside the warehouse without reviewing

18  those records?

19  A    Not off the top of my head.  I used the reports to

20  refresh my recollection.

21  Q    Of course.  And you wouldn't have known off the top of

22  your head there was 1,954 kilograms in total in connection

23  with this investigation?

24  A    No.

25  Q    Or that there was 418 kilograms inside the silver

Ryan - cross - Lichtman                    2153

1   vehicle?

2   A     No, I would not have.

3   Q     Colors of the cars, that was all refreshed from these

4   reports from 16 years ago?

5   A     That's correct.

6   Q     And the amount of, number of, cars, vehicles inside, you

7   didn't know that off the top of your head until you reviewed

8   all these materials, correct?

9   A     Actually, I had a very good recollection of what occurred

10  that day because it was a significant seizure, but, again, I

11  did use the reports to refresh in terms of finite numbers and

12  specific numbers, things of that nature.

13  Q     If you had walked in cold without looking at your

14  reports, could you have possibly testified the way you did on

15  direct?

16  A     Not as accurately, no, but I could give a very good

17  account of the details for sure.

18  Q     Generally.  But no specifics to the level --

19              MS. PARLOVECCHIO:  Objection.

20  A     Not specific numbers per se in terms of exactly 418 out

21  of the car or 1,500 out of the warehouse, no, I couldn't get

22  that specific in terms of numbers, but I could certainly give

23  you an accurate account of what occurred.

24  Q     Because you had hundreds of investigations over the

25  years?

LAM      OCR      RPR

Ryan - cross - Lichtman                    2154

1  A    I've had a hundred investigations over the years, yes.

2  Q    And you've arrested hundreds of people.

3  A    Yes.

4  Q    Do you remember what you had for breakfast yesterday?

5           MS. PARLOVECCHIO:  Objection.

6           THE COURT:  Sustained.

7           MR. LICHTMAN:  Nothing further, Judge.

8           THE COURT:  Any redirect?

9           MS. PARLOVECCHIO:  No, your Honor.

10          THE COURT:  You may step down.

11          (Witness excused.)

12          THE COURT:  Government's next witness?

13          MS. PARLOVECCHIO:  The Government calls German

14  Rosero.

15          THE COURT:  This is a long witness?

16          MS. PARLOVECCHIO:  It is, your Honor.  Maybe if we

17  can just have a brief moment --

18          THE COURT:  Maybe we should take our afternoon

19  break.

20          Let's take 15 minutes, ladies and gentlemen.  Don't

21  talk about the case amongst yourselves.  See you back in here

22  at 3 o'clock.

23          (Jury exits.)

24          THE COURT:  Okay.  15 minutes.

25          (Recess taken.) (Continued the next page.)

LAM      OCR      RPR

Proceedings                                    2155

1   (Continuing.)

2           (In open court - jury not present.)

3           (Defendant enters the courtroom.)

4           THE COURTROOM DEPUTY:  All rise.

5           (Judge BRIAN M. COGAN enters the courtroom.)

6           THE COURT:  All right, let's have the jury, please.

7           What's your thinking on this, tomorrow morning?

8           MS. PARLOVECCHIO:  I will be done before lunch

9   tomorrow, Your Honor.

10          (The jury enters the courtroom.)

11          THE COURT:  All right, be seated, please.

12          The Government's next witness.

13          MS. PARLOVECCHIO:  The Government calls German

14  Rosero.

15          (Witness enters the courtroom and takes the stand.)

16          THE COURTROOM DEPUTY:  Please raise your right hand.

17          Do you solemnly swear or affirm that the testimony

18  you shall give to the Court will be the truth, the whole truth

19  and nothing but the truth?

20          THE WITNESS:  Yes.

21          THE COURT:  Please state and spell your name for the

22  record.

23          THE WITNESS:  German Rosero.

24          THE COURTROOM DEPUTY:  Spell it.

25          THE WITNESS:  G-E-R-M-A-N, R-O-S-E-R-O.

Proceedings                                                         2156

1          THE COURTROOM DEPUTY:  You may be seated.

2          THE COURT:  You may inquire.

3          MS. PARLOVECCHIO:  Thank you, Your Honor.

4

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Rosero - direct - Parlovecchio                2157

1  G E R M A N   R O S E R O ,

2      called as a witness by the Government, having been

3      first duly sworn/affirmed by the Courtroom Deputy, was

4      examined and testified under oath as follows:

5          THE COURT:  You may inquire.

6          MS. PARLOVECCHIO:  Thank you, Your Honor.

7  DIRECT EXAMINATION

8  BY MS. PARLOVECCHIO:

9  Q    Good afternoon, Mr. Rosero.

10 A    Good afternoon.

11 Q    What nationality are you?

12 A    I'm Colombian.

13 Q    Where were you born?

14 A    Ipiales, Nariño.

15 Q    How far did you go in school?

16 A    I am an attorney in Colombia.

17 Q    Do you speak any English?

18 A    Yes, I speak some English.

19 Q    I see you are testifying with the assistance of a Spanish

20 interpreter.  Are you capable of testifying in English?

21 A    No.

22 Q    Have you heard of something called the Sinaloa Cartel?

23 A    Yes.

24 Q    Did you ever work with the Sinaloa Cartel?

25 A    Yes.

Rosero - direct - Parlovecchio                    2158

1    Q    What did you do with the Sinaloa Cartel?

2    A    I was the link between the Colombian cartels and the

3    Sinaloa Cartel.

4    Q    And what did you do as that link between the Sinaloa

5    Cartel and the Colombian cartels?

6    A    I coordinated cocaine shipments from Colombia to Mexico.

7    Q    On whose behalf did you coordinate those cocaine

8    shipments from Colombia to Mexico?

9    A    Sergio Ramirez, Laureano Renteria and Juan Carlos

10   Ramirez.

11   Q    During what period of time did you make cocaine deals

12   with the Sinaloa Cartel?

13   A    From approximately 1998 to 2006.

14   Q    When in 2006?

15   A    December of 2006.

16   Q    Based on your experience negotiating cocaine deals with

17   the Sinaloa Cartel, what was your understanding of what the

18   Sinaloa Cartel was?

19   A    The Sinaloa Cartel was a group of people who helped each

20   other mutually in order to be able to get cocaine shipments

21   into the United States successfully.

