UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 09-CR-00466(BMC)

-against- : United States Courthouse. Brooklyn, New York.

: Wednesday, December 5, 2018 9:30 a.m.

JOAQUIN ARCHIVALDO GUZMÁN LOERA,

Defendant.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE, and a jury

A P P E A R A N C E S:

For the Government: RICHARD P. DONOGHUE, ESQ.
United States Attorney.
Eastern District of New York
271 Cadman Plaza East.
Brooklyn, New York 11201
BY: GINA M. PARLOVECCHIO, ESQ.
ANDREA GOLDBARG, ESQ.
MICHAEL P. ROBOTTI, ESQ.
Assistant United States Attorneys.

United States Attorney's Office.
Southern District of Florida
99 NE 4th Street.
Miami, Florida 33132
BY: ADAM S. FELS, ESQ.
Assistant United States Attorney.

A P P E A R A N C E S: (Continued)

For the Government: Department of Justice, Criminal Division
Narcotic and Dangerous Drug Section.
145 N. Street N.E.
Suite 300.
Washington, D.C. 20530.
BY: ANTHONY NARDOZZI, ESQ.
AMANDA LISKAMM, ESQ.

For the Defendant: BALAREZO LAW
400 Seventh Street, NW.
Suite 306.
Washington, DC 20004
BY: A. EDUARDO BALAREZO, ESQ.

LAW OFFICES OF JEFFREY LICHTMAN
11 East 44th Street.
Suite 501.
New York, New York 10017.
BY: JEFFREY H. LICHTMAN, ESQ.
PAUL R. TOWNSEND, ESQ.

LAW OFFICE OF PURPURA and PURPURA
8 E. Mulberry Street.
Baltimore, Maryland 21202.
BY: WILLIAM B. PURPURA, ESQ.

LAW OFFICES OF MICHAEL LAMBERT, ESQ.
369 Lexington Avenue.
2nd Floor - PMB #229.
New York, New York 10017.
BY: MARIEL COLON MIRO, ESQ.

Court Reporter: Stacy A. Mace, RMR, CRR, RPR, CCR
Official Court Reporter
E-mail: SMaceRPR@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

(In open court - jury not present.)

(Defendant enters the courtroom.)

THE COURTROOM DEPUTY: All rise.

(Judge BRIAN M. COGAN enters the courtroom.)

THE COURT: Good morning. Let's have the jury, please.

(The jury enters the courtroom.)

THE COURT: Everyone be seated. Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: Let's have the witness back and we will continue with direct examination.

(Witness enters the courtroom and resumes the stand.)

THE COURT: Be seated, please. All right, you may continue.

MS. PARLOVECCHIO: Thank you, Your Honor.

(Continued on the following page.)

**G E R M A N   R O S E R O**,

previously called and sworn/affirmed as a witness by the Government, was examined and testified further under oath as follows:

DIRECT EXAMINATION

BY MS. PARLOVECCHIO:

Q Good morning, Mr. Rosero.

A Good morning.

Q Just a follow-up question from yesterday.

You testified yesterday that the defendant ordered Sergio Ramirez and Juan Carlos Ortiz kidnapped due to a mistake that Gordo made?

A Yes.

Q What was Juan Carlos Ortiz's nickname?

A Cuchilla.

THE INTERPRETER: C-H-U-C-I-L-L-A by interpreter.

Q Before we ended yesterday, you testified that you met with the defendant for the first time at the end of February 2002?

A Yes.

Q Where did you meet the defendant for the first time at the end of February 2002?

A It was in a country house in the outskirts of Culiacán.

Q And based on your understanding, was this the defendant's ranch?

A I don't know.

Q How did you get to this meeting?

A Through the contact that I had had with Mr. Alfredo Vasquez, he sent a person who took me there by road from Guadalajara to Culiacán. I stayed at a hotel. The next day in the morning some people, who belonged to Mr. Guzmán, picked me up and they took me to the country house that I mentioned before.

Q Did you attempt to meet with the defendant's brother Arturo Guzmán on this occasion?

A No.

Q Why not?

A I had been informed that he was in jail.

Q What did the ranch look like where you met the defendant?

A It was a farm. It had a big wooden gate. It was a simple but nice house inside. It was not luxurious. There was a pool there and there was also a *palapa*.

Q Who was present for this meeting?

A That day I sat down to a table that was under the *palapa* only with him. And there were other people around in the place, but I had no contact with any of them.

Q Did you have an understanding of what some of these people were there for?

A I don't know. There were two or three people who had rifles, A-47 [sic]. There were other people who were just

sitting around or just walking around.

Q What types of firearms did you see?

A AK-47 rifles and pistols.

Q And what was the defendant wearing when you met with him?

A He was dressed in a regular way, pants, shirt, and he was wearing a baseball cap.

Q I am showing you what's marked for identification as Government's Exhibit 1-G.

What is this?

A That is Mr. Joaquin Guzmán and, in fact, that is how he looked when I met him.

MS. PARLOVECCHIO: The Government moves to admit Government's Exhibit 1-G.

MR. BALAREZO: No objection.

THE COURT: Received.

(Government's Exhibit 1-G was received in evidence.)

(Exhibit published.)

BY MS. PARLOVECCHIO:

Q Now, you testified that you saw the defendant wearing a baseball cap.

Did you see him wearing a baseball cap on other occasions?

A Yes, it was usual to see him wearing a baseball cap.

Q Why did you meet with the defendant as opposed to someone else in his organization?

A Well, I had been entrusted by Juan Carlos Ramirez and Sergio Ramirez to speak to him because they say he was a very effective person when it came to drug --

MR. BALAREZO: Your Honor, objection to the interpretation. I have understand --

THE COURT: Stop.

Overruled.

BY MS. PARLOVECCHIO:

Q You may answer.

A Can you please repeat it?

Q Yes. Why did you meet with the defendant as opposed to someone else in his organization?

A As I said before, I had been entrusted with doing that from Cali. They knew about the quality, when it came to the drug business, that Mr. Guzmán had.

Q What did you discuss with the defendant at this meeting?

A At the time, I conveyed to him the intention of sending go-fast boats with up to 2,000 kilos of cocaine to Mexico.

Q What other terms did you propose to him?

A And also, at the time, I proposed to him whether it was possible that the merchandise be bought on the beach.

Q And by merchandise, do you mean cocaine?

A Yes.

Q What was the purpose of selling the kilos on the beach on this occasion?

A Well, in Colombia it had been clearly defined, on this occasion when we were going to deal, that we did not want the merchandise to cross into the United States. We wanted to sell it all in Mexico, but nothing in the United States.

Q Was the intention -- during this negotiation, was the intention to do one shipment or multiple shipments?

A Multiple shipments.

Q And even though you had proposed selling the cocaine to the defendant in Mexico, did you have an understanding where the cocaine would ultimately go?

MR. BALAREZO: Objection.

THE COURT: Sustained.

BY MS. PARLOVECCHIO:

Q Did you have a discussion about where the cocaine would ultimately go?

A No.

Q Did you have an understanding about where the cocaine would go?

MR. BALAREZO: Objection.

THE COURT: Sustained.

Q In the history of dealing with the Sinaloa Cartel, over the course of your dealings with them, did you have an understanding where they would sell the cocaine after Mexico?

MR. BALAREZO: Objection. What period?

THE COURT: He can answer the question yes or no.

A Yes.

Q Where did you understand it would go, based on your dealings with The Sinaloa Cartel?

MR. BALAREZO: Objection.

THE COURT: Sustained.

MS. PARLOVECCHIO: Your Honor, we laid a --

May we have a sidebar, please?

THE COURT: Yeah, you did not. You did not. You think you did, but you did not.

Ask him what it was based on.

BY MS. PARLOVECCHIO:

Q What was this based on?

A Well --

MR. BALAREZO: Your Honor, before it's translated, can we have a sidebar, please?

THE COURT: Okay, let's have a sidebar.

(Continued on the following page.)

(The following sidebar held outside the hearing of the jury.)

MR. BALAREZO: The issue with having the answer is the witness was talking about they; he says they. He doesn't mention anybody. If the Government wants to know, they can ask a question instead of --

THE COURT: How does he know that the cocaine was destined for the United States?

MS. PARLOVECCHIO: It's based on his course of dealing with all the various leaders of the Sinaloa Cartel, which I can elicit from him. If he says they, I can ask a follow-up question who did you speak to about that. He had conversations with Nacho Coronel.

THE COURT: Okay, you need to do all that.

MS. PARLOVECCHIO: I will do that.

THE COURT: Okay, you need to do that before he gives his understanding.

MS. PARLOVECCHIO: I understand that, Your Honor.

MR. BALAREZO: Thank you.

(Sidebar concluded.)

(Continued on the following page.)

(In open court - jury present.)

EXAMINATION CONTINUING

BY MS. PARLOVECCHIO:

Q What did the defendant say to you when you proposed the business of a 2,000-kilogram fast-boat shipment to him?

A That he was very much interested.

Q Did you eventually arrange the drug shipments that you had discussed with the defendant at this meeting?

A In this meeting we only spoke about the intention of doing it, but I continued in touch with him, in contact with him through other people, and eventually some shipments were made to him.

Q How long after this first meeting in February 2002 did the first shipment take place?

A Towards the end of May.

Q And you mentioned that there were some continued negotiations after that initial meeting.

When you had those continued negotiations, were they face-to-face or in some other way?

A Well, at that time, I spoke to him on the phone twice only and I stay in touch with him through other people. I did not see him again.

Q What happened with this May 2002 shipment?

A It was successfully received in Mexico.

Q Did you learn who received the cocaine from the shipment?

MR. BALAREZO: Objection, again for basis, 602.

THE COURT: Well, first let him answer the question whether he learned, yes or no.

A Yes, I did.

Q How did you learn?

A Well, we had control on the information, about the information; when it arrived, how it arrived. We had control of everything.

Q Who gave you that information?

A Mr. Joaquin Guzmán Loera's people directly, and people from Colombia directly also.

Q Who received the speedboats loaded with cocaine on this occasion?

A They were received by a gentleman whom they called Marquitos.

THE INTERPRETER: By interpreter, M-A-R-Q-U-I-T-O-S.

BY MS. PARLOVECCHIO:

Q Who is Marquitos?

A Marquitos was the person in charge in Chiapas, in the state of Chiapas, to organize the receiving of the drugs that they sent to Colombia by Mr. Joaquin Guzmán Loera.

Q Approximately when was the next cocaine shipment that you arranged with the defendant?

A At the time there were three shipments, one after the other. First the one I just described. The second one was

one that never arrived because it got lost after leaving Colombia. And the third one was a shipment that was sent around mid July, which arrived successfully in Mexico.

Q So you testified that the next shipment that you sent was lost.

How big was that cocaine shipment?

A 2,000 kilos.

Q And then you said there was a next shipment in July 2002?

A Yes.

Q And that arrived successfully?

A Yes.

Q Were there any problems with the cocaine shipment that you sent in July 2002?

A Yes.

Q What was the problem?

A Because of a mistake in Colombia, the 2,000 kilos that were going to be sent, 600 of those kilos were of a lesser quality than what we should have sent. I was informed about that by the people who did -- well, the people in charge of checking out the merchandise when it was received in Mexico. I consulted this with Colombia and they said that, in fact, that had happened.

Subsequently, I made an appointment with Mr. Joaquin Guzmán to be able to come to an agreement on the price for this product that had arrived that wasn't of the best quality.

Q What exactly was the quality problem that you had to discuss with the defendant?
A At that time, the quality of the cocaine had changed. The cocaine that was demanded at the time had been a quality of cocaine called re-oxidized cocaine. It was a cocaine that was purer and, obviously, was worth more.
Q So what was the problem with the quality of this particular -- these 600 kilos I believe you testified?
A It wasn't re-oxidized.
Q Did you try to see this cocaine so you could address the quality problem?
A Well, Joaquin Guzmán's people had confirmed this to me. Colombia had confirmed this to me. So, I did not have to look at it.
Q Did you, ultimately, get to address the quality problem with the defendant, himself?
A Yes.
Q Did you do that in person or some other way?
A This was the second time I was going to be seeing him. I did it in person.
Q Where did this meeting take place?
A This meeting took place in a location that was not so far away from the city of Culiacán, but in any case they took me by plane.
Q And where did they take you?

A To the mountains, but not so far away. In other words, not so far away from Culiacán.
Q Now, on this occasion when you went to go see the defendant in July 2002, who did you see at the ranch?
A On this occasion when we landed, there was some armed personnel, perhaps ten armed people, and El Señor was at a location that was not luxurious at all, about 500 meters away from the strip, landing strip.
Q When you say El Señor, who are you referring to?
A Mr. Joaquin Guzmán Loera.
Q Now, you said you saw about ten armed individuals. What types of arms were they carrying?
A AK-47 rifles.
Q What did you and the defendant discuss when you saw him?
A First of all, about the shipment that had been received. And secondly, about the product that had arrived at a quality that was not what was needed.
Q What did you do next?
A El Señor -- I mean, the price of all the products at the beach was $6,000 per kilo. The product that was bad, El Señor offered to pay me $5,500 for it. At that time, I was lucky enough that there was a signal in the area, so I was able to make a phone call to Mr. Sergio Ramirez. I consulted with him and he said to split the difference, to tell him to pay me $5,500.

Q Whose phone did you use to call Sergio Ramirez?
A Mine.
Q Who conveyed the message to Sergio during the call?
A I did.
Q Did the defendant talk on the phone to Sergio at all?
A No, not at all.
Q When you had the discussion with the defendant about quality of the cocaine, did you have actual kilograms of cocaine there with you?
A No.
Q Did you ever see the defendant holding a kilogram of cocaine?
A Never.
Q Did you have an understanding why not?
MR. BALAREZO: Objection.
THE COURT: You can answer the question yes or no.
A Can you repeat the question, please?
Q Did you have an understanding why you didn't have a kilo of cocaine there?
A Yes.
Q Based on your experience in the drug business, why didn't you personally have cocaine there on that occasion?
A It wasn't necessary.
Q Why not?
A The cocaine -- well, everyone has their own function in

the organizations. My function wasn't to have cocaine in my hands.

Q What was your function?

A Simply communicate and coordinate the cocaine shipments.

Q Were there others in the organization who had the function of handling the cocaine?

A Of course.

Q Now, you testified that the defendant did not speak on the phone on this occasion when you were discussing the quality issue.

Did you ever speak directly to the defendant on the phone?

A Yes, two or three times.

Q Generally, if you wanted to communicate with the defendant and you weren't face-to-face, how did those communications take place?

A I would send a message through the person that he had dictated for that function.

Q Who were some of those people you would reach out to who had that function?

A I remember two people. A man they called Juanito, and later on there was a man they called El Licenciado.

THE INTERPRETER: By interpreter, E-L, Licenciado, L-I-C-E-N-C-I-A-D-O.

Q Did you ever meet El Licenciado in person?

A Yes.

Q When did you meet him?

A I met him in Mexico City, I spent maybe an entire morning and maybe part of an afternoon with him.

Q Approximately when was that?

A 2003, I'm not too sure. I can't remember too well. Maybe end of 2003.

Q What was the purpose of this meeting with Licenciado?

A El Licenciado got in touch with me on behalf of Mr. Joaquin Guzmán with the purpose of meeting with a person in Mexico. This person was going to provide an airplane service with which we were planning on making some cocaine shipments from Colombia.

Q I am going to show you what's marked for identification as Government's Exhibit 11-A.

What is this?

A El Licenciado.

Q How do you recognize him as that?

A I spent enough time with him to remember his face very well.

MS. PARLOVECCHIO: The Government moves to admit Government's Exhibit 11-A.

MR. BALAREZO: No objection to the extent, though, that he hasn't been identified in any way besides a victim.

THE COURT: Is that no objection?

MR. BALAREZO: No objection, that's fine.

THE COURT: Received.

(Government's Exhibit 11-A was received in evidence.)

(Exhibit published.)

BY MS. PARLOVECCHIO:

Q And, Mr. Rosero, is this the person that you identified as El Licenciado?

A Yes.

Q Did this plane deal that you discussed with El Licenciado go through?

A No.

Q Now, you testified earlier that you were responsible for negotiating cocaine shipments from Colombia to Mexico.

When you would negotiate the cocaine shipments, what exactly were your responsibilities?

A Well, first of all, to be able to reach the person that from Colombia, from Juan Carlos Ramirez and Laureano Renteria they had assigned me to reach to propose the deal, to tell them the amount we were thinking of sending, establish the amount that the client could invest in at the time. After all this, tell them clearly the day the product had left Colombia.

(Continued on the following page.)

BY MS. PARLOVECCHIO: (Continuing.)

Q I'm going to stop you there. When you say you told them, who are you referring to?

A Well, the people I spoke to in Mexico.

Q And what were your other responsibilities?

