**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09 CR 383** |
| **v.** | ) | |
| | ) | **Judge Ruben Castillo** |
| **PEDRO FLORES and** | ) | |
| **MARGARITO FLORES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>DEFENDANTS' MOTION TO COMPEL THE GOVERNMENT TO FILE A MOTION UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 35(b).</u>**

Defendants, **PEDRO FLORES** and **MARGARITO FLORES**, by and through their attorneys, [redacted] and [redacted], pursuant to the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States, respectfully move this Court to enter an order directing the government to file a motion for reduction in their sentence pursuant to Federal Rule of Criminal Procedure 35(b).

In support of this motion the defendants state as follows:

## I. <u>Nature and History of the Case.</u>

Pedro Flores and Margarito Flores headed a large scale drug distribution network on behalf of major Mexican drug cartels and distributed cocaine, heroin, and methamphetamine in the United States, mostly in Chicago. The Flores brothers obtained their drugs directly from Joaquin Guzman-Loera, a/k/a "El Chapo" a/k/a "Chapo Guzman" and Ismael Zambada-Garcia

a/k/a “El Mayo” a/k/a “Mayo Zambada”, for several years while living in Mexico. Guzman-Loera and Zambada-Garcia were the principals in an organization known as the “Sinaloa Cartel”, the “Sinaloa Federation” and the “Beltran-Leyva Organization.”

In the Spring of 2008 Pedro Flores and Margarito Flores, while living in Mexico and actively engaged in drug trafficking with Guzman-Loera and Zambada-Garcia, voluntarily contacted law enforcement agents in the United States. Through a series of telephone conversations, and later in-person meetings in Mexico with an Assistant United States Attorney from the Northern District of Illinois and law enforcement agents, Pedro Flores and Margarito Flores agreed to become government cooperators. While living unprotected in Mexico, they gathered information and evidence that would be crucial in securing an indictment in this district against Guzman-Loera and Zambada-Garcia. Their cooperation efforts directly resulted in the prosecution of approximately 90 individuals. The most significant effort involved secretly recorded drug negotiations with Guzman-Loera which would later be used as trial evidence at the Guzman-Loera trial in the Eastern District of New York.

Pedro Flores and Margarito Flores left Mexico in December 2008, agreeing to return to the United States accompanied by United States law enforcement agents, without an agreement as to sentencing, knowing that life in prison was a possibility. Upon their return to the United States Pedro Flores and Margarito Flores continued their cooperation efforts, actively assisting the government in the investigation and dismantling of the drug distribution network they created with Guzman-Loera and Zambada-Garcia. In August of 2012, after years of interviews by numerous law enforcement agents, and multiple testimonial appearances before the grand jury in this district, Pedro Flores and Margarito Flores entered guilty pleas in this district, through written plea agreements, copies of which are attached hereto as Exhibits A & B. During that

same time period multiple cases were successfully prosecuted in this district based in large part on information provided to the government by the Flores brothers.

In the late summer months of 2014 the United States Attorney's Office ("USAO"), contrary to paragraph 12 of the plea agreements, requested that the matter proceed to sentencing. The government, aware of multiple escape attempts by Guzman-Loera, and the lengthy extradition process to secure the presence of Guzman-Loera in this district, advised that the government viewed the cooperation of both defendants as complete. Undersigned defense counsel and the Assistant U.S. Attorneys handling the matter agreed to proceed to sentencing at this time because it became apparent to them based upon information in the public domain and provided by the USAO that there was no realistic possibility that Guzman-Loera would ever be brought to trial in the United States. The matter proceeded to sentencing on January 27, 2015, and this court imposed a sentence of 168 months, and a term of supervised release of 5 years on each defendant.

Subsequent to the imposition of that sentence, and contrary to the parties' expectations at the time, Pedro Flores and Margarito Flores were later called upon by the United States Attorneys of other districts to provide information and testimony in prosecutions in those districts. Pedro Flores and Margarito Flores did so, even though the provisions of paragraph 12 of the plea agreement referenced their cooperation with the United State's Attorney's Office for the Northern District of Illinois only. And, more importantly, when Guzman-Loera was brought to the United States for prosecution in the Eastern District of New York, both Defendants continued to cooperate with that prosecution. Pedro Flores gave live and significant testimony at Guzman-Loera's trial in December 2018 in which Guzman-Loera was ultimately convicted and sentenced to life plus 30 years.

**II. Pedro Flores**

As mentioned, beginning in July of 2017 and continuing through December 2018, Pedro Flores met with, cooperated with, and participated in trial witness preparation with the government trial team for the cause entitled *United States of America -vs- Joaquin Archivaldo Guzman-Loera*, No. 09 CR 466 (BMC), in the United States District Court, Eastern District of New York, Honorable Brian Cogan presiding. Pedro Flores testified as a government witness in 09-CR-466 on or about December 18, 2018, under the watchful eye of daily world-wide media coverage. The months long trial resulted in the conviction of Guzman-Loera. While the defendant recognizes that numerous witnesses were called upon by the government to testify at this trial, the testimony of Pedro Flores provided crucial evidence detailing recorded conversations Flores secured of Guzman-Loera while living in Mexico as a government cooperator. Additionally, Flores provided the only testimony/evidence presented by the government as to one of the counts of the indictment. The guilty verdict on that Count establishes that the testimony of Pedro Flores was accepted by the jury as truthful, reliable, and credible.

In preparation for his trial testimony Pedro Flores met with assistant United States Attorney Adam Fels, and other members of the Guzman-Loera trial team, including at times AUSA Andrea Goldbarg, at a prison facility in excess of 20 times. During some of the preparation sessions Assistant Unites States Attorneys from the Northern District of Illinois were present. During these sessions Pedro Flores was repeatedly advised by Assistant United States Attorney Adam Fels that upon conclusion of the Guzman-Loera trial in New York, a Rule 35(b) motion would be pursued for the benefit of the defendant, requesting a reduction in his sentence

in exchange for his trial testimony. During the trial preparation sessions Pedro Flores expressed his concerns of violence directed at him, and his family members as retaliation by Guzman-Loera and his associates for providing trial testimony. Pedro Flores agreed to undertake the risk of retaliation based upon the offered reward of a reduction in his sentence offered by AUSA Fels and AUSA Goldbarg. Additionally, AUSA Fels advised Pedro Flores that upon conclusion of the Guzman-Loera trial he would prepare a memorandum directed to the United States Attorney for the Northern District of Illinois directing that a Rule 35(b) motion be filed for the defendant, which Fels in fact provided.

