UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,    :   09-CR-466(BMC)
                             :
                             :
                             :
     -against-               :   United States Courthouse
                             :   Brooklyn, New York
                             :
                             :
                             :
JOAQUIN GUZMAN LOERA,        :   Friday, January 4, 2019
                             :   9:30 a.m.
          Defendant.         :
                             :
                             :
                             :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    RICHARD P. DONOGHUE, ESQ.
                       United States Attorney
                       Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                       BY: ANDREA GOLDBARG, ESQ.
                           GINA M. PARLOVECCHIO, ESQ.
                           MICHAEL P. ROBOTTI, ESQ.
                           ADAM S. FELS, ESQ.
                           ANTHONY NARDOZZI, ESQ.
                           MICHAEL LANG, ESQ.
                           AMANDA LISKAMM, ESQ.
                           Assistant United States Attorneys


For the Defendant:     BALAREZO LAW
                       Attorneys for the Defendant -
                       Joaquin Guzman Loera
                            400 Seventh Street, NW
                            Suite 306
                            Washington, DC 20004
                       BY: A. EDUARDO BALAREZO, ESQ.

A P P E A R A N C E S: (Continued.)

LAW OFFICE OF PURPURA AND PURPURA
Attorneys for the Defendant -
Joaquin Guzman Loera
8 E Mulberry Street
Baltimore, Maryland 21202
BY: WILLIAM B. PURPURA, ESQ.


Court Reporter: Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter
Telephone: (718) 613-2487
Facsimile: (718) 613-2694
E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography. Transcript
produced by Computer-aided Transcription.

1           (In open court.)

2           (Witness takes the witness stand.)

3           (Defendant enters the courtroom at 9:34 a.m.)

4           COURTROOM DEPUTY:  All rise.

5           THE COURT:  Good morning.  Let's have the jury in,

6    please.

7           COURTROOM DEPUTY:  Jury entering.

8           (Jury enters courtroom at 9:37 a.m.)

9           THE COURT:  All right.  Everyone be seated, please.

10   Good morning, ladies and gentlemen.

11          THE JURY: (Collectively) Good morning.

12          THE COURT:  We will continue with direction.

13          MS. LISKAMM:  Thank you, your Honor.

14   **VICENTE ZAMBADA NIEBLE**,

15        called as a witness, having been previously duly

16        sworn, was examined and testified as follows:

17   DIRECT EXAMINATION

18   BY MS. LISKAMM:

19   Q    Mr. Zambada, we were talking about what was going on in

20   Culiacan in the beginning of 2008 and you said Alfredo Beltran

21   had been arrested?

22   A    That's right.  That's how it was.

23   Q    What happened after Culiacan?

24   A    Well, based on this Arturo Beltran Leyva thought that my

25   dad and think Compadre Chapo had given up Alfredo Beltran

1    Beltran Leyva.

2    Q    What happened next?

3    A    Well, as a result, and as a result of the information

4    about that, there was a war that broke out against the Beltran

5    Leyvas.

6    Q    When did the war break out?

7    A    April 30, 2008.

8    Q    And how do you remember that date?

9    A    In Mexico, it's a holiday.  It's Children's Day.

10   Q    What happened on April 30th of 2008?

11   A    Well, that day, actually, we had been collecting

12   information months before that.  We had been collecting

13   information as to the location of the offices and the safe

14   houses of the Beltran Leyvas and the Carillo Funteses.  And we

15   were passing on that information that we had collected to the

16   Government and to the PFP, the military people because we had

17   reached an agreement prior to that; that is, my dad, my

18   Compadre Chapo, and I, and the PFP.  And the military people

19   wanted that information so they could act up on this and work

20   with the Government.

21         And another one of the reasons was that my dad and

22   my Compadre Chapo had indicated that if we had located an

23   office or a safe house with 15 to 20 people, we had to then

24   send twice as many people so that an armed confrontation would

25   ensue and a lot of people would end up dead.  So the PFP and

1    the military, they acted up on this information that we had

2    passed on to them, and were searches and raids on the

3    Government side.  And there were armed confrontations between

4    the PFP and the military against the Beltran Leyvas sicarios

5    in those houses.  And that's how that war broke out on

6    April 30th against the Beltran Leyvas.

7    Q    When you say "armed confrontation," what do you mean?

8    A    Well, it's a confrontation, it's a shooting.  It's

9    between the sicarios and the Government in this case.  And the

10   Government had gotten to those houses to search them.

11   Q    You mentioned sicarios.  Are you familiar with who the

12   defendant's sicarios were at this time?

13   A    Well, we had different people who were in charge of our

14   security.  And we had different offices and people, people in

15   charge of those offices and those people.  I had some people.

16   I had M-1 with Manuel Torres.  Gonzalo Inzunza, Macho Prieto,

17   he was part my security detail.  Another guy who was my people

18   Chino Anthrax.  And on my Compadre Chapo's side, even though

19   we were all the same people, Negro.  Fantasma, there was

20   Licensiado Damaso and Licensiado Damaso's people.  And another

21   person they call Cholo, Cholo Ivan.

22   Q    What kind of interactions did you have with these people

23   that ran the groups of sicarios?

24   A    Well, since I was the one who was in Culiacan because my

25   dad and my Compadre Chapo were up in the mountains most of the

1    time, well, then all these people were in direct communication

2    with me and they received the orders directly from me.

3    Q    And who were you in communication with at that time?

4    A    I was in direct communication at the time with my dad and

5    my Compadre Chapo.

6    Q    And these individuals that you just mentioned who were in

7    charge of the sicarios, approximately how many actual sicarios

8    were they each in charge of?

9    A    Well from, like, 25 to 30 people each.

10   Q    Okay.  You mentioned somebody named Cholo Ivan.  Who is

11   that?

12   A    Well, I know him he's a friend of mine.  He was my

13   Compadre Chapo's people.  He was part of his group and he was

14   also in charge of his security.

15   Q    When you say "he" and "his," are you referring to the

16   defendant?

17   A    Ivan, Cholo Ivan, was part of my compadre's people and

18   his security.

19   Q    And how many times have you met Cholo Ivan?

20   A    Several times.  Many times.

21   Q    Okay.  For the witness only.  Showing you what's been

22   marked for identification as Government's Exhibit 56.

23            MR. BALAREZO:  No objection, your Honor.

24            THE COURT:  56 is received.

25            (Government's Exhibit 56 was received in evidence

1   as of this date.)

2   Q    Mr. Zambada, do you recognize this person?

3   A    Yes.  To me, that's Cholo Ivan.

4   Q    Okay.  And again for the witness only.

5        Showing you what's been marked as Government's

6   Exhibit 1-E for identification?

7        MR. BALAREZO:  No objection, your Honor.

8        THE COURT:  1-E is received.

9        (Government's Exhibit 1-E was received in evidence

10  as of this date.)

11  Q    Mr. Zambada who is in this photo?

12  A    First of all, my Compadre Chapo.  And secondly, Cholo

13  Ivan.

14  Q    All right.  During this time period, what were the

15  objectives of the Sinaloa Cartel?

16  A    Well, to look for the Beltran Leyvas's people, the

17  Carillo Funtes's people.  There had already been a war that

18  declared and a lot of people had died by then.  So the

19  objective was to look for their offices so we can send our

20  people to fight them.

21  Q    What would happen when you would locate one of the

22  Beltran Leyva or Carillo Funtes's offices?

23  A    Well, these people would tell me and they would also

24  Juancho at the time and, you know, the people who were also in

25  charge of locating those offices.  Well, so then I would then

1    ask authorization from my dad.  I would tell him that we had

2    located an office.  And Juancho would could the same thing

3    with my Compadre Chapo.  And I would then send my people on

4    this occasion.  I would send M1, Chino Anthrax, Fantasma,

5    Negro.  And then they would go to the houses where the Beltran

6    Leyvas were, and then there would be a confrontation that

7    would ensue between our people and the people of the Beltran

8    Leyvas and the Carillo Funteses and I mean shootings.

9    Q    Okay.  Did you stay in Culiacan after the war broke out?

10   A    I would he was in Culiacan for about two months and then

11   I moved out.

12   Q    Why did you leave?

13   A    Well, we had already collected a lot of information

14   regarding to the fact that one of the main targets of the

15   Beltran Leyvas, the Carillo Funteses, and the Zetas was me, my

16   own person.  And another reason was that since the Government

17   had acted on April 30th, there were many arrests of all the

18   sicarios.

19          And one of the Beltran Leyvas's people offices was

20   very close to my house where my wife and my children lived.

21   And out of the sicarios that had been arrested by the

22   Government, I had a connection with a major from the army who

23   had actually arrested them at that safe house.  He sent a

24   message to me asking me if my wife had a car of a certain

25   color and certain plates and he did send me pictures of my

1    wife.  And I said, yes.  And then he told me that one of the

2    targets of the people who were at the office was to follow my

3    wife whenever she would go drop off my kids at school.  And

4    they were stating that their objective was to kidnap my wife,

5    to kill her and to send me her head.

6          So I took my family to Mazatlan.  My children were

7    little, so I put them in school there.  And I had more

8    information about that and, in fact, I had people who were

9    protecting my wife without her knowing so that she wouldn't

10   feel mortified and she didn't know this.  But anyway, the

11   sicarios didn't go ahead with this because they knew that she

12   had a security detail and they didn't want for there to be an

13   armed confrontation.  And that was the reason why I left

14   Culiacan and took my family to Mazatlan.

15   Q    During the two months that you were in Culiacan before

16   you moved, how many people were killed as a result of this

17   war?

18          MR. BALAREZO:  Objection.

19          THE COURT:  More of a basis.

20   Q    Mr. Zambada, while you were in Culiacan, were the heads

21   of the sicarios reporting everything to you that was on in

22   Culiacan?

23   A    Yes, they kept reporting to me the radio and phone what

24   was happening in Culiacan.

25   Q    What types of things would they report to you?

1  A    That in Culiacan that there were a lot of armed

2  confrontations, shootouts, and that there were many people who

3  had been killed, I don't know the exact number.  And that

4  there were many people who resulted dead from the Government,

5  from the PFP, because the Beltran Leyvas's hit men had

6  attacked them.  And so, what they did was they tried to attack

7  the Government because they knew that the Government was on

8  our side protecting us.  So there were dozens who would end up

9  dead from the PFP.

10  Q    Okay.  You said you want to Mazatlan; correct?

11  A    Yes.

12  Q    While you were in Mazatlan, who was left in charge in

13  Culiacan?

14  A    Juancho.

15  Q    And who did Juancho report to?

16  A    To me and he also was in direct communication with my dad

17  and my Compadre Chapo.

18  Q    And while you were in Mazatlan, did you remain in contact

19  with the heads of the sicarios?

20  A    On occasion, yes.  But I was in more contact with

21  Juancho, and Juancho would report things to me.

22  Q    How were you in contact with the people in Culiacan?

23  A    By radio and by Juancho.

24  Q    And who what were you learning was happening in Culiacan

25  during that time?

1  A    Well, that the war was still on and that we were still

2  looking for the Beltran Leyvas.  And also whenever the Beltran

3  Leyvas's people would attack.

4  Q    Thank you, sir.

5        Who, specifically, from the Beltran Leyvas were you

6  targeting?

7  A    The targets, well, the main target was a person they

8  called Guacho who had large group of the Beltran Leyvas.

9  There was another person by the name Gonzalito.  Gonzalo

10  Arajo.  Another person any Chaiman who had another group of

11  the Beltran Leyvas.  And they were the ones who were right

12  there in Culiacan.

13  Q    Were these three people that you mentioned, did they run

14  the sicarios nor the Beltran Leyvas?

15  A    Yes.

16  Q    Okay.  Have you ever met Guacho?

17  A    Yes.  I saw him two or three times with a friend of

18  Alfredo Beltran Leyva.

19  Q    Showing for the witness only.

20        Showing you what's marked as Government's Exhibit

21  87-B for identification.

22        MR. BALAREZO:  No objection.

23        THE COURT:  Received.

24        (Government's Exhibit 87-B was received in evidence

25  as of this date.)

1  Q    Mr. Zambada, who are we looking at here?

2  A    To me, that's Guacho.

3  Q    Okay.  And do you know what specifically he was

4  responsible for doing with the Beltran Leyvas?

5  A    He was a sicario who was in charge of all the Beltran

6  Leyvas people in Culiacan.

7  Q    Okay.  Let's talk briefly about the communication systems

8  being used during the war.

9        How did the Sinaloa Cartel know what their rivals

10 were doing during this period of time?

11 A    Well, I specifically, myself, had wiretapping equipment

12 for phones and radios.  Excuse me?

13 Q    I interrupted you.  Where did you obtain that equipment?

14 A    I bought it directly through a connection that I had with

15 the military.  A general sold it to me.

16 Q    For how much?

17 A    Juancho and I, the two of us together, paid $750,000.

18 Q    And what did this equipment allow you to do?

19 A    Intercept phones, also messages, that were sent to

20 phones, radios, like a portable radios with repeaters.

21 Q    Okay.  You've mentioned a couple times yesterday the use

22 of either code names or code words being used by the

23 Sinaloa Cartel.

24 A    Yes.

25 Q    Why would you use code names and code words?

1   A    Well, because we didn't want for us to be identified well

2   by the Government and also with our enemies could also have

3   wiretapping equipment and they could be tapping us.

4   Q    Okay.  I want to turn now and talk a little bit weapons

5   that were used during the war.

6             Geographically, where did you and members of the

7   cartel obtain these weapons?

8   A    99 percent of them were obtained here in the

9   United States at the borders.

10  Q    Where at the borders?

11  A    Well, in El Paso, Texas.  I had a Herman who would get

12  weapons for me.  And in California, Mexicali and Calixeco

13  there was Pacheco.

14  Q    And what kind of weapons were you obtaining?

15  A    At that time we had a lot of assault rifles:  AK-47s

16  AR-15s, 50 millimeters.  Pistols of different calibers.

17  .38 Super, .9 millimeters.  There were other weapons that were

18  called *mata policia*, police killers.  That's the name they

19  would give to these in Mexico.

20  Q    You mentioned .50 caliber weapons.  Are you aware of

21  any .50 caliber weapons being used during the war?

22             MR. BALAREZO:  Objection.  §401.

23             THE COURT:  I agree.  Sustained.

24  Q    Mr. Zambada, how many weapons were you receiving per

25  month during the war?

1  A    It varied but it was more than a hundred weapons a month

2  on average.

3  Q    Okay.  And where were you obtaining ammunition for these

4  weapons?

5  A    Also here in the United States in the same areas at the

6  border.

7  Q    And how much ammunition were you obtaining at this time?

8  A    Well, in those years, let's say, six or seven years,

9  where we had weapons I would say millions in ammunition.

10  Q    Have you ever seen the defendant armed?

11  A    Yes.

12  Q    How often?

13  A    Every time we saw each other he was armed.

14  Q    What type of weapons did you see him armed with?

15  A    Well, always his gun at .38 Super and assault rifles as

16  AR-15, M-16 because, in my opinion, they look the same.

17  Q    The .38 Super that you saw him with, was there anything

18  distinctive about it?

19  A    Well, you know, the handle was a luxury, it was made out

20  of diamonds.

21  Q    And was there anything distinctive about the diamonds on

22  the handle?

23  A    Well, most of the time that I saw it on my compadre it

24  had an animal, jaguar, on it.

25  Q    Okay.  For the witness only.  Showing you what's been

1  marked as Government's Exhibit 1-K and 1-L.

2          Do you recognize any of the individuals in these

3  photos?

4  A    My Compadre Chapo.

5  Q    Okay.  Is this a fair and accurate picture of our

6  Compadre Chapo?

7  A    Yes.  That is my Compadre Chapo.

8          MR. BALAREZO:  No objection.

9          THE COURT:  They are received.

10         (Government's Exhibits 1-K and 1-L were received in

11 evidence as of this date.)

12 Q    And, Mr. Zambada, let me zoom in here.

13         What do we see on the -- in the pants of the

14 defendant here in this photo?

15 A    His gun, to me it's a .38 Super.  That's a caliber, I

16 recognize that.

17 Q    And what do we see -- let me see if I can zoom this in --

18 what do we see on hand grip of the .38 super?

19 A    The animal that I spoke of.  To me, it's a jaguar or

20 panther.

21 Q    And do you know who the other individual is in this

22 photo?

23 A    No, I don't know the name.

24 Q    Okay.  And, for the record, we're looking at Exhibit 1-K.

25 And switching to Exhibit 1-L again, who are we looking at here

1   in this photo?

2   A    My Compadre Chapo.

3   Q    And does that appear to be the same time period as the

4   photo we just looked at before in 1-K?

5            MR. BALAREZO:  No objection.

6            THE COURT:  It's in.  They're both in.

7            MS. LISKAMM:  Thank you.  I was asking if it appears

8   to be the same period.

9            MR. BALAREZO:  We stipulate it's the same.

10            THE COURT:  Okay.

11            MS. LISKAMM:  All right.  With that stipulation,

12   we'll move on.

13   Q    Mr. Zambada, have you ever attended any meetings with the

14   defendant where a bazooka has been fired?

15   A    Yes, one time I did.

16   Q    And where was that?

17   A    It was in the mountains, a place called Las Coloradas.

18   Q    And who was present for that?

19   A    My dad, my Compadre Chapo, my uncle Rey, Azul, me, and

20   Juancho.

21   Q    And, approximately, when did this happen?

22   A    At the end of 2007.

23   Q    Okay.  What happened in Las Colorados?

24   A    Well, we were taking the opportunity to go say hi to my

25   Compadre Chapo, my dad, Azul, who was in Culiacan at the time.

1   My uncle Rey, for whom it wasn't common to be in Culiacan, we

2   went to say hi to him.  After we had eaten and spoken, when we

3   were already on the strip at Las Colorados to get on the

4   planes, a person, a bodyguard for my Compadre Chapo, had a

5   bazooka on him.

6          MR. BALAREZO:  Your Honor, objection, §401.

7          THE COURT:  Overruled.

8   A    And Azul, one of Cesar's *armarenos*, saw the bazooka and

9   said he wanted to know how it was activated, how it was used.

10          MR. BALAREZO:  Same objection.

11          THE COURT:  I don't think it's §401 but I do think

12   it's §403.

13          MR. BALAREZO:  Objection.  §403, your Honor.

14          MS. LISKAMM:  Your Honor can we have a sidebar?

15          THE COURT:  Okay.

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1           (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4           THE COURT:  Why do we need this?

5           MS. LISKAMM:  Your Honor, this corroborates another

6   witness who has already testified about this story and it also

7   goes to the §924(c) the Violation 85.  This is one of the

8   manners and means conspiracy.

9           THE COURT:  He's already testified that he had the

10  bazooka, I had it.  So there's your §924(c), right?  Do we

11  need to go to the familiarity about firing?

12          MS. LISKAMM:  I actually wasn't trying to elicit

13  that.  He started the story about the weapon being fired.

14          MR. BALAREZO:  What's the relevance of this weapon

15  being fired?  They had multiple weapons, they had AK-47s.

16          THE COURT:  Showing he's familiar enough about it to

17  fire to which shows, tends to corroborate the fact that he had

18  it.

19          MR. BALAREZO:  But the testimony from who I

20  understand is not to be my client is the someone who fired it.

21          MS. LISKAMM:  Correct.

22          MR. BALAREZO:  Who fired to it.

23          MS. LISKAMM:  That Azul fired it.  Either Azul or

24  one of his men.

25          MR. BALAREZO:  Azul is not even here.

1      THE COURT:  So why does that matter that it was

2  fired?

3      MS. LISKAMM:  Your Honor, it goes to the defense,

4  I'm speculating here.  The defense theory of the case is that

5  the cooperators are all liars.  The corroboration in this case

6  is to be critical.  This corroborates one of the other

7  witnesses who testified to the very same story.  The story has

8  already come in, it is literally going to be, like, one more

9  question on this.

10      THE COURT:  Okay.  We're spending too much time

11  talking about it.  Take your one more question literally.

12      MS. LISKAMM:  Literally.  Thank you, your Honor.

13      (Sidebar discussion concludes.)

14      (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2    EXAMINATION BY

3    MS. LISKAMM:

4    (Continuing.)

5    Q    Mr. Zambada, you were talking about what was happening in

6    Las Colorados before you guys left to get to another location

7    to get on plane you were telling us about a bazooka?

8    A    Yes.

9    Q    What happened?

10   A    My Compadre Chapo ordered the person who was carrying it

11   to activate it to show Azul and the rest of us how it worked.

12   And he did activate it and the shot come out and it exploded,

13   up on the side of the mountain.  It was just a practice shot.

14           Afterwards, because he was right there, Azul, wanted

15   to try it himself but to target shoot but with a different

16   caliber weapon, a .40 caliber, it's also a type of explosive.

17   So he was told, like, how this worked and how to shoot.  But

18   he aimed it very low and so it exploded very near all of us.

19           MR. BALAREZO:  Your Honor, I repeat my objection to

20   this line.

21           THE COURT:  I think we had enough of this incident.

22           MS. LISKAMM:  I asked one question.

23           THE COURT:  You asked two, but that's all right.

24   Let's go on to something else.

25   Q    Mr. Zambada, are you aware of whether the cartel used

1   semiautomatic or fully automatic weapons?

2   A    They were automatic.

3   Q    How do you know that?

4   A    Well, when they arrived to us from the border they

5   arrived at semiautomatic but we had some people who were some

6   special people that turned them into fully automatic.

7   Q    Okay. You said you were receiving the semiautomatic

8   weapons from the border. Where on the border?

9        MR. BALAREZO: Objection. Asked and answered. I

10   think we know.

11   Q    Once the semiautomatic weapons arrived from the border to

12   Culiacan, who was responsible for working on them?

13   A    Well, on my part, I had a person in charge of that. His

14   name as was Pepe Jose he was an arms specialist we called an

15   armero.

16   Q    Did you have any conversations with Pepe about what work

17   he would do to the weapons?

18        MR. BALAREZO: Objection.

19        THE COURT: Sustained.

20        MS. LISKAMM: Your Honor, can I have a sidebar on

21   this.

22        THE COURT: Sure.

23        (Continued on the next page.)

