UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,　　: 09-CR-466(BMC)
　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　:
　　　　-against-　　　　　　 : United States Courthouse
　　　　　　　　　　　　　　　: Brooklyn, New York
　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　:
JOAQUIN GUZMAN LOERA,　　　　 : Monday, January 28, 2019
　　　　　　　　　　　　　　　: 9:30 a.m.
　　　　　Defendant.　　　　　 :
　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　:
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:　　　RICHARD P. DONOGHUE, ESQ.
　　　　　　　　　　　　　United States Attorney
　　　　　　　　　　　　　Eastern District of New York
　　　　　　　　　　　　　　　271 Cadman Plaza East
　　　　　　　　　　　　　　　Brooklyn, New York 11201
　　　　　　　　　　　　　BY: ANDREA GOLDBARG, ESQ.
　　　　　　　　　　　　　　　GINA M. PARLOVECCHIO, ESQ.
　　　　　　　　　　　　　　　MICHAEL P. ROBOTTI, ESQ.
　　　　　　　　　　　　　　　ADAM S. FELS, ESQ.
　　　　　　　　　　　　　　　ANTHONY NARDOZZI, ESQ.
　　　　　　　　　　　　　　　MICHAEL LANG, ESQ.
　　　　　　　　　　　　　　　AMANDA LISKAMM, ESQ.
　　　　　　　　　　　　　　　Assistant United States Attorneys

For the Defendant:　　　 BALAREZO LAW
　　　　　　　　　　　　　Attorneys for the Defendant -
　　　　　　　　　　　　　Joaquin Guzman Loera
　　　　　　　　　　　　　　　400 Seventh Street, NW
　　　　　　　　　　　　　　　Suite 306
　　　　　　　　　　　　　　　Washington, DC 20004
　　　　　　　　　　　　　BY: A. EDUARDO BALAREZO, ESQ.

A P P E A R A N C E S: (Continued.)

                    LAW OFFICE OF PURPURA AND PURPURA
                    Attorneys for the Defendant -
                    Joaquin Guzman Loera
                         8 E Mulberry Street
                         Baltimore, Maryland 21202
                    BY: WILLIAM B. PURPURA, ESQ.


Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                    Official Court Reporter
                    Telephone: (718) 613-2487
                    Facsimile: (718) 613-2694
                    E-mail:  Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

 1          (In open court.)

 2          (Defendant present in open court.)

 3          COURTROOM DEPUTY:  All rise.  The United States

 4  District Court for the Eastern District of New York is now in

 5  session.  The Honorable Brian M. Cogan is now presiding.

 6          (Honorable Brian M. Cogan takes the bench.)

 7          COURTROOM DEPUTY:  Calling criminal cause for jury

 8  trial in Docket No. 09-CR-466, *United States of America*

 9  *against Joaquin Guzman Loera*.

10          Counsel, please note your appearances for the

11  record.

12          MS. GOLDBARG:  For the United States of America,

13  Assistant United States Attorney Andrea Goldbarg.

14          Good morning, your Honor.

15          MR. BALAREZO: A. Eduardo Balarezo for Joaquin Guzman

16  Loera.

17          Good morning, your Honor.

18          (Defendant enters the courtroom at 9:27 a.m.)

19          (Witness takes the witness stand.)

20  **ISAIH VALDEZ RIOS**,

21      called as a witness, having been previously duly

22      sworn, was examined and testified as follows:

23          COURTROOM DEPUTY:  All rise.

24          THE COURT:  Good morning.  Let's have the jury,

25  please.  Is it.

1           COURTROOM DEPUTY:  Jury entering.

2           (Jury enters courtroom at 9:33 a.m.)

3           THE COURT:  All right.  Everyone be seated.  Good

4     morning, ladies and gentlemen.

5           THE JURY: (Collectively) Good morning.

6           THE COURT:  We will continue with direct

7     examination.

8           MR. NARDOZZI:  Thank you.

9     DIRECT EXAMINATION

10    BY MR. NARDOZZI:

11    (Continuing.)

12    Q    Good morning, Mr. Valdez, how are you today?

13    A    Good morning.  I'm fine.  Thank you.

14    Q    Last week, you testified that you were in communication

15    with secretaries for the defendant.

16          Do you remember that?

17    A    Yes.

18    Q    In 2013 and 2014, who were some of those secretaries?

19    A    Well, among those that were secretaries with Chapo Guzman

20    were Chaneke, Condor, Picudo.  Those are the ones that I

21    remember.

22    Q    I'm going to show you what's in evidence as

23    Government Exhibit 63.

24          Can you tell us who that is?

25    A    Condor.

1    Q    I'm also going to show you what's in evidence as

2    Government Exhibit 68.

3              Who is that?

4    A    Picudo.

5    Q    In 2013, towards the end of the year, were you working on

6    a drug shipment for the defendant?

7    A    Yes.

8    Q    And where was that drug shipment supposed to emanate

9    from?

10   A    From Colombia.  From a place called Ipiales.

11   Q    I'm going to show you, actually, just for the witness.

12   I'm going to show you what's marked as Government Exhibit 505.

13             Do you recognize this?

14   A    Yes.

15   Q    What is this?

16             MR. BALAREZO:  No objection, your Honor.

17             THE WITNESS:  Colombia and Ipiales.

18             MR. NARDOZZI:  I ask to move this into evidence,

19   your Honor.

20             THE COURT:  505 is admitted.

21             (Government's Exhibit 505 was received in evidence

22   as of this date.)

23   Q    Take a look at Government Exhibit 505.  Can you circle

24   for the ladies and gentlemen of the jury where Ipiales is on

25   this map?

1   A    Yes.  (Circling).

2   Q    Okay.  Now, I just want to fast forward briefly.

3        Did you wind up ultimately flying this drug shipment

4   out of Ipiales?

5   A    No.

6   Q    Why not?

7   A    Well, because I had broken my hand in a motorcycle

8   accident.  I wasn't able to fly, I was in rehab.  By the time

9   that I found myself well enough to fly, the weather conditions

10  didn't allow me to take off.

11  Q    All right.  And were you involved in the planning of this

12  drug shipment even though you didn't end up flying to?

13  A    Yes.

14  Q    Were you coordinating with anybody who was on the ground

15  in Colombia?

16  A    Yes.

17  Q    For the witness only.

18       First of all, who was that person you were

19  coordinating with?

20  A    Hector Coronel.

21  Q    Did he go by any nicknames?

22  A    Yes, we called him Ricon.

23  Q    For the witness only.

24       I'm showing you what's marked as

25  Government Exhibit 46.

1          Do you recognize that?

2          MR. BALAREZO:  No objection, your Honor.

3          THE WITNESS:  Yes, Hector Coronel a/k/a Ricon.

4          MR. NARDOZZI:  I ask that Government Exhibit 46 be

5    moved into evidence in evidence.

6          THE COURT:  Received.

7          (Government's Exhibit 46 was received in evidence

8    as of this date.)

9    Q    What was Hector Coronel's role within the cartel?

10   A    Well, according to what he told me, he would buy the

11   drugs, the cocaine.  He would go all the way into the jungle

12   to the kitchens where the cocaine was to purchase cocaine at a

13   better price.

14   Q    How did you come into contact with Ricon?

15   A    Through the office, the *oficina*.  They give me the PIN

16   for his Blackberry.

17          MR. NARDOZZI:  Your Honor, if we can I would like to

18   switch over our PowerPoint.  It's Government Exhibit 515-3

19   which, I believe, has no objection.

20          For the record, your Honor, this Government Exhibit

21   contains transcripts that are already in evidence.

22          THE COURT:  Okay.  But this exhibit itself has not

23   yet been received?

24          MR. NARDOZZI:  It is not.  I believe there is no

25   objection.

1          MR. BALAREZO:  No objection.

2          THE COURT:  Received.  515-3.

3          (Government's Exhibit 515-3 was received in

4     evidence as of this date.)

5     EXAMINATION BY

6     MR. NARDOZZI:

7     (Continuing.)

8     Q    I'm going to fast forward here a little bit to Slide 5.

9     I want to show you a series of intercepts, Mr. Valdez, and

10    read through them and talk about them with you.

11          First of all, Slide 5, which is demonstrated on your

12    screen in front of you.

13          Have you seen this before?

14    A    Yes.

15    Q    And is this something that you had an opportunity to

16    review before coming to court today?

17    A    That's right.

18    Q    We see two names along the left side of this Ofis 2 and

19    Memo?

20          Who is Ofis 2?

21    A    That's a name that was used for Chapo Guzman up in the

22    mountains so that we wouldn't have to put on the Blackberry

23    Chapo or Joaquin.

24    Q    Who is Memo?

25    A    Me.

1    Q    For the record, I'm going to read to you Paragraphs 3

2    through 7 and I'm going ask you some follow-up questions.

3                OFIS 2:  Cachimba has the coordinates for that

4    island.  Listen, it's better much me to you go to Chetumal

5    before Cachimba to take the plane over there to you.

6                MEMO:  Listen.  To go where?  To go from that island

7    to where, bro, because I got confused there.

8                OFIS 2:  That island is in Belize, bro.

9                First of all, in Paragraph 2, who is this Cachimba

10   that is being referenced?

11   A    Chapo Guzman's pilot.

12   Q    And showing you what's in evidence has

13   Government Exhibit 93.

14                Is that Cachimba?

15   A    Yes.

16   Q    What is the office telling you in this portion of the

17   exchange that we see in Paragraphs 3 and 4?

18                MR. BALAREZO:  Objection.

19                THE COURT:  Overruled.

20   A    Well, over there in the area of Belize there's an island

21   that has a clandestine airstrip, and Cachimba had already

22   worked there.  And they wanted me to work from there, meaning,

23   to go to that place.

24   Q    Where was that place?

25   A    In Belize.

1   Q    I want to show you what's in evidence as

2   Government Exhibit 504.

3        Can you draw on the screen your flight path from

4   Ipiales to the clandestine strip in Belize.

5   A    Sorry, it's not --

6        MR. NARDOZZI:  Your Honor, we might need to switch

7   back over to the Elmo.  I don't know if it works on the

8   PowerPoint.

9        THE COURT:  I think you got documents pressed up

10  against the screen.

11       MR. NARDOZZI:  Thank you.

12  Q    Can you draw the path for us, please, sir?

13  A    My finger is not allowing me to do this.  (Marking).

14  Q    Okay.  Why that specific flight path?

15  A    Well, first of all, because Colombia knocks down planes,

16  so I just wasn't -- I wouldn't dare to go into Colombia.  So

17  it was decided that I was going to go in through the Ecuador

18  area.  I would fly a straight line to an area named Manta in

19  Ecuador, and through there I would go into Ipiales.

20  Q    And when you say, "the Colombian government knocks down

21  planes," what do you mean by that?

22  A    Any planes that are clandestine and that are not

23  identified or reported, the Government of Colombia knocks them

24  down if they don't pay attention or listen to the warnings

25  that are given to them.

1  Q     Okay.  I want to move to back to the slide if I can find

2  it.  Paragraphs 8 through 10.

3          MEMO:  Yes, but from Belize to here, or where do I

4  go is what I am referring to, bro.

5          OFIS 2:  I will check for you here.  Bro, you're

6  going to go to the border between Ecuador and Colombia.  It's

7  called Ipiales you are going to go through.  You are going to

8  head to Manta, and from Manta to Ipiales you are going to do

9  that route.  Because over there, an arrangement can be made

10 with 100 percent security.  And here, no arrangement as

11 always.  They have never made arrangements, always at random.

12 Now, more will be given to you, you will be given 100.

13         MR. NARDOZZI:  Your Honor, I don't believe I said

14 this before, but for the record there is a transcript of an

15 interception from October 9, 2013.

16 Q     When the office says "100 percent security" to you, what

17 are they referring to you?

18 A     Well, they were referring to the fact that they had

19 already fixed things up or made arrangements with the people,

20 the police, and in this particular case of Ipiales, the flight

21 was not getting to a clandestine airstrip, it was arriving in

22 an airport.

23 Q     The fact that the flight was arriving in an airport, was

24 that different than other shipments that you had conducted in

25 the past?

1  A    Different?  I don't know what you are referring to as

2  different.  Can you explain?

3  Q    Well, what was the significance of the fact that it was

4  coming to an airport?

5  A    Well, basically, there wasn't going to be a problem when

6  arriving because the police had been bought during a shift at

7  the airport when I was going to arrive there.  And I would get

8  paid more.

9  Q    And that last line where it says "you will be given 100,"

10  what does that refer to?

11  A    A hundred thousand dollars.

12  Q    And, of course, I don't want to assume anything.  Why

13  would the police need to be paid off at that airport.  What

14  was going to be shipped from there?

15  A    Drugs, cocaine.

16  Q    Okay.  Let's go ahead to Slide 10.  And this is an

17  interception from October 10, 2013, and I'm going to read

18  Paragraphs 2 and 3.

19        MEMO:  Listen, so we have to wait until the bad

20  weather clears because it's still ugly over there.  And I've

21  been checking because airplanes have been taken down through

22  that route in Honduras.  So going through there is serious.

23  What do you think?

24        What are you telling the office here?

25  A    Well, that the weather, weather conditions are bad.  In

1  the area of Honduras, some planes have been activated.  These

2  were government airplanes called *Tucanos*.  They are armed,

3  they are combat planes, and that they had been knocking down,

4  that they had already put down planes in that area.  And for

5  that reason, I obviously was afraid of flying through there.

6  Q    Let's take a look at Paragraphs 4 through 7.

7         OFIS 2:  From Belize get the route straight from

8  Manta to Ipiales.  Did you check that out yet?

9         MEMO:  Yes, I already checked it out.  But what I'm

10  telling you is that the crossing in Honduras it's fucked up.

11  It can't be done through there, they are bringing down the

12  airplanes, the *Tucanos*?

13  A    OFIS 2:  No, don't believe it.  It's all lies.  One

14  arrived yesterday and a week ago, one of them arrived from

15  Belize, a 210.  What do you mean they're shooting down planes?

16  If they were shooting them down, why would I tell you to go

17  when I am going to lose a plane and a merchandise.  That

18  wouldn't be good for me, and to lose you would be even worse.

19  Otherwise, go there with Profe with Nina in Tapachula in

20  Guatemala and where ever you want.

21  Q    First of all, who did you believe this message have from,

22  Ofis 2?

23         MR. BALAREZO:  Objection.

24         THE COURT:  Sustained.

25  Q    What is Ofis 2 telling you here?

1    A    Well, they're saying to not pay any attention to the

2    comments that people are saying.  That it's all lies that they

3    are knocking down planes.  Basically, he's saying that I could

4    fly through there, that I wasn't going to have any problems.

5    Q    When you reference the Tucanos in Paragraph 6, what are

6    the Tucanos?

7              MR. BALAREZO:  Objection.  Asked and answered.

8              THE COURT:  Overruled.

9    A    Those are the armed combat planes which the Honduras

10   government also uses.

11   Q    In Paragraph 7, when Ofis 2 says "a 210," what is that in

12   reference to?

13   A    210 that had just arrived with drugs.

14   Q    Moving on to Paragraphs 10 through 13.

15             MEMO:  Well, bro, I need the office for Ipiales so I

16   can start coordinating.  I need the contact information for

17   the one I'm going to arrive with so I can coordinate the

18   numbers times and photos of the line so that I can get to the

19   location.

20             What information are you seeking here from the

21   office?

22   A    I'm asking practically for the number, the PIN of the

23   person who was going to receive me in Ipiales.  The

24   coordinators for the airstrip where I was going to land.  And

25   times, times when I would be able to arrive.

1    Q    And in Paragraph 13 when you ask for photo of the line,

2    what is that in reference to?

3    A    I'm referring to photographs, photographs of the landing

4    strip where I'm going to land.  Since this is a location which

5    I still do not know, I needed to say what that location looked

6    like, the place that I was going to land with the airplane.

7    Q    Let's take a look next at Paragraphs 16 and 17.  This is

8    on Slide 12.

9         OFIS 2:  Go check the weather because an airplane

10   arrived from there yesterday and go check the airplane and fly

11   to first so you can go and get the coordinators for Ipiales.

12   It was decided over there because it was well squared off from

13   the top with the military and police.  There aren't any police

14   officers here like other times.  This trip when you will be

15   arriving is all arranged.

16        MEMO:  Exactly, bro.  That's why I want to check

17   what the situation is because Ipiales is 200 miles from Manta

18   and it's still Ecuador.  Ipiales is already Colombia.

19        In Paragraph 16, where the office says, "it was well

20   squared off from the top with the military and police," what

21   does that mean?

22   A    They had paid off the military police and the police in

23   the Ipiales area so that they would not interfere.  So they

24   wouldn't interfere with my arrival there to Ipiales to the

25   airport.

1  Q    And what are you trying to express in your response to

2  the office?

3  A    Well, Manta that area is quite a distance from Colombia.

4  From Ipiales, excuse me.  And so, the amount of fuel that I

5  was going to have to carry with me was going to be much

6  greater than what I had to carry before because during those

7  flights I also had to keep in mind the cargo, the load and the

8  fuel.

9  Q    Let's take a look at a series of interceptions from the

10 next day, October 10, 2013.  Paragraphs 2 and 5.

11        MEMO:  Send me the details of who I'm going to

12 arrive with and all the stuff so I can start checking because

13 I don't have anything.

14        OFIS 2:  2B21ACB9 Ricon's PIN.  He is the one who

15 will receive you over there that's set.  Coordinate with him,

16 tell him you are the driver.

17        That eight-character figure at the beginning of

18 Paragraph 5, what is that?

19 A    That's the PIN number for the Blackberry that belongs to

20 Ricon.

21 Q    Just quickly showing you Government Exhibit 46.  Is that

22 the person you are talking about?

23 A    Yes.

24 Q    All right.  Paragraph 6.

25        OFIS 2:  Bro "mi apa" is asking what do you think

1  what he told you.

2          Who is mi apa?

3  A    Chapo Guzman.

4  Q    And when the office asks you what did you of what mi apa

5  told you, what is the office referring to?

6  A    What I thought about that supposed agreement, that

7  arrangement which had been made in Ipiales, to be able to have

8  a secure arrival and departure.

9  Q    And when did mi apa talk to you about it?

10  A    Could you please repeat that it me again.

11  Q    In Paragraph 6, it's referencing something.  What did you

12  think about what mi apa told you?

13          When did mi apa tell you something?

14  A    Okay.  Right at that moment.  I didn't know that it was

15  Chapo Guzman talking with me.  But afterwards, afterwards, I

16  said to the secretary was that mi apa, the one who was

17  talking?  And he said yes, ma'am, that's who we were talking

18  with.

19  Q    When you say, "The one who was talking," in reference to

20  what?  When was that conversation?

21  A    It's the one we have right here.  November 10,

22  2010, -- 2013.

23  Q    Going back to Slide 12, the day before.  Who did you

24  believe Ofis 2, who was typing to you after you received the

25  message the next day?

1  A    First of all, I thought it was a secretary.  But after

2  that, I started reading the conversation carefully and reading

3  everything about it since then they started writing to me.  As

4  I said to you, right at that moment, I didn't realize that it

5  was Chapo Guzman who was writing, talking with me because

6  those weren't the only conversations that I had with him.  And

7  after that, I realized that it was Mr. Chapo Guzman the one

8  who was speaking, talking you.

9  Q    Let's move to Paragraph 9.  Let's skip ahead a little

10  bit.

11          MR. NARDOZZI:  Sorry, your Honor, one second.

12  Q    Paragraph 9 from the same date.

13          MEMO:  But if what you told me regarding

14  arrangements from Manta to Ipiales, it's fine.

15          What are you referring to here?

16  A    I'm commenting to the acting secretary at that time that

17  what he had told me about that arrangement that had been made

18  in Ipiales that that was fine.

19  Q    Did you have an opportunity to go to the airstrip in

20  Ipiales?

21  A    Yes.

22  Q    When did you do that?

23  A    Saying 2013.

24  Q    And why did you go to that airstrip?

25  A    Because I had to really see that area well where it was.

1  Check out how I was going to be able to come in how I was

2  going to be able to depart out of there because independent of

3  the fact that it is an airport, nonetheless planes have to

4  land with instruments because it's a high area and it's cloudy

5  all the time and it's surrounded by mountains.  And my

6  departure out of there, since it's a small plane loaded with

7  fuel, I couldn't take off in a straight line from that airport

8  because the mountains were too close to the airstrip.

9           And, at the moment, that I would take off, I had to

10  take off making a spiral to be able to take off and get out of

11  there, to be able to get a sufficient altitude to be able to

12  go over the mountains.

13  Q    What type of plane were you planning on using to conduct

14  this flight?

15  A    A Cessna 210.

16  Q    When you visited the airport, did you go by yourself or

17  with other individuals?

18  A    I arrived alone by myself to Ipiales.  Hector Coronel

19  received me there and another two guys who were with him.  And

20  Hector Coronel with those other two guys when I arrived at

21  that airport where supposedly I was supposed to work at.  They

22  drove me, they took me all around to be able to look at the

23  area.

24  Q    Okay.  Let's skip ahead a little bit.  I want to show you

25  a communication that was intercepted from January 29, 2014.

1   Let's start by reading Paragraph 1.

2          OFI:  Good evening, captain.  Listen, get in contact

3   with Ricon to see if you can take off for there tomorrow.

4          First of all, we see a different screen name, Ofi,

5   but is it the same office that you were in contact with before

6   from the other intercepts?

7   A    Yes, it would depend.  Sometimes they would change the

8   Blackberry or they would change the PIN or they would call it

9   Ofi or Ofi 1, Ofi 2, Ofi 3.  Depending.

10  Q    What is the office asking you to do here?

11  A    For me to communicate with Ricon so I could check out the

12  weather to see what the weather was like so that I could

13  immediately depart from there going in the direction of

14  Ipiales.

15  Q    All right.  Paragraphs 2 through 4.  I'll read.

16         MEMO:  Captain, I need to go to the shore.  I don't

17  have any co-pilot to help me.  I only carry bulk, that is why

18  I'm following along the shore because I don't have a co-pilot,

19  I only have students that haven't really flown a contraption

20  thoroughly.  And we also need to check the weather, it's still

21  not good out there.

