```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                       09 CR 466(BMC)
 3   UNITED STATES OF AMERICA
                                       United States Courthouse
 4        versus                       Brooklyn, New York

 5   JOAQUÍN ARCHIVALDO GUZMÁN LOERA,
                                       January 7, 2019
 6                   Defendant.        9:30 a. m.
     --------------------------------x
 7
                 TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
 8                 BEFORE THE HONORABLE BRIAN M. COGAN
                      UNITED STATES DISTRICT JUDGE
 9

10                             APPEARANCES

11

12   For the Government:     UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
13                           271 Cadman Plaza East
                             Brooklyn, New York 11201
14                           BY:  GINA M. PARLOVECCHIO, AUSA
                                  ANDREA GOLDBARG, AUSA
15                                MICHAEL ROBOTTI, AUSA

16                           UNITED STATES ATTORNEY'S OFFICE
                             Southern District of Florida
17                           99 NE 4th Street
                             Miami, Florida 33132
18                           BY:  ADAM S. FELS, AUSA

19                           DEPARTMENT OF JUSTICE
                             Criminal Division
20                           Narcotic and Dangerous Drug Section
                             145 N. Street N.E. Suite 300
21                           Washington, D.C. 20530
                             BY:  ANTHONY NARDOZZI, ESQ.
22                                AMANDA LISKAMM, ESQ.

23   For the Defendant:      BALAREZO LAW
                             400 Seventh Street, NW
24                           Washington, D.C. 20004
                             BY:  A. EDUARDO BALAREZO, ESQ.
25
```

```
 1                    (CONTINUED APPEARANCES)

 2   For the Defendant:

 3   LAW OFFICES OF JEFFREY LICHTMAN
     11 East 44th Street, Suite 501
 4   New York, New York 10017
     BY:  JEFFREY H. LICHTMAN, ESQ.
 5   PAUL R. TOWNSEND, ESQ.

 6   LAW OFFICE OF PURPURA & PURPURA
     8 E. Mulberry Street
 7   Baltimore, Maryland 21202
     BY:  WILLIAM B. PURPURA, ESQ.
 8
     LAW OFFICES OF MICHAEL LAMBERT, ESQ.
 9   369 Lexington Avenue, PMB #229
     New York, New York 10017
10   BY:  MARIEL COLON MIRO, ESQ.

11

12

13

14

15

16

17

18

19

20

21   Reported by:

22   LISA SCHMID, CCR, RMR
     OFFICIAL COURT REPORTER
23   225 Cadman Plaza East, Room N377
     Brooklyn, New York 11201
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

```
 1              (In open court, outside the presence of the jury.)
 2              THE CLERK:  All rise.
 3              THE COURT:  Good morning.  Have a seat, please.
 4              Just a few Monday morning details that I want to
 5    discuss with the parties.  I got the usual weekend
 6    applications yesterday.
 7              First, what I'll call the medical application to
 8    modified the SAMS, all I need to hear from the Government now
 9    is, is there consent?  If there's not consent, you want to put
10    in a writing?  What do you want to do?
11              MS. PARLOVECCHIO:  Is this in regard to Mr.
12    Lambert's filing, Your Honor?
13              THE COURT:  Yes.
14              MS. PARLOVECCHIO:  Okay.  We'd like to put something
15    in writing, please.
16              THE COURT:  Can you do that tonight?
17              MS. PARLOVECCHIO:  We can try.
18              THE COURT:  Please.
19              Okay.  Next, with regard to the Motion in Limine on
20    Tuesday's cooperating witness, tomorrow's cooperating witness,
21    does the Government want to put in a reply on that?
22              MR. LICHTMAN:  Judge, if I could interrupt?
23              THE COURT:  Yes?
24              MR. LICHTMAN:  Last night, after we put our letter
25    in, we received additional 3500 on this witness, which
```

PROCEEDINGS

```
1   included text messages between that witness and his FBI
2   handler.  There's significant material in here that relates
3   directly to the issue at hand.
4             So before they reply, I think we need to put in an
5   addendum into our letter.  Otherwise, you're not getting the
6   full story.
7             THE COURT:  Well, okay.  But it's a Tuesday witness.
8             MR. LICHTMAN:  They gave it to us last night --
9             THE COURT:  I'm not blaming you.
10            Why is it so late?  Not that there's anything I can
11   do about it now.
12            MS. GOLDBARG:  Your Honor, the material was provided
13   to us over the weekend and we turned it over as soon as we got
14   it.
15            THE COURT:  I'm going to take an exchange of letters
16   tonight from the parties.  The defense can put in their
17   supplements saying, here's why this is so important, and the
18   Government can say, here's why this should still be precluded.
19            MR. LICHTMAN:  We can do it earlier.  I just need to
20   go through this carefully and just give you copies of some
21   pages.  I'm not going to write anything up, Judge.  It's
22   fairly self-evident.
23            THE COURT:  Okay.  That's good.
24            MR. LICHTMAN:  Thanks.
25            THE COURT:  And then lastly, I have the -- well,
```

PROCEEDINGS

```
 1    what I'll call the written motion from the defendants.  What
 2    does the Government think about that?  Any objection to that?
 3              MS. PARLOVECCHIO:  Your Honor, we haven't received
 4    an unsealed copy of it yet, despite our request for receiving
 5    it last night.  So I don't even know what it says.
 6              THE COURT:  Oh.  I thought a copy was sent to you by
 7    email.
 8              MR. BALAREZO:  Your Honor, actually, if I could just
 9    approach the bench for two seconds, ex parte?  I know it's --
10              THE COURT:  All right.  It's an ex parte
11    application, so I guess you can.
12              (Ex Parte Sidebar.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EX PARTE SIDEBAR

```
 1              (Ex Parte Sidebar.)

 2              MR. BALAREZO:  Your Honor, I apologize.  I was going

 3    to address the Court about that.  It's a very short letter,

 4    which the Court saw.

 5              We had some discussion months ago.  I'm not entirely

 6    sure if you had asked me to produce it the Government.  I can

 7    email it to them right now.  I'm sure it's not going to create

 8    any issue.  So it wasn't any sort of game plan.  I just didn't

 9    know if you had wanted us to turn it over or not.

10              THE COURT:  Well, I wanted it filed in such a way

11    that the Government would have access to it.

12              MR. BALAREZO:  Okay.

13              THE COURT:  But if you email it to them.  That's

14    fine.

15              MR. BALAREZO:  I will email it to them right now.

16              THE COURT:  Okay.

17              MR. BALAREZO:  Thank you.

18              (Ex Parte Sidebar concluded.)

19

20

21

22

23

24

25
```

PROCEEDINGS

```
 1                    (In open court.)
 2              THE COURT:  Okay.  The Government hasn't seen that
 3    application, I understand.  It's not a crucially urgent
 4    application.  The Government will look at it and tell me what
 5    it wants to do.
 6              MS. PARLOVECCHIO:  Yes, Your Honor.
 7              And to just briefly put on the record, to the extent
 8    it concerns the defense case, to date, we have yet to receive
 9    any discovery concerning what case they will put on or any
10    other materials related to that.
11              We are approaching the end of trial, so we would
12    request that the defense produce any material they intend to
13    put into evidence in their case.
14              THE COURT:  Okay.
15              MR. BALAREZO:  Your Honor, we'll produce discovery
16    as it's available.  That's all I can say.
17              MS. PARLOVECCHIO:  And just briefly, Your Honor,
18    given the international scope of this case, the Government is
19    going to need time to do any necessary investigation, should
20    they intend to put on witnesses who are located abroad.  So we
21    would just request that it be provided to us sooner rather
22    than later.
23              THE COURT:  I'm not going to delay the trial because
24    you didn't give them enough notice.
25              MR. BALAREZO:  I understand.  It sounds like the
```

PROCEEDINGS

```
 1   same argument we made at the beginning of trial when we had
 2   300,000 pages of documents.
 3              THE COURT:  No.
 4              MR. BALAREZO:  We will give the Government
 5   everything they're entitled to.
 6              THE COURT:  It doesn't sound like quite the same
 7   argument, and there was one witness that I prohibited the
 8   Government from calling on the day they wanted to because you
 9   hadn't had enough notice.  And I said to all parties, I don't
10   want to be in that position again.  So far, the Government has
11   followed through with that.  I expect the defense to, too.
12              Counsel is correct that it is possible, even with
13   regard to these writ witnesses -- although I don't know if it
14   does or doesn't -- that the Government's going to have to do
15   some legwork to be ready for this.  So they're entitled to the
16   same advance disclosure of witnesses that the defense was
17   entitled to, and that's really got to happen.
18              MR. BALAREZO:  Your Honor, as I said, I will email
19   the Government the letter we filed last night.  I will inform
20   them who the witnesses are and what we expect they will
21   testify to, if called.
22              THE COURT:  Right.  But the question is, is there
23   anything else beyond that?
24              MR. BALAREZO:  Your Honor, I don't anticipate that
25   there is any 3500 to produce.
```

```
 1              THE COURT:  Okay.
 2              MR. BALAREZO:  There is no Rule 16 discovery to
 3    produce.
 4              THE COURT:  Okay.
 5              MR. BALAREZO:  So that's it.
 6              THE COURT:  Okay.  That should do it.
 7              All right.  Let's have the jury, please.
 8              (Pause in proceedings.)
 9              THE COURT:  You should sit down.  They're not in the
10    hall yet, so.
11              (Jury enters.)
12              THE COURT:  All right.  Everyone be seated.
13              Good morning, ladies and gentlemen.
14              JURORS:  (In unison.) Good morning.
15              THE COURT:  We'll continue with cross-examination.
16              Mr. Balarezo?
17              MR. BALAREZO:  Your Honor, I will, and I'll have to
18    speak very loudly.  I forgot to get the --
19              THE COURT:  Come over and get it.
20              MR. BALAREZO:  Sorry.
21              THE COURT:  No problem.
22              MR. BALAREZO:  Thank you, Your Honor.
23                          CROSS-EXAMINATION
24    BY MR. BALAREZO:
25    Q    Good morning, sir.  How are you?
```

ZAMBADA/CROSS/BALAREZO

```
 1   A     Good morning.  Very well.  Thank you.
 2              THE COURT:  Interpreter, a little closer to the mic.
 3   Pull it towards you.  Thank you.
 4   BY MR. BALAREZO:
 5   Q     Sir, on Friday, I'm just going to go back to clarify a
 6   couple things.
 7              On Friday, you talked about a meeting in the
 8   mountains of Sinaloa in which you said that Compadre Chapo,
 9   German, Mayo and M-10 had in the mountains of Sinaloa.  Do you
10   remember that meeting?
11   A     Yes, sir.
12   Q     And according to you, this person, M-10, was asking for
13   support from Mayo, from your father, in the war against the
14   Carrillo Fuenteses, is that correct?  Yes or no?
15   A     Yes, sir.
16   Q     And in fact, your father, Mayo, directed German to supply
17   weapons that were coming through El Paso to M-10 if he needed
18   it to fight Carrillo Fuentes, is that correct?
19   A     Yes, sir.
20   Q     And M-10 said that one of his workers in Juárez, that he
21   had a worker in Juárez, and that that worker's name was Jaguar
22   in English or Jaguar in Spanish, is that correct?
23   A     Yes, sir.  One of his workers mentioned Jaguar.
24              MR. BALAREZO:  And could I have the Elmo, please?
25   BY MR. BALAREZO:
```

ZAMBADA/CROSS/BALAREZO

1   Q    And sir, I'm showing you Government's Exhibit 71, who

2   has already been identified as Antonio Marrufo.  This is the

3   Jaguar or Jaguar that you are referring to, correct?

4   A    Yes, sir.

5   Q    Thank you.

6   A    Yes, sir.

7   Q    Now, we also talked briefly about some calls that you

8   had -- after you started cooperating, you had some telephone

9   calls with your father, correct?

10  A    Yes, sir.

11  Q    And I think on Friday, you said that you had only spoken

12  with your father once, is that correct?

13  A    I didn't say the amount of times.  I said that I was put

14  on the phone with my father.

15  Q    All right.  That's what I want to clarify.  From the time

16  that you began cooperating -- or strike that.

17        From the time that you came to the United States,

18  extradited, until today, how many times have you spoken -- not

19  face-to-face but on the telephone or some other means -- with

20  your father?

21  A    There were two times on the phone.

22  Q    And those two times, if you recall, were in April of

23  2012, correct?

24  A    I don't remember the exact date, but it was in 2012.

25  Q    And when you were on those calls, there were two agents,

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

```
1    Todd Smith and Emily Fernandez, there with you, correct?

2    A    Yes, sir.

3    Q    And when you said on Friday that you had been pulled out

4    of your cell at midnight to take a call from your father, that

5    wasn't entirely correct, is that right?

6    A    I don't understand.

7    Q    Well, your attorney, Frank Perez, had arraigned for the

8    calls, correct?

9    A    No, sir.

10   Q    He had gone to Sinaloa, spoken to your father, and made

11   the arrangements for the communication to be made between him

12   and you through the Government.

13            THE COURT:  Mr. Balarezo, let the translation

14   happen, but he said no, your question was incorrect.  His

15   lawyer didn't arrange for the call.

16            MR. BALAREZO:  My question was my question, but his

17   answer was no.  Is that I guess what the Court is saying?

18            THE COURT:  I added that he said no.

19            MR. BALAREZO:  Thank you.

20            THE COURT:  That was his answer.

21            MR. BALAREZO:  Thank you, Your Honor.

22   BY MR. BALAREZO:

23   Q    Now, during these conversations with your father, however

24   they were arranged -- well, strike that.

25            Your lawyer didn't arrange those calls is what
```

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

```
 1   you're saying?
 2   A      My lawyer made arrangements for the phone calls, not
 3   Mr. Frank Perez.
 4   Q      Well, Frank Perez is your lawyer, right?
 5   A      Currently, he is.
 6   Q      Mr. Gargiola, did he make the arrangements?
 7   A      Mr. Gargiola and another lawyer of the name Loya.
 8   Q      So your lawyers -- and I just -- I'm not trying to trick
 9   you.  I just want to clarify so I understand.  Your lawyers
10   met with your father, correct?  In Sinaloa?  Yes?
11   A      That is what Attorney Gargiola told me after these phone
12   calls.
13   Q      And the arrangement was, your father could call in to the
14   Government and ask to speak to you, wasn't that correct?
15   A      I don't understand, no.  Can you make the question more
16   direct?
17   Q      I'll break it down.
18          The arrangement was for your father, Mayo Zambada,
19   would make a call to some number of the Government's, and when
20   that call was received, the Government would take you out of
21   your cell and you would talk to Papa Mayo, right?
22   A      Yes, sir.  That's how it was.
23   Q      Now, during these calls -- which lasted about eight
24   minutes and 12 minutes, I believe -- you weren't just saying
25   hello and how's mom, how's my sister, were you?
```

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

```
 1   A     No, sir.

 2   Q     These calls were made after you were released from the

 3   SHU by the Government.  Remember the SHU?

 4   A     Yes, sir.

 5   Q     So you had been a risk of flight.  You had been all these

 6   bad things that kept you in the SHU.  You began cooperating,

 7   you came out of the SHU, and then you're make making these

 8   calls?

 9   A     Yes, sir.

10   Q     And in those phone calls with Papa Mayo, you were asking

11   him for help, right?  You wanted him to help you in your case?

12   A     My dad and my Compadre Chapo, both.

13   Q     Thank you for adding Compadre Chapo, but I'm asking you

14   about your father right now.

15   A     Yes, sir.

16   Q     Compadre Chapo did not have a phone number for the U. S.

17   Government that he could use to call in and talk to you, did

18   he?

19   A     He was aware of this, and his lawyer also participated in

20   this, attorney, lawyer.

21   Q     Thank you for that, but answer my question.  You want me

22   to repeat it?

23   A     Please.

24   Q     Did Compadre Chapo -- in case you forgot, the man right

25   here with the dark suit.  You see him?  Did he ever call you
```

ZAMBADA/CROSS/BALAREZO

```
 1   at a government number and ask to speak to you?

 2   A     No, sir.

 3   Q     And when you were talking to your father, your Papa Mayo,

 4   you were asking him for radio frequencies, right?

 5   A     No, sir.

 6   Q     Were you asking him for photos?

 7   A     I don't remember.  It's possible.

 8         MR. BALAREZO:  One moment, Your Honor.

 9   BY MR. BALAREZO:

10   Q     Were you asking him for locations?

11   A     No, sir.

12   Q     Were you asking for transportation routes?

13   A     I asked him about --

14   Q     Did you asked him for PINs?

15         THE COURT:  Wait.

16         MR. BALAREZO:  Oh, I'm sorry, Your Honor.

17   A     I asked him about several things.  I don't remember all

18   of them.

19   BY MR. BALAREZO:

20   Q     Well, you remember things that happened 20, 30 years ago.

21   You can't remember something that happened in two phone calls

22   with your Papa Mayo?

23   A     You were asking me very specific, very direct questions

24   and I don't remember exactly.  I remember saying, dad, how are

25   you?  I love you very much.  Please, are you going to help me?
```

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

```
 1   I asked about the job that I had left hanging with the Pennick
 2   ship.
 3   Q    So you can answer very general questions, but specific
 4   questions with details, that just escapes your memory?  Is
 5   that what you're telling me?
 6   A    No, sir.
 7   Q    Well, let me ask you --
 8            THE COURT:  Wait.  Wait.  I didn't get the
 9   translation, the answer.
10            What was the answer to the last question?
11            THE INTERPRETER:  No, sir.
12            THE COURT:  Go ahead.  I understand.  You've got
13   to focus more.
14   BY MR. BALAREZO:
15   Q    So let me ask you very general question.  Your Papa Mayo
16   was going to help you by giving you PINs, transportation
17   routes, locations, photos, radio frequencies of people that
18   the United States Government can then capture and you could
19   get credit for, right?  That is a very general question.  Do
20   you understand the question?
21            MS. LISKAMM:  Objection; mischaracterizes the
22   testimony.
23            THE COURT:  Well, it is a question.  If that's the
24   objection, it's overruled.
25   A    Yes, sir.
```

ZAMBADA/CROSS/BALAREZO

```
1    BY MR. BALAREZO:
2    Q    And you know that during that time, your Papa Mayo had
3    communications with Compadre Chapo, correct?
4    A    Yes, sir.
5    Q    And your father had the PIN for Compadre Chapo?
6    A    I suppose so.
7    Q    And had the locations for Compadre Chapo?
8    A    Yes.  They see each other often.
9    Q    And of course, shortly after that, Compadre Chapo gets
10   arrested, but Mayo doesn't, right?
11   A    Not shortly after that.
12   Q    Now, these telephone calls that you claim, these two
13   calls were not the only communications in general that you had
14   with Papa Mayo, right?
15   A    No, through my lawyer, as well.
16   Q    Right.  Your lawyers would see you, would go see him and
17   they would pass messages back and forth, correct?
18   A    No, no, no.  It wasn't like that.  It wasn't like you
19   say.  There were times that my lawyer said he had seen my
20   father and that he sent his regards.
21   Q    So you're telling these 18 people here that your lawyers
22   saw you, saw Mayo, but they never passed any messages between
23   the two of you?  Is that what you're telling us?
24   A    No, sir.  What I said is their messages were, how are
25   you, how are you doing, to send their regards, how was I doing
```

ZAMBADA/CROSS/BALAREZO

1    and to stay strong.

2    Q    So you're telling the jury that your father never passed

3    you any PINs of Chapo, of other people, never passed you any

4    locations, anything -- anything that could help your case, he

5    never passed onto you through your lawyers?  That's what

6    you're telling this jury today?

7    A    No, sir.  What my attorney says is that my dad and

8    Compadre Chapo gave the information directly to the U. S.

9    Government through their lawyers.

10   Q    So Compadre Chapo gave his PIN number, his location to

11   your lawyers, so they can give it to the government?  I'm just

12   trying to understand what you're saying.

13   A    No.  The PIN for my Compadre Chapo was never given over,

14   and my dad's was never given over.  The ones that were given

15   over were our enemies.

16   Q    You're testifying against him.  He is your enemy.  Right?

17   A    No, sir.  He's not my enemy.

18   Q    You thought you were doing a favor to him?

19   A    No, sir.  He knew that I was going to come and testify

20   against him.  I pled guilty when my Compadre Chapo was out

21   with my father, and he knew I was coming to cooperate.

22            I committed -- I made a commitment with the

23   prosecution that I would testify if they needed me, and that's

24   why I'm here today.  I did not know the future.  I didn't know

25   that my Compadre Chapo would be here, but I gave my word and

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

1    I'm here.  My Compadre Chapo is not my enemy.

2    Q    Done?

3    A    I'm done answering your question.

4    Q    Thank you.

5         During this entire time, you said that Compadre

6    Chapo knew you were going to testify against him.  You're

7    alive and you're testifying, correct?

8    A    Yes, sir.

9    Q    Now, besides those communications with your lawyers and

10   your -- the phone calls with your father, the Government also

11   allowed you -- during your over one hundred meetings with

12   them -- to text.  Correct?

13   A    Yes, sir.  There were some text messages.

14   Q    There were a lot of text messages, and you were texting

15   somebody named Ismael, right?

16   A    Yes, sir.

17   Q    But of course that Ismael is not Ismael Zambada Garcia,

18   correct?

19   A    No, sir.

20   Q    But this mysterious Ismael, that's another way that you

21   were able to communicate with your father while you were

22   cooperating with the United States Government, correct?

23   A    Yes, sir.

24   Q    Now, you also Friday -- just very brief questions -- we

25   talked about a shooting at the Guadalajara Airport.  Do you

ZAMBADA/CROSS/BALAREZO

```
 1   remember that?
 2   A    Yes, sir.
 3   Q    And you testified about how Compadre Chapo was arrested
 4   for the murder of the cardinal, correct?
 5   A    No, sir.  I was very clear.  I said that my Compadre
 6   Chapo told me he had not killed the cardinal.
 7   Q    No, I know what he told you, but that's why he was
 8   arrested, was my question.
 9   A    Well, some days after that, he was arrested because of
10   that happen -- that incident.
11   Q    So, the eight years that he spent Puente Grande from '93
12   until 2001 was basically for something he didn't do, correct?
13   A    I don't know what charges were against him, sir.  I'm
14   just saying that he told me that he hadn't killed him.
15   Q    Now, do you know who -- a guy by the name of Armando
16   Corral -- is C-O-R-R-A-L?
17   A    Yes, sir.
18   Q    And who is Armando Corral?
19   A    As far as I know, he was Vicente Carrillo Fuentes'
20   people.
21   Q    And he didn't sell drugs for your father in Chicago?
22   A    Carrillo Fuentes, he did sell for my namesake, Vicente,
23   and for my dad whenever they were partners.
24   Q    And you know Javier Armando's nephew?
25   A    Yes, sir.
```

ZAMBADA/CROSS/BALAREZO

1  Q    And Javier did sell drugs for your father in Chicago,

2  correct?

3  A    Yes, sir.

4  Q    And in fact, the Carrillo Fuenteses killed Javier in

5  Juárez, Mexico, correct?

6  A    Yes, sir.

7  Q    And also, you talked about a guy named Macho Prieto?

8  A    Yes, sir.

9  Q    Macho Prieto was very close to your father, correct?

10 A    Yes, sir.

11 Q    And Rodolfo had Macho Prieto's brother killed, didn't he?

12 A    Yes, sir.

13 Q    So, Rodolfo Carrillo murdered Macho Prieto's brother, who

14 was very close to your father and also, the Carrillo Fuenteses

15 killed Javier, who was a worker of your father, correct?

16 A    Yes, sir.

17 Q    But you told this jury here that it was Compadre Chapo

18 that ordered the murder of Rodolfo Carrillo Fuentes, right?

19 A    I said that my dad and my Compadre Chapo ordered the

20 murder of Rodolfo Carrillo.

21 Q    Now, you also testified about weapons on Friday.  You

22 remember that?

23 A    Yes, sir.

24 Q    You've got AK-47s, AR-15, 15 millimeters, 9 millimeters?

25 A    Yes, sir.

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

1    Q    And on occasion, you've got M16s, correct?

2    A    Yes, sir.

3    Q    And M16 is a fully automatic weapon.  You don't have to

4    convert them or anything?

5    A    Yes, sir.

6    Q    And you know from your experience of all these weapons

7    that M16s are standard issue for the United States military,

8    correct?

9    A    Yes, sir.

10   Q    Thank you.

11        Did the military provide them to you, the U. S.

12   military?

13   A    I don't know.  I don't know if that was done directly,

14   but, you know, we did buy some M16s.  We got about two or

15   three of those rifles.  They're very difficult to come by.

16        MR. BALAREZO:  Your Honor, I would like to show the

17   witness only Defense Exhibit 382.  (Exhibit published to the

18   witness.)

