```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------x
                                      09 CR 466(BMC)
 3    UNITED STATES OF AMERICA
                                      United States Courthouse
 4         versus                     Brooklyn, New York

 5    JOAQUÍN ARCHIVALDO GUZMÁN LOERA,
                                      January 8, 2019
 6                   Defendant.       9:30 a. m.
      -------------------------------x
 7
                 TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
 8              BEFORE THE HONORABLE BRIAN M. COGAN
                     UNITED STATES DISTRICT JUDGE
 9

10                          APPEARANCES

11

12    For the Government:     UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
13                            271 Cadman Plaza East
                              Brooklyn, New York 11201
14                            BY:  GINA M. PARLOVECCHIO, AUSA
                                   ANDREA GOLDBARG, AUSA
15                                 MICHAEL ROBOTTI, AUSA

16                            UNITED STATES ATTORNEY'S OFFICE
                              Southern District of Florida
17                            99 NE 4th Street
                              Miami, Florida 33132
18                            BY:  ADAM S. FELS, AUSA

19                            DEPARTMENT OF JUSTICE
                              Criminal Division
20                            Narcotic and Dangerous Drug Section
                              145 N. Street N.E. Suite 300
21                            Washington, D.C. 20530
                              BY:  ANTHONY NARDOZZI, ESQ.
22                                 AMANDA LISKAMM, ESQ.

23    For the Defendant:      BALAREZO LAW
                              400 Seventh Street, NW
24                            Washington, D.C. 20004
                              BY:  A. EDUARDO BALAREZO, ESQ.
25
```

LISA SCHMID, CCR, RMR

```
 1                    (CONTINUED APPEARANCES)

 2    For the Defendant:

 3    LAW OFFICES OF JEFFREY LICHTMAN
      11 East 44th Street, Suite 501
 4    New York, New York 10017
      BY:  JEFFREY H. LICHTMAN, ESQ.
 5    PAUL R. TOWNSEND, ESQ.

 6    LAW OFFICE OF PURPURA & PURPURA
      8 E. Mulberry Street
 7    Baltimore, Maryland 21202
      BY:  WILLIAM B. PURPURA, ESQ.
 8
      LAW OFFICES OF MICHAEL LAMBERT, ESQ.
 9    369 Lexington Avenue, PMB #229
      New York, New York 10017
10    BY:  MARIEL COLON MIRO, ESQ.

11

12

13

14

15

16

17

18

19

20

21    Reported by:

22    LISA SCHMID, CCR, RMR
      OFFICIAL COURT REPORTER
23    225 Cadman Plaza East, Room N377
      Brooklyn, New York 11201
24
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

```
 1              (In open court, outside the presence of the jury.)

 2              THE CLERK:  All rise.

 3              THE COURT:  Good morning.

 4              Have a seat, please.  Just before we bring in the

 5      jury, twenty seconds of your time?

 6              First, I don't know if the parties have seen it, but

 7      I docketed an order on the Government's Motion in Limine

 8      regarding the psychological issues.  I'd like to unseal all

 9      the motion papers on that.  Think about that.  Tell me during

10      the next break whether we can do that.  I don't see any reason

11      to seal it, based on my ruling.

12              Second, I've gotten the Government's proposed

13      instructions.  I'd like any objections or proposed

14      counter-instructions from the defense by a week from today.

15              Okay?  All right.  Let's have the jury.

16              MR. PURPURA:  Your Honor, if I may, yesterday, there

17      was an issue as to the 924(c) and consecutive 924(c)s.  I've

18      shared with Government counsel early this morning *United*

19      *States versus Deal*, which is a 1993 Supreme Court case, 508

20      United States 129, which makes it clear for all the circuits

21      that the 924(c)s do run consecutive on top of each other.

22              THE COURT:  Yes.  I assume from the Government's

23      lack of any counter to that, that you had taught us all

24      something yesterday, for which we thank you.

25              MR. PURPURA:  You're welcome.
```

```
 1              THE COURT:  Let's have the jury, please.

 2              (Jury enters.)

 3              THE COURT:  All right.  Everyone be seated.

 4              Good morning, ladies and gentlemen.

 5              JURORS:  (In unison) Good morning.

 6              THE COURT:  We'll continue with cross-examination.

 7              Mr. Purpura?

 8              MR. PURPURA:  Your Honor, thank you.

 9              Your Honor, I'm going to move into evidence at this

10   point without objection Demonstrative 420.

11              (Exhibit published to the jury.)

12              MR. PURPURA:  And ask that it please -- oh, there it

13   is.  Thank you.

14              THE COURT:  All right.  That's received.  It's a

15   summary?

16          (Defense Exhibit 420 was received in evidence.)

17              MR. PURPURA:  Thank you.

18   Q    Mr. Galvan, just to get back to where we were yesterday,

19   we agreed that on February 9th, 2011, there was a superseding

20   indictment against you, that on February 11th, 2011, you were

21   arrested in the maroon Hummer, which we saw.  September 19th,

22   2011, there was a jury selection in your case, and then on

23   September 23rd, 2011, there was a plea.

24   A    Correct, sir.

25   Q    Thank you, sir.
```

```
 1              And you signed the proffer agreement on
 2   September 29th -- excuse me.  There was a proffer agreement
 3   dated September 29th, 2011, which has been admitted into
 4   evidence, and you signed it on November 10th, 2011.  And these
 5   (indicating) would be the following proffer dates that we have
 6   agreed upon.  Is that about right, sir?
 7   A    Yes.  Well, I don't remember the dates exactly, but I do
 8   remember there were several sessions.
 9   Q    And Mr. Galvan, when you initially spoke to Government
10   counsel and agents back on February 10th, 2011, but as you
11   indicated in your prior testimony, that you wanted to be as
12   truthful as possible, correct?
13   A    Yes.  I was answering to all of the questions that they
14   were interested in asking me at the time.
15   Q    And you knew that the more information you can give about
16   criminal activity, the more helpful it would be to you.  It's
17   just common sense, correct?
18   A    Yes.  I was asked -- I was answering to all of the
19   questions they were asking me.
20   Q    Okay.  Well, let me ask you this.  Did you hold
21   information back if they didn't ask you a question?
22   A    The time that I was asked the question, I was focused on
23   the questions that they were asking me, and I had so much
24   information that that's what I was trying to do.
25   Q    Fair enough.
```

1            And you gave that information about your drug

2    partner, Isaac Hernandez, correct?

3    A    At that time.

4    Q    And you also gave them information about his source at

5    that time and you indicated on your direct testimony that was

6    Lic, L-I-C, correct?

7    A    I don't know who that one is.

8    Q    You don't remember suggesting that Mr. Hernandez had a

9    source of supply.  His name was Lic or he was referenced as

10   Lic, L-I-C, as professor?

11   A    Oh, Licensiado.  Yes.

12   Q    And I apologize.  LIC, that's an abbreviation apparently

13   for Licensiado?

14   A    Yes.

15   Q    And that's a general reference to someone who may have a

16   degree perhaps beyond college, perhaps a lawyer or someone

17   with education, correct?

18   A    It is a nickname that any person can get.

19   Q    Okay.  And you indicated that you worked with

20   Mr. Hernandez maybe three or four years, right?

21   A    At times.

22   Q    Okay.  And that Hernandez -- Mr. Hernandez worked for the

23   Juárez Cartel?

24   A    No, I didn't know who he worked for.

25            MR. PURPURA:  May I please have EIG-9?

```
 1    BY MR. PURPURA:

 2    Q    Do you recall at that debriefing on September 10th, 2011,

 3    do you remember telling the Government agents that Hernandez

 4    worked for the Juárez Cartel?

 5    A    What I remember is that Isaac and I would hang out

 6    together on the side, El Paso side.

 7    Q    The answer is, do you remember -- you do not remember, is

 8    that correct, saying that?

 9    A    No, I do not remember.

10    Q    Very good.

11         Let me show you what has been marked as Defense

12    Exhibit 404.

13         MR. PURPURA:  Bates stamp 137 for the Government.

14         (Publishes exhibit to the witness.)

15         And I'd ask the interpreter, please, just to read

16    this sentence right here. (Indicating.)

17         THE INTERPRETER:  Where it starts with -- could you

18    point that out, again, counsel?  Thank you.

19         THE COURT:  Paragraph or the sentence?

20         MR. PURPURA:  Just the sentence.

21         THE INTERPRETER:  (Complies.)

22         MR. PURPURA:  If you want to read the whole

23    paragraph just for context?  Thank you.  Your Honor.

24         THE INTERPRETER:  (Complies.)

25         THE WITNESS:  (Speaking in Spanish.)
```

```
 1              MR. PURPURA:  There's no question.
 2    BY MR. PURPURA:
 3    Q    Okay.  Now, I'm going to ask you, do you recall, first of
 4    all, saying that you had a working relationship with
 5    Mr. Hernandez selling drugs for three to four years?
 6    A    There was no working relation, but --
 7              THE INTERPRETER:  Relationship.  Interpreter
 8    correction.
 9    A    But we did do a couple of things together, two or three
10    things together.
11    Q    Over three or four years?
12    A    Maybe about two or three years.
13    Q    And then you did not tell the agents that you had a three
14    to four year working relationship in drug trafficking with Mr.
15    Hernandez?  Is that what you're saying here today?  It's a yes
16    or a no?
17    A    I'm sorry.  What was the question again?
18    Q    We'll move on.
19              Now, do you remember telling the agents that
20    Mr. Hernandez worked for the Juárez Cartel?
21    A    Well, what I told them is that he did not work for the
22    Sinaloa Cartel because what happens is that there are no
23    cartels in El Paso, Texas.
24    Q    Well, let me ask you again:  Specifically, did you tell
25    the agents when you first proffered that Mr. Hernandez worked
```

```
 1   for the Juárez Cartel and he had historical relationship
 2   involvement with that cartel?
 3   A    What I told them is that he did not work for the Sinaloa
 4   Cartel.
 5   Q    Just yes or no, did you -- did you tell them that
 6   Mr. Hernandez worked for the Juárez Cartel, yes or no?  Si or
 7   no?
 8   A    Are you asking me -- if you are asking me if I told them
 9   that Isaac Hernandez worked for the Juárez Cartel, no, I did
10   not tell them that he worked for the Sinaloa Cartel.
11   Q    All right.  And you indicated that you and Mr. Hernandez
12   had a source for marijuana, correct?
13   A    No, we didn't have like a supplier.
14   Q    Do you Mr. Capulina, C-A-P-U-L-I-N-A?
15   A    Who.
16   Q    Do you recall telling the agents that you received a
17   thousand pounds of marijuana and that your source of supply
18   was Mr. Capulina?
19   A    If I remember, well, Capulina was on Rudy's side.
20   Q    Do you remember telling the agent that you received a
21   thousand pounds of marijuana from this source, Mr. Capulina to
22   distribute?  Yes or no, do you remember that?
23   A    Yes, sir.
24   Q    Okay.  Thank you.
25        Do you remember that you also indicated to the
```

```
 1    agents that you received drugs, in particular, cocaine, from a

 2    Mr. Pelon, P-E-L-O-N?

 3    A    No, I don't remember.

 4    Q    All right.

 5          MR. PURPURA:  Government counsel, Bates stamp 140,

 6    same document.

 7          Can you please read this paragraph?

 8          THE INTERPRETER:  (Complies.)

 9    BY MR. PURPURA:

10    Q    Did you read it?

11    A    Yes, sir.

12    Q    Now, did Mr. Hernandez have a source, independent source

13    of supply, known as Mr. Pelon?

14    A    I did not meet that guy.  I only -- he was asking me to

15    accompany him once, and I so I saw him, but those are Isaac's

16    words.

17    Q    So what I'm asking you is, Mr. Hernandez had an

18    independent source of marijuana who is not connected to any

19    cartel, and that was Mr. Pelon, correct?

20    A    I don't know what kind of relationship he had with Pelon.

21    I don't know what kind of business they did.

22    Q    Well, you know that Mr. Pelon was supplying cocaine and

23    it was being shipped by UPS, United Parcel Service, isn't that

24    correct, sir?

25    A    I don't know Pelon.  I don't know what he does.
```

```
 1   Q     Do you remember telling the agents that Galvan received

 2   six kilograms of cocaine from Mr. Pelon, which was shipped

 3   Dayton, Ohio?  And in particular, that Pelon was the source of

 4   supply for this cocaine?

 5   A     I've never had any dealings with Pelon.

 6   Q     Do you remember telling the agents that Hernandez and you

 7   received the six kilograms of cocaine which was being sent by

 8   UPS?  Do you remember that?

 9   A     No, I do not remember.

10             MR. PURPURA:  Page 142.

11             I'm sorry.  I apologize.  It is a lengthy paragraph,

12   but if you could just start reading the first two sentences?

13             THE INTERPRETER:  (Complies.)

14             Just the first two sentences, right, counsel?

15             MR. PURPURA:  I apologize.  I did say Dayton, Ohio.

16   It was Daytona, Florida, my correction.

17             THE INTERPRETER:  (Complies.)

18             MR. PURPURA:  She read it?

19             THE INTERPRETER:  Counsel, for the interpreter, just

20   the first two sentence, right?

21             MR. PURPURA:  Well, I'm going to ask you to continue

22   on to -- I'll put my pen right there.

23             THE INTERPRETER:  And one sentence or all the way to

24   the bottom of the paragraph?

25             MR. PURPURA:  The bottom, please.
```

```
 1              THE INTERPRETER:  Right to the bottom?  Okay.
 2   (Complies.)
 3   BY MR. PURPURA:
 4   Q    Now, sir, do you remember telling the agents about the
 5   six kilograms of cocaine which was shipped by UPS that
 6   actually never made it to its destination, and you and
 7   Hernandez had to supply a receipt to Mr. Pelon to verify its
 8   mailing?
 9   A    I do remember that occasion very well now.  If you allow
10   me, I can explain.
11   Q    No, I'll ask the questions.  Thank you.
12              And you indicated to the agents that Mr. Pelon was
13   not upset about the loss of six kilos back because, in fact,
14   that's inherent when you distribute via UPS, correct?
15   A    No, I did not say that to the agents.  I do not know
16   Pelon.
17   Q    Okay.  And do you remember telling the agents that
18   Galvan -- excuse me -- that Mr. Marrufo worked for a person
19   from the town of Villa Ahumada, A-H-U-M-A-D-A?
20   A    That Antonio Marrufo, Jaguar, is from Villa Ahumada.
21   He was born there, Villa Ahumada.
22   Q    And do you remember telling the agents that Galvan, in
23   fact, worked for someone from that village, from that area,
24   but you didn't know the name?
25              MR. FELS:  Objection as to time, please, time frame?
```

LISA SCHMID, CCR, RMR

```
 1              THE COURT:  Overruled.
 2   A    Well, Galvan?  I'm Galvan.
 3   BY MR. PURPURA:
 4   Q    I'm sorry.  That you learned that Marrufo worked for
 5   someone from Villa Ahumada.
 6   A    I do not understand your question, and I don't know what
 7   time you're referring to.
 8   Q    You don't remember the date now?  Is that the issue?
 9   A    I don't know about that question about Villa Ahumada.  He
10   was born in Villa Ahumada.
11   Q    Well, let me try the question as clear as I can.
12   A    Thank you, sir.
13   Q    Did you tell the agents when you first meet with them,
14   that Marrufo worked drug trafficking for someone in Villa
15   Ahumada?  Either you remember or you don't remember.
16   A    Just like you're saying, sir, that's not how things were.
17   Q    Okay.  Do you remember saying that to the agents?  Yes or
18   no?
19   A    No, sir.
20   Q    Thank you.
21              Bates stamp 147.
22              And I'd ask the interpreter, please, to read
23   starting right here. (Indicating.)
24              THE INTERPRETER:  (Complies.)
25
```

```
 1   BY MR. PURPURA:

 2   Q    Now does that refresh your recollection, sir, that you

 3   told the agents on your very first proffer when you tried to

 4   be truthful and honest, that you learned that Marrufo worked

 5   for -- drug trafficking for someone in Villa Ahumada?

 6   A    I said that he was from Villa Ahumada, and that he was in

 7   charge of bringing all the marijuana to Ciudad Juárez, but I

 8   really ignored how he managed to get it there.

 9   Q    The question is, did you tell the agents that he worked

10   for someone in that village, someone other than Joaquín

11   Guzmán, someone from the village of Ahrmuda?

12   A    No.  Well, in 2004, he did not work for Chapo Guzmán.

13   Q    You indicated yesterday that you listened to one phone

14   call or over one phone call, is that correct?

15   A    Only one, sir.

16   Q    Just one phone call?

17   A    Yes, sir.

18   Q    And based on hearing that one phone call, you can't

19   recognize the voices?  Is that fair to say?

20   A    That's fair.

21   Q    And the one phone call that you overheard, you described

22   yesterday on your direct examination, is that correct, sir?

23   A    I said yesterday that it was only one time that I heard a

24   call.

25   Q    And that phone call involved yourself and Mr. Marrufo in
```

```
 1   a car and you were going to party that night, and Mr. Marrufo
 2   wanted to let -- according to you -- Joaquín Guzmán know that
 3   you'd be out of touch for a period of time, correct?
 4   A    Yes.  The thing is that he had to wake up early the next
 5   day to do something.
 6   Q    You don't have to -- I'm just trying to quicken this.
 7   Without the whole story, is that -- that's the phone call
 8   we're talking about, correct?
 9   A    Yes, sir.
10   Q    Thank you.
11        And that's the phone call where you overheard,
12   according to you, from the other side, someone saying not to
13   worry, that he was doing things right, that they were very
14   happy with him, correct?
15   A    That that person was very happy with him.  Correct, sir.
16   Q    Very good.
17        And that's your testimony on January 7th, 2019,
18   correct?
19   A    Correct.
20   Q    And I'm going to take you back to when -- your first
21   proffer again, your very first proffer on November 10th, 2011.
22   Do you recall you also spoke about one phone call at that
23   time, as well.  Do you remember that?
24   A    Yes, sir.  There's only been one phone call.
25             (Continued on the next page.)
```

GALVAN/CROSS/PURPURA

1    CROSS-EXAMINATION

2    BY MR. PURPURA: (Continued.)

3    Q    And at that time, once you told the U.S. Attorneys and

4    the Government agents that that phone call was about the

5    temporary disconnection of phones, and it was during that

6    phone call that you learned over the phone that Chapo gave

7    Marrufo the name Jaguar on that call.

8              Do you remember telling him that?

9    A    Correct, sir.

10   Q    Correct.

11             Nothing -- nothing whatsoever -- about what you told

12   Government counsel and this jury about being in the car,

13   traveling, you're going to be away all night long, and Chapo

14   says, Good work, don't worry, carry on.  Nothing about that,

15   right?  Yes or no.

16   A    At the time, only what they ask me.

17   Q    So that phone conversation changed over time.

18   A    No, it hasn't changed.  It was only one phone call.

19   Q    All right.  Do you remember that you did not at all

20   reference -- strike that.  It was in the weeds.

21             Showing you 149 Bates stamped --

22             MR. FELS:  Objection, Your Honor.  Improper.

23             MR. PURPURA:  Fair enough.

24             THE COURT:  Okay.  Go ahead.

25   BY MR. PURPURA:

GALVAN/CROSS/PURPURA

1    Q    I've asked you a couple times now whether you recall on
2    that one phone conversation back in 2011 that the only
3    discussion you allegedly overheard dealt with swapping out
4    phones and the fact that on that very phone call, Joaquin
5    Guzman gave Marrufo the nickname "Jaguar."
6              MR. FELS:  Objection.
7              THE COURT:  What's the objection?
8              MR. FELS:  Form, Your Honor.
9              THE COURT:  Simplify it, please, if you can.
10             MR. PURPURA:  I'm taking -- the Court wants me to
11   move and I'm trying to.
12             THE COURT:  I know.
13             MR. PURPURA:  All right.  All right.
14   BY MR. PURPURA:
15   Q    Do you remember saying on that one phone call that
16   Joaquin Guzman gave Marrufo the nickname "Jaguar"?
17   A    Yes, sir.
18   Q    And do you remember on that one phone call the only thing
19   was discussed was that the phones would be down for a period
20   of time, correct?  Do you remember?  It's a yes or no.
21   A    Your question about what?
22   Q    I'll move on.
23             Not one time in any of these initial proffers when
24   the information is fresh in your mind did you ever say that
25   all the cocaine Marrufo received came from Chapo Joaquin

Denise Parisi, RPR, CRR

GALVAN/CROSS/PURPURA

1    Guzman, did you?  Not once.  Yes or no.

2    A    I mentioned it the first time and then they did not ask

3    me again.

4    Q    Not one time did you ever say in any of those initial

5    debriefings -- November 10th, 2011, through February 6th,

6    2012 -- that Chapo offered to Jaguar to be in charge of Juárez

7    and killing or cleaning out La Linea.  Not once.  Yes or no.

8    Not once.

9    A    Only the first time.

10   Q    Not once in any of those --

11   A    The first time.

12   Q    -- debriefings, November 10th, 2011, through

13   February 6th, 2012, did you ever tell the agents or Government

14   counsel that Marrufo was buying weapons with Chapo's money.

15   Not once.

16   A    Correct, sir.

17   Q    Now, based on your cooperation, the Government filed

18   what's called a 5K1.1.  They filed a letter with the judge --

19   that was Judge Philip Martinez -- to reduce your sentence,

20   correct?

21   A    Correct, sir.

22   Q    And on June 5th, 2012, the same day that letter was filed

23   with the judge, Judge Martinez, you, in fact, were sentenced;

24   is that correct, sir?

25   A    Yes, sir.

GALVAN/CROSS/PURPURA

1   Q    And you have in that 5K1.1 letter that we just spoke

2   about, that's where the Government tells the judge that you

3   cooperated and that you should receive a benefit for

4   cooperation, correct?

5   A    Correct, sir.

6   Q    Very good.

7        And in addition to that letter, you had the right to

8   allocute.  That means you had the right to speak to His Honor,

9   Judge Martinez, and tell him why he should give you a small

10  sentence, no sentence, or any type of sentence, right?

11  A    Yes, sir.

12  Q    And you did.  You spoke truly from the bottom of your

13  heart, you told the judge that you apologized, and that -- and

14  you said, the moment I ended up in jail, it changed my life,

15  you found peace and tranquility.

16  A    Yes, sir.

17  Q    And you said a lot more, and you said it rather

18  eloquently as well; would you agree with me?

19  A    Yes, sir.

20  Q    Okay.  And despite the Government's filing of the 5K1 and

21  despite your eloquence, you still got sentenced to 292 months,

22  correct?

23  A    Yes, sir.

24  Q    And then in addition for the other counts, you received,

25  I believe, 240 months, and they were concurrent, running

GALVAN/CROSS/PURPURA

```
 1   together, right?

