```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------x
                                      09 CR 466(BMC)
 3   UNITED STATES OF AMERICA
                                      United States Courthouse
 4        versus                      Brooklyn, New York

 5   JOAQUIN ARCHIVALDO GUZMAN LOERA,
                                      January 9, 2019
 6                  Defendant.        9:30 a. m.
     -------------------------------x
 7
                TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
 8             BEFORE THE HONORABLE BRIAN M. COGAN
                  UNITED STATES DISTRICT JUDGE
 9

10                          APPEARANCES

11

12   For the Government:   UNITED STATES ATTORNEY'S OFFICE
                           Eastern District of New York
13                         271 Cadman Plaza East
                           Brooklyn, New York 11201
14                         BY:  GINA M. PARLOVECCHIO, AUSA
                                ANDREA GOLDBARG, AUSA
15                                MICHAEL ROBOTTI, AUSA

16                         UNITED STATES ATTORNEY'S OFFICE
                           Southern District of Florida
17                         99 NE 4th Street
                           Miami, Florida 33132
18                         BY:  ADAM S. FELS, AUSA

19                         DEPARTMENT OF JUSTICE
                           Criminal Division
20                         Narcotic and Dangerous Drug Section
                           145 N. Street N.E. Suite 300
21                         Washington, D.C. 20530
                           BY:  ANTHONY NARDOZZI, ESQ.
22                                AMANDA LISKAMM, ESQ.

23   For the Defendant:    BALAREZO LAW
                           400 Seventh Street, NW
24                         Washington, D.C. 20004
                           BY:  A. EDUARDO BALAREZO, ESQ.
25
```

```
 1                    (CONTINUED APPEARANCES)

 2    For the Defendant:

 3    LAW OFFICES OF JEFFREY LICHTMAN
      11 East 44th Street, Suite 501
 4    New York, New York 10017
      BY:  JEFFREY H. LICHTMAN, ESQ.
 5    PAUL R. TOWNSEND, ESQ.

 6    LAW OFFICE OF PURPURA & PURPURA
      8 E. Mulberry Street
 7    Baltimore, Maryland 21202
      BY:  WILLIAM B. PURPURA, ESQ.
 8
      LAW OFFICES OF MICHAEL LAMBERT, ESQ.
 9    369 Lexington Avenue, PMB #229
      New York, New York 10017
10    BY:  MARIEL COLON MIRO, ESQ.

11

12

13

14

15

16

17

18

19

20

21    Reported by:

22    LISA SCHMID, CCR, RMR
      OFFICIAL COURT REPORTER
23    225 Cadman Plaza East, Room N377
      Brooklyn, New York 11201
24
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

MARSTON/DIRECT/ROBOTTI

```
 1              (In open court, outside the presence of the jury.)
 2              THE CLERK:  All rise.
 3              THE COURT:  Good morning, let's have the jury in,
 4    please.
 5              (Jury enters.)
 6              THE COURT:  All right.  Everyone be seated.
 7              Good morning, ladies and gentlemen.
 8              JURORS:  (In unison) Good morning.
 9              THE COURT:  Continue with direct examination, Mr.
10    Robotti.
11              MR. ROBOTTI:  Thank you, Judge.
12                        DIRECT EXAMINATION
13    BY MR. ROBOTTI:
14    Q    Good morning, Special Agent Marston.
15    A    Good morning.
16    Q    All right.  So when we left off yesterday, we were
17    talking about Government Exhibit 511-9A, which is in evidence.
18              So just as a reminder, these pages at the bottom
19    here, 9A, those are the parts of the ledgers seized in Los
20    Cabos on February 22nd, 2012, is that right?
21    A    That is correct.
22    Q    And one of these pages was entitled "extensiones"?
23    A    That's correct.
24    Q    And this information at the top here, under phone book
25    information, that was pulled from the pages below, right?
```

1   A     That is correct.

2   Q     All right.  So let me direct your attention to the entry

3   "Tello" here, at the bottom right.

4           The Area Code 667, do you know whether there is an

5   area code in Mexico associated with that number?

6   A     I do.

7   Q     For what area in Mexico?

8   A     Culiacán.

9   Q     Now, looking at the extensions found in this phone book,

10  what range of extensions do we have here?

11  A     The extensions range from 101 to one hundred, through up

12  around 174, as well the 700 series, as well, starting at 712

13  and ending at 779.

14  Q     All right.  So going back to the chart on the left over

15  here.  So this call on the left here shows the captured

16  extensions.  Those are the extensions captured over the Dutch

17  servers, is that correct?

18  A     Yes.

19  Q     And on the right here, we have the corresponding phone

20  book entry for those numbers, right?

21  A     Yes.

22  Q     All right.  I would like to direct you attention to entry

23  127 or the extension 127.  What's the corresponding phone book

24  entry?

25  A     It's Mexicali.

1          MR. ROBOTTI:  Okay.  So now, I would like to play

2    two phone calls.  We're going to start at transcript 601F-5AT,

3    ladies and gentlemen.  If could you take that out of your

4    transcript binders.

5          And this is going to be audio clip 601F-5A, which is

6    dated July 6th, 2011, at 10:10 p.m., and then we're going to

7    play 601F-5B, which is two minutes later.

8          And before we start that, Special Agent Marston, if

9    you look at the front page of 601F-5AT, what extensions are in

10   this phone call?

11   A    601F-5AT?

12   Q    Yes, towards the front there.

13   A    The extensions are 120 and 127.

14   Q    And who are the participants in the call.

15   A    Leopoldo Dominguez and Condor.

16   Q    And which extension is Leopoldo Dominguez using?

17   A    127.

18   Q    And which extension is Condor using?

19   A    120.

20          MR. ROBOTTI:  All right.  So we can go ahead and

21   play this call.  And this will be the whole call, ladies and

22   gentlemen.

23          (Audio played in open court.)

24   BY MR. ROBOTTI:

25          MR. ROBOTTI:  All right.  If we play the call that's

MARSTON/DIRECT/ROBOTTI

1    two minutes later, the very next transcript in the book,

2    601F-5AT, and this will be paragraph one to paragraph 15, and

3    it will be zero to 48 seconds.

4              (Audio played in open court.)

5              MR. ROBOTTI:  Okay.  We can stop it.

6    BY MR. ROBOTTI:

7    Q    All right.  So Special Agent Marston, let me direct your

8    attention to the paragraph seven, and what did Leopoldo

9    Dominguez say in paragraph seven?

10   A    That's it.  Mexi -- Mexicali, Baja California.

11   Q    And then going back to 511-9A, what is listed as the

12   entry for 127 here?

13   A    Mexicali.

14   Q    All right.  I'd next like to talk about 137, extension

15   137.  What's listed for that extension?

16   A    It is Virgo.

17             MR. ROBOTTI:  All right.  So let's turn to another

18   call.  This transcript is going to be 601F-9AT.  It is about

19   four or five back from the one we were just on.  And the audio

20   clip is going to be 601F-9A, which is dated July 7th, 2011, at

21   7:18 p.m.

22             And this transcript is just going to be in your

23   binders, ladies and gentlemen.  It's going to just be just

24   paragraphs one and two.  It's going to be from zero seconds to

25   ten seconds.

MARSTON/DIRECT/ROBOTTI

```
1              Go ahead.
2              (Audio played in open court.)
3   BY MR. ROBOTTI:
4   Q    All right.  So, Special Agent Marston, looking at
5   paragraph two.
6              MR. ROBOTTI:  Can we switch back to the Elmo?
7   BY MR. ROBOTTI:
8   Q    All right.  And could you read paragraph two?
9              MR. LICHTMAN:  Judge, objection.  May I?  That's all
10  that was played.  Now we're doing it again.
11             THE COURT:  I know.  I'm going to allow it.  We can
12  talk about it later, but I'm going to allow him to do it this
13  way.
14  BY MR. ROBOTTI:
15  Q    All right.  Go ahead.  Would you read paragraph two,
16  Special Agent Marston?
17  A    Yes, Virgo.  Good afternoon.  How are you?
18  Q    All right.  And just looking back to the very -- the
19  cover page of that transcript, what are the extensions
20  involved in this phone call here?
21  A    Extension 121 and extension 137.
22  Q    And what extension is Virgo using?
23  A    Extension 137.
24  Q    And again, looking back at 511-9A, who is listed as the
25  extension for 137?
```

```
 1   A     Virgo.

 2   Q     All right.  What's the extension for -- who's listed

 3   under 101 and 147?

 4   A     101 is Charly, in parenthesis is Karen, and 147 is

 5   Gordito.

 6   Q     Now, I would like to show you what's been marked for

 7   identification as Government Exhibit 29.  And do you recognize

 8   this person? (Exhibit published to the witness.)

 9   A     I do.

10   Q     Who's that?

11   A     He's known as Gordo.

12   Q     And how did you recognize him?

13   A     He is one of the engineers that assisted the defendant in

14   the day-to-day operations of the system.

15   Q     Were you investigating him?

16   A     We were.

17         MR. ROBOTTI:  All right.  The Government offers

18   Government Exhibit 29 into evidence.

19         MR. LICHTMAN:  No objection.

20         THE COURT:  Received.

21         (Government Exhibit 29 was received in evidence.)

22         (Publishes exhibit to the jury.)

23   BY MR. ROBOTTI:

24   Q     And this is Gordo?

25   A     Yes.
```

MARSTON/DIRECT/ROBOTTI

1    Q    And were you investigating anyone known as Charly in

2    connection with this case?

3    A    Yes.

4    Q    Why?

5    A    He was another engineer that assisted in the day-to-day

6    operations of the system.

7              MR. ROBOTTI:  All right.  Now, I'd like to play

8    another call here.  This is going to be transcript 601-I-5T,

9    just a little further back in the transcript binder from where

10   we were just were.

11             And the audio clip is going to be 601-I-5A, which is

12   dated June 30th, 2011, and we're going to begin on paragraph

13   28 and go to paragraph 36, and the clip's going to be from one

14   minute and 17 seconds to one minute and 57 seconds.

15             And we can go ahead.

16             (Audio played in open court.)

17   BY MR. ROBOTTI:

18   Q    Okay.  Now, did you recognize any voices in that call?

19   A    I did.

20   Q    And which voice?

21   A    I recognized the voice of Christian.

22   Q    And looking back at the cover page of 601-I-5T, which

23   extension was Christian using?

24   A    He was using 101.

25   Q    And was Christian cooperating at the time of this call?

MARSTON/DIRECT/ROBOTTI

```
 1   A     He was not.

 2   Q     This is during the time period of the Dutch servers?

 3   A     Sorry.  He was.  This is June 30th, 2011.  He would have

 4   been cooperating at that time.

 5   Q     Switching gears a little bit, you mentioned yesterday

 6   that you stopped submitting MLAT requests for the first three

 7   servers in December of 2011.

 8         Did you submit additional MLAT request to the

 9   Netherlands following that date?

10   A     We did.

11   Q     For what?

12   A     The establishment of servers for Alex Cifuentes.

13   Q     And how many servers -- were servers, in fact,

14   established in the Netherlands for that purpose?

15   A     They were.

16   Q     How many servers?

17   A     Five in total.

18   Q     And are these servers different than the servers we spoke

19   about yesterday?

20   A     They were different.

21   Q     Did the FBI obtain communications from these servers?

22   A     We did.

23   Q     What types of communications?

24   A     We received phone calls as well as messages.

25   Q     And what was the method used to obtain these
```

MARSTON/DIRECT/ROBOTTI

1    communications?

2    A    In these cases, we used the MLAT procedure, as well.

3    Q    And what did you request the Dutch authorities to do?

4    A    To intercept the communications.

5    Q    And is this judicially -- judicially authorized?

6    A    It was.

7    Q    During what time period did the Dutch conduct these

8    interceptions or searches of these servers?

9    A    January of 2012, through September, October, 2012.

10   Q    And did these servers also use the three digit extension

11   system?

12   A    They did.

13   Q    And how if at all did these extensions differ from the

14   extensions on the defendant's servers?

15   A    These extensions for the Cifuentes servers did not

16   contain any one hundred series extensions; however, there were

17   two 700 series extensions that did overlap with the

18   defendant's server.

19   Q    And do you know whether the same people were using those

20   extensions on the two different servers?

21   A    I don't know for sure.  I know who was using the ones on

22   the Alex Cifuentes servers.

23   Q    All right.  I would like to show you what's been marked

24   for identification only as Government Exhibit 603A through

25   603C, and 603F and 603G.  (Published to the witness.)

MARSTON/DIRECT/ROBOTTI

```
 1    A     (Examines exhibits.)

 2    Q     Do you recognize those?

 3    A     I do.

 4    Q     What are they?

 5    A     These are the original downloaded recordings from the

 6    Alex servers.

 7    Q     All right.  Now, I would like to show you what's been

 8    marked for identification as 603D.  Do you recognize this?

 9    A     (No response.)

10    Q     Sorry.  Let me take it out of the sleeve for you.  Do you

11    recognize this.  (Exhibit published to the witness.)

12    A     (Examines exhibit.) I do.

13    Q     What's that?

14    A     This is a copy of the Cifuentes call intercepts.

15    Q     All right.  How do you recognize it?

16    A     With my initials, SCM.

17    Q     Are the copies of the calls on this disk from 603A to

18    603C?

19    A     They are.

20    Q     Sorry.  Excuse me.  Are these copies of the calls from

21    603A to 603C?

22    A     They are copies of the calls.

23    Q     Are the calls on here marked 603D-1 to 603D-19?

24    A     Yes.

25    Q     And is there also call data on here?
```

MARSTON/DIRECT/ROBOTTI

1   A     There is call data, as well.

2   Q     And is that marked 603D-20?

3   A     Yes.

4   Q     What type of data is on this disk?

5   A     You would have the date and time associated with that, as

6   well as the call interaction and associated numbers.

7           MR. ROBOTTI:  All right.  Your Honor, the Government

8   offers 603D into evidence.

9           MR. LICHTMAN:  No objection.

10          THE COURT:  Received.

11      (Government Exhibit 603D was received in evidence.)

12          (Exhibit published to the jury.)

13  BY MR. ROBOTTI:

14  Q     All right.  Now showing you 603E for identification.

15  What's this? (Exhibit published to the witness.)

16  A     (Examines exhibit.) That's a copy of the Cefuentes call

17  intercepts again.

18  Q     This is another copy of the calls from 603A to 603C?

19  A     Correct.

20  Q     And also 603F to 603G?

21  A     That is correct.

22  Q     All right.  And are the calls on here marked 603E-1 to

23  603E-19?

24  A     That is correct.

25          MR. ROBOTTI:  All right.  The Government offers 603

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

```
 1   into evidence.

 2              MR. LICHTMAN:  No objection.

 3              THE COURT:  Received.

 4         (Government's Exhibit 603 was received in evidence.)

 5   BY MR. ROBOTTI:

 6   Q    All right.  Now were you aware of the Cefuentes family

 7   operating another server in another country aside from the

 8   Netherlands?

 9   A    Yes.

10   Q    What country was that?

11   A    In Canada.

12   Q    And what if any investigative steps did you take with

13   respect to that server?

14   A    We obtained some data from that server.

15   Q    And was that pursuant to a legal search?

16   A    It was.

17   Q    And what types of messages or data did you obtain as a

18   result of that search?

19   A    Emails.

20   Q    All right.  I would like to show you for identification

21   only what is marked Government Exhibit 605A and 605B.  And do

22   you recognize these?  (Exhibits published to the witness.)

23   A    (Examines exhibits.)  I do.

24   Q    What are these?

25   A    These would be the original downloads of that information
```

MARSTON/DIRECT/ROBOTTI

1    from the Canadian BES server.

2    Q    All right.  And next, I would like to show you for

3    identification 605C and 605D, and do you recognize these?

4    (Exhibits published to the witness.)

5    A    (Examines exhibits.)  I do.

6    Q    What are those?

7    A    These are select calls from the Canadian BES server for

8    the Cifuentes.

9    Q    Are these calls or emails?

10   A    I'm sorry, for emails.

11   Q    All right.  And are these copies the emails from 605A and

12   605B?

13   A    That is correct.

14         MR. ROBOTTI:  Your Honor, the Government offers 605C

15   and 605D into evidence.

16         MR. LICHTMAN:  No objection.

17         THE COURT:  Received.

18   (Government Exhibits 605C and 605D were received in evidence.)

19         (Publishes exhibit to the jury.)

20   BY MR. ROBOTTI:

21   Q    All right.  So I'd like to look back at Government

22   Exhibit 49.  This is the person you identified yesterday as --

23   this is in evidence -- person you identified yesterday as

24   Andrea Velez?

25   A    Yes.

MARSTON/DIRECT/ROBOTTI

1   Q     All right.  So let me direct your attention to

2   September 2012.  What if anything occurred with respect to

3   her?

4   A     Ms. Velez was approached by myself and others in

5   Colombia, South America.

6   Q     For what purpose?

7   A     To gain her cooperation.

8   Q     And what, if anything, happened at that meeting, without

9   getting into what was said?

10  A     She agreed to be a proactive cooperator for the FBI.

11  Q     What did that proactive cooperation entail, going

12  forward?

13  A     She would participate actively, essentially in that

14  undercover capacity, reporting back to the FBI or at the

15  direction of the FBI, reporting back the information she

16  collect.

17  Q     And who were the primary targets of her cooperation?

18  A     The defendant and Alex Cefuentes.

19  Q     What, if anything, did her cooperation yield?

20  A     Part of the cooperation was many messages with Cifuentes.

21  Q     For how long did Ms. Velez proactively cooperate?

22  A     Approximately September of 2012 through 2014.

23  Q     And where was she instructed to work proactively?

24  A     She was instructed to work mostly in foreign locations,

25  Mexico, South and Central America, as well as Canada.

MARSTON/DIRECT/ROBOTTI

1   Q    And was she instructed to interact in person with the

2   targets of the investigation during this time period?

3   A    She was.

4   Q    All right.  Next, I'd like to show you what's been marked

5   for identification only as Government's Exhibits 604A through

6   G, and 604-I and J.  And do you recognize all those? (Exhibits

7   published to the witness.)

8   A     (Examines exhibits) I do.

9   Q    What are those?

10  A    These are downloads from the Blackberry devices used by

11  Ms. Velez.

12  Q    I would like to show you now what's been marked for

13  identification as Government Exhibit 604H.  Do you recognize

14  that? (Exhibit published to the witness.)

15  A     (Examines exhibit.)  I do.

16  Q    And what's that?

17  A    These are messages provided by the source.

18  Q    And are those copies of the -- copies of messages from

19  the original disks we just looked at?

20  A    They are.

21        MR. ROBOTTI:  All right.  Your Honor, the Government

22  offers 604H into evidence.

23        MR. LICHTMAN:  No objection.

24        THE COURT:  Received.

25      (Government Exhibit 604H was received in evidence.)

MARSTON/DIRECT/ROBOTTI

```
 1              (Publishes exhibit to the jury.)
 2   BY MR. ROBOTTI:
 3   Q    All right.  So I'd like to talk for a moment about the
 4   benefits and payments to Christian Rodriguez and Andrea Velez
 5   as part of their cooperation.
 6              So what benefits did Christian Rodriguez receive
 7   from the U. S. Government in connection with his proactive
 8   cooperation?
 9   A    He received a total of $460,000.
10   Q    Was there any other benefit?
11   A    He was also relocated to the United States.
12   Q    What types of payments were involved in that $460,000?
13   A    They were comprised of expenses and services.
14   Q    And what's the difference between expenses and services?
15   A    Services would be compensation for the information
16   provided or the assistance provided.  Expenses would be
17   reimbursements.
18   Q    And is Christian Rodriguez potentially eligible for a
19   reward?
20   A    Potential, yes.
21   Q    What reward is that?
22   A    There's a Department of State $5 million reward for the
23   capture of certain individuals.  In this case, Jorge Cifuentes
24   and the defendant would be on that list.
25   Q    And who decides whether he gets that reward?
```

MARSTON/DIRECT/ROBOTTI

 1   A    Ultimately, it's the Department of State, and for the

 2   FBI, it would be at our headquarters executive management,

 3   where it would leave the FBI to go to the Department of State.

 4   Q    Why is he eligible for that reward?

 5   A    The substantial assistance he provided leading to their

 6   capture.

 7   Q    Capture of Jorge Cifuentes?

 8   A    Capture of Jorge Cifuentes.

 9   Q    Was Christian Rodriguez ultimately prosecuted for a

10   crime?

11   A    He was not.

12   Q    To your knowledge, did Christian Rodriguez pay all the

13   taxes on his service payments at the time they were due?

14   A    He did not.

15   Q    And when did it come to your attention that he had not

16   made all the taxes on the service payments?

17   A    In the months prior to trial.

18   Q    And what if any information did the FBI provide in

19   response to that?

20   A    The FBI provided a spreadsheet surrounding all the

21   payments made, so that he can have those addressed with a

22   lawyer, accountant, however he handled it.

23   Q    And you mentioned that Christian Rodriguez was relocated

24   to the United States.  Why was that?

25           MR. LICHTMAN:  Objection.

MARSTON/DIRECT/ROBOTTI

```
 1              THE COURT:  Overruled.

 2   A    Due to a threat to his safety.

 3   BY MR. ROBOTTI:

 4   Q    All right.  So let's talk about Andrea Velez.  What

 5   benefits did she receive from the U. S. Government?

 6   A    She received $290,000, approximately.

 7   Q    And what was that comprised of?

 8   A    Again, it is both services and expenses.

 9   Q    And did she receive any other benefit?

10   A    She has also -- there's been an application for an

11   S-Visa, which is special visa that allows witnesses to stay in

12   the United States, with the potential over a period of time to

13   gain legal permanent residency.

14   Q    And was she also relocated?

15   A    She was.

16   Q    And why was she relocated?

17   A    Again, due to a threat to her life.

18              MR. LICHTMAN:  Objection.

19              THE COURT:  Overruled.

20   BY MR. ROBOTTI:

21   Q    Did she ultimately plead guilty to a crime?

22   A    She did.

23   Q    All right.  Now, we've spoken a bit about proactive

24   cooperation.  Are you familiar with something known as

25   historical cooperation?
```

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

```
1    A    Yes.

2    Q    What's that?

3    A    Historical would be not acting in that undercover

4    capacity, basically providing the information that you know,

5    and obviously would be historical in nature.

6    Q    Are you familiar with what's called proffer sessions?

7    A    I am.

8    Q    What are proffer sessions?

9    A    Proffer sessions would be a formal agreement between a

10   witness or a defendant, their lawyer, and the United States

11   Attorney's Office.  It provides them with a level of

12   protection, so that they can come in and talk about their

13   criminal activities.

14   Q    And is that protection that their statements on that day

15   won't be used against them in certain circumstances?

16   A    That's correct.

17   Q    What's the goal of a proffer session?

18   A    The goal is to ultimately become a cooperator or to work

19   towards a 5K in their case.

20   Q    And what's the goal from the Government's perspective?

21   A    To gain the truth.

22   Q    And during these debriefs, isn't one of the purposes to

23   learn the information that the witness has?

24   A    It is.

25   Q    Now, what happens if the proffer sessions are successful?
```

MARSTON/DIRECT/ROBOTTI

1    A    If they are successful, normally, the United States

2    Attorney's Office would move towards a cooperation agreement

3    with that individual.

4    Q    And is that at the discretion of the U. S. Attorney's

5    Office?

6    A    Yes.

7    Q    So how does a cooperation agreement differ from a proffer

8    agreement?

9    A    Can you repeat that?

10   Q    Sure.  How does a cooperation agreement differ from a

11   proffer agreement?

12   A    So a proffer agreement is, as we talked about, that

13   formal agreement where they can speak freely with some limited

14   protections.  The cooperation agreement is -- I would say

15   another level of formalization, where they know that they're

16   going to get some protections and it's also going to be

17   provided to the judge at their sentencing.

18   Q    And is a cooperation agreement more of a longterm

19   agreement between the witness and the Government?

20   A    That is correct.

21   Q    Do meetings with a cooperating witness continue following

22   a cooperation agreement, typically?

23   A    They do.

24   Q    And for what purposes might that be?

25   A    To gather continual information, help the Government as

MARSTON/DIRECT/ROBOTTI

```
 1    things move forward with his case.
 2    Q    And would that involve trial preparation?
 3    A    Yes, it would.
 4    Q    And preparing for additional investigations?
 5    A    That is correct.
 6    Q    In your experience, does it typically take one session to
 7    debrief a potential cooperating witness or more than one
 8    session?
 9    A    Normally more than one session.
10    Q    All right.  I'd like to go back to December 2011,
11    Christian Rodriguez was still proactively cooperating at that
12    time, is that right?
13    A    That is correct.
14    Q    What other investigative steps did you take during this
15    time?
16    A    We applied for a series of search warrants in the months
17    coming after that, for something known as FlexiSPY.
18    Q    And what prompted you to do that?
19    A    Information provided by Christian.
20    Q    So during the course of your investigation, did you
21    become familiar with FlexiSPY?
22    A    I did.
23    Q    And what is FlexiSPY?
24    A    FlexiSPY is a software that is placed on devices -- in
25    this case on phones.  It is designed to be covertly placed on
```

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

 1   the phone.  It will collect information on that phone and then

 2   forward it onto another location, so the individual that has

 3   access to FlexiSPY can review what they've collected.

 4   Q    And what type of information is sent from the phone to

 5   this other location?

 6   A    Most notable, your messages.  It also records the

 7   geolocation where the phone is, as well as the call data, who

 8   you're calling, the phone numbers, as well as the date and

 9   time associated those records.

10   Q    What's another name for this type of software?

11   A    It's called spyware.

12   Q    And how do you obtain this type of spyware?

13   A    You can purchase it from a commercial vendor.

14   Q    And how is FlexiSPY placed on a device?

15   A    Once you have the license or you've purchased it, there

16   is a -- you would work within however that commercial vendor

17   sets it up, but the most important thing is you have to have

18   access to the device itself, the phone.

19   Q    And is the user of the device supposed to be aware of

20   this software being on it?

21   A    No.

22   Q    And is the user of the device or the phone supposed to be

23   aware that their information is collected and sent elsewhere?

24   A    No.

25   Q    How is the spyware placed on a given device identified?

MARSTON/DIRECT/ROBOTTI

```
 1    A     It's identified by an account number.

 2    Q     Or name?

 3    A     Or account name.

 4    Q     So what did you seek authorization to search in your

 5    search warrants?

 6    A     We sought authorization to search specific accounts.

 7    Q     How did you decide which FlexiSPY accounts to search?

 8    A     They were the ones that were purchased by Christian.

 9    Q     And were these accounts named?

10    A     They were.

11    Q     And what names in general?

12    A     They were variations of Charly and Black.  So Charly

13    Black, Black with a number generally associated at the end.

14    Q     And you mentioned that these accounts were purchased by

15    Christian.  Was it your understanding or did the FBI ask him

16    to do that or was it your understanding that someone else

17    asked him to do that?

18    A     Someone else.

19    Q     Who was that?

20    A     The defendant.

21    Q     What were these specific FlexiSPY accounts associated

22    with?

23    A     They were -- each was associated with a specific phone.

24    Q     All right.  So each search warrant authorized the search

25    of accounts associated with different phones?  Is that fair to
```

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

```
 1   say?
 2   A    Yes.
 3   Q    Where was the information gathered through the FlexiSPY
 4   accounts stored in this case?
 5   A    In this case, it was stored in the Amazon Cloud
 6   environment.
 7   Q    What do you mean by the "cloud"?
 8   A    The "cloud" is a reference in the IT structure for the
 9   way that they store your data in a large environment.
10   Q    Did -- and how is that information in the cloud accessed?
11   A    By using a user name and a password.
12   Q    And where did you get the user name and password from?
13   A    From Christian.
14   Q    How many search warrants did the FBI execute on FlexiSPY
15   accounts?
16   A    A total of 15.
17   Q    During what time period?
18   A    Was January -- January of 2012 into the fall of 2012.
19   Q    And why did the FBI execute ongoing search warrants?
20   A    Well, a search warrant would be a historical look-back
21   from the time that you execute the warrant.
22        So when you execute the warrant, you'd get the
23   historical data.  So in order to get the latest data that was
24   being collected, the FBI continued to do search warrants.
25   Q    And how was the data obtained from the servers pursuant
```

MARSTON/DIRECT/ROBOTTI

```
 1   to the search warrants?

 2   A     Leveraging the user names and the password.

 3   Q     And who actually downloaded the data?

 4   A     The first two times -- the first two times, Christian was

 5   directed by the FBI to download the data onto disks.  Those

 6   disks were then brought over to -- and a search warrant was

 7   applied in the Southern District of New York.

 8             Thereafter, so the remaining 13, FBI agents went

 9   into the accounts and pulled down the data.

10   Q     And what type of information did you obtain as a result

11   of these warrants?

12   A     We received the messages that were being captured, as

13   well as GPS coordinates that were associated with that device,

14   as well as some of the call data we talked about.

15   Q     And when you're saying messages, what type of messages

16   are you referring to?

17   A     Text messages.

18   Q     And so is it fair to say you obtained text messages sent

19   to and from particular devices or phones?

20   A     Yes.

21   Q     And those were the phones with the spyware secretly

22   installed on it?

