```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                       09 CR 466(BMC)
 3   UNITED STATES OF AMERICA
                                       United States Courthouse
 4        versus                       Brooklyn, New York

 5   JOAQUÍN ARCHIVALDO GUZMÁN LOERA,
                                       January 10, 2019
 6                  Defendant.         9:30 a. m.
     --------------------------------x
 7
                  TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
 8             BEFORE THE HONORABLE BRIAN M. COGAN
                    UNITED STATES DISTRICT JUDGE
 9

10                        APPEARANCES

11

12   For the Government:    UNITED STATES ATTORNEY'S OFFICE
                            Eastern District of New York
13                          271 Cadman Plaza East
                            Brooklyn, New York 11201
14                          BY:  GINA M. PARLOVECCHIO, AUSA
                                 ANDREA GOLDBARG, AUSA
15                               MICHAEL ROBOTTI, AUSA

16                          UNITED STATES ATTORNEY'S OFFICE
                            Southern District of Florida
17                          99 NE 4th Street
                            Miami, Florida 33132
18                          BY:  ADAM S. FELS, AUSA

19                          DEPARTMENT OF JUSTICE
                            Criminal Division
20                          Narcotic and Dangerous Drug Section
                            145 N. Street N.E. Suite 300
21                          Washington, D.C. 20530
                            BY:  ANTHONY NARDOZZI, ESQ.
22                               AMANDA LISKAMM, ESQ.

23   For the Defendant:     BALAREZO LAW
                            400 Seventh Street, NW
24                          Washington, D.C. 20004
                            BY:  A. EDUARDO BALAREZO, ESQ.
25
```

```
 1                    (CONTINUED APPEARANCES)

 2   For the Defendant:

 3   LAW OFFICES OF JEFFREY LICHTMAN
     11 East 44th Street, Suite 501
 4   New York, New York 10017
     BY:  JEFFREY H. LICHTMAN, ESQ.
 5   PAUL R. TOWNSEND, ESQ.

 6   LAW OFFICE OF PURPURA & PURPURA
     8 E. Mulberry Street
 7   Baltimore, Maryland 21202
     BY:  WILLIAM B. PURPURA, ESQ.
 8
     LAW OFFICES OF MICHAEL LAMBERT, ESQ.
 9   369 Lexington Avenue, PMB #229
     New York, New York 10017
10   BY:  MARIEL COLON MIRO, ESQ.

11

12

13

14

15

16

17

18

19

20

21   Reported by:

22   LISA SCHMID, CCR, RMR
     OFFICIAL COURT REPORTER
23   225 Cadman Plaza East, Room N377
     Brooklyn, New York 11201
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

```
 1              (In open court, outside the presence of the jury.)

 2              THE CLERK:  All rise.

 3              THE COURT:  Good morning.

 4              MR. BALAREZO:  Good morning, Your Honor.

 5              THE COURT:  Let's bring in the jury, please.

 6              A reminder to any sketch artist who may not have

 7    been here yesterday when I reminded them then that this

 8    witness is not to be sketched.

 9              MS. PARLOVECCHIO:  Your Honor, I just wanted to show

10    -- I'm sorry.  A pending motion --

11              THE COURT:  I didn't get you.

12              (Jury enters.)

13              THE COURT:  All right.  Everyone be seated.

14              Good morning, ladies and gentlemen.

15              JURORS:  (In unison.)  Good morning.

16              THE COURT:  We'll continue direct examination.

17              MS. GOLDBARG:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19    BY MS. GOLDBARG:

20    Q    Good morning.

21    A    Good morning.

22    Q    When we left off yesterday, you were telling the jury

23    about the spy software that the defendant asked you to install

24    on various devices?

25    A    Correct.
```

LISA SCHMID, CCR, RMR

```
 1   Q     What's the name of that spy software that you were using
 2   with the defendant?
 3   A     FlexiSPY.
 4   Q     F-L-E-X-I-S-P-Y, is that correct?
 5   A     F-L-E-X-I-S-P-Y.
 6   Q     Thank you.
 7             Now, did the defendant discuss with you all of the
 8   technology that he was using?
 9   A     No.
10   Q     How do you know this?
11   A     Because the Cifuentes family in Colombia told me that
12   they had been using BlackBerry equipment to communicate.
13   Q     And how does this relate to the defendant?
14   A     Because Chapo had sent them those BlackBerry devices to
15   communicate, and they wanted to know whether they were safe,
16   whether they were secure, and they gave them to me to check
17   them.
18   Q     So the defendant gave the Cifuenteses in Colombia
19   BlackBerry devices to use, is that correct?
20   A     Correct.
21   Q     What is a BlackBerry device?
22   A     A BlackBerry is a smartphone which has keyboard.  They
23   were very popular at the time.  They had BBM, BlackBerry
24   Messenger to chat, and they were somewhat safe.
25   Q     Did you, in fact, analyze the BlackBerry device that the
```

1    Cifuenteses gave you?

2    A     Yes.

3    Q     And what was the result of your analysis?

4    A     That they were regular BlackBerrys.  They did not have

5    point-to-point encryption; therefore, they were not that

6    secure.

7    Q     Did you discuss this, your findings with the defendant?

8    A     Yes.

9    Q     Did you speak with him over the phone or in person about

10   this?

11   A     In person.

12   Q     How did you set up this meeting?

13   A     I called him and I asked for a meeting to speak on the

14   subject.

15   Q     And did the defendant agree to meet with you?

16   A     Yes.

17   Q     Where was this meeting?

18   A     It took place at a ranch in the outskirts of Culiacán.

19   Q     How did you get to the meeting?

20   A     By car.  They picked me up at the hotel and they took me

21   to the place.

22   Q     Who's they?  Who took you to this meeting?

23   A     El Gordo took me to the meeting.

24   Q     How many people were at the meeting when you arrived at

25   this ranch?

```
 1   A     Approximately 20 people, armed, security people.

 2   Q     And then where did the meeting take place in the ranch?

 3   A     In a room in the ranch.

 4   Q     Who was present in that room at the ranch?

 5   A     Chapo, Licensiado and Mayo.

 6   Q     I'm showing you what's in evidence as Government Exhibit

 7   2A.  Do you recognize the person in this photograph?  (Exhibit

 8   published.)

 9   A     Yes.

10   Q     Who is that?

11   A     Mayo.

12   Q     Now, you said Licensiado was there.  Is this the same

13   person you saw the photograph of yesterday?

14   A     Yes.

15   Q     Just to refresh your recollection, 11A.  (Exhibit

16   published.)

17   A     Yes.

18   Q     And had you met Licensiado before this meeting?

19   A     Yes.

20   Q     So what happened when you got to the meeting?

21   A     Well, I explained to them that the BlackBerry equipment

22   they had been using had only the regular BBM, that they were

23   not completely secure.

24   Q     You did explain to them why they weren't secure?

25   A     Yes.
```

1   Q    And what did you explain?

2   A    Because they did not have point-to-point encryption.

3   They were just regular BlackBerrys.

4   Q    So did you discuss with them what the venerabilities were

5   with those BlackBerrys that they were using?

6   A    Yes.  I explained to them that it was possible that both

7   the American and Mexican government might have access to the

8   BlackBerry messages.

9   Q    Did anyone ask questions of you at this meeting?

10  A    Yes.

11  Q    Who was that?

12  A    Licensiado asked me how they worked.

13  Q    So what did you do?

14  A    I showed them.  I had prepared a demonstration for them.

15  I had two BlackBerry devices, and I said -- and I sent emails

16  from one to the other.

17  Q    And after you did this demonstration, what if anything

18  did they say?

19  A    Yes, they liked the system.

20  Q    Did the defendant instruct you or order you to do

21  anything with regards to the system?

22  A    Yes, he gave me instructions to install the server.

23  Q    Now, while you were at this meeting with the defendant,

24  Licensiado and Mayo, did you propose any other type of

25  technology or project to them?

1    A    Yes.

2    Q    What was that?

3    A    I explained to them, I gave them a proposal to move the

4    servers to the cloud.

5    Q    What do you mean by that?

6    A    That instead of having the servers physically in Mexico,

7    we could put them in a data center.  In this case, I explained

8    to them that we could move them to Canada.

9    Q    What is the data center?

10   A    It is a place where there are a lot of servers, where

11   this is a high internet connectivity and they are very secure

12   places.

13   Q    How is it that these data centers are more secure than

14   what you had set up in Mexico?

15   A    Well, first, the server in a data center would be more

16   stable with the internet connection, with the electricity

17   power had backup, additional.  At a data center, we would be

18   less noticeable because you have -- there are many servers for

19   many different companies.

20   Q    Why did you choose Canada?

21   A    Because I read in the Internet that the privacy laws in

22   Canada were more stronger when it came to data and that it

23   would be perhaps more difficult for the government to obtain

24   an order to access that information.

25   Q    What did the defendant respond after you explained this

1   to him?

2   A    He liked the proposal and he approved it.

3   Q    Now, did Mayo speak at all during this meeting?

4   A    Not one word.

5   Q    Did you end up setting up a BlackBerry server for the

6   defendant?

7   A    Yes.

8   Q    Where did you set it up?

9   A    In Canada.

10  Q    And did you also set up a cloud server for the defendant?

11  A    Yes.

12  Q    And where did you set that up?

13  A    In Canada.

14  Q    Now, did the defendant ask you to find new technologies?

15  Is that something he would ask you to do frequently?

16  A    Yes.  Yes.  He asked me to investigate an interception

17  system.

18  Q    What do you mean by interception system?

19       MR. BALAREZO:  Your Honor, objection; 401, 403.

20       THE COURT:  Overruled.

21  A    Interception equipment allows you to listen to phone

22  calls, Internet, text messages.

23  Q    And did you find anything for the defendant that fit this

24  description?

25  A    Yes.

RODRIGUEZ/DIRECT/GOLDBARG

1  Q     Where did you find it?

2  A     In Holland.

3  Q     And did the defendant end up purchasing this technology?

4  A     Yes.

5  Q     How much did the technology cost the defendant?

6  A     Approximately one million.

7  Q     One million what?

8  A     Dollars.

9  Q     And how did the defendant pay for this technology?

10 A     I sent him the account number and he made the deposits

11 into it.

12 Q     Did you ever end up using this technology with the

13 defendant?

14 A     No, we never did.

15 Q     Did you get paid anyway for this service?

16 A     Yes, I received a commission.

17 Q     How much were you paid?

18 A     Approximately $300,000.

19 Q     Now, in the meeting that you discussed with the

20 defendant, Mayo and Licensiado, it happened in Culiacán.  Was

21 that the first time that you met with the defendant outside of

22 the mountains?

23 A     Yes, correct.

24 Q     Did you see the defendant again after this?

25 A     Yes.

RODRIGUEZ/DIRECT/GOLDBARG

1    Q    And where did these meetings occur?

2    A    In the Sinaloa Sierra.

3    Q    This isn't the same place you met with him previously in

4    the mountains?

5    A    I think it was the same area, but at a different house.

6    Q    Now, did the defendant ever talk to you about concerns he

7    had with the servers that you had set up for him?

8    A    Yes.

9    Q    And what did he tell you?

10   A    Chapo told me that he had spoken to a friend who knew a

11   lot about computers, who told him that the system that we were

12   using for the extensions was very secure.  But if one of those

13   phones, one of the extension phones fell in the hands of the

14   authorities, they could intercept the entire system.

15   Q    Now, was Chapo's friend correct when he described this

16   vulnerability?

17   A    No.

18   Q    Explain why not.

19   A    Because the phone had only part of the key, and to be

20   able to intercept the system, you needed both parts of the

21   key.  The other part of the key was in the server, so it was

22   impossible that with just one phone, they would be able to

23   intercept the entire system.

24   Q    I'm going to show you what's already in evidence -- and

25   we discussed this yesterday -- Government Exhibit 513-1.  You

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

1    just mentioned a couple of times keys, a key on the device and

2    a key on the server.  Using this graph, can you explain a

3    little bit what you mean by the keys?

4    A    Yes.  Each phone has a key.  The little lock here

5    represents the key.  So to establish a call, it is necessary

6    to have the key of the phone, the device where the call

7    originates, the key of the server, and the key of the

8    destination phone.

9    Q    Now did you explain this to the defendant?

10   A    Yes.

11   Q    And what did he respond?

12   A    He understood.

13   Q    Did you propose anything to him to solve any concerns he

14   may have?

15   A    Yes.

16   Q    And what were those two proposals?

17   A    The first one was the one that we had spoken about

18   before, about moving the server from Mexico to Canada.  And I

19   offered -- I offered him two options.  The first one was to

20   migrate the server from Mexico to Canada by moving all the

21   users of the system in an automatic way to Canada.

22           The second option was to establish a completely new

23   system from scratch, in which each phone would have to be

24   reconfigured one-by-one in such a way that he would be able to

25   control who was in the system.

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

1   Q     Which option did the defendant choose?

2   A     To set up a completely new system from scratch.

3   Q     Did anyone help you set up this new system from scratch?

4   A     I made the installation of the server entirely and El

5   Gordo helped me to configure the new phones.

6   Q     Did the defendant give you instructions about who could

7   get an extension or who would be authorized?

8   A     Yes.

9   Q     What did the defendant tell you?

10  A     He told me and Charly and Gordo that only the people that

11  were authorized by him personally could have access to the

12  system.

13  Q     Now, before you moved this extension server or the system

14  from Mexico to Canada, how many extensions were on the system?

15  A     Approximately one hundred.

16  Q     And after you moved the -- or installed this completely

17  new server in Canada, how many extensions did the defendant

18  authorize to be installed?

19  A     Approximately 50.

20  Q     And when approximately was this that you moved the server

21  from Mexico to Canada?

22  A     In 2009.

23  Q     Did you discuss with any members of the defendant's

24  organization why the defendant wanted to limit the users?

25  A     Yes.

RODRIGUEZ/DIRECT/GOLDBARG

1    Q    Who did you speak with?

2    A    With Gordo.

3    Q    And what did Gordo tell you?

4    A    That he was only going to give extensions to people that

5    he could really trust.

6    Q    Now, did the defendant ask you for any other type of

7    technology?

8    A    Yes.

9    Q    What did the defendant request of you?

10   A    He wanted to have the possibility of intercepting every

11   single internet cafe in Culiacán.

12   Q    Did the defendant tell you why he wanted to incept every

13   single internet cafe in Culiacán?

14   A    No.

15   Q    So what did you do?

16   A    I prepared a demo that would show how it would work to

17   use a system or a spy software in the cafes there.

18   Q    And did you show this demonstration to the defendant?

19   A    Yes.

20   Q    Was this -- was your demonstration successful?

21   A    We had a problem with the antivirus, some of the

22   antivirus apps detected, because the way it worked is that you

23   would plug in a USB device, and that would automatically

24   install this spy software.

25   Q    What did the defendant respond when you told him that you

RODRIGUEZ/DIRECT/GOLDBARG

 1    were having this problem?

 2    A     To try to solve it.

 3    Q     Where were you when you had this conversation with the

 4    defendant?

 5    A     In the mountains in Sinaloa.

 6    Q     Was this the last time that you saw the defendant

 7    face-to-face?

 8    A     Yes.

 9    Q     How did you get up to the mountains that day?

10    A     In the same way, the clandestine air stip, a small plane

11    into the mountains in Sinaloa.

12    Q     Did you get back the same way?

13    A     No.

14              MR. BALAREZO:  Objection; relevance.

15              THE COURT:  Overruled.

16    A     No.

17    BY MS. GOLDBARG:

18    Q     What happened on that day?

19    A     The Army was coming to try to capture Chapo.

20    Q     How do you know that?

21    A     Because someone notified Chapo that day that someone was

22    coming in the direction that we were located.

23    Q     So what happened?

24    A     He said, well, if they take this way up, let me know.  If

25    they take this other way, then there's no problem.

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

```
 1    Q    What happened?

 2    A    They took the way that was headed towards us.

 3    Q    Who was present at the camp when this happened?

 4    A    There was -- Alex Cifuentes was there, Gordo, Chapo and

 5    the security personnel.

 6    Q    How many security personnel did the defendant have up in

 7    the camp?

 8    A    Approximately 15, approximately.

 9    Q    So what happened?

10    A    We walked and moved up the mountain further up, waiting

11    to see what happened with the Army.

12    Q    So what happened?

13    A    The Army came to the place where we were, so we started

14    walking through the mountains to get away.

15    Q    What was the defendant's demeanor during this?

16              MR. BALAREZO:  Objection.

17              THE COURT:  Overruled.

18    A    He was very calm.

19    BY MS. GOLDBARG:

20    Q    How were you feeling?

21    A    Very scared.

22    Q    So what happened?

23    A    We walked through the mountains for three days.

24    Q    You said that there were security guards with you.  Were

25    they armed?
```

RODRIGUEZ/DIRECT/GOLDBARG

```
 1    A     Yes.

 2    Q     What kind of weapons were they carrying?

 3    A     They carried the large weapons, and there was one that

 4    had a very large weapon, and so someone told me that it could

 5    knock out a helicopter.

 6    Q     What happened during these three days that you were

 7    walking through the mountains?

 8    A     The first night, we stayed in a small house.  We spent

 9    the night in a small house, and the next day, we kept on

10    walking.

11    Q     Was the military still looking?

12    A     Yes.  And there were helicopters around there.

13    Q     Where did you go next?

14    A     We walked over the mountains, then we spent another night

15    on the mountains and then next day, we kept on walking.

16    Q     After three days in the mountains, what was the

17    defendant's demeanor?

18    A     He was always very calm, very sure, and very tranquil.

19    Q     After three days walking in the mountains, how were you

20    feeling?

21    A     Very badly.

22    Q     What happened on the third day?

23    A     Well, on the third day, we went to a third house, that

24    last house, where we were given food and there were vehicles

25    there to take us back to the city.
```

RODRIGUEZ/DIRECT/GOLDBARG

```
 1    Q     Did you go back to the city?

 2    A     Yes.

 3    Q     And did you ever go back to the mountains again?

 4    A     Never again.

 5    Q     Why not?

 6    A     I was very frightened.

 7    Q     Did you stop working for the defendant after this

 8    incident?

 9    A     No.

10    Q     Did you keep working for him?

11    A     Yes.

12    Q     Did you change anything about how you were working for

13    him?

14    A     Yes.

15    Q     What was that change?

16    A     I wanted to put some distance between myself and the

17    organization, so I started training Charly and Gordo, so that

18    they could -- on the system, so that they could stay in charge

19    of the system and they would have no need for me.

20    Q     So what were you doing?

21    A     I would give them remote support from Colombia.

22    Q     Did you speak to the defendant after this incident in the

23    mountains?

24    A     Yes, on the phone.

25    Q     Now, at some point in time, did anyone ask you to shut
```

RODRIGUEZ/DIRECT/GOLDBARG

1    down any of your systems?

2    A    Yes.

3    Q    And who asked you that?

4    A    Dolly Cifuentes.

5    Q    Did she tell you why it is that she wanted you to shut

6    down one of her systems?

7    A    Yes.  She told me that there had been a problem in

8    Ecuador, that we had to shut down the computer system.

9    Q    Did you learn what the problem was in Ecuador?

10   A    Yes.

11   Q    What was the problem?

12   A    There was a seizure of a large shipment of drugs in

13   Ecuador.

14   Q    Do you know approximately how many kilos of drugs were

15   seized?

16   A    Yes.  It was like 7,000 or 8,000.

17   Q    And do you know when this was?

18   A    In 2009.

19   Q    Did this seizure in Ecuador happen before or after the

20   attempted capture in the mountains?

21   A    After.

22   Q    How do you remember that?

23   A    Because Alex Cifuentes moved from the mountains to an

24   apartment in Cancún.  He was no longer with El Chapo.

25   Q    Now, I would like to draw your attention to February of

RODRIGUEZ/DIRECT/GOLDBARG

1   2011.  What if anything happened to you around that time?

2   A    Yes.  In February of 2011, I traveled from Medillín to

3   Bogota and in Bogotá, some FBI agents approached me.

4   Q    Did the FBI agents inform you why they wanted to speak

5   with you?

6   A    Yes.  They told me that they knew that I worked for Chapo

7   Guzmán and that I was in serious trouble.

8   Q    Did you admit to the FBI agents right then and there that

9   you did work for the defendant?

10  A    No.

11  Q    What did you tell the FBI agents?

12  A    That I worked for the Cifuentes family, but that I didn't

13  work for Chapo Guzmán.

14  Q    Was that true?

15  A    No.

16  Q    So why didn't you tell the FBI agents the truth?

17  A    Well, I was frightened, and admitting to the FBI agents

18  that I worked for a public figure like El Chapo was very

19  difficult.

20  Q    Did you eventually admit to the FBI that you did, in

21  fact, work for the defendant?

22  A    Yes, I did, that very same day.

23  Q    And did you make any other decision that same day?

24  A    Yes, I made the decision to cooperate with the government

25  of the United States.

RODRIGUEZ/DIRECT/GOLDBARG

```
 1    Q      Now, have you pled guilty to any crimes?

 2    A      No.

 3    Q      Why not?

 4    A      Because it was the agreement that I was able to obtain

 5    through my lawyer.

 6    Q      Were you asked to do anything in exchange for not being

 7    charged with a crime?

 8    A      Yes.

 9    Q      And what were you asked to do?

10    A      Cooperating with the Government and giving the Government

11    access to all of Chapo's communications.

12    Q      Were you provided any other benefits by the Government as

13    a result of your cooperation?

14    A      Yes.  They gave me immigration benefits, and they also

15    paid me for services and for expenses for my family here in

16    the United States.

17    Q      What type of immigration benefits were you provided?

18    A      I -- they gave me a work permit, and right now, there's

19    an S-Visa in process.

