MANDATE

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 25th day of January, two thousand twenty-two,

Before:     Jon O. Newman,
            Gerard E. Lynch,
            Michael H. Park,
                *Circuit Judges.*

_____

United States of America,

              Appellee,

        v.

Joaquin Archivaldo Guzman Loera, AKA El Chapo,
AKA El Rapido, AKA Chapo Guzman, AKA Shorty,
AKA El Senor, AKA El Jefe, AKA Nana, AKA Apa,
AKA Papa, AKA Inge, AKA El Viejo, AKA Joaquin
Guzman-Loera,

              Defendant - Appellant.

_____

**JUDGMENT**

Docket No. 19-2239

The appeal in the above captioned case from a judgment of the United States District Court for the Eastern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 03/09/2022

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2021

Argued:  October 25, 2021               Decided: January 25, 2022

Docket No. 19-2239

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

      APPELLEE,

V.

JOAQUIN ARCHIVALDO GUZMAN LOERA, AKA EL CHAPO, AKA EL
RAPIDO, AKA CHAPO GUZMAN, AKA SHORTY, AKA EL SENOR, AKA
EL JEFE, AKA NANA, AKA APA, AKA PAPA, AKA INGE, AKA EL VIEJO,
AKA JOAQUIN GUZMAN-LOERA,

      DEFENDANT - APPELLANT.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before:  NEWMAN, LYNCH, and PARK, *Circuit Judges*.

---

[1] The Clerk is directed to conform the official caption as above.

Appeal from the July 18, 2019, judgment of the District Court for the Eastern District of New York (Brian M. Cogan, District Judge), convicting Joaquin Archivaldo Guzman Loera, known as "El Chapo," of conducting a continuing criminal enterprise, drug trafficking conspiracies, unlawful use of a firearm, and a money laundering conspiracy.

AFFIRMED.

> MARC FERNICH, Law Office of Marc Fernich, New York, NY, for Defendant-Appellant Joaquin Archivaldo Guzman Loera.
>
> HIRAL D. MEHTA, Asst. U.S. Atty., Brooklyn, NY, and Brett C. Reynolds, Trial Atty., Washington, DC (Mark J. Lesko, Acting U.S. Atty. for the Eastern District of New York, Michael P. Robotti, David C. James, Patricia E. Notopoulos, Asst. U.S. Attys., Brooklyn, NY, Arthur G. Wyatt, Chief, Narcotic & Dangerous Drug Section, Criminal Division, U.S. Dept. of Justice, Ariana Fajardo Orshan, U.S. Atty. for the Southern District of Florida, on the brief), for Appellee United States of America.

JON O. NEWMAN, *Circuit Judge*:

Appellant Joaquin Archivaldo Guzman Loera ("Guzman"), known as "El Chapo," appeals from the July 18, 2019, judgment of the District Court for the Eastern District of New York (Brian M. Cogan, District Judge), convicting him, after a three-month jury trial, of conducting a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(a)-(b). The CCE comprised a number of large-scale narcotics violations and a murder conspiracy. Guzman was also convicted of drug trafficking conspiracies, unlawful use of a firearm, and a money laundering conspiracy. He was sentenced primarily to five concurrent terms of life imprisonment for the CCE and narcotics trafficking violations and 30 years consecutively for the firearms violation, and ordered to forfeit more than $12 billion.

Guzman makes ten claims on appeal: (1) his indictment should have been dismissed under the doctrine of specialty, (2) he was denied his Fifth and Sixth Amendment rights to a fair trial and the effective assistance of counsel, primarily because of the conditions of his pretrial detention, (3) the murder conspiracy,

charged as one of the CCE violations, should have been dismissed, (4) the Government violated the Fourth Amendment and Rule 41 of the Federal Rules of Criminal Procedure when it obtained electronic data from servers located in the Netherlands and the state of Washington, (5) the District Court exceeded its discretion in making various evidentiary rulings, (6) Guzman's lead lawyer had a *per se* conflict of interest, (7) Guzman was prohibited from presenting a defense of Government bias, (8) the jury charge on unanimity was erroneous, (9) a new trial should have been granted based on juror misconduct, and (10) the case should be remanded for a hearing on whether the Government and the District Court engaged in improper *ex parte* proceedings.

We conclude that none of these claims has merit and therefore affirm.

## Background

*Facts*. Guzman is the former leader of a Mexican drug trafficking organization known as the Sinaloa Cartel. Under his leadership, the Sinaloa Cartel imported more than a million kilograms of cocaine and hundreds of kilograms of heroin, marijuana, and methamphetamine into the United States. The Sinaloa

Cartel used murder, kidnapping, torture, bribery of officials, and other illegal methods to control territory throughout Mexico and to subdue opposition. The extensive trial evidence included testimony from 14 cooperating witnesses.

Facts relating to Guzman's specific claims on appeal are set forth in the discussion of those claims.

*Procedure.* In July 2009, a grand jury in the Eastern District of New York ("E.D.N.Y.") indicted Guzman, and a warrant was issued for his arrest. At that time, Guzman had been a fugitive in Mexico for approximately eight years after escaping from a Mexican prison in 2001 by bribing prison officials. In 2014, Mexican authorities recaptured Guzman and detained him in a maximum-security prison. However, in 2015, he escaped again after digging a mile-long tunnel starting under his cell. In 2016, he was recaptured by Mexican authorities.

In May 2016, a grand jury in E.D.N.Y. returned a fourth superseding indictment against him.[2] In 2017, Mexico extradited Guzman to the United States to stand trial.

