*Law Offices of*
*Mariel Colon Miro, PLLC*
*300 Cadman Plaza W 12ᵗʰ Floor #381*
*Brooklyn, NY 11201*
*Ph: (917) 743-7071*
*Email: mcolon@marielcolonmiro.com*

January 24, 2024

The Honorable Brian M. Cogan
United States District Court Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: *United States v. Guzmán Loera, 09-CR-466 (BMC) & 22-CV-6300***

Your Honor:

I am filing this *pro se* document on behalf of Mr. Guzmán Loera. I simply translated word by word what Mr. Guzmán wrote in Spanish.

Thank you for your consideration in this matter.

Respectfully submitted,

Mariel Colón Miró, Esq.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____X

UNITED STATES OF AMERICA


     -against-                           Nº 09-cr-0046


JOAQUÍN A. GUZMÁN LOERA
_____X


Dear Judge Cogan,

     I include exhibits on each point here. That way it will be easier for you to see the great inefficiency that some of the defense attorneys carried out and the fraud committed by the U.S. Government.


## POINT I: History of Mr. Guzmán

     In his first motion, Mr. Guzmán describes how his problem began. His case became too political and it all began with the death of Cardinal Juan Jesús Posadas Ocampo at the Guadalajara airport in Mexico on May 24, 1993. That day the Mexican government classified Mr. Guzmán as the largest and most dangerous drug trafficker of the world. One day before that event, Mr. Guzmán did not exist for the Mexican government. But the next day everything changed.

     That May 24, 1993, Mr. Guzmán arrived at the Guadalajara airport to go to the beach. He parked his car and got out to look for his suitcases in the trunk. When he was opening the trunk of the car to unload his things, another car arrived and parked right next to Mr. Guzmán's car. While Mr. Guzmán was taking out his luggage, he heard gunshots very close to him. Mr. Guzmán realized that some men were shooting at the car next to him. The people in the parking lot began to run, including Mr. Guzmán, who left all his belongings behind to look for somewhere to hide. Mr. Guzmán's identification was also left there on the parking lot floor. The Mexican government took advantage of that and grabbed Mr. Guzmán's identification to have someone to blame.

     The next day, the Mexican government invented a story, which it released through the media. They invented that Mr. Guzmán had been in a crossfire against a rival group of drug traffickers, the Arellano Félix, and that the Cardinal had died in a crossfire between Mr. Guzmán and the Arellano Félix.

1

But a forensic doctor denied what the government said to the media. But even so, the Mexican government began a hunt against Mr. Guzmán (see newspaper articles). From then on, the world knew Mr. Guzmán.

Later, the United States government also began a negative campaign against Mr. Guzmán and gave him negative publicity. There was so much bad information given to the media, which made Mr. Guzmán look too big, that they had to arrest him because society could no longer understand how Mr. Guzmán was still free. The government had to stop him, so they would not to look bad in the eyes of the public.

In order to stop him, the American government then fabricated a case against Mr. Guzman, using servers located in Holland and also with a software called "FlexiSpy software". They committed fraud, lied and kidnapped him to the Eastern District of New York, violating the extradition law.

There is evidence indicating that they committed fraud and violated the extradition law, taking Mr. Guzmán to the Eastern District of New York. There are also other types of evidence, such as the testimony of a government witness called Vicente Zambada, who said in his cross-examination that before the Cardinal's death, no one knew who Mr. Guzmán was, but that after that event, both the American and Mexican governments carried out a negative campaign against Mr. Guzmán to make him big and thus be able to catch him (See exhibit 1, p.4244-4246 of the cross-examination of Vicente Zambada).

In the motion that the prosecutors sent to the court on July 21, 2023, they did not respond to anything that Mr. Guzmán said about this point. They ignored it because it is not in their interest for the truth to be known. Mr. Guzmán sends the part of Vicente Zambada's testimony where he says that both governments made Mr. Guzmán big in order to arrest him.

## POINT II: Government's Opening Statements

The prosecutor who did the opening statements during the trial told the jury that this case was about money, violence, drug trafficking and seizures of billions of dollars in illegal substances from 1989 to 2014, and that the person who ran this criminal organization was Joaquín Guzmán Loera. (See exhibit 2, p.556 of the government 's opening arguments).

Some of the trial lawyers acted ineffectively since they did not object to what the prosecutor said, even though they had the accusation that demonstrated that the American government told the grand jury on September 21, 2014 that Mr. Guzmán and Ismael Zambada conspired together since from 1989 to 2014 (See exhibit 3, NY Indictment). But they then changed their version and told the jury that it was Mr. Guzmán alone. And the defense attorney who did the closing arguments was too ineffective because he did not tell the jury of the contradiction said by the prosecutor during the opening statements, when the prosecutor said that Mr. Guzmán had moved drugs from 1989 to 2014. The lawyers were too ineffective by not fighting this or alerting the jury to this contradiction.

At the opening of the trial the government told the jury that Mr. Guzmán sold drugs from 1989 to 2014 (See exhibit 4, p.569 of the government's opening statements). But the grand jury

2

had been told otherwise; they had been told that Mr. Guzmán and Ismael Zambada conspired together from 2001 onwards. This was a very big contradiction.

Then, not even twenty minutes had passed and the prosecutor changed his story again, telling the jury that Mr. Guzmán and Ismael Zambada, also known as "Mayo Zambada" formed a very large association together from 2001 until the final capture of Mr. Guzmán in 2016 (See exhibit 5, p.563 of the opening government statement). The prosecutor said that Mr. Guzmán and Mayo Zambada had been the main leaders of the Sinaloa Cartel organization.

The trial lawyers were very ineffective by not objecting to what the prosecutor said since they had the accusation and the accusation alleged that Mr. Guzmán and Ismael Zambada had conspired together from 1989 to 2014. The indictment did not say that from 2001 onwards. The lawyers let that go and that was a very great inefficiency.

The government told the jury that Mr. Guzmán was in prison in Mexico for years and alleged that not even the four walls of the prison could prevent Mr. Guzmán from continuing to run his drug empire (See exhibit 6, p.562 of the government's opening arguments). He told the jury that they were going to hear how Mr. Guzmán continued to run his drug empire, giving orders through messages to his workers while he was in prison (See exhibit 6, p.562 of the government's opening arguments).

Also, the defense lawyer who made the summation acted very inefficiently by not telling the jury that what the prosecutor said regarding the fact that when Mr. Guzmán was in prison in Mexico he was committing a crime, was not true. The lawyer did not deny these allegations in his closing. The lawyer had evidence to deny it, since he had the testimony of the witness Damaso López, who never alleged that. And that was the perfect witness to contradict what the prosecutor alleged, since Damaso López had worked in the prison where Guzmán was imprisoned, and Damaso López never said that Mr. Guzmán continued to carry out criminal activities inside prison in Mexico. But the defense lawyer did not use that evidence to refute the prosecutor. That was very inefficient of them.

The defense lawyer also acted inefficiently by not using what Vicente Zambada had said in his cross-examination that when Mr. Guzmán left prison in 2001 he had no money because he had been in prison from 1993 to 2001 and that during that time he did not traffic drugs (See exhibit 7, p.4141-4142 of the cross-examination of Vicente Zambada). The defense attorney also did not use that evidence in his closing to clarify for the jury, which resulted in very great inefficiency on his part.

The prosecutor in the opening statement tells the jurors that the war they were going to hear about had been in 2006 and that it had been over control of a city called Ciudad Juárez, which shares a border with Texas (See exhibit 8, p. 564-565 of the government's opening arguments).

The prosecutor told them that they would hear that it was a critical gateway to the lucrative illegal drug market, and that before the war, Mr. Guzmán and other rival traffickers shared a critical portal, but that Mr. Guzmán did not want to share and that he wanted that city for himself and that, therefore, he sent assassins to kill his rivals and that, in the coming years, Juárez became a war

3

zone with bodies piled up everywhere (See exhibit 9, p. 565 of the government's opening arguments).

The defense lawyer who did the closing arguments acted inefficiently, since he did not tell the jury that what the prosecutor said in the opening statements was a lie regarding what he alleged had happened in Ciudad Juárez in 2006. The lawyer had the evidence of the witness Vicente Zambada who had said in his direct examination that the people who had fought in Juárez were Mario Núñez Mesa "M-10", Jaguar and another person with the last name of Arámbula (See exhibit 10, p.4068-4069 of the direct examination of Vicente Zambada). Vicente said that neither his father Mayo Zambada nor Mr. Guzmán were fighting on war. The prosecutors lied to the jury and the lawyers did nothing to refute them.

The prosecutor then told the jury that, to maintain control of his drug empire, Mr. Guzmán had to communicate his orders to members of his organization and that he had to find a secret and secure way to pass messages to his workers without these communications being intercepted by law enforcement, and that Mr. Guzmán began to use more sophisticated methods to communicate with his workers, starting with pay phones, then cell phones, and then encrypted phones and finally, encrypted applications on phones to spy on his workers and his competitors and thus know what was happening (See exhibit 11, p. 566 of the government's opening arguments). He also told the jury that, during that period, Mr. Guzmán did not realize that the government was recording him and that the jury would be able to hear all of this evidence (See exhibit 11, p. 566 of the government's opening arguments).

The prosecutor also told the jury that the recordings and text messages had provided evidence of drug deals, kidnappings, corruption, and murders (See exhibit 12, p. 567 of the government's opening arguments). He also said that they were going to hear about Guzmán's escape from Cabo San Lucas in Mexico in 2001, and that in his rush to flee, Mr. Guzmán had left evidence linking him to the drug trafficking business (See exhibit 12, p. 567 of the government's opening arguments).

The inefficiency of Mr. Guzmán's defense attorneys led to his conviction. For example, the prosecutor told the jury that Mr. Guzmán spoke with his workers both over calls and text messages about drug trafficking, murders and corruption, making Mr. Guzmán look to the jury as a ruthless villain without scruples. And the defense lawyers let the jury take that into account as if it had been true. The lawyers had in their possession the evidence produced by the servers located in the Netherlands, which demonstrated that what the prosecutor said was not true, since there was no incriminating evidence against Mr. Guzmán in those servers located in the Netherlands. They also had in their possession the evidence that the "FlexiSpy softwares" showed, which also had no incriminating evidence against Mr. Guzmán. But they did not use it to defend Mr. Guzmán from what the prosecutor. They were too inefficient.

Additionally, in the cross-examination of witness Pedro Flores, defense lawyer Purpura played a video to Flores, in which Mr. Guzmán was speaking and then compared Mr. Guzmán's voice in that video with a call that prosecutors alleged was Mr. Guzmán speaking. And the same witness said it was not the same voice, that the voices were not alike. The witness said that he had spoken with Mr. Guzmán several times both in person and by call and that the voice did not sound similar (See exhibit 13, p.3658 of Flores' cross-examination).

It is clear that everything that the prosecutor said in the opening statements was a lie. And the defense lawyers did not object to such large accusations that the prosecutor made against Mr. Guzmán, which were lies. It was a very great and limitless inefficiency. And the lawyer who made the closing, Lichtman, never warned the jury of the false accusations made by the prosecutor who did the opening statements so that the jury would not take those accusations into account, since it was all lies by the prosecutor. It was an overwhelming amount of ineffectiveness and inefficiency on the part of the defense lawyer that did the closing arguments. Judge Cogan, you will realize that the inefficiency of this defense attorney was very big and that this was a very great abuse on his part.

The prosecutor told the jury that they were there because for 25 years Mr. Guzmán had shipped massive quantities of illegal drugs to the United States and because he had led a big drug trafficking empire (See exhibit 14, p. 569 of the government's opening arguments). The prosecutor knew that wasn't true, but he said that anyways, knowing that the government witness, Vicente Zambada, had denied this in his testimony when he said that Mr. Guzmán had no money when he left prison in 2001, since from 1993 to 2001 he had been in prison and had not been trafficking (See exhibit 15, p.4142 of the cross examination of Vicente Zambada). But the prosecutor still lied to the jury. They held more than 100 meetings with Vicente Zambada during the time he was imprisoned in the United States and Vicente never said that. On the contrary, Vicente said that when Mr. Guzmán left prison in 2001, he had no money and that from 1993 to 2001, he did not traffic drugs (See exhibit 15, p.4142 of the cross examination of Vicente Zambada). But still the prosecutors lied.

And Mr. Guzmán's lawyers did not object to his and did not deny these allegations during the closing arguments. And attorney Lichtman, who did the closing arguments, never warned the jury that what the prosecutor had said was a lie. And he had Vicente's testimony, where Vicente said that Mr. Guzmán had not trafficked drugs from 1993 to 2001. But he still did not use that evidence to deny what the government was alleging against Mr. Guzmán.

The lawyers let the jury believe the government's lies and did nothing to defend Mr. Guzmán. And the evidence existed to disprove the government, but the lawyers chose not to use it and not defend Mr. Guzmán as they should have done.

First, they never denied what the government said about Mr. Guzmán having moved drugs from 1989 to 2014. The prosecutors said that and not even 20 minutes passed and then they changed their version and said that Mr. Guzmán and Mayo Zambada had been partners from 2001 to 2014. Nor did the accusation say that from 2001 onwards. But the defense lawyers let this slide and did not object.

The government then told the Chicago grand jury in 2008 that Mr. Guzmán had one faction and that Mayo Zambada had another faction of the alleged Sinaloa Cartel (See exhibit 16, the Chicago Indictment). There is another contradiction there.

The prosecutor then assured the jury that Mr. Guzmán was trafficking drugs while in prison. The defense lawyers also did nothing to refute what the prosecutor said. They had the testimony of Vicente Zambada in which Vicente said that Mr. Guzmán had not trafficked while he was in prison, but decided to not use it.

5

The prosecutor then told the jury that Mr. Guzmán had waged a war against the Juárez Cartel. Defense attorneys also did not object. The prosecutor then told the jury that Mr. Guzmán had encrypted communications to succeed in his drug empire and that the government had recorded some conversations (See exhibit 11, p. 566 of the government's opening arguments). There was no objection from the defense lawyers either. And Mr. Guzmán's lawyers had the evidence that the servers located in Holland had returned and they knew that there was not a single piece of evidence from Mr. Guzmán. With that they could refute what the prosecutor had told the jury.

The prosecutor then told the jury that those calls and text messages had provided evidence of Mr. Guzmán's illicit dealings, and that they had also provided evidence of acts of corruption. There was no objection from the defense lawyers either. By not objecting or clarifying, the jury took into account everything the prosecutor said. The prosecutor did not even discount the eight years that Mr. Guzmán was imprisoned from the 25 years that he told the jury that Mr. Guzmán had been sending drugs to the United States.