22   Q    During the time you were dealing with the Sinaloa Cartel,

23   did you deal with any of its leaders?

24   A    Yes.

25   Q    How did you know that they were the leaders?

SAM      OCR      RMR      CRR      RPR

Rosero - direct - Parlovecchio                    2159

1   A    First of all, because when I went to Mexico for the

2   cocaine shipments, Juan Carlos Ramirez and Sergio Ramirez, who

3   had great experience already sending cocaine to Mexico,

4   explained to me who the people were who I should speak to and

5   who the leaders of the cartel were.

6   Q    Who were some of the leaders of the Sinaloa Cartel with

7   whom you dealt?

8   A    With Mr. Nacho Coronel, Mr. Arturo Beltran and

9   Mr. Joaquin Guzmán.

10  Q    Now, you mentioned Mr. Joaquin Guzmán.  Did you actually

11  meet Joaquin Guzmán?

12  A    Yes.

13  Q    Is that the name by which you refer to him?

14  A    Mr. Joaquin Guzmán or El Chapo Guzmán.

15  Q    Do you see Joaquin Guzmán in the courtroom today?

16  A    Yes.

17  Q    Can you please identify --

18           MR. BALAREZO:  Your Honor, we will stipulate that

19  this is Mr. Guzmán.

20           THE COURT:  And that the witness recognizes him?

21           MR. BALAREZO:  That's fine.

22           THE COURT:  Okay.

23           MS. PARLOVECCHIO:  May the record reflect that, Your

24  Honor?

25           THE COURT:  It does.

1        MS. PARLOVECCHIO:  Thank you.

2   BY MS. PARLOVECCHIO:

3   Q    Now, you testified that you negotiated cocaine shipments

4   with the leaders of the Sinaloa Cartel.

5        What exactly was your role in those negotiations?

6   A    I would let the people in Mexico know the intention of

7   sending shipments of cocaine, and based on that we would

8   negotiate the amounts of drugs that were going to be sent,

9   spots where the Colombia boats were to meet the Mexican boats

10  and equipment, and also establish the city where the cocaine

11  should be delivered in Mexican territory.

12  Q    Did these negotiations also include discussion of

13  pricing?

14  A    Yes, obviously.

15  Q    Now, where were you located physically when you would

16  engage in these negotiations with the Sinaloa Cartel?

17  A    Always in Mexico.

18  Q    When did you first become involved with drug-trafficking

19  organizations in your life?

20  A    In 2001 -- I'm sorry, 1991.

21  Q    And how did you become involved?

22  A    I was an attorney working for the Colombian government as

23  a public defender, but, unfortunately, there was an attempt

24  against my life in Colombia so I went to seek protection from

25  Mr. Sergio Ramirez and Juan Carlos Ramirez.  That's when I

Rosero - direct - Parlovecchio                    2161

1   started working with them as an attorney.

2   Q    Now, you said you sought out their protection.

3        Why did you seek them, in particular, for their

4   protection?

5   A    I had been friends with Mr. Ramirez, Sergio Ramirez, from

6   the time we were very young.  And I had met Mr. Juan Carlos

7   Ramirez at university when he was studying economics and I was

8   studying law.

9   Q    Who is Juan Carlos Ramirez?

10  A    Juan Carlos Ramirez is a Colombian drug trafficker who

11  became one of the leaders of the North Valle Cartel.

12  Q    Did he have any nicknames?

13  A    Chupeta.

14  Q    I am showing you what's in evidence as Government's

15  Exhibit 85-A.

16       (Exhibit published.)

17  A    That's Mr. Juan Carlos Ramirez.

18  Q    After Juan Carlos Ramirez provided protection to you, you

19  testified that you went to work for him as a lawyer?

20  A    Yes.

21  Q    What types of things did you do for him as an attorney

22  initially?

23  A    In the beginning, I worked with him legalizing documents

24  regarding the purchase of properties.  And there were also

25  people who were in jail and I would go with them, meet with

Rosero - direct - Parlovecchio                    2162

1   them, and I would try to help them out as part of the team to

2   get them out.

3   Q    I am going to show you what's in evidence as Government's

4   Exhibit 90.

5              (Exhibit published.)

6   Q    Who is this?

7   A    That's me.

8   Q    At some point later on, did you come to have a nickname

9   among the people who worked with Juan Carlos Ramirez's

10  organization?

11  A    Yes, they called me Barbas.

12             THE INTERPRETER:  By interpreter, B-A-R-B-A-S.

13  Q    Now, you testified about somebody named Sergio Ramirez.

14  Who is Sergio Ramirez?

15  A    Sergio Ramirez is somebody I met when I was very young.

16  He went to Mexico to study.  He graduated as a medical doctor

17  in Mexico.  And during the times he was -- time he was

18  studying, he became Juan Carlos Ramirez's right-hand man for

19  the drug business in Mexico.

20  Q    Did Sergio Ramirez have any nicknames?

21  A    Yes, he was called Pechuga.

22  Q    I am going to show you what's in evidence as Government's

23  Exhibit 84.

24             (Exhibit published.)

25  Q    Who is this?

Rosero - direct - Parlovecchio                    2163

1    A     Yes, that's Mr. Sergio Ramirez.

2    Q     Now, you mentioned that he was -- Sergio Ramirez was Juan

3    Carlos's person in Mexico.

4          What did he do for Juan Carlos Ramirez's business in

5    Mexico?

6    A     Well, as far as business was concerned, he did the same

7    thing; he coordinated shipments, he spoke to people, the drug

8    traffickers in Mexico.  He coordinated shipments from

9    Colombia.  And at that time he also made sure that the cocaine

10   was crossed into the United States.

11   Q     During what period of time did Sergio Ramirez do all of

12   this in Mexico?

13   A     '85, '92 maybe.

14   Q     What, if anything, did Sergio Ramirez tell you about who

15   he worked with in Mexico?

16   A     He mentioned Guero Palma to me, Amado Carrillo, Joaquin

17   Guzmán.

18   Q     Anyone else?

19   A     Not that I remember at this time.

20   Q     Did Sergio Ramirez ever tell you about a problem that he

21   had with the defendant while he was working in Mexico?