A Well, be on the lookout for the crucial moment which is when the cocaine from the Colombian boat is going to be transferred onto the boat from the Mexicans with their crew and equipment; to be on the lookout for when the Mexicans were going to bring the cocaine into Mexican territory; the sale of this cocaine to those people; charging the money and be on the lookout for the money being delivered to the people who were going to bring it back down to Colombia.

Q As a general matter where would you be when you're waiting for a cocaine shipment to arrive in Mexico?

A Always in Mexican territory.

Q Did you ever learn the name of the vessels or the boats being used in these shipments?

A Never.

Q Did you ever invest in drug shipments?

A No.

Q How were you compensated?

A Well, I was compensated, first of all, per sold kilo and they would pay me for a project that had been successful.

Q What would you do when the cocaine reached its

destination in Mexico?

A Well, as I said, establish a price for the cocaine sale and collect the money.

Q Did you see the brand stamped on the cocaine during this time?

A Yes, it was different brands and they were constantly changing.

Q Did you have an understanding of why they were constantly changing?

A Well, it was the policy because the cocaine had a long journey ahead from Colombia to Mexico and possibly the United States. If the cocaine was seized in Mexico or the United States and the cocaine had a certain brand, obviously if later on another large amount of cocaine was confiscated with the same brand, obviously the authorities were going to assume that the cocaine belonged to the same person. That's why the brands were constantly being changed.

Q Do you remember what any of the brands were of the cocaine that came through the shipments?

A Some of them had a four-by-four, a rocket, maybe a sign that said Yin and Yang, different brands.

Q Do you remember all of them?

A No, not at all.

Q Now, you testified that you are responsible for collecting the money from these cocaine shipments. Did you

personally collect the money that the Sinaloa Cartel sent down to Colombia to pay for those shipments?

A Very seldom.

Q Did you ever collect the money for their investments up front?

A The -- we always requested that the investment of the Mexicans for their shipment, we always requested from them that they themselves would bring down the money and pay that money in Colombia.

Q What was your understanding of how the Mexicans or the Sinaloa Cartel leaders would send their investment money down to Colombia for the investments?

MR. BALAREZO: Objection.

THE COURT: You can answer the question yes or no. Did he have an understanding?

A Yes.

Q How did you know about that?

A As I mentioned before, this is a business in which there are different responsibilities so it was logical that they should have the responsibility of bringing down their money and deliver that in Colombia because had they given it to me and I was the one bringing it down, and if the money got lost then I would be responsible for that, and we did not want that.

Q Did you have discussions with Sergio Ramirez or any of

the other individuals you worked with in Colombia about how the Sinaloa Cartel got their investment money down to Colombia?

A Well, they mentioned to me that they did it through bajadores --

THE INTERPRETER: By interpreter, B-A-J-A-D-O-R-E-S.

A Who are people who bring down money --

THE INTERPRETER: The interpreter needs to clarify.

A They confirm that and I also confirm that through my experience. And on one occasion Mr. Joaquin Guzman Loera informed me that it was a possibility of sending money through -- by plane, by a plane which was -- which belonged to him which had the distinction of being made out of carbon fiber, which made the plane nondetectable by radar and since it was a small plane, it could be successful.

THE COURT: Before you go on, one thing.

Ladies and gentlemen, I know there is a lot of testimony to listen to and as I said to you before very hard work and we appreciate you doing it. Without singling anyone out, sometimes I look over and I wonder if someone is as focused as they should be. Please do your best, and I know the vast majority of you are paying close attention to the testimony, and not kind of drop off there. Thank you.

Please continue.

BY MS. PARLOVECCHIO:

Q So you testified that the Sinaloa Cartel had something called bajadores?

A Yes. The Sinaloa Cartel had them and so too the Colombians.

Q So the ways in which they would move their money down was by using bajadores?

A Yes.

Q And the second way you testified about was this plane?

A Yes.

Q And what did the defendant tell you about this carbon fiber plane?

MR. BALAREZO: Your Honor, asked and answered.

THE COURT: Overruled.

A Well, he simply said that it could be very effective and very cheap the sending of the money down to Colombia.

Q You testified that you were responsible for collecting money from the sales of cocaine in Mexico. How did that work?

A From Colombia I would be given telephone numbers of the bajadores in Mexico.

MR. BALAREZO: Your Honor, objection.

Could we approach?

THE COURT: Yes

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

MR. BALAREZO: I understand that there's a CC account and I understand there's conspiracy accounts, but this is a very general thing that's been going on throughout the trial. The witnesses get up and testify that they provided -- we don't know who was provided. We don't know if it's Guzman or Mayo. We don't -- at some point, he's got to say something what this man knows. I think the Government needs to lay a better foundation or get the witness to explain who he's talking about. For example, right now he said, They gave me numbers. Who gave them numbers?

MS. PARLOVECCHIO: Your Honor, I can follow up and elicit that. He testified that he did at least three cocaine deals with the defendant in 2002. He testified that he collected the money from those cocaine sales that occurred in Mexico and he explained the process by which he would get the money down. It's completely relevant.

THE COURT: To the extent there is an objection, I am overruling the objection. The witness has established enough of a foundation of knowledge of what he is talking about so that he can give testimony without giving the particulars of who he talked to on what date to gain particular information. That, to me, we have crossed the threshold with this witness where that to me is now a proper

element of cross-examination. I.

Will say to both sides that, you know, foundation is not just an evidentiary matter. Sometimes a witness' testimony can be made more persuasive by more foundation and conversely someone opposing testimony may actually want less foundation in order to avoid saying, okay, here is everything I know and here is the particulars which makes it more persuasive.

I think I am going to leave it at that, but I will say that the question now being asked there is enough of a foundation that it may be answered.

MS. PARLOVECCHIO: And just to sort of curtail further sidebars on this issue, Your Honor, there was extensive testimony from Juan Carlos Ramirez about the fact that multiple leaders of the Sinaloa Cartel cartel invested in these shipments together. Much of this testimony is relevant to that. It's corroborative --

THE COURT: The objection is not irrelevance. The objection is the basis for the witness' knowledge.

MS. PARLOVECCHIO: I understand.

THE COURT: And I think the witness demonstrated enough knowledge for this question. I'm taking the questions one at a time and technically if the basis isn't out there, I'm going to sustain the objection. Whether it is advantageous to object or not, I leave to defense counsel, but

for this question there is enough. We have enough from this witness. Let's go on.

MS. PARLOVECCHIO: Thank you.

(Sidebar ends.)

(Continued on next page.)

BY MS. PARLOVECCHIO: (Continuing.)

Q Mr. Rosero, I believe you were explaining how the movement of money would work from these cocaine sales.

A As I was telling you, in Colombia they provided me with phone numbers for people who worked in Mexico. These people had a -- and they explained this to me very well, a certain limit of money that could be delivered to them. So, what I did was when the Mexicans would tell me that they had money to pay me, I provided them with those numbers with clear specifications of how much, what was the upper limit of the money that could be delivered to them. The Mexicans would then deliver the money and confirm to me at the time just like the person who had the phone number also did.

The person confirmed to me how much money he or she had received and then these people would be in charge of contacting Colombia, do an accounting with Colombia, and they would pay directed in Colombia.

Q And when you use the term "these people" who are you referring to?

A Well, first of all, when I say that, the Mexicans delivered to these people, I meant the bajadores.

Q What's the significance of the telephone numbers?

A Just to have a direct contact with the person who's going to deliver and with the person who's going to receive. Along with the phone number, there was always the code of asking for

someone and to say on behalf of whom the call was being made.

Q And would you provide those code names?

A Of course. Those names were sent to me directly from Colombia.

Q And how did you know it worked this way?

A I -- I coordinated that. The deliveries, I coordinated the deliveries myself.

Q You testified that there are upper limits that the bajadores had. What were some of those upper limits?

A At first we handled -- we began to handle $500,000, $1 million. This would be determined by Sergio and Laureano in accordance with what they spoke with the person who owned the business, but then later those policy limits went up; up to $5 million.

Q You testified that Sergio and Laureano would have the discussions with the person who owned the business. Who are you referring to by the person who owned the business?

A Well, the business of bringing money down was also a multi-million dollar business, but those who did it were always Colombians who had their own workers in Mexico, but most of them lived in Colombia.

THE INTERPRETER: The interpreter needs to clarify something.

A And we had control over those people. We knew where they lived. We knew so they would be responsible if any money got

lost.

Q Did you use this money movement method for all the drug shipments you did with the defendant?

A Yes.

Q Did you ever personally physically move drug money?

A Yes.

Q Can you describe the circumstances under which you physically moved drug money?

A Well, simply at the time there was no available bajador and the money had to be collected. It was better to have it in hand already so I received it.

Q What currency was this drug money in?

A We handle American dollars all the time.

Q On the occasions when you would have to move this drug money, what quantity of drug money were you moving?

A $500,000, a million dollars perhaps.

Q What denominations was the currency in?

A In general, 100, 50, 20 and very occasionally $10 bills.

Q How big is a million dollars?

A It depends on the denomination.

Q What if it's in a small denomination, small bills like five or ten?

A That's very big and very heavy.

Q Approximately how big?

A Perhaps five to six -- five to six square feet.

Q Now, you testified yesterday that you surrendered to the U.S. authorities in June 2009.
A Yes.
Q Have you spent time in jail as a result of your case?
A No.
Q Since coming to the U.S. were you required to consult a psychiatrist?
A Yes.
Q What was the treatment for?
A Anxiety, simply just anxiety.
Q Was this treatment in any way related to your ability to remember things from your past?
A Not at all.
Q Now, you testified earlier about three cocaine shipments you helped the defendant or you negotiated with the defendant in 2002. Did you arrange any other cocaine shipments for leaders of the Sinaloa Cartel during the 2002 period?
A Yes.
Q And were there additional shipments to the defendant?
A Later. The following year, yes.
Q Now, how large were these next shipments?
A They increased until they got to 12,500 kilos.
Q So did you do any cocaine shipments with the leaders of the Sinaloa Cartel in 2003?
A Yes.

Q How many cocaine shipments did you send to the Sinaloa Cartel in 2003?
A Three, four.
Q Did any of these shipments go directly to the defendant?
A Yes.
Q In what, if any, sequence did you send cocaine shipments to the Sinaloa Cartel?
A So, in 2002 we made those shipments to Joaquin Guzman Loera and after that we made a shipment to Nacho Coronel. So, the following year it was to Joaquin Guzman Loera, Nacho Cornell and we had some conversations with Alvaro Palau who had been working with Mr. Conejo.

THE INTERPRETER: By interpreter, C-O-N-E-J-O.

A We set up another shipment with them.
Q So, did you meet with the defendant face-to-face to negotiate his cocaine shipments around this period in 2003?
A Yes.
Q Where did you meet him?
A In the mountains.
Q Was this mountain location different from the prior mountain location that you described?
A Yes.
Q Around this time in 2003 what were the steps necessary to get to a meeting with the defendant?
A The same as usual, be able to contact the person he had

given me to be able to set up an appointment with him; to go to Culiacan; wait for one of his people to pick me up, be it at the airport or the hotel where I was staying. This person would take me to one of the airstrips by land where the airplane would be waiting to take me to where Mr. Guzman Loera was.

Q You said you would go to an airstrip where the plane would be waiting. What kind of airplane would you take to get to the location?

A Cessnas.

Q What condition were these Cessna airplanes in?

A These were planes that were not new. You can tell they had been used a lot. But the pilots always told me that these were the planes that had the best service of all.

Q When you took these Cessna airplanes to see the defendant, did you see anything else on the plane?

A Yes, depending. If I was alone with a pilot, there would be provisions in the back like fruits, vegetables. There were other people, I'm sure because of the weight. There was nothing else on the plane.

Q Now, on this occasion what did the airstrip in the mountains look like when you landed?

A At this point in time the airstrips were further away. The distinction they had was that they had an upward incline and they were made out of dirt.

Q Now, you described an upward incline. Could you describe for the jury how the plane would land and take off from those inclined airstrips?

A Yes. These are strips, airstrips, that the pilots told me were much shorter. The function of the upward incline was that when the airplane would land, it would decrease the speed of the airplane to make it stop no problem. And when the airplane was going to take off, the downward incline would give the airplane the necessary speed to be able to stay up in the air.

Q What did you see after you landed on the airstrip on the mountains on this occasion?

A So, when I landed in these airstrips, at this time the topography was very different. It was much more inland in the mountains and much more barren. The people there where it was clear that this was security detail. They were wearing camouflage. There were many more weapons. And the location where the meeting was held was much more basic.

Q Was this the only time you went to see the defendant at this ranch higher up in the mountains?

A No, I went there maybe six to eight additional times.

Q Did you follow the same steps you just described every time you had to go see the defendant up in the mountains?

A Yes.

Q How many different locations did you visit the defendant

at in the mountains up in the Sierras?

A Three, four.

Q And where were they located generally?

A They were located in what is known as the Sierra Madre.

Q I'm going to show you what's marked for identification as Government Exhibit 503. What is this, Mr. Rosero?

A It's a topographic map of Mexico.

MS. PARLOVECCHIO: The Government moves to admit Government Exhibit 503.

MR. BALAREZO: No objection.

THE COURT: Received.

(Government Exhibit 503 received in evidence.)

(Exhibit published.)

BY MS. PARLOVECCHIO:

Q Mr. Rosero, using Government Exhibit 503 can you indicate for the jury using your screen where these ranches were located primarily?

A In this region (indicating).

Q And I'm going to show you Government Exhibit 506-19 in evidence?

(Exhibit published.)

Q Using Government Exhibit 506-19 can you indicate the region, please?

A (Witness complies.)

MS. PARLOVECCHIO: For the record, the witness has

circled the middle of Government Exhibit 506-19.

Q What is this area known as?

A The golden triangle.

(Continued on the following page.)

BY MS. PARLOVECCHIO: (Continuing)

Q Now, in the course of having these meetings with the defendant in the mountains, did you notice anything different about his clothing?

A Yes. On some occasions, I saw him wearing fatigues, camouflage clothing.

Q Now, in 2003, what, if anything, changed about the way you were doing cocaine shipments with the defendant and other leaders of the Sinaloa Cartel?

A Mr. Joaquin Guzman Loera sent me a message for me to travel to Culiacan because he wanted to speak to me. I followed the same protocol. I went to Culiacan. I was picked up, I got into an airplane and I was taken to a location that was different from the others I had been to. I landed on an airstrip that was near, well, just a very large ranch. I'm referring to structures. There were some very large houses there.

Q Who was at this location?

A Once we landed, the pilots told me that the ranch belonged to the Beltran Leyvas.

Q And who was at this particular meeting?

A When I went into the ranch, Mr. Joaquin Guzman Loera greeted me very friendly -- in a very friendly manner, sorry. And he called up a person who was identified as Arturo Beltran Leyva.

Q Was this the first time you had met Arturo Beltran Leyva?
A Yes.
Q I'm going to show you what's in evidence as Government's Exhibit 4. Who is this?
A Mr. Arturo Beltran Leyva.
Q What was discussed at this meeting?
A Mr. Joaquin Guzman Loera told me from then on, all the shipments I made to him was going to have a person receiving it in charge and that was going to be Mr. Arturo Beltran Leyva.
Q Was anyone carrying a firearm during this meeting?
A Most of them had guns.
Q Who, in particular?
A Mr. Joaquin Guzman Loera had a gun. Mr. Arturo Beltran Leyva had a gun.
Q On the occasions when you met with the defendant, was he armed?
A Always.
Q What firearms did you see him carry?
A Most of the time, he had a pistol. Maybe sometimes he was carrying an AK-47 rifle.
Q Can you describe the AK-47 rifle you saw him with?
A On one occasion, I saw an AK-47 that was gold plated.

THE INTERPRETER: The interpreter wants to make a correction. The interpreter said "pistol." The Interpreter

should have said "handgun."

Q Okay. So the AK-47, you said it was gold plated?

A Once I saw him with that rifle.

Q Did it have any other features?

A Some precious stones encrusted in it.

Q What did you do as a result of your meeting with the defendant and Arturo Beltran Leyva in 2003?

A I stayed in contact with Mr. Arturo Beltran Leyva and I went to speak to him, meet with him and to, and inspect the equipment he had to be able to receive the cocaine at high seas.

Q What type of equipment are you referring to?

A Go fast.

Q Now, you testified that there were about three to four cocaine shipments in 2003. Approximately how large was each shipment?

A These shipments were somewhat larger now. It started at 3,600 kilos to 5,000 kilos.

Q Were all of those shipments successfully delivered to Mexico?

A Yes.

Q And where were you primarily located in Mexico during this period?

A Between Mexico City and Guadalajara.

Q I'm going to show you what's in evidence as Government

Exhibit 502. Using Government's Exhibit 502, can you just indicate to the jury where Guadalajara is located?

A (Witness complies.)

Guadalajara is in the state of Jalisco.

MS. PARLOVECCHIO: And for the record, the witness has circled in the bottom center of Government's Exhibit 502.

Q What was the price per kilogram of cocaine in Guadalajara in 2003?

A Between 8,500 and $8,800.