The defendant learned that in March 2019 AUSA Fels provided a memorandum to the United States Attorney for the Northern District of Illinois advocating a Rule 35(b) motion for the defendant. The defendant was advised in May 2019 by the USAO in Chicago that a Rule 35(b) motion would not be filed, despite the recommendation of AUSA Adam Fels. Specifically, the defendant was advised that a Rule 35(b) motion would not be filed, as the government claimed the defendant had already received sentencing consideration through the government's Guideline §5K1.1 motion at the January 27, 2015 sentencing hearing. The defendants disagree, asserting that their post-sentencing cooperation is not part of their plea agreement, as evidenced by the government's insistence that the matter proceed to sentencing, contrary to the provisions of paragraph 12. As stated below the defendants assert that the refusal of the USAO in the Northern District of Illinois to file a Rule 35(b) motion has been made in bad faith.

## III. Margarito Flores

As mentioned, Margarito Flores and his counsel were contacted by AUSA Fels about his potential testimony against Guzman-Loera and remained ready, willing and able to do so. As

was also already mentioned, from a safety and fear standpoint, Margarito and his family stood virtually in the same shoes as Pedro and his family due to the enormous pre-trial publicity leading up to the trial. And uncomfortable and frightening those shoes were. Both Defendants and their families remain in enormous danger based upon Guzman's conviction regardless of which brother testified. In plain point of fact, as this Court pointed out at the sentencing in 2015, this will follow these men and their families for the remainder of their lives; and the danger they, their wives, and their children faced in 2015 is now exponentially exacerbated.

## IV. Relief Sought

The defendants[1] now seek an order from the Court directing the United States Attorney for the Northern District of Illinois to file a motion under Rule 35(b) of the Federal Rules of Criminal Procedure, requesting a reduction in the 168 month sentence imposed by this Court on January 27, 2015, based upon their post-sentencing substantial assistance to the government that could not have been anticipated by the parties or the Court at the time of sentencing. Nor was such post-sentencing cooperation in the Eastern District of New York contractually or otherwise obligated under the express terms of the plea agreements, see ¶ 12. The defendants assert that as they were advised by the government in 2014 that their cooperation was complete, triggering their January 2015 sentencing and the surrender of the possibility that this Court would know the nature and extent of their complete cooperation and a jury determination of the credibility of their testimony, this was not properly weighed by the court at the 2015 sentencing. The

[1] While only Pedro Flores testified at the Guzman-Lorena trial, Margarito Flores remained willing and able to testify if needed; and undersigned counsel, [redacted] spoke several times with the Guzman prosecutors. Because of the nature of the brothers' relationship and mutual cooperation the government has always agreed to treat each brother's cooperation as the same. More to the point, however, and as will be discussed more fully herein, the danger and consequences of such testimony to both Defendants and their families has become essentially the same since virtually every media story or article in the enormously widespread publicity leading up to the trial anticipated the testimony of both brothers, contained both of their photographs, and essentially treated them as one much like the plea agreement.

defendant's extensive debriefing in 2017 and 2018, and his December 2018 trial testimony outside this District, support his claim of post-sentencing substantial assistance. The defendant assert that the offer of a sentence reduction by the government, repeatedly offered to Pedro Flores by AUSA Fels during his trial preparation sessions is binding upon the United States Attorney in this District. The memorandum of AUSA Fels to the United States Attorney for the Northern District of Illinois establishes that the defendant has earned sentence reduction consideration. The defendant asserts that the United States Attorney for the Northern District of Illinois has acted in bad faith by failing to provide the relief sought under Federal Rule of Criminal Procedure 35(b).

Wade v. United States, 504 U.S. 181 (1992) establishes that Federal District Courts have authority to review a prosecutor's refusal to file a substantial assistance motion and to grant a remedy if it is determined that the refusal is based on an unconstitutional motive. In Kirk v. U.S. Department of Justice, 842 F. 3d 1063 (7th Cir. 2016) the court held that the district court has the power to entertain a motion asking the judge to compel the government to file a motion under Rule 35(b).

Based upon the many conversations that the undersigned counsels have had with the USAO regarding this Rule 35 issue, it appears to be the opinion of that office that while only remotely possible, the testimony against Guzman-Loera was anticipated by the contractual provisions of the plea agreement. The written agreement drafted by the government does not support this position. The plain meaning of paragraph 12 establishes that the Flores' have provided post-sentencing cooperation which was beyond their obligation under the plea agreement. While sophisticated contract lawyers might well come to the same or different conclusions, this sentencing should not be affected by what undersigned counsel—reaching back

to their law school days which is longer than they would care to admit—a "mutual mistake." Contract or no contract, undersigned counsel represent to the Court that if they had believed there was a realistic chance these men would ever be required to testify against Guzman-Loera, they would never have consented to the 2015 sentencing date, which expressly contemplated and stated that they would not be sentenced until their cooperation was complete. See, ¶ 12 of the plea agreements.

Thus, since the law clearly permits the Court to compel the government to file a Rule 35(b) motion under circumstances such as this, the undersigned counsels submit that this Court can easily cut to the very heart of the matter by requiring the government to produce *in camera* the memorandum authored by AUSA Adam Fels of the Department of Justice, Criminal Division, Narcotics and Dangerous Drugs Section. Upon review of this memorandum the Court can make its own independent decision as to whether this constitutes substantial assistance to the government meriting a further reduction in sentence attributable to Defendants giving live testimony against Guzman-Loera, and the attendant publicity and danger that such testimony would create for them, their wives, and their children, In plain-point of fact, the Defendants, their wives, and now their children, feel far more unsafe today than they did in 2015. That, too, is the opinion of AUSA Fels and the Guzman-Loera prosecution team.