24

25

1            (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4            THE COURT:  We've got Pepe modified the weapons from

5    semi to full auto.  What more do we need?

6            MS. LISKAMM:  Your Honor, we had an expert witness

7    testify that modifications were made.  The, witness if we can

8    ask him how, like, what he knows about how the modifications

9    are made, this corroborates the witness.  This goes to the

10    machine gun enhancement that we have the burden of proving

11    beyond a reasonable doubt.  If the defense is to stipulate

12    that all the guns were machine guns, then I don't need to go

13    into this.

14            THE COURT:  Okay.  Go ahead.

15            MS. LISKAMM:  Thank you.

16            (Sidebar discussion concludes.)

17            (Continued on the next page.)

18

19

20

21

22

23

24

25

1  EXAMINATION BY

2  MS. LISKAMM:

3  (Continuing.)

4  Q    Mr. Zambada, did you have any conversations with Pepe

5  about what type of work he would do on the weapons?

6  A    Yes, they came up automatic, he made them

7  semiautomatic, which we call in Culiacan automatic, rapida

8  bursts.

9  Q    I just want to clarify the translation.

10            They came in semiautomatic and they left Pepe

11 as what type of a weapon?

12 A    He converted them into automatic and we would call them

13 bursts.

14 Q    Okay.  And was the term -- the Spanish term that you

15 used "rapida"?

16 A    Rapida.

17 Q    And what does that -- what does that mean?

18 A    If it's semiautomatic, when you pull the trigger, there

19 is one shot that comes out for every pull of the trigger.

20            When it's automatic, or rapida, as we call it,

21 they come out up to 15 bullets per second.  Or until you let

22 go of the trigger so that the weapon stops shooting.

23 Q    Okay.  Are you aware of whether the defendant's weapons

24 were semiautomatic or fully automatic?

25 A    Automatic.

1    Q    How do you know that?

2    A    Well, it's common for everyone in Culiacan to use

3    automatic weapons that are rapida.  And I saw my compadre

4    shooting, practice shooting, two or three times, and it was

5    rapida.

6    Q    Okay.  I want to turn now and talk a little bit about

7    some of the murders that happened in Culiacan.

8              You previously mentioned someone named

9    El Caiman.

10   A    Yes.

11   Q    Who was he?

12   A    He was the sicario in charge of the Beltran Leyva

13   people in Culiacan.

14   Q    And what happened to El Caiman?

15   A    In the course of the war in 2008, he was murdered.

16   Q    What involvement did you have with that murder?

17   A    Well, as I said before, the guys in Culiacan and

18   Juancho as well reported to me to let me know everything

19   that was going on.  And it was reported to me that they had

20   located at a ranch Caiman.  He was one of the objectives,

21   one of the Beltran Leyva people.

22              I gave the order to go get Caiman.

23   Q    Okay, what happened to him?

24   A    Caiman, the people, my people, our people, M-1 and

25   Macho Prieto, they reported to me that they had kidnapped

1    him alive, detained him alive.

2              So I reported that to Juancho, because at the

3    time he was the person in charge at Culiacan.  And he told

4    me to put him to -- in a house of ours, a safe house of

5    ours.

6              I asked Chino, another one of my people, to

7    put Caiman in one of our offices.  And I reported that to

8    Juancho.  And I reported that to my dad, and Juancho told me

9    he had done the same for my Compadre Chapo.

10   Q    What happened to Caiman while he was at Chino's office?

11   A    Well, they kept him there for a few days.  I didn't see

12   himself myself, because I wasn't there, but Juancho would

13   tell me that he would go several times to interview him, to

14   talk to him.

15   Q    When you say "interview," what does that mean?

16   A    Well, Juancho told me the information, that he would go

17   to the office to talk to Caiman, and I want to say in a nice

18   way, but he tortured him.  They tortured him to get

19   information from him about the Beltran Leyva people in

20   Culiacan.

21   Q    Did you discuss with Juancho where he was getting

22   direction from during this time period?

23   A    Juancho would tell me that he was in direct

24   communication with my Compadre Chapo -- Chapo, excuse me,

25   and that they were passing on all the information that they

1   were extracting from Caiman.

2   Q    What ultimately what happened to Caiman?

3   A    After having him there at the office for a few days and

4   extracting that information from him, he was murdered.

5   Q    Did you discuss with Juancho who ordered that murder?

6   A    Juancho told me that he had spoken to his dad, and

7   that's how he called my Compadre Chapo, and he had said to

8   go ahead to kill him.  And on my end, I had also told my

9   dad, and he had said the same thing.

10  Q    Okay.  And, Mr. Zambada, have you ever personally

11  killed anyone?

12  A    No.

13  Q    Okay.  Have you ever relayed any orders from someone to

14  die?

15  A    Yes.  Several times.

16  Q    How many times?

17  A    I don't know, but there were several times.

18  Q    What was going on during the time period that you were

19  relaying orders to kill people?

20  A    Well, all of the people that I had mentioned before,

21  and all the people, the hitmen, they would report to me

22  regarding all the information as to what was happening in

23  Culiacan.  So I was like the boss to them, there was another

24  boss.

25              And regarding to any decision with respect to

1  killing somebody or any confrontation, I would then get

2  authorization from my dad, and Juancho would get

3  authorization from my Compadre Chapo.

4  Q    So the orders that you were relaying to kill people

5  were coming from where?

6  A    Meaning in my case?  From my dad.

7  Q    Have you ever ordered anyone to be abducted or picked

8  up?

9  A    Yes, before that I had ordered for Caiman to be

10 kidnapped, which I mentioned before.

11 Q    Okay.  Anyone else?

12 A    Well, you know the order at the time was, you know,

13 regarding all of the people that we were looking for, the

14 order was either to kill them or to kidnap them so that we

15 can get information from them.

16 Q    Mr. Zambada, have you ever stolen anything before?

17 A    No.

18 Q    And have you ever had an extramarital affair?

19 A    Yes.  One time.

20          MR. BALAREZO:  Your Honor, can we have a sidebar?

21          THE COURT:  Okay.

22          (Continued on the next page.)

23          (Sidebar conference.)

24

25

1          (The following occurred at sidebar.)

2          MR. BALAREZO:  I objected because this is my

3    witness, but this is an issue that Mr. Lichtman would like

4    to raise, because it will pertain to a witness of his.

5          THE COURT:  Okay.

6          MR. LICHTMAN:  We're getting motion after motion

7    to not be able to go in on cross-examination about personal

8    affairs that may embarrass the witness; about abortions,

9    about this, about that, about family relationships, and now

10   out of nowhere they ask about --

11         THE COURT:  Excuse me.  Excuse me.  They asked

12   because they think you're going to ask.  If you say you're

13   not going to ask, then they'll withdraw the question.

14         MR. LICHTMAN:  Where do we ask about extramarital

15   affairs?

16         THE COURT:  You must understand their thinking.

17   Conceivably it goes to honesty.  He was deceiving someone.

18   So they are concerned you are going to bring it out on

19   cross.

20         If you're not going to bring it out on cross --

21         MR. LICHTMAN:  Has it been asked yet on any of the

22   crosses?

23         THE COURT:  I don't know who's had affairs and who

24   hasn't.  Look, the important point is you don't intend to go

25   there, right?

1       MR. LICHTMAN:  Extramarital affairs?  No.

2       THE COURT:  Okay.  So we need not go there.

3       MS. LISKAMM:  Can I clarify?

4       I'm pretty sure Mr. Balarezo is doing

5  cross-examination, I want to make sure --

6       THE COURT:  Look, I agreed to hear from him.

7       MS. LISKAMM:  I just want to make sure that

8  Mr. Balarezo is not --

9       THE COURT:  Now, you've made sure.

10      MR. LICHTMAN:  Just so we're clear, we can ask,

11  have you ever lied to your family?  We don't need who they

12  cheated on their wives with.

13      MS. LISKAMM:  If you don't want to, that's fine, I

14  can withdraw the question.

15      THE COURT:  Excuse me.  Excuse me.  Are there any

16  other teeth you intend to pull before cross-examination that

17  maybe they don't intend to go?

18      MS. LISKAMM:  I'm going to ask if he's ever used a

19  fake ID before.

20      MR. LICHTMAN:  We've gone into that.

21      THE COURT:  When in doubt, when you think you're

22  about to pull the teeth on something that, in fact, is

23  closely related to motions *in limine* you have made because

24  it's not just not probative enough, talk to the defense

25  counsel, he may well say to you, I'm not going there, and

1   then you don't have to bring it out.

2          MS. LISKAMM:  Understood, Your Honor.  I didn't

3   think this was going to be an issue.  I apologize.

4          MR. LICHTMAN:  Thank you, Judge.

5          (End of sidebar conference.)

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            (In open court; Jury present.)

 2            MS. LISKAMM:  Your Honor, we withdraw the last

 3   question.

 4   BY MS. LISKAMM

 5   Q    Mr. Zambada, have you ever used a fake ID?

 6   A    Yes.

 7   Q    Okay, how many times have you done that?

 8   A    Many.  I would -- I would always travel with a fake ID.

 9   Q    Why?

10   A    Well, because of the person whom I was.  You know, I

11   was wanted by the Government, by the enemies, and I didn't

12   want to be identified.

13   Q    I want to the turn back and just wrap up, we're almost

14   done, the murder section.

15            Do you know someone by the name of Julio

16   Beltran?

17   A    Yes, I met him.

18   Q    Who is that?

19   A    Well, he was from Culiacan Sinaloa.

20   Q    Is he any relation to the Beltran Leyvas?

21   A    No.

22   Q    Okay.  Did you have any conversations with your dad or

23   defendant about Julio Beltran?

24   A    Yes, with my dad and my Compadre Chapo, and at that

25   time it was decided to kill Julio Beltran.

1   Q    Who made that decision?

2   A    Mainly my dad and my Compadre Chapo.

3   Q    And did you have any conversations with them about what

4   actually happened to Julio Beltran?

5   A    Well, at the time it was decided that Julio Beltran

6   would be killed due to problems that they had had with Julio

7   Beltran prior to that.

8   Q    What were those problems?

9   A    Well, one time Julio referred badly about my father.

10  And that was like a trader that my dad told me about.

11            And there was also a call that had been

12  intercepted with Julio was saying that those fucking -- and

13  excuse my French, but those fucking old men, referring to my

14  dad and my Compadre Chapo, and that they were the new

15  generation.

16  Q    When was Julio Beltran killed?

17  A    2007, as far as I remember.

18  Q    And did you have any conversations with your dad or the

19  defendant about who was going to kill Julio Beltran?

20  A    Excuse me, could you repeat that, please?  I didn't

21  understand the translation.

22  Q    Did you have any conversations with your dad or the

23  defendant about who was going to actually physically kill

24  Julio Beltran?

25  A    Well, my dad was the one who was the most upset with

1    Julio Beltran because of the way he had referred to him.

2    And he told me for me to send our people to kill Julio

3    Beltran.

4    Q    And did you relay that order?

5    A    Yes.

6    Q    Do you know someone by the name of Teco Lindoro?

7    A    Yes.

8    Q    Who is that?

9    A    He's originally from Culiacan and he's friends with my

10   dad and my Compadre Chapo.

11   Q    And did you have any conversations with your dad or the

12   defendant about Teco Lindoro?

13   A    Yes.

14   Q    What were those conversations about?

15   A    Well, they reached an agreement also to kill Teco

16   Lindoro.  That was between my dad and my Compadre Chapo.

17   Q    And why did they agree to kill Teco Lindoro?

18   A    My Compadre Chapo said that he had information that

19   Teco Lindoro was in Tijuana with the Tijuana people, who

20   were our enemies, Arellano Felixes, and that Teco Lindoro

21   had a partnership with somebody from Guadalajara by the name

22   of El Cachorro, who had connections with the Arellano

23   Felixes.

24   Q    And so because of that, what happened next?

25   A    Well, since Teco was more like an ally to my dad, my

1   dad was very angry, because he felt that he was being

2   betrayed by Teco, and especially because my dad had helped

3   him since he was really little.  And my dad had called Teco

4   Lindoro for him to go see him in Culiacan.

5              I was there present.  Juancho was there as

6   well.  And my dad said that the moment that he would see

7   Teco, he would actually ask for him to report to him and to

8   like settle things regarding the information that we had.

9              And Juancho and I moved from that place where

10  my dad was actually waiting for Teco, and I actually went to

11  a gas station that was close to where my father was, and my

12  dad told me to let him know whenever I saw Teco Lindoro

13  approach.

14             And I told him -- it was Juancho and I who

15  were there at that gas station, and I told him when we saw

16  Teco go by.  And my dad -- five minutes later, my dad called

17  me and he asked me if either Juancho or I had a place where

18  they could move to with Teco Lindoro.  And close to that

19  area, Juancho had a ranch that belonged to him.  And we told

20  my dad to move to that place.  We gave him the coordinates

21  for him to go there.

22             When we got there to see my dad, Teco Lindoro

23  was there and he was handcuffed.  And my dad asked me to

24  locate one of Azul's sons, Juanito, and for me to call him.

25  And because he wanted for him to be present so that he could

1  tell his dad, meaning El Azul, about what was happening at
2  that time.  Because Azul knew Teco also since they were
3  children, they were friends, and he didn't want for there to
4  be any problems with El Azul.  And he wanted his son to be
5  present so that his son would be listening to what, you
6  know, my dad would be talking to Teco.
7            And my dad told Teco directly all that
8  information that we had.  And Teco dia said that meant that
9  he had done wrong, that he was indeed hanging out with those
10 people.  And because of that my dad ordered him killed.
11 Q    And did you learn whether or not Teco was, in fact,
12 killed?
13 A    Yes, yes, I knew that he was killed.
14 Q    How did you learn that?
15 A    Well, at that time, Gonzalo Izunza, Macho Prieto, took
16 him with him.  We gave him up to him.
17 Q    Okay.  The last person I want to talk about is -- do
18 you know someone named Vasconcelos?
19 A    Well, I know the name.  I know who Vasconcelos is.
20 Q    Who is he?
21 A    He was the attorney general with SIEDO.  A federal law
22 enforcement agency in Mexico, the SIEDO.
23 Q    Did you have any conversations with your dad or the
24 defendant about Vasconcelos?
25 A    Yes.

1    Q    And what did you discuss?

2    A    Well, at times we spoke, my dad, my Compadre Chapo and

3    I, and my Compadre Chapo said about killing Vasconcelos.

4    Q    Why did you discuss killing Vasconcelos?

5    A    Well, Vasconcelos was attacking my dad and my

6    Compadre Chapo very much so.  And, in fact, Vasconcelos had

7    arrested Ivan, my Compadre Chapo's son, with no basis, just

8    to, you know, give my Compadre Chapo a hard time.

9              At that time, my Compadre Chapo's son, Ivan,

10   didn't have anything to do with the business, and he was

11   arrested in Guadalajara, and he was arrested just to

12   pressure my Compadre Chapo.

13   Q    Was the decision made during that conversation about

14   Vasconcelos?

15   A    Well, you know, we spoke about that two or three times.

16   My dad would advise my Compadre Chapo.  And they would say

17   that by killing Vasconcelos there would be a big problem in

18   Mexico, because he was the attorney general with the SIEDO.

19             And he was sent just to wait a little longer

20   to see what would happen to Ivan so that we could talk to

21   Vasconcelos.  But Vasconcelos kept mistreating Ivan and he

22   kept attacking my dad and my Compadre Chapo through

23   different sting operations, so he was really an enemy of

24   ours.

25             And there came a time when there was the order

1  that was given to kill Vasconcelos.  My Compadre Chapo had

2  people following him in Mexico City.  Yes, Mexico City.

3          There were some people who were sent to Mexico

4  City, former military people.  They worked for my

5  Compadre Chapo.  And they took with them three bazookas, the

6  ones who call the guatemaltecas, it's a specific type of

7  bazooka.

8          And, you know, there was sometime that we were

9  following Vasconcelos and that, you know, we were trying to

10  figure out how to kill him.  We didn't want for there to be

11  cameras in the place because we knew there would be a huge

12  problem that would come about after the killing.

13          But then there came a time when the people who

14  had been sent to Mexico City to commit the attack, they were

15  arrested before the attack was committed.  And, in fact, it

16  was exactly on that same day when they were about to do

17  that, that they were arrested, and they even found the

18  bazookas on them and everything.

19  Q    So were these people successful with killing

20  Vasconcelos?

21  A    No.

22  Q    Who provided the special bazookas that you referred to

23  as guatemaltecas?

24  A    Well, I gave some to Juancho that I had gotten from

25  Gonzalo, who had gotten them in Guatemala, meaning Macho

1   Prieto.

2   Q    And approximately when did this occur?

3   A    Before 2006, or I would say towards the end of 2005.

4   Yeah, let's say 2005.

5   Q    Okay.  I'm going to turn now to some calls.  I have a

6   couple questions for you before we play some of the clips.

7                   We previously discussed a lot about Juancho.

8                   How many times do you think you met Juancho?

9   A    Hundreds.  Thousands of times.

10  Q    Okay.  And during those meetings, were these

11  face-to-face meetings or conversations over the phone?

12  A    98 percent of the time it was face-to-face.  We were

13  always together in Culiacan in the same office, in the same

14  house.

15  Q    Okay.  And based on those conversations, are you

16  familiar with what Juancho's voice sounds like?

17  A    Yes.

18  Q    Okay.  And what other name do you know Juancho by?

19  A    As Virgo, that was more common over the radio.  And

20  between us, I called him "Sanka".

21  Q    Okay.  And we talked this morning about someone named

22  Cholo Ivan.

23                   Same questions.  How many times do you think

24  you've spoken with Cholo Ivan?

25  A    That I've spoken to Cholo?  It's been more times than

1  the amount of times that I saw him.

2  Q    Okay.  So were those conversations over the phone or in

3  person?

4  A    On the phone.  Well, I had more conversations on the

5  phone with him than that person.

6  Q    Okay.  Based on those conversations, are you familiar

7  with Cholo Ivan's voice sounds like?

8  A    Yes.

9  Q    Okay.  Yesterday we discussed somebody that you called

10  M-10?

11  A    Yes.

12  Q    How many occasions have you spoken with M-10?

13  A    No, not much.  Only one time, but that one time when I

14  met him, we were talking to each other all day.

15  Q    Okay.  About how many hours do you think you spoke with

16  him that one time?

17  A    Well, we talked early in the morning with my dad and my

18  Compadre Chapo, and it was the entire day until the

19  afternoon or evening.  I do remember another time when I was

20  present, Juancho was talking to him and he passed over the

21  phone so I could say "hi".

22  Q    Okay.  Based on those conversations, are you familiar

23  with what M-10's voice sounds like?

24  A    Yes.

25  Q    Okay.  And similarly, how many times do you think that

1  you've spoken with the defendant?

2  A    Hundreds of times.  Thousands of times.

3  Q    Okay.  And were those conversations over the phone or

4  in person?

5  A    Both.

6  Q    Okay.  Based on those conversations, are you familiar

7  with what the defendant's voice sounds like?

8  A    Yes.

9         MS. LISKAMM:  Okay.  For the witness only, showing

10  you what's been marked as Government's Exhibit 601M.

11  Q    Mr. Zambada, do you recognize this?

12         MR. BALAREZO:  No objection, Your Honor.

13         THE COURT:  601 is received.

14         (Government Exhibit 601M, was received in

15  evidence.)

16         MS. LISKAMM:  Okay.

17         (Exhibit published.)

18  Q    Mr. Zambada, what are we looking at here?

19  A    A CD, a compact disk, with my initials and the date.

20  Q    Why are your initials and the date on this disc?

21  A    I, myself, wrote my initials and the date by hand on

22  the day that I listened to that CD.

23  Q    Okay.  So do your initials and date, the date on there,

24  signify that you reviewed the calls that are on this disc?

25  A    Yes.

1          MS. LISKAMM:  Okay.  And for the witness only.

2    Q    Showing you what's been marked as Government's

3    Exhibit 601M-5.

4               Do you recognize this?

5    A    Yes, that's my handwriting.

6    Q    Okay.  And what did you denote on Government's

7    Exhibit 601M-5?

8    A    The amount of calls or the number of the calls and the

9    voices on the calls.

10   Q    Okay.  So are these essentially your notes from your

11   review of those calls?

12   A    Yes.

13         MS. LISKAMM:  Okay.  Your Honor, I'd ask to move

14   in Government's Exhibit 601M-5.

15         MR. BALAREZO:  No position.

16         No objection.

17         THE COURT:  It's received.

18         MS. LISKAMM:  Thank you.

19         (Government Exhibit 601M-5., was received in

20   evidence.)

21         (Exhibit published.)

22         MS. LISKAMM:  Okay.  We are going to play some

23   audio clips for you now from Government's Exhibit 601M.  And

24   we're going to start with Government's Exhibit 601M-1.

25         And for the record, we're going to play a clip

1  from 601M-1-C from three minutes and 19 seconds to three

2  minutes and 33 seconds.

3          (Audio recording played.)

4  Q    And going back to Government's Exhibit 601M-5.

5          Mr. Zambada, whose voices do you recognize on

6  that call?

7  A    The voice of my Compadre Chapo and the voice of Cholo

8  Ivan.

9          THE COURT:  Do we have the transcripts of these

10  calls?

11          MS. LISKAMM:  They will be going in later, your

12  Honor.

13  Q    And, Mr. Zambada, how many calls did you review on

14  Government's Exhibit 601M-1?

15  A    Five calls.

16  Q    Okay.  And on all five of those calls, whose voices did

17  you hear?

18  A    My Compadre Chapo's and Cholo Ivan's.

19  Q    Okay.  Now we're going to turn to the second subset of

20  calls on Government's Exhibit 601M, and that's specifically

21  601M-2.  We're going to play a clip from 601M-2-A.  The clip

22  going to start at two minutes and 22 seconds and go to three

23  minutes and 34 seconds.

24          (Audio recording played.)

25  Q    And looking back --

1       MR. BALAREZO:  Can we have a sidebar.

2       (Continued on the next page.)

3       (Sidebar conference.)

1          (The following occurred at sidebar.)

2          MR. BALAREZO:  Your Honor, I object to this.  The

3   Government is now playing these calls supposedly for this

4   witness to identify the speakers.