22         What I can do is tell Ricon to arrange things for me

23  to arrive there by day because arriving there at night, the

24  way it gets now, is fucked up because it's all clouds there.

25  The place is very high up.  At the latest, arrive there at

1    5:00 in the afternoon so we can leave with some visibility

2    because at night we needed to be somewhat clear because if

3    it's cloudy it won't be good, it gets all dark and you can't

4    see the mountains.  And when taking off, the mountains are

5    very near and while loaded up we don't stand a chance without

6    visibility.

7              What are you telling the office here?

8    A    Yes, I have to check, to check carefully with Hector

9    Coronel, with Ricon, about the weather and coordinate really

10   well the arrival times since I explained to you before it's a

11   really critical area.  It's high up, and it's very cloudy.  I

12   was there, I personally looked at that location, and it was a

13   very rare day when it would be semi-clear.

14             And honestly, it be able to arrive there, and to

15   depart, that it be little I have at least a little bit of

16   daylight and it had to be at least a little bit with the --

17   not cloudy so that I would be able to take off from there.

18   Q    Earlier, you testified that you had suffered a broken

19   wrist?

20   A    Yes.

21   Q    Is that still an issue on January 29, 2014, leading in a

22   January 30th?

23   A    Yes.

24   Q    Okay.  When I reference only having students to help you

25   fly, what are you referring to?

1  A      The thing is that normally pilots bring a co-pilot.  In

2  this case, with me -- in this case with me, I didn't have with

3  me another pilot that could be my co-pilot.  Just people who

4  were just learning how to fly.  And much me that was

5  complicated, I only brought those people as load just so that

6  they would talk to me so I wouldn't fall asleep on the way.

7  Q      Okay.  Let's move forward to Paragraphs 6 and 7.

8          OFI:  Understood, captain.  Tomorrow early, I will

9  have the money sent to you so you can go to the shore

10  tomorrow.  El Gerente said it, captain.

11         What is the office telling you here?

12  A      Well, okay, because the office wanted me to go to the

13  shore for the same reason Chapo Guzman wanted me to go from

14  Culiacan to the border with Guatemala.  And from there, I

15  would go to Ipiales but that was very harsh on me because, as

16  I said, I didn't bring a person with me that could help me

17  during the flight.

18         (Continued on the next page.)

19

20

21

22

23

24

25

1  DIRECT EXAMINATION(Continued)

2  BY MR. NARDOZZI:

3  Q    And in paragraph 7 where it says, El Generte said it,

4  who is El Generte?

5  A    Chapo Guzman.

6  Q    Finally, paragraph 8, Memo.  Send me the expense money

7  so I can go to the shore.  I already told Ricon he's going

8  to square things up for me to arrive there with him at five

9  in the afternoon and take off with visibility.

10             What you telling the office there?

11 A    That they should send the money for the expenses to go

12 to the border between Mexico and Guatemala, which was where

13 I was going to depart from.

14 Q    That's where you were going to fly the drugs to from

15 Ipiales, correct?

16 A    Yes.  Yes, I was going to go to Ipiales to pick up

17 drugs to bring them to Mexico.

18 Q    When you said that Ricon is going to square things up

19 for you, what does that mean?

20 A    That he was going to make arrangements for the right

21 times because he wanted me to arrive between six and 7 p.m.,

22 because during that time that was when supposedly the police

23 that were going to provide security had their shift at the

24 Ipiales Airport.  The police had been bought off or

25 arranged, as you say.

1  Q    You never wound up actually making this drug shipment,

2  correct?

3  A    That's right.

4  Q    Without telling us what you learned, did you ever learn

5  what happened to the drug shipment, yes or no?

6  A    Yes.

7  Q    How did you learn?

8  A    Through Cachimba.

9  Q    What did Cachimba tell you about the drug shipment?

10  A    Well, that he had sent the pilot, who was a friend of

11  his, they called him Boloche, the friend did the route that

12  I had laid out, he flew over on the Ecuador side; he got

13  lost.  He was lost for a while.  He was flying into Quito,

14  Ecuador, ultimately he arrived in Ipiales, but he was

15  intercepted by radar.  And when he arrived at the airport

16  when the plane was being loaded, the supposed authorities

17  that had been bought off seized a portion of the drugs and

18  they arrested some people right there from the airport.

19        MR. NARDOZZI:  Okay.  I need to switch back over

20  to the Elmo.

21  Q    I have just a couple of very quick questions for you,

22  sir.

23        I show you what's in evidence as

24  Government Exhibit 601K.  Do you recognize this?

25  A    Yes.

1  Q    What is that?

2  A    The intercepted phone calls for El Chapo.

3  Q    And you see your signature on that disk?

4  A    Yes, my initials are on there.

5  Q    Did you have an opportunity to listen to these

6  intercepted phone calls?

7  A    Yes.

8  Q    I'd like to play one short voice exemplar?

9         MR. BALAREZO:  Objection.

10         THE COURT:  Say it again.

11         MR. BALAREZO:  I object to the characterization of

12  what's about to be played.

13         MR. NARDOZZI:  I'll say it quick, your Honor.

14         THE COURT:  We will see.

15         MR. NARDOZZI:  And for the record, this is from

16  2011.04.05 from five seconds to sixteen seconds, 601K-1-A.

17  Q    Mr. Valdez, you heard two voices on that brief clip,

18  who is the last voice that you heard?

19  A    Mr. Chapo Guzman.

20  Q    Did you recognize the other voice on that clip?

21  A    No.  Mr. Chapo Guzman was speaking to somebody, I don't

22  know who.

23         MR. NARDOZZI:  And for the witness only, Your

24  Honor.

25  Q    Showing you what's marked as Government Exhibit 601K-3,

1   what do you see here?

2   A    It is my signature -- well, my initials, and the

3   names -- I don't know what you call the names on the CD of

4   the voices of Mr. Chapo Guzman speaking to other people.

5          MR. NARDOZZI:  Your Honor, at this time I'd ask to

6   move Government Exhibit 601K-3 into evidence.

7          MR. BALAREZO:  No objection.

8          THE COURT:  Received.

9          (Government's Exhibit 601K-3 was received in

10  evidence as of this date.)

11  BY MR. NARDOZZI:

12  Q    How many phone calls did you listen to on that disk

13  that we looked at moment ago, 601K?

14  A    Only one.

15  Q    There's a marking next to 601K-1-A, K-1-B, K-1-C,

16  K-1-D, K2.  Did you listen to separate phone calls for each

17  of those entries?

18  A    Yes.

19  Q    And in each of those entries did you recognize the

20  voice of the defendant and another person who you couldn't

21  identify?

22          MR. BALAREZO:  Objection, 611(c).

23          THE COURT:  Sustained.

24  BY MR. NARDOZZI:

25  Q    What did you recognize from each of those calls?

1  A    The voice of Mr. Chapo Guzman.

2  Q    Did you recognize any other voices?

3  A    No.

4        MR. NARDOZZI:  I have no further questions, Your

5  Honor.

6        THE COURT:  All right.  Cross-examination.

7        MR. BALAREZO:  Thank you, Your Honor.

8  CROSS-EXAMINATION

9  BY MR. BALAREZO:

10  Q    Good morning, sir.

11  A    Good morning.

12  Q    You just spent the last hour or so testifying about

13  these text messages that are -- if I could have the Elmo

14  please -- that you claim were you and other individuals

15  texting about various things, correct?

16  A    Yes.

17  Q    And in particular, you were asked about several of the

18  text messages in particular, let's look at the one on

19  Slide 5 where you, for example, you were asked:  What did

20  this line mean, the one that reads Cachimba has the

21  coordinates for the island.

22        Do you remember that question?

23  A    Yes.

24  Q    So this is not in code, is it?

25  A    No.

1  Q    I mean, you could read it, the jury can read it and it

2  says Cachimba has the coordinates for that island, correct?

3  A    That's right.

4  Q    And before I continue let me ask you this:  Did you

5  provide the Government with all of these text messages?

6  A    No.

7  Q    Like when you were arrested and decided you were going

8  to cooperate with these people, you didn't say here's the

9  disk that they showed you, here's all my texts with Chapo,

10  with whoever else you said you were talking to, right?

11  A    I didn't hand over anything to the Government.

12  Q    Right.  So what happened is during your discussions

13  with the Government they produced these texts and said to

14  you tell me what they say, right?

15  A    That's right.

16  Q    So again, for that first line, Cachimba has the

17  coordinates for that island, there is nothing to interpret,

18  right?

19  A    That's right.

20  Q    And even the second line, Listen, it's better for you

21  to go to Chetumal and for Cachimba to take the plane over

22  there to you.  The jury can read that and understand that it

23  says that it's better for you to go to Chetumal and for

24  Cachimba to take the plane over there to you, right?

25  A    Yes.

1  Q    And we'll just do this last one and then the next line,

2  To go from that island to where bro because I got confused

3  there.  And then me that island is in Belize, bro.  Right?

4  A    Yes.

5  Q    So when you sit here and you testify that those are the

6  things you said, I mean that's pretty clear because that's

7  what the text messages say, right?

8  A    Yes.

9  Q    And when the Government asked you other things that are

10 not in the texts, that's you telling the jury these are the

11 things that happened, right?

12 A    Yes.

13 Q    And of course because you're here testifying, you want

14 the jury to believe what you're telling them, correct?

15 A    I'm only telling my truth.

16 Q    I'm not interested in your truth, I'm interested in you

17 answering my question.  My question was:  When you were

18 sitting here telling them about other things -- strike that.

19            Is there a reason why you're looking at the

20 prosecutor?

21 A    No.

22        MR. BALAREZO:  I'll stand over here so you can

23 look at both of us.

24        MR. NARDOZZI:  There's no question.

25 BY MR. BALAREZO:

1   Q    When I said when you're filling in the blanks, things

2   that are not in the text, you want the jury to believe you,

3   right?

4   A    I'm only telling my truth.

5   Q    Your truth.

6              And you're the man who is in prison; is that

7   correct?

8   A    I am in prison as well.

9   Q    I'm talking about you, you're in prison?

10  A    Yes.

11  Q    You've been in prison for a few years?

12  A    Yes.

13  Q    And you're trying to get out of prison, correct?

14  A    Yes.

15  Q    Or do you want to stay there?

16  A    No, of course not.

17  Q    I mean you had to think about it a little bit, I just

18  want to make sure you're giving the right answer.

19  A    No, I don't want to stay in prison.

20  Q    You want to get out as soon as possible, right?

21  A    Yes.

22  Q    Now let's talk about that a little bit.  You were

23  indicted in Washington, D.C.; is that correct?

24  A    Yes.

25              MR. BALAREZO:  I believe this is in evidence, it's

1   Government Exhibit 501, your indictment; is that correct?

2              Any objection?  No objection to Defense

3   Exhibit 501, Your Honor.

4              THE COURT:  Received.

5              (Defendant's Exhibit 501 was marked in evidence as

6   of this date.)

7   BY MR. BALAREZO:

8   Q    You see this, sir?

9   A    Yes.

10  Q    And you recognize that as your indictment, correct?

11  A    Yes.

12  Q    And you were charged in the Federal Court in

13  Washington, D.C., not here in the Eastern District of New

14  York; is that right?

15  A    That's right.

16  Q    You were not charged in an indictment with Chapo

17  Guzman, correct?

18  A    No.

19  Q    And you were charged with one count of conspiracy to

20  traffic drugs to the United States, right?

21  A    Yes.

22  Q    And the Government also filed a forfeiture allegation

23  meaning that they want some -- some money at some point,

24  correct?

25  A    Yes.

1   Q    And now as I mentioned, you were not charged with Chapo

2   Guzman in this courthouse, it was in D.C., right?

3   A    Can you repeat the question, please.

4   Q    You were not charged with Chapo Guzman in the

5   indictment that's in trial here today, is it -- were you?

6   A    That's right.

7   Q    You were charged -- and you were charged in this

8   conspiracy from January 2009 through the date of the

9   indictment, which is in 2014; is that correct?

10  A    Yes.

11  Q    Does Chapo Guzman make an appearance in your

12  indictment?

13  A    No.

14  Q    And did you write the indictment or did your lawyer

15  write the indictment?

16  A    Pardon?

17  Q    Yes or no?

18  A    Could you please repeat that for me.  Thank you.

19  Q    Did you or your lawyer write that document, that

20  indictment that -- did you type it in the computer and file

21  it in court?

22            The answer is no, correct?

23  A    The Government did that.

24  Q    The Government.  And if you were conspiring with Chapo

25  Guzman, was there any reason why Chapo Guzman's name didn't

1  appear on there?

2          MR. NARDOZZI:  Objection.

3          THE COURT:  Sustained.

4  BY MR. BALAREZO:

5  Q    Are you aware of any reason why Chapo Guzman's name did

6  not appear in your indictment?

7          MR. NARDOZZI:  Objection.

8          THE COURT:  I'll let him answer.

9  A    No.

10  Q    Now they did -- when they wrote this, they did -- it

11  said that you willfully conspired and agree with others,

12  known and unknown, to the grand jury, right?

13  A    I didn't understand that question.

14  Q    Well, your indictment says that you conspired with

15  others, known and unknown, to the grand jury.

16  A    Yes.

17  Q    All right.  And in 2014, when the indictment was filed,

18  it's your understanding that the Government had information

19  on Chapo Guzman, correct?

20  A    Yes.

21  Q    And again, his name doesn't appear?

22  A    No.

23  Q    Now in this indictment where you're charged and that

24  you have pled guilty to, is there any mention of the flights

25  that you're talking about today or yesterday -- or Thursday?

1   A    I just read this one time.  I really don't remember

2   what it actually has in it.

3   Q    Let me remind you.  Count One reads:  Beginning in and

4   around January 2009 --

5            THE COURT:  Slow, slow please.

6            THE INTERPRETER:  Counsel, did you wish to read

7   and after I interpret or you?

8            MR. BALAREZO:  Can I read the whole thing and then

9   show him --

10           THE COURT:  I think you should, but read it slowly

11   enough for the reporter to get it.

12           MR. BALAREZO:  Will do.

13   Q    Beginning in and around January 2009, and continuing

14   through the date of the indictment, the exact dates being

15   unknown to the Grand Jury, in the countries of Colombia,

16   Ecuador, Mexico, United States and elsewhere, the defendant,

17   Isaias Valdez Rios, also known as Memin and 300, did

18   knowingly, intentionally and willfully conspire and agree

19   with others, known and unknown to the grand jury, to

20   distribute a Schedule II controlled substance, knowing and

21   intending that said substance would be unlawfully imported

22   into the United States from a place outside thereof in

23   violation of the stated code.

24               With respect to the defendant, the controlled

25   substance involved in the conspiracy attributable to the

1   defendant as a result of his own conduct and the conduct of

2   other conspirators reasonably foreseeable to him, is five

3   kilograms or more of a mixture and substance containing a

4   detectable amount of cocaine.  And the remainder then is the

5   criminal forfeiture.

6                   Did you follow all of that?

7   A    Yes.

8   Q    There's no mention in there about any of these loads

9   that you told the jury about, right?

10  A    I just talked about some loads, I don't know what

11  you're referring to.

12  Q    Let me make it very simple so you maybe understand.

13  Does your indictment mention anything about these loads that

14  you just told about, told the jury about?  Yes or no.

15  A    Yes.

16  Q    Where in the parts that was read does it mention

17  anything about these loads?

18  A    The part that's mentioned it doesn't say loads but it

19  does say to transport drugs.

20  Q    Does it mention anything about kidnappings?

21  A    No.

22  Q    Does it mention anything about murders?

23  A    No.

24  Q    And these kidnappings and these murders that you have

25  been involved in, you have not been charged with that, have

1   you?

2   A    That's right.

3   Q    And just -- if you need help, where does it say

4   anything about transporting in the indictment?

5            If you want, the interpreter can help you with

6   it.

7   A    Please.

8            MR. BALAREZO:  Why don't you read it for him

9   slowly, if you don't mind, once again.

10               (Interpreter reading document to witness.)

11  Q    Did I miss it, where was transport?

12  A    No, you're right, it doesn't say it.

13  Q    Did I miss it, was there anything about a flight?

14           MR. NARDOZZI:  Asked and answered, Your Honor.

15  A    No.

16           THE COURT:  It's overruled.

17           MR. BALAREZO:  Let me show the witness Defense

18  Exhibit 502, just for the witness.  This is in evidence,

19  Your Honor, I'm not sure what the Government's exhibit

20  number was.  Defense Exhibit 502.

21           THE COURT:  Okay.  Received.

22           (Defendant's Exhibit 502 was marked in evidence as

23  of this date.)

24  BY MR. BALAREZO:

25  Q    Sir, this document is the plea agreement that you

1  reached in your case; is that correct?

2  A    Yes.

3  Q    And this is where you pled to that one count of

4  conspiracy, correct?

5  A    Yes.

6  Q    And you know that you're facing a 10-year mandatory

7  minimum up to possibly life; is that correct?

8  A    Yes.

9  Q    And you know that your guidelines in this particular

10  case are at a level 40; is that correct?

11  A    Yes.

12  Q    And that corresponds to a possible sentence of 292 to

13  365 months; is that correct?

14  A    Ah, yes.

15  Q    Now you also when you -- for the witness, Defense

16  Exhibit 503.

17          MR. BALAREZO:  Any objection?

18          MR. NARDOZZI:  No.

19          THE COURT:  503 received.

20          (Defendant's Exhibit 503 was marked in evidence as

21  of this date.)

22  BY MR. BALAREZO:

23  Q    This document is the, what's called a Joint Statement

24  of Stipulated Facts, right?

25              You've seen this before?  There's your

1   signature, there's your lawyer's signature.

2   A    Yes.

3   Q    This is not the first time you've seen this document,

4   right?

5   A    I just saw this one time.

6   Q    Well, you saw this document the one time that you say

7   you did when you pled guilty, correct?

8   A    Yes.

9   Q    And this is another one of those documents that was

10  written by the Government, correct?

11  A    That's right.

12  Q    And your attorney, Mr. Vanegas, is a Spanish speaker,

13  right?

14  A    Yes.

15  Q    And you could communicate with him and you understood

16  the document that -- and where your signature appears; is

17  that right?

18  A    Yes.

19  Q    In fact, it says that you have reviewed a Spanish

20  translation of this proffer and have discussed it with your

21  attorney and you fully understand it, right?

22  A    Yes.

23  Q    Right?

24  A    Yes.

25  Q    And this particular document, when you plead guilty you

1  have to admit to some facts that you were involved in that

2  constituted a crime, right?

3  A    Yes.

4  Q    And in this particular document it gives a little more

5  information than your indictment, but tell the jury, does

6  the name Chapo Guzman appear in this document?

7  A    No.

8  Q    But yet you're here testifying about Chapo Guzman and

9  you plead guilty and agreed to facts that don't even mention

10 him, right?

11 A    Yes.

12 Q    Now let's talk briefly on -- last week you testified

13 and you gave some very -- some very detailed information

14 about some incidents that you said you were involved in and

15 Chapo was involved in, right?

16 A    Yes.

17 Q    Now before I get into those particular incidents, right

18 at the very end of your testimony on direct examination you

19 were asked by the Government about how you had found out

20 about that load in Ipiales.

21 A    Yes.

22 Q    And I think you said Cachimba told you the details of

23 that seizure?

24 A    Yes.

25 Q    And that he told you about the drugs?

1   A    Yes.

2   Q    And he told you about guns also on the flight?

3   A    I don't remember.

4   Q    Well, you do remember having spoken with the Government

5   many times; is that right?

6   A    Yes.

7   Q    And in particular you met with the Government on

8   March 25th, 2014; is that right?

9   A    Yes.

10  Q    And during that meeting you were asked about that

11  seizure in Ipiales also?

12  A    Yes.  Those two weeks that I was with the Government we

13  were talking a lot, yes.

14  Q    And do you recall that during that meeting you had told

15  them, when they were asking you about the load that was

16  seized in Ipiales, do you recall telling the Government that

17  you had seen on the Internet that there were planes --

18  excuse me, guns on that plane?

19  A    Yes, now I do remember.  Yes, you're right.

20  Q    Right.  So some of this information that you're sharing

21  with the Government you saw on the Internet, right?

22  A    Yes, some of it.  Some of it, but all the rest it was

23  Cachimba who told me.  And it was afterwards that I saw that

24  on the Internet.

25  Q    But just so I get a clear answer to my question, some

1   of your truths that you have told the Government you've

2   gotten from the Internet, right?

3   A    No.

4   Q    So the thing about the guns now is not true?

5   A    No.  What happens is the Government asked me if I was

6   going to be transporting weapons, I told them that I was not

7   aware of the transportation of weapons.  After Cachimba had

8   told me, I looked on the Internet and I saw weapons there.

9   That's it.

10  Q    And you told the Government about what you had seen on

11  the Internet, yes or no?

12  A    Yes, I also told them that.

13  Q    So the answer to my question where I said some of the

14  information that you have shared with these people you got

15  off the Internet is yes, correct?

16  A    No, that wasn't all I got off the Internet.

17  Q    Right.

18              Now, when you first started talking to the

19  Government you spoke with them for about two weeks straight;

20  is that correct?

21  A    Yes.

22  Q    You guys met in a nice little hotel outside Washington,

23  D.C., right?

24  A    Yes.

25  Q    You weren't arrested yet, were you?

1  A    I was arrested.

2  Q    Where were you staying at the time?

3  A    They had me at a hotel.

4  Q    Wait a minute, you were detained in a hotel?

5  A    Yes, I don't know the procedures of the United States,

6  I'm not an American, but they had me there.

7  Q    Well, it doesn't matter whether you're an American, or

8  Mexican or Chinese, you said you were detained but you were

9  staying in a hotel, right?

10  A    That's where the Government had me, at a hotel.

11  Q    Were you getting room service?

12  A    No.

13  Q    They brought you food?

14  A    That's right.

15  Q    Did you get your sheets changed regularly?

16  A    Yes.

17  Q    Okay.  So as you were talking to the Government for two

18  weeks straight while you're detained in this hotel, you had

19  access to television?