19   BY MR. BALAREZO:

20   Q    Can you see that, sir?

21   A    Yes, sir.

22   Q    Can you just describe what I'm showing you right now?

23   A    The picture of my father and the picture of my Compadre

24   Chapo.

25   Q    And which one is your Compadre Chapo?

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

```
 1   A     The one on my left, and then on my right is my father.

 2   Q     And does this picture fairly and accurately depict

 3   Compadre Chapo and Papa Mayo?

 4   A     Yes, sir.

 5             MR. BALAREZO:  Your Honor, I move Defense Exhibit

 6   382 into evidence.

 7             MS. LISKAMM:  No objection.

 8             THE COURT:  Received.

 9         (Defense Exhibit 382 was received in evidence.)

10             (Exhibit published to the jury.)

11   BY MR. BALAREZO:

12   Q     So, sir, your father likes to wear baseball hats, right?

13   A     Yes, sir.

14   Q     And just for the jury, the person that I'm pointing to

15   right now on the right of Defense Exhibit 382, that is Ismael

16   Zambada Garcia, alias El Mayo, your father, right?

17   A     Yes, sir.

18   Q     And the person on the right with the lighter blue cap,

19   that's Compadre Chapo, as you say?

20   A     Yes, sir.

21   Q     And apparently, they both like mustaches also?

22   A     Yes, sir.

23   Q     That's kind of a Mexican thing, right?  Fairly common?

24   A     Yes, sir.

25   Q     Now, everything that you said indicates that Mayo
```

ZAMBADA/CROSS/BALAREZO

1    Zambada, the guy on the right, was and is and continues to be

2    a very, very powerful man in Mexico, is that right?

3    A    Yes, sir.

4    Q    And you know that your father has been the leader of the

5    Sinaloa Cartel, as you describe it, since at least the 1970s,

6    right?

7    A    Yes, sir.

8    Q    And in fact, Mayo Zambada is known in Mexico as a

9    narcotics trafficker, and people want to hear what he has to

10   say, is that right?  Is that your understanding?

11   A    Yes, sir.

12   Q    And in fact, your father has not really given -- has not

13   really talked much, right?  But he has given at least one

14   interview, is that correct?

15   A    Yes, sir.

16   Q    You know what --

17   A    I found out, so yes.

18   Q    Do you know what *Proceso* is?

19   A    Yes, sir.

20            MR. BALAREZO:  If I can just show the witness

21   Defense exhibit Number 370?  (Exhibit published to the

22   witness.)

23   BY MR. BALAREZO:

24   Q    Do you see that, sir?

25   A    Yes, sir.

ZAMBADA/CROSS/BALAREZO

1    Q    Just describe for us what you see.

2    A    I am looking at the cover of the *Proceso* magazine where

3    my father is, and with Mr. Julio.

4             THE INTERPRETER:  And the interpreter needs to

5    clarify the last name?  Scherer Garcia.

6    BY MR. BALAREZO:

7    Q    And does this Exhibit 370 fairly and accurately represent

8    or depict the cover of that magazine where your father gave an

9    interview?

10   A    Yes, sir.

11            MR. BALAREZO:  Your Honor, I'd move 370 into

12   evidence.

13            MS. LISKAMM:  Your Honor, I have no objection to the

14   photo, but the writing on the photo, I would object to.

15            THE COURT:  All of the writing?

16            MS. LISKAMM:  Yes.

17            MR. BALAREZO:  That's fine, Your Honor.  Can I leave

18   it there?  Is that all right?

19            MS. LISKAMM:  I have no problem with the current

20   view on the screen.

21            MR. BALAREZO:  That's fine.  We'll use the current

22   view, Your Honor.

23            THE COURT:  Okay.  We'll redact it when we give it

24   to the jury.

25            MR. BALAREZO:  Thank you.

LISA SCHMID, CCR, RMR

```
 1                    THE COURT:  When I say we, I mean you.

 2                    MR. BALAREZO:  Mr. Lichtman will.

 3                    THE COURT:  Okay.

 4                    MR. BALAREZO:  Thank you.

 5              (Defense Exhibit 370 was received in evidence.)

 6   BY MR. BALAREZO:

 7   Q    So, sir, is this the cover of the -- that magazine,

 8   Proceso, from Mexico, which contained the interview with your

 9   father, El Mayo Zambada?

10   A    Yes, sir.

11   Q    And just so we're clear, that's not Papa Maya, right?

12   A    The one where your finger is pointing?  Yes, that's my

13   father.

14   Q    With the mustache and the baseball hat?

15   A    Yes, sir.

16   Q    Thank you.

17              Now, and the gentleman, the older gentleman next to

18   him, to his -- to his right, to our left, who is that?  You

19   named him, but who is he?

20   A    He's a man who is very well known in Mexico.  He's a

21   writer.  He writes for Proceso magazine.

22   Q    And he's the one who interviewed your father?

23   A    As far as according to what I heard and what I can see

24   here.  Yes, sir.

25   Q    He found your father, right, for the interview?
```

ZAMBADA/CROSS/BALAREZO

```
 1              MS. LISKAMM:  Objection.

 2              THE COURT:  Sustained.

 3   BY MR. BALAREZO:

 4   Q    Now, since your father has been a powerful narco

 5   trafficker since the seventies, he has never been arrested, is

 6   that correct?

 7   A    Yes.  That's correct.

 8   Q    Not in Mexico?

 9   A    Nowhere.

10   Q    And of course, his friends haven't been that lucky,

11   correct?

12   A    Sir, what do you want me to tell you?

13              MR. BALAREZO:  Could I have the Elmo, please, for

14   the witness only? (Exhibit published to the witness.)

15   BY MR. BALAREZO:

16   Q    Defense Exhibit 385A.  Do you recognize this gentleman?

17   A    Yes, sir.

18   Q    And who is that?

19   A    Benjamin Arellano Felix.

20   Q    Does it fairly and accurately depict Mr. Benjamin

21   Arellano Felix?

22   A    Yes, sir.

23              MR. BALAREZO:  Your Honor, I move 385 into evidence

24   -- 385A, excuse me.

25              MS. LISKAMM:  No objection.
```

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

```
 1                 THE COURT:  Received.

 2             (Defense Exhibit 385A was received in evidence.)

 3    BY MR. BALAREZO:

 4    Q    And Mr. Benjamin Arellano Felix is in prison right now,

 5    isn't he?

 6    A    Yes, sir.

 7                 MR. BALAREZO:  For the witness. (Exhibit published

 8    to the witness.)

 9    BY MR. BALAREZO:

10    Q    Defense Exhibit 286.  Do you recognize that gentleman?

11    A    Yes, sir.

12    Q    And who is that?

13    A    Javier Arellano Felix.

14    Q    Does it fairly and accurately represent Mr. Javier

15    Arellano Felix?

16    A    Yes, sir.

17                 MR. BALAREZO:  Your Honor, I move 286 into evidence.

18                 MS. LISKAMM:  No objection.

19                 THE COURT:  Received.

20             (Defense Exhibit 286 was received in evidence.)

21    BY MR. BALAREZO:

22    Q    And where is he?

23    A    As far as I know, he's in jail.

24    Q    In prison?

25    A    Yes, sir.
```

ZAMBADA/CROSS/BALAREZO

1          MR. BALAREZO:  For the witness only.  (Exhibit

2   published to the witness.)

3   BY MR. BALAREZO:

4   Q    Defense Exhibit 387, do you recognize that person?

5   A    Yes, sir.

6   Q    Who's that?

7   A    Ramon Arellano Felix.

8   Q    And does that fairly and accurately represent Ramon

9   Arellano Felix?

10  A    Yes, sir.

11  Q    And Ramon Arellano Felix is dead, right?

12  A    Yes, sir.

13          MR. BALAREZO:  And Your Honor, I'd move 387 into

14  evidence.

15          MS. LISKAMM:  No objection.

16          THE COURT:  Received.

17      (Defense Exhibit 387 was received in evidence.)

18  BY MR. BALAREZO:

19  Q    Nacho Coronel, right?  (Exhibit published.)

20  A    Yes, sir.

21  Q    Government Exhibit 7.  He's dead?

22  A    Yes, sir.

23  Q    Government Exhibit Number 8, El Guero Palma? (Exhibit

24  published.)

25  A    Yes, sir.

LISA SCHMID, CCR, RMR

ZAMBADA/CROSS/BALAREZO

```
 1   Q     In prison?

 2   A     Yes, sir.

 3   Q     Government Exhibit Number 10, Vicente Carrillo Fuentes.

 4   (Exhibit published.)

 5   A     Yes.

 6   Q     Where is he?

 7   A     In prison.

 8            MR. BALAREZO:  For the witness only.  (Exhibit

 9   published to the witness.)

10   BY MR. BALAREZO:

11   Q     You recognize this gentleman?

12   A     I knows that's Osciel Cardenas Guillon.

13   Q     And does that fairly and accurately represent Osciel

14   Cardenas Guillon?

15   A     To me, yes.

16            MR. BALAREZO:  Your Honor, I move 388 into evidence.

17            MS. LISKAMM:  No objection.

18            THE COURT:  Received.

19         (Defense Exhibit 388 was received in evidence.)

20            (Exhibit published to the jury.)

21   BY MR. BALAREZO:

22   Q     And Osciel Cardenas is where?

23   A     As far as I know, he's in prison.

24   Q     Government Exhibit 31, who's that? (Exhibit published.)

25   A     Alfredo Beltrán Leyva.
```

ZAMBADA/CROSS/BALAREZO

```
 1   Q     Also know as El Mochomo.  He's in prison, isn't he?

 2   A     Yes, sir.

 3   Q     And Government Exhibit Number 4, Arturo Beltrán Leyva?

 4   He's dead, right? (Exhibit published.)

 5   A     Yes, sir.

 6   Q     Government Exhibit Number 5, Hector Beltrán Leyva?

 7   (Exhibit published.)

 8   A     Yes, sir.

 9   Q     He was in prison and he's dead now, isn't he?

10   A     Yes, sir.

11         MR. BALAREZO:  For the witness only.  (Exhibit

12   published to the witness.)

13   BY MR. BALAREZO:

14   Q     Defense Exhibit 391B.  Do you recognize this gentleman?

15   A     He looks like Trevino, Miguel Angel Trevino.

16   Q     Excuse me?  Former head of the Zetas?

17   A     Yes, sir.

18   Q     He's in prison, correct?

19   A     As far as I know, yes, he is.

20   Q     And for everyone, Government Exhibit 28.  (Exhibit

21   published.)

22   A     That's my dad.

23   Q     Free, in Sinaloa?

24   A     Yes, sir.

25   Q     Still leading the Sinaloa Cartel like he has since the
```

ZAMBADA/REDIRECT/LISKAMM

```
 1   seventies, correct?

 2   A    Yes, sir.

 3            MR. BALAREZO:  Thank you, Your Honor.  I have no

 4   further questions for the witness.

 5            THE COURT:  All right.

 6            Redirect?

 7                    REDIRECT EXAMINATION

 8   BY MS. LISKAMM:

 9   Q    Good morning, Mr. Zambada.

10   A    Good morning.

11   Q    You were asked on Friday a number of questions about your

12   plea agreements.  Do you remember that?

13   A    Yes.

14   Q    Okay.  And defense counsel showed you what's been marked

15   as Government Exhibit 349, and I'm putting on the screen right

16   now. (Exhibit published.)

17   A    Yes.

18            MS. LISKAMM:  And this is in evidence.

19   BY MS. LISKAMM:

20   Q    All right.  Do you recall that?

21   A    Yes.

22   Q    And defense counsel had you take a look at page four of

23   this plea agreement, which I'm turning to now.  And

24   specifically, he had you read paragraph 9A; however, he had

25   you read a portion of 9A, which he had highlighted in yellow
```

ZAMBADA/REDIRECT/LISKAMM

1    and underlined here.  He skipped over the beginning of that

2    paragraph that I highlighted in pink.

3              MS. LISKAMM:  If we can have the interpreter read

4    the beginning of that paragraph that's highlighted in pink?

5              THE INTERPRETER:  (Complies.)

6    BY MS. LISKAMM:

7    Q    Okay.  What -- pursuant to that provision of the plea

8    agreement, what are you required to do?

9    A    To always provide my true testimony.

10   Q    Okay.  And since we're talking about plea agreements,

11   Mr. Zambada, what happens if you lie here in court today to

12   your plea agreement?

13   A    Well, it would automatically be ripped up, the agreement,

14   and I would be in a bad situation.

15   Q    Okay.  And what would your sentence be if your plea

16   agreement is ripped up?

17   A    Life.

18   Q    Okay.  And that's on each case, correct?

19   A    Correct.

20   Q    Okay.  And Mr. Zambada, you have provided information to

21   the U. S. Government on other cases before coming in here and

22   testifying today, is that correct?

23   A    Yes.

24   Q    Okay.  And if you lie here to this jury, what happens to

25   your prior cooperation?

ZAMBADA/REDIRECT/LISKAMM

```
 1   A     Well, like I said, they would rip up my agreement.
 2   Things would be really bad for me and they would give me life.
 3   Q     Would you get credit for your prior cooperation?
 4   A     No.
 5   Q     Okay.  So is it in your best interest to tell the truth
 6   here or to lie?
 7   A     No, to tell the truth.
 8   Q     Okay.  Do you also recall on Friday being asked whether
 9   the defendant was simply a made-up myth?
10   A     Yes.
11   Q     Okay.  Do you know this defendant to be a real drug
12   trafficker or a made-up myth who doesn't traffic drugs?
13   A     No, a real drug trafficker, a partner of my dad's, as I
14   said.
15   Q     Okay.  And do you know this defendant to be a powerful
16   leader of the Sinaloa Cartel or a made-up myth who hides in
17   the mountains and does nothing?
18   A     No, he's a leader, another leader as my father is of the
19   Sinaloa Cartel.
20   Q     Okay.  This morning, defense counsel asked you a number
21   of questions about some phone calls and text messages that
22   were made when you were cooperating with the U. S. Government.
23   Do you recall that?
24   A     Yes.
25   Q     Okay.  Those calls and text messages were made at the
```

LISA SCHMID, CCR, RMR

ZAMBADA/REDIRECT/LISKAMM

 1    direction of the DEA, is that correct?

 2    A     Yes.

 3    Q     And they were monitoring you when you made those calls

 4    and sent those messages, correct?

 5              MR. BALAREZO:  Objection, 611(c).  Form.

 6              THE COURT:  I know what you're saying.  I'm just

 7    wondering if it's worth it.

 8              Yes.  Please rephrase the question.

 9    BY MS. LISKAMM:

10    Q     Mr. Zambada, who was monitoring the text messages and

11    phone calls that you were making while you were cooperating

12    with the U. S. Government?

13    A     The government of the United States, especially the DEA.

14    Q     Okay.  Let's turn now just briefly to corruption.  You

15    were asked a number questions about corruption payments that

16    were being made on Friday.  Do you recall that?

17    A     Yes.

18    Q     Who were those payments being made on behalf of?

19    A     On behalf of my dad and my Compadre Chapo.

20    Q     And in fact, this defendant had his own contacts in the

21    government, is that correct?

22              MR. BALAREZO:  Objection.

23              THE COURT:  Sustained.

24    BY MS. LISKAMM:

25    Q     What if any contacts did this defendant have in the

LISA SCHMID, CCR, RMR

ZAMBADA/REDIRECT/LISKAMM

```
 1    federal government?

 2    A    At all levels.

 3    Q    Okay.  And can you remind the ladies and gentlemen of the

 4    jury who El Doctor is?

 5    A    Yes, Roberto Beltrán, A/K/A El Doctor.

 6    Q    And who did Roberto Beltrán, El Doctor, report to?

 7    A    Directly to my Compadre Chapo.

 8    Q    And what were his responsibilities in the cartel?

 9    A    Pay off government, corruption.

10    Q    For whom?

11    A    For my Compadre Chapo.

12    Q    Okay.  And just lastly, I just want to follow up.  You

13    were asked a number of questions and shown a number of

14    pictures about people in the cartel just now.

15    A    Yes.

16    Q    Okay.  Who in your family has been arrested?

17    A    My brothers.

18    Q    Who?

19    A    Ismael Zambada Imperial, Serafin Zambada Ortiz.  My Uncle

20    Rey, Jesus Reynaldo Zambada Garcia, and me.

21    Q    And just to be clear, let's look at them one at a time.

22         Ismael, what is his relationship to your father?

23    A    Friend, bodyguard.

24    Q    What is his familial relationship with your father?

25    A    They're the sons of my father.
```

ZAMBADA/RECROSS/BALAREZO

```
 1   Q    Okay.  And Serafin?

 2   A    Son of my father.

 3   Q    You are obviously your father's son, correct?

 4            MR. BALAREZO:  Objection.

 5   A    Yes.

 6   Q    And your Uncle Rey, what is his familial relationship

 7   with your dad?

 8   A    Brothers.

 9   Q    Okay.

10            MS. LISKAMM:  I have no further questions.

11            THE COURT:  Nothing else?

12            MR. BALAREZO:  Very brief, just very brief.

13            THE COURT:  Go ahead.

14                      RECROSS-EXAMINATION

15   BY MR. BALAREZO:

16   Q    Sir, Defense Exhibit 362, you can see that, right?

17   A    Yes, sir.

18   Q    I'll put it on the Elmo for the Government. (Exhibit

19   published.)

20            They have been arrested, but they're both

21   cooperating with the Government, right?

22   A    Serafin and my brother, Medito Gordo is in Mexico still.

23   He hasn't been extradited yet.

24   Q    How long ago was he arrested, 2014, around there?

25   A    Around then, yes.  I don't know the exact date, but yes.
```

ZAMBADA/RECROSS/BALAREZO

```
1    Q    Four years, hasn't been extradited, right?
2    A    Yes.
3    Q    And the other guy, Serafin, got a 66 month sentence for
4    drug trafficking when he was facing the thing same thing you
5    are, right?
6    A    I don't know if it's the same.  I'm a different case, but
7    it is drug trafficking, too.
8    Q    And the Government just asked you about who was
9    monitoring your conversations.  Remember that?
10   A    Yes.
11   Q    Well, when your lawyers were going to see Papa Mayo, the
12   Government wasn't monitoring these conversations, right?
13   A    I don't know that.  No.
14   Q    And when your lawyers were visiting you and talking to
15   you after visiting Papa Mayo, the Government wasn't monitoring
16   those conversations, were they?
17   A    No, sir.  I don't know.
18   Q    Those were the only conversations with your Papa Mayo
19   that he just said hello and how are you?
20   A    Yes, sir.
21   Q    And finally, the Government asked you about that one line
22   in your plea agreement that was highlighted in pink.  Do you
23   remember that, were you promised to tell the truth or
24   something like that?
25   A    Yes, sir.
```

LISA SCHMID, CCR, RMR

ZAMBADA/RECROSS/BALAREZO

```
 1   Q    Oh.  Nobody at this table, no one that you met with,
 2   agents, were present at any of these events that you've
 3   testified about, is that correct?
 4   A    I'm sorry?  I'm sorry?
 5   Q    All the things that you have testified about from
 6   whenever you started until today, when you ordered murders,
 7   when you did all those things, no one sitting at this table
 8   was present, right?  Obviously.
 9   A    Oh, yeah.
10   Q    And none of these 18 people here in the jury were present
11   either, correct?
12   A    Correct.
13   Q    All of this jury has to go by is your testimony?
14   A    Because I am telling the truth.  And the only one who was
15   there, too, is my Compadre Chapo.
16   Q    But you're facing two life sentences, right?
17   A    Yes.
18           MR. BALAREZO:  I have nothing further, Your Honor.
19           THE COURT:  All right.
20           Nothing, right?
21           MS. LISKAMM:  No, Your Honor.
22           THE COURT:  Now, ladies and gentlemen, give us just
23   a moment while we reset the courtroom and get the next
24   witness.  If you could just line up outside, stay there in the
25   line, and we'll be with you in a minute.
```

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
 1            (Jury exits.)

 2            THE COURT:  All right.  Everyone may be seated.  The

 3    Marshals may be remove the witness.  I put the jury in the

 4    jury room for a minute.

 5            MS. PARLOVECCHIO:  Your Honor, one of our witnesses

 6    wasn't produced by the Marshals, so we're going to put

 7    somebody else, but we just need an extra minute to --

 8            THE COURT:  We could take a five minute break.

 9            MS. PARLOVECCHIO:  That would be fine or if you want

10    to take the morning break now.

11            THE COURT:  Now is too early.

12            MS. PARLOVECCHIO:  Okay.

13            THE COURT:  Let's recess for five minutes while we

14    get the other witness up.

15            THE INTERPRETER:  Do you need the interpreters for

16    the next one?

17            MS. PARLOVECCHIO:  No.

18            (Recess.)

19            THE CLERK:  All rise.

20            THE COURT:  Okay.  Let's have the jury, please.

21            (Jury enters.)

22            THE COURT:  Everyone be seated.

23            The Government may call its next witness.

24            MS. PARLOVECCHIO:  The Government calls Jose Moreno.

25            (Witness sworn.)
```

LISA SCHMID, CCR, RMR

MORENO/DIRECT/PARLOVECCHIO

```
 1              THE CLERK:  Please state and spell your name for the
 2   record.
 3              THE WITNESS:  Jose Moreno.
 4              THE CLERK:  Spell it.
 5              THE WITNESS:  J-O-S-E, M-O-R-E-N-O.
 6              THE COURT:  Make sure you speak directly into the
 7   microphone.  Okay?
 8                        DIRECT EXAMINATION
 9   BY MS. PARLOVECCHIO:
10   Q    Good morning.
11   A    Good morning, ma'am.
12   Q    By whom are you employed?
13   A    The FBI.
14   Q    That is also known as the Federal Bureau of
15   Investigation?
16   A    Yes, it is.
17   Q    How long have you been employed by the FBI?
18   A    Seventeen years.
19   Q    And what is your current assignment?
20   A    I'm currently assigned as a Supervisory Special Agent in
21   the Bakersfield office of the Sacramento Division.
22   Q    And how long have you been assigned there in Bakersfield?
23   A    Five years.
24   Q    What does your job entail as a Supervisory Special Agent
25   with the FBI?
```

MORENO/DIRECT/PARLOVECCHIO

1    A    Supervise up to 13 agents who investigate a variety of

2    federal violation.

3    Q    Prior to being assigned to Bakersfield, where were you

4    assigned?

5    A    I was assigned to the Monterrey Regional Office in

6    Monterrey, Mexico.

7    Q    And just prior to that?

8    A    The Tijuana Regional Office, in Mexico.

9    Q    I'm going to direct your attention to February 2012.

10   Where you assigned at that time?

11   A    To the Tijuana Regional office, in Mexico.

12   Q    What were your duties as a Special Agent with the FBI in

13   Tijuana?

14   A    My primary duties was to support U. S.-based drug

15   investigations and also work with fellow U. S. counterparts,

16   investigating cartel activity.

17   Q    Which federal U. S. counterparts were you working with

18   while you were in the Tijuana Regional office?

19   A    Personnel from DEA, HSI and ATF.

20   Q    When you were assigned in Tijuana, what types of cases

21   were you working on that that time?

22   A    Largely matters supporting, like I said, U. S.-based drug

23   investigations, strategic matters and I also worked on some

24   cartel-related criminal activity.

25   Q    Were you working on any cases related to the defendant,

MORENO/DIRECT/PARLOVECCHIO

```
 1    Joaquín Guzmán?

 2    A     Yes, I was.

 3    Q     What was that?

 4    A     I worked in a number of operations trying to target the

 5    location of the defendant.

 6    Q     I'm going to direct your attention to February 18th,

 7    2012.  What, if anything, did you do in relation to the

 8    defendant that day?

 9    A     On that day, I was in Mexico City along with fellow DEA

10    counterparts and some FBI personnel here from New York, and

11    other Mexican USA officials, where we were awaiting tips by

12    SEMAR, who is the Mexican Marines, and some of the federal

13    special operations group who were in the area of Cabo San

14    Lucas, in attempts to locate the defendant.

15    Q     Did they locate the defendant that day?

16    A     No, they did not.

17    Q     And you mentioned SEMAR, the Mexican Marines.  Could

18    you -- what does SEMAR stand for?

19    A     Secretaría de Marina.

20    Q     And what was the other federal Mexican group related to

21    that capture operation.

22    A     The group that was working that we were -- that was out

23    there was the GOPAS group, which is the Special Operations

24    Group made up of federal agents, Mexican federal agents.

25    Q     Did you take any investigative steps based on information
```

LISA SCHMID, CCR, RMR

MORENO/DIRECT/PARLOVECCHIO

```
 1    that you learned that day?

 2    A    After that operation, we were ordered to go down to and

 3    coordinate another operation in the area of Cabo San Lucas.

 4    Q    And who were you going to be coordinating with?

 5    A    Fellow U. S. Marshals personnel, DEA personnel, and the

 6    Mexican counterparts who were there, down there already.

 7    Q    I'm going to show you what's in evidence as Government's

 8    Exhibit 502.  Using Government's Exhibit 502, could you please

 9    indicate where Cabo San Lucas is located?

10    A    Cabo San Lucas is the southern end of the peninsula, down

11    here at the end. (Indicating.)

12    Q    And could you just circle that on your screen, please?

13    A    With my finger?

14          THE COURT:  Yes.

15    BY MS. PARLOVECCHIO:

16    Q    Yes.

17    A    (Complies.)

18          MS. PARLOVECCHIO:  And let the record indicate that

19    the witness has circled the bottom of the Baja California Sur,

20    on the left side of the exhibit.

21    BY MS. PARLOVECCHIO:

22    Q    And now, Special Agent Moreno I'm just going to show you

23    Government's Exhibit 561.  What are we looking at here?

24    A    This is the map of the Baja California Sur.

25    Q    And where is Cabo San Lucas located?
```

MORENO/DIRECT/PARLOVECCHIO

```
1    A    Down here at the end. (Indicating.)

2    Q    And how do you recognize it?

3    A    Because I've traveled there many-a-times.

4         MS. PARLOVECCHIO:  The Government moves -- this is

5    actually not in evidence.  I'm sorry.  The Government moves to

6    admit Government Exhibit 561.