 2   A     Yes, sir.

 3   Q     And for some reason, in the federal system, we talk in

 4   months, but that's 24.3 years, right?

 5   A     Yes.  Yes, sir.

 6   Q     That's -- in anybody's mind, that's a lot of time, right?

 7   A     A lot of time, sir.

 8   Q     Yes.

 9          And what you did -- obviously, no one wants to serve

10   that type of time -- and you tried to reach out and do

11   anything you could do to help yourself, correct?

12   A     No, sir.

13   Q     As brought out by Government counsel, you reached out to

14   an inmate in the prison for the inmate to prepare a document

15   which you thought would help you, correct?

16   A     Correct, sir.

17   Q     And that document --

18          MR. PURPURA:  May I?  Thank you.  It's for witness

19   only, please, Defense Exhibit 414.

20   BY MR. PURPURA:

21   Q     This is the document we are talking about; is that

22   correct, sir?

23   A     Yes, the 2255, sir.

24   Q     And this is your signature?

25   A     Yes, sir.
```

GALVAN/CROSS/PURPURA

```
 1    Q     And this, regardless of who prepared it, it's filed

 2    under, as we suggest, under the threat of perjury, if you are

 3    not being truthful, correct?

 4    A     Yes, sir.

 5    Q     So on June 27th, 2013, you filed a 22 -- 2255 is filed,

 6    correct?

 7    A     It was not on that date, sir.

 8    Q     But it was filed, correct?

 9    A     Yes, sir.

10    Q     Actually -- I apologize.  Let's take a look.

11          Do you see it's stamped --

12          MR. PURPURA:  I'm sorry, this is in evidence.  Did I

13    move it in, Judge?  I apologize, 414 --

14          THE COURT:  You did.  You did.

15          MR. PURPURA:  Okay.

16    BY MR. PURPURA:

17    Q     414 is now in evidence --

18          THE COURT:  Wait.  No, you didn't.

19          MR. PURPURA:  Well, I move in 414.

20          THE COURT:  Any objection?

21          MR. FELS:  No, Your Honor.

22          THE COURT:   Received.

23          MR. PURPURA:  Thank you.

24          (Defense Exhibit 414 received in evidence.)

25          (The above-referred to exhibit was published.)
```

GALVAN/CROSS/PURPURA

1    BY MR. PURPURA:

2    Q    Do you see the stamp which is stamped in by the United

3    States Clerk?

4    A    Yes, sir.

5    Q    And the date is June 27th, 2013, correct?

6    A    Yes, sir.

7    Q    And in that document, what's claimed is that your lawyer

8    was ineffective, right?

9    A    That's what I told the person who helped me do the

10   appeal.

11   Q    In addition, you actually claim in there that you were

12   actually innocent.

13   A    No, sir.

14   Q    Showing you page 4.

15         The petitioner contends but for counsel's error --

16   meaning your lawyer's error -- he would have timely appealed

17   his 24-year sentence as unreasonable, comma, he -- meaning

18   you -- was actually innocent.

19         Do you see that?

20   A    Yes.  I only saw that paper four days ago.

21   Q    All right.  But you didn't -- you never looked at it,

22   you're saying, the paper that was filed on your behalf, right?

23   A    I never read it.  I only signed it.

24   Q    And --

25   A    -- because it was --

GALVAN/CROSS/PURPURA

1    Q    Thank you.

2    A    -- because you had a year only.

3    Q    Very good.

4         Since you didn't read it, this person just made that

5    up that you were actually innocent?  Did he make it up or not?

6    Yes or no.

7         THE INTERPRETER:  Your Honor, would you like for the

8    interpreter to interpret what the witness said or --

9         THE COURT:   Well, he did ask him a "yes" or "no"

10   question, so we can get an answer.

11   A    What was the question again?

12   Q    That the person who wrote this petition for you made that

13   up that you were innocent.  Yes or no.

14   A    Yes, sir.

15   Q    And in the petition, you claim, through this person, that

16   your lawyer was completely ineffective, right?

17   A    Correct, sir.

18   Q    But you recall when you entered your guilty plea, the

19   judge asked you a series of questions -- that's Judge Martinez

20   in Texas -- asked you a series of questions about your lawyer,

21   right?

22   A    Yes, sir.

23        MR. PURPURA:  Bates stamp 027, counsel.

24        Your Honor, at this point, I would just move in a

25   portion of the colloquy between Judge Martinez and Mr. Galvan.

GALVAN/CROSS/PURPURA

 1    This is without objection, Your Honor, and it's Exhibit

 2   No. 423.

 3                THE COURT:  Received.

 4                (Defendant's Exhibit 423 received in evidence.)

 5                (The above-referred to exhibit was published.)

 6   BY MR. PURPURA:

 7   Q    Judge Martinez took his time and asked you a lot of

 8   questions, didn't he?

 9   A    Correct, sir.

10   Q    Actually, I believe that proceeding was in English,

11   correct?

12   A    Yes, sir.

13   Q    Because you can speak English, correct?

14   A    Yes, sir.

15   Q    And the Court said, "Mr. Galvan, I need to ask you a few

16   questions about your relationship with your lawyer.  Are you

17   completely satisfied with the assistance that Mr. Schydlower

18   has provided to you in this case?"  And your response was

19   what?  Say it.

20   A    "Yes, Your Honor."

21   Q    Okay.  And the Court also asked you, "At this time, do

22   you have any complaints of any kind or nature about anything

23   that Mr. Schydlower has done or that you believe he has failed

24   to do?" and your response was, "No, Your Honor."

25   A    Correct, sir.

GALVAN/CROSS/PURPURA

1   Q    Meaning, he was asking you, do you have any problems with

2   your lawyer, and you said no, you're satisfied with him,

3   right?

4   A    Yes.  At that time, I was.

5   Q    And then the judge goes on to say, "Okay.  This is the

6   only opportunity you have to tell me about any such concerns

7   or complaints before we actually get to the plea part of the

8   hearing.  Are there any issues of concern to you?" and your

9   response was, "No, Your Honor," right?

10  A    Correct, sir.

11  Q    At that point, if you had any issues about your lawyer,

12  such as, I didn't get the indictment, he never reviewed

13  discovery with me, he never came to visit me, anything, the

14  judge was asking you, do you have any complaints, right?

15  A    Correct, sir.

16  Q    And then when you or your jailhouse lawyer files for you

17  the 2255, you basically try to throw the lawyer under the bus,

18  right?

19  A    Yes, sir.

20  Q    I didn't get discovery, he didn't review anything with

21  me, I didn't even get a copy of the indictment.

22  A    I was angry at my lawyer because of the sentence that I

23  had gotten.

24  Q    Fair enough.

25       And so because of your anger, you lied.

GALVAN/CROSS/PURPURA

1   A    No.  I said that he had promised me 17 years -- 17 years

2   or less, and that's what I told the person who was helping me

3   with that application.

4   Q    And when the judge asked you at your sentencing, has

5   anyone made any promises as to what your sentence is going to

6   be, your response was, "No, Your Honor," correct?

7   A    Correct, sir.

8   Q    And you were under oath then as you are today, correct?

9   A    Correct, sir.

10  Q    Your 2255 was summarily dismissed, correct?

11  A    Yes, sir.

12  Q    October 31st, 2014, right?

13  A    Yes, sir.

14  Q    Thank you.

15       You were given the opportunity to file a belated

16  appeal, as you testified to, but apparently that was never

17  filed, or was an Anders brief, if you know what that means.

18  A    I don't know what that is.

19  Q    All right.  Fair enough.

20       Then you didn't give up -- at that point, you did

21  your own filing, what's called a pro se filing, and now you

22  want all the documents your attorney had, correct?

23  A    Yes, sir.

24  Q    And that was filed with the Court on April 17th -- excuse

25  me, excuse me -- August 10th, 2015; does that sound right,

GALVAN/CROSS/PURPURA

1    sir?

2    A    More or less, yes.

3    Q    Thank you.

4         That went nowhere as well, correct?

5    A    No.

6    Q    You still didn't give up because there was a change in

7    the United States guidelines.

8         Do you remember that?

9    A    Yes, sir.

10   Q    And you filed on your own what's called a motion for

11   modification of sentence, right?

12   A    To modify the sentence?

13   Q    Yes.

14   A    That was because of the new law that they had passed

15   about the two points.  I wanted to know if I would get credit

16   for that.

17   Q    You asked the judge in your own writings to give you

18   credit based on this new law to reduce your sentence by at

19   least two points so you can get some time off your sentence,

20   right?

21   A    Yes.  A friend of mine helped me fill it out.

22   Q    Okay.  And --

23        MR. PURPURA:  May I have 408, please?

24   BY MR. PURPURA:

25   Q    Showing you --

Denise Parisi, RPR, CRR

GALVAN/CROSS/PURPURA

```
 1              MR. PURPURA:  Just for the witness, please.
 2    BY MR. PURPURA:
 3    Q    -- defense 408.  Does this appear to be your motion for
 4    modification which was filed?
 5    A    (No verbal response.)
 6    Q    Let me show you the signature page, too.
 7    A    Yes, sir.
 8    Q    So this is the motion you filed with the help of another
 9    inmate September 8th of 2015?
10    A    Yes, sir.
11    Q    I apologize.  This is August 19th, 2015, correct?
12    A    Correct.
13    Q    And in that motion, you even told the judge how well you
14    were doing, correct?
15    A    I don't remember what I said exactly.
16    Q    Fair enough.
17              MR. PURPURA:  Your Honor, at this time, I would move
18    in Defendant's Exhibit 408.
19              MR. FELS:  No objection.
20              THE COURT:  Did you say no objection?
21              MR. FELS:  No objection.
22              THE COURT:  Received.
23              (Defendant's Exhibit 408 received in evidence.)
24              (The above-referred to exhibit was published.)
25    BY MR. PURPURA:
```

GALVAN/CROSS/PURPURA

```
 1   Q    Page 4 of the motion:  Specifically during his period of

 2   incarceration, meaning you, Galvan, has signed up to

 3   participate in different classes, programs, which are designed

 4   to reduce recidivism as well as great importance as to

 5   Galvan's post sentencing conduct.

 6              Do you remember saying those things?

 7   A    Yes, sir.

 8   Q    And you said more and I believe it was heartfelt, right?

 9   You were telling the judge you were doing everything you could

10   do, correct?

11   A    Correct.

12   Q    And, again, because you wanted to reduce your sentence;

13   you wanted to get out from under the 24.3 years, right?

14   A    I wanted to know if the two points that had been credited

15   because of the new law, if they would benefit me.

16   Q    And what happened was the judge denied -- Judge

17   Martinez -- denied your motion, right?

18   A    Yes, sir.

19   Q    And that was February 8th, 2016.

20   A    Yes, sir.

21   Q    So at that point -- strike that.

22              At that point, all your efforts, your 5K1, your post

23   conviction, your 2255, you're appeal, they were all gone.

24   A    Correct, sir.

25   Q    And what every inmate knows, they know what their release
```

Denise Parisi, RPR, CRR

GALVAN/CROSS/PURPURA

```
 1    date is.

 2    A     Correct, sir.

 3    Q     And your release date is February 3rd, 2032, correct?

 4    A     Correct, sir.

 5    Q     And back in February 2016, when that motion was denied

 6    and -- well, you had 16 years left to serve, correct?

 7    A     Correct, sir.

 8    Q     And to your knowledge, there was no other motions left

 9    available to you.

10    A     Correct.

11    Q     All you had was time to do.

12    A     Yes, sir.

13    Q     And it's terrible, isn't it?

14    A     Yes, sir.

15    Q     But then, as if a gift from the gods -- with a small

16    "G" -- Government counsel found you in the Bureau of Prisons.

17    A     Yes, they sought me out.

18    Q     And actually one of the attorneys in this courtroom,

19    maybe not at table, but in this courtroom, came down and

20    interviewed you, do you remember that, in the Bureau of

21    Prisons, May 13th, 2016?

22    A     Yes, I remember that they came to see me.

23    Q     And they wanted to talk about Chapo, right?

24    A     Correct, sir.

25    Q     And for the very first time, never spoken before by you,
```

GALVAN/CROSS/PURPURA

1  what you tell them is that Marrufo told you that he had to pay

2  $3 million a month to this man, Chapo Guzman, for the Juárez

3  drug trafficking, 3 million a month.  That's what you told the

4  U.S. Attorneys, correct?

5  A    Correct.

6  Q    You never mentioned that before in any of those other

7  debriefings, correct?

8  A    Correct.

9  Q    You didn't even mention it on your direct examination

10  when Government counsel had you on the witness stand

11  yesterday, did you?

12  A    I did not mention it yesterday.

13  Q    Because you weren't asked that either, were you?

14  A    Correct, sir.

15  Q    Because it's so incredible that no one's going to believe

16  it, right?

17            MR. FELS:  Objection.

18            THE COURT:  Sustained.

19  BY MR. PURPURA:

20  Q    Did you see Marrufo giving up $3 million a month, month

21  after month after month, while you were in Juárez?

22  A    May I tell you --

23  Q    No.  You can answer the question "yes" or "no."

24  A    Yes.  One time.

25  Q    A payment of $3 million?

GALVAN/CROSS/PURPURA

```
 1   A     Yes, sir.

 2   Q     That you never mentioned on your direct examination when

 3   counsel asked you questions, right?  Correct?  That you never

 4   mentioned back in 2011 when you --

 5            THE COURT:   Mr. Purpura, we didn't get the answer

 6   to the last question.

 7            MR. PURPURA:   I apologize.

 8   A     The answer was I mentioned it before.

 9            THE INTERPRETER:   Now the interpreter didn't get

10   your last question.  Would you mind repeating it for the

11   interpreter, please?

12            MR. PURPURA:   I will.  Let's just go back a step.

13   BY MR. PURPURA:

14   Q     Before 2016, you are suggesting that you mentioned that

15   to Government counsel.

16   A     When they came to visit me starting in 2016 and onwards,

17   that's when I told them.

18   Q     Right, 2016 and onwards, correct.

19            And actually, you remembered more and more about

20   Mr. Guzman as present Government counsel interviewed you from

21   January 11th, 2018, through January 6th, 2019, correct?

22   A     Correct, sir.

23   Q     And you know -- strike that.

24            You want this Government team to file what's called

25   a Rule 35 in your behalf, right?
```

GALVAN/CROSS/PURPURA

```
1    A    Correct, sir.

2    Q    Because every other attempt to get a reduced sentence has

3    failed, right?

4    A    All the other ones have failed, yes, they have.

5    Q    And you lied before in those other ones, right?

6    A    Yes, sir.

7    Q    And of course you are not going to lie now, right?

8    A    It is very different here, sir.

9              MR. PURPURA:  Just one or two more questions.

10   BY MR. PURPURA:

11   Q    Government counsel asked you about an arrest in July of

12   2005.

13             Do you remember that?

14   A    Yes, sir.

15   Q    I think they said there was some marijuana in the car,

16   right?

17   A    Yes, sir.

18   Q    Actually, it was 550 pounds of marijuana in the car,

19   correct?

20   A    Yes, sir.

21   Q    You were involved in the distribution of that marijuana,

22   correct?

23   A    Yes, sir.

24   Q    You were the passenger in that car, correct?

25   A    Yes, sir.
```

GALVAN/CROSS/PURPURA

```
 1    Q     You lied to the police, correct?

 2    A     Yes, sir.

 3    Q     You lied to the police because you didn't want to get

 4    arrested, correct?

 5    A     Yes, sir.

 6    Q     You lied so well to the police that the charges against

 7    you were dismissed, correct?

 8    A     Yes, sir.

 9    Q     Would you say you are a pretty good liar?

10          MR. FELS:  Objection.

11          THE COURT:  Overruled.

12    BY MR. PURPURA:

13    Q     Are you a good liar?

14    A     I used to be.

15          (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25
```

Denise Parisi, RPR, CRR

GALVAN/REDIRECT/FELS

```
 1                MR. PURPURA:  I have no further questions.

 2                THE COURT:  Any redirect?

 3                MR. FELS:  Yes.

 4                MR. PURPURA:  Could I just have a moment to go get

 5     my stuff off here?

 6                         REDIRECT EXAMINATION

 7     BY MR. FELS:

 8     Q     Good morning, Mr. Galvan.

 9     A     Good morning, sir.

10     Q     Do you remember when defense counsel showed you

11     Government's Exhibits 71 and 415?   (Exhibits published.)

12     A     Yes, sir.

13     Q     Be clear, is this the same person?

14     A     Yes, sir.

15     Q     And had you been asked by the Government years ago to

16     identify both of these photographs?

17     A     Yes, sir.

18     Q     And who are both of these photographs of?

19     A     Jaguar, Antonio Marrufo.

20     Q     Now, you were asked a number of questions about the very

21     first time that you provided an interview for -- by the United

22     States Government.  Do you remember that?

23     A     Yes, sir.

24     Q     There are a number of things that you couldn't remember?

25     A     Yes, many.
```

GALVAN/REDIRECT/FELS

```
1    Q    And this interview was back in November of 2011, right?

2    A    Correct, sir.

3    Q    Do you remember there were some times that the defense

4    attorney had to show you portions of that report?  Do you

5    remember that?

6    A    Correct.

7    Q    And do you remember when he asked you a question about

8    that cocaine deal, the six kilograms of cocaine?  First, it

9    was Dayton, Ohio, then it was Daytona, Florida.  Do you

10   remember those questions?

11   A    Yes, sir.

12   Q    You were talking about how this was with Isaac Hernandez?

13   A    Yes, sir.

14   Q    Do you remember this is before or after you stopped

15   working with Marrufo?

16   A    It was months after I stopped working for Jaguar.

17   Q    Months?

18   A    Months.

19   Q    Okay.  So, this was -- you remember you testified on

20   direct that you didn't start doing cocaine -- dealing with

21   cocaine until when you met Marrufo, correct?