23   A     That's correct.

24   Q     When these text messages were download, in what type of

25   document were they stored?
```

MARSTON/DIRECT/ROBOTTI

1    A    Either an Excel spreadsheet or a Word document.

2    Q    Were there dates and times associated with the message?

3    A    There were.

4    Q    And what times zone was that?

5    A    It was associated with device or the phone.

6    Q    And aside from the search warrants, did you obtain

7    FlexiSPY messages by any other method?

8    A    We did.

9    Q    And how was that?

10   A    Prior to the search warrants, we received email from

11   Christian with some data from FlexiSPY.

12   Q    And was that also a lawful means of obtaining the

13   FlexiSPY messages?

14   A    It was.

15            MR. ROBOTTI:  All right.  So Judge, I would like to

16   show this witness a series of exhibits and then publish the

17   relevant information at the end of showing them, all the

18   exhibits?

19            THE COURT:  Okay.

20   BY MR. ROBOTTI:

21   Q    All right.  So I'm going to begin by showing you 602A to

22   602E.  Do you recognize those?  (Exhibits published to the

23   witness.)

24   A    (Examines exhibits.)  I do.

25   Q    What are those?

MARSTON/DIRECT/ROBOTTI

```
 1   A     Those are going to be or the original disks containing
 2   the results of search warrants.
 3   Q     So the FlexiSPY data?
 4   A     Correct.
 5   Q     All right.  And just looking at 602A, could you tell me
 6   the date of the search for 602A at the top here?
 7   A     We have March 14th, 2012.
 8   Q     And 602B?
 9   A     Thank you.  February 27th, 2012.
10   Q     All right.  Now, I'd like to show you 602F-3BT1 through
11   602H.  And do you recognize those?  (Exhibits published to the
12   witness.)
13   A     (Examines exhibits.)  I do.
14   Q     And what are they?
15   A     The one on the right, upper right, is the email messages
16   from Christian.
17   Q     That's 602G?
18   A     602G.
19   Q     Okay.
20   A     602F is the search warrant returns that has select
21   messages on it.  And 602H are messages from FlexiSPY, as well,
22   select ones.
23   Q     All right.  And for 602F, does that contain images marked
24   602F-1 through 602F-6?
25   A     Yes.
```

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1   Q    And for 602H, does that contain messages marked 602H-1,

2   and 602H-2?

3   A    Yes.

4           MR. ROBOTTI:  Your Honor, the Government offers

5   Government Exhibits 602F, G, and H into evidence.

6           MR. LICHTMAN:  No objection.

7           THE COURT:  Received.

8    (Government's Exhibits 602F, G, H were received in evidence.)

9           MR. ROBOTTI:  All right.  Next, I'd like to show you

10  a series of transcripts.  These will be for the record,

11  602F-1AT, 602F-2 AT and BT, 602F-3AT, 602F-3B1, BT2, BT3, BT4,

12  BT5, BT6, 602F-3CT1, 3CT2, 3CT3, 3CT4 and 3CT5, 602F-4,

13  602F-5AT, 602F-5AT, 602F-5BT1 and BT2, and 602F-6T.

14          And I'd also like to show you Government Exhibits

15  402-1, 402-2, 402-3 and 402-4.

16          And just for the record, I think I misspoke.

17  602F-4AT.

18          May I approach, Your Honor?  Sorry.

19          THE COURT:  You may.

20          MR. ROBOTTI:  (Handing to the witness.)

21  BY MR. ROBOTTI:

22  Q    All right.  So Special Agent Marston, do you recognize

23  what's in the binder before you there?

24  A    I do.

25  Q    And what's that?

MARSTON/DIRECT/ROBOTTI

1   A    These are going to be the transcripts from select

2   FlexiSPY accounts.

3   Q    And also translations?

4   A    And the translations, yes.

5   Q    Okay.  And looking then at the four hundred series there,

6   402-1, the other set of documents, 402-1 through 402-4, what

7   are these?

8   A    These are public documents.

9   Q    Okay.  And what's the first one there, 402-1?

10  A    The first one is a birth certificate from the state of

11  California.

12  Q    Is that a certified copy?

13  A    It is a certified copy.

14  Q    The next one, 402-2?

15  A    The second one is an application for U.S. passport for

16  Emma Coronel.

17  Q    And the next one, 402-3?

18  A    U. S. passport applications for the defendant's

19  daughters.

20  Q    And for 402-4, is that another one of those passport

21  applications?

22  A    That is correct.

23  Q    And are those all certified copies?

24  A    And they're all certified copies.

25          MR. ROBOTTI:  Your Honor, the Government will offer

MARSTON/DIRECT/ROBOTTI

1    402-1, 402-2, 402-3 and 402-4 into evidence.

2              MR. LICHTMAN:  Judge, 401.

3              THE COURT:  I'm sure the Government has a theory.

4    I'll hear it at sidebar.

5              (Sidebar.)

SIDEBAR

1              (Sidebar.)

2              THE COURT:  The relevance is not self-evident?

3              MR. ROBOTTI:  Sure.  So we're about to go into the

4    text messages that were captured over these search warrants.

5              THE COURT:  Yes?

6              MR. ROBOTTI:  The way that we're able to identify

7    the defendant as the user of these accounts is through

8    identifying information in the text messages themselves,

9    including the names of his wife, the names of his children --

10             THE COURT:  Got you.

11             MR. ROBOTTI:  -- and their birth dates.

12             THE COURT:  But why do we need the passport

13   material?

14             MR. LICHTMAN:  We can stipulate to it.

15             MR. ROBOTTI:  We were going to compare the public

16   documents, Your Honor, to the -- what's actually in the text

17   messages, and there is some identifying information beyond the

18   names, include an email address as well that is associated

19   with some of the screen names found in the accounts.

20             THE COURT:  Are you willing to stipulate that the

21   text -- or emails are between the wife and the daughters?

22             MR. ROBOTTI:  So the text messages are between the

23   defendant and his wife.

24             THE COURT:  Yes.

25             MR. LICHTMAN:  No.

LISA SCHMID, CCR, RMR

SIDEBAR

```
 1              THE COURT:  Okay.  Then we do it this way.

 2              (Sidebar ends.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SIDEBAR

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MARSTON/DIRECT/ROBOTTI

```
 1              (In open court.)
 2              THE COURT:  The exhibits are received over
 3   objection.
 4         (Government Exhibits 402-1, 2, 3, 4 were received in
 5                        evidence.)
 6   BY MR. ROBOTTI:
 7   Q    All right.  Next, I'd like to show you Government Exhibit
 8   45 for identification. Do you recognize this?  (Exhibits
 9   published to the witness.)
10   A    (Examines photograph.)  I do.
11   Q    Who is that?
12   A    Emma Coronel.
13              MR. ROBOTTI:  Your Honor, the Government offers
14   Government Exhibit 45 into evidence.
15              MR. LICHTMAN:  No objection.
16              THE COURT:  Received.
17         (Government Exhibit 45 was received in evidence.)
18   BY MR. ROBOTTI:
19   Q    And who is Emma Coronel?
20   A    It is the wife of the defendant.
21   Q    All right.  Next, I'd like to show you what's in evidence
22   as Government Exhibits 809-1, 809-1T, 809-2 and 809-2T.  And
23   do you recognize those?  (Exhibits published to the jury.)
24   A    I do.
25   Q    And what are they?
```

MARSTON/DIRECT/ROBOTTI

```
1    A    We have the transcripts from the letters written by the

2    defendant at the MCC, and as well the redacted copies of those

3    letters.

4    Q    All right.  So next, I'd like to show you what's in

5    evidence as Government Exhibits 218-11, 218-19, 218-20,

6    218-24, 218-29A-1, 218-29AT, 218-29A3, 218-29B1.

7                (Publishes exhibits to the jury.)

8                And I'll also show you Government's Exhibits 70 and

9    33 in evidence.  (Exhibits published to the jury.)

10               All right.  Do you recognize all those documents?

11   A    I do.

12   Q    And what are those documents, in general?

13   A    The documents associated with the raid in Los Cabos.

14   Q    Next, I'd like to show you a series of exhibits, starting

15   with Government Exhibit 511-2.  This is for identification.

16   511-4, 511-5, 511-7, 511-8, 511-10, 511-11, 511-12, 511-13,

17   and 511-14.  Do you recognize all these documents?  (Exhibits

18   published to the witness.)

19   A    I do.

20   Q    What are these?

21   A    It's the summaries of the information found in the search

22   warrants results from FlexiSPY, associated with the public

23   documents and the MCC letter that we just put into evidence,

24   as well as all the documents from the raid in Los Cabos.

25   Q    And so these are summaries of all those documents that we
```

MARSTON/DIRECT/ROBOTTI

1    just looked at?

2    A     That is correct.

3    Q     And looking just at 511-7, do you recognize the photo in

4    the bottom center there?

5    A     I do not.

6             MR. ROBOTTI:  Your Honor, the Government would offer

7    511-2, 4, 5, 8, 10, 11, 12, 13, and 14 into evidence.  And

8    511-7 into evidence with this photograph, subject to

9    connection.

10            MR. LICHTMAN:  What, they're demonstrative?

11            THE COURT:  No.  Summaries.

12            MR. LICHTMAN:  No objection.

13            THE COURT:  Received.

14            (Government Exhibits 511-2, 4, 5, 8, 10, 11, 12, 13,

15   14 were received in evidence.)

16            (Continued on the next page.)

17

18

19

20

21

22

23

24

25

MARSTON/DIRECT/ROBOTTI

```
 1    BY MR. ROBOTTI: (Continued.)

 2            MR. ROBOTTI:  All right.  And finally, Your Honor,

 3    the Government's going to offer into evidence 511-15.

 4    BY MR. ROBOTTI:

 5    Q    Special Agent Marston, is this a compilation of exhibits

 6    already in evidence in this case?

 7    A    Yes.

 8            MR. ROBOTTI:  All right.  Your Honor, the Government

 9    offers 511-15 into evidence.  This is going to be a PowerPoint

10    presentation.

11            MR. LICHTMAN:  No objection.

12            THE COURT:  Received.

13            (Government's Exhibit 511-15 received in evidence.)

14            (The above-referred to exhibit was published.)

15    BY MR. ROBOTTI:

16    Q    So beginning with this slide here, what are we looking at

17    in general?

18    A    In general, it's a visual representation of the results

19    of the search warrant from FlexiSpy on February 27, 2012.

20    Q    And what do the names on the left side mean?

21    A    They are the associated account name.

22    Q    And were these the accounts that were searched during

23    this search warrant?

24    A    They were.

25    Q    And what was each account associated with?
```

MARSTON/DIRECT/ROBOTTI

1   A     A specific phone.

2   Q     So it's one account per phone.

3   A     That's correct.

4   Q     And is there a difference between an account and a screen

5   name?

6   A     There is.

7   Q     And what's that difference?

8   A     The account is a associated with the license.  The screen

9   name is something that the user of the phone can change at any

10  time.

11  Q     And typically what would a screen name be associated with

12  on a phone?

13  A     With a contact.

14  Q     And what types of applications?

15  A     With messages -- text messages.

16  Q     And can the account have more than one screen name or

17  change the screen name?

18  A     It can.

19  Q     Why is that?

20  A     The user has access to that and can change it at any time

21  they like.

22  Q     Who actually downloaded the data associated with this

23  search warrant return?

24  A     For this particular search warrant was FBI agents.

25  Q     So looking to the right side here, what does that show?

MARSTON/DIRECT/ROBOTTI

1   A    On the right side is the number of contacts that were

2   observed inside the FlexiSpy.

3   Q    And what do you mean by "contacts"?

4   A    The other phones that it was in contact with.

5   Q    And so each contact is a different phone?

6   A    That is correct.

7   Q    All right.  So for instance, let's look at the top line

8   here.  What did the search warrant show with respect to

9   CharlyBlack 2?

10  A    That the CharlyBlack 02 account was in touch with two

11  different phones.

12  Q    All right.  So turning to the next slide, let's talk

13  about the phones we're going to focus on today.

14       Looking at the phones from the February 27, 2012,

15  search warrant, which phones are we going to focus on?

16  A    CharlyBlack 02, CharlyBlack 11, CharlyBlack 14, and

17  CharlyBlack 15.

18  Q    And which of these were in contact with the contact J?

19  A    CharlyBlack 02, CharlyBlack 11, and CharlyBlack 15.

20  Q    And CharlyBlack 14 was not in contact with J.

21  A    That's correct.

22  Q    All right.  Then let's focus on a fifth phone today from

23  the March 14th, 2012 search warrant.  Which phone is that?

24  A    CH6.

25  Q    And when that account was searched, who downloaded the

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

```
 1   data?
 2   A     FBI agents.
 3   Q     And was that account also in contact with J?
 4   A     Yes.
 5   Q     All right.  Turning to the next slide, let's start by
 6   talking about the accounts in contact with J.  So looking at
 7   slide 3, in general, what does this show?
 8   A     This is a summary of the other -- the FlexiSpy accounts
 9   that were in touch with the contact J.
10   Q     And we're going to go through this in some more detail
11   during this presentation, but were you able to locate
12   identifying information for the users of some of these
13   accounts and screen names within the text messages themselves?
14   A     We were.
15   Q     All right.  So looking at the photo in the top center,
16   who is that?
17   A     The defendant.
18   Q     And did you locate identifying information associated
19   with the defendant in J's text messages to these three phones?
20   A     We did.
21   Q     All right.  Looking at the photo on the left, who is
22   that?
23   A     Agustina Cabanillas Acosta.
24   Q     Did you locate identifying information associated with
25   her on a phone in contact with J?
```

MARSTON/DIRECT/ROBOTTI

```
 1    A     We did.

 2    Q     And on which phones?

 3    A     On CharlyBlack 15 and CH6.

 4    Q     All right.  Looking at the photo on the right, who is

 5    that?

 6    A     Emma Coronel.

 7    Q     And did you locate identifying information associated

 8    with her on a phone in contact with J?

 9    A     We did in CharlyBlack 11.

10    Q     Looking at the final photograph in the bottom center, are

11    you familiar with Lucero Sanchez Lopez through your

12    investigation?

13    A     No.

14    Q     Did you identify her as the user of this account?

15    A     We did not.

16    Q     And what account and screen name is listed under her

17    photo?

18    A     CharlyBlack 2.

19    Q     And the screen name?

20    A     Screen name M.

21    Q     All right.  So let's begin by talking about CharlyBlack

22    11.  How many contacts did CharlyBlack 11 have?

23    A     One contact.

24    Q     And was that J?

25    A     Correct.
```

MARSTON/DIRECT/ROBOTTI

```
 1   Q    All right.  So turning to the next slide, slide 5, what
 2   do we see here in general?
 3   A    In general, we have the identifying information that's
 4   inside the text messages associated with CharlyBlack 11, as
 5   well as the public documents and the MCC letter, as well as
 6   some other accounts from FlexiSpy.
 7   Q    And so in the top center here, this is identifying
 8   information found within the text messages themselves.
 9   A    That's correct.
10   Q    All right.  So directing your attention first to the
11   public documents, based on the list of U.S. passport
12   applications and birth certificates, did you identify the
13   names of Emma Coronel's children?
14   A    I did.
15   Q    What are those names?
16   A    Emaly and Maria Joaquina Coronel.
17   Q    Did you identify their birth date?
18   A    I did.
19   Q    Ane what's that?
20   A    August 15th, 2011.
21   Q    And so they are twins?
22   A    That's correct.
23   Q    And based on the U.S. passport application for Emma
24   Coronel, did you identify one of her e-mail addresses?
25   A    We did.
```

MARSTON/DIRECT/ROBOTTI

1    Q    And what was that?

2    A    Coronareyna0@icloud.com.

3    Q    And in reviewing the letters from the defendant at the

4    MCC, did you identify the name of the defendant's wife and his

5    children?

6    A    I did.

7    Q    And what are those?

8    A    The defendant refers to his wife as Emma, his children as

9    Emmely or Mali and Maria Joaquina, and he also refers to them

10   as Reynitas.

11   Q    Now let's talk about the information found in the text

12   messages in the middle.  Looking at the first bullet point in

13   the middle, what, if anything, do you notice about the first

14   screen name there?

15   A    Emma's last name, Coronel.

16   Q    So that screen name is Reynita Coronel?

17   A    That's correct.

18   Q    How does that screen name compare to Emma Coronel's

19   e-mail address in the public documents below?

20   A    There's a similarity to it.  The e-mail address Corona

21   similar to Coronel and Reyna, similar to Reynita.

22   Q    All right.  So let's refer to the user of the CharlyBlack

23   11 phone as Reynita Coronel for short here.  So looking at

24   bullet point 2 in the text messages, did you identify the

25   names of Reynita Coronel's daughters in those text messages?

MARSTON/DIRECT/ROBOTTI

1    A    We did.

2    Q    How did those names compare to the names of the

3    defendants and Emma Coronel's daughters?

4    A    They were the exact same names as the birth certificates.

5    Q    What were the nicknames used for Reynita Coronel's

6    daughters in the text messages?

7    A    Mali and Kiki.

8    Q    And how did that compare -- and also Reynitas?

9    A    And also Reynitas.

10   Q    How did that compare to the nicknames used in the

11   defendant's MCC letters?

12   A    Mali matched up with Mali, and Reynitas matched up with

13   Reynitas.

14   Q    Going back to bullet point 1 for a moment, on the second

15   line there, what's the screen name -- what's the second screen

16   name there?

17   A    RC Emaly YM Joaquina.

18   Q    And how does that compare to the names of the defendant's

19   and Emma Coronel's daughters?

20   A    It's similar.

21   Q    And do you know what Reynitas and Reyna mean?

22   A    Reynitas means princesses and Reyna, queen.

23   Q    All right.  So going back to the third bullet point, were

24   you able to identify the date of birth for Reynita Coronel's

25   daughters?

MARSTON/DIRECT/ROBOTTI

```
 1   A    We were.

 2   Q    And what was that?

 3   A    It was associated with August 15th, 2011.

 4   Q    And how did that compare to the date of birth for the

 5   defendant and Emma Coronel's daughters?

 6   A    It matched the birth certificate, August 15, 2011.

 7   Q    And how did J refer to Reynita Coronel during these

 8   conversations -- these text messages?

 9   A    The references were to "my love" and "Mommy."

10   Q    Now, looking at the other accounts in the bottom right,

11   what do we see there?

12   A    Other identifying information from some of the other

13   accounts.

14   Q    And by "other accounts," are these other phones that were

15   searched -- one other phone that was searched in your search

16   warrant and one other phone that Christian e-mailed you

17   information about?

18   A    That is correct.

19   Q    And under Reynita SMS, how is the user of that account

20   referred to?

21   A    She's referred to as Emma.

22   Q    And did you locate an e-mail address in text messages

23   from that phone?

24   A    In the text messages, there was an e-mail address

25   provided for reynita_guzman@hotmail.com.
```

MARSTON/DIRECT/ROBOTTI

1    Q     And what do you notice about that e-mail?

2    A     It has a similarity, Reynita, and Guzman being the last

3    name of the defendant.

4    Q     And finally, looking at black 01, what did you notice

5    about the text messages from that phone?

6    A     Within the text messages, there was reference to the

7    daughters as Mali and Kiki, which coincided with the Reynita

8    Coronel messages, and also a reference to a date of birth of

9    eight -- August 15, 2011, which matches up to the public

10   documents for their birth being August 15th, 2011.

11   Q     All right.  So based on the information in this slide,

12   what did you determine about Reynita Coronel, the user of the

13   phone associated with CharlyBlack 11?

14   A     CharlyBlack 11 phone we concluded was being used by Emma

15   Coronel.

16   Q     All right.  So turning to the next slide, what do we see

17   here in general?

18   A     In general, the message is associated with -- this is

19   identifying information associated with the screen name J

20   within CharlyBlack 11 messages, as well as public documents,

21   the defendant's MCC letter, and information gathered at the

22   Los Cabos raid.

23   Q     Did you rely on the same public documents that we saw on

24   the previous slide?

25   A     We did.

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

1    Q    Now, directing your attention to the information on the

2    bottom right about the Los Cabos raid, what information is

3    listed in the first bullet point?

4    A    It's the three individuals who were detained in Los

5    Cabos.

6    Q    And who were they?

7    A    Angel Jorge Lopez Urias, Maria Luisa Macias, Agustina

8    Cabanillas Acosta.

9    Q    And what information is listed in the second bullet point

10   there?

11   A    The recovery of size 9 shoes -- U.S. size 9 shoes; as

12   well as pants, size 32/30.

13   Q    All right.  So going to the information in the center

14   here, this is information pulled from the text messages from

15   Emma Coronel to the screen name J; is that right?

16   A    That is correct.

17   Q    And J was the only contact for that phone, right?

18   A    Yes.

19   Q    All right.  So turning to the first bullet point, was the

20   screen name J significant to you in any way?

21   A    It was.

22   Q    Why?

23   A    It was the first letter of the defendant's first name.

24   Q    And turning to the second bullet point here, how did Emma

25   Coronel refer to J during the course of these conversations?

MARSTON/DIRECT/ROBOTTI

1    A    As Don Joaquin, Mr. Joaquin, as well as Daddy.

2    Q    And looking at the third bullet point, what were the

3    names of J's daughters in the text messages?

4    A    Names were Emali and Maria Joaquina, as well as a

5    reference to Reynitas.

6    Q    And what were J's daughters' dates of birth?

7    A    Again, associated date of birth for August 15, 2011.

8    Q    And how does that information, the names and date of

9    birth, compare to the public documents?

10   A    It matches exactly.

11   Q    What does the fifth bullet point show?

12   A    Within the text messages, there were references to three

13   individuals who were known associates to the defendant.

14   Q    And who were they?

15   A    Cachimba, Dona Consuelo, and Condor.

16   Q    And finally, looking at the sixth bullet point, in

17   general, what information was located in J's messages with

18   Emma Coronel following the February 22, 2012, raid in Los

19   Cabos?

20   A    Within the messages, J is referring to needing a pair of

21   Mexican size 7 shoes, which is equivalent to U.S. 8 1/2; he's

22   also requesting pants, and he provides a size of 32/30; and

23   the last part J references that Maria and Angel were left

24   behind.  Two of the individuals arrested and maintained in Los

25   Cabos were Angel Jorge Lopez Urias and Maria Luisa Macias.

MARSTON/DIRECT/ROBOTTI

1  Q    Based on the information in this chart, what did you

2  determine about the user of the screen name J?

3  A    That the defendant was the user of the screen name J.

4  Q    All right.  So turning to slide 7, let's go through some

5  of the messages between the defendant and Emma Coronel.  Let's

6  begin by going through some examples of the identifying

7  information we just discussed.

8            First, let me just ask you, during what time period

9  did all these conversations take place?

10 A    This is January and February of 2012.

11 Q    All right.  So turning to the next slide, what do we see

12 here?

13 A    This is the birth certificates from California for Emali

14 and Maria Joaquin Coronel.

15 Q    And what's the birth date?

16 A    8/15/2011.

17 Q    All right.  Turning to the next slide, what's this?

18 A    This is the U.S. passport application for Emma Coronel.

19 Q    And what does that list?

20 A    The e-mail address being coronareyna0@icloud.com.

21 Q    All right.  Turning to the next slide, what do we see

22 here?

23 A    This is the redacted letter from MCC that the defendant

24 wrote, and in it the defendant addresses his wife Emma, or "my

25 wife Emma"; he addresses -- it's also addressed to Emmely or

MARSTON/DIRECT/ROBOTTI

1    Mali, as well as Maria Joaquina; he makes references to the

2    daughters as Reynitas; and last, it's signed, your dad,

3    Joaquin Guzman, L, period.

4    Q     Let's look at some of the messages and the information

5    that matches up to these public documents.  What do we see

6    highlighted in red in the first two white boxes?

7    A     We see the name of the daughters, Joaquina and Emali.

8    Q     And the screen name there, Emaly y M Joaquina; is that

9    right?

10   A     Yes.  In the second part, that's correct.

11   Q     And going to the third white box there, could you read

12   that message?

13   A     Sure.

14         J:  Our Kiki is fearless.  I'm going to give her an

15   AK-47 so she can hang with me.

16   Q     All right.  So turning to the next slide, what do we see

17   here?

18   A     We have Emma and the defendant communicating.  There's a

19   reference to their birthday being tomorrow with another

20   reference that you will be one month older, the date is

21   February 14th, 2012.

22   Q     January 14th?

23   A     January 14th, 2012.

24   Q     Okay.  And then the bottom box there?

25   A     We have another reference to their birthdays.  This one

MARSTON/DIRECT/ROBOTTI

```
 1    is February 15th, 2012, and a reference to -- it's their six
 2    months.
 3    Q    What's six months before that date?
 4    A    August 15th, 2000 -- August 15th, 2011.
 5    Q    Next, looking at slide 13, what is highlighted here in
 6    paragraph 227?
 7    A    Little princesses.
 8    Q    And what's the Spanish for that?
 9    A    Mi Reynita.
10    Q    Can you read paragraph 230?
11    A    Emma:  Or maybe it's best if mommy makes them for you.
12    After all, it was her enchiladas that made you fall in love
13    with her.
14    Q    All right.  So turning next to slide 14, could you read
15    the messages starting at paragraph 164 and on to the following
16    slide?
17    A    J:  I don't like you saying shape, mommy, because it
18    makes me mad.
19
20         RC:  Just like I call you Don Joaquin, sneaky.
21         J:  Your daddy's not sneaky, mommy.  I will get mad
22    if you badmouth my daddy.
23         RC:  I'm telling you.  The girls ask what is wrong
24    with Mr. Joaquin.  Why the face?
25         J:  My Kiki is a cutie.  Mali is not like that,
```

MARSTON/DIRECT/ROBOTTI

1    love.

2              RC:   Recently, I have been told that Mali looks more

3    like you, but she has a very sweet disposition.

4              THE COURT:   I need a sidebar, please.

5              (Sidebar.)

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
 1              (Sidebar conference held on the record out of the

 2     hearing of the jury.)

 3              THE COURT:  Why?

 4              MR. ROBOTTI:  Judge, we are establishing the

 5     identity --

 6              THE COURT:  Got it.

 7              MR. ROBOTTI:  That was the last slide on it.

 8              THE COURT:  I'm always too late for these things.

 9              MR. ROBOTTI:  That slide I was having him read in

10     particular because it shows the defendant's name on two

11     occasions, that's why I had him go through that one.  I

12     understand we went through the summary, Your Honor, but we

13     also felt it was important to actually show the jury the work

14     that we did rather than just have the agent say it.

15              THE COURT:  It's not irrational what you are doing,

16     I understand it.  If we're at the end, let's just finish it.

17              MR. ROBOTTI:  I'm moving on.  Okay.  Thank you,

18     Judge.

19              (Sidebar ends.)

20              (Continued on next page.)

21

22

23

24

25
```

MARSTON/DIRECT/ROBOTTI

```
 1              (In open court.)
 2    BY MR. ROBOTTI:
 3    Q    Special Agent Marston, if you can just finish reading
 4    this slide.
 5    A    RC:  But Joaki has your mannerisms.
 6              J:  Yes.  The splitting image of Dona Consuelo.
 7    Exactly like her.
 8    Q    All right.  Now, turning to the next slide, did you
 9    review messages in the CharlyBlack 11 phone about transporting
10    kilos by plane?
11    A    We did.
12    Q    Could you read this conversation beginning on this slide
13    and continuing through the next several slides?
14    A    RC:  I've already eaten.  My father is here, he is going
15    over there.  To work.
16              J:  Put him on, love.
17              RC:  Okay.  Hi.  How are you doing, sir?
18              J:  That's good.  When are you heading to the
19    border?
20              RC:  Tomorrow.  By way of Cananea.  What do you
21    think?
22              RC:  There's a good crossing point around there.  I
23    have a flight all packed up back at the ranch.
24              J:  Who's going to help you over there?
25              RC:  Marquitos's people from before.  Alfredo
```

MARSTON/DIRECT/ROBOTTI

1    referred us.

2              J:  I spoke to Alfredo so that Marquitos's people

3    would take care of you over there.  Who helped you?

4              RC:  Yes, Marquitos's people did.  I want to leave

5    tomorrow.

6              J:  Since my sweetheart told me that you and my

7    compadre were going to Agua Prieta, I told her I was going to

8    talk to Alfredo so as he would send word, otherwise you would

9    not get any help.

10             RC:  Yes.  Thanks to you we are very well taken care

11   of.  Thanks.

12             J:  Who will be helping you in Cananea?

13   Q    Where did we see the names Marquitos and Alfredo

14   previously?

15   A    Those were part of the ledgers recovered from Los Cabos.

16   Q    Turning to the next slide, could you read this slide as

17   well?

18   A    RC:  A guy from Amacuable.  He lives there and knows his

19   way around.  We already have points and couriers who are just

20   waiting for me because I'm going to set up a repeater for the

21   radio.  I want to bring my flight from the ranch.  I would

22   like it by plane.  What do you think would be best, by plane?

23             J:  Don't use radios.  Use just black because that's

24   the reason it drops because of the radio.  Just black,

25   otherwise don't even send one kilo because everything will

MARSTON/DIRECT/ROBOTTI

```
1   drop.  That's the reason memos drop because of the radios.
2               RC:  Great idea.  That's how it will be done, sir.
3               J:  Don't say anything to anybody so the border
4   patrol will chase some other people.  They are listening to
5   all the radios.  Be discrete because nobody is using black.
6   Friends from Mexico sent word saying that working with radios
7   is dangerous because the border patrol listens to everything.
8               RC:  Very well.  Will do.
9   Q    Based on your training and experience, what does the term
10  "black" refer to?
11  A    They are referring to BlackBerrys.
12  Q    Just to be clear, based on the previous slide, who is
13  this conversation between right now?
14  A    It's between the defendant and Emma's father.
15  Q    Turning to the next slide, could you walk us through this
16  one?
17  A    In this slide, they are --
18  Q    Sorry, you can go ahead and read this one.
19  A    Okay.  Line 58, RC:  I'll send it/her there by plane from
20  the ranch.  I have everything ready.  If you'd like to send
21  yours.  It's up to you.
22              J:  Get that flight through and I'll send that.
23              RC:  Will do.  We'll do it tomorrow.  I'll leave
24  then.
25              J:  Do you have people ready to pick up -- pick you
```

MARSTON/DIRECT/ROBOTTI

1   up on the other side?

2            RC:   I don't.  Jose Luis says he does.  I don't

3   have any to sell him, either.  Over there.  Take good care.

4   We'll be in touch.  Via my daughter or the secretary.

5   Q    What's the Spanish term for "secretary" highlighted

6   there?

7   A    "Secre."

8   Q    Where have we seen the term "secre" before?

9   A    Also on the ledgers from Los Cabos.

10  Q    All right.  Turning to the next slide, could you read the

11  highlighted portion?

12  A    Certainly.

13           J:  All right.  Be well.  Once there, I have friends

14  that will buy.  I'll refer you to somebody.

15  Q    All right.  Turning to the next slide, could you read the

16  highlighted portions here?

17  A    J:  That's good.  How's it going with your dad?

18           RC:  He was telling me that he will be given the

19  crossing the day after tomorrow.  They had not given him the

20  crossing yet.

21           Line 329:  I mentioned to my dad that you had asked

22  me if he wanted to make a trip and that Cachimba charged

23  12,000 dollars.  He said he'll take you up on it, if it's

24  possible.

25           Line 331, J:  All right, darling.  Have him work it

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

1   out with him, love.  Are Cachimbas and him in touch, love?

2              J:  I'll tell him to get together with him and take

3   him.

4   Q      Where have we seen the name Cachimba before?

5   A      Also in the ledgers recovered in Los Cabos.

6   Q      Turn to the next slide.  Could you read the highlighted

7   portions?

8   A      RC:  When you have a chance, let Cachimba know that you

9   authorize my dad's flight because Cachi said he had not been

10  told anything.

11             J:  Cachimba said it's too windy and that as soon as

12  the weather improves he will go.  I'll lend him the plane and

13  he and Elijio will get a pilot.

14  Q      Turning to the next slide, could you read this one for

15  us?

16  A      Las Reynaas:  Yes.  I was talking to my dad.  He is

17  feeling down.

18             J:  What does he say?

19             Las Reynaas:  The federal authorities raided the

20  house where he had the things and they took everything.  The

21  family that took care of the house as well, but I think

22  they've already released them.  He was in a hiding spot.  They

23  did not seize the house.  And supposedly, they have everything

24  that they took; that the soldiers still have not given it

25  back.  Oh, no, he says the federal authorities are from

MARSTON/DIRECT/ROBOTTI

```
 1    Hermosillo.
 2              J:  Have him talk to the person in charge over there
 3    to see if they [unspecific] give him back some of the stuff.
 4    Q    Turning to the next slide in the text messages from
 5    CharlyBlack 11 phone, did you review communications about
 6    money?
 7    A    I did.
 8    Q    And could you summarize what occurs during this
 9    conversation here?
10    A    Yes.  RC has received a gift, it's a $12,000 watch.
11    It's -- they discussed a return gift back to which J says at
12    the bottom to provide about 1,000 pesos, anything over 60,000.
13    Q    1,000 or 100,000 pesos?
14    A    Sorry.  100,000 pesos.
15    Q    About how much was 100,000 pesos worth in U.S. dollars in
16    2012?
17    A    100,000 was about $7500.
18    Q    Turning to the next slide, could you summarize what this
19    conversation is about?
20    A    Certainly.  This is a conversation regarding money to be
21    paid for plastic surgery.
22    Q    And what month is this conversation?
23    A    January -- January 2012.
24    Q    All right.  Turning to the next slide, did you review
25    messages about properties on the CharlyBlack 11 phone?
```

MARSTON/DIRECT/ROBOTTI

```
 1   A    We did.