20    Q      And you said that you were paid for services and

21    expenses.  How much money in total did the United States

22    Government provide to you?

23    A      Approximately $480,000.

24    Q      Over what period of time?

25    A      Seven years.
```

RODRIGUEZ/DIRECT/GOLDBARG

1   Q    And what did that amount of money cover?

2   A    It included the expenses for housing, reimbursements for

3   traveling, for technology, for licenses.  It included

4   services.  It included relocation expenses for my family and

5   for me to come to the U. S.

6   Q    And approximately how much money did you make working for

7   the defendant?

8   A    Approximately $500,000.

9   Q    Were you required to pay that money back?

10  A    No.

11  Q    Were you required to pay taxes on the money that you did

12  receive from the United States Government?

13  A    Yes.

14  Q    And did you pay those taxes?

15  A    No.

16  Q    Did you eventually pay those taxes?

17  A    Yes.

18  Q    Did you pay them when they were due?

19  A    No.

20  Q    Why not?

21  A    Because I didn't want to pay them.

22  Q    So how did the Government find out that you didn't pay

23  your taxes?

24  A    I told them about it.

25  Q    And as a result of that, what did you have to do?

RODRIGUEZ/DIRECT/GOLDBARG

```
 1   A     I had to hire an attorney and reach an agreement of
 2   non-prosecution for my cooperation.  I also had to amend my
 3   taxes and pay them.
 4   Q     Did you amend your taxes and pay them?
 5   A     Yes.
 6   Q     Now, you mentioned a non-prosecution agreement.
 7   A     Yes.
 8   Q     What is your understanding of what your non-prosecution
 9   agreement is?
10   A     It is an agreement where I commit to pay my taxes and
11   testify with the truth, and cooperate with the Government, and
12   in exchange, I will not be processed for the crime of not
13   paying my taxes.
14   Q     Now, in 2011 when you made the decision to cooperate with
15   the FBI, what did you do?
16   A     I gave them access to Chapo Guzmán's server.
17   Q     What kind of servers did you give them access to?
18   A     I gave them access to the VOIP server, the BlackBerry
19   server, and FlexiSPY accounts.
20   Q     And when you started cooperating with the Government,
21   with the U. S. Government, where were those three servers set
22   up.
23   A     In Canada.
24   Q     What about FlexiSPY?
25   A     FlexiSPY were accounts that were administered by the
```

1    FlexiSPY company, and they were in the cloud.

2    Q    So how did you provide the FBI access to these accounts?

3    A    I gave them the user names and passwords.

4    Q    Were you tasked by the Government to provide them with

5    anything in addition to access to these servers?

6    A    Yes.  The Government asked me to find a way to install a

7    recorded -- to record the encrypted codes.

8    Q    So what did you focus on first?

9    A    In the trunk server.

10   Q    Why did you focus on the trunk server first?

11   A    Because it was easier to access those codes because they

12   did not have point-to-point encryption, but the codes were

13   rather through a regular phone that was not encrypted.

14            MS. GOLDBARG:  I would like to show for the witness

15   only Government Exhibit 513-2.  (Exhibit published to the

16   witness.)

17   BY MS. GOLDBARG:

18   Q    Did you prepare a graph based on the 513-1 about how it

19   is that you gave the FBI access to your servers?

20   A    Yes.

21   Q    Does this fairly and accurately depict --

22            MR. BALAREZO:  No objection, Your Honor.

23            MS. GOLDBARG:  Government moves to admit 513-2.

24            THE COURT:  Received.

25            (Government Exhibit 513-2 was received in evidence.)

RODRIGUEZ/DIRECT/GOLDBARG

```
 1              (Publishes exhibit to the jury.)

 2   BY MS. GOLDBARG:

 3   Q    So this is substantially similar to 513-1, correct?

 4   A    Correct.

 5   Q    Now, using this, can you explain to the jury how it is

 6   that you were able to give the FBI access to this system?

 7   A    Yes.  A system to record the calls was installed on the

 8   main server in such a way that all of the codes, both internal

 9   and external, were recorded on the server.

10              Aside from that, an external server, which was a

11   collection server, was also installed.  And all the codes that

12   were recorded during day were copied automatically to the

13   collection server.

14   Q    The first thing that you marked on this graph is a pink

15   circle with a microphone in it and it's on the PBX server?

16   A    Yes.

17   Q    Can you explain how that worked?

18   A    Yes.  It was a software to record calls.  So all the

19   calls that were made between extensions went to the server.

20   That software then recorded the audio of the calls and created

21   files.

22   Q    Did the FBI ask you to retrieve any calls from the

23   server?

24   A    Yes.

25   Q    Did they ask to you focus on any in particular?
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

1   A    Yes.

2   Q    Which ones?

3   A    The ones in which Chapo took part.

4   Q    So what did you do?

5   A    I would download the recordings of the calls, listen to

6   them, and I would then mark the ones in which Chapo's voice

7   appeared with "---C---" to identify them.

8   Q    Once you identified them, what did you do with these

9   calls?

10  A    I would send them to the FBI, via email.

11  Q    Now, did the ---C---, did you do that for every single

12  call that you listened to on the server?

13  A    No, only a few of them.

14  Q    Okay.  Now, once you downloaded the calls and emailed

15  them to the FBI, what did they ask you to do next?

16  A    Later, they asked me to install the collection server

17  system.

18  Q    And that's -- you circled that on the top left-hand side

19  of 513-2, which is yellow boxes.  Can you please explain to

20  the jury what is a collection server?

21  A    Yes.  A collection server was like a warehousing server,

22  which had hard disks of a good capacity, where the audio files

23  that were produced in the server of encrypted calls were saved

24  there and they were copied automatically every night.

25  Q    How is it that the calls on the server were then saved

RODRIGUEZ/DIRECT/GOLDBARG

1    automatically onto the collection server?

2    A    It was a process that had been programmed to copy

3    automatically all the calls, and send them at midnight, every

4    day.

5    Q    With these two systems in place, were you able to send

6    both extension and external calls to the FBI?

7    A    Correct.

8    Q    And at this time that you were recording these calls,

9    what extension was the defendant using that you remember?

10   A    121.

11   Q    And again, how is it that the FBI got access to the

12   collection server?  How could they get the information?

13   A    They have the user name and the password of the system

14   administrator of the server and were able to download the

15   calls at any time.

16   Q    Of the collection server?

17   A    Correct.

18   Q    Do you know what the FBI did when they accessed the

19   collection server?  Did they provide you with any information

20   on that?

21   A    No.

22   Q    You also mention that you gave the FBI access to the

23   FlexiSPY.

24   A    Correct.

25   Q    How did you do that?

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

1    A     I also gave them the user name and the password of all

2    the accounts and additionally to that, I would also download

3    reports and send them to them.

4    Q     Okay.  What type of information were you downloading from

5    the FlexiSPY?

6    A     The GPS location, BBM messages, text messages, call logs.

7    Q     Could you access any audio from the FlexiSPY?

8    A     No.

9    Q     Why not?

10   A     Because all you had was the call logs.  The software did

11   not have the capacity of recording audio.

12   Q     Did you have the ability to upload information into

13   FlexiSPY?

14   A     No.

15   Q     How would the reports get downloaded from FlexiSPY that

16   you would send to the FBI?

17   A     From the FlexiSPY and Excel, an Excel file would be

18   exported, and that Excel file was the one that I would send to

19   the FBI, via email.

20   Q     Could those Excel files be manipulated?

21   A     Yes.

22   Q     Did you manipulate any of these Excel files?

23   A     No.

24   Q     Why not?

25   A     First, because according to my cooperation agreement, I

RODRIGUEZ/DIRECT/GOLDBARG

1  couldn't do that.  And second, because the FBI had also access

2  to the original FlexiSPY account.  So had they wanted to, they

3  could compare the information.

4  Q    While you're providing information and access to the FBI,

5  are you still in contact with members of the defendant's

6  organization?

7  A    Yes.

8  Q    Who are you in contact with?

9  A    Alex Cifuentes, Gordo, Charly.

10 Q    Are you speaking with the defendant at this time?

11 A    No.

12 Q    Why not?

13 A    He did not call me anymore.

14 Q    Did there come a time that these people suspected that

15 you were cooperating with the United States Government?

16 A    Yes.

17 Q    How do you know that?

18 A    Because I heard a call between Alex Cifuentes and his mom

19 in which he said that they had found out that I was

20 cooperating and that it had been confirmed one hundred

21 percent.

22 Q    How did you react when you heard that?

23 A    I became very frightened.

24 Q    As a result of that, what did you do?

25 A    I moved to the U. S. permanently.

RODRIGUEZ/DIRECT/GOLDBARG

1   Q    Did your cooperation with the Government end when you

2   moved to the United States?

3   A    No.

4   Q    Did you focus on something different at this point in

5   time?

6   A    Yes.

7   Q    What did you focus on?

8   A    On locating Jorge Cifuentes.

9   Q    Who asked you to locate Jorge Cifuentes?

10  A    The FBI.

11  Q    So what did you do?

12  A    So I developed a system to remotely install GPS to know

13  the exact location of the phone.

14  Q    What happened to Jorge Cifuentes?

15  A    He was captured.

16  Q    And what role did you play in his capture?

17  A    I simply installed the software of GPS location on his

18  cell phone without his realizing it.

19  Q    Did that GPS location software work?  Is that how they

20  found him?

21            MR. BALAREZO:  Objection.

22            THE COURT:  Sustained.

23  BY MS. GOLDBARG:

24  Q    Do you know whether or not the software that you

25  installed helped find Jorge Cifuentes?

RODRIGUEZ/DIRECT/GOLDBARG

```
 1              MR. BALAREZO:  Objection.

 2              THE COURT:  Sustained.

 3  BY MS. GOLDBARG:

 4  Q    You said Jorge Cifuentes was captured, correct?

 5  A    Correct.

 6  Q    Were you promised anything as a result of helping locate

 7  Mr. Cifuentes?

 8  A    They promised me that my name would be submitted to the

 9  State Department to try to collect a reward that they had for

10  Jorge Cifuentes' capture.

11  Q    How much is that reward for?

12  A    It could be anything between zero and $5 million.

13  Q    Have you received that reward?

14  A    No.

15  Q    Now, drawing your attention to February of 2012.  Did the

16  Government ask you to do anything around that time?

17  A    Yes.

18  Q    What did they ask you to do?

19  A    They asked me to travel to Mexico, and to analyze

20  FlexiSPY reports in real time, to identify the phone that

21  Chapo might be using.

22  Q    Why were you asked to go to Mexico to do this?

23  A    Because at the time, an operation for Chapo's capture was

24  being conducted.

25  Q    What did you do?
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

```
 1   A    I traveled to Mexico, and I looked at all the
 2   communications reports, and informing the FBI about everything
 3   I found.
 4   Q    Were agents with you at all times when you were analyzing
 5   the FlexiSPY data?
 6   A    Yes.
 7   Q    Okay.  What was the screen name that the defendant was
 8   using at this time?
 9   A    J, jota.
10   Q    And where was the defendant located at this time that you
11   were analyzing the FlexiSPY data?
12               MR. BALAREZO:  Objection.
13               THE COURT:  Overruled.
14   A    In Los Cabos.
15   BY MS. GOLDBARG:
16   Q    When you would see the defendant, would he carry his own
17   phones with him?
18   A    No.
19   Q    Who would carry them for him?
20   A    He had a communications secretary.
21   Q    How do you know this?
22   A    Because I explained to the secretary how to place and how
23   to receive calls, and when I would call Chapo, he would put
24   him on the phone.
25   Q    Do you remember the name of any of his secretaries?
```

RODRIGUEZ/DIRECT/GOLDBARG

```
 1   A     No.

 2   Q     Now, after you relocated to the United States and as you

 3   continued to help the United States Government, did this have

 4   an impact on your mental health?

 5   A     Yes, I had a nervous breakdown.

 6   Q     Approximately when was this?

 7   A     In 2013.

 8   Q     What happened?

 9   A     I had two much stress on me.  I had the nervous breakdown

10   and I went to the hospital to get some help.

11   Q     How many times were you hospitalized for this?

12   A     Twice.

13   Q     And what type of treatment did you receive while you were

14   in the hospital?

15   A     I received electroconvulsive therapy.

16   Q     What is that?

17   A     It's a therapy in which electricity is placed on your

18   body to control the nervous breakdown.

19   Q     Did this treatment have any impact on your memory?

20   A     Yes, but only for like the day before and the day after I

21   received treatment.

22   Q     Did the treatment impact your longterm memory?

23   A     No.

24   Q     Did the treatment that you received impact your memory,

25   your memory of working for the defendant and all the activity
```

RODRIGUEZ/DIRECT/GOLDBARG

 1    you did for him?

 2    A    No.

 3    Q    And after you were released from the hospital, did you

 4    continue to receive treatment?

 5    A    Yes.

 6    Q    What kind of treatment?

 7    A    I take medicine -- medication every day for my health

 8    problems, and I also receive therapy.

 9    Q    Do either of those impact your ability to remember the

10    events that you testified about today?

11    A    No.

12    Q    Now, you testified that you provided several -- that you

13    sent several emails with items in it to the FBI?

14    A    Correct.

15    Q    I'm showing you what's in evidence as Government Exhibit

16    601-H.  Is there something on the CD that you recognize?

17    (Exhibit published.)

18    A    Yes.

19    Q    What is that?

20    A    It's the content of the emails that I sent the FBI.

21    Q    How do you know that?

22    A    Because I reviewed the contents of the CD, and I also

23    signed.

24           MS. GOLDBARG:  I've got a few more.

25

RODRIGUEZ/DIRECT/GOLDBARG

1    BY MS. GOLDBARG:

2    Q    Showing you what has been marked as --

3             MS. GOLDBARG:  Actually, for the witness only,

4    602-G.  (Exhibit published to the witness.)

5    BY MS. GOLDBARG:

6    Q    You also said that you sent FlexiSPY data to the FBI?

7    A    That's correct.

8    Q    Do you recognize this CD?

9    A    Yes.

10   Q    How do you recognize it?

11   A    Because I remember having reviewed it and I signed it, as

12   well.

13   Q    What's on the CD?

14   A    This is the information that I would download in the

15   FlexiSPY reports and I would send them via email.

16           MS. GOLDBARG:  At this time, the Government moves to

17   admit 602-G.

18           MR. BALAREZO:  No objection.

19           THE COURT:  Received.

20           (Government Exhibit 602-G was received in evidence.)

21           (Publishes exhibit to the jury.)

22   BY MS. GOLDBARG:

23   Q    I'd like you to show you what's been marked for

24   identification as 601-H-1E1.  (Exhibit published to the

25   witness.)

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

1              Now, you testified that the FlexiSPY software had

2    the ability to track or GPS tracking.  Do you recall that?

3    A    Correct.

4    Q    What are we looking at here in Government Exhibit 601-H-

5    1E1?

6    A    It -- they are examples of the tracking of the GPS

7    locations with a map.

8    Q    And were you able to download the maps that you could get

9    from FlexiSPY from these files?

10   A    Yes.  That's correct.

11   Q    First one I'm going to show you is from the title "Charly

12   16-GPS3.PNG."  (Exhibit published to the witness.)

13              I'll show them all for you for identification and

14   then hopefully, we can publish.

15              Showing you 816-1, 816-2, 816-3, and 816-4.  Do you

16   recognize these documents?  (Exhibits published to the

17   witness.)

18   A    Yes.

19   Q    What are these?

20   A    Those are the GPS data that were downloaded from the next

21   spy account.

22   Q    Are these fair and accurate depictions of what you

23   downloaded from the FlexiSPY account?

24   A    Yes.

25              MS. GOLDBARG:  At this time, the Government moves to

RODRIGUEZ/DIRECT/GOLDBARG

 1    admit Government Exhibit 816-1 through 4 and 601H-1E.1.

 2              MR. BALAREZO:  Objection.

 3              THE COURT:  Do you have an objection?

 4              MR. BALAREZO:  Yes.  It could be hearsay as to this

 5    witness.

 6              MS. GOLDBARG:  May we approach, Your Honor?

 7              THE COURT:  Yes.

 8              (Sidebar.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR

```
 1              (Sidebar.)

 2              THE COURT:  What's the out-of-court statement?

 3              MR. BALAREZO:  The information contained in the

 4  maps.

 5              THE COURT:  What does it say?

 6              MR. BALAREZO:  Well --

 7              THE COURT:  It says where people are.  That is the

 8  out-of-court statement?

 9              MR. BALAREZO:  Right.  Basically.

10              THE COURT:  And it's being offered to show that

11  these people were at those locations?

12              MR. BALAREZO:  Correct.

13              MS. GOLDBARG:  No, Your Honor.  These are reports

14  from the GPS and it just shows the data that was available

15  from the FlexiSPY system that he was providing access to the

16  FBI.  We're not identifying who the people, just that this is

17  one of --

18              THE COURT:  Oh.

19              MS. GOLDBARG:  -- capabilities of the --

20              MR. BALAREZO:  But it still contains hearsay

21  information, which would be in evidence if the Court admits

22  it.  The proper way would have been to have it certified and

23  brought in like all the other documents.

24              THE COURT:  No, no.  Wait a minute.  If they're not

25  tying it to individual people being in individual places, that
```

SIDEBAR

```
 1    it's not being offered for the truth, just being offered to
 2    show how the system worked.
 3              MR. BALAREZO:  Well, they are tying it to one
 4    particular person, I think Charly16, whoever that was.  That
 5    is what the Government was focusing on when they discussed it.
 6    Look at the data from Charly16.  There was a pen pointing at
 7    Charly16, and then the next step was bringing in these
 8    particular maps.  So they are tying it to a particular person.
 9              THE COURT:  Well, you're saying it can be tied.
10              MR. BALAREZO:  Well, the Government is.
11              MS. GOLDBARG:  We're not trying it to a specific
12    individual.  We're tying this is the information he provided
13    to the FBI and the type of data that's included.
14              THE COURT:  Right.  I think it's illustrative of the
15    data.  I don't think it's being offered for the purpose of
16    showing where these people were, even if, in fact, one could
17    add things up and say, oh, well, this shows where the people
18    were.  The Government is not going to elicit that argument, is
19    not going to argument that information.
20              MS. GOLDBARG:  No, we're not going to argue that.
21    There are maps from different cities.
22              THE COURT:  Right.
23              MS. GOLDBARG:  But no.
24              MR. BALAREZO:  Was one of them Cabo? Sorry, I didn't
25    --
```

SIDEBAR

```
1              MS. GOLDBARG:  No.

2              THE COURT:  Okay.  I overrule the objection.

3              MS. GOLDBARG:  Thank you.

4              MR. BALAREZO:  Thank you.

5              (Sidebar ends.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

RODRIGUEZ/DIRECT/GOLDBARG

 1              (In open court.)

 2              MS. GOLDBARG:  Your Honor, the Government moves

 3   816-1 through 4 and 601-H-1E1 into evidence.

 4              THE COURT:  All right.  Those are received over

 5   objection.

 6              MS. GOLDBARG:  I would like to publish the first

 7   one, 816-1.  (Exhibit published to the jury.)

 8   BY MS. GOLDBARG:

 9   Q    What are we looking at here?

10   A    They are latitude and longitude points that are GPS

11   coordinates that were downloaded from FlexiSPY.

12   Q    What city does it say on the map?

13   A    Mexico City.

14   Q    And this is the type of information that you could get

15   from the FlexiSPY?

16   A    That's correct.

17   Q    Showing you what's in evidence has 816-2.  What are we

18   looking at here?  (Exhibit published to the jury.)

19   A    Same thing.  They are GPS coordinates for latitude and

20   longitude.  In this case, it's the city of Culiacán.

21   Q    Same thing with 816-3. (Exhibit published to the jury.)

22   A    Correct.

23   Q    What are we looking at here?

24   A    These are different GPS coordinates near the airport in

25   Culiacán.

RODRIGUEZ/DIRECT/GOLDBARG

1   Q     And 816-4, what are we looking at here?  (Exhibit

2   published to the jury.)

3   A     GPS coordinates in the city of Phoenix.

4   Q     Showing you what's now in evidence as 601H-1E1.  What are

5   we looking at here?

6   A     These are -- this is a summary of the BIOS as an example

7   of what I sent of map images and the GPS.

8   Q     What do we see on the left-hand side of this chart?

9   A     It's the user names that were on FlexiSPY.

10  Q     And are these the FlexiSPYs that were installed on

11  devices per the defendant's instructions?

12  A     That's correct.

13  Q     In addition to downloading the calls from the server,

14  what other type of data could you get?

15  A     The call logs.

16  Q     What is a call log?

17  A     Call log indicates the date, the time and the duration

18  and the phone number that is being called.

19  Q     Now, you testified earlier that on some of the calls in

20  the beginning that you listened to where you recognized the

21  defendant's voice, you modified the name of the file.  Do you

22  recall that?

23  A     Correct.

24  Q     And again, showing you what is in evidence as 601-H,

25  these are the emails that you sent, some of the emails that

LISA SCHMID, CCR, RMR

1    you sent to the FBI, correct?

2    A    Correct.

3    Q    And in Government Exhibit 601H-1B, did you send actual

4    audio files to the FBI in that email?

5    A    I believe I did.

6    Q    All right.  Would showing you something refresh your

7    recollection?

8    A    Yes.

9         MS. GOLDBARG:  For the witness only.  (Exhibit

10   published to the witness.)

11   BY MS. GOLDBARG:

12   Q    Does this refresh your recollection whether or not you

13   attached files to that email?

14   A    Yes.

15   Q    What are we seeing in this exhibit?

16        MR. BALAREZO:  Objection.  His memory has been

17   refreshed.  He shouldn't be reading from the document.

18        THE COURT:  Well, I think she's laying a foundation

19   to admit it.

20        MS. GOLDBARG:  Yes.

21        THE COURT:  Is that right?

22        MS. GOLDBARG:  Yes, Your Honor.

23        THE COURT:  You can describe generally what it is

24   without giving us the specifics.  Translate that for me.

25        THE WITNESS:  There were different calls, and three

 1   of them, I placed ---C--- to identify El Chapo.  I also

 2   included an Excel file where the call log is.

 3             MS. GOLDBARG:  And just for the -- so the record is

 4   clear, these items are already in evidence, Your Honor.  It's

 5   just a screen shot.

 6             THE COURT:  I see.

 7             MS. GOLDBARG:  The Government would move to admit in

 8   601-H-1B1 into evidence.

 9             MR. BALAREZO:  No objection.

10             THE COURT:  Received.

11             MS. GOLDBARG:  If we could publish?

12      (Government's Exhibit 601H-1B1 was received in evidence.)

13             (Publishes exhibit to the jury.)

14   BY MS. GOLDBARG:

15   Q    Looking at the last three audio files on there, what are

16   we looking at?

17   A    They are calls that Chapo did and it says the time, the

18   day and the duration of when it was made.

19   Q    Could you tell us on the last three calls when would be

20   the day, the month and the year that the calls were made?