---

[2] We note that the fact of a fourth superseding indictment, 09-CR-466 (S-4), is helpfully reflected by the ending "(S-4)," although the District Court's docket entry reporting the judgment

After a three-month jury trial, Guzman was convicted of a CCE offense (Count I), an international narcotics conspiracy (Count II), a cocaine importation conspiracy (Count III), a cocaine distribution conspiracy (Count IV), international distribution of cocaine (Counts V, VI, VII, and VIII), use of firearms in relation to drug trafficking crimes (Count IX), and conspiracy to launder narcotics proceeds (Count X).[3] At sentencing, Counts II, III, and IV were dismissed on the Government's motion as lesser included offenses. Guzman was sentenced to five concurrent sentences of life imprisonment for the CCE and the drug trafficking offenses (Counts I, V, VI, VII, and VIII), a consecutive 30-year term for the firearms offense (Count IX), and a concurrent term of 240 months for the money laundering offense (Count X). Guzman was also ordered to forfeit more than $12 billion.

---

uses the letter "s" three times to identify counts of the fourth indictment. Twenty-two years ago, encountering a ninth superseding indictment, we suggested the use of "S9" or "S-9" in preference to an indictment numbered with "s" repeated nine times. *See United States v. Marquez*, 909 F.2d 738, 740 n.1 (2d Cir. 1990).

[3] The numbering of the counts is from the jury's verdict sheet and differs from the numbering of the counts in the superseding indictment.

**Discussion**

**1. Specialty Claim**

Guzman contends that the indictment violated the doctrine of specialty, an international law principle requiring that an extradited defendant "can only be tried for one of the offenses described in th[e] [extradition] treaty, and for the offense with which he is charged in the proceedings for his extradition." *United States v. Rauscher*, 119 U.S. 407, 430 (1886). Guzman makes two challenges to his extradition. First, after Mexico agreed to extradite him to the United States to stand trial on charges in indictments returned in the Western District of Texas and the Southern District of California, the Government, he alleges, fraudulently procured Mexico's waiver of the specialty doctrine in order to transfer him to E.D.N.Y. to stand trial on charges in an indictment returned there. Second, he alleges that Mexico did not agree to the harsh conditions of his pretrial detention.

In May 2016, Mexico granted the Government's request to extradite Guzman to the United States, and he was extradited in January 2017 pursuant to the Extradition Treaty between the United States and Mexico, May 4, 1978, 31

U.S.T. 5059 ("Treaty"). Thereafter, pursuant to Article 17 of the Treaty, Mexico

consented to an exception to the doctrine of specialty in order to transfer Guzman

to E.D.N.Y. to face prosecution there. In September 2017, the District Court denied

Guzman's motion to dismiss the E.D.N.Y. indictment based on the doctrine of

specialty. The Court ruled that Guzman lacked standing to invoke the doctrine,

relying on this Court's decision in *United States v. Barinas*, 865 F.3d 99, 105 (2d Cir.

2017).

The Treaty provides:

> "A person extradited under the present Treaty shall not be
> detained, tried or punished in the territory of the requesting
> Party for an offense other than that for which extradition has
> been granted nor be extradited by that Party to a third State
> unless . . . [t]he requested Party has given its consent to his
> detention, trial, punishment or extradition to a third State
> for an offense other than that for which the extradition was
> granted."

Treaty art. 17.

The Treaty does not confer an individual right to assert violations of the

Treaty. In *Barinas*, we explained that "'international treaties establish rights and

obligations between States-parties—and generally not between states and

individuals, notwithstanding the fact that individuals may benefit because of a treaty's existence.'" 865 F.3d at 104-05 (quoting *Mora v. New York*, 524 F.3d 183, 200 (2d Cir. 2008)). Accordingly, "[a]n extraditee lacks standing to complain of noncompliance with an extradition treaty unless the 'treaty [contains] language indicating "that the intent of the treaty drafters" was that such benefits "could be vindicated" through private enforcement.'" *Id.* at 105 (quoting *United States v. Garavito-Garcia*, 827 F.3d 242, 247 (2d Cir. 2016) (quoting *United States v. Suarez*, 791 F.3d 363, 367 (2d Cir. 2015)). "'[S]pecialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused.'" *Id.* (quoting *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973)).

In his memorandum of law in support of his motion to dismiss, Guzman acknowledged that "the Second Circuit's . . . decision in . . . *Barinas* . . . appears to preclude" the District Court "from granting" his motion but argued that "*Barinas* was wrongly decided." *United States v. Guzman Loera*, 09-cr-00466, ECF No. 110 at 1-2 (E.D.N.Y. Aug. 3, 2017).

We decline to reconsider *Barinas* and are "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *NML Capital v. Republic of Argentina*, 621 F.3d 230, 243 (2d Cir. 2010) (citation omitted). As Guzman conceded in the District Court, that decision is dispositive here.