And even more so, Attorney Lichtman acted very inefficiently by not using the evidence to disprove the government. He had the evidence demonstrating the prosecutor's three contradictions regarding the dates the government alleged Mr. Guzmán had trafficked drugs, but he chose not to use that evidence. He also had the evidence to show that the servers located in Holland had no incriminating evidence against Mr. Guzman, meaning that there were no calls or text messages from Mr. Guzmán. He also had the text messages that FBI agent Marston claimed were from Mr. Guzmán and he had the evidence that disproved what the agent said, since he had those text messages that were not from Mr. Guzmán because he did not receive them on Amazon server. That showed they were not from Mr. Guzmán, and the FBI agent said Mr. Guzmán's text messages had been received by Amazon's server. That showed that they were not Mr. Guzmán's. He also had evidence from Vicente Zambada that refuted the prosecutor's claim that Guzmán had trafficked drugs while in prison. And the lawyer did not tell the jury that the prosecutor had contradicted himself and that he had lied to them. This attorney was very inefficient and ineffective. With such great inefficiency it was impossible for Mr. Guzmán to not be convicted.

## POINT III: The Government's Summation/Witness Miguel Ángel Martínez

In the direct examination of the witness Miguel Ángel Martínez, the prosecutor asked him to tell him approximately how much cocaine was on each plane, and Miguel Ángel answered that between 650-750 to 800 kilos (See exhibit 17, p.1362 of Miguel Ángel Martínez's direct examination). The prosecutor then asked him (See exhibit 18, p.1363 of Miguel Ángel Martínez's direct examination) if he could give him an estimate of the total number of airplanes received from 1987 to 1990, and the witness told him that between 150 to 200 flights. Miguel Ángel was talking about 180 tons of cocaine in the 200 plane flights. He awarded a world of cocaine to Mr. Guzmán.

Miguel Ángel said that from 1987 to 1990, 95% of the cocaine crossed through Agua Prieta and that between 25 to 30 tons of cocaine were transported annually into the United States in those years and that this drug went to Los Angeles, CA (See exhibit 19, p. 1410 of Miguel Ángel's direct examination).

6

In the government's closing arguments, the prosecutor told the jury that witness Miguel Ángel Martínez had stated that between 1987 and 1990, around 95% of the drugs that Mr. Guzmán allegedly had crossed from Mexico to the United States, he had crossed it through Agua Prieta and that the drugs crossed through a tunnel that connected to the United States (See exhibit 20, p. 6582 of the government's summation). The prosecutor knew very well that this was not true, since that same witness had testified in another trial in 2006 in Arizona and he had lied in that trial. But prosecutors still had him lie in Mr. Guzmán's trial.

For example, Miguel Ángel Martínez said that starting in February 1987 he began receiving airplane shipments of cocaine and that in two years he received around 200 flights from Colombia to Mexico, loaded with cocaine and that each flight brought between 650-750 kilos of cocaine (See exhibit 21, p.1362-1363 of Miguel Ángel's direct examination). He also said that this cocaine had been taken to Los Angeles, California but that it had been passed through an underground tunnel in Agua Prieta, Mexico (See exhibit 19, p.1410 of Miguel Ángel's direct examination). So, in 1989 the two years that the person who had received these 200 flights said had already passed (1987-1989). But the detail is that on that date from 1987 to 1989, the alleged Agua Prieta tunnel did not exist. Prosecutors knew that what Miguel Ángel was alleging was not true. But, even so, they allowed this witness go to Mr. Guzmán's trial to lie and deceive the jury.

The government had the testimony of DEA agent Carlos Salazar, who testified at the trial that he had carried out an investigation and that the land where the tunnel exit was located was purchased in July 22, 1989 (See exhibit 22, p. 668-669 of Salazar's direct examination). So, Agent Salazar's testimony contradicted what Miguel Ángel said in his testimony, since from 1987 to 1989 the tunnel did not exist, then it was impossible for all that cocaine to have passed through that tunnel at that time, if according to Agent Salazar, the land where the tunnel exit was located was not purchased until July of 1989.

But still, the government continued with their lies and misleading the jury. What Miguel Ángel alleged that from 1987 to 1989 95% of the cocaine had passed through that tunnel was a lie, because the tunnel did not yet exist. In 1987, the land for the construction of the tunnel had not even been purchased, but, according to DEA agent Salazar, it was purchased two years later (in 1989). Even knowing of this great contradiction, the government still blamed Mr. Guzman. And they did so in bad faith. Mr. Guzmán was falsely accused of having trafficked 180 tons of cocaine between 1987 to 1989.

And the worst thing is that the defense attorneys had this evidence of the testimony of Agent Salazar, but did not use it to deny what the government and their witness was claiming. They allowed the jury to believe this lie. This was a very great inefficiency on the part of the defense attorneys. And the defense attorney who did the closing arguments did not tell the jury anything about this during summations.

Miguel Ángel said that the tunnel was used until the day it was discovered in 1990 (See exhibit 23, p.1408 of Miguel Ángel's direct interrogation). Agent Salazar had said that the land where the tunnel exit was, was purchased on July 22, 1989 (See exhibit 22, p.668-669 of Salazar's direct examination). The agent said that it was two blocks away from Mexico where the mouth of the tunnel exited in the United States and that in March 1990 when they found out that something was happening in that place and they decided to put cameras to see what was happening and who

7

was entering and leaving and that on May 11th they saw a truck leaving the warehouse (See exhibit 24, p.642-645 of the direct interrogation of Salazar). This means that on May 11th of 1990 they finished making the tunnel, since the tunnel in the video is seen with a lot of cement. However, Miguel Ángel was making a story up saying that from 1987 to 1990 the tunnel was in service. And the worst thing is that the government allowed its witness to lie.

The government knew perfectly well that Miguel Ángel was lying, since the prosecutors had the evidence from Agent Salazar's testimony, but they still lied and made the jury believe that what Miguel Ángel had testified was the truth.

And the worst of all was the ineffectiveness and inefficiency of Mr. Guzmán's lawyers, who did not dispute what the prosecutor said in his closing arguments, even though they had the evidence of what DEA Agent Salazar had said, which contradicted what the prosecutor was saying at the closing arguments and also contradicted what Miguel Ángel said during his testimony, but they didn't do anything. Mr. Guzmán's lawyers were very inefficient.

Mr. Guzmán did not exist for the Mexican government before May 24th of 1993. Mr. Guzmán came into existence for the Mexican government on May 24, 1993, when the Mexican government killed Cardinal Juan Jesús Posadas Ocampo, because they needed a culprit and decided that it was Mr. Guzmán. From that day on, the Mexican government decided to make people believe that Joaquín Guzmán Loera was the biggest and most dangerous drug trafficker in the world. That day the Mexican government began a negative publicity campaign against Mr. Guzmán using the media and the press. And from that day the Mexican government began to blame Mr. Guzmán for everything that happened in Mexico. If there were drug seized or if there were massacres, they blamed everything on Mr. Guzmán.

And then the American government continued with this negative campaign against Mr. Guzmán, inventing that all the drugs that came to the United States were brought by Mr. Guzmán and inventing that he was part of an alleged drug cartel called the Sinaloa Cartel. And all this was said by the government witness, Vicente Zambada. Vicente said in his testimony during trial that both governments launched a campaign against Mr. Guzmán to make him big and thus be able to arrest him (See exhibit 25, p.4245-4246 of the cross-examination of Vicente Zambada).

Judge, today when you see the evidence in the exhibits you will realize that the case against Mr. Guzmán is a soap opera and that together with the ineffectiveness of the defense lawyers that led the trial, led Mr. Guzmán to be in prison today. Mr. Guzmán's conviction was the result of the ineffectiveness of the defense attorneys who led the trial.

In the government's closing arguments, the prosecutor says that, according to the testimony of Miguel Ángel Martínez, after the Agua Prieta tunnel was discovered by the authorities, the defendant had to find a new way to cross their cocaine over the border between the United States and Mexico, and that instead of passing under the border, they began using cans of "La Comadre" brand chili to pass the drug (See exhibit 26, p. 6586 of the government's closing arguments). The prosecutor said that from 1990 to 1993, the defendant crossed between 75 to 90 tons of cocaine from Tijuana to the United States (See exhibit 26, p. 6586 of the government's closing arguments). The prosecutor knew that what she was saying was not true, but, even so, she dared to affirm Miguel Ángel's lies, since in a jury in Arizona in 2006 Miguel Ángel said in his direct examination

that there were no seizures because Mr. Guzmán paid the police. So, how could the government in Mr. Guzmán's case dare to deceive the jury, assuring them that the cocaine seized belonged to Mr. Guzmán, if according to Miguel Ángel, there was never a seizure because Guzmán paid the police officers so that wouldn't happen? They did it conscientiously and with bad faith.

And Mr. Guzmán's defense lawyers acted very inefficiently, since they did not say anything to the judge to intervene, nor did they clarify any of this to the jury.

At the government's closing arguments, the government said that Miguel Ángel had said that the value of the 7.3 tons of cocaine that had been seized in Mexico was 100 million dollars (See exhibit 27, p. 6587-6588 of the government's closing arguments). The government also said that Miguel Ángel knew about this seizure, because Mr. Guzmán had put him in charge of that operation and also said that Miguel Ángel had testified that Mr. Guzmán had his workers transport those shipments in cans of "La Comadre" brand chili (See exhibit 28, p.6587 of the government's closing arguments).

The American government knew well that what it was saying was not true, since that same witness, Miguel Ángel, had testified in front of another jury in 2006 and he had told that jury that while he was in charge, there had been no drug seizures or seizures in Mexico, because he knew that Mr. Guzmán paid the police to prevent that from happening. How is it possible that the American government, even knowing that Miguel Ángel had said that at another trial, dared to put him on the stand to testify in Mr. Guzmán's case and lie about that alleged seizure of 7.3 tons, when in 2006 he had testified to the contrary, that there had never been a seizure in Mexico? The government knew that the seized drugs were not Mr. Guzmán's, but they still made the jury believe that they belonged to Mr. Guzmán.

Even the defense lawyer provided evidence from that 2006 testimony in Arizona, to prove that Miguel Ángel had indeed said that in 2006. But, even so, the government in its closing arguments dared to affirm that the seized drugs belonged to Mr. Guzmán, even though it was not true.

And the defense lawyer who did the closing arguments was very inefficient, since knowing that what the government alleged in its closing arguments was not true, did not do anything or even mentioned this during his closing arguments. Nor did any of the other two defense attorneys leading the trial submit any motion to the judge to dispute the validity of that evidence. The lawyers who led Mr. Guzmán's defense during trial (Purpura, Lichtman and Balarezo) were very ineffective and their inactions led to Mr. Guzmán's conviction.

The government played a video to Miguel Ángel during his direct examination and asked him to narrate what he was seeing while the video was playing (See exhibit 29, p. 1438 of Miguel Ángel's direct examination). Miguel Ángel began to narrate what he was seeing. He said that those were some cans of chili that had cocaine and he also said that they put half a kilo in plastic bags in each can. (See exhibit 29, p. 1438 of Miguel Ángel's direct examination). Then the government asked him what who was the supplier of the cocaine and Miguel Ángel said it was Juan Carlos Ramírez, also known as Chupeta (See exhibit 30, p. 1439 of Miguel Ángel's direct examination).

It occurred to Miguel Ángel to attribute those 7.2 tons of cocaine seized to Mr. Guzmán because he saw on television that those 7.2 tons had been seized and decided to tell the American government that they belonged to Mr. Guzmán. But when Juan Carlos Ramírez alias "Chupeta" testified about that same seizure of 7.2 tons, he said something completely different from what Miguel Ángel testified.

For example, Miguel Ángel said in his direct examination (See exhibit 29, p. 1438 of Miguel Ángel's direct examination) that he put half a kilo in plastic bags and that each half kilo then went inside a can of chili. But Chupeta said something different in his direct examination. Chupeta said that the amount of cocaine that was put inside the chili cans was the exact measurement of the chili cans. In fact, Chupeta said that Mr. Guzman would even send the mold to him so that he could produce the cocaine in that cylindrical shape (See Exhibit 31, p. 1867-1868 of Chupeta's direct examination). And Chupeta also said that the seizure of 7.2 tons had been in Los Angeles, CA (See Exhibit 32, p.1869 of Chupeta's direct examination). But Miguel Ángel said it had been in Mexico (See exhibit 28, p.6587 of the government's closing arguments). So, who is lying and who is telling the truth? And even knowing all these contradictions, the American government dared to have these two witnesses testify against Mr. Guzmán. Prosecutors are supposed to apply the law and not violate it as it happened in the entire trial of Mr. Guzmán.

But here no one is more guilty than the defense lawyers who led the trial because due to their inefficiency in not fighting as they were supposed to, they led Mr. Guzmán to his conviction.

### POINT IV: The Government's Summation/Witness FBI Agent Stephen Marston

The prosecutor who made the government's closing argument during Mr. Guzmán's trial told the jury that in some of the calls they had presented during the trial, the person heard speaking was the accused, Mr. Guzmán (See exhibit 33, p.6574 of the government's closing arguments). The prosecutor said "Well, we are going do through a couple ways the defendant's voice was identified on these systems. Now, seven cooperating witnesses independently identified the defendant's voice on the calls captured over the defendant's encrypted system as well as other calls captured from other sources. A call that was recovered, and was received in evidence into evidence, from the Colombian authorities after the judge in Colombian authorized that wiretap. There was also a wiretap in the Dominican Republic and you heard that call as well. And there were the two phone calls from Pedro Flores" (See exhibit 34, p.6574-6575 of the government's closing arguments). How is it possible that the prosecutor consciously and in bad faith tried to confuse the jury, knowing well that Pedro Flores said in his cross-examination upon hearing Mr. Guzmán's voice in the Rolling Stone video, that it was not the same voice in the call and the prosecutor knew it. The prosecutor knew that those calls were not from Mr. Guzmán, since there is not a single piece of evidence from Mr. Guzmán that came from the servers that were located in the Netherlands.

And the ineffectiveness of the defense attorneys, who did not object during the prosecutor's closing, nor did attorney Lichtman clarify it in his summation so that the jury would not take into account what the prosecutor said.

The prosecutor also said: "Some of these cooperating witnesses don't even know each other, and the ones that do haven't even each other in years; yet, they all identified the same voices belonging to the defendant. Second, using the calls in which the defendant was identified by name, the FBI determined which telephone number or which extension the defendant was using to make the calls. Cristian Rodriguez told you that the defendant used several extensions including 121. The FBI confirmed this extension, 121, was an extension in which the defendant was referred to as Chapo. This is a call on Extension 121 between the defendant and Juan Guzman Rocha known as either Juancho or Virgo. The same voice is captured on Extension 120. Another extension in which the defendant is referred to as Joaquin. And the same voice is captured on Extension 185. The extension also captured that was also captured during the interrogation video. Remember that there was a part where the host was being interrogated and someone had their microphone on and you could hear an overlap in the two conversations. This also proves that the defendant was using Extensions 120, 121, and 185" (See exhibit 35, p.6575-6576 of the government's closing arguments).

The prosecutor tried to deceive the jury so that the jury believed that the person who was interrogating the person who was seen in the video tied to a palm tree was Mr. Guzmán. The prosecutors were showing that video for the three months that the trial lasted so that the jury would believe that it was Mr. Guzmán.

But, in the cross-examination of the FBI agent Stephen Marston, it was very clear that those extensions that the FBI agent assigned to Mr. Guzmán, in reality what they dialed to was a number whose IP ended in 103. They did not dial to the servers that were located in Holland, which were adjudicated to Mr. Guzmán.