22   A     When I left to go work in Mexico, he told me I had to be

23   very careful because of the deals that were being handled were

24   very delicate.  And on one occasion, because of a mistake that

25   was made by one of Joaquin Guzmán Loera's workers, he and

SAM      OCR      RMR      CRR      RPR

Rosero - direct - Parlovecchio                    2164

1   Mr. Juan Carlos Ortiz had been kidnapped.

2   Q    Did Sergio mention who he was kidnapped by?

3   A    Mr. Joaquin Guzmán.

4   Q    Did Sergio Ramirez tell you who was responsible for the

5   mistake that led to the kidnapping?

6   A    Yes, it had been a worker of Mr. Joaquin Guzmán Loera at

7   the time, or his right-hand man at the time whom they called

8   El Gordo.

9   Q    Did you ever meet El Gordo?

10  A    Never.

11  Q    Did you ever hear the defendant talk about El Gordo?

12  A    Yes, on some occasion, I don't know why, the subject of

13  El Gordo came up and he told me that he was a person who was

14  testifying against him in the United States.

15

16              (Continued on the following page.)

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Rosero - direct - Parlovecchio                    2165

1    BY MS. PARLOVECCHIO:

2    Q    And were you referring to he testifying against someone

3    in the United States, could you use the names who were making

4    that statement?

5    A    Yes.  That El Gordo was testifying against Mr. Joaquin

6    Guzman Loera in the United States.

7    Q    Did Juan Carlos Ramriez have anyone working for him in

8    Mexico after Sergio Ramirez?

9    A    Yes.

10   Q    Who was that?

11   A    Mr. Alvaro Palau.

12   Q    Do you know Alvaro Palau?

13   A    Yes.

14   Q    How long have you known him?

15   A    Since the time I'm 18, perhaps -- since the time I was

16   18, perhaps.

17   Q    Were you ever involved in the drug business with him?

18   A    When I arrived in Mexico to work he was one of the people

19   that I looked to work with him, to do business with him, on

20   Sergio Ramirez's instructions.

21   Q    I show you what's in evidence as Government Exhibit 80.

22   A    That is Mr. Alvaro Palau.

23   Q    Did Alvaro Palau ever tell you whether he dealt with the

24   Sinaloa Cartel?

25   A    Yes.

Rosero - direct - Parlovecchio                    2166

1   Q    What did he tell you?

2   A    That due to his role, being that he was the person in

3   charge on behalf of Juan Carlos Ramirez in Mexico, he had had

4   to work with -- with some of the main heads.  And one of them

5   was Mr. Amado Carillo.

6   Q    Do you know of anyone else Alvaro Palau was close to in

7   the Sinaloa Cartel?

8   A    He mentioned to me once that Mayo Zambada's son was very

9   close to him and also a compadre of his.

10  Q    Did he mention which son of Mayo Zambada's?

11  A    Vicentillo.

12  Q    Did you ever meet Mayo Zamada's son, Vicentillo?

13  A    On one occasion.

14  Q    What was that occasion?

15  A    I was coming out of a meeting with Mr. Arturo Beltran.

16  And at that time, Mr. Ray Zambada and his nephew Mr. Vicente

17  Zambada were getting there.  We simply introduced one another

18  and that was it.

19  Q    I'm going to have you take a step back and -- back into

20  the '90s.  You testified that you initially worked as an

21  attorney for Juan Carlos Ramirez.  Do your role in Juan Carlos

22  Ramirez's organization change over time?

23  A    Yes.

24  Q    What other roles did you fulfill in his organization?

25  A    When he surrendered himself to Colombian justice he told

Rosero - direct - Parlovecchio                    2167

1   me to go work with him and to help him obtain a good stay in

2   jail.

3   Q    And what did that entail?

4   A    Well, we had to bribe jail directors.  We had to bribe

5   guards so that perhaps he could have more visits, perhaps he

6   could have some special food.

7   Q    I'm going to direct your attention now to 1997.  What, if

8   any, bribes did you start paying around that time?

9   A    In 1997 there was a problem in Columbia which we call it

10  a national problem.  The United States was putting a lot of

11  pressure on Columbia so that they would amend the national --

12  the Colombian Constitution to include an article of

13  extradition.  So there was a meeting of the North Valley

14  Cartel with people from Medellin and Mr. Pacho Herrera and

15  they agreed that we have to be able to accomplish that the

16  extradition that was going to pass anyway in Congress, that it

17  would not be made retroactive.

18  Q    What was the significance of keeping the Congress from

19  making extradition retroactive?

20  A    Well, most of the heads of the cartels of the Cali

21  Cartel, the Medellin Cartel and the North Valley Cartel were

22  in jail at the time.  If the extradition were to be approved

23  without being retroactive, they would all be extradited to the

24  United States.

25  Q    What was your role in this plan?

Rosero - direct - Parlovecchio                    2168

1  A     All the cartels had senators and representatives in their

2  pocket, so the mission was through those senators and

3  representatives to try to get to the rest of senators and

4  representatives so that they could be paid so that they could

5  make sure that the extradition approved into the Colombian

6  Constitution would not be retroactive.

7  Q     And were you one of the individuals who made the

8  payments?

9  A     Yes.

10 Q     Did the bribes work?

11 A     Yes.

12 Q     Did they use false names?

13 A     Yes.

14 Q     Did you have documents in false names?

15 A     Yes.

16 Q     Which documents?

17 A     I had a fake Mexican passport, a fake driver's license,

18 and a national identification document in Mexico which is

19 called IFE.

20 Q     Did there come a time when you surrendered to the United

21 States authorities as a result of your criminal activity?

22 A     Yes.

23 Q     When did you surrender to the United States authorities?

24 A     In 2008 I sent a letter to the Department of Justice at

25 the United States telling them that I wanted to submit myself

Rosero - direct - Parlovecchio                2169

1    to American justice.

2    Q    Did there come a time when you met with representatives

3    from the United States Government?

4    A    Yes.

5    Q    When was that?

6    A    Towards the end of February, beginning of March of 2009.

7    Q    What was the purpose of that meeting?

8         THE INTERPRETER:  The interpreter needs to clarify a

9    term.