Q And you testified that you did approximately three to four shipments of cocaine up to 6,000 kilograms for the Sinaloa Cartel in the year 2003.

A Yes.

Q What was the value of the cocaine shipped that year at the Guadalajara price?

A Well, it was approximately 10 to 12 tons so it could be, I don't know, maybe 80 million, $90 million.

Q And what currency is that price in?

A U.S. dollars.

Q Now, around this time in 2003, did you become aware of who Sergio Ramirez and Laureano Renteria's boss was?

A It was always Juan Carlos Ramirez.

Q And so by extension was he also your boss?

A Yes.

Q Did you have an understanding whether the Sinaloa Cartel

dealers you dealt with knew that Juan Carlos Ramirez was your boss?

A We never spoke about it directly but I suppose they did.

Q How did you have that supposition?

A Because Sergio Ramirez had worked with all these people while being an employee of Juan Carlos Ramirez.

Q Did you learn some of the ways in which the defendant moved cocaine to the U.S. generally?

A No.

Q Did you have conversations with Sergio Ramirez and Juan Carlos Ramirez about how the defendant moved cocaine to the United States?

A During the time they worked with him, yes.

Q What did they tell you?

A That he did it by using tunnels and also by packing, packing it in chili cans.

Q You testified earlier that you met with a worker of the defendant named Alfredo Vazquez.

Showing you Government's Exhibit 197-A, who is that?

A Mr. Alfredo Vazquez.

Q What, if anything, did Alfredo Vazquez tell you about his smuggling route to the United States?

THE COURT: This is in evidence, isn't it?

MS. PARLOVECCHIO: It is in evidence, yes.

A He told me that he had made a lot of money by

transporting cocaine in the United States by using trains.

Q Now, when you say that you are sending a shipment to a particular leader of the Sinaloa Cartel, did you have an understanding about whether other leaders of the cartel were investors in those shipments as well?

A Each person had a group. So, for example, Mr. Arturo would tell me that every time he carried out a cocaine project, that he would always include, aside from including his brothers, he would always include Mr. Joaquin Guzman Loera and Mr. Ignacio Coronel --

THE INTERPRETER: Interpreter's correction: "Mayo Zambada."

Q And were you aware of the defendant's relationship with Mayo Zambada at this time?

A On several occasions, Mr. Joaquin Guzman Loera, he mentioned to me that he was his partner.

Q He -- Joaquin Guzman Loera was partners with who?

A Mr. Mayo Zambada.

Q Did Arturo Beltran Leyva ever comment to you on the defendant's relationship with Mayo Zambada?

A Yes. Yes. He used to tell me that the two of them together were very strong.

Q Do you know whether the defendant and Mayo Zambada invested in cocaine shipments together?

A Mr. Joaquin Guzman Loera mentioned that to me on two

occasions.

Q When the defendant did cocaine shipments with you, did he partner with other traffickers in investing in the shipments or did he invest in those shipments by himself?

A As I mentioned to you before, on some occasions, he mentioned to me that his partner was Mr. Mayo Zambada.

Q Mr. Rosero, are you aware of the term "*plaza*"?

A Yes.

Q What does that mean in drug trafficking?

A "*Plaza*" is a given place in which there is a person in charge of doing all arrangements and handles the business in that place.

Q During your course of dealing with the Sinaloa Cartel, did you learn whether the leaders of the Sinaloa Cartel had control over their own *plazas*?

A Yes.

Q Are you aware of whether leaders of the Sinaloa Cartel ever shared *plazas*?

A Yes.

Q How do you know about this?

A Well, there came a time when we spoke -- for example, I spoke to Arturo Beltran and he told me that he managed really well his *plaza* which was Acapulco and that if anyone, any other person wanted to use Acapulco to bring in drugs or to even visit Acapulco, those who arrived or were going to use

the place, they would tell him their intentions.

Q What about Nacho Coronel, did he discuss sharing *plazas* with you?

A Well, Mr. Ignacio Coronel was very zealous, very possessive of all his actions, but obviously his *plaza* was in Guadalajara.

Q What did you see during the course of your dealing with the Sinaloa Cartel that indicated whether Nacho Coronel shared the Guadalajara *plaza* with other leaders of the Sinaloa Cartel?

A Well, because he, he was in Guadalajara, he worked in Guadalajara, but there were also people there who belonged to Arturo Beltran.

Q Did you continue to organize shipments of cocaine from Colombia to Mexico with the Sinaloa Cartel after 2003?

A Yes.

Q Over what period of time did you do shipments with the Sinaloa Cartel after 2003?

A In 2004, 2005 and 2006, up until December.

Q Between 2004 and 2006, what was the approximate range of the size of the cocaine shipments that you were doing with the Sinaloa Cartel?

A In 2004, there were very big shipments, up to 12,500 kilos. In 2005, we made very small shipment, only one perhaps, of 1,500 kilos. And in 2006, a big shipment of

5,000 kilos was made.

Q What accounted for the increase in the size of these cocaine shipments in 2004?

A In 2004, the success that we, that we've had with the previous shipments. The more successful you are with the shipments, people want to invest more and increase the number of kilos.

Q What were the cocaine shipments to Mexico that you negotiated in 2004 with the Sinaloa Cartel?

A In 2004, we started with a shipment of 8,000 kilos that was sent to Mr. Joaquin Guzman Loera. Then we sent 10,000 kilos to Mr. Ignacio Coronel. Then we made two shipments in a row, one for 12,500 kilos that was sent to Joaquin, Mr. Joaquin Guzman Loera and Mr. Arturo Beltran Leyvas, and then one of 10,000 kilos that was sent to Mr. Ignacio Coronel and then, finally, a shipment that we started in December of '04 and we finished by January of '05 that was going to Mr. Joaquin Guzman Loera.

Q So let's first talk about the 8,000 kilogram shipment. Who were the direct investors for that shipment?

A It was Mr. Joaquin Guzman Loera.

Q And how did you know that he was invested in the shipment?

A I went to speak to him directly and we agreed that a boat from Colombia with that quantity was going to be sent to him.

Q When did that shipment occur?

A That shipment left Colombia, left the Colombian beaches in February of '04.

Q What happened to the shipment?

A As the boat was going up with 8,000 kilos, it was boarded by the U.S. Navy. The Navy retained the ship for approximately 17 hours looking for the place where the cocaine was or whether the ship, in fact, had cocaine and they never found anything, they let the boat go.

In Colombia, they decided that the ship could not continue going up, that it had to go back. While the ship was going down to Colombia, I was given instructions to speak to Mr. Joaquin Guzman Loera and to tell him that the Mexicans could no longer use go-fast boats for that shipment, but rather, that they needed, that they had to use a fishing boat, a tuna fishing boat.

Q Who gave you the instructions about using a tuna fishing boat?

A Laureano Renteria.

Q Did Laureano Renteria tell you why they wanted you to use a tuna fishing both rather than a go-fast?

A Because the boat to which the drugs were going to be transferred in Colombia was not going to follow the conventional route in the Pacific Ocean but, rather, was going to take a great distance from the Mexican coast -- oh, it was

going to go to the high seas, very fast, from the Colombian coast. So, by doing that, once they did this, the only way that a Mexican boat could be that far from the coast, the vessel needed to be a tuna fishing boat because a distinction of tuna fishing boats is that they go long distances and they take a great distance from the continent.

(Continued on next page.)

THE COURT: Ms. Parlovecchio, at a convenient time.

MS. PARLOVECCHIO: This is fine, Your Honor.

THE COURT: Are you sure?

MS. PARLOVECCHIO: Yes.

THE COURT: We will take our morning break, ladies and gentlemen. Do not talk about the case.

See you back here at 11:30.

(Jury exits.)

THE COURT: Okay. 15 minutes.

(Recess taken.)

(In open court; jury not present.)

THE COURT: Let's have the jury, please.

(Jury enters.)

THE COURT: Everyone may be seated.

Please continue.

MS. PARLOVECCHIO: Thank you, Your Honor.

(Continued on next page.)

BY MS. PARLOVECCHIO:

Q Mr. Rosero, before the break, you testified that Laureano Renteria instructed you to tell the Sinaloa Cartel that they need to use a tuna boat for this shipment.

A True.

Q What did you do after Laureano Renteria told you to use a tuna boat?

A Since it wasn't the usual equipment that we had used up to that point, I then asked for an appointment with Joaquin Guzman Loera to let him know the need that we had to get a tuna boat.

Q And did you have an appointment with the defendant to discuss this?

A Yes.

Q What did you discuss with him?

A I explained the situation why and that he had to get a tuna boat so that we could finalize the project.

Q What, if any, instructions did the defendant give you at that time?

A Yes. He told me to go to the city of Culiacan, that there would be a meeting there and Mr. Alfredo Beltran Leyva would be present, Mr. Conejo would be there and another man I didn't know who was Mr. Julio Beltran.

Q Who is Julio Beltran?

A From what Mr. Joaquin Guzman had told me and what I was

also able to see during the meeting, he was also very strong person in the organization.

Q What function did he serve in the organization based on what the defendant told you and what you were able to observe?

A Well, no, he was a person who worked on his own within the organization but he received and he also did his own business deals, but he obviously was a member of the group.

Q And you mentioned that you were instructed to go to a meeting with Conejo, Alfredo Beltran and Julio Beltran. Did you, in fact, attend that meeting?

A Yes, of course.

Q What happened at this meeting?

A At the meeting -- well, first of all, the normal introductions among all of us there, and Julio gave me some instructions that I had to communicate to Colombia and he accepted that once I had the coordinates for the location where the Colombians were going to send their boat, then he would send their tuna boat there.

Q Did Julio Beltran receive this 8,000 kilogram shipment from the defendant?

A Yes.

Q Approximately when did this happen?

A That was about a week to ten days prior to Holy Week in 2004.

Q And how do you remember it was Holy Week?

A Because of what happened after Mr. Julio received the product, I remember perfectly well that that was when it happened.

Q What happened after?

A Mr. Julio Beltran received a product and then he went on to go to Mexican territory, but the normal way that the Mexicans proceeded when they were entering cocaine into Mexican territory was that they had to advise of the location and the exact time of entry and how many kilos were entering.

Q Did Julio Beltran follow this normal procedure with this 8,000 kilo shipment?

A No.

Q Did you speak to the defendant about this problem?

A Yes.

Q Where did this meeting with the defendant take place?

A In the mountains.

Q Can you describe what happened when you arrived at the location in the mountains?

A When I got to the location in the mountains with Mr. Joaquin Guzman Loera to let him know how unhappy I was about the fact that I had not been advised about these details, when we landed on, in the airplane, there was another airplane on the airstrip. When I got out of the airplane, I ran into Mr. Alfredo Beltran who told me: Licenciado, don't worry, all the product made it successfully.

In any case, I still went to speak to Mr. Joaquin Guzman. I explained to him how unhappy I was about what had happened and in any case, we Colombians were not in a position to take any, attempt to justify a loss of product. He knew the Leyvas, that they had not done something that was very important. In a very polite way, he agreed and he told me to go away and not worry, that all the product that belonged to the Colombians was going to be delivered.

Q The defendant told you not to worry and that all the product would be delivered?

A Yes.

Q Were any of the kilograms in this 8,000 kilogram shipment lost?

A Yes. Once Holy Week had passed, Mr. Julio Beltran got in touch with me and asked me to come see him in Mazatlan and he told me that 4,000 kilos were lost.

Q What did Julio Beltran do as a result of the lost 4,000 kilograms of cocaine?

A He paid it with the kilos that belonged to him. That's how he paid the fee that they had to pay the Colombians.

Q How, if at all, did this lost shipment affect Julio Beltran's relationship with the defendant?

A Well, Mr. Joaquin Guzman Loera told me that what Julio had done was really bad and he was really upset at the situation.

Q What, if anything, did the defendant say to you about working with Julio Beltran at that point?

A I told him that Mr. Julio Beltran had told me that we should work together and the defendant told me that for now, I should not work with him.

Q At this time in 2004, was Alvaro Palau still working in Mexico?

A Yes, of course.

Q Who did he work with principally?

A With Conejo and they worked with Mr. Arturo Beltran.

Q And to show you what's in evidence as Government Exhibit 67, who is this?

A That's Mr. Conejo.

Q And just to be clear, who did Conejo do cocaine shipments for in the Sinaloa Cartel around this time?

A For Mr. Arturo Beltran.

Q Now, you testified earlier, you testified earlier that there were three more shipments of cocaine in 2004. Were you aware of whether members of your organization in your Colombia had a code name for these shipments?

A Yes.

Q How do you know about that?

A When I would go and speak to them, the shipments had names on their ledgers.

(Continued on next page.)

EXAMINATION CONTINUES

BY MS. PARLOVECCHIO:

Q What was the code name they used to refer to these shipments in their ledgers?

A Juanita.

Q Now, which leader in the Sinaloa Cartel was going to receive the next cocaine shipment in 2004 after the 8,000 kilogram shipment?

A Mr. Ignacio Coronel.

Q How much was this next cocaine shipment?

A 10,000 kilos.

Q When was that shipment planned to arrive in Mexico?

A That shipment arrived maybe ten to 15 days after the problem I had had with Mr. Julio Beltran.

Q So in the spring of 2004, is that fair to say?

A Yes.

Q Did that shipment successfully reach Mexico?

A Yes.

Q What were the next two cocaine shipments in 2004 after that?

A Laureano Renteria called me, he told me or asked me if we could do two large shipments together, and we planned a shipment of 12,500 kilos and another one of 10,000 kilos together.

Q Who was supposed to receive the 12,500 kilos?

A Arturo Beltran was going to receive the 12,500 kilos.

Q Did you learn who invested in this 12,500-kilogram shipment?

A Joaquin Guzmán Loera and Arturo Beltran invested.

Q How did you know who invested in that shipment?

A Because I spoke to both of them -- obviously separately, but I met with both of them to speak to them about the intention of sending this large shipment.

Q When was the 12,500-kilogram shipment planned to arrive in Mexico?

A The 12,500-kilo shipment was supposed to arrive around September 15th.

Q Of 2004?

A Yes, 2004.

Q How do you remember that it was September 15th, 2004, in particular?

A Because I had to travel to the city of Acapulco to be closer to Mr. Arturo Beltran and I remember perfectly well because September 15th is a holiday. It's Independence Day in Mexico, and obviously, the beaches were packed with people and the trip from Mexico City to Acapulco was very long.

Q Why was it long?

A Because there were many cars out on the road. It took me eight hours in what normally would take me three and a half hours.

Q What types of vessels were used to send the cocaine to Mexico for this large shipment?
A Fishing boats, same thing.
Q What happened to the defendant and Arturo Beltran-Leyva's shipment?
A At a certain point, the shipment lost communication with Colombia. It didn't arrive to the meeting point where Arturo's people were, and we later found out that the shipment -- interpreter correction -- that the load had been seized.
Q And just to be clear, this is the 12,500-kilo shipment?
A Yes.
Q What happened after you realized this 12,500-kilo shipment had been lost?
A I went to Joaquin Guzmán Loera and I told him it was lost.
Q What happened to -- and what was his reaction?
A He told me we had to keep moving forward, that we had to keep working.
Q Now, you testified that there was also a 10,000 kilo shipment that was sent out close in time to that 12,500-kilo shipment. What happened with that shipment?
A It was also lost.
Q And now I am going to direct your attention to late 2004 into early 2005.

Did you do any cocaine shipments with the defendant at that time?

A Yes. When those two large loads were lost, the Colombians decided not to continue on, but Laureano had some -- interpreter -- Laureano had some merchandise left over from the shipments, the large shipments, and he said it was 3,000 kilos and that I could send them by boat and that I should send them to Mr. Joaquin Guzmán Loera.

Q Did you have any discussions with the defendant about this shipment?

A Yes.

Q What did you discuss?

A About the 3,000-kilo shipment.

Q Approximately when was this scheduled to go out from Colombia?

A It would be shipped out end of December and it would arrive in the beginning of January.

Q And just to be clear, how large was this shipment?

A Three thousand kilos.

Q Who was supposed to receive this 3,000-kilo shipment?

A Arturo Beltran-Leyva.

Q How did you know that he was going to receive it?

A That was Joaquin Guzmán Loera's instructions. He said he was to receive it all, and I also had spoken in person -- I had also personally spoken with Arturo Beltran-Leyva.

Q How was this particular cocaine shipment going to get from Colombia to Mexico?

A In a fishing boat.

Q What happened to the shipment?

A It was also lost.

Q Who told you it was lost?

A Laureano Renteria.

Q Did you inform the defendant about this loss?

A Yes.

Q What was the defendant's reaction when he learned about the loss of the 3,000 kilos?

A That we needed to continue working to recover ourselves.

Q What do you mean by "recover ourselves"?

A To send kilos of cocaine from Colombia to Mexico in a successful manner to recover the money that had been lost.

Q During this time in 2004, did the defendant ever express an interest in your personal life?

A Yes.

Q Can you please explain the circumstances?