**WHEREFORE** the defendants respectfully pray for this Honorable Court to enter an order directing the government to produce, for an in-camera inspection, the memorandum by AUSA Adam Fels advocating for a motion under Rule 35(b) of the Federal Rules of Criminal Procedure, and to further enter an order directing the government to file a Rule 35(b) motion.

Respectfully submitted,

[redacted]

[redacted],

.

[redacted]

[redacted]

## CERTIFICATE OF SERVICE

[redacted] Attorney at Law, hereby certifies that the foregoing Defendants' Motion to Compel the Government to File a Motion Under Federal Rule of Criminal Procedure 35(b), was served on August 21, 2019.

[redacted]

[redacted]

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
AUG 22 2012
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 383 - 10 |
| vs. | ) | Judge Ruben Castillo |
| | ) | |
| PEDRO FLORES | ) | |

## PLEA AGREEMENT

1. This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, GARY S. SHAPIRO, and defendant PEDRO FLORES, and his attorney, [redacted] is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2. The third superseding indictment in this case charges defendant with conspiracy to possess with intent to distribute and to distribute controlled substances in violation of Title 21, United States Code, Section 846 (Count One), and conspiracy to import a controlled substance into the United States, in violation of Title 21, United States Code, Section 963 (Count Two).

3. Defendant has read the charges against him contained in the third superseding indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

**Charge to Which Defendant is Pleading Guilty**

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the superseding indictment: Count One, which charges defendant with conspiring to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely 5 kilograms or more of mixtures and substances containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, and 1 kilogram or more of mixtures and substances containing a detectable amount of heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

**Factual Basis**

6. Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the third superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than in or about May 2005, and continuing until at least on or about December 1, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant PEDRO FLORES conspired with Joaquin Guzman-Loera, a/k/a "El Chapo," a/k/a "Chapo Guzman," Ismael Zambada-Garcia, a/k/a "El Mayo," a/k/a "Mayo

Zambada," Jesus Vicente Zambada-Niebla, a/k/a "Vicente Zambada-Niebla," a/k/a "Vicente Zambada," a/k/a "Mayito," a/k/a "30," Alfredo Guzman-Salazar, a/k/a "Alfredillo," Alfredo Vasquez-Hernandez, a/k/a "Alfredo Compadre," Juan Guzman-Rocha, a/k/a "Juancho," German Olivares, Felipe Cabrera-Sarabia, Tomas Arevalo-Renteria, and Margarito Flores, and with others known and unknown, knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely 5 kilograms or more of mixtures and substances containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, and 1 kilogram or more of mixtures and substances containing a detectable amount of heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

In particular, PEDRO FLORES, Margarito Flores, and their associates (collectively, the "Flores Crew") operated a wholesale cocaine and heroin distribution organization that distributed thousands of kilograms of cocaine and multi-kilogram quantities of heroin in the Chicago, Illinois, area and elsewhere. PEDRO FLORES and Margarito Flores obtained substantial quantities of cocaine and heroin from a drug trafficking organization in Mexico under the control of Guzman-Loera and Zambada-Garcia -- known at times as the "Federation," the "Sinaloa Cartel," and the "Sinaloa Federation" -- as well as from other sources of supply, including from members and associates of a drug trafficking organization known as the "Beltran-Leyva Organization." At the direction of PEDRO FLORES and

Margarito Flores, the Flores Crew took receipt of multi-ton quantities of cocaine, imported into the United States from Mexico, usually in shipments of hundreds of kilograms at a time, as well as multi-kilogram quantities of heroin, in Chicago, Illinois, and elsewhere. The cocaine and heroin was provided to PEDRO FLORES, Margarito Flores, and the Flores Crew on consignment, without payment at the time of delivery. Payment was subsequently made by PEDRO FLORES, Margarito Flores, the Flores Crew, and others on their behalf after some or all of the cocaine and heroin was sold to customers of PEDRO FLORES, Margarito Flores, and the Flores Crew.

PEDRO FLORES is aware that Guzman-Loera, Zambada-Garcia, and factions of the Sinaloa Cartel controlled by them, coordinated their narcotics trafficking activities to import multi-ton quantities of cocaine from Central and South American countries, including Colombia and Panama, to the interior of Mexico, using various means, including but not limited to, Boeing 747 cargo aircraft, private aircraft, submarines and other submersible and semi-submersible vessels, container ships, go-fast boats, fishing vessels, buses, rail cars, tractor trailers, and automobiles.

At certain times during the conspiracy, the Flores Crew obtained and distributed from Chicago, Illinois, and elsewhere, on average, 1500 to 2000 kilograms of cocaine per month, and received some of that quantity (and at certain times all) from factions of the Sinaloa Cartel led by Guzman-Loera and Zambada-Garcia. For some shipments of narcotics from the Guzman-Loera Faction and Zambada-Garcia Faction, PEDRO FLORES, Margarito

Flores, and the Flores Crew received the cocaine and heroin in the greater Chicago, Illinois area. For other shipments, PEDRO FLORES, Margarito Flores, and the Flores Crew received the cocaine and heroin in the greater Los Angeles, California area, where truck drivers for the Flores Crew transported the cocaine and heroin to the greater Chicago, Illinois area for further distribution.

PEDRO FLORES, Margarito Flores, and the Flores Crew used several warehouse locations to unload and store shipments of cocaine and heroin received from the Sinaloa Cartel and others in the greater Chicago, Illinois area. PEDRO FLORES, Margarito Flores, and the Flores Crew sold the cocaine and heroin for cash to wholesale customers in the greater Chicago, Illinois area, as well as to customers in the areas of Detroit, Michigan; Cincinnati, Ohio; Philadelphia, Pennsylvania; Washington, D.C.; New York, New York; Vancouver, British Columbia; Columbus, Ohio; and elsewhere. Wholesale customers in these areas further distributed the cocaine and heroin to other areas, including Milwaukee, Wisconsin.