5          There's no transcripts.  The jury is just sitting

6   here listening to a language that they don't speak, and the

7   Government has already said that they are going to come in

8   later with the transcript so we're going to have to go

9   through this all over again.

10          THE COURT:  It's a little unorthodox, but I see

11   what the Government is doing.

12          The Government is first getting him to

13   authenticate the voices, and once the voices are

14   authenticated, then they'll go to the transcripts.

15          I think the Government wants to do it that way --

16          MR. BALAREZO:  If I -- as I understood it, the

17   transcripts were going to come in through another witness.

18          MS. PARLOVECCHIO:  They are in evidence.

19          THE COURT:  The transcripts are already in.  This

20   witness or some other witness may explain those transcripts.

21   I assume this witness.

22          MS. LISKAMM:  This witness is just doing voice

23   IDs, except for one call that he was a participant in.

24          THE COURT:  So what will the other witness will

25   do?

1          MS. LISKAMM:  Will be putting the transcript in

2     and explaining what the calls mean.

3          This witness is simply just doing the voice

4     identification.

5          THE COURT:  But if he knows the voices, how does

6     that help another witness testify about what those voices

7     said?

8          MS. LISKAMM:  It corroborates who is speaking on

9     the calls.  They've already put in at issue whether or not

10    it's --

11         THE COURT:  I see.

12         MS. LISKAMM:  -- the defendant's voice on the

13    calls, and he is someone who is familiar with the defendant.

14         THE COURT:  The only around this -- kind of

15    reverse order, but the only way around this is if you were

16    to stipulate that these are the people who the witness said

17    they are --

18         MR. BALAREZO:  No.

19         THE COURT:  -- which I'm not asking you to do, but

20    I see why the Government is saying, yes, these are the

21    voices.  Another witness will also say these are the voices

22    and here's what they are saying.

23         MS. LISKAMM:  Correct, Your Honor.

24         MR. BALAREZO:  The first clip, you know, was a

25    couple of seconds, no problem, but now we're listening to a

1  large portion of a call.

2          THE COURT:  But it's in Spanish.

3          MR. BALAREZO:  I understand.  It's a waste of

4  time.

5          THE COURT:  Well, if that's the objection, I'm

6  going to let the Government do that its way.

7          I don't know which would be more efficient, so I'm

8  not going to say it's a waste of time.  It may be.  It may

9  be a better way to do it, but this is a permissible way to

10  do it.

11          MS. LISKAMM:  Thank you, your Honor.

12          (End of sidebar conference.)

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; Jury present.)

2    BY MS. LISKAMM:

3    Q    I believe I was asking you about Government's

4    Exhibit 601M-2, and whose voice do you recognize on that

5    call?

6    A    I only recognize the voice of my Compadre Chapo.  The

7    other voice is unknown to me.  I don't know who it is.

8    Q    I know we just took a break there, but do you recall if

9    Chapo's voice was the first voice or the second voice on

10   that call?

11   A    I remember, I think, the second voice.

12   Q    Okay.  And how many calls did you listen to under

13   Government's Exhibit 601M-2?

14   A    Two calls.

15   Q    Okay.  We're going to turn now to the third subset of

16   calls.  Sorry, before we do that.

17              And whose voice do you recognize on both of

18   those calls under Government's Exhibit 601M-2?

19   A    My Compadre Chapo.

20        MS. LISKAMM:  We're going to turn to the third

21   subset of calls now, which is 601M-3, and play a clip from

22   601M-3E, and we're going to start the clip at the beginning

23   of the call.

24              (Audio recording played.)

25   Q    Mr. Zambada, whose voice do you recognize on this call?

1   A    I recognize the voice of my Compadre Chapo and M-10.

2   Q    And whose voice did you hear first?

3   A    Can you play that again?

4        MS. LISKAMM:  Start it from the beginning.

5        THE COURT:  Go ahead.

6        (Audio recording played.)

7   A    My Compadre Chapo.

8   Q    Whose voice is that?

9   A    My Compadre Chapo.

10  Q    And looking back at Government's Exhibit 601M-5, how

11  many calls did you review under Government's Exhibit 601M-3?

12  A    Four calls.

13  Q    And whose voices were on those four calls?

14  A    My Compadre Chapo and M-10.

15       MS. LISKAMM:  All right, one more subset of calls

16  on this disk.  We're going to talk about Government's

17  Exhibit 601M-4.

18       We're going to play a clip from 601M-4-B.  And

19  start the clip at the beginning of the call.

20       (Audio recording played.)

21       MS. LISKAMM:  Okay, and we're stopping it, for the

22  record, at 42 seconds.

23  Q    Mr. Zambada, whose voices did you hear on this call?

24  A    Juancho's and my Compadre Chapo's.

25  Q    Okay.  And we can play the beginning again, but do you

1  know who was speaking first?

2  A    The first one who says "bueno" is Juancho.

3  Q    Okay.  And the second voice was?

4  A    My Compadre Chapo.

5  Q    Okay.  Looking back at Government's Exhibit 601M-5, how

6  many calls did you review under Government's Exhibit 601M-4?

7  A    Fifteen calls.

8  Q    And whose voices were on those 15 calls?

9  A    My Compadre Chapo's and Juancho's.

10 Q    Okay.

11                (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION BY

2  MS. LISKAMM:

3  Q    We're through that exhibit.  We're going to turn now to

4  Government's Exhibit 606M, which is already in evidence as

5  Government's Exhibit 606-J and 606-I-3H.

6              Mr. Zambada, do you recognize this disk?

7  A    Yes.

8  Q    And how do you recognize it?

9  A    Well, my handwriting, my initials and the date in which

10  I listened to it.

11  Q    Okay.  We're going to play a clip from this disk from

12  606M.  For the record, we're going to start the clip at two

13  minutes and 13 seconds.

14              (Audiotape played.)

15              (Audiotape stopped.)

16  Q    Mr. Zambada, do you recognize any of the voices on that

17  clip?

18  A    I just recognize my Compadre Chapo's voice.  The other

19  voice is unknown to me.

20  Q    Was your Chapo's voice the first voice or the second

21  voice in the call?

22  A    Yes, the first one.

23              MR. BALAREZO:  Your Honor, can I consult with

24  Ms. Liskamm for a moment?

25              THE COURT:  Go ahead.

1          (Pause in proceedings.)

2          THE COURT:  Shall we take our morning break?

3          MS. LISKAMM:  Yes, Your Honor.

4          THE COURT:  We're going to take our morning break.

5     Please don't talk about the case, ladies and gentlemen, and

6     we'll see you here at 11:20.

7          (Jury exits courtroom.)

8          THE COURT:  All right, everyone be seated.  The

9     marshals can take the witness out.

10               Before you talk about what you're all going

11    to talk about, there are a couple of housekeeping details

12    that I wanted to cover while the jury wasn't here relating

13    to last night's filings.  First of all, with regard the

14    Government's letter that the pixilation is fine, why does

15    the letter have to be sealed?  Any reason?  The cover

16    letter.

17          MS. GOLDBARG:  I'm sorry, Your Honor, I believe

18    what we did with the prior witness that was a similarly

19    situated that we would unseal it once the witness testifies.

20          THE COURT:  But this is just the picture -- I

21    mean, it's just a cover letter for the picture, it doesn't

22    disclose anything.

23          MS. GOLDBARG:  I think we're just following the

24    practice of how we did the prior one, with the --

25          THE COURT:  Let's try to improve the practice.

1        MS. GOLDBARG:  We can.

2        THE COURT:  I'm going to unseal that.

3        MS. GOLDBARG:  Okay.

4        THE COURT:  With regard to the two motions in

5   limine, are these witnesses both expected to testify next

6   Tuesday, is that the idea?

7        MS. PARLOVECCHIO:  One witness is set to testify

8   next Tuesday and the other will probably go on Wednesday or

9   Thursday.

10        THE COURT:  What does the defendant want to do

11   about response time, if any?  One of them, based on our

12   sidebar, you may want to partially consent to, I'm not sure.

13        MR. BALAREZO:  Your Honor, we actually -- those

14   motions were filed late last night, we were preparing other

15   things and we haven't had a chance to consult, so we could

16   maybe by the end of the day we'll give you an answer.

17        THE COURT:  That's fine.  Okay, see you in a few

18   minutes.

19        (Recess.)

20        THE COURTROOM DEPUTY:  All rise.

21        THE COURT:  Please bring in the jury.

22        (Jury enters courtroom.)

23        THE COURT:  All right.  Everyone be seated.  Let's

24   continue.

25   BY MS. LISKAMM:

1   Q    Mr. Zambada, just finishing up on our last exhibit,

2   Government's Exhibit 606M, you said that you recognized the

3   defendant's voice on that call?

4   A    Yes, that's right.

5   Q    Did you recognize the other voice?

6   A    Yes, Juancho.

7   Q    So I know we just took a break, we were in the middle

8   of Government's Exhibit 606M, and I know we've played a lot

9   of clips for you.  Showing you Government's Exhibit 606M,

10  which is the disk that we discussed before, in addition to

11  your initials and the date did you write anything on that

12  disk?

13  A    Yes.

14  Q    What did you write?

15  A    That I did not recognize the other voice.  That was my

16  mistake.

17  Q    Okay.  And above that it says C. Chapo.

18  A    That means that it was my Compadre Chapo's voice.

19  Q    And for the record, the clip that we played was from

20  two minutes and 13 seconds to three minutes and one second.

21             I want to turn back to the Flores twins that

22  we discussed yesterday.  How many times have you spoken with

23  the Flores twins?

24  A    The four times that I had meetings with them.

25  Q    And based on those four times, are you familiar with

1  what the Flores twins' voice sounds like?

2  A    Yes.

3        MS. LISKAMM:  And, Your Honor, I believe there is

4  no objection to these.

5  Q    Showing you what's been marked as Government's

6  Exhibit 609B --

7        MR. BALAREZO:  No objection.

8  Q    -- Mr. Zambada, do you recognize this?

9  A    Yes, my initials with my own handwriting and the date

10  when I listened to that CD.

11       THE COURT:  It's received.

12       (Government's Exhibit 609B was received in evidence

13  as of this date.)

14       MS. LISKAMM:  Thank you.

15  Q    And the initials signify that you reviewed the calls on

16  this disk?

17  A    That's right.

18  Q    How many calls did you review on this disk?

19  A    Two calls.

20  Q    Okay.  And I believe also without objection --

21       MR. BALAREZO:  No objection.

22  Q    -- showing you Government's Exhibit 609B-3.

23       THE COURT:  609B-3 is received.

24       (Government's Exhibit 609B-3 was received in

25  evidence as of this date.)

1    MS. LISKAMM:  Thank you.

2  Q    Mr. Zambada, are these your notes from your review of

3  Government's Exhibit 609B?

4  A    Exactly, yes.

5  Q    Let's start with the second call on this disk,

6  Government's Exhibit 609B-2.  And I believe the jurors had a

7  copy of the transcript on their chair this morning when they

8  came in and that will be Government's Exhibit 609A-9T, which

9  is already in evidence.  And we're going to play this call

10  in its entirety.

11              (Audiotape played.)

12              MS. LISKAMM:  You can stop it.

13              (Audiotape stopped.)

14  Q    Mr. Zambada, do you recognize that call?

15  A    At the beginning of the call they called Juancho, then

16  comes me and then one of the Flores' brothers.

17  Q    Is this call that we discussed yesterday?

18  A    Yes, when we spoke about the weapons, yes.  When we

19  said toys we were referring to the weapons.

20  Q    I'm going to show you the second page of the

21  transcript, which is Government's Exhibit 609A-9T.  And the

22  first line where it says "Juancho," is that the Juancho that

23  you were just referring to speaking first on the call?

24  A    Yes.  Yes.

25  Q    And where it says "MF," who is that?

1    A    Well, the second voice that's one of the Flores' twins

2    and from the initials it's then Margarito Flores.

3    Q    Where it says "Vicente," who is that?

4    A    That's me.

5    Q    I'm going to turn to the third page of the transcript

6    and on line 19 -- actually let's go up to line 17.  The

7    Flores twin says, "Do you remember Felipe?"

8    A    Yes.

9    Q    And on line 19 you say:  "Sure, what's up with Felipe?"

10                  Who is Felipe?

11   A    He was referring to Felipe Cabrera, one of my father's

12   people, friends with my father.

13   Q    And is this the Felipe we discussed yesterday?

14   A    Yes, that's the same Felipe.

15   Q    Then turning to page 5 of the transcript on line 38,

16   the Flores twin says:  "And do you remember what we talked

17   about, the -- the toys?"

18   A    Yes.

19   Q    What are toys a reference to?

20   A    It's referring to the weapons, the weapons that we

21   spoke about at the meeting that him and I had.

22   Q    And, Mr. Zambada, did you know that you were being

23   recorded when you participated in this call?

24   A    No.

25   Q    All right.  Last call.  We previously discussed someone

1  who you referred to as Chaparro, do you recall that?

2  A    Yes.

3  Q    And who is that?

4  A    Chaparro is Jorge Cifuentes' brother.

5  Q    How many times have you spoken to Chaparro?

6  A    On many occasions.

7  Q    And were these conversations over the phone or in

8  person?

9  A    In person.

10 Q    Based on those conversations, are you familiar with

11 Chaparro's voice?

12 A    Yes.

13 Q    We're now going to turn to Government's Exhibit 609B-1,

14 which is already in evidence as 609A-7.  Okay, and we're

15 going to play two clips from this call.  The first one will

16 start at six seconds and we'll play it all -- eventually

17 play it all the way through to 19 seconds.

18              And I'm just going to ask that we pause after

19 the first voice for a second.

20              (Audiotape played.)

21              (Audiotape stopped.)

22 Q    Who is that first voice?

23 A    My Compadre Chapo's.

24 Q    And if we can continue.

25              (Audiotape played.)

1                    (Audiotape stopped.)

2  Q    And pausing again at seven seconds, whose voice did you

3  hear there?

4  A    It's a voice of one of the Flores' brothers.

5  Q    Then we can just continue.

6                    (Audiotape played.)

7                    (Audiotape stopped.)

8  Q    Then turning to the second clip from this call, start

9  at a minute 14 seconds.  And if we can pause again after the

10 first voice.

11                   (Audiotape played.)

12                   (Audiotape stopped.)

13 Q    I know that was short.  Do you recognize that voice?

14 A    The first one is one of the Flores' brothers.

15 Q    Was there a voice after that?

16 A    My Compadre Chapo's.  I got to listen to it, part of

17 it, a little bit of it.

18 Q    I might have cut that off too short.  Let's continue

19 the call.

20                   (Audiotape played.)

21                   (Audiotape stopped.)

22 Q    Whose voices did you hear on that call?

23 A    One of the Flores' brothers and to me I recognize the

24 voice of one of the Cifuentes'.

25 Q    Okay.

1   A     And Chaparro --

2          THE INTERPRETER:  Interpreter correction,

3   Chaparro.

4   BY MS. LISKAMM:

5   Q     Can we go back to the beginning of that clip just to

6   verify whose voice was first and whose voice was second.

7   Starting from the beginning.

8                    (Audiotape played.)

9   A     It's the same voice, it's Chaparro's.  That was my

10  mistake.

11  Q     Okay.

12         MS. LISKAMM:  And just for the record we paused it

13  this time at two seconds.

14                I have no further questions.

15         THE COURT:  All right.  Cross-examination.

16         MR. BALAREZO:  Thank you, Your Honor.

17         THE COURT:  Ms. Liskamm, maybe you want to give us

18  that mic back we'll recharge it in the meantime.

19                You may proceed.

20         MR. BALAREZO:  Thank you, Your Honor.

21  CROSS-EXAMINATION

22  BY MR. BALAREZO:

23  Q     Good morning, Mr. Zambada.

24  A     Good morning.

25  Q     Yesterday you testified that you knew that Mr. Guzman

1    had escaped from the Puente Grande prison, do you remember

2    that?

3    A    Yes, sir.

4    Q    And you had that knowledge not because you helped him

5    escape or because you were there, but you had that knowledge

6    because somebody told you about it, right?

7    A    Yes.  He as well my Compadre Chapo told me.

8    Q    Right.  And when you spoke to him after the escape, one

9    of the things you found out was that Compa Chapo, the

10   gentleman here with the blue suit, tan shirt, and blue tie

11   was not doing well financially, right?

12   A    Yes.

13   Q    And the reason he wasn't doing well financially was

14   because he had been locked up for seven, eight years,

15   correct?

16   A    That's right.

17   Q    He had been in prison from '93 to 2001?

18   A    Yes, sir.

19   Q    He didn't have any contacts, right, during that time?

20   A    As far as I knew, he was in contact with my Compadre

21   Pollo.  He would send his regards to my dad and to me.

22   Q    You misunderstood.  I wasn't saying that he didn't have

23   contact with humanity, but thank you for that answer.

24              He was in contact, he sent you greetings, sent

25   your father greetings, right?

1   A    Yes.

2   Q    But when you testified yesterday you said that he

3   didn't have contacts, you meant he didn't have drug

4   contacts, right?

5   A    Yes.

6   Q    And he was doing -- he was not well financially because

7   he had not been trafficking drugs during that time he was

8   locked up at least, correct?

9   A    Yes, that's what my dad mentioned, that he was not

10  doing well financially.

11  Q    And now also during that time after the escape from

12  Puente Grande, you know -- well strike that.

13              You know who Mochomo is, correct?

14  A    That's right.

15  Q    And Mochomo is Alfredo Beltran Leyva, one the Beltran

16  Leyva Brothers?

17  A    That's right.

18  Q    And you know that during that time after -- sometime

19  after the escape, that Chapo was in the mountains of

20  Sinaloa, correct?

21  A    Correct.

22  Q    He was running away from the Mexican authorities?

23  A    Yes.

24  Q    He was hiding?

25  A    Yes.

1    Q    And, in fact, Mochomo protected Mr. Guzman; is that

2    right?

3    A    Yes.  In the first few years he was there with Mochomo,

4    with Alfredo up in the mountains.

5    Q    The first few years -- how many first few years -- how

6    many years is that?

7    A    I would say five years, up until 2005.

8    Q    Well, 2006 because he was out in 2001, right?

9    A    Exactly.

10   Q    So for five years after he gets out of the Puente

11   Grande prison, Chapo is doing badly economically, has no

12   money, right?

13   A    Well, for those, like, after those five years he was

14   doing well financially.

15   Q    Of course you had to get that in, right?

16              Now you, for your entire life, have obviously

17   known Mayo, you call him me papa, right?

18   A    Well, he is my dad.

19   Q    In your entire life your Papa Mayo has been a drug

20   trafficker; is that correct?

21   A    Well, since I have, you know, a presence of mind since

22   I was 13 or 14 years old I realized that my dad was involved

23   in drug trafficking.

24   Q    Well, you're not telling the jury that your father Papa

25   Mayo began trafficking when you were 13, you know that he

1    was trafficking before that, correct?

2    A    Well, it was in that age range when I was that old that

3    I realized what my dad was doing, and what he had been doing

4    years before.

5    Q    And your father and your -- I'll call him Papa Mayo,

6    you know who I'm talking about.  Your Papa Mayo was not, you

7    know, selling half a kilo on the street corner on Culiacan,

8    was he?

9    A    No.  I don't know from that time, but no.

10   Q    Well, let me ask you from the time that you had your --

11   what did you call it, your "uso de razon" -- sorry, Your

12   Honor.  Since when you can remember your father was a large

13   scale, high level drug trafficker, right?

14   A    That's right.

15   Q    And you know from your father being a very high level

16   narcotics trafficker, that he's also a very powerful man,

17   right?

18   A    Yes, yes, that's right.

19   Q    And when we talk about he was a very powerful man, I'm

20   not talking about he lifted weights and was strong, right?

21   A    That's right.

22   Q    He was a powerful man because he ran a drug trafficking

23   organization?

24   A    Yes.

25   Q    He ran groups of sicarios, right?

1  A    Yes, he had his security detail, the people who would

2  guard him.

3  Q    He ordered people killed, right?

4  A    Yes.

5  Q    Ordered people kidnapped?

6  A    Yes.

7  Q    Had his own drug trafficking structure, correct?

8  A    That's right.

9  Q    Now yesterday you talked about some of that structure,

10 in fact, you talked about how your father was a partner with

11 Amado Carrillo Fuentes.

12                    And he was also --

13 A    That's right.

14 Q    I'm sorry.  And he was also a partner with Vicente

15 Carrillo Fuentes?

16 A    Yes.

17 Q    And to your knowledge, both Amado and Vicente Carrillo

18 Fuentes were also high level, powerful Mexican drug

19 traffickers, correct?

20 A    Yes.

21 Q    And they were also powerful men and they were also

22 making a lot of money, right?

23 A    Correct.

24 Q    And the reason your father partnered with both Vicente

25 and Amado was because your father wanted to make money,

1   right?

2   A    Yeah, they were partners and through the drug

3   trafficking they had several partnerships they would make

4   more money.

5   Q    Right.  So Vicente Carrillo Fuentes and Amado Carrillo

6   Fuentes, they weren't doing badly economically, were they?

7   A    No, not at that time.

8   Q    Your father then cut them in for the 50 percent of his

9   profits?

10  A    It was 50 percent; they were partners.  Him and my

11  Compadre Amado it was 50 percent of all the drugs that

12  arrived to Mexico at that time.

13  Q    Right.  But as I said they weren't doing badly

14  economically?

15  A    Well, my Compadre Amado in '88 came out of prison and

16  he was also doing bad financially.

17  Q    Let me ask you, was your Papa Mayo a social worker?

18              Was he in the business --

19              THE COURT:  Wait, wait, let me catch up, please.

20  A    I know that in the past, that long time in the past he

21  was a worker, yes.

22  Q    Well, my point is your father didn't have -- wasn't in

23  the business of helping struggling drug traffickers, was he?

24  A    No, no.

25  Q    Now yesterday when you talked about your father's

1   infrastructure, you talked about at one point Vicente

2   Carrillo Fuentes had a new route for trains to bring cocaine

3   into the United States.  Do you remember that?