20  A    Yes.

21  Q    And you had access to a computer perhaps?

22  A    Yes.

23  Q    And you had access to a telephone perhaps?

24  A    Yes.

25  Q    And during this two weeks that you were talking to the

1   Government, they were asking you about a lot of things,

2   right?

3   A    Yes.

4   Q    And so some of these things that they asked you about

5   of course you didn't look it up on the Internet, right?

6   A    That's right.

7   Q    You know that video about that the Burrion, that

8   shootout?

9   A    Yes.

10  Q    That's off the Internet, YouTube, right?

11  A    It's from the local newspaper in Sinaloa.

12  Q    Well, let's just stop right there, it's a video so it's

13  not in the newspaper.

14  A    Okay.

15  Q    Correct?

16             So that video is from YouTube and you told the

17  Government about the video, right?

18  A    Yes.

19  Q    But of course you didn't watch it and then fill in your

20  truth when you spoke to the Government and when you told the

21  jury about these things, right?

22  A    Of course not, because I was there.

23  Q    Right.  We're going to get to that in sec, but let's

24  talk about these incidents that you discussed on Friday or

25  Thursday --

1          THE COURT:  Mr. Balarezo, if you're going to

2    finish in 15 minutes, okay, but if you're not --

3          MR. BALAREZO:  No.

4          THE COURT:  -- we should take a break now.

5          MR. BALAREZO:  We'll take a break, your Honor.

6          THE COURT:  Thank you.

7              Please don't talk about the case, ladies and

8    gentlemen.  See you at 11:15.

9          (Jury exits courtroom.)

10          THE COURT:  Okay, 15-minute recess.

11          (Recess.)

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present.)

2          (Defendant enters.)

3          (Witness resumes the stand.)

4          THE COURTROOM DEPUTY:  All rise.

5          THE COURT:  Please bring in the jury.

6          (Jury enters.)

7          THE COURT:  Okay.  Everyone be seated, please.

8          Continue, Mr. Balarezo.

9          MR. BALAREZO:  Thank you, your Honor.

10 CROSS-EXAMINE BY

11 MR. BALAREZO: (Continued.)

12 Q    Sir, I just want to clarify the last bit that I was

13 asking you.  It was that video about the aftermath of the

14 Burrion incident.

15          Do you remember that?

16 A    Yes.

17 Q    And it's correct that you told the Government where to

18 find that video on the Internet, correct?

19 A    I only said that there was a video on the Internet about

20 that.  That's all I said.

21 Q    So the answer to my question is yes?

22 A    Yes.

23 Q    Thank you.

24          Now, let me show you what is already in evidence.

25          (The above-referred to exhibit was published.)

1   BY MR. BALAREZO:

2   Q    Do you see that picture, sir?

3   A    Yes.

4   Q    And who do you recognize to be in the picture?

5   A    Mr. Joaquin Guzman Loera, a/k/a Chapo Guzman.

6   Q    And the other gentleman, do you know who he is?

7   A    Yes.  We called him -- we called him comandante --

8   Comandante Juan.

9   Q    And isn't it true that during your many meetings with the

10  Government, this picture also came up in the discussion?

11  A    Yes.

12  Q    And it's correct that you told the Government where

13  the -- or how to Google for this picture on the Internet,

14  correct?

15  A    I just said the photo's on the Internet.

16  Q    So the answer to my question again is yes, right?

17  A    Yes.

18  Q    Now, I'm going to ask you about several things.

19       Last week you mentioned someone by the name of

20  Virgo?

21  A    Yes.

22  Q    And Virgo was -- and you know also who Mayo Zambade is,

23  of course.

24  A    Yes.

25  Q    And Virgo was the person that was in charge of Mayo

1  Zambada's communications, right?  His radio and

2  communications.

3  A    I only said that when Mr. Chapo Guzman wanted to

4  communicate with Mayo, I had to go and communicate through

5  Virgo, because at that time, he was the one who had the radio

6  on him and there was no other person to call.

7  Q    Well, sir, during one of your discussions -- meetings

8  with the Government specifically on December 7th, 2017, do you

9  recall telling the Government that Virgo was Mayo's person in

10 charge of monitoring the radio and communicating with people

11 over it?  Yes or no.

12 A    Of course.

13 Q    And the reason -- if any communications needed to be made

14 with Mayo, you had to go through Virgo, correct?

15 A    Yes.

16 Q    And that's because Virgo was working with Mayo, correct?

17 A    Yes.

18 Q    And Virgo is also the guy that you've mentioned was named

19 Juancho, correct?

20 A    Yes.

21 Q    Now, you also told the Government during some of your --

22 strike that.

23        The Government asked you a few times about finances

24 of Chapo, correct?

25 A    Yes.

1   Q    And several times you told the Government that the Chapo

2   Guzman, the leader of the Sinaloa Cartel, did not have

3   stockpiles of money, correct?

4   A    No, because those things -- those are things that I never

5   saw, obviously.

6   Q    What are you laughing about?

7   A    I never heard Mr. Chapo Guzman talking about money or say

8   that he had money here or stashed there.  I never heard him

9   say anything like that.

10  Q    Never?

11  A    I never heard that.  The truth is I never -- I don't

12  remember having heard him ever say anything like that.

13           MR. BALAREZO:  There's no question pending, your

14  Honor.

15           THE COURT:  Okay.  Put another one.

16  BY MR. BALAREZO:

17  Q    Now, back on the meeting that you had with the Government

18  on March 25th, 2014, do you recall -- yes or no -- telling the

19  Government that you did not believe that there is stockpiles

20  of money because in 2012, salary was not paid --

21           MR. NARDOZZI:  Objection, your Honor, to the form.

22           THE COURT:  I can't tell what's wrong with the form.

23           MR. NARDOZZI:  Can we have a brief sidebar?

24           THE COURT:  Can you summarize --

25           MR. NARDOZZI:  Thank you, your Honor.

1          THE COURT:  -- instead of verbatim quoting.

2          MR. BALAREZO:  Yes.  Thank you.

3   BY MR. BALAREZO:

4   Q    Do you recall back on March 25th, 2014, you told the

5   Government that you didn't believe that there was money lying

6   around because Chapo couldn't afford to pay workers?  Yes or

7   no.

8   A    That's right.

9   Q    You did tell them that, right?

10  A    Yes.

11  Q    Okay.  And do you also recall at the same meeting telling

12  them that Chapo Guzman, one of the leaders of the

13  Sinaloa Cartel, had to borrow money from Mayo Zambade to pay

14  workers?  Yes or no.

15  A    Yes.

16  Q    So when you had these meetings with the Government when

17  you were supposed to tell the truth, right?

18  A    That's right.

19  Q    And you just told the jury that you had never heard Chapo

20  Guzman talk about money or how much he has or anything else a

21  few minutes ago, right?

22  A    That's right.

23  Q    Yet you could tell the Government during the meetings

24  about these things that you know nothing about, right?

25  A    Of course, because I don't know anything.  That was

1  what -- that's what I would say to the Government when they

2  would ask me questions about Chapo Guzman's money, I would say

3  I don't know anything about his money.

4  Q    And since you don't know anything, though, you told him

5  that he couldn't pay his workers and he had to borrow money;

6  and you also told them -- excuse me -- that there were no

7  stockpiles of cash, correct?  Did you look it up on the

8  Internet?  Yes or no.

9  A    No.

10 Q    Is this one of your truths?

11 A    That's right.

12 Q    Now, Thursday you testified about your -- when you first

13 started working for Chapo Guzman, as you said, right?

14 A    Yes.

15 Q    And you said that you were looking for work and you ended

16 up on one of the mountains, right?

17 A    Yes.

18 Q    And that's where you were there for a period of, like, a

19 month; you got a job, you were handed a vest, you were handed

20 weapons, all those things, right?

21 A    Yes.

22 Q    And you had not met Chapo Guzman before that, right?

23 A    No.

24 Q    You were just some ex-military guy now going to do

25 something for somebody else, going to work in the mountains.

1  A    Yes.

2  Q    And you know that Chapo Guzman was in the mountains, he

3  was hiding from the Government, correct?  Yes or no, sir.

4  A    At that time, I didn't --

5  Q    Yes or no sir.

6  A    I cannot answer that with yes or no.

7  Q    And you didn't know that he was hiding from his

8  quote/unquote enemies, as you've said?

9  A    He was hiding from the Government.

10 Q    And also it was after about 15 days or so that he came up

11 to you and said, hey, you know, welcome to the family,

12 chavalon, right?

13 A    He had me called to go to him.

14 Q    After 15 days?

15 A    Ten or fifteen days, approximately, yes.

16 Q    During that time, he had never talked to you before.

17 A    No.

18 Q    He had never seen you before, to your knowledge.

19 A    No.

20 Q    You were some guy off the street basically, correct?

21 A    That's right.

22 Q    But what you are telling the jury here is your truth is

23 that the head of the Sinaloa Cartel brings in some guy off the

24 street to protect him from the Government, protect him from

25 his enemies, and hugs you and says, hey, you're now part of

1  the family, chavalon, right?

2  A    Can you ask that question again, please?

3        MR. BALAREZO:  Do you mind if I have it read back,

4  your Honor?

5        THE COURT:  You can read back it back.  When you

6  hear it, you may want to rephrase it.

7        MR. BALAREZO:  I will rephrase it, your Honor.

8  BY MR. BALAREZO:

9  Q    I will break it down for you.

10        Your truth that you are telling the jury is that the

11  head of the Sinaloa Cartel took a guy off the street after 15

12  days, embraces him, and says welcome to the family, chavalon;

13  is that correct?  Yes or no.

14  A    I can't answer that question with yes or no.

15  Q    Well, what was hard about it?  You said you were off the

16  street; you said that it was 10 to 15 days later when he gave

17  you the hug and said welcome to the family, chavalon.  That's

18  what happened, correct?  Yes or no.  Did that happen?  Yes or

19  no.

20  A    Yes, that happened.

21  Q    Thank you.

22        THE COURT:  Don't translate that.

23        Go ahead.

24        MR. BALAREZO:  I move to strike whatever he said.

25        THE COURT:  There's nothing on the record in

1    English, so there's nothing to strike.

2           MR. BALAREZO:  Very well.

3    BY MR. BALAREZO:

4    Q    When you met him -- I mean, the first day you were there,

5    you already had an AK47; you already had a -- other weapons,

6    grenade launchers, all these little toys, right?

7    A    Yes.

8    Q    So this guy that's hiding in the mountains, super

9    conscious about security, given all these armed people around

10   him, again, arms an unknown person off the street and welcomes

11   him into the family, right?

12   A    Those were people that he was looking for --

13   Q    Right.

14   A    -- with training.

15   Q    Right.

16          And you are one of those trustworthy people,

17   correct?

18   A    At that time, he didn't trust me yet before he welcomed

19   me into the family.

20   Q    I see.

21          Now, you also testified on Thursday, you talked

22   about some period of time when you were sent to Honduras.

23   A    Yes.

24   Q    Do you remember that incident or --

25   A    Yes.

1  Q    And, in particular, you talked about having received --

2  or having Chapo authorize, I believe, $240,000 to give to you.

3  Yes or no.

4  A    Yes.

5  Q    And you told the jury about how you were looking for a

6  property, and you told the jury how you were looking for a

7  car.  Do you remember that?

8  A    Yes, that's right.

9  Q    And you told the jury that you ended up buying a Mercedes

10  truck for $20,000?

11  A    Yes.

12  Q    And you also testified to the jury that this woman,

13  Julissa, you gave her $40,000 of Chapo's money supposedly,

14  right?

15  A    Yes.

16  Q    And Chapo Guzman never authorized you to give Julissa

17  $40,000 for her sick kid, right?

18  A    That's right.

19  Q    Okay.  And at some point thereafter, you were taken or

20  you went back to Mexico, right?

21  A    That's right.

22  Q    And that guy Panchito was talking -- was spreading rumors

23  about you, correct?

24  A    Yes.

25  Q    And the rumor was that you had stolen the money.

1    A    Yes.

2    Q    Right?

3         And the rumor was that something was going to happen

4    to you, correct?  Something bad.

5    A    They hadn't told me what was going to happen, but I could

6    imagine it.

7    Q    Right.

8         What you imagined was that you were going to get

9    picked up, right?

10   A    That's right.

11   Q    That you were going to get beaten up, right?

12   A    No.

13   Q    Maybe you were going to be burned with some iron -- with

14   an iron?

15   A    Possibly.

16   Q    Maybe, like, beaten up with, like, a large tree branch?

17   A    Maybe.

18   Q    Maybe even killed, correct?

19   A    That's right.

20   Q    And you were so scared that you basically hid from Chapo

21   and his, you know, his cartel, right?

22   A    That's right.

23   Q    I mean, you were so scared that you had a cast put on

24   your leg so that you can say, hey, my leg is broken, this is

25   why I can't go see you, correct?

1   A    Yes, that's right.

2   Q    I mean, that broken leg didn't come from that tree

3   branch, right?

4   A    No, no, no, of course not.  I never said that.

5   Q    And Chapo Guzman, the leader of the Sinaloa Cartel, comes

6   to you a few days later and says, it's all right chavalon,

7   give me a hug, right, we're all family?

8   A    He never came to me.  I talked to him on the phone.  He

9   asked to speak to me on the phone.

10  Q    And he said, chavalon, it's okay, right?

11  A    Okay.  Yes.

12  Q    Yes or no?  He said that.

13  A    Yes.

14  Q    And you weren't beaten.

15  A    No.

16  Q    You just happened to be a very fortunate person, right?

17  A    That's right.

18  Q    Or it never happened, correct?

19  A    I didn't understand that last question.

20  Q    Of course.

21       Now, let me ask you just out of the blue, you're

22  Mexican, correct?

23  A    That's right.

24  Q    And, you know, like, if -- if somebody is locked up in a

25  prison, let's say, and they escape, correct?

1   A    Yes?

2   Q    I think it's fairly common knowledge that escaping from a

3   jail is not a crime in Mexico, right?

4            MR. NARDOZZI:  Objection.

5   BY MR. BALAREZO:

6   Q    To your knowledge, is escaping from a jail in Mexico a

7   crime?

8            THE COURT:  You can answer.

9   A    You're saying that's not a crime?

10  Q    Yes.  To your knowledge.

11           THE COURT:  No, you confused the witness.  Put the

12  question again, please.

13  BY MR. BALAREZO:

14  Q    To your knowledge, is escaping from a prison in Mexico a

15  crime?  Yes or no.

16  A    Yes, it is a crime.

17  Q    Now, let's talk about Thursday, those incidents that you

18  talked about, these violent acts.  Do you remember you were

19  asked about informant one, informant two, and then you were

20  asked about what specific, like, violent acts you had seen

21  Mr. Guzman do.  Do you remember those questions?

22  A    Yes.

23  Q    And the very first one you talked about was an incident

24  involving a so-called -- a *dedo*, a snitch, that was supposed

25  to be picked up in Tamazula, Durango, correct?

1  A    Yes.

2          MR. BALAREZO:  Excuse me one second, your Honor.

3  BY MR. BALAREZO:

4  Q    Now, in that particular one, that incident, you told --

5  you told the jury that the people that went to the -- that

6  went to the pick-up, if you will, you said that five of you

7  got out of the car; it was Bravo, another guy you called

8  Mojojojo, you, Cavorka, and a guy named Roke.  Do you remember

9  that?

10 A    Cavorka and Bocho, yes.

11 Q    What was that last name you just mentioned?

12 A    Bocho.

13 Q    Okay.  Well, do you recall, again, January the 24th,

14 which was Thursday, as you testified before this jury under

15 oath, and page 6187, line 11, you were asked:  What happened

16 next?  And you responded:  Well, you know, it came to the --

17 it came the afternoon, early evening, and we went by the house

18 of that person and -- and Cojito actually pointed that house

19 to us.

20 A    Gallito.

21 Q    Gallito.

22          And Guyito told Bravo, you know what, they are

23 actually telling me that asshole is indeed there.

24          And you continued:  So we turned around and the

25 doors to the home were open -- I'm not finished, sir.

1   A    Yes, we turned around.

2   Q    -- five of us got out of the cars.  It was Bravo, another

3   guy we call Mojojojo.  It was Bravo, Mojojojo, me, Cavorka,

4   and a guy we call Roke.

5        THE INTERPRETER:  Roke, interpreter correction.

6   A    I never mentioned any Roke.

7   Q    Let me show you what I will mark as Defense Exhibit 512.

8   And, sir, this is a transcript of your testimony under oath

9   last week, and if you need the help, I will have the

10  interpreter read for you these last three lines that are

11  highlighted.  There's no question.  Do you need help reading

12  those lines so the interpreter can read it for you?

13  A    Go ahead.

14       (Interpreter reading from the above-mentioned

15  document.)

16  A    I -- I never at any point mentioned Roke.  If they --

17  Bravo, Mojojojo, Cavorka, Bocho, and me.  Okay.  I never at

18  any point mentioned Roke.  If it's written down that way, they

19  wrote it down wrong.  I mentioned Bravo, Mojojojo, Cavorka,

20  Bocho, and myself.

21  Q    And you were then asked on Friday -- on Thursday what

22  happened when you went inside the house, and you recall

23  telling them that one of the people had subdued the people in

24  the house?

25  A    Yes.

1   Q    Okay.  And then you continued:  Bravo, Roke, and I headed

2   towards the patio of the home where there were some bedrooms

3   there, and we started searching the bedrooms until, in fact,

4   we actually found the person whom we were looking for who was

5   in one of the bedrooms.  He was a very, you know, tall, like,

6   big guy, bigger than Bravo, bigger than Roke, and bigger than

7   me.

8           I'm not done yet, sir.

9   A    Excuse me.

10  Q    Bravo and I, we stayed outside and then Roke went in and

11  he pretty much, you know, got him out, pushing him out.

12          And then you had this very detailed discussion or

13  testimony about how there was a column in the middle of the

14  house and the guy was hugging the column.  Do you remember

15  that?

16  A    Yes.

17  Q    And he was such a big guy and he was hugging the column

18  so tight that you couldn't get him off, remember?

19  A    Yes, that's right.

20  Q    And then what you told the jury was that Bravo pretty

21  much, you know, like, shot out a burst of bullets and

22  automatic with his weapon and the person was just lying there,

23  and then from there, Roke also activated his weapon and he

24  shot him in his head.

25          Do you remember testifying about that on Friday?  On

1   Thursday, excuse me.  Yes or no.  Did you testify to that on

2   Thursday?

3   A    Yes, I did testify to that, but the person -- person

4   you're mentioning is not Roke, it's Bocho.

5   Q    Thank you.

6           THE COURT:  Mr. Balarezo, before you go on, let's

7   have a sidebar, please.

8           (Sidebar.)

9           (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (sidebar conference held on the record out of the

2 hearing of the jury.)

3      THE COURT:  I can't tell you whether I recall the

4 witness saying Bocho or El Roke, but I will tell you, having

5 filed the transcript, the court reporters are doing their best

6 to get the Spanish names correctly, and it's perfectly

7 plausible that the transcript is an error on this.

8      MR. BALAREZO:  Your Honor, I respectfully disagree

9 with that.  I, myself, wrote down Roke.  He said Roke.  If

10 there's a tape that they can listen to and correct the

11 transcript, great, but the word was "El Roke."  There was no

12 error there, otherwise I wouldn't be wasting my time.

13      THE COURT:  Well, look, we will put that aside, but

14 if that's your recollection, I'm not going to do anything

15 about it.  We will talk about whether I've got to give some

16 instruction to the jury about possible transcription errors as

17 part of the final charge, but I'm not stopping you, go ahead.

18      MR. NARDOZZI:  Your Honor, if I can, I just want to

19 put something briefly on the record.

20      After court on Thursday, one of the court reporters

21 approached us about the spelling of one of the names, she said

22 Roke.  He had testified about a Roke earlier in his testimony

23 when he was talking about the role he had as a secretary, and

24 we said yes, it's Roke, and they spell it the same way it is

25 there.  I don't -- and it's the wife's nickname referred to in

1  other parts of this trial.  I don't know if the court reporter

2  took that to mean the same thing for this name, so I just

3  wanted to make sure it was clear on the record.

4          THE COURT:  It's entirely possible, but because

5  Mr. Balarezo has a different recollection and also, frankly,

6  because he speaks Spanish, I am going to let him go on with

7  his questioning.

8          MR. BALAREZO:  Thank you.  I won't be much longer.

9          (Sidebar ends.)

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2    BY MR. BALAREZO:

3    Q    Now, Mr. Valdez, if I say the name "Roke," you understand

4    what I'm saying, right?  Yes or no.  Yes or no.

5    A    Yes.

6    Q    Then if I say the name "El Bocho" or "Bocho," you also

7    understand what I'm saying, correct?  Yes or no.

8    A    Yes.

9    Q    And you would agree with me since you speak Spanish that

10   the name "Roke" and the name "Bocho" really don't sound alike,

11   do they?

12   A    That's right.

13   Q    So let's talk about this particular incident again, the

14   one in Tamazula, Durango where you were going to pick up the

15   *dedo*.

16          You, and whoever you said on Thursday, or whoever

17   you're saying today, went to pick up the dedo, correct?

18   A    Yes.

19   Q    And, of course, when you went, you were asked to go with

20   a group, right?

21   A    That's right.

22   Q    And you were armed?

23   A    Yes.

24   Q    You had ammunition?

25   A    Yes.

1  Q    And you went there because, if necessary, you would use

2  the gun and the ammunition to shoot and/or kill people,

3  correct?

4  A    Yes.

5  Q    But, of course, when you got there, you didn't do

6  anything; you just saw the other guys, you watched them do

7  things, right?

8  A    That's right.

9  Q    You didn't subdue the people or the family in the living

10 room?

11 A    No.

12 Q    You didn't go and try to find a big guy who was hugging

13 on the post?

14 A    We went in -- Bravo, Bocho, and me -- for the person.

15 Q    And you couldn't pull the guy off, right?  You didn't try

16 pulling him off the post, right?