7         MR. FELS:  No objection.

8         THE COURT:  Received.

9    (Government's Exhibit 561 was received in evidence.)

10        MS. PARLOVECCHIO:  And publish to the jury, I guess.

11   Thank you.  (Exhibit published.)

12   BY MS. PARLOVECCHIO:

13   Q    And you circled the Cabo San Lucas dot at the bottom of

14   the map?

15   A    Yes, ma'am.

16   Q    Now, I want to direct your attention now to

17   February 22nd, 2012.  Did you have an assignment that day?

18   A    Yes, I did.

19   Q    What was your assignment on that day?

20   A    Our assignment was to coordinate to my fellow U. S.

21   counterparts and the Mexican counterparts to attempt to locate

22   the defendant.

23   Q    And where did that operation take place?

24   A    In the area of Cabo San Lucas.

25   Q    Where in Cabo San Lucas?
```

MORENO/DIRECT/PARLOVECCHIO

1   A     Specifically, in the Hacienda Encantada residential area.

2   Q     What was the goal of the operation that day?

3   A     To locate the defendant and then have the Mexican

4   counterparts conduct an operation to apprehend him.

5   Q     So just to be clear, who was going to be doing the actual

6   apprehension of the defendant if he was located?

7   A     Our Mexican counterparts.

8   Q     Why the Mexican counterparts and not the American law

9   enforcement agents?

10  A     When we as an American law enforcement agency are in

11  Mexico, we have no jurisdictional power.

12  Q     And what was your specific role in this

13  counter-operation?

14  A     My specific role was to coordinate with my fellow

15  counterparts in the U. S. and to provide our Mexican

16  counterparts the exact or the location where we believed the

17  defendant may be presently residing in.

18  Q     Which American law enforcement counterparts worked with

19  you in this operation?

20  A     U. S. Marshals and the DEA.

21  Q     Now, what was the first thing you did in connection with

22  this operation?

23  A     First thing we did was attempt to -- when we first got

24  there -- was attempt to locate the general area where we

25  believed the defendant might have been residing in.

MORENO/DIRECT/PARLOVECCHIO

```
 1    Q    And what did you do after you determined the general
 2    location of the defendant?
 3    A    We had a come up with a plan of action to get into this
 4    private residential area.  It was very secure.  They had about
 5    three different gates or guard shacks.
 6    Q    And what generally was the nature of this area?
 7    A    Very high end residential area with a Hyatt Hotel and
 8    Resort.
 9    Q    I'm going to show you --
10         MS. PARLOVECCHIO:  -- for the witness only --
11    BY MS. PARLOVECCHIO:
12    Q    -- what's marked for identification as Government's
13    Exhibit 218-31.  What are we looking at here? (Exhibit
14    published to the witness.)
15         MR. BALAREZO:  No objection, Your Honor.
16         THE COURT:  All right.  That's received into
17    evidence.
18      (Government's Exhibit 291-31 was received in evidence.)
19         MS. PARLOVECCHIO:  Let me publish that.  Thank you.
20         (Exhibit published to the jury.)
21    BY MS. PARLOVECCHIO:
22    Q    Special Agent Moreno, what are we looking at in
23    Government's Exhibit 218-31?
24    A    We're looking at the neighborhood of -- that we
25    targeted -- that we targeted that day, and the actual
```

MORENO/DIRECT/PARLOVECCHIO

1   location, I can identify that for you, where we believe the

2   defendant was at.

3   Q    Using your finger, could you please circle the target

4   location that you believed the defendant was located at.

5   A    That was in La Camino del Estero Number 114, which is

6   this residence right here. (Indicating.)

7           MS. PARLOVECCHIO:  For the record, the witness has

8   circled the house at the top middle of the exhibit.

9   BY MS. PARLOVECCHIO:

10  Q    Now, what was the plan of action that day?

11  A    After we identified the two -- what we identified two

12  potential target residences for the defendant, we believed the

13  defendant to be in, the plan of action was for me to brief the

14  Mexican counterparts, go over specific directions in terms of

15  how to target them, and let them do their operation.

16  Q    So what did you do next?

17  A    Once we identified the general location, we identified

18  two specific residences where we thought the target -- the

19  defendant might be in, and that was these last two residences,

20  and after that, we -- I provided specific directions to the

21  Mexican counterparts to go secure both of those locations, and

22  make entry into those locations.

23  Q    What time was this operation planned to start?

24  A    This operation was -- we had initially wanted to start

25  this at 1:30 or 1:35 p.m.

MORENO/DIRECT/PARLOVECCHIO

1    Q     Did it start on time?

2    A     No, it did not.

3    Q     Why not?

4    A     We were waiting for the special operations group to show

5    up.  They were supposed to there be in 20 minutes.  Twenty

6    minutes came and went and they did not show up until almost an

7    hour later.

8    Q     So approximately what time did the operation ultimately

9    begin?

10   A     By the time they showed up here to this target area, it

11   was approximately 3:35 p.m. in the afternoon.

12   Q     Now, you testified that the residence was located on

13   Camino del Estero?

14   A     Yes, ma'am.

15   Q     I'm going to show you what's been marked for

16   identification --

17            MS. PARLOVECCHIO:  -- for the witness only --

18   BY MS. PARLOVECCHIO:

19   Q     -- Government's Exhibit 218-26.  (Exhibit published to

20   the witness.)

21            What are we looking at here?

22   A     This is the picture of the entrance of the cul-de-sac.

23   Q     And how do you recognize it?

24   A     I recognize it as I remember exactly how it looked, and I

25   could see that that.  I was assigned to the office in Cabo San

MORENO/DIRECT/PARLOVECCHIO

```
 1    Lucas.
 2              MS. PARLOVECCHIO:  The Government moves to admit
 3    Government Exhibit 218-26.
 4              MR. BALAREZO:  No objection.
 5              THE COURT:  Received.
 6         (Government Exhibit 218-26 was received in evidence.)
 7              (Exhibit published to the jury.)
 8    BY MS. PARLOVECCHIO:
 9    Q    So it's a little part bit hard to see here.  I'll adjust
10    for the quality of the photograph.  But what are we looking at
11    here?
12    A    Looking at the entrance of the cul-de-sac.  One of the
13    vehicles that was there, present, and also, the sign up here,
14    the back that says, Camino del Estero, that part in here.
15    Q    Okay.  Circling it.  The top of the exhibit.  And I'll
16    just zoom out here, so you can see.
17              Now, you testified that this was a gated community.
18    Was there one gate or multiple gates?
19    A    From what I recall into that whole entire Hacienda
20    Encantada area, there was three.
21    Q    Now, what happened after you identified the two potential
22    locations of the defendant?
23    A    After we identified them, I specifically met with the
24    federal agents, gave them specific direction as to which
25    target locations they should conduct the operation on, and was
```

MORENO/DIRECT/PARLOVECCHIO

 1   very specific as to the fact that they needed to secure the

 2   locations before we gained entry.

 3   Q    What were the next steps of the operational plan once you

 4   briefed the Mexican counterparts on the information?

 5   A    Their job was to come in and conduct the operation.

 6   Q    Did there come a time when the Mexican counterparts

 7   started their part of the operation?

 8   A    Yes, they did.

 9   Q    What did they do first?

10   A    There are four -- if you look back at the other map that

11   you actually showed me, there's four residences on that

12   cul-de-sac.  And they began to start their -- they began their

13   operation targeting this specific location first (indicating),

14   before making their way to the last two that we suspected.

15   Q    Was that part of the operational plan, to your

16   understanding?

17   A    No, absolutely not.

18   Q    How many Mexican law enforcement officers were involved

19   in this operation?

20   A    We had with us 52 of the GOPES, which is the special

21   operations group and 12 of the SIU, which is their

22   investigative unit that they had.

23   Q    Did you ultimately see the Mexican counterparts go to the

24   target residence?

25   A    Yes, I did.

LISA SCHMID, CCR, RMR

MORENO/DIRECT/PARLOVECCHIO

```
 1   Q     And how did you see that?
 2   A     I saw that as I was situated on this side, right about
 3   here, in this area here somewhere. (Indicating.)
 4   Q     Could you try marking it again?
 5   A     Yes.  (Complies.)
 6              I was just north of the target residence.
 7   Q     How did the Mexican law enforcement officers enter the
 8   residence?
 9   A     They went through went through the front gate, front
10   area.
11   Q     Now, could you observe from your vantage point whether
12   the Mexican law enforcement officers went to cover the back of
13   the residence?
14   A     From where I was at -- I was on the north side of the
15   residence -- no, they did not, at least not on that side.
16   Q     Now, based on -- and based on your understanding of the
17   operational plan, were they supposed to be covering the back
18   of the residence?
19   A     Yes, they were.
20   Q     Based on your 17 years of law enforcement experience, is
21   it normal practice to cover the back of a residence when
22   trying to execute an arrest at a location?
23   A     It's always normal practice.  Yes.
24   Q     Did you have an understanding why the Mexican law
25   enforcement officers did not cover the back of the residence?
```

LISA SCHMID, CCR, RMR

MORENO/DIRECT/PARLOVECCHIO

1    A    No, I have no idea why they did that.

2    Q    Now, what happened after you saw the Mexican law

3    enforcement officers go through the front of the residence?

4    A    We waited until it was clear, until they secured the

5    location, and that's when we made our way to the front of the

6    residence.

7    Q    And I'm going to show you Government's Exhibit 218-26

8    again.  This is the second page of the exhibit. (Exhibit

9    published.)

10           THE COURT:  Ms. Parlovecchio, I think you've got

11   some documents pressed up against the monitor, which is why

12   it's hard to mark it.

13           MS. PARLOVECCHIO:  I see.

14   BY MS. PARLOVECCHIO:

15   Q    And what are we looking at here?

16   A    This is a picture of the residence.

17   Q    And that's the residence that you saw the Mexican law

18   enforcement officers enter that day?

19   A    Yes, ma'am.

20   Q    Now, what happened after they entered the residence?

21   A    After they entered the residence, I'm sure they secured

22   the place.  That's when they let us know that the place was

23   secured, so that's when we showed up to the front of the

24   residence.

25   Q    Approximately how long did it take to secure the

MORENO/DIRECT/PARLOVECCHIO

1   residence?

2   A     Probably no more than five, six minutes.

3   Q     And to your knowledge, was the defendant inside of the

4   residence?

5   A     No, he was not.

6   Q     So what happened next?

7   A     After they secured the residence, we were in front, I

8   noticed them coming out and they started bringing items out of

9   the residence, and then I proceeded to go inside the residence

10  myself.

11  Q     And when you say they were bringing items outside of the

12  residence, who were you referring?

13  A     Talking about the local -- the federal law enforcement

14  agents from Mexico.

15  Q     So what did you see them bring out, what types of items?

16  A     They brought out some phones, some ledgers, different

17  paperwork.

18  Q     And what if anything did you do with these items?

19  A     Later, after I went in there and I interviewed the

20  individuals inside that residence, I documented each and every

21  one of those items I could get my hands on.

22           MS. PARLOVECCHIO:  May I approach, Your Honor?

23           THE COURT:  You may.

24           MS. PARLOVECCHIO:  (Handing to the witness.)

25  BY MS. PARLOVECCHIO:

MORENO/DIRECT/PARLOVECCHIO

 1    Q    Special Agent Moreno, I'm showing you what's marked for

 2    identification as Government's Exhibit 218-1 through 218-25.

 3    Could you just take a look through them?

 4    A    (Complies.)

 5    Q    And did you have an opportunity to look at these before

 6    you came to court today?

 7    A    Yes, I have.

 8    Q    So what are you looking at here?

 9    A    I'm looking at the photographs of the items that I

10    photographed on that day, after I conducted the interviews.

11    Q    How do you recognize them?

12    A    Because I remember these photographs and I remember

13    taking these pictures.

14         MS. PARLOVECCHIO:  Government moves to admit

15    Government's Exhibit 218-1 through 218-25.

16         MR. BALAREZO:  No objection.

17         THE COURT:  Received.

18    (Government's Exhibits 218-1 through 218-25 were received in

19                          evidence.)

20    BY MS. PARLOVECCHIO:

21    Q    Special Agent Moreno, I'm going to go through some of

22    these exhibits with you, not every single one.

23         Showing you Government's Exhibit 218-1.  What do we

24    see here?  (Exhibit published.)

25    A    Photographs of some of the items that they took out of

LISA SCHMID, CCR, RMR

MORENO/DIRECT/PARLOVECCHIO

1    the house, some phones, and some ledgers, notebooks.

2    Q    And it looks like this is in the back of a vehicle.

3    Whose vehicle is that?

4    A    I believe it was one of their vehicles that they started

5    bringing out some of the items and they started putting it on

6    the back of one of the SUVs that was there.

7    Q    The Mexican counterparts' vehicles?

8    A    Yes, ma'am.

9    Q    Now showing you Government's Exhibit 218-2.  (Exhibit

10   published.)

11          What do we see here?

12   A    It's a photograph of one of the notebooks or the ledgers

13   that I started taking photos of.

14   Q    That's multiple pages?

15   A    Yes, ma'am.  I took it.  Photos of every page that I

16   could find.

17   Q    I'm now showing you Government's Exhibit 218-4.  (Exhibit

18   published.)

19          What do we see here?

20   A    Again, another notebook, ledger of sorts that I took

21   pictures of every page.

22   Q    And this is multiple pages?

23   A    Yes, ma'am.  Every page.

24   Q    Now Government's Exhibit 218-6. (Exhibit published.)

25          What is this?

MORENO/DIRECT/PARLOVECCHIO

```
 1    A    Again, another one of the notebooks that I took pictures
 2    of.  Took pictures of every page of that notebook.
 3    Q    That's multiple pages?
 4    A    Yes, ma'am.
 5    Q    And Government's Exhibit 218-8.  (Exhibit published.)
 6         What is this?
 7    A    This is a picture of one of the vehicles that was in the
 8    garage that I took a picture of.
 9    Q    And just for the record, what color is that vehicle?
10    A    Looks gold, beige, if I recall correctly.
11    Q    Now showing you Government's Exhibit 218-11.  What do we
12    see here that? (Exhibit published.)
13    A    That's a photograph of the inside of the residence.
14    Q    Showing you Government's Exhibit 218-11, later in the
15    exhibit.  It's a little bit dark, this photograph. (Exhibit
16    published.)
17    A    It's kind of like the entrance of the residence.  You can
18    see the gate on the left hand side.
19    Q    Government's Exhibit 218-12? (Exhibit published.)
20    A    Yeah.  This is some of the pictures of some of the
21    weapons that were located inside.
22    Q    Showing you another photograph of 218-12, another page,
23    rather of 218-12.  (Exhibit published.)
24         What do we see here?
25    A    Some of the fragmentation grenades and the grenade
```

LISA SCHMID, CCR, RMR

MORENO/DIRECT/PARLOVECCHIO

```
 1   launcher.  Typically, fragmentation grenades, pineapple
 2   grenades were in that bag.  Some of these -- I can't recall
 3   what these are called.  Ten millimeter grenade launchers --
 4   Q    Um --
 5            THE COURT:  I think they're 40.
 6            THE WITNESS:  Forty.  I'm sorry, 40 millimeters.
 7   Sorry.
 8   BY MS. PARLOVECCHIO:
 9   Q    And these items were seized from the residence?
10   A    Yes.
11   Q    And also, 218-12?
12   A    That's a photograph of some of the weapons that were
13   found in the back of vehicle with grenade launchers and MP5, I
14   believe, in there.
15            (Continued on the next page.)
16
17
18
19
20
21
22
23
24
25
```

David R. Roy, RPR, CSR, CCR

MORENO/DIRECT/PARLOVECCHIO

1   BY MS. PARLOVECCHIO (CONTINUED):

2   Q    And another page of 218-12, what do we see here?

3   A    The photo I took of some of the other items to include

4   some night-vision goggles.

5   Q    I'm showing you Government's Exhibit 218-13.  What do we

6   see here?

7   A    It's an identification card for one of the individuals

8   that was found in there.

9   Q    And another page of Government's Exhibit 218?

10  A    Again, some more identification for one of the

11  individuals and then a bag of various ammunition.

12  Q    And what is shown here in this page of 218-13?

13  A    Photograph of a car that had the name of Enrique

14  Gastelluim and his phone number written in the back.

15  Q    Now, showing you Government's Exhibit 218-18.  Turn to

16  the second page.

17  A    (Witness complies.)

18  Q    What do we see here?

19  A    An aircraft bill of sale for $20,000.  The purchaser was

20  Angel Jorge Lopez Urias, one of the individuals that was found

21  at the residence.

22  Q    Government's Exhibit 218-19.

23  A    Some identification, photographs of identification

24  information from another individual that was at the

25  precedence.

MORENO/DIRECT/PARLOVECCHIO

```
 1   Q    And I'm going to direct your attention to the third page
 2   of this exhibit.  Who is this an ID for?
 3   A    It's for Agustina Cabanillas Acosta, who was at the
 4   residence who I interviewed, and this is her driver's license.
 5   Q    And what state is Agustina Cabanillas from?
 6   A    From the state of Sinaloa, Mexico.
 7   Q    Show you Government's Exhibit 218-21.  What is this?
 8   A    Baggies of bags with some methamphetamine that was found
 9   as well.
10   Q    Now, 218-22, what do we see here?
11   A    Looks like a small address book of sorts.
12   Q    And is it multiple pages?
13   A    Yes, multiple pages with various different phone numbers.
14   Q    Now, Special Agent Moreno, I'm going to show you --
15        MS. PARLOVECCHIO:  Just for the witness only,
16   please.
17   Q    -- what is marked for identification as
18   Government's Exhibit 218-27T.  What is this?
19   A    This is a verbatim translation of all the photographs
20   that I took from Spanish to English.
21   Q    And how do you recognize it?
22   A    I recognize it because I've seen it before and you showed
23   it to me when we reviewed it.
24   Q    And did you have an opportunity to compare the exhibit,
25   Government's Exhibit 218-1 through 218-25, to see if it
```

MORENO/DIRECT/PARLOVECCHIO

1    matched 218-27T?

2    A    Yes, ma'am, I did and it does match.

3         MS. PARLOVECCHIO:  Government moves to admit

4    Government's Exhibit 218 --

5         MR. BALAREZO:  It is in evidence.

6         MS. PARLOVECCHIO:  It is in evidence.

7         THE COURT:  Okay.

8         MS. PARLOVECCHIO:  Thank you.

9    Q    Let me show you some pages from this exhibit.  Directing

10   your attention the Page 1 of this exhibit.  What do we see

11   here?

12   A    RTG7 and Colombia matters.

13   Q    What about this one?

14   A    Senor Clavos de trailers.

15   Q    This one?

16   A    Matter regarding cooks.

17   Q    And here?

18   A    Matter regarding the warehouse in Calexico.

19   Q    Showing you Page 2 of this exhibit.

20        MR. BALAREZO:  Which Exhibit Number?

21   Ms. Parlovecchio, which Exhibit Number?

22        MS. PARLOVECCHIO:  218-27T.

23        MR. BALAREZO:  Thank you.  I apologize.

24   Q    What do we see here on Page 2?

25   A    The word methylamine hydrochloride.

David R. Roy, RPR, CSR, CCR

MORENO/DIRECT/PARLOVECCHIO

```
1    Q    And here?

2    A    Send extension to Nacho and H[IL] tomorrow.

3    Q    And on Page 4 of this document, what do we see here?

4    A    $20,000 to Lasaro.

5    Q    And here?

6    A    I can't see it.  Oh.

7    Q    There we go?

8    A    300 - call Condor.

9    Q    And the next one?

10   A    12,000 3 Black for blackberries.

11   Q    And below that?

12   A    30,000 Dr. Alan.

13   Q    And on this one?

14   A    8,000 pesos 2 - Blackberry Omar.

15   Q    And here?

16   A    Charly 100 sheets for purchase of Blackberries, phones.

17   Q    And what are we looking at here?

18   A    80 Cachimba's, gas.

19   Q    And what are we looking at here?

20   A    15 - expenses for technicians.

21   Q    And here?

22   A    Raton to Charly.

23   Q    Now, directing your attention here.

24   A    Can you bring it down?

25   Q    Oh, yes, my apologies.
```

MORENO/DIRECT/PARLOVECCHIO

1    A    300 - Condor.

2    Q    And here?

3    A    $20,000 Lasaro.

4    Q    And here at the bottom of the page on Page 8?

5    A    50 - talk the chemist PGR.

6    Q    Now, based on you experience working in Mexico, do you

7    have an understanding of the abbreviation PGR stands for?

8    A    Yes, ma'am.

9    Q    What is that?

10    A    Procuradura General de la Repblica.

11    Q    And what is that?

12    A    Basically the Attorney General's Office.

13    Q    What does it say right below that?

14    A    How many houses do they have now to speak with the

15    delegate.  Where do they have chemists that are friends so

16    they can improve?

17    Q    And looking at Page 9, what do we see at the top of the

18    page?

19    A    At $150,000 it is 3 percent commission $385,000 is

20    5 percent commission.

21    Q    And looking at the bottom of the page there's some names

22    there.  What are the names?

23    A    Raton, Gato, Proceso, Panchito.

24    Q    And what's the name we see here?

25    A    Bigotes, Comaria.

MORENO/DIRECT/PARLOVECCHIO

```
 1   Q     And here?

 2   A     Colocho - pending at 2:00 in the afternoon.  Sec.

 3   Changel.

 4   Q     And at the bottom of the page?

 5   A     Charly:  The little antenna so you can put it on the edge

 6   of town so that it can go from town to town.

 7   Q     Okay.  Now looking at Page 11, can you read this note

 8   that begins with Panchito?

 9   A     Yes, ma'am.  Panchito, what's going on with Misterios?

10   The week's over so what are they going to do?  I'm going to

11   send Chavalo who is in Cali to Ecuador.

12   Q     And the next note that begins with Cachimba?

13   A     Cachimba Go get Chure so that he can meet with Tocayo.

14   Q     And below that starts with Lic. Omar.

15   A     Licensiado Omar to talk to the coordinator of the TJ

16   planes.  To put him in touch with the one in Tapachula and in

17   Mexico.  To set up the plane that's coming from Tapachula to

18   ask and find out if the same plane goes to TJ.

19   Q     And what is -- do you know TJ to be an abbreviation for?

20   A     Tijuana, Baja California.

21   Q     Now looking at Page 13 at the top, what do we see here?

22   A     Cholo - green light.

23   Q     And Page 16, what do we see here at the bottom of the

24   page?

25   A     100 - Wacho.
```

MORENO/DIRECT/PARLOVECCHIO

1    Q    And do you see Lasaro here again?

2    A    Yes, ma'am.  2,000 – To Lasaro.

3    Q    Now looking at Page 20, what do we see here?

4    A    79 white Garu brand and 98 brown Garu brand were

5    delivered to Licensiado.

6    Q    And what is below that?

7    A    52 are big corona, 23 are big coco, 41–82 are small coco,

8    185 to 307 are rs, and 20 to 40 are Bob or B-O-B.

9    Q    Now looking at Page 22, what do we see here?

10   A    November 17th, 2011, Thursday, Felipe delivered to Gato

11   2220, 2190 plus, Popeye to Gato takes 5,000 and change.

12   Q    Now looking at Page 23 at the bottom, what is the name

13   that is highlighted here?

14   A    Virgo.

15   Q    And at the bottom?

16   A    I'm here, near where you are because the Licensiado

17   recommended that I leave where I was.

18   Q    Now Page 24, what do we see here?

19   A    Three tons of weed that has to be CON, that means with,

20   at will, complete the five so they can leave.

21   Q    And further down the page?

22   A    Ivan.

23   Q    And below that?

24   A    Tocayo.

25   Q    Now looking at Page 26, and I would like beginning with

David R. Roy, RPR, CSR, CCR

MORENO/DIRECT/PARLOVECCHIO

1    Virgo, have you read this entire portion.

2    A    Virgo:  Information that Tocayo gave me which was given

3    to him by his father.  To tell his/your buddy Pequeo not to go

4    and baptise the twins, to inform exactly where he is because

5    the operation they're doing on El Chaparrito is very big.

6    Last night I was told that 50 agents, five letters, showed up.

7    He doesn't know where they're -- what they're after.

8    Q    And, Special Agent Moreno, do you see where you testified

9    earlier that you had supported an operation on February 18,

10   2012, and just remind the jury who was involved in that

11   operation on the Mexican side?

12   A    SEMAR which the Mexican marines and the special

13   operations group called GOPES, the federal police.

14   Q    And how many letters are in the abbreviation SEMAR?

15   A    Five.

16   Q    And how many agents participated in that operation from

17   GOPES?

18   A    Fifty-two.

19   Q    Now directing your attention down the page where it says

20   starts here (indicating)?

21   A    The Los Angeles deposit, 2,500 plus $20,000 Licensiado.

22   Q    And now Page 28 of this exhibit what do we see here at

23   the top?

24   A    380 kilos of weed, 1,990 kilos of weed, brands, gifts and

25   R1 and ARK1 or I.

MORENO/DIRECT/PARLOVECCHIO

```
 1   Q     ARKI?

 2   A     Yeah, ARKI.

 3   Q     Now directing your attention further down the page

 4   starting here (indicating).

 5   A     22 silver (perico).

 6   Q     And based on your experience working in Mexico and drug

 7   trafficking cases, what is the perico known to be?