22   A    Correct, sir.

23   Q    And that's accurate, correct?

24   A    Yes, sir.

25   Q    And you also testified on direct that there were some
```

GALVAN/REDIRECT/FELS

1    attempts to do drugs after you broke off with Marrufo or with

2    Jaguar.  Do you remember that?

3    A    Yes, I said that I wanted to do a couple of things, but

4    everything was going badly, and that was one of them.

5    Q    That's what I was -- thank you.

6         Now, there were some other question about Jaguar and

7    whether he worked with someone in -- I think Villa Ahumada.

8    Right?  Do you remember that?

9    A    Yes, sir.

10   Q    And do you remember -- you said you couldn't recall what

11   you said about that?

12   A    Correct, sir.

13   Q    And the defense attorney showed you one paragraph.  Do

14   you remember that?

15   A    Yes, sir.

16   Q    But remind us, when you testified on direct that when you

17   first met Jaguar in 2004, he was already dealing with

18   marijuana, correct?

19              MR. PURPURA:  Objection.

20              THE COURT:  Sustained.  Sustained.

21   BY MR. FELS:

22   Q    Sir, do you remember what you told the agents back on

23   November 10th of 2011 as to the time frame as to when Jaguar

24   was working for this individual in Villa Ahumada?

25   A    Yes, I remember telling them that Jaguar was from Villa

GALVAN/REDIRECT/FELS

```
 1   Ahumada and he lived in Juárez.  He lived in Juárez,
 2   Chihuahua.  And that he was -- and Jaguar was in charge of all
 3   the marijuana that arrived into Juárez, Chihuahua, Mexico.
 4   Q    And my question was, in that first initial interview, do
 5   you remember the time frame that you said that Jaguar worked
 6   for this person in Villa Ahumada?
 7   A    Yes, the year was 2004.
 8   Q    And do you remember on direct, you testified that you --
 9        MR. PURPURA:  Objection.
10   BY MR. FELS:
11   Q    Okay.  I'll ask it this way.  In 2004, you said that
12   Jaguar was working for this person in Villa Ahumada.  Could
13   you remind us, when did Jaguar start working for Chapo?
14   A    In 2007.
15   Q    Three years later, right?
16   A    Yes, sir.
17   Q    All right.  Now, you mentioned on cross-examination that
18   you, in fact, talked briefly about Chapo Guzmán in your very
19   first interview, correct?
20   A    Yes, sir.
21   Q    Do you remember back in November 2011, was Chapo Guzmán
22   the focus of that interview?
23   A    No.  At that time when I mentioned him, they told me
24   everything is fine and they focus on other questions.
25   Q    Okay.  And do you have an opportunity when you're sitting
```

GALVAN/REDIRECT/FELS

```
 1   down with the Government to say you know what?  I'm going to
 2   take charge.  I'm going to just tell you everything about
 3   everything.  Don't ask me any questions.  I'm just going to go
 4   on?
 5                 MR. PURPURA:  Objection.
 6                 THE COURT:  Sustained.
 7   BY MR. FELS:
 8   Q    Let me ask you a more focused question.  Were you asked
 9   for -- to provide every piece of information about Chapo
10   Guzmán that you had back in 2011?
11   A    Yes, sir.
12   Q    Did you have an opportunity to go through every specific
13   detail back in 2011?
14                 MR. PURPURA:  Objection; asked and answered.
15                 THE COURT:  Overruled.
16   A    No, I did not have the opportunity.
17   BY MR. FELS:
18   Q    All right.  So let's go back now to 2016 or go forward
19   five years to 2016.  Sir, did the Government reach out to you
20   or did you come to the Government and say, oh, I've got
21   information on Chapo?
22   A    No.  I was doing my time in Phoenix when they sent for
23   me, when the agents say that they wanted to speak to me.  So
24   it was them who looked for me.
25   Q    Now, you remember questions about being asked during your
```

LISA SCHMID, CCR, RMR

GALVAN/REDIRECT/FELS

```
 1    plea colloquy about whether you were happy with your lawyer.
 2    A    Correct, sir.
 3    Q    And I think you testified on direct that your concern or
 4    your frustration with your lawyer was because you got
 5    sentenced to more time than you had expected?
 6    A    I remember very well that -- to the person who did the
 7    legal papers in prison, I mentioned to him that the lawyer had
 8    sold me out, that he had lied to me because he had said that I
 9    would get 17 years or less, which is what Rudy has gotten.
10    Q    Right.
11    A    That I was going to receive less time than Rudy.
12    Q    That's what I'm talking about.  Your issues with him were
13    not about your plea.  It was about your sentence, correct?
14    A    Yes.  I was upset because I had been given 24 years and I
15    had been expecting way less.
16    Q    Which happens first, your plea or your sentencing?
17    A    My plea.
18    Q    And so at the time of your plea, you hadn't yet been
19    frustrated about your sentence, correct?
20              MR. PURPURA:  Objection.
21              THE COURT:  Sustained.
22    BY MR. FELS:
23    Q    At the time you were asked these questions about whether
24    you were satisfied with your lawyer at your plea colloquy, you
25    didn't yet know what your sentence was, correct?
```

LISA SCHMID, CCR, RMR

GALVAN/REDIRECT/FELS

1   A    No.  I had all my trust on my lawyer and I believed

2   everything he had told me.

3   Q    So when you were asked those questions about whether you

4   had any problems with your lawyer at your plea and you said

5   no, that was truthful, correct?

6   A    Yes.  At the time, I had a lot of trust in him.

7   Q    And as you've testified on both direct and cross, you

8   never read this letter, this 2255, correct, until a few days

9   ago?

10  A    Yes.  I only signed it that day, and he told me, sign it

11  right away because it is already expired and I have to -- I

12  have to put the day of one year exactly from the previous day.

13  And just that trust in me.  We have to send it right away.

14         So the only thing I did was sign it, and he took it

15  upon himself to send it by mail.

16  Q    Sir, you remember you were asked whether you've lied

17  before, and you said yes?

18  A    Yes, sir.

19  Q    And then you started to say, "But I'm not lying now," but

20  you weren't able to get your answer?

21         MR. PURPURA:  Objection.

22         THE COURT:  Well, I don't know if I heard a question

23  yet.

24  BY MR. FELS:

25  Q    The question is, why aren't you lying now?  Why wouldn't

LISA SCHMID, CCR, RMR

GALVAN/REDIRECT/FELS

```
 1    you lie now?
 2    A    It is completely different now.  Now, well, at the time,
 3    there are many reasons why I'm here to tell the truth.  First
 4    of all, I have to tell the truth because if I don't, my
 5    agreement is torn apart, and I'll have to face what I was
 6    facing before, which is life.
 7             If I were to lie now, all my benefits, go to the
 8    trash.  So I have to tell the truth now.  I don't know how
 9    long -- the Government hasn't promised me how long they are
10    going to take away from me.  The Government has not promised
11    me anything.  And I agreed with that because it is something
12    that I want to do for myself.
13             When I was arrested in 2011, my girl was 13 years
14    old.
15             MR. PURPURA:  Objection.  It's a little --
16             THE COURT:  No, it was a proper broad question.  He
17    can finish his answer.
18    A    My girl, my daughter was at the time 13 years old.  And
19    she would always ask me, "Dad, when are you coming?"  And I
20    would tell her, "Soon."
21             She's 21 now.  When she was 18, she found out who
22    her dad was.  So she doesn't speak to me anymore.  So I
23    want that in the future, I want my daughter to know that I did
24    the right thing, and that I'm being as truthful as possible,
25    so that tomorrow, she might be -- she will be proud of me.
```

LISA SCHMID, CCR, RMR

GALVAN/REDIRECT/FELS

```
 1              So I'm doing it to clean my image and to be a better
 2   person.  That is why I am not lying now.
 3              THE COURT:  All right.  If you're not done, we need
 4   to take a break.
 5              MR. FELS:  I'm finished, Your Honor.
 6              THE COURT:  Okay.  Let's take a break.
 7              If you want recross, we'll talk about it when we get
 8   back.
 9              Let's take our 15 minute break, ladies and
10   gentlemen, 11:20.
11              (Jury exits.)
12              THE COURT:  Mr. Fels, sorry to have interrupted you.
13   One of the jurors really needed a break right away.
14              Let me just mention to the parties that, you know,
15   going forward, remember if you file something under seal, you
16   need to file a redacted version publicly, and in that public
17   version, please set forth the basis that you want me to find
18   to determine that, in fact, the sealing was proper.  Okay?
19              All right.  11:20.
20              MR. BALAREZO:  Your Honor?  If the Court is
21   referring to the Docket 537 from the Government's disclosure
22   --
23              THE COURT:  I wasn't referring to just that.
24   There's a lot.
25              MR. BALAREZO:  I did file an objection to the
```

GALVAN/RECROSS/PURPURA

```
1    sealing in general.

2              THE COURT:  I've seen that.

3              MR. BALAREZO:  Thank you.

4              THE COURT:  11:20.

5              (Recess.)

6              THE CLERK:  All rise.

7              THE COURT:  All right.  Please bring in the jury.

8              This will be brief, Mr. Purpura?

9              MR. PURPURA:  (Nods head affirmatively.)

10             (Jury enters.)

11             THE COURT:  All right.  Be seated, please.

12             Recross-examination, Mr Purpura?

13             MR. PURPURA:  (Nods head affirmatively.)

14             THE COURT:  You're working on it?

15             MR. PURPURA:  Yeah.  Thank you.

16                       RECROSS-EXAMINATION

17   BY MR. PURPURA:

18   Q    Sir, briefly, if I may, yesterday on cross-examination, I

19   first put up Exhibit Number 71, and then I put up Exhibit 415,

20   and I asked you specifically, page 61, line nine, "Does it

21   appear to be the same person to you?"

22             And your answer, line ten, is, "He looks different."

23             They do look different, is that correct, sir?  Yes

24   or no?

25   A    It is the same person, but they look different.
```

LISA SCHMID, CCR, RMR

GALVAN/RECROSS/PURPURA

1    Q    Now, what, you said that Mr. Marrufo is in prison,

2    correct?

3    A    Yes, sir.

4    Q    When did he go to prison?

5    A    After I was arrested.

6    Q    And you were arrested in 2011, correct?

7    A    Yes, sir.

8    Q    So how soon after you were arrested?

9    A    I don't remember the date exactly, but it was about two

10   or three years afterwards.

11   Q    And he -- he is -- you're 41.  He's 38 years old.  Is

12   that correct?

13   A    I know he's younger than I am.

14   Q    And he's been incarcerated for a period of time, is that

15   correct?

16   A    Yes, sir.

17   Q    Thank you.

18        When -- I spoke about your allocution.  That's when

19   you went to the sentencing before Judge Martinez and I said

20   you spoke eloquently and you agreed with me, correct?

21   A    Correct.

22   Q    And would you agree with me that, again, when you were

23   asked the very last question and the effect of prison on your

24   daughter, again, you spoke eloquently, correct?

25   A    Correct.

GALVAN/RECROSS/PURPURA

```
 1    Q     And when your daughter was a little girl, you were
 2    dealing cocaine, correct?
 3    A     I was doing drug trafficking.
 4    Q     Cocaine, correct?
 5    A     In 2009.
 6    Q     So she was a young girl and you're dealing cocaine,
 7    correct?
 8    A     Yes.
 9    Q     Large scale marijuana, correct?
10    A     Yes.
11    Q     You obtained weapons, correct?
12    A     Yes, sir.
13    Q     For the attempted murder of Freddy while your daughter
14    was still a young little girl, you obtained a gun with a
15    silencer, correct?
16    A     My girl has never lived with me.
17    Q     Whether she lived with you or not, during that time
18    period, you obtained a gun with a silencer, correct?
19    A     Correct, sir.
20    Q     For the attempted murder, for the contemplated murder of
21    Freddy, correct?
22    A     Correct, sir.
23    Q     And again, when I said you spoke eloquently at
24    sentencing, you even told the judge that -- Judge Martinez --
25    at sentencing that you were born again, and you want to ask
```

LISA SCHMID, CCR, RMR

GALVAN/RECROSS/PURPURA

1   Your Honor to give you a second chance to prove to the United

2   States I can do a lot of good things.  That was back before

3   Judge Martinez gave you 23 years, 24 years, correct?

4   A    Correct, sir.

5   Q    And then, after you got that sentence, as we discussed

6   before, you did file or had filed for you the 2255, the

7   post-conviction, correct?

8            MR. FELS:  Objection; outside the scope.

9            THE COURT:  Sustained.  Well, not outside the scope,

10  but we're repeating your cross.

11           MR. PURPURA:  Just it does fit in, if you just give

12  me a --

13           THE COURT:  I'll give you a couple of questions.

14           MR. PURPURA:  Thank you.

15  BY MR. PURPURA:

16  Q    Page five.  And after you told that judge that you were

17  born again and all those promises, this 2255 petition, as you

18  suggested before, has a lot of lies in it, right?

19  A    Correct, sir.

20  Q    And as Government counsel brought up, you indicated you

21  were unsatisfied with the sentence, correct?

22  A    Correct, sir.

23  Q    But what he's saying is that you have never had the

24  opportunity to see your indictment?  Correct?

25  A    That's what he wrote.

LISA SCHMID, CCR, RMR

GALVAN/RECROSS/PURPURA

 1   Q    That's a lie, signed by you, right?

 2   A    Yes.  When I signed it, I didn't read any of those

 3   papers.

 4   Q    Now, you want to get home.  Fair to say?

 5   A    Yes, sir.

 6   Q    And there are a lot of people in prison with you that

 7   have families, correct?

 8   A    Correct, sir.

 9   Q    And those people share your same feelings.  They want to

10   get home, too, correct?

11   A    Of course, sir.

12   Q    But for whatever reason, Judge Martinez felt that the 24

13   year sentence for you was a proper sentence, correct?

14            MR. FELS:  Objection.

15            THE COURT:  Sustained.

16   BY MR. PURPURA:

17   Q    And your only ability now to get home before 2032,

18   February, is to through a Rule 35, correct?

19            MR. FELS:  Objection.

20            THE COURT:  Sustained.

21   BY MR. PURPURA:

22   Q    In 2011, you indicated that you were answering some

23   questions, and you answered those questions during your first

24   proffer, correct?

25   A    Correct, sir.

GALVAN/RECROSS/PURPURA

1  Q    And in essence when the Government -- or when you started

2  talking supposedly about Mr. Guzmán, the Government and the

3  DEA said, that's okay.  We don't need anymore?

4            MR. FELS:  Objection.

5            MR. PURPURA:  It was brought up in --

6            THE COURT:  It's beyond the scope.  It doesn't quite

7  characterize what he said, but he can say whether it does or

8  not.

9            THE WITNESS:  And what was the question exactly?

10           MR. PURPURA:  I knew you'd have a problem with that.

11  BY MR. PURPURA:

12  Q    You indicated that you gave some information about

13  Joaquín Guzmán Chapo in 2011, correct?

14  A    Yes, I mentioned him at the first meeting.

15  Q    And basically, what your testimony was that the agents

16  and/or the Government said everything's fine.  You don't have

17  to go into that, correct?

18           MR. FELS:  Objection.

19           THE COURT:  I'll let him answer.

20  A    Not that he was just fine.  They just started asking

21  questions and questions and they just stopped asking me about

22  Chapo.

23           MR. PURPURA:  Nothing further, thank you.

24           THE COURT:  Anything else?

25           MR. FELS:  Nothing, Your Honor.

GALVAN/RECROSS/PURPURA

```
 1              THE COURT:  All right.  Ladies and gentlemen, we
 2   need to adjust the courtroom, and I'm going to send you into
 3   the jury room for three or four minutes, and then we'll be
 4   right back to you.  So stay loose.
 5              (Jury exits.)
 6              THE COURT:  All right.  Be seated.
 7              The Marshals can remove the witness.
 8              And what's the Government doing next?
 9              MS. GOLDBARG:  We have two exciting stipulations to
10   read, and then our next witness.
11              THE COURT:  Oh.  Okay.  Are we going have to clear
12   the courtroom out again?
13              MS. GOLDBARG:  No, Your Honor.  It's law
14   enforcement.
15              THE COURT:  All right.
16              (Pause in proceedings.)
17              (Jury enters.)
18              THE COURT:  All right.  Everyone be seated.
19              How would the Government like to proceed?
20              MS. GOLDBARG:  Your Honor, at this time, the
21   Government would ask to read into the record two stipulations,
22   and to make it easier, I'd ask to have them published on the
23   Elmo while I read it.
24              THE COURT:  Okay.  That's fine.  The only thing I
25   would ask is instead of reading the whole preamble, just say,
```

LISA SCHMID, CCR, RMR

GALVAN/RECROSS/PURPURA

 1    "The parties through their attorneys have agreed as follows."

 2              MS. GOLDBARG:  Thank you.  I will do that.

 3              I would first like to publish to the jury without

 4    objection, I believe, Government Exhibit 1001.

 5              THE COURT:  All right.  That's received.

 6         (Government Exhibit 1001 was received in evidence.)

 7              MS. GOLDBARG:  All the parties agree and stipulate

 8    to the following.  The following Government's exhibits,

 9    209-37T, 212-10T, 301A-T, 30B -- I'm sorry.  301B-T, 601F-1T

10    through 601F-9LT, 606-I-1AT through 606-I-3HT, 219-15T,

11    610N-5T, 610N-6T, 706T-1 through 706T-3, are true and accurate

12    transcriptions of Spanish and/or translations from Spanish to

13    English of the corresponding exhibits: 201-37T, 212-10T,

14    301A-T, 301B-T, 601F-1T through 601F-9LT, 606-I-1AT through

15    606-I-3HT, 219-15T, 610N-5T, 610N-6T, 706T-1 through 706T-3,

16    respectively.

17              Government's Exhibits 209-37T, 212-10T, 301A-T,

18    301B-T, 601F-1T through 601F-9LT, 606-I-1AT through 606-I-3HT,

19    219-15T, 610N-5T, 610N-6T, 706T-1 through 706T-3, as well as

20    the stipulation are offered into evidence without objection as

21    evidence at trial.

22              THE COURT:  All right.  That's received.  The number

23    of exhibits are received.

24              MS. GOLDBARG:  And there's an even shorter one, Your

25    Honor.

GALVAN/RECROSS/PURPURA

```
 1              THE COURT:  Okay.

 2              MS. GOLDBARG:  This is Government Exhibit 1002, I

 3     believe also without objection:  All the respective parties

 4     agree and stipulate that paragraph one, Government's Exhibit

 5     605C-4T, 605C-5T, 605C-6T, and 605C-7T are true and accurate

 6     transcriptions of Spanish, and/or translations from Spanish to

 7     English of the corresponding exhibits:  605C-4T, 605C-5T,

 8     605C-6T, and 605-7T, respectively.

 9              Last paragraph, Government's Exhibit 605C-4T,

10     605C-5T, 605C-6T, and 605C-7T, as well as the stipulation are

11     offered in evidence without objection as evidence at trial.

12              THE COURT:  All right.  The stipulation and the

13     referenced exhibits are also received.

14              Next?

15              MR. ROBOTTI:  Your Honor, the Government calls

16     Stephen Marston.

17              (Witness sworn.)

18              THE CLERK:  Please state and spell your name for the

19     record.

20              THE WITNESS:  Stephen Marston, S-T-E-P-H-E-N,

21     Marston, M-A-R-S-T-O-N.

22              THE INTERPRETER:  Excuse me, Your Honor.  Could we

23     adjust the microphone, so that --

24              THE COURT:  When he sits down, I'm hoping you'll

25     hear better.  He's just saying and spelling his name.
```

MARSTON/DIRECT/ROBOTTI

```
 1                 All right.  You may inquire.
 2                 MR. ROBOTTI:  Thank you, Judge.
 3                      DIRECT EXAMINATION
 4   BY MR. ROBOTTI:
 5   Q     Are you employed?
 6   A     I am.
 7   Q     What's your present position?
 8   A     I'm a Special Agent with the FBI.
 9   Q     And how long have you been a Special Agent with the FBI?
10   A     Over 18 years.
11   Q     What are your current duties and responsibilities as
12   Special Agent for the FBI?
13   A     I currently investigate violations associated with cyber
14   crime.
15   Q     Where are you based?
16   A     In New York City.
17   Q     Previously, to what types of cases were you assigned?
18   A     Previously, I was working narcotics-related
19   investigations.
20   Q     And how long were you assigned to narcotics cases?
21   A     Approximately 16, 17 years.
22   Q     In general, what positions did you hold while you were
23   assigned to narcotics investigations?
24   A     I was a Special Agent.  I was also a Supervisory Special
25   Agent in our headquarters, where we conducted oversight over
```

MARSTON/DIRECT/ROBOTTI

1   the narcotics violations, as well as the supervisor of a

2   narcotics squad.

3   Q    And what does a supervisor of a narcotics squad do?

4   A    Oversees the case agents -- in my case, ten to 12

5   agents -- who ran the daily investigations that they were

6   assigned.

7   Q    Are you familiar with someone named Christian Rodriguez?

8   A    I am.

9   Q    How so?

10  A    Christian was a target of our investigation back in 2009.

11  Q    And during approximately what years were you

12  investigating Christian Rodriguez?

13  A    From 2009 to 2011.

14  Q    What was your role in this investigation?

15  A    I was a Special Agent at the time, and I was one of the

16  case agents.

17  Q    And what did it mean to be a case agent in this

18  particular case?

19  A    As one of the case agents, you conducted the daily

20  activities of case, directing sources, following up on the

21  investigative leads.  So you managed it on a daily basis.

22  Q    And have you been continuously involved in this

23  investigation since it began?

24  A    I have.

25  Q    Why did you start investigating Christian Rodriguez?

MARSTON/DIRECT/ROBOTTI

```
 1   A    We learned through a confidential source that Christian
 2   Rodriguez has developed a secure communication platform for
 3   the Cifuentes drug trafficking organization and ultimately,
 4   also for the defendant.
 5   Q    And where was Christian Rodriguez living at this time?
 6   A    He was living in Colombia, in South America.
 7   Q    I'm going to show you what's been marked for
 8   identification as Government Exhibit 94.  Do you recognize
 9   this? (Exhibit published to the witness.)
10   A    I do.
11   Q    And what is it?
12   A    This is a picture of Christian.
13        MR. ROBOTTI:  Your Honor, the Government offers
14   Government Exhibit 94 into evidence.
15        MR. LICHTMAN:  No objection.
16        THE COURT:  Received.
17     (Government's Exhibit 94 was received in evidence.)
18   BY MR. ROBOTTI:
19   Q    And looking back at Government Exhibit 94, this is the
20   person you identified as Christian Rodriguez?
21   A    It is.
22        MR. ROBOTTI:  We're having some issues with the
23   microphones.
24        THE COURT:  Are we?  I'm hearing fine.  It's
25   working.
```

MARSTON/DIRECT/ROBOTTI

1   BY MR. ROBOTTI:

2   Q    Now, directing your attention to February 3rd, 2010, what

3   if anything happened on that date with respect to Christian

4   Rodriguez?

5   A    Since 2009 up until 2010, the FBI had access to some of

6   the devices that were being used in these encrypted systems.

7   Unfortunately, we're not able to infiltrate the system on our

8   own.

9          So in 2010 -- oh, excuse me.  In 2010, the FBI

10  conducted a series of undercover operations targeting

11  Christian, in order to gather some intelligence regarding the

12  communications system, as well as his connection to drug

13  trafficking.

14  Q    And what specifically happened on February 3rd, 2010?

15  A    On February 3rd, there was a meeting at a hotel in New

16  York City, in which Christian and a cooperating witness or

17  confidential human sources for the FBI talked about the

18  procurement of equipment from Christian.

19          One of the cooperating sources was portraying his

20  role as a member of organized crime and also needed this

21  equipment to evade law enforcement protection.

22  Q    And was this meeting between Christian Rodriguez and

23  these other confidential sources under surveillance?

24  A    It was.

25  Q    And were you involved in that surveillance?

MARSTON/DIRECT/ROBOTTI

```
1   A      I was.

2   Q      And where was this meeting?

3   A      The meeting took place at a hotel in Manhattan.

4   Q      And what types of surveillance were involved in that

5   meeting?

6   A      Audio recordings of the meeting, as well as a covert

7   video recording of the meeting.

8   Q      And was Christian Rodriguez informed that he was being

9   recorded?