 2   Q    And could you summarize what occurs during this slide?

 3   A    They are discussing building a house.  In the highlighted

 4   portion of 186, they describe the house.

 5   Q    Could you read 186 for us?

 6   A    Certainly.

 7            J:  It's going to be four bedrooms plus the maid's

 8   quarters, love.  The master bedroom has to be spacious and

 9   have high ceilings.

10   Q    There's a name highlighted in the paragraph 183, Angel.

11   How does that compare to the name of the persons arrested in

12   the Los Cabos raid?

13   A    There was an Angel arrested in the Los Cabos raid.

14   Q    Turning to the next slide, could you summarize what we

15   see here?

16   A    Discussion about registering the house under different

17   names associated with the children.

18   Q    Sir, could you read 194, just the highlighted portion

19   beginning "register"?

20   A    Register the babies under a different name so you can put

21   them under their name so -- so you can put them under their

22   names, love.

23   Q    Turning to the next slide, 28, could you read this slide

24   for us?

25   A    J:  And as a single mother.
```

MARSTON/DIRECT/ROBOTTI

```
 1              Las Reynaas:  Do I have to register first?

 2              J:  Yes, love.

 3              Las Reynaas:  I don't know if I can be done again to

 4    get a certificate.

 5              J:  It can be done.  It is so that the baby girls

 6    can have the properties recorded under that name.

 7              Las Reynaas:  If one could use an identification

 8    card to record it, it could be done right away using whatever

 9    name.

10              J:  Check with Omar, love.  See if he can get you

11    the certificate first.

12              Las Reynaas:  It would be falsified.  Let's see if

13    they take it.

14              Las Reynaas:  I'll see what I can do.

15    Q    Where have we heard the name "Omar" before?

16    A    It is also a name captured in the ledgers from Los Cabos.

17    Q    Was it referenced in two different ways?

18    A    It was.

19    Q    What were those ways?

20    A    One was Omar and another one was Lic Omar.

21    Q    And do you know what Lic is short for in Spanish?

22    A    Liscensiado.

23    Q    And what does that mean?

24    A    Lawyer.

25    Q    So looking at slide 29, could you continue just reading
```

MARSTON/DIRECT/ROBOTTI

1   the highlighted portions of the slide?

2   A    J:  Darling, what do you think about Carla for Kiki and

3   Ermelinda for Mali?

4             J:  Let's see if by tomorrow we come up with

5   different names.

6   Q    All right.  Turning to slide 30, did you review messages

7   about security procedures in the CharlyBlack 11 phone?

8   A    We did.

9   Q    And looking at paragraph 96, who are the defendant and

10  Emma Coronel talking about here?

11  A    El Arqui.

12  Q    Could you read the highlighted messages at the bottom?

13  A    J:  Don't say anything over the phone about the house.

14  Have them give you a pin number over the phone.  Don't mention

15  the house at all otherwise they will find out where he's

16  building it.

17            RC:  He doesn't have black.  He said he was going to

18  buy one but we discuss everything in person.

19            J:  Have him buy one and do everything via pin

20  number, otherwise nothing will be done because they are --

21  they are being listened to and they'll know.

22  Q    And turning to the next slide, could you just read

23  paragraph 135 and paragraph 138?

24  A    RC:  Charli understands the equipment, love.  The blacks

25  freeze up a lot.

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

```
1              J:  It's because the encryption was not done
2    correctly.  Give it to him and have him check it for you,
3    love.
4    Q    Where have we seen the name "Charli" before?
5    A    Also recovered in the ledgers from Los Cabos.
6    Q    And could you read the highlighted paragraphs in the
7    first box?
8    A    Las Reynaas:  Is Cachimbas available?
9              J:  Well, he's always -- he will always be ready for
10   my princesses.  We just have to make sure there are no
11   soldiers around.
12   Q    And this is slide 32, for the record.
13             And in the next box, on slide 32, could you also
14   read that highlighted portion?
15   A    J:  Darling, what time will you be at the 3 tomorrow
16   morning so that Cachimbas can be on it.
17   Q    What is the location referred to as in paragraph 674?
18   A    It's referred to by the number 3.
19   Q    Turning to the next slide, could you read this slide as
20   well?
21   A    J:  Love, whenever you guys see suspicious-looking cars,
22   let me know right away so I can get them checked out, love.
23             RC:  Yes.  The guys outside spend their time out
24   there.  They thought it was suspicious but they said that they
25   were told they were from the government.
```

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

1         J:  Yes, that's right, love.  I am told they are

2    following you, darling.  You go ahead and lead a normal life,

3    that's it.  They just want to see if you are coming to where I

4    am.

5    Q    All right.  Turning to slide 34, did you review messages

6    about security that also included discussions of weapons?

7    A    I did.

8    Q    Could you read the highlighted portions on this slide?

9    A    Las Reynaas:  Oscar just told me that some soldiers are

10   going to raid at an address.  They checked and they said it's

11   this house.  What do you know?

12        J:  I haven't heard anything, darling.  Let me check

13   and see what's going on.

14        J:  Any weapons there, love?  Do you have a gun?

15        Las Reynaas:  I have one of yours.  That you gave

16   me.

17        J:  I'm asking if there are any guns, darling?

18   Q    Turning to the next slide, reading the highlighted

19   portions.

20   A    Las Reynaas:  Yes, there are.  One.  Well, two.

21        J:  Put it in the hidden compartment, darling.

22        J:  Darling, I'm being told they're going to the

23   Amado Nervo house.  They are checking to see whose house it

24   is.  What is your house number?

25        Las Reynaas:  Yes, it's this one.

MARSTON/DIRECT/ROBOTTI

```
 1    Q    Can you read the highlighted on the next slide as well?

 2    A    J:  They are doing a thorough check for me, darling.

 3              Las Reynaas:  Let me know when it will be.

 4              J:  Darling, in a while, I will let you know

 5    whatever I hear.

 6              Las Reynaas:  Okay.  If I don't answer it means

 7    they're here and I turned it off.  All right?  Just in case

 8    they get here shortly.

 9    Q    And the highlighted boxes on the following page?

10    A    J:  Yes, darling.  And make sure you delete everything

11    every time we're done chatting, love.

12              J:  There's not going to be any search, darling.

13    Have a good night's rest.

14    Q    Just briefly going back to slide 35, line 393, what is

15    the Spanish word for hidden compartment?

16    A    "Clavo."

17    Q    All right.  So turning next to slide 38, you mentioned

18    earlier that you reviewed messages about the raid in Los

19    Cabos, Mexico, on February 22, 2012; is that correct?

20    A    That's correct.

21    Q    All right.  Let's start by reading the first four

22    paragraphs here and then stopping.

23    A    Las Reynaas:  Honey, some guys in Guadalupe Victoria were

24    killed just now.  Was it any of your people?

25              J:  No, darling.
```

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

```
 1                  Las Reynaas:  I love you, love.  Talk to you soon.
 2     J:  And who might have been killed them -- and who might
 3     killed them?
 4     Q     What time is that message from J in paragraph four?
 5     A     It is at 14:54 and 59 seconds.
 6     Q     And looking to paragraph 6, what time was that message?
 7     A     That message is 18:22 and 43 seconds.
 8     Q     That's the next message from the defendant, right?
 9     A     That is correct.
10     Q     Now, is there anything significant to you about that
11     break in time?
12     A     There is.
13     Q     What's that?
14     A     The operation in Los Cabos took place at approximately
15     3:00 p.m.
16     Q     All right.  So when J returns on line 6, what does he
17     say?
18     A     All right -- all is well, love.  I'm on the road right
19     now.  I'll get back to you later.  I love you all.
20     Q     All right.  Turning to the highlighted portion of
21     paragraphs 8 and 9, could you read that for us.
22     A     J:  Darling, when you get back tomorrow, I need you to
23     buy me some clothes, darling, sweats, underwear, five shirts,
24     shampoo, aftershave lotion.  Anyway, everything, because I
25     haven't heard from Maria or Angel because I had to rush out at
```

MARSTON/DIRECT/ROBOTTI

1    3:00 in the afternoon, love.

2    Q    Just to be clear, what's the date of those messages?

3    A    February 22nd, 2012.

4    Q    And the same date as the raid, right?

5    A    That's correct.

6    Q    All right.  Turning next to slide 39, still on the same

7    date, right?

8    A    That's correct.

9    Q    Could you read this slide?

10   A    J:  Yes, love, a bit scratched up but fine, thank God.

11        Las Reynaas:  Oh, poor thing.  Maybe you need

12   Cachimbas tomorrow for whatever?  We can wait.

13        J:  I already managed for an attorney to go find

14   Mari and Angel.

15        Las Reynaas:  God willing.  It's only Mari and Angel

16   left behind -- it's only Mari and Angel left.

17        J:  I hope so, darling.  It all happened very fast

18   and Condor's and my equipment was left behind and Mari and

19   Angel as well.

20   Q    Now, you mentioned that in connection with your

21   investigation you reviewed photographs of items seized during

22   the raid in Los Cabos, Mexico on February 22, 2012; is that

23   right?

24   A    That's correct.

25   Q    So what do we see on this slide?

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

```
 1   A    Exhibit 7 -- the top left is a picture of Mari, the top

 2   right is a picture of Angel, and in the bottom center is

 3   identification card for Angel Jorge Lopez Urias.  That was

 4   seized or recovered at Los Cabos.

 5   Q    Turning to the next slide, what do we see here?

 6   A    This is a receipt for a bill of sale in the name of Angel

 7   Jorge Lopez Urias, and the amount is indicated as $20,000.

 8   Q    And where was this recovered?

 9   A    In Los Cabos.

10   Q    Now, in the previous message we looked at, the defendant

11   mentioned that he left his and Condor's equipment behind; is

12   that right?

13   A    That's correct.

14   Q    All right.  So let's look at some of the items recovered

15   from the raid in Los Cabos.  What do we see on the left here?

16   A    On the left, various phones, some notebooks.

17   Q    Okay.  And on the right?

18   A    Those are plastic bags that contain a white powdery

19   substance.

20   Q    And turning to the next slide, what do we see here?

21   A    On the left-hand side, there's a laptop and then

22   military-grade equipment.  To the right are grenades.

23   Q    Okay.  The next slide?

24   A    Again, vest with grenades; night vision goggles are on

25   the bottom; and high capacity magazines on the right inside
```

MARSTON/DIRECT/ROBOTTI

1    the vest.

2    Q    All right.  So turning back to the text messages on slide

3    45.

4             We are still on the same date as the raid, right?

5    A    That's correct.

6    Q    Could you read the highlighted messages?

7    A    J:  I saw them pounding on the door next door and I was

8    able to jump out.  But they're telling me they went into many

9    houses.

10            Las Reynaas:  Oh love, that's horrible.  Would they

11   have known anything?

12            J:  I'm told that last night they went into all the

13   houses in a different district; that it wasn't anywhere

14   specific.

15   Q    All right.  Turning to the next slide, could you read the

16   highlighted messages still on the same date.

17   A    J:  That's good, love.  Make sure she doesn't find out

18   about Mari so she doesn't get nervous.

19            Las Reynaas:  Who is not to find out, love?

20            J:  Your mom, love.

21   Q    And continuing on paragraph 28.

22   A    J:  I hope she doesn't say anything about what she knows.

23   I figure she'll say she was just visiting and doesn't know

24   anything.

25            Las Reynaas:  Yes.  I hope so, darling.

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

1   Q    All right.  And continuing on the same date, following

2   slide.

3   A    Las Reynaas:  Did Condor also leave with you?

4          J:  Yes, darling.

5   Q    And just the highlighted portions.

6   A    Las Reynaas:  I'll be watching the news to see what they

7   say, love.

8          J:  Yes, it already started but there's no TV where

9   I'm at.  I'll have to have one purchased tomorrow, love.

10          Las Reynaas:  That's good.  Any news from Mari?

11          J:  Nothing.  A lawyer went over there and they

12   didn't give any information whatsoever.

13   Q    All right.  Turning to the next slide, could you

14   summarize what the defendant and Emma Coronel are discussing

15   here?

16   A    This is a slide in which they are discussing both jeans

17   and sneakers needed by the defendant.

18   Q    And turning to the next slide, what information does the

19   defendant provide here?  What's he asking for?

20   A    He's asking for two pair of black shoes, Mexican size 7,

21   as well as 32 by 30 size jeans.

22   Q    And you mentioned this before.  About what U.S. size is

23   Mexican size 7?

24   A    Approximately 8 1/2 U.S.

25          (Continued on the following page.)

MARSTON/DIRECT/ROBOTTI

1   (Continuing.)

2   BY MR. ROBOTTI:

3   Q    All right.  Turning to the next slide, slide 15, what do

4   we see here?

5   A    Those were items, photographs of items that were at the

6   scene in Los Cabos.  On the left is the shoe there, is a size

7   9, US, and on the right are jeans, size 32/30.

8   Q    Turning to the next slide, what do we see on the left

9   here?

10  A    Those are photographs from inside Los Cabos and it is the

11  dark-colored hat, ball hat.

12  Q    And what do we see on the right?

13  A    That is a screen shot from the online video.

14  Q    That we watched yesterday?

15  A    Correct.

16  Q    And you testified yesterday that the phone call that

17  captured that video was on April 25th, 2011, is that right?

18  A    That is correct.

19  Q    And how long before the raid in Los Cabos was that?

20  A    Approximately two months.

21  Q    Approximately -- I think it's the following year,

22  April 25th, 2011, to February the 22nd, 2012?

23  A    That is correct, yes.

24  Q    And finally, turning to the next slide here, what is the

25  defendant asking for here?

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1    A    Black mustache dye.

2    Q    And turning to the next slide, what do we see?

3    A    This is a photograph of the defendant and Alex Cifuentes,

4    both with mustaches.

5    Q    All right.  So I'd like to move on and talk about three

6    additional phones that we're going to focus on today:

7    CharlyBlack15, CharlyBlack14, and CH6.  And so again here,

8    CharlyBlack15 and CH6, are in contact with J, is that right?

9    A    That is correct.

10   Q    All right.  So turning to this slide did you locate

11   identifying information in the text messages to and from these

12   three phones?

13   A    I did.

14   Q    In general, what is the time frame of these messages?

15   A    January to February, of 2012.

16   Q    And do you notice any commonality between the text

17   messages from these three phones?

18   A    I did.

19   Q    So let's start with the first bullet point for each

20   phone.  What did you see there?

21   A    Each had the screen name "Fiera."

22   Q    All right.  So let's call the user of these three phones

23   "Fiera" for short.

24        In the second bullet point, what information is

25   shown about Fiera on each of these three phones?

MARSTON/DIRECT/ROBOTTI

1   A    Fiera is traveling.  In CH6, Fiera is talking about

2   travel in all three phone, traveling in February of 2012, with

3   CharlyBlack15, a specific reference to Los Cabos.

4   Q    All right.  Looking at the third bullet point for each

5   phone, what do we have then?

6   A    On the third bullet point, they're talking about her

7   recovery in February following surgery in January of 2012.

8   Q    What identifying information is given over the

9   CharlyBlack15 phone about that surgery?

10  A    That the surgery was lipo.

11  Q    All right.  Looking at the fourth bullet point under

12  CharlyBlack14, what's that?

13  A    She provides her name in CharlyBlack14.

14  Q    And --

15  A    I was going to say, at least a partial of her name.

16  Q    So full first name and partial last name?

17  A    That is correct.

18  Q    And in the final bullet point here, what information is

19  there about Fiera?

20  A    The final bullet point under CharlyBlack14, it's about

21  her detention on February 23rd with Angel Jorge Lopez Urias,

22  which was one of the individuals detained in Los Cabos.

23  Q    All right.  And so just looking at -- going down to the

24  bottom portion of the slide here, about the February 22nd,

25  2012 raid, let's focus on the second bullet point there.  What

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1    does that show?

2    A    Also recovered at the raid were documents, medical

3    documents in the name of Agustina Cabanillas Acosta.

4    Q    What type of surgery did those documents show she had?

5    A    It was plastic surgery.

6    Q    Specifically for what kind?

7    A    Lipodystrophy.

8    Q    And just to be clear, was Agustina Cabanillas Acosta also

9    arrested during the raid in February 22nd, 2012?

10   A    She was.

11   Q    All right.  So based on the information in this summary,

12   what did you conclude about the user of CH6, CharlyBlack14,

13   and CharlyBlack15?

14   A    The user was Agustina Cabanillas Acosta.

15   Q    All right.  So turning to --

16            THE COURT:  Mr. Robotti, is it a convenient time?

17            MR. ROBOTTI:  Now would be great, Your Honor.

18            THE COURT:  Okay.  We'll take 15 minutes.  Ladies

19   and gentlemen, please don't talk about the case.  See you at

20   11:20.

21            (Jury exits.)

22            THE COURT:  Mr. Robotti, time estimate?

23            MR. ROBOTTI:  I think about lunch time, Judge.

24            THE COURT:  Okay.  11:20, recess.

25            (Recess.)

MARSTON/DIRECT/ROBOTTI

```
 1              THE CLERK:  All rise.
 2              THE COURT:  Please bring in the jury.
 3              (Jury enters.)
 4              THE COURT:  Everyone be seated.
 5              Let's continue.
 6              MR. ROBOTTI:  Thank you, Judge.
 7              And if you could put the PowerPoint back up?  Thank
 8    you.
 9    BY MR. ROBOTTI:
10    Q    All right.  Special Agent Marston, when we left off, we
11    had just talked about the identifying information associated
12    with Agustina Cabanillas Acosta found in these three phones,
13    is that right?
14    A    That is correct.
15    Q    All right.  So let's turn to the next slide here, slide
16    56.  In general, what does this slide show?
17    A    It's a summary of the comparisons between the information
18    found in the text messages for the screen name J and
19    CharlyBlack11, as compared to the other two accounts, CH6 and
20    CharlyBlack15.
21    Q    So basically, you're comparing the defendant's text
22    messages to Emma Coronel to J's text messages to Agustina
23    Cabanillas Acosta?
24    A    That is correct.
25    Q    And in general, what did you notice when you did that
```

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1    comparison?

2    A    In general, there were similarities between them.

3    Q    Okay.  So let's walk through a few of those similarities

4    here.

5              Let's start at the top bullet point.  What do you

6    recognize there?

7    A    The first similarity was the screen name was the same, J.

8    Q    What about the two next two bullet points?

9    A    J was speaking with the accounts during the same time

10   frame, as the well as the licenses for FlexiSPY or for these

11   accounts were all purchased by Christian, which to me, linked

12   it all together.

13   Q    And the fourth bullet point, in general, what does that

14   say?

15   A    In general, these are some of the terms that are found in

16   both accounts or with J's text messages with Emma and J's text

17   messages with Fiera.

18   Q    And are these unique terms that are common to both sets

19   of the text messages?

20   A    They are.

21   Q    Okay.  So let's walk through some of those terms that

22   were found in both sets of text messages.

23              Could you start with the top bullet point?

24   A    Certainly.  There was discussion being Cachimvas or

25   Cachimvas discussing a flight.  There was also a discussion

MARSTON/DIRECT/ROBOTTI

```
 1   about Charly handing out Blackberries or a Blackberry.
 2   Discussion about J being with Angel, and a reference to the
 3   location, that number three again.
 4   Q    Okay.  And so those were things that were found in the
 5   messages between the defendant and Emma Coronel and the
 6   messages between J and Agustina Cabanillas?
 7   A    Yes.
 8   Q    What's the next bullet point there?
 9   A    The next bullet point, there was discussion about J
10   paying for plastic surgery.
11   Q    Was there also a similar discussion about the defendant
12   paying for plastic surgery in the messages with Emma Coronel?
13   A    There was.
14   Q    Okay.  And the final bullet point?
15   A    The final bullet point was discussions about travel to
16   Los Cabos prior to the raid, which would happen on August --
17   I'm sorry, February 22nd, 2012.
18   Q    And as we just looked at a moment ago, there were similar
19   conversations in the text messages between the defendant and
20   Emma Coronel?
21   A    That's correct.
22   Q    So based on the information in this slide, what did you
23   conclude about the J who was in contact with Agustina
24   Cabanillas?
25   A    The J that was in contact with Agustina Cabanillas was
```

MARSTON/DIRECT/ROBOTTI

1    the defendant.

2    Q    All right.  So let's turn to some communications

3    involving Agustina Cabanillas and the defendant.

4              And just before we do that, what are the different

5    screen names that Agustina uses?

6    A    She uses Fiera, also the letter "A," and also "Mona."

7    Q    Now, turning to the next slide, slide 58.  Did you review

8    a text message about Agustina's phone use?

9    A    I did.

10   Q    Okay.  Could you read paragraph 289?

11   A    Certainly.

12             Fiera:  Yes, love.  If it takes a while to reply to

13   you, it's because I'm talking, texting with four at the same

14   time, and I get really dizzy.

15   Q    All right.  So let's look at slide 59 here.  What does

16   this show, in general?

17   A    In general, it shows the accounts, the three accounts

18   associated with Ms. Acosta, and the contacts that she has on

19   each one of those accounts.

20   Q    And for CharlyBlack15 and CharlyBlack14, are those just

21   some of the contacts that she had?

22   A    Yes.

23   Q    So she was using multiple phones to talk to multiple

24   people.  Is that fair to say?

25   A    Yes.

MARSTON/DIRECT/ROBOTTI

1    Q    All right.  So you mentioned that there were some

2    communications about the raid in Los Cabos, Mexico.  Looking

3    at slide 60, who is involved in those communications over

4    CharlyBlack15?

5    A    The defendant and Agustina.

6    Q    And who was involved in those communications over

7    CharlyBlack 14?

8    A    It was a Agustina, Nadien or Karen.  Jeobana and Gerry.

9    Q    So looking at this slide here, who are these

10   communications between?

11   A    These communications are between J and Fiera.

12   Q    Okay.  And what are the days of these communications?

13   A    This is January, 20th, 2012.

14   Q    And in general, what are they about?

15   A    Travel to Los Cabos.

16   Q    Whose travel to Los Cabos?

17   A    J's travel and Fiera's travel to Los Cabos.

18   Q    All right.  Turning to the next slide, your

19   communications between Karen and Fiera.  Could you summarize

20   what we see here?

21   A    There's going to be discussions about a plane ticket --

22   or travel.  I should say it's discussions about travel in this

23   conversation.

24   Q    And what's Volaris?

25   A    It is a Mexican airline.

MARSTON/DIRECT/ROBOTTI

1   Q    And turning to the next slide, what do we see here in
2   this conversation?
3   A    This is where the name is provided, at least the first
4   full name, Agustina, and then a partial last name, Cabani with
5   the dot, dot, dot, and Acost, dot, dot, dot.
6   Q    And was this provided to purchase a plane ticket for
7   Fiera?
8   A    Yes.
9   Q    All right.  So turning to the next slide, what's the
10  date here?
11  A    February 16th -- I'm sorry, February 16th, 2012.
12  Q    All right.  Could you read paragraph 81 and paragraph 83?
13  A    Fiera:  Yes, love.  I understand.  I'm going to get there
14  as soon as I can.
15           And then J:  Love, go to 3 at the base.  All right?
16  Q    And paragraph 83, that referenced the location 3.  Where
17  did we see that before?
18  A    The prior messages.
19  Q    Between the defendant and Emma Coronel?
20  A    Yes.
21  Q    And then looking to paragraph 105, could you read that?
22  A    Fiera:  I'll be with you in 10, love.
23  Q    And what's the date of that message?
24  A    That is February 16th, 2012.
25  Q    And how long before the raid is that?

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1    A     Approximately six days before the raid.

2    Q     All right.  Turning to slide 65, who are these messages

3    between?

4    A     The top part between Karen and Fiera, and then the bottom

5    is between Nadien -- which is a different screen name -- and

6    Fiera.

7    Q     So, Karen and Nadien are the same user, just different

8    screen names?

9    A     That is correct.

10   Q     All right.  And what do we notice in the top box?  What's

11   happening there?

12   A     In the top box, there is Karen or the screen name Karen

13   is letting Fiera know that it's somebody else with the phone

14   right now.

15   Q     So Fiera, can you read 106?

16   A     Certainly.

17         Fiera:  What's up?  This is Mimi, hahaha.  Your

18   caller left and forgot her phone.

19   Q     Okay.  And so that's Mimi saying she has Fiera's phone,

20   right?

21   A     That's correct.

22   Q     Okay.  And the bottom box, what do we see there?

23   A     Another variation of Agustina's name.

24   Q     Could you read 123?

25   A     Certainly.  When I bought the ticket for her, it was

MARSTON/DIRECT/ROBOTTI

1    her -- it was with her name.

2    Q    So turning to the next conversation, which is between

3    Fiera and Jeobana.  What's the date of these messages?

4    A    This is February 20th, 2012.

5    Q    What do we see in 82 and 83?

6    A    That Mimi is still holding the phone.

7    Q    Okay.  Could you read 86 to 89 for us?

8    A    Fiera:  I can't communicate with her right now.  In fact,

9    when I gave her the message to confirm tomorrow's appointment.

10   The guy that lent her the bb answered me and told me that the

11   lady has gone out.

12   Q    Okay.  And what's the date of that set of messages?

13   A    February 23rd, 2012.

14   Q    And so that's the day after the Cabo raid?

15   A    Yes.

16   Q    All right.  So continuing with the conversation on the

17   same date, between Fiera and Jeobana.  Could you read the

18   highlighted messages?

19   A    Fiera:  That the house has a large gate entrance

20   consisting of two black doors.  Angel Jorge Lopez Urias is the

21   name of the man two happens to be with the women.

22         Jeobana:  You're telling me that they have only

23   surrounded the house, right?

24         Fiera:  The whole complex.

25   Q    Okay.  And turning to the next slide, could you read the

MARSTON/DIRECT/ROBOTTI

1  highlighted portion?

2  A    Fiera:  Apparently, they have them in the house.

3  Q    All right.  So looking back to these documents recovered

4  from the raid in Los Cabos, on slide 69, what do we see here

5  again?

6  A    The picture of Marie on the left, and Angel, on the

7  right, and the identification card for Angel on the bottom.

8  Q    Okay.  And looking next at slide 70, what's this?

9  A    On top is a picture of Agustina Acosta, and her

10  identification card on the bottom.

11  Q    And that photo was taken at the Los Cabos raid?

12  A    Yes.

13  Q    And that identification was recovered there, as well?

14  A    Yes.

15  Q    Okay.  Turning to slide 71, what do we see here?

16  A    This was a photo taken at the Los Cabos raid, presumably

17  the driveway with a gate on the left.

18  Q    And that is a large black gate?

19  A    It is.

20  Q    All right.  So turning to the next slide, continuing on

21  February 23rd, 2012, with Fiera and Jeobana, could you read

22  the highlighted portion?

23  A    Jeobana:  They're going to negotiate with money.

24           Fiera:  Okay.  Very good.

25           Jeobana:  And I'm asking that she prove first that

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1    she's talking with the one in charge, to be able to make an

2    offer.

3    Q    Okay.  Turning to slide 73, can you continue with this

4    conversation reading the highlighted portion?

5    A    Fiera:  Listen, the attorney that you're going to contact

6    is named Omar.

7    Q    Okay.  And again, where have we seen the name "Omar"

8    before?

9    A    In the ledges recovered from Los Cabos.

10   Q    He was referred to as LIC Omar, right?

11   A    There was Omar, and he was LIC Omar.

12   Q    Turning to slide 74.  This is a conversation between

13   Fiera and Gerry.  Could you read paragraphs 104?

14   A    Fiera:  Good evening this is Mimi.

15            And four, Fiera, I am writing to you regarding the

16   same thing that Jeobana wrote to you about.

17   Q    All right.  So Mimi is still using the device here?

18   A    Correct.

19   Q    All right.  Continuing to slide 75, could you read the

20   highlighted portions of this conversation?

21   A    Fiera:  Listen.  What can you tell me about the three

22   people on the bottom?

23            Gerry:  Tell the man that they're going to let me

24   know if they are -- if they were transferred to Mexico, but

25   that -- they're not at SEIDO yet.

MARSTON/DIRECT/ROBOTTI

```
 1   Q    And what's SEIDO?

 2   A    Mexican law enforcement.

 3   Q    Turning to slide 76, what do we see here?

 4   A    These are medical documents recovered in Los Cabos,

 5   associated with Agustina Acosta.

 6   Q    And the top document, is that a medical document or a

 7   hotel receipt?

 8   A    The top document is a hotel document that was recovered

 9   at the scene.