21   A    Yes.  It was May 4th, 2011.

22   Q    Was it in American date time or Latin American date time?

23   Do you recall?

24   A    I don't remember.

25   Q    And what do we see after 2011?

RODRIGUEZ/DIRECT/GOLDBARG

```
 1   A     We see the call log and the Excel file.

 2   Q     I'm drawing your attention to this part right here.

 3   (Indicating.)

 4             That data, after 2011, what does that indicate on

 5   the call?

 6   A     The time of the phone call.

 7   Q     Now, you said that there were call logs.

 8             MS. GOLDBARG:  For the witness only.  (Exhibit

 9   published to the witness only.)

10   BY MS. GOLDBARG:

11   Q     Showing you Government Exhibit 817.  Do you recognize

12   this document?

13   A     Yes.

14   Q     And showing you this document, does it help you refresh

15   your recollection whether or not the date was in Latin

16   American time or American date?

17   A     It was a U. S. format.

18   Q     If I go back to what's in evidence, 601H-1B1, what are

19   the dates of the calls that you marked -- indicated that

20   belonged to the defendant?

21   A     It's May 4th, 2011.

22   Q     Okay.  Now, showing you --

23             MS. GOLDBARG:  The Government would move to admit

24   government Exhibit 817.

25             MR. BALAREZO:  No objection.
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/DIRECT/GOLDBARG

```
 1                THE COURT:  Received.

 2                (Government Exhibit 817 was received in evidence.)

 3                (Publishes exhibit to the jury.)

 4    BY MS. GOLDBARG:

 5    Q    Focusing on line 310, what are we looking at here?

 6    A    The date and the time.  Then the destination phone

 7    number, the country, and the duration of the phone call.

 8    Q    Okay.  And now drawing your attention to line 309, are we

 9    seeing the same information there? (Exhibit published to the

10    jury.)

11    A    Yes.  It's the same thing as the date, the time, the

12    destination, the country and the duration.

13    Q    And again with line 305?

14    A    Correct.  The same thing.

15    Q    I'd like to -- what does this call log tell you, if we

16    compare it to the calls that you actually sent to the FBI?

17    A    The log shows the same information as the recordings.  So

18    the call log coincides with the audio, the audio information.

19    Q    Now showing what is in evidence as 601-I.  So that you

20    said there were calls attached to it.  Do you recognize the

21    CD?  (Exhibit published to the jury.)

22    A    Yes.

23    Q    And what is on the CD?

24    A    Audio files.

25    Q    Are these the audio files that you emailed to the FBI?
```

RODRIGUEZ/DIRECT/GOLDBARG

1    A    Correct.

2              (Continued on the next page.)

CHRISTIAN RODRIGUEZ – DIRECT – MS. GOLDBARG

```
 1    BY MS. GOLDBARG:

 2    Q    Where did you get these calls from?

 3    A    From the VOIP server.

 4    Q    Did you listen to all the calls on the CD?

 5    A    Yes.

 6    Q    You were asked to identify the voice of the speaker on

 7    those calls?

 8    A    Yes.

 9    Q    Showing you just for the witness only, Government's

10    Exhibit 601I1-11.  Do you recognize this document?

11    A    Yes.

12    Q    What is it?

13    A    Those are each one of the calls that I listened to and I

14    identified Chapo there and I marked them with his name.

15    Q    Were there speaker on these calls that you did not

16    recognize?

17    A    That's right.

18    Q    How did you mark them?

19    A    Unknown.

20    Q    Are there calls where you're intercepted on this?  Were

21    there recordings of you as well?

22    A    Yes.

23    Q    Does this fairly and accurately depict a summary of the

24    attributions of the calls that you listened to that correspond

25    to 601I?
```

CHRISTIAN RODRIGUEZ – DIRECT – MS. GOLDBARG

1   A    Yes.

2           MS. GOLDBARG:  At this time the Government would

3   move to admit 601I1-11.

4           MR. BALAREZO:  No objection, your Honor.

5           THE COURT:  Received.

6           How are you doing on time?

7           MS. GOLDBARG:  I'm getting there, maybe ten, 15

8   minutes.

9           THE COURT:  Okay.  Go ahead.

10  BY MS. GOLDBARG:

11  Q    We're going to play a clip from 601I-2C.  These have the

12  sanctions on them so you be able to read along.

13          MR. BALAREZO:  What is the exhibit number?

14          MS. GOLDBARG:  601I-2C.

15          MR. BALAREZO:  Thank you.

16          (Audio played.)

17  Q    Do you recognize any voices on that call?

18  A    Yes.

19  Q    Who's voice?

20  A    Chapo's.

21  Q    On that transcript, how was the portion that was Chapo

22  speaking, how is that delineated?

23  A    With his initials, JGL.

24  Q    Going back to 601I, did you listen to every single call

25  on the CD?

CHRISTIAN RODRIGUEZ – DIRECT – MS. GOLDBARG

1   A    Yes.

2   Q    Now 601I-11, did you look at all the transcripts for

3   these calls as well?

4   A    Yes.

5   Q    Did you compare the transcription to the voices that you

6   were hearing?

7   A    Yes.

8   Q    On all those occasions, how is the defendant identified

9   in the transcript?

10  A    As JGL.

11  Q    I'd like to now play a clip from GX601I-5 and this has

12  sanctions.  I'll go through the transcript.  I'll put the

13  transcript on the Elmo.

14           (Audio played.)

15           Do you recognize the voices in that call?

16  A    Yes.

17  Q    Who is speaking?

18  A    El Gordo and myself.

19  Q    If you look at the screen in front of you, what initials

20  are used for where you're speaking?

21  A    CR.

22  Q    How is Gordo identified, with what initials, on this

23  call?

24  A    AD.

25  Q    If I can switch back to the Elmo.  I'm publishing to the

CHRISTIAN RODRIGUEZ – DIRECT – MS. GOLDBARG

 1   jury what is in evidence as Government's Exhibit 601I-5T.

 2   Starting with page four and where you're speaking in paragraph

 3   31, you say, Try to talk to the friend over-the-phone so you

 4   can tell him what we talked about.

 5           When you say talk to the friend, who are you

 6   referring to?

 7   A    To Chapo.

 8   Q    What are you telling Gordo in this call?

 9   A    I'm telling him to speak to Chapo to tell him about the

10   project that we were proposing.

11   Q    Going to page five of the same exhibit, paragraph 34, you

12   talk about Blackberries, in 36 what does Adrian or Gordo

13   respond to you?

14   A    He says, Very well, cool, let me call him up now to see

15   what it says.  I'll let you know.

16   Q    What do you understand that to mean?

17   A    That he was going to call Chapo Guzman.

18   Q    That who was going to call?

19   A    That El Gordo was going to call Chapo.

20   Q    I'm going to play a clip of what is in evidence as

21   601I-7A, we're going to play two short clips from this.

22           (Audio played.)

23           Now I'm going to publish from the transcript, also

24   in evidence, Government's Exhibit 601I-7AT.  I'm showing you

25   page three.  I'm drawing your attention to paragraph ten,

CHRISTIAN RODRIGUEZ – DIRECT – MS. GOLDBARG

1   where the defendant says, That they are encrypted for the

2   voice not for, if this telephone ends up in the Government's

3   hands, well, since they have a chip, they are Tel-Cel.

4          Do you understand what the defendant is talking

5   about here?

6   A    Yes.

7   Q    What is he talking about?

8   A    He is saying that the phone system is encrypted, no one

9   is able to hear the voice.

10  Q    What system is he talking about?

11  A    My system, the one I had installed, the VOIP system.

12  Q    Keep going.

13  A    He also mentions that the extension from the Nokia have

14  chips, like Tel-Cel, so since they have chips they could be

15  located.

16  Q    Is the defendant correct in his description of your

17  system?

18  A    Yes.

19  Q    If we could play the second clip.

20         (Audio played.)

21         I'd like to go back to the same exhibit, page four,

22  paragraph 24.  When the defendant says, it's just that I only

23  use the extensions for my family and the technician and with

24  certain people.  Do you understand what the defendant is

25  talking about there?

CHRISTIAN RODRIGUEZ – DIRECT – MS. GOLDBARG

1   A    Yes.  He's saying there that the extension system he

2   basically gives only to those close to him.

3   Q    Had you heard this before from the defendant?

4   A    Yes.

5   Q    When was that?

6   A    When we moved the server to Canada, when he gave us

7   instructions that we could not add any phones to the system

8   without his previous authorization.

9           MS. GOLDBARG:  May I have a moment, your Honor?

10          THE COURT:  Yes.

11          MS. GOLDBARG:  The Government has no further

12  questions, your Honor.

13          THE COURT:  Let's take our morning break, ladies and

14  gentlemen.  We'll reconvene at 11:25.  Please don't talk about

15  the case.

16          (Jury exits.)

17          THE COURT:  Ms. Parlovecchio, you were saying before

18  we started that you needed a ruling on the Motion in Limine

19  before the next witness?

20          MS. PARLOVECCHIO:  Yes, your Honor.

21          THE COURT:  I hope to have that for you before

22  lunch.

23          (Brief recess.)

24          THE COURT:  Let's have the jury please.

25          (Jury enters.)

CHRISTIAN RODRIGUEZ - CROSS - MR. BALAREZO

```
 1              THE COURT:  Everyone be seated.  Cross-examination,
 2   Mr. Balarezo.
 3              MR. BALAREZO:  Thank you, your Honor.
 4   CROSS-EXAMINATION
 5   BY MR. BALAREZO:
 6   Q    Good morning, Mr. Rodriguez, how are you?
 7   A    Fine.
 8   Q    I want to ask you a few questions about this whole server
 9   thing.  To be honest, I don't understand.  It's not a trick
10   question, I just want to understand, is that all right?
11   A    Okay.
12              MR. BALAREZO:  Your Honor, if I could -- I'm showing
13   the witness the copy of Government's Exhibit 513-1, which I
14   have marked as Defendant's exhibit 426A.  Your Honor, this
15   will at this point demonstrative, if that's okay?
16              THE COURT:  Sure.  But the original is already in
17   evidence, right?
18              MR. BALAREZO:  It is, but I'm going to write over
19   this one.
20              THE COURT:  I see.
21              MR. BALAREZO:  I didn't want to deface the
22   Government's exhibit.
23   BY MR. BALAREZO:
24   Q    What I understand from you is that you were tasked with
25   the secure communication servers, right?
```

CHRISTIAN RODRIGUEZ – CROSS – MR. BALAREZO

 1    A    Correct.

 2    Q    And this exhibit, which is 426A, which system does this

 3    exhibit particularly depict?

 4    A    This is a diagram of how the server was installed and the

 5    communication system.

 6    Q    Is this the server for e-mails, voicemails, phone calls?

 7    A    For phone calls.

 8    Q    Only phone calls?

 9    A    That's correct.

10    Q    So if I understood correctly, in the upper left-hand side

11    where it says PBXSRTP, right, you see that?

12    A    Yes.

13    Q    That represents what?

14    A    It represents the main server where the phone calls are,

15    where phone calls are produced.

16    Q    Is it accurate that I wrote in with a circle, main

17    server?

18    A    Correct.

19    Q    Is the main server the server through which all the

20    telephone calls in this network passed?

21    A    Correct.

22    Q    So is it accurate to say that this main server, the

23    reason it was set up, was so that it would be a private

24    server?

25    A    Correct.

CHRISTIAN RODRIGUEZ – CROSS – MR. BALAREZO

```
 1   Q    And private server meaning -- let me I'll write the word
 2   private, is that accurate?
 3   A    Correct.
 4   Q    And private meaning that you set it up so that it could
 5   not be intercepted, for example, through wiretaps or something
 6   like that, correct?
 7   A    Correct.
 8   Q    And these little images on the right side, which some
 9   seem to be sort of the smart phones and these other little
10   ones with locks these are the telephones or at least the
11   extensions that communicate through the main private server;
12   is that correct?
13   A    Correct.
14   Q    So that means that if two people were using, for example,
15   phone one and phone two, let's put in a three, if phone one
16   was calling phone two, those calls would go through this main
17   private server, correct?
18   A    Correct.
19   Q    And those would be the calls that would be very hard or
20   impossible to intercept through a wiretap or any other
21   intervention of that nature?
22   A    Correct.
23   Q    So being the techy that you are, you also know what an IP
24   address is you've discussed that, correct?
25   A    Correct.
```

CHRISTIAN RODRIGUEZ – CROSS – MR. BALAREZO

1    Q    An IP address is just a series of numbers that allows a
2    particular device to be identified on the Internet, correct?
3    A    Correct.
4    Q    And an IP address, of course, it's like a fingerprint,
5    each device has a specific IP address; is that correct?
6    A    That's correct.  But, however, in some cases several
7    devices can share one IP address.
8    Q    Right.  But in this particular case, the way you set this
9    up, this main private server had a specific IP address
10   assigned to it; is that right?
11   A    Correct.
12   Q    Do you recall, you seem to have a pretty good memory
13   about things, do you recall what the IP address was for that
14   private server?
15   A    No, it's a very long number.
16   Q    Does the number 83.149.125.226 ring a bell?
17   A    No, I don't remember the IP address.
18   Q    I'm going to write here, own IP address, that's
19   consistent with your testimony, correct?
20   A    Correct.
21   Q    Talking about this network again, which is the private
22   network, those communications could only be held amongst these
23   devices that were on that network, right?
24   A    Correct.
25   Q    These particular devices could not call out through this

RIVKA TEICH, RMR, FCRR

CHRISTIAN RODRIGUEZ – CROSS – MR. BALAREZO

 1   server to an outside line that was not part of the network; is

 2   that right?

 3   A    They could do it through this server here, they could

 4   call any normal phone.

 5   Q    I understand that.  You didn't hear my question

 6   correctly.

 7          My question was, those phones one, two, three, and

 8   all the ones in the upper-right portion, those phone numbers

 9   could not call outside using that one private server, correct?

10   A    Yes, they could do it.

11   Q    What you're saying then is that these phones would have

12   to go through this main private server and go through this

13   trunk server; is that right?

14   A    Correct.

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

RODRIGUEZ/CROSS/BALAREZO

```
1    BY MR. BALAREZO: (Continued.)

2    Q    And this trunk server, was that a -- how would you

3    describe that?  Is that a secure private server like the PBX?

4    A    Yes.

5    Q    But that's the one that would allow calls coming in to

6    the network or calls going out to the network, right?

7    A    Correct.

8              MR. BALAREZO:  If I could just have one second, Your

9    Honor.

10             (Pause.)

11   BY MR. BALAREZO:

12   Q    And so we're clear, this device that is listed or named

13   trunk server or SIP vendor, that was a separate server from

14   the PBX server, correct?

15   A    Correct.

16   Q    And that trunk server also had a specific IP address

17   attached to it; is that correct?

18   A    Correct.

19   Q    So I'm going to write "own IP address"; is that accurate?

20   A    Correct.

21   Q    So then it's accurate to say that the IP address of the

22   PBX server was not the same as the PBX -- excuse me -- the IP

23   address of the trunk server, right?

24   A    Correct.

25   Q    And as I asked you for the PBX server, do you recall what
```

Denise Parisi, RPR, CRR

RODRIGUEZ/CROSS/BALAREZO

```
1    the IP address was for the trunk server?
2    A    No.  It's a very long number.  I wouldn't be able to
3    remember it.
4    Q    Does the number 95.211.10.70 ring a bell?
5    A    I don't remember.
6    Q    Let me show you -- just for the witness -- Defense
7    Exhibit 427.  I'm going to show you page 2 of this document,
8    and I'm going to ask you -- you understand English enough to
9    read, correct?
10   A    Correct.
11   Q    Okay.  I'm going to just -- just take your time --
12            MS. GOLDBARG:  What's the document number on this?
13            MR. BALAREZO:  What's the COR number?
14            I'm sorry.
15            Oh, well, what is it?
16            FK-1A, page 393.
17   BY MR. BALAREZO:
18   Q    I'm just going to ask you to focus for right now, just
19   read everything that's under here until this paragraph
20   (indicating), so I'll -- so the part that I have circled.  Let
21   me know when you're done.
22            (Pause.)
23   A    Okay.
24   Q    Are you ready?  You read it to yourself?
25   A    Yes.
```

Denise Parisi, RPR, CRR

RODRIGUEZ/CROSS/BALAREZO

1   Q    And you were able to understand?  It's in English,

2   correct?

3   A    Correct.

4   Q    And does reading that document refresh your recollection

5   as to what the IP addresses were for the -- let's go back for

6   a second -- to the main server and to the trunk server?

7   A    Yes.  However, as I said before, it's a number that is

8   too long to memorize.

9            MR. BALAREZO:  For the witness only.

10  BY MR. BALAREZO:

11  Q    I understand it's a long number, but you said the

12  document has refreshed your recollection.

13           What would be the IP address for the main private

14  server?

15           MS. GOLDBARG:  Objection, Your Honor.

16           THE COURT:  Sustained.

17  BY MR. BALAREZO:

18  Q    You read the document, correct?

19  A    Correct.

20  Q    And the information that you read pertains to the private

21  server and to the trunk server; is that correct?

22  A    Correct.

23  Q    And do you have any doubt to believe -- or any reason to

24  believe that the servers that are being discussed in that

25  document -- the private server and the trunk server -- are not

RODRIGUEZ/CROSS/BALAREZO

```
 1    the same ones that you claim you set up for Mr. Guzman?
 2              MS. GOLDBARG:  Objection.
 3              THE COURT:  I'll allow that.
 4    BY MR. BALAREZO:
 5    Q    Yes or no.
 6    A    Well, I don't remember the IP addresses, and there's
 7    several IP addresses, there were several of them, many of
 8    them, and we could change them around.
 9    Q    Did you ever change the IP addresses for the PBX server?
10    A    I don't remember.
11    Q    Did you ever change the IP address for the trunk server?
12    A    I don't remember.
13    Q    So within this system that you created, if -- let's say
14    if I was around back then and I decided I want to call phone
15    number 1 from my little iPhone -- you follow me?
16    A    Yes.
17    Q    So here, I'll put this here, my initials right over it.
18    If I were to call from that number -- excuse me -- that
19    telephone, which is listed or labeled EB and I was able to go
20    through your trunk server through the main server and all this
21    other doodads and reach phone number 1, let's say, my device,
22    the EB phone, has its own IP address; is that correct?
23    A    No.  In this part here, the phones don't have an IP
24    address because they are regular phones.  They are not
25    Internet phones.
```

RODRIGUEZ/CROSS/BALAREZO

```
1   Q     So you're saying, like, a regular phone, you mean, like,
2   an iPhone or just off the store shelf; is that right?
3   A     Correct.
4   Q     So you're saying those phones do not have a separate IP
5   address for each of those devices.  You're sure about that.
6   A     Any phone that's, let's say, an iPhone has its own phone
7   number with its area code --
8   Q     I'm not asking you a trick question.  I'm not asking you
9   for the telephone number or --
10             MS. GOLDBARG:  Your Honor, if can be allowed to
11  explain.
12             THE COURT:  Let me cut through this.
13             Pretend I'm holding my iPhone.  Does it have an IP
14  address?
15             THE WITNESS:  Yes.
16             THE COURT:  Okay.  Go ahead.
17             MR. BALAREZO:  Thank you, Your Honor.  I'll take a
18  note of that question.
19  BY MR. BALAREZO:
20  Q     So these phones, as you just told the Judge, have their
21  own individual IP addresses, right?
22  A     Correct.
23  Q     Okay.  So I will -- my notation, which says "own IP
24  address" over -- is that accurate or consistent with your
25  testimony?
```

RODRIGUEZ/CROSS/BALAREZO

```
 1   A    Yes, but to call those phones, the IP address was not
 2   used.  We would -- you would use only the phone number because
 3   those phones -- on a phone line -- because those phones were
 4   not on the Internet.
 5   Q    Which phones are you talking about?  These phones or
 6   these phones (indicating)?
 7   A    These phones down here have their own phone number
 8   (indicating), so to call them, you use that phone number.
 9   These phones up here (indicating), they have an IP address, so
10   to make a call from one to the other, you would use the IP
11   address.  The phones down here to call them, you would only
12   use the phone number.
13   Q    All right.  Maybe I didn't make myself clear.
14        I was saying the EB phone, which is down here, is
15   making a call to one of these phones (indicating).  That's
16   different from the scenario you must mentioned, right?
17             MS. GOLDBARG:  Objection.  Asked and answered.
18             THE COURT:  I will allow him to answer.
19   A    Correct.
20   Q    So if the EB phone, which has its own IP address, was
21   calling in through your trunk server to phone number 1, for
22   example, would there be a record somewhere of the telephone
23   number of the EB phone?
24   A    Correct.
25   Q    And if it was just a regular phone call, would there be a
```

RODRIGUEZ/CROSS/BALAREZO

1    record -- should there be a record of the IP address of the EB

2    phone calling into phones 1, 2, or 3?

3    A    No, because the phone line was used to make the call, not

4    the Internet.

5    Q    If the EB phone used the Internet -- voice over IP, for

6    example -- to call into phones 1, 2, or 3, it would be using

7    the Internet, there would be a record of the IP address,

8    correct?

9    A    In that case, the EB phone would be part of the internal

10   phones because in that case, it would be an internal phone

11   with that IP address.

12   Q    Maybe, again, I didn't ask the right question.  I will

13   ask again.

14        If the EB phone was on a separate network, let's

15   call it, a third network, and, for example, it ended in just a

16   made-up IP address that ends in 103 and there happens to be a

17   record of that call made by EB phone with the IP address that

18   ends in 103, how would that call have been made?

19   A    It would not be possible because only the internal phones

20   could make calls to phones 1, 2, or 3.  An external phone

21   could not make a call.

22   Q    An external phone could not make a call?  I thought

23   that's what the EB phone was.

24   A    Yes, but the EB phone could not make a call through the

25   Internet -- via the Internet to phones 1, 2, or 3, precisely,

RODRIGUEZ/CROSS/BALAREZO

1    because it is a private server with assigned extensions, so if

2    you wanted to make a call through the Internet, you would have

3    to configure the EB phone as part of the server.

4    Q    Is there any reason why a call coming from -- from a call

5    made into the system would have an IP address that is

6    different from the main server or the trunk server?

7    A    Yes, it is possible.

8    Q    Thank you.

9             Now, just to clarify, and I will --

10            MR. BALAREZO:  Your Honor, I will actually put up

11   426-B, which is the exact same document -- and actually, Your

12   Honor, if I could move into evidence 426-A?

13            THE COURT:  Any objection?

14            MS. GOLDBARG:  Is it a demonstrative only, Your

15   Honor?

16            MR. BALAREZO:  Not at this point.

17            THE COURT:  It doesn't really have any purpose other

18   than demonstrating.

19            Is there any other purpose?

20            MS. GOLDBARG:  I would object, Your Honor.

21            MR. BALAREZO:  I guess there isn't, Your Honor.

22   Thank you.

23            If I could show the witness 426-B as demonstrative.

24   BY MR. BALAREZO:

25   Q    Now, sir, I'm just going to --

RODRIGUEZ/CROSS/BALAREZO

```
1              THE COURT:  Do you want this shown to the jury?
2              MR. BALAREZO:   Yes, please.
3              (The above-referred to exhibit was published.)
4   BY MR. BALAREZO:
5   Q    Do you see it, sir?
6   A    Yes, sir.
7   Q    I'm just going to trace it with my finger at this point.
8   This top portion, this part of the network (indicating), is
9   that what you've told the jury you have set up for the Sinaloa
10  Cartel?
11  A    Correct.
12  Q    So I will go ahead and circle that part.
13             Is that accurate to your testimony?
14  A    Correct.
15  Q    And what that means is basically that whoever the members
16  of this Sinaloa Cartel were were communicating within that
17  network, right?
18             MS. GOLDBARG:  Objection, Your Honor.
19             THE COURT:   You can ask the question.
20             MS. GOLDBARG:  Your Honor, there was an objection.
21             THE COURT:  Yes.  What I said was, he can ask the
22  question.
23             MS. GOLDBARG:  Okay.
24             MR. BALAREZO:  I did ask the question.
25             THE COURT:  You did.  Ask it again, please.  Let's.
```

Denise Parisi, RPR, CRR

RODRIGUEZ/CROSS/BALAREZO

```
 1              MR. BALAREZO:  Let's see if I can recall.