Moreover, Mexico explicitly consented to having Guzman tried on the indictment returned in E.D.N.Y. To the extent that a few of our sister circuits have expressed willingness to entertain a defendant's specialty argument in the absence of an express waiver by the extraditing sovereign, none of them has done so in the face of such a waiver. *See, e.g.*, *United States v. Puentes*, 50 F.3d 1567, 1575 (11th Cir. 1995) ("[A]n individual extradited pursuant to an extradition treaty has standing under the doctrine of specialty . . . [but] enjoys this right at the sufferance of the requested nation. As a sovereign, the requested nation may waive its right to object to a treaty violation and thereby deny the defendant standing to object to such an action."); *United States v. Fontana*, 869 F.3d 464, 469 (6th Cir. 2017) (same); *United States v. Riviere*, 924 F.2d 1289, 1291 (3d Cir. 1991) ("[I]n light of an express waiver

by the Commonwealth of Dominica of any restrictions on his prosecution by the United States, Riviere cannot successfully assert rights under the treaty."). Thus, to the extent there is any disagreement among the circuits about a defendant's standing to raise a specialty objection in the absence of a waiver by the extraditing nation, there is no support for granting such standing in a case like this, in which Mexico has explicitly consented to having Guzman tried on the instant indictment.

Because Guzman lacks standing to challenge his trial on the basis of the extradition treaty, his specialty claim was properly rejected.

## 2. Claim of Restrictions Denying Fifth and Sixth Amendment Rights

Guzman contends that his Fifth and Sixth Amendment rights to present a defense and to have the effective assistance of counsel were unconstitutionally restricted in various ways: (1) he was subjected to unduly harsh conditions of pretrial solitary confinement, including special administrative measures ("SAMs"); (2) he was denied access to material information that the Government classified as implicating national security interests, and the Government unreasonably restricted his access to certain witnesses based on security concerns;

and (3) he was denied the ability to present a defense because the District Court issued an improper protective order.

*Conditions of pretrial confinement.* Guzman contends that the conditions of his pretrial detention were so harsh that they deprived him of a meaningful opportunity to participate in his own defense and to receive a fair trial. After Guzman was transferred to E.D.N.Y., the United States Attorney General determined that Guzman was a substantial threat to others and a flight risk and that several highly restrictive SAMs should be implemented during his detention.[4] The basis for the Attorney General's characterization included Guzman's history of escaping from Mexican prisons, having prospective witnesses murdered, bribing prison officials, and using third parties to continue to manage the Sinaloa Cartel from prison.

Guzman was placed in Special Housing Unit 10 ("SHU") of the Metropolitan Correctional Center with highly restricted access to mail, media,

---

[4] The Attorney General may authorize implementation of "special administrative measures that are reasonably necessary to protect persons against risk of death or serious bodily injury" pursuant to 28 C.F.R. § 501.3(a).

telephone, and visitors. The SHU is "the most secure housing available at any Bureau of Prisons facility in the New York City Metropolitan Area and is generally reserved for terrorism suspects and other inmates considered to be a danger to other inmates and/or prison guards." *In re Basciano*, 542 F.3d 950, 953 n.1 (2d Cir. 2008) (citation omitted).

As described by Guzman, and not disputed by the Government, his conditions of confinement included the following:

• he was confined to a small, windowless cell for 23 hours a day from Monday through Friday, with one hour of exercise permitted in another solitary cell that has a stationary bicycle and a treadmill;

• he was confined to his cell for 24 hours each day on weekends without any exercise;

• he was always alone;

• his meals were passed through a slot in his cell;

• the light in his cell was always on;

• with erratic air-conditioning, he often lacked enough warm clothing to avoid shivering;

• he never went outdoors;

• although he purchased a small clock, it was removed from his cell; and

• without a window or access to natural light, the clock was his only way to distinguish night from day.

Guzman remained in the SHU for two-and-a-half years before his conviction.

Because the SHU does not have room for contact visits, Guzman's meetings with counsel occurred in what the District Court called the "divided room" and the "auxiliary room." *United States v. Guzman Loera*, No. 09-cr-00466, ECF No. 155 at 1-2 (E.D.N.Y. Oct. 17, 2017) (order denying defendant's motion for contact visits with attorney). In the divided room, Guzman and his attorney were separated by a heavy metal door with a narrow rectangular plexiglass window in the top half. The attorney portion was equipped with a 32-inch computer monitor. The "auxiliary room" contained a computer monitor on the inmate's side, and the

Government later modified it to include a computer monitor on the attorney's side.

The District Court denied Guzman's motion to vacate the SAMs, ruling that the pretrial conditions of Guzman's detention passed constitutional muster under the four-factor test laid out in *Turner v. Safley*, 482 U.S. 78 (1987).[5] The District Court pointed out that Guzman's second escape from a Mexican prison "was accomplished under 24-hour video surveillance in solitary confinement." *United States v. Guzman Loera*, No. 09-cr-00466, ECF No. 71 at 5 (E.D.N.Y. May 4, 2017) (order granting in part and denying in part defendants' motion to modify the SAMs).

With respect to the denial of contact visits with counsel, the District Court ruled that modifications to the divided room and the auxiliary room enabled

---

[5] The four *Turner* factors are: (1) a valid, rational connection between the prison regulation and a legitimate government interest; (2) whether there is an alternative way for the prisoner to exercise the asserted right; (3) the impact that accommodation of the asserted right would have on guards, inmates, and prison resources; and (4) the absence of ready alternatives to the regulation at issue. 482 U.S. at 89-91.

Guzman "to work effectively with his counsel."[6] *Id.*, ECF No. 155 at 6 (E.D.N.Y. Oct. 17, 2017).

Because Guzman's constitutional objection to his solitary confinement is predicated on his Fifth and Sixth Amendment rights to present a defense and to receive a fair trial, we apply the four-factor test laid out in *Turner*, 482 U.S. at 89, to determine whether the conditions in the SHU were "reasonably related to legitimate penological objectives or whether [they] represent[ed] an exaggerated response to those concerns." *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (citation omitted). Where the prison regulation at issue is imposed upon a pretrial detainee, as opposed to a convicted prisoner, the restriction must be regulatory and not punitive. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *El-Hage*, 213 F.3d at 81.