And the prosecutor knew that the servers located in the Netherlands had not shown any incriminating evidence that belonged to Mr. Guzmán, but, even so, the American government made the jury believe that those servers located in Holland had shown a lot of evidence that incriminated Mr. Guzman. It is very clear that Mr. Guzmán did not interrogate that person because those extensions that the prosecutor alleged they were using when they interrogated the person who was seen tied up in the video were not part of the servers located in Holland. Instead, they belonged to a server whose IP ended in 103 and that was not part of the servers located in Holland.

And FBI agent Stephen Marston said both in direct and cross-examination that Mr. Guzmán was talking from servers located in the Netherlands. He never said that Mr. Guzmán used another server to talk to (See exhibit 36, p.4505 and 4728 of Marston's direct examination). And the extensions that Agent Marston adjudicated to Mr. Guzmán were extensions 120, 121 and 185 (See exhibit 37, p.4526 of Marston's direct examination). He also said that Mr. Guzmán spoke from extension 185 to the servers located in the Netherlands, but he lied since in the cross-examination it was discovered the fact that extension 185 was actually dialing to a server that was not part of the servers located in the Netherlands and that its IP ended in 103 and when asked, Marston said he could not explain why that was (See exhibit 38, p. 4733-4734 of Marston's cross examination). And the prosecutors knew this, but they still knowingly and in bad faith misled the jury. The jury took into account what the prosecutor said and did not doubt her word.

11

The defense lawyers had the evidence, they had the testimony of what Agent Marston had stated in his cross-examination, but they did not use that evidence to contradict the prosecutors. What the government alleged that the three extensions belonged to Mr. Guzmán was not true. That lie was uncovered during Agent Marston's cross-examination. It became clear that Mr. Guzmán did not use those extensions to talk. Agent Marston never imagined that his lies would be uncovered during his cross-examination.

Mr. Judge, you will realize when you see the evidence that Agent Marston lied, since the American government fabricated the entire process for Mr. Guzmán with the servers located in the Netherlands. And with the complicity of Christian Rodríguez, who helped the FBI by lying against Mr. Guzmán for the amount of $460,000 dollars (See exhibit 39, p.4614 of Marston's direct examination). And the prosecutors knew all this and, even so, they took Agent Marston to the trial to lie, since the prosecutor who made the closing arguments knew that the servers located in the Netherlands had been adjudicated to Mr. Guzmán consciently and in bad faith. They misled the jury by telling them that the calls were from Mr. Guzmán, knowing full well that was not true.

## **POINT V: The Government's Summation/Direct Examination of Witness Vicente Zambada**

Vicente Zambada said that shortly after Mr. Guzman got out of prison in 2001, that that was when his father and Chapo became partners (See exhibit 40, p.3970 of Vicente's direct examination). But during the cross-examination, it was revealed that Vicente lied, since the defense lawyer asked him if he knew who Mochomo Beltrán Leyva was and Vicente answered that he did (See exhibit 41, p.4142 of Vicente's cross-examination). And then the defense lawyer asked him if he knew that after the escape, Mr. Guzmán spent some time in the mountains of Sinaloa, hiding from the Mexican authorities and Vicented said yes (See exhibit 41, p.4142 of Vicente's cross-examination).

And then the defense lawyer asked him if he knew that Mochomo had protected Mr. Guzmán and Vicente said yes, that in the first 5 years after leaving prison, from 2001 to 2006, Mr. Guzmán had been with Mochomo and that Mochomo was helping him financially because Mr. Guzmán was in bad shape financially after leaving Puente Grande (See exhibit 42, p. 4143 of Vicente's cross-examination). Vicente then said that from 2006 onwards things began to go well for Mr. Guzmán financially, but he did not give a date for when. It was then clear that there was never a drug partnership between Mr. Guzmán and Mayo Zambada, as the government alleged.

Vicente Zambada arrived to the United States in 2010 and in 2013 pleaded guilty and never said anything about his father, Mayo Zambada, and Mr. Guzmán having been partners from 1989 to 2014. The government knew that Vicente had never said that Mr. Guzmán and his father would have been partners from 1989 to 2014, but they still told the jury that Mr. Guzmán had moved drugs from 1989 to 2014. Vicente then invented that from 2001 onwards. Prosecutors told the grand jury that Mayo and Mr. Guzmán conspired together from 1989 to 2014 and at the opening of the trial against Mr. Guzmán they told the jury that Mr. Guzmán had moved drugs from 1989 to 2014. But not even 20 minutes had passed and they changed their version and told the jury that in 2001, Mr. Guzmán formed an association with Mayo Zambada. It couldn't be clearer that everything was invented by the government. First, they give a date and then they change it and give another.

Then, to get the Chicago indictment against Mr. Guzmán, they told the grand jury there that Mr. Guzmán had an alleged faction of the Cartel and that Mayo had another (See exhibit 16, the Chicago Indictment).

And the defense lawyers had all the evidence with them and did not object to any of the prosecutors' huge contradictions. It was unprecedented inefficiency and ineffectiveness on the part of the defense attorneys.

Mr. Judge Cogan, when you see the prosecutors' contradictions in the evidence, you will realize that what Mr. Guzmán says is true. What the witness Vicente Zambada said during his interrogation is not true. Now, there is no doubt that he did tell the truth when he said that both governments, both the Mexican and the American, wanted to make Mr. Guzmán big by giving him bad publicity in order to arrest him. But the prosecutors invented many things and contradicted themselves and there is evidence to prove what Mr. Guzman claims.

Then, at the government's closing arguments, the prosecutor told the jury that they did not even have to prove that Mr. Guzmán had been the boss or even one of the top bosses, but that he was one of the top bosses without a doubt (See exhibit 43, p.6522-6523 of the government's closing arguments). And the prosecutor continued talking and inventing the worst about Mr. Guzmán to the jury. But how is it possible that the prosecutor dared to tell that to the jury if she knew that none of that was true, since the prosecutor who made the opening statements said that Mr. Guzmán had moved drugs from 1989 to 2014.

What Vicente testified in the direct examination was contradicted in the cross-examination since his lie that there was a partnership between his father (Mayo Zambada) and Mr. Guzmán in 2001 was uncovered. And the prosecutor knew perfectly well that there was neither a partnership between Mayo Zambada and Mr. Guzmán from 1989 to 2014, nor was a partnership formed between Mayo and Mr. Guzmán in 2001. The government invented that on September 21, 2014, telling that lie to the grand jury of the Eastern District of New York so that they would remove the indictment against him, as happened. They did it conscientiously and with bad faith.

And the defense lawyers were inefficient because they did not object to what the prosecutor said during her closing arguments, nor did attorney Lichtman deny it in front of the jury so that they would not take into account what the prosecutor said. The defense lawyers had the evidence that showed that what the prosecutor said was not true. And Lichtman never told the jury in his closing arguments that what the prosecutor said was not true regarding the alleged association between Mayo Zambada and Mr. Guzmán. He had the testimony of Vicente Zambada, which contradicted what the prosecutor said, but he did nothing.

For example, they had the evidence of Rey Zambada were the prosecution asked Rey during his direct examination what was the type of relationship that Amado Carrillo Fuentes had with his brother, Mayo Zambada, at that time in the 90s, and Rey answered that they were working together in Cancún and that they were partners (See exhibit 44, p.727 and 728 of the direct examination of Rey Zambada).

Also in his direct examination, Vicente Zambada said that in 1996 his brother-in-law Javier was killed (See exhibit 45, p. 3954 of the direct examination of Vicente Zambada) and that at that time, Javier was in charge of receiving the drugs in Cancún and that those drugs belonged to his father Mayo and Amado Carrillo Fuentes, who were partners at that time (See exhibit 45, p.3954 of the direct examination of Vicente Zambada).

The defense lawyers had both testimonies, that of Rey Zambada and that of Vicente Zambada, that demonstrated that the government was lying about the alleged partnership between Mayo and Mr. Guzmán from 1989 to 2014, but decided not to use this evidence to fight for their client. That was great inefficiency on their part. The inefficiency of these defense attorneys was unprecedented.

On page 4084 of Vicente Zambada's testimony, the prosecutor tells him: "Mr. Zambada, we were talking about what happened in Culiacan at the beginning of 2008 and you said that Alfredo Beltrán Leyva had been arrested and Vicente answered that that was correct (See exhibit 46, p.4084 of Vicente's direct examination). Then, Vicente said to the prosecutor that his father and his compadre Chapo spoke with the police and the military, so that they would arrest some of Beltrán Leyva's people and some of Carrillo Fuentes's people, because these people were hiding in some houses and their intentions were to go kill his father and his compadre Chapo (See exhibit 47, p.4085 of the direct examination of Vicente Zambada).

Later, Vicente said that two months after the war began, Vicente took his family to Mazatlán and left Juancho in charge (See exhibit 48, p.4090 of Vicente's direct examination). He also said that Juancho reported everything that was happening to him, as well as to his father and his compadre Chapo (See exhibit 49, p.4091 of Vicente's direct examination). Compadre Chapo was mentioned last. Vicente had to mention Mr. Guzmán's name, since Vicente was testifying against him. But the reality is that Juancho was one of Vicente's people, according to Vicente himself. Vicente said that Juancho reported to him. He only mentioned Mr. Guzmán because he had to, because he was testifying against him. But by his own account, Mr. Guzmán was hiding in the mountains at the time and without money. So, what is the truth? Clearly Vicente was lying.

Then on page 4091, Vicente continues explaining to the prosecutor that he was aware of everything that was happening in Culiacan through Juancho because he had left him in charge (See exhibit 49, p.4091 of Vicente's direct examination). It is clear that Juancho worked for Vicente and Mayo and not for Mr. Guzmán.

Then, the prosecutor said during the closing arguments that things got worse after Alfredo Beltrán Leyva, brother of Arturo Beltrán Leyva, was arrested in January 2008 (See exhibit 50, p.6675 of the government's closing arguments). She also said that the Beltrán Leyva organization suspected that Mr. Guzmán had something to do with the arrest of Alfredo Beltrán and that this made things worse, and that on April 30th of 2008, they reached a critical point (See exhibit 50, p.6675 of the government's closing arguments). The prosecutor said that that day there were armed confrontations between Mr. Guzmán and Mayo on one side against the Beltrán Leyva and the Carrillo Fuentes on the other side, and she also said that the police were in the middle (See exhibit 50, p.6675 of the government's closing arguments).

14

The prosecutor knew from Vicente Zambada himself that the people who really fought against the Carrillo Fuentes and Beltrán Leyva's hitmen had been the police and the army, since Vicente had said that Mr. Guzmán and his father Mayo, had given information to the police and the army about these people's whereabouts so that they would be the ones to handle it. So, Mr. Guzmán doesn't understand how the prosecutor was capable to lie to the jury, telling them that it was Mr. Guzmán and Mayo who had sent people to fight against the Beltrán Leyva's and the Carrillo Fuentes's people, if their witness, Vicente Zambada, had said that it was the police and the military who went to fight against the Beltrán Leyva's and the Carrillo Fuentes's people.

And the inefficiency of the defense lawyers Balarezo, Purpura and Lichtman was very big because they did not object to what the government said during their summation, knowing that there was testimony that contradicted what the prosecutor was saying to the jury about that fight. With such great inefficiency on the part of these defense lawyers it was impossible for the jury not to find Mr. Guzmán guilty.

## POINT VI: The Government's Summation/Witness Edgar Galván

On page 6692 of the government's closing arguments, the prosecutor told the jury that they had the firearms because the accused bought them (See exhibit 51, p.6692 of the government's closing arguments). She also told the jury that they could see numerous examples of this in the accounting books, which were seized and that these notebooks had a weapons purchase list and that they requested 50 AK47, 100 M16, 27 RP7 and R15 (See exhibit 51, p.6692 of the government's closing arguments). She also said that wasn't the only thing on the list, but that they also had grenade launchers, bullets, and more. The prosecutor also spoke about multiple narco wars, which the defendant had allegedly led as one of the leaders of the Sinaloa Cartel and said that the defendant had led these wars to protect his territory, to protect his drug empire and that the defendant could not lead their wars without tools of war such as firearms (See exhibit 51, p.6692 of the government's closing arguments).

The prosecutor also told the jury that Mr. Guzmán had started certain narco wars to protect his drug trafficking empire and that one of the wars they had heard about was the one that the defendant had allegedly led between the Sinaloa Cartel and his former partner Vicente Carrillo Fuentes, the leader of the Juárez Cartel and which took place on the other side of the Border in El Paso Texas (See exhibit 51, p. 6692 of the government's closing arguments). The prosecutor also spoke about what happened during the war with "La Linea" on January 13, 2010, that the police found a hiding place that contained cash, 40 AK47 rifles brought to the accused's conspirators and that they heard from Edgar Galván that the purpose was to clear Ciudad Juárez for the accused of all members of "La Linea" (See exhibit 51, p. 6692 of the government's closing arguments). She also reminded the jury of the 40 AK47s that were on a cart that the government showed to them at trial and of the vests and bullets.

The government told the jury that they knew that those weapons were for Mr. Guzmán due to the sworn testimony of Vicente Zambada, who said that the accused and Mayo were supporting the fight against "La Linea" and against Vicente Carrillo Fuentes in Ciudad Juárez and that the support was with weapons and money (See exhibit 52, p. 6693 of the government's closing arguments). The government also told the jury that they knew that the Cartel had obtained firearms

from El Paso, TX and that they also knew that the 40 AK-47s were for Mr. Guzmán because they were purchased on Antonio Marrufo's orders, an individual whom both Edgar Galván and Vicente Zambada identified as "Jaguar" (See exhibit 52, p.6693 of the government's closing arguments). And then the prosecutor told the jury that they knew from both witnesses that Jaguar was in charge of the war in Ciudad Juárez for the defendant and that Galván had said that, as part of his role, Jaguar was responsible for moving drugs and weapons across the border between Ciudad Juárez and El Paso, TX and that Galván had helped Jaguar to do this (See exhibit 52, p.6693 of the government's closing arguments). The prosecutor said that Galván had testified that he helped Jaguar move AK-47s across the border from El Paso, TX to Mexico on four or five occasions and that all the shipments had been successful, except for the last shipment of 40 AK-47 assault rifles that the jury saw in the courtroom (See exhibit 52, p. 6693 of the government's closing arguments). The prosecutor told the jury that those weapons were intended for one thing; to clean up Juárez from "La Linea Cartel", who were the enemies of the accused, in order to help the accused to take and maintain control over that important drug plaza (See exhibit 52, p. 6693 of the government's closing arguments). Everything that the prosecutor said to the jury was done consciously and in bad faith. She knew perfectly well that what she told the jury was not true, because she knew that Edgar Galván was taken to the trial to lie, since Vicente Zambada in his more than 100 meetings with the government, never said that Guzmán had a man named Antonio Marrufo alias Jaguar in Ciudad Juárez buying weapons for Guzmán, nor fighting for the plaza in Ciudad Juárez, as the prosecutor told the jury.