10   Q    Okay.

11   A    To validate, to actually validate the letter that I had

12   sent by telling them here I am, I want to submit myself.

13        MS. PARLOVECCHIO:  Your Honor, I think the mics have

14   gone out again.

15        THE COURT:  As you're tapping it, I hear it.

16        MS. PARLOVECCHIO:  Okay.  Maybe it's just the

17   speaker.

18   BY MS. PARLOVECCHIO:

19   Q    Did you eventually physically surrender in the United

20   States?

21   A    Yes.

22   Q    When was that?

23   A    June of 2009.

24   Q    Where were you?

25   A    I was in Mexico.

Rosero - direct - Parlovecchio                    2170

1    Q    And where did you surrender in the United States?

2    A    Miami.

3    Q    Were there criminal charges against you in the United

4    States before you surrendered?

5    A    No, there were none, but I thought that there were.

6    Q    After you surrendered in the U.S. did you meet with U.S.

7    authorities again?

8    A    Yes.

9    Q    Were the charges filed against you after you surrendered?

10   A    Yes.

11   Q    In which U.S. district?

12   A    Eastern District of New York.

13   Q    What were the U.S. charges filed against you?

14   A    Drug trafficking conspiracy and money laundering.

15   Q    How did you resolve those charges against you?

16   A    I pled guilty.

17   Q    What sentence are you facing based upon your guilty plea?

18   A    From ten years to life.

19   Q    Do you have a mandatory minimum sentence under the law?

20   A    Ten years.

21   Q    Are you obligated to pay any financial penalty as a

22   result of your guilty plea?

23   A    Yes.

24   Q    How much?

25   A    Up to $4 million.

Rosero - direct - Parlovecchio                    2171

1    Q     Have you made any forfeiture payments to the United

2    States?

3    A     Yes.

4    Q     How much?

5    A     $100,000.

6    Q     Is that the entire forfeiture you have to pay?

7    A     No.

8    Q     Prior to pleading guilty, did you make a financial

9    disclosure to the United States government?

10   A     Yes.

11   Q     What types of things did you disclose?

12   A     The properties I own, the money I had, jewelry that I

13   had, everything, all of my assets.

14   Q     Did you disclose all of your properties to the Government

15   when you surrendered and pled guilty?

16   A     Yes.

17   Q     Where were these properties located?

18   A     I had some properties in Mexico and some others in

19   Columbia.

20   Q     Mr. Rosero, what is the OFAC list?

21   A     It is a list created by President Clinton which the main

22   objective is that those included on the list are not able to

23   have any dealings with a natural person or an American

24   corporation.

25   Q     What types of activity gets someone put on the OFAC list?

Rosero - direct - Parlovecchio                    2172

1  A    Drug trafficking, money laundering and I don't know

2  whether terrorism is also included.

3  Q    Were you ever on this list?

4  A    Yes.

5  Q    Were you ever taken off the list?

6  A    Yes.

7  Q    When?

8  A    2010.

9  Q    Did you still own properties in Columbia at that time?

10 A    Yes, I had properties in Columbia.

11 Q    Were these properties in Columbia from legal or illegal

12 activity?

13 A    Yes, these were properties I owned before I went to work

14 in Mexico.

15 Q    So they were from illegal activity you?

16        MR. BALAREZO:  Objection.

17        THE COURT:  Overruled.

18 BY MS. PARLOVECCHIO:

19 A    Yes.

20 Q    How, if at all, did being on the OFAC list affect your

21 ability to deal with your financial affairs in Columbia?

22 A    The Colombian banks and Colombian companies get together,

23 unite in this list.  So the people on the list will have all

24 of their bank accounts closed including medical insurance,

25 health insurance, all types of insurance.  They're all taken

Rosero - direct - Parlovecchio                    2173

1    away.  They take away your civil rights.

2    Q    How did this affect your ability to sell properties that

3    you owned in Columbia?

4    A    A lot because I couldn't receive checks so when I sold

5    properties.

6    Q    What happened when you tried to sell one of your

7    properties in Columbia in 2014?

8    A    I had to receive cash.

9    Q    And what happened as a result of that?

10   A    Since I didn't have any personal accounts in Columbia I

11   couldn't do transfers into the United States.  So I looked for

12   people who could do this legally and these people did it the

13   wrong way and deposited cash in the United States.

14   Q    What happened next?

15   A    So obviously this called the attention or got the

16   prosecutor's attention because they thought that this money

17   that I deposited in my accounts or that they were depositing

18   in my accounts was illegal money.  And they asked me to show

19   them where the money was coming from.  I gathered the

20   documents that showed the sale of those properties and took

21   care of the situation.

22   Q    And the prosecutor's office was satisfied with the

23   documents that you showed them?

24   A    Yes, but they warned me to be careful with that because

25   it's something that's not well-regarded or you shouldn't do

Rosero - direct - Parlovecchio                    2174

1  it.

2  Q    Have you done it since then?

3  A    No.

4  Q    What was the purpose of selling that property in

5  Columbia?

6  A    To be able to live in the United States with my family.

7  Q    Did you ever receive monetary support from the U.S.

8  government since coming here in June of 2009?

9  A    No.

10 Q    As a part of your guilty plea did you sign any agreement

11 with the Government?

12 A    Yes.

13 Q    What is that agreement called?

14 A    It's a cooperation agreement.

15

16            (Continued on the following page.)

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Rosero - direct - Parlovecchio                    2175

1   BY MS. PARLOVECCHIO (Continuing):

2   Q    I'm going to show you what's marked for identification as

3   Government Exhibit 3500-GRA-2.

4         What is this?

5   A    My cooperation agreement with the United States.

6   Q    And how do you recognize it?

7   A    My signature is at the end.

8         MS. PARLOVECCHIO:  Government moves to admit

9   Government Exhibit 3500-GRA-2.

10        MR. BALAREZO:  No objection.

11        THE COURT:  Received.

12        (Government Exhibit 3500-GRA-2 so marked.)

13        MS. PARLOVECCHIO:  May I publish?

14        (Exhibit published to the jury.)