A One of my children had been born and he asked me to be his Godfather.

Q How did you respond to that?

A I said yes.

Q Why did you say yes?

A He was always a person who showed a lot of respect for

me, and within the organization, it was an honor to have him as a Godfather.

Q Mr. Rosero, who is Vicente Carrillo?

A I never met him, but he was Amado Carrillo-Fuentes' brother.

Q Are you aware of the relationship that the defendant had with Vicente Carrillo around this time, in late 2004 into 2005?

A Well, at first they were very good friends.

Q Did that change?

A Yes, Mr. Ignacio Coronel mentioned to me that a problem had come up between them due to one of Vicente Carrillo's brothers.

Q What was the problem?

A He mentioned to me that Vicente Carrillo's brother had taken a very aggressive and very offensive position towards Mr. Joaquin Guzmán.

Q Did anything happen as a result?

A Mr. Ignacio Coronel mentioned to me that Vicente Carrillo's brother had ended up dead, and unfortunately, also Mr. Joaquin Guzmán Loera's brother had died.

THE INTERPRETER: Interpreter's correction, Mr. Joaquin Guzmán Loera's son had also died.

BY MS. PARLOVECCHIO:

Q I am now going to direct your attention to 2006.

Did you arrange any cocaine shipments with members of the Sinaloa Cartel that year?

A Yes.

Q What type of shipment was it?

A We started to put together a shipment of 5,000 kilos using a semi-submersible.

Q When you say "we," who are you referring to?

A Mr. Jorge Mira sent me very clear instructions for me to speak to someone, whom I had never seen before. With whom -- well, I eventually met the gentleman and we began to have the first approaches about this shipment.

Q What was your understanding of who this gentleman was?

A At first I knew nothing about him, but then Mr. Arturo Beltran told me that the person I had been speaking with was the son of a certain El Azul.

Q Who is El Azul?

A I don't know the gentleman in person, but I had references. I had heard from both Colombia and from Mr. Ignacio Coronel that he was a very important person within the organization.

Q Turning back to the submarine shipment, what was your involvement in the shipment?

A Well, I organized it with the gentleman I mentioned already, with supposedly El Azul's son; the place, a place of sailing, place of arrival, the time of arrival, the quantity,

the quantity in which they were going to invest, all the details.

Q Where was the submarine received?

A In Chiapas.

Q Who received it in Chiapas?

A Mr. Marquitos.

Q Did you know who Marquitos was working for principally at this time?

A When I was together with them, I could -- I was able to realize that the gentleman worked directly, that his boss was Mr. Mayo Zambada.

Q You mentioned that when you were "together with them." Who were you referring to?

A I referred to -- well, I personally went to Chiapas and I got together with Mr. Marquitos and his assistants.

Q Was any of the cocaine from this semi-submersible shipment sold to any leaders of the Sinaloa Cartel?

A Yes. When it was decided that that product had to go to Culiacán, and had to be sold in Culiacán, 200 kilos out of that product, I got in touch with Licenciado to tell him, to ask him whether Mr. Joaquin Guzmán Loera might want to purchase them at a way lower price than the price in Culiacán.

Q Did Licenciado accept your offer?

A Yes, he did. And he sent -- Mr. Joaquin Guzmán Loera sent his thanks and, you know, it was a token of appreciation

for Mr. Joaquin Guzmán Loera.

Q I am showing you Government's Exhibit 11-A.

MS. PARLOVECCHIO: It's in evidence.

(Exhibit published.)

BY MS. PARLOVECCHIO:

Q Is this the person you referred to as Licenciado?

A Yes.

Q I now want to direct your attention to 2007.

Did you become aware of any conflicts the Sinaloa Cartel was involved in at that time?

A Yes. Mr. Ignacio Coronel called me to tell me that a war had broken out between Joaquin Guzmán Loera against Mr. Arturo Beltran.

Q Did you do any other cocaine shipments to Mexico after the conflict between the Sinaloa Cartel -- I'm sorry, Joaquin Guzmán Loera became involved in a conflict with Arturo Beltran-Leyva?

A Never again.

Q And just taking a step back, when Nacho Coronel informed you that there had been a conflict between Joaquin Guzmán Loera and Arturo Beltran-Leyva, did Ignacio Coronel tell you what side he was aligned with?

A Obviously, Mr. Ignacio Coronel took the side of Joaquin Guzmán Loera against Arturo Beltran-Leyva.

Q Now, you testified that you never did cocaine shipments

with the cartel again after that.

Why not?

A Well, first of all, Mr. Juan Carlos Ramirez had left the country. Mr. Laureano Renteria had been arrested and then later he had been killed. Sergio Ramirez also left the country and he no longer wanted to continue working. And I, frankly, did not want to work anymore because I did not want to be in the middle of a war.

Q What war?

A The war between the Beltran-Leyvas and Joaquin Guzmán and Mr. Ignacio Coronel.

Q When was the last time you saw the defendant?

A It was, perhaps, when the shipment of the 3,000 kilos got lost, when I went up to let him know. Perhaps it was then.

Q And why didn't you see the defendant after that?

A Well, the circumstances by then had changed. It was very complicated for me to move to Culiacán, to go where Mr. Joaquin Guzmán was, and I also had changed my place of residence from Guadalajara. I left Guadalajara, I tried to be like in hiding. I went into hiding.

Q Were you doing business with the defendant anymore at that point?

A When I saw him last, yes.

Q And after 2007, did you do business with him anymore?

A No, never again.

MS. PARLOVECCHIO: Can I have one moment, Your Honor?

THE COURT: Yes.

MS. PARLOVECCHIO: No further questions, Your Honor.

THE COURT: Mr. Balarezo, what's your preference? Do you want to start now?

MR. BALAREZO: We could go after lunch.

THE COURT: Okay, let's take our lunch break, ladies and gentlemen. We'll come back here at 1:05. Please remember not to talk about the case amongst yourselves.

See you at 1:05.

(Jury exits.)

THE COURT: Lunch recess.

(Lunch recess taken.)

A F T E R N O O N S E S S I O N

(In open court.)

(The Hon. Brian M. Cogan, presiding.)

(Defendant present.)

(The following occurs outside the presence of the jury.)

THE COURT: I understand what is happening. The witness had a personal problem and so we are calling a new witness, right?

MS. PARLOVECCHIO: Yes, Your Honor.

THE COURT: And reserving cross-examination.

MS. PARLOVECCHIO: Thank you.

THE COURT: Bring them in, please.

(Jury enters.)

THE COURT: Ladies and gentlemen, the witness that we had on the stand had a personal emergency that he had to attend to. So we are going to put off his cross-examination until he takes care of that and the Government will call its next witness, but we will hear from that witness for cross-examination.

MS. PARLOVECCHIO: Just a slight clarification, if I may.

(Pause in proceedings.)

THE COURT: What I just told you, ladies and gentlemen, was wrong. The reason that we are not hearing cross-examination on the prior witness is because this witness

from whom you are about to hear has something he needs to take care of. So we are going to do his direct examination. When that is done he will leave and we will have the other witness come back and this witness will come back for his cross-examination.

MR. ROBOTTI: This witness will be crossed as well. We are just going to take him out of order.

MR. LICHTMAN: It's very possible that we can do the cross quickly as well.

THE COURT: Okay. In any event, we are proceeding with a new witness.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Noel Moloney M-O-L-O-N-E-Y.

(Continued on the following page.)

**NOEL MOLONEY**,

called by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROBOTTI:

Q Good afternoon. How are you?

A Very well, sir.

Q Are you employed?

A Yes, sir.

Q Where are you employed?

A With U.S. Customs and Border Protection.

Q Is that also known as CBP?

A Yes.

Q How long have you worked with CBP?

A 15 years and a few months.

Q What's your position there?

A I'm a supervisor for a U.S. Customs and Border Protection at the Port of Newark.

Q What are your current duties and responsibilities?

A Currently I'm supervising a team of cargo inspection officers. I supervise them to a daily basis as well as cargo examinations.

Q And what did you do before working at CBP?

A Prior to my employment with the federal government, I was

a New York City detective.

Q Now, in the course of your work at CBP, have you become familiar with VACIS, V-A-C-I-S?

A Yes, sir.

Q And what does VACIS stand for?

A It's a vehicle and cargo inspection system.

Q And what does the VACIS system do?

A Put in a nutshell, the VACIS system is designed to inspect conveyances; trains, boats, tractor trailers, any type of self-propelled motor vehicle. It also looks at cargo so you get a better idea as to what's inside the container that the cargo is in.

Q Where are VACIS images typically captured?

A The port of entries. It could be a seaport, it could be a land border or it could be an airport.

Q When those images are captured, where are they stored?

A On a CBP database.

Q In connection with your work at CBP, have you been trained on the VACIS system?

A Yes, sir.

Q Can you describe that training?

A The training is the ability to utilize the system, to be able to take a look at the images, to differentiate what could be anomalies which could be areas of interest within that cargo that we may want to take a look at just to make sure the

cargo on the manifest is, in fact, what we're looking at on the image.

Q During approximately what years has the CBP used the VACIS system?

A It was introduced in about 1997 and is currently still used today.

Q And you mentioned the VACIS system produces images of these containers and conveyances; is that right?

A That's correct, sir.

Q Where are those images stored?

A On a CBP database.

Q Could you generally describe the database?

A Basically the images that are stored in there are whatever is captured by the machine. It's basically placed on that and then it's taken a look at -- we take a look to determine whether or not the images are, in fact, as I stated before, the commodity that's with inside the boxes or the conveyances.

Q During the course of your work, have you become familiar with VACIS images?

A Yes, sir.

Q I would like to show you what's been marked for identification as Government Exhibit 216-36 to Government Exhibit 216-41. These will appear on the screen right next to you. Do you recognize these?

A Yes, sir. This is the copy of what we would receive after we take the image.

Q And how do you recognize these images?

A Basically that the way that it's depicted on here, but it also has the information on the right-hand side which would indicate the amount of images starting with the dates. It also has the picture in the top left-hand corner which is the actual conveyance that we're looking at. And then below that there's two pictures of the actual railcar or the commodity in any case that we would be looking at to make a determination as to whether we want to further inspect that.

Q To make clear, you recognize all of these as VACIS images?

A Yes, sir.

Q Are these VACIS images kept in the ordinary course of CBP's activities?

A Yes, sir.

Q Were these images captured in the database at the time of inspection?

A Yes, they are.

Q Are VACIS inspections a regular practice of CBP?

A Yes, sir.

MR. ROBOTTI: Your Honor, the Government offers Government Exhibits 216-36 to 216-41 into evidence.

MR. LICHTMAN: No objection.

THE COURT: Received.

(Government Exhibits 216-36 to 216-41 received in evidence.)

(Exhibit published.)

BY MR. ROBOTTI:

Q So, first, I would like to look at Government Exhibit 216-41. And could you just walk the jury through what we see in this image?

A Yes, if you're looking at the top left-hand corner, you will notice that there's a picture of what looks like a gigantic cylindrical unit. Basically that's a railcar and those railcars are typically used for some sort of chemicals.

Q The top left corner here?

A Correct, yes.

Q Looking at this picture on the right here what do we see here?

A The picture to the right would be the image of the car that's before or after, depending on how the system is set up so that would be either the next image that you're going to look at or the previous image that came through the VACIS.

Q And looking at the second row of images here, what's this?

A What you're looking at in the first long tubular shape is the actual railcar that's the machine that we used. It takes a look for a better turn to X-ray that to see what's inside of

it.

Q And the final row of image here, the last image, what do we see?

A That's the same image that you're looking at. It just has a different palate to it. You're looking at it in a different way. Nothing is changed. It's the same item just looking at it with a different shine of light on it.

Q Are you able to see the date on which this image was taken here?

A Yes, sir. It's 2/13.

Q And what year?

A This one -- 2003. I'm sorry, it's vague.

Q Could you circle where that is on the image for the jury?

A (Witness complies.)

Q So looking at this particular image in Government Exhibit 216-41, are there any anomalies here?

A Not in this one, sir, no.

Q I'd like to show you what's Government Exhibit 215-5 which is in evidence already.

(Exhibit published.)

Q And just as a point of reference, are these the type of tanker cars that we're looking at in these images?

A Yes, sir.

Q Now I'd like to look at Government Exhibit 216-36 by comparison here.

(Exhibit published.)

Q And what's this?

A This is also a VACIS image of a tanker.

Q And what do we see in the top left corner here?

A You see the image as it appears to the officer working it, which would be the tanker car coming into view before it's X-rayed.

Q Okay. And below that image what's this?

A That is the actual X-ray image of the tanker.

Q And do we see the date of the image here?

A Yes, sir. It's 2002.

Q And what day?

A I'm sorry, 12/30.

Q And could we circle that for the jury there?

A Yes, sure.

Q And do we see the tanker car number here?

A Yes. It's G as in George, A as in Adam, T as in Thomas and X as in X-ray, 124006.

Q And do you see any anomalies in this image?

A Compared to the previous image, yes, sir.

Q Could you identify for us where you see those anomalies?

A In this particular one -- shall I circle it?

Q Yes. That would be great.

A In this particular one in the nose cap area on both ends of this particular tanker it's a very, very dark area and that

would become an area of interest that would be inspected further in the secondary situation.

Q And I would just like to show you two other images here. Government Exhibit 216-39. This is in evidence.

(Exhibit published.)

Q Okay. What's this?

A This is also another railcar, a tanker car, sir.

Q And this image appears to be shorter than the others. Do you know why that is?

A Yes. What the system does is normally there's a space between the cars. When I say "cars" I mean the railcars. And what the system is designed to do is within that space it should capture that complete image and then elongate it. And some sensors, depending on the speed of the train coming through, it can capture it really quickly and shorten the image, but the whole image is still there.

Q This is still an image of the same style tanker car we looked at in 215-5?

A That's correct, sir.

Q And despite this image being shortened, are you able to detect anomalies here?

A Yes, sir. This is also something I would send in for a secondary inspection. May I circle it?

Q Yes, that would be great.

A So similar to the first one that we had seen that was

longer, this here would also have the end caps which are very dark and if you're looking at lots of these throughout the day, you will notice that it should be able to go through and you won't see anything in the ends of it that are very, very dark. So that would be something that I would send in for a further inspection.

Q And looking finally at Government Exhibit 216-40, what's this?

A This is also a railcar.

Q And this one appears to have a white line running through it. Do you know why that is?

A That's probably something to do with the printer, I would imagine.

Q Are you able to see anomalies here?

A Yes. Shall I circle it?

Q Yes, please.

A Similar to the one previous to this, again the dark shaded area in both of these cap areas here would be an area of interest of which I would send in for a further examination.

Q And do you know whether any of these tanker cars in Government Exhibit 216-36 to 216-41 were, in fact, sent in for secondary inspection?

A I don't know that, sir.

MR. ROBOTTI: Thank you very much.

THE COURT: Are we doing cross?

MR. LICHTMAN: Just one from here, Judge.

THE COURT:

CROSS-EXAMINATION

BY MR. LICHTMAN:

Q Officer, this VACIS system, it's basically an X-ray of sorts?

A For layman's terms it's an X-ray. It doesn't do an X-ray as a normal X-ray would be done or normal X-rays are generated. This is done in a similar fashion.

Q But it shows the inside which you can't see from the outside?

A That's correct, sir.

Q It doesn't show every detail, but it shows heft or bulk?

A I'm sorry?

Q It shows the bulk, something that's inside of the tanker?

A An anomaly. That's referred to as an anomaly. If it doesn't look like it's supposed to be there after looking at numerous ones similar to this, if it looks different, then that would warrant further inspection.

Q When you say anomaly, that's something that's different from what you would expect within an oil tanker or something that has liquid?

A Correct.

Q And an anomaly is something that's solid as opposed to

liquid?

A More dense would be the proper terminology.

Q And obviously a solid is more dense than a liquid?

A Not really. It depends on what the liquid is, sir. Some liquids are going to give you -- in this particular system, are going to appear more dense than other liquids.

Q But the anomaly is something that is denser than the rest of what's inside the tank?

A That's correct, sir.

Q And that's why you're getting the heavier shading at the front and the back of the cone?

A That's correct.

Q Did you use cone?

A No. It's just the ends look like they're cylindrical.

Q This VACIS system, was it a secret system that was in place?

MR. ROBOTTI: Objection.

THE COURT: Sustained.

BY MR. LICHTMAN:

Q Was it openly used?

MR. ROBOTTI: Objection.

THE COURT: Sustained.

BY MR. LICHTMAN:

Q Was there ever any publication or public announcement that the VACIS system was being used by your office?

MR. ROBOTTI: Objection.

THE COURT: Overruled.

A I don't believe so, sir.

Q But this wasn't something that only you knew about, was it?

MR. ROBOTTI: Objection.

THE COURT: Overruled. I see where he's going.

A No.

Q So this wasn't secret?

MR. ROBOTTI: Objection.

THE COURT: Sustained.