At the direction of PEDRO FLORES and Margarito Flores, members of the Flores Crew were responsible for: (1) collecting and picking up payment from customers of the Flores Crew; (2) delivering this money to various storage locations used by the Flores Crew; (3) counting and packaging the money; and (4) reporting cash receipts to the PEDRO FLORES and Margarito Flores.

Also at the direction of PEDRO FLORES and Margarito Flores, members of the Flores Crew and other co-conspirators counted cash narcotics proceeds and packaged them so that they could be delivered to couriers who would transport them back to Mexico. Members of the Flores Crew then delivered, and caused to be delivered, millions of dollars in cash narcotics proceeds to other co-conspirators, including members of the Sinaloa Cartel, who smuggled the proceeds back to Mexico in bulk. PEDRO FLORES and Margarito Flores were aware that members and associates of the Sinaloa Cartel and other sources of supply transported and caused the transportation of large quantities of cash narcotics proceeds from locations in the United States to locations in Mexico.

The Flores Crew routinely delivered large quantities of United States currency from the sale of cocaine and heroin to the Sinaloa Cartel in one bulk shipment, without differentiating which portions of the cash narcotics proceeds were in payment for cocaine and heroin obtained from particular factions of the Sinaloa Cartel headed by Guzman-Loera and Zambada-Garcia.

At the direction of PEDRO FLORES and Margarito Flores, the Flores Crew maintained ledgers, in paper and electronic form, which tracked information relating to the Flores Crew's drug-trafficking activities, including, but not limited to: (1) amounts of narcotics received; (2) money sent to Mexican sources of supply, including the Sinaloa Cartel; (3) amounts of narcotics delivered to customers of the Flores Crew; (4) the courier

or couriers responsible for particular deliveries to customers; (5) money received from customers; and (6) payments to members of the Flores Crew.

PEDRO FLORES, Margarito Flores, and other members of the conspiracy used coded language and other means to misrepresent, conceal and hide, and to cause to be misrepresented, concealed and hidden, the drug trafficking activities of the conspiracy, and to avoid detection and apprehension by law enforcement authorities.

Through the course of the above-described conspiracy, PEDRO FLORES and Margarito Flores, and their co-conspirators are responsible for approximately $938,415,000 of cash narcotics proceeds, in the form of bulk United States Currency, that was transported from the United States to Mexico in furtherance of the conspiracy.

In approximately 2007, at the direction of PEDRO FLORES, Flores Crew member Cesar Perez purchased a number of firearms – including 9 mm handguns, a .45 caliber handgun, a .357 handgun and a .38 caliber revolver – to be distributed to customers of the Flores Crew. Perez stored these firearms at one of the Flores Crew's stash houses located at 1272 Sante Fe Road, Romeoville, Illinois. Also at the direction of PEDRO FLORES, in approximately 2007, Perez purchased an AK-47, which he stored at one of the Flores Crew's stash houses located at 14238 Napa Circle, Plainfield, Illinois.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are

not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

8. Defendant, for purposes of computing his sentence under Guideline § 1B1.2, stipulates to having committed the following additional offense(s), originally charged in the United States District Court for the Eastern District of Wisconsin, and thereafter transferred pursuant to Fed. R. Crim. P. 20 to the United States District Court for the Northern District of Illinois as Case No. 09 CR 660: Beginning in or about September 2001, and continuing thereafter until at least November 18, 2003, in the State and Eastern District of Wisconsin and elsewhere, PEDRO FLORES and Margarito Flores knowingly and intentionally conspired with each other, and with other persons known and unknown to the grand jury, to distribute and to possess with the intent to distribute a controlled substance, namely five kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Sections 846.

On or about April 17, 2003, in the State and Eastern District of Wisconsin, PEDRO FLORES and Margarito Flores knowingly and intentionally possessed with the intent to distribute a controlled substance, namely five kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

On or about November 18, 2003, in the State and Eastern District of Wisconsin, PEDRO FLORES and Margarito Flores knowingly and intentionally possessed with the intent to distribute a controlled substance, namely five kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1).

From on or about July 1, 2001, to on or about February 19, 2004, in the State and Eastern District of Wisconsin, and elsewhere, PEDRO FLORES and Margarito Flores knowingly and willfully conspired with each other, and with other persons known and unknown to the grand jury, to conduct financial transactions involving the proceeds of specified unlawful activity, knowing that the transaction is designed, in whole or in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

In particular, in or about December 2001, PEDRO FLORES is aware that Margarito Flores purchased a property located in Oak Forest, Illinois. Although Margarito Flores was the actual owner of the property, Flores put the property in the name of two other individuals, (hereafter referred to as "Person A" and "Person B"). In connection with the purchase, Person A and Person B applied for a mortgage from a legitimate financial institution. On the loan application, Person A provided false income information. During 2003, Person A and

Person B purchased money orders with proceeds from Margarito Flores' and PEDRO FLORES' drug trafficking to pay the $2,133.81 monthly mortgage.

In or about January 2003, PEDRO FLORES purchased a property located in Romeoville, Illinois from two other individuals (hereafter referred to as "Person C" and "Person D"). Person D had purchased the property in or about 2001, although he maintained his residence elsewhere in 2001 and 2002. In connection with the purchase, PEDRO FLORES applied for a mortgage from Express Mortgage. On the loan application, PEDRO FLORES provided false income information. PEDRO FLORES reported he earned $6,000 monthly ($72,000 annually) from a barbershop. PEDRO FLORES paid over $13,000 at the closing in or about January 2003, and paid over $20,175 in total monthly mortgage payments during 2003 with proceeds from PEDRO FLORES' and Margarito Flores' drug trafficking.