4   A    Yes, I remember.

5   Q    And, in fact, you testified yesterday before this jury.

6   You remember that, you were under oath?

7   A    Of course.

8   Q    And you said that Vicente Carrillo Fuentes went to your

9   father to ask for Mayo's authorization, do you remember

10  that?

11  A    Yes, my namesake Vicente did go to ask for

12  authorization but also to offer this new way of bringing

13  drugs into the United States.

14  Q    But the reason Vicente went to your father for

15  authorization was your father was -- excuse me, Papa Mayo

16  was the boss, right?

17  A    Well, I don't know.  Maybe for my namesake Vicente that

18  my dad was his boss.  In my opinion they were partners,

19  50 percent partners.

20  Q    Well, I'm not asking your opinion and I'm not asking

21  what Vicente thought, I'm asking about what you testified

22  yesterday.

23  A    The thing is I did not declare that my dad was the boss

24  of Vicente Carrillo Fuentes.  I declared that they were

25  partners.

1    Q    Yesterday, January 3rd, when the Government was asking

2    questions regarding this particular event you initially were

3    asked to circle a portion of the screen and then you were

4    asked, page 3978 at line 18 --

5    A    Yes.

6    Q    -- you were asked:

7                  Going back to the conversation you overheard

8    between your dad and Vicente Carrillo Fuentes, what

9    specifically were they discussing about the train route?

10                 Do you remember that question?

11   A    Yes.

12   Q    And then under oath, before this jury, you answered:

13                 Well, at the time I went to visit my dad at a

14   place called Gomez Palacio, Durango, it was an office that

15   my dad had and my namesake Vicente went there to say hello

16   to him --

17   A    Yes.

18   Q    -- to my dad and there came a time when I was sitting

19   together with them in the living room and my namesake

20   Vicente was telling my dad that he had another way of

21   crossing the drugs over to the United States, a new way, and

22   more specifically, to bring them into Chicago, Illinois.

23   A    Yes.

24   Q    And my namesake Vicente said that it was by trains and

25   he was pretty much telling my dad about it and at the same

1  time he was asking his authorization, since he was the boss,

2  and my dad said it was fine.

3              That's the answer you gave yesterday, right?

4  A    I remember that they were partners, he asked for

5  authorization and they were partners.  If that is what I

6  said --

7  Q    There is no question pending.  Thank you.

8              THE INTERPRETER:  Excuse me.

9              THE COURT:  He's right, you don't need to

10 translate.  Go ahead.

11             MR. BALAREZO:  Your Honor, I'll mark as Defense

12 Exhibit 377 the transcript of Mr. Zambada's testimony of

13 yesterday and at some point I would move it in as evidence

14 as a prior inconsistent statement under oath.

15             THE COURT:  What point is that?

16             MR. BALAREZO:  I'll do it now, Your Honor.

17             THE COURT:  Any objection?

18             MS. LISKAMM:  No, Your Honor.

19             THE COURT:  Received.

20             (Defendant's Exhibit 377 was marked in evidence as

21 of this date.)

22 BY MR. BALAREZO:

23 Q    Mr. Zambada, I'm showing you Exhibit 377, the

24 transcript of your testimony yesterday.  I'll draw your

25 attention to page 3978 and here's the section where we read,

1    and I'm going to direct your attention again, And my

2    namesake Vicente said that it was by trains and he was

3    pretty much telling my dad about it and at the same time he

4    was asking his authorization, since he was the boss, and my

5    dad said it was fine.

6              And yesterday, when you were on direct

7    examination, you didn't have any hesitation, did you?

8    A    No.

9    Q    Your father Mayo Zambada, Papa Zambada is the boss.

10   You had Vicente Carrillo Fuentes asking for his

11   authorization.

12   A    I said -- the first thing I said yesterday was that my

13   father was a leader of Sinaloa Cartel, that he was the boss

14   and he was a partner of many other bosses.  I have never

15   denied that my father is the boss of the cartel.

16   Q    Then why did you have a problem answering my simple

17   question?

18   A    Well, if it was like that, I didn't remember.  I'm

19   sorry about that.  I'm not denying that my father was the

20   boss.  If the point is to say my boss -- that my dad was the

21   boss, my dad was the boss of the Sinaloa Cartel.

22             (Continued on the next page.)

23

24

25

1  EXAMINATION BY

2  MR. BALAREZO:

3  (Continued.)

4  Q    So you don't remember something you said yesterday,

5  less than 24 hours ago?

6  A    I remember -- I remember 99 percent, and maybe I forgot

7  that -- why I made a mistake with that word "boss," or maybe

8  there was something in the translation.  I am sorry, I am

9  not denying that my father was the boss.

10 Q    But you are telling this jury about things that

11 happened 20, 30 years ago, and you remember everything,

12 right?

13 A    Yes, of course.

14 Q    And there's no transcript of what happened 20 to

15 30 years ago to challenge you, is there?

16 A    I'm saying that my dad is the boss.  I just made a

17 mistake, that's all.  If -- that's your point, that my dad

18 was a boss of the Sinaloa Cartel, right?

19 Q    You made very clear your father was boss.  Just answer

20 my question now.

21        Do you remember the question?

22 A    What was your question?  Please, again.

23 Q    There's no transcripts of anything that happened 20 to

24 30 years ago to challenge you, right?

25 A    Well, I mean, I need to say that it is impossible for

1  me to remember a hundred percent what has happened, but what I

2  have lived and the facts of my life and the responsibility

3  that I have been taking in this case, this is what I am

4  testifying about.

5          MR. BALAREZO:  There's no question pending, your

6  Honor.

7  A    I have no motivation to lie.

8          MR. BALAREZO:  I will withdraw my comment, your

9  Honor.

10 BY MR. BALAREZO:

11 Q    You have no motivation to lie.

12 A    Why am I going to lie?  I'm telling about my life and

13 what I've lived through.  Every human being makes mistakes.

14 If I made a mistake about a word, then I rectified about the

15 "boss" word; I rectified it.

16 Q    Let me ask you this:  When you were on direct examination

17 by the Government, you had no problems just answering a

18 question, did you?

19 A    There were two or three occasions that I made a mistake

20 and I rectified it.

21 Q    Now when I'm asking some simple questions, you've got

22 diarrhea of the mouth, right?

23         THE COURT:  That question is stricken.

24 BY MR. BALAREZO:

25 Q    Well, now I'm asking you simple questions.  All of a

1 sudden you've got to explain everything, right? You can't

2 just answer the question?

3 A    Yesterday, there were also simple questions and about the

4 same case.  I made mistakes, too, and I rectified them.

5 Q    So is the problem my questions are a little too difficult

6 for you?

7 A    No, sir.  Yesterday they weren't difficult either, and I

8 still made mistakes.

9 Q    I'll tell you what, I'm going to break them down,

10 simple/stupid, okay?

11        Yesterday, when you were talking about your father,

12 Mayo, and you were talking about your father Mayo's structures

13 in drug trafficking --

14 A    Yes.

15 Q    Do you follow me?

16 A    Yes.

17 Q    You talked about how drugs for your father, Mayo, arrived

18 in southern Mexico and they were received by somebody -- Rey

19 Zambada somebody.  Rey Zambada is your uncle, right?

20 A    Yes.

21 Q    Who was working for your Papa Mayo, correct?

22 A    Yes, he worked on his own and he also worked for my

23 father at a certain time.

24 Q    And yesterday you also testified about something called a

25 Plaza in Juarez that was controlled by somebody named Herman.

1          Do you remember that from yesterday?

2   A     On our side, from my father and myself, yes, Herman.

3   Q     And Herman was Papa Mayo's man, right?

4   A     Yes.

5   Q     And you also talked about how your Papa Mayo had

6   suppliers in Colombia.

7          Do you remember that?

8   A     Yes.

9   Q     Specifically, you mentioned one of your Papa Mayo's

10  suppliers in Colombia by the name of Chupeta.

11         Do you remember that?

12  A     Yes.

13  Q     And you also talked about some particular incident when

14  you, Papa Mayo had sold ephedrine in Belize.

15         Do you remember that?

16  A     Yes.  Two tons of -- a shipment of ephedrine, two tons of

17  ephedrine belonging to my father and to my Compadre Chapo.

18  Q     Now, during your direct examination, almost all of your

19  answers were me Papa Mayo -- my father Mayo.

20         Do you remember that?

21  A     Yes.

22  Q     Now, your Papa Mayo is not sitting at this table today,

23  is he?

24  A     No.

25  Q     Look, the only one sitting here on trial is this man,

1  Joaquin Guzman, El Chapo, or -- excuse me -- Compa Chapo,

2  right?

3  A    My Compadre Chapo.

4  Q    Excuse me.

5  A    Not compa.

6  Q    And you know that you are here to testify about me

7  Compadre Chapo, right?

8  A    Yes.

9  Q    So when you gave your answer and you happened to throw in

10  "me Compadre Chapo" at the end of every answer you give, this

11  jury should believe you, correct?

12  A    No -- no, sir.  I'm here to give my testimony, not -- it

13  doesn't mean that he is guilty.  They are the ones who have to

14  decide whether my Compadre Chapo is guilty or not.  My duty

15  here is to tell the truth about the facts that happened in my

16  life and in the Sinaloa Cartel, not because I'm sitting here

17  they shouldn't just decide that my Compadre Chapo is guilty.

18  They have to make their own decision about whether he is or

19  not.

20  Q    Do you want to answer the question I asked you?

21  A    I did answer it.

22  Q    Let me ask you another simple/stupid question so maybe we

23  get a simple/stupid answer.

24         MR. BALAREZO:  Your Honor, can we have a bench

25  conference, please?

1          THE COURT:  Okay.

2          (Sidebar.)

3          (Continued on next page.)

1        (Sidebar conference held on the record out of the

2   hearing of the jury.)

3        MR. BALAREZO:  I would like to ask the Government to

4   please tell their staff on the first row there to be quiet.

5        THE COURT:  I agree.

6        MR. BALAREZO:  It's completely --

7        THE COURT:  I agree.  Your people are too loud the

8   whole trial.  Stop.  Pass the word.  Those of you sitting in

9   the first row, Judge says be quiet.

10       MR. BALAREZO:  Thank you, your Honor.

11       (Sidebar ends.)

12       (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          MR. BALAREZO:  I'm sorry, your Honor, can I have my

3  question read back because it was so long ago I forgot.

4          THE COURT:  Sure.

5          (Record read.)

6          THE COURT:  Hope that helps.

7          Go back one more.

8          I've got it.  The question was:  Do you want to

9  answer the question I asked you?

10          The question you asked him was:  So when you gave

11  your answer and you happened to throw in "me compadre" at the

12  end of every answer you give, this jury should believe you,

13  correct?  Then the witness gave an extended answer.  Then you

14  said:  Do you want to answer the question I asked you?  And

15  the witness said he did answer it.

16          MR. BALAREZO:  I will tell you what, I will move on

17  because I lost it.

18  BY MR. BALAREZO:

19  Q    Now, yesterday you also testified that at some point,

20  from all this money that your Papa Mayo was making in the

21  United States, you had to get it back down to Colombia.

22          Do you remember that?

23  A    Part of it, yes, because of the investments with the

24  Colombians.

25  Q    And the way you did it was sending the money down in

1  tankers, right?

2  A    Yes.

3  Q    And the "pipas" belonged to Papa Mayo, right?

4  A    Yes, my dad.

5  Q    And then, at some point, you personally wanted to send

6  somebody to run the Mexicali Plaza.

7           Do you remember that testimony?

8  A    Yes.

9  Q    And, in fact, you had to go and ask your Papa Mayo for

10 permission to send somebody named Pacheco.

11 A    Yes.

12 Q    So during all of those instances that we've talked about,

13 in particular, the trains, Vicente Carrillo Fuentes did not

14 come as Chapo -- excuse me -- Compadre Chapo for permission to

15 use the trains, did he?

16 A    No, no.  I did not say that yesterday.

17 Q    And the Juarez Plaza was not controlled by Compadre

18 Chapo's man, right?

19 A    No, no.  I did not say that either yesterday.

20 Q    And when the drugs had to be picked up in Belize, you

21 weren't using Compadre Chapo's tanker trucks, right?

22 A    No.  I was using my dad's tanker trucks, and I said that

23 very clearly yesterday, but I said that I was going to go pick

24 up some ephedrine that belonged to my dad and my

25 Compadre Chapo.

1   Q    And when you were sending down the money to the

2   Colombians for their inversions, you weren't using Compadre

3   Chapo's tankers, were you?

4   A    No, but in the tanker trucks, there was money that

5   belonged also to my Compadre Chapo.

6   Q    I want to assume you are going to say Compadre Chapo

7   everything, so you don't have to if you don't want to say it.

8   A    Well, no, of course I have to.  I mean, he's my

9   Compadre Chapo, and he also calls me my Compadre Vicente.  If

10  there is a problem here, the highest authority in this

11  courtroom is the Honorable Judge, so he could just ask me not

12  to say my Compadre Chapo if he wants me not to say it.

13  Q    You done?

14  A    Yes.

15  Q    Thank you.

16  A    You're welcome.

17  Q    I didn't hear what you said.

18  A    You're welcome.

19  Q    No, no.  You didn't say "de nada" in Spanish, did you?

20  A    No.

21  Q    What language did you say it in?

22  A    In English.

23  Q    That's because you understand English very well, don't

24  you?

25  A    Yesterday, when we started this in this courtroom, I said

1  I did understand English.

2  Q    All right.  So the fresh air in this courtroom all of a

3  sudden allows you to understand English, answer in English?

4  A    No -- no.  I just said it because you were saying that I

5  don't remember many of the things I said in this courtroom,

6  but I do remember that I said that.

7  Q    You done?

8  A    Yes, sir.

9  Q    Thank you.

10        Now, let's talk about something that you know really

11  well, bribing -- bribing public officials.

12  A    Yes.

13  Q    Because your father, Mayo -- Papa Mayo was such a

14  powerful man, one of the ways he got to be so powerful was by

15  bribing public officials, right?

16  A    Yes.

17  Q    Papa Mayo paid off the state police in Sinaloa, right?

18  A    Yes.

19  Q    He paid off the municipal police in Sinaloa.

20  A    Yes.

21  Q    Papa Mayo paid off the military in Mexico, right?

22  A    Yes.

23  Q    In fact, your father had such control of the military

24  that you, yourself, had some meetings with some generals,

25  correct?

1  A    Yes.  I said that yesterday.

2  Q    And you know who a General Miranda is, right?

3  A    Yes.

4  Q    Who is General Miranda?

5  A    His name is Roberto Miranda.

6  Q    Thank you for the first name, but what is his position?

7  A    Well, he was a general with a division, and he is such a

8  high-ranking official after being a general with a division,

9  he could become the secretary of defense.

10 Q    Suffice it to say, this was a very high ranking, Mexican

11 military officer, right?

12 A    Yes.

13 Q    And you had a personal meeting with General Miranda at a

14 place called Los Pinos?

15 A    Yes, sir.

16 Q    And Los Pinos, for the people who don't know, is like the

17 Mexican White House; is that correct?

18 A    Yes, sir.

19 Q    Which means this is like where the president of Mexico

20 lives.

21 A    Yes, sir.

22 Q    And where he works.

23 A    At the -- at that time, General Miranda was the chief of

24 the presidential guard for President Zedillo.

25 Q    That's President Ernesto Zedillo at the time, right?

1   A     Yes, sir.

2   Q     Did Papa Mayo bribe him too?  I'm talking about Zedillo.

3         THE INTERPRETER:  I'm sorry, your Honor, would you

4   like for the interpreter to interpret what the witness said?

5         THE COURT:  Yes, first do the witness.

6         THE INTERPRETER:  Thank you, your Honor.

7         THE COURT:  You have to let the translation occur.

8   Just because you know what's happening doesn't mean the jury

9   and I do.  I understand the temptation.

10        THE INTERPRETER:  The interpreter would like to say

11  that the response was:  I went to see General Miranda.

12        THE COURT:  Now what's your question?

13  BY MR. BALAREZO:

14  Q     My question was:  Did your Papa Mayo bribe President

15  Zedillo?  Yes or no.

16  A     No, my dad never told me that.

17  Q     But Papa Mayo's baby boy went to have a meeting at the

18  president's house with a very high military official in

19  Mexico, right?

20  A     Well, I would like to clarify it that I did not go into

21  the president's house.  I was right next door where the

22  presidential guard is, and I met up with a General Miranda.

23  Q     All right.  You went next door to the presidential

24  palace.

25  A     Yes.

1  Q    And at the time of this meeting, your Papa Mayo was a

2  high-level Mexican drug trafficker, correct?

3  A    Yes, sir.

4  Q    And Papa Mayo's baby, you, were also a high-level Mexican

5  drug trafficker, right?

6  A    Not at that time.  That happened in 1997.  I remember it

7  very well.  That's when I went to see General Miranda at Los

8  Pinos.  And, if you would like, I can also explain the reason

9  why I went to see General Miranda.

10 Q    Just answer my questions.

11        The reason you went to see General Miranda was to

12 complain to him, correct?  Yes or no.

13        Yes or no.

14 A    Well, yes or no is an answer that could actually cover

15 many things, so you should let me explain.

16        MR. BALAREZO:  There's no question pending, your

17 Honor.

18 A    I cannot complain with the general, like, right in his

19 face just like that.

20 Q    Did you meet with the general?  Yes or no.

21 A    Yes.

22 Q    And did you go to speak to the general about the way your

23 mother was being treated?  Yes or no.

24 A    Yes.  All the family.

25 Q    And you went to talk to the general because you were

1  upset, and your Papa Mayo was upset, that they were raiding

2  your mother's businesses, correct?

3  A    Yes.

4  Q    And your mother didn't have a job, did she?

5  A    She's a businesswoman.  She was the owner of a business

6  she has in Mexico in Culiacan.

7  Q    My question was:  Did your mother have a job?

8        MS. LISKAMM:  Objection.  Asked and answered.

9        THE COURT:  I agree, it is.

10        Sustained.

11  BY MR. BALAREZO:

12  Q    Well, that company that she had was not obtained through

13  a salary that she had selling tamales or something, was it?

14  A    Well, I mean, you know, she started that company with --

15  how do they call it here? -- with a will, with the money that

16  she inherited from my grandfather.

17  Q    And you are telling the jury that none of your Papa

18  Mayo's drug money went into that company?

19  A    Not the company.

20  Q    And we have your word for that, right?

21  A    Yes.

22  Q    Now, back to all the bribery that you were engaged in.

23        Your Papa Mayo also paid off, besides the Sinaloa

24  state and the judicial -- or the municipal police, he also

25  paid off the federal police, right?

1   A    Yes.

2   Q    He also paid off the PGR; do you remember?

3   A    The Yankees, they belong to the PGR.

4   Q    And this is the federal attorney general's office?

5   A    Yes.

6   Q    And I think you also testified that your Papa Mayo was

7   one of those people that liked to meet personally with the

8   people he brought up, right?

9   A    Yes.

10  Q    He also paid off the SIEDO, S-I-E-D-O?

11  A    There were certain SIEDO personnel that he paid off as

12  well.

13  Q    What's the SIEDO?

14  A    Another agency that is part of the PGR as well.  They do,

15  like, money laundering and all those types of things.

16  Q    Would the SIEDO then investigate, like, front companies

17  of drug traffickers?

18  A    Yes.

19  Q    Did he pay them also that they wouldn't investigate your

20  mother's company?

21  A    No.  In fact, my mom was subpoenaed for her to testify

22  with the SIEDO, and my sisters as well, so that she would

23  testify about her businesses.  And there's a record, there's

24  paperwork of all of that when they went there, and that was

25  the investigation that was conducted by the Department of

1  Treasury regarding money laundering in regards to my mom and

2  my sisters.

3  Q    You want to throw in Compadre Chapo, too?  Were you done?

4  A    No, he didn't have anything to do with that.  That's why

5  I didn't say my Compadre Chapo.  He didn't have -- he doesn't

6  have anything to do with my mother or with my sisters.

7  Q    Your father also paid off the federal judicial police?

8  A    Yes.

9  Q    He also paid off some guy named Chuy Tono?

10 A    Yeah, but he was with the judicial state police.

11 Q    And he was the head of that in Sinaloa, correct?

12 A    The chief, the director of the judicial state police in

13 Sinaloa, yes.

14 Q    Chuy Tono was a good friend of your father's, right?

15 A    Yes, very good friends with my dad.

16 Q    Did your father pay off the meter maids, the dogcatchers

17 too?

18 A    No, no, but he also had acquaintances with transit.  He

19 was friends with the transit people.

20 Q    Safe to say your father didn't even have to pay any

21 tickets, right?

22 A    No, I never knew of -- no, I never knew of any transit

23 officer who stopped him or that he has any, like, traffic

24 tickets.

25 Q    So the bottom line is your father had an infrastructure;

1   he had a supplier; he bribed half of Mexico, if not more,

2   right?

3   A    Yes.  That's what I've been saying since yesterday and

4   now.

5   Q    So Papa Mayo really had no use for this guy over here,

6   right (indicating)?  Especially when this guy right here

7   (indicating) comes out of prison after eight years and is not

8   doing well economically.

9   A    Yes, but he got out and he became my dad's partner and

10  then financially he did well.

11  Q    You were arrested in 2009.  You've had communications

12  with your father since then, right?  With Papa Mayo.

13  A    I haven't had any communication with my dad.

14  Q    You've never communicated with your father through your

15  lawyers?

16  A    Through the attorneys, yes.

17  Q    So you have had communications with your father since

18  2009.  Yes or no.

19  A    Yes.  I just wanted to clarify.  I mean, it wasn't just,

20  you know, over the phone; it was through the attorneys.

21  Q    Thank you.

22         Now, you know that your father, Mayo, has several

23  federal criminal cases against him in the United States,

24  correct?

25  A    Yes, but that happened the year that I was in prison in

1  Mexico with the Mexican attorneys, yes.

2  Q    So we're clear, and I want to make sure you understand my

3  question:  Your father, Papa Mayo, has several federal

4  narco-trafficking cases against him in the United States.  Yes

5  or no.

6  A    Yes.

7  Q    And you know, because he has these federal criminal cases

8  pending against him in the United States, that the

9  United States Government, supposedly, is after Papa Mayo to

10  bring him here, right?