17 A    Bravo couldn't.  Bravo couldn't do it.

18 Q    I don't know, maybe the interpreter misspoke, but I said,

19 did you try to do it.  You didn't, did you?

20 A    If I tried to do it?  No.

21 Q    Right.

22       And after Bravo shot him and maybe Roke or Bocho

23 shot him, you did nothing, right?

24 A    No.

25 Q    You were just sort of an innocent bystander in all of

1   this.

2   A    I was obviously providing security.

3   Q    All right.  By standing around watching?

4   A    I didn't think Bravo was going to shoot.

5   Q    Right.

6           Now, let's talk about Burrion, that video that we --

7   that you discussed last week.

8   A    Yes.

9           (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   EXAMINATION BY

2   MR. BALAREZO:

3   (Continuing.)

4   Q    The Internet video that you discussed?

5   A    Yes.

6   Q    Now, what you told the jury was that you guys were going

7   to go after Chapo Yisidro; correct?

8   A    Yes.

9   Q    And you had a team of, like, 15 to 20 SUV trucks; right?

10  A    Those were the people, those of us who arrived there at

11  that location, and there were also a lot of vehicles, a lot of

12  pickups, yes.

13  Q    How many vehicles did your side have?

14  A    I didn't count them, I wasn't going to start counting

15  them.  But, yes, there were quite a last vehicles.  I wasn't

16  going to start counting vehicle by vehicle, person by person.

17  What I gave was an approximate amount.  I gave the best

18  calculation of approximately how many people, but it was quite

19  a few, yes.  It could have been more, but as I said, I was not

20  going to give a number.

21  Q    As you testified here under oath in front of this jury,

22  you are giving an estimate of something you don't know

23  anything about in particular.  You didn't know a specific

24  number.

25  A    I repeat you again, I wasn't going to count persons and

1  people, excuse me, persons and vehicles at that time.

2  Q    Right.  But that's understandable.  But, you know, when

3  you were asked that in this courtroom, you didn't tell the

4  jury, I wasn't going to count the numbers of cars and you know

5  blah, blah, blah.  You said between 15 and 20.

6  A    People, not vehicles.

7  Q    Okay.  That's like Bocho and Roke, also?

8  A    I don't know.  I'm not the ones writing things down, I'm

9  sorry.

10  Q    Now, you told the jury also that you were driving --

11  well, in the video, you saw a white Cherokee SUV; correct?

12  A    Yes.

13  Q    And this was the Cherokee that had the black Xs on the

14  door?

15  A    Yes.

16  Q    Xs.  Were they crosses or were they Xs?

17  A    Crosses, Xs, however you want to call.

18  Q    A cross is like this, correct?  Like, Jesus Christ,

19  correct?

20  A    As you prefer to call them, sir.

21  Q    So it's your truth.  Xs, crosses, it's all the same;

22  correct?

23  A    You prefer to call them again.

24  Q    Now?

25            MR. BALAREZO:  If I could have one second.

1          (A brief pause in the proceedings was held.)

2          MR. BALAREZO:  Thank you, your Honor.

3    Q    So what you described to this jury was, there was a

4    moment when you were in your white Cherokee with the Xs or

5    crosses; right?

6    A    Yes.

7    Q    And, at some point, some guy was in the middle of the

8    road and started shooting at you with an AK-47; correct?

9    A    I did not name the weapon but he did start to shoot.

10   Q    Was it a cap gun, what?

11   A    It was an assault rifle but I couldn't see what type of

12   it was.  I couldn't say what type it was, I just said that the

13   person started shooting.

14   Q    An assault rife is a powerful high-caliber weapon; right?

15   A    That's right.

16   Q    And when this person is shooting at your car, I believe

17   what you said, Well, my pickup was hit with several shots.

18   Well, we immediately turned around, all of the vehicles, and

19   then I, we went towards the gas station and I personally went

20   with a vehicle on that person.  The person laid there dead.

21          Do you remember saying that Thursday?

22   A    What I said was that the person was standing in the

23   middle of the street, it was when they started receiving the

24   shots that is when we turned the trucks around towards the gas

25   station, and that's when I went on the person with the truck.

1  Q    Well, thanks for repeating what I just read.  The answer

2  to my question is yes; right?

3  A    Yes.

4  Q    And when you said, "I personally went with a vehicle on

5  that person," you ran him over; correct?

6  A    Yes, that's right.

7  Q    I mean, this guy was shooting an assault rifle at you,

8  your car is getting hit, you were driving at a high rate of

9  speed when you went up to him and ran him over, you hit him?

10 A    Yes, that's right.

11 Q    I mean, you weren't just driving as fast as I'm walking,

12 you were speeding down the road until you took him out?

13 A    Yes.

14 Q    And when you took this guy out, he had the assault rifle

15 in his hands; right?

16 A    That's right.

17 Q    And the guy that you hit with your white Cherokee with

18 the Xs or the crosses on them eventually you saw that he was

19 dead later; correct?

20 A    Yes.

21 Q    On that Internet video, you later saw him covered up with

22 a tarp on the street; correct?

23 A    Well, I saw him dead during this action, during the

24 crossfire.  Afterwards, I also saw him on the Internet as

25 well.

1   Q    But the guy wasn't just dead his body was torn apart,

2   right?  There was a leg over here and there was an arm over

3   there; right?

4   A    Yes.

5   Q    Let me show you what I've marked as defense

6   Exhibits 513-A, B, and C.

7            MR. NARDOZZI:  No objection.

8            THE COURT:  They are received.

9            MR. BALAREZO:  Strike that.

10  Q    Of course?

11           MR. BALAREZO:  I do want them.  I wasn't striking

12  them.

13           (Defendant's Exhibit 513-A, B, and C were marked in

14  evidence as of this date.)

15           THE COURT:  So the exhibits are admitted.

16           MR. BALAREZO:  They're admitted.

17  Q    When you went at this guy with your car, and you struck

18  him, obviously, you struck him with the front part of your

19  car, correct, with the grille and the hood; right?

20  A    Yes.

21  Q    Let me show you 515-A in evidence.  That's your Jeep;

22  correct?

23  A    Yes.

24  Q    Did you see any blood on the Jeep?

25  A    No, I don't see blood.

1  Q    Can you point to the jury and make one of those little

2  fancy circles and show the jury where the impact spot is on

3  the Jeep?

4  A    I hit him with the front of the Jeep.  The person was not

5  standing at that point, he had one knee on the ground when he

6  was firing.  I don't know what action he took when I went over

7  towards him.

8  Q    That's interesting.  Because when I asked you when you

9  were taking the car to him, running him over, you said the guy

10 was standing there shooting at you and you said yes?

11 A    I didn't say was standing.

12        MR. NARDOZZI:  Can he answer, your Honor.

13        THE COURT:  What was the answer?

14 A    I didn't say he was standing.

15 Q    I said he was standing and shooting at you and you said

16 yes?

17 A    I don't remember you asking that question, but the person

18 I never said that he was standing.  I said he was there that I

19 never -- I said the specific position he was in.  I said he

20 was stopped in the middle of the road.  I now clarify that he

21 was putting his knee down.

22 Q    Now, you had the opportunity when I asked you when I said

23 was the man standing and shooting at you, you didn't give us

24 the whole thing he was on his knees.  It was after you saw the

25 picture with no damage now you have an explanation; correct?

1           Your explanation comes after you see the picture

2   with no damage; right?

3   A    Well, what can I tell you?  I was there.

4   Q    Well, just tell us your truth.

5   A    I am telling you the truth.  The person had a knee on the

6   floor.  He wasn't standing.  Maybe beforehand I didn't

7   understand you.  I didn't listen to you properly and I

8   answered yes, but.

9           THE COURT:  Mr. Balarezo, I think we need to move

10  on.

11          MR. BALAREZO:  One more.  That's not in evidence

12  yet.

13          THE COURT:  I think we did receive all three.

14          MR. BALAREZO:  That was another one.

15  Q    So let me get this right for the jury.  The white SUV,

16  did hit this guy sitting or standing; is that right?

17  A    Yes, that's right.

18  Q    There was an impact?

19  A    Yes, that's right.

20  Q    You hit him so hard that body parts were strewn around

21  the street; is that correct?

22  A    I hit him hard, yes.

23  Q    This is 513-B, your Honor, this is in evidence now.

24          MR. BALAREZO:  There's no question pending.

25          THE COURT:  Put another question to the witness.

1  Q    If the guy was kneeling, do you see any damage on the

2  bumper of the car?

3  A    That image is fuzzy.

4  Q    You see any blood, any red?  I mean, you could see that

5  even if it was fuzzy.

6  A    No, I don't see any.

7  Q    Now, you also indicated that the Xs, if I could have the

8  Elmo again, I'm sorry, or Xs or crosses or hieroglyphics, what

9  ever it is, they're obviously in black; is that correct?

10 A    Yes.

11 Q    Do you recall during one of your many meetings with the

12 Government, specifically, on March 5, 2018, that you told the

13 Government that you and others went in a convoy of 15 to 20

14 trucks marked with a single X, and that you stated that the X

15 was drawn onto the windows and bodies of their vehicles with

16 white shoe polish.

17       Yes or no, do you remember telling the Government

18 that?

19 A    I don't remember saying just one X.

20 Q    Thank you.

21 A    I said they were marked with some Xs.

22 Q    Let me show you Defense Exhibit 505.

23       MR. BALAREZO:  For the witness only.

24       MR. NARDOZZI:  Objection.

25       THE COURT:  Sustained.  Actually, I'll let you do

1  it.  Go ahead.

2  Q    For the witness only.  If the interpreter can make an

3  effort of reading the highlighted portions.

4        Does this document refresh your recollection as to

5  whether or not you, A, told the Government you were in a

6  convoy of 15 to 20 trucks marked with a single X with white

7  shoe polish.

8        Does it refresh your recollection, yes or no?

9  A    Forgive me.  I wasn't the one who was writing.  And I

10  just answered the questions that the Government asked me, and

11  if I said X, they could have written one X, two Xs, three Xs.

12  I'm not the one who is writing things down.

13  Q    Well, I'm asking you if you said it to the Government,

14  not asking whether you wrote it down, whether you --

15  A    I said X to the Government, not just one X.

16  Q    You find that funny?

17  A    No, sir.

18  Q    You didn't tell them white shoe polish either?

19  A    I said paints for shoes, what you use to put on shoes.

20  It would depend on the color of the pickup truck, either white

21  or black.

22  Q    So white or black, doesn't matter, does it?

23  A    It would depend on the color of the vehicle or the pickup

24  truck.

25  Q    So other people made a mistake not you; right?

1    A    Mistaken in what, excuse me?

2    Q    That particular video that was seen here in court which

3    you've talked about a lot, you already told the Government

4    that about where to find that video; correct?

5         You said that earlier unless you want to change your

6    mind now.

7         MR. NARDOZZI:  Objection, your Honor.

8         THE COURT:  Sustained.  Put another question,

9    please.

10   Q    You told the Government where to find that vehicle?

11   A    Yes.

12   Q    So you knew that that video existed on the Internet;

13   right?

14   A    Yes.

15   Q    And before you talked to the Government about the video

16   and told them where to find it, you had seen that video;

17   right?

18   A    Yes.  At the time period when this happened.

19   Q    That video doesn't have a depiction of the guy standing

20   or kneeling or shooting at you; right?

21   A    It doesn't show anybody.

22   Q    Right?  It doesn't show you running him over; correct?

23   A    No.

24   Q    It doesn't show you there; correct?

25   A    No.

1    Q    Right.  So what you're telling the jury to believe that

2    you were there; right?

3    A    I'm just telling him what you I lived through at that

4    time.

5    Q    Let me ask you.  Did that white Jeep have some extra

6    strength butcher that when you take somebody out and cut them

7    up into pieces, it doesn't get damaged.  Is that your truth,

8    also?

9    A    It was an armored pickup truck.

10   Q    That's your story and you're going to stick with it now?

11   A    It was an armored pickup what I was driving.

12   Q    Now, you also talked about a couple people from the

13   Arellano Felix group that were picked up.  Do you remember

14   that?

15   A    Yes.

16   Q    You sure?

17   A    Could you repeat that question.  A couple people, you

18   said?

19   Q    This is that real detailed incident where you said that

20   these people from the Arellano Felix organization were picked

21   up, they were brought over to Chapo, they had been burned with

22   an iron?

23   A    It wasn't a couple people, it was just one person.

24   Q    You remember the whole thing with the iron that he had

25   been burned; right?

1   A    That's how the person arrived where we were.

2   Q    You could see the iron marks on his body?

3   A    Of course.  His whole front, his whole back, his legs.

4   Q    His shirt was stuck to his skin?

5   A    Yes, of course.  It even had those little holes that the

6   iron has marked.

7   Q    Where the little holes are?

8   A    You know where the steam comes out of the iron.

9   Q    And, at some point, it was so bad that he actually

10  started smelling bad; right?

11  A    Yes, of course.

12  Q    Now, at some point, you talked about when Chapo came over

13  and started interrogating these guys, do you remember that?

14  A    Yes, twice.

15  Q    And I think you testified on Thursday Page 6203, Line 24

16  you said -- strike that.  Line 22.  21.

17         "QUESTION:  What happened next?"

18         Your answer was:

19         *"ANSWER:  Well, the next day, on the third day, he*

20         *then approached the area where the person was."*

21         And -- strike that.

22         *"QUESTION:  When you say, 'He,' you're talking about*

23         *the defendant?"*

24         *You answered:*

25         *"ANSWER:  Yes, Mr. Chapo, he came close to where the*

1   *person was and he started interrogating him.  And I, I*

2   *heard him asking him about what happened with the*

3   *members of that cartel.  He would ask about specific*

4   *names."*

5   A   Yes.

6   Q   That's what you testified here Thursday?

7   A   Yes.

8   Q   There's no mistake with that?

9   A   I don't think so.

10  Q   Now, you were there when this happened; right?

11  A   Yes.

12  Q   I mean, you saw Chapo coming in, you saw him

13  interrogating the guy, you saw him -- you heard him

14  interrogate the guy; correct?

15  A   Yes.

16  Q   And, of course, you had no role in it.  You didn't hit

17  the guy, you didn't burn him, you didn't shoot him; right?

18  A   Well, no, the person had -- and, no, the person had

19  already arrived tortured.  And Mr. Chapo Guzman even got upset

20  about it and I said, Why have they brought someone like this?

21  What is this person good for?  Why would they bring someone

22  like this?

23  Q   My question was about you, not about Chapo Guzman.  Did

24  you hear the question?  Did you hear the question?

25  A   Could you repeat if to me?

1   Q   Did you shoot the man?

2   A   No.

3   Q   Did you hit him?

4   A   No.

5   Q   Did you burn him with an iron?

6   A   No.

7   Q   Did you hit him with a tree branch?

8   A   No.

9   Q   Once again, you did nothing; right?

10  A   No.

11  Q   You stood around and watched so that several years later

12  you could testify about it; correct?

13  A   Well, I didn't know I was going to be arrested.

14  Q   Well, when you were arrested, and you were detained in

15  that hotel in Washington on March 5th, do you recall when the

16  Government asked you about this particular incident?

17  A   No, they didn't ask me about specific incidents.

18  Q   Well, did you tell them about a 2005 murder of an

19  Arellano Felix cartel member, you did?

20          Do you remember that?

21  A   Yes, I did speak.  I did talk about incidents.

22  Q   I'm not talking about incidents, you talked -- excuse me?

23  A   Assassinations, whatever you want to call it.

24  Q   Incidents, according to you, but the Government did ask

25  you questions about this particular incident with the guy that

1   was burned with the iron, yes or no?

2   A    What date, excuse me.

3   Q    You tell me you were there?

4   A    In the first meeting that I was with the Government, I

5   don't remember having talked about murders and assassinations.

6   Afterwards I did do that.

7   Q    Do you recall telling the Government that you were not

8   present during the entire interrogation of the Arellano Felix

9   guy?

10  A    Yes.

11  Q    Do you remember that now?

12  A    Yes.

13  Q    Is that a yes, not a mm-hmm?

14           THE COURT:  It's a yes.  Let's go.

15           MR. BALAREZO:  Just trying to make sure the record

16  is clear.

17           THE COURT:  It's clear.

18  Q    Do you also remember telling the Government that you did

19  not know the questions or the answers that Chapo asked or that

20  the man gave.

21           You remember that, don't you?

22  A    Yes, I believe so.  Yes.

23  Q    But yet, you testified under oath to this jury, it's

24  totally different from what you told the Government

25  previously; right?

1          And you told this jury not five minutes ago, you

2   told the jury I was there, I heard him, I saw him; is that

3   correct?

4   A    Yes.

5   Q    But, at another time, when you meet with these people who

6   put you on the stand for you to testify under oath, you

7   weren't there most of the time; right?

8   A    Well, we were -- how can I explain this to you?  Those of

9   us who were close to Mr. Chapo Guzman, normally, he didn't

10  like more than one or two people to be there right close to

11  him.  At the most, it would be one or two people.  He would be

12  asking and the other person would be writing things down

13  during those interrogations.  I did manage to hear that.

14  Q    Right.  And these are things that you're now saying on

15  the stand, right?  Doesn't appear in any other location, there

16  is no video of that, there is no tape of it; right?

17          Did you find a video of this interrogation on the

18  Internet?

19  A    No.

20  Q    So on the little things like you were there maybe not

21  there, doesn't matter, you want the jury to believe you;

22  right?

23  A    I'm just telling you what I lived through during that

24  time period.

25  Q    If they don't believe you on the little things, how can

1  they believe you on the big things?

2          MR. NARDOZZI:  Objection, your Honor.

3          THE COURT:  Sustained.

4  Q    Now, there was another incident that you talked about.

5  It was about two Zetas.  Do you remember them?

6  A    Yes.

7  Q    And that was even a more detailed testimony that you gave

8  to the jury; right?

9  A    Yes.

10 Q    Yes or no.  I mean, it's kind of like --

11         MR. NARDOZZI:  Objection.  Asked and answered.

12         THE COURT:  Sustained.

13 Q    And when you sat here Thursday and gave this testimony to

14 this jury under oath, you were given the truth; right?

15 A    Yes.

16 Q    And this was the incident where you said Chapo had hit

17 this guy with a big branch?

18 A    Yes.

19 Q    It was like for three hours Chapo Guzman was beating the

20 hell out of this guy with a tree branch; right?

21 A    Yes, to both Zetas who were there.

22 Q    Chapo with a tree branch for three hours?

23         MR. NARDOZZI:  Objection.

24         THE COURT:  I need to instruct the witness.

25         I know you don't do this for a living.  Translate

1   that, please.

2          But if counsel asks you a question which you can

3   reasonably answer with a yes-or-no answer, try to answer it

4   that way.  If you can't reasonably answer it that way, just

5   tell him you can't answer that, yes or no.  I think if we

6   follow that rule the examination will go a little faster.

7          THE WITNESS:  Okay.  Thank you.

8          THE COURT:  Okay.  Proceed.

9   EXAMINATION BY

10  MR. BALAREZO:

11  (Continuing.)

12  Q    And those details of that interrogation, I mean, you saw

13  that with your own eyes; right?

14  A    I can't answer you simply with a yes or a no.

15  Q    You gave a lot of details about that incident?

16  A    Yes, because at one point I did come closer do that

17  location when I was called by Bravo.

18  Q    So maybe you were there, maybe you weren't?

19  A    I said very clearly, I specified that I was at some

20  distance.  I said it very clearly that I wasn't at the very

21  specific location close to it until Bravo called me over with

22  instructions to dig a very large hole and fill it with wood.

23          And it was at that time when I was able to observe

24  Mr. Chapo Guzman that he kept hitting those two people, those

25  Zetas saying, How is this possible you assholes that have been

 1   in Sinaloa, you were with the Zetas.

 2              MR. BALAREZO:  Strike that, your Honor.

 3              THE COURT:  Put another question to the witness,

 4   please.

 5   Q    You were far away; right?

 6   A    I was some meters away.

 7   Q    And for those three hours, you saw -- Mr. Guzman, please

 8   stand.

 9        This 5'6" guy, 60 something years old, just whacking

10   these guys for three hours with a big tree branch; is that

11   right?

12   A    That's right.

13   Q    And you even heard him say whatever the hell he just

14   said; right?

15   A    That's right.

16   Q    Now, but Thursday when you were describing this beating,

17   you didn't explain to the jury, you know, I was some meters

18   away and I wasn't really there and I can't answer your

19   question.

20        You didn't say that, did you?

21   A    With all my respect, I did say that.

22   Q    You just gave them all the details and they have to

23   believe you because you're telling your version of the truth;

24   right?

25              MR. NARDOZZI:  Objection, your Honor.

1      THE COURT:  Did you object?

2      MR. NARDOZZI:  I did.

3      THE COURT:  Object louder so I can hear you.

4      Sustained.

5      Next question.

6   Q    You were telling the jury your truth is what you said

7   earlier?

8      MR. NARDOZZI:  Objection.

9      THE COURT:  Sustained.

10     MR. BALAREZO:  I heard that, your Honor.

11  Q    Now, do you recall this meeting on March 5th of actually

12  2018 less than a year ago when you were being prepared for

13  trial.  The prosecution met with you and you guys discussed

14  this particular incident?

15  A    Yes.

16  Q    Now, and you gave as much detail, obviously, as you gave

17  the jury because it's the truth; right?

18  A    Yes.

19  Q    And do you recall telling the Government or agents,

20  whoever was present then, that you were not present during

21  that interrogation?

22  A    I always said that and I've always been saying that, yes.

23     THE COURT:  Mr. Balarezo, we need to take a

24  convenience break for the jury.

25     MR. BALAREZO:  I don't want to come between the jury

1    and a convenience break, your Honor.

2         THE COURT:  Why don't we do that as lunch, ladies

3    and gentlemen.  Come back, please, at 1:35.  Please don't talk

4    about the case.

5         (Jury exits courtroom at 12:45 p.m.)