 8   A     Usually referred to cocaine.

 9   Q     And here (indicating), what does it say?

10   A     One kilo of white chiva.

11   Q     And based on your experience working drug cases, what do

12   you to know chiva to be?

13   A     Heroin.

14   Q     And here (indicating)?

15   A     Capi base is better for remove.

16   Q     And further down the page what do we see here?

17   A     Seor Tocayo.

18   Q     Now we're looking at Page 31.  What is the name we see

19   here?

20   A     Gato.

21   Q     And here (indicating)?

22   A     Gordo.

23   Q     Now I'm showing you Government's Exhibit 218-27T Page 59.

24   Can you see what is on the left-hand side of the page?

25   A     Yes, It's a hotel receipt.
```

MORENO/DIRECT/PARLOVECCHIO

1   Q    And the name?

2   A    Hotel Malibu for $6,400 issued Agustina Cabanillas.

3   Q    And below that, what is that?

4   A    A receipt, prescription order issued by Dr. Alonso Daniel

5   Miranda Torres who requesting for Mrs Cabanillas to be

6   admitted to the hospital on January 24th at 10:30 for a

7   lipodystrophy.

8   Q    Looking at Government's Exhibit 218-27T Page 66, what do

9   we see here?

10  A    50 horns, 1,000 horns, 100 M16, 50 minimum short,

11  container of 200, 1,000 grenades PI[IL], 20,000 shots of

12  cue[IL], and 25 RP7 and R-15, 10 VC[IL].

13  Q    Now, after taking the photographs of the items that we

14  just looked at, did you go into the residence?

15  A    Yes.  Like I previously stated, I was actually in the

16  residence before that.  I interviewed just three of the

17  individuals that were in the residence.

18  Q    And did you -- when you were inside the residence -- I'm

19  sorry.

20           How was the house furnished?

21  A    It was a well-furnished residence.

22  Q    Did you do anything that day to document the interior and

23  the condition of the house?

24  A    Yes.  I took photographs and I also videotaped the inside

25  and outside of the residence.

MORENO/DIRECT/PARLOVECCHIO

1   Q    Now, when you were taking the video, was there anything

2   you observed inside the residence that was notable to you?

3   A    Notable to me were the, obviously, four individuals that

4   were still in there and also the room that we believed the

5   defendant might have been in.

6   Q    And I'm going to show you what is marked for

7   identification as Government's Exhibit 218-29A through C.

8   What are we looking at here?

9   A    One of the disks that we reviewed that I initialed

10  yesterday.

11  Q    And how do you recognize those?

12  A    Those are my initials and the date that I inscribed on

13  it.

14  Q    Does this CD contain portions of the video that you took

15  of the interior and the exterior of the house that day?

16  A    Yes, it does, ma'am.

17          MS. PARLOVECCHIO:  The Government moves to admit

18  218-29A through 29C.

19          MR. BALAREZO:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibit Numbers 218-29A through

22  218-29C so marked and received in evidence.)

23  Q    Now I'm going to play some of these videos for you and

24  the ladies and gentlemen of the jury.

25          MS. PARLOVECCHIO:  Okay.  First we're going to play

MORENO/DIRECT/PARLOVECCHIO

```
 1   29D, the third clip -- I'm sorry, 29D the second clip and the
 2   time stamp on this is two minutes and 51 seconds to three
 3   minutes and nine seconds.
 4              (Video plays.)
 5   Q    Special Agent Moreno what do we see here?
 6   A    The videotape of the residence, the kitchen area, pantry.
 7              (Video stops.)
 8   Q    Next I'm going to play for you Government's Exhibit 29D,
 9   the third clip, which is time stamped three minutes and 29
10   seconds to three minutes and 32 seconds.
11              (Video plays.)
12   A    This is a video of, I think it was main residence -- the
13   main room in the residence and the balcony.
14   Q    And does the balcony --
15              MS. PARLOVECCHIO:  Oops, stop there.
16              (Video stops.)
17   Q    Does that balcony have a view of the ocean?
18   A    I can't recall whether it did or not.
19   Q    Next I'm going to play for you Government's Exhibit 29D,
20   it's the first clip, which is from the beginning to two
21   minutes and 43 seconds.
22              MS. PARLOVECCHIO:  Go ahead.
23              (Video plays.)
24   A    This is video of the -- looks like his -- or the
25   defendant's, what we believe to be the defendant's closet,
```

MORENO/DIRECT/PARLOVECCHIO

```
 1   with some pants hanging size 32, 30.

 2   Q    A lot of jeans?

 3   A    A lot of jeans hanging from the closet.

 4            More jeans there with the shirts that were hanging

 5   from the closet.

 6            Banana Republic shirt size medium.

 7   Q    Okay.  And just stopping there at 38 seconds, that's size

 8   medium on the shirt?

 9   A    Yes, ma'am.

10   Q    Okay.

11            MS. PARLOVECCHIO:  Go ahead, please.

12            (Video plays.)

13   A    Some other shirts, I believe that brand is Lacoste.

14            Some dress shirts, long-sleeved dress shirts.

15   Q    And so we just were looking at some long-sleeved dress

16   shirt, were they collared shirts?

17   A    Yes.  They appeared to be collared shirts.

18            And some video of the drawers.  There's some jewelry

19   there, a black hat on top of the drawer.  Underwear size 30.

20            Other items that I didn't take including the shoes

21   up on top?

22   Q    Those are women's shoes?

23   A    Women's shoes.

24            Duffle bag.

25            Cologne, Trinity cologne, a couple of other items, a
```

David R. Roy, RPR, CSR, CCR

MORENO/DIRECT/PARLOVECCHIO

```
 1    lot of women makeup material on the bathroom counter there,
 2    the vanity.
 3              Brushes, grooming equipment.  There's the bathroom
 4    area, the toilet area, some wipies down on the bottom.
 5              More sandals.  There's the shower area of the main
 6    room there.
 7              Some tennis shoes, black tennis shoes that were
 8    there.
 9    Q    And who are the individuals who are depicted here?
10    A    The SSP Mexican counterparts that were there and VA
11    counterpart as well.
12              Items that they were looking at some cards.
13    Q    And now we are in the main part of the bedroom?
14    A    Yes, main part.  A travel bag of sorts.
15              And this goes out into the house.
16              (Video stops.)
17    Q    Okay.  Now I'm going to show you
18    Government's Exhibit 29C, the first clip.
19              (Video plays.)
20    A    This is a video of the garage.  You see some Mexican
21    elements right there outside the garage.  This is after we
22    took out those vehicles out of there.  And some video of the
23    side of the house.  You can see the brick wall on the other
24    side.  You see the side of the house there, big house with a
25    tile roof.  There's the main gate into the residence that they
```

MORENO/DIRECT/PARLOVECCHIO

```
 1    went in.

 2    Q     And that was a black gate?

 3    A     Yes, ma'am.

 4              (Video stops.)

 5    Q     Next I'm going to show you Government's Exhibit 29A, the

 6    second clip.

 7              (Video plays.)

 8    A     This is more video of his -- of the what we felt the

 9    defendant's --

10              MR. BALAREZO:  Objection.

11              THE COURT:  Sustained.

12              MR. BALAREZO:  Move to strike, Your Honor.

13              THE COURT:  It's granted.

14    A     I'm sorry, the equipment that I found there, what we

15    believed was here, that I gave you tapes.

16              Water.

17              His bed that was in that main room.  Some items on

18    that.  Black hat, like a sunglass case.  I don't know what

19    that was, a card of some sort.

20    Q     Is that a baseball cap?

21    A     Baseball cap, a black baseball cap.

22              Another duffle bag there on top.

23              Box.

24              I can't remember what that was, some type of

25    medication of sorts, like a Nexium, I'm not sure.
```

David R. Roy, RPR, CSR, CCR

MORENO/DIRECT/PARLOVECCHIO

```
 1              Some gum and a calendar.

 2              There's the black tennis shoes that he had.

 3              Size nine.

 4              A hat.  Some other clothes there on the ground.

 5              (Video stops.)

 6   Q    All right.  Next and finally, I'm going to play for you

 7   Government's Exhibit 29A, the first clip.

 8              (Video plays.)

 9   A    Video of the pool area that I took.  And notable is

10   the -- kind of backs up in the -- into a dry creek of sorts in

11   the back and what I at least found to be some footprints down

12   there in the bottom.

13   Q    And can you circle on your screen the footprints you just

14   mentioned?

15   A    Right around there (indicating).

16   Q    And did you go and examine those footprints more closely?

17   A    No, I didn't, I just took the video from this distance.

18              MS. PARLOVECCHIO:  Go ahead and play.  And that was

19   14 seconds, for the record.

20              (Video plays.)

21   A    More video of the side of the house coming from the back

22   of the house.  You can see the beige tile roof.  There's the

23   pool with a slide that comes down from the top.  Pictures of

24   the yard, or video, I'm sorry.  And some more video of the

25   patio side of the house or the patio area.
```

PROCEEDINGS

```
 1              MR. BALAREZO:  Your Honor, this is very nice.

 2              THE COURT:  Look, it's in evidence but I agree.

 3    We're seeing more than we need to take the jury's time to see.

 4              MS. PARLOVECCHIO:  You can stop it.

 5              (Video stops.)

 6              MS. PARLOVECCHIO:  Your Honor, this is actually -- I

 7    have a bit more left with this witness.

 8              THE COURT:  Okay.  Let's take a break.

 9              Come back at a quarter 'til.  Ladies and gentlemen,

10    remember not to talk about the case amongst yourselves.

11              (Jury exits the courtroom.)

12              (The following matters occurred outside the presence

13    of the jury.)

14              THE COURT:  All right.  Everyone have a seat.  I

15    didn't want to cut that off because I never know if you're

16    20 percent done or 80 percent done.  But I want you to try not

17    to do that again.  I appreciate the need for an overview.  I

18    appreciate the need for honing in quickly to some items that

19    you may or may not be able the linkup, I don't know.  But to

20    take all this time like a real estate seller's broker's, you

21    know, survey of the property, that's just too much time.  We

22    don't need that much.

23              MS. PARLOVECCHIO:  Your Honor, we're required to

24    prove substantial income in this case and the defense has

25    vigorously attacked the Government's assertions of the
```

MORENO/DIRECT/PARLOVECCHIO

```
 1    defendant's wealth.
 2              THE COURT:  I understand that and I think you have
 3    done that.  But I think you have done that more than you need
 4    to do that.  Okay?  So if we have future witnesses
 5    authenticating similar kinds of extravagances, do what you
 6    need to do but don't beat a dead horse.  That's all I'm
 7    saying.  Okay.  See you at a quarter 'til.
 8              (Recess taken.)
 9              THE COURTROOM DEPUTY:   All rise.
10              THE COURT:  Okay.  Let's have the jury, please.
11              (Jury enters the courtroom.)
12              (Jury present.)
13              THE COURT:  All right.  Let's continue.
14              MS. PARLOVECCHIO:  Thank you, Your Honor.
15    BY MS. PARLOVECCHIO:
16    Q    Special Agent Moreno, I'm going to show you three
17    exhibits that are marked for identification.
18              MS. PARLOVECCHIO:  For the witness only, please.
19              218-29A1, 218-29A3, and 218-29B1.
20    Q    And what are these just generally?
21    A    Some photographs that I took.  The first one is the shoe
22    size.
23              MR. BALAREZO:   No objection, Your Honor.
24              THE COURT:  Okay.  They are received.
25              (Government's Exhibit Numbers 218-29A1, 218-29A3 and
```

MORENO/DIRECT/PARLOVECCHIO

```
 1   218-29B1 so marked and received in evidence.)

 2              MS. PARLOVECCHIO:  Thank you, Your Honor.

 3              THE COURT:   Please continue with your answer.

 4   A    Of course.  That one there is the shoe size of the black

 5   tennis shoes that were in there.

 6   Q    Is that a still shot from the video you took inside of

 7   the bedroom?

 8   A    Yeah.  I'm not sure if that was a still shot of the video

 9   or just a photograph I took.  It could be, I guess.

10   Q    Okay.  And showing you next

11   Government's Exhibit 218-29A3.

12              What is this showing here?

13   A    Another shot of the -- this is a hat that was on the bed,

14   black hat.

15   Q    And Government's Exhibit 218-29B1, what is this?

16   A    Another still shot of the pants.

17   Q    And what is the waist size?

18   A    32 width and length 30.

19   Q    Now, before the break, you testified that you interviewed

20   several people inside the residence that day.  Do you recall

21   that testimony?

22   A    Yes, ma'am, I do.

23   Q    And who are the individuals you interviewed?

24   A    I interviewed Agustina Cabanillas Acosta, Maria Macias,

25   and Omar Hinojosa Villegas.
```

MORENO/DIRECT/PARLOVECCHIO

```
 1   Q    I'm going to show you what is marked for identification
 2   as Government's Exhibit 33.  Who is this?
 3   A    That is a photograph of or a still of Agustina Cabanillas
 4   Acosta.
 5   Q    And I'm going to show you Government's Exhibit -- I'm
 6   sorry.  How do you recognize her?
 7   A    I recognize her because I -- I remember taking a video
 8   when she was there and I'm not sure if I took a photo of her
 9   or not.  I recognize her.
10   Q    And did you interview her that day?
11   A    Yes, I did interview her.
12        MS. PARLOVECCHIO:  The Government moves to admit
13   Government's Exhibit 33.
14        MR. BALAREZO:  No objection.
15        THE COURT:  Received.
16        (Government's Exhibit Number 33 so marked and
17   received in evidence.)
18        MS. PARLOVECCHIO:  May I publish?  Thank you.
19   Q    And this is the woman you identified as Agustina
20   Cabanillas?
21   A    Cabanillas Acosta.
22   Q    And I'm going to show you what is marked for
23   identification as Government's Exhibit 70.
24   A    This is a photograph of the Maria Macias who was also at
25   the residence.
```

MORENO/DIRECT/PARLOVECCHIO

```
 1   Q    And did you interview her?
 2   A    Yes, I did.
 3            MS. PARLOVECCHIO:  The Government moves to admit
 4   Government's Exhibit 70.
 5            MR. BALAREZO:  No objection.
 6            THE COURT:  Received.
 7            (Government's Exhibit Number 70 so marked and
 8   received in evidence.)
 9   Q    And again just for the jury, could you identify who this
10   is?
11   A    Maria Macias.
12   Q    Now, was there another individual who was detained that
13   day who you did not interview?
14   A    Yes, Angel Urias.
15   Q    And did you get an opportunity to observe him?
16   A    I saw him, but I did not get to interview him.
17   Q    I'm going to show you what is marked for identification
18   as Government's Exhibit 218-24.  Who is this?
19   A    This is Angel Urias.
20            MS. PARLOVECCHIO:  And the Government moves to admit
21   Government's Exhibit 218-24.
22            MR. BALAREZO:  No objection.
23            THE COURT:   Received.
24            (Government's Exhibit Number 218-24 so marked and
25   received in evidence.)
```

MORENO/DIRECT/PARLOVECCHIO

```
 1   Q    And just for purposes of -- for the jury, could you
 2   identify who this is?
 3   A    Angel Urias.
 4   Q    Now, what happens to the physical evidence that you
 5   observed that day and that were photographed in
 6   Government's Exhibit 218-1 through 218-25?
 7   A    After I photoed and documented as much as I could the
 8   evidence, the evidence was taken by the federal counterparts,
 9   Mexican federal counterparts.
10   Q    Was the normal practice for the Mexican counterparts to
11   take possession of evidence seized in an operation like this?
12   A    Yes.  It was not our evidence to take.
13   Q    And now you testified that there were a number of phones
14   and computers seized during the raid.  Prior to the Mexican
15   counterparts taking the phones and the computers, were any of
16   the U.S. law enforcement counterparts given the opportunity to
17   download or I do any sort soft forensic examination of those
18   items?
19   A    No, we were not.
20   Q    So what, if anything, happened next in this operation?
21   A    After the initial operation and after I departed that
22   location, I returned back in the residence in the evening,
23   approximately around 11:00 o'clock at night.
24   Q    And what, if anything, did the Mexican counterparts do
25   next as part of the operation?
```

MORENO/DIRECT/PARLOVECCHIO

```
 1    A    After that day, the next day, they was indication that
 2    the defendant --
 3             MR. BALAREZO:  Objection.
 4             MS. PARLOVECCHIO:  I can lay more of a foundation,
 5    Your Honor.
 6             THE COURT:  Well or maybe you can just skip over
 7    that and ask what happened next.
 8    Q    What happened next?
 9    A    What happened next was a couple of series of other
10    operations that is conducted by the Mexican counterparts with
11    belief that the defendants --
12             MR. BALAREZO:  Objection.
13             THE COURT:  What did you do?
14             THE WITNESS:  I participated with the Mexican
15    counterparts on various other operations after that operation
16    on the 22nd.
17    Q    Now during this part of your participation with the
18    Mexican counterparts and the next step of the operation, what
19    did your Mexican counterparts do as part of the next steps of
20    the operation?
21    A    They brought in reinforcements from Mexico City.
22    Q    What type of reinforcements?
23    A    Approximately three Black Hawk helicopters, maybe a
24    hundred or so more of personnel.
25    Q    I'm going to show you what's marked for identification as
```

MORENO/DIRECT/PARLOVECCHIO

1   Government's Exhibit 218-30.  What is this?

2   A    One of the photographs that I took of one of the Black

3   Hawk helicopters that was used -- utilized in operation.

4           MS. PARLOVECCHIO:  The Government moves to admit

5   Government's Exhibit 218-30.

6           MR. BALAREZO:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit Number 218-30 so marked and

9   received in evidence.)

10  Q    Zooming in, this is one of the Black Hawk helicopters

11  they brought in?

12  A    Yes, ma'am.

13  Q    Did you see what your Mexican counterparts were using the

14  Black Hawk helicopter for?

15  A    Yes.  To travel from one place to another in attempts to

16  locate --

17          MR. BALAREZO:  Objection.

18  A    -- the defendant.

19          MS. PARLOVECCHIO:  He observed it, Your Honor.

20          THE WITNESS:  I observed it.

21          THE COURT:  The objection's overruled.

22          MR. BALAREZO:  Your Honor, can we approach because

23  there's an issue with this.

24          THE COURT:  You can approach but the question was

25  did you see what they were using it for.  That's what he said.

David R. Roy, RPR, CSR, CCR

MORENO/DIRECT/PARLOVECCHIO

1          (Continued on next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
 1                (The following occurred at sidebar.)

 2           MR. BALAREZO:  Your Honor, this witness has been

 3      slipping in a couple of things that I haven't objected to.

 4      But right now the question was very simple, Did you see?  He

 5      can say "yes" or "no."  But then -- Yes, I see -- I saw it,

 6      and they were using it for an operation.

 7                Unless, he was in the helicopter observing

 8      everything, he can't tell what's being done with the

 9      helicopter.

10           THE COURT:  I do not know what more he is going to

11      say, and I will strike things that there is not a foundation

12      for.  But I think it is too cumbersome to have them say, Yes,

13      I observed them using it.

14                Well, what did you observe them using it to do.

15                I do not think the Government has to break it down

16      that much.  You know, he says he saw something.  Now let's

17      find out what he saw.

18           MS. PARLOVECCHIO:  And he --

19           MR. BALAREZO:  Well, that's what I'm saying, unless

20      he's in the helicopter, he cannot -- all he can say is the

21      helicopter took off and went somewhere.

22           THE COURT:  I don't know whether he was in the

23      helicopter.  For all I know, he was.  I don't know.

24           MS. PARLOVECCHIO:  He's not going to testify to what

25      the people in the helicopter saw.  He was part of the
```

SIDEBAR

1   operation, and I said, What did you observe?  He saw them

2   flying around.  And he knew as being part of the operation

3   that they were searching for the defendant.  They're not just

4   randomly flying around in search --

5           THE COURT:  This is normal police officer

6   investigative testimony.  Here is what we were all doing.  I

7   am doing this.  These guys are doing that.  There is nothing

8   unique about it, just that the case is important.

9           Let's continue.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MORENO/DIRECT/PARLOVECCHIO

```
 1                    (In open court.)
 2   BY MS. PARLOVECCHIO:
 3   Q    So based on your observation and your work in the
 4   operation with your Mexican counterparts, what did you see the
 5   Black Hawk helicopter doing?
 6   A    I observed on numerous occasions the Black Hawk
 7   helicopter being utilized to travel from one location to
 8   another in search of the defendant.
 9   Q    Now what was happening at Cabo San Lucas around this same
10   time?
11   A    The G20 summit was in town.
12   Q    Now what happened next in this operation?
13   A    The next day there was reports, we received reports of
14   the Mexican counterparts that they were looking for the
15   defendant.
16   Q    And what did you do in response to that?
17   A    We traveled with them to another area of Cabo San Lucas
18   where they conducted operations in attempts to locate the
19   defendant.
20   Q    Approximately how long did this pursuit continue?
21   A    This was the next day, the 23rd and this went on for at
22   least another two days, the 26th.
23   Q    Did you ever find the defendant?
24   A    No, we did not.
25   Q    What did you do next after the 25th of February?
```

MORENO/CROSS/BALAREZO

1   A     After that, I traveled here to New York to meet up with

2   case agents from the FBI office where I subsequently provided

3   the photographs and the evidence that I collected.

4              MS. PARLOVECCHIO:  May I have a moment, Your Honor.

5              THE COURT:  Yes.

6              MS. PARLOVECCHIO:  No further questions for this

7   witness.

8              THE COURT:  All right.  Any cross?

9              MR. BALAREZO:  Just a little bit, Your Honor.

10             THE COURT:  Okay.

11  CROSS-EXAMINATION

12  BY MR. BALAREZO:

13  Q     Good morning, sir.  How are you?

14  A     Good, sir.

15  Q     Or good afternoon?

16  A     Good afternoon, yes.

17  Q     How long did you participate in this tracking operation,

18  if you will?

19  A     I arrived in Cabo San Lucas on February the 21st and did

20  not depart until, I think, it was the, 25th or 26th.

21  Q     So how long is that?

22  A     Five days.

23  Q     Now, and your role was to look for Mr. Guzman; is that

24  correct?

25  A     Yes.  My goal was to coordinate with the Mexican

MORENO/CROSS/BALAREZO

 1    counterparts and our local U.S. counterparts to assist to

 2    locate him.

 3    Q    And have you worked in Mexico looking for Mr. Guzman on

 4    other occasions than this week or five days?

 5    A    The other operation that was -- the other time I was

 6    involved with anything related to the defendant was when I was

 7    in Mexico City on the 18th.

 8    Q    And have you at any time when you're -- was it 17, 18

 9    years with the FBI?

10    A    17, sir.

11    Q    In your 17 years with the FBI did you have any experience

12    where you tracked somebody named Mayo Zambada?

13    A    No, I did not have any.

14    Q    And at the time that Joaquin Guzman was being tracked by

15    your team, I'll call it, I know they were Mexican

16    counterparts, are you aware whether or not the Mexican

17    government or you American counterparts were tracking Mayo

18    Zambada?

19              MS. PARLOVECCHIO:  Objection.

20              THE COURT:  Sustained.

21    Q    Now, we saw a lengthy tour of that residence in

22    Cabo San Lucas.  Do you recall that?

23    A    Yes, I do, sir.

24    Q    You had an opportunity to walk through it to see all the

25    luxuries, the marble, all that stuff, right?

MORENO/CROSS/BALAREZO

```
 1   A      Yes, I did.

 2   Q      And have you ever been able to establish who owned that

 3   house?

 4   A      I received information afterwards that it was sold to --

 5   Urias was the one who purchased that residence for the

 6   defendant for a million dollars.

 7   Q      Okay.

 8   A      I don't know who owned it before.

 9   Q      All right.  Let me ask you this because I kind of missed

10   it because I was talking.

11           Who sold it to whom?

12   A      As I said, this is information after the fact.

13   Q      Uh-huh.

14   A      That I heard.

15   Q      Okay.

16   A      Unsubstantiated.

17   Q      Right.  It's a rumor, right?

18   A      That the residence was purchased by the defendant and

19   Mr. Urias for a million dollars.

20   Q      Right.  So you're telling this jury it's a rumor that you

21   heard, correct?

22   A      I did not say it was a rumor, sir.

23   Q      Well, unsubstantiated, right?  You said it yourself.  Is

24   it unsubstantiated or not?

25   A      Yes.
```

MORENO/CROSS/BALAREZO

```
 1    Q    Okay.  Do you have any documentary evidence that

 2    indicates that Mr. Guzman, the man over here with the -- third

 3    one from the right there, was the owner of that house; any

 4    documents, real estate documents, bill of sale like you have

 5    from the airplane, anything like that, do you have that?

 6    A    No, none of that came out.

 7    Q    Do you have any of that type of documentation with

 8    respect to Mr. Urias?

 9    A    No, I do not.

10    Q    All right.  So unsubstantiated rumor, right?

11              MS. PARLOVECCHIO:  Objection.

12              THE COURT:  Sustained.

13    Q    In any of those notes or books or whatever they were, the

14    little tablets, there was a lot of handwriting, correct?

15    A    Yes, there was.

16    Q    Did you, did you, first of all, personally, did you

17    submit any of that handwriting for any sort of writing

18    evaluation to see if any of that writing was Joaquin Guzman's?

19    A    I did not personally do that, no.

20    Q    You also saw or we also saw some, I think it was pictures

21    or videos of a vehicle, a truck.  I think you said it was a

22    silver, gray truck?

23    A    The SUV?

24    Q    An SUV that had some kind of weapons in it and like

25    vests, tactical vests, that kind of thing.  Do you know what
```

David R. Roy, RPR, CSR, CCR

1    I'm talking about?

2    A    Yes.

3    Q    What kind of weapons s were in that car?

4    A    You saw the pictures of M4's -- what else, some grenade

5    launchers, some MP5's.