10  A      He was not.

11  Q      All right.  I'm going to show you what's been marked for

12  identification as Government Exhibit 706A.  And do you

13  recognize this?  (Exhibit published.)

14  A      I do.

15  Q      And what is it?

16  A      This is our original evidence for the recorded -- or the

17  video recorded meeting that took place in Manhattan that we

18  just spoke about.

19  Q      All right.  And I'd like you to show you what's been

20  marked for identification as Government's Exhibits 706B and

21  706C.  And do you recognize these?  (Exhibit published.)

22  A      I do.

23  Q      What are they?

24  A      So the disk on the left, I recognize through my initials,

25  as well as the date.  It's a copy of the video from the hotel
```

MARSTON/DIRECT/ROBOTTI

1  meeting in February of 2010, that we just spoke about, and

2  also on the right.

3  Q    All right.

4         MR. ROBOTTI:  All right.  Your Honor, the Government

5  offers Government Exhibit 706B and 706C into evidence.

6         MR. LICHTMAN:  No objection.

7         THE COURT:  Received.

8      (Government Exhibits 706B and 706 C were received in

9                          evidence.)

10 BY MR. ROBOTTI:

11 Q    Now, directing your attention to early 2011.  What if

12 anything occurred with respect to Christian Rodriguez at that

13 time?

14 A    In 2011, the decision was made to approach Christian

15 Rodriguez in an effort to get inside access to this

16 sophisticated communication system being used by the

17 defendant.

18 Q    What was the status of your investigation at that time?

19 A    The status was ongoing.  We were trying to make access

20 into the system, but realized that without the insider access

21 to the system, we were not going to be able to get inside.

22 Q    And how had the FBI been trying to gain access to the

23 system?

24 A    We had access to various devices that were used on the

25 system.  With those devices, in conjunction with our folks,

MARSTON/DIRECT/ROBOTTI

1   our technical folks, we were trying to see what angles we

2   could play in order to listen to the communications of the

3   defendant and others.

4   Q    And up until this point, the FBI had not been successful

5   in reaching that goal?

6   A    That is correct.

7   Q    So what was your ultimate goal with your approach of

8   Christian Rodriguez?

9   A    We were seeking to gain Christian's cooperation.

10  Q    And did this approach take place?

11  A    It did.

12  Q    And where was that?

13  A    It also took place -- I'm sorry.  It took place in

14  Colombia, South America.

15  Q    And were you there for that approach?

16  A    I was.

17  Q    And what if anything happened as a result of your

18  approach or meeting with Christian Rodriguez?

19  A    Christian agreed to proactively cooperate with the FBI.

20  Q    So what does proactive cooperation mean?

21  A    Proactive cooperation is when an individual actively

22  agrees to work with law enforcement essentially in an

23  undercover capacity to the folks or the individuals in which

24  they're targeting.

25  Q    And going forward, were you Christian Rodriguez's

MARSTON/DIRECT/ROBOTTI

1   handling agent?

2   A     I was not.

3   Q     What's a handling agent?

4   A     A handling agent is a Special Agent that's assigned

5   responsibility for the direction, the administration of a

6   particular confidential human source.

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARSTON/DIRECT/ROBOTTI

```
 1    BY MR. ROBOTTI:   (Continuing.)

 2    Q    And who is the handling agent for Christian Rodriguez?

 3    A    One of the other case agents, Robert Potash.

 4    Q    Were you nonetheless involved in this proactive

 5    investigation as a case agent?

 6    A    I was.

 7    Q    Who were the primary targets of this proactive

 8    cooperation?

 9    A    The primary targets were the defendant, Jorge Cifuentes,

10    Dolly Cifuentes, Alex Cifuentes as well as Andrea Velez.

11    Q    All right.   So I would like to show you what's been --

12    what's in evidence as Government Exhibit 1-H.

13              (Exhibit published.)

14    Q    Do you recognize the person on the left?

15    A    I do.

16    Q    Who is that?

17    A    That is the defendant.

18    Q    And the person in the center?

19    A    That is Alex Cifuentes.

20              (Exhibit published.)

21    Q    Showing you Government Exhibit 42, which is also in

22    evidence.   Do you recognize that person?

23    A    I do.

24    Q    And who is that?

25    A    That is Jorge Cifuentes.
```

MARSTON/DIRECT/ROBOTTI

1   Q    I'd like to show you Government Exhibit 40 for

2   identification.  Do you recognize this person?

3   A    I do.

4   Q    And who is that?

5   A    Dolly Cifuentes.

6            MR. ROBOTTI:  Your Honor, the Government moves

7   Government Exhibit 40 into evidence.

8            MR. LICHTMAN:  No objection.

9            THE COURT:  Received.

10           (Government Exhibit 40 received in evidence.)

11           (Exhibit published.)

12  Q    And also for identification, Government Exhibit 49.  Do

13  you recognize this person?

14  A    I do.

15  Q    Who is that?

16  A    Andrea Velez.

17           MR. ROBOTTI:  Your Honor, the Government moves

18  Government Exhibit 49 into evidence.

19           MR. LICHTMAN:  No objection.

20           THE COURT:  Received.

21           (Government Exhibit 49 received in evidence.)

22           (Exhibit published.)

23  BY MR. ROBOTTI:

24  Q    Now, for how long did Christian Rodriguez proactively

25  cooperate in this investigation?

MARSTON/DIRECT/ROBOTTI

1   A     His proactive cooperation was from 2011 into 2013.

2   Q     Now, we're going to talk about this in some more detail

3   in a moment but in general what was the result of Christian

4   Rodriguez's proactive cooperation?

5           MR. LICHTMAN:  Objection, overbroad.

6           THE COURT:  No, overruled.

7   Q     Go ahead.

8   A     The FBI was able to get inside access to the encrypted

9   communication system being used by the defendant.

10  Q     And what, if anything, did the FBI obtain as a result?

11  A     We obtained calls that were transiting through that

12  system.

13  Q     And what else if anything aside from calls did the FBI

14  obtain?

15  A     We obtained calls as well as some messages as well.

16  Q     Would those be text messages?

17  A     They would.

18  Q     So let's talk about how the FBI got these calls and text

19  messages.  Beginning in early 2011 did you come up with a plan

20  for Christian Rodriguez's proactive cooperation?

21  A     We did.

22  Q     And did Christian Rodriguez's role within the cartel

23  inform that plan?

24  A     It did.

25  Q     And what was your understanding of his role at that time?

MARSTON/DIRECT/ROBOTTI

 1    A    Christian developed a system that was being used by the

 2    defendant and his associates.  He had also trained some of the

 3    defendants' associates to run the daily activities of the --

 4    of the system.  He still had access and was routinely asked to

 5    help with upgrades or problems that they were having with this

 6    system.

 7    Q    And did your understanding of the cartel's communication

 8    system at that time inform your plan?

 9    A    It did.

10    Q    And what was that understanding?

11    A    The way the system worked was the communications were

12    through the internet and worked with something called

13    encryption such that without special keys, even if you could

14    in fact grab the communications you would not be able to

15    listen to what was inside the actual communications

16    themselves.

17    Q    Did you have an understanding of the location of the

18    communication system at the time of early 2011?

19    A    Yes.

20    Q    And how if at all did that affect your plan going

21    forward?

22    A    The decision was to try to get the communication system

23    over to a favorable location for the FBI such that we can one,

24    get insider access; again, referring back to the keys.  If we

25    could have those keys we could in fact decrypt the

MARSTON/DIRECT/ROBOTTI

1   communications.

2   Q    Okay.  And at this time in early 2011 where was the

3   system located?

4   A    It was located in Canada.

5   Q    And what was your plan going forward?

6   A    The plan going forward was to move the servers that

7   housed the communication system to the Netherlands.  At that

8   time when they would be moved, Christian would have access to

9   the new keys as they were being configured which he would then

10   provide to the FBI.

11   Q    Why did you believe that moving the servers to the

12   Netherlands would be advantageous to the FBI?

13   A    We had a longstanding law enforcement relationship with

14   the Dutch as well as it would not be suspicious to the Sinaloa

15   Cartel associates that were helping with the daily activities

16   of the system.  It was a location that they were also okay

17   with.

18   Q    And you mentioned a couple of times encryption now.

19   What's encryption?

20   A    Encryption is a layer of security that is placed on

21   communications.  The best way to describe it would be having a

22   package that you're sending through the mail and you could put

23   a blanket around it and have a special key, a key that's just

24   unique to you that's very, very difficult for anybody else to

25   fabricate.  So even if law enforcement or somebody took that

MARSTON/DIRECT/ROBOTTI

1    package, they would just not be able to open it.  So it's --

2    that's just kind of the generic description of encryption.

3    Q    You mentioned that when you moved the servers to the

4    Netherlands you believed you would be able to obtain the key

5    from Christian Rodriguez?

6    A    That is correct.

7    Q    So why didn't you just direct Christian to put the

8    servers in the United States?

9    A    The -- we would have preferred to put them in the United

10   States.  Unfortunately it would have been very suspicious to

11   the individuals, the defendant and the defendant's workers,

12   that were managing the system on a daily basis.  It is

13   well-known that U.S. law enforcement is very aggressive in

14   pursuit of drug trafficking --

15             MR. LICHTMAN:  Objection, Judge.

16             THE COURT:  Well, overruled.

17   Q    So for that reason you believe it would be suspicious to

18   put the servers inside the United States?

19   A    That is correct.

20   Q    So how many servers did Christian Rodriguez set up

21   initially in the Netherlands?

22   A    There were three servers.

23   Q    And what types of servers were these in general?

24   A    Two of the servers carried voice communications and one

25   was electronic.

MARSTON/DIRECT/ROBOTTI

```
 1    Q     What types of voice communications?

 2    A     They're referred to as VOIP.

 3    Q     What's VOIP?

 4    A     VOIP is Voice Over Internet Protocol.  It stands for

 5    being able to communicate on your phone and translating that

 6    information instead of through a telephone company transmit it

 7    in a way through protocols on the internet so that voice is

 8    broken down into a bunch of little packets of data.  It's sent

 9    out over the internet and whoever you're talking to receives

10    that data where it's reassembled and you hear what they said.

11    Q     How are these servers identified in the Netherlands?

12    A     They're identified through something called an IP

13    address.

14    Q     What's that?

15    A     IP stands for Internet Protocol.  It would be an

16    equivalent on the internet to having a mailing address.  It's

17    designed so people or devices can find each other on the

18    internet.

19    Q     Are you familiar with what's known as a Mutual Legal

20    Assistance Treaty or MLAT request?

21    A     I am.

22    Q     What's that?

23    A     An MLAT is a formal agreement between countries that

24    enables for the sharing of information and evidence as well as

25    requesting information and evidence.  It's oftentimes used in
```

MARSTON/DIRECT/ROBOTTI

```
 1    transnational criminal -- transnational investigations.
 2    Q    And who submits that request to a foreign country on
 3    behalf of the United States?
 4    A    The Department of Justice.
 5    Q    Did the FBI request the Department of Justice to submit
 6    an MLAT request in this case?
 7    A    We did.
 8    Q    And to whom?
 9    A    To the Dutch.
10    Q    What specifically did the FBI request the Dutch
11    authorities to do through this MLAT process?
12    A    We requested the Dutch intercept the communications that
13    were transited through the servers.
14    Q    Was that a judicial wiretap authorized by a judge?
15    A    It was.
16    Q    When did the Department of Justice submit the first MLAT
17    request to Dutch authorities in this case?
18    A    It was April of 2011.
19    Q    And at some point did the Dutch respond to that MLAT?
20    A    They did.
21    Q    And what did they provide in response?
22    A    They provided the calls that were transiting through the
23    servers.
24    Q    And were these VOIP calls?
25    A    They were.
```

MARSTON/DIRECT/ROBOTTI

1    Q     And did the Dutch provide any text messages from these

2    three servers?

3    A     There were never text messages that were received.

4    Q     Now, through your investigation and review of these

5    communications provided by the Dutch were you able to

6    determine how the servers worked?

7    A     We were.

8    Q     In general could you explain how phone calls were sent

9    through these servers in the Netherlands?

10   A     Certainly.  The -- when a call was going to be placed, an

11   individual would have two options.  One was a -- an internal

12   closed system equivalent to calls within an office space and

13   the second was an ability to dial an outside line like hitting

14   9 in your office and dialing an outside extension.  So there

15   were two versions.

16   Q     All right.  And we'll talk about that in a moment but

17   just in general were you able to determine where these phone

18   calls were being made to and from?

19   A     We were.

20   Q     How so?

21   A     The -- through either the content of the communications

22   as well as the phone numbers associated or the exterior phone

23   numbers, the phone numbers that it captured.

24   Q     And when you say you were able to determine that based on

25   the phone numbers, what specifically about the phone numbers

SOPHIE NOLAN, OFFICIAL COURT REPORTER

MARSTON/DIRECT/ROBOTTI

1  told you that?

2  A     The country codes that were called.

3  Q     And what country was that associated with?

4  A     Mexico.

5  Q     And so is it your understanding that these calls were

6  being made from Mexico and being piped through the server in

7  the Netherlands?

8  A     That is correct.

9  Q     And describe how that worked in general.

10  A     The communications -- when somebody would use their phone

11  they would type in a phone number, the communications, as we

12  talked about before, leveraged the VOIP.  So it would break

13  down into bits of data.  It transits to the server in the

14  Netherlands which decides where that call is going to go and

15  routes it.  The server acts as a switchboard but this happens

16  within seconds.

17  Q     So you were speaking a moment ago about the two different

18  types of phone calls or networks on the server.  Could you

19  break that down for us?

20  A     Sure.  There are two types of calls as we talked to

21  earlier; the internal equivalent to an office setting where

22  you would dial an extension and it never leaves -- it never

23  leaves the office.  It stays within that computer system, if

24  you will.  The second would be the ability to dial 9 and

25  getting an outside line.

SOPHIE NOLAN, OFFICIAL COURT REPORTER

MARSTON/DIRECT/ROBOTTI

1    Q      And these extensions how many digits were those?

2    A      Three digits.

3    Q      So to reach another user on the internal network you

4    would dial that three-digit extension?

5    A      That's correct.

6    Q      And how would someone reach an external phone number?

7    A      I don't know the exact mechanism.  However, essentially

8    you're going to put in the phone number that you want to

9    connect to.

10   Q      Could an external phone number like a cell phone user

11   dial into the system?

12   A      It did not have the ability for anybody to dial into the

13   system.

14   Q      So approximately when did you start receiving the first

15   set of intercepted calls from the Dutch servers?

16   A      April of 2011.

17   Q      And how did Dutch law enforcement authorities provide the

18   intercepted calls to the FBI?

19   A      They provided them automatically and the communications

20   were still in their encrypted status.

21   Q      And how long after the calls were made did the FBI

22   receive them?

23   A      Within days, a day or two.

24   Q      During 2011 how many MLAT requests did the Department of

25   Justice make to Dutch authorities for the wiretapping of these

MARSTON/DIRECT/ROBOTTI

1   servers?

2   A     A total of ten.

3   Q     And why did the FBI make supplemental requests following

4   this initial MLAT in April of 2011?

5   A     Dutch laws as signed off by the judge required them to be

6   reviewed every 30 days.

7   Q     And so ultimately during what time period did you receive

8   calls for?

9   A     April 2011 to the beginning of January 2012.

10  Q     And at that point beginning -- end of 2011, early 2012,

11  did you stop making requests for the interception of these

12  servers?

13  A     We did.

14  Q     Why?

15  A     The defendant stopped using the system in the summer of

16  2011 and the call volume went down significantly thereafter.

17  Q     Now, during this time period did the FBI also receive

18  calls by means other than through the Dutch MLAT process?

19  A     We did.

20  Q     How so?

21  A     We also conducted a search warrant towards the end of or

22  in September of 2011, as well as we received e-mails with --

23  from our source, Christian, that also contained some of the

24  calls that were in the server.

25  Q     Did Christian e-mail these calls on his own or was he

MARSTON/DIRECT/ROBOTTI

```
 1    directed to do that?

 2    A    He was directed.

 3    Q    And when did he send those e-mailed calls?

 4    A    It was prior to -- it was March -- March and April of

 5    2011 and then again in June and July of 2011.

 6    Q    And then in the first time period what was going on with

 7    the e-mailed calls?

 8    A    The servers were being established in the Netherlands at

 9    that time.

10    Q    And June and July of 2011 what was happening at that

11    point?

12    A    The FBI recognized that we were not receiving all the

13    data that was transiting through the servers.

14    Q    You mentioned before that Christian Rodriguez was located

15    in Colombia.  How was he accessing these servers in the

16    Netherlands?

17    A    Remotely.

18    Q    Okay.  And was this also a lawful means of obtaining

19    these calls from the server?

20    A    It was.

21    Q    Why didn't you just have Christian Rodriguez e-mail all

22    the calls to you?

23    A    In consultation with the Department of Justice, the

24    preferred method was to pursue the MLAT as we prior talked

25    about with our Dutch partners.
```

MARSTON/DIRECT/ROBOTTI

1    Q    So why didn't FBI agents access the servers directly and

2    download the calls instead of having Christian Rodriguez do

3    it?

4    A    Christian had trained some of the defendant's associates

5    to handle the daily activities of the communication server.

6    As such, they were -- they had access, as did Christian, and

7    were aware or could be aware of any of the activities that

8    were happening in the servers.  As such, we did not want to

9    leave a footprint from the FBI within those servers that could

10   be found and essentially alert them to the presence of law

11   enforcement.

12   Q    Were there any technological difficulties during the

13   interception period?

14   A    There were.

15   Q    And could you explain what those were?

16   A    The initial interception that the Dutch did for the FBI

17   pursuant to the MLAT intercepted the communications as they

18   went into and left the server.  So they weren't intercepting

19   inside the server.  As we mentioned before, those packets of

20   communications as we mentioned were encrypted.  The data would

21   be sent to the FBI down in Quantico where our folks in

22   Quantico had to apply a series of algorithms to unencrypt the

23   data and put the packages together to complete the call.  It

24   required a lot of time and efforts by our folks down in

25   Quantico.

MARSTON/DIRECT/ROBOTTI

1    Q    And aside from that was there another technological

2    problem as well?  Were some calls not being recorded?

3    A    Some calls are not being recorded, correct.

4    Q    And that was through the interception process Dutch had

5    set up, some calls were being missed?

6    A    That is correct.

7    Q    What did the FBI do in response to these technological

8    difficulties?

9    A    So, the FBI approached the software developer who handled

10   the transit of the VOIP calls through the server and had the

11   code modified so that when the calls were inside the server in

12   an unencrypted status, they were complete calls.  They would

13   essentially take a copy of that call and send it to another

14   server that the Dutch controlled so that we would have a full

15   compiled copy of the call that would then be intercepted by

16   the Dutch and sent over to the FBI.

17   Q    When was this technological change made?

18   A    June and July of 2011.

19   Q    And who actually made these changes inside the servers?

20   A    Christian was directed to make those changes to the

21   software inside the server.

22   Q    And, again, why was Christian directed to do that rather

23   than the FBI going and doing that?

24   A    Just again due to the nature of the defendant's

25   associates also had access inside the server.  We directed

MARSTON/DIRECT/ROBOTTI

1    Christian to do it.

2    Q    And did this change solve the technological difficulties

3    that the FBI was having?

4    A    It did.

5    Q    You mentioned that there was also a search warrant done

6    of these servers towards the end of 2011.  Why was that?

7    A    What the FBI learned was that calls were also stored

8    inside the server that had unencrypted data, unencrypted

9    calls.  As a result, we requested through an MLAT a search

10   warrant for that server from our Dutch partners which they

11   provided to us.

12   Q    And why didn't the FBI just do these search warrants all

13   along?

14   A    The FBI wanted to have realtime access to the

15   communications that were transiting through there.  So that

16   delayed any of the intelligence that was ongoing.

17   Q    All right.  Just to summarize, what were the three

18   methods by which the FBI obtained the calls from these Dutch

19   servers?

20   A    The three methods were through interception with our

21   Dutch partners; through a search warrant, with our Dutch

22   partners as well as e-mails provided by Christian at our

23   direction.

24   Q    How many calls in total did the FBI obtain from these

25   three servers?

MARSTON/DIRECT/ROBOTTI

```
 1   A     About 1,500 calls.

 2   Q     And were all of those calls actual recorded

 3   conversations?

 4   A     They were not.

 5   Q     And when they weren't recorded conversations, in general

 6   what were they?

 7   A     They were hang ups or dialing where no one picked up the

 8   phone.

 9   Q     And, as I will speak about further in a moment, did you

10   obtain recorded calls with the defendant on them?

11   A     We did.

12   Q     How many recordings of the defendant did you obtain?

13   A     Between 100 and 200 calls.

14   Q     And on top of that were there other recorded

15   conversations?

16   A     There were.

17   Q     In total how many recorded conversation did the FBI

18   obtain?

19   A     Over 800 calls.

20   Q     To your knowledge is there any indication that any of

21   these calls have been altered or tampered with in any way?

22   A     There are no indications.

23   Q     Is there any indication that these calls were fabricated

24   in any way?

25           MR. LICHTMAN:  Objection.
```

MARSTON/DIRECT/ROBOTTI

```
 1              THE COURT:  Overruled.

 2   A    There is no indication.

 3   Q    All right.  I would like to show you what's been marked

 4   for identification only as Government Exhibit 601-A-1 to

 5   601-A-3, 601-B and 601-E.

 6              Do you recognize those?

 7   A    I do.

 8   Q    And what are they?

 9   A    These are evidence or -- evidence -- our original

10   recordings.