10        THE COURT:  Remind me.  These are in evidence?

11        MR. ROBOTTI:  These are this evidence, Judge

12   everything is in the presentation.

13   BY MR. ROBOTTI:

14   Q    So looking first at the top left, what's the name in red

15   there?

16   A    Agustina Cabanillas.

17   Q    And what is the date on the hotel receipt?

18   A    January 12th -- I'm sorry.  January 30th, '12.

19   Q    Okay.  2012?

20   A    Correct.

21   Q    And the bottom document there, is the name "Cabanillas"

22   listed there?

23   A    It is.  It's highlighted.

24   Q    What else is highlighted there?

25   A    Lipodystrophy.
```

MARSTON/DIRECT/ROBOTTI

```
 1    Q     And that appears to be a medical document, correct?
 2    A     That is correct.
 3    Q     And then the document on the right, what's in the
 4    highlighted box?
 5    A     They have the name, Agustina, Cabanillas Acosta.
 6    Q     And what's the date?
 7    A     It's January 23rd, 2012.
 8    Q     And you mentioned earlier that you reviewed some messages
 9    about Fiera having plastic surgery leading up to the raid in
10    Los Cabos, is that right?
11    A     Yes.
12    Q     All right.  So let's look at those messages.
13                MR. LICHTMAN:  Judge, may we approach?
14                THE COURT:  Yes.
15                (Sidebar.)
16
17
18
19
20
21
22
23
24
25
```

SIDEBAR

```
 1              (Sidebar.)

 2         MR. LICHTMAN:  I don't mean to waste more time by

 3   having another sidebar, but this is I think our third

 4   discussion about the plastic surgery of this woman, and we've

 5   reached full saturation, and then some.  And I at some point,

 6   there's a 403 argument here.  Has to be.

 7         THE COURT:  Yes.  No, no.  There clearly is an

 8   argument.  Whether it's one that I should sustain, I'm not

 9   entirely sure of, frankly.

10         MR. ROBOTTI:  Not much left, Judge.  The point here,

11   again, is --

12         MR. LICHTMAN:  Every time.

13         MR. ROBOTTI:  You always call me up when I'm almost

14   done.

15         MR. LICHTMAN:  Well, next time, I'm going to call

16   you up right in the beginning, after the first question.

17         MR. ROBOTTI:  Judge, the point I make here is this

18   is key identifying information because these documents are

19   found at the raid in Los Cabos, and they link up to these next

20   few text messages that I'm about to go through.  We'll go

21   through them very quickly.

22         THE COURT:  Okay.  We're going to do this.  But I

23   implore the Government, in future witnesses, think about what

24   you need, not what you can do at the maximum.  Now, you may

25   feel you have already made that cut.  It doesn't seem like
```

SIDEBAR

```
 1    it's defense counsel and it doesn't seem like it's me.

 2              MR. ROBOTTI:  Okay.

 3              THE COURT:  Okay?  Let's just finish this and go on.

 4              MR. ROBOTTI:  Just on that point, Judge, I would

 5    point out that we intercepted about thousands or tens of

 6    thousands of communications, and I've cut them down to a --

 7              MR. LICHTMAN:  8,000.

 8              MR. ROBOTTI:  A very short PowerPoint presentation.

 9              THE COURT:  I have no doubt that's true.  I would

10    simple quibble over the meaning of very short in this.  Okay?

11              MR. ROBOTTI:  I understand, Judge.

12              THE COURT:  He's right.  We have done a lot of

13    talking about plastic surgery, which is not a direct issue in

14    the case.

15              MR. ROBOTTI:  Well, it also goes to substantial

16    income, Judge.  The defense argument here is that --

17              THE COURT:  It goes to it so slightly.

18              MR. ROBOTTI:  I understand, Your Honor.  We'll get

19    done shortly.

20              MR. LICHTMAN:  Thank you, Judge.

21              (Sidebar ends.)

22

23

24

25
```

MARSTON/DIRECT/ROBOTTI

```
 1              (In open court.)
 2    BY MR. ROBOTTI:
 3    Q    All right, Special Agent Marston.  So could you just
 4    briefly summarize what we see in this slide?
 5    A    It's messages regarding surgery that Fiera's discussing
 6    with Jeobana.
 7    Q    Okay.  And the date is?
 8    A    This is January 15th, 2012.
 9    Q    All right.  And could you summarize what we see here?
10    A    Again, some discussions about the payment for the
11    surgery.  This is happening between Fiera and J.
12    Q    Okay.  Is there a reference to the specific type of
13    surgery in paragraph 189?
14    A    It is lipo.
15    Q    All right.  And then turning to the next slide, slide 79,
16    this is a conversation between J and A, but as we've talked
17    about earlier, that's another screen name for Fiera, right?
18    A    Yes.
19    Q    Okay.  And in general, what is this about?
20    A    It's about the recovery from the surgery.
21    Q    And is there a reference to being in hotel room, right?
22    A    There is.
23    Q    All right.  Turning to slide 80, did you review
24    communication about what's referred to as black flight in
25    these communications?
```

MARSTON/DIRECT/ROBOTTI

```
1    A    We did.

2    Q    And looking at this slide, who are those communications

3    between?

4    A    They're between Agustina and the defendant.

5    Q    And that's over the CharlyBlack15 phone?

6    A    Yes.

7    Q    Okay.  And looking to the next slide, could you summarize

8    what we see in the slide?

9    A    This slide, it is the defendant and Agustina talking

10   about pilots.

11   Q    Okay.  Is there a reference to two particular pilots

12   here?

13   A    Yes.

14   Q    Who are they?

15   A    Memin and Marcos.

16   Q    Could you read photograph 106?

17   A    J:  No.  Not this one, love.  He's doing a double with

18   Memin, to send them, love.

19   Q    All right.  Turning to the next slide, could you read the

20   highlighted portions?

21   A    Fiera:  I'm here with the pilot whose name is Marcos

22   Mendez.

23             J:  And what does he say about going on a 210?

24             And J again:  Arrive at Belize and sleep there.

25             J:  And there -- and from there to Apure, Venezuela
```

LISA SCHMID, CCR, RMR

MARSTON/DIRECT/ROBOTTI

1    and to Guayaquil, Ecuador.  It's $200,000 round-trip.

2    Q    All right.  Turning to the next slide.  Could you read

3    this slide?

4    A    Fiera:  $200,000?  Because I don't make -- because I

5    don't want to make a mistake.  Is that right?

6            J:  During daytime, it's eight and-a-half hours to

7    Ecuador from Belize to the Apure, Venezuela, it's nine.  It's

8    more.  The first time, if he wants to go as a co-pilot, he

9    can.  But it's not to his benefit, because he'd earn less.

10           Fiera:  I'm explaining it to him now.  Love, he'd

11   leave from here in the 210, right?  He's asking if he'd need a

12   passport.

13           J:  Have him talked to Cachimvas.  He's from

14   Guamuchil.  He knows him.

15           J:  No.  No passport, love.  It's a black flight.

16   Q    All right.  Did you also review communications about J

17   spying on other persons?

18   A    Yes.

19   Q    All right.  Looking at this slide, who was involved in

20   those communications?

21   A    Agustina and the defendant, using CharlyBlack15, and

22   Agustina and Jeobana using CharlyBlack14.

23   Q    All right.  So looking at slide 85, could you read

24   photographs one and four?

25   A    Fiera:  Guess what this jerk is telling me.  Because I

MARSTON/DIRECT/ROBOTTI

```
 1   told him that I must have the security system in the
 2   construction site as soon as possible, he told me to get
 3   Gordo, who happens to be very good, the one who installed the
 4   security system for Peni.
 5            Fiera again:  But you know I caught him yesterday
 6   with the computer, looking at a whole bunch of pictures, like
 7   coming from security cameras, and he started deleting them
 8   quickly and closing the pages, so I wouldn't be able to see
 9   them, and I'm going to be so dumb as to give him the job?
10            What I saw was the most likely from a system ordered
11   by someone else.  And he would want me to do -- he would want
12   to do the same to me, to be spying on me.  Fuck that.  Get
13   what?  I am way smarter than him.
14   Q    Turning to the next slide, could you read paragraphs six
15   and 12?
16   A    Fiera:  There were like hidden camera pictures in a
17   modern house.  You could see decorations similar to yours.
18   Oh, do me a favor.  Can you ask your brother-in-law if after
19   installing them, I can check if someone else can see me or
20   what type of security I can get.
21            Fiera again:  That's right.  That's what I don't
22   want.  Besides, I don't trust these Blackberries, the ones he
23   gives me over here, because the bastard can locate them.
24            (Continued on the next page.)
25
```

MARSTON/DIRECT/ROBOTTI

```
1    DIRECT EXAMINATION

2    BY MR. ROBOTTI:  (Continued.)

3    Q    And these messages are on January 14th, correct?

4    A    Yes.

5    Q    All right.  Turning to the next slide, still on

6    January 14th, between Fiera and Jeobana, could you read

7    paragraph 19?

8    A    Fiera:  Oh, you know that my husband just gave me a

9    BlackBerry and he just sent me an invite, and I think that the

10   jerk made a mistake because he is talking to me and I am in

11   the bedroom and he is outside and he is telling me, "Tomorrow

12   they are picking you up in Los Angeles, my love..." but I'm

13   going to play along to see what else the idiot tells me.

14   Q    All right.  And so looking next at the slide below,

15   messages between J and Mona, another screen name for Fiera,

16   can you read the highlighted portion?

17   A    J:  Yes, love, you are the most important person to me, I

18   adore you.  Tomorrow they'll come to Los Angeles to pick you

19   up, sweetheart.

20   Q    And was that message about ten minutes before the message

21   above?

22   A    Yes.

23   Q    Okay.  Now, turning to slide 88, there are a number of

24   contacts highlighted here.  Could you just give us the names

25   of the contacts at the bottom?
```

MARSTON/DIRECT/ROBOTTI

 1   A     Poy, Guero, the defendant, Gerry, War Princess, and

 2   emoticon.

 3   Q     What, if anything, did you notice in reviewing the

 4   messages among these people and Agustina Cabanillas?

 5   A     Agustina was relaying messages between the contacts and

 6   the defendant.

 7   Q     All right.  So let's look at slide 89.  What does this

 8   show?

 9   A     This is the messages that flow through Fiera originating

10   from the defendant.

11   Q     Okay.  And so the messages flow through her to the

12   individuals -- the five individuals on the bottom there.

13   A     That's correct.

14   Q     And there's locations listed beneath each one of those

15   individuals.  What are those locations?

16   A     Within the messages, those are locations that are found

17   within the messages on Agustina's phone through FlexiSpy.

18   Q     So let's look first at some examples of messages sent

19   from the defendant to Agustina to Riris.  What's the date of

20   these messages?

21   A     January 26, 2012.

22   Q     All right.  Could you read paragraphs 10 and 18?

23   A     Riris:  I already have the stuff on the machinery and

24   there are three companies in Mexico that sell it.  I couldn't

25   find used machines.  If we want to comply with the quality

MARSTON/DIRECT/ROBOTTI

1    control that they are going to request from me, they need to

2    be brand new in order to export abroad.

3    Q       Paragraph 18?

4    A       Riris:  Ask him what part of Ho he wants the factory.

5    Q       Okay.  Now, let's next look at messages between Fiera and

6    J on the same date.  Could you read the first message?

7    A       Fiera:  The Greek asked me the exact place in Honduras

8    where you want the factory.  He already found someone to

9    supply the containers and he found three machines; they told

10   him the machines must be new to get approval for export to the

11   U.S.

12   Q       And so what do you notice about that message as compared

13   to the message on the previous slide?

14   A       There is a discrepancy with the time frame.  If you read

15   the content of the message, it's clear that Fiera is providing

16   this information to J, but if you look back through the

17   messages, there's a two-second time difference.  I think the

18   previous message was at 32 seconds suggesting that it was in

19   the future compared to what's happening here.

20   Q       Let's break that down a little bit.  Let's talk about the

21   content first.

22           What do you notice about the content of the message

23   in paragraph 18 versus the content of the message in paragraph

24   258 on the following slide?

25   A       In 18, Riris is asking where they want it in Ho, and in

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

 1    the next message, Fiera asks, The Greek asked me the exact

 2    place in Honduras where you want it.

 3    Q    Based on that, could you tell the flow of information?

 4    A    I could.

 5    Q    Where was that?

 6    A    The flow of information was coming from Riris to Fiera,

 7    and then from Fiera to J.

 8    Q    And so then let's talk about the time stamps here.  These

 9    time stamps are two seconds apart.

10    A    That's correct.

11    Q    Okay.  And what did you notice about those time stamps?

12    A    I noticed in this -- throughout various portions there

13    will be instances where there's some discrepancy.  There will

14    also be numerous messages where you have the same time stamp

15    to the second.

16    Q    Okay.  So this instance, the time -- do the time stamps

17    match up to your conclusion about the flow of information from

18    Fiera to Agustina to the defendant?

19    A    They do not.

20    Q    And do you know why there is that discrepancy?

21    A    I do not.

22    Q    And where do these time stamps come from?

23    A    This is the original data from FlexiSpy.

24    Q    Okay.  And through the rest of the presentation, are

25    there a few instances where other messages have this type of

MARSTON/DIRECT/ROBOTTI

1  discrepancy?

2  A    There are.

3  Q    What's your conclusion about the flow of information

4  based upon?

5  A    It's based upon the content of the communications.

6  Q    Okay.  All right.  So let's look next at paragraphs 259

7  and 260.  Could you read those?

8  A    J:  Love, the exports will be to Europe, Canada,

9  Australia, but also to the United States.  What's the price of

10 a small machine so it will be a medium-sized factory, it

11 should not be big.  Tell him now, so he can begin to set up

12 the company.

13 Q    All right.  Looking to the next slide, the conversation

14 between Fiera and Riris on the same date.

15 A    Riris:  Tell him that regarding China, I already found my

16 friend; and regarding Germany, I got a translator, and he can

17 advise me.

18          And then below Fiera:  My friend is asking me how

19 much is the machinery.  He says to set up the company where

20 you are.  Check where there are more businesses/commercial

21 establishments and make it a midsize company to export to

22 Europe, Canada, Australia, and also the U.S.

23 Q    All right.  So how does the message in paragraph 33

24 compare to the message from the defendant we looked at on the

25 previous slide?

MARSTON/DIRECT/ROBOTTI

1    A    It was being forwarded on.  Messages are similar.

2    Q    All right.  So then let's look at the next slide.  Could

3    you read this slide in its entirety for us?

4    A    Fiera:  At the capital.  And he tells me that regarding

5    China, he already found his friend and in Germany he has

6    someone to translate and found someone to advise him.

7              J:  To buy chemicals.  That would be good.  In

8    Germany.

9              Fiera:  Do you want him to buy chemicals from China

10   or where?  So I can tell him.  Oh, okay.  In Germany, that's

11   fine.

12   Q    Turning to slide 95, could you read the highlighted

13   portion between the defendant and Fiera?

14   A    J:  I'd like Germany better.  J again:  Like I was

15   telling you about Germany -- to send the chemicals to Ecuador.

16   And J again:  To open a chemicals company, for chemical

17   fertilizers?

18   Q    And then continuing with the defendant and Fiera.

19   A    J:  And another company for the citrics.  There would be

20   two companies in Ecuador, love.

21             Fiera:  Okay.  You want the citrics and the

22   fertilizer in Honduras?

23             J:  Ecuador.

24             Fiera:  Oh, because he was telling me Honduras, but

25   I'll clarify that with him.

MARSTON/DIRECT/ROBOTTI

```
 1          J:  He's going to Ecuador.
 2   Q    Okay.  And then going back to the messages between Fiera
 3   and Riris, could you read these?
 4   A    Fiera:  And regarding the liquids that he had mentioned,
 5   he thinks it would be better in Germany and that you already
 6   knew.
 7          Fiera again:  Listen, the whole deal, the company,
 8   is in Ecuador, right?  Because that's what he's telling me and
 9   to open another one in Germany but for chemicals and another
10   one in Ecuador for export and import.
11          Riris:  It's for citrus in Ecuador.  And for
12   chemicals in Germany.  Okay.
13          Fiera:  Yes, and he's telling me also to open
14   another one there for fertilizers to run it with chemicals
15   imported from Germany.  And citrus can be exported to the
16   other places I had told you about.  Let me know if you have
17   any questions.
18   Q    All right.  So let's next turn to Poy -- communications
19   between the defendant to Fiera to Poy.  Starting on slide 99,
20   let's look at the top box which is between Fiera and Poy.  On
21   January 27th, 2012, could you read the highlighted?
22   A    Poy:  I'm here.  She says they have 700 in Belize.  The
23   brand is 1800 and the quality percentage is from 95 to 97.
24   Q    And then looking at the message on the same date from
25   Fiera to the defendant.
```

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

1   A   Fiera:  And a friend is also telling me that they have

2   700 in Belize, 1800 brand with between 95 percent and

3   97 percent purity.  If you want to send someone to check them

4   out.

5   Q   All right.  Turn to the next slide, the top between Fiera

6   and Poy, the first box there, can you read the highlighted?

7   A   Poy:  At 10,500 in Belize's runway; he would keep it at

8   that price.  And to give them two hundred, for him and for

9   Franco.

10  Q   All right.  Next turning to the messages between the

11  defendant and Fiera in the second box, could you read the

12  highlighted?

13  A   Fiera:  They're telling me at 10,500 they're in Belize,

14  love.

15          J:  And how many days for payment?

16  Q   And back to Fiera and Poy in the third box.

17  A   Fiera:  Ask the comadre how many days they give to make

18  the payment.

19  Q   All right.  And Fiera and Poy in the first highlighted

20  box, could you read that?

21  A   Poy:  They say that since it's you, you can set the date

22  and the place.  Obviously as soon as possible and it can be

23  where you got the visa or at "La Virgin."

24  Q   And back to Fiera and the defendant in the second box,

25  can you read the highlighted?

Denise Parisi, RPR, CRR

MARSTON/DIRECT/ROBOTTI

1   A    Fiera:  I'm being told by my friend that since it's me, I

2   should set the payment date.  That there's no problem, the

3   sooner the better, but I should set the date.

4           J:  How much is it, 700 kilos?

5           Fiera:  Well, first they told me it was 700K, but

6   they're telling me that they had to pay a percentage; so the

7   total is 630, but in any case, I am verifying.

8   Q    All right.  And moving to the next slide, the top box

9   between Fiera and Poy, could you read the highlighted?

10  A    Fiera:  Hey, why did you say 700 at first and then 630?

11          Poy:  Because they told me that it was 700, then

12  said they were charged 10 percent.  So they had 630 left.  And

13  the money wasn't included.  That's 10,500 plus the 200 for

14  them.  It would be a total of 10,700.

15  Q    And then back to Fiera and the defendant in the bottom,

16  could you read the highlighted?

17  A    Fiera:  Listen, they told me that of the 10,500, there

18  are two people who would only take 200, that would make it a

19  total of 10,700 for each one.  But if you're not interested,

20  or you think that's high, I'll tell them.

21          J:  That's fine.  Have them give you the number for

22  a pickup tomorrow, love.

23  Q    Turning to the next slide, slide 104, could you read the

24  highlighted messages between Fiera and Poy?

25  A    Fiera:  Tell my comadre to have them give you a number to

MARSTON/DIRECT/ROBOTTI

1    pick them up and that I can pay them in 20 days and I'll be

2    picking them up tomorrow.  Hey, have her tell you what

3    happened with the number.  Is she going to take that long to

4    tell us?  Business has to be quick.  Tell her that the boss

5    gets anxious.

6              Poy.  Poy provides two phone numbers, followed by

7    "with Dr. Roger."

8              Fiera:  Did they tell you on behalf of who?

9              Then in the bottom box, Poy:  Okay.  Listen.  The

10   comadre says she spoke with the guy who spoke on behalf of the

11   company.  Just like that, to say it's on behalf of Orlando

12   Rios.

13   Q    Okay.  And finally in this set between Fiera and the

14   defendant, can you read highlighted messages?

15   A    Fiera.  There's two phone numbers followed by "with

16   Dr. Roger."

17             Fiera:  They were telling me that the money can be

18   delivered in Mexico or in Guadalajara.

19             Then the bottom box, Fiera:  Love, I'm being told

20   the guy called to go pick up what I mentioned to you last

21   night, but tell them to speak on behalf of Orlando Rios,

22   please.

23   Q    And those two phone numbers there, are those the same two

24   phone numbers we saw in the previous slide?

25   A    Yes.

MARSTON/DIRECT/ROBOTTI

1   Q    All right.  Turning to slide 105, let's talk about some

2   messages from the defendant to Fiera to War Princess.  Slide

3   106, could you read the highlighted messages between Fiera and

4   War Princess?

5   A    War Princess:  Yes, the name is Sergio Inzunza.  The work

6   is in Nogales with cars and trailers.  There is also a team by

7   the hills.  We have everything, it's well organized.  Just

8   tell him that we can't [proceed] without permission.  That's

9   what we need.

10       The thing is that there is a lot to do in Nogales,

11  however, we don't have the access.  With your permission,

12  everything will be alright.  You'll be included in anything

13  you want.

14       Fiera on the bottom:  I'm a little busy at the

15  moment, so you'll have to wait a little.

16  Q    All right.  That's January 17th, 2012, correct?

17  A    Yes.

18  Q    All right.  So then picking back up on January 27th,

19  2012, messages between the defendant and Fiera in the top two

20  boxes, please.

21  A    Fiera:  And you know what my girlfriend is telling me?

22  That over there at the Arbol, the small cars are already

23  ready.

24       J:  Not right now; we have until next week.  Right

25  now things are in Tijuana and the next one I'll be in -- and

MARSTON/DIRECT/ROBOTTI

1   the next one I'll be in Nogales.  Tell her to arrange for more

2   cars since I'll be bringing her a ton.

3   Q    All right.  And then turning to the next box, messages on

4   the same date between Fiera and War Princess.  Could you read

5   paragraphs 10 and 11?

6   A    Fiera:  Woman, get ready big time.  Get many cars.  Hurry

7   up because they are going to bring you one tonta.  I don't

8   want mistakes.  Hurry up man.  You wanted work?  Then, hang on

9   tight.  We must take advantage.  Realize that these are

10  streaks.

11          War Princess:  Hahaha, no kidding.  Don't worry,

12  we're going to work hard.

13          Well, I hope there aren't many people in the mix.

14  It is better if it gets to Imuris directly.

15          (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

MARSTON – DIRECT – MR. ROBOTTI

```
 1   DIRECT EXAMINATION (Continued)
 2   BY MR. ROBOTTI::
 3   Q    All right.  Turning to slide 108.  Let's talk about some
 4   messages from the defendant to Fiera to the emoticons.
 5               All right, this is between defendant and Fiera on
 6   January 26th, 2012.
 7               Can you read paragraphs 295 and 296.
 8   A    J:  Very well, love.  Ask him if we buy -- ask him if we
 9   buy him a fishing boat to fish there in Los Angeles if he
10   would be willing to receive at 200 miles.
11               In front of San Diego.
12   Q    All right, turning to slide 110, Fiera and the emoticon.
13               Can you read the highlighted portions.
14   A    Fiera:  My friend here wants to know if you can start
15   talking to the man -- that if we buy him a boat -- if he would
16   be willing to go fish in Los Angeles, and willing to receive
17   to 200 miles out from San Diego.
18               As it is -- and as to the material, I'll ask him
19   right now, hold on.
20               Listen, which one, of the small ones or the grass?
21               And the emoticon screen name responds at the bottom:
22   Of the small ones.
23   Q    All right, turning back to messages between the defendant
24   and Fiera, can you read this?
25   A    Fiera:  The man is asking if you have there the material
```

MARSTON – DIRECT – MR. ROBOTTI

1    you told him about.

2              J:  Marijuana or cocaine?

3              Fiera:  The small ones.

4              J:  Cocaine?

5              Fiera:  Yes.

6              J:  To bring over.

7              Fiera:  I'm asking him how many.

8    Q    All right, turning to the next slide.  This is between

9    Fiera and emoticon in the top box.

10             Can you read the highlighted portions.

11   A    Fiera:  How many do you need?

12             Emoticon screen name:  Alright, I'm gonna explain to

13   him in more detail and see what he says.

14             And then a response at:  10.

15   Q    All right.  And in the bottom box there between the

16   defendant and Fiera, can you read the highlighted.

17   A    Fiera:  Love, he says only 10 but if you have more, he'd

18   find a way to sell them.

19   Q    All right.  Turning next, communications between

20   defendant to Fiera, to Guero.

21             All right.  So this is between Mona and Guero at the

22   top box.  And Mona is another screen name for Fiera.

23             Can you read the highlighted portion.

24   A    Mona:  Listen, clients in Phoenix need it urgently but we

25   can't sell it over there.

MARSTON – DIRECT – MR. ROBOTTI

```
 1              Guero:  Grass?

 2              And Mona:  Yes, it would be 550 kilos.

 3    Q    Turning to next box between the defendant and Fiera on

 4    January 21st, 2012.

 5    A    J:  The work got here fine.  Figure it out with Wuero and

 6    find someone to sell it in Phoenix.

 7              Fiera:  I'll arrange with him now to move forward,

 8    love.

 9    Q    All right, and turning to the next page, conversations

10    between Mona and Guero.

11              Could you read the highlighted portion in the top

12    box.

13    A    Guero --

14    Q    Both boxes.

15    A    Guero:  Listen, I found someone through your aunt.  Look,

16    she told me last night she received 31 peri in los but I

17    wasn't told anything -- and the secretary is telling me to

18    deliver it but the guy over there already took it to

19    customers.  I didn't know he was going to deliver it.

20              Mona:  Well, sell it.

21              Guero on the bottom:  So you can mention it, I have

22    two clients, they want about 2,000 lbs; they want a price.  I

23    priced the 2K at 230, 5K at 320, and 10 at 350.  They want

24    from the three price.  Do I have your authorization to reach

25    an agreement with them?
```

MARSTON – DIRECT – MR. ROBOTTI

```
 1            And then Fiera:  Don't think about it, do it.
 2  Q    All right, and turning to the next slide, the top box
 3  conversation between the defendant and Fiera.
 4            Can you read the highlighted portion.
 5  A    J:  Yes.  And Wuero didn't answer this morning and Memo
 6  sent out the merchandise that arrived today so that Wuero can
 7  get three houses with garage -- with garages so they can be
 8  picking up as it arrives.
 9  Q    And then the next box between Fiera and Guero.
10  A    Fiera:  You need to get three houses with garages through
11  the aunt.  Get moving, if not, we're going to be out, you and
12  me.
13            Guero:  I already picked up some last night.  And
14  the secretary dialed this morning and told me to pick up 500.
15  That's what it was -- that's the way it was left, he didn't
16  give me a number, nor asked.
17  Q    All right, and turning to the next slide between the
18  defendant and Guero.
19  A    Fiera:  Listen love, Wuero is telling me that he picked
20  up 500 last night and that just now in the morning he told the
21  secretary and he's still waiting to get the number or to find
22  out with the whom and there has been no reply.
23  Q    And in paragraph 81, do you see the Spanish word for
24  secretary there?
25  A    Yes.
```

MARSTON – DIRECT – MR. ROBOTTI

```
 1   Q    What is that?

 2   A    Secre.

 3   Q    All right, and turn -- continuing on to slide 118 between

 4   the defendant and Fiera.

 5            Can you read this.

 6   A    J:  Tell Wuero to get at least two houses which fit a

 7   van, love.

 8            Fiera:  I already told him to get houses with

 9   garages, love.

10            J:  That's good and how are the sales going?

11            Fiera:  Oh, like busy bees, nonstop, love.

12   Q    All right turning to the next slide between the defendant

13   and Fiera.

14            Can you read the highlighted portions.

15   A    J:  Ask Wuero about the storage and the shipment from

16   nutroy.

17            J:  So the trailer can leave now.

18            J:  To have the trailer picked up in San Diego.

19   Q    And between Fiera and Guero on the following slide.

20   A    Fiera:  What did you find out about the storage?  Look at

21   what time it is and he's asking me.

22            Fiera:  He's telling me to have you pick up a

23   trailer in San Diego.