 2              Actually, can you refresh my recollection?

 3              THE COURT:  What he's asking is:  What that means is

 4   basically that whoever the members of the Sinaloa Cartel were

 5   communicating within that network, right?

 6              You've got to rephrase that question.

 7   BY MR. BALAREZO:

 8   Q    According to you, you set that network up for the Sinaloa

 9   Cartel members so that Sinaloa Cartel members could

10   communicate privately in that little bubble up there, right?

11              MS. GOLDBARG:  Objection.  Mischaracterizes the

12   testimony.

13              THE COURT:  The witness can answer.  If it's wrong,

14   the witness will tell us.

15   A    I installed this system for Chapo.  I don't know who else

16   used it.

17   Q    One of the first questions you were asked on direct

18   examination was, before you were -- you went to the FBI, what

19   did you do for a living or how did you work.

20              Do you remember that question?

21   A    Yes.

22   Q    And immediately you said I worked for Chapo Guzman,

23   right?

24   A    Correct.

25   Q    And the Cartel de Sinaloa.  That's what you said, right?
```

RODRIGUEZ/CROSS/BALAREZO

```
 1   A     Correct.

 2   Q     Now you're, what, 32 years old right now?

 3   A     Yes.

 4   Q     And you said that you met this Joaquin Guzman Chapo

 5   fellow in, what, 2008?

 6   A     Correct.

 7   Q     So you were about 20, 21 years old when you first went up

 8   to a mountain top and saw the big guy, right?

 9   A     Correct.

10   Q     Was there a burning bush on the side of the road, too?

11              MS. GOLDBARG:  Objection.

12              THE COURT:  Sustained.

13              Mr. Balarezo, don't do that.

14   BY MR. BALAREZO:

15   Q     You have been working with computers most of your life,

16   right?

17   A     Correct.

18   Q     You are very technologically savvy, correct?

19   A     Yes.

20   Q     You know how to use computers for good; you know how to

21   use computers for bad, correct?

22              MS. GOLDBARG:  Objection.

23              THE COURT:  Overruled.

24   A     Correct.

25   Q     And for whatever reason, you've chosen to use your very
```

Denise Parisi, RPR, CRR

RODRIGUEZ/CROSS/BALAREZO

1  good computer skills mainly for bad, right?

2  A    Correct.

3  Q    I mean, from 2008 when you were about 20, 21 years old,

4  you got hooked up with the Cifuentes family, right?

5  A    Correct.

6  Q    And at that time, you weren't poor; you weren't begging;

7  you weren't selling oranges; any of that nonsense, right?  You

8  came from a nice family.

9  A    Correct.

10  Q    Family could afford computers for you?

11  A    Correct.

12  Q    And, in fact, one of the -- once you became, sort of,

13  knowledgeable about computers, one of the things you did was

14  break into the U.S. energy system, the grid, right, for fun?

15  A    No, no.  That is not true.

16  Q    And, of course, you don't remember telling the Government

17  that, do you?

18  A    I did not do it.

19  Q    My question was, you don't remember telling the

20  Government that you did.

21         MS. GOLDBARG:  Objection, Your Honor.

22         THE COURT:  Overruled.

23  A    No.

24  Q    Now --

25         MR. BALAREZO:  If I can just have one second, Your

RODRIGUEZ/CROSS/BALAREZO

```
 1    Honor.
 2                (Pause.)
 3                MR. BALAREZO:  I would like to show the witness what
 4    I have marked as Defense Exhibit 449, which is COR-5, first
 5    page.
 6    BY MR. BALAREZO:
 7    Q    I'm just going to ask you again to just read this first
 8    paragraph.
 9                (Pause.)
10    A    Should I read it?
11    Q    Read it to yourself and let me know when you're done,
12    please.
13    A    Correct, yes.
14    Q    Now, do you recall, after reading this document, has your
15    recollection been refreshed that on June 15th of 2009, you
16    told the agents who were interviewing you that you hacked into
17    energy systems of the United States simply for pleasure?
18    A    I don't recall having said that.
19    Q    And of course you don't recall having hacked, right?
20    A    Correct.
21    Q    Now, you know -- because of your deep knowledge of
22    computers, you know that a lot of things can be manipulated
23    with computers; is that right?
24    A    Correct.
25    Q    You can manipulate sounds?
```

RODRIGUEZ/CROSS/BALAREZO

1    A     Correct.

2    Q     You can manipulate telephone calls, for example; you can

3    edit them, right?

4    A     Correct.

5    Q     You can manipulate text messages, for example?

6    A     Correct.

7    Q     You can manipulate video sometimes?

8    A     Correct.

9    Q     And even you can -- I am getting ahead of myself, but

10   Government Exhibit 601H-1B.1, which is in evidence, this was a

11   log on your computer of whatever files these were, correct?

12   A     Correct.

13   Q     And, of course, you had absolutely no problems

14   manipulating the names, right?  You changed the name; you

15   added something to it.

16   A     Correct.

17   Q     And similarly, Government Exhibit 817-B, this is some

18   material that, I believe, you turned over to the Government;

19   is that right?

20   A     Correct.

21   Q     And am I correct this looks like what's called an Excel

22   file; is that right?

23   A     Correct.

24   Q     And because of your familiarity with computers and

25   programs and stuff, you know that an Excel file can be easily

RODRIGUEZ/CROSS/BALAREZO

1   manipulated by just changing some figures, right?

2   A     Correct.

3   Q     You don't even have to go one line at a time.  You can

4   change one figure and the whole table changes, correct?

5   A     Correct.

6   Q     Now, yesterday, again, as I mentioned, when you were

7   asked what did you do prior to the -- prior to beginning your

8   work with the Government, with the DEA, you said you worked

9   for Joaquin Chapo Guzman, right?

10  A     Correct.

11  Q     That really wasn't truthful, because you actually worked

12  for the Cifuenteses prior to ever laying eyes on this guy,

13  right?

14  A     Well, I worked for both and they were partners.

15  Q     And do you see any of the Cifuenteses at this table?

16  A     No.

17  Q     That's a hard question, right?  Chapo Guzman is the only

18  one here, right?

19  A     Correct.

20  Q     And, of course, your job is to come here and testify

21  against Chapo Guzman; and everything that is said, it's Chapo

22  Guzman, right?

23              MS. GOLDBARG:  Objection.

24              THE COURT:  Was that an objection?

25              MS. GOLDBARG:   It was, Your Honor.

Denise Parisi, RPR, CRR

RODRIGUEZ/CROSS/BALAREZO

```
 1              THE COURT:  You have to speak up a little.  I'm

 2  having a hard time hearing you.

 3              MS. GOLDBARG:  Sorry, Your Honor.

 4              THE COURT:  Sustained.

 5  BY MR. BALAREZO:

 6  Q    Now, when you were working for -- excuse me -- for the

 7  Cifuenteses before -- strike that.

 8              You did work for the Cifuenteses family alone prior

 9  to when you claim you met Chapo Guzman, correct?

10  A    Correct.

11  Q    And while you were working with them, you were aware that

12  they were a very powerful drug trafficking company, family, in

13  your native Colombia, right?

14  A    Correct.

15  Q    You know that they had a lot of money.

16  A    Correct.

17  Q    You know that they had a lot of power.

18  A    Correct.

19  Q    And you had no compunction or no problems going to work

20  with them, correct?

21  A    Correct.

22  Q    And, in fact, what you were doing is you were helping

23  them run their drug trafficking organization; is that right?

24  A    Correct.

25  Q    So, in fact, you were a coconspirator of the Cifuenteses
```

RODRIGUEZ/CROSS/BALAREZO

1    in the operation of their drug trafficking organization,

2    right?

3    A     Correct.

4    Q     And you're a smart guy; you knew that what you were doing

5    was against the law, right?

6    A     Correct.

7    Q     Tell the jury, have you ever been charged with any --

8    with the Cifuenteses, for example, with conspiracy to commit

9    any narco-trafficking crimes?  Just have you been charged.

10   A     No.

11   Q     And because the Cifuentes people were very powerful drug

12   traffickers in Colombia, you -- well, I think you said at some

13   point you were afraid, right?

14          MS. GOLDBARG:  Objection, Your Honor.

15          THE COURT:  Overruled.  He can tell us.

16   BY MR. BALAREZO:

17   Q     Were you afraid of the Cifuenteses?

18   A     No.

19   Q     You told us about a little call that you heard Dolly

20   talking to -- I don't know -- some other family member saying

21   that you were a 100 percent cooperator.  Do you remember that?

22   A     Yes.

23   Q     And I think that's when you decided you wanted to migrate

24   to the United States.

25   A     Correct.

RODRIGUEZ/CROSS/BALAREZO

1   Q    And the reason you migrated to the United States was

2   because you were not scared or scared?

3   A    I was scared.

4   Q    You thought that they might kill you because they thought

5   that you were a snitch; you were cooperating, right?  Or in

6   Colombia, I think they call you a sapo, right?

7   A    Correct.

8   Q    Right.

9        And, in fact, there was one little anecdote that you

10  told the Government where you met with Dolly Cifuentes --

11  Dolly, the woman -- and she showed you pictures of your

12  family, remember that?  And as she was showing you the

13  pictures, she asked you --

14        THE COURT:  Do you want an answer to that question?

15        MR. BALAREZO:  It's the second part of the question,

16  Your Honor.

17        THE COURT:   Well, then it's going to be compound.

18  Get an answer to the first part.

19        MR. BALAREZO:  I'll withdraw the question.

20  BY MR. BALAREZO:

21  Q    Did Dolly ever ask you if you were out or if you were in?

22  A    I don't remember her having asked me that.

23  Q    At any point during your time with the FBI or whoever it

24  is you were working for, these guys, did you ever hear a call

25  or recording with Chapo Guzman, this gentleman right here

RODRIGUEZ/CROSS/BALAREZO

```
 1   (indicating), saying I think Christian is a sapo or a snitch
 2   or cooperating 100 percent?  No, right?
 3              MS. GOLDBARG:  Objection.
 4              THE COURT:  That question is stricken.
 5              Ask another question.
 6   BY MR. BALAREZO:
 7   Q    Well, did you hear any calls, any recordings with
 8   Joaquin --
 9              THE COURT:   Wait.  Mr. Balarezo, let's have a
10   little sidebar.
11              (Sidebar.)
12              (Continued on next page.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```



1          (SEALED SIDEBAR.)

2

3

4          THE COURT:

5

6

7

8          MR. BALAREZO:

9

10         THE COURT:

11         MR. LICHTMAN:

12         THE COURT:

13

14         THE COURT:

15

16         MR. BALAREZO:

17

18

19

20

21

22

23

24

25

RODRIGUEZ/CROSS/BALAREZO

```
 1                (In open court.)

 2                MR. BALAREZO:  May I continue, Your Honor?

 3                THE COURT:   As soon as the reporter is set up.

 4                Go ahead.

 5    BY MR. BALAREZO:

 6    Q    I will try to remember again what I asked.

 7                You never heard of a recording of Chapo Guzman

 8    talking to anyone else saying that you were a cooperator, a

 9    sapo, or anything of that nature, right?

10    A    Correct.

11    Q    And, in fact, Chapo Guzman never threatened you, did he?

12    A    No.

13    Q    Now, when you met Chapo Guzman, you said it was through

14    the Cifuenteses, right?

15    A    Correct.

16    Q    And when you met him, you met him up in the mountains of

17    Sinaloa, in the Sierra, and you met him at a very -- in a

18    shack basically, correct?

19    A    Correct.

20    Q    It was not a mansion, didn't have a pool, didn't have a

21    nice fountain out front, right?

22    A    Correct.

23    Q    No marble bathrooms.

24    A    No.

25    Q    Did you see any black Nike shoes lying around?
```

RODRIGUEZ/CROSS/BALAREZO

1   A    I don't remember.

2   Q    Did you see any black baseball caps lying around?

3   A    I don't remember.

4   Q    Now, you also said on direct that when Chapo Guzman asked

5   you, after you claim you set up the server, that he didn't --

6   that he preferred to talk as opposed to texting; is that

7   right?

8   A    Correct.

9   Q    And the reason -- after you talked to Chapo Guzman, you

10  know that he's not an educated man, right?

11  A    Correct.

12  Q    And, in fact, he has a fair amount of difficulty writing,

13  right?

14       MS. GOLDBARG:  Objection.

15  A    I don't know.

16       THE COURT:  Overruled.

17  BY MR. BALAREZO:

18  Q    Well, you know that part of the reason he wanted to talk

19  as opposed to text was because it was difficult for him to

20  write out whatever communications he was having, right?

21       MS. GOLDBARG:  Objection.

22       THE COURT:  Overruled.

23  A    I don't know that.

24  Q    And you also testified at some point that with this

25  FlexiSPY stuff, that there was some kind of, like, four-,

RODRIGUEZ/CROSS/BALAREZO

1   five-page log that he had somebody else read for him, correct?

2   A    Correct.

3   Q    And, again, because he's not a well educated man, the

4   reason for that is because he had trouble reading, correct?

5   A    He used to read the reports directly in the past, so I

6   don't think he had any problems reading.

7   Q    Did you ever ask him about the reports?

8   A    No.

9   Q    You never had a discussion with him, hey, look at this

10  report, look what it says?

11  A    No.

12  Q    So you can't sit here and say that he actually read what

13  was in those reports, right?

14  A    Well, I did know that he spent quite a bit of time

15  reading those reports.

16  Q    Now, you also testified that he would call you daily, I

17  believe, right?

18  A    Correct.

19  Q    And he called you with a lot of questions about this

20  network, according to you, right?

21  A    Mainly about FlexiSPY.

22  Q    Now, you began your testimony, I guess, yesterday, but

23  yesterday was not the first time you've seen any of these

24  prosecutors, right?

25  A    Correct.

RODRIGUEZ/CROSS/BALAREZO

```
 1   Q    In fact, again, you've met with them repeatedly in
 2   preparation for this trial.
 3   A    Correct.
 4   Q    And during those sessions, you also met with some agents
 5   of the FBI, probably Agent Marston?
 6   A    Not with him.
 7   Q    But you have met other agents, and you've met some
 8   prosecutors repeatedly in preparation for your testimony here.
 9   A    That's correct.
10   Q    All right.  And during those meetings, you were asked to
11   review a lot of recordings, right?
12   A    Correct.
13   Q    And you were also asked to review many text messages; is
14   that right?
15   A    Correct.
16   Q    Now, let me just ask you, any of those text messages that
17   you reviewed -- well, strike that.
18        Any of those recordings that you reviewed, did you
19   ever listen to one recording between Chapo Guzman and
20   yourself?
21   A    No.
22   Q    Did you ever, through the review of the calls that you
23   had, did you ever listen to a call between Chapo Guzman and
24   this guy Mayo Zambada that you say you met once?
25   A    I don't know Mayo Zambada's voice, so I couldn't tell
```

RODRIGUEZ/CROSS/BALAREZO

```
 1   you.

 2   Q     You met him, right?

 3   A     Only once.

 4   Q     And he just remained there quietly?

 5   A     Yes.

 6   Q     Didn't even say hello?

 7   A     I remember he shook my hand, so maybe he said hello, but

 8   he didn't speak during the meeting.

 9   Q     Do you recall any recordings between Chapo Guzman -- or

10   listening in preparation for any recordings between Chapo

11   Guzman and a guy named Damaso Lopez Nunez that you've said is

12   named Lic?

13   A     I would not be able to recognize Liscensiado's voice

14   either on the phone because I didn't talk to him very much,

15   and I didn't speak to him on the phone.

16   Q     You met with him, right?

17   A     Yes.

18   Q     Several times.

19   A     A couple of times.

20   Q     So as you sit here today testifying under oath, you

21   cannot say that you heard any recordings between Chapo Guzman

22   and Damaso Lopez Nunez, alias Lic, right?

23               MS. GOLDBARG:  Objection.

24               THE COURT:  Overruled.

25   A     Correct.
```

Denise Parisi, RPR, CRR

RODRIGUEZ/CROSS/BALAREZO

```
 1   Q    And as you sit here testifying under oath, can you tell
 2   the jury whether or not you heard any recordings between Chapo
 3   Guzman and somebody that goes by the name of Damaso Lopez
 4   Serrano, also known as mini Lic?
 5   A    I never met that person mini Lic, so I wouldn't be able
 6   to identify him.
 7   Q    As you sit here under oath testifying, can you tell the
 8   jury whether or not, through this network or listening to
 9   these calls in preparation for trial, you ever heard any
10   recordings between Chapo Guzman and somebody that goes by the
11   name of Cesar Gastelum?  I believe he goes by the name of
12   Marisquero or Enrique.
13   A    I don't know that person, so I wouldn't be able to
14   identify him on the phone.
15   Q    Just one more.
16        As you reviewed all these calls, did you ever hear a
17   recording with Chapo Guzman and somebody by the name of Isaias
18   Valdez Rios, also known as Memin, M-E-M-I-N?
19   A    I don't know him.  I would not be able to identify him.
20        MR. BALAREZO:  Your Honor, I'm just asking
21   time-wise, when is the Court planning for lunch?
22        THE COURT:  Well, if you can finish within the next
23   25 minutes, I would like you to.  Can you?
24        MR. BALAREZO:  I don't think I will.
25        THE COURT:  Okay.
```

PROCEEDINGS

```
 1              Let's break for lunch now, ladies and gentlemen.
 2   Please don't talk about the case.  We will come back here at
 3   1:25.
 4              (Jury exits.)
 5              THE COURT:  All right.  Have a seat.
 6              The witness is excused until after lunch.
 7              (Witness excused.)
 8              THE COURT:  I think we've come to the point in the
 9   case where we've got to talk more seriously about scheduling.
10   The only thing that concerns me is that I've signed a writ for
11   three witnesses that the defendant wants.  Originally, the
12   defendant had requested those witness for January 28th.  I
13   accelerated that because I thought that would be too late, and
14   I accelerated it to the 21st.  However, the marshal tells me
15   they can't get those witnesses here before the 23rd.  That may
16   still be too late.
17              What I would like the parties to do is just confer
18   over lunch and tell me, number one, am I wrong, is the 23rd
19   not going to be too late?  Number two, if I'm right, what's
20   the solution to that, which may well be another interim break,
21   which I don't want to take, but will if I have to.  It may be
22   that witnesses like this sometimes are fairly straight forward
23   and maybe the parties can stipulate to a proffer and then we
24   don't need the witnesses.  It's not a problem if we've got the
25   time anyway.
```

PROCEEDINGS

1          On the other hand, in my view, from my perspective,

2     a signed-off proffer is always better than a witness, but I

3     can see why the parties might disagree.  But talk about that,

4     and maybe before the afternoon break, or at the beginning of

5     the afternoon break, you will tell me what you all think about

6     scheduling, or maybe you can tell me now, it's up to you.

7          MR. BALAREZO:  Your Honor, just one thing.  I was

8     going to address the Court with respect to the writs

9     themselves.

10          THE COURT:  Yes.

11          MR. BALAREZO:  I had discussions with the team and

12     with Mr. Guzman this morning, and I believe that out of the

13     three that were listed, we are only going to need number two,

14     so if we could send them back where from they came -- one and

15     three -- we'll be fine.

16          THE COURT:  Okay.  Well, that's helpful.

17          Does the Government have anything to add to that?

18          MS. PARLOVECCHIO:  In light of the Martin Luther

19     King Day holiday, I actually think the 23rd will be okay.

20          THE COURT:  Really?

21          MS. PARLOVECCHIO:  Yes.

22          THE COURT:  Okay.  Well, then I articulated a

23     problem that doesn't exist.

24          See you at 1:25.

25          MR. BALAREZO:  Thank you, Your Honor.

PROCEEDINGS

1              (Lunch recess taken.)

2              (Continued on the following page.)

RODRIGUEZ/CROSS/BALAREZO

```
 1              A F T E R N O O N   S E S S I O N

 2         (In open court, outside the presence of the jury.)

 3              THE CLERK:  All rise.

 4              THE COURT:  Please bring in the jury.

 5              (Jury enters.)

 6              THE COURT:  All right.  Be seated, please.

 7              Please continue, Mr. Balarezo.

 8              MR. BALAREZO:  Thank you, Your Honor.

 9    BY MR. BALAREZO:

10    Q     Good afternoon, sir.

11    A     Good afternoon.

12    Q     On direct examination, you talked about having made I

13    think $300,000 from Mr. Guzmán one particular project?

14    A     Correct.

15    Q     And I think you told the jury that for that particular

16    project, you gave Mr. Guzmán an account number and that he

17    transferred a money payment into your account number, is that

18    correct?

19    A     It was not my account.  It was the provider's account.

20    Q     Provider of what?

21    A     Of the system.

22    Q     But you gave -- you, Mr. Rodriguez, gave Mr. Guzmán the

23    account number so Mr. Guzmán or whomever could put money into

24    that account of the provider, is that right?

25    A     Correct.
```

RODRIGUEZ/CROSS/BALAREZO

1    Q    Okay.  During the entire time that you've been talking to

2    the FBI or the prosecutors, did you ever give them, the

3    prosecutors, the agents, whomever, that account number?