---

[6] In response to Guzman's request for contact visits with his counsel, Judge Cogan referred the issue to Chief Magistrate Judge Roanne L. Mann, who recommended granting Guzman's request. Chief Magistrate Judge Mann's concerns stemmed primarily from the conditions making it impracticable for Guzman to review documents simultaneously with his counsel. Judge Cogan declined to accept the recommendation after the Government proposed making several adjustments to Guzman's conditions of confinement, including outfitting the auxiliary room with a monitor on the attorney side and installing a slot to facilitate the transfer of documents. Judge Cogan also noted that Chief Magistrate Judge Mann could not have considered the Government's modifications to the divided room and the auxiliary room because the Government introduced them after she had made her recommendation.

The District Court did not err in concluding that Guzman was able to assist in his own defense and receive a fair trial, despite the conditions of his pretrial confinement. First, the Government demonstrated a sufficient connection between its security concerns and Guzman's segregation from the general prison population. Guzman's history of bribing prison officials, harming cooperating witnesses, escaping from prison, and continuing to manage his illegal enterprise from jail were valid bases for the Government to seek his segregation. *See El-Hage*, 213 F.3d at 81 (finding a legitimate government purpose in preventing a pretrial detainee from communicating with others to orchestrate terrorist attacks by placing him in solitary confinement); *United States v. Felipe*, 148 F.3d 101, 110 (2d Cir. 1998) (first *Turner* factor satisfied because "Appellant has shown himself to be resourceful in the past[, and] it cannot now be definitely determined that he will refrain from. . . order[ing] the commission of a violent act"). Next, the Government was entitled to deem the only alternative to Guzman's solitary confinement—release into the general prison population—unacceptable. The Government's security concerns stemmed primarily from Guzman's behavior if

he were to communicate with others, and therefore no "ready alternative[]" was available. *Turner*, 482 U.S. at 90; *see also El-Hage*, 213 F.3d at 82 (confinement in general population not a reasonable alternative "[b]ecause [appellant's] dangerousness arises out of the information he might communicate to others"). Finally, the risk to prison guards and other inmates if Guzman were placed in the general population is also supported by the Government's evidence that he previously bribed prison officials and attempted to harm cooperating witnesses. *See Felipe*, 148 F.3d at 111 (likelihood that appellant would continue illegal activity if he were able to communicate with others "could significantly impact not only his fellow inmates, but also individuals living outside prison"). Each *Turner* factor supports the Government's legitimate security concerns.

The conditions of Guzman's pretrial confinement, harsh as they were, do not provide a basis for disturbing his conviction. We emphasize that our task is limited to considering his claim that those conditions violated his Fifth and Sixth Amendment rights. We have no occasion to consider whether these conditions might have warranted relief directed to modifying the conditions before trial.

*Protective orders*. Guzman contends that the District Court's April 3, 2017, protective order was improper for two reasons. First, he challenges paragraph 6, which prohibited removal from the United States of what the order termed "Protected Discovery." Protected Discovery was defined to include witness statements, information that could lead to the identification of potential witnesses, information related to ongoing investigations, and information related to sensitive law enforcement techniques. Second, he challenges paragraph 5, which required District Court approval before Protected Discovery could be shown to persons not part of defense counsel's team, other than prospective expert witnesses. Paragraph 5 also required defense counsel to submit the names of such persons to so-called firewall counsel,[7] who would have an opportunity to respond to the District Court prior to the Court's approval.

These restrictions were well within the discretion of the District Court under Rule 16(d)(1) of the Federal Rules of Criminal Procedure, *see Alderman v. United*

---

[7] Firewall counsel were Government lawyers familiar with the Guzman investigation, who maintained complete separation from the prosecuting lawyers. *See United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) (approving use of firewall counsel).

*States*, 394 U.S. 165, 185 (1969), and no substantial prejudice, which is required to warrant relief, *see United States v. Vinas*, 910 F.3d 52, 60 (2d Cir. 2018), has been shown.

Guzman also challenges the District Court's Feb. 5, 2018, and April 4, 2018, protective orders, permitting the Government to defer disclosure of various discovery documents until close to the trial. These orders, indeed, all aspects of the District Court's entire management of discovery, were also within the District Court's broad discretion in such matters. *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 122 (2d Cir. 2008); *United States v. Delia*, 944 F.2d 1010, 1018 (2d Cir. 1991).

*Ex parte filings.* Guzman challenges various instances in which the Government submitted *ex parte* filings to the District Court. He contends that these filings were improper under this Court's decision in *United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004). In *Abuhamra*, we ruled that it was improper for the District Court to rely on an *ex parte* affidavit filed by the Government because it was submitted in opposition to a request for bail pending sentencing and affected the

defendant's liberty. *See* 389 F.3d at 322. The filings challenged in the present case were not presented to justify any restriction on liberty interests similar to those at issue in *Abuhamra*. Instead, they were offered for such matters as support of deferred disclosure of discovery, to inform the District Court about Guzman's housing during trial, and a request to permit a witness to testify under a pseudonym. The District Court carefully explained sufficient bases for each use of an *ex parte* filing.