Vicente Zambada said that Mario Núñez Mesa alias "M-10" was Jaguar's boss and that he had Jaguar fighting in Ciudad Juárez (See exhibit 53, p. 4067 of Vicente Zambada's direct examination) and also said that Mario Núñez was the one who gave him the nickname of "Jaguar" and not Mr. Guzmán, as Galván had said during his direct examination (See exhibit 54, p.4186 of Vicente Zambada's cross examination). In his meetings with the government, Vicente never said anything about Mr. Guzmán having bought weapons in the United States, nor that he had sent people to fight against Vicente Carrillo Fuentes, as the prosecutor told the jury.

Vicente Zambada said that German bought weapons in El Paso, TX for him and Mayo and that he sent them to Culiacan (See exhibit 53, p. 4067 of Vicente Zambada's direct examination) and he also said that Pacheco bought weapons in California for him (See exhibit 55, p. 4094 of Vicente Zambada's direct examination). Vicente also said that Pacheco worked for him and his father and not for Mr. Guzmán (See exhibit 56, p. 4057 of Vicente Zambada's direct examination).

Vicente also said in his direct examination that him and his father had gone to see Mr. Guzmán to the mountains of Sinaloa and that they met Mario Núñez "M-10", who had also gone to the mountains to see Mr. Guzmán to tell him that he was fighting against the Carrillo Fuentes (See exhibit 57, p. 4065 of Vicente Zambada's direct examination).

Vicente also said that Mayo told M10 that if he needed support from the government or with weapons and money, that he should ask Mayo (See exhibit 58, p.4066 of Vicente Zambada's direct examination). Vicente did not say that Mr. Guzmán was the one who offered support to M-10 for that war that M-10 had against the Carrillo Fuentes. The government knew perfectly well that Jaguar worked for M-10 and that Edgar Galván said that the person who asked him for help

16

to get weapons was Jaguar (See exhibit 59, p. 41 and p.46 of Galván's direct examination) and not Mr. Guzman.

Vicente Zambada also said that Mayo had a meeting in Zacatecas where Miguel Treviño and another person named "2,000" and another person named JL were present and that the meeting was to discuss how the war could end in Ciudad Juárez with the Carrillo Fuentes and M -10 (See exhibit 60, p.4074-4075 of Zambada's direct examination). In that meeting, Mayo clarified that his people were not there fighting in Ciudad Juárez and that those who were there fighting against the Carrillo Fuentes were M-10's people and Arambula's people (See exhibit 61, p.4075 of Vicente Zambada's direct examination). The government had this testimony from Vicente Zambada, which contradicted what the witness Galván said, but they ignored it and still decided to make the jury believe that Mr. Guzmán had been responsible for the war against the Carrillo Fuentes in Ciudad Juárez.

Galván was exposed and the government knew it, but they still decided to confirm Galván's lies in their closing arguments. The jury took into account what the government said in their closing arguments and therefore, decided to find Mr. Guzmán guilty.

And the lawyers Purpura, Balarezo and Lichtman knew that what the prosecutor had said in the closing arguments was not true, since they had the evidence of Vicente Zambada's testimony that contradicted the prosecutor's statement, but even so they did not object to that. And the defense attorney who did the summation not tell the jury that what the government had said during their closing arguments was not true. This attorney had the evidence of Vicente Zambada's and Dámaso López's testimony that showed that the prosecutor's statement to the jury was not true, since the government always said that Dámaso López was Guzmán's right arm, but Dámaso López never said anything about Guzmán fighting against the Vicente Carrillo Fuentes. And he didn't say that because it wasn't true. The government invented everything conscientiously and in bad faith.

## POINT VII: The Government's Summation/Witness Dámaso López

Dámaso said in his direct examination that, under the orders of his compadre, people would go to Culiacan and that Dámaso then would meet with them and establish communication (See exhibit 62, p.5839 of Dámaso López's examination). Then the prosecutor asked Dámaso that when was it that he had started communicating with the Colombians on behalf of the defendant and Dámaso told him that approximately in 2004 and that they were talking about drug shipments to Sinaloa and that he also gave them information about the coordinates of where the ships were going to go (See exhibit 62, p.5839 of Dámaso López's direct examination). Dámaso also said that the person who gave him that information was his compadre Chapo or that other times someone else would give him that information directly to the Colombians (See exhibit 62, p.5839 of Dámaso López's direct examination). Then Dámaso talked about how the shipments were transported from Colombia and said that they were transported in submarines, boats and planes (See exhibit 63, p. 5840 of Dámaso López's direct examination). Dámaso then continued to talk throughout the direct examination that he was Mr. Guzmán's worker and that Guzmán was his boss in the drug business. But the reality was different; he thought the defense attorney had no evidence to the contrary.

17

Dámaso and his son had an indictment against them in the Eastern District of Virginia and Dámaso pleaded guilty to that charge in that indictment. Mr. Guzmán was not included in that indictment. And the defense lawyer asked Dámaso all of this during the cross-examination (See exhibit 64, p.6057 of Dámaso López's direct examination) and Dámaso even acknowledged that Mr. Guzmán was not in his indictment.

Dámaso then had to admit that him and his son had their own faction of the Sinaloa Cartel and that it was for those charges that he pleaded guilty (See exhibit 65, p.6060 of the cross-examination of Dámaso López). It became clear that Dámaso and his son had their own organization and they used Mr. Guzmán's name knowingly and in bad faith, for their own benefit.

The defense lawyers acted ineffectively because they did not object to what the prosecutor said to the jury. They had the evidence from Dámaso López's testimony that demonstrated that Dámaso lied to the jury, since when he pleaded guilty, he accepted his crimes and admitted to having his own organization together with his son, starting from 2003 until 2016. There is evidence that this was the case and the prosecutor knew it, since Dámaso was already sentenced to life imprisonment. Therefore, Dámaso did not mind lying because he had nothing to lose. On the contrary, if he lied, he could have something to gain; the recommendation of the 5K1 letter for a reduction of his sentence.

Judge Cogan, when you see this evidence, you will realize that what Mr. Guzmán is saying it's true. Due to the inefficiency of the lawyers, the jury took into account Dámaso López's lies and the government's lies.

### POINT VIII: The Government's Summation/Witness Rey Zambada

On direct examination, the government asked Rey Zambada what was his understanding of the association between his brother Mayo Zambada and Mr. Guzmán from approximately 2001 until his arrest in October 2008, and Rey replied that it was a working relationship for the importation of cocaine and drug trafficking (See exhibit 66, p. 709 of Rey Zambada's direct examination).

Throughout his direct examination, Rey said that from 2001 to 2008, he received shipments of drugs from Colombia and that he spoke with Mayo, but that all the drugs he received for Mayo also belonged to Mr. Guzmán because they were partners. But when the defense lawyer cross-examined him, it was revealed that Rey he had gone to the trial to lie against Mr. Guzmán.

The defense attorney asked Rey about the third time that he spoke with the government on May 2nd, and that if during that third proffer, if he had said that his brother began working bringing drugs through the airport in suitcases between 2000-2001 (See exhibit 67, p.1097-1098 of Rey Zambada's cross examination) and Rey said yes. Then the lawyer asked him that if in that same meeting on May 2, 2012, he had told the government that from 2002 to 2003, his brother added the Guerrero route and that to do that, he spoke with Arturo Beltrán to ask for permission and Rey said that that was correct (See exhibit 68, p.1098 of Rey Zambada's cross-examination). And then the lawyer asked him if he had said that the only investor in the speedboat shipments from 2002 to 2003 was Mayo, and Rey said yes (See exhibit 68, p. 1098 of Rey Zambada's cross-

examination). Then the lawyer asked him if he remembered that on approximately May 22nd he met again with the government and that he told them about Pineda and told them that Pineda was carrying shipments for Arturo Beltrán Leyva, and Rey said that he remembered (See exhibit 69, p. 1098-1099 of Rey's cross-examination). And then the lawyer asked Rey if he remembered telling the government that he had gotten involved because he could move cocaine faster and that from 2002 to 2006 he helped sell seven tons of cocaine, and Rey said that was true (See exhibit 70, p.1099 of Rey's cross-examination).

Then the defense lawyer asked him if he remembered the meeting with the government on May 23rd, 2012, where he told the government that Mayo was a partner of Benny Contreras, and Rey said yes (See exhibit 70, p. 1099 of Rey Zambada's cross-examination). And then the lawyer asked him if the next day he had another meeting with the government where he had told them that Kiki Fernández was a very large investor with his brother, and Rey said that that was correct (See exhibit 71, p.1100 of Rey Zambada's cross examination). And then the lawyer told him that he had specifically mentioned Kiki, Tocayo, Alonso, Vicente Zambada and Benny Contreras, but that there was no mention of Mr. Guzmán, and Rey said that that was correct (See exhibit 71, p.1100 of Rey Zambada's cross examination).

Then the defense lawyer asked him, (See exhibit 72, p.1116 of Rey's cross-examination):

*Q: Mr. Zambada, you, obviously, when you were first interviewed those eight times in 2012, you knew the name of Joaquin Guzman, correct?*
*A: That's right.*
*Q: And you know the nickname El Chapo and you know all the other nicknames, correct?*
*A: Correct.*
*Q: So, when Government counsel Ms. Parlovecchio asked you did you give all the information you knew about the leaders of the cartel, that is certainly one of the people you knew in 2012, correct; when you first came here, right?*
*A: That's right.*
*Q: And not once in that entire time in those initial interviews when you first came here did you ever say that Joaquin Guzman and Mayo Zambada were partners, did you?*
*A: I don't know. I don't recall.*
*MR. PURPURA: No further questions.*

In the first eight times Rey met with the government, he never mentioned Mr. Guzmán. He never told the government that Mayo and Mr. Guzmán were partners from 2001 onwards, but he still went to trial to lie against Mr. Guzmán.

The prosecutor began to tell the jury that Rey Zambada said that it was at that time in 2001 when the defendant and Mayo Zambada settled their 50/50 partnership and that this further strengthened their positions within the cartel (See Exhibit 73, p. 6529 of the government's closing arguments).

19

It is very clear that the government brought Rey as a witness to lie at trial. There is evidence that this was the case and everything was done to harm Mr. Guzmán. And in return for Rey lying, they gave him a 5K-1 letter recommending that he be free. All he had to do was lie against Mr. Guzmán.

## POINT IX: Witness Isaías Valdés Ríos

The government witness, Isaías Valdés Ríos, alias "Memin", said in his direct examination that in 2004 he began working as Mr. Guzmán's security guard (See exhibit 74, p.6167 of the direct examination of Isaías Valdés) and later, in around 2006 or 2007, became his secretary (See exhibit 75, p.6214 of the direct examination of Isaías Valdés).

Memin also said that in 2006 he was with Mr. Guzmán on one occasion and that Mr. Guzmán received a call and that when he hung up, Mr. Guzmán told him that Dámaso López was sending a gift to Mr. Guzmán and that the gift was some of Zetas Cartel's people that Dámaso had kidnapped and sent them to Mr. Guzmán (See exhibit 76, p. 6207 of the direct examination of Isaías Valdés). Then Memin said that Mr. Guzmán had sent him to look for those people and that he went and looked for them and took them to Mr. Guzmán and that Guzmán told him to put them in a cabin and then ordered them to start hitting them so that they could start talking (See exhibit 77, p .6208 of the direct examination of Isaías Valdés). And then he continued making up another series of things (See exhibit 78, p. 6209-6210 of the direct examination of Isaías Valdés).

But Memin was making all this up, because Dámaso López, neither in his proffers with the government nor in his testimony at trial, ever said that he had kidnapped people from the Zetas Cartel to send them to Mr. Guzmán as a gift. And the prosecutors did not ask Dámaso this question during his direct examination, when they had the opportunity to do so. They obviously didn't ask him because what Memin had said wasn't true. But still, the government allowed Memin to go to trial and testify lies against Mr. Guzmán. The government knew very well that Memin had gone to the trial to lie, since the prosecutors had all the evidence of the proffers with Dámaso López and in none of those meetings was the alleged kidnapping of the Zetas discussed. And he didn't say anything regarding that because that wasn't true. Memin lied and the government allowed him to lie.

And the defense lawyers were very inefficient by not exposing Memin and by not alerting the Judge of this. Here is another example of how the defense attorneys' gross inefficiency led to the jury convicting Mr. Guzmán.

In his direct examination, Memin said that he had begun to bring cocaine for Mr. Guzmán in 2011 from South America on a Cessna 210 plane, and that on each flight he would put between 400 to 450 kilos of cocaine (See exhibit 79, p.6233-6234 of the direct examination of Isaías Valdés). But in his cross-examination, it was revealed that he lied. Memin was arrested in early 2014 and extradited to the United States from Colombia, and since his arrival to the United States, Memin began to cooperate with American authorities, and in 2014 he pleaded guilty. Back in 2014 Memin never said that the drugs he was transporting belonged to Mr. Guzmán. It was not until Mr. Guzmán was extradited to the U.S. in 2017 that Memin decided to change his story and say that

the drugs he was transporting belonged to Mr. Guzmán. Evidence of this is the fact that Mr. Guzmán does not appear anywhere on Memin's indictment.

For example, in Memin's cross-examination, the defense lawyer asked him if he had been accused in the same indictment with Mr. Guzmán, and Memin answered no (See exhibit 80, p.6273-6275 of the cross-examination of Isaías Valdés). And then the lawyer asked him if he had been accused of being in a conspiracy from 2009 to 2014 and Memin answered yes and again the lawyer asked him if Mr. Guzmán appeared in that indictment as a co- conspirator and Memin answered no (See exhibit 81, p.6274 of the cross-examination of Isaías Valdés). It is clear that Memin lied about bringing those drugs for Mr. Guzmán, because if that had been the case, Mr. Guzmán would have also appeared on Memin's indictment. Once again it is proven that the government knew that Memin was lying, but they still took him to Mr. Guzmán's trial to lie, because it was not until years later that Memin began to mention Mr. Guzmán in his proffers with the government.

And the defense lawyers were very inefficient for not doing anything to expose Memin's lies and the government's lies. And the defense attorney who did the summation was very ineffective because he didn't clarify to the jury during his summation that both Memin and the government were lying. The lawyer had the evidence of Memin's previous proffers to show that Memin had lied on direct, but he did not use it. The jury took into account Memin's lies, since by not denying what the prosecutor had said in her summation and what Memin had said during his direct examination, it was normal for the jury to take it as true. They were responsible for the jury convicting Mr. Guzmán.

On page 6516 of the government's summation, the prosecutor told the jury that in the mountains of Sinaloa, a bonfire roared in what became a shallow grave and that there were two men lying in front of the bonfire, who had been beaten almost to death and also said that Mr. Guzmán shot each of them on the head and then ordered Memin to throw them in the bonfire (See exhibit 82, p.6516 of the government's closing arguments). The government knew very well that they had brought Memin to trial to lie. They had all the evidence from Dámaso López's testimony, which contradicted what Memin said, but they still allowed him lie.

In his meetings with the government, Dámaso López never said anything about the two Zetas that Memin alleged Dámaso had sent to Mr. Guzmán. And he didn't say anything because it wasn't true. The government never asked Dámaso during the trial either, nor did anything like that ever come out in Dámaso's 3500 evidence.

The defense lawyers Balarezo, Purpura and Lichtman were very inefficient because they should have questioned Dámaso about what Memin alleged about him, but they did not do so. The inefficiency of the lawyers was what caused Mr. Guzmán to be found guilty.