15  Q    Mr. Rosero, this is your cooperation agreement?

16  A    Yes.

17  Q    And you made reference to your signature on the last

18  page.  I'm going to show it to you.

19  A    This is my signature.

20  Q    Did anyone translate this cooperation agreement into

21  Spanish for you before you signed it?

22  A    Yes.

23  Q    Now, as a part of this agreement, did you make any

24  promises?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

W. Name - direct/cross - Atty                    2176

1    Q    What did you promise to do?

2    A    Tell the truth about all my illegal activities.

3    Q    Did the Government agree to do anything for you if you

4    abided by the terms of your cooperation agreement?

5    A    Yes.

6    Q    What did the Government agree to do?

7    A    First of all, to provide me and my family legal status

8    here in the United States while I'm -- while my case is

9    pending; secondly, write the judge a letter, the letter called

10   5K1; and, thirdly, to request an S visa for my family.

11   Q    You mentioned something called a "5K1 letter."

12        What is this 5K1 letter supposed to do?

13   A    So, the 5K1 letter will tell the judge all my

14   cooperation, from beginning to end.  And it also tells the

15   judge if the judge deems appropriate, that the judge could set

16   a sentence that goes below what is stipulated by law.

17   Q    Do you expect the Government to recommend any particular

18   sentence?

19   A    No.

20   Q    Who will decide your sentence?

21   A    The judge.

22   Q    Is the judge required to give you a more lenient

23   sentence?

24   A    No.

25   Q    Does the filing of this 5K1 letter depend on the result

W. Name - direct/cross - Atty                    2177

1    of this case?

2    A    No.

3    Q    Do you know whether an S visa application has been made

4    on your and your family's behalf?

5    A    Yes.

6    Q    Has the Government granted you an S visa yet?

7    A    No.

8    Q    What is the purpose of having you and your family stay

9    here in the United States?

10   A    It's the only safe place I would have to live.

11   Q    Have you ever testified in court before today?

12   A    No.

13   Q    Before coming to court today, did you meet with the

14   Government to prepare to testify?

15   A    Yes.

16   Q    Mr. Rosero, I'm going to take a step back and direct your

17   attention to approximately 1998.

18   A    Okay.

19   Q    Did you work for Juan Carlos Ramirez at that point?

20   A    Yes.

21   Q    Where was Juan Carlos Ramirez living in 1998?

22   A    He was in jail in Cali.

23   Q    Now I'm going to direct your attention to March of 1998.

24        Where did Juan Carlos Ramirez direct you to go at

25   that time?

W. Name - direct/cross - Atty                2178

1   A    He told me to go to Mexico.

2   Q    Briefly, can you tell the jury why Juan Carlos Ramirez

3   told you to go to Mexico?

4   A    Juan Carlos Ramirez and Victor Patino were approaching or

5   having an rapprochement to the DEA.  And in order to solve of

6   their problem, they promised to do some positives in the

7   United States.

8   Q    What are "positives" in drug trafficking?

9   A    They were going to hand over to the DEA people who did

10  drugs, they were going to turn over drugs, and they were going

11  to deliver routes into the United States.

12  Q    Did Juan Carlos Ramirez tell you why he wanted positives?

13  A    In order to be able to negotiate with the DEA.

14  Q    And you assisted Juan Carlos Ramirez in this approach to

15  the DEA?

16  A    Yes.

17  Q    Did the deal between Juan Carlos Ramirez and U.S.

18  authorities ever work out?

19  A    No.

20  Q    Did any American law enforcement officials direct you to

21  take particular actions in Mexico?

22  A    No.

23  Q    Now, in 1998, what, if anything, did you do to educate

24  yourself about the drug business in Mexico?

25  A    I spoke a lot with Juan Carlos Ramirez and Sergio Ramirez

W. Name - direct/cross - Atty                    2179

1  about the drug business in Mexico because I had never had any

2  experience in this.

3  Q    So, what did Sergio Ramirez and Juan Carlos Ramirez tell

4  you about the drug business in Mexico?

5  A    They gave me the details of the business, and they

6  promised me that once I arrived in Mexico they were going to

7  set meetings with certain people in order to do a shipment of

8  cocaine into Mexico, in order for the Mexicans to pass -- to

9  get that merchandise or part of the merchandise into the

10 United States, and once that product was in Juan Carlos' or

11 Victor Patino's hands or other people's hands, we could have

12 those positives.

13 Q    Now, you mentioned the word "merchandise."

14      What do you mean when you refer to merchandise?

15 A    Cocaine.

16 Q    You also testified that Sergio and Juan Carlos Ramirez

17 directed you to meet with certain people in Mexico.

18      Who were those people they directed you to meet

19 with?

20 A    They told me that they were going to have some contacts

21 for me.  The first contact was to be Mr. Arturo Guzman,

22 another one was to be Mr. Hector Beltran, another contact was

23 going to be Mr. Mario Zambada, and, lastly Mr. Ignacio

24 Coronel.

25 Q    Did they tell you who Arturo Guzman was?

W. Name - direct/cross - Atty                    2180

1   A    Mr. Arturo Guzman is Mr. Joaquin Guzman's brother.

2   Q    And did you know who Joaquin Guzman was at that time?

3   A    They had mentioned to me his importance and who the

4   gentleman was.  But they knew that the gentleman was in jail

5   and that, therefore, no negotiations could be conducted with

6   him.

7   Q    Directly with him?

8   A    Directly with him.

9   Q    Did they tell you who Hector Beltran was?

10  A    They told me that Hector Beltran was another person who

11  was also close to Mr. Joaquin Guzman and Mr. Arturo Guzman.

12         Why?  Because they call one another cousins.

13  Q    And did Sergio and Juan Carlos tell you who Mayo Zambada

14  was?

15  A    Yes.  They told me that he was one of the main heads of

16  the cartel in Mexico.

17  Q    Did they tell you who Nacho Coronel was?

18  A    Yes.  They also tell me that he was a very important and

19  very strong person within the cartel.

20  Q    Did Sergio and Juan Carlos tell you whether they had

21  dealt with all these individuals before?

22  A    Yes.  Obviously, they told me that they were able to get

23  those appointments for me because they had had contact with

24  them before, they had worked with them.