MR. LICHTMAN: No other questions. I figured I would try it a different way.

THE COURT: Any redirect?

MR. ROBOTTI: No, Your Honor.

THE COURT: You may step down. Thank you.

THE WITNESS: Thank you for taking consideration for my emergency this afternoon. Thank you, folks. Have a good day.

(Witness excused.)

THE COURT: So I take it we're going to have the prior witness back for cross-examination?

MS. PARLOVECCHIO: Yes, Your Honor.

THE COURT: Let's do that.

For example, Mr. Lichtman, liquid mercury is much

more dense than most solids.

MR. LICHTMAN: I'm going to order the transcript just for that answer. THE COURT: Cross-examination.

MR. BALAREZO: Thank you, Your Honor.

(Continued on the following page.)

**GERMAN ROSERO**,

called as a witness, having been previously duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. BALAREZO:

Q Good afternoon Mr. Rosero. How are you?

A Good afternoon. Very well, thank you.

Q Mr. Rosero, I want to start off a little bit with your background. I think on direct examination you testified that you were born Ipiales Narino, Colombia?

A Yes.

Q And that's a relatively small city on the border with Ecuador; is that right?

A Yes.

Q Now, you came -- I think it's obvious, you came from a nice, middle-class family in Colombia?

A Yes.

Q Did you have any opportunities as a youth?

A I had the opportunity to go to university.

Q Well, before you had the opportunity to go to university you actually had the opportunity to go to a Catholic school; right?

A Yes.

Q And that was in Cali?

A Yes.

Q So it's fair to say that you and your family at that point were not dirt poor; correct?
A No.
Q You weren't -- I don't know, you weren't selling oranges on the streets of Narino or Cali?
A No.
Q You weren't harvesting cocoa leaves on the hillsides of Colombia?
A No.
Q You weren't harvesting poppy or marijuana; right?
A No.
Q In fact, you even had shoes to wear; correct?
A Yes.
Q So you had a nice little youth; correct?
A Yes.
Q So, now, I believe you were born in 1964; is that right?
A Yes.
Q So if Colombia is like the United States, you go to elementary school, high school and you graduated, what, around 1982 from high school?
A Yes.
Q And then you went into the Army for a couple of years?
A One year.
Q So you got out in 1983; is that right?
A Yes.

Q And you started studying law right after that. You went to the Buenaventura, I believe; is that right?
A The University of San Buenaventura.
Q And Colombia is not like the United States; you basically go into university and you study and you come out a lawyer; right?
A So you do five years and then you have an apprenticeship year and then you have to do a thesis.
Q Now I'm just going to ask you, just so we know these names as we go forward, who's Claudia Bedoya, B-E-D-O-Y-A?
A She was a girlfriend of mine when I was in the Army.
Q And then around that time when you were in the Army you were friends with a guy named Sergio Ramirez?
A Yes.
Q And Sergio Ramirez is the Sergio that you've been talking about as kind of the right hand man to Chupeta; correct?
A Yes.
Q And Sergio Ramirez was actually a childhood friend of yours; you knew him from your youth?
A Yes, I know him from that time, from the time I was in the Army.
Q So yesterday you didn't testify here under oath that he was your childhood friend?
A I told them that we had been friends since we were young.
Q Now, after those five years of law school you became a

public defender in Colombia; right?

A Yes.

Q And public defenders in Colombia probably don't make a lot of money do they?

A No.

Q And were you married at the time?

A No.

Q But you were a single lawyer in Colombia not making a lot of money; right?

A Yes.

(Continued on the following page.)

BY MR. BALAREZO: (Continuing)

Q Now, you mentioned that some guy named Cuchilla -- yesterday, I believe you testified under oath that somebody named Cuchilla tried to kill you, is that right?

MS. PARLOVECCHIO: Objection.

THE COURT: One word.

MS. PARLOVECCHIO: Misstates the testimony.

THE COURT: Overruled.

A Yes.

MR. BALAREZO: Can I have this for the witness, please. Defense Exhibit 253.

Q Can you see that picture?

A Yes.

Q Who do you recognize that to be?

A Cuchilla.

Q And Cuchilla's name was actually Juan Carlos Ortiz Escobar, correct?

A Yes.

Q And that Escobar, that's because he was a nephew of Pablo Escobar, right?

A I don't know. I don't think so.

Q But you know he was a drug trafficker, correct?

A Are you referring to --

Q Everybody knows --

A -- Pablo Escobar or Cuchilla?

THE COURT: Wait. You know, you understand.

MR. BALAREZO: I do.

THE COURT: Translate the answer, please.

A Are you referring to Pablo Escobar or to Cuchilla?

MR. BALAREZO: Your Honor, I move into evidence 253.

THE COURT: Any objection?

MS. PARLOVECCHIO: No objection.

THE COURT: Received.

(Defense Exhibit 253 so marked.)

Q Well, I think we all know that Pablo Escobar was a drug trafficker, right?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

Q Did you know that Pablo Escobar was a drug trafficker?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

MR. BALAREZO: Very well, Judge.

Q This guy who's on the screen, Cuchilla, he wanted to kill you, correct?

A Yes.

Q And that's because he took an interest in Claudia?

A No.

Q Well, which of your girlfriends did he take an interest in?

A Ana Agudelo.

Q And Ana Agudelo was a love interest of Cuchilla's, right?
A Yes.
Q And so with you?
A No.
Q Well, then why did Cuchilla want to kill you?
A Because she had been my girlfriend first. When I finished the relationship -- ended the relationship -- interpreter correction -- he started going out with her.
Q Right. So you were no longer dating the young lady, correct?
A Correct.
Q So Cuchilla had, what did he care about you? You weren't in the picture anymore.
A Jealousy.
Q Jealousy? You're sure that's not just a little story you made up?

MS. PARLOVECCHIO: Objection.

THE COURT: Did you object?

MS. PARLOVECCHIO: Yes, I did.

THE COURT: Sustained.

Q Now --

THE COURT: You have to object louder. I didn't hear it.

MS. PARLOVECCHIO: I will. I'm sorry, Your Honor.

THE INTERPRETER: The interpreter did not hear.

MS. PARLOVECCHIO: I will use this mic instead.

Q So when Cuchilla took an interest in trying to kill you, the ex relationship of his current relationship, you decided you had to leave Cali and go to Bogota, is that correct?

A Yes. First, I went to Ipiales.

Q But the reason you left Cali was because you feared for your safety?

A Yes.

Q You were afraid that Cuchilla was going to kill you?

A I didn't know who had ordered to kill me.

Q Let me show this for the witness only. It's Defense Exhibit 248. It's 3500GRA-8, page one.

I'll ask you a question first. I don't want to get ahead, but you've met with the government on many occasions, correct?

A Yes.

Q And back in 2009 when you first approached them, you met with them initially two times, correct? February 19, 2009 and June 29, 2009, is that right?

A Yes.

(Continued on next page.)

Q I'm going to draw your attention --

MS. PARLOVECCHIO: Objection, Your Honor.

THE COURT: Sustained.

Let's have a sidebar, please.

(The following occurred at sidebar.)

MR. BALAREZO: I understand, Your Honor.

THE COURT: You understand?

MR. BALAREZO: Yes.

THE COURT: Move on to something else.

(Sidebar conference ends.)

(Continued on next page.)

BY MR. BALAREZO:

Q Sir, with respect to those meetings, do you recall discussing the situation with Cuchilla with the government?

A I don't understand the question.

Q Two meetings initially with the government.

A Okay.

Q You sat with them, they sat with you?

A Yes.

Q They asked you questions?

A Yes.

Q You talked?

A Yes.

Q Are you following me?

A Yes.

Q Okay. And the question was do you recall during those meetings talking to the government about this issue with Cuchilla?

A Yes.

Q And do you recall during those meetings explaining to them that after you become a public defender in Colombia, that Cuchilla wants to kill you over a girl?

A Yes.

Q So you do remember that now?

A Yes, of course.

Q So that was the same girl that you didn't, that you don't

recall telling the government about a few minutes ago, right?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

Q Well, the reason you went to Cali -- excuse me -- you went to Bogota was because Cuchilla was trying to kill you, right?

A Somebody was trying to kill me. I didn't know who.

Q So did you have a lot of people that were trying to kill you at that time?

A I was a public defender and I didn't know what was going on.

Q So you weren't that good of a lawyer that your clients wanted to kill you?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

Q Now, when you did go to law school, you graduated, you became a public defender and you took an oath as an attorney in Colombia, right?

A Yes.

Q And do you remember what that oath was?

A I don't remember.

Q Do you have any idea what the general theme of that oath was?

A So when the priest at my university, the chancellor of the university is giving me my diploma, they make you swear

loyalty to the laws, loyalty to your profession. That's what I remember.

Q Okay. So you took an oath as an attorney to uphold the law, right?

A Yes.

Q And on top of that, you took the oath to the priest?

A Yes.

Q And notwithstanding that oath, almost immediately after you took it, you started doing criminal activity, correct?

A Not immediately, no.

Q How long did you wait before you became a criminal?

A Maybe around five years.

Q Now, yesterday, I think you testified that your friend from youth said you had studied and became a doctor in Mexico, is that right?

A Yes.

Q And he became a drug trafficker, right?

A Yes.

Q And you did too?

A Yes.

Q Now, I'm going to put on the ELMO Defense Exhibit 228 which is in evidence. You recognize this person, don't you?

A Juan Carlos Ramirez Abadia.

Q Also known as what?

A Chupeta.

Q Now, when you became, began your association with Chupeta, you knew that he was a drug trafficker, right?
A Yes.
Q And when you began working for him, you immediately started committing crimes on behalf of Chupeta, right?
A No.
Q Well, you first started doing real estate work for him, correct?
A Yes.
Q And part of your work was to do contracts, buy/sell agreements, that kind of thing?
A Yes.
Q And do you know what the word *"testaferro"* means?
A Yes.
Q You were a *testaferro* for Chupeta, weren't you?
A No.
Q No? Well, tell the jury what is a *testaferro*.
A *Testaferro* is a person who allows their name to be used to be able to, to be able to have property in front of the law.
Q So the *testaferros* would basically lend their names to buy properties on behalf of Chupeta?
A Yes.
Q So that the law would be able to seize that property?
A Yes.

THE COURT: "Would" or "wouldn't"?

MR. BALAREZO: "Would not."

THE COURT: "Would not"?

MR. BALAREZO: "Be able to seize the properties." Should I repeat it for him?

THE COURT: I think so because the court reporter and I didn't get it.

Q The reason why large drug traffickers like Chupeta use a *testaferro* is because they want to hide their assets from the authorities, right?

MS. PARLOVECCHIO: Objection.

THE COURT: Overruled.

A Yes.

Q All right. Now, as part of your work with Chupeta, you also became aware that paying bribes to government officials is a crime, right?

A Yes.

Q And so is paying bribes to jail officials?

A Yes.

Q And now you also testified yesterday about some, some of Chupeta's guys that got arrested at some point during your work for him. Do you recall that?

A Yes.

Q And your job there was to get them, I think you called it, you wanted to be sure that they had a better quality of

life. Do you remember that?

A For Chupeta, yes.

Q And for the guys, you didn't bribe the guards?

A No.

MR. BALAREZO: Let me just have one second, Your Honor.

THE COURT: Yes.

(Pause.)

Q Now, we'll come back to that in a second, sir, but at some point I believe around 1996, Chupeta turned himself in to the Colombian authorities, do you remember that?

A Yes.

Q And your job there was to assure the better quality of life for Chupeta when he was in prison, right?

A Yes.

Q And, again, that's just a nice way of saying that you bribed prison officials to assure that better quality of life, right?

A Yes.

Q And that included probably bringing in, what, liquor for him?

A I did not have to do that.

Q So you had someone else bribe people for liquor, is that what you're saying?

A In jail, yes.

Q And you didn't bribe any officials for better food for Chupeta?

A Yes, I did that.

Q And I think yesterday you also mentioned that you bribed officials so that he could get "special visits"?

A Yes.

Q All right. And that special visit, that's just a nicer way of saying hookers, right, prostitutes?

A No.

Q What were these special visits?

A At that time, Juan Carlos had two or three permanent partners and special visits referred to them or to people who needed to speak to Juan Carlos for longer times than, than the visits were for.

Q So the three love interests weren't hookers, they were just special visits, right?

MS. PARLOVECCHIO: Objection.

THE COURT: Overruled.

A They were people with whom he had a relationship.

Q Let's move on a little bit to 1997 in particular. In 1997, you testified a lot about yesterday regarding the extradition laws in Colombia.

A Yes.

Q And Chupeta knew that he could possibly be extradited to the United States at that time, right?

A Yes.

Q And he did not want to come to the United States because he knew he had to face justice here?

A Yes.

Q Now, I think you probably had heard, you probably heard a saying by Pablo Escobar: Better a tomb in Colombia than a jail in the United States. Do you remember that?

MS. PARLOVECCHIO: Objection.

Q Have you heard that?

THE COURT: Sustained.

Q So Chupeta didn't want to come to the United States so he had you bribe politicians, correct?

A Yes.

Q And your job was to pay these politicians? In fact, senators in Colombia got $100,000 apiece?

A The senators did, yes.

Q And the representatives, they only got 42,500 in bribes apiece, correct?

A 42,000.

Q And, in fact, your little setup was so good that you rented hotel rooms where the politicians would come and pick up their envelopes of cash, right?

A Yes.

Q Now, how much did you pay out in bribes, do you recall?

A Approximately, I -- I paid approximately between 5 and

$6 million.

Q That's a lot of senators and congressmen?

A Yes.

Q And it was all for the purpose of allowing Chupeta to continue trafficking drugs, correct?

A No.

Q You just wanted to bribe politicians? Had nothing else to do?

A The only purpose of those bribes was that extradition in Colombia would pass the congress with no retroactivity.

Q And the point of no retroactivity was so that Chupeta was not be extradited to the United States?

A Yes.

Q So he could continue trafficking drugs?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

Q Sir, who is Carlos Medina Espinoza?

A That is the name that I used in Mexico.

Q Is that the name you were born with?

A No.

Q That was a fake name you used, right?

A Yes.

Q That was another one of your continuing lies, right?

A I don't understand.

Q That's all right. I don't want to confuse you.

Who is Juan Manuel Organista Munoz?
A That's another fake name that I used in Mexico.
Q Was that fake name one -- was that also a lie that you used?
A That's another fake name that I used in Mexico.
Q And you had a fake Mexican passport?
A Yes.
Q And you had a fake Mexican driver's license?
A Yes.
Q And you had a fake I believe you called it an IFE, I-F-E, card?
A Yes.
Q And that's an identification that's used in Mexico?
A Yes.
Q And that was also a fake?
A Yes.
Q So whenever -- and the reason you used these fake license, passport, two identifications was because you were trying to protect yourself, correct?
A Yes.
Q So when it's time to protect you, you don't have a problem lying, correct?
A I don't understand.
Q Tell me what don't you understand about that question.
MS. PARLOVECCHIO: Objection.

THE COURT: The witness can answer if you can answer. It is hard to tell someone, you know, what you don't know when you don't know.

MR. BALAREZO: I'll withdraw the question. I'll reask it.

Q You just testified that the reason you used a fake ID was in order to protect yourself, right?

A Yes.

Q Same thing with the passports, the license, the IFE card, all those things?

A Yes.

Q You didn't want the authorities to find out who you really were?

A Precisely.

Q You probably didn't want to know -- didn't want the people you were dealing with to know who you were?

A It was the authorities whom I did not want to know exactly.

Q Well, you didn't want the authorities to know because you didn't want to be arrested?

A No.

Q That's not the reason?

A I used those fake documents to be able to move around freely within Mexico because for a Colombian to be on the road, to get on the plane, Colombians have very much, very much surveilled in Mexico. (Continued on next page.)

EXAMINATION CONTINUES

BY MR. BALAREZO:

Q And they're very much surveilled because you have a reputation as a drug trafficker, correct?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

Q Why are they very much surveilled in Mexico?

MS. PARLOVECCHIO: Objection.

THE COURT: No, I will let him answer that.

A Because of the cocaine traffic.

Q Now, let's move on to 1998. You said Chupeta asked you to make what I think you termed as an approach with the DEA.

Do you remember that part?

A Yes.

Q Chupeta wanted to cooperate with the DEA and he wanted you to make the contact, right?

A Yes. Well, not only me, there were other people.

Q Right, but I'm talking to you. So you were one of those people?

A Yes.

Q And the plan was that Chupeta wanted to be able to turn over loads of drugs, and maybe some people, to the DEA to get benefit, correct?

A Yes.

Q And I think that's what you termed as a *falso positivo*?

A I don't recall. I don't remember what I was referring to when I said *falso positivo*.

Q Well, do you know the term *falso positivo*?

A Yes.

Q You said it yesterday?

MS. PARLOVECCHIO: Objection, misstates the testimony.

THE COURT: Sustained.

BY MR. BALAREZO:

Q What is a *falso positivo*?