**Maximum Statutory Penalties**

9. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a. A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $4,000,000. Defendant further understands that the judge also must impose a term of supervised release of at least five years, and up to any number of years, including life.

b. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

**Sentencing Guidelines Calculations**

10. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2011 Guidelines Manual.

b. **Offense Level Calculations.**

i. The base offense level is 38, pursuant to Guideline §§ 2D1.1(a)(5) and 2D1.1(c)(1) because the offense involved more than 150 kilograms of cocaine and more than 30 kilograms of heroin.

ii. The base offense level should be increased by two levels, pursuant to Guideline § 2D1.1(b)(2) because the offense involved importation of a controlled

substance in which an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance and a submersible or semi-submersible vessel as described in 18 U.S.C. § 2285 was used.

iii. The base offense should be increased by two levels pursuant to § 2D1.1(b)(12) because defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.

iv. The base offense level should be increased by two levels, pursuant to Guideline § 2D1.1(c)(1) because a firearm was possessed in connection with the offense.

v. The base offense level should be increased by four levels, pursuant to Guideline § 3B1.1(a) because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

vi. The base offense level should be increased by two levels pursuant to § 2D1.1(b)(14)(C) because defendant receives an adjustment under § 3B1.1 and defendant was directly involved in the importation of a controlled substance.

vii. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested

financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

viii. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c. **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d. **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 47, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of life imprisonment, in addition to any supervised release and fine the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment.

e. Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

**Cooperation**

12. Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation. The parties will make reasonable efforts to recommend a mutually agreeable date for sentencing.

**Agreements Relating to Sentencing**

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the low end of the applicable Guideline range or the statutory minimum sentence, whichever is higher, and to impose a sentence within the range agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range and statutory minimum sentence rests solely with the Court.

14. If the government moves the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth in the preceding paragraph, this Agreement will be governed,

in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of no less than 10 years and no more than 16 years. Both parties shall be free to recommend any sentence within the agreed range of 10 to 16 years. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes a sentence within the agreed range of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose a sentence within the agreed range of incarceration set forth herein, thereby rejecting this Agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this Agreement.

15. If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth above, the preceding paragraph of this plea agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e).

16. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17. After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment as to defendant.

**Forfeiture**

18. The third superseding indictment charges that defendant is liable to the United States for approximately $938,415,000, which funds are subject to forfeiture because those funds constitute proceeds of the violation to which defendant is pleading guilty. Defendant expressly acknowledges that the following funds constitute proceeds of the violation to which defendant is pleading guilty: (1) $81,500 seized from Individual A on or about September 1, 2010; (2) $10,000 used as a down payment on a vacant lot seized from G.V. Designer Homes LTD on or about September 17, 2004; and (3) the principal balance, plus any accrued interest, held in the Client Fund Account deposited at MB Financial Bank, entitled "[redacted] Client Fund Account f/b/o Margarito Flores," and bearing account number [redacted] (the "[redacted] Client Account"). Defendant agrees to the forfeiture of any and all funds held in this account with the exception of a total of $300,000 to be distributed between the families of defendant and co-defendant Margarito Flores.

Defendant further acknowledges that the 2008 Land Rover seized from Individual A on or about September 2, 2010 was purchased with proceeds of the violation to which defendant is pleading guilty. By entry of a guilty plea to the charge in the superseding indictment, defendant acknowledges that the property and funds identified above are subject to forfeiture.

19. Defendant agrees to the entry of a forfeiture judgment in an amount calculated as follows: all funds on deposit in the [redacted] Client Account as of the date of sentencing or as of a mutually-agreed date of disbursement in advance of sentencing (the account balance as of August 7, 2012 totaled $3,861,542.24), including any additional accrued interest, less $300,000 for distribution to defendant and co-defendant's families, as described in ¶18 above. Defendant and his counsel agree to remit payment in above-calculated amount to the U.S. Marshals Service. Defendant further agrees to the entry of a forfeiture judgment against the property identified above, in that this property is subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described funds and further agrees to the seizure of these funds and property so that these funds may be disposed of according to law.

20. Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

21. Defendant further acknowledges that administrative forfeiture proceedings were commenced against certain property, including: (1) a 2009 Bentley Continental Flying

Spur, seized from Individual B, declared administratively forfeited by the Drug Enforcement Administration (DEA) on or about April 25, 2011; (2) a 2003 Lexus GX470, seized from Individual C, declared administratively forfeited by DEA on September 28, 2004; (3) $406,137 worth of assorted jewelry seized from Pedro Flores, declared administratively forfeited by DEA on August 25, 2004; (4) a 2003 Lexus SUV, seized from Individual D, declared administratively forfeited by DEA on June 24, 2004; (5) one pair of diamond earrings seized from Individual D, declared administratively forfeited by DEA on June 24, 2004; (6) $8,850 worth of assorted electronic equipment seized from Individual E, declared administratively forfeited by DEA on June 24, 2004; (7) $15,000 in assorted electronic equipment seized from Individual F, declared administratively forfeited by DEA on February 19, 2004; (8) $6,425 in assorted electronic equipment seized from Pedro Flores, declared administratively forfeited by DEA on June 24, 2004; $6,132 seized from Individual E, declared administratively forfeited by DEA on June 3, 2004; (9) $3,419 seized from Individual D, declared administratively forfeited by DEA on June 3, 2004; and (10) $4,995 USC seized from Individual F, declared administratively forfeited by DEA on June 30, 2004. Defendant relinquishes all right, title, and interest he may have in this property and understands that declarations of forfeiture have been or will be entered, extinguishing any claim he may have had in the seized property.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

22. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 09 CR 383.

23. This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

24. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a. **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a

jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would

be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii. With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

b. **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of

imprisonment and fine within the maximums provided by law, and including any order of forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

c. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

25. Defendant understands that he has the right to be prosecuted for any criminal offense in the district or districts where the offense was committed. By signing this Plea

Agreement, defendant knowingly consents to prosecution of the charges against him in the Northern District of Illinois and waives any objection to the venue of this prosecution.