11 A    Yes.

12 Q    And you know that the Mexican Government is also after

13 your father, correct?

14 A    Yes.

15 Q    And you know -- well, strike that.

16       All these bribes that your father has paid to the

17 Mexican Government officials, in part, that's to keep him from

18 being arrested, right?

19 A    Yes.

20 Q    And, in fact, you know that there's a five million dollar

21 reward for Papa Mayo.

22 A    Yes.  Since I was out, there was that reward.

23 Q    And it's the United States Government that's offering

24 that reward, right?

25 A    Yes.

1  Q    And, in fact, you have seen reward posters by the

2  United States saying reward for capture, Ismael Mayo Zambada,

3  right?

4  A    Before I was arrested, yes.  I saw some before I was

5  arrested, yes.

6          MR. BALAREZO:  Can I have the ELMO for the witness

7  only, please?

8  BY MR. BALAREZO:

9  Q    Do you see -- this is Defense Exhibit 369.

10         Do you see that?

11  A    Yes, sir.

12  Q    Do you recognize the person depicted in the picture?

13  A    Yes, that's my father.  Ismael Zambada Garcia.

14  Q    What do you recognize the exhibit itself to be?

15  A    That he is wanted in this case by the DEA agency.

16  Q    Does it fairly and accurately represent your father and

17  the wanted posters that you are familiar with concerning your

18  father?

19  A    I'm sorry, I don't understand the question.

20         MR. BALAREZO:  There's no objection, your Honor, for

21  the admission of Defense 369.

22         THE COURT:  You are offering it?

23         MR. BALAREZO:  I am offering it and there's no

24  objection.

25         THE COURT:  Okay.  It is received.

 1          (Defendant's 369 received in evidence.)

 2          (The above-referred to exhibit was published.)

 3   BY MR. BALAREZO:

 4   Q    Do you see that, sir?

 5   A    Yes.

 6   Q    You know that there has been -- the Mexican Government,

 7   the U.S. Government have been after your father for years,

 8   correct?

 9   A    Yes.

10   Q    And you know -- you already said that money was being

11   offered for his arrest.  I don't know, but tell me, has he

12   been captured yet?

13   A    As far as I know, no.

14   Q    Now, during the time of your cooperation with the

15   United States Government, you have met with them over a

16   hundred times, right?

17   A    Yes, sir.

18   Q    In each of those over one hundred times you met with the

19   United States Government was to discuss your drug trafficking

20   activity, for one; and number two, your drug trafficking

21   activity has always involved Papa Mayo, right?

22   A    Yes.

23   Q    So tell the jury, didn't the Government ask you many,

24   many questions about Papa Mayo?

25   A    Yes.  They asked me many questions about my dad.

1  Q     And yesterday I think you said that you were basically

2  your Papa Mayo's right-hand man, correct?

3  A     Yes.

4  Q     You knew everything about his drug-trafficking

5  organization?

6  A     Yes.

7  Q     You knew about the drugs, you knew about the money, you

8  knew were the bones were buried, right?

9  A     I did not speak about buried bones.

10 Q     All right, forget the buried bones.  Answer the question.

11 Forget about the buried bones.

12 A     Yes.  Everything else, yes.

13 Q     And the Government, when you met with them these over a

14 hundred times, tell the jury, did they ask you, where is your

15 father, your Papa Mayo?

16 A     Yes, I was asked many times, and I gave all the

17 information about the places that I knew up in the mountains,

18 in airstrips, the coordinates, ranches, houses.  I gave them

19 all the information I had.

20 Q     I think you even gave them coordinates, didn't you?

21 A     Yes.  Yes.  They would show me on a screen some airstrips

22 and it would show the coordinates and I -- they would write

23 down what the coordinates were, I would point them out.

24 Q     But it wasn't just airstrips that they were asking you

25 about; they asked you about his hideouts, right?

1  A    Yes, hideouts, and everything I knew about my father, all

2  locations; and many of the hideouts, you need an airstrip to

3  reach my father.

4  Q    And I think you even gave them the coordinates for one of

5  your Papa Mayo's girlfriend's house.

6         Do you remember that?

7  A    I gave many for the houses that I was at and my father's

8  houses.  I don't remember specifically a girlfriend.

9  Q    So all these meetings, all this information, all these

10 coordinates, and they're still looking for him, right?

11 A    I -- I gave that information that they asked me for and

12 what I knew about him.  If he hasn't been arrested, it's not

13 my fault.

14 Q    You're sure you didn't keep some of those coordinates to

15 yourself?

16 A    Yes, I gave them.  I gave them the coordinates.  I don't

17 have any way to communicate with my dad.  Since I've been in

18 the United States, I haven't communicated with him.

19 Q    Wait a minute.  I thought, like a few minutes ago, you

20 said you communicated with him through your lawyers?

21 A    I said it very clearly that it was during the year where

22 I was in prison in Mexico, and through the lawyers would

23 communicate with my father to ask how he was and to say how my

24 case was doing.

25 Q    So your lawyers can find Papa Mayo, but the Government

1  can't?

2  A    Am I to blame for that?  My father finds the lawyers, I

3  can tell you that, not the lawyers finding him.

4  Q    So did your Papa Mayo find your lawyers?  And I'm talking

5  about to represent you.

6  A    Well, there was a time that the attorneys went to see my

7  family, my mom, to say how I was doing and how my case was

8  going, and when the lawyer was there, they took him there.  He

9  can't protest that; he can't oppose that.  They went to see my

10 father.

11 Q    So your lawyers made it to your mother's house.

12 A    Yes, at the ranch where my mother lives.

13 Q    And your Papa Mayo showed up to your mother's house; is

14 that right?

15 A    No.  He sent a person.  My lawyer was talking to my

16 mother and sent a person who then took him to go see my

17 father.

18 Q    Now, during all those meetings that you had with the

19 Government --

20         THE COURT:  Before you go there, good time to break

21 for lunch?

22         MR. BALAREZO:  Fine, your Honor.

23         THE COURT:  I don't want to interrupt.

24         MR. BALAREZO:  It's fine.  It's fine.

25         THE COURT:  Please don't talk about the case, ladies

1    and gentlemen.  We will see you back in here at 1:35.

2              (Jury exits.)

3              THE COURT:  At the beginning of the afternoon break,

4    I would like to get the schedule down on the two motions that

5    were filed last night.

6              MR. LICHTMAN:  I can do that now, Judge.  Can we do

7    it by the end of -- five o'clock on Monday?

8              THE COURT:  For a Tuesday witness?  There's one

9    Tuesday and one Thursday.

10             MR. LICHTMAN:  Why don't we do the one for the

11   Tuesday witness by Sunday night.

12             THE COURT:  Fine.

13             MR. LICHTMAN:  And then --

14             THE COURT:  For the Thursday witness, by Tuesday

15   night.

16             MR. LICHTMAN:  Fine.

17             THE COURT:  Okay.  Thank you.

18             (Lunch recess taken.)

19             (Continued on next page.)

20

21

22

23

24

25

1                    AFTERNOON SESSION

2

3           (In open court.)

4           (Parties present.)

5           (Witness takes the witness stand.)

6           (Defendant enters the courtroom at 1:37 p.m.)

7           COURTROOM DEPUTY:  All rise.

8           THE COURT:  Bring in the jury, please.

9           MR. LICHTMAN:  Judge, very quickly.  One of the

10   prosecutors and myself have a plea in front of Judge Amon at

11   4:30.  Would it be possible --

12           THE COURT:  You want to leave earlier than that?

13           MR. LICHTMAN:  Yes.

14           THE COURT:  Let's see where we are and I'll try to

15   accommodate you.

16           MR. LICHTMAN:  Thank you.

17           COURTROOM DEPUTY:  Jury entering.

18           (Jury enters courtroom at 1:40 p.m.)

19           THE COURT:  Everyone be seated.  We'll continue with

20   cross-examination.

21           MR. BALAREZO:  Thank you, your Honor.

22   EXAMINATION BY

23   MR. BALAREZO:

24   (Continuing.)

25   Q    Mr. Zambada, before we left off for lunch, I was asking

1    you of the many times that you had met with the Government

2    since you began cooperating.  Do you remember that?

3    A    Yes.

4    Q    And, specifically, we were talking about all the

5    information you had given about your Papa Mayo.  Do you recall

6    those questions?

7    A    Yes, sir.

8    Q    And during those meetings with the Government, many times

9    the Government gave you the opportunity to communicate with

10   other individuals during the proffer sessions; is that right?

11   A    Yes, sir.

12   Q    Well, I said communicate, but I think it was translated

13   as speak.  I'll ask you both.

14          Were you given the opportunity to communicate and/or

15   speak?

16   A    Communicate and talk.

17   Q    Let's -- I'm sorry, your Honor, I had something in my

18   throat here.

19          Let's talk about the opportunities the gave you the

20   opportunity to talk?

21   A    Well, one time, the Government took me out at midnight

22   and put my father on the phone.

23   Q    Let's stop right there.

24          THE COURT:  Before you go on, we have a technical

25   issue.  We need 30 seconds.  Just hang on right there.

1              (A brief pause in the proceedings was held.)

2    EXAMINATION BY

3    MR. BALAREZO:

4    (Continuing.)

5    Q    Mr. Zambada, to make sure I understood your answer they

6    took you out at midnight and put you on the phone with your

7    father.  Is that what you just said?

8    A    Yes, sir.

9    Q    And by "they," you're talking about the

10   United States Government; right, prosecutors or agents?

11   A    Yes, sir.

12   Q    When you say "took me out at midnight," you're saying

13   they took you out of your jail cell?

14   A    Yes, sir.

15   Q    And they took you where?

16   A    I don't know, sir, I wasn't looking until I arrived in an

17   office.

18   Q    So the Government took you out of your cell in whatever

19   prison you were staying in at midnight, took you to someplace

20   you don't know, and said "Here's a phone, talk to your

21   father."

22   A    Yes, sir, that's the way it happened.  They put my father

23   on the phone.

24   Q    When was this, generally?

25   A    I was in Chicago, at the prison in Chicago.  It was 2012.

1    Q    2012.

2         Did you know you were to be taken out of your cell

3    at midnight?

4    A    No, sir.  I didn't know the time.

5    Q    So you had not arranged for this call to your father with

6    the Government previously; right?

7    A    Me?  No, sir.

8    Q    And when you got that phone and were told to talk to your

9    father, did you talk to them?

10   A    Yes, sir.

11   Q    So you have spoken with your father since you've been

12   arrested and in the United States; right?

13   A    Yes, sir.

14   Q    I thought earlier you said that you only spoke to him

15   when you were in Mexico?

16   A    You asked me about communication and, to me, to have

17   communication with my father means that I can speak to him,

18   and right now I had no communication with him.  I can't speak

19   to him when I want to, that's why I'm explaining how things

20   happened.

21   Q    How about when you were on the phone with your father at

22   that time?

23   A    I don't know.  Some minutes.  I don't know exactly how

24   many.

25   Q    What did you talk about?

1  A    First of all, how was I?  That I was doing fine?  That I

2  was to receive some help to get -- to just do well and go

3  ahead with my case.  He said he would help as well as my

4  Compadre Chapo.  That he told me he loved me very much that I

5  shouldn't worry that everything would be okay.  I said to him

6  that however he could help me he should help me.  He said,

7  yes.

8  Q    When you talked tor your Papa Chapo -- can I have the

9  Elmo, please.

10        When you talked your Papa Chapo for however many

11  minutes the Government record that phone call?

12  A    I imagine so, yes.

13  Q    And he still remains free, your Papa Chapo, excuse me,

14  I'm sorry.  All right.

15  A    You see that sometimes we make mistakes.

16  Q    Touché.

17        THE COURT:  Let's ask a question, please.

18  Q    Touché.  I correct myself.  Papa Mayo.  You're telling us

19  the Government of the United States sets up a phone call

20  without your help, with your father, Mayo, but they can't find

21  him.  He still remains free?

22  A    The thing is that at that time I did not know apparently

23  it was through my attorneys.  But, at that time, I didn't know

24  how that phone call came about.  I didn't know how it was to

25  happen.  I can say that later on I found out it was through my

1    lawyers.

2    Q    And did you ever hear a recording of that conversation?

3    A    Yes.

4    Q    Do you know if the Government tracked that phone call,

5    like, traced it?

6    A    I don't know that, sir.

7    Q    After that particular conversation with Mayo, did you

8    have any additional phone calls with him?

9    A    No, sir.

10   Q    Now, isn't it correct that part of the reason that the

11   Government wanted you to speak to your father, Mayo, was that

12   you can ask him to surrender?

13   A    Yes, that was one the reasons.  They told me at that time

14   to see if I could tell my dad to surrender.

15   Q    And you asked him to surrender, didn't you?

16   A    I sent that message to my dad for him to surrender, yes.

17   Q    Did he?

18   A    I don't know.

19   Q    Now, let me just talk briefly about part of your

20   testimony --

21        MR. BALAREZO:  Strike that.

22   Q    During these many, many proffer sessions that you had

23   with the Government, you were asked questions beyond Mayo;

24   right?

25   A    In what sense?  I don't understand, in what sense?

1    Q    Mayo wasn't the only thing they asked you about; correct?

2    A    They asked me about several people who belonged to the

3    Sinaloa Cartel.

4    Q    And, specifically, what I'm getting at, they asked you

5    questions about things that they believed you had done; right?

6    A    Yes, many things that I had done and I did confirm if I

7    had done those things or not.

8    Q    And you understand that the Government based those

9    questions to you on information that they got from other

10   cooperators; correct?

11   A    Yes, sir.  I understand so.

12   Q    And one of the questions that they had asked you in

13   particular was whether or not after your uncle Rey Zambada was

14   arrested whether or not you and Mayo planned to retaliate

15   against the Government of Mexico.  Do you remember that?

16   A    Yes, they did ask me that question.

17   Q    You told them that wasn't true?

18   A    I said no.  I told them that I had never been present.

19   My dad never said that, and my dad had never told me he said

20   that.

21           THE INTERPRETER:  I'm sorry, the interpreter would

22   like to correct.  And I didn't think that either.

23   Q    They also asked you whether you had ever planned to kill

24   a Captain Ramirez because he had beat you up at some point?

25   A    No, sir.  I don't remember that.

1  Q    You don't remember them asking you?

2  A    That if they had, you know, if I had sent to kill Captain

3  Ramirez.  I mean, I remember that question.  I mean, I don't

4  remember I never sent anyone to kill Captain Ramirez.

5  Q    They did ask you whether you had planned to kill him or

6  not, yes or no?

7  A    Well, to that question, I answered no.

8  Q    So, first of all, answer my question.  They did ask you

9  that?

10 A    Yes, sir.

11 Q    Or sí?

12 A    Yes.

13 Q    And you denied that also, didn't you?

14 A    Yes, I said no.

15 Q    And they also specifically asked you whether you, you

16 personally shot four workers and then dumped their bodies

17 somewhere.  Do you remember that question?

18 A    Yes, they did ask me that question as well.

19 Q    And they also asked you if you were a violent person,

20 right?

21 A    Yes, sir.

22 Q    And you denied that.  You're not a violent person?

23 A    Yes.  I said that I ordered people killed, but that I was

24 not present where there were shootouts or armed

25 confrontations.  And I also denied regarding the four people

1  that supposedly I had shot in the head because that was not

2  true.

3  Q    And they also asked you a lot of similar things that you

4  deny doing; right?

5  A    It was something that I had not done.  I denied it

6  because I had not done it.

7  Q    So all those questions that you denied having been

8  involved in:  The Captain Ramirez, the bodies, those things

9  that you understood the Government was asking you because they

10 were based on information that they got from other

11 cooperators.

12 A    Yes, that's what I understood but that was information

13 they had about me from other witnesses.

14 Q    So what you're telling the jury then is that sometimes

15 cooperators lie; right?

16 A    I'm answering what you're asking me.

17 Q    Right.  But whatever cooperators gave them that

18 information were lying?

19 A    In that regard, yes.

20 Q    Now, yesterday, excuse me, you were asked be a series of

21 questions concerning Juárez, Juárez, Mexico?

22 A    Yes, sir.

23 Q    And, in particular, in respect to Juárez, you mentioned a

24 person named Mario, M-a-r-i-o.

25 A    Yes.

1    Q    And you said that his nickname was M Diez, M-10?

2    A    Yes, that too.

3    Q    And you told the jury just yesterday that you had a

4    meeting with M-10, or Mario, in the mountains of Sinaloa?

5    A    Yes, sir.

6    Q    You need the interpreter or not?

7    A    I do need her.

8         MR. BALAREZO:  You want to translate?

9         THE INTERPRETER:  Sure.

10   A    Yes, sir.

11   Q    And that the meeting was between Mayo, Juancho, and Chapo

12   and that it happened some time at the end of 2005, beginning

13   of 2006?

14   A    I also mentioned that Herman was there.

15   Q    And you also mentioned that during that meeting there was

16   some discussion of some workers of M-10's were having problems

17   with somebody?

18   A    Yes.  M-10 said that it was his people that they were on

19   his side.

20   Q    And, specifically, you mentioned that one of those was

21   Jaguar.

22   A    Yes, sir.

23        MR. BALAREZO:  Can I have the Elmo, please.  It's in

24   evidence.

25   Q    Government Exhibit 71.  This is the Jaguar that you are

1   referring to?

2   A    Yes.  I said that to me that's Jaguar.

3   Q    For the benefit of Mr. Reporter that's Jaguar?

4   A    Yes.

5   Q    Now, when you were at that meeting with Jaguar, M-10,

6   your father, all these people.  Your father then indicated

7   that he already knew Jaguar, did he?

8   A    No, I never said that my dad and my Compadre Chapo met.

9   He only mentioned M-10, not Jaguar.

10  Q    So you're saying Jaguar was not at the meeting?

11  A    Yes, he was not at the meeting.

12  Q    Was he mentioned at the meeting?

13  A    Yes, he was mentioned at the meeting by M-10.

14  Q    And when he was mentioned meeting by M-10 did your

15  Father Mayo indicate that he knew Jaguar?

16  A    No, no.  I don't remember the one who said that he knew

17  was Herman that's what I remember.

18  Q    And similarly, at that meeting, when the topic of Jaguar

19  came up, did this man, Compadre Chapo, did he indicate that he

20  knew Jaguar?

21  A    No, he said that he didn't know him as far as I remember.

22  Q    So if Chapo didn't know him, he certainly didn't give him

23  that nickname, Jaguar?

24  A    I mentioned yesterday that it was M-10 who had given him

25  that name, that nickname, that it was his people.

1  Q     Thank you.

2         Now, I want to talk a little bit about events that

3  took place in 2009.

4  A     Mm-hmm.

5  Q     Well, actually, before 2009.  2007.  At some point around

6  2007, you and your Father Mayo began having communications

7  with the DEA; right?

8  A     No, the one who had communications with them was my

9  Compadre Chapo.

10        MR. BALAREZO:  One moment, your Honor.

11        (A brief pause in the proceedings was held.)

12 Q     Well, let me rephrase that.

13        Some time prior to your arrest in March of 2009,

14 you, I'm talking about you right now, you were having some

15 kind of discussions or communications or smoke signals with

16 the DEA, is that yes or no?

17        MS. LISKAMM:  Objection.

18        THE COURT:  Sustained.

19        MR. BALAREZO:  Can I have a word, your Honor?  Form?

20        THE COURT:  It was form, "smoke signals."

21 Q     Some time before March 2009 when you were arrested, were

22 you having some kind of communications with the DEA?

23        MS. LISKAMM:  Objection.

24        YhTHE COURT:  It's not to form.  Let's have sidebar.

25        (Continued on the next page.)

1           (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4           THE COURT:  I'm not hearing yet a public authority

5    defense.

6           MS. LISKAMM:  Your Honor, the only authority reasons

7    to elicit the fact that the witness was trying to meet with

8    the DEA before the Government arrested him which is the whole

9    basis of the public authority defense.

10          THE COURT:  But it could also be without, not a

11   public authority defense.  It could also be something that

12   affects his credibility when he ultimately tells his story.

13   You know, don't go to the public authority defense.

14          MR. BALAREZO:  I'm not.

15          THE COURT:  But I think the meetings with the

16   Government prior to his arrest are perfectly valid.

17          MR. BALAREZO:  Just so the Court knows, I have no

18   questions.  I'm not mentioning public authority.

19          THE COURT:  Are you --

20          MS. LISKAMM:  I ask for a proffer on this.

21          THE COURT:  Are you to imply on questioning that, in

22   fact, he struck some kind of authority agreement with the DEA?

23          MR. BALAREZO:  No.  This is strictly --

24          MS. PARLOVECCHIO:  What's the purpose of this line

25   of questions?

1             MS. LISKAMM:  What's the relevance?

2             THE COURT:  I see relevance.  I'm overruling the

3    objection.  Don't do go where you're not supposed to go.

4             (Sidebar discussion concludes.)

5             (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2   EXAMINATION BY

3   MR. BALAREZO:

4   (Continuing.)

5   Q    I'm going to ask the question again.

6          You were arrested in March of 2009.  Prior to that

7   date, you had direct or indirect communications with the

8   United States Drug Enforcement Administration, the DEA; is

9   that correct, yes or no?

10  A    Yes, sir, indirectly.

11  Q    And the reasons you were having those indirect

12  communications with the DEA was because you were trying to

13  help yourself out; is that correct?

14  A    Yes, I wanted to get out of the cartel.  I wanted to

15  retire from everything with my dad and with my Compadre

16  Chapo's permission.

17  Q    Why didn't you just go to one of your homes and smoke a

18  cigar and jump in the pool.  Why did you need Chapo's

19  permission to retire?  You didn't work for him.

20  A    Well, you know, I already had problems with the

21  United States and with Mexico, and one of the things I wanted

22  to withdraw from the cartel and retire because, in fact, it

23  had been one of the objectives, since I was in the middle, and

24  when I say that, you know, it was my dad and my Compadre

25  Chapo's permission, I'm saying that just because it was their

1   suggestion that I retire and that I get out of the business

2   because that was one of the ideas for me to go about my own

3   life.