6         THE COURT:  All right.  The marshals can take the

7    witness out.  Everyone else be seated, we're going to remain

8    in session for just a minute.

9         (Witness takes the witness stand.)

10        THE COURT:  Mr. Balarezo, give me a non-binding

11   good-faith estimate.

12        MR. BALAREZO:  Your Honor, maybe half hour.

13        THE COURT:  Okay.

14        MR. BALAREZO:  Plus or minus, but I am almost done.

15        THE COURT:  Okay.  We do have to pick this up.

16        Now, I'm not entirely blaming because I understand,

17   as I said on Thursday, we've got a very loquacious witness

18   here.

19        On the other hand, a lot of your questions to which

20   I'm not getting any objections were somewhat argumentative.

21   So I think both sides have to try to expedite this just a

22   little bit.  That's the first thing I wanted to tell you.

23        The second thing is I don't know if you've seen it

24   yet, I entered an order on the most recent motion in limine.

25   I'm giving the defendants, the defendant a very limited

1    license to inquire into a couple of areas.  And because it's

2    just a couple, and it's limited, the parties may want to read

3    that order and consider it during lunch whether we can obviate

4    the need for testimony with a stipulation now that the issue

5    has been joined and decided.

6             MR. LICHTMAN:  Two issues, Judge.

7             THE COURT:  Okay.

8             MR. LICHTMAN:  One, I don't know that I fully

9    understood your ruling regarding the stash house issue.  The

10   point that I was trying to make was that when Mr. Cifuentes

11   told the agent during the debriefing that he visited the stash

12   house, that it contained all of this money that supposedly

13   Mr. Guzman had, and yet, when he testified on the stand that

14   he had never been there that it was false.  I'd like to be

15   able to argue with the jury that, of course, he visited it and

16   he gave that information to the Government who then would have

17   looked for the money in the stash houses.

18            THE COURT:  And what does that relate to other than

19   a purely inconsistent statement from the witness?  How does

20   that go to his bias motive to lie?  How does it go to the

21   charges?

22            MR. LICHTMAN:  Judge, because he could be covering

23   up for the Government who failed to look into those stash

24   houses and find the huge amounts money that he then testifies

25   later the man has a $20 million debt.  It's a huge part of

1    that, of not just the inconsistency but the wealth of

2    Mr. Guzman and that's part CCE charge.

3          THE COURT:  What's the Government's reading of my

4    order.

5          MR. FELS:  Your Honor, we agree absolutely with the

6    Court's order.  We don't think, as we said in our papers, if

7    anything, it suggests he had greater information in the

8    debriefs than he did as he testified.  It doesn't help him in

9    any way.  We agree with your Honor's order, it's purely a

10   collateral matter.

11         THE COURT:  Because of the lack of detail,

12   Mr. Lichtman -- first of all, I don't think the ruling is

13   unclear, I don't think you like to.

14        I think it's pretty clear.  I think it's much too

15   attenuated and Rule 403 says we can't spend any more time

16   asking an agent what he said on some session date for which

17   there's a note which may or may not be accurate.  It's just

18   not worth the additional on the case to trouble the jury with

19   that.

20        MR. LICHTMAN:  Judge, the second question I had, and

21   this is unrelated to our prior submission, is that

22   Mr. Cifuentes testified that during the war with the Beltran

23   Leyvas that Mr. Guzman was paying the Mexican military,

24   basically, to help him fight the war.  You recall that

25   testimony.

1          When I asked him if, in fact, the Beltran Leyvas

2     were paying the president of Mexico at the time which was

3     President Calderone, he didn't say no.  He said, I don't

4     particularly remember that well.  In his debriefing, he said

5     Mr. Guzman was paying the military to help find the Beltran

6     Leyvas, they would then initiate a war for -- you're already

7     shaking your head no.

8          THE COURT:  I'm shaking my head no because I haven't

9     seen the §3500 report, so I don't know exactly what he said.

10    But his testimony is he doesn't remember whether he said that

11    or not.

12         MR. LICHTMAN:  But he did tell the agent during a

13    debriefing that President Calderone was bribed by the Beltran

14    Leyvas to help him kill Mr. Guzman.  Maybe's --

15         THE COURT:  And what you can do is you can refresh

16    him and say, Does this note fix your recollection of that?

17         MR. LICHTMAN:  He said no.

18         THE COURT:  And he said no.  And that's the way it

19    is.

20         MR. LICHTMAN:  But that's why I'd like the agent to

21    come on the stand.

22         THE COURT:  Sure.  It's a collaterally detail it is

23    not -- tell me how it relates to this witness bias.

24              (Continued on the next page.)

25

1          MR. LICHTMAN:  Because he's trying to protect, for

2    some reason he didn't have a clear recollection with regard

3    to the payment of money, the bribe to President Nieto, it

4    took literally drilling teeth to get him to admit that

5    President Nieto was -- that he initially told agents the

6    amount of money that President Nieto was supposedly bribed,

7    and now the only other part that he doesn't remember from the

8    entire testimony regarding the bribery of Calderone, is the

9    fact that Calderone was bribed.  He had no problem

10   recollecting the fact that Mr. Guzman paid off the Mexican

11   military, but suddenly he had a lack of recollection

12   regarding the bribery of President Calderone, that's

13   directly --

14          THE COURT:  And that means --

15          MR. LICHTMAN:  -- related to his bias and motive

16   to protect this government that's been trying to protect the

17   Mexican government since day one.

18          THE COURT:  So we have the witness first trying to

19   protect the United States Government and they're doing that

20   because they are trying to protect -- the

21   United States Government is trying to protect the Mexican

22   government.

23          MR. LICHTMAN:  Absolutely.

24          THE COURT:  I don't think any of that matters, I

25   got to tell you.  I just don't.

1      MR. LICHTMAN:  That's my argument, I have to put

2  it on the record.

3      THE COURT:  Okay.  Anything else we need to talk

4  about?

5          Anything else the Government needs to say on

6  that point, since the Government didn't say anything?

7      MS. PARLOVECCHIO:  No, Your Honor.

8      THE COURT:  Let's resume at 1:35.  See you then.

9      MR. PURPURA:  Judge.

10     THE COURT:  Yes.

11     MR. PURPURA:  I apologize.

12     THE COURT:  That's all right.

13     MR. PURPURA:  There has to come to a time, and I'm

14  not sure how you proceed in this matter, to advise Senior

15  Guzman of his right to testify or remain silent.

16     THE COURT:  Yes.  Here's what happens.  When the

17  Government rests, which hopefully will be soon, I send the

18  jury out, I take any motions that there are, then I'll

19  inquire of the defense as to what case they want to put on.

20  The defense will let me know whether the defendant wishes to

21  testify or not.  If the defense advises me that the

22  defendant is not going to testify, I'll have a brief

23  dialogue with the defendant to ensure that he's discussed

24  that thoroughly with his attorneys and he understands that

25  it's his decision, not anybody else's, as to whether he

1    wants to testify.  That's when I'll do that.

2              MR. PURPURA:  Thank you.

3              THE COURT:  Okay.  See you after lunch.

4              MR. LICHTMAN:  Thank you.

5              (Luncheon recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        A F T E R N O O N   S E S S I O N

2

3                        (1:45 p.m.)

4              THE COURTROOM DEPUTY:  All rise.

5              THE COURT:  Please bring in the jury.

6              (Jury enters courtroom.)

7              THE COURT:  Everyone be seated please.

8                    Continue, Mr. Balarezo.

9         MR. LICHTMAN:

10        MR. BALAREZO:  Thank you, Your Honor.

11   CROSS-EXAMINATION(Continued)

12   BY MR. BALAREZO:

13   Q    Mr. Valdez, before the break we were talking about one

14   of these incidents where you claimed that Chapo was beating

15   people and shooting them eventually.

16                    Do you remember that, that incident with the

17   two Zetas?

18   A    Yes.

19   Q    And when you testified here you agreed that you've been

20   telling the truth, right, about all these incidents,

21   correct?

22   A    Yes.

23   Q    And of course that's -- you took the oath and you

24   understand what the truth is, right?

25   A    Yes.

1   Q    I mean, it doesn't change from one meeting with the

2   Government to the one time you told the Government -- I

3   mean, the jury, right?

4   A    No.

5   Q    So, for example, when you -- on Thursday you testified

6   to this jury, while under oath you testified to them when

7   you were discussing the Zetas and how they were brought

8   closer to the bonfire, page 6212 at line 16.  You were asked

9   what happened next and you said:  So when the other ones of

10  us from the security circle that were there, they picked

11  them up, they threw them off the ATVs, then Mr. Joaquin got

12  off his ATV and he put a bullet in the chamber of this

13  rifle, the AR15 or M16 that he had, the Zetas were seeing

14  the bonfire.

15            And then you continued.

16  A    Yes.

17  Q    They were seeing the bonfire in their faces, they were

18  scared.  Go ahead.  Mr. Joaquin did not say much.  He just

19  came up with the rifle to the head of one of them and said:

20  Fuck your mother, boom, shot him.

21            Do you remember that?

22  A    Yes.

23  Q    And then he did the same thing to the other one, shot

24  him in the head and the same thing, fuck your mother, put

25  him in the bonfire.

1         Do you remember saying that to this jury?

2   A    Yes.

3   Q    So when you're telling this jury on Thursday under

4   oath, when you're telling them fuck your mother once, fuck

5   your mother again, that's the truth, right?

6   A    Yes, "a chingar a su madre."

7   Q    That's correct, right?

8   A    Yes.

9   Q    But now when you've met with the Government previously,

10  you were also telling them the truth, right?

11  A    Yes.

12  Q    I mean, the truth that you told the Government is not

13  different from the truth you're telling the jury, right?

14        THE COURT:  Mr. Balarezo, we got that already.  He

15  said that already when we started the examination.  When you

16  started the examination you got him to say the truth doesn't

17  change, so we've got that.  Go on to something else.

18        MR. BALAREZO:  Thank you, Your Honor, I'll move

19  on.

20  Q    So on March 5th, 2018, when you met with the

21  Government, you were discussing this particular incident

22  with them about the two Zetas, correct?

23  A    I don't know the date, I'm not very good with dates, I

24  always say around this time.  I did have a lot of meetings

25  with them, yes.

1   Q    Right.  My question is, do you recall during one of

2   those meetings with the Government when you were telling

3   them the truth, that you were talking about this incident

4   with the Zetas?  Yes or no.

5   A    Yes, in one of many meetings and not just in one, in

6   many.

7   Q    And do you recall that at that point when you were

8   telling the Government the truth during your meeting, that

9   you told them that Chapo had said throw them into the fire.

10           Do you remember telling them that?  Yes or no.

11  A    Yes, that's what they said to throw them into the fire,

12  that's what he said.

13  Q    But you never told this government that little detail,

14  fuck your mother, did you?

15  A    I always told them.

16  Q    Well, do you recall at that particular meeting telling

17  them that?  Yes or no.

18  A    Yes, I've always told them that.

19           MR. BALAREZO:  Let me show you Defense

20  Exhibit 505.

21           MR. NARDOZZI:  Objection.

22           THE COURT:  Sustained.

23  BY MR. BALAREZO:

24  Q    What did you tell them at that meeting, sir?  Did you

25  tell them exactly what you told this jury?

1    A    The Government always asked me for details, yes, right.

2    The Government was always asking me to tell them details and

3    if I didn't remember a specific detail, then during the time

4    that I wasn't meeting with them, when I was in jail I would

5    sit around and think about things and remember things and

6    correct any details that I would remember about the things

7    the Government had asked me.

8    Q    So like you said earlier, though, at times you told the

9    Government your version of the truth but then when you told

10   the jury it's a little bit different, correct?

11            MR. NARDOZZI:  Objection to the characterization.

12            THE COURT:  Sustained.

13   BY MR. BALAREZO:

14   Q    You told the Government some bits of information

15   previously that when you recounted them to the jury was

16   different, correct?

17   A    I've always been telling them what I've lived through,

18   what I lived through with Mr. Joaquin.  If it is one more

19   word or one fewer word that does not alter the fact that Don

20   Joaquin did that.

21   Q    Or it also could be that you're just making it up as

22   you go along, right?

23            MR. NARDOZZI:  Objection.

24            THE COURT:  Sustained.

25   Q    Let me asking you this:  This beating of the Zetas and

1  this throwing them into the fire, you were there for that,
2  right?
3  A    Yes.
4  Q    I mean, you saw with your own eyes when they're being
5  interrogated, correct?
6  A    I repeat again, that I wasn't exactly in the same area
7  when they were being beat.  I just came closer at the moment
8  when Mr. Bravo, Mr. Joaquin's compadre called me over to
9  make a big hole and that's when I was able to see that he
10  was beating them with the log and then let it go and was
11  even beating them with his weapon.
12  Q    Right.  But the point is -- sir, there's no question
13  pending.
14          The point is when you talked to this jury on
15  Friday and you gave those stories, you didn't make these
16  qualifications about your testimony, right?
17          MR. NARDOZZI:  Objection.
18          THE COURT:  Sustained.
19  Q    You didn't tell the jury I was standing far away, I
20  only came for a moment and saw him.  You told him I saw him
21  beating them for three hours with this tree branch.
22  A    I did say that.  I did say that I only came closer when
23  Bravo called out to me so I would go and he gave me the
24  order to dig the hole.
25  Q    Let me ask you now, were you present during the

1  interrogation of the two Zetas?  Yes or no.

2  A    I cannot answer that question with yes or no.

3  Q    Either you were or you weren't?

4          MR. NARDOZZI:  Objection.

5          THE COURT:  Overruled.

6  A    I cannot answer that question with yes or no.

7  Q    Do you recall -- do you recall previously meeting with

8  government agents and prosecutors and telling them that you

9  were not present during the interrogation?

10         MR. NARDOZZI:  Objection.  Asked and answered

11 earlier.

12         THE COURT:  If it was, I don't recall it.  I'll

13 allow him to answer.

14 Q    Do you recall that?  Yes or no.

15 A    Yes.

16 Q    So at some point previously when you met with the

17 Government you told them, the Government, these prosecutors

18 and agents, that you were not present during the

19 interrogation, right?

20 A    Physically, oh, it's the same, I just can't answer that

21 question like that.  I can't answer yes or no.

22 Q    This whole story that you gave Thursday about the bones

23 being ground so that there's nothing left, you never told

24 the Government about the bones being ground before, did you?

25 A    With all my respect, yes, I did say that.

1  Q    How were the bones ground, did you see bones being

2  ground?

3  A    That is what the guys came to tell me, the guys who had

4  stayed burning the bodies, they said they had ground up the

5  bones.

6  Q    Right.  And when you met with the Government you gave

7  them all the information you had, right?

8  A    Well, I'm telling you again, at the beginning no, but

9  gradually little by little I was saying more things as I

10  remembered things.

11  Q    Right.  Or as you were using the Internet to look

12  things up?

13          MR. NARDOZZI:  Objection.

14          THE COURT:  Sustained.

15  Q    Or as you were talking to other people to try to get

16  information?

17          MR. NARDOZZI:  Objection.

18          THE COURT:  Sustained.

19  Q    You weren't wholly truthful, were you?

20          MR. NARDOZZI:  Objection.

21          THE COURT:  Sustained.

22  Q    Now let me ask you this, whatever information you gave

23  to the Government, at some point you gave the Government the

24  best, most truthful information you had, right?

25  A    Yes.  And as time went on, as time kept passing by I

1    was clearing up the details.

2    Q    And, for example, with the Arellano Felix guy that was

3    killed and buried, as time went on you gave them your best

4    recollection of that event, right?

5    A    That's right.

6    Q    You told the Government where it happened, correct?

7    A    Yes.

8    Q    'Cause you had told them where is that camp that Chapo

9    had up in the mountains, right?

10   A    Yes, because I was there.

11   Q    Right.  And you gave them everything possible that you

12   could so they could perhaps go find one of these graves,

13   correct?

14            MR. NARDOZZI:  Objection.

15            THE COURT:  Sustained.

16   Q    Well, in all the times that you've met with the

17   Government have you seen any evidence, besides your

18   testimony, of any of these deaths, have you seen a picture?

19   A    The proof is me.

20   Q    I know, I know, but my question is, did you see

21   anything besides your proof, besides your words?

22   A    That the Government showed to me, no.

23   Q    Have you seen a body?

24   A    I saw the bodies when I was up there in the sierra with

25   Chapo.

1  Q    Can this jury see a body besides your words?

2         MR. NARDOZZI:  Objection.

3         THE COURT:  Sustained.

4  Q    Have you seen a picture of the bodies?

5  A    No, but I did see the bodies.

6  Q    Do you know who the dead people are?

7  A    They were Zetas and people who worked with the Arellano

8  Felix cartel.

9  Q    Have you seen a death certificate of these dead people?

10 A    There wouldn't be one.

11 Q    Have you seen like one of these little Google Earth

12 pictures, you know showing where it all happened?

13 A    Yes.

14 Q    They showed you where the graves were?

15 A    No, I showed them, not the graves, but the location.

16 Q    Did they show you that picture while you testified on

17 direct of the location where this happened?

18 A    I didn't understand the question, can you repeat it,

19 please.

20 Q    During your direct examination, did the Government show

21 you a picture that you're talking about that you showed to

22 them?

23 A    No.

24 Q    So what you said is the evidence that this jury has is

25 you, right?

1  A    I'm just saying what I lived through with Mr. Guzman in

2  the mountains.

3  Q    Answer my questions.

4  A    I am only saying what I lived with Mr. Guzman in the

5  mountains.

6           MR. NARDOZZI:  Objection.

7  Q    Answer my question.

8           THE COURT:  He hasn't gotten an answer and if the

9  question was objectionable it should have been objected to

10 three times ago.

11 BY MR. BALAREZO:

12 Q    Besides your testimony on the stand, does this jury

13 have any other evidence that any of these violent acts,

14 murders, burnings, burials happened?

15          MR. NARDOZZI:  Objection.

16          THE COURT:  Overruled.

17 A    Only what I told about.

18 Q    Right.  And you're testifying here because you want to

19 get out of prison, correct?

20 A    Of course.

21          MR. BALAREZO:  I have nothing further, Your Honor.

22          THE COURT:  Redirect.

23          MR. NARDOZZI:  Thank you, Your Honor.

24             *** VALDEZ RIOS - REDIRECT - NARDOZZI

25             REDIRECT EXAMINATION

1    BY MR. NARDOZZI:

2    Q    Mr. Valdez --

3              THE COURT:  Come get a lapel mic.

4    Q    Mr. Valdez, Mr. Balarezo asked you some questions about

5    the killing of the two Zetas that you testified to on

6    Thursday, do you recall that?

7    A    Yes.

8    Q    While the defendant was beating and interrogating those

9    Zetas, were there portions of that that you were not present

10   for?

11   A    That's right, I wasn't present.  Just on that one

12   occasion.

13   Q    So, similarly, were there portions that you were

14   present for?

15   A    That's right.

16   Q    After the two Zetas were shot and thrown into the fire,

17   did anyone come up to the mountains to perform an autopsy on

18   their remains?

19   A    No, of course not.

20   Q    Mr. Balarezo started your cross-examination by asking

21   you some questions about the indictment against you, do you

22   remember that?

23   A    That's right.

24   Q    Have you personally ever prepared an indictment?

25   A    Of course not.

1  Q    Do you know what information appropriately appears in

2  an indictment?

3  A    No.

4  Q    Do you have any insight into the charging decisions

5  made by the United States Government?

6  A    Of course not, because I'm not American.

7  Q    Mr. Balarezo also asked you some questions about

8  someone named Juancho or Virgo.  Do you remember that?

9  A    Of course, yes.

10 Q    During the time period that you were a secretary for

11 the defendant, is that when you would contact Juancho to

12 contact Mayo?

13 A    Yes.

14 Q    And what time frame was that, just remind us.

15 A    That was around 2006, 2007 approximately.

16 Q    And while you were close with the defendant, was there

17 ever a time that the defendant had an in-depth discussion

18 with you about his personal finances or the profits of the

19 cartel?

20 A    No.

21 Q    Mr. Balarezo asked you some questions about you being

22 placed in a hotel when you were first brought to the

23 United States.  Do you remember that?

24 A    Yes, of course, yes.

25 Q    What were you doing in that hotel when you were first

1   brought to the United States?

2   A    I was fixed in that location there and I was answering

3   questions from the Government, the United States Government.

4   Q    And your use of telephones and computers during that

5   time period, was that monitored by U.S. law enforcement

6   agents?

7   A    Yes, that's right.

8   Q    Finally, Mr. Balarezo asked you some questions about

9   the Dedo that you went to go and abduct, do you remember

10  that?

11  A    Yes, sir.

12  Q    You started to answer one of his questions about saying

13  that Roke was a person, but then you were stopped.  Who is

14  Roke?

15  A    Okay, last time during the interrogation last week I

16  did mention a person named Roke, but I was given that name

17  as an example of when Chapo Guzman would ask to speak over

18  the Senaos.  And when I said that was when I said if Chapo

19  Guzman wanted to speak on a phone or on a cell phone, he

20  would say, okay, pass me that one, that one that Roke has.

21  Q    When you were answering Mr. Balarezo's questions you

22  said that the person that was in the house with you was

23  someone named El Bocho I think; is that correct?

24  A    Bocho.

25  Q    Who is Bocho?

1   A   That Bocho is a hitman, a gunslinger who used to go

2   around with us in Sinaloa, in the City in Culiacan.

3   Q   So in between Thursday when you testified and today

4   here in court, did you have an opportunity to review the

5   trial transcript of your testimony and send any corrections

6   to the court reporter?

7   A   Of course not.

8          MR. NARDOZZI:  I've got nothing further, Your

9   Honor.  Thank you.

10          *** VALDEZ - RECROSS - BALAREZO

11          RECROSS EXAMINATION

12  BY MR. BALAREZO:

13  Q   Sir, just two questions that Mr. Nardozzi asked you.

14  One was when you were at the hotel looking up things on the

15  Internet and he asked you was that monitored by somebody,

16  yes or no, did he ask you that and what did you say?