6    Q    Are you aware whether any of the material in that car or

7    any place in that car was ever fingerprinted?

8    A    I was not aware of it, no.

9    Q    So are you aware of whether or not any fingerprints exist

10   that that vehicle on any of those weapons or anything in that

11   car that would tie it to that man right there, Joaquin Guzman?

12   A    I am not aware of anything, no.

13   Q    You showed or we saw a picture or video of some bank

14   receipts.  Did you see that?  Or you found some bank receipts,

15   right?

16   A    Everything I photographed there was in that location was

17   brought out, yes.

18   Q    And included bank receipts, correct?

19   A    I believe so, yes.

20   Q    Did you do any investigation into those bank receipts to

21   see if any of those accounts were tied to Joaquin Guzman?

22   A    No.  My job was to document exactly what we found and

23   that was it.

24   Q    And then you just forgot about it, right?

25   A    I did not forget about it.

MORENO/CROSS/BALAREZO

```
 1    Q    Well, you knew you were going to testify here?
 2    A    Sir, I did not have all the information afterwards.  In
 3    other words, they took the actual evidence and I passed that
 4    information on to investigating agents.
 5    Q    Well, are you aware whether or not any investigation was
 6    done of those bank accounts to see if they are tied to Joaquin
 7    Guzman?
 8    A    I am not aware of anything else that was done after that.
 9         THE COURT:  The objection's overruled.  Go ahead.
10    Q    Same thing with that plane receipt, are you aware of any
11    information that ties that plane to Joaquin Guzman?
12    A    No, I am not.
13    Q    Now, a couple times when you were being shown a video and
14    some pictures, that there was a bedroom and I think you said
15    that there was a bedroom of interest, we'll call it that,
16    right?
17    A    I believe that's what I called it, yes.
18    Q    And what you wanted to say that that's the room where
19    Joaquin Guzman was, right?
20    A    I said that was a room of interest to me, yes.
21    Q    What because you liked the linen or because you thought
22    he had been in that room?
23         MS. PARLOVECCHIO:  Objection.
24         THE COURT:  Sustained.
25    Q    It was of interest to you because you thought Joaquin
```

David R. Roy, RPR, CSR, CCR

MORENO/CROSS/BALAREZO

 1    Guzman had been in that room, correct?

 2    A     That was my belief, yes.

 3    Q     Right.  So are you aware whether or not any fingerprints

 4    were taken anywhere in that room that are Joaquin Guzman's?

 5    A     No, I am not aware of any that had been done.

 6    Q     And an attractive young lady in the house, right?

 7    This -- what was her name?

 8                MS. PARLOVECCHIO:  Objection.  Form.

 9                THE COURT:  Sustained.

10    Q     Well, there was a young lady named Cabanillas in the

11    house, correct?

12    A     Yes, there was a young lady in the house.

13    Q     And again your belief was that she had been with

14    Mr. Guzman; is that correct?

15    A     That was my belief.

16    Q     Your belief?

17    A     That's from information that I obtained from the local

18    counterparts.

19    Q     Right.  No fingerprints in the bedroom tying the room to

20    Mr. Guzman, correct?

21    A     Not that I'm aware.

22                MS. PARLOVECCHIO:  Objection.

23    Q     Any hair samples tying the room to Mr. Guzman?

24    A     Not that I'm aware of.

25    Q     Any DNA samples of any type tying the room to Mr. Guzman?

MORENO/CROSS/BALAREZO

```
 1    A     Not that I aware of.
 2    Q     Now, you've been with the FBI for 17 years, right?
 3    A     Yes, I have, sir.
 4    Q     And you know that it's very hold science to collect DNA
 5    samples, hair samples, fingerprints and that they can be
 6    accurately connected to somebody; is that correct?
 7    A     I do.
 8    Q     But we have none of that here?
 9    A     Sir, I wasn't in charge of the crime scene.
10    Q     My question is, we had none of that here, do we?
11    A     Yes, you're right.
12    Q     Those shoes that you pointed out, there were what, Nike
13    shoes?
14    A     I believe so, yes.
15    Q     All right.  And of course you're saying that those shoes
16    are not here in this courtroom to be shown to the jury, right?
17    A     No, they are not.
18    Q     So if they don't fit Mr. Guzman, the jury has no way of
19    knowing that, right?
20    A     Of course not, no.
21    Q     Right.
22          So if they don't fit, what?
23          MS. PARLOVECCHIO:  Objection.
24    A     Is this the OJ trial or what?
25          THE COURT:  Sustained.
```

MORENO/REDIRECT/PARLOVECCHIO

```
 1   Q    Let me show you defense -- Government's Exhibit 218-29 --
 2   29A3, which I believe is in evidence.
 3             Do you see that, sir?
 4   A    I do.
 5   Q    And that item that I'm pointing at right here, that's a
 6   baseball cap, correct?
 7   A    Yes, black baseball cap.
 8   Q    Right.  And I'm going to show you now what's been
 9   admitted into evidence as Defense 382.  Do you see these two
10   images?
11   A    Yes, I do.
12   Q    What color is that baseball cap?
13   A    Blue.
14   Q    And this one?
15   A    Black.
16   Q    Thank you.
17             MR. BALAREZO:  No further questions, Your Honor.
18             THE COURT:  All right.  Any redirect?
19             MS. PARLOVECCHIO:  Yes, Your Honor.
20   REDIRECT EXAMINATION
21   MS. PARLOVECCHIO:
22   Q    Special Agent Moreno, you were asked some questions on
23   cross-examination about what you did and did not do in this
24   case.  What was your role in this case?
25   A    My role was to coordinate with the Mexican counterparts
```

MORENO/REDIRECT/PARLOVECCHIO

```
 1   and my fellow U.S. counterparts and supply the location we

 2   felt the defendant was residing in.

 3   Q     Did you have any other responsibilities beyond that?

 4   A     No, I did not.

 5   Q     Now who controlled the evidence here?

 6   A     The Mexican federal agents did.

 7   Q     Not the U.S. Government?

 8   A     No, that was not our City.

 9   Q     Now you asked them -- you were asked some questions on

10   cross-examination about the defendant's ownership of the

11   residence and you testified that you learned that he had paid

12   a million dollars for it.  Do you remember that testimony?

13   A     Yes, I do.

14                     (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   REDIRECT EXAMINATION

 2   BY MS. PARLOVECCHIO: (Continued.)

 3   Q    How did you learn about that?

 4   A    I learned that through secondhand communications with

 5   other folks involved in the investigation.

 6   Q    Did that come from witness interviews?

 7   A    That came from information that was provided to me by the

 8   Mexican counterparts.

 9   Q    Now, you were also asked some questions on

10   cross-examination about whether you, in your 17 years at the

11   FBI, ever tried to locate and capture Mayo Zambada.

12            Do you recall those questions?

13   A    Yes, I do.

14   Q    During the time you were in Mexico, what were your areas

15   of responsibility?

16   A    My area of responsibility was Baja California and Baja

17   California Sur.

18   Q    Just to be clear for the jury, what does "area of

19   responsibility" mean?

20   A    The area that I was assigned to cover.

21   Q    And to your knowledge -- and that means you're only

22   responsible to cover that area; is that right?

23   A    Yes.  Other areas in Mexico are covered by other agents

24   assigned to other locations.

25   Q    To your knowledge, was Mayo Zambada present in your area
```

MORENO/REDIRECT/PARLOVECCHIO

```
 1   of responsibility during your tenure in Mexico?

 2   A    Not that I was aware of.

 3              MS. PARLOVECCHIO:  No further questions.

 4              THE COURT:  All right.  You may step down.  Thank

 5   you.  You may step down.

 6              (Witness excused.)

 7              THE COURT:  Government's next witness?

 8              MR. FELS:  Your Honor, we have an in-custody

 9   witness, so we need --

10              THE COURT:  Okay.  If you wouldn't mind lining up

11   outside, we will be with you in just a moment.

12              (Jury exits.)

13              THE COURT:  All right.  I guess everyone should have

14   a seat while we bring in the witness.

15              Let me tell the Government, I would like to break

16   for lunch sometime between quarter to one and 1:00, depending

17   where you are.

18              (Pause.)

19              (Witness takes the stand.)

20              (Jury enters.)

21              THE COURT:  All right.  Everyone be seated, please.

22   Let's have the witness sworn.

23              THE COURTROOM DEPUTY:  Sir, please raise your right

24   hand.

25              (Witness sworn.)
```

GALVAN/DIRECT/FELS

```
 1                 THE WITNESS:  Yes, ma'am.

 2                 THE COURTROOM DEPUTY:  Please state and spell your

 3    name for the record.

 4                 THE WITNESS:   Edgar Ivan Galvan.

 5                 THE COURTROOM DEPUTY:  Spell that, please?

 6                 MR. FELS:  Your Honor, we are missing the

 7    interpreter.  We are getting him.

 8                 THE COURT:  I'm not missing the interpreter.  You

 9    have to get the interpreter here.

10                 THE COURTROOM DEPUTY:  Please raise your right hand.

11       E D G A R   I V A N   G A L V A N,

12                          called as a witness, having been first

13    duly sworn/affirmed, was examined and testified as follows:

14                 THE WITNESS:  Yes.

15                 THE COURTROOM DEPUTY:  Please state and spell your

16    name for the record.

17                 THE WITNESS:  My name is Edgar Ivan Galvan,

18    E-D-G-A-R, I-V-A-N, G-A-L-V-A-N.

19                 THE COURTROOM DEPUTY:  You may be seated.

20                 THE WITNESS:  Thank you.

21                 THE COURT:  All right.  You may inquire.

22                 MR. FELS:  Thank you, Your Honor.

23    DIRECT EXAMINATION

24    BY MR. FELS:

25    Q    Good afternoon, Mr. Galvan.
```

GALVAN/DIRECT/FELS

```
 1    A     Good afternoon.

 2    Q     How old are you?

 3    A     Forty-one years old.

 4    Q     And where were you born?

 5    A     Ciudad Juarez, Chihuahua.

 6    Q     That's in Mexico?

 7    A     Yes, sir.

 8    Q     And how old were you when you came to the United States?

 9    A     When I came to the United States, I was 13 years old,

10    approximately.

11    Q     And, sir, do you speak English?

12    A     Yes, sir.

13    Q     What's the first language that you learned?

14    A     Spanish it is.

15    Q     And what language do you use in your everyday life?

16    A     Spanish.

17    Q     If you don't mind, we will do this in Spanish through an

18    interpreter.

19    A     I feel more comfortable in Spanish.

20    Q     Sir, what is your highest level of education?

21    A     Two semesters of community college.  I finished high

22    school, and then I did two semesters of community college.

23    Q     And, sir, are you currently incarcerated?

24    A     Yes, sir.

25    Q     And for what reason?
```

GALVAN/DIRECT/FELS

```
 1   A     For two charges.  The first one is conspiracy for

 2   cocaine, and the second one is for conspiracy for weapons.

 3   Q     Now, sir, how much time are you currently serving?

 4   A     Twenty-four years.

 5   Q     And how long have you been in custody since?

 6   A     Eight years.  In February, it will be eight years since

 7   I'm in jail.

 8   Q     Now, Mr. Galvan, did you plead guilty, or did you go to

 9   trial?

10   A     I pled guilty.

11   Q     And what did you do to decide to attempt to reduce your

12   sentence?

13   A     I decided to cooperate with the Government.

14   Q     Have you already received some reduction in your

15   sentence?

16   A     Yes.  I was facing life already, and they gave me a

17   reduction and they gave me 24 years.

18   Q     All right.  So what did you do in order to earn that

19   reduction from life down to 24 years?

20   A     I started to cooperate with the Government telling them

21   the truth about what I did.

22   Q     And sir, are you hoping to obtain another reduction?

23   A     Yes, sir.

24   Q     I want to talk a little bit --

25               THE COURT:  Sir?
```

GALVAN/DIRECT/FELS

```
 1              MR. BALAREZO:  Could you have the witness speak up
 2   also so Mr. Guzman can hear him?  I can't hear him at all.
 3              THE COURT:  As I have mentioned previously, the
 4   record is in English.  It's what the interpreter said that
 5   governs, not what the witness says.  If you need an
 6   interpreter next no Mr. Guzman, we will get an interpreter
 7   there.
 8              MR. BALAREZO:   But then we're going to have from
 9   Spanish to English back to Spanish again.
10              THE COURT:   Actually, that's the way it's supposed
11   to be.
12              MR. BALAREZO:  He can't hear him, so if we can do
13   something about it --
14              THE COURT:  Okay.  Let's have the interpreters stand
15   and interpret.  I will ask, for the convenience of Mr. Guzman,
16   that the witness speak up if he can.  Maybe you can share the
17   microphone a little bit more.
18              MR. BALAREZO:  Thank you.
19              THE COURT:  But it is the interpreter's statements
20   that comprise the testimony, not the witness's.
21   BY MR. FELS:
22   Q    So you mentioned that you pled guilty to conspiracies
23   involving drug trafficking and weapons, correct?
24   A    Yes, sir.
25   Q    And for which organization were you agreeing to move
```

Denise Parisi, RPR, CRR

GALVAN/DIRECT/FELS

1  drugs and weapons?

2  A    For the Sinaloa Cartel.

3  Q    Now, sir, did you sign a plea agreement in your case?

4  A    Yes, sir.

5         MR. FELS:  I would like to show the witness what's

6  been marked as Government's Exhibit 3500-EIG-2.

7         Sir, on page 6 --

8         MR. PURPURA:   Your Honor, there's no objection to

9  the agreement itself coming in.

10         THE COURT:  Okay, the exhibit is admitted.

11         (Government's Exhibit 3500-EIG-2 received in

12  evidence.)

13         MR. FELS:  Move to publish.

14         (The above-referred to exhibit was published.)

15  BY MR. FELS:

16  Q    Showing you what's been marked as Government's

17  Exhibit 3500-IEG-2, page 6.

18         Do you recognize your signature on this document?

19  A    Yes, sir.

20  Q    And this document is in English.  Sir, were you, prior to

21  signing it, given an opportunity to read it and have it

22  interpreted to you in Spanish?

23  A    Yes, sir.

24  Q    I want to talk with you about certain aspects of it.

25         On page 1, under the heading Counts of Conviction,

GALVAN/DIRECT/FELS

1    it says you agreed to plead guilty of Count Five.  It says,

2    Conspiracy to possess a controlled substance and cocaine.

3              And Count Ten, which is Section 924(o), do you

4    recognize that 924(o)?  Do you know what that charge is?

5    A    That is the weapons charge.

6    Q    And down here it says that the Government, in exchange,

7    agrees to move for dismissal of the remaining counts.

8              How many counts were there, sir?

9    A    At the beginning, there were ten charges.

10   Q    Okay.  So the Government agreed to dismiss eight; is that

11   correct?

12   A    Yes, sir.

13   Q    Sir, what benefit, if any, did you receive by the

14   Government dropping eight of the ten counts?

15   A    No benefit really because with the other two charges, it

16   was the same as if I had ten charges.  There's no difference.

17   Q    And let's go to the next page.

18             Page 2 goes through your range of punishment:  Not

19   less than ten years or more than life; and for Count Ten, not

20   to -- sorry -- not to exceed 20 years.

21             Sir, did you understand what potential penalties you

22   were facing before you pled guilty?

23   A    Yes, sir.

24   Q    And, sir, did your lawyer explain to you what your

25   guideline sentence would be?

1   A    Yes, sir.

2   Q    And what amount of time were you facing under those

3   advisory guidelines?

4   A    Minimum ten years to life.

5   Q    Do you understand what the guidelines are, sir?

6   A    No.

7   Q    Was there a number that was assigned to you after the

8   judge -- before the judge sentenced you, sir?

9   A    The -- I was given a number, 46, which means that I had

10  to do life.

11  Q    Okay.  Now, let me go on to this next paragraph.

12        It says a plea of guilty can affect immigration

13  status and may result in deportation and removal from the

14  United States.

15        Sir, are you a United States citizen?

16  A    Yes, sir.

17  Q    And at the time that you applied for United States

18  citizenship, were you involved in drug trafficking?

19  A    Yes, sir.

20  Q    What, if anything, were you asked about your drug

21  trafficking activities when you applied for citizenship?

22  A    Yes, they asked me whether I was involved in any kind of

23  drug trafficking.  I said no.

24  Q    So that was not true, correct?

25  A    Yes.  I lied.

GALVAN/DIRECT/FELS

1   Q    And was that once or more than once on these

2   naturalization applications?

3   A    That I remember, it was on two occasions that they asked

4   me.

5   Q    So why did you tell these people in your citizenship

6   applications that you were weren't a drug dealer when, in

7   fact, you were?

8   A    Because if I had told them that I was a drug trafficker,

9   they were not going to give me citizenship.

10  Q    And why did you want to be a U.S. citizen, sir?

11              MR. PURPURA:  Objection.

12              THE COURT:  Sustained.

13  BY MR. FELS:

14  Q    Now, do you understand the consequences of having made

15  these false statements in your application for citizenship,

16  sir?

17  A    Yes.  Well, the moment they discovered that I'm lying,

18  they cancelled my citizenship and they deport me to Mexico.

19  Q    And has anyone promised you, sir -- well, first of all,

20  are you aware that it's a crime, a separate crime, to make a

21  false statement on your citizenship application?

22  A    Yes, I do know it.

23  Q    Has anyone promised you that you won't have your

24  citizenship taken away?

25  A    No, no one has.

GALVAN/DIRECT/FELS

```
 1   Q     Has anyone promised you you won't get deported back to
 2   Mexico?
 3   A     No, no one has promised me that.
 4   Q     Has anyone promised you that you won't get charged for
 5   having made a false statement on your citizenship application?
 6   A     No, no one has.
 7   Q     I want to go back to Government's Exhibit 3500-EIG-2,
 8   page 3, this paragraph called Substantial Assistance.
 9             Earlier this afternoon, you testified that you
10   cooperated with the United States Government and that -- and
11   that based on your cooperation, you received a reduction of
12   your time from life in prison down to 24 years.
13   A     Yes.
14   Q     So I want to go through this paragraph just very briefly,
15   that you acknowledge that as a condition precedent to
16   consideration under this section, the defendant must cooperate
17   fully in the investigation, give a complete and truthful
18   statement to law enforcement authorities concerning illegal
19   activities, and testify when required at any trial on the
20   merits or other proceedings.
21             What is your understanding of what your obligations
22   are in order to be eligible for a sentencing reduction?
23   A     My obligations are to cooperate fully with the Government
24   and to tell the truth always because the minute I don't tell
25   the truth, the agreement would be cancelled.
```

GALVAN/DIRECT/FELS

1   Q    And what consequences would you face?

2   A    The moment I lie, that very moment, my contract is ripped

3   and I -- then I will have to do what I was supposed to do at

4   first, which is life.

5   Q    All right.  I want to talk to you a little bit about how

6   you got involved in drug trafficking.

7             What kind of work were you doing before you got

8   involved in drug trafficking?

9   A    I used to work at a grocery store and as a cab driver.

10  Q    And how did you first get involved in drug trafficking?

11  A    It all began after my divorce.  I divorced back in 2003,

12  so I started to go to nightclubs in Juarez, and I started to

13  meet people there who moved drugs.

14  Q    And what kind of drugs were you selling initially?

15  A    At first, only marijuana.

16  Q    Now, was there a time in 2005 down in Orlando, Florida

17  that you got arrested with some marijuana in a car?

18  A    Yes, sir.

19  Q    Tell us what happened.

20  A    That happened July 20th, 2005.  I arrived to Orlando, and

21  my buddy and I were arrested with 550 pounds of marijuana.

22  Q    Did you give a statement to the police?

23  A    Yes.  I told the police I didn't have anything to do with

24  that.

25  Q    Was that true?

GALVAN/DIRECT/FELS

```
 1   A    No, sir.
 2   Q    Did you have some identification cards on you at the
 3   time?
 4   A    I had my ID and I had the IDs of two of my friends.
 5   Q    Now, these IDs of your other friends, did they have your
 6   picture on it or their picture?
 7   A    No.  Each picture had their own picture.
 8   Q    Did you try to pass off one of these identification cards
 9   of your friends as you?
10   A    No, because my own ID with my own picture was there.
11   Q    So did you explain to the police who these two people --
12   these other two people were -- the IDs that you had on your
13   person?
14   A    No.  I just told them that I had them on me and that they
15   belonged to my two friends.
16   Q    Were these two individuals going to be joining you later
17   and help you with the marijuana trafficking?
18   A    Yes, sir, they were going to help later on.
19   Q    Now, I want to talk to you about 2004, one year before.
20   A    Yes, sir.
21   Q    Where were you living at that time?
22   A    In El Paso, Texas.
23   Q    What's the city right across from El Paso, Texas?
24   A    El Paso Texas is the border town with Ciudad Juarez,
25   Chihuahua.  The only thing that divides the two of them is a
```

GALVAN/DIRECT/FELS

```
1   bridge.

2   Q    And did you rent an apartment in Juarez at that time?

3   A    Yes.  A friend of mine and myself had rented an apartment

4   in Juarez and we were using it to party.

5   Q    I'm just showing you what's been marked and admitted as

6   Government's Exhibit 502.

7             Do you mind using your finger and just circling for

8   the jury where El Paso and Ciudad Juarez are?

9             (The above-referred to exhibit was published.)

10  A    Here's El Paso, and here's Juarez.

11  Q    Thank you.

12            All right.  So while you're renting this apartment

13  in Ciudad Juarez, is there someone that you meet in 2004?

14  A    Yes.  It was one apartment, but it was a place where

15  there were four apartments, and in another apartment, there

16  was a person I met by the name Antonio Marrufo.

17  Q    Did he go by a nickname?

18  A    Not at that time.

19  Q    Did you later learn that he had a nickname?

20  A    Yes.  Later on he earned the nickname Jaguar.

21  Q    So what was your initial relationship back in 2004 with

22  Jaguar?

23  A    In the beginning, we were just party friends.

24  Q    And did Jaguar -- Jaguar tell you what he did for a

25  living?
```

Denise Parisi, RPR, CRR

GALVAN/DIRECT/FELS

1    A    Yes.  He told me that he was the person in charge of all

2    of the marijuana that arrived into that Juarez and he would

3    collect a percentage for all of that marijuana arriving into

4    that Juarez.

5    Q    And did he explain to you or admit to you what

6    organization he worked for at that time?

7    A    At that time, he worked for La Linea Cartel.

8    Q    Now, have you met Jaguar one time?  Many times?

9    A    Many times.

10   Q    Showing you what's been introduced into evidence already

11   as Government's Exhibit 71.

12            (The above-referred to exhibit was published.)

13   BY MR. FELS:

14   Q    Do you recognize the man in Government's Exhibit 71?

15   A    Yes, sir.

16   Q    And who is that?

17   A    He is Antonio Marrufo -- Jaguar.

18   Q    Now, let's skip ahead several years to late 2007.

19            Where are you living at that time?

20   A    At that time, I lived in El Paso, Texas.

21   Q    And were you continuing to traffic marijuana throughout

22   that period of time between 2004 and late 2007?

23   A    Yes, sir.

24   Q    And did you traffic in any other drugs during that period

25   of time?

GALVAN/DIRECT/FELS

1   A    No, sir.

2   Q    So did that eventually change that you started

3   trafficking in a different drug?

4   A    What do you mean?  I mean, yeah, later on it changed.

5   Q    We will get to that in just a moment.

6         But did someone approach you with a message from

7   Jaguar in late 2007?

8   A    Yes.  A common friend by the name of Chuy.  I received a

9   call from him and he told me that somebody wanted to meet with

10  me, and I said who, and then he said, well, somebody --

11  Marrufo, he said, Jaguar.  And he told me that it would

12  behoove me to go, for me to travel to Juarez to meet up with

13  him, that it would be a good thing for me to meet up with him.

14  Q    And did you meet up with Jaguar in Juarez?

15  A    Yes.  I went to Juarez and he picked me up at a store.

16  Q    And when was the last time that you had seen Jaguar

17  before that time in late 2007?

18  A    The last time I had seen him, it was at the beginning of

19  2005.

20  Q    Did he appear different to you in the two and a half

21  years that had intervened?

22  A    Yes.  His physical appearance was very different.  When I

23  first met him, he dressed just like the people from the areas

24  where there are ranches.  Like, he didn't really care what he

25  would wear.  And now when I saw him in 2007, it really caught

GALVAN/DIRECT/FELS

```
 1   my attention the fact that he now cared about his appearance;

 2   he would wear really nice brand clothing, and even his haircut

 3   was different.

 4   Q    Sir, did he make any admissions to you about what

 5   criminal activity he was involved in in late 2007?

 6   A    Yes.  He told me what he had been offered.

 7   Q    And who had offered Jaguar something?

 8   A    Chapo had offered Jaguar to be in charge of Juarez, of

 9   cleaning Juarez and killing all of the contras.

10   Q    And by "Chapo," you mean whom?

11   A    Joaquin Guzman.

12   Q    Now, when you say that Chapo Guzman had asked Jaguar to

13   clean up, what does that mean?  To be a janitor?

14   A    What happened is that Chapo wanted to go into Ciudad

15   Juarez, Chihuahua; and at that time, it was controlled by the

16   La Linea Cartel, and so Chapo needed somebody who was -- who

17   had a strong character, who was daring, who could then

18   eliminate the La Linea Cartel people little by little so that

19   he could go in and take over the control of Juarez.

20   Q    When you say, "eliminate the La Linea people," what do

21   you mean?

22   A    To kill all of the people who worked for La Linea.

23   Q    Now, you testified earlier this afternoon that Jaguar

24   used to work for La Linea.  Did he explain to you why he was

25   now going to work with Chapo Guzman to kill La Linea?
```

GALVAN/DIRECT/FELS

1          MR. PURPURA:  Objection.

2          THE COURT:  Overruled.

3    A    What happened is that Jaguar had been kidnapped in 2005,

4    and the person who had kidnapped him was JL, who was Vicente

5    Carrillo's right-hand man, and JL kidnapped Jaguar --

6    Jaguar -- and Jaguar saw that this was the perfect opportunity

7    for him to be able to kill JL.