11   Q    These are the original recordings from the Dutch servers?

12   A    That is correct.

13   Q    Are these all of the calls or a subset of the calls?

14   A    Just a subset of the calls.

15   Q    I would like to now show you Government Exhibit 601-F for

16   identification.  Do you recognize this?

17   A    I do.

18   Q    And what's that?

19   A    This is a -- this is select calls from the search warrant

20   returns as well as the intercepts as well as a call data

21   spreadsheet.

22   Q    And are these select calls copied from the exhibits that

23   we just looked at 601-A-1 to A-3, 601-B to 601-E?

24   A    That's correct.

25              MR. ROBOTTI:  Your Honor, the Government offers
```

MARSTON/DIRECT/ROBOTTI

1   these into evidence.

2          MR. LICHTMAN:  No objection.

3          THE COURT:  Received.

4          (Government Exhibits 601-F, 601A-1 to A-3, 601-B to

5   601 received in evidence.)

6          (Exhibit published.)

7   BY MR. ROBOTTI:

8   Q    So are the calls on here marked 601-F-1 to 601-F-9?

9   A    They are.

10  Q    Is there also call data included on this disk?

11  A    There is.

12  Q    What type of data?

13  A    The data on the disk is the date and time as well as the

14  associated extensions that were calling each other, where the

15  extension would be associated with a phone number.

16  Q    Are those contained in the spreadsheets?

17  A    They are.

18  Q    And that's marked 601-F-10?

19  A    Yes.

20  Q    All right.  And what are the time zone of the calls on

21  this disk?

22  A    The time phone is called Coordinated Universal Time,

23  priorly known as Greenwich Meantime.

24  Q    How does that compare to the time in Sinaloa, Mexico?

25  A    At the time of the interceptions it's a six-hour

MARSTON/DIRECT/ROBOTTI

1   difference.

2   Q    I would like to show you Exhibit 601-H for

3   identification.  Do you recognize this?

4   A    I do.

5   Q    And what do you recognize this to be?

6   A    This is a disk that contains the e-mails that Christian

7   had provided with the attachments from those e-mails which

8   would be the audio calls.

9            MR. ROBOTTI:  So the Government, Your Honor, offers

10   Government Exhibit 601-H into evidence.

11            MR. LICHTMAN:  No objection.

12            THE COURT:  Received.

13            (Government Exhibit 601-H received in evidence.)

14            (Exhibit published.)

15   BY MR. ROBOTTI:

16   Q    And this list of numbers on the right-hand side of the

17   disk there, does that correspond to the e-mails on the disk?

18   A    It does.

19   Q    Looking next at Government Exhibit 601-G for

20   identification.  Do you recognize this?

21   A    I do.

22   Q    And what's this one?

23   A    This disk contains select calls from the e-mails as well

24   as a data spreadsheet.

25   Q    Select calls from e-mails marked Government Exhibit

MARSTON/DIRECT/ROBOTTI

```
 1   601-H?  Is that what we just looked at?

 2   A     Correct.

 3          MR. ROBOTTI:  Your Honor, the Government offers

 4   601-G into evidence.

 5          MR. LICHTMAN:  No objection.

 6          THE COURT:  Received.

 7          (Government Exhibit 601-G received in evidence.)

 8          (Exhibit published.)

 9   BY MR. ROBOTTI:

10   Q     So are the calls on this disk marked 601-G-1 to 601-G-4?

11   A     That's correct.

12   Q     And the data is 601-G-5?

13   A     That is correct.

14   Q     And in general again here what type of data do we have on

15   this disk?

16   A     We have the date and time.  We'll have a file name or a

17   name of what the call was called or what it put down as well

18   as the extensions and if there was an extension with the phone

19   number.

20   Q     Where did this data come from?

21   A     The data came from inside the server.

22   Q     These are the e-mails called -- sorry.

23          All right.  Just a few more to get through here.

24   601-I for identification.  Do you recognize this one.

25   A     I do.
```

MARSTON/DIRECT/ROBOTTI

1  Q    And what's this one?

2  A    These will be the audio that was attached to -- or

3  attached within the e-mails.

4  Q    Okay.  And are these select calls from those e-mails?

5  A    They are.

6        MR. ROBOTTI:  The Government offers Government

7  Exhibit 601-I into evidence.

8        MR. LICHTMAN:  No objection.

9        THE COURT:  Received.

10       (Government Exhibit 601-I received in evidence.)

11       (Exhibit published.)

12  BY MR. ROBOTTI:

13  Q    And are the calls on this disk labeled on the exhibit

14  numbers on the right there?

15  A    They are.

16  Q    I'd like to show you 601-J, K, L for identification and M

17  which is already in evidence.

18       MR. ROBOTTI:  Some of these are only for

19  identification.

20       THE COURT:  Only M is in, right?

21       MR. ROBOTTI:  Yup.

22  BY MR. ROBOTTI:

23  Q    If you can see all of those, do you recognize these?

24  A    I do.

25  Q    And what are they?

MARSTON/DIRECT/ROBOTTI

1    A     These are all select calls from both the intercepts as

2    well as the e-mails provided by Christian.

3              MR. ROBOTTI:  Your Honor, the Government offers

4    601-J, 601-K and 601-L into evidence.

5              MR. LICHTMAN:  No objection.

6              THE COURT:  Received.

7        (Government Exhibits 601-J, 601-K and 601-L received in

8                          evidence.)

9              (Exhibit published.)

10   BY MR. ROBOTTI:

11   Q     And one final disk.  I'm going to show you what's been

12   marked as Government Exhibit 601-N for identification.  Do you

13   recognize this one?

14   A     I do.

15   Q     And what's this?

16   A     It's a disk that contains an original as well as an

17   enhanced call from the intercepts.

18             MR. ROBOTTI:  Your Honor, the Government offers

19   601-N into evidence.

20             MR. LICHTMAN:  No objection.

21             THE COURT:  Received.

22             (Government Exhibit 601-N received in evidence.)

23             (Exhibit published.)

24   BY MR. ROBOTTI:

25   Q     And you mentioned a moment ago that Sinaloa has a

MARSTON/DIRECT/ROBOTTI

1    six-hour difference with Greenwich meantime.  Is that six

2    hours behind or six hours ahead?

3    A    Six hours behind.

4    Q    I'd like to show you Government Exhibit 511-1 for

5    identification.  Do you recognize this?

6    A    I do.

7    Q    What's this?

8    A    This is a spreadsheet of some of the calls, select calls,

9    that are from the e-mails that Christian provided as well as

10   the intercepted calls that the FBI got from the Dutch.

11   Q    Is this a summary chart?

12   A    It is a summary chart.

13   Q    Let's talk briefly about what you reviewed in preparing

14   this chart.  Looking at the first two columns there which list

15   Call Exhibit and Transcript Exhibit.  Are those the exhibit

16   numbers for calls and transcripts you reviewed?

17   A    They are.

18   Q    All right.  And the columns entitled Participant 1,

19   Participant 2 and Participant 3, what are those?

20   A    The three columns of Participant 1, 2 and 3 represent the

21   individuals that were intercepted on the calls.

22   Q    Is that information derived from the transcripts that you

23   reviewed?

24   A    It is.

25   Q    Now, the information, the date and time columns, where

MARSTON/DIRECT/ROBOTTI

1    did you get them from?

2    A     That is also from the transcripts.

3    Q     And is that also pulled from the data spreadsheets that

4    were on the disks we just looked at?

5    A     Yes.

6    Q     And, finally, the original file name or the call ID

7    number, where is that from?

8    A     The file numbers would be associated with the e-mails

9    that Christian provided and the call ID number would be

10   associated with the calls that were intercepted.

11              MR. ROBOTTI:  Your Honor, the Government offers

12   Government Exhibit 511-1 into evidence.

13              MR. LICHTMAN:  Judge, I'm going to object.  Could we

14   approach, please?

15              THE COURT:   Yes.

16              (Sidebar held outside of the hearing of the jury.)

17              (Continued on next page.)

18

19

20

21

22

23

24

25

SIDEBAR

```
 1              (The following sidebar took place outside the
 2    hearing of the jury.)
 3              MR. LICHTMAN:  Judge, the participants that are
 4    listed on that chart list Guzman's name and there hasn't been
 5    any testimony yet that it's Guzmán.  So we're basically
 6    putting the cart before the horse.  I don't mind this coming
 7    in after the testimony comes in as to who is on the calls.
 8    Right now you've got a chart that's going to be shown to the
 9    jury that already presumes that the defendant is on it.
10              THE COURT:  Is Rodriguez going to testify that the
11    defendant is on these calls on the chart?
12              MR. ROBOTTI:  He will.  Special Agent Marston will
13    also make voice identification here based on a known
14    comparison.
15              THE COURT:  I will take it subject to connection.
16              MR. ROBOTTI:  Your Honor, he testified that what he
17    reviewed was the actual transcripts which do have the
18    identification on there.
19              THE COURT:  There's plenty on there.  There's
20    enough.
21              (Sidebar ends.)
22              (Continued on next page.)
23
24
25
```

1    BY MR. ROBOTTI:  (Continuing.)

2            MR. ROBOTTI:  The Government offers 511-1 in

3    evidence.

4            THE COURT:  That is received over objection subject

5    to connection.

6            (Government Exhibit 511-1 received in evidence.)

7    BY MR. ROBOTTI:

8    Q    I would like to direct your attention to the individual

9    listed in the Participant 1 column.  Who is listed in that

10   column for all of these calls?

11   A    The defendant.

12   Q    And which extensions are listed as associated with the

13   defendant in the chart?

14   A    The very top one they are unknown extensions or unknown

15   extension but we have 185, 121 and extension 120.

16   Q    And these are the three digit extensions you talked about

17   earlier for that closed system; is that right?

18   A    That's right.

19   Q    And the extension that's listed as unknown for certain

20   calls, why is that?

21   A    The e-mails or the audio that was e-mailed to us from

22   Christian did not contain that data.

23   Q    Now for the calls on this list, were you able to conduct

24   any type of comparison?

25   A    I was.

MARSTON/DIRECT/ROBOTTI

```
 1    Q     What type of comparison did you conduct?

 2    A     I was able to conduct a voice comparison.

 3    Q     How did you conduct that comparison?

 4    A     I conducted that comparison against a call from the MCC

 5    from the defendant.

 6    Q     Did you use another sample as well?

 7    A     I used the video from the Rolling Stone interview.

 8    Q     And are you an expert in voice comparisons?

 9    A     I am not.

10    Q     Do you have any experience conducting voice comparisons?

11    A     I do.

12    Q     And what type of experience would that be?

13    A     Through our wiretap investigations, as well as consensual

14    recordings.  I've had opportunities to do voice -- to review

15    those and in trying to compare voices.

16    Q     Now, when you conducted that comparison what conclusion

17    did you reach with respect to the participants on these calls?

18              MR. LICHTMAN:  Objection.

19              THE COURT:  Overruled.

20    A     I concluded that the defendant's voice that was part of

21    our intercepts was the same as the voice from the MCC call, as

22    well as the Rolling Stone video.

23    Q     Now, having listened to the defendant's voice on the

24    calls and also on these known samples, how would you describe

25    his voice in general?
```

MARSTON/DIRECT/ROBOTTI

1  A    In general it has a higher pitch.  It has kind of a

2  sing-song-y variation to it and I pick up kind of like a

3  nasally undertone.  Those are the characteristics that I

4  associate with it.

5  Q    Did you identify any other voices listed in Government

6  Exhibit 511-1?

7  A    I did not.

8  Q    Now in the transcripts that you reviewed for all the

9  calls listed in this chart, how is the defendant's voice

10  identified?

11  A    It was marked as JGL.

12  Q    And did you recognize the defendant's voice as the one

13  associated with JGL in those transcripts?

14  A    I did.

15  Q    When did you first become familiar with the defendant's

16  voice on these calls?

17  A    Back at the beginning of the interceptions, back in 2011,

18  April/May time frame.

19  Q    And at that time what was your view that this was the

20  defendant's voice based upon?

21  A    In part, information provided by Christian coupled with a

22  call in which he's referred to as Chapo and then the content

23  of the communication suggests that when they're referring to

24  him, they're referring to him as the man, the boss and showing

25  signs of respect such as sir.

SOPHIE NOLAN, OFFICIAL COURT REPORTER

MARSTON/DIRECT/ROBOTTI

1   Q    At some point after April of 2011 did you compare the

2   defendant's voice to anything else?

3   A    Yes, I did.

4   Q    And what was that?

5   A    In March 2012 there was a release of a video, an online

6   video that I reviewed that compared -- that I compared to the

7   defendant's voice and to me it sounded the same.

8   Q    And we'll talk about a video in a little bit.  All right.

9   So let's start by listening to one of the known samples of the

10  defendant's voice.  I would like to show you what's in

11  evidence as Government Exhibit 608-2.

12           (Exhibit published.)

13  Q    Do you recognize this?

14  A    I do.

15  Q    And what's that?

16  A    This is the MCC call that the defendant made.

17  Q    And this is dated May 7, 2018?

18  A    Yes.

19           MR. ROBOTTI:  All right.  Now if the members of the

20  jury can take out their transcript binders under their seats.

21  We're going to play a clip from this call.  Many of the clips

22  are going to be on the screen in front of you today.  This one

23  is just in the binder.  It's the last call in the binder.

24  608-2A-T.  And we're going to begin on page 12 at paragraph

25  124 and we're going to go to 140 on page 13.

MARSTON/DIRECT/ROBOTTI

1        (Audio played.)

2    BY MR. ROBOTTI:

3    Q    I would like to direct your attention, Special Agent

4    Marston, to paragraph 137.  Could you read paragraph 137?

5    A    Paragraph 137:  "UF:  Yes, because they said it was

6    already flat all the way to Mayo's house, like, ready to pave,

7    be paved.  We haven't been down there."

8        MR. ROBOTTI:  And just for the record, the clip we

9    played was from 7 minutes and 52 seconds to 9 minutes and 10

10   seconds.

11   Q    You mentioned a moment ago that there was a call you

12   reviewed where the defendant was referred to as Chapo; is that

13   right?

14   A    That's correct.

15   Q    I would like to return to that call.  We'll play

16   Government Exhibit 601-F-9-A which is in evidence.  It's a

17   call dated July 7, 2011 at 7:18 p.m.  Let's play the clip from

18   1 minute and 54 seconds 2 minutes and 45 seconds.  This is the

19   transcript, 601-F-9-A-T, but it will also be on the screen

20   here.  It starts on paragraph 21 on page four to paragraph 20

21   on page five.

22        (Audio played.)

23   BY MR. ROBOTTI:

24   Q    So looking at the transcript here with whom is the

25   defendant identified as speaking?

SOPHIE NOLAN, OFFICIAL COURT REPORTER

MARSTON/DIRECT/ROBOTTI

```
 1   A     With Virgo.

 2   Q     And JGL, which voice is that?

 3   A     The defendant's.

 4   Q     So looking -- directing your attention to the middle of

 5   paragraph 23, what does Virgo say beginning with, "He told

 6   him"?

 7   A     "He told him, no.  Well, to be honest with you my

 8   compadre over there, my Compadre Chapo, said not to give you a

 9   hand."

10   Q     And how does the defendant respond in paragraph 24?

11   A     The defendant, or JGL:  "I have never said that to

12   Changel."

13   Q     And then on the following page, paragraph 28, what does

14   the defendant say there?

15   A     JGL:  "That -- he's lying."

16              MR. LICHTMAN:  Objection, Judge.

17              THE COURT:  Sustained.

18              MR. ROBOTTI:  Can we approach?

19              THE COURT:  Yeah.

20              (Sidebar held outside of the hearing of the jury.)

21              (Continued on next page.)

22

23

24

25
```

SIDEBAR

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          THE COURT:  First, what's the objection?

4          MR. LICHTMAN:  It's being read to the jury.  And

5    then it's being read again and then it's in conclusion.  How

6    many times are we going to go through this?

7          THE COURT:  I thought he was interpreting it, which

8    I do not think he can do.  Now I am not so sure.

9          MR. ROBOTTI:  He was not interpreting it.  I'm aware

10   of that limitation here.  As the Court has recognized

11   previously because these calls are in a foreign language and

12   because they're scrolling along the screen, it is difficult

13   for the jurors to follow along so we would ask for a little

14   leeway with reading back the portions that are the relevant so

15   we're sure the jury understands it.

16         MR. LICHTMAN:  They're highlighted.  It's being read

17   and immediately translated into English so it's right there

18   for them to see and the Government goes back and says we

19   really want you to see this and tell us again what's being

20   said.

21         THE COURT:  The calls are in evidence.  I do not see

22   the problem with the Government highlighting those portions of

23   the calls that they want the jury to focus on, particularly

24   because being a translation it's not immediately apparent as

25   being a high volume of material.  It will not be clear to the

SIDEBAR

 1   jury what the Government wants them to focus on so I think

 2   excerpts can be read to the jury as long as there is no

 3   interpretation.

 4           MR. ROBOTTI:  Thank you, Judge.

 5           THE COURT:  Mr. Robotti, I would like to break any

 6   time between now and 1, wherever it is convenient for you.

 7           MR. ROBOTTI:  I would like to finish this call and

 8   one more brief one and then that would be a good time to

 9   break.

10           (Sidebar ends.)

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARSTON/DIRECT/ROBOTTI

1          (Continuing.)

2          THE COURT:  Put the question again, please.

3          MR. ROBOTTI:  Yes, Judge.

4   BY MR. ROBOTTI:

5   Q    Special Agent Marston, directing your attention to

6   paragraph 28, what does the defendant say there?

7   A    That:  "He's lying that Changel told him that because I

8   didn't even -- I never told Changel anything."

9   Q    Okay.  I would like to turn to another clip.  Now, have

10  you identified information associated with the defendant in

11  another call?

12  A    I have.

13  Q    And what identifying information was that?

14  A    The name Joaquin.

15  Q    So I would like to look at call Government Exhibit

16  601-F-7, which is in evidence, a call dated July 6, 2011 at

17  8:45 p.m.

18          MR. ROBOTTI:  For the jurors, this transcript will

19  be 601-F-7-T.  The F exhibits are in the front half and the I

20  exhibits are in the second half.  So this one will be in the

21  front half of your binders there.  It will begin at paragraph

22  one on page two and then we're going to play a little clip

23  there and then go to paragraph 12 on page one.  It will be --

24  the first clip will be 0 seconds to 34 seconds and then 2

25  minutes 13 seconds to 3 minutes and 8 seconds.

MARSTON/DIRECT/ROBOTTI

```
 1              If we could play the clip.
 2              (Audio played.)
 3   BY MR. ROBOTTI:
 4   Q    All right, now let's move to the second part.
 5              (Audio played.)
 6   BY MR. ROBOTTI:
 7   Q    I would like to direct your attention to paragraphs 23 to
 8   25.  Which are up on the screen here.
 9              (Exhibit published.)
10   Q    Did you locate identifying information for the defendant
11   in those paragraphs?
12   A    I did.
13   Q    And starting with, "He says," could you read that
14   sentence?
15   A    "He says, sell one of Joaquin's trucks over there and
16   send me the money.  No, I told him, I cannot sell the cars
17   that he has over here."
18   Q    Okay.
19   A    And then --
20   Q    And then picking up at the bottom of 23 here to 25.
21   A    "UF:  So he wants me to sell a truck that you have over
22   here but I tell him no."
23   Q    Okay.  And, just for the record, which voice did you
24   identify as associated with the defendant in this call?
25   A    The transcript marked as JGL.
```

MARSTON/DIRECT/ROBOTTI

1              MR. ROBOTTI:  Judge, now would be a good time to

2    break.

3              THE COURT:  We will take our lunch break, ladies and

4    gentlemen.  Please remember not to talk about the case amongst

5    yourselves.  We will come back at 1:40.  We will see you then.

6              (Jury exits.)

7              (In open court.)

8              THE COURT:  Recess until 1:40.

9              (Luncheon recess taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    A F T E R N O O N   S E S S I O N

2              (In open court.)

3              THE COURTROOM DEPUTY:  All rise.

4              THE COURT:  Please bring in the jury.

5              (Jury enters.)

6              THE COURT:  All right.  Everyone be seated.  We will

7    continue with direct, Mr. Robotti.

8              MR. ROBOTTI:  Thank you, Judge.

9    DIRECT EXAMINATION

10   BY MR. ROBOTTI:  (Continued.)

11   Q    Good afternoon, Special Agent Marston.

12   A    Good afternoon.

13   Q    Before the break, we played two phone calls.  I would

14   like to ask you about extensions used in those two phone

15   calls.  So looking back for a moment at 511-1, in this top row

16   here, Government's Exhibit 601F-9A, what extension did the

17   defendant use?

18   A    Extension 121.

19   Q    And then Government's Exhibit 601F-7, what extension did

20   the defendant use?

21   A    Extension 120.

22   Q    All right.  So before we turn to any additional phone

23   calls, I would like to show you what's been marked for

24   identification as Government's Exhibit 511-3.

25              Do you recognize this?
```

MARSTON/DIRECT/ROBOTTI

1   A    I do.

2   Q    And what is it?

3   A    It's a visual -- visual representation of the

4   spreadsheet.

5   Q    All right.  This is a summary of the information in the

6   spreadsheet marked Government's Exhibit 511-1?

7   A    It is.

8        MR. ROBOTTI:  Your Honor, the Government's offers

9   511-3 into evidence.

10       MR. LICHTMAN:  No objection.

11       THE COURT:   Received.

12       (Government's Exhibit 511-3 received in evidence.)

13       MR. ROBOTTI:   We'd also like to offer 511-3A, which

14   is just a board size version of this.

15       MR. LICHTMAN:  No objection.

16       THE COURT:  Okay.

17       (Government's Exhibit 511-3A received in evidence.)