24   Q    And turning to slide 121 between Fiera and Guero.

25            Can you read the highlighted portion.
```

MARSTON – DIRECT – MR. ROBOTTI

1    A    Guero:  What happened with Detroit -- what happened with

2    the Detroit thing and the shipment that we should bring up?

3    Because as you know, we get that with those who work on

4    getting shipments, it doesn't matter if we have to pay a

5    little more.

6         Guero:  Yes, they're waiting for it to be delivered;

7    it was already ordered.

8    Q    All right, and the final set of messages for this set

9    between Fiera and the defendant.

10        Could you read the highlighted portions.

11   A    Fiera:  Wuero is telling me now that the shipment for

12   Detroit has already been ordered.  I'll be checking until he

13   gets it and I'll let you know.  I'm going to ask him now what

14   he ordered.

15        J:  We're going to work with only 30 and we'll see.

16   He needs to rent the warehouse in nitroy, since the

17   information was already given to Wero, because if there's no

18   warehouse the trailer cannot leave.

19        J:  Alright, love.  Tell Wero to the hurry and get

20   people soon.  Some kilos are on the way.

21   Q    All right.  Now, did you review any communications about

22   a seizure of marijuana in the text messages between the

23   defendant and Agustina?

24   A    Yes.

25   Q    All right, now looking at this slide, who was involved in

MARSTON – DIRECT – MR. ROBOTTI

1   those communications?

2   A    On CharlyBlack 15, it was Guero, the defendant, and

3   Agustina.

4          And on CharlyBlack 14, it was with Floress, the

5   screen name with the emoticon, and Agustina.

6   Q    All right, so turning to slide 124, what's the date of

7   this set of messages between Guero and Mona?

8   A    January 15th, 2012.

9   Q    All right.  Can you read the highlighted portions for us.

10  A    Mona:  Listen, they're asking me if you know someone who

11  can go out into the water there to pick up some grass.

12         Guero:  Where and what's needed so I can check.

13         Mona:  To pick up grass in Los Angeles at the

14  edge/shore to sell it.

15         Guero:  Ask what is needed.

16         Mona.  Only a car and a driver.  The things will be

17  on a boat.  I'll ask shortly but please start checking.

18         And then Mona at bottom:  Listen, he tells me that

19  for now this will not be needed but we'll see if it will be

20  needed later on.  I'll let you know.

21  Q    All right, and turning to conversation on the next page

22  between Fiera and Floress.  What's the date of these

23  conversations -- or excuse me, the first two boxes, what's the

24  date?

25  A    The date on the first two boxes is January 16th, 2012.

MARSTON – DIRECT – MR. ROBOTTI

1   Q    And the next box is the following date?

2   A    Yes.

3   Q    All right, can you read the highlighted portions for us.

4   A    Fiera:  Girl, you're going to say I'm such a pain...

5   Another favor:  Could you check the news from where you are

6   and see if they seized 400K in Santa Barbara, please.

7            Fiera:  Yesterday at 4 a.m. in a boat on the waters

8   of Santa Barbara, they caught three people and seized 400K of

9   marijuana.  Check to see if it comes out, girl, please.

10           Fiera:  Hey -- this is now January 17th, 2012.

11           Fiera:  Hey, girl, would you know if the Viri or

12  someone can get an attorney for some detainees that are there

13  in Los O.

14           On the bottom, Fiera:  It's three people that are

15  detained.

16  Q    All right, so turning to slide 126.  Did you notice any

17  messages being relayed about the seizure to and from the

18  defendant?

19  A    Yes.

20  Q    Looking at this slide, to whom were those messages being

21  related?

22  A    Well, they're being relayed through Fiera with the

23  emoticon.

24  Q    All right, so turning to slide 127.

25           What's the date of these messages?

MARSTON – DIRECT – MR. ROBOTTI

```
 1   A     This is January 29th, 2012.
 2   Q     And these are between the defendant and Fiera, correct?
 3   A     Yes.
 4   Q     All right.  Could you please read the highlighted
 5   portions.
 6   A     J:  And I'll give you the names of the three people so
 7   that you can see a lawyer.  I'll give you the details, love.
 8              J:  Pedro Lopez Rocha and Rafael Castillo Juarez.
 9              And then J on the bottom:  Javier Everardo Lizarraga
10   Calderon.  The public defender's name is Umberto Diaz with a
11   telephone number.  That lawyer will give you information about
12   the detainees.  Call him and see what he says and let me know
13   soon.  I love you.
14   Q     All right, so turning to messages between Fiera and the
15   emoticon on that same date.  Can you read the highlighted
16   message in paragraph 41?
17   A     Yes.
18              Pedro Lopez Rocha, Rafael Castillo Juarez, Javier
19   Everardo Lizarraga Calderon.  Public defender, Humberto Diaz,
20   was handling their case, his cell, the number.  He'd be able
21   to give you the detainees' information.  Do me -- do me that
22   huge favor, please.
23              MR. ROBOTTI:  One second, I think we lost our mics.
24              THE COURTROOM DEPUTY:  One second.
25              (Pause.)
```

MARSTON - DIRECT - MR. ROBOTTI

```
1              MR. ROBOTTI:  Thank you.
2    Q    All right, so turning to slide 129.
3              What do we see here?
4    A    These are pieces of information that was part of the
5    public document in the Central District of California.
6    Q    All right.  And what is the defendant's listed -- who are
7    the defendants listed in that case?
8    A    The defendants are listed as Pedro Lopez, also known as
9    Pedro Lopez-Rocha.  Javier Alverado Lizarraga-Calderon.  And
10   the third defendant is Rafael Castillo-Juarez.
11   Q    And who's the public defender listed here?
12   A    Humberto Diaz.
13   Q    And what's the date that the complaint was filed?
14   A    It's filed on January 16th, 2012.
15   Q    All right, so turning next to slide 130 at the top box
16   between the defendant and Fiera, what does the defendant say?
17   A    J:  Love, anything from the lawyer in Los Angeles?
18   Q    And message on the same date, February 22nd --
19   February 2nd of 2012, between Fiera and the emoticon in the
20   middle box, can you read that for us.
21   A    Fiera:  Hello, my friend.  Listen, what did the attorney
22   tell you?  The man is asking me.
23             The emoticon:  I have an early appointment with him
24   tomorrow.  I'll let you know what he says.
25   Q    All right, and back to the defendant's and Fiera in the
```

MARSTON – DIRECT – MR. ROBOTTI

1    bottom box, same date.  Could you read that.

2    A    Fiera:  Love, a guy has an appointment with the lawyer

3    early tomorrow and he'll let me know what he says.

4    Q    All right, turning to slide 131.  Between the emoticon

5    and Fiera.

6              What does the emoticon say?

7    A    I'm on the way to see the attorney.  I have an

8    appointment with him at 1:00.

9    Q    All right, and then turning to the next slide.  It's

10   still February 3rd, 2012, same date as the last slide, between

11   the defendant and Fiera.

12             Could you read the highlighted portions.

13   A    J:  Love, what is the lawyer from the United States

14   saying.

15             Fiera:  Love, I'm talking to my friend.  He's just

16   leaving now for an appointment with the lawyer at 1 p.m.

17   Q    All right, turning to slide 133, paragraph 527, same

18   date.

19             Could you read the message from the defendant to

20   Fiera.

21   A    J:  Yes, love.  Let's wait for today and if he doesn't

22   come up with anything today, find another one tomorrow.  I

23   love you.

24   Q    All right.  And back to the emoticon and Fiera, can you

25   read on the messages in this slide, both of them.

MARSTON - DIRECT - MR. ROBOTTI

1   A    I spoke to him and he said that no one had gotten in

2   touch with him regarding that.  And that this guy, Diaz, has

3   not cooperated much with him, per say, but that he's gotten

4   some information from him.  Once he has the information, he's

5   going to call me back with additional details.

6           But he says that one attorney cannot represent all

7   three of them; that is not allowed.  He says that if they give

8   him the case, he can find others that are of his trust, but

9   that he would be the one in charge, per say.  He says it's

10  better this way because they would all be working together,

11  and not like some attorneys that are not trustworthy and that

12  will just dig the other's graves.  The key here is for all

13  three to work together.

14  Q    All right, and continuing on the next slide on

15  February 6th between the emoticon and Fiera.

16          Can you read this slide as well.

17  A    What's new.  Listen, I'm back at the attorney's.  He's

18  telling me that he's going to need more information because,

19  as I told you on Friday, Diaz doesn't want to cooperate all

20  that much and he says that this time, when he spoke to him he

21  didn't like he sounded he was a bit suspicious, so he's going

22  to a different route.  Among other things, he will need

23  birthdates.  I'll call you in a bit to let you know what else.

24          Fiera:  Okay, Alright my friend.

25          The emoticon:  He's asking if they have relatives

MARSTON - DIRECT - MR. ROBOTTI

1    here or someone who they stay in touch with so that if he goes

2    see them, he can tell them he's there on behalf of.  So get me

3    the birthdates for the three of them, and who he visiting this

4    them on behalf of.  Anyway, he's trying to find out as much as

5    he can.

6    Q    All right, and finally in this set between the defendant

7    and Fiera, could you please read the slide -- the entire

8    slide.

9    A    Fiera:  Well, my friend who went to see the lawyer is

10   checking in.  And he says the lawyer, Diaz, the one that was

11   looking into the case, didn't do much for them.  He hasn't

12   cooperated much with the other lawyer and didn't give him any

13   information.  But he looked into it and said he's not allowed

14   to represent all three at the same time but can he get two

15   trustworthy colleagues to work together to help them.  He says

16   the lawyer said he would give him in a little while and he'll

17   give me the information.

18        Fiera continues:  The lawyer is asking for the

19   birthdates of the detainees and for you to tell me the name of

20   someone they know so that the lawyer can see them and so the

21   detainees trust him because they are saying that the other

22   lawyer doesn't want to cooperate with this lawyer even though

23   he doesn't stop trying to get information.

24        J:  I'll give you -- I'll give you information

25   tomorrow, love.

MARSTON – DIRECT – MR. ROBOTTI

```
 1   Q    All right, we're not going through any messages between
 2   CharlyBlack 02 and J today, but I do want to talk briefly
 3   about this phone.
 4            So on this slide, CharlyBlack 02 was in contact with
 5   J; that's correct?
 6   A    Yes.
 7   Q    And we talked early, the photograph associated on the
 8   slide with CharlyBlack 02 is Lucero Sanchez Lopez; is that
 9   right?
10   A    Yes.
11   Q    And you're not familiar with her through your
12   investigation; is that correct?
13   A    Yes.
14   Q    Have you seen the name Lucero anywhere before?
15   A    Yes.
16   Q    Where was that?
17   A    On the ledgers from Los Cabos.
18   Q    And have you reviewed -- looking at the next slide, have
19   you reviewed the messages between J and the screen name M,
20   which is being used by CharlyBlack 02?
21   A    Yes.
22   Q    And have you compared information in those messages to
23   the defendant's other text messages using the screen name J?
24   A    Yes.
25   Q    And those would be the message we talked about today
```

MARSTON – DIRECT – MR. ROBOTTI

1   between the defendant and Emma Coronel?

2   A     Yes.

3   Q     And also between the defendant and Agustina Cabanillas,

4   correct?

5   A     Correct.

6   Q     So could you walk us through what your comparison showed

7   between those text messages and the text messages for

8   CharlyBlack 02.

9           Let's start with the first three bullet points.

10  A     Once again, we have the same screen name being used,

11  that's the letter J.  It was, again, a license purchase by

12  Christian for the defendant.

13          And the time frame is in the same associated with

14  the screen name J.

15  Q     Why was that significant to you?

16  A     To me that linked it all together.

17  Q     All right, and then turning to the fourth bullet point.

18          In general, what does this bullet talk about?

19  A     Once again, common people and topics that were found in

20  the messages with CharlyBlack 02 that were also found in the

21  other messages we discussed earlier.

22  Q     All right, and so what were the common names and topics

23  that we noticed here?

24  A     Once again the name Cachimba was present and -- which was

25  present CharlyBlack 11, 15, and Charlie CH6.  The name Condor

MARSTON – DIRECT – MR. ROBOTTI

```
 1    being with J, as well as Angel being with J.

 2    Q    And the common topic with Cachimba was discussing a

 3    flight, right?

 4    A    Yes.

 5    Q    And that appears in all of the messages that we spoke

 6    about today.

 7    A    Yes.

 8    Q    All the accounts, excuse me.

 9         All right.  And the last one there, what is that

10    last bullet point?

11    A    There's discussion about transporting kilos by plane.

12    And, again, we saw that in the messages in CharlyBlack 11, or

13    at least about planes.  And then in CharlyBlack 15, the

14    discussion of the black flight.

15    Q    And based on your comparison between the text messages in

16    CharlyBlack 02, and the other text messages sent by the

17    defendant today, what conclusion did you reach about the J in

18    contact with CharlyBlack 02?

19    A    My conclusion was the defendant is J in this account as

20    well.

21         MR. ROBOTTI:  Thank you, Special Agent Marston, I

22    have no further questions.

23         THE COURT:  Mr. Lichtman, do you want to break for

24    lunch and then start?

25         MR. LICHTMAN:  Yes.
```

MARSTON – DIRECT – MR. ROBOTTI

1              THE COURT:  All right, we'll take a slightly early
2    lunch, ladies and gentlemen.
3              Please don't talk about the case.  We'll see you
4    back in here at 1:20.
5              (Jury exits the courtroom.)
6              THE COURT:  You looked like you were going to say
7    something.
8              MS. GOLDBARG:  Yes, Your Honor.  Can we have a brief
9    sidebar.
10             THE COURT:  Yes.
11             MS. GOLDBARG:  Thank you.
12             THE COURT:  We're in recess, except for the sidebar.
13             (Continued on the next page.)
14             (Sidebar conference.)
15
16
17
18
19
20
21
22
23
24
25

SIDEBAR CONFERENCE

```
 1              (The following occurred at sidebar.)
 2              THE COURT:  The lawyers have asked me for a sidebar.
 3   We're having a sidebar.  You can get the transcript, it is not
 4   sealed.
 5              Yes.
 6              MR. BALAREZO:  Not yet.
 7              MS. GOLDBARG:  The reason I called a sidebar, Your
 8   Honor, is about the next witness.
 9              THE COURT:  Yes.
10              MS. GOLDBARG:  The next witness is Christian
11   Rodriguez.
12              THE COURT:  Yes.
13              MS. GOLDBARG:  He is not in custody, so we will not
14   require a reset of the courtroom.
15              Three things with regard to him.  The first is that
16   he is one that, per the Court's order, he is -- the court
17   sketch artists are required not to sketch his face, and that
18   the Court wanted to do that outside the presence of the jury.
19
20
21
22
23
24
25
```





 1
 2
 3          THE COURT:
 4
 5
 6          MS. GOLDBARG:
 7
 8
 9          THE COURT:
10
11          MS. GOLDBARG:
12          THE COURT:
13
14          MR. BALAREZO:
15          THE COURT:
16
17
18          MS. GOLDBARG:
19
20
21          THE COURT:
22          MS. GOLDBARG:
23
24          THE COURT:
25



SIDEBAR CONFERENCE

1          THE COURT:  (Cont'g.)  And then before we begin the

2   witness' testimony, I will remind the sketch artists not to

3   sketch him.

4          And I will make a finding as to why a certain

5   portion of the sidebar that we held is sealed.

6          Yes?

7          MS. GOLDBARG:  The reason I'm raising it now is that

8   I'm not sure there will be a break between the

9   cross-examination of this current witness and us putting the

10  next witness on.

11         THE COURT:  So we would have to take the jury out.

12         MS. GOLDBARG:  Or you could possibly do it when we

13  return from the lunch break.

14         THE COURT:  I'll do it before we start with

15  cross-examination.

16         MS. GOLDBARG:  All right.

17         Thank you very much, Your Honor.

18         THE COURT:  All right, thank you.

19         MS. PARLOVECCHIO:  Thank you.

20         (In open court; Jury not present.)

21         (Whereupon, a recess was taken at 12:37 p.m.)

22

23

24

25

PROCEEDINGS

```
 1                A F T E R N O O N   S E S S I O N

 2           THE COURTROOM DEPUTY:  All Rise.

 3           THE COURT:  Be seated.  With regard to the sidebar

 4   we had prior to the lunch break, the Government raised several

 5   topics, most of those are unremarkable.  One of them, however,

 6   I made a finding after hearing that public disclosure of it

 7   would create an undue risk of compromising the security and

 8   safety of witnesses in this case.  I therefore directed the

 9   court reporter for that reason to redact that portion of the

10   sidebar that refers to that one topic that was under

11   consideration.  The rest of the sidebar will be available.

12           Let's have the jury.

13           MR. PURPURA:  If we could?  If Ms. Goldbarg and I

14   could approach?  It was something that was raised at the

15   sidebar.

16           THE COURT:  The part that I sealed?

17           MR. BALAREZZO:  No.

18           THE COURT:  Another topic to be sealed?

19           MR. BALAREZZO:  No.

20           THE COURT:  Why do we need to have a sidebar?

21           MR. BALAREZZO:  It was about the topic that I had

22   said that I was not going to discuss concerning the next

23   witness.

24           THE COURT:  Yes.  Have you changed your mind?

25           MR. BALAREZZO:  I informed Ms. Goldbarg she's free
```

MARSTON - CROSS - MR. LICHTMAN

```
 1    to bring it in; I'll be free to do whatever.
 2              THE COURT:  You've changed your mind.
 3              MR. BALAREZZO:  Yes.
 4              THE COURT:  You're aware.  So you're going to
 5    withdraw that.
 6              MS. GOLDBARG:  Yes, your Honor.
 7              THE COURT:  That's not part of the sealed.
 8              MR. BALAREZZO:  No.
 9              THE COURT:  Let's have the jury.
10              (Jury enters the courtroom.)
11              THE COURT:  Be seated, please.
12              Cross-examination, Mr. Lichtman.
13              MR. LICHTMAN:  Thank you, Judge.
14    CROSS-EXAMINATION
15    BY MR. LICHTMAN::
16    Q    Good afternoon, Agent.
17    A    Good afternoon.
18    Q    Some preliminary stuff before I go into it, with regard
19    to the Cabo raid that occurred in 2012?
20    A    Yes.
21    Q    What month was that?
22    A    February.
23    Q    February.  Now, as you know -- would you consider
24    yourself the case agent of this case?
25    A    In the beginning I was.
```

MARSTON - CROSS - MR. LICHTMAN

1   Q    You're obviously aware of huge swaths of investigation
2   that occurred in the lead up to the Indictment in this case?
3   A    Yes.
4   Q    And you're aware that in 1993 a Mexican cardinal was
5   killed at an airport in Guadalajara?
6           MR. ROBOTTI:  Objection.
7           THE COURT:  Scope.
8           MR. LICHTMAN:  Judge, I'll being brief.
9           THE COURT:  I'll give you a little leeway.
10          MR. LICHTMAN:  Thank you.
11  A    I think I heard of that, yes.
12  Q    You're aware of that Mr. Guzman was on the run after
13  being accused of killing that cardinal?
14  A    I believe I'm aware of that, I'm not 100 percent sure.
15  Q    From 1993, you're aware that in 2001 he escaped a prison
16  after being arrested following that murder of the cardinal?
17          MR. ROBOTTI:  Hearsay.  Scope.
18          THE COURT:  Hearsay, no.  Scope, yes.
19          MR. LICHTMAN:  One more question.
20          THE COURT:  Go ahead.
21  A    Yes.
22  Q    And by the time 2012 occurred, when he was supposedly at
23  this, would you call it a safe house in Cabo?
24  A    No, I wouldn't.
25  Q    A house?

RIVKA TEICH, RMR, FCRR

MARSTON - CROSS - MR. LICHTMAN

```
 1    A     House.

 2    Q     He was still on the run from Mexican authorities?

 3    A     Yes.

 4    Q     Back from 1993 all the way through 2012, correct?

 5    A     Yes.

 6    Q     One other matter.  You've obviously reviewed all of the

 7    phone calls and texts in connection with your direct

 8    examination?

 9    A     I have looked at them all, or tried to recall as many as

10    I can today.

11    Q     These are calls and texts that were between various

12    members of this alleged cartel?

13    A     Yes.

14    Q     Were there any direct conversations between Joaquin

15    Guzman and either Jorge or Alex Cifuentes?

16    A     No.

17    Q     You testified regarding the set up of the server in the

18    Netherlands?

19    A     Yes.

20    Q     And that allowed encrypted communications among members

21    of the supposed Sinaloa Cartel?

22    A     Yes.

23    Q     You testified that these servers were migrated to the

24    Netherlands by Christian Rodriguez?

25    A     Yes.
```

MARSTON - CROSS - MR. LICHTMAN

```
 1   Q    And you testified that there were two servers that were
 2   actually maintained by the cartel?
 3   A    The migration, sir?
 4   Q    No, in terms of the servers that were ultimately set up
 5   for communication purposes, there were two servers?
 6   A    There are three set up, two that were used.
 7   Q    Two that were used.  And each of the servers had a unique
 8   IP address?
 9   A    Yes.
10   Q    You're going to help me with this, this is not my
11   specialty.  I'll be asking you some open-ended questions.  The
12   purpose of the unique IP address was to allow for separate
13   functions for each of the servers?
14   A    That was my understanding, yes.
15   Q    The server with the IP address 83.149.125. ending in 226,
16   that's maybe that be easier to identify it that way, that was
17   used for internal cartel communications?
18   A    I believe that's correct, sir.
19   Q    And that's how you remember the IP address ending in 226?
20   A    I do remember that, yes.
21   Q    The point of having an internal server was so that
22   members of the cartel could communicate sort of in a closed
23   box, so to speak?
24   A    Yes.
25   Q    Without having to go outside?
```

MARSTON - CROSS - MR. LICHTMAN

1    A    Yes.

2    Q    And everybody that was in the cartel was assigned a

3    three-digit number?

4              MR. ROBOTTI:  Objection.  Misstates the testimony.

5              THE COURT:  Overruled.  He can answer.

6    Q    If you can answer.

7    A    There were extensions assigned to different individuals,

8    yes.

9    Q    Whether it was everyone or some?

10   A    Correct, I don't know if it was everyone.

11   Q    You just know what you found and that's what you had?

12   A    Yes.

13   Q    I think you had stated on direct that Mr. Guzman's

14   three-digit extension was 121?

15   A    We identified 121, 120, 185 with Mr. Guzman at least

16   being recorded on those extensions.

17   Q    You had found the phone book, and by you I mean the FBI

18   collectively or at least law enforcement, in the Cabo search

19   after February 2012?

20   A    Yes.

21   Q    This was Government's Exhibit 511-9A.  This was your

22   summary of what was found inside the phone book at the bottom?

23   A    Yes.

24   Q    What you did is you took, apparently there were

25   three-digit extensions in the book and you just put them in

MARSTON - CROSS - MR. LICHTMAN

1    the chart above?

2    A    That's correct.

3    Q    And their names next to certain extensions?

4    A    Yes.

5    Q    Now, there is no mention on this in the phone book, where

6    Mr. Guzman's name is next to any extensions, correct?

7    A    Yes.

8    Q    There is no mention of Mr. Guzman's, any of his aliases,

9    he had numerous aliases as you know?

10    A    Yes.

11    Q    Nothing at all in that book that you found?

12    A    That's correct.

13    Q    There was another server the internal server, as you

14    said, ending 226?

15    A    I believe the 226, I think was internal server, I'm not

16    100 percent sure on that.

17    Q    If I can refresh your recollection that might -- the

18    external server ended in 70, if you recall?

19    A    I do believe that's correct.

20    Q    What I mean by external, is that means that if there are

21    people using the internal system with the three-digit

22    extensions and want to call outside of that closed box system,

23    they would have to use the other server, the 70 server?

24    A    That was my understanding.

25    Q    So a person that's using -- you had mentioned VOIP, what

RIVKA TEICH, RMR, FCRR

MARSTON – CROSS – MR. LICHTMAN

1    does that stand for?

2    A     Voice Over Internet, and the P stands for Protocol.

3    Q     The people that were calling out would use the 70 server?

4    A     That was my understanding.

5    Q     No one could call into it?

6    A     Again that was my understanding, yes, sir.

7    Q     Now, you went over the various calls that Mr. Guzman's

8    alleged to have made in preparation for your testimony today?

9    A     Yes, sir.

10   Q     And there are actually summaries of these calls that were

11   created, correct?

12   A     Yes.

13   Q     And in the summaries, you've obviously reviewed these

14   before your testimony today?

15   A     Yes.

16   Q     In these summaries, it will show the three-digit

17   extension of the person making the phone call?

18   A     Yes.

19   Q     In Mr. Guzman's, for example, he was number 185 as you

20   had said?

21   A     Yes.

22   Q     And the IP address presumably from where he's calling

23   would be the 226 server?

24   A     Yes.

25   Q     So he'd be calling from 226.  If he was calling out it

MARSTON - CROSS - MR. LICHTMAN

 1   would then go to the 70 server, the call would be bounced,

 2   correct?

 3   A    So I don't know technically how it worked.  I'm not in a

 4   position to answer that.  But the calls, from my

 5   understanding, that went to the external server were

 6   associated with the .70, and then the calls for the internal

 7   were associated with, I believe, the .226 server, as least as

 8   initially set up.

 9   Q    The point was to try to maintain some sort of secrecy?

10   A    Correct.

11   Q    So all the calls were basically coming from two different

12   IP addresses?

13   A    Correct.

14   Q    Now, with regard to the summaries, are you aware that

15   calls that are attributed to 185, the three-digit code that

16   you claim is for Mr. Guzman, actually has an IP address ending

17   in 103?

18   A    I just don't recall that, sir.

19   Q    If I can refresh your recollection.  You can see the

20   Bates on the bottom.  If you can look at the part that I

21   squared off.  This was one of the calls that were made from

22   Mr. Guzman that was played in court?

23   A    I believe so, sir.  It says Guzman there.

24   Q    With regard to the three-digit code, 185 was Mr. Guzman?

25   A    Yes.

MARSTON - CROSS - MR. LICHTMAN

```
 1    Q    And the IP address from the phone that he's calling
 2    doesn't end in either 70 or 226, but ends in 103, doesn't it?
 3    A    Yes.
 4    Q    Can you explain why that is?
 5    A    I cannot.
 6    Q    Are you the best witness for the Government with regard
 7    to the understanding of how this works?
 8    A    The technical aspect I would say, no.
 9    Q    Who would be?  Not you.
10    A    Not me, sir.
11    Q    You've been working on this investigation for about ten
12    years, would you say?
13    A    I've been associated with it for ten years, yes, sir.
14    Q    Your beginnings in this investigation started
15    investigating the Cifuentes drug trafficking organization,
16    correct?
17    A    Yes.
18    Q    Your involvement has been, in part, of the communication
19    mechanisms that were used for the Cifuentes drug trafficking
20    organization?
21    A    Yes.
22    Q    Later it morphed into Mr. Guzman?
23    A    Shortly thereafter, yes, sir.
24    Q    You've obviously spoken to many people during your
25    investigation in this case?
```

RIVKA TEICH, RMR, FCRR

MARSTON - CROSS - MR. LICHTMAN

1    A    I have.

2    Q    Dozens, hundreds maybe?

3    A    Certainly dozens.

4    Q    You've spoken to sources that just provide information?

5    A    Yes.

6    Q    Cooperating witnesses?

7    A    Yes.

8    Q    Confidential sources?

9    A    Yes.

10   Q    You spoken to anyone that was really significant with

11   regard to communications of the either the Sinaloa Cartel drug

12   cartel or the Cifuentes drug trafficking organization; is that

13   fair?

14   A    Fair.

15   Q    Anyone that was available.

16   A    Yes.

17   Q    Obviously not everyone is available.

18   A    Yes.

19   Q    Have you ever spoken to Cholo?

20   A    I have never spoken to Cholo.

21   Q    Have you spoken to Virgo?

22   A    No.

23   Q    What about M10?

24   A    No.

25   Q    What about the various unidentified males in the calls

MARSTON - CROSS - MR. LICHTMAN

1   that were played during the direct examination?

2   A    I have not spoken to them.

3   Q    Any of the unidentified females that were captured in the

4   calls that were played during your direct examination?

5   A    I have not.

6   Q    There were some people that were listed on the

7   transcripts that you explained as FNU/LNU, that stands for

8   First Name Unknown/Last Name Unknown?

9   A    That's correct.

10  Q    I'm guessing because you don't know the names you haven't

11  spoken to them either?

12  A    Correct.

13  Q    You haven't debriefed any of them?

14  A    I have not.

15  Q    You've never spoken to Mr. Guzman?

16  A    I have not.

17  Q    So what you know about what was said on the tapes that

18  were played on direct is obviously not first-hand?

19  A    Correct.

20  Q    Or even second-hand because you didn't speak to the

21  people who were on the tapes?

22  A    That's correct.

23  Q    You testified on direct you consider yourself to be an

24  expert of sorts of Mr. Guzman's voice?

25  A    I don't believe I used the word expert.

MARSTON – CROSS – MR. LICHTMAN

```
 1   Q     I pushed that, I agree.
 2         But you consider yourself someone that is capable
 3   enough to identify Mr. Guzman's voice that you're willing to
 4   come into an American courtroom, raise your hand under oath
 5   and testify as such?
 6   A     That's correct.
 7   Q     That's a pretty high standard, wouldn't you agree?
 8   A     I think under oath is very high standard.
 9   Q     You obviously are working for the Government in this
10   case?
11   A     Right.
12   Q     You're working to get a conviction here?
13   A     Correct.
14   Q     There is no question that you want a conviction in this
15   case.
16   A     I believe that's correct.
17   Q     Not believe, there is not even a question, correct?
18   A     That's correct.
19   Q     I'm looking for an acquittal.  We know where we stand.
20         MR. ROBOTTI:  Objection.
21         THE COURT:  Sustained.
22   Q     So you would agree that you've got at least a slight bias
23   in favor of the Government because you're part of the
24   Government?
25   A     I try not to have any biases, sir.
```

RIVKA TEICH, RMR, FCRR

MARSTON - CROSS - MR. LICHTMAN

1    Q    You try, but it's natural, wouldn't you say, working

2    towards a conviction you want a conviction?

3    A    Of course I want a conviction.  But as you know, it's

4    about the truth.

5    Q    Well, it's about the truth.  As you said on direct that

6    the purpose of a proffer is to get the truth?

7    A    That's correct.

8    Q    Have you ever sat in any debriefing with a cooperator who

9    has lied?

10   A    Yes.

11   Q    Happens fairly frequently, doesn't it?

12   A    I don't know frequency, but it does happen.

13   Q    It's happened many times in your career when you sat in

14   debriefings and cooperating witnesses or people attempting to

15   become cooperators have lied?

16   A    That's correct.

17   Q    You've sat in courtrooms when you've seen witnesses lie

18   as well, haven't you, in your career?

19   A    I can't say that I have.

20   Q    You're telling me that -- how long have you been an

21   agent?

22   A    An agent 18 years.

23   Q    In 18 years of sitting through trials you've never seen a

24   Government witness lie under oath?

25              MR. ROBOTTI:  Objection.

MARSTON - CROSS - MR. LICHTMAN

```
1              THE COURT:  You kind of switched gears.  Are you
2    talking about cooperating witnesses?
3              MR. LICHTMAN:  Government witnesses.
4              THE COURT:  Any witness called by the Government.
5              MR. LICHTMAN:  Yes.
6              THE COURT:  You can answer that.
7    A    I have not seen a witness lie under oath, no.  I've
8    certainly seen them not tell the truth in proffers.  But, no,
9    I have not seen them lie under oath.
10   Q    If you had, you would tell us.
11   A    If they lied under oath --
12             MR. ROBOTTI:  Objection.
13             THE COURT:  Sustained.
14   Q    You're saying if one would have lied under oath that
15   would end their cooperation, is that what you're attempting to
16   say?
17   A    It should.
18   Q    It should, immediately, as soon as they lie, correct?
19   A    They don't tell the truth, there has to be a meeting with
20   the AUSAs.  They have to make a determination.
21   Q    The determination doesn't happen until well after the
22   fact?
23   A    I don't know when the determination happens.  I know it
24   happens by the Department of Justice.
25   Q    After a conviction, correct?
```

MARSTON - CROSS - MR. LICHTMAN

1    A    I don't know the answer to that.

2    Q    In order for you to determine if Mr. Guzman was the one

3    speaking on the tapes, you listened to what you believed were

4    some samples of his voice?

5    A    Yes.

6    Q    What you did -- you had what we would call, let's say, a

7    controlled sample?

8    A    Yes.

9    Q    What I mean by control, that's the one that they are

10   absolutely, no dispute is Mr. Guzman?

11   A    Yes.

12   Q    In this case the voice that you used was the one for him

13   calling from the MCC?

14   A    Yes.

15   Q    Because in order for him to call, he had to put in an

16   identification code?

17   A    I don't know the process, but I would assume something to

18   that fact.

19   Q    But you felt comfortable enough that calls that were made

20   under Mr. Guzman's number or name from the MCC were absolutely

21   his?

22   A    I did.

23   Q    I think you described his voice as high pitched?

24   A    I hear it as a higher pitched voice, yes.

25   Q    I think you said it had a nasally undertone?

MARSTON - CROSS - MR. LICHTMAN

1   A    I did.

2   Q    Sing-songy, I think was the language you used?

3   A    I did.

4        MR. LICHTMAN:  If we can, I'd like to play some of

5   that tape.  This is Government's Exhibit 6082.

6        (Audio played.)

7   Q    That's good.  Sing-songy a little bit?

8   A    Again it's how I kind of describe it.

9   Q    That's fine.  I would agree with you.  A little bit of

10  nasally?

11  A    At times, yes.

12  Q    Somewhat high pitched?

13  A    He can be, yes.

14  Q    On the tape that you just heard -- obviously you didn't

15  get those adjectives out of the blue, you grabbed them from a

16  known sample of his voice?

17  A    Correct, yes.

18  Q    You also then compared it to a videotape his voice, you

19  claim, on a videotape in which he's doing an interrogation of

20  sorts?

21  A    I did.

22  Q    This is from a live leak, a video?

23  A    That's correct.

24       MR. LICHTMAN:  This was Government's Exhibit 704B if

25  we can play that.

RIVKA TEICH, RMR, FCRR

MARSTON – CROSS – MR. LICHTMAN

```
 1              (Video played)
 2    Q    Same voice, right?
 3    A    That's very difficult to hear.
 4    Q    It's very difficult to hear, isn't it?
 5    A    Absolutely.
 6    Q    You don't hear the sing-songy part of the voice that you
 7    had heard on the MCC tape, do you?
 8    A    That's correct.
 9    Q    You don't hear the nasally undertone, do you?
10    A    It's a lot of background noise, correct.
11    Q    It's not just a lot of background, it doesn't sound like
12    the same guy, the same voice, on the MCC tape?
13    A    It's different, different audio and setting.
14    Q    You had no problem testifying on direct yesterday that it
15    was the same, correct?
16    A    I did.
17    Q    Another way you identified this is Mr. Guzman, even
18    though the voices don't exactly sound the same, is that the
19    man had a mustache and a hat?
20    A    I did.
21    Q    Mexicans have mustaches.
22    A    I don't know if that's a fact, sir, I assume they do.
23    Q    I have to be very careful here.  From your investigation
24    in this case, we can agree that Mexicans associated with this
25    investigation often have mustaches?
```

MARSTON - CROSS - MR. LICHTMAN

```
 1              MR. ROBOTTI:  Objection.