4    A    No, I don't remember.  I don't remember that.

5    Q    You don't remember what, giving any account number or

6    what?

7    A    Giving them the account number.

8    Q    Prior to your testimony this morning on direct, did you

9    ever tell these people or the agents about this $300,000

10   payment by Mr. Guzmán into that account?

11   A    Yes.

12   Q    And have they ever shown you any records from whatever

13   bank it was, indicating that a deposit of $300,000 was made by

14   Chapo Guzmán into that account?

15           MS. GOLDBARG:  Objection.

16           MR. BALAREZO:  Chapo Guzmán?

17           MS. GOLDBARG:  Objection.

18           THE COURT:  Overruled.

19   A    No.

20   BY MR. BALAREZO:

21   Q    And with your familiarity with computers and technology

22   and all these things, you understand that banks normally keep

23   records, correct?

24   A    Correct.

25   Q    For example, at the end of the month, you get a statement

RODRIGUEZ/CROSS/BALAREZO

```
 1   from the bank that says, oh, $300,000 deposit from Chapo
 2   Guzmán.  You never saw anything of that nature, right?
 3   A    Correct.
 4   Q    And you agree with me that that would have been a very
 5   easy way to corroborate something that you testified about?
 6              MS. GOLDBARG:  Objection.
 7              THE COURT:  Sustained.  But I knew the end.
 8              MR. BALAREZO:  I didn't, Your Honor.
 9              THE COURT:  Yes, you did.
10              MR. BALAREZO:  All right.
11   BY MR. BALAREZO:
12   Q    Now, I just want a little clarification about one event
13   you talked about.  You talked about a meeting that you had
14   with Chapo in the mountains of Sinaloa, where you ended up
15   trudging through the -- I don't know, the woods or the jungle
16   or something -- for three days.  Do you remember that?
17   A    Yes, sir.
18   Q    When was that?
19   A    In 2009.
20   Q    Can you narrow it down a little more?
21   A    I don't recall exactly what month in 2009.
22   Q    But you do remember being followed by the Mexico
23   military, right?
24   A    Yes.
25   Q    And you remember that they had this really long gun,
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

1   right?

2   A    Correct.

3   Q    You remember that somebody told you, hey, we can take

4   down a helicopter with that really long gun, right?

5   A    Correct.

6   Q    Do you remember whether they took down a helicopter,

7   since they were being chased by the military?

8   A    They did not bring down any helicopters.

9   Q    And you remember the third day, somebody provided you

10  with food and cars and then you left?

11  A    Correct.

12  Q    And but you can't tell us when it happened in 2009?

13  A    I don't recall the exact date.

14  Q    Now, is it correct that the first encounter you had with

15  the FBI was in a hotel room in New York, is that correct?  Yes

16  or no?

17  A    No.

18  Q    When was the first encounter you had with the FBI?

19  A    In Bogota, Colombia, in 2011.

20  Q    Was there -- did there ever come a time when you met with

21  someone that you thought was a Russian organized crime figure,

22  a Russian criminal?

23  A    Yes.

24  Q    Was that before or after that meeting with the FBI in

25  Colombia?

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

1    A      Before.

2    Q      And as you sit here today, you understand that that

3    meeting with the so-called Russian organized crime figure, the

4    Russian criminal, was an FBI sting operation, is that right?

5    A      Correct.

6    Q      And in fact, what you were going to do when you met with

7    that organized -- or what you thought was a Russian criminal,

8    was to do what?

9    A      To encrypt his communications.

10   Q      So, being the smart guy that you are, you understand that

11   you're meeting with a Russian organized crime figure, and he

12   wanted you to do something to help him run his organized

13   crime.  You understand that that is also a crime, right?

14   A      Correct.

15   Q      So you had no qualms at that point to again engage in

16   criminal activity, correct?

17   A      Correct.

18   Q      And that criminal activity that you were engaging in at

19   that time had absolutely nothing to do with Chapo Guzmán, is

20   that right?

21   A      Correct.

22   Q      And in fact, the FBI was onto you and your criminal

23   activity without having any knowledge of Chapo Guzmán and your

24   supposed connection, right?

25   A      I don't know whether the FBI knew about my connections at

RODRIGUEZ/CROSS/BALAREZO

1    the time.

2    Q    Well, when you testified earlier that at whatever first

3    meeting you had with the FBI, they asked you who you were

4    working for.  Do you remember that?  Yes or no?

5    A    Yes.

6              MR. BALAREZO:  (Confers with Ms. Goldbarg.)

7    BY MR. BALAREZO:

8    Q    And when they asked you who you worked for, your response

9    was, you work for the Cifuenteses, right?

10   A    Correct.

11   Q    And you said later that day, you said, well I told the

12   truth, and I told them I also work for Chapo Guzmán.

13   A    Correct.

14   Q    But what really happened is that they started asking you

15   who you were working for.  You told them Cifuentes, right?

16   A    Correct.

17   Q    And you were nervous because you're talking to the FBI in

18   the United States, right?

19   A    In Colombia.

20   Q    In Colombia.  Right?

21   A    Correct.

22   Q    And you know you had committed crimes, right?

23   A    Correct.

24   Q    And the FBI kept asking you and asking you about Chapo

25   Guzmán, correct?

RODRIGUEZ/CROSS/BALAREZO

```
 1    A    So did Chapo Guzmán.

 2    Q    So did Chapo Guzmán, correct?

 3    A    Correct.

 4    Q    Right?

 5    A    Correct.

 6    Q    So at that point when they're asking you and asking you,

 7    do you know Chapo?  Do you know Chapo?  You knew that they

 8    wanted to hear about Chapo, correct?

 9    A    Correct.

10    Q    And of course then you tell them, I also work for Chapo

11    Guzmán, correct?

12    A    Correct.

13    Q    Let me ask you briefly -- this is Government Exhibit

14    601-I.

15              MR. BALAREZO:  I think this is in evidence, correct?

16              MS. GOLDBARG:  (Nods head affirmatively.)

17              (Publishes exhibit to the jury.)

18    BY MR. BALAREZO:

19    Q    Is that right?  You see that?

20    A    Yes.

21    Q    And the initials here are your initials and that's the

22    date that you reviewed them, on 12-27-18, is that correct?

23    A    Correct.

24    Q    And remind me what information is contained in this

25    particular CD?
```

RODRIGUEZ/CROSS/BALAREZO

```
 1   A     Those are recorded telephone calls.
 2             MR. BALAREZO:  Okay.  And I am going to now put up
 3   Government Exhibit 602-G.
 4             (Publishes exhibit to the jury.)
 5   BY MR. BALAREZO:
 6   Q     And again, those are your initials and you reviewed this
 7   disk, seems like six days before you reviewed the -- or
 8   actually a month.  And so November 21st of last year, correct?
 9   A     Correct.
10   Q     And 602-G contains, as is written there, email messages,
11   right?
12   A     Correct.
13   Q     Now, the data itself that is contained in those CDs, both
14   calls and emails, is that information -- strike that.
15             That is information that you downloaded from the
16   server, correct?
17   A     Correct.
18   Q     And when you downloaded that information from the server,
19   you put it on something and turned it over to the FBI, right?
20   A     Correct.
21   Q     Now, these disks that we see here, these two disks with
22   those labels, those are not the disks that you downloaded that
23   information to, is it?
24   A     Correct.
25   Q     What did you download them on?
```

RODRIGUEZ/CROSS/BALAREZO

1    A    To my computer.

2    Q    And how did you transmit it to the FBI?

3    A    Via email.

4    Q    Okay.  And have you seen the email files or the email

5    file that you sent?  Have you been shown that or have you just

6    been shown these disks?

7    A    I have also been shown the disks with the emails.

8    Q    And where is your laptop computer right now, the one that

9    you downloaded the material to?

10   A    I don't -- I don't have it with me.  That was many years

11   ago.  That was my personal computer.

12   Q    Did you trade it in for a new one?  Did you throw it in

13   the trash?  Did you give it to your daughter?  I mean, what?

14   A    Yes, I gifted it to a relative.

15   Q    So we have no way of actually confirming that the

16   information you downloaded ended up being on these disks,

17   correct?

18   A    I was shown the information that I had sent via email,

19   and it the same information on these disks.

20   Q    When were you shown that information?

21   A    Throughout the preparation process.

22   Q    Years after you downloaded it, correct?

23   A    Correct.

24   Q    So again, we don't have your computer -- because you

25   never answered the question -- we do not have your computer to

RODRIGUEZ/CROSS/BALAREZO

```
 1   have it analyzed to make sure that the information that is on

 2   those disks is exactly hat was downloaded by you to your

 3   laptop, yes or no?

 4   A    Correct.

 5   Q    And in fact, you already talked about how easy it is to

 6   manipulate sounds, calls, emails?

 7              MS. GOLDBARG:  Objection.

 8              THE COURT:  Sustained.  Sustained.

 9   BY MR. BALAREZO:

10   Q    Well, you've already testified about how easy it is to

11   manipulate things with a computer, right?

12              MS. GOLDBARG:  Objection.

13              THE COURT:  Sustained.

14   BY MR. BALAREZO:

15   Q    You've testified that sounds recordings, emails, text

16   messages can be manipulated, correct?

17   A    Correct.

18   Q    Now, you testified on direct that you began having some

19   mental health issues in 2013, right?

20   A    Correct.

21   Q    And that was a couple years after you had your last

22   contact with Chapo Guzmán, correct?

23   A    Correct.

24   Q    And unfortunately because of whatever situation you were

25   in, you had not one but two nervous breakdowns, right?
```

RODRIGUEZ/CROSS/BALAREZO

```
 1   A     Correct.

 2   Q     Now -- and I'm sorry to ask this -- I want for you to

 3   describe for the jury what the nervous breakdown looks like.

 4   What happened to you?

 5              MS. GOLDBARG:  Objection, Your Honor.

 6              THE COURT:  Overruled.

 7   A     Well, I had a lot of stress on me, on my mind, on my

 8   body.  I was not able to sleep.  So I asked for help, and I

 9   went to a hospital.

10   BY MR. BALAREZO:

11   Q     Maybe a little more than that, right?

12              MS. GOLDBARG:  Objection, Your Honor.

13              THE COURT:  Let's have a sidebar, please.

14              (Sidebar.)

15

16

17

18

19

20

21

22

23

24

25
```

SIDEBAR

```
 1              (Sidebar.)

 2              THE COURT:  How did the stress manifest?  What do

 3   you want to get out here?

 4              MR. BALAREZO:  Well, I would have been over except

 5   for the answer he gave.

 6              Right now, it's a matter of credibility.  The guy

 7   was hospitalized twice for weeks on end.  He's saying, well, I

 8   just didn't sleep and I had stress.  That's obviously not

 9   true.  It was a little more than that.

10              THE COURT:  What?  What more was it?

11              MR. BALAREZO:  Well, I don't know since the

12   Government --

13              THE COURT:  That's my question.

14              MS. GOLDBARG:  I'm sorry.  That's an inaccurate

15   statement that the Government --

16              THE COURT:  Did you produce it?

17              MS. GOLDBARG:  Of course we produced all the

18   information.

19              MR. BALAREZO:  Not the specifics.

20              THE COURT:  Tell me what are the specifics.

21              MS. GOLDBARG:  Your Honor, I do believe that it's

22   associated with that.  I believe that it was a -- he tends to

23   down-speak a lot of things.  He's not overly verbose.  But it

24   was I think days on end when he was unable to sleep.  That he

25   was extremely anxious and nervous and physically manifesting
```

SIDEBAR

1    that to the point where they took him to the hospital.

2              THE COURT:  Okay.  He was in enough mental distress

3    that he felt he needed to go to the hospital?

4              MR. BALAREZO:  May I just have a couple follow-ups?

5              THE COURT:  A couple follow-ups, yes.

6              MR. BALAREZO:  Three or four, max.

7              THE COURT:  A couple.

8              (Sidebar ends.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RODRIGUEZ/CROSS/BALAREZO

```
1              (In open court.)

2    BY MR. BALAREZO:

3    Q    Were you hallucinating during that time?

4    A    Not hallucinations.  I was just not thinking clearly.

5    Q    Even so, whatever happened, your situation twice was so

6    bad that I think you said on direct that you underwent

7    electroconvulsive therapy?

8    A    Correct.

9    Q    And correct me if I'm wrong, but isn't that the kind of

10   therapy where you're literally getting electrical impulses

11   shot into your brain?

12   A    Correct.

13              MR. BALAREZO:  Just one second, Your Honor.  I

14   apologize.  (Pausing.)

15   BY MR. BALAREZO:

16   Q    And part of the stress that you mentioned, isn't it

17   correct that the stress that you were under had to do with the

18   work that you were doing at the time?

19   A    Correct.

20   Q    Including your work with the FBI, of course, right?

21   A    Correct.

22   Q    Now, and you also were having a lot of stress because you

23   had some personal problems, right?

24   A    Correct.

25   Q    Now, at the time when you had these stresses, around what
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

```
 1   year was that, 2013?

 2   A    2013.

 3   Q    Without giving the names or locations or anything, you

 4   were married at that time, correct?

 5   A    No.

 6   Q    Did you have a partner?

 7   A    Yes.

 8   Q    Did you have children with that partner?

 9   A    Yes.

10   Q    Okay.  And was that your primary relationship?

11   A    Yes.

12   Q    Isn't it true though that you also had a separate family

13   from that principal relationship?

14   A    Yes.

15   Q    Did you have children in that relationship?

16   A    Yes.

17   Q    And that situation was causing you a lot of stress also,

18   right?

19   A    Correct.

20   Q    Because one of the partners knew about the other one, but

21   the other one didn't know about the other, right?

22   A    Correct.

23   Q    So you were lying to one, but not to the other?

24   A    Correct.

25   Q    Now, when you were having -- before you had that
```

RODRIGUEZ/CROSS/BALAREZO

1    electroconvulsive therapy, you didn't just go to a

2    electro-compulsive center and say, hey, hook me up, right?

3              MS. GOLDBARG:  Objection, Your Honor.

4              THE COURT:  Sustained.

5    BY MR. BALAREZO:

6    Q    You talked to a doctor before you had this therapy,

7    correct?

8              MS. GOLDBARG:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. BALAREZO:

11   Q    Were you made aware of the risks of having that therapy?

12   A    Yes.

13   Q    And you knew that one of the risks of having that therapy

14   was that you could suffer memory loss, correct?

15   A    Correct, but only around the days when you receive the

16   therapy, not long term.

17   Q    And besides just the stress and the lack have sleep, you

18   were also diagnosed with being bipolar?

19             MS. GOLDBARG:  Objection, Your Honor.

20             THE COURT:  Sustained.

21             MR. BALAREZO:  Could we have a sidebar, Your Honor?

22             THE COURT:  Sure.

23             (Sidebar.)

24

25

SIDEBAR

1          (Sidebar.)

2          MR. BALAREZO:  The question -- I don't know what the

3     objection is first.

4          MS. GOLDBARG:  As we stated in our Motion in Limine,

5     again, whether or not this goes to, you know, does bipolar go

6     to issues of finding credibility, and I think the Court, in

7     granting -- or denying our motion, said that they would allow

8     some leeway.  I don't see what the relevance is of the --

9          THE COURT:  I can't say that just because someone is

10    bipolar, there is, therefore, a chance that the jury can't

11    possibly measure as to whether there's a propensity to lie

12    accompanying that condition.  That would do an injustice to a

13    lot of bipolar people, some of whom may well in be in this

14    room.

15          So I think it's a clear 403 issue, and I think the

16    balance does not come out in favor of saying, I think he's

17    bipolar, therefore, he has an increased propensity to lie.

18          MR. BALAREZO:  And that's not what I'm getting at,

19    Your Honor.  I think right now, it goes to his credibility on

20    the stand.  Once again, when I first asked him about the

21    stress, he minimized it.  He says, I just couldn't sleep.  I

22    was stressed.

23          THE COURT:  You don't know that the bipolar had

24    anything to do with his depression.  It can or it may not.

25          MR. BALAREZO:  But I do know from just the

SIDEBAR

1   literature, being bipolar and then having that

2   electroconvulsive therapy can create lot more problems than

3   what he's letting on.  It's not just a matter of --

4          THE COURT:  But you don't know that it did.

5          MR. BALAREZO:  Well, I can ask him.

6          THE COURT:  The only good faith basis you have --

7   no.  You have a pretty full explanation of what happened, and

8   you have the short term memory loss, which is the only reason

9   I let in the ECT to begin with.

10          So I'm not going to let you use that to bootstrap

11   more things that we have no reason to think are present with

12   this witness.  So I'm sustaining the objection.

13          MR. BALAREZO:  Thank you.

14          MS. GOLDBARG:  Thank you.

15          (Sidebar ends.)

16

17

18

19

20

21

22

23

24

25

RODRIGUEZ/CROSS/BALAREZO

```
 1              (In open court.)
 2  BY MR. BALAREZO:
 3  Q    Now, sir, you testified yesterday on direct and today on
 4  cross, and multiple times, you said there's some things you
 5  don't remember.
 6  A    Yes, especially dates.
 7  Q    You didn't recall, for example, if you had heard some
 8  people's voices?
 9              MS. GOLDBARG:  Objection; mischaracterizes his
10  testimony.
11              THE COURT:  Sustained.
12  BY MR. BALAREZO:
13  Q    Let's just say you did testify multiple times that you
14  don't remember, right?
15  A    Correct.
16  Q    Now, we talked about -- you agree with me that when you
17  were meeting with the Russian criminal or purported Russian
18  criminal, you agreed that you were about to commit a crime or
19  thought you were about to commit a crime?
20  A    Correct.
21  Q    And Chapo Guzmán and -- according to you -- and the
22  Cifuenteses, that's not really the only time you ever engaged
23  in helping what purports to be criminal people commit crimes,
24  is it?
25  A    Correct.
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

 1   Q     And tell the jury, have you ever been charged for any of
 2   those crimes?
 3   A     No, it was the agreement that I was able to get through
 4   my lawyer, in exchange for my cooperation.
 5   Q     The answer's no?
 6   A     Correct.
 7   Q     And tell the jury, weren't you also, apart from Chapo
 8   Guzmán and apart from the Cifuenteses and apart from the
 9   Russian whatever, you were also engaged in a nice little money
10   laundering business when you were in Colombia, weren't you?
11   A     Correct.
12   Q     And you knew that that money laundering business wasn't
13   that small, right?
14   A     (No response.)
15   Q     It was laundering money for drug trafficking
16   organizations, right?
17   A     No, the only thing is that the money that I obtained from
18   the Cifuenteses and Chapo, I invested in Colombia, but I did
19   not launder money for other people.
20   Q     So if you're saying the money that you invested for Chapo
21   was not related to drug trafficking, then I have no further
22   questions.  Is that what you're telling us?
23   A     (No response.)
24   Q     I'll strike the question.
25         Have you ever been charged with money laundering?

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

1    A    No.

2    Q    In fact, you haven't been charged with any crime,

3    correct?

4    A    Correct.

5           MR. BALAREZO:  Now, for the witness only.  (Exhibit

6    published to the witness.)

7    BY MR. BALAREZO:

8    Q    I want to show you Defense Exhibit 430.  Do you recognize

9    that document, sir?

10   A    Correct.

11   Q    Is that a yes?

12   A    Yes.

13   Q    Okay.  And what is this document?

14   A    It's my financial information.

15   Q    And I know you can't see it, but that would have been

16   your signature where it's blacked out, right?

17   A    Correct.

18          MR. BALAREZO:  Your Honor, I would like to move 430

19   into evidence, please.

20          THE COURT:  Any objection?

21          MS. GOLDBARG:  I'm just trying to figure out what's

22   the basis, Your Honor.

23          MR. BALAREZO:  It's his financial statement, Your

24   Honor.

25          THE COURT:  Well, yes.  But so?

RODRIGUEZ/CROSS/BALAREZO

```
 1              MR. BALAREZO:  All right.
 2              THE COURT:  There is another way to get at it.
 3    BY MR. BALAREZO:
 4    Q    Well, let me ask you, sir.  You didn't just find this
 5    document on the Internet, right?  The Government told you you
 6    need to fill this out, right?
 7    A    Correct.
 8    Q    And in fact, you filled this out February 15th of last
 9    year.
10    A    Correct.
11    Q    And what you indicated to the Government and -- strike
12    that.
13              You knew that when you filled that document out and
14    turned it over to the Government, you were filing that under
15    oath, under penalty of perjury, right?
16    A    Correct.
17    Q    And disclosed to the Government that you had -- part of
18    your assets was $30,000 in the sale of property in Colombia,
19    right?
20    A    Correct.
21    Q    You also disclosed that you had $60,000 that was money
22    expected -- you were expecting to receive from the sale of
23    another property in Colombia, right?
24    A    Correct.
25    Q    And, you also disclosed that you had five apartments in
```

RODRIGUEZ/CROSS/BALAREZO

```
 1   Colombia that were worth approximately $210,000?
 2   A    Correct.
 3   Q    And you had one piece of land in Colombia that was worth
 4   $200,000, right?
 5   A    Correct.
 6   Q    So if my math is correct, that's approximately $480,000?
 7            MR. BALAREZO:  Sorry, Your Honor.  Correct.
 8   BY MR. BALAREZO:
 9   Q    That's approximately $500,000.
10   A    Correct.
11   Q    And, since you have already told us basically from the
12   age of 21, you have been engaging in criminal activity, right?
13   A    Correct.
14   Q    So, those apartments in Colombia, that piece of land, you
15   didn't obtain that through legitimate lawful employment,
16   right?
17   A    Correct.
18   Q    You got that being a criminal, correct?
19   A    Correct.
20   Q    And did the Government take any of that $500,000, about?
21   A    No.
22   Q    And you don't expect them to, right?
23   A    Correct.
24   Q    And that the $500,000 that you claim that you made in
25   total from Chapo Guzmán, you haven't turned over one penny to
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

```
 1   the Government, have you?

 2   A    Correct.

 3   Q    And the millions of dollars you made from the

 4   Cifuenteses, you haven't turned a penny of that over to the

 5   Government either, have you?

 6   A    I did not make millions with the Cifuenteses.

 7   Q    How much did you make?

 8   A    In total, between Chapo and Cifuenteses, the total was

 9   approximately $500,000.

10   Q    So now your answer is $500,000 with Chapo and the

11   Cifuenteses.  That's not exactly what you said earlier, right?

12            MS. GOLDBARG:  Objection.

13            THE COURT:  Sustained.

14   BY MR. BALAREZO:

15   Q    Now, as part of your cooperation, you have been paid,

16   right, for services and for expenses, right?

17   A    Correct.

18   Q    And let's say, when -- when you talk about for services,

19   like let's say, what services did you provide?

20   A    My technical services, like installing servers.

21   Basically, my technology services.

22   Q    Well, when you -- what you've testified about is that you

23   were working for the FBI.  You were working with them to get

24   Cifuentes and you were working with them to get Chapo Guzmán,

25   right?
```

RODRIGUEZ/CROSS/BALAREZO

1    A     Correct.

2    Q     And not to name names, but were you setting up networks

3    for the FBI for other people?