*Classified Information Protection Act ("CIPA") motions*. Guzman objects on appeal to several *ex parte* motions made by the Government concerning material protected under CIPA, 18 U.S.C. app. 3 §§ 1-16. Guzman received contemporaneous notice of all the motions to which he now objects, and did not oppose any of them in the District Court. Under applicable standards of plain error review, *see United States v. Olano*, 507 U.S. 725, 736-37 (1993), there is no basis for any relief.

### 3. Murder Conspiracy Claim

Guzman contends that the District Court erred in denying his motion to dismiss Violation 27,[8] one of the offenses within the CCE offense charged in Count I. Violation 27 alleged Guzman's role in a murder conspiracy in violation of 21 U.S.C. § 848(e). Guzman challenges Violation 27 because, he argues, section 848(e) is only a sentencing enhancement and not a separate substantive offense.

Section 848 criminalizes participation in a CCE, and subsection 848(e) authorizes the death penalty for intentionally killing someone while engaged in a CCE. *See* 21 U.S.C. § 848(e)(1)(A)–(B). This Court has construed section 848(e) to constitute a separate substantive offense rather than a sentencing enhancement. *See United States v. Fletcher*, 997 F.3d 95, 97 (2d Cir. 2021) ("[A] violation of § 848(e)(1)(A) is a standalone, substantive offense that is distinct from the underlying drug crime."). Furthermore, the Supreme Court has instructed that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United*

---

[8] The murder conspiracy was charged as Violation 85 of Count I of the 4th superseding indictment but was submitted to the jury as Violation 27.

*States*, 570 U.S. 99, 103 (2013); *see also Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000). Because section 848(e) increases the mandatory minimum for predicate offenses from 10 to 20 years and increases the maximum penalty from life imprisonment to death, it "constitute[s] a new, aggravated crime, each element of which must be submitted to the jury." *Alleyne*, 570 U.S. at 113.

Guzman's motion to dismiss Violation 27 was properly denied.

Guzman also contends that even if section 848(e) creates a standalone offense, the introduction of evidence of the murders violated Rule 403 of the Federal Rules of Evidence because such evidence was both prejudicial and cumulative. However, evidence of these murders was admissible as direct proof of the CCE charge. The crux of the Government's case against Guzman was that he was the ringleader of the Sinaloa Cartel. Evidence that he ordered murders to maintain control went directly to his role as the leader of the cartel. The District Court had discretion to allow the jury to hear about the lengths to which Guzman went to maintain control over his criminal enterprise.

**4. Fourth Amendment and Rule 41 Claims**

Guzman contends that evidence of calls and text messages derived from two surveillance operations should have been suppressed.

*The Dutch Calls*. Guzman contends that the Government violated the Fourth Amendment when it obtained conversations in telephone calls stored on servers in the Netherlands (the "Dutch Calls") and that the District Court erred in not suppressing these conversations. Obtaining these conversations was the result of several events. Before any action by the Government, a computer engineer had set up a private, encrypted communications system, which was used by Guzman and some of his Colombian cocaine suppliers. In 2008, Guzman met the engineer and asked him to set up a similar network ("Guzman Network") to enable him and members of the Sinaloa Cartel to communicate with each other. The Guzman Network consisted of several servers that supported voice communications, emails, and text messages. These servers, initially located in Colombia, were moved to Mexico and then to Canada.

In early 2011, FBI agents obtained the cooperation of the engineer, who then became a confidential source ("CS"). At the direction of the FBI agents, the CS moved the Guzman Network servers to the Netherlands.

The Government obtained the Dutch Calls from the Guzman Network by three methods. First, Dutch authorities conducted surveillance of three IP addresses associated with the network's servers from April 2011 through December 2011 after receiving Mutual Legal Assistance Treaty ("MLAT") requests from the Government and obtaining Dutch judicial authorization. Second, in early April 2011, after the Government had submitted MLAT requests to Dutch authorities, but prior to the beginning of the Dutch authorities' surveillance, the CS accessed the servers directly and downloaded Guzman's calls. The CS also downloaded data from the servers in late June and early July 2011, after the FBI became aware that the Dutch authorities' interception method was not capturing all of the calls passing through the servers. Third, in September and October 2011, Dutch authorities obtained search warrants for the servers after the Government became aware that they contained specific calls.

Prior to trial, Guzman moved to suppress the Dutch Calls, arguing that they were obtained in violation of the Fourth Amendment. In August 2018, the District Court denied Guzman's motion.

"The party moving to suppress bears the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). The District Court correctly ruled that Guzman had failed to meet this burden because, to establish standing, he relied on the affidavit of an agent lacking personal knowledge that the Dutch servers belonged to Guzman. *See United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995). Guzman does not challenge this ruling on this appeal.

Even if Guzman had established standing, the Fourth Amendment does not apply to "the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country."[9] *United States v. Verdugo-Urquidez*, 494 U.S. 259, 261 (1990). With respect to the Dutch Calls, neither Guzman

---

[9] Although the CS was acting as an agent of the Government, we need not determine whether Dutch authorities were Government agents. Even if the Dutch authorities are subject to the higher standard applicable to Government agents, Guzman's argument fails.

nor the servers on which the calls were stored were located in the United States. Accordingly, the Dutch Calls were not subject to Fourth Amendment protections.[10]

*The FlexiSpy Data*. Guzman contends that the Government violated the Fourth Amendment and Rule 41 of the Federal Rules of Criminal Procedure when it obtained and searched data captured by use of spyware called FlexiSpy (a program that collects information without the knowledge of device users). Before the CS began assisting the Government, Guzman asked him to provide the capability for Guzman to monitor the conversations of his girlfriends. The CS purchased licenses for FlexiSpy, created usernames and passwords for these accounts, and installed the spyware on various mobile devices that Guzman gave to his girlfriends and members of the Sinaloa Cartel. The FlexiSpy software collected and stored messages sent to and from these devices, including messages from Guzman discussing his criminal activities. These messages were ultimately

---

[10] Guzman also argues for the first time on appeal that certain calls originating from an IP address ending in 103 were of unexplained origin and therefore obtained in violation of the Fourth Amendment. Guzman's argument lacks merit because the record demonstrates that these calls were routed through the servers of the Guzman Network.

stored on an Amazon cloud server in the Western District of Washington. Guzman effectively intercepted his own messages and enabled the Government to do so as well.