Also, in Memin's direct examination, the government asked him how many times the accused had asked him to carry out acts of violence against informants, and Memin answered that on two occasions (See exhibit 83, p. 6185-6186 of Memin's direct examination). Memin said that the first time was around 2006-2007, that he, Bravo and Roke went to Tamazula, Durango to look for a person and that Bravo and Roke shot and killed that person right there (See exhibit 84, p.6186-6188 of Memin's direct examination). But in Memin's cross-examination it was revealed that he

had lied, since he contradicted himself because he changed his story during his cross-examination and said that he had never mentioned Roke, but the defense attorney read what Memin had said during his direct examination back to him and it was clear that he had mentioned Roke (See exhibit 85, p. 6301-6302 of Memin's cross-examination). It is very clear that the government brought Memin to Mr. Guzmán's trial to lie.

On page 6692 of the government's closing arguments, the prosecutor told the jury that they had the firearms because the defendant bought them (See exhibit 86, p.6692 of the government's closing arguments). The prosecutor told the jury that they had seen numerous examples of this in the accounting books that were seized and that those books had a weapons purchase list, and that the list included 50 AK47s, 100 M16s, 27 RP7s and R15s, grenade launchers and bullets (See exhibit 86, p.6692 of the government's closing arguments). The prosecutor then told them that they had talked about multiple narco wars that the defendant led as one of the leaders of the Sinaloa Cartel and told them that the defendant had carried out these wars to protect his territory and to protect his drug empire (See exhibit 86, p.6692 of the government's closing arguments).

She then spoke about the alleged war between the Sinaloa Cartel and Vicente Carrillo Fuentes, leader of the Juárez Cartel (See exhibit 86, p.6692 of the government's closing arguments).

The prosecutor told the jury that the police found a stash house that contained 40 AK47 rifles brought to the accused's conspirators as they had heard from witness Edgar Galván (See exhibit 86, p.6692 of the government's closing arguments). She told them that the purpose was to clean Ciudad Juárez for the defendant of all the members of "La Linea" (See exhibit 86, p.6692 of the government's closing arguments).

She said, "You saw the 40 AK47s that were on a cart before you came here, three of them are right here in front of you, you saw the vests, you saw the bullets. Well, how do we know that these weapons were for the accused? Well, this is known from the sworn testimony of Vicente Zambada, who said that the accused and Mayo were supporting the war against La Linea and against Vicente Carrillo Fuentes in Juárez with weapons and money. We also know that the Cartel obtained firearms from El Paso, TX and we know that the 40 AK47s were for the defendant and that they were purchased on the orders of Antonio Marrufo, an individual that Galván and Vicente Zambada identified as Jaguar. And they know from the two witnesses that Jaguar was in charge of the fighting in Juarez and they also know that Jaguar was responsible for moving drugs and weapons across the border between Juarez and El Paso. Galván helped Jaguar do this. He testified that he helped Jaguar move AK47s across the border from El Paso to Mexico on about four or five occasions. All of them were successful except for the last shipment of the 40 brand new AK47 assault rifles that you saw brought into this courtroom, as well as the bullet proof vest and ammunition. I submit that these weapons were meant for one thing, to clean the Juárez Cartel of La Linea, the defendant's enemies, to help the defendant seize and maintain control over the important drug-crossing point" (See exhibit 87, p.6692-6693 of the government's closing arguments).

Everything the prosecutor said to the jury was done consciously and in bad faith. She knew perfectly well that what she was telling the jury was not true. She knew that Edgar Galván was

lying, since in the more than 100 meetings that Vicente Zambada had with the government, he never said that Guzmán had a man named Antonio Marrufo alias Jaguar in Cuidad Juárez buying weapons for Guzmán, nor fighting for the plaza from Cuidad Juárez, as the prosecutor stated to the jury.

Even more, in his direct examination Vicente Zambada said that Mario Núñez Mesa alias M-10 was Jaguar's boss and M10, had Jaguar in Cuidad Juárez and that M10 was the one who gave him the nickname Jaguar and not Mr. Guzmán as Galván said in his direct examination. Vicente never said that Guzmán had bought weapons in the United States or that he had sent people to fight against Vicente Carrillo Fuentes' Juárez Cartel, as the prosecutor told the jury in bad faith.

Vicente Zambada did say that German bought weapons in El Paso, Texas for himself and his father and that he sent them to Sinaloa and that Pacheco bought them in Los Angeles (See exhibit 88, p. 4094 of Vicente Zambada's direct examination). Vicente also said in his direct examination that Mario Núñez alias M10 went to the mountains to see Guzmán and that Vicente, Mayo and German were there and that M10 told them that he was fighting in Ciudad Juárez against the Juárez Cartel and that Jaguar was on his side.

Vicente Zambada said that Mayo told Mario that if he needed weapons, he should ask German. Vicente did not say that he asked Mr. Guzmán for them. And he did not say Guzmán, because Guzmán did not have weapons to give as the prosecutor alleged.

Vicente Zambada also said that Mayo had a meeting in Zacatecas with Vicente Carrillo Fuentes' lieutenant and that Miguel Treviño was there and that the meeting was with the intention of ending the war in Ciudad Juárez between the Carrillo Fuentes and M10. Vicente said that at the meeting everyone told Mayo that they thought that M10 and his people were in Ciudad Juárez on Mayo's orders, but that Mayo clarified that that was not true. Vicente said that Mayo told them that what was true was that the M10 had approached him, but that those were problems between them. Mayo also told them that he had withdrawn his people from Ciudad Juárez (See exhibit 61, p.4075 of Vicente Zambada's direct examination).

The government knew that Galván was lying, but they still allowed him to come to the trial to lie against Mr. Guzmán. The jury took this into account and did not doubt the government's story and therefore, decided to find Mr. Guzmán guilty. The government did it conscientiously and in bad faith.

## POINT X: Witness Edgar Galván

At the government's summation, the prosecutor told the jury that they had the firearms because the defendant bought them (See exhibit 86, p. 6692 of the government's closing arguments). She also told them that they had seen numerous examples of the accounting books that were seized in Los Cabos and that those notebooks had a weapons purchase list, where they requested 50 AK47s, 100 M16s, 27 RP7s and R15s (See exhibit 86, p. 6692 of the government's closing arguments). She also said that they had grenade launchers, bullets, among other things.

The prosecutor also said that they had talked about multiple drug wars, that the accused was one of the leaders of the Sinaloa Cartel and that the accused carried out these wars to protect his territory and his drug empire (See exhibit 86, p. 6692 of the government's closing arguments).

She then spoke of the alleged war between the Sinaloa Cartel and Vicente Carrillo Fuentes, the leader of the Juárez Cartel and said that all of those wars had occurred in Ciudad Juarez (See exhibit 86, p. 6692 of the government's closing arguments).

She then talked about how Edgar Galván had said in his testimony that supposedly, on January 13, 2010, the police came across a house containing 40 AK47 rifles, which had been taken to Mr. Guzmán's co- conspirators and that the purpose was to clean Ciudad Juárez of all the members of the Juárez Cartel and that that was for Mr. Guzmán (See exhibit 86, p. 6692 of the government's closing arguments).

She then goes back to talking about the weapons that the government had presented at trial for the jury to see and told them that those weapons were for the defendant, since Vicente Zambada had said in his testimony that Mr. Guzmán and Mayo Zambada were supporting that war against the Juarez Cartel and that they were supporting it with weapons and money. (See exhibit 87, p. 6693 of the government's closing arguments). The prosecutor also told the jury that the forty AK47s had been brought from El Paso, TX by a person nicknamed "Jaguar" and that this had been on the orders of Mr. Guzmán (See exhibit 87, p.6693 of the government's closing arguments). She also said that both Vicente Zambada and Edgar Galván had said in their testimonies that "Jaguar" was in charge of the war in Ciudad Juárez on the orders of Mr. Guzmán (See exhibit 87, p. 6693 of the government's closing arguments). She also said that Galván said that Jaguar had also been responsible for moving drugs and weapons across the border between Ciudad Juárez and El Paso, TX (See exhibit 87, p. 6693 of the government's closing arguments). The prosecutor said that Galván had said that he helped Jaguar move AK47s across the border on four or five occasions, and that each time they were successful, except for the last shipment. The prosecutor then said that all of those weapons had been intended for a purpose and that that purpose was to clean up the Juárez Cartel of La Linea, so that Mr. Guzmán could then take control over this drug- crossing point (See exhibit 87, p. 6693 of the government's closing arguments).

Everything the prosecutor told the jury was done consciously and in bad faith. She knew perfectly well what she was saying was not true. She knew that Edgar Galván was lying, since Vicente Zambada never said either in his testimony during the trial or in the more than 100 proffers that he had with the government that Mr. Guzmán had a man named Jaguar in Ciudad Juárez buying weapons for him, nor fighting for the plaza of Ciudad Juárez as the prosecutor stated in her summation.

Vicente Zambada did say in his cross-examination that Jaguar was from Mario Núñez Mesa's people "M-10", and that M-10 was the one who gave Marrufo the nickname of "Jaguar" and that "M-10" had Jaguar in Ciudad Juárez fighting (See exhibit 89, p. 4186 and 4268 of the cross- Vicente Zambada's cross-examination). But in his testimony, Edgar Galván had said that the person who had given Marrufo the nickname of "Jaguar" had been Mr. Guzmán (See exhibit 90, p.55 of Edgar Galván's cross-examination). So, who do we believe? Here we see another

contradiction from the government and its witness. Their witnesses went to the trial to lie against Mr. Guzmán.

Vicente Zambada never said either in his testimony during the trial or in the more than 100 meetings he had with the government that Mr. Guzmán had bought weapons in the United States, nor that he had sent people to fight against the Juárez Cartel. The prosecutors once again lied in bad faith.

What Vicente Zambada did say was that Germán bought weapons in El Paso, Texas from him and his father and that he sent them to Sinaloa and he also said that he ordered Germán that if Mario alias "M10" asked for support with weapons, to provide it to him (See exhibit 53, p. 4067 of Vicente Zambada's direct examination). Vicente did not say anything about Mr. Guzmán regarding weapons. And he did not mention it because Mr. Guzmán did not have weapons, as the government alleged to the jury.

Vicente Zambada also said that Mayo had a meeting in Zacatecas with Vicente Carrillo, Arturo Beltrán Leyva and Miguel Treviño to talk about the intention of ending the war in Ciudad Juárez between the Carrillo Fuentes and M-10's people. And Vicente said that at the meeting everyone blamed Mayo and Chapo for having all those people there fighting and that Mayo clarified to them that that was not true, since he had taken all his people out of Juárez, including German, and he told them that the rest of what was happening was their problem (See exhibit 61, p.4075 of Vicente Zambada's direct examination).

The government knew this from Vicente Zambada, but they still wanted to involve Mr. Guzmán. The prosecutors knew that what Vicente Zambada said contradicted Edgar Galvan's statement, but they still took him to the trial to lie about Mr. Guzmán.

Mr. Guzmán did not know Jaguar and Galvan said that Jaguar told him that he went to see Mr. Guzmán in the mountains of Sinaloa. How to affirm Galvan's lies to the jury knowing perfectly well that they were not true? The jury took all of that into account and did not doubt the government's story.

And Mr. Guzmán's lawyers knew that what the prosecutor told the jury was not true, since they had evidence from Vicente Zambada that contradicted the prosecutor's statement, but they did not object at all. And the attorney who did the summation on Mr. Guzman's behalf never told the jury that what the prosecutor told them during their summation was not true. The lawyer had the evidence of Vicente Zambada's testimony and of Dámaso López's testimony that showed that what the government was claiming was false, since the government always said that Dámaso López was Mr. Guzmán's right arm and Dámaso López never said that Mr. Guzmán had fought against Vicente Carrillo Fuentes, and Dámaso never said that because it wasn't the truth. The government invented everything conscientiously and in bad faith. They brought their witnesses to the trial to lie and to make a case against Mr. Guzmán in exchange for 5K-1 letters. And the ineffectiveness and inefficiency of Guzman's lawyers helped the government get away with all the lies.

## POINT XI: Witness Juan Carlos Ramirez "Chupeta"

During the direct examination of the government witness "Chupeta", the prosecutor told Chupeta that he had testified that the defendant had begun receiving his cocaine in approximately beginning of the 90s, when he had the first meeting with the defendant (See exhibit 91, p. 1850 of Chupeta's direct examination). Chupeta said that Mr. Guzmán gave him a mold of cylindrical shape to see if they could manufacture cocaine in that form and that this had been around 1991-1992 (See exhibit 92, p. 1867-1868 of Chupeta's direct examination). Chupeta then talks about losing several tons in a seizure in Los Angeles and said he knew it was his cocaine because the shape of the container was a cylinder mold that Mr. Guzmán had sent him and that the cocaine was in chili cans (See exhibit 93, p.1869 of Chupeta's direct examination). And then he said that his worker spoke to him and told him that Arturo Guzmán alias "El Pollo", brother of Mr. Guzmán, had called him, informing him that they had lost several tons of cocaine in Los Angeles and that he was waiting for the indictment documents that supported that seizure and that Arturo then provided those documents to him (See exhibit 94, p.1870 of Chupeta's direct interrogation). But this was Chupeta's pure saying, because the prosecutors never provided any evidence at trial to prove that Chupeta's statement was true and they did not provide it because what Chupeta said was not true. The government never brought those indictment documents that supported that seizure for the jury to see.

Then the prosecutor asked him (See exhibit 93, p.1869 of Chupeta's direct examination) why he had stopped making the special form of cocaine and Chupeta answered that because there was a seizure in Los Angeles of several tons and that it had been his cocaine. So, it is clear that Chupeta went to the trial to lie, since, if it had been true that they had seized several tons of cocaine in chili cans in Los Angeles, the prosecutors would have shown the evidence that demonstrated that Chupeta's statement was true.

And Mr. Guzman's lawyers were very ineffective because they never demanded that evidence. Instead, they remained silent and did not say anything so that the jury would not take Chupeta's lie into account. A very great ineffectiveness and inefficiency of the lawyers.

And furthermore, during the government's closing arguments, the prosecutor told the jury that Los Angeles workers said that tons of their cocaine in chili cans had been seized and that Chupeta wanted proof that that cocaine had been seized by the police and not stolen (See exhibit 95, p. 6590 of the closing government arguments). She also said that the defendant's brother, "El Pollo", had presented evidence to Chupeta in the form of documents, which demonstrated the seizure (See exhibit 95, p. 6590 of the closing government arguments). The government knew that what Chupeta had told the jury was not true, because the prosecutors did not present that evidence and they did not present it because there was no such seizure.

And the worst thing was that the lawyer who made the closing arguments did not tell the jury that the government had not provided evidence of the indictment documents for that seizure that Chupeta claimed to have happened. For this reason, the jury did take into account what was alleged by the government. Everything was overwhelming ineffectiveness and inefficiency on the part of the lawyer who did the summation.