25  Q    Did you go to Mexico as requested?

W. Name - direct/cross - Atty                    2181

1   A     Yes.

2   Q     Approximately when did you go to Mexico?

3   A     March of '98.

4   Q     Where in Mexico did you go first?

5   A     I arrived in the city of Acapulco.

6   Q     Let me show you what's in evidence as Government Exhibit

7   502.

8          (Exhibit published to the jury.)

9   Q     Using Government Exhibit 502, can you show the jury where

10  Acapulco is located?

11  A     It is in Guerrero state.

12  Q     Just to circle it to make it clearer.  You put your dots

13  in the middle of Government Exhibit 502.

14          What did you do after you arrived in Acapulco,

15  Mexico, in March 1998?

16  A     I followed instructions from Juan Carlos and Sergio and I

17  was able to meet with Mr. Arturo Guzman.

18  Q     Where did you meet with Arturo Guzman?

19  A     The first time I met with him was at a restaurant called

20  VIPS, which is next to a WalMart store, which are located

21  where Costera Miguel Aleman starts.  It's a highway.

22  Q     When you met with Arturo Guzman, what did you discuss?

23  A     I brought the proposal to him of taking a shipment of

24  3,000 kilos of cocaine to Mexico.  The proposal entailed that

25  3,000 kilos would be sent with the condition that 2,000 of

W. Name - direct/cross - Atty                2182

1   those would be purchased on the beach and the other 1,000

2   would be crossed into the United States to be delivered to

3   Juan Carlos' and Victor's people and to produce the positive.

4   Q    What does it mean to purchase drugs "on the beach"?

5   A    So, trafficking business is based on responsibilities.

6   To sell on the beach meant to sell for a lower price.

7            And that way, the Colombians avoided the

8   responsibility of having to take those drugs to a city in

9   inland Mexico.

10  Q    Did Arturo Guzman accept the terms you offered him?

11  A    No.

12  Q    Who did you meet with next?

13  A    Arturo obtained for me a meeting with Hector Beltran.

14  Q    I'm showing you what's in evidence as Government Exhibit

15  5.

16            (Exhibit published to the jury.)

17  A    This is Mr. Hector Beltran.

18  Q    What role did Hector Beltran have in the Sinaloa cartel?

19  A    Mr. Hector Beltran was another of those important people

20  who worked within the cartel and with whom Juan Carlos and

21  Sergio had had deals in the past and who obviously was always

22  under the protection of Mr. Joaquin Guzman.

23  Q    Did you know whether Hector Beltran and Arturo Guzman had

24  had a working relationship when you met with them in

25  March 1998?

W. Name - direct/cross - Atty                    2183

1   A    Yes, they worked together.

2   Q    How do you know that?

3   A    From the conversations I had with them, I became aware of

4   the closeness between them two.  And at the time, they were

5   sharing the Acapulco Plaza.

6   Q    Did Juan Carlos Ramirez and Sergio Ramirez tell you who

7   Arturo Guzman and Hector Beltran's boss was?

8   A    They did not express directly that Mr. Joaquin Guzman was

9   their boss but they did say that they acted under the

10  protection of Mr. Joaquin Guzman.

11  Q    When you met with Hector Beltran on this occasion, what

12  did you discuss?

13  A    The same -- I brought to him the same proposal, proposal

14  of the 3,000 kilos of cocaine.

15  Q    Did he accept the terms you proposed?

16  A    No.

17  Q    What did you do as a result?

18  A    Mr. Arturo Guzman obtained an appointment for me with

19  Mr. Mario Zambada.

20  Q    Did you meet with Mario Zambada?

21  A    Yes, once.

22  Q    Approximately when was that?

23  A    Perhaps two or three days after the meeting with Hector

24  Beltran.

25  Q    And approximately how long did that meeting last?

W. Name - direct/cross - Atty                    2184

1   A    An hour and a half, perhaps.

2   Q    I'm going to show you what's in evidence as Government

3   Exhibit 2B.

4           (Exhibit published to the jury.)

5   A    That's Mr. Mario Zambada.

6   Q    And this is the only time you met with Mayo Zambada?

7   A    Yes.

8   Q    Where did that meeting take place?

9   A    In Mexico City.

10  Q    How did you get to this meeting with Mayo Zambada in

11  Mexico City?

12  A    I went by road from Acapulco to Mexico City.

13  Q    Who took you there?

14  A    I drove myself.  Once I arrived there and followed the

15  instructions given to me by Mr. Arturo Guzman, I waited at a

16  place, at a pre-agreed place, and some people picked me up who

17  worked for either -- I don't know whether they worked for

18  Arturo or for Mario, and they took me to a house where

19  Mr. Mario Zambada was.

20  Q    To be clear, you got there on the instructions of Arturo

21  Guzman?

22  A    Yes.

23  Q    Briefly, what did you discuss with Mayo Zambada at this

24  meeting?

25  A    I made the same proposal to him of the shipment of 3,000

W. Name - direct/cross - Atty                    2185

1   kilos.

2   Q    Did he accept those terms?

3   A    No, he did not.  He told me very clearly that he did not

4   like to purchase merchandise on the beach.

5   Q    Now, you testified earlier that you understood that

6   Arturo Guzman and Hector Beltran were under the protection of

7   Joaquin Guzman.

8           What does it mean to be under the protection of

9   Joaquin Guzman?

10  A    Simply that they have contacts together, that they share

11  contacts and that they share routes belonging to Mr. Joaquin.

12

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Rosero - direct - Parlovecchio                    2186

1    EXAMINATION CONTINUES

2    BY MS. PARLOVECCHIO:

3    Q    Now, you testified that Mayo Zambada also rejected this

4    offer for buying kilos on the beach.

5         Was that the end of your discussions with leaders of

6    the Sinaloa Cartel about this particular shipment?

7    A    No, I met later with Mr. Ignacio Coronel.

8    Q    I am going to show you what's in evidence as Government's

9    Exhibit 7.

10        (Exhibit published.)

11   Q    Who is this?

12   A    Mr. Ignacio Coronel.

13   Q    And did Ignacio Coronel have a nickname?

14   A    Nacho Coronel.

15   Q    Did you make the same offer to Nacho Coronel that you had

16   made to Arturo Guzmán, Hector Beltran and Mayo Zambada?