A A *falso positivo* is when you set up a farce to deliver to DEA something that doesn't really correspond with reality.

Q Well, you wanted to turn over loads to the DEA, correct?

A But they were real.

Q So some real positives you wanted to turn over to the DEA then?

A Juan Carlos Ramirez wanted to turn over real positive to DEA in United States.

Q And one of the real positives that he wanted to turn over, I believe you said it was a load of 3,000 kilos, where 1,000 kilos was going to be turned over to the DEA and the rest would be trafficked and sold and money gained; correct?

A I'll say it again. 2,000 kilos were to be sold in Mexico and the 5,000 -- the 1,000 remaining kilos were to be given over to DEA as a positive.

Q They were to be turned over for credit for Chupeta, that's the whole point, right?
A Yes.
Q Now, 1998 was a big year for you professionally, correct?
A (No response.)
Q Do you remember 1998?
A Yes, of course I do. Yes.
Q That's when you moved on from bribing officials to actually becoming a drug trafficker, right?
A Yes.
Q Now, your buddy Sergio was a drug trafficker, as you said, and so was another boyhood friend of yours, Palau; do you remember him?
A Yes.
Q And they had both been working for Chupeta in Mexico?
A Yes.
Q And you decided to follow in their footsteps and go to Mexico for Chupeta, correct?
A I'm going to respond to that by saying that the intention was to obtain a benefit for Juan, not drug trafficking per se.
Q Not drug trafficking per se.
Well, you were going to help Juan send cocaine to Mexico, right?
A Yes.
Q And 2,000 kilos was going to be sold in Mexico?

A Yes.

Q And Juan, or Chupeta, was going to make money off those 2,000 kilos?

A Yes.

Q You don't consider that drug trafficking?

A Yes.

Q Now, you talked yesterday about on one occasion when you went to Mexico and you met with Arturo Guzmán, Hector Beltran, Mayo Zambada and Nacho Coronel.

Do you remember those?

A Yes.

Q And you didn't meet them all at once, but you first met with Arturo Guzmán and you pitched the deal to him?

A Yes.

Q And then he rejected your deal?

A Yes.

Q And then you met with Hector Beltran?

A Yes.

Q And he also rejected your offer, correct?

A Yes.

Q Now, do you know where Hector Beltran is?

A No, in Mexico, I don't know.

Q Do you know if he's alive or dead?

A No.

Q Now, you also -- well, Hector also rejected that deal you

were offering him, right?

A Yes.

Q So you were a bit persistent and then you went to talk to Mayo Zambada?

A Yes.

Q And you pitched the deal to him also?

A Yes.

Q And --

THE COURT: Excuse me, Mr. Balarezo, when you're done with an exhibit, you need to take it off the screen so we can clear the markings.

MR. BALAREZO: Oh.

THE COURT: Okay, hang on one second.

(Pause.)

THE COURT: It looks like you have documents pushed up on the monitor and it's causing the markings.

MR. BALAREZO: Oh, sorry, Your Honor.

THE COURT: There we go. Okay, go ahead. Sorry.

BY MR. BALAREZO:

Q So, that time when you pitched that deal to Mayo Zambada, that was the first time -- well, the first and only time you met with him, correct?

A Yes.

Q And when you met Mayo Zambada, I believe you described it previously as meeting him at a huge home, right, luxurious?

A It was a large home, luxurious.

Q All right. But once he turned you down, your persistence continued and you went and met with this man.

Who is this man, Government Exhibit 7?

(Exhibit published.)

A Ignacio Coronel.

Q Also known as Nacho?

A Yes.

Q Now, you pitched the exact same deal to him that Arturo had rejected, right?

A Yes.

Q And Hector had rejected?

A Yes.

Q And Mayo rejected?

A Yes.

Q But Nacho took it on?

A Yes.

MR. BALAREZO: Nacho, not Macho.

THE INTERPRETER: Nacho.

BY MR. BALAREZO:

Q And have you ever seen the movie The Godfather?

A Yes.

Q Do you know who Fredo is?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

BY MR. BALAREZO:

Q Well, for some reason, Nacho Coronel was persuaded to accept this deal, right?

A Yes.

Q And the deal was eventually done, but the load was seized, I think you testified?

A Yes.

Q Now, yesterday you testified -- I think today, that Mayo, Nacho, Hector and Arturo were all working together, they were all part of the cartel in Sinaloa, correct?

A Yes.

Q But Nacho was able to make his own independent decision to do that deal with you, right?

A Yes.

Q Now, after this particular deal fell -- well, went wrong, you went back to Colombia?

A Yes.

Q And I believe you said you had made enough money from drug trafficking?

A No.

Q Well, you bought a ranch?

A Yes.

Q And you retired?

A No.

Q Were you using that law degree you swore to uphold?

A Yes.
Q Were you still being a public defender at that point?
A No.
Q You had a successful practice, or were you still representing Chupeta?
A No.
Q What kind of business were you in at that point?
A I kept in touch with Sergio Ramirez and he and I were trying to do legal deals.
Q Your childhood buddy, who was a drug trafficker, you were trying to do legal business with him?
A With Sergio Ramirez, yes.
Q Now, during that time of your non-retirement, Sergio Ramirez did convince you to go back to Mexico, correct?
A Yes.
Q And did Sergio Ramirez convince you to go back to Mexico for legal business?
A No.
Q Well, what could it be? What could he ask you to go to Mexico for?
A He trusted me a lot.
Q Just answer my question.
What could he have asked you, what kind of business did he send you to Mexico for?
A Obviously, drug trafficking deals.

Q Not the legal stuff you were trying to do in Colombia, right?
A No.
Q Let me stop right there for a second.
Your testimony yesterday and today is based on what's in your head, right?
A Yes.
Q You don't have any notes written up of what happened ten years ago?
A No.
Q Fifteen years ago?
A No.
Q And you are here under cooperation agreement with the Government, right?
A Yes.
Q And you want this jury to believe that everything you are telling them is true, correct?
A It is the truth.
Q And that is because you've been a very truthful and honorable person throughout your career and your life?
A I am telling the truth.
Q Answer my question.
A Can you repeat it?
Q You want them to believe you are being a truthful and honorable person because you've been a truthful and honorable

person throughout your life?
A No, I'm answering the questions about my past.
Q Well, let me ask you some more questions about your past.
By the time Sergio Ramirez --
MR. BALAREZO: Can I have the ELMO?
BY MR. BALAREZO:
Q By the time Sergio Ramirez asked you to go to Mexico to, obviously, deal with drug trafficking, you had already been working with Chupeta or for Chupeta since about 1993; is that right?
(Exhibit published.)
A Yes.
Q So you were very aware with Chupeta's organization?
A Yes.
Q You knew how his organization worked?
A Yes.
Q You knew a lot of his lieutenants; Sergio, Laureano?
A Yes.
Q And you knew that, in general, although Chupeta was a big drug trafficker, himself -- Chupeta didn't have just one customer to sell drugs to, did he?
A No.
Q Well, you've talked a lot about this cartel, The Sinaloa.
You know that there were other, quote/unquote, cartels in Mexico, right?

A Yes.
Q There was one in Tijuana?
A (No response.)
Q Come on, you've heard of it.
A Yes, yes.
Q There was one in Juarez, did you ever hear of that one?
A No.
Q Didn't hear of the Gulf Cartel either?
A Yes.
Q So there were other cartels in Mexico, quote/unquote, besides this cartel, The Sinaloa, that you're talking about, right?
A Yes.
Q So when you testified here under oath and tell this jury that these meetings that you had and these transactions that you did were with this man over here (indicating), with Joaquin Guzmán, right, and with Nacho, with Mayo, with Hector, with Arturo, all we have is your word saying that that's what happened; right?
A Yes.
Q Now, you said, on direct examination, that you were familiar with the term juanitas.
Do you remember that?
A Yes.
Q And juanitas was the name that Chupeta's organization,

including you, gave various loads that supposedly went to Mexico from 2002 to 2006, I believe; is that right?

A Yes.

Q And does the time of the juanitas, 2002 to 2006, does that coincide with the time that you were in Mexico?

A Yes.

Q So, if there just happened to be some records of these juanitas explaining each of the ships -- or, excuse me, each of the loads, you are aware of each of those loads, correct, because you were the man in Mexico?

MS. PARLOVECCHIO: Objection, Your Honor.

THE COURT: Sustained.

BY MR. BALAREZO:

Q Well, on direct examination you mentioned some ledgers.

Do you remember that?

A Yes.

Q Have you ever seen any ledgers with respect to the juanitas?

A Very superficially. I wasn't in charge of the accounting, so it wasn't my job.

Q It wasn't your responsibility, I take it?

A I took care of my own accounting.

Q And did you do an accounting for each of these juanitas?

A No.

Q Well, what accounting did you keep on your own?

A Every time there was a project finished, I kept an accounting of the expenses, who had been paid, who had been delivered to, and I would bring this information down to Colombia.

Q And, of course, when you met with the Government, you didn't turn those accounts over to them, right?

A I destroyed it. I always destroyed it.

MR. BALAREZO: If I could have one second, Your Honor.

BY MR. BALAREZO:

Q I want you to see Government Exhibit 97-A in evidence.

(Exhibit published.)

A Yes.

Q Is it -- I'm sorry.

Is this Alfredo Vasquez that you testified today set up a meeting or that first meeting with you and Chapo?

A Yes.

Q It's the same guy that yesterday you said that, I think, time hasn't been kind to him, right?

A Yes.

Q And you can tell that he's wearing a jail jumpsuit in that picture, can't you?

A Yes.

Q Because he's in prison, right?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

BY MR. BALAREZO:

Q You do understand, though, that prison doesn't make time go by, it's not kind to you, correct?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

BY MR. BALAREZO:

Q Now, when you met Chapo for that first time, you had like a seven-hour ride from Guadalajara?

A Yes.

Q It was by car?

A Yes.

Q And when you finally arrived at Chapo's -- the place where Chapo was staying, it was a very humble and basic house, correct?

A It wasn't a humble house.

MR. BALAREZO: One second.

(Continued on the following page.)

BY MR. BALAREZO:

MR. BALAREZO: Sorry, Your Honor. I can't find the document.

THE COURT: That is all right.

MR. BALAREZO: One second, Your Honor. I apologize.

THE COURT: That is okay. Maybe you want to go into something else and pick it up later.

MR. BALAREZO: Yes.

BY MR. BALAREZO:

Q Now, I want to deal specifically with a transaction that you said was done with Chapo sometime in 2004. There was a load of 4,000 kilos. Do you remember that one?

A 6,000, no, I do not recall 6,000 kilos.

Q What was the deal that you talked about something happened during Semana Santa, holy week?

A 8,000 kilos.

Q And when that transaction was made, was it sent as one load or multiple loads?

A Just one.

Q Now you are certain that that one was an 8,000 kilo load; right?

A Yes.

Q When was that load sent -- pardon me, when was that deal done?

A February.

Q February what?
A February of 2004.
Q And that is one of those deals that you particularly negotiated with Joaquin Guzman; right?
A Yes.
Q You told the Government about this particular transaction before; correct?
A Yes.
Q Now, do you recall when you met with them back in February of 2008 and June of 2009, do you recall speaking with them about that particular load?
A Yes.
Q And what you said, just so we make sure we're talking about the same thing, you said that that particular load was boarded by the Coast Guard?
A Yes.
Q And was searched but eventually nothing was found?
A Yes.
Q And do you recall telling the government during those meetings that the load was a 6,000 load that was supposed to arrive a week before Easter of 2004?
A I told them that it was 8,000 kilos.
Q Do you recall saying 6,000?
A No.
Q Let me show you Defense Exhibit 248, Government 3500

GRA-8?

MR. BALAREZO: For the witness only.

Q Do you see that?

A Yes.

Q Could you read the part that's in the red?

THE COURT: You want it translated for him?

MR. BALAREZO: Well the interpreter can. I'm sorry, just the section that's in the red.

A Okay.

Q Does that refresh your recollection as to whether or not you told the Government that it was a 6,000 kilo load?

A It was a load of 8,000 kilos. It says 6,000 kilos there. They probably made a mistake. They certainly made a mistake. It was a load of 8,000 kilos.

Q Do you remember meeting with the Government back in about August of 2015? It was a meeting in Miami, Florida.

A I don't remember.

Q Do you recall at another meeting besides the one we talked about previously having discussed that particular load with the Government?

A Yes, I told them about that load to the -- I told the Government about that load.

Q And do you recall another time you told the Government about that load, you mentioned that the deal was in February of 2005 and that the load was of 6,500 to 7,000 kilograms?

A I am clear that the shipment was for 8,000 kilos.

Q Let me show you what's been marked as Defendant's Exhibit --

THE COURT: All right let's have a sidebar, please

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: I am just calling a sidebar to save some time. You are not refreshing his recollection. He has got a rock-solid recollection that it was 8,000, okay, and you cannot impeach him with a statement that's not his. It is the agent's statements.

MR. BALAREZO: Very well.

THE COURT: So if it doesn't refresh -- if he says I don't remember, maybe I did say that, fine, refresh him, but this guy doesn't need refreshing on this.

MR. BALAREZO: Very well.

(Sidebar ends.)

(Continued on next page.)

BY MR. BALAREZO: (Continuing.)

Q This particular load, the one that you say is for 8,000 kilos, who -- who received that load out at sea?

A Julio Beltran.

Q This was the one where there was an issue about having the go-fast boats picking it up?

A Yes.

Q And there was a problem so the Mexicans needed to send out a tuna boat to pick it up, a problem out at sea?

A Yes.

Q And if you are certain of anything you are certain that it was Julio Beltran and not Chapo whose men picked up that load; right?

A Yes, it was Julio Beltran who picked it up.

Q And I believe yesterday or earlier today you said Julio Beltran worked on his own?

A Yes.

Q Now, with respect to the other two loads that you specifically testified about, there was loads for -- in September of 2004, there were loads for 10,000 kilos and 12,500; am I correct?

A Yes.

Q And who was going to receive the 10,000 kilo load?

A Nacho Coronel.

Q And who was going to receive the 12,000 kilo load?

A Arturo Beltran.

Q Now, your memory is pretty good on that; right?

A Well, I think so.

Q Now, do you recall when you met with the Government back in 2009 you also discussed these two loads with them?

A Yes.

Q And at that time you did say that the 10,000 was for Nacho and the 12,000 was for Chapo and Arturo; right?

A Yes.

Q Now, do you recall meeting also with the Government in 2017 and discussing the same load?

A In 2017?

Q A year ago.

A Yes.

Q And do you remember that you told them different? You said Arturo was going to get the 10,000 and you said Nacho was going to get the 12,000?

A They probably made a mistake.

Q Not you?

A No.

Q Because it really doesn't matter who received it to you; right?

A It does matter who receives.

Q Now, as you said a little earlier you met with the Government many times in preparation for your testimony and

for your cooperation; is that right?

A Yes.

Q And during some of these meetings you have specifically spoken about Chapo Guzman, my client; right?

A Yes.

Q And specifically with respect to Mr. Guzman's abilities to transport, you have told the Government that Chapo worked through Mayo Zambada; correct?

A No.

Q And you don't recall telling the Government that?

A No.

Q Do you recall telling the Government that Chapo did not have an organization of transporters of his own?

A No.

Q Let me show you Defendant's Exhibit 248.

MS. PARLOVECCHIO: What's the number, counsel?

MR. BALAREZO: GRA-8, page three.

The bottom box if I could have the interpreter review that for the witness.

Q There's no question pending. Have you reviewed that.

A Yes, I just did, I read it -- I it was just read to me, yes.

Q And does this document refresh your recollection as to whether or not in 2008 you told the Government, yes or no, that Chapo did not really have organization transporters of

his own, yes or no?

A Yes.

Q And did you, in fact, tell the Government that?

A Yes.

Q And did you not tell the Government that Chapo worked through Mayo using workers in Chiapas, yes or no?

A Yes.

Q And you did tell the Government that?

A Yes.

Q And, of course, as part of your cooperation you are supposed to be truthful with the Government; right?

A Yes.

Q And as you sit here as a witness, you are under oath. You're supposed to be truthful with the jury; correct?

A Yes.

Q Now, you also, during some of these meetings, discussed with the Government particular areas that other -- that individuals controlled. Do you remember that part?

A Yes.

Q And particular ports where drugs would come in?

A Yes.

Q And, in fact, do you remember telling the Government during one of those meetings that Mayo Zambada controlled Chiapas?

A Yes.

Q Not Chapo?
A No.
Q And do you recall telling the Government during those meetings that either Nacho or Arturo controlled Nayarit?
A Yes.
Q Not Chapo?
A Nope.
Q And do you also recall telling the Government during those meetings that either Arturo or Nacho controlled Acapulco?
A Yes.
Q Not Chapo?
A No.
Q Do you also recall telling the Government during those meetings that Arturo controlled the Port of Manzanillo?
A Yes.
Q Not Chapo?
A No.
Q Do you also recall telling the Government that the Plaza al Guadalajara belonged to Nacho?
A Yes.
Q Not Chapo; right?
A No.
Q And that you also recall or do you recall having told the Government at some point during these meetings that Arturo,

meaning Arturo Beltran-Leyva, holds the airport, meaning controls the airport in Mexico City?