**Presentence Investigation Report/Post-Sentence Supervision**

26. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

27. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

28. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant

further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

29. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

## Conclusion

30. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

31. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require

defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

32. Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

33. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

34. Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 8-22-12

GARY S. SHAPIRO
Acting United States Attorney

THOMAS D. SHAKESHAFT
Assistant U.S. Attorney

PEDRO FLORES
Defendant

[redacted]
Attorney for Defendant

# EXHIBIT B

/s/ Signed Agreement
8.23.12

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 383 |
| vs. | ) | Judge Ruben Castillo |
| | ) | |
| MARGARITO FLORES | ) | |

# PLEA AGREEMENT

1. This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, GARY S. SHAPIRO, and defendant MARGARITO FLORES, and his attorney [redacted] is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2. The third superseding indictment in this case charges defendant with conspiracy to possess with intent to distribute and to distribute controlled substances in violation of Title 21, United States Code, Section 846 (Count One), and conspiracy to import a controlled substance into the United States, in violation of Title 21, United States Code, Section 963 (Count Two).

3. Defendant has read the charges against him contained in the third superseding indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

**Charge to Which Defendant is Pleading Guilty**

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the superseding indictment: Count One, which charges defendant with conspiring to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely 5 kilograms or more of mixtures and substances containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, and 1 kilogram or more of mixtures and substances containing a detectable amount of heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

**Factual Basis**

6. Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the third superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than in or about May 2005, and continuing until at least on or about December 1, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant MARGARITO FLORES conspired with Joaquin Guzman-Loera, a/k/a "El Chapo," a/k/a "Chapo Guzman," Ismael Zambada-Garcia, a/k/a "El Mayo," a/k/a "Mayo

Zambada," Jesus Vicente Zambada-Niebla, a/k/a "Vicente Zambada-Niebla," a/k/a "Vicente Zambada," a/k/a "Mayito," a/k/a "30," Alfredo Guzman-Salazar, a/k/a "Alfredillo," Alfredo Vasquez-Hernandez, a/k/a "Alfredo Compadre," Juan Guzman-Rocha, a/k/a "Juancho," German Olivares, Felipe Cabrera-Sarabia, Tomas Arevalo-Renteria, and Pedro Flores, and with others known and unknown, knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely 5 kilograms or more of mixtures and substances containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, and 1 kilogram or more of mixtures and substances containing a detectable amount of heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

In particular, MARGARITO FLORES, Pedro Flores, and their associates (collectively, the "Flores Crew") operated a wholesale cocaine and heroin distribution organization that distributed thousands of kilograms of cocaine and multi-kilogram quantities of heroin in the Chicago, Illinois, area and elsewhere. MARGARITO FLORES and Pedro Flores obtained substantial quantities of cocaine and heroin from a drug trafficking organization in Mexico under the control of Guzman-Loera and Zambada-Garcia -- known at times as the "Federation," the "Sinaloa Cartel," and the "Sinaloa Federation" -- as well as from other sources of supply, including from members and associates of a drug trafficking organization known as the "Beltran-Leyva Organization." At the direction of MARGARITO

FLORES and Pedro Flores, the Flores Crew took receipt of multi-ton quantities of cocaine, imported into the United States from Mexico, usually in shipments of hundreds of kilograms at a time, as well as multi-kilogram quantities of heroin, in Chicago, Illinois, and elsewhere. The cocaine and heroin was provided to MARGARITO FLORES, Pedro Flores, and the Flores Crew on consignment, without payment at the time of delivery. Payment was subsequently made by MARGARITO FLORES, Pedro Flores, the Flores Crew, and others on their behalf after some or all of the cocaine and heroin was sold to customers of MARGARITO FLORES, Pedro Flores, and the Flores Crew.

MARGARITO FLORES is aware that Guzman-Loera, Zambada-Garcia, and factions of the Sinaloa Cartel controlled by them, coordinated their narcotics trafficking activities to import multi-ton quantities of cocaine from Central and South American countries, including Colombia and Panama, to the interior of Mexico, using various means, including but not limited to, Boeing 747 cargo aircraft, private aircraft, submarines and other submersible and semi-submersible vessels, container ships, go-fast boats, fishing vessels, buses, rail cars, tractor trailers, and automobiles.

At certain times during the conspiracy, the Flores Crew obtained and distributed from Chicago, Illinois, and elsewhere, on average, 1500 to 2000 kilograms of cocaine per month, and received some of that quantity (and at certain times all) from factions of the Sinaloa Cartel led by Guzman-Loera and Zambada-Garcia. For some shipments of narcotics from the Guzman-Loera Faction and Zambada-Garcia Faction, MARGARITO FLORES, Pedro

Flores, and the Flores Crew received the cocaine and heroin in the greater Chicago, Illinois area. For other shipments, MARGARITO FLORES, Pedro Flores, and the Flores Crew received the cocaine and heroin in the greater Los Angeles, California area, where truck drivers for the Flores Crew transported the cocaine and heroin to the greater Chicago, Illinois area for further distribution.

MARGARITO FLORES, Pedro Flores, and the Flores Crew used several warehouse locations to unload and store shipments of cocaine and heroin received from the Sinaloa Cartel and others in the greater Chicago, Illinois area. MARGARITO FLORES, Pedro Flores, and the Flores Crew sold the cocaine and heroin for cash to wholesale customers in the greater Chicago, Illinois area, as well as to customers in the areas of Detroit, Michigan; Cincinnati, Ohio; Philadelphia, Pennsylvania; Washington, D.C.; New York, New York; Vancouver, British Columbia; Columbus, Ohio; and elsewhere. Wholesale customers in these areas further distributed the cocaine and heroin to other areas, including Milwaukee, Wisconsin.

At the direction of MARGARITO FLORES and Pedro Flores, members of the Flores Crew were responsible for: (1) collecting and picking up payment from customers of the Flores Crew; (2) delivering this money to various storage locations used by the Flores Crew; (3) counting and packaging the money; and (4) reporting cash receipts to the MARGARITO FLORES and Pedro Flores.