4           And the thing with the DEA is that, you know, my

5   Compadre Chapo's contact at the time, I mean, it was obvious

6   that I was the only person who at the time could make an

7   arrangement to get out of that.

8   Q    Anything else?  So what you're telling the jury is that

9   you were tired of the killing, the violence, the money, the

10  jets.  You were tired of all that stuff, you wanted to walk

11  away.  Is that what you're saying?

12  A    No.  I mean, I didn't say that yesterday.  What I just

13  said was I wanted to retire, and I did have many

14  opportunities.  I went to Europe, I went to Canada, but then I

15  went back to Culiacan and my dad.

16  Q    Let's cut through all of this.

17          You spoke with the DEA because you wanted to resolve

18  your problems in the United States, yes or no?

19  A    That was the objective, yes, sir.

20  Q    And the problems you had in the United States were the

21  cases you had in Chicago and the case you had in D.C., in

22  federal district courts of the Northern District of Illinois

23  and the United States District Court for the District of

24  Columbia, yes or no?

25  A    No, sir.  At that time, I only had the one in Washington,

1    D.C., Columbia.

2    Q    You knew that if you provided information to the DEA,

3    your case could go away possibly; right?

4    A    Yes, sir, but it was information about the enemies of my

5    father and my Compadre Chapo.

6    Q    We're going to get there.  And you knew that your case

7    could possibly be made to go away by the Americans because you

8    had a friend who had done this; right?

9              MS. LISKAMM:  Objection.

10             THE COURT:  Sustained.

11             MR. BALAREZO:  Could I approach?

12             THE COURT:  If you want to approach.  Maybe to help

13   you out, you went a step too far.

14             MR. BALAREZO:  Okay.

15   Q    Mr. Zambada, prior to your having your indirect

16   communications with the DEA, you had spoken to someone

17   associated with the so-called Sinaloa Cartel; right?  I'm not

18   finished with the question.  Who had a case in the

19   United States, was providing information to the DEA --

20             MS. LISKAMM:  Objection.

21             THE COURT:  You have to wait till he's done, but I

22   understand the problem.

23             Let me have a sidebar, please.

24             (Continued on the next page.)

25

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          THE COURT:  Once he's giving you, and he has, that

5     he was talking to the DEA in order to get out of his District

6     of Columbia problem, what does it matter if he learned he

7     could do that from somebody else who had done something

8     similar which is where you're, I take it --

9          MR. BALAREZO:  This goes to his state of mind at

10    that point because the other individual who I'm not going to

11    mention or say anything about his cooperator status had a case

12    dismissed as a result of what he was doing.  At least that's

13    what he understood.

14         THE COURT:  But why does that matter?  He already

15    said his state of mind was doing this would get the case

16    dismissed.

17              MR. BALAREZO:  That's fine.

18         THE COURT:  I sustained.

19         MR. BALAREZO:  Did he say clearly he was?

20         THE COURT:  Yes, he did.

21         (Sidebar discussion concludes.)

22         (Continued on the next page.)

23

24

25

1           (In open court.)

2           MR. BALAREZO:  And, your Honor, I just want to

3    clarify that question and answer if I may?

4           THE COURT:  Okay.

5           MS. LISKAMM:  Your Honor, objection.

6           THE COURT:  I haven't heard the question yet.  Don't

7    object because when there's no question because I can't make a

8    ruling when there's no question.  You can stay standing, it's

9    okay, ask your question.

10          MS. LISKAMM:  Thank you, your Honor.

11   EXAMINATION BY

12   MR. BALAREZO:

13   (Continuing.)

14   Q    I just want to clarify the reason you communicated

15   indirectly with the DEA was because you wanted to get rid or

16   resolve your case in the District of Columbia?

17          MS. LISKAMM:  Objection, asked and answered.

18          THE COURT:  Question.  Let's cut through all of this

19   which I thought you did.

20          You spoke with the DEA because you wanted to resolve

21   your problems in the United States, yes-or-no answer, that was

22   the objective?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  I got that.

25                          ///

1      MR. BALAREZO:  Now I got it.

2    EXAMINATION BY

3    MR. BALAREZO:

4    (Continuing.)

5    Q    In that case, in the United States District Court for the

6    District of Columbia, you were charged with what?

7    A    It was a conspiracy, a conspiracy for distribution and

8    importation of cocaine in the United States.

9    Q    You were charged with drug trafficking; right?

10   A    Yes, sir.

11   Q    And before you had those indirect communications with the

12   DEA, your father, Papa Mayo, gave you authorization to speak

13   to them; correct?

14   A    Yes.  And my Compadre Chapo, too.

15   Q    Just to be clear, my question was about your father, Papa

16   Mayo?

17   A    The thing is that this conversation we had, the three of

18   us together, and the one who had indirect communication was my

19   Compadre Chapo.

20   Q    How old were you when this happened?

21   A    2007 I'm 43, I got blocked.

22   Q    30 something?

23   A    32, I believe.

24   Q    You're a grown man?

25   A    Yes, sir.

1   Q    Married?

2   A    Yes, sir.

3   Q    Kids?

4   A    Yes.  I've been married for 25 years.

5   Q    You were also already a fairly high-level narcotics

6   trafficker; right?

7   A    Yes, sir, and that was what was discussed in that meeting

8   with my Compadre Chapo and my father.

9   Q    So this man, "Shorty," the compadre, had to give a

10  34-year-old married man who was a large-scale drug trafficker

11  permission to go talk to the DEA.  That's what you're telling

12  us?

13  A    No.  I mean, it was a proposal that he made because it

14  was his contact because, at that point, my level of

15  trafficking had been even higher than theirs, so I had the

16  opportunity to do what I always wanted to do which is to step

17  away from this.

18       My Compadre Chapo told me was that his contacts at

19  the DEA.  They could only help me, they were not able at that

20  time to help my Compadre Chapo or my dad.  That there was this

21  opportunity.

22  Q    So if I heard you through all that, you said at that time

23  you were actually a larger drug trafficker than Mayo and

24  Chapo?

25  A    And saying what my Compadre Chapo told me that his

1    contacts at the Government level told him that I was being

2    more wanted right then because I was the person in charge of

3    Culiacan for my Compadre Chapo and for Mayo.

4    Q    And the information, as you said earlier, that you were

5    to provide to the DEA was about your enemies; correct?

6    A    That was the proposal made by my dad and my

7    Compadre Chapo.  They said that they were even already

8    receiving information about our enemies, the people at the

9    DEA.

10   Q    Try to focus a little bit.

11         When you provided the information with your quote,

12   unquote, enemies, to the DEA, you were aware and understood

13   that the DEA would share with the Mexican government, yes or

14   no?

15   A    Yes.

16   Q    And the types of information that you were giving them

17   was about locations of these enemies; right?

18   A    Yes.

19   Q    Where they had their *officinas*, their offices; right?

20   A    Yes.

21   Q    You were trying to give the DEA and the Mexican

22   government any information you could so that they could

23   capture your enemies; correct?

24   A    Yes, a part of the Mexican government.

25   Q    So what you were trying to do in effect was either to

1  have the United States Government or the Mexican government

2  fight your battles, let them take on your enemies; right?

3  A    That was an objective, yes, to stop our enemies.

4  Q    Just as an example, you gave them information about a

5  person named be on Osciel Cardenas?

6  A    No, sir.

7  Q    During one of these over 100 sessions that you had with

8  the Government, do you recall telling the Government that

9  after you began communicating indirectly with the, DEA you

10  provided information on Osciel Cardenas?

11  A    No, sir.

12  Q    Do you recall telling the Government that once you

13  started having those communications with the DEA, you provided

14  to the DEA information about someone named "Forty"?

15  A    No, sir.

16  Q    And Forty is Miguel Treviño who is the leader of the

17  Zetas; is that correct?

18  A    Yes, sir.

19  Q    Were the Zetas one of your enemies?

20  A    Yes, sir.

21  Q    And Osciel Cardenas, the first guy I told you about, he

22  was the leader of the Gulf Cartel?

23  A    Yes, sir.

24  Q    And were they your enemies, too?

25  A    No, Osciel Cardenas was arrested in 2003.

1  Q     How about someone named Costilla?

2  A     He was from the Gulf Group as well, the Zetas.

3  Q     Do you remember giving the Government, or telling the

4  Government, that you gave the DEA information on Costilla?

5  A     No, sir.

6  Q     Do you recall telling the Government that you provided to

7  the DEA, and when I say "government," I meant prosecutors in

8  this case, telling them that you provided the DEA information

9  on Arturo Beltran Leyva?

10 A     Yes, sir.

11           (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BALAREZO:  If I could have the Elmo for the

2   witness only.  The Elmo?

3          THE COURT:  You got it.

4   EXAMINATION BY

5   MR. BALAREZO:

6   (Continuing.)

7   Q    Defense Exhibit 379, I'm going to direct your

8   attention.

9          MS. LISKAMM:  Your Honor, can we have a sidebar?

10          THE COURT:  Well, we have the same problem we had

11   before.  Let's go to sidebar and we'll talk about it there.

12          (Continued on the next page.)

13          (Sidebar conference.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          THE COURT:  The problem is the way you and

3   Mr. Purpura did the same thing as to this particular

4   question.  When you say, "Do you remember telling the

5   Government", and the witness says, "no," that answer is

6   consistent with, no, I did not tell the Government that, or,

7   no, I don't remember whether I told the Government that or

8   not.

9          So if you're going to refresh his recollection,

10  you need to lay a better foundation by saying, for example:

11  Are you saying you didn't tell them that, or you don't

12  remember telling them that?

13         If he says I don't remember telling them that,

14  then that's all you need to do to refresh his recollection.

15  Okay?

16         MR. BALAREZO:  Okay.  Yes.

17         THE COURT:  Anybody dispute that?

18         MR. PURPURA:  I do.

19         MR. BALAREZO:  No.

20         MR. PURPURA:  I do.  I do.

21         THE COURT:  Why?

22         MR. PURPURA:  Because if you do it your way,

23  you're giving him the opportunity at that point to say I

24  never said that.  And that's been totally established that

25  he has said it.

1          THE COURT:  I think you got the horse before the

2     cart.

3          In order to refresh his recollection, you have to

4     first show that he has no recollection.  And the answer to

5     the question the way you two have been posing it, does not

6     show that.

7          MR. PURPURA:  Do you recall telling the Government

8     X?

9          THE COURT:  I don't know what his answer "no"

10    means.  I don't know if it means, no, I don't recall, or,

11    no, I didn't tell them that.

12         MR. BALAREZO:  The question is, do you recall?  I

13    understand what you're saying.

14         MR. PURPURA:  Judge, I got you.  We can follow up

15    with that little thing.  I do not recall, that's all he was

16    saying.

17         THE COURT:  If it's clear that the witness has no

18    recollection and, therefore, needs to be refreshed, if you

19    need to lay that down, so let's do that.

20         MR. BALAREZO:  If I could just have one second.

21         (End of sidebar conference.)

22         (Continued on the next page.)

23

24

25

1                    (In open court; Jury present.)

2    BY MR. BALAREZO:

3    Q    Mr. Zambada, you do agree that you told the Government

4    information -- excuse me, strike that.

5                    You shared with the DEA information about

6    Arturo Beltran Leyva, right?

7    A    Yes, sir.

8    Q    And the information that you shared with the DEA was

9    Arturo's telephone number, right?

10   A    Yes, it was one of Arturo's numbers.

11   Q    And the reason you gave the DEA that information was so

12   that they can track and capture Arturo, correct?

13   A    Yes, sir, that was the objective.

14   Q    Tell the jury, where's Arturo now?

15   A    I was already arrested, but I found out through the

16   news that he had been killed.  That he was killed.

17   Q    And he wasn't just killed, there was an operation by

18   the Mexican government in Puerto Vallarta.

19                    MS. LISKAMM:  Objection.

20                    THE COURT:  I don't know the question.

21                    MS. LISKAMM:  Your Honor, can we have a sidebar?

22                    MR. BALAREZO:  Your Honor, I'll move on.  I want

23   to get through this.

24                    THE COURT:  Okay.  Question withdrawn.

25   BY MR. BALAREZO:

1   Q    So you know that Arturo Beltran Leyva was killed,

2   right?

3   A    Yes.

4   Q    And you know that he was killed by the Mexican Marines,

5   correct?

6   A    Yes, sir.

7   Q    Thank you.

8           Now, the day of your arrest -- strike that.

9           The day before your arrest, you actually did

10  have a meeting with the DEA in person; didn't you?

11  A    Some hours before I was arrested, yes, sir.

12  Q    And you had a meeting with two agents, DEA -- U.S. DEA

13  agents.

14  A    Yes, sir.

15  Q    And I think even a prosecutor showed up, not one of the

16  people here, but a prosecutor showed up, right?

17  A    No, sir.  The two agents and the contact with the DEA

18  said that there was information that the agents of the --

19  from the agents of the DEA that there was going to be a

20  meeting of the U.S. prosecutors with a high-ranking member

21  of the cartel, of the Sinaloa Cartel.

22  Q    We agree, though, you had a meeting with the DEA.

23  A    Yes, sir, I was just explaining the reason.

24           Yes, sir, I was just explaining the reason

25  why, you know, the other person didn't show up.  But the

1  deal was for that other person to be at that meeting.

2  Q    So there was going to be a prosecutor there.

3  A    I was told that the DEA chief who was in charge of

4  Mexico was going to be there.

5  Q    So the DEA chief was going to be there, two DEA agents

6  were going to be there, and they are about to meet Papa

7  Mayo's right-hand man.

8  A    Mayo's son, to be more direct.

9  Q    You?

10  A    Yes, sir, me.

11  Q    A large scale Mexican narcotics trafficker meeting

12  face-to-face with the DEA.

13  A    Yes, sir.

14  Q    Did the DEA arrest you?

15            Did the DEA arrest you?

16  A    No, Mexican special forces.

17  Q    The next day.

18  A    Hours later.

19            It was the same day.  I finished that meeting

20  at 2 a.m., and I was arrested at 4 a.m.

21  Q    So the record is clear, the answer to my question is,

22  no, the DEA did not arrest you, right?

23  A    No.

24  Q    Let's talk a little bit about when you came to the

25  United States.  You were eventually extradited from Mexico

 1  to the Chicago; is that right?

 2  A    Yes, sir.

 3  Q    And the reason you went to Chicago is because now you

 4  had a federal indictment in Chicago for drug trafficking

 5  also.

 6  A    Yes, sir.

 7  Q    And when you came to Chicago, you were detained at the

 8  Metropolitan Detention Center, correct?

 9  A    Yes, sir.

10  Q    And were you held in something that's called a "SHU"?

11  The special housing unit?

12  A    Yes, sir.

13  Q    How long were you in that SHU?

14  A    Almost two years.

15  Q    That wasn't a good place to be; was it?

16  A    No, sir.

17  Q    The conditions that you were under in the SHU were

18  horrendous, right?

19  A    Yes, sir.

20  Q    You were kept isolated from other prisoners.

21  A    Yes, sir.  Nobody could talk to me.

22  Q    Everything you did, you did in your cell?

23  A    Yes, sir.

24  Q    You ate in your cell.

25  A    Yes.

1   Q    You went to the bathroom in your cell.

2   A    Yes, sir.

3   Q    Everything.  That was your world for two years.

4   A    Yes, sir.

5   Q    And the reason you were in there -- you didn't ask to

6   be put in there; did you?

7   A    Yes.  No.  No, sir.

8   Q    The Government put you there, right?

9   A    Yes, sir.

10  Q    Now, in that SHU, you were also prohibited from talking

11  to prison officials.  There were only certain ones you could

12  talk to.

13  A    Yes, sir, only to the lieutenants.

14  Q    And when they moved you, they had to have a lieutenant

15  there to help move you?

16  A    Yes, sir, otherwise I couldn't be moved.  It was just

17  only done with him.

18  Q    And when your meals came, they were handed to you

19  through that little slot in the door?

20  A    Yes, sir.

21  Q    And sometimes they came three, four hours late and it

22  was cold.

23  A    Yes, sir.

24  Q    When you got mail from your family, sometimes it was

25  months late, if you got it?

1    A     Yes, sir.

2    Q     And you know your family was sending you mail daily,

3    correct?

4    A     Yes, sir.

5    Q     And, in fact, even your telephone calls were limited;

6    weren't they?

7    A     Yes, sir.

8    Q     You had to sleep with a miserable little thin mattress?

9    A     Yes, sir.

10   Q     They even limited what you could order from the

11   commissary.

12   A     Yes, sir.

13   Q     And you didn't even get to breath fresh air or see the

14   sun for those two years; is that correct?

15   A     Yes, sir.

16   Q     And that was the worst thing for you; wasn't it?

17   A     Yes, sir.

18   Q     You couldn't see the clouds.  You couldn't see the sun.

19         MS. LISKAMM:  Objection.

20         THE COURT:  Sustained.

21   Q     So those conditions to you, they were torture; weren't

22   they?

23         MS. LISKAMM:  Objection.

24         THE COURT:  Overruled.

25   A     Yes, sir.

1    Q    It was inhuman the way you were being kept in that

2    cage, right?

3              THE COURT:  I think we've got it.

4              MR. BALAREZO:  I'll move on.

5    Q    So those two years in the SHU, you weren't cooperating

6    at that time; were you?

7    A    Yes, sir, no, I wasn't.

8    Q    In fact, you were fighting your case.

9    A    Yes, sir.

10   Q    At some point those conditions got to be a little too

11   much and they started affecting you psychologically, right?

12   A    Yes, sir.  Yes.

13   Q    And isn't it true, though, that those conditions did

14   get better at some point.

15   A    Yes, sir.

16   Q    Well you're not in the SHU now, right?

17   A    No, but it's still a prison.

18   Q    You think you should be free right now?

19   A    I don't know.  No.  Well, actually I paid for what I

20   did.  I pled guilty in the case.  I paid for what I did.

21   Q    While you were in the SHU, you were able to make a

22   couple phone calls, right?

23   A    They would give me 1-A month with my family.  And

24   sometimes there were two calls a month.

25   Q    And you would call your wife.

 1  A    Yes, sir.

 2  Q    And sometimes you would call her, you were crying.

 3  A    Yes, sir.

 4  Q    You were crying, right?

 5  A    Me and my wife.

 6  Q    You?

 7  A    Yes.  Sometimes I did cry together with her when I

 8  heard her crying.

 9  Q    And you would tell her how you were dead inside from

10  being in the SHU.

11  A    Yes, sir.

12  Q    When you got out of that SHU, when you were able to

13  breath the fresh air and see the sun, the Government helped

14  you out, didn't it, they helped you get out of that SHU?

15  A    Yes, sir.

16  Q    So everything got better all of a sudden because why?

17  A    Because I accepted my culpability and I had an

18  agreement with the Government regarding my own culpability.

19  Q    So part of the reason you had been in the SHU to begin

20  with was because you were this large scale Mexican drug

21  trafficker, right?

22            MS. LISKAMM:  Objection.

23            THE COURT:  Overruled.

24  A    I guess so.

25  Q    The Government considered you to be a dangerous person,

1    right?

2    A    I imagine so.

3    Q    The Government thought that you might try to escape,

4    right?

5            MS. LISKAMM:  Objection.

6            THE COURT:  Sustained.

7    Q    You understood that the Government -- part of the

8    reason you were in the SHU was because the Government

9    thought that you might try to escape?

10           MS. LISKAMM:  Objection.

11           THE COURT:  Overruled.

12   A    Yes, that was one of the reasons, yes, I imagine.

13   Q    So as soon as you started -- or decided, excuse me, to

14   accept responsibility and begin cooperating, the Government

15   worries went away; is that correct?

16           MS. LISKAMM:  Objection.

17           THE COURT:  Sustained.

18   Q    Once you started cooperating, that's when you got out

19   of the SHU, right?

20           MS. LISKAMM:  Objection.  Asked and answered.

21           THE COURT:  You can answer again.

22   A    Yes, sir.

23           THE COURT:  All right, sidebar.

24           (Continued on the next page.)

25           (Sidebar conference.)

1        (The following occurred at sidebar.)

2        THE COURT:  I don't know what the Government is

3   getting here.  The defense did exactly what I thought they

4   were going to do at the last sidebar, which is to show --

5   they had to go into the DEA arrest and his confinement

6   because they were trying to show that he was so desperate

7   over the conditions of his confinement that he was willing

8   to make up or say anything.

9        I'm not saying it's a valid theory, but it's an

10  argument they are entitled to make, to at least paint the

11  picture of how horrible it was, and now he's gone on to --

12  he started cooperating and things got better, and that's

13  perfectly valid.

14       So what's the problem?

15       MS. LISKAMM:  Your Honor, he made that point five

16  minutes ago.  He's belaboring the point.

17       THE COURT:  Oh, people in glass houses.

18       No, the objection is overruled.

19       And I'm telling you, I'm going to give the defense

20  some leeway on this.

21       MR. BALAREZO:  I have two questions.

22       MS. PARLOVECCHIO:  Your Honor, I don't mean to do

23  a whack-a-mole.

24       THE COURT:  Well, Ms. Liskamm objected today when

25  Mr. Lichtman said something.

1      MS. LISKAMM:  Your Honor, I was trying to make the

2  record clear that Mr. Balarezo wasn't going to ask questions

3  about it.

4      THE COURT:  The record was clear.  Okay, so.

5      MS. PARLOVECCHIO:  It's not just the belaboring

6  issue, it's the fact that when Mr. Balarezo is trying to go

7  down here, it's to create the inclination that his client is

8  also in the SHU and to taint the jury --

9      THE COURT:  I don't see that at all.  I'm sorry, I

10  think you're getting all paranoid in this case.  I'm not

11  seeing that at all.  I do not expect to hear that in closing

12  argument.

13      MR. BALAREZO:  No.

14      MR. LICHTMAN:  I'm the one doing it.

15      MS. PARLOVECCHIO:  Your Honor, he tried to do it,

16  so that's why we -- we're not paranoid for zero reason.

17      THE COURT:  I know, people are the really out to

18  get you.  I understand.  Let's go.

19      (End of sidebar conference.)

20      (Continued on the next page.)

21

22

23

24

25

1           (In open court; Jury present.)