17  A   Yes.

18  Q   Well, was there an agent looking over your shoulder

19  every time you were on the Internet?

20  A   Yes.

21  Q   Now when I asked you those questions why didn't you

22  tell the jury that?  You have a habit of talking a lot, why

23  didn't you just say it?

24          MR. NARDOZZI:  Objection.

25  A   You didn't ask me if someone was monitoring me or if

1   there was an agent looking over my shoulder monitoring me,

2   you just asked me I had phones, TV, computers.

3   Q    And you didn't think it was important to bring that up

4   when I'm asking you if you could look up things on the

5   Internet?

6             MR. NARDOZZI:  Objection.

7             THE COURT:  Sustained.

8   Q    Let me ask you this, Mr. Nardozzi, right here, asked

9   you a question about whether or not you're familiar with the

10  Government's charging decisions.  Do you remember that one?

11  A    Yes.

12  Q    Right.  So they've -- at least to your knowledge, they

13  decided what goes in the indictment right?  Right?

14  A    It's just they are the ones who know not me.

15  Q    They are the ones that decide what goes into your

16  statement of facts, correct?

17  A    Could you repeat that question again for me, please, I

18  didn't understand it.

19  Q    That's all right.

20             The point is, Chapo Guzman's name is not in

21  your indictment that I showed you, correct?

22             Did you understand that question?

23  A    Yes.

24  Q    And your answer is?

25  A    No, it doesn't appear.

1          MR. BALAREZO:  That's all, Your Honor.  Thank you.

2          THE COURT:  All right.  Ladies and gentlemen, give

3     us a minute, if you'll just line up in the hall and we'll

4     get things ready for you for the next witness.

5          (Jury exits courtroom.)

6          THE COURT:  All right.  Everyone be seated.

7     Marshals can take the witness out.

8          (Witness excused.)

9          THE COURT:  What's the Government going to do

10    next?

11         MS. PARLOVECCHIO:  Your Honor, the Government has

12    a list of exhibits to read into the record which I

13    understand defense does not object to and then we have two

14    more law enforcements witnesses and that is it.

15         THE COURT:  Short?

16         MS. PARLOVECCHIO:  Yes.

17         THE COURT:  Okay.  Let's have the jury back in.

18              Let's have a seat.

19         (Jury enters courtroom.)

20         THE COURT:  All right, everyone be seated.

21              The Government may proceed.

22         MS. PARLOVECCHIO:  Thank you, Your Honor, before

23    we call our next witness the Government would like to move

24    to admit several exhibits that did not make it into the

25    record over the course of trial.

1    THE COURT:  Okay.  Have you reviewed these with

2 defendant?

3    MS. PARLOVECCHIO:  Yes, Your Honor, my

4 understanding is they have no objection.

5    THE COURT:  Just read the numbers.

6    MS. PARLOVECCHIO:  Thank you, Your Honor.

7         The Government moves to admit Government's

8 Exhibit 76, 79, 211, 203-29.  Government's Exhibit 210-3 and

9 500C, as in cat.  The Government also moves to admit

10 Government Exhibit 203-21-A to 203-21C as in cat.

11 Government's Exhibit 506-20, 204-4, 207-10, 401-2 to

12 401-10B, as in boy.  Government's Exhibit 205-18, 301-AT and

13 301B, as in boy, T.  Government's Exhibits 203-3, 203-6,

14 206-7, 203-14, 203-16.  Government's Exhibits 58, 205-30,

15 60, 609A-3, 217-17 to 217-18, and

16 Government Exhibit 511-6-A.

17    THE COURT:  That's it.

18    MS. PARLOVECCHIO:  Yes.

19    THE COURT:  All right.  Those are received.

20    (Government's Exhibits 76, 79, 211, 203-29, 210-3,

21 500C, 203-21-A to 203-21C, 506-20, 204-4, 207-10, 401-2 to

22 401-10B, 205-18, 301-AT and 301B, 203-3, 203-6, 206-7,

23 203-14, 203-16, 58, 205-30, 60, 609A-3, 217-17, 217-18,

24 511-6-A were received in evidence as of this date.)

25    THE COURT:  The Government's next witness.

 1          MR. ROBOTTI:  Your Honor, the Government calls
 2   James Bradley.
 3          THE COURTROOM DEPUTY:  Come forward, sir.  Please
 4   raise your right hand.
 5          (Witness sworn.)
 6          THE WITNESS:  I do.
 7   JAMES S. BRADLEY, called as a witness, having been first
 8   duly sworn/affirmed, was examined and testified as follows:
 9          THE COURTROOM DEPUTY:  Please state and spell your
10   name for the record.
11          THE WITNESS:  James Stephan Bradley.  J-A-M-E-S
12   S-T-E-P-H-A-N B-R-A-D-L-E-Y.
13          THE COURTROOM DEPUTY:  You may be seated.
14          THE COURT:  You may inquire.
15          MR. ROBOTTI:  Thank you, Judge.
16   DIRECT EXAMINATION
17   BY MR. ROBOTTI:
18   Q    Good afternoon.
19   A    Good afternoon.
20   Q    Are you employed?
21   A    Yes, I am.
22   Q    And by whom are you employed?
23   A    Department of Defense.
24   Q    Where are you currently stationed?
25   A    Fort Bullis, Texas.

1   Q    To what command are you assigned?

2   A    Joint Task Force North.

3   Q    What's the Joint Task Force North?

4   A    Joint Task Force North provides support to federal law

5   enforcement agencies, duty support.

6   Q    What's your position there?

7   A    I'm an analyst.

8   Q    What are your duties and responsibilities as an analyst

9   with the Joint Task Force North?

10  A    I study the drug threat emanating from Mexico.

11  Q    How long have you worked at Joint Task Force North?

12  A    Twenty-one years.

13  Q    And in August of 2015, were you detailed from Joint

14  Task Force North to somewhere else?

15  A    Yes, I was.

16  Q    And where were you detailed?

17  A    I was detailed to Mexico City to go to look at an

18  escape tunnel in Altiplano Prison.

19  Q    Are you familiar with something called El Paso

20  Intelligence Center?

21  A    Yes, I am.

22  Q    What is that?

23  A    I was detailed to the El Paso Intelligence Center for

24  approximately five years.

25  Q    Were you there during August 2015?

1    A    Yes, I was.

2    Q    And that's in El Paso, Texas, correct?

3    A    That's correct.

4    Q    What is the El Paso Intelligence Center or EPIC do?

5    A    That provides law enforcement support to state, federal

6    local law enforcement agencies.

7    Q    And what were you your duties and responsibilities

8    while you were detailed at EPIC?

9    A    I was a writer of intelligence products on Mexico.

10   Q    Now you mentioned that you went to Mexico City in

11   August of 2015; is that correct?

12   A    That's correct.

13   Q    Let me direct your attention to August 21st, 2015, were

14   you in Mexico City then?

15   A    Yes, I was.

16   Q    And what, if anything, did you do that day?

17   A    I went to Altiplano Prison and the residence where an

18   escape tunnel was present.

19   Q    And what was the purpose of your trip to that escape

20   tunnel?

21   A    To assist federal, Mexican federal authorities and U.S.

22   authorities in understanding what had occurred at the

23   prison.

24   Q    And did you in fact tour the tunnel that day?

25   A    Yes, I did.

1    Q    And who went to the tunnel with you?

2    A    There are members of the Mexican Federal Police as well

3    as the embassy staff.

4    Q    I'd like show you what's in evidence as

5    Government Exhibit 502.

6                   Just zooming in here, could you show us about

7    where Altiplano Prison is on this map?

8    A    It's about 35 miles to the west of Mexico City.

9    Q    And is that near Toluca?

10   A    Yes, it is.

11   Q    I'd like to show you for identification what's been

12   marked as Government Exhibit 220-2.  And do you recognize

13   this?

14   A    Yes, I did.

15               MR. ROBOTTI:  I believe this is coming in without

16   objection.

17               THE COURT:  All right, received.

18               (Government's Exhibit 220-2 was received in

19   evidence as of this date.)

20   BY MR. ROBOTTI:

21   Q    So looking at Government Exhibit 220-2, in general what

22   is this?

23   A    This is a representation of the escape tunnel

24   originating from the residence to Altiplano Prison.

25   Q    Let me direct your attention to the structure in the

1  top center here with the red dot, what's that?

2  A    That is Altiplano Prison.

3  Q    And what's this red line running from the top to the

4  bottom here?

5  A    This red line is a distance, approximate distance of

6  the length of the tunnel from the prison to a residence to

7  the southwest.

8  Q    Is this the residence at the bottom left with the red

9  dot you're speaking about?

10  A    That is correct.

11  Q    Was a tunnel a straight line?

12  A    No, it was not.

13  Q    So does this map show the actual path of the tunnel or

14  the general direction?

15  A    The general direction.

16  Q    Now what on this map did you tour?

17  A    I toured both ends of the tunnel starting with the

18  residence first, then proceeding to the cell block and into

19  the access within the cell block at the prison.

20  Q    How far inside the tunnel did you go?

21  A    On the residence side, about 300 feet.

22  Q    So there's an indication here that the tunnel is

23  4600 feet, is that just short of a mile?

24  A    Yes, it is.

25  Q    Did you take photos during your tour of these two

1    facilities and the tunnel?

2    A    Yes, I did.

3    Q    All right.  So I'm going to show you what I believe is

4    coming in without objection, Government's Exhibit 220-3 to

5    220-6, 220-8 to 220-11, 220-14, 220-16 to 220-18, 220-21,

6    220-25 to 26, 220-29, 220-30, 220-34 to 37, 220-40, 220-42

7    and 220-43.

8              MR. PURPURA:  No objection.

9              THE COURT:  Received.

10             (Government's Exhibits 220-3 to 220-6, 220-8 to

11   220-11, 220-14, 220-16 to 220-18, 220-21, 220-25 to 26,

12   220-29, 220-30, 220-34 to 37, 220-40, 220-42 and 220-43 were

13   received in evidence as of this date.)

14   BY MR. ROBOTTI:

15   Q    So let's start with Government Exhibit 220-3.  What are

16   we looking at here?

17   A    This is the overall view of the residence from the

18   western perimeter of the location of the residence and work

19   area.

20   Q    So when you're saying the residence, we're talking

21   about this structure at the bottom left of this map, 220-2,

22   right?

23   A    That is correct.  It's on the west side, which is right

24   here. (Indicating).

25   Q    All right.  Looking at Government Exhibit 220-4, what

1  do we see here?

2  A    This is looking due north towards Altiplano Prison,

3  which is right here. (Indicating).

4  Q    That's the structure, for the record, on the center

5  left of the map; is that correct?

6  A    That is correct.

7  Q    Looking at Government's Exhibit 220-5, what do we see

8  here?

9  A    This is a work area, which is attached to the residence

10  at the point of origin in the tunnel.

11  Q    And 220-6, what do we see here?

12  A    This is the driveway leading up to the residence.  The

13  residence is in front and then the work area is off to the

14  left.

15  Q    Looking at 220-8, what's this?

16  A    This is a clear shot of the work area which will house,

17  as we see shortly, a generator, an underground room and

18  other equipment associated with the tunnel.  Off to the left

19  there is a what appears to be a barbecue pit.

20  Q    What, if anything, did you notice about that barbecue

21  pit?

22  A    That it did not -- that there was exhaust fumes --

23  exhaust carbon from a generator that we'll see underground

24  here shortly.

25  Q    And so this barbecue pit was disguising this exhaust

1  exit?

2  A    That is correct.

3  Q    What did the diesel generator inside this building

4  power?

5  A    The diesel generator powered the lights, electric

6  tools, and the ventilation system to blow forced air into

7  the tunnel.

8  Q    Looking at Government Exhibit 220-9, what do we see

9  here?

10  A    These are cots.

11  Q    These are inside the residence?

12  A    No, these are in the work space.

13  Q    And 220-10.

14  A    This is part of the residence, the kitchen.

15  Q    Moving on to 220-11.  Now there appear to be two

16  different holes in the floor here.  Let's talk about the

17  hole in the front first, what's that?

18  A    The hole in the front is induction for the generator

19  providing air into the space where the generator was

20  positioned.

21  Q    What do you mean by induction?

22  A    This was providing air to feed the generator.

23  Q    And what's the hole in the back there?

24  A    The hole in the back is for access for personnel, and

25  it provided access to an underground room, which this

1  gentleman is standing over.

2  Q    Looking at 220-14, what's that?

3  A    This is a closer picture of the man pass hole portion

4  accessing into the underground room and it's about

5  eight feet deep once you go down the ladder.

6  Q    220-16, what's this?

7  A    This is inside the underground room here.  We can see

8  some five-gallon pails and some spoil or dirt probably from

9  the tunnel.

10  Q    Is this the room right below the floor that you were

11  just looking at?

12  A    That is correct.

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION

2  BY MR. ROBOTTI: (Continued.)

3  Q    220-17?

4  A    This is the generator that I spoke about earlier, and

5  this is almost directly under where that small square hole was

6  in the previous picture.

7  Q    And this was connected to the exhaust exit disguised as

8  the grille, right?

9  A    That's correct.

10 Q    Looking at 228-26, what do we see here?

11 A    This is a blower motor that would -- that is connected to

12 the PVC privacy hatch right here, but that fed the air into

13 the PVC pipe, which we will see shortly, which fed forced air

14 into the tunnel.

15 Q    And was this on or off when you arrived?

16 A    This was off when we arrived.

17 Q    Okay.  Did you turn it on to go into the tunnel?

18 A    That is correct.

19 Q    All right.  Looking at 220-25, what do we see here?

20      (The above-referred to exhibit was published.)

21 A    This is a winch that is positioned over the vertical

22 shaft, which is directly below it, and is used to move

23 materials up and down through the tunnel.

24 Q    And looking next at 220-18, what is this?

25      (The above-referred to exhibit was published.)

1  A     This is looking down the vertical shaft directly below

2  the winch down into the -- to provide access to the horizontal

3  shaft.

4  Q     Okay.  So this goes down into the tunnel?

5  A     That is correct.

6  Q     How far is this drop?

7  A     Approximately 35 feet.

8  Q     Looking at Government's Exhibit 220-20, what do we see

9  here?

10             (The above-referred to exhibit was published.)

11 A     This is the bottom of the vertical shaft.  We can see the

12 PVC pipe, which we also saw in the previous picture, which

13 provides the forced air to the tunnel.

14 Q     Okay.  And the PVC pipe is in the top right corner; is

15 that correct?

16 A     That is correct.

17 Q     Next, turning to 220-30.

18             (The above-referred to exhibit was published.)

19 A     This is a widened area along the tunnel.  This is the

20 actual tunnel right here to the left.  You can see some steel

21 rails, and within the widened-out area, there was tool marks

22 from powered equipment -- tools.

23 Q     And are these the tools to build the tunnel?

24 A     That's correct.

25 Q     Looking at 220-21, what do we see in this photo?

1    (The above-referred to exhibit was published.)

2  A    This is looking down the tunnel from the vertical shaft.

3  You can see steel rails here at the bottom.  We have powered

4  lights here.  Up in the upper left is cabling and also the PVC

5  pipe that provides forced air.

6  Q    And how tall and wide is this tunnel?

7  A    The width was approximately 3 feet, and the height was

8  approximately 5 feet.

9  Q    And you mentioned that there's some cabling in the top

10  left there.  What did that do?

11  A    The cabling provided power to the lights and also for

12  tools along the tunnel and towards the end.

13  Q    And these tracks here along the bottom that you

14  highlighted, what were those for?

15  A    Those were used to support a cart that enabled the

16  movement of tools and equipment through the tunnel.

17  Q    Looking at Government's Exhibit 220-29, what's this?

18    (The above-referred to exhibit was published.)

19  A    This is a cart that runs on the rails that's used to move

20  materials through the tunnel.

21  Q    And 220-34, what do we see here?

22    (The above-referred to exhibit was published.)

23  A    This is a federal police officer that's looking at the

24  PVC pipe which is used to provide forced air.  Also, we can

25  see some cabling here to the upper right as well, as well as a

1   illuminated light which ran the length of the tunnel.

2   Q    All right.  Is this as far as you went in the tunnel?

3   A    That is correct.

4   Q    Where did you go after that?

5   A    We returned to the vertical shaft and climbed up and out.

6   Q    And what happened next?

7   A    Once we were -- concluded our visit to the residence, we

8   headed towards the prison to look at the access point within

9   the prison cell.

10  Q    And did you, in fact, tour that access point?

11  A    Yes, I did.

12  Q    I would like to show you Government's Exhibit 220-35 in

13  evidence.  What's this?

14       (The above-referred to exhibit was published.)

15  A    The cellblock 20 which housed the access to the escape

16  tunnel.

17  Q    All right.  Looking at 220-36.  What do we see here?

18       (The above-referred to exhibit was published.)

19  A    This is a surveillance camera that was positioned to

20  monitor the inside of the cell.

21  Q    Looking at 220-37, what do we see here?

22       (The above-referred to exhibit was published.)

23  A    This is the access point to the tunnel, and this is a

24  shower.  Then this wall secured direct surveillance from the

25  camera.

 1  Q     So, for the record, that's the wall on the right-hand

 2  side of the photograph that secured the camera; is that

 3  correct?

 4  A     That's correct.

 5  Q     Looking at 220-40, what do we see here?

 6          (The above-referred to exhibit was published.)

 7  A     This is a federal police officer that's below the shower

 8  in a room that's been hollowed out below the cellblock.

 9  Q     And looking at 220-42, what's this?

10          (The above-referred to exhibit was published.)

11  A     Going from top to bottom on here, this is the cellblock

12  floor reinforced with steel girders and jacks, and then

13  there's this -- this has been hollowed out throughout the

14  bottom of the cellblock, and then the girders supported the

15  floor from collapse.

16  Q     And so this is right below the shower that we looked at

17  in the cell?

18  A     That is correct.

19  Q     And just for the record, the jacks are in the center

20  right in the photo, and the floor is in the top of the photo;

21  is that correct?

22  A     That's correct.

23  Q     Looking at Government's Exhibit 220-43, what's this?

24          (The above-referred to exhibit was published.)

25  A     This is access to the tunnel vertical shaft and it's at

1  the bottom of the room that we just looked at.

2  Q    Okay.  So this is the entrance to the tunnel below the

3  shower floor; is that right?

4  A    That is correct.

5  Q    And then looking at 220-45, what's this?

6          (The above-referred to exhibit was published.)

7  A    This is the actual vertical shaft where the fabricated

8  steel ladder is, and we see some cabling and pipes.

9  Q    All right.  I would like to show you what's been

10 marked -- excuse me -- what's in evidence as Government's

11 Exhibit 220-46.  Do you recognize this?

12         (The above-referred to exhibit was published.)

13 A    Yes.  This is a disk that I reviewed of the tunnel on the

14 22nd of January, 2019.

15 Q    Is this a news footage of the tunnel you visited?

16 A    Yes, it is.

17 Q    And it's the same tunnel you toured, right?

18 A    That is correct.

19         MR. ROBOTTI:  I would like to play a portion of -- I

20 would actually like to play the whole video of 220-46.  It's

21 about two minutes long.

22         THE COURT:  It's already in evidence?

23         MR. ROBOTTI:  It's in evidence, your Honor.

24         THE COURT:  Given the pictures, do we need to see

25 the video, too?

1    MR. ROBOTTI:  It's just a short video, your Honor.
2  I think that's --
3    THE COURT:  Two minutes here, two minutes there,
4  pretty soon you are talking about days.  All right.  Show the
5  video.
6  BY MR. ROBOTTI:
7  Q    If you can narrate the relevant portions.
8  A    Yes.
9        (Video played.)
10  A    This individual is walking up the driveway that
11  approaches the residence.  We can see the residence portion of
12  the structure on the right and then the work area on the left.
13  He's in the work area right now and headed over to the access
14  point that we reviewed in a previous picture.  You can see the
15  ladder.  He's going to proceed down through the ladder.
16  Q    And is this the room right below --
17  A    Yes.  So the individual's position below the winch that
18  we saw in the previous picture, he's looking down the vertical
19  shaft into the tunnel, and now he's climbing down.  This is
20  the cart that we saw previously in the pictures.  You can also
21  see the ventilated pipe to the upper left.
22  Q    How was the air quality down in the tunnel?
23  A    The air quality was poor.  The only air that was being
24  forced in there was being forced in there through the
25  generator which was turned on when we were in there.  He's

1   proceeding down the tunnel.  You can see the ventilated -- the

2   forced air ventilation pipe, the upper left; cabling on the

3   right; tool marks on the side of the tunnel from drill tools.

4   Q    Are you able to tell what he's on there?

5   A    Yes.  That's a cart with a motorcycle on it.  Now he's

6   back in the vertical shaft.  We can see the same PVC corner

7   here.  He's headed up the ladder.

8            (Video paused.)

9   BY MR. ROBOTTI:

10  Q    Next I would like to show you what's in evidence as

11  Government's Exhibits 220-1 and 220-1-A, and do you recognize

12  this?

13           (The above-referred to exhibit was published.)

14  A    Yes.  This is a disk that I reviewed on the 22nd of

15  January of the jail cell.

16  Q    And this is the jail cell that you toured at Altiplano

17  Prison?

18  A    That is correct.

19  Q    And is this a surveillance footage from that jail cell?

20  A    Yes, it is.

21  Q    All right.  So we would like to play three clips from

22  this video.  The first one is going to be 1 minute and

23  35 seconds to 4 minutes and 35 seconds.

24           (Video played.)

25           (Video paused.)

1  BY MR. ROBOTTI:

2  Q    All right.  And the next clip is going to be 4 minutes

3  and 49 seconds to 6 minutes and 30 seconds.

4            (Video played.)

5            (Video paused.)

6  BY MR. ROBOTTI:

7  Q    And the final clip is going to be 7 minutes and

8  25 seconds to 10 minutes and 10 seconds.

9            (Video played.)

10            (Video paused.)

11            MR. ROBOTTI:  Thank you, Mr. Bradley.  No further

12  questions.