8          MR. FELS:  And just a few more questions, Your

9    Honor, I know we're...

10   BY MR. FELS:

11   Q    Did Jaguar at some point explain to you why Chapo Guzman

12   wanted to take over Juarez?

13         MR. PURPURA:  Objection.

14         THE COURT:  Overruled.

15   A    Yes.  It was something that was personal, and in his own

16   words, he said that by his balls, he was going to take over

17   Juarez.

18   Q    And did Jaguar explain to you at this time how he got to

19   meet Chapo?

20   A    Jaguar told me they had taken him driving, then by a

21   small plane, then there was more driving so that he was taken

22   up to the mountains for him to meet Chapo.

23   Q    Did you stay in contact with Jaguar after this

24   conversation you had with him in late 2007?

25   A    Yes, sir.

PROCEEDINGS

1    Q    And a couple months later in December of 2007, did you

2    have another conversation with Jaguar about the situation in

3    Ciudad Juarez?

4    A    Jaguar told me that I shouldn't go to Juarez because

5    things were going to get really ugly.  He told me that if I

6    were to go there and if I were to get into a problem, he

7    wouldn't be able to help me because they were going to start

8    killing people and things were going to get really ugly.

9              MR. FELS:  Your Honor, this might be a good time to

10   break.

11             THE COURT:  Okay.

12             We will break for lunch, ladies and gentlemen.

13   Please come back at 1:45.  Don't talk about the case amongst

14   yourselves.  See you shortly.

15             (Jury exits.)

16             THE COURT:  We are going to stay in session for a

17   second.  Everyone can be seated.  The marshals can take the

18   witness out.

19             (Witness excused.)

20             THE COURT:  I would just like to hear a little more

21   from the Government.  I think I know where it's going, but I

22   want to make sure with regard to Mr. Purpura's hearsay

23   objections, I take it this was a sales pitch that ended up

24   bringing him into the organization?

25             MR. FELS:   That's correct, Your Honor.

PROCEEDINGS

```
 1              THE COURT:  That's what I thought, Mr. Purpura.

 2              MR. FELS:  Just to be crystal clear about it, the

 3    sales pitch -- this is sort of the first part.  The sales

 4    pitch happens some months later.  The first part is really

 5    also a statement against interest as well because he's

 6    describing now that he's agreed with another individual,

 7    Joaquin Guzman, to engage in cleaning out a group of people

 8    for killings, so there's really two bases for it.

 9              THE COURT:  What do you think about that,

10    Mr. Purpura?

11              MR. PURPURA:  I agree that some of it was a

12    statement against penal interest.  I'm not sure that all of it

13    was, whether it's -- whether it's an inducement to have him

14    join the organization, we'll see.

15              THE COURT:  Okay.  I will continue to pay attention

16    to this.

17              MR. PURPURA:   And so the Court notes, I did not

18    object when it appeared that it was clearly a statement

19    against penal interest --

20              THE COURT:  Yes.

21              MR. PURPURA:  -- because that was pretty obvious.

22              THE COURT:  I saw where you were going.

23              MR. FELS:  Also, just to close the loop on this,

24    when he does make the sales pitch, one of the key factors is

25    that he's got Chapo Guzman behind him to Jaguar, so explaining
```

PROCEEDINGS

1    the connection is important to him.

2            THE COURT:  I think that's all right, but I think we

3    do have to pay close attention to each statement as its

4    elicited, so keep that in mind as we go forward.

5            Okay.  1:40.

6            (Lunch recess taken.)

7            (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GALVAN/DIRECT/FELS

```
 1              A F T E R N O O N   S E S S I O N

 2              (In open court.)

 3              THE COURTROOM DEPUTY:  All rise.

 4              THE COURT:  All right.  Please bring in the jury.

 5              (Jury enters.)

 6              THE COURT:  Be seated, please.

 7              You may continue, Mr. Fels.

 8              MR. FELS:   Thank you, Your Honor.

 9  DIRECT EXAMINATION

10  BY MR. FELS: (Continued.)

11  Q    Before we broke, Mr. Galvan, you were describing how

12  Jaguar explained to you how he -- Chapo also talked about La

13  Linea.

14              Do you remember that?

15  A    I cannot hear you that well.

16              THE COURT:   Can you repeat the question?  It was

17  the noise of everyone settling in.

18              MR. FELS:   Sure.

19  BY MR. FELS:

20  Q    Before the break, we were talking about how Jaguar

21  explained to you how he met Chapo Guzman and you also

22  mentioned about La Linea.

23  A    Yes, correct.

24  Q    And you also then talked about some connection between

25  Chapo and Vicente Carrillo.
```

GALVAN/DIRECT/FELS

```
 1                 Do you remember that?
 2   A     Yes, that there was something personal between them two,
 3   a problem.
 4   Q     Is there a connection between what La Linea is and
 5   Vicente Carrillo Fuentes?
 6   A     Yes.  He's the leader of that organization.
 7   Q     Okay.  And if you wouldn't mind just maybe going a little
 8   bit closer to the microphone again so we can hear you a little
 9   bit louder.
10                 Okay, sir.  Okay.  I want to direct your attention
11   to late 2008.
12   A     Yes, sir.
13   Q     Did Jaguar approach you with a proposal?
14   A     Yes.  He asked me whether I wanted to work for him.
15   Q     Could you explain to the jury when specifically Jaguar
16   wanted you to do?
17   A     What Jaguar wanted me to do was to get a house -- houses
18   that I trusted to be -- to be able to stash the cocaine that
19   he was going to be sending me from Ciudad Juarez.
20   Q     Where were those houses that you were talking about to be
21   located?
22   A     The houses were to be located in El Paso, Texas; and I
23   had to get people in my trust to be able to take care of the
24   cocaine that was going to be coming in from Ciudad Juarez to
25   El Paso, Texas.
```

GALVAN/DIRECT/FELS

1   Q     Once the cocaine were at these houses, what then did

2   Jaguar want you to do?

3   A     When he spoke to me, he would tell me to send someone in

4   my trust to pick up the cocaine.  That person in my trust

5   would pick up the cocaine and take it to his house, to the

6   safe house we had, and it would stay there until Jaguar called

7   me on the phone, and Jaguar would tell me the that the

8   driver -- the truck driver, the guy who was going to bring up

9   the cocaine, was ready.

10  Q     Do you know where the truck driver would be going after

11  picking up the cocaine from your safe houses in El Paso?

12  A     Yes, sir.  He would be going to two places.  Once he

13  picked it up in El Paso, he would go to Atlanta and Chicago.

14  Q     Showing you what's been marked as Government's Exhibit --

15  A     Atlanta or Chicago.

16  Q     Thank you.

17        Showing you what's been marked as Government's

18  Exhibit 500, could you use your finger to just show both

19  El Paso, Chicago, and Atlanta?

20  A     El Paso is here, Atlanta is here, and Chicago is here

21  (indicating).

22  Q     Thank you.

23        So now, did you have discussions with Jaguar about

24  how much money you would get to do this service for Jaguar?

25  A     No.  We never spoke about prices.  We never spoke about

Denise Parisi, RPR, CRR

GALVAN/DIRECT/FELS

```
1    how much he was going to pay me or anything like that.

2    Q    Did you expect that you would get paid for storing and

3    picking up Jaguar's cocaine?

4    A    Yes.  I thought he was going to pay me very well.

5    Q    Did you initially agree with Jaguar's proposal?

6    A    No, sir.  At first, I was not in agreement.  I told him

7    to allow me to think it over.  When he offered me that, I was

8    in Juarez with him, then I came over to El Paso and I

9    mentioned that to my friend, Rudy, and then he was trying to

10   convince me; and a week later, I went to Juarez and I told

11   Jaguar that I was, in fact, going to help him.

12   Q    Were you aware at the time that you were making this

13   decision about Jaguar's taste for violence?

14   A    Yes, sir.

15   Q    Specifically, what had Jaguar shown you in Juarez that

16   caused you to realize that he was a violent person?

17   A    When we were driving around in his car, he was driving

18   and I was next to him, he would always take me to places that

19   I did not ask him to take me to.  He took me to a house, one,

20   which floor was white, it was just white like -- the tiles,

21   what do you call that? -- with a drainage outlet in the

22   middle, but before going in, it seemed like a regular house

23   with a small garage.  So we went in the garage, he closed the

24   gate of the garage, then we went into the house, and in that

25   house, no noise comes out of -- comes out of it.  So if
```

GALVAN/DIRECT/FELS

```
 1   someone were to scream, he told me that that's where he had

 2   people took or where he killed people.

 3   Q    And did the fact that he was violent, was that a

 4   consideration for you as to whether you wanted to work for

 5   him?

 6   A    No, I did not take that into consideration.  That's why

 7   at first I didn't want to work with him.  I told him that I

 8   would tell him later, and a week later, I told him yes.

 9   Q    So you ultimately decided after consulting with your

10   friend, Rudy, that you would take this position.

11   A    Correct.

12   Q    Now, once you took the position, did Jaguar explain to

13   you who was giving -- or who was selling him the cocaine that

14   you would be receiving?

15   A    Yes.  He told me that all of the cocaine he got was from

16   Chapo Guzman.

17   Q    Now, did Jaguar, in fact, ever send you loads of cocaine

18   that you would store in El Paso in these houses?

19   A    Yes, several times.

20   Q    Did you ever personally observe any of this cocaine?

21   A    On one occasion, I saw one or two bricks.

22   Q    And where was that?

23   A    That was at Rudy's house.  I arrived to his house and I

24   told him to show them to me because I wanted to see them.

25   Q    Was there something specifically on the top of the brick
```

GALVAN/DIRECT/FELS

```
 1    of cocaine that you remember?

 2    A     Yes.  The brick had the stamp of an animal, a Jaguar.

 3    Q     Showing you --

 4          MR. FELS:  Just for the witness.

 5    Q     -- Government's Exhibit 803 for identification.

 6          Sir, do you recognize what's being depicted in

 7    Government's Exhibit 803?

 8    A     Yes, sir.  That's the stamp on the brick.

 9    Q     Does it appear to be similar to the stamp that you saw in

10    Rudy's house?

11    A     It is the same.

12          MR. FELS:  Your Honor, I move to introduce

13    Government's Exhibit 803.

14          MR. PURPURA:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 803 received in evidence.)

17          MR. FELS:  And publish, Your Honor.

18          (The above-referred to exhibit was published.)

19    BY MR. FELS:

20    Q     Can you please, describe, Mr. Galvan, what are we looking

21    at here in Government's Exhibit 803?

22    A     That's a kilo of coke, and on top of it, they placed a

23    stamp of the owner, of the person who was moving it, in this

24    case, Jaguar.

25    Q     I notice you used the word "perico."  What is "perico"?
```

GALVAN/DIRECT/FELS

 1   A     "Perico" means cocaine.

 2   Q     And you said that this has the stamp of a Jaguar.  What

 3   did you understand the significance of this to be?

 4   A     That means that the Jaguar stamp, that would be Antonio

 5   Marrufo who is Chapo Guzman's worker.

 6   Q     All right.  Now I want to talk -- let's go through some

 7   of the specifics of how you were able to store this cocaine in

 8   El Paso.

 9           Did you have to recruit some individuals to help

10   you?

11   A     Yes.  Several people.

12   Q     You mentioned Rudy.  Were there other people besides

13   Rudy?

14   A     Yes.

15   Q     Without the need to go through all of the names of the

16   individuals, have you provided all of these individuals' names

17   to the United States Government in your cooperation?

18   A     Yes, sir.

19   Q     Is that a requirement of your cooperation to talk about

20   even your workers?

21   A     It is something that I have to say everything I did, the

22   truth.

23   Q     So how much cocaine at a time would Jaguar send to you

24   for you to pick up through your workers?

25   A     Every time that Jaguar would call me, we picked up

GALVAN/DIRECT/FELS

1    12 kilos, and we got those 12 kilos until they amounted to

2    50 -- between 50 and 80, until the truck driver was ready.

3    Q    And overall, from late 2008 until you get arrested,

4    approximately how much cocaine did you receive at Jaguar's

5    instruction?

6    A    250 kilos, approximately.

7    Q    Was there ever a time that you kept some of those kilos

8    of Jaguar's cocaine and didn't arrange to have it delivered

9    back to Jaguar as he had instructed?

10   A    Yes.  On one occasion, when Martin was arrested, he was

11   arrested with 12 kilos, and he had 50 in his house -- 50 kilos

12   in his house.  When I called Jaguar, I told him that Martin

13   had been arrested with 12 kilos.  The first thing he did --

14   the first thing Jaguar did was to ask me where the other

15   50 kilos were.  I mentioned to him that they were at Martin's

16   house, and he told me to go there immediately to pick them up

17   before the police arrived.

18            So then I called Rudy so that he would go pick up

19   those 50 kilos and I told him to put two of those aside

20   because we needed to pay the attorney because Martin had just

21   gotten arrested, and we needed to pay the others, and we

22   needed to pay us, because up until then, we hadn't even

23   received not even one dollar.

24   Q    Jaguar hadn't yet paid you?

25   A    No, sir.

GALVAN/DIRECT/FELS

1    Q    So how did you sell those two kilograms of cocaine that
2    you had taken from the 50?
3    A    With a person in El Paso.  We sold them right there.
4    Q    Now, did you not tell the truth to Jaguar about the fact
5    that you had taken these two kilograms from him?
6    A    No, I did not tell him the truth.  I was afraid of asking
7    for money.
8    Q    Why were you afraid for asking him for money?
9    A    Because I was afraid of him and I expected for him to
10   call me and to say, you know what, can you go and pick up that
11   money for you, but he never did that.
12   Q    So how was this situation resolved?  Was he angry that he
13   didn't get all 50 kilograms?
14   A    No.  On the contrary, he was happy because we were able
15   to recover those 48 kilos which he had already thought were
16   lost due to Martin's arrest because Martin was the owner of
17   that safe house where the kilos were.
18           (Continued on the following page.)
19
20
21
22
23
24
25

GALVAN/DIRECT/FELS

1    (Continuing.)

2    BY MR. FELS:

3    Q    And he believed that there initially were fewer than 50

4    kilograms?

5              MR. PURPURA:  Objection.

6              THE COURT:  Sustained.

7              MR. FELS:  I'll move on.

8    BY MR. FELS:

9    Q    Sir, you talked about cocaine.  Have you used cocaine

10   yourself?

11   A    Yes, sir.

12   Q    Tell the jury what --

13             MR. PURPURA:  Objection.

14             MR. FELS:  Okay.

15             Your Honor, can we do a quick sidebar?

16             THE COURT:  I think if you talked to each other for

17   ten seconds, you can work it out.

18             MR. FELS:  (Confers with Mr. Purpura.)

19             THE COURT:  Was I right?

20             MR. FELS:  Yes.

21             MR. PURPURA:  As usual.

22   BY MR. FELS:

23   Q    All right.  Let's talk about marijuana, your movement of

24   marijuana for Jaguar?

25   A    Yes, sir.

GALVAN/DIRECT/FELS

1    Q    Did that work -- can you describe, did that work in a

2    different way than the movement of the cocaine or was it the

3    same?

4    A    It was the same process.

5    Q    And approximately how much marijuana did you ultimately

6    move for Jaguar?

7    A    Approximately one or two tons.

8    Q    Now, you testified earlier that Jaguar specifically told

9    you that the cocaine that he was getting was coming from

10   Chapo.  What, if anything, did he specifically tell you about

11   the marijuana?

12   A    As to the marijuana, he didn't tell me where it came

13   from.

14   Q    Now, based on your experience in the marijuana business,

15   what's one of the street names for marijuana?

16   A    Mota, weed.

17   Q    Now, you mentioned that you were afraid of Jaguar?

18   A    Yes, very much so.

19   Q    Did you ever observe Jaguar giving orders to kill people?

20   A    Yes, more than once.  In fact, one time we were together

21   at a discotheque, and he actually stepped aside to give the

22   order of killing two people.

23   Q    Okay.  What about did Jaguar ever ask you to help him

24   kill people?

25   A    Yes, on two occasions.

GALVAN/DIRECT/FELS

1   Q    Let's talk about them.  Let's talk about the first.  Was

2   one of the individuals ultimately killed?

3   A    Yes.  What happened was that Jaguar asked me to go pick

4   up a gun with a silencer.  And then he told me to go to

5   Juárez, so I could go talk to him.  I was in El Paso, Texas at

6   the time.

7            So then I went to Juárez to talk to Jaguar

8   personally, and he asked me to kill a person by the name of

9   Freddy.  Freddy used to live in Juárez, but he had gone to El

10  Paso, Texas to hide.

11           So then he, Jaguar, gave me a picture of Freddy.  I

12  took that picture from Juárez and then I went to El Paso,

13  Texas.  I picked up the gun with the silencer.  I went to a

14  friend's house by the name Luni, and I told him what we had to

15  do.

16           And that time before that, I went over to pick up

17  Rudy.  Rudy was the one who would hang out with me all the

18  time.

19  Q    So why did you want Rudy there when you gave these

20  instructions to Luni?

21  A    Because well, I would always have Rudy there with me,

22  just in case in the future, he would be called to Juárez, and

23  then he would tell Jaguar everything that I was doing.

24  Q    What instructions if any did you give Luni about whether

25  to kill this person?

GALVAN/DIRECT/FELS

1   A    Well, I was with Luni and Rudy, and I then was the one
2   who told Luni.  Excuse me.
3             And so I told Luni, look, like Luni, this is the
4   job.  It's killing this person.  I gave him the picture.  I
5   gave him the gun and I gave him the silencer.  I asked him if
6   he wanted to do it, and then he said yes.  I told him okay,
7   and I told him to wait for me until I got back to him.
8   Q    Why did you tell him to wait?
9   A    Because I'm not a murderer.  I wasn't going to give him
10  the order to kill that person.
11  Q    Well, why did you talk to Luni and give him the gun and
12  photograph if you really didn't want to kill anybody?
13  A    Because Jaguar is the type of person who doesn't ask you
14  questions.  He orders you.  And he had ordered me to do that,
15  and just because I am so afraid, so in panic of him, I said
16  yes.  Otherwise, he would then kill me.
17  Q    Did you ever give Luni a final order to kill Freddy?
18  A    No, I never gave him the order.
19  Q    And did you learn from Jaguar what ultimately happened to
20  Freddy?
21  A    Yes.  About two weeks later, I received a call from
22  Jaguar.  I was driving by myself, and he told me to go over to
23  Freddy's apartment because he had just been told that there
24  was a park in Juárez where actually Freddy's workers were.
25            So then I said okay, and then I hung up the call.

GALVAN/DIRECT/FELS

1   And then about ten minutes later, he called me back and he

2   said, forget it.  And he was actually laughing.  He was really

3   happy.  And he told me that he had actually gotten the big

4   prize, because he had found Freddy there and he had killed

5   him.

6   Q    Now, you mentioned that there was a second instance where

7   you agreed with Jaguar to go kill somebody.

8   A    One time, Jaguar called me so that I would go pick up one

9   of his friends.  And the friend -- well, when I went to pick

10  up the friend, he told me to go to this old man's house.

11       And then he told me that that was the old man's

12  house, and then when I went over to Juárez, Jaguar explained

13  to me what we had to do, which was to kill an old man.

14  Q    All right.  Just -- let's get a little bit to the point.

15  Did you do the same thing with Freddy that you did with this

16  old man, that you recruited people and asked them to help you

17  kill this old man?

18  A    Yes.  I did the same thing.  I told Jaguar, yes.  And

19  when I crossed over to El Paso, I went to pick up Rudy.  And

20  then we went to talk to two other people.  And I told them the

21  same thing, to wait until I would let them know.  And that

22  never happened.  I never gave them the final order.

23  Q    Did the old man, to your knowledge, ever get killed?

24  A    No, he was never killed.

25  Q    Now, again, you keep mentioning that you brought Rudy

GALVAN/DIRECT/FELS

```
1    involved.  Can you just explain a little bit more why you
2    wanted Rudy present?
3              MR. PURPURA:  Objection.
4              THE COURT:  Sustained.
5    BY MR. FELS:
6    Q    Did Rudy have his own direct relationship with Jaguar?
7    A    Well, at that time, Rudy -- Jaguar --
8              THE INTERPETER:  Interpreter correction.
9    A    Jaguar would call Rudy, so that Rudy would take him
10   things like clothes from the store, things like that, and I
11   wouldn't go with Rudy.  So I was afraid that if Rudy went to
12   Juárez without me, he would tell Jaguar what I was doing or
13   what I wasn't doing.
14   Q    So, I guess my question, just to be -- was there a
15   concern that you had --
16             MR. PURPURA:  Objection.
17             THE COURT:  Sustained.
18   BY MR. FELS:
19   Q    Can I -- why did you have Rudy present?
20             MR. PURPURA:  Objection.
21             THE COURT:  Sustained.
22   BY MR. FELS:
23   Q    Let's --
24             MR. FELS:  (Confers with Ms. Goldbarg.)
25   BY MR. FELS:
```

GALVAN/DIRECT/FELS

1    Q    We'll move on to a different topic.

2         You said you didn't want to be involved in -- you

3    didn't want to be involved in murders.  Were you involved in

4    other violence relating to drug trafficking?

5    A    Yes.  But it wasn't related to this case.  It was related

6    to something, a personal matter.

7    Q    Tell us what you did.

8    A    I called a person on the phone.  I told him I was going

9    to go pick him up.  When I went, we got back in the car and we

10   were driving for a while.  And I asked him about his brother,

11   because his brother owed me $8,000.  And he lied to me as to

12   his brother's whereabouts, so I hit him.

13   Q    And have you also been involved in bar fights?

14   A    Yes, several.

15   Q    Let's talk about something else.  You testified earlier

16   about this conflict between La Linea and Chapo's people, and

17   Jaguar.  Were you -- did you ever learn from Jaguar about any

18   efforts to end this war?

19   A    Jaguar told me that one time, Chapo called him, for him

20   to go to an appointment in Zacatecas, Mexico, because La Linea

21   was interested in a truce.  Jaguar didn't want to go to that

22   appointment, but Chapo told him that he was going to be fine,

23   for him not to worry, that he was going to be fine.

24        And Jaguar wasn't really comfortable in going there

25   because that area was an area controlled by the Zetas.  But

GALVAN/DIRECT/FELS

 1    when Chapo asked him to go, he went to the appointment.

 2    Q    Did Jaguar explain to you what happened at that meeting

 3    in Zacatecas?

 4    A    Yes.  At that meeting, there was JL, and JL was the

 5    person who had kidnapped Jaguar in 2005, and JL was Vicente

 6    Carrillo's right hand man.  And he is the one who wanted to

 7    reach a truce with Jaguar.

 8              Jaguar, the moment he saw him, he said there was no

 9    truce.  He told him not to hide, and that at the moment he

10    would go out, that he was going to kill him.

11    Q    Now, Jaguar mentioned that at this meeting in Zacatecas,

12    that JL was there.  Who else did Jaguar say was brokering this

13    meeting?

14    A    The leaders of the Zetas.  He didn't give me names.  He

15    just told me the word "the leaders."

16    Q    Did Jaguar ever talk to you about anyone else who he was

17    close to down in Mexico who was in charge of Chihuahua?

18    A    Yes.  One time, Jaguar told me that he had a friend who

19    was in charge of Chihuahua, and that that person was M-10.

20    Q    I want to transition to something different.

21              Sir, you said you received a 24 year sentence,

22    correct?

23    A    Correct.

24    Q    Were you -- did you think that you would have received a

25    smaller sentence than 24 years?

GALVAN/DIRECT/FELS

```
 1    A    Yes, sir.

 2    Q    And after you got sentenced and went to federal prison,

 3    did you talk to a fellow inmate about the frustrations you had

 4    with your sentence?

 5    A    Yes.  There was a person who was very good.  He was

 6    famous in working in legal cases.  So I was told to go talk to

 7    him and to share about my case with him.  I spoke to him about

 8    my case and then he told me that I had a year to appeal.

 9              And he asked me if I wanted him to help me out and

10    that if that was the case, he would charge me two hundred

11    dollars.

12    Q    Did you agree?

13    A    Yes.  Yes, sir.  I paid him the two hundred dollars in

14    installments, and he did it, did the entire appeal.

15    Q    And you say appeal.  Do you remember what it was that he

16    prepared for you to sign?

17              MR. PURPURA:  (Confers with Mr. Fels.)

18    BY MR. FELS:

19    Q    Sir, are you familiar with the term "2255"?

20    A    Yes.  He mentioned that to me.

21    Q    And sir, did you read the document that he had you to

22    sign?

23    A    No.  The thing is that a year went by, because I had a

24    year.  I had been sentenced in June 5th of 2012, and he

25    completed the 2255 June 10th of 2013.
```

LISA SCHMID, CCR, RMR

GALVAN/DIRECT/FELS

1              So what he mentioned to me was, sign it immediately.

2    I have to send it now.  What I did was, I backdated it.  I

3    backdated the form to June 6th.  He did not use the date on

4    which in fact he had finished the document.