18       (The above-referred to exhibit was published.)

19   BY MR. ROBOTTI:

20   Q    In general, what does 511-3 and -3A show?

21   A    In general, it's the defendants encrypted phone system

22   with some select individuals on the bottom.

23   Q    Okay.  And are these the individuals that he was speaking

24   with that are listed in your chart marked Government's Exhibit

25   511-1?

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

1  A     That's correct.

2            THE COURT:  Mr. Robotti, I have to tell you, I mean,

3  the jurors have it on their screen, they have it on the

4  overhead screen, and they have it on the board that you just

5  put up, but the board isn't going to be any easier for them to

6  see from there than it is for them to see the big screen,

7  neither of which are probably as good as looking at it on

8  their screen, so if you are going to use the board, it's got

9  to be closer to them.

10           MR. ROBOTTI:   Sure, Judge.  We are going to keep

11  that up while we're playing the phone calls today, so I think

12  we can maybe move it over by where the marshals are sitting

13  there.

14           THE COURT:  Wherever you like.  My point is it's not

15  doing any good there.

16           MR. ROBOTTI:   Thanks, Judge.

17           (Pause.)

18           MR. ROBOTTI:   So while we're doing that, the next

19  phone call is going to be another excerpt from Government's

20  Exhibit 601F-7.

21           So for the jurors, the transcript is going to be

22  601F-7T.   This is a call with UF No. 1, who is third from the

23  right on the bottom of our exhibit there.

24           For the record, the clip will be from eight minutes

25  and 44 seconds to ten minutes and 41 seconds.  It will begin

MARSTON/DIRECT/ROBOTTI

 1   on paragraph 48 on page 9, and it will go to paragraph 61,

 2   page 11.

 3              (Recording played.)

 4   BY MR. ROBOTTI:

 5   Q    All right.  So I would like to have you first read

 6   paragraph 62, which is just -- that wasn't in the clip.  It's

 7   the next paragraph after the end of the clip.  Could you read

 8   that here?

 9   A    Yes.

10              Paragraph 62.  JGL:  Then let me know so I can have

11   the account number and how we are going to do it because if I

12   pay the -- if I pay the masons and they -- and then they raid

13   the warehouse, are they going to say where they got the money

14   from?

15   Q    All right.  And going back to paragraph 51, let me direct

16   your attention to -- it's actually on page 10, beginning "in

17   the end," could you read the rest of that paragraph?

18   A    In the end, nothing was put inside, but you can see

19   the -- the tunnel, you know, just like that, and when the

20   little soldiers, I mean, saw it, well, they simply -- didn't

21   see anything, and then they left.  They were looking for other

22   things, weapons, and other things.

23   Q    And could you read 52 to 54?

24   A    JGL:  Oh, all right, but if you go inside the -- the

25   warehouse, can you see the hole?

MARSTON/DIRECT/ROBOTTI

1          UF:  If you go inside El Carrizo, you can see the

2   hole, uh, yes.

3          JGL:  They should have covered it, man.

4   Q    So then looking back at our board up there, our next set

5   of calls is going to be between the defendant and Cholo Ivan,

6   who is the photograph in the far left corner, and he is using

7   a Mexican phone number on those calls -- Cholo Ivan.

8          The transcript for the jurors is going to be

9   601I-2AT.  It's about, I think, two transcripts behind the one

10  we just looked at; and the clip is going to be marked

11  Government's Exhibit 601G-1A dated April 9th, 2011, at

12  2:11 a.m.  It will be from 19 seconds to one minute and 23

13  seconds, and it will begin on paragraph 11 on page 2.

14         (Recording played.)

15  BY MR. ROBOTTI:

16  Q    All right.  So I would like to just have you read another

17  section that's not in the call, paragraph 23 on page 4, and

18  that's going to be the sentence starting "there's no."

19  A    JGL:  There's no security like that.  There's no security

20  like that because we do -- because who do you notify you are

21  going to be or where you're going?  There's none like that.

22  There's none that way, so tell -- tell Alfonso to introduce

23  you and that -- that there will be a nice gift if he

24  introduces you.

25  Q    Then going back to page 2, paragraph 11, to whom does the

MARSTON/DIRECT/ROBOTTI

```
 1   defendant refer during this phone call?

 2   A     Cholo.

 3   Q     And on page 3, paragraph 12, could you read what Cholo

 4   says?

 5   A     Well, you know, here on the road just going all over the

 6   place, but we're here fucking battling it out.

 7   Q     All right.  So the next clip will be from the same call,

 8   and this will be from three minutes and 37 seconds to five

 9   minutes and --

10         MR. ROBOTTI:  Hold on one second.

11   BY MR. ROBOTTI:

12   Q     -- three minutes and 37 seconds to five minutes and

13   39 seconds, it will begin at paragraph 31, and we'll go to

14   paragraph 51 on page 8.

15         (Recording played.)

16   BY MR. ROBOTTI:

17   Q     All right.  So I would like to have you take a look at

18   paragraphs 35 to 38 on page 6, and could you read those

19   paragraphs for us?

20   A     Thirty-five.  JGL:  On that topic, about abductions,

21   well, over there when -- whenever they stop somebody who has

22   nothing to do with anything, well, he needs to leave right

23   away.  And if they are policemen, the same, because the chief

24   of police around there were saying, I don't know how, but that

25   some had arrived all scratched up, uh, that -- that someone
```

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

```
 1   named Cholo scratched them up.  Is it true or could it be
 2   another?
 3               Cholo:  Which ones?  Which ones?
 4               Line 38.  JGL:  It was the police.
 5   Q    Turning to paragraphs 43 to 45 on the following page.
 6   A    Forty-three.  Cholo:  The local cops, the local cops, the
 7   other day I was able to put them in their place because I
 8   spoke with the director, with the director, and they said that
 9   things were going to work out all right, and a while later, I
10   called for them to stop cars over there so we don't lose
11   ground, and the guys -- don't lose ground and the guys, and he
12   didn't answer the phone.  And I sent him, stay at the house,
13   close it up, and paid them over the top.  The motherfuckers
14   running so that they understand.
15               JGL:  Did you beat them up?
16               Cholo:  Yeah.  I gave them a good kick in the ass.
17   Q    And paragraph 49.
18   A    Cholo:  No, and then AFI, they also came, came down on
19   the house where I was hiding.  They raided me last night and,
20   well, I don't know who they are and these people and they
21   fucked them up as well.
22   Q    And are you familiar with what AFI is?
23   A    I am.
24   Q    What is that?
25   A    It's part of Mexican law enforcement.
```

MARSTON/DIRECT/ROBOTTI

1    Q    All right.  So the next call with Cholo Ivan will be the

2    transcript 601I-2BT.  It's the following transcript in your

3    binders.

4                THE COURT:  Two Baker Thomas?

5                MR. ROBOTTI:  Yes, 2BT.

6    BY MR. ROBOTTI:

7    Q    This will be Government's Exhibit 601G-1B dated April 9,

8    2011, at 2:18 a.m.  The clip will be from zero seconds to two

9    minutes and 30 seconds, and the transcript will begin at

10   paragraph 1 on page 2 and go to paragraph 41 on page 7.

11               MR. ROBOTTI:  We can go ahead.

12               (Recording played.)

13               MR. ROBOTTI:  I think there's another 15 seconds

14   there.

15               (Recording played.)

16   BY MR. ROBOTTI:

17   Q    So I would like to direct your attention, Special Agent

18   Marston, to paragraph 10 and 11 on page 3.  And could you read

19   those?

20   A    JGL:  When you talk -- talk to them, you know that they

21   are policemen.  It's better not to smack those around.

22               Cholo:  No, no, uh, well, why don't they ask for

23   permission to come in here since they already know where --

24   how to talk to us.  He -- he has my -- he -- he has my

25   brother's number and all that shit, the bastard.  Why doesn't

MARSTON/DIRECT/ROBOTTI

1   he check in?

2   Q    All right.  And paragraphs 14 and 15?

3   A    JGL:  Yeah, better not, better not, so we don't end up

4   badly with them.  Tell them that -- that you're there at their

5   disposal.

6            Cholo:  No, well, they were fucking watching me.

7   They sicked the state, the federals, the municipals, even

8   traffic, they sicked them on me, the sons of bitches, so right

9   now I ran in them.

10  Q    Paragraphs 18 and 19.

11  A    JGL:  And, uh, anybody -- once you have them tied up and

12  such, we'll check it out to make sure we don't execute

13  innocent people.

14           Cholo:  Yes, senor, but, uh, well, there are people

15  here who are quick to act here, too, that, well, they don't

16  give a fuck, though, and it's going to be fucking hard.

17           MR. ROBOTTI:  All right.  Let's continue with the

18  rest of that call.

19           (Recording played.)

20  BY MR. ROBOTTI:

21  Q    All right.  So I would like to direct your attention back

22  to paragraphs 36 and 37.  Could you read those two paragraphs?

23  A    JGL:  All right, then, Cholo.  Count -- count on that and

24  we'll be in touch.  Uh, just take it easy with the people so

25  that, uh, listen -- so then did you beat up those policeman?

MARSTON/DIRECT/ROBOTTI

1              Cholo:  I kicked their asses, the federals, all of

2    them, local and...

3    Q    All right.  And then finally after this call, I would

4    like to have you read paragraphs 40 and 41 at the stop of this

5    page.

6    A    JGL:  Don't be so harsh, fucking, Cholo.  Take it easy

7    with the police.

8              Cholo:  Well, you taught us to be a wolf, acting

9    like a wolf, I'm remembering, and that is how I like to do it.

10   Q    All right.  So I would like to turn next to the third

11   call with Cholo Ivan.

12             MR. ROBOTTI:  This is going to be the very next

13   transcript in your binders, ladies and gentlemen, 601I-2CT.

14   It's going to be Government's Exhibit 601G-1C dated April 9th,

15   2011, at 6:21 p.m.  The clip will be from zero seconds to one

16   minute and 46 seconds.  Transcript will begin at paragraph 1

17   on page 2 and go to paragraph 30 on page 4.

18             We can go ahead with that.

19             (Recording played.)

20   BY MR. ROBOTTI:

21   Q    All right.  I would like to direct your attention to

22   paragraph 14, and could you read that?

23   A    JGL:  Don't be chasing cops.  They are the ones who help.

24   Leave them alone, uh...

25   Q    And then paragraphs 17 and 18.

MARSTON/DIRECT/ROBOTTI

 1  A    Cholo:  The thing -- the thing is that we tell them and

 2  they don't pay us any mind, and so then, well, what do we do?

 3          JGL:  No, no, no, no, no, no, no, uh-huh, uh, just

 4  remind -- just reprimand them.  Don't beat them -- don't beat

 5  them anymore.  Well, the other day, you told me that, last

 6  night, that -- that already, uh, you worked out running.

 7  Q    And then paragraph 30 on the following page.

 8  A    JGL:  Talk to them calmly, because otherwise, they can

 9  call the soldiers.

10  Q    All right.  So let's turn to a second clip from that

11  call, same transcript.  It's going to be three minutes and

12  19 seconds to 3 minutes and 33 seconds.  It will begin at

13  paragraph 54 on page 6, and it will go to paragraph 56 on that

14  same page.

15          MR. ROBOTTI:  You can go ahead and play that.

16          (Recording played.)

17  BY MR. ROBOTTI:

18  Q    All right.  And directing your attention to paragraphs 55

19  and 56, could you, please, read those?

20  A    Cholo:  No -- no, well, whenever you want to.  I can

21  leave now if you -- if you need to rough him up.

22          JGL:  No.  Let's do things right.  The magazines,

23  when do you get them?

24  Q    All right.  So the fourth clip with Cholo -- the fourth

25  call -- excuse me -- the fourth call with Cholo Ivan will be

MARSTON/DIRECT/ROBOTTI

1   the next transcript, 601I-2DT, and it's going to be 601G-1D

2   dated April 9th, 2011, at 6:29 p.m.  The clip will be from

3   17 seconds to one minute and seven seconds, and it's going to

4   begin on paragraph 4 of page 2 and go to paragraph 15 on

5   page 3.

6          MR. ROBOTTI:  You can go ahead and play this.

7          (Recording played.)

8   BY MR. ROBOTTI:

9   Q    All right.  So I would like to direct your attention to

10  paragraph 6 on page 2, and could you read that paragraph?

11  A    JGL:  When will you get the magazines that you told me

12  about yesterday?  When will those magazines arrive?  Because

13  they are going to be needed to go over there.

14  Q    And then on the following page, paragraphs 12 through 14.

15  A    JGL:  Once the magazines get there, let me know so I --

16  so I can send you that money, and so you gas up and, uh, and

17  those cops, don't beat them up anymore.

18          Cholo.  No, well, they should behave, the assholes

19  because, well...

20          JGL:  Listen, you already beat them up once, they

21  should listen now.  Talk to the director.

22  Q    All right.  So this is going to be another clip from this

23  phone call, it's going to begin on paragraph 23 on page 3 and

24  go to paragraph 39 on page 5.

25          MR. ROBOTTI:  For the record, it's one minute and 37

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

```
 1    seconds to two minutes and 46 seconds.
 2              (Recording played.)
 3    BY MR. ROBOTTI:
 4    Q    So directing your attention to paragraph 28.  Could you
 5    read that paragraph?
 6    A    JGL:  That's good, but wait for them to bring the
 7    magazines, because what are you going to do without magazines?
 8    Q    And on the following page, paragraphs 34 and 35 at the
 9    top.
10    A    JGL:  But listen to this, whoever -- whoever is stealing,
11    you tell them, and that's it, we tell the police so they'll
12    put the -- they'll put him in jail.
13              Cholo:  No, well, no reason to go around being a
14    troublemaker, boss.  You have taught me that.
15    Q    How does Cholo Ivan refer to the defendant in that
16    paragraph?
17    A    As boss.
18    Q    And then could you read paragraphs 38 and 39?
19    A    JGL:  You just have to tell me, because, what if -- if
20    they set up or pick up a friend and kill him?  There are a lot
21    of friends there.
22              Cholo:  No.  Well, that's true.  One picks without
23    knowing, something that is other than what it is.
24    Q    So the next clip will begin at paragraph 54 on page 7,
25    and it will go to paragraph 81 on page 9, and the clip will be
```

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

 1   from four minutes and 18 seconds to six minutes and

 2   40 seconds.

 3              (Recording played.)

 4   BY MR. ROBOTTI:

 5   Q    All right.  So let me direct your attention to

 6   paragraphs 54 and 55 in the transcript.  Could you read those

 7   two paragraphs?

 8   A    JGL:  Okay, okay, then.  I'm going to send you money for

 9   gasoline and the -- and for you to pay for the magazines.  How

10   many magazines are there?

11              Cholo:  There are 60 magazines.  I ordered 30 and

12   30, at least 1,000 pesos.

13   Q    And moving down to paragraph 58.

14   A    JGL:  Listen, and the -- and I -- I'm glad you brought up

15   the topic.  Don't shoot whoever sells cocaine.

16   Q    Turning to the next page, at the top, paragraph 62

17   through 64.

18   A    JGL:  The crystal, don't sell it, and, uh...

19              Cholo:  I'm already -- I'm already fucking rushing

20   him, the movement.

21              JGL:  And the cocaine?

22   Q    And then can we go to paragraphs 70 to 74?

23   A    JGL:  Ask if he has cocaine.

24              Cholo:  I work it out with them.

25              JGL:  Make sure you have no kilos left over, right?

MARSTON/DIRECT/ROBOTTI

1  Q    All right.  So the final call with Cholo Ivan will be the

2  transcript marked 601I-2ET.

3       MR. ROBOTTI:  It should be the next transcript in

4  your binder, ladies and gentlemen.  This will be Government's

5  Exhibit 601G-1E dated April 10th, 2011, at 10:24 p.m.  This is

6  be the full call starting at paragraph 1.  Ladies and

7  gentlemen, this transcript will just be in your binders.  This

8  will not be on the screen.

9       Go ahead.

10       (Recording played.)

11  BY MR. ROBOTTI:

12  Q    All right.  We are going to pause for the record at

13  two minutes and 24 seconds.  Special Agent Marston, I'm going

14  to ask you to read back paragraph 19 on page 3.

15  A    Cholo:  No, no, well, sons of bitches, it's just that --

16  well, well, I got all the way over, over there to Guasavito

17  last night.  I gave those damn bastards a good spray because

18  those fuckers showed up and killed one of my police by the

19  entrance there last night.  Can you hear me?  Hello?

20  Q    Turning to the following page, could you read

21  paragraphs 29 to 32?

22  A    Cholo:  No, again, I'm telling you, they can't fucking

23  make me run anywhere.  Shit run.  I'd die -- I'd die on the

24  line first before I run.

25       JGL:  Oh, oh, oh.  No, then, so then, like that,

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

```
 1   things are like, like, like, that then.
 2            Cholo:  We chased them all the way to Guasavito.  We
 3   went there last night.  From Burrion they ran further up.
 4            JGL:  Well, son of a bitch, and what were they doing
 5   there?
 6   Q    All right.  We can turn to the rest of the call.
 7            (Recording played.)
 8            (Continued on the following page.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MARSTON/DIRECT/ROBOTTI

```
 1    (Continuing.)

 2    BY MR. ROBOTTI:

 3    Q    All right.  Special Agent Marston, directing your

 4    attention to paragraph 36.  Could you please read that

 5    paragraph?

 6    A    36, JGL:  Listen.  Get together with the locals and go in

 7    there and make yourself known.  It's just that the troops --

 8    the troops.  You need to talk with -- with -- with -- with the

 9    major, so he can hook you up because if you don't get hooked

10    up, how are you going to go do it?

11    Q    All right.  And turning to paragraph 43 on the following

12    page?

13    A    Forty-three, Cholo:  Yes, Señor.  Yes, Señor.  And we're

14    going to be here.  Son of a bitch.  See if -- see if I'm not

15    going to be beat the shit out of him.  If he doesn't

16    support me, then he'll find out the hard way.

17    Q    And how does Cholo Ivan refer to the defendant in the

18    paragraph?

19    A    Señor.

20    Q    All right.  And directing your attention to paragraphs 49

21    to 55, could you please read those?

22    A    Forty-nine.  Cholo:  Yes, Señor.  Otherwise, well, I'll

23    take care of it with some 40 bastards here.  Anyway, we'll be

24    fine here.  You don't worry.