 2              THE COURT:  Sustained.

 3    Q    Mexicans even wear hats.

 4              MR. ROBOTTI:  Objection.

 5              THE COURT:  Sustained.  Argumentative.

 6              MR. LICHTMAN:  Is it?

 7              THE COURT:  It is something you can say to the jury;

 8    you don't have to say it to this witness.

 9    BY MR. LICHTMAN::

10    Q    The point is that someone who wears a mustache or hat

11    isn't necessarily a shocking minority of people, is it?

12    A    No.

13    Q    You were shown pictures of Mr. Guzman with other hats

14    than the one that was in the video, correct?

15    A    I believe so, yes.

16    Q    You were shown a picture of him dancing with a woman and

17    he had a hat on?

18    A    Correct.

19    Q    You were shown a picture of him I think staring straight

20    at the camera, he had that hat on, correct again, correct?

21    A    Yes.

22    Q    So hat, hat, then hat in the video, that's got to be

23    Mr. Guzman?

24    A    That wasn't my only determination, sir.

25    Q    Well, correct the other determination was how similar the
```

RIVKA TEICH, RMR, FCRR

MARSTON – CROSS – MR. LICHTMAN

1   voices sounded in the interrogation video to the MCC audio?

2   A    And the fact that the conversation was caught on our

3   intercepts that was a system set up by the defendant.

4   Q    According to you.

5   A    Yes, sir.

6   Q    But that doesn't mean that every person that is captured

7   is him, is it?

8   A    No, sir.

9   Q    Now, this is in evidence already, Defendant's Exhibit

10  382.  Do you recognize this picture?

11  A    I do.

12  Q    Do you know who these people are?

13  A    I do.

14  Q    Who is the man on the left?

15  A    The defendant.

16  Q    Who is the man on the, right?

17  A    El Mayo.

18  Q    Hats in each?

19  A    They both have hats.

20  Q    They both have mustaches too?

21  A    They do.

22  Q    They look similar?

23  A    They do look similar, but not the same.

24  Q    Well, they look closer than perhaps the audio in the

25  interrogation video and the audio in the MCC call, do you

MARSTON - CROSS - MR. LICHTMAN

```
 1   think?

 2   A    Can you repeat?

 3             MR. ROBOTTI:  Objection.

 4             MR. LICHTMAN:  Withdrawn.

 5   Q    You didn't get a great direct frontal view of the man in

 6   the interrogation video, did you?

 7   A    I did not.

 8   Q    Just the side view, correct?

 9   A    That's correct.

10   Q    Now, you're aware of what a voice print is?

11   A    Vaguely, I think I am.

12   Q    A voice is like a fingerprint in a way, correct?

13   A    Yes.

14   Q    No two people have the same fingerprints?

15   A    I don't believe -- I believe you're right.

16   Q    Even identical twins don't have the identical prints?

17   A    That's correct.

18   Q    I've got identical twins, I've checked.

19             MR. ROBOTTI:  Objection.

20   Q    Because a voice, when broken down scientifically --

21   withdraw that.

22             A voice when broken down scientifically shows that

23   no two voices are identical either.

24             MR. ROBOTTI:  Objection.

25             THE COURT:  Sustained.
```

MARSTON - CROSS - MR. LICHTMAN

```
 1  Q    You're aware that there are ways to determine if two
 2  voices are the same?
 3  A    Yes.
 4  Q    Not just based on what the agent hears, correct?
 5  A    That's correct.
 6  Q    You know what spectrography is?
 7  A    I do not.
 8  Q    You've never done a voice analysis in 18 years as an FBI
 9  agent?
10  A    Not from a technical perspective, no, sir.
11  Q    Are you aware that such a thing exists?
12  A    Probably down in our lab in Quantico.
13  Q    You've been involved in cases in which voices have been
14  analyzed, haven't you?
15  A    Yes, sir.
16  Q    You're aware that there are instruments that measure
17  various parts of a voice?
18  A    Yes, sir.
19  Q    Frequency?
20  A    Yes.
21  Q    Intensity?
22  A    Yes.
23  Q    Pitch?
24  A    I would assume so.
25  Q    It gets laid out on a graph --
```

MARSTON – CROSS – MR. LICHTMAN

```
1                 MR. ROBOTTI:  Objection, your Honor.

2                 THE COURT:  Sustained.

3    Q    My point is there are ways to scientifically determine

4    whether a voice is the same as another voice, isn't there?

5                 MR. ROBOTTI:  Objection, your Honor.

6                 THE COURT:  Sustained.

7                 MR. LICHTMAN:  Can I ask why at sidebar?

8                 THE COURT:  Yes.

9                 (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SIDEBAR CONFERENCE

```
1              (Sidebar conference.)

2              THE COURT:  I think it's pretty obviously this

3    witness doesn't know anything what you're talking about.  He

4    heard about this.  He probably has the same level of knowledge

5    of it as I do, which is none.  You're trying to use him as an

6    expert, when he has zero expertise.

7              MR. LICHTMAN:  I want to draw out he knows this

8    exists.

9              THE COURT:  You asked him that.  He said yes, I know

10   it exists.  Like I know it exists.

11             MR. LICHTMAN:  It was a such a fertile area.

12             THE COURT:  But you're testifying, that's the

13   problem.

14             MR. LICHTMAN:  Fair enough.

15             (End of sidebar conference.)

16             (Continued on the next page.)

17

18

19

20

21

22

23

24

25
```

MARSTON - CROSS - MR. LICHTMAN

```
 1                    (In open court.)
 2    BY MR. LICHTMAN::
 3    Q    So we can cut to the chase, Agent, you didn't do any
 4    scientific testing on the voices comparing them from the MCC
 5    tape, to the interrogation video, to the voice captured from
 6    the servers, correct?
 7    A    That's correct.
 8    Q    You could have though, right?
 9    A    I believe we could have, yes.
10    Q    Now, did you think that would have put you guys over
11    budget on this case?
12                    MR. ROBOTTI:  Objection.
13                    THE COURT:  Sustained.
14    Q    You testified about Christian Rodriguez?
15    A    Yes.
16    Q    Now he was hugely important in setting up the
17    communication network for the Cifuentes drug trafficking
18    organization?
19    A    Yes.
20    Q    And this was arguably the biggest cocaine drug
21    trafficking organization in Colombia?
22    A    They are pretty large, sir.
23    Q    And Colombia is of sort of known as that's where you get
24    cocaine sometimes, correct?
25                    MR. ROBOTTI:  Objection.
```

MARSTON - CROSS - MR. LICHTMAN

```
 1              THE COURT:  I'll allow that question, that
 2    rhetorical question.
 3    Q    I'll rephrase it.  Colombia is more known for cocaine
 4    than let's say Micronesia?
 5              MR. ROBOTTI:  Objection.
 6              THE COURT:  Do you know?
 7              THE WITNESS:  I don't know.
 8              THE COURT:  He doesn't know.  Why would you think he
 9    knows?
10    Q    There are a lot of cocaine drug trafficking organizations
11    in Colombia, if you know?
12    A    Yes.
13    Q    That's where a large percentage of cocaine that ends up
14    in the United States begins in Colombia, correct?
15    A    Correct.
16    Q    So the Cifuentes, forget Mr. Guzman, the Cifuentes family
17    was a huge cocaine organization, correct?
18              MR. ROBOTTI:  Objection.  Asked and answered.
19              THE COURT:  Sustained.
20    Q    And Christian Rodriguez was a hugely important part of
21    the Cifuentes drug trafficking organization, correct?
22    A    Yes.
23    Q    And according to you, he became a huge part of the
24    Sinaloa drug trafficking organization as well?
25    A    Yes.
```

MARSTON - CROSS - MR. LICHTMAN

1   Q    These are two separate organizations, correct?

2   A    I'm not sure how to answer that.

3   Q    Well, according to the Government, they worked together

4   at times, correct?

5   A    Correct.

6   Q    But they are separate entities, correct?

7   A    Yes.

8   Q    With different leadership, correct?

9   A    Yes.

10  Q    So Christian Rodriguez was a significant member of let's

11  say two very significant drug trafficking organizations,

12  correct?

13  A    Yes.

14  Q    He committed very serious crimes, didn't he?

15  A    He set up their cryptic communication platform.

16  Q    Very serious crimes.

17  A    Yes.

18  Q    He was a co-conspirator?

19  A    Yes.

20  Q    He was aware the cocaine was moved through his

21  communication network, correct?

22  A    I believe so, yes.

23  Q    You don't know that he knew --

24       MR. ROBOTTI:  Objection.

25  Q    -- it was illegal?

MARSTON - CROSS - MR. LICHTMAN

```
 1            THE COURT:  Overruled.
 2   A    He did know.  He set it up for drug trafficking, yes.
 3   Q    So there is no question that Christian Rodriguez
 4   committed massive American federal crimes, correct?
 5   A    Yes.
 6   Q    Punishable by up to even life in prison, correct?
 7   A    Yes.
 8   Q    When you consider the amount of weight that was involved
 9   and he was the co-conspirator, correct?
10   A    Yes.
11   Q    You know the top of the sentencing guidelines table only
12   goes up to 450 kilograms of cocaine, correct?
13   A    Yes.
14   Q    Then you're at life, correct?
15   A    Yes.
16   Q    The amount of drugs that passed through his communication
17   network were thousands times that, correct?
18            MR. ROBOTTI:  Objection.  Asked and answered.
19            THE COURT:  Sustained.  We got the point,
20   Mr. Lichtman.
21            MR. LICHTMAN:  Thank you.
22   BY MR. LICHTMAN:
23   Q    He never was required to plead guilty to a crime, was he?
24   A    He was not.
25   Q    He was given a immunity?
```

MARSTON - CROSS - MR. LICHTMAN

```
 1   A      I just don't think he was charged, sir.
 2   Q      Were you part of that charging decision?
 3   A      I was not.
 4   Q      So someone who was facing life in prison got a free pass,
 5   correct?
 6              MR. ROBOTTI:  Objection.
 7              THE COURT:  Sustained.
 8   Q      Got a legal free pass?
 9              MR. ROBOTTI:  Objection.
10              THE COURT:  Sustained.  Wrong witness.
11              MR. LICHTMAN:  But he's the one I'm doing.
12              THE COURT:  I know.  But there is another one,
13   whoever is doing it.
14   BY MR. LICHTMAN:
15   Q      Is this unusual?
16              MR. ROBOTTI:  Objection.
17              THE COURT:  Sustained.
18   Q      Now, over the eight years of his cooperation -- he's been
19   cooperating since 2011, you would say?
20   A      Yes.
21   Q      And he's obviously cooperating up to today?
22   A      He's still on the books for the FBI, yes.
23   Q      He's received, as you said, over $400,000 in payments
24   from our Government?
25   A      Yes.
```

MARSTON - CROSS - MR. LICHTMAN

```
 1   Q    You had said that some of them were for expenses?

 2   A    Yes.

 3   Q    What kind of expenses?

 4   A    Relocation expenses, some were directly related to the

 5   operations either refundable or reimbursed to the agents or to

 6   Christian.

 7   Q    He also received money just for the work he was doing?

 8   A    Yes.

 9   Q    By work I mean his cooperation?

10   A    Yes.

11   Q    He basically, not only did he not get indicted he was

12   also paid for his work?

13   A    Yes.

14   Q    That's like a win/win?

15             MR. ROBOTTI:  Objection.

16             THE COURT:  Sustained.

17   Q    Now you said that he was reimbursed for his expenses?

18   A    It's reimbursement, a term I used for expenses he may

19   have laid out, some that the agents did, to just pay for those

20   expenses.

21   Q    You were involved in every aspect of Christian

22   Rodriguez's cooperation, correct?

23   A    Not sure how to answer that, I wouldn't say every aspect.

24   Q    Bad question.  You were intimately involved in his

25   handling?
```

MARSTON – CROSS – MR. LICHTMAN

```
 1   A    At the time that Christian came on board I was at
 2   headquartered for an 18-month temporary assignment, during the
 3   large portion of his cooperation I was not present in New
 4   York.
 5   Q    At any point in his cooperation were you involved in the
 6   handling of him?
 7   A    I was around Christian, yes.
 8   Q    You were involved when he submitted requests for money,
 9   is that how it works?
10   A    Again, I wasn't here during that time so I can't answer
11   those questions for you, sir.
12   Q    So you're unaware of how he was paid, the mechanism of
13   how he was paid?
14   A    Reviewing his file I am, but I wasn't here for it.
15   Q    Have you reviewed the payment records to him in
16   preparation for your testimony today?
17   A    I did go through them.
18            THE COURT:  Sidebar.
19            (Continued on the next page.)
20
21
22
23
24
25
```

SIDEBAR CONFERENCE

```
 1              (Sidebar conference.)
 2              THE COURT:  This witness gave some opinions about
 3     voice, about who was on calls, you can impeach those witness
 4     opinions by showing they are wrong.  You can also impeach him
 5     by showing he has a bias or not credible.  You cannot use him
 6     to impeach another witness who hasn't yet testified, and who
 7     you're going to impeach when he does the testify.
 8              MR. LICHTMAN:  This is not for impeaching Christian
 9     Rodriguez.
10              THE COURT:  Really?
11              MR. LICHTMAN:  Absolutely not.
12              THE COURT:  What is it for?
13              MR. LICHTMAN:  In regards to the expenses.  It's
14     with regard to the fact that there were massive amounts of
15     money given in flat numbers.
16              THE COURT:  What is the significance of that?
17              MR. LICHTMAN:  To show they were throwing money of
18     him regardless of whether he actually earned it or had
19     expenses.
20              THE COURT:  Christian Rodriguez cannot be relied
21     upon because they were throwing tons of money for whatever he
22     was doing.
23              MR. LICHTMAN:  No, the Government wants a conviction
24     so badly they are willing to throw money at witnesses.
25              THE COURT:  That's not this witness.
```

SIDEBAR CONFERENCE

1    I understand you're not the attorney cross-examining

2    Rodriguez.  I'm not going to have two of you doing it.

3    Everything you're asking this witness will be asked of

4    Rodriguez.

5    I will let you call this witness back, if indeed

6    Rodriguez gives you any answer that you couldn't have

7    reasonably anticipated.  But the amounts of money he got, what

8    he was doing...

9    MR. LICHTMAN:  If there is an area that I don't

10   think will be coming through Christian, I'll alert you to

11   before I do it.

12   THE COURT:  You can do it.  I'll let you know

13   whether you're right or not.

14   MR. LICHTMAN:  I may want to take something from his

15   3500 that was not necessarily brought out during, make him my

16   own witness without bringing him back.  I can alert you.

17   THE COURT:  Go ahead and try it.  I'll let you know

18   if can you do it.  You don't have to alert me.  Keep in mind,

19   the basic rule is you cannot use him to impeach another

20   witness who hasn't testified yet.

21   MR. LICHTMAN:  Just again so I'm clear, so we're

22   clear, I was not doing this to impeach Rodriguez.  I was doing

23   it to impeach their case.

24   THE COURT:  I know you think that.  But the only way

25   you were impeaching their case was by impeaching Rodriguez.

SIDEBAR CONFERENCE

1          MR. LICHTMAN:  Fair enough.

2          (End of sidebar conference.)

3          (Continued on the next page.)

MARSTON – CROSS – MR. LICHTMAN

```
 1                (In open court.)
 2    BY MR. LICHTMAN:
 3    Q    You testified on direct, sir, that you had put the
 4    paperwork in place, correct me if I'm wrong, regarding a
 5    reward possibly to go Mr. Rodriguez?
 6                MR. ROBOTTI:  Objection.  Misstates the testimony.
 7                THE COURT:  Sustained.  Rephrase.
 8    Q    Why don't you tell us what you testified on direct with
 9    regard to a possible reward for Mr. Rodriguez?
10    A    I believe I testified to the fact that there is a
11    Department of State award that's for the information provided
12    to lead to a capture of individuals listed on their website,
13    one of them was Jorge Cifuentes.  And what I said was there
14    could be a possibility that his paperwork could be placed in
15    for that.  But the way that it works is, it would have to go
16    through the supervisors through the New York office, approved
17    by the head of the New York office, then through our second
18    commanded at headquarters.  If it was then approved, it could
19    make its way over to the Department of State for their
20    determination if he was entitled to any of that reward.
21    Q    You make it sound as if it's just a possibility of
22    putting in the paperwork, didn't you in fact put in the
23    paperwork seven years ago?
24    A    Not that I'm aware of, sir.
25    Q    I'm going to show you, to refresh your recollection.  If
```

MARSTON - CROSS - MR. LICHTMAN

1    you can, look at the top, the date, and if can you read the

2    part that's underlined and let me know after you're done

3    reading it.

4    A    Certainly.  "Please fair and accurate" --

5    Q    Don't read it.  It's not in evidence.

6         THE COURT:  Read it to yourself.

7    Q    To yourself, sorry.

8         (Witness reviewing document.)

9    A    I see the e-mail.

10   Q    Does this refresh your recollection that back in

11   September of 2012 you were already putting into play the

12   ability of Mr. Rodriguez to receive that award, reward?

13   A    We were in fact talking about it, yes, sir, but it never

14   went forward.

15   Q    So to today you've never gone forward?

16   A    It has not been pushed forward, sir.

17   Q    Why is that?

18   A    I'm not sure.

19   Q    Do you think that Mr. Rodriguez is eligible for the

20   $5 million?

21   A    I think his efforts were pretty extraordinary to capture

22   Jorge Cifuentes.  However, I'm not sure how that stacks up to

23   the Department of State and any other folks that would put in

24   for that reward, sir.

25   Q    So I can understand and the jury can understand, is it

Rivka Teich CSR, RPR, RMR FCRR
Official Court Reporter

MARSTON – CROSS – MR. LICHTMAN

 1  5 million split between anybody who assisted in the capture

 2  of Cifuentes or 5 million a piece?

 3           MR. ROBOTTI:  Objection.

 4  A    I think it's upward of $5 million, I'm not sure.

 5  Q    If there are five people --

 6           MR. ROBOTTI:  Objection.

 7           THE COURT:  Sustained.

 8  Q    There were multiple people that you handled that you were

 9  considering putting up for this reward, weren't you?

10  A    For this reward, no, sir.

11  Q    Andrea Fernandez Velez?

12  A    No.

13  Q    You had didn't?

14  A    I handled her, but we never considered putting her up for

15  the reward.

16  Q    Never considered.  You didn't put in an e-mail that there

17  were three sources that were eligible potentially for this

18  reward?

19           MR. ROBOTTI:  Objection.

20           THE COURT:  I'm going to allow it.

21  A    I'm not sure who the three sources would be.  When Jorge

22  was captured the three sources that were involved in the

23  overall case would have included Christian and two others.

24  Q    Andrea?

25  A    She was one.

MARSTON – CROSS – MR. LICHTMAN

1   Q    And the person that was the assistant for Alex Cifuentes

2   when Andrea was not, correct?

3   A    The person who was --

4   Q    Wasn't there another source that assisted you with regard

5   to Alex Cifuentes?

6   A    Um, I'm not following you, sir.

7   Q    You said that there were three sources?

8   A    Correct.

9   Q    Without names, the third source, one of them was Andrea

10  Fernandez Velez, one was Christian Rodriguez?

11  A    There was a third, yes.

12  Q    What was the situational position of that third source?

13  A    Not necessarily connected to Andrea.

14  Q    Not connected to Andrea, connected to Alex Cifuentes?

15  A    No.

16  Q    Nothing to do with Alex Cifuentes?

17  A    Connected to the Cifuentes, but not --

18  Q    Jorge Cifuentes?

19  A    Correct.

20  Q    So of the three sources that you believed were eligible

21  for the 5 million, two of them were Christian Rodriguez and

22  Andrea Fernandez Velez, correct?

23          MR. ROBOTTI:  Objection.  Asked and answered, 401.

24          THE COURT:  Sustained.

25          (Continued on next page.)

MARSTON/CROSS/LICHTMAN

1    BY MR. LICHTMAN:

2    Q    Now, Andrea Fernandez -- or you've described her as

3    Andrea Velez -- she was the personal assistant for Alex

4    Cifuentes?

5    A    That's correct.

6    Q    She's also a criminal, correct?

7    A    Correct.

8    Q    She was responsible for overseeing drug and money

9    operations on behalf of Alex?

10   A    That is correct.

11   Q    And she obviously, at least in your mind, knew that she

12   was committing crimes?

13   A    Correct.

14   Q    She was traveling all over the globe, doing Alex

15   Cifuentes's bidding, correct?

16   A    That is correct.

17   Q    She was meeting with drug dealers?

18   A    Correct.

19   Q    Meeting with members of the FARC?  You know what the FARC

20   is?

21   A    Yes.

22   Q    She was meeting with members of the FARC?

23   A    Yes.

24   Q    She was traveling to Canada, meeting drug dealers?

25   A    Yes.

MARSTON/CROSS/LICHTMAN

1   Q    Traveling to Ecuador, meeting drug dealers?

2   A    Yes.

3   Q    She was his mouthpiece, so to speak?

4   A    That's correct.

5   Q    She was a co-conspirator of his with regard to the

6   movement of massive amounts of cocaine into America, correct?

7   A    Correct.

8   Q    And her goal was to make money from her crimes, correct?

9   A    Oh, correct.

10  Q    And her goal was to make money from criminal activity and

11  use it for a legitimate business, correct?

12  A    For illegitimate business?  Her goal was to make money,

13  clearly.

14  Q    Her goal was to make money?

15  A    Yes, sir.

16  Q    And she was indicted, as you said, in federal court in

17  New York?

18  A    That is correct.

19  Q    In 2012, May?

20  A    Correct.

21  Q    And you approached her in September of 2012?

22  A    Correct.

23  Q    In Colombia?

24  A    Correct.

25  Q    And you asked her to cooperate?

MARSTON/CROSS/LICHTMAN

```
 1   A     We did.

 2   Q     Was she aware, if you know, that she was under indictment

 3   in New York?

 4   A     Yes.

 5   Q     And also someone facing up to life in prison?

 6   A     Yes.

 7   Q     She hasn't been sentenced yet, has she?

 8   A     She has.

 9   Q     She has been sentenced?

10   A     She has.

11   Q     Did she spent an hour in jail?

12              MR. ROBOTTI:  Objection.

13              MR. LICHTMAN:  Excuse me?

14              THE COURT:  Sustained as to the form.

15   BY MR. LICHTMAN:

16   Q     Did she receive any jail time?

17   A     She received time served.

18   Q     How much time was served?

19   A     Well, she received time served, but she did not do a day

20   in jail, sir.

21   Q     So how do could you get a time served sentence when there

22   is no time that is served?

23              MR. ROBOTTI:  Objection.

24              THE COURT:  Sustained.

25              That's what happens, Mr. Lichtman.  Okay.  When
```

LISA SCHMID, CCR, RMR

MARSTON/CROSS/LICHTMAN

1    someone says time served, if they were arrested by the

2    Marshal, it is considered time served.

3    BY MR. LICHTMAN:

4    Q    So the one day that she was getting fingerprinted by the

5    Marshals --

6                   MR. ROBOTTI:  Objection.

7                   THE COURT:  Sustained.

8                   Let's go onto something else.

9    BY MR. LICHTMAN:

10   Q    She was facing life in prison?

11                  MR. ROBOTTI:  Objection.

12                  THE COURT:  Sustained.

13   BY MR. LICHTMAN:

14   Q    Now, you know that her cooperation could not be shared at

15   the time with local authorities in Colombia or Mexico?

16   A    I'm sorry.  What do you mean?

17   Q    While she was cooperating, she was a proactive

18   cooperator?

19   A    Correct.

20   Q    So she was cooperating undercover, so to speak, for you?

21   A    Correct.

22   Q    And she was doing this in Mexico?

23   A    That is correct.

24   Q    She was doing this Colombia?

25   A    Correct.

LISA SCHMID, CCR, RMR

MARSTON/CROSS/LICHTMAN

```
1   Q    Canada?
2   A    Correct.
3   Q    Ecuador?
4   A    Correct.
5   Q    And you, the FBI, were not able to tell the local
6   prosecutorial authorities in any of those countries that she
7   was actually cooperating, correct?
8              MR. ROBOTTI:  Objection.
9              THE COURT:  Sustained.
10  BY MR. LICHTMAN:
11  Q    You were concerned that Alex Cifuentes had contact in
12  these various governments' law enforcement bodies, correct?
13             MR. ROBOTTI:  Objection.
14             THE COURT:  Sustained.
15  BY MR. LICHTMAN:
16  Q    During your investigation, obviously, you were
17  investigating Alex Cifuentes as part of the Cifuentes drug
18  trafficking organization, correct?
19  A    Correct.
20  Q    And you're aware that he's testifying in this case?
21  A    I believe he is.
22  Q    Are you aware that he was arrested in Mexico?
23             MR. ROBOTTI:  Objection.
24             THE COURT:  Overruled.
25  A    Yes.
```

MARSTON/CROSS/LICHTMAN

```
1   BY MR. LICHTMAN:
2   Q    You remember when he was arrested?
3   A    I believe it was October 2014.  I'm not a hundred percent
4   sure on that.
5   Q    And you've written emails about him.  You knew about what
6   he was doing, correct?
7   A    Yes.
8   Q    And you learned that his brother and sister -- let me
9   back up.  He had a brother named Jorge Cifuentes, correct?
10  A    Yes.
11  Q    And a sister named Dolly Cifuentes, correct?
12  A    Yes.
13  Q    Both drug dealers?
14  A    Yes.
15  Q    Jorge Cifuentes cooperated with the American authorities?
16  A    Yes.
17  Q    Dolly Cifuentes?
18  A    I believe so.
19  Q    And you were aware that their American lawyers were
20  representing Alex here, as well?
21            MR. ROBOTTI:  Objection.
22            THE COURT:  Sustained.
23            MR. LICHTMAN:  Judge, can we approach?
24            THE COURT:  Sure.
25            (Sidebar.)
```

LISA SCHMID, CCR, RMR

SIDEBAR

```
 1              (Sidebar.)

 2              MR. LICHTMAN:  Here's the point.

 3              THE COURT:  What are you trying to do, because I'm

 4    not following.

 5              MR. LICHTMAN:  Here's what I'm trying to get out.

 6    Jorge Cifuentes testified that he made that phone call from

 7    the MDC on -- literally on Alex's birthday, January 18th,

 8    2015.  And the purpose of that phone call was because he had

 9    to convince his brother to cooperate because his brother did

10    not want to cooperate.

11              THE COURT:  Right.

12              MR. LICHTMAN:  Now, in this fellow's emails, he

13    writes that in February of 2014, by then already by then, he

14    said by now that the U. S.-based lawyers for Cifuentes' sister

15    and brother continues to communicate with the Miami AUSA that

16    Alex was willing to cooperate.

17              So a year before this call, Jorge Cifuentes claimed

18    he couldn't convince his brother, he brother's been desperate

19    to cooperate with the Americans a full year before.

20              THE COURT:  So you're impeaching --

21              MR. LICHTMAN:  Jorge.

22              THE COURT:  -- with this testimony?

23              MR. LICHTMAN:  Yeah.  There's no other person I can

24    get this through.  How else can I get this through, judge?

25              MR. ROBOTTI:  This is rank hearsay, Your Honor.
```

SIDEBAR

1           MR. LICHTMAN:  Rank hearsay?  He can answer it, if

2   he was aware of it.

3           MR. ROBOTTI:  But he's hearing about what the --

4           MR. LICHTMAN:  Not hearing.  He was the one that had

5   the conversation.

6           MR. ROBOTTI:  He's hearing about what Alex Cifuentes

7   --

8           MR. LICHTMAN:  So then should I call Mr. Fels?

9           THE COURT:  Wait, wait.  Let me hear.  Let me hear

10  from the Government.