4              MS. GOLDBARG:  Objection, Your Honor.

5              THE COURT:  Sustained.

6    BY MR. BALAREZO:

7    Q     And let me ask you, did you go to an FBI office from nine

8    to five and punch in and punch out?

9    A     No.

10   Q     You worked from home, basically, right?  You worked

11   remotely, as they say?

12   A     That's correct, but I'd also meet up frequently with the

13   agents.

14   Q     Let me just veer off to something before I forget.

15             During your preparations for trial, you heard some

16   recordings that identified as being Chapo Guzmán, correct?

17   A     Correct.

18   Q     And you know who the -- or excuse me -- Special Agent

19   Marston is, right?

20   A     Correct.

21   Q     You work with him a lot?

22   A     Yes.

23   Q     And from your many conversations with him, you know that

24   Marston never spoke personally with Chapo Guzmán, right?

25             MS. GOLDBARG:  Objection.

RODRIGUEZ/CROSS/BALAREZO

1          THE COURT:  Sustained.

2    BY MR. BALAREZO:

3    Q    Well, to your knowledge, you're the person identifying

4    Chapo Guzmán on those recordings, is that correct?  Yes or no?

5          MS. GOLDBARG:  Objection, Your Honor.

6          THE COURT:  Overruled.

7    A    Correct.

8    BY MR. BALAREZO:

9    Q    And in fact, I think on direct examination, you said that

10   on some text messages, there was somebody that was using

11   the -- I think initial J, jota?

12   A    Correct.

13   Q    And you're the one that identified jota to the FBI as

14   being Joaquín Chapo Guzmán, correct?

15   A    Correct.

16   Q    And in fact, those are text messages, so you really can't

17   say who was typing stuff into the little text message device,

18   right?

19   A    Well, I could identify it by the way it was written and

20   the content of the message.

21   Q    Well, the contents of the messages can't be talked about

22   that we don't have your computer to confirm the original

23   contents of the message.  You have already said that.  You'd

24   agree?

25          MS. GOLDBARG:  Objection.

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

```
 1            THE COURT:  Sustained.
 2    BY MR. BALAREZO:
 3    Q    Well, you can't tell me whether or not from when you
 4    downloaded it to when it was presented in court, the message
 5    was the same, can you?
 6            MS. GOLDBARG:  Objection.
 7            THE COURT:  It was asked and answered.
 8    BY MR. BALAREZO:
 9    Q    Now, with respect to those expenses that we were talking
10    about, you have gotten a total of -- am I correct -- almost
11    $500,000 for expenses and services?
12    A    Correct.
13    Q    And for your services, let's say, not expenses, for your
14    services, did you ever submit any proof of the work that you
15    had done for to FBI or the Government or anybody?
16    A    Well, I followed their instructions and whatever they
17    asked me for, I would present to them.
18    Q    Let me rephrase the question.
19            Did you, Mr. Rodriguez, ever present to the FBI or
20    the Government any documentation as proof that you have
21    performed any work for any period of time?
22    A    Well, the delivery of the projects was proof of work
23    done.
24    Q    Well, let me show you what you have I've marked as
25    Defense Exhibit 450.
```

RODRIGUEZ/CROSS/BALAREZO

```
1              MR. BALAREZO:  Just for the witness only.  (Exhibit
2    published to the witness.)
3    BY MR. BALAREZO:
4    Q    You recognize this, right?
5    A    Correct.
6    Q    And this is basically a receipt for money that you
7    received on one occasion from the FBI, right?
8    A    Correct.
9    Q    And when you were paid money by the FBI, were you paid in
10   a check with like a W-2, showing your withholdings and all
11   that stuff?
12   A    No, I was a source, not an employee.
13   Q    Well, how did they pay you, cash?  Right?
14   A    Correct.
15   Q    So, you go to the FBI and you say, pay me, and they gave
16   you cash?  Right?
17   A    Correct.
18   Q    And in fact, if you look at this one, the first page that
19   I'm showing you, you received from Special Agent Robert
20   Potash, $3,000, which was for expenses of $3,000 for the
21   period from February 21st, '11, to March 15th,' 11, right?
22   A    Correct.
23   Q    What expenses did you have?
24   A    I had travel expenses because I was traveling between
25   Colombia and the United States.  I also paid for servers for
```

RODRIGUEZ/CROSS/BALAREZO

1    software, different expenses.  Also, the living expenses of my

2    family.

3    Q    And you submitted receipts for all these things, for the

4    servers, the flights, your family's living expenses?

5    A    Yes.

6    Q    And all those expenses just happened to total $3,000 and

7    no cents, right?

8    A    (No response.)

9    Q    Right here. (Indicating.)

10   A    Okay.  Yes.  It says there, $3,000, yes.  It was $3,000

11   for expenses.

12   Q    Listen to my question again.  The expenses just happened

13   to add up to $3,000 with no cents, right?

14   A    (No response.)

15   Q    You don't understand the question?

16   A    I don't understand the question.

17   Q    You have recognized this document that I'm showing you?

18   A    Yes.

19   Q    Now, that would have been your signature, except that

20   it's blacked out, correct?

21   A    Correct.

22   Q    You received from Agent Potash $3,000 for expenses for

23   the dates indicated, correct?

24   A    Correct.

25   Q    And you said you turned in receipts?  And a simple

RODRIGUEZ/CROSS/BALAREZO

1   question is, did those receipts all total up just to $3,000

2   even?

3   A    No.

4   Q    You got paid more?

5   A    Yes, I got paid more for expenses.  I mean, it wasn't

6   a -- I was paid several times for expenses.

7   Q    Right.  For example, from June 1 to June 15th of 2011,

8   you received $14,500, right?

9   A    Correct.

10  Q    Another bunch of cash?

11  A    Yes.

12  Q    Wasn't like a gift card or anything like that, right?

13  Just cash in an envelope?

14  A    Correct.

15  Q    And let me just go quickly through these.  You've got

16  $6,000 another time?

17  A    Correct.

18  Q    Another $6,000?

19  A    Correct.

20  Q    All cash?

21  A    Correct.

22  Q    Another $6,000.

23  A    Correct.

24  Q    All cash?

25  A    Yes.

RODRIGUEZ/CROSS/BALAREZO

1   Q     And your expenses always add up to an even number with no

2   cents, right?

3               MS. GOLDBARG:  Objection.

4               THE COURT:  Overruled.

5   BY MR. BALAREZO:

6   Q     Well, here's a good one:  $4,298 that time, right?

7   A     Correct.

8   Q     Another 6,000?

9   A     Correct.

10  Q     Another 6,000?

11  A     Correct.

12  Q     6,000?

13  A     Correct.

14  Q     6,000 more?

15  A     Correct.

16  Q     And you're working a little harder here.  You're making

17  $8,000?

18              MS. GOLDBARG:  Objection, Your Honor.

19              THE COURT:  Sustained.

20  BY MR. BALAREZO:

21  Q     This payment was for $8,000?

22  A     Correct.

23  Q     All cash still?

24  A     Sometimes they would deposit into my account.

25  Q     When did they start depositing into your account?

RODRIGUEZ/CROSS/BALAREZO

1    A    I don't recall.  Sometimes they would give me cash.

2    Sometimes they would make deposits.

3    Q    Another 8,000.  Is that cash or check or deposit?

4    A    I don't remember.

5              MS. GOLDBARG:  Objection.

6              THE COURT:  Overruled.

7              MR. BALAREZO:  We'll move on.

8    BY MR. BALAREZO:

9    Q    You see all these other cash payments you received?

10   A    Correct.

11   Q    Here's where it starts getting good:  25,000, right?

12   A    Correct.

13   Q    Cash or deposit?

14   A    I don't remember.

15   Q    70,000, cash or deposit?

16   A    I think it was a check.

17   Q    So you did get some checks?

18   A    Yes.

19   Q    30,000?

20   A    Correct.

21   Q    Check, deposit, cash?

22   A    Perhaps check.

23   Q    So, the bottom line is, because of your work with the

24   Government, you received approximately $500,000, cash, check,

25   maybe a deposit, right?

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

```
 1    A     Correct.
 2    Q     And that money was paid to you here in the United States,
 3    right?
 4    A     Correct.
 5    Q     And again, maybe it wasn't a lot of money, but you
 6    decided you did not want to pay taxes on it?
 7    A     Correct.
 8    Q     So you just didn't declare it.  You didn't file a -- what
 9    is it, 1099 or whatever it is, whatever tax form?  I don't
10    know.
11    A     Correct.
12    Q     And at the time you're evading paying taxes, you didn't
13    tell the Government, hey, I'm not going to pay taxes, right?
14    You just didn't pay them?
15    A     Correct.
16    Q     So, in effect, you were lying to the Government that
17    you're testifying for today, right?
18    A     I never lied to them because they never asked me about
19    it.
20    Q     If you're not asked about it, it's cool?
21    A     I did not lie to them.  That's the point.
22    Q     Let me be more accurate.  You withheld information from
23    the Government that you're testifying on behalf of?
24    A     No.  The minute they asked me whether I had paid my
25    taxes, I was honest and I told them no.
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

```
 1   Q    Right.  And they didn't come ask you about whether you

 2   paid your taxes because it popped into their head out of the

 3   blue, the IRS contacted you, right?

 4              MS. GOLDBARG:  Objection.

 5              THE COURT:  Sustained.

 6   BY MR. BALAREZO:

 7   Q    Well, how much in taxes did you owe from that at least

 8   half a million dollars that you got?

 9   A    I have already paid part of it, and I continue paying

10   by -- in monthly installments the rest.

11   Q    My question is very simple:  How much did you owe to the

12   IRS?

13   A    $35,000, approximately.

14   Q    That's a good tax rate.  I need your accountant.

15              MS. GOLDBARG:  Objection.

16              THE COURT:  Sustained.

17   BY MR. BALAREZO:

18   Q    What, out of the 35,000, how much did you pay?

19   A    I've paid approximately like 15,000.  I still owe around

20   20,000.

21   Q    And you're paying that off at the comfortable rate of

22   $250 a month?

23   A    Correct.

24   Q    And of course, you've never been and will never be

25   prosecuted for tax evasion, right?
```

LISA SCHMID, CCR, RMR

RODRIGUEZ/CROSS/BALAREZO

1   A     That was the agreement I was able to obtain through my

2   lawyer, via non-prosecution agreement.

3   Q     And again, my question was, you haven't been and will

4   never be prosecuted for tax crimes, tax evasion?  Yes or no?

5   A     Correct.

6               (Continued on the next page.)

CHRISTIAN RODRIGUEZ – CROSS – MR. BALAREZO

1  BY MR. BALAREZO:

2  Q    And you did testify that some paperwork was put in on

3  your behalf to try to get a reward for I guess helping to

4  capture Jorge Cifuentes, right?

5  A    Correct.

6  Q    Do you know how long ago that paperwork was put in?

7  A    No.

8  Q    But you haven't gotten it as of now, right?

9  A    Correct.

10  Q    And in fact you really hope that you're going to get it

11  at some point in the future, right?

12  A    Of course I have the hope and that I'll receive it one

13  day.

14  Q    Of course that hope that you'll receive $5 million has

15  nothing to do with your testimony, right?

16  A    Correct.

17  Q    You're going to pay taxes on it if you get it?

18  A    Yes, of course.

19  Q    And if that weren't enough, in one of the meetings you

20  actually asked if you could get a reward for Chapo Guzman too,

21  right?

22  A    Correct.

23  Q    How much is that reward?

24  A    It could be anything between zero and 5 million.

25  Q    You're hoping to get that too?

CHRISTIAN RODRIGUEZ – REDIRECT – MS. GOLDBARG

1   A     No, because my assistance was not effective for towards

2   the capture.

3   Q     Let me ask you this, tell the jury for all these crimes

4   you've committed how many years have you spent in jail,

5   prison?

6   A     None.

7   Q     Any months?

8   A     No.

9   Q     Weeks?

10  A     No.

11  Q     Days?

12  A     No.

13  Q     Minutes?

14  A     No.

15  Q     Seconds?

16          MS. GOLDBARG:  Objection.

17          THE COURT:  Come on, please.

18          MR. BALAREZO:  Nothing further.

19          THE COURT:  Any redirect?

20          MS. GOLDBARG:  Very briefly, your Honor.

21  REDIRECT EXAMINATION

22  BY MS. GOLDBARG:

23  Q     On cross-examination defense counsel asked you if you

24  listened to calls with a whole bunch of names of people you

25  never heard of, do you recall those questions?

CHRISTIAN RODRIGUEZ – REDIRECT – MS. GOLDBARG

1   A    Yes.

2   Q    He asked you about Damaso Lopez Sirano, other people?

3   A    Correct.

4   Q    I'd like to show you what is in evidence as Government's

5   Exhibit 511-3.  Have you is ever seen this document before?

6   A    No.

7   Q    I'd like to ask you, do you know who the person is on the

8   bottom, left-hand corner, known as Cholo Ivan?

9   A    No.

10  Q    Do you know the person next to him known by the alias Don

11  Proceso?

12  A    No.

13  Q    What about the person next to him known as El Cuate?

14  A    No.

15  Q    The person next to him, Gato?

16  A    No.

17  Q    How about the person next to him, Aureliano Guzman Loera?

18  A    No.

19  Q    The person next to him, Mario Nunez Mesa M10?

20  A    No.

21  Q    How about the person next to him, Moiran?

22  A    No.

23  Q    All the way right to the right-hand side, Juan Guzman

24  Rocha, do you know him?

25  A    No.

RIVKA TEICH, RMR, CSR, FCRR

1           MS. GOLDBARG:  Government has no further questions.

2           THE COURT:  All right.

3           MR. BALAREZO:  I have one or two.

4           THE COURT:  Go ahead.

5    RECROSS-EXAMINATION

6    BY MR. BALAREZO:

7    Q    Sir, 511-3, you just testified you don't know any of

8    these people down here, right?

9    A    Correct.

10   Q    Never talked to them, never heard their voice, nothing,

11   right?

12   A    Well, I might have heard their voices during when I

13   reviewed the recordings, but not before then.

14   Q    Prior to -- you don't know who these people are?

15   A    No.

16   Q    You don't know Cholo Ivan, Don Proceso, or these other

17   people, you have no idea whether they belong to the Sinaloa

18   Cartel or any other group, do you?

19   A    I don't know.

20           MR. BALAREZO:  Thank you.

21           THE COURT:  You may step down.  Thank you very much.

22           (Whereupon, the witness was excused.)

23           THE COURT:  Let's have the Government's next

24   witness.

25           MS. LISKAMM:  The Government calls Juan Aguayo.

JUAN AGUAYO – DIRECT – MS. LISKAMM

```
 1                COURTROOM DEPUTY:  Raise your right-hand.

 2                (Witness takes the witness stand.)

 3   JUAN AGUAYO, called as a witness, having been first duly

 4   sworn/affirmed, was examined and testified as follows:

 5                THE WITNESS:  I do.

 6                COURTROOM DEPUTY:  State and spell your name.

 7                THE WITNESS:  Juan Aguayo, J-U-A-N, A-G-U-A-Y-O.

 8                COURTROOM DEPUTY:  You may be seated.

 9                THE COURT:  You may inquire.

10                MS. LISKAMM:  Thank you.

11   DIRECT EXAMINATION

12   BY MS. LISKAMM:

13   Q    Good afternoon.

14   A    Good afternoon.

15   Q    Where are you currently employed?

16   A    I'm currently employed as a Border Patrol agent for the

17   United States Border Patrol.

18   Q    What are your current responsibilities?

19   A    Assigned as a canine handler.

20   Q    How long have you been with the Border Patrol?

21   A    Almost 11 years.

22   Q    Prior to being a canine handler, what responsibilities

23   did you have with the Border Patrol?

24   A    I've been a part of the San Diego Sector Smuggling

25   Interdiction Group, San Diego Sector Coastal Border
```

JUAN AGUAYO – DIRECT – MS. LISKAMM

1    Enforcement Team.  And I've been detailed to other stations

2    for work, as well as serve as an instructor for Criminal

3    Interdiction.

4    Q    You mentioned the Coastal Border Enforcement Team, what

5    is that?

6    A    An assignment, undercover assignment.  Our duties were to

7    patrol the coastline from the San Diego Sector, San Clemente

8    Station, up to Santa Barbara, California.

9    Q    What were you patrolling that area for?

10   A    Suspected vessels involved in narcotics and human

11   smuggling.

12   Q    Specifically what type of vessels were you looking for?

13   A    Specifically panga vessels.

14        MS. LISKAMM:  Showing you, just for the witness

15   only, what is marked Government's Exhibit 829 for

16   identification.  I believe there is no objection.

17        MR. LICHTMAN:  No objection.

18        THE COURT:  Received.

19   Q    What there we looking at here?

20   A    A panga fishing boat.

21   Q    What did you say was being smuggled in these types of

22   vessels?

23   A    Typically we encountered illegal aliens and narcotics.

24   Q    Approximately how many maritime interdictions have you

25   been involved in during your 11 years with the Border Patrol?

JUAN AGUAYO – DIRECT – MS. LISKAMM

```
 1    A    Approximately 50 or so.

 2    Q    Based on your involvement with those, where are these

 3    panga boats typically coming from?

 4    A    From my knowledge, typically from Mexico.

 5    Q    What route were they typically taking?

 6    A    Typically start off somewhere in south of Tijuana,

 7    Mexico.  And they would travel as far as Santa Barbara,

 8    California.

 9    Q    What time of day would they typically travel?

10    A    They would typically operate at night.

11    Q    Were you working as a Border Patrol Agent in

12    January 2012?

13    A    I was.

14    Q    What if anything occurred January 15, 2012?

15    A    My partner and I responded to a call for assistance from

16    other agents who encountered individuals and suspected

17    marijuana packages on the beach.

18    Q    Where geographically?  We're talking about California,

19    correct?

20    A    Yes.

21    Q    Where geographically are you responding to?

22    A    Malibu, California.

23    Q    For those that are not as familiar with the West Coast,

24    what two major cities is that in between?

25    A    That would fall between Los Angeles and Santa Barbara
```

JUAN AGUAYO - DIRECT - MS. LISKAMM

 1    counties.

 2    Q    Can you describe the location that you responded to?

 3    A    It's a remote area, on the coast of Pacific Coast

 4    Highway, on the coast of ocean.  The road itself was called

 5    Deer Creek Road, a known landmarker to us.

 6    Q    What time did you respond to that location?

 7    A    At approximately 4:40 in the morning.

 8    Q    When you arrived at location, what, if anything, did you

 9    observe?

10    A    I met up with the agents who had called us for

11    assistance, and we noticed there was a suspected narcotics on

12    the beach.  And we got information from the agents that three

13    subjects had absconded the area.

14    Q    Upon receiving that information, what did you do?

15    A    We began a search for the outstanding subjects.

16    Q    Were you able to locate them?

17    A    Yes.

18    Q    Where did you locate them?

19    A    About a quarter mile from where the smuggling incident

20    took place.

21    Q    What condition were they in?

22    A    Sandy, wet, they were hiding in between the rocks.

23    Q    When you encountered these three individuals what did you

24    do next?

25    A    We identified ourselves as Border Patrol Agents.  We

JUAN AGUAYO – DIRECT – MS. LISKAMM

1    questioned them as to their immigration status.

2    Q    What did you determine?

3    A    They all three stated that they were Mexican citizens who

4    had no legal documents to be in the U.S.

5    Q    Did you determine what their names were?

6    A    We did.

7    Q    What were they names?

8    A    One subject was Pedro Lopez Rocha, Javier -- if I look at

9    the report, I can read the names.

10   Q    For the witness only.  Showing you what is marked

11   Government's Exhibit 3500-JA1, specifically to pages ten and

12   11 of that report.

13        Agent Aguayo, I've highlighted in pink to move the

14   process along, looking at page ten, then page 11, does that

15   refresh your recollection as to the individuals' names?

16   A    Yes.

17   Q    What were they?

18   A    Pedro Lopez Rocha, Javier Alverado Calderon, and Rafael

19   Castillo Juarez.

20   Q    After detaining these three individuals, did you return

21   to the location where the suspected narcotics were observed?

22   A    Yes, we did.

23        MS. LISKAMM:  Showing you, I believe again no

24   objection?

25        MR. LICHTMAN:  No.

RIVKA TEICH, RMR, CSR, FCRR

JUAN AGUAYO – DIRECT – MS. LISKAMM

1          MS. LISKAMM:

2    Q    What is marked 211-1 --

3          THE COURT:  Received.

4    Q    -- two, three, four, five, six.  Agent Aguayo, what are

5    we looking at here?

6    A    Those were suspected marijuana bundles.

7    Q    What type of -- looking at 211-1, is this the same?

8    A    Yes.

9    Q    And again 211-3 is another view?

10   A    Yes, ma'am.

11   Q    Now looking at Government's Exhibit 211-4, what are we

12   looking at here?

13   A    The packages that were recovered from the beach at HSI

14   Cambria office.

15   Q    Looking at Government's Exhibit 211-5, what are we

16   looking at here?

17   A    A package of marijuana broken apart from the original

18   bundle.

19   Q    It appears to have some sort of a green, leafy substance

20   here; is that correct?

21   A    Yes, ma'am.

22   Q    Lastly, 211-6, what are we looking at here?

23   A    That was a field test kit that tested the substance

24   positive for marijuana.

25   Q    Just briefly, what is a field test?

JUAN AGUAYO - DIRECT - MS. LISKAMM

1    A    Initial determination that we use in the field, a test

2    used in the field before any lab work, just a presumptive

3    test.

4    Q    After the bales on the beach were in fact seized; is that

5    correct?

6    A    Yes.

7    Q    After they were seized, what happened to them?

8    A    They were seized and turned over to the HSI agents who

9    then tested them and inventoried the narcotics.

10            MS. LISKAMM:  I believe again without objection.

11            MR. LICHTMAN:  No objection.

12            MS. LISKAMM:  Move in 211-9.

13            THE COURT:  Received.

14   Q    Agent Aguayo, what did the bales that were recovered on

15   the beach test positive for?

16   A    For the characteristics of marijuana.

17   Q    Lastly, Agent Aguayo, are you aware of whether the

18   individuals arrested on the beach were later charged?

19   A    Yes, they were.

20   Q    Where were they charged?

21   A    In the Central District of California.

22   Q    State or District Court?

23   A    State, I believe District Court of Central District.

24            MS. LISKAMM:  Showing you what is marked

25   Government's Exhibit 211-10, I believe no objection?

JUAN AGUAYO – DIRECT – MS. LISKAMM

1          MR. LICHTMAN:  I'm not sure.

2          THE COURT:  There is an objection.

3          MS. LISKAMM:  I'm happy to explain at sidebar.

4          (Continued on the next page.)

SIDEBAR CONFERENCE

```
 1              (Sidebar conference.)