In December 2011 and January 2012, at the direction of the FBI, the CS downloaded data from the Amazon server, which the FBI transferred onto DVDs. After each download, the Government obtained warrants ("FlexiSpy Warrants I and II") to search the DVDs. The Government also obtained another warrant ("FlexiSpy Warrant III") to search the FlexiSpy data directly, without any download.

In August 2018, the District Court denied Guzman's motion to suppress the FlexiSpy data in the same ruling that denied suppression of the Dutch Calls. As with the Dutch Calls, the Court ruled that Guzman lacked standing to make a Fourth Amendment challenge to the FlexiSpy data for lack of sworn evidence. *See Montoya-Eschevarria*, 892 F. Supp. at 106. We agree.

In addition, the District Court ruled that even if the Fourth Amendment applied, neither downloading the FlexiSpy data nor searching the FlexiSpy data

violated the Fourth Amendment because Guzman had no reasonable expectation of privacy after giving access to the data to third parties such as the CS and co-conspirators. *See Carpenter v. United States*, 138 S. Ct. 2206, 2216 (2018) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." (citation omitted)). Again, we agree.

Guzman also contends that FlexiSpy Warrant III was issued in violation of Rule 41 of the Federal Rules of Criminal Procedure. Specifically, he contends that this warrant violated the venue provision of Rule 41(b)(1) because a magistrate judge in the Southern District of New York issued the warrant for electronic data located in the Western District of Washington.

The District Court ruled that, "although Rule 41(b) does not appear to provide a basis for the magistrate judge to have issued the warrant[,] . . . the Stored Communications Act [("SCA")] does," and such warrants do not need to comply with Rule 41(b).[11] *United States v. Guzman Loera*, No. 09-cr-00466, ECF No. 298

---

[11] Guzman argues that the warrant was not issued pursuant to the SCA because it did not explicitly invoke the SCA. However, the warrant application indicates that "immediate notification may have an adverse result listed in 18 U.S.C. § 2705," which is a provision of the SCA.

(E.D.N.Y. Aug. 30, 2018) (order denying defendant's motion to suppress). The parties agree that neither the Supreme Court nor this Circuit has determined whether warrants issued pursuant to the SCA are exempted from Rule 41(b)'s geographic restrictions.

However, three circuits have ruled that warrants issued pursuant to the SCA are exempted from the venue limitation of Rule 41(b), and no circuit has ruled to the contrary. *See United States v. Ackies*, 918 F.3d 190, 201 (1st Cir. 2019); *United States v. Bansal*, 663 F.3d 634, 662 (3d Cir. 2011); *United States v. Berkos*, 543 F.3d 392, 397-98 (7th Cir. 2008). We agree with our sister circuits and find that the geographical limitations of Rule 41(b) do not apply to warrants issued under SCA § 2703 for essentially the same reasons set forth in those decisions. *See, e.g.*, *Ackies*, 918 F.3d at 201.

The District Court properly denied Guzman's motion to suppress.

## 5. Evidentiary Rulings

Guzman challenges several evidentiary rulings. He contends that the District Court incorrectly weighed prejudice to the Government in deciding to

preclude evidence in several instances. Guzman relies on *United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984), to argue that the only issue for the District Court to consider when seeking to admit evidence as a "shield" under Rule 404(b) is "whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense."[12] *Id.* at 912. However, *Aboumoussallem* also held that evidence that is relevant under Rule 404(b) may be excludable under Rule 403. *Id.* ("Though admissible under Rule 404(b), relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by 'the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay . . . .'") (quoting Fed R. Evid. 403). In each of the alleged instances of error, the District Court cited factors such as unfair prejudice, confusion of the issues, or cumulative evidence as grounds to exclude the evidence.

Guzman also contends that the District Court erred when it admitted

---

[12] While Guzman cites Rule 404(b), in many instances he actually sought to admit prior bad acts not to show motive, opportunity, plan, etc., but rather to impeach a witness. Such evidence is admitted pursuant to Rules 607-609.

evidence that was "inextricably intertwined" with evidence of the charged offense because "other circuits have criticized or done away with . . . 'inextricably intertwined' theories of intrinsic evidence." However, this Court has not. *See United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Guzman also contends that the District Court improperly permitted the Government to withhold evidence suggesting Guzman worked for other traffickers. Guzman argues that the evidence was exculpatory and required to be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), because it "bore directly on whether Guzman was a principal administrator, organizer, or leader of the enterprise," which is an element of 21 U.S.C. § 848(b). However, section 848(b) can also be satisfied if the defendant is "*one of several* such principal administrators, organizers, or leaders." *Id.* (emphasis added). Therefore, the District Court had discretion to rule that evidence that Guzman was not the sole leader of the enterprise was not exculpatory.