Chupeta then said in his direct examination that at the end of 2000 he restarted his business and began sending cocaine to the towns of the Sinaloa Cartel using fast boats and that those boats

could fit approximately 2000 kilos of cocaine, and that they had two very large and powerful outboard motors and that that's why they were fast (See exhibit 96, p.1963 of Chupeta's direct examination). Then the prosecutor asked him who were the leaders of the Sinaloa Cartel to whom he sent these kilos to and Chupeta said that they were Mayo Zambada, Rey Zambada, the Beltrán Leyva brothers, Nacho Coronel and Vicente Carrillo (See exhibit 97, p. 1965 from Chupeta's direct examination). Then the prosecutor asked Chupeta who German Rosero was and Chupeta said that it was someone that had helped him run his organization in Mexico (See exhibit 97, p.1965 of Chupeta's direct examination).

And then the prosecutor continued asking him questions and Chupeta said that sometimes there were problems on the high seas and that sometimes they had to throw the cocaine into the sea because the coast guard followed the boats and that they had to change the way that they were sending the cocaine to fishing boats (See exhibit 98, p.1966 of Chupeta's direct examination). Chupeta also said that he told German Rosero to propose to the people of the Sinaloa Cartel to participate in the shipment that he was sending, and then he said that he began to send ships to the Sinaloa Cartel that they called "Juanitas" (See exhibit 99, p.1967 of Chupeta's direct examination). He also said that he created his own accounting and that the people of the Sinaloa Cartel invested in each "Juanita" a certain amount of kilos of cocaine and that the investors of the Sinaloa Cartel were Mr. Guzmán, Mayo Zambada, Rey Zambada, Nacho Coronel, Arturo Beltrán and Vicente Carrillo Fuentes (See exhibit 100, p.1975 of Chupeta's direct examination). He also said that until 2005 he sent a total of 10 Juanitas (See exhibit 100, p.1975 of Chupeta's direct examination).

The government accused Mr. Guzmán of having been a member of three "Juanitas" (Juanitas 4, 8 and 9). Chupeta alleged that Mr. Guzmán had received "Juanitas 4" on the high seas and that he was bringing 8,000 kilos of cocaine (See exhibit 101, p.1994 of Chupeta's direct examination). Chupeta also alleged that he knew that it was Mr. Guzmán who had received it because in the accounting books it said that "Cha Cha" had received that shipment and that that was the nickname they used for Mr. Guzmán (See exhibit 102, p.1995 of Chupeta's direct examination).

But Chupeta's lies were exposed by German Rosero, who was his lieutenant and the person Chupeta had said he had in charge in Mexico (See exhibit 98, p.1966 of Chupeta's direct examination). Mr. Guzmán's lawyer asked German Rosero in cross-examination who was "Cha Cha" and German Rosero did not know (See exhibit 103, p.2327 of German's cross-examination). Then the defense lawyer asked him if he knew who "Mona Cha" was and German said that perhaps he was a Chupeta worker named Camilo (See exhibit 103, p.2327 of German's cross-examination). It was clear that Chupeta lied, since not even his lieutenant knew who "Cha Cha" was, and he was not sure who "Mona Cha" was, although he thought it could be a Chupeta worker named Camilo. It was proven by German Rosero, a government witness, that their other witness Chupeta lied. It was impossible that Chupeta's lieutenant would not know the codes used in his boss's accounting books.

German Rosero's testimony about who had received the 8,000 kilos was different from Chupeta's, since Rosero said that the person who had received those kilos had been Julio Beltrán (See exhibit 104, p.2249 of German's cross-examination). The government brought Chupeta to Mr. Guzmán's trial to lie consciously and in bad faith.

Then, Chupeta said that he sent "Juanita 8" and "Juanita 9" and that he put 10,500 kilos to "Juanita 8" and that the Beltrán Leyva brothers received that shipment through Álvaro Palau and the prosecutor asked him how he knew that and Chupeta answered that because the accounting books said so and also because he had Álvaro Palau under the name of "Orestes" to identify him in his books (See exhibit 105, p.2003-2004 of Chupeta's direct examination).

Then, Chupeta talked about "Juanita 9" and said that he sent 12,000 kilos in that shipment and that the person who received them was Nacho Coronel and the prosecutor asked him how he knew that and Chupeta answered that he knew it because his accounting books said so, because his lieutenant told him so and because "Nieto" was the code word they used for Nacho Coronel in their accounting book (See exhibit 106, p.2005 of Chupeta's direct examination).

Then the prosecutor asked Chupeta what were the names of the three Juanitas that were seized and Chupeta said Juanitas 8, 9 and 10 and the prosecutor asked him when they were seized and Chupeta said that Juanitas 8 was seized approximately in September 2004 and that Juanitas 9 was seized approximately in September 2004 and that those two Juanitas had a total of 22,500 kilos of cocaine together (See exhibit 107, p.2006 -2007 of Chupeta's direct examination). And the prosecutor asked him how he remembered it so clearly and Chupeta told him because that had been a tragedy for him as a drug trafficker in his life (See exhibit 107, p.2006-2007).

Then on Rosero's cross-examination, Mr. Guzmán's defense attorney asked him about the two shipments he had talked about (one of 10,000 kilos and another of 12,000) and he said that the 10,000 kilos had been received by Nacho Coronel and the 12,000 kilos had been received by Arturo Beltrán (See exhibit 108, p.2318-2319 of Rosero's cross-examination). Rosero said something completely different from what Chupeta said because Chupeta had said that the person who had received those 12,000 kilos had been Nacho Coronel and that the person who had received the 10,000 kilos had been Arturo Beltrán and that he was sure because his accounting books said so. Who lied then?

Chupeta also said that those who had invested in Juanita 4, Juanita 8 and Juanita 9 had been Guzmán, Mayo, Rey Zambada, Vicente Zambada and Nacho Coronel. But the curious thing here is that in the more than 100 meetings that Vicente Zambada had with the government, Vicente never said that his father had invested money in cocaine from 2002 to 2005 with Rosero, since Chupeta said that his name did not appear with the Mexicans and that the one who appeared as the owner was Rosero. Nor did he say anything about Nacho Coronel or Arturo Beltrán having made investments with them from 2002 to 2005. Vicente always said that he was the one who spoke with the Colombians and that he was the one who reported everything to his father Mayo. Vicente also did not say that Guzmán had made any type of investment with Rosero, nor did he allege that Guzmán had made an investment with Nacho Coronel or Arturo Beltrán.

The government said in the indictment that Mayo and Guzmán were partners from 1989 to 2014 and that they split the cocaine profits 50/50. But Rosero said in his direct examination that Guzmán did not have transportation and that the transportation belonged to Mayo (See exhibit 109, p. 2321 of Rosero's cross examination).

However, in the meetings that Vicente had with the government, Vicente Zambada never said anything about his father's transportation having been used from 2002 to 2005, nor did he say that Arturo Beltrán or Nacho Coronel had used his father's transportation. And he didn't say anything like that because what Chupeta and Rosero said wasn't true.

Chupeta also said that another investor who invested in each Juanita was Rey Zambada. But in all the meetings that Rey Zambada had with the government, Rey never said anything about him having made investments with Rosero from 2000 to 2007 as Chupeta said. Chupeta had said that he began sending his cocaine in 2000 until his arrest in 2007 to the Sinaloa Cartel, including to Rey Zambada (See exhibit 110, p.1963-1965 of Chupeta's direct examination). But Rey didn't say any of this because it wasn't true. This is further proof that it was not true.

The prosecutors never asked either Rey Zambada or Vicente Zambada during their direct examinations at trial about the investments Chupeta alleged Rey and Mayo made in each shipment he shipped. And they did not ask them because the prosecutors knew that what Chupeta alleged was not true. If it had been true, the prosecutors would have asked Rey and Vicente to corroborate Chupeta's version.

They also did not take Conejo to the trial to testify, who is in prison and the prosecutors had the ability to take him to Guzmán's trial to testify. Conejo allegedly worked for the Beltrán Leyva family. But they didn't bring him to because Conejo had denied what Chupeta had said.

Chupeta talked about how he began to run the Juanitas in 2002 until 2005, but Vicente Zambada had said that, in those years, when Guzmán left prison in 2001, he was in bad shape financially and that he spent five years with Alfredo Beltrán alias "Mochomo" in the mountains of Sinaloa and that, in that period of time, Mr. Guzmán had no money (See exhibit 111, p. 4142-4143 of the cross-examination of Vicente Zambada). Five years (from 2001 to 2006) were those in which Vicente said that Mr. Guzmán was in bad shape financially. So, Chupeta's claims against Mr. Guzmán do not make sense. It does not make sense that Mr. Guzmán invested in the shipments that Chupeta sent from 2002 to 2005, since Guzmán did not have money at that time. It is very clear that Chupeta lied and the prosecutors knew it, but even knowing it, they decided to take him to trial to lie against Mr. Guzmán. They did everything so that the jury would convict Mr. Guzmán, as it happened.

Prosecutors were willing to give 5K1 letters to people like Chupeta, who had committed horrible crimes, so long as they would help convict Mr. Guzmán. For example, Chupeta committed acts of terrorism. He testified that he had ordered the killing of 150 people and that he had taken hundreds of thousands of kilos of cocaine to the United States (See exhibit 112, p.1834 of Chupeta's direct examination). But, for lying against Mr. Guzmán at trial, prosecutors rewarded him by giving him a 5K1 letter.

And the ineffectiveness of the defense attorney who made the summation was very big, since he did not tell the jury that what the government said was not true. The lawyer had the evidence of the direct examination of Rey Zambada, which proved that Rey never said anything about making investments with Rosero to buy kilos of cocaine, nor did prosecutors ever ask him about that. And they did not ask him because the government knew that what Rosero and Chupeta

alleged was not true. But the attorney did not use the opportunity to make that clear during his closing arguments. The attorney was very inefficient.

Also, the defense attorney who cross-examined Rey was very inefficient because he did not even ask Rey if he knew Rosero. Also, the defense attorney who cross-examined Vicente Zambada was very inefficient, since he never asked Vicente if he knew Rosero and neither did he ask him anything about what Chupeta had said about how his uncle Rey invested in each shipment with his father Mayo and Guzmán. What Vicente did say in his direct examination was that he was the one who coordinated drug shipments with the Colombians. But the defense lawyers never clarified any of this, when they had the opportunity to do so. It was a very great inefficiency on the part of the attorneys who cross-examined these witnesses. They let the government lie and get away with it. These defense lawyers (Balarezo, Purpura and Lichtman) were very ineffective and their ineffectiveness contributed to the jury finding Mr. Guzmán guilty.

Another example of where Chupeta is seen lying is when he talks about "Mona Cha". Chupeta had said in his direct examination that "Mona Cha" was the name he used to identify a person and that "Cha Cha" was the name he used to identify Mr. Guzmán in his accounting books. Then, on page 2032 of Chupeta's cross-examination, the defense lawyer asked him about a date that was in the accounting book of January 9, 2004 and asked if "Mona Cha" appeared there and Chupeta did not answer, but instead what he said was that the word "Cha Cha" came after that. The lawyer then asked again who "Mona Cha" was and once again Chupeta did not answer (See exhibit 113, p.2032-2034 of Chupeta's cross-examination). What Chupeta said was that where it said the word income in the book, that that meant that it was the money that a person brought them, and that they called that person "Mona" and that that was why when money came in from the work they had made with Chapo, because they called her "Mona Cha" (See exhibit 113, p.2032-2034 of Chupeta's cross-examination).

Here Chupeta changes the version of what "Mona Cha" meant. In direct examination he said that the word "Mona Cha" was the word they used to identify Mr. Guzmán in the accounting book. But the lawyer continued to question him and finally Chupeta admitted that "Mona Cha" was a person, that is, the person whom Chupeta said was making payments to him (See exhibit 113, p.2032-2034 of Chupeta's cross-examination).

Chupeta was also exposed by German Rosero, who was his lieutenant and the person Chupeta had said he had in charge in Mexico (See exhibit 98, p.1966 of Chupeta's direct examination). Mr. Guzmán's defense lawyer asked German Rosero during cross-examination who was "Cha Cha" and German Rosero did not know (See exhibit 103, p.2327 of German's cross-examination). Then the lawyer asked him if he knew who "Mona Cha" was and German said that perhaps he was a Chupeta worker named Camilo (See exhibit 103, p.2327 of German's cross-examination). It was clear that Chupeta lied, since not even his lieutenant knew who "Cha Cha" was and he was not sure who "Mona Cha" was, although he thought it could be a worker named Camilo. It was proven by German Rosero, a government witness, that Chupeta lied. It was impossible that Chupeta's lieutenant would not know the codes used in his boss's accounting books.

Juan Carlos Ramírez alias Chupeta is a shameless person who did not mind lying under oath in the trial against Mr. Guzmán, to obtain a benefit from the government. Worst of all, the

government knew that Chupeta was lying, since they had met with Chupeta since he arrived to the United States from Brazil, more than 10 years ago. And they had also met with and had the testimony of German Rosero, Chupeta's lieutenant, who denied and contradicted many of the things that Chupeta said. But they still took them both to trial to lie against Mr. Guzmán knowingly and in bad faith.

And the defense attorneys were very inefficient. They did not object to anything the government said in their summation, nor did they clarify anything when they had the chance during the defense's summation. An excessive and unprecedented inefficiency.

## POINT XII: Witness Tirso Martínez

The government began when they brought the accusation against Guzmán on September 21, 2014. They accused him of violations 81, 82, 83, 84. Then, by the time the trial began, those violations had changed to 20, 21, 22, 23. At the trial, they brought a person named Tirso Martínez Sánchez to testify. However, he had already testified in 2016 and back then, he had said on February 3 and 8, 2016 who was the owner of the drugs. Back then he had not said anything or mentioned anything about Mr. Guzmán being the owner of the drugs.

For example, the prosecutor told the jury that at the time of the drug seizure in 1999 in El Paso, TX, Mayo Zambada and the defendant were both leaders of the Sinaloa Cartel and that the defendant depended on Mayo Zambada to manage the drug shipments together with the Beltrán Leyva and his brother Pollo (See exhibit 114, p.6641 of the government's closing arguments). He also said that when Mr. Guzmán was in jail, the drugs seized in El Paso, TX belonged to Mayo Zambada and Vicente Carrillo and that the defendant knew that Mayo Zambada was sending drugs to the United States in 1999 and that, according to the law, that meant that the accused was also guilty of sending, since the rule was quite simple, everyone in a conspiracy bears responsibility for the crime committed by one of the conspirators (See exhibit 115, p. 6642 of the government's closing arguments).

The government also told the jury that they had heard from Tirso Martínez that the defendant and Mayo handled drug shipments while the defendant was in prison in the 1990s (See exhibit 115, p. 6642 of the government's closing arguments). The government also told the jury that Mayo and Vicente Carrillo were associates of the defendant, and that they agreed to traffic drugs together and that this was a conspiracy (See exhibit 115, p. 6642 of the government's closing arguments).

They also talked about what Tirso had said about how there was a shipment of cocaine in El Paso, TX that was going to be shipped in shoe boxes, but that it was seized by the government and that they had also heard that from Special Agent Johnson (See exhibit 115, p.6642 of the government's closing arguments). They also told the jury that as soon as the defendant had people like Mayo moving cocaine for him, that it was a conspiracy and that Judge Cogan was going to instruct them that they could find the defendant responsible for violation 23 (See exhibit 115, p.6642 of the government's closing arguments).