17   A    Yes.

18   Q    What did Nacho Coronel do?

19   A    He accepted the proposal.

20   Q    Now, after having this series of meetings, did you have

21   an understanding whether the defendant, Nacho Coronel, Mayo

22   Zambada, Hector Beltran and Arturo Guzmán had any particular

23   relationship with each other?

24   A    I had information that had been given to me by Sergio

25   Ramirez and Juan Carlos Ramirez that all of them belonged to

SAM      OCR      RMR      CRR      RPR

Rosero - direct - Parlovecchio                    2187

1    the same group and that they were friends.

2    Q    What kind of group?

3    A    The group was The Sinaloa Cartel.

4    Q    And now I want to jump ahead to approximately

5    September 2001.

6              What were you doing for work at that time?

7    A    By 2001 I had retired from working with Juan Carlos

8    Ramirez.  I had my own profession and I owned a farm where I

9    produced milk.

10   Q    Now, in September 2001, did you have any meetings about

11   the drug business?

12   A    Yes, yes.

13   Q    And who did you meet with?

14   A    Sergio Ramirez looked for me so that I could go to work

15   in Mexico.

16   Q    Did you have an understanding of who Sergio Ramirez was

17   working with at that time?

18   A    Sergio Ramirez always worked with Juan Carlos Ramirez.

19   Q    And were they working with anyone else at the time?

20   A    Sergio Ramirez, Laureano Renteria, Lieutenant Rodriguez,

21   Jorge Mira.

22   Q    Were you aware of who Laureano Renteria was at that time?

23   A    So, yes, Laureano Renteria is a person who had had a very

24   high place in Juan Carlos Ramirez Abadia's organization.  He

25   was his right-hand man.

Rosero - direct - Parlovecchio                    2188

1  Q     You also mentioned someone named Jorge Enrique Mira.  Who
2  is that?
3  A     Jorge Enrique Mira is the nephew of a very important
4  person and colleague whose name is Mario Valencia.
5  Q     Now, you testified that Sergio Ramirez approached you
6  about going to Mexico.
7         Did he tell you why he wanted you to go to Mexico?
8  A     Yes, he wanted me to -- well, because many people didn't
9  know who I was in Mexico, and because he trusted me so much,
10 he wanted me to go there to offer cocaine shipments to the
11 Mexican drug traffickers.
12 Q     Any Mexican drug traffickers in particular?
13 A     Yes, he asked me to please go find Ignacio Coronel again,
14 and to go find Joaquin Guzmán Loera, and to go speak to Alvaro
15 Palau to set up a business with him, too.
16 Q     Did you go to Mexico?
17 A     Yes.
18 Q     Where did you go first?
19 A     The first city I arrived at, on this occasion, was
20 Cancún.
21 Q     When did you go?
22 A     That was January 2002.
23 Q     Who did you meet with when you arrived in Mexico in
24 January 2002?
25 A     The first person I met with was with Mr. Ignacio Coronel.

Rosero - direct - Parlovecchio                    2189

1    Q    And what did you discuss with Ignacio Coronel?

2    A    The intention the Colombians had of sending go-fast with

3    2,000 kilos and have him receive them.

4    Q    Was there any terms about where the cocaine was supposed

5    to be sold?

6    A    Yes, this time the intention of the Colombians was that

7    all the product that was sent to Mexico should be sold in

8    Mexico.

9    Q    Did you meet with any other leaders of The Sinaloa Cartel

10   after you met with Nacho Coronel?

11   A    Yes, at the end of February I was told to contact a

12   person in Guadalajara so that that person could get me a

13   meeting with Mr. Joaquin Guzmán.

14   Q    And we are talking about in February 2002 at this point?

15   A    Yes.

16   Q    Was the defendant in jail anymore?

17   A    No.

18   Q    Were you aware of how he had gotten out of jail at that

19   time?

20   A    I didn't know, but everybody was saying he had escaped

21   from jail.

22   Q    Who, in particular, had told you that?

23   A    Juan Carlos Ramirez -- no, I'm sorry, Sergio Ramirez had

24   told me about the situation.

25   Q    So could you just explain how you arranged this meeting

SAM      OCR      RMR      CRR      RPR

Rosero - direct - Parlovecchio                    2190

1   with Guzmán?

2   A    Yes, so once I was in Guadalajara I was to go speak to

3   this man Alfredo Vasquez.  That person had contact at the time

4   with Mr. Joaquin Guzmán.

5   Q    And who is Alfredo Vasquez?

6   A    Alfredo Vasquez was another drug trafficker in Mexico.

7   And at this time, as far as I was concerned, he was my link

8   for me to be able to reach Mr. Guzmán.

9   Q    Did you meet Alfredo Vasquez?

10  A    Yes.

11  Q    I am going to show you what's marked for identification,

12  for the witness only, as Government's Exhibits 97-A and 97-B.

13          And who are these photographs of?

14  A    Mr. Alfredo Vasquez.

15  Q    How do you recognize them?

16  A    I met with him several times.

17          MS. PARLOVECCHIO:  The Government moves to admit

18  Government's Exhibits 97-A and 97-B.

19          MR. BALAREZO:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibits 97-A and 97-B were received

22  in evidence.)

23  BY MS. PARLOVECCHIO:

24  Q    Now, Mr. Romero, showing you Government's Exhibit 97-B,

25  who is this?

Rosero - direct - Parlovecchio                    2191

1              (Exhibit published.)

2    A    Mr. Alfredo Vasquez.

3    Q    And how does this photograph compare to when you met him

4    in 2002?

5    A    He's very young in this photo.

6    Q    I am now going to show you Government's Exhibit 97-A.

7              (Exhibit published.)

8    Q    Who is this?

9    A    That's Mr. Alfredo Vasquez.

10   Q    And how does this photograph compare to the time period

11   when you knew him in 2002 and beyond?

12   A    Obviously, time had not been kind to him.  It was him,

13   but he didn't look too good.

14   Q    So he's older here than when you met him?

15   A    Yes.

16   Q    Okay.  Did you arrange a meeting with the defendant

17   through Alfredo Vasquez?