A Yes.

Q Not Chapo?

A No.

Q And do you also remember telling the prosecutors during your meetings that -- well, strike that.

Do you know at some point, Joaquin Guzman escaped from a jail in Colombia -- excuse me, in Mexico in 2003 -- 2001?

A Yes.

Q And do you also recall telling the Government that it was Nacho Coronel who gave money to Chapo to help him with that escape?

A No.

Q You don't remember that?

A No.

Q Let me show you Defense Exhibit 262. This is GRA 13, second page Bates number 161, just for the witness. If the interpreter can read the section that's marked in read?

THE INTERPRETER: By interpreter. I'm not sure the interpreter can read that.

MR. BALAREZO: Try, please.

THE INTERPRETER: The interpreter doesn't feel comfortable reading that handwriting. Doesn't want to make a

mistake.

Q You don't remember that, do you?

A No.

Q Now, as part of the -- well, let me ask you this, do a lot of Colombians have nicknames? Is that a cultural thing with Colombians?

A Not all.

MR. BALAREZO: Government 90 in evidence.

(Exhibit published.)

Q That's you; right?

A Yes.

Q And your nickname, I think you said yesterday, was Barbas?

A Barbas.

Q And barbas basically refers to the hair around the bottom part of your face, right, a beard?

A Yes, a beard.

Q Were you ever called Marin?

A Yes.

Q Or Marino?

A Marin.

Q And were you also called Licenciado?

A Yes.

Q Or Lic?

A Yes.

Q And that's because *licenciado* means -- that's what they use for lawyer in Colombia; right?
A In Mexico.
Q It's doctor in Colombia; right?
A Yes.
Q Thank you. Now, do you know what the word, the Spanish word, *barco* means, B-A-R-C-O?
A A boat.
Q Like on the water?
A Yes.
Q That wasn't one of your nicknames, was it?
A No.
Q Never?
A I don't know, no.
Q Now, you were working with the Chupeto organization for a very long time.
A Yes.
Q And you know obviously Juan Carlos Ramirez Abadia had a nickname. His was Chupeta?
A For the world, yes.
Q Government Number 84, Sergio Ramirez?
A Yes.
Q Pechuga?
A Yes.

(Continued on the following page.)

BY MR. BALAREZO: (Continuing)

Q Defense 253. Cuchillo?

A Cuchilla.

Q Defendant. Defense 232, who's that?

A Laureano Renteria.

Q Did he have a nickname?

A Laurita.

Q Laurita. Alvaro Palau, Government Exhibit 80. What was his nickname?

A El Flaco.

Q Not El Gordo, right?

A No.

Q Now, your knowledge of this organization, do you ever, do you know who, who was referred to as "N"?

A No.

Q How about someone named Don R, D-O-N, R?

A No.

Q How about someone that went by the name of Nieto?

A No.

Q How about someone that went by the name of Riascos? Riascos, with a "C."

A No.

Q How about someone by the name Olmedo?

A No.

Q How about somebody by the name of Olfato, O-L-F-A-T-O?

A Alvaro Palau.
Q You remember that one, right?
A Yes.
Q How about Olafo?
A No.
Q How about Broder, B-R-O-D-E-R?
A Laureano Renteria's brother.
Q How about Oreste, O-R-E-S-T-E?
A Orestes. No.
Q How about Cha, C-H-A?
A No.
Q How about Mona Cha?
A Perhaps Camilo Molina.
Q And who is Camilo Molina?
A He was one of the Juan Carlos Ramirez's workers.
Q And how about a lady by the name of Yamile?
A No.

(Continued on next page.)

THE COURT: Mr. Balarezo, at a convenient time, or if you're close --

MR. BALAREZO: We can take it now because I may be able to get rid of some stuff.

THE COURT: Let's take a 15 minute break, ladies and gentlemen. Remember not to talk about the case amongst yourselves. We'll come back here at 3:15.

(Jury exits.)

THE COURT: Recess to 3:15.

How much longer, do you think, Mr. Balarezo?

MR. BALAREZO: Twenty minutes max.

(Recess taken.)

(In open court; outside the presence of the jury.)

THE COURT: Let's have the jury, please.

(Jury enters.)

THE COURT: All right. Be seated.

Please continue, Mr. Balarezo.

MR. BALAREZO: Thank you, Your Honor.

(Continued on next page.)

BY MR. BALAREZO:

Q Mr. Rosero, I'm just going to take you back really quick. Earlier, I had asked you if you had told the government at some point that Mr. Guzman lived in a humble and basic house. Do you remember that?

A Yes.

Q And that humble and basic house did not have any paintings of this type, did it? This is Government's 172-B.

A No.

Q And 172-A, same thing?

A No.

Q And when you were there, these multiple meetings at these small humble homes, you didn't see any large collection of expensive watches, did you?

A No.

Q You didn't see any gold bars lying around?

A No.

Q Any big piles of money lying around?

A No.

Q And on direct examination, you said there were several times when you went to see him in the mountains, that you flew Cessna planes, do you remember that?

A Yes.

Q And I think you described them as being old, well used airplanes, right?

A Yes.
Q And that you would land on these dirt strips up in the mountains of the Sierra Madre?
A Yes.
Q You were never picked up in what's depicted here in Government Exhibit 810, were you?
A No.
Q You smiled a little bit. You recognize these planes, right?
A Yes, they're jets.
Q Not propellers?
A Right.
Q And the second exhibit, second page of that exhibit, same thing, you don't recognize this one as one of the Cessnas that you flew in, do you?
A No.
Q Now, you understand from your long time in the drug trafficking business that people do it, "do it" meaning traffic drugs, that they do it for money, right?
A Yes.
Q Now, that's why you did it too, correct?
A Yes.
Q Now, your career wasn't going that well so you needed a little extra income so you decided to traffic drugs along with Chupeta?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

Q Well, you said on direct examination though that, that you didn't invest in any loads, is that right?

A Yes.

Q You merely got paid per kilo?

A Yes.

Q And then you got a bonus at the end if the deal went through?

A Yes.

Q Now, do you recall when meeting with the government many times, do you ever recall telling the government that Rosero -- and who's that?

A That's me.

Q And Enrique Mira, who's that?

A He's, he's Mario Valencia's nephew.

Q And Sergio?

A Sergio is Sergio Ramirez.

Q And do you recall telling the government at a meeting, January 10, 2018, this year, you told them that: Rosero, Enrique Mira and Sergio did the loads independently from Juan Carlos, obviously?

Yes or no. Do you remember saying that?

A No.

Q And do you recall also telling them that the typical

shipments were about 3,000 kilos and when they increased to 7,000, it was because Juan Carlos joined in? Do you remember that? Yes or no.

A Yes.

Q So the loads increased when Juan Carlos or Chupeta joins in, yes?

A Once he came in to manage the business directly.

(Continued on next page.)

Q So let me show you Defense Exhibit 251 which is GRA-16, page one.

MR. BALAREZO: For the witness only.

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

MR. BALAREZO: This is going back to the one he didn't remember. I'm sorry.

THE COURT: That's all right, but let's have a sidebar to follow up on that.

(The following occurred at sidebar.)

THE COURT: Okay. Look, you keep asking him this formal question, Do you remember telling the government X, and he says no. Now we don't know from that answer whether he doesn't remember telling the government this or whether he's quite sure he didn't tell the government this.

MR. BALAREZO: Right. I'll try to clarify it.

THE COURT: Clarify before you use the document.

That was your objection?

MS. PARLOVECCHIO: Yes, Your Honor.

THE COURT: Okay.

(Sidebar conference ends.)

(Continued on next page.)

BY MR. BALAREZO:

Q Mr. Rosero, on January the 10th, 2018, do you remember telling the government that: Rosero, Enrique Mira and Sergio did the loads independently from Juan Carlos, obviously?

Do you remember saying that to the government?

A Yes.

Q And when you were doing loads independent of Juan Carlos, that was because you were doing loads for you, for Enrique Mira and for your childhood buddy, Sergio?

A I cannot answer yes or no. I'll have to explain it.

Q Well, let me ask you this. You're telling this jury that all you did was make $100 per kilo of the drugs that you were involved with, right?

A Yes, between 100 and $200 per kilo and between 100,000 -- yes, $100 per kilo and between 100,000 and 200,000 once the event was over.

Q And during the entire time that you worked with Chupeta and Enrique Mira and Sergio, how many kilos approximately did you traffic?

A I don't remember.

Q Well, you were involved with those two big shipments that were seized, the 10,000 and 12,500, right?

A The ones that were lost.

Q Did you ever get paid for those?

A No.

Q So you worked for free?
A I would be paid as long as the merchandise was sold.
Q So you left Mexico at one point and you went back to Mexico to start drug trafficking but you really weren't making a lot of money, right?
A Enough for me.
Q Enough for you? Well, do you remember you testified yesterday that you were listed in something called OFAC?
A Yes.
Q And OFAC stands for the Office of Foreign Asset Controls, correct?
A Yes.
Q And you were put into that list by the United States Government in May of 2008, right?
A Yes.
Q And you know that the Office of Foreign Asset Control, OFAC, is an office of the U.S. Department of Treasury?
A Yes.
Q And the reason they put you -- strike that.

When the government, the U.S. Treasury put you in that OFAC list, they designated you a specially designated narcotics trafficker. Do you remember that?

THE INTERPRETER: Can counselor repeat it?

MR. BALAREZO: Specially designated narcotics trafficker.

A Yes.

Q That's because OFAC targets, like you said yesterday, terrorists, right?

A I'm not certain whether they are terrorist but I know about money laundering and drug trafficking.

Q Right. And you were put onto it because you were a major narcotics trafficker?

A Because I was a drug trafficker.

Q Well, you weren't put on that list just because you were making $100 a kilo when and if a load went through, were you?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

Q Now, do you know -- I asked you a little earlier if you knew, if you were a *testaferro* for Chupeta.

A I think after 2005, I was a *testaferro* for Chupeta.

Q And you know that a company by the name of La Hollanda, L-A, H-O-L-L-A-N-D-A, is a veterinary products company, right?

A No, it's --

Q Veterinary products?

THE INTERPRETER: The interpreter misheard. Sorry.

Q A veterinary products company.

THE INTERPRETER: Veterinary, sorry.

A Yes.

Q And you were at the head of that company, right?

A I was the owner.

Q Actually, Chupeta was the owner, right?
A No.
Q Was that one of your legal businesses that you were trying to do?
A Yes.
Q Now, your being put on the OFAC list was a big deal, is that right? I think that's what you said yesterday.
A It caused a lot of problems for me, of course.
Q Right, because it basically says that you cannot use the financial system to conduct any business?
A Yes.
Q And you get no credit?
A No.
Q Your bank accounts are shut?
A Yes.
Q You can't do any bank transactions at all, correct?
A Yes.
Q And I think you called it the "*muerta civil*," civil death. Did I hear you right?
A Yes.
Q Now, you said at some point, you wrote a letter to the United States Government letting them know that you wanted to cooperate. Do you remember that?
A Yes.
Q And that's because you thought that there was some

charges coming against you, correct?

A Yes.

Q And that's because you had been listed on that OFAC?

A No, due to some bad information that I had received from a person that was my contact in the United States.

Q Okay. So you had a bad contact, but you wrote a letter to the Department of Justice. Do you remember to whom?

A Not exactly. I don't remember.

Q Now, writing a letter to the government of the United States telling them that you want to cooperate for being a drug trafficker, that's a big step to take, isn't it?

A Yes.

Q Did you keep a copy of the letter?

A Yes, but I don't remember if I still have it or I've already destroyed it.

Q And during all these meetings with the prosecutors, you never gave them a copy?

A No.

Q Now, at some point, I believe you said in early 2009, you came to the United States?

A June 2009.

Q June. And you met with prosecutors, correct?

A Yes.

Q And that's when your cooperation with the United States government began?

A Yes.

Q And as a result of that, that meeting and subsequent meetings, you entered into an agreement with the United States, the government, to cooperate with them, right?

A Yes.

MR. BALAREZO: Your Honor, if I can have this for the witness, Defense Exhibit 247 which is GRA-2.

THE COURT: Again, you have documents pushing up against the screen.

MR. BALAREZO: Okay.

THE COURT: There you go.

MS. PARLOVECCHIO: This is actually in evidence.

THE COURT: It is in evidence.

MR. PURPURA: I'll use mine because I've marked it up.

THE COURT: Okay.

Q You see that, sir?

A Yes.

Q And what is this?

MR. BALAREZO: Your Honor, if there's no objection --

A It is my cooperation agreement.

MS. PARLOVECCHIO: It's already in evidence, Your Honor.

THE COURT: Well, he wants to use his copy.

We will use the government's copy, but you can use your markings for the examination.

MR. BALAREZO: Very well.

Q And you see that you signed this agreement? That's your signature down here, is it not?

A Yes.

Q And you signed this on July 9, 2009?

A Yes.

Q So that's approximately now, what, nine years ago, over nine years ago?

A Yes.

Q And you did have charges but because you entered into this agreement, you pled guilty to some charges that were filed against you, right?

A Yes.

Q And as you can see on the exhibit, Count One that you pled to was an international distribution conspiracy, right?

A Yes.

Q And the maximum term that you can be sentenced to under that particular count is what?

A (In English) Life.

Q You need the interpreter for that?

A No. You can tell me.

Q Life?

A Life.

Q And you know from your conversations with lawyers that if you were to get life in the United States in the federal system, life means life, right?

A Yes.

Q Meaning that if you were to get a life sentence in your case, you would die in prison?

A Yes.

Q And, of course, you don't want to die in prison, do you?

A No.

Q And at the other end, there's a mandatory minimum term of imprisonment for your offense which is ten years, right?

A Yes.

Q Now, you don't want to do ten years either, do you?

A No.

Q In fact, you don't want to do any time, do you?

A No.

Q Page two of your cooperation agreement talks about a maximum fine of up to $4 million.

A Yes.

Q You don't want to pay a $4 million fine, do you?

A I don't have $4 million.

Q Right. Other penalties: You could be deported or removed from the United States. Correct?

A Yes.

Q And you've been living in the United States since you

entered into this cooperation agreement, right?

A Yes.

Q You don't want to be deported or removed back to Colombia, do you?

A No.

Q Count Two that you pled guilty to, conspiracy to launder money, you see that?

A Yes.

Q And you understand that for that particular count alone, you could get 20 years maximum?

A Yes.

Q And if you don't want to do life, you don't want to do 20, right?

A No.

(Continued on next page.)

EXAMINATION CONTINUES

BY MR. BALAREZO:

Q And, of course, you could also get a fine of up to $500,000 for the money laundering count alone?

A Yes.

Q And if you don't have $4 million, you don't have 500,000?

A No.

Q Now, on direct examination you mentioned that you had been -- you had to complete a financial statement?

A Yes.

Q And that was a very long document that the Government gave you to fill out to list your assets, your accounts, your money, your cash -- those kinds of things, right?

A Yes.

MR. BALAREZO: And, Your Honor, for the witness only, Defense Exhibit 208-5, GRA-4.

Q Do you see that, sir?

A Yes.

Q And on page 29 -- excuse me, page 30 of that document, that you completed on July 5th, '09, is that your signature?

A Yes.

Q And when you completed this document, you turned it over to the Government?

A Yes.

Q Did you turn over any other financial documents to the

Government or just this?

A As far as I remember, just this one.

Q Well, you would remember if you turned over more documents and you're giving them your whole financial status, right?

A Possibly.

Q And in this document, as I mentioned a little earlier, you included many things like bank accounts, right?

A Yes.

Q You didn't turn over any bank statements?

A No.

Q You disclosed that you had some properties that you owned in Mexico and in Colombia?

A Yes.

Q You didn't turn over any documents related to those homes to the Government, did you?

A No.

Q So, basically, you just wrote whatever you wanted in that document and turned it over and they didn't ask for anything else?

A I wrote the truth.

Q That's not what I asked you.

What I asked you is: You just wrote whatever you wanted on there, truth or not, and gave it to them and they didn't ask you anything else, right?

MS. PARLOVECCHIO: Objection.

THE COURT: Overruled.

MR. BALAREZO: Can we get the reporter's help with the question now?

THE INTERPRETER: The interpreter has the question, the interpreter can repeat it.

(Question repeated by Interpreter.)

A I wrote the truth and that's what I handed over.

Q Exhibit 247 are the -- your cooperation agreement.

(Exhibit published.)

BY MR. BALAREZO:

Q The paragraph that's highlighted here, where you said that you agreed to furnish to the Office all documents and other materials that may be relevant to the investigation -- do you see that?

A (No response.)

Q Of course, that are in your possession and control, right?

A Yes.

Q Didn't turn anything over?