Also at the direction of MARGARITO FLORES and Pedro Flores, members of the Flores Crew and other co-conspirators counted cash narcotics proceeds and packaged them so that they could be delivered to couriers who would transport them back to Mexico. Members of the Flores Crew then delivered, and caused to be delivered, millions of dollars in cash narcotics proceeds to other co-conspirators, including members of the Sinaloa Cartel, who smuggled the proceeds back to Mexico in bulk. MARGARITO FLORES and Pedro Flores were aware that members and associates of the Sinaloa Cartel and other sources of supply transported and caused the transportation of large quantities of cash narcotics proceeds from locations in the United States to locations in Mexico.

The Flores Crew routinely delivered large quantities of United States currency from the sale of cocaine and heroin to the Sinaloa Cartel in one bulk shipment, without differentiating which portions of the cash narcotics proceeds were in payment for cocaine and heroin obtained from particular factions of the Sinaloa Cartel headed by Guzman-Loera and Zambada-Garcia.

At the direction of MARGARITO FLORES and Pedro Flores, the Flores Crew maintained ledgers, in paper and electronic form, which tracked information relating to the Flores Crew's drug-trafficking activities, including, but not limited to: (1) amounts of narcotics received; (2) money sent to Mexican sources of supply, including the Sinaloa Cartel; (3) amounts of narcotics delivered to customers of the Flores Crew; (4) the courier

or couriers responsible for particular deliveries to customers; (5) money received from customers; and (6) payments to members of the Flores Crew.

MARGARITO FLORES, Pedro Flores, and other members of the conspiracy used coded language and other means to misrepresent, conceal and hide, and to cause to be misrepresented, concealed and hidden, the drug trafficking activities of the conspiracy, and to avoid detection and apprehension by law enforcement authorities.

Through the course of the above-described conspiracy, MARGARITO FLORES and Pedro Flores, and their co-conspirators are responsible for approximately $938,415,000 of cash narcotics proceeds, in the form of bulk United States Currency, that was transported from the United States to Mexico in furtherance of the conspiracy.

In approximately 2007, at the direction of Pedro Flores, Flores Crew member Cesar Perez purchased a number of firearms – including 9 mm handguns, a .45 caliber handgun, a .357 handgun and a .38 caliber revolver – to be distributed to customers of the Flores Crew. Perez stored these firearms at one of the Flores Crew's stash houses located at 1272 Sante Fe Road, Romeoville, Illinois. Also at the direction of Pedro Flores, in approximately 2007, Perez purchased an AK-47, which he stored at one of the Flores Crew's stash houses located at 14238 Napa Circle, Plainfield, Illinois.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are

not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

8. Defendant, for purposes of computing his sentence under Guideline § IB1.2, stipulates to having committed the following additional offense(s), originally charged in the United States District Court for the Eastern District of Wisconsin, and thereafter transferred pursuant to Fed. R. Crim. P. 20 to the United States District Court for the Northern District of Illinois as Case No. 09 CR 660: Beginning in or about September 2001, and continuing thereafter until at least November 18, 2003, in the State and Eastern District of Wisconsin and elsewhere, MARGARITO FLORES and Pedro Flores knowingly and intentionally conspired with each other, and with other persons known and unknown to the grand jury, to distribute and to possess with the intent to distribute a controlled substance, namely five kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Sections 846.

On or about April 17, 2003, in the State and Eastern District of Wisconsin, MARGARITO FLORES and Pedro Flores knowingly and intentionally possessed with the intent to distribute a controlled substance, namely five kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A).

On or about November 18, 2003, in the State and Eastern District of Wisconsin, MARGARITO FLORES and Pedro Flores knowingly and intentionally possessed with the intent to distribute a controlled substance, namely five kilograms or more of a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1).

From on or about July 1, 2001, to on or about February 19, 2004, in the State and Eastern District of Wisconsin, and elsewhere, MARGARITO FLORES and Pedro Flores knowingly and willfully conspired with each other, and with other persons known and unknown to the grand jury, to conduct financial transactions involving the proceeds of specified unlawful activity, knowing that the transaction is designed, in whole or in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

In particular, in or about December 2001, MARGARITO FLORES purchased a property located in Oak Forest, Illinois. Although MARGARITO FLORES was the actual owner of the property, Flores put the property in the name of two other individuals, (hereafter referred to as "Person A" and "Person B"). In connection with the purchase, Person A and Person B applied for a mortgage from a legitimate financial institution. On the loan application, Person A provided false income information. During 2003, Person A and Person

B purchased money orders with proceeds from MARGARITO FLORES' and Pedro Flores' drug trafficking to pay the $2,133.81 monthly mortgage.

In or about January 2003, MARGARITO FLORES is aware that Pedro Flores purchased a property located in Romeoville, Illinois from two other individuals (hereafter referred to as "Person C" and "Person D"). Person D had purchased the property in or about 2001, although he maintained his residence elsewhere in 2001 and 2002. In connection with the purchase, Pedro Flores applied for a mortgage from Express Mortgage. On the loan application, Pedro Flores provided false income information. Pedro Flores reported he earned $6,000 monthly ($72,000 annually) from a barbershop. Pedro Flores paid over $13,000 at the closing in or about January 2003, and paid over $20,175 in total monthly mortgage payments during 2003 with proceeds from Pedro Flores' and MARGARITO FLORES' drug trafficking.