2    BY MR. BALAREZO

3    Q    Mr. Zambada, during those two years in that hellhole,

4    the SHU, did you ever see, with your own eyes, have a visit

5    with your wife?

6    A    A year after I was in the SHU, my wife came to see me

7    one time.  So in those two years, only once.

8    Q    The only reason, or the only way that your wife was

9    able to come visit you was because the Government was able

10   to get a visa for her to come from Mexico to see you, right?

11   A    Yes, it was a three-day permit.

12   Q    Did your children come?

13   A    No, just my wife.

14   Q    But the Government got her that visa, right?

15   A    Yes, sir.

16   Q    Now, we mentioned, we've gone around these cases that

17   you had in the United States.

18           Just to be clear for this particular section,

19   you have two cases in the United States.  You started off

20   with two federal narco trafficking conspiracies against you

21   in the United States, correct?

22   A    Yes, sir.

23   Q    And the first one, as you said earlier, was in the

24   District of Columbia.

25   A    Yes, sir.

1   Q    And in that particular case, you're charged with -- why

2   don't you tell the jury what you're charged with.

3   A    I'm sorry?

4   Q    Who is charged with him in the case.

5   A    Well, it was a case with my dad mainly, Javier Torres

6   Felix, and me.

7   Q    You want to throw in Compadre Chapo in that case?

8   A    No, because he wasn't there.

9   Q    He wasn't charged in the DC case; was he?

10  A    No, sir.

11  Q    And specifically, that case charged you with engaging

12  in a narco traffic conspiracy from 1992 to 2003; is that

13  correct?

14  A    Yes, sir.

15  Q    And that particular indictment also dealt with your

16  trafficking drugs with an organization from Colombia called

17  the Mejia Munera organization, right?  The twins.

18                    Yes?

19  A    I didn't know.

20  Q    You didn't read your indictment?

21  A    Yes, but it doesn't say the twins, the Mejia twins.

22  It's a drug trafficking conspiracy, and that was against my

23  dad.

24  Q    And you.

25  A    Me, and Javier Torres as well, who was mentioned.

1    Q    And not Compadre Chapo, right?

2         THE COURT:  We got that.  Go ahead.

3    Q    Now, when you were -- when you were free, before your

4    arrest, let's say, you were -- when you were helping

5    Papa Chapo run his narco trafficking empire --

6         THE COURT:  You misspoke.  Try again.

7         MR. BALAREZO:  What did I say?

8         I'm confused.  English is my second language.  I

9    apologize.

10        THE COURT:  You speak both very well.

11   Q    I'm talking about Mayo.  When you were helping Mayo run

12   his narco trafficking empire, you were out there, you were

13   enjoying all the money you were making, right?

14   A    Yes, sir.

15   Q    You were out there, you were trafficking thousands of

16   kilos of cocaine into the United States.

17   A    Yes, sir.

18   Q    And you had your enemies.

19   A    Yes, sir.

20   Q    And isn't it correct to say that you and your father,

21   Mayo, didn't like cooperators; is that accurate?

22   A    Yes, sir.

23   Q    Cooperators are considered bad by you and Mayo,

24   correct?

25   A    Yes, sir.

1    Q    They were considered untrustworthy.

2    A    Yes, sir.

3    Q    They were considered dishonest.

4    A    Yes, sir.

5    Q    They were considered rats.

6    A    Well, they called them the dedo, fingers.

7    Q    The lowest of the low.

8              THE COURT:  Mr. Balarezo, you're demonstrating

9    that English may as well be your first language, you've

10   asked the same question eight different ways.  Ask another

11   question.

12   Q    Well, in Mexico, there's a nice little expression.  You

13   called them something like pinche cabrones, right?

14   A    You could refer to them as that as well.

15   Q    Tell the jury, what's a pinche cabron?

16   A    Well, it's a fucking asshole.  It's a pinche cabron.

17   Q    I know we're having fun, but when you were arrested and

18   you were in the SHU, what did you become?

19              You became a cooperator, right?

20   A    Yes.  I did sign a contract.  I pled guilty.

21   Q    Now, eventually you -- in the DC case, you pled guilty;

22   is that correct?

23   A    Yes, sir.

24              MR. BALAREZO:  And, Your Honor, I'd like to show

25   the witness Defense Exhibit 349.  It's already in evidence

 1  by the Government's as Exhibit VZN3, I believe.

 2          If I could have a moment.

 3  Q    You see Defense Exhibit 349, sir?

 4              Just for the witness, I'm sorry.  Apparently

 5  it's not in evidence, Your Honor.

 6              THE COURT:  Okay.

 7  Q    Do you recognize this document?

 8              Do you recognize these two words?

 9  A    Yes, sir.

10  Q    Do you recognize your name at the top?

11  A    Yes, sir.

12  Q    Do you recognize what it says:  In the United States

13  District Court for the District of Columbia?

14  A    Yes, sir.

15  Q    Do you recognize this last page.  Is that your

16  signature?

17  A    Yes, sir.

18  Q    What is this document, sir?

19  A    It's my guilty plea.  It's my agreement with the

20  Government about my guilty plea.

21              MR. BALAREZO:  Your Honor, I move into evidence

22  Defense Exhibit 349.

23              THE COURT:  Received.

24              (Defense Exhibit 349, was received in evidence.)

25  Q    Now, I want to the draw your attention specifically at

1   the beginning here to the last page where you signed your

2   name, November 5th, 2012.

3                Do you see this part here that's highlighted?

4   A    Yes, sir.

5   Q    You can read it in English, right, you understand, or

6   do you want it interpreted?

7                (Interpreter reading the document to the witness.)

8                THE COURT:  All right, for the record, the

9   interpreter has read for the witness in Spanish the first

10  sentence of the paragraph.

11               MR. BALAREZO:  Second, Your Honor.

12               THE COURT:  Second one, right.

13               MR. BALAREZO:  Of the defendant's acceptance on

14  page 17.

15               THE COURT:  First sentence, second paragraph.

16  Q    So basically before you signed this plea agreement, you

17  went over it with your attorneys, right?

18  A    Yes.

19  Q    And you understood everything that was in the

20  agreement; is that right?

21  A    Yeah, at the time they did, my lawyer did explain it to

22  me, but I did follow some bad recommendations from my

23  lawyers.

24  Q    And what you understood that particular sentence right

25  above your name to mean was that any promises or any

1    agreement that the Government had with you was contained in

2    that one plea agreement; is that right?

3    A    Yes, sir.

4    Q    There were no side promises, no wink wink, no --

5    nothing of that nature, right?

6    A    No, sir.

7    Q    All you were required to do was sit down with the

8    Government, tell them what you know, right?

9    A    Yes, sir.

10   Q    According to you, tell the truth, right?

11   A    Yes, sir.

12   Q    And in exchange for doing that, you were hoping to get

13   a lower sentence; is that correct?

14   A    For me?  What I thought?  Yes.  That's what I want.

15   Q    So you pled guilty to the one count that was pending

16   against you in DC.

17   A    Yes, sir.

18   Q    And you knew that that one count that you had pending

19   in DC had a mandatory minimum of ten years that you were

20   facing.

21   A    Yes, sir.

22   Q    And you could have been sentenced up to life in prison,

23   correct?

24   A    Yes, sir.

25   Q    You're a young man.  You have a wife.  You have kids,

 1  right?

 2  A    Yes, sir.

 3  Q    You sure as heck don't want to be serving a life

 4  sentence; is that correct?

 5  A    Of course, I don't want to.

 6  Q    And you know that there's this thing called the federal

 7  sentencing guidelines, which are very high in your case;

 8  weren't they?

 9  A    Yes, sir.

10  Q    And all the promises that the Government made in this

11  agreement were in the agreement, there was a lot of things

12  that you had to do, correct?

13  A    Yes, sir.

14  Q    And this plea agreement has 17 pages, right?

15  A    I think so.

16  Q    See your signature page?

17  A    Yes, sir.

18  Q    It's a long document.

19              You didn't write this; did you?

20  A    No, sir.

21  Q    Your team of lawyers didn't write this; did they?

22  A    No, they reviewed it, just reviewed it.  But, yes, they

23  checked out my agreement, too.

24  Q    Who wrote this?

25  A    The Government in agreement with my lawyers.

1    Q    Did you negotiate any terms in this agreement?  No.

2    A    No.

3    Q    This was your only option to avoid a life sentence; is

4    that right?

5    A    Yes, to plead guilty and accept my culpability; yes, of

6    course.

7    Q    Take it or leave it, you had no choice.

8    A    Yes, sir.

9    Q    And under the terms of your plea agreement, if the

10   Government said to you, I want you to testify against

11   Eduardo, you'd have to testify against Eduardo, right?

12   A    Yes, one of the parts that I accepted and gave my word

13   for is if they needed testimony or any information, I would

14   be willing.  I was able.

15            MR. BALAREZO:  Paragraph 4 -- excuse me, page 4

16   paragraph 9A.

17            If the interpreter can read that paragraph for

18   him.

19               (Interpreter reading the document to the

20   witness.)

21   Q    When called upon by the United States, if they say

22   testify against Compadre Chapo, you come, right?

23   A    Yes, sir, it's my obligation.  I accepted that

24   agreement.

25            MR. BALAREZO:  Paragraph 9D for the interpreter,

1  please, for the witness.

2                   (Interpreter reading the document to the

3  witness.)

4  Q    Do you see that last part?  It says:  May be required

5  by the United States.

6  A    Yes, sir.

7                   MR. BALAREZO:  Paragraph 9E, if you could read the

8  highlighted portion, please.

9                   (Interpreter reading the document to the

10  witness.)

11  Q    You see that, right?

12  A    Yes, sir.

13  Q    Like telling the truth, turning over any interest in

14  property, any possession of yours, is an obligation under

15  the agreement, right?

16  A    Yes, sir.

17  Q    Have you turned over any property?

18  A    I don't have properties in the United States.

19  Q    Did you sell any of your properties in Mexico and turn

20  it to over to the Government?

21  A    No, I haven't been asked for that yet.

22  Q    And you pled guilty how long ago?

23  A    In the first case, it was November 2012.  And the

24  second case, April 2013 in Illinois.

25  Q    In order for you to not have to serve a very high

1   sentence, maybe even a life sentence in the United States,

2   the Government has to ask the judge that's going to sentence

3   you to reduce your sentence, correct?

4   A    I don't know if they're going to ask for a reduction in

5   my sentence.  That's what I want, and what I've asked for.

6   Q    Listen to my question.

7                In order to get that -- excuse me.  In order

8   for you to get that sentencing reduction that you want, can

9   I ask a sentencing judge to reduce your sentence?

10  A    Yes, sir.

11  Q    I can ask?

12  A    No, no, not me.  My -- the prosecutor and the -- they

13  could do it, but I don't know if they're going to do it.

14  They haven't promised that to me.

15  Q    You know that it's the Government alone that can file

16  the motion under either 5K1 or a Rule 35 for you to get a

17  sentence reduction, right?

18  A    Yes, sir.

19  Q    And, in fact, even if you think that you deserve a

20  sentence reduction and the Government says "no", you can't

21  do anything about it, correct?

22  A    Yes.

23  Q    So, although I think on direct examination you

24  testified that your judge makes the decision of your

25  sentence, do you remember that?

1   A    Yes, sir, because he really is who is going to make

2   that decision.

3   Q    But without the Government's motion, he can't give you

4   a reduction, right?

5   A    I'm sorry.  I'm sorry.  Can you ask me again?

6              THE COURT:  I think...

7              MR. BALAREZO:  I'll move on, Your Honor.

8              THE COURT:  Okay.

9              Are you nearly done, or do you want to take an

10  afternoon break?

11             MR. BALAREZO:  We can take a break.

12             THE COURT:  We'll take until 3:20, ladies and

13  gentlemen.  Please don't talk about the case.  See you in a

14  few minutes.

15             (Jury exits the courtroom.)

16             THE COURT:  Mr. Balarezo, are you close to being

17  done?

18             MR. BALAREZO:  I'm about two-fifths of the way

19  through, Your Honor.

20             THE COURT:  Two-fifths?

21             MR. BALAREZO:  Yes.

22             THE COURT:  Is that a serious answer?

23             MR. BALAREZO:  No, Your Honor, I hope to be

24  finished today.  I'll try.

25             THE COURT:  Okay.

1          MR. BALAREZO:  It all depends on...

2          THE COURT:  Okay.  That's fine.

3          Mr. Lichtman, with regard to your sentencing

4    that's been adjourned to -- your guilty plea, that's been

5    adjourned until 4:45, if necessary.  If it's not necessary,

6    then it's on schedule.

7          MR. LICHTMAN:  Thank you.

8          (Whereupon, a recess was taken at 3:07 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (In open court.)

2       THE COURTROOM DEPUTY:  All rise.

3       THE COURT:  All right, please bring in the jury.

4       (Jury enters courtroom.)

5       THE COURT:  Be seated please.  Let's go on,

6  Mr. Balarezo.

7  EXAMINATION BY

8  MR. BALAREZO:

9  (Continuing.)

10  Q    Mr. Zambada, with respect to that D.C. -- the case in

11  D.C., you pled guilty, eventually you agreed to cooperate

12  and that was in 2012, right?

13  A    Yes, sir.

14  Q    Although that was six years ago, you have not been

15  sentenced in that case, correct?

16  A    Yes, sir.

17  Q    And you're never going to be sentenced in that case,

18  correct?

19  A    I haven't been sentenced on that case yet, no.

20  Q    Well, your lawyers and the Government agreed that in

21  that case you could take back your guilty plea and have the

22  case transferred to Chicago; is that right?

23  A    It was explained to me that they were going to transfer

24  the case from D.C. to Chicago so that I would have the two

25  cases in Chicago and just be sentenced once.

1    Q    Right.  Because in D.C. that was a conspiracy that was

2    separate from the one in Chicago, right?

3    A    Yes, sir.

4    Q    So, really, you pled guilty in D.C. you should be

5    getting a sentence for your D.C. case, right, up to life in

6    prison?

7    A    Yes, sir.

8    Q    But because you're cooperating, the Government has

9    agreed that both cases can be taken in Chicago and you're

10   going to get only one sentence; is that right?

11   A    Well, that was the agreement that my attorneys and the

12   prosecutors reached, so I don't know the legal terms, but it

13   is for me to be sentenced only at one time.

14   Q    I'm not using legal terms, all I'm asking you is

15   instead of being sentenced in two separate cases you're only

16   going to get one, right?

17   A    Yes, sir, that's what I said.

18   Q    And that's a pretty good benefit you've gotten already,

19   correct?

20   A    Yes, sir, I understand so.  My attorneys explained to

21   me that it was the case.

22   Q    You remember that paragraph -- remember that paragraph

23   I showed you in the D.C. plea agreement -- can I have the

24   Elmo please -- where we read about the -- that little

25   paragraph -- excuse me, I apologize.  This highlighted in

1   yellow above your name, you remember we read that?

2   A    Yes, sir.

3   Q    And that paragraph, you told the jury, meant that all

4   the promises by the Government, all the agreements by the

5   Government were contained in this particular document.  You

6   said that, right?

7   A    Yes, sir.

8   Q    Nowhere in that 17-page plea agreement was there any

9   agreement by the Government to transfer your case to

10  Chicago, was there?

11  A    Yes, sir, that's not the case.

12  Q    Now, when your case was transferred, when the D.C. case

13  was transferred to Illinois, you eventually -- actually not

14  eventually, in November of 2018, November 8th, 2018, you

15  pled guilty in Illinois to the conspiracy that you had been

16  charged with initially in D.C.; is that right?  Yes or no.

17  A    Yes, sir.

18  Q    And it wasn't a new indictment and it wasn't new

19  charges, it was the exact same facts and the exact same

20  charge that you had in D.C. that you pled guilty to in

21  Illinois, in Chicago, right?

22  A    Yes, sir.

23  Q    And in Illinois, when you pled guilty to that D.C.

24  case, you entered into another plea agreement this time it

25  was A-19-page plea agreement, right?

1    A    Yes, sir.

2    Q    And you told us earlier that the D.C. case only

3    involved Javier Felix Torres, Papa Mayo and you, right?

4    A    Yes, sir.

5    Q    And that 19-page plea agreement that you pled guilty to

6    in Chicago was, again, written not by you or your lawyers

7    but by the Government; is that right?

8    A    Yes, sir.

9    Q    And, interestingly, this plea agreement that you signed

10   in Chicago to the same charges in D.C., which did not

11   involve Compadre Chapo, all of a sudden has his name in it,

12   correct?

13   A    Yes, sir.

14   Q    You didn't put his name in there, the Government put it

15   in the agreement, right?

16   A    Yes, sir.

17        MR. BALAREZO:  Now -- and Your Honor, I'm going to

18   help us along, I'm going to try to move through this

19   quickly.

20   Q    Let's talk briefly about your case, the Chicago case,

21   the Illinois case.  That was a separate indictment and in

22   that case you were charged in a narcotics conspiracy that

23   went from 2005 to 2008, right?

24   A    Yes, sir.

25   Q    And in that particular case, again you were charged

1  with two counts not just one, with two counts of conspiracy?

2  A    Yes, sir.

3  Q    And there was also something called a forfeiture

4  allegation in that case, you remember that?

5  A    Yes, sir.

6  Q    And it was a very interesting figure, it was a figure

7  that the Government was seeking forfeiture of one billion

8  three hundred seventy-three thousand -- excuse me, let me

9  get my math, correct.  $1,373,415,000, right?

10  A    Yes, sir.

11  Q    1 billion not 1 million?

12  A    Yes, sir.

13  Q    We'll come back to that.

14              Now with -- I'm sorry.  With respect to that

15  case in Illinois you also signed a separate plea agreement

16  whereby you pled guilty to those two counts, right?

17  A    Yes, sir.

18  Q    And, once again, that plea agreement was written by the

19  government, you and your lawyers had no input into it,

20  right?

21  A    Yes, sir.

22  Q    And in that plea agreement those things we mentioned

23  earlier, the federal guidelines, they were set forth

24  specifically in that plea agreement, right?

25  A    Yes, sir.

1   Q    And the federal guidelines, just very briefly -- well,

2   strike that.  You know, from having been now charged for

3   several years and having been in the system, that there's

4   two things that have to be considered in sentencing, one is

5   the law, the statute, right?

6   A    Yes, sir.

7   Q    And under that law that's where you're facing a 10-year

8   mandatory minimum sentence up to life?

9   A    Yes, sir.

10  Q    But that other thing that a judge has to take into

11  account is the federal sentencing guidelines that we talked

12  about briefly.

13  A    Yes, sir.

14  Q    And the federal sentencing guidelines it's basically --

15  well, let me show you exhibit, Defense Exhibit 347 just for

16  the witness.

17                You've seen this before, right?

18  A    Yes.

19  Q    And is it a federal sentencing table?

20  A    Yes, sir.

21            MR. BALAREZO:  Your Honor, if I could just use it

22  as a demonstrative it would be very short.

23            THE COURT:  Any objection?

24            MS. LISKAMM:  No, Your Honor.

25            THE COURT:  All right.

1    BY MR. BALAREZO:

2    Q    So under that plea agreement that you had in Chicago,

3    it took into account the guidelines, and you're aware that

4    the numbers on this offense level section goes up to

5    depending on the amount of drugs that were involved in your

6    case, correct?

7    A    Yes, sir.

8    Q    And the columns basically have to do with criminal

9    history, but your criminal history was in the first column,

10   correct?

11   A    Yes, sir.

12   Q    And just to get to the point, your offense level under

13   the guidelines that you agreed to in your plea agreement was

14   a level 51; is that correct?

15   A    Yes.  The highest one, yes.

16   Q    And you know that anything above a level 43 or level 43

17   and above results in a guideline sentencing range of life,

18   right?

19   A    Yes, sir.

20   Q    And, once again, because you -- you know what's going

21   on you know that in the federal system if you get a life

22   sentence you're going to die in a prison, right, in a

23   federal prison in the United States?

24   A    Yes, sir.

25   Q    And the only way you're going to get out is in a pine

1    box, right?

2    A    Yes, sir.

3    Q    Now, in your plea agreement you also agreed that you

4    would forfeit that curious amount of $1,373,415,000, right?

5    A    Yes, sir.

6    Q    And you accepted that plea agreement and went before

7    the judge in Illinois in 2013 to plead guilty, right?

8    A    Yes, sir.

9    Q    And let me ask you, did you come up with that number,

10   $1,373,415,000?

11   A    No, sir.

12   Q    The Government made that number up, right?

13   A    Yes, sir.

14   Q    All that time you were trafficking drugs, did you make

15   $1,373,415,000?

16   A    No, sir.

17   Q    Did your Papa Mayo make that much money?  Maybe?

18   A    Throughout decades maybe he had that money go through

19   his hands.

20   Q    But you didn't?

21   A    No, sir.

22   Q    And although you pled guilty six years ago, you have

23   not been sentenced in that case either, right?

24   A    Yes, sir.  No, I haven't.

25   Q    And have you started making your installment payments

1  on that forfeiture number?

2  A    No, sir.

3  Q    When are you going to start?

4  A    As far as I understand and for what my attorneys have

5  explained to me, once I'm sentenced that is going to be

6  ordered and it's going to be explained to me.

7  Q    Don't you think you should get a head start for paying

8  that off already?

9  A    It's not about what I think, sir, it's about the fact

10 that the Government hasn't asked for that yet.

11 Q    The bottom line is you're never going to pay anything

12 remotely resembling that number, right?

13 A    An amount like that, no.

14 Q    And you said you may or have to start paying it if the

15 Government asked for it after you're sentenced, right?

16 A    That's what I think, that they could ask me to do that.

17 Q    Well you agreed to it?

18 A    Yes, sir.

19 Q    So your sentencing was scheduled for August 1st, 2018,

20 were you sentenced on that date?

21 A    No, sir.  I still haven't been sentenced.

22 Q    And it was also set for December 18th and you weren't

23 sentenced, as you said?

24 A    Yes, sir, not yet.

25 Q    And, currently, your sentencing in both of those cases

1  you're going to get the one sentence in two cases is now set

2  for February 27th of this year, right?

3  A    Right now it's set for that date.  I don't know if it

4  will be carried out on that date.