13            THE COURT:  All right.  Any cross?

14            MR. PURPURA:  Yes.  Thank you.

15            THE COURT:  Okay.

16  CROSS-EXAMINATION

17  BY MR. PURPURA:

18  Q    Mr. Bradley, good afternoon.  Welcome to New York.

19  A    Thank you.

20  Q    You're welcome.

21            Back on August 21st, 2015, was that your first time

22  to look at Altiplano Prison?

23  A    That is correct.

24  Q    And I know you are an analyst.  Have you visited prisons

25  before in your job as an analyst?

1  A     No, I have not.

2  Q     Were you involved at all in analyzing other tunnels --

3         MR. ROBOTTI:  Objection.

4         THE COURT:  Overruled.

5  BY MR. PURPURA:

6  Q     -- in Mexico, in particular, a tunnel for escape in 2014?

7  A     No, I have not.

8  Q     Did you look at data about that tunnel escape?

9  A     Which escape -- what specific location are we talking

10  about?

11  Q     I'm talking about the Culiacan Prison in 2014 where

12  Adelmo Niebla Gonzalez escaped with two other people through a

13  tunnel.

14         MR. ROBOTTI:  Objection to scope.

15         THE COURT:  No, I will allow it.

16         Do you know anything about that?

17         THE WITNESS:  Yes, I do.

18  BY MR. PURPURA:

19  Q     And, in fact, that is one of the things that you did.

20  You reviewed a report by EPIC, E-P-I-C, Intelligence, which is

21  El Paso Intelligence Center; is that correct, sir?

22  A     That is correct.

23  Q     And in that report, and as part of your duties as an

24  analyst, you reviewed that report to determine if there was

25  consistencies in these two tunnels; is that correct, sir?

1   A     Yes, it is.

2   Q     And, in fact -- let me just take a step back for a

3   second.

4             I'm going to show you, for your eyes only --

5             MR. PURPURA:  Without objection, your Honor, move to

6   admit Defense Exhibit 525?

7             THE COURT:  Received.

8             (Defendant's Exhibit 525 received in evidence.)

9             (The above-referred to exhibit was published.)

10  BY MR. PURPURA:

11  Q     I'm not sure how clear that comes out.

12            Can you recognize that as the outside of Altiplano

13  Prison?

14  A     I don't recognize that image.

15  Q     All right.  Let me show you Defense Exhibit 526.

16            THE COURT:  Also no objection?

17            MR. ROBOTTI:  No objection.

18            THE COURT:  Received.

19            (Defendant's Exhibit 526 received in evidence.)

20  A     I don't recognize that image either.

21  Q     You were at Altiplano Prison; is that correct?

22  A     Yes.

23  Q     And you looked at the outside of the prison; is that

24  correct?

25  A     Not in any great detail.  Vaguely.

1  Q    Okay.  And is this the first prison you've ever been to?

2            MR. ROBOTTI:  Objection.  Asked and answered.

3            MR. PURPURA:  I apologize.  I forgot the answer.

4            THE COURT:  Sustained.

5  BY MR. PURPURA:

6  Q    Are you familiar with Bureau of Prisons here in the

7  United States?

8  A    No, I'm not.

9  Q    Do you know if this prison is designed after the BOP

10 prisons here in the United States?

11           MR. ROBOTTI:  Objection.

12           THE COURT:  Sustained.

13 BY MR. PURPURA:

14 Q    In your -- I guess, why did you go to that prison?  What

15 was your job?

16 A    I was requested by the U.S. Government to assist our

17 embassy personnel in assisting the Mexican officials in

18 understanding exactly how this came about.

19 Q    And part of that, wouldn't that be to look at the

20 structure of the darn prison on the outside?

21 A    My interest is in the tunnel.

22 Q    But the tunnel has got to go underneath something, right?

23 That's why -- I guess, as an analyst, you have to think, let's

24 see, should he -- if an escape, should it be a laundry cart

25 out the front door?  Is the facility suitable for that?  Or

 1  should it be a tunnel?  Because it's a big darn building like

 2  we see here.

 3           MR. ROBOTTI:  Objection to form.

 4           THE COURT:  Sustained.

 5  BY MR. PURPURA:

 6  Q    Do you look to analyze factors as the size of the prison

 7  itself as to why a tunnel is chosen?

 8  A    That's outside the scope of what I was assigned to do.

 9  Q    Okay.  You've written a report about some of your

10  findings; is that correct, sir?

11  A    That's correct.

12  Q    And you've looked at other tunnels; is that correct, sir?

13  A    That's correct.

14  Q    And you found certain unique factors in this tunnel at

15  Altiplano Prison; is that correct, sir?

16  A    That's correct.

17  Q    One of the unique factors -- how many tunnels did you

18  investigate?

19  A    Investigate?  I'm not an investigator.

20  Q    Analyze.  Review.

21  A    Over 200.

22  Q    In Mexico?

23  A    Mostly on the U.S. side.

24  Q    And based on your analysis, you found certain unique

25  factors in this tunnel; is that correct, sir?

1  A    That's correct.

2  Q    And one of the unique factors was the large generator; is

3  that correct, sir?

4  A    That's correct.

5  Q    Another unique factor is this tunnel was close to a mile

6  in length; is that correct, sir?

7  A    That's correct.

8  Q    Now, let's take a step back to 2014.

9       The tunnel at the Culiacan Prison, did you go and

10 investigate the tunnel at the Culiacan Prison?

11 A    No, I did not.

12 Q    In reading about the tunnel and analyzing, you did

13 analyze that and compare it, did you not, sir, to this

14 particular tunnel?

15 A    I didn't compare it to this tunnel.  That wasn't the

16 purpose of reviewing that.

17 Q    Did you analyze the 2014 tunnel from the Culiacan

18 Prison -- Culiacan Prison?

19 A    There was very limited information available to me on

20 that particular tunnel.

21 Q    You knew that it was a lengthy tunnel; is that correct,

22 sir?

23 A    What do you mean by "lengthy"?

24 Q    Lengthy means larger than the normal tunnels than the

25 other 200 you reviewed.

1   A    What distance do you --

2   Q    I won't play.

3        How long was the tunnel, sir?

4   A    I don't remember the specific length of the --

5   Q    Culiacan tunnel.

6   A    It was --

7        MR. ROBOTTI:  Objection, your Honor.

8   BY MR. PURPURA:

9   Q    How many feet?

10       THE COURT:  Overruled.

11  BY MR. PURPURA:

12  Q    How many feet?

13  A    Around 1100 feet.  I don't remember the exact number.

14  Q    Fairly lengthy tunnel, correct?

15  A    Yes.

16  Q    Went underneath five houses, correct?

17       MR. ROBOTTI:  Objection, your Honor.  Can we

18  approach on this tunnel?

19       THE COURT:  I guess so, okay.

20       (Sidebar.)

21       (Continued on next page.)

22

23

24

25

1      (sidebar conference held on the record out of the

2  hearing of the jury.)

3              MR. ROBOTTI:  Judge --

4              THE COURT:  Well, let me hear from Mr. Purpura first

5  because I'm interested to know what he's got in mind.

6              MR. PURPURA:  Okay.  There's two levels of relevance

7  under Rule 401, which I think is appropriate here.  Number

8  one, obviously the Government hasn't demonstrated -- this is

9  the first tunnel, the tunnel in 2015, the Guzman tunnel -- the

10  suggestion it's really unique, it's extraordinary in all its

11  dimensions -- while the 2014 tunnel rivals that in depth,

12  almost in length, and it actually goes underneath a water bed

13  without any seepage, which this analyst knows about, so that's

14  the first level.

15              This is --

16              THE COURT:  What does that mean that there's

17  similarities or differences?

18              MR. PURPURA:  I'm going to get to that.

19              The person who escaped in the first tunnel was

20  Vicente Zambade -- that's Mayo Zambada's son's uncle -- who is

21  in the Mayo Zambade crime family, so these tunnels are similar

22  within a short period of time; and it's also been the defense

23  theory of this case that Mr. Guzman had nothing to do with the

24  construction of the particular tunnel, that it was done by

25  someone else, and he took advantage of it.

1      THE COURT:  The one depicted in the video he had

2  nothing to do with?

3      MR. PURPURA:  That's correct.

4      THE COURT:  It was through the shower in his cell.

5      MR. PURPURA:  He exited -- he took advantage of it;

6  he went out that way, but he didn't construct it.

7      THE COURT:  How did it get up into his cell?

8      MR. PURPURA:  Your Honor, it's been explained

9  multiple times.  He has the corner cell, there's one floor

10 there, he's right there, and that's how -- directly there into

11 the system.

12     THE COURT:  But it's his cell.

13     MR. PURPURA:  That may be a good argument, but --

14     THE COURT:  I just don't see how it can be relevant,

15 some other tunnel, considering there's an entry to a tunnel in

16 his cell which goes right in.  And you don't have any evidence

17 that there's any other entries to that tunnel, do you?

18     MR. PURPURA:  I don't have any -- the -- let's

19 assume that he knew that someone was building a tunnel for him

20 to escape --

21     THE COURT:  Okay.

22     MR. PURPURA:  -- and he takes advantage of that --

23     THE COURT:  Okay.

24     MR. PURPURA:  -- without -- himself, as the

25 Government's theory is, spending the money, because --

1          THE COURT:  Oh, it's a money thing.

2          MR. PURPURA:  That's number one.

3          And then it's who built the tunnel for him, and I

4    believe we can connect -- these tunnels are very similar --

5    2014 --

6          THE COURT:  I see.  I see.  Okay.  Now I understand.

7          Go ahead.

8          MR. ROBOTTI:  I have three objections:  Scope,

9    relevancy, hearsay.

10          First of all, scope, this witness only testified

11    very narrowly to the 2016 tunnel, so this is far outside the

12    scope.

13          Hearsay, he never went to the other tunnel, so

14    anything that he's going to be testifying about regarding the

15    other tunnel is going to be hearsay based on other people

16    going to those -- that tunnel and the reports that he read, so

17    that's strictly hearsay.

18          In terms of relevancy, there's nothing in the record

19    about this other tunnel.  There's nothing in the record that

20    this other person escaped from it, so this comparison that

21    he's going to draw, I just don't see how he's doing it based

22    on the evidence in this trial.

23          THE COURT:  Okay.

24          Last word.

25          MR. PURPURA:  I will ask the analyst.  I mean, those

1   are questions that this person -- if his job --

2           THE COURT:  He's not a tunnel expert.

3           MR. PURPURA:  Well, then his job is to analyze the

4   escape and how to prevent this in the future.  He makes

5   suggestions as to how to avoid these tunnel issues as well, so

6   I'm going to ask him if he knows the similarities between the

7   two, who escaped, and the relationship.

8           THE COURT:  I know what you want to ask him.  I just

9   don't know what it has to do with it.  I mean, the Government

10  has not produced any evidence that Mr. Guzman used personal

11  assets to construct this tunnel.  So whoever built it -- they

12  built it for him or he built it himself -- what's the

13  difference how the other tunnel was built?

14          MR. PURPURA:  Because the building of the other

15  tunnel shows the connection to the Zambade family to this

16  particular tunnel.

17          THE COURT:  Do you have any evidence at all that the

18  Zambadas are connected to this tunnel other than the fact that

19  you think there are a couple of features between them that are

20  somewhat similar?  Because, like, as far as I know, a tunnel

21  is a tunnel.

22          MR. PURPURA:  Obviously, he's been prepared to be as

23  cagey as possible --

24          MR. ROBOTTI:  That is not accurate.

25          MR. PURPURA:  -- but the bottom line is --

1          THE COURT:  He's an analyst.

2          MR. PURPURA:  He is an analyst, and I want him

3    analyzed.  If he analyzes the features of these tunnels --

4    listen, it's 2014, 2015.  They are very close in time; they

5    are extraordinary in the sense that they are extremely long;

6    they are extraordinary in the sense that they both have large

7    generators, which is unique; they are extraordinary in the

8    sense of the width; they are extraordinary in the sense of the

9    depth -- they are both below 30 foot; they are extraordinary

10   in the sense that the 2014 tunnel, although not as long, goes

11   underneath a riverbed without seepage.

12         THE COURT:  Didn't he say that the 2014 tunnel was

13   1100 feet long?

14         MR. PURPURA:  I think it was about 1100 feet.

15         THE COURT:  This one is a mile long.  It's, like,

16   five times as long.

17         MR. PURPURA:  Four times, actually, this one is.

18         THE COURT:  Look, it really doesn't make Rule 403.

19   The amount of time we've spent talking about it right now

20   shows that it's a --

21         MR. PURPURA:  I could have finished.

22         THE COURT:  You probably could have, but the jury

23   would be thinking, yeah, what does that mean?  So no, we are

24   not going to take the time to do that.  The objection is

25   sustained.

1          MR. ROBOTTI:  Thank you, Judge.

2      (Sidebar ends.)

3      (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (In open court.)

 2          THE COURT:  Anything further?

 3          MR. PURPURA:  Yes, Judge.  Thank you.

 4    BY MR. PURPURA:

 5    Q    We were just talking about the unique factors of this

 6    particular tunnel, right?  Yes?

 7    A    That's correct.

 8    Q    Thank you.

 9          All right.  And in addition to the large generator,

10    there was unusual engineering under the vertical shaft in the

11    cell; is that correct, sir?  It's a factor that you found,

12    right?

13    A    I'm not sure what you mean by "unusual."

14    Q    Well, those are your words, "unusual engineering under

15    the cell vertical shaft."  Your words.  What does it mean,

16    Analyst?

17    A    There was rails and there was the ventilation.  These

18    things are consistent with advanced tunnels we see on the

19    southwest border.

20    Q    Advanced tunnels, correct?

21    A    That's correct.

22    Q    And they are consistent with other tunnels you have seen;

23    is that correct, sir?

24    A    Yes, but --

25    Q    As an analyst, did you look to see who built those

1  tunnels, sir, on the southwest border in 2015?

2          MR. ROBOTTI:  Objection.

3          THE COURT:  Overruled.  He can answer.

4  BY MR. PURPURA:

5  Q    Let me be more specific.

6          Mayo Zambade, did you look to see if he was involved

7  in building those tunnels, sir, in 2015?

8          MR. ROBOTTI:  Objection.  Hearsay.  Relevancy.

9          THE COURT:  Well, he just asked him if he looked to

10 see.

11 BY MR. PURPURA:

12 Q    Did you?

13         THE COURT:  He can answer the question if he looked

14 to see.  I think I know the answer.

15         MR. PURPURA:  He's an analyst.

16 A    I've read reports.

17 Q    Thank you.

18         THE INTERPRETER:  Excuse me, the interpreter did

19 not --

20         MR. PURPURA:  He read reports.

21 BY MR. PURPURA:

22 Q    And in addition, there was an ability -- a primary and a

23 secondary ability to communicate within the tunnel itself; is

24 that correct, sir?

25 A    I don't recall saying that or writing that, but...

1   Q    Let me see if this refreshes your recollection.

2        I'm going to show you what has been marked as 3500

3   JSB-1, and now it's Defense Exhibit 535 for identification

4   only, Bates stamp page 9.

5        MR. PURPURA:  For the witness only, please.

6   BY MR. PURPURA:

7   Q    I'm showing you the first page.  Sorry.  Can you read

8   that, sir?  To yourself.

9        THE COURT:  The highlighted language?

10       MR. PURPURA:  Yes.

11       THE COURT:  Just read that to yourself.

12  BY MR. PURPURA:

13  Q    The short sentence.

14  A    Yes, but I didn't have direct observation on that.

15  Q    I'm sorry, what?

16  A    I did not have direct observation on that first sentence

17  that's highlighted.

18  Q    How about this part right here (indicating) and some --

19  can you see that?

20       THE COURT:  The question is, does that refreshes his

21  recollection as to what?

22  A    Yeah, so -- right, but I didn't see evidence of that

23  communication when I was in there.

24  Q    You mean you didn't --

25  A    There was --

1  Q    Go on.

2  A    There was no indication that -- when I say

3  "communication," communication means lines of communication.

4  That doesn't necessarily mean a telephone or a radio.  Lines

5  of communication can be a street, it can be an airway.  Those

6  are called LOCs, lines of communication.

7  Q    You said there's some theory of primary communication; is

8  that correct, sir?  What would that mean?  As an analyst, tell

9  us.

10 A    That was speculation.

11 Q    Speculating?

12 A    This was a -- yes.

13 Q    Well, as an analyst, did you inquire from an engineer --

14 as an analyst, did you inquire from an engineer as to the

15 length of time it would take to build such a tunnel?

16        MR. ROBOTTI:  Objection.

17        THE COURT:  Was that within the scope of your

18 assignment to find out how long it would take to build such a

19 tunnel?

20        THE WITNESS:  No, your Honor.

21 BY MR. PURPURA:

22 Q    Well, the scope of your assignment was to assess, in

23 essence, for Department of Defense the threat that tunnels

24 posed to the United States, correct?  Right?

25 A    (No verbal response.)

1  Q    Yes?  You have to say yes or no.

2  A    That's correct.

3  Q    And so wouldn't how long it takes to build these tunnels,

4  wouldn't that be important for assessment of a threat?

5  A    It is, but I don't -- didn't have that information at

6  hand.

7  Q    Did subsequently take a look at that?

8  A    (No verbal response.)

9  Q    Yes?  You could say it.

10 A    Yes.

11 Q    Okay.  Good.

12       So how long does it take?

13 A    That depends on the geology and the work crew and other

14 factors, so it's not unique.  I mean, it's like fingerprints,

15 in a sense, that no two are alike; and the length of time it

16 takes to construct one varies.

17 Q    Did you give a -- eventually give a rough estimate how

18 long it took to build this mile-long tunnel?

19       MR. ROBOTTI:  Objection.  701.

20       MR. PURPURA:  No.  As an analyst.

21       THE COURT:  I understand.

22       MR. PURPURA:  It's a job --

23       THE COURT:  Stop.  Stop.  If you win, you don't have

24 to argue.

25       MR. PURPURA:  You're right.

1          THE COURT:  You can answer the question.

2    A    Yes.  We had an approximate window of how long we believe

3    it took.

4    Q    That wasn't hard, was it?

5          MR. ROBOTTI:  Objection.

6    BY MR. PURPURA:

7    Q    How long -- how big is that window?

8    A    At least eight months.

9    Q    And did you assess that there must be some sort of --

10   strike that.

11          The tunnel was how many feet below the Earth's

12   surface?

13   A    It varied in depth.  The shallowest was around 35 feet.

14   Q    So it's a little more than 10 yards in depth at the

15   deepest part; is that correct?

16   A    That's correct.

17   Q    That, in your review of the hundreds of tunnels, that's

18   fairly significant; is that correct?

19   A    That's an average depth.

20   Q    And there was a ventilation system that ran the whole

21   point nine-tenths of a mile down the tunnel, correct?

22   A    I can only speak for the piece that I saw.  I cannot tell

23   you that it went the whole length.

24   Q    There was a ventilation system, as far as you could tell;

25   is that correct?

1  A    That's correct.

2  Q    And in addition to the ventilation system, there was an

3  electrical system which allowed lighting throughout the almost

4  mile-long tunnel, correct, sir?

5  A    That's correct.

6  Q    There was this metal track that ran down the middle of

7  the tunnel; is that correct?

8  A    That's correct.

9  Q    And there was a cart on it with a -- what looked like a

10 portion of a motorcycle as well; is that correct, sir?

11 A    I did not see that cart with the motorcycle.

12 Q    Did you see it in the video that Government counsel

13 played?

14 A    I did see the video, but I did not see that on my visit.

15 Q    And as an analyst, does it appear to be -- strike that.

16        You saw the access into the cell itself; is that

17 correct, sir?

18 A    That's correct.

19 Q    And there's a grate there.  You saw a grate where the

20 shower is; is that correct?

21 A    There was an open hole.

22 Q    Did you --

23 A    I didn't see a grate.  I don't understand what you mean

24 by "grate."

25 Q    There's a grate normally over the hole -- the shower so

1    water can run down inside or --

2    A    That was not present.  I did not see that.

3    Q    Did you ever determine how that hole was made?  Was it

4    knocked through cement?

5    A    I don't know how it was created.

6    Q    Did you ask?

7              MR. ROBOTTI:  Objection.

8              THE COURT:  Sustained.

9    BY MR. PURPURA:

10   Q    As we played the video, it appears that at

11   approximately -- this is in Clip 1 -- that approximately

12   8:52 p.m., you see Mr. Guzman go into the shower and he

13   disappears.  Does that sound about right?

14   A    That's on the video.

15   Q    Sound about right, though?

16   A    Yeah, but, again, I wasn't there for that, so --

17   Q    I know, but they played the video through you.  You

18   watched the video, right?

19   A    Right.

20   Q    And then there was a period of time -- and on the video,

21   some time after that, there was guards that came up to the

22   cell.  Do you remember watching that?

23   A    Yes.

24   Q    And they kind of look through the bars without going in,

25   right?

1   A     Yes.

2   Q     And then they left, right?

3   A     That's correct.

4   Q     And then some time passed, and then eventually it looks

5   like at 9:29 p.m., some 37 minutes after Mr. Guzman goes down

6   that tunnel, someone opens up the door to the cell.  Do you

7   remember seeing that?

8   A     Yes.

9   Q     And what they do -- what that person does when they walk

10  in there -- you saw the video -- they looked under the bed.

11         Do you remember that?

12  A     I didn't pay attention to that.

13  Q     All right.  And then after looking under the bed and he's

14  not there, they see the hole, right, and that's what appeared.

15  Did you see that?

16  A     In the video, one of the personnel indicated that there

17  was a hole in the shower.

18  Q     And at that point, and as far as an analyst is concerned,

19  you want to, I would think, you want to analyze how quick the

20  reaction was from the authorities to try to stop this,

21  correct?

22  A     That was outside the scope of my duties.

23  Q     Then your duties didn't entail -- did you -- did anyone

24  tell you that the red alert wasn't sounded for the escape

25  until almost midnight?

1          MR. ROBOTTI:  Objection.

2          THE COURT:  Sustained.

3    BY MR. PURPURA:

4    Q    Did you ever interview anybody to see if they heard the

5    banging (indicating) for nine months under the ground?