5              So all he said was sign it, because we have no time.

6    That's what I did.  I signed it.  It was my mistake.  I signed

7    it without reading it.

8    Q    Now, did you -- and you didn't know at the time what was

9    in it?

10   A    No, my only interest was to send it as soon as possible.

11   Q    Did you now know what the allegations were in that

12   document that you attested to under penalty of perjury?

13   A    Yes.

14   Q    Give us some examples, if you remember.

15   A    The one I remember, the most important was that it read

16   there that I had told him -- told him that my lawyer had

17   promised me less than ten years, ten years or less.  And what

18   he had promised me was that I was going to be given 17 years

19   or less.

20   Q    All right.  Now, when did you first learn what was in

21   that document that you signed?

22   A    Four days ago.

23   Q    And were the things that you had included or that this

24   individual who prepared this for you that you didn't read,

25   were those things true?

LISA SCHMID, CCR, RMR

GALVAN/DIRECT/FELS

1    A    No.

2    Q    Now, what happened to this motion that you filed, this

3    2255?

4    A    The judge denied it, but he gave me the right to appeal,

5    but I never did.

6    Q    All right.  Let's talk about a different area.

7         Besides marijuana and cocaine, did Jaguar order you

8    to pick up some other -- something else besides cocaine and

9    marijuana?

10   A    Yes.  He told me -- Jaguar called me on the phone and he

11   told me to go pick up some little toys.

12   Q    And what did he mean by "little toys"?

13   A    Little toys means weapons.

14   Q    And you had described before how cocaine and marijuana

15   was coming from Mexico into the United States.  Which

16   direction were the guns, these weapons going?

17   A    Now it was the opposite.  The weapons came to El Paso.  I

18   stashed them in a house there and I had to -- I had to wait

19   for Jaguar to call me, to give them -- to give the weapons

20   then to a person in his trust.

21   Q    What specifically did Jaguar tell you about why you

22   needed -- why he needed to wait to give you an order to return

23   the weapons to him?

24   A    What happens is that Jaguar had to wait for his trusted

25   people who work in Mexican customs.  So when Mexican customs

GALVAN/DIRECT/FELS

1  people told Jaguar to tell them that they were ready, it was

2  then when Jaguar would tell me to deliver the weapons, so that

3  he would have a green light to cross the weapons.

4  Q    Now, again, do you know who is purchasing the weapons?

5  Did Jaguar tell you?

6  A    Yes.  Jaguar was buying those weapons with Chapo's money.

7  Q    And did Jaguar explain why he needed the weapons?

8  A    What Jaguar wanted was to strengthen his cartel, to be

9  able to, and he needed the weapons to continue killing people,

10 to continue eliminating people who work for La Linea.

11 Q    In which city?

12 A    Ciudad Juárez, Chihuahua.

13 Q    Now, at some point, did Jaguar ask you for weapons that

14 weren't just in the state of Juárez?

15 A    On one occasion, Jaguar asked me whether I could get him

16 weapons because he wanted to send them to Sinaloa, that he

17 wanted to send them to Los Señores because they were waging

18 their own war against the Beltrán in Sinaloa.

19 Q    Who do you understand Los Señores to be?

20 A    Mayo and Chapo.

21 Q    Did you ever meet either Mayo or Chapo?

22 A    No, never.

23 Q    Did you ever meet a man named Vicente Zambada?

24 A    No, sir.

25 Q    All right.  Well, let's go to Chapo and Mayo.  You didn't

LISA SCHMID, CCR, RMR

GALVAN/DIRECT/FELS

1    meet them -- did you ever hear either one of them on a Nextel

2    push-to-talk phone?

3    A    On one occasion, Jaguar was driving.  I was next to him.

4    We had been drinking.  And since we were going to spend the

5    night and Jaguar had to wake up the following day very early,

6    seems we were going to be drinking the -- all night.

7         He told me, give me a minute to call Chapo.  So he

8    dialed the radio, a red Nextel.  Jaguar dialed the radio and

9    he set it to talk, and he would address him as "Señor."

10        He said, I know that I have to wake up early

11   tomorrow.  I know that this is the communication I'm going to

12   have with you.  So, just to let you know if it's okay if that

13   I don't sleep the whole night.

14        I won't sleep the entire night.  At any rate, I will

15   have the Nextel next to me.  That's what he said.  Those were

16   Jaguar's words.

17   Q    And what was the response on the other end of the phone

18   that you heard?

19   A    From the other side, they told Jaguar that -- not to

20   worry, that he was doing things right, that they were very

21   happy with him.

22   Q    And again, who is it that Jaguar told you was on the

23   other end of that phone call?

24   A    Jaguar told me that at the end of the line was -- Chapo

25   was at the end of the line.

GALVAN/DIRECT/FELS

1   Q     Now, did you ultimately agree to use the people that you

2   had recruited to store weapons in El Paso, as ordered by

3   Jaguar?

4   A     Yes, sir.

5   Q     Okay.  Can you describe for the jury how would this work?

6   A     Jaguar would call me on the phone, would tell me to be

7   ready to go pick up the little toys, and that I know what I

8   needed to do, which was to stash them away in a house, to put

9   them away in a safe house, a house that I trusted until Jaguar

10  would call me again for the weapons to be picked up.

11  Q     Did you ever see any of these weapons yourself?

12  A     Yes.  On one occasion, at Rudy's house, there was a .50

13  caliber.

14  Q     Did one of your workers pose with that weapon?

15  A     One of my helpers had been in the army, so he had weapons

16  experience.  So he got the .50 caliber and he began to put it

17  together himself.

18        He put it together, and he told me the type of

19  weapon that it was.  And he was very happy with that, with the

20  weapon, and so he took a picture.

21  Q     Showing you --

22        MR. FELS:  For the Government -- for the witness,

23  Your Honor, Government's Exhibit 804.  (Exhibit published to

24  the witness.)

25        MR. PURPURA:  No objection, Your Honor.

LISA SCHMID, CCR, RMR

GALVAN/DIRECT/FELS

1                    THE COURT:  It's received.

2                    MR. FELS:  Move to admit, Your Honor, and move to

3       publish.

4            (Government's Exhibit 804 was received in evidence.)

5                    (Exhibit published to the jury.)

6       BY MR. FELS:

7       Q    In you don't mind looking at Government's Exhibit 804 and

8       describe what we're looking at here?

9       A    That's the weapon that Ivan, my helper, was carrying.  It

10      is a caliber .50, and I know it because he told me so.  And I

11      was there.  I was present when they took the picture.

12      Q    Now, did you confirm that this was a .50 caliber weapon

13      with somebody else?

14      A    Yes.  Yes.  When I called Jaguar to let him know that the

15      little toys were ready, that the little toys were in the house

16      already, Jaguar asked me whether I had liked the special

17      little toy.  And he started to laugh.  He went, "Did you like

18      the little toy?"  And I told him, yes.  I said, what a big

19      animal, I said.  He said told me that's a .50 caliber.  Take

20      care of it very much.

21      Q    So, sir, were there other weapons besides this .50

22      caliber weapon that were in this shipment that you were

23      preparing for Jaguar?

24      A    Yes, there were many AK-47s.

25      Q    Now, you mentioned a term there in Spanish, cuerno de

                    LISA SCHMID, CCR, RMR

GALVAN/DIRECT/FELS

1   chivos?

2   A     That is an AK-47.

3   Q     What do those words literally mean?

4   A     That is the horn, where you place the magazine.

5   Q     And chivos?

6   A     I don't know.

7   Q     And do you know if this .50 caliber weapon depicted in

8   Government's Exhibit 804 ultimately ever made it across the

9   border to Jaguar?

10  A     Yes.  That shipment did arrive in Ciudad Juárez, in

11  Chihuahua.  When I got to Juárez after the shipment had

12  arrived, he was very happy and he told me that he was going to

13  mount the .50 caliber on top of a truck.

14            (Demonstrating.)  This is the gesture he made, that

15  he was going to put it on top of a truck and that he was going

16  to use it.

17            MR. FELS:  And just for the record, the witness held

18  his hands apart, his fists apart, at shoulder length.

19            THE WITNESS:  Yes.

20  BY MR. FELS:

21  Q     Now, approximately how many times did you receive weapon

22  shipments in the United States to be sent to Jaguar in Mexico?

23  A     About four or five times.

24  Q     And what types of weapons besides this .50 caliber rifle

25  and the AK-47s did you receive for Jaguar and arrange to send

LISA SCHMID, CCR, RMR

GALVAN/DIRECT/FELS

1   to him in Mexico?

2   A    Well, also and aside from that, bulletproof vests.

3   Q    We'll get to that in just a moment.

4        These four or five shipments, did they all make it

5   to Jaguar in Mexico?

6   A    All of them except for the last one.

7   Q    Let's talk about that last time, right from the

8   beginning.  Who told you that the weapons needed to be picked

9   up in the United States?

10  A    Jaguar told me once again to go pick up some little toys.

11  We did the same process.  I told Rudy, and Rudy brought them

12  to the house of a person by the name of Alberto Sandoval.

13  Q    And did he have a nickname, Alberto Sandoval?

14  A    Beto.

15  Q    Did Rudy confirm that he, in fact, brought those weapons

16  to Beto Sandoval's house?

17  A    Yes.  Once he had arranged everything there at Beto's

18  house, Rudy called me on the phone to tell me that everything

19  was fine.

20  Q    Now, had you and Rudy ever used Beto Sandoval's house in

21  a prior shipment to store weapons?

22  A    Yes.  Beto had already helped us before.

23  Q    And at some point, did you know where Beto Sandoval's

24  house was located?

25  A    In one of the previous shipments, Rudy brought me over to

GALVAN/DIRECT/FELS

1   his house.  We didn't go in, but he told me where he lived.

2   Q    And when you say where he lived, you mean Beto Sandoval?

3   A    Yes.  Excuse me.  Beto's house.

4   Q    Did you arrange for something other than these rifles to

5   be stored at Beto Sandoval's house?

6   A    Ivan told me that he had a friend by the name Arturo whom

7   had these vests, and he asked me if I was interested in buying

8   them.  I told him that that was not my decision, and that I

9   needed to make a phone call.  I called Jaguar, and he told me

10  to go see the vests.

11          I went to see the vests, and Arturo just pulled one

12  out.  I called Jaguar on the phone and I described that

13  bulletproof vest to him.  He liked them and he told me to buy

14  the seven of them.

15  Q    And you said you saw one of them.  Could you describe it

16  for the jury, what did it look like?

17  A    It was brand new.  It was green, like camouflage green

18  just like from the army.  There were four that were completely

19  the same.  They were completely new and then the other three

20  had been used, and they were a little different.

21  Q    Okay.  And so, with whose money did you purchase these

22  seven vests?

23  A    With Jaguar's money.

24  Q    How did the vests ultimately -- where did the vests

25  ultimately go?

GALVAN/DIRECT/FELS

1   A    Once we bought the vests, I told Ivan to take them to

2   Beto's house.  And they got there and they were there together

3   with the weapons and with the ammunition.

4   Q    And you said the weapons.  Do you know what kind of

5   weapons these were?

6   A    At Beto's house?  It was all AK-47s.

7   Q    All right.  So how long were these AK-47s being stored at

8   Beto Sandoval's house?

9   A    A long time.  Usually, they would just be there for a

10  week, and this time around at Beto's house, they had been

11  there for three weeks.  And Beto was already feeling really

12  uncomfortable.  He wanted them to take them out of there.

13  Q    Do you know approximately what month this was?

14  A    In January, January 2010.

15  Q    All right.  So you said that Beto was putting -- was

16  upset that the weapons were there too long.  Was there someone

17  else who was upset that the weapons were there too long?

18  A    Everyone was upset.  Jaguar was also very upset because

19  he hadn't been able to arrange for crossing them over.  Rudy

20  was really angry because Beto kept calling him and calling

21  him, because he wanted them out of there.  So they were also

22  like calling me and I was all stressed out.

23  Q    All right.  Did you ultimately get the green light to

24  move those weapons, vests?

25  A    Yes.  On the last day, I mean, Jaguar called me and he

GALVAN/DIRECT/FELS

```
 1   told me that we needed to really hurry up, that we didn't have
 2   a lot of time, that we had to hurry up, so that we could
 3   deliver them to the guy that he trusted, for him to take them
 4   to Juárez.
 5   Q    Now, where were you when you got that call from Jaguar?
 6   A    I was at my wife's house.  The people who had been
 7   renting that house had just moved out.  And right at the
 8   moment when Jaguar called me, I was actually painting that
 9   house because my plans were to move in there with my wife.
10   Q    And you said painting the house.  Are you talking about
11   painting the inside or the outside or what?
12   A    We painted it all, but at that time, I personally was
13   painting it on the inside.
14   Q    And you get the call from Jaguar to tell you, got to move
15   them.  What do you do?
16   A    By the time I called Rudy and I told him to like very
17   quickly go to Beto's house, and for him to go pick the weapons
18   up so he could deliver them, because they had to go to Juárez
19   right away.
20   Q    Now, where was Beto Sandoval's house in proximity to the
21   house that you were painting?
22             MR. PURPURA:  Objection.
23             THE COURT:  Sustained.
24   BY MR. FELS:
25   Q    Tell us what happened next.
```

GALVAN/DIRECT/FELS

1   A     After I hung up with Rudy, I awaited about 15 minutes and

2   after those 15 minutes, and since I was about five minutes

3   away from Beto's house, I went there to check everything and

4   make sure that everything was fine.

5   Q     When you say to check there and make sure everything's

6   fine, what was your intention?  What were you planning to do

7   there?

8   A     I just wanted to pretty much be the lookout, just in case

9   like a police officer would go by.  I just wanted to let them

10  know and make sure that everything was fine.

11              (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GALVAN/DIRECT/FELS

```
1   BY MR. FELS (CONTINUED):

2   Q    So what happened once you approached Beto Sandoval's

3   house; what did you see?

4   A    I didn't go right in front of the house.  I went on the

5   side of the house, and when I did that, I saw all the police

6   there.

7   Q    And showing you what's been introduced as Government's

8   Exhibit GX 217-11.  Do you recognize this house?

9   A    Yes, that's Beto's house.

10  Q    So once you see all the police in front of the house,

11  what do you do then?

12  A    After I saw all the police there, I called Rudy to tell

13  him what happened, and then he told me that he had already

14  seen that.  And I told him to leave that area right away and

15  then to head to the bar, which was the business that I had.

16  Q    What bar was that?

17  A    It was called the 77 Bar.

18  Q    And once you instructed Rudy to meet you at your bar, who

19  did you call then?

20  A    When I hung up with Rudy, I was on the way to the bar.

21  And then I called Jaguar, and I told Jaguar what had happened.

22  And he was really pissed.  He asked me, well, what had

23  happened?  And he told me to find out who had been the rat.

24  Q    Did you ever learn that information?

25  A    No, I never knew what happened.
```

David R. Roy, RPR, CSR, CCR

GALVAN/DIRECT/FELS

1    Q    And just to be clear, when Jaguar asked you who is the

2    rat, what did you understand him to mean by that?

3    A    For me to find out how it was that they had gotten to

4    that shipment and who it had been that had told the police.

5    Q    Did you ever do any future shipments with Jaguar?

6    A    That was the last time I ever talked to Jaguar.

7    Q    And I just want to go back.

8         When you said I think the words used was dedo?

9    A    Dedo, finger, is the same thing as rat or somebody who's

10   actually talking to the police.

11   Q    So you said you never spoke to Jaguar after this

12   incident?

13   A    It was the last time I spoke to him.

14   Q    Did you ultimately attempt to do any other drug deals

15   with any other individuals after this incident in

16   January 2010?

17   A    Yes, but everything went wrong.  Everything, you know,

18   that I started would go wrong, so that was it.

19   Q    And where did you get arrested and when?

20   A    When?  That was February 2011.  Where?  That was in

21   El Paso, Texas while I was driving.

22   Q    When you pled guilty, did you accept responsibility for

23   your role in the storage of those vests, the AK-47's stored in

24   Beto Sandoval's house that's depicted as GX 217-11?

25   A    Not when I pled guilty.

GALVAN/CROSS/PURPURA

1    Q    When you pled guilty, did you ultimately accept

2    responsibility after you pled guilty?

3    A    Afterwards?  Yes.

4              MR. FELS:   No further questions.

5              THE COURT:  All right.  We'll take our afternoon

6    break.  Let's come back here at 3:20.  Please don't talk about

7    the case.

8              See you in 15 minutes.

9              (Jury exits the courtroom.)

10             (The following matters occurred outside the presence

11   of the jury.)

12             THE COURT:  Recess until 3:20.

13             (Recess taken.)

14             THE COURTROOM DEPUTY:   All rise.

15             THE COURT:  Please bring in the jury.

16             (Jury enters the courtroom.)

17             (Jury present.)

18             THE COURT:  All right.  Be seated, please

19   cross-examination, Mr. Purpura.

20             MR. PURPURA:  Your Honor, thank you.

21   CROSS-EXAMINATION

22   BY MR. PURPURA:

23   Q    Mr. Galvan, I'm putting up Government's Exhibit

24   Number 71, and you've identified that man; is that correct,

25   sir?

GALVAN/CROSS/PURPURA

1   A     Yes, sir.

2   Q     And that is Jaguar or Mr. Marrufo?

3   A     Yes, sir.

4   Q     Now, let me ask you specifically:  Who gave Mr. Marrufo

5   the nickname Jaguar?

6   A     Jaguar told me that Chapo Guzman had given him that name.

7   Q     And that's what you told the United States Government way

8   back in 2011; is that correct, sir?

9   A     When in 2011?

10  Q     The very first time you proffered, the very first time

11  you proffered you said the same thing.

12  A     Okay.  Yes.

13  Q     According to you, Mr. Marrufo, or Jaguar, if you believe

14  it, indicated he received his nickname from Chapo, right?

15  A     Jaguar's own words, yes.  He told me that Chapo had given

16  him to name.

17  Q     And Jaguar didn't tell you that the name was given to him

18  by M-10?

19  A     No, he never said that.

20  Q     M-10 is someone that Jaguar worked with and for; isn't

21  that correct?

22  A     I don't know whether they working together.  All I know

23  is that they were friends.

24  Q     And you indicated that this man here, Jaguar,

25  Mr. Marrufo, that he was at least going in your words, he was

David R. Roy, RPR, CSR, CCR

GALVAN/CROSS/PURPURA

```
 1   kidnapped; is that correct?
 2              THE INTERPRETER:  Counsel, could you repeat the
 3   question for the interpreter?
 4              MR. PURPURA:  I apologize.
 5   BY MR. PURPURA:
 6   Q    You indicated on direct testimony that Mr. Marrufo was
 7   kidnapped by J.L.; is that correct?
 8   A    Mr. Marrufo, Jaguar, told me that J.L. had kidnapped him
 9   back in '05 at the same time while I had been arrested in
10   Orlando, Florida.
11   Q    And did he ever tell you that one of his relatives was
12   also kidnapped by J.L.?
13   A    No.
14   Q    Now, do you recall your very first proffer again back on
15   November 10th, 2011, after you agreed to cooperate, you were
16   present with your attorney, agents, and an Assistant
17   United States Attorney; and do you recall at that time telling
18   them that Jaguar, Mr. Marrufo, told you that one of his
19   relatives was kidnapped, not that Jaguar was kidnapped?
20   A    No.  I remember -- no, I remember very clearly that
21   Jaguar told me that he had been kidnapped back in '05, and
22   that that was precisely the reason why he was not able to help
23   me with my case.  He had not been kidnapped at the time, he
24   would have helped me with my case due to our friendship.
25   Q    So you do not remember that Marrufo, Jaguar, told you
```

GALVAN/CROSS/PURPURA

```
 1   that he received news that a family relative of one of his

 2   associates was kidnapped by J.L. and that broke the truce; yes

 3   or no?

 4   A    I don't remember.

 5   Q    Very good.

 6   A    I don't remember.

 7   Q    Let me show you what has been marked as

 8   Defense Exhibit 404?

 9           MR. PURPURA:  That Bates Stamped 149.

10   Q    I'm going to direct -- and you can read English, can't

11   you?

12   A    Yes, sir.

13   Q    All right.  Why didn't you read it?  Give the interpreter

14   a little break.

15           MR. FELS:  Objection, Your Honor.

16           THE COURT:  The witness has indicated he's more

17   comfortable in Spanish, so the interpreter --

18   BY MR. PURPURA:

19   Q    Are comfortable reading in Spanish as well?

20   A    That he should read it to me.  That I would feel more

21   comfortable if he would read it to me.

22   Q    Please read it.  Don't waste time.

23           Go ahead.

24           THE COURT:  Yes, which paragraph?

25   BY MR. PURPURA:
```

GALVAN/CROSS/PURPURA

```
 1   Q    The paragraph right here, please -- actually, I
 2   apologize.
 3           Let's start with -- so there's no misunderstanding,
 4   with this paragraph here.
 5           THE COURT:  You need to pull it down a little.
 6           MR. PURPURA:  Okay.  Thank you, Your Honor.
 7   BY MR. PURPURA:
 8   Q    Right here.
 9           THE INTERPRETER:  (Complies.)
10   Q    Continue, Galvan stated.
11           THE INTERPRETER:  (Complies.)
12   Q    Thank you.
13           And then could you please read this paragraph here?
14           THE INTERPRETER:    (Complies.)
15   Q    Now, sir, after reading that, does that refresh your
16   recollection that what broke the truce between J.L. and
17   Marrufo, this gentleman here, was the kidnapping not of
18   Marrufo, but of one of his associate's relatives?
19   A    Marrufo's kidnapping was in '05.
20           What happened there, that was in 2008, 2009 --
21   Q    So, sir --
22   A    -- and it wasn't Marrufo's relative.  It was like someone
23   close to him.
24   Q    And that's what broke the truce; is that correct sir,
25   according to Mr. Marrufo?
```

GALVAN/CROSS/PURPURA

```
 1   A     The truce?  There was never a truce.

 2   Q     Do you remember telling the Government, the paragraph you

 3   just read, that there was an agreement at the meeting that

 4   J.L. and Marrufo would not hurt each other?

 5   A     During the meeting, there was no truce.  He said later

 6   that there was, like, a code that they would not charge each

 7   other's family.  That -- that they -- that the fight was

 8   between them two.

 9   Q     Now, do you know how old Mr. Marrufo is?

10   A     He's younger than me by about two or three years.

11   Q     Okay.  You're 41?

12   A     Thirty-eight, thirty-nine.

13   Q     And you have known him for a few years, correct?

14   A     Since 2004.

15   Q     And you indicated there was a time period for about two

16   and a half years when you did not see him, correct?

17   A     Correct.

18   Q     And what you said on direct examination was that

19   something looked different, that he dressed better at that

20   point two and a half years later, correct?

21   A     Correct, sir.

22   Q     And that his hair was difference as well, correct?

23   A     Yes, sir.

24   Q     Indicative that he was making apparently more money, it

25   appeared, than he was making before; is that fair to say?
```

GALVAN/CROSS/PURPURA

1    It's a yes or no.

2    A    Yes.

3    Q    Okay.  Now, the Government asked you -- actually they

4    showed you in one of their proffers, they showed you a series

5    of photographs for you to identify.  Do you remember that?

6    A    Yes, sir.

7    Q    And you identified at that time back on February 6th,

8    2017 a photograph of Antonio Marrufo, correct?

9    A    Yes, sir.

10   Q    It wasn't this Government Exhibit 71, was it?

11   A    I don't remember.

12   Q    Well, just for your eyes only, please.

13        Showing you what has been marked as Defense

14   Exhibit 415.  Do you see these initials on that photograph

15   there, EG, right?

16   A    Yes, sir.

17   Q    There's a date on it February 6, 2017, correct?

18   A    Yes, sir.

19   Q    And that's the date that you identified what's purported

20   to be, at least to you, a photograph of Tony Marrufo; is that

21   correct?

22   A    Yes, sir.

23        MR. PURPURA:  Move 415 into evidence and ask that it

24   be displayed.