25              JGL:  Okay then.  Fine.
```

MARSTON/DIRECT/ROBOTTI

```
1              Cholo:  Get fucked.  Then we will fuck them up.
2              JGL:  Hey.  We'll be talking.  Be well.
3              Cholo:  Yes, Señor.  Nice talking to you.
4              MR. ROBOTTI:  All right.  So for our next set of
5    calls, just directing everyone's attention back to Government
6    Exhibit 511-3A for a moment.  We're going to play calls
7    between the defendant and Gato, who is fourth from the left,
8    and he's using extension 170.
9              So the first call with Gato is going to be 601F-2AT.
10   So if you would turn to the front of your transcript binders,
11   and it's going to be the very first transcript.
12             And this will be Government Exhibit 601F-2A, dated
13   July 9th, 2011, at 6:39 p. m.  The clip will be from one
14   minute to five minutes and 25 seconds, and it's going to begin
15   at paragraph one on page two and go to paragraph 35 on page
16   six.
17             (Audio played in open court.)
18   BY MR. ROBOTTI:
19   Q    All right.  So pausing at three minutes and nine seconds,
20   Special Agent Marston, let me direct your attention back to
21   paragraph 14.  Could you read that portion of that paragraph,
22   beginning, "Hey I'm here with" --
23   A    Gato:  Hey, I'm here with El, El Yanqui, the one, the new
24   one who just arrived.  I have always been paying him here.
25   Well, so they could be at our service and keep us up to date
```

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1   with -- with what happens.  What do you think?

2   Q    All right.  And going to paragraph 18, could you just

3   read the first sentence of that?

4   A    Gato:  Initially, in the beginning, it was Licensiado who

5   are introduced me.

6   Q    And then going to paragraphs 25 and then 26 on the

7   following page, could you read those?

8   A    JGL:  But, uh, but he receiving the monthly payment, but

9   is he receiving the monthly payment?

10          Gato:  Yes.  He's receiving the monthly payment.

11          MR. ROBOTTI:  All right.  And we can play the next

12  portion of this call.

13          (Audio played in open court.)

14  BY MR. ROBOTTI:

15  Q    All right.  So for the record, stopping at four minutes

16  and 29 seconds.

17          Special Agent Marston, directing your attention to

18  paragraphs 27 through 29, could you read those paragraphs for

19  us?

20  A    JGL:  Yes.  So you want me to ask him please -- you want

21  me to ask him to please leave, leave that young man?  Uh.

22  Give me his name.

23          Gato:  He's here with me.  Do you want me to put --

24  do you want me to put him on?

25          JGL:  Oh.  That is better, better, better.

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1   Q    All right.  And just paragraph 28, that is to put El

2   Yanqui on?

3   A    Correct, to put El Yanqui on.

4        MR. ROBOTTI:  All right.  And let's play the rest of

5   that call.

6        (Audio played in open court.)

7   BY MR. ROBOTTI:

8   Q    All right.  Can we read paragraph 31?

9   A    JGL:  No, I tell them that those young men, since they

10  have always worked here at the company, I mean, in favor of

11  the company, that is not convenient to me to, to, to, to -- to

12  remove them.

13  Q    And where does the defendant say these young men have

14  always worked?

15  A    The company.

16       MR. ROBOTTI:  All right.  I would like to play a

17  second call with Gato.  This will be the next transcripts in

18  your binder, ladies and gentlemen, 601F-2BT.  We can begin at

19  paragraph 15 on page three, and go to paragraph 19 on page

20  four.  The audio exhibit is 601-F2B, dated July 9, 2011, at

21  6:44 p. m., and the clip is going to be one minute and 41

22  seconds to one minute and 58 seconds.

23       (Audio played in open court.)

24       MR. ROBOTTI:  All right.  Let's go right in the next

25  clip, which will be two minutes and 27 seconds to the end of

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

 1   the call.

 2              (Audio played in open court.)

 3              MR. ROBOTTI:  Sorry.  I apologize.  Sorry.  The

 4   paragraph will be paragraph 22 on page four and go to the end.

 5   Thanks.

 6              (Audio played in open court.)

 7   BY MR. ROBOTTI:

 8   Q    All right.  So let's look at paragraph 29.  And if you

 9   could read -- here, what does the defendant say to Yanqui?

10   A    Sorry.  Which part again?

11   Q    Paragraph 29?

12   A    The whole paragraph?

13   Q    Please.

14   A    JGL:  Good, good, my friend.  Good afternoon.  Nice to

15   talk through these means and this man that is there.  This man

16   that is there is from the company.  I ask that you take care

17   of him.  I ask that you look after him and uh, well, whatever

18   we can do for you, you can count on it, my friend.  And also,

19   uh, if there is anyone who is up to no good and so forth, if

20   we can help, you can count on our support.

21   Q    And in that paragraph, where does the defendant say the

22   man is from?

23              MR. LICHTMAN:  Objection.

24              THE COURT:  Sustained.

25   BY MR. ROBOTTI:

MARSTON/DIRECT/ROBOTTI

1   Q    All right.  So looking next to paragraph 31, could you

2   read that?

3   A    JGL:  Yes, thank you.  Uh, listen.  Another favor, a

4   special favor I would like to ask.  Look, there is -- here at

5   the company, there is -- are some young men of ours that have

6   done a really good job over there.  So, uh, I'm going to ask

7   you for a favor that the guy that is there, with -- knows who

8   they are, that you they don't change the ones that are there.

9   They know all the company activities.  So I would like that,

10  that they continue there, so that the rest don't find out.

11  Q    And then paragraph 38, what does the defendant say to

12  Gato?

13  A    Thirty-eight, JGL:  Yeah.  Get together with him about

14  the guys.  Those from the team, do not move them.  I already

15  told him.

16  Q    And in the following paragraph, 39, how does Gato refer

17  to the defendant?

18            MR. LICHTMAN:  Objection.

19            THE COURT:  Sustained.

20  BY MR. ROBOTTI:

21  Q    And could we read paragraph 40?

22  A    JGL:  If the boss that you are telling me about shows up,

23  it is better and so that we don't have to talk that much, it

24  is better if you explain to him personally on my behalf that,

25  that, I want to know who those guys are, where they are from,

LISA SCHMID, CCR, RMR

1    and more specific details.

2           MR. ROBOTTI:  All right.  So the next set of calls

3    we will turn to will be between the defendant and M-10.  M-10

4    is in the middle Government Exhibit 511-3A, with his

5    photograph there.  He's using two different Mexican phone

6    numbers.

7           So the first transcript will be Government Exhibit

8    701-I-7CT, and so that's going to be, ladies and gentlemen,

9    towards the back of your binder.

10          THE COURT:  Those are not in my white binder.

11          MR. ROBOTTI:  So it's 601-I-7CT.

12          THE COURT:  That is in my binder.

13          MR. ROBOTTI:  Sorry.  I may have misspoken, Your

14   Honor.

15          And the audio is going to be 601-G-2A, dated

16   April 14th, 2011, at 7:32 p.m.  The clip will be from three

17   minutes and 36 seconds to five minutes and 22 seconds.

18          And we can -- at paragraph 35 on page five will be

19   where we start and go to paragraph 43 on page seven.

20          We can go ahead and play that.

21          (Audio played in open court.)

22   BY MR. ROBOTTI:

23   Q    All right.  Looking at paragraph 37, could you read the

24   portion of that paragraph, beginning "especially"?

25   A    M-10:  Especially, they have always, always been around

MARSTON/DIRECT/ROBOTTI

```
 1  us, ever since -- ever since the incident that happened in

 2  December, with, with one of our offices.  In fact, that group

 3  was a special group from -- from Mexico.

 4  Q    All right.  And then paragraphs 41 to 43?

 5  A    M-10:  You know, what it does, uh?  Well, it's that these

 6  guys are managing it.  I was telling Alejo, listen, my --

 7  these past days, they have taken about 20 of my guys.  Uh,

 8  some that -- some that were indeed, indeed, indeed captured

 9  while they were operating.  They captured them.  They're on,

10  on some trail or at some checkpoint.

11              JGL:  Yeah.

12              M-10:  But there were others that had nothing to do

13  with it, and uh, they were really loaded with, with drugs and

14  with weapons.  And they all -- all are -- are all, and they

15  are all, I have 20, 20 guys that have been detained.

16  Q    All right.  So turning next to paragraph 35.  Excuse me.

17  So the second clip will be from six minutes and 21 seconds to

18  nine minutes and 28 seconds and that will be paragraph 47 on

19  page eight, and go to paragraph 61, on page 11.

20              (Audio played in open court.)

21  BY MR. ROBOTTI:

22  Q    All right.  And stopping for the record, for a moment at

23  one minute and 33 seconds.

24              Directing your attention to paragraph 51.  Could you

25  read that paragraph?
```

MARSTON/DIRECT/ROBOTTI

 1  A     M-10:  He called him, and he told him, listen, I'm

 2  calling on behalf of Chapo, and on behalf of Mayo, uh, so that

 3  you aren't confused and don't get tangled up.  He said TM that

 4  are there are no longer their people, he said.  They went to

 5  Los Zetas, he said.  And the bosses have ordered to go heavy

 6  against them, he said.

 7            So then these guys, Felipe and 24, were controlling

 8  the soldier assigned to the prosecutor's office, investigators

 9  office, and they're communicating with the commanding officer

10  of the Azules in Culiacán and all that.  So it's clear that

11  your friend is supporting him.

12            MR. ROBOTTI:  All right.  And we can play the rest

13  of that clip.

14            (Audio played in open court.)

15            MR. ROBOTTI:

16  Q    All right.  And looking at paragraph 54 on page ten,

17  could you read the first half of that paragraph, up until

18  "Mario"?

19  A    JGL:  Let's say that -- that they have, uh, communicated.

20  I'm not saying that he's not because my friend there.  Well,

21  I'm not saying he's not because my friend there.  Well, he has

22  gone and met every commanding officer that arrives there.

23            As for me, I don't go to see them, I send someone to

24  see them because I'm always up here and uh, but, we have to

25  take a very close look at that man.  We have to take a very

MARSTON/DIRECT/ROBOTTI

1    close look at that, Mario.

2    Q    And the Spanish work for "my friend", which is circled

3    here, what's that?

4              MR. LICHTMAN:  Objection.

5              THE COURT:  You could read the word.

6              THE WITNESS:  Mi compadre.

7              MR. ROBOTTI:  Let's turn to the next clip, which

8    will be Government Exhibit 601-I-7DT, the very next transcript

9    in your binders, ladies and gentlemen.

10             It's going to be an audio clip marked 601-G-2B,

11   dated April 4th, 2011, at 7:46 p. m.  The clip to be from zero

12   seconds to one minute and 41 seconds, and we're going to begin

13   at paragraph one on page two and go to paragraph eight on page

14   three.

15             (Audio played in open court.)

16   BY MR. ROBOTTI:

17   Q    All right.  And Special Agent Marston, could you read

18   paragraphs two and three?

19   A    JGL:  Hello.  And have you tried to call or send word to

20   that governor?  How long is he going to keep the people there?

21             M-10:  Yes.  We are in touch.  You could say that we

22   have daily contact with him.

23   Q    And could you read half of paragraph six, up until "you

24   all"?

25   A    JGL:  If there is communication with him, well, it's

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1   really easy.  Then, then, then, listen, remove those people,

2   and then, then they can stay.  But uh, I don't know how it is

3   with that governor and you all.

4           MR. ROBOTTI:  All right.  The second clip will be

5   the same call from four minutes and 55 seconds to five minutes

6   and 50 seconds.  We're going to begin at paragraph 24 on page

7   six and we will go into paragraph 25 on the following page.

8           (Audio played in open court.)

9   BY MR. ROBOTTI:

10  Q    All right.  So looking at paragraph 25 on page seven,

11  could you read this sentence, just in the middle of paragraph,

12  highlighted here, beginning with, "I'm saying"?

13  A    M-10:  I'm saying as we have made the effort and have

14  supported the -- the cartel, in what we have been able to,

15  right?

16          MR. ROBOTTI:  All right.  So the next set of calls

17  we're going to talk about are with the defendant and an

18  unidentified male, listed second from the right in Government

19  Exhibit 511-3A, and using extension 161.

20          So this is going to be Government Exhibit 601-I-9BT.

21  So this should be the very next transcript in your binder,

22  ladies and gentlemen.  We're going to begin at paragraph 25 on

23  page four and go to the end.

24          For the record, the audio clip is 601-G3, which is

25  dated June 30th, 2011, and the clip will be from two minutes

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

```
 1   and 35 seconds to four minutes and 18 seconds.
 2              (Audio played in open court.)
 3   BY MR. ROBOTTI:
 4   Q    All right.  So let's look at paragraphs 31 to 33.  Could
 5   you please read those?
 6   A    UM1:  All right, then.  Listen.  Now we, we owe you for
 7   the stuff we brought over, like a ton, 700.  What, whatever
 8   was brought over, arrived and delivered over there.
 9              And now, uh, like around 120 is on the way, and due
10   to arrive now, arrive now or tomorrow, but the 700 one has
11   already been delivered and received over there.
12              JGL:  So 120 is on the way?
13              UM1:  Yes.  On the way with some guys.  They put
14   some guys with three small suitcases and another three and
15   they said tomorrow, they'll arrive, but anyway, we'll jot it
16   down.
17              MR. ROBOTTI:  All right.  And let's turn to calls
18   between the defendant and UF.
19              Judge, this would be a good place to take the
20   afternoon break or I can go for a few more minutes.
21              THE COURT:  Let's do that.
22              Please don't talk about the case, ladies and
23   gentlemen.  We'll see you at 3:25.
24              (Jury exits.)
25              THE COURT:  About how long, Mr. Robotti?
```

MARSTON/DIRECT/ROBOTTI

1          MR. ROBOTTI:  So there's only a few more calls left

2    in this part, and there are some other aspects of this

3    witness's testimony that will take us into tomorrow.

4          THE COURT:  Okay.  3:25.

5          (Recess.)

6          THE CLERK:  All rise.

7          THE COURT:  Please bring in the jury.  We'll wait

8    for the defendant, and then we'll bring in the jury.

9          MR. LICHTMAN:  Judge, I think we're missing, in case

10   anyone noticed --

11         THE COURT:  I noticed.  Melonie noticed.

12         (Defendant enters the courtroom.)

13         (Jury enters.)

14         THE COURT:  All right.  Be seated.

15         We'll continue.

16         MR. ROBOTTI:  Thank you, Judge.

17         Special Agent Marston, when we left off, we were

18   about to play some calls between the defendant and UF1, and if

19   you'd look at Government Exhibit 511-3A, she's listed fourth

20   from the right and is using a Mexican telephone number.

21         So for the jurors, this is going to be Government

22   Exhibit 601F-6AT, and the audio clip is going to be 601F-6A,

23   dated May 10th, 2011, at 11:43 p.m.  The clip will be from two

24   minutes and 58 seconds to the end, and we're going to begin on

25   paragraph 38 on page five, and go to the end.

MARSTON/DIRECT/ROBOTTI

```
 1              (Audio played in open court.)
 2    BY MR. ROBOTTI:
 3    Q    All right.  So pausing for a moment at two minutes and 44
 4    seconds, Special Agent Marston, looking at paragraphs 46 to
 5    49, could you please read those?
 6    A    JGL:  What can I tell -- what can you tell me?  Do you
 7    have -- do you have customers, uh, in Los Angeles or not
 8    anymore?
 9              UF:  We have a lot.  Right now, we have customers in
10    Ohio, and that's what I wanted to tell you.  Right now, my
11    cousin brings this little label of -- of -- he brings some
12    companies and brings four trailers and he is sending people
13    with 50, with 70 at the most and in four, five days at the
14    latest, they get rid of that for us, up there.
15              JGL:  Ohio?
16    Q    And 49?
17    A    Forty-nine, UF:  Well, over there in Ohio, yes, and we
18    have three other places here, but my cousin goes to the 52
19    states, you know.  We just, we just need a huge favor and that
20    is to help us -- us -- with some -- with material there, to
21    let us borrow from Los Angeles, so that we can start working
22    or we can work for you.  Whatever way you want it.
23    Q    Okay.  And next, could you read 50 to 54?
24    A    JGL:  It's just that, what, what is it that you're
25    getting out, uh, cocaine or ice?
```

MARSTON/DIRECT/ROBOTTI

1          UF:  CO, and then, no with cocaine, because I had a

2    problem with ice there in, in Tucson.  And it's very

3    troublesome, but we have more customers for cocaine.  We have

4    them for as ice, but it is much, much harder to -- it's more

5    of a struggle, you know.

6          JGL, line 53:  Where do you have them for ice?

7          UF:  For ice, we also have them over there, up

8    there, and up there, we have, uh, I placed some, very few over

9    there by like Minneapolis.  But there was a slight problem

10   there, but don't think there is a big demand for ice.  What we

11   mostly, our main thing is cocaine, you know.

12   Q    And then and finally in this clip, could you read 55 to

13   57?

14   A    JGL:  Okay.  Okay.  But right now, right now, I don't

15   have cocaine over there.  Uh, just yesterday, yesterday, what

16   I took over there was the other stuff, so once cocaine comes

17   in, then --

18          UF:  Uh-hum (affirmative response).

19          JGL:  We'll make arrangements.

20          MR. ROBOTTI:  All right.  So could we play the rest

21   of the call?

22          (Audio played in open court.)

23   BY MR. ROBOTTI:

24   Q    All right.  So, looking back at the transcript, could you

25   read 65 to 68?

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

```
1   A    JGL:  Do we have customers for ice?

2              UF:  For pounds.  Not that either.  But if you tell

3   me, you know what, there's -- there's some there.  Help me.

4   I -- you can be sure that I will be working on that and start

5   looking for people the next day.

6              JGL:  Yes.  Get them for ice, because that's what I

7   have over there right now.

8              UF:  Uh, how many would we start with, so that I can

9   offer them?

10  Q    And then last portion, 69 to 71?

11  A    JGL:  Uh, you tell me this much is needed over there, and

12  I would give them to you over there.

13             UF:  Oh, that's great.  Oh, well, that's great.  I

14  will talk to -- to the people right now I work with and tell

15  them that, you know, that what we have there is that, and --

16  and keeping in mind that when the other stuff arrives, you

17  will hit us hard with it.

18             JGL:  I will be sending -- I will be sending someone

19  to talk to you.

20  Q    Special Agent Marston, based on your training and

21  experience as a Special Agent in narcotics, what does the term

22  "ice" mean?

23  A    It's a slang term for Methamphetamines.

24             MR. ROBOTTI:  All right.  I would like to play next

25  the transcript 601F-6BT.  This should be the next transcript
```

MARSTON/DIRECT/ROBOTTI

1    in your binder.

2    BY MR. ROBOTTI:

3    Q    And Special Agent Marston, this is about nine minutes

4    after the previous call, right?

5    A    That is correct.

6              (Audio played in open court.)

7              (Continued on the next page.)

MARSTON/DIRECT/ROBOTTI

1    BY MR. ROBOTTI:  (Continuing.)

2    Q    The audio clip is 601-F-6-B which is dated May 10, 2011

3    at 11:52 p.m.  And we're going to begin at paragraph one and

4    play the full call.

5              (Audio played.)

6    Q    I would like to direct your attention to paragraph 2.

7    could you read that?

8    A    "JGL:  I'll be sending you -- someone is going to talk to

9    you so that -- talk to El Ranchero to tell him to find

10   customers for ice over there in the United States."

11   Q    And paragraph ten?

12   A    "JGL:  You first check on your customers so that -- so

13   that I can give you a few right now, you know, to try it out,

14   to see -- to see what you think or what they think."

15   Q    So I would like to turn back to the voice exemplars we

16   talked about, the jail call and the video.  And I would like

17   to play a brief portion of the jail call we listened to

18   earlier, 608-2.  Let's play about 30 seconds.

19             MR. ROBOTTI:  This is the last transcript in your

20   binder, ladies and gentlemen.  And it's only in the binder.

21   And this begins on paragraph 124 on page 12.

22             (Audio played.)

23   BY MR. ROBOTTI:

24   Q    Can you describe the similarities or differences in this

25   exemplar to the ones we heard on the Dutch servers?

SOPHIE NOLAN, OFFICAL COURT REPORTER

MARSTON/DIRECT/ROBOTTI

1          MR. LICHTMAN:  Objection.

2          THE COURT:  Hang on.

3          Overruled.

4    Q    Go ahead.

5    A    The similarities that I hear on the two calls are again

6    to that sing-song-y nature or characteristic of the voice

7    between what we just heard as well as the prior exemplar,

8    between the intercepts and also you have kind of a higher

9    pitch that I pick up in the audio.  That's what draws my

10   attention to it.

11   Q    I would now like to play the other voice and the exemplar

12   that you listened to.  Can we play -- let me show you

13   Government Exhibit 705-C which is in evidence.

14          (Exhibit published.)

15   Q    Do you recognize this?

16   A    I do.

17   Q    And have you previously reviewed this?

18   A    I have.

19   Q    What do you recognize it as?

20   A    This is the Rolling Stone video and it's the excerpts

21   from that video.

22   Q    Did you listen to these excerpts in doing your voice

23   comparison?

24   A    I did.

25   Q    I'm going to play a clip from 1 minute and 40 seconds to

MARSTON/DIRECT/ROBOTTI

```
1    2 minutes and 12 seconds.
2              (Audio played.)
3    Q    Can you describe the similarities or differences that you
4    hear between this voice exemplar and the calls we heard on the
5    Dutch servers?
6              MR. LICHTMAN:  Objection.
7              THE COURT:  Overruled.
8    A    In the Rolling Stone interview the speech pattern is
9    slower and more deliberate which makes sense because it is an
10   interview, but I still hear that higher pitch tone and the
11   kind of sing-song-y variation in the speech.  That's the
12   characteristics that I focused on.
13             MR. LICHTMAN:  I object and move to strike.
14             THE COURT:  I understand the objection.  If you want
15   to make a record on it, you can, but I'm overruling the
16   objection.
17             MR. LICHTMAN:  I would like to make a record.
18             THE COURT:  Okay.
19             (Sidebar held outside of the hearing of the jury.)
20             (Continued on next page.)
21
22
23
24
25
```

SIDEBAR

```
 1            (The following sidebar took place outside the

 2   hearing of the jury.)

 3            MR. LICHTMAN:  I had to make the continued objection

 4   because it was the same one as I had made previously.  He's

 5   basically testifying as an expert, talking about different

 6   modulation of voice and --

 7            THE COURT:   Federal Rule of Evidence 901(b)(5) says

 8   that someone can testify as to their opinion as to somebody's

 9   voice if there is a contextual basis for it.  I think he's got

10   that.  He can give the opinion that it is the same voice he

11   hears.  If he can give the opinion that it is the same voice

12   he hears, then I think it follows that he can explain why he

13   has that opinion and that is what he has just done and that is

14   why I have overruled the objections.

15            (Sidebar ends.)

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25
```

MARSTON/DIRECT/ROBOTTI

1    BY MR. ROBOTTI:

2    Q    Now, Special Agent Marston, I would like to turn to the

3    other online video that you mentioned in your testimony today.

4    When did you first become aware of this video?

5    A    March of 2012.

6    Q    I would like to show you what's been marked for

7    identification as Government Exhibit 704-B.  Do you recognize

8    this?

9    A    I do.

10   Q    What is this?

11   A    It's the results of a search warrant served on Google.

12   Q    Does this contain the video that you were referencing?

13   A    It does.

14   Q    Or a copy of it.  And I would like to show you Government

15   Exhibit 704-C and 704-E for identification.  Do you recognize

16   these?

17   A    I do.

18   Q    What are they?

19   A    On the left is a clip from the online video and on the

20   right are screenshots as well as the Google letter of

21   authenticity.

22   Q    704-C also contains still shots from the video?

23   A    It does.

24   Q    And the documents and videos on 704-C, are those marked

25   704-C-1 to 704-C-5?

MARSTON/DIRECT/ROBOTTI

1    A     Yes.

2    Q     The Government -- and are these copies from the video of

3    704-B?

4              THE COURT:  Any objection?

5              MR. LICHTMAN:  I do, Judge, to the video.  The audio

6    I don't have a problem with at this point.

7              THE COURT:  What is wrong with the video?

8              MR. LICHTMAN:  I think 403 --

9              THE COURT:  Let's have a sidebar.

10             (Sidebar held outside of the hearing of the jury.)

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
 1              (The following sidebar took place outside the
 2     hearing of the jury.)
 3              MR. LICHTMAN:  Judge, so we're clear, this is the
 4     interrogation video.
 5              THE COURT:  Right.
 6              MR. LICHTMAN:  So I don't know why we need to see
 7     him interrogating partially a person when the only thing
 8     that's relevant to this line of questioning is the audio.
 9              MR. ROBOTTI:  Your Honor, the witness is going to
10     identify the defendant in the video based on the voice and his
11     physical depiction of him.  This is critical evidence in this
12     case that shows the defendant walking back and forth in front
13     of a hostage.  We already have a Pretrial ruling that this
14     type of evidence is permissible as part of the methods and
15     means of the CCE and in furtherance of the --
16              THE COURT:  The point is if you've got the audio in
17     already what does the video add?
18              MR. ROBOTTI:  Your Honor, the video depicts -- on
19     one hand in terms of the identification, it's not just -- it
20     reinforces the identification that this witness has already
21     made here because you can see the visual depiction and he's
22     going to identify both the voice and the person.
23              THE COURT:  I wish you had done it in a different
24     order to save time.  You could have done the video and the
25     voice at the same time, right?
```

SOPHIE NOLAN, OFFICAL COURT REPORTER

SIDEBAR

1          MR. ROBOTTI:  We're going to play the video and the

2    voice now.  They haven't heard the voice yet.  He said he

3    previously used this as a voice exemplar in 2012.