11          MR. ROBOTTI:  Your Honor --

12          THE COURT:  One at a time, please.

13          MR. ROBOTTI:  Can I see the email?

14          MR. LICHTMAN:  Yes.

15          MR. ROBOTTI:  He's not there speaking with Alex

16  about this or speaking with -- this isn't direct here.  He's

17  having -- he's relaying information that he's heard from other

18  people, perhaps the attorneys, perhaps Alex.  I don't even

19  know who it is from this email that he's speaking with about

20  the status of Alex's cooperation.  This is hearsay.

21          MR. LICHTMAN:  So how do I get this out through Alex

22  when he denies it?

23          MR. ROBOTTI:  If it's inadmissible under the Rules

24  of Evidence, then you don't get it.

25          MR. LICHTMAN:  The Miami AUSA is Mr. Fels.  Why

SIDEBAR

```
 1    don't we have him up here?  There he is, right behind me.

 2              MR. FELS:  It wasn't me.

 3              MR. LICHTMAN:  It wasn't?

 4              THE COURT:  Look, there's only so much you can do on

 5    credibility point with the witness.  Okay?  If it's

 6    collateral, the fact is, you can't introduce extrinsic

 7    evidence to suggest that somebody was lying about something

 8    that is not the incident with which the defendant is charged.

 9    Okay?

10              MR. LICHTMAN:  Well, it goes to bias and motive,

11    judge, doesn't it?

12              THE COURT:  Not this witness's bias and motive.

13              MR. LICHTMAN:  Well, how else can I get it out if I

14    don't get it through this witness?

15              THE COURT:  It may be that you can't get it out.

16    Okay?

17              MR. LICHTMAN:  That's not the answer I was looking

18    for, Judge.

19              THE COURT:  I know, but I mean, I don't want to

20    litigate your case for you.  Offhand, I can't think of a way

21    to get it out.  I don't think this is the way.

22              MR. LICHTMAN:  Can I simply ask him if he was aware

23    that Alex Cifuentes in February of 2014 was trying to

24    cooperate?  That's all I'm asking.  If he says no, that's it.

25              THE COURT:  One question.  You can have that.
```

SIDEBAR

1              MR. LICHTMAN:  Thank you, judge.

2          (Sidebar ends.)

MARSTON/CROSS/LICHTMAN

```
 1                    (In open court.)
 2    BY MR. LICHTMAN:
 3    Q    What I was saying before that brief break was that you
 4    were aware that by early 2014, Alex Cifuentes through his
 5    American-based lawyers, was trying to cooperate with the
 6    Government, correct?
 7    A    I was not aware of that.
 8    Q    You created progress reports in connection with this
 9    investigation?
10    A    There were some, yes.
11    Q    And there were no weekly?
12    A    For a period of time, there were.  Yes, sir.
13    Q    Does this look like one of your progress reports?
14    (Exhibit published.)
15    A    I'm not sure if it was one I created, but --
16              MR. ROBOTTI:  Objection.
17              THE COURT:  Overruled.
18              He can answer the question.
19    A    We created lot of them.  It could be I created them.  I
20    don't know, sir.
21    BY MR. LICHTMAN:
22    Q    You have certainly reviewed the progress reports before
23    you testified today, correct?
24    A    Certainly, yes, sir.
25    Q    If you can read the part?
```

LISA SCHMID, CCR, RMR

MARSTON/CROSS/LICHTMAN

1              MR. ROBOTTI:  Objection, Your Honor.  Can we

2     approach?

3              THE COURT:  I'm going to let him read this and see

4     if it refreshes his recollection.

5              MR. ROBOTTI:  Your Honor, that's improper

6     impeachment.

7              THE COURT:  Well, not to refresh his recollection.

8              MR. ROBOTTI:  Could we approach briefly, Judge?

9              THE COURT:  It's okay.

10             (Sidebar.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
1                (Sidebar.)

2           MR. ROBOTTI:  Your Honor, as far as I can tell, he

3    has not established that the witness does not remember this

4    particular statement in this report.  If he wants to establish

5    that --

6           THE COURT:  No, no, no.  What the witness said was,

7    I made have written it.  I don't recall whether I wrote it or

8    not.  That's what he said.

9           MR. ROBOTTI:  But about this particular statement,

10   Your Honor, he has to establish that he does not remember the

11   particular subject that's in the report before he can stick it

12   in front of him --

13          THE COURT:  I see.

14          MR. ROBOTTI:  -- to refresh his recollection about

15   it.  That hasn't been done.

16          MR. LICHTMAN:  He said he wasn't sure whether he

17   even wrote this.

18          THE COURT:  That's correct.

19          MR. LICHTMAN:  So I'm giving him the opportunity to

20   tell me whether he wrote this one or whether he reviewed it.

21          THE COURT:  But for the next question, ask him the

22   substantive question, okay, that you want to, that's in the

23   report.  Ask him that.  If he doesn't remember that, you can

24   show him this because it doesn't matter whether he wrote it or

25   not to refresh his recollection.  See if that refreshes his
```

SIDEBAR

1   recollection.

2           MR. LICHTMAN:  Okay.

3           (Sidebar ends.)

MARSTON/CROSS/LICHTMAN

```
 1                 (In open court.)
 2    BY MR. LICHTMAN:
 3    Q    Have you had a chance to review this?
 4    A    I have, sir.
 5    Q    Does that refresh your recollection that Alex Cifuentes
 6    --
 7                 MR. ROBOTTI:  Objection.
 8                 THE COURT:  Wait.  Let me have the question, please.
 9                 Finish your question.
10    BY MR. LICHTMAN:
11    Q    Does that refresh your recollection that by early 2014,
12    Alex Cifuentes, through his American-based attorneys, was
13    trying to cooperate with the Government?
14                 MR. ROBOTTI:  Objection.
15                 THE COURT:  I will let him answer that one question,
16    then we're moving on.
17                 Does it refresh your recollection or not?
18                 THE WITNESS:  By reading it?  It doesn't reflect --
19    I don't recall prior to his arrest that there was any
20    indication that he wanted to cooperate with the Government.
21    Certainly reading this, it suggests --
22                 THE COURT:  Okay, stop.  The question was, does it
23    refresh your recollection, yes or no?
24                 THE WITNESS:  It does not, sir.
25                 THE COURT:  Okay.
```

MARSTON/CROSS/LICHTMAN

```
 1              Next question?
 2    BY MR. LICHTMAN:
 3    Q    When you say prior to his arrest --
 4              MR. ROBOTTI:  Objection.
 5              THE COURT:  We need to move on.
 6              MR. LICHTMAN:  Nothing further.
 7              THE COURT:  Okay.
 8              Any redirect?
 9              MR. BALAREZO:  Your Honor?  Your Honor, if I could
10    speak with Mr. Lichtman?
11              MR. LICHTMAN:  Actually, Judge.  I'm sorry.  Could I
12    have one more piece if I can?
13              THE COURT:  Why don't you talk to Mr. Balarezo first
14    and then you might have two more pieces.
15              MR. BALAREZO:  It might be two more pieces, Your
16    Honor. (Confers with Mr. Lichtman.)
17              MR. LICHTMAN:  Two pieces, Judge.
18              THE COURT:  Thought so.
19              MR. BALAREZO:  They were the same, they're just
20    halves.
21              THE COURT:  Go ahead.
22    BY MR. LICHTMAN:
23    Q    You described the PowerPoint.  You went through it on
24    direct examination?
25    A    Yes, sir.
```

MARSTON/CROSS/LICHTMAN

1    Q    And you read many, many, many, many, sections in English?

2             MR. ROBOTTI:  Objection.

3             THE COURT:  Would you wait until he finishes the

4    question, please?

5             MR. ROBOTTI:  Oh, I apologize, Your Honor.

6             THE COURT:  Start again.

7    BY MR. LICHTMAN:

8    Q    You read numerous sections of purportedly intercepted

9    conversations to the jury?

10   A    Yes.

11   Q    And they were initially in Spanish, correct?

12   A    Yes.

13   Q    Were they translated?

14   A    Yes.

15   Q    And you just read the translations?

16   A    Yes.

17   Q    How is your Spanish?

18   A    Not very good.

19   Q    Like me.  So you were basically reading what was on the

20   paper?

21             MR. ROBOTTI:  Objection.

22             THE COURT:  You mean he was reading in the English?

23   BY MR. LICHTMAN:

24   Q    You were reading the English --

25             THE COURT:  We've got that.

LISA SCHMID, CCR, RMR

MARSTON/CROSS/LICHTMAN

```
 1   BY MR. LICHTMAN:

 2   Q    -- that was put on the paper in the PowerPoint?

 3            THE COURT:  We've got that.  He said his Spanish

 4   wasn't good and he was going off the English.

 5   BY MR. LICHTMAN:

 6   Q    You were just reading the English?

 7   A    Yes.

 8   Q    You obviously didn't do the translation?

 9            THE COURT:  Just pretend I'm not here.  Okay?

10            MR. LICHTMAN:  It would make it a lot easier, Judge.

11            THE COURT:  Yes, it would.

12            MR. LICHTMAN:  Okay.

13            THE COURT:  Okay.  We know he was reading the

14   English.  Go on to something else.

15   BY MR. LICHTMAN:

16   Q    Who you didn't prepare the translations, obviously?

17   A    I did not, sir.

18   Q    Do you recall reading -- I'm going to point to this

19   section in the box.  Can you read that to the jury?

20   A    J:  Not right now.  We have until next week.  Right now,

21   things were in Tijuana, and the next one, I'll be in Nogales.

22   Tell her to arrange for more cars, since I'll be bringing her

23   a ton.

24   Q    Now, if I understand that your Spanish is poor, like

25   mine.  If you can look --
```

LISA SCHMID, CCR, RMR

MARSTON/CROSS/LICHTMAN

1          MR. ROBOTTI:  Your Honor, can we approach?

2          THE COURT:  Yes.  Really.

3          (Sidebar.)

SIDEBAR

```
 1              (Sidebar.)

 2              THE COURT:  Didn't we have a stipulation that the

 3   translations were accurate?

 4              MR. LICHTMAN:  You know, I was hoping you wouldn't

 5   say that.  We did.  Unfortunately, I was the one who signed it

 6   and don't speak Spanish.

 7              THE COURT:  I can't let you out of it, especially

 8   with this witness, okay?  Because this witness doesn't speak

 9   Spanish any better than you do.

10              MR. LICHTMAN:  Clearly, because he read a worth.

11              THE COURT:  I'm going to sustain the objection.

12   You've got to go on to something else.

13              MR. LICHTMAN:  Thank you.

14              (Sidebar ends.)

15

16

17

18

19

20

21

22

23

24

25
```

MARSTON/CROSS/LICHTMAN

```
 1                    (In open court.)

 2               THE COURT:  Was that one or two?

 3               MR. LICHTMAN:  That was one, Your Honor.

 4    BY MR. LICHTMAN:

 5    Q    Okay.  Government Exhibit 1C, do you recognize this

 6    picture? (Exhibit published to the witness.)

 7    A    I do.

 8    Q    And it came in through your direct testimony?

 9    A    I definitely saw the picture.  I'm not sure if it came in

10    through me, but I've seen the picture.

11    Q    But you've seen it as part of this investigation?

12    A    I've seen that picture before, sir.

13    Q    Now, you have obviously seen other pictures of Mr. Gúzman

14    throughout your investigation, correct?

15    A    Yes.

16    Q    Have you seen this picture?

17               MR. LICHTMAN:  This is just for the witness.

18               MR. BALAREZO:  This is us, Defense 424B.

19               MR. LICHTMAN:  Where is the picture?

20               THE CLERK:  He needs to put it back on the monitor.

21               THE COURT:  Okay.  You have to take your papers off

22    the machine.

23               MR. LICHTMAN:  Nothing on here.

24               MR. BALAREZO:  Your Honor, this is coming through

25    the computer, not in paper form.
```

LISA SCHMID, CCR, RMR

MARSTON/CROSS/LICHTMAN

```
 1              THE COURT:  Let's switch over to the defense
 2    computer, and just to the witness.
 3              (Publishes exhibit to the witness.)
 4    BY MR. LICHTMAN:
 5    Q    Do you recognize that picture?
 6    A    I have not seen that picture before, sir, but I recognize
 7    I believe the individual in it.
 8    Q    And who is that individual?
 9    A    It looks like it's -- looks likes the defendant.
10    Q    Looks like the defendant?  Are you sure?
11    A    No, I'm not a hundred percent sure on that one, sir.
12    Q    Well, let me put that one back, if I can, if we can
13    switch over to Elmo.
14              MR. ROBOTTI:  We'll stipulate it's the defendant.
15              MR. LICHTMAN:  I would ask to move it into evidence.
16              THE COURT:  Any objection?
17              MR. ROBOTTI:  No objection.
18              THE COURT:  What's the Exhibit Number?
19              MR. LICHTMAN:  424B.
20              MR. ROBOTTI:  Your Honor, actually, can we have a
21    brief sidebar about this?
22              THE COURT:  I'm not sure what you're worried about.
23    You have agreed the picture can come in, right?  I haven't let
24    him ask any questions.  I see heads shaking.  You're not
25    agreeing.  You can come.  Let's have a sidebar.
```

SIDEBAR

```
 1                (Sidebar.)
 2           MR. ROBOTTI:  I apologize, Judge.  We have not seen
 3    this before.  There were some concerns.  I'm just looking at
 4    this.  Is this a Photoshopped photo by the defense?  If that's
 5    what this is, we'd like to know that before this is shown to
 6    the witness.
 7           MR. LICHTMAN:  We were just handed it.
 8           MR. BALAREZO:  Your Honor, that picture is off the
 9    Internet, just like the other picture is off the Interest.  No
10    --
11           THE COURT:  I certainly accept that there was no
12    deliberate intent by the defense to Photoshop the picture, but
13    what's authenticating the picture?
14           MR. BALAREZO:  He's identifying --
15           MR. LICHTMAN:  He just did.
16           THE COURT:  He didn't really.
17           MR. LICHTMAN:  They stipulated.
18           MR. ROBOTTI:  And we're taking it back.
19           MR. LICHTMAN:  You can't take back a stipulation.
20           THE COURT:  Stop, stop.  We're getting all a little
21    slap-happy here.
22           Look, it's a cute point, but he can't authenticate
23    the picture.
24           MR. LICHTMAN:  If he can't, then he can't.
25           THE COURT:  So the answer is, the objection is
```

SIDEBAR

1    sustained.  Go on to something else.

2              (Sidebar ends.)

MARSTON/REDIRECT/ROBOTTI

```
 1              (In open court.)
 2              MR. LICHTMAN:  Nothing further, Judge.
 3              THE COURT:  Okay.
 4              Redirect?
 5              MR. ROBOTTI:  Yes, Your Honor.  Very brief.
 6                       REDIRECT EXAMINATION
 7   BY MR. ROBOTTI:
 8   Q    Good afternoon, Special Agent Marston.
 9   A    Good afternoon.
10   Q    So you were asked some questions about IP address for the
11   phone call that captured a portion of the interrogation video
12   that we spoke of.  Do you recall that?
13   A    I do.
14   Q    All right.  I would like to show you what's in evidence
15   as Government Exhibit 511-1.  All right?  (Exhibit published.)
16              So on this line here, Government Exhibit 601F-4 on
17   the call exhibit, that's the call, correct?
18   A    Correct.
19   Q    That's marked product ID number 3805?
20   A    That's correct.
21   Q    I would like to show you the call data on marked
22   Government Exhibit 601-F-10D, and I apologize.  It's very
23   small print. (Exhibit published.)
24              All right.  The highlighted portion there, call
25   3805.  What server is associated with that?  Just the last
```

MARSTON/REDIRECT/ROBOTTI

```
1    three digits.

2    A    Dot 226.

3    Q    All right.  You were asked some questions about

4    identifying the defendant's voice.  Do you recall those

5    questions?

6    A    I do.

7    Q    In your experience, does a person's voice always sound

8    exactly the same?

9    A    It does not.

10   Q    And what kind of factors might cause a person to have a

11   different sounding voice at times?

12   A    Stress, an interview, background noise.

13   Q    Perhaps being tired or difference in age?

14   A    Certainly.

15   Q    Now, aside from the voice comparison that we spoke about,

16   what other factors led you to conclude that this is the

17   defendant's voice on those calls?

18         MR. LICHTMAN:  Objection.  Other than voice factor,

19   the sound of his voice?

20         THE COURT:  The objection is overruled.

21         Go ahead.

22   A    In one of the calls, the defendant is referred to by the

23   name "Chapo," as well as the content of the communications

24   suggests that he's referred to in a respectful way.  There's

25   references to man, boss, and sir.
```

MARSTON/RECROSS/LICHTMAN

1          Those, adding up with the intelligence or the

2   information that was coming over the intercepts was

3   corroborated by other U. S. information, so it made sense that

4   this, in fact, was the defendant.

5               MR. ROBOTTI:  No further questions, Judge.

6               THE COURT:  All right.

7               MR. LICHTMAN:  Judge, very briefly.

8                        RECROSS-EXAMINATION

9   BY MR. LICHTMAN:

10  Q    You testified that the voice that you heard in the

11  interrogation video was the same as the voice that you heard

12  on the MCC call?

13  A    Correct.

14  Q    Did they sound anything alike when you heard them on

15  cross?

16  A    It is very difficult to hear.  It's almost -- very

17  difficult.

18              MR. LICHTMAN:  Nothing further.

19              THE COURT:  All right.  I think we'll take an early

20  afternoon break now, ladies and gentlemen.  Come back at five

21  to three.  Please don't talk about the case.

22              (Jury exits.)

23              THE COURT:  Okay.  Fifteen minutes.

24              (Recess.)

25              (Continued on the next page.)

LISA SCHMID, CCR, RMR

PROCEEDINGS

```
 1                    (In open court; jury not present.)

 2                    THE COURTROOM DEPUTY:  All rise.

 3                    (Defendant enters.)

 4                    THE COURT:  All right.  Before we bring in the jury,

 5      I want to remind the sketch artists who are here, there is to

 6      be no sketching of this particular witness, as previously

 7      discussed.

 8                    All right.  Let's have the jury, please.

 9                    And for those of you in the overflow courtroom,

10      that's also the case.

11                    (Jury enters.)

12                    THE COURT:  All right.  Everyone be seated.

13                    The Government's next witness?

14                    MS. GOLDBARG:  Thank you, Your Honor.

15                    The Government calls Christian Rodriguez.

16                    THE COURTROOM DEPUTY:  Please stand and raise your

17      right hand.

18      C H R I S T I A N    R O D R I G U E Z,

19                            called as a witness, having been first

20      duly Sworn/affirmed, was examined and testified as follows:

21                    THE WITNESS:  Yes.

22                    THE COURTROOM DEPUTY:  Please state and spell your

23      name for the record.

24                    THE WITNESS:  Christian Rodriguez, C-H-R-I-S-T-I-A-N

25      R-O-D-R-I-G-U-E-Z.
```

RODRIGUEZ/DIRECT/GOLDBARG

```
1              THE COURTROOM DEPUTY:  You may be seated.

2              THE COURT:  All right.  Please proceed.

3              MS. GOLDBARG:  Thank you, Your Honor.

4    DIRECT EXAMINATION

5    BY MS. GOLDBARG:

6    Q    Good afternoon.

7    A    Good afternoon.

8    Q    Sir, how old are you?

9    A    Thirty-two years old.

10   Q    In what country were you born?

11   A    Colombia.

12   Q    In what country do you currently live?

13   A    The United States.

14   Q    And how long have you lived in the United States?

15   A    Six years.

16   Q    And at the time that you came to the United States, what

17   were you doing?

18   A    I was cooperating with the U.S. Government.

19   Q    In what capacity were you cooperating with the United

20   States Government?

21   A    With all of my capacity.

22   Q    Did you have a formal relationship with any group within

23   the United States Government at that time?

24   A    I was a source for the FBI.

25   Q    Before you became a source for the FBI, who were you
```

RODRIGUEZ/DIRECT/GOLDBARG

1   working for?

2   A     For the Sinaloa Cartel.

3   Q     And who specifically within the Sinaloa Cartel did you

4   work for?

5   A     For Chapo Guzman.

6   Q     When did you start working for the defendant?

7   A     2008.

8   Q     When did you stop working for the defendant?

9   A     2012.

10  Q     Can you describe generally for the jury what it is that

11  you did for the defendant from 2008 until 2012?

12  A     I installed a secure communications system.

13  Q     Did you meet the defendant face-to-face?

14  A     Yes.

15  Q     Approximately how many times did you meet with the

16  defendant face-to-face?

17  A     About 12.

18  Q     Did you speak with the defendant over the phone?

19  A     Yes.

20  Q     Approximately how many times did you speak with him over

21  the phone?

22  A     Hundreds of times.

23  Q     Mr. Rodriguez, do you see the defendant in the courtroom

24  today?

25  A     Yes.

RODRIGUEZ/DIRECT/GOLDBARG

```
1   Q    Can you please describe an article of clothing that he is
2   wearing?
3   A    He is wearing a gray tie, a gray shirt, a suit, which is
4   kind of like gray -- a dark gray, and a gray tie.
5            MS. GOLDBARG:  Your Honor, I would ask the record to
6   reflect that the witness has identified the defendant.
7            THE COURT:  It does.
8            MS. GOLDBARG:  Thank you.
9   BY MS. GOLDBARG:
10  Q    Do you speak English?
11  A    Yes.
12  Q    What is your native language?
13  A    Spanish.
14  Q    Do you speak or read English better?  Which one?
15  A    I'm able to read better.
16  Q    In which language do you feel most comfortable speaking?
17  A    In Spanish.
18  Q    Is that why you are using the services of an interpreter
19  today?
20  A    Yes.
21  Q    Sir, how far did you go in school?
22  A    I did some college.
23  Q    How much time did you spend in college?
24  A    Three semesters -- semesters, approximately.
25  Q    What were you studying while you were in college?
```

RODRIGUEZ/DIRECT/GOLDBARG

```
 1   A     Systems engineering.

 2   Q     Why did you leave the university?

 3   A     Because I wanted to start my own business.

 4   Q     What kind of business did you want to start?

 5   A     Technology.

 6   Q     Did you start that business?

 7   A     Yes.

 8   Q     Did you come to have a specialization?

 9   A     Yes.

10   Q     And what was your specialization?

11   A     Cyber security.

12   Q     Can you briefly and generally describe for the members of

13   the jury what is cyber security?

14   A     It is to protect communications and data.

15   Q     And when you say data and information, what are you

16   referring to?

17   A     You can protect calls, e-mails, files, all kinds of

18   information.

19   Q     Now, you mentioned that you started working for the

20   defendant in 2008.  Who introduced you to the defendant?

21   A     The Cifuentes family.

22   Q     Who are the Cifuentes family?

23   A     A Colombian family that do drug trafficking.

24   Q     Did you work for the Cifuentes family?

25   A     Yes.
```

RODRIGUEZ/DIRECT/GOLDBARG

1    Q    When did you start working for the Cifuentes family?

2    A    2008.

3    Q    Who did you first meet with in the Cifuentes family?

4    A    Dolly Cifuentes.

5    Q    Where did you meet with Dolly Cifuentes that first time?

6    A    Her house in Medellin.

7    Q    I would like to show you what's in evidence as

8    Government's Exhibit 40.

9              (The above-referred to exhibit was published.)

10   BY MS. GOLDBARG:

11   Q    Do you recognize the person in this photograph?

12   A    Yes.

13   Q    Who is that?

14   A    Dolly Cifuentes.

15   Q    What did Dolly Cifuentes want from you?

16   A    Security in her communications.

17   Q    Is this something that you have the technical ability to

18   do?

19   A    Yes.

20   Q    Did you meet with anyone else in the Cifuentes family to

21   discuss this project?

22   A    Yes.

23   Q    Who did you meet with?

24   A    Jorge Cifuentes.

25   Q    Who is Jorge Cifuentes?

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

1    A    He is a member of the Cifuentes family and he's a

2    Colombian drug trafficker.

3    Q    In what country did you meet with Jorge Cifuentes?

4    A    In Ecuador.

5    Q    Do you recall approximately when it was that you met with

6    Jorge Cifuentes in Ecuador?

7    A    Yes.   In 2008 -- at the beginning of 2008.

8    Q    Do you know why Jorge Cifuentes was in Ecuador in 2008?

9    A    No.

10   Q    I would like to show you what's in evidence as

11   Government's Exhibit 42.

12              (The above-referred to exhibit was published.)

13   BY MS. GOLDBARG:

14   Q    Do you recognize the person in that photograph?

15   A    Yes.

16   Q    Who is that?

17   A    Jorge Cifuentes.

18   Q    Now, what happened when you met with Jorge Cifuentes in

19   Ecuador?

20   A    I explained to him how my system worked and he liked it.

21   Q    Did you come to an agreement with Jorge Cifuentes at that

22   time?

23   A    Yes.

24   Q    And what was that?

25   A    To install a server for secure communications for

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

1   computer, for instant messaging.

2   Q    What is instant messaging?

3   A    It is a communication system in -- in which you can chat

4   in real time.  It is like WhatsApp; you can send messages back

5   and forth.

6   Q    Did you, in fact, install a secure system for the

7   Cifuentes family?

8   A    Yes.

9   Q    How big was the system?

10  A    He had approximately 100 users.

11  Q    What do you mean when you say that the system you set up

12  had 100 users?

13  A    That there were 100 people using it.

14  Q    Can you generally describe how it is that you set this

15  system up?

16  A    Yes.  I installed the communications server, and then I

17  install an application on each of the computers so that they

18  could communicate from one to the other by using the server.

19  Q    What is an application?

20  A    It is a software that you install on a device for a

21  specific function.

22  Q    So how did this system, the security system, function?

23  How were these communications protected?

24  A    The communications in the chat were encrypted from point

25  to point so no one would be able to intercept them, and we

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

```
 1   would also protect the location -- the location of the user by
 2   using BPNs.
 3   Q    Okay.  Let's break that down.
 4           What does it mean that something is encrypted point
 5   to point?
 6   A    It means that each user has a key by which he codifies
 7   the message, and only the recipient, by using other part of
 8   the key, can decrypt the message, so that makes it secure.
 9   Q    You said that there were about a hundred users on the
10   system you set up for the Cifuentes family, correct?
11   A    Correct.
12   Q    In Colombia, were there other members of the Cifuentes
13   family that you provided them with a service?
14   A    Yes.
15   Q    And who was that?
16   A    Dolly Cifuentes, Lucia Cifuentes, and JR.
17   Q    Again, showing you Government's Exhibit 40.
18           (The above-referred to exhibit was published.)
19   BY MS. GOLDBARG:
20   Q    Who is that?
21           MR. BALAREZO:  Asked and answered, Your Honor.
22           THE COURT:  Overruled.
23   BY MS. GOLDBARG:
24   Q    Is this Dolly Cifuentes?
25   A    Dolly Cifuentes.
```

RODRIGUEZ/DIRECT/GOLDBARG

1            MS. GOLDBARG:  For the witness only, Your Honor.

2    BY MS. GOLDBARG:

3    Q    Do you recognize the person in this photograph?

4    A    Yes.

5    Q    Who is that?

6    A    Lucia Cifuentes.

7    Q    And is this one of the people you installed on the secure

8    system?

9    A    Yes.

10           MS. GOLDBARG:   At this time, Your Honor, Government

11   moves to admit Government Exhibit 43.

12           MR. BALAREZO:  No objection.

13           THE COURT:  Received.

14           (Government's Exhibit 43 received in evidence.)

15           MS. GOLDBARG:   To publish it, Your Honor.

16           (The above-referred to exhibit was published.)

17   BY MS. GOLDBARG:

18   Q    And again, who is this?

19   A    Lucia Cifuentes.

20   Q    What role did she have within the organization?

21   A    I don't know exactly.

22           MS. GOLDBARG:  For the witness only.

23   BY MS. GOLDBARG:

24   Q    Showing you Government's Exhibit 89, do you recognize the

25   person in this photograph?

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

1    A    Yes.

2    Q    Who is this person?

3    A    Jaime, and they also used to call him JR.

4    Q    Did you set him up on the secure system as well?

5    A    Yes.

6         MS. GOLDBARG:  At this time, Your Honor, Government

7    moves to admit Government's Exhibit 89 into evidence.

8         MR. BALAREZO:  No objection.

9         THE COURT:  Received.

10        (Government's Exhibit 89 received in evidence.)

11        MS. GOLDBARG:   Publish?

12        (The above-referred to exhibit was published.)

13   BY MS. GOLDBARG:

14   Q    And this is Jaime Cifuentes?

15   A    Yes.

16   Q    Now, did Jorge Cifuentes ask you to speak with any family

17   members of his?

18   A    Yes.

19   Q    Who did he ask you to speak with?

20   A    With Alex Cifuentes.

21   Q    And did Jorge tell you why he wanted you to speak with

22   Alex Cifuentes?

23   A    He told me that he was in Mexico and that he had specific

24   needs.

25   Q    What did you understand by "specific needs"?

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

1    A    That he had problems with technology and that he wanted
2    to improve it.
3    Q    So did you speak with Alex Cifuentes?
4    A    Yes.
5    Q    And where were you when you spoke with him?  In what
6    country?
7    A    Colombia.
8    Q    And do you know where Alex Cifuentes was when you spoke
9    with him?
10   A    Yes.
11   Q    Where was he?
12   A    Mexico.
13   Q    Did you know anything more about his specific location at
14   that time?
15   A    No.
16   Q    What did you discuss with Alex Cifuentes the first time
17   that you spoke with him?
18   A    He told me that he was having problems with Internet,
19   that it was very slow and unstable, and he was also having
20   problems with his cell phone signal.
21   Q    Did you ask him what kind of technology he had in Mexico?
22   A    Yes.
23   Q    And what did Alex Cifuentes tell you?
24   A    He told me that he used Internet via satellite, and he
25   used cordless phones called Senao.

RODRIGUEZ/DIRECT/GOLDBARG

```
 1    Q    Senao, S-E-N-A-O, what is that?
 2    A    It is a long-range cordless phone.
 3    Q    Did Alex explain to you why they were having problems
 4    with the satellite phone and the Senao phones?
 5    A    He told me that they were having problems with the
 6    satellite Internet.  When it rained too much, it became very
 7    unstable.
 8    Q    During this phone call, did Alex Cifuentes ask anything
 9    of you?
10    A    Yes.  He asked me to visit him.
11    Q    Visit him where?
12    A    Mexico.
13    Q    Did you go to Mexico to visit Alex Cifuentes?
14    A    Yes.
15    Q    Where did you go?
16    A    I went to Culiacan, and then I went to visit him to a
17    camp.
18    Q    Can you describe how is it that you got from Culiacan to
19    the camp?
20    A    Yes.  They picked me up and they took me to a strip, an
21    airstrip, clandestine airstrip, a private airstrip.
22    Q    What do you mean by "clandestine airstrip"?
23    A    I mean that there was no security there.  It was not like
24    an airport.
25    Q    What did the airstrip actually look like?
```

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

1   A    It was a small and short airstrip, and the plane that
2   took me to the camp was also a small plane.
3   Q    Did this cause you any concerns?
4   A    Yes, of course.
5   Q    Why?
6   A    Because it looked very unsafe.
7   Q    Did you get on the plane?
8   A    Yes.
9   Q    How long was the flight?
10  A    Around 20 to 30 minutes.
11  Q    And where did you land?
12  A    In the mountains near Culiacan.
13  Q    When you landed, who, if anyone, was there?
14  A    There were several people dressed in military garb
15  waiting for me.
16  Q    What do you mean by they were dressed in military garb?
17  A    They had uniforms, as if they were people in the Army,
18  and they also had large weapons (indicating).
19  Q    When you said "large weapons," you made a gesture with
20  your hand.  Can I ask you to repeat that, please?
21  A    Yes, like this (indicating).
22       MS. GOLDBARG:  Just for the record, I would describe
23  that he's holding his hands apart by approximately two feet.
24       THE COURT:  Okay.
25       MS. GOLDBARG:  Thank you.

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

```
 1    BY MS. GOLDBARG:

 2    Q    Was anyone on the plane with you other than the pilot?

 3    A    Yes.  El Gordo was there.

 4    Q    Who is El Gordo?

 5    A    El Gordo was a person -- he was a technician who worked

 6    for the organization.