 2         MS. LISKAMM:  This is the docket sheet for the three

 3    individuals that were arrested.  I believe it was part of the

 4    Power Point that Mr. Robotti put in yesterday.  It lists their

 5    names, the attorneys name, and phone number.  Everything else

 6    has been redacted out.

 7              THE COURT:  Satisfactory?

 8         MR. LICHTMAN:  Obviously it's already, I can't

 9    object.  I'm curious what is the putting the attorneys names

10    for.

11         MS. LISKAMM:  It matches up with the intercepts that

12    we introduced yesterday.

13              MR. LICHTMAN:  Understood.

14              (End of sidebar conference.)

15              (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25
```

AGUAYO - DIRECT - MS. LISKAMM

```
 1              (In open court.)

 2              THE COURT:  The Exhibit is received.

 3    BY MS. LISKAMM:

 4    Q    If we can publish.  Agent Aguayo, the three individuals

 5    that listed on this document are Pedro Lopez, correct?

 6    A    Yes, ma'am.

 7    Q    The second individual?

 8    A    Javier Alverado Lizarraga Calderon.

 9    Q    And the third individual?

10    A    Rafael Castillo Juarez.

11    Q    The attorney's name listed for the first defendant, Pedro

12    Lopez?

13    A    Humberto Diaz.

14    Q    Phone number?

15    A    (213)894-5308.

16              MS. LISKAMM:  No further questions.

17              MR. LICHTMAN:  No questions, your Honor.

18              THE COURT:  You may step down.

19              (Whereupon, the witness was excused.)

20              THE COURT:  Let's take our mid-afternoon break.

21    We'll come back here at 3:05.  Please don't talk about the

22    case.

23              (Jury exits.)

24              THE COURT:  Mr. Balarezo, you have got to cut out

25    the sarcastic interjections between questions.
```

AGUAYO – DIRECT – MS. LISKAMM

```
 1                 MR. BALAREZO:  I will.  I apologize.

 2                 (Brief recess.)

 3                 THE COURT:  Let's have the jury please.

 4                 (Jury enters.)

 5                 THE COURT:  Everyone but the witness, be seated

 6    please.

 7                 Government, who is the witness.

 8                 MS. PARLOVECCHIO:  The Government calls Alex

 9    Cifuentes Villa.

10                 THE COURT:  Raise your right hand.

11                 (Witness takes the witness stand.)

12    HILDEBRANDO ALEXANDER CIFUENTES VILLA, called as a witness,

13    having been first duly sworn/affirmed, was examined and

14    testified as follows:

15                 THE COURT:  Do you affirm the testimony you're about

16    to give is the truth nothing but the truth?

17                 THE WITNESS:  Yes, sir.

18                 THE COURT:  Please state and spell your name for the

19    record.

20                 THE WITNESS:  Hildebrando Alexander Cifuentes Villa.

21                 THE COURT:  Spell it, please.

22                 THE WITNESS:  H-I-L-D-E-B-R-A-N-D-O,

23    A-L-E-X-A-N-D-E-R, C-I-F-U-E-N-T-E-S, V-I-L-L-A.

24                 THE COURT:  You may be seated.

25                 THE WITNESS:  Thank you.
```

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

```
 1            THE COURT:  You may inquire.

 2            MS. PARLOVECCHIO:  Thank you, your Honor.

 3   DIRECT EXAMINATION

 4   BY MS. PARLOVECCHIO:

 5   Q    Good afternoon, Mr. Cifuentes.

 6   A    Good afternoon.

 7   Q    Mr. Cifuentes, how old are you?

 8   A    I'm going to turn 51 on January 18.

 9   Q    Do you have any nicknames?

10   A    Yes.

11   Q    What are your nicknames?

12   A    Panchito or Ahijado.

13   Q    What nationality are you?

14   A    I'm Colombian.

15   Q    Where did you grow up?

16   A    In Medellin, Colombia.

17   Q    How much schooling do you have?

18   A    High school.

19   Q    I see that you're using a Spanish interpreter, do you

20   also speak English?

21   A    That's right.

22   Q    What is your native language?

23   A    Spanish.

24   Q    In what language do you feel most comfortable testifying?

25   A    I would like to do it in Spanish.
```

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

1   Q     Have you ever heard of something called the Sinaloa

2   Cartel?

3   A     Yes.

4   Q     Did you have a relationship with the Sinaloa Cartel?

5   A     Yes.

6   Q     What was your relationship?

7   A     I worked for Mr. Joaquin Guzman Loera.

8   Q     What did you do for Joaquin Guzman Loera?

9   A     I would buy drugs for him, and then I would sell them for

10  him later on.

11  Q     Which drugs did you buy and sell for Joaquin Guzman?

12  A     I helped him buy cocaine, ephedrin, and I helped him sell

13  cocaine, heroin, and ice.

14  Q     During what period of time did you work for Joaquin

15  Guzman Loera?

16  A     I worked since mid 2007 up until the day I was arrested.

17  Q     When were you arrested?

18  A     I was arrested in November 2013.

19  Q     Did you ever hear the defendant describe what you did for

20  him?

21  A     Yes.

22  Q     How did he describe your role?

23  A     He would describe me as his secretary, his right-hand

24  man, and his left-hand man.

25  Q     When you worked for Joaquin Guzman, what name did you use

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

1   to refer to him?

2   A    El Senor, or Padrino, Godfather.

3   Q    Why Padrino?

4   A    He was the Godfather at my wedding.

5   Q    How well do you know the defendant?

6          MR. LICHTMAN:  Objection.

7   Q    How well do you know Joaquin Guzman?

8   A    I lived with him in the Sinaloa mountains.

9   Q    Do you see Joaquin Guzman in the courtroom today?

10  A    It's the man who is back there.

11  Q    Can you please describe him by an article of clothing

12  he's wearing?

13  A    Well, I cannot really distinguish his tie's color but it

14  is the first time I see him wearing a suit.

15  Q    Can you distinguish the color of the suit, sir?

16  A    Dark.

17  Q    Dark what?

18  A    Black.

19  Q    What color is the shirt?

20  A    Like a light purple.

21  Q    What number is he from the left?

22  A    The second one.

23         MS. PARLOVECCHIO:  Let the record reflect the

24  witness has identified the defendant.

25         MR. LICHTMAN:  No objection.

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

1          THE COURT:  So identified.

2     Q    Mr. Cifuentes, I'm showing you what is in evidence as

3     Government's Exhibit 1H.  What is depicted in this photograph?

4     A    I see Mr. Joaquin Guzman on the left-hand side.  I'm in

5     the middle.  And on the right-hand side it is Ms. Quirey

6     Estolano.

7     Q    Approximately when was this photo taken?

8     A    In 2008.

9     Q    Where were you living at the time?

10    A    In the Sinaloa mountains with Joaquin.

11    Q    Before we proceed, do you have any health issues

12    concerning your eyes?

13    A    I have a dual corneal transplant.

14    Q    Does that mean that both of the corneas in your eyes have

15    been transplanted?

16    A    That's right.

17    Q    Do you have any difficulty seeing as a result of your

18    corneal transplants?

19    A    Yes, but right now I'm wearing contact lenses.

20    Q    When did you live with the defendant?

21    A    Since approximately the fall of 2007 up until the spring

22    of 2009.

23    Q    You testified that you worked for the defendant in

24    connection with the Sinaloa Cartel.  To your knowledge what

25    was the defendant's position within the Sinaloa Cartel?

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

1    A    He was the boss.

2    Q    What, if any, terms did you hear the defendant use when

3    he referred to the Sinaloa Cartel?

4    A    La Empresa, The Company, Los Confederados, or La

5    Federacion, The Federation.

6    Q    You stated that you bought and sold drugs for the

7    defendant.  Did you consider yourself a member of the Sinaloa

8    Cartel?

9    A    Yes.

10   Q    At what point did you consider yourself a member of the

11   Sinaloa Cartel?

12   A    Starting in 2007.

13   Q    When in 2007?

14   A    I would say the fall of 2007.

15   Q    What specific work did you do for the defendant from fall

16   2007 to November 2013?

17   A    I had several activities.  Starting with the purchase of

18   cocaine in Colombia, cocaine in Ecuador.  I would send money

19   to Bolivia to purchase cocaine, same thing in Panama.  I

20   helped him buy farms in Costa Rica, Honduras, to be able to

21   use them as a pivot point, then take the drugs all the way to

22   Mexico.  I helped him sell drugs here in New York, cocaine and

23   heroin.  I also helped sell cocaine, heroin and ice in Canada.

24   I helped him install communications systems all over the

25   mountains.  And I represented him together with him at several

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

 1    meetings as an interpreter.  I helped him get weapons.

 2    Q    Now Mr. Cifuentes, you used the term ice.  What is ice in

 3    drug trafficking?

 4    A    Ice is methamphetamines.

 5    Q    Have you ever heard the term perico?

 6    A    Yes, it is the same term to say cocaine.

 7    Q    What are some other names that you used to refer to

 8    cocaine?

 9    A    We would call it frijol.  We would call it cuadros,

10    ladrillos, merchandise.

11    Q    Are you familiar with the slang term for heroin in drug

12    trafficking?

13    A    Manteco and chiva.

14    Q    When did you start working in the drug trafficking

15    business in your life?

16    A    Since I was a child.

17    Q    How long did you work in drug trafficking?

18    A    Approximately 40 years.

19    Q    What drugs have you trafficked over the course of your

20    entire life?

21    A    Cocaine, hashish, heroin, ice.

22    Q    You mentioned something called hashish, what is hashish?

23    A    Hashish is a product that comes from the Middle East.

24    It's a little milder than marijuana, you can smoke it.

25    Q    Have you used illegal drugs?

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Which ones? |
| 3 | A | Cocaine, marijuana, and hashish. |
| 4 | Q | Have you used them other than on a social basis? |
| 5 | A | No. |
| 6 | Q | Did you ever have a problem with alcohol? |
| 7 | A | That's right. |
| 8 | Q | During which periods in your life did you have a problem |
| 9 | | with alcohol? |
| 10 | A | In the 90s and in the 2000s. |
| 11 | Q | Did you eventually stop using alcohol? |
| 12 | A | Yes. |
| 13 | Q | When did you stop? |
| 14 | A | In 2006. |
| 15 | Q | When did you stop using alcohol in 2006? |
| 16 | A | At the end of 2006. |
| 17 | Q | Why did you stop using it then? |
| 18 | A | I had pancreatitis; I almost died. |
| 19 | Q | Were you sober during the period that you were dealing |
| 20 | | with the defendant? |
| 21 | A | Always. |
| 22 | Q | Have you ever used false names? |
| 23 | A | Yes, of course. |
| 24 | Q | Which false names? |
| 25 | A | I used Jose Alejandro Turado Ortiz, Alejandro Garza Sada, |

ALEX CIFUENTES - DIRECT - MS. PARLOVECCHIO

```
1    Alejandro Osuna Buria, Romel Alberto Sada de la Garza, Felipe

2    Aguilar Islas, Enrique Rodriguez Garcia, Mauricio Garza Sada.

3    Q    Did have you documents in these false names?

4    A    Yes.

5    Q    Have you ever paid bribes in connection with your drug

6    trafficking activities?

7    A    Yes.

8    Q    Have you ever lied to law enforcement officers to keep

9    them from arresting you?

10   A    Yes.

11   Q    Have you ever been dishonest with your family members

12   about your personal affairs about your drug business?

13   A    Yes.

14   Q    Who is Jorge Cifuentes Villa?

15   A    Jorge Cifuentes is my second brother.

16   Q    What did Jorge do for work?

17   A    He was a drug trafficker.

18   Q    I'm going to show what you is in evidence as Government's

19   Exhibit 42, who is this?

20   A    My brother Jorge Milton.

21   Q    Did you work for Jorge Milton?

22   A    I did work for my brother Jorge Milton, yes.

23   Q    What did you do for him?

24   A    I worked in the area of accounting.  I received several

25   cocaine operations in Mexican waters.
```

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

1   Q    What code words did you and Jorge use for cocaine when

2   you were working together?

3   A    XT, puntos, camisetas, T-shirts.

4   Q    Aside from Jorge, did you work in the drug business with

5   any other members of your family?

6   A    Yes.

7   Q    What other family members did you work with?

8   A    With my brother, Francisco Ivan.

9   Q    Did your brother Francisco Ivan have any nicknames?

10  A    Yes.

11  Q    What were they?

12  A    Pachito and El Menor.

13  Q    What did Francisco do in the drug business?

14  A    He transported cocaine shipments.

15  Q    Over what period of time did you work with your brother

16  Francisco?

17  A    End of 2005.

18  Q    I'm going to show you what is in evidence Government's

19  Exhibit 41, who is depicted here?

20  A    My brother, Francisco Ivan.

21  Q    To your knowledge, did your brother Francisco ever have

22  business with the defendant during the period when you were

23  working with him in the end of 2005?

24  A    That's right.

25  Q    What kind of business?

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

1   A    Cocaine.

2   Q    Briefly, how do you know about that?

3   A    I was once with my brother on Hangar 34 at the Olaya

4   Herrera Airport in Medellin and one of his pilots came with a

5   guy.  He was saying that he was representative of Mr. Joaquin

6   Guzman Loera, the name of the guy was Tony.  My brother asked

7   me for the favor to confirm that in fact this person was there

8   on behalf of Mr. Joaquin.

9   Q    Around this time did you in late 2005, do you recall an

10  incident involving a carbon fiber airplane?

11  A    That's right.

12  Q    What was that incident?

13  A    There was a plane that was coming in two parts.  My

14  brother -- they were bringing it into the Olaya Herrera

15  Airport in Medellin.  That airplane was a Lanquer.  My brother

16  told me that he had just rescued that plane belonged to Chapo.

17  Q    Did your brother Francisco tell you why the defendant had

18  a carbon fiber airplane in Colombia?

19  A    No, he did not tell me.

20  Q    Who is Dolly Cifuentes villa?

21  A    Dolly Cifuentes is my sister.

22  Q    I'm going to show you what is in evidence as Government's

23  Exhibit 40, who is depicted in this photograph?

24  A    My sister, Dolly Cifuentes.

25  Q    What, if anything, did your sister Dolly Cifuentes do in

ALEX CIFUENTES – DIRECT – MS. PARLOVECCHIO

1    connection with the drug business?

2    A    My sister worked with us.  She would receive the money of

3    the drug sales of the cocaine and the heroin sales, so that

4    she could buy again in Colombia, so she could use it again to

5    buy more cocaine in Colombia and Ecuador.

6    Q    To your knowledge, did Dolly ever work with the defendant

7    in the drug business?

8    A    Yes.

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Denise Parisi, RPR, CRR

CIFUENTES/DIRECT/PARLOVECCHIO

1    DIRECT EXAMINATION

2    BY MS. PARLOVECCHIO: (Continued.)

3    Q    How do you know that Dolly worked in the drug business

4    with the defendant?

5    A    She would receive my own instructions.

6    Q    What instructions?

7    A    Whatever I would ask her, starting with accounting in

8    Colombia.  One time a plane that was loaded up with drugs was

9    sent.

10   Q    When was that?

11   A    December 2008.

12   Q    You said there was a plane loaded up with drugs in

13   December 2008.  What drugs did you and Dolly send on this

14   plane?

15   A    We sent cocaine base, a few kilos of heroin, a few kilos

16   of ephedrine, and some --

17           THE INTERPRETER:  The interpreter needs to clarify a

18   term.

19   A    -- and some cocaine -- coca seeds, rather.

20   Q    How much cocaine base was on this plane in December 2008?

21   A    Approximately 440 kilos.

22   Q    To whom did you send these drugs?

23   A    To Mr. Joaquin Guzman Loera.

24   Q    Where did these drugs arrive?

25           THE INTERPRETER:   I'm sorry, did you say "where"?

CIFUENTES/DIRECT/PARLOVECCHIO

1    Q    Where did these drugs arrive?

2    A    That plane arrived in Campeche, Mexico.

3    Q    What type of plane?

4    A    It was a modified beach craft.  Joaquin sent the money

5    for the purchase of that plane.  Very kindly, he gave my

6    sister the opportunity to do that job.

7    Q    Now, what happened to this drug shipment?

8    A    Mr. Joaquin told me that the police had seized the drugs

9    on their way to Culiacan.

10   Q    Were you eventually arrested for your drug crimes?

11   A    That's right.

12   Q    Now, you testified earlier that you were arrested in

13   November 2013.  What U.S. charges were against you when you

14   were arrested?

15   A    International drug trafficking.

16   Q    Did there come a time when you came to the United States

17   to face U.S. charges?

18   A    That's right.

19   Q    What was the legal process by which you got to the United

20   States?

21   A    Through extradition.

22   Q    Where were you extradited from?

23   A    I was extradited from Colombia, Bogota.

24   Q    When you were in Colombia, were you in jail?

25   A    That's right.

CIFUENTES/DIRECT/PARLOVECCHIO

```
 1   Q    Did you have a list of cell phones while you were there

 2   in jail in Colombia?

 3   A    That's right.

 4   Q    Was this common or uncommon in Colombian prisons?

 5            MR. LICHTMAN:  Objection.

 6            THE COURT:  Get a little more first.

 7            MS. PARLOVECCHIO:  I can move on.

 8            THE COURT:  Okay.

 9   BY MS. PARLOVECCHIO:

10   Q    While you were in prison in Colombia, did you speak to

11   your brother Jorge?

12   A    Yes.

13   Q    Approximately when was that?

14   A    December.  The end of December, 2014.

15   Q    How many times did you speak with him?

16   A    At least twice.

17   Q    How long did your conversations last?

18   A    No longer than five minutes.

19   Q    At the time you spoke to your brother Jorge, did you know

20   that you had a case in the United States?

21   A    Yes.  Yes, that's right.

22   Q    Did you talk to Jorge about what you were going to do in

23   your case in the United States?