Guzman challenges the District Court's decision to preclude cross-examination regarding a cooperating witness's auditory hallucinations suffered

while in solitary confinement in 2001. The District Court may exclude evidence if its probative value is substantially outweighed by its potential for unfair prejudice. *See* Fed. R. Evid. 403. The District Court properly excluded evidence of the auditory hallucinations for various reasons, including their remoteness in time.

Finally, Guzman challenges the District Court's preclusion of cross-examination of another cooperating witness regarding that witness's paranoid beliefs and alleged acts of drugging fellow prison inmates in Colombia. The District Court ruled that because the witness's unorthodox beliefs did not "fundamentally alter[] the witness's ability to function or participate in everyday life," the witness's beliefs could not be the subject of cross-examination. *United States v. Guzman Loera*, No. 09-cr-00466 (BMC) (E.D.N.Y. Nov. 12, 2018) (order denying defendant's request for reconsideration of preclusion of evidence). The Court also ruled that the other proposed cross-examination would have been cumulative and had little probative value. The exclusion of this cross-examination was within the District Court's discretion and not remotely prejudicial.

## 6. Conflict of Interest Claim

Guzman contends, for the first time on appeal, that his lawyer, Jeffrey Lichtman, had a *per se* conflict of interest because Lichtman allegedly "negotiated questionable settlements" in other cases and aided Guzman in violating the SAMs. Guzman's allegations are based on leaked texts allegedly written by Lichtman including one in which Lichtman asked if it is "bad that I'm hiring a belly dancer to be Chapo's daily visitor? . . . he has no pretty women visiting him. I feel bad." and another in which Lichtman indicated that in the "past year I've gotten three insanely high settlements for consensual sex as sex harassment."[13]

"The trial court has an obligation to inquire into the facts and circumstances of an attorney's interests either in response to a timely conflict of interest objection, or 'when it knows or reasonably should know of the possibility of a conflict of interest.'" *United States v. Stantini*, 85 F.3d 9, 13 (2d Cir. 1996) (citation omitted) (quoting *Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir. 1991)). This Court recognizes three types of conflicts of interest: *per se*, actual, and potential. *See United States v.*

---

[13] Dana Schuster, *Sarma Melngailis Had a Steamy Affair with Her Married Lawyer*, N.Y. Post (Jan. 12, 2019), https://nypost.com/2019/01/12/sarma-melngailis-had-an-x-rated-relationship-with-her-married-lawyer/ (last visited Jan. 8, 2022).

*Williams*, 372 F.3d 96, 102-03 (2d Cir. 2004). "[A] *per se* conflict of interest requires 'automatic reversal without a showing of prejudice.'" *Id.* at 103 (quoting *United States v. John Doe No. 1*, 272 F.3d 116, 125 (2d Cir. 2001)). We have recognized a *per se* conflict "only where trial counsel is not authorized to practice law and where trial counsel is implicated in the 'same or closely related criminal conduct' for which the defendant is on trial." *Id.* (quoting *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993)). Even if the allegations against Lichtman are credible, aiding violation of the SAMs and conduct in other cases is not the "same or closely related" criminal conduct for which Guzman is on trial. There was no *per se* conflict of interest.

## 7. Denial of Complete Defense Claim

Guzman contends that the District Court deprived him of his right to present a complete defense in violation of the Fifth and Sixth Amendments by precluding him from arguing that "investigatory and prosecutorial bias hopelessly tainted the integrity and reliability of the case the [G]overnment had assembled, rendering it wholly unworthy of belief." Prior to trial, the Government moved to preclude a selective prosecution defense, and the District Court granted the

motion. Nonetheless, at trial Guzman's counsel argued that the Government was biased and driven by an improper motive. The District Court warned counsel to discontinue such arguments and issued a curative instruction.

Guzman's argument relies primarily on *Kyles v. Whitley*, 514 U.S. 419 (1995). In *Kyles*, the prosecution committed a *Brady* violation by failing to provide exculpatory evidence, including inconsistent statements made by a key witness. *See id.* at 454. The Court observed that, with knowledge of the statements, "the defense could have examined the police to good effect on their knowledge of [the witness's] statements and so have attacked the reliability of the investigation in failing even to consider [the witness's] possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted." *Id.* at 446. *Kyles* concerned the use of police negligence or misconduct to question the quality of the investigation, whereas Guzman sought to argue improper motive and accuse the Government of suborning perjury. *See United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (defense improperly "invited jury nullification by questioning the Government's motives in subpoenaing appellants

and prosecuting them for contempt"). Here, there is no evidence of a *Brady* violation, and Guzman was permitted to cross-examine witnesses and challenge their credibility. Furthermore, Guzman's arguments concerning prosecutorial bias amount to claims of selective prosecution and outrageous Government conduct, both of which must be decided by the trial court, not the jury. *See United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (selective prosecution); *United States v. Nunez-Rios*, 622 F.2d 1093, 1098 (2d Cir. 1980) (outrageous government conduct). Guzman was not deprived of a complete defense.

## 8. Unanimity Charge Claim

In his *pro se* brief, Guzman contends that the jury instruction on unanimity was erroneous because, he argues, it required the jury to reach a verdict. However, there was no such requirement. The District Court's standard language on the purpose of jury deliberations included urging the jurors to consider each others' views "and to reach an agreement based on the evidence presented, *if you can do so without violence to your own individual judgment*." The instruction continued by telling the jurors that "[i]f . . . you still entertain a conscientious view that differs

from the others, you're not to yield your conviction simply because you're outnumbered." *Id*. at 7040:20-25. The charge was entirely correct.