On page 6626 the prosecutor spoke about violations 20, 21, 22, 23. First she said that violations 20, 21 and 22 were seizures that occurred in Queens, Chicago and Brooklyn (See exhibit 116, p. 6626 of the government's closing arguments).

But, during Tiro's cross-examination lawyer it was revealed that what the prosecutor was telling the jury was not true and she knew it, since Tirso Martínez had already told the government in 2016 who really owned the drugs and the prosecutors knew it, but, even then, they took Tirso Martínez to the trial to lie against Mr. Guzmán.

For example, the defense lawyer asked Tirso in cross-examination if he had already testified that Mayo Zambada had been the owner of the thousands of kilos seized in El Paso, TX, and Tirso said yes (See exhibit 117, p. 2732 of Tirso's cross-examination). And then the defense lawyer asked him if he remembered testifying about the 2002 seizure of 2,000 kilos in Brooklyn and Tirso said yes and then the lawyer asked him if he remembered that both in his statement in 2016 and in his "affidavit in expedition for Joaquín Guzmán", he had said that the owner of those drugs was Mayo Zambada, and Tirso said yes (See exhibit 117, p. 2732 of Tirso's cross-examination).

The defense attorney then asked Tirso about a seizure at a warehouse in Chicago in August of 2002 where approximately 1,900 kilos had been seized, and Tirso said that he remembered testifying about that and said that those 1,900 kilos belonged to Camelia (See exhibit 118, p.2732-2733 of Tirso's cross-examination).

Then the lawyer asked him about the 2,000 kilos seized in Queens, NY and asked him if he had said both in his 2016 affidavit and in the affidavit for the extradition of Joaquín Guzmán Loera, that the person who really owned those kilos was Mayo Zambada, and Tirso said yes (See exhibit 119, p. 2733-2734 of Tirso's cross-examination).

And the prosecutor knowingly and with bad faith told the jury that Vicente Carrillo, Mr. Guzmán and Mayo Zambada were partners, knowing well that what she was saying was not true, since the same government had said in the 2008 Chicago indictment that Mr. Guzmán had a faction and Mayo had another of the Sinaloa Cartel. And at the opening statements of the trial, the prosecutor had said that Mr. Guzmán moved drugs from 1989 to 2014. The government never said that Mr. Guzmán and Vicente Carrillo had done it, but rather he said that it had been Mr. Guzmán.

It was clear that Mr. Guzmán was never a partner of either Mayo or Vicente Carrillo as the prosecutor stated to the jury during closing arguments. What the prosecutor told the jury was too damaging for Mr. Guzmán, since the jury took it into account and did not doubt the prosecutor's word and therefore, found him guilty.

## POINT XIII: Witness Jorge Cifuentes

During the direct examination of witness Jorge Cifuentes, the prosecutor asked witness Jorge Cifuentes what was his relationship with Robachivas, and Jorge said that they became partners in the drug field and that they had a relationship as if they were brothers (See exhibit 120, p.2850 of Jorge Cifuentes's direct examination).

The prosecutor asked him how long he had been with Robachivas and Jorge answered that, for approximately eight years, from 1990 to 1998 (See exhibit 120, p.2850 of the direct examination of Jorge Cifuentes). Then, the prosecutor asked Jorge what had happened to Robachivas and Jorge told him that Robachivas had been murdered and that when he heard that he had been murdered, Jorge returned to Colombia because he feared for his life (See exhibit 121, p.2852 of the direct examination of Jorge Cifuentes). Jorge also said that when he returned to Colombia in 1998 after the death of Robachivas, he began working on his legal businesses in Colombia from 1998 to 2003 (See exhibit 121, p.2852 of the direct examination of Jorge Cifuentes). Jorge said that in 2003 he decided to return to the drug business and that he needed to recover his structure, especially the tuna fishing boats that he had left to Humberto Ojeda's widow whose name was Laura Ávila and that he contacted her in the 2002 (See exhibit 122, p.2854-2855 of Jorge Cifuentes's direct examination).

Jorge then said that he wanted to look for Don Joaquín (referring to Joaquín Guzmán Loera) to talk to him about returning to the drug business, and also to ask him for protection, since Jorge feared for his safety since the murder of Humberto Ojeda "Robachivas" and Jorge wanted to be under the protection of Mr. Guzmán and wanted Mr. Guzmán to know that Jorge suspected that Mayo Zambada had ordered Robachivas to be killed (See exhibit 123, p.2858-2859 of Jorge's direct examination).

Here we see that Jorge Zambada was led to lie at trial against Mr. Guzmán, because Jorge had previously stated in his meetings with the government that it was in the 3500 material, that he had sought Mr. Guzmán through Robachivas's widow, since he knew that Mayo had ordered him to be killed and he also knew that Mayo knew of the relationship between Jorge and Robachivas and Jorge feared that Mayo would also have him killed. And since at that time the government was running a negative campaign against Mr. Guzmán in the media, saying that he was the biggest and most dangerous drug trafficker in the world, well, Jorge upon hearing that thought it was true and thought that Mayo would listen to Mr. Guzmán. And according to Jorge, that is why Jorge asked Robachivas's widow to look for Mr. Guzmán and ask him to meet Jorge. Jorge changed his version during his direct examination in the trial from what he had said to the government during of one of the proffers, which was in the 3500 material. In the meetings with the government that we read in 3500 material, he first said that he had sought out Mr. Guzmán to ask him for protection. And in the trial against Mr. Guzmán Jorge changed his version and said that he had sought Mr. Guzmán to ask for security/protection, but also to traffic drugs.

But Jorge never imagined that the defense lawyer would have his statement from June 23, 2016, which contradicted what Jorge said at trial. The defense lawyer in Jorge's cross-examination asked him if he had signed an affidavit in 2016 under penalty of perjury in relation to his extradition, and Jorge said yes (See exhibit 124, p. 3135 of Jorge's cross-examination). And then the lawyer asked him if he had sworn to tell the truth, and Jorge said yes (See exhibit 124, p.3136 of Jorge's cross-examination). And then the lawyer asked Jorge if in that sworn statement of June 23, 2016, he had said that in 2003 he requested a meeting with Mr. Guzmán to talk about his concern for his safety, and Jorge answered yes (See exhibit 125, p.3136 of Jorge's cross-examination). In the sworn statement of June 23, 2016, Jorge does not say that he had sought out Mr. Guzmán in 2003 to talk about drug trafficking. He only said that he sought him out to talk

about his safety and the lawyer asked him this and Jorge admitted in his cross-examination that he had not said that in his statement of June 23, 2016 (See exhibit 126, p.3137 of Jorge's cross-examination). It is clear that Jorge went to Mr. Guzmán's trial to change his version and lie and that the government allowed him to lie against Mr. Guzmán. Jorge was facing life in prison, so he didn't mind lying in order to get a reduced sentence.

Further proof that Jorge Cifuentes lied in his testimony at trial is when the defense lawyer asked Jorge if the death of his brother Pacho had prevented him from continuing to traffic drugs and Jorge said yes, and that he went to Mexico to meet with Mr. Guzmán so that Mr. Guzmán would help him find out who had killed his brother because Jorge wanted to know if his life was in danger (See exhibit 126, p.3137 of Jorge's cross-examination). In 2007 Pacho was killed and in 2007 Jorge said that he went to see Mr. Guzmán to talk again about his safety. The same thing he did in 2003 when he thought Mayo wanted to kill him.

Later in the direct examination, Jorge made up that in 2007 he had gone to Ecuador to send shipments of cocaine to Mr. Guzmán, and that in 2009 there was a cocaine seizure in Ecuador of more than 8 tons of cocaine. And he lied and said that this cocaine belonged to Mr. Guzmán, since he had purchased it for Mr. Guzmán. He also said that he left his brother Alex Cifuentes in the mountains of Sinaloa with Mr. Guzmán so that his brother could coordinate the cocaine shipments that Jorge sent to Mr. Guzmán. Jorge lied knowing that this was not true, since it was revealed during his cross-examination that when his brother Pacho died in 2007, Jorge stopped trafficking drugs (See exhibit 126, p.3137 of Jorge's cross examination). Therefore, if he said that he had stopped trafficking drugs in 2007, then he was lying when he said that he was trafficking in 2009. Which is it then?

And the prosecutors in the summation continued with the lies, assuring the jury that Jorge had testified that Mr. Guzmán had put him in charge of the operation along with his brother Alex Cifuentes (See exhibit 127, p.6612 of the government's closing arguments). The prosecutors knew that what Jorge said was not true, since they had the evidence of what Jorge had testified on June 23, 2016, but they still allowed him to lie. The prosecutors did everything to convict Mr. Guzmán, regardless of whether they were lying or not. They only cared about condemning Mr. Guzmán at any cost, without caring if they had to benefit people who committed horrible crimes, like Jorge Cifuentes himself, who committed acts of terrorism.

For example, this was demonstrated in his testimony, as Jorge testified that he had been responsible for arming the paramilitaries in Colombia. Jorge said that he brought them 5,000 AK47 assault rifles and 5 million rounds of ammunition (See exhibit 128, p. 2853 of Jorge's direct examination). How many thousands of people have died and will continue to die because of Jorge for arming that group? But the American Government didn't care about that. They didn't mind benefiting Jorge, so long as Jorge helped convict Mr. Guzmán. And Jorge agreed to lie in exchange for a 5K1 letter.

And that was not Jorge's only crime. Jorge also admitted to having trafficked drugs from 1990 to 1998 to the United States with his partner Roba Chivas. And he also trafficked with Mayo Zambada from 1988 to 1990.

Even with all these crimes under his belt, the U.S. Government still decided to make a deal with Jorge. Jorge lied against Mr. Guzmán and in return they gave him a 5K1 to recommend a reduction of his sentence.

## POINT XIV: Witness Pedro Flores

During closing arguments, the prosecutor told the jury that witness Pedro Flores had testified that he and his brother Margarito Flores had already moved 15 tons of cocaine for the Sinaloa Cartel when Pedro Flores was kidnapped in 2005 (See exhibit 129, p. 6643 of the government's closing arguments). The prosecutor also told the jury that after Pedro's rescue, they went to see Mayo Zambada and to their surprise, Mayo shook their hand and thanked them for the 15 tons of cocaine that he had distributed for Mr. Guzmán and Mayo (See exhibit 130, p.6644 of the government's closing arguments).

The prosecutor then told the jury that they went to see the defendant and that at that meeting the defendant arranged with the Flores twins to send cocaine and heroin directly to them, cutting out the middleman, and that over the course of three years until the twins turned themselves in to the police, the Flores brothers received more than 38 tons of cocaine from Mr. Guzmán and Mayo, and more than 200 kilograms of heroin (See exhibit 130, p.6644 of the government's closing arguments).

Then the prosecutor showed some calls to the jury. The first call was a conversation that the prosecutors alleged was between Margarito Flores and the son of the accused, Alfredillo Guzman, in which Pedro Flores alleged that they were supposedly talking about 18 kilos of cocaine (See exhibit 131, p.6646 of the government's closing arguments).

And the prosecutor told the jury that they had heard the calls between the defendant's worker, who spoke to Pedro Flores about where he was going to deliver the drugs (See exhibit 132, p. 6647 of the government's closing arguments). The prosecutor then alleged that the defendant's son had arranged a call with his father, the defendant, and with Pedro Flores and that when that call did not happen, Pedro called Juancho. And the prosecutor said to the jury that they heard Juancho and Pedro talking about their work together.

She also told them that there was a call between the defendant and Pedro and that they were talking about the price of the heroin that the defendant had sent to Pedro and that they negotiated the price to $50,000, and that the accused had decided to sell 20 kilos of heroin for $5,000 less (See exhibit 132, p. 6647 of the government's closing arguments).

Everything the prosecutor told the jury was said in bad faith, since she knew well that what Pedro Flores had said was not true, and that Pedro Flores had been brought to trial to lie. And the evidence says so.

For example, Pedro Flores testified at trial that he began buying cocaine from a person named Guadalupe Ledesma because he could get it for cheaper and that the cocaine that Ledesma sold him was supposedly Mr. Guzmán's cocaine, because allegedly Mr. Guzman was his boss (See exhibit 133, p. 3629-3630 of Flores's cross examination).

But during his cross-examination the defense attorney questioned him about a meeting in Monterrey on August 10, 2008, in which Pedro had told the prosecutors that he eventually learned that Ledesma received all of his cocaine from German Olivares and that Olivares was Mayo's chief lieutenant, and therefore, Flores would receive the drugs from Ledesma and Ledesma would receive it from Olivares, and Olivares received it from Mayo (See exhibit 134, p. 3630-3633 of Pedro's cross-examination). Pedro Flores never mentioned Chapo. Then, the defense attorney asked him if he remembered that that was what he had testified years before in the grand jury of the Northern District of Illinois, and Pedro answered yes (See exhibit 134, p.3630-3633 of Pedro Flores's cross-examination).

Then the lawyer asked him if he remembered saying that in this meeting Pedro had discussed the debt that was owed to Ledesma, and that they had reached an agreement to pay the debt, and Pedro answered yes, that he and his brother Margarito told Mayo Zambada that over time they had bought and sold approximately between 15 and 20 tons of cocaine for him and that they would pay his debt in full (See exhibit 135, p.3635 of Pedro's cross-examination). Pedro said that in his testimony in the Northern Illinois grand jury. Then the lawyer asked Pedro Flores that if the cocaine he had been receiving came directly from Ledesma, and he said yes (See exhibit 136, p.3636 of Pedro's cross-examination). It became very clear that Pedro Flores lied about who owned the cocaine.

Later, he also said that the cocaine he bought from Juancho belonged to Mr. Guzmán. He tried to do the same thing he had done with Ledesma, trying to involve Mr. Guzmán and trying to say that the cocaine belonged to Mr. Guzmán, when that was not the case.

It is clear that he also lied, since in the more than 100 meetings that Vicente Zambada had with the American Government, Vicente never said that the cocaine that Juancho sold to the Flores brothers belonged to Mr. Guzmán. And the prosecutor said that when Pedro Flores called Juancho to get him on the phone to talk about heroin, that they talked about their business. He never said that they had discussed Mr. Guzmán's business. And then he told the jury that there were two calls allegedly between Pedro Flores and Mr. Guzmán where they talked about 20 kilos of heroin. The prosecutor played those calls to the jury and told the jury that it was Mr. Guzmán and Pedro Flores talking, knowing very well that it was not true, since no evidence linking Mr. Guzmán was ever found on the servers located in the Netherlands as the prosecutors alleged. Prosecutors alleged that Mr. Guzmán spoke from servers located in the Netherlands about issues of violence and drugs.

The evidence is that when the defense attorney in the cross-examination of Pedro Flores played a video in which Mr. Guzmán was seen speaking in a video that he had recorded for "Rolling Stones" and then played a call to the witness Pedro Flores, in which prosecutors alleged was Mr. Guzmán speaking with Pedro Flores, the same witness said that Mr. Guzmán's voice in the "Rolling Stones" video did not resemble the voice of the person speaking on the call. It is clear that Pedro Flores was brought to trial to lie against Mr. Guzmán. They did everything they could to get the jury to find Mr. Guzmán guilty.