18   A    Yes.

19   Q    Please describe for the jury the steps that you went

20   through to get to this meeting with the defendant in

21   February 2002.

22   A    When I was in Guadalajara, Alfredo Vasquez sent me a

23   person who took me to Culiacán by land.  We traveled almost

24   the entire night.  We stayed at a hotel in Culiacán.  The

25   following day, some people who worked for Mr. Joaquin Guzmán

Rosero - direct - Parlovecchio                    2192

1   came by and they took me to a country home, country estate

2   outside of Culiacán, where supposedly or actually Mr. Joaquin

3   Guzmán was there.

4

5            (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Rosero - direct - Parlovecchio                    2193

1  (Continuing.)

2          THE COURT:  Ms. Parlovecchio, either now or sometime

3  in the next five minutes or so.

4          MS. PARLOVECCHIO:  Actually, two questions and it

5  will be a good stopping place.

6  Q    Mr. Rosero, I'm showing you what's in evidence as

7  Government Exhibit 506-19.

8  A    Yes.

9  Q    Using Government Exhibit 506-19, can you show us where

10  Culiacan is?

11  A    Culiacan is here where the star is.

12  Q    And that's in the center of Government Exhibit 506-19?

13          MR. BALAREZO:  Your Honor, I assume where it says

14  Culiacan?

15          THE COURT:  Thank you.

16  BY MS. PARLOVECCHIO:

17  Q    Thank you.  Based on your experience dealing with the

18  Sinaloa Cartel, what if any significant does Culiacan have for

19  the leaders of the cartel?

20  A    Culiacan was their main city where they had been born,

21  where they had their family, where they started out.

22  Q    And why is that significant?

23  A    Well, because that's where they started out.  They

24  managed that plaza.

25          MS. PARLOVECCHIO:  Your Honor, I think this is a

SN       OCR      RPR

Rosero - direct - Parlovecchio                    2194

1    good stopping point.

2           THE COURT:  Before be leave, ladies and gentlemen,

3    one question I want you to think about overnight and get back

4    to Ms. Clarke tomorrow.  In a couple of weeks, we are going to

5    be taking off for Christmas week and then we are taking off a

6    major part of the following New Year's week as well.  We are

7    doing well.  I think we are going faster than anyone

8    anticipated.  I won't guarantee you, but I am hoping we will

9    finish the case earlier than you were told.

10          Nevertheless, because of the of long Christmas break

11   and then the New Year's break the following week, although I

12   told you we do not sit on Fridays, I would like to sit on

13   Friday, January 4th, so at least we have Thursday and Friday

14   of that week.  However, I told you all that we are not sitting

15   on Fridays and if anyone made plans that make that impossible,

16   then we will not do it.  Talk amongst yourselves about that

17   and see if you can come to a consensus that you can

18   communicate to Ms. Clarke whether you can sit on January 4th.

19          I may overrule you if you simply say you just don't

20   want to.  You know the drill.  Stay away from media.  Stay

21   away from the internet communications about this.  Do not talk

22   to anybody about this case.  Have a good night's sleep.  We

23   will see you tomorrow morning at 9:30.

24          (Jury exits.)

25          (In open court.)

SN        OCR        RPR

Rosero - direct - Parlovecchio                    2195

1              THE COURT:  Anything else?

2              MS. PARLOVECCHIO:  No, Your Honor.

3              THE COURT:  Okay.  9:30.  Have a good night.

4              MS. PARLOVECCHIO:  Thank you.

5              MR. BALAREZO:  Thank you.

6

7    (Matter adjourned to Wednesday, December 5, 2018 at 9:30 a.m.)

8

9                         - ooOoo -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    SN       OCR      RPR

2196

I N D E X

WITNESS                                                      PAGE


JUAN CARLOS RAMIREZ ABADIA

    CROSS-EXAMINATION BY MR. PURPURA              2023

    REDIRECT EXAMINATION BY MS. GOLDBARG          2092

    RECROSS-EXAMINATION BY MR. PURPURA            2103



JAMAL HORNEDO

    DIRECT EXAMINATION BY MR. ROBOTTI             2112

    CROSS-EXAMINATION BY MR. BALAREZO             2123



MATTHEW RYAN

    DIRECT EXAMINATION BY MS. PARLOVECCHIO        2129

    CROSS-EXAMINATION BY MR. LICHTMAN             2148



GERMAN ROSERO

    DIRECT EXAMINATION BY MS. PARLOVECCHIO        2157

2197

**E X H I B I T S**

**EXHIBIT**                                                    **PAGE**


Defense Exhibit 242-A                                          2024

Defense Exhibit 242-B                                          2025

Defense Exhibit 242-C                                          2026

Defense Exhibit 232                                            2027

Defense Exhibit 174-A                                          2036

Defense Exhibit 228                                            2066

Defense Exhibit 238                                            2071

Defense Exhibit 227                                            2086

Government's Exhibit 208-8C                                    2098

Government Exhibit 201                                         2113

Government Exhibits 206-2 and 206-3                            2116

2198

# E X H I B I T S

**EXHIBIT**                                                      **PAGE**

Government Exhibit 206-4                                      **2119**

Government Exhibits 206-9A through D                          **2120**

Government Exhibits 206-5 to 206-8                            **2122**

Government Exhibits 204-21 and 204-23                        **2135**

Government Exhibits 204-16 through -18                        **2137**

Government Exhibits 204-2, 204-9, 204-10,
and 204-12                                                   **2139**

Government Exhibit 204-15                                     **2141**

Government Exhibit 204-14                                     **2142**

Government Exhibits 204-1, -5, -6, -8, and
-11                                                          **2143**

Government Exhibit 204-13                                     **2145**

SAM     OCR     RMR     CRR     RPR

2199

1                                  **E X H I B I T S**

2            <u>EXHIBIT</u>                                          <u>PAGE</u>

3

4        Government Exhibits 204-19 and 204-20              **2146**

5

6        Government Exhibit 3500-GRA-2                      **2175**

7

8        Government's Exhibits 97-A and 97-B                **2190**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM        OCR        RMR        CRR        RPR