A I would have to ask my attorney what happened with that.

Q I'm asking you, did you turn anything over?

A No, I didn't turn over anything.

Q Your cooperation agreement, paragraph 4, it says: The Office agrees that -- you know what the Office is, right?

It's the Government, the prosecutors?

A The Government.

Q The prosecutors, right?

A Yes.

Q And what that agreement says: That no criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity.

Right?

A Yes.

Q So, as long as you tell them about whatever you did, you are not going to get charged with that, is that what you understand that to be?

A Yes.

Q And, of course, as part of your cooperation agreement, you said it several times, you are here to tell the truth, right?

A Yes.

Q And if you were to be found to have lied here, you could be charged with what's called perjury?

A Yes.

Q And you are well aware that the people that would charge you with perjury, if they would ever charge you with perjury, are the prosecutors, right?

A Yes.

Q So, as long as you sing the song and dance the dance,

you're fine?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

BY MR. BALAREZO:

Q Now, as part of your cooperation agreement and this financial agreement that you completed, you disclosed that you had tens of thousands of dollars in bank accounts, right?

A Tens of thousands of dollars?

Q Well, let me ask you this:

You disclosed that you had $5,000 in a Bank of America account in Bal Harbour, Florida?

A Yes.

Q And you disclosed that you had a Bank of America account in Boca Raton, $15,000?

A Yes.

Q And you also had an account in Mexico at Banamex for $30,000?

A Yes.

Q And also at Bancomer in Mexico for $8,000, right?

A Yes.

Q I am not good at numbers, but that comes up to about $58,000?

A Okay.

Q Would you agree?

A I don't have an exact accounting here, and just like you,

I'm not that good at math.

Q What's 5,000 plus 15,000?

A 20,000.

Q Plus 30,000?

A 50,000.

Q Plus 8,000?

A 58,000.

Q Not too complicated, right?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained. Sustained.

BY MR. BALAREZO:

Q Now, those are just the accounts that you listed in that form.

And, in fact, you listed one of those accounts, the one with $30,000 in Mexico, was under that name of Juan Manuel Organista, one of those fake names that you used?

A Yes.

Q That doesn't include any cash you might have had lying around your house, any *caletas*, any jewelry, any of that kind of stuff, does it?

A Yes.

Q And, of course, because you weren't asked for any documents, and as far as you know the Government didn't even look into this --

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

BY MR. BALAREZO:

Q Now, you also listed properties.

A Yes.

Q You listed properties -- well, I forgot, Your Honor.

MR. BALAREZO: Is this in evidence? That's all right.

Q Do you recall on that particular document, the financial document, you were asked -- Question 32, you were asked to list cash over $2,500 in which you, your spouse or any other member of your household has an interest directly or indirectly into.

Do you remember that?

A I don't remember. I'd like to have the document in my hands.

Q So would exhibiting for you Defense Exhibit 255, which is a financial statement, would that refresh your recollection?

A Yes.

Q Question 32, if the interpreter could read it.

(Interpreter reading.)

A Yes.

Q And what was your response to that particular question?

A I had that money.

Q What was the answer to the question?

A I had that money.

Q Does it say "I had that money" there? What was your answer to that question?
A Excuse me, I'm confused. Can you clarify that for me?
Q I'll clarify it for you.

MR. BALAREZO: Your Honor, I move this document into evidence, Defense Exhibit Number --

MS. PARLOVECCHIO: Objection.

MR. BALAREZO: -- 255?

THE COURT: Sustained.

BY MR. BALAREZO:

Q You wrote down, as an answer, that you had 550 --

THE COURT: Mr. Balarezo, you have to let him finish interpreting.

MR. BALAREZO: I'm sorry, thank you.

THE COURT: Wait until you don't hear him speaking Spanish anymore.

MR. BALAREZO: It's hard. Go ahead.

THE COURT: He's done, but it overlapped.

THE INTERPRETER: Thank you, Judge.

MR. BALAREZO: I'm off the beat, sorry.

Q Now, what you said in response to that particular question was approximately $550,000, yes or no?
A Yes.
Q And that was $550,000 that you had?
A Yes.

Q And you did not turn that $550,000 over to the Government, did you?
A No.
Q So you got to keep it, you got to use it, and you got to do whatever you wanted to do with it?
A Yes.
Q And, of course, by this time when you filled that out, they already knew you had been a drug trafficker, right?
A Yes.
Q And also, going back to those bank accounts with the $58,000, the Government didn't seize those bank accounts, did it?
A No.

(Continued on the following page.)

BY MR. BALAREZO: (Continuing.)

Q So you got to use that money however you wanted?

A Yes.

Q Now, as part of your financial disclosures you also told the Government that you had a property in Guadalajara that was valued at approximately $400,000?

A Yes.

Q And you also let him know that you had a house in Colombia worth about $180,000?

A Yes.

Q And you had a house in Cali, in Colombia that was worth with $200,000?

A Yes.

Q And the Government never made any effort to try to seize or forfeit any of those properties; right?

A No.

Q And additionally you had an apartment in Puerto Vallarta in Mexico that was worth about $438,000?

A Yes.

Q And the Government never tried to seize or forfeit that property; right?

A Yes.

Q They did try to forfeit it?

A I don't know. They didn't tell me anything.

Q So, this was signed on -- in July of 2009, nine years

ago. As you sit here today did they freeze any of those bank accounts?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

BY MR. BALAREZO:

Q As of today, as you sit here today, are you aware that they're seeking to forfeit any of your properties?

A No.

THE COURT: Getting close Mr. Balarezo?

MR. BALAREZO: I'm trying.

BY MR. BALAREZO:

Q Now, as part of your -- now, you told the jury that so far you've only had to -- strike that.

After you pled guilty, you have had to forfeit some money; correct?

A Yes.

Q And that was a sum of $100,000?

A Yes.

Q Now, with respect to some properties that you had in Mexico, do you recall telling the Government that properties that you had in Mexico were sold for approximately $1.5 million U.S. and that you were able to send that through bank transfers from Mexico to Colombia in your wife's name.

A Yes.

Q You didn't disclose that wire transfer of $1.5 million in

your financial disclosure form, did you?

A No.

Q Now, as part of your cooperation agreement you disclosed to the Government that you also had some vehicles?

A Yes.

Q And in 2009 I believe you had a -- a Toyota Sienna and a Toyota Land Cruiser?

A Yes.

Q And you had -- you got to keep those; right?

A Yes.

Q Are you still driving those?

A No.

Q You got some new cars along the way?

A Yes.

Q And the Government is not taking those away?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained.

BY MR. BALAREZO:

Q Are you aware if the Government is trying to seize or forfeit those vehicles?

MS. PARLOVECCHIO: Objection.

THE COURT: Sustained. Do you need a sidebar for some reason?

MS. PARLOVECCHIO: Yes.

MR. BALAREZO: No, that's fine, Your Honor.

BY MR. BALAREZO:

Q You also had a BMW motorcycle at that time; correct?

A Yes.

Q Tell the jury, were you able to keep that motorcycle?

A Yes.

Q Now, you know from the nine years since you pled guilty you know what an S Visa is; correct?

A Yes.

Q And the S means there's something that you want?

A Yes.

Q For you, for your wife?

A Yes.

Q For your children?

A Yes.

Q And the S Visa is the mechanism by which if the Government can get it for you, you get to stay in the United States?

A Yes.

Q So although, according to your cooperation agreement, the penalty for pleading guilty to the conspiracy charge is deportation or removal, if you get that S Visa you're not going anywhere; right?

A If I get it, yes.

Q And of course you are hoping that they give it to you; right?

A Yes.
Q Now without giving us specifics, you own some businesses now; right?
A I'm trying to be able to survive, yes.
Q And those businesses are doing well?
A No.
Q Aren't you expanding to Atlanta or Houston or something like that?
A No, I have no way to do that.
Q Now, you worked -- for 13 years you worked for Chupeta, yes?
A Yes.
Q You trafficked drugs for Chupeta?
A Yes.
Q You made money trafficking drugs for Chupeta?
A Yes.
Q Can you tell the jury, how many kilos of cocaine were you involved in sending, whether they made it where they were going or not?
A None.
Q You didn't participate in sending --
A No.
Q -- the 10,000 -- do you need the interpreter or do you want --
A Sending it, yes, but not as my own investment.

Q Let me clarify the question. Were you involved in sending the 10,000 kilo load from Colombia to Mexico?
A Yes.
Q And there were many 10,000 kilo loads; right?
A Two.
Q And there was a 12,500 kilo load?
A Yes.
Q And there were other loads of thousands of kilos; right?
A Yes.
Q So if you just add up the Juanitas, you're talking about 50,000 kilos of cocaine that you were involved in sending from Colombia to Mexico; right?
A Yes.
Q That you trafficked?
A Yes.
Q To make money?
A Yes.
Q And when you pled guilty -- when you came in and you pled guilty in front of another judge, notwithstanding all of that, the Government asked the judge to release you; correct?
A Yes.
Q Now, tell the jury, you didn't sleep in a jail cell last night; right?
A No.
Q You haven't been in solitary confinement for nine years?

A No.

Q You haven't been prevented from contacting your wife?

A No.

Q You haven't been prohibited from hugging your kids?

MS. PARLOVECCHIO: Objection.

THE COURT: Was that an objection?

MS. PARLOVECCHIO: It was -- I don't know --

THE COURT: Sustained.

Enough. We get the point, Mr. Balarezo.

BY MR. BALAREZO:

Q Now, the bottom line is since you pled guilty nine years ago, you have been free; right?

A Yes.

Q You have not been sentenced yet?

A No.

Q Last question, very simple. Tell the jury how many days or nights or hours have you spent in jail?

MS. PARLOVECCHIO: Objection.

THE COURT: Asked and answered.

MR. BALAREZO: I haven't asked it.

THE COURT: You did, a few questions ago.

BY MR. BALAREZO:

Q Since the other federal judge released you at the Government's request, have you spent any time in prison or jail?

MS. PARLOVECCHIO: Objection.

THE COURT: I will allow it.

A No.

MR. BALAREZO: That's it, Your Honor. No further questions.

THE COURT: Can you finish redirect this afternoon?

MS. PARLOVECCHIO: I think so.

THE COURT: Okay, let's try.

REDIRECT EXAMINATION

BY MS. PARLOVECCHIO:

Q Mr. Rosero, you were asked some questions on cross-examination about your financial disclosures, do you recall those questions?

A Yes.

Q In addition to the $100,000 forfeiture payment you made to the Government, could you also be required to pay a fine?

A No.

Q At sentencing could you be required to pay a fine?

A Yes, of course.

Q You were also asked some questions by Mr. Balarezo about a wire transfer.

A Yes.

Q That wire transfer from Mexico, did that happen before or after you filled out your financial disclosure in July 2009?

A One was before and one was after.

Q Now, Mr. Balarezo asked you some questions on cross-examination about shipments you did independently or a statement that you made to the Government about shipments you did independently with Sergio and Enrique Mira and you were trying to say something. What were you trying to say?

A The three of us worked for Mr. Juan Carlos Ramirez. We did nothing without him giving his approval. Whether he, at a certain given point, said to Sergio and to Enrique, work, it still meant that we had to be under his direction.

(Continued on the following page.)

BY MS. PARLOVECCHIO: (Continuing)

Q Now, you were also asked some questions on cross-examination about statements you made to the government about the defendant's transporters in 2009. What did you tell the government about the defendant's transporters when you met with them in 2009?

A So what I said to the government when I saw them was that at the beginning, Mr. Guzman Loera used Mayo Zambada to, for the organization, for his transporting for the organization and later on when I met Mr. Guzman Loera in the mountains, he told me that from now on, the person that was going to do the pickups or the transportation, receiving, was going to be Mr. Arturo Guzman.

Q Arturo Guzman?

A Arturo Beltran.

THE INTERPRETER: Interpreter correction. "Arturo Beltran."

Q And who was Mayo Zambada's transporter in Chiapas?

A Marquitos.

Q You were also asked some questions on cross-examination about areas controlled by other leaders of the Sinaloa Cartel. Do you recall those questions?

A Yes.

Q What was your understanding of whether leaders of the Sinaloa Cartel shared territory within Mexico?

A My understanding was that even if somebody managed one area, that did not mean that the others couldn't ask for permission or ask for help but, in using that territory.
Q Now, you were also asked some questions on cross-examination about ledgers, drug ledgers. Do you recall those questions?
A Yes.
Q Did you review the ledgers that Juan Carlos Ramirez and Sergio Ramirez kept down in Colombia?
A No.
Q Were you familiar with the figures in those ledgers?
A Some of them, the ones I provided.
Q Were you familiar with all of the codes that they used in those ledgers down in Colombia?
A No, the codes were handled by the person who did the ledgers.
Q Do you know who created those ledgers?
A Juan Carlos' accountants.
Q Now, aside from the exhibits that you saw on the witness stand today, do you know has the government shown you any other evidence in this case?
A No.
Q Now, you were asked some questions on cross-examination about whether you saw gold bars or watches at the defendant's ranch. Do you recall those questions?

A Yes.
Q Now, you testified on direct examination that you did see something at the defendant's ranch with gold and jewels in it. Do you recall that?
A Yes, a rifle.
Q What kind of rifle?
A An AK-47 rifle.
Q So you saw a gold plated AK-47 with jewels?
A Yes.
Q And that was the defendant's, right?
A Yes.
Q Now, as you sit here today, do you know whether the government is going to file a 5K1 letter in your case?
A No.
Q What do you understand will happen if you didn't tell the truth to the jury today?
A I would be committing, committing the crime of perjury and I have no right to any benefit that could be given to me.
Q So could you go to jail if you lied today?
A Yes.
Q Would you be able to stay in the U.S. if you lied today?
A No.
Q And why do you need to stay in the United States?
MR. BALAREZO: Objection.
THE COURT: Overruled.

Q You may answer, sir.

A It's the only safe place that I believe to have for me, for myself and my children.

Q Why is it the only safe place?

A I consider that the safety offered to me by the United States to live here without anyone harming me, it is the only place where I can live.

Q Why is it that an S visa is an important thing for you?

MR. BALAREZO: Objection.

THE COURT: Overruled.

A The visa is important for me because it changes my status either in the United States, the one I have in the United States right now, and legalizes my situation in the United States.

Q Now, do you believe it's in your best interest to tell the truth or to lie to the jury today?

A To tell the truth.

Q Why is that?

A So I abide by my agreement which is the agreement I made which is to tell the truth and then also have the right to receive all the benefits that were promised to me.

MS. PARLOVECCHIO: One moment, Your Honor.

(Pause.)

MS. PARLOVECCHIO: No further questions for this witness.

MR. BALAREZO: Two questions, Your Honor.

THE COURT: Two questions? Two.

MR. BALAREZO: Two. *Dos*.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MR. BALAREZO:

Q Ms. Parlovecchio just asked you if you could go to jail for perjury. Do you remember that question?

A Yes.

Q In nine years, you haven't gone to jail for trafficking over 50,000 kilos, have you?

MS. PARLOVECCHIO: Objection.

THE COURT: Overruled.

A No.

(Continued on next page.)

MR. BALAREZO: Thank you. Two.

THE COURT: Very rarely, ladies and gentlemen, when a lawyer says they have two questions, they ask two questions.

We are going to send you home -- I take it you are done, Ms. Parlovecchio?

MS. PARLOVECCHIO: I'm done.

THE COURT: We are going to send you home, ladies and gentlemen.

Please remember not to talk about the case with anybody. The deeper we get into the case, the more important that becomes although it has been important at all times. Please don't post anything, don't tweet any impressions, don't put anything on Facebook how you're sitting on this jury and have a restful evening. Stay away from media coverage if there is any of these proceedings.

We'll see you tomorrow morning at 9:30.

(Jury exits.)

THE COURT: Okay. Anything we need to talk about?

MS. PARLOVECCHIO: No, Your Honor.

THE COURT: Okay. 9:30 tomorrow. Have a good night.

MR. BALAREZO: Thank you, Your Honor.

(Matter adjourned to December 6, 2018 at 9:30 a.m.)

# I N D E X


| WITNESS | PAGE |
|---|---|
| **GERMAN ROSERO** | |
| DIRECT EXAMINATION BY MS. PARLOVECCHIO | 2203 |
| **NOEL MOLONEY** | |
| DIRECT EXAMINATION BY MR. ROBOTTI | 2266 |
| CROSS-EXAMINATION BY MR. LICHTMAN | 2275 |
| **GERMAN ROSERO** | |
| CROSS-EXAMINATION BY MR. BALAREZO | 2279 |
| REDIRECT EXAMINATION BY MS. PARLOVECCHIO | 2359 |
| RECROSS-EXAMINATION BY MR. BALAREZO | 2365 |

**E X H I B I T S**

Government's Exhibit 1-G 2205

Government's Exhibit 11-A 2218

Government Exhibit 503 2234

Government Exhibits 216-36 to 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

Defense Exhibit 253 2284