**Maximum Statutory Penalties**

9. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a. A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $4,000,000. Defendant further understands that the judge also

must impose a term of supervised release of at least five years, and up to any number of years, including life.

b. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

**Sentencing Guidelines Calculations**

10. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2011 Guidelines Manual.

b. **Offense Level Calculations.**

i. The base offense level is 38, pursuant to Guideline §§ 2D1.1(a)(5) and 2D1.1(c)(1) because the offense involved more than 150 kilograms of cocaine and more than 30 kilograms of heroin.

ii. The base offense level should be increased by two levels, pursuant to Guideline § 2D1.1(b)(2) because the offense involved importation of a controlled substance in which an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance and a submersible or semi-submersible vessel as described in 18 U.S.C. § 2285 was used.

iii. The base offense should be increased by two levels pursuant to § 2D1.1(b)(12) because defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.

iv. The base offense level should be increased by two levels, pursuant to Guideline § 2D1.1(c)(1) because a firearm was possessed in connection with the offense.

v. The base offense level should be increased by four levels, pursuant to Guideline § 3B1.1(a) because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

vi. The base offense level should be increased by two levels pursuant to § 2D1.1(b)(14)(C) because defendant receives an adjustment under § 3B1.1 and defendant was directly involved in the importation of a controlled substance.

vii. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to

accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

viii. In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c. **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d. **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 47, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of life imprisonment, in addition to any supervised

release and fine the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment.

e. Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead either party to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

## Cooperation

12. Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation. The parties will make reasonable efforts to recommend a mutually agreeable date for sentencing.

## Agreements Relating to Sentencing

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the low end of the applicable Guideline range or the statutory minimum sentence, whichever is higher, and to impose a sentence within the range agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range and statutory minimum sentence rests solely with the Court.

14. If the government moves the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth in the preceding paragraph, this Agreement will be governed,

in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). At the time of the execution of this Plea Agreement, it is the government's express intention to so move. That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of no less than 10 years and no more than 16 years. Both parties shall be free to recommend any sentence within the agreed range of 10 to 16 years. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes a sentence within the agreed range of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose a sentence within the agreed range of incarceration set forth herein, thereby rejecting this Agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this Agreement.

15. If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth above, the preceding paragraph of this plea agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw

his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e).

16. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17. After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment as to defendant.

**Forfeiture**

18. The third superseding indictment charges that defendant is liable to the United States for approximately $938,415,000, which funds are subject to forfeiture because those funds constitute proceeds of the violation to which defendant is pleading guilty. Defendant expressly acknowledges that the following funds constitute proceeds of the violation to which defendant is pleading guilty: (1) $81,500 seized from Individual A on or about September 1, 2010; (2) $10,000 used as a down payment on a vacant lot seized from G.V. Designer Homes LTD on or about September 17, 2004; and (3) the principal balance, plus any accrued interest, held in the Client Fund Account deposited at MB Financial Bank, entitled "[redacted] Client Fund Account f/b/o Margarito Flores," and bearing account number [redacted] (the "[redacted] Client Account"). Defendant agrees to the

forfeiture of any and all funds held in this account with the exception of a total of $300,000 to be distributed between the families of defendant and co-defendant Margarito Flores. Defendant further acknowledges that the 2008 Land Rover seized from Individual A on or about September 2, 2010 was purchased with proceeds of the violation to which defendant is pleading guilty. By entry of a guilty plea to the charge in the superseding indictment, defendant acknowledges that the property and funds identified above are subject to forfeiture.

19. Defendant agrees to the entry of a forfeiture judgment in an amount calculated as follows: all funds on deposit in the [redacted] Client Account as of the date of sentencing or as of a mutually-agreed date of disbursement in advance of sentencing (the account balance as of August 7, 2012 totaled $3,861,542.24), including any additional accrued interest, less $300,000 for distribution to defendant and co-defendant's families, as described in ¶18 above. Defendant and his counsel agree to remit payment in the above-calculated amount to the U.S. Marshals Service. Defendant further agrees to the entry of a forfeiture judgment against the property identified above, in that this property is subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described funds and further agrees to the seizure of these funds and property so that these funds may be disposed of according to law.

20. Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

21. Defendant further acknowledges that administrative forfeiture proceedings were commenced against certain property, including: (1) a 2009 Bentley Continental Flying Spur, seized from Individual B, declared administratively forfeited by the Drug Enforcement Administration (DEA) on or about April 25, 2011; (2) a 2003 Lexus GX470, seized from Individual C, declared administratively forfeited by DEA on September 28, 2004; (3) $406,137 worth of assorted jewelry seized from Pedro Flores, declared administratively forfeited by DEA on August 25, 2004; (4) a 2003 Lexus SUV, seized from Individual D, declared administratively forfeited by DEA on June 24, 2004; (5) one pair of diamond earrings seized from Individual D, declared administratively forfeited by DEA on June 24, 2004; (6) $8,850 worth of assorted electronic equipment seized from Individual E, declared administratively forfeited by DEA on June 24, 2004; (7) $15,000 in assorted electronic equipment seized from Individual F, declared administratively forfeited by DEA on February 19, 2004; (8) $6,425 in assorted electronic equipment seized from Pedro Flores, declared administratively forfeited by DEA on June 24, 2004; $6,132 seized from Individual E, declared administratively forfeited by DEA on June 3, 2004; (9) $3,419 seized from Individual D, declared administratively forfeited by DEA on June 3, 2004; and (10) $4,995 USC seized from Individual F, declared administratively forfeited by DEA on June 30, 2004. Defendant relinquishes all right, title, and interest he may have in this property and understands that declarations of forfeiture have been or will be entered, extinguishing any claim he may have had in the seized property.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

22. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 09 CR 383.

23. This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

24. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a

jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would

be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii. With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

b. **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of

imprisonment and fine within the maximums provided by law, and including any order of forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255.The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

c. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

25. Defendant understands that he has the right to be prosecuted for any criminal offense in the district or districts where the offense was committed. By signing this Plea

Agreement, defendant knowingly consents to prosecution of the charges against him in the Northern District of Illinois and waives any objection to the venue of this prosecution.

**Presentence Investigation Report/Post-Sentence Supervision**

26. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

27. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

28. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant

further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

**Other Terms**

29. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

**Conclusion**

30. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

31. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require

defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

32. Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

33. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

34. Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 8.23.12

Gary S. Shapiro / MSS
GARY S. SHAPIRO
Acting United States Attorney

/s/
MARGARITO FLORES
Defendant

Thomas D. Shakeshaft
THOMAS D. SHAKESHAFT
Assistant U.S. Attorney

/s/
[redacted]
Attorney for Defendant