5  Q    You want to be sentenced because you want to know how

6  much time you're going to do, right?

7  A    Yes, I do want to know my sentence.

8  Q    And you didn't ask for the sentencing date to be

9  changed all those times, did you?

10  A    No, it was a recommendation from my lawyers and the

11  prosecutor's office and I agreed.  I agreed.

12  Q    The Government doesn't want to sentence you until after

13  you testify in this case, that's the bottom line --

14          I apologize, your Honor.

15  A    Yes, sir.

16  Q    -- right?  Because they want to see how you perform

17  before this jury, right?

18  A    Yes, sir.

19  Q    They want to make sure you tell the story that you are

20  supposed to tell, right?

21  A    I'm sorry I don't understand the question.

22  Q    I'll move on.

23          Now yesterday you testified -- well, strike

24  that.  You've been a trusted lieutenant of Papa Mayo for

25  almost your entire adult life, right?

1  A    Yes, sir.

2  Q    And yesterday you were asked a question about something

3  called OFAC, do you remember that?

4  A    Yes, sir.

5  Q    And OFAC stands for the Office of Foreign Asset

6  Control, an agency of the United States Department of

7  Treasury, right?

8  A    Yes, sir.

9  Q    And, in fact, before you even were arrested and

10 extradited to the United States, the

11 United States Government placed you on that OFAC list,

12 right?

13 A    Yes, sir.

14 Q    And by being placed on that OFAC list basically you

15 were prohibited from using the financial system or having

16 any financial transactions, correct?

17 A    Yes, sir.

18 Q    So basically -- when you're put on the OFAC list it's

19 not just the United States, Mexico also puts restrictions on

20 you, correct?

21 A    Yes, sir.

22 Q    That means you can't use credit cards, right?

23 A    Yes, sir.

24 Q    No bank accounts?

25 A    Yes, sir.

1   Q    You can't benefit from all of that drug money you had,
2   right?
3   A    Yes, sir.
4   Q    And, in fact, the United States Government designated
5   you to that OFAC list back in 2007, right?
6   A    Yes, sir, I -- I don't remember the date but, yes.
7   Q    And they also designated your Papa Mayo, right?
8   A    Yes, sir.
9   Q    And they also designated that Javier Felix Torres guy,
10  the one that you were charged with in D.C.?
11  A    Yes, sir.
12  Q    And when you were designated under OFAC, there were
13  various companies that were owned by your family, including
14  Papa Mayo, that were put on the OFAC list, right?
15  A    Yes --
16  Q    And you -- I'm sorry.
17  A    -- my family.
18  Q    And you understand that people that are placed on OFAC
19  with respect to drug trafficking, are suspected of being
20  engaged in some kind of drug trafficking, money laundering
21  activity, correct?
22  A    Yes.
23  Q    And besides your father, you, Javier, your wife was
24  also designated, wasn't she?
25  A    My wife was designated, yes.

1  Q   Maria Teresa Zambada, your sister, also was designated,
2  wasn't she?
3  A   Yes, sir.
4  Q   Midiam Patricia Zambada was also designated, your
5  sister?
6  A   Yes, sir.
7  Q   Monica Rosario Zambada, your sister, was she also
8  designated?
9  A   Yes, sir.
10 Q   And Modesta Zambada, was she your sister?
11 A   Yes, sir.
12 Q   She's also designated?
13 A   Yes, sir.
14 Q   And Rosario Niebla Cardoza was also designated, right?
15 A   Yes, sir.
16 Q   Who is that?
17 A   She's my mother, my mom.
18 Q   And although the United States Government placed them
19 on this OFAC list because they're associated with drug
20 trafficking or money laundering, have any of those people
21 that I just named been charged?
22 A   No, sir.
23 Q   And all those companies, there were about 11 or 12 of
24 them, I won't go through them, you know what they are.
25 A   Yes, sir.

1    Q    They weren't seized by the Mexican government, were
2    they?
3    A    The accounts of my whole family were frozen, they can't
4    do any deals with -- any dealings with banks so the
5    companies failed, they can't do any business.  And the
6    Mexican government opened an investigation in my family.
7              (Continued on the next page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  EXAMINATION BY

2  MR. BALAREZO:

3  (Continued.)

4  Q    Well, as late as last year, weren't those companies

5  actually paying taxes in Sinaloa?

6  A    I don't know, sir.  I don't know what's going on outside.

7  Q    And does your mother still own that business that you

8  went to complain about -- to the general about?

9  A    Yes.  My mom is the owner.

10 Q    And that business is still going, right?

11 A    I don't know, sir.

12 Q    Now, at some point while you were having these proffer

13 sessions with the Government, you let the Government -- the

14 prosecutors -- know that you were upset because of the way

15 your wife was being treated, right?

16 A    Yes, sir.

17 Q    Because you had left them behind when you were

18 extradited, they didn't have any money.  They were having a

19 hard time, right?

20 A    Yes, sir.

21 Q    And as a result of your complaints about how badly your

22 wife was being treated, the United States Government made it

23 possible for them to come to the United States, correct?

24 A    Well, I asked the Government for help.  I asked them for

25 help bringing my wife and my kids here because they are the

1   most important thing to me.

2   Q    But that's not all they did for her, is it?

3   A    She is here, she came, and my children, too.

4   Q    She didn't come empty handed, though, is what I mean,

5   right?

6   A    Oh, no, sir.

7   Q    The Government allowed her to bring $400,000 from Mexico

8   to the United States, right?

9   A    Yes, sir.

10  Q    And they took her off the OFAC list, correct?

11  A    Years later, yes, they did.  She's not on the OFAC list

12  anymore.

13  Q    And of course the Government has not seized that

14  $400,000, right?

15  A    No, sir.  I requested it and they gave me permission.  An

16  account was opened in my wife's name, and the reason I did

17  that is so that my children could go to school, get an

18  education, and so my wife and my kids could live.  I didn't

19  ask for it for me.  And, in fact, my children are studying and

20  they are living from that payment of that money in the house

21  where they live in.  That was the reason that I asked for

22  that.

23  Q    All right.  All you want is to get out of prison,

24  correct?

25  A    Of course.

1  Q    Let's talk very briefly.

2        Yesterday you were asked some questions about

3  Guadalajara, the airport at Guadalajara.

4        Do you remember that?

5  A    Yes, sir.

6  Q    You talked about that there had been a shooting in 1993

7  where the beloved Mexican Cardinal Ocampo was killed; is that

8  right?

9  A    Yes, sir.

10 Q    And you know from living in Mexico at that time that

11 Cardinal Ocampo, before his murder, complained, if you will,

12 about political corruption in Mexico, right?

13 A    I remember that, sir, yes.  I don't know the details very

14 well, but yes.

15 Q    And the president of Mexico at that time was Carlos

16 Salinas de Gortari, right?

17 A    Yes, sir.

18 Q    And you also know from being in the life of a

19 narco-trafficker that Carlos Salinas was in bed with the

20 Arrellano Felix's, right?

21 A    No, sir, I don't know that.

22 Q    Now, when you testified yesterday, you said that you had

23 met at some point with Compadre Chapo in the mountains and he

24 talked about what happened at the airport, remember?

25 A    Yes.  I said that it was spoken about some.  It wasn't a

1  conversation specifically about that, but yes.

2  Q    And part of the reason that you talked about it was

3  because it was in the news, right?

4  A    Yes, yes.  I talked about the Cardinal.  Each year, the

5  Cardinal is remembered.

6  Q    And you know, though, that each year that the cardinal is

7  remembered, Compadre Chapo is also remembered by the news and

8  the media in Mexico, right?

9  A    Yes -- yes, sir, that's what I said.

10 Q    And the reason he's remembered by the media in all of

11 Mexico is because they tie him to the murder of Cardinal

12 Ocampo, correct?

13 A    That's what the news says.

14 Q    But you know that Compadre Chapo didn't kill him, right?

15 A    That's what I said yesterday, that he didn't kill him.

16 Q    The Arrellano Felix's killed Cardinal Ocampo.

17 A    Yes, sir.

18 Q    And you know, once again, from living in Mexico at the

19 time, from being in the business at that time that prior to

20 the murder of the Cardinal Ocampo, the Mexican public in large

21 had no idea who Compadre Chapo was, correct?

22 A    Yes, sir.

23 Q    It was only when the news blew up, Chapo hit the

24 spotlight, right?

25 A    Yes, sir.

1  Q    And when after he had been arrested in Guatemala and

2  taken back to Mexico and was at the prison -- do remember

3  talking about that?

4  A    Yes, sir.

5  Q    And Compadre Chapo got out of that prison in a laundry

6  cart, right?

7  A    Yes, sir.

8  Q    Compadre Chapo blew up even bigger, right?

9  A    Yes, sir, that's correct.

10 Q    Unlike your father who was in the shadows, Compadre Chapo

11 was all over the news.

12 A    Yes, sir.

13 Q    Now, during those various meetings that you had with the

14 Government -- well, strike that.

15       You believed at some point that there was a,

16 quote/unquote, campaign to inflate Compadre Chapo's persona in

17 order to get him arrested, correct?

18 A    Yes.  We talked about it, my dad and Compadre Chapo, all

19 together.

20 Q    And that campaign was by whom?

21 A    The Government.

22 Q    What Government?

23 A    Well, Mexico and the United States, too.

24 Q    So according to you, the Government of Mexico and the

25 Government of the United States made Compadre Chapo bigger

1   than he was, made him this persona that was a myth in order to

2   bring him down, right?

3   A    Well, sir, because of the escape, I mean, yeah, there was

4   more that was said about that, about him.  And, like I said,

5   we did talk about it, and there was a campaign against him.

6   Q    Because then the Government of Mexico and the

7   United States can say, hey, we took down Chapo Guzman, right?

8   A    Well, it was my Compadre Chapo, and just like that, they

9   also wanted to get to my father.

10  Q    Right.

11        But who is sitting here today?

12  A    My Compadre Chapo.

13  Q    Your father, Papa Mayo, still in Sinaloa, right?

14  A    I imagine so, in Sinaloa.

15  Q    Leading the cartel in Sinaloa, correct?

16  A    Yes, sir.

17  Q    Now, you and your Papa Mayo are not the only drug

18  traffickers in your family, correct?

19  A    Well, yes.  Me, my dad, and my Uncle Rey, who has also

20  been arrested.

21  Q    Rey Zambada is also a drug trafficker, pled guilty, and

22  testified against Compadre Chapo in this case, right?

23  A    Yes.

24  Q    And during the entire time that you have been locked up

25  in the United States, you have had contact with your family.

1   You know what's going on with your family, right?

2   A    Yes, I have contact with my mom and with my wife.

3   Q    Well, you have a brother that's named Ismael Zambada

4   Imperial who is also a drug trafficker, right?

5   A    Yes, sir.

6   Q    And his nickname is Mayito Gordo; is that correct?

7   A    Yes, sir.

8   Q    And he also learned the narco-trafficking game at your

9   father's need, right?

10  A    Well, after I was arrested, that's what I actually heard

11  about.  When I was out, they didn't do anything like that.

12  And I don't know what happened in the time, you know, after I

13  was arrested.  And -- but like you said, through my family, I

14  found out that he, my brother, was arrested for drug

15  trafficking.

16  Q    And you also have a brother named Serafin Zambada Ortiz

17  who is a drug trafficker, right?

18  A    Well, I also found out that he was also arrested after I

19  had been in custody.  What I mean to say is that I left him

20  pretty much -- he was still going to school when I left.

21  Q    He's a drug trafficker, isn't he?

22  A    Yes.  He was charged and he was processed for drug

23  trafficking.

24          MR. BALAREZO:  Your Honor, for the witness only,

25  Defense 362.

1    BY MR. BALAREZO:

2    Q    Do you see that?

3    A    Yes, sir.

4    Q    What is Defense Exhibit 362?

5    A    Those are my brothers, Serafin and Mayito Gordo.

6    Q    Does this fairly and accurately represent your brother

7    Serafin and Mayito Gordo?

8    A    Yes.  They are my brothers.

9              MR. BALAREZO:  Your Honor, I move into evidence 362.

10             MS. LISKAMM:  No objection.

11             THE COURT:  Okay.  Received.

12             (Defendant's Exhibit 362 received in evidence.)

13             (The above-referred to exhibit was published.)

14   BY MR. BALAREZO:

15   Q    The gentleman here with the chest hair, that's Mayito

16   Gordo, right?

17   A    Yes, sir.

18   Q    And the handsome fellow with the sunglasses, is that

19   Serafin?

20   A    Yes, sir.

21   Q    And you know that both of these little brothers of yours

22   have been charged in the United States in San Diego in federal

23   court for drug trafficking like yourself, right?

24   A    Yes, sir.

25   Q    And, in fact, the gentleman with the sunglasses, you know

1  that he's already been sentenced, don't you?

2  A    Yes, sir.

3  Q    And you know that he was facing the same penalties as

4  you, ten to life?

5  A    I don't know the details of his case, but I imagine

6  that's so.

7  Q    And you also know that he's been sentenced to 66 months,

8  right?

9  A    Yes, sir.

10  Q    And he got that nice 66-month sentence because he

11  cooperated, right?

12  A    Yes, sir.

13  Q    So you are well aware of the benefits you can get by

14  cooperating with the United States Government, right?

15  A    Well, with my brother, I did realize that.  I don't know

16  what's going to happen to me.

17            MR. BALAREZO:  I would like to put up Government's

18  Exhibit 2-A and 2-B-B for the witness.  They are already in

19  evidence.

20            (The above-referred to exhibit was published.)

21  BY MR. BALAREZO:

22  Q    Do you see 2-A?

23  A    Yes, sir.

24  Q    And 2-B?

25  A    Yes, sir.

1  Q    And I'm not going to beat a dead horse, but that's

2  obviously Papa Mayo, correct?

3  A    Yes, sir.

4  Q    And do you remember yesterday, one of the very first

5  questions that you were asked was, what does your dad do for a

6  living?

7  A    Yes, sir.

8  Q    And your answer was very clear and very quick, and it

9  said, My dad is the Sinaloa Cartel's leader.

10       Do you remember that?

11 A    I said my father is leader of the Sinaloa Cartel,

12 exactly.

13 Q    And your entire life, your entire adult life, you have

14 worked with your father, you have been a very high level

15 member of his drug trafficking organization.

16 A    Yes, sir.

17 Q    You passed and received messages for your father.

18 A    Yes, sir.

19 Q    You were a logistical coordinator for his drug

20 trafficking organization.

21 A    Yes, sir.

22 Q    You coordinated deliveries of cocaine into Mexico and out

23 of Mexico for your father.

24 A    Yes, sir.

25 Q    You smuggled money for your father.

1    A    Yes, sir.

2    Q    You paid bribes on behalf of your father.

3    A    Yes, sir.

4    Q    You ordered murders on behalf of your father.

5    A    Yes, sir.

6    Q    You gave the order for this guy Julio Beltran to be

7    killed, didn't you?

8    A    Yes, sir.

9    Q    You didn't pull the trigger yourself, though, right?

10   A    No, sir.

11   Q    And, in fact, you told the jury that you had never killed

12   anybody yourself, correct?

13   A    Yes, sir.

14   Q    What, are you too good to get your hands dirty?

15   A    No, sir.  I just answered the question that I was asked.

16   Since I gave the order to kill that person, I'm acting just

17   like that person did.  It's a death, a murder, and I feel --

18   I'm remorseful, but I did, yes, I did give that order.

19   Q    So what you are telling the jury is by giving the order,

20   you're just as bad as the guy that pulled the trigger, right?

21   Is that correct?

22   A    Well, it's two things that are very different.  I am not

23   saying I'm not responsible for the order; and yes, it was a

24   murder.  But the question was if I had actually killed

25   somebody with my own hands, if I had actually pressed the

1   trigger, and I haven't done it.

2   Q    Have you been charged in Mexico or the United States for

3   the murder of Julio Beltran?

4   A    No, sir.

5   Q    You gave the order to kill Teco Lindoro, right?

6   A    My dad did.  I was -- I was present.  I was there.  I was

7   present.

8   Q    You have no responsibility for that one.

9   A    I already said what it was.  I was present when the order

10  was given, and I was pretty much a witness of a kill order --

11  a murder.

12  Q    Have you been charged in Mexico or the United States for

13  the murder of Teco Lindoro?

14  A    No, sir.

15  Q    You also talked about having given the order for some guy

16  named El Caiman to be killed.

17       Do you remember that one?

18  A    Yes, sir.

19  Q    And yesterday you said -- or today, this morning, I don't

20  know -- you said that he had been brought in and was being

21  interviewed.

22  A    Yes, sir.  It was now.

23  Q    That's just a nice way for saying he was killed, correct?

24  A    When they asked me the question, they asked me what they

25  had done to him and I said that he was brought to a safe house

1 for him to -- for them to extract some information from him.

2 Q    Your sicarios didn't bring him to that safe house and sit

3 at a table and have coffee and say, hey, what did you do, did

4 they?

5 A    No.  I was very clear with the members of the jury.  I

6 told them that he had been taken to that house for them to

7 extract information, for them to torture him.

8 Q    He was tortured, right?

9 A    Yes, sir.

10 Q    He was beaten.

11 A    Yes, sir.

12 Q    And then your friend, M-10, one of your sicarios, cut his

13 head while he was still alive, right?

14 A    M-10, no, I don't know.  I didn't say that.

15 Q    You just gave the order; you don't care what happened to

16 him, right?

17 A    No.  I just knew that he had been killed.  That was it.

18            THE COURT:  Mr. Balarezo, are you going to finish in

19 ten minutes?

20            MR. BALAREZO:  I will finish in probably ten

21 minutes, your Honor.

22            THE COURT:  No "probably."  Yes or no.  It's a "yes"

23 or "no" question.

24            MR. BALAREZO:  I will tell you no, and if I do, then

25 we're lucky, I guess.  I'm trying.  I'm trying.  I'm trying.

1        THE COURT:  I know you're trying, but realistically,

2  are you going to?

3        MR. BALAREZO:  Yes, I think I can.  I'm a lawyer,

4  what do you want?

5        THE COURT:  I expect a definite answer from a lawyer

6  at this stage of a cross-examination.  How much have you got?

7        MR. BALAREZO:  I'm at, like, 95 percent.

8        THE COURT:  Okay.  That's not close enough.

9        Ladies and gentlemen, we are going to break now for

10 the weekend.  Please remember not to communicate about this

11 case with anybody else.  No social media, blogging about it,

12 anything.  No e-mails about it; do not do any research about

13 the case; do not Google anything about the case; do not Bing

14 anything about the case.

15       We'll see you Monday morning at 9:30.  Thank you.

16       (Jury exits.)

17       THE COURT:  All right.  Be seated.

18       The marshals can take the witness out.

19       (Witness excused.)

20       THE COURT:  The Government has not been objecting,

21 but there have been -- and it's gotten more, I think, or maybe

22 I'm just more sensitive to it as the examination has gone

23 on -- a lot of this is argumentative.  A lot of these

24 questions -- you know, you can say these things to the jury,

25 but you are not getting any admissions or new information out

1   of the witness.  I'm going to expect you to conclude promptly

2   on Monday morning, okay?

3              MR. BALAREZO:  I will.

4              THE COURT:  Okay.

5              Does the Government anticipate a redirect?

6              MS. LISKAMM:  Very briefly, your Honor.

7              THE COURT:  What does the Government have planned

8   for Monday?

9              MS. PARLOVECCHIO:  Sorry, your Honor, I want to make

10  sure I'm well mic'd because I know I've had some issues.

11             We anticipate putting on another cooperating witness

12  and a law enforcement officer and another witness after that.

13             THE COURT:  Will the cooperating witness be as long

14  as these cooperating witnesses have been?

15             MS. PARLOVECCHIO:  No, not even close.

16             THE COURT:  Okay.  What I want to ask both sides to

17  do, because we've had a couple of glitches where the

18  Government, not thinking it would need to be ready because its

19  witnesses would take longer, and the defense thinking they

20  wouldn't have to start a witness, although it didn't come to

21  that as it turned out, everyone be ready on the next witness,

22  okay?  In other words, you've had a preview of who the

23  Government is calling on Monday.  I expect you to be ready for

24  those people.

25             MS. PARLOVECCHIO:  Your Honor, consistent with your

1  prior instructions, we have been providing the defense with a

2  preview of a week and a half in advance of who we will be

3  putting on the stand.

4          THE COURT:  Right.  That's why there should be no

5  surprises or no, "oh, I thought I was going to start at 9:30

6  in the morning.  I can't start at two o'clock in the afternoon

7  the day before."  We should have everything, at this point, so

8  that we have one witness after another with no need to take a

9  morning or an afternoon off to get another witness, that's all

10 I'm saying.

11         Okay.  Have a good weekend.  See you Monday morning.

12

13         (Matter adjourned to January 7, 2019, at 9:30 a.m. )

14

15                      *     *     *     *     *

16

17

18

19

20

21

22

23

24

25

I N D E X

EXAMINATIONS                                          PAGE

VICENTE ZAMBADE NIEBLE.........................    4084

DIRECT EXAMINATION ............................    4084

BY MS. LISKAMM

CROSS-EXAMINATION..............................    4140

BY MR. BALAREZO

1              E X H I B I T S

2   Defendant's Exhibit 377 was marked in              4149

3   evidence as of this date

4   Defense Exhibit 349, was received in evidence       4218

5   as of this date

6   Government's Exhibit 56 was received in             4087

7   evidence as of this date

8   Government's Exhibit 1-E was received in            4088

9   evidence as of this date

10  Government's Exhibit 87-B was received in           4092

11  evidence as of this date

12  Government's Exhibits 1-K and 1-L were              4096

13  received in evidence as of this date

14  Government Exhibit 601M, was received in            4121

15  evidence as of this date

16  Government Exhibit 601M-5 was received in           4122

17  evidence as of this date

18  Government's Exhibit 609B was received in           4135

19  evidence as of this date

20  Government's Exhibit 609B-3 was received in         4135

21  evidence as of this date

22  Defendant's Exhibit 369 was received in            4171

23  evidence as of this date

24  Defendant's Exhibit 362 was received in         4248

25  evidence as of this date