6          MR. ROBOTTI:  Objection.

7          THE COURT:  Sustained.

8    BY MR. PURPURA:

9    Q    But you did have some conclusions as part of your

10   analysis, correct?

11   A    Not what the prison personnel did or did not do, that was

12   not -- that was outside the scope of what I was there for.

13   Q    But you did have some conclusions, correct?

14   A    No.

15   Q    You concluded that this escape on July 15th, two

16   thousand -- July 11th, 2015, cemented Chapo's reputation,

17   correct?  That was your --

18         MR. ROBOTTI:  Objection.

19   BY MR. PURPURA:

20   Q    -- analytical conclusion.

21         THE COURT:  Overruled.

22   A    I don't recall writing that, but --

23   Q    Let me see if this refreshes your recollection.  Showing

24   you the same exhibit as before, Bates stamp 13 --

25         MR. ROBOTTI:  Judge, can we approach on this?

1           THE COURT:  Yes, but I'm going to let him do it.

2           MR. PURPURA:  Thank you.

3           THE COURT:  You put the witness on the stand.  This

4    is his report.

5    BY MR. PURPURA:

6    Q    You see that?  Does that refresh your recollection as to

7    your conclusion?

8    A    That's not fact; that's speculation on my part.

9    Q    As an analyst, you concluded that the escape cements

10   Chapo's reputation, correct?

11   A    Yes.

12           MR. PURPURA:  No further questions.

13           THE COURT:  Any redirect?

14           MR. ROBOTTI:  No, Judge.

15           THE COURT:  All right.  You may step down.

16           THE WITNESS:  Thank you.

17           (Witness excused.)

18           THE COURT:  Ladies and gentlemen, let's take our

19   midafternoon break.  We will come back at 3:30.  Remember,

20   don't talk about the case.  See you in a few minutes.

21           (Jury exits.)

22           THE COURT:  Okay.  Fifteen minutes.

23           (A recess in the proceedings was taken.)

24           (Continued on the following page.)

25

1        (Defendant enters the courtroom at 3:31 p.m.)

2        THE COURT:  All right.  Let's have the jury, please.

3        COURTROOM DEPUTY:  All rise.

4        (Jury enters courtroom at 3:33 p.m.)

5        THE COURT:  Okay, everyone.  Be seated.  The

6   Government may call its next.

7        MS. PARLOVECCHIO:  The Government calls Brendan

8   Hanratty.

9   **BRENDAN HANRATTY**, called by the Government, having been

10       first duly sworn, was examined and testified as

11       follows:

12       THE WITNESS:  I do.

13       COURTROOM DEPUTY:  State your name for the record.

14       THE WITNESS:  Special Agent Brendan Hanratty.

15   B-r-e-n-d-a-n.  H-a-n-r-a-t-t-y.

16       THE COURT:  You may inquire.

17       MS. PARLOVECCHIO:  Thank you, your Honor please

18   tell.

19   DIRECT EXAMINATION

20   BY MS. PARLOVECCHIO:

21   Q    Good afternoon?

22   A    Good afternoon.

23   Q    By whom are you employed?

24   A    The Department of Justice.

25   Q    What part of the Department of Justice?

1  A   The Drug Enforcement Administration.

2  Q   How long have you been with the Drug Enforcement

3  Administration?

4  A   Approximately 14 years.

5  Q   What is your current assignment?

6  A   I'm a special agent in New England Field Division.

7  Q   How long have you been assigned there?

8  A   Approximately a year and a half.

9  Q   What is your job as a special agent entail?

10  A   I investigate international narcotics trafficking.

11  Q   I'm going to direct your attention to January 2017.

12      Where were you assigned at that time?

13  A   Mexico City, Mexico.

14  Q   And how long were you assigned to Mexico City?

15  A   Approximately four years.

16  Q   What were your duties as a special agent with DEA in

17  Mexico City?

18  A   I served as a liaison and shared intelligence between the

19  domestic offices for DEA and the Government of Mexico.

20  Q   When you're an agent with the DEA in Mexico City, did you

21  ever try to collect evidence from the Mexican government?

22  A   Yes.

23  Q   And how did that process work?

24  A   Usually unsuccessfully.

25  Q   What was the process that you would use?

1  A    An MLAT would be submitted from the DEA Domestic Office

2  or from the DEA in the U.S. embassy and it was provided

3  usually to the PDR.

4  Q    You mentioned MLAT.  What does an MLAT stand for?

5  A    It's Mutual Legal Assistance Treaty.

6  Q    You mentioned that it's usually unsuccessful.  Would you

7  explain what you mean by that when you submitted an MLAT?

8  A    Law enforcement entities in Mexico have their own

9  policies and procedures much maintaining evidence which is

10  usually inconsistent with DEA's policies and procedures.

11  Q    And based on your experience, how often would you get

12  evidence back from an MLAT request made by a domestic office?

13  A    Very seldom.

14  Q    Now, what, if any, role did you have in the extradition

15  of Joaquin Guzman Loera?

16  A    I participated in extradition.  I accompanied the

17  defendant on a flight from Mexico to the United States.

18  Q    Do you see Joaquin Guzman Loera in the courtroom?

19  A    Yes, I do.

20  Q    Can you please point him out by an article of clothing?

21        MR. PURPURA:  We'll stipulate that he identified

22  Mr. Guzman.

23        THE COURT:  All right.

24  Q    Special Agent Hanratty I want to direct your attention to

25  January 18, 2017.

1      Were you given any particular assignment on that

2 day?

3 A    Yes, I was.

4 Q    What assignment were you given?

5 A    I was informed that I would be assisting in the transport

6 of the defendant to New York.

7 Q    And so, what happened on the next day, January 19, 2017?

8 A    On January 19th, I took a flight from Toluca

9 International Airport to El Paso International Airport and was

10 transported to Ciudad Juárez International Airport and

11 prepared to accompany the defendant.

12 Q    Did you board a plane once in your opinion Ciudad Juárez

13 International Airport?

14 A    Yes, I did.

15 Q    And what happened once you were on the plane?

16 A    Once I was on the plane, I provided my passport and

17 signed several extradition documents and waited for the

18 defendant to board the flight.

19 Q    So what, if anything, did you see after you signed those

20 documents and prepared for the defendant to board the plane?

21 A    The defendant was accompanied by numerous law enforcement

22 entities from the Government of Mexico onto the flight.

23 Q    And just to be clear, did the defendant get on the plane

24 with you?

25 A    Yes, he did.

1  Q    What happened next?

2  A    Shortly thereafter, the flight departed Ciudad Juárez and

3  was destined or McArthur Airport in Islip, New York.

4  Q    Where is Islip or McArthur Airport located?

5  A    In Long Island.

6  Q    Long Island, New York?

7  A    Yes.

8  Q    Did you stop at all during this flight between

9  Ciudad Juárez, Mexico to Islip, New York?

10 A    No, we did not.

11 Q    I'm going to show you what's marked for identification as

12 Government's Exhibit 1M.

13      MS. PARLOVECCHIO:  And, your Honor, I believe there

14 is no objection to the admission of this exhibit.

15      THE COURT:  All right.  Received.

16      (Government's Exhibit 1-M was received in evidence

17 as of this date.)

18 Q    Special Agent Hanratty, what are we looking at here?

19 A    It's a photo of the defendant debarking from the

20 aircraft.

21 Q    I'm going to circle the individual at the top of the

22 photograph there.  Who is that?

23 A    That's myself.

24      MS. PARLOVECCHIO:  No further questions.

25      THE COURT:  Any cross?  Really?

1     MS. PARLOVECCHIO:  *Un poquito.*

2  CROSS-EXAMINATION

3  BY MR. PURPURA:

4  Q    Special Agent Hanratty, I just have to follow up on your

5  ability to obtain evidence, evidence requests in Mexico.

6         Aside from evidence requests such as perhaps bullets

7  or casings or drugs, how about -- what would be your ability

8  for the United States's ability to obtain a simple death

9  certificate.  Do you think you guys could do that in Mexico?

10 A    The only experience I had obtaining evidence was photos

11 from the Mexican government.

12 Q    So you've never attempted to get a death certificate,

13 something as simple as that; is that correct?

14 A    I've never had any success getting anything other than

15 photos.

16 Q    Have you ever tried to get a death certificate?

17         MS. PARLOVECCHIO:  Objection.  Asked and answered.

18         MR. PURPURA:  I'm not sure.

19         THE COURT:  I don't think it was answered.  He can

20 answer.

21 Q    Have you ever tried to obtain a death certificate?

22 A    I've never been requested to obtain a death certificate.

23 Q    Okay.  Have you ever been requested to obtain property

24 records in Mexico?

25 A    Yes.

1    Q    Were you able to obtain proper records?

2    A    No.

3    Q    Couldn't obtain them?

4    A    No, we did not.

5    Q    Bill of sale for houses, nothing like that?

6    A    No, we did not have any success.

7    Q    How many times have you tried this?

8    A    At least 20.

9    Q    All right.  Finally, I'm going to ask you, that was the

10   January 19th of 2017.  Was that the presidential inauguration

11   the same day?

12             MS. PARLOVECCHIO:  Objection.

13             THE COURT:  Sustained.

14             MR. PURPURA:  No further questions.

15             THE COURT:  Any redirect?

16             MS. PARLOVECCHIO:  No, your Honor.

17             THE COURT:  All right.  You may step down.  Thank

18   you.

19             THE WITNESS:  Thank you.

20             (Witness leaves the witness stand.)

21             THE COURT:  All right.  What does the Government

22   want to do?

23             MS. PARLOVECCHIO:  The Government rests, your Honor.

24             THE COURT:  Okay.  Ladies and gentlemen, if you'll

25   excuse us for maybe ten minutes or so, I'm probably going to

1   let you go early but let me talk to the lawyers first and

2   we'll see what we're going to do with the rest of the case.

3           Give us about ten minutes and we'll be back here

4   shortly.

5           Please don't talk about the case.

6           (Jury exits courtroom at 3:41 p.m.)

7           THE COURT:  Okay.  Everyone be seated.

8           Just because I don't want to hold the jury any

9   longer than I have to, can defendants now tell me what are you

10  going to do, if anything, for a case.

11          MR. BALAREZO:  Your Honor, I believe that

12  Mr. Purpura had talked or mentioned to the Court that we were

13  going to ask the Court to advise Mr. Guzman of his rights.

14          THE COURT:  We're going to do that.  We're going to

15  do that.  I want to talk about scheduling.

16          MR. BALAREZO:  Beyond that we won't anticipate that

17  we will be presenting any witnesses.

18          MR. LICHTMAN:  We have the two agents that we

19  discussed from your order.  They'll be put on tomorrow

20  morning.

21          THE COURT:  You're still going to do that?

22          MR. LICHTMAN:  Yes.

23          THE COURT:  Okay.  Any reason you can't do at least

24  one tonight?

25          MR. LICHTMAN:  I don't think they're here.

1          THE COURT:  Not here?

2          MS. PARLOVECCHIO:  Not here, your Honor.  We weren't

3     sure until really this afternoon which ones he was looking to

4     put on the stand So we were unable to get them here.

5          THE COURT:  Okay.  And the parties weren't able to

6     work out a stipulation for that testimony.

7          MR. LICHTMAN:  Tried over the weekend, Judge, didn't

8     work out.

9          THE COURT:  Things have changed now because I issued

10    a ruling.

11         MR. LICHTMAN:  I understand.

12         THE COURT:  Okay.  All right.  Let's do this then.

13    Let's send the jury home.  Does anyone mind if instead of

14    giving them the usual admonitions that I give them Ms. Clarke

15    just goes and reminds them of those admonitions for the

16    evening.

17         Do you want me to bring them back in the courtroom

18    and re-admonish them yet again?

19         MS. GOLDBARG:  We have no objection to that your

20    Honor.

21         MR. PURPURA:  Neither do we.

22         THE COURT:  Ms. Clarke will go ahead and do that and

23    we can send the jury home.  And then we'll have that

24    conversation you all wanted me to have with the defendant when

25    the defense starts its case before we get there, though, I

1   assume there's a defense motion.

2           MR. BALAREZO:  Yes, your Honor.

3           THE COURT:  Okay.  Do you want to say anything about

4   it?

5           MR. BALAREZO:  You want to at this time?

6           THE COURT:  I think.

7           MR. BALAREZO:  We move for a judgment of acquittal

8   and we'll submit on the evidence.

9           THE COURT:  Okay.  Anything from the Government?

10          MS. PARLOVECCHIO:  Your Honor, we oppose that

11  motion.  I can make the record unless your Honor would like to

12  rule.

13          THE COURT:  I think that's clear that the motion

14  should be denied.  I will say, also, for the sake of good

15  order, I'm not really sure if I have to do this, but I'll also

16  make a finding that the Government has demonstrated enough of

17  a prima facie case to support the admission of co-conspirator

18  statements throughout.  I'm not going to go through all of the

19  evidence to show that, but I think there was abundant evidence

20  so I'm making that finding.  Okay.  So that will leave us with

21  defendant's case tomorrow morning.

22          And then the question is to Mr. Guzman, do you want

23  to testify as part of the defendant's case?

24          THE DEFENDANT:  Your Honor, me and my attorneys have

25  spoken about this and I will reserve.

1          THE COURT:  Reserve?

2          THE DEFENDANT:  Yes, I will not testify.

3          THE COURT:  Okay.  Do you understand that you have

4    the absolute right to testify if you want to.

5          THE DEFENDANT:  Yes, your Honor, my attorneys

6    already explained that.

7          THE COURT:  Okay.  And do you understand that it's

8    your decision as to what to do, not your attorneys' decision.

9          THE DEFENDANT:  Yes, but they counseled me about it

10   and I agree with them.

11         THE COURT:  Okay.  Anything else you want to put on

12   Mr. Purpura.

13         Thank you, Mr. Guzman.

14         THE DEFENDANT:  Thank you very much.

15         MR. PURPURA:  Your Honor, I can tell the Court for

16   the record that I explained in essence what cross-examination

17   would be if he testified.  I explained to him again under

18   Rule 609 what the Government attempts to bring in as far as

19   impeachment.  I explained what they could or could not bring

20   in as far as impeachment.  So I think his decision is knowing

21   and voluntary today.

22         THE COURT:  Thank you.  All right.

23         Now, the next question is when are we going to do

24   the charging conference and the closings, and how is that

25   going to work?

1      Mr. Lichtman, the two witnesses you anticipate

2 calling not long, right?

3      MR. LICHTMAN:  Very brief.

4      THE COURT:  So we should be done by 10:30 tomorrow

5 earlier maybe.

6      MR. LICHTMAN:  Earlier.

7      THE COURT:  I wonder if we should have the jury come

8 in at 10:30 and do our charging conference at 9:30, or we can

9 do the charging conference tonight if you all want to.

10      MR. LICHTMAN:  Judge, I think it depends on when you

11 plan on doing the summation perhaps we can work backwards.

12      THE COURT:  Yes, I plan on doing the summations when

13 you all plan on doing the summations.  The fastest possible

14 Schedule I see would be to finish the charging conference and

15 the defense case tomorrow on the early side.  If we were able

16 to get done with that by noon, would the Government be able to

17 commit to finishing closing arguments by 4:30.  Probably not.

18      MS. PARLOVECCHIO:  Your Honor, unfortunately, we

19 can't commit to that given the lunch break and everything else

20 I don't think we would be able to finish.

21      THE COURT:  Okay.  So then the question is:  Should

22 we start the Government's closing argument tomorrow if we're

23 going to have to break it anyway.  Let me put it this way, is

24 it going to be more than a full day?

25      MS. PARLOVECCHIO:  No, your Honor.

1    THE COURT:  Okay.  So should we start tomorrow if we

2  can and break in the middle or two-thirds or wherever it ends

3  up at the he end of the day, or would the Government prefer to

4  start closing on Wednesday?

5    MS. PARLOVECCHIO:  We would prefer to start closing

6  on Wednesday, your Honor.

7    THE COURT:  Okay.  So then what I think we'll do is

8  we'll have the Government's closing for all day Wednesday.

9  We'll have the defendant's closing for all day Thursday, yes,

10  Thursday.

11    Can you commit to a day?

12    MR. LICHTMAN:  I can commit to Thursday.  I just

13  can't commit to all day.

14    THE COURT:  Do you think it would be longer than a

15  day?

16    MR. LICHTMAN:  No, Judge.  Few hours.

17    THE COURT:  Right.

18    MS. PARLOVECCHIO:  Just for planning purposes, I

19  don't think we would need an entire day.  I think just so the

20  defense may be able to start on Wednesday if he wants to.

21    THE COURT:  Well, but what time would you finish?

22  This is very hard to tell because we don't know when we're

23  going to finish tomorrow morning.  But, no, if you start on

24  Wednesday, it's going to be till 3:30, 4:00 o'clock, right?

25    MS. PARLOVECCHIO:  Possibly.

1      THE COURT:  If it weren't, I'd make you start

2  tomorrow in the afternoon.  I'm assuming the full day for

3  Wednesday even though it might not be a full day to might be a

4  full day.  It might be 2:30, 3:00 o'clock, or 4:00.  And then

5  the question to you, Mr. Lichtman, would be you want to start

6  that day or the next morning.

7      MR. LICHTMAN:  I'd rather start Thursday morning and

8  finish rebuttal thereafter on the same day.

9      THE COURT:  So you'll have a few hours with enough

10  time for rebuttal?

11      MR. LICHTMAN:  Yes.

12      THE COURT:  Then I can charge the jury if they want

13  to sit on Friday, and I will encourage them to, Friday

14  morning.  Maybe there'll even be time to do that, I don't

15  think so, but maybe on Thursday afternoon after the

16  Government's rebuttal closing.  If I can instruct them, then I

17  will.  Maybe I can do the first part of the charge or

18  something on Thursday afternoon.  In any event, finish the

19  charge on Friday and they'll start deliberating on Friday

20  assuming they don't revolt at the idea of sitting on Friday

21  which I don't think they will.  That all sound good?

22      MS. PARLOVECCHIO:  Yes, your Honor.

23      THE COURT:  Okay.  And so, when did we say we're

24  doing the charging conference?

25      MS. PARLOVECCHIO:  We haven't said that.

1          MR. LICHTMAN:  Can I ask if we could do -- the

2    witnesses are very short.  Perhaps we can have them come in,

3    finish the witnesses, and then do the charge conference?

4    Because I frankly like to do as Ms. Goldbarg did today get out

5    of here and work on the summation as soon as I can.

6    Unfortunately, I got the witnesses tomorrow morning.

7          THE COURT:  Right.

8          MR. LICHTMAN:  My own fault but still.

9          THE COURT:  Right.  So we do, we would do the

10   witnesses, send the jury home, do the charging conference,

11   come back Wednesday for closing.

12         MR. PURPURA:  Correct.

13         MS. PARLOVECCHIO:  No objection.

14         THE COURT:  Okay.  We'll proceed on that basis.  See

15   you tomorrow morning at 9:30.

16         Have a good evening.

17         (Defendant exits from courtroom at 3:50 p.m.)

18         (WHEREUPON, this matter was adjourned to January

19   29, 2019, at 9:30 a.m.)

20

21                         *   *   *

22

23

24

25

1                    <u>INDEX</u>

2

3

4   <u>WITNESS:</u>                                      <u>PAGE</u>:

5   ISAIH VALDEZ RIOS

6           DIRECT EXAMINATION

7           BY MR. NARDOZZI.......................... 6246

8           CROSS-EXAMINATION

9           BY MR. BALAREZO.......................... 6269

10  JAMES S. BRADLEY

11          DIRECT EXAMINATION

12          BY MR. ROBOTTI........................... 6354

13          CROSS-EXAMINATION

14          BY MR. PURPURA........................... 6371

15  BRENDAN HANRATTY

16          DIRECT EXAMINATION

17          BY MS. PARLOVECCHIO...................... 6395

18          CROSS-EXAMINATION

19          BY MR. PURPURA........................... 6400

20

21                    * * * * *

22

23

24

25

1

2                    <u>INDEX OF EXHIBITS</u>

3

4  <u>FOR THE GOVERNMENT:</u>                              <u>PAGE:</u>

5  Government's Exhibit 505 was received in evidence

6  as of this date................................... 6247

7  Government's Exhibit 46 was received in evidence

8  as of this date................................... 6249

9  Government's Exhibit 515-3 was received in

10  evidence as of this date.......................... 6250

11  Government's Exhibit 601K-3 was received in

12  evidence as of this date.......................... 6268

13  Government's Exhibits 76, 79, 211, 203-29, 210-3,

14  500C, 203-21-A to 203-21C, 506-20, 204-4, 207-10,

15  401-2 to 401-10B, 205-18, 301-AT and 301B, 203-3,

16  203-6, 206-7, 203-14, 203-16, 58, 205-30, 60,

17  609A-3, 217-17, 217-18, 511-6-A were received in

18  evidence as of this date.......................... 6353

19  Government's Exhibit 220-2 was received in

20  evidence as of this date.......................... 6357

21  Government's Exhibits 220-3 to 220-6, 220-8 to

22  220-11, 220-14, 220-16 to 220-18, 220-21, 220-25

23  to 26, 220-29, 220-30, 220-34 to 37, 220-40,

24  220-42 and 220-43 were received in evidence as of

25  this date......................................... 6359

1  Government's Exhibit 1-M was received in evidence

2  as of this date.................................. 6399

3

4  FOR THE DEFENSE:

5  Defendant's Exhibit 501 was marked in evidence as

6  of this date.................................... 6273

7  Defendant's Exhibit 502 was marked in evidence as

8  of this date.................................... 6278

9  Defendant's Exhibit 503 was marked in evidence as

10  of this date.................................... 6279

11  Defendant's Exhibit 513-A, B, and C were marked

12  in evidence as of this date...................... 6313

13  Defendant's Exhibit 525 was marked in evidence as

14  of this date .................................... 6373

15  Defendant's Exhibit 526 was marked in evidence as

16  of this date .................................... 6373

17

18

19

20                        *****

21

22

23

24

25