25        MR. FELS:   No objection, Your Honor.

David R. Roy, RPR, CSR, CCR

GALVAN/CROSS/PURPURA

```
 1              THE COURT:  Received.

 2              (Defense Exhibit Number 415 so marked and received

 3  in evidence.)

 4  BY MR. PURPURA:

 5  Q    And that's the person who you identified and signed as

 6  Antonio or Tony Marrufo; is that correct?

 7  A    Yes, sir.

 8  Q    Does that appear to be the same person to you?

 9  A    You can tell that he did something to his face.

10  Q    Does it appear to be the same person to you?

11  A    He looks different.

12  Q    The Government on direct examination never showed you the

13  photograph you identified, did they?

14  A    What photograph?  There's nothing there.

15  Q    Showing you what's already in evidence as

16  Government's Exhibit 1-A, you know who that is, don't you?

17  A    I don't know him, but I know who he is.

18  Q    You've seen his photograph in the media or press; is that

19  correct?

20  A    Yes, I have.

21  Q    And you know that photograph as Government Exhibit 1-A to

22  be Mr. Guzman, the person you called Chapo; is that correct,

23  sir?

24  A    Yes, sir.

25              MR. PURPURA:  Your Honor, with the Court's
```

GALVAN/CROSS/PURPURA

```
 1   permission, may I just have Mr. Guzman stand up for a moment?
 2           THE COURT:  Okay.
 3   BY MR. PURPURA:
 4   Q    Can you see Mr. Guzman from where you're seated?
 5   A    Yes, sir.
 6   Q    Okay.
 7           You've never met him before; is that correct, sir?
 8   A    Never in my life.
 9   Q    And you indicated or you testified that you overheard on
10   a push-to-talk telephone what supposedly was Mr. Guzman's
11   voice; is that correct, sir?
12   A    Correct, sir.
13   Q    I don't mean to waste your time and the Court's time, but
14   if I played a series of snippets of phone calls, do you think
15   you could identify Mr. Guzman's voice?
16   A    I think that would be impossible because I only heard him
17   at that time once and that was many years ago.
18   Q    So you never met Mr. Guzman, correct?
19   A    Correct, sir.
20   Q    You can't identify his voice, correct?
21   A    Correct, sir.
22   Q    And you are here today testifying against him; is that
23   correct?
24   A    Yes, sir.
25   Q    And the basis of all the information that you have given
```

GALVAN/CROSS/PURPURA

```
 1   to us comes from --
 2            MR. PURPURA:   -- thank you --
 3   Q    -- one of these two people, Government's Exhibit 71 or
 4   Defense Exhibit 415, correct?
 5   A    It's the same person.
 6   Q    Mr. Guzman never spoke to you directly, did he?
 7   A    Never.
 8   Q    Where is Mr. Marrufo today?
 9   A    He was arrested.  He's in Mexico.
10   Q    Government counsel asked you about your nationalization
11   form.  Do you remember that?
12   A    Yes, sir.
13            MR. PURPURA:  Your Honor, without objection as a
14   demonstrative only, I'm going to put a blank Form M-400, which
15   is an application for nationalization on the screen.
16            THE COURT:  Okay.
17   Q    So you began to fill this application out back in January
18   of 2008, correct?
19   A    Correct, sir.
20   Q    And as government counsel mentioned to you, you filled
21   the application out under oath; is that correct, sir?
22   A    Yes, sir.
23   Q    All right.  And in general, what it says to you here,
24   highlighted, is:  I understand that the USCIS will require me
25   to appear for appointment to take my biometrics -- we'll just
```

GALVAN/CROSS/PURPURA

 1   leave that out and at that time, I will be required to sign an

 2   oath reaffirming that, number one, that you provided or

 3   authorize all the information in my application;

 4           I understand all of the information contained in and

 5   submitted with my application and;

 6           All of this information was complete, true, and

 7   correct at the time of filing;

 8           And then you certify under the penalty of perjury

 9   that you provided and authorized all the information in the

10   application and that the information is true and correct?

11   A    That's correct.

12   Q    That was either read to you or you read that; is that

13   correct, sir?

14   A    Yes, sir.

15   Q    You wanted to become a United States citizen; is that

16   correct, sir?

17   A    Absolutely.

18   Q    It's the same oath that you basically had when you were

19   sworn in today to tell the truth, correct, sir?

20   A    Yes, it is the same oath, but it's very different cases.

21           I can explain the difference--

22   Q    Excuse me.  There's no question.  There's no question.

23   Thank you.

24           Answer my questions.  If you don't understand them,

25   stop me, I'll repeat the question, okay?

GALVAN/CROSS/PURPURA

1    A    Okay.

2    Q    All right.  Very good.

3         Now, you wanted to become a citizen and you were

4    willing to lie for that; is that correct, sir?

5    A    I was lying.

6    Q    Correct.

7         Question Number 22 in particular said:  Have you

8    ever committed, assisted in committing or attempted to commit

9    a crime or offense for which you were not arrested?

10        At that time in January of 2008 at the very minimum,

11   you were involved in large-scale marijuana distribution,

12   correct?

13   A    Correct.

14   Q    And you knew if you put down "yes" to that, that you

15   wouldn't get your application granted; you would not become a

16   citizen, right?

17   A    Yes, I knew that, sir.

18   Q    Now, the reaffirmation, that's when you go back again and

19   they ask you about the application and they ask you again, Is

20   everything on the application true and correct?  And again,

21   it's under the -- supposedly -- the pains and penalties of

22   perjury, correct?

23   A    Correct, sir.

24   Q    So on March 10th, 2009 when you moved up to at least not

25   only a large-scale marijuana trafficker, but also a cocaine

1    trafficker, you lied when you reaffirmed that you had never

2    committed or assisted in committing a crime, right?

3    A    Yes, I did lie, sir.

4    Q    All right.  And now, Government Counsel brought up that,

5    you know, you haven't been charged with perjury, but you could

6    be charged, right?

7    A    Yes, correct, sir.

8    Q    And you became a citizen, right?

9    A    Yes, sir.

10   Q    2009?

11   A    Yes, sir.

12   Q    Nine years ago?

13   A    Yes, sir.

14   Q    In the past nine years, have you ever been charged with

15   perjury on that form?

16   A    No, sir.

17   Q    In the past nine years, has anyone come to you and

18   suggested that they were going to revoke your citizenship?

19   A    No, sir.

20   Q    And now that you're working or cooperating with the

21   Government, do you think they're going to move to revoke your

22   citizenship at this point?

23   A    I do not know, sir.

24   Q    You were indicted in the United States District Court for

25   the Western District of Texas; is that correct, sir?

GALVAN/CROSS/PURPURA

1    A     Correct, sir.

2    Q     And you did receive a copy of your superseding

3    indictment; is that correct, sir?

4    A     Correct, sir.

5    Q     Now, showing you without objection is just the first page

6    to your indictment, Defense Exhibit 401.

7              Now, as you indicated before, you have ten separate

8    counts; is that correct?

9    A     Correct, sir.

10   Q     And one thing -- correct me if I'm wrong -- one thing

11   every defendant wants to know is how much time am I facing,

12   right?

13   A     That's correct, sir.

14   Q     And you knew in this indictment that you had multiple,

15   what are called, 924(C) counts; that means using, carrying, or

16   possessing a firearm during -- in relation to a crime of

17   violence a drug trafficking crime -- go head.  I'll wait.  I

18   apologize -- that's Count 4, Count 8, and Count 9; is that

19   correct?

20   A     Yes, sir.

21   Q     And what you knew about those counts, those 924(C)

22   counts, is that you were told that the first time, first

23   conviction on those counts is a mandatory five years, and that

24   subsequent -- that means the other 924(C) counts -- were a

25   mandatory 25 years apiece, which means those counts carry 55

GALVAN/CROSS/PURPURA

```
 1    mandatory years consecutive to anything else --

 2              MR. FELS:   Objection.

 3    BY MR. PURPURA:

 4    Q    -- did you now that?

 5              THE COURT:  Well, let's talk about that.

 6              MR. PURPURA:  Yeah.

 7              THE COURT:  Let's have a sidebar.

 8              (Continued on next page.).

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SIDEBAR

```
1                    (The following occurred at sidebar.)

2              THE COURT:  Who is the most sure of the answer --

3              MR. PURPURA:  I am.

4              THE COURT:  -- because I'm not.

5              MR. LICHTMAN:  I think it's 20, isn't it?

6              MR. FELS:  It can't be all at once.  You have to

7    get a prior conviction first, and the prior conviction --

8              MR. PURPURA:  No, it's connected --

9              THE COURT:  No, no, no.  The question is if you are

10   charged with multiple 924(C) counts, do they have to all run

11   consecutive to each other?

12             MR. PURPURA:  Yes.

13             MR. FELS:  I don't know that they have to.  But the

14   point is what he's saying is that -- is that because you've

15   already got a prior conviction, the next one is 20.

16             MR. PURPURA:  No, that not at all --

17             THE COURT:  That's not the point Mr. Purpura is

18   making.  On direct examination you had him say it is really

19   the same that I pleaded to.

20             MR. FELS:  Right.

21             THE COURT:  Mr. Purpura is making the point that by

22   not pleading to the five for 924(C) count, he got out of a

23   mandatory consecutive 20 by piling on -- have I got your

24   position right?

25             MR. PURPURA:  Except the numbers are wrong.
```

SIDEBAR

```
 1                THE COURT:  Okay.

 2                MR. PURPURA:  It's five for the first and it's 25

 3      for each additional --

 4                THE COURT:  Okay.

 5                MR. PURPURA:  -- and consecutive.

 6                THE COURT:  I don't think that's right, because I

 7      think that has to be a prior conviction.

 8                I do agree that it would be stacked at five and five

 9      and five is my understanding.

10                MR. PURPURA:  Well, look, Judge, I know -- well,

11      I --

12                THE COURT:  All right.  The fact that none of us,

13      except Mr. Purpura --

14                MR. PURPURA:  I do.

15                THE COURT:  -- appear to be certain of it, suggests

16      to me that this witness is not going to be certain of it.  But

17      there's also a good-faith basis for the question, because I

18      believe that Mr. Purpura believes that that is the way it

19      works.  So you can ask the question to see if the witness

20      knows whether that's right or not.

21                (Continued on next page.)

22

23

24

25
```

David R. Roy, RPR, CSR, CCR

GALVAN/CROSS/PURPURA

```
1                    (In open court.)

2                    MR. PURPURA:  Thank you, Your Honor.

3                    THE COURT:  Okay.

4    BY MR. PURPURA:

5    Q    Mr. Galvan, where I left off is these 924(C) counts carry

6    consecutive mandatory time and you knew that; is that correct,

7    sir?

8    A    I did not know that at that time.

9    Q    Do you know it now?

10   A    You're just telling me now, yes.

11   Q    All right.  So when you have a plea agreement, you

12   indicated that by pleading just to the counts you pled to,

13   Count 5 and Count 10, you didn't receive any other benefits

14   because the other counts don't make a difference; do you

15   remember saying that on direct examination?

16   A    Yes, I remember that.

17   Q    And then you really don't know what benefit the

18   negotiations your attorney did for you then in the plea

19   agreement, do you?

20   A    Well, the thing is, with those two charges I'm already

21   looking at life, so I don't see the difference.

22   Q    Fair enough.

23              The superseding indictment -- excuse me -- that's

24   February 9th of 2011, correct?

25   A    Correct.
```

David R. Roy, RPR, CSR, CCR

GALVAN/CROSS/PURPURA

 1  Q    And you were arrested on February 11th, 2011; was that

 2  correct, sir?

 3  A    Two days later.

 4         MR. PURPURA:    Demonstrative only, Your Honor,

 5  showing without objection.

 6  Q    You were arrested in a maroon H3, correct, a hummer?

 7  A    Yes, sir.

 8  Q    That was your vehicle, correct?

 9  A    No, sir.

10  Q    You were going eastbound on Lake Avenue; is that correct?

11  A    Well, I was going to go pick up -- well, I don't remember

12  the street.

13  Q    I apologize.

14         After your arrest on -- you didn't want to speak the

15  authorities, you wanted an attorney which is your right; is

16  that correct?

17  A    Correct.

18  Q    And then you were being charged in a United States

19  District Court, a federal court just like this, correct?

20  A    Correct, sir.

21  Q    And you went right up to the point -- you actually picked

22  the jury with your lawyer for your trial; is that correct?

23  A    Correct, sir.

24  Q    And if I told you the transcript indicated that the jury

25  selection was September 19, 2011, does that sound about right

GALVAN/CROSS/PURPURA

1   to you?

2   A    Yes, sir.

3   Q    But, in fact, you didn't go through with the trial, did

4   you?

5   A    Correct.  I pled guilty before I went to trial.

6   Q    On September 23, 2011, the same day that you had a plea

7   agreement, signed a plea agreement, you entered a guilty plea;

8   is that correct, sir?

9   A    Yes.

10  Q    And that was the guilty plea that the Government

11  withdrew -- asked you the questions that they had direct

12  examination, correct?

13  A    Correct, sir.

14  Q    And as you've indicated multiple times, you knew you were

15  facing up to a life sentence; is that correct, sir?

16  A    Yes, sir.

17  Q    And you knew that your guidelines gave you a life

18  sentence, correct, sir?

19  A    Yes, 46 means life.

20  Q    And the one thing in your plea agreement which was your

21  key to not getting life was your cooperation; is that correct,

22  sir?

23  A    It was to tell the truth about what I have done.

24  Q    And that's called, in this case, cooperation, right?

25  A    Yes.  Yes, sir.

GALVAN/CROSS/PURPURA

```
 1   Q    And showing you Page 3, and I've emphasized it, the
 2   substantial assistance paragraph indicates that if the
 3   defendant fully complies with this agreement and the
 4   Government determines the defendant has provided substantial
 5   assistance...
 6            Who determines whether, in fact, you have provided
 7   substantial assistance; is it the judge, is it the defense
 8   lawyer, or is it the Government?
 9   A    Who determines it, what I have said --
10   Q    It's not a trick question.  I'm sorry.
11            The Government determines the defendant has
12   provided, right?  The Government?  These people over here --
13   A    The Government --
14   Q    -- right?
15   A    -- determined.
16            THE COURT:  Wait, wait, wait.  You have got to wait
17   for her --
18            MR. PURPURA:  I'm sorry.
19            THE WITNESS:  Okay.
20   Q    And substantial -- the word "substantial" means you want
21   to give them everything you know, right?
22   A    That means that I will answer everything that they have
23   asked of me.
24   Q    And give them freely all the information you know about
25   criminal activity, even without them asking you, right?
```

GALVAN/CROSS/PURPURA

```
 1   A     Of whatever I was -- I knew about or whatever I was
 2   talking to them about now.  If they were not interested in
 3   what I was saying, that's not my fault.
 4   Q     Fair enough.
 5           But you wanted to help yourself out so you wanted to
 6   give them anything you could; is that correct, sir?
 7   A     Not anything, just the truth.  The truth that I knew
 8   about me.
 9   Q     Okay.  You weren't holding things back, were you?
10   A     That I was holding things?
11   Q     I'm asking you.  Were you holding back criminal activity;
12   did you not tell them everything?
13   A     I don't think I have pretty much said everything.  I
14   mean, I was talking to them and they were asking questions,
15   and I was just responding to the questions that they were
16   asking me.  I was with them many hours, and I was responding
17   to everything that they were asking me.
18           (Continued on the next page.)
19
20
21
22
23
24
25
```

Denise Parisi, RPR, CRR

GALVAN/CROSS/PURPURA

```
 1   CROSS-EXAMINATION

 2   BY MR. PURPURA:  (Continued.)

 3   Q    Now, you signed that proffer agreement on November 10th,

 4   2011.  Showing you what has been marked as Defense Exhibit 412

 5   for identification at this point.

 6             MR. PURPURA:  Just for the witness.

 7   A    Correct.

 8   Q    And I will show you the front page.

 9             Does that appear to be the proffer agreement you

10   signed, sir?

11   A    Yes, sir.

12             MR. PURPURA:  And now I would move into evidence

13   Defense Exhibit --

14             MR. FELS:  Your Honor, we would object.  It's

15   hearsay.

16             THE COURT:  One word.  What's the ground?

17             MR. FELS:  Hearsay.

18             THE COURT:  No.  Overruled.  Wait a minute.  Wait a

19   minute.  Maybe I'm not appreciating this.  Give me a short

20   sidebar, please.

21             (Sidebar.)

22             (Continued on next page.)

23

24

25
```

Denise Parisi, RPR, CRR

SIDEBAR

```
 1              (Sidebar conference held on the record out of the

 2    hearing of the jury.)

 3              THE COURT:  This is a queen-for-a-day agreement

 4    between the Government and who?  This witness?

 5              MR. PURPURA:  Mr. Galvan, yes.

 6              THE COURT:  State of mind.

 7              MR. FELS:  Our only argument, we haven't been doing

 8    these proffer agreements with other witnesses.  I think it's

 9    perfectly -- he can ask about it.  I just don't know that

10    there's -- it would be confusing to the jury to have this

11    proffer --

12              THE COURT:  That's a different objection than

13    hearsay.  It's not hearsay because it's not offered for the

14    truth.  It's offered to show what was at stake when he was

15    giving this proffer.

16              MR. FELS:  I mean, the only thing I would say to

17    that point is, again, he's -- the contents of the letter, I

18    think, are fine for him to question about because it does go

19    to his state of mind, but the actual document itself would be

20    hearsay.  It's the statements themselves --

21              THE COURT:  It's not hearsay.  It's not being

22    offered for the truth of what's stated in the letter.

23              (Sidebar end.)

24              (Continued on next page.)

25
```

Denise Parisi, RPR, CRR

GALVAN/CROSS/PURPURA

```
1               THE COURT:  The document is admitted.

2               (Defense Exhibit 412 received in evidence.)

3    BY MR. PURPURA:

4    Q     The first paragraph reads:  The purpose of your client

5    making a proffer is to provide the Government with an

6    opportunity to assess the value, extent, and truthfulness of

7    your client's information about the criminal activities of

8    your client and others.

9               Do you see that?

10   A     It's fine.

11   Q     Yes?

12   A     Yes, sir.

13   Q     And in that paragraph itself, they want to know -- they

14   are suggesting -- they want to know what information you have

15   about yourself and others, correct?  Correct?

16   A     Yes, sir.

17   Q     And the purpose is so that the Government has the

18   opportunity to assess the value, right?

19   A     Correct.

20   Q     And if you had nothing to say, like, if you said, I

21   didn't do anything, I don't know anything, you would have zero

22   value, right?

23   A     Correct.

24   Q     But the more you know and the more you can say, the more

25   value you have, fair?
```

GALVAN/CROSS/PURPURA

```
 1    A      Yes, sir.
 2    Q      And there's paragraph 3, do you see that one?
 3    A      Yes.
 4    Q      It says your client agrees to submit to polygraph
 5    examinations if the Government so requests, right?  That is
 6    the language that they use in the Western District of Texas,
 7    right?
 8    A      Correct.
 9    Q      Back in 2011, were you ever requested to submit to a
10    polygraph exam?
11    A      I don't remember.
12    Q      You don't remember a polygraph exam, what that would be?
13    A      No, I don't.
14    Q      You remember what Marrufo said back in 2007 and 2006 and
15    you don't know whether they hooked you up to a machine to see
16    if you're telling the truth?
17              MR. FELS:  Objection, Your Honor.
18              THE COURT:  Sustained.
19    BY MR. PURPURA:
20    Q      All right.  You don't remember, right?  That's what
21    you're saying?
22    A      I don't recall having been applied one.
23    Q      Not one in 2011, 2012, 2013, 2014, '15, '16, '17, or '18,
24    right?  Never.  "Nunca."
25    A      Never.
```

Denise Parisi, RPR, CRR

GALVAN/CROSS/PURPURA

```
1    Q    If I tell you that you had -- just trying to save time --
2    initially before you were sentenced in Texas that you were
3    debriefed, that meant you met with Government counsel and
4    agents five times; does that sound about right?
5    A    After I pled guilty, yes.
6    Q    Right, yes.  Thank you.
7         Okay.  And the dates would be the date of the
8    proffer, November 10th, 2011; November 29th, 2011;
9    November 30th; December 15th, 2011; and February 6th of 2012.
10        Does that seem about accurate to you, sir?
11   A    Yes, sir.
12        MR. PURPURA:  Unfortunately, we have to approach the
13   bench.  I apologize.
14        THE COURT:  Let me ask you something.  How is your
15   timing?
16        MR. PURPURA:  I'm not going to finish today.
17        THE COURT:  Rather than make you wait, ladies and
18   gentlemen, we will send you home now.  Remember, stay away
19   from any media coverage of the case; do not do any research
20   about the case; don't look anything up on Google; and don't
21   talk to anybody or post anything on the Internet having to do
22   with this case.  We are getting there; we are making good
23   progress.  We will see you tomorrow at 9:30.
24        (Jury exits.)
25
```

PROCEEDINGS

```
 1              THE COURT:  All right.  Everyone can sit down.

 2              The marshals can take the witness out.

 3              (Witness excused.)

 4              THE COURT:  As to the matter that we discussed at

 5    sidebar on the 924(c), I think, based on what is obviously

 6    very quick research, that Mr. Purpura is probably right.

 7    There's a case U.S. v. Lee, 660 Federal Appendix 8 at page 21,

 8    Second Circuit 2016.  It's dictum, but it does proceed from

 9    the assumption that Mr. Purpura has stated.

10              If the Government wants to convince me otherwise and

11    to give the jury an instruction that he wasn't facing that

12    consecutive exposure, send me a letter; and if I'm convinced

13    that this case does not dispose of it, which it may not, it is

14    federal appendix, and, like I say, it is dictum, then I will

15    give the jury an instruction to that effect, but it looks like

16    Mr. Purpura is probably right.

17              MR. PURPURA:  There is a supreme court case directly

18    on point.  It was bank robbery -- I'm sorry, I thought I had

19    this on.  It was multiple bank robberies and one bank robbery

20    conspiracy.  The first bank robbery was five years, the next

21    was 25 --

22              THE COURT:  In one indictment?

23              MR. PURPURA:  One indictment.

24              THE COURT:  Give the Government that citation and

25    maybe they will be convinced.
```

PROCEEDINGS

```
1              The other thing is, let's try to meet at 9:25

2    tomorrow and I will give you a ruling on motions 522 and 523.

3    That's the motion in limine regarding the cooperating witness

4    that the Government expects to call tomorrow.  You are each

5    going to give me something in writing tonight.  Obviously, the

6    earlier you give it to me, the better off we will all be.  To

7    put it another way, the more likely it is that I will get the

8    ruling right.

9              You look puzzled, Ms. Goldbarg.  Is there something

10   I'm missing?

11             MS. GOLDBARG:   No, Your Honor.  At this point in

12   time with the scheduling, I'm not sure whether or not that

13   witness will actually make it on tomorrow.  It may give the

14   Court a little more time.

15             THE COURT:   Oh, let's not meet at 9:25 for that

16   matter.  We will know better after the morning break if we are

17   going to call that witness, and that will even make it more

18   likely that I will get the right ruling.

19             Okay.  Yes?

20             MR. PURPURA:  The reason for the bench -- just one

21   second.

22             (Pause.)

23             THE COURT:  Okay.  Frankly, I don't know what I

24   would do if I had to stack a bunch of 924(c)s on top of each

25   other.
```

PROCEEDINGS

1          MR. PURPURA:  I had a client who went to trial, he

2   got 75 years on the bank robberies and eight years -- seven

3   years of the actual -- 75 years on the 924(c)s and seven years

4   on the actual robberies.

5          MR. LICHTMAN:  There's no discretion, Judge.

6          THE COURT:  I could treat it like another judge in

7   this court and just say it's a violation of due process.  Just

8   kidding, for the record.

9          Anything else we need to talk about?

10          MR. PURPURA:  Yes.  This is a demonstrative I want

11   to use.  This is the issue we have, and I'm about halfway

12   through at this point.  I want to display half of it.  In

13   essence, it's a summary of a lot of dates in this particular

14   witness's life which are important, and it helps the jury

15   understand where I'm going, and it quickens, as I'm trying to

16   do, the cross-examination.

17          THE COURT:  It looks like a summary.

18          Government have any objection?

19          MR. FELS:  Your Honor, I obviously want to take a

20   look at it.  We are looking at it for the first time.  Would

21   it be possible for us to give you a thumbs up or thumbs down

22   tomorrow morning?

23          THE COURT:  Yes, you can try.  Like I say, it looks

24   okay to me, unless you are going to tell me there's things

25   that are factually wrong in here.  If there's things that are

Denise Parisi, RPR, CRR

PROCEEDINGS

```
 1   not factually wrong and you think there ought to be more, then

 2   on redirect, you can go ahead and write them in, so that

 3   should be okay.

 4           Okay.  You will check it out and let me know

 5   tomorrow.

 6           MR. PURPURA:  Thank you, Your Honor.

 7           THE COURT:  I'm going to give this back to you for

 8   now.

 9           Good night, everyone.

10       (Matter adjourned to January 8th, 2019, 9:30 a.m.)

11

12               *   *   *   *   *.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

```
 1

 2

 3     ZAMBADA/CROSS/BALAREZO          4268
       ZAMBADA/REDIRECT/LISKAMM        4291
 4     ZAMBADA/RECROSS/BALAREZO        4296
       MORENO/DIRECT/PARLOVECCHIO      4300
 5     MORENO/CROSS/BALAREZO           4346
       MORENO/REDIRECT/PARLOVECCHIO    4354
 6     GALVAN/DIRECT/FELS              4358
       GALVAN/DIRECT/FELS              4359
 7     GALVAN/CROSS/PURPURA            4409
       DEX 382                         4282
 8     DEX 370                         4285
       DEX 385A                        4287
 9     DEX 286                         4287
       DEX 387                         4288
10     DEX 388                         4289
       GEX 561                         4304
11     GEX 281-31                      4306
       GEX 218-26                      4309
12     GEX 218-1 through 218-25        4314
       GEX 218-29A through 29C         4328
13     GEX 218-29A1                    4336
       GEX 218-29A3                    4336
14     GEX 218-29B1                    4336
       GEX 33                          4337
15     GEX 70                          4338
       GEX 218-24                      4338
16     GEX 218-30                      4341
       GEX 3500 EIG-2                  4362
17     GEX 803                         4382
       GEX 804                         4400
18
       DEX 415                         4416
19     DEX 412                         4433

20

21

22

23

24

25
```