4          THE COURT:  I do not think it's going to waste so

5    much time that the Government shouldn't be able to do it the

6    way it wants to do it.  There is arguably added weight to the

7    video as well as just the audio so I'm going to overrule the

8    objection.

9          (Sidebar ends.)

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARSTON/DIRECT/ROBOTTI

```
 1              (Continuing.)
 2              MR. ROBOTTI:  I think we were pending the
 3    Government's motion to admit Government Exhibits 704-C and
 4    704-E.
 5              THE COURT:  Yeah, the motion is granted.  The
 6    exhibits are received over objection.
 7              (Government Exhibits 704-C and 704-E received in
 8    evidence.)
 9    Q    I would like to show you Exhibit 704-C-2 which is in
10    evidence.
11              (Exhibit published.)
12    Q    Do you recognize this?
13    A    I do.
14    Q    What's that?
15    A    This is a summary of the information from the Google
16    search warrant.
17    Q    And is this provided by Google?
18    A    As provided by Google.
19    Q    Is this the date and time that the video was created on
20    YouTube?
21    A    Yes.
22    Q    And what's that?
23    A    July 18, 2015 at 1:13 p.m. UTC.
24    Q    Now, I would like to show you Government Exhibit 704-A
25    which is in evidence.
```

MARSTON/DIRECT/ROBOTTI

```
1              (Exhibit published.)

2    Q    Do you recognize this?

3    A    I do.

4    Q    What's that?

5    A    This is a CD containing the video.  It's from Live Leak

6    and it has a certification from Live Leak as well.

7    Q    I would like to show you Government Exhibit 704-A-1.

8              (Exhibit published.)

9    Q    Is that the certification you just described for us?

10   A    Yes.

11   Q    And what's the date according to the certification on

12   which this video was uploaded?

13   A    March 11, 2012.

14   Q    And how does the video in Government Exhibit 704-A from

15   LiveLeak.com compare to the YouTube video in 704-C?

16   A    They're the same.

17   Q    And showing you Government Exhibit 704-D.

18             (Exhibit published.)

19   Q    Do you recognize this?

20   A    I do.

21   Q    And what's that?

22   A    This is a subtitled version of the YouTube video.

23   Q    Were those subtitles on the video or were they added?

24   A    They were added.

25   Q    Now did you recognize anyone in the video on Government
```

MARSTON/DIRECT/ROBOTTI

```
 1    Exhibit 704-D?

 2    A     I did.

 3    Q     Who did you recognize?

 4    A     The defendant.

 5    Q     And how did you recognize him?

 6    A     From his speech as well as visual.

 7    Q     All right.  So at this time the Government would like to

 8    play the video on Government Exhibit 704-D.

 9              (Video played.)

10    Q     Next I would like to turn our attention to 704-C-4 and

11    704-C-5 which are in evidence.

12              (Exhibit published.)

13    Q     There is 704-C-5 and 704-C-4.  Do you recognize these?

14    A     I do.

15    Q     And what are they?

16    A     Those are screenshots from the video.

17    Q     I would like to show you a few photographs now.  Showing

18    you Government Exhibit 1-J for identification.  Do you

19    recognize anyone in that photograph?

20    A     I do.

21    Q     And who is that?

22    A     The gentleman sitting down blue shirt second from the

23    right is the defendant.

24              MR. ROBOTTI:  The Government offers Government

25    Exhibit 1-J.
```

MARSTON/DIRECT/ROBOTTI

```
 1                 MR. LICHTMAN:  No objection.

 2                 THE COURT:  Received.

 3                 (Government Exhibit 1-J received in evidence.)

 4                 (Exhibit published.)

 5     BY MR. ROBOTTI:

 6     Q    Next looking at Government Exhibit 1-C which is marked

 7     for identification, do you recognize anyone in this photo?

 8     A    I do.

 9     Q    Who is that?

10     A    On the left-hand side is the defendant.

11                 MR. ROBOTTI:  The Government offers Government

12     Exhibit 1-C into evidence.

13                 MR. LICHTMAN:  I object.

14                 THE COURT:  Overruled.

15                 (Government Exhibit 1-C received in evidence.)

16                 THE COURT:  If you have 50 of these, it is going to

17     be too many.

18                 MR. ROBOTTI:  I don't have 50.  Just two more, Your

19     Honor.

20     Q    And the next two are in evidence, Government Exhibit 1-L

21     and 1-G.

22                 (Exhibit published.)

23     Q    Government Exhibit 1-L, do you recognize anyone in that

24     photo?

25     A    I do.
```

MARSTON/DIRECT/ROBOTTI

1   Q     Who is that?

2   A     The defendant is on the right-hand side.

3   Q     And Government Exhibit 1-G do you recognize anyone in

4   that?

5   A     I do.

6   Q     Who is that?

7   A     The defendant.

8   Q     And what did you notice about these photographs as

9   compared to the screenshots we looked at from the video?

10  A     The one thing that I pointed out is the hat, the ball cap

11  is in each.  The mustache, although on the video it's

12  difficult to see, I'm not sure you can see it and the

13  dark-colored hair and that comes down below the ball cap.

14  Q     Now, during the course of your investigation did you

15  compare this online video to anything else?

16  A     I did.

17  Q     And what prompted you to do that?

18  A     One of our translators told us that a portion of the --

19              MR. LICHTMAN:  Objection.

20              MR. PURPURA:  Objection.

21              THE COURT:  Just one is fine, but it is overruled.

22  He's not offering it for the truth.  He is offering it to

23  explain why he did what he next did.

24  BY MR. ROBOTTI:

25  Q     Stepping back, what did you compare this video to?

SOPHIE NOLAN, OFFICAL COURT REPORTER

MARSTON/DIRECT/ROBOTTI

1    A    One of the intercepted calls.

2    Q    What prompted you to do that?

3            THE COURT:  Do not tell us the specifics.  Just say

4    generally what prompted you to do this.  Go ahead.

5    A    One of the translators advised that a portion of the call

6    or a portion of what was on the video was intercepted on our

7    calls.

8    Q    And what did you notice when you did that comparison?

9    A    I noticed that again a portion of the video or the

10   portion of the conversation that was on the video is exactly

11   what is on our intercepted calls.

12   Q    And could you describe how this conversation was captured

13   in calls?

14   A    A particular call, it's captured as background.

15   Background noises, if you would, on a call that had -- did not

16   connect.

17   Q    So is that call what -- one of the ones we've talked

18   about before, Government Exhibit 601-F-4 which is in evidence?

19   A    Yes.

20   Q    And that's a call dated April 25, 2011?

21   A    That's correct.

22   Q    Now, in preparation for your testimony today, have you

23   reviewed an enhanced version of this phone call?

24   A    I have.

25   Q    Is that the phone call in evidence as Government Exhibit

MARSTON/DIRECT/ROBOTTI

1    601-N-2?

2    A    It is.

3    Q    So before we turn to the enhanced version of this call,

4    let's play the first 15 seconds of the original just to hear

5    how it's captured.

6              (Audio played.)

7    Q    Could you describe what we heard there?

8    A    I hear someone in the background -- a conversation that's

9    happening and the beeping sound you hear is the dial tone.

10   Q    All right.  And now let's turn to Government Exhibit

11   601-N-2.  What did you notice about this version of the call

12   as compared to the original call?

13   A    The enhanced version changes some of the frequencies so

14   it will mute -- not mute, but it will bring down the quality

15   of the beeping sound and it enhances some of the background

16   conversation.

17   Q    Before we play this exhibit, is there anything that the

18   jury should listen out for?

19             MR. LICHTMAN:  Objection.

20             THE COURT:  Sustained.

21             MR. ROBOTTI:  Can we approach, Your Honor.

22             THE COURT:  No.  Think of another way to ask the

23   question.

24             MR. ROBOTTI:  Okay.

25   BY MR. ROBOTTI:

MARSTON/DIRECT/ROBOTTI

1    Q    Are there any noticeable characteristics in this call?

2    A    Yes.  One of the most noticeable is towards the end of

3    the call you will hear a beep that's kind of distinguishable.

4    You will hear the roosters in the background and you can also

5    pick up on some of the locations they talk about like Los

6    Noches and Zacatecas.

7    Q    So, let's go ahead and play that call.

8              (Audio played.)

MARSTON/DIRECT/ROBOTTI

1           (Recording played.)

2    DIRECT EXAMINATION

3    BY MR. ROBOTTI: (Continued.)

4    Q    All right.  So do you hear that ding at the end there?

5    A    I did.

6    Q    So can we just back up to 55 seconds for a moment and

7    play about ten seconds of that and to listen for it?  And can

8    you tell us, Special Agent Marston, after you hear it?

9           (Recording played.)

10   A    There's the sound.

11          MR. ROBOTTI:  Can we go back to 704-D, the video,

12   for a moment and start at 1:05 and play for about 15 seconds?

13          (Video played.)

14   BY MR. ROBOTTI:

15   Q    What did you hear there?

16   A    It was just prior to that.  It's not as discernable as

17   the prior enhanced video.

18   Q    Now, I would like to show you what's marked for

19   identification as Government's Exhibit 511-6.  What's this?

20   A    These are two transcripts, one from the intercepted

21   calls, and the other one is from the video transcript.

22   Q    All right.  And so is Government's Exhibit 601F-4T the

23   transcript of the call we just listened to?

24   A    Yes.

25   Q    And is Government's Exhibit 704-T the transcript of the

MARSTON/DIRECT/ROBOTTI

1    video?

2    A    That's correct.

3    Q    Your Honor, the Government is going to offer Government's

4    Exhibit 511-6 into evidence?

5              MR. LICHTMAN:    No objection.

6              THE COURT:  Received.

7              (Government's Exhibit 511-6 received in evidence.)

8              MR. ROBOTTI:  I would like to put this up on the

9    PowerPoint, if we can.

10             I think our mics might still be out, sorry.

11             THE COURTROOM DEPUTY:  One second.

12   BY MR. ROBOTTI:

13   Q    All right.  Special Agent Marston, can you tell the jury

14   what we are looking at here?

15   A    We have the two transcripts side by side, and the

16   highlighted portions in each transcript are the places or the

17   locations where the conversation is exactly the same.

18   Q    All right.  So let's look at a few examples.  First let's

19   look at paragraph 6 on the left from the call transcript and

20   paragraph 6 from the video transcript on the right.

21             Could you read the identical portions in both here?

22   A    Certainly.

23             On the left:  So the ones from Mazatlan, those

24   from...

25             And from the video transcript on the right:  So the

MARSTON/DIRECT/ROBOTTI

1    ones from Mazatlan, those from...

2    Q    All right.  Let's look at paragraph 9 from the call, and

3    paragraph 11 from the video.

4    A    Paragraph 9 from the call:  There's also people from

5    there, from, from Zacatecas, and they -- and there we picked

6    up El Quattro and the other.

7           And then from line 11 on the video transcript on the

8    right:  There's also people from there, from, from Zacatecas,

9    and there we picked up El Quattro and the other.

10   Q    And just one more of these, paragraphs 15 and 19.

11   A    Fifteen on the left from the call:  We have the beep.

12   They asked me for several pick-up trucks.  I don't know how

13   many they're -- they were going to send.

14           And then line 19 from the video transcript on the

15   right:  The beep again.  They asked me for several pick-up

16   trucks.  I don't know how many they are going to send.

17   Q    Is that beep we talked about in the same place in both

18   transcripts?

19   A    It is.

20   Q    Now, there's certain text from lines 4 to 20 on the video

21   transcript that are not in the transcript of the call.  Are

22   you able to determine why that is?

23   A    There was background, so the intercepted call was picking

24   up the background noise, plus you had the beeping at the same

25   time, so we were not getting a clear call through.

MARSTON/DIRECT/ROBOTTI

1   Q    So certain portions of the conversation were not captured

2   in the background there?

3   A    That's correct.

4   Q    Now, similarly, lines 1 through 3 in the call transcript

5   on the left, those did not appear to be captured in the video;

6   is that right?

7   A    That is correct.

8   Q    And were you able to tell why that is?

9   A    There appears to be an edit to the video.

10  Q    Okay.  And if we can just go to 26 seconds in the video,

11  and we'll play about ten seconds, and could you just let us

12  know where you see the edit?

13            (Video played.)

14  BY MR. ROBOTTI:

15  Q    And you saw the edit there?

16  A    So it's before -- there's screen shots on the left, and

17  then the screen moves to the right, and to me, that's where

18  the edit is.

19  Q    And was that about 32 seconds or so?

20  A    I believe so.

21  Q    All right.  So based on your review of the transcripts,

22  what did you conclude?

23  A    I concluded that a portion of the online video was, in

24  fact, captured on our intercepted calls.

25  Q    Is that the same conversation captured in both?

MARSTON/DIRECT/ROBOTTI

1    A    It is.

2    Q    All right.  I would like to next direct your attention to

3    February 22nd, 2012.  Were you working as a special agent that

4    day?

5    A    I was.

6    Q    And what was your assignment?

7    A    I was assigned at the time to our headquarters.

8    Q    And where were you located?

9    A    For me, I was located down in Washington, D.C. in the

10   United States.

11   Q    And where had you been located in the days before that?

12   A    We were in Mexico City, Mexico.

13   Q    What were your duties and responsibilities while you were

14   in Mexico City, Mexico?

15   A    We were supporting a operation targeting the defendant.

16   Q    And did that operation take place?

17   A    It did.

18   Q    And what date was that?

19   A    February 22nd, 2012.

20   Q    Now, were you actually in Mexico for the operation

21   itself, or just the days leading up to it?

22   A    We were there for the days leading up to it.

23   Q    And where were you during the actual operation?

24   A    Back in the United States.

25   Q    And during the course of your investigation, did you

MARSTON/DIRECT/ROBOTTI

 1   review any documents seized during that raid?

 2   A     I did.

 3   Q     What type of documents, in general, did you review?

 4   A     Documents were basically -- were ledgers.

 5   Q     And other photographs did you review as well?

 6   A     I did review the other photographs from the operation.

 7   Q     All right.  I would like to show you what's in evidence

 8   as Government's Exhibit 218-22.  And there's multiple pages

 9   here, but just flipping through some of them, do you recognize

10   this?

11   A     I do.

12   Q     What is this?

13   A     These are some of the photographs taken from the

14   operation in Los Cabo's.

15   Q     All right.  I would like to look at page 13441A.

16         Do you recognize that?

17   A     I do.

18   Q     And what's that?

19   A     These are pictures taken from the scene.  They were

20   inside a book.  On the top right, they talk about the

21   "extensiones," and they match up with our information that

22   they used extensions on the security system.

23   Q     And are there other pages in this document as well that

24   have similar entries; for instance, 13440A?

25   A     Yes.

MARSTON/DIRECT/ROBOTTI

1    Q    All right.  I would like to show you what's been marked

2    as Government's Exhibit 511-9 for identification.

3              Do you recognize this?

4    A    I do.

5    Q    And what's this?

6    A    It's a summary of the information found in the seized

7    phonebook, as well as the captured extensions from our

8    interceptions.

9              MR. ROBOTTI:  Your Honor, the Government offers

10   Government's Exhibit 511-9 into evidence.

11             MR. LICHTMAN:  No objection.

12             THE COURT:  Received.

13             (Government's Exhibit 511-9 received in evidence.)

14             (The above-referred to exhibit was published.)

15   BY MR. ROBOTTI:

16   Q    All right.  So looking at these pages at the bottom here,

17   what do we see?

18   A    Photocopies from one of the books found in Cabo that have

19   different extensions on them.

20   Q    And this information here at the top under phonebook

21   information (indicating), what's that?

22   A     It's a compilation of the information in the slides below

23   or the pictures below.

24   Q    So those are the extensions and names pulled out of the

25   slides below?

MARSTON/DIRECT/ROBOTTI

1    A    That's correct.

2    Q    And what do we see here on the left (indicating)?

3    A    On the left is the captured extensions associated with

4    our interceptions.

5    Q    And what do you mean by that?

6    A    When the calls went through, as we talked about earlier,

7    they had extensions.  If it was internal, we captured those

8    extensions during the course of the interceptions.

9    Q    And so those are listed on the left here (indicating)?

10   A    That's correct.

11   Q    And what do we see on the right portion here?

12   A    That is a name from the phonebook entries which would be

13   the information from the Cabo San Lucas operation.

14   Q    So I would now like to show you a highlighted version

15   marked Government's Exhibit 511-9A, and this is an identical

16   copy, Your Honor, so we just move this into evidence?

17            THE COURT:  Okay.  Received.

18            (Government's Exhibit 511-9A received in evidence.)

19            (The above-referred to exhibit was published.)

20   BY MR. ROBOTTI:

21   Q    All right.  So could you read for us the entries in this

22   phonebook highlighted in yellow?

23   A    Certainly.

24            Extension 102, Charly, in parentheses is Lucero;

25   extension 125, Felizardo; extension 128, Secre; extension 129,

MARSTON/DIRECT/ROBOTTI

 1  Tocayo; extension 130, Mama Tocayo; extension 131, Menor;

 2  extension 135, Raton; extension 136, the number 50 --

 3              THE COURT:  What did you say 125 was?

 4              THE WITNESS:  135, sir?

 5              THE COURT:  No.  125.

 6              THE WITNESS:  Felizardo.

 7              THE COURT:  Okay.

 8  BY MR. ROBOTTI:

 9  Q    I think you were on 150, I think, is the next one here

10  (indicating).

11  A    150 -- extension 150, Cosina; extension 152, Alfredo;

12  extension 166, Menor; extension 718, Roke; extension 725,

13  Cachimba; extension 728, Comp. Cosina; extension 733, Zazaza;

14  extension 777, Panchito; there's a phone number, 667-746-7667,

15  Tello; there's a cutoff, which the extensions or the numbers

16  could not be read, and it's Markitos.

17  Q    All right.  And so then let's just look briefly at the

18  other chart here on the left under captured extensions.  And

19  so does the captured extension here correspond to the same

20  entry in the phonebook information?

21  A    That is correct.

22  Q    All right.  Could you read for us the captured extensions

23  highlighted in blue?

24  A    Certainly.

25              Extension 101 is Charly Karen; extension 127,

MARSTON/DIRECT/ROBOTTI

```
 1   Mexicali; extension 137, Virgo; extension 145, Lic. Omar;

 2   extension 147, Gordito; extension 148, Moiran; extension 165,

 3   Popeye; extension 170, Gato.

 4              MR. ROBOTTI:  Your Honor, I'm about to go to a new

 5   topic.  I think now would be a good time to break.

 6              THE COURT:  Okay.

 7              We will break for the day, ladies and gentleman.

 8   Please remember not to talk about the case with anybody, don't

 9   do any research on the case, don't post anything on the

10   Internet, don't do a Google search, and stay away from any

11   media coverage of the case that you might run into.  See you

12   tomorrow morning at 9:30.

13              (Jury exits.)

14              THE COURT:  Anything else we need to cover?

15              MS. PARLOVECCHIO:  No, Your Honor, not from the

16   Government.

17              MR. LICHTMAN:  I just have one issue about --

18              THE COURT:  Everyone sit down, please.

19              MR. LICHTMAN:  The issue of the sealing this

20   morning.  We have no problem with it being unsealed.

21              THE COURT:  Okay.  That's helpful.  Thank you.

22              Okay.  See you tomorrow morning 9:30.

23              (Matter adjourned to January 9, 2019, 9:30 p.m.)

24                          *****

25
```

INDEX

| | |
|---|---|
| Defense Exhibit 420 | 4444 |
| DEX 414 | 4461 |
| DEX 423 | 4464 |
| DEX 408 | 4468 |
| GEX 1001 | 4491 |
| GEX 1001 | 4491 |
| GEX 1002 | 4492 |
| GEX 706 B, GEX 706C | 4498 |
| GEX 40 | 4502 |
| GEX 49 | 4502 |
| GEX 601-A-1 to A-3 | 4519 |
| GEX 601-B to 601-E | 4519 |
| GEX 601-H | 4520 |
| GEX 601-G | 4521 |
| GEX 601-I | 4522 |
| GEX 601-J | 4523 |
| GEX 601-K | 4523 |
| GEX 601-L | 4523 |
| GEX 601-N | 4523 |
| GEX 511-1 | 4527 |
| GEX 511-3 | 4539 |
| GEX 511-3A | 4539 |
| GEX 704-C | 4579 |
| GEX 704-E | 4579 |
| GEX 704-C-2 | 4579 |
| GEX 1-J | 4582 |
| GEX 1-C | 4582 |
| GEX 511-6 | 4588 |
| GEX 511-9 | 4593 |
| GALVAN/REDIRECT/FELS | 4475 |
| GALVAN/RECROSS/PURPURA | 4484 |
| MARSTON/DIRECT/ROBOTTI | 4493 |
| | 4594 |