 7    Q    Did he have another name other than -- was he known by

 8    any other name other than Gordo?

 9    A    Adrian.

10    Q    Showing you what's already in evidence as Government's

11    Exhibit 29.

12              (The above-referred to exhibit was published.)

13    Q    Who is that?

14    A    That's El Gordo.

15    Q    So what happened when you got off the plane and you're

16    met by military men in military garb with weapons?

17    A    Well, they had ATVs with them and in the ATVs, they

18    transported me up the mountain to a small house.

19    Q    Who set up your transportation?  Was that Alex?

20    A    Yes.

21    Q    Did Alex tell you that you were going to be met by armed

22    men when you landed?

23    A    No.

24    Q    How did you feel when you saw that?

25    A    Well, somewhat frightened.
```

RODRIGUEZ/DIRECT/GOLDBARG

1    Q     What happened when you got to the small house?

2    A     Alex was waiting for me and he introduced me to his

3    partner.

4    Q     When you say Alex introduced you to his partner, who did

5    Alex introduce you to?

6    A     Chapo Guzman.

7    Q     The same person you identified earlier?

8    A     Yes.

9    Q     Now, had you met either one of these people before?

10   A     No.

11   Q     Okay.  I'm showing you what's in evidence as Government's

12   Exhibit 39.

13            (The above-referred to exhibit was published.)

14   BY MS. GOLDBARG:

15   Q     Who is this person?

16   A     Alex Cifuentes.

17   Q     So what happened when you met with Alex Cifuentes and the

18   defendant in this small house in the mountains?

19   A     We talked about the system that they had and how we could

20   improve on it.

21            THE COURT:  Let me just ask, I notice the defendant

22   is not using an interpreter.  Let's see if we can bend the mic

23   a little bit closer to the witness and ask him to speak up

24   just a little bit.

25            Okay.  Go ahead.

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

```
 1    BY MS. GOLDBARG:
 2    Q    Could I ask you to repeat your answer?  I'm sorry,
 3    Mr. Rodriguez.
 4    A    Yes, we talked about the system that they had, the
 5    satellite Internet system and how it could be improved upon.
 6    Q    Now, at the time that you went to this meeting in the
 7    mountains, what system did you have set up for the Cifuentes's
 8    in Colombia?
 9    A    We had an instant messaging system through VPN and --
10    no -- and we had a VPN to protect the locations of the
11    computers.
12    Q    So the instant messaging and the VPN are two separate
13    things?
14    A    That's correct.
15    Q    Can you describe just very generally for the jury, what
16    is VPN?
17    A    It is a private virtual network, and when the computer
18    connects to a server, it appears that the computer can be
19    anywhere in the world.  It could appear to be in a different
20    place, like in Europe or anywhere else.
21    Q    Was Alex Cifuentes on the system that you had set up?
22    A    Yes.
23    Q    How do you know that?
24    A    Because I installed it for him.
25    Q    So when you go up to the meeting with the defendant and
```

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

```
 1   Alex Cifuentes, do you inspect the installation or the
 2   technology they had at the time?
 3   A     That's right.
 4   Q     And what conclusion did you reach after inspecting it?
 5   A     I proposed that we would install a system of high speed
 6   Internet that would start out at a point in the city via
 7   cable, and then wirelessly it would go up to the camp.
 8   Q     What did they respond when you gave them this proposal?
 9   A     They liked it.
10   Q     Did you give either Alex or the defendant a demonstration
11   of the system -- the security system -- you had already been
12   using?
13   A     Yes.
14   Q     What did you do?
15   A     I explained on the computer how it worked, both the
16   messaging and the VPN, in order to change the location of the
17   computer.
18   Q     Who was present when you gave this demonstration?
19   A     It was Alex Cifuentes, El Gordo, and El Chapo.
20   Q     Did the defendant ask you any questions about the system
21   that you had set up?
22   A     No.
23   Q     Did he ask you any questions about anything at that time?
24   A     Yes.  He asked me if I had had any trouble entering
25   Mexico.
```

RODRIGUEZ/DIRECT/GOLDBARG

1    Q    And what did you respond?

2    A    I said no.

3    Q    Did he respond to that?  Did he have any comments?

4    A    Yes.  He said, you guys, professionals, don't have

5    problems when you're traveling.

6    Q    Did you reach an understanding with the defendant and

7    Alex Cifuentes at the end of this meeting in the mountains?

8    A    Yes.  I was going to continue to add users to the system

9    they already had, and I was going to propose a new

10   communications system for the phones.

11   Q    Did you set up a user for the defendant on the system you

12   already had in place, the instant messaging?

13   A    No.

14   Q    Why not?

15   A    Because he didn't like to write on the computer.  He

16   preferred to talk.

17   Q    How do you know that the defendant didn't like to write,

18   but preferred to talk?

19   A    He told me.

20   Q    Based on that, what did you decide to do?

21   A    To design a communications solution for phones.

22   Q    And what was that system that you designed?

23   A    A VoIP system to make phone calls over the Internet.

24   Q    Did you have an understanding that you were going to set

25   this system up when you left the mountain top that time?

RODRIGUEZ/DIRECT/GOLDBARG

1    A    No.

2    Q    So what happened?

3    A    I went back and continued to add users to the chat

4    system, and then I came back there for a second meeting.

5    Q    Approximately how much time passed between the first and

6    the second meeting?

7    A    Approximately a month and a half.

8    Q    Where did the second meeting take place?

9    A    In the mountains near Culiacan.

10   Q    How did you get to the meeting in the mountains?

11   A    The same way.  They took me to the clandestine airstrip,

12   a small plane, and we landed in the mountains.

13   Q    Were you met by armed guards in military garb on this

14   time, too?

15   A    Yes.

16   Q    When you get to the house in the mountains, who was

17   present?

18   A    It was Alex Cifuentes and El Chapo were there.

19   Q    Were any of his workers present?

20   A    Around him, there were some people that I think were for

21   security, and it's possible that Gordo was there.

22   Q    Now, you testified that at the first meeting you

23   recommended to the defendant cable Internet.  Did they follow

24   your recommendation?

25   A    Yes.  They followed my recommendation and they installed

RODRIGUEZ/DIRECT/GOLDBARG

1    it.

2    Q    How do you know they installed it?

3    A    Because the -- when I went to the second meeting, I

4    tested it.  I tested the speed.

5    Q    What was the result of that test?

6    A    The speed was very good.

7    Q    So what did you do at the second meeting?

8    A    I proposed that I would install a system of phone calls

9    over the Internet, voice over IP.

10   Q    Did you give them a demonstration?

11   A    Yes.

12   Q    What did you do?

13   A    I connected the phone to a server that I had in my

14   office, and through the phone, I -- through the Internet, I

15   made a call to Dolly Cifuentes.

16   Q    Who spoke to Dolly Cifuentes?

17   A    Alex Cifuentes and El Chapo did.

18   Q    What did Alex Cifuentes and Chapo say to Dolly Cifuentes

19   on this call?

20   A    It was just a test phone call.  It was, like, Hi, can you

21   hear me?

22   Q    What did the defendant say after you did this test call?

23   A    He liked the system.

24   Q    Did he give you any instructions or any orders?

25   A    Yes.  He asked me to install it for him.

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

1   Q    Did you prepare a chart or a graph to explain this VoIP

2   system to the defendant?

3   A    Yes.

4   Q    And did you show it to the defendant?

5   A    Yes.

6   Q    Do you remember approximately when it was that you did

7   that?

8   A    In 2008.

9           MS. GOLDBARG:  For the witness only.

10  BY MS. GOLDBARG:

11  Q    I would like to show you, for identification purposes,

12  Government Exhibit 513-1.

13          Do you recognize this document?

14  A    Yes.

15  Q    What is this document?

16  A    It is a diagram that shows how the system worked.

17  Q    Is this the same diagram that you showed to the defendant

18  when you explained how your system worked?

19  A    Yes.

20          MS. GOLDBARG:  Your Honor, at this time, the

21  Government moves to admit 513-1 into evidence.

22          MR. BALAREZO:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 513-1 received in evidence.)

25          MS. GOLDBARG:  I ask that it be published.

RODRIGUEZ/DIRECT/GOLDBARG

```
 1              (The above-referred to exhibit was published.)
 2   BY MS. GOLDBARG:
 3   Q    Could I please ask you to walk the jury through what it
 4   is that you explained to the defendant when you were
 5   explaining your system to him.
 6   A    Yes.
 7   Q    And you can mark on the screen in front of you, and --
 8   A    This was the main server.
 9              MS. GOLDBARG:  Let me just, for the record, indicate
10   that he has put a circle on the image on the upper left-hand
11   corner of the graph.  Above it it says PBX-srtp.
12   A    Okay.
13              MS. GOLDBARG:  Your Honor, since the witness has
14   moved closer to the screen, he's farther awake from the
15   microphone.  Perhaps we can get a lapel mic for him.  That
16   might make things easier.
17              THE COURT:  Okay.
18              (Pause.)
19   A    The main server was protected by a firewall and it was
20   connected to the Internet, and basically, any phone that was
21   connected to the Internet via Wi-Fi or a DSM cell network
22   could connect to the server.
23   Q    Is that DSM or GSM?
24   A    GSM.
25   Q    And on the top right-hand corner of the graph, there are
```

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

1   what looks like phones and the word "extensions" underneath

2   it.

3   A     Yes.  The system had extensions, and it worked in a way

4   similar to a company -- a company system.  In this case, they

5   were three-digit extensions for internal phone calls.  For

6   example, you could make a phone call from extension 100 to

7   101.  Those were phone calls between phones and they were

8   completely secure.

9   Q     How is it that these calls internally or on these

10  extensions were completely secure?

11  A     Because each phone was encrypted, meaning the entire

12  communication was encrypted from one phone to the other.  We

13  also had some adapters, the ATA --

14  Q     Before we get into the ATA's.  You said that if extension

15  100 called extension 101, what route would that phone call

16  take to get from one extension to the other?

17  A     Well, the route would be to the server and back to the

18  extension, but they had -- the call was from one phone

19  directly to the other.

20  Q     Now, you circled on the top right-hand corner under a

21  blue box that has a X-looking thing, it says ATA.  What is

22  ATA?

23  A     It is an adapter that allows analog -- a conventional

24  analog phone to connect to the system and to make calls via

25  the Internet.

RODRIGUEZ/DIRECT/GOLDBARG

1    Q    Why did you have this adapter?

2    A    To be able to connect the Senao phones to the network.

3    Q    Who asked you to set up the Senao phones to this network?

4    A    Chapo.

5    Q    Did the defendant tell you why it is he wanted you to use

6    these Senao phones?

7    A    Yes.  See, like the mobility that the Senao phones lent

8    him, and he had -- he was in the habit of using them from

9    before.

10   Q    So what did this converter allow the defendant to do?

11   A    To go from a Senao -- to place a call from a Senao phone

12   to an internal extension.

13   Q    Is there anything else on this chart or this graph that

14   you explained to the defendant?

15   A    Yes.  We also had a trunk server which allowed to make

16   secure phone calls -- phone calls to any phone in the world.

17   Q    Let's break that down.

18        On the image on the bottom left-hand corner, it says

19   trunk server or SIP vendor.  What is a trunk server?

20   A    A trunk server allows communications VoIP to trunk

21   phones, meaning -- meaning that a phone that uses the Internet

22   to call is allowed to call to any part of the world, be it a

23   landline or a mobile phone by using the network.

24   Q    How is this safe?  How is this a secure call?

25   A    Because it is very difficult to track down the origin of

Denise Parisi, RPR, CRR

RODRIGUEZ/DIRECT/GOLDBARG

 1    the call.  To be able to do that, they would have to go

 2    through the trunk server to the firewall, to the Internet, so

 3    it is very difficult to, in fact, track the origin of the

 4    call.

 5              (Continued on the following page.)

RODRIGUEZ/DIRECT/MS. GOLDBARG

```
 1   (Continuing.)
 2   BY MS. GOLDBARG::
 3   Q    You explained all of this to the defendant using this
 4   chart?
 5   A    Yes.
 6   Q    Did the defendant have any questions about the server?
 7   A    No.
 8   Q    Did the defendant approve this proposal?
 9   A    Yes.
10   Q    Who paid for it?
11   A    He did.
12   Q    You say he, who are you referring to?
13   A    Chapo.
14   Q    How much did setting up the system cost?
15   A    $100,000 approximately.
16   Q    Who paid you?
17   A    Chapo.
18   Q    How did you get the money?
19   A    In cash.  It would be given to me, part of it in Mexico
20   sometimes, and part of it Colombia.
21   Q    Did you in fact set up a VOIP system as shown in
22   Government's Exhibit 513-1 for the defendant?
23   A    Yes.
24   Q    How many extensions did you set up on this system?
25   A    One hundred approximately.
```

RODRIGUEZ/DIRECT/MS. GOLDBARG

1   Q    Do you recall how many extensions the defendant had on

2   this system?

3   A    He had a couple, approximately three.

4   Q    Do you remember any extensions that he had?

5   A    I remember one, 121.

6   Q    So after the defendant approved setting up the system and

7   gave you the money, what did you do?

8   A    I went back to Colombia and I started to install the

9   system.

10  Q    Did you go back up to the mountains?

11  A    Yes.

12  Q    Was the defendant present when you got there?

13  A    Yes.

14  Q    What was the purpose of you going to the mountains on

15  this trip?

16  A    It was to configure the extensions system in the

17  mountains.

18  Q    How do you configure the extension systems in the

19  mountains?

20  A    Well, I configure the ATA devices and I also configure

21  some Nokia phones.

22  Q    For those who are not technically inclined, the ATA

23  phones, which ones are those?

24  A    Those were the adapters we used to connect the Senao

25  phones.

RODRIGUEZ/DIRECT/MS. GOLDBARG

1    Q    And the Nokia phones?

2    A    They were the Nokia phones that were very popular at the

3    time.

4    Q    After you configured the system in the mountains, what

5    did you do?

6    A    I did a demonstration for Chapo of how he could make a

7    call between extensions and also how he could make a call

8    outside of the network.

9    Q    Can you describe for the jury how it is that you

10   demonstrated for the defendant how the defendant could make a

11   call using the extension system?

12   A    Yes.  I picked up the Senao phone in the one hand and the

13   extension phone in the other, and I dialed an extension

14   number, let's say 100.  I receive the call and I make sure

15   that it worked.

16   Q    Did the defendant say anything after the test?

17   A    No.  He liked it.  And then we also tested the system of

18   calls to cellphones in Mexico.

19   Q    When you say that, is that not an extension to extension

20   call?

21   A    No.  That would be a call through the trunk server by

22   which you can make a call to a phone in Mexico.

23   Q    Did you do a demonstration for the defendant on how to

24   make a call using the trunk server?

25   A    Yes.

RODRIGUEZ/DIRECT/MS. GOLDBARG

```
 1   Q     How did you do that?
 2   A     I explained to him that he would have to dial the
 3   international code 0052, then the number 1 for cellphones,
 4   then the area code.
 5   Q     Did you do a test?
 6   A     Yes.
 7   Q     Was the defendant present.
 8   A     Yes.
 9   Q     Did the defendant talk on the phone when you did this
10   demonstration?
11   A     Yes.
12   Q     Do you know who he called?
13   A     No.
14   Q     Did the call work?
15   A     Yes.
16   Q     Did the defendant say anything after the test?
17   A     No.  He liked it.
18   Q     So what were your next instructions from the defendant?
19   A     To configure phones for those who work with him.
20   Q     Who would give you instructions on which phones to
21   configure?
22   A     Chapo.
23   Q     How would Chapo give you instructions on which phones to
24   configure on to this system?
25   A     He would call me to my extension.
```

RODRIGUEZ/DIRECT/MS. GOLDBARG

 1   Q    How frequently would the defendant call you at this time?

 2   A    A couple of types a week.

 3   Q    You mentioned that Gordo was one of his technicians, did

 4   the defendant have other technicians working for him?

 5   A    Yes.

 6   Q    Who were those workers?

 7   A    Charlie, and then later another person who's name was

 8   Benjamin would also give me instructions.

 9   Q    Would other people other than the defendant give you

10   instructions on which phones to configure?

11   A    Sometimes the technicians.

12   Q    Did the defendant give you instructions to install this

13   system or configure phones or other devices for some of his

14   top lieutenants?

15   A    Yes.

16   Q    Who did he ask you to help?

17   A    To Licensiado.

18   Q    Who is Licensiado?

19   A    He was someone who worked with Chapo.

20   Q    What instructions did the defendant give you regarding

21   Licensiado?

22   A    He told me to configure his phone and explain to him

23   really well how it worked.

24   Q    Did the defendant tell you why he wanted you to configure

25   the phones for Licensiado?

RODRIGUEZ/DIRECT/MS. GOLDBARG

```
 1    A     No.

 2    Q     Did you in fact meet with Licensiado?

 3    A     Yes.

 4    Q     Where did you meet with Licensiado?

 5    A     In the outskirts of Culiacan.

 6    Q     Where did the meeting take place?

 7    A     In a car.

 8    Q     What type of car?

 9    A     An armored car.

10    Q     What happened at this meeting?

11    A     I configured his extension and I explained to him how it

12    worked.

13    Q     Showing you what is in evidence as Government's Exhibit

14    11A.  Do you recognize this person?

15    A     Yes.

16    Q     Who is that?

17    A     Licensiado.

18    Q     Did you configure anything else other than telephones for

19    Licensiado?

20    A     Yes, his computer.

21    Q     Do you remember what extensions Licensiado had?

22    A     No.

23    Q     When was the next time that you met with the defendant in

24    the mountains?

25    A     A month-and-a-half later, approximately.
```

RODRIGUEZ/DIRECT/MS. GOLDBARG

1   Q    How frequently would you go to the mountains when you

2   were working for the defendant?

3   A    Like every month-and-a-half.

4   Q    How would you get to the camp in the mountains?

5   A    The same way, by using the clandestine airstrip.

6   Q    Did the defendant ask you for any type of specific

7   technology?

8   A    Yes, he asked me for spy software.

9   Q    What is spy software?

10  A    It is an application installed on a device that allows

11  you to monitor the activities of that device.

12  Q    What do you mean that you can install an application to

13  monitor a device?

14  A    It's an application that it can be installed, let's say

15  on a phone, it can have the phone's location, the phone's text

16  messages, the phone contact log, e-mails, and the GPS location

17  of the phone.

18  Q    How did the topic of spy software come up with the

19  defendant?

20  A    He asked me about it.

21  Q    What did he ask you?

22  A    Whether I had spy software for cellphones or computers.

23  Q    Where did this first conversation take place when he

24  asked you about spy software?

25  A    During that visit in the mountains.

RODRIGUEZ/DIRECT/MS. GOLDBARG

1    Q    Do you remember who was present when you were discussing

2    spy software?

3    A    Alex Cifuentes.

4    Q    Any of the defendant's workers?

5    A    And Gordo.

6    Q    Did you provide any information or proposal to the

7    defendant on spy software?

8    A    Yes.

9    Q    What was that.

10   A    It was spy software for cellphones and I showed him how

11   it worked.

12   Q    Can you explain to the jury how you showed the defendant

13   how the spy software worked?

14   A    In his computer we would go to a web page so we had a

15   username and a password on that web page.  Once you enter that

16   web page, you could see through it, you could see by using it

17   all the activities of the phone and the GPS location of it.

18   Q    When you gave the defendant a demonstration of the spy

19   software, did he ask any questions?

20   A    I don't remember.

21   Q    So did he order you to do anything or give you

22   instructions?

23   A    Yes, he gave me instructions to install it.

24   Q    Who paid for this?

25   A    Chapo.

RODRIGUEZ/DIRECT/MS. GOLDBARG

1   Q    How would this system work?  Was it just access to the

2   website?

3   A    No.  You had to have the device and install the

4   application on the device.  And then through the web page you

5   could see the reports for that device.

6   Q    Did you demonstrate this for the defendant?

7   A    Yes.

8   Q    After you would log into the website, what type of

9   information did you show the defendant you could access with

10  this software?

11  A    You could see the call log, the text messages, the BBM

12  messages, the locations, you could have a copy of the contact

13  and a copy of the e-mails.

14  Q    You previously testified that you did this demonstration

15  on the defendant's computer?

16  A    Yes.

17  Q    Did you install anything on the defendant's computer

18  regarding the spy software?

19  A    I gave him direct access so he could go into the web page

20  and see the report.

21  Q    You did this on the defendant's computer?

22  A    Yes.

23  Q    What was the defendant's reaction?

24  A    He liked the system.

25  Q    Did the defendant ask you for any additional access

RODRIGUEZ/DIRECT/MS. GOLDBARG

1    beyond what you could get?

2    A    Yes.

3    Q    What additional access did the defendant ask for?

4    A    He wanted to have the ability to remotely open up the

5    microphone on the device.

6    Q    How would that work?

7    A    When you install this software on the telephone, the spy

8    software, the caller ID comes up on the line that it is going

9    to call.  And when the call is picked up, he can automatically

10   listen to what is going on in the room.

11   Q    Was this something that came standard with the software

12   that you proposed to the defendant?

13   A    Yes.

14   Q    Did you give the defendant a demonstration of how this

15   would work?

16   A    Yes.

17   Q    What did you demonstrate to him?

18   A    When you dial the phone that had the spy software to one

19   specific line, you would call and then the microphone would

20   come on and you could hear what was going on in the room of

21   everything around the phone.

22   Q    The person that had the phone with the software

23   installed, would they know that the microphone was turned on

24   remotely?

25   A    No.

RODRIGUEZ/DIRECT/MS. GOLDBARG

```
1    Q    Did you explain that to the defendant as well?
2    A    Yes.
3    Q    Did he make any comments or did he seem -- is that
4    something that he wanted to have happen?
5    A    Yes, he liked the system.
6    Q    Was there anything else that you could do with this spy
7    software?
8    A    No, it was basically that all of the logs of everything
9    that happened on the phone, the GPS location, and the
10   microphone.
11   Q    Did the defendant give you any instruction or orders
12   regarding this spy software?
13   A    Yes.
14   Q    What were those?
15   A    He asked me to start installing phones with the spy
16   software.
17   Q    When you say installing phones, what do you mean by that?
18   A    I would be given new phones and on the new phone I would
19   install the spy software.
20   Q    Who would give you the phones?
21   A    One of the technicians would give them to me or Benjamin.
22   Q    On how many phones or devices did you install this spy
23   software for the defendant approximately?
24   A    Approximately 50.
25   Q    Did the defendant in fact use the spy software?
```

RODRIGUEZ/DIRECT/MS. GOLDBARG

```
1    A     Yes.

2    Q     How do you know this?

3    A     Because he called me all the time to ask me things

4    regarding the spy software.

5    Q     When you say he, who are you referring to?

6    A     El Chapo did.

7    Q     What would the defendant call you specifically about?

8    A     Chapo would call me because, for example, the GPS

9    location would not be updating on a device, or there was a

10   device that was not reporting information into the server for

11   two or three days.

12   Q     So what would the defendant say to you when he would call

13   you?

14   A     He asked me to ask -- he would call me to ask me to solve

15   it.

16   Q     How would the defendant call you?

17   A     Chapo would call me on my extension.

18   Q     You said he would call you frequently, how frequently was

19   the defendant calling you about the spy software?

20   A     Almost every day.

21   Q     Do you know why he was calling you so frequently about

22   the spy software?

23   A     Because he liked it very much.

24   Q     How do you know that the defendant really or liked it

25   very much?
```

RODRIGUEZ/DIRECT/MS. GOLDBARG

1   A    Well, first of all, Alex Cifuentes and Gordo told me that

2   it was like his toy.  And besides that, because of the amount

3   of phone calls that he would make to me.

4   Q    Would the defendant call you with the same frequency

5   about the extension system?

6   A    No.

7   Q    You said that both Alex Cifuentes and Gordo told you that

8   it was like a toy for him, did they give you any examples of

9   what type of things the defendant was doing with this spy

10  software?

11  A    Yes.  For example, he would call a person on their

12  extension, talk about whatever topic they needed to talk

13  about, then he would hang up, then call from another telephone

14  and open up the microphone to hear what they would say about

15  him.

16  Q    Did you provide the defendant access to the spy software,

17  the website?

18  A    Yes.

19  Q    Did he use it?

20  A    Yes.

21  Q    How do you know?

22  A    Because Chapo would call me all the time to ask me for

23  help with the spy software.

24  Q    Did the defendant have a name for, or what he would call

25  these devices that you installed the spy software on?

RODRIGUEZ/DIRECT/MS. GOLDBARG

```
 1   A     Yes, he would call them special phones.
 2   Q     How many of these special phones did the defendant
 3   initially ask you to install spy software on?
 4   A     Approximately ten.
 5   Q     And what happened?
 6   A     Then he kept asking for me to install it on more devices.
 7   Q     Did the defendant ask you to install these spy software
 8   only on cellphones?
 9   A     No.
10   Q     What else did he ask you?
11   A     In computers.
12   Q     Do you recall specific instances in which the defendant
13   asked you to install spy software on a computer?
14   A     Yes.
15   Q     Where was this?
16   A     In the mountains, in his house.
17   Q     What happened on that occasion?
18   A     I remember he was with a woman.  And the woman had a
19   computer in the house.  And he asked me how long it would take
20   me to make the computer special.  I said about three minutes.
21   He said he was going to distract her while I installed the spy
22   software on the computer.
23   Q     So what happened?
24   A     It happened.  I installed it.  El Chapo distracted the
25   woman and I installed the spy software on the computer.
```

RODRIGUEZ/DIRECT/MS. GOLDBARG

1    Q    You testified that the defendant would personally read

2    the reports from the spy software, did that change over time?

3    A    Yes.

4    Q    What happened?

5    A    He put Benjamin in charge of reading the reports and pass

6    on a summaries to him.

7    Q    Do you know why the defendant put Benjamin in charge of

8    reading the spy software reports?

9    A    Because it took a long time to read the reports.

10   Q    Did the defendant give Benjamin any instructions about

11   how to monitor the spy software?

12   A    Yes, I trained Benjamin on how to do it.

13   Q    Did Benjamin in fact monitor the spy software for the

14   defendant?

15            MR. BALAREZO:  What is the relevance of this?  401.

16            THE COURT:  I see the relevance.  Overruled.

17   A    Yes.

18   Q    How do you know this?

19   A    Because he would call me all the time.

20   Q    What would he call you for?

21   A    To report problems with the spy software.

22   Q    Did the defendant want other people knowing that Benjamin

23   was reading the software reports?

24   A    Yes.  Well, he didn't want people to know so he would

25   wear headphones.  So he told him that if he was asked, he

RODRIGUEZ/DIRECT/MS. GOLDBARG

1    could say that he was listening to music.

2    Q    A lot of "he's" going on in that sentence.  Could you

3    clarify who was wearing the headphones and who asked who to

4    wear the headphones.?

5    A    El Chapo asked Benjamin to say, if asked what he was

6    doing on the computer, that to say that he was listening to

7    music.  Because what he was doing was listening to phone calls

8    that had been intercepted with the headphones.

9    Q    Once you trained Benjamin to read the reports for the spy

10   software, how frequently would Benjamin call you?

11   A    Several times a day.

12   Q    Who was Benjamin calling on behalf of?

13   A    El Chapo.

14   Q    How do you know that?

15   A    He would tell me, El Senor, referring to Chapo, needs

16   this fixed.

17        MS. GOLDBARG:  Your Honor, I'm about to move on to a

18   new topic.

19        THE COURT:  We'll send you home, ladies and

20   gentlemen.  Please don't talk about the case with anyone.

21   Don't research anything on the Internet.  Don't post anything

22   on social media.  Stay away from any media coverage on the

23   case.

24        See you tomorrow morning at 9:30.

25        (Jury exits.)

RODRIGUEZ/DIRECT/MS. GOLDBARG

1              THE COURT:  Anything else we need to cover?

2              (Proceedings adjourned at 4:25 p.m. to resume on

3       January 10, 2019 at 9:30 a.m.)

INDEX

MARSTON/DIRECT/ROBOTTI          4600
MARSTON/CROSS/LICHTMAN          4727
MARSTON/REDIRECT/ROBOTTI        4788
MARSTON/RECROSS/LICHTMAN        4790
RODRIGUEZ/DIRECT/GOLDBARG       4792
GEX 29                          4605
GEX 603D                        4610
GEX 603                         4611
GEX 605C, 605D                  4612
GEX 604H                        4615
GEX 602F, G, H                  4627
GEX 402-1, 2, 3, 4              4633
GEX 45                          4633
GEX 511-2, 4, 5, 8, 10          4635
GEX 511-11, 12, 13, 14          4635
GEX 511-15                      4636
GEX 43                          4800
GEX 89                          4801
GEX 513-1                       4812