24            MR. LICHTMAN:  Objection.  Leading.

25            THE COURT:  Overruled.
```

Denise Parisi, RPR, CRR

CIFUENTES/DIRECT/PARLOVECCHIO

1    A    No.

2    Q    What, if anything, did Jorge say to you?

3    A    He told me, and I quote specifically his words, that with

4    the Americans, I should confess the way that I would confess

5    to God, and that if I decided to go to trial --

6              MR. LICHTMAN:  Objection.

7              THE COURT:  Overruled.

8    A    -- he would be the first one who would sit down and

9    testify against me.

10   Q    Did you talk to Jorge about what you were going to say to

11   the U.S. Government when you came to the U.S.?

12   A    No.

13   Q    Did Jorge tell you what he had said to the United States

14   Government?

15   A    No.

16   Q    Did you talk to Jorge about what you were going to say

17   about the defendant?

18   A    No.

19   Q    Did Jorge mention any individuals to you on this call?

20   A    Yes.

21   Q    Who did he mention?

22   A    He told me that if it was possible to get Goliath, his

23   friend, to hand him over to the United States Government, that

24   that would be very good.

25   Q    What is Goliath's other name?

CIFUENTES/DIRECT/PARLOVECCHIO

1    A    He is Shimon Yelenick.

2    Q    When was the last time you spoke to Jorge?

3    A    That was the last time that I spoke to him.

4    Q    When were you extradited to the United States?

5    A    I was extradited on January 14th, 2016.

6    Q    Did you plead to your U.S. charges?

7    A    That's right.

8    Q    How did you plead?

9    A    I pled guilty.

10   Q    Did you have charges in one U.S. District or more than

11   one?

12   A    In more than one.

13   Q    Which U.S. districts?

14   A    The Southern District of Florida and the Southern

15   District in New York.

16   Q    In what courthouse did you plead guilty?

17   A    I pled guilty in this Court.

18   Q    In the Eastern District of New York?

19   A    That's correct, ma'am.

20   Q    Now, when you pled guilty, did you do it in English or in

21   Spanish?

22   A    I did it in English.

23   Q    And which crimes did you plead guilty to?

24   A    I pled guilty to manufacturing cocaine in the Southern

25   District and conspiracy for the same thing here in New York.

CIFUENTES/DIRECT/PARLOVECCHIO

1    Q    What sentence are you facing based upon your guilty plea?

2    A    From ten years to life.

3    Q    Are you obligated to pay any financial penalty?

4    A    That's right.

5    Q    What is that penalty?

6    A    A million dollars.

7    Q    Did you also face a fine?

8    A    Yes.

9    Q    And how much could that be?

10   A    Between 1 million and $10 million.

11   Q    Now, as a part of your guilty plea, did you sign any

12   agreement with the Government?

13   A    Yes.

14   Q    What is that agreement called?

15   A    It's called a cooperation agreement.

16        MS. PARLOVECCHIO:  Just for the witness.

17   BY MS. PARLOVECCHIO:

18   Q    I'm showing you what's marked for identification as

19   Government's Exhibit 3500-HACV-6.  Will you take a look at

20   that, Mr. Cifuentes.

21        Mr. Cifuentes, what are we looking at here?

22   A    We are looking at my Cooperation Agreement.

23   Q    How do you recognize it?

24   A    Well, it says Cooperation Agreement and my full name is

25   on there.

CIFUENTES/DIRECT/PARLOVECCHIO

1          MS. PARLOVECCHIO:  Government moves to admit

2    Government's Exhibit 3500-HACV-6.

3          MR. LICHTMAN:  No objection.

4          THE COURT:  Received.

5          (Government's Exhibit 3500-HACV-6 received in

6    evidence.)

7    BY MS. PARLOVECCHIO:

8    Q    Mr. Cifuentes, directing your attention to the last page

9    of 3500-HACV-6, whose signature is that?

10   A    That's my signature.

11   Q    Now, as a part of this agreement, did you make any

12   promises?

13   A    Yes.

14   Q    What did you promise to do?

15   A    To tell the truth.

16   Q    Did the Government agree to do anything for you if you

17   abided by the terms of your agreement?

18   A    Yes.

19   Q    What would they agree to do if you abide by the terms of

20   your agreement?

21   A    Issue a letter to the Honorable Judge.

22   Q    Is there a name for this letter?

23   A    They call it the 5K1.

24   Q    What is this 5K1 letter supposed to do?

25   A    This letter can give an idea -- a full idea to the judge

CIFUENTES/DIRECT/PARLOVECCHIO

1  of everything bad that I've done during my entire life and the

2  good things.

3  Q     Now, do you expect the Government to recommend any

4  particular sentence in this letter?

5  A     No.

6  Q     Who will decide your sentence?

7  A     The Honorable Judge.

8  Q     Is the Judge required to give you a more lenient sentence

9  as a result of getting this letter?

10 A     No.

11 Q     Does the filing of this 5K1 letter depend on the result

12 of this case?

13 A     No.

14 Q     Did the Government agree to potentially provide you with

15 any other benefits?

16 A     Yes.

17 Q     What is that?

18 A     An S visa.

19 Q     Now, Mr. Cifuentes, I want to direct your attention to

20 2002.

21        Where were you living at the time?

22 A     I lived in Mexico City.

23 Q     For whom were you working when you lived in Mexico City

24 in 2002?

25 A     For my brother, Jorge Milton Cifuentes.

CIFUENTES/DIRECT/PARLOVECCHIO

1    Q    Did there come a time in 2002 when Jorge sent you to do a

2    meeting on his behalf?

3    A    That's right.

4    Q    What meeting did he ask you to attend?

5    A    Jorge asked me the favor to help him with an appointment

6    in Culiacan to go meet Mr. Joaquin Guzman Loera.

7    Q    What was the purpose of this meeting?

8    A    It was -- it was to do a job, a partnership.

9    Q    What type of partnership?

10   A    To get 5,000 kilos of cocaine on a tuna fishing boat that

11   Mr. Joaquin Guzman Loera had or that he had access to.

12   Q    Who went to this meeting with you?

13   A    I traveled to the city of Culiacan with Mr. Ruben

14   Reygosa.  He was my brother's trusted man.  He was Mexican.

15   Q    Where in Culiacan did this meeting take place?

16   A    In the outskirts of the city of Culiacan.

17   Q    How did you get to the meeting once you arrived in

18   Culiacan?

19   A    Can you repeat the question, please?

20   Q    Sure.

21        How did you get to the meeting once you arrived in

22   Culiacan?

23   A    Well, Mr. Ramon, who is that same man, Damaso Lopez

24   Nunez, took me to the ranch where Mr. Joaquin Guzman Loera

25   was.

CIFUENTES/DIRECT/PARLOVECCHIO

1   Q    What kind of a ranch?

2   A    It was a ranch that was an ostrich ranch.  It belonged or

3   used to belong to the ex partner of my brother's, Jorge

4   Milton.

5   Q    Now, you mentioned that somebody named Damaso took you to

6   this meeting.  Who is Damaso?

7   A    Damaso is Mr. Joaquin Guzman's lawyer, personal

8   secretary, and partner.

9   Q    And when did you first meet Damaso?

10  A    At that place in Culiacan.

11  Q    And you mentioned that the ostrich ranch used to belong

12  to your brother Jorge's partner.  Who did belong to at that

13  time when you went to this meeting?

14  A    I believe it was the widow of Mr. Robachivas.

15  Q    Now, you mentioned that this is the first time you had

16  met Damaso.  Did you know him by any other names?

17  A    Later on, I learned of the other names that Mr. Joaquin

18  would call him.

19  Q    Which names are those?

20  A    He would call him Felizardo, Armando, or Licensiado.

21  Q    I'm going to show you what's in evidence as Government's

22  Exhibit 11-A.

23          (The above-referred to exhibit was published.)

24  BY MS. PARLOVECCHIO:

25  Q    Who is depicted in this photograph?

Denise Parisi, RPR, CRR

CIFUENTES/DIRECT/PARLOVECCHIO

```
 1   A     Licensiado Damaso Lopez Nunez.

 2   Q     How did Damaso refer to the defendant?

 3   A     El Patron.

 4   Q     Now, did you, in fact, meet with the defendant on this

 5   occasion in 2002?

 6   A     Yes, certainly.

 7   Q     Now, what did you see when you arrived at the ostrich

 8   ranch?

 9   A     Well, at the entrance, there were several people in Don

10   Joaquin's personal bodyguard team.  They were armed with

11   rifles, and there was a green Explorer truck with dark

12   windows, and it was on.  The driver's side door was ajar, and

13   there was a nurse waiting for him because they were -- he was

14   drawing blood.

15   Q     Now, who was present for this meeting at the ranch?

16   A     Mr. Reygosa, who was sent by my brother; me; and

17   Mr. Joaquin Guzman Loera.

18   Q     And what happened after you arrived at the ranch?

19   A     We sat down to talk.  I asked Mr. Joaquin if there was

20   the possibility that he would provide the boat so we could

21   load it, and Mr. Joaquin said it was very possible.  I told

22   him that my brother wanted to load it up with 5,000 kilos.

23   Joaquin told me that he wanted to put on it just a thousand

24   kilos.

25   Q     Did you reach a final agreement at this meeting?
```

CIFUENTES/DIRECT/PARLOVECCHIO

1    A    No.  The conversation remained open.

2    Q    Aside from drug business, did you discuss anything else

3    with the defendant at this meeting?

4    A    That's right.

5    Q    What was that?

6    A    About the security of Mr. Joaquin.

7    Q    What did you say to him about his security?

8    A    I asked him if he knew how to fly helicopters.  He said

9    no.  I told him that all of my brothers had taken courses to

10   fly helicopters and that indeed they did fly helicopters, and

11   I told him that that was really good for his safety because in

12   the event that the police would go try to arrest him, or if

13   there was, like, a really significant incident, all he needed

14   to do was get in the helicopter, turn it on, and he could fly

15   from one mountain to the other.

16   Q    What did the defendant say?

17   A    He was surprised, and he asked me if, in fact, my

18   brothers knew how to fly, and I said yes.

19   Q    Did you say anything to him about -- anything else about

20   a helicopter?

21   A    Yes.  I told him that my brother had one in Mexico City

22   and that I was going to ask him if he would send it to him.

23   Q    Now, what happened after this meeting at the ostrich

24   ranch?

25   A    Well, Mr. Joaquin Guzman said good-bye to me and then we

Denise Parisi, RPR, CRR

CIFUENTES/DIRECT/PARLOVECCHIO

 1   went to Mexico City.

 2   Q    Did you --

 3   A    And I gave my brother a report regarding everything that

 4   we had discussed.  I told him that I noticed that his security

 5   was a little fragile and that he should send him the

 6   helicopter so that he would have better security.

 7   Q    Did your brother, Jorge, ever do this 5,000 kilo cocaine

 8   deal with the defendant using a tuna boat?

 9   A    I wouldn't know what to say, ma'am.

10   Q    Do you know or do you not know?

11   A    I do not know.

12   Q    Did your brother, Jorge, ever send the defendant a

13   helicopter?

14   A    I heard that that was the case.

15   Q    Who did you hear from?

16   A    Because I learned that the helicopter had gotten damaged

17   in Culiacan because they turned it on inside of a hanger.

18   Q    Did you see the helicopter before it crashed?

19   A    Well, I saw it in Mexico.

20   Q    I'm going to show you what's in evidence as Government's

21   Exhibit 814.

22           (The above-referred to exhibit was published.)

23   BY MS. PARLOVECCHIO:

24   Q    What's depicted in this photograph?

25   A    The helicopter.

Denise Parisi, RPR, CRR

CIFUENTES/DIRECT/PARLOVECCHIO

```
1    Q    Which helicopter?

2    A    That was my brother's helicopter.

3    Q    Now, what, if anything, was notable about the turbine on

4    this helicopter?

5    A    In Mexico, at the time, there were only two helicopters

6    that had the back turbine.

7    Q    I now want to direct your attention to April 2007.

8         What happened in your family around that time?

9    A    My brother Francisco was murdered.

10   Q    Where were you when you learned that your brother,

11   Francisco, had been killed?

12   A    In the city of Cancun.

13   Q    Did you speak to your brother Jorge after you learned

14   your brother, Francisco, had been killed?

15   A    Yes.

16   Q    What did you speak to Jorge about?

17   A    About that security issue that they were killing us off.

18   Q    What else?

19   A    And about the fact that my brother needed some cash and

20   that there were some pending debts on behalf of my brother,

21   Francisco.

22   Q    Now, what, if anything, did Jorge want to do to resolve

23   the debts your family had after Francisco died?

24   A    Well, to start working again in the drug business.

25   Q    Did Jorge tell you how much money he wanted to raise?
```

CIFUENTES/DIRECT/PARLOVECCHIO

1    A    He needed about $10 million.

2    Q    Now, what happened after you had this discussion with

3    Jorge?

4    A    Well, since I had just had the pancreas surgery and I

5    still had a fistula in my stomach, I told him I was going to

6    undergo a second surgery in Mexico City, and that if I managed

7    to come out alive of that surgery, I was going to do whatever

8    was needed.

9    Q    So did you come out alive?

10   A    I'm here.

11   Q    And what happened after your surgery?

12   A    Well, after the surgery, my brother made arrangements for

13   me to go to the city of Culiacan and to interview with

14   Mr. Joaquin Guzman Loera.

15   Q    What was the purpose of you going to see the defendant?

16   A    To go back to work and to try to find out who had killed

17   our brother so that we could retaliate.

18   Q    Now, who arranged this meeting with the defendant?

19   A    My brother, Jorge, through Licensiado Damaso Lopez Nunez.

20   Q    Did you ever meet the defendant in 2007?

21   A    Yes, that's right.

22   Q    Approximately when in 2007 did you meet the defendant?

23   A    It was, like, in the summer, beginning of autumn.

24   Q    Where did this meeting take place?

25   A    In the Sinaloa mountains.

CIFUENTES/DIRECT/PARLOVECCHIO

1   Q    How did you get to the defendant's location in the
2   Sinaloa mountains?
3   A    Well, first, I was taken to a landing strip that was
4   right in the outskirts of the city, there was a pilot who was
5   waiting for us there, and I was taken in a small plane at
6   2:06.  It was, like, a 45-minute flight right on top of the
7   mountains, and then we landed on a small airstrip that was
8   sort of like -- it had an incline.
9   Q    What did you see when you landed in the mountains?
10  A    When I landed, I saw a group of men who were in ATVs.
11  They were wearing camouflaged clothing and they had rifles.
12  Q    What happened after you landed?
13  A    Well, after I landed, the bodyguards picked me up and
14  then they took me over to where Mr. Joaquin Guzman Loera was.
15  Q    Approximately how many guards did you see on that
16  occasion?
17  A    There were several.  Let's say, 50.
18  Q    Now, did you speak with the defendant on this occasion?
19  A    That's right.
20  Q    What did you talk about?
21  A    Well, we were talking about my brother -- my brother,
22  Francisco.  He told me that he hadn't had the pleasure of
23  meeting him.  He offered his sympathy for my brother's death,
24  and he told me that the best thing was for us to start
25  working.  He asked me about my brother Francisco's widow, and

Denise Parisi, RPR, CRR

CIFUENTES/DIRECT/PARLOVECCHIO

 1   about who the people who worked for him were, and he said to

 2   bring them over.

 3   Q    Now, what happened after this meeting ended?

 4   A    Well, I was trying to get in touch with my brother,

 5   Jorge, from there because I had my own computer, but in that

 6   place, Joaquin didn't have any Internet.  I slept over there

 7   that night in a little tent that he assigned to me so that I

 8   could sleep right outside of the kitchen.

 9   Q    Why did you stay overnight?

10   A    Because it was a little late already, and the small

11   airplane couldn't come from the city all the way up to the

12   mountains and then head back down again.

13   Q    Where did you go the next morning?

14   A    Well, the next day, the small plane came to pick me up

15   and I went back to Culiacan and I got in touch with my brother

16   Jorge, and I gave her -- gave him --

17             THE INTERPRETER:  Interpreter correction.

18   A    -- the details of the meeting.

19   Q    What did Jorge say?

20   A    That we were going to look for which one of the widows we

21   had to send over to Mr. Joaquin, because my brother had about

22   five wives.

23   Q    Now, did you eventually introduce one of Francisco's

24   widows to the defendant?

25   A    That's right.  I introduced him to Ms. Patricia

CIFUENTES/DIRECT/PARLOVECCHIO

1   Rodriguez.

2   Q     Did you do that in person or in some other way?

3   A     Yes, in person.

4   Q     Now, where was this meeting between the defendant and

5   Patricia?

6   A     The meeting took place in the same area, but in a

7   different house.

8   Q     Were you there?

9   A     Yes, I was present.

10  Q     What did you and Patricia discuss with the defendant on

11  this occasion?

12  A     Well, they discussed several topics.  There was some

13  money that was pending that Don Joaquin was telling Patricia

14  about, and there was also some cocaine that was pending that

15  he was going to deliver or he had already delivered to her.

16  Q     Approximately how much cocaine?

17  A     About 650 kilos, approximately.

18  Q     What else did they discuss?

19  A     They also discussed about the fact that the widow wanted

20  to leave the work farms to Mr. Joaquin Guzman Loera, one that

21  is located in the northern Colombian Pacific side, and

22  Mr. Joaquin called it Rancho Viejo, and another one that's in

23  the area of Uraba that was called Casa Coima or Tower 80 --

24  ochenta.  What was really nice about that one was that it had

25  its own landing strip.  Mrs. Patricia also told him about how

CIFUENTES/DIRECT/PARLOVECCHIO

1   the farms worked and how to use them in the drug business.

2   Q    What, if any, agreements did the defendant and Patricia

3   reach at this meeting?

4   A    That Joaquin would keep the farms, but that before

5   anything, they would test them out first.  The farm in the

6   Traco (ph) area, she offered it to him for $9 million, and

7   Joaquin thought that that was a very high price, and she

8   agreed that she would bring to him the deeds.  They also

9   reached an agreement to work in a cocaine shipment.  The widow

10  asked for -- from him 35 percent of all of the work.  Don

11  Joaquin offered her 25 percent.

12  Q    Now, how large is this cocaine shipment supposed to be?

13  A    It was going to be a shipment of 3,000 kilos, where each

14  kilo -- well, the widow told him that each kilo would cost

15  $2400, and Don Joaquin agreed and Don Joaquin agreed to

16  sending the money.

17  Q    Now, what did you and Patricia do right after this

18  meeting?

19  A    After the meeting, we went down to Culiacan and we gave a

20  report to Don Joaquin's personal secretary, Damaso Nunez.  And

21  in addition to this, Don Joaquin very kindly said that he

22  would send some representatives and observers to each farm and

23  to verify that indeed we could work out of those farms.

24  Q    Now, did you meet with the defendant again after that?

25  A    That's right.

Denise Parisi, RPR, CRR

CIFUENTES/DIRECT/PARLOVECCHIO

1    Q    When was the next meeting with the defendant?

2    A    It was a little after the first visit with Patricia.

3    Q    Who was with you on that occasion?

4    A    I brought Negrito up.

5    Q    Who is Negrito?

6    A    He was my brother Francisco's favorite cook.

7    Q    What kind of a cook?

8    A    Cocaine cook.

9    Q    Now, did you introduce Negrito to the defendant?

10   A    Yes, ma'am.

11   Q    Where did the meeting between you, the defendant, and

12   Negrito take place?

13   A    At the same place where we had taken Mrs. Patricia.

14   Q    What did the defendant discuss with Mr. Negrito?

15   A    They discussed about cocaine base and about setting up a

16   lab in Mexico so that they could finish up with the cocaine

17   process right there in Mexico; and they talked about -- well,

18   they were talking about that shipment of 10,000 kilos, but

19   Joaquin wanted a 50 percent discount -- actually, he wanted it

20   as a credit.  As a good businessman, always trying to get some

21   advantage from the actual business deal.

22   Q    Now, when was your next meeting with the defendant?

23   A    The next meeting was with my niece's husband.  Juan

24   Bonito is what we called him.

25   Q    Now, briefly, what did the defendant and Juan Bonito

CIFUENTES/DIRECT/PARLOVECCHIO

1   discuss with you at this meeting?

2   A    With Juan we discussed bringing money down because he was

3   the person that my brother trusted to do that.

4   Q    Approximately how much money did the defendant discuss

5   with Juan Bonito?

6   A    Joaquin said that he had $40 million to bring down

7   monthly, and that was between him and his cousin, Arturo

8   Beltran Leyva, all together.

9   Q    Now, you testified earlier that you and Patricia

10  discussed a 3,000 kilogram deal with the defendant.  Did the

11  defendant ultimately do this 3,000 kilogram deal with

12  Patricia?

13  A    Yes, that's right.

14  Q    Approximately when did that take place?

15  A    Well, that was right then in December, approximately

16  December 2008 when it was completed.

17  Q    2008?

18  A    Yes.

19  Q    At the beginning or the end of 2008?

20  A    At the beginning.

21  Q    Now, how much cocaine did the defendant receive from you

22  and Patricia?

23  A    It was 2,951 kilos.  There was a -- an added cost of $500

24  per kilo.

25  Q    How was the cocaine transported from Colombia?

CIFUENTES/DIRECT/PARLOVECCHIO

1   A    That shipment came up by sea on the Pacific Ocean.

2   Q    Who was in charge of overseeing the arrangements for the

3   shipment?

4   A    Licensiado Damaso Lopez Nunez.  Well, the person -- the

5   people in charge of loading up the boat, including El Cuate

6   and a group of boaters that Joaquin Guzman Loera very kindly

7   sent to do that job.

8   Q    Was the shipment of 2,951 kilograms successful?

9   A    Yes.

10  Q    Did the defendant continue to work with El Cuate?

11  A    Yes.  Certainly.

12  Q    How do you know that the defendant continued to work with

13  El Cuate?

14  A    Patricia told me that Cuate had done seven more trips

15  with Comba's people, and she complained to me about why they

16  hadn't invited her to be part of the deal.  She said they

17  hadn't paid them -- her anything.

18  Q    When you are saying "they," who are you referring to?

19  A    Mr. Joaquin Guzman Loera.

20  Q    Along with whom?

21  A    Can you repeat the question?

22  Q    Sure.

23       I asked -- you said "they," and you responded the

24  defendant.  I was asking the defendant with who.

25  A    Well, with us.  With me.

Denise Parisi, RPR, CRR

PROCEEDINGS

1   Q    Now, Mr. Cifuentes, how many times have you spoken to the

2   defendant?

3   A    I would say very many.

4   Q    When you had these conversations with the defendant, were

5   they over the phone, or were they face-to-face?

6   A    On the phone, on the radio, face-to-face.

7   Q    Approximately how long did those conversations last?

8   A    Short, long.

9   Q    Now, based on these conversations, did you become

10  familiar with the defendant's voice?

11  A    Yes.

12  Q    Mr. Cifuentes, I'm going to show you what's in evidence

13  as Government's Exhibit 601-J.

14           (The above-referred to exhibit was published.)

15           THE COURT:  Ms. Parlovecchio?

16           MR. PARLOVECCHIO:  Yes.

17           THE COURT:  Do you want to break?

18           MS. PARLOVECCHIO:  This would be a good time to

19  break, Your Honor.

20           THE COURT:  Ladies and gentlemen, over the weekend,

21  remember not view any media coverage of this case, do not talk

22  to anybody about it, don't research anything about it on the

23  Internet, no Googling, no Binging, no Yahooing, no

24  Facebooking, no Tweeting, nothing to do with this case.  Put

25  it out of your mind, please, until I see you back here Monday

PROCEEDINGS

1    at 9:30.

2              Have a great weekend.

3              (Jury exits.)

4              THE COURT:  Okay.  Anything else we need to address?

5              MS. PARLOVECCHIO:  Not from the Government, Your

6    Honor.

7              MR. BALAREZO:  No, Your Honor.

8              THE COURT:  Have a good weekend.

9

10             (Matter adjourned to January 14, 2019, 9:30 a.m. )

11

12                         *****

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

| | |
|---|---|
| RODRIGUEZ/DIRECT/GOLDBARG | 4837 |
| RODRIGUEZ/CROSS/BALAREZO | 4888 |
| RODRIGUEZ/REDIRECT/GOLDBARG | 4958 |
| RODRIGUEZ/RECROSS/BALAREZO | 4960 |
| AGUYAYO/DIRECT/LISKAMM | 4961 |
| GEX 513-2 | 4859 |
| GEX 602-G | 4869 |
| GEX 816-1 to 816-4 | 4875 |
| 601-H-1E1 | 4875 |
| GEX 601H-1B1 | 4878 |
| GEX 817 | 4880 |
| GEX 601I1-11 | 4883 |
| GEX 829 | 4962 |
| GEX 211-1 | 4966 |
| GEX 211-9 | 4967 |
| GEX 211-10 | 4970 |
| CIFUENTES/DIRECT/PARLOVECCHIO | 4972 |
| GEX 3500-HACV-6 | 4989 |

ALEX CIFUENTES

LISA SCHMID, CCR, RMR