**9. Juror Misconduct Claim**

Guzman contends that the District Court abused its discretion by denying his motion under Rule 33 of the Federal Rules of Criminal Procedure for a new trial and an evidentiary hearing based on alleged juror misconduct. The claim is based on a magazine article that appeared in a publication called "VICE News" one week after the jury returned its verdict. In the article, an unnamed juror alleged that the jurors followed media coverage of the trial on Twitter in violation of their oaths and the District Court's partial sequestration order, and that they heard about allegations of defense counsel's personal affairs, as well as allegations—precluded from the evidence at trial by the District Court—that Guzman drugged and raped underaged girls. The Government responds that the District Court properly investigated the allegation of juror exposure to media and sufficiently instructed the jury.

As an initial matter, the District Court did not exceed its discretion in denying Guzman's request for a factual hearing. Courts should be especially "hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983). "Allegations of juror misconduct . . . raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process." *Tanner v. United States*, 483 U.S. 107, 120 (1987).

Here, the unsworn, uncorroborated statements that one unidentified juror made to a magazine reporter do not constitute the "clear, strong, substantial and incontrovertible evidence," *Moon*, 718 F.2d at 1234, requiring any juror inquiry beyond that already made. The District Court was keenly aware of the vast media coverage that Guzman's trial received every day. Judge Cogan instructed the jury that it was imperative to avoid all media coverage about the case, first during three days of *voir dire*, then daily, and sometimes twice daily, during the trial, and again in his final jury charge.

On two separate occasions during the trial, the District Court canvassed the jury and spoke with jurors individually about news articles they had seen.[14] The first was after publication of an article reporting an affair by Guzman's trial attorney. The second was after extensive media publicity concerning allegations of Guzman drugging and sexually abusing underage women. In the presence of counsel for both parties, Judge Cogan spoke to the two jurors who admitted to exposure to extra-record information and concluded that these jurors remained impartial.[15] The District Court did not exceed its discretion by refusing to bring the jury back to court to ask them the same questions again. The Court was allowed to credit its own observations over an unidentified juror's statements in an uncorroborated news article.

The District Court also properly denied Guzman's request for a new trial. Judge Cogan thoroughly examined each basis for Guzman's motion for a new trial

---

[14] The District Court followed the three-part test that this Court outlined in *United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir. 1987), to determine whether media coverage affected a juror's ability to be impartial.

[15] One juror briefly noticed a newspaper headline concerning the case before turning away. The other juror saw only the words "El Chapo had" on an internet application, Reddit, before closing the page.

and—presuming the allegations in the VICE News article to be true—determined that the jury was not prejudiced by any extraneous information to which they might have been exposed. Moreover, any possible prejudice was harmless in view of the overwhelming evidence of Guzman's guilt that was presented at his three-month long trial. *See Farhane*, 634 F.3d at 168-69 ("While the law presumes prejudice from a jury's exposure to extra-record evidence, that presumption may be rebutted by a 'showing that the extra-record information was harmless.'" (citations omitted) (quoting *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994)).

Guzman argues that the article demonstrates that the jury lied to the Court, which, he contends, constitutes structural error. We disagree. None of the allegations in the VICE News article shows that any juror was not impartial, harbored bias against Guzman, or was otherwise unfit to serve. There was no structural error that deprived Guzman of "'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.'" *Neder v. United States*, 527 U.S. 1, 8-9 (1999) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)). The District Court properly concluded that, even

crediting the article's allegations, any untruthfulness on the part of the jury" does not mandate an automatic reversal without a showing of harm." *United States v. Guzman Loera*, No. 09-cr-00466, ECF No. 633 at 40 n.23 (E.D.N.Y. July 3, 2019) (order denying defendant's motion for new trial).

The District Court did not exceed its discretion in denying Guzman an evidentiary hearing or a new trial, and neither is warranted now.

**10. Improper *Ex Parte* Proceeding Claim**

Guzman finally contends that the District Court and the Government engaged in improper *ex parte* communications that undermined Guzman's defense. Specifically, Guzman contends that at some point in 2018, the District Court conducted a video conference with Government counsel, Guzman himself, and "shadow counsel" appointed to represent Guzman, in the absence and without the knowledge of his counsel of record, to discuss a potential disposition of the case. The problem arose when lawyers purporting to represent Guzman contacted the Government and attempted to initiate plea negotiations, representing that Guzman had authorized their actions but did not want his

counsel of record to be aware of their involvement. The District Court appointed an independent lawyer, who had previously been assigned to advise Guzman in connection with a conflict of interest inquiry pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), to consult with Guzman and advise the Court and the Government as to his preferences with respect to representation. The conference was intended to explore Guzman's choice of counsel and whether he would accept a plea bargain.

As Guzman concedes, he was represented at the conference and, as is obvious, he chose not to plead guilty. It is understandable why, at that time, Guzman would not have wanted his counsel of record to attend the conference. The entire sequence of events was set in motion by Guzman's own effort to engage in overtures to the Government without the knowledge of his counsel of record. The conference was not an improper *ex parte* communication, and Guzman's request for a factual inquiry before a different district court judge is denied.

**Conclusion**

Judge Cogan conducted the three-month trial with diligence and fairness, after issuing a series of meticulously crafted pretrial rulings. For the reasons set forth above, the resulting judgment of the District Court is AFFIRMED.