The American Government deceived the jury since they knew that what they were alleging about Pedro Flores was not true, since it was well demonstrated during the cross-examination of Pedro Flores.

And the prosecutors did it on purpose to continue poisoning the jury's mind, more than they already had. The jury was not going to doubt what the prosecutor said, and they took into account everything the prosecutor told them during her summation.

## POINT XV: Witness Germán Rosero

The prosecutor asked witness Germán Rosero about the shipments to Mexico that he had negotiated in 2004 with the Sinaloa Cartel, and Rosero answered that in 2004 he began with a shipment of 8,000 kilos of cocaine that had been sent to Mr. Guzmán (See exhibit 137, p.2244 of Germán Rosero's direct examination). Rosero said that this shipment had left the Colombian beaches in February 2004 and that the American Navy had stopped the boat containing the shipment and spent 17 hours trying to find where the cocaine was hidden, but they eventually released the boat. They had to turn back, and when the ship was already back in Colombia, they gave instructions to Rosero to speak with Mr. Guzmán to tell him that the Mexicans could no longer use speed boats for that shipment and that they had to use a fishing boat (See exhibit 138, p.2245 of Germán Rosero's direct examination).

Then, Rosero said that Mr. Guzmán told him to go to Culiacán because there was a meeting there, and that Alfredo Beltrán, El Cojo and Julio Beltrán were going to be present at the meeting (See exhibit 139, p.2248 of Germán Rosero's direct examination). He also said that he did not know who Julio Beltrán was (See exhibit 139, p.2248 of Germán Rosero's direct examination).

Rosero lied, since during the cross-examination he said that the person who had received the 8,000 kilos had been Julio Beltrán and he also said that Julio Beltrán worked alone (See exhibit 140, p.2318 of Rosero's cross-examination). Rosero also said that Conejo worked for Arturo Beltrán on shipments at that time (See exhibit 141, p.2252 of Germán Rosero's direct examination). It is very clear that Rosero lied, since Rosero said that Conejo was working with Arturo at that time, and also said that the shipment of 8,000 kilos belonged to Mr. Guzmán (See exhibit 141, p.2252 of Germán Rosero's direct examination). If that had been true, then what was Julio Beltrán doing receiving that shipment (See exhibit 140, p.2318 of Rosero's direct interrogation), if according to Rosero, Julio worked independently. t is very clear that this shipment was from Arturo Beltrán, Conejo and Julio Beltrán, and not from Mr. Guzmán. If that had been true, then the shipment would have been picked up by Mr. Guzmán. Furthermore, if it had been true, then why not bring Conejo to Mr. Guzmán's trial to testify?

Rosero said that Nacho Coronel was very jealous and very possessive (See exhibit 142, p.2243 of Rosero's direct examination). It is very clear that Nacho Coronel and Arturo Beltrán were the ones who worked with Chupeta on all the Juanitas shipments, which was the name Chupeta gave to each shipment, since in all the Juanitas, Chupeta made up a story saying that those shipments were for Mr. Guzmán, Nacho Coronel, Mayo Zambada, the Beltrán Leyva and Vicente Carrillo. But Rosero never said that the shipments had been sent to Nacho Coronel, nor he ever said that these people had invested money with Nacho Coronel. This is further proof that both Chupeta and Rosero lied.

For example, Chupeta made up that the shipment of 8,000 kilos was the shipment that he sent to Mr. Guzmán, knowing that this was not true, since Rosero had said that the person who had received that shipment was Julio Beltrán. So, which of the two government witnesses lied?

Further proof that Rosero lied about that shipment being for Mr. Guzmán is that Rosero said that when he went to the meeting in Sinaloa, that Alfredo Beltrán (Arturo Beltrán's brother) met him at the landing strip and told him not to worry because the entire product made it successfully (See exhibit 143, p.2250 of Rosero's direct examination). This is further proof that Alfredo Beltrán was the one who was coordinating that shipment with his brother Arturo and Julio Beltrán. But Chupeta pinned that shipment on Mr. Guzmán in bad faith.

Later, Rosero also said that Julio Beltrán had contacted him and asked him to visit him in Mazatlán and told him that 4,000 kilos had been lost and Rosero said that he paid him for that with about 4,000 kilos that belonged to him (See exhibit 144, p.2251 of Rosero's direct examination). Both Rosero and Chupeta didn't mind lying. Chupeta only cared about the 5K1 letter that the government had promised that they would give him if he helped them. It is clear that the people who Rosero really sent that shipment to was Julio Beltrán and Arturo Beltrán.

Another part of the trial where we see Rosero lying was when he said in his direct examination that the shipments he had sent in 2004 were for Arturo Beltrán (See exhibit 145, p.2252 of Rosero's direct examination). But later, he changed his version and said that the shipment of 12,500 kilos sent in 2004 had been for Arturo Beltrán and Mr. Guzmán. First he said that in 2004, the shipments he sent were for Arturo Beltrán. He did not mention anything about Mr. Guzmán. Then later, he changed his version and included Mr. Guzmán.

Rosero contradicted what Chupeta said. For example, Chupeta said in his testimony that the Juanita of 10,000 kilos was received by Arturo Beltrán and that the Juanita of 12,000 kilos was received by Nacho Coronel (See exhibit 146, p. 2005 of Chupeta's direct examination). But Rosero said that those 12,000 kilos had been received by Arturo Beltrán and that the 10,000 kilos had been received by Nacho Coronel. (See exhibit 140, p.2318 of Rosero's cross-examination).

Then, the defense lawyer asked Rosero if he remembered when he had met with the government in 2009 where they discussed those two shipments and Rosero said that he did remembered. Then the lawyer asked him if he remembered that at that time Rosero had said that the 10,000 kilos were for Nacho and that the 12,000 kilos were for Chapo and Arturo Beltrán, and Rosero said that he did remember (See exhibit 108, p.2318-2319 of Rosero's cross-examination).

Then, the defense lawyer asked him if he remembered the meeting he had with the government in 2017, where they also discussed those shipments again and that Rosero said that the 10,000 kilos were for Nacho and Rosero said that the government had probably made a mistake when writing that. Then it continues on page 2320 and the defense lawyer asked him if he said that Chapo worked through Mayo Zambada and Rosero said that he did not remember having said that (See exhibit 147, p.2320 of Rosero's cross-examination).

38

Then, the defense lawyer showed him exhibit 248 where he said that Rosero had said that (See exhibit 148, p.2321 of Rosero's cross-examination). Upon being discovered, Rosero had no choice but to say that Chapo was working through Mayo by using transportation.

This is further proof that Rosero lied. First he told the U.S. Government that Guzman worked through Mayo Zambada, and then changed his statement and said he worked with Arturo Beltran 's transportation. Rosero went to the trial against Mr. Guzman to lie.

In the cross-examination of Rosero, the defense attorney asked him who "Cha Cha" was and Rosero said that he did not know who that nickname belonged to (See exhibit 103, p.2327 of German's cross-examination). Then, the lawyer asked him who the nickname "Mona Cha" belonged to, and Rosero said that perhaps it was for Camilo Molina, who was one of Chupeta's workers. With this testimony from Rosero, Chupeta was exposed that he lied in his testimony when he said that "Mona Cha " were two people. Both Chupeta and Rosero went to the trial to lie against Mr. Guzmán. Rosero was Chupeta's lieutenant. So, who better than Rosero to know the code name they used to refer to Mr. Guzmán in the accounting books? Of course Chupeta lied in his testimony when he said that "Mona Cha" were two people. It is clear that Mr. Guzmán never made any drug negotiations with Chupeta.

The defense attorneys were very inefficient since they did not use the evidence from Chupeta and Rosero's testimonies to refute the government's claims during the trial. Their inefficiency contributed to Mr. Guzmán being found guilty.

And the government in its closing said that Chupeta had sent the Juanitas shipments and that those shipments were the focus of the violations between 2002 and 2005 (See exhibit 149, p.6595 of the closing government arguments). The government also said that Chupeta had testified that all the cartel members invested in these shipments and that this was true because German Rosero had testified that his job was to collect the money from all the cartel members who were investing in these shipments and that they were Mr. Guzmán, Mayo Zambada, the Beltrán Leyvas, Nacho Coronel and Vicente Carrillo Fuentes (See exhibit 149, p.6595 of the closing government arguments).

But what the prosecutor said about Rosero being in charge of collecting the money was not true, since Rosero never said that he collected the money from Mayo Zambada. Rosero also said that he did not know Vicente Carrillo. The only thing that Rosero alleged was that Mr. Guzmán and Arturo Beltrán made an investment together in "Juanita 9", and that Nacho Coronel was very jealous of his businesses (See exhibit 142, p.2243 of Rosero's direct examination). The prosecutor made everything up and that was very damaging for Mr. Guzmán, since the jury took into account what the prosecutor said during her closing arguments.

And the defense lawyers were inefficient because they did nothing to refute what the prosecutor said during her closing arguments, even though they had the evidence from Rosero's testimony where they could have used it to refute what the government was claiming.

At the government's closing arguments, the prosecutor said that the cartel members helped each other carry these shipments and that Rosero had testified that the cartel members took turns

picking up the shipments (See exhibit 149, p.6595 of the closing government arguments). She then told them that these shipments had been sent between 2002 and 2005. But what the prosecutor said was not true. Rosero never said in his testimony that Rey Zambada had invested in the shipments, much less that he had collected any shipments. Another investor Chupeta mentioned was Mayo Zambada. But Rosero never mentioned anything about Mayo Zambada having invested in those shipments. Another lie from Chupeta and the U.S. Government.

Furthermore, Vicente Zambada had said in his cross-examination that Mr. Guzmán did poorly financially during the first 5 years after leaving prison (from 2001 to 2006) (See exhibit 15, p.4142 of Vicente's cross-examination). If Vicente said that Mr. Guzmán had no money until 2006, then it cannot be true that Mr. Guzmán was sending shipments between 2002 to 2005, because he had no money. Both Chupeta and Rosero lied.

## POINT XVI: Conclusion

Mr. Judge Cogan, you will notice the great ineffectiveness of Mr. Guzmán's defense attorneys (both trial and appellate attorneys) throughout his process. And you will understand why Mr. Guzmán says that that ineffectiveness and inefficiency was what caused the jury to find Mr. Guzmán guilty. Here in this document, Mr. Guzmán gives you an account and explains point by point why this was like this.

The defense attorneys did nothing to try to intervene or let the jury know about the lies of the government witnesses. The government led these witnesses to lie consciously and in bad faith. Mr. Guzmán's lawyers did know and did nothing to stop the government.

For example, the U.S. Government told the jury that Mr. Guzmán had moved drugs from 1989 to 2014, but in the grand jury the government said that Mr. Guzmán and Mayo Zambada had conspired together from 1989 to 2014. But at the trial they changed the version and did not include Mayo and only said that it was Mr. Guzmán alone who moved drugs from 1989 to 2014. The government contradicted itself.

And before this in 2008, at the Chicago grand jury, the government said that Mr. Guzmán had one faction of the Sinaloa Cartel and that Mayo Zambada had another faction. Once again they contradict each other. With so many contradictions it means that in reality, there was never such a partnership between Mr. Guzmán and Mayo Zambada. But the lawyer who made the opening arguments did not alert the jury to these major contradictions. It was very inefficient on the part of the lawyer.

The government also told the jury that while Mr. Guzmán was in prison from 1993 to 2001, he continued to traffic drugs from inside prison. They also told the jury that Mr. Guzmán had waged a war against the Juárez Cartel in 2006. They also alleged that Mr. Guzmán was shipping drugs to the United States for 25 years. But during the trial it was demonstrated by witnesses from the government itself that none of this was true, but the lawyers never did anything to argue this.

For example, the defense attorney who did the closing arguments did not present evidence of Vicente Zambada's testimony where Vicente had said that when Mr. Guzmán was released from

prison in 2001 he was in very bad shape financially and that he had no drug contacts (See exhibit 15, p.4142 of the cross-examination of Vicente Zambada). So, if Mr. Guzmán was in bad shape financially when he left prison in 2001 and had no contacts, how is it possible that the government could allege that he continued trafficking drugs from inside prison from 1993 to 2001? If he had continued trafficking drugs from inside of prison, he would not have been in bad shape financially upon his release in 2001 and would have maintained his contacts.

Nor did he present evidence at the closing of Vicente Zambada's testimony where Vicente had said that Mr. Guzmán had not fought with the Juárez Cartel.

But not only did the government lie at trial, the government's witnesses also went to the trial to lie and the government allowed it.

For example, the government in its closing arguments told the jury that witness Miguel Ángel Martínez had said that from 1987 to 1990 he received 200 planes loaded with cocaine and that 95% of that cocaine was crossed into the United States through a tunnel located in Agua Prieta (See exhibit 20, p. 6582 of the government's summation). But that was not true, since another government witness, DEA Agent Carlos Salazar, said that they had discovered that tunnel in May 1990 and that the land where that tunnel was located had been purchased on July 22, 1989. (See exhibit 22, p.668-669 of Agent Salazar's direct examination). And in March 1990 they found out that there was something suspicious going on in that place and that was when they decided to put cameras to monitor what was happening in the place and finally in May 1990 was when they discovered the tunnel. But, if the land was purchased on July 22, 1989, and then the construction of that tunnel began, then it is impossible that since 1987 drugs had been crossing through that tunnel as Miguel Ángel alleged, because the tunnel simply did not exist. The government knew that Miguel Ángel was lying, but they still took him to trial to lie. And again, Mr. Guzmán's lawyers did nothing. Again you can see how they acted so inefficiently.

The American Government fabricated the entire process against Mr. Guzmán through lies. They violated the law, kidnapped him, and committed fraud. And thanks to the inefficiency of Mr. Guzmán's lawyers (Lichtman, Purpura, Balarezo and Fernich ), they got away with it.

But in this document it has been demonstrated that the witnesses went to the trial to lie, since the evidence presented here speaks for itself. It is demonstrated that in the closing arguments the jury took into account all the lies of the government witnesses and the lies of the prosecutor who made the closing arguments.

It is demonstrated that Mr. Guzmán's lawyers acted very inefficiently and irresponsibly. It has been proven that the government misled Judge Cogan. And it is demonstrated that Mr. Guzmán's appeal judge was also very inefficient and acted as a prosecutor in his brief for the Second Circuit and he was responsible for the Second Circuit judges affirming the sentence.

Mr. Judge Cogan, Mr. Guzmán very respectfully asks you to apply the law impartially and annul Mr. Guzmán's sentence and order a new trial. I think that after having seen all the evidence presented here, it is more than clear that the American government committed fraud and that Mr. Guzmán's lawyers were very ineffective. The law is supposed to be uniform for all people in this

country, regardless of color, race, nationality, or political ideal. If not, I will have to write to Amnesty International and the UN. And I will also make another motion against the great violations that the American Government committed against me, so that they intercede in my case, since it is more than proven that the U.S. Government did commit many violations against me.


Thank you,

_____/s/_____
Joaquín Guzmán Loera